**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JR a Minor, by his mother EAR** | * | |
| | * | |
| **Plaintiffs** | * | |
| **v.** | * | |
| | * | |
| **PIKE COUNTY BOARD OF** | * | |
| **EDUCATION,** | * | |
| **SAMUEL MARK BAZZELL** | * | |
| **Individually and in his official capacity** | * | |
| **as Superintendent of Schools;** | * | |
| **TERRY CASEY, individually and in** | * | |
| **his official capacity as Principal** | * | |
| **Of Pike County High School,** | * | **Case No. CV 2:06-cv-1120-MEF** |
| **BUDDY PYRON, individually and in** | * | |
| **his official capacity as** | * | |
| **Principal of Pike County High School,** | * | |
| **ROBERT MCDANIEL, individually** | * | |
| **and in his official capacity as Assistant/** | * | |
| **Principal of   Pike County High School;** | * | |
| **CHARLES LESLIE COON, individually** | * | |
| **and in his official capacity as a teacher** | * | |
| **at Pike County High School** | * | |
| **DOE DEFENDANTS 1-5 being those** | * | |
| **persons legally responsible for providing** | * | |
| **for the safety of special education** | * | |
| **students and for conducting** | * | |
| **investigations of complaints** | * | |
| **relating to the physical safety of** | * | |
| **students and for establishing policies** | * | |
| **and procedures to protect said students.** | * | |
| **Defendants** | * | |

**SUBMISSION OF EXHIBITS
IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**

**Comes now**  the Plaintiff J.R. a Minor, by and through  his attorneys of record and submits the following exhibits in Support of Plaintiff's Motion for Entry of Default Judgment against Defendant Charles Leslie Coon:

        Exhibit A:  Deposition of Andrew Wright
        Exhibit B:  Deposition of Karen Berry
        Exhibit C:  Deposition of Mona Watson

Defendant's Exhibit 5
Plaintiff's Exhibits 19, 26, 27, 28

Dated this 16th day of February, 2008.

s/ Susan Shirock DePaola

**Susan Shirock DePaola**
**1726 West Second Street ~Suite B**
**Montgomery, Alabama 36106**
**Phone: 334-262-1600          ASB: DEP001**
specialeducationattorney@mindspring.com

s/ Deanie Clark Allen

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, Alabama 36106**
**Phone: 334-265-8551          ASB: ALL067**
dallen@azarlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been served on the following by ECF or by first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on this the 16th day of February, 2008.

VIA US MAIL:
Charles Leslie Coon
308 Country Club Drive
Greenville, AL 36037

VIA ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/ Susan Shirock DePaola

**Exhibit A~ Andrew Wright**

1

1             IN THE UNITED STATES DISTRICT COURT

2                  MIDDLE DISTRICT OF ALABAMA

3

4

5     JR, A MINOR, BY HIS

6     MOTHER AND FATHER, EAR

7     AND TMR,

8          PLAINTIFF,

9

10    VS.                              CASE NO.:

11                                     2:06-CV-1120-MEF

12

13    PIKE COUNTY BOARD OF

14    EDUCATION

15          DEFENDANT.

16              * * * * * * * * * *

17          DEPOSITION OF ANDREW WRIGHT, taken before Mary

18    Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

19    October, 2007, in the offices of Pike County Board of

20    Education, 101 Love Street, Troy, Alabama, 36081,

21    pursuant to stipulations set forth herein, commencing

22    at approximately 10:30 a.m.

23

              * * * * * * * *

6

<u>ANDREW WRIGHT</u>

1

2      **(Whereupon, the witness, after having first been**

3   **duly sworn to speak the truth, the whole truth, and**

4   **nothing but the truth, testified as follows:)**

5                    **MS. ALLEN:**  Usual stipulations?

6                    **MR. SWEENEY:**  Please.

7                    **MS. ALLEN:**  Here's the notice to

8                         include.

9                         (Whereupon, Plaintiff's Exhibit 25

10                        was marked for identification and

11                        is attached hereto.)

12                        **EXAMINATION**

13  **BY MS. ALLEN**

14  Q    Mr. Wright, you've met everybody.  You know who we

15       all are?

16  A    I do believe I know who everyone is.

17                   **MR. SWEENEY:**  The superintendent.

18                   **THE WITNESS:**  Yes.  I have known him for

19                        quite some time.

20  Q    Would you state your name, please, for the Record?

21  A    My name is Andrew Wright.

22  Q    What is your address?

23  A    My work address is 200 Cherry Street, Troy,

7

```
 1        Alabama.
 2    Q   And that is the location of what?
 3    A   East Central Mental Health.
 4    Q   Can you give us a little bit of your educational
 5        background?
 6    A   Yes, ma'am.  I have a double Major in 1988 from
 7        Troy University in criminal justice and
 8        psychology.
 9            MR. SWEENEY:  Criminal justice and what?
10            THE WITNESS:  Psychology.
11    A   In 1989, I obtained my Master's degree in clinical
12        psychology, specializing in testing and
13        evaluations.  I have been working for East Central
14        Mental Health as a therapist since 1990.  And I am
15        also a licensed professional counselor with the
16        State of Alabama, licensed to do private practice.
17    Q   When did you first begin treating J    R   ?
18    A   I believe my first contact with him was back on
19        February 23rd.
20    Q   Of...
21            MR. SWEENEY:  Of what year?
22    A   Of this year.
23    Q   That was your first done contact with J
```

8

| | | |
|---|---|---|
| 1 | A | Yes.  It was my first contact. |
| 2 | Q | So, the records that you gave us would have been |
| 3 | | from other counselors who -- |
| 4 | A | Yes, that is possibly correct. |
| 5 | Q | All right.  So, you began treating him again in |
| 6 | | 2003 -- |
| 7 | | **MS. DePAOLA:**  Five.  Did you say -- |
| 8 | A | My first contact was 2007.  But he had prior |
| 9 | | counselors to see him before my contact with him. |
| 10 | | He was in services before seeing me. |
| 11 | Q | So, you did not counsel him or see him at all |
| 12 | | until 2007? |
| 13 | A | 2007, that's correct. |
| 14 | Q | So, you were not involved, then, in any way in his |
| 15 | | being committed to UAB? |
| 16 | A | Absolutely.  That happened in February of 2007, or |
| 17 | | March. |
| 18 | Q | All right.  Was that your first contact with |
| 19 | | J     ? |
| 20 | A | My first contact with him. |
| 21 | Q | All right.  Would you tell us about that incident, |
| 22 | | please? |
| 23 | A | I received a phone call, I'm going to say |

9

| 1  | approximately 10:30. |
|----|---------------------|

1    approximately 10:30.

2    Q    Excuse me.  And the date would have been?

3    A    I believe it was on the 20 -- 22nd, or 23rd.

4                    **MS. DePAOLA:**  Of...

5                    **THE WITNESS:**  2007.

6                    **MR. SWEENEY:**  February?

7    A    February.  I'm sorry.  And received a phone call

8         from the father requesting help for his son,

9         because he was having several symptoms that seemed

10        to be very out of character for his son:  Extreme

11        agitation; violence towards the father, violence

12        towards his older brother.  His father was very

13        concerned that he could be suffering from some

14        type of post-traumatic stress at this time.  I

15        believe he suffered in the past from ADHD,

16        historically speaking.  But this behavior was

17        totally out of character.  And this went on for

18        about an hour trying to coach the father and the

19        family on how to deal with this crises.

20            The next day, I scheduled J      for an

21        appointment to see myself.  For approximately

22        several days, we tried to manage him on an

23        outpatient basis.  He did do well for a short

10

1    while.  But his temper and agitation symptoms

2    seemed to increase.

3        After a major outburst, he could not be

4    managed on an outpatient basis any longer.  And we

5    had to commit him through the Juvenile Court

6    system.

7  Q  When you say to begin with you tried to coach the

8    father --

9  A  Yes.

10  Q  -- through the episode --

11  A  Yes, ma'am.

12  Q  -- that was on the phone?

13  A  Yes, ma'am.

14  Q  And then after that, you scheduled appointments

15    for J      o come in three or four days in a row?

16  A  I'm not -- whatever the notes reflect.  I know we

17    saw him several days in a row.  We saw him on the

18    22nd.  There was a crisis on -- on February 22nd,

19    2007, is when the initial crisis took place.  I

20    saw him again the next day on February 23rd.  I

21    saw him again on February 26th.

22            **MR. SWEENEY:**  Twenty-sixth?

23            **THE WITNESS:**  The 26th, yes.

11

| | | |
|---|---|---|
| 1 | A | Several sessions in sequence. |
| 2 | | And he also saw a psychiatrist on |
| 3 | | February 26th, as well. |
| 4 | Q | Who was the psychiatrist? |
| 5 | A | Dr. Fernando Lopez. |
| 6 | Q | So, you actually saw J       on those days? |
| 7 | A | Absolutely.  Yes, I did. |
| 8 | Q | Did you have a history -- were you given or |
| 9 | | provided with a history of -- |
| 10 | A | Yes, I was provided with a history of J |
| 11 | | condition. |
| 12 | Q | You said that the father felt like that his |
| 13 | | behavior was more extreme than it had ever been? |
| 14 | A | Absolutely. |
| 15 | Q | Okay.  Did you diagnose J      it that time? |
| 16 | A | Yes.  I did give J      a diagnoses somewhere |
| 17 | | during this whole episode. |
| 18 | Q | What was your diagnosis? |
| 19 | A | My diagnoses consisted of historical information, |
| 20 | | reports from the family, reports from Child |
| 21 | | Advocacy, as well as my own evaluation of his |
| 22 | | condition.  And my diagnoses or diagnostic |
| 23 | | impression was Attention Deficit Disorder -- |

12

1          Attention Deficit Hyperactivity Disorder,

2          predominantly inattention type, in partial

3          remission, as well as Post-Traumatic Stress

4          Disorder, Major Depressive Disorder, severe, with

5          psychotic features; and borderline intellectual

6          functioning.  And I believe on Axis IV, I did

7          notate a sexual abuse of 2005 on Axis IV.

8    Q     Okay.  Did you attribute the Post-Traumatic Stress

9          Disorder to anything in particular?

10   A     Uhm, yes, primarily from historical information.

11         In trying to, I guess, articulate the symptoms

12         that J     had over those several months, he

13         always avoided the conversation about the sexual

14         abuse.  And I want to say -- and if I might say --

15         I think -- I think J     and myself, we had a

16         mainly breakthrough on September 10th.

17   Q     Of...

18   A     Of this year.

19            -- and I spent -- I spent more time in that

20         session trying to articulate what feelings were

21         traumatic for him.  I spent time consulting with

22         other experts about this condition.  I spent time

23         searching the DSM-IV about this condition.

13

```
 1   Q   When you say "this condition" --
 2   A   Yes, this condition.  Specifically the
 3       Post-Traumatic Stress Disorder.
 4           And from every indication from the DSM-IV --
 5       and if I might backtrack a little bit --
 6   Q   Sure.
 7   A   -- I spent a lot of time those first several
 8       months dealing with the anger, dealing with his
 9       depression.  J     was severely depressed during
10       the month of February.  Lots of anger in the month
11       of February.  We had the commitment process going
12       on.  Trying to get him back into school.  Didn't
13       really want to push him at that time dealing with
14       the post-traumatic stress, because he didn't want
15       to deal with it.
16           But this past -- I think I'm saying -- moving
17       forward to September 10th --
18   Q   Of 2000 --
19   A   Of 2007, yes.  Every symptom I saw in that session
20       when I questioned him about the sexual abuse are
21       classic DSM-IV symptoms for Post-Traumatic Stress
22       Disorder.
23   Q   And -- excuse me.  Go ahead.
```

15

**BY MS. ALLEN**

Q    You said that you were able to make real inroads

with J     'n September?

A    Yes.

Q    Did J     ever relate to you what had happened to

him?  Was he ever able to articulate that to you?

A    No, he's not able to articulate.  But I think he

knows that he's been humiliated.  He knows he's

experiencing lots of shame.  And the thing that

complicates this is the fact that he has a

borderline intellectual functioning diagnoses,

which means that he suffers from a mild MR

diagnoses.  He's not really MR.  He's on the

borderline, you know what I mean?  And that does

complicate his ability to articulate his feelings.

All I know is that any topic I talk to J

about:  Anger at being committed, anger towards

his parents, issues at school, issues about his

siblings; you name it; he's a normal young man; he

can talk about those things.  But the minute I

brought up the sexual abuse, he completely shuts

down and disassociates.  That is a strong symptom

of a Post-traumatic Stress Disorder.  There is no

16

|  |  |  |
|---|---|---|
| 1 |   | way he could fabricate that.  And that means that |
| 2 |   | he's experiencing lots of shame.  And he does |
| 3 |   | everything he can to avoid that stimulus. |
| 4 | Q | What does "disassociates" mean? |
| 5 | A | It means to move beyond a normal conscious |
| 6 |   | thinking into a mode of another personality or |
| 7 |   | completely shutting down as though the person is |
| 8 |   | not there.  And that's what he did in that |
| 9 |   | session.  He would only -- he wouldn't even -- in |
| 10 |   | the rest of that session, he would no longer even |
| 11 |   | talk.  He would only acknowledge my questions by |
| 12 |   | shaking his head.  He would not make eye contact. |
| 13 |   | As a matter of fact, he kept his eyes closed the |
| 14 |   | rest of that session.  He was not the same person |
| 15 |   | again. |
| 16 | Q | And you saw that as a breakthrough because -- |
| 17 | A | Oh, well -- I did.  I did.  Especially when it |
| 18 |   | came to diagnoses and his symptomology and tying |
| 19 |   | that symptomology into what the DSM-IV says a |
| 20 |   | Post-Traumatic Stress Disorder is. |
| 21 | Q | So, he was not able to articulate to you what had |
| 22 |   | happened to him? |
| 23 | A | He did tell me what happened.  But articulate is |

17

```
 1          an advanced cognitive function.  And to tell me --
 2          he told me what happened.  But he was not able to
 3          articulate his emotions.  You know what I'm
 4          saying?  To say, I feel hopeless; I feel shame; I
 5          feel pain; I feel hurt.  Now, he did say he does
 6          have some shame and hurt.  But I asked him those
 7          questions, and he would shake his head in an
 8          affirmative or in a negative like this
 9          (indicating).
10                          (Ms. A    R    present).
11     Q    When you say he did tell you what happened, how
12          specific was he?
13     A    I asked him -- there were some reports to me that
14          he performed oral sex on this gentleman.  He
15          denied that.  I said, did you perform oral sex on
16          this gentleman -- I hate to be so graphic about
17          this -- but he shook his head no like this
18          (indicating).  He didn't say a word.  Because,
19          remember, we're in this dissociative state now.
20          He's no longer verbal.  He did like this, with his
21          eyes closed.  I said, well, did he touch you,
22          fondle you?  (Indicating).  That's the way he
23          responded, by shaking his head.
```

18

1    Q    All right.  Let me ask you this:  You mentioned in

2         your diagnosis Major Depressive Disorder, I think

3         you said, severe, with --

4    A    Yes.

5    Q    -- severe with psychotic features?  Is that what

6         you said?

7    A    Yeah, that's what I said.

8    Q    What do you mean when you say "psychotic

9         features"?

10   A    Him not being able to totally be in control of his

11        emotions or his thoughts and completely not being

12        able to function or to think correctly.

13   Q    Is this or is it not exacerbated by his MR

14        condition?

15   A    Are you asking me if --

16   Q    The psychotic features, the inability to -- how

17        did you put that --

18   A    To control his emotions, to manage his emotions or

19        his person, so to speak.

20             Does the borderline intellectual functioning

21        complicate that, you're asking me?

22   Q    Yes.

23   A    Yes.  Absolutely.  Lack of coping skills.

19

| | | |
|---|---|---|
| 1 | Q | What is J    's -- in your opinion, do you think |
| 2 | | that J    , with counseling, or further |
| 3 | | treatment, what are his prospects to move beyond |
| 4 | | or to work through what you have just described? |
| 5 | A | Uhm, I guess in psychology, or in psychiatry, we |
| 6 | | measure cases' prognosis of good, fair, or poor. |
| 7 | | I would say his is very good, because he's getting |
| 8 | | counseling.  And we have him on the right |
| 9 | | medications.  I mean, really, we've done a great |
| 10 | | job with these medications for J    .  We really |
| 11 | | have. |
| 12 | Q | What medications is he on? |
| 13 | A | Uhm, let me see.  Adderall, 20 milligrams 1:00 AM. |
| 14 | | Just a second.  He's on some other meds, as well. |
| 15 | | And also Lexapro, 20 milligrams. |
| 16 | | **MR. SWEENEY:**  Which one? |
| 17 | | **THE WITNESS:**  Lexapro. |
| 18 | Q | Lexapro.  And what is the Lexapro for? |
| 19 | A | It's an antidepressant. |
| 20 | Q | So, he is on that for depression? |
| 21 | A | Yes, he is. |
| 22 | | **MS. ALLEN:**  Excuse me just one second. |
| 23 | Q | You said you were provided with J    's records? |

20

1   A   Yes.

2   Q   Okay.  Have you seen any of the school's

3       assessments of J    's intellectual ability?

4   A   Uhm, I believe -- I have access.  I referred

5           for testing, psychological testing.

6   Q   But you --

7   A   That gave me some information on him.

8       We have some information also in the chart

9       from him seeing someone at East Central Mental

10      Health before I saw him.  This was back in 2000

11      when he was 11.  So, I had access to those

12      records.

13  Q   But as far as any actual testing, had you seen any

14      actual testing on his intellectual abilities?

15  A   I believe Dr. Warren --

16  Q   I mean prior to Dr. Warren's.

17  A   No.  I don't believe that's in here.  Now, I could

18      be wrong, but I don't believe that's in here.

19  Q   I just wanted to check and make sure.

20      When you said that his prognosis was good --

21  A   Yes.

22  Q   -- as far as -- I don't know if I should use the

23      word "recovering", but coming to terms or being

21

1        able to deal with what had happened to him.  And

2        you said it was good -- well, explain that to me.

3   A    Okay.  As far as the severe symptoms of aggression

4        and the anger, sleep disturbance, those kinds of

5        things we saw back in February, I think he can

6        function well, I think, in society, as long as he

7        stays in therapy and remains on his medications.

8        But when it comes to a Post-traumatic Stress

9        Disorder -- how should I say this -- this is an

10       art, and not exactly a science.  It depends on the

11       individual, how well he makes progress.  I

12       probably should have clarified my statements more

13       earlier when I said that.  I'm hoping that through

14       J·      trusting me that we can make progress.  I

15       should have clarified that better.  But to say how

16       well he's going to be able to deal with the trauma

17       of that event, I probably should have said that a

18       little bit better.  I'm not sure how well he --

19   Q   So, if I understand you correctly, you're saying

20       that a lot of his -- a lot of it -- his

21       improvement or his ability to -- will depend on

22       continued counseling --

23   A   Yes.

22

| | | |
|---|---|---|
| 1 | Q | -- and the fact that he's on medication? |
| 2 | A | That's correct, yes.  And his willingness to deal |
| 3 | | with it. |
| 4 | Q | Uh-huh. |
| 5 | A | His willingness to deal with it. |
| 6 | Q | I just have one other quick question:  I recall in |
| 7 | | the -- in some of the notes, there were some |
| 8 | | discussion of him hearing voices? |
| 9 | A | Yes. |
| 10 | Q | What would that be connected with? |
| 11 | A | Psychoses. |
| 12 | Q | Okay.  Under that -- |
| 13 | A | Yes.  Yes. |
| 14 | Q | -- can you identify these? |
| 15 | | (Brief off-the-Record discussion.) |
| 16 | Q | Can you identify -- what are the numbers of those |
| 17 | | so I can say them?  I'll read them off, if you'll |
| 18 | | look at them and then -- |
| 19 | | **MR. SWEENEY:**  Is this 25, Mary Moore? |
| 20 | | **THE COURT REPORTER:**  No, sir. |
| 21 | | Twenty-five is the Notice. |
| 22 | | **MS. DePAOLA:**  This is -- could you give |
| 23 | | us -- |

28

1    Q    Had you had any prior contact with the family --

2    A    None whatsoever.

3    Q    -- prior to that date?

4    A    None whatsoever.

5    Q    You just happened to the emergency officer on

6         call?

7    A    That's correct.

8    Q    So, the father calls at 9:50.  And what does he

9         share with you?

10   A    The initial phone call was made by Mona Watson, of

11       Child Advocacy.  She, in turn, connected me with

12       the father who had called her.  Mona gave me the

13       history of the case, basically what was going on

14       as far as him being traumatized two years ago.

15       Sheriff's office was called for backup to help

16       control the situation.  That's how out of hand

17       that situation was.  I had made several phone

18       calls to psychiatric hospitals trying to find a

19       bed for him that night.  Couldn't find one.

20   Q    What was going on between J    and his father or

21       family as reported --

22   A    Okay.

23   Q    -- in your notes?

29

1   A    Father reported that he had taken the car without

2          permission.  Became very aggressive when the

3          father confronted him about that behavior.  Hit

4          the brother.  Bit the brother, bit him

5          (indicating), with his teeth.  Sheriff's office

6          arrived.  And when the sheriff's deputies arrived,

7          I believe he had calmed down.  So, they did bring

8          him under control that night and managed him until

9          the next day until I could get the court

10         proceedings started.

11   Q    And then the next day you began that process on

12          February 23rd?

13   A    I did.  But because he had improved the next day,

14          we put that court process on hold.  Because we

15          thought he could manage -- we thought we could

16          manage his anxiety and depression and aggression

17          with medication and counseling.  But it got worse

18          after that.

19   Q    What do your notes show you did on the 23rd?  Did

20          you meet with J    ?

21   A    Uhm, yes, I met with client, dad, mother, and

22          brother of client.

23   Q    What did you do when you met with him?

32

1   Q     So, even though he's mildly retarded, his

2         retardation is not so severe that he can't

3         understand rational explanations?

4   A     Absolutely.

5              MS. DePAOLA:  Object to the form of the

6              question.

7   Q     Is that correct?

8              MS. DePAOLA:  Object to the form.  You

9              can answer.

10             MS. ALLEN:  You can answer.

11  BY MR. SWEENEY

12  Q     You can answer.

13  A     Oh, I'm sorry.  Yes.  I thought that he

14        functions -- well, I know that he functions high

15        enough to understand consequences.  But his

16        condition was so severe that he couldn't

17        articulate -- the word she used earlier -- or

18        manage his behavior.  Therefore, he's severely

19        mentally ill, or we call a child that's SED.

20  Q     Now, at that point, on February 23rd, did you make

21        a diagnosis as to the origin of his anger?

22  A     I did not make a diagnoses.  Primarily working

23        with impressions up until that point.  Well, let

41

1          referral for testing at that point?

2     A    Uhm, well, by this time, I had received back -- it

3          says here on this date, I covered psychological

4          tests -- testing with him that day.  That's what

5          it says here in my notes.  So, evidently, I

6          already had made the referral, and we covered the

7          psychological testing information from the

8          psychologist.

9     Q    Okay.  What were the tests that were done, and

10         what were the results of the tests?

11    A    Okay.  I will have to locate that information

12         here.  Let me see if I can see what section we put

13         it in.  Hold on a second here.

14              Okay.  One of the assessment tools --

15    Q    All right.  You're looking at what document?

16    A    This is the complete psychological evaluation.

17    Q    And it was done by who and what date?

18    A    Dr. Fernell Warren.

19    Q    Is he with East --

20    A    No, he's just a consultant -- I mean, he -- we

21         make referrals for our psychological testing.

22    Q    Is he in Troy?

23    A    He's in Troy.

42

1    Q    What test did he undertake?

2    A    He did several instruments.

3    Q    What did he do?

4    A    Okay.  He did the Reynolds Intellectual Assessment

5         Scale.  He did Wide Range Achievement Test.  He

6         did the Behavioral Rating Inventory of Executive

7         Functioning.  He did the Behavioral Assessment

8         System for Children, an Attention Deficit

9         Hyperactivity Disorder test.

10   Q    When did he do this battery of tests?

11   A    2/27/2007.

12   Q    Okay.  Given the test data that you had before

13        you, was there anything particularly significant

14        from your counseling perspective?

15   A    Uhm, one of the things -- I underlined several

16        things that stood out for me.  And I want to flip

17        through this so I can see things that were

18        significant that I didn't know.  Most of the stuff

19        he did kind of reinforced what I already knew.

20        Hang on a second here.

21            Okay.  It says here, personality and emotional

22        assessment, Behavioral Assessment System for

23        Children, some of the items that stood out for me

43

1    I think was seeing things that others -- I mean,

2    seeing things that are not there.  He says he

3    responded to that often.  That's a visual

4    hallucination.  Threatens to hurt others, and he

5    said sometimes.  That stood out for me.

6         Hits other adolescents.  He said sometimes.

7    That stood out for me.

8         Eats things that are not food.  He said often.

9    That stood out for me.

10        Hears sounds that are not there.  He said

11   often on the test.  That stood out.

12        Easily annoyed by others, almost always.  That

13   stood out for me.

14        Just a second here.  This test is kind of

15   lengthy here, so bear with me.  Testing of the

16   intellectual testing.  And this kind of confirmed

17   that he functions in the borderline level.  So, we

18   already know that.  I won't say that again.

19        Okay.  On the Behavior Assessment System for

20   Children, one of the things that stood out as

21   being significant in the testing, critical item,

22   he said -- the psychologist suggests that the

23   interpretation of this was -- is that -- it says

44

1    here that the Behavioral Assessment System for

2    Children also identifies certain responses as

3    critical items, because they suggest potential for

4    causing harm to one's self and others.  And that

5    was significant in this testing.  And I just read

6    all those items.

7        So, that stood out for me.  And that did

8    affect, basically, the approach we had in therapy.

9    And -- which led up to the point -- and I am

10   jumping ahead of myself here -- but led up to the

11   episode where we court ordered him to a

12   psychiatric hospital.

13   Q  Okay.  We'll visit that in a minute.  With regard

14      to hallucinations, what is the cause or

15      explanation for hallucinations in any person?

16   A  It could be to a mood disturbance, a mood

17      disorder, characterized by mood swings, being

18      extremely sad or extremely hyper.  In his case, we

19      attributed that to him being extremely depressed.

20      And could be -- and we feel that it's exacerbated

21      by the Post-Traumatic Stress Disorder, the

22      depression is.

23   Q  Have you reviewed his records to determine if

45

| | | |
|---|---|---|
| 1 | | there was any prior reference to hallucinations in |
| 2 | | his life while he's been under treatment? |
| 3 | A | I'll flip back to a note that I have access to. |
| 4 | Q | Do you know of any information -- |
| 5 | A | Okay. |
| 6 | Q | -- from his history that would indicate |
| 7 | | hallucinations in the past? |
| 8 | A | According to the documentation I see here in 2000, |
| 9 | | there is no mention of any hallucinations at that |
| 10 | | time. |
| 11 | Q | All right.  Is there any history of violent or |
| 12 | | aggressive behavior or anger management issues for |
| 13 | | him? |
| 14 | A | I think that there is probably some emotional |
| 15 | | oppositional-type symptomology, but none to |
| 16 | | reflect aggression or assaultive behavior. |
| 17 | Q | But just testifying from memory, you think that |
| 18 | | J    did have anger problems sometime in the |
| 19 | | past prior to the alleged sexual abuse? |
| 20 | | **MS. DePAOLA:**  Object to the form. |
| 21 | A | Okay.  I'm looking at the -- if I may have a |
| 22 | | minute to look at the documentation we have going |
| 23 | | back to 1998.  It appears here problems coping, |

61

```
 1   A    No, no.  Just increasing his agitation.

 2   Q    But what I want to make sure is:  Was the meeting

 3        on the 4/16 the result of an emergency, or was

 4        that previously scheduled?

 5   A    No.  I -- let me hold on a second here.

 6   Q    It looks like you're meeting with him every week.

 7        And so you previously met with him on 4/9.  And

 8        then seven days later on 4/16?

 9   A    Yeah.

10   Q    Does that appear to be the case?

11   A    Yeah.

12   Q    And when he comes in on the 4/16, you learn that

13        he had a meltdown?

14   A    No, not a meltdown.  He was starting to loose

15        control of his emotions, completely.

16   Q    Tell me what your notes indicate was occurring on

17        4/16.

18   A    Okay.  Seemed to be having an increase in

19        agitation.  Uncooperative.  Okay.  Client had

20        threatened to tear up the television on last

21        Friday.  I provided a behavioral technique for

22        him.  Again, talked about consequences.  Talked

23        about managing his anger.
```

55

1        indicate vulnerability to sexual abuse?

2    A   Well, now, I haven't read through all these notes

3        yet.  But so far in the therapy progress, in the

4        therapy notes, there is no indication that he was

5        extremely gullible or easily influenced by others.

6    Q   Wouldn't you agree that people that are

7        oppositional defiant are almost at the other end

8        of the pole from being gullible?

9    A   The only setback in his case is borderline

10       intellectual functioning.  That would open him up

11       to that.

12   Q   But oppositional defiant is not someone that's

13       pliable and gullible as a rule; wouldn't you agree

14       with that?

15   A   Separate from that disorder.  That's true.

16   Q   But we're talking about J    , who is

17       oppositional defiant.

18   A   If you -- see, to separate diagnoses like that is

19       not appropriate, though.

20   Q   Well, I've got to talk about them in some order.

21   A   Okay.

22   Q   Would you agree that J     is a pliable, gullible

23       person, notwithstanding his oppositional defiant?

56

| | | |
|---|---|---|
| 1 | A | He is.  He is definitely gullible. |
| 2 | Q | What is it in the records or testing that indicate |
| 3 | | that? |
| 4 | A | The borderline intellectual functioning. |
| 5 | Q | Where in the reports, your reports or any other |
| 6 | | reports, does it indicate that he's gullible? |
| 7 | A | I probably would have to go to the DSM-IV and look |
| 8 | | up -- |
| 9 | Q | Okay.  But I am asking your reports -- |
| 10 | A | Okay.  Not in the reports -- |
| 11 | Q | At any time -- |
| 12 | A | No, no.  Not in the reports. |
| 13 | Q | -- when J    came to you -- |
| 14 | A | No, not in the reports -- |
| 15 | Q | -- did you make a notation -- |
| 16 | | **MS. DePAOLA:**  Hold on just a second. |
| 17 | | Can we have -- just wait until he |
| 18 | | finishes his question. |
| 19 | | **THE WITNESS:**  Right. |
| 20 | **BY MR. SWEENEY** | |
| 21 | Q | At any point while East Central Mental Health has |
| 22 | | been working with J     from 1998 through 2005, |
| 23 | | is there any indication that any of you all, any |

61

1    A    No, no.  Just increasing his agitation.

2    Q    But what I want to make sure is:  Was the meeting

3         on the 4/16 the result of an emergency, or was

4         that previously scheduled?

5    A    No.  I -- let me hold on a second here.

6    Q    It looks like you're meeting with him every week.

7         And so you previously met with him on 4/9.  And

8         then seven days later on 4/16?

9    A    Yeah.

10   Q    Does that appear to be the case?

11   A    Yeah.

12   Q    And when he comes in on the 4/16, you learn that

13        he had a meltdown?

14   A    No, not a meltdown.  He was starting to loose

15        control of his emotions, completely.

16   Q    Tell me what your notes indicate was occurring on

17        4/16.

18   A    Okay.  Seemed to be having an increase in

19        agitation.  Uncooperative.  Okay.  Client had

20        threatened to tear up the television on last

21        Friday.  I provided a behavioral technique for

22        him.  Again, talked about consequences.  Talked

23        about managing his anger.

62

1    Q    Was the agitation based on his parent

2         relationship, sibling relationship --

3    A    No.  This is something else.  This is where we're

4         talking about this thing that happened in

5         February.  This is where he has no control over

6         anything now.  He's starting to become this other

7         person.  This other personality is coming out.

8         Boundaries, consequences.  Weighing the right and

9         wrong doesn't even matter anymore.  And he seemed

10        to have a grasp of what I was saying to him.

11        Seemed to receive my counseling during that

12        session.  But after the session, I saw him at

13        10:15 a.m. that morning.  At 11:00 a.m., mother

14        calls me, says he completely refuses to go back to

15        school.  Completely.  I told the mother to bring

16        him back to the office.  Became intensely

17        agitated.  Refusing to get out of the van.

18        Started kicking the chair of the van.  Police had

19        to be called.  Troy Police Department came over.

20        Even with the police there, he refused to get out

21        of the van.

22             And at that point, I started commitment

23        proceedings.  And we court ordered him that day to

63

| | | |
|---|---|---|
| 1 | | UAB for treatment. |
| 2 | Q | And was he admitted? |
| 3 | A | Yes, he was. |
| 4 | Q | That same day? |
| 5 | A | Yes, that same day. |
| 6 | Q | You saw him on April 25th? |
| 7 | A | Yes. |
| 8 | Q | Had he been released? |
| 9 | A | He had been released. |
| 10 | Q | How long was he at UAB? |
| 11 | A | I am going to say approximately nine days, I |
| 12 | | think.  A bit less, maybe. |
| 13 | Q | So, you saw him the day he was released? |
| 14 | A | Yes. |
| 15 | Q | Or approximately the day he was released. |
| 16 | | Did you get any notes or information for what |
| 17 | | UAB did while they were treating him? |
| 18 | A | The only thing they sent us was that summary |
| 19 | | sheet. |
| 20 | Q | Do you have that in your file? |
| 21 | | **MS. ALLEN:**  Have what in your file? |
| 22 | | **THE WITNESS:**  The exhibit.  She has it |
| 23 | | somewhere.  I have it in my chart, |

64

1           but I --

2           MS. DePAOLA:  Do you have the three

3                exhibits?

4           THE COURT REPORTER:  No, Mr. Sweeney has

5                got them.

6           MS. DePAOLA:  You have them.

7    BY MR. SWEENEY

8    Q    I'm sorry.  Which one is the summary sheet from

9         UAB?

10   A    Okay.  Depress --

11   Q    Do you see an exhibit --

12   A    Yes, sir.  Exhibit 26.

13   Q    What exhibit?

14   A    Exhibit 26.

15   Q    And that's from UAB?

16   A    From UAB.  Depressive disorder, NOS.

17        Post-Traumatic Stress Disorder.  Attention Deficit

18        Hyperactivity Disorder by history.

19   Q    All right.  But do they indicate to you in any

20        report what they did with J        while he was

21        there for nine days?

22   A    I have not gotten those records from them.  I

23        don't know why they -- they had told me they were

Mary Moore-Wynn
Court Reporting Services
(334) 244-0203

101

```
1              September 10th?

2       A      Now, I haven't written that note and placed that

3              in the chart yet.  But I am getting ready to put

4              that in there.  So, I have got to admit I have not

5              placed that in the chart.  But I am getting ready

6              to.

7       Q      Well, do you often wait two or three weeks --

8       A      No, I don't.  I don't.

9       Q      -- to put notations --

10      A      I don't.  No, sir.  I am just being honest with

11             you.  No, sir.

12      Q      What is it that J      told you about his shame?

13      A      I asked him does he fell shame for that.  And he

14             shook his head yes.

15      Q      Shame for what?

16      A      Shame for being molested by --

17      Q      Did you say molested or being fondled?

18      A      Being fondled.

19      Q      What question did you pose to him the response to

20             which he said he felt shame?

21      A      I asked him, I said, J     , do you feel shame

22             because of what happened?  He said (indicating).

23             By he would not talk or would not open his eyes.
```

102

```
 1    Q    So, he just nodded his head?

 2    A    He just nodded his head.

 3    Q    He didn't verbalize?

 4    A    No, he didn't verbalize.

 5    Q    What did he say about humiliation?

 6    A    I asked him did he feel humiliated?  And he

 7         (indicating), but no verbal response.

 8    Q    And when you said that you made notes about that,

 9         that was not entirely accurate, was it?

10    A    No, sir, I have not made the notes.

11    Q    The psychotic features, if I wanted to look at

12         DSM-IV, would I look under psychotic features to

13         understand what you mean when you say J

14         exhibits psychotic features?

15    A    I'm sorry, sir.

16    Q    Okay.  Let's go back.  You have said that J

17         manifests --

18    A    Major Depressive Disorder with psychotic features.

19    Q    So, you are indicating that major depression is a

20         psychotic feature?  I haven't heard that.

21    A    No, sir.  No, sir.  Major depression with

22         psychotic features.  In other words, his psychosis

23         is due to depression, but it could be to other
```

103

1       disorders, as well.

2   Q   What is psychotic, and what aspects of psychosis

3       relates to J     ?   What is psychotic?

4   A   Hearing and seeing things.

5   Q   And what aspects of psychotic features does Justin

6       indicate?

7   A   He exhibited hearing and seeing things.

8   Q   What has he told you he hears and sees?  And when

9       did he do that?

10  A   According to the testing of Dr. Warren --

11  Q   But has he done that to you, or is this just

12      reports from others?

13  A   Give me one second here.

14          Primarily, when I saw him initially, the

15      dominant symptom I saw at my initial visit back in

16      February the 23rd, were the aggression symptoms,

17      easy agitation, noncompliance with meds,

18      exhibiting behavioral problems.  And because we

19      were in a crisis mode, and because those were the

20      dominant symptoms -- not secondary symptoms -- I

21      treated those symptoms alone at that time, as well

22      as treated the ADHD.

23          But after the testing with Dr. Warren, and

114

1        right, goals and objectives?

2    A    That's right.  Absolutely.

3    Q    And at the bottom, Ms. Ŗ   signs that on 10/8/98?

4    A    That's correct.

5    Q    The next page, it looks like it's 10/8/98, Bates

6        635.  Can you read what's in the comment section?

7    A    Not as bad at school.

8    Q    Severe problems, not as bad at school?

9    A    Severe defiant behavior at home, but not as bad at

10       school.

11    Q    Okay.  The next page, 636.  Can you read what's

12       been highlighted there?

13    A    Oppositional behavior.  Child is extremely defiant

14       at home.

15    Q    All right.  So, we are showing a consistent

16       oppositional defiant attitude between Justin and

17       his parents?

18    A    That's what it's reflecting.

19    Q    Okay.  On 10/8/98, it's judgment average.  Poor.

20       And I can't read what's under the family history?

21    A    Hold on one second.  Let me look in the chart

22       here.

23                THE WITNESS:  Can I take a break for a

115

```
 1                    minute to call this Court that is

 2                    calling me?

 3              MS. DePAOLA:  Sure.

 4              MS. ALLEN:  Sure.

 5                    (Brief recess.)

 6  BY MR. SWEENEY

 7   Q   Did you find that, Mr. Wright, whatever the family

 8       history is?  I just can't read it.

 9   A   Yes.  Give me one second.

10   Q   Uh-huh.

11   A   Okay.

12   Q   10/8/98.

13   A   Okay.  It says, brother, mental health services.

14   Q   What is --

15   A   Brother.  And mental health services.  In other

16       words, brother has had treatment, it seems.

17   Q   Okay.  Next page, the comment section, it says

18       what?

19   A   That's gonna be dated 3/9/05 or something.

20   Q   I can't read the date.

21   A   Yeah.

22   Q   This is Bates Stamped 638.

23   A   Almost there.  Okay.  9/13/05.
```

116

1    Q    9/13/05.  And what's the comment?

2    A    Sexual abused by teacher.  Dealing with guilt.

3    Q    Okay.  Whose notes would those be?

4    A    This is --

5                    **MS. ALLEN:**  It says Mona Watson, I

6                    think.

7    A    No, it's LaShonda -- it looks like LaShonda

8         Stevens, I believe.  Latesha something.  Oh, boy.

9         It's one of our therapists we had at Mental

10        Health.  I'm trying to --

11   Q    This is a document from East Central Mental

12        Health?

13   A    It is.  It is.  Yeah.

14   Q    And who is she?

15   A    She was a mental -- she was a Master's-level

16        therapist at Mental Health.

17   Q    So, she works with him along with you?

18   A    No, sir.  No, sir.  She worked with him back in

19        2005.  But he dropped out of services for a while.

20   Q    So, what is her position?

21   A    She was a child and adolescent therapist at Mental

22        Health.

23   Q    So, she would have been helping him debrief after

117

| 1 | | the realization that he had been sexually abused? |
|---|---|---|
| 2 | A | Yes.  Because she specifically talks about guilt, |
| 3 | | dealing with guilt. |
| 4 | Q | So, earlier we were talking that he did not get |
| 5 | | intensive therapy after it was discovered that he |
| 6 | | may have been abused.  We now learn from the |
| 7 | | records that East Central Mental Health was |
| 8 | | providing him the debriefing that East Central |
| 9 | | Mental Health thought was appropriate? |
| 10 | A | Yes, especially the guilt feelings, because you |
| 11 | | can -- |
| 12 | Q | All right.  And if East Central Mental Health had |
| 13 | | thought he needed more or less therapy than was |
| 14 | | being provided, you would have given it; correct? |
| 15 | A | Let me look at the -- okay, I will tell you this, |
| 16 | | now, what we did.  Can I just tell you? |
| 17 | Q | Sure.  Please. |
| 18 | A | He was readmitted on 9/13/05.  Family education |
| 19 | | and support with the mother on 10/04/05. |
| 20 | Q | What was the previous session before that one you |
| 21 | | just made reference in September? |
| 22 | A | He was out of services for several years, it |
| 23 | | appears. |

141

| | | |
|---|---|---|
| 1 | | Post-Traumatic Stress Disorder as preliminary to |
| 2 | | asking questions about Justin.  We don't have the |
| 3 | | DSM-IV before us.  That would be your reference, |
| 4 | | wouldn't it? |
| 5 | A | Yes, absolutely. |
| 6 | Q | With that understanding, would you just give me a |
| 7 | | general definition of Post-Traumatic Stress |
| 8 | | Disorder? |
| 9 | A | It is a disorder, an anxiety disorder -- that's |
| 10 | | the class it falls under -- whereby a person, I |
| 11 | | guess -- how should I say this -- has recurring |
| 12 | | thoughts, emotions, feelings, about a trauma |
| 13 | | experienced, or an adverse -- aversive-type |
| 14 | | stimulus or situation. |
| 15 | Q | And what are the tests to evaluate or diagnoses |
| 16 | | someone having Post-Traumatic Stress Disorder? |
| 17 | A | There is no test.  But primarily following the |
| 18 | | criteria outlined in the DSM-IV.  And the DSM-IV |
| 19 | | gives you a list of criteria, symptoms you check, |
| 20 | | in order to diagnose or give a diagnostic |
| 21 | | impression of a person suffering from |
| 22 | | Post-Traumatic Stress Disorder. |
| 23 | Q | While that would be the definitive source, for |

149

| | | |
|---|---|---|
| 1 | A | That is correct. |
| 2 | Q | He also kicked the band door? |
| 3 | A | That is correct. |
| 4 | Q | He has been aggressive at home, too? |
| 5 | A | That is correct. |
| 6 | Q | He had outbursts and defiant behavior recently? |
| 7 | A | Yes. |
| 8 | Q | And then there is a recitation of the types of |
| 9 | | behavior that culminated in this referral? |
| 10 | A | That's correct. |
| 11 | Q | Now, you're familiar with the records of J |
| 12 | | and isn't it true and correct that he has had |
| 13 | | anger management problems since at least 1998? |
| 14 | A | I -- we're talking about something that maybe I |
| 15 | | discussed last time I was here and had a chance to |
| 16 | | reflect in those notes again.  But I do believe he |
| 17 | | had some issues, but not issues to the magnitude |
| 18 | | of what we saw in February and April. |
| 19 | Q | Well, have you referred to notes recently as to |
| 20 | | what the manifestations were that resulted in |
| 21 | | counseling and therapy in 1998? |
| 22 | A | I'm having to have to reflect back again.  I think |
| 23 | | that's the best thing. |

150

| | | |
|---|---|---|
| 1 | Q | Do you recall, Mr. Wright, that he had episodes of |
| 2 | | choking a sibling and other physical -- |
| 3 | | MS. ALLEN: Object to the form. |
| 4 | Q | -- outbursts towards parents and family in 1998? |
| 5 | A | I don't remember reading that. I'll have to look |
| 6 | | at that note if you don't mind. |
| 7 | | MS. ALLEN: Yeah, let's look -- |
| 8 | A | Because I don't remember saying that. |
| 9 | Q | If I ask you about the history of present illness |
| 10 | | that appears on page 2 of this UAB report, page 3 |
| 11 | | of the exhibit, you're not in a position to tell |
| 12 | | me whether this conduct mirrors conduct that he |
| 13 | | has exhibited since 1998? |
| 14 | | MS. ALLEN: Object to the form. |
| 15 | A | This -- |
| 16 | Q | You can answer. |
| 17 | A | There is no indication that this is a mirror of |
| 18 | | that behavior. No, sir. No indication |
| 19 | | whatsoever. |
| 20 | Q | But you haven't recently referred to those notes |
| 21 | | for the consulting people in 1998; is that right? |
| 22 | A | I'm sorry. Rephrase your question, again. |
| 23 | Q | Yeah. Okay. I have notes from Dr. Wright's |

151

1       records.  An entry on 10/8/98, referred for

2       services because of oppositional behavior along

3       with attention deficit behavior.  Child is

4       extremely defiant at home.  But mother indicated

5       doesn't have any problems with child at school.

6           Does that refresh your recollection about

7       notes in your records?

8  A    It does.  But I don't remember saying that, you

9       know, he had choked a sibling back in '98, though.

10      And I think that's what you're saying.  I don't

11      remember saying that.

12  Q    An entry on 11/9/98 --

13  A    Okay.

14  Q    -- reported that he, J    , tried to choke his

15      brother over a piece of candy?

16             **MS. ALLEN:**  Do you know what the Bates

17              Stamp --

18             **MR. SWEENEY:**  I'm sorry.  Just an entry

19              of 11/9/98.  I may be able to find

20              that.

21  A    What page is that note?

22             **MS. ALLEN:**  That's what we're looking

23              for.

155

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  | Q | That's right.  And that is consistent with your      |
| 2  |   | observation that you have not seen any physical      |
| 3  |   | manifestation of the mental issues that have         |
| 4  |   | stressed him?                                        |
| 5  | A | Okay.  Okay.  Yes.                                   |
| 6  | Q | Hospital course.  There is, starting in the          |
| 7  |   | mid-section, it says, later part of the hospital,    |
| 8  |   | we came to know that patient was actually sent to    |
| 9  |   | hospital according to court order because of his     |
| 10 |   | violent behavior?                                    |
| 11 | A | That's correct.                                      |
| 12 | Q | And that was on your referral?                       |
| 13 | A | That's -- well, yes.                                 |
| 14 | Q | And it was violent behavior towards his family on    |
| 15 |   | that occasion that precipitated the referral?        |
| 16 | A | Uhm, initially, in February, and we were afraid      |
| 17 |   | that he was going to become violent again in         |
| 18 |   | April.  That's why we referred him, because he was   |
| 19 |   | starting to kick things and --                       |
| 20 | Q | But it was --                                        |
| 21 | A | -- heading that way.                                 |
| 22 | Q | But it was anger --                                  |
| 23 | A | Yes.                                                 |

162

| | | |
|---|---|---|
| 1 | Q | So, as far as you know -- |
| 2 | A | Yes, yes. |
| 3 | Q | -- things are going well in the school |
| 4 | | environment? |
| 5 | A | That's correct.  That's correct. |
| 6 | Q | You indicated in the last consultation with J |
| 7 | | that you are verbalizing with him about the |
| 8 | | alleged sexual abuse.  Are you finding that J |
| 9 | | is opening up gradually in his ability to cope |
| 10 | | with that? |
| 11 | A | J    seems -- in that last session -- completely |
| 12 | | avoid the topic, which tells me, it's -- it's |
| 13 | | painful and traumatizing to him to even discuss |
| 14 | | it. |
| 15 | Q | Okay.  What is your suggestion for continued |
| 16 | | therapeutic intervention for J        ' |
| 17 | A | To continue to try to identify triggers that might |
| 18 | | be -- that might exacerbate his condition, to |
| 19 | | continue to develop coping skills, to continue to |
| 20 | | identify symptoms of his Post-Traumatic Stress |
| 21 | | Disorder.  Right now, we seem to have a dominant |
| 22 | | symptom, which like you said, the word you used, |
| 23 | | is a defense mechanism to avoid dealing with the |

169

1        Post-Traumatic Stress Disorder.

2    Q    All right.  And can you connect that in any way to

3        the sexual abuse?

4            **MR. SWEENEY:**  Object to the form.

5    A    There appears to be a connection to the sexual

6        abuse.

7    Q    Okay.  Can you tell the Court whether or not

8        J      .as sustained any kind of psychological

9        injury as a result of sexual abuse?

10           **MR. SWEENEY:**  Object to the form.

11   A    There appears to be psychological injury.

12   Q    Okay.  So, I would be correct in that the

13       behaviors you are seeing are indications of a

14       psychological injury?

15           **MR. SWEENEY:**  Object to the form.

16   A    I would say that it is a consensus that the

17       reoccurrence -- or it appears that the

18       reoccurrence and intensity of his aggression and

19       anger is linked to a psychological trauma.

20   Q    Okay.  Is sexual abuse and the psychological

21       injury resulting from that a permanent thing?

22           **MR. SWEENEY:**  Object to the form.

23   Q    In your opinion?

170

1          **MR. SWEENEY:**  Object to the form.

2   A    I think that traumas can always be engraved in the

3        memory, but the effects of a trauma depend on the

4        person's willingness to resolve and recover from

5        that trauma and the administration of therapy.

6   Q    You indicate that recovery depends on, in part,

7        the person's willingness.  Would recovery also

8        depend on the person's ability to deal with the

9        stress and the trauma?

10  A    Absolutely.

11         **MR. SWEENEY:**  Object to the form.

12  Q    Okay.  Would I be correct in interpreting what you

13       said that medications and therapy are not going to

14       cure anything; they are simply to help deal with

15       stressors --

16  A    Yes.

17         **MR. SWEENEY:**  Object to the form.

18  Q    -- that aggravate the situation?

19  A    That's correct.

20         **MR. SWEENEY:**  Object to the form.

21  Q    Okay.  When we talk about ODD, is that a common

22       co-diagnosis or side effect of ADHD?

23  A    It is frequently, often seen with that diagnoses.

172

```
 1          alleviate --

 2     A    It's definitely showing the medications and

 3          therapy is helping to alleviate the symptoms of

 4          his disorders.

 5     Q    Okay.  Okay.  You are familiar with Dr. Warren's

 6          psychological report; correct?

 7     A    Yes.  That's correct.

 8     Q    Okay.  Are you in agreement with Dr. Warren when

 9          he indicates that J      's insight and judgment

10          are poor?

11     A    Absolutely.

12     Q    Do you agree with Dr. Warren's report when he says

13          that he is very susceptible to the influence of

14          others?

15     A    Absolutely.

16     Q    Do you agree with Dr. Warren's report that he may

17          not -- he may act without recognizing the

18          potential consequences of his behavior?

19     A    Most definitely.

20     Q    Okay.  Would you attribute these

21          characteristics -- in your opinion, are these

22          things that are more reflective of the fact that

23          J     is borderline intellectual functioning, or
```

173

| | | |
|---|---|---|
| 1 | | are they more indicative of ADHD or ODD? |
| 2 | | **MR. SWEENEY:**  Object to the form. |
| 3 | A | Borderline intellectual functioning. |
| 4 | Q | Okay.  One of the questions that Mr. Sweeney asked |
| 5 | | you:  Was there anything in the UAB report that |
| 6 | | would indicate -- if I am correct -- that would |
| 7 | | indicate that there was any suicidal ideations, |
| 8 | | hearing voices, et cetera.  I won't -- the |
| 9 | | question is in the Record.  Would you look at the |
| 10 | | report from UAB? |
| 11 | A | Yes. |
| 12 | Q | And I do not have a page on that, but it's marked |
| 13 | | R   versus PCBE815.  Do I understand this |
| 14 | | correctly; it says circle pertinent check box if |
| 15 | | negative.  So, am I correct that the boxes are |
| 16 | | checked, J    showed no indication of those |
| 17 | | symptomologies?  In other words, any weight |
| 18 | | problems? |
| 19 | A | Yes. |
| 20 | Q | Those boxes appear to be checked? |
| 21 | A | Yes. |
| 22 | Q | All right.  When you get down to the very bottom, |
| 23 | | the second from the last one, it says, psych? |

176

| | | |
|---|---|---|
| 1 | | under consultations on page 1. |
| 2 | A | Okay. |
| 3 | Q | And see if it does not appear to you that |
| 4 | | consultations, page 1 on the discharge summary, is |
| 5 | | the typed notes of that page.  You would have to |
| 6 | | have gone through it -- |
| 7 | | **MR. SWEENEY:**  That appears to be the |
| 8 | | case, though. |
| 9 | A | Okay.  It does appear to be the case. |
| 10 | Q | And the reason that I bring that out is because I |
| 11 | | have noted some mistakes. |
| 12 | A | Uh-huh. |
| 13 | Q | And when I refer to them on page 1, if you want to |
| 14 | | look back and see that I have -- you know -- |
| 15 | A | I see.  Uh-huh. |
| 16 | Q | Under consultation, it says that some |
| 17 | | psychological testing was done.  And I assume that |
| 18 | | this is a result of Dr. Isbell? |
| 19 | A | Uh-huh. |
| 20 | Q | Do you know Dr. Isbell? |
| 21 | A | No. |
| 22 | Q | The psychological testing that was done -- and I |
| 23 | | am reading from page 1 -- suggests that J |

177

| | | |
|---|---|---|
| 1 | | views the world in an overly narrow frame of |
| 2 | | reference? |
| 3 | A | Uh-huh. |
| 4 | Q | He lacks consistent coping skills and tends to go |
| 5 | | back and forth between expressive, and they have |
| 6 | | intentional, and I would say that that should have |
| 7 | | been I-D-E-N-T-I-O-N-A-L, identional.  Can you |
| 8 | | tell us what that means? |
| 9 | | Well, let me ask you this:  That he goes back |
| 10 | | and forth between expressive and some other way of |
| 11 | | dealing with things? |
| 12 | A | Uh-huh.  Uh-huh. |
| 13 | Q | And I am suggesting they are saying ways -- that |
| 14 | | detecting should have been dealing with |
| 15 | | experience.  Often ineffectively.  All right? |
| 16 | A | Uh-huh. |
| 17 | Q | He is much less willing than most people to |
| 18 | | approach and process emotional stimuli.  And may |
| 19 | | appear emotionally or socially withdrawn to |
| 20 | | others. |
| 21 | A | Uh-huh. |
| 22 | Q | His lack of psychological complexity likely |
| 23 | | contributes significantly to his coping deficits |

178

1       issues.

2           Are these things, characteristics of J

3       that I have just read, do you agree with those?

4   A   I do agree.

5   Q   Were those characteristics of J      that you

6       noted in your sessions with him?

7   A   I'm gonna say the notations would be probably

8       borderline intellectual functioning would be the

9       notations and reference.

10  Q   With all of these accompanying characteristics

11      that I have just read?

12  A   They describe that diagnoses.

13  Q   Okay.  There is no evidence -- this was left out

14      of the typed report -- there is no evidence in the

15      current testing of a thought disorder.  The typed

16      one says, the patient does not have any thought

17      disorder.  The doctors note said there is no

18      evidence in the current testing of a thought

19      disorder.  However, he appears to be avoiding self

20      focusing and stays away from introspection, not

21      complication.  The patient is less interested in

22      other people than most peers.  Difficulty

23      establishing relationships.  Limited social skills

181

| | | |
|---|---|---|
| 1 | Q | -- and do a behavior modification -- |
| 2 | A | Absolutely. |
| 3 | Q | Okay. |
| 4 | | -- that was based on the same type of thing |
| 5 | | you were trying to do with J |
| 6 | A | That's correct. |
| 7 | | **MR. SWEENEY:**  Object to the form. |
| 8 | Q | If I understand correctly, what you were trying to |
| 9 | | do is to eliminate the stressors that were |
| 10 | | bringing on this exceptionally violent behavior? |
| 11 | | **MR. SWEENEY:**  Object to the form. |
| 12 | A | That's correct. |
| 13 | Q | Okay.  There seems to be a consensus between the |
| 14 | | professionals who have tested, counseled, talked |
| 15 | | to, and dealt with J      -- and I will mention |
| 16 | | those as yourself, Dr. Warren, the people at |
| 17 | | UAB -- |
| 18 | A | Uh-huh. |
| 19 | Q | -- there seems to be a consensus that J |
| 20 | | because of his borderline intellectual capacity, |
| 21 | | his lack of intellectual complexity -- and I won't |
| 22 | | go through all those things again -- that he would |
| 23 | | have, and is having, an extremely difficult time |

182

1    with dealing with the kind of trauma that would be

2    brought on by something like sexual abuse?

3                    MR. SWEENEY:   Object to the form.

4    A   Difficult time processing it, yeah.

5    Q   Okay.  Did you state the opinion that J       will

6        need ongoing treatment for PTSD?

7    A   Yes.

8    Q   That he will need ongoing treatment for coping --

9        learning to -- social skills, coping skills, that

10       are connected with articulating --

11   A   Absolutely.

12   Q   Okay.  So, you don't see that as a short-term

13       thing?

14   A   No.

15   Q   Do you envision a time when J       may not need

16       the medication or the therapy, based on the

17       characteristics that are a part of his makeup that

18       are not -- that are just there?

19   A   It definitely seems like his diagnoses, the

20       imprinting of his behaviors, the way he copes with

21       life, will constantly need some external catalyst

22       to help him to adjust with every phase of life and

23       to deal with the day-to-day stressors of life.

**Exhibit B~ Karen Berry**

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

      PLAINTIFF,


VS.                                CASE NO.:

                                   2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION

      DEFENDANT.

               * * * * * * * * * *

     DEPOSITION OF KAREN BERRY, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 8:00 a.m.


             * * * * * * * * *

11

| 1 | | on BBSST training. |
|---|---|---|
| 2 | Q | Okay.  Any other kind of training that you have |
| 3 | | ever provided to special ed, general ed, or |
| 4 | | administrative personnel? |
| 5 | | **MR. SWEENEY:**  Object to the form. |
| 6 | A | No, ma'am.  To the -- |
| 7 | Q | You can't think of any? |
| 8 | A | I cannot recall. |
| 9 | Q | And if you think of any as we go along, you just |
| 10 | | let me know. |
| 11 | | Okay.  So, you have a specialization in the |
| 12 | | area of mental retardation? |
| 13 | A | Yes, ma'am. |
| 14 | Q | Could you tell the Court what your definition of |
| 15 | | mental retardation is? |
| 16 | A | Mental retardation is a child or an adult whose IQ |
| 17 | | falls anywhere from 69 and below.  It could also |
| 18 | | be not only intellectually, it could be -- |
| 19 | | intellectually is part of it, but they have |
| 20 | | somewhat limited adaptive skills. |
| 21 | Q | Okay.  So, there is an intellectual component, the |
| 22 | | IQ kind of component, and adaptive behavior |
| 23 | | component? |

12

| | | |
|---|---|---|
| 1 | A | Yes, ma'am. |
| 2 | Q | Now, do you know or did you know J     R     prior |
| 3 | | to 2006? |
| 4 | A | Yes, ma'am, I did. |
| 5 | Q | Okay.  And was he ever identified by the system as |
| 6 | | a student with mental retardation? |
| 7 | A | Yes, ma'am. |
| 8 | Q | Okay.  And just -- we asked you to produce today |
| 9 | | all of the student's educational records.  And I |
| 10 | | did that simply to make sure we had everything. |
| 11 | | The last intellectual evaluation I have conducted |
| 12 | | for Pike County Board of Education is dated May of |
| 13 | | 2003. |
| 14 | A | Yes, ma'am. |
| 15 | Q | Is there any more recent evaluation prior to 2006, |
| 16 | | but something done by Pike County Board of |
| 17 | | Education? |
| 18 | A | Not to my knowledge. |
| 19 | Q | Okay.  And let me just ask you to identify this |
| 20 | | document if you can, for us.  And you might want |
| 21 | | to look at your own records.  But I will just |
| 22 | | represent to you that's a copy of what I was given |
| 23 | | as to your records. |

13

1    A    Yes, ma'am.  It was administered by Mr. Hudson,

2         yes, sir -- yes, ma'am.

3                   **MS. DePAOLA:**  Let's mark that, please.

4                        (Whereupon, Plaintiff's Exhibit 23

5                        was marked for identification and

6                        is attached hereto.)

7    **BY MS. DePAOLA**

8    Q    Let me ask you to identify for the Record what

9         Plaintiff's Exhibit 23 is.  Tell the Court what

10        that is.

11   A    Yes, ma'am.  This is a psychological given with

12        the Wechsler Intelligence Scale, III, which is an

13        individual IQ test.  Mr. Hudson, who is our school

14        psychometrist, administered it to J    in

15        February of '03.

16   Q    And if I have read that correctly, as a result of

17        that test, Mr. Hudson estimated J    's IQ to be

18        a full scale IQ of 53; is that correct?

19   A    Yes, ma'am.

20   Q    And am I also correct that that puts him in the

21        first percentile with respect to intellectual

22        functioning as tested on that test?

23   A    As tested on this one, yes, ma'am.

15

```
 1        taken?

 2    A   Thirteen years and six months.

 3    Q   Okay.  Do you have his eligibility report done in

 4        2003?

 5    A   Yes, ma'am.  Do you mind --

 6    Q   Might I look at that?

 7    A   There is all his work samples and everything

 8        (tenders documents).

 9    Q   Thank you.

10    A   May I put it up?

11    Q   Yeah.  Sure.  That will be fine.

12    A   I'm peculiar about my documents.  I'm sorry.

13    Q   At the time that evaluation was done, did they

14        also do an evaluation of J    's oral language

15        skills?

16            And let me just show you a document.  The top

17        is kind of cut off.  But I believe this is the

18        Oral and Written Language Scales also administered

19        in --

20    A   The OWLS, yes, ma'am, by Mrs. Calhoun.

21    Q   Actually, this was done in May of 2005; is that

22        correct?

23    A   Yes.  That's what I am seeing, yes, ma'am.
```

16

```
 1    Q    Are those also a part of the school's records?

 2    A    I could check.  This -- he received speech therapy

 3         services with Mrs. Calhoun.  And she may -- I'm

 4         not familiar with her entire profile.  But I know

 5         she gives this at the end of the school term as

 6         part -- to see if he's improved or regressed.

 7    Q    Could you look --

 8    A    I would be glad to.

 9                        (Whereupon, Plaintiff's Exhibit 24

10                         was marked for identification and

11                         is attached hereto.)

12    BY MS. DePAOLA

13    Q    Let me ask you if what we have marked as

14         Plaintiff's Exhibit 24 is part of the educational

15         records for Pike County as it relates to J·

16         R   ·?

17    A    I'm sorry.  Your question?

18    Q    Could you identify what I have marked as

19         Plaintiff's Exhibit 24?

20    A    Yes, ma'am.  That is the test of listening

21         comprehension and oral expression.

22    Q    For J    R   ?

23    A    For J.   . ?   .
```

17

| | | |
|---|---|---|
| 1 | Q | And are part of the Pike County Board of Education |
| 2 | | records for him? |
| 3 | A | Yes. |
| 4 | Q | And can you tell the Court what J scored as |
| 5 | | far as a percentile rank on oral expression? |
| 6 | A | Standard score of 66. |
| 7 | Q | What was his percentile rank? |
| 8 | A | Percentile?  First. |
| 9 | Q | Okay.  And, again, would that mean that 99 percent |
| 10 | | of the children who took that test scored higher |
| 11 | | than J    did? |
| 12 | A | On that particular subpart, yes. |
| 13 | Q | And if a child has a percentile rank of |
| 14 | | first percentile in oral expression, would you |
| 15 | | expect him to have difficulty with communication? |
| 16 | A | Would I expect? |
| 17 | Q | Well -- |
| 18 | A | Some. |
| 19 | Q | -- put it this way:  What do you expect to -- |
| 20 | A | What I look at is the totals.  I look at all of |
| 21 | | that. |
| 22 | Q | Okay.  I'm just asking you about this one. |
| 23 | A | Okay. |

18

1    Q    An oral expression score in the first percentile,

2         how would you expect this child to perform in

3         terms of communicating with others?

4    A    Somewhat -- with somewhat difficulty.  But not

5         that much of a difficulty.  Sixty-six.

6    Q    Okay.  You don't think being in the

7         first percentile is indicative of difficulties

8         communicating with others?

9    A    First percentile is somewhat misleading.  I would

10        look at the standard scores.

11   Q    And that oral expression, what age equivalent did

12        it indicate he was in his ability to communicate

13        with others on that test?

14   A    Six years, 11 months.

15   Q    And what was his chronological age at that time?

16   A    Fifteen years.

17   Q    Okay.

18   A    Fifteen years, nine months.

19   Q    All right.  Now, you mentioned earlier that a

20        child with mental retardation would also have

21        problems with adaptive skills?

22   A    Somewhat.

23   Q    What does that mean?

**Exhibit C~ Mona Watson**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,

VS.                                CASE NO.:

                                   2:06-CV-1120-MEF

PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

                * * * * * * * * * *

    DEPOSITION OF MONA WATSON, taken before Mary

Moore-Wynn, as Commissioner, on the 4th of September,

2007, in the offices of Pike County Board of Education,

101 West Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 10:30 a.m.


              * * * * * * * * *

31

| 1 | | Resources to do an interview of B    F      ? |
|---|---|---|
| 2 | A | No. |
| 3 | Q | Why would that be? |
| 4 | A | Because the alleged abuse occurred in Butler |
| 5 | | County. |
| 6 | Q | So, the Child Advocacy Center in Butler County |
| 7 | | would have done that interview? |
| 8 | A | I would hope so. |
| 9 | Q | So, you never interviewed B.    F     ? |
| 10 | A | No. |
| 11 | Q | Did you ever interview anyone other than J |
| 12 | | R   ? |
| 13 | A | Uhm -- |
| 14 | Q | Relative to any sexual abuse claims by Mr. Coon. |
| 15 | A | No, not until we interviewed Joey. |
| 16 | Q | Okay.  All right.  I want to talk to you about the |
| 17 | | interview with J   .  When was the first time |
| 18 | | you interviewed J   ? |
| 19 | A | I believe it was on July 13th. |
| 20 | | **MR. SWEENEY:**  I'm sorry.  What was the |
| 21 | | date? |
| 22 | | **THE WITNESS:**  13th. |
| 23 | | **MR. SWEENEY:**  Of what month? |

32

1              **THE WITNESS:**  July.

2    **BY MS. ALLEN**

3    Q    Of '05?

4    A    Uh-huh.

5    Q    And you did this interview at the request of who?

6    A    Law enforcement.

7    Q    Specifically, who called you from law enforcement?

8    A    Bob Bradbury, Investigator.

9    Q    Where did the interview take place?

10   A    At the Child Advocacy Center.

11   Q    To your knowledge, was this the first time J

12        had been interviewed by anybody?

13   A    I'm sure law enforcement had done preliminaries.

14        But I'm not sure.

15   Q    Does the procedure allow for law enforcement to do

16        any interviewing before you do the interview?

17   A    The procedure is if a allegation comes in to law

18        enforcement or to the Department of Human

19        Resources, they get just the preliminary

20        information, basic information, and then they set

21        the interview up at the Child Advocacy Center.

22        The purpose of that is to keep that child from

23        having to go through the -- you know, the whole

38

1    ability what J      said to you in that interview.

2                    **MR. SWEENEY:**  Let's take a break.  And

3                            if you will read the document, and

4                            then respond to the question.  But

5                            if you will, read that summary in

6                            it's entirety.

7                            (Witness reads document.)

8                    **THE WITNESS:**  Okay.

9                    **MR. SWEENEY:**  Is that more than one

10                           page?

11                   **THE WITNESS:**  No, this is it.

12                   **MS. ALLEN:**  We're back on the Record.

13   **BY MS. ALLEN**

14   Q    Would you please, Ms. Watson, to the best of your

15        ability, tell me what you recall about that

16        interview with J      ?

17   A    The thing I recall the most about that interview

18        is that J      had a very difficult time talking

19        about it.  He had a very difficult time

20        verbalizing it.  He said that Mr. Coon had him

21        perform oral sex on him on several occasions.  He

22        said that some of the time it occurred in the band

23        room at Pike County High School.  And he said that

39

```
1         he would have him sit on the steps that led down

2         to the band room from the side door -- that he

3         would have him sit on the steps, and that Mr. Coon

4         would unzip his pants and have him perform oral

5         sex on him.

6    Q    How long did the interview last?

7    A    A long time.  It was probably around an hour, hour

8         and a half.

9    Q    And to the best of your recollection, it was just

10        you and Misty Hubbard in the room?

11   A    I know that's --

12   Q    Is that what you said?

13   A    Yes.

14   Q    You think that Bob Bradbury might have been in the

15        room, though?

16   A    Not in our room, no.  He might have been in an

17        observation room.

18   Q    But you're sure that he wasn't present during the

19        interview?

20   A    Positive.

21   Q    Okay.  But he was observing from another room,

22        Bob?

23   A    If he was not in the other room, he -- I think I
```

**DX 5**
**(Portion of Records)**

## Confidential
## Psychological Report

**Name:** J      M. R
**ID #:** 418334541
**Gender:** Male
**Date of Birth:** 07/28/1989
**Age:** 17
**Ethnicity:** Caucasian/White
**Grade/Education:** 11
**Test Date:** 02/27/2007
**Examiner:** Fernelle L. Warren, Ph.D.

Clinical Impression:  314.01   Attention Deficit Hyperactivity Disorder, Predominantly
Inattention Type, In Partial Remission
309.81   Posttraumatic Stress Disorder
296.34   Major Depressive Disorder, Severe, With Psychotic
Features
V62.89   Borderline Intellectual Functioning

### Reason For Referral
J      is a 17 year, 6 month of age White/Caucasian male referred for testing because of
failing grades, poor concentration, difficulty following directions, and to assist in
facilitating development of a more appropriate treatment plan.

### Assessment Procedures
Parent Conference
Diagnostic Intake

### Test Administered
Reynolds Intellectual Assessment Scale (RIAS)
Wide Range Achievement Test (WRAT-4)
Behavior Rating Inventory of Executive Functioning (BRIEF)
Behavior Assessment System for Children (BASC-2)
Attention Deficit Hyperactivity Disorder Test (ADHDT)

### Background Information
J      currently resides with mother and father. He has three two brothers (ages 23 and
14) and one sister (age 20). He is in the 11th grade at Charles Henderson High School.
He attends regular classes with some modifications. He was sent to the alternative school
in 2004 for having a knife and recently has been sent to In School Suspension (ISS) for
having his cell phone on. He was sexually molested in 2005 while attending Charles
Henderson High School. He is currently taking medication for ADHD.

J      is presenting with the following behaviors: psychosis hearing voices of past 2
weeks; middle insomnia; startled response; forgetfulness; difficulty following directions;

impulsivity; defiance; temper problems; anger; mood swings; depressed mood; startled response; and self-mutilating behaviors.

**Relevant Medical History**
Meningitis

**Allergies**
None reported

**Previous Testing**
There is no known previous psychological testing.

**Observation**
J        was escorted to the testing area by the examiner where rapport was established. He readily agreed to participate in the assessment. He completed all tasks unless they were discontinued by the examiner. During the testing session, his attention span was noticeably average when compared with other students of the same chronological age. He answered items carefully and appeared to think silently and aloud during the testing. He remained seated and was able to regulate his behaviors. Although he had a good understanding of concepts during testing, his articulation appeared to be poor. Currently, he denies suicidal or homicidal ideations or thoughts. J        denies hallucinations/delusions at this testing. Overall, Justin was cooperative.

## TEST DATA AND INTERPRETATON

**Intelligence Tests:**

Reynolds Intellectual Assessment Scale (RIAS)

J        received the following scores:

| | |
|---|---|
| Verbal Intelligence Index | 81 |
| Nonverbal Intelligence Index | 83 |
| Composite Intelligence Index | 80 |

Verbal, Nonverbal and Composite Intelligence Index mean scores are 100 with a standard deviation (SD) 15. Subtests Scores follow: (Subtests mean scores are 50 with a SD of 10).

| Verbal Subtests | SS | Nonverbal Subtests | SS |
|---|---|---|---|
| Guess What | 33 | Odd-Item Out | 44 |
| What's Missing | 33 | Nonverbal Memory | 46 |

J        overall intelligence was assessed using a variety of test items. Some of the RIAS items emphasize the understanding and use of words to solve problems. These items require the use of language, knowledge of words and their meanings, and thinking skills,

and are part of the RIAS Verbal Intelligence Index (VIX). Examples of such verbal items include, "What rises every morning, heats the earth, and shines brightly in the sky?"* and "Lead is to pencil as ink is to... ?"*

The RIAS also includes nonverbal items that require thinking with pictures and shapes or identifying the part of an object that is missing in a picture. Examples of such nonverbal items include a picture of a coffee cup with the handle missing* in which the examinee must identify the part that is missing, and a picture of three squares and a circle* in which the examinee must point out which object does not belong with the others. Such items are part of the RIAS Nonverbal Intelligence Index (NIX). When correct responses are added up across these verbal and nonverbal items, a good estimate of J    's overall intelligence is obtained. In the case of the RIAS, this overall intelligence score is called the Composite Intelligence Index (CIX).

On testing with the RIAS, Justin earned a Composite Intelligence Index or CIX of 80 (**_Borderline Intellectual Functioning_**). On the RIAS, this level of performance falls within the range of scores designated as below average and exceeds the performance of 9% of individuals at J     s age. The chances are 90 out of 100 that Justin's true CIX falls within the range of scores from 76 to 86.

J     's VIX of 81 and NIX of 83 are consistent with his CIX noted above and indicate that Justin's verbal and nonverbal abilities are similarly developed.

**Achievement Tests:**

   **Wide Range Achievement Test - 4 (WRAT - 4)**

J    s academic achievement was assessed with the WRAT - 4. The WRAT - 4 has a mean of 100 and a SD of 15. Results follow:

| Subtest Scores | SS | PR | GE |
|---|---|---|---|
| Word Reading | 69 | 2 | 3.4 |
| Sentence Comprehension | 70 | 2 | 3.9 |
| Spelling | 70 | 2 | 3.5 |
| Math Computation | 70 | 2 | 3.7 |
| Reading Composite | 68 | 2 | -- |

   *Score significantly below IQ expectancy level.

The achievement scores are presented with both grade equivalent and standard scores. The grade equivalent scores represent the grade equivalent based on the national standardization sample. Percentile ranks are the percentage of individuals in the normative group obtaining scores below a particular standard score. The Standard Scores (SS) represent the anticipated IQ score for individuals the same age and can be compared directly to the IQ scores on the RIAS. Differences of 16 points or greater, between these standard scores and the IQ score, are usually considered significant.

In comparison to J       s RIAS Composite Intelligence Index of 80, his Word Reading subtest was within the expected range. His standard score was 69, which yielded a percentile rank of 2 when compared with other children the same age. Based on the test, J       's general ability to perform letter and word decoding through letter identification and word recognition was at lower extreme range. The grade equivalent was at the lower 3rd grade level.

On the Sentence Comprehension subtest, J       obtained a standard score of 70, which yielded a percentile rank of 2 when compared with other children the same age. This suggest that J       s general ability to gain meaning from words and to comprehend ideas and information contained in sentences throughout the use of a modified cloze technique was at the low range. In comparison to J       s RIAS Composite Intelligence Index, his performance was within the expected range.  The grade equivalent was at the upper 3rd grade level.

On the Spelling subtest, J       obtained a standard score of 70, which placed him at the 2nd percentile rank. This suggest that J       s general ability to encode sounds into written form through the use of a dictated spelling format containing both letters and words was at the low range. In comparison to J       's RIAS Composite Intelligence Index, his performance was within the expected range. The grade equivalent was at the middle 3rd grade level.

On the Math Computation subtest, J       obtained a standard score of 70, which placed him at the 2nd percentile rank. This suggests that J       's general ability to perform basic mathematics computations through counting, identifying numbers, solving simple oral problems, and calculating written mathematics problems was at the low range. In comparison to J       s RIAS Composite Intelligence Index, his performance was within the expected range. The grade equivalent was the upper 3rd grade level.

On the Reading Composite (Word Reading Standard Score + Sentence Comprehension Standard Score), J       obtained a standard score of 68, which placed him at the 2nd percentile rank and his performance at the lower range. In comparison to J       's RIAS Composite Intelligence Index, his performance was within the expected the range.

## Neuropsychological Test:

### Behavior Rating Inventory of Executive Functioning (BRIEF)

J       's executive functioning was assessed with the BRIEF. The BRIEF has a T score mean of 50 and a SD of 10. Results follow:

### Parent Form

J       's parent completed the Parent form of the Behavior Rating Inventory of Executive Function (BRIEF) on 02/28/2007. In the context of these validity considerations, ratings of J       's executive function exhibited in everyday behavior reveal some areas of concern.

The overall index, the Global Executive Composite (*GEC*), was elevated (*GEC T* = 76, %ile = 99). Both the Behavioral Regulation (*BRI*) and the Metacognition (*MI*) Indexes were elevated (*BRI T* = 73, %ile = 97 and *MI T* = 74, %ile = 98).

Within these summary indicators, all of the individual scales are valid. One or more of the individual BRIEF scales were elevated, suggesting that J      exhibits difficulty with some aspects of executive function. Concerns are noted with his ability to adjust to changes in routine or task demands (Shift *T* = 76, %ile = 98), modulate emotions (Emotional Control *T* = 75, %ile = 98), initiate problem solving or activity (Initiate *T* = 76, %ile = 99), sustain working memory (Working Memory *T* = 71, %ile = 97), plan and organize problem solving approaches (Plan/Organize *T* = 77, %ile = 99), and monitor his own behavior (Monitor *T* = 65, %ile = 96). J     's ability to inhibit impulsive responses (Inhibit *T* = 60, %ile = 89) and organize his environment and materials (Organization of Materials *T* = 63, %ile = 85) is not described as problematic by the respondent.

J      scores on the Shift scale and the Emotional Control scale are significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of J     's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

The BRIEF Inhibit and Working Memory scales can be helpful in identifying J      with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). In this particular profile, J     's score on the Working Memory scale is significantly elevated as compared to like-aged peers (*T* = 71, %ile = 97) while his score on the Inhibit scale is not significantly elevated (*T* = 60, %ile = 89). This profile is similar to that seen in children clinically diagnosed with ADHD, Inattentive Type.

### Teacher Form

J     s teacher completed the Teacher form of the Behavior Rating Inventory of Executive Function (BRIEF) on 02/27/2007. The respondent's ratings of J      do not appear overly negative. In the context of these validity considerations, ratings of Justin's executive function exhibited in everyday behavior reveal some areas of concern.

The overall index, the Global Executive Composite (*GEC*), was elevated (*GEC T* = 89, %ile = 99). Both the Behavioral Regulation (*BRI*) and the Metacognition (*MI*) Indexes were elevated (*BRI T* = 73, %ile = 93 and *MI T* = 92, %ile = 99).

Within these summary indicators, all of the individual scales are valid. One or more of the individual BRIEF scales were elevated, suggesting that J      exhibits difficulty with some aspects of executive function. Concerns are noted with his ability to inhibit impulsive responses (Inhibit *T* = 67, %ile = 93), adjust to changes in routine or task demands (Shift *T* = 84, %ile = 97), modulate emotions (Emotional Control *T* = 66, %ile = 90), initiate problem solving or activity (Initiate *T* = 101, %ile = 99) sustain working memory (Working Memory *T* = 101, %ile = 99), plan and organize problem solving approaches (Plan/Organize *T* = 78, %ile = 97), organize his environment and materials

FROM AZAR, AZAR & Moore, LLC

(Organization of Materials $T = 90$, %ile = 98), and monitor his own behavior (Monitor $T$ = 71, %ile = 91).

J     's scores on the Shift scale and the Emotional Control scale are significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of J     's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

The BRIEF Inhibit and Working Memory scales can be helpful in identifying J     with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). In this particular profile, J     's score on the Working Memory scale is significantly elevated as compared to like-aged peers ($T = 101$, %ile = 99). His score on the Inhibit scale is also moderately elevated ($T = 67$, %ile = 93). This profile is similar to that seen in children clinically diagnosed with ADHD, although the subtype is unclear given the moderate elevation on the Inhibit scale. Additional sources of data may assist in clarifying the diagnostic subtype.

**Note:** Higher T scores and percentiles indicate greater degrees of executive function. For all the BRIEF clinical scales and indexes, T scores at or above 65 (*) should be considered as having potential clinical significance.

### Personality and Emotional Assessment:

#### Behavior Assessment System for Children (BASC-2)

The BASC-2 is an Integrated behavior rating system designed to facilitate the differential diagnosis and classification of a variety of emotional and behavior disorders of children and to aid in the design of treatment plans. The BASC has Clinical and Adaptive Scaled Scores reported as T-Scores. T-Scores have a mean of 50 and a standard deviation of 10.

On the **Clinical Scales,** At-Risk (AR) T-Scores (60-69) indicate the presence of significant problems that, while requiring treatment and or monitoring, may not be severe enough to warrant a formal diagnosis. Clinically Significant (CS) scores (70 and above) denote a high level of maladaptive behavior. **Adaptive Scales** scores are CS if scores are 30 or less and are AR if between 31 and 40.

The BASC also identifies certain responses as Critical Items because they suggest the potential of causing harm to one's self or others. A listing of Critical Items Ms. E R     the mother endorsed on the Parent Rating Scales (PRS) follows:   (Ms. R Caution Indices were all in the acceptable range.

The following Critical Items were endorsed:

| Item | Response |
|------|----------|
| Sees things that are not there | Often |
| Threatens to hurt others | Sometimes |

| | |
|---|---|
| Hits other adolescents | Sometimes |
| Eats things that are not food | Often |
| Hears sounds that are not there | Often |
| Is easily annoyed by others | Almost always |

The male norm group comparison follows:

| Scale | T-Score | Percentile |
|---|---|---|
| **Clinical Scales** | | |
| Hyperactivity | 65+ | 91 |
| Aggression | 57 | 80 |
| Conduct Problems | 56 | 79 |
| Anxiety | 55 | 73 |
| Depression | 71* | 96 |
| Somatization | 54 | 76 |
| Atypicality | 86* | 99 |
| Withdrawal | 67+ | 94 |
| Attentional Problems | 66+ | 93 |
| | | |
| **Adaptive Scales** | | |
| Adaptability | 37+ | 12 |
| Social Skills | 35 | 7 |
| Leadership | 32+ | 4 |
| Activities of Daily Living | 32+ | 5 |
| Functional Communication | 25* | 1 |

| Scale | T-Score | Percentile |
|---|---|---|
| **Composite** | | |
| Externalizing Problems | 60+ | 87 |
| Internalizing Problems | 62+ | 89 |
| Behavioral Symptoms Index | 75* | 97 |
| Adaptive Skills | 29* | 3 |

+At-Risk Scores
*Clinically Significant Scores

Ms. Mitz Woodall completed the Teacher Rating Scale. His scores follow: (The Caution Indices were all in the acceptable range.)

The following critical items endorsed that may deserve attention:

| Item | Response |
|---|---|
| Is easily annoyed by others | Some....es |

The male group norm comparison follows:

| Scale | T-Score | Percentile |
|---|---|---|
| **Clinical Scales** | | |
| Hyperactivity | 47 | 51 |
| Aggression | 43 | 20 |
| Conduct Problems | 56 | 80 |
| Anxiety | 77 | 98 |
| Depression | 66 | 92 |
| Somatization | 79 | 97 |
| Attentional Problems | 74* | 99 |
| Learning Problems | 79* | 99 |
| Atypicality | 47 | 56 |
| Withdrawal | 80 | 99 |
| | | |
| **Adaptive Scales** | | |
| Adaptability | 42 | 24 |
| Social Skills | 53 | 61 |
| Leadership | 31+ | 1 |
| Study Skills | 38+ | 15 |
| Functional Communication | 28* | 1 |

| Scale | T-Score | Percentile |
|---|---|---|
| **Composite** | | |
| Externalizing Problems | 49 | 53 |
| Internalizing Problems | 78* | 98 |
| School Problems | 79* | 99 |
| Behavioral Symptoms Index | 62+ | 89 |
| Adaptive Skills | 37 | 10 |

+At-Risk Scores
*Clinically Significant Scores

Any score in the Clinical Significant range suggest a high level of maladjustment. The TRS show clinical significant scores on Anxiety, Somatization, Attentional Problems, Learning Problems and Withdrawal, and at risk scores on Depression. The PRS show clinical significant scores on Depression, Atypicality, and at risk scores on Hyperactivity, Withdrawal, and Attentional Problems. Both PRS and TRS were somewhat consistent with J____'s history of behaviors at home and school.

**Conclusion**

J____ is a 17 year, 6 month of age White/Caucasian male referred for testing because of failing grades, poor concentration, difficulty following directions, and to assist in facilitating development of a more appropriate treatment plan.

On testing with the RIAS, Justin earned a Composite Intelligence Index or CIX of 80 (*Borderline Intellectual Functioning*). On the RIAS, this level of performance falls

within the range of scores designated as below average and exceeds the performance of 9% of individuals at J      's age.

In comparison to J        s RIAS Composite Intelligence Index of 80, his Word Reading, Sentence Comprehension, Spelling, Math Computation, and Reading Composite subtest standard scores of 69, 70, 70, 70, and 68, respectively, were within the expected range.

On the Parent and Teacher BRIEF rating scale, J        's scores on the Shift scale and the Emotional Control scale were significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of J      's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

Moreover, The BRIEF Inhibit and Working Memory scales were be helpful in identifying Justin with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). On the Parent Rating Scale, J      's score on the Working Memory scale was significantly elevated as compared to like-aged peers ($T = 71$, %ile = 97) while his score on the Inhibit scale is not significantly elevated ($T = 60$, %ile = 89). This profile is similar to that seen in children clinically diagnosed with ADHD, Inattentive Type. On the Teacher Rating Scale, J      's score on the Working Memory scale was significantly elevated as compared to like-aged peers ($T = 101$, %ile = 99). His score on the Inhibit scale was also moderately elevated ($T = 67$, %ile = 93). This profile is similar to that seen in children clinically diagnosed with ADHD, although the subtype was unclear given the moderate elevation on the Inhibit scale. It is the examiners opinion that this score was suppressed due to his medication for ADHD.

According to the information from the BASC-2, The TRS show clinical significant scores on Anxiety, Somatization, Attentional Problems, Learning Problems, and Withdrawal, and at risk scores on Depression. The PRS show clinical significant scores on Depression, Atypicality, and at risk scores on Hyperactivity, Withdrawal, and Attentional Problems. Both PRS and TRS were somewhat consistent with J      's history of behaviors at home and school. These serious problems, as indicated by results of the personality and emotional assessments indicate that Justin is expected to experience difficulty in the regular classroom without intervention or remediation.

Overall, given the reported history, observations and testing, it is the examiners opinion that J      meets the criteria for Attention Deficit Hyperactivity, Predominantly Inattentive Type, In Partial Remission; Posttraumatic Stress Disorder, Major Depression Disorder, Severe With Psychotic Features, and Borderline Intellectual Functioning.

Results from these tests are considered a valid estimate of Justin's abilities.

## Recommendations

R    . PCBE
734

1. J___ may qualify for special education and related services. Ongoing monitoring of J___'s behavior and academic performance would be help in determining whether additional classroom interventions are needed.

2. It is suggested that J___ begin therapy sessions as needed to encourage appropriate behaviors and positive interactions. Also, J___ could benefit from weekly therapy sessions to explore and monitor his ADD-like behaviors/Anxiety/Depression. Furthermore, the seriousness of his emotional disturbances suggests that therapy should be initiated for both J___ and his parents.

2. Behavior-modification techniques may be valuable in developing new social skills.

**Additional student based interventions are suggested:**

*Working Memory Tasks*

1. Children with difficulties sustaining working memory often show problems in the ability to remain focused on a task or activity, particularly for schoolwork or homework assignments. Many demonstrate a natural tendency to use "self-talk" or verbal mediation in order to guide their own problem solving and to direct their attention. Such verbal mediation strategies might be encouraged or taught directly. Initially, J___ might verbalize aloud with supervision as he steps through a task. Eventually, talking aloud can be minimized such that J___ relies on subvocalization or only a whisper to direct his focus.

2. Individuals like J___ often demonstrate difficulties keeping track of more than one or two steps at a time. Providing a written checklist of steps required to complete a task can serve as an external memory support and alleviate some of the burden on working memory.

3. It is often necessary to repeat instructions or new information for children like J___ so that they may increase the amount of information captured.

4. Children like J___ can benefit from learning compensatory skills to apply independently. J___ can learn how to actively listen, such as stopping what he is doing at the time, focus his attention, ask questions, restate the information or question, or take notes. Have J___ repeat or paraphrase what he has heard or understood in order to check for accuracy and to provide an opportunity for rehearsal. Ultimately, teaching self-initiated "comprehension checking" strategies (e.g., the child asking for repetition of instructions) helps to promote independent management of working memory weaknesses.

*Inhibit Tasks*

1. A student with inhibitory control difficulties often requires additional structure in his environment at the outset in order to maintain more appropriately controlled behavior. Justin might need a more explicit, extensive, and/or clear set of rules and expectations, and might need these reviewed with him regularly.

2. Often, it is important to limit distractions that are problematic for a student with inhibitory control difficulties. This might include visual and auditory distractions as well as other students or activities that can pull Justin's attention away from a task.

3. Environmental structure can be an important consideration for children like J Open classroom settings often have too many distractions and too many opportunities for impulsive behaviors.

4. A student like J     often benefits from careful placement in the classroom. This is not necessarily in the front and center, but might be close to the center of activity to help him feel more involved or in a place where frequent eye contact with the teacher is likely.

5. Disinhibited children often require more frequent redirection and more frequent limit-setting from the teacher. Placement in close proximity of the teacher can facilitate greater interaction without disturbing other students.

6. J     might benefit from sitting with or near more well-controlled and more focused peers who can serve as models and can resist his distracting tendencies.

*Emotional Control Tasks*

1. Children with executive difficulties, particularly with fragile inhibitory control and/or difficulties adapting to change in their home and school environments, may express their feelings more strongly and more directly than most children. This can make them seem more angry, irritable, sad, or silly than their peers. Such emotional expression should prompt evaluation to rule out mood or affective difficulties. When difficulties with modulation of affect occur in the context of other self-regulatory problems, management of the child's executive difficulties may be helpful.

2. Difficulties with emotional control can often be viewed as one expression of disinhibition. Thus, techniques for supporting inhibitory control and reducing impulsivity may be helpful.

3. J     might benefit from opportunities to discuss upcoming situations or events that may provoke an emotional outburst. Increasing his awareness of the potential for emotional reactivity and the likely consequences to follow may help him modulate more effectively in the moment.

4. Processing situations that have led to emotional outbursts with J     in a non-threatening setting and manner is important. Choose a situation where he is relaxed and therefore more receptive to objective analysis of what happened. This can help J gain better control while increasing his awareness of his reactions.

5. Peer modeling may be helpful for J     Placing him in activity-focused, small groups with well-controlled peers may help him emulate their behavior.

Thank you for referring this patient for psychological services. Should the reader have any questions in regards to this evaluation, feel free to contact me at (334) 808-8991.

*Fernelle J. W*                          3-12-07

Fernelle L. Warren, Ph.D.                 Date

Licensed Clinical Psychologist

E    . PCBE
737

~~gional child Advocacy/Family Resource Center~~

### Date of Interview: 7/14/05

CAC CASE # 23      INTERVIEWER'S NAME: Mona Watson

VICTIM'S NAME:   R_____   J_____   N._____
                 (LAST)           (FIRST)        (MIIDDLE)

ADDRESS:   Rt. 2 Box 318-F _____

TELEPHONE:   334-735-2935

DOB:   7/28/89      SEX:   M X      F __      RACE: White

PARENTS NAME:            EMPLOYMENT:

POSSIBLE OFFENDER: Charles Coon      DOB/AGE: unknown

ADDRESS: Greenville, AL

TYPE OF ABUSE:   Sexual

DATE OF INCIDENCE:

LOCATION: Pike County High School Band Room & Home of Victim

DHR WORKER: Misty Hubbard

LE INVESTIGATOR: Bob Bradberry

PRESENT AT FORENSIC INTERVIEW: Mona Watson, Misty Hubbard
                               Viewed by Bob Bradberry & DA

SUMMARY OF INTERVIEW:

J    ad a very difficult time with interview. Even though he is fifteen years old he has difficulty in verbalizing what happened to him. After a very difficult time, J finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one time he described was in the band room back before Christmas. He stated that Mr. Coon had him lock the band room door and sit on the steps leading into the room. He stated that Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last time this happened was about three weeks ago when Mr. Coon went to J    's house. Parents were not there.



PLAINTIFF'S EXHIBIT
19

R    v. PCBE
124

State of Alabama
Twelfth Judicial Circuit
Pike County Multi-disciplinary Team Report

Reporting Agency: _____    Date: 8/9/05
(Place name of person reporting next to agency)    Phone 807-6143

DA _____
TPD _____
DHR M. Hubbard _____
BPD _____
PCSO _____
Other _____

Victim Information:

➤ Name J____ R____ _____  DOB 7/28/89  Age 15 16
Address 162 Co. Rd 4430 _____  Gender Male Female
        Brundidge, AL _____
Phone ( ) 735 - 3925 _____

                                    Mom cell
                                    268-6483
Parent/guardian E_____ & M____ R_____ __

Other Household members (List Names, ages and relationship to victim)
J____ R____ brother, age 21 _____
J____ R____ sister, age 18 _____
J____ R____ brother, age 12 _____

Person Allegedly Responsible for Abuse/ Neglect Information:

Name Charles Coon _____ DOB ___/___/___ Age _____
Address _____  Gender Male Female
        _____

Allegations
_____ Sexual abuse- _____
_____
_____
_____
_____
_____

## III.    MULTI-DISCIPLINARY TEAM'S ASSESSMENT AND RECOMMENDATIONS

**Assessment**

**Recommendations**

**Comments**

## IV.    DISPOSITION

☐ **Team Will Review Case**  enter date here          ☐ **Team Is Closing Case**  enter date here

**Date Assessment/Recommendations Given/Sent To DHR Worker**  enter date here

_____          _____
Team Coordinator's Signature                                                Date

DHR-FCS-1610 (September 2002)                          2                                    125  B

PLAINTIFF'S
EXHIBIT
26

## AFTERCARE SERVICE SUMMARY
### Please keep this document and take it to future appointments.

**Patient Name:** J   R
**DOB:** 7/28/89
**County:** Pike
**Parent/Guardian:** A  and T   R
**Date Admitted:** 4/17/07
**Date Discharged:** 4/24/07

**Medications at Discharge:** Lexapro 20 mg. qd, Adderall XR 20 qam

### Diagnosis:

**Axis I:** Depressive Disorder NOS, PTSD, ADHD by history
**Axis II:** None
**Axis III:** PVC on EEG, on review patient is not symptomatic
**Axis IV:** Sexual abuse, Conflict with parents, Peer problems
**Axis V:** GAF at Admission= 45  GAF at Discharge= 50

**Recommended Services:**
1. Removal of all firearms and/or lethal weapons from the home environment.
2. Continue to take medication as prescribed.
3. Keep follow up appointment with Dr. Wright on 4/25/07 at 8:30 am.
   Continue outpatient therapy with Andrew Wright.

—————————————
Nasima J. Amin, M.D.
Psychiatry Resident

Kathy A. Fleming, LCSW, PIP
Psychiatric Adolescent Social Worker

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 2-26-07
LOCATION: PIKE

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|-------|----------|-----------|---------------|------------|
| 14689 | J   R | 111 | 14/24 | | 484/5589 | :15 | :15 |

**NEXT APPOINTMENT:** DAY: (Mon.)  Tues.  Wed.  Thur.  Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ✓ Phys. Assess.  ✓ Med. Monit.  ____ Consult

____ Family Support / Education

---

**TOP COPY** - Client / **WHITE ORIGINAL WITH NOTE** - Chart

---

**MENTAL STATUS:** (Check Where Applicable):

Affect: ✓ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate

Mood: ____ Anxious  ____ Dysphoric  ____ Euthymic  ____ Expansive  ____ Irritable   mother + pat   good health

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations  ____ Delusions

____ Suicidal  ____ Homicidal  ____ Paranoid  ____ N/A

COMMENTS: 17 c. ⊙ .

**MED. COMPLIANCE:** ____ Yes  ____ No  COMMENTS: _____

**SLEEP:** ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ✓ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ____ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: 17 yo  120/78 B/P  wt  #  Crisis referral.
History - Sexual abuse by teacher 2yrs. ago - mild MR - ADHD Aggressive
Auditory hallucinations - see referral previously on Concerta

**PROBLEMS/GOALS ADDRESSED:** _____

Reed v. PCBE
638

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

PLAINTIFF'S EXHIBIT 27

ECMH  006

# East Central Mental Health - Mental Retardation, Inc.
## Plan of Care and Order of Services

| | | | Case Number: 14689 | Date: 3-26-07 |
|---|---|---|---|---|
| | | | | |

J            R

| Diagnosis: | DSM-IV Code | Description | Addition and/or Revision (if needed) | Date of Addition and Revision (if needed) |
|---|---|---|---|---|
| AXIS I: | 304. 31 | Attention deficit Hyperactivity Disorder, Predominantly Inattention Type, In Partial Remission | | |
| AXIS II: | 309 81 | Post traumatic Stress Disorder | | |
| AXIS III: | 296.34 | Major depressive Disorder, Severe, with Psychotic Features | | |
| → | V62 89 | Borderline Intellectual Functioning | | |
| AXIS IV: | | Sexual Abuse (2005) | | |

| AXIS V: | Current GAF/CGAS: 65 | GAF/CGAS at 6 mos: |
|---|---|---|
| | Highest Past Year: 65 | GAF/CGAS at closure: |

Comments: Client has history of behavior problems as well as experience some type of sexual abuse 2 years ago.

Identified Strengths Which May Facilitate Treatment:
① client is motivated to do better.
② client is now compliant with meds.

Identified Limitations or Barriers Which May Impede Treatment:
① Client is borderline intellectual function.
② Client sometimes makes poor decisions

Prioritization of Problem Areas / Clinical Needs
① eliminate aggression
② reduce behavior problems
③ explore and treat sexual abuse

PLAINTIFF'S
EXHIBIT
28

R      v. PCBE
676

Life Needs:            (Check Appropriate Categories)        Date:

(For Case Management Use)        Case Mgr. Signature:

| | | | | |
|---|---|---|---|---|
| ☐ 1. Emotional/Psychological | ☐ 2. Psychiatric | ☐ 3. Safety/Crisis | ☐ 4. Financial | ☐ 5. Housing |
| ☐ 6. Family/Social Support | ☐ 7. Legal | ☐ 8. Thinking | ☐ 9. Vocational | ☐ 10. Communication |
| ☐ 11. Self Direction Learning | ☐ 12. Leisure | ☐ 13. Behavior | ☐ 14. Ed/Learning | ☐ 15. Role Performance |
| ☐ 16. Mobility Transportation | ☐ 17. Language | ☐ 18. Self-Care | ☐ 19. Self-Sufficiency | ☐ 20. Health/Medical |
| ☐ 21. Substance Use Abuse | ☐ 22. Spiritual/Cultural | ☐ 23. Other | ☐ 24. Other | |

CMH-009