IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| J.R., a minor, by his mother and father EAR and TMR, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NUMBER: 2:06-cv-1120-MEF |
| PIKE COUNTY BOARD OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) | |

## BRIEF AND NARRATIVE STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS PIKE COUNTY BOARD OF EDUCATION, SAMUEL MARK BAZZELL, TERRY CASEY, BUDDY PYRON AND ROBERT MCDANIEL

Defendants, Pike County Board of Education (hereinafter "Board"), Samuel Mark Bazzell (hereinafter "Bazzell"), Terry Casey (hereinafter "Casey"), Buddy Pyron (hereinafter "Pyron"), and Robert McDaniel (hereinafter "McDaniel") (or hereinafter collectively referred to as "Individual Defendants"), submit this brief in support of their motion for summary judgment filed contemporaneously herewith.

1/1678385.1

<u>Introduction</u>

Plaintiffs sued the Pike County Board of Education, its Superintendent and four administrators as individuals and in their official capacities. Plaintiff also sues Charles Coon ("Coon"), the former band director at Pike County High School ("PCHS").

Plaintiffs allege that Coon sexually abused J.R. during the 2004-2005 school year.

On July l6, 2005, after Coon had retired from the Board, Coon was arrested in Butler County and charged with sexual abuse of Blake Faulkner. (Pl. Ex. 32.) On March 21, 2006, Coon pled guilty to Sexual Abuse First Degree in the District Court of Pike County for sexually abusing J.R. (Pl. Ex. 40.) Coon was sentenced to one year in prison and four years probation.

Plaintiffs sue the School Board and individual defendants for damages based on the Rehabilitation Act of 1973 (§ 504), 42 U.S.C. § 1983; 42 U.S.C. § 1988; the United States Constitution; and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a); and assert State claims for negligence, and wanton and reckless conduct[1]. *See* Plaintiffs' Complaint Ex. 1. Plaintiffs seek monetary damages from these defendants for Coon's sexual abuse of J.R. As a matter of

---

[1] Plaintiffs' complaint also indicates a claim against Coon (Count 1). That claim is not addressed herein.

law, however, the Court should enter judgment in favor of the Defendants on all of Plaintiffs' claims for the foregoing reasons.

First, with regard to Plaintiffs' Title IX claims against the individual defendants, the Eleventh Circuit has held that individual school officials may not be held liable under Title IX.

Second, with regard to Plaintiffs' § 1983 claim against the individual defendants for supervisory liability, summary judgment should be entered as a matter of law because Plaintiffs cannot establish the elements of such a claim.[2]

Third, summary judgment should be granted with regard to Plaintiffs' Title IX claims because there is not sufficient evidence for a jury to find that the School Board had actual knowledge that the teacher was a danger to the minor child, or that, after receiving information, the School Board acted with deliberate indifference.

Fourth, the summary judgment should be granted with regard to Plaintiffs' § 1983 claim against  the School Board because there is no evidence that the School Board had actual knowledge of the sexual abuse or that the School Board acted with deliberate indifference to the possibility of sexual abuse.

---

[2] Plaintiffs sue individual defendants in their individual capacities.  Plaintiffs' mother stated in her deposition she does not know why she is suing them in their individual capacities.  She is not alleging that they did anything outside the scope of their employment.  *See* E.A. Reed Depo. pp. 100-101, 106.

Fifth, with regard to Plaintiffs' § 1983 claim, summary judgment should be granted because there is no evidence that the alleged assault was pursuant to a custom or policy.

Sixth, with regard to Plaintiffs' § 504 of the Rehabilitation Act claim, the Court should grant summary judgment because there is not sufficient evidence for a jury to find that J.R. "was discriminated against based on his disability." Plaintiffs cannot show that the discrimination reflected bad faith or gross misjudgment. J.R. received educational services pursuant to an IEP as required by 20 U.S.C. § 1414(d). A plaintiff need not exhaust IDEA's administrative procedures when pursuing a non-IDEA claim if the claim is "wholly unrelated to the IEP process. *M.P. v. Ind. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006); *M.Y. v. Special School Dist. No. 1*, 519 F.Supp.2d 995 (D. Minn. 2007).

Seventh, with regard to Plaintiffs' claims sounding in tort for negligence and wanton and reckless conduct, the doctrine of governmental immunity constitutes a complete bar to such claim.

Eighth, the Court should grant Defendants' Motion for Summary Judgment on all claims because there is not sufficient evidence for a jury to find these Defendants liable under the law for the unilateral, unsuspected, unknown misconduct of Coon, some of which is alleged to have occurred at Plaintiffs' home. Defendants move the Court to grant summary judgment on all claims.

Narrative Statement of Undisputed Facts

Affidavit of Bazzell

1.      Defendant Mark Bazzell ("Bazzell") was the Superintendent of the Board during the 2004-2005 school year.  (Ex. 2 Bazzell Aff. 1.)

2.      Bazzell was well aware of his statutory duty to report "known or suspected" child abuse "to a duly constituted authority."  (Ex. 2 Bazzell Aff. 1.)

3.      If Bazzell had any suspicion that Coon had sexually abused J.R., he would have reported him to law enforcement officials.  (Ex. 2 Bazzell Aff. 1.)

4.      When Bazzell did get a complaint about Coon on March 30, 2005, he immediately suspended Coon pending an investigation.  (Ex. 2 Bazzell Aff. 1-2; *see* Pl. Ex. 14.)

5.      Bazzell and his staff thoroughly investigated the information provided by Butch Phelps of the Troy Police Department.  (Ex. 2 Bazzell Aff. 1-2.)

6.      When the investigation was completed, Bazzell met with Butch Phelps to share what was done and  found, and to ask if anything else should be done.  (Ex. 2 Bazzell Aff. 2.)

7.      In addition, Bazzell drove to Brundidge, Alabama to meet with Chief of Police Moses Davenport to share what had been done and the information developed.  Bazzell asked Chief Davenport if anything else should be done.  (Ex. 2 Bazzell Aff. 2.)

8.     By Alabama law it is the responsibility of law enforcement officers to investigate "known or suspected" child abuse.  (Ex. 2 Bazzell Aff. 1.)

9.     The information known was not sufficient to warrant "suspected" child abuse.  (Ex. 2 Bazzell Aff. 3.)

10.    On May 23, 2005, Coon submitted and the Board accepted his retirement.  (Ex. 2 Bazzell Aff. 7.)

11.    At  that time no one suspected Coon had sexually abused J.R.  (Ex. 2 Bazzell Aff. 2.)

12.    Pike County has a "no tolerance" policy regarding sexual harassment and sexual abuse.  (Ex. 2 Bazzell Aff. 2.)

13.    Bazzell and his staff have conducted in-service programs and meetings to address issues of child abuse; signs and recognition; and reporting procedures.  (Ex. 2 Bazzell Aff. 2-3.)

14.    Before Coon was hired, all references were checked out.  Coon had excellent recommendations and after a due diligence check there was no information of concern.  (Ex. 2 Bazzell Aff. 3.)

15.    Prior to employment, Coon submitted to ABI and FBI background checks as required by Alabama law and was issued a positive suitability report from the Alabama State Department of Education.  (Ex. 2 Bazzell Aff. 3.)

16.    In fact, one of Coon's previous employers, the Superintendent of the Monroe County Board of Education, sought to re-hire Coon during the summer of 2004.  (Ex. 2 Bazzell Aff. 4.)

17.    Bazzell suspended Coon immediately on April 3, 2005 after talking to Butch Phelps with the Troy Police Department.  (Ex. 2 Bazzell Aff. 4.) (Pl. Ex. 14, p. 1.)

18.    Prior to April 3, 2005, only three complaints had come to the attention of Bazzell:   (1) not enough discipline on the school bus; (2) Coon grabbed a student by the neck; and (3) Coon gave a student an F and the parent complained about that grade and the fact that Coon was smoking on the school campus.  (Ex. 2 Bazzell Aff. 4.)

19.    None of these complaints had sexual implications and none of these incidents raised any suspicion about Coon engaging in sexual misconduct with a student.  (Ex. 2 Bazzell Aff. 4.)

20.    Coon called Bazzell demanding that his cell phone be returned.  The cell phone had been confiscated when it was being used by a student.  Bazzell told Coon it was  a local matter and he would not intervene.  (Ex. 2 Bazzell Aff. 4.)

21.    On March 30, 2005, Officer Phelps called Bazzell with information from an informant.  (Ex. 2 Bazzell Aff. 5.)

22.    The informant said that Coon had smoked  marijuana with students and that one of the students was referred to as Coon's "butt buddy."  (Ex. 2 Bazzell Aff. 5.)

23.    With that information Bazzell acted immediately to put Coon on administrative leave and commenced an investigation. (Ex. 2 Bazzell Aff. 5.)

24.    Officer Phelps provided a list of students who might have information.  Each student was interrogated concerning the allegations and with reference to the "butt buddy."  No corroborating evidence concerning the use of marijuana or the identification of the "butt buddy" was discovered.

In addition to interrogating the students, Bazzell had Coon drug tested.  The drug test came back negative.  (Ex. 2 Bazzell Aff. 6; Ex. 19 Pl. Ex. 14, p. 2.)

25.    After the completion of the investigation, Bazzell discussed what had been done and the information found with Troy Police Officer Phelps.  (Ex. 2 Bazzell Aff. 6.)

26.    In addition, Bazzell drove to Brundidge, Alabama to discuss what had been done and what had been found with chief of the Brundidge Police Department Moses Davenport. Pike County High School is located in Brundidge, Alabama. (Ex. 2 Bazzell Aff. 7.)

27.    Bazzell complied with his statutory responsibility by discussing the information reported with two "duty constituted law enforcement officers." (Ex. 2 Bazzell Aff. 8.)

28.    The School Board was not negligent in hiring Coon.  He had obtained tenure in three previous systems.  One of his previous employers wanted to hire him back.  He had a good record before coming to Pike County.  (Ex. 2 Bazzell Aff. 8.)  His criminal background check was clear.  (Ex. 2 Bazzell Aff. 4.)

29.    None of the staff had any reason to suspect Coon was abusing J.R. J.R.'s name never came up as a student who might be subject to abuse. (Ex. 2 Bazzell Aff. 8.)

30.    Teachers were interrogated to see if J.R. had been released from their classes to go to the band room or if they had any knowledge of any suspicious activity during the 2004-2005 school year.  No teacher reported any suspected misconduct by Coon.  (Ex. 2 Bazzell Aff. 8.)

31.    Plaintiff's mother Mrs. Reed was President of the Band Boosters.  She thought enough of Coon that he was a visitor to their home and the Reeds gave Coon permission to drive their sons and their daughter out of town.  (Ex. 2  Bazzell Aff. 9.)

32.     Bazzell and the staff were not indifferent or insensitive.  When a serious report came to their attention, they acted immediately to suspend Coon and to engage in a diligent investigation.  (Ex. 2 Bazzell Aff. 9.)

<u>Deposition of Bazzell</u>

33.     Coon was hired before Bazzell became Superintendent.  (Ex. 3 Bazzell Depo. 7.)

34.     Pike County has over 600 special education students who are entitled to receive and are receiving free appropriate education.  (Ex. 3 Bazzell Depo. 22.)

35.     Pike County has provided sexual abuse training to its staff.  (Ex. 3 Bazzell Depo. 26.)

36.     There is no information that J.R. was pulled out of classes to go to the band room. The teachers deny that occurred.  (Ex. 3 Bazzell Depo. 64.)

37.     Bazzell verified with J.R.'s teachers that this did not occur.  (Ex. 3 Bazzell Depo. 65.)

38.     J.R. had an IEP committee and a multi-disciplinary team that was available to address any concerns.  (Ex. 3 Bazzell Depo. 70.)

39.     The sexual harassment policy of the School Board is defined in Policy JCK.  (*See* Pl. Ex. 5, Bates #0117-0124.)  The Board provided various training, in-services and meetings with faculty to address sexual abuse and the reporting requirements.  (Ex. 3 Bazzell Depo. 87-97.)

40.    After Bazzell received a call on March 30, 2005 from Troy City Police Officer Butch Phelps, Coon was suspended and an immediate investigation commenced.  (Ex. 3 Bazzell Depo. 132-160.)

41.    The students questioned did not know who was referred to as Coon's butt buddy.  (Ex. 3 Bazzell Depo.148.)

42.    Bazzell tried to track down all leads concerning any misconduct by Coon.  (Ex. 3 Bazzell Depo. 160.)

43.    Bazzell knew that Coon had given Blake Faulkner his cell phone. Faulkner's father lived in Montgomery.  Mr. Faulkner had given Coon permission to drive his son.  (Ex. 3 Bazzell Depo. 160-161.)

44.    After the investigation, Bazzell met with Officer Phelps and Chief Davenport.  (Ex. 3 Bazzell Depo. 178.)

45.    J.R.'s name never came up in the investigation.  There was no reference to him by anyone.  (Ex. 3 Bazzell Depo. 186.)

46.    Prior to Coon's retirement as an employee of the Board, J.R.'s name never came up as someone potentially being abused.  (Ex. 3 Bazzell Depo. 187.)

<u>Affidavit of Mona Watson</u>

47.    Mona Watson was the school counselor at Pike County High School. (Ex. 4 Watson Aff. 1.)

48.    Watson served as the "go to" person at the school if there was any concern about child abuse.  (Ex. 4 Watson Aff. 1.)

49.    Watson knew J.R., a student at PCHS, and Coon, the band director. (Ex. 4 Watson Aff. 1.)

50.    At no time during the 2004-2005 school year while Watson was school counselor did she see or hear anything that created any suspicion or concern that Coon was engaged in sexually inappropriate conduct with J.R. or any other student.  (Ex. 4 Watson Aff. 1.)

51.    No one said anything to Watson that created any concern or suspicion in her mind – not students whom she counseled; not teachers, administrators or parents.  (Ex. 4 Watson Aff. 1-2.)

52.    If Watson had any suspicion, she would have reported it.  (Ex. 4 Watson Aff. 2.)

53.    Watson has had extensive training on sexual abuse.  (Ex. 4 Watson Aff. 2.)

54.    With her training and background, Watson would have reported anything of a suspicious nature about Coon regarding inappropriate sexual conduct.  (Ex. 4 Watson Aff. 2.)

55.    With extensive professional training, and an abiding interest and concern about sexual abuse of children, Watson would have been sensitive to any

suspicious signs, conduct, behavior or reference to sexual abuse of J.R.  (Ex. 4 Watson Aff. 2.)

56.     Watson had no such information.  (Ex. 4 Watson Aff. 2.)

57.     No one raised suspicions that Coon might be "grooming" or otherwise engaging in sexually abuse conduct with students.  (Ex. 4 Watson Aff. 2.)

58.     Pike County has had numerous in-service training for teachers and training through Building-Based Student Support Team meetings at PCHS.  (Ex. 4 Watson Aff. 3.)

59.     Watson saw Coon on a fairly regular basis.  She often went to his band room to fix his computer.  (Ex. 4 Watson Aff. 3.)

60.     Watson never saw anything about Coon that made her suspicious that he might be sexually abusing students.  (Ex. 4 Watson Aff. 3.)

61.     Watson currently serves as Director of the Pike County Child Advocacy Center.  (Ex. 4 Watson Aff. 4.)

62.     Prior to leaving PCHS in January 2005, Watson states without qualification that no one to her knowledge suspected Coon of sexually abusing his students in general or J.R. in particular.  (Ex. 4 Watson Aff. 4.)

63.     Sexual abuse was taken seriously at PCHS and any suspicious conduct would have been reported immediately to law enforcement officials.  (Ex. 4 Watson Aff. 4.)

<u>Deposition of Mona Watson</u>

64.     For over 12 years, Watson's professional training focused on child abuse.  (Ex. 5 Watson Depo. 8.)

65.     Watson has had extensive training dealing with sexually abused students with mental retardation and has been trained in forensic interviewing and evaluation of sexually abused children.  (Ex. 5 Watson Depo. 10.)

66.     Watson does not agree that special education children are more likely to be sexually abused.  (Ex. 5 Watson Depo. 10.)

67.     Watson has tracked statistics for Bullock, Pike and Coffee counties and there is no indication that any certain group of children are more likely to be abused.  (Ex. 5 Watson Depo. 12.)

68.     There is no set rule or signs for when children are being or have been sexually abused.  (Ex. 5 Watson Depo. 13.)

69.     At training conducted at PCHS, recognition of sexual abuse was always discussed.  (Ex. 5 Watson Depo. 24.)

70.     These discussions with teachers included what to do – how to report – a suspicion of child abuse.  (Ex. 5 Watson Depo. 25.)

71.     There was not a set procedure on investigating child abuse because it is not the Board's responsibility.  It is done by law enforcement or DHR.  (Ex. 5 Watson Depo. 27.)

72.    As a counselor, it was her responsibility to report abuse to the proper authorities.  (Ex. 5 Watson Depo. 29.)

73.    Watson knew that Coon had let Blake Faulkner use his cell phone when it was confiscated.  Watson told Coon that he was ignorant to have done so. But the teachers all let kids use their phones at some time to make calls. (Ex. 5 Watson Depo. 51-52.)

### Deposition of Sherry Shackelford

74.    Sherry Shackelford is a police officer with the Brundidge Police Department. (Ex. 6 Shackelford Depo. 8)

75.    For the last six years Shackelford has served as the school resource officer at PCHS. (Ex. 6 Shackelford Depo. 8.)

76.    Watson serves as a liaison between parents, students, teachers and administrators. (Ex. 6 Shackelford Depo. 10.)

77.    Shackelford visited the band room in the afternoons. (Ex. 6 Shackelford Depo. 13.)

78.    Shackelford got to know Coon during the 2004–2005 school year. (Ex. 6 Shackelford Depo. 14.)

79.    Coon was high strung and had a "thing" about kids leaving school, their driving habits, and being loud and boisterous. (Ex. 6 Shackelford Depo. 14.)

80.     Coon reported complaints to the office and Shackelford would meet him in the afternoons to discuss the problems. (Ex. 6 Shackelford Depo. 15.)

81.     Coon would smoke near the road on Gilmore Sheet, near the band area. But Shackelford never saw Coon smoking anywhere else on campus. (Ex. 6 Shackelford Depo. 15-16.)

82.     Shackelford worked closely with Assistant Principal Robert McDaniel to improve discipline at the school. (Ex. 6 Shackelford Depo. 18-19.)

83.     McDaniel was brought to the school to straighten out the school. He was very strict, very straight forward. (Ex. 6 Shackelford Depo. 20.)

84.     McDaniel was no nonsense. (Ex. 6 Shackelford Depo. 32.)

85.     McDaniel was the disciplinarian. (Ex. 6 Shackelford Depo. 34.

86.     Coon often complained to McDaniel that something needed to be done about the students. (Ex. 6 Shackelford Depo. 20-21.)

87.     Coon had high expectations for the students. Some were never going to come up to par with him. It agitated him. (Ex. 6 Shackelford Depo. 21.)

88.     Coon was an old school type teacher, meaning that back in the old days a child would never speak to a teacher disrespectfully. This bothered Coon. (Ex. 6 Shackelford Depo. 21.)

89.     Coon would ask her to be at the band room in the afternoon to see what the students were doing. Shackelford tried to appease him by doing that. Having a police car out there was a help. (Ex. 6 Shackelford Depo. 22.)

90.     Shackelford never heard any sexual allegations about Coon. (Ex. 6 Shackelford Depo. 23.)

91.     Shackelford never saw Coon acting out of the way with any child in any form. (Ex. 6 Shackelford Depo. 23.)

92.     Shackelford never pictured Coon as being an abuser. (Ex. 6 Shackelford Depo. 25.)

93.     Shackelford never pictured Coon being a molester because of the way he reacted toward students, particularly male students. (Ex. 6 Shackelford Depo. 26.)

94.     Shackelford has had training to look for signs of abuse. (Ex. 6 Shackelford Depo. 27-28.)

95.     There were no signs of suspicion about Coon. (Ex. 6 Shackelford Depo. 29.)

96.     Shackelford never saw J.R. leaving class to go to the band room. (Ex. 6 Shackelford Depo. 36.)

## Affidavit of Robert McDaniel

97.    Robert McDaniel served as Assistant Principal at PCHS during the 2004 - 2005 school year. (Ex. 7 McDaniel Aff. 1.)

98.    During that year McDaniel did not see, hear or know of anything that indicated Charles Coon would be a sexual predator. (Ex. 7 McDaniel Aff. 1)

99.    McDaniel retired after a 22 year career in the Air Force before going into public education. He had extensive training in sexual harassment. (Ex. 7 McDaniel Aff. 1.)

100.   As an African-American with a military background, McDaniel wanted to be a role model for the students as well as a disciplinarian. (Ex. 7 McDaniel Aff. 1.)

101.   McDaniel did not make exceptions for J.R. when he dealt with him nor did he make exceptions for Coon when he had to deal with him.  (Ex. 7 McDaniel Aff. 1.)

102.   McDaniel knew the law made it mandatory to report known or suspected child abuse to law enforcement authorities. McDaniel would have reported Coon without the slightest hesitation if he had known or suspected Coon was abusing J.R. or any student at PCHS. (Ex. 7 McDaniel Aff. 2.)

103.   According to McDaniel, for anyone to assert that McDaniel would have ignored Pike County policy regarding sexual misconduct or violate the law to

protect Charles Coon – who is no friend of McDaniel's – is irresponsible. (Ex. 7 McDaniel Aff. 2.)

104.   Yet McDaniel is being sued in this case as an individual and as an assistant principal.  (Ex. 7 McDaniel Aff. 2.)

105.   During the 2004–2005 school year, McDaniel saw Coon frequently and had several situations during the year to deal with Coon extensively. (Ex. 7 McDaniel Aff. 2.)

106.   McDaniel's relationship with Coon was at arm's length, entirely professional relationship. (Ex. 7 McDaniel Aff. 2.)

107.   Nothing happened during the 2004–2005 school year that suggested misconduct by Coon of a sexual nature; no suggestion of grooming the students. (Ex. 7 McDaniel Aff. 3.)

108.   McDaniel investigated an incident with J.R. towards the end of the school year where J.R. broke a window in the band room. During the investigation of this incident, neither J.R. nor his parents complained that Coon was sexually abusing J.R. (Ex. 7 McDaniel Aff. 3.)

109.   McDaniel never saw Coon riding with students and never had any information that Coon took students off campus.  (Ex. 7 McDaniel Aff. 5.)

110.  McDaniel had a number of opportunities to deal with Coon. McDaniel always insisted that the rules be followed and always reported Coon when he found violations of the rules.  (Ex. 7 McDaniel Aff. 5.)

111.  If McDaniel had any reason to suspect misconduct by Coon toward J.R., McDaniel would had reported it.  ((Ex. 7 McDaniel Aff. 5.)

112.  During the 2004–2005 school year, McDaniel attended faculty meetings at PCHS where they talked about inappropriate conduct between teachers and students.  (Ex. 7 McDaniel Aff. 5.)

<u>Deposition of Robert McDaniel</u>

113.  McDaniel received training in sexual abuse in the Air Force and in courses in Macon, Elmore and Pike County Board of Education. (Ex. 8 McDaniel Depo. 7-8.)

114.  In retrospect, McDaniel did not see anything that would have indicated that Coon was a predator. (Ex. 8 McDaniel Depo. 9.)

115.  McDaniel investigated Coon concerning an incident where Coon grabbed a student by the neck. McDaniel reprimanded Coon.  (Ex. 8 McDaniel Depo. 19-20.)

116.  McDaniel confiscated Coon's cell phone which he had let a student use. (Ex. 8 McDaniel Depo. 24-25.)

117.   Coon told him that he let the student use it to call his parents. Coon found out that there was an agreement between Coon and the student's parent to let him use the phone. (Ex. 8 McDaniel Depo. 25-26.)

118.   McDaniel had no information that Coon took students off campus during school and never saw Coon transport students. (Ex. 8 McDaniel Depo. 44.)

119.   McDaniel never saw anything with Coon to make him suspicious of Coon regarding sexual abuse. (Ex. 8 McDaniel Depo. 55.)

120.   No student reported anything to McDaniel to make him suspicious of Coon. (Ex. 8 McDaniel Depo. 55-56.)

121.   During the investigation of Coon in April of 2005, J.R.'s name never came up in any fashion. (Ex. 8 McDaniel Depo. 56.)

122.   McDaniel was a strict disciplinarian and if he had had any information that Coon was abusing anyone he would have reported it to the authorities. (Ex. 8 McDaniel Depo. 57.)

<u>Affidavit of Terry Casey</u>

123.   Terry Casey served as principal of PHCS for seven and a half years until he retired in December of 2004. (Ex. 9 Casey Aff. 1.)

124.   Prior to resigning his position in December of 2004, Casey never suspected Coon of inappropriate conduct with J.R. or any student. (Ex. 9 Casey Aff. 1.)

125.   No student, faculty member, parent or anyone said anything to Casey that created any suspicion that Coon was sexually mistreating students.  (Ex. 9 Casey Aff. 1.)

126.   At PCHS they had a "no tolerance" policy regarding sexual abuse and sexual harassment. (Ex. 9 Casey Aff. 1.)

127.   Casey knew the law and the District policy that required him to report any complaint of sexual harassment to DHR or law enforcement officials. (Ex. 9 Casey Aff. 1.)

128.   Casey would have reported Coon to DHR or law enforcement officials if he had had any reason to suspect Coon was sexually abusing J.R. or any student. (Ex. 9 Casey Aff. 1.)

129.   J.R.'s mother, Mrs. Reed, was President of the Band Boosters and worked very closely with Coon. (Ex. 9 Casey Aff. 2.)

130.   Neither Mrs. Reed nor Mr. Reed ever complained to Casey about Coon. (Ex. 9 Casey Aff. 2.)

131.   Casey understands that Coon was a welcomed visitor to the Reed's home and that the Reeds trusted Coon to drive their children in his car, to take trips and to be with them. (Ex. 9 Casey Aff. 2.)

132.   If the Reeds had said anything to Casey about Coon, he would have investigated it. They did not. (Ex. 9 Casey Aff. 2.)

133.   Casey knew Coon while he worked for three years as vocational director for the Butler County school system. Coon was band director. Coon was very well respected.  (Ex. 9 Casey Aff. 2.)

134.   When Coon applied for the position of band director at PCHS, Coon checked out all his references. Casey received no negatives and all of the references were very positive. (Ex. 9 Casey Aff. 2-3.)

135.   PCHS trained the staff regarding the no tolerance policy of the Board regarding sexual harassment. (Ex. 9 Casey Aff. 3.)

136.   Casey made sure that the students read the handbook and knew how to report abuse.  (Ex. 9 Casey Aff. 3.)

137.   During Casey's years as principal at PCBS, there were no occurrences of sexual abuse prior to this matter with Coon.  (Ex. 9 Casey Aff. 4.)

<u>Deposition of Terry Casey</u>

138.   Casey knew Coon in Butler County and never heard any allegation about Coon before the complaint by J.R. (Ex. 10 Casey Depo. 8.)

139.   Before recommending that Coon be hired, Casey checked out his references and received good recommendations. (Ex. 10 Casey Depo. 12-13.)

140.   The Superintendent discussed sexual abuse at Institute Day and Casey had discussions about signs of abuse with faculty. (Ex. 10 Casey Depo. 18-19.)

141.  Faculty was told if they suspected abuse to report it immediately and he would investigate. (Ex. 10 Casey Depo. 21.)

142.  Casey did not see Coon driving students in his vehicle and had no information that J.R. was being released from his classroom to go to the band room. (Ex. 10 Casey Depo. 39.)

143.  There was no evidence to believe that Coon abused J.R. while Casey was principal. (Ex. 10 Casey Depo. 54-60.)

144.  The Reeds spent a lot of time at PCHS and never made any complaint about Coon. (Ex. 10 Casey Depo. 60-61.)

<u>Affidavit of Walter "Buddy" Pyron</u>

145.  Walter Pyron served as interim principal at PCHS for six months from January 3, 2005 through June 2005. (Ex. 11 Pryon Aff. 1.)

146.  Pyron discussed sexual abuse with the faculty and told them to inform an administrator if they had any suspicion.  (Ex. 11 Pryon Aff. 1.)

147.  Pike County has a no tolerance policy regarding sexual harassment and sexual abuse. (Ex. 11 Pryon Aff. 1.)

148.  Pyron was aware of state law that made it mandatory to report child abuse to law enforcement officials for investigation. (Ex. 11 Pryon Aff. 1.)

149.  Pyron participated in an investigation of Coon in April 2005. Superintendent Bazzell received information that Coon had been smoking,

possibly marijuana, with students in his car. The report also referenced that Coon had a butt buddy. (Ex. 11 Pryon Aff. 2.)

150.   Prior to this report, Pyron had no information that Coon was transporting students in his car.  (Ex. 11 Pryon Aff. 2.)

151.   Pyron was given a list of students who might have information about the report. (Ex. 11 Pryon Aff. 2.)

152.   Coon was put on administrative leave by Dr. Bazzell as soon as the complaint came in.  (Ex. 11 Pryon Aff. 2.)

153.   Pyron talked with each of the students who might have information and endeavored to find out any other information about inappropriate conduct from the students.  (Ex. 11 Pryon Aff. 3.)

154.   Pyron obtained no information from the investigation that made him suspicious that sexual misconduct was going on.  (Ex. 11 Pryon Aff. 3.)

155.   After 29 years of experience, Pyron believes that any suggestion of sexual misconduct by Coon from the students would have registered during the investigation. (Ex. 11 Pryon Aff. 3.)

156.   If Pyron had picked up any suspicion, he would have reported it. (Ex. 11 Pryon Aff. 3.)

157.   During the five month period from January 2005 until May 2005 when Coon retired, no one brought anything to Pyron's attention – not one thing –

indicating or even raising suspicion that Coon was sexually molesting student J.R. (Ex. 11 Pryon Aff. 3.)

158.   At no time during the investigation in April of 2005 did the name of student J.R. come up. (Ex. 11 Pryon Aff. 3.)

159.   In the investigation of Coon, the name of J.R. never came up. No student, no parent, no information from anyone put Pyron on notice that Coon might be abusing students. (Ex. 11 Pryon Aff. 3.)

160.   Pyron attaches the policies of the Pike County Board concerning sexual abuse and sexual harassment.  (Ex. 11 Pryon Aff. 6.)

161.   Pyron has been in public education for over 29 years and has never been accused, prior to this lawsuit, of being indifferent or insensitive to sexual abuse. (Ex. 11 Pryon Aff. 6-7.)

<u>Deposition of Walter Pyron</u>

162.   Pyron retired after 33 years in education and does consulting work with school systems on school improvement. (Ex. 12 Pyron Depo. 5.)

163.   The Pike County School Board policy covers both sexual harassment and sexual abuse.  (Ex. 12 Pyron Depo. 9.)

164.   The policy sets forth the procedure to follow. (Ex. 12 Pyron Depo. 11.)

165.   Law enforcement officials would be summoned in cases of sexual harassment. (Ex. 12 Pyron Depo. 18.)

166.   Pyron told the faculty to inform the administration if they thought or recognized any sexual abuse or harassment. (Ex. 12 Pyron Depo. 19-20.)

167.   Pyron has never received any complaint or information about any problem with Coon from any other system where he worked. (Ex. 12 Pyron Depo. 26.)

168.   Pyron was thorough, conscientious, and careful to investigate the information provided by the police in April of 2005. (Ex. 12 Pyron Depo. 32-46.)

169.   J.R.'s name never came up during this investigation. (Ex. 12 Pyron Depo. 70-71.)

Deposition of Robert Bradbury

170.   Robert Bradbury is employed by the Pike County Sheriff Department. (Ex. 13 Bradbury Depo. 7.)

171.   Bradbury interviewed J.R. with the District Attorney. (Ex. 13 Bradbury Depo. 8.)

172.   J.R. told him Coon touched him in his private parts once or twice. (Ex. 13 Bradbury Depo. 8; Pl. Ex. 34.)

173.   J.R. had previously been interviewed by Mona Watson, but the interview was badly done and not admissible in court. (Ex. 13 Bradbury Depo. 32, 90, 92.)

174.   J.R. said Coon never touched him inside his pants at school and they did not have oral sex. (Ex. 13 Bradbury Depo. 42-43.)

175.   Coon was arrested for sex abuse third degree. (Ex. 13 Bradbury Depo. 50.)

176.   Coon pled guilty to Enticing a Child for Immoral Purposes and sentenced to one year in incarceration and eight years on probation. (Ex. 13 Bradbury Depo. 54-55; Pl. Ex. 37.)

177.   No one at PCHS had suspicion that Coon was abusing J.R. (Ex. 13 Bradbury Depo. 81.)

178.   No one in the Pike County Board of Education central office or Superintendant Bazzell had any suspicion that Coon was abusing J.R. (Ex. 13 Bradbury Depo. 81-82.)

179.   Mona Watson, a caring advocate for students, would have looked out for the welfare of J.R. while employed at Pike County High School. (Ex. 13 Bradbury Depo. 82.)

180.   Based on the investigation, there was no information that Coon had ever abused students at prior school systems where he worked. (Ex. 13 Bradbury Depo. 86.)

<u>Deposition of Karen Berry</u>

181.   Karen Berry had served as special education coordinator for the Pike County Board of Education since 1988. (Ex. 14 Berry Depo. 8.)

182.   Berry is in charge of Building-Based Student Support training for faculty and discussed sexual awareness in training programs. (Ex. 14 Berry Depo. 10.)

183.   J.R. was a special education student served through an IEP.  (Ex. 14 Berry Depo. 12-19.)

184.   Mentally retarded students were not necessarily more susceptible to be victimized. (Ex. 14 Berry Depo. 22.)

185.   Berry tells teachers to be aware of any change in behavior and report it to the school administrators. (Ex. 14 Berry Depo. 24.)

186.   Through BBSST training of special education teachers, they focus on indicators to be aware of – to notice – in students. The training includes sexual abuse. (Ex. 14 Berry Depo. 30-31.)

187.   Handouts given to teachers include checklists of observable indicators for children at risk. (Ex. 14 Berry Depo. 33; Pl. Ex. 6 Bates 190.)

188.   The Board policy on sexual harassment was based on what the Office of Civil Rights gave to Berry. (Ex. 14 Berry Depo. 44.)

189.   Every teacher got a copy of the policy. (Ex. 14 Berry Depo. 47.)

190.   If sexual abuse is suspected, the teacher must notify the counselor; the counselor notifies the principal; the principal and the counselor are required to notify the appropriate authorities. (Ex. 14 Berry Depo. 48.)

191.   Berry investigated one aspect of J.R.'s case: whether J.R. was repeatedly allowed out of class to go to the band room. (Ex. 14 Berry Depo. 51.)

192.   J.R.'s teachers said this did not happen.  (Ex. 14 Berry Depo. 51.)

<u>Deposition of Lucia Grantham</u>

193.   Lucia Grantham is employed by Troy University in the Department of Human Resources. (Ex. 18 Grantham Depo. 6.)

194.   Grantham serves as coordinator of the Children's Justice Task Force. (Ex. 18 Grantham Depo. 11.)

195.   Grantham has provided in-service training for Pike County regarding sexual abuse. (Ex. 18 Grantham Depo. 11.)

196.   Grantham has provided in service training on indicators of sexual abuse. (Ex. 18 Grantham Depo. 12.)

197.   The teachers in attendance took the subject matter very seriously. (Ex. 18 Grantham Depo. 27.)

198.    Mona Watson is competent in what she does. (Ex. 18 Grantham Depo. 23-24.)

199.    Grantham has never had an occasion to investigate a sexual abuse matter at Pike County High School during the 15 years she worked for DHR. (Ex. 18 Grantham Depo. 24-25.)

200.    No sexual abuse case was reported involving Pike County schools. (Ex. 18 Grantham Depo. 25.)

201.    If a teacher suspects child abuse, the matter should be reported to DHR. (Ex. 18 Grantham Depo. 30.)

202.    The school system should rely on DHR to do the investigation and depend on what DHR decides. (Ex. 18 Grantham Depo. 31.)

<u>Deposition of Elizabeth Reed</u>

203.    Elizabeth Reed is the plaintiff and mother of J.R. (Ex. 15 E. Reed Depo. 8.)

204.    Reed served as President of the Band Boosters at PCHS and was very active in the band program at PCHS. (Ex. 15 E. Reed Depo. 13.)

205.    Reed worked very closely with Coon: she went on a number of trips; rode the bus with him; watched band practices; and went on band trips. (Ex. 15 E. Reed Depo. 14.)

206.   Reed chaperoned bus trips in 2004–2005 with Coon. (Ex. 15 E. Reed Depo. 15-16.)

207.   Coon had her permission to bring J.R. home after practice; it was a convenience for her. (Ex. 15 E. Reed Depo. 21.)

208.   Reed trusted Coon. (Ex. 15 E. Reed Depo. 21.)

209.   Daughter, Jessica, and J.R. rode with Coon on a regular basis. Reed gave permission for Coon to drive them. (Ex. 15 E. Reed Depo. 22.)

210.   Coon would come to their house and visit. During the 2004–2005 school year Coon would come to their home on weekends. He was welcome. (Ex. 15 E. Reed Depo. 24.)

211.   Reed had no information or belief that J.R. was being abused in any way by Coon during the 2004–2005 school year. (Ex. 15 E. Reed Depo. 28.)

212.   Reed learned about the abuse in June of 2005 from DHR. (Ex. 15 E. Reed Depo. 29.)

213.   Until that time, she had been entirely trusting of Coon. (Ex. 15 E. Reed Depo. 29.)

214.   Reed trusted Coon in every way. (Ex. 15 E. Reed Depo. 30-31.)

215.   Reed never complained to school officials with any concern about Coon. (Ex. 15 E. Reed Depo. 31.)

216.    Daughter Jessica never complained about Coon. (Ex. 15 E. Reed Depo. 32.)

217.    Sheriff Bradley interviewed J.R. and told her Coon fondled J.R. outside his pants. (Ex. 15 E. Reed Depo. 35.)

218.    Reed knows of nothing else that happened. (Ex. 15 E. Reed Depo. 36.)

219.    J.R. told her Coon fondled him outside his pants once in the band room. (Ex. 15 E. Reed Depo. 40-41.)

220.    Joseph, her son, saw Coon fondle J.R. outside his pants at their home. Joseph did not report it. (Ex. 15 E. Reed Depo. 50.)

221.    Reed did not know that Coon was abusing her son at their home. (Ex. 15 E. Reed Depo. 50.)

222.    Reed could not do anything about the abuse because she did not know it was happening. (Ex. 15 E. Reed Depo. 51.)

223.    Reed never talked to Pike County Board members about Coon. (Ex. 15 E. Reed Depo. 55.)

224.    Reed has not incurred any out-of-pocket expenses for J.R.'s medical bills. J.R. is on Medicaid. (Ex. 15 E. Reed Depo. 57.)

225.   Sherry Shackelford is the school resource officer at Pike County High School. Shackelford had no information about the abuse before June of 2005. (Ex. 15 E. Reed Depo. 65.)

226.   Jessica, Reed's daughter, did work for Coon at his house in Greenville. Jessica made no complaint about Coon. (Ex. 15 E. Reed Depo. 66.)

227.   No other band parent has come forward with information about abuse concerning Coon. (Ex. 15 E. Reed Depo. 73.)

228.   Reed had no suspicion in August of 2004 or any time during the 2004-2005 school year about J.R. being abused. (Ex. 15 E. Reed Depo. 73.)

229.   Reed talked with Superintendent Bazzell from time-to-time, but never about Coon. (Ex. 15 E. Reed Depo. 77.)

230.   Reed talked with Principal Casey, Principal Pyron, Assistant Principal McDaniel from time-to-time, but never about Coon. (Ex. 15 E. Reed Depo. 78.)

231.   When Mrs. Reed brought things for J.R. from the house, Coon would drive J.R. in his car from the band room to the office to pick the articles up. (Ex. 15 E. Reed Depo. 79-80.)

232.   Reed attended special education IEP meetings for J.R. during the 2004-2005 school year and never shared any concerns about Coon or complained about Coon. (Ex. 15 E. Reed Depo. 88.)

233.    Reed felt the school was providing an appropriate education for J.R. (Ex. 15 E. Reed Depo. 89.)

234.    Reed expressed no concern at the IEP meeting on May 13 or May 25, 2005 – at the end of the school year – about Coon. (Ex. 15 E. Reed Depo. 90-93.)

235.    Reed has no knowledge that any board member knew Coon. (Ex. 15 E. Reed Depo. 96.)

236.    Reed does not contend that the Board had actual knowledge of what Coon did to J.R. (Ex. 15 E. Reed Depo. 99.)

237.    Reed does not know if Mark Bazzell had any prior information about Coon prior to June 2005. (Ex. 15 E. Reed Depo. 100.)

238.    Reed does not contend that Bazzell had any information that Coon was abusing J.R. prior to June of 2005. (Ex. 15 E. Reed Depo. 100.)

239.    Reed does not know why she is suing Bazzell in his individual capacity. (Ex. 15 E. Reed Depo. 100-101.)

240.    Reed never discussed any concerns about Coon with Terry Casey while he was principal. (Ex. 15 E. Reed Depo. 103.)

241.    Reed had no concerns about J.R. riding with Coon but thinks Casey should have investigated J.R. riding with Coon. (Ex. 15 E. Reed Depo. 103.)

242.    Reed does not know if Casey knew Coon was transporting J.R. in his vehicle. (Ex. 15 E. Reed Depo. 104.)

243.  Reed has no information that Coon had problems at other schools and she has never heard of a complaint against Coon for sexual abuse at another school. (Ex. 15 E. Reed Depo. 106.)

244.  Reed does not know why she is suing Casey in his individual capacity. (Ex. 15 E. Reed Depo. 106.)

245.  Buddy Pyron was interim principal at PCHS for five months. (Ex. 15 E. Reed Depo. 108.)

246.  There were many reasons why students had to call Coon about band practices. (Ex. 15 E. Reed Depo. 109-110.)

247.  Reed never asked Pyron to investigate the matter. (Ex. 15 E. Reed Depo. 110-111.)

248.  Reed has no information about Robert McDaniel violating J.R.'s rights or that he had any reason to be suspicious of Coon. (Ex. 15 E. Reed Depo. 112.)

249.  Reed admits that Coon abused J.R. at their house while she had responsibility for supervision. (Ex. 15 E. Reed Depo. 117.)

250.  Reed trusted Coon in her house. (Ex. 15 E. Reed Depo. 118.)

251.  Reed does not know of any information that was given to the Board that they failed to investigate. (Ex. 15 E. Reed Depo. 121, 127.)

252.  Reed did not know that Coon had been suspended pending an investigation in April of 2005. (Ex. 15 E. Reed Depo. 124.)

253.  Reed trusted Coon to be alone with her children. (Ex. 15 E. Reed Depo. 130.)

254.  Reed never had any suspicion about Coon prior to June of 2005. (Ex. 15 E. Reed Depo. 131.)

<u>Deposition of Thomas Michael Reed</u>

255.  Thomas Michael Reed is the father of Justin. (Complaint)

256.  Reed was involved with the band program and worked with the Band Boosters. (Ex. 16 T. Reed Depo. 8.)

257.  During 2004–2005, Reed went to band practices. (Ex. 16 T. Reed Depo. 12.)

258.  Reed never observed or heard anything during his involvement with the band – 2002 through 2005 – that put him on notice that Coon might be sexually abusing J.R. (Ex. 16 T. Reed Depo. 11-12.)

259.  Reed had no suspicion about Coon during the 2004–2005 school year and made no complaint to any member to the Pike County Board about Coon or to Bazzell, Casey, Pyron, or McDaniel. (Ex. 16 T. Reed Depo. 12-13; 17.)

260.  Reed first learned about the abuse in June of 2005 when a DHR representative called. (Ex. 16 T. Reed Depo. 13.)

261.   Reed's daughter was allowed to go to Greenville with Coon in the summer of 2004 to do yard work. It was fine with him for her to go. (Ex. 16 T. Reed Depo. 18-19.)

262.   Reed never expressed concern in 2004–2005 that Coon worried him or his wife. (Ex. 16 T. Reed Depo. 19.)

263.   Coon visited their house four or five times. (Ex. 16 T. Reed Depo. 21-22.)

Deposition of Polly King

264.   Polly King is the mother of Matthew King, a student at PCHS, during the 2004–2005 school year. (Ex. 17 King Depo. 6.)

265.   King is a pediatric nurse and cares for neglected, abused children. (Ex. 17 King Depo. 8.)

266.   King is knowledgeable about signs of sexual abuse, signs that would indicate grooming for sexual abuse. (Ex. 17 King Depo. 10-11.)

267.   King complained that Coon offered her son a marijuana or a cigarette when he brought him home from the football game. (Ex. 17 King Depo. 11.)

268.   Assistant Principal, Robert McDaniel, met with her, and investigated the complaint. (Ex. 17 King Depo. 35.)

269.   McDaniel did everything he could to investigate the matter. McDaniel met with her after the investigation and explained the results. (Ex. 17 King Depo. 35-36.)

270.   King never had any concerns about Coon concerning sexual abuse. (Ex. 17 King Depo. 11, 24.)

271.   King complained to Butch Phelps with the Troy Police Department. (Ex. 17 King Depo. 32.)

272.   King knew nothing about J.R. being involved in anything. (Ex. 17 King Depo. 22.)

## ARGUMENT

### I.    CLAIMS AS TO INDIVIDUAL DEFENDANTS

This Court should render judgment as a matter of law in favor of the individual defendants on Plaintiffs' Title IX claim because the Eleventh Circuit has held that individual defendants cannot be liable under Title IX.  This Court should render judgment as a matter of law in favor of the individual defendants on Plaintiffs' § 1983 claim because Plaintiffs cannot establish all the elements of a cause of action for supervisory liability.

### A.    Title IX Claim

The Eleventh Circuit has repeatedly held that individuals cannot be liable under Title IX for failing adequately to respond to a claim of sexual harassment.

*See Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999) ("[i]ndividual school officials, such as [the school principal] may not be held liable under Title IX"); *see also*, *Floyd v. Waiters*, 133 F.3d 786, 789 (11th Cir. 1999) ("a Title IX claim can only be brought against a recipient - - that is, a local school district - - and not an individual").  Thus, as a mater of law, the individual defendants cannot be liable to the Plaintiffs under Title IX and summary judgment should be entered in their favor.

      B.    <u>Section 1983 Claim</u>

      Supervisory officials, such as the Board members, superintendent and former principals and assistant principal, cannot be held liable under § 1983 for the unconstitutional acts of their subordinates "on the basis of respondeat superior or vicarious liability."  *Hartley*, 193 F.3d at 1269.  Rather, supervisory liability under § 1983 occurs "either when the supervisor personally participates in the alleged unconstitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation."  *Id.*  To establish such a casual connection, the Plaintiff must show that there existed a "history of widespread abuse [that] put[] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fail[ed] to do so."  *Id.*  The widespread abuse sufficient to notify the supervising official "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Id.*

Plaintiff may also establish "causal connection" "where the supervisor's improper 'custom or policy . . . results in deliberate indifference to constitutional rights.'" *Id*.

Plaintiffs have failed to create a genuine issue as to the existence of supervisory liability with regard to any of the individual defendants.  First, Plaintiffs do not allege (nor could they) that any of the individual defendants "personally" participated in Turner's sexual harassment of the minor child.  There is just simply no evidence to support such an allegation. *See Hartley*, 193 F.3d at 1269.

Second, Plaintiffs cannot establish any casual connection between the individual defendants' conduct and the sexual harassment.

During the 2004-2005 school year, neither Bazzell as Superintendent, nor the school administrators Casey, Pyron and McDaniel, had any suspicion, much less knowledge, that Coon was abusing J.R.  Moreover, J.R.'s parents had no suspicion notwithstanding their active participation in the band program, and the visitor's status they extended to Coon in their home.  There is no evidence that anyone – teacher, parent or student – made any complaint to these administrators or to the Board prior to April 2005 that had any sexual connotation.  There is no evidence that any member of the Board had any knowledge or information that Coon might be abusing students.

Mona Watson, a child advocate and counsel at PCHS, stated she interacted frequently with Coon. She said she was trained to recognize sexual abuse and yet saw nothing to raise suspicion about Coon.

SRO Sherry Shackelford knew Coon well and often spent time in his band room.  Officer Shackelford said she never had any suspicion about Con sexually abusing students.

Thus, Plaintiffs cannot establish any "history of widespread abuse" that would have put any of the individual defendants "on notice of the need to correct the alleged deprivations." *See Id.*  To the contrary, Coon was a band director who came to the School Board highly recommended.  There is no evidence on the record that Coon had problems of this nature at any previous time or employment.

Superintendent Bazzell states in his affidavit that Coon was subjected to a criminal background check as a new employee.  The background check revealed no history of problems.

Similarly, Plaintiffs cannot establish that any of the individual defendants adopted any "custom or policy" that resulted in "deliberate indifference" to the minor child's constitutional rights.  Immediately upon receiving information on March 30, 2005 that had some sexual connotation, Superintendent Bazzell put Coon on administrative leave.  Immediately thereafter, every student whose name

was provided was questioned. No student suggested in any form or fashion that Coon was engaged in sexual misconduct with any student.

No information surfaced from any source about J.R. J.R.'s name was never mentioned by anyone. After Superintendent Bazzell and his staff thoroughly and diligently investigated the information disclosed by Officer Phelps with the Troy Police Department, Superintendent Bazzell met with Officer Phelps and then with Brundidge Police Chief Moses Davenport to see if they had any other suggestions.

Defendants thus exercised due diligence.

Defendants exercised due diligence (rather than deliberate indifference) when conducting these investigations. *See Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) ("[i]ndeed, a supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted); *see also*, *Doe v. Dallas Ind. Sch. Dist.*, 153 F.2d 211, 219 (5th Cir. 1998) (concluding that school official who investigated complaint of sexual abuse was not deliberately indifferent even though the official erroneously concluded that complaint was baseless). In *Baynard v. Malone*, for example, the court affirmed summary judgment in favor of defendant personnel director and superintendent on plaintiff's section 1983 claim after concluding that "no rational jury could find that [the personnel director] was deliberately indifferent" where she instituted a thorough investigation. *Baynard*, 268 F.3d at 236. With regard to the superintendent, the

court held that that "it was not [the superintendent]'s responsibility to conduct the investigation himself," particularly since the personnel director's investigation was adequate. *Id*. at 237.

Recent Pertinent Case

The Court will find attached the Report and Recommendation of the U.S. Magistrate T. Michael Putnam dated July 21, 2006, in a case styled *Fortner v. Breaseale*, 2:04-cv-0318-TMP, and the Memorandum Opinion issued in that case by U.S. District Judge Karon Owen Bowdre. The facts in that case are similar: a male band director had a sexual relationship with a female band student. The band director went to jail for his crime. The Court granted summary judgment for the Blount County (Alabama) Board of Education, the Superintendent and Principal.

## II.   OFFICIAL CAPACITY CLAIMS

Plaintiffs' claims against Bazzell, Casey, Pryon and McDaniel in their official capacities are "functionally equivalent" to claims against the entity they represent. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). As a redundant exercise, the Court should grant summary judgment. *See Gadley v. Montgomery County Bd. of Education*, 996 F. Supp. 1390, 1403 (M.D. Ala. 1998).

There is, of course, no respondeat superior liability under § 1983. *Id.* at 1403-1404. Nor is there any evidence that the Defendant Board had an official policy or custom to promote, tolerate or approve of sexual abuse of students.

Accordingly, the Court should grant summary judgment for Defendants. *Id.* at 1404-1406.

### III.    TITLE IX CLAIM AGAINST THE SCHOOL BOARD

The United States Supreme Court has held that two factors must be present for a plaintiff to state a cause of action against a school district under Title IX for a teacher's sexual harassment of a student. *See Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 279 (1998). First, an "appropriate person", such as a school district official, who at a minimum, has authority to institute corrective measures on the district's behalf must have *actual knowledge* of the harassment. *Id.* at 291 (emphasis added). Second, upon actual notice of the harassment, the school district must have acted with *deliberate indifference* to the conduct. *Id.* (emphasis added). Plaintiff, thus, cannot maintain a cause of action under Title IX against a school district for a teacher's sexual harassment based on principles of respondeat superior or constructive notice. *See id.* at 287; *see Floyd*, 133 F.3d at 790 ("we basically reject respondeat superior liability (and liability based on other variants of agency law) for local school districts under Title IX").

Following the Court's decision in *Gebser*, the Eleventh Circuit has held that a Title IX claimant must establish the following two things to survive summary judgment in a cause of action against a school district for the discriminatory acts of its employees: "First, some supervisor with authority to take corrective action was

placed on notice of the bad conduct.    Second, the supervisor possessing this authority was a school official high enough up in the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." *Davis V. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000), citing *Floyd v. Waiters*, 171 F. 3d 1264 (11th Cir. 1999).   Because there is no evidence to raise a genuine issue as to the existence of either of those two factors, summary judgment should be entered in favor of the School Board.   *See Floyd*, 133 F.3d at 790 ("[w]e also accept and adopt the conclusion . . . that the grant recipient – the local school district – must have actual notice of the pertinent sexual harassment and then fail to act if the school district is to incur liability under Title IX").

A.    No School Board Official with the Authority To Institute Corrective Measures on the School Board's Behalf Had Actual Knowledge of The Harassment.

Plaintiffs do not claim that Bazzell, Casey, Pyron and McDaniel had actual notice that Coon was sexually harassing the minor child.   Mrs. Reed suggests a cell phone incident involving Blake Faulkner might have produced information about Coon abusing other students.    That allegation, even if true, is irrelevant as a matter of law.   In *Floyd v. Waiters*, the Eleventh Circuit stated that, "we cannot agree that notice of sexual harassment can be imputed to the school district." *Floyd*, 133 F.3d at 790.   Rather the "kind of notice that triggers the necessity for the school

district's leaders to act or else the district will be held liable for violating Title IX"
is when "a harassing employee's supervisor, with the authority to take action to
end such abuse, has knowledge of the harassment." *Id.* Because neither Pyron nor
McDaniel were school officials with authority to take corrective action against
Coon, such that their acts could constitute an official decision by the School Board,
any knowledge they may have had regarding the relationship between Coon and
the minor child (though the defendants adamantly contend they had none), cannot
be imputed to the School Board. *See Davis*, 233 F.3d at 1371; *see also, Baynard*,
206 F.3d at 239.

In *Baynard v. Malone*, the Fourth Circuit held that a principal's knowledge
of sexual harassment, even if true, was not sufficient to overcome a motion for
summary judgment in favor of the school board on plaintiff's Title IX claim
because "no rational jury could find that [the principal] was invested with the
power to take corrective action on behalf of [the board]." *Baynard*, 206 F.3d at
238-39. The court continued to explain that, "whether a supervisory employee
may be viewed as the proxy of the school district depends upon whether the district
has delegated to that employee the traditional powers of an employer, e.g., the
authority to hire and terminate employees." *Id.* at 239, adopting, the Fifth Circuit's
opinion in *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648 (5th Cir. 1997).
The court recognized that a principal "possesses authority over the school to which

he or she is assigned," and is responsible for "provid[ing] instructional leadership"; "the administration of the school, and must supervise its operations and management." *Id*. The key element missing from those responsibilities, however, are "the powers that would make the proxy of the school district; the power to hire, fire, transfer or suspend teachers." *Id*. Thus, the court held that because the principal had "no independent authority to suspend, reassign, or terminate [the teacher] no rational jury could have concluded that her knowledge of ongoing discrimination at [the school] should be imputed to the [board]." *Id*.

Like the principal in *Baynard*, Casey and Pyron, as principals at PCHS, or McDaniel as assistant principal, were responsible for the supervision and administration of PCHS. Their responsibilities included serving as the instructional leaders for the School. However, like the principal in *Baynard*, under Alabama law, they had no authority to fire, suspend or otherwise terminate Coon's employment with the School Board. That sole responsibility and power rested on the shoulders of the School Board, who could only act upon the recommendation of the Superintendent. *See* ALA. CODE § 16-9-23; 16-24-9. Thus, because there is no dispute (or evidence) that the School Board did not have actual knowledge of the sexual relationship between the minor child and Coon, summary judgment should be entered in favor of the School Board. *See Floyd*, 133 F.3d at 793 (affirming summary judgment in favor of defendants on plaintiff's Title IX claim

where "record reveals no evidence that [] - - the BOE superintendent of schools - - or the school board members were ever aware of [the teacher]'s conduct before the incidents at issue here, nor does it show a failure to take remedial action once necessary").

Even assuming, arguendo, that actual knowledge by the principals and assistant principal is sufficient to impute liability to the School Board, there is no evidence that they had actual knowledge of the sexual harassment.  It is undisputed that the minor child did not report Coon's conduct to any school official.  It is further undisputed that the minor child's parents were unaware of any sexual relationship until July 2005, after DHR calleld Mrs. Reed.  The parents, in fact, did not think that a sexual relationship was going between the minor child and Coon and invited Coon to be a visitor at their house with the minor child.  Thus, there is no evidence that the administrators had actual knowledge of Coon's conduct until after Coon confessed to the relationship in July 2005.  *See Davis*, 233 F.3d at 1374 ("[w]e reiterate that there is simply no evidence that [the board] had 'actual notice' of [the teacher]'s misconduct until one of the plaintiffs was confronted by the school detective in September 1994.  It is undisputed that [the teacher]'s sexual abuse of the Plaintiffs occurred in secret, where no one could observe what he was doing."); *see also, Floyd*, 133 F.3d at 792 ("[i]t is true that sexual misconduct is usually covert; but we have no good reason to think that Congress intended to

place substantial monetary liability on local school districts for the secret misconduct of employees").

Clearly, there is no evidence that the Defendant Superintendent and administrators had "actual knowledge" of a sexual relationship between Coon and the minor child. *See Gebser*, 524 U.S. at 291 (holding that complaints from parents of other students charging only that [the teacher] had made inappropriate comments during class was not sufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student); *see also, Davis* 233 F.3d at 1373 (finding no actual knowledge where there was no evidence that anyone witnessed any of the improper acts and plaintiffs never told their parents, legal guardians or anyone at school about the improper acts). Thus, without evidence to raise a genuine issue of fact that an "appropriate person" at the School Board had *actual knowledge* of the sexual relationship between Coon and the minor child, plaintiff cannot recover against the School Board under Title IX, as a matter of law. *See Floyd*, 133 F.3d at 793.

B.    The School Board Did Not Act With Deliberate Indifference

Assuming arguendo, for purposes of this summary judgment only, Plaintiffs can somehow satisfy the first element of a cause of action under Title IX, Plaintiffs cannot establish the second element of their claim under Title IX. There is no evidence sufficient to raise a genuine issue as to whether the School Board acted

with deliberate indifference.  The "deliberate indifference" standard as set out by the United States Supreme Court in these cases is a "high standard."  *See Gebser*, 524 U.S. at 291 ("[u]nder a lower standard, there would be a risk that the [school district] would be liable in damages, not for its own official decision but instead for its employees' independent action").  It requires a showing that the School Board "refuse[d] to take action" or, in other words, refused to "remedy the violation." *Gebser*, 524 U.S. at 291.  Plaintiffs cannot make such a showing in this case.

There is absolutely no argument the School Board refused to take action against Coon after it had actual notice of the abuse.  Coon was no longer an employee.  The Superintendent and school administrators investigated every concern they received regarding Coon with due diligence.  *See Davis*, 233 F.3d at 1373 (finding no evidence of deliberate indifference as a matter of law where principal met with the teacher to discuss the situation; told the teacher he disapproved of the conduct and directed him to stop; directed the teacher to avoid all contact with the plaintiff other than class and forbade the teacher from being alone with the plaintiff or any female student).[3]  There is, thus, no evidence that the School Board acted with deliberate indifference.  *See Davis*, 233 F.3d at 1373 (finding no evidence of deliberate indifference where principal investigated

---

[3]    In *Davis*, the Eleventh Circuit further rejected plaintiffs' argument that the principal acted with deliberate indifference by failing to interview any teachers or students about the teacher's conduct or putting any of his interviews in writing.  *See Davis*, 233 F.3d at 1374.

complaints; met with teacher to discuss the gravity of the situation and instructed teacher to avoid all contact with the minor child).

## IV.   SECTION 1983 CLAIM AGAINST THE SCHOOL BOARD

To overcome a motion for summary judgment on Plaintiff's § 1983 claim against the School Board, Superintendent and the three administrators, Plaintiffs must present evidence to create a genuine issue that the School Board either had actual knowledge that Coon was sexually harassing the minor child or that the School Board acted with reckless disregard to the possibility of a sexual relationship between Coon and the minor child. *See Davis*, 233 F.3d at 1370 (11th Cir. 2000). Like a Title IX claim against a school district, a school district "may not be held liable under section 1983 on a theory of respondeat superior." *Floyd*, 133 F.3d at 793.

As discussed in detail above, there is no evidence that either the School Board or Bazzell or the administrators had actual knowledge of the harassment. For example, in *Davis v. DeKalb County Sch. Dist.*, the plaintiffs, seeking recovery under section 1983, alleged that the principal and school officials "were aware of facts sufficient to alert them to [the teacher]'s misconduct and that the school's response was clearly unreasonable." *Davis*, 233 F.3d at 1371. The court, however, disagreed, holding that, in the absence of any complaints by the victims or any observances of impropriety in regards to the victims by others, another student's

complaint of inappropriate touching by the teacher was not sufficient to alert school officials that the teacher was abusing the plaintiffs. *Id*. at 1372-73. Thus, for the same reasons set forth above, there is no evidence that the School Board, Bazzell or the administrators had actual knowledge of the harassment.

Furthermore, there is no evidence that the School Board, Bazzell or the administrators acted with deliberate indifference to the possibility of sexual harassment by Coon. Bazzell thoroughly investigated the April 2005 concerns that were expressed to him regarding Coon. Bazzell's conduct thus displays, as a matter of law, anything but deliberate indifference. *See Davis*, 233 F.3d at 1373-74 (finding no deliberate indifference where principal took such steps as interviewing witnesses; meeting with the teacher and forbidding him to engage in inappropriate conduct and following up with other students and teachers). Thus, for the same reasons that summary judgment should be entered in favor of the School Board on Plaintiffs' Title IV claim, summary judgment should be entered in favor of the School Board on Plaintiffs' § 1983 claim. *See Davis*, 233 F.3d at 1371 (holding defendants entitled to summary judgment because "the record contain[ed] no evidence that the Defendants knew that [the teacher] was sexually harassing the plaintiffs, or that defendants were deliberately indifferent to information that should have put them on notice").

V.     REHABILITATION ACT

Plaintiffs seek relief under the provisions of § 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794.  Section 504 prohibits discrimination by government actors on the basis of disability.  29 U.S.C. § 794(a).

To make a prima facie case under § 504, a plaintiff must show among other things that the student "was discriminated against based on [his] disability." *Timothy H. v. Cedar Rapids County Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999). A plaintiff must also show that the discrimination reflected bad faith or gross misjudgment.  *M.P. v. Ind. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006).

In the complaint, Plaintiffs assert that "as a disabled individual he is entitled to services and accommodations necessitated by his disability (mental retardation) . . . and that he will not be subjected to extraordinary personal security risks arising out of his disability."   Complaint ¶ 44.  Plaintiffs claim the Defendants failed to address these issues in terms of hiring, training, and supervision of programs, activities, and personnel, development and implementation of policies and procedures to address personal privacy and security. . . ."  Plaintiffs claim that this "failure to act" amounts to intentional, purposely bad faith conduct.

In *M.Y. v. Special School Dist. No. 1*, 519 F.Supp.2d 995 (D. Minn. 2007, the court granted summary judgment in a case involving § 504 where a bus driver sexually assaulted a 15-year old female special education student.  M.Y. qualified

for special education services pursuant to IDEA, 20 U.S.C. § 1400(d) as did J.R. M.Y. was served by the school district pursuant to an IEP – an Individualized Education Program – just as J.R. was served by Defendant Board with an IEP.

IDEA requires a plaintiff to exhaust administrative remedies through the procedures set forth in 20 U.S.C. § 1415(f)-(g).   An IDEA special education student has the obligation to pursue redress of the student's special education program and related services through the provision of IDEA.   IDEA does not authorize damages or monetary relief as a rule.   In *M.Y.*, the court found that the IDEA plaintiff could purse § 504 relief only to the extent the claims are non-IDEA claims:

> A plaintiff need not exhaust IDEA's administrative procedures when pursuing a non-IDEA claim if the claim is 'wholly unrelated to the IEP process, which involves individual identification, evaluation, educational placement, and [FAPE] decisions'

*Id.* at 1001.[4]

In *M.Y.*, the court dismissed the § 504 claims because the articulated bases were FAPE issues that were the province of IDEA.

Plaintiff J.R. received services through an IEP agreed to by Mrs. Reed.  *See* Depo. K. Berry 12-19.

---

[4] Plaintiffs and Defendant Board have resolved IDEA claims.  But Plaintiffs have not articulated what non-IDEA claims are being pursued in this litigation.

J.R. was not discriminated against because of his disability regarding the band program which Coon directed. He was an active participant. There is no evidence that he was deprived of the right to participate. Mrs. Reed was the President of the Band Boosters. Mrs. Reed stated in her deposition that she never complained about Coon or the band program.

Plaintiffs allege in ¶ 55 of the Complaint that J.R.'s program was inadequate. J.R.'s program as a special education student would be an IEP matter under the provisions of IDEA.

Plaintiffs allege "failure to act" amounting to intentional, purposeful bad faith conduct."

As previously discussed, all matters relating to Coon were handled in good faith with due diligent investigation. In the one complaint with sexual connotation, Coon was put on administrative leave and all evidence collected was given to the Troy and Brundidge police departments – "lawfully constituted authorities."

The Court should grant summary judgment with regard to the § 504 cause of action because there is no evidence that the Defendant Board discriminated against J.R. on the basis of his disability.

## VI.   STATE LAW CLAIMS

Plaintiffs contend that Defendants Bazzell, Casey, Pyron and McDaniel were negligent in failing to report child abuse or suspicions of child abuse when they

knew or should have known that the abuse of J.R. had occurred. *See* Amended Complaint: County V. Plaintiffs also contend that the failure of these Defendants to report child abuse and/or suspicions of child abuse were wanton and reckless as it relates to J.R. *See* Amended Complaint: Count VI.

Under Alabama law as interpreted by the Eleventh Circuit, local school boards enjoy sovereign immunity from suits at law or equity, as they are local agencies of the state. *Nance v. Matthews*, 622 So. 2d 297, 300 (Ala. 1993); *Gadley v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1415 (M.D. Ala. 1998).

State officials are likewise provided immunity when engaging in discretionary acts. "The administration and direction of employees has been held to be a discretionary function because it 'necessarily requires the supervisor to use his best judgment in making these decisions affecting' schools." *Gadley* at 1415. *See McMillian v. Johnson*, 101 F.3d 1363, 1365 (11th Cir. 1996.)

While the defense of immunity should constitute a complete bar to recovery under Count V and Count VI, the Court should grant summary judgment under Alabama law because Plaintiffs cannot discharge their affirmation duty to show that the employee's misconduct was actually known to the employer. *Ledbetter v. United Amer. Ins. Co.*, 624 So. 2d 1371, 1373 (Ala. 1993); *Gadley* at 1416.

In the present case, the first information of misconduct by Coon that had any sexual connotation came from the Troy City Police Department. Plaintiffs assert

that Defendants violated J.R.'s rights by not reporting known or suspected sexual abuse to the "authorities."  In actuality, the "authorities" were involved at the threshold of the expressed concern.  The "authorities" were also involved when the investigation was completed.  Superintendent Bazzell discussed what had been done and what information had been uncovered with Officer Phelps with the Troy City Police Department.  Officer Phelps provided the initial information based on an informant.  Superintendent Bazzell asked Officer Phelps if anything else should be done and Superintendent Bazzell said that they would keep the investigation open in case any new information should come forth.  Superintendent Bazzell then drove to Brundidge, Alabama to meet with Police Chief Moses Davenport to share with Chief Davenport what had been done and what was done.  PCHS is located in Brundidge, Alabama.

The facts of this case and the applicable law support Defendants' request that the Court enter summary judgment on the State claims.

## VII.  EQUAL PROTECTION:  COUNT VII, 42 U.S.C. § 1983

In order to establish liability by a municipality or any entity or person acting under the color of state law, Plaintiffs must demonstrate that an employer's discriminatory actions are representative of an official policy or custom of the governmental entity, or are taken by an official with final policy making authority.  *Morrell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018,

56 L.Ed.2d 611 (1978); *Pembar v. City of Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 89 L.Ed. 2d 452 (1986).

The evidence in this case fails to reveal any incidence that the School Board or official with final policy making authority engaged in an official policy of deliberate indifference to sexual harassment.  The Board has no such policy.  Nor does the Board have a record of widespread or pervasive indifference so as to constitute a "custom."  *City of Canton v. Harris,* 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989); *see Melvin A. by Delores A. v. Bd. of Educ.*, 934 F.2d 929, 934-35 (8th Cir. 1991) (failure to train not evidence of deliberate indifference to right of students unless board had notice its procedures were inadequate and likely to result in violation of constitutional rights.)

<u>Conclusion</u>

If Charles Coon sexually abused J.R., he engaged in outrageous conduct, warranting jail and judgment against him.

Plaintiffs, however, seek to tax the Pike County Board of Education for monetary damages for what Coon did. The evidence of record is clear that no one on the Board knew about the abuse.  Each of the named defendants state that they neither knew nor suspected child abuse by Coon.  The SRO officer who was frequently in the band room during the 2004-2005 school year had no suspicion

about Coon. Mona Watson, the dedicated, competent child advocate, saw no evidence to suspect Coon of abuse while she was counselor.

All of these people state they had no personal connection with Coon and they would have reported him for investigation to law enforcement if they had any reason to suspect child abuse.

Plaintiffs claim that better or different policies, better or different background checks, better or different investigation – some or all of these matters might have made a difference.

But the law sets a much higher standard for liability – flagrant insensitivity and deliberate indifference. Superintendent Bazzell was not indifferent; retired Principal Terry Case was not indifferent; Interim Principal Walter Pyron was not indifferent; and Assistant Principal Robert McDaniel was not indifferent in the discharge of their duties.

The Defendants ask the Court to enter summary judgment in favor of Defendants. The facts of this case provide utterly no reason why these dedicated educators should have endured litigation against them in their individual capacities. The facts of this case provided utterly no reason why education money for the students and faculty of Pike County should be taxed by this lawsuit for the unknown and unsuspected criminal acts of Charles Coon.

Respectfully submitted,


s/Donald B. Sweeney, Jr.
Donald B. Sweeney, Jr.


OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800


CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deanie Clark Allen, Esq.
Susan Shirock DePaola, Esq.

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Mr. Charles L. Coon
308 Country Club Drive
P.O. Box 201
Greenville, AL  36037


s/ Donald B. Sweeney, Jr.