IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JR, a minor, by his mother and father EAR and TMR, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NUMBER: 2:06-cv-1120-MEF |
| PIKE COUNTY BOARD OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) | |

**MOVANTS' EVIDENTIARY SUBMITTAL
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Come now Defendants, Pike County Board of Education, Samuel Mark Bazzell, Terry Casey, Buddy Pyron, and Robert McDaniel, to submit this evidentiary submittal in support of Defendants' Motion for Summary Judgment filed concurrently herewith. As additional support of the motion, Defendants submit the following evidence attached hereto:

1. Amended Complaint;

2. Affidavit of Mark Bazzell, Superintendent, Pike County Board of Education;

3.    Deposition transcript of Mark Bazzell;

4.    Affidavit of Mona Watson, former Counselor at Pike County High School;

5.    Deposition transcript of Mona Watson;

6.    Deposition transcript of Sherry Shackelford, Brundidge Police Department, SRO for Pike County High School;

7.    Affidavit of Robert McDaniel, Assistant Principal, Pike County High School;

8.    Deposition transcript of Robert McDaniel;

9.    Affidavit of Terry Casey, Principal, Pike County High School;

10.    Deposition transcript of Terry Casey;

11.    Affidavit of Walter L. Pyron, Interim Principal, Pike County High School;

12.    Deposition transcript of Walter L. Pyron;

13.    Deposition transcript of Robert Bradbury, Troy City Police Department;

14.    Deposition transcript of Karen Berry, Special Education Coordinator, Pike County Board of Education;

15.    Deposition transcript of Elizabeth Reed, mother of J.R.;

16.    Deposition transcript of Thomas Reed, father of J.R.

17.    Deposition transcript of Polly King. Parent of student at Pike County High School;

18.    Deposition transcript of Lucia Grantham, Faculty, Troy University;

19.    Exhibits from depositions;

20.    Ala. Code § 26-14-3;

21.    Memorandum Opinion:  *Fortner v. Breaseale*, Case No. 2;04-cv-0318-TMP;

22.    Report and Recommendation:  :  *Fortner v. Breaseale*, Case No. 2;04-cv-0318-TMP.

                                        s/Donald B. Sweeney, Jr.
                                        Donald B. Sweeney, Jr.


OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF RETENTION OF ORIGINAL

As attorney for the filer of this document, I hereby certify that the filer or the filer's attorney currently holds the original signature document with any required formalities, will make the same available upon request of the Court or of a party, and will retain the hard copy of the same for one year after the expiration of all time periods for appeals, or resolution of appeals, whichever is later.

s/ Donald B. Sweeney, Jr.
Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deanie Clark Allen, Esq.
Susan Shirock DePaola, Esq.

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Mr. Charles L. Coon
308 Country Club Drive
P.O. Box 201
Greenville, AL  36037

Respectfully submitted,

s/ Donald B. Sweeney, Jr.

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **JR a Minor, by his mother and father** | * | |
| **EAR and TMR** | * | |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **PIKE COUNTY BOARD OF** | * | PLAINTIFF DEMANDS A JURY |
| **EDUCATION,** | * | |
| **SAMUEL MARK BAZZELL** | * | **TRIAL ON ALL COUNTS** |
| **Individually and in his official capacity** | * | |
| **as Superintendent of Schools;** | * | |
| **TERRY CASEY, individually and in** | * | |
| **his official capacity as Principal** | * | |
| **of Pike County High School,** | * | Case No. CV 2:06-cv-1120 |
| **BUDDY PYRON, individually and in** | * | |
| **his official capacity as** | * | |
| **Principal of Pike County High School,** | * | |
| **ROBERT MCDANIEL, individually** | * | |
| **and in his official capacity as Assistant/** | * | |
| **Principal of Pike County High School;** | * | |
| **CHARLES LESLIE COON, individually** | * | |
| **and in his official capacity as a teacher** | * | |
| **at Pike County High School** | * | |
| **DOE DEFENDANTS 1-5 being those** | * | |
| **persons legally responsible for providing** | * | |
| **for the safety of special education** | * | |
| **students and for conducting** | * | |
| **investigations of complaints** | * | |
| **relating to the physical safety of** | * | |
| **students and for establishing policies** | * | |
| **and procedures to protect said students.** | * | |
| **Defendants** | * | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT
### Parties

1. Plaintiff JR is a minor and is the son of EAR and TMR who sue on his behalf as his parents and legal guardians. JR is a special education student and is mentally retarded. He is a resident of Pike County, Alabama and at all times relevant hereto was enrolled in the Pike County School system.

1

2. Plaintiff EAR is the mother of JR. She is an adult resident of Pike County, Alabama and at all times relevant hereto she has been one of the custodial parents of JR.

3. Plaintiff TMR is the father of JR. He is an adult resident of Pike County, Alabama and at all times relevant hereto he has been one of the custodial parents of JR.

4. Defendant Pike County Board of Education (hereinafter the "Board") is now, and has been at all times material to this action, a local board of education located within the Northern Division of the Middle District of Alabama. The Board has the underlying responsibility for hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,    for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

5. Defendant Mark Bazzell (hereinafter "Bazzell") is an adult and is an employee of the Pike County Board of Education, serving in the capacity of Superintendent of Education. In his capacity as Superintendent he is the agent of the Board responsible for hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,    for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

6. Defendant Terry Casey (hereinafter "Casey") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School. Casey was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students;    and,    for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

7. Defendant Buddy Pyron (hereinafter "Pyron") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School.    Pyron was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,    for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

8. Defendant Robert McDaniel (hereinafter "McDaniel") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Assistant Principal or Principal of the High School. McDaniel was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel;   development and implementation of policies and procedures to address personal privacy and security of special education students;   and,   for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

9. Defendant Charles Leslie Coon (hereinafter "Coon") is an adult and was, at all times material hereto, an employee of the Board. He was a teacher of the plaintiff JR and was at all times hereto responsible for oversight, supervision and personal safety and security of this student while he was in his custody and/or on school grounds. Coon is sued in his individual and official capacity.

10. Upon information and belief, Coon is currently incarcerated and has plead guilty to sexual abuse of Plaintiff JR.

11. Doe Defendants 1-5 are those persons legally responsible for hiring, training and supervision of programs, activities and personnel;   development and implementation of policies and procedures to address personal privacy and security of special education students;   and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

## Jurisdiction & Venue

12. Jurisdiction in this matter is based on The Rehabilitation Act of 1973, 29 U.S.C. §794 (hereinafter 504); 42 U.S.C. §1983; 42 U.S.C. §1988. The United States Constitution; 28 U.S.C. §1331; 28 U.S.C. §1367 and Title IX of the Education Amendments of 1972 20 U.S.C. §1681(a).

13. Venue is appropriate under 28 U.S.C. §1391(b).

## Facts

14. Plaintiff JR is a minor child and is a qualified individual with a disability as defined by the following statutes:   the Alabama Exceptional Children's Education Act, Individuals with Disabilities Education Improvement Act and Section 504 of the Rehabilitation Act.

15. JR has been enrolled in the Pike County school system since approximately 1994 and has been classified as a special education student since approximately 1996. JR's area of disability is mental retardation.

16. The Board is a governmental entity for the purposes of 42 U.S.C. §1983 and §1988. The Board is required to provide special education and related services to students with disabilities within its jurisdiction pursuant to Section 504.

17. The Board is a recipient of Federal financial assistance to aid in the provision of special education and other educational services to students with disabilities.

18. Defendant Bazzell is an employee of the Board of Education, serving in the capacity of Superintendent of Education.

19. Defendant Casey at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School.

20. Defendant Pyron at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School

21. Defendant McDaniel at certain times material hereto was an employee of the Board, serving in the capacity of Assistant Principal of the High School.

22. Defendant Coon was, at all times material hereto, an employee of the Board and acting in his official capacity. He was a teacher of the Plaintiff JR and was at all times hereto responsible for oversight, supervision and personal safety and security of this student while he was in his custody and/or on school grounds. Coon was also responsible for implementing policies and procedures for the system as they related to the students including attending to the safety and security of said students.

23. Doe Defendants 1-5 are those persons designated by the Board with the responsibility for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. .

24. At all times material hereto, Defendants individually and jointly acted under color of state law and all Defendants were agents, servants or employee of the Defendant Board.

25. Beginning in the academic year 2004-2005 the student's personal privacy and security were repeatedly violated by Defendant Coon. Said violations consisted of establishing and maintaining sexual contact with the student; using his authority as a teacher to intimidate and/or coerce the student to engage in sexually inappropriate conduct, taking the student off campus in a personal vehicle and using school property and/or school procedures to conduct said activities.

26. Defendants Board, Bazzell, Casey, Pyron and McDaniel and John Doe Defendants 1-5 were responsible for defelopment and implementation of

policies and procedures to address personal privacy and security of special education students.

27. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 were responsible for monitoring and investigating complaints of sexually inappropriate conduct and/or violations of personal privacy and security.

28. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 responsible for the hiring, training and supervision of programs, activities and personnel as it relates to personal privacy and security issues for students.

29. At all times material hereto, the Defendants knowingly and/or willfully and/or with reckless indifference failed to consider the issue of sexual assaults in hiring, failed to train and supervise programs, activities and personnel with respect to this issue, failed to develop and implement policies and procedures to address personal privacy and security issues as they relate to special education students and failed to monitor and investigate complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students including but not limited to a failure to inform teachers and parents of the existence of these allegations.

## Count I: 42 U.S.C. §1983
### Charles Leslie Coon

30. Plaintiff adopts and incorporates by reference paragraphs 1-28 hereinabove.

31. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

32. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

33. Defendant Coon violated those rights as set forth hereinabove.

34. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Count II: 42 U.S.C. §1983
### Pike County Board of Education, Mark Bazzell
### Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

35. Plaintiff adopts and incorporates by reference paragraphs 1-33 hereinabove.

36. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

37. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

38. Defendants Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had no formal policy to address issues of bodily integrity, personal security and/or the right to privacy as it relates to special education students in particular, including but not limited to policies relating to hiring, training and supervision of programs, activities and personnel, and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to investigation of complaints and monitoring and supervision of employee contact with special education students and in particular students with mental retardation.

39. In the alternative, Defendants' custom(s) or polic(ies) were grossly insufficient and resulted in violations of the Plaintiff's clearly protected constitutional rights to privacy, personal security and/or bodily integrity.

40. The Defendant's conduct as set forth hereinabove evidences deliberate or reckless indifferences to the Plaintiff's constitutional rights.

41. There is a casual relationship between the Defendants' failure to act as set forth hereinabove and the injuries or damages complained of herein.

42. As a result of the Defendants' conduct the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Count III: Rehabilitation Act

43. Plaintiff adopts and incorporates by reference paragraphs 1-41 hereinabove.

44. Plaintiff is a disabled individual as that term is defined under the Rehabilitation Act. As a disabled individual he is entitled to services and accommodations necessitated by his disability (mental retardation) such that he will have similar access to educational programs and services and that he will not be subjected to extraordinary personal security risks arising out of his disability.

45. Because of the nature of the Plaintiff's mental disability he is unable to judge, respond to or internalize what behavior may be socially appropriate or inappropriate in the school setting to the same extent that a student who is not mentally retarded.

6

46. Defendants have willfully failed to address these issues in planning his school program.

47. Defendants have further failed to address these issues in terms of hiring, training and supervision of programs, activities and personnel, development and implementation of policies and procedures to address personal privacy and security of special education students and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to, monitoring and supervision of employees who come into contact with special education students such as the Plaintiff.

48. Defendants failure to act in this regard amounts to intentional, purposeful bad faith conduct, and violated the rights of Plaintiff secured by Section 504 of the Rehabilitation Act of 1973 *as amended*, 29 U.S.C. §794 and implementing regulations.

49. Accordingly, Defendants have subjected Plaintiff to discrimination on the basis of his disability in violation of 29 U.S.C. §794(a) and implementing regulations.

50. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.


### Count IV: 20 U.S.C. §1681(a)
### Pike County Board of Education

51. Plaintiff adopts and incorporates by reference paragraphs 1-49 hereinabove.

52. Defendant Board is a recipient of Federal financial assistance as set forth hereinabove.

53. Plaintiff was subjected to sexual harassment at the hands of a school official which resulted in his exclusion from participation in and denial of the benefits of, an educational program or activity in violation of Title IX, 20 U.S.C. §1681(a).

54. The Board and/or officials of the Board knew or should have known of this harassment.

55. The Board and/or relevant officials who were invested by the Board with the duty to supervise the harasser and had the power to take action against him remained deliberately indifferent to this harassment and refused to take action against the harasser.

56. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Count V:  Negligence

**57.** Plaintiff adopts and incorporates by reference paragraphs 1-55 hereinabove.

**58.** Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had a non-delegable statutory duty to report child abuse and/or suspicions of child abuse to the Department of Human Resources pursuant to Ala. Code §26-14-3.

**59.** Upon information and belief, a timely report was not made when the Defendants first knew or should have known that the abuse of a minor child or children may have occurred.

**60.** The Defendants' conduct was a breach of the standard of care, particularly as it applies to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

**61.** The Defendant's conduct was the proximate cause of a continuing series of sexually abusive acts which were inflicted on the Phintiff and caused injury or damage as set forth hereinafter.

## Count VI:  Wanton and Reckless Conduct

**62.** Plaintiff adopts and incorporates by reference herein paragraphs 1-60 hereinabove.

**63.** The failure to report child abuse and/or suspicions of child abuse by Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 was wanton and reckless as it relates to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

**64.** The Defendants' conduct was the proximate cause of a continuing series of sexual abusive acts which were inflicted on the Plaintiff and caused injury or damage as set forth hereinafter.

## Count VII:  42 U.S.C. §1983
## Equal Protection
### Pike County Board of Education, Mark Bazzell
### Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

**65.** Plaintiff adopts and incorporates by reference herein paragraphs 1-63 hereinabove.

66. 42 U.S.C. §1983 provides that any person acting under color of state law who deprives any other person of rights granted by the Constitution or laws of the United States shall be liable to that person for equitable or legal relief.

67. As set forth hereinabove, Plaintiff was denied equal protection of the law to the extent that policies and procedures developed and implemented by the Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 did not allow him the same level of personal security, personal privacy and/or bodily integrity as was provided to other students enrolled in the Board's programs.

68. Defendants' conduct was the reckless and willful disregard for the student's right to participate in educational programs in a non-discriminatory manner.

69. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Injuries or Damages

70. As a result of Defendant's conduct, JR suffered and continues to suffer, mental anguish, distress, humiliation, embarrassment, regression in academic and social skills, exclusion from his regular school environment with no friends or support, ongoing fear and confusion, all exacerbated by his disability.

71. The Plaintiff will require continuing counseling, care and training associated with his social and emotional development which would not have been required but for the Defendants conduct.

## Prayer for Relief

**WHEREFORE, THE PREMISES CONSIDERED,** the Plaintiffs request the following relief:

A. That the Court assume Jurisdiction in this case;

B. That the matter be set for trial by jury;

C. Issue an award of compensatory damages against the Defendants;

D. Issue a mandatory injunction requiring the development and implementation of policies and procedures relating to hiring, training and supervision of programs, activities and personnel with respect to personal privacy and security issues;

E. Issue a mandatory injunction requiring the development and implementation of Board Policies and procedures relating to monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students;

F. Issue a mandatory injunction requiring the development and implementation of policies and procedures to address personal privacy and security of special education students;

G. Issue an award of punitive damages against the Defendants;

9

H.  Award Plaintiffs' attorneys fees and costs pursuant to 29 U.S.C. §794 and §42, U.S.C. §1988 and under the Rehabilitation Act;

I.  Award such other further relief deemed appropriate by this Honorable Court

Respectfully submitted on this 26th day of June, 2007


/s/   Susan Shirock DePaola
ASB:  7431-L75S


**Susan Shirock DePaola**
**1726 West Second Street~Suite B**
**Montgomery, AL 36106**
specialeducationattorney@mindspring.com


/s/   Deanie Clark Allen
ASB:  1662-G69A


**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, AL 36106**
dallen@azarlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint has been served on the following by ECF or by first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on this the 26th day of June, 2007.

VIA US MAIL:
Charles Leslie Coon
AIS  244732
Kilby Correctional Facility
PO Box 150
Mt. Meigs, AL  36057

VIA ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/ Susan Shirock DePaola

11

# EXHIBIT 2

## AFFIDAVIT OF
## DR. MARK BAZZELL

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Dr. Mark Bazzell, who being by me first duly sworn, deposes and says as follows:

My name is Dr. Mark Bazzell. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am the appointed Superintendent of the Pike County Board of Education. In this position, I have the statutory responsibility to "see that the laws relating to the schools, the rules and regulations of the state and county boards of education are carried into effect." Ala. Code § 16-9-13. (Copy attached as Appendix A.)

I am aware of the mandate set forth in Ala. Code § 26-14-3 to report "known or suspected" child abuse "to a duly constituted authority." (Copy attached as Appendix B.)

If I had any suspicion that Charles Coon, the band director at Pike County High School, had sexually abused J.R. or any student, I would have reported him to law enforcement officials.

When I did get a complaint about Charles Coon on March 30, 2005, it was from Butch Phelps with the Troy City Police. Officer Phelps reported that an informant believed Charles Con had been smoking marijuana with students in his private vehicle. Mindful of my duties as superintendent, I immediately called Charles Coon into office and put him on administrative leave pending an investigation. When we finished our investigation, I shared

everything I had – all the information – with Officer Phelps and also with Moses Davenport, Chief of Police for the Brundidge Police Department. Pike County High School is in Brundidge and is under the law enforcement authority of the Brundidge Police Department. I explained to both officers what we had done, what information we had about Charles Coon, what we were going to do, and asked both officers if they thought we should do anything else.

I shared this information to indicate that the first time I had any report from any source about potentially serious misconduct about Charles Coon, I immediately put him on administrative leave; I had the information thoroughly investigated as a first priority concern; and I shared with law enforcement officers everything we knew; and I asked the law enforcement officers if we should do anything else.

In May of 2005, Coon submitted his resignation in order to retire from public education. The Board accepted his resignation at its Board meeting May 23, 2005. At that time, we had no reason to suspect and did not suspect that Charles Coon had sexually abused J.R. or any student. It was a complete shock to learn in July of 2005 that Charles Coon had been arrested and charged with sexual misconduct.

The complaint in this case sues me individually and in my official capacity as superintendent. The complaint sues me and other administrators for not having policies and procedures to protect J.R. from sexual abuse; for not monitoring and investigating complaints; for not training and supervising Charles Coon; and for negligent conduct.

In Pike County, we have what is essentially a "no tolerance" policy regarding sexual abuse and sexual harassment. (Policy attached as Appendix C.) As Superintendent, I have set up in-service programs for all our employees at Institute Day. I have requested at principal meetings that in-services be conducted at each school. I have instructed our people that

we have a mandatory obligation to report known or suspected child abuse to law enforcement authorities. We communicate each year with all students and parents through the Student Code of Conduct how they should report concerns or problems. I have arranged for guest speakers such as Lucia Grantham from Troy University to conduct sexual abuse training. Our special education coordinator Karen Berry has conducted training for our Building-Based Student Support Team people. This information and efforts involved the staff and employees at Pike County High School.

Through these efforts, I think we have achieved an excellent record. To my knowledge, the matter with Charles Coon is the first case of sexual abuse by an employee of the Pike County School System.

When Charles Coon was recommended for employment beginning August 1, 2002 at Pike County High School, Principal Terry Case believed that Charles Coon was an excellent candidate based on what he knew of Charles Coon and from Charles Coon's references. Mr. Casey had worked in Butler County for three years. Charles Coon and his wife also worked for the Butler County School System. Mr. Casey said Charles Coon was well respected in Butler County. Mr. Casey checked each of Charles Coon's references and every one was complimentary about Charles Coon. Prior to employment, Mr. Coon submitted to ABI and FBI background checks as required by Alabama Law and was issued a positive suitability report from the Alabama State Department of Education. In other words, before Charles Coon was hired, we had done our due diligence check on Charles Coon and had no information that should have given us concern.

Plaintiff says we were negligent in hiring Charles Coon. But I think it is important for the Court to knew that one of Charles Coon's former employers tried to get Charles

Coon to leave Pike County after we hired him. It was either the first or second year of Charles

Coon's employment with us that I received a call from the superintendent of the Monroe County

Board of Education asking if we would release Charles Coon so Charles Coon could come back

and work for Monroe County. The superintendent of Monroe County thought that much of

Charles Coon based on Charles Coon's work in that system.

Prior to April 2005, I recall only three complaints about Charles Coon. Assistant

Principal McDaniel complained that there was not enough discipline on the band buses and in

the band class.

The second complaint came in November 2004 from a parent of a student.

Charles Coon had grabbed the student by the neck. The matter was investigated; and Charles

Coon was reprimanded for what he did. A written record was completed.

The third problem occurred in January 2005 when a parent complained about the

grade – an F – that Charles Coon gave her son in band. I learned of this matter some time after

the parent complained. By that time, it had been resolved and properly addressed by the school

principal.

None of these problems regarding Charles Coon had sexual implications and none

of these incidents raised any suspicion in my mind about Charles Coon engaging in sexual

misconduct with a student. One other matter came to my attention about Charles Coon. Charles

Coon himself called me. Charles Coon let a student, Blake Faulkner, use his cell phone to call

his parents according to Charles Coon. It was a violation of school policy for a student to have a

cell phone. The cell phone as confiscated by the assistant principal. Charles Coon called me to

ask that it be returned. I told Charles Coon that was a local school matter and I would not

intervene.

By comparison, the information I received from Officer Phelps on March 30, 2005 was serious and I reacted to the information provided with serious concern. I put Charles Coon on administrative leave the next day and I asked my staff to investigate every aspect of the information given to me.

What Officer Phelps said was this: he had learned from an informant about an incident where Charles Coon allegedly used marijuana while riding around with students in his vehicle. He gave me a list of six or seven names of kids who might be able to corroborate the story.

Matt King was one of the students. It was his mother who told Mr. McDaniel in January that Charles Coon should not smoke with the kids around the band room sitting in his truck.

I asked Officer Phelps if there was anything else I needed to know. Officer Phelps told me there was one kid that the other kids made fun of – they referred to him as his butt buddy. I asked if Officer Phelps if the informant had indicated anything about any other inappropriate conduct. He said no that he was just calling about the marijuana – the use of marijuana. Officer Phelps made no mention of J.R. and said nothing about sexual favors or misconduct.

Nevertheless, this phrase – butt buddy – raised a red flag in my mind and I asked the principal to keep that in mind as he talked to each of the listed students about Charles Coon smoking marijuana.

The next day I put Charles Coon on administrative leave. Appendix D is the letter I gave to Charles Coon. While Officer Phelps had not called about sexual misconduct, I thought the reference to "butt buddy" justified my statement to Charles Coon about alleged sexual

misconduct. The phrase "butt buddy" was the only information I had but I took that as a red flag I wanted to investigate.

It may sound self-serving but I thought and think my reaction reflects that was not insensitive or indifferent to the information provided: I was alarmed at the outset to the possibility of sexual abuse.

In addition to putting Charles Coon on administrative leave, I had Charles Coon drug tested for marijuana. Marijuana stays in the human system 30 to 45 days after use. Knowing Officer Phelps, I felt the information he was sharing was very current. I thought the drug test would be a timely response to Officer Phelps' report.

The drug test came back negative.

Charles Coon worked at two schools: Pike County High School and Banks School. I talked with both principals, gave them the names of the students and asked them to investigate these students and any other students whose names came up. I asked them to see if Charles Coon had been smoking with students and/or smoking marijuana. Either would be a violation. I also directed both principals to see if Charles Coon had engaged in any other inappropriate conduct with his students. I wanted them to push the questioning of the students to see if anything else was going on. And I wanted them to see if they could identify the student who was referred to as the "butt buddy." I wanted to know who the butt buddy was if we could determine that fact. I told them to talk to other students beyond those listed – at least a couple – about Charles Coon and to do it in the context of trying to get a feed for how the program was going.

I have one other thought as I was trying to exhaust this matter. I remembered the cell phone incident where Blake Faulkner had Charles Coon's cell phone. I told Mr. Pyron to talk to him even though Blake was not one of the students listed, as I recall.

I was just trying to track down every lead to see if something inappropriate was going on – such as sexual abuse.

The two principals followed my instruction and reported back to me. None of the students identified a "butt buddy."

At least one student confirmed that Charles Coon had smoked with students. No student confirmed ever seeing Charles Coon smoke marijuana. At least one student saw Charles Coon driving from school after school with a student in the vehicle. The student in the vehicle was not identified, but we learned that Blake Faulkner's parents had given Charles Coon permission to drive Blake in his vehicle after band practice.

No student provided any information about other misconduct by Charles Coon – no information of any inappropriate conduct. Attached as Appendix E are notes we have about student responses.

I also talked with former Principal Terry Casey to see if he had suspected any misconduct by Charles Coon. He had none.

After going over this information in detail with my administrators, I called Officer Phelps and discussed it with him. I then went to Brundidge and met in person with Police Chief Moses Davenport and reviewed with him everything we had done and all we had learned.

I told both Officer Phelps and Chief Davenport that I thought I had to put Charles Coon back to work but we would remain on the look out and continue to investigate if anything

new came up. I asked each of them – Officer Phelps and Chief Davenport – if there was anything else they thought we should do. Neither did.

The final step was to go over what we had with Charles Coon. I am attaching my letter to Charles Coon dated April 8, 2005. I wanted him to know that we had turned this matter over to the appropriate law enforcement people for further investigation if necessary.

I pointed out that it was a criminal act for him to provide cigarettes to students and that it was a violation of school policy for him to smoke on school property. I told him not to transport students in his personal vehicle except in extreme emergency situations.

Between April 8, 2005 and the end of the school year, we received no further complaints of any kind about Charles Coon. On May 15, 2005, Charles Coon wrote saying he intended to retire at the end of the school year. On May 23, 2005 I recommended and the Board accepted Charles Coon's resignation. Charles Coon's resignation was accepted without any knowledge that he had sexually abused J.R. or any student.

In conclusion, I cannot think of anything more reprehensible than for a teacher to sexually abuse a student. The thought is revolting. But this suit is very troubling.

I take my statutory responsibilities very, very seriously. We had every reason to believe Charles Coon was a good educator. He had obtained tenure in three other systems. The superintendent where he had previously worked tried to rehire him after he was employed by Pike County. He obviously had a good record there.

None of our staff had any reason to suspect that Charles Coon was abusing J.R. J.R.'s name never came up as a student that might be subject to abuse. We have asked our teachers if they suspected any misconduct by Charles Coon and they did not.

Mrs. Reed was a past president of the Band Boosters and thought enough of Charles Coon that he was a visitor to their house and had the Reed's permission to take J.R., their other son, and daughter on trips with him.

We have been conscientious about training our people and we have an excellent record as a result. This is the only case of child abuse I know of by an employee of the Pike County School System.

When a serious report about Charles Coon came to our attention, we worked diligently to investigate and we shared everything we found with the Troy City Police (Butch Phelps) and the Brundidge City Police (Moses Davenport).

I sincerely believe we have been diligent; not indifferent or insensitive. I did all I could think of to explore the possibility of misconduct by Charles Coon, and I would have done anything else the law enforcement people recommended.

This suit against me in my personal and professional capacities is a very sad development. I hope the Court will dismiss the lawsuit in its entirety.


Dr. Mark Bazzell

Sworn to and subscribed before me this the 2ᵗʰ day of March, 2008.


Notary Public

My Commission expires: July 18, 2009
(Seal)

# APPENDIX A

**Section 26-14-13**

**Penalty for failure to make required report.**

Any person who shall knowingly fail to make the report required by this chapter shall be guilty of a misdemeanor and shall be punished by a sentence of not more than six months' imprisonment or a fine of not more than $500.00.

*(Acts 1965, No. 563, p. 1049, §5; Acts 1975, No. 1124, p. 2213, §1.)*

# APPENDIX B

**Section 26-14-3**

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

# APPENDIX C

FILE: JCK

## Pike County Board of Education
## Prohibiting Harassment Policy

### I.    General Statement of Policy

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation. This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0117*

## II.    Definitions

## A.    Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1.    a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2.    the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to
- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical conduct such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0118

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office of the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation. The student will then be informed that he/she has three (3) choices:

1. The student may converse by phone with his/her parent or guardian.

2. The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3. The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect. If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services. The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0124

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:     U.S. Const. Amend. IV; U.S. Const. Amend.
XIV1; Moore v. Student Affairs Committee of
Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
1970); Note from Moore: "It is settled that
Fourth Amendment does not prohibit reasonable
searches when the search is conducted by a
superior charged with the responsibility of
maintaining discipline or of maintaining
security ..."; New Jersey v. T.L.O.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0125

FILE: JCAC
(continued)

1. The educator should immediately notify the principal.

2. The principal/educator should consult with the school nurse and counselor.

Human Resource caseworkers will proceed to investigate the reported case. If the investigation is to begin at the school, the Human Resource caseworker will report to the school office and identify himself/herself to the principal or designated representative. Child abuse/neglect investigations are highly confidential, and the student's rights to privacy must be respected. Only those persons necessary to conduct the investigation should be present in any interview. After an evaluation/intervention has been made, the caseworker will provide feedback to the principal and arrange monitoring procedures as needed. Educators will report further incidents of abuse/neglect regarding that child to the assigned caseworker.

### Special Information Regarding Neglect Cases:

1. Teachers should document and date <u>specific</u> instances or examples of neglect.
   Ex: On Wednesday, January 14, 1988, John Doe came to school with no coat, wearing unclean clothes and shoes with large holes.

2. Keep a running account of the above examples over a period of time.

3. Contact the parents and express concern over the neglect and make suggestions as to how they can help or seek help by calling Child Welfare at Human Resource.

### Right to Privacy Considerations:

1. A student's school record continues to be protected by the terms of the Family Rights and Privacy Act and the policies of the Board. The School System needs a parental release form, court order or other legal document which gives school personnel the permission to release information in school records to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0126**

FILE:JCAC
(continued)

2.  In return, Human Resource personnel should share
    needed information with school officials.  The
    school principal or counselor could be designated
    as a <u>confidential</u> person to receive this information
    and use it in the best interest of the student.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0127*

# APPENDIX D

PLAINTIFF'S
EXHIBIT
14

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

**Dr. Mark Bazzell**
Superintendent

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register



April 1, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

This purpose of this correspondence is to notify you that you are being placed on administrative leave with pay, effective immediately, pending the outcome of an investigation into alleged misconduct involving a number of students. According to reports, you have allegedly engaged in the use of illegal drugs with students, provided illegal drugs to students, and also allegedly engaged in other inappropriate activities with students of a sexual nature. Since these reports involve allegations of criminal conduct on your part, I have also notified the appropriate law enforcement personnel.

I would very much like to meet with you at your earliest convenience to explain the nature of these reports and to offer you the opportunity to provide a written statement if you so desire. Also, I am directing that you not return to the Pike County High and Banks campus until this matter is resolved. In addition, I am further directing that you have no contact with Pike County High and Banks students, including band students until this matter is resolved.

Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Schools

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0087

101 W. Love Street, Troy, Alabama 36081-2613  Telephone : (334) 566-1850  Fax: (334) 566-2580

# EXHIBIT E

## Wednesday
## March
# 30
### 2005

| March 2005 | April 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 | 1 2 |
| 6 7 8 9 10 11 12 | 3 4 5 6 7 8 9 |
| 13 14 15 16 17 18 19 | 10 11 12 13 14 15 16 |
| 20 21 22 23 24 25 26 | 17 18 19 20 21 22 23 |
| 27 28 29 30 31 | 24 25 26 27 28 29 30 |

✓ Completed
→ Forwarded
X Deleted
○ Delegated
→ In Process

**ABC** Prioritized Daily Task List

- Phillip Faulkner (Call ph #)
- Adam Helms — not at pres (Banks)
- Andrew Law
- Jarron Senn
- Levin Davis ?
- Thomas Green

**Appointment Schedule**

8

9

10

11

12

1

2

3

4

5

6

7

8

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0105

Life is not lost by dying; life is lost minute
by minute, day by dragging day, in all
the thousand small uncaring ways.
—Stephen Vincent Benét

# 30
**Wednesday**
*March 2005*

**Daily Notes**

CALLS

① _____
Thomas Mitchem
242-8038
Assessor DB
242-7341

② 10:45 - J. E-Fox
366-2571

③ Esther Taylor
RCT D.T.I
NOW - Rpt IN new
242-9269      Bldg

To Do:

< → >
< → >

— Shipes, Whaley, Felton,
Goytia, — (Butt & H) (Sex. Favors).
— Loon — Hdzg Helms and Law
— Neal —
— Commission —

④ B. _____
670-____
372-2215

Sup-t list
Apr. 12
(Fax)

< e-mp - Alex → >

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0106

# April 2005 Index



| Date | Index important information and events recorded on this month's daily notes. |
|------|------|

CALLS
1) Charlotte Rogers    Robson
   235-9814

2) Ed Ivey - Pike Baldwin Co
          opt in 3
              474-3856
   e911    835 66X7

3) Soon
   342-7635

4) Pickett
   appt

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0107

Whoever claims a right for himself
must respect the like right in another.
—James Bryce

# 4

Monday

April 2005

**Daily Notes**

1. Serv. Syst. Tony Cable
2. Policy Review
3. Shelly Deed
4. Shipman House
5. Foundation                    B I C
6. Obbuntin (N2)
7. PEPE Adm.
8. Fac. Mentg Banks
9. Customer Focus
10. ESC, SSC
11. Bus Stop Banks
12. Jeans - Roedle Bus Shoe
13. MTLAC
14. Peris Art
15. Ayp spec 82. Acntbty
16. Conch Support
17. Comm. Plan               BOE
18. 50/50 BPD               Roadf - Bus
19. Supt/Boe End.           BR lights
20. CTE Bond               Botts - Plea
21. Budget
22. Cell Bills              Lyons
23. Coy Ship-J             Russell
24. Felton   SSC          Harrison
25. Commission            Lee-Mixed

                           T Nval
                           T Coon

1. Peirs - Thomas report
2. 10:24  Chris Kelly
   - Bus - Nelson
   334-296-5043

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0108



Monday
**April** **4**
2005

Appointment Schedule

8

9

10

11 — 9:30 —

12 — Cell. Bills

1

2 — Staffy Dept 50/50 Bdt.

3 — (Felton Ships)

4 — Coon — King

5 — Adam Helms — Andy Law

6 — ? Leslie Davis — Thomas Green

7 — Faulkner

8 — **JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0109



Reality was such a jungle—with no
signposts, landmarks, or boundaries.
—Helen Hayes

**11**
**Monday**
**April 2005**

Daily Notes

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0110

My own experience has taught me this:
if you wait for the perfect moment when
all is safe and assured it may never arrive.
—Maurice Chevalier

# 13
### Wednesday
### April 2005
103rd Day 262 Left  Week 15

**Daily Notes**



EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

        PLAINTIFF,


VS.                          CASE NO.:

                             2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

        DEFENDANT.

            * * * * * * * * * *

    DEPOSITION OF MARK BAZZELL, EdD, taken before Mary

Moore-Wynn, as Commissioner, on the 24th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 9:00 A.M.


            * * * * * * * * *

JR, A Minor                    July 24, 2007                    Pike County Board of Education

2 (Pages 2 to 5)

Page 2

```
1         * * * * * * * * * *
2         APPEARANCES:
3  FOR THE PLAINTIFF:
4  Hon. Susan DePaola
        Attorney at Law
5  1726 West 2nd Street, Suite
        Montgomery, Alabama 36104
6
7  and
8  Hon. Deanie Allen
        Azar and Azar
9  260 Washington Avenue
        Montgomery, Alabama 36104
10
11  FOR THE DEFENDANT:
12  Hon. Donald B. Sweeney
        Bradley, Arant, Rose & White
13  One Federal Place
        1819 Fifth Avenue North
14  Birmingham, Alabama 35203
15
16
17
18
19
20
21
22
23
```

Page 4

```
1  Statute, regardless of the waiving of the filing of
2  same.
3      It is further stipulated and agreed by and
4  between counsel and the witness that the reading
5  and signing of the deposition by the witness is
6  hereby waived.
7              INDEX
8  MARK BAZZELL, EDD
9  Examination By Ms. DePaola          6
        Examination By Mr. Sweeney       185
10
        Reporter's Certificate          191
11
12          INDEX OF EXHIBITS
13  Exhibit Number    Description      Page Number
14  Plaintiff's Exhibit 1  Organizational    30
        Diagram for Pike County Schools
15  Plaintiff's Exhibit 2  Student Code of    45
        Conduct for 2004-2005
16  Plaintiff's Exhibit 3  Essential          57
        Administrative Information
17  Plaintiff's Exhibit 4  High School        58
        Student Planner (2004-2005)
18  Plaintiff's Exhibit 5  Pike County Board  74
        of Education Policy Manual
19      Excerpts
        Plaintiff's Exhibit 6  Training Material  98
20      Relating to Sexual Abuse
        Plaintiff's Exhibit 11  Coon Retirement  114
21      Documents
        Plaintiff's Exhibit 12  Monroe County   116
22      Schools Verification of
        Employment of Coon Document
23
```

Page 3

```
1         * * * * * * * * * *
2
3
4         STIPULATIONS
5
6      It is hereby stipulated and agreed by and between
7  counsel representing the parties that the deposition of
8  MARK BAZZELL, EdD, is taken pursuant to the Federal
9  Rules of Civil Procedure, and that said deposition may
10  be taken before Mary Moore-Wynn, CSR, as Commissioner
11  without the formality of a commission; that objections
12  to questions, other than objections as to the form of
13  the questions, need not be made at this time, but may
14  be reserved for a ruling at such time as the deposition
15  may be offered into evidence, or used for any other
16  purpose by either party hereto, provided by the
17  Statute.
18      It is further stipulated and agreed by and between
19  counsel representing the parties in this case, that the
20  filing of the deposition of MARK BAZZELL, EdD, is
21  hereby waived, and that said deposition may be
22  introduced at the trial of this case or used in any
23  other manner by either party hereto provided for by the
```

Page 5

```
1  Plaintiff's Exhibit 13  Dr. Bazzell's    128
        Diary Notes
2  Plaintiff's Exhibit 14  Administrative   139
        Leave Letter for Mr. Coon
3  Plaintiff's Exhibit 15  Bazzell          173
        Handwritten Document
4
5
6
7         * * * * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

---

**Page 6**

1      MARK BAZZELL, EDD
2      (Whereupon, the witness, after having first been
3 duly sworn to speak the truth, the whole truth, and
4 nothing but the truth, testified as follows:)
5      THE COURT REPORTER: Usual stips?
6      MR. SWEENEY: Please.
7      MS. DePAOLA: Yes.
8           EXAMINATION
9 BY MS. DePAOLA
10 Q   Good Morning, Dr. Bazzell?
11 A   Good morning.
12 Q   Could you state your name for the Record, please?
13 A   Mark Bazzell.
14 Q   What is your residence address?
15 A   105 Woodley Avenue, Troy, Alabama.
16 Q   And your current employment is Superintendent of
17     schools?
18 A   Superintendent, Pike County Board of Education.
19 Q   And how long have you served in that capacity?
20 A   At the end of December, it will be five years.
21 Q   So, did you come in 2002?
22 A   January, 2003. I was elected in November of 2002.
23     And my term of office began January, 2003.

---

**Page 7**

1 Q   All right. And your term continues for how long?
2 A   It was a four-year term. And the position changed
3     from an elected position to an appointed position.
4 Q   When was that?
5 A   January of 2007.
6 Q   Okay. And if I understand the records, was Mr. --
7     I think his name Charles Coon -- hired prior to
8     you becoming Superintendent?
9 A   Uhm, he was hired in -- I would have to check the
10     record. He was employed -- I would have to check
11     the record. I'm not sure of the exact date. But
12     I believe -- it's my best recollection that he was
13     employed in 2003 --
14      MR. SWEENEY: Let's take a minute. My
15     recollection is August of 2002.
16      THE WITNESS: Yeah, I would have to look
17     at the --
18 BY MS. DePAOLA
19 Q   What records would you need to look at? Would it
20     be in the documents that you have produced?
21 A   It would be in the documents that I have
22     submitted.
23 Q   Okay.

---

**Page 8**

1 A   Yeah, July of 2002.
2 Q   Okay. All right. So, that was prior to your
3     becoming Superintendent?
4 A   That's correct.
5 Q   Were you employed here at that time?
6 A   Yes.
7 Q   What was your position?
8 A   Assistant Superintendent.
9 Q   Did you have any role in the hiring of Mr. Coon?
10 A   No.
11 Q   Okay. And am I correct you're appointed by the
12     Board of Education?
13 A   I'm -- yes, I am appointed by the Board of
14     Education, yes, when it became an appointed
15     position in January.
16 Q   All right. Could you, just for the Record, give
17     me your employment history?
18 A   Uhm, I have been Superintendent now going on five
19     years. It will be five years in -- it will be
20     five years in December. Prior to that, I served
21     as Assistant Superintendent for eight years. John
22     Key was the Superintendent.
23 Q   In Pike County?

---

**Page 9**

1 A   In Pike County. Prior to that, I was the
2     principal at Pike County High School for seven
3     years. Prior to that, I was the principal at
4     Banks School, which is a K-8 unit school -- or K-9
5     unit school for two years. And I was a teacher at
6     Pike County High School for five years. I think
7     that comes up to about 26 years. Twenty-one in
8     administration.
9 Q   All right. All of your experience in education
10     being in Pike County?
11 A   No. No.
12 Q   Okay. Where else have you --
13 A   I was employed at the University --
14 Q   University of Alabama?
15 A   Troy University over here for a year.
16 Q   What was your position there?
17 A   I was -- at that time, I was a graduate assistant
18     working on graduate degree. Prior to that, I was
19     employed in Florida for two years.
20 Q   At what school?
21 A   Rutherford High School.
22 Q   What was your teaching position there?
23 A   Science. Biology. Biology, Chemistry.

---

Page 10

1  Q  Any further employment history in education?
2  A  Uhm, I have done adjunct work for Troy University.
3  Q  Is that currently?
4  A  Ah, no.
5  Q  When was that?
6  A  That would have been in -- I stopped about a year
7     ago, because my wife became -- was ill, had an
8     illness. So, probably the three or four years
9     prior to that, I taught graduate classes for them.
10 Q  Were those in educational administration?
11 A  Ah, yes. It was courses -- the course I taught
12    was titled Teachers and the Law.
13 Q  So, did you always teach the same course?
14 A  Uh-huh.
15 Q  Did you have a textbook that you used in that
16    course?
17 A  Uh-huh.
18 Q  What was the name of it?
19 A  Oh, gosh, I don't recall that. I mean, I've got a
20    copy of it somewhere. But I don't recall that.
21 Q  Did any portion of it deal with identifying sexual
22    abuse in the schools?
23 A  I'm -- I'm sure it did.

Page 11

1  Q  And you don't know the name of the textbook you
2     used?
3  A  I don't recall the name.
4  Q  Do you have any of your teaching materials?
5  A  I would have to look and see. Like I said, it's
6     been chaotic the last year and a half with my
7     wife's situation.
8  Q  Okay.
9          MS. DePAOLA: Donald, is that something
10         you could follow up with him on and
11         produce any teaching materials he
12         had?
13         MR. SWEENEY: If there is any other than
14         the textbook. And we'll be glad to
15         give you the name of the textbooks.
16         MS. DePAOLA: And any notes he has from
17         lectures, course syllabus, any
18         things of that nature.
19 BY MS. DePAOLA:
20 Q  Could you look for those things and provide them
21    to Mr. Sweeney?
22 A  Uh-huh.
23 Q  Any other employment that we haven't covered?

Page 12

1  A  Education related?
2  Q  Yes, sir.
3  A  Huh-huh.
4  Q  How about noneducation related? And I don't mean
5     to go back to when you were in high school. But
6     post college?
7  A  Uhm, I hold certification -- certification in --
8     technical degrees and certification as an
9     emergency medical technician, basic, intermediate,
10    and paramedic.
11 Q  So, have you worked in those fields?
12 A  Back in the day when I was a -- wasn't on a
13    12-month contract and had the responsibilities I
14    have now, like most teachers do, summertimes,
15    Christmas, and so forth, I worked as a paramedic.
16 Q  And that's with what agency or entity?
17 A  Oh, gosh, I worked with a lot of them. I worked
18    with --
19 Q  Like here in Pike County?
20 A  I worked with Haynes out of Montgomery. I worked
21    with Haynes in Troy. I worked with -- I can't
22    even remember the name of the -- there was a
23    couple here before Haynes. And I worked with

Page 13

1     them, too. So, that's been --
2  Q  But those are like private employers?
3  A  Yeah. Private.
4  Q  Did you ever work for any public agency as an EMT?
5  A  No.
6  Q  And just for the Record, could you tell us your
7     educational history?
8  A  Yes. I have an associates degree from Gulf Coast
9     Community College.
10 Q  In what field?
11 A  Education.
12 Q  Okay.
13 A  I have a Bachelor's degree from Troy State
14    University in education. I had --
15 Q  Is that in elementary or secondary?
16 A  No, I had -- I graduated in -- my degree qualified
17    me for certification in Biology, health -- Biology
18    and health and physical education. Biology,
19    health, and physical education.
20 Q  Is that "K" through twelve, the physical
21    education?
22 A  Yes.
23 Q  Okay.

JR, A Minor                    July 24, 2007              Pike County Board of Education

**Page 14**

1   A   I have a Master's degree.
2   **Q   Is that an MEd?**
3   A   Master's of Science. Master's degree in secondary
4       education. The emphasis in Biology. I have
5       double "A" certification, which is six-year degree
6       certification in Biology. Then my wife says I
7       finally decided what I wanted to do when I grew
8       up, so I went back and got Master's level
9       certification in administration and double "A"
10      certification in administration. And then I have
11      a doctorate in educational foundations, leadership
12      and technology from Auburn University.
13  **Q   I'm sorry. I didn't get to write that down.**
14  A   Educational leadership foundations -- EFLT --
15      educational foundations leadership and technology,
16      Auburn.
17  **Q   What year did you get your EdD?**
18  A   '97.
19  **Q   What was your -- I assume you did a thesis,**
20      **doctoral dissertation?**
21  A   It was -- it use multi-varied analysis. It was
22      comparing the roles of principals -- I compared
23      how the roles of principals varied among different

**Page 15**

1       kinds of schools, I guess you might say. And the
2       variables that I looked at is how they differed
3       between the rural and urban schools. Differences
4       based on poverty level --
5   **Q   Okay.**
6   A   -- large schools versus small schools. And,
7       again, it was role variations, how the roles
8       changed in those locations.
9   **Q   The roles, meaning -- explain to me what factors.**
10  A   Actually, it was the task -- how the tasks of the
11      principal changed. And a measure of the role of
12      the principal was the tasks that the principals
13      performed and how those tasks changed, the
14      frequency in which the principal engaged in those
15      tasks -- in specific tasks in a large school
16      versus a small school, a rural school versus urban
17      school. A school that was in an affluent area
18      versus an area that was in poverty.
19  **Q   Could you tell me some of the tasks you're talking**
20      **about?**
21  A   For example, I went in with some assumptions, for
22      example, that a principal that worked in a -- in
23      an affluent school with a -- with students whose

**Page 16**

1       parents were more affluent who were actively
2       engaged in the school and did things for the
3       school would have to spend more time dealing with
4       things of a political nature and working with
5       parents and those kinds of things versus a school
6       where you didn't have a lot of parent involvement,
7       and you spent less time working with parents.
8           And so, the survey basically asks for
9       responses from principal as to with what frequency
10      did they engage in those tasks. That was a long
11      time ago. That was --
12  **Q   Okay. As part of your educational training, did**
13      **you ever receive any training in the field of**
14      **recognizing sexual abuse?**
15  A   I'm sure I did.
16  **Q   Well, could you tell us about that training?**
17  A   Oh, gosh, I don't -- I don't remember the
18      specific -- you know, I am sure it was part of
19      undergraduate training. I'm sure it was part of
20      graduate training.
21  **Q   Okay. Well, all right. What you're having**
22      **trouble identifying is specific courses in which**
23      **you may have received this training?**

**Page 17**

1   A   Yes.
2   **Q   Okay. Well, can you tell me any of the content of**
3       **the course? In other words, as a result of this**
4       **training and these courses, what signs are you**
5       **aware of that one should look for in recognizing**
6       **sexual abuse of students?**
7   A   Uhm, there is -- you know, there are -- there is a
8       lot of signs. You know --
9   **Q   Tell me any that you can think of while we're**
10      **sitting here.**
11  A   Uhm, all the ones that -- that the research says.
12      You know, the kids who are withdrawn. Kids who
13      are struggling academically. Kids who are -- uhm,
14      have trouble socializing, those kinds of things.
15  **Q   Any others you can think of?**
16  A   Uhm, I'm sure there are, giving me some time to
17      think about it.
18  **Q   Are you thinking about it, or do you want me to go**
19      **on?**
20  A   Give me the ones that I have listed.
21  **Q   Students who are withdrawn, struggling**
22      **academically, students with social problems.**
23  A   I can't recall others right this second. I'm sure

Page 18

1   there is many. It's been a while since I've
2   looked at it.
3 Q  Well, as a result of your training, are you aware
4   that there is an increase incidence of sexual
5   abuse amongst students with disabilities as
6   opposed to regular ed students?
7       MR. SWEENEY: Object to the form. You
8           can answer.
9 A  Uhm, repeat the question.
10 Q  Can you tell me whether or not you are aware as a
11   result of your training that there is an increase
12   incidence of sexual abuse among students with
13   disabilities as compared to regular education
14   students?
15       MR. SWEENEY: Object to the form.
16 A  Uhm, I'm not sure that I have read -- I am not
17   sure that I have read that.
18 Q  So, you don't know that?
19 A  I'm not sure that I have read that.
20 Q  What does that mean; "I'm not sure that I have
21   read that"?
22 A  It means I'm not sure that I recall reading that
23   and know that answer to that. I may know that. I

Page 19

1   may not. I just don't recall that.
2 Q  Well, do you have an opinion as to that at this
3   point?
4 A  Repeat the question again.
5 Q  The question is: Are you aware that there is an
6   increased incidence of sexual abuse among students
7   with disabilities as compared to students in the
8   regular education population?
9       MR. SWEENEY: Object to the form.
10 A  I would agree that individuals with --
11       MR. SWEENEY: Excuse me. If you
12           understand the question, answer it.
13           If you know what disability, what
14           incidence, what age group? That's a
15           complex question. If you understand
16           it, answer it. If you don't, ask
17           for clarification.
18 A  Okay. Repeat the question, again.
19 Q  Okay.
20       MS. DePAOLA: Would you read it back?
21           (Whereupon, the requested material
22           was read by the Court Reporter.)
23 A  Uhm, if you will be more specific, then I can

Page 20

1   probably maybe answer that. I don't know. The --
2       MR. SWEENEY: Let's go off the Record
3           just a minute.
4           (Brief recess.)
5 BY MS. DePAOLA:
6 Q  I will stick with my question: Do you have an
7   answer to my question?
8 A  I --
9 Q  I will limit that to the US --
10 A  I think the problem that I am having, again, is it
11   is very broad. You know, there is a lot of
12   research out there on the topic of child abuse,
13   lots of it. Over the years, I have had the
14   opportunity to read a lot of it. And, you know,
15   an individual piece of research really has to
16   stand on its own merits: You kno, who the
17   researcher was, what was the quality of the
18   research, what was the research methodology used,
19   all of those different kinds of things.
20   So, you have this set of research, this set of
21   research, this set of research, this set of
22   research, and they all say different things. And
23   they all apply to the conclusions that you can

Page 21

1   draw from a specific set of research pertains to
2   the sample or the individuals in that study. They
3   don't necessarily apply to everybody in general.
4   And when you ask me to draw conclusions about
5   a -- that are very broad and very general, you
6   know, it's pretty hard to answer that question.
7 Q  Are you aware of any research indicating that
8   regular education students are abused more often
9   than children with disabilities in the United
10   States?
11 A  I'm not -- I'm not -- I do not recall right now
12   that research. That doesn't mean that I haven't
13   read that -- read research related to that.
14   Because, again, I have read a lot over the years.
15 Q  Don't you think it's your responsibility to know
16   this?
17 A  To know what?
18 Q  Whether or not students with disabilities are more
19   likely to be subject to sexual abuse?
20       MR. SWEENEY: Object to the form.
21 A  What disabilities?
22 Q  Just children with disabilities.
23 A  What disabilities?

Page 22

1  Q  Can you answer my question?
2  A  I could if I knew what specific disabilities we
3     were talking about.
4  Q  I'm talking about all your special education
5     students.
6  A  Well, we've got probably 600.
7  Q  Yes.
8  A  I would expect that in that 600, out of that 600
9     that we have, there may be more -- there may be
10    some that I would respond in the affirmative to
11    your question. And there may be some that I would
12    not respond in the affirmative to. So...
13 Q  But would you agree it's your responsibility to
14    know whether or not this occurs more often?
15 A  It's my responsibility to be -- to do my due
16    diligence and to be as informed as I can possibly
17    be on many, many topics.
18 Q  I am just here about one topic, Dr. Bazzell.
19 A  Including that topic.
20 Q  Is it your responsibility to know whether or not
21    special ed kids are subject to an increased
22    incidence of sexual abuse?
23 A  I think I just answered that question.

Page 23

1  Q  Is that a yes?
2  A  What I said was that I believe it is my
3     responsibility as Superintendent to be widely read
4     and informed and educated and schooled on a
5     wide -- on the research that exists on many, many
6     topics, including that topic.
7  Q  All right. Well, and I am asking you, as a result
8     of your responsibility to do this, what have you
9     learned about the incidence of sexual abuse of
10    disabled children?
11 A  What have I learned from -- from -- repeat the
12    question.
13        MS. DePAOLA: Could you read it back to
14        him, please?
15        (Whereupon, the requested material
16        was read by the Court Reporter.)
17 A  Again, that obviously depends on what the
18    disability is.
19 Q  Okay. Explain that to us.
20 A  I would -- I think it's a fair -- it's fair to say
21    that individuals, whether they are adults or
22    children -- that individuals whether adult or
23    children who have limited cognitive ability can be

Page 24

1     taken advantage of. And, again, that's whether
2     they are adults or children. And, again, it
3     depends on the setting and those kinds of things.
4  Q  All right. So, "can be taken advantage of", do
5     you mean sexually abused?
6  A  I think I mean be -- they can be the victim of
7     crime, whether it's sexual abuse or any -- you
8     know, all kinds of crime.
9  Q  And are you aware of an increased incidence of
10    sexual abuse among students with cognitive
11    disabilities as opposed to regular ed students?
12        MR. SWEENEY: Object to the form.
13 A  I haven't seen that data.
14 Q  You don't know that?
15 A  I haven't seen that data.
16 Q  Is it your responsibility to be informed on that
17    issue?
18        MR. SWEENEY: Object to the form.
19 A  Uhm, it's -- again, I would have to refer back to
20    my previous response. It's my responsibility to
21    be informed and schooled and -- on a wide variety
22    of topics; including those kinds of topics.
23 Q  And what have you done to investigate that issue?

Page 25

1  A  What issue is that?
2  Q  The increased incidence of sexual abuse among
3     individuals with cognitive disabilities?
4  A  What have I done to investigate that?
5  Q  Uh-huh. Yes.
6  A  I guess you are referring to what are the things I
7     have done to be schooled and informed about that
8     issue and other issues --
9  Q  I'm talking about the sexual abuse issue.
10 A  I haven't participated in any related training
11    that I can call that's outside the school system
12    recently that I can recall. That doesn't mean
13    that I haven't. I just can't recall any recently
14    that was put on by say SSA, or AASB or --
15 Q  What's SSA?
16 A  School Superintendent's Association. Alabama
17    Association of School Boards, different
18    professional organizations. I can't recall
19    anything in the last couple of years related to
20    those topics.
21 Q  Has there been anything that you have done outside
22    of those entities? In other words, reading,
23    study, looking on the Internet, anything to inform

## Page 26

1    yourself?
2  A  I read a variety of professional journals.
3  Q  And I am focusing on the issue of sexual abuse.
4  A  I don't recall any.
5  Q  Okay.  Now, you specifically said you don't recall
6     any training outside of the school system.  Are
7     you saying that you received some training within
8     the school system?
9  A  We have conducted training within the school
10    system.  And --
11 Q  All right.  When was that?
12 A  That's in the documents that we have provided.
13 Q  Okay.  Are you referring to the sexual abuse
14    seminar done for K through three and three through
15    five?
16 A  Well, I have got -- we can go through each one of
17    those documents individually where we have talked
18    about those and provided training.  I don't recall
19    all of them, but --
20 Q  Okay.  We'll do that later.
21       Now, have you done any research or looked into
22    the issue of signals -- I don't want to say
23    signals -- that you should be looking for when you

## Page 27

1     look at the behavior of educators within your
2     system that relate to potential sexual abuse by
3     that educator?
4        MR. SWEENEY:  Object to the form.  I
5           don't understand "signals".  Maybe
6           you do.  I am just not clear about
7           that, Susan.  I apologize.
8  Q  Things that you should look for.
9        MR. SWEENEY:  As in detecting potential
10          sexual predators?
11       MS. DePAOLA:  Sexual abuse by educators.
12 A  Uhm, I think I have already --
13 Q  Well, what you gave me before were things, it
14    looked to me like, the child might be withdrawn,
15    or the child might be struggling academically, or
16    the child might have social problems.  I am
17    looking at it from the other perspective.
18 A  Again, you know, children struggle academically,
19    and kids withdraw socially and all those different
20    things for a lot of different reasons.  Sexual
21    abuse could be one of those reasons.  But --
22 Q  Okay.  I am not asking about the child now.  I am
23    looking at what do you look at in your teachers --

## Page 28

1  A  I haven't seen any research related to that.
2  Q  And you don't know of any --
3        MS. DePAOLA:  I said signals, and you
4           said something else that made it
5           clearer.
6        MS. ALLEN:  Things you look at.
7  Q  -- things you look at --
8        MR. SWEENEY:  Is there a profile of a
9           potential sexual abuser?
10 Q  I am asking if there are any behaviors that are
11    typical of a sexual abuser in the educational
12    setting.
13 A  I am not familiar with any research related to
14    that.
15 Q  Have you seen any research as to the teachers mos
16    likely to commit sexual abuse?
17 A  Uhm, I don't recall.
18 Q  So, you may have seen that research?
19 A  I may have, may have not.  I just don't recall.
20 Q  Well, as we sit here today do you have any
21    information --
22 A  I have no recollection of seeing that -- that kind
23    of research.

## Page 29

1  Q  Have you seen or reviewed any of the research
2     regarding the percentage of victims that self
3     report sexual abuse within an educational setting?
4  A  Again, I don't -- in response to all those
5     questions, I don't -- I don't recall that.  I
6     don't recall that research.  I don't --
7  Q  Well, since that happened, have you done anything
8     to inform yourself more about the issues I have
9     just been over?  Since all this happened; meaning,
10    you have got the history of at least two children
11    in your system being sexually abused by one of
12    your educators.
13       MR. SWEENEY:  Object to the form.
14 Q  What have you done in response to that to educate
15    yourself more?
16       MR. SWEENEY:  Object to the form.  That
17          postdates what's happened and,
18          therefore, is not relevant to the
19          issue in your complaint.  But you
20          can answer the question.  I object
21          to the question.
22 A  Repeat the question.
23 Q  What have you done since you have learned that a

Page 30

1  least two of your students were sexually abused to
2  inform yourself more on these issues?
3       MR. SWEENEY: Object to the form.
4  Q  If anything?
5       MR. SWEENEY: Object to the form.
6  A  Uhm -- I haven't done anything related to that.
7  You know, it's just --
8       MS. DePAOLA: Okay. Would you mark this
9            as Plaintiff's Exhibit 1?
10           (Whereupon, Plaintiff's Exhibit 1
11            was marked for identification and
12            is attached hereto.)
13      MS. DePAOLA: And, Donald, this is your
14           document number 202.
15  BY MS. DePAOLA
16  Q  Let you show what we have marked as Plaintiff's
17  Exhibit 1 and ask you if you recognize that
18  document.
19  A  I do.
20  Q  What is that?
21  A  That is the Organizational Diagram for Pike County
22  schools.
23  Q  And I see that it's dated July, 2006. And I also

Page 31

1  see some handwritten notes on the right-hand side.
2  Would I be correct in assuming that the changes
3  you made on the right-hand side reflect the status
4  of each of these positions in 2004 when the
5  complaint arose?
6  A  That's correct.
7  Q  Okay. So, as of 2004, Mrs. Townsend was the
8  principal at Banks School. Was that during the
9  entire year?
10  A  Yes.
11  Q  And Mr. Casey and Mr. Pyron were the principals at
12  Pike County High School. And then Mr. McDaniel
13  was the assistant principal at Pike County High
14  School; is that correct?
15  A  That's correct.
16  Q  He wasn't the assistant principal there the whole
17  year, was he?
18  A  He was there the entire year, Mr. McDaniel was.
19  Q  Okay. Because I understood he came in later in
20  the year. No?
21  A  If I recall correctly, he was employed prior to
22  the beginning of school. I mean, I -- yeah, he
23  was there the entire year.

Page 32

1  Q  Okay. Where did he come from; do you know?
2  A  Oh, gosh. Uhm, Mr. McDaniel was -- was retired
3  Air Force. And I don't recall off the top of my
4  head.
5  Q  I mean, had he previously been employed somewhere
6  in Pike County, or was this the first --
7  A  No, no. His first year to our system.
8  Q  Now, you said that you became appointed as
9  Superintendent in January of '07. So, prior to
10  that, the relevant time period here being
11  2004-2005, you were an elected Superintendent
12  during that period; is that correct?
13  A  That's correct.
14  Q  Can you explain to me what your relationship is to
15  the Pike County Board of Education? I mean, are
16  you a member of the Board, or the Secretary for
17  the Board? Or do you vote? Can you explain to
18  me --
19  A  I'm Secretary to the Board. I don't vote.
20      MS. DePAOLA: And, Donald, I meant to
21           put this on the Record at the
22           beginning. As I understand it,
23           Mr. Bazzell here is testifying on

Page 33

1  his own behalf and also on behalf of
2  the Pike County Board of Education;
3  is that correct?
4      MR. SWEENEY: That's correct.
5  BY MS. DePAOLA
6  Q  Okay. Am I correct that the Pike County Board is
7  responsible for the overall control and
8  supervision of the Pike County school system?
9  A  They're responsible for making policy for the
10  Board.
11  Q  And how do they execute that responsibility? Do
12  you make recommendations to them about policies?
13  A  I -- yes.
14  Q  And they vote on every single policy that's
15  promulgated for the school system?
16  A  Uhm, not all policies. I mean, you have got
17  policies, procedures, and practices. And, you
18  know, those things that we consider policies would
19  be voted on the Board -- by the Board. We have --
20  we have procedures that are established
21  administratively, which, of course, have to be
22  consistent with and congruent with the policies
23  that guide them.

Page 34

1 Q  But do those procedures have to be approved by the
2    Board?  And this may be too generic of a question.
3    I mean, there may be some you present, and some
4    you don't present.  I don't know.
5 A  Uhm, I think that it's fair to say that, for
6    example -- and I can give you an example -- the
7    Board directs us to -- the Board has a policy that
8    basically says that we will have a curriculum -- a
9    curriculum guide that outlines what the academic
10   program will be.  The nuts and bolts of that and
11   all that are established are not necessarily
12   policy.  Non-substantive changes in that may not
13   come before the Board.  But if there is
14   substantive changes in that guide that relate to
15   the -- that relate to graduation, units necessary
16   for graduations, those kind of things; they would
17   certainly go before the Board.
18 Q  For instance, you have produced certain faculty --
19   looks like faculty handbooks in conjunction with
20   the request for production that we filed.  Are
21   those handbooks passed on by the Board?
22 A  You will have to let me see which ones you are
23   referring to, because some of them may have been.

Page 35

1    Some of them may have not been.
2 Q  Okay.  Let's look first at, for instance, what was
3    this 2006-07.  You have produced an Essential
4    Administrative Information document.
5 A  Uh-huh.
6 Q  I want to go back to 2004-2005.  Did you have a
7    document like that 2004-2005?
8 A  2004-2005.  It would -- yes, we did.  And it would
9    have essentially been the same document.  This
10   was -- this is produced -- this is produced by
11   me -- this was produced by me.  It is modeled
12   after the one that John Key did as Superintendent.
13   There may have been minor changes.  There may be
14   minor changes in this from year to year to year.
15   But for the most part, the only thing that really
16   changed is the cover sheet with the date on it.
17 Q  Can you produce for us a copy of that document in
18   the state it was in as of 2004-2005?
19      THE WITNESS:  Donald, I think if we
20         could have done that, we would have
21         done that at that time -- at
22         discovery when we provided to begin
23         with.

Page 36

1 A  We don't -- we don't keep -- wouldn't necessarily
2    keep all these for each year.
3 Q  Can you identify any differences between that
4    document and what was in effect in 2004-2005?
5 A  I sure can.  Would you like for me to do that now?
6 Q  Let me -- we're talking about document number 313
7    produced by the Pike County Board of Education.
8 A  Sure.  It shouldn't take but just a second to do
9    that.
10      MS. DePAOLA:  Can you give me that
11         document, please?  It's 313.
12      MR. SWEENEY:  Let's go off the Record
13         just a minute.
14      (Brief recess.)
15 BY MS. DePAOLA
16 Q  So, what I asked you was:  What aspects of
17   document 313 through 331 --
18 A  Okay --
19 Q  -- were different in 2004?
20 A  Yeah, we can do that real quick.  The page 3,
21   school-opening information.  The dates would have
22   been different to reflect the school calendar for
23   that year.  The last sentence down there, they

Page 37

1    are --
2 Q  Okay.  Are you talking about paragraph 1, opening
3    school information?
4 A  Yeah, school opening information.
5 Q  Okay.  We will skip that.  We will say there may
6    have been changes in paragraph 1.
7      MR. SWEENEY:  Could we stipulate that
8         the relevant portion of that would
9         have to do with some issue in the
10        complaint, so that we can focus on
11        whether it addressed sexual abuse
12        policy or practices or something
13        germane to that as opposed to school
14        calendar?
15      MS. DePAOLA:  Well, I would like to --
16 BY MS. DePAOLA
17 Q  Let's do this, Dr. Bazzell:  Let me go through
18   these and ask you about the ones I am specifically
19   interested in, okay?
20 A  Okay.
21 Q  I am specifically interested in number 5, the
22   policy manual.  First of all, what policy manual
23   are you referring to there?  Is that this document

## Page 38

1    or some other document?
2  A   It's the policy manual of the Board.
3  Q   And has that been produced?
4  A   Uhm, we produced those parts of the policy manual
5      that you requested.
6  Q   All right. So, those are some individual sheets
7      you produced relating to sexual discrimination; is
8      that what you're saying?
9  A   Those were the ones that you asked for, yes.
10  Q   Okay. So, paragraph 5 says that hard copies of
11      policy manuals are provided, and online versions
12      will be available. Did you provide any kind of
13      policy manual to the individual teachers that's
14      referenced in paragraph 5?
15  A   Ah, yes.
16  Q   And you did that in 2004?
17  A   Well, I don't remember the year that we -- uhm,
18      yes. At -- when they are employed, yes, they get
19      a policy manual.
20  Q   And that was the case in 2004-2005?
21  A   Yes.
22  Q   Okay. And did that policy manual go to parents or
23      students, the one referenced in paragraph 5 here?

## Page 39

1  A   We don't send an entire policy manual to parents
2      and students.
3  Q   I'd like you to look at paragraph 9. There is a
4      reference there to student handbooks. Was this
5      paragraph in effect in 2004-2005?
6  A   Yes.
7  Q   And have you produced the student handbook for
8      2004-2005?
9  A   Uhm, I -- I believe we have. I don't know. I
10      would have to check.
11  Q   I mean, I see that you produced a Pike County
12      Student Code of Conduct. But I am not familiar
13      with what you're referring to this in this
14      paragraph.
15  A   Student handbooks. Let me -- there is a variety
16      of -- there is a variety of documents that you may
17      or may not be calling student handbooks that we
18      may be calling something differently. The Board
19      of Education produces a -- what we call a student
20      planner, student calendar -- a student planner
21      calendar. It would be the -- I don't see it. I
22      don't see that. I know we have provided you with
23      those. But those are the -- those are published

## Page 40

1      at the central office level. And they have got
2      the school calendar in it with all the dates. And
3      it's got some care education information in it and
4      some things that we would consider policy
5      statements and statements of procedure.
6  Q   Okay. Could you identify that in the documents
7      that you have given Mr. Sweeney -- I am sure he
8      has a complete set of the documents here -- what
9      you're referring to?
10      MR. SWEENEY: I'm sorry? Did you --
11      MS. DePAOLA: He says he's sure he's
12          produced the student handbook that's
13          given to the students. And I'm not
14          clear what document he's referring
15          to.
16  A   It would be all of these (tenders documents).
17  Q   Okay.
18      MS. DePAOLA: Have you produced these?
19      MR. SWEENEY: Uh-huh.
20      MS. DePAOLA: Have we seen these? They
21          are --
22      MS. ALLEN: They are all those calendar
23          sheets is what I'm assuming.

## Page 41

1  A   We didn't produce the actual documents. Copies of
2      those. Yes. You have got all of that.
3      MS. ALLEN: Is that Bates stamped?
4      MS. DePAOLA: What Bates stamped pages
5          have you produced, Donald?
6      MR. SWEENEY: Susan, I would have to go
7          back and reconstruct. These come
8          from the file of this case, which I
9          understood to be documents produced
10          to you. But you would be the best
11          source of information whether you
12          have these. It's my information
13          they were prepared to give to you.
14      MS. DePAOLA: Let's go off the Record
15          for a second.
16      (Brief recess.)
17      MS. DePAOLA: Let's go back on the
18          Record.
19  BY MS. DePAOLA:
20  Q   We were looking at paragraph 9, which relates to
21      students' handbooks. And you said every student
22      received a handbook, but they did not receive the
23      Board's policy manual; is that correct?

JR, A Minor                          July 24, 2007                          Pike County Board of Education

12  (Pages 42 to 45)

---

Page 42

1  A   Right.
2  Q   And I'm not saying anybody has been hiding
3      anything.  I am not -- you know.  I am just saying
4      now I have seen here what you're referring to as
5      the student handbook.  And that is this document
6      that says, High School Student Planner for
7      2004-2005; is that correct?
8  A   Uh-huh.
9  Q   There is no other student handbook to which you're
10     referring?
11 A   Again, let me -- because there is a difference
12     between handbook, planner, Code of Conduct and so
13     forth.  There are three different planners each
14     year guiding different grade levels.  There is
15     like a kindergarten, 1st and 2nd grade planner.
16     There is a one that deals with elementary.  But,
17     yes, that is what we would consider the high
18     school planner.  That is generated by the Board --
19     by this office here.  And it is provided to each
20     school and provided to each student.  So, that is
21     the -- that is what we distribute from up here to
22     schools.  The local --
23 Q   All right.  Is there any other handbook that you

---

Page 43

1      distribute from here?
2  A   The local -- no, there is not.  We do distribute
3      the Student Code of Conduct from the system level.
4  Q   All right.  And is that the document that I am
5      showing you now which is Pike County document --
6  A   Yes.
7  Q   -- 382?
8  A   That's it.  Well, looks like part of it.
9  Q   How far back in the -- what page does it end on,
10     the Code of Conduct there?
11 A   Well, this looks like the entire document.  It
12     looks much thicker, because single pages for each.
13 Q   All right.  So, just -- excuse me, let me look at
14     that.  So, we're referring here -- I'm looking
15     Bates stamped number.  When you say Code of
16     Conduct, you're looking at document 382 through
17     521; is that correct?
18 A   Yes.
19 Q   Okay.  Is that what they all --
20 A   Wait just a second here, because I want to make
21     sure that -- this is actually a -- more than one
22     Code of Conduct.  This is multiple codes of
23     conduct that you have got in the same.

---

Page 44

1  Q   Let me ask you this:  Is there anything in the
2      Code of Conduct that relates to sexual abuse of
3      students?
4  A   Yes.
5  Q   All right.
6  A   This is more than one Student Code of Conduct.
7  Q   Can you show me the Student Code of Conduct that
8      was in effect for 2004-2005?
9  A   I can.  Okay.
10 Q   Okay.  Now, that's dated after the 2004-2005
11     school year.
12 A   Let me look and see.  2005.  Let me go back to the
13     next one.  Okay.  That would be -- it would be,
14     again -- and it's confusing.  I apologize.  It's
15     confusing.  But these are simply cover sheets for
16     the particular year.  What is important would be
17     these revision dates.  This was revised June of
18     2005.  The revision prior to that was in June of
19     2003.  So, it would be one where the revision 2005
20     was not there.  Then would be one -- I'm sure
21     there is one here that says that.
22 Q   Can you find me that one, the applicable one.
23 A   Yeah.  Let me start and go through page by page.

---

Page 45

1      That's it right there.  It's this first one.
2  Q   All right.  And can you give me the beginning and
3      end and pages in the middle of the applicable Code
4      of Student Conduct?
5  A   Uhm, 382 through 19, 20, 22, 24, uhm, I believe it
6      ends on 421.
7  Q   Okay.  Let's take those pages out now.  We're
8      going to mark those.  And let me get all my other
9      pages away.
10           (Whereupon, Plaintiff's Exhibit 2
11            was marked for identification and
12            is attached hereto.)
13 Q   Mark this as Plaintiff's Exhibit 2.  And it's your
14     testimony that this was the applicable code of
15     student conduct distributed by the
16     Superintendent's office to students during
17     2004-2005; is that correct?
18 A   Let me look at it one more time.
19           MS. DePAOLA:  Let's go off the Record.
20           (Brief off-the-Record discussion.)
21           MR. SWEENEY:  What are you looking for,
22     Mark?
23           THE WITNESS:  I'm looking at this to --

---

JR, A Minor                    July 24, 2007                    Pike County Board of Education

13 (Pages 46 to 49)

Page 46

1     MS. DePAOLA: Wait, are we on the
2     Record?
3     THE COURT REPORTER: Since Mr. Sweeney
4     asked him what he was looking for.
5     MS. DePAOLA: Oh, good.
6 A  This is -- repeat your question. You asked if
7 this was the Code of Conduct for the year 04-05?
8 Q  Yeah.
9 A  This is the Student Code of Conduct, minus what
10 is -- you know, the appendix that goes on the back
11 of it, which would include those things that --
12 let me show you.
13     MR. SWEENEY: Can you go get a copy of
14     just what's bracketed?
15     MS. DePAOLA: Wait. Let's go off the
16     Record.
17     (Brief off-the-Record discussion.)
18 BY MS. DePAOLA
19 Q  Are you looking for something in this?
20 A  Let me look. The letter -- these things at the
21 end here are not numbered. This information about
22 No Child Left Behind, gifted education, gifted
23 education, notification of rights for elementary

Page 47

1 and secondary schools, notice of directory
2 information. And then -- that was under Appendix
3 A. Now, there is some additional information
4 in -- related to 504 and so forth that fall under
5 the heading of Appendix A that we put in each year
6 in accordance -- to meet federal guidelines,
7 whether it's No Child Left Behind or whatever.
8 So, those are not numbered. But when we publish
9 the document, the Appendix A guess in the back.
10     THE WITNESS: Where is the Code of
11     Conduct, Donald, that we just had?
12 A  For example, this is Code of Conduct. But when
13 you get back to the back, you have an Appendix A.
14 Code of Conduct ends at 37, and then you have
15 Appendix A. And it covers all those
16 notifications.
17 Q  Would those have been the same in 2004-2005?
18 A  Uhm -- Parents Guide to 504. Yeah, I think they
19 would have pretty much been the same. Again, my
20 staff puts those in there according to what the
21 federal notifications need to be. And so we plug
22 those into the back.
23     MS. DePAOLA: Let me ask Donald if this

Page 48

1     would be all right with him -- and
2     we will remain on the Record --
3     could he get the appendix documents,
4     and we'll attach it to Plaintiff's
5     Exhibit 2? We can do that on the
6     break. It appears that the
7     appendices that he wants are
8     available to him now, and we can
9     attach it so we have a complete copy
10     of Plaintiff's Exhibit 2.
11     MR. SWEENEY: What do you want copied?
12     MS. DePAOLA: Whatever the appendices
13     were to include in Plaintiff's
14     Exhibit 2.
15     MR. SWEENEY: Where are they? Have you
16     got the appendices?
17     THE WITNESS: Yeah, they would be out of
18     that 2005 Student Code of Conduct.
19 A  So, you want copies of the Appendix to this?
20 Q  Any appendix that should be part of Plaintiff's
21 Exhibit 2.
22 A  That would be this. And we were looking at that,
23 still.

Page 49

1     MS. DePAOLA: Can we go off the Record
2     now?
3     (Brief recess.)
4 BY MS. DePAOLA
5 Q  Dr. Bazzell, what I understand we will have when
6 they finish copying is a document that we have
7 marked Plaintiff's Exhibit 2 that is a complete
8 copy of the Code of Student Conduct for 2004-2005
9 is that your understanding?
10 A  It would be Student Code of Conduct with the
11 attached Appendix.
12 Q  For 2004-2005?
13 A  Uh-huh.
14 Q  And as I understand, that was promulgated by the
15 Superintendent's office; is that correct; the Code
16 of Student Conduct?
17 A  Yes.
18 Q  And was it approved by the Board?
19 A  Yes.
20 Q  So, there will be some minutes or something of the
21 Board meeting showing the approval of the Code of
22 Student Conduct?
23 A  Uh-huh.

JR, A Minor                     July 24, 2007                Pike County Board of Education

14 (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  Q  Let me back up to the planner, which is now being
2     copied. As I understand, that was prepared by the
3     Superintendent's office; is that correct?
4  A  Prepared by our office, yes.
5  Q  And it was distributed to each student?
6  A  Uh-huh.
7  Q  Was it approved by the Board?
8  A  I believe we give them a copy. We don't ask for
9     their approval. Only because it's not -- no --
10 Q  And then --
11 A  And they approve -- again, I want to make sure --
12    they don't approve the document, itself. There is
13    items within the document that are pieces and
14    parts of other documents that they did approve.
15 Q  Right.
16 A  For example, they would have approved the school
17    calendar that's within this document. They would
18    have approved the high school diploma and
19    certificate options, which -- in another
20    document -- which is part of this document. They
21    would have approved the promotional criteria
22    that's within this document, but is its own
23    separate document. There is parts of the Student

**Page 52**

1     the documents. But these look like all of the
2     Pike County High School documents I have seen.
3  A  This is a -- this would not be a student handbook.
4     This is a faculty handbook.
5  Q  So, there would be both a student handbook and a
6     faculty handbook?
7  A  Again, that's at the discretion of the principal.
8     The principal might -- I think most of them do
9     have some kind of faculty handbook that tells --
10 Q  And can you identify for me the 2004-2005 faculty
11    handbook at Pike County High School?
12 A  Uhm, no, I can't do that. I'm not -- Mr. Casey
13    may be able to do that from the ones that we have
14    here.
15 Q  So, you don't even review the faculty handbook?
16 A  The -- we do not review the faculty handbooks at
17    the local school, because, again, they are not --
18    they are not policy. Most of them are filled with
19    procedures like what football game does each
20    teacher work and those kinds of things. So, no,
21    we don't.
22 Q  Is there a student handbook for 2004-2005 for Pike
23    County High School?

**Page 51**

1     Code of Conduct that's in this document.
2  Q  Were those approved by the Board, the parts of
3     the --
4  A  Yeah. There are parts in this -- there are -- in
5     this -- in each student planner, there are parts
6     of other documents that were approved by the
7     Board.
8        MS. DePAOLA: Let's go off the Record.
9        (Brief off-the-Record discussion.)
10       MS. DePAOLA: Let's go back on the
11       Record.
12 BY MS. DePAOLA
13 Q  All right. Now, when we started this, you also
14    said there was a handbook. You said there was a
15    handbook, a planner, and Code of Conduct? And
16    tell me what this handbook is.
17 A  Each school -- each school -- each school may or
18    may not generate a handbook at the local school
19    level.
20 Q  And for 2004-2005, was there a handbook at Pike
21    County High School?
22 A  Uhm --
23 Q  And I don't want to represent to you these are all

**Page 53**

1  A  Again, that would be something Mr. Casey would
2     have to answer. Most --
3        (Brief interruption.)
4  Q  Okay. Would the student handbook be something you
5     would review?
6  A  Not necessarily.
7  Q  Okay.
8  A  Now, again, the -- most student handbooks -- most
9     student handbooks are pieces and parts of other
10    documents that we produce. And they have to be
11    congruent with -- they have to operate within the
12    policies and procedures that we have established
13    at the system level.
14 Q  But are not approved up above the building level?
15 A  Well, you're talking about, you know, obviously a
16    student handbook might have things in it like how
17    do you go to lunch. Well, how you go to lunch at
18    Pike County High School is different than how you
19    go to lunch at Goshen High School.
20       So, yes, there's things in the handbook that
21    are unique to that school that we would not
22    dictate from up here.
23       But general statements of policy within the

Mary Moore-Wynn, CSR                 Mary Moore-Wynn              (334)244-0203
                                  Court Reporting Services

Page 54

1　student handbook would have to be congruent with
2　what we put up here.
3　**Q　Okay.  Now, having gone through four types of**
4　**documents; the faculty handbook, the student**
5　**handbook, which are printed locally or published**
6　**locally, a planner, and a Code of Conduct, we are**
7　**still left with this document called Essential**
8　**Administrative Information.  What is that?**
9　A　Again, that is the -- Essential Administrative
10　Information is information that the
11　superintendent, both past and present, has
12　generated to -- to send to the members of the
13　administrative team.
14　**Q　Just to building administrators?**
15　A　To -- well, to central office administrators,
16　building-level administrators that's intended to
17　give them guidance.
18　**Q　All right.  And having been through all that, we**
19　**were attempting to determine whether anything in**
20　**this Essential Administrative Information document**
21　**that you produced was essentially different than**
22　**the one that would have been in effect in**
23　**2004-2005.  And let me continue through here,**

Page 55

1　**because I'm not going to be interested in all**
2　**these paragraphs.**
3　**For instance, paragraph 15 -- are you in the**
4　**same document I am -- employee sign-in sheets.**
5　A　Uh-huh.
6　**Q　Would that have been the same in 2004-2005?**
7　A　Uh-huh.
8　**Q　How about paragraph 18?  Would that have been the**
9　**same?**
10　A　Yes.
11　**Q　How about paragraph 27?  Would that have been the**
12　**same?**
13　A　Yes.
14　**Q　How about paragraph 37?  Would that have been the**
15　**same?**
16　A　Ah, yes.
17　**Q　How about 39?**
18　A　Yes.
19　**Q　How about paragraph 46?**
20　A　Yes.
21　**Q　How about 49?  Would that have been the same?**
22　A　Yes.
23　And, again, to my best recollection, all these

Page 56

1　would be -- all the ones including that one would
2　be the same.  There may have been some slight
3　tweaking of the language.  But there's not -- I
4　mean, when I am sitting there at the computer
5　going through it, I might decide, oh, it would
6　sound better if I said it this way.  But,
7　essentially -- you know, substantively, it's the
8　same exact thing.
9　**Q　How about paragraph 53; would that be**
10　**substantially the same?**
11　A　Let's see, 53.  Yes.
12　**Q　Then would that be the end of this document?**
13　A　No.  It goes to -- well, there are -- yes.  Well,
14　it has a calendar.  And I think in this particular
15　one right here, it has some additional things that
16　would not have been there in 2005.
17　**Q　2004-2005?**
18　A　2004-2005.
19　**Q　I'm going to mark document pages 313 through 331**
20　**as the Essential Administrative Information that**
21　**was in effect for 2004-2005 with your testimony**
22　**that it is essentially unchanged as to the**
23　**paragraphs I asked you about; is that correct?**

Page 57

1　A　Yes, that's my best recollection.  I can't recall
2　any substantive changes that were made -- or I
3　made what I was going through those.  Again, I may
4　have changed the way I said a particular sentence
5　or something just to make it -- clarify it.  But
6　other than that, it didn't change.
7　**MS. DePAOLA:  I'm going to mark this**
8　**document as Plaintiff's Exhibit 3 as**
9　**identified by this witness.**
10　**(Whereupon, Plaintiff's Exhibit 3**
11　**was marked for identification and**
12　**is attached hereto.)**
13　**BY MS. DePAOLA**
14　**Q　Was the document I have labeled as Plaintiff's**
15　**Exhibit 3 approved by the Board?**
16　A　No.
17　**Q　Now, I'd like to go through each of these**
18　**documents.  With respect to the planner -- did we**
19　**get the planner?**
20　A　Did she bring it back?
21　**MS. ALLEN:  Not yet.  No.**
22　**(Brief interruption.)**
23　**MS. DePAOLA:  And there she is.**

Page 58

1   A   High school student planner, 04-05.
2           MS. DePAOLA:  Thank you.
3   A   Oh, and this is the Appendix A, which would go in
4       the back of this; is that correct?
5   Q   Yes.  If you could just put that in there.
6           THE WITNESS:  Did you see that this is
7               Appendix A that would be included in
8               this?
9           MR. SWEENEY:  Okay.
10  BY MS. DePAOLA:
11  Q   Okay.  Just to put on the Record now, Plaintiff's
12      Exhibit 2 is document 382 through 421, plus
13      Appendix A, which is pages 461 through 473; is
14      that accurate?
15  A   Uh-huh.  Yes, ma'am.
16  Q   Okay.  Let's go back over these.
17          MS. DePAOLA:  Let me mark one more.
18          (Whereupon, Plaintiff's Exhibit 4
19              was marked for identification and
20              is attached hereto.)
21  BY MS. DePAOLA:
22  Q   This will be Plaintiff's Exhibit 4.  Would you
23      take a look at Plaintiff's Exhibit 4 and just

Page 59

1       identify what that is for the Record?
2   A   This is the high school student planner.
3       Sometimes we call it student calendar planner,
4       student calendar.
5   Q   Is that also called a student agenda?
6   A   Yes.  It's sometimes referred to as a student
7       agenda, yes.
8   Q   And I did not copy every page as far as the
9       calendar portion of it.  But, otherwise, does that
10      appear to be a complete copy of that planner?
11  A   It appears to be a complete copy of it.
12  Q   All right.  Let's start with that one.  With
13      respect to Plaintiff's Exhibit 4, is there
14      anything in Plaintiff's Exhibit 4 which relates to
15      sexual abuse; any policy or procedure which
16      relates to sexual abuse?
17  A   Ah, not that I recall.
18      I don't --
19  Q   Just wanted to give you a chance to review it.
20  A   No, I am not -- I'm just flipping through it
21      again.  I mean -- I've already answered that.
22  Q   Well --
23  A   I'm not going to change it.

Page 60

1   Q   Well, not that I recall and no are two different
2       things.  Is that no?
3   A   Well, not that I recall.  I don't recall anything
4       in the planner that deals with sexual abuse.  And,
5       you know, I mean, you can -- I can stretch that
6       answer and say, well, you know -- well, we, you
7       know, we are very diligent in our efforts to
8       supervise students.  For example, one of the
9       reasons we provide the planner is so that it is --
10      is because of the -- is to provide the sign-out
11      information -- the hall pass information in the
12      back.  I mean, that's --
13  Q   Okay.  The planner, in essence, serves as their
14      hall pass?
15  A   Ah, yes.
16  Q   And does the school keep any records, other than
17      what's in the planner, as to when a student is out
18      of class as reflected in their hall pass?
19  A   Well, students -- students -- the planner is used,
20      and the hall pass in here are used for students
21      moving from teacher to teacher, or from teacher to
22      the office or from the office back.  And it's --
23      you know, it has time in time out for sending

Page 61

1       teacher, receiving teacher.  That is why we
2       have -- that is why we've done that.
3   Q   But my question is:  Other than to the extent it's
4       contained in that document, is it contained in any
5       other school records?
6   A   Records concerning the movement of students within
7       the school?
8   Q   Yes, sir.  Yes.
9   A   Uhm, I mean, we maintain records for students to
10      check in and check out.  Records when kids, you
11      know, are absent from school or present in school.
12      We probably keep records pertaining to kids who
13      are absent from school for a field trip during the
14      day.  We track the coming and going of students
15      who are attending career technical education
16      classes throughout the day, school day --
17  Q   Let me ask it this way --
18  A   -- all those things, yes.
19  Q   Okay.  Justin Reed, we believe, was leaving class
20      to go down to the band room during the school day.
21      Would there be any records in your possession
22      relating to that occurring or not occurring?
23          MR. SWEENEY:  Object to the form.

---

Page 62

1    A   Uhm, I'm sorry.  Can I ask you to repeat the
2        question again?  Because I don't want to --
3    Q   Okay.  If Justin Reed were leaving his classroom,
4        say his English class, to go to the band room
5        during the school day, would you have any record
6        of that, other than what might be contained in the
7        planner?
8    A   Only -- only if his absence was authorized.
9    Q   What do you mean by "authorized", like a teacher
10       said, please go?
11   A   Like if a teacher -- if he was -- if he was
12       leaving class for a legitimate reason; such as, to
13       leave early to go -- leave early to go to the band
14       concert, or leave early to go to the parade along
15       with other students.  You know, there is a number
16       of reasons students could be out of class
17       legitimately that may be tracked.  But if a
18       student is leaving a class covertly, or in a
19       manner to --
20   Q   Covertly?
21   A   Well, not covertly -- that's not a good word --
22       but in a manner -- in a manner -- if a student is
23       trying to leave class in a manner -- if a student

Page 63

1        is leaving class in a -- in -- uhm, for a reason
2        that would not be authorized to leave class, no,
3        there is no method to track that.
4    Q   Okay.  Let's --
5    A   Can I give you an example?  Ms. Reed mentioned the
6        other day that Justin was disciplined for leaving
7        class when he wasn't supposed to leave class.  No,
8        there wouldn't be a method for us to track that
9        other than the discipline file.  But systems that
10       we have in place, such as this here
11       (indicating) --
12   Q   He's pointing to Plaintiff's Exhibit 4.
13   A   -- the planner is to try to track the comings and
14       goings of kids.
15   Q   Say that Mr. Coon was sending a note to Justin's
16       teacher, please let Justin come down to the band
17       room during your class, and the teacher was
18       allowing him to do so; would there be any record
19       in the central office or school office that would
20       track that?
21            MR. SWEENEY:  Object to the form.
22   A   Again, that's a hypothetical that if that was
23       occurring.  If that was occurring, there would be

Page 64

1        no method to track that.
2    Q   Okay.
3    A   I would expect -- you know, most of the teachers I
4        know wouldn't let them come and go like that.
5    Q   Have you investigated whether that occurred in the
6        Justin Reed case?
7    A   I have no information to suggest that that
8        occurred in the Justin Reed case.
9    Q   Have you talked to his teachers?
10   A   Uhm, yes.
11   Q   And they deny that that occurred?
12   A   Yes.
13   Q   All right.  I want to go back to these documents.
14       So, as to Plaintiff's Exhibit 4, you indicated you
15       did not see anything in there related to sexual
16       abuse.
17            Let's look at Plaintiff's Exhibit 3.  Is there
18       anything in there that relates to sexual abuse
19       policies or procedures?
20   A   That's the Essential Administrators --
21   Q   Dr. Bazzell, before you respond to that, could I
22       just interrupt you?
23   A   Uh-huh.

Page 65

1    Q   Ms. Allen wants me to ask you which teachers have
2        you spoken to about Justin being released from
3        class?
4    A   We spoke with, I believe, Ms. Catrett, and
5        Mr. Suber, I think.
6    Q   Thank you.
7    A   There is nothing in here that specifically
8        mentions child abuse.  Again, there is numerous
9        sections that refer to issues related to
10       supervision of students and those kind of things.
11       Things that we have in place --
12   Q   Can you tell me what you're referring to that
13       might relate to supervision?
14   A   Uh-huh.  Well, do you want me to go through all of
15       them?  Forty-nine, specifically, the principal
16       should make every effort to insure that the
17       professional staff is assigned to monitor
18       supervise students throughout the day.
19            District emergency code relates to students'
20       safety and supervision.
21            Internet use policy refers to policies and
22       procedures in place to insure proper use of
23       technology.

Page 66

1      Leaving school during workday relates to --
2  Q  **What paragraph are you reading from?**
3  A  Thirty-nine.
4      Thirty-seven deals with parent-student-teacher
5      relationships.
6  Q  **Okay.**
7  A  And not creating a climate of openness for parents
8      to express any concerns they have about their
9      schools, including their -- any concerns they may
10     have about their teachers.
11     I think that's all.
12 Q  **Okay.  All right.  So, we have looked at the**
13     **planner, the Essential Administrative Information.**
14     **Look at Plaintiff's Exhibit 2 and tell us if there**
15     **is anything there related to sexual abuse issues.**
16 A  And, again, sexual abuse issues are very broad.
17     And I assume that you are asking questions about
18     things related to sexual harassment, student
19     supervision.  Complaints of discrimination and --
20 Q  **I'm asking --**
21 A  -- due process --
22 Q  **I'm asking about sexual contact between educators**
23     **and students.**

Page 67

1      MR. SWEENEY:  His response embraces
2      that.
3  BY MS. DePAOLA
4  Q  **Well, I just want to make clear you understand**
5      **what I am when I say sexual abuse.  I am talking**
6      **about educator/student sexual contact.  Is there**
7      **anything in there that relates to that?**
8  A  Well, you know, this is -- this is an employee
9      Code of Conduct -- I mean, this is a Student Code
10     of Conduct, not an employee Code of Conduct.  But,
11     you know, there are procedures in here that
12     outline what students and parents need to do if
13     they have concerns about something that's going on
14     involving either another student or a staff -- or
15     a staff member.
16 Q  **All right.  Show me where the procedure is for**
17     **concerns about sexual abuse.**
18 A  I'm making sure I don't miss anything.
19     Uhm -- again, when you're talking about
20     complaints by students and/or parents, there is a
21     section on page 32 that deals with public
22     complaints that may or may not be related to that.
23 Q  **Well, is this your procedure for reporting**

Page 68

1      concerns about sexual abuse by a teacher?
2  A  No.
3  Q  **Because this seems to appear to relate to**
4      **discipline matters.**
5  A  No.  It relates to any public complaint -- any
6      public complaint or concern.
7  Q  **Where does it say that on the front?**
8  A  Page 32.
9  Q  **Could you read me -- I see it says, parents**
10     **guardians have a right to arrange a hearing with**
11     **principal on discipline matters if desired.  Is**
12     **that what you're referring to?**
13 A  Complaints and grievances shall be handled and
14     resolved whenever possible as close to their
15     origin as possible.
16 Q  **That's your procedure for handling sexual abuse**
17     **claims?**
18 A  No.  No.  That's -- I mean, that's one of the ways
19     that parents can have their concerns expressed --
20     or reviewed.
21     And then, of course, due process procedures.
22 Q  **What page are you on?**
23 A  The student -- I'm on page of Appendix A, due

Page 69

1      process procedures, under file JCAA.
2  Q  **What Bates stamp number is in the lower right-hand**
3      **corner?**
4  A  I'm sorry.  It's 419.
5  Q  **Okay.  Are you saying that Appendix A due process**
6      **procedures is the Pike County Board's policy on**
7      **reporting and handling sexual abuse matters?**
8  A  I am saying that the students and parents who have
9      concerns about that issue as well as a variety of
10     other issues, it says in the next to the last
11     paragraph, Pike County Board of Education, we use
12     the following procedure for any grievance of any
13     nature to include but not limited to alleged -- to
14     include but not limited to alleged discrimination
15     based on the grounds of race, color, disability,
16     sex, religion, creed, national origin, or age.
17 Q  **So my question was:  Is this document here, page**
18     **419, Pike County's procedure for handling sexual**
19     **abuse complaints?**
20 A  It says any grievance of any nature to include but
21     not limited to, so, yes --
22 Q  **Is there any -- excuse me.  Go ahead.**
23     Well, is there any other document that shows a

JR, A Minor                          July 24, 2007                          Pike County Board of Education

---

Page 70

1    procedure for handling sexual abuse complaints
2    other than that page you have just showed me?
3  A  I don't recall any other.
4       You know, let me say this: You know, in the
5    case of Justin, we have an obligation to do the
6    very best we can to protect all students. And I
7    think that the information and documents that we
8    have provided does a -- outlines a very clear plan
9    for doing -- for doing that as it relates to
10   supervision, and those kinds of things. Above and
11   beyond that, you have -- in this case of Justin,
12   you have an IEP committee, multidisciplinary team
13   that meets, certainly is available to hear any
14   issues or concerns that might be brought up,
15   whether they relate to sexual abuse or other
16   issues.
17 Q  Are you telling me that's Pike County's procedure
18   for a parent and/or a student to go to the IEP
19   team about sexual abuse?
20 A  That's not what I said.
21 Q  You're saying that's another avenue?
22 A  I'm saying that's another avenue if there is any
23   concerns that are being expressed.

---

Page 71

1  Q  Okay. So, we have looked at the Code of Conduct.
2    And we have looked at the planner. Have we looked
3    at all three of those documents now; Plaintiff's
4    Exhibit 2, 3, and 4, and you have identified all
5    of your policies and procedures in those documents
6    relating to sexual abuse complaint?
7  A  We have looked thoroughly at the three that you
8    have asked me about, yes.
9  Q  Okay. Since I have a pink sticky note from
10   Ms. Allen, let me go back to this question. Who
11   spoke with Ms. Catrett and Ms. Suber about Justin
12   Reed leaving class?
13 A  Ms. Berry.
14 Q  Now, how were those teachers selected?
15 A  It would have been -- it would have -- based on
16   the student's schedule. Based on the schedule
17   Justin had during that year.
18 Q  I mean, he had like four or five teachers. Do you
19   know why these were selected?
20 A  I'm not sure. She may have spoke with all of
21   them. I just -- and she -- I just don't know. I
22   know she spoke with -- I know she spoke with those
23   two. I think one of the other teachers is not

---

Page 72

1    with us now is possibly why she didn't.
2  Q  Who is that?
3  A  I shouldn't guess like that, because I can't
4    recall her name. So...
5  Q  Okay. Are there any other policies and procedures
6    manuals for Pike County for 2004-2005 other than
7    what we have already identified?
8  A  Well, there is policies within the policy manual
9    itself --
10 Q  Okay.
11 A  -- that have not been.
12 Q  All right. Let's take a look at those. Now, as I
13   understand it, the policy manual itself is
14   promulgated by the Board?
15 A  Yes.
16 Q  And I'm not clear on whom it's distributed as of
17   2004-2005.
18 A  It's distributed to all faculty members.
19 Q  Any students?
20 A  Ah, no.
21 Q  Or parents?
22 A  No. There is a copy sent to the schools for -- to
23   maintain in the office. I mean, there is copies

---

Page 73

1    available. But they are not distributed. They
2    are -- and, actually, they are student sections of
3    the policy manual. There is student sections of
4    the policy manual that wind up being distributed
5    to the parents in other forms, such as --
6  Q  Okay. Let me just see if we can figure out what
7    pages you're talking about.
8       MS. DePAOLA: Pull out pages 112 through
9       133.
10 BY MS. DePAOLA:
11 Q  Okay. Let me just show you these documents, which
12   are numbered in the lower right-hand corner. Are
13   any of these documents what you are referring to
14   when you say the policy manual?
15 A  These are in the Pike County Board of Education --
16 Q  Policy manual? Okay. Now, which of these are in
17   the policy manual for 2004-2005?
18 A  All of these. No, this would not have been
19   (indicating).
20 Q  Okay. All right. So, we're going to mark this as
21   Plaintiff's Exhibit --
22 A  That last page would not have been.
23 Q  Sorry.

---

JR, A Minor                     July 24, 2007                  Pike County Board of Education

20  (Pages 74 to 77)

Page 74

1          (Whereupon, Plaintiff's Exhibit 5
2          was marked for identification and
3          is attached hereto.)
4  BY MS. DePAOLA
5   Q   I'm going to mark this as Plaintiff's Exhibit 5
6       and ask you:  Is it your testimony that all of
7       those pages were in the policy manual in
8       2004-2005?
9   A   Yes.
10  Q   And which of those policies relate to the sexual
11      abuse of students?
12  A   The -- it will be the -- it would be -- again,
13      these -- all of those policies relate to
14      supervision of students in one way or another.
15      But as it relates to sexual harassment, it would
16      be JCK117, 118, 124 -- and all of these relate
17      remotely to the supervision of students.
18  Q   Are you aware of the words "sexual abuse"
19      appearing anywhere in these policies?
20  A   It's been a while since I have read it very
21      closely.  And, again, you are referring to JCK?
22  Q   I'm referring to Plaintiff's Exhibit 5, which is
23      the --

Page 75

1   A   All of them?  All of these?
2   Q   Yeah.  Do you have any knowledge of the words
3       "sexual abuse" appearing in there?
4   A   I know it's -- you're talking about 16 pages.
5       Some of them are front and back.  It's been a
6       while since I read it.  So, I can't answer that.
7   Q   Do you distinguish in any way between sexual
8       harassment and sexual abuse?
9   A   Yes.
10  Q   Okay.  How?
11  A   Uhm, sexual harassment is -- is defined in JCK
12      there.
13  Q   Are you talking about 118?  Where are you
14      referring to, the Bates Stamp Numbers?
15  A   117, 118.  Uhm, and, again, not all -- let me
16      think about how -- uhm, sexual harassment is --
17      you know, you can have -- you can have situations
18      where someone is sexually harassing another
19      person, and it not necessarily be a criminal
20      activity.  But certainly, a great deal of sexual
21      harassment, particularly when it's between an
22      adult and a child, is obviously adult and a
23      student at school, would certainly be criminal.

Page 76

1       So --
2   Q   I mean, this is --
3   A   I mean, you know --
4   Q   I'm trying to understand.  Is your distinction
5       sexual abuse is criminal and sexual harassment is
6       not necessarily?
7   A   No.  No.  No.
8   Q   How do you distinguish between the two?
9   A   Well, the criminal code specifically devines --
10      the criminal code specifically defines, you know,
11      the elements of a crime that -- as it relates to
12      specific things that -- uhm -- and, again, I want
13      to make sure I'm clear on this.  If a school
14      employee tells a joke that -- that is not
15      appropriate, it could certainly be considered
16      sexual harassment, particularly if the jokes are
17      something that happens over and over again and is
18      just an inappropriate kind of thing.  That would
19      be sexual harassment.  It wouldn't necessarily be
20      criminal.  It would certainly be something we
21      would be concerned about and take action on.
22          It is -- by the same token, touching, patting
23      grabbing, pinching, all those things listed on

Page 77

1       page 118 would be both sexual harassment and
2       criminal conduct.  So, you know, in some cases,
3       it's both.
4   Q   Who wrote this document, page 118?
5   A   This document was put together by Ms. Karen Berry.
6   Q   Do you see the reference in the definition of
7       sexual harassment to unwelcome sexual advances?
8   A   Where is that at?
9   Q   Line one.  Sexual harassment of a student consists
10      of unwelcome and unsolicited sexual advances.
11  A   Uh-huh.  I do see that.
12  Q   So, if -- if the conduct is welcomed, does it
13      violate this policy?
14  A   If the conduct is welcomed?
15  Q   Yeah.
16  A   Again, let me make sure that --
17          MR. SWEENEY:  Read the whole policy
18          before you answer.
19          THE WITNESS:  Yeah.
20  A   Well, we would -- I mean, we would consider -- we
21      would consider whether it's welcomed or unwelcomed
22      if it involves a student or a child to be sexual
23      harassment.  I mean, it's just not --

JR, A Minor                         July 24, 2007                    Pike County Board of Education

---

Page 78

1  Q  So, even if it's welcomed by the child --
2  A  If it's welcomed by the child --
3  Q  -- it's sexual harassment?
4  A  Yeah.
5  Q  Does it say that here?
6  A  Not that I see there.  No.  It does not.
7  Q  Now, as I understand it, this policy that you're
8     referring to, document 118, is distributed only to
9     faculty members.  And there is a copy of the
10    document in the school?
11 A  I'm not sure -- I know that to be correct.  I'm
12    not sure if there is other -- I'm not sure if
13    there is a wider distribution of that.  I can
14    check.
15 Q  And this is the policy document we have marked as
16    Plaintiff's Exhibit 5 --
17 A  Yes.
18 Q  -- that is approved by the Board?
19 A  Yes.  I'm trying to recall if that's published
20    somewhere else.  I just can't recall right now.
21 Q  Is there anything in the policy manual about the
22    procedures for addressing complaints of sexual
23    abuse?

---

Page 79

1  A  There -- within the -- within the Student Code of
2     Conduct, within the --
3  Q  I'm looking at this document.
4  A  Within this document here, there's -- again, I
5     refer back to the due process -- the due process
6     procedures and --
7  Q  Are you --
8  A  -- the grievance procedures.
9  Q  Well, show me exactly what you mean.  Are you
10    talking about page 0130, student grievance
11    procedure?
12 A  I'm, again, referring to the 130 through 132.
13 Q  That appears to relate peripherally, anyway, to if
14    a student has some kind of grievance.  What about
15    procedures for faculty members or principals or
16    you to use when addressing issues of sexual abuse?
17       MR. SWEENEY:  You mean, reporting sexual
18       abuse?
19       MS. DePAOLA:  No.
20 Q  Is there any document that outlines the procedures
21    that your administrators, including you, are to
22    follow when there is a suspicion or allegation of
23    sexual abuse?

---

Page 80

1  A  Let me just -- the last paragraph relates to --
2  Q  What page are you on?
3  A  I'm on 117 -- relates to school systems will act
4     promptly to investigate all complaints either
5     formal, informal, verbal or written of harassment.
6     And it lists all of those.  You know, so, I refer
7     to that and those documents that I have previously
8     mentioned as our policy concerning reporting those
9     matters.
10 Q  Okay.  The only thing I -- as to procedures to be
11    used in investigating sexual abuse allegations or
12    issues, the only thing I have seen you refer to
13    thus far is page 117.  Tell me anything else that
14    outlines the procedures that you and your
15    administrators use in investigating sexual abuse
16    allegations.
17 A  Again, the procedures that we would use to
18    investigate sexual abuse would be those same
19    procedures that we would use to investigate all
20    kinds of concerns.
21 Q  And where are those procedures?  Show those to me
22 A  As far as --
23 Q  In any of the documents that we have produced.

---

Page 81

1  A  Well, there is not -- I mean, if you are asking
2     for -- you know, each situation is different.  So,
3     if you are asking for a list of things, okay, this
4     is what you do first, and when you finish doing
5     that, then you go and do the second thing --
6  Q  As it relates to sexual abuse complaints, yes,
7     where is that?
8  A  Okay.  Well, that's what I am answering, is that,
9     you know, if you're asking for a itemized list of
10    what we would do in a complaint of sexual abuse,
11    or any other complaint, for that matter --
12 Q  No, I am just limiting it --
13       MR. SWEENEY:  Let him finish.
14 A  If you are asking for a list of canned steps that,
15    okay, the first thing you do is Number 1, and the
16    second thing you do is Number 2, and the next
17    thing you do is Number 3, and the next thing you
18    do is Number 4, we don't have that list.
19 Q  Okay.  Whose responsibility would it be to draw up
20    procedures for administrators to use in
21    investigating sexual abuse complaints?
22 A  Uhm, again, each situation is different, and --
23    each situation is different.  And what you do in

---

Mary Moore-Wynn, CSR                Mary Moore-Wynn                      (334)244-0203
                                  Court Reporting Services

JR, A Minor                    July 24, 2007                    Pike County Board of Education

Page 82

1    terms of step by step by step varies by situation.
2  Q  And whose responsibility is it to determine what
3    those steps are?
4  A  Well -- and, again, the steps -- what would do in
5    a particular situation might vary.  So, it would
6    not be -- it would not be appropriate to have a
7    one-size-fit-all (sic) list.
8  Q  Okay.  So, you felt it was not appropriate to have
9    a written procedure for investigating sexual abuse
10   complaints?
11 A  No, that's not what I said.  What I said is it's
12   not appropriate to have a one-size-fit-all list of
13   the steps that would need to be followed in
14   investigating a variety of different kinds -- all
15   complaints, including complaints of sexual abuse.
16 Q  So, you've determined -- is that your
17   responsibility to determine whether or not to
18   promulgate a procedure for the investigation of
19   sexual abuse -- a written procedure for the
20   investigation of sexual abuse complaints?  Is that
21   your duty?
22 A  I think you asked -- I think that you asked that,
23   and I answered it.  What I said was that -- again,

Page 83

1    is that I am not sure it's appropriate to -- to
2    for there to be a one-size-fits-all list of you do
3    A, B, C, D, E, as it relates to investigating any
4    kind of complaint, including complaints of sexual
5    abuse.
6  Q  Is it your responsibility to make that decision
7    whether or not to promulgate a procedure to
8    investigate sexual abuse complaints?
9  A  Uhm --
10 Q  Or is it the principals' or is it the Board's?
11 A  It's myself and the Board's responsibility to
12   determine -- to determine that.
13 Q  Have you ever presented that issue to the Board?
14   Do we need a sexual abuse investigation procedure?
15 A  Uhm, I don't recall doing that.
16 Q  All right.  Now, assuming that we don't have a
17   written procedure other than what you have already
18   identified, did you do any directions to any
19   principals or school administrators as to how to
20   investigate a sexual abuse complaint?
21 A  Uhm, we've -- again -- you know, we -- our
22   policies say that complaints -- all complaints,
23   regardless of the nature of those complaints,

Page 84

1    would be investigated thoroughly.  The -- you
2    know, I am not going to list a series of
3    step-by-step things that they need to do or should
4    do, because some of that is certainly
5    discretionary.  That -- and again, situations
6    vary.  You know, situations are different and may
7    call for a -- might call for a different -- you
8    know, they have got to -- they have got to use
9    their best judgment and some discretion to
10   investigate matters.
11 Q  Have you ever given them any direction as to what
12   you expect them to do to investigate a
13   sexual-abuse complaint?
14 A  On a case-by-case basis, yes, I have certainly
15   said -- if a complaint to my attention, I have
16   certainly called and said, I want you to talk
17   to -- this is what the complaint is.  You need to
18   talk to A, B, C, and D.  When you get done doing
19   that, you need to go to E and F.
20 Q  So, you just ex--- what's the word -- you just
21   on-the-spot make a decision on a case-by-case
22   basis?
23 A  We -- we investigate the cases.  And the manner in

Page 85

1    which we proceed depends on where -- what the
2    information is that we're getting.
3  Q  All right.  Whose responsibility is it to
4    investigate sexual abuse cases?  Within the school
5    system, whose responsibility is that?  Is that
6    your responsibility?
7  A  Yes.  It's my responsibility with the assistance
8    of others.
9  Q  Who else is responsible for conducting the
10   investigation?
11 A  I answered that.
12 Q  I'm sorry.  I don't remember.
13 A  Myself and others.
14 Q  Who are the others?
15 A  The others would be those related to the case or
16   those that have information relating to the case
17   who can help me conduct the investigation.
18 Q  Would it be the principal's responsibility to
19   conduct --
20 A  It might be principals, assistant principals.
21   And, again, you say "investigate" it.  I am
22   talking about assisting with gathering
23   information.  Would be principals, assistant

Page 86

1    principals, central office staff.
2    Q    All right. Well, exactly what training have you
3         provided to school personnel about sexual abuse?
4         And by "school personnel", I mean employees, not
5         students. I'm talking about school personnel.
6    A    We will need to go through that folder of those.
7         That was a specific question, I think, that was in
8         the interrogatories. And I think we provided --
9              MR. SWEENEY: Do you have those answers,
10             Susan?
11             Let's go off the Record.
12             (Brief recess.)
13   BY MS. DePAOLA
14   Q    All right. In response to interrogatories through
15        your attorney, Board's attorney has produced
16        pages 139 through 201, being all the training
17        materials relating to sexual harassment. Can you
18        identify in there any training materials relating
19        to sexual abuse? I'm sorry; not sexual
20        harassment.
21   A    I mean, I can go through page by page and tell you
22        what each one of these -- we have put checkmarks
23        by --

Page 87

1    Q    Anything relating to sexual abuse, please.
2    A    But all of it relates to protecting students in
3         some way or another. I mean, I can go through
4         these -- on the July 2002, new teacher
5         orientation, there is a block of time in there for
6         school safety and discipline. I was Assistant
7         Superintendent at that time. And I talked about
8         school safety and discipline issues, and that
9         would have included a topic relating to
10        supervision of students and abuse.
11   Q    All right. Excuse me. So, it's your testimony
12        under oath that in 2002 you talked to the teachers
13        about sexual abuse?
14   A    This is new teacher orientation.
15   Q    You talked to new teachers about sexual abuse?
16   A    It's my testimony that that would have been a
17        likely topic of discussion during new teacher
18        orientation during my block of time there from
19        10:00 to 10:30 under school safety and discipline.
20        It is something --
21   Q    You mean, you don't know --
22   A    -- that it --
23   Q    You don't know whether you talked about it or not?

Page 88

1    A    I'm saying it would have been a likely topic of
2         discussion in that block -- it usually is in that
3         section.
4    Q    All right. Now, let's look at that. So, did you
5         provide them with any training materials, policies
6         procedures, anything on sexual abuse at that --
7    A    I don't -- I don't recall.
8    Q    Anything else in this document about sexual abuse?
9    A    In -- on that page?
10   Q    This whole document.
11   A    This whole document. Again, as it relates to
12        category of student supervision, June 10th, 2003,
13        the administrators' meeting, we talked about
14        agenda and discipline.
15   Q    No. My question is anything about sexual abuse.
16   A    Page 143 talks about protecting instructional
17        time.
18   Q    Dr. Bazzell, is there anything that indicates you
19        talked about sexual abuse?
20   A    All right. Page 144 sexual harassment and
21        reporting requirements DHR law enforcement.
22   Q    Okay. So, page 144 has a reference to sexual
23        harassment; is that what you're saying?

Page 89

1    A    It has a reference to sexual harassment. And it
2         has a reference to reporting requirements, DHR,
3         law enforcement.
4    Q    Anything else in that document -- I'm sorry. Who
5         was that for; that one on page 144, is new
6         teachers?
7    A    Administrators, system administrators.
8    Q    And what was the date on that?
9    A    November 6th of 2003.
10   Q    And was that all administrators for a specific
11        school or what?
12   A    All system administrators.
13   Q    Okay. Who did a presentation on sexual abuse at
14        that meeting?
15   A    At that meeting on November 6th, this is -- this
16        is my portion of the agenda. And at that meeting,
17        I did -- I discussed with them reporting
18        requirements. It was under policy matters and
19        legal issues, reporting requirements, DHR law
20        enforcement.
21   Q    All right. Did you produce any materials to give
22        to them on sexual abuse?
23   A    I don't recall. It's been a long time ago.

JR, A Minor                        July 24, 2007                    Pike County Board of Education

Page 90

1      Again, the next one is --
2  Q   **What page number are you looking at?**
3  A   146.  Relates to student supervision and safety
4      plans.
5  Q   **Okay.  I am asking you specifically about sexual**
6      **abuse.  Is there anything on that document --**
7      **anything further in that document about sexual**
8      **abuse?**
9  A   In this entire document?
10 Q   **Yes, sir.**
11 A   All right.  Let me just go through all of them
12     again, because I -- you know, earlier we were
13     talking about broad categories of things that
14     somehow related in that other.  And now we're not.
15     It does talk about discrimination on 147.  But
16     I think you would not consider that what you were
17     asking.  Uhm, 148 does talk about the Child
18     Advocacy Center.  Page 149 talks about complaints
19     of racial harassment and discrimination of all
20     types, monitoring and reporting of those.
21 Q   **Tell me who gave that presentation on monitoring**
22     **and reporting?**
23 A   Uhm, let's see.  That was under general

Page 91

1      information.  On the -- that was in January of
2      2005, which would have been -- and it's under my
3      agenda -- my agenda --
4  Q   **Okay.  Let's stop right there.  That would have**
5      **been a good time.  January 2005.  What did you**
6      **tell them the policies and procedures were for**
7      **reporting sexual abuse?**
8  A   Uhm, I don't -- I don't remember the details of
9      that.  I would have probably given them a copy of
10     the Code -- of the Alabama Code as it relates to
11     that.
12 Q   **What are you referring to?**
13 A   The --
14 Q   **The criminal code on sexual abuse?  You gave out**
15     **the criminal code?**
16 A   The portion of the criminal code that deals with
17     reporting.
18 Q   **Just the DHR report requirements; is that what**
19     **you're talking about?**
20 A   The reporting requirement, yeah.
21     Let me just go through these.  I think the
22     rest of these -- I think you would not consider
23     them.  The things that we have already talked

Page 92

1      about; Code of Conduct, student planners.  Again,
2      Child Advocacy Center was discussed again on
3      September 7th.
4      February 2005, recognizing sexual abuse.
5  Q   **All right.  Let's talk about that one.  What page**
6      **number is that?  Look at the bottom right-hand**
7      **corner.**
8  A   Uhm, 159.
9  Q   **Okay.  What was the date on that document?**
10 A   February 2002.
11 Q   **Okay.  Now, that's the only reference -- I'll just**
12     **represent to you that's the only reference to**
13     **sexual abusive I've seen in that entire document.**
14     **Are you aware of any other reference to sexual**
15     **abuse in those training materials?**
16 A   I know that -- in this (indicating) here?
17 Q   **Yes, sir.**
18 A   Do you have the BBSST stuff?
19 Q   **Yes, sir.**
20 A   I know that it's discussed in BBSST training,
21     which is done with everybody.
22 Q   **We're going to go over that.  Let's go back to**
23     **page 159.**

Page 93

1      In February '02, it appears that you had a
2      reference to sexual abuse on that document.  What
3      schools was that training provided to?
4  A   It would have been the schools that had -- at that
5      time, we kind of -- at that time, we had -- well,
6      I think it would have covered all.  It would have
7      been Banks -- uhm, Banks, Pike County Elementary,
8      Goshen Elementary.
9  Q   **What grades were in Banks at that time?**
10 A   K-8.
11 Q   **Let me look at that document.  I'm sorry.  I don't**
12     **have another copy, apparently.  I don't know where**
13     **it is at this point.**
14     It appears to me from reading this that some
15     sort of recognizing sexual abuse seminars was done
16     with teachers for K through two and three through
17     five in February 2002.  Is that what that document
18     indicates?
19 A   Ah, yes.
20 Q   **Do you have any of the materials from that**
21     **training seminar?**
22 A   That -- I don't know.  That was -- the presenter
23     was Lucia Grantham, who works at Troy University.

Mary Moore-Wynn, CSR                Mary Moore-Wynn              (334)244-0203
                                 Court Reporting Services

Page 94

1  Q  Where is she now?
2  A  I'm not sure.
3  Q  Did you attend that seminar?
4  A  Yes.
5  Q  What are the signs that she went over --
6  A  That's 2002. I don't recall the materials at that
7     time.
8  Q  Well, did you think it was important to provide
9     this training to teachers in K through five?
10 A  I think it's important to provide it to all
11    teachers.
12 Q  Did you provide any similar seminars to any
13    teachers grade six through 12?
14 A  I think we provided -- I think we provided -- you
15    know, we provided that kind of information through
16    other -- through other -- in other manners such as
17    the BBSST.
18 Q  Is there anything else besides BBSST you can think
19    of?
20 A  Not that I can think of, no.
21 Q  Well, if you think of something, will you inform
22    your attorney, so I will have a complete response
23    on other training on sexual abuse?

Page 95

1  A  I sure will. Yes.
2  Q  Any other reference in those documents to sexual
3     abuse? We will get back to BBSST, because I think
4     it is in there. Any other training on sexual
5     abuse?
6  A  I don't see anything else right offhand.
7  Q  Was it your responsibility to determine whether or
8     not a teacher would receive training in sexual
9     abuse issues?
10 A  Uhm, it's not my responsibility entirely. The
11    professional development needs of our faculty and
12    staff is determined jointly by all of our
13    administrators.
14 Q  So, the principal and the Superintendent
15    determines what training is required?
16 A  Principal, superintendents, central office staff.
17    And we also rely on a number of surveys that are
18    sent out; needs surveys. Sometimes to faculty
19    members. Sometimes -- sometimes they are not even
20    conducted by us. I can't remember if we had any
21    done during those years. But sometimes the
22    Regional Inservice Center sends out a needs
23    assessment survey.

Page 96

1  Q  All right. The only other reference to sexual
2     abuse you have indicated was in the BBSST
3     documents; is that correct?
4  A  Uh-huh.
5  Q  All right. And could you show us in there what
6     you're referring to?
7  A  Is it -- I will have to see the documents. I
8     don't have them.
9  Q  This is what you produced as BBSST documents.
10 A  Alabama SDE at-risk definition of observable
11    indicators. And, again, you know, I guess what
12    you're trying to do with BBSST is to look for
13    reasons for kids not being successful. And it
14    lists under environment; family, school,
15    community, adverse or chronic health condition,
16    home, family, mobility, limited literacy, family
17    poverty, student neglect, and/or abuse. And it's
18    my understanding that that is a topic of
19    discussion when we -- when we -- when we go
20    through -- when we do the BBS training with our
21    faculty and staff. And Ms. Berry --
22 Q  Okay. What page are you referring to?
23 A  -- Ms. Berry does the training.

Page 97

1  Q  So, are you saying Ms. Berry is responsible for
2     deciding whether they are going to have training
3     on sexual abuse?
4  A  What I am saying is that Ms. Berry is responsible
5     for making sure that all of our faculty and staff
6     at all grade levels receive the BBSS training.
7     Part of the BBSS training includes going over the
8     Alabama SDE at-risk definition and observable
9     indicators which make reference to one of those
10    indicators being student neglect and/or abuse.
11    So, it would have been a topic that is covered.
12 Q  Are you speculating, Dr. Bazzell?
13 A  No, I am not speculating.
14 Q  Have you attended those discussions and heard a
15    discussion of sexual abuse?
16 A  No. I asked Ms. Berry -- I have discussed it with
17    Ms. Berry and asked about the content of BBSS
18    training and whether sexual abuse and those kinds
19    of topics were covered in -- in these discussions.
20 Q  All right. So, we'd have to depose Ms. Berry to
21    find out exactly what training she provided --
22 A  Yes.
23 Q  -- on sexual abuse?

JR, A Minor                     July 24, 2007                     Pike County Board of Education

26 (Pages 98 to 101)

Page 98

1   A   Yes.
2   Q   And would that have been provided to all teachers
3       at the high school?
4   A   It would have been provided to all teachers system
5       wide.
6           And she has indicated to me, again, talking
7       about at-risk indicators she would have -- those
8       are issues that are discussed as reasons why kids
9       have problems -- some kids have problems.
10  Q   All right.  We're going to mark that as
11      Plaintiff's Exhibit 6.
12          (Whereupon, Plaintiff's Exhibit 6
13              was marked for identification and
14              is attached hereto.)
15          MR. SWEENEY:  I'm sorry, Susan, what is
16          6?
17          MS. DePAOLA:  As I understand it, it is
18              all of the training materials that
19              he has relating to sexual abuse.
20  BY MS. DePAOLA
21  Q   Is that accurate?
22  A   Yes.
23          MR. SWEENEY:  What he said was he had

Page 99

1               provided that information in the
2               response to discovery.  And what you
3               presented to him appeared to be what
4               was referenced.  But I haven't
5               verified that.
6   A   I -- I don't recall.  I mean, it looks complete.
7       I don't recall anything else that we sent that's
8       not in there.  There could be a page or two.  I
9       don't know.  It looks complete to me.
10          MS. DePAOLA:  Donald, can you look in
11          your documents and see what document
12          615 is?
13          MR. SWEENEY:  I don't have a 615.
14          MS. DePAOLA:  In your response to
15          interrogatories, you I have
16          identified document --
17          MR. SWEENEY:  I do.  It's an inservice
18          schedule, Pike County schools
19          January 15, 2002.
20  BY MS. DePAOLA
21  Q   Can you show that to me so I can --
22  A   It's the one with sexual abuse -- recognizing --
23      it's that page.

Page 100

1           MS. DePAOLA:  Can I just look at that,
2           Donald?
3           MR. SWEENEY:  The reason I hesitated,
4           it's somewhat annotated.
5           MS. DePAOLA:  Okay.  All right.  Believe
6           it or not, I'm ready to get to the
7           specifics now.
8               Off the Record.
9           (Lunch recess.)
10          (Whereupon, at approximately 2:30,
11              the deposition of Dr. Bazzell was
12              resumed.)
13  BY MS. DePAOLA
14  Q   Dr. Bazzell, could you just authenticate this as
15      the records of the school system that relate to
16      the Foster incident?  Mr. Casey didn't appear to
17      be familiar with them.
18  A   Yes.
19  Q   So, Plaintiff's Exhibit 10 is all the documents in
20      the Board's files relating to the Foster incident?
21  A   Yes.
22  Q   Can you tell me what your participation was in
23      that incident?

Page 101

1   A   Uhm, I received this letter in my office.
2   Q   Is that from the parent?
3   A   It's from the parents.
4   Q   Okay.  Go ahead.
5   A   I received this letter, I don't recall the exact
6       date.  And I wrote Mr. and Mrs. Foster back, which
7       would be the letter dated November 22nd.  And I
8       sent a copy of this to Mr. Casey with the attached
9       note -- with the note that's in there.
10  Q   Directing him to investigate it?
11  A   Yes.
12  Q   And then did you do anything after that?
13  A   Actually, Mr. McDaniel -- I talked with Mr. Casey
14      about it and talked with Mr. McDaniel about it.
15      Mr. McDaniel stated that he was working -- had
16      already heard about the situation; and that he was
17      working on that and had met with the parents,
18      himself.  And that he had scheduled some time
19      for -- he had already scheduled a meeting with
20      Mr. Coon and the parents.  And he -- he then
21      reported back to me on -- on December 2 with a
22      letter that's in this file.  And --
23  Q   And that would be document number 0080?

JR, A Minor                    July 24, 2007                    Pike County Board of Education

27 (Pages 102 to 105)

Page 102

1  A  That's correct.

2  Q  And 81, that was his letter to you?

3  A  Yes, ma'am.

4  Q  And then did you have any kind of meeting with

5     Mr. Coon?

6  A  No, I did not meet with Mr. Coon. We -- we also

7     had the statement here and also I think on 0079 --

8         (Brief interruption.)

9  A  -- on 0079, there is phone numbers for LaTonya

10    Foster and --

11 Q  Who is?

12 A  Who is the mother. And so, I spoke with

13    Ms. Foster. And also the last page back there, it

14    shows where Ms. Foster returned my call. So, if I

15    recall, I tried to call her back several times. I

16    spoke with her one time. And I'm almost certain

17    that I spoke with her husband, as well. After all

18    this was investigated, and they had a meeting and

19    so forth, I wanted to make sure that they were

20    satisfied that the matter had been -- had been

21    looked into.

22 Q  Did you consider Mr. Coon's action to be excessive

23    disciplinary force?

Page 103

1  A  Yes.

2  Q  Did it raise any questions in your mind about his

3     mental stability?

4        MR. SWEENEY: Object to the form.

5  A  It's certainly not something that we would condone

6     at all in terms of his -- it didn't raise any

7     concerns about his mental stability. He admitted

8     in his letter that he was angry and acted

9     inappropriately. But, you know, in the absence

10    of -- in the absence of other similar situations

11    or other situations where he was out of control

12    and -- you know, I viewed it at that time as an

13    isolated incident for which he knew and understood

14    that it was inappropriate. And --

15 Q  Was Mr. Casey correct in reporting that he called

16    you and let you know about Mr. Coon smoking in the

17    school?

18 A  I don't recall that.

19 Q  I think he also reported that he called you and

20    reported about the cell phone -- Mr. Coon

21    providing --

22 A  No, he didn't -- he didn't call me about that. I

23    knew about that, but he --

Page 104

1  Q  So, he never discussed it with you?

2  A  No, he did not call me about that.

3  Q  Was he still employed there when it occurred?

4  A  Yes.

5  Q  Tell me what happened with respect to that

6     incident.

7  A  I was on the campus and was circulating through

8     the classrooms and all the different buildings.

9     And Mr. Coon approached me and asked me if I could

10    intervene on his behalf and get his cell phone

11    returned to him. And I said -- he said that

12    Mr. McDaniel had his cell phone and would not

13    return it. And so I asked him what -- I asked him

14    what Mr. McDaniel was doing with it. And he said

15    that he -- he had lent it to a student to call his

16    parents or father, I don't remember the exact

17    words. But that he had lent it to him and that

18    the student had dropped it. And -- had dropped it

19    out of his pocket or something. And that the

20    teacher saw it drop on the floor. And the teacher

21    confiscated it from him and turned it in to

22    Mr. Coon.

23 Q  Mr. McDaniel?

Page 105

1  A  I mean -- I'm sorry -- Mr. McDaniel.

2  Q  So, what did you do next?

3  A  I told him that he knew and understood what the

4     policy was concerning cell phones on campus. And

5     that -- that was a matter that he would have to

6     take up with Mr. -- that would be a matter that he

7     would have to take up with Mr. McDaniel; that I

8     would not intervene on his behalf.

9  Q  Well, did you then conduct any further

10    investigation about why Mr. Coon was, in fact,

11    providing a cell phone to a student?

12 A  He wasn't -- he was allowing a student to use a

13    cell phone.

14 Q  I mean, that's what he told you?

15 A  Yes.

16 Q  Did you conduct any further investigation?

17 A  No. I talked with Mr. McDaniel. And I told him

18    that Mr. Coon had asked me about the cell phone.

19    I said, you know, I don't expect you to give it

20    back to him. I expect you to follow the policy.

21    The policy is that if we confiscate a cell phone

22    from a student, it can only be returned with the

23    knowledge of the parent or to the parent.

Mary Moore-Wynn, CSR                Mary Moore-Wynn                    (334)244-0203
                                Court Reporting Services

Page 106

1  Q  So, what happened?  Did they return it to the
2     parent?
3  A  I'm not sure.
4  Q  You didn't do anything further about it?
5  A  No.
6  Q  Didn't talk with the student who had the cell
7     phone?
8  A  No.  That would be -- you know, Mr. McDaniel, I
9     believe, and/or Mr. Casey had already done that.
10 Q  So, essentially -- I mean, you believed Mr. Coon's
11    story about how and/or why the student had the
12    cell phone?
13 A  Well, in isolation that wouldn't -- in isolation,
14    that wouldn't necessarily raise a red flag.  I
15    mean, there is probably not a day goes by that
16    some teacher or somebody has a cell phone and
17    doesn't hand it to a kid and let them use it for
18    just a minute to, you know, call a parent or
19    whatever.
20    So, that situation by itself outside the
21    context of any other thing wouldn't necessarily
22    raise a red flag.
23 Q  Would you agree it would be important to have some

Page 107

1     centralized reporting of incidents so that some
2     one person knows all the flags that are going up?
3  A  "All the flags"...
4  Q  All the red flags.  You said this wouldn't -- in
5     isolation, wouldn't raise a red flag.  Is it
6     important that there be a central person, one
7     person, who receives all these flags --
8  A  I think --
9  Q  -- so that they can look at the whole picture?
10    MR. SWEENEY:  Object to the form.
11 A  You know, it's the responsibility of the
12    principal, the counselor, and assistant principal.
13    Those are where the reports come to.  And our
14    schools are very small.  So, the -- you know,
15    their offices are close together.  And they
16    communicate, you know, every day about issues
17    going on within the school.
18 Q  So, you just gave me three people.  So, there is
19    no one central person to whom these issues are
20    reported?
21 A  Uhm -- well, the issues, in most cases, go -- go
22    to counselors.
23 Q  So, the counselor is the designated person to

Page 108

1     receive all --
2  A  The counselor is -- there is no designated person.
3     But I believe that all of our staff members know
4     and understand that any concerns that they have
5     need to go to the counselor or to the principal.
6  Q  Now, are you familiar with the term "grooming"?
7  A  I've heard that term.
8  Q  What's that mean to you?
9  A  It was described as Mr. Casey described it.
10 Q  Do you know of any -- well, so you agree with
11    everything he said as to grooming activities?
12    MR. SWEENEY:  Object to the form.
13 A  I agree with the definition that he gave.  I don't
14    remember exactly how he worded it.
15 Q  Tell me what grooming activities you can identify
16    that you're familiar with.
17 A  Well, those, again, would be the same ones that he
18    mentioned:  Purchasing gifts.  Again, those things
19    that he mentioned.
20 Q  And you're not familiar with any others?
21 A  Well, that would be the ones -- likes I said, the
22    ones that he mentioned.
23 Q  Now, you are aware, I assume, that Justin Reed is

Page 109

1     mentally retarded?
2  A  I am aware that he -- I am aware that he is being
3     served by our special education program -- or was
4     being served at that time by our special education
5     program.
6  Q  Under what disability?
7  A  I now know that he is MR.
8  Q  And would it be fair to assume that you know that
9     he would have significant limits on his
10    intellectual functioning?
11    MR. SWEENEY:  Object to the form.
12 A  Well, his intellectual functioning would be, you
13    know, defined by the assessments that had been
14    done.
15 Q  Well, the assessment that your school did
16    indicated that he had a full scale IQ of 67, which
17    placed him at the first percentile.  Would you
18    agree that's a significant limitation on
19    intellectual ability?
20 A  Yes.
21 Q  Would you also agree that that would include his
22    ability to deal with academic tasks?
23 A  Certainly.

JR, A Minor                          July 24, 2007                    Pike County Board of Education

Page 110

1   Q   And would it also include his social skills?
2   A   Uhm, to some extent.
3   Q   Okay.  Anything else you are aware of about Justin
4       Reed's areas of disability?
5   A   No, that's --
6   Q   Not aware of his expressive language problems?
7   A   No.
8   Q   Would it be fair to assume that children in the
9       first percentile in terms of mental ability would
10      be more likely to acquiesce to demands of
11      authority figures?
12          MR. SWEENEY:  Object to the form.
13  A   I don't -- I haven't read that.
14  Q   You don't know that?
15  A   I haven't read that.
16  Q   Do you have an opinion on that?
17  A   Uhm, no.
18  Q   Okay.  And if I am understanding the testimony
19      that you have given and that Mr. Casey has given,
20      nothing in your policies and procedures were done
21      different or especially for special education
22      students?
23  A   Our policies --

Page 111

1   Q   As they relate to sexual abuse, now.
2   A   Our policies and procedures are designed -- I
3       think, designed to -- we do the very best we can
4       to protect all students, regular program and those
5       students with disabilities.
6   Q   Is there anything additional you're doing for
7       special ed students to protect them?
8   A   Uhm, not specifically.
9   Q   Okay.  Can you just identify for us the employment
10      application?  I think it's --
11          MR. SWEENEY:  I think it's 7.
12  Q   -- would be 7.  Could you just identify that as
13      being the document in the record that related to
14      the employment of Mr. Coon?
15  A   Some of this -- some of this is from the
16      employment -- from the employment application.
17      This is the application, itself.
18  Q   Okay.
19  A   A lot of this other information in here is from
20      the personnel file.
21  Q   Okay.  All of it relates to Charles Coon?
22  A   Yes, ma'am.
23  Q   And those are all from the records from Pike

Page 112

1       County Board of Education?
2   A   And there are some things missing from this that I
3       know we submitted.
4   Q   Like what?
5   A   The State Department -- the printout from -- well,
6       the transcripts from his universities.
7   Q   Sure.  Yeah, okay.
8   A   Verification from the State Department of
9       Education that he had a criminal background check,
10      ABI and FBI criminal background check.
11  Q   Right.
12  A   And there may be other things.  But this is not
13      complete in terms of what we provided from his
14      personnel file.
15  Q   But all of the documents in there are from his
16      personnel file?
17  A   Yes, ma'am.
18  Q   I wanted to ask you on the resume' portion, there
19      is some handwriting.  Is that your handwriting?
20  A   No, that's not mine.  But -- I was going to
21      speculate, but...
22  Q   And I note that there are no -- it strike that.
23  A   I can tell that's not mine.  I'm left-handed.  I

Page 113

1       make left-handed checks.
2   Q   I haven't marked this.  Do you recognize the
3       handwriting on this pre-hire application
4       checklist?
5   A   That handwriting is Elizabeth Grubbs'.
6   Q   And that application is from 2000.  But he wasn't
7       hired until 2002.  Do you know why -- or if I am
8       correct in assuming they didn't get any new
9       references from him in 2002?
10          MR. SWEENEY:  Object to the form.
11  A   That is -- it's not uncommon for applicants to
12      apply in the system.  Our policy is to keep
13      applications -- and I believe it's two years or
14      three years -- in our applicant file.  At some
15      point, we purge those, unless an applicant comes
16      in and says, I want you to -- I want to re-up, I
17      guess you might say.
18      So, the fact that his application was
19      submitted in 2000, and he was employed in 2002,
20      that would have still been a valid application in
21      our eyes.
22  Q   Well, I mean, it appears that his application was
23      actually submitted in 1996.

JR, A Minor                    July 24, 2007              Pike County Board of Education

30 (Pages 114 to 117)

Page 114

1   A   And then he evidently called in July of 2000 and
2       asked us to change the date of his -- change the
3       date on the application. And that writing there
4       looks like Ms. June Collier's writing. She would
5       have scratched through that and put a new date,
6       which would have indicated that the applicant
7       would like to --
8   Q   Renew his application?
9   A   Yes. Renew his application, yes.
10  Q   Okay. Thank you. I want to address one other
11      issue. Let me show you what we're going to mark
12      as Plaintiff's Exhibit 11.
13              (Whereupon, Plaintiff's Exhibit 11
14              was marked for identification and
15              is attached hereto.)
16  BY MS. DePAOLA
17  Q   Ask you if these are documents relating to the
18      retirement of Mr. Coon. And I include in there
19      his application for retirement, his letter of
20      retirement, and the Board minutes from May 23rd,
21      '05. Are there any other documents you are aware
22      of that relate to his retirement?
23  A   Uhm -- no.

Page 115

1   Q   Was that no?
2   A   No, I don't think so.
3   Q   And am I correct that he -- was he on a 12-month
4       contract?
5   A   He was on a ten-month contract. His contract
6       expired in -- I think it ended June 30th.
7   Q   Okay. So, he continued to be an employee through
8       June 30th of '05?
9   A   Uh-huh. Yes, ma'am.
10  Q   And that's reflected on this application for
11      retirement on page 1 at the bottom?
12  A   Yes.
13  Q   Now, did he come to you and advise you he was
14      going to retire for some reason?
15  A   No, ma'am. He just submitted the resignation
16      (sic) for retirement.
17  Q   And did you have any conversations with him about
18      that?
19  A   No, ma'am.
20  Q   And were you later asked to -- were you told he
21      was going to go work somewhere else?
22  A   I believe it -- and, again, I don't remember who told
23      me -- but I believe he was considering employment

Page 116

1       in a private school. And that he was going to
2       retire and draw his State -- he was going to
3       retire, draw his State retirement, and go to work
4       in a private -- at a private school.
5   Q   What school was that?
6   A   I don't recall.
7   Q   Where did you hear about that?
8   A   I just don't recall who told me that. It would
9       have been somebody from -- I mean, somebody from
10      the school may have told me that.
11  Q   And were you subsequently asked by Monroe County
12      schools to verify his employment? And I'm showing
13      you Plaintiff's Exhibit 12 there.
14              (Whereupon, Plaintiff's Exhibit 12
15              was marked for identification and
16              is attached hereto.)
17  A   Were we asked by Monroe County to verify his
18      employment in that he was leaving us going to
19      Monroe? Is that what --
20  Q   Well, you tell me what 12 is.
21  A   Okay. This is -- this was completed and signed by
22      me in 2004. And -- let me see --
23  Q   Okay. Maybe I --

Page 117

1   A   I am trying to --
2   Q   What is this?
3   A   This is verification of employment.
4   Q   That you're asking someone else to verify?
5   A   Yes.
6   Q   Or they are asking you to verify?
7   A   We have -- if this came from our personnel file on
8       him, we should have one of these -- we should have
9       one of these from every place he's ever worked.
10  Q   Yes. Okay.
11  A   So, this would be verification of employment.
12  Q   Why would you have been doing this in May of 2004?
13  A   Actually, in May of 2004 -- in May of 2004, he --
14      I would have to ask Ms. Warren, Sheila Warren, why
15      we did one of these in May, 2004.
16          I do know that -- I do know that in one year,
17      it was either after the first year or the second
18      year, I received a call from a superintendent --
19      it may have been Monroe County -- requesting that
20      we release Mr. Coon to go to work for them.
21      Again, I don't remember if it was Monroe or who it
22      was. But we were inside the 45 days -- actually,
23      when he called, we were in -- actually -- I don't

Page 118

1  remember the exact dates. But he asked -- the
2  superintendent asked me to release Mr. Coon, so
3  that he could return to the school that he had
4  taught at previously. And that may have been --
5  he may have been in Monroe County prior to coming
6  to us. I don't recall. But he wanted -- the
7  superintendent down there wanted him to come back.
8  But it was inside the 45-day limit. And -- I
9  refused to release him. That's --
10 Q  Okay. All right.
11 A  And in anticipation of him being released, Sheila
12    may have done one of those for Monroe County.
13 Q  Is this your handwriting?
14 A  Yes.
15 Q  Okay. We'll go over that.
16    And is this your handwriting?
17 A  Yes.
18 Q  Okay. Okay. So, just to go to 2004-2005, did you
19    say earlier that Mr. Casey did not, to the best of
20    your recollection, report the smoking incident to
21    you?
22 A  I don't recall him doing that.
23 Q  So, what was the first report you had from any

Page 119

1  administrator regarding Mr. Coon in 04-05 --
2  negative? Let's put it that way.
3  A  The only -- Mr. McDaniel expressed his
4  frustrations with me about Mr. Coon. Or -- well,
5  it was -- he expressed his frustration about the
6  band program, overall band program. Not -- he was
7  frustrated with the discipline on the buses to and
8  from ball games. And he had stated that he had to
9  follow the bus or ride the bus.
10    So, Mr. McDaniel expressed with me some --
11    expressed some frustrations with me about the band
12    program in general. And that would the first time
13    anything came up as it related to Mr. Coon.
14 Q  When would this have been, what period of time?
15 A  Oh, it was during -- it was, you know,
16    mid-football season, probably October, November.
17 Q  Okay. Did Mr. McDaniel report the smoking
18    incident to you?
19 A  I don't recall that.
20 Q  Okay. Other than discipline on the buses, what
21    were Mr. McDaniel's other frustrations?
22 A  Uhm, that is the only thing that he -- that's the
23    only thing that he reported; that he was very

Page 120

1  frustrated with the band -- with the band students
2  and their -- and them not behaving themselves
3  properly, and those kind of things.
4  Q  And no complaints about Mr. Coon?
5  A  No. I mean, I assume from his comments that --
6  that he felt like some of the -- you know, the
7  buck stops with Mr. Coon when it comes to whether
8  the band is disciplined and doing what they are
9  supposed to do. So --
10 Q  "Doing what they are supposed to do", I mean, are
11    you talking about they are rowdy on the bus?
12 A  Well, you know, just the -- his big complaint was
13    the conduct of the students on the bus.
14 Q  So, what did you do in response to that?
15    Anything?
16 A  I didn't do anything in particular at that time.
17    I told them that we were -- you know, we were --
18    it was pretty clear that we were going to enter
19    into a transition period with new leadership; that
20    Mr. Casey was going to be leaving, and that at
21    some point in the spring that we would need to
22    evaluate the program.
23 Q  Did Mr. Casey have some kind of emotional

Page 121

1  breakdown?
2  A  No.
3  Q  You're not aware of him being treated for any
4    emotional problems?
5  A  No, ma'am.
6  Q  So, you said Mr. Casey -- we're in transition,
7    we'll deal with it later? I mean, is that --
8  A  No, I -- you know -- you know, the kids
9    misbehaving on the bus and those kind of things,
10    you know, I told him to continue to follow the bus
11    and monitor the situation. He spent a lot of
12    time -- Mr. McDaniel was a first-year principal --
13    or first-year assistant principal. And he ran
14    a -- he ran a real tight ship, he really did, in
15    terms of discipline. And his expectations were
16    very high in terms of student conduct. For
17    example, we made the Montgomery Advertiser that
18    year, because Mr. McDaniel cracked down on dress
19    code. That's the kind of person Mr. McDaniel is.
20    So --
21 Q  So, if we have heard comments that Mr. McDaniel
22    was brought in to clean up the situation at Pike
23    County High School; is that what you're talking

Page 122

1    about, disciplinary --
2  A    No. Mr. McDaniel was employed to be the assistant
3    principal down there. And I didn't know of
4    Mr. McDaniel prior to his employment down there.
5    I didn't know he was -- I didn't know whether he
6    would be an individual that would run a tight ship
7    or not. After we employed him, it was pretty
8    clear that he -- that he was going to be the kind
9    of person who would run a tight ship.
10 Q    I want to talk about Mr. McDaniel for a minute.
11    Did Mr. McDaniel have any responsibility for
12    hiring of the faculty at Pike County High School?
13 A    No.
14 Q    Did he have any responsibility for training the
15    faculty at Pike County High School?
16 A    No.
17 Q    That would have been Mr. Casey's responsibility?
18 A    Mr. Casey.
19 Q    Did he have any responsibility for supervision of
20    personnel at Pike County High School?
21 A    Yes.
22 Q    That would include supervision of Mr. Coon?
23 A    It would include supervision of Mr. Coon. And,

Page 123

1    also, he would have been expected to participate
2    in the annual evaluations, PEPE evaluations.
3  Q    Did he have any responsibility to develop policies
4    and procedures to address sexual-abuse issues?
5  A    No.
6  Q    Would he have any responsibility for investigating
7    complaints of sexual abuse?
8  A    He would -- I would expect him and any other
9    administrator to assist as directed by me to -- or
10    his immediate supervisor, the principal, and/or to
11    cooperate fully with law enforcement as it relates
12    to any of those kinds of investigations.
13 Q    At the school level, who was primarily responsible
14    for investigation of allegations of sexual abuse?
15 A    Well, sexual-abuse allegations that originate at
16    the school level, what we would expect would be
17    that the -- again, we have situations where
18    concerns were reported to teachers, and they go
19    straight to DHR. And we have -- again, you're
20    talking about sexual abuse of a faculty member --
21    by a faculty member?
22 Q    Yeah. And I am talking about what Mr. McDaniel's
23    responsibility was.

Page 124

1  A    As it relates to investigating an issue relating
2    to Mr. Coon, or any --
3  Q    Of sexual abuse by a faculty member. I mean, was
4    that primarily Casey and/or Pyron's
5    responsibility, and anything Mr. McDaniel did was
6    under their supervision and control?
7  A    No. I -- if they had any -- if they had any -- if
8    any of those three individuals had concerns about
9    the conduct of any of our faculty members, I would
10    expect them to let me know. I would expect them
11    to -- because at that point, you know, that's
12    something that I need to know.
13 Q    Okay. And I guess -- but that is not outlined in
14    any of these written documents we have looked at;
15    that procedure you just said?
16 A    No.
17 Q    Okay. Now, after the band program frustration,
18    what was the next thing you heard about Mr. Coon?
19    Was that the Foster incident? Or was there
20    anything else before that?
21 A    I think his -- what was the date on the Foster
22    situation? November -- I think -- yeah, that was
23    November 22nd. That's getting close to the end of

Page 125

1    the year -- close to the end -- right at
2    Thanksgiving time. I think that's actually into
3    the playoff season. So, his frustrations would
4    have been -- he would have told me his
5    frustrations earlier than this.
6  Q    The question is: Is this the next thing you heard
7    about Mr. Coon of concern?
8  A    Yes.
9  Q    The Foster incident?
10 A    Uh-huh.
11 Q    And as I understand it, you didn't talk directly
12    with Mr. Coon about this?
13 A    Uhm, no.
14 Q    Now, what is the next issue or complaint that came
15    to your attention about Mr. Coon?
16 A    The only other -- the only other issue that I can
17    recall that school year that related to Mr. Coon
18    was -- and Ms. King, bless her heart, she is -- we
19    have gotten her kids through school. And she --
20    it hasn't been without some trying times. But she
21    had came to the school. And I believe this was
22    in -- it would have been in January. She came to
23    the school -- normally, the term ends in the third

JR, A Minor                    July 24, 2007                    Pike County Board of Education

Page 126

1    week of December. First term would have ended in
2    December -- like December 18th or 19th. And
3    report cards would have been distributed over in
4    January. And it was my understanding that
5    Mrs. King at some point either around that time or
6    maybe even before that time had -- had came there
7    and was fussing with Mr. McDaniel about Mr. Coon.
8    And -- because her son, MAK -- Matt -- MAK had
9    received a poor grade in band program. And --
10   Q   Was she claiming that some students were receiving
11       preferential treatment?
12   A   No. She was mad because her son had not turned in
13       some equipment. This was after the season, and
14       she was complaining that there was -- that he had
15       not turned in some equipment, and that because he
16       had not turned in that equipment, whether -- I
17       don't know if it was his uniform or whatever. But
18       he had not turned it in, and it had reflected on
19       his grade.
20   Q   Now, did this come to your attention?
21   A   No, this came to my attention only later. I had
22       not talked to her about that at all.
23   Q   You mean, later after --

Page 127

1    A   This was over in -- Mr. McDaniel told me about
2        this.
3    Q   At the time or later?
4    A   I think it was a little bit later. I don't
5        remember.
6    Q   So, you didn't take any active role in that
7        complaint?
8    A   I didn't -- with Ms. King, no.
9    Q   Yes.
10   A   No.
11   Q   Then, what's the next thing you heard about
12       Mr. Coon?
13   A   That was it. That's all.
14   Q   For the rest of the year?
15   A   Uh-huh.
16   Q   You never heard about these allegations that he
17       was giving the students Marijuana?
18   A   Oh, well, I did hear. That was over in --
19   Q   That's in April?
20   A   That was over in April. Yeah.
21   Q   But between January, you said you didn't hear
22       about the January incident until later you said,
23       but you weren't clear where?

Page 128

1    A   Yeah, and I don't remember exactly when
2        Mr. McDaniel had that -- Ms. King came to him.
3        But January, February, March. I didn't -- I had
4        not had no complaints.
5                (Whereupon, Plaintiff's Exhibit 13
6                 was marked for identification and
7                 is attached hereto.)
8    BY MS. DePAOLA
9    Q   I am going to mark as Plaintiff's Exhibit 13 what
10       I understand to be your diary or notes.
11   A   Uh-huh.
12   Q   Is that accurate that that's some kind of planner
13       you have?
14   A   Yes, uh-huh.
15   Q   Now, January 5th, you have reference to Mr. Coon.
16       What was that about? Item Number 15?
17   A   Uhm, I don't recall. I mean, you know,
18       Mr. McDaniel had expressed enough frustration with
19       me about the band program. We were in -- we were
20       in -- we were in the process, at that time, of
21       bringing in Mr. Pyron. And I believe that note
22       there was to, you know, discuss with Mr. Pyron
23       that he needed to evaluate Mr. Coon and the band

Page 129

1    program during the spring of that year so that we
2    could make a decision as to whether he was the
3    right person to continue in that position.
4    Q   All right. Is there anything else on that page
5        that relates to Mr. Coon or Justin Reed or any of
6        the allegations of sexual abuse that you have
7        heard since that time?
8    A   No.
9    Q   None of these legal matters relate to that?
10   A   No.
11   Q   All right. You also have an entry on January 12th
12       that appears to relate to Charles Coon. First of
13       all, could you read it to me, please?
14   A   Charles Coon requests professional leave 1/20,
15       1/21.
16   Q   And what's the 82506?
17   A   That's probably his extension.
18   Q   Do you know what that was for?
19   A   I don't recall. He may have called me requesting
20       professional leave and wanted to ask me about
21       professional leave on the 20th and 21st. I
22       can't -- my copies are color coded. And -- they
23       are color coded. And I could tell by the colors

JR, A Minor                July 24, 2007                Pike County Board of Education

Page 130

1    what I did. So, if it's color coded in green, I
2    could tell --
3  Q   Could you get that, and you can look at the color?
4      I mean, this is what I received.
5  A   (Witness Indicating.)
6      Okay.
7  Q   Do you have that here in the office?
8  A   Yeah, I've got about eight years of them. So, I
9      would -- I mean, that's not going to be -- that's
10     something I will have to find.
11 Q   All right. You also have a reference on
12     March 14th. It's the next page to Mr. Coon, I
13     believe. Is that correct?
14 A   Where is that? Band -- at the bottom, yeah.
15 Q   What's that about?
16 A   Uhm, I don't recall. These were -- Neil and Coon
17     were the two staff members. Neil is at -- is at
18     the career tech center. And, again, that's a
19     reference to making -- that we need to make sure
20     that when Pyron comes in that we evaluate that
21     program.
22 Q   Why would you be writing that on March 14th?
23 A   Well, again, we're -- in March 14th?

Page 131

1  Q   Uh-huh.
2  A   I don't -- I don't recall.
3  Q   Now --
4  A   I mean, these were two -- these were -- those were
5      two individuals who we were concerned about their
6      performance in those programs. These were two
7      important programs and --
8  Q   Okay. Up above that, you have got a reference to
9      Butch Phelps.
10 A   That's correct.
11 Q   What does that -- does that have relationship to
12     this case?
13 A   Yes.
14 Q   What is that?
15 A   Butch Phelps called me on March 14th. And the
16     left-handed check there indicates that I tried to
17     call him back on that date.
18 Q   And did he leave any message?
19 A   No.
20 Q   The next document that you produced was dated
21     March 30th. Can you tell us what occurred that
22     caused you to make that entry there?
23 A   I think these are -- let's see here.

Page 132

1  Q   I got the impression that you have like a
2      double-sided planner?
3  A   It is. It is. I was trying to figure out. I
4      think it's like this (indicating).
5  Q   Okay. So --
6  A   I think there are some pages in between here,
7      because -- I think there was some efforts in
8      between there where I attempted to call him back
9      that's documented.
10     But on March 30th, I finally heard from
11     Mr. Coon -- I mean, from Mr. Phelps.
12 Q   So, he returned your call on March 30th?
13 A   Uhm, no, actually I think I called him.
14 Q   You called him?
15 A   I think.
16 Q   Tell me to the best of your recollection the
17     substance of the March 30th conversation?
18 A   He told me that he had -- that he had received
19     some confidential information that he felt like I
20     needed to know about.
21 Q   And what did he say that information --
22 A   Or some -- actually, what he said was, I received
23     some information from a confidential informant
       that I need to tell you about.

Page 133

1  Q   Okay.
2  A   He told me that --
3  Q   And while he's talking, were you writing the stuff
4      that's on page 106?
5  A   Some of it, yes. Well, yeah.
6  Q   Okay. Go ahead and tell me what he said.
7  A   The -- he told me that -- he told me that his
8      informant had told him that Mr. Coon was -- that
9      there was an incident where Mr. Coon was using
10     Marijuana with students.
11 Q   Uh-huh.
12 A   I asked him where this was occurring at. And he
13     said that the only incident that he -- the only
14     incident that the informant knew about was an
15     incident where kids were in -- kids were in --
16     there were some kids in his vehicle, I think three
17     other students. And they were riding around and
18     smoking Marijuana.
19 Q   Who were those kids?
20 A   And I asked him to -- I asked him to give me the
21     names of the kids involved. And he told me Adam
22     Helms, Jeron Senn, Levon Davis, Andrew Law, Thomas
23     Green. And he did -- he did mention that that

JR, A Minor                    July 24, 2007              Pike County Board of Education

35 (Pages 134 to 137)

---

Page 134

1  they were leaving during class time and had gone
2  to -- they had gone up to Hardees to get a
3  hamburger.
4  Q   So, he told you that Mr. Coon had one, two, three,
5      four, five, students with him in his truck; is
6      that what you said?
7  A   No. He -- you know, he didn't tell me a lot. I
8      mean, it came from a confidential informant. He
9      said that his informant had told him that they
10     were riding around in the truck smoking Marijuana.
11     And there was supposed to be three kids. And he
12     said, of course, that the kid that was reporting
13     to the confidential informant that was
14     someone that didn't smoke any, but Mr. Coon and
15     the other kids did.
16 Q   I see you have Matt (sic) King's name there, too.
17     Is that in relation to this report from
18     Mr. Phelps?
19 A   Yeah. And I never did get a chance to go there on
20     the Polly King situation with the complaint back
21     in -- back around January or whatever about
22     Ms. King coming in and being frustrated. We kind
23     of stopped there.

---

Page 135

1      But Ms. King -- Ms. King had given a story
2  to -- one of the things that she -- parents tend
3  to start looking -- when they are mad at a
4  teacher -- start looking at reasons why the
5  teacher is a bad person. And one of the things
6  that Ms. King had said to Mr. McDaniel that
7  Mr. McDaniel relayed to me was that Mr. Coon
8  didn't need to be smoking with the kids down there
9  and riding around in the truck.
10 Q   Need to be smoking down where?
11 A   Did not need to be smoking --
12 Q   Down where?
13 A   -- down around the band room and with the kids in
14     the truck. And when I was sitting at my desk --
15     when I was sitting at my desk, and I was writing
16     down all these names. He did not give me the name
17     of Matt King. A bell went off in my head that
18     this story sounds like -- this story sounds
19     like -- this story sounds like a story I had heard
20     before.
21 Q   Okay. So, you just -- you came up with the name
22     Matt King?
23 A   Yes. That's, my --

---

Page 136

1  Q   And then up above that S. King or something
2      King -- oh, maybe that's smoking?  What is that?
3  A   My writing is terrible. I don't know. It looks
4      like S. King or something.
5  Q   So, you just wrote that there.  Did you discuss it
6      with Mr. Phelps, something about Polly King?
7  A   No, not yet. I didn't mention it to him at that
8      point.
9  Q   What else did he tell you?
10 A   That's pretty much all that he told me. I did --
11     I asked him, I said, well, Butch, do you know of
12     any other inappropriate conduct that may be going
13     on? I said, I need to know if there is anything
14     else. And he said -- he said, well, there is one
15     kid that the other kids make fun of that's
16     called -- and I said -- that they refer to him as
17     his -- they refer to this kid as being his butt
18     buddy. And I said, well, is there -- do you know
19     anything about anything else that's not
20     appropriate? And he said, well, now the Marijuana
21     is -- the Marijuana is what I am calling you
22     about, the using the Marijuana -- the use of the
23     Marijuana.

---

Page 137

1  Q   You have got in there sexual favors, sex favors.
2  A   Yeah, he didn't say that. That's -- I wrote that
3      down kind of as a sexual favors question mark?
4      Is -- you know -- I mean, I --
5  Q   Was it at that point the alarms were going off?
6  A   Uhm, well, you know, I think -- I think what we
7      did shows a heightened sensitivity to these kind
8      of issues. I mean, it's -- you've got some
9      allegations kids -- he's smoking Marijuana with
10     them. And he's got a kid that other kids refer to
11     as butt buddy. It's not something we're going to
12     ignore.
13 Q   What did you understand butt buddy to mean?
14 A   Well, with kids, butt buddy could mean a lot of
15     things. We used to say, he's my right arm, or
16     he's my best friend or whatever. In kids'
17     terminology, butt buddy could be somebody's best
18     friend. And in other situations, it could mean
19     something else, in my opinion.
20 Q   Like homosexual intercourse, anal intercourse?
21 A   Well -- no, not that specifically. But, you know,
22     it certainly -- it certainly raised a red flag
23     with me. That, oh, oh, butt buddy. What is that

---

Page 138

1   about?  You know, that's --
2   Q   Well, did you take that to be a sexual
3       connotation?
4   A   Yes, I did.
5   Q   Okay.
6   A   At that point, I didn't even -- I didn't know
7       which student it was that --
8   Q   Was referred to that way?
9   A   -- was referred to.
10  Q   Now, I don't know which way these pages go, but on
11      the page, the facing page, you then listed these
12      one, two, three -- five names.  Was this done
13      after the conversation?
14  A   Yeah.  Yes, ma'am.  Yeah.
15  Q   And then at the top, you have written, Phillip
16      Faulkner, and cell phone.  What's that?
17  A   These are just the notes that I have -- just as --
18      you know, as we went through the week looking into
19      this, those are just the names -- you know -- you
20      know, we wanted to go back and look at the cell
21      phone situation.  I -- when you start putting all
22      the dots together over in -- when you start
23      putting the dots together over in March, you say,

Page 139

1   okay, what are the things back there that could
2   support some contention that inappropriate conduct
3   was going on?  So, these are the kids I wanted to
4   make sure that they talked to and looked into
5   those situations.  And that's what that is.
6   Q   Now, why is there a question by -- I can't read
7       this -- Levon Davis?
8   A   At some point in the process, I was not sure what
9       school he was at.  I wasn't sure if he was at
10      Banks or Pike County High, because he went to both
11      schools.
12  Q   So, when you received this information from
13      Mr. Phelps, what did you do?
14  A   I placed Mr. Coon on administrative leave.
15  Q   That's -- I mean, that's the first thing you did?
16      You didn't call the principal or -- I mean --
17  A   No.  I -- you know, I -- I -- you know, with that
18      information coming from law enforcement, even
19      though it was coming through a confidential
20      informant, it was not a situation that I was not
21      going to look at.  So, I placed him on
22      administrative leave.
23          (Whereupon, Plaintiff's Exhibit 14

Page 140

1   was marked for identification and
2   is attached hereto.)
3   BY MS. DePAOLA
4   Q   Let me show you what I am going to mark as
5       Plaintiff's Exhibit 14 and ask you if that's the
6       letter you wrote placing Mr. Coon on
7       administrative leave.
8   A   That's correct.
9   Q   Did you have that hand delivered to him at school,
10      or what did you do?
11  A   I had him come to my office, and I handed it to
12      him.
13  Q   Did you have a conversation with him about it?
14  A   Yes.
15  Q   Did you call over to the school and direct them to
16      have him come to the office?
17  A   Uhm, yes.  Actually -- actually, I probably
18      composed this the night before.  When did I talk
19      to Mr. Phelps, on the 30th?  I would have composed
20      this letter right after that.  I probably had him
21      report to my office that morning instead of going
22      to school.
23  Q   And what conversation did you have with him that

Page 141

1   morning in your office?  Did you tell him what the
2   allegations are?
3   A   Yeah, I gave him the letter and told him what the
4       allegations are.  I did not -- I did not tell him
5       where the allegations came from, because, you
6       know, again, they came from a confidential
7       informant.  At that point, I was not going to tell
8       him that I was placing him on administrative leave
9       based on a confidential informant who may or may
10      not be reliable.
11  Q   What did he tell you about these allegations?
12  A   He denied these.  Denied them.  Denied them
13      completely.
14  Q   Did you ask him anything about the cell phone?
15  A   No, because that was not -- no, I didn't ask him
16      about that at that point.
17  Q   Did you consult with an attorney about this
18      matter?
19  A   I don't recall if I spoke with -- I don't recall
20      if I spoke with -- if I did, it would have been
21      Richard Calhoun.
22  Q   Do you have any --
23  A   I don't recall doing that.  But I may have.

JR, A Minor                          July 24, 2007                    Pike County Board of Education

---

**Page 142**

1  Q  All right. So, the first page of Plaintiff's
2     Exhibit 14 is the letter. Did you request that he
3     take a drug test?
4  A  I did.
5  Q  And did he agree to do that?
6  A  Uh-huh.
7  Q  Do you have any knowledge of how long, for
8     instance, Marijuana, remains in someone's system?
9  A  It's my understanding it's up to 30 or 45 days.
10 Q  And when did -- were you informed these incidents
11    occurred with the Marijuana use?
12 A  Uhm, you know, again, if -- he called me in March.
13    I mean, his first phone call to me would have been
14    in March. Actually, the first time he tried to
15    call me was in March. And so, you know, this is
16    April 1st. So, we're about two weeks out. So, my
17    assumption is, you know, based on that information
18    I had, was that this was something that happened
19    fairly recently. I could not --
20 Q  At least more than two weeks ago?
21 A  Possibly a little more than two weeks. I could
22    not imagine Mr. Coon -- I could not imagine
23    Mr. Phelps sitting on this for a month and a half

**Page 143**

1     before calling me.
2  Q  And the next two pages appear to be a drug report
3     indicating it was negative for Marijuana; is that
4     correct?
5  A  That's correct.
6  Q  And then the next page -- keep going one more
7     page. That is some handwritten notes. Is that
8     your handwriting?
9  A  That's my handwriting.
10 Q  Okay. Now, when were these generated?
11 A  During the investigation.
12 Q  Were you speaking with someone on the phone? Tell
13    me how you came to write --
14 A  I was speaking with -- well, the first one I was
15    speaking with Buddy Pyron on the phone.
16 Q  Okay. I'm not doing very well doing this. You
17    got Mr. Phelps' allegations on the phone. And you
18    immediately suspended Mr. Coon. He came to your
19    office. You suspended him and told him to go get
20    a drug test. What's the next thing that happened?
21    Let's do it that way.
22 A  Well, we -- I spoke with Carolyn Townsend. Spoke
23    with --

**Page 144**

1  Q  What did you tell Carolyn Townsend?
2  A  I gave her a list of names of students I wanted
3     her to speak with.
4  Q  Which of these students would Carolyn Townsend
5     have been directed to speak with?
6  A  Oh, well, we can go through these. Let me see.
7     Actually, there was only one -- there was actually
8     only one at her school.
9  Q  And who was that?
10 A  And that is Adam Helms. And that would be hers --
11    that's on Number 100.
12 Q  Those are her notes on 100?
13 A  Those are -- those are -- those are her notes.
14 Q  Well, tell me what you specifically asked her to
15    ask these students.
16 A  I told her that -- I told her that -- I told her
17    that we had an allegation that Mr. Coon was
18    engaged in inappropriate conduct with -- was
19    possibly involved in inappropriate conduct with
20    his students. And I said that the allegation is
21    that he used -- was using Marijuana with them --
22        (Brief interruption.)
23 Q  Sorry. Go ahead.

**Page 145**

1  A  I told her that -- I told her --
2  Q  I'm listening. I'm just going to turn it off.
3     It's my husband. He will call back.
4        (Off-the-Record discussion.)
5  Q  Go ahead. I'm sorry.
6  A  I asked her to -- I told her that the only student
7     that I knew at this point that was from her school
8     that I felt like needed to be talked to, but that
9     there may be others, but that I wanted her to
10    speak with Adam Helms.
11 Q  And did you define inappropriate conduct?
12 A  I told her that the allegation was that he was
13    smoking Marijuana with students.
14 Q  Did you bring up any other issues of possible
15    sexual abuse?
16 A  I told her that -- that I needed her to speak
17    with -- when you talk with Adam, to push him to
18    see if there was any other -- any other kinds of
19    things going on. And I said, I'm not sure -- I
20    think I told her I want to know who butt buddy is.
21    You know, at that point, I didn't know who butt
22    buddy was. I wanted to know who butt buddy was.
23 Q  Okay.

---

Page 146

1  A   And so, she was to push that. And I said, now, at
2      your school right now, there is only one person
3      you need to talk to. So, what I would like for a
4      you to do is talk to at least a couple of other
5      students about Mr. Coon and do it in the context
6      of -- do it in the context of -- of you're just
7      trying to get a feel for how the program is going.
8      And the other two students she picked to talk to
9      on that day are the ones that are in the notes.
10     They have no relationship to the situation.
11     Jessica Henderson and Lacey Hussey.
12 Q   Okay. Are those girls?
13 A   Yes.
14 Q   Okay. So, you directed her to find out who the
15     butt buddy was?
16 A   Well, I directed her to --
17 Q   To push that issue?
18 A   To push that issue, yes.
19 Q   Let me ask you this: What training in forensic
20     interviewing does Ms. Townsend have?
21 A   I don't know. I have no idea if she has any or
22     not.
23             (Brief off-the-Record discussion.)

Page 147

1  BY MS. DePAOLA:
2  Q   Did you have anybody on staff that has training in
3      forensic interviewing?
4  A   No.
5  Q   Looking at page 100, you didn't interview any
6      children yourself?
7  A   I did not.
8  Q   And the only person you know of who interviewed
9      them was Ms. Townsend?
10 A   Yes.
11 Q   These three on page 100?
12 A   Yes.
13 Q   And did she just send this over to you, this
14     report?
15 A   I believe -- I believe she -- I don't know if she
16     emailed it or faxed it.
17 Q   Okay. Did you have a conversation with her about
18     this report?
19 A   Yeah. I called her back and told her that I had
20     received it. And that -- you know, we went
21     through the responses, because I wanted to make
22     sure that the responses that were on here
23     accurately reflected her -- accurately reflected

Page 148

1      the comments of the kids.
2  Q   Did you ask her to send over to you any notes she
3      had taken when she interviewed the kids?
4  A   No.
5  Q   Did she make any tapes of the conversations?
6  A   Not that I know of.
7  Q   There is nothing on here about butt buddy. Did
8      she pursue that issue with these kids?
9  A   I assume that she did.
10 Q   Did you ask her that?
11 A   I don't recall doing that.
12 Q   So, you really don't know what she asked them?
13 A   Well, I know -- all I know is what the responses
14     are to what --
15 Q   Okay.
16 A   -- that she sent to us.
17 Q   You didn't give her any specific direction about
18     questions to ask other than the push them on the
19     butt buddy and see if there is any issue of sexual
20     abuse?
21 A   Yeah. I asked her to push the Marijuana and butt
22     buddy.
23 Q   Now, did you inform any of the parents identified

Page 149

1      by Mr. Phelps that there is this ongoing
2      investigation?
3  A   I didn't. Now, at some point -- I don't think
4      that would be something we would do during the
5      investigation, because we certainly do not want
6      anybody to close ranks -- the kids to close ranks
7      and not talk to us. So, I know that -- I know
8      that the principals had conversations with some of
9      the parents. I don't know --
10 Q   Okay. Did Ms. Townsend have any conversations
11     with Adam Helms' parents?
12 A   I don't know.
13 Q   Did you have any conversations with any of the
14     parents?
15 A   No.
16 Q   Did Mr. Pyron or McDaniel have any conversations
17     with any of the parents?
18 A   I don't know that -- I don't know -- I don't know
19     for sure, but I -- well, let me put it this way:
20     I believe that Mr. McDaniel or Mr. Pyron, one or
21     the other, has told me that they did have
22     conversations with Mr. Faulkner.
23 Q   During this investigation?

Page 150

1  A  At the conclusion of it. And I think they -- I
2     think they -- yeah, at the conclusion of it.
3     Yeah.
4  Q  **What was the purpose of that conversation?**
5  A  Uhm --
6  Q  **You are not saying that Blake Faulkner was one of**
7     **the identified problems in this instance. Why**
8     **would the principal have talked to Blake**
9     **Faulkner's father?**
10 A  Is it Blake Faulkner? Yeah. I am going to have
11    to look at my notes through this to maybe answer
12    that question.
13 Q  **Well, why you're doing that, would you mind**
14    **reading them out loud to me, because I can't read**
15    **them? Just starting with underneath Cody Dunn's**
16    **store. Does that say Cody Dunn's store?**
17 A  Yeah.
18 Q  **Read the rest there?**
19 A  It says Matt King -- or MAK King -- Buddy Pyron,
20    Robert McDaniel report the story was made by
21    mother of Matt King late first semester when she
22    was at school concerning Matt's grades.
23 Q  **Now, what does that mean? Explain that sentence**

Page 151

1     to me.
2  A  That the riding around in the car smoking
3     Marijuana is the same story that we had back in --
4     except it's transitioned from -- it's transitioned
5     from Polly King talking about -- with Mr. McDaniel
6     about smoking cigarettes to her talking with Butch
7     Phelps about it's now Marijuana.
8  Q  **So, they are telling you that -- or your**
9     **investigation indicated that during the first**
10    **semester Polly King had reported to Mr. McDaniel**
11    **that the kids were riding around smoking**
12    **cigarettes?**
13 A  Well, they connected -- I mean, Mr. McDaniel and
14    Mr. Pyron connected the dots just like I did
15    immediately when I told them this is what Butch
16    has said. And, you know, the first thing that
17    came to mind with them --
18 Q  **Wait. Butch who? This is what Butch had said?**
19 A  Butch Phelps.
20 Q  **Okay.**
21 A  I'm sorry. Mr. Phelps.
22 Q  **I'm sorry. Say it again.**
23 A  What that says is that it -- this was made after

Page 152

1     discussion with them, during discussions with
2     them. Mr. Pyron, Mr. McDaniel, you know, as soon
3     as I gave them the information about what the
4     allegation was -- because I did tell them where it
5     came -- I did tell them where it came from.
6  Q  **I thought you didn't know. I thought you said it**
7     **was a confidential source, and you didn't know?**
8  A  Well, I told them that it came from law
9     enforcement.
10 Q  **Okay.**
11 A  And they drew -- immediately drew the same
12    conclusions that that sounds like what Ms. King
13    said.
14 Q  **Last semester?**
15 A  Last semester. So, she stated that this occurred
16    (inaudible) --
17 Q  **Okay. Wait. Wait. Mary --**
18       THE WITNESS: I'm sorry. I forgot you
19          were trying to get all that down.
20 A  Buddy Pyron discussed with --
21 Q  **Where are you reading?**
22 A  I'm starting again.
23 Q  **Okay. Can you just back up? Made at the...**

Page 153

1  A  Okay. Made at the time Matt had D or F in band.
2  Q  **Okay.**
3  A  Stated -- she stated this occurred a month
4     earlier. No explanation as to why she did not
5     report.
6  Q  **And we're still talking about the first semester?**
7  A  Why she didn't report -- yeah. Why she didn't
8     report it earlier. Buddy Pyron discussed with --
9     Chris -- but I think that means Matt. In fact, is
10    his name Christopher Matt.
11      MS. ALLEN: No, it's MAK, M-A-K.
12 A  MAK. He denied seeing Marijuana used by anyone
13    only cigarettes. And he denied any other
14    inappropriate activity or knowledge of this.
15 Q  **And are we talking about -- this is a report that**
16    **Mr. Pyron gave to you that he discussed it with**
17    **MAK?**
18 A  This is a summary I made -- yeah -- well, I was
19    speaking with him on the phone.
20 Q  **And writing?**
21 A  And writing, yeah. Because we discussed
22    whether -- you know, you know, is it -- in fact,
23    in this conversation I said to Buddy, I said,

Page 154

1    Buddy, when I talk to Mr. Phelps again, Detective
2    Phelps whatever he is, I'm going to ask him if
3    Polly King is his confidential informant. I said,
4    I bet I know she is his confidential informant,
5    because the stories matched up so much. And I
6    wanted to make sure that he had hit Matt (sic)
7    pretty good about the Marijuana and any other
8    inappropriate activity.
9  **Q  Well, now, Mr. Phelps didn't tell you that anyone**
10  **alleged that MAK King had engaged in any of this,**
11  **did he? Because he's not a listed person on**
12  **your --**
13  A  No, but when Ms. -- when Ms. King made the
14    complaint to -- when Ms. King made the complaint
15    to Mr. McDaniel --
16  **Q  First semester?**
17  A  -- right -- right around the end of first
18    semester, beginning of second.
19  **Q  Okay.**
20  A  And it was probably second, because that's when
21    the report cards would have came out -- Ms. King
22    stated that Matt had witnessed that; and was in
23    the vehicle when they were smoking the cigarettes.

Page 155

1    But Matt didn't smoke.
2    Now that -- and, again, with it coming through
3    Mr. Phelps now, Matt wasn't there. But because
4    the story sounded so much alike, I told them, you
5    know, you need to talk to Matt. So, that's how
6    MAK, got into it.
7  **Q  Now, what specifically did you direct -- did you**
8  **direct Mr. Pyron to conduct this investigation?**
9  A  I spoke with both of them about it. And I told
10    them I wanted the students interviewed. And that
11    I would get back with them. I needed, you know --
12    I needed some follow up in terms of whether
13    anything was going on. Anything that was -- that
14    was of concern to them that -- I needed to follow
15    up from that.
16  **Q  Well, did you tell -- are either of them forensic**
17  **interviewers?**
18  A  No.
19  **Q  Did you tell them to follow up on allegations or**
20  **issues relating to sexual abuse?**
21  A  I told both of them just like I told Ms. Townsend
22    that -- I told them just like I told Ms. Townsend
23    that I wanted to know if they could find out who

Page 156

1    the student was that they were referring to as
2    butt buddy.
3  **Q  Did you specifically mention you wanted to know if**
4  **there were any sexual activities involved?**
5  A  I don't remember the exact words. I think that
6    was made pretty clear; that I wanted to know
7    whether there was any indication that Marijuana
8    was being used; that -- or any other inappropriate
9    activity of any type, including inappropriate
10    sexual activity.
11  **Q  So, did you have some suspicion as a result of**
12  **connecting all these dots that one or more of**
13  **these students may be being sexually abused?**
14  A  I'm not sure which dots --
15  **Q  Well, a minute ago you said you started connecting**
16  **the dots.**
17  A  Well, I mean, I connect the dot -- I mean, you
18    know, basically standalone -- the cell phone
19    situation standing alone, to me, is not a red flag
20    considering the number of cell phones that are out
21    there. Again, standing alone, that's not a thing.
22    The fact that Mr. -- the fact that
23    Mr. McDaniel has issues with the band --

Page 157

1    disciplining the band doesn't necessarily relate
2    to that kind of situation.
3  **Q  Well, I think I am just using your phrase from**
4  **earlier you said you were correcting the dots.**
5    **MR. SWEENEY: Let him finish his**
6    **explanation.**
7  A  The -- you know, the -- the allegation that
8    Mr. Coon gave a bad grade to a student, because
9    he -- because he didn't turn in his band uniform.
10    And then we get this situation with Mr. Phelps
11    over in April that, again, comes from a
12    confidential informant who may or may not be
13    reliable. You know, we have -- I believe that we
14    were very thorough and aggressive in the things
15    that we did in placing him on administrative leave
16    and in interviewing the number of students that we
17    interviewed.
18  **Q  Did you at this point have some suspicion that**
19  **sexual abuse may be occurring?**
20  A  No.
21  **Q  Then why were you investigating it?**
22  A  Well, what we were investigating -- we were
23    investigating whether there was any truth to the

Page 158

1    use of Marijuana. And --
2  **Q   And such --**
3  A   -- I wanted to know who butt buddy was. It would
4      not be -- again, maybe I am wrong. But the
5      information that I received from Mr. Phelps -- and
6      I think it's pretty clear where it came from --
7      that was Ms. King. And it was limited to the butt
8      buddy situation. So, I think it shows a
9      heightened sensitivity to the fact that we were --
10     you know, I wanted to know who butt buddy was.
11 **Q   You had no suspicion, however, that any sexual**
12     **abuse had occurred?**
13 A   No. I wanted to know -- I wanted to know who butt
14     buddy was.
15 **Q   Because you thought it might refer to sexual**
16     **abuse?**
17 A   I thought it might, because it obviously has a
18     sexual connotation, yes.
19 **Q   Now, did you personally interview any of these**
20     **kids?**
21 A   No.
22 **Q   What is the reference to Cody Dunn's store there?**
23 A   I don't -- I don't recall. I don't even know

Page 159

1      where Cody Dunn's store is.
2  **Q   Is that your handwriting?**
3  A   Yes.
4  **Q   Was this -- were these notes made in relationship**
5      **to a conversation with Mr. Pyron or with**
6      **Mr. McDaniel?**
7  A   Mr. -- these were made talking to Mr. Pyron.
8      Yeah, because they are -- the next pages have
9      those notes at the bottom.
10 **Q   Now, did you direct him also to talk to Phillip**
11     **Faulkner -- Blake Faulkner?**
12 A   Yes, I directed him to talk to all those students.
13 **Q   Did you have some suspicion that Blake Faulkner**
14     **might be being sexually abused by Mr. Pyron?**
15 A   I thought his name was on the original list of
16     people we needed to talk to. I would have to go
17     back and look.
18     Uhm, no -- and I will tell you the reason that
19     I -- was that I believe that I asked them to talk
20     to Blake -- to add Blake to the list, because he
21     was the one with the cell phone.
22 **Q   What did that have to do with the Marijuana use?**
23 A   Well, again, I believe trying to track down every

Page 160

1      lead that I possibly can that something
2      inappropriate might be going on.
3  **Q   Such as sexual abuse?**
4  A   Yes.
5  **Q   So, you did have some suspicion that possibly**
6      **Blake Faulkner was being sexually abused?**
7  A   Well, I had some suspicion that Blake would be
8      possibly the person that Butch was referring to as
9      the butt buddy.
10 **Q   Can you read at the bottom of page 91 those notes**
11     **to us, please?**
12 A   Sure. Buddy Pyron talked with student. No
13     information. Student cooperative. Denies
14     allegations. Parents approve of CC -- who is
15     Charles Coon -- and student spending time away
16     from school.
17 **Q   So, now you knew also that they were spending time**
18     **together away from school?**
19 A   Well, I knew that -- I knew that there were some
20     occasions where -- where Mr. Coon had taken him
21     home.
22 **Q   All right. Did you know about the camping trips?**
23 A   No.

Page 161

1  **Q   When did you find out about those?**
2  A   I didn't know that there was camping trips.
3  **Q   How about fishing?**
4  A   I had no idea.
5  **Q   How about trips to Six Flags?**
6  A   I have no idea they took trips to Six Flags.
7  **Q   So, spending time away from school, the only thing**
8      **you understand that to be was driving him home?**
9  A   No. Mr. Phillip Faulkner -- or Blake Faulkner's
10     father is Phillip Faulkner. And he is an Alabama
11     State Trooper. And I am not sure where he is
12     assigned now. But it was my understanding that he
13     was assigned Montgomery, Butler County area. And
14     they were divorced -- Phillip is divorced. The
15     mother lives in Montgomery County. Mr. Faulkner
16     lived in Bullock County. And Blake lived in Pike
17     County with grandparents. And it was my
18     understanding there were some times where -- where
19     Mr. -- I only found this out about this time --
20     that -- that Mr. -- that Mr. Coon had provided
21     transportation, so that he could -- so that Blake
22     could either meet his mother or meet his father
23     and that was with the permission of the mother and

JR, A Minor                        July 24, 2007                Pike County Board of Education

42 (Pages 162 to 165)

Page 162

1    the father.
2  Q  **Meet Blake's mother and father?**
3  A   Yes.  In other words, they were in a location away
4     from Pike County and that Mr. Coon would -- as
5     a -- to be helpful to the parents, he would carry
6     them to -- he would carry Blake to meet them.
7  Q  **You found that out as a result of this**
8     **investigation in March of '05?**
9  A   No.  I think that was -- I think that was -- well,
10     that may have been during that time, because I
11     know I quizzed them about -- I quizzed them about,
12     you know, what's this about Blake going -- what do
13     you mean about being away from school?  Because
14     again, that's what -- parents approve of CC and
15     student spending time away from school.  He told
16     me that.  And I was, what does that mean?  What
17     does that mean "spending time away from school"?
18     And that's when he explained that the father was a
19     State Trooper.  I know Mr. Faulkner.  I've known
20     him since he was -- I know Blake's dad.  I have
21     known him since he was 14 years old.
22  Q  **Would this conduct by Mr. Coon violate school**
23     **policy?**

Page 163

1          MR. SWEENEY:  What conduct?
2  Q  **Transporting students.**
3  A   We don't have a policy concerning transporting
4     students.  Our practice is to discourage -- our
5     practice is to discourage faculty members from
6     transporting students unless they are -- unless
7     it's an emergency situation.  And the truth is
8     that we live in a rural -- we will in a rural
9     county.  And there are many children, including
10     possibly the Reed children and many, many other
11     children who would not be able to participate in
12     programs like this if a coach didn't take them
13     home or band director take them home or debate
14     team teacher take them home or the drama club
15     teacher take them home.
16  Q  **Well, how about transporting a student across**
17     **county lines to visit their parents?  Is that a**
18     **violation of school policy for teachers who do**
19     **that?**
20  A   No.  There is no policy concerning transporting
21     students in county or out of county.
22  Q  **Okay.  Now, why did you include in these documents**
23     **Phillip Faulkner's attendance records?**

Page 164

1  A   That wasn't pulled for any particular reason.
2     That was just when we ran the printout, it just
3     printed it out.  I mean I -- I mean, you asked for
4     everything that we had.  And I just --
5  Q  **Okay.  Let's go over to page 095.  Can you read**
6     **those notes to us?  These relate to Jeron Senn.**
7  A   Confirmed smoking cigarettes with student.  Saw
8     them leave campus together and smoking.  Saw going
9     by house on several occasions.
10  Q  **Is that numerous occasions or several?**
11  A   Numerous.  Saw him going by house on numerous
12     occasions, yeah.  That refers to, again, Blake.
13  Q  **Oh, it says, Jeron Senn at the top.**
14  A   No, that's not -- that was not -- this refers to
15     Blake, because I think we were at some point
16     focusing in on Blake as the butt buddy.
17  Q  **So, you're saying that when Mr. Pyron interviewed**
18     **Jeron Senn that Jeron confirmed that Mr. Coon was**
19     **smoking with students?**
20  A   With a student.
21  Q  **With a student.  And that Jeron Senn saw Mr. Coon**
22     **leaving campus and smoking with a student.  And**
23     **you're saying that student was Blake Faulkner?**

Page 165

1  A   I don't recall who the student was.  I would have
2     to ask Mr. Pyron.
3  Q  **And that Jeron Senn saw Mr. Coon going by Blake**
4     **Faulkner's home on numerous occasions?  Is that**
5     **what this means?**
6  A   No, no.  Let me -- I guess I need to back up and
7     start over.  Jeron Senn, it was my understanding
8     that his statement was that, yes, he had seen
9     Mr. Coon smoking with a student.  And that he also
10     saw Mr. Coon in a vehicle smoking with students,
11     or a student.
12  Q  **How about leaving campus?**
13  A   Yeah.  Leaving campus together and smoking.  Like
14     whether it was -- like when they said they were
15     going up to Hardees to get lunch, he saw them
16     leaving maybe going to Hardees to get something.
17     And that's when he saw them smoking.
18  Q  **What's the last thing?  Seen going by home on**
19     **numerous occasions.  What does that mean?  Who is**
20     **going by whose home?**
21  A   I'm not sure where Jeron Senn lives, but he would
22     have seen them going by his house.  That's the way
23     I took that; was that he saw them passing by his

Page 166

1  house.
2  Q  Okay. The next page refers to Thomas Green. And
3     it just says, no knowledge. What's that
4     underneath it that's crossed out?
5  A  I have no idea.
6  Q  All right. Let's look at the next page. Andrew
7     Law. What does that say?
8  A  Uhm, BP. Something voc tech.
9  Q  What did he tell you about Andrew Law?
10 A  I don't recall.
11 Q  Back up. What did he tell you about Thomas Green?
12 A  He told me that Thomas Green had no knowledge of
13    the smoking -- smoking cigarettes or being
14    involved in smoking Marijuana. And he knew of no
15    other inappropriate conduct.
16 Q  All right. Look couple of pages over, Adam Helms.
17    It appears to say, see CT notes. What does that
18    mean?
19 A  CT. That's Carolyn Townsend.
20 Q  So, during this process, you personally spoke to
21    none of the kids; is that correct?
22 A  That's correct.
23 Q  You spoke to none of the parents?

Page 167

1  A  I didn't.
2  Q  Okay. Well, do you know if Buddy Pyron or Carolyn
3     Townsend spoke to any of the parents in conducting
4     this investigation?
5  A  It was my understanding that they did. I'm -- I
6     don't know.
7  Q  Don't know? And the only person you spoke to was
8     Mr. Coon other than Buddy Pyron and Mr. McDaniel
9     and Carolyn Townsend?
10 A  No, I spoke with -- I spoke Buddy
11    Pyron, Robert McDaniel. I spoke with Carolyn
12    Townsend. I spoke with Terry Casey. I spoke
13    with -- I spoke with Mr. Phelps about it. And I
14    spoke with Moses Davenport about it.
15 Q  All right. Now, with respect to Mr. Pyron, as I
16    understand, you directed him to make the
17    investigation. And you received the reports we
18    have just went over?
19 A  Yes.
20 Q  Did you have any other discussions with him about
21    it?
22 A  Not that I recall.
23 Q  And Mr. McDaniel, I don't know. What discussions

Page 168

1     did you have with him?
2  A  I know that he was involved either directly or
3     indirectly in talking with some of the kids. I
4     don't know if they interviewed the kids together
5     or apart or --
6  Q  The question is: What conversations did you have
7     with Mr. McDaniel?
8  A  I don't recall.
9  Q  Don't know if you spoke with him about this at
10    all?
11 A  Oh, I'm sure I did.
12 Q  Because seems like he was the one most upset about
13    Mr. Coon.
14 A  Oh, I'm sure I did speak with him about it. I
15    don't recall specifically those conversations.
16 Q  Other than directing Carolyn Townsend to make the
17    report, what other conversations did you have with
18    her?
19 A  None.
20 Q  What conversations did you have with Terry Casey?
21 A  I asked him -- I asked him if he would -- as it
22    related to the Marijuana, did he ever have any
23    concerns that Mr. Coon may be using Marijuana or

Page 169

1     drugs or those kind of things and whether he had
2     noticed any other inappropriate conduct.
3  Q  Did you bring up the butt-buddy question?
4  A  I don't recall that specifically.
5  Q  Did you bring up sexual abuse of any kind?
6  A  I don't recall that.
7  Q  What was Mr. Casey's response to your inquiry?
8  A  He told me that he had never had any suspicions
9     that Mr. Coon was involved in anything
10    inappropriate.
11 Q  Let me help ask you this -- and this is an
12    aside -- since this happened, have you heard that
13    Mr. Coon was involved in any inappropriate conduct
14    in any prior school systems?
15 A  No, ma'am.
16 Q  How about what was your conversations with
17    Mr. Phelps other than the initial call that you
18    have already discussed with us?
19 A  I called him back and basically walked him through
20    everything that we had done. I told him that I
21    bet I knew who his confidential informant was.
22    And that I believed that his confidential
23    informant was Polly King -- that his confidential

JR, A Minor              July 24, 2007           Pike County Board of Education

Page 170

1    informant was Polly King or somebody related to
2    Polly King. He did not confirm or deny that it
3    was her. But, you know, I discussed that with
4    him.
5  Q   Well, what significance was that?
6  A   I just thought it was -- you know, I just wanted
7    him to know that I had connected the dots on who
8    the confidential informant was, and that --
9  Q   Well, I mean, that's all you told him is, I know
10   who your confidential informant is?
11  A  No, I went through --
12  Q   What else?
13  A  I went through everything that we had, and I told
14   him that we had talked to all the kids that he had
15   suggested that we talk to. That he had tested
16   negative on a drug screen. And that unless he had
17   any more ideas about where the investigation
18   should go, anybody else that I needed to talk to
19   or -- that I would be glad to do that. But
20   that --
21  Q   Did he have any other suggestions?
22  A  No.
23  Q   So, on the last document in that pile of

Page 171

1    Plaintiff's Exhibit 13 -- or maybe it's 14 -- is
2    that your letter to Mr. Coon?
3  A  In 13? This is 13? I think it's 14. Is it 14?
4  Q   Yes, sir.
5  A  Yes.
6  Q   And you said there is no evidence to substantiate
7    these claims. There certainly was evidence to
8    indicate he was smoking with students.
9  A  Well, I think that's in the next paragraph. It
10   says, the investigation did reveal numerous
11   reports that on several occasions you used
12   cigarettes with students.
13  Q   Okay. Did you indicate that transport off
14   campus --
15  A  Yeah. It says in the next paragraph, it says the
16   investigation revealed numerous reports of
17   students being transported in your personal
18   vehicle.
19  Q   Now, when did you inform DHR that you had these
20   suspicions relating to Blake Faulkner?
21  A  I didn't inform DHR. I reported back to the
22   source of the information, which was -- which was
23   Mr. Phelps, and I carried a complete packet -- I

Page 172

1    carried a complete packet of everything at the
2    suggestion of Mr. Phelps to the Chief of Police in
3    Brundidge, Moses Davenport.
4  Q   Okay, now, a complete packet. Is that --
5  A  Everything.
6  Q   Is this Plaintiff's Exhibit 14?
7  A  Uhm --
8  Q   And 14 is this one (indicating).
9  A  The last page was not part of that.
10  Q   Okay. What is that last page?
11  A  That's where I summarized (Witness removing page
12   from staple) --
13  Q   Well.
14  A  Oops. I'm sorry. That's a bad habit. That
15   actually is where at some point I was interested
16   in summarizing -- going back and looking at his
17   employment -- I think that's where I went back and
18   looked at his --
19  Q   Okay. Let's go over that page. Maybe we should
20   take that one out that you're ripping out.
21  A  I apologize.
22  Q   So, let's mark this separately.
23  A  That's not really part of that, anyway. Or it

Page 173

1    doesn't need to be.
2  Q   Let's mark this as Plaintiff's Exhibit 15.
3          (Whereupon, Plaintiff's Exhibit 15
4          was marked for identification and
5          is attached hereto.)
6  BY MS. DePAOLA
7  Q   And just ask you to tell us what that is.
8  A  I don't remember when that was done. It may have
9   been after --
10  Q   At the top it says April 1, '05. That's the very
11   first entry on this document.
12  A  That's April 1, '05. That's when he was
13   suspended. There is not a date on this.
14       This might have actually been done after the
15   filing of this lawsuit. It might have been just
16   me going through looking at his -- at his
17   preemployment history.
18  Q   What would make you write there, eight different
19   systems?
20  A  Because he was employed in eight different
21   systems.
22  Q   Did you think that made you suspicious about him?
23  A  Not really, because for coaches and band

Page 174

1  directors, they tend to bounce around. More --
2  important to me was the fact that he was tenured
3  in three -- he was tenured in three systems. He
4  was tenured in Crenshaw County, Butler County, and
5  Dallas County.
6  Q  Did you ever call anybody in any of these other
7     systems where he only served one year to find out
8     why he was bouncing around?
9  A  Did I?
10 Q  Yeah.
11 A  I was not Superintendent at that time. I was not
12    involved in that process.
13 Q  No, I mean when you were doing this investigation?
14 A  Oh, no.
15 Q  You've also produced in relation to this lawsuit,
16    it looks like a grade book. Does that have any --
17    (Brief interruption.)
18 A  These are just his grade books.
19 Q  Did you pull them at the time of the investigation
20    to see who his students were?
21 A  Did we pull these?
22 Q  Uh-huh.
23 A  No. No.

Page 175

1  Q  Did you make any effort to determine if there were
2     any special ed kids in his classes?
3  A  No.
4     I mean, it's more than likely -- it's more
5     than likely in a small school like ours that the
6     band is very small and that we're going to have
7     special ed football players, special ed band
8     members, special ed baseball players.
9  Q  Did you conduct any kind of separate or additional
10    investigation with respect to his relationship
11    with the special ed kids during this April
12    investigation?
13 A  Uhm, no.
14 Q  When did you become aware that Justin had
15    Mr. Coon's cell phone number?
16 A  I didn't know he did have it.
17 Q  Okay. And you mentioned transporting the students
18    to Hardees. Did you say someone reported he was
19    transporting a student or students to Hardees for
20    lunch? I don't know if you were making that up as
21    an example.
22 A  No, no. It was -- I think it was in -- one of the
23    notes. I would have to go back and look.

Page 176

1  That's in the original call from Mr. Phelps.
2  I think it says, buy him -- buy -- buy lunch or
3  buy him lunch. Class time, Hardees, it says
4  there. That's where that came from.
5  Q  I'm sorry. Is that this little thing up there?
6  A  Buy him lunch. Class time. Hardees.
7  Q  I see. Are you saying -- I'm sorry; I don't
8     understand -- are you saying Mr. Phelps told you
9     that Mr. Coon was buying students lunch at
10    Hardees, or that this is another thing that sprang
11    to your mind?
12 A  No, no. That's -- no, I think he told me that.
13    That -- that they were buying each other lunch. I
14    mean, I -- I mean, I don't --
15 Q  And on March 30th, again, just to make sure I
16    understand everything here, what does this say?
17    And does this have any relation to any of --
18 A  My diary, unfortunately, is not an exact science.
19    But, Al Griffin is our technology coordinator.
20    And it says no MT, which was probably
21    manufacturing -- no manufacturing technology -- no
22    manufacturing -- MT is manufacturing technology.
23    B and I is probably business and industry. And I

Page 177

1  can't read what the last one is. But that's some
2  reference to career technical education. And it
3  probably has to do with Mr. Neil, because Mr. Neil
4  was the career technical teacher.
5  Q  Now, when you wrote this letter to Mr. Coon, did
6     you call him into your office, or just mail it to
7     him, or what did you do?
8  A  No, I met with him.
9  Q  What was the substance of your discussions with
10    him?
11 A  I mailed -- I sent him a letter. But I also
12    called him in and handed him the letter and told
13    him that I was going to place him back to work.
14    But that -- we would continue the investigation.
15    And that if additional information came -- came to
16    our attention, that we would certainly be
17    revisiting his situation. And that -- I notified
18    him that I had passed on all this information to
19    law enforcement.
20 Q  Okay. Tell me about your conversation with
21    Mr. Davenport. When did this occur and --
22 A  It was -- I don't know the exact date. I would
23    suspect that it was -- it actually would have

JR, A Minor                          July 24, 2007                          Pike County Board of Education

Page 178

1   probably been the date that I put him back to
2   work.
3 Q  Was it Mr. Davenport —
4 A  Chief Davenport --
5 Q  -- you said you gave a complete packet?
6 A  Chief Davenport. I personally went to the
7   Brundidge Police Department. We went into his
8   office. I sat down with him. I briefed him on
9   the situation. And gave him a packet of the
10   information.
11 Q  All right. And did he make any recommendations to
12   you?
13 A  No.
14 Q  Did he indicate he was going to do anything
15   further?
16 A  No, not at that time. I told him that we would be
17   glad to -- if he felt like there was anything else
18   that we could do or needed to be done, we would be
19   glad to assist him with that. But that we -- I
20   was not sure what else we could do at this point,
21   given the lack of information that we had.
22 Q  So, you still felt uncertain as to the truth or
23   falsity of the allegations?

Page 179

1 A  Ah, yes.
2 Q  Let's look on Plaintiff's Exhibit 13. I want to
3   go to the next entry. Following March 30th, I'm
4   not sure where this goes with.
5 A  That's the opposite side of --
6 Q  Is that the opposite side of April 4th, or do you
7   know?
8 A  That's the opposite side of April 4th.
9 Q  What's that number 3 with Coon next to it and a
10   phone number? What does that signify?
11 A  I think that was his phone number. I think he had
12   called me and left me his phone number to call
13   him. I --
14 Q  Did you call him?
15 A  I don't recall. I -- you know, he -- you know,
16   may have been that he was wanting to know what his
17   status was going to be. What is -- I am not sure
18   what day of the week April 30th is. But
19   Wednesday, April -- let's see, April 30th. That
20   would -- that could have been on a Friday. He may
21   have been wanting to know, you know, can I come
22   back to work?
23 Q  The next date I see Mr. Coon's name is April 4th.

Page 180

1 A  That's the same -- the same Neil and Coon that's
2   been running throughout the entire calendar.
3 Q  What were you going to do about Mr. Coon on
4   April 4th, Mr. Coon?
5 A  Well, we weren't going to do anything about him.
6   Those were two programs. Neil's program was
7   automotive technology program that we were not --
8   that was not -- I felt like the automotive
9   technology program was not performing up to
10   standards, and I had concerns about the band
11   program down there. And I knew we needed to
12   follow up and discuss those programs.
13 Q  All right. Go to the next page. There is a
14   reference here to Mr. Coon. Can you tell me what
15   caused you to write this down?
16 A  This is just some additional notes that were taken
17   during the investigation. We were -- you know, it
18   identifies Adam Helms as a Banks student. Andrew
19   Law, Pike County High. This is -- see, Lavine
20   Davis, again, has got the question mark by it,
21   Pike County High. We were just going through --
22 Q  Under the PCHS, what does that say under there
23   patio band? Or what does that say?

Page 181

1 A  Not in band.
2 Q  Okay. Not in band? Then below that you've got
3   blank Faulkner.
4 A  That's Blake. It said, Blake Helms. And it was
5   actually Blake Faulkner.
6 Q  Well, up above that, it's crossed out something
7   Faulkner?
8 A  Well, again, we were trying to match up names of
9   who was who. And I think it was Blake Helms and
10   something Faulkner. There was a cross up in the
11   first name and the last name.
12 Q  And then under Matt King, you have got
13   parentheses, mother. Then what does it say under
14   that?
15 A  Cigarette smelled like something.
16 Q  Well, that's what I want to know. What does it
17   say?
18 A  I have no idea.
19 Q  All right. Can you get your original documents
20   out and provide Mr. Sweeney with a translation of
21   what that says at the bottom of 0109?
22        MR. SWEENEY: Not right now, but we will
23   get that to you.

JR, A Minor                         July 24, 2007                    Pike County Board of Education

Page 182

1        MS. DePAOLA:  Yeah, that's what I am
2           asking you to do.
3    BY MS. DePAOLA
4    Q    All right.  In the lower left, what does that say?
5        Not told until --
6    A    Not told until he had an F.  In band is what that
7        was.
8    Q    In other words --
9    A    That refers to Matt King's mother.
10   Q    Didn't tell you all this stuff?
11   A    Didn't tell us all this stuff about the cigarette
12       smoking until Matt had gotten an F in band.
13   Q    All right.  April 11th, it appears you had a
14       meeting with Butch Phelps?
15   A    That's the day I talked to him.
16   Q    And on April 13th, you have got a reference to
17       Charles Coon.  What's that?
18   A    That was probably a call from bookkeeping.  That's
19       probably an internal call from bookkeeping wanting
20       the right to know how to code his absences.
21   Q    I see.  Did you, at any time, provide any training
22       regarding sexual abuse issues to any of the
23       parents of your students?

Page 183

1    A    I don't recall us doing that.  We have a fairly
2        decent community education program and parent
3        education program.  Ms. Grubbs runs that program
4        and may have done that.  I don't specifically
5        recall that.
6    Q    Okay.
7        MS. DePAOLA:  Can we take a quick break?
8        (Brief recess.)
9    BY MS. DePAOLA
10   Q    Dr. Bazzell, have you reviewed the answer that was
11       filed on your behalf to the complaint?
12   A    Ah, yes.
13   Q    And do you deny that Justin Reed was sexually
14       abused?
15   A    Let me see what numbers and all you're referring
16       to.
17   Q    Okay.  Paragraph 25 of the complaint and 25 on
18       your right is your answer.  Twenty-five is the
19       question, and 25 is your answer.
20   A    Twenty-five?  I -- I have no knowledge -- I have
21       no knowledge -- I have no knowledge and have seen
22       no information relating to whether he was abused
23       or not.

Page 184

1    Q    You haven't?
2    A    No.
3    Q    You haven't looked into it?
4    A    I haven't, no.
5    Q    You don't know that Mr. Coon pleaded guilty to
6        sexual abuse of Justin Reed?
7    A    I know that he pled guilty to that.  But I have no
8        direct knowledge of that.
9    Q    Do you have any basis for denying it when you know
10       that there is a plea of guilty for same?
11   A    I have no knowledge of it.
12   Q    Of the guilty plea?
13   A    I have no knowledge even to what he pled guilty
14       to.
15   Q    And you have conducted no investigation in
16       conjunction to your responses to this complaint?
17   A    Uhm, no.
18       MS. DePAOLA:  I don't have any further
19       questions.  I would like to reserve
20       the right to -- if we cannot
21       understand the responses that were
22       submitted with respect to those
23       items we have identified that you're

Page 185

1        going to produce, we want to resume
2        as to those items for Mr. --
3    THE WITNESS:  What were those?
4    MR. SWEENEY:  Are you going to
5        specify --
6    MS. DePAOLA:  I did during the
7        deposition.
8    MR. SWEENEY:  For clarification, if you
9        will write me what you want from us,
10       that will be helpful.
11   MS. DePAOLA:  I didn't write it all
12       down.  It will be in the deposition.
13       I'll review it when it comes down.
14       EXAMINATION
15   BY MR. SWEENEY
16   Q    Dr. Bazzell, you have shared information about
17       Charles Coon in the deposition today.  Have you
18       had any relation with Charles Coon outside the
19       line and scope of your employment as
20       Superintendent of this system?
21   A    No, sir.
22   Q    And with regard to every conversation,
23       communication, or correspondence between you on

Mary Moore-Wynn, CSR                Mary Moore-Wynn                          (334)244-0203
                                    Court Reporting Services

JR, A Minor                          July 24, 2007                    Pike County Board of Education

Page 186

1    the one hand and Mr. Coon on the other, was that
2    always done within the line and scope of your
3    professional employment as Superintendent?
4  A   Yes.
5  Q   Have you had any personal or social relation of
6    any kind with Charles Coon?
7  A   No.
8  Q   Have you had any relationship with Justin Reed
9    outside of your official position as
10   Superintendent of this school system?
11 A   No.
12 Q   At any time prior to Mr. Coon's retirement, did
13   the name of Justin Reed come up as someone that
14   had been abused or potentially abused by Charles
15   Coon?
16 A   No.
17 Q   During April when you were investigating the
18   information Butch Phelps had given you, did Justin
19   Reed's name ever surface?
20 A   No.
21 Q   So, prior to what was reported in the summer of
22   2005, whatever Charles Coon admitted to, did you
23   have any information from any source that would

Page 188

1    possibility, Number 1, that he was smoking
2    Marijuana, or alleged to be smoking Marijuana,
3    and/or that he may be engaged in other
4    inappropriate activity.
5  Q   To what extent did you try to collaborate and
6    cooperate with law enforcement officials
7    concerning this information from Butch Phelps?
8  A   Well, we took every -- we took all the information
9    that they gave us and did everything we could with
10   it and reported back to them and asked for
11   additional guidance in terms of whether we needed
12   to do anything else. We took all the information
13   that we had and turned it over to a second law
14   enforcement agency and provided them all the
15   information and briefed them on what we had done.
16 Q   Did Butch Phelps or anyone from his department
17   ever request that you do anything further than
18   what you did?
19 A   No, we did -- we did everything that we felt like
20   they wanted us to do.
21 Q   Did Chief Davenport or the Brundidge police ever
22   suggest that you do anything more than what you
23   did after you reported to them?

Page 187

1    have led you to be suspicious of conduct between
2    Charles Coon and Justin Reed?
3        MS. DePAOLA: Object to the form.
4  A   No.
5  Q   Huh?
6  A   No.
7  Q   Okay. After Butch Phelps called you with the
8    information that he did, how soon after that did
9    you put Charles Coon on administrative leave?
10 A   Immediately.
11 Q   So, you didn't waste any time --
12 A   No, sir.
13 Q   -- to take action in that regard?
14 A   No, sir.
15 Q   How seriously did you take the investigation
16   concerning the information that Butch Phelps
17   provided you?
18 A   We took it seriously. And we acted, I believe,
19   aggressively in placing him on administrative
20   leave and reviewing -- and investigating the
21   matter. I mean, I think it -- given -- given the
22   information we had, I think it -- I think what we
23   did shows a heightened sensitivity to the

Page 189

1  A   No.
2  Q   When you asked your principals to talk to these
3    students as a follow up to the information that
4    Butch Phelps gave you, why did you think it was
5    appropriate for the principals who knew the
6    students to talk to them rather than you?
7  A   Well, it's -- well, for a number of different
8    reasons. Number 1, they are -- you know, they are
9    charged with that responsibility of conducting
10   those investigations and assist with gathering
11   information. So, it's appropriate for them to do
12   that.
13       Number 2, I felt like the kids would be more
14   open in talking with them and more trusting in
15   talking with them than it would be for me, someone
16   they don't know, to come down there and start
17   asking, you know, a lot of questions when they
18   don't know me.
19 Q   In making that decision, were you using your
20   professional discretion as to what you thought
21   would be the most effective way to get information
22   from the students?
23 A   Yes.

JR, A Minor                     July 24, 2007                Pike County Board of Education

49 (Pages 190 to 191)

Page 190

1      MR. SWEENEY: Thank you very much.
2
3          (Whereupon, at approximately, 4:30
4          p.m. on the 24th day of July, 2007
5          the deposition was concluded.)
6
7
8          * * * * * * * * *
9      FURTHER DEPONENT SAITH NOT
10         * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 191

1
2          REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8  transcript of deposition of MARK BAZZELL, EdD, was
9  taken down by me in machine shorthand on the 24th of
10 July, 2007, and the questions and answers thereto
11 reduced to writing under my personal supervision, and
12 that the foregoing represents a true and correct
13 transcript of the proceedings given by said witness
14 upon said hearing.
15     I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18     Dated this 10th day of August, 2007.
19
20         _____
21         Mary Moore-Wynn
22         Certified Shorthand Reporter
23

JR, A Minor    July 24, 2007    Pike County Board of Education

Page 192

**A**

AASB 25:14
ABI 112:10
ability 23:23
  109:19,22
  110:9
able 52:13
  163:11
absence 62:8
  103:9,10
absences 182:20
absent 61:11,13
abuse 4:20
  10:22 16:14
  17:6 18:5,12
  19:6 20:12
  21:19 22:22
  23:9 24:7,10
  25:2,9 26:3,13
  27:2,11,21
  28:16 29:3
  37:11 44:2
  59:15,16 60:4
  64:16,18 65:8
  66:15,16 67:5
  67:17 68:1,16
  69:7,19 70:1
  70:15,19 71:6
  74:11,18 75:3
  75:8 76:5
  78:23 79:16,18
  79:23 80:11,15
  80:18 81:6,10
  81:21 82:9,15
  82:19,20 83:5
  83:8,14,20
  85:4 86:3,19
  87:1,10,13,15
  88:6,8,15,19
  89:13,22 90:6
  90:8 91:7,14
  92:4,15 93:2
  93:15 94:23
  95:3,5,9 96:2
  96:17 97:3,10

97:15,18,23
98:19 99:22
111:1 123:7,14
123:20 124:3
129:6 145:15
148:20 155:20
157:19 158:12
158:16 160:3
169:5 182:22
184:6
abused 21:8
  24:5 29:11
  30:1 156:13
  159:14 160:6
  183:14,22
  186:14,14
abuser 28:9,11
abusive 92:13
academic 34:9
  109:22
academically
  17:13,22 27:15
  27:18
accurate 58:14
  98:21 128:12
accurately
  147:23,23
acquiesce
  110:10
act 80:3
acted 103:8
  187:18
action 76:21
  102:22 187:13
  191:16
active 127:6
actively 16:1
activities 108:11
  108:15 156:4
activity 75:20
  153:14 154:8
  156:9,10 188:4
actual 41:1
Adam 133:21
  144:10 145:10
  145:17 149:11

166:16 180:18
add 159:20
additional 47:3
  56:15 111:6
  175:9 177:15
  180:16 188:11
address 6:14
  114:10 123:4
addressed 37:11
addressing
  78:22 79:16
adjunct 10:2
Administative
  4:16
administration
  9:8 10:10 14:9
  14:10
administrative
  5:2 35:4 54:8,9
  54:13,20 56:20
  66:13 139:14
  139:22 140:7
  141:8 157:15
  187:9,19
administrativ...
  33:21
administrator
  119:1 123:9
administrators
  54:14,15,16
  64:20 79:21
  80:15 81:20
  83:19 88:13
  89:7,7,10,12
  95:13
admitted 103:7
  186:22
adult 23:22
  75:22,22
adults 23:21
  24:2
advances 77:7
  77:10
advantage 24:1
  24:4
adverse 96:15

Advertiser
  121:17
advise 115:13
Advocacy 90:18
  92:2
affirmative
  22:10,12
affluent 15:17
  15:23 16:1
age 19:14 69:16
agency 12:16
  13:4 188:14
agenda 59:5,7
  88:14 89:16
  91:3,3
aggressive
  157:14
aggressively
  187:19
ago 10:7 16:11
  89:23 142:20
  156:15
agree 19:10
  22:13 106:23
  108:10,13
  109:18,21
  142:5
agreed 3:6,18
  4:3
Ah 10:4,11
  38:15 55:16
  59:17 60:15
  72:20 93:19
  179:1 183:12
ahead 69:22
  101:4 133:6
  144:23 145:5
Air 32:3
Al 176:19
Alabama 1:2,20
  2:5,9,14 6:15
  9:14 25:16
  91:10 96:10
  97:8 161:10
  191:4
alarms 137:5

alike 155:4
allegation 79:22
  144:17,20
  145:12 152:4
  157:7
allegations
  80:11,16
  123:14,15
  127:16 129:6
  137:9 141:2,4
  141:5,11
  143:17 155:19
  160:14 178:23
alleged 69:13,14
  154:10 188:2
Allen 2:8 28:6
  40:22 41:3
  57:21 65:1
  71:10 153:11
allowing 63:18
  105:12
anal 137:20
analysis 14:21
Andrew 133:22
  166:6,9 180:18
and/or 67:20
  70:18 96:17
  97:10 106:9,11
  123:10 124:4
  188:3
angry 103:8
annotated 100:4
annual 123:2
answer 18:8,23
  19:12,16 20:1
  20:7 21:6 22:1
  29:20 53:2
  60:6 75:6
  77:18 150:11
  183:10,18,19
answered 22:23
  59:21 82:23
  85:11
answering 81:8
answers 86:9
  191:10

**anticipation**
118:11
**anybody** 42:2
147:2 149:6
170:18 174:6
**anyway** 79:13
172:23
**apart** 168:5
**apologize** 27:7
44:14 172:21
**apparently**
93:12
**appear** 59:10
68:3 100:16
143:2
**APPEARAN...**
2:2
**appeared** 99:3
**appearing** 74:19
75:3
**appears** 48:6
59:11 79:13
93:1,14 113:22
129:12 166:17
182:13
**appendices** 48:7
48:12,16
**appendix** 46:10
47:2,5,9,13,15
48:3,19,20
49:11 58:3,7
58:13 68:23
69:5
**applicable** 44:22
45:3,14
**applicant**
113:14,15
114:6
**applicants**
113:11
**application**
111:10,16,17
113:3,6,18,20
113:22 114:3,8
114:9,19
115:10

**applications**
113:13
**apply** 20:23 21:3
113:12
**appointed** 7:3
8:11,13,14
32:8
**approached**
104:9
**appropriate**
76:15 82:6,8
82:12 83:1
136:20 189:5
189:11
**approval** 49:21
50:9
**approve** 50:11
50:12,14
160:14 162:14
**approved** 34:1
49:18 50:7,16
50:18,21 51:2
51:6 53:14
57:15 78:18
**approximately**
1:21 100:10
190:3
**April** 127:19,20
142:16 157:11
173:10,12
175:11 179:6,8
179:18,19,19
179:23 180:4
182:13,16
186:17
**Arant** 2:12
**area** 15:17,18
161:13
**areas** 110:4
**arm** 137:15
**arose** 31:5
**arrange** 68:10
**aside** 169:12
**asked** 36:16
38:9 46:4,6
56:23 71:8

82:22,22 97:16
97:17 104:9,13
104:13 105:18
114:2 115:20
116:11,17
118:1,2 133:12
133:20,20
136:11 144:14
145:6 148:12
148:21 159:19
164:3 168:21
168:21 188:10
189:2
**asking** 23:7
27:22 28:10
66:17,20,22
81:1,3,9,14
90:5,17 117:4
117:6 182:2
189:17
**asks** 16:8
**aspects** 36:16
**assessment**
95:23 109:15
**assessments**
109:13
**assigned** 65:17
161:12,13
**assist** 123:9
178:19 189:10
**assistance** 85:7
**assistant** 8:8,21
9:17 31:13,16
85:20,23 87:6
107:12 121:13
122:2
**assisting** 85:22
**associates** 13:8
**Association**
25:16,17
**assume** 14:19
66:17 108:23
109:8 110:8
120:5 148:9
**assuming** 31:2
40:23 83:16

113:8
**assumption**
142:17
**assumptions**
15:21
**attach** 48:4,9
**attached** 30:12
45:12 49:11
57:12 58:20
74:3 98:14
101:8 114:15
116:16 128:7
140:2 173:5
**attempted** 132:7
**attempting**
54:19
**attend** 94:3
**attendance**
163:23
**attended** 97:14
**attending** 61:15
**attention** 84:15
125:15 126:20
126:21 177:16
**attorney** 2:4
86:15,15 94:22
141:17
**at-risk** 96:10
97:8 98:7
**Auburn** 14:12
14:16
**August** 7:15
191:18
**authenticate**
100:14
**authority**
110:11
**authorized** 62:8
62:9 63:2
**automotive**
180:7,8
**available** 38:12
48:8 70:13
73:1
**avenue** 2:9,13
6:15 70:21,22

**aware** 17:5 18:3
18:10 19:5
21:7 24:9
74:18 92:14
108:23 109:2,2
110:3,6 114:21
121:3 175:14
**Azar** 2:8,8
**A.M** 1:21

**B**

**B** 2:12 83:3
84:18 176:23
**Bachelor's**
13:13
**back** 12:5,12
14:8 19:20
23:13 24:19
35:6 41:7,17
43:9 44:12
46:10 47:9,13
47:13,22 50:1
51:10 57:20
58:4,16 60:12
60:22 64:13
71:10 75:5
79:5 92:22
95:3 101:6,21
102:13,15
105:20 118:7
131:17 132:7
134:20,21
138:20 139:1
145:3 147:19
151:3 152:23
155:11 159:17
165:6 166:11
169:19 171:21
172:16,17
175:23 177:13
178:1 179:22
188:10
**background**
112:9,10
**bad** 135:5 157:8
172:14

**ball** 119:8
**band** 61:20 62:4
  62:13 63:16
  119:6,6,11
  120:1,1,8
  124:17 126:9
  128:19,23
  130:14 135:13
  153:1 156:23
  157:1,9 163:13
  173:23 175:6,7
  180:10,23
  181:1,2 182:6
  182:12
**Banks** 9:4 31:8
  93:7,7,9
  139:10 180:18
**baseball** 175:8
**based** 15:4
  69:15 71:15,16
  141:9 142:17
**basic** 12:9
**basically** 16:8
  34:8 156:18
  169:19
**basis** 84:14,22
  184:9
**Bates** 41:3,4
  43:15 69:2
  75:14
**Bazzell** 1:17 3:8
  3:20 4:8 5:3
  6:1,10,13
  22:18 32:23
  37:17 49:5
  64:21 88:18
  97:12 100:11
  100:14 183:10
  185:16 191:8
**Bazzell's** 5:1
**BBS** 96:20
**BBSS** 97:6,7,17
**BBSST** 92:18,20
  94:17,18 95:3
  96:2,9,12
**becoming** 7:8

8:3
**began** 6:23
**beginning** 31:22
  32:22 45:2
  154:18
**behalf** 33:1,1
  104:10 105:8
  183:11
**behaving** 120:2
**behavior** 27:1
**behaviors** 28:10
**believe** 7:12
  23:2 39:9 45:5
  50:8 61:19
  65:4 100:5
  106:9 108:3
  113:13 115:22
  115:23 125:21
  128:21 130:13
  147:15,15
  149:20 157:13
  159:19,23
  187:18
**believed** 106:10
  169:22
**bell** 135:17
**Berry** 71:13
  77:5 96:21,23
  97:1,4,16,17
  97:20
**best** 7:12 41:10
  55:23 57:1
  70:6 84:9
  111:3 118:19
  132:15 137:16
  137:17
**bet** 154:4 169:21
**better** 56:6
**beyond** 70:11
**big** 120:12
**Biology** 9:23,23
  13:17,17,18
  14:4,6
**Birmingham**
  2:14
**bit** 127:4

**Blake** 150:6,8,10
  159:11,13,20
  159:20 160:6,7
  161:9,16,21
  162:6,12
  164:12,15,16
  164:23 165:3
  171:20 181:4,4
  181:5,9
**Blake's** 162:2,20
**blank** 181:3
**bless** 125:18
**block** 87:5,18
  88:2
**Board** 1:13,19
  4:18 6:18 8:12
  8:13 32:15,16
  32:17,19 33:2
  33:6,10,19,19
  34:2,7,7,13,17
  34:21 36:7
  38:2 39:18
  42:18 49:18,21
  50:7 51:2,7
  57:15 69:11
  72:14 73:15
  78:18 83:13
  112:1 114:20
**Boards** 25:17
**Board's** 41:23
  69:6 83:10,11
  86:15 100:20
**bolts** 34:10
**book** 174:16
**bookkeeping**
  182:18,19
**books** 174:18
**bottom** 92:6
  115:11 130:14
  159:9 160:10
  181:21
**bounce** 174:1
**bouncing** 174:8
**BP** 166:8
**bracketed** 46:14
**Bradley** 2:12

**break** 48:6
  183:7
**breakdown**
  121:1
**Brief** 20:4 36:14
  41:16 45:20
  46:17 49:3
  51:9 53:3
  57:22 86:12
  102:8 144:22
  146:23 174:17
  183:8
**briefed** 178:8
  188:15
**bring** 57:20
  145:14 169:3,5
**bringing** 128:21
**broad** 20:11
  21:5 66:16
  90:13
**brought** 70:14
  121:22
**Brundidge**
  172:3 178:7
  188:21
**buck** 120:7
**buddy** 136:18
  137:11,13,14
  137:17,23
  143:15 145:20
  145:22,22
  146:15 148:7
  148:19,22
  150:19 152:20
  153:8,23 154:1
  156:2 158:3,8
  158:10,14
  160:9,12
  164:16 167:2,8
  167:10
**building** 53:14
  54:14
**buildings** 104:8
**building-level**
  54:16
**Bullock** 161:16

**bus** 119:9,9
  120:11,13
  121:9,10
**buses** 119:7,20
**business** 176:23
**Butch** 131:9,15
  136:11 151:6
  151:15,18,18
  151:19 160:8
  182:14 186:18
  187:7,16 188:7
  188:16 189:4
**Butler** 161:13
  174:4
**butt** 136:17
  137:11,13,14
  137:17,23
  145:20,21,22
  146:15 148:7
  148:19,21
  156:2 158:3,7
  158:10,13
  160:9 164:16
**butt-buddy**
  169:3
**buy** 176:2,2,2,3
  176:6
**buying** 176:9,13

**C**

**C** 83:3 84:18
**calendar** 36:22
  37:14 39:20,21
  40:2,22 50:17
  56:14 59:3,4,9
  180:2
**Calhoun** 141:21
**call** 25:11 39:19
  59:3 84:7,7
  102:14,15
  103:22 104:2
  104:15 106:18
  117:18 131:17
  132:7,11
  139:16 140:15
  142:13,15

JR, A Minor                    July 24, 2007              Pike County Board of Education

145:3 169:17
174:6 176:1
177:6 179:12
179:14 182:18
182:19
**called** 54:7 59:5
84:16 103:15
103:19 114:1
117:23 129:19
131:15 132:12
132:13 136:16
142:12 147:19
169:19 177:12
179:12 187:7
**calling** 39:17,18
136:21 143:1
**camping** 160:22
161:2
**campus** 104:7
105:4 164:8,22
165:12,13
171:14
**canned** 81:14
**capacity** 6:19
**car** 151:2
**cards** 126:3
154:21
**care** 40:3
**career** 61:15
130:18 177:2,4
**Carolyn** 143:22
144:1,4 166:19
167:2,9,11
168:16
**carried** 171:23
172:1
**carry** 162:5,6
**case** 1:10 3:19
3:22 38:20
41:8 64:6,8
70:5,11 85:15
85:16 131:12
**cases** 77:2 84:23
85:4 107:21
**Casey** 31:11
52:12 53:1

100:16 101:8
101:13 103:15
106:9 108:9
110:19 118:19
120:20,23
121:6 122:18
124:4 167:12
168:20
**Casey's** 122:17
169:7
**case-by-case**
84:14,21
**categories** 90:13
**category** 88:12
**Catrett** 65:4
71:11
**cause** 191:17
**caused** 131:22
180:15
**CC** 160:14
162:14
**cell** 103:20
104:10,12
105:4,11,13,18
105:21 106:6
106:12,16
138:16,20
141:14 156:18
156:20 159:21
175:15
**center** 90:18
92:2 95:22
130:18
**central** 40:1
54:15 63:19
86:1 95:16
107:6,19
**centralized**
107:1
**certain** 34:18
102:16
**certainly** 34:17
70:13 75:20,23
76:15,20 84:4
84:14,16 103:5
109:23 137:22

137:22 149:5
171:7 177:16
**certificate** 4:10
50:19 191:2
**certification**
12:7,7,8 13:17
14:5,6,9,10
**Certified** 191:22
**certify** 191:7,15
**chance** 59:19
134:19
**change** 57:6
59:23 114:2,2
**changed** 7:2
15:8,11,13
35:16 57:4
**changes** 31:2
34:12,14 35:13
35:14 37:6
57:2
**chaotic** 11:6
**charged** 189:9
**Charles** 7:7
111:21 129:12
129:14 160:15
182:17 185:17
185:18 186:6
186:14,22
187:2,9
**check** 7:9,10
39:10 61:10,10
78:14 112:9,10
131:16
**checklist** 113:4
**checkmarks**
86:22
**checks** 113:1
**Chemistry** 9:23
**Chief** 172:2
178:4,6 188:21
**child** 20:12
27:14,15,16,22
46:22 47:7
65:8 75:22
77:22 78:1,2
90:17 92:2

**children** 21:9,22
23:10,22,23
24:2 27:18
29:10 110:8
147:6 163:9,10
163:11
**Chris** 153:9
**Christmas** 12:15
**Christopher**
153:10
**chronic** 96:15
**cigarette** 181:15
182:11
**cigarettes** 151:6
151:12 153:13
154:23 164:7
166:13 171:12
**circulating**
104:7
**Civil** 3:9
**claiming** 126:10
**claims** 68:17
171:7
**clarification**
19:17 185:8
**clarify** 57:5
**class** 60:18
61:19 62:4,12
62:16,18,23
63:1,2,7,7,17
65:3 71:12
134:1 176:3,6
**classes** 10:9
61:16 175:2
**classroom** 62:3
**classrooms**
104:8
**clean** 121:22
**clear** 27:6 40:14
67:4 70:8
72:16 76:13
120:18 122:8
127:23 156:6
158:6
**clearer** 28:5
**climate** 66:7

**close** 68:14
107:15 124:23
125:1 149:6,6
**closely** 74:21
**club** 163:14
**coach** 163:12
**coaches** 173:23
**Coast** 13:8
**code** 4:15 39:12
42:12 43:3,10
43:15,22 44:2
44:6,7 45:3,14
46:7,9 47:10
47:12,14 48:18
49:8,10,15,21
51:1,15 54:6
65:19 67:9,9
67:10 71:1
76:9,10 79:1
91:10,10,14,15
91:16 92:1
121:19 182:20
**coded** 129:22,23
130:1
**codes** 43:22
**Cody** 150:15,16
158:22 159:1
**cognitive** 23:23
24:10 25:3
**collaborate**
188:5
**college** 12:6 13:9
**Collier's** 114:4
**color** 69:15
129:22,23
130:1,3
**colors** 129:23
**come** 6:21 32:1
34:13 41:7
63:16 64:4
107:13 115:13
118:7 126:20
140:11,16
179:21 186:13
189:16
**comes** 9:7

JR, A Minor                                    July 24, 2007                         Pike County Board of Education

113:15 120:7
130:20 157:11
185:13
**coming** 61:14
118:5 134:22
139:18,19
155:2
**comings** 63:13
**commencing**
1:21
**comments** 120:5
121:21 148:1
**commission**
3:11
**Commissioner**
1:18 3:10
**commit** 28:16
**committee** 70:12
**communicate**
107:16
**communication**
185:23
**community** 13:9
96:15 183:2
**compared** 14:22
18:13 19:7
**comparing**
14:22
**complaining**
126:14
**complaint** 29:19
31:5 37:10
68:5,6 71:6
81:10,11 83:4
83:20 84:13,15
84:17 120:12
125:14 127:7
134:20 154:14
154:14 183:11
183:17 184:16
**complaints**
66:19 67:20,22
68:13 69:19
70:1 78:22
80:4 81:6,21
82:10,15,15,20

83:4,8,22,22
83:23 90:18
120:4 123:7
128:4
**complete** 40:8
48:9 49:7
59:10,11 94:22
99:6,9 112:13
171:23 172:1,4
178:5
**completed**
116:21
**completely**
141:13
**complex** 19:15
**composed**
140:18,19
**computer** 56:4
**concern** 68:6
125:7 155:14
**concerned** 76:21
131:5
**concerning** 61:6
80:8 105:4
150:22 163:3
163:20 187:16
188:7
**concerns** 66:8,9
67:13,17 68:1
68:19 69:9
70:14,23 80:20
103:7 108:4
123:18 124:8
168:23 180:10
**concert** 62:14
**concluded** 190:5
**conclusion**
150:1,2
**conclusions**
20:23 21:4
152:12
**condition** 96:15
**condone** 103:5
**conduct** 4:15
39:12 42:12
43:3,10,16,22

43:23 44:2,6,7
45:4,15 46:7,9
47:11,12,14
48:18 49:8,10
49:16,22 51:1
51:15 54:6
67:9,10,10
71:1 77:2,12
77:14 79:2
85:17,19 92:1
105:9,16
120:13 121:16
124:9 136:12
139:2 144:18
144:19 145:11
155:8 162:22
163:1 166:15
169:2,13 175:9
187:1
**conducted** 26:9
95:20 184:15
**conducting** 85:9
167:3 189:9
**confidential**
132:18,22
134:8,13
139:19 141:6,9
152:7 154:3,4
157:12 169:21
169:22,23
170:8,10
**confirm** 170:2
**confirmed** 164:7
164:18
**confiscate**
105:21
**confiscated**
104:21
**confusing** 44:14
44:15
**congruent** 33:22
53:11 54:1
**conjunction**
34:19 184:16
**connect** 156:17
**connected**

151:13,14
170:7
**connecting**
156:12,15
**connotation**
138:3 158:18
**consider** 33:18
40:4 42:17
77:20,21 90:16
91:22 102:22
**considered**
76:15
**considering**
115:23 156:20
**consistent** 33:22
**consists** 77:9
**consult** 141:17
**contact** 66:22
67:6
**contained** 61:4,4
62:6
**content** 17:2
97:17
**contention**
139:2
**context** 106:21
146:5,6
**continue** 54:23
121:10 129:3
177:14
**continued** 115:7
**continues** 7:1
**contract** 12:13
115:4,5,5
**control** 33:7
103:11 124:6
**conversation**
132:16 138:13
140:13,23
147:17 150:4
153:23 159:5
177:20 185:22
**conversations**
115:17 148:5
149:8,10,13,16
149:22 168:6

168:15,17,20
169:16
**Coon** 4:20,22
5:2 7:7 8:9
63:15 101:20
102:5,6 103:16
103:20 104:9
104:22 105:10
105:18 111:14
111:21 114:18
117:20 118:2
119:1,4,13
120:4,7 122:22
122:23 124:2
124:18 125:7
125:12,15,17
126:7 127:12
128:15,23
129:5,12,14
130:12,16
132:10 133:8,9
134:4,14 135:7
139:14 140:6
142:22 143:18
144:17 146:5
157:8 160:15
160:20 161:20
162:4,22
164:18,21
165:3,9,10
167:8 168:13
168:23 169:9
169:13 171:2
176:9 177:5
179:9 180:1,3
180:4,14
182:17 184:5
185:17,18
186:1,6,15,22
187:2,9
**Coon's** 102:22
106:10 175:15
179:23 186:12
**cooperate**
123:11 188:6
**cooperative**

160:13
**coordinator**
176:19
**copied** 48:11
50:2
**copies** 38:10
41:1 48:19
72:23 129:22
**copy** 10:20
35:17 46:13
48:9 49:8 50:8
59:8,10,11
72:22 78:9
91:9 93:12
101:8
**copying** 49:6
**corner** 69:3
73:12 92:7
**correct** 8:4,11
31:2,6,14,15
32:12,13 33:3
33:4,6 41:23
42:7 43:17
45:17 49:15
50:3 56:23
58:4 78:11
96:3 102:1
103:15 113:8
115:3 130:13
131:10 140:8
143:4,5 166:21
166:22 191:12
**correcting** 157:4
**correctly** 31:21
**correspondence**
185:23
**counsel** 3:7,19
4:4 191:15
**counselor**
107:12,23
108:2,5
**counselors**
107:22
**county** 1:13,19
4:14,18,21
6:18 8:23 9:1,2

9:6,10 12:19
30:21 31:12,13
32:6,15 33:2,6
33:8 36:7
39:11 43:5
51:21 52:2,11
52:23 53:18
69:6,11 72:6
73:15 93:7
99:18 112:1
116:11,17
117:19 118:5
118:12 121:23
122:12,15,20
139:10 161:13
161:15,16,17
162:4 163:9,17
163:21,21
174:4,4,5
180:19,21
191:5
**County's** 69:18
70:17
**couple** 12:23
25:19 146:4
166:16
**course** 10:11,13
10:16 11:17
17:3 33:21
68:21 134:12
**courses** 10:11
16:22 17:4
**Court** 1:1 6:5
19:22 23:16
46:3
**cover** 35:16
44:15
**covered** 11:23
93:6 97:11,19
**covers** 47:15
**covertly** 62:18
62:20,21
**cracked** 121:18
**creating** 66:7
**creed** 69:16
**Crenshaw** 174:4

**crime** 24:7,8
76:11
**criminal** 75:19
75:23 76:5,9
76:10,20 77:2
91:14,15,16
112:9,10
**criteria** 50:21
**cross** 181:10
**crossed** 166:4
181:6
**CSR** 3:10
**CT** 166:17,19
**current** 6:16
**currently** 10:3
**curriculum** 34:8
34:9

---

**D**

**D** 83:3 84:18
153:1
**dad** 162:20
**Dallas** 174:5
**data** 24:13,15
**date** 7:11 35:16
89:8 92:9
101:6 114:2,3
114:5 124:21
131:17 173:13
177:22 178:1
179:23
**dated** 30:23
44:10 101:7
131:20 191:18
**dates** 36:21 40:2
44:17 118:1
**Davenport**
167:14 172:3
177:21 178:3,4
178:6 188:21
**Davis** 133:22
139:7 180:20
**day** 12:12 61:14
61:16,16,20
62:5 63:6
65:18 106:15

107:16 146:9
179:18 182:15
190:4 191:18
**days** 117:22
142:9
**deal** 10:21 75:20
109:22 121:7
**dealing** 16:3
**deals** 42:16 60:4
66:4 67:21
91:16
**Deanie** 2:8
**debate** 163:13
**December** 6:20
8:20 101:21
126:1,2,2
**decent** 183:2
**decide** 56:5
**decided** 14:7
**deciding** 97:2
**decision** 83:6
84:21 129:2
189:19
**DEFENDANT**
1:15 2:11
**define** 145:11
**defined** 75:11
109:13
**defines** 76:10
**definition** 77:6
96:10 97:8
108:13
**degree** 9:18 13:8
13:13,16 14:1
14:3,5
**degrees** 12:8
**delivered** 140:9
**demands** 110:10
**denied** 141:12
141:12,12
153:12,13
**Denies** 160:13
**deny** 64:11
170:2 183:13
**denying** 184:9
**DePaola** 2:4 4:9

6:7,9 7:18 11:9
11:16,19 19:20
20:5 23:13
27:11 28:3
30:8,13,15
32:20 33:5
36:10,15 37:15
37:16 40:11,18
40:20 41:4,14
41:17,19 45:19
46:1,5,15,18
47:23 48:12
49:1,4 51:8,10
51:12 57:7,13
57:23 58:2,10
58:17,21 67:3
73:8,10 74:4
79:19 86:13
98:17,20 99:10
99:14,20 100:1
100:5,13
114:16 128:8
140:3 147:1
173:6 182:1,3
183:7,9 184:18
185:6,11 187:3
**department**
112:5,8 178:7
188:16
**depends** 23:17
24:3 85:1
**DEPONENT**
190:9
**depose** 97:20
**deposition** 1:17
3:7,9,14,20,21
4:5 100:11
185:7,12,17
190:5 191:8
**described** 108:9
108:9
**Description** 4:13
**designated**
107:23 108:2
**designed** 111:2
111:3

desk 135:14,15
details 91:8
detecting 27:9
Detective 154:1
determine 54:19
   82:2,17 83:12
   83:12 95:7
   175:1
determined
   82:16 95:12
determines
   95:15
develop 123:3
development
   95:11
devines 76:9
DHR 88:21 89:2
   89:19 91:18
   123:19 171:19
   171:21
Diagram 4:14
   30:21
diary 5:1 128:10
   176:18
dictate 53:22
differed 15:2
difference 42:11
differences 15:3
   36:3
different 14:23
   20:19,22 25:17
   27:19,20 36:19
   36:22 42:13,14
   53:18 54:21
   60:1 81:2,22
   81:23 82:14
   84:6,7 104:8
   110:21 173:18
   173:20 189:7
differently
   39:18
diligence 22:16
diligent 60:7
diploma 50:18
direct 140:15
   155:7,8 159:10

184:8
directed 123:9
   144:5 146:14
   146:16 159:12
   167:16
directing 101:10
   168:16
direction 84:11
   148:17
directions 83:18
directly 125:11
   168:2
director 163:13
directors 174:1
directory 47:1
directs 34:7
disabilities 18:5
   18:13 19:7
   21:9,18,21,22
   21:23 22:2
   24:11 25:3
   111:5
disability 19:13
   23:18 69:15
   109:6 110:4
disabled 23:10
disciplinary
   102:23 122:1
discipline 63:9
   68:4,11 87:6,8
   87:19 88:14
   119:7,20
   121:15
disciplined 63:6
   120:8
disciplining
   157:1
discourage
   163:4,5
discovery 35:22
   99:2
discretion 52:7
   84:9 189:20
discretionary
   84:5
discrimination

38:7 66:19
69:14 90:15,19
discuss 128:22
   136:5 180:12
discussed 89:17
   92:2,20 97:16
   98:8 104:1
   152:20 153:8
   153:16,21
   169:18 170:3
discussion 45:20
   46:17 51:9
   87:17 88:2
   96:19 97:15
   145:4 146:23
   152:1
discussions
   97:14,19 152:1
   167:20,23
   177:9
dissertation
   14:20
distinction 76:4
distinguish 75:7
   76:8
distribute 42:21
   43:1,2
distributed
   45:15 50:5
   72:16,18 73:1
   73:4 78:8
   126:3
distribution
   78:13
District 1:1,2
   65:19
divorced 161:14
   161:14
doctoral 14:20
doctorate 14:11
document 4:22
   5:3 30:14,18
   35:4,7,9,17
   36:4,6,11,17
   37:23 38:1
   40:14 42:5

43:4,5,11,16
47:9 49:6
50:12,13,17,20
50:20,22,23
51:1 54:7,20
55:4 56:12,19
57:8,14 58:12
61:4 69:17,23
77:4,5 78:8,10
78:15 79:3,4
79:20 88:8,10
88:11 89:4
90:6,7,9 92:9
92:13 93:2,11
93:17 99:11,16
101:23 111:13
131:20 170:23
173:11
documented
132:8
documents 4:21
7:20,21 26:12
26:17 39:16
40:6,8,16 41:1
41:9 48:3
50:14 51:6
52:1,2 53:10
54:4 57:18
64:13 70:7
71:3,5 73:11
73:13 80:7,23
95:2 96:3,7,9
99:11 100:19
112:15 114:17
114:21 124:14
163:22 181:19
doing 70:9,9
81:4 83:15
84:18 104:14
111:6 117:12
118:22 120:8
120:10 141:23
143:16,16
148:11 150:13
174:13 183:1
Donald 2:12

11:9 30:13
32:20 35:19
41:5 47:11,23
99:10 100:2
dot 156:17
dots 138:22,23
151:14 156:12
156:14,16
157:4 170:7
double 14:5,9
double-sided
132:1
Dr 5:1 6:10
22:18 37:17
49:5 64:21
88:18 97:12
100:11,14
183:10 185:16
drama 163:14
draw 21:1,4
81:19 116:2,3
dress 121:18
drew 152:11,11
driving 161:8
drop 104:20
dropped 104:18
104:18
drug 142:3
143:2,20
170:16
drugs 169:1
due 22:15 66:21
68:21,23 69:5
79:5,5
duly 6:3
Dunn's 150:15
150:16 158:22
159:1
duty 82:21

**E**

E 83:3 84:19
EAR 1:6
earlier 90:12
118:19 125:5
153:4,8 157:4

**early** 62:13,13
  62:14
**ed** 18:6 22:21
  24:11 111:7
  175:2,7,7,8,11
**EdD** 1:17 3:8,20
  4:8 6:1 14:17
  191:8
**educate** 29:14
**educated** 23:4
**education** 1:14
  1:19 4:18 6:18
  8:12,14 9:9
  10:1 12:1
  13:11,14,18,19
  13:21 14:4
  18:13 19:8
  21:8 22:4
  32:15 33:2
  36:7 39:19
  40:3 46:22,23
  61:15 69:11
  73:15 109:3,4
  110:21 112:1,9
  177:2 183:2,3
**educational**
  10:10 13:7
  14:11,14,15
  16:12 28:11
  29:3
**educator** 27:3
**educators** 27:1
  27:11 29:12
  66:22
**educator/stud...**
  67:6
**effect** 36:4 39:5
  44:8 54:22
  56:21
**effective** 189:21
**effort** 65:16
  175:1
**efforts** 60:7
  132:6
**EFLT** 14:14
**eight** 8:21 130:8

173:18,20
**either** 3:16,23
  67:14 80:4
  117:17 126:5
  155:16 161:22
  168:2
**elected** 6:22 7:3
  32:11
**elementary**
  13:15 42:16
  46:23 93:7,8
**elements** 76:11
**Elizabeth** 113:5
**emailed** 147:16
**embraces** 67:1
**emergency** 12:9
  65:19 163:7
**emotional**
  120:23 121:4
**emphasis** 14:4
**employed** 7:10
  7:13 8:5 9:13
  9:19 31:21
  32:5 38:18
  104:3 113:19
  122:2,7 173:20
**employee** 55:4
  67:8,10 76:14
  115:7
**employees** 86:4
**employers** 13:2
**employment**
  4:22 6:16 8:17
  10:1 11:23
  111:9,14,16,16
  115:23 116:12
  116:18 117:3
  117:11 122:4
  172:17 185:19
  186:3
**EMT** 13:4
**ended** 115:6
  126:1
**ends** 45:6 47:14
  125:23
**enforcement**

88:21 89:3,20
  123:11 139:18
  152:9 177:19
  188:6,14
**engage** 16:10
**engaged** 15:14
  16:2 144:18
  154:10 188:3
**English** 62:4
**enter** 120:18
**entire** 31:9,18
  31:23 39:1
  43:11 90:9
  92:13 180:2
**entirely** 95:10
**entities** 25:22
**entity** 12:16
**entry** 129:11
  131:22 173:11
  179:3
**environment**
  96:14
**equipment**
  126:13,15,16
**especially**
  110:21
**essence** 60:13
**Essential** 4:16
  35:3 54:7,9,20
  56:20 64:20
  66:13
**essentially** 35:9
  54:21 56:7,22
  106:10
**established**
  33:20 34:11
  53:12
**evaluate** 120:22
  128:23 130:20
**evaluations**
  123:2,2
**everybody** 21:3
  92:21
**evidence** 3:15
  171:6,7
**evidently** 114:1

**ex** 84:20
**exact** 7:11 56:8
  101:5 104:16
  118:1 156:5
  176:18 177:22
**exactly** 79:9
  86:2 97:21
  108:14 128:1
**Examination**
  4:9,9 6:8
  185:14
**example** 15:21
  15:22 34:6,6
  47:12 50:16
  60:8 63:5
  121:17 175:21
**Excerpts** 4:19
**excessive** 102:22
**excuse** 19:11
  43:13 69:22
  87:11
**execute** 33:11
**Exhibit** 4:13,14
  4:15,16,17,18
  4:19,20,21 5:1
  5:2,3 30:9,10
  30:17 45:10,13
  48:5,10,14,21
  49:7 57:8,10
  57:15 58:12,18
  58:22,23 59:13
  59:14 63:12
  64:14,17 66:14
  71:4 73:21
  74:1,5,22
  78:16 98:11,12
  100:19 114:12
  114:13 116:13
  116:14 128:5,9
  139:23 140:5
  142:2 171:1
  172:6 173:2,3
  179:2
**EXHIBITS** 4:12
**exists** 23:5
**expect** 22:8 64:3

84:12 105:19
  105:20 123:8
  123:16 124:10
  124:10
**expectations**
  121:15
**expected** 123:1
**experience** 9:9
**expired** 115:6
**explain** 15:9
  23:19 32:14,17
  150:23
**explained**
  162:18
**explanation**
  153:4 157:6
**express** 66:8
**expressed** 68:19
  70:23 119:3,5
  119:10,11
  128:18
**expressive** 110:6
**extension**
  129:17
**extent** 61:3
  110:2 188:5
**eyes** 113:21

**F**

**F** 84:19 153:1
  182:6,12
**facing** 138:11
**fact** 105:10
  113:18 153:9
  153:22 156:22
  156:22 158:9
  174:2
**factors** 15:9
**faculty** 34:18,19
  52:4,6,9,10,15
  52:16 54:4
  72:18 78:9
  79:15 95:11,18
  96:21 97:5
  122:12,15
  123:20,21

JR, A Minor                                July 24, 2007                    Pike County Board of Education
Page 200

124:3,9 163:5
**fair** 23:20,20
  34:5 109:8
  110:8
**fairly** 142:19
  183:1
**fall** 47:4
**falsity** 178:23
**familiar** 28:13
  39:12 100:17
  108:6,16,20
**family** 96:14,16
  96:16
**far** 43:9 59:8
  80:13,22
**father** 1:6
  104:16 150:9
  161:10,22
  162:1,2,18
**Faulkner** 138:16
  149:22 150:6
  150:10 159:11
  159:11,13
  160:6 161:9,10
  161:15 162:19
  164:23 171:20
  181:3,5,7,10
**Faulkner's**
  150:9 161:9
  163:23 165:4
**favors** 137:1,1,3
**faxed** 147:16
**FBI** 112:10
**February** 92:4
  92:10 93:1,17
  128:3
**federal** 2:13 3:8
  47:6,21
**feel** 146:7
**felt** 82:8 120:6
  132:18 145:8
  178:17,22
  180:8 188:19
  189:13
**field** 13:10 16:13
  61:13

**fields** 12:11
**Fifth** 2:13
**figure** 73:6
  132:2
**figures** 110:11
**file** 41:8 63:9
  69:1 101:22
  111:20 112:14
  112:16 113:14
  117:7
**filed** 34:20
  183:11
**files** 100:20
**filing** 3:20 4:1
  173:15
**filled** 52:18
**finally** 14:7
  132:9
**find** 44:22 97:21
  130:10 146:14
  155:23 161:1
  174:7
**finish** 49:6 81:4
  81:13 157:5
**first** 6:2 32:6,7
  35:2 37:22
  45:1 81:4,15
  109:17 110:9
  117:17 118:23
  119:12 126:1
  129:12 139:15
  142:1,13,14
  143:14 150:21
  151:9,16 153:6
  154:16,17
  173:11 181:11
**first-year**
  121:12,13
**fishing** 161:3
**five** 6:20 8:18,19
  8:20 9:6 26:15
  71:18 93:17
  94:9 134:5
  138:12
**flag** 106:14,22
  107:5 137:22

156:19
**flags** 107:2,3,4,7
  161:5,6
**flipping** 59:20
**floor** 104:20
**Florida** 9:19
**focus** 37:10
**focusing** 26:3
  164:16
**folder** 86:6
**follow** 11:10
  79:22 105:20
  119:9 121:10
  155:12,14,19
  180:12 189:3
**followed** 82:13
**following** 69:12
  179:3
**follows** 6:4
**football** 52:19
  175:7
**force** 32:3
  102:23
**foregoing** 191:7
  191:12
**forensic** 146:19
  147:3 155:16
**forgot** 152:18
**form** 3:12 18:7
  18:15 19:9
  21:20 24:12,18
  27:4 29:13,16
  30:3,5 61:23
  63:21 103:4
  107:10 108:12
  109:11 110:12
  113:10 187:3
**formal** 80:5
**formality** 3:11
**forms** 73:5
**forth** 1:21 12:15
  42:13 47:4
  102:19
**Forty-nine**
  65:15
**Foster** 100:16,20

101:6 102:10
  102:13,14
  124:19,21
  125:9
**found** 161:19
  162:7
**foundations**
  14:11,14,15
**four** 10:8 54:3
  71:18 134:5
**four-year** 7:2
**frequency** 15:14
  16:9
**Friday** 179:20
**friend** 137:16,18
**front** 68:7 75:5
**frustrated** 119:7
  120:1 134:22
**frustration**
  119:5 124:17
  128:18
**frustrations**
  119:4,11,21
  125:3,5
**full** 109:16
**fully** 123:11
**fun** 136:15
**functioning**
  109:10,12
**further** 3:18 4:3
  10:1 90:7
  105:9,16 106:4
  178:15 184:18
  188:17 190:9
  191:15
**fussing** 126:7

_____ G _____
**game** 52:19
**games** 119:8
**gathering** 85:22
  189:10
**general** 21:3,5
  53:23 90:23
  119:12
**generate** 51:18

**generated** 42:18
  54:12 143:10
**generic** 34:2
**germane** 37:13
**getting** 85:2
  124:23
**gifted** 46:22,22
**gifts** 108:18
**girls** 146:12
**give** 8:16 11:15
  17:20 34:6
  36:10 41:13
  45:2 50:8
  54:17 59:19
  63:5 89:21
  105:19 133:20
  135:16 148:17
**given** 40:7,13
  84:11 91:9
  110:19,19
  135:1 178:21
  186:18 187:21
  187:21 191:13
**giving** 17:16
  127:17
**glad** 11:14
  170:19 178:17
  172:19
**go** 12:5 17:18
  20:2 26:16
  34:17 35:6
  36:12 37:17
  38:22 41:6,14
  41:17 44:12,23
  45:19 46:13,15
  49:1 51:8,10
  53:17,17,19
  57:17 58:3,16
  61:20 62:4,10
  62:13,13,14
  64:4,13 65:14
  69:22 70:18
  71:10 81:5
  84:19 86:6,11
  86:21 87:3
  90:11 91:21

JR, A Minor                                   July 24, 2007                         Pike County Board of Education
                                                                                    Page 201

| | | | | |
|---|---|---|---|---|
| 92:22,22 96:19 | good 6:10,11 | guardians 68:10 | handwritten 5:3 | 144:10 145:10 |
| 101:4 107:21 | 46:5 62:21 | guess 15:1 25:6 | 31:1 143:7 | 149:11 166:16 |
| 107:21 108:5 | 91:5 154:7 | 47:9 72:3 | happened 29:7,9 | 180:18 181:4,9 |
| 115:21 116:3 | gosh 10:19 | 96:11 113:17 | 29:17 104:5 | help 85:17 |
| 117:20 118:15 | 12:17 16:17 | 124:13 165:6 | 106:1 142:18 | 169:11 |
| 118:18 123:18 | 32:2 | guidance 54:17 | 143:20 169:12 | helpful 162:5 |
| 133:6 134:19 | Goshen 53:19 | 188:11 | happens 76:17 | 185:10 |
| 138:10,20 | 93:8 | guide 33:23 34:9 | harassing 75:18 | Henderson |
| 143:19 144:6 | gotten 125:19 | 34:14 47:18 | harassment | 146:11 |
| 144:23 145:5 | 182:12 | guidelines 47:6 | 66:18 74:15 | hereto 3:16,23 |
| 159:16 164:5 | grabbing 76:23 | guiding 42:14 | 75:8,11,16,21 | 30:12 45:12 |
| 170:18 172:19 | grade 42:14,15 | guilty 184:5,7,10 | 76:5,16,19 | 57:12 58:20 |
| 175:23 179:3 | 94:13 97:6 | 184:12,13 | 77:1,7,9,23 | 74:3 98:14 |
| 180:13 | 126:9,19 157:8 | Gulf 13:8 | 78:3 80:5 | 114:15 116:16 |
| goes 46:10 56:13 | 174:16,18 | | 86:17,20 88:20 | 128:7 140:2 |
| 106:15 179:4 | grades 93:9 | **H** | 88:23 89:1 | 173:5 |
| going 8:18 45:8 | 150:22 | habit 172:14 | 90:19 | hesitated 100:3 |
| 55:1 56:5,19 | graduate 9:17 | half 11:6 142:23 | hard 21:6 38:10 | hiding 42:2 |
| 57:3,7 59:23 | 9:18 10:9 | hall 60:11,14,18 | Hardees 134:2 | high 4:17 9:2,6 |
| 61:14 67:13 | 16:20 | 60:20 | 165:15,16 | 9:21 12:5 |
| 73:20 74:5 | graduated 13:16 | hamburger | 175:18,19 | 31:12,13 42:6 |
| 84:2 92:22 | graduation | 134:3 | 176:3,6,10 | 42:17 50:18 |
| 97:2,7 98:10 | 34:15 | hand 106:17 | Haynes 12:20,21 | 51:21 52:2,11 |
| 107:2,17 | graduations | 140:9 186:1 | 12:23 | 52:23 53:18,19 |
| 112:20 114:11 | 34:16 | handbook 39:7 | head 32:4 | 58:1 59:2 98:3 |
| 115:14,21 | grandparents | 40:12 41:22 | 135:17 | 121:16,23 |
| 116:1,2,18 | 161:17 | 42:5,9,12,23 | heading 47:5 | 122:12,15,20 |
| 120:18,20 | Grantham | 51:14,15,16,18 | health 13:17,18 | 139:10 180:19 |
| 122:8 128:9 | 93:23 | 51:20 52:3,4,5 | 13:19 96:15 | 180:21 |
| 130:9 136:12 | great 75:20 | 52:6,9,11,15 | hear 70:13 | hired 7:7,9 |
| 137:5,11 139:3 | green 130:1 | 52:22 53:4,16 | 116:7 127:18 | 113:7 |
| 139:21 140:4 | 133:23 166:2 | 53:20 54:1,4,5 | 127:21 | hiring 8:9 |
| 140:21 141:7 | 166:11,12 | handbooks | heard 97:14 | 122:12 |
| 143:6 145:2,19 | grew 14:7 | 34:19,21 39:4 | 101:16 108:7 | history 8:17 |
| 146:7 150:10 | grievance 69:12 | 39:15,17 41:21 | 121:21 124:18 | 10:1 13:7 |
| 154:2 155:13 | 69:20 79:8,10 | 52:16 53:8,9 | 125:6 127:11 | 29:10 173:17 |
| 160:2 162:12 | 79:14 | handed 140:11 | 127:16 129:7 | hit 154:6 |
| 164:8,11 165:3 | grievances | 177:12 | 132:9 135:19 | hold 12:7 |
| 165:15,16,18 | 68:13 | handled 68:13 | 169:12 | home 96:16 |
| 165:20,22 | Griffin 176:19 | handling 68:16 | hearing 68:10 | 160:21 161:8 |
| 172:16 173:16 | grooming 108:6 | 69:7,18 70:1 | 191:14 | 163:13,13,14 |
| 175:6 177:13 | 108:11,15 | handwriting | heart 125:18 | 163:15 165:4 |
| 178:14 179:17 | grounds 69:15 | 112:19,19 | heightened | 165:18,20 |
| 180:3,5,21 | group 19:14 | 113:3,5 118:13 | 137:7 158:9 | homosexual |
| 185:1,4 | Grubbs 113:5 | 118:16 143:8,9 | 187:23 | 137:20 |
| goings 63:14 | 183:3 | 159:2 | Helms 133:22 | Hon 2:4,8,12 |

**house** 164:9,11
   165:22 166:1
**Huh** 187:5
**Huh-huh** 12:3
**husband** 102:17
   145:3
**Hussey** 146:11
**hypothetical**
   63:22

**I**

**idea** 146:21
   161:4,6 166:5
   181:18
**ideas** 170:17
**identification**
   30:11 45:11
   57:11 58:19
   74:2 98:13
   114:14 116:15
   128:6 140:1
   173:4
**identified** 57:9
   71:4 72:7
   83:18 99:16
   148:23 150:7
   184:23
**identifies** 180:18
**identify** 36:3
   40:6 52:10
   59:1 86:18
   108:15 111:9
   111:12
**identifying**
   10:21 16:22
**IEP** 70:12,18
**ignore** 137:12
**ill** 10:7
**illness** 10:8
**imagine** 142:22
   142:22
**immediate**
   123:10
**immediately**
   143:18 151:15
   152:11 187:10

**important** 44:16
   94:8,10 106:23
   107:6 131:7
   174:2
**impression**
   132:1
**inappropriate**
   76:18 103:14
   136:12 139:2
   144:18,19
   145:11 153:14
   154:8 156:8,9
   160:2 166:15
   169:2,10,13
   188:4
**inappropriately**
   103:9
**inaudible**
   152:16
**incidence** 18:4
   18:12 19:6,14
   22:22 23:9
   24:9 25:2
**incident** 100:16
   100:20,23
   103:13 104:6
   118:20 119:18
   124:19 125:9
   127:22 133:9
   133:13,14,15
**incidents** 107:1
   142:10
**include** 46:11
   48:13 69:13,14
   69:20 109:21
   110:1 114:18
   122:22,23
   163:22
**included** 58:7
   87:9
**includes** 97:7
**including** 22:19
   23:6 24:22
   56:1 66:9
   79:21 82:15
   83:4 156:9

163:9
**increase** 18:4,11
**increased** 19:6
   22:21 24:9
   25:2
**INDEX** 4:7,12
**indicate** 171:8
   171:13 178:14
**indicated** 64:14
   96:2 98:6
   109:16 114:6
   151:9
**indicates** 88:18
   93:18 131:16
**indicating** 21:7
   63:11 73:19
   92:16 130:5
   132:3 143:3
   172:8
**indication** 156:7
**indicators** 96:11
   97:9,10 98:7
**indirectly** 168:3
**individual** 20:15
   38:6,13 122:6
**individually**
   26:17
**individuals**
   19:10 21:2
   23:21,22 25:3
   124:8 131:5
**industry** 176:23
**inform** 25:23
   29:8 30:2
   94:21 148:23
   171:19,21
**informal** 80:5
**informant**
   132:22 133:8
   133:14 134:8,9
   134:13 139:20
   141:7,9 154:3
   154:4 157:12
   169:21,23
   170:1,8,10
**information**

4:16 28:21
   35:4 36:21
   37:3,4 40:3
   41:11,12 46:21
   47:2,3 54:8,10
   54:10,20 56:20
   60:11,11 64:7
   66:13 70:7
   85:2,16,23
   91:1 94:15
   99:1 111:19
   132:18,20,22
   139:12,18
   142:17 152:3
   158:5 160:13
   171:22 177:15
   177:18 178:10
   178:21 183:22
   185:16 186:18
   186:23 187:8
   187:16,22
   188:7,8,12,15
   189:3,11,21
**informed** 22:16
   23:4 24:16,21
   25:7 142:10
**initial** 169:17
**inquiry** 169:7
**inservice** 95:22
   99:17
**inside** 117:22
   118:8
**instance** 34:18
   35:2 55:3
   142:8 150:7
**instructional**
   88:16
**insure** 65:16,22
**intellectual**
   109:10,12,19
**intended** 54:16
**intercourse**
   137:20,20
**interested** 37:19
   37:21 55:1
   172:15 191:17

**intermediate**
   12:9
**internal** 182:19
**Internet** 25:23
   65:21
**interrogatories**
   86:8,14 99:15
**interrupt** 64:22
**interruption**
   53:3 57:22
   102:8 144:22
   174:17
**intervene**
   104:10 105:8
**interview** 147:5
   158:19
**interviewed**
   147:8 148:3
   155:10 157:17
   164:17 168:4
**interviewers**
   155:17
**interviewing**
   146:20 147:3
   157:16
**introduced** 3:22
**investigate**
   24:23 25:4
   80:4,18,19
   83:8,20 84:10
   84:12,23 85:4
   85:21 101:10
**investigated**
   64:5 84:1
   102:18
**investigating**
   80:11,15 81:21
   82:9,14 83:3
   123:6 124:1
   157:21,22,23
   186:17 187:20
**investigation**
   82:18,20 83:14
   85:10,17
   105:10,16
   123:14 143:11

JR, A Minor                    July 24, 2007                    Pike County Board of Education
Page 203

149:2,5,23
151:9 155:8
162:8 167:4,17
170:17 171:10
171:16 174:13
174:19 175:10
175:12 177:14
180:17 184:15
187:15
**investigations**
123:12 189:10
**involved** 133:21
144:19 156:4
166:14 168:2
169:9,13
174:12
**involvement**
16:6
**involves** 77:22
**involving** 67:14
**IQ** 109:16
**isolated** 103:13
**isolation** 106:13
106:13 107:5
**issue** 24:17,23
25:1,8,9 26:3
26:22 29:19
37:9 69:9
83:13 114:11
124:1 125:14
125:16 146:17
146:18 148:8
148:19
**issues** 25:8 29:8
30:2 65:9
66:15,16 69:10
70:14,16 79:16
80:12 87:8
89:19 95:9
98:8 107:16,19
107:21 123:4
137:8 145:14
155:20 156:23
182:22
**Item** 128:16
**itemized** 81:9

**items** 50:13
184:23 185:2
——————
**J**
**January** 6:22,23
7:5 8:15 32:9
91:1,5 99:19
125:22 126:4
127:21,22
128:3,15
129:11 134:21
**JCAA** 69:1
**JCK** 74:21
75:11
**JCK117** 74:16
**Jeron** 133:22
164:6,13,18,18
164:21 165:3,7
165:21
**Jessica** 146:11
**John** 8:21 35:12
**jointly** 95:12
**joke** 76:14
**jokes** 76:16
**journals** 26:2
**JR** 1:5
**judgment** 84:9
**July** 1:18 8:1
30:23 87:4
114:1 190:4
191:10
**June** 44:17,18
88:12 114:4
115:6,8
**Justin** 61:19
62:3 63:6,16
64:6,8 65:2
70:5,11 71:11
71:17 108:23
110:3 129:5
175:14 183:13
184:6 186:8,13
186:18 187:2
**Justin's** 63:15
——————
**K**

**K** 13:20 26:14
93:16 94:9
**Karen** 77:5
**keep** 36:1,2
60:16 61:12
113:12 143:6
**Key** 8:22 35:12
**kid** 106:17
134:12 136:15
136:17 137:10
**kids** 17:12,12,13
22:21 27:19
61:10,12 63:14
96:13 98:8,9
121:8 125:19
133:15,15,16
133:19,21
134:11,15
135:8,13
136:15 137:9
137:10,14,16
139:3 148:1,3
148:8 149:6
151:11 158:20
166:21 168:3,4
170:14 175:2
175:11 189:13
**kind** 28:22
34:16 38:12
52:9 65:10
76:18 79:14
83:4 93:5
94:15 102:4
120:3,23 121:9
121:19 122:8
128:12 134:22
137:3,7 157:2
169:1,5 175:9
186:6
**kindergarten**
42:15
**kinds** 15:1 16:5
17:14 20:19
24:3,8,22
52:20 70:10
80:20 82:14

97:18 123:12
145:18
**King** 125:18
126:5 127:8
128:2 134:20
134:22 135:1,1
135:6,17,22
136:1,2,4,6
150:19,19,21
151:5,10
152:12 154:3
154:10,13,14
154:21 158:7
169:23 170:1,2
181:12
**King's** 134:16
182:9
**knew** 22:2
103:13,23
105:3 133:14
145:7 160:17
160:19,19
166:14 169:21
180:11 189:5
**kno** 20:16
**know** 11:1 16:18
17:7,8,12
18:18,23,23
19:13 20:1,11
20:14 21:6,15
21:17 22:14,20
24:8,14 27:18
28:2 30:7 32:1
33:18 34:4
39:9,22 42:3
46:10 53:15
56:7 60:5,6,7
60:23 61:11
62:15 64:3,4
67:8,11 70:4,4
71:19,21,22,22
75:4,17 76:3
76:10 77:2
78:11 80:6
81:2,9 83:21
84:2,6,8 87:21

87:23 90:12
92:16,20 93:12
93:22 94:15
96:11 99:9
103:9,12,16
105:19 106:8
106:18 107:11
107:14,16
108:3,10 109:7
109:8,13
110:14 112:3
113:7 117:16
117:16 119:15
120:6,12,17
121:8,8,10
122:3,5,5
124:10,11,12
126:17 128:17
128:22 129:18
132:19 134:7
136:3,11,13,18
137:4,6,21
138:1,6,10,18
138:19,20
139:17,17
141:6 142:12
142:15,17
145:20,21,21
145:22 146:21
147:8,15,20
148:6,12,13,13
149:7,7,9,12
149:18,18,18
151:16 152:2,6
152:7 153:22
153:22 154:4
155:5,11,23
156:3,6,18
157:7,13 158:3
158:10,10,13
158:13,23
160:22 161:2
162:11,12,19
162:20 167:2,6
167:7,23 168:2
168:4,9 170:3

170:6,7,9
175:16,20
177:22 179:7
179:15,15,16
179:21,21
180:17 181:16
182:20 184:5,7
184:9 189:8,16
189:17,18
**knowledge** 75:2
105:23 142:7
153:14 166:3
166:12 183:20
183:21,21
184:8,11,13
**known** 162:19
162:21
**knows** 107:2
**K-8** 9:4 93:10
**K-9** 9:4

**L**

**labeled** 57:14
**Lacey** 146:11
**lack** 178:21
**language** 56:3
110:6
**large** 15:6,15
**late** 150:21
**LaTonya** 102:9
**Lavine** 180:19
**law** 2:4 10:12
88:21 89:3,19
123:11 133:22
139:18 152:8
166:7,9 177:19
180:19 188:6
188:13
**lawsuit** 173:15
174:15
**lead** 160:1
**leadership** 14:11
14:14,15
120:19
**learned** 23:9,11
29:23

**leave** 5:2 62:13
62:13,14,23
63:2,7 129:14
129:20,21
131:18 139:14
139:22 140:7
141:8 157:15
164:8 187:9,20
**leaving** 61:19
62:3,12,18
63:1,6 66:1
71:12 116:18
120:20 134:1
164:22 165:12
165:13,16
**lectures** 11:17
**led** 187:1
**left** 46:22 47:7
54:7 179:12
182:4
**left-handed**
112:23 113:1
131:16
**legal** 89:19
129:9
**legitimate** 62:12
**legitimately**
62:17
**lent** 104:15,17
**letter** 5:2 46:20
101:1,5,7,22
102:2 103:8
114:19 140:6
140:20 141:3
142:2 171:2
177:5,11,12
**let's** 7:14 20:2
35:2 36:12
37:17 41:14,17
45:7,19 46:15
51:8,10 56:11
58:16 59:12
63:4 64:17
72:12 86:11
88:4 90:23
91:4 92:5,22

119:2 131:23
143:21 164:5
166:6 172:19
172:22 173:2
179:2,19
**level** 14:8 15:4
40:1 43:3
51:19 53:13,14
123:13,16
**levels** 42:14 97:6
133:7
**Levon** 133:22
139:7
**likes** 108:21
**limit** 20:9 118:8
**limitation**
109:18
**limited** 23:23
69:13,14,21
96:16 158:7
**limiting** 81:12
**limits** 109:9
**line** 77:9 185:19
186:2
**lines** 163:17
**list** 81:3,9,14,18
82:7,12 83:2
84:2 144:2
159:15,20
**listed** 17:20
76:23 138:11
154:11
**listening** 145:2
**lists** 80:6 96:14
**literacy** 96:16
**little** 127:4
142:21 176:5
**live** 163:8
**lived** 161:16,16
**lives** 161:15
165:21
**local** 42:22 43:2
51:18 52:17
**locally** 54:5,6
**location** 162:3
**locations** 15:8
**long** 6:19 7:1

16:10 89:23
142:7
**look** 7:16,19
11:5,20 17:5
27:1,8,23 28:6
28:7 35:2 39:3
43:13 44:12
45:18 46:20
52:1 58:23
64:17 66:14
72:12 88:4
92:6 93:11
96:12 99:10
100:1 107:9
130:3 138:20
139:21 150:11
159:17 166:6
166:16 175:23
179:2
**looked** 15:2 18:2
26:21 27:14
66:12 71:1,2,2
71:7 102:21
124:14 139:4
172:18 184:3
**looking** 25:23
26:23 27:17,23
41:20 43:14,16
45:21,23 46:4
46:19 48:22
79:3 90:2
135:3,4 138:18
147:5 172:16
173:16
**looks** 34:19 43:8
43:11,12 99:6
99:9 114:4
136:3 174:16
**lot** 12:17 16:6
17:8 20:11,14
21:14 27:20
111:19 121:11
134:7 137:14
189:17
**lots** 20:13
**loud** 150:14

**Love** 1:20
**lower** 69:2 73:12
182:4
**Lucia** 93:23
**lunch** 53:17,17
53:19 100:9
165:15 175:20
176:2,3,6,9,13

**M**

**machine** 191:9
**mad** 126:12
135:3
**mail** 177:6
**mailed** 177:11
**maintain** 61:9
72:23
**MAK** 126:8,8
150:19 153:11
153:12,17
154:10 155:6
**making** 33:9
67:18 97:5
130:19 175:20
189:19
**manner** 3:23
62:19,22,22,23
84:23
**manners** 94:16
**manual** 4:18
37:22,22 38:2
38:4,13,19,22
39:1 41:23
72:8,13 73:3,4
73:14,16,17
74:7 78:21
**manuals** 38:11
72:6
**manufacturing**
176:21,21,22
176:22
**March** 128:3
130:12,22,23
131:15,21
132:9,11,16
138:23 142:12

142:14,15
162:8 176:15
179:3
**Marijuana**
127:17 133:10
133:18 134:10
136:20,21,22
136:23 137:9
142:8,11 143:3
144:21 145:13
148:21 151:3,7
153:12 154:7
156:7 158:1
159:22 166:14
168:22,23
188:2,2
**mark** 1:17 3:8
3:20 4:8 6:1,13
30:8 45:8,13
45:22 56:19
57:7 58:17
73:20 74:5
98:10 114:11
128:9 137:3
140:4 172:22
173:2 180:20
191:8
**marked** 30:11
30:16 45:11
49:7 57:11
58:19 74:2
78:15 98:13
113:2 114:14
116:15 128:6
140:1 173:4
**Mary** 1:17 3:10
152:17 191:21
**Master's** 14:1,3
14:3,8
**match** 181:8
**matched** 154:5
**material** 4:19
19:21 23:15
**materials** 11:4
11:11 86:17,18
88:5 89:21

92:15 93:20
94:6 98:18
**Matt** 126:8
134:16 135:17
135:22 150:19
150:21 153:1,9
153:10 154:6
154:22 155:1,3
155:5 181:12
182:9,12
**matter** 81:11
102:20 105:5,6
141:18 187:21
**matters** 68:4,11
69:7 80:9
84:10 89:18
129:9
**Matt's** 150:22
**ma'am** 58:15
102:3 111:22
112:17 115:9
115:15,19
121:5 138:14
169:15
**McDaniel** 31:12
31:18 32:2
101:13,14,15
104:12,14,23
105:1,7,17
106:8 119:3,10
119:17 121:12
121:18,19,21
122:2,4,10,11
124:5 126:7
127:1 128:2,18
135:6,7 149:16
149:20 150:20
151:5,10,13
152:2 154:15
156:23 159:6
167:8,11,23
168:7
**McDaniel's**
119:21 123:22
**mean** 10:19 12:4
18:20 21:12

24:5,6 25:12
31:22 32:5,15
33:16 34:3
39:11 56:4
59:21 60:5,12
61:9 62:9 67:9
68:18 71:18
72:23 76:2,3
77:20,23 79:9
79:17 81:1
86:4,21 87:3
87:21 99:6
105:1,14
106:10,15
108:8 113:22
116:9 120:5,10
121:7 124:3
126:23 128:17
130:4,9 131:4
132:10 134:8
137:4,8,13,14
137:18 139:15
139:16 142:13
150:23 151:13
156:17,17
162:13,16,17
164:3,3 165:19
166:18 170:9
174:13 175:4
176:14,14
187:21
**meaning** 15:9
29:9
**means** 18:22
153:9 165:5
**meant** 32:20
**measure** 15:11
**MEd** 14:2
**medical** 12:9
**meet** 47:6 102:6
161:22,22
162:2,6
**meeting** 49:21
88:13 89:14,15
89:16 101:19
102:4,18

182:14
**meets** 70:13
**member** 32:16
67:15 123:20
123:21 124:3
**members** 54:12
72:18 78:9
79:15 95:19
108:3 124:9
130:17 163:5
175:8
**mental** 103:3,7
110:9
**mentally** 109:1
**mention** 133:23
136:7 156:3
**mentioned** 63:5
80:8 108:18,19
108:22 175:17
**mentions** 65:8
**merits** 20:16
**message** 131:18
**met** 101:17
177:8
**method** 63:3,8
64:1
**methodology**
20:18
**middle** 1:2 45:3
**mid-football**
119:16
**mind** 103:2
150:13 151:17
176:11
**mine** 112:20,23
**minor** 1:5 35:13
35:14
**minus** 46:9
**minute** 7:14
20:3 36:13
106:18 122:10
156:15
**minutes** 49:20
114:20
**misbehaving**
121:9

**missing** 112:2
**mobility** 96:16
**modeled** 35:11
**monitor** 65:17
121:11
**monitoring**
90:20,21
**Monroe** 4:21
116:11,17,19
117:19,21
118:5,12
**Montgomery**
2:5,9 12:20
121:17 161:13
161:15 191:5
**month** 142:23
153:3
**Moore-Wynn**
1:18 3:10
191:21
**morning** 6:10,11
140:21 141:1
**Moses** 167:14
172:3
**mother** 1:6
102:12 150:21
161:15,22,23
162:2 181:13
182:9
**movement** 61:6
**moving** 60:21
**MT** 176:20,22
**multidisciplin...**
70:12
**multiple** 43:22
**multi-varied**
14:21
**M-A-K** 153:11

_____N_____

**name** 6:12 7:7
10:18 11:1,3
11:15 12:22
72:4 134:16
135:16,21
153:10 159:15

JR, A Minor                    July 24, 2007                    Pike County Board of Education
Page 206

179:23 181:11
181:11 186:13
186:19
**names** 133:21
135:16 138:12
138:19 144:2
181:8
**national** 69:16
**nature** 11:18
16:4 69:13,20
83:23
**necessarily** 21:3
34:11 36:1
53:6 75:19
76:6,19 106:14
106:21 157:1
**necessary** 34:15
**need** 3:13 7:19
47:21 67:12
82:13 83:14
84:3,17,19
86:6 108:5
120:21 124:12
130:19 132:23
135:8,10,11
136:13 146:3
155:5 165:6
173:1
**needed** 128:23
132:19 145:8
145:16 155:11
155:12,14
159:16 170:18
178:18 180:11
188:11
**needs** 95:11,18
95:22
**negative** 119:2
143:3 170:16
**neglect** 96:17
97:10
**Neil** 130:16,17
177:3,3 180:1
**Neil's** 180:6
**neither** 191:15
**never** 104:1

127:16 134:19
169:8
**new** 87:4,14,15
87:17 89:5
113:8 114:5
120:19
**night** 140:18
**noneducation**
12:4
**Non-substanti...**
34:12
**normally** 125:23
**North** 2:13
**note** 63:15 71:9
101:9,9 112:22
128:21
**notes** 5:1 11:16
31:1 128:10
138:17 143:7
144:12,13
146:9 148:2
150:11 159:4,9
160:10 164:6
166:17 175:23
180:16
**notice** 47:1
**noticed** 169:2
**notification**
46:23
**notifications**
47:16,21
**notified** 177:17
**November** 6:22
89:9,15 101:7
119:16 124:22
124:23
**number** 4:13,13
30:14 36:6
37:21 43:15
62:15 69:2
81:15,16,17,18
90:2 92:6
95:17 101:23
128:16 144:11
156:20 157:16
175:15 179:9

179:10,11,12
188:1 189:7,8
189:13
**numbered** 46:21
47:8 73:12
**numbers** 75:14
102:9 183:15
**numerous** 65:8
164:10,11,11
165:4,19
171:10,16
**nuts** 34:10

---

**O**

**oath** 87:12
**object** 18:7,15
19:9 21:20
24:12,18 27:4
29:13,16,20
30:3,5 61:23
63:21 103:4
107:10 108:12
109:11 110:12
113:10 187:3
**objections** 3:11
3:12
**obligation** 70:5
**observable**
96:10 97:8
**obviously** 23:17
53:15 75:22
158:17
**occasions**
160:20 164:9
164:10,12
165:4,19
171:11
**occur** 177:21
**occurred** 64:5,8
64:11 104:3
131:21 142:11
152:15 153:3
158:12
**occurring** 61:22
61:22 63:23,23
133:12 157:19

**occurs** 22:14
**October** 119:16
**offered** 3:15
**offhand** 95:6
**office** 6:23 40:1
42:19 45:16
49:15 50:3,4
54:15 60:22,22
63:19,19 72:23
86:1 95:16
101:1 130:7
140:11,16,21
141:1 143:19
177:6 178:8
**offices** 1:19
107:15
**official** 186:9
**officials** 188:6
**off-the** 45:20
**off-the-Record**
46:17 51:9
145:4 146:23
**oh** 10:19 12:17
16:17 32:2
46:5 56:5 58:3
119:15 127:18
136:2 137:23
137:23 144:6
164:13 168:11
168:14 174:14
**okay** 7:6,23 8:2
8:11 9:12 11:8
13:12,23 15:5
16:12,21 17:2
19:18,19 23:19
26:5,13,20
27:22 30:8
31:7,19 32:1
33:6 35:2
36:18 37:2,5
37:19,20 38:10
38:22 40:6,17
43:19 44:9,10
44:13 45:7
53:4,7 54:3
58:9,11,16

60:13 61:19
62:3 63:4 64:2
66:6,12 69:5
71:1,9 72:5,10
73:6,11,16,20
75:10 80:10
81:3,8,15,19
82:8 88:22
89:13 90:5
91:4 92:9,11
96:22 100:5
101:4 110:3,18
111:9,18,21
112:7 114:10
115:7 116:21
116:23 117:10
118:10,15,18
118:18 119:17
119:20 124:13
124:17 130:6
131:8 132:4
133:1,6 135:21
138:5 139:1
143:10,16
145:23 146:12
146:14 147:17
148:15 149:10
151:20 152:10
152:17,23
153:1,2 154:19
163:22 164:5
166:2 167:2
171:13 172:4
172:10,19
175:17 177:20
181:2 183:6,17
187:7
**old** 162:21
**ones** 17:11,20
34:22 37:18
38:9 52:13
56:1 108:17,21
108:22 146:9
**one-size-fits-all**
83:2
**one-size-fit-all**

82:7,12
ongoing 149:1
online 38:11
on-the-spot
  84:21
Oops 172:14
open 189:14
opening 37:2,4
openness 66:7
operate 53:11
opinion 19:2
  110:16 137:19
opportunity
  20:14
opposed 18:6
  24:11 37:13
opposite 179:5,6
  179:8
options 50:19
Organizational
  4:14 30:21
organizations
  25:18
orientation 87:5
  87:14,18
origin 68:15
  69:16
original 159:15
  176:1 181:19
originate 123:15
outline 67:12
outlined 124:13
outlines 34:9
  70:8 79:20
  80:14
outside 25:11,21
  26:6 106:20
  185:18 186:9
overall 33:7
  119:6

_____

**P**

packet 171:23
  172:1,4 178:5
  178:9
page 4:13 36:20

43:9 44:23,23
59:8 67:21
68:8,22,23
69:17 70:2
73:22 77:1,4
79:10 80:2,13
86:21,21 88:9
88:16,20,22
89:5 90:2,18
92:5,23 96:22
99:8,23 102:13
115:11 129:4
130:12 133:4
138:11,11
142:1 143:6,7
147:5,11
160:10 164:5
166:2,6 172:9
172:10,11,19
180:13
pages 41:4 43:12
45:3,7,9 56:19
58:13 73:7,8
74:7 75:4
86:16 132:5
138:10 143:2
159:8 166:16
parade 62:14
paragraph 37:2
37:6 38:10,14
38:23 39:3,5
39:14 41:20
55:3,8,11,14
55:19 56:9
66:2 69:11
80:1 171:9,15
183:17
paragraphs 55:2
56:23
paramedic
12:10,15
parent 16:6
70:18 101:2
105:23,23
106:2,18 183:2
parentheses

181:13
parents 16:1,5,7
38:22 39:1
47:18 66:7
67:12,20 68:9
68:19 69:8
72:21 73:5
101:3,17,20
104:16 135:2
148:23 149:9
149:11,14,17
160:14 162:5
162:14 163:17
166:23 167:3
182:23
parent-studen...
66:4
part 16:12,18,19
35:15 43:8
48:20 50:20
97:7 172:9,23
participate
123:1 163:11
participated
25:10
participation
100:22
particular 44:16
56:14 57:4
82:5 120:16
164:1
particularly
75:21 76:16
parties 3:7,19
191:16
parts 38:4 50:14
50:23 51:2,4,5
53:9
party 3:16,23
pass 60:11,14,18
60:20
passed 34:21
177:18
passing 165:23
patio 180:23
patting 76:22

PCHS 180:22
people 107:18
159:16
PEPE 123:2
percentage 29:2
percentile
109:17 110:9
performance
131:6
performed
15:13
performing
180:9
period 32:10,12
119:14 120:19
peripherally
79:13
permission
161:23
person 75:19
107:2,6,7,19
107:23 108:2
121:19 122:9
129:3 135:5
146:2 147:8
154:11 160:8
167:7
personal 171:17
186:5 191:11
personally
158:19 166:20
178:6
personnel 86:3,4
86:5 111:20
112:14,16
117:7 122:20
perspective
27:17
pertaining 61:12
pertains 21:1
Phelps 131:9,15
132:10 134:18
136:6 139:13
140:19 142:23
143:17 149:1
151:7,19,21

154:1,2,9
155:3 157:10
158:5 167:13
169:17 171:23
172:2 176:1,8
182:14 186:18
187:7,16 188:7
188:16 189:4
Phillip 138:15
159:10 161:9
161:10,14
163:23
phone 102:9
103:20 104:10
104:12 105:11
105:13,18,21
106:7,12,16
138:16,21
141:14 142:13
143:12,15,17
153:19 156:18
159:21 175:15
179:10,11,12
phones 105:4
156:20
phrase 157:3
physical 13:18
13:19,20
picked 146:8
picture 107:9
piece 20:15
pieces 50:13
53:9
Pike 1:13,19
4:14,18 6:18
8:23 9:1,2,6,10
12:19 30:21
31:12,13 32:6
32:15 33:2,6,8
36:7 39:11
43:5 51:20
52:2,11,22
53:18 69:6,11
69:18 70:17
72:6 73:15
93:7 99:18

111:23 121:22
122:12,15,20
139:10 161:16
162:4 180:19
180:21
**pile** 170:23
**pinching** 76:23
**pink** 71:9
**place** 2:13 63:10
65:11,22 117:9
177:13
**placed** 109:17
139:14,21
**placing** 140:6
141:8 157:15
187:19
**PLAINTIFF** 1:8
2:3
**Plaintiff's** 4:14
4:15,16,17,18
4:19,20,21 5:1
5:2,3 30:9,10
30:16 45:10,13
48:4,10,13,20
49:7 57:8,10
57:14 58:11,18
58:22,23 59:13
59:14 63:12
64:14,17 66:14
71:3 73:21
74:1,5,22
78:16 98:11,12
100:19 114:12
114:13 116:13
116:14 128:5,9
139:23 140:5
142:1 171:1
172:6 173:2,3
179:2
**plan** 70:8
**planner** 4:17
39:20,20 42:6
42:12,15,18
50:1 51:5,15
54:6 57:18,19
58:1 59:2,3,10

60:4,9,13,17
60:19 62:7
63:13 66:13
71:2 128:12
132:1
**planners** 42:13
92:1
**plans** 90:4
**players** 175:7,8
**playoff** 125:3
**plea** 184:10,12
**pleaded** 184:5
**please** 6:6,12
23:14 36:11
62:10 63:16
87:1 129:13
160:11
**pled** 184:7,13
**plug** 47:21
**plus** 58:12
**pocket** 104:19
**point** 19:3 93:13
113:15 120:21
124:11 126:5
136:8 137:5
138:6 139:8
141:7,16 145:7
145:21 149:3
157:18 164:15
172:15 178:20
**pointing** 63:12
**police** 172:2
178:7 188:21
**policies** 33:12,16
33:17,18,22
53:12 64:19
65:21 71:5
72:5,8 74:10
74:13,19 83:22
88:5 91:6
110:20,23
111:2 123:3
**policy** 4:18 33:9
33:14 34:7,12
37:12,22,22
38:2,4,11,13

38:19,22 39:1
40:4 41:23
52:18 53:23
59:15 65:21
69:6 72:8,13
73:3,4,14,16
73:17 74:7
77:13,17 78:7
78:15,21 80:8
89:18 105:4,20
105:21 113:12
162:23 163:3
163:18,20
**political** 16:4
**Polly** 134:20
136:6 151:5,10
154:3 169:23
170:1,2
**poor** 126:9
**population** 19:8
**portion** 10:21
37:8 59:9
89:16 91:16
112:18
**position** 7:2,3,3
8:7,15 9:16,22
129:3 186:9
**positions** 31:4
**possession** 61:21
**possibility** 188:1
**possible** 68:14
68:15 145:14
**possibly** 22:16
72:1 142:21
144:19 160:1,5
160:8 163:10
**post** 12:6
**postdates** 29:17
**potential** 27:2,9
28:9
**potentially**
186:14
**poverty** 15:4,18
96:17
**practice** 163:4,5
**practices** 33:17

37:12
**predators** 27:10
**preemployment**
173:17
**preferential**
126:11
**prepared** 41:13
50:2,4
**present** 34:3,4
54:11 61:11
**presentation**
89:13 90:21
**presented** 83:13
99:3
**presenter** 93:22
**pretty** 21:6
47:19 120:18
122:7 136:10
154:7 156:6
158:6
**previous** 24:20
**previously** 32:5
80:7 118:4
**pre-hire** 113:3
**primarily**
123:13 124:4
**principal** 9:2,3
15:11,12,14,22
16:9 31:8,13
31:16 52:7,8
65:15 68:11
95:14,16
107:12,12
108:5 121:12
121:13 122:3
123:10 139:16
150:8
**principals** 14:22
14:23 15:12
31:11 79:15
83:10,19 85:20
85:20,23 86:1
149:8 189:2,5
**principal's**
85:18
**printed** 54:5

164:3
**printout** 112:5
164:2
**prior** 7:7 8:2,20
9:1,3,18 10:9
31:21 32:9
44:18 118:5
122:4 169:14
186:12,21
**private** 13:2,3
116:1,4,4
**probably** 10:8
20:1 22:6
61:12 91:9
106:15 119:16
129:17 140:17
140:20 154:20
176:20,23
177:3 178:1
182:18,19
**problem** 20:10
**problems** 17:22
27:16 98:9,9
110:6 121:4
150:7
**procedure** 3:9
40:5 59:15
67:16,23 68:16
69:12,18 70:1
70:17 79:11
82:9,18,19
83:7,14,17
124:15
**procedures**
33:17,20 34:1
52:19 53:12
64:19 65:22
67:11 68:21
69:1,6 71:5
72:5 78:22
79:6,8,15,20
80:10,14,17,19
80:21 81:20
88:6 91:6
110:20 111:2
123:4

proceed 85:1
proceedings
  191:13
process 66:21
  68:21 69:1,5
  79:5,5 128:20
  139:8 166:20
  174:12
produce 11:11
  35:17 41:1
  53:10 89:21
  185:1
produced 7:20
  34:18 35:3,10
  35:10,11 36:7
  38:3,4,7 39:7
  39:11 40:12,18
  41:5,9 54:21
  80:23 86:15
  96:9 131:20
  174:15
produces 39:19
production
  34:20
professional
  25:18 26:2
  65:17 95:11
  129:14,20,21
  186:3 189:20
profile 28:8
program 34:10
  109:3,5 111:4
  119:6,6,12
  120:22 124:17
  126:9 128:19
  129:1 130:21
  146:7 180:6,7
  180:9,11 183:2
  183:3,3
programs 131:6
  131:7 163:12
  180:6,12
promotional
  50:21
promptly 80:4
promulgate

82:18 83:7
promulgated
  33:15 49:14
  72:14
proper 65:22
properly 120:3
protect 70:6
  111:4,7
protecting 87:2
  88:16
provide 11:20
  38:12 60:9,10
  88:5 94:8,10
  94:12 181:20
  182:21
provided 3:16
  3:23 26:12,18
  35:22 38:11
  39:22 42:19,20
  70:8 86:3,8
  93:3 94:14,14
  94:15 97:21
  98:2,4 99:1
  112:13 161:20
  187:17 188:14
providing
  103:21 105:11
public 13:4
  67:21 68:5,6
publish 47:8
published 39:23
  54:5 78:19
pull 73:8 174:19
  174:21
pulled 164:1
Purchasing
  108:18
purge 113:15
purpose 3:16
  150:4
pursuant 1:20
  3:8
pursue 148:8
push 145:17
  146:1,17,18
  148:18,21

put 25:14 32:21
  47:5 54:2 58:5
  58:11 77:5
  86:22 114:5
  119:2 149:19
  178:1 187:9
puts 47:20
putting 138:21
  138:23
Pyron 31:11
  128:21,22
  130:20 143:15
  149:16,20
  150:19 151:14
  152:2,20 153:8
  153:16 155:8
  159:5,7,14
  160:12 164:17
  165:2 167:2,8
  167:11,15
Pyron's 124:4
p.m 190:4

_____ Q _____
qualified 13:16
quality 20:17
question 18:9
  19:4,5,12,15
  19:18 20:6,7
  21:6 22:1,11
  22:23 23:12
  29:20,21,22
  34:2 46:6 61:3
  62:2 69:17
  71:10 86:7
  88:15 125:6
  137:3 139:6
  150:12 168:6
  169:3 180:20
  183:19
questions 3:12
  3:13 29:5
  66:17 103:2
  148:18 184:19
  189:17 191:10
quick 36:20

183:7
quizzed 162:11
  162:11

_____ R _____
race 69:15
racial 90:19
raise 103:2,6
  106:14,22
  107:5
raised 137:22
ran 121:13,14
  164:2
ranks 149:6,6
read 18:16,17,19
  18:21 19:20,22
  20:14 21:13,13
  21:14 23:3,13
  23:16 26:2
  68:9 74:20
  75:6 77:17
  110:13,15
  129:13 139:6
  150:14,18
  160:10 164:5
  177:1
reading 4:4
  18:22 25:22
  66:2 93:14
  150:14 152:21
ready 100:6
real 36:20
  121:14
really 20:15
  35:15 121:14
  148:12 172:23
  173:23
reason 62:12
  63:1 100:3
  115:14 159:18
  164:1
reasons 27:20
  27:21 60:9
  62:16 96:13
  98:8 135:4
  189:8

recall 10:19,20
  11:3 17:23
  18:22 19:1
  21:11 25:12,13
  25:18 26:4,5
  26:18 28:17,19
  29:5,6 31:21
  32:3 57:1
  59:17 60:1,3,3
  70:3 72:4
  78:19,20 83:15
  88:7 89:23
  94:6 99:6,7
  101:5 102:15
  103:18 116:6,8
  118:6,22
  119:19 125:17
  128:17 129:19
  130:16 131:2
  141:19,19,23
  148:11 158:23
  165:1 166:10
  167:22 168:8
  168:15 169:4,6
  179:15 183:1,5
receive 16:13
  41:22 95:8
  97:6 108:1
received 16:23
  26:7 41:22
  101:1,5 117:18
  126:9 130:4
  132:17,21
  139:12 147:20
  158:5 167:17
receives 107:7
receiving 61:1
  126:10
recess 20:4
  36:14 41:16
  49:3 86:12
  100:9 183:8
recognize 30:17
  113:2
recognizing
  16:14 17:5

92:4 93:15
99:22
**recollection** 7:12
7:15 28:22
55:23 57:1
118:20 132:15
**recommendati...**
33:12 178:11
**reconstruct** 41:7
**record** 6:12 7:10
7:11 8:16 13:6
20:2 32:21
36:12 41:14,18
45:19,20 46:2
46:16 48:2
49:1 51:8,11
58:11 59:1
62:5 63:18
86:11 100:8
111:13
**records** 7:6,19
60:16 61:5,6,9
61:10,12,21
100:15 111:23
163:23
**red** 106:14,22
107:4,5 137:22
156:19
**reduced** 191:11
**Reed** 61:19 62:3
63:5 64:6,8
71:12 108:23
129:5 163:10
183:13 184:6
186:8,13 187:2
**Reed's** 110:4
186:19
**refer** 24:19 65:9
79:5 80:6,12
136:16,17
137:10 158:15
**reference** 39:4
77:6 88:22
89:1,2 92:11
92:12,14 93:2
95:2 96:1 97:9

128:15 130:11
130:19 131:8
158:22 177:2
180:14 182:16
**referenced**
38:14,23 99:4
**references** 113:9
**referred** 59:6
138:8,9
**referring** 25:6
26:13 34:23
37:23 39:13
40:9,14 42:4
42:10 43:14
65:12 68:12
73:13 74:21,22
75:14 78:8
79:12 91:12
96:6,22 156:1
160:8 183:15
**refers** 65:21
164:12,14
166:2 182:9
**reflect** 31:3
36:22
**reflected** 60:18
115:10 126:18
147:23,23
**refused** 118:9
**regard** 185:22
187:13
**regarding** 29:2
119:1 182:22
**regardless** 4:1
83:23
**Regional** 95:22
**regular** 18:6,13
19:8 21:8
24:11 111:4
**relate** 27:2
34:14,15 65:13
68:3 70:15
74:10,13,16
79:13 100:15
111:1 114:22
129:9,12 157:1

164:6
**related** 12:1,4
21:13 25:10,19
28:1,13 30:6
47:4 64:15
65:9 66:15,18
67:22 85:15
90:14 111:13
119:13 125:17
168:22 170:1
191:16
**relates** 41:20
44:2 59:14,16
64:18 65:19
66:1 67:7 68:5
70:9 74:15
76:11 80:1,3
81:6 83:3 87:2
88:11 90:3
91:10 111:21
123:11 124:1
129:5
**relating** 4:20
38:7 61:22
71:6 85:16
86:17,18 87:1
87:9 98:19
100:20 114:17
124:1 155:20
171:20 183:22
**relation** 134:17
174:15 176:17
185:18 186:5
**relationship**
32:14 131:11
146:10 159:4
175:10 186:8
**relationships**
66:5
**relayed** 135:7
**release** 117:20
118:2,9
**released** 65:2
118:11
**relevant** 29:18
32:10 37:8

**reliable** 141:10
157:13
**religion** 69:16
**rely** 95:17
**remain** 48:2
**remains** 142:8
**remember** 12:22
16:17 38:17
85:12 91:8
95:20 104:16
108:14 115:22
117:21 118:1
127:5 128:1
156:5 173:8
**remotely** 74:17
**removing**
172:11
**Renew** 114:8,9
**repeat** 18:9 19:4
19:18 23:11
29:22 46:6
62:1
**report** 29:3
91:18 118:20
118:23 119:17
126:3 134:17
140:21 143:2
147:14,18
150:20 153:5,7
153:8,15
154:21 168:17
**reported** 101:21
103:19,20
107:20 119:23
123:18 151:10
171:21 175:18
186:21 188:10
188:23
**Reporter** 6:5
19:22 23:16
46:3 191:22
**Reporter's** 4:10
191:2
**reporting** 67:23
69:7 79:17
80:8 88:21

89:2,17,19
90:20,22 91:7
91:17,20
103:15 107:1
134:12
**reports** 107:13
167:17 171:11
171:16
**represent** 51:23
92:12
**representing** 3:7
3:19
**represents**
191:12
**request** 34:20
142:2 188:17
**requested** 19:21
23:15 38:5
**requesting**
117:19 129:19
**requests** 129:14
**required** 95:15
**requirement**
91:20
**requirements**
88:21 89:2,18
89:19 91:18
**research** 17:11
20:12,15,18,18
20:20,21,21,22
21:1,7,12,13
23:5 26:21
28:1,13,15,18
28:23 29:1,6
**researcher**
20:17
**reserve** 184:19
**reserved** 3:14
**residence** 6:14
**resignation**
115:15
**resolved** 68:14
**respect** 57:18
59:13 104:5
167:15 175:10
184:22

**respond** 22:10
22:12 64:21
**response** 24:20
29:4,14 67:1
86:14 94:22
99:2,14 120:14
169:7
**responses** 16:9
147:21,22
148:13 184:16
184:21
**responsibilities**
12:13
**responsibility**
21:15 22:13,15
22:20 23:3,8
24:16,20 33:11
81:19 82:2,17
83:6,11 85:3,5
85:6,7,18 95:7
95:10 107:11
122:11,14,17
122:19 123:3,6
123:23 124:5
189:9
**responsible** 33:7
33:9 85:9 97:1
97:4 123:13
**rest** 91:22
127:14 150:18
**result** 17:3 18:3
18:11 23:7
156:11 162:7
**results** 191:17
**resume** 112:18
185:1
**resumed** 100:12
**retarded** 109:1
**retire** 115:14
116:2,3
**retired** 32:2
**retirement** 4:20
114:18,19,20
114:22 115:11
115:16 116:3
186:12

**return** 104:13
106:1 118:3
**returned** 102:14
104:11 105:22
132:11
**reveal** 171:10
**revealed** 171:16
**review** 52:15,16
53:5 59:19
185:13
**reviewed** 29:1
68:20 183:10
**reviewing**
187:20
**revised** 44:17
**revision** 44:17
44:18,19
**revisiting**
177:17
**re-up** 113:16
**Richard** 141:21
**ride** 119:9
**riding** 133:17
134:10 135:9
151:2,11
**right** 7:1 8:2,16
9:9 16:21
17:23 21:11
23:7 24:4
26:11 38:6
42:1,23 43:4
43:13 44:5
45:1,2 48:1
50:15 51:13
54:18 56:15
59:12 64:13
66:12 67:16
68:10 72:12
73:20 78:20
83:16 85:3
86:2,14 87:11
88:4,20 89:21
90:11 91:4
92:5 95:6 96:1
96:5 97:20
98:10 100:5

112:11 118:10
125:1 129:3,4
129:11 130:11
137:15 140:20
142:1 146:2
154:17,17
160:22 166:6
166:16 167:15
178:11 180:13
181:19,22
182:4,13
183:18 184:20
**rights** 46:23
**right-hand** 31:1
31:3 69:2
73:12 92:6
**ripping** 172:20
**Robert** 150:20
167:11
**role** 8:9 15:7,11
127:6
**roles** 14:22,23
15:7,9
**room** 61:20 62:4
63:17 135:13
**Rose** 2:12
**rowdy** 120:11
**Rules** 3:9
**ruling** 3:14
**run** 122:6,9
**running** 180:2
**runs** 183:3
**rural** 15:3,16
163:8,8
**Rutherford** 9:21

___

**S**

S 136:1,4
**safety** 65:20
87:6,8,19 90:3
**SAITH** 190:9
**sample** 21:2
**sat** 178:8
**satisfied** 102:20
**saw** 104:20
164:7,8,11,21

165:3,10,15,17
165:23
**saying** 26:7 38:8
42:2,3 69:5,8
70:21,22 88:1
88:23 97:1,4
150:6 164:17
164:23 176:7,8
**says** 14:6 17:11
34:8 38:10
40:11 42:6
44:21 68:9
69:10,20
113:16 150:19
151:23 164:13
166:3 171:10
171:15,15
173:10 176:2,3
176:20 181:21
**scale** 109:16
**schedule** 71:16
71:16 99:18
**scheduled**
101:18,19
**school** 4:17 9:2,4
9:4,5,6,20,21
12:5 15:15,16
15:16,17,17,23
16:2,3,5 25:11
25:16,17 26:6
26:8,9 31:8,12
31:14,22 33:8
33:15 36:22
37:3,4,13 40:2
42:6,18,20
44:11 50:16,18
51:17,17,17,18
51:21 52:2,11
52:17,23 53:18
53:19,21 58:1
59:2 60:16
61:5,7,11,11
61:13,16,20
62:5 63:19
66:1 75:23
76:13 78:10

80:3 83:19
85:4 86:3,4,5
87:6,8,19
89:11 96:14
98:3 100:15
103:17 107:17
109:15 116:1,4
116:5,10 118:3
121:23 122:12
122:15,20
123:13,16
125:17,19,21
125:23 139:9
140:9,15,22
144:8 145:7
146:2 150:22
160:16,18
161:7 162:13
162:15,17,22
163:18 169:14
175:5 186:10
**schooled** 23:4
24:21 25:7
**schools** 4:14,22
6:17 10:22
15:1,3,6,6
30:22 42:22
47:1 66:9
72:22 93:3,4
99:18 107:14
116:12 139:11
**school-opening**
36:21
**science** 9:23
14:3 176:18
**scope** 185:19
186:2
**scratched** 114:5
**screen** 170:16
**SDE** 96:10 97:8
**season** 19:16
125:3 126:13
**second** 17:23
36:8 41:15
43:20 81:5,16
117:17 154:18

JR, A Minor                          July 24, 2007                    Pike County Board of Education

Page 212

| | | | | |
|---|---|---|---|---|
| 154:20 188:13 | 147:13 148:2 | 67:5,6,17 68:1 | 40:23 44:15 | **sitting** 17:10 |
| **secondary** 13:15 | **sending** 60:23 | 68:16 69:7,18 | 55:4 | 56:4 135:14,15 |
| 14:3 47:1 | 63:15 | 70:1,15,19 | **Sheila** 117:14 | 142:23 |
| **Secretary** 32:16 | **sends** 95:22 | 71:6 74:10,15 | 118:11 | **situation** 11:7 |
| 32:19 | **Senn** 133:22 | 74:18 75:3,7,8 | **ship** 121:14 | 81:2,22,23 |
| **section** 67:21 | 164:6,13,18,21 | 75:11,16,20 | 122:6,9 | 82:1,5 101:16 |
| 88:3 | 165:3,7,21 | 76:5,5,16,19 | **shorthand** 191:9 | 106:20 121:11 |
| **sections** 65:9 | **sensitivity** 137:7 | 77:1,7,7,9,10 | 191:22 | 121:22 124:22 |
| 73:2,3 | 158:9 187:23 | 77:22 78:3,22 | **show** 30:16 44:7 | 134:20 138:21 |
| **see** 11:5 30:23 | **sent** 72:22 95:18 | 79:16,17,23 | 46:12 67:16 | 139:20 146:10 |
| 31:1 34:22 | 99:7 101:8 | 80:11,15,18 | 73:11 79:9 | 156:19 157:2 |
| 39:11,21,22 | 148:16 177:11 | 81:6,10,21 | 80:21 96:5 | 157:10 158:8 |
| 44:12 56:11 | **sentence** 36:23 | 82:9,15,19,20 | 99:21 114:11 | 163:7 177:17 |
| 58:6 64:15 | 57:4 150:23 | 83:4,8,14,20 | 140:4 | 178:9 |
| 68:9 73:6 77:6 | **separate** 50:23 | 85:4 86:3,17 | **showed** 70:2 | **situations** 75:17 |
| 77:11 78:6 | 175:9 | 86:19,19 87:1 | **showing** 43:5 | 84:5,6 103:10 |
| 90:23 95:6 | **separately** | 87:13,15 88:6 | 49:21 116:12 | 103:11 123:17 |
| 96:7 99:11 | 172:22 | 88:8,15,19,20 | **shows** 69:23 | 137:18 139:5 |
| 116:22 131:23 | **September** 92:3 | 88:22 89:1,13 | 102:14 137:7 | **six** 94:13 161:5,6 |
| 134:16 144:6 | **series** 84:2 | 89:22 90:5,7 | 158:8 187:23 | **six-year** 14:5 |
| 145:18 148:19 | **seriously** 187:15 | 91:7,14 92:4 | **sic** 82:7 115:16 | **skills** 110:1 |
| 166:17 174:20 | 187:18 | 92:13,14 93:2 | 134:16 154:6 | **skip** 37:5 |
| 176:7 179:19 | **served** 6:19 8:20 | 93:15 94:23 | **side** 31:1,3 179:5 | **slight** 56:2 |
| 179:23 180:19 | 109:3,4 174:7 | 95:2,4,8 96:1 | 179:6,8 | **small** 15:6,16 |
| 182:21 183:15 | **serves** 60:13 | 97:3,15,18,23 | **signals** 26:22,23 | 107:14 175:5,6 |
| **seeing** 28:22 | **set** 1:21 20:20,20 | 98:19 99:22 | 27:5 28:3 | **smelled** 181:15 |
| 153:12 | 20:21,21 21:1 | 111:1 123:7,14 | **signed** 116:21 | **smoke** 134:14 |
| **seen** 24:13,15 | 40:8 | 123:20 124:3 | **significance** | 155:1 |
| 28:1,15,18 | **setting** 24:3 | 129:6 137:1,3 | 170:5 | **smoking** 103:16 |
| 29:1 40:20 | 28:12 29:3 | 138:2 145:15 | **significant** | 118:20 119:17 |
| 42:4 52:2 | **seven** 9:2 | 148:19 155:20 | 109:9,18 | 133:18 134:10 |
| 80:12 92:13 | **sex** 69:16 137:1 | 156:4,10 | **signify** 179:10 | 135:8,10,11 |
| 165:8,18,22 | **sexual** 4:20 | 157:19 158:11 | **signing** 4:5 | 136:2 137:9 |
| 183:21 | 10:21 16:14 | 158:15,18 | **signs** 17:4,8 94:5 | 145:13 151:2,6 |
| **selected** 71:14 | 17:6 18:4,12 | 160:3 169:5 | **sign-in** 55:4 | 151:11 154:23 |
| 71:19 | 19:6 21:19 | 182:22 184:6 | **sign-out** 60:10 | 164:7,8,19,22 |
| **self** 29:2 | 22:22 23:9 | **sexually** 24:5 | **similar** 94:12 | 165:9,10,13,17 |
| **semester** 150:21 | 24:7,10 25:2,9 | 29:11 30:1 | 103:10 | 166:13,13,14 |
| 151:10 152:14 | 26:3,13 27:2 | 75:18 156:13 | **simply** 44:15 | 171:8 182:12 |
| 152:15 153:6 | 27:10,11,20 | 159:14 160:6 | **single** 33:14 | 188:1,2 |
| 154:16,18 | 28:9,11,16 | 183:13 | 43:12 | **social** 17:22 |
| **seminar** 26:14 | 29:3 37:11 | **sexual-abuse** | **sir** 12:2 61:8 | 27:16 110:1 |
| 93:21 94:3 | 38:7 44:2 | 84:13 123:4,15 | 90:10 92:17,19 | 186:5 |
| **seminars** 93:15 | 59:15,16 60:4 | **shared** 185:16 | 171:4 185:21 | **socializing** 17:14 |
| 94:12 | 64:15,18 66:15 | **sheet** 35:16 | 187:12,14 | **socially** 27:19 |
| **send** 39:1 54:12 | 66:16,18,22 | **sheets** 38:6 | **sit** 28:20 | **somebody** |

106:16 116:9,9
170:1
**somebody's**
137:17
**someone's** 142:8
**somewhat** 100:4
**son** 126:8,12
**soon** 152:2
187:8
**sorry** 14:13
40:10 62:1
69:4 73:23
85:12 86:19
89:4 93:11
98:15 105:1
144:23 145:5
151:21,22
152:18 172:14
176:5,7
**sort** 93:15
**sound** 56:6
**sounded** 155:4
**sounds** 135:18
135:18,19
152:12
**source** 41:11
152:7 171:22
186:23
**speak** 6:3 144:3
144:5 145:10
145:16 168:14
**speaking** 143:12
143:14,15
153:19
**special** 22:4,21
109:3,4 110:21
111:7 175:2,7
175:7,8,11
**specific** 15:15
16:18,22 19:23
21:1 22:2
76:12 86:7
89:10 148:17
**specifically** 26:5
37:18,21 65:7
65:15 76:9,10

90:5 111:8
137:21 144:14
155:7 156:3
168:15 169:4
183:4
**specifics** 100:7
**specify** 185:5
**speculate** 112:21
**speculating**
97:12,13
**spend** 16:3
**spending** 160:15
160:17 161:7
162:15,17
**spent** 16:7
121:11
**spoke** 65:4
71:11,20,22,22
102:12,16,17
141:19,20
143:22,22
155:9 166:20
166:23 167:3,7
167:10,10,10
167:11,12,12
167:13,14
168:9
**spoken** 65:2
**sprang** 176:10
**spring** 120:21
129:1
**SSA** 25:14,15
**stability** 103:3,7
**staff** 47:20 65:17
67:14,15 86:1
95:12,16 96:21
97:5 108:3
130:17 147:2
**stamp** 69:2
75:14
**stamped** 41:3,4
43:15
**stand** 20:16
**standalone**
156:18
**standards**

180:10
**standing** 156:19
156:21
**staple** 172:12
**start** 44:23
59:12 135:3,4
138:21,22
165:7 189:16
**started** 51:13
156:15
**starting** 150:15
152:22
**state** 6:12 13:13
35:18 112:5,8
116:2,3 161:11
162:19 191:4
**stated** 101:15
119:8 152:15
153:3,3 154:22
**statement** 102:7
165:8
**statements** 40:5
40:5 53:23
**States** 1:1 21:10
**status** 31:3
179:17
**Statute** 3:17 4:1
**step** 82:1,1,1
**steps** 81:14 82:3
82:4,13
**step-by-step**
84:3
**stick** 20:6
**sticky** 71:9
**stips** 6:5
**stipulate** 37:7
**stipulated** 3:6
3:18 4:3
**stipulations**
1:20 3:4
**stop** 91:4
**stopped** 10:6
134:23
**stops** 120:7
**store** 150:16,16
158:22 159:1

**stories** 154:5
**story** 106:11
135:1,18,18,19
135:19 150:20
151:3 155:4
**straight** 123:19
**Street** 1:20 2:5
**stretch** 60:5
**strike** 112:22
**struggle** 27:18
**struggling** 17:13
17:21 27:15
**student** 4:15,17
39:4,7,12,15
39:17,19,20,20
40:12 41:21
42:5,6,9,20
43:3 44:6,7
45:4,15 46:9
48:18 49:8,10
49:16,22 50:5
50:23 51:5
52:3,5,22 53:4
53:8,9,16 54:1
54:4 58:1 59:2
59:3,4,5,6
60:17 62:18,22
62:23 66:18
67:9,14 68:23
70:18 73:2,3
75:23 77:9,22
79:1,10,14
88:12 90:3
92:1 96:17
97:10 104:15
104:18 105:11
105:12,22
106:6,11
121:16 138:7
145:6 156:1
157:8 160:12
160:13,15
162:15 163:16
164:7,20,21,22
164:23 165:1,9
165:11 175:19

180:18
**students** 15:23
17:6,21,22
18:5,6,12,14
19:6,7 21:8,18
22:5 24:10,11
30:1 38:23
39:2 40:13
41:21 44:3
45:16 60:8,19
60:19,20 61:6
61:9,14 62:15
62:16 65:10,18
65:19 66:23
67:12,20 69:8
70:6 72:19
74:11,14,17
86:5 87:2,10
110:22 111:4,5
111:7 120:1,13
126:10 127:17
133:10,17
134:5 144:2,4
144:15,20
145:13 146:5,8
155:10 156:13
157:16 159:12
163:2,4,6,21
164:19 165:10
171:8,12,17
174:20 175:17
175:19 176:9
182:23 189:3,6
189:22
**student's** 71:16
**study** 21:2 25:23
**stuff** 92:18
133:3 182:10
182:11
**Suber** 65:5
71:11
**subject** 21:19
22:21
**submitted** 7:22
112:3 113:19
113:23 115:15

subsequently 116:11
substance 132:16 177:9
substantially 56:10
substantiate 171:6
substantive 34:14 57:2
substantively 56:7
successful 96:13
suggest 64:7 188:22
suggested 170:15
suggestion 172:2
suggestions 170:21
Suite 2:5
summarized 172:11
summarizing 172:16
summary 153:18
summer 186:21
summertimes 12:14
superintendent 6:16,18 7:8 8:3 8:8,18,21,22 23:3 32:9,11 35:12 54:11 87:7 95:14 117:18 118:2,7 174:11 185:20 186:3,10
superintendents 95:16
Superintende... 25:16 45:16 49:15 50:3
supervise 60:8 65:18

supervision 33:8 65:10,13,20 66:19 70:10 74:14,17 87:10 88:12 90:3 122:19,22,23 124:6 191:11
supervisor 123:10
support 139:2
supposed 63:7 120:9,10 134:11
sure 7:11 10:23 16:15,18,19 17:16,23 18:16 18:17,19,20,22 36:5,8 40:7,11 43:21 44:20 50:11 67:18 71:20 76:13 77:16 78:11,12 78:12 83:1 94:2 95:1 97:5 102:19 106:3 112:7 130:19 139:4,8,9 145:19 147:22 149:19 154:6 156:14 160:12 161:11 165:21 168:11,14 176:15 178:20 179:4,17
surface 186:19
survey 16:8 95:23
surveys 95:17 95:18
Susan 2:4 27:7 41:6 86:10 98:15
suspect 177:23
suspended 143:18,19 173:13

suspicion 79:22 156:11 157:18 158:11 159:13 160:5,7
suspicions 169:8 171:20
suspicious 173:22 187:1
Sweeney 2:12 4:9 6:6 7:14 11:13,21 18:7 18:15 19:9,11 20:2 21:20 24:12,18 27:4 27:9 28:8 29:13,16 30:3 30:5 33:4 36:12 37:7 40:7,10,19 41:6 45:21 46:3,13 48:11 48:15 58:9 61:23 63:21 67:1 77:17 79:17 81:13 86:9 98:15,23 99:13,17 100:3 103:4 107:10 108:12 109:11 110:12 111:11 113:10 157:5 163:1 181:20 181:22 185:4,8 185:15 190:1
sworn 6:3
syllabus 11:17
system 25:11 26:6,8,10 27:2 29:11 32:7 33:8,15 43:3 53:13 85:5 89:7,12 98:4 100:15 113:12 142:8 185:20 186:10
systems 63:9

80:3 169:14 173:19,21 174:3,7

**T**
take 7:14 36:8 45:7 58:23 72:12 76:21 105:6,7 127:6 138:2 142:3 163:12,13,14 163:15 172:20 183:7 187:13 187:15
taken 1:17 3:8 3:10 24:1,4 148:3 160:20 180:16 191:9
talk 84:16,18 90:15,17 92:5 106:6 122:10 125:11 140:18 145:17 146:3,4 146:8 149:7 154:1 155:5 159:10,12,16 159:19 170:15 170:18 189:2,6
talked 26:17 64:9 87:7,12 87:15,23 88:13 88:19 91:23 101:13,14 105:17 126:22 139:4 145:8 150:8 160:12 170:14 182:15
talking 15:19 22:3,4 25:9 36:6 37:2 53:15 67:5,19 73:7 75:4,13 79:10 85:22 86:5 90:13 91:19 98:6 120:11 121:23

123:20,22 133:3 151:5,6 153:6,15 159:7 168:3 189:14 189:15
talks 88:16 90:18
tapes 148:5
task 15:10
tasks 15:10,12 15:13,15,15,19 16:10 109:22
taught 10:9,11 118:4
teach 10:13
teacher 9:5 52:20 60:21,21 60:21 61:1,1 62:9,11 63:16 63:17 68:1 87:4,14,17 95:8 104:20,20 106:16 135:4,5 163:14,15 177:4
teachers 10:12 12:14 27:23 28:15 38:13 64:3,9 65:1 66:10 71:14,18 71:23 87:12,15 89:6 93:16 94:9,11,13 98:2,4 123:18 163:18
teaching 9:22 11:4,11
team 54:13 70:12,19 163:14
tech 130:18 166:8
technical 12:8 61:15 177:2,4
technician 12:9
technology

JR, A Minor                    July 24, 2007                    Pike County Board of Education

Page 215

| | | | | |
|---|---|---|---|---|
| 14:12,15 65:23 | tested 170:15 | 169:1 | thought 152:6,6 | 116:8,10 |
| 176:19,21,22 | testified 6:4 | think 7:7 9:6 | 158:15,17 | 120:17 121:10 |
| 180:7,9 | testifying 32:23 | 17:9,15,17 | 159:15 170:6 | 125:4 127:1 |
| tell 13:6 15:19 | testimony 45:14 | 20:10 21:15 | 189:20 | 132:17 133:2,7 |
| 16:16 17:2,9 | 56:21 74:6 | 22:23 23:20 | three 10:8 26:14 | 133:7,8,21 |
| 18:10 51:16 | 87:11,16 | 24:6 27:12 | 26:14 42:13 | 134:4,9 136:10 |
| 65:12 66:14 | 110:18 | 34:5 35:19 | 71:3,7 93:16 | 141:3 143:19 |
| 80:13 86:21 | textbook 10:15 | 47:18 52:8 | 107:18 113:14 | 144:16,16,16 |
| 90:21 91:6 | 11:1,14 | 56:14 65:5 | 124:8 133:16 | 145:1,1,6,12 |
| 100:22 104:5 | textbooks 11:15 | 66:11 70:7 | 134:4,11 | 145:16,20 |
| 108:15 112:23 | Thank 58:2 65:6 | 71:23 75:16 | 138:12 147:11 | 147:19 149:21 |
| 116:20 129:23 | 114:10 190:1 | 82:22,22 86:7 | 174:3,3 | 151:15 152:8 |
| 130:2 131:21 | Thanksgiving | 86:8 90:16 | tight 121:14 | 155:4,9,21,21 |
| 132:15,23 | 125:2 | 91:21,22 93:6 | 122:6,9 | 155:22,22 |
| 133:6 134:7 | thereto 191:10 | 94:8,10,14,14 | time 3:13,14 8:5 | 162:15 166:12 |
| 136:9 141:1,4 | thesis 14:19 | 94:18,20,21 | 9:17 16:3,7,11 | 169:8,20 170:9 |
| 141:7,11 | thicker 43:12 | 95:3 102:7 | 17:16 32:10 | 170:13 176:8 |
| 143:12 144:1 | thing 35:15 56:8 | 103:19 107:8 | 35:21 45:18 | 176:12 177:12 |
| 144:14 152:4,5 | 76:18 80:10,12 | 111:3,10,11 | 60:23,23 87:5 | 178:16 182:5,6 |
| 154:9 155:16 | 81:5,15,16,17 | 115:2,6 124:21 | 87:7,18 88:17 | top 32:3 138:15 |
| 155:19 159:18 | 81:17 106:21 | 124:22 125:2 | 89:23 91:5 | 164:13 173:10 |
| 166:9,11 173:7 | 119:22,23 | 127:4 131:23 | 93:5,5,9 94:7 | topic 20:12 |
| 177:20 180:14 | 124:18 125:6 | 132:3,5,6,12 | 101:18 102:16 | 22:18,19 23:6 |
| 182:10,11 | 127:11 139:15 | 132:14 133:16 | 103:12 109:4 | 87:9,17 88:1 |
| telling 70:17 | 143:20 151:16 | 137:6,6 145:20 | 119:12,14 | 96:18 97:11 |
| 151:8 | 156:21 161:7 | 149:3 150:1,2 | 120:16 121:12 | topics 22:17 |
| tells 52:9 76:14 | 165:18 176:5 | 153:9 156:5 | 125:2 126:5,6 | 23:6 24:22,22 |
| tend 135:2 174:1 | 176:10 | 157:3 158:6,8 | 127:3 128:20 | 25:20 97:19 |
| tenders 40:16 | things 11:18,20 | 162:9,9 164:15 | 129:7 134:1 | touching 76:22 |
| tenured 174:2,3 | 16:2,4,5 17:14 | 171:3,9 172:17 | 142:14 153:1 | Townsend 31:7 |
| 174:4 | 20:19,22 24:3 | 173:22 175:22 | 160:15,17 | 143:22 144:1,4 |
| ten-month 115:5 | 25:6 27:8,13 | 176:2,12 | 161:7,19 | 146:20 147:9 |
| term 6:23 7:1,2 | 27:20 28:6,7 | 179:11,11 | 162:10,15,17 | 149:10 155:21 |
| 108:6,7 125:23 | 33:18 34:16 | 181:9 187:21 | 174:11,19 | 155:22 166:19 |
| 126:1 | 40:4 46:11,20 | 187:22,22 | 176:3,6 178:16 | 167:3,9,12 |
| terminology | 52:20 53:16,20 | 189:4 | 182:21 186:12 | 168:16 |
| 137:17 | 56:15 60:2 | thinking 17:18 | 187:11 | track 61:14 63:3 |
| terms 82:1 103:6 | 61:18 65:10,11 | third 125:23 | times 102:15 | 63:8,13,20 |
| 110:9 112:13 | 66:18 70:10 | Thirty-nine 66:3 | 125:20 161:18 | 64:1 159:23 |
| 121:15,16 | 76:12,23 81:3 | Thirty-seven | titled 10:12 | tracked 62:17 |
| 155:12 188:11 | 84:3 90:13 | 66:4 | TMR 1:7 | training 4:19 |
| terrible 136:3 | 91:23 108:18 | Thomas 133:22 | today 28:20 | 16:12,13,16,19 |
| Terry 167:12 | 112:2,12 120:3 | 166:2,11,12 | 185:17 | 16:20,23 17:4 |
| 168:20 | 121:9 135:2,5 | thorough 157:14 | token 76:22 | 18:3,11 25:10 |
| test 142:3 | 137:15 139:1 | thoroughly 71:7 | told 105:3,14,17 | 26:6,7,9,18 |
| 143:20 | 145:19 157:14 | 84:1 | 115:20,22 | 86:2,16,18 |

88:5 92:15,20
93:3,21 94:9
94:23 95:4,8
95:15 96:20,23
97:2,6,7,18,21
98:18 122:14
146:19 147:2
182:21
**transcript** 191:8
191:13
**transcripts**
112:6
**transition**
120:19 121:6
**transitioned**
151:4,4
**translation**
181:20
**transport**
171:13
**transportation**
161:21
**transported**
171:17
**transporting**
163:2,3,6,16
163:20 175:17
175:19
**treated** 121:3
**treatment**
126:11
**trial** 3:22
**tried** 102:15
131:16 142:14
**trip** 61:13
**trips** 160:22
161:2,5,6
**Trooper** 161:11
162:19
**trouble** 16:22
17:14
**Troy** 1:20 6:15
9:15 10:2
12:21 13:13
93:23
**truck** 134:5,10

135:9,14
**true** 191:12
**trusting** 189:14
**truth** 6:3,3,4
157:23 163:7
178:22
**try** 63:13 188:5
**trying** 62:23
76:4 78:19
96:12 117:1
125:20 132:2
146:7 152:19
159:23 181:8
**turn** 145:2 157:9
**turned** 104:21
126:12,15,16
126:18 188:13
**tweaking** 56:3
**twelve** 13:20
**Twenty-five**
183:18,20
**Twenty-one** 9:7
**two** 9:5,19 29:10
30:1 60:1
71:23 76:8
93:16 99:8
113:13 130:17
131:4,5,6
134:4 138:12
142:16,20,21
143:2 146:8
180:6
**type** 156:9
**types** 54:3 90:20
**typical** 28:11

___U___
**uhm** 7:9 8:18
10:2 12:7 17:7
17:11,13,16
18:9,16 19:23
24:19 27:12
28:17 30:6
32:2 33:16
34:5 38:4,17
39:9 45:5,5

47:18 51:22
52:12 61:9
62:1 63:1
64:10 67:19
75:11,15,16
76:12 81:22
83:9,15,21
90:17,21 91:8
92:8 93:7
95:10 101:1
107:21 110:2
110:17 111:8
114:23 119:22
125:13 128:17
130:16 132:12
137:6 140:17
142:12 150:5
159:18 166:8
172:7 175:13
184:17
**uh-huh** 10:14,17
11:22 25:5
35:5 40:19
42:8 49:13,23
50:6 55:5,7
58:15 64:23
65:14 77:11
96:4 115:9
125:10 127:15
128:11,14
131:1 133:11
142:6 174:22
**uncertain**
178:22
**unchanged**
56:22
**uncommon**
113:11
**undergraduate**
16:19
**underneath**
150:15 166:4
**understand** 7:6
19:12,15 27:5
32:22 49:5,14
50:2 67:4

72:13 76:4
78:7 98:17
108:4 125:11
128:10 137:13
161:8 167:16
176:8,16
184:21
**understanding**
49:9 96:18
110:18 126:4
142:9 161:12
161:18 165:7
167:5
**understood**
31:19 41:9
103:13 107:21
**unfortunately**
176:18
**uniform** 126:17
157:9
**unique** 53:21
**unit** 9:4,5
**United** 1:1 21:9
**units** 34:15
**universities**
112:6
**University** 9:13
9:14,15 10:2
13:14 14:12
93:23
**unsolicited**
77:10
**unwelcome** 77:7
77:10
**unwelcomed**
77:21
**upset** 168:12
**urban** 15:3,16
**use** 14:21 65:21
65:22 69:11
79:16 80:15,17
80:19 81:20
84:8 105:12
106:17 136:22
142:11 158:1
159:22

**Usual** 6:5
**usually** 88:2

___V___
**valid** 113:20
**variables** 15:2
**variations** 15:7
**varied** 14:23
**varies** 82:1
**variety** 24:21
26:2 39:15,16
69:9 82:14
**vary** 82:5 84:6
**vehicle** 133:16
154:23 165:10
171:18
**verbal** 80:5
**verification** 4:22
112:8 117:3,11
**verified** 99:5
**verify** 116:12,17
117:4,6
**versions** 38:11
**versus** 15:6,16
15:16,18 16:5
**victim** 24:6
**victims** 29:2
**viewed** 103:12
**violate** 77:13
162:22
**violation** 163:18
**visit** 163:17
**voc** 166:8
**vote** 32:17,19
33:14
**voted** 33:19
**VS** 1:10

___W___
**Wait** 43:20 46:1
46:15 151:18
152:17,17
**waived** 3:21 4:6
**waiving** 4:1
**walked** 169:19
**want** 17:18

JR, A Minor                     July 24, 2007                Pike County Board of Education

| | | | | |
|---|---|---|---|---|
| 26:22 35:6 | 142:21 | **witnessed** | 177:5 | **0080** 101:23 |
| 43:20 48:11,19 | **welcomed** 77:12 | 154:22 | ——— | **0109** 181:21 |
| 50:11 51:23 | 77:14,21 78:1 | **Woodley** 6:15 | **Y** | **0130** 79:10 |
| 62:2 64:13 | 78:2 | **word** 62:21 | **yeah** 7:16 8:1 | **02** 93:1 |
| 65:14 67:4 | **went** 14:8 15:21 | 84:20 | 13:3 31:22 | **04-05** 46:7 58:1 |
| 76:12 84:16 | 94:5 135:17 | **worded** 108:14 | 36:20 37:4 | 119:1 |
| 113:16,16 | 138:18 139:10 | **words** 17:3 | 44:23 46:8 | **05** 114:21 115:8 |
| 114:10 122:10 | 147:20 167:18 | 25:22 74:18 | 47:18 48:17 | 162:8 173:10 |
| 145:20 149:5 | 170:11,13 | 75:2 104:17 | 51:4 75:2 | 173:12 |
| 179:2 181:16 | 172:17 178:6,7 | 156:5 162:3 | 77:15,19 78:4 | **07** 32:9 |
| 185:1,9 | **weren't** 127:23 | 182:8 | 91:20 112:7 | **095** 164:5 |
| **wanted** 14:7 | 180:5 | **work** 10:2 13:4 | 123:22 124:22 | |
| 59:19 102:19 | **West** 2:5 | 52:20 115:21 | 127:20 128:1 | ——— |
| 112:18 118:6,7 | **we'll** 11:14 | 116:3 117:20 | 130:8,14 133:5 | **1** |
| 129:20 138:20 | 26:20 48:4 | 177:13 178:2 | 134:19 137:2 | **1** 4:14 30:9,10 |
| 139:3 144:2 | 118:15 121:7 | 179:22 | 138:14,14 | 30:17 37:2,6 |
| 145:9,22 | **we're** 17:9 36:6 | **workday** 66:1 | 141:3 147:19 | 81:15 115:11 |
| 147:21 154:6 | 43:14 45:7 | **worked** 12:11 | 148:21 150:2,3 | 173:10,12 |
| 155:10,23 | 73:20 85:2 | 12:15,17,17,20 | 150:10,17 | 188:1 189:8 |
| 156:3,6 158:3 | 90:14 92:22 | 12:20,21,23 | 153:7,18,21 | **1st** 42:15 142:16 |
| 158:10,13,13 | 98:10 114:11 | 15:22 117:9 | 159:8 164:12 | **1/20** 129:14 |
| 170:6 188:20 | 121:6 130:23 | **working** 9:18 | 165:13 171:15 | **1/21** 129:15 |
| **wanting** 179:16 | 137:11 142:16 | 16:4,7 101:15 | 174:10 182:1 | **10** 100:19 |
| 179:21 182:19 | 153:6 175:6 | 101:17 | **year** 9:15 10:6 | **10th** 88:12 |
| **wants** 48:7 65:1 | **we've** 22:6 61:2 | **works** 93:23 | 11:6 14:17 | 191:18 |
| **Warren** 117:14 | 83:21 | **wouldn't** 36:1 | 31:9,17,18,20 | **10:00** 87:19 |
| 117:14 | **White** 2:12 | 63:8 64:4 | 31:23 32:7 | **10:30** 87:19 |
| **Washington** 2:9 | **wide** 23:5 24:21 | 76:19 106:13 | 35:14,14,14 | **100** 144:11,12 |
| **wasn't** 12:12 | 98:5 | 106:14,21 | 36:2,23 38:17 | 147:5,11 |
| 31:16 63:7 | **widely** 23:3 | 107:4,5 | 42:14 44:11,16 | **105** 6:15 |
| 105:12 113:6 | **wider** 78:13 | **write** 14:13 | 46:7 47:5 | **106** 133:4 |
| 139:9 155:3 | **wife** 10:7 14:6 | 143:13 173:18 | 71:17 117:16 | **107** 1:19 |
| 164:1 | **wife's** 11:7 | 180:15 185:9 | 117:17,18 | **11** 4:20 114:12 |
| **waste** 187:11 | **wind** 73:4 | 185:11 | 121:18 125:1 | 114:13 |
| **way** 56:6 57:4 | **wise** 191:16 | **writing** 114:3,4 | 125:17 127:14 | **11th** 182:13 |
| 61:17 74:14 | **withdraw** 27:19 | 130:22 133:3 | 129:1 174:7 | **112** 73:8 |
| 75:7 87:3 | **withdrawn** | 135:15 136:3 | **years** 6:20 8:19 | **114** 4:20 |
| 119:2 138:8,10 | 17:12,21 27:14 | 153:20,21 | 8:19,20,21 9:3 | **116** 4:21 |
| 143:21 149:19 | **witness** 4:4,5 6:2 | 191:11 | 9:5,6,7,19 10:8 | **117** 75:15 80:3 |
| 165:22 189:21 | 7:16 35:19 | **written** 80:5 | 20:13 21:14 | 80:13 |
| **ways** 68:18 | 45:23 47:10 | 82:9,19 83:17 | 25:19 95:21 | **118** 74:16 75:13 |
| **Wednesday** | 48:17 57:9 | 124:14 138:15 | 113:13,14 | 75:15 77:1,4 |
| 179:19 | 58:6 77:19 | **wrong** 158:4 | 130:8 162:21 | 78:8 |
| **week** 126:1 | 130:5 152:18 | **wrote** 77:4 | ——— | **12** 4:21 94:13 |
| 138:18 179:18 | 172:11 185:3 | 101:6 136:5 | **0** | 116:13,14,20 |
| **weeks** 142:16,20 | 191:13 | 137:2 140:6 | **0079** 102:7,9 | **12th** 129:11 |
| | | | | **12-month** 12:13 |

JR, A Minor                      July 24, 2007                      Pike County Board of Education
Page 218

115:3
**124** 74:16
**128** 5:1
**13** 5:1 128:5,9
171:1,3,3
179:2
**13th** 182:16
**130** 79:12
**132** 79:12
**133** 73:9
**139** 5:2 86:16
**14** 5:2 139:23
140:5 142:2
162:21 171:1,3
171:3 172:6,8
**14th** 130:12,22
130:23 131:15
**143** 88:16
**144** 88:20,22
89:5
**146** 90:3
**147** 90:15
**148** 90:17
**149** 90:18
**15** 5:3 55:3
99:19 128:16
173:2,3
**159** 92:8,23
**16** 75:4
**1726** 2:5
**173** 5:3
**18** 55:8
**18th** 126:2
**1819** 2:13
**185** 4:9
**19** 45:5
**19th** 126:2
**191** 4:10
**1996** 113:23

___

**2**

**2** 4:15 45:10,13
48:5,10,14,21
49:7 58:12
66:14 71:4
81:16 101:21

189:13
**2nd** 2:5 42:15
**2:06-CV-1120...**
1:11
**2:30** 100:10
**20** 45:5
**20th** 129:21
**2000** 113:6,19
114:1
**2002** 6:21,22
7:15 8:1 87:4
87:12 92:10
93:17 94:6
99:19 113:7,9
113:19
**2003** 6:22,23
7:13 44:19
88:12 89:9
**2004** 31:4,7
36:19 38:16
116:22 117:12
117:13,13,15
**2004-2005** 4:15
4:17 32:11
35:6,7,8,18
36:4 38:20
39:5,8 42:7
44:8,10 45:17
47:17 49:8,12
51:20 52:10,22
54:23 55:6
56:17,18,21
72:6,17 73:17
74:8 118:18
**2005** 44:12,18
44:19 48:18
56:16 91:2,5
92:4 186:22
**2006** 30:23
**2006-07** 35:3
**2007** 1:18 7:5
190:4 191:10
191:18
**201** 86:16
**202** 30:14
**21st** 129:21

**22** 45:5
**22nd** 101:7
124:23
**23rd** 114:20
**24** 45:5
**24th** 1:18 190:4
191:9
**25** 183:17,17,19
**26** 9:7
**260** 2:9
**27** 55:11

___

**3**

**3** 4:16 36:20
57:8,10,15
64:17 71:4
81:17 179:9
**30** 4:14 142:9
**30th** 115:6,8
131:21 132:9
132:11,16
140:19 176:15
179:3,18,19
**313** 36:6,11,17
56:19
**32** 67:21 68:8
**331** 36:17 56:19
**35203** 2:14
**36104** 2:5,9
**37** 47:14 55:14
**382** 43:7,16 45:5
58:12
**39** 55:17

___

**4**

**4** 4:17 58:18,22
58:23 59:13,14
63:12 64:14
71:4 81:18
**4th** 179:6,8,23
180:4
**4:30** 190:3
**419** 69:4,18
**421** 45:6 58:12
**45** 4:15 117:22
142:9

**45-day** 118:8
**46** 55:19
**461** 58:13
**473** 58:13
**49** 55:21

___

**5**

**5** 4:18 37:21
38:10,14,23
74:1,5,22
78:16
**5th** 128:15
**504** 47:4,18
**521** 43:17
**53** 56:9,11
**57** 4:16
**58** 4:17

___

**6**

**6** 4:9,19 98:11
98:12,16
**6th** 89:9,15
**600** 22:6,8,8
**615** 99:12,13
**67** 109:16

___

**7**

**7** 111:11,12
**7th** 92:3
**74** 4:18

___

**8**

**81** 102:2
**82506** 129:16

___

**9**

**9** 39:3 41:20
**9:00** 1:21
**91** 160:10
**97** 14:18
**98** 4:19

EXHIBIT 4

## AFFIDAVIT OF
## MONA WATSON

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Mona Watson, who being by me first duly sworn, deposes and says as follows:

My name is Mona Watson. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am aware of the complaint filed on behalf of student J.R. against the Pike County Board of Education stating that J.R. was sexually abused during the 2004-2005 school year at Pike County High School. I was the school counselor at Pike County High School.

I served Pike County High School as school counselor for five school years: 2000-2001, 2001-2002, 2002-2003, 2003-2004, and 200-4 until January 23, 2005.

As school counselor, I was particularly sensitive to any allegations or information concerning student abuse. In my position, I was one of the "go to" persons at the school if there was any concern about child abuse of any type, and, as pertinent to J.R., sexual abuse.

I knew J.R. He was a student at Pike County High School while I was counselor.

I knew Charles Coon, the band director, who, I understand, pled guilty in the summer of 2005 of sexual misconduct involving J.R.

At no time during the 2004-2005 school year while I was school counselor did I see or hear anything that created any suspicion or concern that Charles Coon was engaged in sexually inappropriate conduct with J.R. or any other student. Nor did anyone say anything to

1/1677198.1

me that created any concern or suspicion in my mind – not students whom I counseled; not teachers, administrators, or parents.

If I had seen or otherwise learned of anything of a suspicious nature about Charles Coon regarding inappropriate sexual conduct toward students, I would have reported it. That was my training, my responsibility, and my duty to my students.

I have had extensive training in sexual abuse. I have a Master's degree in special education with an emphasis in mental retardation. I have Master's level certification in learning disabilities and emotional conflict. I also have a Master's degree in counseling psychology.

For some 20 years – since the 1980s – I have made the subject of sexual abuse a point of study and particular focus. For the last 12 years, I have attended a week-long national symposium on child abuse. As part of this training, I have taken a 40-hour training course on forensic evaluation and interviewing sexually abused children. This training is in addition to numerous courses and clinics I have attended regarding sexual abuse.

With this professional training and with an abiding interest and concern about sexual abuse of children, I know I would have been sensitive to any suspicious signs, conduct, behavior or reference to sexual abuse of J.R. or any other student at Pike County High School and Charles Coon.

I had no such information. I would have investigated and acted upon any such information about Charles Coon's conduct if it had come to my attention.

People other than me have been sued in this case. But I want to state in the strongest possible terms that during the time I served as counselor at Pike County High School no one raised a suspicion to me that Charles Coon might be "grooming" or otherwise engaging in sexually abusive conduct with students. I cannot speak for the people sued in this case, but I can

1/1677198.1

say if any of them had any suspicion – which I understand they did not – we would have diligently investigated and turned over any information to the Department of Human Resources or law enforcement officials or both.

We have had numerous in-service training for teachers. I have discussed on numerous occasions what I look for regarding abuse, how to go about reporting sexual abuse, and the procedure to follow.

I regularly attended Building-Based Student Support Team meetings while at Pike County High School. At these meeting, we discussed what do to if there were any signs of child abuse, and in particular sexual abuse. We had such BBSST training meetings, for example, in the fall of 2004. The BBSST training lasted a full day. Karen Berry, Federal Program Director, discussed at these meetings sexual abuse, and how to recognize sexual abuse in children.

We would discuss that any teacher who suspected abuse should report it to the school counselor and then the school counselor would report the information to the principal and to DHR. By law, law enforcement officers and DHR would then investigate any suspicious information.

As I said, I never heard anything about Charles Coon while I was at Pike County High School that made me suspicious at the time that he might sexually abuse students.

I saw Charles Coon smoking on campus and reported him for this violation of school policy. I did know that Charles Coon had let a student use his cell phone and the phone had been confiscated. I did not think at the time this was out of the ordinary given band practice and schedules. I did see Charles Coon at school on a fairly regular basis. Charles Coon often asked me to come to the band room to fix his computer. In the band room I would see him

1/1677198.1)

working with the band students. Nothing I saw made me suspicious of Charles Coon or be concerned that he might sexually abuse his students.

I left Pike County High School to become the Director of the Pike County Child Advocacy Center in January of 2005. I was hired in this position because of my expertise and training in working with special education children. In this position, I do in-service training for Pike County teachers as one of my responsibilities.

Prior to leaving Pike County High School in January 2005, I can say without qualification that no one to my knowledge suspected Charles Coon of sexually abusing his students in general, or J.R. in particular. What he did is outrageous, and he deserved to be treated like a criminal.

But it is my professional opinion based on my employment at Pike County High School that sexual abuse was taken seriously, that any suspicious conduct would have been reported immediately to law enforcement officials, and misconduct would have been dealt with aggressively. At Pike County High School we did not cover up reports or suspicion of child abuse, and we had no history or record, prior to Charles Coon, of having sexual abuse of students at Pike County High School.

It is very important to me – both professionally and personally – to let the court know that while I was counselor at Pike County High School, I never suspected Charles Coon to be sexually abusing his students. Never. If I had, I would have reported it. I believed that Charles Coon was a professional and was accountable for his conduct. When I saw him smoking in violation of school rules, I reported him. And, I can assure the court if I had heard or seen anything of a suspicious nature about Charles Coon and J.R. or any other student I would have reported it to DHR or law enforcement officials.

1/1677198.1

_Mona Watson_

Mona Watson

Sworn to and subscribed before me this the _____ day of March, 2008.

Notary Public

My Commission expires: _4-17-2011_

(Seal)

GAIL LAMBERT
Notary Public, AL State al ...
My Comm. Expires A... 2011

1/1677198.1

EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,

VS.                              CASE NO.:

                          2:06-CV-1120-MEF

PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

DEPOSITION OF MONA WATSON, taken before Mary

Moore-Wynn, as Commissioner, on the 4th of September,

2007, in the offices of Pike County Board of Education,

101 West Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 10:30 a.m.

* * * * * * * * *

|  | Page 2 |
|---|---|

1         * * * * * * * * * *
2            APPEARANCES:
3  FOR THE PLAINTIFF:
4  Hon. Deanie Clark Allen
   Azar and Azar
5  260 Washington Avenue
   Montgomery, Alabama 36104
6
7  and
8  Hon. Susan Shirock DePaola
   Attorney at Law
9  1726 West Second Street, Suite B
   Montgomery, Alabama 36106
10
11 FOR THE DEFENDANT:
12 Hon. Donald R. Sweeney
   Bradley, Arant
13 One Federal Place
   1819 Fifth Avenue North
14 Birmingham, AL 35203-2104
15 ALSO PRESENT:
16 Elizabeth Ann Reed
17 Dr. Mark Bazzell, Superintendent
18
19
20
21
22
23

|  | Page 4 |
|---|---|

1  the trial of this case or used in any other manner by
2  either party hereto provided for by the Statute,
3  regardless of the waiving of the filing of same.
4      It is further stipulated and agreed by and
5  between counsel and the witness that the reading
6  and signing of the deposition by the witness is
7  hereby waived.
8                INDEX
9  MONA WATSON
10 Direct Examination By Ms. Allen          5
11 Reporter's Certificate          66
12           INDEX OF EXHIBITS
13 Exhibit Number      Description      Page Number
14 Plaintiff's Exhibit 19  Mona Watson      33
                Interview Summary of Justin Reed
15 Plaintiff's Exhibit 20  Mona Watson Notice    55
                of Deposition
16 Plaintiff's Exhibit 21  Pike Regional      58
                Child Advocacy Investigative
17                Protocol
   Plaintiff's Exhibit 22  Multidisciplinary    59
18                Team Agreement
19
20
21
22
23

|  | Page 3 |
|---|---|

1         * * * * * * * * * *
2
3
4
5
6            STIPULATIONS
7
8      It is hereby stipulated and agreed by and between
9  counsel representing the parties that the deposition of
10 MONA WATSON is taken pursuant to the Federal Rules of
11 Civil Procedure, and that said deposition may be taken
12 before Mary Moore-Wynn, CSR, as Commissioner, without
13 the formality of a commission; that objections to
14 questions, other than objections as to the form of the
15 questions, need not be made at this time, but may be
16 reserved for a ruling at such time as the deposition
17 may be offered into evidence, or used for any other
18 purpose by either party hereto, provided by the
19 Statute.
20     It is further stipulated and agreed by and between
21 counsel representing the parties in this case, that the
22 filing of the deposition of MONA WATSON is hereby
23 waived, and that said deposition may be introduced at

|  | Page 5 |
|---|---|

1            MONA WATSON
2      (Whereupon, the witness, after having first been
3  duly sworn to speak the truth, the whole truth, and
4  nothing but the truth, testified as follows:)
5          MS. ALLEN:  Usual stipulations?
6          MR. SWEENEY:  Please.
7          DIRECT EXAMINATION
8  BY MS. ALLEN
9  Q   Please state your name.
10 A   Mona Watson.
11 Q   Ms. Watson, we have talked before.  You know that
12     I am the attorney for Justin, and Susan DePaola.
13     You have met her.  We represent Justin in this
14     case against the Pike County Board of Education
15     and the individuals named.
16 A   Uh-huh.
17 Q   Have you ever been deposed before?
18 A   Uhm, no.  Not like this.
19 Q   Well, I will be asking you questions about the
20     issues in this case.  And if you don't understand
21     my question, please be sure to stop me.  And I'll
22     try to clarify it.  If you don't, and you answer
23     the question, I will assume that you understood

JR, A Minor                                    September 4, 2007 Pike County Board of Education

Page 6

1    what the question was.
2        I'll try to give you a chance, and at any
3    time, if you want to say, I need to change that,
4    add to that, clarify that, feel free to do so.
5        Have you talked to anybody prior to this
6    deposition besides us?
7  A  Since when?
8        MR. SWEENEY:  You have talked to me in
9        my capacity as attorney for the
10       Board.
11 A  Yes.  Yes.
12 Q  What did you all discuss?
13       MR. SWEENEY:  Object to the form.  She
14       is an employee of the school system.
15       And I object that that is
16       attorney/client confidential
17       discussions.
18 BY MS. ALLEN
19 Q  Where do you currently reside?
20 A  In Troy.
21 Q  What is your address?
22 A  515 West Fairview Street, Troy.
23 Q  And the zip code?

Page 7

1  A  36081.
2  Q  How long have you lived there?
3  A  Twenty-nine years.
4  Q  So, you're lifelong resident of Troy?
5  A  Yes -- well, since '73.
6  Q  Are you married?
7  A  I am.
8  Q  To whom?
9  A  Wallace Watson.
10 Q  Is this the only marriage?
11 A  Uh-huh.
12 Q  Do you have any children?
13 A  I do.
14 Q  How many?
15 A  Two.
16 Q  How old are are they?
17 A  Brandon is 27, and Brad is 24.
18 Q  Give me a little bit of your educational history
19 A  I have a BS degree in physical education and
20    recreation.  I have a Master's degree in secondary
21    education.  I have a Master's degree in special
22    education, with emphasis in mental retardation.  I
23    also have certification, Master's level

Page 8

1    certification, in learning disabilities and
2    emotional conflict.  I also have a Master's degree
3    in counseling psychology.
4  Q  Wow.  What in your education -- or have you had
5     any specific training in sexual abuse?
6  A  Yes.  Back in the '80's, late '80's, sexual abuse
7     became my point of interest and my point of study.
8     I began going to all the conferences and
9     symposiums I could in that area.  I began
10    attending the national symposium on child abuse --
11    which is a week-long training -- 12 years ago.
12    And I have been every year since then.
13        I have been to forensic evaluation and
14    interviewing of sexually abused children, which is
15    a 40-hour course.  I have been to play therapy
16    trainings.  I have been to numerous trainings on
17    sexual abuse.
18        MS. DePAOLA:  Let me stop you.
19        (Off-the-Record discussion.)
20 Q  We want to clarify:  You were not an employee of
21    Pike County Board of Education during 2004-2005,
22    were you?
23        MR. SWEENEY:  Object to the form.  You

Page 9

1     can answer.
2  A  Yes.
3  Q  Yes, you were an employee?
4  A  Uh-huh.
5  Q  So, you were an employee of Pike County Board of
6     Education during 2004 and 2005?
7  A  Uh-huh.
8        MS. ALLEN:  Can we go off the Record for
9        a second?
10       (Brief off-the-Record discussion.)
11 BY MS. ALLEN
12 Q  Back on the Record.  What we want to clarify is --
13    and we'll get to this -- but when did you leave
14    Pike County High School?
15 A  In February -- February 1st of 2005, I left Pike
16    County High School as guidance counselor and
17    became the Executive Director of the Child
18    Advocacy Center.
19 Q  Okay.  All right.  So, you've got extensive
20    training in sexual abuse?
21 A  (Witness Indicating.)
22 Q  What about training as far as mentally retarded or
23    handicapped children who are sexually abused; have

                                    3  (Pages 6 to 9)

## Page 10

1    you had training in that area?
2  A  Uhm, yes.
3  Q  Go ahead.
4  A  That's why I do what I do now.  Back in the '80's,
5    I worked with Emotionally Disturbed children.  And
6    most of those children were or had been abused in
7    some way.  Most of those children that were in my
8    class were special education students.  They all
9    were special education students.  So, that's when
10    I began my training in working with special
11    education students who had been abused.
12  Q  So, is it your experience that mentally retarded
13    or special needs children that there is a higher
14    incidence of sexual abuse among those children?
15  A  No, ma'am.
16    MR. SWEENEY:  Object to the form.  You
17      can answer.
18  A  No.
19  Q  Can you clarify what you were saying then?  You
20    said you worked with special needs kids, and it
21    was --
22  A  Well, what I meant was emotionally disturbed
23    children.  Emotionally disturbed children, a lot

## Page 11

1    of the times, end up being placed in special
2    education, because the definition of Emotionally
3    Disturbed was children who did not perform in
4    school due to an unknown reason.  And those
5    unknown reasons, a lot of the times, were due to
6    abuse or dysfunctional home environments, those
7    kinds of things.
8    I have found that through my own work, through
9    my own study, that that was the case as to
10    children who were acting out, unusual behavior
11    patterns, those kinds of things.  But that doesn't
12    mean all children ended up that way.
13  Q  Right.  Are you familiar with any studies which
14    indicate that mentally retarded, or special needs
15    kids -- and I'm not talking about just emotionally
16    disturbed -- are more vulnerable to sexual abuse?
17  A  No specific studies, no.
18  Q  So, in your experience, there is not a higher
19    incidence of sexual abuse among special needs kids
20    or mentally retarded kids?
21  A  I don't see that now.  I don't see that.  Sexual
22    abuse occurs across the board.  We have children
23    that are doctors' children, lawyers' children,

## Page 12

1    valedictorians, all the way down to mentally
2    retarded.
3  Q  Well, but, specifically, I was talking about any
4    studies or statistics that would indicate that
5    mentally retarded or special needs kids are more
6    vulnerable to sexual abuse.
7    MR. SWEENEY:  I'm sorry.  You asked her
8      about her experience, and that's
9      what she was answering.
10  Q  All right.  Then let me ask you about your -- I
11    thought I asked you about any studies or any
12    statistics that you were aware of.
13  A  I have statistics that we have been tracking since
14    2002.  There is no indication in our statistics
15    that indicate any certain group of children is
16    more apt to be sexually abused as any other group.
17  Q  So, when you say you have been tracking
18    statistics, from what group, what kind of control
19    group?
20  A  Our Pike County, Bullock County, Coffee County.
21  Q  Oh, okay.  So, you have records of those students
22    that you have been tracking that are mentally
23    retarded versus those that are not?

## Page 13

1  A  Having their specific disabilities, no.  No.
2  Q  Are you saying that you have never reviewed any
3    professional literature that indicated that
4    mentally retarded -- and I don't want to eliminate
5    any kind of special need that has to do with
6    intelligence -- but that mentally retarded
7    children are not more vulnerable to sexual abuse?
8  A  I won't say that I haven't.  I review a lot of
9    literature.  My emphasis when I am reviewing
10    literature is signs and repercussions -- what
11    causes children to become abused.  I don't look at
12    a particular type of child.  That's just not been
13    my field of study.
14  Q  You mentioned signs.  What would be some of the
15    signs that you would look for in a child that had
16    been sexually abused?
17  A  I do a lot of inservices and a lot of speeches, or
18    whatever, on this area.  And there is no set rule
19    of signs.  People like to think that children that
20    have been abused are withdrawn.  They -- you know,
21    they tell somebody right off.  They may act out
22    sexually.  I'm just pulling a few off the list
23    that most people think is the way it should be.

4  (Pages 10 to 13)

JR, A Minor                                  September 4, 2007 Pike County Board of Education

---

Page 14

1  But that's not the way it should be, because some
2  children -- I mean, there is not a book written
3  anywhere that says this is the signs that sexually
4  abused children always have, because that's not
5  the case.
6  Q  **All right.  There are no signs that say that these**
7  **are the -- there is no indication that these are**
8  **the signs they always have, but what are some of**
9  **the signs that you see in sexually abused**
10 **children?**
11 A  Some of the signs that I see common, sexually
12 acting out.  Uhm, usually, some type of change in
13 behavior from before and after.  Maybe a change in
14 grades before and after.  Withdrawing from
15 friends, those kinds of things.
16 Q  **You have an expertise in the area of sexual abuse?**
17 A  Uh-huh.
18 Q  **Have you ever done any seminars or been asked to**
19 **do any seminars or training by the Pike County**
20 **Board of Education?**
21 A  I do inservice with all the teachers in all the
22 schools since I've taken on this capacity at the
23 Child Advocacy Center.

---

Page 15

1  Q  **And when did you take on that capacity at the**
2  **Child --**
3  A  February of 2005.
4  Q  **All right.  Prior to February of 2005, did you**
5  **ever do any seminars or training on sexual abuse?**
6  A  As counselor?
7  Q  **In any capacity.**
8  A  Uhm, I can't remember dates, but there have been
9  many times that I would talk to the faculties of
10 whichever school I was at at the time about
11 reporting and our procedure as far as reporting
12 and what to look for and those kinds of things as
13 counselor.
14 Q  **Did you do any specific seminars at Pike County**
15 **High School?**
16 A  No.  Other than just that.
17     MS. DePAOLA:  We want to know the
18          specifics, please.  When you did
19          these seminars.
20 Q  **Right.  When you did it, what materials --**
21 A  No.
22 Q  **-- if any, did you disseminate?**
23 A  No.  Not at Pike County High, not as counselor.

---

Page 16

1  Q  **In any capacity.**
2  A  As Executive Director of the Child Advocacy
3  Center, in the -- I believe in the fall, last
4  fall, I believe we did the mandatory reporter.
5  Q  **I'm talking about prior to 2005.**
6  A  No.  No.
7  Q  **Do you know Justin Reed?**
8  A  Yes.
9  Q  **You know that Justin transferred from Pike County**
10 **High School to Charles Henderson.**
11 A  Un-huh.
12 Q  **Did you play any role in that?**
13 A  I did.
14 Q  **What was that?**
15 A  I wrote a letter recommending -- because his mom
16 had asked me to do so -- recommending that he be
17 allowed to transfer to Charles Henderson just
18 because of any repercussions that he might get
19 from other children or anything like that.
20 Q  **Did you feel like a transfer was in his best**
21 **interest?**
22 A  Uhm, personally, I don't know.  I really don't
23 know if that was the best thing for him to do.

---

Page 17

1  Justin has a hard time getting along with other
2  children.  Has a hard time making friends.  He has
3  a hard time talking to people.  I was concerned
4  about that, changing schools and not knowing
5  anyone.
6  Q  **And what was the reason that he would be changing**
7  **schools?**
8  A  Because his mother was concerned that he would be
9  getting a lot of teasing and repercussions from
10 the other children due to what had happened with
11 him and Mr. Coon.
12 Q  **So, you were aware of what had happened with**
13 **Justin and Mr. Coon?**
14 A  Yes.
15 Q  **And you were concerned about him transferring,**
16 **because you knew that Justin had difficulty making**
17 **friends --**
18 A  That was a concern.
19 Q  **-- and that he was withdrawn and had difficulty**
20 **talking to people?**
21     So, transferring, in your opinion, was a mixed
22 **blessing?**
23 A  Yeah.

---

5  (Pages 14 to 17)

JR, A Minor                                    September 4, 2007 Pike County Board of Education

---

Page 18

1  **Q  Do you recall what you put in the letter that you**
2  **wrote to Troy City schools requesting the**
3  **transfer?**
4  A  Actually, I directed the letter to the Pike County
5  Board, I believe, asking for permission for him to
6  transfer to Charles Henderson.
7  **Q  Do you recall what you put in that letter to the**
8  **Pike County Board?**
9  A  Not exactly. I sure don't.
10 **Q  I don't think I asked you this:  When did you**
11 **start as guidance counselor at Pike County?**
12 A  2000.
13 **Q  So, you started in 2000, and your last day at Pike**
14 **County was in February of 2005?**
15 A  Five. Uh-huh.
16 **Q  And, specifically, you left Pike County for what**
17 **reason?**
18 A  To become Director of the Child Advocacy Center.
19 **Q  What was the purpose of the Child Advocacy Center?**
20 A  The purpose of the Child Advocacy Center is to do
21 interviews of children that have been sexually
22 abused that are referred to us by the Department
23 of Human Resources or law enforcement. We do

---

Page 19

1  courtesy interviews. We do not set up the
2  interviews. We do not solicit the interviews. We
3  do them as a courtesies for the Department of
4  Human Resources and law enforcement..
5  **Q  So, there was no Child Advocacy Center prior to**
6  **February --**
7  A  No.
8  **Q  -- of 2005?  All right.  Where were those**
9  **interviews and that sort of intervention done?**
10 A  I have done interviews for a number of years at
11 the DA's office or at law enforcement -- for law
12 enforcement or at the DA's office. They did them
13 themselves.
14 **Q  While you were working at the Pike County High**
15 **School?**
16 A  Yes.
17 **Q  So, explain to me exactly who your employer is.**
18 **When you were -- as an employee of the Child**
19 **Advocacy Center, are you an employee of the Pike**
20 **County Board of Education?**
21 A  I am. Do you want me to explain that?
22 **Q  Were you an employee of the Pike County Board of**
23 **Education -- you were an employee of the Pike**

---

Page 20

1  **County Board of Education while you were a**
2  **guidance counselor at Pike County High School?**
3  A  Yes.
4  **Q  And then when you left Pike County and went to the**
5  **Child Advocacy Center, you were still an employee?**
6  A  Technically.
7  **Q  All right.  Explain that.**
8  A  Okay. When I was hired as Director of the Child
9  Advocacy Center, we had formed a board. I am a
10 separate entity of the Pike County Board. I am
11 not -- I am a separate -- I work under a separate
12 board. I have a board who directs what we do, how
13 we do it. That board is directed by the Alabama
14 Network of Children's Advocacy Centers. I am
15 employed by the Pike County Board of Education due
16 to a partnership that was formed between the Pike
17 County Board and the Child Advocacy Center Board
18 to basically retain my retirement. Funds that pay
19 my salary is paid to the Pike County Board of
20 Education through grants. Pike County Board of
21 Education does not pay me a cent from their funds.
22 All monies that are paid to me is paid to me
23 through grants and monies that are raised through

---

Page 21

1  the Child Advocacy Center.
2  **Q  All right.  You said you were working under a**
3  **different board than the Pike County Board of**
4  **Education.  Explain that.**
5  A  I am under the Pike County Board of Education as
6  far as hiring and firing and all of those kinds of
7  things. But as far as what we do and how we do it
8  at the Child Advocacy Center, we have a separate
9  board that is in no way connected to the Pike
10 County Board of Education.
11 **Q  So, in 2005, when you became Director of the Child**
12 **Advocacy Center, you were -- let me get back to**
13 **that.  Let me make sure I understand what you have**
14 **said.  I will go back and review that.**
15 **Tell me what your responsibilities were as far**
16 **as counselor at Pike County High School.**
17 A  At Pike County High School, I was responsible for
18 scheduling, scholarships, planning -- four-year
19 plans for the children, you know, getting them
20 ready for college, helping them get into college,
21 doing scholarships and grades and that kind of
22 thing, as well as counseling. I tried to do a
23 little counseling when I could. But as a high

---

6  (Pages 18 to 21)

JR, A Minor                    September 4, 2007 Pike County Board of Education

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    school guidance counselor, you don't have that
2    much time.
3  **Q  How involved were you in discipline matters at**
4    **Pike County High School?**
5  A  I was not involved in discipline.
6  **Q  Whatsoever?**
7  A  I would say a lot of times when a child was --
8    gotten into some type of trouble or something,
9    then the principal or assistant principal would
10   refer them to me for counseling as part of
11   their -- due to what had happened.
12 **Q  Were you required or did you attend BBSST meetings**
13   **while you were counselor at Pike County High**
14   **School?**
15 A  BBSST, yes.
16 **Q  Was there ever any any discussion or training at**
17   **BBSST meetings that related to sexual abuse?**
18 A  Uhm --
19 **Q  Did the topic ever come up?**
20 A  Yes. Uhm, BBSST training was about making sure
21   that children receive the appropriate educational
22   placement and academic help as well as what to do
23   if they were showing signs of any other problems,

**Page 24**

1  A  Isn't that what you asked me?
2  **Q  That's what I was asking. You're taking about**
3    **Pike County High School. So, you had one or two**
4    **meetings and --**
5  A  Training dates. And then we had a committee
6    formed.
7  **Q  So, you don't recall any specific -- or if there**
8    **was any specific training on recognizing sexual**
9    **abuse?**
10 A  We always discuss that. That's part of the
11   training procedure.
12 **Q  All right. So, can you tell me what was**
13   **discussed, any materials that were given out, who**
14   **led the discussion?**
15 A  Karen Berry usually did the training on BBSST.
16   And then we would talk about specifics. That's
17   been four years ago. I cannot remember exactly
18   who did what at that particular time.
19 **Q  Can you recall any discussion about recognizing**
20   **sexual abuse in children?**
21 A  That was part of the training, yes.
22 **Q  Right. Can you recall any of the discussion --**
23 A  No.

| Page 23 | Page 25 |
|---|---|

**Page 23**

1    you know, who to go to, who to call, who to
2    contact, that kind of thing.
3  **Q  Was there any specific training at those meetings**
4    **on recognizing sexual abuse, what to do if it was**
5    **suspected, that sort of thing?**
6  A  Yes.
7  **Q  When? Tell me when. During the 2004 school year,**
8    **did you have any specific trainings at BBSST**
9    **meetings?**
10 A  We always did BBSST training in the fall when
11   school first started.
12 **Q  So, in 2004, when school first started, you had**
13   **some specific training on recognizing sexual**
14   **abuse?**
15 A  I would say, yes. But I'm not -- I mean, I'm
16   almost positive. But I couldn't say what date.
17 **Q  So, you can't recall — how many meetings did you**
18   **have in the fall?**
19 A  In training, BBSST training?
20 **Q  Right.**
21 A  I think it's one day of training, possibly two.
22 **Q  You're talking about Pike County High School,**
23   **right; at Pike County High School?**

**Page 25**

1  **Q  None of it?**
2  A  That's been --
3  **Q  Any of the discussion about recognizing abusers?**
4  A  I have given so many seminars since that date on
5    recognizing the abusers and signs of sexual abuse,
6    I cannot pinpoint one time back four years ago.
7  **Q  Did you discuss any policy or procedure that the**
8    **Board might have for reporting --**
9  A  Yes. Yes.
10 **Q  All right. What was that?**
11 A  Procedure, we had -- we have -- well, we had a
12   procedure throughout the County that if a
13   report -- if a teacher suspected that there was
14   any type of abuse or any problem dealing with a
15   child that might interfere with their academic
16   progress to report it to the counselor. And then
17   the counselors were usually the reporters after
18   they told the principal.
19 **Q  The counselor reported it to the principal, and**
20   **then who did the counselor report it to?**
21 A  Department of Human Resources.
22 **Q  Is this written down anywhere in any school Board**
23   **policy or procedure manual?**

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
Court Reporting Services

Page 26

1  A  It's in our -- again, that's been four years ago.
2     It's in our policy and procedure book now on
3     mandatory reporter.  But back then, I think it was
4     just basically an accepted fact.  That's the way
5     we did it.
6        In the State of Alabama, there is not a set
7     way that it has to be done.  It's usually adopted
8     by each individual school system as to how they do
9     it.  And as I go out and speak to all these
10    schools now, I make sure I tell them how important
11    it is to have, you know, a procedure in place.
12       But as far as whether it's written down, I'm
13    not sure.
14 Q  **So, you never saw any Pike County Board of**
15    **Education policy or procedure for reporting sexual**
16    **abuse?**
17          MR. SWEENEY:  Object to the form.
18 A  I believe --
19          MR. SWEENEY:  You can answer.
20 A  I believe it's in our policies and procedure book.
21    But I am the one that usually did the inservices
22    on that.  So, I am not sure.
23 Q  **Had you ever seen any Pike County Board policy or**

Page 27

1     **procedure on investigating sexual abuse**
2     **allegations?**
3  A  Absolutely not.  That's not the purpose of the
4     Board.
5  Q  **Excuse me?**
6  A  The Board does not investigate child abuse.  That
7     is done by law enforcement or Department of Human
8     Resources.
9  Q  **So, the Board does not do any investigations of**
10    **child abuse allegations in schools?**
11 A  If it's done by a Board employee, then they would
12    do their investigation as far as that goes.  But
13    as far as investigating a child abuse allegation
14    of any sort, no.  If it involves a Board employee,
15    yes.
16 Q  **All right.  If a school -- if there is an**
17    **allegation, as in this case, of a teacher sexually**
18    **abusing a child, is there a Board policy and**
19    **procedure to do the investigation, how to handle**
20    **the investigation?**
21 A  That would be administrative handbook.  And I was
22    not an administrator.  I don't know.
23 Q  **So, have you ever seen anything like that?**

Page 28

1  A  Administrative handbook?  No.
2  Q  **Have you ever seen a Board, a written policy or**
3     **procedure put out by the Pike County Board of**
4     **Education that -- that informed its employees of**
5     **how to investigate sexual abuse allegations?**
6  A  It's made mention to in our policies and
7     procedures.  But as far as exactly what's done,
8     no.
9  Q  **No procedure that you have ever seen?**
10 A  Basically, I am -- I think I remember it being
11    mentioned in our policies and procedures, but as
12    far as exactly what's done, that's in our
13    administrative handbook.  And that's for
14    administration.
15 Q  **When you say administrative handbook, what are you**
16    **referring to?**
17 A  Administrators have their own -- have a handbook
18    that --
19 Q  **As a guidance counselor in the school, would it**
20    **not be part of your responsibility to know the**
21    **procedure for investigating a sexual abuse --**
22 A  Of a Board --
23 Q  **-- (inaudible).**

Page 29

1           THE COURT REPORTER:  I'm sorry.  I
2     missed part of that.
3  Q  **As a guidance counselor in a school, would it not**
4     **be part of your responsibility to know what the**
5     **procedure was to investigate sexual abuse**
6     **allegations by a Board employee?**
7  A  No.
8  Q  **That would not be part of your --**
9  A  No.
10 Q  **-- responsibility?**
11 A  Okay.
12          MS. DePAOLA:  Even when a student is
13    involved?
14          MS. ALLEN:  Pardon?
15          MS. DePAOLA:  Even when a student is
16    involved?
17          THE WITNESS:  My responsibility as a
18    guidance counselor is to report to
19    the proper authorities what has been
20    suspected or allegations -- or any
21    allegations that have been made.
22          My position as a Board
23    employee, as a guidance counselor,

8  (Pages 26 to 29)

Page 30

1        is not to investigate. That's not
2    my job.
3    BY MS. ALLEN
4    Q   Okay. I didn't ask you if that was your job to
5        investigate. I asked you was it your job to know
6        what the procedure to investigate is; what the
7        Board procedure to investigate is.
8    A   No. My job -- that would be left up to the
9        administrators.
10   Q   When did you first become aware of any allegations
11       of sexual abuse by Mr. Coon?
12   A   In July of 2005.
13   Q   Can you tell me how you became aware of the
14       allegations?
15   A   Uhm, I was contacted by the Department of Human
16       Resources and law enforcement to do an interview
17       of Justin Reed due to allegations that were
18       made -- or reported to law enforcement.
19   Q   Did you hear about the allegations of sexual abuse
20       of Blake Faulkner before you heard about the
21       allegations against Justin Reed?
22   A   Yes.
23   Q   Were you called by the Department of Human

Page 31

1        Resources to do an interview of Blake Faulkner?
2    A   No.
3    Q   Why would that be?
4    A   Because the alleged abuse occurred in Butler
5        County.
6    Q   So, the Child Advocacy Center in Butler County
7        would have done that interview?
8    A   I would hope so.
9    Q   So, you never interviewed Blake Faulkner?
10   A   No.
11   Q   Did you ever interview anyone other than Justin
12       Reed?
13   A   Uhm --
14   Q   Relative to any sexual abuse claims by Mr. Coon.
15   A   No, not until we interviewed Joey.
16   Q   Okay. All right. I want to talk to you about the
17       interview with Justin. When was the first time
18       you interviewed Justin?
19   A   I believe it was on July 13th.
20          MR. SWEENEY: I'm sorry. What was the
21          date?
22          THE WITNESS: 13th.
23          MR. SWEENEY: Of what month?

Page 32

1          THE WITNESS: July.
2    BY MS. ALLEN
3    Q   Of '05?
4    A   Uh-huh.
5    Q   And you did this interview at the request of who?
6    A   Law enforcement.
7    Q   Specifically, who called you from law enforcement?
8    A   Bob Bradbury, Investigator.
9    Q   Where did the interview take place?
10   A   At the Child Advocacy Center.
11   Q   To your knowledge, was this the first time Justin
12       had been interviewed by anybody?
13   A   I'm sure law enforcement had done preliminaries.
14       But I'm not sure.
15   Q   Does the procedure allow for law enforcement to do
16       any interviewing before you do the interview?
17   A   The procedure is if a allegation comes in to law
18       enforcement or to the Department of Human
19       Resources, they get just the preliminary
20       information, basic information, and then they set
21       the interview up at the Child Advocacy Center.
22       The purpose of that is to keep that child from
23       having to go through the -- you know, the whole

Page 33

1        thing over and over and over again.
2    Q   So, Mr. Bradbury called you and asked you to
3        interview Justin. And interview held on July 13th
4        of '05?
5    A   During that week.
6    Q   Who was present at that interview?
7    A   Bob Bradbury with the Pike County Sheriff's
8        Department, and Misty Hubbard through the
9        Department of Human Resources, and myself. And I
10       believe that was all.
11   Q   Was the DA present at the interview?
12   A   No.
13   Q   Okay. I want to introduce this as an exhibit.
14       Would you tell me what that is?
15   A   It's just a brief summary of the interview.
16          MR. SWEENEY: What are we marking this
17          as Exhibit what?
18          MS. ALLEN: Exhibit 19. Plaintiff's
19          Exhibit 19.
20          (Whereupon, Plaintiff's Exhibit 19
21          was marked for identification and
22          is attached hereto.)
23

9  (Pages 30 to 33)

JR, A Minor                    September 4, 2007 Pike County Board of Education

| Page 34 | Page 36 |
|---|---|
| 1 BY MS. ALLEN | 1 Q So, do you have any idea what happened to the |
| 2 Q If you will notice where it says present at | 2 tape? |
| 3 forensic interview -- | 3 A The -- once the tape is turned over to law |
| 4 A Uh-huh. | 4 enforcement, it's submitted as State's evidence. |
| 5 Q -- who does it say was present? | 5 Q Okay. So, that was the first interview that you |
| 6 A Mona Watson, Misty Hubbard, and Bob Bradbury. | 6 had with Justin. And then Plaintiff's Exhibit 19 |
| 7 Q And -- | 7 says the date of interview was 7/14/05? |
| 8 A DA. | 8 A Right. |
| 9 Q Who would that have been? | 9 Q Is that correct as far as you're concerned? |
| 10 A Viewed by the DA. | 10 A Yes. |
| 11 Bruce Matthews with the DA's office viewed the | 11 Q You summarized the interview; is that correct? |
| 12 tape. | 12 A Base -- yes. That's basically just a brief |
| 13 Q So, is Bruce Matthews a DA? | 13 summary of what was stated in the interview. |
| 14 A No. He's an investigator through the DA's office. | 14 Q Can you tell us what your summary says? |
| 15 Q So, explain. Was he actually present -- | 15 MR. SWEENEY: The best evidence is the |
| 16 A No. | 16 report. |
| 17 Q -- at the interview? | 17 Q All right. Well, I want you to tell me in your |
| 18 A I -- I don't think so. He was not there. That's | 18 own words what Justin said in that interview. |
| 19 not the norm for the DA to be there. The norm is | 19 MR. SWEENEY: Object to the form. If |
| 20 for him to view the tape. The norm is not for him | 20 the summary is the best evidence, do |
| 21 to be there. | 21 you want her to read what's in the |
| 22 To clarify that a little bit, when we do an | 22 document? |
| 23 interview, the only person in the room with the | 23 MS. ALLEN: No. I want her to tell me |

| Page 35 | Page 37 |
|---|---|
| 1 victim, or the alleged victim, is myself. This | 1 from her recollection what Justin |
| 2 was a little bit unusual that day, because Misty | 2 told her in that interview. |
| 3 Hubbard actually sat in on the interview with me. | 3 MR. SWEENEY: Have you put that down in |
| 4 We no longer do that. | 4 your summary? |
| 5 But the DA normally is not there during the | 5 THE WITNESS: Uh-huh. |
| 6 interview. | 6 MR. SWEENEY: Well, if you will, rather |
| 7 Q And do you recall him being there during that | 7 than second guess that, if you will |
| 8 interview? | 8 just read the summary. |
| 9 A Bruce? He might have been. I know now he would | 9 MS. ALLEN: No, no, no, no. I want to |
| 10 not have been. But at that time, he might have | 10 know -- |
| 11 been. | 11 MS. DePAOLA: Now, wait a minute Donald. |
| 12 Q Was Bob Bradbury there during that interview? | 12 We're entitled to her answering the |
| 13 A I don't think so. I don't -- really, I don't | 13 question. |
| 14 think so. I think that he actually viewed the | 14 MR. SWEENEY: You have introduced an |
| 15 tape at a later date. | 15 exhibit that's the best evidence of |
| 16 Q All right. Tell me about the tape. Was it an | 16 what took place two years ago. And |
| 17 audio as well as a videotape? | 17 now you're asking her to -- |
| 18 A It's a DVD tape. It's audio and video. | 18 MS. ALLEN: To try to recall -- |
| 19 Q What happened to the tape? | 19 MR. SWEENEY: -- (inaudible) what she |
| 20 A The tape is turned over as State's evidence to the | 20 remembers. I object to the |
| 21 DA's office. | 21 question. |
| 22 Q And who was the tape turned over to specifically? | 22 BY MS. ALLEN |
| 23 A Bob Bradbury. | 23 Q I would like for you to recall to the best of your |

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
Court Reporting Services

JR, A Minor                          September 4, 2007 Pike County Board of Education

Page 38

1  ability what Justin said to you in that interview.
2  MR. SWEENEY: Let's take a break. And
3  if you will read the document, and
4  then respond to the question. But
5  if you will, read that summary in
6  it's entirety.
7  (Witness reads document.)
8  THE WITNESS: Okay.
9  MR. SWEENEY: Is that more than one
10  page?
11  THE WITNESS: No, this is it.
12  MS. ALLEN: We're back on the Record.
13  BY MS. ALLEN
14  Q  Would you please, Ms. Watson, to the best of your
15  ability, tell me what you recall about that
16  interview with Justin?
17  A  The thing I recall the most about that interview
18  is that Justin had a very difficult time talking
19  about it. He had a very difficult time
20  verbalizing it. He said that Mr. Coon had him
21  perform oral sex on him on several occasions. He
22  said that some of the time it occurred in the band
23  room at Pike County High School. And he said that

Page 39

1  he would have him sit on the steps that led down
2  to the band room from the side door -- that he
3  would have him sit on the steps, and that Mr. Coon
4  would unzip his pants and have him perform oral
5  sex on him.
6  Q  How long did the interview last?
7  A  A long time. It was probably around an hour, hour
8  and a half.
9  Q  And to the best of your recollection, it was just
10  you and Misty Hubbard in the room?
11  A  I know that's --
12  Q  Is that what you said?
13  A  Yes.
14  Q  You think that Bob Bradbury might have been in the
15  room, though?
16  A  Not in our room, no. He might have been in an
17  observation room.
18  Q  But you're sure that he wasn't present during the
19  interview?
20  A  Positive.
21  Q  Okay. But he was observing from another room,
22  Bob?
23  A  If he was not in the other room, he -- I think I

Page 40

1  remember him having to leave during that
2  interview. But as I said, we were taping the
3  interview. So, the only people that were actually
4  in the room during the interview was Misty Hubbard
5  and myself.
6  Q  All right. What happened after the interview?
7  What did you recommend? So, you don't think Bob
8  Bradbury was still there?
9  A  I don't remember.
10  Q  Okay. That was the first interview done with
11  Justin. Do you know when another interview was
12  done with Justin?
13  A  By me?
14  Q  All right. As I recall, Justin gave an interview
15  to Mr. Bradbury and Bruce Matthews. Okay. That
16  was provided as one of the discovery documents.
17  Whose idea was that that he give that interview to
18  them; that they interview him?
19  A  Not mine.
20  Q  Were you present during that interview?
21  A  No.
22  Q  Should they have conducted that interview if they
23  were not trained forensic interviewers?

Page 41

1  A  Was this after my interview or before?
2  Q  After your interview.
3  A  They were trying -- now, I do not investigate.
4  All I do is interview.
5  Q  I understand.
6  A  What they decide to do is their decision. Should
7  they have? Probably because of the fact that we
8  had such a hard time getting information from
9  Justin during the interview.
10  Q  Excuse me just a minute, please.
11  (Off-the-Record discussion.)
12  BY MS. ALLEN
13  Q  Did you indicate to Mr. Bradbury what Justin had
14  told you in the interview?
15  A  Yes.
16  Q  Did you indicate to Mr. Bradbury that it might be
17  a good idea for him to try and get that
18  information -- get Justin to admit to that
19  information to them?
20  A  Yes.
21  Q  Okay. So, did an interview follow?
22  A  I don't know.
23  Q  How would they have gotten the information if they

11 (Pages 38 to 41)

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 42

1    did not interview Justin personally?
2  A  That would be the only way they got the
3    information.  Unless I went over with them what
4    was stated in the interview because Justin was
5    speaking so low and so quietly during the
6    interview that they could not understand him on
7    the DVD.  So, the only way that we could possibly
8    get enough information for them to prosecute would
9    be for Justin to talk directly to them, which he
10    would not do.
11  Q  How did you know he wouldn't do that?
12  A  Because we agonized over that.  We wanted Justin
13    to tell them.
14  Q  Who is "we"?
15  A  Everyone involved.  We wanted -- Bob Bradbury,
16    Bruce Matthews, myself -- we wanted him to be able
17    to tell.  But he wouldn't.  He couldn't.
18  Q  Is it unusual for a mentally retarded child to
19    have difficulty talking about sexual abuse?
20  A  It's hard for any child to talk about sexual
21    abuse.  Not just a mentally retarded child.
22  Q  Would it be, in your educational experience, be
23    more difficult, or could it be more difficult for

Page 43

1    a mentally retarded child to talk about sexual
2    abuse?
3  A  In Justin's case, it was more of a
4    humiliation-type situation, more so than his
5    disability.  Justin is not that low mentally.
6  Q  Okay.  Explain what you mean by more of a
7    humiliation issue.
8  A  He was embarrassed.  He was a 15-year-old young
9    man.  He was embarrassed.  He didn't want to talk
10    about it.  He talked about it to me, but he didn't
11    want to talk about anyone else.  He wanted it to
12    go away.  He wanted it to stop.
13  Q  Did Justin articulate to you that he was
14    embarrassed?
15  A  Yes.
16  Q  Did he ever articulate to you that he felt guilty?
17  A  Yes.
18  Q  All right.  Let's get back to -- all right.  That
19    was the initial interview that you did.  There was
20    an interview with Mr. Bradbury and Bruce Matthews
21    after that.  Did you have any other interviews
22    with Justin?
23  A  Not official interviews, no.

Page 44

1  Q  So, that was the only official interview that you
2    had?
3  A  Right.
4  Q  You did end up meeting with Justin, counseling
5    with Justin?
6  A  I talked with Justin on several occasions.  Joey
7    and Jessica and Justin were coming in for
8    mentoring, which is a program that we do, as big
9    brother, big sister type just to help them deal
10    with what had happened.  They did not discuss what
11    had happened with their mentors.  I personally
12    talked with Justin.  I wanted Justin to be able to
13    tell what had happened to him.  He just -- he just
14    didn't want to.  He was receiving counseling
15    originally in Montgomery, so I did not do
16    counseling him, technically.  Even though we
17    chatted a lot.
18  Q  Do you know how the sexual abuse allegations
19    became known to begin with, initially, against
20    Mr. Coon?
21  A  Referring to Blake or Justin?
22  Q  Period.  Yeah, Blake first.  I assume that was
23    when it first came out.

Page 45

1  A  I under -- when the interview was set up with
2    Justin, then I was told what else had happened
3    with Blake.
4  Q  All right.  Were any other potential victims
5    mentioned?
6  A  Uhm, we felt like there might be.  But we didn't
7    know that.  Some names had been mentioned.  But we
8    had no way of knowing.
9  Q  Do you recall what those names were?
10  A  Uhm, Blake, of course -- and Justin -- Justin's
11    name did not come out until quite a period of time
12    after Blake, I believe.  And the only reason
13    Justin's name came out was because Justin's -- I
14    think his number was in Blake's phone or something
15    like that.  I think that's where some of the names
16    had come out.
17        MS. DePAOLA:  She didn't answer the
18    question.
19        MS. ALLEN:  Would you read the question
20    back?
21        (Whereupon, the requested material
22        was read by the Court Reporter.)
23  A  Just speculation, just word of mouth.  Justin,

12  (Pages 42 to 45)

JR, A Minor                          September 4, 2007 Pike County Board of Education

| Page 46 | Page 48 |
|---|---|

Page 46

1   Blake. Uhm, I think Adam's name was mentioned. I
2   am not sure. That is strictly off the Record.
3   That is just hearsay.
4   Q   Adam who?
5   A   Helms.
6   Q   Did you hear, or were you told, that Justin's name
7       came up because it showed up on Mr. Coon's
8       computer?
9   A   On Mr. Coon's computer?
10  Q   Right.
11  A   I don't --
12  Q   That when a search warrant was issued, and his --
13  A   I believe so, yes.
14  Q   Were any other names mentioned as having come up
15      on Mr. Coon's computer?
16  A   Yes. But I was not at liberty to know that. I am
17      not a part of the investigation.
18  Q   I understand that. But were you told any other
19      names that came up on the computer?
20  A   I believe -- well, Blake's name. I think Adam's
21      name was mentioned. And Justin's. And Jessica's.
22      You know, he was e-mailing a lot of the kids.
23  Q   Anybody else that you can recall?

Page 47

1   A   I would be afraid to say. I can't remember
2       exactly.
3   Q   Okay. So, who told you about the names that
4       showed up on the computer, on Coon's computer?
5   A   I believe Bob Bradbury told me about that.
6   Q   Uhm --
7   A   When we were reviewing the case before the
8       interview.
9   Q   All right. Were you familiar with the
10      investigation that was done by the school based on
11      reports to the school of inappropriate behavior by
12      Mr. Coon?
13          MR. SWEENEY: Object to the form.
14  Q   Were you aware of the investigation?
15  A   No.
16  Q   Were you aware of any reports made to the school
17      by anyone regarding any inappropriate behavior?
18  A   When we received -- when I was asked to do this
19      interview with Justin, I did not know any of that.
20  Q   No, I'm talking about in April or --
21  A   No. I did not know --
22  Q   -- in 2005, did you know that any reports were
23      made to the school?

Page 48

1   A   No.
2   Q   Have you ever heard that?
3   A   I've heard that later.
4   Q   When did you hear that?
5   A   It was during MDT talking about the case.
6           MS. DePAOLA: What's MDT?
7           THE WITNESS: MDT is multidisciplinary
8               team meetings. That's when all the
9               agencies are involved in a case come
10              together to discuss a case.
11  BY MS. ALLEN
12  Q   When would that have been?
13  A   We do it the second Tuesday of every month.
14  Q   When would the MDT meeting have been when you
15      first heard about --
16  A   Probably the first Tuesday of August -- second
17      Tuesday of August in --
18  Q   What year?
19  A   -- 2005.
20  Q   So, you didn't have any idea that anybody had
21      reported any inappropriate behavior of Mr. Coon
22      until August of 2005?
23          MR. SWEENEY: Object to the form.

Page 49

1   A   That's true. I had no way of knowing. I was no
2       longer at the school. I was too busy trying to
3       get a Child Advocacy Center started. I did not in
4       the loop. I did not know.
5   Q   Did you talk to Mr. Bazzell about any of the
6       reports that were made?
7   A   Not prior to July. Not prior to all of this
8       coming out about -- after school was out that
9       year. I did not know anything about that.
10  Q   So, you were not called in to be an unofficial
11      part of any kind of investigation that was done of
12      Mr. Coon during the 2005 school year?
13  A   That was in April. I left in February.
14  Q   I understand. I said, were you called in --
15  A   No.
16  Q   -- in an unofficial capacity --
17  A   No.
18  Q   Did you talk to Mr. Bazzell during the first part
19      of the -- after you left, and the investigation
20      was taking place --
21  A   No.
22  Q   Okay. Do you know Polly King?
23  A   Yes.

Mary Moore-Wynn, CSR Mary Moore-Wynn         (334)244-0203
        Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 50

1  Q  How do you know her?
2  A  She is one of our parents -- or was one of our
3     parents.
4  Q  What do you know about her in connection to the
5     investigation of Mr. Coon?
6  A  She is a band parent.
7  Q  And that's it?
8  A  Allegedly -- uhm, let's see -- I believe that -- I
9     think she was the one that allegedly had made a
10    report about Mr. Coon or something like that, that
11    I heard about later.
12  Q  And you heard about that report she made when?
13  A  After school was out that year.  After all this
14    came out.
15  Q  And what did you hear?
16    MR. SWEENEY: Object to the form.  You
17       can answer.
18  A  I just heard that she had made a report about
19    something that had happened with Mr. Coon.  Like I
20    said, I was not in on that.  I don't know.  I
21    couldn't say for sure, because I was not there.
22    And I was not part of that investigation.
23  Q  So, again -- while you were at Pike County High

Page 51

1     School, did you ever hear of any -- any suggestion
2     of any inappropriate behavior of any kind by
3     Mr. Coon?
4  A  Sexually?
5  Q  Any kind.
6  A  Inappropriate behavior?
7  Q  Any kind.  That would include --
8  A  He smoked on campus.  Uhm -- the only other time
9     that was inappropriate was one time right before I
10    left he had loaned his -- he said he had loaned
11    his cell phone to Blake, and Blake got his cell
12    phone taken up.  And Mr. Coon had a fit.
13    Screaming at everybody because he had gotten his
14    phone taken up.  And I told him, well, you
15    shouldn't have loaned it to the student.
16  Q  Mr. Coon loaning his cell phone to a student, did
17    that raise any question in your mind about the --
18  A  Other than him being ignorant, no.  We all loan
19    our cell phones to students at some point in time
20    if there is a need that they may use that phone.
21    He told me that the reason he had loaned his phone
22    to Blake was because Blake needed to contact his
23    father who left at 4:00 o'clock in the morning.  I

Page 52

1     did not find that unusual.  I just found it
2     irresponsible.
3  Q  Did you ever loan your cell phone to a student
4     while you were a guidance counselor?
5  A  Every now and then.
6  Q  Did you let them take the phone out of your sight?
7  A  No.
8  Q  Okay.  When you loaned it to them, they always
9     used it with you present?
10  A  Right.
11  Q  Would you ever have loaned your --
12  A  No.
13  Q  Okay.  Did you hear of, or were you aware of, an
14    incident with Mr. Coon connected to choking a
15    child?
16  A  No.
17  Q  You never heard anything about that?
18  A  Choking a child?
19  Q  Choking a child whose last name was Foster.
20  A  No.
21  Q  That would have happened in the fall of '04.
22  A  I remember things -- you know, Mr. Coon would get
23    upset with kids and fly off the handle with kids.

Page 53

1     But as far as choking a child, no.  I don't
2     remember that.
3  Q  Who did you hear, or what were the circumstances
4     of you hearing that he would fly off the handle
5     with kids?
6  A  He would just get angry.  He would get mad with
7     them over -- I've seen it.  I mean, you know, he
8     would get mad.  He was constantly calling me down
9     to his office trying to fix his computer, and he
10    would be fussing and yelling at the kids, you
11    know, about different things.  And then the next
12    minute, he was their best friend.
13    So, you know, you just really -- he just
14    wasn't real consistent.
15  Q  Okay.  So, when it came to the smoking on campus,
16    was that against school policy?
17  A  Yes.
18  Q  Do you know or have any idea what happened as a
19    result of that?
20  A  No.
21    I reported it.
22  Q  Who did you report it to?
23  A  Mr. Casey.

14  (Pages 50 to 53)

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 54

1  Q  When did you make that report?
2  A  I can't remember the exact date. But it was
3     during the 2004-2005 year.
4  Q  Would it have been in the fall of 2004? Well, it
5     would have had to have been if it was Mr. Casey.
6  A  Yeah.
7  Q  Because Mr. Casey left in December.
8  A  In December, correct.
9  Q  Were you aware that some kids had reported to
10    Mr. Casey that Mr. Coon had been smoking --
11       MR. SWEENEY: Object to the form.
12 Q  -- on campus?
13 A  I wouldn't know that.
14 Q  Did Mr. Casey indicate whether he had any
15    knowledge of Mr. Coon smoking on campus when you
16    reported it to him; any prior knowledge?
17 A  He had -- I mean, he told me he had discussed that
18    with him and told him not to do it. But now, I
19    don't know.
20 Q  But you actually saw him doing it?
21 A  Yes.
22 Q  So, this would have been after he had done it
23    before, because Mr. Casey had told him not to do

Page 55

1     it?
2  A  I don't know when he had been told, or I just know
3     what I --
4  Q  But he said he had talked to him?
5  A  Yes.
6  Q  Mr. Casey said he had talked to him?
7       MS. ALLEN: Can we take a quick break?
8        (Whereupon, Plaintiff's Exhibit 20
9          was marked for identification and
10         is attached hereto.)
11        (Brief recess.)
12 BY MS. ALLEN
13 Q  All right. I'm going to try one more time to
14    clarify something that we're not clear about.
15    Okay. Between February when you left Pike County
16    High School and September when you signed an
17    agreement with the Child Advocacy Center, were you
18    receiving checks from Pike County High School, or
19    Pike County Board of Education?
20 A  Paid by Pike County Board of Education?
21 Q  Yes.
22 A  My last check from Pike County Board of Education
23    came the end of February.

Page 56

1  Q  So, you were not an employee during that interim
2     period of Pike County Board of Education?
3  A  Technically, yes, on paper.
4       MS. DePAOLA: Technically yes what?
5  Q  Technically yes what?
6       MR. SWEENEY: If you will let one
7          attorney ask questions, Ms. DePaola.
8  A  It is a very confusing situation. However, it is
9     a partnership between the Pike County Board of
10    Education and the Child Advocacy Center that
11    monies to pay my salary, which comes from grants
12    and other things, runs through -- we reimburse the
13    Pike County Board of Education for my salary every
14    month due to the fact -- so that I could retain my
15    retirement. I only needed two more years to
16    retire. I told the Pike County Board -- the DA's
17    office and the Board of the Child Advocacy Center
18    that I could not accept that job unless I could
19    retain my retirement. It would have been crazy.
20    So, the Board of Education agreed to retain me
21    as an employee, name only, to -- and allow me --
22    they did me a favor -- by allowing me to retain my
23    employment and to retain my retirement.

Page 57

1     I do not -- they do not have anything to do
2     with what we do, how we do it, when we do it.
3  Q  So, you did not get paid during that interim by
4     the Pike County Board?
5  A  Monies --
6  Q  February to September of '05, you were not paid by
7     the Pike County Board?
8  A  My check that I get every month is a Pike County
9     Board of Education check. They cut me a check
10    just like they do everyone else.
11 Q  During that period of time?
12 A  They do it today.
13 Q  Okay. But they did it during that period of time?
14 A  Yes.
15 Q  February to September of '05.
16 A  Yes. But the monies were not from the Pike County
17    Board.
18 Q  Did you have any responsibilities as far as the
19    Pike County Board was concerned --
20 A  The only --
21 Q  -- during February to September of '05?
22 A  The only responsibilities that I had was to come
23    to administrators meetings and serve as an

15 (Pages 54 to 57)

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 58

1    administrator.
2  Q  Of?
3  A  Pike County Board. I just come to the
4     administrators meetings to keep abreast of what's
5     going on.
6  Q  Okay.
7        MS. ALLEN: I want to introduce this
8        Pike County Regional CAC Protocol
9        into evidence.
10 Q  And ask you, Ms. Watson, if you will identify
11    that.
12 A  This is the Pike Regional Child Advocacy Center
13    Investigative Protocol. This is the way we
14    investigate our cases from the time it's reported
15    to the time it is -- goes for prosecution.
16        (Whereupon, Plaintiff's Exhibit 21
17         was marked for identification and
18         is attached hereto.)
19 BY MS. ALLEN
20 Q  And when was that protocol put into place?
21 A  This was -- the first one was done in September of
22    '05. However, the last one was done February of
23    '07.

Page 59

1  Q  So, prior to September of '05, was there a
2     protocol?
3  A  Yes. This was just an update.
4  Q  Okay. Are there any significant changes --
5  A  No.
6  Q  -- in this protocol?
7  A  No. This was done -- actually, it was done in
8     September of '03, the first one. This was just an
9     update. And then this was yet another update. We
10    update it every two years.
11       MS. ALLEN: We will mark that
12       Plaintiff's Exhibit 21.
13       (Whereupon, Plaintiff's Exhibit 22
14        was marked for identification and
15        is attached hereto.)
16    MR. SWEENEY: What was 20?
17    THE COURT REPORTER: You haven't said it
18        on the Record.
19    MS. ALLEN: What was 20?
20    THE COURT REPORTER: It's her Notice.
21    MS. ALLEN: I'm sorry. My Notice of
22        Deposition.
23        And this will be 22, and it is

Page 60

1        the Multidisciplinary Team
2        Agreement.
3  BY MS. ALLEN
4  Q  Can you identify Plaintiff's Exhibit 22?
5  A  This is the interagency agreement where all
6     agencies involved in working together for this
7     purpose signs this agreement.
8  Q  Is this an update of an earlier agreement, or is
9     this the initial agreement?
10 A  There has only been one of these. The only thing
11    we do is we sign these every two years, as well.
12    This has not been changed, however.
13 Q  So, this is the initial agreement dated
14    September 6, if I recall?
15 A  2005. But there was one prior to that.
16 Q  All right. I'd like for you to read under
17    Article 2 that first sentence.
18 A  Victims of child abuse and their family in Pike
19    County are underserved in another inadequately
20    served due to a lack of (inaudible) --
21       THE COURT REPORTER: Okay. That's too
22       fast. Sorry.
23 A  Victims of child abuse and their families in Pike

Page 61

1     County are underserved and in other instances,
2     inadequately served due to a lack of coordination,
3     collaboration, education, and delivery of the
4     numerous varied services that are available in
5     Pike County and surrounding areas to victims and
6     their families.
7  Q  All right. Can you tell me what some of the
8     inadequacies are that that statement refers to?
9  A  It simply --
10       MR. SWEENEY: Object to the form.
11 A  It simply refers to the fact that prior to the
12    organization of the Child Advocacy Center, all
13    agencies had a job to do. Each agency did their
14    job. But they didn't coordinate services.
15    The purpose of the Child Advocacy Center was
16    to bring all the agencies together to coordinate
17    services so that children and families didn't fall
18    through the cracks, which was happening. And
19    without a coordinating service, that's always
20    going to happen.
21 Q  To your knowledge, did any of this come about as a
22    result of the sexual abuse allegation as at Pike
23    County High School?

JR, A Minor                                September 4, 2007 Pike County Board of Education

Page 62

1      MR. SWEENEY: Object to the form.
2   A  Absolutely not.
3   Q  **The timing of this was not in any way --**
4   A  Absolutely not. We have been working on this for
5      20 years.
6   Q  **Twenty years?**
7   A  Yes, ma'am. My first child abuse case occurred in
8      1987 at Goshen Elementary School. That's when it
9      started.
10  Q  **Okay. Finally, let me ask you a little bit about**
11     **the investigation that was done once the abuse**
12     **allegations became public. Are you familiar with**
13     **the investigation that was -- that took place at**
14     **Pike County High School?**
15  A  As -- personally, no.
16  Q  **If the record indicated that no parents were**
17     **contacted --**
18     MR. SWEENEY: I'm sorry. I'm confused.
19        What investigation are you talking
20        about?
21     MS. ALLEN: The investigation at Pike
22        County High School after the
23        allegations of sexual abuse were

Page 63

1      initially made.
2      MR. SWEENEY: You mean in July?
3      MS. ALLEN: No -- to the school.
4      MR. SWEENEY: You're assuming a fact
5         that's not of record that there was
6         a sexual abuse investigation in
7         April. I object to the form of the
8         question.
9      MS. DePAOLA: You can answer. We --
10        Dr. Bazzell testified there was an
11        investigation.
12     MR. SWEENEY: It's one thing that an
13        investigation concerning Marijuana
14        and smoking took place. It's
15        another based on the insertion of
16        sexual abuse that you have just
17        included.
18        I object to the form of the
19        question.
20     MS. DePAOLA: You can answer.
21     MS. ALLEN: You can answer.
22  A  I didn't -- I wasn't involved in that.
23  Q  **I understand. My question is this: If an**

Page 64

1      investigation was conducted, and no parents were
2      contacted, no teachers were contacted --
3         **(Off-the-Record discussion.)**
4      MS. ALLEN: I'll withdraw that question.
5         Do you have anything else?
6         (Off-the-Record discussion.)
7   BY MS. ALLEN
8   Q  **Would I be correct in saying that this policy that**
9      **we have introduced as -- where is it --**
10     **Plaintiff's Exhibit 21 does not cover**
11     **investigating sexual abuse by a teacher against a**
12     **student?**
13  A  No.
14  Q  **No, it does not?**
15  A  It does not. It's any allegation. It doesn't
16     matter if it's a teacher or not.
17  Q  **I understand. I understand. But there is nothing**
18     **specifically in there that would cover**
19     **investigation of sexual abuse by a teacher against**
20     **a student?**
21  A  No. This is not investigative protocol of a
22     school.
23     MS. ALLEN: I understand. I understand.

Page 65

1      That's all.
2      MR. SWEENEY: Thank you very much. No
3         questions. You may be excused.
4      (Whereupon, at approximately, 11:50
5         a.m. on the 4th day of September,
6         2007 the deposition was
7         concluded.)
8      * * * * * * * *
9      FURTHER DEPONENT SAITH NOT
10     * * * * * * * * * *

17  (Pages 62 to 65)

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
           Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 66

```
 1
 2              REPORTER'S CERTIFICATE
 3
 4   STATE OF ALABAMA
 5   MONTGOMERY COUNTY
 6
 7       I do hereby certify that the above and foregoing
 8   transcript of the deposition of MONA WATSON was taken
 9   down by me in machine shorthand on the 4th of
10   September, 2007, and the questions and answers thereto
11   reduced to writing under my personal supervision, and
12   that the foregoing represents a true and correct
13   transcript of the proceedings given by said witness
14   upon said hearing.
15       I further certify that I am neither of counsel nor
16   related to the parties to the action, nor am I any wise
17   interested in the results of said cause.
18       Dated this 11th day of September, 2007.
19
20              _____
21              Mary Moore-Wynn
22              Certified Shorthand Reporter
23
```

Mary Moore-Wynn, CSR Mary Moore-Wynn         (334)244-0203
        Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education
Page 1

---

**A**

**ability** 38:1,15
**able** 42:16 44:12
**abreast** 58:4
**Absolutely** 27:3
  62:2,4
**abuse** 8:5,6,10
  8:17 9:20
  10:14 11:6,16
  11:19,22 12:6
  13:7 14:16
  15:5 22:17
  23:4,14 24:9
  24:20 25:5,14
  26:16 27:1,6
  27:10,13 28:5
  28:21 29:5
  30:11,19 31:4
  31:14 42:19,21
  43:2 44:18
  60:18,23 61:22
  62:7,11,23
  63:6,16 64:11
  64:19
**abused** 8:14
  9:23 10:6,11
  12:16 13:11,16
  13:20 14:4,9
  18:22
**abusers** 25:3,5
**abusing** 27:18
**academic** 22:22
  25:15
**accept** 56:18
**accepted** 26:4
**act** 13:21
**acting** 11:10
  14:12
**action** 66:16
**Adam** 46:4
**Adam's** 46:1,20
**add** 6:4
**address** 6:21
**administration**
  28:14

**administrative**
  27:21 28:1,13
  28:15
**administrator**
  27:22 58:1
**administrators**
  28:17 30:9
  57:23 58:4
**admit** 41:18
**adopted** 26:7
**Advocacy** 4:16
  9:18 14:23
  16:2 18:18,19
  18:20 19:5,19
  20:5,9,14,17
  21:1,8,12 31:6
  32:10,21 49:3
  55:17 56:10,17
  58:12 61:12,15
**afraid** 47:1
**agencies** 48:9
  60:6 61:13,16
**agency** 61:13
**ago** 8:11 24:17
  25:6 26:1
  37:16
**agonized** 42:12
**agreed** 3:8,20
  4:4 56:20
**agreement** 4:18
  55:17 60:2,5,7
  60:8,9,13
**ahead** 10:3
**AL** 2:14
**Alabama** 1:2,18
  2:5,9 20:13
  26:6 66:4
**allegation** 27:13
  27:17 32:17
  61:22 64:15
**allegations** 27:2
  27:10 28:5
  29:6,20,21
  30:10,14,17,19
  30:21 44:18

**62:12,23**
**alleged** 31:4
  35:1
**allegedly** 50:8,9
**Allen** 2:4 4:10
  5:5,8 6:18 9:8
  9:11 29:14
  30:3 32:2
  33:18 34:1
  36:23 37:9,18
  37:22 38:12,13
  41:12 45:19
  48:11 55:7,12
  58:7,19 59:11
  59:19,21 60:3
  62:21 63:3,21
  64:4,7,23
**allow** 32:15
  56:21
**allowed** 16:17
**allowing** 56:22
**angry** 53:6
**Ann** 2:16
**answer** 5:22 9:1
  10:17 26:19
  45:17 50:17
  63:9,20,21
**answering** 12:9
  37:12
**answers** 66:10
**anybody** 6:5
  32:12 46:23
  48:20
**APPEARAN...**
  2:2
**appropriate**
  22:21
**approximately**
  1:20 65:4
**April** 47:20
  49:13 63:7
**apt** 12:16
**Arant** 2:12
**area** 8:9 10:1
  13:18 14:16

**areas** 61:5
**Article** 60:17
**articulate** 43:13
  43:16
**asked** 12:7,11
  14:18 16:16
  18:10 24:1
  30:5 33:2
  47:18
**asking** 5:19 18:5
  24:2 37:17
**assistant** 22:9
**assume** 5:23
  44:22
**assuming** 63:4
**attached** 33:22
  55:10 58:18
  59:15
**attend** 22:12
**attending** 8:10
**attorney** 2:8
  5:12 6:9 56:7
**attorney/client**
  6:16
**audio** 35:17,18
**August** 48:16,17
  48:22
**authorities**
  29:19
**available** 61:4
**Avenue** 2:5,13
**aware** 12:12
  17:12 30:10,13
  47:14,16 52:13
  54:9
**Azar** 2:4,4
**a.m** 1:20 65:5

---

**B**

**B** 2:9
**back** 8:6 9:12
  10:4 21:12,14
  25:6 26:3
  38:12 43:18
  45:20

**band** 38:22 39:2
  50:6
**Base** 36:12
**based** 47:10
  63:15
**basic** 32:20
**basically** 20:18
  26:4 28:10
  36:12
**Bazzell** 2:17
  49:5,18 63:10
**BBSST** 22:12,15
  22:17,20 23:8
  23:10,19 24:15
**began** 8:8,9
  10:10
**behavior** 11:10
  14:13 47:11,17
  48:21 51:2,6
**believe** 16:3,4
  18:5 26:18,20
  31:19 33:10
  45:12 46:13,20
  47:5 50:8
**Berry** 24:15
**best** 16:20,23
  36:15,20 37:15
  37:23 38:14
  39:9 53:12
**big** 44:8,9
**Birmingham**
  2:14
**bit** 7:18 34:22
  35:2 62:10
**Blake** 30:20
  31:1,9 44:21
  44:22 45:3,10
  45:12 46:1
  51:11,11,22,22
**Blake's** 45:14
  46:20
**blessing** 17:22
**board** 1:11,17
  5:14 6:10 8:21
  9:5 11:22

---

| | | | | |
|---|---|---|---|---|
| 14:20 18:5,8 | **CAC** 58:8 | **changed** 60:12 | **Civil** 3:11 | **conflict** 8:2 |
| 19:20,22 20:1 | **call** 23:1 | **changes** 59:4 | **claims** 31:14 | **confused** 62:18 |
| 20:9,10,12,12 | **called** 30:23 | **changing** 17:4,6 | **clarify** 5:22 6:4 | **confusing** 56:8 |
| 20:13,15,17,17 | 32:7 33:2 | **Charles** 16:10 | 8:20 9:12 | **connected** 21:9 |
| 20:19,20 21:3 | 49:10,14 | 16:17 18:6 | 10:19 34:22 | 52:14 |
| 21:3,5,9,10 | **calling** 53:8 | **chatted** 44:17 | 55:14 | **connection** 50:4 |
| 25:8,22 26:14 | **campus** 51:8 | **check** 55:22 | **Clark** 2:4 | **consistent** 53:14 |
| 26:23 27:4,6,9 | 53:15 54:12,15 | 57:8,9,9 | **class** 10:8 | **constantly** 53:8 |
| 27:11,14,18 | **capacity** 6:9 | **checks** 55:18 | **clear** 55:14 | **contact** 23:2 |
| 28:2,3,22 29:6 | 14:22 15:1,7 | **child** 4:16 8:10 | **code** 6:23 | 51:22 |
| 29:22 30:7 | 16:1 49:16 | 9:17 13:12,15 | **Coffee** 12:20 | **contacted** 30:15 |
| 55:19,20,22 | **case** 1:9 3:21 4:1 | 14:23 15:2 | **collaboration** | 62:17 64:2,2 |
| 56:2,9,13,16 | 5:14,20 11:9 | 16:2 18:18,19 | 61:3 | **control** 12:18 |
| 56:17,20 57:4 | 14:5 27:17 | 18:20 19:5,18 | **college** 21:20,20 | **Coon** 17:11,13 |
| 57:7,9,17,19 | 43:3 47:7 48:5 | 20:5,8,17 21:1 | **come** 22:19 | 30:11 31:14 |
| 58:3 | 48:9,10 62:7 | 21:8,11 22:7 | 45:11,16 46:14 | 38:20 39:3 |
| **Bob** 32:8 33:7 | **cases** 58:14 | 25:15 27:6,10 | 48:9 57:22 | 44:20 47:12 |
| 34:6 35:12,23 | **Casey** 53:23 | 27:13,18 31:6 | 58:3 61:21 | 48:21 49:12 |
| 39:14,22 40:7 | 54:5,7,10,14 | 32:10,21,22 | **comes** 32:17 | 50:5,10,19 |
| 42:15 47:5 | 54:23 55:6 | 42:18,20,21 | 56:11 | 51:3,12,16 |
| **book** 14:2 26:2 | **cause** 66:17 | 43:1 49:3 | **coming** 44:7 | 52:14,22 54:10 |
| 26:20 | **causes** 13:11 | 52:15,18,19 | 49:8 | 54:15 |
| **Brad** 7:17 | **cell** 51:11,11,16 | 53:1 55:17 | **commencing** | **Coon's** 46:7,9,15 |
| **Bradbury** 32:8 | 51:19 52:3 | 56:10,17 58:12 | 1:19 | 47:4 |
| 33:2,7 34:6 | **cent** 20:21 | 60:18,23 61:12 | **commission** | **coordinate** |
| 35:12,23 39:14 | **Center** 9:18 | 61:15 62:7 | 3:13 | 61:14,16 |
| 40:8,15 41:13 | 14:23 16:3 | **children** 7:12 | **Commissioner** | **coordinating** |
| 41:16 42:15 | 18:18,19,20 | 8:14 9:23 10:5 | 1:16 3:12 | 61:19 |
| 43:20 47:5 | 19:5,19 20:5,9 | 10:6,7,13,14 | **committee** 24:5 | **coordination** |
| **Bradley** 2:12 | 20:17 21:1,8 | 10:23,23 11:3 | **common** 14:11 | 61:2 |
| **Brandon** 7:17 | 21:12 31:6 | 11:10,12,22,23 | **computer** 46:8,9 | **correct** 36:9,11 |
| **break** 38:2 55:7 | 32:10,21 49:3 | 11:23 12:15 | 46:15,19 47:4 | 54:8 64:8 |
| **brief** 9:10 33:15 | 55:17 56:10,17 | 13:7,11,19 | 47:4 53:9 | 66:12 |
| 36:12 55:11 | 58:12 61:12,15 | 14:2,4,10 | **concern** 17:18 | **counsel** 3:9,21 |
| **bring** 61:16 | **Centers** 20:14 | 16:19 17:2,10 | **concerned** 17:3 | 4:5 66:15 |
| **brother** 44:9 | **certain** 12:15 | 18:21 21:19 | 17:8,15 36:9 | **counseling** 8:3 |
| **Bruce** 34:11,13 | **Certificate** 4:11 | 22:21 24:20 | 57:19 | 21:22,23 22:10 |
| 35:9 40:15 | 66:2 | 61:17 | **concerning** | 44:4,14,16 |
| 42:16 43:20 | **certification** | **Children's** | 63:13 | **counselor** 9:16 |
| **BS** 7:19 | 7:23 8:1 | 20:14 | **concluded** 65:7 | 15:6,13,23 |
| **Bullock** 12:20 | **Certified** 66:22 | **choking** 52:14 | **conducted** 40:22 | 18:11 20:2 |
| **busy** 49:2 | **certify** 66:7,15 | 52:18,19 53:1 | 64:1 | 21:16 22:1,13 |
| **Butler** 31:4,6 | **chance** 6:2 | **circumstances** | **conferences** 8:8 | 25:16,19,20 |
| | **change** 6:3 | 53:3 | **confidential** | 28:19 29:3,18 |
| ———— **C** ———— | 14:12,13 | **City** 18:2 | 6:16 | 29:23 52:4 |

counselors 25:17
County 1:11,17 5:14 8:21 9:5 9:14,16 12:20 12:20,20 14:19 15:14,23 16:9 18:4,8,11,14 18:16 19:14,20 19:22 20:1,2,4 20:10,15,17,19 20:20 21:3,5 21:10,16,17 22:4,13 23:22 23:23 24:3 25:12 26:14,23 28:3 31:5,6 33:7 38:23 50:23 55:15,18 55:19,20,22 56:2,9,13,16 57:4,7,8,16,19 58:3,8 60:19 61:1,5,23 62:14,22 66:5
course 8:15 45:10
Court 1:1 29:1 45:22 59:17,20 60:21
courtesies 19:3
courtesy 19:1
cover 64:10,18
cracks 61:18
crazy 56:19
CSR 3:12
currently 6:19
cut 57:9

___ D ___

DA 33:11 34:8 34:10,13,19 35:5
date 23:16 25:4 31:21 35:15

36:7 54:2
dated 60:13 66:18
dates 15:8 24:5
day 18:13 23:21 35:2 65:5 66:18
DA's 19:11,12 34:11,14 35:21 56:16
deal 44:9
dealing 25:14
Deanie 2:4
December 54:7 54:8
decide 41:6
decision 41:6
DEFENDANT 1:13 2:11
definition 11:2
degree 7:19,20 7:21 8:2
delivery 61:3
DePaola 2:8 5:12 8:18 15:17 29:12,15 37:11 45:17 48:6 56:4,7 63:9,20
Department 18:22 19:3 25:21 27:7 30:15,23 32:18 33:8,9
DEPONENT 65:9
deposed 5:17
deposition 1:15 3:9,11,16,22 3:23 4:6,15 6:6 59:22 65:6 66:8
Description 4:13
different 21:3 53:11

difficult 38:18 38:19 42:23,23
difficulty 17:16 17:19 42:19
Direct 4:10 5:7
directed 18:4 20:13
directly 42:9
Director 9:17 16:2 18:18 20:8 21:11
directs 20:12
disabilities 8:1 13:1
disability 43:5
discipline 22:3,5
discovery 40:16
discuss 6:12 24:10 25:7 44:10 48:10
discussed 24:13 54:17
discussion 8:19 9:10 22:16 24:14,19,22 25:3 41:11 64:3,6
discussions 6:17
disseminate 15:22
DISTRICT 1:1 1:2
disturbed 10:5 10:22,23 11:3 11:16
DIVISION 1:3
doctors 11:23
document 36:22 38:3,7
documents 40:16
doing 21:21 54:20
Donald 2:12 37:11

door 39:2
Dr 2:17 63:10
due 11:4,5 17:10 20:15 22:11 30:17 56:14 60:20 61:2
duly 5:3
DVD 35:18 42:7
dysfunctional 11:6

___ E ___

EAR 1:6
earlier 60:8
education 1:12 1:17 5:14 7:19 7:21,22 8:4,21 9:6 10:8,9,11 11:2 14:20 19:20,23 20:1 20:15,20,21 21:4,5,10 26:15 28:4 55:19,20,22 56:2,10,13,20 57:9 61:3
educational 7:18 22:21 42:22
either 3:18 4:2
Elementary 62:8
eliminate 13:4
Elizabeth 2:16
embarrassed 43:8,9,14
emotional 8:2
emotionally 10:5,22,23 11:2,15
emphasis 7:22 13:9
employed 20:15
employee 6:14 8:20 9:3,5 19:18,19,22,23

20:5 27:11,14 29:6,23 56:1 56:21
employees 28:4
employer 19:17
employment 56:23
ended 11:12
enforcement 18:23 19:4,11 19:12 27:7 30:16,18 32:6 32:7,13,15,18 36:4
entirety 38:6
entitled 37:12
entity 20:10
environments 11:6
evaluation 8:13
everybody 51:13
evidence 3:17 35:20 36:4,15 36:20 37:15 58:9
exact 54:2
exactly 18:9 19:17 24:17 28:7,12 47:2
Examination 4:10 5:7
Excuse 27:5 41:10
excused 65:3
Executive 9:17 16:2
exhibit 4:13,14 4:15,16,17 33:13,17,18,19 33:20 36:6 37:15 55:8 58:16 59:12,13 60:4 64:10
EXHIBITS 4:12
experience

10:12 11:18
12:8 42:22
**expertise** 14:16
**explain** 19:17,21
  20:7 21:4
  34:15 43:6
**extensive** 9:19
**e-mailing** 46:22

**F**

**fact** 26:4 41:7
  56:14 61:11
  63:4
**faculties** 15:9
**Fairview** 6:22
**fall** 16:3,4 23:10
  23:18 52:21
  54:4 61:17
**familiar** 11:13
  47:9 62:12
**families** 60:23
  61:6,17
**family** 60:18
**far** 9:22 15:11
  21:6,7,15
  26:12 27:12,13
  28:7,12 36:9
  53:1 57:18
**fast** 60:22
**father** 1:6 51:23
**Faulkner** 30:20
  31:1,9
**favor** 56:22
**February** 9:15
  9:15 15:3,4
  18:14 19:6
  49:13 55:15,23
  57:6,15,21
  58:22
**Federal** 2:13
  3:10
**feel** 6:4 16:20
**felt** 43:16 45:6
**field** 13:13
**Fifth** 2:13

**filing** 3:22 4:3
**Finally** 62:10
**find** 52:1
**firing** 21:6
**first** 5:2 23:11
  23:12 30:10
  31:17 32:11
  36:5 40:10
  44:22,23 48:15
  48:16 49:18
  58:21 59:8
  60:17 62:7
**fit** 51:12
**Five** 18:15
**fix** 53:9
**fly** 52:23 53:4
**follow** 41:21
**follows** 5:4
**foregoing** 66:7
  66:12
**forensic** 8:13
  34:3 40:23
**form** 3:14 6:13
  8:23 10:16
  26:17 36:19
  47:13 48:23
  50:16 54:11
  61:10 62:1
  63:7,18
**formality** 3:13
**formed** 20:9,16
  24:6
**forth** 1:19
**Foster** 52:19
**found** 11:8 52:1
**four** 24:17 25:6
  26:1
**four-year** 21:18
**free** 6:4
**friend** 53:12
**friends** 14:15
  17:2,17
**funds** 20:18,21
**further** 3:20 4:4
  65:9 66:15

**fussing** 53:10

**G**

**getting** 17:1,9
  21:19 41:8
**give** 6:2 7:18
  40:17
**given** 24:13 25:4
  66:13
**go** 9:8 10:3
  21:14 23:1
  26:9 32:23
  43:12
**goes** 27:12 58:15
**going** 8:8 55:13
  58:5 61:20
**good** 41:17
**Goshen** 62:8
**gotten** 22:8
  41:23 51:13
**grades** 14:14
  21:21
**grants** 20:20,23
  56:11
**group** 12:15,16
  12:18,19
**guess** 37:7
**guidance** 9:16
  18:11 20:2
  22:1 28:19
  29:3,18,23
  52:4
**guilty** 43:16

**H**

**half** 39:8
**handbook** 27:21
  28:1,13,15,17
**handicapped**
  9:23
**handle** 27:19
  52:23 53:4
**happen** 61:20
**happened** 17:10
  17:12 22:11

35:19 36:1
40:6 44:10,11
44:13 45:2
50:19 52:21
53:18
**happening**
  61:18
**hard** 17:1,2,3
  41:8 42:20
**hear** 30:19 46:6
  48:4 50:15
  51:1 52:13
  53:3
**heard** 30:20
  48:2,3,15
  50:11,12,18
  52:17
**hearing** 53:4
  66:14
**hearsay** 46:3
**held** 33:3
**Helms** 46:5
**help** 22:22 44:9
**helping** 21:20
**Henderson**
  16:10,17 18:6
**hereto** 3:18 4:2
  33:22 55:10
  58:18 59:15
**high** 9:14,16
  15:15,23 16:10
  19:14 20:2
  21:16,17,23
  22:4,13 23:22
  23:23 24:3
  38:23 50:23
  55:16,18 61:23
  62:14,22
**higher** 10:13
  11:18
**hired** 20:8
**hiring** 21:6
**history** 7:18
**home** 11:6
**Hon** 2:4,8,12

**hope** 31:8
**hour** 39:7,7
**Hubbard** 33:8
  34:6 35:3
  39:10 40:4
**Human** 18:23
  19:4 25:21
  27:7 30:15,23
  32:18 33:9
**humiliation** 43:7
**humiliation-ty...**
  43:4

**I**

**idea** 36:1 40:17
  41:17 48:20
  53:18
**identification**
  33:21 55:9
  58:17 59:14
**identify** 58:10
  60:4
**ignorant** 51:18
**important** 26:10
**inadequacies**
  61:8
**inadequately**
  60:19 61:2
**inappropriate**
  47:11,17 48:21
  51:2,6,9
**inaudible** 28:23
  37:19 60:20
**incidence** 10:14
  11:19
**incident** 52:14
**include** 51:7
**included** 63:17
**INDEX** 4:8,12
**indicate** 11:14
  12:4,15 41:13
  41:16 54:14
**indicated** 13:3
  62:16
**Indicating** 9:21

**indication** 12:14 14:7
**individual** 26:8
**individuals** 5:15
**information** 32:20,20 41:8 41:18,19,23 42:3,8
**informed** 28:4
**initial** 43:19 60:9,13
**initially** 44:19 63:1
**insertion** 63:15
**inservice** 14:21
**inservices** 13:17 26:21
**instances** 61:1
**intelligence** 13:6
**interagency** 60:5
**interest** 8:7 16:21
**interested** 66:17
**interfere** 25:15
**interim** 56:1 57:3
**intervention** 19:9
**interview** 4:14 30:16 31:1,7 31:11,17 32:5 32:9,16,21 33:3,3,6,11,15 34:3,17,23 35:3,6,8,12 36:5,7,11,13 36:18 37:2 38:1,16,17 39:6,19 40:2,3 40:4,6,10,11 40:14,17,18,20 40:22 41:1,2,4 41:9,14,21 42:1,4,6 43:19

43:20 44:1 45:1 47:8,19
**interviewed** 31:9,15,18 32:12
**interviewers** 40:23
**interviewing** 8:14 32:16
**interviews** 18:21 19:1,2,2,9,10 43:21,23
**introduce** 33:13 58:7
**introduced** 3:23 37:14 64:9
**investigate** 27:6 28:5 29:5 30:1 30:5,6,7 41:3 58:14
**investigating** 27:1,13 28:21 64:11
**investigation** 27:12,19,20 46:17 47:10,14 49:11,19 50:5 50:22 62:11,13 62:19,21 63:6 63:11,13 64:1 64:19
**investigations** 27:9
**investigative** 4:16 58:13 64:21
**investigator** 32:8 34:14
**involved** 22:3,5 29:13,16 42:15 48:9 60:6 63:22
**involves** 27:14
**irresponsible** 52:2

**issue** 43:7
**issued** 46:12
**issues** 5:20

_____

**J**

**Jessica** 44:7
**Jessica's** 46:21
**job** 30:2,4,5,8 56:18 61:13,14
**Joey** 31:15 44:6
**JR** 1:5
**July** 30:12 31:19 32:1 33:3 49:7 63:2
**Justin** 4:14 5:12 5:13 16:7,9 17:1,13,16 30:17,21 31:11 31:17,18 32:11 33:3 36:6,18 37:1 38:1,16 38:18 40:11,12 40:14 41:9,13 41:18 42:1,4,9 42:12 43:5,13 43:22 44:4,5,6 44:7,12,12,21 45:2,10,23 47:19
**Justin's** 43:3 45:10,13,13 46:6,21

_____

**K**

**Karen** 24:15
**keep** 32:22 58:4
**kids** 10:20 11:15 11:19,20 12:5 46:22 52:23,23 53:5,10 54:9
**kind** 12:18 13:5 21:21 23:2 49:11 51:2,5,7
**kinds** 11:7,11 14:15 15:12

21:6
**King** 49:22
**knew** 17:16
**know** 5:11 13:20 15:17 16:7,9 16:22,23 21:19 23:1 26:11 27:22 28:20 29:4 30:5 32:23 35:9 37:10 39:11 40:11 41:22 42:11 44:18 45:7 46:16,22 47:19,21,22 49:4,9,9,22 50:1 50:4,20 52:22 53:7,11,13,18 54:13,19 55:2 55:2
**knowing** 17:4 45:8 49:1
**knowledge** 32:11 54:15,16 61:21
**known** 44:19

_____

**L**

**lack** 60:20 61:2
**late** 8:6
**law** 2:8 18:23 19:4,11,11 27:7 30:16,18 32:6,7,13,15 32:17 36:3
**lawyers** 11:23
**learning** 8:1
**leave** 9:13 40:1
**led** 24:14 39:1
**left** 9:15 18:16 20:4 30:8 49:13,19 51:10 51:23 54:7 55:15
**letter** 16:15 18:1

18:4,7
**let's** 38:2 43:18 50:8
**level** 7:23
**liberty** 46:16
**lifelong** 7:4
**list** 13:22
**literature** 13:3,9 13:10
**little** 7:18 21:23 34:22 35:2 62:10
**lived** 7:2
**loan** 51:18 52:3
**loaned** 51:10,10 51:15,21 52:8 52:11
**loaning** 51:16
**long** 7:2 39:6,7
**longer** 35:4 49:2
**look** 13:11,15 15:12
**loop** 49:4
**lot** 10:23 11:5 13:8,17,17 17:9 22:7 44:17 46:22
**Love** 1:18
**low** 42:5 43:5

_____

**M**

**machine** 66:9
**mad** 53:6,8
**making** 17:2,16 22:20
**man** 43:9
**mandatory** 16:4 26:3
**manner** 4:1
**manual** 25:23
**Marijuana** 63:13
**mark** 2:17 59:11
**marked** 33:21 55:9 58:17

59:14
**marking** 33:16
**marriage** 7:10
**married** 7:6
**Mary** 1:15 3:12
  66:21
**Master's** 7:20
  7:21,23 8:2
**material** 45:21
**materials** 15:20
  24:13
**matter** 64:16
**matters** 22:3
**Matthews** 34:11
  34:13 40:15
  42:16 43:20
**ma'am** 10:15
  62:7
**MDT** 48:5,6,7
  48:14
**mean** 11:12 14:2
  23:15 43:6
  53:7 54:17
  63:2
**meant** 10:22
**meeting** 44:4
  48:14
**meetings** 22:12
  22:17 23:3,9
  23:17 24:4
  48:8 57:23
  58:4
**mental** 7:22
**mentally** 9:22
  10:12 11:14,20
  12:1,5,22 13:4
  13:6 42:18,21
  43:1,5
**mention** 28:6
**mentioned**
  13:14 28:11
  45:5,7 46:1,14
  46:21
**mentoring** 44:8
**mentors** 44:11

**met** 5:13
**MIDDLE** 1:2
**mind** 51:17
**mine** 40:19
**MINOR** 1:5
**minute** 37:11
  41:10 53:12
**missed** 29:2
**Misty** 33:8 34:6
  35:2 39:10
  40:4
**mixed** 17:21
**mom** 16:15
**Mona** 1:15 3:10
  3:22 4:9,14,15
  5:1,10 34:6
  66:8
**monies** 20:22,23
  56:11 57:5,16
**Montgomery**
  2:5,9 44:15
  66:5
**month** 31:23
  48:13 56:14
  57:8
**Moore-Wynn**
  1:16 3:12
  66:21
**morning** 51:23
**mother** 1:6 17:8
**mouth** 45:23
**multidiscipln...**
  4:17 48:7 60:1

_____
**N**
**name** 5:9 45:11
  45:13 46:1,6
  46:20,21 52:19
  56:21
**named** 5:15
**names** 45:7,9,15
  46:14,19 47:3
**national** 8:10
**need** 3:15 6:3
  13:5 51:20

**needed** 51:22
  56:15
**needs** 10:13,20
  11:14,19 12:5
**neither** 66:15
**Network** 20:14
**never** 13:2 26:14
  31:9 52:17
**norm** 34:19,19
  34:20
**normally** 35:5
**North** 2:13
**NORTHERN**
  1:3
**notice** 4:15 34:2
  59:20,21
**number** 4:13,13
  19:10 45:14
**numerous** 8:16
  61:4

_____
**O**
**object** 6:13,15
  8:23 10:16
  26:17 36:19
  37:20 47:13
  48:23 50:16
  54:11 61:10
  62:1 63:7,18
**objections** 3:13
  3:14
**observation**
  39:17
**observing** 39:21
**occasions** 38:21
  44:6
**occurred** 31:4
  38:22 62:7
**occurs** 11:22
**offered** 3:17
**office** 19:11,12
  34:11,14 35:21
  53:9 56:17
**offices** 1:17
**official** 43:23

44:1
**Off-the-Record**
  8:19 9:10
  41:11 64:3,6
**Oh** 12:21
**okay** 9:19 12:21
  20:8 29:11
  30:4 31:16
  33:13 36:5
  38:8 39:21
  40:10,15 41:21
  43:6 47:3
  49:22 52:8,13
  53:15 55:15
  57:13 58:6
  59:4 60:21
  62:10
**old** 7:16
**once** 36:3 62:11
**opinion** 17:21
**oral** 38:21 39:4
**organization**
  61:12
**originally** 44:15
**o'clock** 51:23

_____
**P**
**page** 4:13 38:10
**paid** 20:19,22,22
  55:20 57:3,6
**pants** 39:4
**paper** 56:3
**Pardon** 29:14
**parent** 50:6
**parents** 50:2,3
  62:16 64:1
**part** 22:10 24:10
  24:21 28:20
  29:2,4,8 46:17
  49:11,18 50:22
**particular** 13:12
  24:18
**parties** 3:9,21
  66:16
**partnership**

20:16 56:9
**party** 3:18 4:2
**patterns** 11:11
**pay** 20:18,21
  56:11
**people** 13:19,23
  17:3,20 40:3
**perform** 11:3
  38:21 39:4
**period** 44:22
  45:11 56:2
  57:11,13
**permission** 18:5
**person** 34:23
**personal** 66:11
**personally** 16:22
  42:1 44:11
  62:15
**phone** 45:14
  51:11,12,14,16
  51:20,21 52:3
  52:6
**phones** 51:19
**physical** 7:19
**Pike** 1:11,17
  4:16 5:14 8:21
  9:5,14,15
  12:20 14:19
  15:14,23 16:9
  18:4,8,11,13
  18:16 19:14,19
  19:22,23 20:2
  20:4,10,15,16
  20:19,20 21:3
  21:5,9,16,17
  22:4,13 23:22
  23:23 24:3
  26:14,23 28:3
  33:7 38:23
  50:23 55:15,18
  55:19,20,22
  56:2,9,13,16
  57:4,7,8,16,19
  58:3,8,12
  60:18,23 61:5

JR, A Minor                          September 4, 2007 Pike County Board of Education

61:22 62:14,21
**pinpoint** 25:6
**place** 2:13 26:11
  32:9 37:16
  49:20 58:20
  62:13 63:14
**placed** 11:1
**placement** 22:22
**PLAINTIFF** 1:8
  2:3
**Plaintiff's** 4:14
  4:15,16,17
  33:18,20 36:6
  55:8 58:16
  59:12,13 60:4
  64:10
**planning** 21:18
**plans** 21:19
**play** 8:15 16:12
**please** 5:6,9,21
  15:18 38:14
  41:10
**point** 8:7,7
  51:19
**policies** 26:20
  28:6,11
**policy** 25:7,23
  26:2,15,23
  27:18 28:2
  53:16 64:8
**Polly** 49:22
**position** 29:22
**positive** 23:16
  39:20
**possibly** 23:21
  42:7
**potential** 45:4
**preliminaries**
  32:13
**preliminary**
  32:19
**present** 2:15
  33:6,11 34:2,5
  34:15 39:18
  40:20 52:9

**principal** 22:9,9
  25:18,19
**prior** 6:5 15:4
  16:5 19:5 49:7
  49:7 54:16
  59:1 60:15
  61:11
**probably** 39:7
  41:7 48:16
**problem** 25:14
**problems** 22:23
**procedure** 3:11
  15:11 24:11
  25:7,11,12,23
  26:2,11,15,20
  27:1,19 28:3,9
  28:21 29:5
  30:6,7 32:15
  32:17
**procedures** 28:7
  28:11
**proceedings**
  66:13
**professional**
  13:3
**program** 44:8
**progress** 25:16
**proper** 29:19
**prosecute** 42:8
**prosecution**
  58:15
**protocol** 4:17
  58:8,13,20
  59:2,6 64:21
**provided** 3:18
  4:2 40:16
**psychology** 8:3
**public** 62:12
**pulling** 13:22
**purpose** 3:18
  18:19,20 27:3
  32:22 60:7
  61:15
**pursuant** 1:18
  3:10

**put** 18:1,7 28:3
  37:3 58:20

### Q

**question** 5:21,23
  6:1 37:13,21
  38:4 45:18,19
  51:17 63:8,19
  63:23 64:4
**questions** 3:14
  3:15 5:19 56:7
  65:3 66:10
**quick** 55:7
**quietly** 42:5
**quite** 45:11

### R

**R** 2:12
**raise** 51:17
**raised** 20:23
**read** 36:21 37:8
  38:3,5 45:19
  45:22 60:16
**reading** 4:5
**reads** 38:7
**ready** 21:20
**real** 53:14
**really** 16:22
  35:13 53:13
**reason** 11:4 17:6
  18:17 45:12
  51:21
**reasons** 11:5
**recall** 18:1,7
  23:17 24:7,19
  24:22 35:7
  37:18,23 38:15
  38:17 40:14
  45:9 46:23
  60:14
**receive** 22:21
**received** 47:18
**receiving** 44:14
  55:18
**recess** 55:11

**recognizing** 23:4
  23:13 24:8,19
  25:3,5
**recollection** 37:1
  39:9
**recommend**
  40:7
**recommending**
  16:15,16
**record** 9:8,12
  38:12 46:2
  59:18 62:16
  63:5
**records** 12:21
**recreation** 7:20
**reduced** 66:11
**Reed** 2:16 4:14
  16:7 30:17,21
  31:12
**refer** 22:10
**referred** 18:22
**referring** 28:16
  44:21
**refers** 61:8,11
**regarding** 47:17
**regardless** 4:3
**Regional** 4:16
  58:8,12
**reimburse** 56:12
**related** 22:17
  66:16
**Relative** 31:14
**remember** 15:8
  24:17 28:10
  40:1,9 47:1
  52:22 53:2
  54:2
**remembers**
  37:20
**repercussions**
  13:10 16:18
  17:9
**report** 25:13,16
  25:20 29:18
  36:16 50:10,12

50:18 53:22
  54:1
**reported** 25:19
  30:18 48:21
  53:21 54:9,16
  58:14
**reporter** 16:4
  26:3 29:1
  45:22 59:17,20
  60:21 66:22
**reporters** 25:17
**Reporter's** 4:11
  66:2
**reporting** 15:11
  15:11 25:8
  26:15
**reports** 47:11,16
  47:22 49:6
**represent** 5:13
**representing** 3:9
  3:21
**represents** 66:12
**request** 32:5
**requested** 45:21
**requesting** 18:2
**required** 22:12
**reserved** 3:16
**reside** 6:19
**resident** 7:4
**Resources** 18:23
  19:4 25:21
  27:8 30:16
  31:1 32:19
  33:9
**respond** 38:4
**responsibilities**
  21:15 57:18,22
**responsibility**
  28:20 29:4,10
  29:17
**responsible**
  21:17
**result** 53:19
  61:22
**results** 66:17

| | | | | |
|---|---|---|---|---|
| retain 20:18 | 56:11,13 | separate 20:10 | sign 60:11 | 62:9 |
| 56:14,19,20,22 | sat 35:3 | 20:11,11 21:8 | signed 55:16 | state 5:9 26:6 |
| 56:23 | saw 26:14 54:20 | September 1:16 | significant 59:4 | 66:4 |
| retardation 7:22 | saying 10:19 | 55:16 57:6,15 | signing 4:6 | stated 36:13 |
| retarded 9:22 | 13:2 64:8 | 57:21 58:21 | signs 13:10,14 | 42:4 |
| 10:12 11:14,20 | says 14:3 34:2 | 59:1,8 60:14 | 13:15,19 14:3 | statement 61:8 |
| 12:2,5,23 13:4 | 36:7,14 | 65:5 66:10,18 | 14:6,8,9,11 | STATES 1:1 |
| 13:6 42:18,21 | scheduling | serve 57:23 | 22:23 25:5 | State's 35:20 |
| 43:1 | 21:18 | served 60:20 | 60:7 | 36:4 |
| retire 56:16 | scholarships | 61:2 | simply 61:9,11 | statistics 12:4,12 |
| retirement | 21:18,21 | service 61:19 | sister 44:9 | 12:13,14,18 |
| 20:18 56:15,19 | school 6:14 9:14 | services 61:4,14 | sit 39:1,3 | Statute 3:19 4:2 |
| 56:23 | 9:16 11:4 | 61:17 | situation 43:4 | steps 39:1,3 |
| review 13:8 | 15:10,15 16:10 | set 1:19 13:18 | 56:8 | stipulated 3:8 |
| 21:14 | 19:15 20:2 | 19:1 26:6 | smoked 51:8 | 3:20 4:4 |
| reviewed 13:2 | 21:16,17 22:1 | 32:20 45:1 | smoking 53:15 | stipulations |
| reviewing 13:9 | 22:4,14 23:7 | sex 38:21 39:5 | 54:10,15 63:14 | 1:19 3:6 5:5 |
| 47:7 | 23:11,12,22,23 | sexual 8:5,6,17 | solicit 19:2 | stop 5:21 8:18 |
| right 9:19 11:13 | 24:3 25:22 | 9:20 10:14 | somebody 13:21 | 43:12 |
| 12:10 13:21 | 26:8 27:16 | 11:16,19,21 | sorry 12:7 29:1 | Street 1:18 2:9 |
| 14:6 15:4,20 | 28:19 29:3 | 12:6 13:7 | 31:20 59:21 | 6:22 |
| 19:8 20:7 21:2 | 38:23 47:10,11 | 14:16 15:5 | 60:22 62:18 | strictly 46:2 |
| 23:20,23 24:12 | 47:16,23 49:2 | 22:17 23:4,13 | sort 19:9 23:5 | student 29:12,15 |
| 24:22 25:10 | 49:8,12 50:13 | 24:8,20 25:5 | 27:14 | 51:15,16 52:3 |
| 27:16 31:16 | 51:1 53:16 | 26:15 27:1 | speak 5:3 26:9 | 64:12,20 |
| 35:16 36:8,17 | 55:16,18 61:23 | 28:5,21 29:5 | speaking 42:5 | students 10:8,9 |
| 40:6,14 43:18 | 62:8,14,22 | 30:11,19 31:14 | special 7:21 10:8 | 10:11 12:21 |
| 43:18 44:3 | 63:3 64:22 | 42:19,20 43:1 | 10:9,10,13,20 | 51:19 |
| 45:4 46:10 | schools 14:22 | 44:18 61:22 | 11:1,14,19 | studies 11:13,17 |
| 47:9 51:9 | 17:4,7 18:2 | 62:23 63:6,16 | 12:5 13:5 | 12:4,11 |
| 52:10 55:13 | 26:10 27:10 | 64:11,19 | specific 8:5 | study 8:7 11:9 |
| 60:16 61:7 | Screaming | sexually 8:14 | 11:17 13:1 | 13:13 |
| role 16:12 | 51:13 | 9:23 12:16 | 15:14 23:3,8 | submitted 36:4 |
| room 34:23 | search 46:12 | 13:16,22 14:3 | 23:13 24:7,8 | suggestion 51:1 |
| 38:23 39:2,10 | second 2:9 9:9 | 14:9,11 18:21 | specifically 12:3 | Suite 2:9 |
| 39:15,16,17,21 | 37:7 48:13,16 | 27:17 51:4 | 18:16 32:7 | summarized |
| 39:23 40:4 | secondary 7:20 | Sheriff's 33:7 | 35:22 64:18 | 36:11 |
| rule 13:18 | see 11:21,21 | Shirock 2:8 | specifics 15:18 | summary 4:14 |
| Rules 3:10 | 14:9,11 50:8 | shorthand 66:9 | 24:16 | 33:15 36:13,14 |
| ruling 3:16 | seen 26:23 27:23 | 66:22 | speculation | 36:20 37:4,8 |
| runs 56:12 | 28:2,9 53:7 | showed 46:7 | 45:23 | 38:5 |
| | seminars 14:18 | 47:4 | speeches 13:17 | Superintendent |
| —————— | 14:19 15:5,14 | showing 22:23 | start 18:11 | 2:17 |
| S | 15:19 25:4 | side 39:2 | started 18:13 | supervision |
| SAITH 65:9 | sentence 60:17 | sight 52:6 | 23:11,12 49:3 | 66:11 |
| salary 20:19 | | | | |

JR, A Minor

**sure** 5:21 18:9
21:13 22:20
26:10,13,22
32:13,14 39:18
46:2 50:21
**surrounding**
61:5
**Susan** 2:8 5:12
**suspected** 23:5
25:13 29:20
**Sweeney** 2:12
5:6 6:8,13 8:23
10:16 12:7
26:17,19 31:20
31:23 33:16
36:15,19 37:3
37:6,14,19
38:2,9 47:13
48:23 50:16
54:11 56:6
59:16 61:10
62:1,18 63:2,4
63:12 65:2
**sworn** 5:3
**symposium** 8:10
**symposiums** 8:9
**system** 6:14 26:8

**T**

**take** 15:1 32:9
38:2 52:6 55:7
**taken** 1:15 3:10
3:11 14:22
51:12,14 66:8
**talk** 15:9 24:16
31:16 42:9,20
43:1,9,11 49:5
49:18
**talked** 5:11 6:5,8
43:10 44:6,12
55:4,6
**talking** 11:15
12:3 16:5 17:3
17:20 23:22
38:18 42:19

47:20 48:5
62:19
**tape** 34:12,20
35:15,16,18,19
35:20,22 36:2
36:3
**taping** 40:2
**teacher** 25:13
27:17 64:11,16
64:19
**teachers** 14:21
64:2
**team** 4:18 48:8
60:1
**teasing** 17:9
**technically** 20:6
44:16 56:3,4,5
**tell** 13:21 21:15
23:7 24:12
26:10 30:13
33:14 35:16
36:14,17,23
38:15 42:13,17
44:13 61:7
**testified** 5:4
63:10
**Thank** 65:2
**therapy** 8:15
**thereto** 66:10
**thing** 16:23
21:22 23:2,5
33:1 38:17
60:10 63:12
**things** 11:7,11
14:15 15:12
21:7 52:22
53:11 56:12
**think** 13:19,23
18:10 23:21
26:3 28:10
34:18 35:13,14
35:14 39:14,23
40:7 45:14,15
46:1,20 50:9
**thought** 12:11

**time** 3:15,16 6:3
15:10 17:1,2,3
22:2 24:18
25:6 31:17
32:11 35:10
38:18,19,22
39:7 41:8
45:11 51:8,9
51:19 55:13
57:11,13 58:14
58:15
**times** 11:1,5
15:9 22:7
**timing** 62:3
**TMR** 1:7
**today** 57:12
**told** 25:18 37:2
41:14 45:2
46:6,18 47:3,5
51:14,21 54:17
54:18,23 55:2
56:16
**topic** 22:19
**tracking** 12:13
12:17,22
**trained** 40:23
**training** 8:5,11
9:20,22 10:1
10:10 14:19
15:5 22:16,20
23:3,10,13,19
23:19,21 24:5
24:8,11,15,21
**trainings** 8:16
8:16 23:8
**transcript** 66:8
66:13
**transfer** 16:17
16:20 18:3,6
**transferred** 16:9
**transferring**
17:15,21
**trial** 4:1
**tried** 21:22
**trouble** 22:8

**Troy** 1:18 6:20
6:22 7:4 18:2
**true** 49:1 66:12
**truth** 5:3,3,4
**try** 5:22 6:2
37:18 41:17
55:13
**trying** 41:3 49:2
53:9
**Tuesday** 48:13
48:16,17
**turned** 35:20,22
36:3
**Twenty** 62:6
**Twenty-nine** 7:3
**two** 7:15 23:21
24:3 37:16
56:15 59:10
60:11
**type** 13:12 14:12
22:8 25:14
44:9

**U**

**uhm** 5:18 10:2
14:12 15:8
16:22 22:18,20
30:15 31:13
45:6,10 46:1
47:6 50:8 51:8
**Uh-huh** 5:16
7:11 9:4,7
14:17 18:15
32:4 34:4 37:5
**underserved**
60:19 61:1
**understand** 5:20
21:13 41:5
42:6 46:18
49:14 63:23
64:17,17,23,23
**understood** 5:23
**UNITED** 1:1
**unknown** 11:4,5
**unofficial** 49:10

49:16
**unusual** 11:10
35:2 42:18
52:1
**unzip** 39:4
**Un-huh** 16:11
**update** 59:3,9,9
59:10 60:8
**upset** 52:23
**use** 51:20
**Usual** 5:5
**usually** 14:12
24:15 25:17
26:7,21

**V**

**valedictorians**
12:1
**varied** 61:4
**verbalizing**
38:20
**versus** 12:23
**victim** 35:1,1
**victims** 45:4
60:18,23 61:5
**video** 35:18
**videotape** 35:17
**view** 34:20
**viewed** 34:10,11
35:14
**VS** 1:9
**vulnerable**
11:16 12:6
13:7

**W**

**wait** 37:11
**waived** 3:23 4:7
**waiving** 4:3
**Wallace** 7:9
**want** 6:3 8:20
9:12 13:4
15:17 19:21
31:16 33:13
36:17,21,23

JR, A Minor

37:9 43:9,11
44:14 58:7
**wanted** 42:12,15
42:16 43:11,12
44:12
**warrant** 46:12
**Washington** 2:5
**wasn't** 39:18
53:14 63:22
**Watson** 1:15
3:10,22 4:9,14
4:15 5:1,10,11
7:9 34:6 38:14
58:10 66:8
**way** 10:7 11:12
12:1 13:23
14:1 21:9 26:4
26:7 42:2,7
45:8 49:1
58:13 62:3
**week** 33:5
**week-long** 8:11
**went** 20:4 42:3
**West** 1:18 2:9
6:22
**we'll** 9:13
**we're** 37:12
38:12 55:14
**Whatsoever**
22:6
**whichever** 15:10
**wise** 66:16
**withdraw** 64:4
**Withdrawing**
14:14
**withdrawn**
13:20 17:19
**witness** 4:5,6 5:2
9:21 29:17
31:22 32:1
37:5 38:7,8,11
48:7 66:13
**word** 45:23
**words** 36:18
**work** 11:8 20:11

**worked** 10:5,20
**working** 10:10
19:14 21:2
60:6 62:4
**wouldn't** 42:11
42:17 54:13
**Wow** 8:4
**writing** 66:11
**written** 14:2
25:22 26:12
28:2
**wrote** 16:15
18:2

---

### Y

**Yeah** 17:23
44:22 54:6
**year** 8:12 23:7
48:18 49:9,12
50:13 54:3
**years** 7:3 8:11
19:10 24:17
25:6 26:1
37:16 56:15
59:10 60:11
62:5,6
**yelling** 53:10
**young** 43:8

---

### Z

**zip** 6:23

---

### 0

**03** 59:8
**04** 52:21
**05** 32:3 33:4
57:6,15,21
58:22 59:1
**07** 58:23

---

### 1

**1st** 9:15
**10:30** 1:20
**101** 1:18
**11th** 66:18
**11:50** 65:4

**12** 8:11
**13th** 31:19,22
33:3
**15-year-old** 43:8
**1726** 2:9
**1819** 2:13
**19** 4:14 33:18,19
33:20 36:6
**1987** 62:8

---

### 2

**2** 60:17
**2:06-CV-1120...**
1:10
**20** 4:15 55:8
59:16,19 62:5
**2000** 18:12,13
**2002** 12:14
**2004** 9:6 23:7,12
54:4
**2004-2005** 8:21
54:3
**2005** 9:6,15 15:3
15:4 16:5
18:14 19:8
21:11 30:12
47:22 48:19,22
49:12 60:15
**2007** 1:17 65:6
66:10,18
**21** 4:16 58:16
59:12 64:10
**22** 4:17 59:13,23
60:4
**24** 7:17
**260** 2:5
**27** 7:17

---

### 3

**33** 4:14
**35203-2104** 2:14
**36081** 7:1
**36104** 2:5
**36106** 2:9

---

### 4

**4th** 1:16 65:5
66:9
**4:00** 51:23
**40-hour** 8:15

---

### 5

**5** 4:10
**515** 6:22
**55** 4:15
**58** 4:16
**59** 4:17

---

### 6

**6** 60:14
**66** 4:11

---

### 7

**7/14/05** 36:7
**73** 7:5

---

### 8

**80's** 8:6,6 10:4

EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JR, A MINOR, BY HIS

MOTHER AND FATHER EAR

AND TMR,

     PLAINTIFF,

VS.                              CASE NO.:

                              2:06-CV-1120-MEF

PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

          * * * * * * * * * *

     DEPOSITION OF SHERRY SHACKELFORD, taken before

Mary Moore-Wynn, as Commissioner, on the 4th of

September, 2007, in the offices of Pike County Board of

Education, 101 West Love Street, Troy, Alabama,

pursuant to stipulations set forth herein, commencing

at approximately 9:30 a.m.


          * * * * * * * * * *

JR, A Minor                    September 4, 2007 Pike County Board of Education

| Page 2 |
| --- |

```
 1          * * * * * * * * * *
 2          APPEARANCES:
 3   FOR THE PLAINTIFF:
 4   Hon. Deanie Clark Allen
     Azar and Azar
 5   260 Washington Avenue
     Montgomery, Alabama 36104
 6
 7   and
 8   Hon. Susan Shirock DePaola
     Attorney at Law
 9   1726 West Second Street, Suite B
     Montgomery, Alabama 36106
10
11   FOR THE DEFENDANT:
12   Hon. Donald R. Sweeney
     Bradley, Arant
13   One Federal Place
     1819 Fifth Avenue North
14   Birmingham, AL 35203-2104
15   ALSO PRESENT:
16   Elizabeth Ann Reed
17   Dr. Mark Bazzell, Superintendent
18
19
20
21
22
23
```

| Page 3 |
| --- |

```
 1          * * * * * * * * * *
 2
 3
 4
 5
 6          STIPULATIONS
 7
 8      It is hereby stipulated and agreed by and between
 9   counsel representing the parties that the deposition of
10   SHERRY SHACKELFORD is taken pursuant to the Federal
11   Rules of Civil Procedure, and that said deposition may
12   be taken before Mary Moore-Wynn, CSR, as Commissioner
13   without the formality of a commission; that objections
14   to questions, other than objections as to the form of
15   the questions, need not be made at this time, but may
16   be reserved for a ruling at such time as the deposition
17   may be offered into evidence, or used for any other
18   purpose by either party hereto, provided by the
19   Statute.
20      It is further stipulated and agreed by and between
21   counsel representing the parties in this case, that the
22   filing of the deposition of SHERRY SHACKELFORD is
23   hereby waived, and that said deposition may be
```

| Page 4 |
| --- |

```
 1   introduced at the trial of this case or used in any
 2   other manner by either party hereto provided by the
 3   Statute, regardless of the waiving of the filing of
 4   same.
 5      It is further stipulated and agreed by and
 6   between counsel and the witness that the reading
 7   and signing of the deposition by the witness is
 8   hereby waived.
 9
10               INDEX
11   SHERRY SHACKELFORD
12   Examination By Ms. Allen              5
13   Reporter's Certificate              44
14
15
16          INDEX OF EXHIBITS
17   Exhibit Number    Description      Page Number
18   Petitioner's Exhibit 18 Sherry Shackelford    5
                 Deposition Subpoena
19
20
21
22
23          * * * * * * * * *
```

| Page 5 |
| --- |

```
 1          (Whereupon, Petitioner's Exhibit 18
 2              was marked for identification and
 3              is attached hereto.)
 4          SHERRY SHACKELFORD
 5      (Whereupon, the witness, after having first been
 6   duly sworn to speak the truth, the whole truth, and
 7   nothing but the truth, testified as follows:)
 8               EXAMINATION
 9   BY MS. ALLEN
10   Q   Please state your name.
11   A   Sherry Shackelford.
12   Q   I am Deanie Allen. I think I have talked with you
13       on the phone before.
14   A   You have.
15   Q   This is Susan DePaola. She is my co-counsel in
16       this action against the Pike County Board;
17       Dr. Bazzell, Mr. Casey, Mr. Pryon, and
18       Mr. McDaniel. I will be asking you some questions
19       that deal with the issues in this case.
20   A   Okay.
21   Q   If you don't understand a question, please feel to
22       stop me, and I'll try to clarify it. If you
23       answer the question, I will assume that you
```

Mary Moore-Wynn, CSR    Mary Moore-Wynn          (334)244-0203
              Court Reporting Services

Page 6

1    understand what I have asked. Okay?
2  A  Okay.
3  Q  If at any time you want to go back and change
4     anything or modify it or add to it or whatever,
5     just please let me know, and I'll try to give you
6     that opportunity to at the end.
7  A  All right.
8       MS. DePAOLA:  Are we going to do usual
9       stipulations?
10       MS. ALLEN:  Yes, please.
11       MS. DePAOLA:  Is that -- Donald?
12       MR. SWEENEY:  Yes.
13  BY MS. ALLEN:
14  Q  You stated your full name as Officer Sherry
15     Shackelford?
16  A  Yes, ma'am.
17  Q  Where do you reside?
18  A  In Brundidge.
19  Q  Can you give me your address?
20  A  316 North Main.
21  Q  What's the zip code?
22  A  36010.
23  Q  How long have you lived there?

Page 7

1  A  August is two years.
2  Q  Where did you live before that?
3  A  In Troy.
4  Q  So, are you a lifelong resident of Troy?
5  A  Of Pike County.
6  Q  Of Pike County?
7  A  Yes, ma'am.
8  Q  How long have you been a police officer?
9  A  Twenty years in February.
10  Q  Wow.  Have you worked anywhere besides Pike
11     County?
12  A  No.
13  Q  Okay.  Are you married?
14  A  No.
15  Q  Have you ever been married?
16  A  I have.
17  Q  Do you have any children?
18  A  I have one daughter.
19  Q  Does she live with you?
20  A  Most of the time.
21  Q  Okay.  So, you have been married one time?
22  A  I have been married twice.
23  Q  Okay.  One daughter?

Page 8

1  A  One daughter.
2  Q  Let's talk a little bit about your work history.
3  A  Okay.
4  Q  Start with the most recent.  Where are you working
5     at the present?
6  A  At Brundidge Police Department.
7  Q  And what do you do at the Brundidge Police
8     Department?
9  A  I'm the school resource officer.
10  Q  Okay.  What is a school resource officer?
11  A  It was a federally-funded joint venture with
12     schools of Alabama -- I guess schools all over --
13     uhm, and there was an agreement or a contract
14     written between Pike County Board and Brundidge
15     Police Department.  I think it started five or six
16     years ago.  I'm getting old.
17       But, anyway, that's my predominant role is
18     to -- anything that happens at the school, I am
19     supposed to be notified.  I go to the schools.
20     But in the last probably two years I have not been
21     in the school system as much for the simple fact
22     we have been so low on help at work.  So, the
23     chief -- you know, if something happens, I go.

Page 9

1     And if not, you know, I work the street.
2  Q  You were assigned to Pike County High School at
3     some point as the resource officer?
4  A  Yes, ma'am.
5  Q  All right.  When did you start working at Pike
6     County as the resource officer, Pike County High
7     School?
8  A  Maybe -- Mr. Bazzell can help me.  It's been about
9     six years ago.
10       THE WITNESS:  Is that how long it's
11       been?
12       DR. BAZZELL:  At least six years ago.
13  Q  That you started working at the Pike County High
14     School?
15  A  And elementary.
16  Q  Oh, the elementary school, also?
17  A  Yes, ma'am.
18  Q  Six years ago.  So, that would have been in 2001.
19     Would that have been the 2000-2001 school year?
20  A  Either the 2000-2001 or 2001-2002.  I -- I'm not
21     real sure.
22  Q  When were first assigned to Pike County High
23     School and elementary, how much time did you spend

JR, A Minor                           September 4, 2007 Pike County Board of Education

Page 10

1    at the school?
2  A   I spent probably three to three and a half hours
3     at the elementary school, and then I would go over
4     to the high school. And then if I were called to
5     either place during the times, I would go to each
6     one that was -- whoever was calling.
7  Q   When you were at the elementary school, what were
8     your duties?
9  A   Just to be on campus. I was there as a liaison
10     between parents, students, teachers, and
11     administrators.
12  Q   When you went to the high school, were your duties
13     similar, or the same?
14  A   The same.
15  Q   Were you involved in any disciplinary actions as
16     resource officer? Let's focus on the high school.
17  A   Okay. What do you mean by "disciplinary actions"?
18  Q   Well, in your role as resource officer, what were
19     your duties relative to discipline, if any?
20  A   On many occasions, if there was a fight, I would
21     be called in. At the beginning of the duties,
22     performing in the very early stages, we had
23     Mr. Boyd, who was the assistant principal, and if

Page 11

1     there was ever a fight or a parent that may have
2     become irate, or sounded like they were going to
3     be irate when they got on campus, I was always
4     called so that I could be there just in case.
5  Q   So, did your duties relative to discipline involve
6     anything other than fights or irate parents?
7  A   Uhm. It depended on the situation and the student
8     itself. I grew up in Pike County. I knew most of
9     the parents that were at the high school, at the
10     elementary school. Because of my job being what
11     it was, I got to know a lot of the parents through
12     it. So, that was how I knew most of the kids at
13     school, anyway.
14  Q   So, as far as any other disciplinary actions that
15     the kids were involved in, would you be involved
16     in those as a matter of course, other than a
17     fight?
18  A   Like I said, it would depend on the situation
19     itself.
20  Q   Give me an example.
21  A   Okay. Uhm, like, I would have an open-door
22     policy. I had an office in what is considered the
23     ROTC building. And anybody that needed to see me

Page 12

1     on a personal level or professional level, my door
2     was always open. And if I weren't there, they
3     were allowed to leave notes under the door, and I
4     could actually go to the classrooms and get them
5     out.
6        There could be problems at home. There could
7     be problems with other students that had not
8     escalated to a point to where discipline would be
9     involved. And sometimes we would just try to, you
10     know, halt it there. It would just vary on all
11     kind of different degrees.
12  Q   Did you actually have students who would come to
13     you to talk about problems that they had with
14     other students or at home or whatever?
15  A   Sure.
16  Q   So, you would act in the capacity of a counselor?
17  A   At times, yes. Sometimes they needed to know
18     where they could go --
19  Q   To deal with --
20  A   -- where -- exactly.
21  Q   So, you had an office at Pike County High School?
22  A   Yes, ma'am.
23  Q   Is that where you would stay during most of the

Page 13

1     time when you were there unless there was a
2     problem?
3  A   In the first couple of years, yes. And I would be
4     called. I had my own extension. If any of them
5     needed me for any reason -- you know, if it was
6     just to go into a classroom and sit in there to
7     make sure that the students quieted down. Or, you
8     know, if there was just any type of any problem, I
9     could go in. I was allowed.
10  Q   If you weren't in your office, where would you be
11     most of the time?
12  A   I would walk around campus, or I would stay in the
13     offices with the principals or assistant
14     principals.
15  Q   Were you ever down in the vicinity of the band
16     room?
17  A   Very seldom during the day, because I don't think
18     they had that much of a classroom thing going on.
19     At times, we would have to go down there in the
20     afternoon.
21  Q   And what was that for?
22  A   Because of the teacher himself.
23  Q   Can you explain that?

4  (Pages 10 to 13)

JR, A Minor                                    September 4, 2007 Pike County Board of Education

## Page 14

1   A   He was very high strung.
2   Q   And you're referring to, Mr. Coon?
3   A   Uhm, Mr. Coon. I don't even know his first name.
4       He would come to the office -- especially the
5       last two years that he worked at Pike County
6       High -- right --
7   Q   And that would have been 2003-4, and 4-5?
8   A   Three and four, '4 and '5 that I really got to
9       know him.
10  Q   And he would come to the office?
11  A   He would send messages to the office. And
12      Mr. McDaniel had to deal with him on a heavier
13      level than I did. His thing was kids leaving
14      school in the afternoon, their driving habits,
15      uhm --
16  Q   Now, when you say "his thing", are you talking
17      about Mr. Coon?
18  A   Mr. Coon.
19  Q   All right. He said that kids were leaving school?
20  A   Driving erratically, being loud, boisterous. And,
21      in my opinion, he had a real dislike for certain
22      students.
23  Q   Are you saying that he would report certain

## Page 15

1       students more than others?
2   A   Well, no, he would report -- to me, he would
3       report more like a vehicle. He would not know
4       their names, or he didn't give me names. And we
5       would sit down there in the afternoon to see, you
6       know, what was what. Certain times in the
7       afternoon, I would sit down there, he would stand
8       out near the road. He would smoke.
9   Q   On campus?
10  A   No. Well, I call it on campus, but I guess he
11      wouldn't. There is -- right beside on Gilmore
12      Street, which is the band area, and that back
13      parking lot, there is curbing with grass in it.
14      He would stand there. I guess he was the monitor
15      for that area, because all of the teachers have to
16      have their own areas that they stand out there
17      before and after school. And he would stand out
18      there and smoke. And certain students would come
19      up. And they always came to see me and say hello
20      or whatever. And that's how I got to know his
21      gripes or complaints.
22  Q   And, specifically, his gripes and complaints were?
23  A   Certain students that just drove him crazy. I

## Page 16

1       mean, he would just lose it on them. So...
2   Q   Did he ever mention the name of any of those
3       students?
4   A   He possibly did.
5   Q   Did he ever mention a Foster child, F-O-S-T-E-R?
6   A   Foster as foster child, or last name --
7   Q   No, last name Foster.
8   A   -- Foster?
9       Not that I remember.
10  Q   Did you ever see Mr. Coon smoking anywhere else on
11      campus?
12  A   No.
13  Q   Did you have any other connection with Mr. Coon,
14      besides what you have just described?
15  A   No.
16  Q   When was the first time that you noticed or heard
17      anything in connection with Mr. Coon that seemed
18      out of the ordinary?
19      MR. SWEENEY: Object to the form. You
20          can still answer.
21  A   Okay. And this did not come to me from him. It
22      came to me through the assistant principal.
23  Q   And the assistant principal being?

## Page 17

1   A   Robert McDaniel.
2   Q   Okay.
3   A   Okay. Mr. McDaniel would --
4       MR. SWEENEY: Object to the form. It's
5           hearsay, but you can answer.
6   A   He -- I would go into his office. We had the
7       portable buildings then. And that was where I
8       predominantly spent my time, because at the time
9       we were trying to clean up the school of -- more
10      or less your -- trying to think of what I can call
11      the kids without it being so bad -- the
12      troublemakers. Uhm...
13  Q   Let me stop you there for just a second.
14  A   Okay.
15  Q   What was the condition of Pike County when you
16      went to work there relative to discipline,
17      behavior issues, that sort of thing?
18      MR. SWEENEY: In 2001?
19  Q   In 2000 -- you said went there in 2000-2001?
20  A   Along in there, yes.
21      It was not horrible. Uhm, it could have been
22      better, and we did make it better. And I say part
23      "we," because I -- you know, I was a big part of

Mary Moore-Wynn, CSR    Mary Moore-Wynn                    (334)244-0203
                        Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 18

1  it, also.
2      Uhm, you had students that -- they were
3  actually pretty bad, very disrespectful. But we
4  worked as a group there. We tried not to put
5  children out of school, because that's what they
6  wanted. So, we tried to do something different.
7      So, back then, we would use, you know, the
8  parents coming in. With me being there, sometimes
9  I think -- I like to think, anyway -- that having
10  a uniform with a gun there, actually did, you
11  know, make them rethink what they wanted to do.
12      Uhm, it was nothing like some of the schools
13  you hear about on, you know, the news. It was
14  nothing like that.
15      The coaches, they helped a lot. We just tried
16  to get more respect back into the school. And
17  like I said, the kids were doing enough that they
18  could get suspended for. And that's exactly what
19  they wanted. So, we tried other avenues. And it
20  pretty much worked.
21 Q  Was this the situation throughout the 2000-2001?
22  Throughout the time when you were at Pike County,
23  would you say this describes the situation?

Page 19

1  A  Sure.
2  Q  All right. Get back to you going into
3   Mr. McDaniel's office and talking to him. I asked
4   you what was the first time that you heard or
5   noticed anything you considered out of the
6   ordinary with Mr. Coon?
7  A  Well, Mr. McDaniel and I -- like I said, I would
8   go in to see him every day. He and I would back
9   each other up, as far as if he had some kind of
10   disciplinary problems with some students -- and it
11   was usually males -- I was in there. Always with
12   a female, for the simple fact him being a male, he
13   didn't need to be alone with them on certain
14   things.
15 Q  So, that was the stated, or the understood, reason
16   that you were in there; that concern for
17   appearances?
18          MR. SWEENEY: Object to the form.
19 A  Actually, it was not -- it was something that I
20   basically came up with --
21 Q  Okay. Can I ask you why?
22 A  -- because -- because of my past with female
23   students. Females actually, in general, if they

Page 20

1  feel like they are being threatened, they will use
2  whatever measures, you know, in order to get over
3  on the situation. That being, he was brought in
4  to -- he was brought in to really straighten out
5  the school, in my opinion.
6  Q  Mr. McDaniel?
7  A  Mr. McDaniel. As far as clothes, how they wore
8   their clothes, their attitudes. And he was very
9   strict, very straightforward. And he would
10   actually anger the students to the point where we
11   would have to call parents in on those certain
12   things. And they were hot and hostile towards
13   him, too. So, I was always there, mostly as a
14   protector for him --
15 Q  I gotcha.
16 A  -- and the school.
17 Q  All right. Continue with the first time that you
18   noticed or heard anything out of the ordinary with
19   Mr. Coon. You were in Mr. McDaniel's office.
20 A  Apparently, Mr. Coon would come in quite often and
21   telling Mr. McDaniel he needed to do something
22   with this, or he needed to do something with that.
23   They were driving him crazy, this sort of thing.

Page 21

1  I couldn't pinpoint and tell you exactly who the
2  students were. But I do know that it was kind of
3  a running joke with McDaniel and I and -- because
4  he was such a high-strung teacher.
5  Q  And when you say "high strung", you mean easily
6   agitated?
7  A  Easily agitated. His expectations, I think, from
8   some of the students, were never ever going to
9   come up to par with him. And it just agitated
10   him. And then if they said anything out of the
11   way -- at the time, I was thinking he was an
12   old-school type teacher, meaning that back in the
13   day a child would never ever speak to an adult,
14   much less a teacher, in the manner that they were
15   speaking to him.
16 Q  And you felt like this bothered Mr. Coon --
17 A  Yes.
18 Q  -- any disrespect, or any anything?
19      So, my question was: This was the first time
20   this you noticed anything relative to Mr. Coon
21   that you considered out of the ordinary, or that
22   made you focus on Mr. Coon?
23 A  Well, looking back -- we didn't really focus on

6  (Pages 18 to 21)

Page 22

1    it. You know, he spoke about it. And I would
2    speak to Mr. Coon. And he would tell me, you need
3    to be here in the afternoon. You need to see what
4    they are doing. And that's what we tried to do.
5    We tried to appease him. Of course, you see a
6    police car out there, they are not going to see the
7    same things. But he was appeased for that time.
8    And that was the main goal.
9  Q    And you don't recall any names of any students
10       that Mr. Coon mentioned?
11 A    I don't.
12 Q    All right. Can you recall what might have come up
13       next that brought your attention to Mr. Coon?
14       Anything you heard or anything you saw? Anything
15       you heard?
16 A    Well, I'm not sure how exactly I heard about it.
17       I may have read about it in the paper, or either
18       Chief may have called me at home. But that was
19       when he was accused of molesting or whatever the
20       Faulkner boy.
21 Q    Was that the first time that you heard anything
22       connecting Mr. Coon with any sexual abuse
23       allegations?

Page 23

1  A    Yes.
2  Q    Did you ever see or observe Mr. Coon doing
3       anything at Pike County High School that you
4       considered inappropriate? Not talking about just
5       sexual abuse, anything at all.
6  A    Me, personally, I never saw him out of the way
7       with any child in any form.
8  Q    Were you aware of any reprimands that Mr. Coon
9       received from Mr. Casey or Mr. McDaniel?
10 A    Mr. Casey and I didn't talk that much. We would
11       see each other in passing. Mr. McDaniel did say
12       that he -- and I don't know what date it was or
13       anything -- that Mr. Coon had done something
14       inappropriate with a student, but it was about a
15       cell phone. And that didn't click to me -- and
16       this was after it had hit -- hit the news or the
17       public.
18 Q    So, you didn't have any conversations with
19       Mr. McDaniel, say in the fall of 2004, about any
20       kind of reprimands or activities of Mr. Coon that
21       he didn't approve of?
22 A    Only that -- and like I said, it was after all of
23       it had come out -- or what we thought was all of

Page 24

1    it had come out -- about the Faulkner child, he
2    said that Mr. Coon had been reprimanded by himself
3    about a cell phone. But I don't know any more
4    particulars than that.
5  Q    Mr. McDaniel told you that?
6  A    Yes.
7  Q    What was the context of the conversation?
8  A    To be honest, it has been so long, I wish I could
9       tell you verbatim. There is only certain
10       circumstances that I could actually tell you
11       verbatim anything that was said in those offices.
12       And those are just the things that really stand
13       out that has nothing to do with any of this.
14 Q    So, you were not aware that Mr. Casey spoke to
15       Mr. Coon?
16 A    No, ma'am.
17 Q    About any behavior issues, smoking --
18 A    No, ma'am. Like I said, Mr. Casey and I didn't
19       talk on that type of a level, unless it was
20       something that we were brought into by Mr. Casey.
21 Q    When Mr. Coon -- when you were in the office with
22       Mr. McDaniel and Mr. Coon, and he was complaining
23       about the behavior of the students, did

Page 25

1    Mr. McDaniel ever say anything about Mr. Coon's
2    ability or inability to control the students?
3  A    No.
4       MR. SWEENEY: Object to the form.
5       That's okay. You can answer.
6  Q    Did you ever observe any students in Mr. Coon's
7       truck or car during school hours?
8  A    During -- no, ma'am. Not during school hours.
9  Q    Did you ever observe any students in his truck or
10       car outside of school hours?
11 A    I'm not sure. I think maybe on one or two
12       occasions in the afternoon. I guess band practice
13       after school. Maybe. Or possibly -- no, it
14       wasn't even up town. It would have been me on
15       campus. Possibly. I --
16 Q    Do you have any idea who those students might be?
17 A    None.
18 Q    Do you recall whether you reported it to anybody?
19 A    No, because it wasn't out of the way. It was not
20       a thing that you would look at -- like I said,
21       there would have been no way I would have ever
22       pictured this man --
23 Q    Well, aside from that --

7 (Pages 22 to 25)

Page 26

1    MR. SWEENEY: Excuse me. She hadn't
2      finished her answer.
3    MS. ALLEN: Oh, I'm sorry.
4    MR. SWEENEY: No way you would have
5      pictured what?
6  A  This man being a child molester at all just
7    because of the way he reacted towards students,
8    male and female, but mostly male.
9  Q  Were there any rules that you were aware of as far
10   as teachers taking students in their cars, in
11   their personal vehicles?
12 A  No.
13 Q  So, there wouldn't have been any reason for you to
14   think there was anything unusual about him having
15   a student in the car with him?
16   MR. SWEENEY: Object to the form.
17 A  No. Not -- not at those times, I guess I should
18   say. I have had suspicions about other teachers
19   at other times, years ago. But that was late
20   night.
21 Q  Okay. Do you have any training in recognizing the
22   signs of sexual abuse?
23 A  To a degree, yes. Uhm --

Page 27

1  Q  What would that be?
2  A  Well, I actually have many hours as far as
3    paperwork is concerned. You look for the signs of
4    the way a teacher -- teacher, I'm sorry -- an
5    adult would treat a child. Especially -- mine is
6    more like of a home setting. That's what I am
7    trained more for, like a parent and a child or a
8    stepchild or something like that. That's more of
9    the training that I have received. And there are
10   certain signs you look for.
11 Q  And what exactly would the signs be?
12 A  Like if a father or a stepfather is very
13   particular about a certain child. They treat them
14   so much differently. You look for signs,
15   especially in girls, for anorexia, bulimia. I
16   have one child where she cuts herself, so that's
17   something else that you look for. You look for
18   signs of, you know, anything that they have done
19   to their own bodies because of the way that they
20   are feeling.
21 Q  In any of the paperwork or training you have had,
22   has there been anything that would indicate that
23   sexual abuse is more prevalent among special needs

Page 28

1    or MR kids?
2    MR. SWEENEY: Object to the form.
3  A  No, not that we have been trained to find.
4  Q  The training that you are describing, who provided
5    it?
6  A  Uhm, it's different seminars that we have to
7    attend. I have to attend X amount of hours every
8    year to keep my certification as a police officer.
9  Q  Who sponsors the seminars?
10 A  Sometimes it's the State of Alabama. I'm going to
11   a five-state conference that is put on by the
12   federal government for domestic abuse. So, it
13   just varies. It's according to what comes up, if
14   I am available, if I am allowed to go.
15 Q  Did Pike County Board ever sponsor any seminars
16   that you attended?
17 A  No.
18 Q  Did they ever sponsor any seminars that you are
19   aware of on sexual abuse?
20 A  Not that I am aware of.
21 Q  When did you first hear about the allegations of
22   sexual abuse by Mr. Coon?
23 A  The -- probably the Monday after it hit the

Page 29

1    newspapers.
2  Q  And what did you hear?
3  A  Basically, I didn't hear anything. I read it
4    myself.
5  Q  And what did you read?
6  A  Just that he had been arrested and was bonded out
7    after the Phillip Faulkner -- I found out who the
8    child was, of course. But, you know, him being a
9    juvenile, his name was not in the paper. And I
10   was thoroughly shocked.
11 Q  In retrospect when you looked back, was there
12   anything that you might have observed that might
13   have --
14 A  I have gone through --
15   MR. SWEENEY: Excuse me. Object to the
16     form. You can answer.
17 A  I have gone through it in my head over and over
18   and over. There was no kind of signs that are so
19   blatant that you would know that. I'm still in
20   shock that he was accused of that.
21   Now, you know, other things he may have been
22   accused of he wasn't that I would have been
23   looking for. But this is something that never

8 (Pages 26 to 29)

JR, A Minor                September 4, 2007 Pike County Board of Education

---

Page 30

1  entered my mind.
2  **Q  What might that have been?**
3  A  Oh, just talking ugly to students, cursing at
4  them, or that sort of thing.
5  **Q  Did you actually hear this?**
6  A  Oh, no. No, no, no.
7  **Q  How do you know?**
8  A  Students would tell it. Well, yeah, he has told
9  it to me on the side of the road. You know, he
10  would, call them names or whatever.
11  **Q  To you?**
12  A  Yes.
13  **Q  What kind of names?**
14      MR. SWEENEY: Object to the form.
15  A  He would call them -- like -- the little son of a
16  bitch or that little bastard or, you know,
17  something of that nature. And I would just tell
18  him, you know, you just calm down. Things -- you
19  know, it's going to be all right. We're going to
20  work this out.
21  **Q  Would this be during school time?**
22  A  No. It would be after the last bell rang.
23  **Q  Did I ask you if you were aware of any time that**

---

Page 31

1  **Mr. Coon was suspended?**
2  A  You did. But I don't know of any time that he was
3  suspended.
4  **Q  Prior to the allegations of sexual abuse?**
5  A  All I knew was what McDaniel had told me. And I
6  don't think he was suspended. And I -- I don't
7  even think we even looked further than.
8  **Q  Are you talking about some incident prior to the**
9  **sexual abuse allegations? Was there ever any time**
10  **in 2004 --**
11  A  No. This came out after he was accused of it.
12  **Q  Did you ever hear of an incident in 2004 when**
13  **Mr. Coon was choking a student?**
14      MR. SWEENEY: Object.
15  A  I had --
16      MR. SWEENEY: You can answer.
17  A  I had heard that. But nobody made a report. I'm
18  not sure what the outcome was with the school.
19  **Q  Mr. McDaniel didn't discuss that with you?**
20  A  No.
21  **Q  And I asked you if you had ever heard that some**
22  **kids had reported that he was smoking on campus?**
23      MR. SWEENEY: Object to the form.

---

Page 32

1  A  No, I -- that was just told to me the other day.
2  **Q  So, you did not hear that while you were actually**
3  **working at Pike County?**
4  A  No, ma'am.
5  **Q  Once the sexual abuse allegations were made**
6  **public, are you familiar with the investigation**
7  **that was handled?**
8  A  No, ma'am.
9  **Q  Or how it was handled?**
10  A  No, ma'am.
11  **Q  Were you ever called in and asked any questions?**
12  A  No, ma'am, not until now.
13  **Q  Never asked anything about anything you might have**
14  **observed or heard?**
15  A  No, ma'am.
16  **Q  Nobody at the school asked you?**
17  A  No, ma'am.
18      MR. SWEENEY: Object to the form.
19  **Q  You made the comment that Mr. McDaniel was called**
20  **in, or brought in, to clean up the school.**
21  **Explain that if you would.**
22  A  Well, that's my opinion of it. He is -- he was a
23  very no-nonsense, military-minded type gentleman.

---

Page 33

1  Like I said, our school was being overrun
2  basically by thug-like behavior, and -- you know,
3  with the pants hanging off of the behind. And the
4  girls' shirts real low. They would wear low
5  riders and have the little string bikinis or
6  thongs on. And it's inappropriate.
7      So, like I said, this is my opinion. This is
8  what everyone else, that I know, thinks. Is he
9  was brought in to help clean up the school.
10  **Q  Who was principal at the time?**
11  A  Terry Casey.
12  **Q  Well, was there some problem with Mr. Casey**
13  **cleaning up the school to your knowledge?**
14  A  I have no idea.
15  **Q  You were there when Mr. Casey resigned?**
16  A  I was.
17  **Q  Do you know why Mr. Casey resigned?**
18  A  No, ma'am, I don't.
19  **Q  Do you know why Mr. McDaniel was not made**
20  **principal?**
21  A  No, ma'am. I don't.
22  **Q  Did you ever hear the comment that Mr. McDaniel**
23  **was the real principal -- the in-effect principal?**

---

Mary Moore-Wynn, CSR  Mary Moore-Wynn    (334)244-0203
Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 34

1          MR. SWEENEY: Object to the form.
2  A   In my opinion, he was.
3  Q   Okay. And why do you say that?
4  A   Well, because Mr. Casey is -- was administrative.
5      He was more the paperwork person. McDaniel was
6      more of a disciplinarian.
7  Q   And Mr. McDaniel, to your knowledge, did he handle
8      all the discipline?
9  A   He didn't handle all of it, no. He did not handle
10     all of it. But a good bit of it, he did. Just
11     like before him, Mr. Boyd handled it -- a good bit
12     of the discipline, I mean.
13 Q   Do you know Justin Reed?
14 A   I do.
15 Q   How well do you know Justin?
16 A   Excuse me. Pretty good.
17 Q   Were you familiar with the incident during the
18     school year when Justin broke a window in the band
19     room?
20 A   No.
21 Q   You weren't involved with that? Did you know
22     about it?
23 A   No, ma'am.

Page 35

1  Q   When did you leave Pike County High School? Were
2      you there during 2004-5?
3  A   Actually, I still haven't left. It's -- like I
4      said, because of us having a shortage of officers,
5      I can't predominantly be there anymore. But if
6      anything happens -- just like this morning, if
7      anything happens at the school, I should be the
8      one that is called in.
9  Q   So, you're still working at Pike County High
10     School?
11 A   Yes, ma'am. And the elementary school.
12 Q   And you have other duties?
13 A   I do.
14 Q   Would you be sent to any other school?
15 A   No, ma'am, not unless I am doing it as a favor to
16     that school. With the classes that I do, I guess
17     you should say, teach.
18 Q   What classes do you teach?
19 A   I have a DUI simulation with the go cart.
20 Q   At school?
21 A   Yes, ma'am.
22 Q   Were you aware that Justin was sent to alternative
23     school for having a weapon during the 2004-5

Page 36

1      school year?
2  A   I remember some of it. I was shocked, because
3      he's a sweet little boy. I've known them since
4      they were real small. Actually grew up with his
5      father. I don't remember the particulars about it
6      now. But I do know that he was in alternative
7      school. And I believe quite a long time.
8  Q   A month. Does that sound right?
9  A   Possibly.
10 Q   Did Mr. McDaniel discuss that with you at all?
11 A   He didn't.
12 Q   Did you ever see Justin leave class and go to the
13     band room --
14 A   No.
15 Q   -- during school time?
16 A   I don't even know what block he had. I guess it
17     was the block system, even then. I don't know
18     when he had band.
19 Q   Okay. Do you know Polly King?
20 A   I do.
21 Q   How do you know her?
22 A   I used to be a tenant of hers. That's how I first
23     knew her, many, many years ago. I know her

Page 37

1      children. I know her ex-husband. That's how I
2      know her.
3  Q   Right. Have you had any contact with Polly King
4      during the 2004 -- during the fall of 2004?
5  A   If I did, I don't remember.
6  Q   Okay. Were you aware that -- or had you heard
7      that she made any reports to anyone about
8      Mr. Coon?
9          MR. SWEENEY: Object to the form.
10 A   Not to my knowledge.
11 Q   So, you have never heard her name in connection
12     with Mr. Coon in anything he might have done?
13         MR. SWEENEY: Object to the form.
14 A   The only thing -- and I'm not even sure how I
15     heard it was -- I believe her son Matt -- MAK,
16     they didn't get along. Him and Mr. Coon did not
17     get along. But I don't know to what extent. I do
18     know that he was in the band. He played drums.
19 Q   How did you know that they didn't get along?
20 A   I don't know. I'm sure it was word of mouth.
21     Maybe even other students. I don't remember Polly
22     King coming to me about anything.
23 Q   And you don't remember Polly King -- you don't

JR, A Minor                          September 4, 2007 Pike County Board of Education

| Page 38 | Page 40 |
|---|---|
| 1    remember her name in connection with any of the | 1    clear: You were never provided with any training |
| 2    allegations concerning Mr. Coon? | 2    by the Pike County Board of Education relating to |
| 3   A   Not with Mr. Coon. But Polly always -- she is | 3    sexual abuse? |
| 4    very vocal about her children. And that's up to | 4       MR. SWEENEY: Object. |
| 5    absolutely today. | 5   A   No, ma'am. |
| 6   Q   What was the school's attitude towards Polly King? | 6       MS. DePAOLA: Now, wait. Is that |
| 7   A   I have no idea. | 7        correct? |
| 8   Q   So, when you say she was "very vocal", that's your | 8   BY MS. ALLEN |
| 9    opinion? | 9   Q   Is that correct? |
| 10   A   Yes, because I deal with her on other levels, | 10   A   That's true. |
| 11    also. | 11   Q   Were you ever provided with any policies, or did |
| 12   Q   Are you aware of any established procedures that | 12    you ever see any policies and procedures provided |
| 13    Pike County school or Pike County Board of | 13    to you by the Pike County Board of Education |
| 14    Education had when it came to investigating a | 14    relating to sexual abuse? |
| 15    sexual abuse claim? | 15   A   I was presented with -- I am trying to think of |
| 16   A   I don't. | 16    the name -- I'm looking at the book in my mind. I |
| 17   Q   Were you ever part of an investigation that dealt | 17    don't know that it was called rules and |
| 18    with sexual abuse at Pike County High School? | 18    regulations, but I was given a book from the |
| 19   A   No, ma'am. | 19    Board. I touched on issues that I would deal |
| 20   Q   Are you aware of any sexual abuse allegations | 20    with -- an everyday issue. And it probably was in |
| 21    while you have been at Pike County High School | 21    there. But I can't sit here and tell you that it |
| 22    connected with anybody? | 22    was in there for sure about any sexual anything. |
| 23       MR. SWEENEY: Object to the form. | 23   Q   So, you said you were provided with what now? |

| Page 39 | Page 41 |
|---|---|
| 1   A   I'm not sure if it would be called sexual abuse. | 1   A   It's like a rules and regulations book. But I |
| 2    I know that there was an incident that happened in | 2    don't think that's what they call it. |
| 3    a classroom. But those students were dealt with. | 3   Q   Board rules and regulations? |
| 4    There was no adults in it. | 4   A   Of what is expected of, I guess, employees. |
| 5   Q   So, that had to do strictly with students? | 5   Q   Are you referring to an employee policy manual? |
| 6   A   Yes, ma'am. | 6   A   A policy manual. That was it. |
| 7   Q   Do you know what kind of process, or was there a | 7   Q   Are you aware of anything in there that related to |
| 8    process followed, procedure followed? | 8    sexual abuse? |
| 9   A   They were both sent to ALC, alternative school. | 9   A   No. |
| 10       MS. ALLEN: Excuse us for one second. | 10   Q   Or was any kind of procedure to follow if there |
| 11       (Brief recess.) | 11    were any allegations? |
| 12   BY MS. ALLEN | 12   A   There possibly was, but I couldn't tell you. |
| 13   Q   Just a few more questions. You made the comment | 13   Q   Are you aware of any policy or procedures that the |
| 14    that Mr. Coon, you would have never suspected him | 14    Board has that it utilizes in an investigation of |
| 15    of sexually abusing a child; is that correct? | 15    sexual abuse? |
| 16   A   Yes, ma'am. | 16   A   No, ma'am. I have no idea. |
| 17   Q   So, then, in your opinion, it wouldn't surprise | 17   Q   Okay. And during 2004-2005, you were the only law |
| 18    you that a parent wouldn't suspect him of -- | 18    enforcement person who was on site at Pike County |
| 19   A   Sure. | 19    High School? |
| 20   Q   Would you -- I'm sorry -- answer out loud? | 20   A   Yes, ma'am. |
| 21   A   No, I would never -- I don't think a parent would | 21   Q   And you were never asked to participate in any |
| 22    have. | 22    investigation of Mr. Coon or to participate in any |
| 23   Q   Okay. Let me just make sure I have got this | 23    investigation of sexual allegations? |

11 (Pages 38 to 41)

Page 42

1      MR. SWEENEY:  You mean after he left the
2      school?
3      MS. ALLEN:  While she was there during
4      2004-2005.
5      MR. SWEENEY:  I object to the form.  You
6      can answer.
7  A   No, ma'am.
8  **Q   Just one last question:  Did you talk to anybody**
9  **before this deposition in preparation for the**
10 **deposition?**
11 A   Yes, ma'am.  I talked to this gentleman.
12     MR. SWEENEY:  Donald Sweeney.
13 **Q   And what was the gist of your conversation?**
14 A   That you all were very professional.  He would
15     tell me when he would speak up.  Like he's been --
16     I don't know what he's saying, because I can't
17     hear very well.  And just that this was going to
18     be the deposition, answer as honestly and
19     truthfully as you can.  Other than -- and we
20     talked by phone.
21 **Q   Did you talk about any of the testimony that you**
22 **would give?**
23 A   No, ma'am.

Page 43

1      MS. ALLEN:  Okay.  That's it.
2      MR. SWEENEY:  Thank you very much.
3      THE WITNESS:  You're welcome.
4      MS. ALLEN:  Yes, thank you very much.
5      (Whereupon, at approximately, 10:25
6      a.m. on the 4th day of September,
7      2007 the deposition was
8      concluded.)
9      * * * * * * * *
10     FURTHER DEPONENT SAITH NOT
11     * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23

Page 44

1
2          REPORTER'S CERTIFICATE
3
4   STATE OF ALABAMA
5   MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8   transcript of the deposition of SHERRY SHACKELFORD was
9   taken down by me in machine shorthand on the 4th of
10  September, 2007, and the questions and answers thereto
11  reduced to writing under my personal supervision, and
12  that the foregoing represents a true and correct
13  transcript of the proceedings given by said witness
14  upon said hearing.
15     I further certify that I am neither of counsel nor
16  related to the parties to the action, nor am I any wise
17  interested in the results of said cause.
18     Dated this 7th day of September, 2007.
19
20     _____
21     Mary Moore-Wynn
22     Certified Shorthand Reporter
23

| A | | | | |
|---|---|---|---|---|
| **ability** 25:2 | 31:4,9 32:5 | 32:16 41:21 | 37:15 | 40:17 |
| **absolutely** 38:5 | 38:2,20 41:11 | **asking** 5:18 | **bell** 30:22 | **calling** 10:6 |
| **abuse** 22:22 | 41:23 | **assigned** 9:2,22 | **better** 17:22,22 | **calm** 30:18 |
| 23:5 26:22 | **Allen** 2:4 4:12 | **assistant** 10:23 | **big** 17:23 | **campus** 10:9 |
| 27:23 28:12,19 | 5:9,12 6:10,13 | 13:13 16:22,23 | **bikinis** 33:5 | 11:3 13:12 |
| 28:22 31:4,9 | 26:3 39:10,12 | **assume** 5:23 | **Birmingham** | 15:9,10 16:11 |
| 32:5 38:15,18 | 40:8 42:3 43:1 | **attached** 5:3 | 2:14 | 25:15 31:22 |
| 38:20 39:1 | 43:4 | **attend** 28:7,7 | **bit** 8:2 34:10,11 | **capacity** 12:16 |
| 40:3,14 41:8 | **allowed** 12:3 | **attended** 28:16 | **bitch** 30:16 | **car** 22:6 25:7,10 |
| 41:15 | 13:9 28:14 | **attention** 22:13 | **blatant** 29:19 | 26:15 |
| **abusing** 39:15 | **alternative** | **attitude** 38:6 | **block** 36:16,17 | **cars** 26:10 |
| **accused** 22:19 | 35:22 36:6 | **attitudes** 20:8 | **Board** 1:11,17 | **cart** 35:19 |
| 29:20,22 31:11 | 39:9 | **Attorney** 2:8 | 5:16 8:14 | **case** 1:9 3:21 4:1 |
| **act** 12:16 | **amount** 28:7 | **August** 7:1 | 28:15 38:13 | 5:19 11:4 |
| **action** 5:16 | **anger** 20:10 | **available** 28:14 | 40:2,13,19 | **Casey** 5:17 23:9 |
| 44:16 | **Ann** 2:1 | **Avenue** 2:5,13 | 41:3,14 | 23:10 24:14,18 |
| **actions** 10:15,17 | **anorexia** 27:15 | **avenues** 18:19 | **bodies** 27:19 | 24:20 33:11,12 |
| 11:14 | **answer** 5:23 | **aware** 23:8 | **boisterous** 14:20 | 33:15,17 34:4 |
| **activities** 23:20 | 16:20 17:5 | 24:14 26:9 | **bonded** 29:6 | **cause** 44:17 |
| **add** 6:4 | 25:5 26:2 | 28:19,20 30:23 | **book** 40:16,18 | **cell** 23:15 24:3 |
| **address** 6:19 | 29:16 31:16 | 35:22 37:6 | 41:1 | **certain** 14:21,23 |
| **administrative** | 39:20 42:6,18 | 38:12,20 41:7 | **bothered** 21:16 | 15:6,18,23 |
| 34:4 | **answers** 44:10 | 41:13 | **boy** 22:20 36:3 | 19:13 20:11 |
| **administrators** | **anybody** 11:23 | **Azar** 2:4,4 | **Boyd** 10:23 | 24:9 27:10,13 |
| 10:11 | 25:18 38:22 | **a.m** 1:20 43:6 | 34:11 | **Certificate** 4:13 |
| **adult** 21:13 27:5 | 42:8 | | **Bradley** 2:12 | 44:2 |
| **adults** 39:4 | **anymore** 35:5 | B | **Brief** 39:11 | **certification** |
| **afternoon** 13:20 | **anyway** 8:17 | **B** 2:9 | **broke** 34:18 | 28:8 |
| 14:14 15:5,7 | 11:13 18:9 | **back** 6:3 15:12 | **brought** 20:3,4 | **Certified** 44:22 |
| 22:3 25:12 | **Apparently** | 18:7,16 19:2,8 | 22:13 24:20 | **certify** 44:7,15 |
| **agitated** 21:6,7,9 | 20:20 | 21:12,23 29:11 | 32:20 33:9 | **change** 6:3 |
| **ago** 8:16 9:9,12 | **appearances** 2:2 | **bad** 17:11 18:3 | **Brundidge** 6:18 | **chief** 8:23 22:18 |
| 9:18 26:19 | 19:17 | **band** 13:15 | 8:6,7,14 | **child** 16:5,6 |
| 36:23 | **appease** 22:5 | 15:12 25:12 | **building** 11:23 | 21:13 23:7 |
| **agreed** 3:8,20 | **appeased** 22:7 | 34:18 36:13,18 | **buildings** 17:7 | 24:1 26:6 27:5 |
| 4:5 | **approve** 23:21 | 37:18 | **bulimia** 27:15 | 27:7,13,16 |
| **agreement** 8:13 | **approximately** | **basically** 19:20 | | 29:8 39:15 |
| **AL** 2:14 | 1:20 43:5 | 29:3 33:2 | C | **children** 7:17 |
| **Alabama** 1:2,18 | **Arant** 2:12 | **bastard** 30:16 | **call** 15:10 17:10 | 18:5 37:1 38:4 |
| 2:5,9 8:12 | **area** 15:12,15 | **Bazzell** 2:17 | 20:11 30:10,15 | **choking** 31:13 |
| 28:10 44:4 | **areas** 15:16 | 5:17 9:8,12 | 41:2 | **circumstances** |
| **ALC** 39:9 | **arrested** 29:6 | **beginning** 10:21 | **called** 10:4,21 | 24:10 |
| **allegations** | **aside** 25:23 | **behavior** 17:17 | 11:4 13:4 | **Civil** 3:11 |
| 22:23 28:21 | **asked** 6:1 19:3 | 24:17,23 33:2 | 22:18 32:11,19 | **claim** 38:15 |
| | 31:21 32:11,13 | **believe** 36:7 | 35:8 39:1 | **clarify** 5:22 |

**Clark** 2:4
**class** 36:12
**classes** 35:16,18
**classroom** 13:6
  13:18 39:3
**classrooms** 12:4
**clean** 17:9 32:20
  33:9
**cleaning** 33:13
**clear** 40:1
**click** 23:15
**clothes** 20:7,8
**coaches** 18:15
**code** 6:21
**come** 12:12 14:4
  14:10 15:18
  16:21 20:20
  21:9 22:12
  23:23 24:1
**comes** 28:13
**coming** 18:8
  37:22
**commencing**
  1:19
**comment** 32:19
  33:22 39:13
**commission**
  3:13
**Commissioner**
  1:16 3:12
**complaining**
  24:22
**complaints**
  15:21,22
**concern** 19:16
**concerned** 27:3
**concerning** 38:2
**concluded** 43:8
**condition** 17:15
**conference**
  28:11
**connected** 38:22
**connecting**
  22:22
**connection**

16:13,17 37:11
  38:1
**considered**
  11:22 19:5
  21:21 23:4
**contact** 37:3
**context** 24:7
**Continue** 20:17
**contract** 8:13
**control** 25:2
**conversation**
  24:7 42:13
**conversations**
  23:18
**Coon** 14:2,3,17
  14:18 16:10,13
  16:17 19:6
  20:19,20 21:16
  21:20,22 22:2
  22:10,13,22
  23:2,8,13,20
  24:2,15,21,22
  28:22 31:1,13
  37:8,12,16
  38:2,3 39:14
  41:22
**Coon's** 25:1,6
**correct** 39:15
  40:7,9 44:12
**counsel** 3:9,21
  4:6 44:15
**counselor** 12:16
**County** 1:11,17
  5:16 7:5,6,11
  8:14 9:2,6,6,13
  9:22 11:8
  12:21 14:5
  17:15 18:22
  23:3 28:15
  32:3 35:1,9
  38:13,13,18,21
  40:2,13 41:18
  44:5
**couple** 13:3
**course** 11:16

22:5 29:8
**COURT** 1:1
**co-counsel** 5:15
**crazy** 15:23
  20:23
**CSR** 3:12
**curbing** 15:13
**cursing** 30:3
**cuts** 27:16

————————
**D**
**date** 23:12
**Dated** 44:18
**daughter** 7:18
  7:23 8:1
**day** 13:17 19:8
  21:13 32:1
  43:6 44:18
**deal** 5:19 12:19
  14:12 38:10
  40:19
**dealt** 38:17 39:3
**Deanie** 2:4 5:12
**DEFENDANT**
  1:13 2:11
**degree** 26:23
**degrees** 12:11
**DePaola** 2:8
  5:15 6:8,11
  40:6
**Department** 8:6
  8:8,15
**depend** 11:18
**depended** 11:7
**DEPONENT**
  43:10
**deposition** 1:15
  3:9,11,16,22
  3:23 4:7,18
  42:9,10,18
  43:7 44:8
**described** 16:14
**describes** 18:23
**describing** 28:4
**Description** 4:17

**different** 12:11
  18:6 28:6
**differently**
  27:14
**disciplinarian**
  34:6
**disciplinary**
  10:15,17 11:14
  19:10
**discipline** 10:19
  11:5 12:8
  17:16 34:8,12
**discuss** 31:19
  36:10
**dislike** 14:21
**disrespect** 21:18
**disrespectful**
  18:3
**DISTRICT** 1:1
  1:2
**DIVISION** 1:3
**doing** 18:17 22:4
  23:2 35:15
**domestic** 28:12
**Donald** 2:12
  6:11 42:12
**door** 12:1,3
**Dr** 2:17 5:17
  9:12
**driving** 14:14,20
  20:23
**drove** 15:23
**drums** 37:18
**DUI** 35:19
**duly** 5:6
**duties** 10:8,12
  10:19,21 11:5
  35:12

————————
**E**
**EAR** 1:6
**early** 10:22
**easily** 21:5,7
**Education** 1:12
  1:18 38:14

40:2,13
**either** 3:18 4:2
  9:20 10:5
  22:17
**elementary** 9:15
  9:16,23 10:3,7
  11:10 35:11
**Elizabeth** 2:16
**employee** 41:5
**employees** 41:4
**enforcement**
  41:18
**entered** 30:1
**erratically** 14:20
**escalated** 12:8
**especially** 14:4
  27:5,15
**established**
  38:12
**everyday** 40:20
**evidence** 3:17
**exactly** 12:20
  18:18 21:1
  22:16 27:11
**Examination**
  4:12 5:8
**example** 11:20
**Excuse** 26:1
  29:15 34:16
  39:10
**Exhibit** 4:17,18
  5:1
**EXHIBITS** 4:16
**expectations**
  21:7
**expected** 41:4
**explain** 13:23
  32:21
**extension** 13:4
**extent** 37:17
**ex-husband**
  37:1

————————
**F**
**fact** 8:21 19:12

JR, A Minor                          September 4, 2007 Pike County Board of Education
                                                                    Page 3

**fall** 23:19 37:4
**familiar** 32:6
  34:17
**far** 11:14 19:9
  20:7 26:9 27:2
**father** 1:6 27:12
  36:5
**Faulkner** 22:20
  24:1 29:7
**favor** 35:15
**February** 7:9
**federal** 2:13
  3:10 28:12
**federally-fund...**
  8:11
**feel** 5:21 20:1
**feeling** 27:20
**felt** 21:16
**female** 19:12,22
  26:8
**Females** 19:23
**Fifth** 2:13
**fight** 10:20 11:1
  11:17
**fights** 11:6
**filing** 3:22 4:3
**find** 28:3
**finished** 26:2
**first** 5:5 9:22
  13:3 14:3
  16:16 19:4
  20:17 21:19
  22:21 28:21
  36:22
**five** 8:15
**five-state** 28:11
**focus** 10:16
  21:22,23
**follow** 41:10
**followed** 39:8,8
**follows** 5:7
**foregoing** 44:7
  44:12
**form** 3:14 16:19
  17:4 19:18

23:7 25:4
26:16 28:2
29:16 30:14
31:23 32:18
34:1 37:9,13
38:23 42:5
**formality** 3:13
**forth** 1:19
**foster** 16:5,6,6,7
  16:8
**found** 29:7
**four** 14:8
**full** 6:14
**further** 3:20 4:5
  31:7 43:10
  44:15
**F-O-S-T-E-R**
  16:5

       **G**
**general** 19:23
**gentleman** 32:23
  42:11
**getting** 8:16
**Gilmore** 15:11
**girls** 27:15 33:4
**gist** 42:13
**give** 6:5,19
  11:20 15:4
  42:22
**given** 40:18
  44:13
**go** 6:3 8:19,23
  10:3,5 12:4,18
  13:6,9,19 17:6
  19:8 28:14
  35:19 36:12
**goal** 22:8
**going** 6:8 11:2
  13:18 19:2
  21:8 22:6
  28:10 30:19,19
  42:17
**good** 34:10,11
  34:16

**gotcha** 20:15
**government**
  28:12
**grass** 15:13
**grew** 11:8 36:4
**gripes** 15:21,22
**group** 18:4
**guess** 8:12 15:10
  15:14 25:12
  26:17 35:16
  36:16 41:4
**gun** 18:10

       **H**
**habits** 14:14
**half** 10:2
**halt** 12:10
**handle** 34:7,9,9
**handled** 32:7,9
  34:11
**hanging** 33:3
**happened** 39:2
**happens** 8:18,23
  35:6,7
**head** 29:17
**hear** 18:13
  28:21 29:2,3
  30:5 31:12
  32:2 33:22
  42:17
**heard** 16:16
  19:4 20:18
  22:14,15,16,21
  31:17,21 32:14
  37:6,11,15
**hearing** 44:14
**hearsay** 17:5
**heavier** 14:12
**hello** 15:19
**help** 8:22 9:8
  33:9
**helped** 18:15
**hereto** 3:18 4:2
  5:3
**high** 9:2,6,13,22

10:4,12,16
11:9 12:21
14:1,6 21:5
23:3 35:1,9
38:18,21 41:19
**high-strung**
  21:4
**history** 8:2
**hit** 23:16,16
  28:23
**home** 12:6,14
  22:18 27:6
**Hon** 2:4,8,12
**honest** 24:8
**honestly** 42:18
**horrible** 17:21
**hostile** 20:12
**hot** 20:12
**hours** 10:2 25:7
  25:8,10 27:2
  28:7

       **I**
**idea** 25:16 33:14
  38:7 41:16
**identification**
  5:2
**inability** 25:2
**inappropriate**
  23:4,14 33:6
**incident** 31:8,12
  34:17 39:2
**INDEX** 4:10,16
**indicate** 27:22
**interested** 44:17
**introduced** 4:1
**investigating**
  38:14
**investigation**
  32:6 38:17
  41:14,22,23
**involve** 11:5
**involved** 10:15
  11:15,15 12:9
  34:21

**in-effect** 33:23
**irate** 11:2,3,6
**issue** 40:20
**issues** 5:19
  17:17 24:17
  40:19

       **J**
**job** 11:10
**joint** 8:11
**joke** 21:3
**JR** 1:5
**Justin** 34:13,15
  34:18 35:22
  36:12
**juvenile** 29:9

       **K**
**keep** 28:8
**kids** 11:12,15
  14:13,19 17:11
  18:17 28:1
  31:22
**kind** 12:11 19:9
  21:2 23:20
  29:18 30:13
  39:7 41:10
**King** 36:19 37:3
  37:22,23 38:6
**knew** 11:8,12
  31:5 36:23
**know** 6:5 8:23
  9:1 11:11
  12:10,17 13:5
  13:8 14:3,9
  15:3,6,20
  17:23 18:7,11
  18:13 20:2
  21:2 22:1
  23:12 24:3
  27:18 29:8,19
  29:21 30:7,9
  30:16,18,19
  31:2 33:2,8,17
  33:19 34:13,15

JR, A Minor                          September 4, 2007 Pike County Board of Education
Page 4

34:21 36:6,16
36:17,19,21,23
37:1,2,17,18
37:19,20 39:2
39:7 40:17
42:16
**knowledge**
33:13 34:7
37:10
**known** 36:3

_____ **L** _____

**late** 26:19
**law** 2:8 41:17
**leave** 12:3 35:1
36:12
**leaving** 14:13,19
**left** 35:3 42:1
**Let's** 8:2 10:16
**level** 12:1,1
14:13 24:19
**levels** 38:10
**liaison** 10:9
**lifelong** 7:4
**little** 8:2 30:15
30:16 33:5
36:3
**live** 7:2,19
**lived** 6:23
**long** 6:23 7:8
9:10 24:8 36:7
**look** 25:20 27:3
27:10,14,17,17
**looked** 29:11
31:7
**looking** 21:23
29:23 40:16
**lose** 16:1
**lot** 11:11 15:13
18:15
**loud** 14:20 39:20
**Love** 1:18
**low** 8:22 33:4,4

_____ **M** _____

**machine** 44:9
**main** 6:20 22:8
**MAK** 37:15
**male** 19:12 26:8
26:8
**males** 19:11
**man** 25:22 26:6
**manner** 4:2
21:14
**manual** 41:5,6
**Mark** 2:17
**marked** 5:2
**married** 7:13,15
7:21,22
**Mary** 1:16 3:12
44:21
**Matt** 37:15
**matter** 11:16
**ma'am** 6:16 7:7
9:4,17 12:22
24:16,18 25:8
32:4,8,10,12
32:15,17 33:18
33:21 34:23
35:11,15,21
38:19 39:6,16
40:5 41:16,20
42:7,11,23
**McDaniel** 5:18
14:12 17:1,3
19:7 20:6,7,21
21:3 23:9,11
23:19 24:5,22
25:1 31:5,19
32:19 33:19,22
34:5,7 36:10
**McDaniel's** 19:3
20:19
**mean** 10:17 16:1
21:5 34:12
42:1
**meaning** 21:12
**measures** 20:2
**mention** 16:2,5
**mentioned**

22:10
**messages** 14:11
**MIDDLE** 1:2
**military-mind...**
32:23
**mind** 30:1 40:16
**mine** 27:5
**MINOR** 1:5
**modify** 6:4
**molester** 26:6
**molesting** 22:19
**Monday** 28:23
**monitor** 15:14
**Montgomery**
2:5,9 44:5
**month** 36:8
**Moore-Wynn**
1:16 3:12
44:21
**morning** 35:6
**MOTHER** 1:6
**mouth** 37:20

_____ **N** _____

**name** 5:10 6:14
14:3 16:2,6,7
29:9 37:11
38:1 40:16
**names** 15:4,4
22:9 30:10,13
**nature** 30:17
**near** 15:8
**need** 3:15 19:13
22:2,3
**needed** 11:23
12:17 13:5
20:21,22
**needs** 27:23
**neither** 44:15
**never** 21:8,13
23:6 29:23
32:13 37:11
39:14,21 40:1
41:21
**news** 18:13

23:16
**newspapers**
29:1
**night** 26:20
**North** 2:13 6:20
**NORTHERN**
1:3
**notes** 12:3
**noticed** 16:16
19:5 20:18
21:20
**notified** 8:19
**no-nonsense**
32:23
**Number** 4:17,17

_____ **O** _____

**object** 16:19
17:4 19:18
25:4 26:16
28:2 29:15
30:14 31:14,23
32:18 34:1
37:9,13 38:23
40:4 42:5
**objections** 3:13
3:14
**observe** 23:2
25:6,9
**observed** 29:12
32:14
**occasions** 10:20
25:12
**offered** 3:17
**office** 11:22
12:21 13:10
14:4,10,11
17:6 19:3
20:19 24:21
**officer** 6:14 7:8
8:9,10 9:3,6
10:16,18 28:8
**officers** 35:4
**offices** 1:17
13:13 24:11

**Oh** 9:16 26:3
30:3,6
**okay** 5:20 6:1,2
7:13,21,23 8:3
8:10 10:17
11:21 16:21
17:2,3,14
19:21 25:5
26:21 34:3
36:19 37:6
39:23 41:17
43:1
**old** 8:16
**old-school** 21:12
**Once** 32:5
**open** 21:2
**open-door** 11:21
**opinion** 14:21
20:5 32:22
33:7 34:2 38:9
39:17
**opportunity** 6:6
**order** 20:2
**ordinary** 16:18
19:6 20:18
21:21
**outcome** 31:18
**outside** 25:10
**overrun** 33:1

_____ **P** _____

**Page** 4:17
**pants** 33:3
**paper** 22:17
29:9
**paperwork** 27:3
27:21 34:5
**par** 21:9
**parent** 11:1 27:7
39:18,21
**parents** 10:10
11:6,9,11 18:8
20:11
**parking** 15:13
**part** 17:23 38:17

**participate** 41:21,22
**particular** 27:13
**particulars** 24:4 36:5
**parties** 3:9,21 44:16
**party** 3:18 4:2
**passing** 23:11
**performing** 10:22
**person** 34:5 41:18
**personal** 12:1 26:11 44:11
**personally** 23:6
**Petitioner's** 4:18 5:1
**Phillip** 29:7
**phone** 5:13 23:15 24:3 42:20
**pictured** 25:22 26:5
**Pike** 1:11,17 5:16 7:5,6,10 8:14 9:2,5,6,13 9:22 11:8 12:21 14:5 17:15 18:22 23:3 28:15 32:3 35:1,9 38:13,13,18,21 40:2,13 41:18
**pinpoint** 21:1
**place** 2:13 10:5
**PLAINTIFF** 1:8 2:3
**played** 37:18
**please** 5:10,21 6:5,10
**point** 9:3 12:8 20:10
**police** 7:8 8:6,7 8:15 22:6 28:8

**policies** 40:11,12
**policy** 11:22 41:5,6,13
**Polly** 36:19 37:3 37:21,23 38:3 38:6
**portable** 17:7
**possibly** 16:4 25:13,15 36:9 41:12
**practice** 25:12
**predominant** 8:17
**predominantly** 17:8 35:5
**preparation** 42:9
**present** 2:15 8:5
**presented** 40:15
**pretty** 18:3,20 34:16
**prevalent** 27:23
**principal** 10:23 16:22,23 33:10 33:20,23,23
**principals** 13:13 13:14
**prior** 31:4,8
**probably** 8:20 10:2 28:23 40:20
**problem** 13:2,8 33:12
**problems** 12:6,7 12:13 19:10
**procedure** 3:11 39:8 41:10
**procedures** 38:12 40:12 41:13
**proceedings** 44:13
**process** 39:7,8
**professional** 12:1 42:14

**protector** 20:14
**provided** 3:18 4:2 28:4 40:1 40:11,12,23
**Pryon** 5:17
**public** 23:17 32:6
**purpose** 3:18
**pursuant** 1:19 3:10
**put** 18:4 28:11

---

**Q**

**question** 5:21,23 21:19 42:8
**questions** 3:14 3:15 5:18 32:11 39:13 44:10
**quieted** 13:7
**quite** 20:20 36:7

---

**R**

**R** 2:12
**rang** 30:22
**reacted** 26:7
**read** 22:17 29:3 29:5
**reading** 4:6
**real** 9:21 14:21 33:4,23 36:4
**really** 14:8 20:4 21:23 24:12
**reason** 13:5 19:15 26:13
**recall** 22:9,12 25:18
**received** 23:9 27:9
**recess** 39:11
**recognizing** 26:21
**reduced** 44:11
**Reed** 2:16 34:13
**referring** 14:2

41:5
**regardless** 4:3
**regulations** 40:18 41:1,3
**related** 41:7 44:16
**relating** 40:2,14
**relative** 10:19 11:5 17:16 21:20
**remember** 16:9 36:2,5 37:5,21 37:23 38:1
**report** 14:23 15:2,3 31:17
**reported** 25:18 31:22
**Reporter** 44:22
**Reporter's** 4:13 44:2
**reports** 37:7
**representing** 3:9 3:21
**represents** 44:12
**reprimanded** 24:2
**reprimands** 23:8,20
**reserved** 3:16
**reside** 6:17
**resident** 7:4
**resigned** 33:15 33:17
**resource** 8:9,10 9:3,6 10:16,18
**respect** 18:16
**results** 44:17
**rethink** 18:11
**retrospect** 29:11
**riders** 33:5
**right** 6:7 9:5 14:6,19 15:11 19:2 20:17 22:12 30:19 36:8 37:3

**road** 15:8 30:9
**Robert** 17:1
**role** 8:17 10:18
**room** 13:16 34:19 36:13
**ROTC** 11:23
**rules** 3:11 26:9 40:17 41:1,3
**ruling** 3:16
**running** 21:3

---

**S**

**SAITH** 43:10
**saw** 22:14 23:6
**saying** 14:23 42:16
**school** 8:9,10,18 8:21 9:2,7,14 9:16,19,23 10:1,3,4,7,12 10:16 11:9,10 11:13 12:21 14:14,19 15:17 17:9 18:5,16 20:5,16 23:3 25:7,8,10,13 30:21 31:18 32:16,20 33:1 33:9,13 34:18 35:1,7,10,11 35:14,16,20,23 36:1,7,15 38:13,18,21 39:9 41:19 42:2
**schools** 8:12,12 8:19 18:12
**school's** 38:6
**second** 2:9 17:13 39:10
**see** 11:23 15:5 15:19 16:10 19:8 22:3,5 23:2,11 36:12 40:12

| | | | | |
|---|---|---|---|---|
| **seldom** 13:17 | **simulation** | **Statute** 3:19 4:3 | **surprise** 39:17 | **tenant** 36:22 |
| **seminars** 28:6,9 | 35:19 | **stay** 12:23 13:12 | **Susan** 2:8 5:15 | **Terry** 33:11 |
| 28:15,18 | **sit** 13:6 15:5,7 | **stepchild** 27:8 | **suspect** 39:18 | **testified** 5:7 |
| **send** 14:11 | 40:21 | **stepfather** 27:12 | **suspected** 39:14 | **testimony** 42:21 |
| **sent** 35:14,22 | **site** 41:18 | **stipulated** 3:8 | **suspended** | **thank** 43:2,4 |
| 39:9 | **situation** 11:7 | 3:20 4:5 | 18:18 31:1,3,6 | **thereto** 44:10 |
| **September** 1:17 | 11:18 18:21,23 | **stipulations** | **suspicions** 26:18 | **thing** 13:18 |
| 43:6 44:10,18 | 20:3 | 1:19 3:6 6:9 | **Sweeney** 2:12 | 14:13,16 17:17 |
| **set** 1:19 | **six** 8:15 9:9,12 | **stop** 5:22 17:13 | 6:12 16:19 | 20:23 25:20 |
| **setting** 27:6 | 9:18 | **straighten** 20:4 | 17:4,18 19:18 | 30:4 37:14 |
| **sexual** 22:22 | **small** 36:4 | **straightforward** | 25:4 26:1,4,16 | **things** 19:14 |
| 23:5 26:22 | **smoke** 15:8,18 | 20:9 | 28:2 29:15 | 20:12 22:7 |
| 27:23 28:19,22 | **smoking** 16:10 | **street** 1:18 2:9 | 30:14 31:14,16 | 24:12 29:21 |
| 31:4,9 32:5 | 24:17 31:22 | 9:1 15:12 | 31:23 32:18 | 30:18 |
| 38:15,18,20 | **son** 30:15 37:15 | **strict** 20:9 | 34:1 37:9,13 | **think** 5:12 8:15 |
| 39:1 40:3,14 | **sorry** 26:3 27:4 | **strictly** 39:5 | 38:23 40:4 | 13:17 17:10 |
| 40:22 41:8,15 | 39:20 | **string** 33:5 | 42:1,5,12,12 | 18:9,9 21:7 |
| 41:23 | **sort** 17:17 20:23 | **strung** 14:1 21:5 | 43:2 | 25:11 26:14 |
| **sexually** 39:15 | 30:4 | **student** 11:7 | **sweet** 36:3 | 31:6,7 39:21 |
| **Shackelford** | **sound** 36:8 | 23:14 26:15 | **sworn** 5:6 | 40:15 41:2 |
| 1:15 3:10,22 | **sounded** 11:2 | 31:13 | **system** 8:21 | **thinking** 21:11 |
| 4:18 5:4,11 | **speak** 5:6 21:13 | **students** 10:10 | 36:17 | **thinks** 33:8 |
| 6:15 44:8 | 22:2 42:15 | 12:7,12,14 | | **thongs** 33:6 |
| **SHACKLEF...** | **speaking** 21:15 | 13:7 14:22 | ——————— | **thoroughly** |
| 4:11 | **special** 27:23 | 15:1,18,23 | **T** | 29:10 |
| **Sherry** 1:15 | **specifically** | 16:3 18:2 | **taken** 1:15 3:10 | **thought** 23:23 |
| 3:10,22 4:11 | 15:22 | 19:10,23 20:10 | 3:12 44:9 | **threatened** 20:1 |
| 4:18 5:4,11 | **spend** 9:23 | 21:2,8 22:9 | **talk** 8:2 12:13 | **three** 10:2,2 |
| 6:14 44:8 | **spent** 10:2 17:8 | 24:23 25:2,6,9 | 23:10 24:19 | 14:8 |
| **Shirock** 2:8 | **spoke** 22:1 | 25:16 26:7,10 | 42:8,21 | **thug-like** 33:2 |
| **shirts** 33:4 | 24:14 | 30:3,8 37:21 | **talked** 5:12 | **time** 3:15,16 6:3 |
| **shock** 29:20 | **sponsor** 28:15 | 39:3,5 | 42:11,20 | 7:20,21 9:23 |
| **shocked** 29:10 | 28:18 | **Subpoena** 4:18 | **talking** 14:16 | 13:1,11 16:16 |
| 36:2 | **sponsors** 28:9 | **Suite** 2:9 | 19:3 23:4 30:3 | 17:8,8 18:22 |
| **shortage** 35:4 | **stages** 10:22 | **Superintendent** | 31:8 | 19:4 20:17 |
| **shorthand** 44:9 | **stand** 15:7,14,16 | 2:17 | **teach** 35:17,18 | 21:11,19 22:7 |
| 44:22 | 15:17 24:12 | **supervision** | **teacher** 13:22 | 22:21 30:21,23 |
| **side** 30:9 | **start** 8:4 9:5 | 44:11 | 21:4,12,14 | 31:2,9 33:10 |
| **signing** 4:7 | **started** 8:15 | **supposed** 8:19 | 27:4,4 | 36:7,15 |
| **signs** 26:22 27:3 | 9:13 | **sure** 9:21 12:15 | **teachers** 10:10 | **times** 10:5 12:17 |
| 27:10,11,14,18 | **state** 5:10 28:10 | 13:7 19:1 | 15:15 26:10,18 | 13:19 15:6 |
| 29:18 | 44:4 | 22:16 25:11 | **tell** 21:1 22:2 | 26:17,19 |
| **similar** 10:13 | **stated** 6:14 | 31:18 37:14,20 | 24:9,10 30:8 | **TMR** 1:7 |
| **simple** 8:21 | 19:15 | 39:1,19,23 | 30:17 40:21 | **today** 38:5 |
| 19:12 | **STATES** 1:1 | 40:22 | 41:12 42:15 | **told** 24:5 30:8 |
| | | | **telling** 20:21 | |

JR, A Minor

| | | | |
|---|---|---|---|
| 31:5 32:1 | **use** 18:7 20:1 | 44:13 | **2003-4** 14:7 |
| **touched** 40:19 | **usual** 6:8 | **word** 37:20 | **2004** 23:19 |
| **town** 25:14 | **usually** 19:11 | **wore** 20:7 | 31:10,12 37:4 |
| **trained** 27:7 | **utilizes** 41:14 | **work** 8:2,22 9:1 | 37:4 |
| 28:3 | | 17:16 30:20 | **2004-2005** 41:17 |
| **training** 26:21 | **V** | **worked** 7:10 | 42:4 |
| 27:9,21 28:4 | **varies** 28:13 | 14:5 18:4,20 | **2004-5** 35:2,23 |
| 40:1 | **vary** 12:10 | **working** 8:4 9:5 | **2007** 1:17 43:7 |
| **transcript** 44:8 | **vehicle** 15:3 | 9:13 32:3 35:9 | 44:10,18 |
| 44:13 | **vehicles** 26:11 | **wouldn't** 15:11 | **260** 2:5 |
| **treat** 27:5,13 | **venture** 8:11 | 26:13 39:17,18 | |
| **trial** 4:1 | **verbatim** 24:9 | **Wow** 7:10 | **3** |
| **tried** 18:4,6,15 | 24:11 | **writing** 44:11 | **316** 6:20 |
| 18:19 22:4,5 | **vicinity** 13:15 | **written** 8:14 | **35203-2104** 2:14 |
| **troublemakers** | **vocal** 38:4,8 | | **36010** 6:22 |
| 17:12 | **VS** 1:9 | **X** | **36104** 2:5 |
| **Troy** 1:18 7:3,4 | | **X** 28:7 | **36106** 2:9 |
| **truck** 25:7,9 | **W** | | |
| **true** 40:10 44:12 | **wait** 40:6 | **Y** | **4** |
| **truth** 5:6,6,7 | **waived** 3:23 4:8 | **yeah** 30:8 | **4** 14:8 |
| **truthfully** 42:19 | **waiving** 4:3 | **year** 9:19 28:8 | **4th** 1:16 43:6 |
| **try** 5:22 6:5 12:9 | **walk** 13:12 | 34:18 36:1 | 44:9 |
| **trying** 17:9,10 | **want** 6:3 | **years** 7:1,9 8:16 | **4-5** 14:7 |
| 40:15 | **wanted** 18:6,11 | 8:20 9:9,12,18 | **44** 4:13 |
| **Twenty** 7:9 | 18:19 | 13:3 14:5 | |
| **twice** 7:22 | **Washington** 2:5 | 26:19 36:23 | **5** |
| **two** 7:1 8:20 | **wasn't** 25:14,19 | | **5** 4:12,18 14:8 |
| 14:5 25:11 | 29:22 | **Z** | |
| **type** 13:8 21:12 | **way** 21:11 23:6 | **zip** 6:21 | **7** |
| 24:19 32:23 | 25:19,21 26:4 | | **7th** 44:18 |
| | 26:7 27:4,19 | **1** | |
| **U** | **weapon** 35:23 | **10:25** 43:5 | **9** |
| **ugly** 30:3 | **wear** 33:4 | **101** 1:18 | **9:30** 1:20 |
| **uhm** 8:13 11:7 | **welcome** 43:3 | **1726** 2:9 | |
| 11:21 14:3,15 | **went** 10:12 | **18** 4:18 5:1 | |
| 17:12,21 18:2 | 17:16,19 | **1819** 2:13 | |
| 18:12 26:23 | **weren't** 12:2 | | |
| 28:6 | 13:10 34:21 | **2** | |
| **understand** 5:21 | **West** 1:18 2:9 | **2:06-CV-1120...** | |
| 6:1 | **We're** 30:19 | 1:10 | |
| **understood** | **window** 34:18 | **2000** 17:19 | |
| 19:15 | **wise** 44:16 | **2000-2001** 9:19 | |
| **uniform** 18:10 | **wish** 24:8 | 9:20 17:19 | |
| **UNITED** 1:1 | **witness** 4:6,7 5:5 | 18:21 | |
| **unusual** 26:14 | 9:10 43:3 | **2001** 9:18 17:18 | |
| | | **2001-2002** 9:20 | |

# EXHIBIT 7

## AFFIDAVIT OF
## ROBERT MCDANIEL

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Robert McDaniel, who being by me first duly sworn, deposes and says as follows:

My name is Robert McDaniel. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I served as assistant principal at Pike County High School during the 2004-2005 school year.

During that year I did not see, hear or know of anything that indicated Charles Coon, the band director, would be a sexual predator.

I have been in education for nine years after retiring from a career of 22 years in the U.S. Air Force. I consider myself a military man – rules and regulations are there to be followed, no exceptions. While I had a number of duties as assistant principal at Pike County High School, I considered a primary responsibility to see that student discipline was enforced, no exceptions. As an African-American with a military background, I wanted to be a role model for the students as well as a disciplinarian. I think most of the students and my colleagues understood that I intended to see that everyone followed and respected the rules.

I did not make exceptions for student J.R. when I had to deal with him and I did not make exceptions for Charles Coon when I had to deal with him.

1/1677710.1

I knew that the law made it mandatory to report known or suspected child abuse. I would have reported Charles Coon without the slightest hesitation if I had known or suspected he was abusing J.R. or any student at Pike County High School.

For anyone to assert that I would have ignored Pike County policy regarding sexual misconduct or violated the law to protect Charles Coon – who was no friend of mine – is irresponsible. Yet I am being sued in this case as an individual and as assistant principal.

I first met Charles Coon at band camp for Pike County High School in the summer of 2004. I did not know him before coming to Pike County High School, and I had no dealings with him except in my professional capacity as assistant principal.

During the 2004-2005 school year, I would see Charles Coon frequently as I walked through the school and I had several situations during the year where I had to deal with Charles Coon rather extensively.

Early in the school year, I told Charles Coon I wanted him to get better control of his students. I thought the band and the athletes were the school ambassadors. I wanted his band students in their class when the bell rang, and I wanted the band class to be as orderly as any other class. I let Charles Coon know my expectations and that his students would be disciplined if they were not in class on time and on task.

I share this to let the Court know that from the get-go my relationship with Charles Coon was an arms' length, entirely professional one.

Later in the fall of 2004, I caught a student with a cell phone. It dropped out of his pocket. Having a cell phone violated school rules. In accordance with our policy, I confiscated the phone. It turned out that the phone was Charles Coon's. He let the student use it to call his parents. Charles Coon demanded that I return the phone to him. I refused. The rule is

1/1677710.1

the rule. The student should not have had a cell phone and I did not care who owned it. I did learn that there was an agreement between Charles Coon and the student's parents to let him use the phone. Charles Coon said he let that particular student use the phone and other band students on occasion to call parents about late band practice. I thought it was inappropriate for the student to have the phone in violation of policy. But the explanation seemed credible. There was nothing about this incident that suggested to me an inappropriate relationship between Charles Coon and the student.

In January of 2005, a parent, Polly King, complained about an F Charles Coon gave her son for band. She was very mad about the grade. During her tirade about the grade and about Charles Coon, she mentioned that Charles Coon had been smoking in the presence of students. I reported this to Principal Pyron because I thought smoking on campus was unprofessional conduct if it happened. Mr. Pyron reprimanded Charles Coon.

During this incident there was no suggestion of misconduct of a sexual nature about Charles Coon; no suggestion of grooming the students. The parent, if anything, was mad because the grade was too harsh – not preferential.

Later on in the year, a parent complained that Charles Coon had grabbed a student around the neck in a fit of anger. I investigated. Charles Coon admitted he had overreacted. He apologized; he apologized to the student and to the parents. The parents were satisfied after I told them in front of Charles Coon that we did not approve of what he did, and we would not tolerate such behavior. I reprimanded Charles Coon for his conduct and reported it to the principal.

Grabbing a student by the neck was unacceptable conduct. We investigated it and reprimanded Charles Coon. Sexual abuse is infinitely worse conduct. You can be absolutely sure

1/1677710.1

we would have reported Charles Coon if we had any suspicion. Charles Coon was not above the rules and we cut him no slack.

In April of 2005, I knew Mr. Pyron was investigating Charles Coon but I did not participate in the interviews. I knew that Superintendent Bazzell placed Charles Coon on administrative leave during the investigation.

In the context of the investigation, Mr. Pyron told me that they had received a report about Charles Coon acting unprofessionally – smoking and riding with students. I did not know all the details. There was also reference to the term "butt buddy" but I understood that to mean a teacher's pet or favorite. There was nothing I knew that suggested to me the term had a sexual connotation.

On April 18, 2005, I investigated a matter involving J.R. He broke a window in Charles Coon's office. I investigated by taking statements from the students who witnessed what happened. J.R. had taken a flag stick and knocked the window out. It was first reported he was locked in the office. That was not the case. The office locked from the inside. I had J.R. charged with criminal mischief for what he did.

Now this was mid April – toward the end of the school year and not long before Charles Coon submitted his resignation to retire.

Neither J.R. nor his parents said anything at this late date near the end of the school year about Charles Coon abusing J.R. No complaint whatsoever. And to my knowledge neither J.R. nor the parents complained to law enforcement people about Charles Coon in connection with the criminal mischief charge against J.R.

1/1677710.1

Other than the information reported to Mr. Pryon that he was investigating information that Charles Coon was transporting students, I never saw Charles Coon riding with students and never had any information that Charles Coon took students off campus.

To summarize, I had a number of opportunities to deal with and about Charles Coon. I always insisted the rules be followed and I always reported when I found he had violated the rules. I was never indifferent to rule violations by Coon. If I had any reason to suspect misconduct by Charles Coon toward I R., I would have reported it. I had none.

During my deposition, I was asked about my training or expertise concerning sexual abuse. During my Master's degree courses, I received training about sexual abuse. While in the Air Force, I taught a course for six years that covered sexual abuse. When I worked at other school systems – Macon County and Elmore County – I received professional development courses on sexual abuse.

During the year I was at Pike County High School, I attended faculty meetings where we talked about professional standards – the line that must be kept between faculty and students. We talked about liability if there was inappropriate conduct between teachers and students.

As a result of my training, I know about "grooming" as a tactic used by sexual predators. I knew to look for or be aware of reports of inappropriate touching, speech or gifts that might be indicative of an inappropriate relationship.

I saw things about Charles Coon I did not like and I reprimanded him on several occasions. I never saw anything that made me suspicious that Charles Coon was "grooming" his students or was engaged in or trying to engage students in an inappropriate relationship.

1/16777/0.1

If Mrs. Reed had complained in any manner to me about Charles Coon, I would have carried the matter as far as it needed to go.

If I had any information that Charles Coon was abusing anyone, I would have reported it to the authorities. I knew the law required that; I knew we had a no tolerance policy regarding sexual abuse; and I had a professional commitment to see that the rules and laws were respected.

_Robert McDaniel_

Robert McDaniel

Sworn to and subscribed before me this the 7th day of March, 2008.

_Brenda Autry_

Notary Public

My Commission expires: 08/16/2011

(Seal)

1/1677710.1

EXHIBIT 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                  CASE NO.:

                            2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

\* \* \* \* \* \* \* \* \*

DEPOSITION OF ROBERT McDANIEL, taken before Mary

Moore-Wynn, as Commissioner, on the 25th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 12:00.


\* \* \* \* \* \* \* \* \*

JR, A Minor                    July 25, 2007   Pike County Board of Education

| Page 2 | Page 4 |
|---|---|

**Page 2**

```
1                 * * * * * * * * * *
2              APPEARANCES
3  FOR THE DEFENDANT:
4  Hon. Susan DePaola
      Attorney at Law
5  1726 West 2nd Street, Suite B
      Montgomery, Alabama 36105
6
7  and
8  Hon. Deanie Allen
      Azar and Azar
9  260 Washington Avenue
      Montgomery, Alabama 36104
10
11  FOR THE DEFENDANT:
12  Hon. Donald R. Sweeney
      Bradley, Arant, Rose & White
13  One Federal Place
      1819 Fifth Avenue North
14  Birmingham, Alabama 35203
15
16  ALSO PRESENT:
17  Dr. Mark Bazzell, Superintendent
18  Ms. Elizabeth Reed
19
20
21
22
23          * * * * * * * * * *
```

**Page 4**

```
1  either party hereto provided for by the Statute,
2  regardless of the waiving of the filing of same.
3     It is further stipulated and agreed by and
4  between counsel and the witness that the reading
5  and signing of the deposition by the witness is
6  hereby waived.
7
8                INDEX
9  ROBERT MCDANIEL
10  Examination By Ms. DePaola          5
    Examination By Mr. Sweeney          51
11  Further Examination By Ms. DePaola      57
12  Reporter's Certificate            60
13          INDEX OF EXHIBITS
14  Exhibit Number     Description     Page Number
15  Plaintiff's Exhibit 17  Student          37
              Disciplinary Report Relating to
16              Justin Reed
17
18
19
20
21
22          * * * * * * * * *
23
```

**Page 3**

```
1
2
3
4
5              STIPULATIONS
6
7     It is hereby stipulated and agreed by and between
8  counsel representing the parties that the deposition of
9  ROBERT McDANIEL is taken pursuant to the Federal Rules
10  of Civil Procedure, and that said deposition may be
11  taken before Mary Moore-Wynn, CSR, as Commissioner,
12  without the formality of a commission; that objections
13  to questions, other than objections as to the form of
14  the questions, need not be made at this time, but may
15  be reserved for a ruling at such time as the deposition
16  may be offered into evidence, or used for any other
17  purpose by either party hereto, provided by the
18  Statute.
19     It is further stipulated and agreed by and between
20  counsel representing the parties in this case, that the
21  filing of the deposition of ROBERT McDANIEL is hereby
22  waived, and that said deposition may be introduced at
23  the trial of this case or used in any other manner by
```

**Page 5**

```
1          ROBERT MCDANIEL
2     (Whereupon, the witness, after having first been
3  duly sworn to speak the truth, the whole truth, and
4  nothing but the truth, testified as follows:)
5          EXAMINATION
6  BY MS. DePAOLA
7  Q  Could you state your name for the Record, please?
8  A  My name is Robert Lee McDaniel, Senior.
9  Q  What is your home address?
10  A  Home address is 9441 Winfield Place, Montgomery,
11  Alabama.
12  Q  Is it 36 --
13  A  117.
14  Q  -- 116?
15  A  117.
16  Q  And where are you currently employed?
17  A  I am employed at Wilcox Central High School in
18  Camden, Alabama.
19  Q  And what is your position there?
20  A  I am the assistant -- one of the assistant
21  principals there.
22  Q  Could you just briefly give me a history of your
23  educational employment?
```

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
          Court Reporting Services

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 6

1  A    Okay. Yes. I -- I have been in public education
2      right now -- I'm starting in my ninth year. I
3      taught two years social studies and computer
4      application systems in Macon County at Booker
5      Washington High School. I did three years as the
6      assistant principal in Elmore County at Wetumpka
7      High School. I did one year as the assistant
8      principal at Pike County High School in Brundidge.
9      I did two years as the principal at Bullock County
10     High School in Union Springs. And I am currently
11     with the Wilcox Central High School in Camden,
12     Alabama.
13            MS. DePAOLA:  Off the Record.
14            (Brief off-the-Record discussion.)
15  BY MS. DePAOLA
16  Q    And can you tell us about your educational
17     background?
18  A    I have one Bachelor's of Science from Jackson
19     State University in Jackson, Mississippi. That's
20     in political science, I'm sorry. I have a
21     Bachelor's in social studies from Colorado State
22     University in Pueblo, Colorado. I have a Master's
23     degree in social studies from Alabama State

Page 7

1      University in Montgomery.
2  Q    When you say -- you mean, social studies
3      education?
4  A    Yes.
5  Q    Like an MED?
6  A    Yes. Certification in school administration K12
7      from ASU. Associates from the Community College
8      of Air Force in computer application systems. And
9      an associate from Coahoma Community College,
10     Clarksville, Mississippi in social science.
11  Q    Okay. And I'm just trying to place Pike County in
12     this list. So, Pike County was after Bullock
13     County but before Wilcox?
14  A    No. Pike County was after Elmore County. It was
15     Macon County, Elmore County, Pike County, Bullock
16     County.
17  Q    Oh, I see. Okay. I understand.
18         And in your educational training -- let me ask
19     you that, first of all -- did you ever receive --
20            (Brief interruption.)
21  Q    Did you ever receive any training in the field of
22     sexual abuse of students?
23  A    Uhm, yes. My professional development courses, we

Page 8

1      refer to it as EEO treatment during my 22 years in
2      the Air Force. As a matter of fact, I taught the
3      course for six years.
4  Q    You taught a course on equal employment
5      opportunity?
6  A    Equal opportunity and treatment, which included
7      sexual harassment.
8  Q    My question is specifically about sexual abuse:
9      Did you ever have any background or training in,
10     for instance, recognizing the characteristics of
11     sexual predators?
12  A    Yes. Professional development courses sponsored
13     both in Macon County, Elmore County, and most
14     recently, Pike County and my current employment,
15     as well.
16  Q    Okay. Well, tell me what you have learned about
17     recognizing characteristics of sexual predators.
18  A    Basically, the line between, say, anyone who is
19     actually in charge of another individual, for
20     example, trends that does not follow the usual for
21     an individual who is a professional. Making sure
22     that individuals who are entrusted with the lives
23     of students or people they are in charge of,

Page 9

1      maintain a professional demeanor, which does not
2      lend itself to professional -- nonprofessional
3      things, such as touching, speeches, things of that
4      nature.
5  Q    All right. I'm not sure if that was responsive to
6      my question. What are the characteristics of
7      sexual predators that you learned about in your
8      professional training? Are you saying anyone who
9      doesn't follow trends or maintain a professional
10     demeanor are individuals that you suspect of
11     sexual abuse?
12  A    I would say those things that are indicative of
13     things that are not the norm; gifts, phone calls,
14     language, things of that nature.
15  Q    I see what you mean. Okay. How about anything
16     else you can think of?
17  A    No.
18  Q    In reflecting on this case, are there any things
19     that you see in retrospect that would appear to be
20     indicative of sexual abuse in Mr. Coon's conduct?
21  A    No.
22  Q    No gifts, not aware of any gifts?
23  A    No.

Mary Moore-Wynn, CSR Mary Moore-Wynn    (334)244-0203
              Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 10

1  Q  Not aware of any phone calls?
2  A  No.
3  Q  How about anything else that you can think of that
4     is indicative of sexual predators?
5  A  No, not that I know.
6  Q  Tell me specifically what training Pike County
7     provided you as relates to sexual predators or
8     sexual abuse?
9  A  We typically had faculty meetings during my tenure
10    at Pike County which involved of reminding faculty
11    members of their professional responsibility as it
12    pertained to dealing with students, faculty
13    members, and each other.
14 Q  Tell me specifically what training you recall
15    receiving relating to sexual abuse.
16 A  Uhm, the training that dealt specifically with
17    sexual abuse was entailed in that which, in most
18    cases, reminded faculty members of their
19    relationships with students along the line of
20    liability and maintaining professional standards,
21    which would have included those responsibilities
22    or relationships between teachers and students.
23 Q  Tell me specifically any presentation on sexual

Page 11

1     abuse that you recall.
2  A  None.
3  Q  And advise me, did you ever receive any written
4     handouts in any training sessions from Pike County
5     on sexual abuse?
6  A  None that I remember.
7  Q  Did you ever see any videos or film strips on
8     sexual abuse in Pike County?
9  A  No.
10 Q  Did any expert ever come talk to you from outside
11    about recognizing sexual abuse?
12 A  No.
13 Q  Now, with respect to your position at Pike County
14    High School, as I understand it, you were the
15    assistant principal at all times; is that right?
16 A  Yes, ma'am.
17 Q  And did you, as assistant principal, have any
18    responsibility for providing faculty members with
19    training as it relates to sexual-abuse issues?
20 A  No.
21 Q  Whose responsibility was that?
22 A  Well, once again, it was along the line of just
23    professional relationships and professional

Page 12

1     responsibilities. That responsibility, I assume,
2     would have come from someone else. But
3     specifically under my realm, it was not mine.
4  Q  Okay. And as I understand it, you had no role in
5     the hiring of Charles Coon?
6  A  No.
7  Q  And you are saying it was not your responsibility
8     to provide training to faculty members relating to
9     sexual abuse?
10 A  Only from the lines of professional relationships.
11 Q  Well, what training did you provide? Did you ever
12    talk to the faculty members about sexual abuse?
13 A  No.
14 Q  And was it your responsibility -- what was your
15    responsibility with respect to supervision of
16    faculty?
17 A  My responsibility was I performed evaluations on,
18    I would say the first year, some maybe half of the
19    faculty. I assisted with a consultant team,
20    JBH&M, to evaluate, or to review evaluations on
21    probably 100 percent of the teachers.
22 Q  Are you talking about at Pike County High School?
23 A  Yes.

Page 13

1  Q  And who was JBH&M?
2  A  JBH&M was a consulting firm that was brought in to
3     oversee the academics of the county at the time.
4  Q  Why was that -- why were they brought in?
5  A  I wouldn't know.
6  Q  You have no idea?
7  A  Well, I would think that it had something to do
8     with bringing the test scores up. When I said
9     "academics", getting the test scores up, which had
10    kind of dipped.
11 Q  Well, during your evaluations of faculty members,
12    were any of the evaluations relating to the
13    appropriateness of their interaction with students
14    on a personal level?
15 A  No.
16 Q  Okay. Was there ever any central place, or
17    location, where you were directed to file or put
18    any reports you might have of any incidence that
19    caused you concern about a faculty member?
20 A  Uhm, none specifically, no.
21 Q  Okay. Did you ever receive either from the
22    principal or the Superintendent or the Board any
23    written direction as to how to investigate claims

4  (Pages 10 to 13)

JR, A Minor                     July 25, 2007  Pike County Board of Education

Page 14

1   of sexual abuse?
2   A   No.
3   Q   Okay.  Did you have any duty to establish policies
4       and procedure at Pike County High School?
5   A   Yes.  And they were more or less on the line of
6       school climate; classroom management, discipline.
7       Different situations that would occur during the
8       regular school day.
9   Q   Would those be reflected in the faculty handbook?
10  A   No.  They would have been reflected in the Code of
11      Conduct, but more or less just a re-reminder to
12      the students and the faculty how the Code of
13      Conduct reflects and determine the school climate
14      and culture of the school.
15  Q   But, I mean, I didn't understand that you had the
16      responsibility for writing that Code of Conduct.
17  A   No, when I say that, I meant just letters of
18      reminders, for example, reminding students that a
19      tardy bell means it's time to get to class.
20  Q   The question is:  Did you have any responsibility
21      for establishing policies and procedure at Pike
22      County High School?
23  A   Only enforcing them.

Page 15

1   Q   Only enforcing them.  Okay.  All right.  And you
2       are familiar with Charles Coon?
3   A   Yes.
4   Q   All right.  And am I correct you were only in Pike
5       County one year?
6   A   One year, yes, ma'am.
7   Q   So, your first contact with him was at Pike County
8       High School?
9   A   Yes, ma'am.
10  Q   And now have you heard or do you know from any
11      source whatsoever other than Mr. Sweeney whether
12      Mr. Coon has ever been charged -- well, not
13      charged -- accused of any sexual improprieties in
14      any place other than Pike County?
15  A   No.
16  Q   You don't know that?
17  A   No.
18  Q   Okay.  And tell me what your first contact was
19      with Mr. Coon other than general faculty meetings?
20      I mean, one-to-one contact with him.
21  A   Uhm, it was actually during the summer, band camp
22      of '05.
23  Q   And can you tell me about that contact?

Page 16

1   A   Basically, I met him, because I met the students
2       who were in band camp first.  They were the only
3       students on campus.  And I met the students who
4       were in the gym.  As a matter of fact, it was my
5       second day there.  And sometimes during that same
6       week, I met him in my office.  He came up and
7       introduced himself as being the band director.
8   Q   At that time when you met him, did you have any
9       issues or concerns about him that you expressed to
10      him?
11  A   No.
12  Q   Were you aware at that time that he was
13      transporting Pike County High School students in
14      his private vehicle?
15          MR. SWEENEY:  Object to the form.
16  A   No.
17  Q   Did you ever become aware of that?
18  A   I was told that by a third party January of '05 --
19      '0 -- '05.
20  Q   Who was that third party?
21  A   I believe it was a parent.  Name was Polly King.
22  Q   Okay.  Well, is that something that would be of
23      concern to you with your background of

Page 17

1   sexual-abuse training?
2   A   It was something that I thought was
3   unprofessional.  And I relayed it up the chain.
4   Q   Okay.  Who did you report that to?
5   A   I reported it to Mr. Pyron, who was at the time
6   the principal.
7   Q   And do you know if any action was taken in
8   response to that?
9   A   I am not aware of that -- of the specifics of it.
10  Q   Okay.  Did you make any kind of note for any file
11  on Mr. Coon about that concern?
12  A   Written, no.  No, I didn't.
13  Q   Okay.  I want to go back in time.  So, your first
14  contact with him was during band camp?
15  A   Uh-huh.  Summer '04.
16  Q   Did you meet Justin Reed during that band camp?
17  A   Can't say.  I don't remember.
18  Q   Do you know who Justin Reed is?
19  A   I knew of Justin, but not very well.
20  Q   I mean, if he walked through the door, would you
21  recognize him?
22  A   No, I wouldn't.
23  Q   All right.  Tell me this:  When is the first time

5  (Pages 14 to 17)

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 18

1    that you had any concerns about Mr. Coon's
2    behavior or contact with the students,
3    performance, whatever?
4  A   My only concern with Mr. Coons was from the
5    standpoint of classroom management, discipline.
6  Q   Can you explain that to me? What was the problem?
7  A   The problems I wouldn't say was specifically with
8    Mr. Coons (sic). It was my perception, or my
9    idea, of the conduct of any axillaries that
10   represented the school, which was the band, the
11   football team. My concern was that if they went
12   on the road that they would be ambassadors, good
13   ambassadors for the school. And any reports that
14   came back to me that arose that that was not the
15   case, I always addressed those to those
16   individuals who was in charge.
17 Q   What issues were there with respect to the band's
18   behavior?
19 A   I think basically kids being kids. Loud on the
20   bus during trips to -- to and from games.
21   Misconduct during band practices. Not --
22 Q   Such as?
23 A   Not reporting -- for example, had a policy that

Page 19

1    stated that any student who was on campus
2    following the last bell for the last class should
3    be under the control or supervision of a faculty
4    member, may it be band, cheerleaders, or whatever.
5    And, occasionally, they would roam and not show up
6    for practice on time.
7        So, other than that, that was it. Maintaining
8    control of your classes before, during, and after
9    school.
10 Q   And who did you report this concern to?
11 A   I wouldn't say it was a report. It was an
12   approach that I made to Mr. Coons to get better
13   control of the band during band practices.
14 Q   All right. Now, were you at school when the
15   choking incident occurred with the Foster child?
16 A   Uhm, I can't say if I was at school. But the
17   report was brought back to me.
18 Q   That was a bad question. I mean, are you familiar
19   with the indent involving the Foster --
20 A   Yes.
21 Q   Tell us what you know about that.
22 A   First of all, the parents brought the situation to
23   me about the alleged choking of the Foster child.

Page 20

1    And I had a conversation with Mr. Coons. And he
2    explained to me that because of, I guess his size,
3    or whatever, when he walked over and placed his
4    hand on the child, apparently, it stunned the
5    child. And the child reported back to the
6    parents. I had a meeting with the parents in my
7    office that same week. And both parents agreed
8    that they believed that it was kind of an
9    overreaction by Mr. Coons. And agreed to keep the
10   child in the band at that time.
11 Q   Did you report this incident to anyone?
12 A   I reported it to Mr. Pyron. And I believe he
13   relayed it to Dr. Bazzell.
14 Q   Okay. Was there any written record of this
15   incident placed in a file relating to Mr. Coon
16   somewhere?
17 A   It was a verbal warning to Mr. Coons, I believe.
18   And he agreed that he did put -- place his hand on
19   the child. And he apologized. And the parents
20   and Mr. Coon had an amiable agreement that he was
21   wrong. And they accepted his explanation of it.
22 Q   I think the question was: Was any written report
23   of this placed in a centralized file about

Page 21

1    Mr. Coon?
2  A   Only -- no, it was just a report that I did
3    referencing that particular case.
4  Q   To Dr. Bazzell?
5  A   Yes.
6  Q   Now, you mentioned that Polly King brought some
7    concern -- I think you said Polly King -- to your
8    attention about Mr. Coon. Is that correct?
9  A   That is correct.
10 Q   Tell me when that occurred and what she said.
11 A   That occurred January of '05 following first
12   semester report cards.
13 Q   And tell me what happened.
14 A   This particular parent arrived in my office to
15   complain about a grade that her son received
16   during the first semester. I explained to her
17   that I would look into the case. And as always
18   was the case, I would refer it up the chain to
19   Mr. Pyron, who was the principal. And --
20 Q   Is that the only concern she brought to your
21   attention?
22 A   The other concern was -- it was not necessarily a
23   concern, it was a sort of a warning, threat, that

6 (Pages 18 to 21)

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 22

1    if, you know, the grade or whatever was not fixed
2    that she was concerned, is that she would report
3    the fact that he had a student in his truck and
4    smoked with the student present.
5  Q    She was going to -- she was threatening to report
6       that to who?
7  A    She didn't say who she threatened to report it to.
8  Q    Now, having a student in the truck, transporting a
9       student in the truck, is that within the bounds of
10      professional conduct?
11 A    Absolutely not.
12 Q    And I wasn't clear what the report was. Was it
13      that Mr. Coon was smoking, or Mr. Coon and the
14      student were smoking?
15 A    Mr. Coon.
16 Q    Was smoking in front of a student within the
17      bounds of professional conduct?
18 A    Absolutely not.
19 Q    So, what did you do about that aspect of the
20      problem?
21 A    I relayed that up the chain to Mr. Pyron, and he,
22      in turn, relayed it to Dr. Bazzell.
23 Q    How do you know that?

Page 23

1  A    Discussions. What became of it, that type of
2       thing.
3  Q    What became of it?
4  A    In other words, discussion of the incident between
5       Mr. Pyron and myself.
6  Q    Okay. But what was done about this?
7  A    Mr. Pyron, I believe, handled the investigation
8       from there.
9  Q    Was there any kind of centralized location where
10      you placed a report of this complaint? You know,
11      like the file somewhere where you say, well,
12      here's another issue about Mr. Coon. Let me put
13      this in that file?
14 A    No.
15 Q    Okay. So, that brings you to January of '05.
16      After it was resolved, did you have further
17      conversation with Polly King?
18 A    None specifically that I can recall. They were
19      always parents in and out of the office regarding
20      children, their grades, their performance,
21      discipline. But specifically, no, I cannot recall
22      having a conversation with her.
23 Q    Was Ms. King one of the parents that was in

Page 24

1    complaining a lot?
2  A    She was at the school more than the average
3       parent, I would say.
4  Q    Complaining?
5  A    No. Just a parent -- just at the school
6       occasionally. Her son was in the band. Band
7       parents stayed at the school a lot.
8  Q    What's the next issue that came to your attention
9       with respect to Mr. Coon, prior to April 1st, '05.
10      Let's say that.
11 A    None specifically.
12 Q    Okay. Did you ever become aware that Mr. Coon had
13      provided a cell phone to Blake Faulkner?
14 A    Yes. That actually occurred in the fall of '04.
15 Q    Tell me about that incident.
16 A    Which was normally the case; cell phones, dress
17      code, school climate, that type of thing, as
18      assistant principal, that was me. Especially with
19      the situation with kids having cell phones.
20 Q    So, how did this incident come to your attention?
21 A    What happened is that the child was outside band
22      practice, I believe. And during practice, I
23      believe the phone may have, I think, fell out.

Page 25

1    And I retrieved it. And did with that particular
2    phone as I did with all the others. I took it to
3    the office and labeled it and locked it up.
4  Q    So, what happened next about the phone?
5  A    I believe Mr. Coon, on the second or third day,
6       came in and requested the phone and stated that
7       the phone belonged to him. I explained to him
8       that I retrieved the phone from a student, and it
9       was unauthorized, and I was going to treat it as I
10      did any other cell phone that I confiscated from a
11      student. And I refused to give it back to him.
12 Q    Did you ask him why he provided a student with a
13      cell phone?
14 A    He volunteered the information to me.
15 Q    Which was what?
16 A    The fact that occasionally that particular student
17      being at band practice late or whatever, would
18      occasionally have to call a parent and use it.
19      So, he allowed him to use it.
20 Q    Did you consider this professionally appropriate
21      conduct?
22 A    I considered it inappropriate.
23 Q    So, to who did you report this?

7  (Pages 22 to 25)

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 26

1  A   I reported it to -- at the time, Mr. Pyron was not
2      with us at that time. I reported it to Mr. Casey,
3      who was still on campus at the time. And
4      Mr. Casey explained to him that it was my decision
5      to confiscated it -- confiscate it. And he stood
6      behind me. But I believe Mr. Coons got in touch
7      with the Superintendent. And the Superintendent
8      relayed the same; that it was confiscated. And he
9      was not going to force me to give it back.
10 Q   So, you never returned the cell phone?
11 A   I returned the cell phone to Mr. Coons, I believe
12     some maybe one, two weeks afterwards -- after the
13     child stated that it was an agreement between his
14     father and Mr. Coons that he was allowed to use
15     the phone. And I gave it back to Mr. Coons.
16 Q   So, Blake Faulkner came in and talked to you about
17     the cell phone?
18 A   Oh, Blake came in the same day and practically
19     every day to try to get the phone back.
20 Q   Tell me about those conversations.
21 A   Mr. Mc, can I have my phone? No, Blake you
22     cannot.
23 Q   Did you ever examine him about why he had accepted

Page 27

1      a gift like a cell phone --
2          MR. SWEENEY:  Object to the form.
3  Q   -- Mr. Pyron -- Mr. Coon?
4          MR. SWEENEY:  There is no evidence of a
5          gift.
6  A   No.
7  Q   Did you ever examine him about why he accepted a
8      cell phone from Mr. Coon?
9  A   No. I confiscated it as if I did any other cell
10     phone.
11 Q   And you made no investigation on that?
12 A   No.
13 Q   Did you contact Blake's father to see whether the
14     parent was aware --
15 A   No.
16 Q   -- that the child had a cell phone from the
17     teacher?
18 A   No.
19 Q   Did you ever talk to Blake's father?
20 A   No.
21 Q   The whole year, you never talked to Blake's
22     father?
23 A   No.

Page 28

1  Q   Did you ever look at any of the numbers on the
2      cell phone; contact information, anything?  Did
3      you turn it on and look at any of that?
4  A   No. I occasionally took the batteries out to keep
5      it from being damaged. But other than that --
6      some of the phones stayed in the office for an
7      entire year, the entire time that I was there.
8      And I would simply remove the batteries.
9  Q   And it's your recollection that this occurred in
10     the fall of '04?
11 A   I believe it was the fall, ma'am, because at the
12     time, I know for a fact that Mr. Pyron was not
13     there. Mr. Pyron didn't get there until the
14     second semester. So, I am fairly certain that it
15     was the fall of the year.
16 Q   So, you're saying this cell phone thing was
17     reported to Mr. Casey?
18 A   Yes. Uh-huh. Uh-huh.
19 Q   Okay. Did you have any further concerns about any
20     incidents that came to your attention involving
21     Mr. Coon and students?
22 A   None.
23 Q   None. Okay. So, did you participate in the

Page 29

1      April 1st investigation relating to Mr. Coon?
2  A   I was aware of it, but I did not take part in the
3      investigation.
4  Q   How did you become aware of it?
5  A   Uhm, just general conversation between myself and
6      Mr. Pyron.
7  Q   Tell me what those conversations were, what you
8      can recall from them.
9  A   Specifically, I think it was more or less just
10     relayed that there was some things that were
11     not -- I would say, professional, that had been
12     found during Mr. Pyron's investigation. And that
13     Mr. Coons would -- was going to be placed on
14     leave.
15 Q   That's all you knew?
16 A   That's all I know.
17 Q   You were never told there was allegations of
18     inappropriate sexual contact?
19         MR. SWEENEY:  Object to the form.
20 A   (Witness Indicating.)
21 Q   You were never told that there were, quote,
22     inappropriate activities with students of a sexual
23     nature, closed quote?

8  (Pages 26 to 29)

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 30

1  A  A very, very vague --
2  Q  Let's be specific. What do you recall?
3  A  The information that I think that I got was that
4     information that had been relayed through local
5     authorities back to the school regarding Mr. Coons
6     and a student.
7  Q  And who was that student?
8  A  Absolutely, ma'am, at this particular point, I
9     can't recall the student's name.
10 Q  Okay. Well, tell me what the very, very vague
11    recollection you have is.
12 A  It was reported to, I believe, the Superintendent
13    and back down through the chain to Mr. Pyron, who
14    did the investigation.
15 Q  What was reported?
16 A  The relationship between Mr. Coons and another
17    student.
18 Q  Are you saying that you got the very, very vague
19    impression that there was some, quote,
20    inappropriate activity with this student?
21 A  Yes.
22 Q  Of a sexual nature?
23 A  I wouldn't say a sexual nature. But the fact that

Page 31

1     there were unprofessional relationships.
2  Q  Well, in what respect?
3  A  Things that would not necessarily be indicative of
4     a student/teacher relationship.
5  Q  Like what?
6  A  Uhm, (indicating), students being in the same
7     automobile with a teacher, uhm, things of that
8     nature.
9  Q  I am sorry, I am not trying to badger you. But
10    "things of that nature" gives us no information.
11 A  I don't --
12 Q  What other things can you recall?
13 A  That's it.
14 Q  The only information you knew about was that he
15    was transporting students --
16 A  That's it.
17 Q  -- in an unprofessional manner?
18 A  Yes, ma'am.
19 Q  Did you, at that time, bring to anyone's attention
20    any of these prior incidents, like the cell phone
21    that Blake Faulkner had?
22 A  Can you repeat that, please?
23 Q  At that point, when you became aware there was an

Page 32

1     investigation about Mr. Coon, did you bring any of
2     these prior incidents to anyone's attention, like
3     Mr. Pyron or Dr. Bazzell, such as the Blake
4     Faulkner cell phone incident.
5  A  Well, they knew about it.
6  Q  Just answer my question.
7  A  Yes.
8  Q  Did you then, at that point in time, remind
9     anyone?
10 A  No.
11 Q  Did you remind anyone that you had previously
12    reprimanded Mr. Coon for transporting students in
13    a private vehicle?
14 A  I didn't -- at that particular time, I don't
15    recall reprimanding Mr. Coon.
16 Q  You said following band camp in 2005 you felt that
17    it was -- he was transporting students in a
18    private vehicle -- that it was unprofessional and
19    you reported it up the chain?
20 A  Repeat that.
21 Q  Was that not your testimony; that following band
22    camp you reported up the chain that Mr. Coon was
23    transporting students in a private vehicle, and

Page 33

1     you felt that was unprofessional?
2  A  Yes.
3  Q  Did you do that or not?
4  A  Yes.
5  Q  Well, when these new allegations came up, did you
6     remind anyone, did you call anyone like
7     Dr. Bazzell and say, you know, he's been doing
8     this since last summer?
9  A  No.
10    MS. ALLEN: Can we go off the Record for
11    just a minute.
12    (Brief off-the-Record discussion.)
13 BY MS. DePAOLA
14 Q  When you became aware there was allegations of
15    some kind of improper relationship, did you call
16    Dr. Bazzell and remind him of the incident where
17    this man, Mr. Coon, choked or attempted to choke
18    the Foster child?
19 A  No. He was aware of it. He was in part of the
20    report.
21 Q  It was in what?
22 A  It was part of the report that had been done.
23    Sort of a memo.

9 (Pages 30 to 33)

JR, A Minor                     July 25, 2007  Pike County Board of Education

Page 34

1  Q   Did you call or remind anyone, Dr. Bazzell or
2      Mr. Pyron, about the Polly King allegations
3      that -- in January -- that Mr. Coon was
4      transporting students in the truck and smoking
5      with them?
6  A   No.
7  Q   Have you ever heard the term "butt buddy" used in
8      reference to Mr. Coon or any of the students who
9      were hanging around him?
10 A   Uhm, yes.  Only after the April incident.
11 Q   And what did you hear about that?
12 A   Only in reference to that particular student.
13 Q   Who was that student?
14 A   I can't recall.
15 Q   And what did you hear?
16 A   The fact that particular student, who had
17     been reported to the authorities, school
18     authorities, was referred to as "butt buddy".
19 Q   And what did that mean?
20 A   (Witness Indicating.) I'm not sure, ma'am.
21 Q   You're not sure?
22 A   No.
23 Q   So, you don't know who this student was?

Page 35

1  A   No.
2  Q   Because no one else seems to know who it is,
3      either?
4  A   I have no idea, ma'am.
5  Q   Well, who told you this?
6  A   I had actually gotten through conversations about
7      that particular title -- discussions with
8      Mr. Pyron during the investigation.
9  Q   So, Mr. Pyron informed you of the name of the
10     student, but you just can't remember it?
11 A   The title.
12 Q   Just the title?
13 A   Uh-huh.
14 Q   And did he explain to you what he thought that
15     meant?
16 A   I have a pretty good idea what it meant.
17 Q   What did you think it meant?
18 A   I assumed that it referred to some relationship
19     between the two.
20 Q   Sexual relationship?
21 A   Relationships.
22 Q   Well, what do you mean; they are just good
23     friends, or they have a sexual relationship?

Page 36

1  A   I just assumed that it was relationships, ma'am.
2  Q   Of what type?
3  A   Friends.
4  Q   So, you thought there was no sexual connotations
5      with that?
6  A   I had no evidence what it was, ma'am.
7  Q   I didn't ask you what you had evidence.  I said
8      what did you think?
9  A   I considered it friend, but I also, ma'am,
10     specifically thought that it was unprofessional
11     relationships between student and teacher.
12 Q   Well, did you think it meant sexual contact
13     between them?
14 A   No.
15 Q   Well, then, unprofessional in what respect?
16 A   Unprofessional from the standpoint that under
17     normal circumstances professional standards would
18     be Mr. Coons and whoever that student was, and not
19     necessarily Mr. Coon and a title like butt buddy.
20         MS. DePAOLA: Did you understand that?
21         MS. ALLEN: No.
22         MS. DePAOLA: What was my question,
23             because I didn't understand his

Page 37

1              response?
2          (Whereupon, the requested material
3              was read by the Court Reporter.)
4  BY MS. DePAOLA
5  Q   All right. I'll repeat it.  Unprofessional in
6      what respect?
7  A   Mr. Coons is referred to as Mr. Coons.  Whoever
8      this students were was referred to by name.  The
9      title of "butt buddy" was something that came up
10     during the investigation when Mr. Coons was
11     suspended.
12 Q   And it's unprofessional to have a nickname for a
13     student; is that what your comment was?
14 A   I would say so.
15 Q   That was your only concern?
16 A   Yes.
17 Q   Were you involved in the incident when Justin Reed
18     broke the band room window?
19 A   Yes.  I investigated it.
20          (Whereupon, Plaintiff's Exhibit 17
21              was marked for identification and
22              is attached hereto.)
23

10  (Pages 34 to 37)

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 38

1   BY MS. DePAOLA
2   Q   I'm going to mark this as be Plaintiff's
3       Exhibit 17.
4           MS. DePAOLA: And we can make a clean
5               one, Donald, if you want.  This one
6               has got a lot of highlighting on it.
7           MR. SWEENEY: Plaintiff's what?
8           MS. DePAOLA: Seventeen.
9           MR. SWEENEY: And it's what?
10          MS. DePAOLA: It's student's
11              disciplinary report.
12              (Brief interruption.)
13          THE WITNESS: Excuse me.
14          MR. SWEENEY: Do you need to take a
15              break?
16          THE WITNESS: Oh, no.  I'm going to cut
17              it off.
18  BY MS. DePAOLA
19  Q   Mr. McDaniel, can you identify that as a student
20      discipline report relating to Justin Reed?
21  A   Ah, yes.
22  Q   I mean, you are kind of familiar with those
23      documents I would expect, generally?

Page 39

1   A   Yes.
2   Q   I will represent to you this was a disciplinary
3       report produced by the Pike County Board of
4       Education.
5   A   Uh-huh.
6   Q   And I see that there is an incident that happened
7       on April 18th that has your name, Robert McDaniel,
8       on it?
9   A   Uh-huh.
10  Q   Is that the incident that relates to the band
11      room?
12  A   I believe it is.
13  Q   Can you tell us what happened on that date?
14  A   If I recall, I was summoned to the band room
15      for -- to investigate a broken window -- a broken
16      plate glass inside the band room.  And when I got
17      there, I noticed that the glass encasement where I
18      believe Mr. Coon's office, or a storage area was,
19      had been -- had been broken.  And --
20  Q   Were there any students in there at that time?
21  A   Yes, as a matter of fact, there was students who
22      actually reported the incident back to me.  And --
23      which is always the case.  We sit down, and we

Page 40

1       take statements, sometimes verbal, sometimes
2       written, about the actual incident.
3   Q   So, what were you told about the incident by the
4       students?
5   A   That the window had been broken in the -- in the
6       band room.
7   Q   Did they identify anybody who did that?
8   A   Uhm, I believe the individual that was identified
9       was this particular child, Justin Reed.  I cannot
10      recall specifically who the child was.  But I do
11      remember investigating the incident.
12  Q   All right.  And so what did you do to follow up?
13      Other than someone identifying Justin Reed to you
14      and you see the window, what else did you do?
15  A   Investigated it.
16  Q   Well, explain what you did.
17  A   I talked to several of the children, the best of
18      my recollection, ma'am, who were in the band room
19      at the time.  And the best I can remember is that
20      this particular child had been locked inside the
21      office and, uhm, used a -- the flag stick to break
22      the window, either to get out or by accident.
23      But --

Page 41

1   Q   Did you call that student to the office?
2   A   Yes.  I did the referral.
3   Q   Okay.  So, the student who was -- did he lock
4       himself in this office; is that what you're
5       saying?
6   A   I am not sure.  At the time, as I recall writing
7       it up, is that he was charged with criminal
8       mischief, which entailed destruction of property,
9       breaking or destroying school property.
10  Q   So, if he's locked in this office, he's not
11      allowed -- it's some kind of offense to get
12      yourself out in some way?
13  A   I wouldn't say so, ma'am, that it was an offense
14      to get yourself out.  But it was reported to me
15      that he simply broke the glass.
16  Q   While he was locked inside?
17  A   The best I recall is that he was inside with a
18      flag baton.  I believe that the statement from
19      this child stated that he was actually locked
20      inside.  I'm not sure.  But he did --
21  Q   "From this child" meaning Justin Reed?
22  A   Uh-huh.
23  Q   Okay.  What else do you remember about the

11  (Pages 38 to 41)

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 42

1    incident?
2  A   That's basically it.
3  Q   All right. Do you remember on that occasion
4     calling Justin and his mother to the office to
5     meet with you? And this is his mother here
6     (indicating).
7  A   Uhm, yes, whenever there was an incident where a
8     child was disciplined, especially if they were
9     going to be some suspensions and things of that
10    nature, in-school suspension, alternative school,
11    the parent was always encouraged to visit with the
12    school officials --
13 Q   Well --
14 A   -- before --
15 Q   -- what happened in that meeting?
16 A   Uhm, best I recall, ma'am, is that we tried to
17    ascertain how the glass, or how the window was
18    broken. And --
19 Q   What were you told?
20 A   Pardon me?
21 Q   What were you told?
22 A   I was told, I believe, by Justin, that he was
23    locked inside the office. But if he's charged

Page 43

1     with criminal mischief, that is, breaking the
2     glass, if I reflect back, I'm thinking that he was
3     charged, and the office was not locked.
4         If he was locked inside the office, and could
5     not get out, I doubt very seriously if I would
6     have charged him with that.
7  Q   Is there a telephone in Mr. Coon's office?
8  A   I believe that there was a phone call -- a phone
9     inside the office, yes.
10 Q   Did Justin inform you that he had called Mr. Coon
11    to ask him about what should I do?
12 A   I don't recall the specifics of that, no.
13 Q   You don't recall that happening at all?
14 A   I don't recall that particular conversation as him
15    being in there to make a phone call.
16 Q   You don't ever recall Justin telling you that he
17    made a phone call to Mr. Coon?
18 A   No. He may have, but I don't remember that
19    specifically.
20 Q   When you were in the office, did he tell you that
21    he wanted to call Mr. Coon?
22 A   Specifically, I don't remember that.
23 Q   Did you ever become aware during that incident

Page 44

1     that Justin Reed had Mr. Coon's cell phone number?
2  A   No.
3  Q   All right. Did you place a call to Mr. Coon
4     during that incident?
5  A   I don't recall.
6  Q   You don't recall doing that?
7  A   No.
8  Q   Who else was in the meeting besides you?
9  A   Oh, I believe it was the student and during the
10    initial investigation, possibly the parent, as
11    well. I don't recall the specific --
12 Q   Was Mr. Pyron present?
13 A   No, I don't believe he was.
14 Q   Have you ever received any information that
15    Mr. Coon took students off campus during school
16    hours?
17 A   No.
18 Q   Did you ever --
19 A   Other than with Ms. King.
20 Q   Okay. Did you ever see Mr. Coon transport Justin
21    or any other student on campus in his truck?
22 A   No.
23 Q   Other than that document there, would there ever

Page 45

1     be any disciplinary report or documents that
2     relate to that incident?
3  A   No.
4  Q   You wouldn't have written up anything else?
5  A   No.
6  Q   Pike County doesn't have any forms you write up
7     that says, I interviewed the student?
8  A   Well, you know, there is always a referral -- what
9     we call a hard copy of the referral. And that
10    referral is transferred into the -- into the
11    system's database.
12 Q   Is that a form, this referral thing?
13 A   Uh-huh. Uh-huh.
14 Q   What do you do with the hard copy?
15 A   The hard copy is put inside a personnel file.
16 Q   On the student?
17 A   Uh-huh.
18 Q   Other than the referral, though, do you write on
19    there what your investigation showed and what the
20    outcome was on the referral form?
21 A   Yes.
22 Q   So, it's sort of one document that follows the
23    whole incident all the way through?

12 (Pages 42 to 45)

Page 46

1  A   Uh-huh. If it was extensive, ma'am, we would
2      occasionally do a narrative, or if there is not
3      enough space on the form to do that.
4  Q   Okay.
5          MS. DePAOLA: Let me talk to her.
6          MS. ALLEN: Yeah, let's do that.
7          (Brief recess.)
8          MS. DePAOLA: Back on the Record.
9  BY MS. DePAOLA
10 Q   Mr. McDaniel, do you recall placing Justin in the
11     press box after this breaking-the-window incident
12     and leaving him there until his mother came after
13     school to pick him up?
14 A   Press box? Press box? Uhm, I don't recall
15     specifically placing --
16 Q   That doesn't refresh your recollection about what
17     happened?
18 A   No. But there were -- there were occasions if
19     they -- there was not in-school suspension on
20     campus. And if the temperature and everything was
21     okay, I would occasionally put a kid what I call
22     in timeout.
23 Q   In the press box?

Page 47

1  A   Well, not the press box, ma'am. It was like in
2      the bleachers right across the street from my
3      office.
4  Q   Just put them in the bleachers in the outside?
5  A   Yeah.
6  Q   I'm sorry?
7  A   Outside. The bleachers, out on the football
8      field.
9  Q   Now, do you recall calling in to your office, the
10     three boys who reported this incident and
11     examining them about it?
12         MR. SWEENEY: The broken window?
13         MS. DePAOLA: Yes, the broken window.
14 A   I interviewed those individuals who were present
15     at the time.
16 Q   And was the mother present during that?
17 A   No. Not that I recall, ma'am.
18 Q   So, I'm still trying to understand why Justin Reed
19     was punished for this incident.
20 A   During the investigation, ma'am, as I look at what
21     I have here, basically, the punishment was done
22     based on what we thought was the witnesses of the
23     other student.

Page 48

1  Q   So, you interviewed these other three boys, and
2      they said he wasn't locked in there; is that what
3      you're telling me?
4  A   I am basing that, ma'am, on what I charged Justin
5      with.
6  Q   You don't have any independent recollection?
7  A   No.
8  Q   Was Mr. Coon a probationary employee the year that
9      you were there?
10 A   I think the term is "nontenured".
11 Q   Was he a nontenured --
12         MR. SWEENEY: Wait a minute. That's a
13             legal question. He had been
14             employed since 2002.
15         MS. DePAOLA: Right.
16 Q   I'm just talking about the year that you were
17     there. What was his status the best that you
18     recall?
19 A   The best that I recall, that he was nontenured.
20 Q   Now, is it your testimony that Polly King only
21     talked with you one time during the whole year
22     about any problems or concerns she had about
23     Mr. Coon?

Page 49

1  A   Uhm, about Mr. Coon, specifically, that
2      conversation, as I have already said, yes, that
3      was it.
4  Q   That's the only time?
5  A   But there were conversations ongoing between
6      myself and parents. So --
7  Q   Do you recall any other conversations with Polly
8      King during 2004-2005?
9  A   I recall several conversations, but the
10     specificity of them, I don't --
11 Q   You don't know what the subject matter is?
12 A   Parent will just occasionally walk in and talk.
13 Q   No, I am asking you about Polly King. Do you
14     remember the subject matter of any other
15     conversations with her?
16 A   No.
17 Q   Now, you indicated at the outset that you had some
18     special training in the field of sexual abuse; is
19     that correct?
20 A   Sexual abuse?
21 Q   Yes.
22 A   Uhm, can you --
23 Q   Well, let's just ask that question: Do you have

13 (Pages 46 to 49)

JR, A Minor                    July 25, 2007  Pike County Board of Education

| Page 50 |
| --- |

1    any special training in the field of sexual
2    abuse --
3  A   No.
4  Q   -- whatsoever?
5  A   No.
6  Q   Pardon?
7  A   No.
8  Q   So, you don't consider yourself a forensic
9      interviewer for victims of sexual abuse?
10  A   Absolutely not.
11  Q   Do you have any knowledge about the statistical
12     prevalence of sexual abuse in school systems?
13  A   Other than the fact, ma'am, that it occasionally
14     happens.
15  Q   Do you have any information about the incidence of
16     sexual abuse as it relates to special education
17     students?
18  A   No, ma'am.
19  Q   And have you ever written a sexual-abuse policy
20     for this school, Pike County High School?
21  A   No.
22  Q   For any school?
23  A   No.

| Page 51 |
| --- |

1  Q   Have you ever written any procedural outlines for
2      investigating complaints of sexual abuse?
3  A   No.
4  Q   For this school or any other school?
5  A   No.
6  Q   So, if I understand your professional background
7      that you were talking about earlier, would it be
8      fair to say that was more in the area of equal
9      employment opportunity?
10  A   Uh-huh.
11  Q   Yes?
12  A   Uh-huh.
13  Q   And what was that training?
14  A   It was actually prior to my duties in public
15     education. It was in the military, which came
16     under the same umbrella.
17  Q   What years would that have been?
18  A   From 1979 until 1999.
19  Q   So, during that time, you received some training
20     about discrimination in the workplace; is that
21     what you're saying?
22  A   Discrimination in the workplace, sexual harassment
23     in the workplace.

| Page 52 |
| --- |

1         MS. DePAOLA:  That's all I have.
2            EXAMINATION
3  BY MR. SWEENEY
4  Q   Do you know of any requirement that an assistant
5      principal in a public school in Alabama has to
6      have forensic training?
7  A   No.
8  Q   Do you know of any requirement that would preclude
9      an assistant principal from talking to students
10     about disciplinary Master's without forensic
11     training?
12  A   No. No.
13  Q   Was it one of your essential ongoing regular
14     duties to talk to students about conduct issues?
15  A   Repeat that, please.
16  Q   Yeah. Was it one of your regular duties as
17     assistant principal to investigate conduct issues
18     concerning students and to find out what might
19     have happened?
20  A   Yes.
21  Q   With regard to this incident with Justin and the
22     broken window, was the window a window of his
23     office, of Coon's office?

| Page 53 |
| --- |

1  A   Yes. It was the plateglass window that encased
2      his office.
3  Q   From his office, could he look out and see the
4      band room?
5  A   Yes. Yes.
6  Q   Do you recall if the door to the Coon's office
7      locked only from the inside?
8  A   It did lock only from the inside.
9  Q   So that if that were the case, then a student
10     locked inside could unlock the door from the
11     inside?
12  A   Absolutely.
13  Q   Did you get information from the students that
14     Coon had not broken the window to get out of a
15     locked room, or what do you recall in that regard?
16        MS. DePAOLA:  I am assuming you mean
17           Justin.
18  BY MR. SWEENEY
19  Q   Let me rephrase that. As I understand what you
20     said, Justin Coon (sic) said he had been locked in
21     the office?
22  A   Uh-huh.
23  Q   Did you get a different version from the other

JR, A Minor                    July 25, 2007   Pike County Board of Education

---

Page 54

1    students you talked to?
2  A  Yes.
3  Q  Based on all of the information you had, what was
4    your conclusion about whether Justin has been
5    innocent or not?
6  A  I concluded based on what I was able to ascertain
7    from the other students is that if the office was
8    locked only from the inside, he could have opened
9    the door and not broken the window.
10 Q  Was Charles Coon there that day, or was there a
11   substitute teacher?
12 A  It was a sub there at the time.
13 Q  You made reference to this "butt-buddy" reference.
14   Did you ever talk to Butch Phelps?
15 A  No, I didn't.
16 Q  Do you know what information he communicated to
17   Mark Bazzell about that term?
18 A  I have only a vague reference what it may have
19   been.  Not a specific person, but just a term.
20 Q  You've mentioned that you had dialogue with
21   Charles Coon during that 2004-2005 school year.
22   Did you have any reason to deal with Coon outside
23   of the school?

---

Page 55

1  A  No.
2  Q  Did you have any opportunity or occasion when you
3    socialized with Charles Coon?
4  A  No.
5  Q  Or have any private dealings with him separate and
6    apart in your employment responsibilities as
7    assistant principal?
8  A  No.
9  Q  With regard to all of your dealings with Charles
10   Coon, was that always as an assistant principal
11   and within the line and scope of your duties as
12   assistant principal?
13 A  That's correct.
14 Q  With regard to Justin Reed, did you have any
15   dealings with him outside of your position as
16   assistant principal?
17 A  No.
18 Q  During the 2004-2005 year when you had various
19   opportunities to see Charles Coon, did you ever
20   see anything that would make you suspicious of him
21   in terms of sexual abuse of students?
22 A  No.
23 Q  Did any student ever report to you anything that

---

Page 56

1    would put you on notice that Charles Coon might be
2    sexually abusing students?
3  A  No.
4  Q  Or sexually abusing Justin Reed?
5  A  No, sir.
6  Q  In the investigation in April of 2005, did
7    anything come up in connection with Charles Coon
8    and Justin Reed?
9  A  No.
10   MS. DePAOLA:  Object to the form.
11 A  No.
12 Q  Did any faculty member, parent, or law enforcement
13   officer ever report to you that Justin Reed should
14   be suspected of possible child abuse?
15 A  No, sir.
16 Q  When you heard that -- or did you hear that
17   Charles Coon had submitted his retirement at the
18   end of the school year, or had resigned?
19 A  Yes.
20 Q  Was there any indication, to your knowledge at
21   that time, that he was under any cloud of
22   investigation for improper conduct?
23 A  No, sir.

---

Page 57

1  Q  You indicated that you did not remember getting
2    the written material from anyone at Pike County on
3    sexual abuse.  But you did have conversations and
4    communication about that subject?
5  A  Yes, sir.
6  Q  It's my impression from the things you have said
7    today that you are a pretty strict
8    disciplinarian --
9  A  Yes.
10 Q  -- would that be true?
11 A  That's correct.
12 Q  It's my impression that you're pretty strict about
13   what you think is an appropriate professional
14   relationship between teachers and students?
15 A  Yes, sir.
16 Q  If you had had any report that Charles Coon was
17   sexually abusing a student, what would you have
18   done?
19 A  I would have reported it to the authorities.
20 Q  The law enforcement authorities?
21 A  My superiors, Dr. Bazzell.
22 Q  And to...
23 A  The authorities.

---

15  (Pages 54 to 57)

Page 58

1 **Q  Would you have taken that seriously?**
2 A  Yes, sir. Absolutely.
3          MR. SWEENEY:  Thank you very much.
4          FURTHER EXAMINATION
5 BY MS. DePAOLA
6 **Q  Okay.  Exactly what are those conversations and**
7 **communication that you say are training on sexual**
8 **abuse that you have had.  You just responded to**
9 **his questions, no written materials but**
10 **conversations and communications.  What are they?**
11 **Be specific.**
12 A  Basically, ma'am, those that entail
13    relationships --
14 **Q  With who?**
15 A  -- that are forbidden between students --
16 **Q  Conversations with who --**
17          MR. SWEENEY:  Let him finish his answer,
18            please.
19          MS. DePAOLA:  Well, we are we going to
20            go until tomorrow.
21          MR. SWEENEY:  Yeah, we can.  But we're
22            going to have the witness finish his
23            answers before we --

Page 59

1          MS. DePAOLA:  The question is --
2          MR. SWEENEY:  And I would like for you
3            to not interrupt when I am
4            objecting, please.
5 A  Go ahead, ma'am.
6 **Q  Conversations with whom?**
7 A  Faculty members about professional relationships.
8 **Q  Okay.  Conversations with any faculty members that**
9 **you can tell us about about sexual abuse.**
10 A  In the line of faculty meetings, faculty
11    communications, about professional relationships,
12    which might entail that.
13 **Q  Was there any discussion about sexual abuse,**
14 **specifically?**
15 A  No.
16 **Q  And were there any communications that you just**
17 **referred to about sexual abuse?**
18 A  No.
19          MS. DePAOLA:  That's all.  Thank you.
20            Could you get the signed
21            interrogatories?
22          MR. SWEENEY:  Yeah, we're doing that
23            now.

Page 60

1          (Whereupon, at approximately, 1:35
2          p.m. on the 25th day of July, 2007
3          the deposition was concluded.)
4          * * * * * * * * *
5          FURTHER DEPONENT SAITH NOT
6          * * * * * * * * * *

Page 61

2          REPORTER'S CERTIFICATE
3
4 STATE OF ALABAMA
5 MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8 deposition of ROBERT McDANIEL was taken down by me in
9 machine shorthand on the 25th of July, 2007, and the
10 questions and answers thereto reduced to writing under
11 my personal supervision, and that the foregoing
12 represents a true and correct transcript of the
13 proceedings given by said witness upon said hearing.
14      I further certify that I am neither of counsel nor
15 related to the parties to the action, nor am I any wise
16 interested in the results of said cause.
17      Dated this 10th day of August, 2007.
18
19      _____
20      Mary Moore-Wynn
21      Certified Shorthand Reporter
22
23

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 1

---

**A**

able 54:6
**Absolutely**
22:11,18 30:8
50:10 53:12
58:2
**abuse** 7:22 8:8
9:11,20 10:8
10:15,17 11:1
11:5,8,11 12:9
12:12 14:1
49:18,20 50:2
50:9,12,16
51:2 55:21
56:14 57:3
58:8 59:9,13
59:17
**abusing** 56:2,4
57:17
**academics** 13:3
13:9
**accepted** 20:21
26:23 27:7
**accident** 40:22
**accused** 15:13
**action** 17:7
61:15
**activities** 29:22
**activity** 30:20
**actual** 40:2
**address** 5:9,10
**addressed** 18:15
**administration**
7:6
**advise** 11:3
**agreed** 3:7,19
4:3 20:7,9,18
**agreement**
20:20 26:13
**Ah** 38:21
**ahead** 59:5
**Air** 7:8 8:2
**Alabama** 1:2,20
2:5,9,14 5:11
5:18 6:12,23

52:5 61:4
**allegations**
29:17 33:5,14
34:2
**alleged** 19:23
**Allen** 2:8 33:10
36:21 46:6
**allowed** 25:19
26:14 41:11
**alternative**
42:10
**ambassadors**
18:12,13
**amiable** 20:20
**answer** 32:6
58:17
**answers** 58:23
61:10
**anybody** 40:7
**anyone's** 31:19
32:2
**apart** 55:6
**apologized**
20:19
**apparently** 20:4
**appear** 9:19
**APPEARAN...**
2:2
**application** 6:4
7:8
**approach** 19:12
**appropriate**
25:20 57:13
**appropriateness**
13:13
**approximately**
1:21 60:1
**April** 24:9 29:1
34:10 39:7
56:6
**Arant** 2:12
**area** 39:18 51:8
**arose** 18:14
**arrived** 21:14
**ascertain** 42:17

54:6
**asking** 49:13
**aspect** 22:19
**assistant** 5:20,20
6:6,7 11:15,17
24:18 52:4,9
52:17 55:7,10
55:12,16
**assisted** 12:19
**associate** 7:9
**Associates** 7:7
**assume** 12:1
**assumed** 35:18
36:1
**assuming** 53:16
**ASU** 7:7
**attached** 37:22
**attempted** 33:17
**attention** 21:8
21:21 24:8,20
28:20 31:19
32:2
**Attorney** 2:4
**August** 61:17
**authorities** 30:5
34:17,18 57:19
57:20,23
**automobile** 31:7
**Avenue** 2:9,13
**average** 24:2
**aware** 9:22 10:1
16:12,17 17:9
24:12 27:14
29:2,4 31:23
33:14,19 43:23
**axillaries** 18:9
**Azar** 2:8,8

**B**

**B** 2:5
**Bachelor's** 6:18
6:21
**back** 17:13
18:14 19:17
20:5 25:11

26:9,15,19
30:5,13 39:22
43:2 46:8
**background**
6:17 8:9 16:23
51:6
**bad** 19:18
**badger** 31:9
**band** 15:21 16:2
16:7 17:14,16
18:10,21 19:4
19:13,13 20:10
24:6,6,21
25:17 32:16,21
37:18 39:10,14
39:16 40:6,18
53:4
**band's** 18:17
**based** 47:22
54:3,6
**basically** 8:18
16:1 18:19
42:2 47:21
58:12
**basing** 48:4
**baton** 41:18
**batteries** 28:4,8
**Bazzell** 2:17
20:13 21:4
22:22 32:3
33:7,16 34:1
54:17 57:21
**behavior** 18:2
18:18
**believe** 16:21
20:12,17 23:7
24:22,23 25:5
26:6,11 28:11
30:12 39:12,18
40:8 41:18
42:22 43:8
44:9,13
**believed** 20:8
**bell** 14:19 19:2
**belonged** 25:7

**best** 40:17,19
41:17 42:16
48:17,19
**better** 19:12
**Birmingham**
2:14
**Blake** 24:13
26:16,18,21
31:21 32:3
**Blake's** 27:13,19
27:21
**bleachers** 47:2,4
47:7
**Board** 1:13,19
13:22 39:3
**Booker** 6:4
**bounds** 22:9,17
**box** 46:11,14,14
46:23 47:1
**boys** 47:10 48:1
**Bradley** 2:12
**break** 38:15
40:21
**breaking** 41:9
43:1
**breaking-the-...**
46:11
**Brief** 6:14 7:20
33:12 38:12
46:7
**briefly** 5:22
**bring** 31:19 32:1
**bringing** 13:8
**brings** 23:15
**broke** 37:18
41:15
**broken** 39:15,15
39:19 40:5
42:18 47:12,13
52:22 53:14
54:9
**brought** 13:2,4
19:17,22 21:6
21:20
**Brundidge** 6:8

---

**buddy** 34:7,18
  36:19 37:9
**Bullock** 6:9 7:12
  7:15
**bus** 18:20
**Butch** 54:14
**butt** 34:7,18
  36:19 37:9
**butt-buddy**
  54:13

**C**

**call** 25:18 33:6
  33:15 34:1
  41:1 43:8,15
  43:17,21 44:3
  45:9 46:21
**called** 43:10
**calling** 42:4 47:9
**calls** 9:13 10:1
**Camden** 5:18
  6:11
**camp** 15:21 16:2
  17:14,16 32:16
  32:22
**campus** 16:3
  19:1 26:3
  44:15,21 46:20
**cards** 21:12
**case** 1:10 3:20
  3:23 9:18
  18:15 21:3,17
  21:18 24:16
  39:23 53:9
**cases** 10:18
**Casey** 26:2,4
  28:17
**cause** 61:16
**caused** 13:19
**cell** 24:13,16,19
  25:10,13 26:10
  26:11,17 27:1
  27:8,9,16 28:2
  28:16 31:20
  32:4 44:1

**central** 5:17
  6:11 13:16
**centralized**
  20:23 23:9
**certain** 28:14
**Certificate** 4:12
  61:2
**Certification** 7:6
**Certified** 61:21
**certify** 61:7,14
**chain** 17:3 21:18
  22:21 30:13
  32:19,22
**characteristics**
  8:10,17 9:6
**charge** 8:19,23
  18:16
**charged** 15:12
  15:13 41:7
  42:23 43:3,6
  48:4
**Charles** 12:5
  15:2 54:10,21
  55:3,9,19 56:1
  56:7,17 57:16
**cheerleaders**
  19:4
**child** 19:15,23
  20:4,5,5,10,19
  24:21 26:13
  27:16 33:18
  40:9,10,20
  41:19,21 42:8
  56:14
**children** 23:20
  40:17
**choke** 33:17
**choked** 33:17
**choking** 19:15
  19:23
**circumstances**
  36:17
**Civil** 3:10
**claims** 13:23
**Clarksville** 7:10

**class** 14:19 19:2
**classes** 19:8
**classroom** 14:6
  18:5
**clean** 38:4
**clear** 22:12
**climate** 14:6,13
  24:17
**closed** 29:23
**cloud** 56:21
**Coahoma** 7:9
**code** 14:10,12,16
  24:17
**College** 7:7,9
**Colorado** 6:21
  6:22
**come** 11:10 12:2
  24:20 56:7
**commencing**
  1:21
**comment** 37:13
**commission**
  3:12
**Commissioner**
  1:18 3:11
**communicated**
  54:16
**communication**
  57:4 58:7
**communicatio...**
  58:10 59:11,16
**Community** 7:7
  7:9
**complain** 21:15
**complaining**
  24:1,4
**complaint** 23:10
**complaints** 51:2
**computer** 6:3
  7:8
**concern** 13:19
  16:23 17:11
  18:4,11 19:10
  21:7,20,22,23
  37:15

**concerned** 22:2
**concerning**
  52:18
**concerns** 16:9
  18:1 28:19
  48:22
**concluded** 54:6
  60:3
**conclusion** 54:4
**conduct** 9:20
  14:11,13,16
  18:9 22:10,17
  25:21 52:14,17
  56:22
**confiscate** 26:5
**confiscated**
  25:10 26:5,8
  27:9
**connection** 56:7
**connotations**
  36:4
**consider** 25:20
  50:8
**considered**
  25:22 36:9
**consultant** 12:19
**consulting** 13:2
**contact** 15:7,18
  15:20,23 17:14
  18:2 27:13
  28:2 29:18
  36:12
**control** 19:3,8
  19:13
**conversation**
  20:1 23:17,22
  29:5 43:14
  49:2
**conversations**
  26:20 29:7
  35:6 49:5,7,9
  49:15 57:3
  58:6,10,16
  59:6,8
**Coon** 12:5 15:2

15:12,19 17:11
  20:15,20 21:1
  21:8 22:13,13
  22:15 23:12
  24:9,12 27:3,8
  28:21 29:1
  32:1,12,15,22
  33:17 34:3,8
  36:19 43:10,17
  43:21 44:3,15
  44:20 48:8,23
  49:1 53:14,22
  54:10,21,22
  55:3,10,19
  56:1,7,17
  57:16
**Coons** 18:4,8
  19:12 20:1,9
  20:17 25:5
  26:6,11,14,15
  29:13 30:5,16
  36:18 37:7,7
  37:10
**Coon's** 9:20
  18:1 39:18
  43:7 44:1
  52:23 53:6
**copy** 45:9,14,15
**correct** 15:4
  21:8,9 49:19
  55:13 57:11
  61:12
**counsel** 3:8,20
  4:4 61:14
**county** 1:13,19
  6:4,6,8,9 7:11
  7:12,13,14,14
  7:15,15,15,16
  8:13,13,14
  10:6,10 11:4,8
  11:13 12:22
  13:3 14:4,22
  15:5,7,14
  16:13 39:3
  45:6 50:20

JR, A Minor                    July 25, 2007   Pike County Board of Education
Page 3

57:2 61:5
course 8:3,4
courses 7:23
  8:12
Court 1:1 37:3
criminal 41:7
  43:1
CSR 3:11
culture 14:14
current 8:14
currently 5:16
  6:10
cut 38:16

**D**
damaged 28:5
database 45:11
date 39:13
Dated 61:17
day 14:8 16:5
  25:5 26:18,19
  54:10 60:2
  61:17
deal 54:22
dealing 10:12
dealings 55:5,9
  55:15
dealt 10:16
Deanie 2:8
decision 26:4
DEFENDANT
  1:15 2:3,11
degree 6:23
demeanor 9:1
  9:10
DePaola 2:4
  4:10,11 5:6
  6:13,15 33:13
  36:20,22 37:4
  38:1,4,8,10,18
  46:5,8,9 47:13
  48:15 52:1
  53:16 56:10
  58:5,19 59:1
  59:19

DEPONENT
  60:5
deposition 1:17
  3:8,10,15,21
  3:22 4:5 60:3
  61:8
Description 4:14
destroying 41:9
destruction 41:8
determine 14:13
development
  7:23 8:12
dialogue 54:20
different 14:7
  53:23
dipped 13:10
directed 13:17
direction 13:23
director 16:7
disciplinarian
  57:8
disciplinary
  4:15 38:11
  39:2 45:1
  52:10
discipline 14:6
  18:5 23:21
  38:20
disciplined 42:8
discrimination
  51:20,22
discussion 6:14
  23:4 33:12
  59:13
discussions 23:1
  35:7
DISTRICT 1:1
  1:2
document 44:23
  45:22
documents
  38:23 45:11
doing 33:7 44:6
  59:22
Donald 2:12

38:5
door 17:20 53:6
  53:10 54:9
doubt 43:5
Dr 2:17 20:13
  21:4 22:22
  32:3 33:7,16
  34:1 57:21
dress 24:16
duly 5:3
duties 51:14
  52:14,16 55:11
duty 14:3

**E**
EAR 1:6
earlier 51:7
education 1:14
  1:19 6:1 7:3
  39:4 50:16
  51:15
educational 5:23
  6:16 7:18
EEO 8:1
either 3:17 4:1
  13:21 35:3
  40:22
Elizabeth 2:18
Elmore 6:6 7:14
  7:15 8:13
employed 5:16
  5:17 48:14
employee 48:8
employment
  5:23 8:4,14
  51:9 55:6
encased 53:1
encasement
  39:17
encouraged
  42:11
enforcement
  56:12 57:20
enforcing 14:23
  15:1

entail 58:12
  59:12
entailed 10:17
  41:8
entire 28:7,7
entrusted 8:22
equal 8:4,6 51:8
especially 24:18
  42:8
essential 52:13
establish 14:3
establishing
  14:21
evaluate 12:20
evaluations
  12:17,20 13:11
  13:12
evidence 3:16
  27:4 36:6,7
Exactly 58:6
Examination
  4:10,10,11 5:5
  52:2 58:4
examine 26:23
  27:7
examining 47:11
example 8:20
  14:18 18:23
Excuse 38:13
Exhibit 4:14,15
  37:20 38:3
EXHIBITS 4:13
expect 38:23
expert 11:10
explain 18:6
  35:14 40:16
explained 20:2
  21:16 25:7
  26:4
explanation
  20:21
expressed 16:9
extensive 46:1

**F**

fact 8:2 16:4
  22:3 25:16
  28:12 30:23
  34:16 39:21
  50:13
faculty 10:9,10
  10:12,18 11:18
  12:8,12,16,19
  13:11,19 14:9
  14:12 15:19
  19:3 56:12
  59:7,8,10,10
fair 51:8
fairly 28:14
fall 24:14 28:10
  28:11,15
familiar 15:2
  19:18 38:22
father 1:6 26:14
  27:13,19,22
Faulkner 24:13
  26:16 31:21
  32:4
Federal 2:13 3:9
fell 24:23
felt 32:16 33:1
field 7:21 47:8
  49:18 50:1
Fifth 2:13
file 13:17 17:10
  20:15,23 23:11
  23:13 45:15
filing 3:21 4:2
film 11:7
find 52:18
finish 58:17,22
firm 13:2
first 5:2 7:19
  12:18 15:7,18
  16:2 17:13,23
  19:22 21:11,16
  fixed 22:1
flag 40:21 41:18
follow 8:20 9:9
  40:12

JR, A Minor                    July 25, 2007   Pike County Board of Education

following 19:2
21:11 32:16,21
follows 5:4
45:22
football 18:11
47:7
forbidden 58:15
force 7:8 8:2
26:9
foregoing 61:7
61:11
forensic 50:8
52:6,10
form 3:13 16:15
27:2 29:19
45:12,20 46:3
56:10
formality 3:12
forms 45:6
forth 1:21
Foster 19:15,19
19:23 33:18
found 29:12
friend 36:9
friends 35:23
36:3
front 22:16
further 3:19 4:3
4:11 23:16
28:19 58:4
60:5 61:14

G
games 18:20
general 15:19
29:5
generally 38:23
getting 13:9
57:1
gift 27:1,5
gifts 9:13,22,22
give 5:22 25:11
26:9
given 61:13
gives 31:10

glass 39:16,17
41:15 42:17
43:2
go 17:13 33:10
58:20 59:5
going 22:5 25:9
26:9 29:13
38:2,16 42:9
58:19,22
good 18:12
35:16,22
gotten 35:6
grade 21:15
22:1
grades 23:20
guess 20:2
gym 16:4

H
half 12:18
hand 20:4,18
handbook 14:9
handled 23:7
handouts 11:4
hanging 34:9
happened 21:13
24:21 25:4
39:6,13 42:15
46:17 52:19
happening
43:13
happens 50:14
harassment 8:7
51:22
hard 45:9,14,15
hear 34:11,15
56:16
heard 15:10
34:7 56:16
hearing 61:13
hereto 3:17 4:1
37:22
High 5:17 6:5,7
6:8,10,11
11:14 12:22

14:4,22 15:8
16:13 50:20
highlighting
38:6
hiring 12:5
history 5:22
home 5:9,10
Hon 2:4,8,12
hours 44:16

I
idea 13:6 18:9
35:4,16
identification
37:21
identified 40:8
identify 38:19
40:7
identifying
40:13
impression
30:19 57:6,12
improper 33:15
56:22
improprieties
15:13
inappropriate
25:22 29:18,22
30:20
incidence 13:18
50:15
incident 19:15
20:11,15 23:4
24:15,20 32:4
33:16 34:10
37:17 39:6,10
39:22 40:2,3
40:11 42:1,7
43:23 44:4
45:2,23 46:11
47:10,19 52:21
incidents 28:20
31:20 32:2
included 8:6
10:21

indent 19:19
independent
48:6
INDEX 4:8,13
indicated 49:17
57:1
indicating 29:20
31:6 34:20
42:6
indication 56:20
indicative 9:12
9:20 10:4 31:3
individual 8:19
8:21 40:8
individuals 8:22
9:10 18:16
47:14
inform 43:10
information
25:14 28:2
30:3,4 31:10
31:14 44:14
50:15 53:13
54:3,16
informed 35:9
initial 44:10
innocent 54:5
inside 39:16
40:20 41:16,17
41:20 42:23
43:4,9 45:15
53:7,8,10,11
54:8
instance 8:10
interaction
13:13
interested 61:16
interrogatories
59:21
interrupt 59:3
interruption
7:20 38:12
interviewed
45:7 47:14
48:1

interviewer 50:9
introduced 3:22
16:7
investigate
13:23 39:15
52:17
investigated
37:19 40:15
investigating
40:11 51:2
investigation
23:7 27:11
29:1,3,12
30:14 32:1
35:8 37:10
44:10 45:19
47:20 56:6,22
involved 10:10
37:17
involving 19:19
28:20
in-school 42:10
46:19
issue 23:12 24:8
issues 11:19
16:9 18:17
52:14,17

J
Jackson 6:18,19
January 16:18
21:11 23:15
34:3
JBH&M 12:20
13:1,2
JR 1:5
July 1:18 60:2
61:9
Justin 4:16
17:16,18,19
37:17 38:20
40:9,13 41:21
42:4,22 43:10
43:16 44:1,20
46:10 47:18

48:4 52:21
53:17,20 54:4
55:14 56:4,8
56:13

**K**

**keep** 20:9 28:4
**kid** 46:21
**kids** 18:19,19
24:19
**kind** 13:10
17:10 20:8
23:9 33:15
38:22 41:11
**King** 16:21 21:6
21:7 23:17,23
34:2 44:19
48:20 49:8,13
**knew** 17:19
29:15 31:14
32:5
**know** 10:5 13:5
15:10,16 17:7
17:18 19:21
22:1,23 23:10
28:12 29:16
33:7 34:23
35:2 45:8
49:11 52:4,8
54:16
**knowledge**
50:11 56:20
**K12** 7:6

**L**

**labeled** 25:3
**language** 9:14
**late** 25:17
**law** 2:4 56:12
57:20
**learned** 8:16 9:7
**leave** 29:14
**leaving** 46:12
**Lee** 5:8
**legal** 48:13

**lend** 9:2
**letters** 14:17
**let's** 24:10 30:2
46:6 49:23
**level** 13:14
**liability** 10:20
**line** 8:18 10:19
11:22 14:5
55:11 59:10
**lines** 12:10
**list** 7:12
**lives** 8:22
**local** 30:4
**location** 13:17
23:9
**lock** 41:3 53:8
**locked** 25:3
40:20 41:10,16
41:19 42:23
43:3,4 48:2
53:7,10,15,20
54:8
**look** 21:17 28:1
28:3 47:20
53:3
**lot** 24:1,7 38:6
**Loud** 18:19
**Love** 1:20

**M**

**machine** 61:9
**Macon** 6:4 7:15
8:13
**maintain** 9:1,9
**maintaining**
10:20 19:7
**Making** 8:21
**man** 33:17
**management**
14:6 18:5
**manner** 3:23
31:17
**mark** 2:17 38:2
54:17
**marked** 37:21

**Mary** 1:17 3:11
61:20
**Master's** 6:22
52:10
**material** 37:2
57:2
**materials** 58:9
**matter** 8:2 16:4
39:21 49:11,14
**ma'am** 11:16
15:6,9 28:11
30:8 31:18
34:20 35:4
36:1,6,9 40:18
41:13 42:16
46:1 47:1,17
47:20 48:4
50:13,18 58:12
59:5
**Mc** 26:21
**McDANIEL**
1:17 3:9,21 4:9
5:1,8 38:19
39:7 46:10
61:8
**mean** 7:2 9:15
14:15 15:20
17:20 19:18
34:19 35:22
38:22 53:16
**meaning** 41:21
**means** 14:19
**meant** 14:17
35:15,16,17
36:12
**MED** 7:5
**meet** 17:16 42:5
**meeting** 20:6
42:15 44:8
**meetings** 10:9
15:19 59:10
**member** 13:19
19:4 56:12
**members** 10:11
10:13,18 11:18

12:8,12 13:11
59:7,8
**memo** 33:23
**mentioned** 21:6
54:20
**met** 16:1,1,3,6,8
**MIDDLE** 1:2
**military** 51:15
**mine** 12:3
**MINOR** 1:5
**minute** 33:11
48:12
**mischief** 41:8
43:1
**Misconduct**
18:21
**Mississippi** 6:19
7:10
**Montgomery**
2:5,9 5:10 7:1
61:5
**Moore-Wynn**
1:18 3:11
61:20
**mother** 1:6 42:4
42:5 46:12
47:16

**N**

**name** 5:7,8
16:21 30:9
35:9 37:8 39:7
**narrative** 46:2
**nature** 9:4,14
29:23 30:22,23
31:8,10 42:10
**necessarily**
21:22 31:3
36:19
**need** 3:14 38:14
**neither** 61:14
**never** 26:10
27:21 29:17,21
**new** 33:5
**nickname** 37:12

**ninth** 6:2
**nonprofessional**
9:2
**nontenured**
48:10,11,19
**norm** 9:13
**normal** 36:17
**normally** 24:16
**North** 2:13
**note** 17:10
**notice** 56:1
**noticed** 39:17
**number** 4:14,14
44:1
**numbers** 28:1

**O**

**Object** 16:15
27:2 29:19
56:10
**objecting** 59:4
**objections** 3:12
3:13
**occasion** 42:3
55:2
**occasionally**
19:5 24:6
25:16,18 28:4
46:2,21 49:12
50:13
**occasions** 46:18
**occur** 14:7
**occurred** 19:15
21:10,11 24:14
28:9
**offense** 41:11,13
**offered** 3:16
**office** 16:6 20:7
21:14 23:19
25:3 28:6
39:18 40:21
41:1,4,10 42:4
42:23 43:3,4,7
43:9,20 47:3,9
52:23,23 53:2

53:3,6,21 54:7
**officer** 56:13
**offices** 1:19
**officials** 42:12
**off-the-Record**
6:14 33:12
**Oh** 7:17 26:18
38:16 44:9
**okay** 6:1 7:11,17
8:16 9:15 12:4
13:16,21 14:3
15:1,18 16:22
17:4,10,13
20:14 23:6,15
24:12 28:19,23
30:10 41:3,23
44:20 46:4,21
58:6 59:8
**once** 11:22
**one-to-one**
15:20
**ongoing** 49:5
52:13
**opened** 54:8
**opportunities**
55:19
**opportunity** 8:5
8:6 51:9 55:2
**outcome** 45:20
**outlines** 51:1
**outset** 49:17
**outside** 11:10
24:21 47:4,7
54:22 55:15
**overreaction**
20:9
**oversee** 13:3

**P**

**Page** 4:14
**Pardon** 42:20
50:6
**parent** 16:21
21:14 24:3,5
25:18 27:14

42:11 44:10
49:12 56:12
**parents** 19:22
20:6,6,7,19
23:19,23 24:7
49:6
**part** 29:2 33:19
33:22
**participate**
28:23
**particular** 21:3
21:14 25:1,16
30:8 32:14
34:12,16 35:7
40:9,20 43:14
**parties** 3:8,20
61:15
**party** 3:17 4:1
16:18,20
**people** 8:23
**percent** 12:21
**perception** 18:8
**performance**
18:3 23:20
**performed**
12:17
**person** 54:19
**personal** 13:14
61:11
**personnel** 45:15
**pertained** 10:12
**Phelps** 54:14
**phone** 9:13 10:1
24:13,23 25:2
25:4,6,7,8,10
25:13 26:10,11
26:15,17,19,21
27:1,8,10,16
28:2,16 31:20
32:4 43:8,8,15
43:17 44:1
**phones** 24:16,19
28:6
**pick** 46:13
**Pike** 1:13,19 6:8

7:11,12,14,15
8:14 10:6,10
11:4,8,13
12:22 14:4,21
15:4,7,14
16:13 39:3
45:6 50:20
57:2
**place** 2:13 5:10
7:11 13:16
15:14 20:18
44:3
**placed** 20:3,15
20:23 23:10
29:13
**placing** 46:10,15
**PLAINTIFF** 1:8
**Plaintiff's** 4:15
37:20 38:2,7
**plate** 39:16
**plateglass** 53:1
**please** 5:7 31:22
52:15 58:18
59:4
**point** 30:8 31:23
32:8
**policies** 14:3,21
**policy** 18:23
50:19
**political** 6:20
**Polly** 16:21 21:6
21:7 23:17
34:2 48:20
49:7,13
**position** 5:19
11:13 55:15
**possible** 56:14
**possibly** 44:10
**practically**
26:18
**practice** 19:6
24:22,22 25:17
**practices** 18:21
19:13
**preclude** 52:8

**predators** 8:11
8:17 9:7 10:4,7
**present** 2:16
22:4 44:12
47:14,16
**presentation**
10:23
**press** 46:11,14
46:14,23 47:1
**pretty** 35:16
57:7,12
**prevalence**
50:12
**previously** 32:11
**principal** 6:6,8,9
11:15,17 13:22
17:6 21:19
24:18 52:5,9
52:17 55:7,10
55:12,16
**principals** 5:21
**prior** 24:9 31:20
32:2 51:14
**private** 16:14
32:13,18,23
55:5
**probably** 12:21
**probationary**
48:8
**problem** 18:6
22:20
**problems** 18:7
48:22
**procedural** 51:1
**procedure** 3:10
14:4,21
**proceedings**
61:13
**produced** 39:3
**professional**
7:23 8:12,21
9:1,2,8,9 10:11
10:20 11:23,23
12:10 22:10,17
29:11 36:17

51:6 57:13
59:7,11
**professionally**
25:20
**property** 41:8,9
**provide** 12:8,11
**provided** 3:17
4:1 10:7 24:13
25:12
**providing** 11:18
**public** 6:1 51:14
52:5
**Pueblo** 6:22
**punished** 47:19
**punishment**
47:21
**purpose** 3:17
**pursuant** 1:20
3:9
**put** 13:17 20:18
23:12 45:15
46:21 47:4
56:1
**Pyron** 17:5
20:12 21:19
22:21 23:5,7
26:1 27:3
28:12,13 29:6
30:13 32:3
34:2 35:8,9
44:12
**Pyron's** 29:12
**p.m** 60:2

**Q**

**question** 8:8 9:6
14:20 19:18
20:22 32:6
36:22 48:13
49:23 59:1
**questions** 3:13
3:14 58:9
61:10
**quote** 29:21,23
30:19

**R**

**R** 2:12
**read** 37:3
**reading** 4:4
**realm** 12:3
**reason** 54:22
**recall** 10:14 11:1
23:18,21 29:8
30:2,9 31:12
32:15 34:14
39:14 40:10
41:6,17 42:16
43:12,13,14,16
44:5,6,11
46:10,14 47:9
47:17 48:18,19
49:7,9 53:6,15
**receive** 7:19,21
11:3 13:21
**received** 21:15
44:14 51:19
**receiving** 10:15
**recess** 46:7
**recognize** 17:21
**recognizing** 8:10
8:17 11:11
**recollection** 28:9
30:11 40:18
46:16 48:6
**record** 5:7 6:13
20:14 33:10
46:8
**reduced** 61:10
**Reed** 2:18 4:16
17:16,18 37:17
38:20 40:9,13
41:21 44:1
47:18 55:14
56:4,8,13
**refer** 8:1 21:18
**reference** 34:8
34:12 54:13,13
54:18
**referencing** 21:3
**referral** 41:2

45:8,9,10,12
45:18,20
**referred** 34:18
35:18 37:7,8
59:17
**reflect** 43:2
**reflected** 14:9
14:10
**reflecting** 9:18
**reflects** 14:13
**refresh** 46:16
**refused** 25:11
**regard** 52:21
53:15 55:9,14
**regarding** 23:19
30:5
**regardless** 4:2
**regular** 14:8
52:13,16
**relate** 45:2
**related** 61:15
**relates** 10:7
11:19 39:10
50:16
**relating** 4:15
10:15 12:8
13:12 20:15
29:1 38:20
**relationship**
30:16 31:4
33:15 35:18,20
35:23 57:14
**relationships**
10:19,22 11:23
12:10 31:1
35:21 36:1,11
58:13 59:7,11
**relayed** 17:3
20:13 22:21,22
26:8 29:10
30:4
**remember** 11:6
17:17 35:10
40:11,19 41:23
42:3 43:18,22

49:14 57:1
**remind** 32:8,11
33:6,16 34:1
**reminded** 10:18
**reminders** 14:18
**reminding** 10:10
14:18
**remove** 28:8
**repeat** 31:22
32:20 37:5
52:15
**rephrase** 53:19
**report** 4:15 17:4
19:10,11,17
20:11,22 21:2
21:12 22:2,5,7
22:12 23:10
25:23 33:20,22
38:11,20 39:3
45:1 55:23
56:13 57:16
**reported** 17:5
20:5,12 26:1,2
28:17 30:12,15
32:19,22 34:17
39:22 41:14
47:10 57:19
**Reporter** 37:3
61:21
**Reporter's** 4:12
61:2
**reporting** 18:23
**reports** 13:18
18:13
**represent** 39:2
**represented**
18:10
**representing** 3:8
3:20
**represents** 61:12
**reprimanded**
32:12
**reprimanding**
32:15
**requested** 25:6

37:2
**requirement**
52:4,8
**reserved** 3:15
**resigned** 56:18
**resolved** 23:16
**respect** 11:13
12:15 18:17
24:9 31:2
36:15 37:6
**responded** 58:8
**response** 17:8
37:1
**responsibilities**
10:21 12:1
55:6
**responsibility**
10:11 11:18,21
12:1,7,14,15
12:17 14:16,20
**responsive** 9:5
**results** 61:16
**retirement**
56:17
**retrieved** 25:1,8
**retrospect** 9:19
**returned** 26:10
26:11
**review** 12:20
**re-reminder**
14:11
**right** 6:2 9:5
11:15 15:1,4
17:23 19:14
37:5 40:12
42:3 44:3 47:2
48:15
**road** 18:12
**roam** 19:5
**Robert** 1:17 3:9
3:21 4:9 5:1,8
39:7 61:8
**role** 12:4
**room** 37:18
39:11,14,16

40:6,18 53:4
53:15
**Rose** 2:12
**Rules** 3:9
**ruling** 3:15

**S**

**SAITH** 60:5
**saying** 9:8 12:7
28:16 30:18
41:5 51:21
**says** 45:7
**school** 5:17 6:5,7
6:8,10,11 7:6
11:14 12:22
14:4,6,8,13,14
14:22 15:8
16:13 18:10,13
19:9,14,16
24:2,5,7,17
30:5 34:17
41:9 42:10,12
44:15 46:13
50:12,20,20,22
51:4,4 52:5
54:21,23 56:18
**science** 6:18,20
7:10
**scope** 55:11
**scores** 13:8,9
**second** 16:5 25:5
28:14
**see** 7:17 9:15,19
11:7 27:13
39:6 40:14
44:20 53:3
55:19,20
**semester** 21:12
21:16 28:14
**Senior** 5:8
**separate** 55:5
**seriously** 43:5
58:1
**sessions** 11:4
**set** 1:21

| | | | | |
|---|---|---|---|---|
| **Seventeen** 38:8 | 47:6 | 1:20 3:5 | **substitute** 54:11 | **talk** 11:10 12:12 |
| **sexual** 7:22 8:7,8 | **sort** 21:23 33:23 | **stood** 26:5 | **Suite** 2:5 | 27:19 46:5 |
| 8:11,17 9:7,11 | 45:22 | **storage** 39:18 | **summer** 15:21 | 49:12 52:14 |
| 9:20 10:4,7,8 | **source** 15:11 | **street** 1:20 2:5 | 17:15 33:8 | 54:14 |
| 10:15,17,23 | **space** 46:3 | 47:2 | **summoned** | **talked** 26:16 |
| 11:5,8,11 12:9 | **speak** 5:3 | **strict** 57:7,12 | 39:14 | 27:21 40:17 |
| 12:12 14:1 | **special** 49:18 | **strips** 11:7 | **Superintendent** | 48:21 54:1 |
| 15:13 29:18,22 | 50:1,16 | **student** 4:15 | 2:17 13:22 | **talking** 12:22 |
| 30:22,23 35:20 | **specific** 30:2 | 19:1 22:3,4,8,9 | 26:7,7 30:12 | 48:16 51:7 |
| 35:23 36:4,12 | 44:11 54:19 | 22:14,16 25:8 | **superiors** 57:21 | 52:9 |
| 49:18,20 50:1 | 58:11 | 25:11,12,16 | **supervision** | **tardy** 14:19 |
| 50:9,12,16 | **specifically** 8:8 | 30:6,7,17,20 | 12:15 19:3 | **taught** 6:3 8:2,4 |
| 51:2,22 55:21 | 10:6,14,16,23 | 34:12,13,16,23 | 61:11 | **teacher** 27:17 |
| 57:3 58:7 59:9 | 12:3 13:20 | 35:10 36:11,18 | **sure** 8:21 9:5 | 31:7 36:11 |
| 59:13,17 | 18:7 23:18,21 | 37:13 38:19 | 34:20,21 41:6 | 54:11 |
| **sexually** 56:2,4 | 24:11 29:9 | 41:1,3 44:9,21 | 41:20 | **teachers** 10:22 |
| 57:17 | 36:10 40:10 | 45:7,16 47:23 | **Susan** 2:4 | 12:21 57:14 |
| **sexual-abuse** | 43:19,22 46:15 | 53:9 55:23 | **suspect** 9:10 | **team** 12:19 |
| 11:19 17:1 | 49:1 59:14 | 57:17 | **suspected** 56:14 | 18:11 |
| 50:19 | **specificity** 49:10 | **students** 7:22 | **suspended** | **telephone** 43:7 |
| **shorthand** 61:9 | **specifics** 17:9 | 8:23 10:12,19 | 37:11 | **tell** 6:16 8:16 |
| 61:21 | 43:12 | 10:22 13:13 | **suspension** | 10:6,14,23 |
| **show** 19:5 | **speeches** 9:3 | 14:12,18 16:1 | 42:10 46:19 | 15:18,23 17:23 |
| **showed** 45:19 | **sponsored** 8:12 | 16:3,3,13 18:2 | **suspensions** | 19:21 21:10,13 |
| **sic** 18:8 53:20 | **Springs** 6:10 | 28:21 29:22 | 42:9 | 24:15 26:20 |
| **signed** 59:20 | **standards** 10:20 | 31:6,15 32:12 | **suspicious** 55:20 | 29:7 30:10 |
| **signing** 4:5 | 36:17 | 32:17,23 34:4 | **Sweeney** 2:12 | 39:13 43:20 |
| **simply** 28:8 | **standpoint** 18:5 | 34:8 37:8 | 4:10 15:11 | 59:9 |
| 41:15 | 36:16 | 39:20,21 40:4 | 16:15 27:2,4 | **telling** 43:16 |
| **sir** 56:5,15,23 | **starting** 6:2 | 44:15 50:17 | 29:19 38:7,9 | 48:3 |
| 57:5,15 58:2 | **state** 5:7 6:19,21 | 52:9,14,18 | 38:14 47:12 | **temperature** |
| **sit** 39:23 | 6:23 61:4 | 53:13 54:1,7 | 48:12 52:3 | 46:20 |
| **situation** 19:22 | **stated** 19:1 25:6 | 55:21 56:2 | 53:18 58:3,17 | **tenure** 10:9 |
| 24:19 | 26:13 41:19 | 57:14 58:15 | 58:21 59:2,22 | **term** 34:7 48:10 |
| **situations** 14:7 | **statement** 41:18 | **student's** 30:9 | **sworn** 5:3 | 54:17,19 |
| **six** 8:3 | **statements** 40:1 | 38:10 | **systems** 6:4 7:8 | **terms** 55:21 |
| **size** 20:2 | **STATES** 1:1 | **student/teacher** | 50:12 | **test** 13:8,9 |
| **smoked** 22:4 | **statistical** 50:11 | 31:4 | **system's** 45:11 | **testified** 5:4 |
| **smoking** 22:13 | **status** 48:17 | **studies** 6:3,21,23 | | **testimony** 32:21 |
| 22:14,16 34:4 | **Statute** 3:18 4:1 | 7:2 | ——————— | 48:20 |
| **social** 6:3,21,23 | **stayed** 24:7 28:6 | **stunned** 20:4 | **T** | **Thank** 58:3 |
| 7:2,10 | **stick** 40:21 | **sub** 54:12 | **take** 29:2 38:14 | 59:19 |
| **socialized** 55:3 | **stipulated** 3:7 | **subject** 49:11,14 | 40:1 | **thereto** 61:10 |
| **son** 21:15 24:6 | 3:19 4:3 | 57:4 | **taken** 1:17 3:9 | **thing** 23:2 24:17 |
| **sorry** 6:20 31:9 | **stipulations** | **submitted** 56:17 | 3:11 17:7 58:1 | 28:16 45:12 |
| | | | 61:8 | |

| | | | | |
|---|---|---|---|---|
| **things** 9:3,3,12 9:13,14,18 29:10 31:3,7 31:10,12 42:9 57:6 | **touch** 26:6 **touching** 9:3 **training** 7:18,21 8:9 9:8 10:6,14 10:16 11:4,19 | 49:1,22 **Uh-huh** 17:15 28:18,18 35:13 39:5,9 41:22 45:13,13,17 | **W** | 17:22 18:7 19:11 30:23 41:13 45:4 **write** 45:6,18 **writing** 14:16 |
| **think** 9:16 10:3 13:7 18:19 20:22 21:7 24:23 29:9 30:3 35:17 36:8,12 48:10 57:13 | 12:8,11 17:1 49:18 50:1 51:13,19 52:6 52:11 58:7 **transcript** 61:12 **transferred** 45:10 | 46:1 51:10,12 53:22 **umbrella** 51:16 **unauthorized** 25:9 **understand** 7:17 11:14 12:4 | **Wait** 48:12 **waived** 3:22 4:6 **waiving** 4:2 **walk** 49:12 **walked** 17:20 20:3 **want** 17:13 38:5 | 41:6 61:10 **written** 11:3 13:23 17:12 20:14,22 40:2 45:4 50:19 51:1 57:2 58:9 **wrong** 20:21 |
| **thinking** 43:2 **third** 16:18,20 25:5 **thought** 17:2 35:14 36:4,10 47:22 | **transport** 44:20 **transporting** 16:13 22:8 31:15 32:12,17 32:23 34:4 **treat** 25:9 | 14:15 36:20,23 47:18 51:6 53:19 **Union** 6:10 **UNITED** 1:1 **University** 6:19 | **wanted** 43:21 **warning** 20:17 21:23 **Washington** 2:9 6:5 **wasn't** 22:12 | **Y** |
| **threat** 21:23 **threatened** 22:7 **threatening** 22:5 **three** 6:5 47:10 48:1 | **treatment** 8:1,6 **trends** 8:20 9:9 **trial** 3:23 **tried** 42:16 **trips** 18:20 | 6:22 7:1 **unlock** 53:10 **unprofessional** 17:3 31:1,17 32:18 33:1 | 48:2 **way** 41:12 45:23 **week** 16:6 20:7 **weeks** 26:12 **went** 18:11 | **Yeah** 46:6 47:5 52:16 58:21 59:22 **year** 6:2,7 12:18 15:5,6 27:21 28:7,15 48:8 |
| **time** 3:14,15 13:3 14:19 16:8,12 17:5 17:13,23 19:6 20:10 26:1,2,3 28:7,12 31:19 | **Troy** 1:20 **truck** 22:3,8,9 34:4 44:21 **true** 57:10 61:12 **truth** 5:3,3,4 **try** 26:19 | 36:10,15,16 37:5,12 **use** 25:18,19 26:14 **usual** 8:20 | **West** 2:5 **Wetumpka** 6:6 **we're** 58:21 59:22 **whatsoever** 15:11 50:4 | 48:16,21 54:21 55:18 56:18 **years** 6:3,5,9 8:1 8:3 51:17 |
| 32:8,14 39:20 40:19 41:6 47:15 48:21 49:4 51:19 54:12 56:21 | **trying** 7:11 31:9 47:18 **turn** 22:22 28:3 **two** 6:3,9 26:12 35:19 | **V** | **White** 2:12 **Wilcox** 5:17 6:11 7:13 **window** 37:18 | **0** |
| **timeout** 46:22 **times** 11:15 **title** 35:7,11,12 36:19 37:9 | **type** 23:1 24:17 36:2 **typically** 10:9 | **vague** 30:1,10 30:18 54:18 **various** 55:18 **vehicle** 16:14 | 39:15 40:5,14 40:22 42:17 47:12,13 52:22 52:22,22 53:1 | **0** 16:19 **04** 17:15 24:14 28:10 **05** 15:22 16:18 |
| **TMR** 1:7 **today** 57:7 **told** 16:18 29:17 29:21 35:5 | **U** | 32:13,18,23 **verbal** 20:17 40:1 **version** 53:23 | 53:14 54:9 **Winfield** 5:10 **wise** 61:15 **witness** 4:4,5 5:2 | 16:19 21:11 23:15 24:9 |
| 40:3 42:19,21 42:22 **tomorrow** 58:20 | **uhm** 7:23 10:16 13:20 15:21 19:16 29:5 31:6,7 34:10 40:8,21 42:7 42:16 46:14 | **victims** 50:9 **videos** 11:7 **visit** 42:11 **volunteered** 25:14 **VS** 1:10 | 29:20 34:20 38:13,16 58:22 61:13 **witnesses** 47:22 **words** 23:4 **workplace** 51:20 51:22,23 **wouldn't** 13:5 | **1** **1st** 24:9 29:1 **1:35** 60:1 **10th** 61:17 **100** 12:21 **107** 1:19 **116** 5:14 **117** 5:13,15 **12:00** 1:21 **17** 4:15 37:20 38:3 **1726** 2:5 **18th** 39:7 |

**1819** 2:13
**1979** 51:18
**1999** 51:18

---

### 2

**2nd** 2:5
**2:06-CV-1120...**
  1:11
**2002** 48:14
**2004-2005** 49:8
  54:21 55:18
**2005** 32:16 56:6
**2007** 1:18 60:2
  61:9,17
**22** 8:1
**25th** 1:18 60:2
  61:9
**260** 2:9

---

### 3

**35203** 2:14
**36** 5:12
**36104** 2:9
**36105** 2:5
**37** 4:15

---

### 5

**5** 4:10
**51** 4:10
**57** 4:11

---

### 6

**60** 4:12

---

### 9

**9441** 5:10

EXHIBIT 9

## AFFIDAVIT OF
## TERRY CASEY

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Terry Casey, who being by me first duly sworn, deposes and says as follows:

My name is Terry Casey. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I have been sued in this case in my professional and personal capacities. I served as Principal of Pike County High School for seven and a half years. I resigned as principal in December of 2004. The complaint states that student J.R. was sexually abused by Charles Coon during the 2004-2005 school year.

Prior to resigning, I never suspected Charles Coon of inappropriate conduct with J.R. or any student. No student, faculty member, parent or anyone said anything to me that created in my mind any suspicion that Charles Coon was sexually mistreating students.

As far as I was concerned as principal at Pike County High School, we had a "no tolerance" policy regarding sexual abuse and sexual harassment. I knew it was the law, the District policy and the policy and practice at Pike County High School to report any complaint of sexual harassment to DHR or law enforcement officials. I would have done just that – reported Charles Coon to DHR or law officials – if I had any reason to suspect he was sexually abusing J.R. or any student.

Regarding J.R., I knew how involved his mother Mrs. Reed had been with the band program at Pike County High School. For the 2003-2004 school year, Mrs. Reed was President of the Band Boosters. She worked constantly with Charles Coon. She rode the bus with the band to events; she worked with Charles Coon for band activities; and she was often at band practice.

It is my recollection that Mrs. Reed continued to be very active with the band program during the fall of the 2004 school year.

Neither Mrs. Reed nor Mr. Reed ever complained to me about Charles Coon. Nor did they ever complain, to my knowledge, to any of my staff.

It is my understanding that Charles Coon was a welcome visitor to the Reed's home and that the Reeds trusted Charles Coon to drive this children in his car, to take trips and to be with them.

If the Reeds had said anything to me about Charles Coon, I would have investigated. They did not. I must assume they were as unsuspecting as we were, else they would have complained to us about Charles Coon and put a stop to the visits to their house.

As I said, nothing happened at Pike County High School that made me suspicious of Charles Coon.

I knew of Charles Coon when I was Vocational Director for the Butler County School System for three years. Charles Coon was the band director. He was very well respected and his wife held an important administrative position for the school system. I did not know them well, but I did know that they were a respected family.

When Charles Coon applied for the band director position at Pike County High School, I interviewed him and checked out his references. The principal at his school, T. J.

Shields, gave him a very good recommendation. Everything I knew and learned about Charles Coon during the application process was positive. I did our "due diligence" as required in checking him out. It is not true for anyone to assert we did not carefully check his record and his references. We were diligent and nothing in this file, record or references indicated any problems.

At Pike County High School we had a "no tolerance policy" regarding sexual harassment and sexual abuse. We trained our staff regarding our policy and our practice. At Institute Day, which all employees attend, Dr. Bazzell, Superintendent, and the former superintendent John Key, talked about sexual abuse. We made sure our students read the handbook and knew to report abuse and how to report it. As principal, I discussed sexual harassment and sexual abuse – what to look for, the signs and what to do if sexual abuse was suspected. Any suspected abuse was to be reported immediately to the counselor or to the principal.

While I was principal, no one expressed any concern about Charles Coon sexually abusing any student. In December of 2004, I received information that he was smoking on campus. I met with Charles Coon, and told him he had to obey the no smoking policy. This incident raised no suspicion about student abuse.

I received a complaint that Charles Coon got mad at a student and grabbed the student around the neck. I investigated this complaint, met with Charles Coon and the parents. Charles Coon apologized and the parents were satisfied. I reprimanded Charles Coon for what he did. Nothing about this incident caused suspicion about sexual abuse.

I also knew that Charles Coon let a band student use his cell phone. My staff investigated it. Charles Coon said he had not "given" the student the phone but let him use it.

This did not seem strange in context. Coaches and activity sponsors often do this when transportation is affected by practice schedules. At the time, the cell phone incident created no suspicion.

If Mrs. Reed or anyone else had complained that Charles Coon was engaged in any type of suspicious conduct, I would have investigated it immediately.

During my years as principal at Pike County High School, we were diligent in investigating complaints. To my knowledge, we had no other occurrence of sexual abuse. Moreover, no one – until this lawsuit – has ever accused me of not being diligent in looking after my students.

The Reeds apparently saw nothing of a suspicious nature during all the time Mrs. Reed and her husband spent with the band program, or spent with Charles Coon at their home, and neither I nor my staff saw anything that would create a basis to suspect Charles Coon would sexually abuse J.R.

Finally, I had no dealings with Charles Coon other than in my professional capacity.

_Terry Casey_
Terry Casey

Sworn to and subscribed before me this the 7th day of March, 2008.

_Janet C Rascoe_
Notary Public

JANET C. RASCOE
Notary Public, AL State at Large
My Comm. Expires Aug. 19, 2010

My Commission expires:
(Seal)

1/1677339.1

EXHIBIT 10

JR, A Minor                    July 24, 2007   Pike County Board of Education

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

      PLAINTIFF,


VS.                          CASE NO.:

                             2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

      DEFENDANT.

* * * * * * * * * *

DEPOSITION OF TERRY CASEY, taken before Mary

Moore-Wynn, as Commissioner, on the 24th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 12:00

noon.

* * * * * * * * *

JR, A Minor                    July 24, 2007  Pike County Board of Education

---

**Page 2**

```
 1        * * * * * * * * * *
 2        APPEARANCES:
 3  FOR THE PLAINTIFF:
 4  Hon. Susan DePaola
    Attorney at Law
 5  1726 West 2nd Street, Suite
    Montgomery, Alabama 36104
 6
 7  and
 8  Hon. Deanie Allen
    Azar and Azar
 9  260 Washington Avenue
    Montgomery, Alabama 36104
10
11  FOR THE DEFENDANT:
12  Hon. Donald B. Sweeney
    Bradley, Arant, Rose & White
13  One Federal Place
    1819 Fifth Avenue North
14  Birmingham, Alabama 35203
15
16  ALSO PRESENT:
17  Dr. Mark Bazzell
18
19
20
21
22
23
```

**Page 4**

```
 1  the trial of this case or used in any other manner by
 2  either party hereto provided for by the Statute,
 3  regardless of the waiving of the filing of same.
 4      It is further stipulated and agreed by and
 5  between counsel and the witness that the reading
 6  and signing of the deposition by the witness is
 7  hereby waived.
 8              INDEX
 9  TERRY CASEY
10  Examination By Ms. DePaola          5
    Examination By Mr. Sweeney         59
11  Further Examination By Ms. DePaola  61
12  Reporter's Certificate           63
13          INDEX OF EXHIBITS
14  Exhibit Number     Description     Page Number
15  Plaintiff's Exhibit 7  Composite Exhibit   10
                Including Application for
16              Employment (Coon)
    Plaintiff's Exhibit 8  2004-2005 Faculty  23
17              Handbook
    Plaintiff's Exhibit 9  School Safety Plan  26
18  Plaintiff's Exhibit 10  All Pike County   35
                Board of Education Record
19              Relating to David Foster Incident
20
21
22
23
```

**Page 3**

```
 1
 2        * * * * * * * * * *
 3
 4
 5
 6          STIPULATIONS
 7
 8      It is hereby stipulated and agreed by and between
 9  counsel representing the parties that the deposition of
10  TERRY CASEY is taken pursuant to the Federal Rules of
11  Civil Procedure, and that said deposition may be taken
12  before Mary Moore-Wynn, CSR, as Commissioner, without
13  the formality of a commission; that objections to
14  questions, other than objections as to the form of the
15  questions, need not be made at this time, but may be
16  reserved for a ruling at such time as the deposition
17  may be offered into evidence, or used for any other
18  purpose by either party hereto, provided by the
19  Statute.
20      It is further stipulated and agreed by and between
21  counsel representing the parties in this case, that the
22  filing of the deposition of TERRY CASEY is hereby
23  waived, and that said deposition may be introduced at
```

**Page 5**

```
 1          TERRY CASEY
 2      (Whereupon, the witness, after having first been
 3  duly sworn to speak the truth, the whole truth, and
 4  nothing but the truth, testified as follows:)
 5          EXAMINATION
 6  BY MS. DePAOLA
 7  Q  My name is Susan DePaola.  I represent Justin Reed
 8     in the lawsuit filed against you and the Pike
 9     County Board of Education.  This is Deanie Allen.
10     She is my co-counsel.
11  A  (Witness Indicating.)
12  Q  Could you give us your street address, please,
13     your home address?
14  A  200 Reynolds Street.
15  Q  200 what?
16  A  Reynolds.
17  Q  Oh, Reynolds.  In Brundidge?
18  A  Brundidge, Alabama, 36010.
19  Q  And where are you currently employed?
20  A  I'm under contract with Ozark City Board of
21     Education.
22  Q  You're on a contract?
23  A  (Witness Indicating.)
```

JR, A Minor                    July 24, 2007   Pike County Board of Education

---

Page 6

1  **Q   To do what?**
2  A   Principal.
3  **Q   At what school?**
4  A   Carroll High School.
5  **Q   And you began that position when?**
6  A   Two years ago.
7  **Q   Okay.  So, in July of 2005?**
8  A   July of 2005.
9  **Q   Now, you left the Pike County Board of**
10    **Education -- I don't know when you left.  Did you**
11    **leave in the middle of the year?**
12  A   December, 2004.
13  **Q   And why did you leave?**
14  A   It was -- I was tired, stressed, and ready to
15    change.
16  **Q   Tired and stressed and ready for a change?**
17  A   (Witness Indicating.)
18  **Q   Any of that stress related to your position as**
19    **principal?**
20  A   There is always stress in a principal's position.
21  **Q   So, between December of 2004 and July of 2005,**
22    **where were you employed?**
23  A   I worked for myself.

---

Page 7

1  **Q   What were you doing?**
2  A   Carpentry work.
3  **Q   Okay.  Now, have you ever been under treatment for**
4    **any psychiatric --**
5  A   No, ma'am.
6  **Q   -- issues?**
7  A   No, ma'am.
8  **Q   Never seen a psychologist or psychiatrist?**
9  A   No, ma'am.
10  **Q   Ever seen any medical doctors for any of these**
11    **issues that you just brought up; stress?**
12  A   No, ma'am.
13  **Q   So, you just tendered your resignation in December**
14    **of '04?**
15  A   Yes, ma'am.
16  **Q   Without any other employment with a school system**
17    **in sight; is that right?**
18  A   Yes, ma'am.
19  **Q   Had you decided to leave education?**
20  A   At that point in time, yes.
21  **Q   Okay.  How long were you employed in the Pike**
22    **County school system?**
23  A   Seven and a half years.

---

Page 8

1  **Q   And can you tell me what your employment was --**
2  A   Principal.
3  **Q   Were you always the principal?**
4  A   Principal, Pike County High School.
5  **Q   Now, did you know Charles Coon before you came to**
6    **Pike County?**
7  A   Yes, ma'am.  I knew of him.
8  **Q   How did you know of him?**
9  A   I was the Vocational Director in Butler County.
10    And that is Greenville.  And that is where he
11    lives.  And he was working in the school system at
12    that time.
13  **Q   Now, have you ever heard of any allegations of**
14    **sexual improprieties relating to Mr. Coon?**
15  A   No, ma'am.
16  **Q   Not --**
17        MR. SWEENEY:  You mean, since this
18        allegation?
19  A   Since this.
20  **Q   Prior to this allegation?**
21  A   Prior to this, no, ma'am.
22  **Q   And since these allegations arose, have you**
23    **learned that there were other allegations of**

---

Page 9

1    sexual improprieties?
2  A   I have heard that, yes.
3  **Q   Who did you hear that from?**
4  A   Well, I have heard it from this incident here.
5    Dr. Bazzell called and told me about that.
6  **Q   Okay.**
7  A   The incident which he was charged in Butler
8    County, I was told.  I was not with the school
9    system.  Someone told me.  I forgot.  I think I
10    heard it on the news or something and asked
11    someone about it.
12  **Q   You're talking about the Blake Faulkner case?**
13  A   Yes, ma'am.  And of that, that's all I know.
14  **Q   All right.  So, you haven't heard from any other**
15    **source, any rumors or information that he had ever**
16    **had similar allegations against him in any other**
17    **school system?**
18  A   No, ma'am.
19  **Q   Now, were you the person who actually contacted**
20    **him to come work in Pike County?**
21  A   He had filled out an application for employment,
22    yes, ma'am.  And as a principal, I did all the
23    interviewing and made the recommendation to the

---

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
Court Reporting Services

JR, A Minor           July 24, 2007  Pike County Board of Education

---

Page 10

1   superintendent for all teachers.
2   **Q   Let me just show you what I would like to mark as**
3   **Plaintiff's Exhibit 7.**
4   (Whereupon, Plaintiff's Exhibit 7
5   was marked for identification and
6   is attached hereto.)
7   MR. SWEENEY:  You marked this -- I'm
8   sorry, Susan -- as...
9   MS. DePAOLA:  Plaintiff's Exhibit 7.
10  BY MS. DePAOLA
11  **Q   And, actually, it's a composite exhibit.  So,**
12  **let's look at some of it and see what you can**
13  **identify.  The first four pages of that, is that**
14  **what you're referring to when you said you were --**
15  **his application for employment?**
16  A   This is the application of the Board, yes.
17  **Q   For Charles Coon?**
18  A   According to this what's on the page, yes, ma'am.
19  **Q   Have you ever seen this before?**
20  A   I have seen his application, yes, ma'am.
21  **Q   Well, to the best of your knowledge --**
22  A   To the best of my knowledge, this looks like the
23  one I seen, yes, ma'am.

---

Page 11

1   **Q   I notice on there that this application was filled**
2   **out -- well, there is an indication it was filled**
3   **out on June 5th, 1996.  Do you see that?  Where**
4   **did I see that?  It's hard to read upside down.**
5   **Right there (indicating).**
6   A   Okay.
7   **Q   And then it's crossed out and says 7/2000.  Do you**
8   **know what that is about?**
9   A   All I would know is unless he had filed
10  application here before, and they just renewed his
11  application.
12  **Q   Is that your handwriting on the 7/2000?**
13  A   No, ma'am.
14  **Q   Okay.  Well, when he applied -- when did he apply**
15  **that you talked to him?  Was it in 2000?  Because**
16  **you said it was --**
17  A   Yes, ma'am.  It would have been --
18  MR. SWEENEY:  Didn't we stipulate it was
19  July of 2002?
20  A   2002.
21  **Q   But I want to know if there is another application**
22  **that follows this application for employment,**
23  **which is dated '96 and 2000.**

---

Page 12

1   A   I wouldn't know.
2   MS. DePAOLA:  Is there any other
3   applications, Donald?
4   MR. SWEENEY:  I don't know of any other
5   other than what we have provided to
6   you.
7   BY MS. DePAOLA
8   **Q   So, to the best of your knowledge, this is the**
9   **document that was in front of you when you**
10  **interviewed Mr. Coon?**
11  A   Yes, ma'am.
12  **Q   Well, did you ask him for any update of his**
13  **application since this was two years old at that**
14  **time?**
15  A   At this point in time that I talked with him, I
16  read through this and talked to him about what he
17  was doing, because he was employed in another
18  school system at that time.
19  **Q   Which school system?**
20  A   Shields over in -- what's that -- T.G., T.J.
21  Shields over in West Alabama.
22  **Q   T.J. Shields?**
23  A   I think that's right.

---

Page 13

1   **Q   Is that a public school?**
2   A   Yes, ma'am.
3   THE SUPERINTENDENT:  I think it's J.F.
4   A   J.F.
5   **Q   What did he tell you his reason for leaving was?**
6   A   To get closer to home.
7   **Q   All right.  Now, did you check any references on**
8   **Mr. Coon?**
9   A   Yes, ma'am.
10  **Q   Which ones did you check?**
11  A   Having known him or known of him in Butler County.
12  I also talked with the principal at the high
13  school in which he was currently serving.
14  **Q   Who was that?**
15  A   I don't remember his name.
16  **Q   So, the principal at the Shields High School,**
17  **you're saying?**
18  A   Gave him a very good recommendation.
19  **Q   All right.  Anybody else you talked to?**
20  A   No, ma'am.
21  **Q   Is there any policy or procedure handed down from**
22  **the central office as to what references you were**
23  **to check?**

---

4  (Pages 10 to 13)

JR, A Minor                July 24, 2007  Pike County Board of Education

Page 14

1   A   There is now.  But I -- we always checked
2       references if -- you know, if we knew the people,
3       we always checked the references if they came from
4       a different school system.
5   Q   Was there any written policy --
6   A   Yes, ma'am.
7   Q   -- that you are aware -- let me finish my
8       question -- that told you who to check references,
9       which references to check?
10  A   Not that I am aware of.
11  Q   So, it's kind of discretionary with you which ones
12      you checked?
13  A   As long as I checked references.  I was told to
14      check references.
15  Q   And that was extent of your instruction?
16  A   Pretty much.
17  Q   Who gave you that instruction?
18  A   The Superintendent that hired me.
19  Q   Was that Dr. Keys?
20  A   Yes.
21  Q   Did you receive any different instruction from
22      Dr. Bazzell?
23  A   That we were -- that is the time that we were

Page 15

1       going under Lee versus Macon, and we were changing
2       all employment processes.  And we did have a
3       policy for dealing with employment at that time.
4   Q   What policy did you have with respect to checking
5       references?
6   A   That we had to document the references that we
7       checked and show documentation of those references
8       and so forth.
9   Q   But they didn't tell you which one to check?
10  A   We just had to check references.
11  Q   The ones that were listed by the applicant, or
12      were you free to check other references at your
13      discretion?
14  A   We could check others at our discretion.
15  Q   Okay.  Let's go to page 5 of Plaintiff's
16      Exhibit 7.  And I'll ask you, did you ever see
17      this letter dated 1997 where Mr. Coon applied for
18      the position of assistant principal, were you
19      aware of that, at Goshen school?
20  A   I had -- I knew that he had applied for principal
21      and assistant principal at several school systems;
22      I didn't know particularly Goshen.  Or I don't
23      remember.

Page 16

1   Q   Let's look at the next item.  Did you review this
2       vita that he apparently provided?
3   A   I can't remember, to be honest with you.
4   Q   Did you raise any questions about why he had
5       worked in so many school systems?
6   A   I don't remember, to be honest with you.
7   Q   So, essentially, you knew of him from prior
8       employment?
9   A   (Witness Indicating.)
10  Q   Did you conduct an interview with him?
11  A   I did.
12  Q   And you talked with the principal at Shields High
13      School about him?
14  A   I did.
15  Q   Is there anything else you did in the interview
16      and hiring process?
17  A   Not that I can remember.
18  Q   And then are you authorized to actually hire --
19  A   No, ma'am.
20  Q   -- or do you just make the recommendation?
21  A   I just make the recommendation.
22  Q   And you make that recommendation to -- is it
23      Dr. Key or Mr. Key?

Page 17

1   A   Dr. Key.
2   Q   Did you make that recommendation to Dr. Key or to
3       Dr. Bazzell?
4   A   That would have been -- I think that would have
5       been Dr. Bazzell.
6   Q   Okay.  All right.  Is that a written
7       recommendation you made?
8   A   Yes, ma'am.
9   Q   Is there a form, or do you write a letter, or how
10      do you do that?
11  A   If I'm not mistaken, we do a thing -- we just do a
12      memo to Dr. Bazzell making recommendation -- or
13      the Superintendent making recommendations.
14          MS. DePAOLA:  Do you have any such
15          document?
16          MR. SWEENEY:  You would have gotten it
17          if we had one.
18          MS. ALLEN:  Is this it?
19  BY MS. DePAOLA
20  Q   Let me show you page 007 produced by the Pike
21      County Board of Education.  It's dated July 22nd,
22      2002.  Is that your recommendation regarding
23      hiring?

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

JR, A Minor                    July 24, 2007   Pike County Board of Education

---

Page 18

1  A   I would say so.
2  Q   Okay.  And then does the Superintendent actually
3      interview the candidate?
4  A   That's totally the discretion of the
5      Superintendent.
6  Q   Did he interview Mr. Coon?
7  A   I am not aware.
8  Q   Mr. Casey, what training have you received from
9      Pike County with respect to sexual abuse;
10     recognizing and dealing with sexual abuse?
11  A  In training for the sexual abuse, or recognizing
12     sexual abuse, other than the educational training
13     I got with my degree, you know, we have had --
14  Q  Okay.  Let's stick with Pike County, and then I'll
15     go back to your degree.  What training did Pike
16     County provide to you?
17  A  We have had -- Dr. Bazzell and Dr. Key both during
18     institute would talk about the topic.  They
19     wouldn't dwell on it.  They would just mention the
20     topic.  To be aware of it and so on and so forth
21     to protect the children as they go through their
22     institute day and --
23  Q  "Wouldn't dwell on it", I mean, you would say they

---

Page 19

1      would mention be careful of sexual abuse?
2  A   Be on the lookout for it.  Make kids aware of it.
3      When we read the handbooks to them first day of
4      orientation, to make sure that they know what to
5      do and who to report it to.  Those are just, you
6      know, things that we need to make sure we cover.
7  Q   Is that it?  Is that the training?
8  A   No, ma'am.  We -- the principals in many cases we
9      have had where articles would come out, and we
10     would read the articles and have discussions with
11     those with the faculty.
12  Q  Tell me any of those that you can recall --
13  A  I don't.
14  Q  -- doing with the faculty.  Let me finish my
15     question.  Are you saying you have discussed
16     sexual abuse with the faculty at Pike County High
17     School?
18  A  Yes, ma'am.
19  Q  And you read articles to them?
20  A  I didn't read articles to them.
21  Q  What are you saying you did as far as training
22     with faculty relating to sexual abuse?
23  A  I just highlighted the faculty, went over points

---

Page 20

1      to be looking for, or things to be looking for, as
2      signs of sexual abuse, based off articles we have
3      read or information that we have received.
4  Q   What were those points?
5  A   I don't remember all of those points.
6  Q   Do you remember any?
7  A   Just if a child came in -- not only sexually
8      abused, but physically abused, we discussed that
9      with the topic.  If they came in with bruises.  Or
10     if they came in reporting things to the teacher, a
11     lot of kids would talk to the teachers.  They
12     would confide to the teachers that they needed to
13     report that immediately to the counselor or to
14     myself.
15  Q   This sounds very generic.  I don't hear you
16     telling me that you provided any structured
17     training on sexual abuse.
18  A  Are you talking about a workshop?
19  Q  Yeah.  Sure.
20  A  No, ma'am, I never did that in faculty meeting.
21  Q  Did you provide them any written materials on
22     sexual abuse?
23  A  No, ma'am.

---

Page 21

1  Q   Did you direct them as to, these are the
2      procedures to use when you suspect sexual abuse?
3  A   Yes, ma'am.
4  Q   What were those procedures?
5  A   If they suspected it, they were to contact either
6      myself, personally, or the counselor.  And then we
7      would investigate it from that point on.
8  Q   And what were they supposed to look for to tip
9      them off that sexual abuse was taking place?  Just
10     the bruises?  Is that what you're saying?
11  A  No.  What I am saying is if a child came up and
12     told a teacher of abuse --
13  Q  Okay.  So, if the victim reported it?
14  A  Reported it, this is the procedure you are to
15     follow.
16  Q  What if the victim didn't report it, and they
17     saw -- what suspicious signs should they be
18     looking for to identify sexual abuse is occurring?
19  A  I can't answer that question.
20  Q  Now, you have made some reference to the handbook
21     And as I understand it, you were responsible for
22     producing a faculty handbook and a student
23     handbook if you so choose to do?

6  (Pages 18 to 21)

JR, A Minor                    July 24, 2007   Pike County Board of Education

Page 22

1  A  Right.
2  Q  If you so chose to do.
3  A  Right.
4  Q  Let me ask you to look at some documents and tell
5     me for 2004-2005 whether your faculty handbook is
6     contained in those documents. There is several
7     faculty handbooks in there. So --
8  A  (Witness Indicating).
9  Q  Now, what we're looking for is the 2004-2005
10    faculty handbook.
11 A  Uh-huh.
12 Q  Okay.
13 A  Okay.
14 Q  Let me get rid of these. These are not 04-05; is
15    that right?
16 A  Not according to the cover.
17 Q  And let me look at these, please.
18 A  (Tenders documents).
19 Q  You have identified documents 522 through document
20    561 as being the 2004-2005 faculty handbook; is
21    that correct?
22 A  Based on the dates of the pages, yes, ma'am.
23 Q  Okay. And I am going to mark this -- let me put

Page 23

1     the sticker on the front -- Plaintiff's Exhibit 8.
2           (Whereupon, Plaintiff's Exhibit 8
3            was marked for identification and
4            is attached hereto.)
5  BY MS. DePAOLA
6  Q  Were you the author of that document?
7  A  Pretty much, yes, ma'am.
8  Q  Was it your responsibility to promulgate that
9     document?
10 A  Yes, ma'am.
11 Q  All right. Is there any reference in there
12    whatsoever to sexual abuse, policies, procedures,
13    prohibitions?
14 A  I didn't see any at the time I glanced through it.
15          MR. SWEENEY: Take your time and look
16          and see, if you will, Mr. Casey.
17 A  Okay.
18          MS. DePAOLA: What was the question,
19          again, Ms. Wynn?
20          (Whereupon, the requested material
21          was read by the Court Reporter.)
22 BY MS. DePAOLA
23 Q  Now, did you produce during 04-05 any kind of

Page 24

1     student handbook?
2  A  I think we had the student planner.
3  Q  So, nothing other than what's in the planner?
4  A  (Witness Indicating.)
5  Q  Is that correct?
6  A  Yes.
7  Q  And whatever is in the faculty handbook, I would
8     assume that was distributed only to faculty
9     members?
10 A  Right.
11 Q  Now, your attorney has also produced something
12    called a school safety plan?
13 A  Yes, ma'am.
14 Q  Could you tell me -- and there is three of them
15    here. I'm just trying to identify which was the
16    one -- I'm looking for 04-05.
17       If there was one. I'm not sure there was one.
18    I am just asking.
19 A  Student -- the safety plan?
20 Q  Yes.
21 A  I would think there would be one. It's a
22    requirement of the State.
23 Q  Is that it for 04-05?

Page 25

1  A  I can't be sure. It's not a date on it. But
2     basically -- the school safety plan was put
3     together, the original. And then all we did was
4     update each year with new information or anything
5     required by the State.
6  Q  For the 04-05 school safety plan, was it different
7     in that respect from any document?
8  A  If there were guidelines from the State asking for
9     more information or whatever, it would have been,
10    yes, ma'am.
11          MS. DePAOLA: Okay. Donald, can you
12          tell us what date that document is
13          for so we know whether that's the
14          applicable document?
15    MR. SWEENEY: I don't have that
16          information.
17    MS. DePAOLA: Can your client tell you
18          that?
19    MR. SWEENEY: I'm sure we can get that
20          if that's your request. I just --
21    MS. DePAOLA: Well, let's get it now, so
22          we don't have to --
23    MR. SWEENEY: Let's go off the Record

Mary Moore-Wynn, CSR Mary Moore-Wynn       (334)244-0203
        Court Reporting Services

JR, A Minor                    July 24, 2007  Pike County Board of Education

| Page 26 |
|---|

1          for just a minute.
2          (Brief-off-the-Record discussion.)
3  BY MS. DePAOLA
4  Q   Let me go ahead and mark this as Plaintiff's
5      Exhibit 9.
6          (Whereupon, Plaintiff's Exhibit 9
7           was marked for identification and
8           is attached hereto.)
9  BY MS. DePAOLA
10 Q   Did you actually prepare this document, or who
11     prepared it?
12 A   I worked on it. I had a leadership team that
13     worked with me on it. Coaches worked with me.
14 Q   And who was this submitted to?
15 A   Dr. -- to the Superintendent -- or Ms. Berry, or
16     whoever was in charge.
17 Q   Was it distributed to the parents?
18 A   No, it was distributed -- no, ma'am.
19 Q   Who was it distributed to?
20 A   To teachers.
21 Q   So, every teacher received a copy of Plaintiff's
22     Exhibit 9?
23 A   The school safety plan, yes, ma'am.

| Page 27 |
|---|

1  Q   Okay. Okay. We will come back to this. Let me
2      ask you about your employment history. Just give
3      me a complete summary of since you graduated from
4      college as it relates to educational employment?
5  A   My first employment was at Escambia County Board
6      of Education.
7          MR. SWEENEY: Which one?
8  Q   When?
9          THE WITNESS: Escambia.
10 A   In '81, 1981. I was hired there at the what they
11     called the Voc tech, to teach marketing and
12     education. And from there, I went in --
13 Q   How long did you stay there?
14 A   Six years, seven years.
15 Q   Okay.
16 A   Then I went into business for myself.
17 Q   What business was that?
18 A   Men's retail.
19 Q   Okay.
20 A   And then from there, I went to Greenville for a
21     year to fill in for a teacher to teach --
22 Q   What year was that?
23 A   Uhm -- '80 -- '90.

| Page 28 |
|---|

1  Q   In the early '90's?
2  A   (Witness Indicating.)
3  Q   Late 80's, early 90's. How long did you do that?
4  A   For A year. And then I went to Phenix City.
5  Q   Okay. What were you teaching there?
6  A   I taught marketing.
7  Q   How long did you stay there?
8  A   Three years. And then I went back to Butler
9      County as vocational director.
10 Q   Okay. How long did you stay there?
11 A   Three years.
12 Q   Okay.
13 A   Then I came to Pike County as principal of Pike
14     County High.
15 Q   So, seven years?
16 A   Seven and a half years. And then I -- for six
17     months, December 2004, I was employed by myself.
18 Q   Okay.
19 A   And then in '05, I went to Ozark City.
20 Q   So, you haven't been an employee in Pike County
21     since you left in December of '04; is that right?
22 A   Yes, ma'am.
23 Q   Did Mr. Coon come with you from Greenville at the

| Page 29 |
|---|

1      same time, or did he come after you?
2  A   No, ma'am. He came after me.
3  Q   Okay. On -- now, while you were the principal at
4      Pike County High School, did you have an occasion
5      to know Justin Reed?
6  A   Justin Reed was a 9th grader my last year there, I
7      think it was.
8  Q   All right. And what did you know about him? Was
9      he --
10 A   Well, I knew his older brother and his sister. I
11     knew his parents.
12 Q   Okay. I mean, academically, did you know
13     anything? Did you know he was in special
14     education?
15 A   Yes, ma'am.
16 Q   Okay. And did you know he was in the band?
17 A   Yes, ma'am.
18 Q   Now, are you familiar with the term "grooming" as
19     it relates to sexual predators?
20 A   I am aware it, yes, ma'am.
21 Q   What does it mean to your understanding?
22 A   Preparing to work up to a sexual event with a
23     person.

Mary Moore-Wynn, CSR Mary Moore-Wynn          (334)244-0203
        Court Reporting Services

JR, A Minor                    July 24, 2007  Pike County Board of Education

---

Page 30

1  Q   Okay.  And what are some of the activities that
2      would be described as grooming activities?
3  A   Joking around with them.  Teasing.  In some cases,
4      it could be even looked at as sexual harassment,
5      things of that nature.
6  Q   Anything else?  I mean "things of that nature" is
7      too broad.  What other grooming activities are you
8      familiar with?
9  A   Minor touching.  That's all.
10 Q   Okay.  Well, how about giving kids gifts?
11 A   That can be perceived that way, yes, ma'am.
12 Q   Did you understand this back in 2004-2005 that
13     that could be a grooming activity?
14 A   Yes, ma'am.
15 Q   How about calling them at home on the telephone?
16 A   If that happened, that could be, yes, ma'am.
17 Q   How about providing them with cell phones?
18 A   Wouldn't that be a gift?
19 Q   Would you agree that might be a grooming activity?
20     You understood that to be a grooming activity?
21 A   It could have been, yes, ma'am.
22 Q   How about providing them with cigarettes?
23 A   That could be perceived as that.

---

Page 31

1  Q   All right.  How about transporting them in a
2      private vehicle?
3  A   I wouldn't necessarily think that would be that.
4  Q   Okay.  Are you saying it could be could or
5      couldn't be?  Could be perfectly innocent?
6  A   Could be perfectly innocent, yes, ma'am.
7  Q   How about having children spend the night at your
8      house?  Would you understand that to be a grooming
9      activity?
10 A   Depending on the context in which they were
11     spending.
12 Q   So, you can think of instances in which it would
13     be appropriate for a teacher to have their
14     students spending the night at their house?
15 A   I know of several incidents in which several
16     teachers have; cheerleader sponsors, and things of
17     that nature.
18 Q   And you don't understand that to be a grooming
19     activity?
20 A   I don't think that it's necessarily a grooming
21     activity.
22 Q   But it could be?
23 A   It could be.

---

Page 32

1  Q   How about taking children on overnight trips?
2      Could that be a grooming activity in your
3      understanding?
4  A   Taking a child over an overnight trip?
5  Q   Uh-huh.
6  A   Depending on the circumstances of the trip.
7  Q   It could be, or it could be innocent?
8  A   It could be.  It could be innocent.  We have kids
9      who go off with faculty on band trips and
10     competitions.
11 Q   All right.  I would assume you are aware that
12     children with -- who are mentally retarded are at
13     an increased risk of sexual abuse?
14         MR. SWEENEY:  Object to the form.
15 Q   Would that be a fair assumption of your
16     understanding?
17         MR. SWEENEY:  Object to the form.
18 A   I would say that -- not necessarily at a higher
19     risk.
20 Q   You don't know that?
21 A   I am saying to the elements in which -- and
22     articles in which I have read.
23 Q   Oh --

---

Page 33

1  A   And being a principal through magazines and
2      articles and things that based on the
3      information -- depending on where the information
4      came from, and who was doing the source and who
5      was doing the study and how they wanted that study
6      to show up.
7  Q   Tell me any article you have read that indicates
8      my statement is incorrect?  Any article.
9  A   I don't know --
10 Q   Any source?
11 A   I don't know any --
12 Q   Any author?
13 A   I don't know.  Just articles in magazines.
14 Q   Can you provide those articles to Mr. Sweeney?
15 A   No, ma'am.  Those things that come through the
16     office and go.
17 Q   So, it's your testimony that you have read there
18     is no indication that children who are mentally
19     retarded are at an increased risk of sexual abuse?
20 A   Not just point blank, no, ma'am.
21 Q   So, what is the first time that you received any
22     information about Mr. Coon engaging in any
23     activity that you thought was inappropriate or

---

9  (Pages 30 to 33)

JR, A Minor                    July 24, 2007   Pike County Board of Education

Page 34

1    required an investigation by you?
2  A   Just when I was told he was smoking on campus.
3  Q   When was that?  I guess you left in December of
4      '04, so it was prior to December of '04?
5  A   Yes, ma'am.
6  Q   Who told you that?
7  A   Some students.
8  Q   Do you recall who they were?
9  A   No, ma'am.
10 Q   None of them?  You can't recall any of them?
11 A   No, ma'am.  Just had some kids come and say, Coon
12     is down there smoking.
13 Q   Where was he smoking?
14 A   Down there at the band hall, which is on campus.
15 Q   Did you conduct an investigation?
16 A   I did.
17 Q   What did you do?
18 A   I went down and spoke to Mr. Coon about the
19     situation and explained to him that the school
20     policy was that there was no smoking on the
21     grounds.  And that he should follow those
22     policies, or we would have to take further action.
23 Q   Were any students smoking with him?

Page 35

1  A   No, ma'am.
2  Q   So, the only allegation was that he was smoking on
3      the school grounds; is that correct?
4  A   Yes, ma'am.
5  Q   You don't recall who those kids were?
6  A   It was just a group of kids.
7  Q   And were there any other incidents that wre
8      reported to you of anything that you thought was
9      inappropriate while he was working at Pike County?
10 A   No, ma'am.
11 Q   I'm sorry.  While you were working at Pike County?
12 A   No, ma'am.
13 Q   Were you there when the incident occurred with
14     David Foster?
15 A   David Foster?
16 Q   The choking incident.
17 A   I don't remember that.
18 Q   You don't remember it?
19 A   No, ma'am.
20         (Whereupon, Plaintiff's Exhibit 10
21         was marked for identification and
22         is attached hereto.)
23

Page 36

1  BY MS. DePAOLA:
2  Q   I'm going to mark this as Plaintiff's Exhibit 10.
3      Ask you if that refreshes your recollection in any
4      way?
5  A   Okay.
6  Q   Does that refresh your recollection at all?
7  A   Yes, ma'am.
8  Q   What do you recall about this incident?
9  A   I remember -- I remember talking with Mr. Coon
10     about it.  And he told me that he grabbed him.
11     And that he didn't mean to choke him or anything,
12     but he grabbed him and that -- if I am not
13     mistaken -- I don't remember all the details to
14     it, but if I am not mistaken -- I had a meeting
15     with the Fosters about the situation.
16 Q   Okay.  Did you consider his conduct inappropriate
17     in that --
18 A   Well, no teacher should grab any child.
19 Q   So, you considered it outside of the bounds of
20     normal discipline?
21 A   Yes, ma'am.  You don't grab a child.
22 Q   Look on page 3 of that Plaintiff's Exhibit 10.
23     There appears to be a handwritten note to you from

Page 37

1      Mr. Bazzell?
2  A   Uh-huh.
3  Q   Can you read that to yourself?  Did you provide
4      him with any written statements from Mr. Coon or
5      the student?
6  A   I don't really remember, to be honest with you.
7  Q   Okay.  The next page in this exhibit appears to be
8      a letter from Mr. McDaniel.  Did he take over the
9      investigation or --
10 A   Mr. McDaniel was my assistant at that time.
11 Q   Yes, sir.
12 A   And he may have worked with the case, also.
13 Q   Okay.  Have you ever seen the note from
14     Mr. McDaniel to Dr. Bazzell?
15 A   No.
16 Q   Pardon?
17 A   I don't remember seeing it, no,ma'am.
18 Q   How about the next page of this document; have you
19     ever seen that letter to Dr. Bazzell from
20     Mr. McDaniel?
21 A   I don't remember.
22 Q   Did you just sort of hand off the investigation to
23     Mr. McDaniel?

Page 38

1       MR. SWEENEY: Object to the form.
2   A   Mr. McDaniel looked into the investigation along
3       with myself.  And we worked it together.
4   Q   Okay.  Look through the rest of that and see if
5       there is anything else that you produced or that
6       you recognize in that exhibit.
7   A   All right.  What's the question?
8   Q   Any indication that you had any further
9       participation in this incident from these
10      documents?
11  A   No, ma'am.
12  Q   Did you investigate Mr. Coon's mental stability in
13      any way after this incident?
14  A   No, ma'am.
15  Q   Would it be fair to say that choking a student was
16      probably a pretty extreme form of punishment in
17      Pike County High School in 04-05?
18      MR. SWEENEY: Object to the form.
19  Q   You can answer it.
20  A   I don't think any child should be choked.
21  Q   But you didn't investigate his mental stability as
22      a result of this incident?
23  A   No, ma'am.

Page 39

1   Q   Okay.  Now, were you aware that Justin was being
2       released from class to go down to the band room
3       during the day?
4       MR. SWEENEY: Object to the form.
5   A   No, ma'am.
6   Q   You weren't aware of that?
7   A   No, ma'am.
8   Q   Do you know about it now?
9   A   I have heard about it, yes, ma'am.
10  Q   What have you heard?
11  A   I heard he went down to the band room.
12  Q   Who told you that?
13  A   It was in discussion with my attorney.  That's
14      all.
15  Q   But your testimony is you weren't aware of it at
16      all during 2004?
17  A   No, ma'am.
18  Q   Okay.  Did you ever see Mr. Coon driving J.R. or
19      any other students around in his vehicle?
20  A   Personally?
21  Q   Yes, sir.
22  A   Not that I am aware of.  Not that I remember,
23      either.

Page 40

1   Q   Did you hear about it --
2   A   I --
3   Q   -- during 2004 before you left?
4   A   I know that Mr. Coon along with coaches and others
5       took students home after band practices or
6       football practices or whatever.
7   Q   So, you were aware of that during 2004?
8   A   Yes, ma'am.
9   Q   Any other incidence in which Mr. Coon was driving
10      students around in his vehicle that you heard
11      about or personally witnessed?
12  A   None that I am aware of.  None that I can
13      remember.  Let me put it that way.
14  Q   Did you become aware that at some point that
15      Mr. Coon was taking students on overnight trips?
16  A   No, ma'am.
17  Q   Never became aware of that in 2004-2005.
18      Were you ever aware that he had provided any
19      of his students with his personal cell phone
20      number?
21  A   The only cell phone incident I am aware of is the
22      one with Blake.
23  Q   All right.  Tell me about that incident.

Page 41

1   A   All I know about that is we picked up a cell phone
2       from a student which was policy.  And it turned
3       out to be Mr. Coon's.
4   Q   So, this would have been prior to December of '04
5       when you left?
6   A   Yes, ma'am.
7   Q   Okay.  How did you come to pick up Blake's cell
8       phone?
9   A   He was using it on campus.  And Mr. McDaniel, the
10      assistant principal, saw him using it and picked
11      it up.
12  Q   All right.  And what was done about it?
13  A   Same thing we do with any other.  We try and
14      contact the parents about it and retain possession
15      of the cell phone.
16  Q   Now, you testified earlier you knew that giving a
17      student a gift like a cell phone was a grooming
18      activity.  What did you do with respect to the
19      possible sexual abuse implications of this gift?
20  A   At that time, I did not think it was sexual in any
21      way.
22  Q   Why?
23  A   From my understanding from Mr. McDaniel who picked

11  (Pages 38 to 41)

## Page 42

1  it up, the young man was just using the telephone
2  to call somebody.
3  Q  So, in other words, although you know this may be
4     a grooming activity, you didn't look into it any
5     further?
6  A  No, ma'am.
7  Q  You did not?
8  A  No, ma'am.
9  Q  Okay. Did you talk to Mr. Faulkner?
10 A  Mr. McDaniel talked to him.
11 Q  Did you get a report back about this from
12    Mr. McDaniel?
13 A  I'm sure I did.
14 Q  What was the substance of that report?
15 A  I don't remember.
16 Q  Okay. Did you ever become aware that Mr. Coon had
17    provided cell phones to any other student?
18 A  No, ma'am.
19 Q  Did you ever become aware that Mr. Coon was
20    providing cigarettes to any students?
21 A  No, ma'am.
22 Q  All right. And I may have already asked you this:
23    But were you ever aware that Mr. Coon had provided

## Page 43

1     students with his personal phone number?
2  A  No, ma'am.
3  Q  All right. So, you didn't meet with Mr. Faulkner?
4  A  No, ma'am.
5  Q  Did you notice when you reviewed Mr. Coon's
6     application that he had multiple employers; a
7     large number of educational employers?
8  A  Yes, ma'am.
9  Q  Did you make any inquiry into why that was?
10 A  I don't remember.
11 Q  Are you aware that that may be an indication of a
12    sexual predator?
13       MR. SWEENEY: Object to the form.
14 A  No, ma'am, I was not aware of that.
15 Q  Did you raise any questions about the gaps in his
16    employment?
17 A  No, ma'am.
18 Q  Did you contact any personnel in this process, in
19    this interviewing process, other than the
20    references given by Mr. Coon?
21 A  Personnel?
22 Q  Did you contact any references other than the ones
23    identified by Mr. Coon?

## Page 44

1  A  Not that I remember.
2  Q  Okay. All right. So, from what date did you quit
3     in Pike County? December?
4  A  December the -- end of the December.
5  Q  December 31st. All right. In the spring of 2005,
6     were you ever contacted by anyone from Pike County
7     about Mr. Coon?
8  A  What do you mean "contacted by"?
9  Q  Dr. Bazzell, any employee of Pike County?
10 A  Dr. Bazzell called me at some point and --
11 Q  What was the substance of that conversation?
12 A  He made me aware that -- of the incident over in
13    Butler County.
14 Q  What incident are you talking about?
15 A  The incident in which he was charged within --
16 Q  I'm sorry?
17 A  I'm thinking.
18    I remember talking to Dr. Bazzell. It was
19    either March or April of that year.
20 Q  Did he call you, or you called him?
21 A  He -- my -- he sent a message by my wife, and I
22    called him, I think. I don't remember exactly.
23 Q  And tell me the substance of those discussions.

## Page 45

1  A  I don't remember.
2  Q  You have no idea what you talked about?
3  A  I talked to Dr. Bazzell. We talked about --
4     during that spring, I talked to him. And it
5     was -- I want to say it was the charges about
6     drugs. But I am not sure.
7  Q  So, at some point in the spring, you talked with
8     him about drug charges against Mr. Coon?
9  A  Uh-huh.
10 Q  What do you recall about that conversation?
11 A  They were just -- there there were just charges
12    against him -- that him being investigated or
13    something.
14 Q  Was he was calling just to tell you that, or did
15    he ask you questions?
16 A  Yeah. Asked me if knew anything about it. I told
17    him I didn't know anything about it. You know,
18    prior if I had any indication of it. I told him
19    no.
20 Q  Did you tell him about the cell phone incident?
21 A  Who, Dr. Bazzell?
22 Q  Yeah.
23 A  No, I didn't tell him the cell phone incident.

JR, A Minor                    July 24, 2007    Pike County Board of Education

---

Page 46

1  Q  Why not?
2  A  I think Mr. McDaniel told him about that.
3  Q  Do you know if Mr. McDaniel told him about that?
4  A  About the cell phone?
5  Q  Uh-huh.
6  A  About when we picked it up at school?
7  Q  Uh-huh.
8  A  Yes.
9  Q  You know that Mr. McDaniel told Mr. Bazzell that
10    Mr. Coon had provided Blake Faulkner with a cell
11    phone?
12  A  Yes.
13  Q  Did you tell him about him smoking in the school?
14  A  Who, Dr. Bazzell?
15  Q  Yes.
16  A  Yes.
17  Q  When did you tell him that?
18  A  At the beginning of the year.
19  Q  You mean when it occurred with Mr. Coon, you
20    reported it to Dr. Bazzell?
21  A  Yeah.
22  Q  Okay.  And I guess the incident with the Foster
23    child was reported to Dr. Bazzell, also; is that

---

Page 47

1    correct?
2  A  Yes, ma'am.
3  Q  Were you aware that -- I'm sorry.  I'm not sure if
4    I asked this -- were you aware that Mr. Coon was
5    transporting Blake Faulkner in his vehicle?
6  A  I was aware that after band practice he had taken
7    Blake home.
8  Q  Okay.
9  A  Along with other students.
10  Q  Who were the other students you knew were being
11    transported?
12  A  I know he took -- I think he took the little Helms
13    boy home one time.  He's taken band students who
14    didn't have rides.
15  Q  How about Justin Reed?  Did you know that he had
16    transported Justin Reed in his private vehicle?
17  A  No.
18  Q  Did you report to Dr. Bazzell this transporting of
19    students in his private vehicle by Mr. Coon?
20  A  No, ma'am.
21  Q  So, as far as policies and procedures for
22    investigating sexual abuse complaints --
23  A  Uh-huh.

---

Page 48

1  Q  -- I'm not sure if you answered this -- who was
2    responsible to your understanding for promulgating
3    those policies and procedures?
4  A  There is a system of --
5  Q  It wasn't you?
6  A  You mean, like at the school, or --
7  Q  Well, I didn't see that you promulgated any
8    policies or procedures for investigating and
9    handling sexual abuse claims.
10  A  No.
11  Q  Okay.  So, who was responsible for establishing
12    those policies and procedures to your
13    understanding?  Was it you?
14  A  I would think that would be a Board policy.
15  Q  And who --
16  A  And state policy.
17  Q  Not your responsibility?
18  A  In -- in --
19  Q  For promulgating policies and procedures for
20    investigating sexual-abuse issues.
21  A  Give me your definition of "promulgating".
22  Q  Writing and/or disseminating.
23  A  I disseminated.

---

Page 49

1  Q  You were responsible for disseminating --
2  A  Yes, ma'am.
3  Q  -- policies as to the investigation of sexual
4    abuse complaints?
5  A  Disseminating that information to the faculty,
6    yes.  Through the Board policy, yes.
7  Q  And you were responsible at your school for the
8    procedures for reporting and investigating sexual
9    abuse in your school?
10  A  Yes, ma'am.
11  Q  Those are apparently not represented in any of
12    these documents; is that correct?
13  A  They are Board policy, yes, ma'am.
14  Q  So, are you saying you didn't promulgate any
15    procedures, or you did?
16  A  Well, we -- you know, I'm saying that we used the
17    Board policy manual.
18  Q  Okay.  Anything else?
19  A  That's all.
20  Q  You didn't believe that you had any responsibility
21    to promulgate or write any separate policies and
22    procedures?
23  A  No, ma'am.

13  (Pages 46 to 49)

Page 50

1  **Q**   Okay. And, specifically, do you recall what
2     training -- well, whose responsibility was it to
3     provide faculty with training as it relates to
4     sexual abuse in your building, in Pike County High
5     School?
6  A   I think that's twofold. I think it's mine and the
7     Board's.
8  **Q**   And I'm just not clear on what training you
9     provided.
10 A   As far as inservice training, straight --
11 **Q**   On sexual abuse.
12 A   -- bringing someone in or whatever, I don't ever
13     recall doing that.
14 **Q**   Okay.
15 A   Going over the policies of the Board, yes, we did
16     that.
17 **Q**   And can you identify any policies of the Board
18     relating to sexual abuse that you went over?
19 A   Not off the top of my head, no, ma'am.
20 **Q**   Now, with respect to whatever was supposed to be
21     done in your school relating to investigation of
22     sexual abuse complaints, did you have any special
23     policies or procedures that related to special ed

Page 51

1     kids?
2  A   No more so than any of the regular kids.
3  **Q**   They were the same policies?
4  A   Yes, ma'am.
5  **Q**   Okay. I just want --
6       MS. DePAOLA: Let's go off the Record.
7       (Brief recess.)
8  BY MS. DePAOLA
9  **Q**   Mr. Casey, did you ever reprimand Mr. Coon for
10     taking students off campus in his private vehicle?
11 A   No, ma'am.
12 **Q**   Were you the principal when Justin broke the
13     window in the band room?
14 A   No, ma'am.
15 **Q**   Are you aware that happened?
16 A   Yes, ma'am.
17 **Q**   Okay. Do you know when that happened?
18 A   No, ma'am.
19 **Q**   What did you do to monitor and supervise employee
20     contact with your students?
21 A   Repeat that, now.
22 **Q**   What did you do to monitor and supervise employee
23     contact with the students?

Page 52

1  A   As a principal, I walked around and checked all
2     classes -- you know, checked all my classes every
3     day. I was at most all athletic events. I made
4     sure that there were chaperones on buses when they
5     traveled. I did the things that most principals,
6     I would think, would do.
7  **Q**   Did you ever instruct the teachers -- well, is
8     there any document that indicates you instructed
9     the teachers not to have students in a closed-door
10     office?
11 A   Is there a document for that?
12 **Q**   Yeah.
13 A   Not that I am aware of.
14 **Q**   Okay. Now, were there cameras at Pike County High
15     School?
16       MR. SWEENEY: I'm sorry. Was there
17       what?
18 **Q**   Security cameras?
19 A   They -- let see. When did we put those things in?
20     We had some cameras, but we disengaged them when
21     we started new construction.
22 **Q**   When would that have been?
23 A   2002 -- 3 -- 5 -- 4 -- 3 -- 3.

Page 53

1  **Q**   2003, you stopped running the security cameras?
2  A   I think so.
3  **Q**   When were they put back in?
4  A   As soon as they put the system back in the new
5     building.
6  **Q**   I mean, while you were there?
7  A   Yes, ma'am.
8  **Q**   And did you monitor those security cameras?
9  A   Yes, ma'am.
10 **Q**   And would those have covered the band room?
11 A   The parking lot of the band room.
12 **Q**   But the band room, itself?
13 A   No, ma'am.
14 **Q**   Are you the one who decided where those security
15     cameras would be placed?
16 A   We -- Dr. Bazzell, myself, along with the
17     technicians to get the best coverage, decided
18     that, yes.
19 **Q**   Have you reviewed the answer that was filed on
20     your behalf in this complaint?
21 A   Yes, ma'am.
22 **Q**   All right. You have denied that Justin Reed was
23     sexually abused by Mr. Coon. On what basis did

Page 54

1  you make that denial?
2        MR. SWEENEY: Object to the form. And
3        would you show the witness the
4        answer you're referring to?
5  BY MS. DePAOLA
6  Q  (Tenders document).
7        MR. SWEENEY: Incidentally, Susan, have
8        we gotten any signed -- do you have
9        a signed copy of his answers yet?
10       MS. DePAOLA: This is the answer to the
11       complaint.
12 BY MS. DePAOLA
13 Q  Paragraph 25 says that beginning in the year
14    2004-05, the student's personal privacy and
15    security were repeatedly violated by Defendant
16    Coon. And I think if you look at paragraph 25
17    there, you have filed a denial of that. What's
18    the basis for your denial of that?
19 A  Twenty-five?
20 Q  Uh-huh.
21 A  I had no evidence to believe that it happened.
22 Q  You don't believe today as we sit here that it
23    happened?

Page 55

1  A  I don't know if it happened.
2  Q  Well, you have to admit or deny in a complaint. I
3     think you have denied. Is there some factual
4     basis on which you base that denial?
5  A  I don't have any evidence of that. I don't know
6     if he did or if he didn't. All I have is hearsay.
7  Q  Okay. You don't know that he pled guilty to
8     sexual abuse of Justin Reed?
9  A  No, ma'am.
10 Q  You don't know that?
11 A  No, ma'am.
12 Q  Let's look at 26. What does 26 say? Does that
13    also say denied?
14 A  It just --
15 Q  Let me look at it and see what it says.
16    Would you admit that you were responsible for
17    the development and implementation of policies and
18    procedures to protect students from sexual abuse?
19        MR. SWEENEY: Object to the form.
20 A  I -- all students, yes, ma'am.
21 Q  And do you admit that you were responsible for
22    monitoring and investigating complaints of sexual
23    abuse as they relate to your students at Pike

Page 56

1  County High School?
2  A  Yes, ma'am.
3  Q  And would you admit that you are responsible for
4     training as it relates to sexual abuse issues,
5     said training being provided to faculty at Pike
6     County High School?
7  A  Somewhat, yes, ma'am.
8  Q  Have you spoken to any of the Reeds since these
9     allegations of sexual abuse came to light?
10 A  Yes, ma'am.
11 Q  Who have you spoken to?
12 A  I have spoken to Justin. I have spoken to their
13    daughter. And I have spoken to Ms. Reed.
14 Q  All right. When did you do this as to each of
15    them?
16 A  I saw Justin in I think it was Wal-Mart or Lowe's
17    one. And he was telling me he went to Charles
18    Henderson and was graduating. I have talked with
19    Jessica, because she was going to school, and I
20    asked her how school was going. And then said
21    hello to their mom.
22 Q  Have you discussed any of the allegations of
23    sexual abuse with any of the Reeds?

Page 57

1  A  No, ma'am.
2  Q  Have you discussed any of the allegations of
3     sexual abuse with anyone other than Mr. Sweeney
4     since these allegations came to light?
5  A  No, ma'am.
6  Q  You didn't consider it important to determine how
7     you missed this?
8        MR. SWEENEY: Excuse me. What was the
9        question?
10       MS. DePAOLA: How you missed it.
11 A  Missed what?
12 Q  The sexual abuse.
13       MR. SWEENEY: Object to the question.
14       That's argumentative.
15       MS. DePAOLA: Well, I'm just asking.
16       MR. SWEENEY: Well, I'm objecting to the
17       question as being argumentative.
18       There is no evidence that while he
19       was principal there that sexual
20       abuse took place.
21       MS. DePAOLA: Well, that's not true.
22       MR. SWEENEY: You have no factual
23       record. You're assuming facts

15  (Pages 54 to 57)

Page 58

1          without a basis. Object to the
2       question.
3          MS. DePAOLA: What was the question?
4          (Whereupon, the requested material
5          was read by the Court Reporter.)
6          MR. SWEENEY: Object to the question.
7  BY MS. DePAOLA
8  Q  I'll put the question before you again. You can
9     answer it.
10 A  Missed what?
11 Q  Sexual abuse of a Pike County High School student
12    during the 04-05 school year.
13    MR. SWEENEY: Object to the question.
14 A  At that point in time in which I was at Pike
15    County High School, I had no reason to believe
16    there was any abuse.
17 Q  And since that time, you have made no further
18    investigation as to how this occurred?
19 A  As not being principal at Pike County High School,
20    and I have been gone from that situation, not
21    knowing the information, all I got was hearsay
22    from various folks or whatever, the news, or
23    whatever, is all I know about it.

Page 59

1          MS. DePAOLA: That's all. Thank you.
2          EXAMINATION
3  BY MR. SWEENEY
4  Q  Mr. Casey, while you are here, will you get a copy
5     of the answers that were submitted to counsel
6     unsigned and have those signed and notarized
7     before you leave?
8  A  Yes, sir.
9  Q  I have a couple of questions. If a complaint came
10    to you from a student about sexual abuse, what
11    would the procedure be there at the high school
12    while you were principal?
13 A  When I was there, if a complaint came down,
14    normally what we -- the procedure that we would
15    follow is I would get the counselor. The
16    counselor and I together would talk with the
17    student. From that point on, we would discuss it
18    with DHR. And then call DHR in and let DHR pick
19    it up from that point. We would contact the
20    superintendents and let them be aware of what we
21    are doing.
22 Q  Was the procedure that you would have followed for
23    any physical abuse or sexual abuse of any student?

Page 60

1  A  Any abuse of any child.
2  Q  So, you took matters of student abuse seriously --
3  A  Yes, sir.
4  Q  -- whatever the form?
5  A  Yes, sir.
6  Q  Prior to December of 2004, when you resigned your
7     position, did any student ever bring to you any
8     suggestion that Charles Coon was sexually abusing
9     them?
10 A  No, sir.
11 Q  Did any parent bring any information that would
12    indicate that Charles Coon was sexually abusing
13    any student?
14 A  No, sir.
15 Q  Did Mr. or Mrs. Reed ever bring any information to
16    you that Charles Coon was abusing Justin?
17 A  No, sir.
18 Q  Did Ms. Reed spend a lot of time at the school at
19    certain times?
20 A  Yes, sir.
21 Q  Was she real involved in the band?
22 A  Yes, sir.
23 Q  Did she ever report any misconduct or make any

Page 61

1     complaints about Charles Coon based on her
2     involvement with the band?
3  A  No, sir.
4  Q  Did any teacher or faculty person at Pike County
5     High School ever complain to you that Charles Coon
6     had an improper relationship with any student?
7  A  No, sir.
8  Q  You have been sued in this matter on an individual
9     basis as well as your professional capacity. Did
10    you have any connection or relation with Justin
11    Reed other than in your position as principal?
12 A  No, sir.
13 Q  Did you have any connection or dealings with
14    Charles Coon other than in your capacity as
15    principal?
16 A  No, sir.
17    MR. SWEENEY: Thank you very much.
18    (Off-the-Record discussion.)
19    FURTHER EXAMINATION
20 BY MS. DePAOLA
21 Q  Since you left Pike County, have you had any
22    further training in sexual-abuse issues?
23    MR. SWEENEY: Object to the form.

JR, A Minor                    July 24, 2007   Pike County Board of Education

Page 62

1  A  No, ma'am.
2  Q  **Have you instituted any policies or procedures at**
3     **the school you're employed in now, written**
4     **policies and procedures, relating to sexual abuse?**
5            MR. SWEENEY:  Object to the form.
6  A  No, ma'am.
7            MS. DePAOLA:  That's all.
8            MR. SWEENEY:  No further questions.
9              (Whereupon, at approximately, 2:15
10             p.m. on the 24th day of July, 2007
11             the deposition was concluded.)
12             * * * * * * * * *
13         FURTHER DEPONENT SAITH NOT
14             * * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 63

1
2          REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7       I do hereby certify that the above and foregoing
8  transcript of the deposition of TERRY CASEY was taken
9  down by me in machine shorthand on the 24th of July,
10 2007, and the questions and answers thereto reduced to
11 writing under my personal supervision, and that the
12 foregoing represents a true and correct transcript of
13 the proceedings given by said witness upon said
14 hearing.
15      I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18      Dated this 10th day of August, 2007.
19
20      _____
21      Mary Moore-Wynn
22      Certified Shorthand Reporter
23

17  (Pages 62 to 63)

JR, A Minor                          July 24, 2007  Pike County Board of Education
Page 1

| A | | | | |
|---|---|---|---|---|
| **A** | 8:22,23 9:16 | 42:22 45:16 | 51:13 53:10,11 | **Brief** 51:7 |
| **abuse** 18:9,10,11 | 56:9,22 57:2,4 | 47:4 56:20 | 53:12 60:21 | **Brief-off-the-...** |
| 18:12 19:1,16 | **Allen** 2:8 5:9 | **asking** 24:18 | 61:2 | 26:2 |
| 19:22 20:2,17 | 17:18 | 25:8 57:15 | **base** 55:4 | **bring** 60:7,11,15 |
| 20:22 21:2,9 | **and/or** 48:22 | **assistant** 15:18 | **based** 20:2 | **bringing** 50:12 |
| 21:12,18 23:12 | **answer** 21:19 | 15:21 37:10 | 22:22 33:2 | **broad** 30:7 |
| 32:13 33:19 | 38:19 53:19 | 41:10 | 61:1 | **broke** 51:12 |
| 41:19 47:22 | 54:4,10 58:9 | **assume** 24:8 | **basically** 25:2 | **brother** 29:10 |
| 48:9 49:4,9 | **answered** 48:1 | 32:11 | **basis** 53:23 | **brought** 7:11 |
| 50:4,11,18,22 | **answers** 54:9 | **assuming** 57:23 | 54:18 55:4 | **bruises** 20:9 |
| 55:8,18,23 | 59:5 63:10 | **assumption** | 58:1 61:9 | 21:10 |
| 56:4,9,23 57:3 | **Anybody** 13:19 | 32:15 | **Bazzell** 2:17 9:5 | **Brundidge** 5:17 |
| 57:12,20 58:11 | **apparently** 16:2 | **athletic** 52:3 | 14:22 17:3,5 | 5:18 |
| 58:16 59:10,23 | 49:11 | **attached** 10:6 | 17:12 18:17 | **building** 50:4 |
| 59:23 60:1,2 | **APPEARAN...** | 23:4 26:8 | 37:1,14,19 | 53:5 |
| 62:4 | 2:2 | 35:22 | 44:9,10,18 | **buses** 52:4 |
| **abused** 20:8,8 | **appears** 36:23 | **attorney** 2:4 | 45:3,21 46:9 | **business** 27:16 |
| 53:23 | 37:7 | 24:11 39:13 | 46:14,20,23 | 27:17 |
| **abusing** 60:8,12 | **applicable** 25:14 | **August** 63:18 | 47:18 53:16 | **Butler** 8:9 9:7 |
| 60:16 | **applicant** 15:11 | **author** 23:6 | **began** 6:5 | 13:11 28:8 |
| **academically** | **application** 4:15 | 33:12 | **beginning** 46:18 | 44:13 |
| 29:12 | 9:21 10:15,16 | **authorized** | 54:13 | |
| **action** 34:22 | 10:20 11:1,10 | 16:18 | **behalf** 53:20 | **C** |
| 63:16 | 11:11,21,22 | **Avenue** 2:9,13 | **believe** 49:20 | **call** 42:2 44:20 |
| **activities** 30:1,2 | 12:13 43:6 | **aware** 14:7,10 | 54:21,22 58:15 | 59:18 |
| 30:7 | **applications** | 15:19 18:7,20 | **Berry** 26:15 | **called** 9:5 24:12 |
| **activity** 30:13,19 | 12:3 | 19:2 29:20 | **best** 10:21,22 | 27:11 44:10,20 |
| 30:20 31:9,19 | **applied** 11:14 | 32:11 39:1,6 | 12:8 53:17 | 44:22 |
| 31:21 32:2 | 15:17,20 | 39:15,22 40:7 | **Birmingham** | **calling** 30:15 |
| 33:23 41:18 | **apply** 11:14 | 40:12,14,17,18 | 2:14 | 45:14 |
| 42:4 | **appropriate** | 40:21 42:16,19 | **Blake** 9:12 | **cameras** 52:14 |
| **address** 5:12,13 | 31:13 | 42:23 43:11,14 | 40:22 46:10 | 52:18,20 53:1 |
| **admit** 55:2,16 | **approximately** | 44:12 47:3,4,6 | 47:5,7 | 53:8,15 |
| 55:21 56:3 | 1:20 62:9 | 51:15 52:13 | **Blake's** 41:7 | **campus** 34:2,14 |
| **ago** 6:6 | **April** 44:19 | 59:20 | **blank** 33:20 | 41:9 51:10 |
| **agree** 30:19 | **Arant** 2:12 | **Azar** 2:8,8 | **Board** 1:12,18 | **candidate** 18:3 |
| **agreed** 3:8,20 | **argumentative** | | 4:18 5:9,20 6:9 | **capacity** 61:9,14 |
| 4:4 | 57:14,17 | **B** | 10:16 17:21 | **careful** 19:1 |
| **ahead** 26:4 | **arose** 8:22 | **B** 2:12 | 27:5 48:14 | **Carpentry** 7:2 |
| **Alabama** 1:2,19 | **article** 53:7,8 | **back** 18:15 27:1 | 49:6,13,17 | **Carroll** 6:4 |
| 2:5,9,14 5:18 | **articles** 19:9,10 | 28:8 30:12 | 50:15,17 | **case** 1:9 3:21 4:1 |
| 12:21 63:4 | 19:19,20 20:2 | 42:11 53:3,4 | **Board's** 50:7 | 9:12 37:12 |
| **allegation** 8:18 | 32:22 33:2,13 | **band** 29:16 32:9 | **bounds** 36:19 | **cases** 19:8 30:3 |
| 8:20 35:2 | 33:14 | 34:14 39:2,11 | **boy** 47:13 | **Casey** 1:16 3:10 |
| **allegations** 8:13 | **asked** 9:10 | 40:5 47:6,13 | **Bradley** 2:12 | 3:22 4:9 5:1 |

JR, A Minor                     July 24, 2007  Pike County Board of Education
                                                                    Page 2

18:8 23:16
  51:9 59:4 63:8
**cause** 63:17
**cell** 30:17 40:19
  40:21 41:1,7
  41:15,17 42:17
  45:20,23 46:4
  46:10
**central** 13:22
**certain** 60:19
**Certificate** 4:12
  63:2
**Certified** 63:22
**certify** 63:7,15
**change** 6:15,16
**changing** 15:1
**chaperones** 52:4
**charge** 26:16
**charged** 9:7
  44:15
**charges** 45:5,8
  45:11
**Charles** 8:5
  10:17 56:17
  60:8,12,16
  61:1,5,14
**check** 13:7,10,23
  14:8,9,14 15:9
  15:10,12,14
**checked** 14:1,3
  14:12,13 15:7
  52:1,2
**checking** 15:4
**cheerleader**
  31:16
**child** 20:7 21:11
  32:4 36:18,21
  38:20 46:23
  60:1
**children** 18:21
  31:7 32:1,12
  33:18
**choke** 36:11
**choked** 38:20
**choking** 35:16

38:15
**choose** 21:23
**chose** 22:2
**cigarettes** 30:22
  42:20
**circumstances**
  32:6
**City** 5:20 28:4
  28:19
**Civil** 3:11
**claims** 48:9
**class** 39:2
**classes** 52:2,2
**clear** 50:8
**client** 25:17
**closed-door** 52:9
**closer** 13:6
**coaches** 26:13
  40:4
**college** 27:4
**come** 9:20 19:9
  27:1 28:23
  29:1 33:15
  34:11 41:7
**commencing**
  1:20
**commission**
  3:13
**Commissioner**
  1:17 3:12
**competitions**
  32:10
**complain** 61:5
**complaint** 53:20
  54:11 55:2
  59:9,13
**complaints**
  47:22 49:4
  50:22 55:22
  61:1
**complete** 27:3
**composite** 4:15
  10:11
**concluded** 62:11
**conduct** 16:10

34:15 36:16
**confide** 20:12
**connection**
  61:10,13
**consider** 36:16
  57:6
**considered**
  36:19
**construction**
  52:21
**contact** 21:5
  41:14 43:18,22
  51:20,23 59:19
**contacted** 9:19
  44:6,8
**contained** 22:6
**context** 31:10
**contract** 5:20,22
**conversation**
  44:11 45:10
**Coon** 4:16 8:5
  8:14 10:17
  12:10 13:8
  15:17 18:6
  28:23 33:22
  34:11,18 36:9
  37:4 39:18
  40:4,9,15
  42:16,19,23
  43:20,23 44:7
  45:8 46:10,19
  47:4,19 51:9
  53:23 54:16
  60:8,12,16
  61:1,5,14
**Coon's** 38:12
  41:3 43:5
**copy** 26:21 54:9
  59:4
**correct** 22:21
  24:5 35:3 47:1
  49:12 63:12
**counsel** 3:9,21
  4:5 59:5 63:15
**counselor** 20:13

21:6 59:15,16
**County** 1:12,18
  4:18 5:9 6:9
  7:22 8:4,6,9
  9:8,20 13:11
  17:21 18:9,14
  18:16 19:16
  27:5 28:9,13
  28:14,20 29:4
  35:9,11 38:17
  44:3,6,9,13
  50:4 52:14
  56:1,6 58:11
  58:15,19 61:4
  61:21 63:5
**couple** 59:9
**Court** 1:1 23:21
  58:5
**cover** 19:6 22:16
**coverage** 53:17
**covered** 53:10
**co-counsel** 5:10
**crossed** 11:7
**CSR** 3:12
**currently** 5:19
  13:13

_____
**D**
**date** 25:1,12
  44:2
**dated** 11:23
  15:17 17:21
  63:18
**dates** 22:22
**daughter** 56:13
**David** 4:19
  35:14,15
**day** 18:22 19:3
  39:3 52:3
  62:10 63:18
**dealing** 15:3
  18:10
**dealings** 61:13
**Deanie** 2:8 5:9
**December** 6:12

6:21 7:13
  28:17,21 34:3
  34:4 41:4 44:3
  44:4,4,5 60:6
**decided** 7:19
  53:14,17
**Defendant** 1:14
  2:11 54:15
**definition** 48:21
**degree** 18:13,15
**denial** 54:1,17
  54:18 55:4
**denied** 53:22
  55:3,13
**deny** 55:2
**DePaola** 2:4
  4:10,11 5:6,7
  10:9,10 12:2,7
  17:14,19 23:5
  23:18,22 25:11
  25:17,21 26:3
  26:9 36:1 51:6
  51:8 54:5,10
  54:12 57:10,15
  57:21 58:3,7
  59:1 61:20
  62:7
**depending**
  31:10 32:6
  33:3
**DEPONENT**
  62:13
**deposition** 1:16
  3:9,11,16,22
  3:23 4:6 62:11
  63:8
**described** 30:2
**Description** 4:14
**details** 36:13
**determine** 57:6
**development**
  55:17
**DHR** 59:18,18
  59:18
**different** 14:4

14:21 25:6
**direct** 21:1
**director** 8:9
28:9
**discipline** 36:20
**discretion** 15:13
15:14 18:4
**discretionary**
14:11
**discuss** 59:17
**discussed** 19:15
20:8 56:22
57:2
**discussion** 26:2
39:13 61:18
**discussions**
19:10 44:23
**disengaged**
52:20
**disseminated**
48:23
**disseminating**
48:22 49:1,5
**distributed** 24:8
26:17,18,19
**DISTRICT** 1:1
1:2
**doctors** 7:10
**document** 12:9
15:6 17:15
22:19 23:6,9
25:7,12,14
26:10 37:18
52:8,11 54:6
**documentation**
15:7
**documents** 22:4
22:6,18,19
38:10 49:12
**doing** 7:1 12:17
19:14 33:4,5
50:13 59:21
**Donald** 2:12
12:3 25:11
**Dr** 2:17 9:5

14:19,22 16:23
17:1,2,3,5,12
18:17,17 26:15
37:14,19 44:9
44:10,18 45:3
45:21 46:14,20
46:23 47:18
53:16
**driving** 39:18
40:9
**drug** 45:8
**drugs** 45:6
**duly** 5:3
**dwell** 18:19,23

---

**E**

**EAR** 1:5
**earlier** 41:16
**early** 28:1,3
**ed** 50:23
**education** 1:13
1:18 4:18 5:9
5:21 6:10 7:19
17:21 27:6,12
29:14
**educational**
18:12 27:4
43:7
**either** 3:18 4:2
21:5 39:23
44:19
**elements** 32:21
**employed** 5:19
6:22 7:21
12:17 28:17
62:3
**employee** 28:20
44:9 51:19,22
**employers** 43:6
43:7
**employment**
4:16 7:16 8:1
9:21 10:15
11:22 15:2,3
16:8 27:2,4,5

43:16
**engaging** 33:22
**Escambia** 27:5,9
**essentially** 16:7
**establishing**
48:11
**event** 29:22
**events** 52:3
**evidence** 3:17
54:21 55:5
57:18
**exactly** 44:22
**Examination**
4:10,10,11 5:5
59:2 61:19
**Excuse** 57:8
**exhibit** 4:14,15
4:15,16,17,18
10:3,4,9,11
15:16 23:1,2
26:5,6,22
35:20 36:2,22
37:7 38:6
**EXHIBITS** 4:13
**explained** 34:19
**extent** 14:15
**extreme** 38:16

---

**F**

**facts** 57:23
**factual** 55:3
57:22
**faculty** 4:16
19:11,14,16,22
19:23 20:20
21:22 22:5,7
22:10,20 24:7
24:8 32:9 49:5
50:3 56:5 61:4
**fair** 32:15 38:15
**familiar** 29:18
30:8
**far** 19:21 47:21
50:10
**FATHER** 1:5

**Faulkner** 9:12
42:9 43:3
46:10 47:5
**Federal** 2:13
3:10
**Fifth** 2:13
**filed** 5:8 11:9
53:19 54:17
**filing** 3:22 4:3
**fill** 27:21
**filled** 9:21 11:1
11:2
**finish** 14:7 19:14
**first** 5:2 10:13
19:3 27:5
33:21
**folks** 58:22
**follow** 21:15
34:21 59:15
**followed** 59:22
**follows** 5:4
11:22
**football** 40:6
**foregoing** 63:7
63:12
**forgot** 9:9
**form** 3:14 17:9
32:14,17 38:1
38:16,18 39:4
43:13 54:2
55:19 60:4
61:23 62:5
**formality** 3:13
**forth** 1:20 15:8
18:20
**Foster** 4:19
35:14,15 46:22
**Fosters** 36:15
**four** 10:13
**free** 15:12
**front** 12:9 23:1
**further** 3:20 4:4
4:11 34:22
38:8 42:5
58:17 61:19,22

62:8,13 63:15

---

**G**

**gaps** 43:15
**generic** 20:15
**gift** 30:18 41:17
41:19
**gifts** 30:10
**give** 5:12 27:2
48:21
**given** 43:20
63:13
**giving** 30:10
41:16
**glanced** 23:14
**go** 15:15 18:15
18:21 25:23
26:4 32:9
33:16 39:2
51:6
**going** 15:1 22:23
36:2 50:15
56:19,20
**good** 13:18
**Goshen** 15:19
15:22
**gotten** 17:16
54:8
**grab** 36:18,21
**grabbed** 36:10
36:12
**grader** 29:6
**graduated** 27:3
**graduating**
56:18
**Greenville** 8:10
27:20 28:23
**grooming** 29:18
30:2,7,13,19
30:20 31:8,18
31:20 32:2
41:17 42:4
**grounds** 34:21
35:3
**group** 35:6

guess 34:3 46:22
guidelines 25:8
guilty 55:7

**H**
half 7:23 28:16
hall 34:14
hand 37:22
handbook 4:17
  21:20,22,23
  22:5,10,20
  24:1,7
handbooks 19:3
  22:7
handed 13:21
handling 48:9
handwriting
  11:12
handwritten
  36:23
happened 30:16
  51:15,17 54:21
  54:23 55:1
harassment 30:4
hard 11:4
head 50:19
hear 9:3 20:15
  40:1
heard 8:13 9:2,4
  9:10,14 39:9
  39:10,11 40:10
hearing 63:14
hearsay 55:6
  58:21
hello 56:21
Helms 47:12
Henderson
  56:18
hereto 3:18 4:2
  10:6 23:4 26:8
  35:22
high 6:4 8:4
  13:12,16 16:12
  19:16 28:14
  29:4 38:17

50:4 52:14
56:1,6 58:11
58:15,19 59:11
61:5
higher 32:18
highlighted
  19:23
hire 16:18
hired 14:18
  27:10
hiring 16:16
  17:23
history 27:2
home 5:13 13:6
  30:15 40:5
  47:7,13
Hon 2:4,8,12
honest 16:3,6
  37:6
house 31:8,14

**I**
idea 45:2
identification
  10:5 23:3 26:7
  35:21
identified 22:19
  43:23
identify 10:13
  21:18 24:15
  50:17
immediately
  20:13
implementation
  55:17
implications
  41:19
important 57:6
improper 61:6
improprieties
  8:14 9:1
inappropriate
  33:23 35:9
  36:16
incidence 40:9

incident 4:19
  9:4,7 35:13,16
  36:8 38:9,13
  38:22 40:21,23
  44:12,14,15
  45:20,23 46:22
**Incidentally**
  54:7
incidents 31:15
  35:7
**Including** 4:15
incorrect 33:8
increased 32:13
  33:19
**INDEX** 4:8,13
indicate 60:12
indicates 33:7
  52:8
indicating 5:11
  5:23 6:17 11:5
  16:9 22:8 24:4
  28:2
indication 11:2
  33:18 38:8
  43:11 45:18
individual 61:8
information
  9:15 20:3 25:4
  25:9,16 33:3,3
  33:22 49:5
  58:21 60:11,15
innocent 31:5,6
  32:7,8
inquiry 43:9
inservice 50:10
instances 31:12
institute 18:18
  18:22
instituted 62:2
instruct 52:7
instructed 52:8
instruction
  14:15,17,21
interested 63:17
interview 16:10

16:15 18:3,6
interviewed
  12:10
interviewing
  9:23 43:19
introduced 3:23
investigate 21:7
  38:12,21
investigated
  45:12
investigating
  47:22 48:8,20
  49:8 55:22
investigation
  34:1,15 37:9
  37:22 38:2
  49:3 50:21
  58:18
involved 60:21
involvement
  61:2
issues 7:6,11
  48:20 56:4
  61:22
item 16:1

**J**
Jessica 56:19
Joking 30:3
JR 1:4
July 1:17 6:7,8
  6:21 11:19
  17:21 62:10
  63:9
June 11:3
Justin 5:7 29:5,6
  39:1 47:15,16
  51:12 53:22
  55:8 56:12,16
  60:16 61:10
J.F 13:3,4
J.R 39:18

**K**
Key 16:23,23

17:1,2 18:17
**Keys** 14:19
kids 19:2 20:11
  30:10 32:8
  34:11 35:5,6
  51:1,2
kind 14:11
  23:23
knew 8:7 14:2
  15:20 16:7
  29:10,11 41:16
  45:16 47:10
know 6:10 8:5,8
  9:13 11:8,9,21
  12:1,4 14:2
  15:22 18:13
  19:4,6 25:13
  29:5,8,12,13
  29:16 31:15
  32:20 33:9,11
  33:13 39:8
  40:4 41:1 42:3
  45:17,17 46:3
  46:9 47:12,15
  49:16 51:17
  52:2 55:1,5,7
  55:10 58:23
knowing 58:21
knowledge
  10:21,22 12:8
known 13:11,11

**L**
large 43:7
Late 28:3
Law 2:4
lawsuit 5:8
leadership 26:12
learned 8:23
leave 6:11,13
  7:19 59:7
leaving 13:5
Lee 15:1
left 6:9,10 28:21
  34:3 40:3 41:5

JR, A Minor                    July 24, 2007  Pike County Board of Education
                                                                  Page 5

| | | | N | 61:18 |
|---|---|---|---|---|
| 61:21 | 23:3 26:7 | 38:2 41:9,23 | **N** | **Oh** 5:17 32:23 |
| **letter** 15:17 17:9 | 35:21 | 42:10,12 46:2 | **name** 5:7 13:15 | **Okay** 6:7 7:3,21 |
| 37:8,19 | **marketing** 27:11 | 46:3,9 | **nature** 30:5,6 | 9:6 11:6,14 |
| **let's** 10:12 15:15 | 28:6 | **mean** 8:17 18:23 | 31:17 | 15:15 17:6 |
| 16:1 18:14 | **Mary** 1:16 3:12 | 29:12,21 30:6 | **necessarily** 31:3 | 18:2,14 21:13 |
| 25:21,23 51:6 | 63:21 | 36:11 44:8 | 31:20 32:18 | 22:12,13,23 |
| 55:12 | **material** 23:20 | 46:19 48:6 | **need** 3:15 19:6 | 23:17 25:11 |
| **light** 56:9 57:4 | 58:4 | 53:6 | **needed** 20:12 | 27:1,1,15,19 |
| **listed** 15:11 | **materials** 20:21 | **medical** 7:10 | **neither** 63:15 | 28:5,10,12,18 |
| **little** 47:12 | **matter** 61:8 | **meet** 43:3 | **never** 7:8 20:20 | 29:3,12,16 |
| **lives** 8:11 | **matters** 60:2 | **meeting** 20:20 | 40:17 | 30:1,10 31:4 |
| **long** 7:21 14:13 | **ma'am** 7:5,7,9 | 36:14 | **new** 25:4 52:21 | 36:5,16 37:7 |
| 27:13 28:3,7 | 7:12,15,18 8:7 | **members** 24:9 | 53:4 | 37:13 38:4 |
| 28:10 | 8:15,21 9:13 | **memo** 17:12 | **news** 9:10 58:22 | 39:1,18 41:7 |
| **look** 10:12 16:1 | 9:18,22 10:18 | **mental** 38:12,21 | **night** 31:7,14 | 42:9,16 44:2 |
| 21:8 22:4,17 | 10:20,23 11:13 | **mentally** 32:12 | **noon** 1:21 | 46:22 47:8 |
| 23:15 36:22 | 11:17 12:11 | 33:18 | **normal** 36:20 | 48:11 49:18 |
| 38:4 42:4 | 13:2,9,20 14:6 | **mention** 18:19 | **normally** 59:14 | 50:1,14 51:5 |
| 54:16 55:12,15 | 16:19 17:8 | 19:1 | **North** 2:13 | 51:17 52:14 |
| **looked** 30:4 38:2 | 19:8,18 20:20 | **Men's** 27:18 | **notarized** 59:6 | 55:7 |
| **looking** 20:1,1 | 20:23 21:3 | **message** 44:21 | **note** 36:23 37:13 | **old** 12:13 |
| 21:18 22:9 | 22:22 23:7,10 | **middle** 1:2 6:11 | **notice** 11:1 43:5 | **older** 29:10 |
| 24:16 | 24:13 25:10 | **mine** 50:6 | **no,ma'am** 37:17 | **ones** 13:10 14:11 |
| **lookout** 19:2 | 26:18,23 28:22 | **Minor** 1:4 30:9 | **number** 4:14,14 | 15:11 43:22 |
| **looks** 10:22 | 29:2,15,17,20 | **minute** 26:1 | 40:20 43:1,7 | **orientation** 19:4 |
| **lot** 20:11 53:11 | 30:11,14,16,21 | **misconduct** | | **original** 25:3 |
| 60:18 | 31:6 33:15,20 | 60:23 | **O** | **outside** 36:19 |
| **Love** 1:19 | 34:5,9,11 35:1 | **missed** 57:7,10 | **Object** 32:14,17 | **overnight** 32:1,4 |
| **Lowe's** 56:16 | 35:4,10,12,19 | 57:11 58:10 | 38:1,18 39:4 | 40:15 |
| | 36:7,21 38:11 | **mistaken** 17:11 | 43:13 54:2 | **Ozark** 5:20 |
| **M** | 38:14,23 39:5 | 36:13,14 | 55:19 57:13 | 28:19 |
| **machine** 63:9 | 39:7,9,17 40:8 | **mom** 56:21 | 58:1,6,13 | |
| **Macon** 15:1 | 40:16 41:6 | **monitor** 51:19 | 61:23 62:5 | **P** |
| **magazines** 33:1 | 42:6,8,18,21 | 51:22 53:8 | **objecting** 57:16 | **page** 4:14 10:18 |
| 33:13 | 43:2,4,8,14,17 | **monitoring** | **objections** 3:13 | 15:15 17:20 |
| **making** 17:12 | 47:2,20 49:2 | 55:22 | 3:14 | 36:22 37:7,18 |
| 17:13 | 49:10,13,23 | **Montgomery** | **occasion** 29:4 | **pages** 10:13 |
| **man** 42:1 | 50:19 51:4,11 | 2:5,9 63:5 | **occurred** 35:13 | 22:22 |
| **manner** 4:1 | 51:14,16,18 | **months** 28:17 | 46:19 58:18 | **paragraph** |
| **manual** 49:17 | 53:7,9,13,21 | **Moore-Wynn** | **occurring** 21:18 | 54:13,16 |
| **March** 44:19 | 55:9,11,20 | 1:17 3:12 | **offered** 3:17 | **Pardon** 37:16 |
| **mark** 2:17 10:2 | 56:2,7,10 57:1 | 63:21 | **office** 13:22 | **parent** 60:11 |
| 22:23 26:4 | 57:5 62:1,6 | **MOTHER** 1:5 | 33:16 52:10 | **parents** 26:17 |
| 36:2 | **McDaniel** 37:8 | **multiple** 43:6 | **offices** 1:18 | 29:11 41:14 |
| **marked** 10:5,7 | 37:10,14,20,23 | | **Off-the-Record** | |

parking 53:11
participation 38:9
particularly 15:22
parties 3:9,21 63:16
party 3:18 4:2
people 14:2
perceived 30:11 30:23
perfectly 31:5,6
person 9:19 29:23 61:4
personal 40:19 43:1 54:14 63:11
personally 21:6 39:20 40:11
personnel 43:18 43:21
Phenix 28:4
phone 40:19,21 41:1,8,15,17 43:1 45:20,23 46:4,11
phones 30:17 42:17
physical 59:23
physically 20:8
pick 41:7 59:18
picked 41:1,10 41:23 46:6
Pike 1:12,18 4:18 5:8 6:9 7:21 8:4,6 9:20 17:20 18:9,14 18:15 19:16 28:13,13,20 29:4 35:9,11 38:17 44:3,6,9 50:4 52:14 55:23 56:5 58:11,14,19 61:4,21

place 2:13 21:9 57:20
placed 53:15
PLAINTIFF 1:7 2:3
Plaintiff's 4:15 4:16,17,18 10:3,4,9 15:15 23:1,2 26:4,6 26:21 35:20 36:2,22
plan 4:17 24:12 24:19 25:2,6 26:23
planner 24:2,3
please 5:12 22:17
pled 55:7
point 7:20 12:15 21:7 33:20 40:14 44:10 45:7 58:14 59:17,19
points 19:23 20:4,5
policies 23:12 34:22 47:21 48:3,8,12,19 49:3,21 50:15 50:17,23 51:3 55:17 62:2,4
policy 13:21 14:5 15:3,4 34:20 41:2 48:14,16 49:6 49:13,17
position 6:5,18 6:20 15:18 60:7 61:11
possession 41:14
possible 41:19
practice 47:6
practices 40:5,6
predator 43:12
predators 29:19

prepare 26:10
prepared 26:11
Preparing 29:22
PRESENT 2:16
pretty 14:16 23:7 38:16
principal 6:2,19 8:2,3,4 9:22 13:12,16 15:18 15:20,21 16:12 28:13 29:3 33:1 41:10 51:12 52:1 57:19 58:19 59:12 61:11,15
principals 19:8 52:5
principal's 6:20
prior 8:20,21 16:7 34:4 41:4 45:18 60:6
privacy 54:14
private 31:2 47:16,19 51:10
probably 38:16
procedure 3:11 13:21 21:14 59:11,14,22
procedures 21:2 21:4 23:12 47:21 48:3,8 48:12,19 49:8 49:15,22 50:23 55:18 62:2,4
proceedings 63:13
process 16:16 43:18,19
processes 15:2
produce 23:23
produced 17:20 24:11 38:5
producing 21:22
professional 61:9

prohibitions 23:13
promulgate 23:8 49:14,21
promulgated 48:7
promulgating 48:2,19,21
protect 18:21 55:18
provide 18:16 20:21 33:14 37:3 50:3
provided 3:18 4:2 12:5 16:2 20:16 40:18 42:17,23 46:10 50:9 56:5
providing 30:17 30:22 42:20
psychiatric 7:4
psychiatrist 7:8
psychologist 7:8
public 13:1
punishment 38:16
purpose 3:18
pursuant 1:19 3:10
put 22:23 25:2 40:13 52:19 53:3,4 58:8
p.m 62:10

Q
question 14:8 19:15 21:19 23:18 38:7 57:9,13,17 58:2,3,6,8,13
questions 3:14 3:15 16:4 43:15 45:15 59:9 62:8 63:10

prohibitions

quit 44:2

R
raise 16:4 43:15
read 11:4 12:16 19:3,10,19,20 20:3 23:21 32:22 33:7,17 37:3 58:5
reading 4:5
ready 6:14,16
real 60:21
really 37:6
reason 13:5 58:15
recall 19:12 34:8 34:10 35:5 36:8 45:10 50:1,13
receive 14:21
received 18:8 20:3 26:21 33:21
recess 51:7
recognize 38:6
recognizing 18:10,11
recollection 36:3 36:6
recommendati... 9:23 13:18 16:20,21,22 17:2,7,12,22
recommendati... 17:13
record 4:18 25:23 51:6 57:23
reduced 63:10
Reed 5:7 29:5,6 47:15,16 53:22 55:8 56:13 60:15,18 61:11
Reeds 56:8,23
reference 21:20

23:11
**references** 13:7
  13:22 14:2,3,8
  14:9,13,14
  15:5,6,7,10,12
  43:20,22
**referring** 10:14
  54:4
**refresh** 36:6
**refreshes** 36:3
**regarding** 17:22
**regardless** 4:3
**regular** 51:2
**relate** 55:23
**related** 6:18
  50:23 63:16
**relates** 27:4
  29:19 50:3
  56:4
**relating** 4:19
  8:14 19:22
  50:18,21 62:4
**relation** 61:10
**relationship**
  61:6
**released** 39:2
**remember** 13:15
  15:23 16:5,6
  16:17 20:5,6
  35:17,18 36:9
  36:9,13 37:6
  37:17,21 39:22
  40:13 42:15
  43:10 44:1,18
  44:22 45:1
**renewed** 11:10
**Repeat** 51:21
**repeatedly**
  54:15
**report** 19:5
  20:13 21:16
  42:11,14 47:18
  60:23
**reported** 21:13
  21:14 35:8

46:20,23
**Reporter** 23:21
  58:5 63:22
**Reporter's** 4:12
  63:2
**reporting** 20:10
  49:8
**represent** 5:7
**represented**
  49:11
**representing** 3:9
  3:21
**represents** 63:12
**reprimand** 51:9
**request** 25:20
**requested** 23:20
  58:4
**required** 25:5
  34:1
**requirement**
  24:22
**reserved** 3:16
**resignation** 7:13
**resigned** 60:6
**respect** 15:4
  18:9 25:7
  41:18 50:20
**responsibility**
  23:8 48:17
  49:20 50:2
**responsible**
  21:21 48:2,11
  49:1,7 55:16
  55:21 56:3
**rest** 38:4
**result** 38:22
**results** 63:17
**retail** 27:18
**retain** 41:14
**retarded** 32:12
  33:19
**review** 16:1
**reviewed** 43:5
  53:19
**Reynolds** 5:14

5:16,17
**rid** 22:14
**rides** 47:14
**right** 7:17 9:14
  11:5 12:23
  13:7,19 17:6
  22:1,3,15
  23:11 24:10
  28:21 29:8
  31:1 32:11
  38:7 40:23
  41:12 42:22
  43:3 44:2,5
  53:22 56:14
**risk** 32:13,19
  33:19
**room** 39:2,11
  51:13 53:10,11
  53:12
**Rose** 2:12
**Rules** 3:10
**ruling** 3:16
**rumors** 9:15
**running** 53:1

─────────
**S**
─────────
**safety** 4:17
  24:12,19 25:2
  25:6 26:23
**SAITH** 62:13
**saw** 21:17 41:10
  56:16
**saying** 13:17
  19:15,21 21:10
  21:11 31:4
  32:21 49:14,16
**says** 11:7 54:13
  55:15
**school** 4:17 6:3,4
  7:16,22 8:4,11
  9:8,17 12:18
  12:19 13:1,13
  13:16 14:4
  15:19,21 16:5
  16:13 19:17

24:12 25:2,6
  26:23 29:4
  34:19 35:3
  38:17 46:6,13
  48:6 49:7,9
  50:5,21 52:15
  56:1,6,19,20
  58:11,12,15,19
  59:11 60:18
  61:5 62:3
**security** 52:18
  53:1,8,14
  54:15
**see** 10:12 11:3,4
  15:16 23:14,16
  38:4 39:18
  48:7 52:19
  55:15
**seeing** 37:17
**seen** 7:8,10
  10:19,20,23
  37:13,19
**sent** 44:21
**separate** 49:21
**seriously** 60:2
**serving** 13:13
**set** 1:20
**seven** 7:23 27:14
  28:15,16
**sexual** 8:14 9:1
  18:9,10,11,12
  19:1,16,22
  20:2,17,22
  21:2,9,18
  23:12 29:19,22
  30:4 32:13
  33:19 41:19,20
  43:12 47:22
  48:9 49:3,8
  50:4,11,18,22
  55:8,18,22
  56:4,9,23 57:3
  57:12,19 58:11
  59:10,23 62:4
**sexually** 20:7

53:23 60:8,12
**sexual-abuse**
  48:20 61:22
**Shields** 12:20,21
  12:22 13:16
  16:12
**shorthand** 63:9
  63:22
**show** 10:2 15:7
  17:20 33:6
  54:3
**sight** 7:17
**signed** 54:8,9
  59:6
**signing** 4:6
**signs** 20:2 21:17
**similar** 9:16
**sir** 37:11 39:21
  59:8 60:3,5,10
  60:14,17,20,22
  61:3,7,12,16
**sister** 29:10
**sit** 54:22
**situation** 34:19
  36:15 58:20
**six** 27:14 28:16
**smoking** 34:2,12
  34:13,20,23
  35:2 46:13
**somebody** 42:2
**Somewhat** 56:7
**soon** 53:4
**sorry** 10:8 35:11
  44:16 47:3
  52:16
**sort** 37:22
**sounds** 20:15
**source** 9:15 33:4
  33:10
**speak** 5:3
**special** 29:13
  50:22,23
**specifically** 50:1
**spend** 31:7
  60:18

JR, A Minor                    July 24, 2007   Pike County Board of Education

Page 8

| | | | | |
|---|---|---|---|---|
| **spending** 31:11 31:14 | 42:20 43:1 47:9,10,13,19 | 52:16 54:2,7 55:19 57:3,8 | **telephone** 30:15 42:1 | **time** 3:15,16 7:20 8:12 |
| **spoke** 34:18 | 51:10,20,23 | 57:13,16,22 | **tell** 8:1 13:5 15:9 | 12:14,15,18 |
| **spoken** 56:8,11 56:12,12,13 | 52:9 55:18,20 55:23 | 58:6,13 59:3 61:17,23 62:5 | 19:12 22:4 24:14 25:12,17 | 14:23 15:3 23:14,15 29:1 |
| **sponsors** 31:16 | **student's** 54:14 | 62:8 | 33:7 40:23 | 33:21 37:10 |
| **spring** 44:5 45:4 45:7 | **study** 33:5,5 **submitted** 26:14 | **sworn** 5:3 **system** 7:16,22 | 44:23 45:14,20 45:23 46:13,17 | 41:20 47:13 58:14,17 60:18 |
| **stability** 38:12 38:21 | 59:5 **substance** 42:14 | 8:11 9:9,17 12:18,19 14:4 | **telling** 20:16 56:17 | **times** 60:19 **tip** 21:8 |
| **started** 52:21 | 44:11,23 | 48:4 53:4 | **tendered** 7:13 | **tired** 6:14,16 |
| **state** 24:22 25:5 25:8 48:16 | **sued** 61:8 **suggestion** 60:8 | **systems** 15:21 16:5 | **Tenders** 22:18 54:6 | **TMR** 1:6 **today** 54:22 |
| 63:4 | **Suite** 2:5 | | **term** 29:18 | **told** 9:5,8,9 14:8 |
| **statement** 33:8 | **summary** 27:3 | **T** | **TERRY** 1:16 | 14:13 21:12 |
| **statements** 37:4 | **superintendent** | **take** 23:15 34:22 | 3:10,22 4:9 5:1 | 34:2,6 36:10 |
| **STATES** 1:1 | 10:1 13:3 | 37:8 | 63:8 | 39:12 45:16,18 |
| **Statute** 3:19 4:2 | 14:18 17:13 | **taken** 1:16 3:10 | **testified** 5:4 | 46:2,3,9 |
| **stay** 27:13 28:7 | 18:2,5 26:15 | 3:11 47:6,13 | 41:16 | **top** 50:19 |
| 28:10 | **superintendents** | 63:8 | **testimony** 33:17 | **topic** 18:18,20 |
| **stick** 18:14 | 59:20 | **talk** 18:18 20:11 | 39:15 | 20:9 |
| **sticker** 23:1 | **supervise** 51:19 | 42:9 59:16 | **Thank** 59:1 | **totally** 18:4 |
| **stipulate** 11:18 | 51:22 | **talked** 11:15 | 61:17 | **touching** 30:9 |
| **stipulated** 3:8 | **supervision** | 12:15,16 13:12 | **thereto** 63:10 | **training** 18:8,11 |
| 3:20 4:4 | 63:11 | 13:19 16:12 | **thing** 17:11 | 18:12,15 19:7 |
| **stipulations** | **supposed** 21:8 | 42:10 45:2,3,3 | 41:13 | 19:21 20:17 |
| 1:19 3:6 | 50:20 | 45:4,7 56:18 | **things** 19:6 20:1 | 50:2,3,8,10 |
| **stopped** 53:1 | **sure** 19:4,6 | **talking** 9:12 | 20:10 30:5,6 | 56:4,5 61:22 |
| **straight** 50:10 | 20:19 24:17 | 20:18 36:9 | 31:16 33:2,15 | **transcript** 63:8 |
| **street** 1:19 2:5 | 25:1,19 42:13 | 44:14,18 | 52:5,19 | 63:12 |
| 5:12,14 | 45:6 47:3 48:1 | **taught** 28:6 | **think** 9:9 12:23 | **transported** |
| **stress** 6:18,20 | 52:4 | **teach** 27:11,21 | 13:3 17:4 24:2 | 47:11,16 |
| 7:11 | **Susan** 2:4 5:7 | **teacher** 20:10 | 24:21 29:7 | **transporting** |
| **stressed** 6:14,16 | 10:8 54:7 | 21:12 26:21 | 31:3,12,20 | 31:1 47:5,18 |
| **structured** | **suspect** 21:2 | 27:21 31:13 | 38:20 41:20 | **traveled** 52:5 |
| 20:16 | **suspected** 21:5 | 36:18 61:4 | 44:22 46:2 | **treatment** 7:3 |
| **student** 21:22 | **suspicious** 21:17 | **teachers** 10:1 | 47:12 48:14 | **trial** 4:1 |
| 24:1,2,19 37:5 | **Sweeney** 2:12 | 20:11,12 26:20 | 50:6,6 52:6 | **trip** 32:4,6 |
| 38:15 41:2,17 | 4:10 8:17 10:7 | 31:16 52:7,9 | 53:2 54:16 | **trips** 32:1,9 |
| 42:17 58:11 | 11:18 12:4 | **teaching** 28:5 | 55:3 56:16 | 40:15 |
| 59:10,17,23 | 17:16 23:15 | **team** 26:12 | **thinking** 44:17 | **Troy** 1:19 |
| 60:2,7,13 61:6 | 25:15,19,23 | **Teasing** 30:3 | **thought** 33:23 | **true** 57:21 63:12 |
| **students** 31:14 | 27:7 32:14,17 | **tech** 27:11 | 35:8 | **truth** 5:3,3,4 |
| 34:7,23 39:19 | 33:14 38:1,18 | **technicians** | **three** 24:14 28:8 | **try** 41:13 |
| 40:5,10,15,19 | 39:4 43:13 | 53:17 | 28:11 | **trying** 24:15 |

JR, A Minor                    July 24, 2007   Pike County Board of Education
Page 9

| | | | | |
|---|---|---|---|---|
| **turned** 41:2 | **waiving** 4:3 | **write** 17:9 49:21 | **2:06-CV-1120...** | **6** |
| **Twenty-five** | **walked** 52:1 | **writing** 48:22 | 1:10 | **61** 4:11 |
| 54:19 | **Wal-Mart** 56:16 | 63:11 | **2:15** 62:9 | **63** 4:12 |
| **two** 6:6 12:13 | **want** 11:21 45:5 | **written** 14:5 | **200** 5:14,15 | |
| **twofold** 50:6 | 51:5 | 17:6 20:21 | **2000** 11:15,23 | **7** |
| **T.G** 12:20 | **wanted** 33:5 | 37:4 62:3 | **2002** 11:19,20 | **7** 4:15 10:3,4,9 |
| **T.J** 12:20,22 | **Washington** 2:9 | **Wynn** 23:19 | 17:22 52:23 | 15:16 |
| | **wasn't** 48:5 | | **2003** 53:1 | **7/2000** 11:7,12 |
| **U** | **way** 30:11 36:4 | **Y** | **2004** 6:12,21 | |
| **Uhm** 27:23 | 38:13 40:13 | **Yeah** 20:19 | 28:17 39:16 | **8** |
| **Uh-huh** 22:11 | 41:21 | 45:16,22 46:21 | 40:3,7 60:6 | **8** 4:16 23:1,2 |
| 32:5 37:2 45:9 | **went** 19:23 | 52:12 | **2004-05** 54:14 | **80** 27:23 |
| 46:5,7 47:23 | 27:12,16,20 | **year** 6:11 25:4 | **2004-2005** 4:16 | **80's** 28:3 |
| 54:20 | 28:4,8,19 | 27:21,22 28:4 | 22:5,9,20 | **81** 27:10 |
| **understand** | 34:18 39:11 | 29:6 44:19 | 30:12 40:17 | |
| 21:21 30:12 | 50:18 56:17 | 46:18 54:13 | **2005** 6:7,8,21 | **9** |
| 31:8,18 | **weren't** 39:6,15 | 58:12 | 44:5 | **9** 4:17 26:5,6,22 |
| **understanding** | **West** 2:5 12:21 | **years** 6:6 7:23 | **2007** 1:17 62:10 | **9th** 29:6 |
| 29:21 32:3,16 | **we're** 22:9 | 12:13 27:14,14 | 63:10,18 | **90** 27:23 |
| 41:23 48:2,13 | **whatsoever** | 28:8,11,15,16 | **22nd** 17:21 | **90's** 28:1,3 |
| **understood** | 23:12 | **young** 42:1 | **23** 4:16 | **96** 11:23 |
| 30:20 | **White** 2:12 | | **24th** 1:17 62:10 | |
| **UNITED** 1:1 | **wife** 44:21 | **0** | 63:9 | |
| **unsigned** 59:6 | **window** 51:13 | **007** 17:20 | **25** 54:13,16 | |
| **update** 12:12 | **wise** 63:16 | **04** 7:14 28:21 | **26** 4:17 55:12,12 | |
| 25:4 | **witness** 4:5,6 5:2 | 34:4,4 41:4 | **260** 2:9 | |
| **upside** 11:4 | 5:11,23 6:17 | **04-05** 22:14 | | |
| **use** 21:2 | 16:9 22:8 24:4 | 23:23 24:16,23 | **3** | |
| | 27:9 28:2 54:3 | 25:6 38:17 | **3** 36:22 52:23,23 | |
| **V** | 63:13 | 58:12 | 52:23 | |
| **various** 58:22 | **witnessed** 40:11 | **05** 28:19 | **31st** 44:5 | |
| **vehicle** 31:2 | **words** 42:3 | | **35** 4:18 | |
| 39:19 40:10 | **work** 7:2 9:20 | **1** | **35203** 2:14 | |
| 47:5,16,19 | 29:22 | **10** 4:15,18 35:20 | **36010** 5:18 | |
| 51:10 | **worked** 6:23 | 36:2,22 | **36104** 2:5,9 | |
| **versus** 15:1 | 16:5 26:12,13 | **10th** 63:18 | | |
| **victim** 21:13,16 | 26:13 37:12 | **107** 1:18 | **4** | |
| **violated** 54:15 | 38:3 | **12:00** 1:20 | **4** 52:23 | |
| **vita** 16:2 | **working** 8:11 | **1726** 2:5 | | |
| **Voc** 27:11 | 35:9,11 | **1819** 2:13 | **5** | |
| **vocational** 8:9 | **workshop** 20:18 | **1981** 27:10 | **5** 4:10 15:15 | |
| 28:9 | **wouldn't** 12:1 | **1996** 11:3 | 52:23 | |
| **VS** 1:9 | 18:19,23 30:18 | **1997** 15:17 | **5th** 11:3 | |
| | 31:3 | | **522** 22:19 | |
| **W** | **wre** 35:7 | **2** | **561** 22:20 | |
| **waived** 3:23 4:7 | | **2nd** 2:5 | **59** 4:10 | |

EXHIBIT 11

# AFFIDAVIT OF
## WALTER L. PYRON

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Walter L. Pyron, who being by me first duly sworn, deposes and says as follows:

My name is Walter L. Pyron. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I was the interim principal at Pike County High School for six months from January 3, 2005 when Terry Casey resigned through June of 2005. I was hired as an interim principal. I have been sued in my professional and individual capacities. The complaint in this lawsuit says J.R. was sexually abused by the band director Charles Coon during the 2004-2005 school year.

I did not employ Charles Coon. I did not write the sexual harassment and abuse policy of the Pike County High School. But I was committed to enforcing the policy. I did talk with the faculty on occasions about sexual abuse, and I did tell the faculty to inform an administrator immediately if they had any suspicions. The "no tolerance policy" of Pike County is in the Code of Conduct. Ala. Code § 26-14-3 mandates reporting child abuse to law enforcement officials for investigation. (Appendix A) It is a misdemeanor not to report. If a report of suspected sexual abuse were made to a teacher, the teacher would report it to the counselor or principal. The counselor would report the complaint to me and I would call DHR or law enforcement officials.

1/1677339.1

When I started serving as interim principal on January 3, 2005, I did not know Charles Coon or know anything about him. He was simply the band director.

Soon after I assumed my position at Pike County High School, a parent complained about a grade Charles Coon had given her son – an F in band. Robert McDaniel, assistant principal, talked with the parent. During the discussion, the parent said that Charles Coon had been smoking on campus. When Mr. McDaniel brought this fact to my attention, I called Charles Coon in and told him I would not tolerate smoking on campus.

This episode over a grade involving band and a band student involved criticism of Charles Coon by a mad parent, but nothing was said or suggested that this band parent or band student had any concerns about Charles Coon's conduct with students.

In April of 2005, Superintendent Mark Bazzell asked me to investigate a complaint about Charles Coon. Superintendent Bazzell had received a report that Charles Coon had been smoking, possibly marijuana with students in his car. The report also referenced that Charles Coon had a butt buddy.

Prior to that time, I had not seen Charles Coon transporting students in his car, and did not know if he had or had not been doing so. But the information Superintendent Bazzell received was that Charles Coon was smoking in his vehicle in the presence of students. Dr. Bazzell had the names of six or seven students. He asked me to question the students about Charles Coon – about smoking, about smoking marijuana, and to see if there was anything about his conduct with students that might be of further concern.

Charles Coon was put on administrative leave by Dr. Bazzell as soon as the complaint came in. So Charles Coon was not at the school when I questioned the students.

I talked to each of the students who we thought might have information.  I asked questions like 'have you seen Charles Coon smoke?; have you heard that Charles Coon smokes things other than cigarettes?; what do you think of Charles Coon?' how is he with students?'

One student responded that Charles Coon had his favorites – his butt buddy.  But the student said this in the context that Charles Coon had his favorites –in my terminology, teacher's pet.  I sensed nothing in the context of that conversation or my discussion with any of the other students that sexual misconduct was going on.  Dr. Bazzell had me cued to be sensitive to the implications of whatever the students said or suggested.

After over 29 years in education, any suggestion of sexual misconduct by or about Charles Coon would have registered with me.  And I can assure the Court I had no private or personal loyalty to Charles Coon. I did not know him.  If I had picked up any suspicion, I would have reported it to Dr. Bazzell and seen to it that Charles Coon did not come back to Pike County High School.  I would have reported any suspicion of abuse to law enforcement officials as required by Ala. Code § 24-14-3.

A student that I talked to as part of this investigation did say Charles Coon smoked cigarettes with students.  And at least one student said he saw Charles Coon driving students in his vehicle during the school day.  As the students were sharing this information, I felt they were being truthful and felt comfortable that they were that they were sharing the truth of the extent they had information.  Yet none said anything about Charles Coon's abusing students or anything about 'suggestive' activities or comments by Charles Coon.

I reported the results of my investigation to Dr. Bazzell.  We decided that the evidence warranted reprimanding Charles Coon for violating the no smoking on campus policy and for driving students in his vehicle.  There being no facts or suggestion of any other

misconduct, we felt that there was no basis to sustain a recommendation for termination. This was Charles Coon's third year with Pike County. He was a probationary employee, which meant we would decide during the remaining two months of the 2004-2005 school year whether to nonrenew Charles Coon as an employee.

After our investigation, Dr. Bazzell met with Charles Coon and I met with Charles Coon. We told Charles Coon we would not tolerate further violation of the no smoking policy, and he was not to drive students in his vehicle. Charles Coon assured us he would do as we asked.

Charles Coon decided in May to submit his resignation as band director and retire. The Board accepted his resignation, as I recall, at the May 2005 Board meeting. When that happened, we still had no knowledge or suspicion that Charles Coon had abused any student.

The chronology of what happened regarding Charles Coon during the six months I was principal seems important:

| January 3, 2005 | I became interim principal. |
|---|---|
| January 2005 | A complaint is made by a parent concerning a grade in Charles Coon's band class. |
| | The student is in the school band and a student in Charles Coon's band class. |
| | Parent mad and critical of Charles Coon. But no criticism or suggestion made by parent indicating inappropriate relationship with students. |
| | Only complaint other than grade: smoking on campus. |
| April 4, 2005 | Dr. Bazzell asked me to investigate a report that Charles Coon was smoking with students and to see if there was any significance to the reference "butt buddy." |

Investigation went forward immediately. Charles Coon was reprimanded for smoking and told not to drive students in his personal vehicle.

No information from any student that Charles Coon was abusing students or information creating suspicion about such a possibility.

May 2005      Charles Coon resigns his employment.

<u>No evidence from any source that Charles Coon had sexually abused a student.</u>

July 2005      Charles Coon arrested and charged with sexual misconduct.

Charles Coon had retired: no longer an employee of the Pike County Board of Education.

During this five month period – January 2005 to May 2005 – while Charles Coon was an employee and while I was interim principal, no one brought anything to my attention – not one thing – indicating or even raising a suspicion in my mind that Charles Coon was sexually molesting student J.R. I investigated complaints that were brought to my attention. I reprimanded Charles Coon based on facts that were developed. I had no reason to be indifferent to complaints about Charles Coon and I was not. I did not know Charles Coon other than he was an employee. As an employee, I reprimanded him without hesitation. If I had any information from any source that Charles Coon was sexually abusing a student, I would have brought in DHR and the law officials.

When Dr. Bazzell and I were investigating Charles Coon in April of 2005, I knew Dr. Bazzell was communicating with the law enforcement people. I knew Dr. Bazzell was sharing the information we found with the Brundidge Police Department.

We did not ignore our responsibility. I questioned the students as conscientiously as I possibly could. I may not be a forensic expert as I was asked in my deposition, but after 29

years of being a professional educator, I have a lot of experience dealing with and questioning students. Dr. Bazzell let me know when he discussed the information he was given in April that I was to investigate this information earnestly and carefully. I did.

I am being sued in this case as an individual, as well as in my professional capacity. I am being sued by J.R. and his parents.

But I want the Court to know that at no time during the six months I was interim principal at Pike County High School did anyone share any facts or give me any suggestion or share any suspicion that Charles Coon was sexually abusing J.R. or any student.

Most importantly to me as I react to this lawsuit against me individually is this: in our investigation of Charles Coon, the name of J.R. never came up. No student, no parent, no information from anyone put us on notice about J.R. Smoking: yes. Driving with students: yes. But no mention or reference to J.R.

If anyone had given me any information of any type suggesting any sexual "grooming" or misconduct about Charles Coon, I can assure the Court I would have used every resource available to determine if that was happening.

I am attaching as Appendix B to my affidavit the policies of the Pike County School System regarding sexual abuse and sexual harassment.

I am also attaching Ala. Code § 26-14-3 and § 26-14-13 (Appendix A) which mandates reporting of suspected child abuse and makes it a misdemeanor not to do so.

Policies and mandatory legal obligations are important, of course. But professional standards and professional integrity are just as important. I have lived a professional career without blemish of professional misconduct. To be attacked in this lawsuit that I might have been indifferent or insensitive to sexual abuse by an employee under my

supervision is an outrageous attack. If Charles Coon sexually abused J.R., he engaged in the most depraved and disgusting conduct I can imagine for a professional educator. If we had been given any information of that possibility, I would have shared it with law enforcement officials just as we shared what we did find. That would have been my legal and moral duty. We had nothing. We worked with the law enforcement people. Dr. Bazzell shared with the Brundidge Police Department what we found.

My professional standards and my respect for the standards of professional education were a lot more important to me than Charles Coon. I did not and would not be indifferent or insensitive to the type of misconduct he has gone to jail for doing.


_____
Walter L. Pyron

Sworn to and subscribed before me this the _7_ day of March, 2008.


_____
Notary Public

My Commission expires: _1/19/10_____
(Seal)

# APPENDIX A

<u>Section 26-14-3</u>

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

**Penalty for failure to make required report.**

Any person who shall knowingly fail to make the report required by this chapter shall be guilty of a misdemeanor and shall be punished by a sentence of not more than six months' imprisonment or a fine of not more than $500.00.

*(Acts 1965, No. 563, p. 1049, §5; Acts 1975, No. 1124, p. 2213, §1.)*

# APPENDIX B

### Pike County Board of Education
### Prohibiting Harassment Policy

**I.    General Statement of Policy**

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation. This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0117

## II.     Definitions

### A.     Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1.     a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2.     the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to

- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical conduct such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0118

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office of the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation. The student will then be informed that he/she has three (3) choices:

1. The student may converse by phone with his/her parent or guardian.

2. The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3. The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect. If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services. The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0124

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:    U.S. Const. Amend. IV; U.S. Const. Amend.
               XIV1; Moore v. Student Affairs Committee of
               Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
               1970); Note from Moore:  "It is settled that
               Fourth Amendment does not prohibit reasonable
               searches when the search is conducted by a
               superior charged with the responsibility of
               maintaining discipline or of maintaining
               security ..."; New Jersey v. T.L.O.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0125

FILE: JCAC
(continued)

1.  The educator should immediately notify the
    principal.

2.  The principal/educator should consult with the
    school nurse and counselor.

Human Resource caseworkers will proceed to investigate
the reported case.  If the investigation is to begin at the
school, the Human Resource caseworker will report to the
school office and identify himself/herself to the principal or
designated representative. Child abuse/neglect investigations
are highly confidential, and the student's rights to privacy
must be respected.  Only those persons necessary to conduct
the investigation should be present in any interview.  After
an evaluation/intervention has been made, the caseworker will
provide feedback to the principal and arrange monitoring pro-
cedures as needed.  Educators will report further incidents of
abuse/neglect regarding that child to the assigned caseworker.

### Special Information Regarding Neglect Cases:

1.  Teachers should document and date <u>specific</u> instances
    or examples of neglect.
    Ex: On Wednesday, January 14, 1988, John Doe came
    to school with no coat, wearing unclean clothes and
    shoes with large holes.

2.  Keep a running account of the above examples over a
    period of time.

3.  Contact the parents and express concern over the
    neglect and make suggestions as to how they can
    help or seek help by calling Child Welfare at Human
    Resource.

### Right to Privacy Considerations:

1.  A student's school record continues to be protected
    by the terms of the Family Rights and Privacy Act
    and the policies of the Board.  The School System
    needs a parental release form, court order or other
    legal document which gives school personnel the
    permission to release information in school records
    to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0126

FILE:JCAC
(continued)

2.  In return, Human Resource personnel should share
    needed information with school officials.  The
    school principal or counselor could be designated
    as a <u>confidential</u> person to receive this information
    and use it in the best interest of the student.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0127**

EXHIBIT 12

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                    CASE NO.:

                                 2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

         * * * * * * * * * *

     DEPOSITION OF WALTER (BUDDY) PYRON, taken before

Mary Moore-Wynn, as Commissioner, on the 25th of July,

2007, in the offices of Pike County Board of Education,

107 Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 9:30 a.m.


        * * * * * * * * *

JR, A Minor                    July 25, 2007  Pike County Board of Education

|  | Page 2 |
|---|---|
| 1 |  |
| 2 | * * * * * * * * * * |
| 3 | APPEARANCES: |
| 4 | FOR THE PLAINTIFF: |
| 5 | Hon. Susan DePaola |
|  | Attorney at Law |
| 6 | 1726 West 2nd Street, Suite B |
|  | Montgomery, Alabama 36105 |
| 7 |  |
| 8 | and |
| 9 | Hon. Deanie Allen |
|  | Azar and Azar |
| 10 | 260 Washington Avenue |
|  | Montgomery, Alabama 36104 |
| 11 |  |
| 12 | FOR THE DEFENDANT: |
| 13 | Hon. Donald R. Sweeney |
|  | Bradley, Arant, Rose & White |
| 14 | One Federal Place |
|  | 1819 Fifth Avenue North |
| 15 | Birmingham, Alabama 35203 |
| 16 |  |
| 17 | ALSO PRESENT: |
| 18 | Dr. Mark Bazzell, Superintendent |
| 19 | Ms. Elizabeth Reed |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |

|  | Page 4 |
|---|---|
| 1 | introduced at the trial of this case or used in any |
| 2 | other manner by either party hereto provided by the |
| 3 | Statute, regardless of the waiving of the filing of |
| 4 | same. |
| 5 | It is further stipulated and agreed by and |
| 6 | between counsel and the witness that the reading |
| 7 | and signing of the deposition by the witness is |
| 8 | hereby waived. |
| 9 |  |
| 10 | INDEX |
| 11 | WALTER (BUDDY) PYRON |
| 12 | Examination By Ms. DePaola          5 |
|  | Examination By Mr. Sweeney         68 |
| 13 | Further Examination By Ms. DePaola      72 |
| 14 | Reporter's Certificate      74 |
| 15 | INDEX OF EXHIBITS |
| 16 | Exhibit Number    Description    Page Number |
| 17 | Plaintiff's Exhibit 16  Typed Version of    50 |
|  | Dr. Bazzell's Notes Regarding |
| 18 | Buddy Pyron's Interview of |
|  | Students |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 | * * * * * * * * * |
| 23 |  |

|  | Page 3 |
|---|---|
| 1 | * * * * * * * * * * |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 |  |
| 6 | STIPULATIONS |
| 7 |  |
| 8 | It is hereby stipulated and agreed by and between |
| 9 | counsel representing the parties that the deposition of |
| 10 | WALTER (BUDDY) PYRON is taken pursuant to the Federal |
| 11 | Rules of Civil Procedure, and that said deposition may |
| 12 | be taken before Mary Moore-Wynn, CSR, as Commissioner, |
| 13 | without the formality of a commission; that objections |
| 14 | to questions, other than objections as to the form of |
| 15 | the questions, need not be made at this time, but may |
| 16 | be reserved for a ruling at such time as the deposition |
| 17 | may be offered into evidence, or used for any other |
| 18 | purpose by either party hereto, provided by the |
| 19 | Statute. |
| 20 | It is further stipulated and agreed by and between |
| 21 | counsel representing the parties in this case, that the |
| 22 | filing of the deposition of WALTER (BUDDY) PYRON is |
| 23 | hereby waived, and that said deposition may be |

|  | Page 5 |
|---|---|
| 1 | WALTER (BUDDY) PYRON |
| 2 | (Whereupon, the witness, after having first been |
| 3 | duly sworn to speak the truth, the whole truth, and |
| 4 | nothing but the truth, testified as follows:) |
| 5 | EXAMINATION |
| 6 | BY MS. DePAOLA |
| 7 | Q  I am Susan DePaola.  If you can't hear me, let me |
| 8 |     know? |
| 9 | A  I hear you. |
| 10 | Q  What is your street address? |
| 11 | A  1105 East Hart, H-A-R-T, Avenue, Opp, Alabama, |
| 12 |    36467. |
| 13 | Q  Where are you currently employed? |
| 14 | A  Well, I am independent consultant.  I am a retired |
| 15 |    educator, 33 years.  But I am a consultant. |
| 16 | Q  What kind of consulting work do you do? |
| 17 | A  Education consultant. |
| 18 | Q  Where -- |
| 19 | A  School improvement. |
| 20 | Q  Okay.  Are you currently consulting anywhere? |
| 21 | A  Well, the contracts have not been renewed at this |
| 22 |    time, but at Lee County and in Bullock County the |
| 23 |    past year. |

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
              Court Reporting Services

JR, A Minor                          July 25, 2007  Pike County Board of Education

---

Page 6

1  **Q   What kind of consulting --**
2  A   For school improvement. I mentor principals.
3      Work with teachers. Curriculum. Overall school.
4      It might be in activities, discipline. You know,
5      just anything that could improve the school.
6          And the main purpose why I was hired is
7      because of the AYP.
8  **Q   Annual yearly progress?**
9  A   Annual yearly progress. That and the fact that if
10     they show two years of not passing AYP or have
11     deficiencies, then they have to show school
12     improvement. And I am one of the people that
13     helps with that case.
14         So, teaching, instruction, finding out what
15     the problems are. Why they are not meeting the
16     requirement.
17 **Q   Okay. And could you give me your educational**
18     **employment history?**
19 A   Well, yes, ma'am. I was with the Opp City schools
20     for 29 years. And in that, I was eight years as a
21     math teacher, assistant principal, and principal
22     for 14 years. Assistant principal for seven
23     years. Fourteen years as principal.

---

Page 7

1      I worked two years for the Eufaula City
2      schools as principal for Eufaula High School. And
3      then I retired. For a total of 33 years. I
4      retired.
5  **Q   Okay. I missed two years in there.**
6  A   No, ma'am, they gave me retirement for attendance.
7      You know, you have attendance in the school
8      system.
9  **Q   But you were also employed by Pike County. I**
10     **didn't hear --**
11 A   Yes, ma'am. After that, after I retired, I was
12     employed as an interim principal. And that was
13     from the latter part of December through June --
14     December '04 to June '05.
15 **Q   Okay. So, you had no prior employment in Pike**
16     **County other than that?**
17 A   No, ma'am.
18 **Q   What's your understanding why they needed an**
19     **interim principal?**
20 A   Well, Dr. Bazzell called me and told me that he
21     needed an interim. And I came up and --
22 **Q   Did he tell you why?**
23 A   Didn't tell me why. He just said that Mr. Casey

---

Page 8

1      was leaving. And I came up and talked to him,
2      talked to Mr. Casey. And decided that I could do
3      that.
4  **Q   Okay. When you came here, did you understand any**
5      **portion of your responsibilities to be writing**
6      **policies and procedures for the school level?**
7  A   Ma'am, I came as an interim principal, which would
8      contain all the duties of principal. Principals
9      don't write policy. School boards write policy.
10 **Q   So, your understanding was that you had no**
11     **responsibility for writing any policies or**
12     **procedures?**
13 A   Correct. Responsibility other than policy at the
14     high school level. What I am saying, in the
15     standards of how we are going to doing things
16     procedure wise. For instance -- let me clarify
17     what I am saying. Not writing policy for the
18     whole school, but writing policy which collecting
19     attendance, how we do the administrative things as
20     every day-to-day run of the school. That's what I
21     meant as far as policy, not legalized policy.
22 **Q   Were you responsible for writing the school's**
23     **policies and procedures with respect to sexual**

---

Page 9

1      **abuse complaints?**
2  A   No, no, ma'am.
3  **Q   And so I take it you didn't any new --**
4  A   Those kind of policies, yes, ma'am.
5  **Q   Let me finish my question: So, you didn't write**
6      **any policies or procedures relating to sexual**
7      **abuse complaints?**
8  A   No, ma'am.
9  **Q   Where was the policy or procedure with respect to**
10     **sexual abuse complaints; how to handle them; how**
11     **to investigate them, what they were?**
12 A   Well, there is policy in the Code of Conduct. And
13     teacher -- I meant, student handbook in reference
14     to sexual abuse or harassment.
15 **Q   Okay. The Code of Conduct being the offenses that**
16     **were applicable to students?**
17 A   Yes.
18 **Q   I mean, one student should not harass another**
19     **student?**
20 A   One student or an adult -- or employee.
21 **Q   So, you say the Code of Conduct contained the**
22     **policies and procedures?**
23 A   It tells you that -- how -- what -- it, first of

---

Mary Moore-Wynn, CSR Mary Moore-Wynn         (334)244-0203
         Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 10

1   all, defines it.
2   Q   Okay.
3   A   And then it says that -- what you're to do, as far
4       as if you are abused or harassed.
5   Q   Are you familiar with it saying "sexual abuse" in
6       any place in that policy?
7   A   I would have to look at the policy right now,
8       because that's been more than two years.
9   Q   And you're -- are you talking about --
10  A   Pike County Code of Conduct.
11  Q   The Pike County Code of Conduct. I was finding it
12      here. I've got a list. Let me show you
13      Plaintiff's Exhibit 2. We have been informed that
14      that was the Code of Conduct for 2004. Is that
15      the document you are referring to?
16  A   Well, it's revised for 2003. So, for 04-05, I
17      would think it would be.
18      May I (indicating)?
19  Q   Sure.
20  A   It talks about, Number 11 here, sexual harassment,
21      verbal or physical conduct of sexual nature
22      imposed on the basis of sex by student or agent.
23      (inaudible). That's what I was referring to,

Page 11

1   ma'am.
2   Q   Is that your sexual-abuse policy?
3   A   That's the -- that's the policy that is in the
4       hand -- in the Code of Conduct that we had to go
5       by, yes, ma'am.
6   Q   Is that what you used as a sexual-abuse policy?
7   A   Yes, ma'am, as far as reference to sexual abuse.
8       Here, also, it states that the parents of all
9       students involved in sexual-harassment issues
10      shall be notified in all cases. Law enforcement
11      will be summoned, dah dah dah dah dah.
12      So, it tells you what you're to do as far as
13      policy.
14  Q   Okay. Just tell me what page you're referring to.
15  A   Eleven and 12.
16  Q   Okay. Thank you. Let me take a look.
17  A   Let me put it back together for you.
18      MR. SWEENEY: That's Plaintiff's Exhibit
19      what?
20      MS. DePAOLA: Two.
21  Q   All right. Anything -- any other sexual abuse
22      policy in any -- you mentioned the student
23      handbook. And let me just represent to you that

Page 12

1   the only student handbook that we have been
2   provided is Plaintiff's Exhibit 4. Is that the
3   document you're referring to?
4   A   Not this color one -- yes, ma'am. Hold on. Let
5       me look at it.
6       No, ma'am, this is -- this is not -- this is
7       the planner. I was referring to, when I said
8       handbook, the rules and regulations. And that's
9       not in here.
10      MS. DePAOLA: Mr. Sweeney, is there any
11      other -- can you tell me what
12      document he's talking about?
13      MR. SWEENEY: Huh-huh. I can't. I will
14      have to find out what he's talking
15      about.
16  A   And it may be referring to that same thing that
17      brings out those in there, ma'am.
18  Q   This (indicating)?
19  A   Yes, ma'am. And referring to those as going
20      over -- I recall -- this is all the discipline
21      plans. I'm talking about --
22      MR. SWEENEY: Let's go off the Record.
23      (Brief off the Record discussion.)

Page 13

1   BY MS. DePAOLA
2   Q   Can we go back on the Record and determine whether
3       or not there is an additional handbook that hasn't
4       been produced?
5   A   I can't say there is another handbook. That's all
6       I know. So -- but it was -- I remember one being
7       that color.
8   Q   Purple?
9   A   Yes, ma'am.
10  Q   Like this one?
11  A   Yes, ma'am.
12  Q   Which we have marked as Plaintiff's Exhibit 4?
13  A   Yes, ma'am.
14  Q   So, you've identified in the Code of Student
15      Conduct the sections relating to sexual abuse that
16      you are familiar with?
17  A   Yes, ma'am.
18  Q   Did you make any revisions to this Code of Student
19      Conduct?
20  A   No, ma'am.
21  Q   Did you have any responsibility to do so?
22  A   No, ma'am.
23  Q   Now, you also looked at what we've identified --

4  (Pages 10 to 13)

JR, A Minor                    July 25, 2007  Pike County Board of Education

---

## Page 14

1 we called it a student handbook or planner. Is
2 there anything in this about policies and
3 procedures relating to sexual abuse?
4 A  I didn't see anything.  No.
5 Q  Would it have been your responsibility to put
6 anything in this student handbook that you felt
7 was relevant to sexual abuse?
8 A  No, ma'am.  The handbook was published prior to me
9 coming, and I didn't amend anything to it.
10 Q  Did you have authority to amend it?
11 A  No, ma'am, without -- approval of the
12 Superintendent or the Board.
13 Q  All right.  With approval -- so, your testimony is
14 that this handbook, what you put in it had to be
15 approved by the Superintendent and the Board?
16 A  Yes, ma'am.
17 Q  Did you review when you arrived the faculty
18 handbook?
19 A  Yes, ma'am.
20 Q  Is there anything in that that you're familiar
21 with that relates to sexual abuse?
22 A  No, ma'am.  I did not see anything in reference to
23 that other than what was in the Code.

---

## Page 15

1 Q  Okay.  In your capacity as principal -- and I
2 understand you started late --
3 A  Yes, ma'am.
4 Q  -- but in your capacity as principal, did you have
5 authority to include in the Pike County faculty
6 handbook any policies and procedures you thought
7 were necessary relating to sexual abuse?
8 A  No, ma'am.
9 Q  You didn't have that authority?
10 A  Not unless I approved it through the school Board.
11 Q  So, it's your testimony as to the handbook and
12 student handbook, Plaintiff's Exhibits 4 and 8,
13 any amendments you made --
14 A  Yes, ma'am.
15 Q  -- had to be approved through the -- let me finish
16 yes -- Superintendent and the Board?
17 A  Yes, ma'am.
18 Q  Now, I understand that you would not have had any
19 responsibility with respect to the hiring of
20 Charles Coon?
21 A  That is correct.
22 Q  Now, as principal, did you have responsibility for
23 training of faculty and issues relating to sexual

---

## Page 16

1 abuse?
2 A  No, ma'am.  I did -- no, ma'am, other than what
3 was in the Code and having them go by the Code.
4 No, ma'am.
5 Q  I don't mean what did you do.  The question is:
6 Did you have responsibility to provide training?
7 A  I don't -- no, ma'am.
8 Q  Whose responsibility was that?
9 A  If they were to have -- being an interim, if they
10 were to have had that, it would be in the
11 professional development plan for the year.
12 Q  Well, whose responsibility was it to make sure
13 they received this training, if anyone felt it was
14 necessary?
15 A  Any particular person, you mean, or --
16 Q  Yeah, I mean --
17 A  Well, the principal and the Superintendent work
18 together in developing that plan.
19 Q  So, it was part of the principal's responsibility
20 and the Superintendent's to determine what
21 training was necessary for teachers?
22 A  Yes, ma'am.
23 Q  And during your tenure as principal, did you

---

## Page 17

1 provide any training to faculty members relating
2 to the issues of sexual abuse?
3    MR. SWEENEY:  At Pike County High
4    School?
5    MS. DePAOLA:  Yes, sir.
6 A  No, ma'am, other than covering the Code of
7 Conduct -- what we have looked at.
8 Q  And what was the training that you provided with
9 respect to covering the Code of Conduct?
10 A  Going over it and the procedures that you do in
11 reference to abuse or harassment.
12 Q  What exactly were the procedures that were
13 outlined in the Code of Conduct to do if there was
14 harassment?
15 A  Well, first of all, if the teacher recognized --
16 Q  I'm sorry.  I'm interested what's in there.
17 A  Oh, okay.
18    MR. SWEENEY:  So, you're asking what the
19    policy is, not what he did in
20    instructing the teachers?
21    MS. DePAOLA:  Right.  Right.
22 A  You're asking me -- say that again.
23 Q  What procedures were in this document that relate

---

Mary Moore-Wynn, CSR Mary Moore-Wynn          (334)244-0203
          Court Reporting Services

Page 18

1   to the manner of investigation of complaints of
2   sexual abuse, what procedures were there?
3         MR. SWEENEY: Object to the form.
4   A  Okay.  Law enforcement would be summoned by the
5   school in substantiated cases of sexual
6   harassment, in cases where students and parents
7   wish to file criminal complaints.  And in cases
8   where a pattern or unsubstantiated complaints have
9   been made concerning the individual student.  And,
10  of course, if I had been notified, I would have
11  notified the Superintendent.  And --
12  Q  I'm asking what was in there.
13  A  It's not -- not that I would, as an administrator,
14  notify, no, ma'am.
15  Q  And the only other procedure I see in there is
16  that the parents will be notified; is that
17  correct?
18  A  Yes, ma'am.
19  Q  Okay.  Thank you.  Now, did you independently
20  develop and disseminate some kind of procedure?
21  A  No, ma'am.
22  Q  Okay.  Because it sounded like you wanted to tell
23  me about a procedure that's not in this handbook.

Page 19

1   A  Well, prior to that, I'm saying about what I would
2   do?
3   Q  What did you tell the people --
4   A  No.  Other than what's in the handbook.
5   Q  What did you tell the faculty to do that's not in
6   the handbook?
7   A  Again, I would have to say that I was -- my
8   experience.
9   Q  I'm asking what you did.
10  A  I'm saying things I shouldn't, because of the fact
11  that my experience is from what I have done in the
12  past.  And I would not relate to that --
13  Q  And I didn't --
14  A  -- because it's not in the handbook.
15        MR. SWEENEY: Her question is: What did
16        you tell the faculty: Did you
17        answer that?
18  A  Well, yes --
19  Q  At Pike County High School.
20  A  Ma'am?
21  Q  At Pike County High School.
22  A  That obviously, they would be -- inform the
23  office, inform the administrator if they think or

Page 20

1   recognize any sexual abuse or harassment.  Not
2   just sexual -- but harassment, itself.
3   Q  Okay.  Anything else?
4   A  Ma'am?
5   Q  Is that it?
6   A  Yes, ma'am.
7   Q  Okay.  Let me ask you this:  Do you have any
8   training in recognizing sexual abuse?
9   A  Other than -- no, what I would say, certified
10  training, no, ma'am.  Other than my professional
11  classes that I have been in.  And --
12  Q  What professional classes are you referring to?
13  A  For a teacher or administrator.
14  Q  Okay.  Let's back up.  What is your
15  professional -- or your educational background?
16  A  I'm sorry.  Well, I have a BS degree in math.
17  Q  Okay.
18  A  And I have a Master's in Administration.  And a
19  double A in mathematics.
20  Q  Okay.  All right.  Now, in your receiving your
21  Bachelor's in mathematics, did you get any
22  training in recognizing and investigating sexual
23  abuse complaints?

Page 21

1   A  Not precisely.  Not other than what was discussed
2   or brought about in certain cases when you go
3   through an administration degree.
4   Q  So, you're saying during the Master's program or
5   the double A program, it may have been touched on?
6   A  It may have been touched on.  No certified
7   training, no, ma'am.
8   Q  Do you recall what you were educated to look for
9   in recognizing sexual abuse?
10  A  I would -- I would say -- I can give you symptoms.
11  As far as actual things, no, ma'am.
12  Q  Symptoms that the child might exhibit?
13  A  Yes, ma'am.
14  Q  What are those?
15  A  I would say low self-esteem.  Physical abuse.
16  Q  You mean, like bruises and stuff?
17  A  Yes, ma'am.  Lonely.  Loneliness, as far as being
18  by their self, or herself.  Those type things.
19  And I can't think of any others right now.
20  Q  Did you learn any signals that you might look for
21  that an educator was a sexual predator, signs
22  or --
23  A  No, ma'am.  I don't recall.

JR, A Minor                July 25, 2007    Pike County Board of Education

Page 22

1  Q   All right. Did you ever read any statistics on
2       the incidence of sexual abuse amongst disabled
3       students as opposed to regular education students?
4  A   What precisely are you talking -- what --
5  Q   Do you have any education that led you to
6       understand that students with disabilities, such
7       as mental retardation, had an increased risk of
8       sexual abuse as opposed to children in regular
9       education?
10 A   I don't recall reading anything to that.
11 Q   So, you don't know that?
12 A   No, ma'am.
13 Q   All right. And in implementing the policies and
14      procedures you implemented at Pike County High
15      School and in conducting investigations, did you
16      make any special efforts or any changes in your
17      routine as it relates to special education
18      students when sexual abuse issues arose?
19 A   We didn't have any, ma'am. I don't know of any.
20 Q   No difference in your policies, procedure?
21 A   No, ma'am. No, ma'am.
22 Q   Now, who in your -- I guess who in your school was
23      responsible for investigating sexual abuse

Page 23

1       complaints?
2  A   You're talking about Pike County or any school?
3  Q   No. Pike County High School.
4  A   Well, first of all, the person that it comes to
5       would ask questions or relay it --
6  Q   You mean, the teacher?
7  A   Yes, ma'am. If it came to a teacher, they would
8       certainly investigate and ask some questions to
9       validate or whatever. And then bring it to their
10      superior, which would, of course, be
11      administration, and/or guidance. And the overall
12      investigation would rest with administration.
13 Q   The principal?
14 A   Yes, ma'am.
15 Q   Was there anybody in Pike County High School that
16      had any forensic interview skills that you are
17      aware of?
18         MR. SWEENEY: Object to the form.
19         THE WITNESS: I'm sorry?
20         MR. SWEENEY: You can answer.
21 A   Not that I am aware of.
22 Q   Anyone who had any training in forensic
23      investigation?

Page 24

1  A   Not that I am aware of.
2  Q   Did you have any such training or skills?
3  A   As far as -- no, ma'am. Other than just
4       investigating.
5  Q   Well, I mean, did you have any special training in
6       interviewing victims of crime?
7  A   No special training. Experience.
8  Q   You don't hold yourself out to be an expert --
9  A   No, ma'am, I am not.
10 Q   -- in forensic interviewing?
11 A   No, ma'am.
12 Q   Did you ever receive from the Pike County Board of
13      Education or Dr. Bazzell any written policy or
14      procedure to use in investigating sexual abuse
15      complaints?
16 A   Sexual abuse?
17 Q   Yes, sir.
18 A   No, ma'am.
19 Q   Okay. Now, let's go back to when you arrived. Do
20      you recall when you might have arrived at Pike
21      County High School?
22 A   Yes, ma'am.
23 Q   When was it?

Page 25

1  A   The latter part of December. I call it the
2       transition period for Mr. Casey. I remember,
3       semester tests, the last -- December 10th.
4       December 10th.
5  Q   December 10th. Okay?
6  A   And I was there in the capacity of just observing
7       and transition.
8  Q   And when did you actually become the principal?
9  A   January 3rd. The first week of January.
10 Q   All right. First of all, did you know Charles
11      Coon anywhere else --
12 A   No, ma'am.
13 Q   -- before you encountered him at Pike County High
14      School?
15 A   No, ma'am.
16 Q   Are you, as we sit here today, aware of any other
17      school systems in which he was employed?
18 A   Well, not -- I do -- say that again, please.
19 Q   Are you aware of any other school systems in which
20      he was employed?
21 A   I was told. He actually told me where he was
22      employed previously.
23 Q   Have you been informed that there were any

7 (Pages 22 to 25)

Page 26

1   allegations of sexual improprieties at any other
2   school where he ever worked?
3  A   No, ma'am.
4  Q   Tell me what your first contact was with Mr. Coon?
5  A   As a teacher in January. Just as --
6  Q   I mean, did you call him in your office and say,
7   let's have a talk or --
8  A   Oh, no, ma'am. You're talking about individual?
9  Q   Yes.
10  A   No, ma'am. There was an incident in reference to
11   a grade of a student. And the --
12  Q   Tell me about that.
13  A   There was a complaint that the grade was lower
14   than it should have been. And I consulted him
15   about the grade. And asked him why he gave a
16   child such a grade. And if I remember, he said it
17   was because he did not turn something in. And I
18   said, can you validate that? I remember --
19  Q   Did you talk to the complaining party?
20  A   No, ma'am, I don't remember talking to the
21   complaining party.
22  Q   Do you know if Mr. McDaniel spoke with the
23   complaining party?

Page 27

1  A   I think so. He brought it to my attention.
2  Q   Tell me everything Mr. McDaniel told you about
3   that complaint?
4  A   Is that Mr. Coon was accused of giving an F to the
5   child. And the mother was complaining about it.
6   And --
7  Q   Who was this mother?
8  A   You know, ma'am, I can't --
9  Q   Was it Polly King?
10  A   Possibly. I can't tell you exactly.
11  Q   All right. Did he tell you anything else that
12   Polly King said about Mr. Coon?
13  A   That he might have been smoking, I think.
14  Q   With other students or -- with students or what?
15  A   I'm not -- I cannot recall.
16  Q   But alls you recall is smoking?
17  A   Yes, ma'am.
18  Q   Anything else that she said to you -- I'm sorry --
19   that was reported to you?
20  A   Well, that's why I investigated, because she was
21   upset. Mr. McDaniel related she was upset. And
22   so I talked to Mr. Coon about the grade, why.
23  Q   Okay.

Page 28

1  A   And he indicated that the child had not done
2   something. But that had been corrected over the
3   holidays. I talked to him in January. So,
4   obviously, this happened earlier. And the grade
5   had been corrected. And I guess it was solved.
6   But the main thing I wanted him to know is
7   that he must validate his grades.
8  Q   What did you do about the smoking?
9  A   I talked to him about smoking.
10  Q   What did you say to him about that?
11  A   You can't be smoking on campus.
12  Q   Now, were you made aware of the incident with the
13   Foster child in which Mr. Coon choked a child --
14  A   No, ma'am.
15  Q   -- in November?
16  A   No, ma'am.
17  Q   Nobody told you about that?
18  A   Not anytime while I was there.
19  Q   Was there any centralized place at Pike County
20   where one would keep a record of these kind of
21   incidents?
22  A   Uhm --
23  Q   At the high school, I'm talking about.

Page 29

1  A   Well, yes, ma'am. There was a centralized office
2   at the high school. Of course, we were in
3   trailers at that time, or mobiles. And there
4   should have been incidents -- as far as if it was
5   filed. I -- (indicating) -- I am not aware of
6   that time. I wasn't there when it happened.
7  Q   And continuing during your employment in Pike
8   County, you never were aware of the Foster
9   incident, until this litigation came up, I assume?
10  A   I do not recall. I heard about it. But I don't
11   know -- not during the time I was there as far as
12   any --
13  Q   Now, was Mr. Coon smoking on campus reported to
14   Dr. Bazzell?
15  A   I talked with him about it. And -- I talked to
16   Mr. Coon. But there was a later incident where
17   Dr. Bazzell and I talked about it.
18  Q   Okay. At some point, you did report the smoking
19   incident to Dr. Bazzell?
20  A   Oh, yes, sir -- yes, ma'am.
21  Q   When was that?
22  A   Well, in April, I did an investigation in
23   reference to it.

JR, A Minor                    July 25, 2007  Pike County Board of Education

### Page 30

1  Q  So, it was not until the later issues --
2  A  Yes, ma'am.
3  Q  -- came up that you reported it to Dr. Bazzell?
4     Okay.  Did Mr. McDaniel at the outset of your
5     employment in Pike County express to you any
6     concerns about Mr. Coon, of any nature?
7  A  I don't recall.  You said at the outset of my
8     employment.  We didn't talk about individual
9     teachers.
10 Q  All right.  Did he at some point express concerns
11    about Mr. Coon as a faculty?
12 A  Well, he told me in reference to that about the
13    grade thing.
14 Q  Okay.  Any time after that?
15 A  And that was like the second -- second week in
16    January or something.
17 Q  Did he bring any other issues to your attention
18    before April?
19 A  There was something about a cell phone that he
20    had.
21 Q  Tell me --
22 A  I'm not sure the timeline on that to be honest
23    with you.

### Page 31

1  Q  Is this when Blake Faulkner had a cell phone?
2  A  I don't know the names.  I'm sorry.
3  Q  Is it a student who had one of Mr. Coon's cell
4     phones?
5  A  I remember Mr. McDaniel referring that he had a
6     cell phone that belonged to Mr. Coon.
7  Q  A student did, or Mr. McDaniel?
8  A  Well, yeah, he had taken it up.
9  Q  And what did you do about that?
10 A  Well, he had already taken care of it when he told
11    me this.
12 Q  Just he had taken it up, and that was it; it was
13    over with?
14 A  Mr. Coon wanted to get it back.  And I think he
15    eventually got it back.
16 Q  From you?
17 A  Oh, no.  I didn't have it.  I never had it.
18 Q  Who kept the cell phone?
19 A  Mr. McDaniel.
20 Q  You didn't have any --
21 A  No contact about that.
22 Q  -- input in the decision -- no contact?
23 A  Right.

### Page 32

1  Q  When did you learn about that?
2  A  That, I cannot recall.  It was a later time.  I
3     cannot -- I cannot recall.
4  Q  So, there was no procedure in place that required
5     Mr. McDaniel to report that incident to you?
6  A  No, ma'am.
7  Q  And there was no procedure in place that
8     required -- if you had known about it -- you to
9     report that incident to Dr. Bazzell?
10 A  Uhm, I want to think that Mr. McDaniel reported to
11    Dr. Bazzell.
12 Q  But I'm asking you about -- that was apparently
13    discretionary, is that --
14 A  Well, I don't know of a procedure, other than --
15 Q  Now, did you become aware at some point that
16    Mr. Coon was transporting students in private
17    vehicles?
18 A  Yes.
19 Q  Tell me what you know about that.
20 A  In my investigation --
21 Q  In April?
22 A  In April.
23 Q  What did you learn?

### Page 33

1  A  (Witness Indicating.)
2  Q  I'm sorry.  I said, what did you learn?
3  A  Oh, I'm sorry.  I didn't understand.  I'm sorry.
4  Q  Okay.
5  A  Dr. Bazzell called me.  And he had a person who
6     informed him that it was possible -- that Mr. Coon
7     was smoking, possibly with kids, and possibly
8     Marijuana.  He asked me to do an investigation and
9     determine what the probability was or if it
10    happened or if it did not happen.  And so, he gave
11    me some students' names to investigate.
12 Q  Okay.  Can I -- I don't mean to interrupt you,
13    because I do want to hear about this incident.
14    But this was on or around April 1st?
15 A  April.  Sometime in April.
16 Q  Prior to April 1st and what you are talking about
17    right now, had you ever seen Mr. Coon transporting
18    any students --
19 A  I have never seen --
20 Q  -- in his private vehicle?
21 A  I've never seen Mr. Coon transport any --
22 Q  And had you ever heard of him doing it prior to
23    April 1st?

Mary Moore-Wynn, CSR Mary Moore-Wynn    (334)244-0203
Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

## Page 34

1  A  I do not recall -- I do not recall that, ma'am.
2  Q  You do not recall whether or not you had seen it?
3  A  I did not see it.
4  Q  And you don't know whether or not you had heard
5     it?
6  A  That I had heard it. Prior to that time.
7  Q  Okay. All right. Now, we can go to April.
8  A  I'm sorry.
9  Q  I just was trying to do before April 1st and after
10    April 1st.
11       So, let's go into some detail about the
12    conversation with Dr. Bazzell. We believe this
13    conversation occurred around April 1st. Does that
14    sound reasonable to you?
15 A  Yes, ma'am, it was in April. It was after we got
16    back from AEA. And he contacted me, Dr. Bazzell
17    contacted me, and requested that I do an
18    investigation into what I had told you --
19 Q  Now, what you mentioned was smoking with the kids
20    and/or smoking Marijuana.
21 A  Smoking and possibly smoking with kids --
22 Q  Just plain smoking?
23 A  -- and then the possible use of Marijuana.

## Page 35

1  Q  Anything else he told you to investigate?
2  A  Uhm -- not that I know.
3  Q  Anything related to sexual abuse?
4  A  No, ma'am. Actually, that didn't come up.
5  Q  Okay.
6  A  He gave me six or seven names of people -- I don't
7     know where he got the names -- that could give me
8     some information. And I investigated them and
9     tried to probe -- using probing questions, I term
10    "probing" -- what they might know about Mr. Coon
11    and his behavior.
12 Q  Okay. Give me some examples. What questions do
13    you consider that you would have asked that would
14    be probing?
15 A  First of all, do you know, you know, does Mr. Coon
16    smoke?
17 Q  Okay.
18 A  Have you ever seen him smoke? Have you ever seen
19    him smoke on campus? Have you ever seen him smoke
20    with students? And the like. Have you ever heard
21    of Mr. Coon possibly smoking something other than
22    just regular cigarettes?
23 Q  Did you say Marijuana?

## Page 36

1  A  I don't know if I used that word or not, to be
2     honest with you, ma'am.
3  Q  Something other than regular cigarettes?
4  A  Yes, ma'am.
5  Q  Any other questions that you can recall asking?
6  A  Any other behavior that would be -- you know,
7     unbecoming of a band director, I guess I would --
8     something like that.
9        No -- no student told me anything about
10    Marijuana or -- they did bring up a term that I
11    questioned somewhat. And that was the term "butt
12    baby".
13 Q  Butt baby?
14 A  (Witness Indicating.)
15 Q  And who brought that up?
16 A  I can't tell you, ma'am.
17 Q  But you're saying one of the students brought that
18    up?
19 A  Yes, ma'am.
20 Q  What do you mean, you questioned? I mean, what
21    did you say; what does that mean?
22 A  Yes, ma'am. In reference to -- explain it. And
23    they related it more as a pet. You know, you're

## Page 37

1     my pet. Or treated -- I -- uhm -- I couldn't find
2     out any other than -- as far as them asking
3     questions and such.
4  Q  Did you take notes during these meetings?
5  A  Yes, ma'am.
6  Q  Where are those notes?
7  A  Ma'am, I gave -- I called Dr. Bazzell and related
8     everything that I had found for each student. And
9     he has -- he had those notes.
10 Q  Well, I mean, he took notes of what you said when
11    you talked to him on the phone?
12 A  Yes, ma'am.
13 Q  Did you also have physical notes?
14 A  Well, I just scratched it out.
15 Q  Where are those?
16 A  Today, I cannot tell you that.
17 Q  So, you weren't instructed to turn them in to the
18    office?
19 A  Well, no, ma'am. I asked if he had what he
20    needed.
21 Q  So, you didn't have any policy or procedure for
22    keeping your handwritten notes of these witness
23    examinations in any central location?

10 (Pages 34 to 37)

JR, A Minor                July 25, 2007   Pike County Board of Education

| Page 38 | Page 40 |
|---|---|
| 1 A  I can't recall exactly, ma'am, at this time what I | 1 A  Yes, he did. |
| 2    did with those notes. | 2 Q  So, I'm going to try and read you what he said. |
| 3 Q  Yeah, but -- | 3 A  Okay. |
| 4 A  Because I just scribbled them out as I talked to | 4 Q  Maybe that will refresh your recollection. |
| 5    them. | 5 A  That's fine. |
| 6 Q  Had you received any direction from the central | 6 Q  As to Jeron Senn -- and this is Plaintiff's |
| 7    office as to what you were supposed to do with | 7    Exhibit 14 -- confirmed dash smoking cigs with |
| 8    your handwritten notes? | 8    students. |
| 9 A  To report back to him. | 9 A  Okay. |
| 10 Q  No.  What to do with your handwritten notes. | 10 Q  Do you recall Jeron Senn confirming that? |
| 11 A  At this time, I cannot -- I do not remember -- do | 11 A  Yes, ma'am.  I -- not Jeron Senn.  I can't recall |
| 12    not recall. | 12    which student said what. |
| 13 Q  So, you personally did the interviews with the | 13 Q  But that certainly was confirmed in your |
| 14    students? | 14    interviews? |
| 15 A  Yes, ma'am. | 15 A  Yes, ma'am. |
| 16 Q  Not Mr. McDaniel? | 16 Q  It says here that you -- on the Jeron Senn page I |
| 17 A  No, ma'am.  I did. | 17    am reading from -- it says, saw them leaving |
| 18 Q  Did you ever see the letter that was written to | 18    campus together and smoking? |
| 19    Mr. Coon placing him on suspension? | 19 A  Okay. |
| 20 A  I know Dr. Bazzell related that to me; that he put | 20 Q  Do you recall hearing -- one of the students told |
| 21    him on suspension.  I want to say, yes, ma'am, I | 21    you that? |
| 22    did see that.  I cannot recall if I did or did | 22 A  Yes, ma'am.  Between classes, if I remember. |
| 23    not.  But I know Dr. Bazzell, he contacted me and | 23 Q  Okay.  And then it says, a mysterious -- we're not |

| Page 39 | Page 41 |
|---|---|
| 1    told me that he was putting him on suspension. | 1    sure what this means -- seen going by home on |
| 2 Q  Now -- | 2    numerous occasions. |
| 3 A  For that week. | 3 A  Yes, ma'am.  (Indicating).  There was one |
| 4 Q  Did you meet face to face with Dr. Bazzell to | 4    student -- I don't know who -- said that he lived |
| 5    discuss this matter, at any time? | 5    in a certain area, and he would see Mr. Coon go by |
| 6 A  Well, yes, ma'am.  At some time.  I can't tell you | 6    smoking. |
| 7    exactly when. | 7 Q  Did he say Mr. Coon was going by smoking with |
| 8 Q  I'm just going to tell you some names of students | 8    other students in the class? |
| 9    and ask if you were the person who conducted the | 9 A  Ma'am, I don't remember that.  I just remember he |
| 10    interview with these students.  One of them is | 10    was frequently going by his house smoking. |
| 11    Jeron Senn? | 11 Q  Mr. Coon's house, or the student's house? |
| 12 A  Did I conduct the interview with her -- him.  Is | 12 A  No, the child whoever it was, saw Mr. Coon going |
| 13    that a him or her, ma'am? | 13    by numerous times smoking.  Now -- (indicating) -- |
| 14 Q  I don't know. | 14 Q  Anything else you can recall from the Jeron Senn |
| 15 A  I'm sorry. | 15    interview? |
| 16 Q  I don't know.  I don't know the student.  You | 16 A  I do not know the difference in the students, |
| 17    don't -- | 17    ma'am.  I apologize. |
| 18 A  I cannot recall. | 18 Q  Okay.  Did you also interview Andrew Law?  Does |
| 19 Q  It's a boy -- a male. | 19    that name ring a bell?  It's okay.  If you don't, |
| 20 A  I cannot recall exactly who the students were. | 20    you don't. |
| 21 Q  Okay.  Well, let me read you -- Dr. Bazzell has | 21 A  Well, I do not recall the names, ma'am.  If there |
| 22    testified that when he talked with you on the | 22    is one down there from that from the telephone |
| 23    phone he made notes of what you said. | 23    conversation, I did. |

11  (Pages 38 to 41)

Page 42

1        MS. DePAOLA:  Can we go off the Record
2        for a second?
3        (Off-the-Record discussion.)
4  BY MS. DePAOLA
5  Q  Dr. Bazzell, when you reported to him on Andrew
6     Law -- wrote down -- I guess that's Buddy Pyron --
7     voc tech?
8  A  What, ma'am?
9  Q  I think that means vocational technical, Voc tech.
10 A  Voc tech.
11 Q  What does that mean?  Does that refresh your
12    recollection as to your conversation with Andrew
13    Law?
14 A  No, ma'am.  Voc tech.  Maybe he was in voc tech.
15 Q  He's a 10th grade male at this point in time.
16       MR. SWEENEY:  Don't speculate.  If you
17       don't remember, tell her you don't
18       remember.
19 A  I do not remember.  I don't recall --
20 Q  So, you don't know what he said?
21 A  He wrote that.  I can't tell you.
22 Q  Did you also interview Levi Davis?
23 A  If Dr. Bazzell has notes from down there, I did,

Page 43

1  yes, ma'am.
2  Q  I do not see any notes.  Did you conduct an
3     interview --
4  A  Going back to -- was it Law?  He was at voc tech,
5     which was off campus.  And that is why I maybe did
6     not get to interview him.
7  Q  Okay.  That would have been Andrew Law?
8  A  Of the names that he had given me, I was not able
9     to interview possibly, because he was off -- at
10    voc tech.
11 Q  Levi Davis -- I don't see.  Did you interview Levi
12    Davis?
13 A  I do not recall, ma'am.  If there is notes from
14    Dr. Bazzell, I did.
15 Q  There are none.
16 A  I did not, then.
17 Q  How about Thomas Green?
18 A  Do you have notes from Dr. Bazzell?
19 Q  I'm looking.  Yes.
20 A  Okay.
21 Q  On him, I do.
22 A  No knowledge.
23 Q  Did you -- I mean, you would have been the person

Page 44

1  that spoke with him?
2  A  Yes, ma'am.
3  Q  Well, who else did you interview, if anyone?
4  A  I was given five or six or so names.
5  Q  Did you interview Blake Faulkner?
6  A  Again, I apologize.  I do not -- I don't know all
7     the names of these students, because I --
8  Q  Okay.  Well, let me let you -- let me read it to
9     you on Blake Faulkner.  This is Plaintiff's
10    Exhibit 14.  It says B. Pyron talked with student.
11 A  Blake Foster?
12 Q  B. Pyron?
13 A  That's me.
14 Q  Talked with student.
15 A  Which one?
16 Q  I'm sorry.  Blake Faulkner.
17 A  Okay.  Yes, ma'am, I talked with him, then.
18       MS. DePAOLA:  Could you just read him
19       your notes?  Could we just put this
20       on?  Dr. Bazzell is going to read
21       it.
22       DR. BAZZELL:  Buddy Pyron talked with
23       student.  No information.  Student

Page 45

1  cooperative.  Denies allegation.
2  Parents approve of CC -- who was
3  Charles Coon -- and student spending
4  time away from school.
5  BY MS. DePAOLA
6  Q  Does that refresh your recollection as to who
7     Blake Faulkner is?
8  A  No, ma'am.  If they came in, I would not be able
9     to recognize who they are.  But as far as
10    interviewing them, yes, ma'am.
11 Q  Did you call his father?  When you said, parent
12    approves of him spending --
13 A  That was just his statement, I'm sure.
14 Q  Oh.  That was Blake's statement?
15 A  Yes, ma'am.
16 Q  Now, why was Blake identified to be interviewed?
17 A  He was a name that was given to me by Dr. Bazzell.
18 Q  I gotcha.  Okay.
19       So, at no time were you instructed to do any
20    kind of investigation as to sexual abuse of these
21    children?
22 A  No, ma'am.  It was mainly the complaint of what
23    Dr. Bazzell -- and just like I said about smoking;

## Page 46

1   smoking with students, and possible Marijuana.
2  Q   All right. After you conducted these interviews,
3      did you contact any of the students' parents?
4  A   No, ma'am.
5  Q   Did you contact DHR?
6  A   No, ma'am.
7  Q   So, what's the next thing you did?
8  A   I -- reference to --
9  Q   After you talked to Dr. Bazzell on the phone --
10  A   Dr. Bazzell --
11  Q   -- then what did you do?
12  A   It was him. He was the one that asked for the
13      investigation. So, he -- when I gave him the
14      information, then he responded -- of course --
15  Q   What did you do further? I'm just asking what was
16      your next step?
17  A   Well, I talked to -- when he put Mr. Coon back in
18      school, I talked with Mr. Coon and told him in
19      reference to smoking on campus, again, that no way
20      was going to happen. And that he would be -- no
21      student would be in his vehicle or any reference
22      to him transporting students.
23  Q   Anything else you warned him about?

## Page 47

1  A   I can't remember anything else, ma'am. But I did
2      have a conference with him after he came back,
3      which after Dr. Bazzell had had a conference with
4      him. And uhm --
5  Q   Well, did you ever interview Mr. Coon about these
6      allegations?
7  A   No, ma'am.
8  Q   As part of your investigation?
9  A   That was Dr. Bazzell doing that.
10  Q   Did you ever ask him about this "butt baby" thing?
11  A   No, I did not.
12  Q   Did you interview Matt or MAK King?
13  A   If there is notes there, I did. If not, I didn't.
14      I do not recall, Ms. DePaola, students. And, I
15      apologize, but I don't remember their names.
16  Q   Okay. Let me try and read this --
17  A   All of the students I interviewed were in the
18      band, I remember.
19  Q   Let me try and read you this note and see if you
20      have any recollection of what this is about.
21  A   Okay.
22  Q   First of all -- and this is Plaintiff's
23      Exhibit 14. It's page 90 of the Board's Exhibits,

## Page 48

1      or production. In the middle it said, Cody Dunn's
2      store. (Indicating.) Does that have any meaning
3      to you in terms of this investigation?
4  A   No, ma'am.
5  Q   Okay. All right. Then it says Matt King, dash B.
6      Pyron and R. McDaniel report the story came --
7      well, I'm sorry --
8          MR. SWEENEY: Let's go off the Record.
9          (Brief recess.)
10  BY MS. DePAOLA
11  Q   Mr. Pyron, have you had an opportunity to read the
12      note that Dr. Bazzell made about Matt King?
13  A   Yes, ma'am.
14  Q   Does that refresh your recollection --
15  A   Can I look at it again?
16  Q   Sure.
17  A   I've forgotten what it said. Okay. May he read
18      it again to me?
19  Q   Sure.
20  A   I can't read his writing.
21          DR. BAZZELL: Buddy Pyron and Robert
22              McDaniel report this story made by
23              mother of Matt King late first

## Page 49

1      semester when she was at school
2      concerning Matt's grade. Made at
3      time Matt had D or F in band. She
4      stated occurred month earlier. No
5      explanation as to why she did not
6      report. Buddy Pyron discussed with
7      Chris. I don't know -- he denied
8      saying Marijuana used by anyone.
9      Only cigarettes. Denied any other
10      inappropriate activity or knowledge
11      of this.
12          MS. DePAOLA: Okay. Let me have that
13          back.
14  BY MS. DePAOLA
15  Q   Does that refresh your recollection?
16  A   Yes, ma'am, I think in the investigation thing it
17      was on the second part of that.
18  Q   Talk to her (indicating).
19  A   I reported the second part of that in reference to
20      the investigation where Buddy Pyron --
21          THE WITNESS: You have a unique
22          handwriting, Dr. Bazzell.
23          MR. SWEENEY: Let's go off the Record

JR, A Minor                    July 25, 2007  Pike County Board of Education

---

Page 50

1      just a minute.
2      (Brief recess.)
3      (Whereupon, Plaintiff's Exhibit 16
4          was marked for identification and
5          is attached hereto.)
6  BY MS. DePAOLA
7  Q   All right. Let's go back on the Record.
8      Mr. Pyron, I have marked as Plaintiff's Exhibit 16
9      a typed version of the notes that Mr. -- I'm
10     sorry -- that Dr. Bazzell has provided to us in
11     order to assist us in determining what he said --
12     what he wrote down.
13     Does this assist you in recalling your
14     interview with Matt King?
15 A   Yes, ma'am.  Reading that, yes, ma'am.
16 Q   And in there, there is a reference to, this story
17     was made by mother late first semester.  Does that
18     refer to the story about smoking late last
19     semester --
20 A   About the grades.  See there, it refers to --
21 Q   It says when she was --
22 A   Made at a time Matt had a D or F in band.
23 Q   Right.  So, what story --

---

Page 51

1  A   The story was in reference to grades was because
2      of something happened in first semester.
3  Q   So, in other words, there was no story first
4      semester that you recall about smoking, Mr. Coon
5      smoking?
6  A   That -- obviously, that means that -- that I
7      recall.
8      I talked to Mr. Coon in reference to the grade
9      in the band.  And I think she reported it later
10     about him smoking, because of the grade.
11 Q   You don't know?
12 A   Best I can read from that, yes, ma'am.
13 Q   Oh, okay, yes.
14 A   Those were Dr. Bazzell's notes that he had.
15 Q   I know.
16 A   That he was confirming, I suppose.
17 Q   Well, it says, she stated question mark occurred
18     much earlier.  Is that about the smoking, or
19     is it about the grade?  What occurred much
20     earlier?
21 A   Yes, ma'am, first semester.
22 Q   What occurred first semester?
23 A   The smoking, ma'am, I would think.

---

Page 52

1  Q   Okay.  No explanation as to why she did not report
2      it.  Is that again why she didn't report the
3      smoking?  Is that what you were telling
4      Dr. Bazzell?
5  A   Ma'am, these are Dr. Bazzell's notes --
6  Q   I know.
7  A   -- in reference to what we had reported earlier.
8      And, in turn, in our investigation, was asking --
9      as you notice down here, it says, then Buddy Pyron
10     discussed with the student, and he denied all
11     these other things.
12     He was -- he was saying that goes back to what
13     the parent had said similar earlier.
14 Q   About smoking?
15 A   About the smoking back with grade thing.  Okay?
16 Q   Okay.
17 A   So, I'm thinking in his notes that he put that
18     down.
19 Q   But when you testified about the grade thing, you
20     didn't mention anything about the smoking thing, I
21     guess -- I don't think.  Oh, yes, I apologize.
22     You said he might have been smoking.  Is that your
23     testimony --

---

Page 53

1  A   Yes, ma'am.
2  Q   -- that when the grade issue came up, the might
3      have been smoking came up, also?
4  A   Yes, ma'am.
5  Q   I understand now.
6  A   Which happened in first semester.  I was just
7      trying to solve the problem at the time.  Couldn't
8      solve the problem then.
9  Q   Did you ask Matt King anything about sexual abuse?
10 A   Well, I asked him about any other inappropriate
11     activity.
12 Q   Okay.
13 A   The word "sexual abuse", I did not use.
14 Q   Earlier you said.
15 A   That was not part of the investigation.
16 Q   That wasn't part of your investigation?
17 A   No, ma'am.
18 Q   You said you asked them was there any other
19     behavior that would be unbecoming a band director.
20     Is that substantially the same question that was
21     asked to each of the students?
22 A   Yes, ma'am.
23 Q   Did you ask him about the butt baby?

Mary Moore-Wynn, CSR Mary Moore-Wynn     (334)244-0203
Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 54

1  A  I don't remember exactly which student, what
2     student or all the students precisely about the
3     word "butt baby", ma'am. Uhm --
4  Q  Is that one --
5        MR. SWEENEY: Wait. He hadn't finished
6        his answer.
7        MS. DePAOLA: Sorry.
8  A  In Dr. Bazzell's statement to me to check in on
9     the Marijuana, the smoking with the students, if
10    there was any other inappropriate activity, okay.
11    I'm not sure if the word "butt baby", whether he
12    stated it to me at that time, or if the student
13    said butt baby; but when I started questioning
14    when someone said that, there was no allegation or
15    no reference to go -- it was not eye opening that
16    there was any activity or anything that was sexual
17    harassment or abuse.
18 Q  Did you have a conversation with Dr. Bazzell about
19    this during the break?
20 A  Uhm, in some terms, yes, ma'am.
21 Q  What was said?
22 A  That he sent me a letter -- it's evidence, I
23    think -- that had the investigation -- what he had

Page 55

1     done -- what he had requested me to do.
2  Q  He sent you a letter telling you what you should
3     do?
4  A  Yes, ma'am. In the suspension of Mr. Coon, the
5     letter that you referred to.
6  Q  Yes, sir.
7  A  I did get a copy of that.
8  Q  Okay. So, he told you that during the break?
9  A  Yes, ma'am.
10 Q  Well, I had previously shown you Plaintiff's
11    Exhibit 14, and you said you had never seen that
12    before?
13 A  No, ma'am. I said I don't recall it.
14 Q  And now Dr. Bazzell has told you did?
15 A  He did send me one, yes, ma'am.
16 Q  And now you recall it?
17 A  Uhm, yes, ma'am. The fact that he sent it to me
18    of what he was going to do with Mr. Coon, what he
19    wanted me to do as far as the investigation.
20 Q  So, now you recall receiving this letter?
21 A  Yes, ma'am.
22 Q  Anything else you and Dr. Bazzell discussed during
23    the break?

Page 56

1  A  No, ma'am, not that I know of.
2  Q  Did you discuss the "butt-baby" thing during the
3     break?
4  A  That -- that he sent me that or anything, no,
5     ma'am. We have discussed butt baby --
6        MR. SWEENEY: Now, don't indicate any
7        conversation with me or in my
8        presence.
9        THE WITNESS: Okay. And that's hard to
10       do.
11 A  Repeat your question, ma'am.
12 Q  Outside of the presence of Mr. Sweeney, have you
13    and Dr. Bazzell discussed the butt-baby issue and
14    the questions that I have asked about that?
15 A  In times past?
16 Q  Yes.
17 A  In times past, yes, ma'am.
18 Q  Was Mr. Sweeney present during those meetings?
19 A  Not always, no, ma'am.
20 Q  Tell me any conversations you had with Dr. Bazzell
21    when Mr. Sweeney was not present.
22 A  Well, when I found out in reference to -- when I
23    first heard of the situation that there was going

Page 57

1     to be a deposition.
2  Q  Yes, sir.
3  A  When I was notified, first of all, of what the
4     issue was about.
5  Q  You and Dr. Bazzell had a conversation about the
6     butt-baby thing?
7  A  Well, he called to me and explained to me what the
8     problem was.
9  Q  Yes. Tell me what you recall about that
10    conversation. What was the problem?
11 A  Well, that Mr. Coon, of course, had been charged
12    with sodomy or whatever. I don't know what he's
13    charged with. And that there was a new issue that
14    had arisen reference to Justin Reed --
15       THE WITNESS: Right?
16 A  -- and that there was about situations that
17    happened, supposedly happened, had been said it
18    happened. None of this on campus. But that he
19    was referring to the word "butt baby" --
20 Q  He, who, Dr. Bazzell?
21 A  No. Yeah, Dr. Bazzell.
22    -- that all this came about the same as far as
23    what -- I'm trying to recall exactly how we

15 (Pages 54 to 57)

## Page 58

1  discussed that.  He was informing me about what
2  the situation was.  And I was just -- I was
3  unaware of any of it --
4  **Q   Okay.**
5  A   -- as far as the situation.
6  **Q   All right.  Did you discuss the butt baby or**
7  **similar term about Dr. Bazzell during the break we**
8  **took?**
9  A   Briefly.
10 **Q   What was said?**
11 A   That he did -- on the letter he did recall me
12   to -- that he did ask me to look into the word
13   "butt baby", who they were or whatever.  And I
14   remembered him giving me that letter now.
15 **Q   So, you're changing your testimony --**
16 A   In some aspect to the fact that I do recall it
17   differently.
18 **Q   Now, is there anything in that letter about -- you**
19   **said butt baby.  Is that what you're now recalling**
20   **Dr. Bazzell told you to look into?**
21 A   No.  He was -- he told me to look into smoking,
22   smoking with students, Marijuana, and any other
23   inappropriate behavior that might be -- that could

## Page 59

1  be found out.
2  **Q   Well, did he say, look into sexual abuse of these**
3  **children?**
4  A   No, he did not say "sexual abuse", no, ma'am.
5  **Q   Did he say any word "sexual"?**
6  A   No, ma'am.
7  **Q   Just any other inappropriate behavior?**
8  A   Yes, ma'am.
9  **Q   And that was in your telephone conversation?**
10 A   Yes, ma'am.
11 **Q   And now you're testifying you then received this**
12   **letter?**
13 A   This was after he was suspended, I received the
14   letter indicating he was suspended, and what he
15   was suspended for.
16 **Q   And did this letter direct you to investigate**
17   **possible sexual improprieties?**
18 A   I would have to go back and read the letter,
19   ma'am.
20 **Q   Please do.**
21 A   It says here, according to reports, you have
22   allegedly engaged in the use of illegal drugs with
23   students, provided illegal drugs to students, and

## Page 60

1  also allegedly engaged in other inappropriate
2  activities with students of a sexual nature.
3  Since these reports involve allegations of
4  criminal conduct on your part, I have also
5  notified appropriate law enforcement personnel.
6  **Q   So, are you now testifying that your investigation**
7  **included sexual --**
8  A   Inappropriate behavior.
9  **Q   Just generally inappropriate behavior?**
10 A   Anything that might not be appropriate.
11 **Q   Did that include sexual abuse?**
12 A   Yes, ma'am, if it was noted by the students.
13 **Q   And the only question that you have told me you**
14   **asked them that would remotely relate to that, is**
15   **there any other behavior that would be unbecoming**
16   **to a band director?  Is there any other question**
17   **that you asked?**
18 A   I cannot recall exactly how I was asking the
19   questions.  I did not come out and use the word
20   "sexual abuse or harassment".  I did not use those
21   terms.
22 **Q   Why not?**
23 A   I didn't want to lead them.  I wanted them to --

## Page 61

1  **Q   Just spontaneously --**
2  A   -- come out and tell me, in my probing, that there
3   may be something else.
4  **Q   What other probing did you do besides the one that**
5   **you gave me?**
6  A   Well, all the others I gave you, as well, as far
7   as the activities that reference to Mr. Coon.
8  **Q   You said, do you know if Mr. Coon smokes?  Have**
9   **you seen him smoke on campus?  Does he smoke with**
10   **other students?  Does he smoke anything other than**
11   **regular cigarettes?  And is there any other**
12   **behavior that would be unbecoming a band director?**
13   **Are there any other questions that you can**
14   **recall?**
15 A   I cannot recall.
16 **Q   Did you ever say, has Mr. Coon ever touched you in**
17   **an inappropriate fashion?**
18 A   I do not.
19 **Q   You do not?**
20 A   I did not.
21 **Q   Okay.  And I take it you didn't have any policy or**
22   **procedure or manual to guide you in making this**
23   **investigation?**

JR, A Minor                July 25, 2007  Pike County Board of Education

## Page 62

1   A   I did not.
2   Q   **After that -- after you conducted the interviews**
3       **and you had the phone conference with Mr. --**
4       **Dr. Bazzell, you met with Mr. Coon back at the**
5       **school when he returned?**
6   A   When he returned the next week.
7   Q   **You warned him about the smoking and don't**
8       **transport the students in the vehicle?**
9   A   Right.
10  Q   **Any other warnings?**
11  A   I can't -- I can't recall.
12  Q   **Any other questions to him or any other**
13      **investigatory attempts on your part with Mr. Coon?**
14  A   Well, no, ma'am.  Reference -- it was to
15      Dr. Bazzell, as he had done his investigation.
16      Dr. Bazzell called me before he came back to the
17      school, and he told me what he had also talked
18      with him.  And then I talked with him.  And I was
19      just following up on what Dr. Bazzell had talked
20      with him.
21  Q   **Okay.  Now, at some point, did you have some**
22      **contact with Justin Reed?**
23          MR. SWEENEY:  You mean, anytime he was

## Page 63

1           his interim principal?
2   Q   **Not just -- I am not saying passing him in the**
3       **hall, but I am just saying --**
4   A   Oh, no.  I remember Justin -- an incident on the
5       bus.  And it had to do with Justin and his
6       brother.
7           THE WITNESS:  He's got a brother named
8       Josh -- I think.
9   Q   **Joseph.**
10          THE WITNESS:  Younger brother?
11  Q   **Yes, sir.**
12  A   There was an incident on the bus where the bus
13      driver brought to my attention that the incident
14      happened.  And I remember reenacting the incident
15      and --
16  Q   **What do you remember about it?**
17  A   Uhm -- one of the kids -- and I can't remember if
18      it was -- Joseph is his name?
19  Q   **Yes, sir.**
20  A   -- either got hit in the stomach, or he hit
21      another kid in the stomach.  And Justin came from
22      the back of the bus to handle the situation.  And
23      I had -- and the bus driver had a -- I don't know

## Page 64

1       what all happened on the bus right now.  But I
2       remember reenacting it, and someone, if I remember
3       correctly, was suspended from the bus a couple of
4       days.
5   Q   **Okay.**
6   A   Other than that, I don't remember.
7   Q   **Okay.  Do you not recall the incident in which**
8       **Justin broke the window in the band room?**
9   A   No, ma'am.
10  Q   **And called Mr. Coon --**
11  A   I remember a window being broken, but I do not
12      recall it was Justin that did it.
13  Q   **Do you recall discovering at some point that**
14      **Justin had Mr. Coon's cell phone number and had**
15      **called Mr. Coon?**
16  A   No, ma'am.
17  Q   **Do you recall you then using that number to**
18      **call -- taking that number and calling it to see**
19      **if it was, in fact, Mr. Coon's cell phone?**
20  A   No, ma'am.
21          MS. ALLEN:  Can we talk for just a
22              second?
23          MS. DePAOLA:  Sure.  Excuse us.

## Page 65

1           (Brief off-the-Record discussion.)
2           MS. DePAOLA:  Back on the Record.
3   BY MS. DePAOLA:
4   Q   **Let me just make sure that you know all of the**
5       **facts that I know or think I know, and see if it**
6       **refreshes your recollection.  We understood that**
7       **Justin was locked in the band room during the**
8       **spring of 2005.**
9   A   Okay.
10          MR. SWEENEY:  Object to the form.
11  Q   **Does that refresh any recollection?**
12          MR. SWEENEY:  Object to the form.
13          THE WITNESS:  (Witness Indicating.)
14          MR. SWEENEY:  You can answer.
15  A   I remember -- I did not remember it being Justin.
16      I remember a child was in the office, and some
17      other kids was holding the door.  And for some
18      unknown reason, he smashed the window to get out
19      (indicating).  And if that was Justin, I did not
20      remember it being Justin.  I just remember the
21      window being broken.
22  Q   **And so whoever this child was, what did you do**
23      **about that?  Did you have a meeting in the office**

17  (Pages 62 to 65)

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 66

1    with the child's parent?
2    A   I would think there would be restitution for the
3        window.
4    Q   I don't want you to speculate what you did.  Do
5        you recall being in the office with Mr. McDaniel,
6        Mrs. Reed -- this lady right here (indicating) --
7        a student, and in relation to this
8        breaking-the-window issue?
9    A   I do not recall that.
10   Q   Okay.
11   A   Very likely could have, because I would -- if the
12       child broke the window without reason -- I mean,
13       with -- acting -- it was not just an accident,
14       then I would have requested restitution.
15   Q   Were you aware that Justin was a child with mental
16       retardation?
17   A   No, ma'am.
18   Q   Did you do any evaluations on Mr. Coon?
19   A   PEPE evaluation.
20   Q   Okay.  And at any time, to your knowledge, did you
21       put in any of those evaluations any of the issues
22       about smoking with students?
23   A   No, ma'am, not on PEPE.

Page 67

1    Q   Anything that put people on notice of driving
2        students around in his private vehicle?
3            MR. SWEENEY:  Object to the form.
4    A   No, ma'am, not on PEPE.
5    Q   In anything?
6    A   No, ma'am.
7    Q   Did you at any time talk with Blake Faulkner's
8        father, Phillip Faulkner, the State Trooper?
9    A   Not that I recall.
10           MS. DePAOLA:  That's all.  Thank you --
11           do we have his signature on those?
12           EXAMINATION
13   BY MR. SWEENEY:
14   Q   Mr. Pyron, you have been named as a Defendant in
15       this lawsuit both in your capacity as principal at
16       Pike County High School and as an individual.
17       You've made reference during the deposition that
18       you knew Charles Coon.  You knew the teacher at
19       Pike County High School named Charles Coon?
20   A   Yes, sir.  Only at Pike County.
21   Q   Did you have any dealings with him, with Charles
22       Coon, other than in your official capacity as
23       principal?

Page 68

1    A   No, sir.
2    Q   Did you have any dealings with Charles Coon
3        outside the line and scope of your employment as a
4        principal?
5    A   No.
6    Q   Did you know Charles Coon on a personal or social
7        basis?
8    A   No, sir.
9    Q   You have just indicated that you knew Justin Reed.
10       Did you deal with Justin Reed only within the line
11       and scope of your authority as a principal?
12   A   Only.  Yes, sir.  Yes, sir.
13   Q   Did you have any relation with Justin Reed on a
14       social or personal or private basis?
15   A   No, sir.
16   Q   During your tenure as interim principal at Pike
17       County High School, did any information come to
18       your attention that would have created a suspicion
19       that Justin Reed was being sexually abused?
20           MS. DePAOLA:  Object to the form.
21   Q   Did any information come to your attention while
22       you were interim principal that Justin Reed was
23       being sexually abused?

Page 69

1    A   (Inaudible).
2            MS. DePAOLA:  What did you say?
3            THE COURT REPORTER:  I'm sorry?
4            THE WITNESS:  I'm sorry?
5            MS. DePAOLA:  We can't hear you.
6            THE WITNESS:  I'm sorry.  By no means.
7    BY MR. SWEENEY:
8    Q   Did any student ever bring to you any information
9        that would indicate that Justin Reed was being
10       sexually abused or evidence that might put you on
11       suspicion of that?
12           MS. DePAOLA:  Object to the form.
13   A   No, sir.
14   Q   Did any parent ever bring to you information that
15       would create a suspicion or accusation that
16       Charles Coon was abusing Justin Reed?
17           MS. DePAOLA:  Object to the form.
18   A   No, sir.
19   Q   Did any employee, faculty member, or otherwise,
20       ever bring any information to you that Charles
21       Coon might be acting in an inappropriate manner
22       with students?
23   A   No, sir.

Page 70

1  **Q   Did any law enforcement person bring to your**
2      **attention information that Charles Coon might be**
3      **acting in an inappropriate way with students?**
4  A  No, sir.
5  **Q   As you and your staff investigated matters that**
6      **came up concerning Coon during the spring of 2005,**
7      **did any information, from students or any other**
8      **source, create a suspicion in your mind that**
9      **Charles Coon might be engaged in sexually**
10     **inappropriate conduct with any student?**
11 A  Did not find that, no, sir.
12 **Q   Did Justin Reed's name come up in any of your**
13     **investigation from any source that Charles Coon**
14     **might be having an inappropriate relation with**
15     **him?**
16 A  Justin Reed's name did not come up.
17 **Q   When Mark Bazzell asked you to investigate the**
18     **information that had been provided to him, did you**
19     **take that responsibility seriously?**
20 A  Yes, sir.
21 **Q   To the extent that you interrogated the students,**
22     **did you do so earnestly?**
23 A  Yes, sir.

Page 71

1  **Q   Diligently?**
2  A  To the best of my knowledge.
3  **Q   In your professional judgment, were you thorough**
4      **in investigating the information that was provided**
5      **you?**
6  A  Yes, sir.
7      MR. SWEENEY:  Thank you very much.
8      MS. DePAOLA:  Just a second.
9      (Off-the-Record discussion.)
10     FURTHER EXAMINATION
11 BY MS. DePAOLA
12 **Q   Did any parent other than Polly King ever bring**
13     **any information to your attention that Charles**
14     **Coon might be engaged in any inappropriate**
15     **behavior?**
16     MR. SWEENEY:  Object to the form.
17     THE WITNESS:  I'm sorry?
18     MR. SWEENEY:  You can answer.
19 A  I do not recall any.
20 **Q   Do not recall any?**
21 A  Huh-huh.
22     MS. DePAOLA:  That's all.  Thank you.
23     MR. SWEENEY:  Thank you.

Page 72

1      Buddy, you will need to sign
2      three copies of this -- you read
3      over it, you went back over it,
4      your answers to interrogatories?
5      THE WITNESS:  No, I didn't.
6      MR. SWEENEY:  Before you leave, you'll
7      need to sign that in front of the
8      notary.
9
10     (Whereupon, at approximately, 11:25
11     a.m. on the 25th day of July, 2007
12     the deposition was concluded.)
13
14
15     * * * * * * * * *
16     FURTHER DEPONENT SAITH NOT
17     * * * * * * * * * *
18
19
20
21
22
23

Page 73

1
2      REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8  transcript of the deposition of WALTER (BUDDY) PYRON
9  was taken down by me in machine shorthand on the 25th
10 of July, 2007, and the questions and answers thereto
11 reduced to writing under my personal supervision, and
12 that the foregoing represents a true and correct
13 transcript of the proceedings given by said witness
14 upon said hearing.
15     I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18     Dated this 10th day of August, 2007.
19
20     _____
21     Mary Moore-Wynn
22     Certified Shorthand Reporter
23

Mary Moore-Wynn, CSR Mary Moore-Wynn           (334) 244-0203
Court Reporting Services

**A**

able 43:8 45:8
abuse 9:1,7,10
  9:14 10:5 11:7
  11:21 13:15
  14:3,7,21 15:7
  16:1 17:2,11
  18:2 20:1,8,23
  21:9,15 22:2,8
  22:18,23 24:14
  24:16 35:3
  45:20 53:9,13
  54:17 59:2,4
  60:11,20
abused 10:4
  68:19,23 69:10
abusing 69:16
accident 66:13
accusation
  69:15
accused 27:4
acting 66:13
  69:21 70:3
action 73:16
activities 6:4
  60:2 61:7
activity 49:10
  53:11 54:10,16
actual 21:11
additional 13:3
address 5:10
administration
  20:18 21:3
  23:11,12
administrative
  8:19
administrator
  18:13 19:23
  20:13
adult 9:20
AEA 34:16
agent 10:22
agreed 3:8,20
  4:5
Alabama 1:2,20

2:6,10,15 5:11
  73:4
allegation 45:1
  54:14
allegations 26:1
  47:6 60:3
allegedly 59:22
  60:1
Allen 2:9 64:21
alls 27:16
amend 14:9,10
amendments
  15:13
Andrew 41:18
  42:5,12 43:7
and/or 23:11
  34:20
Annual 6:8,9
answer 19:17
  23:20 54:6
  65:14 71:18
answers 72:4
  73:10
anybody 23:15
anytime 28:18
  62:23
apologize 41:17
  44:6 47:15
  52:21
apparently
  32:12
APPEARAN...
  2:3
applicable 9:16
appropriate
  60:5,10
approval 14:11
  14:13
approve 45:2
approved 14:15
  15:10,15
approves 45:12
approximately
  1:22 72:10
April 29:22

30:18 32:21,22
  33:14,15,15,16
  33:23 34:7,9
  34:10,13,15
Arant 2:13
area 41:5
arisen 57:14
arose 22:18
arrived 14:17
  24:19,20
asked 26:15
  33:8 35:13
  37:19 46:12
  53:10,18,21
  56:14 60:14,17
  70:17
asking 17:18,22
  18:12 19:9
  32:12 36:5
  37:2 46:15
  52:8 60:18
aspect 58:16
assist 50:11,13
assistant 6:21,22
assume 29:9
attached 50:5
attempts 62:13
attendance 7:6,7
  8:19
attention 27:1
  30:17 63:13
  68:18,21 70:2
  71:13
Attorney 2:5
August 73:18
authority 14:10
  15:5,9 68:11
Avenue 2:10,14
  5:11
aware 23:17,21
  24:1 25:16,19
  28:12 29:5,8
  32:15 66:15
AYP 6:7,10
Azar 2:9,9

**a.m** 1:22 72:11

**B**

B 2:6 44:10,12
  48:5
baby 36:12,13
  47:10 53:23
  54:3,11,13
  56:5 57:19
  58:6,13,19
Bachelor's
  20:21
back 11:17 13:2
  20:14 24:19
  31:14,15 34:16
  38:9 43:4
  46:17 47:2
  49:13 50:7
  52:12,15 59:18
  62:4,16 63:22
  65:2 72:3
background
  20:15
band 36:7 47:18
  49:3 50:22
  51:9 53:19
  60:16 61:12
  64:8 65:7
basis 10:22 68:7
  68:14
Bazzell 2:18
  7:20 24:13
  29:14,17,19
  30:3 32:9,11
  33:5 34:12,16
  37:7 38:20,23
  39:4,21 42:5
  42:23 43:14,18
  44:20,22 45:17
  45:23 46:9,10
  47:3,9 48:12
  48:21 49:22
  50:10 52:4
  54:18 55:14,22
  56:13,20 57:5

57:20,21 58:7
  58:20 62:4,15
  62:16,19 70:17
Bazzell's 4:17
  51:14 52:5
  54:8
behavior 35:11
  36:6 53:19
  58:23 59:7
  60:8,9,15
  61:12 71:15
believe 34:12
bell 41:19
belonged 31:6
best 51:12 71:2
Birmingham
  2:15
Blake 31:1 44:5
  44:9,11,16
  45:7,16 67:7
Blake's 45:14
Board 1:13,19
  14:12,15 15:10
  15:16 24:12
boards 8:9
Board's 47:23
boy 39:19
Bradley 2:13
break 54:19
  55:8,23 56:3
  58:7
breaking-the-...
  66:8
Brief 12:23 48:9
  50:2 65:1
Briefly 58:9
bring 23:9 30:17
  36:10 69:8,14
  69:20 70:1
  71:12
brings 12:17
broke 64:8
  66:12
broken 64:11
  65:21

**brother** 63:6,7
  63:10
**brought** 21:2
  27:1 36:15,17
  63:13
**bruises** 21:16
**BS** 20:16
**Buddy** 1:17 3:10
  3:22 4:11,18
  5:1 42:6 44:22
  48:21 49:6,20
  52:9 72:1 73:8
**Bullock** 5:22
**bus** 63:5,12,12
  63:22,23 64:1
  64:3
**butt** 36:11,13
  47:10 53:23
  54:3,11,13
  56:5 57:19
  58:6,13,19
**butt-baby** 56:2
  56:13 57:6

**C**
**call** 25:1 26:6
  45:11 64:18
**called** 7:20 14:1
  33:5 37:7 57:7
  62:16 64:10,15
**calling** 64:18
**campus** 28:11
  29:13 35:19
  40:18 43:5
  46:19 57:18
  61:9
**capacity** 15:1,4
  25:6 67:15,22
**care** 31:10
**case** 1:10 3:21
  4:1 6:13
**cases** 11:10 18:5
  18:6,7 21:2
**Casey** 7:23 8:2
  25:2

**cause** 73:17
**CC** 45:2
**cell** 30:19 31:1,3
  31:6,18 64:14
  64:19
**central** 37:23
  38:6
**centralized**
  28:19 29:1
**certain** 21:2
  41:5
**certainly** 23:8
  40:13
**Certificate** 4:14
  73:2
**certified** 20:9
  21:6 73:22
**certify** 73:7,15
**changes** 22:16
**changing** 58:15
**charged** 57:11
  57:13
**Charles** 15:20
  25:10 45:3
  67:18,19,21
  68:2,6 69:16
  69:20 70:2,9
  70:13 71:13
**check** 54:8
**child** 21:12
  26:16 27:5
  28:1,13,13
  41:12 65:16,22
  66:12,15
**children** 22:8
  45:21 59:3
**child's** 66:1
**choked** 28:13
**Chris** 49:7
**cigarettes** 35:22
  36:3 49:9
  61:11
**cigs** 40:7
**City** 6:19 7:1
**Civil** 3:11

**clarify** 8:16
**class** 41:8
**classes** 20:11,12
  40:22
**Code** 9:12,15,21
  10:10,11,14
  11:4 13:14,18
  14:23 16:3,3
  17:6,9,13
**Cody** 48:1
**collecting** 8:18
**color** 12:4 13:7
**come** 35:4 60:19
  61:2 68:17,21
  70:12,16
**comes** 23:4
**coming** 14:9
**commencing**
  1:21
**commission**
  3:13
**Commissioner**
  1:18 3:12
**complaining**
  26:19,21,23
  27:5
**complaint** 26:13
  27:3 45:22
**complaints** 9:1,7
  9:10 18:1,7,8
  20:23 23:1
  24:15
**concerning** 18:9
  49:2 70:6
**concerns** 30:6
  30:10
**concluded** 72:12
**conduct** 9:12,15
  9:21 10:10,11
  10:14,21 11:4
  13:15,19 17:7
  17:9,13 39:12
  43:2 60:4
  70:10
**conducted** 39:9

46:2 62:2
**conducting**
  22:15
**conference** 47:2
  47:3 62:3
**confirmed** 40:7
  40:13
**confirming**
  40:10 51:16
**consider** 35:13
**consultant** 5:14
  5:15,17
**consulted** 26:14
**consulting** 5:16
  5:20 6:1
**contact** 26:4
  31:21,22 46:3
  46:5 62:22
**contacted** 34:16
  34:17 38:23
**contain** 8:8
**contained** 9:21
**continuing** 29:7
**contracts** 5:21
**conversation**
  34:12,13 41:23
  42:12 54:18
  56:7 57:5,10
  59:9
**conversations**
  56:20
**Coon** 15:20
  25:11 26:4
  27:4,12,22
  28:13 29:13,16
  30:6,11 31:6
  31:14 32:16
  33:6,17,21
  35:10,15,21
  38:19 41:5,7
  41:12 45:3
  46:17,18 47:5
  51:4,8 55:4,18
  57:11 61:7,8
  61:16 62:4,13

64:10,15 66:18
  67:18,19,22
  68:2,6 69:16
  69:21 70:2,6,9
  70:13 71:14
**Coon's** 31:3
  41:11 64:14,19
**cooperative** 45:1
**copies** 72:2
**copy** 55:7
**correct** 8:13
  15:21 18:17
  73:12
**corrected** 28:2,5
**correctly** 64:3
**counsel** 3:9,21
  4:6 73:15
**County** 1:13,19
  5:22,22 7:9,16
  10:10,11 15:5
  17:3 19:19,21
  22:14 23:2,3
  23:15 24:12,21
  25:13 28:19
  29:8 30:5
  67:16,19,20
  68:17 73:5
**couple** 64:3
**course** 18:10
  23:10 29:2
  46:14 57:11
**COURT** 1:1
  69:3
**covering** 17:6,9
  70:8
**create** 69:15
  70:8
**created** 68:18
**crime** 24:6
**criminal** 18:7
  60:4
**CSR** 3:12
**currently** 5:13
  5:20
**Curriculum** 6:3

JR, A Minor                    July 25, 2007  Pike County Board of Education
                                                                    Page 3

**D**

**D** 49:3 50:22
**dah** 11:11,11,11
  11:11,11
**dash** 40:7 48:5
**Dated** 73:18
**Davis** 42:22
  43:11,12
**day** 72:11 73:18
**days** 64:4
**day-to-day** 8:20
**deal** 68:10
**dealings** 67:21
  68:2
**Deanie** 2:9
**December** 7:13
  7:14 25:1,3,4,5
**decided** 8:2
**decision** 31:22
**Defendant** 1:15
  2:12 67:14
**deficiencies** 6:11
**defines** 10:1
**degree** 20:16
  21:3
**denied** 49:7,9
  52:10
**Denies** 45:1
**DePaola** 2:5
  4:12,13 5:6,7
  11:20 12:10
  13:1 17:5,21
  42:1,4 44:18
  45:5 47:14
  48:10 49:12,14
  50:6 54:7
  64:23 65:2,3
  67:10 68:20
  69:2,5,12,17
  71:8,11,22
**DEPONENT**
  72:16
**deposition** 1:17
  3:9,11,16,22
  3:23 4:7 57:1

67:17 72:12
  73:8
**Description** 4:16
**detail** 34:11
**determine** 13:2
  16:20 33:9
**determining**
  50:11
**develop** 18:20
**developing**
  16:18
**development**
  16:11
**DHR** 46:5
**difference** 22:20
  41:16
**differently**
  58:17
**Diligently** 71:1
**direct** 59:16
**direction** 38:6
**director** 36:7
  53:19 60:16
  61:12
**disabilities** 22:6
**disabled** 22:2
**discipline** 6:4
  12:20
**discovering**
  64:13
**discretionary**
  32:13
**discuss** 39:5
  56:2 58:6
**discussed** 21:1
  49:6 52:10
  55:22 56:5,13
  58:1
**discussion** 12:23
  42:3 65:1 71:9
**disseminate**
  18:20
**DISTRICT** 1:1
  1:2
**document** 10:15

12:3,12 17:23
**doing** 33:22 47:9
**Donald** 2:13
**door** 65:17
**double** 20:19
  21:5
**Dr** 2:18 4:17
  7:20 24:13
  29:14,17,19
  30:3 32:9,11
  33:5 34:12,16
  37:7 38:20,23
  39:4,21 42:5
  42:23 43:14,18
  44:20,22 45:17
  45:23 46:9,10
  47:3,9 48:12
  48:21 49:22
  50:10 51:14
  52:4,5 54:8,18
  55:14,22 56:13
  56:20 57:5,20
  57:21 58:7,20
  62:4,15,16,19
**driver** 63:13,23
**driving** 67:1
**drugs** 59:22,23
**duly** 5:3
**Dunn's** 48:1
**duties** 8:8

**E**

**EAR** 1:6
**earlier** 28:4 49:4
  51:18,20 52:7
  52:13 53:14
**earnestly** 70:22
**East** 5:11
**educated** 21:8
**education** 1:14
  1:19 5:17 22:3
  22:5,9,17
  24:13
**educational** 6:17
  20:15

**educator** 5:15
  21:21
**efforts** 22:16
**eight** 6:20
**either** 3:18 4:2
  63:20
**Eleven** 11:15
**Elizabeth** 2:19
**employed** 5:13
  7:9,12 25:17
  25:20,22
**employee** 9:20
  69:19
**employment**
  6:18 7:15 29:7
  30:5,8 68:3
**encountered**
  25:13
**enforcement**
  11:10 18:4
  60:5 70:1
**engaged** 59:22
  60:1 70:9
  71:14
**Eufaula** 7:1,2
**evaluation** 66:19
**evaluations**
  66:18,21
**eventually** 31:15
**evidence** 3:17
  54:22 69:10
**exactly** 17:12
  27:10 38:1
  39:7,20 54:1
  57:23 60:18
**Examination**
  4:12,12,13 5:5
  67:12 71:10
**examinations**
  37:23
**examples** 35:12
**Excuse** 64:23
**exhibit** 4:16,17
  10:13 11:18
  12:2 13:12

21:12 40:7
  44:10 47:23
  50:3,8 55:11
**Exhibits** 4:15
  15:12 47:23
**experience** 19:8
  19:11 24:7
**expert** 24:8
**explain** 36:22
**explained** 57:7
**explanation**
  49:5 52:1
**express** 30:5,10
**extent** 70:21
**eye** 54:15

**F**

**F** 27:4 49:3
  50:22
**face** 39:4,4
**fact** 6:9 19:10
  55:17 58:16
  64:19
**facts** 65:5
**faculty** 14:17
  15:5,23 17:1
  19:5,16 30:11
  69:19
**familiar** 10:5
  13:16 14:20
**far** 8:21 10:3
  11:7,12 21:11
  21:17 24:3
  29:4,11 37:2
  45:9 55:19
  57:22 58:5
  61:6
**fashion** 61:17
**father** 1:6 45:11
  67:8
**Faulkner** 31:1
  44:5,9,16 45:7
  67:8
**Faulkner's** 67:7
**Federal** 2:14

3:10
felt 14:6 16:13
Fifth 2:14
file 18:7
filed 29:5
filing 3:22 4:3
find 12:14 37:1
70:11
finding 6:14
10:11
fine 40:5
finish 9:5 15:15
finished 54:5
first 5:2 9:23
17:15 23:4
25:9,10 26:4
35:15 47:22
48:23 50:17
51:2,3,21,22
53:6 56:23
57:3
five 44:4
following 62:19
follows 5:4
foregoing 73:7
73:12
forensic 23:16
23:22 24:10
forgotten 48:17
form 3:14 18:3
23:18 65:10,12
67:3 68:20
69:12,17 71:16
formality 3:13
forth 1:21
Foster 28:13
29:8 44:11
found 37:8
56:22 59:1
Fourteen 6:23
frequently 41:10
front 72:7
further 3:20 4:5
4:13 46:15
71:10 72:16

73:15
_____ G _____
generally 60:9
give 6:17 21:10
35:7,12
given 43:8 44:4
45:17 73:13
giving 27:4
58:14
go 11:4 12:22
13:2 16:3 21:2
24:19 34:7,11
41:5 42:1 48:8
49:23 50:7
54:15 59:18
goes 52:12
going 8:15 12:19
17:10 39:8
40:2 41:1,7,10
41:12 43:4
44:20 46:20
55:18 56:23
gotcha 45:18
grade 26:11,13
26:15,16 27:22
28:4 30:13
42:15 49:2
51:8,10,19
52:15,19 53:2
grades 28:7
50:20 51:1
Green 43:17
guess 22:22 28:5
36:7 42:6
52:21
guidance 23:11
guide 61:22
_____ H _____
hall 63:3
hand 11:4
handbook 9:13
11:23 12:1,8
13:3,5 14:1,6,8

14:14,18 15:6
15:11,12 18:23
19:4,6,14
handle 9:10
63:22
handwriting
49:22
handwritten
37:22 38:8,10
happen 33:10
46:20
happened 28:4
29:6 33:10
51:2 53:6
57:17,17,18
63:14 64:1
harass 9:18
harassed 10:4
harassment 9:14
10:20 17:11,14
18:6 20:1,2
54:17 60:20
hard 56:9
Hart 5:11
hear 5:7,9 7:10
33:13 69:5
heard 29:10
33:22 34:4,6
35:20 56:23
hearing 40:20
73:14
helps 6:13
hereto 3:18 4:2
50:5
high 7:2 8:14
17:3 19:19,21
22:14 23:3,15
24:21 25:13
28:23 29:2
67:16,19 68:17
hired 6:6
hiring 15:19
history 6:18
hit 63:20,20
hold 12:4 24:8

holding 65:17
holidays 28:3
home 41:1
Hon 2:5,9,13
honest 30:22
36:2
house 41:10,11
41:11
Huh-huh 12:13
71:21
H-A-R-T 5:11
_____ I _____
identification
50:4
identified 13:14
13:23 45:16
illegal 59:22,23
implemented
22:14
implementing
22:13
imposed 10:22
improprieties
26:1 59:17
improve 6:5
improvement
5:19 6:2,12
inappropriate
49:10 53:10
54:10 58:23
59:7 60:1,8,9
61:17 69:21
70:3,10,14
71:14
inaudible 10:23
69:1
incidence 22:2
incident 26:10
28:12 29:9,16
29:19 32:5,9
33:13 63:4,12
63:13,14 64:7
incidents 28:21
29:4

include 15:5
60:11
included 60:7
increased 22:7
independent
5:14
independently
18:19
INDEX 4:10,15
indicate 56:6
69:9
indicated 28:1
68:9
indicating 10:18
12:18 29:5
33:1 36:14
41:3,13 48:2
49:18 59:14
65:13,19 66:6
individual 18:9
26:8 30:8
67:16
inform 19:22,23
information
35:8 44:23
46:14 68:17,21
69:8,14,20
70:2,7,18 71:4
71:13
informed 10:13
25:23 33:6
informing 58:1
input 31:22
instance 8:16
instructed 37:17
45:19
instructing
17:20
instruction 6:14
interested 17:16
73:17
interim 7:12,19
7:21 8:7 16:9
63:1 68:16,22
interrogated

| | | | | |
|---|---|---|---|---|
| 70:21 | issue 53:2 56:13 | knew 67:18,18 | 59:16,18 | marked 13:12 |
| interrogatories | 57:4,13 66:8 | 68:9 | let's 12:22 20:14 | 50:4,8 |
| 72:4 | issues 11:9 | know 5:8 6:4 7:7 | 24:19 26:7 | Mary 1:18 3:12 |
| interrupt 33:12 | 15:23 17:2 | 13:6 22:11,19 | 34:11 48:8 | 73:21 |
| interview 4:18 | 22:18 30:1,17 | 25:10 26:22 | 49:23 50:7 | Master's 20:18 |
| 23:16 39:10,12 | 66:21 | 27:8 28:6 | level 8:6,14 | 21:4 |
| 41:15,18 42:22 | | 29:11 31:2 | Levi 42:22 43:11 | math 6:21 20:16 |
| 43:3,6,9,11 | J | 32:14,19 34:4 | 43:11 | mathematics |
| 44:3,5 47:5,12 | January 25:9,9 | 35:2,7,10,15 | line 68:3,10 | 20:21 |
| 50:14 | 26:5 28:3 | 35:15 36:1,6 | list 10:12 | Matt 47:12 48:5 |
| interviewed | 30:16 | 36:23 38:20,23 | litigation 29:9 | 48:12,23 49:3 |
| 45:16 47:17 | Jeron 39:11 | 39:14,16,16 | lived 41:4 | 50:14,22 53:9 |
| interviewing | 40:6,10,11,16 | 41:4,16 42:20 | location 37:23 | matter 39:5 |
| 24:6,10 45:10 | 41:14 | 44:6 49:7 | locked 65:7 | matters 70:5 |
| interviews 38:13 | Joseph 63:9,18 | 51:11,15 52:6 | Loneliness | Matt's 49:2 |
| 40:14 46:2 | Josh 63:8 | 56:1 57:12 | 21:17 | ma'am 6:19 7:6 |
| 62:2 | JR 1:5 | 61:8 63:23 | Lonely 21:17 | 7:11,17 8:7 9:2 |
| introduced 4:1 | judgment 71:3 | 65:4,5,5 68:6 | look 10:7 11:16 | 9:4,8 11:1,5,7 |
| investigate 9:11 | July 1:18 72:11 | knowledge | 12:5 21:8,20 | 12:4,6,17,19 |
| 23:8 33:11 | 73:10 | 43:22 49:10 | 48:15 58:12,20 | 13:9,11,13,17 |
| 35:1 59:16 | June 7:13,14 | 66:20 71:2 | 58:21 59:2 | 13:20,22 14:8 |
| 70:17 | Justin 57:14 | known 32:8 | looked 13:23 | 14:11,16,19,22 |
| investigated | 62:22 63:4,5 | | 17:7 | 15:3,8,14,17 |
| 27:20 35:8 | 63:21 64:8,12 | L | looking 43:19 | 16:2,2,4,7,22 |
| 70:5 | 64:14 65:7,15 | lady 66:6 | Love 1:20 | 17:6 18:14,18 |
| investigating | 65:19,20 66:15 | late 15:2 48:23 | low 21:15 | 18:21 19:20 |
| 20:22 22:23 | 68:9,10,13,19 | 50:17,18 | lower 26:13 | 20:4,6,10 21:7 |
| 24:4,14 71:4 | 68:22 69:9,16 | law 2:5 11:10 | | 21:11,13,17,23 |
| investigation | 70:12,16 | 18:4 41:18 | M | 22:12,19,21,21 |
| 18:1 23:12,23 | | 42:6,13 43:4,7 | machine 73:9 | 23:7,14 24:3,9 |
| 29:22 32:20 | K | 60:5 70:1 | main 6:6 28:6 | 24:11,18,22 |
| 33:8 34:18 | keep 28:20 | lawsuit 18:23 | MAK 47:12 | 25:12,15 26:3 |
| 45:20 46:13 | keeping 37:22 | lead 60:23 | making 61:22 | 26:8,10,20 |
| 47:8 48:3 | kept 31:18 | learn 21:20 32:1 | male 39:19 | 27:8,17 28:14 |
| 49:16,20 52:8 | kid 63:21 | 32:23 33:2 | 42:15 | 28:16 29:1,20 |
| 53:15,16 54:23 | kids 33:7 34:19 | leave 72:6 | manner 4:2 18:1 | 30:2 32:6 34:1 |
| 55:19 60:6 | 34:21 63:17 | leaving 8:1 | 69:21 | 34:15 35:4 |
| 61:23 62:15 | 65:17 | 40:17 | manual 61:22 | 36:2,4,16,19 |
| 70:13 | kind 5:16 6:1 | led 22:5 | Marijuana 33:8 | 36:22 37:5,7 |
| investigations | 9:4 18:20 | Lee 5:22 | 34:20,23 35:23 | 37:12,19 38:1 |
| 22:15 | 28:20 45:20 | legalized 8:21 | 36:10 46:1 | 38:15,17,21 |
| investigatory | King 27:9,12 | letter 38:18 | 49:8 54:9 | 39:6,13 40:11 |
| 62:13 | 47:12 48:5,12 | 54:22 55:2,5 | 58:22 | 40:15,22 41:3 |
| involve 60:3 | 48:23 50:14 | 55:20 58:11,14 | mark 2:18 51:17 | 41:9,17,21 |
| involved 11:9 | 53:9 71:12 | 58:18 59:12,14 | 70:17 | 42:8,14 43:1 |

45:8,10,15,22
46:4,6 47:1,7
48:4,13 49:16
50:15,15 51:12
51:21,23 52:5
53:1,4,17,22
54:3,20 55:4,9
55:13,15,17,21
56:1,5,11,17
56:19 59:4,6,8
59:10,19 60:12
62:14 64:9,16
64:20 66:17,23
67:4,6
**McDaniel** 26:22
27:2,21 30:4
31:5,7,19 32:5
32:10 38:16
48:6,22 66:5
**mean** 9:18 16:5
16:15,16 21:16
23:6 24:5 26:6
33:12 36:20,20
36:21 37:10
42:11 43:23
62:23 66:12
**meaning** 48:2
**means** 41:1 42:9
51:6 69:6
**meant** 8:21 9:13
**meet** 39:4
**meeting** 6:15
65:23
**meetings** 37:4
56:18
**member** 69:19
**members** 17:1
**mental** 22:7
66:15
**mention** 52:20
**mentioned**
11:22 34:19
**mentor** 6:2
**met** 62:4
**middle** 1:2 48:1

**mind** 70:8
**MINOR** 1:5
**minute** 50:1
**missed** 7:5
**mobiles** 29:3
**Montgomery**
2:6,10 73:5
**month** 49:4
**Moore-Wynn**
1:18 3:12
73:21
**mother** 1:6 27:5
27:7 48:23
50:17
**mysterious**
40:23

_____
N
**name** 41:19
45:17 63:18
70:12,16
**named** 63:7
67:14,19
**names** 31:2
33:11 35:6,7
39:8 41:21
43:8 44:4,7
47:15
**nature** 10:21
30:6 60:2
**necessary** 15:7
16:14,21
**need** 3:15 72:1,7
**needed** 7:18,21
37:20
**neither** 73:15
**never** 29:8 31:17
33:19,21 55:11
**new** 9:3 57:13
**North** 2:14
**notary** 72:8
**note** 47:19 48:12
**noted** 60:12
**notes** 4:17 37:4
37:6,9,10,13

37:22 38:2,8
38:10 39:23
42:23 43:2,13
43:18 44:19
47:13 50:9
51:14 52:5,17
**notice** 52:9 67:1
**notified** 11:10
18:10,11,16
57:3 60:5
**notify** 18:14
**November** 28:15
**number** 4:16,16
10:20 64:14,17
64:18
**numerous** 41:2
41:13

_____
O
**Object** 18:3
23:18 65:10,12
67:3 68:20
69:12,17 71:16
**objections** 3:13
3:14
**observing** 25:6
**obviously** 19:22
28:4 51:6
**occasions** 41:2
**occurred** 34:13
49:4 51:17,19
51:22
**offenses** 9:15
**offered** 3:17
**office** 19:23 26:6
29:1 37:18
38:7 65:16,23
66:5
**offices** 1:19
**official** 67:22
**Off-the-Record**
42:3 65:1 71:9
**Oh** 17:17 26:8
29:20 31:17
33:3 45:14

51:13 52:21
63:4
**okay** 5:20 6:17
7:5,15 8:4 9:15
10:2 11:14,16
15:1 17:17
18:4,19,22
20:3,7,14,17
20:20 24:19
25:5 27:23
29:18 30:4,14
33:4,12 34:7
35:5,12,17
39:21 40:3,9
40:19,23 41:18
41:19 43:7,20
44:8,17 45:18
47:16,21 48:5
48:17 49:12
51:13 52:1,15
52:16 53:12
54:10 55:8
56:9 58:4
61:21 62:21
64:5,7 65:9
66:10,20
**opening** 54:15
**Opp** 5:11 6:19
**opportunity**
48:11
**opposed** 22:3,8
**order** 50:11
**outlined** 17:13
**outset** 30:4,7
**outside** 56:12
68:3
**overall** 6:3
23:11

_____
P
**page** 4:16 11:14
40:16 47:23
**parent** 45:11
52:13 66:1
69:14 71:12

**parents** 11:8
18:6,16 45:2
46:3
**part** 7:13 16:19
25:1 47:8
49:17,19 53:15
53:16 60:4
62:13
**particular** 16:15
**parties** 3:9,21
73:16
**party** 3:18 4:2
26:19,21,23
**passing** 6:10
63:2
**pattern** 18:8
**people** 6:12 19:3
35:6 67:1
**PEPE** 66:19,23
67:4
**period** 25:2
**person** 16:15
23:4 33:5 39:9
43:23 70:1
**personal** 68:6,14
73:11
**personally** 38:13
**personnel** 60:5
**pet** 36:23 37:1
**Phillip** 67:8
**phone** 30:19
31:1,6,18
37:11 39:23
46:9 62:3
64:14,19
**phones** 31:4
**physical** 10:21
21:15 37:13
**Pike** 1:13,19 7:9
7:15 10:10,11
15:5 17:3
19:19,21 22:14
23:2,3,15
24:12,20 25:13
28:19 29:7

30:5 67:16,19
67:20 68:16
**place** 2:14 10:6
28:19 32:4,7
**placing** 38:19
**plain** 34:22
**PLAINTIFF** 1:8
2:4
**Plaintiff's** 4:17
10:13 11:18
12:2 13:12
15:12 40:6
44:9 47:22
50:3,8 55:10
**plan** 16:11,18
**planner** 12:7
14:1
**plans** 12:21
**please** 25:18
59:20
**point** 29:18
30:10 32:15
42:15 62:21
64:13
**policies** 8:6,11
8:23 9:4,6,22
14:2 15:6
22:13,20
**policy** 8:9,9,13
8:17,18,21,21
9:9,12 10:6,7
11:2,3,6,13,22
17:19 24:13
37:21 61:21
**Polly** 27:9,12
71:12
**portion** 8:5
**possible** 33:6
34:23 46:1
59:17
**possibly** 27:10
33:7,7 34:21
35:21 43:9
**precisely** 21:1
22:4 54:2

**predator** 21:21
**presence** 56:8
56:12
**present** 2:17
56:18,21
**previously** 25:22
55:10
**principal** 6:21
6:21,22,23 7:2
7:12,19 8:7,8
15:1,4,22
16:17,23 23:13
25:8 63:1
67:15,23 68:4
68:11,16,22
**principals** 6:2
8:8
**principal's**
16:19
**prior** 7:15 14:8
19:1 33:16,22
34:6
**private** 32:16
33:20 67:2
68:14
**probability** 33:9
**probe** 35:9
**probing** 35:9,10
35:14 61:2,4
**problem** 53:7,8
57:8,10
**problems** 6:15
**procedure** 3:11
8:16 9:9 18:15
18:20,23 22:20
24:14 32:4,7
32:14 37:21
61:22
**procedures** 8:6
8:12,23 9:6,22
14:3 15:6
17:10,12,23
18:2 22:14
**proceedings**
73:13

**produced** 13:4
**production** 48:1
**professional**
16:11 20:10,12
20:15 71:3
**program** 21:4,5
**progress** 6:8,9
**provide** 16:6
17:1
**provided** 3:18
4:2 12:2 17:8
50:10 59:23
70:18 71:4
**published** 14:8
**Purple** 13:8
**purpose** 3:18
6:6
**pursuant** 1:20
3:10
**put** 11:17 14:5
14:14 38:20
44:19 46:17
52:17 66:21
67:1 69:10
**putting** 39:1
**Pyron** 1:17 3:10
3:22 4:11 5:1
42:6 44:10,12
44:22 48:6,11
48:21 49:6,20
50:8 52:9
67:14 73:8
**Pyron's** 4:18

―――――――
      **Q**
―――――――
**question** 9:5
16:5 19:15
51:17 53:20
56:11 60:13,16
**questioned**
36:11,20
**questioning**
54:13
**questions** 3:14
3:15 23:5,8

35:9,12 36:5
37:3 56:14
60:19 61:13
62:12 73:10

―――――――
      **R**
―――――――
**R** 2:13 48:6
**read** 22:1 39:21
40:2 44:8,18
44:20 47:16,19
48:11,17,20
51:12 59:18
72:2
**reading** 4:6
22:10 40:17
50:15
**reason** 65:18
66:12
**reasonable**
34:14
**recall** 12:20 21:8
21:23 22:10
24:20 27:15,16
29:10 30:7
32:2,3 34:1,1,2
36:5 38:1,12
38:22 39:18,20
40:10,11,20
41:14,21 42:19
43:13 47:14
51:4,7 55:13
55:16,20 57:9
57:23 58:11,16
60:18 61:14,15
62:11 64:7,12
64:13,17 66:5
66:9 67:9
71:19,20
**recalling** 50:13
58:19
**receive** 24:12
**received** 16:13
38:6 59:11,13
**receiving** 20:20
55:20

**recess** 48:9 50:2
**recognize** 20:1
45:9
**recognized**
17:15
**recognizing** 20:8
20:22 21:9
**recollection** 40:4
42:12 45:6
47:20 48:14
49:15 65:6,11
**record** 12:22,23
13:2 28:20
42:1 48:8
49:23 50:7
65:2
**reduced** 73:11
**Reed** 2:19 57:14
62:22 66:6
68:9,10,13,19
68:22 69:9,16
**Reed's** 70:12,16
**reenacting**
63:14 64:2
**refer** 50:18
**reference** 9:13
11:7 14:22
17:11 26:10
29:23 30:12
36:22 46:8,19
46:21 49:19
50:16 51:1,8
52:7 54:15
56:22 57:14
61:7 62:14
67:17
**referred** 55:5
**referring** 10:15
10:23 11:14
12:3,7,16,19
20:12 31:5
57:19
**refers** 50:20
**refresh** 40:4
42:11 45:6

JR, A Minor                  July 25, 2007  Pike County Board of Education
                                                              Page 8

48:14 49:15
65:11
**refreshes** 65:6
**Regarding** 4:17
**regardless** 4:3
**regular** 22:3,8
35:22 36:3
61:11
**regulations** 12:8
**relate** 17:23
19:12 60:14
**related** 27:21
35:3 36:23
37:7 38:20
73:16
**relates** 14:21
22:17
**relating** 9:6
13:15 14:3
15:7,23 17:1
**relation** 66:7
68:13 70:14
**relay** 23:5
**relevant** 14:7
**remember** 13:6
25:2 26:16,18
26:20 31:5
38:11 40:22
41:9,9 42:17
42:18,19 47:1
47:15,18 54:1
63:4,14,16,17
64:2,2,6,11
65:15,15,16,20
65:20
**remembered**
58:14
**remotely** 60:14
**renewed** 5:21
**Repeat** 56:11
**report** 29:18
32:5,9 38:9
48:6,22 49:6
52:1,2
**reported** 27:19

29:13 30:3
32:10 42:5
49:19 51:9
52:7
**Reporter** 69:3
73:22
**Reporter's** 4:14
73:2
**reports** 59:21
60:3
**represent** 11:23
**representing** 3:9
3:21
**represents** 73:12
**requested** 34:17
55:1 66:14
**required** 32:4,8
**requirement**
6:16
**reserved** 3:16
**respect** 8:23 9:9
15:19 17:9
**responded** 46:14
**responsibilities**
8:5
**responsibility**
8:11,13 13:21
14:5 15:19,22
16:6,8,12,19
70:19
**responsible** 8:22
22:23
**rest** 23:12
**restitution** 66:2
66:14
**results** 73:17
**retardation** 22:7
66:16
**retired** 5:14 7:3
7:4,11
**retirement** 7:6
**returned** 62:5,6
**review** 14:17
**revised** 10:16
**revisions** 13:18

**right** 10:7 11:21
14:13 17:21,21
20:20 21:19
22:1,13 25:10
27:11 30:10
31:23 33:17
34:7 46:2 48:5
50:7,23 57:15
58:6 62:9 64:1
66:6
**ring** 41:19
**risk** 22:7
**Robert** 48:21
**room** 64:8 65:7
**Rose** 2:13
**routine** 22:17
**rules** 3:11 12:8
**ruling** 3:16
**run** 8:20

---

## S

**SAITH** 72:16
**saw** 40:17 41:12
**saying** 8:14,17
10:5 19:1,10
21:4 36:17
49:8 52:12
63:2,3
**says** 10:3 40:16
40:17,23 44:10
48:5 50:21
51:17 52:9
59:21
**school** 5:19 6:2,3
6:5,11 7:2,7
8:6,9,14,18,20
15:10 17:4
18:5 19:19,21
22:15,22 23:2
23:3,15 24:21
25:14,17,19
26:2 28:23
29:2 45:4
46:18 49:1
62:5,17 67:16

67:19 68:17
**schools** 6:19 7:2
**school's** 8:22
**scope** 68:3,11
**scratched** 37:14
**scribbled** 38:4
**second** 30:15,15
42:2 49:17,19
64:22 71:8
**sections** 13:15
**see** 14:4,22
18:15 34:3
38:18,22 41:5
43:2,11 47:19
50:20 64:18
65:5
**seen** 33:17,19,21
34:2 35:18,18
35:19 41:1
55:11 61:9
**self** 21:18
**self-esteem**
21:15
**semester** 25:3
49:1 50:17,19
51:2,4,21,22
53:6
**send** 55:15
**Senn** 39:11 40:6
40:10,11,16
41:14
**sent** 54:22 55:2
55:17 56:4
**seriously** 70:19
**set** 1:21
**seven** 6:22 35:6
**sex** 10:22
**sexual** 8:23 9:6
9:10,14 10:5
10:20,21 11:7
11:21 13:15
14:3,7,21 15:7
15:23 17:2
18:2,5 20:1,2,8
20:22 21:9,21

22:2,8,18,23
24:14,16 26:1
35:3 45:20
53:9,13 54:16
59:2,4,5,17
60:2,7,11,20
**sexually** 68:19
68:23 69:10
70:9
**sexual-abuse**
11:2,6
**sexual-harass...**
11:9
**shorthand** 73:9
73:22
**show** 6:10,11
10:12
**shown** 55:10
**sign** 72:1,7
**signals** 21:20
**signature** 67:11
**signing** 4:7
**signs** 21:21
**similar** 52:13
58:7
**sir** 17:5 24:17
29:20 55:6
57:2 63:11,19
67:20 68:1,8
68:12,12,15
69:13,18,23
70:4,11,20,23
71:6
**sit** 25:16
**situation** 56:23
58:2,5 63:22
**situations** 57:16
**six** 35:6 44:4
**skills** 23:16 24:2
**smashed** 65:18
**smoke** 35:16,18
35:19,19 61:9
61:9,10
**smokes** 61:8
**smoking** 27:13

27:16 28:8,9
28:11 29:13,18
33:7 34:19,20
34:21,21,22
35:21 40:7,18
41:6,7,10,13
45:23 46:1,19
50:18 51:4,5
51:10,18,23
52:3,14,15,20
52:22 53:3
54:9 58:21,22
62:7 66:22
**social** 68:6,14
**sodomy** 57:12
**solve** 53:7,8
**solved** 28:5
**somewhat** 36:11
**sorry** 17:16
20:16 23:19
27:18 31:2
33:2,3,3 34:8
39:15 44:16
48:7 50:10
54:7 69:3,4,6
71:17
**sound** 34:14
**sounded** 18:22
**source** 70:8,13
**speak** 5:3
**special** 22:16,17
24:5,7
**speculate** 42:16
66:4
**spending** 45:3
45:12
**spoke** 26:22
44:1
**spontaneously**
61:1
**spring** 65:8 70:6
**staff** 70:5
**standards** 8:15
**started** 15:2
54:13

**State** 67:8 73:4
**stated** 49:4
51:17 54:12
**statement** 45:13
45:14 54:8
**states** 1:1 11:8
**statistics** 22:1
**Statute** 3:19 4:3
**step** 46:16
**stipulated** 3:8
3:20 4:5
**stipulations**
1:21 3:6
**stomach** 63:20
63:21
**store** 48:2
**story** 48:6,22
50:16,18,23
51:1,3
**street** 1:20 2:6
5:10
**student** 9:13,18
9:19,20 10:22
11:22 12:1
13:14,18 14:1
14:6 15:12
18:9 26:11
31:3,7 36:9
37:8 39:16
40:12 41:4
44:10,14,23,23
45:3 46:21
52:10 54:1,2
54:12 66:7
69:8 70:10
**students** 4:18
9:16 11:9 18:6
22:3,3,6,18
27:14,14 32:16
33:11,18 35:20
36:17 38:14
39:8,10,20
40:8,20 41:8
41:16 44:7
46:1,3,22

47:14,17 53:21
54:2,9 58:22
59:23,23 60:2
60:12 61:10
62:8 66:22
67:2 69:22
70:3,7,21
**student's** 41:11
**stuff** 21:16
**substantially**
53:20
**substantiated**
18:5
**Suite** 2:6
**summoned**
11:11 18:4
**Superintendent**
2:18 14:12,15
15:16 16:17
18:11
**Superintende...**
16:20
**superior** 23:10
**supervision**
20:19 73:11
**suppose** 51:16
**supposed** 38:7
**supposedly**
57:17
**sure** 10:19 16:12
30:22 41:1
45:13 48:16,19
54:11 64:23
65:4
**Susan** 2:5 5:7
**suspended**
59:13,14,15
64:3
**suspension**
38:19,21 39:1
55:4
**suspicion** 68:18
69:11,15 70:8
**Sweeney** 2:13
4:12 11:18

12:10,13,22
17:3,18 18:3
19:15 23:18,20
42:16 48:8
49:23 54:5
56:6,12,18,21
62:23 65:10,12
65:14 67:3,13
69:7 71:7,16
71:18,23 72:6
**sworn** 5:3
**symptoms** 21:10
21:12
**system** 7:8
**systems** 25:17
25:19

———————
**T**
———————
**take** 9:3 11:16
37:4 61:21
70:19
**taken** 1:17 3:10
3:12 31:8,10
31:12 73:9
**talk** 26:7,19 30:8
49:18 64:21
67:7
**talked** 8:1,2
27:22 28:3,9
29:15,15,17
37:11 38:4
39:22 44:10,14
44:17,22 46:9
46:17,18 51:8
62:17,18,19
**talking** 10:9
12:12,14,21
22:4 23:2 26:8
26:20 28:23
33:16
**talks** 10:20
**teacher** 6:21
9:13 17:15
20:13 23:6,7
26:5 67:18

**teachers** 6:3
16:21 17:20
30:9
**teaching** 6:14
**tech** 42:7,9,10
42:14,14 43:4
43:10
**technical** 42:9
**telephone** 41:22
59:9
**tell** 7:22,23
11:14 12:11
18:22 19:3,5
19:16 26:4,12
27:2,10,11
30:21 32:19
36:16 37:16
39:6,8 42:17
42:21 56:20
57:9 61:2
**telling** 52:3 55:2
**tells** 9:23 11:12
**tenure** 16:23
68:16
**term** 35:9 36:10
36:11 58:7
**terms** 48:3 54:20
60:21
**testified** 5:4
39:22 52:19
**testifying** 59:11
60:6
**testimony** 14:13
15:11 52:23
58:15
**tests** 25:3
**Thank** 11:16
18:19 67:10
71:7,22,23
**thereto** 73:10
**thing** 12:16 28:6
30:13 46:7
47:10 49:16
52:15,19,20
56:2 57:6

JR, A Minor                    July 25, 2007  Pike County Board of Education
Page 10

**things** 8:15,19
    19:10 21:11,18
    52:11
**think** 10:17
    19:23 21:19
    27:1,13 31:14
    32:10 42:9
    49:16 51:9,23
    52:21 54:23
    63:8 65:5 66:2
**thinking** 52:17
**Thomas** 43:17
**thorough** 71:3
**thought** 15:6
**three** 72:2
**time** 3:15,16
    5:22 29:3,6,11
    30:14 32:2
    34:6 38:1,11
    39:5,6 42:15
    45:4,19 49:3
    50:22 53:7
    54:12 66:20
    67:7
**timeline** 30:22
**times** 41:13
    56:15,17
**TMR** 1:7
**today** 25:16
    37:16
**told** 7:20 25:21
    25:21 27:2
    28:17 30:12
    31:10 34:18
    35:1 36:9 39:1
    40:20 46:18
    55:8,14 58:20
    58:21 60:13
    62:17
**total** 7:3
**touched** 21:5,6
    61:16
**trailers** 29:3
**training** 15:23
    16:6,13,21

17:1,8 20:8,10
    20:22 21:7
    23:22 24:2,5,7
**transcript** 73:8
    73:13
**transition** 25:2,7
**transport** 33:21
    62:8
**transporting**
    32:16 33:17
    46:22
**treated** 37:1
**trial** 4:1
**tried** 35:9
**Trooper** 67:8
**Troy** 1:20
**true** 73:12
**truth** 5:3,3,4
**try** 40:2 47:16
    47:19
**trying** 34:9 53:7
    57:23
**turn** 26:17 37:17
    52:8
**two** 6:10 7:1,5
    10:8 11:20
**type** 21:18
**typed** 4:17 50:9

────────
        U
────────
**uhm** 28:22
    32:10 35:2
    37:1 47:4 54:3
    54:20 55:17
    63:17
**unaware** 58:3
**unbecoming**
    36:7 53:19
    60:15 61:12
**understand** 8:4
    15:2,18 22:6
    33:3 53:5
**understanding**
    7:18 8:10
**understood** 65:6

**unique** 49:21
**UNITED** 1:1
**unknown** 65:18
**unsubstantiated**
    18:8
**upset** 27:21,21
**use** 24:14 34:23
    53:13 59:22
    60:19,20

────────
        V
────────
**validate** 23:9
    26:18 28:7
**vehicle** 33:20
    46:21 62:8
    67:2
**vehicles** 32:17
**verbal** 10:21
**version** 4:17
    50:9
**victims** 24:6
**voc** 42:7,9,10,14
    42:14 43:4,10
**vocational** 42:9
**VS** 1:10

────────
        W
────────
**Wait** 54:5
**waived** 3:23 4:8
**waiving** 4:3
**WALTER** 1:17
    3:10,22 4:11
    5:1 73:8
**want** 32:10
    33:13 38:21
    60:23 66:4
**wanted** 18:22
    28:6 31:14
    55:19 60:23
**warned** 46:23
    62:7
**warnings** 62:10
**Washington**
    2:10
**wasn't** 29:6

53:16
**way** 46:19 70:3
**week** 25:9 30:15
    39:3 62:6
**went** 72:3
**weren't** 37:17
**West** 2:6
**we're** 40:23
**we've** 13:23
**White** 2:13
**window** 64:8,11
    65:18,21 66:3
    66:12
**wise** 8:16 73:16
**wish** 18:7
**witness** 4:6,7 5:2
    23:19 33:1
    36:14 37:22
    49:21 56:9
    57:15 63:7,10
    65:13,13 69:4
    69:6 71:17
    72:5 73:13
**word** 36:1 53:13
    54:3,11 57:19
    58:12 59:5
    60:19
**words** 51:3
**work** 5:16 6:3
    16:17
**worked** 7:1 26:2
**write** 8:9,9 9:5
**writing** 8:5,11
    8:17,18,22
    48:20 73:11
**written** 24:13
    38:18
**wrote** 42:6,21
    50:12

────────
        Y
────────
**yeah** 16:16 31:8
    38:3 57:21
**year** 5:23 16:11
**yearly** 6:8,9

**years** 5:15 6:10
    6:20,20,22,23
    6:23 7:1,3,5
    10:8
**Younger** 63:10

────────
        0
────────
**04** 7:14
**04-05** 10:16
**05** 7:14

────────
        1
────────
**1st** 33:14,16,23
    34:9,10,13
**10th** 25:3,4,5
    42:15 73:18
**107** 1:20
**11** 10:20
**11:25** 72:10
**1105** 5:11
**12** 11:15
**14** 6:22 40:7
    44:10 47:23
    55:11
**16** 4:17 50:3,8
**1726** 2:6
**1819** 2:14

────────
        2
────────
**2** 10:13
**2nd** 2:6
**2:06-CV-1120...**
    1:11
**2003** 10:16
**2004** 10:14
**2005** 65:8 70:6
**2007** 1:19 72:11
    73:10,18
**25th** 1:18 72:11
    73:9
**260** 2:10
**29** 6:20

────────
        3
────────
**3rd** 25:9
**33** 5:15 7:3

**35203** 2:15
**36104** 2:10
**36105** 2:6
**36467** 5:12

---
**4**
---
**4** 12:2 13:12
   15:12

---
**5**
---
**5** 4:12
**50** 4:17

---
**6**
---
**68** 4:12

---
**7**
---
**72** 4:13
**74** 4:14

---
**8**
---
**8** 15:12

---
**9**
---
**9:30** 1:22
**90** 47:23

EXHIBIT 13

Page 1

IN THE U.S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

        PLAINTIFF,


VS.                              CASE NO.:

                                 2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

        DEFENDANT.

                * * * * * * * * * *

        DEPOSITION OF ROBERT S. BRADBURY, taken before

Mary Moore-Wynn, CSR, CCR, as Commissioner, on the 18th

of October, 2007, in the offices of Pike County Board

of Education, 101 West Love Street, Troy, Alabama,

36081, pursuant to stipulations set forth herein,

commencing at approximately 9:45 a.m.


                * * * * * * * * *

JR, A Minor                          October 18, 2007                    Pike County Board of Education

|  | Page 2 |
|---|---|
| 1 |  |
| 2 | * * * * * * * * * * |
| 3 | APPEARANCES: |
| 4 | FOR THE PLAINTIFF: |
| 5 | Hon. Deanie Clark Allen |
|  | Azar, Azar & Moore |
| 6 | Aliant Center |
|  | 2740 Zelda Road |
| 7 | Montgomery, Alabama 36106 |
| 8 |  |
| 9 | FOR THE DEFENDANT: |
| 10 | Hon. Donald R. Sweeney |
|  | Bradley, Arant |
| 11 | One Federal Place |
|  | 1819 Fifth Avenue North |
| 12 | Birmingham, AL 35203-2104 |
| 13 | ALSO PRESENT: |
| 14 | Mr. Mark Bazzell, Superintendent |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |

**Page 4**

1  introduced at the trial of this case or used in any
2  other manner by either party hereto provided for by the
3  Statute, regardless of the waiving of the filing of
4  same.
5      It is further stipulated and agreed by and
6  between counsel and the witness that the reading
7  and signing of the deposition by the witness is
8  hereby waived.
9                  INDEX
10  ROBERT S. BRADBURY
11  Examination By Ms. Allen                6
      Examination By Mr. Sweeney              74
12  Further Examination By Ms. Allen         86
      Further Examination By Mr. Sweeney       95
13  Further Examination By Ms. Allen         97
14  Reporter's Certificate                   100
15              INDEX OF EXHIBITS
16  Exhibit Number    Description      Page Number
17  Plaintiff's Exhibit 31  Bob Bradbury      6
      Deposition Subpoena
18  Plaintiff's Exhibit 32  Pike County       16
      Sheriff's Department Reports on
19      Phillip Faulkner
      Plaintiff's Exhibit 33  Transcription of   20
20      Blake Faulkner Tape Recorded
      Interview
21  Plaintiff's Exhibit 34  Justin Reed       33
      statement/Bradbury
22  Plaintiff's Exhibit 35  Pike             51
      County/Bradbury/Coon/Deposition
23

**Page 3**

1            * * * * * * * * * *
2
3
4
5
6            STIPULATIONS
7
8      It is hereby stipulated and agreed by and between
9  counsel representing the parties that the deposition of
10  ROBERT S. BRADBURY is taken pursuant to the Federal
11  Rules of Civil Procedure, and that said deposition may
12  be taken before Mary Moore-Wynn, CSR, CCR, as
13  Commissioner, without the formality of a commission;
14  that objections to questions, other than objections as
15  to the form of the questions, need not be made at this
16  time, but may be reserved for a ruling at such time as
17  the deposition may be offered into evidence, or used
18  for any other purpose by either party hereto, provided
19  by the Statute.
20      It is further stipulated and agreed by and between
21  counsel representing the parties in this case, that the
22  filing of the deposition of ROBERT S. BRADBURY is
23  hereby waived, and that said deposition may be

**Page 5**

1  Plaintiff's Exhibit 36  Charles Coon       51
      Witness Statement
2  Plaintiff's Exhibit 37  Butler County Case  55
      #CC2005-196 Agreement of Counsel
3      and Defendant (Coon)
      Plaintiff's Exhibit 38  Mona Watson       62
4      Summary Interview
      Plaintiff's Exhibit 39  Pike County       63
5      Sheriff's Department Reports on
      Justin Reed
6  Plaintiff's Exhibit 40  Pike County        72
      District Court Case #'s 2005-438,
7      2006-272, Plea Agreement (Coon)
      Plaintiff's Exhibit 41  Pike County       72
8      District Court Case #'s 2005-438,
      2006-272, Signed Settlement
9      Agreement(Coon, Counsel,
      Prosecutor, Judge)
10
11
12
13
14
15
16
17
18
19
20
21
22            * * * * * * * * *
23

Page 6

1       ROBERT S. BRADBURY
2       (Whereupon, the witness, after having first been
3   duly sworn to speak the truth, the whole truth, and
4   nothing but the truth, testified as follows:)
5       MS. ALLEN: Let's make this Plaintiff's
6       Exhibit 31.
7       (Whereupon, Plaintiff's Exhibit 31
8       was marked for identification and
9       is attached hereto.)
10      THE COURT REPORTER: And you want usual
11      stipulations?
12      MR. SWEENEY: Yeah.
13      MS. ALLEN: We want the -- thank you --
14      the usual stipulations.
15          EXAMINATION
16  BY MS. ALLEN
17  Q  Mr. Bradbury, I think you know me. Deanie Allen?
18  A  Yes, ma'am.
19  Q  We have met before. You know Donald Sweeney?
20  A  No. I've never met him.
21  Q  This is Donald Sweeney. He represents the board
22      and the other defendants.
23      And you know Mr. Bazzell?

Page 7

1   A  Yes, ma'am.
2   Q  So, you have been deposed before?
3   A  No, not really.
4   Q  Oh, you have not been deposed before?
5   A  No.
6   Q  Well, just quickly, I will be asking you
7       questions. And then Mr. Sweeney will ask you
8       questions. If you don't understand the question,
9       please let me know, because if you answer it, I
10      will assume that you understood. If you want to
11      correct anything or go back and discuss something
12      again, just let me know. I will be glad to give
13      you that opportunity.
14      Did you talk to anybody in preparation for
15      this deposition?
16  A  Certainly.
17  Q  Who did you talk to?
18  A  Sheriff Thomas.
19  Q  Anybody else?
20  A  We had a conference on a three-way call -- well,
21      not three way, but on speakerphone: Dr. Bazzell,
22      Sheriff Thomas, and Karen Berry.
23  Q  What was the gist of your discussion?

Page 8

1   A  They just asked me what I knew.
2   Q  Can you summarize what you told them?
3   A  Summarize what I told them. I told them that the
4       initial interview done by Mona Watson was a poor
5       interview in as much that she was asking
6       questions -- making statements to the child and
7       saying this is the way it happened. It was not
8       good for law enforcement. You always want your
9       victim to testify, rather than agreeing to what
10      the interviewer says.
11      That I interviewed Justin Reed along with
12      district attorney investigator, Bruce Matthews',
13      tape-recorded statement, where he was -- well,
14      he's slow. I mean, I don't want to say he's
15      retarded, because I'm not a doctor. But he's
16      slow. And he was reluctant to talk to us, because
17      he didn't know us. As he got to know us a little
18      bit better, he stated that Mr. Coon had touched
19      him in his private parts once or twice with his
20      hand outside his clothing while in the band room
21      at school.
22      Uhm, I think that was the gist of it, to be
23      honest. I mean...

Page 9

1   Q  There is nothing else that you can remember about
2       that conversation?
3   A  Well, I asked him several questions, and he
4       answered no to them.
5   Q  No, I'm talking about the -- I understand you're
6       relating to me your conversation with Dr. Bazzell,
7       Karen Berry, and --
8   A  Well, I was talking about the interview with
9       Justin. But that's what I talked to them about.
10  Q  Right. Is there anything else about the
11      conversation, the three-way, four-way conversation
12      you had with them that you can recall?
13  A  No, ma'am.
14  Q  Okay. All right. First of all, state your full
15      name for the Record. I'm sorry.
16  A  Robert S. Bradbury, Junior.
17  Q  And what is your residence address?
18  A  467 County Road 2239, Goshen, Alabama.
19  Q  What's the zip code?
20  A  36035.
21  Q  Are you married?
22  A  Yes, ma'am.
23  Q  What is your wife's name?

**Page 10**

1   A   Sheila.
2   Q   Do you have any children?
3   A   One.
4   Q   How old and what is your child's name?
5   A   She's 30 -- 36.  Her name is Judith Ann.  And she
6       lives in Los Angeles, California.
7   Q   Okay.  First of all, give me a little rundown of
8       your educational history.
9   A   High school graduate.  Some college classes.
10  Q   Where did you graduate from high school?
11  A   Trenton, New Jersey.
12  Q   And what college did you have?
13  A   Some at Enterprise State.  Based on, you know, law
14      enforcement classes that we took down there.
15  Q   Do you have a degree?
16  A   No, ma'am.
17  Q   Okay.  So, when did you move to Alabama?
18  A   1977.
19  Q   All right.  Give me a rundown of your work
20      history, when you moved to Alabama.
21  A   Well, when we first moved, I worked at Zippy Mart
22      in Troy.  I worked at the Goshen Police
23      Department.

**Page 11**

1   Q   And that would be in 1977?
2   A   '77. '77, and then '78, I joined the Pike County
3       Sheriff's Department.  And retired 2007.
4   Q   So, you worked for the Pike County Sheriff's
5       Department from 1978 to 2007?
6   A   Yes, ma'am.
7   Q   Okay.  How familiar were you with Pike County High
8       School?
9   A   Not at all.
10  Q   Okay.  Do you or did you know someone by the name
11      of Johnny Wright?
12  A   No.
13  Q   Okay.
14  A   You have to remember now, Pike County High School
15      is in the jurisdiction of Brundidge Police
16      Department.
17  Q   I understand.
18  A   Any problems that arise down there are to go
19      through the Brundidge Police Department.
20  Q   This was strictly by way of information that I was
21      asking you.
22          I'd like for you to tell me how you first got
23      involved with the investigation regarding

**Page 12**

1       Mr. Coon.
2   A   Telephone call from Mona Watson.
3   Q   All right.  When was that?
4   A   July of -- I don't even remember the year.  I know
5       it was in July.
6   Q   Would 2005 sound accurate to you?
7           MR. SWEENEY:  We'll stipulate it was
8       2005.
9   Q   And Mona Watson called you, and what did she say?
10  A   She said that she had a second victim of Charles
11      Coon in her office; that she had already
12      interviewed him.  And I believe she said that oral
13      sex had been involved.
14  Q   All right.  Did she say how she came about the
15      name -- Justin's name?
16  A   No, ma'am.
17  Q   Did she mention Justin's name to you at that time
18      when she said she had a second victim?
19  A   I believe she did.
20  Q   But she did not tell you how she knew or suspected
21      that Justin was a victim?
22  A   No, ma'am.
23  Q   Do you know how Justin's name came up as a victim

**Page 13**

1       of Mr. Coon?
2   A   Mona Watson called me.
3   Q   But -- so, that's all you know?
4   A   Well -- no.  Originally, she called me -- she
5       called me and told me that she had a second victim
6       in her office in the Justin Reed (sic) case.  And
7       I made arrangements to go down there and talk to
8       her and Ms. Reed.
9   Q   You went where to talk to her and Ms. Reed?
10  A   Child Advocacy Center.
11  Q   All right.  And when was that?
12  A   The same day, I believe.
13  Q   Okay.
14  A   You've got my reports there.  It should be written
15      out there.
16  Q   Well, I would like for you to explain a little bit
17      to me.
18  A   All right.
19  Q   Did you know Mr. Coon prior to the incident
20      involving Mr. Coon?
21  A   Personally, no.
22  Q   All right.  Did you know of Mr. Coon?
23  A   Certainly.

Page 14

1  Q  What did you know about him?
2  A  He was a suspect in a separate sex abuse case.
3  Q  All right.  Was that your first knowledge of
4     Mr. Coon?
5  A  Yes.
6  Q  All right.  So, your first knowledge of Mr. Coon
7     came about through a separate case.  What case was
8     that?
9  A  Phillip Faulkner.
10 Q  All right.  Can you tell me how you got involved
11    in that?
12 A  Well --
13 Q  So, this preceded the investigation and your
14    discussion about Justin?
15 A  Phillip Faulkner's case was ongoing at the time.
16    Sheriff Thomas and I believe Bob Williamson had
17    talked to the Faulkner child.  And I think they
18    even got a telephone call recorded where Faulkner
19    called Coon.  I was sort of on the outside looking
20    in.  I was involved in other things.  And it came
21    up to the point that we were going to Butler
22    County and obtain warrants against Coon for sexual
23    abuse on Faulkner.  And we all went over there.

Page 15

1     And we got warrants issued from Butler County,
2     because the incidents that we investigated were --
3     took place in Butler County.  And I was present at
4     the time of a search of Coon's residence.  And I
5     was present at the time of Coon's arrest.
6  Q  If it took place in Butler County, why would the
7     Pike County Sheriff's Department be involved?
8  A  Phillip's father brought Phillip into our
9     office -- from what I understand.  Now, I wasn't a
10    party to those conversations.  But Phillip's
11    father brought Phillip into the office and talked
12    to Sheriff Thomas.  And it was originally thought
13    that the incidents occurred in Pike County.
14 Q  And that's why Phillip Faulkner's dad brought him
15    into Pike County?
16 A  Yes, ma'am.
17 Q  All right.  You were not a party to those
18    discussions?
19 A  With the Faulkner boy?
20 Q  Uh --
21 A  No, ma'am.
22 Q  With Mr. Faulkner.
23 A  No.

Page 16

1  Q  Can you identify this for me, please?
2     MR. SWEENEY:  Are we going to mark those
3     as exhibits?
4     MS. ALLEN:  I am.
5     MR. SWEENEY:  That would be Plaintiff's
6     Exhibit's 32?
7     MS. ALLEN:  Right.
8     (Whereupon, Plaintiff's Exhibit 32
9     was marked for identification and
10    is attached hereto.)
11 A  This is reports on Phillip Faulkner.
12 Q  And whose signature is at the bottom of those
13    reports?
14 A  Mine.
15 Q  So, does that change your recollection of how you
16    came to be involved in Phillip Faulkner's things?
17 A  Well, if you would look closely, each one of these
18    are in my handwriting -- let's see 7/15 -- 7/8,
19    7/6 -- 6, 8, 17 -- that one should be there.
20 Q  All right.  So, what is this document that I have
21    just handed you?
22 A  This is a supplemental report.
23 Q  All right.  A supplemental report.  And it's Bates

Page 17

1     Stamped 129 through 132 for the Record.
2     And it's a supplemental report on Blake
3     Faulkner.  And what is the date on that?
4  A  Well, one of them says 7/6.  One of them says 7/7.
5     One of them says 7/8.
6  Q  So, did you talk to Mr. Faulkner when he came in
7     and made the complaint?
8  A  I sure didn't remember this.  On 7/6, the
9     supplemental report states that I took a statement
10    from Phillip Faulkner.
11    Now, this would have been done -- as I recall,
12    the Sheriff talked to Phillip and his son -- I
13    mean, Phillip and his father upstairs in their
14    office.  I was called in the Sheriff's office and
15    told to go downstairs and take a tape-recorded
16    statement from Phillip.
17 Q  Did you do that?
18 A  Yes, ma'am.
19 Q  Did the Sheriff's Department keep a copy of the
20    tape-recorded statement?
21 A  No, ma'am.  We kept the original.
22 Q  Excuse me.  I mean the original.  So, there is an
23    original copy of this statement?

| Page 18 |
|---|
| 1  A   Certainly. |
| 2  Q   An original tape-recorded copy of that statement? |
| 3  A   Certainly. |
| 4  Q   Are you familiar with the subpoena that we served |
| 5      on the Sheriff's Department asking for all tapes |
| 6      and any documents that you may have on anything |
| 7      related to Mr. Coon? |
| 8  A   I got a subpoena asking me for it.  I don't know |
| 9      of any subpoena for the Sheriff's Department. |
| 10 Q   You're not familiar with that? |
| 11     All right.  So, you went up to Sheriff Thomas' |
| 12     office, and he asked you to go down and to get a |
| 13     statement. |
| 14         MS. ALLEN:  I am going to enter this in |
| 15         as Plaintiff's Exhibit 32. |
| 16 Q   Did you then interview Blake Faulkner? |
| 17 A   I took his tape-recorded statement.  I asked him a |
| 18     few questions, and he answered. |
| 19 Q   Who was present when you asked him these |
| 20     questions? |
| 21 A   I don't recall. |
| 22 Q   Would you identify this document for me, please? |
| 23 A   It appears to be a transcript of a statement given |

| Page 19 |
|---|
| 1      to me by Phillip Blake Faulkner. |
| 2  Q   Does that appear to be an accurate transcription |
| 3      of the statement that he gave? |
| 4  A   Well, without reading it and -- |
| 5  Q   Well, take your time. |
| 6  A   Well, I would have to compare it to the tape |
| 7      recording, too. |
| 8  Q   Well, would that -- |
| 9  A   I was just looking to see if there was anybody |
| 10     else present. |
| 11         MR. SWEENEY:  May I clarify; who did |
| 12         that? |
| 13         MS. ALLEN:  That was given to me by the |
| 14         Greenville Police Department in |
| 15         response to our subpoena. |
| 16         MR. SWEENEY:  Okay. |
| 17         MS. ALLEN:  And it was marked, so you |
| 18         should have a copy. |
| 19         MR. SWEENEY:  I do.  I just didn't know |
| 20         who typed it up. |
| 21 BY MS. ALLEN |
| 22 Q   It indicates on here -- |
| 23 A   I see on one of the back pages that Sheriff Thomas |

| Page 20 |
|---|
| 1      was present at part of it. |
| 2  Q   It appears that he came in in part of it; is that |
| 3      correct? |
| 4  A   Yes, ma'am. |
| 5  Q   All right.  The person's name who is listed at the |
| 6      bottom of this, Peggy -- |
| 7  A   Peggy Barbaree. |
| 8  Q   Would that indicate that she was the one that |
| 9      transcribed this? |
| 10 A   Yes, ma'am. |
| 11 Q   And who is she? |
| 12 A   She is one of the secretaries in the Sheriff's |
| 13     Department. |
| 14 Q   So, would that make this, in your opinion, a |
| 15     reliable transcription of the statement that was |
| 16     given? |
| 17 A   Yes. |
| 18 Q   All right.  Let me ask you this -- |
| 19         MR. SWEENEY:  Can we mark that as |
| 20         Plaintiff's Exhibit 33? |
| 21         MS. ALLEN:  Yes.  Mark this as |
| 22         Plaintiff's Exhibit 33, if you will. |
| 23         (Whereupon, Plaintiff's Exhibit 33 |

| Page 21 |
|---|
| 1      was marked for identification and |
| 2      is attached hereto.) |
| 3  BY MS. ALLEN |
| 4  Q   What experience do you have in dealing with sexual |
| 5      abuse cases in your position with the Pike County |
| 6      Sheriff's Department? |
| 7  A   Just 30 years experience in law enforcement.  I |
| 8      don't have -- I don't have any specific -- |
| 9  Q   How many sexual abuse cases would you estimate, |
| 10     over that period of time -- and this would, I |
| 11     understand, be an estimate -- of cases that you |
| 12     handled that dealt with sexual abuse? |
| 13 A   Uhm, maybe 15 or 20. |
| 14 Q   How many of those dealt with -- or did they all |
| 15     deal with children? |
| 16 A   Mostly children. |
| 17 Q   Okay.  So, when you say you dealt with those |
| 18     cases, what role did you play? |
| 19 A   As far as... |
| 20 Q   Investigation, anything, any role you played as |
| 21     far as the case was concerned. |
| 22 A   The only thing I do was investigate.  Testify at |
| 23     court, if need be. |

**Page 22**

1  Q   And by "investigate", what do you mean?
2  A   Try to get to the bottom of the facts.  Get the
3      facts in the case.
4  Q   Talk to the individuals?
5  A   Talk to the individuals, the victims.
6  Q   Talk to the victims.  Do you talk to the person
7      who supposedly perpetrated the actions?
8  A   Only when they allow me to.
9  Q   Did you talk to Mr. Coon?  Did you take a
10     statement from Mr. Coon?
11  A   Yes, ma'am.
12  Q   Did you interview Mr. Coon in the way that you
13      interviewed Blake Faulkner, or did you simply ask
14      him what happened?
15  A   After the incident in Greenville, he lawyered up
16      and wouldn't talk to us.
17  Q   Okay.  Well, I will talk about Justin later.  In
18      this discussion with Blake Faulkner, as opposed to
19      having you read this whole thing, can you recall
20      and summarize what Blake said?
21  A   I believe that he indicated that Coon performed
22      oral sex on him; that he would take him to his
23      residence in Greenville.  They would do odd jobs,

**Page 23**

1      clean up the carport, whatever the case may be.
2      And sometimes they would get in the truck and go
3      off --
4          MR. SWEENEY:  I object to the relevance
5          of this testimony and move to strike
6          any reference to Blake Faulkner as
7          having no relevance in our case.
8          MS. ALLEN:  Well, I think that the way
9          that Justin's name came up was
10          through this case.  I think we have
11          a right to --
12          MR. SWEENEY:  I'm not instructing the
13          witness not to answer.  He's not my
14          witness.  I'm just preserving my
15          objection that what happened with
16          Blake Faulkner has nothing to do
17          with the Pike County Board of
18          Education.
19          MS. ALLEN:  I understand.
20  BY MS. ALLEN
21  Q   You can still answer.
22          MR. SWEENEY:  Or this case.
23  A   As I said, I think Faulkner indicated that Coon

**Page 24**

1      had performed oral sex on him; that he had taken
2      him to Greenville to his residence -- Coon's
3      residence, that is.  That they were friendly with
4      each other.
5  Q   Did Blake Faulkner tell you when this sexual
6      activity began?
7  A   I don't -- I don't recall.  I would have to look
8      at the reports.
9  Q   Okay.  The report will show that it happened -- it
10      began two years earlier.
11          MS. ALLEN:  Do you want me to find that
12          place in here?
13          MR. SWEENEY:  Yes, and show the witness,
14          so he can review the accuracy of it.
15  Q   All right.  Here's one of the places.  You can
16      read where it says how long of a period do you
17      think this -- well, that's not -- you don't need
18      to start there.  Since that time --
19  A   Since that time, how many occasions have occurred
20      where he has performed oral sex or fondled you or
21      something of that nature?  About four times.  Four
22      times over the course of the last year or so?
23      This year and over the last -- over the season

**Page 25**

1      last year, or after the Christmas.
2  Q   Okay.
3  A   And when was the last time this occurred?  The
4      last time occurred was last week when I went to
5      his house.  I think it was on Thursday.  Last week
6      on a Thursday, which would have been June 30th.
7  Q   So, he indicates that it took place for two years?
8          MR. SWEENEY:  Object to the form.
9          That's not what he said.
10  Q   What was your understanding of what he said,
11      length of time that it took place?
12          MR. SWEENEY:  Let's go with what it says
13          rather than understanding.
14  Q   Well, I want to ask you what your understanding
15      was as far as how long the activity had taken
16      place.
17          MR. SWEENEY:  Object to the form.
18  Q   All right.  Read this.  The last two --
19  A   And has this gone on since you were how old?  Ever
20      since I started 8th grade.  I would be 14.
21  Q   So, that indicates that it had been going on for a
22      number of years.
23          MR. SWEENEY:  Object to the form.

JR, A Minor                          October 18, 2007                    Pike County Board of Education

---

Page 26

1   Q   How old was he when this interview was done; do
2       you recall?
3   A   I don't recall.  I would have to look at the
4       reports.
5   Q   All right.  When was his birthday?
6   A   Birth date is 9/8/89.
7   Q   So, how old would have been?
8   A   As I say, I don't know.  I would have to look at
9       the report.  9/8/89.
10  Q   So, he was born in '89?  And this was done in
11      2005.
12  A   Yeah, 2005.  So, he's 17 or 16 -- 16 or 17.
13  Q   So, it's been going on since he was 14 --
14          MR. SWEENEY:  Object to the form --
15  Q   -- according to his --
16          MR. SWEENEY:  Instead of you testifying,
17          if you will ask him (inaudible).
18  BY MS. ALLEN
19  Q   All right.  What else did Blake testify to?
20  A   I really don't recall.  I didn't go and read those
21      reports.
22  Q   Do you recall him testifying that he was given
23      gifts by Mr. Coon?

---

Page 27

1   A   Certainly.
2   Q   Can you recall any of those gifts?
3   A   Cell phones and a computer.
4   Q   Can you recall anything about a bank account?
5   A   I seem to remember a credit card or something.
6          MR. SWEENEY:  Excuse me.  What was the
7          last question?
8          MS. ALLEN:  Do you recall anything about
9          a bank account?
10  A   I seem to remember a credit card or something of
11      that nature.
12          MS. ALLEN:  All right.  I want to
13          introduce this interview with Blake
14          Faulkner as Plaintiff's Exhibit 33.
15  BY MS. ALLEN
16  Q   Do you recall any other child being mentioned by
17      Blake Faulkner in this interview?
18  A   Yes.
19  Q   Who was it?
20  A   The Helms boy.
21  Q   And what was the Helms boy's full name?
22  A   Adam.
23  Q   All right.  Adam Helms.  Can you recall what was

---

Page 28

1       said, or do you want to read this?
2   A   I think Adam went to Greenville with them once or
3       twice.
4   Q   Okay.  Are you saying he indicated that Adam had
5       spent time with Mr. Coon?
6   A   Well, going to Greenville with him, yes.
7          MS. ALLEN:  Introduce this as
8          Plaintiff's Exhibit 33.
9   Q   All right.  So, you went to Butler County.  You
10      interviewed Blake Faulkner; you testified to that;
11      correct?
12  A   Here in Troy.
13  Q   Here in Troy.  So, what happened after that as far
14      as the investigation of Mr. Coon is concerned?
15  A   Sheriff Thomas and the Chief, Alonzo Ingram, I
16      believe his name is, talked.  The Sheriff was
17      talking to one or two of their investigators.  And
18      they got warrants issued in Butler County for
19      Mr. Coon's arrest.
20  Q   All right.  And what were the warrants for?
21  A   Sexual abuse, I guess.  I mean, I didn't --
22  Q   When you say "warrants", are you talking about
23      arrest warrants?

---

Page 29

1   A   Yes, ma'am.
2   Q   Okay.
3   A   And a search warrant.
4   Q   And search warrants?  Okay.  Tell me about the
5       search warrants.
6   A   That was conducted by the Greenville Police
7       Department.  I was present.  I mean, I didn't
8       physically conduct the search.  Most of the time,
9       I stayed outside on the carport watching for Coon.
10  Q   Do you recall what was found?
11  A   Several cell phones.
12  Q   Anything else?
13  A   I don't know.  I mean, like I said, I wasn't party
14      to the search.
15  Q   So, you don't recall anything else that was found
16      as a result of the search warrants?
17  A   I don't think I was told what was found.  Of
18      course, I didn't want to know, either.
19  Q   Now, let me understand -- my understanding was
20      that you were an intricate part of this
21      investigation.  Is that accurate?
22  A   No.
23  Q   Okay.  Explain to me, then, what role you played

---

JR, A Minor                               October 18, 2007                    Pike County Board of Education

Page 30

1    in the investigation.
2  A    As far as Phillip Blake is concerned, the only
3        thing I did was take a statement from him.  The
4        Sheriff and Bob Williamson talked to Phillip's
5        father.  They did the telephone call where Coon
6        made an admission of some type of guilt.  I
7        traveled to Greenville with several officers.  I
8        stood outside while a search of the residence was
9        conducted.  I went inside once or twice just to
10       look.  But I didn't -- I didn't move anything, and
11       I didn't take anything.
12  Q    All right.  So, what happened after that as far as
13       the progress of the investigation?
14  A    First got to Coon's house, wasn't nobody there.
15       One of the investigators from Greenville, I
16       believe called him on the phone and him that
17       his house had been burglarized and that needed him
18       to come home.  About an hour later, he drove up.
19       He was arrested.  He opened the residence up, and
20       the Greenville Police Department went in to
21       search.  Coon was transported to the Greenville
22       Police Department where he was questioned by one
23       of their investigators.

Page 31

1  Q    Do you have any knowledge of how Justin Reed's
2        name came up?
3  A    Only thing I can tell you is Mona Watson called
4        me.
5  Q    You don't know anything else about the
6        investigation that would have indicated how his
7        name was made known to Mona?
8  A    I don't.
9  Q    All right.  So, let's take it from there.  All
10       right.  Let's start back with -- did anything else
11       happen as far as Mr. Coon that you were a part of
12       until Mona called you?
13  A    No.
14  Q    All right.  Let's go back to when Mona called you.
15       Mona called you, and what happened then?
16  A    Told me that she had a second victim of Charles
17       Coon in her office; that she had already
18       interviewed him.  I think she said that he
19       indicated that oral sex had been involved.
20  Q    Okay.  And so what did you do then?
21  A    I went down to the Child Advocacy Center.  Talked
22       to Mona Watson and Mrs. Reed.  Made arrangements
23       for Bruce Matthews from the district attorney's

Page 32

1        office and myself to view the interview.  After
2        seeing the interview and its poor -- poor
3        investigative tactics, arranged to interview
4        Justin again.
5  Q    So, it was your judgment that Mona Watson was not
6        qualified to interview Justin?
7  A    I don't know whether she was qualified or not.  I
8        didn't particularly like the way she did it.
9  Q    And what, in particular, again, did you not like
10       about what she did?
11  A    I thought that she was testifying rather than the
12       child.
13  Q    Have you ever witnessed a forensic investigator or
14       anyone from child protect interview a child
15       before?
16  A    No.
17  Q    So, you had nothing to compare it to?
18  A    No.  Just experience.
19  Q    What experience would that be?
20  A    That's not the way you conduct an interview.  You
21       don't tell a child what happened and have him
22       agree to it.
23  Q    Okay.  All right.  Just a second.

Page 33

1  A    You have to remember that at the time that Justin
2        Reed's interview took place, the Child Advocacy
3        Center had just started up.  It was in his
4        infancy.
5  Q    So, does that mean the people that were working
6        there or handling these things were not qualified?
7        Is that something you learn on the job?
8        MR. SWEENEY:  Object to the form.
9  A    I wouldn't say that they weren't qualified.  I
10       just -- I wouldn't say that that was the proper
11       way you do things.  I mean, I don't have any idea
12       what Mona Watson's qualifications are.
13  Q    Okay.  Would you please identify this?
14  A    It appears to be a transcript of a statement given
15       by Justin Reed to me.
16       MS. ALLEN:  All right.  Let's mark that
17       as Plaintiff's Exhibit 34.
18       (Whereupon, Plaintiff's Exhibit 34
19       was marked for identification and
20       is attached hereto.)
21  BY MS. ALLEN
22  Q    All right.  Your primary objection to Mona
23       Watson's interview was that you objected to the

Mary Moore-Wynn, CCR              Mary Moore-Wynn                    (334)244-0203
                                 Court Reporting Services

Page 34

1    way she questioned him?
2    A  Yes, ma'am.
3    Q  Did that make you doubt the results of her
4    interview?
5    A  Well, from looking at -- from looking at the
6    interview and seeing the way she had approached
7    the child, and the child's responses -- you know,
8    in any criminal investigation, you want the victim
9    to be able to tell the story as to what happened;
10   rather than the investigator to lead the person
11   through and have them agree with it. You want
12   everything in the victim's own words.
13   Q  All right. I want you to look at that. And I've
14   got another copy over here. And I would like to
15   go through this interview that you did with
16   Justin.
17       Justin, you're 15 years old. And last year
18   you went to Pike County High School. You're in
19   the 9th grade? Yeah. You're going into the
20   10th grade? Yeah. You know today's date? If I
21   told you July 18th, 2005, would that mean anything
22   to you?
23       So far, have you asked him a single direct

Page 35

1    question that you didn't give him the answer to
2    first?
3    A  Certainly.
4    Q  What?
5    A  I asked him what was today's date.
6    Q  Before he had a chance to answer, according to
7    this transcript, if I told you today July 18th,
8    2005, would that mean anything? Would you take my
9    word for it?
10   A  Well --
11   Q  Is that what you said?
12   A  Yeah, that's what I said. But you have to
13   understand you're talking to a child. The child
14   is not responsive, because he doesn't know you.
15   And as he sits there, you know, because it says,
16   do you know what today's date is? If I told you
17   July 18th, 2005, would you mean this -- anything
18   to you -- would you take this -- that's not all
19   one complete (indicating) question. I mean, I
20   have asked him, do you know what today's date is?
21   And he sits there (indicating). If I told you
22   today's date was such and such and such, would you
23   believe me? (Indicating.)

Page 36

1    Q  Would you say that that was reflected in the
2    interview that Mona Watson had with him; that same
3    type of response?
4    A  No. The interview that Mona Watson did, she was
5    dealing with dolls. And she said something to the
6    effect, didn't he do this to you? Didn't he do
7    this to you?
8    Q  According to my --
9    A  What I would have said was, what did he do to you?
10   Q  Okay. I'm reading on page 1. As best you can, I
11   want you to tell me what happened. Now, you know
12   Ms. Mona. Ms. Mona used the same dolls talking to
13   you. Did you used -- I assume that's supposed to
14   be -- it says the sum dolls -- talking to you.
15   And I don't have no dolls. So, you're gonna have
16   to talk to me. You're gonna have to tell me, just
17   me and you and Mr. Bruce over there. And we're
18   talking. All right? Something happened with you.
19   And you didn't like it. You are gonna have to say
20   it now. You are gonna have to say it so I can
21   hear you.
22       All right. Did Mona ask questions like that?
23   A  The best I can remember from viewing the

Page 37

1    interview -- and like I said, it's been a long
2    time, but --
3    Q  Is there tape of this interview --
4       MR. SWEENEY: Wait. He was answering.
5       MS. ALLEN: Excuse me. Excuse me.
6    Q  Go ahead. I'm sorry. I interrupted.
7    A  As best I can remember, the way Mona was asking
8    the questions, she was telling the child certain
9    things that happened, and then says, isn't this
10   the way it was? As best I can remember.
11   Q  So, if Mona said that she conducted the interview
12   in an appropriate manner as a forensic interviewer
13   would interview a child like this; would you say
14   that your experience of how the interview should
15   be conducted would outweigh her experience?
16       MR. SWEENEY: Object to the form. I
17       don't think that question makes
18       sense.
19   Q  Who has the greater experience; you or Mona?
20   A  I don't know.
21   Q  Okay. Further down: One -- uh, one Auburn man to
22   another Auburn man, tell me what -- what happened
23   that you didn't like.

Page 38

1       Let's see. And then we have Justin's
2   response.
3       Well, the band man touched me in the wrong
4   place and stuff. And then you respond to that.
5   And you said -- I'm missing a page. I'm sorry.
6       So, you said, band director, you know who the
7   band director is. And he said, Mr. Coon. And you
8   said, when you say he touched you in the wrong
9   place, where is the wrong place? And he says
10  between the legs. And he says -- you said, okay
11  between your legs. Now, he did that at school?
12  And he answers yes. What else did he do? And
13  then like that's it. The conversation goes on.
14      When you were interviewing him, and you asked
15  him a question, and he starts responding in this
16  manner, what is that response?
17 A  He didn't do anything else. Do you remember
18  Ms. Mona with the dolls? Did that happen?
19      I don't recall whether -- I would have to -- I
20  don't know.
21 Q  You don't recall --
22 A  I don't remember for it's a yes or no when he
23  answers that way.

Page 39

1  Q  Is there a copy of this interview?
2  A  There is a tape recording.
3  Q  A tape recording of this interview?
4  A  Yeah.
5      MS. ALLEN: All right. I want to
6      request on the Record a tape
7      recording of this interview, please.
8      MR. SWEENEY: Well, we certainly don't
9      have control over that. If you want
10     it from the Sheriff's Department,
11     you'll have to --
12     MS. ALLEN: Well, we have already
13     subpoenaed it. We will go back and
14     do it again.
15 BY MS. ALLEN
16 Q  Do you recall Justin talking about Mr. Coon trying
17  to get him to smoke?
18 A  Yes.
19 Q  What did Justin say?
20 A  Said he didn't do it.
21     MR. SWEENEY: If it's in the transcript,
22     let's rely on the transcript.
23 A  Said he didn't do it.

Page 40

1  Q  Just read the part where he said he tried to get
2     him to smoke.
3  A  When out during school, what did you all do when
4     you were out during school? Just talked about
5     band practice and stuff. You didn't do nothing
6     else? Nope, just smoked. Smoked? Cigarettes?
7     But I was not -- but I was no smoking. He was
8     trying to make me smoke. He tried to make me
9     smoke. Did you smoke? No.
10 Q  Okay. All right. Read this part here. Did you
11    ever go for a ride?
12 A  Did you ever go for a ride with him in his truck?
13    Riding to school. Riding from your house to
14    school? Uh-huh. We was out during school.
15 Q  We was out doing school?
16 A  During school.
17 Q  Okay. So, you read this response as uh-huh. So,
18    that's your recollection that U-H U-H is uh-huh?
19 A  It should be, yeah.
20 Q  All right. Read this part here, please.
21 A  All right. The times that Mr. Coon touched you
22    when you were down at the band, at the band room
23    at the school. Uh-huh. Did he touch you with his

Page 41

1   hand inside your pants or outside your pants?
2   Outside. He never touched you inside your pants?
3   Uh-huh.
4  Q  So, that's --
5  A  Or huh-huh.
6  Q  So, he indicated that it happened in the band room
7     at school?
8  A  On at least one occasion.
9  Q  Okay. Read this part right here, if you will.
10 A  Now, when on the occasion that he touched you at
11    the band room, or touched you between your legs at
12    the band room, was there any other students in the
13    class? No.
14 Q  Keep going.
15 A  How do you -- how did he keep folks from coming in
16    and seeing you all? Did he lock the door? He
17    locked the door on you, or you locked the door?
18    That's what I locked the door.
19 Q  And who --
20 A  Reed speaking.
21 Q  Okay. Thank you?
22 A  I'm sorry? Reed, I locked the door. Bradbury,
23    you locked the door? When you locked the door --

Page 42

1    what did you lock the door for, Justin?  What you
2    lock the door for?  Reed.  Because he told me to.
3  Q   Okay.  That's good.
4       All right.  Read this.
5  A   Bradbury, he never put his mouth on you?  Reed,
6    nope.  He never had you put your mouth on him?
7    Huh-huh.
8  Q   Now, that's the same U-H U-H that you read as
9    uh-huh earlier.
10 A   Well, is it U-H or U-H-P up above on the other
11   one?
12 Q   It was U-H.  Let me find it again.  Is that the
13   same U-H U-H that you read as uh-huh earlier?
14 A   That's the way she has got it typed.
15 Q   Okay.  Start here.
16 A   Bradbury, do you think you can answer a question
17   for Mr. Bruce?  Ah, come on now.  Bruce is a cool
18   guy.  Matthews, you don't want to talk to me,
19   Justin?  Reed, no.  Matthews, why?  What did I do
20   to you?  Reed, sleepy.  Matthews, me too.  Me,
21   too.  You know what I did yesterday?  Reed,
22   huh-huh.
23 Q   Okay.  That's good.  All right.  Start here

Page 43

1    Matthews.
2  A   Matthews, do you remember telling her that -- that
3    he pulled your pants down?  You don't remember
4    that?  Reed, huh-huh.
5  Q   Ah -- is that the same uh-huh?
6  A   To me, it's no.
7  Q   We can go back to that original page.
8  A   With that question and that response, to me,
9    that's no.
10 Q   But no is not what it says according to the rest
11   of this transcript, is it?
12 A   It sayings U-H U-H.
13 Q   Which is --
14 A   To me, in that question and that response, is no.
15 Q   So, are you saying that in the other places uh-huh
16   is yes, but in this place, it's no?
17 A   I'm telling you that in that question and that
18   response, my understanding is that it's no.
19 Q   But in other places uh-huh was yes?
20 A   Well, I would have to go back and listen to the
21   tape.  Just because it's typed that way doesn't
22   mean that's the correct answer.  Either U-H U-H or
23   U-H-M-P, I don't know.  I would have to go back to

Page 44

1    listen to the tape.
2  Q   Okay.  When you're doing an interview, do you
3    normally tell a person to answer yes or no, so
4    that it can be understood?
5  A   I just want them to tell me the truth.
6  Q   Do you normally ask them to answer out loud yes or
7    no?
8  A   No.  You can't ask questions and get yes or nos.
9    If I ask you, what's today's date and what is the
10   weather like?  Can you say, yes?  You're going to
11   have to tell me today's date and whether it's
12   raining or not.
13 Q   Mr. Bradbury --
14 A   The only thing I want them to do is tell me the
15   truth.
16     I am not trying to be ugly with you.  But I am
17   not going to say things that you want me to say.
18 Q   Suppose it's a question that has a yes or no
19   answer, and they indicate by shaking their head or
20   grunting, or making some sound that you cannot be
21   sure of what they are saying; would you say,
22   please answer yes or no?
23 A   Either that or tell them to explain.

Page 45

1  Q   Did you do that in this interview?
2  A   With Justin, it was difficult.
3  Q   Why?
4  A   Have you talked to Justin?
5  Q   I want you to tell me why.
6  A   Justin is slow, nonresponsive a lot of times.  And
7    if he doesn't know you, he's not going to open up
8    and talk to you.
9      Now, as time went on, after this statement, I
10   would see them in the stores, they would come up
11   and talk to me like I was a long-lost brother.
12 Q   But did they talk to you about this case?
13 A   No.
14 Q   So, it wasn't about the sexual abuse?
15 A   No.
16 Q   All right.  Exhibit 34, can you tell me what that
17   is up in the right-hand corner?
18 A   DA called.  DA.  John.  And told him to settle
19   this case.  And it looks like "our words".  I
20   don't -- I'm not sure.  I don't know what that
21   word right there (indicating) is.
22 Q   Could it be Anderson?  Who is the DA?  Who is the
23   DA in Pike County who is -- or Butler County --

Page 46

1  whose first name is John?  Do you know who it
2  might be?
3  A  Uhm, there is a John -- of course, he spells the
4  name J-O-H -- used to be the -- he's the son of
5  the former district attorney here in Pike County.
6  He's an assistant district attorney here in Pike
7  County.
8  Q  You're not sure what that last name is?
9  A  No, ma'am.
10  Q  Do you know why the decision was made to settle
11  this case?
12  A  No, ma'am.  Is that in Butler County or Pike
13  County?
14  Q  Well, when I say "this case", I'm referring to
15  Justin's case.  Do you know why the decision was
16  made to settle Justin's case?
17  A  I never knew that there was a decision to settle
18  the case, to be honest with you.
19  Q  Nobody discussed it with you?
20  A  District attorney's office did not discuss it with
21  me.
22  Q  Did they ask you whether or not you thought Justin
23  would make a good or bad witness?

Page 47

1  A  No, ma'am.
2  Q  Did you ever express that view to anybody?
3  A  Yes.
4  Q  Who did you express that to?
5  A  Mrs. Reed.
6  Q  Anybody else?
7  A  Not that I recall.  I mean --
8  Q  And what did you tell Mrs. Reed?
9  A  Mrs. Reed, I told her that I didn't believe he
10  would be a good witness in front of a jury and the
11  Judge, because of his inability to express
12  himself.
13  Q  Okay.  So, you did notice that he had an inability
14  to express himself?
15  A  Yes, ma'am.
16  Q  Okay.  All right.  Let's get back to the
17  chronology.  You did the interview with Justin,
18  and what happened after that?
19  A  Well, of course, the district attorney's
20  investigator was present at the time.
21  Q  And that was who?
22  A  Bruce Matthews from the -- you can see that
23  looking at the statement there -- or the questions

Page 48

1  in the statement.
2      I think it was left up to Matthews to take it
3  to the district attorney's office for further
4  consideration.
5  Q  Did Matthews take the tape with him?
6  A  I think I gave the tape to Matthews, because our
7  secretary was out.  And he was going to have it
8  transcribed out down there.  I believe.
9  Q  So, the person that transcribed it -- let's see --
10  who does it say transcribed it?
11  A  Fuller, C-R-Y-S Fuller.  How do you produce
12  C-Y-R-S (sic)?
13  Q  I'm not sure.
14      So, that person is not in the Sheriff's
15  Department?
16  A  I believe that person is in the district
17  attorney's office.  If I remember correctly,
18  Barbaree was out -- out sick or something.  And I
19  gave the tape to Matthews to have it transcribed
20  at the district attorney's office.
21  Q  What happened after that?
22  A  It was given back to me.
23  Q  What was given back?

Page 49

1  A  The tape of the transcribed statement.
2  Q  So, the tape was given back to you, and what did
3  you do with it then?
4  A  Put it in the case file in the Sheriff's office.
5  Q  So, as far as you know, the tape is still in the
6  case file in the Sheriff's office?
7  A  It should be.
8  Q  All right.  What happened after that?
9  A  If I recall, at some point in time, I was talking
10  to Justin -- no, I was talking to Justin's
11  brother -- and I don't recall his first name --
12  he's probably two or three years younger than
13  Justin.
14  Q  Would that be Joey?
15  A  Yes, ma'am.  And I was asking him if he saw
16  anything about Coon and his brother, and he
17  blurted out that he had been a victim, also; that
18  he had been fondled.
19  Q  So, the next thing that happened in the sequence
20  of events was that it came to your attention that
21  Joey had also been abused by Coon?
22  A  Yes, ma'am.
23  Q  Is that correct?

Page 50

1  A   And I think we set up an interview at Child
2      Advocacy Center for him.
3  Q   All right. Can you identify this for me, please?
4  A   That's a deposition written by myself.
5  Q   What is that? Describe that for me.
6  A   It's a deposition to obtain an arrest warrant.
7  Q   And what is -- what would the warrant be based on?
8  A   It says, during an interview of Justin Reed, age
9      15, he advised that his teacher, band director,
10     had fondled his privates through his trousers with
11     his hand while at the band room at the Pike County
12     High School.
13 Q   So --
14 A   Sexual abuse, third degree.
15 Q   All right. Why are these three names on this
16     document?
17 A   As witnesses.
18 Q   Were they there at the time?
19 A   Time of what?
20 Q   At the time when you took the statement.
21 A   Mona Watson took the initial statement from Justin
22     Reed. Myself and Bruce Matthews were there at the
23     time that we took the tape-recorded statement.

Page 51

1  Q   So, that's why the three of you all signed this?
2  A   I only signed it. They didn't sign it.
3  Q   You just listed the names --
4  A   I listed the name as witnesses.
5      MS. ALLEN: Okay. I want to introduce
6      this as Plaintiff's 35.
7      (Whereupon, Plaintiff's Exhibit 35
8      was marked for identification and
9      is attached hereto.)
10 BY MS. ALLEN
11 Q   Identify this, please.
12 A   That's a witness statement by Charles Coon.
13 Q   And what does that say?
14 A   In the middle of June, 2005, I went to the Reed
15     residence. Justin and Joey were playing video
16     games. Joey was in his underwear, because school
17     was out. I began tickling him, and I may have
18     touched him in the wrong place and way. Signed
19     Charles Coon.
20 Q   Okay.
21     MS. ALLEN: I want to mark that as
22     Plaintiff's Exhibit 36.
23     (Whereupon, Plaintiff's Exhibit 36

Page 52

1      was marked for identification and
2      is attached hereto.)
3  BY MS. ALLEN
4  Q   To your knowledge, did Charles Coon admit to
5      sexual abuse of Justin Reed?
6  A   As best as he could in that statement. Or as best
7      as he would. His lawyer wouldn't let him say a
8      whole lot.
9  Q   Were you present on the plea day when Charles Coon
10     went to court?
11 A   Yes, ma'am.
12 Q   Can you tell us what happened that day?
13 A   No, ma'am.
14 Q   You can't?
15 A   I was present, but I wasn't in the courtroom.
16 Q   Oh, you were not in the courtroom?
17 A   No, ma'am.
18 Q   Any particular reason why you weren't in the
19     courtroom?
20 A   If I remember correctly, we had prisoners
21     everywhere up there at that time.
22 Q   Are you familiar at all with the plea agreement
23     that was signed by Charles Coon and Pike County

Page 53

1      and Butler County?
2  A   No, ma'am.
3  Q   So, you have never seen that or --
4  A   No, ma'am. What did he agree to?
5  Q   (Tenders document.)
6  A   (Reviews and tenders document.)
7  Q   Can you summarize what he agreed to?
8      MR. SWEENEY: Let's just introduce the
9      document.
10     MS. ALLEN: I will. But I'd like to
11     know --
12     MR. SWEENEY: I don't know that that has
13     any utility. If we have got the
14     document, why should he summarize
15     it?
16     MS. ALLEN: I would like to know what
17     happened to Charlie Coon in Pike
18     County.
19     MR. SWEENEY: Isn't that --
20 A   That's Butler.
21 Q   Well, they agreed to consolidate the cases; did
22     they not?
23 A   I don't know whether he pled guilty or not,

JR, A Minor                         October 18, 2007                    Pike County Board of Education

15 (Pages 54 to 57)

Page 54

1     though.  I wasn't in the courtroom.
2  Q  So, you're saying that you do not know that he
3     pled guilty?
4  A  I don't know.
5  Q  Did you know he was sent to prison?
6  A  I saw him.
7  Q  You were the Chief Investigator on this case; is
8     that correct?
9  A  Which case?
10  Q  Justin Reed's.
11  A  Yes, ma'am.
12  Q  You do not know the outcome of that case?
13  A  I know he pled guilty.  But I don't know how much
14     time he got.
15  Q  I didn't ask you that.  I said did you know that
16     he pled guilty?
17  A  I thought you asked me if I knew the outcome of
18     the case.  To me, that's how much time he got.
19  Q  You do know that he pled guilty?
20  A  Yes, ma'am.
21  Q  To sexual abuse of Justin Reed?
22  A  Yes, ma'am.
23  Q  And sexual abuse of Joey Reed?

Page 55

1  A  Yes, ma'am.
2        MS. ALLEN:  Mark this Plaintiff's
3        Exhibit 36, I think it is.
4        (Whereupon, Plaintiff's Exhibit 37
5        was marked for identification and
6        is attached hereto.)
7  BY MS. ALLEN
8  Q  When Adam Helmsly's name came up in your interview
9     with Blake Faulkner, did you do any investigation
10     regarding Adam Helmsly?
11  A  Adam Helms.  Yes, ma'am.
12  Q  Helms, excuse me.
13  A  Yes, ma'am.
14  Q  What investigation did you do?
15  A  I had him and his mother come in and talk to me.
16  Q  Did you do an interview of him like you did
17     Blake --
18  A  I don't --
19  Q  -- a tape-recorded interview?
20  A  I don't recall whether it was tape recorded or
21     not.  It should have been.  I don't recall right
22     offhand, though.
23  Q  Speaking of --

Page 56

1  A  Do you know what happened to Mr. Helms?
2  Q  I do.  He committed suicide the weekend this
3     became public.
4  A  Yes, ma'am.
5  Q  So, you must have talked to him right before he
6     committed suicide?
7  A  Yes, ma'am.
8  Q  Did he admit to anything?
9  A  No, ma'am.
10  Q  Let me go back and ask you about the tape
11     recording, the DVD that Mona Watson did and showed
12     to you.  Mona Watson testified that she gave you
13     that DVD.  What is your recollection of what
14     happened to that DVD?
15  A  My recollection is that Bruce Matthews and myself
16     went to the Child Advocacy Center, sat and viewed
17     the videotape.  And we never had a hard copy of it
18     or the DVD.  I'm sorry.
19  Q  Are you saying that she did not give you a copy
20     it?
21  A  I don't recall ever getting one.
22  Q  Do you recall me asking to see that DVD?
23  A  Certainly.

Page 57

1  Q  And do you recall your response to me?
2  A  Certainly.  I said, if we had one, it's in the
3     file.
4  Q  You did not tell me that I would have to get it
5     from the DA's office?
6  A  No, I don't remember that.  I said, if we had a
7     copy of the DVD, it would be in the file.  But
8     failing that, Mona Watson could burn another one.
9  Q  What would be the usual procedure in a child abuse
10     case when there was an interview by DHR or child
11     protect; what happens to the tape or DVD?
12  A  Well, like I said, back in the days --
13  Q  I want to know in these days.
14  A  Today?
15  Q  2005.
16  A  All right.  Back in that day, the Child Advocacy
17     Center -- the Child Advocacy Center was in its
18     infancy.  Mona Watson and her staff were not all
19     that familiar with the electronics of doing a DVD
20     and making copies.  On occasion, we didn't get a
21     DVD.  Sometimes it was on the hard drive of the
22     computer, because they just didn't know how to
23     write it.

Page 58

1    When we did get a DVD, we didn't have the
2  ability to copy it. So, what we did was tried to
3  get the Advocacy Center to burn two copies, where
4  one would stay in the District Attorney's file and
5  one would stay in the Sheriff's Department's file.
6    Back in the days of Justin Reed, we're talking
7  about, I don't think Mona Watson and her staff
8  knew the mechanics of making a DVD at that point
9  in time. And I believe that Matthews and myself
10 went down there and viewed the DVD, or viewed the
11 recording off the computer. Didn't have a hard
12 copy of the DVD at that point in time.
13 Q   So, if she said that she gave it to you,
14     specifically to you, Bob Bradbury --
15 A  Yes, ma'am.
16 Q   -- that would not be accurate?
17 A  I don't think so.
18 Q   And you would not have requested a copy of that
19     for evidence of any kind?
20 A  Certainly we did. But like I said, they didn't
21   have -- they didn't have the knowledge of how to
22   write them at the time. And as time goes by, you
23   just don't get it.

Page 59

1  Q   So, you're talking about two years ago?
2  A  Right.
3  Q   We're talking about 2005?
4  A  Two years from today.
5  Q   Right.
6      MR. SWEENEY: What's your question?
7  Q   My question is: You're indicating that the
8      technology was not there? I'm unclear.
9  A  I didn't say the technology wasn't there. I said
10   that Mona Watson and her staff didn't know how to
11   do it.
12 Q   Okay. Do you know Polly King?
13 A  Polly King? Polly King? I'm not sure whether I
14   do or not. I mean, is she a red-headed lady lives
15   out at Banks?
16 Q   Yes.
17 A  I have had occasion to talk with her.
18 Q   Did you have occasion to talk to her about
19     anything to do with this -- Coon, Mr. Coon?
20 A  I don't believe so.
21 Q   Okay. Do you know anybody on the drug task force?
22 A  Bob Williamson.
23 Q   Bob Williamson?

Page 60

1  A  (Witness Indicating.)
2  Q   Now, the drug task force is a part of the
3      Sheriff's Department?
4  A  Well, it's combined with the Troy Police
5    Department, Pike County Sheriff's Department, and
6    I think Brundidge Police Department contributes
7    some funds to it. But the officers are from Troy
8    PD and Pike County Sheriff's Department.
9  Q   Do I understand it's not a separate entity; it's
10     just a part of the Police Department?
11 A  And the Sheriff's Department.
12 Q   But the police department and the Sheriff's
13     Department are not the same?
14 A  No, ma'am.
15 Q   So, I'm just trying to understand this. So, you
16     would have policemen on --
17 A  Well, the Sheriff's Department and the Police
18   Department contribute one officer to patrol drugs.
19 Q   Okay.
20 A  And Brundidge Police Department contributed funds,
21   I believe. They didn't have a man on the task
22   force.
23 Q   So, you had a Troy City, Brundidge City, and Pike

Page 61

1    County Sheriff's that contributed either personnel
2    or funds to make up the --
3  A  Yes, ma'am.
4  Q   And Bob Williamson --
5  A  He's a representative from the Sheriff's
6    Department.
7  Q   From the Pike County Sheriff's Department?
8  A  Yes, ma'am.
9  Q   I must have misunderstood. I thought you
10     mentioned Bob Williamson a minute ago in reference
11     to Butler County.
12 A  No. I said that Sheriff Thomas and Bob Williamson
13   interviewed Phillip Faulkner and talked with his
14   father prior to us going to Butler County. Bob
15   Williamson recorded -- or provided the recording
16   equipment whereby they recorded a telephone
17   conversation between Coon and Phillip Faulkner.
18 Q   Okay. I understand. I see what you're saying
19     now.
20     MS. ALLEN: Can we go off the Record for
21     one second?
22     (Off-the-Record discussion.)
23     MS. ALLEN: Let's make this an exhibit.

Page 62

1              (Whereupon, Plaintiff's Exhibit 38
2              was marked for identification and
3              is attached hereto.)
4    BY MS. ALLEN
5    Q    This is a summary that Mona Watson did of the
6         interview that she had with Justin.  And it
7         indicates here that it was viewed by you and the
8         DA.
9              MS. ALLEN:  And I want to introduce that
10            as Plaintiff's Exhibit 38.
11   Q    What DA would that have been?
12   A    Bruce Matthews.  He's an investigator with the
13        district attorney's office.
14   Q    So, he's an investigator.  He's not an assistant
15        DA?
16   A    No, ma'am.
17   Q    When it says viewed by you and DA, you did not
18        view it while it was being --
19   A    Conducted.
20   Q    -- while she was conducting it?
21   A    No, ma'am.
22   Q    You viewed it after the fact?
23   A    Yes, ma'am.

Page 63

1    Q    Okay.  Let's see --
2    A    In that particular case, I viewed it after the
3         fact.  Other occasions, I view it while it's going
4         on.
5    Q    So, is there any reason why you viewed it after
6         the fact in that case?
7    A    Yeah.  She didn't call me.
8    Q    Okay.  In Exhibit 32, can you identify this,
9         please?
10   A    This is a police report written myself in my
11        handwriting.
12   Q    And it refers to who?
13   A    Justin Reed.
14            MS. ALLEN:  We'll mark that Plaintiff's
15            Exhibit 39.
16            (Whereupon, Plaintiff's Exhibit 39
17            was marked for identification and
18            is attached hereto.)
19   BY MS. ALLEN
20   Q    You indicated that you got a call from Mona
21        Watson -- you've already testified to that --
22        saying that she had another victim of abuse and
23        that she had already interviewed him.  And this

Page 64

1         refers to Justin.  And she indicated that Justin
2         had said that force -- that are Coon had forced
3         him to have oral sex.  Okay.  And then you go to
4         her office.  And she tells you that Justin has a
5         learning problem.  And that he would not talk
6         openly to people he did not know.  She told you
7         that?
8    A    Yes, ma'am.
9    Q    And you didn't know Justin at the time, did you?
10   A    No, ma'am.
11   Q    Okay.  And it says here that you spoke with
12        Ms. Reed and that we agreed -- I assume that means
13        you and Ms. Reed -- to view the recording and
14        possibly get Ms. Watson to ask further questions
15        if needed.
16            Then on this page, it says, Ms. Watson was
17        unable to stay.  And can you explain to me, are we now
18        at the Sheriff's Department?
19   A    No, ma'am.  We're still at the Child Advocacy
20        Center.  She had another appointment someplace.
21   Q    Read that for me so I can clarify.
22   A    Ms. Watson was unable to stay and show me the
23        recording at that time.  And we made arrangements

Page 65

1         to come back on 7/15, which was the following
2         morning.  I contacted DA Investigator Bruce
3         Matthews, and together we went to view the
4         recording.  After viewing the recording, we agreed
5         that we needed to reinterview Justin at a time --
6         and a time of 9:05 a.m., 7/18/05 was agreed upon.
7         I spoke with both Mr. and Mrs. Reed on 7/14 and
8         advised them of my concern as to Justin's being
9         able to tell his story in front of a judge and
10        jury.
11   Q    Okay.  Had Ms. Watson already left?
12   A    Well, I wrote that report at my office.
13   Q    But you're at the CAC?
14   A    No, I wrote this report at my office.  I'm
15        relating to the fact at CAC.
16            We were down at the Child Advocacy Center.
17        Ms. Mona Watson had another appointment.  She
18        couldn't stay.  So, we agreed to come back the
19        next morning and view the tape or view the DVD.
20        I keep getting confused with tape and --
21   Q    Right.  I make that reference.  It's DVD is what
22        it would be, audio and video.
23   A    Yes, ma'am.  But in this particular case, when we

Page 66

1   viewed it, we viewed it off the hard drive. We
2   didn't have the DVD, itself.
3   Q   When you viewed it at Mona Watson's office?
4   A   Yes, ma'am.
5   Q   All right. Explain to me what you mean; you
6       viewed it off the hard drive.
7   A   Well, it's a system whereby they can photograph
8       you and have that result sent to a computer. And
9       when I say "we viewed it off of the hard drive",
10      they went on to the computer itself and replayed
11      it for us.
12  Q   Okay. Uhm, read --
13  A   I'm not technical now.
14  Q   I understand. I am not asking for technical.
15      All right. Read that if you will.
16  A   The whole thing?
17  Q   Yes.
18  A   As arranged, Mrs. Reed brought Justin into my
19      office so that I might talk with him about
20      Mr. Coon and any sexual advances made towards him.
21      After getting to know him, I asked him if anyone
22      had touched him or made feel uncomfortable.
23      Justin stated Mr. Coon, his band director. When

Page 67

1   asked what Mr. Coon had done, Justin stated that
2   Coon had touched his private parts. When asked
3   how, Justin stated that Mr. Coon had rubbed his
4   privates through his pants. Justin further stated
5   that his -- that this activity took place in the
6   band room at Pike County High School in Brundidge,
7   Alabama. Justin also stated that Mr. Coon had
8   come to his residence and had tickled his brother,
9   Joey, and himself. Tape with interview of Justin
10  given to DA Investigator Matthews to be
11  transcribed.
12  Q   All right. So, when you say the tape of the
13      interview was given to Matthews, what interview
14      are we talking about here?
15  A   Justin Reed.
16  Q   I know, but which interview; Mona's interview or
17      the interview that you did with Justin?
18  A   Mine.
19      This is just a statement -- or just a synopsis
20      of the report of what I did. Just a very short,
21      brief --
22  Q   Okay.
23  A   -- explanation of the statement itself.

Page 68

1   Q   Okay. And the statement was given to Reed -- I mean, to
2   A   Matthews, as I said, because our secretary was out
3       sick.
4   Q   Okay. I just wanted to clarify what tape that
5       was.
6   A   Tape and DVD and VCR is sort of interchangeable
7       when I talk, isn't it?
8   Q   All right. Just read that for me, also, into the
9       Record.
10  A   On 7/19/05, Tammy from Child Advocacy Center
11      telephoned and stated that she had Mona Watson's
12      report typed. I picked up the report and faxed a
13      copy to the other -- to Dwight Holley at the DA's
14      office in Enterprise, Alabama.
15  Q   Would that report be Plaintiff's Exhibit 38, would
16      that be this, Plaintiff's Exhibit 38? Is this
17      what you picked up from her office?
18  A   It may be. I don't remember without looking in
19      the files.
20  Q   All right. Then, if there was something else,
21      that would have been in the file? So, we should
22      have a copy of that if we subpoenaed the entire

Page 69

1   file?
2   A   (Witness Indicating.)
3   Q   Okay.
4       Mona Watson indicated to you that Justin
5       probably would not talk to anybody he didn't know?
6   A   Yes, ma'am.
7   Q   Okay. You didn't know Justin?
8   A   No, ma'am.
9   Q   And so you indicate in your summary, in
10      Plaintiff's Exhibit 39, that Justin came in your
11      office, and you got to know him, and then you
12      interviewed him?
13  A   Yes, ma'am.
14  Q   Would you consider that sufficient for Justin to
15      feel comfortable with you?
16  A   To a point.
17  Q   Did Justin, in fact, feel comfortable with you?
18  A   I think he did.
19  Q   Did he talk to you in the way that you would have
20      liked for him to talk to you?
21  A   I would have liked him to have been more
22      responsive to some questions. But --
23      (indicating).

JR, A Minor                    October 18, 2007                    Pike County Board of Education

Page 70

1   Q   Is there anything else that you can recall about
2       the investigation once the interviews were done;
3       any other role that you played in the case? You
4       said --
5   A   I don't --
6   Q   -- you got a statement from Mr. Coon?
7   A   Coon was here for court on some other related
8       matter.
9   Q   Would it have been the Blake Faulkner matter?
10  A   I think that's right. And he wanted to -- his
11      lawyer indicated that he wanted to plead guilty to
12      everything at one time. And I told his lawyer at
13      the time that we hadn't interviewed Mr. Coon. The
14      only thing we had was the statement of the child.
15      And I think the lawyer indicated that -- that that
16      statement that you have got already with Coon,
17      that's what we had. Once he told me, and I wrote
18      it out, his lawyer reviewed it before we signed
19      it. I think later on that day, he pled guilty to
20      the two cases here in Pike County.
21  Q   Do you recall what the charges were?
22  A   Child abuse, third, I think it was.
23  Q   All right. Can you identify this for me, please?

Page 71

1   A   That is Judge Hightower's Sentencing Order.
2   Q   Sentence --
3   A   And a sentence agreement underneath.
4   Q   Sentencing Order of who?
5   A   Charles Coon.
6   Q   For?
7   A   Sexual abuse, first degree. And sentenced to one
8       year in the Pike County Jail for each with the
9       sentence to run concurrently with each other with
10      any and all other sentences presently being served
11      by the defendant. Pay a $25 crime victims'
12      compensation assessment. Defendant is not
13      entitled to jail credit.
14  Q   So, that would be the Judge's Order that followed
15      Mr. Coon's plea of guilty to sexual abuse of
16      Justin and Joey?
17  A   Well, I don't know. I mean, I would assume so.
18      But their names aren't -- aren't mentioned. The
19      only reference would be a court case number that
20      you can go back and pick up the court case.
21  Q   Right. And, let's see. I guess we need to verify
22      that that is their cases.
23      MR. SWEENEY: Was this plea marked as an

Page 72

1       exhibit?
2       MS. ALLEN: I'm going to mark this as
3       Plaintiff's Exhibit 40.
4   A   Both pages are 40?
5   Q   Forty for the top page, and 41, which is part of
6       the settlement agreement that he signed.
7       (Whereupon, Plaintiff's Exhibit 40
8       was marked for identification and
9       is attached hereto.)
10      (Whereupon, Plaintiff's Exhibit 41
11      was marked for identification and
12      is attached hereto.)
13  BY MS. ALLEN
14  Q   We need to verify that those two cases refer to
15      Joey Reed. Maybe we can do it with this. Would
16      you identify this for me?
17  A   Witness subpoena for myself.
18  Q   And what was that for?
19  A   State of Alabama versus Coon, Charles Coon.
20  Q   Can you identify who the victim was?
21  A   I would assume it would be Justin Reed.
22  Q   And what is the case number?
23  A   438. 205-438.

Page 73

1   Q   All right. And what is the case number on this
2       Order?
3   A   Same number. On the first case number.
4   Q   All right. Let's identify the second case number?
5       MS. ALLEN: Unless you wish to stipulate
6       that those were the two cases.
7   Q   That subpoena was issued. Did you end up going to
8       court and testifying --
9   A   Testifying, no.
10  Q   -- relative to that subpoena?
11  A   No.
12  Q   Do you recall why?
13  A   I think he pled guilty.
14  Q   Okay.
15      MS. ALLEN: Excuse me. I'm going to
16      have to find a case number for Joey.
17  Q   Do you understand that normally in cases that
18      involve minors that names are not put into these
19      court documents?
20  A   Certainly.
21  Q   So, that would explain why there is no reference
22      to Justin or Joey; is that correct?
23  A   I would think so.

Mary Moore-Wynn, CCR                    Mary Moore-Wynn                    (334)244-0203
                                        Court Reporting Services

## Page 74

1    THE WITNESS: Dr. Bazzell, you didn't
2    pay the heating bill? Everybody's
3    got long sleeves except me. I'm
4    cold.
5    DR. BAZZELL: Okay.
6    (Brief recess.)
7 BY MS. ALLEN
8 Q   Is there anything else as far as the investigation
9    is concerned that you can recall that you were
10    involved in?
11 A   No, ma'am.
12    MS. ALLEN: I have no more questions.
13    EXAMINATION
14 BY MR. SWEENEY
15 Q   Mr. Bradbury, I have a note that the first contact
16    you had with the Reeds occurred July 14th. Is
17    there any way from memory that you could confirm
18    that, or would you know the exact date from any of
19    the documents showing?
20 A   Ms. Allen entered one of the incident offense
21    reports, I believe, showing the date that I talked
22    to Ms. Mona Watson.
23 Q   And on that same day, did you talk to Mr. Reed?

## Page 75

1 A   Later on in that day, yes, sir.
2 Q   And in that conversation, did you have an extended
3    conversation with Mr. and Mrs. Reed about Justin?
4 A   Mrs. Reed was reluctant to tell her husband about
5    what was going on. And I told her that if she
6    brought her husband back that I would -- I would
7    tell him. And I told him that, you know, I had
8    some concerns about what was going on.
9 Q   Mainly about what was happening with Justin?
10 A   Yes, sir.
11 Q   Okay.
12 A   And I told him where we were going as far as
13    reinterviewing him and stuff like that.
14 Q   And at that time, did Mr. Reed indicate he
15    intended to sue somebody?
16 A   Yes, sir.
17 Q   What did he say?
18 A   He said he was going to sue the school board. I
19    think he said something about his child hadn't
20    been receiving adequate education. And this just
21    put a topper on it.
22    MS. ALLEN: I object. That's hearsay.
23 Q   So, in the first conversation you had with

## Page 76

1    Mr. Reed early in the investigation, he was
2    already saying he was going to sue the school
3    system?
4 A   Yes, sir.
5    MS. ALLEN: Object to the form.
6 Q   And he was indicating that that was based on his
7    dissatisfaction with the education and with the
8    preliminary information you had given him about
9    Justin and possibly Mr. Coon abusing him?
10 A   Yes, sir.
11    MS. ALLEN: Object to the form.
12 Q   Do you recall anything else that took place in
13    that early conversation with Mr. Reed or
14    Mrs. Reed?
15 A   No, sir.
16 Q   At that point, you had seen the interview that
17    Mona Watson conducted?
18 A   No, sir.
19 Q   Okay. What was the information that you were
20    sharing with Mr. Reed, then, on that first
21    conversation?
22 A   Just what Mona Watson had told me. I talked to
23    Mr. Reed on the 14th. We went back on the 15th to

## Page 77

1    view the interview, myself and Matthews.
2 Q   Now, in that conversation, did you refer the Reeds
3    to go to the Brundidge Police Department?
4 A   I asked them if they had filed any complaints with
5    the Brundidge Police Department inasmuch as the
6    allegations were based in Brundidge.
7 Q   And what did they say?
8 A   They weren't satisfied with the Brundidge Police
9    Department.
10 Q   Did they explain why?
11 A   No, sir.
12 Q   But you thought it was appropriate that they take
13    a complaint, if they had one, to the Brundidge
14    Police?
15 A   Certainly. I mean, we try to work in concert with
16    each department.
17 Q   Okay. You eventually watched the DVD or the hard
18    drive of the interview that Ms. Watson conducted?
19 A   Yes, sir.
20 Q   And you conducted an interview of Justin yourself?
21 A   Yes, sir.
22 Q   And you were subpoenaed to testify, but you didn't
23    have to testify because of the plea guilty?

Page 78

1  A  Yes, sir.
2  Q  If you had testified, would you have rendered your
3     testimony based on your interview with Justin --
4  A  The --
5  Q  -- rather than the interview that you watched that
6     Mona Watson conducted?
7  A  I would base my testimony on my interview.
8  Q  In your opinion, would that have been a more
9     reliable basis for what might have happened?
10  A  I think so.
11  Q  Have you ever met, prior to this deposition, with
12     Deanie Allen?
13  A  I -- I've saw her two or three times down at the
14     Child Advocacy Center. I saw her two weeks ago
15     when you all were in depositions.
16  Q  Have you ever had discussions about this case with
17     Ms. Allen or Ms. DePaola?
18  A  Ms. DePaola?
19  Q  The other attorney.
20  A  Uhm, informal. I mean, informal.
21  Q  What do you mean "informal"? Have they asked you
22     about the case?
23  A  Ms. Allen asked me where the DVD was from the

Page 79

1     interview. And if I had one, it would be in the
2     file. And I told her that Mona Watson could
3     certainly burn another one. It's all still on the
4     hard drive.
5  Q  And that was really the extent of your
6     conversation with the Reeds' lawyers in this case?
7  A  Basically.
8  Q  You mentioned that you interviewed Charles Coon
9     early on before the lawyers shut him up. Now --
10  A  No, sir.
11  Q  Huh?
12  A  No, sir.
13  Q  Did I misunderstand?
14  A  Mr. Coon was interviewed by the Greenville Police
15     Department in reference to Phillip Faulkner.
16  Q  And you heard that?
17  A  No, sir. I didn't participate. When it came
18     necessary for us to talk to Mr. Coon about Justin
19     Reed, he already had an attorney and refused to
20     talk with us.
21  Q  Okay.
22  A  Now, I don't know whether his attorney was out of
23     Greenville or Pike County, but he didn't want to

Page 80

1     talk to us at the time.
2  Q  I may have misunderstood. You got a statement
3     from Coon, but after Greenville, he would not
4     talk?
5  A  The statement I got from Coon was on the day he
6     pled guilty upstairs in the small courtroom. In
7     fact, I think we went into the law library and
8     wrote out that short statement.
9  Q  Okay. And that's what I was referring to.
10     During this investigation in the summer of
11     2005, did you talk with anyone who was employed by
12     the Pike County Board of Education?
13  A  No, sir.
14  Q  Other than whatever the connection is between Mona
15     Watson and the board?
16  A  I didn't know Mona was employed by the Board of
17     Education.
18  Q  The Child Advocacy Center has a connection with
19     the Pike County Board. Are you aware of whatever
20     the arrangement is?
21  A  No, sir.
22  Q  I just didn't want to mislead to you about Mona
23     Watson. You did talk to her?

Page 81

1  A  Oh, yeah.
2  Q  But in terms of Mark Bazzell, or anyone at the
3     Pike County High School, you never talked to
4     anyone along those lines?
5  A  No, sir.
6  Q  So, based on any investigation that you conducted
7     during this time, did you ever have any
8     information that anyone at the Pike County High
9     School had knowledge that Coon might have been
10     abusing Justin Reed?
11  A  No, sir.
12  Q  You said that cell phones were collected from
13     Charles Coon's home. Do you know what happened to
14     those or if they were investigated in any fashion?
15  A  I think that the Greenville Police Department was
16     going to try and go back and get some phone
17     records off of them. But I don't know for a fact.
18  Q  Okay. But as far as your testimony today, do you
19     have any reason to believe that anyone at Pike
20     County High School had suspicion that Charles Coon
21     was abusing Justin Reed?
22  A  No, sir.
23  Q  Or anybody in the central office; Mark Bazzell, or

JR, A Minor                    October 18, 2007                    Pike County Board of Education

### Page 82

1  anyone in the central office?
2  A  No, sir.
3  Q  Do you believe that Mona Watson was a caring
4     advocate for children?
5  A  I believe Mona Watson is a caring advocate for the
6     children --
7  Q  And --
8  A  -- based upon my experiences with the Reed case
9     and based upon the experiences with other cases
10    that followed.
11 Q  So, if she were at Pike County High School in the
12    fall of 2004, do you think Mona Watson, based on
13    your experience, would have been a child advocate
14    looking out for the welfare of students, including
15    Justin, at the school?
16 A  I believe she would be.
17 Q  Okay.
18       MR. SWEENEY:  Can we take a minute?
19       (Brief off-the-Record discussion.)
20 BY MR. SWEENEY
21 Q  When you were interviewing Justin, did any
22    information come up concerning a trip he might
23    have taken to the beach with Coon?

### Page 83

1  A  There was questions came up about beach or Six
2     Flags or something of that nature.  I don't recall
3     right offhand.
4  Q  I was going to ask you about Six Flags.  Did
5     Mr. and Mrs. Reed indicate they had given
6     permission to Justin to go to the beach and Six
7     Flags with Mr. Coon?
8  A  I think there was three or four children that
9     went.  Not just Justin, but there was one or two
10    others.
11 Q  And did you discuss with the Reeds that Justin has
12    gone to Greenville on occasion with Mr. Coon?
13 A  I remember -- I remember something about it, but I
14    don't remember the details.
15       MS. ALLEN:  The best evidence would be
16         the interview, Plaintiff's
17         Exhibit --
18 BY MR. SWEENEY
19 Q  Some questions were asked about the response that
20    Justin gave, uh-huh, huh-huh, and so forth.  What
21    would be the best way to determine his response;
22    would be the tapes?
23 A  I think the tape, itself.

### Page 84

1  Q  And those probably are still in existence as far
2     as you know, anyway?
3  A  When I left the Sheriff's Department, they were in
4     the case file.
5  Q  There was one last thing I was going to ask you if
6     you will hold on just a minute.
7       As far as Justin being willing to give
8     information about what had happened to him,
9     eventually you were able to establish a rapport?
10 A  Yes, sir.
11 Q  And have you seen him recently?
12 A  I haven't seen him, I'm guessing in a year.  I
13    used to run into him and his mama or him and his
14    brother out at Wal-Mart.  And they -- Justin and
15    Joey would run over to me and talk to me.  But I
16    haven't seen them probably in a year.  The boys,
17    I'm talking about.  I saw Ms. Reed in here.
18 Q  But early on, you did not think he would be a good
19    witness in court.  As you interrogated him, or
20    questioned or established a better rapport with
21    him, did you come to the conclusion that he would
22    be able to share what happened to him?
23 A  I was concerned that -- of course, he was bashful

### Page 85

1  and shy, and probably ashamed of what had
2  happened.  But he wasn't an open communicator.  He
3  wouldn't communicate well with you.
4     When he got to know you a little bit better,
5  he would talk more openly and freely with you.
6  But that was my concern.
7  Q  Now, you spent some time in Greenville.  And you
8     interfaced with law enforcement officials in
9     Greenville while you were there; correct?
10 A  Yes, sir.
11 Q  Did you have other communication with them from
12    time to time as you all were conducting your
13    interviews and investigation?
14 A  Their investigator called me once or twice and
15    told me what was -- you know, nothing about
16    telephones or something of that nature.  Or asked
17    me for copies of reports.  You know, we
18    communicated in that manner.  But as far as
19    details of the case on Phillip Faulk (sic), no.
20 Q  Did you learn during that process that Mr. Coon
21    had previously worked in the Butler -- in Butler
22    County, with a school system in Butler County?
23 A  I think he worked with two or three school

**Page 86**

1    systems.
2  Q  Was there ever any indication from any source
3      during this investigation that there had been
4      prior notice or knowledge of Coon abusing
5      students?
6  A  No, sir.  Not to me.
7  Q  Nothing came up to the law enforcement people
8      during their investigation that Coon was suspected
9      of any misconduct towards students?
10 A  Not to my knowledge.
11     MR. SWEENEY:  Thank you very much.
12     MS. ALLEN:  Redirect, please.
13     FURTHER EXAMINATION
14 BY MS. ALLEN
15 Q  Did you do any investigation on any of the prior
16     school systems that he --
17 A  No, ma'am.
18 Q  So, if there is nothing there, was there any
19     investigation done to your knowledge?
20 A  I didn't do any investigation as to any other
21     school systems.
22 Q  Okay.  And you were the chief investigator?
23 A  That's a term that --

**Page 87**

1  Q  Well, who else worked -- excuse me.  Answer.
2  A  Chief investigator is a term that's come up
3      through television programs and lawyers.  I was an
4      investigator on the case, yes.  Were there other
5      people investigating?  Yes.
6  Q  Who else was investigating?
7  A  Sheriff Thomas.  Deputy Sheriff Bob Williamson, as
8      I told you earlier.
9  Q  All right.  But your name is on --
10 A  My name is on the reports, because they didn't
11     want to write them.  I had to write them.
12 Q  Not because you participated in that aspect of the
13     investigation?
14 A  No, I participated.  But the only thing I did on
15     the Faulkner case, as we have already said, is
16     Phillip came downstairs to my office and gave a
17     tape-recorded statement.  And I was with the
18     Sheriff and two or three others.  I can't remember
19     who -- I think maybe -- I think the district
20     attorney was over there, too.  But we went to
21     Greenville.
22 Q  But, is it accurate to say that normally, the
23     Deputy Sheriff or Sheriff or whoever that is

**Page 88**

1      handling an aspect of the investigation writes the
2      report on that aspect of the investigation?
3  A  Normal -- under normal conditions, yes.
4  Q  Okay.  You indicated to Mr. Sweeney that when you
5      left the Sheriff's Department the tapes were in
6      the file.  What tapes are we talking about here
7      for --
8  A  The tape-recorded statement of Justin Reed.  The
9      tape-recorded statement of Phillip Faulkner.
10 Q  And those were the only two tape-recorded
11     statements that you can say for sure were in the
12     file?
13 A  They are the only two taped statements that I
14     conducted.
15 Q  Okay.  But, I mean, you were privy to the file, I
16     would assume?
17 A  Yeah.
18 Q  So, had there been another tape in it, would you
19     have seen it?
20 A  Not necessarily.
21 Q  Okay.  Did you ever look at the file?
22 A  Sure.
23 Q  Well, I am trying to understand why you would have

**Page 89**

1      seen those but not seen anything else that was in
2      there.
3  A  The only statements I conducted.  I don't have any
4      need to see any other tapes if there is any in
5      there.
6  Q  Well, if you are investigating a case --
7  A  You're getting off the point.  I work for the Pike
8      County Sheriff's Department.  Russell Thomas is
9      the Sheriff.  He was conducting the investigation.
10     The only thing I did was take a statement from
11     Phillip Faulkner.
12 Q  So, the only two tapes that you know for sure
13     would have been -- so, you do know that those two
14     tapes were in the file?
15 A  Yeah.
16 Q  The one -- okay.  You indicated that the short
17     statement, admission of guilt, that we introduced
18     as an exhibit that Mr. Coon made you took that
19     from him somewhere -- where did that take place?
20 A  Upstairs in the law library at the courthouse.
21 Q  At the courthouse.  Was that admission taped?
22 A  No, ma'am.
23 Q  Is that the usual procedure not to tape an

Page 90

1    admission?
2  A   Sometimes.
3  Q   Well, what's the determining factor in whether or
4      not to tape an admission?
5  A   Time.
6  Q   Suppose Mr. Coon denied he ever made that
7      admission?
8  A   Then he wouldn't have pled guilty to those two
9      cases.
10 Q   Okay. So, that's the way investigations are held.
11     Did you discuss with Mona the method that she
12     used in interviewing Justin at any time?
13 A   After the fact.
14 Q   What did you tell her?
15 A   I told her that it wasn't good for law
16     enforcement.
17 Q   What about her methods, the methods that you have
18     indicated to us here today that -- I won't put
19     words in your mouth -- but that you thought were
20     inappropriate. Do you want to articulate that
21     again?
22 A   The question...
23 Q   What were the methods that Mona used with Justin

Page 91

1      that you feel were inappropriate?
2  A   Well, what she was doing is, I know that he did
3      this to you. I know that he did that to you.
4      Isn't that right? And he would say, yes.
5  Q   All right. The interview, according to Mona,
6      lasted approximately an hour and a half. So, I'm
7      assuming -- and you correct me if I'm wrong --
8      that the whole interview was not conducted that
9      way?
10 A   The parts that I saw where he admitted that --
11 Q   Did you watch the whole interview?
12 A   Yes, ma'am. The parts that he indicated that
13     sexual abuse took place I did not feel that could
14     be used by law enforcement, because it wasn't a
15     free and willing statement.
16 Q   Did you --
17 A   The district attorney's investigator with me, also
18     said that.
19 Q   Did you indicate that to Mona?
20 A   Yes, ma'am.
21 Q   And what was Mona's response?
22 A   Well, we can do it again.
23 Q   And is that why you decided to do it again at the

Page 92

1      police station?
2  A   No, ma'am.
3  Q   Well, why did you decide to do it again?
4  A   The district attorney's investigator suggested it.
5  Q   Why did the district attorney's investigator
6      suggest it?
7  A   I assume that he was in agreement with me.
8  Q   Which was...
9  A   That the statement that Mona Watson got from
10     Justin Reed was not usable by law enforcement.
11 Q   All right. You felt her statement wasn't usable.
12     And yet she is trained -- presumably, by her own
13     statements -- to do that kind of interview. You,
14     by your own statements, have indicated that you
15     are not trained to do that kind of interview. You
16     indicated that you did not know Justin. You
17     indicated that she said he was not likely to talk
18     to somebody he did not know. I'm confused as to
19     how you thought you might get some additional --
20         MR. SWEENEY: I object to the form of
21         the question. I don't know what you
22         are asking --
23 Q   What did you hope to get --

Page 93

1         MR. SWEENEY: -- based on that predicate
2         of information.
3  BY MS. ALLEN
4  Q   -- that Mona could not get?
5  A   A free and willing statement.
6  Q   Your hope was that he would repeat to you what he
7      had said to Mona?
8  A   A free and willing statement.
9  Q   About what?
10 A   About what had happened to him.
11 Q   Okay. So, you doubted Mona's summary of what
12     happened?
13 A   I doubted her method.
14 Q   Did you doubt her conclusions?
15 A   I didn't know. That's the reason I wanted to talk
16     to Justin myself.
17 Q   You did not know whether her conclusions were
18     accurate?
19 A   I didn't know. She indicated that oral sex had
20     been taking place at the school. Where when I
21     talked to the child, he said the only thing he did
22     was fondle him.
23 Q   Were you surprised at that?

Page 94

1  A   I wasn't surprised at anything.
2  Q   Have you had occasion to have another sexual abuse
3      case that Mona has provided an interview for since
4      Justin Reed's case?
5  A   Yes, ma'am.
6  Q   Did you allow Mona to do the interview?
7  A   Yes, ma'am.
8  Q   Is that not the procedure for someone at child
9      protect to do the interview before the police do
10     the interview in Pike County?
11 A   My understanding of the procedure is that the
12     Department of Human Resources is notified. The
13     appropriate law enforcement agency is notified.
14     And, on occasion, the district attorney's office
15     is notified.
16         And the procedure is that they do the
17     statement -- or do the interview of the child with
18     law enforcement, DHR present. They would in a
19     separate room viewing it on a TV screen.
20 Q   So, the child protect person does the interview?
21 A   Yes, ma'am.
22 Q   So, presumably they are the ones that are
23     qualified to do it?

Page 95

1  A   Yes, ma'am.
2      MS. ALLEN: I have no more questions.
3      FURTHER EXAMINATION
4  BY MR. SWEENEY
5  Q   Mr. Bradbury, when you were called in to
6      investigate or play a role in these matters
7      concerning Justin, was your responsibility to be
8      an advocate for Justin?
9  A   Is that the question?
10 Q   That's my question.
11 A   Yes, sir.
12 Q   Was your role to be an advocate for Mr. Coon?
13 A   No, sir.
14 Q   Was your role simply to get the truth?
15 A   Yes, sir.
16 Q   So, when counsel is asking you whether you're
17     second-guessing Mona Watson, or words to that
18     effect, were you second-guessing anybody when you
19     conducted your interview?
20 A   No, sir.
21     MS. ALLEN: Object to the form.
22 Q   What was your sole and singular purpose in asking
23     Justin questions?

Page 96

1  A   To get the facts.
2  Q   And did you think your methodology was a more
3      reliable approach to getting the facts than what
4      she had used?
5  A   At that point in time, yes.
6  Q   Subsequently, has Mona improved the manner by
7      which she interrogates victims of child abuse, in
8      your opinion?
9  A   Yes, sir.
10 Q   Now, you're not critical of Mona, are you?
11 A   No.
12 Q   She just used a technique that would not have
13     stood up in court?
14 A   That's right.
15 Q   And that was the only reason you were criticizing
16     her approach?
17 A   That's right.
18 Q   You weren't second-guessing her motivation?
19 A   No.
20 Q   Correct?
21 A   No. I wasn't second-guessing her motivation.
22 Q   But back to the original line of questioning: Was
23     your only interest in interviewing these people,

Page 97

1      including Justin, to get to the bottom of the
2      facts?
3  A   Yes, sir.
4  Q   To clarify the facts in the best possible fashion?
5  A   Yes, sir.
6  Q   And if the facts indicated that Charles Coon was
7      guilty of something, were you going to go to see
8      that the law was enforced to the best of your
9      ability and responsibility?
10 A   You can bet your life on it.
11     MS. ALLEN: Redirect.
12 BY MR. SWEENEY
13 Q   Now, based on all of the interviews that you had,
14     and all the of the information that you acquired,
15     is it true and correct that there was no
16     indication that anybody had prior knowledge that
17     Charles Coon, in his history as an educator, had
18     engaged in child abuse?
19 A   I had no knowledge.
20     MR. SWEENEY: Thank you.
21     FURTHER EXAMINATION
22 BY MS. ALLEN
23 Q   Mr. Bradbury, just out of curiosity, you said Mona

JR, A Minor                         October 18, 2007                    Pike County Board of Education

26 (Pages 98 to 100)

Page 98

1    is doing her interviews differently now?
2  A   Yes, ma'am.
3  Q   What is she doing differently?
4  A   She is not doing the adversarial-type of
5    interview.
6  Q   What does that mean?
7  A   By telling somebody they did something and having
8    them agree to it.
9      If I told you -- if I had you in an interview,
10   Mona Watson was interviewing you, and she told
11   you, didn't you stand up on the table and jump
12   onto the chairs?  Yes, ma'am, I did.  That's what
13   I consider to be an adversarial interview.
14     Now, if I asked you, what did you do when you
15   were in the board room?  And you said, well, I
16   stood up on the table and jumped onto the chair,
17   that would be a different story.
18  Q   So, you expressed your concern to her, and she has
19   changed her interview methods?
20  A   Yes, ma'am.
21       MS. ALLEN:  No more questions.
22       MR. SWEENEY:  Thank you very much.
23       (Whereupon, at approximately, 12:00

Page 99

1        NOON p.m. on the 18th day of
2      October, 2007 the deposition was
3      concluded.)
4        * * * * * * * * *
5      FURTHER DEPONENT SAITH NOT
6        * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 100

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4    I do hereby certify that the above and foregoing
5  deposition of ROBERT S. BRADBURY taken in the matter of
6  JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND TMR
7  PIKE COUNTY BOARD OF EDUCATION, Case Number:
8  2:06-CV-1120-MEF was taken down by me in machine
9  shorthand on the 18th of October, 2007, and the
10  questions and answers thereto reduced to writing under
11  my personal supervision, and that the foregoing
12  represents a true and correct transcript of the
13  proceedings given by said witness upon said hearing.
14    I further certify that I am neither of counsel nor
15  related to the parties to the action, nor am I any wise
16  interested in the results of said cause.
17    Dated this 26th day of October, 2007.
18
19
20  _____
    Mary Moore-Wynn
21  Certified Court Reporter,
22  ABCR License #275
23

Mary Moore-Wynn, CCR                Mary Moore-Wynn                    (334)244-0203
                                    Court Reporting Services

| A | | | | |
|---|---|---|---|---|
| **ABCR** 100:22 | 65:8 | 33:16,21 37:5 | **appropriate** | 52:2 55:6 62:3 |
| **ability** 58:2 97:9 | **Advocacy** 13:10 | 39:5,12,15 | 37:12 77:12 | 63:18 72:9,12 |
| **able** 34:9 65:9 | 31:21 33:2 | 51:5,10,21 | 94:13 | **attention** 49:20 |
| 84:9,22 | 50:2 56:16 | 52:3 53:10,16 | **approximately** | **attorney** 8:12 |
| **abuse** 14:2,23 | 57:16,17 58:3 | 55:2,7 61:20 | 1:22 91:6 | 46:5,6 78:19 |
| 21:5,9,12 | 64:19 65:16 | 61:23 62:4,9 | 98:23 | 79:19,22 87:20 |
| 28:21 45:14 | 68:11 78:14 | 63:14,19 72:2 | **Arant** 2:10 | **attorney's** 31:23 |
| 50:14 52:5 | 80:18 | 72:13 73:5,15 | **arranged** 32:3 | 46:20 47:19 |
| 54:21,23 57:9 | **advocate** 82:4,5 | 74:7,12,20 | 66:18 | 48:3,17,20 |
| 63:22 70:22 | 82:13 95:8,12 | 75:22 76:5,11 | **arrangement** | 58:4 62:13 |
| 71:7,15 91:13 | **age** 50:8 | 78:12,17,23 | 80:20 | 91:17 92:4,5 |
| 94:2 96:7 | **agency** 94:13 | 83:15 86:12,14 | **arrangements** | 94:14 |
| 97:18 | **ago** 59:1 61:10 | 93:3 95:2,21 | 13:7 31:22 | **Auburn** 37:21 |
| **abused** 49:21 | 78:14 | 97:11,22 98:21 | 64:23 | 37:22 |
| **abusing** 76:9 | **agree** 32:22 | **allow** 22:8 94:6 | **arrest** 15:5 | **audio** 65:22 |
| 81:10,21 86:4 | 34:11 53:4 | **Alonzo** 28:15 | 28:19,23 50:6 | **Avenue** 2:11 |
| **account** 27:4,9 | 98:8 | **Anderson** 45:22 | **arrested** 30:19 | **aware** 80:19 |
| **accuracy** 24:14 | **agreed** 3:8,20 | **Angeles** 10:6 | **articulate** 90:20 | **Azar** 2:5,5 |
| **accurate** 12:6 | 4:5 53:7,21 | **Ann** 10:5 | **ashamed** 85:1 | **a.m** 1:22 65:6 |
| 19:2 29:21 | 64:12 65:4,6 | **answer** 7:9 | **asked** 8:1 9:3 | |
| 58:16 87:22 | 65:18 | 23:13,21 35:1 | 18:12,17,19 | B |
| 93:18 | **agreeing** 8:9 | 35:6 42:16 | 34:23 35:5,20 | **back** 7:11 19:23 |
| **acquired** 97:14 | **agreement** 5:2,7 | 43:22 44:3,6 | 38:14 54:17 | 31:10,14 39:13 |
| **action** 100:15 | 52:22 71:3 | 44:19,22 87:1 | 66:21 67:1,2 | 43:7,20,23 |
| **actions** 22:7 | 72:6 92:7 | **answered** 9:4 | 77:4 78:21,23 | 47:16 48:22,23 |
| **activity** 24:6 | **Agreement(C...** | 18:18 | 83:19 85:16 | 49:2 56:10 |
| 25:15 67:5 | 5:9 | **answering** 37:4 | 98:14 | 57:12,16 58:6 |
| **Adam** 27:22,23 | **Ah** 42:17 43:5 | **answers** 38:12 | **asking** 7:6 8:5 | 65:1,18 71:20 |
| 28:2,4 55:8,10 | **ahead** 37:6 | 38:23 100:10 | 11:21 18:5,8 | 75:6 76:23 |
| 55:11 | **AL** 2:12 | **anybody** 7:14,19 | 37:7 49:15 | 81:16 96:22 |
| **additional** 92:19 | **Alabama** 1:2,20 | 19:9 47:2,6 | 56:22 66:14 | **bad** 46:23 |
| **address** 9:17 | 2:7 9:18 10:17 | 59:21 69:5 | 92:22 95:16,22 | **band** 8:20 38:3 |
| **adequate** 75:20 | 10:20 67:7 | 81:23 95:18 | **aspect** 87:12 | 38:6,7 40:5,22 |
| **admission** 30:6 | 68:15 72:19 | 97:16 | 88:1,2 | 40:22 41:6,11 |
| 89:17,21 90:1 | 100:2 | **anyway** 84:2 | **assessment** | 41:12 50:9,11 |
| 90:4,7 | **Aliant** 2:6 | **appear** 19:2 | 71:12 | 66:23 67:6 |
| **admit** 52:4 56:8 | **allegations** 77:6 | **APPEARAN...** | **assistant** 46:6 | **bank** 27:4,9 |
| **admitted** 91:10 | **Allen** 2:5 4:11 | 2:3 | 62:14 | **Banks** 59:15 |
| **advances** 66:20 | 4:12,13 6:5,13 | **appears** 18:23 | **assume** 7:10 | **Barbaree** 20:7 |
| **adversarial** | 6:16,17 16:4,7 | 20:2 33:14 | 36:13 64:12 | 48:18 |
| 98:13 | 18:14 19:13,17 | **appointment** | 71:17 72:21 | **base** 78:7 |
| **adversarial-ty...** | 19:21 20:21 | 64:20 65:17 | 88:16 92:7 | **based** 10:13 |
| 98:4 | 21:3 23:8,19 | **approach** 96:3 | **assuming** 91:7 | 50:7 76:6 77:6 |
| **advised** 50:9 | 23:20 24:11 | 96:16 | **attached** 6:9 | 78:3 81:6 82:8 |
| | 26:18 27:8,12 | **approached** | 16:10 21:2 | 82:9,12 93:1 |
| | 27:15 28:7 | 34:6 | 33:20 51:9 | 97:13 |

**bashful** 84:23
**Basically** 79:7
**basis** 78:9
**Bates** 16:23
**Bazzell** 2:14
6:23 7:21 9:6
74:1,5 81:2,23
**beach** 82:23
83:1,6
**began** 24:6,10
51:17
**believe** 12:12,19
13:12 14:16
22:21 28:16
30:16 35:23
47:9 48:8,16
58:9 59:20
60:21 74:21
81:19 82:3,5
82:16
**Berry** 7:22 9:7
**best** 36:10,23
37:7,10 52:6,6
83:15,21 97:4
97:8
**bet** 97:10
**better** 8:18
84:20 85:4
**bill** 74:2
**Birmingham**
2:12
**Birth** 26:6
**birthday** 26:5
**bit** 8:18 13:16
85:4
**Blake** 4:20 17:2
18:16 19:1
22:13,18,20
23:6,16 24:5
26:19 27:13,17
28:10 30:2
55:9,17 70:9
**blurted** 49:17
**board** 1:13,19
6:21 23:17
75:18 80:12,15

80:16,19 98:15
100:7
**Bob** 4:17 14:16
30:4 58:14
59:22,23 61:4
61:10,12,14
87:7
**born** 26:10
**bottom** 16:12
20:6 22:2 97:1
**boy** 15:19 27:20
**boys** 84:16
**boy's** 27:21
**Bradbury** 1:17
3:10,22 4:10
4:17 6:1,17
9:16 41:22
42:5,16 44:13
58:14 74:15
95:5 97:23
100:5
**Bradley** 2:10
**brief** 67:21 74:6
82:19
**brother** 45:11
49:11,16 67:8
84:14
**brought** 15:8,11
15:14 66:18
75:6
**Bruce** 8:12
31:23 36:17
42:17,17 47:22
50:22 56:15
62:12 65:2
**Brundidge**
11:15,19 60:6
60:20,23 67:6
77:3,5,6,8,13
**burglarized**
30:17
**burn** 57:8 58:3
79:3
**Butler** 5:2 14:21
15:1,3,6 28:9
28:18 45:23

46:12 53:1,20
61:11,14 85:21
85:21,22

---

## C

**CAC** 65:13,15
**California** 10:6
**call** 7:20 12:2
14:18 30:5
63:7,20
**called** 12:9 13:2
13:4,5 14:19
17:14 30:16
31:3,12,14,15
45:18 85:14
95:5
**card** 27:5,10
**caring** 82:3,5
**carport** 23:1
29:9
**case** 1:10 3:21
4:1 5:2,6,8
13:6 14:2,7,7
14:15 21:21
22:3 23:1,7,10
23:22 45:12,19
46:11,14,15,16
46:18 49:4,6
54:7,9,12,18
57:10 63:2,6
65:23 70:3
71:19,20 72:22
73:1,3,4,16
78:16,22 79:6
82:8 84:4
85:19 87:4,15
89:6 94:3,4
100:7
**cases** 21:5,9,11
21:18 53:21
70:20 71:22
72:14 73:6,17
82:9 90:9
**cause** 100:16
**CCR** 1:18 3:12
**CC2005-196** 5:2

**cell** 27:3 29:11
81:12
**Center** 2:6
13:10 31:21
33:3 50:2
56:16 57:17,17
58:3 64:20
65:16 68:11
78:14 80:18
**central** 81:23
82:1
**certain** 37:8
**certainly** 7:16
13:23 18:1,3
27:1 35:3 39:8
56:23 57:2
58:20 73:20
77:15 79:3
**Certificate** 4:14
100:1
**Certified** 100:21
**certify** 100:4,14
**chair** 98:16
**chairs** 98:12
**chance** 35:6
**change** 16:15
**changed** 98:19
**charges** 70:21
**Charles** 5:1
12:10 31:16
51:12,19 52:4
52:9,23 71:5
72:19 79:8
81:13,20 97:6
97:17
**Charlie** 53:17
**chief** 28:15 54:7
86:22 87:2
**child** 8:6 13:10
14:17 27:16
31:21 32:12,14
32:14,21 33:2
34:7 35:13,13
37:8,13 50:1
56:16 57:9,10
57:16,17 64:19

65:16 68:11
70:14,22 75:19
78:14 80:18
82:13 93:21
94:8,17,20
96:7 97:18
**children** 10:2
21:15,16 82:4
82:6 83:8
**child's** 10:4 34:7
**Christmas** 25:1
**chronology**
47:17
**Cigarettes** 40:6
**City** 60:23,23
**Civil** 3:11
**clarify** 19:11
64:21 68:5
97:4
**Clark** 2:5
**class** 41:13
**classes** 10:9,14
**clean** 23:1
**closely** 16:17
**clothing** 8:20
**code** 9:19
**cold** 74:4
**collected** 81:12
**college** 10:9,12
**combined** 60:4
**come** 30:18
42:17 45:10
55:15 65:1,18
67:8 82:22
84:21 87:2
**comfortable**
69:15,17
**coming** 41:15
**commencing**
1:22
**commission**
3:13
**Commissioner**
1:18 3:13
**committed** 56:2
56:6

JR, A Minor                          October 18, 2007                     Pike County Board of Education

communicate
  85:3
communicated
  85:18
communication
  85:11
communicator
  85:2
compare 19:6
  32:17
compensation
  71:12
complaint 17:7
  77:13
complaints 77:4
complete 35:19
computer 27:3
  57:22 58:11
  66:8,10
concern 65:8
  85:6 98:18
concerned 21:21
  28:14 30:2
  74:9 84:23
concerning
  82:22 95:7
concerns 75:8
concert 77:15
concluded 99:3
conclusion
  84:21
conclusions
  93:14,17
concurrently
  71:9
conditions 88:3
conduct 29:8
  32:20
conducted 29:6
  30:9 37:11,15
  62:19 76:17
  77:18,20 78:6
  81:6 88:14
  89:3 91:8
  95:19
conducting

62:20 85:12
  89:9
conference 7:20
confirm 74:17
confused 65:20
  92:18
connection
  80:14,18
consider 69:14
  98:13
consideration
  48:4
consolidate
  53:21
contact 74:15
contacted 65:2
contribute 60:18
contributed
  60:20 61:1
contributes 60:6
control 39:9
conversation 9:2
  9:6,11,11
  38:13 61:17
  75:2,3,23
  76:13,21 77:2
  79:6
conversations
  15:10
cool 42:17
Coon 5:1,3,7
  8:18 12:1,11
  13:1,19,20,22
  14:4,6,19,22
  18:7 22:9,10
  22:12,21 23:23
  26:23 28:5,14
  29:9 30:5,21
  31:11,17 38:7
  39:16 40:21
  49:16,21 51:12
  51:19 52:4,9
  52:23 53:17
  59:19,19 61:17
  64:2 66:20,23
  67:1,2,3,7 70:6

70:7,13,16
  71:5 72:19,19
  76:9 79:8,14
  79:18 80:3,5
  81:9,20 82:23
  83:7,12 85:20
  86:4,8 89:18
  90:6 95:12
  97:6,17
Coon's 15:4,5
  24:2 28:19
  30:14 71:15
  81:13
copies 57:20
  58:3 85:17
copy 17:19,23
  18:2 19:18
  34:14 39:1
  56:17,19 57:7
  58:2,12,18
  68:14,23
corner 45:17
correct 7:11
  20:3 28:11
  43:22 49:23
  54:8 73:22
  85:9 91:7
  96:20 97:15
  100:12
correctly 48:17
  52:20
counsel 3:9,21
  4:6 5:2,9 95:16
  100:14
County 1:13,19
  4:18 5:2,4,6,7
  9:18 11:2,4,7
  11:14 14:22
  15:1,3,6,7,13
  15:15 21:5
  23:17 28:9,18
  34:18 45:23,23
  46:5,7,12,13
  50:11 52:23
  53:1,18 60:5,8
  61:1,7,11,14

67:6 70:20
  71:8 79:23
  80:12,19 81:3
  81:8,20 82:11
  85:22,22 89:8
  94:10 100:3,7
County/Brad...
  4:22
course 24:22
  29:18 46:3
  47:19 84:23
court 1:1 5:6,8
  6:10 21:23
  52:10 70:7
  71:19,20 73:8
  73:19 84:19
  96:13 100:21
courthouse
  89:20,21
courtroom
  52:15,16,19
  54:1 80:6
credit 27:5,10
  71:13
crime 71:11
criminal 34:8
critical 96:10
criticizing 96:15
CSR 1:18 3:12
curiosity 97:23
C-R-Y-S 48:11
C-Y-R-S 48:12

─────── D ───────
DA 45:18,18,22
  45:23 62:8,11
  62:15,17 65:2
  67:10
dad 15:14
date 17:3 26:6
  34:20 35:5,16
  35:20,22 44:9
  44:11 74:18,21
Dated 100:17
day 13:12 52:9
  52:12 57:16

70:19 74:23
  75:1 80:5 99:1
  100:17
days 57:12,13
  58:6
DA's 57:5 68:14
deal 21:15
dealing 21:4
  36:5
dealt 21:12,14
  21:17
Deanie 2:5 6:17
  78:12
decide 92:3
decided 91:23
decision 46:10
  46:15,17
defendant 1:15
  2:9 5:3 71:11
  71:12
defendants 6:22
degree 10:15
  50:14 71:7
denied 90:6
DePaola 78:17
  78:18
department
  4:18 5:5 10:23
  11:3,5,16,19
  15:7 17:19
  18:5,9 19:14
  20:13 21:6
  29:7 30:20,22
  39:10 48:15
  60:3,5,5,6,8,10
  60:11,12,13,17
  60:18,20 61:6
  61:7 64:18
  77:3,5,9,16
  79:15 81:15
  84:3 88:5 89:8
  94:12
Department's
  58:5
DEPONENT
  99:5

Mary Moore-Wynn, CCR                    Mary Moore-Wynn                        (334)244-0203
                                     Court Reporting Services

JR, A Minor                          October 18, 2007                    Pike County Board of Education
Page 104

deposed 7:2,4
deposition 1:17
  3:9,11,17,22
  3:23 4:7,17
  7:15 50:4,6
  78:11 99:2
  100:5
depositions
  78:15
Deputy 87:7,23
Describe 50:5
Description 4:16
details 83:14
  85:19
determine 83:21
determining
  90:3
DHR 57:10
  94:18
different 98:17
differently 98:1
  98:3
difficult 45:2
direct 34:23
director 38:6,7
  50:9 66:23
discuss 7:11
  46:20 83:11
  90:11
discussed 46:19
discussion 7:23
  14:14 22:18
  61:22 82:19
discussions
  15:18 78:16
dissatisfaction
  76:7
district 1:1,2 5:6
  5:8 8:12 31:23
  46:5,6,20
  47:19 48:3,16
  48:20 58:4
  62:13 87:19
  91:17 92:4,5
  94:14
doctor 8:15

document 16:20
  18:22 50:16
  53:5,6,9,14
documents 18:6
  73:19 74:19
doing 40:15 44:2
  57:19 91:2
  98:1,3,4
dolls 36:5,12,14
  36:15 38:18
Donald 2:10
  6:19,21
door 41:16,17
  41:17,18,22,23
  41:23 42:1,2
doubt 34:3
  93:14
doubted 93:11
  93:13
downstairs
  17:15 87:16
Dr 7:21 9:6 74:1
  74:5
drive 57:21 66:1
  66:6,9 77:18
  79:4
drove 30:18
drug 59:21 60:2
drugs 60:18
duly 6:3
DVD 56:11,13
  56:14,18,22
  57:7,11,19,21
  58:1,8,10,12
  65:19,21 66:2
  68:7 77:17
  78:23
Dwight 68:14
_____
        E
_____
EAR 1:6 100:6
earlier 24:10
  42:9,13 87:8
early 76:1,13
  79:9 84:18
education 1:14

1:20 23:18
  75:20 76:7
  80:12,17 100:7
educational 10:8
educator 97:17
effect 36:6 95:18
either 3:18 4:2
  29:18 43:22
  44:23 61:1
electronics
  57:19
employed 80:11
  80:16
enforced 97:8
enforcement 8:8
  10:14 21:7
  85:8 86:7
  90:16 91:14
  92:10 94:13,18
engaged 97:18
enter 18:14
entered 74:20
Enterprise
  10:13 68:15
entire 68:23
entitled 71:13
entity 60:9
equipment
  61:16
establish 84:9
established
  84:20
estimate 21:9,11
events 49:20
eventually 77:17
  84:9
Everybody's
  74:2
evidence 3:17
  58:19 83:15
exact 74:18
Examination
  4:11,11,12,12
  4:13 6:15
  74:13 86:13
  95:3 97:21

excuse 17:22
  27:6 37:5,5
  55:12 73:15
  87:1
exhibit 4:16,17
  4:18,19,21,22
  5:1,2,3,4,6,7
  6:6,7 16:8
  18:15 20:20,22
  20:23 27:14
  28:8 33:17,18
  45:16 51:7,22
  51:23 55:3,4
  61:23 62:1,10
  63:8,15,16
  68:16,17 69:10
  72:1,3,7,10
  83:17 89:18
exhibits 4:15
  16:3
Exhibit's 16:6
existence 84:1
experience 21:4
  21:7 32:18,19
  37:14,15,19
  82:13
experiences 82:8
  82:9
explain 13:16
  29:23 44:23
  64:17 66:5
  73:21 77:10
explanation
  67:23
express 47:2,4
  47:11,14
expressed 98:18
extended 75:2
extent 79:5
_____
        F
_____
fact 62:22 63:3,6
  65:15 69:17
  80:7 81:17
  90:13
factor 90:3

facts 22:2,3 96:1
  96:3 97:2,4,6
failing 57:8
fall 82:12
familiar 11:7
  18:4,10 52:22
  57:19
far 21:19,21
  25:15 28:13
  30:2,12 31:11
  34:23 49:5
  74:8 75:12
  81:18 84:1,7
  85:18
fashion 81:14
  97:4
father 1:6 15:8
  15:11 17:13
  30:5 61:14
  100:6
Faulk 85:19
Faulkner 4:19
  4:20 14:9,17
  14:18,23 15:19
  15:22 16:11
  17:3,6,10
  18:16 19:1
  22:13,18 23:6
  23:16,23 24:5
  27:14,17 28:10
  55:9 61:13,15
  70:9 79:15
  87:15 88:9
  89:11
Faulkner's
  14:15 15:14
  16:16
faxed 68:13
Federal 2:11
  3:10
feel 66:22 69:15
  69:17 91:1,13
felt 92:11
Fifth 2:11
file 49:4,6 57:3,7
  58:4,5 68:22

JR, A Minor                    October 18, 2007                    Pike County Board of Education

Page 105

| | | | | |
|---|---|---|---|---|
| 69:1 79:2 84:4 | freely 85:5 | going 14:21 16:2 | handed 16:21 | 50:12 67:6 |
| 88:6,12,15,21 | friendly 24:3 | 18:14 25:21 | handled 21:12 | 81:3,8,20 |
| 89:14 | front 47:10 65:9 | 26:13 28:6 | handling 33:6 | 82:11 |
| filed 77:4 | full 9:14 27:21 | 34:19 41:14 | 88:1 | Hightower's |
| files 68:20 | Fuller 48:11,11 | 44:10,17 45:7 | handwriting | 71:1 |
| filing 3:22 4:3 | funds 60:7,20 | 48:7 61:14 | 16:18 63:11 | history 10:8,20 |
| find 24:11 42:12 | 61:2 | 63:3 72:2 73:7 | happen 31:11 | 97:17 |
| 73:16 | further 3:20 4:5 | 73:15 75:5,8 | 38:18 | hold 84:6 |
| first 6:2 9:14 | 4:12,12,13 | 75:12,18 76:2 | happened 8:7 | Holley 68:14 |
| 10:7,21 11:22 | 37:21 48:3 | 81:16 83:4 | 22:14 23:15 | home 30:18 |
| 14:3,6 30:14 | 64:14 67:4 | 84:5 97:7 | 24:9 28:13 | 81:13 |
| 35:2 46:1 | 86:13 95:3 | gonna 36:15,16 | 30:12 31:15 | Hon 2:5,10 |
| 49:11 71:7 | 97:21 99:5 | 36:19,20 | 32:21 34:9 | honest 8:23 |
| 73:3 74:15 | 100:14 | good 8:8 42:3,23 | 36:11,18 37:9 | 46:18 |
| 75:23 76:20 | ——————— | 46:23 47:10 | 37:22 41:6 | hope 92:23 93:6 |
| Flags 83:2,4,7 | **G** | 84:18 90:15 | 47:18 48:21 | hour 30:18 91:6 |
| folks 41:15 | games 51:16 | Goshen 9:18 | 49:8,19 52:12 | house 25:5 |
| followed 71:14 | getting 56:21 | 10:22 | 53:17 56:1,14 | 30:14,17 40:13 |
| 82:10 | 65:20 66:21 | grade 25:20 | 78:9 81:13 | Huh 79:11 |
| following 65:1 | 89:7 96:3 | 34:19,20 | 84:8,22 85:2 | huh-huh 41:5 |
| follows 6:4 | gifts 26:23 27:2 | graduate 10:9 | 93:10,12 | 42:7,22 43:4 |
| fondle 93:22 | gist 7:23 8:22 | 10:10 | happening 75:9 | 83:20 |
| fondled 24:20 | give 7:12 10:7 | greater 37:19 | happens 57:11 | Human 94:12 |
| 49:18 50:10 | 10:19 35:1 | Greenville 19:14 | hard 56:17 | husband 75:4,6 |
| force 59:21 60:2 | 56:19 84:7 | 22:15,23 24:2 | 57:21 58:11 | ——————— |
| 60:22 64:2 | given 18:23 | 28:2,6 29:6 | 66:1,6,9 77:17 | **I** |
| forced 64:2 | 19:13 20:16 | 30:7,15,20,21 | 79:4 | idea 33:11 |
| foregoing 100:4 | 26:22 33:14 | 79:14,23 80:3 | head 44:19 | identification |
| 100:11 | 48:22,23 49:2 | 81:15 83:12 | hear 36:21 | 6:8 16:9 21:1 |
| forensic 32:13 | 67:10,13 68:2 | 85:7,9 87:21 | heard 79:16 | 33:19 51:8 |
| 37:12 | 76:8 83:5 | grunting 44:20 | hearing 100:13 | 52:1 55:5 62:2 |
| form 3:15 25:8 | 100:13 | guess 28:21 | hearsay 75:22 | 63:17 72:8,11 |
| 25:17,23 26:14 | glad 7:12 | 71:21 | heating 74:2 | identify 16:1 |
| 33:8 37:16 | go 7:11 11:18 | guessing 84:12 | held 90:10 | 18:22 33:13 |
| 76:5,11 92:20 | 13:7 17:15 | guilt 30:6 89:17 | Helms 27:20,21 | 50:3 51:11 |
| 95:21 | 18:12 23:2 | guilty 53:23 | 27:23 55:11,12 | 63:8 70:23 |
| formality 3:13 | 25:12 26:20 | 54:3,13,16,19 | 56:1 | 72:16,20 73:4 |
| former 46:5 | 31:14 34:15 | 70:11,19 71:15 | Helmsly 55:10 | improved 96:6 |
| forth 1:21 83:20 | 37:6 39:13 | 73:13 77:23 | Helmsly's 55:8 | inability 47:11 |
| Forty 72:5 | 40:11,12 43:7 | 80:6 90:8 97:7 | hereto 3:18 4:2 | 47:13 |
| found 29:10,15 | 43:20,23 56:10 | guy 42:18 | 6:9 16:10 21:2 | inappropriate |
| 29:17 | 61:20 64:3 | ——————— | 33:20 51:9 | 90:20 91:1 |
| four 24:21,21 | 71:20 77:3 | **H** | 52:2 55:6 62:3 | inasmuch 77:5 |
| 83:8 | 81:16 83:6 | half 91:6 | 63:18 72:9,12 | inaudible 26:17 |
| four-way 9:11 | 97:7 | hand 8:20 41:1 | high 10:9,10 | incident 13:19 |
| free 91:15 93:5,8 | goes 38:13 58:22 | 50:11 | 11:7,14 34:18 | 22:15 74:20 |

incidents 15:2
  15:13
including 82:14
  97:1
INDEX 4:9,15
indicate 20:8
  44:19 69:9
  75:14 83:5
  91:19
indicated 22:21
  23:23 28:4
  31:6,19 41:6
  63:20 64:1
  69:4 70:11,15
  88:4 89:16
  90:18 91:12
  92:14,16,17
  93:19 97:6
indicates 19:22
  25:7,21 62:7
indicating 35:19
  35:21,23 45:21
  59:7 60:1 69:2
  69:23 76:6
indication 86:2
  97:16
individuals 22:4
  22:5
infancy 33:4
  57:18
informal 78:20
  78:20,21
information
  11:20 76:8,19
  81:8 82:22
  84:8 93:2
  97:14
Ingram 28:15
initial 8:4 50:21
inside 30:9 41:1
  41:2
instructing
  23:12
intended 75:15
interchangeable
  68:7

interest 96:23
interested
  100:16
interfaced 85:8
interrogated
  84:19
interrogates
  96:7
interrupted 37:6
interview 4:20
  5:4 8:4,5 9:8
  18:16 22:12
  26:1 27:13,17
  32:1,2,3,6,14
  32:20 33:2,23
  34:4,6,15 36:2
  36:4 37:1,3,11
  37:13,14 39:1
  39:3,7 44:2
  45:1 47:17
  50:1,8 55:8,16
  55:19 57:10
  62:6 67:9,13
  67:13,16,16,17
  76:16 77:1,18
  77:20 78:3,5,7
  79:1 83:16
  91:5,8,11
  92:13,15 94:3
  94:6,9,10,17
  94:20 95:19
  98:5,9,13,19
interviewed
  8:11 12:12
  22:13 28:10
  31:18 61:13
  63:23 69:12
  70:13 79:8,14
interviewer 8:10
  37:12
interviewing
  38:14 82:21
  90:12 96:23
  98:10
interviews 70:2
  85:13 97:13

98:1
intricate 29:20
introduce 27:13
  28:7 51:5 53:8
  62:9
introduced 4:1
  89:17
investigate
  21:22 22:1
  95:6
investigated
  15:2 81:14
investigating
  87:5,6 89:6
investigation
  11:23 14:13
  21:20 28:14
  29:21 30:1,13
  31:6 34:8 55:9
  55:14 70:2
  74:8 76:1
  80:10 81:6
  85:13 86:3,8
  86:15,19,20
  87:13 88:1,2
  89:9
investigations
  90:10
investigative
  32:3
investigator
  8:12 32:13
  34:10 47:20
  54:7 62:12,14
  65:2 67:10
  85:14 86:22
  87:2,4 91:17
  92:4,5
investigators
  28:17 30:15,23
involve 73:18
involved 11:23
  12:13 14:10,20
  15:7 16:16
  31:19 74:10
involving 13:20

issued 15:1
  28:18 73:7

_____
          J
jail 71:8,13
Jersey 10:11
job 33:7
jobs 22:23
Joey 49:14,21
  51:15,16 54:23
  67:9 71:16
  72:15 73:16,22
  84:15
John 45:18 46:1
  46:3
Johnny 11:11
joined 11:2
JR 1:5 100:6
judge 5:9 47:11
  65:9 71:1
Judge's 71:14
judgment 32:5
Judith 10:5
July 12:4,5
  34:21 35:7,17
  74:16
jump 98:11
jumped 98:16
June 25:6 51:14
Junior 9:16
jurisdiction
  11:15
jury 47:10 65:10
Justin 4:21 5:5
  8:11 9:9 12:21
  13:6 14:14
  22:17 31:1
  32:4,6 33:1,15
  34:16,17 39:16
  39:19 42:1,19
  45:2,4,6 46:22
  47:17 49:10,13
  50:8,21 51:15
  52:5 54:10,21
  58:6 62:6
  63:13 64:1,1,4

64:9 65:5
  66:18,23 67:1
  67:3,4,7,9,15
  67:17 69:4,7
  69:10,14,17
  71:16 72:21
  73:22 75:3,9
  76:9 77:20
  78:3 79:18
  81:10,21 82:15
  82:21 83:6,9
  83:11,20 84:7
  84:14 88:8
  90:12,23 92:10
  92:16 93:16
  94:4 95:7,8,23
  97:1
Justin's 12:15
  12:17,23 23:9
  38:1 46:15,16
  49:10 65:8
J-O-H 46:4

_____
          K
Karen 7:22 9:7
keep 17:19
  41:14,15 65:20
kept 17:21
kind 58:19
  92:13,15
King 59:12,13
  59:13
knew 8:1 12:20
  46:17 54:17
  58:8
know 6:17,19,23
  7:9,12 8:17,17
  10:13 11:10
  12:4,23 13:3
  13:19,22 14:1
  18:8 19:19
  26:8 29:13,18
  31:5 32:7 34:7
  34:20 35:14,15
  35:16,20 36:11
  37:20 38:6,20

JR, A Minor                              October 18, 2007                    Pike County Board of Education
Page 107

42:21 43:23
45:7,20 46:1
46:10,15 49:5
53:11,12,16,23
54:2,4,5,12,13
54:13,15,19
56:1 57:13,22
59:10,12,21
64:6,9 66:21
67:16 69:5,7
69:11 71:17
74:18 75:7
79:22 80:16
81:13,17 84:2
85:4,15,17
89:12,13 91:2
91:3 92:16,18
92:21 93:15,17
93:19
**knowledge** 14:3
  14:6 31:1 52:4
  58:21 81:9
  86:4,10,19
  97:16,19
**known** 31:7

_____ **L** _____

**lady** 59:14
**lasted** 91:6
**law** 8:8 10:13
  21:7 80:7 85:8
  86:7 89:20
  90:15 91:14
  92:10 94:13,18
  97:8
**lawyer** 52:7
  70:11,12,15,18
**lawyered** 22:15
**lawyers** 79:6,9
  87:3
**lead** 34:10
**learn** 33:7 85:20
**learning** 64:5
**left** 48:2 65:11
  84:3 88:5
**legs** 38:10,11

41:11
**length** 25:11
**let's** 6:5 16:18
  25:12 31:9,10
  31:14 33:16
  38:1 39:22
  47:16 48:9
  53:8 61:23
  63:1 71:21
  73:4
**library** 80:7
  89:20
**License** 100:22
**life** 97:10
**liked** 69:20,21
**line** 96:22
**lines** 81:4
**listed** 20:5 51:3
  51:4
**listen** 43:20 44:1
**little** 8:17 10:7
  13:16 85:4
**lives** 10:6 59:14
**lock** 41:16 42:1
  42:2
**locked** 41:17,17
  41:18,22,23,23
**long** 24:16 25:15
  37:1 74:3
**long-lost** 45:11
**look** 16:17 24:7
  26:3,8 30:10
  34:13 88:21
**looking** 14:19
  19:9 34:5,5
  47:23 68:19
  82:14
**looks** 45:19
**Los** 10:6
**lot** 45:6 52:8
**loud** 44:6
**Love** 1:20

_____ **M** _____

**machine** 100:8
**making** 8:6

44:20 57:20
58:8
**mama** 84:13
**man** 37:21,22
  38:3 60:21
**manner** 4:2
  37:12 38:16
  85:18 96:6
**mark** 2:14 16:2
  20:19,21 33:16
  51:21 55:2
  63:14 72:2
  81:2,23
**marked** 6:8 16:9
  19:17 21:1
  33:19 51:8
  52:1 55:5 62:2
  63:17 71:23
  72:8,11
**married** 9:21
**Mart** 10:21
**Mary** 1:18 3:12
  100:20
**matter** 70:8,9
  100:5
**matters** 95:6
**Matthews** 8:12
  31:23 42:18,19
  42:20 43:1,2
  47:22 48:2,5,6
  48:19 50:22
  56:15 58:9
  62:12 65:3
  67:10,13 68:3
  77:1
**ma'am** 6:18 7:1
  9:13,22 10:16
  11:6 12:16,22
  15:16,21 17:18
  17:21 20:4,10
  22:11 29:1
  34:2 46:9,12
  47:1,15 49:15
  49:22 52:11,13
  52:17 53:2,4
  54:11,20,22

55:1,11,13
56:4,7,9 58:15
60:14 61:3,8
62:16,21,23
64:8,10,19
65:23 66:4
69:6,8,13
74:11 86:17
89:22 91:12,20
92:2 94:5,7,21
95:1 98:2,12
98:20
**mean** 8:14,23
  17:13,22 22:1
  28:21 29:7,13
  33:5,11 34:21
  35:8,17,19
  43:22 47:7
  59:14 66:5
  68:2 71:17
  77:15 78:20,21
  88:15 98:6
**means** 64:12
**mechanics** 58:8
**memory** 74:17
**mention** 12:17
**mentioned**
  27:16 61:10
  71:18 79:8
**met** 6:19,20
  78:11
**method** 90:11
  93:13
**methodology**
  96:2
**methods** 90:17
  90:17,23 98:19
**middle** 1:2
  51:14
**Mine** 16:14
  67:18
**MINOR** 1:5
  100:6
**minors** 73:18
**minute** 61:10
  82:18 84:6

**misconduct** 86:9
**mislead** 80:22
**missing** 38:5
**misunderstand**
  79:13
**misunderstood**
  61:9 80:2
**Mona** 5:3 8:4
  12:2,9 13:2
  31:3,7,12,14
  31:15,22 32:5
  33:12,22 36:2
  36:4,12,12,22
  37:7,11,19
  38:18 50:21
  56:11,12 57:8
  57:18 58:7
  59:10 62:5
  63:20 65:17
  66:3 68:12
  69:4 74:22
  76:17,22 78:6
  79:2 80:14,16
  80:22 82:3,5
  82:12 90:11,23
  91:5,19 92:9
  93:4,7 94:3,6
  95:17 96:6,10
  97:23 98:10
**Mona's** 67:16
  91:21 93:11
**Montgomery**
  2:7 10:3
**Moore** 2:5
**Moore-Wynn**
  1:18 3:12
  100:20
**morning** 65:2,19
**mother** 1:6
  55:15 100:6
**motivation**
  96:18,21
**mouth** 42:5,6
  90:19
**move** 10:17 23:5
  30:10

**moved** 10:20,21

**N**

**name** 9:15,23
10:4,5 11:10
12:15,15,17,23
20:5 23:9
27:21 28:16
31:2,7 46:1,4,8
49:11 51:4
55:8 87:9,10
**names** 50:15
51:3 71:18
73:18
**nature** 24:21
27:11 83:2
85:16
**necessarily**
88:20
**necessary** 79:18
**need** 3:15 21:23
24:17 71:21
72:14 89:4
**needed** 30:17
64:15 65:5
**neither** 100:14
**never** 6:20 41:2
42:5,6 46:17
53:3 56:17
81:3
**New** 10:11
**nonresponsive**
45:6
**NOON** 99:1
**nope** 40:6 42:6
**normal** 88:3,3
**normally** 44:3,6
73:17 87:22
**North** 2:11
**nos** 44:8
**note** 74:15
**notice** 47:13
86:4
**notified** 94:12
94:13,15
**number** 4:16,16

**O**

**object** 23:4 25:8
25:17,23 26:14
33:8 37:16
75:22 76:5,11
92:20 95:21
**objected** 33:23
**objection** 23:15
33:22
**objections** 3:14
3:14
**obtain** 14:22
50:6
**occasion** 41:8,10
57:20 59:17,18
83:12 94:2,14
**occasions** 24:19
63:3
**occurred** 15:13
24:19 25:3,4
74:16
**October** 1:19
99:2 100:9,17
**odd** 22:23
**offense** 74:20
**offered** 3:17
**offhand** 55:22
83:3
**office** 12:11 13:6
15:9,11 17:14
17:14 18:12
31:17 32:1
46:20 48:3,17
48:20 49:4,6
57:5 62:13
64:4 65:12,14
66:3,19 68:15
68:18 69:11
81:23 82:1
87:16 94:14
**officer** 60:18
**officers** 30:7

60:7
**offices** 1:19
**officials** 85:8
**Off-the-Record**
61:22 82:19
**Oh** 7:4 52:16
81:1
**okay** 9:14 10:7
10:17 11:7,10
11:13 13:13
19:16 21:17
22:17 24:9
25:2 28:4 29:2
29:4,23 31:20
32:23 33:13
36:10 37:21
38:10 40:10,17
41:9,21 42:3
42:15,23 44:2
47:13,16 51:5
51:20 59:12,21
60:19 61:18
63:1,8 64:3,11
65:11 66:12
67:22 68:1,5
69:3,7 73:14
74:5 75:11
76:19 77:17
79:21 80:9
81:18 82:17
86:22 88:4,15
88:21 89:16
90:10 93:11
**old** 10:4 25:19
26:1,7 34:17
**once** 8:19 28:2
30:9 70:2,17
85:14
**ones** 94:22
**ongoing** 14:15
**open** 45:7 85:2
**opened** 30:19
**openly** 64:6 85:5
**opinion** 20:14
78:8 96:8
**opportunity**

7:13
**opposed** 22:18
**oral** 12:12 22:22
24:1,20 31:19
64:3 93:19
**Order** 71:1,4,14
73:2
**original** 17:21
17:22,23 18:2
43:7 96:22
**originally** 13:4
15:12
**outcome** 54:12
54:17
**outside** 8:20
14:19 29:9
30:8 41:1,2
**outweigh** 37:15

**P**

**page** 4:16 36:10
38:5 43:7
64:16 72:5
**pages** 19:23 72:4
**pants** 41:1,1,2
43:3 67:4
**part** 20:1,2
29:20 31:11
40:1,10,20
41:9 60:2,10
72:5
**participate**
79:17
**participated**
87:12,14
**particular** 32:9
52:18 63:2
65:23
**particularly**
32:8
**parties** 3:9,21
100:15
**parts** 8:19 67:2
91:10,12
**party** 3:18 4:2
15:10,17 29:13

**patrol** 60:18
**pay** 71:11 74:2
**PD** 60:8
**Peggy** 20:6,7
**people** 33:5 64:6
86:7 87:5
96:23
**performed**
22:21 24:1,20
**period** 21:10
24:16
**permission** 83:6
**perpetrated**
22:7
**person** 22:6
34:10 44:3
48:9,14,16
94:20
**personal** 100:11
**Personally**
13:21
**personnel** 61:1
**person's** 20:5
**Phillip** 4:19 14:9
14:15 15:8,11
15:14 16:11,16
17:10,12,13,16
19:1 30:2
61:13,17 79:15
85:19 87:16
88:9 89:11
**Phillip's** 15:8,10
30:4
**phone** 30:16
81:16
**phones** 27:3
29:11 81:12
**photograph**
66:7
**physically** 29:8
**pick** 71:20
**picked** 68:13,18
**Pike** 1:13,19
4:18,22 5:4,6,7
11:2,4,7,14
15:7,13,15

21:5 23:17
34:18 45:23
46:5,6,12
50:11 52:23
53:17 60:5,8
60:23 61:7
67:6 70:20
71:8 79:23
80:12,19 81:3
81:8,19 82:11
89:7 94:10
100:7
**place** 2:11 15:3
15:6 24:12
25:7,11,16
33:2 38:4,9,9
43:16 51:18
67:5 76:12
89:19 91:13
93:20
**places** 24:15
43:15,19
**PLAINTIFF** 1:8
2:4
**Plaintiff's** 4:17
4:18,19,21,22
5:1,2,3,4,6,7
6:5,7 16:5,8
18:15 20:20,22
20:23 27:14
28:8 33:17,18
51:6,7,22,23
55:2,4 62:1,10
63:14,16 68:16
68:17 69:10
72:3,7,10
83:16
**play** 21:18 95:6
**played** 21:20
29:23 70:3
**playing** 51:15
**plea** 5:7 52:9,22
71:15,23 77:23
**plead** 70:11
**please** 7:9 16:1
18:22 33:13

39:7 40:20
44:22 50:3
51:11 63:9
70:23 86:12
**pled** 53:23 54:3
54:13,16,19
70:19 73:13
80:6 90:8
**point** 14:21 49:9
58:8,12 69:16
76:16 89:7
96:5
**police** 10:22
11:15,19 19:14
29:6 30:20,22
60:4,6,10,12
60:17,20 63:10
77:3,5,8,14
79:14 81:15
92:1 94:9
**policemen** 60:16
**Polly** 59:12,13
59:13
**poor** 8:4 32:2,2
**position** 21:5
**possible** 97:4
**possibly** 64:14
76:9
**practice** 40:5
**preceded** 14:13
**predicate** 93:1
**preliminary**
76:8
**preparation**
7:14
**present** 2:13
15:3,5 18:19
19:10 20:1
29:7 47:20
52:9,15 94:18
**presently** 71:10
**preserving**
23:14
**presumably**
92:12 94:22
**previously** 85:21

**primary** 33:22
**prior** 13:19
61:14 78:11
86:4,15 97:16
**prison** 54:5
**prisoners** 52:20
**private** 8:19
67:2
**privates** 50:10
67:4
**privy** 88:15
**probably** 49:12
69:5 84:1,16
85:1
**problem** 64:5
**problems** 11:18
**procedure** 3:11
57:9 89:23
94:8,11,16
**proceedings**
100:13
**process** 85:20
**produce** 48:11
**programs** 87:3
**progress** 30:13
**proper** 33:10
**Prosecutor** 5:9
57:11 94:9,20
**protect** 32:14
57:11 94:9,20
**provided** 3:18
4:2 61:15 94:3
**public** 56:3
**pulled** 43:3
**purpose** 3:18
95:22
**pursuant** 1:21
3:10
**put** 42:5,6 49:4
73:18 75:21
90:18
**p.m** 99:1

_____
**Q**
_____
**qualifications**
33:12
**qualified** 32:6,7

33:6,9 94:23
**question** 7:8
27:7 35:1,19
37:17 38:15
42:16 43:8,14
43:17 44:18
59:6,7 90:22
92:21 95:9,10
**questioned**
30:22 34:1
84:20
**questioning**
96:22
**questions** 3:14
3:15 7:7,8 8:6
9:3 18:18,20
36:22 37:8
44:8 47:23
64:14 69:22
74:12 83:1,19
95:2,23 98:21
100:10
**quickly** 7:6

_____
**R**
_____
**R** 2:10
**raining** 44:12
**rapport** 84:9,20
**read** 22:19
24:16 25:18
26:20 28:1
40:1,10,17,20
41:9 42:4,8,13
64:21 66:12,15
68:9
**reading** 4:6 19:4
36:10
**really** 7:3 26:20
79:5
**reason** 52:18
63:5 81:19
93:15 96:15
**recall** 9:12 17:11
18:21 22:19
24:7 26:2,3,20
26:22 27:2,4,8

27:16,23 29:10
29:15 38:19,21
39:16 47:7
49:9,11 55:20
55:21 56:21,22
57:1 70:1,21
73:12 74:9
76:12 83:2
**receiving** 75:20
**recess** 74:6
**recollection**
16:15 40:18
56:13,15
**Record** 9:15
17:1 39:6
61:20 68:10
**recorded** 4:20
14:18 55:20
61:15,16
**recording** 19:7
39:2,3,7 56:11
58:11 61:15
64:13,23 65:4
65:4
**records** 81:17
**Redirect** 86:12
97:11
**reduced** 100:10
**red-headed**
59:14
**Reed** 4:21 5:5
8:11 13:6,8,9
31:22 33:15
41:20,22 42:2
42:5,19,20,21
43:4 47:5,8,9
50:8,22 51:14
52:5 54:21,23
58:6 63:13
64:12,13 65:7
66:18 67:15
68:2 72:15,21
74:23 75:3,4
75:14 76:1,13
76:14,20,23
79:19 81:10,21

82:8 83:5
84:17 88:8
92:10
**Reeds** 74:16
77:2 79:6
83:11
**Reed's** 31:1 33:2
54:10 94:4
**refer** 72:14 77:2
**reference** 23:6
61:10 65:21
71:19 73:21
79:15
**referring** 46:14
80:9
**refers** 63:12
64:1
**reflected** 36:1
**refused** 79:19
**regarding** 11:23
55:10
**regardless** 4:3
**reinterview** 65:5
**reinterviewing**
75:13
**related** 18:7
70:7 100:15
**relating** 9:6
65:15
**relative** 73:10
**relevance** 23:4,7
**reliable** 20:15
78:9 96:3
**reluctant** 8:16
75:4
**rely** 39:22
**remember** 9:1
11:14 12:4
17:8 27:5,10
33:1 36:23
37:7,10 38:17
38:22 43:2,3
48:17 52:20
57:6 68:19
83:13,13,14
87:18

**rendered** 78:2
**repeat** 93:6
**replayed** 66:10
**report** 16:22,23
17:2,9 24:9
26:9 63:10
65:12,14 67:20
68:13,13,16
88:2
**Reporter** 6:10
100:21
**Reporter's** 4:14
100:1
**reports** 4:18 5:5
13:14 16:11,13
24:8 26:4,21
74:21 85:17
87:10
**representative**
61:5
**representing** 3:9
3:21
**represents** 6:21
100:12
**request** 39:6
**requested** 58:18
**reserved** 3:16
**residence** 9:17
15:4 22:23
24:2,3 30:8,19
51:15 67:8
**Resources** 94:12
**respond** 38:4
**responding**
38:15
**response** 19:15
36:3 38:2,16
40:17 43:8,14
43:18 57:1
83:19,21 91:21
**responses** 34:7
**responsibility**
95:7 97:9
**responsive**
35:14 69:22
**rest** 43:10

**result** 29:16
66:8
**results** 34:3
100:16
**retarded** 8:15
**retired** 11:3
**review** 24:14
**reviewed** 70:18
**Reviews** 53:6
**ride** 40:11,12
**Riding** 40:13,13
**right** 9:10,14
10:19 12:3,14
13:11,18,22
14:3,6,10
15:17 16:7,20
16:23 18:11
20:5,18 23:11
24:15 25:18
26:5,19 27:12
27:23 28:9,20
30:12 31:9,10
31:14 32:23
33:16,22 34:13
36:18,22 39:5
40:10,20,21
41:9 42:4,23
45:16,21 47:16
49:8 50:3,15
55:21 56:5
57:16 59:2,5
65:21 66:5,15
67:12 68:9,21
70:10,23 71:21
73:1,4 83:3
87:9 91:4,5
92:11 96:14,17
**right-hand**
45:17
**Road** 2:6 9:18
**Robert** 1:17
3:10,22 4:10
6:1 9:16 100:5
**role** 21:18,20
29:23 70:3
95:6,12,14

**room** 8:20 40:22
41:6,11,12
50:11 67:6
94:19 98:15
**rubbed** 67:3
**Rules** 3:11
**ruling** 3:16
**run** 71:9 84:13
84:15
**rundown** 10:7
10:19
**Russell** 89:8

**S**

**s** 1:17 3:10,22
4:10 5:6,8 6:1
9:16 100:5
**SAITH** 99:5
**sat** 56:16
**satisfied** 77:8
**saw** 49:15 54:6
78:13,14 84:17
91:10
**saying** 8:7 28:4
43:15 44:21
54:2 56:19
61:18 63:22
76:2
**sayings** 43:12
**says** 8:10 17:4,4
17:5 24:16
25:12 35:15
36:14 37:9
38:9,10 43:10
50:8 62:17
64:11,16
**school** 8:21 10:9
10:10 11:8,14
34:18 38:11
40:3,4,13,14
40:14,15,16,23
41:7 50:12
51:16 67:6
75:18 76:2
81:3,9,20
82:11,15 85:22

85:23 86:16,21
93:20
**screen** 94:19
**search** 15:4 29:3
29:4,5,8,14,16
30:8,21
**season** 24:23
**second** 12:10,18
13:5 31:16
32:23 61:21
73:4
**second-guessing**
95:17,18 96:18
96:21
**secretaries**
20:12
**secretary** 48:7
68:3
**see** 16:18 19:9
19:23 38:1
45:10 47:22
48:9 56:22
61:18 63:1
71:21 89:4
97:7
**seeing** 32:2 34:6
41:16
**seen** 53:3 76:16
84:11,12,16
88:19 89:1,1
**sense** 37:18
**sent** 54:5 66:8
**sentence** 71:2,3
71:9
**sentenced** 71:7
**sentences** 71:10
**Sentencing** 71:1
71:4
**separate** 14:2,7
60:9 94:19
**sequence** 49:19
**served** 18:4
71:10
**set** 1:21 50:1
**settle** 45:18
46:10,16,17

settlement 5:8
72:6
sex 12:13 14:2
22:22 24:1,20
31:19 64:3
93:19
sexual 14:22
21:4,9,12 24:5
28:21 45:14
50:14 52:5
54:21,23 66:20
71:7,15 91:13
94:2
shaking 44:19
share 84:22
sharing 76:20
Sheila 10:1
Sheriff 7:18,22
14:16 15:12
17:12 18:11
19:23 28:15,16
30:4 61:12
87:7,7,18,23
87:23 89:9
Sheriff's 4:18
5:5 11:3,4 15:7
17:14,19 18:5
18:9 20:12
21:6 39:10
48:14 49:4,6
58:5 60:3,5,8
60:11,12,17
61:1,5,7 64:18
84:3 88:5 89:8
short 67:20 80:8
89:16
shorthand 100:9
show 24:9,13
64:22
showed 56:11
showing 74:19
74:21
shut 79:9
shy 85:1
sic 13:6 48:12
85:19

sick 48:18 68:4
sign 51:2
signature 16:12
signed 5:8 51:1
51:2,18 52:23
70:18 72:6
signing 4:7
simply 22:13
95:14
single 34:23
singular 95:22
sir 75:1,10,16
76:4,10,15,18
77:11,19,21
78:1 79:10,12
79:17 80:13,21
81:5,11,22
82:2 84:10
85:10 86:6
95:11,13,15,20
96:9 97:3,5
sits 35:15,21
Six 83:1,4,6
sleepy 42:20
sleeves 74:3
slow 8:14,16
45:6
small 80:6
smoke 39:17
40:2,8,9,9
smoked 40:6,6
smoking 40:7
sole 95:22
somebody 75:15
92:18 98:7
someplace 64:20
son 17:12 46:4
sorry 9:15 37:6
38:5 41:22
56:18
sort 14:19 68:7
sound 12:6
44:20
source 86:2
speak 6:3
speakerphone

7:21
speaking 41:20
55:23
specific 21:8
specifically
58:14
spells 46:3
spent 28:5 85:7
spoke 64:11
65:7
staff 57:18 58:7
59:10
Stamped 17:1
stand 98:11
start 24:18
31:10 42:15,23
started 25:20
33:3
starts 38:15
state 9:14 10:13
72:19 100:2
stated 8:18
66:23 67:1,3,4
67:7 68:12
statement 5:1
8:13 17:9,16
17:20,23 18:2
18:13,17,23
19:3 20:15
22:10 30:3
33:14 45:9
47:23 48:1
49:1 50:20,21
50:23 51:12
52:6 67:19,23
68:2 70:6,14
70:16 80:2,5,8
87:17 88:8,9
89:10,17 91:15
92:9,11 93:5,8
94:17
statements 8:6
88:11,13 89:3
92:13,14
statement/Bra...
4:21

states 17:9
station 92:1
Statute 3:19 4:3
stay 58:4,5
64:17,22 65:18
stayed 29:9
stipulate 12:7
73:5
stipulated 3:8
3:20 4:5
stipulations
1:21 3:6 6:11
6:14
stood 30:8 96:13
98:16
stores 45:10
story 34:9 65:9
98:17
Street 1:20
strictly 11:20
strike 23:5
students 41:12
82:14 86:5,9
stuff 38:4 40:5
75:13
subpoena 4:17
18:4,8,9 19:15
72:17 73:7,10
subpoenaed
39:13 68:23
77:22
Subsequently
96:6
sue 75:15,18
76:2
sufficient 69:14
suggest 92:6
suggested 92:4
suicide 56:2,6
sum 36:14
summarize 8:2,3
22:20 53:7,14
summary 5:4
62:5 69:9
93:11
summer 80:10

Superintendent
2:14
supervision
100:11
supplemental
16:22,23 17:2
17:9
Suppose 44:18
90:6
supposed 36:13
supposedly 22:7
sure 4:18 44:21
45:20 46:8
48:13 59:13
88:11,22 89:12
surprised 93:23
94:1
suspect 14:2
suspected 12:20
86:8
suspicion 81:20
Sweeney 2:10
4:11,12 6:12
6:19,21 7:7
12:7 16:2,5
19:11,16,19
20:19 23:4,12
23:22 24:13
25:8,12,17,23
26:14,16 27:6
33:8 37:4,16
39:8,21 53:8
53:12,19 59:6
71:23 74:14
82:18,20 83:18
86:11 88:4
92:20 93:1
95:4 97:12,20
98:22
sworn 6:3
synopsis 67:19
system 66:7 76:3
85:22
systems 86:1,16
86:21

JR, A Minor                                    October 18, 2007                    Pike County Board of Education

| T | | | | |
|---|---|---|---|---|
| **table** 98:11,16 | 48:5,6,19 49:1 | **tenders** 53:5,6 | 14:16 15:12 | 30:16 31:16 |
| **tactics** 32:3 | 49:2,5 55:20 | **term** 86:23 87:2 | 18:11 19:23 | 34:21 35:7,16 |
| **take** 17:15 19:5 | 56:10 57:11 | **terms** 81:2 | 28:15 61:12 | 35:21 42:2 |
| 22:9,22 30:3 | 65:19,20 67:9 | **testified** 6:4 | 87:7 89:8 | 45:18 47:9 |
| 30:11 31:9 | 67:12 68:5,7 | 28:10 56:12 | **thought** 15:12 | 64:6 70:12,17 |
| 35:8,18 48:2,5 | 83:23 88:18 | 63:21 78:2 | 32:11 46:22 | 75:5,7,12 |
| 77:12 82:18 | 89:23 90:4 | **testify** 8:9 21:22 | 54:17 61:9 | 76:22 79:2 |
| 89:10,19 | **taped** 88:13 | 26:19 77:22,23 | 77:12 90:19 | 85:15 87:8 |
| **taken** 1:17 3:10 | 89:21 | **testifying** 26:16 | 92:19 | 90:15 98:9,10 |
| 3:12 24:1 | **tapes** 18:5 83:22 | 26:22 32:11 | **three** 7:21 49:12 | **top** 72:5 |
| 25:15 82:23 | 88:5,6 89:4,12 | 73:8,9 | 50:15 51:1 | **topper** 75:21 |
| 100:5,8 | 89:14 | **testimony** 23:5 | 78:13 83:8 | **touch** 40:23 |
| **talk** 7:14,17 8:16 | **tape-recorded** | 78:3,7 81:18 | 85:23 87:18 | **touched** 8:18 |
| 13:7,9 17:6 | 8:13 17:15,20 | **thank** 6:13 | **three-way** 7:20 | 38:3,8 40:21 |
| 22:4,5,6,6,9,16 | 18:2,17 50:23 | 41:21 86:11 | 9:11 | 41:2,10,11 |
| 22:17 36:16 | 55:19 87:17 | 97:20 98:22 | **Thursday** 25:5,6 | 51:18 66:22 |
| 42:18 45:8,11 | 88:8,9,10 | **thereto** 100:10 | **tickled** 67:8 | 67:2 |
| 45:12 55:15 | **task** 59:21 60:2 | **thing** 21:22 | **tickling** 51:17 | **trained** 92:12,15 |
| 59:17,18 64:5 | 60:21 | 22:19 30:3 | **time** 3:16,16 | **transcribed** 20:9 |
| 66:19 68:8 | **teacher** 50:9 | 31:3 44:14 | 12:17 14:15 | 48:8,9,10,19 |
| 69:5,19,20 | **technical** 66:13 | 49:19 66:16 | 15:4,5 19:5 | 49:1 67:11 |
| 74:23 79:18,20 | 66:14 | 70:14 84:5 | 21:10 24:18,19 | **transcript** 18:23 |
| 80:1,4,11,23 | **technique** 96:12 | 87:14 89:10 | 25:3,4,11 28:5 | 33:14 35:7 |
| 84:15 85:5 | **technology** 59:8 | 93:21 | 29:8 33:1 37:2 | 39:21,22 43:11 |
| 92:17 93:15 | 59:9 | **things** 14:20 | 45:9 47:20 | 100:12 |
| **talked** 9:9 14:17 | **telephone** 12:2 | 16:16 33:6,11 | 49:9 50:18,19 | **transcription** |
| 15:11 17:12 | 14:18 30:5 | 37:9 44:17 | 50:20,23 52:21 | 4:19 19:2 |
| 28:16 30:4 | 61:16 | **think** 6:17 8:22 | 54:14,18 58:9 | 20:15 |
| 31:21 40:4 | **telephoned** | 14:17 23:8,10 | 58:12,22,22 | **transported** |
| 45:4 56:5 | 68:12 | 23:23 24:17 | 64:9,23 65:5,6 | 30:21 |
| 61:13 74:21 | **telephones** | 25:5 28:2 | 70:12,13 75:14 | **traveled** 30:7 |
| 76:22 81:3 | 85:16 | 29:17 31:18 | 80:1 81:7 85:7 | **Trenton** 10:11 |
| 93:21 | **television** 87:3 | 37:17 42:16 | 85:12,12 90:5 | **trial** 4:1 |
| **talking** 9:5,8 | **tell** 11:22 12:20 | 48:2,6 50:1 | 90:12 96:5 | **tried** 40:1,8 58:2 |
| 28:17,22 35:13 | 14:10 24:5 | 55:3 58:7,17 | **times** 24:21,22 | **trip** 82:22 |
| 36:12,14,18 | 29:4 31:3 | 60:6 69:18 | 40:21 45:6 | **trousers** 50:10 |
| 39:16 49:9,10 | 32:21 34:9 | 70:10,15,19,22 | 78:13 | **Troy** 1:20 10:22 |
| 58:6 59:1,3 | 36:11,16 37:22 | 73:13,23 75:19 | **TMR** 1:7 100:6 | 28:12,13 60:4 |
| 67:14 84:17 | 44:3,5,11,14 | 78:10 80:7 | **today** 35:7 57:14 | 60:7,23 |
| 88:6 | 44:23 45:5,16 | 81:15 82:12 | 59:4 81:18 | **truck** 23:2 40:12 |
| **Tammy** 68:11 | 47:8 52:12 | 83:8,23 84:18 | 90:18 | **true** 97:15 |
| **tape** 4:20 19:6 | 57:4 65:9 75:4 | 85:23 87:19,19 | **today's** 34:20 | 100:12 |
| 37:3 39:2,3,6 | 75:7 90:14 | 96:2 | 35:5,16,20,22 | **truth** 6:3,3,4 |
| 43:21 44:1 | **telling** 37:8 43:2 | **third** 50:14 | 44:9,11 | 44:5,15 95:14 |
| | 43:17 98:7 | 70:22 | **told** 8:2,3,3 13:5 | **try** 22:2 77:15 |
| | **tells** 64:4 | **Thomas** 7:18,22 | 17:15 29:17 | 81:16 |

JR, A Minor                              October 18, 2007                  Pike County Board of Education

| | | | | |
|---|---|---|---|---|
| **trying** 39:16 | **understood** 7:10 | **VS** 1:10 | 64:22 65:11,17 | 87:7 |
| 40:8 44:16 | 44:4 | | 69:4 74:22 | **willing** 84:7 |
| 60:15 88:23 | **underwear** | **W** | 76:17,22 77:18 | 91:15 93:5,8 |
| **TV** 94:19 | 51:16 | **Wait** 37:4 | 78:6 79:2 | **wise** 100:15 |
| **twice** 8:19 28:3 | **upstairs** 17:13 | **waived** 3:23 4:8 | 80:15,23 82:3 | **wish** 73:5 |
| 30:9 85:14 | 80:6 89:20 | **waiving** 4:3 | 82:5,12 92:9 | **witness** 4:6,7 5:1 |
| **two** 24:10 25:7 | **usable** 92:10,11 | **Wal-Mart** 84:14 | 95:17 98:10 | 6:2 23:13,14 |
| 25:18 28:17 | **usual** 6:10,14 | **want** 6:10,13 | **Watson's** 33:12 | 24:13 46:23 |
| 49:12 58:3 | 57:9 89:23 | 7:10 8:8,14 | 33:23 66:3 | 47:10 51:12 |
| 59:1,4 70:20 | **utility** 53:13 | 24:11 25:14 | 68:12 | 60:1 69:2 |
| 72:14 73:6 | **U-H** 40:18,18 | 27:12 28:1 | **way** 7:21 8:7 | 72:17 74:1 |
| 78:13,14 83:9 | 42:8,8,10,12 | 29:18 34:8,11 | 11:20 22:12 | 84:19 100:13 |
| 85:23 87:18 | 42:13,13 43:12 | 34:13 36:11 | 23:8 32:8,20 | **witnessed** 32:13 |
| 88:10,13 89:12 | 43:12,22,22 | 39:5,9 42:18 | 33:11 34:1,6 | **witnesses** 50:17 |
| 89:13 90:8 | **U-H-M-P** 43:23 | 44:5,14,17 | 37:7,10 38:23 | 51:4 |
| **type** 30:6 36:3 | **U-H-P** 42:10 | 45:5 51:5,21 | 42:14 43:21 | **word** 35:9 45:21 |
| **typed** 19:20 | **U.S** 1:1 | 57:13 62:9 | 51:18 69:19 | **words** 34:12 |
| 42:14 43:21 | | 79:23 80:22 | 74:17 83:21 | 45:19 90:19 |
| 68:13 | **V** | 87:11 90:20 | 90:10 91:9 | 95:17 |
| | **v** 100:6 | **wanted** 68:5 | **weather** 44:10 | **work** 10:19 |
| **U** | **VCR** 68:7 | 70:10,11 93:15 | **week** 25:4,5 | 77:15 89:7 |
| **ugly** 44:16 | **verify** 71:21 | **warrant** 29:3 | **weekend** 56:2 | **worked** 10:21 |
| **uh** 15:20 37:21 | 72:14 | 50:6,7 | **weeks** 78:14 | 10:22 11:4 |
| **Uhm** 8:22 21:13 | **versus** 72:19 | **warrants** 14:22 | **welfare** 82:14 | 85:21,23 87:1 |
| 46:3 66:12 | **victim** 8:9 12:10 | 15:1 28:18,20 | **went** 13:9 14:23 | **working** 33:5 |
| 78:20 | 12:18,21,23 | 28:22,23 29:4 | 18:11 25:4 | **wouldn't** 22:16 |
| **uh-huh** 40:14,17 | 13:5 31:16 | 29:5,16 | 28:2,9 30:9,20 | 33:9,10 52:7 |
| 40:18,23 41:3 | 34:8 49:17 | **wasn't** 15:9 | 31:21 34:18 | 85:3 90:8 |
| 42:9,13 43:5 | 63:22 72:20 | 29:13 30:14 | 45:9 51:14 | **Wright** 11:11 |
| 43:15,19 83:20 | **victims** 22:5,6 | 45:14 52:15 | 52:10 56:16 | **write** 57:23 |
| **unable** 64:17,22 | 71:11 96:7 | 54:1 59:9 85:2 | 58:10 65:3 | 58:22 87:11,11 |
| **unclear** 59:8 | **victim's** 34:12 | 90:15 91:14 | 66:10 76:23 | **writes** 88:1 |
| **uncomfortable** | **video** 51:15 | 92:11 94:1 | 80:7 83:9 | **writing** 100:10 |
| 66:22 | 65:22 | 96:21 | 87:20 | **written** 13:14 |
| **underneath** 71:3 | **videotape** 56:17 | **watch** 91:11 | **weren't** 33:9 | 50:4 63:10 |
| **understand** 7:8 | **view** 32:1 47:2 | **watched** 77:17 | 52:18 77:8 | **wrong** 38:3,8,9 |
| 9:5 11:17 15:9 | 62:18 63:3 | 78:5 | 96:18 | 51:18 91:7 |
| 21:11 23:19 | 64:13 65:3,19 | **watching** 29:9 | **West** 1:20 | **wrote** 65:12,14 |
| 29:19 35:13 | 65:19 77:1 | **Watson** 5:3 8:4 | **We'll** 12:7 63:14 | 70:17 80:8 |
| 60:9,15 61:18 | **viewed** 56:16 | 12:2,9 13:2 | **we're** 36:17 58:6 | |
| 66:14 73:17 | 58:10,10 62:7 | 31:3,22 32:5 | 59:3 64:19 | **Y** |
| 88:23 | 62:17,22 63:2 | 36:2,4 50:21 | **wife's** 9:23 | **yeah** 6:12 26:12 |
| **understanding** | 63:5 66:1,1,3,6 | 56:11,12 57:8 | **Williamson** | 34:19,20 35:12 |
| 25:10,13,14 | 66:9 | 57:18 58:7 | 14:16 30:4 | 39:4 40:19 |
| 29:19 43:18 | **viewing** 36:23 | 59:10 62:5 | 59:22,23 61:4 | 63:7 81:1 |
| 94:11 | 65:4 94:19 | 63:21 64:14,16 | 61:10,12,15 | 88:17 89:15 |

**year** 12:4 24:22
    24:23 25:1
    34:17 71:8
    84:12,16
**years** 21:7 24:10
    25:7,22 34:17
    49:12 59:1,4
**yesterday** 42:21
**younger** 49:12

**Z**

**Zelda** 2:6
**zip** 9:19
**Zippy** 10:21

**$**

**$25** 71:11

**#**

**#275** 100:22

**1**

**1** 36:10
**10th** 34:20
**100** 4:14
**101** 1:20
**12:00** 98:23
**129** 17:1
**132** 17:1
**14** 25:20 26:13
**14th** 74:16 76:23
**15** 21:13 34:17
    50:9
**15th** 76:23
**16** 4:18 26:12,12
**17** 16:19 26:12
    26:12
**18th** 1:18 34:21
    35:7,17 99:1
    100:9
**1819** 2:11
**1977** 10:18 11:1
**1978** 11:5

**2**

**2:06-CV-1120...**
    1:11 100:8

**20** 4:19 21:13
**2004** 82:12
**2005** 12:6,8
    26:11,12 34:21
    35:8,17 51:14
    57:15 59:3
    80:11
**2005-438** 5:6,8
**2006-272** 5:7,8
**2007** 1:19 11:3,5
    99:2 100:9,17
**205-438** 72:23
**2239** 9:18
**26th** 100:17
**2740** 2:6

**3**

**30** 10:5 21:7
**30th** 25:6
**31** 4:17 6:6,7
**32** 4:18 16:6,8
    18:15 63:8
**33** 4:19,21 20:20
    20:22,23 27:14
    28:8
**34** 4:21 33:17,18
    45:16
**35** 4:22 51:6,7
**35203-2104** 2:12
**36** 5:1 10:5
    51:22,23 55:3
**36035** 9:20
**36081** 1:21
**36106** 2:7
**37** 5:2 55:4
**38** 5:3 62:1,10
    68:16,17
**39** 5:4 63:15,16
    69:10

**4**

**40** 5:6 72:3,4,7
**41** 5:7 72:5,10
**438** 72:23
**467** 9:18

**5**

**51** 4:22 5:1
**55** 5:2

**6**

**6** 4:11,17 16:19
**62** 5:3
**63** 5:4

**7**

**7/14** 65:7
**7/15** 16:18 65:1
**7/18/05** 65:6
**7/19/05** 68:11
**7/6** 16:19 17:4,8
**7/7** 17:4
**7/8** 16:18 17:5
**72** 5:6,7
**74** 4:11
**77** 11:2,2
**78** 11:2

**8**

**8** 16:19
**8th** 25:20
**86** 4:12
**89** 26:10

**9**

**9th** 34:19
**9/8/89** 26:6,9
**9:05** 65:6
**9:45** 1:22
**95** 4:12
**97** 4:13

EXHIBIT 14

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                CASE NO.:

                             2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION

     DEFENDANT.

        * * * * * * * * * *

    DEPOSITION OF KAREN BERRY, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 8:00 a.m.


        * * * * * * * * *

JR, A Minor                    October 1, 2007 Pike County Board of Education

| Page 2 |
| --- |

```
1
2            * * * * * * * * * *
3            APPEARANCES:
4    FOR THE PLAINTIFF:
5    Hon. Susan DePaola
     Attorney at Law
6    1726 West Second Street, Suite B
     Montgomery, Alabama 36106
7
8    and
9    Hon. Deanie C. Allen
     Azar & Azar
10   Aliant Center, Fourth Floor
     2740 Zelda Road
11   Montgomery, AL 36106
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant
14   One Federal Place
     1819 Fifth Avenue, North
15   Birmingham, AL 35203-2104
16   ALSO PRESENT:
17   Dr. Mark Bazzell
18
19
20
21
22
23
```

| Page 4 |
| --- |

```
1    waived, and that said deposition may be introduced a
2    the trial of this case or used in any other manner by
3    either party hereto provided for by the Statute,
4    regardless of the waiving of the filing of same.
5        It is further stipulated and agreed by and
6    between counsel and the witness that the reading
7    and signing of the deposition by the witness is
8    hereby waived.
9                    INDEX
10   KAREN BERRY
11   Examination By Ms. DePaola                6
12   Reporter's Certificate                   57
13           INDEX OF EXHIBITS
14   Exhibit Number      Description      Page Number
15   Plaintiff's Exhibit 23 February, 2003,      13
                WISC-III
16   Plaintiff's Exhibit 24 5/10 Oral and        17
                Written Language Scales (OWLS)
17
18
19
20
21
22            * * * * * * * * *
23
```

| Page 3 |
| --- |

```
1
2            * * * * * * * * * *
3
4
5
6
7            STIPULATIONS
8
9        It is hereby stipulated and agreed by and between
10   counsel representing the parties that the deposition of
11   KAREN BERRY is taken pursuant to the Federal Rules of
12   Civil Procedure, and that said deposition may be taken
13   before Mary Moore-Wynn, CSR, CCR, as Commissioner,
14   without the formality of a commission; that objections
15   to questions, other than objections as to the form of
16   the questions, need not be made at this time, but may
17   be reserved for a ruling at such time as the deposition
18   may be offered into evidence, or used for any other
19   purpose by either party hereto, provided by the
20   Statute.
21       It is further stipulated and agreed by and between
22   counsel representing the parties in this case, that the
23   filing of the deposition of KAREN BERRY is hereby
```

| Page 5 |
| --- |

```
1            KAREN BERRY
2        (Whereupon, the witness, after having first been
3    duly sworn to speak the truth, the whole truth, and
4    nothing but the truth, testified as follows:)
5        THE COURT REPORTER:  Usual stipulations?
6        MS. DePAOLA:  Yes, for me.
7        MR. SWEENEY:  (Indicating).
8            EXAMINATION
9    BY MS. DePAOLA
10   Q   Could you state your name for the Record, please?
11   A   Yes, ma'am, Karen Berry, B-E-R-R-Y.
12   Q   What is your home address?
13   A   1543 County Road 2287, Glenwood, Alabama, 36034
14   Q   Are you currently employed?
15   A   Yes, I am.
16   Q   With whom?
17   A   Pike County Board of Education.
18   Q   How long have you been employed there?
19   A   Since 1974.
20   Q   First of all, would you tell us your educational
21       background?
22   A   Yes, ma'am.  I have a BS degree in history and
23       science -- history and English.  I have a Master's
```

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 6

1   degree in special education with emphasis in
2   mental retardation and minor with Specific
3   Learning Disability.  I have another Master's in
4   school psychometry, a double A in school
5   administration with emphasis in special ed.  And I
6   am currently enrolled in the EdS program for
7   school psychologists.
8   **Q   I'm sorry.  The double A is in school**
9   **administration?**
10  A   Yes, ma'am.
11  **Q   And has your employment history consistently been**
12  **in education?**
13  A   Yes, ma'am.
14  **Q   All right.  Could you just briefly go over with us**
15  **that employment background in education?**
16  A   For example, when I first came to Pike County --
17  **Q   Was that your first job after you finished school?**
18  A   No.  My first job was with Houston County schools,
19  Rehobeth.  I taught special education.
20  **Q   Okay.  MR, children who were mentally retarded?**
21  A   Yes, primarily.
22  **Q   What grade level?**
23  A   It was at the high school, seven through 12.

Page 7

1   **Q   Okay.**
2   A   In '74, I came to Pike County.  I taught special
3   education resource.  And at the elementary and at
4   the high school level until 1985.
5   **Q   And when you say "resource", just for the federal**
6   **court's benefit, tell us what that means.**
7   A   I taught reading, language, and math, the core
8   curriculum.  And resource students were
9   mainstreamed into social studies and science,
10  regular classes.
11  **Q   Okay.  But what you're talking about is special**
12  **education students --**
13  A   Yes.
14  **Q   -- let me see if this is correct -- would come to**
15  **the resource room for assistance with reading,**
16  **language, and math?**
17  A   Yes.
18  **Q   And that might include children with disabilities,**
19  **such as, mental retardation?**
20  A   Yes.
21  **Q   And specific learning disabilities and others?**
22  A   Yes, other disabilities.
23  **Q   How long were you a resource teacher?**

Page 8

1   A   Uhm, let's see, from '74 -- I became coordinator
2   in 1985.
3   **Q   And you became coordinator of what?**
4   A   I'm sorry.  Coordinator of special education.
5   **Q   And what are your responsibilities as coordinator**
6   **of special education?**
7   A   My responsibilities as Special Education
8   Coordinator is to insure that each child receives
9   a free and appropriate public education.
10  **Q   Okay.  But what do you do to do that?**
11  A   I participate in IEP meetings, eligibility
12  meetings, referral meetings.
13  **Q   Anything else?  Do you do any training?**
14  A   As part of special education coordinator?
15  **Q   Yes, ma'am.**
16  A   Yes, I do.
17  **Q   Okay.  Who are you responsible for training?**
18  A   Uhm, let's see.  I'm responsible for training all
19  the special education teachers to insure they are
20  up to date on different aspects of the law,
21  especially reauthorization.  I'm also responsible
22  for keeping them up to date for the Administrative
23  Code, Alabama Administrative Code, and its

Page 9

1   revisions.
2   **Q   You're talking, again, about special education**
3   **teachers?**
4   A   Yes.  Yes.
5   **Q   What else?**
6   A   Okay.  Now, let's see, recently, I have been in
7   charge of awareness training, which came out of
8   the Lee V. Macon Consent Decree from the special
9   education department where it was involving the --
10  **Q   Well, excuse me.  I don't mean to interrupt you,**
11  **but just to shorten this deposition, let's talk**
12  **about prior to what your responsibilities were**
13  **through the 2004-2005 school year.**
14  A   Prior to?
15  **Q   Well, through that year.  In other words, anything**
16  **prior to 2006, we'll just put that aside for the**
17  **moment.**
18  A   Prior to 2004, like I was saying, I was in charge
19  of awareness training.  I was also in charge of --
20  **Q   And just to let the Court know what that is,**
21  **you're talking about the awareness training**
22  **about --**
23  A   The overeridentification of certain

3 (Pages 6 to 9)

JR, A Minor                    October 1, 2007 Pike County Board of Education

---

## Page 10

1  exceptionalities, certain minority children. And
2  the underidentification of minority children.
3  Q  Okay.
4  A  I'm also, as part of the Lee V. Macon Consent
5  Decree, in charge of BBSST training,
6  Building-based Student Support Team training.
7  Q  Do you ever do any training with general education
8  teachers?
9  A  Yes, ma'am, I do.
10 Q  What kind do you do?
11 A  My training with general education teachers is
12 with awareness training and BBSST training.
13 Q  Okay. Awareness training as to these racial
14 issues?
15 A  Yes, ma'am.
16 Q  We will talk about BBSST in a minute. Do you ever
17 do any training with administrators?
18 A  Yes, ma'am, I do.
19 Q  On what topic?
20 A  Same type of topics. When we first started this,
21 it was with administrators to --
22 Q  On awareness training?
23 A  On awareness training, yes, ma'am, because -- and

---

## Page 11

1  on BBSST training.
2  Q  Okay. Any other kind of training that you have
3  ever provided to special ed, general ed, or
4  administrative personnel?
5        MR. SWEENEY: Object to the form.
6  A  No, ma'am. To the --
7  Q  You can't think of any?
8  A  I cannot recall.
9  Q  And if you think of any as we go along, you just
10 let me know.
11    Okay. So, you have a specialization in the
12 area of mental retardation?
13 A  Yes, ma'am.
14 Q  Could you tell the Court what your definition of
15 mental retardation is?
16 A  Mental retardation is a child or an adult whose IQ
17 falls anywhere from 69 and below. It could also
18 be not only intellectually, it could be --
19 intellectually is part of it, but they have
20 somewhat limited adaptive skills.
21 Q  Okay. So, there is an intellectual component, the
22 IQ kind of component, and adaptive behavior
23 component?

---

## Page 12

1  A  Yes, ma'am.
2  Q  Now, do you know or did you know Justin Reed prior
3  to 2006?
4  A  Yes, ma'am, I did.
5  Q  Okay. And was he ever identified by the system as
6  a student with mental retardation?
7  A  Yes, ma'am.
8  Q  Okay. And just -- we asked you to produce today
9  all of the student's educational records. And I
10 did that simply to make sure we had everything.
11 The last intellectual evaluation I have conducted
12 for Pike County Board of Education is dated May of
13 2003.
14 A  Yes, ma'am.
15 Q  Is there any more recent evaluation prior to 2006,
16 but something done by Pike County Board of
17 Education?
18 A  Not to my knowledge.
19 Q  Okay. And let me just ask you to identify this
20 document if you can, for us. And you might want
21 to look at your own records. But I will just
22 represent to you that's a copy of what I was given
23 as to your records.

---

## Page 13

1  A  Yes, ma'am. It was administered by Mr. Hudson,
2  yes, sir -- yes, ma'am.
3        MS. DePAOLA: Let's mark that, please.
4        (Whereupon, Plaintiff's Exhibit 23
5        was marked for identification and
6        is attached hereto.)
7  BY MS. DePAOLA
8  Q  Let me ask you to identify for the Record what
9  Plaintiff's Exhibit 23 is. Tell the Court what
10 that is.
11 A  Yes, ma'am. This is a psychological given with
12 the Wechsler Intelligence Scale, III, which is an
13 individual IQ test. Mr. Hudson, who is our school
14 psychometrist, administered it to Justin in
15 February of '03.
16 Q  And if I have read that correctly, as a result of
17 that test, Mr. Hudson estimated Justin's IQ to be
18 a full scale IQ of 53; is that correct?
19 A  Yes, ma'am.
20 Q  And am I also correct that that puts him in the
21 first percentile with respect to intellectual
22 functioning as tested on that test?
23 A  As tested on this one, yes, ma'am.

---

4  (Pages 10 to 13)

JR, A Minor                          October 1, 2007 Pike County Board of Education

Page 14

1  Q   And tell the Court what the first percentile
2      means.
3  A   The first --
4  Q   How would you explain that to a parent?
5  A   The first percentile means that a child who is --
6      has mild to moderate mental retardation.
7      One percent of the school population, or the
8      testing population, exhibited within this range of
9      scores, like children with mild to moderate mental
10     retardation.
11 Q   In other words, 99 percent of the school
12     population, or the population used in --
13 A   The stand --
14 Q   -- standardizing this test, would perform better
15     than Justin?
16 A   Yes.
17 Q   And his age equivalent on that test was seven
18     years, nine months?
19 A   I don't -- I don't see his age equivalent of seven
20     years, nine months.
21 Q   It's in here somewhere.  I don't know where I saw
22     that.
23         How old was Justin at the time this test was

Page 15

1      taken?
2  A   Thirteen years and six months.
3  Q   Okay.  Do you have his eligibility report done in
4      2003?
5  A   Yes, ma'am.  Do you mind --
6  Q   Might I look at that?
7  A   There is all his work samples and everything
8      (tenders documents).
9  Q   Thank you.
10 A   May I put it up?
11 Q   Yeah.  Sure.  That will be fine.
12 A   I'm peculiar about my documents.  I'm sorry.
13 Q   At the time that evaluation was done, did they
14     also do an evaluation of Justin's oral language
15     skills?
16         And let me just show you a document.  The top
17     is kind of cut off.  But I believe this is the
18     Oral and Written Language Scales also administered
19     in --
20 A   The OWLS, yes, ma'am, by Mrs. Calhoun.
21 Q   Actually, this was done in May of 2005; is that
22     correct?
23 A   Yes.  That's what I am seeing, yes, ma'am.

Page 16

1  Q   Are those also a part of the school's records?
2  A   I could check.  This -- he received speech therapy
3      services with Mrs. Calhoun.  And she may -- I'm
4      not familiar with her entire profile.  But I know
5      she gives this at the end of the school term as
6      part -- to see if he's improved or regressed.
7  Q   Could you look --
8  A   I would be glad to.
9          (Whereupon, Plaintiff's Exhibit 24
10             was marked for identification and
11             is attached hereto.)
12 BY MS. DePAOLA
13 Q   Let me ask you if what we have marked as
14     Plaintiff's Exhibit 24 is part of the educational
15     records for Pike County as it relates to Justin
16     Reed?
17 A   I'm sorry.  Your question?
18 Q   Could you identify what I have marked as
19     Plaintiff's Exhibit 24?
20 A   Yes, ma'am.  That is the test of listening
21     comprehension and oral expression.
22 Q   For Justin Reed?
23 A   For Justin Reed.

Page 17

1  Q   And are part of the Pike County Board of Education
2      records for him?
3  A   Yes.
4  Q   And can you tell the Court what Justin scored as
5      far as a percentile rank on oral expression?
6  A   Standard score of 66.
7  Q   What was his percentile rank?
8  A   Percentile?  First.
9  Q   Okay.  And, again, would that mean that 99 percent
10     of the children who took that test scored higher
11     than Justin did?
12 A   On that particular subpart, yes.
13 Q   And if a child has a percentile rank of
14     first percentile in oral expression, would you
15     expect him to have difficulty with communication?
16 A   Would I expect?
17 Q   Well --
18 A   Some.
19 Q   -- put it this way:  What do you expect to --
20 A   What I look at is the totals.  I look at all of
21     that.
22 Q   Okay.  I'm just asking you about this one.
23 A   Okay.

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn           (334)244-0203
                    Court Reporting Services

JR, A Minor                    October 1, 2007 Pike County Board of Education

## Page 18

1  Q   An oral expression score in the first percentile,
2      how would you expect this child to perform in
3      terms of communicating with others?
4  A   Somewhat -- with somewhat difficulty. But not
5      that much of a difficulty. Sixty-six.
6  Q   Okay. You don't think being in the
7      first percentile is indicative of difficulties
8      communicating with others?
9  A   First percentile is somewhat misleading. I would
10     look at the standard scores.
11 Q   And that oral expression, what age equivalent did
12     it indicate he was in his ability to communicate
13     with others on that test?
14 A   Six years, 11 months.
15 Q   And what was his chronological age at that time?
16 A   Fifteen years.
17 Q   Okay.
18 A   Fifteen years, nine months.
19 Q   All right. Now, you mentioned earlier that a
20     child with mental retardation would also have
21     problems with adaptive skills?
22 A   Somewhat.
23 Q   What does that mean?

## Page 19

1  A   As part of our assessment, we do an adaptive
2      behavior assessment in which it measures
3      communication, personal/social domain,
4      pre-vocational skills, or vocational skills. It's
5      an overall adaptive scale to --
6  Q   Would it include like personal safety issues?
7  A   I'm not familiar -- I can't recall right off the
8      top of my head. The teachers and the parents
9      administer --
10 Q.  Well, I'm not asking about that test. I mean, as
11     a specialist in the area of mental retardation --
12     which I guess you consider yourself to be; is that
13     accurate?
14 A   Yes, ma'am.
15 Q   Okay. Is personal safety an issue that you want
16     to look at for children who are mentally retarded?
17 A   I try to insure that -- yes, very much so.
18 Q   Do you have some particular concerns about these
19     children, the mentally retarded children, as
20     opposed to this issue as it relates to the general
21     education population?
22 A   My concerns are for every child.
23 Q   I'm asking about these children: Are there

## Page 20

1      particular educational issues associated with
2      personal safety that you want to address with the
3      MR population?
4  A   My personal issues, yes, that they are given
5      knowledge; they are taught to be aware of personal
6      safety issues; for example, crossing the street,
7      uhm, different types of --
8  Q   Okay. Let's stop there --
9         MR. SWEENEY: She hadn't finished.
10        MS. DePAOLA: I just want to use this
11        example --
12        MR. SWEENEY: Let her finish the answer
13        she was giving.
14        Go ahead.
15 A   My personal safety issues is like with any --
16     especially with a mentally retarded child -- is to
17     make sure that we have taught them to -- to be
18     aware of different -- different things like
19     crossing the street, essential functional skills.
20 Q   Are you finished? Are you finished?
21 A   Yes.
22 Q   So, let's take crossing the street. I assume that
23     that's something you have to teach the special ed

## Page 21

1      children, and you don't have to teach the general
2      ed population.
3  A   No, ma'am. I hope we teach it to all.
4  Q   Okay. So, what's the difference then with special
5      ed kids on that factor?
6  A   On what factor?
7  Q   Crossing the street.
8  A   Sometimes they have to be taught in different
9      modalities, like color coding signs.
10 Q   Do they sometimes have to be taught in more depth?
11 A   Sometimes, yes.
12 Q   Any other personal safety issues?
13 A   As to what?
14 Q   Anything that you, as a specialist in mental
15     retardation, you believe they should be taught?
16 A   Well, I think personal safety, if they are in the
17     pre-vocational aspect, I think they need to be
18     taught in depth about what different types of
19     jobs, what's related to their critical areas. If
20     they want to go into a job, they have to be taught
21     personal safety issues. It takes -- sometimes it
22     takes the job coach working with them to make sure
23     that they do know about different personal safety

6  (Pages 18 to 21)

JR, A Minor                    October 1, 2007 Pike County Board of Education

Page 22

1  issues.
2  Q  Do you think it's a personal safety issue to teach
3     this MR population about the dangers of getting in
4     a car with a stranger?
5  A  Yes, ma'am.
6  Q  Do you think it's important to teach them the
7     problems with accepting gifts from strangers?
8  A  Yes.
9  Q  Do you think it's a problem to teach them about
10    giving personal information to strangers?
11 A  Yes.
12 Q  Why is this so important; those three things I
13    mentioned?
14 A  So, they would not -- uhm, it's part of their
15    personal safety, so they will not be victims of
16    society, any society.
17 Q  Victims of crime?
18 A  Victims of crime.
19 Q  Are they more susceptible to becoming victims of
20    crime, the mental retarded population?
21    MR. SWEENEY:  Object to the form.
22 A  Not necessarily so.
23 Q  Not necessarily so.  Then why are you teaching

Page 23

1     them these things?
2     MR. SWEENEY:  Object to the form.
3  A  Why?  I hope we're teaching it to all children.
4  Q  And you don't teach it in any more depth to the MR
5     population than they would to the general ed
6     population--
7     MR. SWEENEY:  Object to the form.
8  Q  -- is that your testimony?
9  A  Yes.
10 Q  Well, then what is special about special ed?
11 A  You are asking me that when I taught special
12    education --
13 Q  I'm talking about what you're doing right now.
14    You're Director of Special Ed.  You're the expert
15    for this system.
16 A  I hope my teachers, the special education
17    teachers, know their children.  And if they need
18    more in-depth training, the children -- that those
19    teachers will do that.
20 Q  You haven't given them any instruction to make
21    sure that this MR population receives special
22    attention to the issue of personal safety?
23 A  As part of their overall academic environment,

Page 24

1  yes.
2  Q  Have you told them that these children are more
3     susceptible to being victims of crime?
4  A  I have talked to my staff about their
5     responsibilities as being special education
6     teachers.
7     MS. DePAOLA:  Would you read my question
8        back?  She didn't answer it.
9        (Whereupon, the requested material
10       was read by the Court Reporter.)
11 A  As I said, during our -- and I require all
12    teachers to go to BBSST training.
13 Q  Is that a yes or no?
14 A  I'm getting to that.  Yes, I do tell them to be
15    on -- be aware of different types of -- especially
16    all special ed kids -- that their behavior, if we
17    notice a change in their behavior, to please be
18    aware of it; to go to the counselors if they
19    suspect anything out of the ordinary.
20 Q  That's not an answer to my question.
21    MR. SWEENEY:  Well, if you would save
22       your editorial.  I thought it was
23       very responsive to your question.

Page 25

1     MS. DePAOLA:  Would you read it, once
2        again?  I think a simple yes or no
3        would suffice.
4     MR. SWEENEY:  It's a more complex
5        subject, and she's endeavoring to
6        respond in good faith.
7     MS. DePAOLA:  Read it one more time.
8        (Whereupon, the requested material
9        was read by the Court Reporter.)
10 A  No.
11 Q  All right.  Do you have any information that leads
12    you to believe they may be more susceptible to
13    becoming victims of crime?
14 A  No, ma'am, I don't.
15 Q  Is it your responsibility to research issues like
16    that?
17 A  Yes, ma'am.
18 Q  What research have you conducted?
19 A  I've read numerous articles and --
20 Q  Can you tell me any articles you have read, the
21    names, authors --
22    MR. SWEENEY:  You're clipping the
23       witness' response.  If you'll just

7  (Pages 22 to 25)

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn         (334)244-0203
Court Reporting Services

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 26

1      let her --
2      MS. DePAOLA: I am just trying to
3      expedite the deposition, Donald.
4      MR. SWEENEY: You're expediting by
5      clipping her response. You --
6      MS. DePAOLA: We'll sit here all day,
7      then.
8      MR. SWEENEY: We may be.
9      MS. DePAOLA: And you can just miss all
10     of your meetings, then.
11     MR. SWEENEY: We may be.
12          You were saying that you have
13     read articles.
14     THE WITNESS: Yes, sir.
15  A   I have participated in workshops on different
16     types of issues involving special education
17     students.
18     MS. DePAOLA: What was my question?
19          (Whereupon, the requested material
20          was read by the Court Reporter.)
21  BY MS. DePAOLA
22  Q   **Tell me specifically any articles you have read on**
23     **the topic of the victimisation of special ed kids.**

Page 27

1   A   I cannot recall off the top of my head on --
2   Q   **Do you have some resource you can consult to tell**
3      **us every article you've read off about special**
4      **needs children being victims or not victims of**
5      **crime?**
6      MR. SWEENEY: In the last 30 years?
7   Q   **In the last five years.**
8   A   No, ma'am, I cannot even begin to tell you.
9   Q   **Can you tell me any author or study that can**
10     **recall that says these children are not peculiarly**
11     **susceptible to becoming victims of crime?**
12  A   No, ma'am.
13  Q   **Any workshop that you have attended that indicates**
14     **that they are or are not peculiarly susceptible to**
15     **becoming victims of crime?**
16  A   No.
17  Q   **You can't think of one?**
18  A   I really can't.
19  Q   **Have you read any of the US Department of**
20     **Education studies or summaries of the research on**
21     **this issue?**
22  A   No, I have not.
23  Q   **Is that your responsibility to keep up with those**

Page 28

1      kind of things?
2   A   Yes.
3   Q   **Have you even looked to see if there is such a**
4      **document?**
5   A   No, ma'am.
6   Q   **Now, I'm going to talk especially here about**
7      **children with mental retardation.**
8      MR. SWEENEY: Now, we're talking in the
9      abstract; not about Justin; is that
10     correct?
11     MS. DePAOLA: I'm talking about children
12     with mental retardation.
13  BY MS. DePAOLA
14  Q   **Was Justin identified by the system as having**
15     **mental retardation?**
16  A   Yes, he was.
17     MR. SWEENEY: And you're talking about
18     the whole spectrum of mental
19     retardation from A to Z, all the
20     different characteristics and
21     capabilities?
22  Q   **Go ahead.**
23     MS. DePAOLA: Thank you, Donald.

Page 29

1      MR. SWEENEY: Uh-huh. Is that what
2      you're asking?
3      MS. DePAOLA: I'm talking about children
4      who are mentally retarded, yes.
5   BY MS. DePAOLA
6   Q   **Do you conduct any training that is different from**
7      **the general ed population with the mentally**
8      **retarded kids with respect to sexual issues?**
9      MR. SWEENEY: I'm sorry. What's the
10     question?
11  A   Do you mind rewording or restating the question?
12     I'm sorry.
13  Q   **Do you conduct any training with the mentally**
14     **retarded population relating to sexual issues?**
15  A   With the mentally retarded students, the
16     population?
17  Q   **Yes, yes.**
18  A   No, I do not.
19  Q   **Do you direct your faculty to do that?**
20  A   Yes, I do.
21  Q   **Okay. What have you directed them to cover?**
22  A   I have asked them to -- well, primarily, it's
23     through the BBSST training that I do. And special

8  (Pages 26 to 29)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 30

1    ed and regular ed teachers are present at that
2    training.
3  Q   And what does that consist of?
4  A   What we do, we look -- first of all, I do it every
5    fall, with all teachers, special ed and regular
6    education teachers.  We go into what students may
7    be at risk.  For example, are they low stanines
8    based on Stanford Achievement Tests, stanine one,
9    two, three, or four, which indicates that they may
10   be having a problem academically.  I also go into
11   different types of behavioral characteristics that
12   may show something else may be going on.  Like is
13   it a poor home life?  Is there trouble at home?
14   Is there possible physical, emotional, or sexual
15   abuse?  We go into that.  And we have a handout
16   that I give them on behaviors to look to notice so
17   that they could be aware -- more aware --
18 Q   I think I asked you if you did any training with
19   the students.
20 A   And I said no.
21 Q   Okay.  Okay.  So, what you're saying is you have
22   this BBSST training, and is that the only training
23   you can tell us about relating to sexual issues?

Page 31

1  A   Yes, ma'am.
2  Q   What does it specifically consist of with respect
3    to sexual abuse?
4  A   I brought what I give the teachers.  And we go --
5    this is -- I have it just this little paper gem
6    clipped right here.
7  Q   Let me just see if we've already got that as an
8    exhibit, so we can put this on the Record.  I
9    believe you're referring to a portion of
10   Plaintiff's Exhibit 6.  Is this the document
11   you're talking about?
12 A   Yes, ma'am.
13 Q   Okay.
14 A   It is.
15 Q   All right.  And so, tell me specifically is this
16   all of the training; you provide them with this
17   document, which is Pike County Board of Education
18   document 0190, which is part of Plaintiff's
19   Exhibit 6?
20       MR. SWEENEY:  You mean, passing out that
21       page, or part of the training with
22       that page?  What is your question?
23       MS. DePAOLA:  What did I ask?

Page 32

1        (Whereupon, the requested material
2        was read by the Court Reporter.)
3  BY MS. DePAOLA:
4  Q   Is this the only document you provide them?
5  A   Is this all of that right there?
6  Q   Let me let you look through this.
7  A   Yes, ma'am.
8  Q   You're looking at Plaintiff's Exhibit 6 beginning
9    on page 0183.  And you can just continue to look
10   through that and tell me if this is the document
11   to which you're referring to.
12 A   Yes, ma'am.  This is how -- that's samples of how
13   to do the prereferral intervention.  This is the
14   checklist that they can look at.
15 Q   I'm just asking you if this is the document that
16   you're referring to.
17 A   I'm just making sure.  Yes, ma'am.
18 Q   Now, is this the only written material you provide
19   teachers with respect to sexual abuse?
20 A   Yes.
21 Q   Okay.  And tell me specifically how this relates
22   to sexual abuse.
23 A   It gives teachers a more in-depth overview to look

Page 33

1    at children that everything may not be as black
2    and white.  It could also be any number of
3    factors.
4  Q   I'm trying to understand.  The BBSST is the means
5    of looking at children with low academic
6    achievement; is that correct?
7  A   Not necessary -- not only low academic.  It could
8    be like we have truancy, attendance issues.  It
9    could be children who are having difficulty at
10   home.
11 Q   But, I mean, children who are failing, either
12   academically, socially, whatever, at school, to
13   determine what?
14 A   To see if they need interventions.
15 Q   Okay.  And I don't see the term "sexual abuse" in
16   here anywhere.
17 A   Abuse?  We look at -- I'm sorry -- student neglect
18   and/or abuse.  We look at that.
19 Q   And that could cover anything?
20 A   Yes, ma'am, it covers --
21 Q   Verbal abuse?  Physical --
22 A   Emotional, physical, sexual.
23 Q   Does the word "sexual abuse" occur in here

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn              (334)244-0203
Court Reporting Services

Page 34

1     anywhere?
2  A  No.
3  Q  And this list of factors here on page 0190 --
4  A  Do you mind if I refer --
5  Q  No, I don't mind.
6     -- are symptoms --
7  A  Possible indicators.
8  Q  That, what?
9  A  That there may be something going on.  That there
10    may be trouble at home.  There may be academic
11    problems or emotional problems.  It's just
12    indicators for it.
13 Q  Okay.  All right.  Tell me anything else other
14    than this one page that you do in terms of
15    training them on sexual abuse.
16 A  No, ma'am.  That's -- that's it.
17 Q  Now, what special training as to sexual issues do
18    you give to the special education students,
19    themselves?
20 A  I do not.
21 Q  Do you direct your teachers to give any training
22    on sexual issues with the special education
23    population?

Page 35

1        MR. SWEENEY:  From her, or from other
2           sources?
3        MS. DePAOLA:  I think I said, "do you
4           direct".
5  A  No.
6  Q  Okay.  So, you've never directed them to give any
7     training on appropriate means to gain attention or
8     affection?
9  A  I have never directed them to do that.  But they
10    are special education teachers, so as part of
11    their curriculum, as part of their self-help, I --
12    the teachers would go over that.
13 Q  Okay.  Tell me specifically if you know that has
14    been done with respect to Justin Reed.
15       MR. SWEENEY:  I'm sorry.  What has been
16          done?
17       MS. DePAOLA:  He has been educated on
18          appropriate means to gain attention
19          or affection.
20 A  I can't -- I cannot definitely say so.
21 Q  And you have never directed the teachers to
22    provide this education?
23 A  No, I have not.

Page 36

1  Q  Okay.  Have you ever directed your teachers to
2     educate the special education students about
3     appropriate and inappropriate sexual touching?
4  A  Yes.  I hope they have.  We have gone over the
5     Code.  We have gone over different characteristics
6     of each disability that they serve.  They are very
7     experienced teachers.
8  Q  So, you have directed them to educate the special
9     education student about inappropriate and
10    appropriate sexual touching?
11 A  Directed?  No, I have not.
12 Q  And do you have any information that Justin Reed
13    was ever provided with such information by the
14    school system?
15 A  No, I don't.
16 Q  Okay.  Do you direct the teachers -- would you
17    consider that a personal safety issue?
18       MR. SWEENEY:  Object to the form.
19 A  I'm sorry.
20 Q  Would you consider inappropriate and appropriate
21    sexual touching a personal safety issue?
22 A  Yes.
23 Q  Okay.  Have you ever directed the teachers to

Page 37

1     educate the special education population about
2     appropriate and inappropriate touching by adults?
3  A  I have never directed them.
4  Q  Okay.  So, specifically, what direction have you
5     given them with respect to training special
6     education students on sexual issues?
7  A  Do you mind saying your question, again?
8        MS. DePAOLA:  Would you mind reading the
9           question?
10       (Whereupon, the requested material
11          was read by the Court Reporter.)
12 A  I have not given them any specific directions.
13 Q  Okay.  And let me ask you another thing about this
14    adaptive behavior (indicating).  Does that also
15    include social skills?  Did we talk about that?
16 A  Yes.
17 Q  Social skills?
18 A  Uh-huh.
19 Q  Such as?  Can you tell me what those social skills
20    might be?
21 A  Socialization skills, interacting with peers,
22    interacting with adults, interacting with --
23    primarily with peers and adults.

10  (Pages 34 to 37)

Page 38

1   Q   Do they have some special need for training,
2       different from the general ed population, on these
3       issues?
4   A   Unless it's a different way of teaching it, no
5       more than anything like inappropriate touching.
6       Is that what you're getting at?
7   Q   Well, I mean, okay, so, the only difference in the
8       education of the special ed population is the
9       methodology?
10  A   And the techniques.
11  Q   How about the content?
12  A   The content.
13  Q   Such as, interactions with adults; you may not
14      have to teach that to the general ed population,
15      but you may have to teach it to the special ed
16      population?
17  A   I think we teach it to all; general ed and special
18      ed.
19  Q   Do children who are mentally retarded sometimes
20      have impaired judgment?
21          MR. SWEENEY: Object to the form.
22  A   Not always.
23  Q   I didn't say "always". I said "sometimes".

Page 39

1   A   Sometimes.
2           MR. SWEENEY: Object to the form.
3   Q   And do you have any specific tests that you
4       measure that on; impaired judgment?
5   A   Not to my knowledge.
6   Q   Okay. And by "impaired judgment", what do you
7       mean?
8   A   I'm sorry. I didn't use it. What do you mean by
9       "impaired judgment"?
10  Q   Well, you answered the question. So, I mean, do
11      you mean like they don't always know right from
12      wrong?
13          MR. SWEENEY: Object to the form.
14  Q   What do you mean when you said, yes, they have
15      impaired judgment?
16  A   To a degree. To some.
17  Q   "To some" what?
18  A   Some impaired judgment.
19  Q   Inability to distinguish right from wrong?
20  A   Sometimes.
21  Q   What else?
22  A   Inability to -- sometimes, inability to express
23      themselves.

Page 40

1   Q   Is that a judgment issue?
2   A   It could be.
3   Q   In what way?
4   A   In that they are -- if the child is severely and
5       mentally impaired, that they may have trouble
6       discussing their concerns.
7   Q   Okay. Well, how severe do they have to be to have
8       that problem?
9           MR. SWEENEY: Object to the form.
10  A   How severe?
11  Q   You used the word "severe", if they are severely
12      impaired.
13  A   I said sometimes they are, they have the
14      limited -- how to express themselves.
15  Q   Limited communication skills?
16  A   Could -- sometimes.
17          MR. SWEENEY: I object to all of this
18          line of questioning regarding this
19          broad class of mental retardation.
20          You might as well be asking about
21          the gender of students or the age of
22          students. There is such a wide span
23          of mental retardation that you're

Page 41

1       questions, in the abstract, I think
2       are just confusing the Record.
3   BY MS. DePAOLA:
4   Q   Do you have opinion as to whether or not
5       individuals with mental retardation when
6       confronted with authority figures are more likely
7       to acquiesce to their demands or not?
8           MR. SWEENEY: Object to the form.
9   A   I have --
10  Q   You have no opinion?
11  A   (Witness indicating.)
12  Q   You need to answer something.
13          MS. DePAOLA: She is shaking her head
14          no.
15          THE WITNESS: I'm sorry. No.
16  Q   Now, just to go back to the BBSST. In 2004-2005,
17      are you testifying that this Plaintiff's
18      Exhibit 6, that BBSST materials, was presented to
19      the teachers at Pike County High School?
20  A   Yes.
21  Q   Okay. Every single teacher was present?
22  A   To the best of my knowledge, they were.
23  Q   Were you present?

11  (Pages 38 to 41)

JR, A Minor                    October 1, 2007 Pike County Board of Education

---

Page 42

1  A  Yes.
2  Q  Okay.  Now, what faculty-wide training was
3     provided as to predator behaviors, sexual predator
4     behaviors?
5  A  I did not provide any.
6  Q  Okay.  Did you receive any training as to what
7     predator behaviors you should be looking for?
8  A  I have in the past, yes.
9  Q  I mean, from Pike County Board of Education.
10 A  The meetings, the different workshops I attend,
11    yes.
12 Q  Okay.  Tell me exactly what predator behaviors you
13    have been trained on by Pike County Board of
14    Education and when you received that training.
15 A  When, I don't actually recall.  Type of
16    predator-type behavior?  Gosh, giving gifts.
17    Uhm -- giving gifts.  That's about the -- right
18    there.
19 Q  That's the only one you are aware of?
20 A  Giving gifts, yes.
21 Q  And so did you provide any training for your
22    special ed teachers or the general ed teachers --
23    did you -- on predator behaviors?

---

Page 43

1  A  No, I did not.
2  Q  Can you recall attending any where there was any
3     presentation on predator behaviors?
4  A  Attending workshops?
5  Q  (Indicating).
6  A  Here?
7  Q  Within the system, yes.
8  A  Uhm, no, ma'am.
9  Q  Were you ever put in charge of writing a sexual
10    abuse policy for the Pike County Board of
11    Education?
12 A  Sexual harassment?
13 Q  Sexual abuse.
14 A  Uhm, what I was put in charge of was to come up
15    that we would prohibit any discrimination based on
16    race, sex, disability.  I know there's seven --
17    let's see -- ethnicity.  I was put in charge of
18    that; developing policy.  I was also given -- to
19    develop a sexual harassment policy.
20 Q  Okay.  No sexual abuse policy of which you're
21    aware?
22 A  Our policy is one that prohibits discrimination of
23    anything like that and --

---

Page 44

1  Q  So, the policy on sexual harassment is the only
2     thing you are aware of relating to sexual abuse?
3  A  Yes.
4  Q  And you wrote it?
5  A  Uhm, I took -- I was at -- may I see the policy?
6  Q  Well, I'm not sure if this is what you're
7     referring to.  Your attorney has produced a sexual
8     harassment policy.  Is that what you're referring
9     to?
10 A  Yes, ma'am.
11 Q  Did you write that?
12 A  Uhm, I went to a meeting sponsored by the Office
13    of Civil Rights in Birmingham where they had all
14    school systems to come in and receive help in
15    writing policies.
16 Q  Did you write that?
17 A  The whole thing?
18 Q  Yes, ma'am.
19 A  I took what OCR gave us.
20 Q  You just copied what someone gave you on sexual
21    harassment?
22 A  Yes.
23 Q  And so, does the word "sexual abuse" appear in

---

Page 45

1     this policy you wrote?
2  A  Conduct of a sexual nature.  Regarding race,
3     color, disability.  But not the words -- we do not
4     tolerate sexual harassment.
5        But as far as sexual abuse, there is no direct
6     mention of it.
7  Q  Okay.  And I notice in here that this refers to --
8     or defines sexual harassment as unwelcomed
9     advances.
10 A  Yes.
11 Q  So, if a student considers something unwelcomed
12    it violates this policy?
13 A  Yes.
14 Q  What if they thought it was great?  It's
15    welcome --
16        MR. SWEENEY:  Object to the form.
17 Q  -- does it violate this policy?
18 A  If they welcomed it?
19 Q  Yes.
20        MR. SWEENEY:  Object to the form.  You
21    can answer.
22        THE WITNESS:  I'm sorry?
23        MR. SWEENEY:  You can answer.

---

12  (Pages 42 to 45)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 46

1  BY MS. DePAOLA
2  Q   You can answer.
3  A   Yes.  Anytime a student is harassed, sexually or
4      whatever, it violates it.
5  Q   Would you look at the definition, because it seems
6      to limit it to unwelcome.
7  A   Unwelcome and/or unsolicited sexual advances.
8  Q   So, if a student welcomes these advances and
9      participates in them, does it violate that policy?
10         MR. SWEENEY: Object to the form.
11             You mean if an adult abuses a
12             child, and it's welcome, you're
13             asking her if that is a violation
14             of the policy?
15             We're wasting our time.  Of
16             course, that's a violation.
17         MS. DePAOLA:  You're wasting my time by
18             interrupting and trying to teach
19             your witness.  I'm just asking my
20             question.
21  A   I think any sexual harassment, welcome or
22      unwelcome, violates this policy.
23  Q   Why did you include that welcome,unwelcome in

Page 47

1      there?
2         MR. SWEENEY: It's part of policy.
3  Q   Is it because you just copied it?
4  A   It is part of policy.
5  Q   Okay.  You just copied this from something you
6      received at a seminar?
7  A   From the Office of Civil Rights.  And we did look
8      at it very carefully.
9  Q   But didn't include any mention of sexual abuse in
10     the policy?
11  A   No.
12  Q   And if I understand this policy, this is part of a
13     document that is -- well, let me ask you this:
14     Who gets this policy?  Who receives it?
15  A   Is that in -- that's the employee policy manual.
16  Q   Okay.  I mean, it's something maintained at the
17     Board?
18  A   Policy manuals are given to all teachers.
19  Q   Every teacher has it.  Okay.
20     Are you aware of any other policy that even
21     remotely relates to sexual abuse, written policy
22     in this system?
23  A   Not to my knowledge.

Page 48

1  Q   Are you aware of any written procedures for
2      investigating allegations of sexual abuse against
3      a student?
4  A   Written procedures, like for investigating we
5      have -- during the training, all training, BBSST
6      if they suspect any child, any type of physical,
7      sexual, any type of abuse, they are to notify the
8      counselor.  And the counselor --
9  Q   Okay.  Where is that?
10         MR. SWEENEY: Ecuse me.  She is not
11             through with her explanation.  Go
12             ahead.
13  A   And the counselor informs the principal.  But the
14      counselor is required to notify the appropriate
15      authorities, either DHR or law enforcement.
16  Q   Where is that policy?
17  A   It's just procedure.  You do that.
18  Q   You're not aware of it being written down
19      anywhere?
20         MR. SWEENEY: You asked the procedure.
21             She explained the procedures.
22         MS. DePAOLA:  I asked her for written
23             procedures, Donald.

Page 49

1         MR. SWEENEY: No, you asked procedure.
2  BY MS. DePAOLA
3  Q   Okay.  Where are the written procedures for
4      investigating sexual abuse issues?
5  A   I have no idea.
6  Q   Okay.  But it's your understanding that you are to
7      report it to DHR or the school nurse, did you say?
8      I didn't hear what you said.
9  A   No.  I said, DHR or -- and/or appropriate law
10      authorities -- law enforcement.
11  Q   Okay.  Now, this manual we're talking about is not
12      distributed to students, is it?
13  A   No, ma'am.  They get a Code of Conduct, Student
14      Code of Conduct.
15  Q   And this manual we're talking about, which is
16      Plaintiff's Exhibit 5, is not distributed to the
17      parents, is it?
18  A   To my knowledge, there is one in every library at
19      the school, and each employee is given a policy
20      manual.
21  Q   Okay.  I'll repeat my question:  Is it distributed
22      to the parents?
23  A   No.

13  (Pages 46 to 49)

JR, A Minor                          October 1, 2007  Pike County Board of Education

Page 50

1  Q   Okay. Were you asked to investigate whether
2      Justin Reed was ever removed from class during the
3      school day?
4  A   Excuse me?
5  Q   Were you asked to investigate whether Justin Reed
6      was ever removed from class during the school day?
7  A   No, I was not. The only time it was mentioned to
8      me was during mediation, and Dr. Bazzell, when I
9      was briefing him on mediation, asked me was I
10     aware of Justin being allowed out of class all the
11     time. And, to my knowledge, he was not.
12 Q   Well, did you investigate?
13 A   I asked the teachers, yes, I did.
14 Q   Okay. So, you did conduct an investigation?
15 A   I'm sorry.
16 Q   Who do you speak to?
17 A   I spoke to all the collaborative teachers.
18 Q   Tell me their names.
19 A   I will. Mrs. Catrett, Mrs. Trant, Mrs. Busby --
20     let's see -- Ms. Chancellor, and Mrs. Calhoun, his
21     speech teacher.
22 Q   All right. And what did you ask them?
23 A   I also asked Mr. Suber, the regular ed teacher.

Page 51

1      Mr. Suber, Ms. Morgan, Mrs. Helms, his art
2      teacher, Ms. Sylvia Helms, Sylvia -- were they
3      aware -- was Justin allowed repeatedly out of
4      class, and they said no.
5  Q   Repeatedly?
6  A   Repeatedly.
7  Q   Did you ask them was he ever allowed out of class
8      to go to the band room?
9  A   No, I did not. I asked repeatedly let out of
10     class. And they said, no, because he had an
11     agenda, a planner, that the teachers allowing him
12     to go must sign and then the receiving teacher.
13     And they said not to their knowledge.
14 Q   And you never asked them if this ever occurred.
15     You just said did this repeatedly occur?
16 A   Right.
17 Q   Now, in the Spring of 2005, were you aware that
18     Mr. Coon was suspended from the school?
19 A   In the spring of the '05, Dr. Bazzell asked me was
20     I aware that Mr. Coon had been suspended. And I
21     told him no. He said he was suspended pending an
22     investigation for alleged Marijuana use. He asked
23     me since I was conducting IEP meetings down at

Page 52

1      Pike County High to keep my ears open to see if
2      any of the students were saying anything about
3      this alleged Marijuana use.
4  Q   Okay. Did he ever indicate to you that there was
5      some allegation that Mr. Coon had a butt buddy
6      down at Pike County High School?
7          MR. SWEENEY: Object to the form. You
8              can answer it.
9  A   He said to -- when he said about the alleged
10     sexual abuse -- sexual abuse; I'm sorry -- about
11     the alleged Marijuana use, to just keep my ears
12     open, especially for possible students talking.
13     As far as "butt buddy", I don't actually recall
14     that phrase. But I was to listen out for
15     students. And if they said anything, to let him
16     know.
17        As far as butt buddy, I don't recall hearing
18     that from any students. But Dr. Bazzell may have
19     said, you know, keep your ears open. I am not
20     doubting that.
21 Q   So, he never said to you there were any
22     allegations relating to sexual issues?
23 A   No, just the allegation for alleged Marijuana use.

Page 53

1  Q   And did you, at that time, interview any of the
2      special education students at Pike County High
3      School on this issue?
4  A   For alleged Marijuana use?
5  Q   Whatever he told you.
6  A   No. I listened. And didn't hear.
7  Q   Well, did you conduct interviews on this issue of
8      Marijuana use?
9  A   No.
10 Q   You just if someone happened to be in your
11     vicinity and mentioned it, you would report it
12     back?
13 A   Yes.
14 Q   Did you ever hear the results of Dr. Bazzell's
15     investigation of Mr. Coon?
16 A   No, ma'am, I didn't.
17 Q   Okay. Has it come to your attention that there
18     was an allegation at some point that Justin had
19     been sexually abused by Mr. Coon?
20        MR. SWEENEY: Object to the form.
21 A   An allegation is what I have been told.
22 Q   Okay. And when were you told that?
23 A   Gosh, I really don't recall. I don't recall a

14  (Pages 50 to 53)

JR, A Minor                          October 1, 2007 Pike County Board of Education

## Page 54

1  date.
2  **Q   Well, I mean, was it in the spring of 2005, in the**
3  **summer of 2005, last week?  You know, give us an**
4  **idea.**
5  A   Well, I read about Mr. Coon's arrest in the paper.
6  I mean, that was my first knowledge of it.
7       MR. SWEENEY:  She would like to take
8       break.
9       MS. DePAOLA:  Okay.  That's fine.
10      (Brief recess.)
11      MS. DePAOLA:  Go back on the Record.
12  BY MS. DePAOLA
13  **Q   Let me ask one other question:  In conducting**
14  **evaluations of students for special ed**
15  **eligibility, what intellectual evaluations do you**
16  **use?**
17  A   Uhm, it depends on the child, really.  The C-TONI,
18  which is the Comprehensive Test of Nonverbal
19  Intelligence.  Sometimes the Wechsler scales --
20  Wechsler Individual Scale for Children, III -- I
21  apologize. It's IV now.  Sometimes the
22  Stanford-Binet, Fifth Edition.  Let's see.  The
23  UNIT, Universal Test of Nonverbal Intelligence.

## Page 55

1  **Q   Any others that you use regularly?**
2  A   For --
3  **Q   Intellectual.**
4  A   -- IQ? Intellectual, that's it.
5  **Q   Are these the tests approved by the State?**
6  A   Yes, ma'am, they are.
7  **Q   Any other intellectual evaluations approved by the**
8  **State that you are aware of?**
9  A   Not -- not that I am aware.  There could be some
10  new ones on board.  But those are primarily the
11  ones that are approved by the State.
12  **Q   And do you consider them reliable measures of**
13  **intellectual ability?**
14  A   As reliable -- yes.
15  **Q   Okay.**
16      MS. DePAOLA:  That's all we have.  Thank
17      you.
18      MR. SWEENEY:  No questions.
19
20      (Whereupon, at approximately, 9:20
21      a.m. on the 1st day of October,
22      2007, the deposition was
23      concluded.)

## Page 56

1       * * * * * * * * *
2      FURTHER DEPONENT SAITH NOT
3       * * * * * * * * *

## Page 57

1          REPORTER'S CERTIFICATE
2
3  STATE OF ALABAMA
4  MONTGOMERY COUNTY
5
6     I do hereby certify that the above and foregoing
7  transcript of the deposition of KAREN BERRY in the
8  matter of JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND
9  TMR v. PIKE COUNTY BOARD OF EDUCATION, Case Number:
10  2:06-CV-1120-MEF was taken down by me in machine
11  shorthand on the 1st of October, 2007, and the
12  questions and answers thereto reduced to writing under
13  my personal supervision, and that the foregoing
14  represents a true and correct transcript of the
15  proceedings given by said witness upon said hearing.
16     I further certify that I am neither of counsel nor
17  related to the parties to the action, nor am I any wise
18  interested in the results of said cause.
19     Dated this 8th day of October, 2007.
20
21          _____
              Mary Moore-Wynn
22          Certified Court Reporter
23          ABCR# 275

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn              (334)244-0203
                Court Reporting Services

## A

**ABCR** 57:23
**ability** 18:12
    55:13
**abstract** 28:9
    41:1
**abuse** 30:15
    31:3 32:19,22
    33:15,17,18,21
    33:23 34:15
    43:10,13,20
    44:2,23 45:5
    47:9,21 48:2,7
    49:4 52:10,10
**abused** 53:19
**abuses** 46:11
**academic** 23:23
    33:5,7 34:10
**academically**
    30:10 33:12
**accepting** 22:7
**accurate** 19:13
**achievement**
    30:8 33:6
**acquiesce** 41:7
**action** 57:17
**adaptive** 11:20
    11:22 18:21
    19:1,5 37:14
**address** 5:12
    20:2
**administer** 19:9
**administered**
    13:1,14 15:18
**administration**
    6:5,9
**administrative**
    8:22,23 11:4
**administrators**
    10:17,21
**adult** 11:16
    46:11
**adults** 37:2,22
    37:23 38:13
**advances** 45:9

46:7,8
**affection** 35:8
    35:19
**age** 14:17,19
    18:11,15 40:21
**agenda** 51:11
**agreed** 3:9,21
    4:5
**ahead** 20:14
    28:22 48:12
**AL** 2:11,15
**Alabama** 1:2,20
    2:6 5:13 8:23
    57:3
**Aliant** 2:10
**allegation** 52:5
    52:23 53:18,21
**allegations** 48:2
    52:22
**alleged** 51:22
    52:3,9,11,23
    53:4
**Allen** 2:9
**allowed** 50:10
    51:3,7
**allowing** 51:11
**and/or** 33:18
    46:7 49:9
**answer** 20:12
    24:8,20 41:12
    45:21,23 46:2
    52:8
**answered** 39:10
**answers** 57:12
**Anytime** 46:3
**apologize** 54:21
**appear** 44:23
**APPEARAN...**
    2:3
**appropriate** 8:9
    35:7,18 36:3
    36:10,20 37:2
    48:14 49:9
**approved** 55:5,7
    55:11

**approximately**
    1:22 55:20
**Arant** 2:13
**area** 11:12 19:11
**areas** 21:19
**arrest** 54:5
**art** 51:1
**article** 27:3
**articles** 25:19,20
    26:13,22
**aside** 9:16
**asked** 12:8
    29:22 30:18
    48:20,22 49:1
    50:1,5,9,13,23
    51:9,14,19,22
**asking** 17:22
    19:10,23 23:11
    29:2 32:15
    40:20 46:13,19
**aspect** 21:17
**aspects** 8:20
**assessment** 19:1
    19:2
**assistance** 7:15
**associated** 20:1
**assume** 20:22
**attached** 13:6
    16:11
**attend** 42:10
**attendance** 33:8
**attended** 27:13
**attending** 43:2,4
**attention** 23:22
    35:7,18 53:17
**attorney** 2:5
    44:7
**author** 27:9
**authorities**
    48:15 49:10
**authority** 41:6
**authors** 25:21
**Avenue** 2:14
**aware** 20:5,18
    24:15,18 30:17

30:17 42:19
    43:21 44:2
    47:20 48:1,18
    50:10 51:3,17
    51:20 55:8,9
**awareness** 9:7
    9:19,21 10:12
    10:13,22,23
**Azar** 2:9,9
**a.m** 1:22 55:21

## B

**B** 2:6
**back** 24:8 41:16
    53:12 54:11
**background**
    5:21 6:15
**band** 51:8
**based** 30:8
    43:15
**Bazzell** 2:17
    50:8 51:19
    52:18
**Bazzell's** 53:14
**BBSST** 10:5,12
    10:16 11:1
    24:12 29:23
    30:22 33:4
    41:16,18 48:5
**becoming** 22:19
    25:13 27:11,15
**beginning** 32:8
**behavior** 11:22
    19:2 24:16,17
    37:14 42:16
**behavioral**
    30:11
**behaviors** 30:16
    42:3,4,7,12,23
    43:3
**believe** 15:17
    21:15 25:12
    31:9
**benefit** 7:6
**Berry** 1:17 3:11

3:23 4:10 5:1
    5:11 57:7
**best** 41:22
**better** 14:14
**Birmingham**
    2:15 44:13
**black** 33:1
**board** 1:13,19
    5:17 12:12,16
    17:1 31:17
    42:9,13 43:10
    47:17 55:10
    57:9
**Bradley** 2:13
**break** 54:8
**Brief** 54:10
**briefing** 50:9
**briefly** 6:14
**broad** 40:19
**brought** 31:4
**BS** 5:22
**buddy** 52:5,13
    52:17
**Building-based**
    10:6
**Busby** 50:19
**butt** 52:5,13,17
**B-E-R-R-Y** 5:11

## C

**C** 2:9
**Calhoun** 15:20
    16:3 50:20
**capabilities**
    28:21
**car** 22:4
**carefully** 47:8
**case** 1:10 3:22
    4:2 57:9
**Catrett** 50:19
**cause** 57:18
**CCR** 1:18 3:13
**Center** 2:10
**certain** 9:23
    10:1

**Certificate** 4:12
57:1
**Certified** 57:22
**certify** 57:6,16
**Chancellor**
50:20
**change** 24:17
**characteristics**
28:20 30:11
36:5
**charge** 9:7,18,19
10:5 43:9,14
43:17
**check** 16:2
**checklist** 32:14
**child** 8:8 11:16
14:5 17:13
18:2,20 19:22
20:16 40:4
46:12 48:6
54:17
**children** 6:20
7:18 10:1,2
14:9 17:10
19:16,19,19,23
21:1 23:3,17
23:18 24:2
27:4,10 28:7
28:11 29:3
33:1,5,9,11
38:19 54:20
**chronological**
18:15
**Civil** 3:12 44:13
47:7
**class** 40:19 50:2
50:6,10 51:4,7
51:10
**classes** 7:10
**clipped** 31:6
**clipping** 25:22
26:5
**coach** 21:22
**Code** 8:23,23
36:5 49:13,14

**coding** 21:9
**collaborative**
50:17
**color** 21:9 45:3
**come** 7:14 43:14
44:14 53:17
**commencing**
1:21
**commission**
3:14
**Commissioner**
1:18 3:13
**communicate**
18:12
**communicating**
18:3,8
**communication**
17:15 19:3
40:15
**complex** 25:4
**component**
11:21,22,23
**comprehension**
16:21
**Comprehensive**
54:18
**concerns** 19:18
19:22 40:6
**concluded** 55:23
**conduct** 29:6,13
45:2 49:13,14
50:14 53:7
**conducted** 12:11
25:18
**conducting**
51:23 54:13
**confronted** 41:6
**confusing** 41:2
**Consent** 9:8
10:4
**consider** 19:12
36:17,20 55:12
**considers** 45:11
**consist** 30:3 31:2
**consistently**

6:11
**consult** 27:2
**content** 38:11,12
**continue** 32:9
**Coon** 51:18,20
52:5 53:15,19
**Coon's** 54:5
**coordinator** 8:1
8:3,4,5,8,14
**copied** 44:20
47:3,5
**copy** 12:22
**core** 7:7
**correct** 7:14
13:18,20 15:22
28:10 33:6
57:14
**correctly** 13:16
**counsel** 3:10,22
4:6 57:16
**counselor** 48:8,8
48:13,14
**counselors**
24:18
**County** 1:13,19
5:13,17 6:16
6:18 7:2 12:12
12:16 16:15
17:1 31:17
41:19 42:9,13
43:10 52:1,6
53:2 57:4,9
**course** 46:16
**Court** 1:1 5:5
9:20 11:14
13:9 14:1 17:4
24:10 25:9
26:20 32:2
37:11 57:22
**court's** 7:6
**cover** 29:21
33:19
**covers** 33:20
**crime** 22:17,18
22:20 24:3

25:13 27:5,11
27:15
**critical** 21:19
**crossing** 20:6,19
20:22 21:7
**CSR** 1:18 3:13
**currently** 5:14
6:6
**curriculum** 7:8
35:11
**cut** 15:17
**C-TONI** 54:17

**D**

**dangers** 22:3
**date** 8:20,22
54:1
**dated** 12:12
57:19
**day** 26:6 50:3,6
55:21 57:19
**Deanie** 2:9
**Decree** 9:8 10:5
**DEFENDANT**
1:15 2:12
**defines** 45:8
**definitely** 35:20
**definition** 11:14
46:5
**degree** 5:22 6:1
39:16
**demands** 41:7
**DePaola** 2:5
4:11 5:6,9 13:3
13:7 16:12
20:10 24:7
25:1,7 26:2,6,9
26:18,21 28:11
28:13,23 29:3
29:5 31:23
32:3 35:3,17
37:8 41:3,13
46:1,17 48:22
49:2 54:9,11
54:12 55:16

**department** 9:9
27:19
**depends** 54:17
**DEPONENT**
56:2
**deposition** 1:17
3:10,12,17,23
4:1,7 9:11 26:3
55:22 57:7
**depth** 21:10,18
23:4
**Description** 4:14
**determine** 33:13
**develop** 43:19
**developing**
43:18
**DHR** 48:15 49:7
49:9
**difference** 21:4
38:7
**different** 8:20
20:7,18,18
21:8,18,23
24:15 26:15
28:20 29:6
30:11 36:5
38:2,4 42:10
**difficulties** 18:7
**difficulty** 17:15
18:4,5 33:9
**direct** 29:19
34:21 35:4
36:16 45:5
**directed** 29:21
35:6,9,21 36:1
36:8,11,23
37:3
**direction** 37:4
**directions** 37:12
**Director** 23:14
**disabilities** 7:18
7:21,22
**disability** 6:3
36:6 43:16
45:3

**discrimination**
43:15,22
**discussing** 40:6
**distinguish**
39:19
**distributed**
49:12,16,21
**DISTRICT** 1:1
1:2
**document** 12:20
15:16 28:4
31:10,17,18
32:4,10,15
47:13
**documents** 15:8
15:12
**doing** 23:13
**domain** 19:3
**Donald** 2:13
26:3 28:23
48:23
**double** 6:4,8
**doubting** 52:20
**Dr** 2:17 50:8
51:19 52:18
53:14
**duly** 5:3

**E**
**EAR** 1:6 57:8
**earlier** 18:19
**ears** 52:1,11,19
**Ecuse** 48:10
**ed** 6:5 11:3,3
20:23 21:2,5
23:5,10,14
24:16 26:23
29:7 30:1,1,5
38:2,8,14,15
38:17,18 42:22
42:22 50:23
54:14
**Edition** 54:22
**editorial** 24:22
**EdS** 6:6

**educate** 36:2,8
37:1
**educated** 35:17
**education** 1:14
1:20 5:17 6:1
6:12,15,19 7:3
7:12 8:4,6,7,9
8:14,19 9:2,9
10:7,11 12:12
12:17 17:1
19:21 23:12,16
24:5 26:16
27:20 30:6
31:17 34:18,22
35:10,22 36:2
36:9 37:1,6
38:8 42:9,14
43:11 53:2
57:9
**educational** 5:20
12:9 16:14
20:1
**either** 3:19 4:3
33:11 48:15
**elementary** 7:3
**eligibility** 8:11
15:3 54:15
**emotional** 30:14
33:22 34:11
**emphasis** 6:1,5
**employed** 5:14
5:18
**employee** 47:15
49:19
**employment**
6:11,15
**endeavoring**
25:5
**enforcement**
48:15 49:10
**English** 5:23
**enrolled** 6:6
**entire** 16:4
**environment**
23:23

**equivalent** 14:17
14:19 18:11
**especially** 8:21
20:16 24:15
28:6 52:12
**essential** 20:19
**estimated** 13:17
**ethnicity** 43:17
**evaluation** 12:11
12:15 15:13,14
**evaluations**
54:14,15 55:7
**evidence** 3:18
**exactly** 42:12
**Examination**
4:11 5:8
**example** 6:16
20:6,11 30:7
**exceptionalities**
10:1
**excuse** 9:10 50:4
**exhibit** 4:14,15
4:16 13:4,9
16:9,14,19
31:8,10,19
32:8 41:18
49:16
**exhibited** 14:8
**EXHIBITS** 4:13
**expect** 17:15,16
17:19 18:2
**expedite** 26:3
**expediting** 26:4
**experienced**
36:7
**expert** 23:14
**explain** 14:4
**explained** 48:21
**explanation**
48:11
**express** 39:22
40:14
**expression**
16:21 17:5,14
18:1,11

**F**
**factor** 21:5,6
**factors** 33:3
34:3
**faculty** 29:19
**faculty-wide**
42:2
**failing** 33:11
**faith** 25:6
**fall** 30:5
**falls** 11:17
**familiar** 16:4
19:7
**far** 17:5 45:5
52:13,17
**FATHER** 1:6
57:8
**February** 4:15
13:15
**federal** 2:14
3:11 7:5
**Fifteen** 18:16,18
**Fifth** 2:14 54:22
**figures** 41:6
**filing** 3:23 4:4
**fine** 15:11 54:9
**finish** 20:12
**finished** 6:17
20:9,20,20
**first** 5:2,20 6:16
6:17,18 10:20
13:21 14:1,3,5
17:8,14 18:1,7
18:9 30:4 54:6
**five** 27:7
**Floor** 2:10
**follows** 5:4
**foregoing** 57:6
57:13
**form** 3:15 11:5
22:21 23:2,7
36:18 38:21
39:2,13 40:9
41:8 45:16,20
46:10 52:7

53:20
**formality** 3:14
**forth** 1:21
**four** 30:9
**Fourth** 2:10
**free** 8:9
**full** 13:18
**functional** 20:19
**functioning**
13:22
**further** 3:21 4:5
56:2 57:16

**G**
**gain** 35:7,18
**gem** 31:5
**gender** 40:21
**general** 10:7,11
11:3 19:20
21:1 23:5 29:7
38:2,14,17
42:22
**getting** 22:3
24:14 38:6
**gifts** 22:7 42:16
42:17,20
**give** 30:16 31:4
34:18,21 35:6
54:3
**given** 12:22
13:11 20:4
23:20 37:5,12
43:18 47:18
49:19 57:15
**gives** 16:5 32:23
**giving** 20:13
22:10 42:16,17
42:20
**glad** 16:8
**Glenwood** 5:13
**go** 6:14 11:9
20:14 21:20
24:12,18 28:22
30:6,10,15
31:4 35:12

JR, A Minor                October 1, 2007 Pike County Board of Education

Page 4

41:16 48:11
51:8,12 54:11
**going** 28:6 30:12
34:9
**good** 25:6
**Gosh** 42:16
53:23
**grade** 6:22
**great** 45:14
**guess** 19:12

**H**

**handout** 30:15
**happened** 53:10
**harassed** 46:3
**harassment**
43:12,19 44:1
44:8,21 45:4,8
46:21
**head** 19:8 27:1
41:13
**hear** 49:8 53:6
53:14
**hearing** 52:17
57:15
**Helms** 51:1,2
**help** 44:14
**hereto** 3:19 4:3
13:6 16:11
**high** 6:23 7:4
41:19 52:1,6
53:2
**higher** 17:10
**history** 5:22,23
6:11
**home** 5:12 30:13
30:13 33:10
34:10
**Hon** 2:5,9,13
**hope** 21:3 23:3
23:16 36:4
**Houston** 6:18
**Hudson** 13:1,13
13:17

**I**

**idea** 49:5 54:4
**identification**
13:5 16:10
**identified** 12:5
28:14
**identify** 12:19
13:8 16:18
**IEP** 8:11 51:23
**III** 13:12 54:20
**impaired** 38:20
39:4,6,9,15,18
40:5,12
**important** 22:6
22:12
**improved** 16:6
**inability** 39:19
39:22,22
**inappropriate**
36:3,9,20 37:2
38:5
**include** 7:18
19:6 37:15
46:23 47:9
**INDEX** 4:9,13
**indicate** 18:12
52:4
**indicates** 27:13
30:9
**indicating** 5:7
37:14 41:11
43:5
**indicative** 18:7
**indicators** 34:7
34:12
**individual** 13:13
54:20
**individuals** 41:5
**information**
22:10 25:11
36:12,13
**informs** 48:13
**instruction**
23:20
**insure** 8:8,19
19:17

**intellectual**
11:21 12:11
13:21 54:15
55:3,4,7,13
**intellectually**
11:18,19
**Intelligence**
13:12 54:19,23
**interacting**
37:21,22,22
**interactions**
38:13
**interested** 57:18
**interrupt** 9:10
**interrupting**
46:18
**intervention**
32:13
**interventions**
33:14
**interview** 53:1
**interviews** 53:7
**introduced** 4:1
**investigate** 50:1
50:5,12
**investigating**
48:2,4 49:4
**investigation**
50:14 51:22
53:15
**involving** 9:9
26:16
**in-depth** 23:18
32:23
**IQ** 11:16,22
13:13,17,18
55:4
**issue** 19:15,20
22:2 23:22
27:21 36:17,21
40:1 53:3,7
**issues** 10:14
19:6 20:1,4,6
20:15 21:12,21
22:1 25:15

26:16 29:8,14
30:23 33:8
34:17,22 37:6
38:3 49:4
52:22
**IV** 54:21

**J**

**job** 6:17,18
21:20,22
**jobs** 21:19
**JR** 1:5 57:8
**judgment** 38:20
39:4,6,9,15,18
40:1
**Justin** 12:2
13:14 14:15,23
16:15,22,23
17:4,11 28:9
28:14 35:14
36:12 50:2,5
50:10 51:3
53:18
**Justin's** 13:17
15:14

**K**

**Karen** 1:17 3:11
3:23 4:10 5:1
5:11 57:7
**keep** 27:23 52:1
52:11,19
**keeping** 8:22
**kids** 21:5 24:16
26:23 29:8
**kind** 10:10 11:2
11:22 15:17
28:1
**know** 9:20 11:10
12:2,2 14:21
16:4 21:23
23:17 35:13
39:11 43:16
52:16,19 54:3
**knowledge**
12:18 20:5

39:5 41:22
47:23 49:18
50:11 51:13
54:6

**L**

**language** 4:16
7:7,16 15:14
15:18
**law** 2:5 8:20
48:15 49:9,10
**leads** 25:11
**learning** 6:3
7:21
**Lee** 9:8 10:4
**let's** 8:1,18 9:6
9:11 13:3 20:8
20:22 43:17
50:20 54:22
**level** 6:22 7:4
**library** 49:18
**life** 30:13
**limit** 46:6
**limited** 11:20
40:14,15
**line** 40:18
**list** 34:3
**listen** 52:14
**listened** 53:6
**listening** 16:20
**little** 31:5
**long** 5:18 7:23
**look** 12:21 15:6
16:7 17:20,20
18:10 19:16
30:4,16 32:6,9
32:14,23 33:17
33:18 46:5
47:7
**looked** 28:3
**looking** 32:8
33:5 42:7
**Love** 1:20
**low** 30:7 33:5,7

**M**

**machine** 57:10
**Macon** 9:8 10:4
**mainstreamed**
  7:9
**maintained**
  47:16
**making** 32:17
**manner** 4:2
**manual** 47:15
  49:11,15,20
**manuals** 47:18
**Marijuana**
  51:22 52:3,11
  52:23 53:4,8
**mark** 2:17 13:3
**marked** 13:5
  16:10,13,18
**Mary** 1:17 3:13
  57:21
**Master's** 5:23
  6:3
**material** 24:9
  25:8 26:19
  32:1,18 37:10
**materials** 41:18
**math** 7:7,16
**matter** 57:8
**ma'am** 5:11,22
  6:10,13 8:15
  10:9,15,18,23
  11:6,13 12:1,4
  12:7,14 13:1,2
  13:11,19,23
  15:5,20,23
  16:20 19:14
  21:3 22:5
  25:14,17 27:8
  27:12 28:5
  31:1,12 32:7
  32:12,17 33:20
  34:16 43:8
  44:10,18 49:13
  53:16 55:6
**mean** 9:10 17:9
  18:23 19:10

31:20 33:11
38:7 39:7,8,10
39:11,14 42:9
46:11 47:16
54:2,6
**means** 7:6 14:2
  14:5 33:4 35:7
  35:18
**measure** 39:4
**measures** 19:2
  55:12
**mediation** 50:8
  50:9
**meeting** 44:12
**meetings** 8:11
  8:12,12 26:10
  42:10 51:23
**mental** 6:2 7:19
  11:12,15,16
  12:6 14:6,9
  18:20 19:11
  21:14 22:20
  28:7,12,15,18
  40:19,23 41:5
**mentally** 6:20
  19:16,19 20:16
  29:4,7,13,15
  38:19 40:5
**mention** 45:6
  47:9
**mentioned**
  18:19 22:13
  50:7 53:11
**methodology**
  38:9
**MIDDLE** 1:2
**mild** 14:6,9
**mind** 15:5 29:11
  34:4,5 37:7,8
**minor** 1:5 6:2
  57:8
**minority** 10:1,2
**minute** 10:16
**misleading** 18:9
**modalities** 21:9

**moderate** 14:6,9
**moment** 9:17
**Montgomery**
  2:6,11 57:4
**months** 14:18,20
  15:2 18:14,18
**Moore-Wynn**
  1:18 3:13
  57:21
**Morgan** 51:1
**MOTHER** 1:6
  57:8

_____N_____

**name** 5:10
**names** 25:21
  50:18
**nature** 45:2
**necessarily**
  22:22,23
**necessary** 33:7
**need** 3:16 21:17
  23:17 33:14
  38:1 41:12
**needs** 27:4
**neglect** 33:17
**neither** 57:16
**never** 35:6,9,21
  37:3 51:14
  52:21
**new** 55:10
**nine** 14:18,20
  18:18
**Nonverbal**
  54:18,23
**North** 2:14
**notice** 24:17
  30:16 45:7
**notify** 48:7,14
**number** 4:14,14
  33:2 57:9
**numerous** 25:19
**nurse** 49:7

_____O_____

**object** 11:5

22:21 23:2,7
36:18 38:21
39:2,13 40:9
40:17 41:8
45:16,20 46:10
52:7 53:20
**objections** 3:14
  3:15
**occur** 33:23
  51:15
**occurred** 51:14
**OCR** 44:19
**October** 1:19
  55:21 57:11,19
**offered** 3:18
**Office** 44:12
  47:7
**offices** 1:19
**okay** 6:20 7:1,11
  8:10,17 9:6
  10:3,13 11:2
  11:11,21 12:5
  12:8,19 15:3
  17:9,22,23
  18:6,17 19:15
  20:8 21:4
  29:21 30:21,21
  31:13 32:21
  33:15 34:13
  35:6,13 36:1
  36:16,23 37:4
  37:13 38:7
  39:6 40:7
  41:21 42:2,6
  42:12 43:20
  45:7 47:5,16
  47:19 48:9
  49:3,6,11,21
  50:1,14 52:4
  53:17,22 54:9
  55:15
**old** 14:23
**once** 25:1
**ones** 55:10,11
**open** 52:1,12,19

**opinion** 41:4,10
**opposed** 19:20
**oral** 4:16 15:14
  15:18 16:21
  17:5,14 18:1
  18:11
**ordinary** 24:19
**overall** 19:5
  23:23
**overidentifica...**
  9:23
**overview** 32:23
**OWLS** 4:16
  15:20

_____P_____

**page** 4:14 31:21
  31:22 32:9
  34:3,14
**paper** 31:5 54:5
**parent** 14:4
**parents** 19:8
  49:17,22
**part** 8:14 10:4
  11:19 16:1,6
  16:14 17:1
  19:1 22:14
  23:23 31:18,21
  35:10,11 47:2
  47:4,12
**participate** 8:11
**participated**
  26:15
**participates**
  46:9
**particular** 17:12
  19:18 20:1
**parties** 3:10,22
  57:17
**party** 3:19 4:3
**passing** 31:20
**peculiar** 15:12
**peculiarly** 27:10
  27:14
**peers** 37:21,23

pending 51:21
percent 14:7,11
   17:9
percentile 13:21
   14:1,5 17:5,7,8
   17:13,14 18:1
   18:7,9
perform 14:14
   18:2
personal 19:6,15
   20:2,4,5,15
   21:12,16,21,23
   22:2,10,15
   23:22 36:17,21
   57:13
personal/social
   19:3
personnel 11:4
phrase 52:14
physical 30:14
   33:21,22 48:6
Pike 1:13,19
   5:17 6:16 7:2
   12:12,16 16:15
   17:1 31:17
   41:19 42:9,13
   43:10 52:1,6
   53:2 57:9
Place 2:14
PLAINTIFF 1:8
   2:4
Plaintiff's 4:15
   4:16 13:4,9
   16:9,14,19
   31:10,18 32:8
   41:17 49:16
planner 51:11
please 5:10 13:3
   24:17
point 53:18
policies 44:15
policy 43:10,18
   43:19,20,22
   44:1,5,8 45:1
   45:12,17 46:9

46:14,22 47:2
47:4,10,12,14
47:15,18,20,21
48:16 49:19
poor 30:13
population 14:7
   14:8,12,12
   19:21 20:3
   21:2 22:3,20
   23:5,6,21 29:7
   29:14,16 34:23
   37:1 38:2,8,14
   38:16
portion 31:9
possible 30:14
   34:7 52:12
predator 42:3,3
   42:7,12,23
   43:3
predator-type
   42:16
prereferral
   32:13
present 2:16
   30:1 41:21,23
presentation
   43:3
presented 41:18
pre-vocational
   19:4 21:17
primarily 6:21
   29:22 37:23
   55:10
principal 48:13
prior 9:12,14,16
   9:18 12:2,15
problem 22:9
   30:10 40:8
problems 18:21
   22:7 34:11,11
procedure 3:12
   48:17,20 49:1
procedures 48:1
   48:4,21,23
   49:3

proceedings
   57:15
produce 12:8
produced 44:7
profile 16:4
program 6:6
prohibit 43:15
prohibits 43:22
provide 31:16
   32:4,18 35:22
   42:5,21
provided 3:19
   4:3 11:3 36:13
   42:3
psychological
   13:11
psychologists
   6:7
psychometrist
   13:14
psychometry
   6:4
public 8:9
purpose 3:19
pursuant 1:21
   3:11
put 9:16 15:10
   17:19 31:8
   43:9,14,17
puts 13:20

—————
Q
question 16:17
   24:7,20,23
   26:18 29:10,11
   31:22 37:7,9
   39:10 46:20
   49:21 54:13
questioning
   40:18
questions 3:15
   3:16 41:1
   55:18 57:12

—————
R
R 2:13

race 43:16 45:2
racial 10:13
range 14:8
rank 17:5,7,13
read 13:16 24:7
   24:10 25:1,7,9
   25:19,20 26:13
   26:20,22 27:3
   27:19 32:2
   37:11 54:5
reading 4:6 7:7
   7:15 37:8
really 27:18
   53:23 54:17
reauthorization
   8:21
recall 11:8 19:7
   27:1,10 42:15
   43:2 52:13,17
   53:23,23
receive 42:6
   44:14
received 16:2
   42:14 47:6
receives 8:8
   23:21 47:14
receiving 51:12
recess 54:10
Record 5:10
   13:8 31:8 41:2
   54:11
records 12:9,21
   12:23 16:1,15
   17:2
reduced 57:12
Reed 12:2 16:16
   16:22,23 35:14
   36:12 50:2,5
refer 34:4
referral 8:12
referring 31:9
   32:11,16 44:7
   44:8
refers 45:7
regarding 40:18

45:2
regardless 4:4
regressed 16:6
regular 7:10
   30:1,5 50:23
regularly 55:1
Rehobeth 6:19
related 21:19
   57:17
relates 16:15
   19:20 32:21
   47:21
relating 29:14
   30:23 44:2
   52:22
reliable 55:12
   55:14
remotely 47:21
removed 50:2,6
repeat 49:21
repeatedly 51:3
   51:5,6,9,15
report 15:3 49:7
   53:11
Reporter 5:5
   24:10 25:9
   26:20 32:2
   37:11 57:22
Reporter's 4:12
   57:1
represent 12:22
representing
   3:10,22
represents 57:14
requested 24:9
   25:8 26:19
   32:1 37:10
require 24:11
required 48:14
research 25:15
   25:18 27:20
reserved 3:17
resource 7:3,5,8
   7:15,23 27:2
respect 13:21

| | | | | |
|---|---|---|---|---|
| 29:8 31:2 | **S** | **serve** 36:6 | 37:17,19 | **sponsored** 44:12 |
| 32:19 35:14 | | **services** 16:3 | **Socialization** | **spring** 51:17,19 |
| 37:5 | **safety** 19:6,15 | **set** 1:21 | 37:21 | 54:2 |
| **respond** 25:6 | 20:2,6,15 | **seven** 6:23 14:17 | **socially** 33:12 | **staff** 24:4 |
| **response** 25:23 | 21:12,16,21,23 | 14:19 43:16 | **society** 22:16,16 | **stand** 14:13 |
| 26:5 | 22:2,15 23:22 | **severe** 40:7,10 | **somewhat** 11:20 | **standard** 17:6 |
| **responsibilities** | 36:17,21 | 40:11 | 18:4,4,9,22 | 18:10 |
| 8:5,7 9:12 24:5 | **SAITH** 56:2 | **severely** 40:4,11 | **sorry** 6:8 8:4 | **standardizing** |
| **responsibility** | **samples** 15:7 | **sex** 43:16 | 15:12 16:17 | 14:14 |
| 25:15 27:23 | 32:12 | **sexual** 29:8,14 | 29:9,12 33:17 | **Stanford** 30:8 |
| **responsible** 8:17 | **save** 24:21 | 30:14,23 31:3 | 35:15 36:19 | **Stanford-Binet** |
| 8:18,21 | **saw** 14:21 | 32:19,22 33:15 | 39:8 41:15 | 54:22 |
| **responsive** | **saying** 9:18 | 33:22,23 34:15 | 45:22 50:15 | **stanine** 30:8 |
| 24:23 | 26:12 30:21 | 34:17,22 36:3 | 52:10 | **stanines** 30:7 |
| **restating** 29:11 | 37:7 52:2 | 36:10,21 37:6 | **sources** 35:2 | **started** 10:20 |
| **result** 13:16 | **says** 27:10 | 42:3 43:9,12 | **span** 40:22 | **state** 5:10 55:5,8 |
| **results** 53:14 | **scale** 13:12,18 | 43:13,19,20 | **speak** 5:3 50:16 | 55:11 57:3 |
| 57:18 | 19:5 54:20 | 44:1,2,7,20,23 | **special** 6:1,5,19 | **STATES** 1:1 |
| **retardation** 6:2 | **scales** 4:16 | 45:2,4,5,8 46:7 | 7:2,11 8:4,6,7 | **Statute** 3:20 4:3 |
| 7:19 11:12,15 | 15:18 54:19 | 46:21 47:9,21 | 8:14,19 9:2,8 | **stipulated** 3:9 |
| 11:16 12:6 | **school** 6:4,4,7,8 | 48:2,7 49:4 | 11:3 20:23 | 3:21 4:5 |
| 14:6,10 18:20 | 6:17,23 7:4 | 52:10,10,22 | 21:4 23:10,10 | **stipulations** |
| 19:11 21:15 | 9:13 13:13 | **sexually** 46:3 | 23:11,14,16,21 | 1:21 3:7 5:5 |
| 28:7,12,15,19 | 14:7,11 16:5 | 53:19 | 24:5,16 26:16 | **stop** 20:8 |
| 40:19,23 41:5 | 33:12 36:14 | **shaking** 41:13 | 26:23 27:3 | **stranger** 22:4 |
| **retarded** 6:20 | 41:19 44:14 | **shorten** 9:11 | 29:23 30:5 | **strangers** 22:7 |
| 19:16,19 20:16 | 49:7,19 50:3,6 | **shorthand** 57:11 | 34:17,18,22 | 22:10 |
| 22:20 29:4,8 | 51:18 52:6 | **show** 15:16 | 35:10 36:2,8 | **street** 1:20 2:6 |
| 29:14,15 38:19 | 53:3 | 30:12 | 37:1,5 38:1,8 | 20:6,19,22 |
| **revisions** 9:1 | **schools** 6:18 | **sign** 51:12 | 38:15,17 42:22 | 21:7 |
| **rewording** 29:11 | **school's** 16:1 | **signing** 4:7 | 53:2 54:14 | **student** 10:6 |
| **right** 6:14 18:19 | **science** 5:23 7:9 | **signs** 21:9 | **specialist** 19:11 | 12:6 33:17 |
| 19:7 23:13 | **score** 17:6 18:1 | **simple** 25:2 | 21:14 | 36:9 45:11 |
| 25:11 31:6,15 | **scored** 17:4,10 | **simply** 12:10 | **specialization** | 46:3,8 48:3 |
| 32:5 34:13 | **scores** 14:9 | **single** 41:21 | 11:11 | 49:13 |
| 39:11,19 42:17 | 18:10 | **sir** 13:2 26:14 | **specific** 6:2 7:21 | **students** 7:8,12 |
| 50:22 51:16 | **Second** 2:6 | **sit** 26:6 | 37:12 39:3 | 26:17 29:15 |
| **Rights** 44:13 | **see** 7:14 8:1,18 | **six** 15:2 18:14 | **specifically** | 30:6,19 34:18 |
| 47:7 | 9:6 14:19 16:6 | **Sixty-six** 18:5 | 26:22 31:2,15 | 36:2 37:6 |
| **risk** 30:7 | 28:3 31:7 | **skills** 11:20 | 32:21 35:13 | 40:21,22 49:12 |
| **Road** 2:10 5:13 | 33:14,15 43:17 | 15:15 18:21 | 37:4 | 52:2,12,15,18 |
| **room** 7:15 51:8 | 44:5 50:20 | 19:4,4 20:19 | **spectrum** 28:18 | 53:2 54:14 |
| **Rules** 3:11 | 52:1 54:22 | 37:15,17,19,21 | **speech** 16:2 | **student's** 12:9 |
| **ruling** 3:17 | **seeing** 15:23 | 40:15 | 50:21 | **studies** 7:9 |
| | **self-help** 35:11 | **social** 7:9 37:15 | **spoke** 50:17 | 27:20 |
| | **seminar** 47:6 | | | |

study 27:9
Suber 50:23
  51:1
subject 25:5
subpart 17:12
suffice 25:3
Suite 2:6
summaries
  27:20
summer 54:3
supervision
  57:13
Support 10:6
sure 12:10 15:11
  20:17 21:22
  23:21 32:17
  44:6
Susan 2:5
susceptible
  22:19 24:3
  25:12 27:11,14
suspect 24:19
  48:6
suspended
  51:18,20,21
Sweeney 2:13
  5:7 11:5 20:9
  20:12 22:21
  23:2,7 24:21
  25:4,22 26:4,8
  26:11 27:6
  28:8,17 29:1,9
  31:20 35:1,15
  36:18 38:21
  39:2,13 40:9
  40:17 41:8
  45:16,20,23
  46:10 47:2
  48:10,20 49:1
  52:7 53:20
  54:7 55:18
sworn 5:3
Sylvia 51:2,2
symptoms 34:6
system 12:5

23:15 28:14
36:14 43:7
47:22
systems 44:14

───────────
T
take 20:22 54:7
taken 1:17 3:11
  3:12 15:1
  57:10
takes 21:21,22
talk 9:11 10:16
  28:6 37:15
talked 24:4
talking 7:11 9:2
  9:21 23:13
  28:8,11,17
  29:3 31:11
  49:11,15 52:12
taught 6:19 7:2
  7:7 20:5,17
  21:8,10,15,18
  21:20 23:11
teach 20:23 21:1
  21:3 22:2,6,9
  23:4 38:14,15
  38:17 46:18
teacher 7:23
  41:21 47:19
  50:21,23 51:2
  51:12
teachers 8:19
  9:3 10:8,11
  19:8 23:16,17
  23:19 24:6,12
  30:1,5,6 31:4
  32:19,23 34:21
  35:10,12,21
  36:1,7,16,23
  41:19 42:22,22
  47:18 50:13,17
  51:11
teaching 22:23
  23:3 38:4
Team 10:6

techniques
  38:10
tell 5:20 7:6
  11:14 13:9
  14:1 17:4
  24:14 25:20
  26:22 27:2,8,9
  30:23 31:15
  32:10,21 34:13
  35:13 37:19
  42:12 50:18
tenders 15:8
term 16:5 33:15
terms 18:3 34:14
test 13:13,17,22
  14:14,17,23
  16:20 17:10
  18:13 19:10
  54:18,23
tested 13:22,23
testified 5:4
testifying 41:17
testimony 23:8
testing 14:8
tests 30:8 39:3
  55:5
Thank 15:9
  28:23 55:16
therapy 16:2
thereto 57:12
thing 37:13 44:2
  44:17
things 20:18
  22:12 23:1
  28:1
think 11:7,9
  18:6 21:16,17
  22:2,6,9 25:2
  27:17 30:18
  35:3 38:17
  41:1 46:21
Thirteen 15:2
thought 24:22
  45:14
three 22:12 30:9

time 3:16,17
  14:23 15:13
  18:15 25:7
  46:15,17 50:7
  50:11 53:1
TMR 1:7 57:9
today 12:8
told 24:2 51:21
  53:5,21,22
tolerate 45:4
top 15:16 19:8
  27:1
topic 10:19
  26:23
topics 10:20
totals 17:20
touching 36:3
  36:10,21 37:2
  38:5
trained 42:13
training 8:13,17
  8:18 9:7,19,21
  10:5,6,7,11,12
  10:12,13,17,22
  10:23 11:1,2
  23:18 24:12
  29:6,13,23
  30:2,18,22,22
  31:16,21 34:15
  34:17,21 35:7
  37:5 38:1 42:2
  42:6,14,21
  48:5,5
transcript 57:7
  57:14
Trant 50:19
trial 4:2
trouble 30:13
  34:10 40:5
Troy 1:20
truancy 33:8
true 57:14
truth 5:3,3,4
try 19:17
trying 26:2 33:4

46:18
two 30:9
type 10:20 42:15
  48:6,7
types 20:7 21:18
  24:15 26:16
  30:11

───────────
U
uhm 8:1,18 20:7
  22:14 42:17
  43:8,14 44:5
  44:12 54:17
Uh-huh 29:1
  37:18
underidentific...
  10:2
understand 33:4
  47:12
understanding
  49:6
UNIT 54:23
UNITED 1:1
Universal 54:23
unsolicited 46:7
unwelcome 46:6
  46:7,22
unwelcomed
  45:8,11
use 20:10 39:8
  51:22 52:3,11
  52:23 53:4,8
  54:16 55:1
Usual 5:5

───────────
V
v 9:8 10:4 57:9
Verbal 33:21
vicinity 53:11
victimisation
  26:23
victims 22:15,17
  22:18,19 24:3
  25:13 27:4,4
  27:11,15
violate 45:17

46:9
**violates** 45:12
  46:4,22
**violation** 46:13
  46:16
**vocational** 19:4
**VS** 1:10

**W**

**waived** 4:1,8
**waiving** 4:4
**want** 12:20
  19:15 20:2,10
  21:20
**wasting** 46:15
  46:17
**way** 17:19 38:4
  40:3
**Wechsler** 13:12
  54:19,20
**week** 54:3
**welcome** 45:15
  46:12,21
**welcomed** 45:18
**welcomes** 46:8
**welcome,unw...**
  46:23
**went** 44:12
**West** 2:6
**we'll** 9:16 26:6
**we're** 23:3 28:8
  46:15 49:11,15
**we've** 31:7
**white** 33:2
**wide** 40:22
**WISC-III** 4:15
**wise** 57:17
**witness** 4:6,7 5:2
  25:23 26:14
  41:11,15 45:22
  46:19 57:15
**word** 33:23
  40:11 44:23
**words** 9:15
  14:11 45:3

**work** 15:7
**working** 21:22
**workshop** 27:13
**workshops**
  26:15 42:10
  43:4
**write** 44:11,16
**writing** 43:9
  44:15 57:12
**written** 4:16
  15:18 32:18
  47:21 48:1,4
  48:18,22 49:3
**wrong** 39:12,19
**wrote** 44:4 45:1

**Y**

**Yeah** 15:11
**year** 9:13,15
**years** 14:18,20
  15:2 18:14,16
  18:18 27:6,7

**Z**

**Z** 28:19
**Zelda** 2:10

**0**

**0183** 32:9
**0190** 31:18 34:3
**03** 13:15
**05** 51:19

**1**

**1st** 1:18 55:21
  57:11
**101** 1:20
**11** 18:14
**12** 6:23
**13** 4:15
**1543** 5:13
**17** 4:16
**1726** 2:6
**1819** 2:14
**1974** 5:19
**1985** 7:4 8:2

**2**

**2:06-CV-1120...**
  1:11 57:10
**2003** 4:15 12:13
  15:4
**2004** 9:18
**2004-2005** 9:13
  41:16
**2005** 15:21
  51:17 54:2,3
**2006** 9:16 12:3
  12:15
**2007** 1:19 55:22
  57:11,19
**2287** 5:13
**23** 4:15 13:4,9
**24** 4:16 16:9,14
  16:19
**2740** 2:10
**275** 57:23

**3**

**30** 27:6
**35203-2104** 2:15
**36034** 5:13
**36081** 1:20
**36106** 2:6,11

**5**

**5** 49:16
**5/10** 4:16
**53** 13:18
**57** 4:12

**6**

**6** 4:11 31:10,19
  32:8 41:18
**66** 17:6
**69** 11:17

**7**

**74** 7:2 8:1

**8**

**8th** 57:19
**8:00** 1:22

**9**

**9:20** 55:20
**99** 14:11 17:9

EXHIBIT 15

Page 1

IN THE UNITED STATES DISTRICT COURT OF

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS

MOTHER AND FATHER, EAR

AND TMR,


     PLAINTIFF,


VS.                              CASE NO.:

                                2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

    DEPOSITION OF ELIZABETH ANN REED, taken before

Mary Moore-Wynn, as Commissioner, on the 19th of July,

2007, in the offices of Pike County Board of Education,

101 Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 10:25 a.m.


* * * * * * * * *

| Page 2 | Page 4 |
|---|---|
| 1 <br> 2          * * * * * * * * * * <br> 3          APPEARANCES: <br> 4 FOR THE PLAINTIFF: <br> 5 Hon. Susan DePaola <br>   Attorney at Law <br> 6 1726 West 2nd Street, Suite B <br>   Montgomery, Alabama 36105 <br> 7 <br> 8 and <br> 9 Hon. Deanie Allen <br>   Azar and Azar <br> 10 260 Washington Avenue <br>    Montgomery, Alabama 36104 <br> 11 <br> 12 FOR THE DEFENDANT: <br> 13 Hon. Donald R. Sweeney <br>    Bradley, Arant, Rose & White <br> 14 One Federal Place <br>    1819 Fifth Avenue North <br> 15 Birmingham, Alabama 35203 <br> 16 <br> 17 ALSO PRESENT: <br> 18 Dr. Mark Bazzell, Superintendent <br> 19 Mr. Thomas Michael Reed <br> 20 <br> 21 <br> 22          * * * * * * * * * * <br> 23 | 1 Statute, regardless of the waiving of the filing of <br> 2 same. <br> 3    It is further stipulated and agreed by and <br> 4 between counsel and the witness that the reading <br> 5 and signing of the deposition by the witness is <br> 6 hereby waived. <br> 7 <br> 8          * * * * * * * * * * <br> 9          INDEX <br> 10 ELIZABETH ANN REED <br> 11 Examination By Mr. Sweeney          5 <br> 12 Reporter's Certificate          137 <br> 13          INDEX OF EXHIBITS <br> 14 Exhibit Number    Description    Page Number <br> 15 Defendant's Exhibit 1  Re-Notice to Take    11 <br>    Deposition and Production of <br> 16    Documents <br>    Defendant's Exhibit 2  Plaintiff's First    24 <br> 17    Amended Complaint <br>    Defendant's Exhibit 3  Notice of Proposed    90 <br> 18    Meeting, 2/22/05 <br>    Defendant's Exhibit 4  Notice of Proposed    92 <br> 19    Meeting, 5/25/05 <br> 20 <br> 21 <br> 22          * * * * * * * * * * <br> 23 |

| Page 3 | Page 5 |
|---|---|
| 1 <br> 2 <br> 3 <br> 4          STIPULATIONS <br> 5 <br> 6    It is hereby stipulated and agreed by and between <br> 7 counsel representing the parties that the deposition of <br> 8 ELIZABETH ANN REED is taken pursuant to the Federal <br> 9 Rules of Civil Procedure, and that said deposition may <br> 10 be taken before Mary Moore-Wynn, CSR, as Commissioner <br> 11 without the formality of a commission; that objections <br> 12 to questions, other than objections as to the form of <br> 13 the questions, need not be made at this time, but may <br> 14 be reserved for a ruling at such time as the deposition <br> 15 may be offered into evidence, or used for any other <br> 16 purpose by either party hereto, provided by the <br> 17 Statute. <br> 18    It is further stipulated and agreed by and between <br> 19 counsel representing the parties in this case, that the <br> 20 filing of the deposition of ELIZABETH ANN REED is <br> 21 hereby waived, and that said deposition may be <br> 22 introduced at the trial of this case or used in any <br> 23 other manner by either party hereto provided for by the | 1          ELIZABETH ANN REED <br> 2    (Whereupon, the witness, after having first been <br> 3 duly sworn to speak the truth, the whole truth, and <br> 4 nothing but the truth, testified as follows:) <br> 5    MR. SWEENEY:  Usual stipulations? <br> 6          EXAMINATION <br> 7 BY MR. SWEENEY <br> 8 Q  Would you state your name? <br> 9 A  Elizabeth Ann Reed. <br> 10 Q  Ms. Reed, I'm Donald Sweeney.  I'm the attorney <br> 11    for the Pike County Board of Education and the <br> 12    Defendants that have been named in the lawsuit <br> 13    that you have filed.  Have you been deposed <br> 14    before? <br> 15 A  No, sir. <br> 16 Q  So, this is your first deposition? <br> 17 A  Yes, sir. <br> 18 Q  During the deposition I will be asking you a <br> 19    series of questions about matters relating to the <br> 20    issues stated in the complaint which you have <br> 21    filed against my client.  If my questions aren't <br> 22    clear, will you ask me to restate them? <br> 23 A  Yes, sir. |

| Page 6 | Page 8 |
|---|---|
| 1  Q  If you answer the questions, I will assume you | 1  Q  A dog? |
| 2     understood question.  If you will, I will ask that | 2  A  Yes, sir. |
| 3     you be as full and complete with your answer as | 3  Q  With a neighbor? |
| 4     possible, because I'm going to rely on the | 4  A  Yes, sir. |
| 5     information you share with me today in response to | 5  Q  And what was the circumstance? |
| 6     my questions.  So, can we agree that you will | 6  A  That they -- our dog killed some goats. |
| 7     endeavor to give me full answers to my questions? | 7  Q  And how was that resolved? |
| 8  A  Yes, sir. | 8  A  We won the case. |
| 9  Q  And if at any time during the deposition you want | 9  Q  Okay.  Have you ever been arrested for anything? |
| 10    to supplement, change, add, or whatever an answer | 10 A  No, sir. |
| 11    that you have previously given me, will you do | 11 Q  And you're married to Mr. Reed, who is sitting on |
| 12    that? | 12    your right? |
| 13 A  Yes, sir. | 13 A  Yes, sir. |
| 14 Q  And at the end of the deposition, I will give you | 14 Q  And you have been married for how long? |
| 15    an opportunity to supplement any answer that you | 15 A  Twenty-five years. |
| 16    have given, so when we finish the deposition, I | 16 Q  Have you ever been married before -- |
| 17    will have all of the relevant information that you | 17 A  No, sir. |
| 18    can think about that fits the questions I have | 18 Q  -- your current marriage? |
| 19    asked.  Okay? | 19 A  No, sir. |
| 20 A  Yes, sir. | 20 Q  As a result of this marriage, how many children do |
| 21 Q  Are you under any medication today that you would | 21    you have? |
| 22    impede you from understanding and answering my | 22 A  Four. |
| 23    questions? | 23 Q  And their names are? |

| Page 7 | Page 9 |
|---|---|
| 1  A  No, sir. | 1  A  Jeremy Reed. |
| 2  Q  What is your present address? | 2  Q  And he's how old? |
| 3  A  162 County Road 4430, Brundidge, Alabama, 36010. | 3  A  Twenty-three. |
| 4  Q  Have you been a resident of Brundidge for some | 4  Q  Does he live at home? |
| 5     time? | 5  A  Yes, sir. |
| 6  A  Yes, sir. | 6  Q  Is he out of school? |
| 7  Q  For how long? | 7  A  Yes, sir. |
| 8  A  For about 25 years. | 8  Q  The next child? |
| 9  Q  Have you ever been a plaintiff in a previous | 9  A  Jessica Reed. |
| 10    lawsuit? | 10 Q  Uh-huh.  Age? |
| 11 A  No. | 11 A  Twenty. |
| 12 Q  That is; have you ever sued anybody prior to suing | 12 Q  Does she live at home? |
| 13    the defendants in this case?  Have you ever filed | 13 A  Yes, sir. |
| 14    a lawsuit claiming somebody has injured you or -- | 14 Q  Is she still in school? |
| 15 A  No, sir. | 15 A  She goes to college. |
| 16 Q  Have you ever been a defendant in any lawsuit | 16 Q  Okay.  The next child? |
| 17    where somebody has sued you? | 17 A  Justin Reed. |
| 18 A  Yes, sir. | 18 Q  He's 18? |
| 19 Q  Would you share with me the nature of the suit | 19 A  Seventeen. |
| 20    that you were involved in? | 20 Q  Seventeen.  And he lives at home? |
| 21 A  It was concerning our dogs. | 21 A  Yes, sir. |
| 22 Q  A what? | 22 Q  And the fourth child? |
| 23 A  It was concerning our dogs. | 23 A  Joseph Reed.  He lives at home. |

Page 10

1   Q   And he's how old?
2   A   Fourteen.
3   Q   Did you go to high school in Pike County?
4   A   I went to high school in Montgomery County.
5   Q   Did you graduate from high school?
6   A   Yes, sir.
7   Q   After high school, did you go to college?
8   A   I went to AUM for a year.
9   Q   And as far as employment, are you presently
10      employed?
11  A   No, sir.
12  Q   Have you been employed in the past?
13  A   Yes, sir.
14  Q   Where were you employed in the last ten years?
15  A   Pike County Board of Education.
16  Q   Doing what?
17  A   Substitute teacher.
18  Q   Have you been a substitute for the last ten years?
19  A   No.
20  Q   How long have you been a substitute teacher?
21  A   I was a substitute -- I don't recall.
22  Q   Okay.  Let me rephrase it:  During the last school
23      year, the 2006-2007 school year, did you work as a

Page 11

1       substitute teacher for the Pike County school
2       system?
3   A   No, sir.
4   Q   When was the last time you worked as a substitute
5       teacher?
6   A   Uhm, 2001.
7   Q   And since 2001, you have had no other employment?
8   A   No, sir.
9   Q   Have you ever been fired from any job?
10  A   No, sir.
11          (Whereupon, Defendant's Exhibit I
12          was marked for identification and
13          is attached hereto.)
14  Q   Let me show you what is before you, Defendant's
15      Exhibit 1, which is the Notice of the Deposition
16      that we're taking today.  You will see on page 2 a
17      request for records, notes, memorandum,
18      correspondence, audio or video recordings.  Have
19      you brought with you any records?
20  A   No, sir.
21          MR. SWEENEY:  Ms. Allen, are you
22          representing her in this deposition?
23          MS. ALLEN:  Yes, sir.  Everything

Page 12

1       that -- we gave you everything that
2       she has ever had.
3           MR. SWEENEY:  Okay.
4   BY MR. SWEENEY
5   Q   So, we have all the documentary records pertinent
6       to the issues in your complaint as tendered to us
7       by your counsel?
8   A   Yes, sir.
9   Q   Have you ever had any tape recordings of any
10      conversations that you have had with any of the
11      defendants or any employee of the Pike County
12      Board that would be relevant to the issues in the
13      complaint?  Have you ever taped any recordings?
14  A   No, sir.
15  Q   Okay.  And in preparation for your deposition,
16      other than meeting with your attorneys, what
17      documents did you review?
18  A   On the lawsuit that we're fixing to pursue?
19  Q   Uh-huh.
20  A   That's it.
21  Q   Have you talked with anyone in the last six months
22      concerning this lawsuit other than your attorneys?
23  A   Not that I recall.

Page 13

1   Q   I'll come back to that in a minute.  But let me
2       ask:  Justin, your son, was involved in the band,
3       wasn't he?
4   A   Yes, sir.
5   Q   Were any of your other children involved in the
6       band while Charles Coon was there?
7   A   Yes, sir.
8   Q   Which one?
9   A   Jessica Reed.
10  Q   As a mother of four children, would it be true
11      that you have been very involved in your
12      children's activities?
13  A   Yes, sir.
14  Q   And has that been true for a number of years?
15  A   Yes, sir.
16  Q   Were you very involved in the band program?
17  A   Yes, sir.
18  Q   So, during the 2003-2004 school years; that is,
19      the 2003-2004 and 2004-2005 school years, you were
20      an active member of the band boosters?
21  A   Yes, sir.
22  Q   Were you an officer?
23  A   Yes, sir.

Page 14

1  Q  What was your position?
2  A  2003-2004, I was president.
3  Q  So, you worked very closely with Mr. Coon as
4     president of the band boosters, didn't you?
5  A  Yes, sir.
6  Q  And were you authorized to sign checks on behalf
7     of the band boosters?
8  A  Yes, sir.
9  Q  And as president of the band boosters, did you
10    accompany the band on a number of trips?
11 A  Yes, sir.
12 Q  Often ride in the school bus with the band?
13 A  Yes, sir.
14 Q  And you would go from time to time to see
15    practices of the band at school?
16 A  Yes, sir.
17 Q  And when they participated in parades or other
18    activities other than football games, often you
19    would accompany the band when they did that,
20    didn't you?
21 A  Yes, sir.
22 Q  So, you were very supportive of the band?
23 A  Yes, sir.

Page 15

1  Q  And very involved in the band activities?
2  A  Yes, sir.
3  Q  And worked very closely with Charles Coon?
4  A  Yes, sir.
5  Q  Now, for the 2004-2005 school year, did you
6     continue to be very active in the band?
7  A  No, sir.
8  Q  The last year Mr. Coon was there, you weren't an
9     officer?
10 A  No, sir.
11 Q  But you rode on the bus with the band as a
12    chaperone from time to time, didn't you?
13 A  Yes, sir.
14 Q  How many times do you recall riding on the school
15    bus with the band members during the 2004-2005
16    school year?
17 A  Twice.
18 Q  And when did you do those?  Which times come to
19    your mind?
20 A  I don't recall.
21 Q  Fall, spring, or when?
22 A  It was the fall.
23 Q  Okay.  And was Mr. Coon on the bus when you were

Page 16

1     riding on the bus with the band members?
2  A  Be more -- I don't understand the question.
3  Q  Okay.  When you were on the school bus with the
4     band, was Mr. Coon on the bus at the same time?
5  A  Yes, sir.
6  Q  Did you also participate at the concession stand
7     for the band?  That is, did the band boosters run
8     the concession stands at football games?
9  A  I don't understand the question.  I don't recall.
10 Q  Okay.  What activities did the band boosters put
11    on to raise money?  Or what programs did the band
12    boosters have to help raise money to fund the band
13    program?
14 A  I don't recall.
15 Q  Did you ever work in the concession stand at
16    football games where they sold drinks and popcorn
17    and hot dogs?
18 A  Yes, sir.
19 Q  Did you do that on a regular basis?
20 A  No, sir.
21 Q  During the 2004-2005 school year, you worked at
22    the concession stands during football games on a
23    number of occasions, didn't you?

Page 17

1  A  No, sir.
2  Q  How many times did you do that?
3  A  I don't recall.  I -- I didn't work in 2004-2005.
4  Q  Did you for the 2003-2004 when you were president?
5  A  Yes, sir.
6  Q  And why did you stop doing that for the
7     2004-2005 -- that is, working in the concession
8     stand?
9  A  Because I didn't -- I didn't -- I was no -- being
10    no member of the band boosters.  I was not a
11    member of the band boosters.
12 Q  You had stopped being a member of the band
13    boosters?
14 A  Yes, sir.
15 Q  Why did you stop being a member during the
16    2004-2005 school year?
17 A  I don't know.
18 Q  The 2003-2004 school year, you were president?
19 A  Yes, sir.
20 Q  So, you were very involved in all of the band
21    activities for that year?
22 A  Yes, sir.
23 Q  But the next year, you quit being a member of the

JR, A Minor     July 19, 2007     Pike County Board of Education

6 (Pages 18 to 21)

Page 18

1   band boosters?
2 A   Yes, sir.
3 Q   And do you have any explanation of why you quit
4   the band boosters for that year?
5 A   I don't know, sir.
6 Q   Did you write a letter to the band booster
7   officers and say you were not going to have
8   anything to do with the band boosters for the
9   2004-2005 school year?
10 A   No, sir.
11 Q   So, there wasn't any issue -- you weren't mad at
12   the band boosters, were you?
13 A   No, sir.
14 Q   And you never expressed any ill will towards the
15   band boosters or Mr. Coon prior to dropping out of
16   the band boosters?
17 A   No, sir.
18 Q   Besides riding on the band bus from time to time,
19   did you ever participate in any trips that the
20   band took; that is, driving your own car,
21   accompany the band students to any trip other
22   than, say, a football game?
23 A   No, sir.

Page 19

1 Q   Did the band boosters ever go on field trips to
2   Atlanta or Florida or other places?
3 A   No, sir.
4 Q   So, you wouldn't have accompanied the band
5   students when they would take trips to any place
6   away from Pike County, other than football games
7   or actual functions relating to the band program
8   itself?
9   I'll rephrase --
10   MS. DePAOLA: Object to the form. I got
11   lost.
12 Q   Other than where the band was performing as the
13   Pike County High School band, did you ever travel
14   with band students to Six flags or Florida or any
15   trip like that that was just for recreational
16   purposes?
17 A   No, sir.
18 Q   On occasion, did you give Charles Coon permission
19   to administer medicine to Justin?
20 A   No, sir.
21 Q   When Justin would be at band practices or band
22   programs, did Mr. Coon ever give Justin his
23   medicine?

Page 20

1 A   No, sir.
2 Q   Did you ever write Mr. Coon on an occasion and
3   tell him on that particular day he should not give
4   Justin his medicine?
5 A   No, sir.
6 Q   You don't remember writing such a note?
7 A   No, sir.
8 Q   Is it possible that you could have written
9   Mr. Coon and advised him not to give Justin
10   medicine on a particular day?
11 A   I don't understand the question.
12 Q   Okay. Was Justin taking medicine during the
13   2004-2005 school year?
14 A   Yes, sir.
15 Q   Did he take medicine at school? That is, would he
16   have to take a pill or something during the school
17   day?
18 A   Not -- no, not I recall. He would take it
19   during -- in the morning.
20 Q   But you don't recall ever discussing with Mr. Coon
21   arrangements for Justin to be given or not to be
22   given medicine?
23 A   No, sir.

Page 21

1 Q   Did Justin ever ride home from the school in
2   Mr. Coon's car; that is, from the school to your
3   house?
4 A   Yes, sir.
5 Q   How often would that take place during the
6   2004-2005 school year?
7 A   I don't recall.
8 Q   Did it happen quite regularly?
9 A   Yes, sir.
10 Q   And so, after band practice, Mr. Coon had your
11   permission to drive Justin from the school to your
12   home?
13 A   Yes, sir.
14 Q   And he did that with regularity?
15 A   Yes, sir.
16 Q   And that was a convenience to you; correct?
17 A   Yes, sir.
18 Q   And you trusted Mr. Coon to that extent to allow
19   him to drive Justin from the school to your home?
20 A   Yes, sir.
21 Q   Did he also drive Jessica on occasion from the
22   school to your home in his private car?
23 A   Yes, sir.

## Page 22

1  Q  Did that happen with regularity?
2  A  Yes, sir.
3  Q  Did Mr. Coon provide transportation for Justin and
4     Jessica during the 2003-2004 school year?
5  A  Uhm -- I don't recall.
6  Q  So, the year that you were president of the band
7     boosters you don't recall if Mr. Coon drove Justin
8     and Jessica from the school to your home in his
9     private vehicle?
10 A  Yes, sir.  I don't recall.
11 Q  You don't recall?
12 A  No, sir.
13 Q  Do you have a best judgment of whether he did or
14    not?
15 A  I don't understand.  I mean -- I don't understand.
16 Q  Well, you don't recall whether Charles Coon drove
17    your son and your daughter from the school to your
18    home during the 2003-2004 school year.  But is it
19    your best judgment that that likely happened?
20 A  Yes, sir.
21       MS. DePAOLA:  Object to the form.
22 Q  But during the 2004-2005 school year, Charles
23    Coon, with your permission, drove Justin from the

## Page 23

1     school to your home in his private vehicle on a
2     fairly regular basis?
3  A  Yes, sir.
4  Q  Okay.  Did Mr. Coon, with your permission, have
5     Justin with him on trips to other places; that is,
6     from your home to drive him to other places other
7     than to the school?
8  A  I don't recall.
9  Q  Did Mr. Coon ever, with your permission, drive
10    Justin to Greenville, Alabama?
11 A  No, sir.
12 Q  Did he ever drive him to a lake place or a lake
13    outing?
14 A  No, sir.
15 Q  Did he ever drive him to Florida?
16 A  No, sir.
17 Q  So, to the best of your knowledge, Charles Coon --
18    well, let me ask it this way:  You have indicated
19    that Charles Coon regularly transferred Justin
20    from the school to your home.  Do you recall
21    Mr. Coon ever driving Justin in his private
22    vehicle on any other occasion?
23 A  Yes, sir.

## Page 24

1  Q  Where?  Where would they have been going?
2  A  He drove Justin on campus -- took Justin off
3     campus.
4  Q  So, from school off campus, where would he drive
5     him to?
6  A  He would drive him around the block.
7  Q  Any other occasion that Mr. Coon, to your
8     knowledge, would drive Justin in his private
9     vehicle?
10 A  No, sir.
11 Q  During the 2004-2005 school year when Mr. Coon
12    would bring Justin home in his private vehicle,
13    would Mr. Coon come in and visit in your home?
14 A  Yes, sir.
15 Q  Would he have meals at your home?
16 A  No, sir.
17 Q  Did he come and visit you from time to time during
18    the weekend?  That is, on Saturday or Sundays,
19    just to visit?
20 A  Yes, sir.
21 Q  So, during the 2004-2005 school year, Mr. Coon was
22    welcome in your home?
23 A  Yes, sir.

## Page 25

1        (Whereupon, Defendant's Exhibit 2
2         was marked for identification and
3         is attached hereto.)
4  BY MR. SWEENEY
5  Q  Let me show you what's been marked as Defendant's
6     Exhibit 2, which is before you, the complaint that
7     you have filed, the amended complaint in this
8     lawsuit.  As I understand, just in overview -- and
9     this is a fairly long complaint -- that you are
10    seeking monetary and injunctive relief against
11    these Defendants because your son -- J.R. is how
12    it's referred in the complaint -- that's Justin,
13    isn't it?
14 A  Yes, sir.
15 Q  -- was sexually abused.
16    So, let me repeat that.  As I understand the
17    thrust of your complaint, you're suing my clients,
18    Pike County Board and the named Defendants,
19    seeking money and injunctive relief, because your
20    son, J.R., was sexually abused.  Is that an
21    accurate overview of your complaint?
22       MS. DePAOLA:  Object to the form.  The
23       complaint speaks for itself.

JR, A Minor                    July 19, 2007                    Pike County Board of Education

Page 26

1    BY MR. SWEENEY
2    Q   Is that an accurate overview of your complaint?
3          MS. DePAOLA:  If you can answer.
4    A   I don't know.
5    Q   You indicated that in preparation for this
6          deposition you had read the complaint?
7    A   Yes, sir.
8    Q   While I know the complaint speaks for itself, what
9          is it that you're seeking in this complaint, in
10         your words?
11   A   Damages that my son has encountered.
12   Q   Uh-huh.
13   A   I mean, he's been -- he's severely post-traumatic
14         depressed.  His behavior, he's has anger.  He's
15         self -- I mean, to himself.  And he's just not a
16         right person in my mind.
17   Q   So, one of the things you're seeking is damages,
18         money damages; correct?
19   A   Yes, sir.
20   Q   And is another thing that you are seeking asking
21         the court to enjoin the Defendants from engaging
22         in certain conduct or asking them to do certain
23         things?

Page 27

1          Do you know what injunctive relief is?
2    A   No, sir.  Explain to me.
3    Q   Okay.  I will skip on beyond that.  But the basis
4          for your complaint is your contention that Justin
5          was sexually abused by Charles Coon?
6          MS. DePAOLA:  That's -- object to the
7            form.  Again, the complaint goes
8            beyond that.
9    Q   Are you contending as part of this lawsuit that
10         Charles Coon sexually abused Justin?
11         MS. DePAOLA:  Do you want her to take
12           the time to read the complaint?  I
13           mean, it's in the complaint, Donald.
14         MR. SWEENEY:  I'm just trying to --
15         MS. DePAOLA:  I mean, we can be here a
16           long time if you want her to go over
17           the complaint.
18         MR. SWEENEY:  Yeah, we can be.  If you
19           will stipulate that one of the
20           contentions in the complaint is that
21           Charles Coon sexually abused Justin,
22           I think we can get on with that.
23         MS. DePAOLA:  Yes.  I will.  And will

Page 28

1          you stipulate to that, too?
2          MR. SWEENEY:  Huh?
3          MS. DePAOLA:  Will you stipulate to
4            that, too?
5          MR. SWEENEY:  That that's in the
6            complaint.
7          MS. DePAOLA:  That that occurred.
8          MR. SWEENEY:  I will stipulate that
9            that's in the complaint.
10         MS. DePAOLA:  Okay.  Yeah, we will
11           stipulate that's in the complaint.
12   BY MR. SWEENEY
13   Q   From what source did you first learn that Charles
14         Coon had sexually abused your son?  What was the
15         first information you had that Charles Coon may
16         have sexually abused Justin?
17   A   I don't know.
18         MS. DePAOLA:  How did you first find out
19           about it?
20         THE WITNESS:  I got --
21           Do you mind?
22         MR. SWEENEY:  Thank you.
23         MS. DePAOLA:  How did you first find out

Page 29

1          about this?
2    A   I got a phone call from DHR.
3    Q   Who did you talk to at DHR?
4    A   Misty Hubbard.
5    Q   Mr. Hubbard?
6    A   Misty Hubbard.
7    Q   Mrs. Hubbard.  Do you recall when that call came
8          to you?
9    A   It was June of 2005.
10   Q   So, for the 2004-2005 school year, that entire
11         school year, you had no information or belief that
12         Charles Coon was abusing Justin in any way; is
13         that correct?
14   A   Yes, sir.
15   Q   The first time you heard from any source that
16         Charles Coon might be abusing Justin was when
17         Ms. Hubbard called you from DHR in June of '05;
18         that right?
19   A   Yes, sir.
20   Q   All right.  Until that call, would it be fair to
21         say you were entirely trusting of Charles Coon?
22   A   Yes, I trusted Charles Coon.
23   Q   You trusted Charles Coon to be with Justin at

Mary Moore-Wynn, CSR              Mary Moore-Wynn              (334)244-0203
                              Court Reporting Services

JR, A Minor                          July 19, 2007                    Pike County Board of Education

9 (Pages 30 to 33)

Page 30

1  school?
2  A  Yes, sir.
3  Q  You trusted him to drive Justin in his car?
4  A  Yes, sir.
5  Q  You trusted him in every way; correct?
6  A  Yes, sir.
7  Q  And you had spent a lot of time with Charles Coon,
8     particularly the previous year, hadn't you, as
9     president of the boosters?
10 A  Yes. I trusted him as a person.
11 Q  So, as a conscientious mama, very involved in the
12    band program and in your son's activities, you had
13    no reason to suspect that Charles Coon was abusing
14    Justin until June of 2005?
15 A  I thought it was pretty odd for Mr. Coon to take
16    Justin off campus. I mean, I didn't -- I
17    didn't -- I thought he would be a trustworthy man.
18    And I thought maybe the personnel, the principal
19    and the vice principal, would have some trigger in
20    their mind, you know, saying; hey, there is a
21    teacher taking a student off campus without
22    permission.
23 Q  All right. But my question to you is that you

Page 31

1  trusted Coon throughout that year, didn't you --
2  A  Yes, I trusted Mr. Coon.
3  Q  -- the 2004-2005 school year?
4  A  Yes, sir.
5  Q  And you knew that he might be driving him off
6     campus, but is it correct that you never mentioned
7     that concern that you have just stated to any
8     school official during the 2004-2005 school year?
9  A  I don't -- I don't know. I mean --
10 Q  Well, do you have any notes that you can refresh
11    your recollection?
12 A  No, sir.
13 Q  Do you remember ever going to any school official
14    during the 2004-2005 school year and raising any
15    concerns of any kind concerning Charles Coon and
16    his conduct with your son, Justin?
17 A  No, sir.
18 Q  Okay. What did Ms. Hubbard tell you when she
19    called in June of '05?
20 A  I don't recall. I mean, what do you mean, was
21    she --
22 Q  Did she tell you that there was some concern about
23    how Charles Coon was dealing with Justin?

Page 32

1  A  All -- Ms. Hubbard told me that Mr. Coon was
2     giving Justin a cell phone. There was a cell
3     phone in Justin's name.
4  Q  All right. And did she say why that was of
5     concern?
6  A  I don't recall.
7  Q  Did you know prior to that call that Charles Coon
8     had given Justin a cell phone?
9  A  No, sir.
10 Q  Had you ever seen a cell phone with Justin, the
11    source of which you didn't know?
12 A  No. I did not see --
13 Q  Did Justin have a cell phone that you had given
14    him?
15 A  No, sir.
16 Q  And you never saw Justin with a cell phone prior
17    to this call in June of '05?
18 A  No, sir.
19 Q  Did Jessica ever tell you that Mr. Coon had given
20    Justin a cell phone?
21 A  No, sir.
22 Q  Did Jessica ever complain to you about Mr. Coon?
23 A  Not that I -- I don't recall.

Page 33

1  Q  Okay. So, Ms. Hubbard calls you and says,
2     Mr. Coon has given Justin a cell phone. Had she
3     talked with Justin?
4  A  No, sir.
5  Q  Do you know how she knew that Mr. Coon had given
6     Justin a cell phone?
7  A  I don't recall.
8  Q  What did you do next after you got the call from
9     Ms. Hubbard?
10 A  I didn't do anything.
11 Q  In that conversation with Ms. Hubbard, did
12    Ms. Hubbard indicate that she thought Charles Coon
13    might have sexually abused Justin?
14 A  I don't recall.
15 Q  All you recall is that she said Mr. Coon had given
16    Justin a cell phone?
17 A  Justin was -- Mr. Coon was going to give Justin a
18    cell phone.
19 Q  So, as I understand what you're telling me,
20    Mr. Coon had not yet given Justin a cell phone?
21 A  Yes, sir.
22 Q  Did you ask Justin about a cell phone after that
23    conversation?

JR, A Minor                      July 19, 2007                      Pike County Board of Education

Page 34

1  A   No, sir.
2  Q   Do you know if Mr. Coon ever actually gave Justin
3      a cell phone?
4  A   No, sir.
5  Q   All right. So, when Ms. Hubbard called, she let
6      you know that from some source she understands
7      that Mr. Coon is going to give Justin a cell
8      phone, but that's all you discuss?
9  A   Yes, sir.
10 Q   What's the next information you receive from any
11     source that Mr. Coon might have sexually abused
12     Justin?
13 A   I don't recall.
14 Q   Do you think you learned something in July that
15     might have put you on notice about Justin being
16     sexually abused by Mr. Coon?
17 A   I don't recall.
18 Q   Do you think you knew by August that Mr. Coon was
19     being charged with sexually abusing a student?
20 A   I don't recall.
21        MS. DePAOLA: Is your problem the dates,
22        or can you just tell him what the
23        next thing is you recall happen

Page 35

1          after you talked with Ms. Hubbard?
2        THE WITNESS: I can tell him what
3        happened next after I talked with
4        Ms. Hubbard.
5  BY MR. SWEENEY:
6  Q   That would be helpful.
7  A   I got a phone call. Ms. Hubbard set an
8      appointment up with the Children's Advocate
9      Center. And Mr. Bradbury from the Sheriff's
10     Department took Justin's testimony.
11 Q   And what did Justin tell them when he gave that
12     testimony?
13 A   I don't know. I don't recall -- I don't know what
14     went on between Mr. Bradbury. All Mr. Bradbury
15     told me was Justin was sexually abused.
16 Q   Did he tell you in what manner; that is, how the
17     sexual abuse took place, what was done?
18 A   Yes, sir.
19 Q   What did he tell you?
20 A   He said he fondled him outside his pants.
21 Q   I'm sorry. What?
22 A   He fondled Justin -- Mr. Coon fondled Justin
23     outside his pants.

Page 36

1  Q   Did he do anything else --
2        MS. DePAOLA: Object to the form.
3  Q   -- of a sexual abuse --
4        MS. DePAOLA: Object to the form.
5  Q   -- other than that physical act? I mean, was it
6      reported to you in that conversation that Mr. Coon
7      had done anything else other than that?
8  A   No, sir.
9  Q   Did Mr. Hubbard tell you whether that had happened
10     more than once?
11       MS. DePAOLA: Mr. Hubbard?
12 A   Mr. Bradbury.
13 Q   I'm sorry. Excuse me. Did he tell you that it
14     had happened more than once?
15 A   Yes, sir.
16 Q   Did he tell you how many times Justin had reported
17     it had happened?
18 A   I don't recall.
19 Q   Did he tell you where it had happened?
20 A   I don't recall.
21 Q   Okay. So, after they took Justin's statement,
22     what happened next?
23 A   Then I filed a warrant against Mr. Coon.

Page 37

1  Q   Okay. Do you remember when you did that?
2  A   I don't recall the date.
3  Q   It was probably after June, though, wasn't it,
4      after Ms. Hubbard's call?
5  A   Yes, sir.
6  Q   Do you think it was a few days after or a few
7      weeks or a few months?
8  A   I don't -- it might have been about a month. I
9      don't know. I don't know the month or the date of
10     that.
11 Q   Between the time when Justin gave his statement
12     and when you filed a warrant for Mr. Coon's
13     arrest, did you do anything else regarding Justin
14     and Mr. Coon? That is, did anything else happen
15     after that relating to the issues in this
16     complaint?
17       I'm confusing you. Let me restate it.
18       Justin gave testimony about what had happened?
19 A   Yes, sir.
20 Q   And you don't remember the date of when that took
21     place?
22 A   It was in 2005.
23 Q   Okay. After Justin gave that testimony indicating

Page 38

1    Mr. Coon had fondled him, what happened next?
2  A  Justin went to counseling at the Advocate Center.
3     And then after that, Justin got sent to UAB
4     psychiatric ward in Birmingham.
5  Q  When did that take place?
6  A  That was April of 2006.
7  Q  Okay.
8       MS. DePAOLA: Seven.
9       THE WITNESS: 2007.
10 Q  You mean just recently?
11 A  Yes, sir.
12 Q  And nothing else, really, has happened between the
13    testimony Justin gave on that occasion that you
14    talked about in 2005 and when he was sent to the
15    hospital at UAB in 2007?
16      MS. DePAOLA: Object to the form. It's
17         overly broad.
18 Q  Well, what else happened during that period of
19    time --
20      MS. DePAOLA: In relation to what?
21 Q  -- with regard to Justin?
22 A  In relation --
23      MS. DePAOLA: That's so broad, Donald.

Page 39

1       MR. SWEENEY: I'll refine it. I'm
2         trying to give her an opportunity to
3         share with me the chronology.
4  BY MS. DePAOLA
5  Q  After Justin gave his testimony about being
6     fondled, did you talk to Justin about what
7     Mr. Coon had done?
8  A  He refused to talk to me.
9  Q  Has Justin ever talked to you about what Mr. Coon
10    did to him?
11 A  No, sir.
12 Q  So, you have no further information or details
13    other than the testimony that Justin gave in that
14    original statement?
15      MS. DePAOLA: You mean -- testimony you
16         mean from Justin directly?
17      MR. SWEENEY: From Justin.
18 A  Justin would be secluded. He would go -- he would
19    not talk to anybody from 2004-2005. He would just
20    be like -- like, you know, be depressed. And just
21    go to his room. Just sit there. And then when it
22    was time to eat, he would come out. And then
23    after he got done eating, he would go back in his

Page 40

1     room. He had no connection with nobody. He would
2     be to himself. He would not correspond or talk to
3     anybody.
4  Q  Let me ask the question in this way: At any time
5     since June of 2005, has Justin shared with you
6     information about what Charles Coon did to him?
7  A  No, sir.
8  Q  So, you have no additional information from Justin
9     himself about what Charles Coon did to him?
10 A  I don't -- be more specific. Explain.
11 Q  Okay. I am really not trying to be complicated
12    about it.
13      To the extent that Justin talked to you, his
14    mother, about what Charles Coon did to him, I want
15    to know what Justin told you.
16 A  Justin said that he fondled him outside his pants.
17 Q  And he told you that?
18 A  Yes, sir.
19 Q  Did he tell you that on several occasions or just
20    once?
21 A  He just told us once. And then he would be quiet
22    about it. And just go back to what he was doing.
23 Q  But did that happen -- that is, when Justin was

Page 41

1     telling you that he had been fondled, did he tell
2     you that on a number of occasions or just once?
3  A  Just once, because he said he didn't want to talk
4     about it.
5  Q  So, between 2005 and the present, Justin has only
6     talked to you on one occasion about what Charles
7     Coon did to him?
8  A  Yes, sir.
9  Q  What else did he tell you other than that Charles
10    Coon fondled him? Did he tell you when it
11    happened or where?
12 A  Yes, sir.
13 Q  Where did he -- and I'm asking what Justin told
14    you -- where did he say it happened?
15 A  In the band room. In the office in the band room.
16 Q  How many times did he tell you it happened?
17 A  He just told me that one time. Once.
18 Q  All right. So, he said that on one occasion
19    Charles Coon fondled him at the band room?
20 A  Yes, sir.
21 Q  That was the only time that happened, according to
22    Justin?
23 A  Yes, sir.

## Page 42

1  Q   And you're not sure the date of when that
2      happened; that is, when Charles Coon fondled
3      Justin at the band room?
4  A   I don't recall.
5      MS. ALLEN:  I am afraid there might be
6      some confusion.
7      THE WITNESS:  Yes.
8      MS. ALLEN:  You understand that Donald
9      is asking you how many times --
10     Well, you are asking her two
11     things.  One, how many times did
12     Justin talk to her and tell her
13     what happened?
14 BY MR. SWEENEY
15 Q   And you said one time.  He shared with you only on
16     one time what Charles Coon had done to him?
17 A   Yes, sir.
18 Q   And then my follow-up question was:  When he
19     shared that information with you, when he said
20     what Charles Coon did to him, did he tell you how
21     many times Charles Coon had fondled him?
22 A   Yes, sir.
23 Q   How many times?

## Page 43

1  A   Several times.
2  Q   Do you have the impression it was two or five or
3      what?
4  A   I don't know how many times.
5  Q   So, Justin didn't give you an exact number?
6  A   Right.  Yes, sir.
7  Q   Okay.  In response to a question earlier, you said
8      you found out other information about what Charles
9      Coon had done to Justin.  Did you find out from
10     other sources what Charles Coon might have done to
11     Justin?
12 A   Yes, sir.
13 Q   Who else did you talk to that had knowledge about
14     what Charles Coon had done to Justin --
15 A   Mona --
16 Q   -- after June of 2005?
17 A   Mona Watson.
18 Q   And what did she tell you Charles Coon had done to
19     Justin?
20 A   I don't recall.  Just fondled him outside his
21     pants.
22 Q   Monica told you that?
23     MS. DePAOLA:  Mona.

## Page 44

1  Q   Excuse me.  I mispronounce names sometimes.  Mona?
2  A   Mona Watson.
3  Q   How many times did you talk to Mona, about this?
4  A   I don't recall.
5  Q   Okay.  Who else shared with you information about
6      what Charles Coon had done to Justin other than
7      Mona?
8      MS. DePAOLA:  Do you mean ever since the
9      incident?
10     MR. SWEENEY:  That's right.
11     MS. DePAOLA:  To today?
12     MR. SWEENEY:  That's right.
13 Q   Who else?  You said you had additional information
14     about what Charles Coon had done to Justin other
15     than what Justin told you on that one occasion.
16     You talked to Mona Washington.  Who else did you
17     talk to that had information about what Charles
18     Coon had done to Justin?
19 A   It was Misty Hubbard, Mr. Bradbury, and Mona
20     Wat --
21 Q   Let me write this.
22     Okay.  Anybody else?  Just those three?
23 A   Andrew Wright, who is his counselor.

## Page 45

1  Q   Who?
2  A   Andrew Wright.  He's a counselor at East Central
3      Medical.  And Dr. Ascherman.  He is with UAB
4      psychiatric ward.  And Dr. Warren.
5  Q   Warren?
6  A   Warren.  He did a psychiatric evaluation on
7      Justin.
8      MS. DePAOLA:  Fernell Warren.
9  Q   Have you shared with me everything Mr. Hubbard
10     told you?
11 A   Yes, sir.
12 Q   Mr. Bradbury.  What did Mr. Bradbury tell you?
13 A   That Justin was sexually abused by --
14 Q   Did he give you any explicit information about how
15     he was abused?
16 A   Fondling outside his pants.
17 Q   Did he know when or where that had taken place?
18 A   Yes, sir.
19 Q   And was that information that he got from talking
20     to Justin?
21 A   Yes, sir.
22 Q   Okay.  And did he tell you that it happened more
23     than once?  Did Mr. Bradbury tell you that based

Page 46

1  on what he knew it had happened more than once?
2  A  Yes, sir.
3  Q  Okay. You told me about Mona Washington?
4  A  Ms. Watson.
5  Q  Watkins. I apologize.
6  A  Watson.
7      MS. DePAOLA: Watson.
8  Q  Watson. Watson. Mr. White or a Dr. White?
9  A  Andrew Wright.
10 Q  Is he a doctor?
11 A  He's a licensed counselor.
12 Q  And what did Mr. White tell you?
13     MS. DePAOLA: Mr. Wright.
14 A  Wright.
15 Q  Wright, W-R-I-G-H-T?
16 A  He's -- Mr. Wright is Justin's counselor for his
17    being depressed, for his depression.
18 Q  So, what Mr. Wright would know would be based on
19    his dealings with Justin?
20 A  Yes, sir.
21 Q  And what did Mr. Wright tell you that Justin had
22    shared with him about the abuse?
23 A  I don't know.

Page 47

1  Q  You haven't --
2  A  I don't recall.
3  Q  -- actually talked with Mr. Wright?
4  A  It's confidential information between the
5     counselor and Justin.
6  Q  Okay. Dr. Ascherman. Has he shared with you any
7     information about what Charles Coon did to Justin?
8  A  Alls Mr. -- Dr. Ascherman told us that Justin
9     is -- has a severe case of depression. And Justin
10    is taking Lexapro for his depression.
11 Q  Okay. Have you talked to Dr. Warren?
12 A  Dr. Warren said that his depression is with his --
13    it's uhm, goes with the sexual abuse.
14 Q  All right.
15 A  That everything --
16 Q  Did he share any additional details about what he
17    had learned that Charles Coon had done to Justin
18    from Justin?
19 A  I don't recall.
20 Q  All right. And those are the people that from
21    whom you have obtained some information about what
22    Charles Coon did to Justin?
23 A  Yes, sir.

Page 48

1  Q  After this came up, did any of your other children
2     share any information about how Charles Coon
3     conducted himself with regard to Justin?
4  A  What do you mean? Explain yourself.
5  Q  Okay. Did Jessica talk to you about Mr. Coon and
6     what had come out about Coon abusing Justin? Did
7     she share any --
8  A  Yes, sir.
9  Q  -- additional information?
10 A  Yes, sir.
11 Q  What did she share?
12 A  She had seen Mr. Coon touch Justin between his --
13    between his legs.
14 Q  She actually observed that?
15 A  Yes, sir.
16 Q  But she hadn't told you about that, had she?
17 A  No, sir, not -- not until we asked her.
18 Q  Okay. Had she told anybody else about that; that
19    she had seen Mr. Coon touch Justin between the
20    legs? She told you that after this information
21    came up in the summer of 2005; correct?
22 A  Yes.
23 Q  But she had not mentioned that to you before?

Page 49

1  A  No, sir.
2  Q  Okay. Had Jessica reported that information to
3     anybody else, to your knowledge? That is, had she
4     gone to the school officials or anybody and said,
5     I saw Mr. Coon touch Justin in an inappropriate
6     way, before she talked to you?
7  A  No, sir.
8  Q  Did either of your two sons have information about
9     how Coon had treated Justin? Did they know
10    anything that would shed light on what had
11    happened?
12 A  I don't recall.
13 Q  To your knowledge, were there any witnesses of
14    this abuse -- of Charles Coon abusing Justin --
15    other than Jessica?
16 A  Yes, sir.
17 Q  Who else witnessed the abuse?
18 A  Joseph Reed.
19 Q  I'm sorry?
20 A  Joseph Reed.
21 Q  What did he observe or see?
22 A  He saw Mr. Coon fondle Justin outside his pants.
23 Q  When did he see that take place?

Page 50

1  A   At our house.
2  Q   Did he report that to you when it happened?
3  A   No, sir.
4  Q   Was he sexually abused by Charles Coon?
5      MS. DePAOLA: He who?  Who are we
6      talking about?
7      MR. SWEENEY: What is it, Joseph.
8  Q   Was Joseph sexually abused by Charles Coon?
9  A   Yes, sir.
10 Q   But he hadn't reported that to you?  When it
11     happened, he didn't tell you about that, did he?
12 A   Be more specific.
13 Q   Sure.  Joseph saw Coon sexually abuse Justin at
14     your home?
15 A   Yes, sir.
16 Q   And when that happened, did Joseph tell you what
17     was happening?
18 A   No, sir.
19 Q   So, Coon was sexually abusing your son in your
20     house, and you didn't know that?
21 A   No, sir.
22 Q   So, you weren't able to do anything to stop it,
23     were you?

Page 51

1  A   I trusted the man.
2  Q   Right.  And because of that, you didn't take any
3      steps to prevent what happened from happening?
4  A   Because I did not know.
5  Q   And because you didn't know it, you didn't take
6      any steps to prevent it, did you?
7  A   I don't know.  I mean -- no, sir.
8  Q   Okay.  Did Joseph tell you why he had not reported
9      that to you when it happened at your house?
10     MS. DePAOLA: Now, what are we talking
11     about; about the abuse of Justin or
12     that he --
13     MR. SWEENEY: That's right.
14 Q   When Joseph observed Coon abusing Justin, did
15     Joseph tell you why he didn't come to you and
16     report it?
17 A   No, sir.
18 Q   And Joseph was sexually abused by Coon?
19 A   Yes, sir.
20 Q   But Joseph didn't come and tell you about that,
21     did he?
22 A   No, sir.
23 Q   Have you asked Joseph why he didn't tell you?

Page 52

1  A   No, sir.
2  Q   Do you know of anybody else that was sexually
3      abused by Charles Coon?
4  A   I don't recall.
5  Q   Is there anything that would refresh your
6      recollection about that; about somebody else that
7      has told you that they were sexually abused by
8      Charles Coon?
9      MS. DePAOLA: Is the question:  Has
10     somebody else told her that, or does
11     she know generally anything?
12 Q   Generally.  Do you know of anyone else that was
13     sexually abused by Charles Coon other than Joseph
14     or Justin?
15 A   Yes, sir.
16 Q   Who?
17 A   Blake Faulkner.
18 Q   And how did you learn about Blake?
19 A   I don't recall.
20 Q   Anybody else that you know of that's been sexually
21     abused by Charles Coon?
22 A   I don't recall.
23 Q   Do you know when Blake was sexually abused by

Page 53

1      Charles Coon?
2  A   I don't recall.
3  Q   So, I have asked you about the names of persons
4      that you think were sexually abused by Charles
5      Coon.  Have you shared with me everybody you can
6      think of as we're talking today that might have
7      been sexually abused by Charles Coon?
8  A   Yes, sir.
9  Q   And I have asked you about the people that
10     witnessed Charles Coon sexually abusing people.
11     And you have shared that Jessica and Joseph both
12     witnessed that?
13 A   Yes, sir.
14 Q   Is there anybody else that you know of that might
15     have witnessed Charles Coon sexually abusing
16     someone?
17 A   I don't recall.
18 Q   Have you talked with any employees of the Pike
19     County Board of Education about the sexual abuse
20     that Charles Coon committed on Justin; any
21     teachers, any staff people, anyone that's employed
22     by the Pike County Board of Education?
23 A   I don't recall.

JR, A Minor                     July 19, 2007                Pike County Board of Education

Page 54

1  Q  After you learned in June of 2005 about the cell
2     phone, did you ever go and talk to the principal
3     of the Pike County High School?
4  A  No, sir.
5  Q  Do you know who the principal is or was at that
6     time?
7  A  Yes, sir.
8  Q  Who was that?
9  A  Mr. Hall.
10 Q  Did you ever talk to him about what Charles Coon
11    did to Justin?
12 A  No, sir.
13 Q  Did you ever talk to the assistant principal about
14    what Charles Coon had done to Justin?
15 A  No, sir.
16 Q  Have you had any conversations with any teacher
17    that worked at Pike County High School during the
18    2004-2005 school year about Charles Coon and what
19    he did to Justin?
20 A  No, sir.
21 Q  Have you talked to any custodian or cafeteria
22    worker or anybody else that works at Pike County
23    High School concerning what Charles Coon did to

Page 55

1     Justin?
2  A  No, sir.
3  Q  Have you ever talked to Mark Bazzell, the
4     Superintendent, about what Charles Coon did to
5     Justin?
6  A  No, sir.
7  Q  Do you know any of the Board members who serve on
8     the Pike County Board of Education?
9  A  What do you mean?
10 Q  These people whose picture are behind us have at
11    one time or another served on the Pike County
12    Board of Education. Do you know any person that
13    serves on the Pike County Board of Education?
14 A  Yes, sir.
15 Q  Who?
16 A  Ms. Steed.
17 Q  Have you talked to her about what Charles Coon did
18    to Justin?
19 A  No, sir.
20 Q  Have you talked to any Board member on any
21    occasion about what Charles Coon did to Justin?
22 A  No, sir.
23 Q  Since finding out that Justin was sexually abused,

Page 56

1     you mentioned that he's been under the care of
2     various medical doctors and medical providers.
3     Has he been admitted to the hospital on any
4     occasion other than this most recent admission to
5     UAB?
6  A  No, sir.
7  Q  So, since 2004, has Justin been in the hospital
8     for any reason up to and including today, other
9     than the UAB admission?
10 A  No, sir.
11 Q  Does he have a family doctor?
12 A  Yes, sir.
13 Q  Who is his family doctor?
14 A  Dr. Patterson.
15 Q  Has he been treated by any other doctors since
16    June of 2005, other than those you have already
17    mentioned?
18 A  No, sir.
19 Q  Have you assumed or incurred unreimbursed medical
20    expenses for the medical treatment that Justin has
21    had since June of 2005?
22 A  What you mean, have --
23 Q  Have you had bills to pay for these medical

Page 57

1     services?
2  A  No, sir.
3  Q  Do you have medical insurance?
4  A  Justin is on Medicaid.
5  Q  All right. You have mentioned the psychiatrist.
6     That's Dr. Warren and Dr. Ascherman?
7  A  Dr. Ascherman.
8  Q  Ascherman. Has he been to any other psychiatrist?
9  A  No, sir. No, sir.
10 Q  Has he been to a psychologist, or just
11    psychiatrist?
12 A  Explain on the psychologist and the psychiatrist.
13 Q  Well, other than the persons that you have
14    mentioned; Warren, Ascherman, has he been to any
15    other professional for treatment?
16 A  He sees Dr. Lopez at East Central.
17 Q  Anybody else?
18 A  No, sir.
19 Q  If you were to ask Justin today to talk to you
20    about what Charles Coon did to him, would he be
21    able to talk to you about it?
22 A  I don't know.
23 Q  I mean, he's had counseling from these various

Mary Moore-Wynn, CSR              Mary Moore-Wynn              (334)244-0203
                              Court Reporting Services

JR, A Minor                          July 19, 2007                    Pike County Board of Education

Page 58

1  people during the -- since, I guess, 2000 -- the
2  summer of 2005. Has that helped him deal with the
3  trauma of what happened to him?
4  A  He still has problems.
5  Q  But can he talk about it more easily than he was
6  able to in the past?
7  A  I -- I don't know. I can't -- I mean, I can't
8  speak for Justin. I don't know. He probably
9  would.
10 Q  Does Justin, in your opinion, have the
11  intelligence to know that what happened to him,
12  the abuse that Coon inflicted on him, was wrong?
13 A  Justin doesn't know right from wrong. I mean, he
14  would be real easily coerced into something that
15  he does not understand.
16 Q  If I asked to take the deposition of Justin to
17  find out what had happened to him, would he be
18  able to describe what had happened?
19 A  No, sir.
20 Q  He wouldn't talk to me?
21 A  I don't know.
22 Q  Well, if you asked him about what happened in the
23  last two or three months, was he more able to

Page 59

1  discuss what he went through with Coon?
2  A  No, sir.
3  Q  You said you took out a warrant for Coon. Did you
4  ever attend any hearing regarding Charles Coon,
5  any criminal hearing or proceeding?
6  A  Yes, sir.
7  Q  Was there a trial concerning what he did?
8  A  It was just -- I don't -- I don't recall.
9  Q  Did you ever have to give testimony in a court
10  against Charles Coon?
11 A  No, sir.
12 Q  Do you know what Charles Coon actually pled guilty
13  for doing?
14 A  Yes, sir.
15 Q  What did he plead guilty for doing?
16 A  Inappropriate fondling outside of Justin's pants.
17 Q  Did he plead guilty for abusing Justin or for some
18  other student?
19 A  He -- I don't recall. I mean, alls he pleaded
20  guilty on Justin.
21 Q  Do you know where Charles Coon is today?
22 A  I do not.
23 Q  Have you had any discussions or communication with

Page 60

1  Charles Coon since June of 2005?
2  A  No, sir.
3  Q  So, you don't know exactly what Charles Coon
4  confessed to have done other than the fact that he
5  pled guilty to abusing minors; is that right?
6  A  Yes, sir.
7  Q  Did the district attorney ever come to you and
8  talk to you about what Charles had admitted doing?
9  A  I don't recall.
10  Explain yourself. I mean --
11 Q  You filed a warrant for Charles Coon's arrest
12  charging him with sexually abusing Justin?
13 A  Yes, sir.
14 Q  At some point after that, Charles Coon pled guilty
15  of committing a crime and went to jail, didn't he?
16 A  Yes, sir.
17 Q  At any time before he went to jail, did the
18  district attorney meet with you to talk about what
19  Charles Coon had admitted doing?
20 A  He didn't meet with me. He met with Justin.
21 Q  Okay. But did you have any conversations --
22 A  No, sir.
23 Q  -- with the district attorney?

Page 61

1  A  No, sir.
2  Q  So, no one has shared with you what specifically
3  Charles Coon admitted doing?
4  A  I'm confused -- yes, the DA -- I filed a warrant
5  against Coon.
6  Q  Uh-huh.
7  A  We went to trial -- we had a hearing. Mr. Coon
8  pled guilty on Justin.
9  Q  All right. But did they read out accusations
10  about what Charles Coon had done, and he admitted
11  it in court?
12 A  Yes, sir.
13 Q  And what were the accusations that were read out
14  that he admitted to?
15 A  Inapp -- I don't recall.
16 Q  Do you know if any other parents or people brought
17  charges against Coon for sexually abusing other
18  minors?
19 A  I don't recall.
20 Q  I think I covered this, Ms. Reed, but I want to
21  make sure. Justin rode with Charles Coon in his
22  private vehicle. But to the best of your
23  recollection, the only occasion for that was when

JR, A Minor                                July 19, 2007                    Pike County Board of Education

Page 62

1    Coon would be taking Justin from school to your
2    house?
3  A  No, sir. He took him off campus.
4  Q  I'm sorry. I didn't mean -- at school, he may
5    have driven him off campus. But in terms of going
6    to -- coming to your house, Coon comes to your
7    house. Did he ever leave your house in his
8    private vehicle with Justin to go someplace else?
9  A  I don't recall.
10  Q  So, do you recall Charles Coon ever taking Justin
11    in his car from your house to a lake place?
12  A  No, sir.
13  Q  To a fishing place, a pond or a lake to fish?
14  A  No, sir.
15  Q  To Guntersville for the weekend?
16  A  No, sir.
17  Q  Or a cabin that he might have owned?
18  A  No, sir.
19  Q  To Florida?
20  A  No, sir.
21  Q  To Six Flags Over Georgia?
22  A  No, sir.
23  Q  To a movie?

Page 63

1  A  No, sir.
2  Q  Or to a restaurant?
3  A  No, sir.
4  Q  So, you don't know of any other occasion where
5    Charles Coon would have taken Justin in his car
6    from your house to some other place?
7  A  No, sir.
8  Q  Do you have any information that Justin would have
9    been taken to Charles Coon's house or the school
10    in some private vehicle, and then he left to go
11    with Coon to a lake or a cabin or some kind of
12    out-of-town trip?
13  A  No, sir.
14  Q  Do you know if Justin ever went on a camp out with
15    Coon?
16  A  No, sir.
17  Q  With other students or by himself?
18  A  No, sir.
19  Q  And you don't know of any occasion where Coon
20    would have taken Justin to Greenville or Butler
21    County or anyplace outside of the Pike County?
22  A  No, sir.
23    MS. DePAOLA: Can we take a quick break?

Page 64

1    (Brief recess.)
2  BY MR. SWEENEY
3  Q  Ms. Reed, I was trying to determine from you
4    people that had information that would be
5    supportive of the contentions in the complaint and
6    people that you have talked to. Since June of
7    2005, have you talked to anybody with the Troy
8    Police Department?
9  A  No, sir.
10  Q  Have you talked with anybody with the Brundidge
11    Police Department?
12  A  No, sir.
13  Q  Is there a Mr. or Mrs. Shackleford?
14  A  Yes, sir. I have talked to Sherry.
15  Q  And what is her position? Is she with the
16    Brundidge Police Department?
17  A  I don't know.
18  Q  Well, does she have -- has she shared information
19    with you about Charles Coon and Justin; that is,
20    does she know any information or shared anything
21    that might be relevant to the issues in your
22    complaint?
23  A  I don't recall. I -- let me -- what do you mean,

Page 65

1    you mean with the sexual --
2  Q  The sexual abuse that Charles Coon engaged in with
3    your son, Justin; have you talked with
4    Ms. Shackleford about that?
5  A  Yes, sir.
6  Q  What did you talk about? What does she know, and
7    what did she discuss with you?
8  A  That my -- that Justin Reed was sexually abused by
9    Mr. Coon.
10  Q  Did she know anything about what had happened
11    prior to June of 2005 to your knowledge?
12  A  No, sir.
13  Q  Or had she observed anything at school that she
14    shared with you?
15  A  No, sir.
16  Q  I asked you if Charles Coon had ever driven Justin
17    from your home to any place other than to school.
18    Let me ask about Jessica. Did Charles Coon ever
19    drive Jessica in his car to anyplace?
20  A  Yes, sir.
21  Q  Where did he drive Jessica?
22  A  To his house in Greenville.
23  Q  On several occasions?

Page 66

1   A   On one occasion.
2   Q   And when did that take place?
3   A   I don't recall.
4   Q   Was it during the 2004-2005 school year?
5   A   2004. It was the summer 2004.
6   Q   And what was the occasion for Mr. Coon taking
7       Jessica to Greenville?
8   A   To do some yard work.
9   Q   Was Jessica there over the weekend?
10  A   She was only there for a couple of hours.
11  Q   And then they came back?
12  A   Yes, sir.
13  Q   Did Jessica complain about anything that Mr. Coon
14      did during that trip?
15  A   No, sir.
16  Q   But you had confidence enough in Mr. Coon to let
17      your daughter go to Greenville in his private car?
18  A   Yes, sir. I trusted Mr. Coon.
19  Q   Okay. Did any of your other children ever drive
20      to places with Mr. Coon in his private vehicle?
21  A   No, sir.
22  Q   Did Jessica ever go any other place with Mr. Coon
23      other than to Greenville?

Page 67

1   A   The only -- from school. After school, Mr. Coon
2       would bring Justin and -- Justin and Jessica home
3       after band practice.
4   Q   Did Jessica ever go to Florida with Mr. Coon?
5   A   Mr. Coon asked Jessica to go to Florida, but she
6       refused to.
7   Q   When did he ask her to go?
8   A   It was when Mr. Coon and Blake Faulkner were going
9       to Florida.
10  Q   Okay. Did Mr. Coon ever take any of your other
11      children to anyplace like a lake or Greenville or
12      any other place unrelated to a band trip?
13  A   No, sir.
14  Q   Do you have a computer in your home?
15  A   Yes, sir.
16  Q   Would Justin or Jessica or the children have
17      access to your computer?
18  A   Yes, sir.
19  Q   Where is the computer kept in your home?
20  A   Each one of our kids have a computer.
21  Q   Justin had a computer?
22  A   Justin had a computer.
23  Q   Have you reviewed Justin's computer to see if

Page 68

1       there is any communication between Justin and
2       Mr. Coon on his computer?
3   A   Yes -- yes, sir.
4   Q   Was there communication?
5   A   Yes, sir.
6   Q   Did you turn the e-mail communication over to your
7       attorneys?
8   A   They couldn't find any -- they couldn't bring
9       anything up on the conversations between Mr. Coon
10      and Justin, because it was on Yahoo.
11  Q   So, there was no information that you could
12      produce from Justin's computer?
13  A   Uhm, I -- no, sir.
14  Q   Did you check Jessica's computer to see if there
15      was anything from Mr. Coon to Jessica or from
16      Jessica to Mr. Coon?
17  A   Jessica would talk to Mr. Coon.
18  Q   But on her computer, did you check to see if there
19      is any communication between Jessica and Mr. Coon
20      on a computer?
21  A   I -- I can't -- I don't know. I mean, be more
22      specific. Explain yourself.
23  Q   Jessica has a computer; correct?

Page 69

1   A   Yes, sir.
2   Q   Of her own?
3   A   Yes, sir.
4   Q   Did she communicate with Mr. Coon on her computer?
5   A   Yes, sir.
6   Q   Did you try to retrieve messages from Coon to her
7       and from her to Coon?
8   A   No, sir, because I would -- I mean, I would go
9       over and watch them when they were talking to
10      Mr. Coon.
11  Q   So, during the 2004-2005 school year when they
12      were on their computers, whether it was Justin on
13      his computer or Jessica, you say you were
14      observing what was being communicated?
15  A   Yes, sir.
16  Q   And you never saw anything inappropriate?
17  A   No, sir.
18  Q   Did the district attorney analyze information that
19      was on the computer?
20  A   Be more --
21  Q   As the district attorney was investigating
22      allegations that Mr. Coon had abused Justin, did
23      they look at any computer in your home?

Page 70

1  A  Yes, sir.
2  Q  Did they do an analysis?
3  A  Yes, sir.
4  Q  Did they prepare a report?
5  A  Yes, sir.
6  Q  Did they find communication between members of
7     your family on you all's computers with Mr. Coon?
8  A  I don't know.  The only thing that they found on
9     the computer was gay pornography.
10 Q  Was pornography?
11 A  Yes, sir.
12 Q  Was that pornography generated by Mr. Coon, or
13    what?  Do you know the source of the pornography?
14 A  Gay pornography.
15 Q  Huh?
16 A  It was gay pornography.  I mean, what do you mean
17    by "the source"?
18 Q  On whose computer was the gay pornography?
19 A  On Justin's computer.
20 Q  Could they determine whether Justin had found that
21    on the Internet, or had that been sent to him?
22 A  I don't know.
23 Q  Have you seen the district attorney's analysis of

Page 71

1     the findings of what was on the computer?
2  A  The only knowledge I have on Justin's computer was
3     Mr. Bradbury told me that they found gay
4     pornography on Justin's computer.
5  Q  What is Misty Hubbard's position?
6  A  She is -- I --
7  Q  Is she with DHR?
8  A  She is with DHR.  But she is not with DHR right
9     now -- I mean, she got her job changed.  She is
10    with something else with the Human Resources.
11 Q  All right.  She called you in June of 2005 about
12    the cell phone?
13 A  Yes, sir.
14 Q  Did you know her before she called you?
15 A  No, sir.
16 Q  So, you didn't know who she was when she called
17    you?
18 A  No, sir.  I did not know why I was getting a phone
19    call from DHR.
20 Q  And you had never had any dealings with
21    Ms. Hubbard before then?
22 A  No, sir.
23 Q  Have you had dealings with her since the June of

Page 72

1     2005 conversation?
2  A  The only dealings I had with her is when
3     Ms. Watson and Misty Hubbard did the interview
4     with Justin.
5  Q  Who is Denise McCloud?
6  A  She is one of the twins' mom -- Jessica and
7     Jennifer Thrash's mother.
8  Q  Have you had discussions with her about Mr. Coon?
9  A  Yes.
10 Q  What have you discussed with Ms. McCloud about
11    Charles Coon?
12 A  About Blake Faulkner.
13 Q  And what did you discuss?
14 A  That Blake Faulkner was sexually abused by
15    Mr. Coon.
16 Q  Did she have any knowledge about that?
17 A  She got information from Blake's daddy.
18 Q  Did she have any information about what Charles
19    Coon had done to Justin?
20 A  I mentioned it to her.
21 Q  But did she have any independent information --
22 A  No, sir.
23 Q  -- other than what you told her?

Page 73

1  A  No, sir.
2  Q  Have you talked to any other band parents about
3     Charles Coon and what happened to Justin?
4  A  No, sir.
5  Q  Have any band parents, since June of 2005, come
6     forward and told you that they suspected Mr. Coon
7     was up to -- was abusing the children?
8  A  No, sir.
9  Q  No band parent has told you that?
10 A  Not that I recall.
11 Q  Okay.  I want to make sure that I have got on the
12    Record a pretty clear statement.  So, I want to
13    review the entire year of 2004-2005 school year.
14    In August of 2004, the first month of school,
15    Justin was participating in the band, wasn't he?
16 A  Yes, sir.
17 Q  During the month of August, did you have any
18    suspicion that Charles Coon was abusing Justin in
19    any way?
20 A  No, sir.
21 Q  And during the month of August, did you ever
22    complain to anyone about Charles Coon and his
23    behavior towards your son and for any reason?

Page 74

1  A   No, sir.
2  Q   In September, Justin was in the band at Pike
3      County High School, wasn't he?
4  A   Yes, sir.
5  Q   Under the supervision of Charles Coon?
6  A   Yes, sir.
7  Q   Did you have any reason to believe in September
8      that Charles Coon was abusing Justin?
9  A   No, sir.
10 Q   If I ask you the same question for October,
11     November, December, January, February, March,
12     April, and May; during those months of 2004-2005,
13     did you have any reason to suspect that Charles
14     Coon was abusing Justin?
15 A   No, sir.
16 Q   And during those months, since you had no reason
17     to suspect that Charles Coon was abusing Justin,
18     you didn't complain in any form or fashion to any
19     employee of the Pike County Board of Education,
20     did you?
21 A   No, sir. The only thing I felt funny about is
22     when he was taking him off campus and riding
23     during break. Those 15 minutes from 9:15 to 9:35.

Page 75

1      I mean, I thought I trusted that man. I don't
2      know --
3  Q   But you didn't share that concern with anyone;
4      correct? No other adult did you talk to about
5      that?
6  A   No, sir.
7  Q   Are you aware that Charles Coon retired as an
8      employee from the Pike County school system in May
9      of 2005?
10     MS. DePAOLA: Object to the form. I --
11 Q   Are you aware that he retired in May?
12     MS. DePAOLA: Object to the form.
13     That's inaccurate.
14 BY MR. SWEENEY
15 Q   Are you aware of that?
16 A   He mentioned at the band banquet that he was
17     retiring.
18 Q   All right. So, you knew that he was retiring at
19     the end of May from his employment with the Pike
20     County school system?
21     MS. DePAOLA: Object to the form. It
22     doesn't accurately reflect --
23     MR. SWEENEY: Just let her answer. You

Page 76

1      can object, Susan.
2  Q   Did you know that?
3      MS. DePAOLA: Well, I mean, she doesn't
4      have to agree. You're stating facts
5      that are not exactly accurate.
6      MR. SWEENEY: I'm saying, did you know
7      that?
8      MS. DePAOLA: You're not being accurate?
9  A   I don't --
10 Q   Did you know Charles Coon submitted his
11     resignation from employment with the school system
12     in May of 2005?
13 A   No, sir.
14 Q   You didn't know that?
15 A   No, sir.
16 Q   What did he say at the banquet?
17 A   He was retiring, and he was going to spend time
18     with his son.
19 Q   When was the banquet?
20 A   It was in May of 2005.
21 Q   And so I'm clear and the Record is clear: Prior
22     to June of 2005, you never shared any concern
23     about Charles Coon of any type, any nature with

Page 77

1      Mark Bazzell? Prior to June of 2005, you never
2      brought any complaint or concern to Superintendent
3      Mark Bazzell; is that right?
4  A   I don't -- I mean, I don't understand. Explain
5      yourself. I mean --
6  Q   Did you ever bring any concern to Mark Bazzell,
7      who is sitting next to me, prior to June of 2005
8      about Charles Coon?
9  A   I don't recall. I --
10 Q   Well, you would recall talking to the
11     Superintendent of the Pike County Board of
12     Education, wouldn't you?
13 A   Yes, sir.
14 Q   Do you recall talking to Mark Bazzell about
15     anything prior to June of 2005?
16 A   Yes, sir.
17 Q   What would you have talked to him about?
18 A   Other personal issues.
19 Q   But did they have anything to do with Charles Coon
20     or Justin?
21 A   No, sir.
22 Q   So, with regard to Charles Coon and Justin and
23     what Charles Coon might or might not be doing with

JR, A Minor                July 19, 2007                Pike County Board of Education

21 (Pages 78 to 81)

Page 78

1    Justin, you never shared any concerns with Mark
2    Bazzell?
3 A  No, sir.
4 Q  Prior to June of 2005; correct?
5        And if I ask you the same question concerning
6    Terry Casey: Did you ever share any concerns with
7    Terry Casey about Charles Coon and what he was
8    doing or not doing with Justin?
9 A  No, sir.
10 Q  Same question concerning Buddy Pryon. Did you
11    ever share any concerns with him about Charles
12    Coon and what he might be doing or was not doing
13    concerning Justin?
14 A  No, sir.
15 Q  Same question concerning Robert McDaniel? Did you
16    ever come to Robert McDaniel with any complaint or
17    concern about conduct or behavior of Charles Coon
18    prior to June 2005?
19 A  No, sir.
20 Q  Have you ever brought any concern or complaint
21    about Charles Coon to any of those people;
22    Mr. Bazzell, Casey, Pryon, or McDaniel, since June
23    of 2005, other than this complaint?

Page 79

1 A  No, sir.
2 Q  Now, you mentioned that Charles Coon would
3    sometimes drive Justin from school during school.
4    Did you say something to that effect?
5 A  Yes, sir.
6 Q  All right. Explain that. What do you believe
7    Mr. Coon would do at school in driving Justin?
8 A  There was on occasions, I saw Mr. Coon -- I was in
9    the office, and Mr. Coon would drive up with
10    Justin in the vehicle. And I asked Justin why
11    were you in the car? And he said, Mr. Coon was
12    just bringing me from the band room to the office.
13 Q  How far away is that? How far is the band room to
14    the office?
15 A  I -- I don't know. I can't give you a distance.
16    I don't know.
17 Q  How many times did you see that happen where you
18    were in the office, and you would see Coon bring
19    Justin to the office?
20 A  Four times.
21 Q  Huh?
22 A  Four times.
23 Q  On those occasions, were you in the office waiting

Page 80

1    for Justin to take him home?
2 A  No. I was fixing to bring something up to him,
3    because he would call down at the band room and
4    say, mama, can you bring me something that he
5    needed.
6 Q  So, you would come to the school?
7 A  Yes, sir.
8 Q  With something for Justin?
9 A  Yes, sir.
10 Q  And then Charles Coon would drive him from the
11    band room up to the office to meet you?
12 A  Yes, sir.
13 Q  So, as far as you knew, Mr. Coon knew that you
14    were there, and he was driving Justin to the
15    office to meet you?
16 A  I don't know if Mr. Coon knew I was up there at
17    the office waiting for something.
18 Q  Well, when Justin would get out of Mr. Coon's car
19    when you had brought something for him, would he
20    then return to Mr. Coon's car and drive back to
21    the band room?
22 A  No. At that time, the bell had rung, and he had
23    to get to class.

Page 81

1 Q  Okay. Did you accept Justin's explanation that
2    Coon was just driving him there to accommodate
3    him?
4 A  Yes, sir.
5 Q  And so you didn't have any real concerns at the
6    time?
7 A  No, because I trusted Mr. Coon.
8 Q  Okay. On any other occasion, do you know whether
9    Mr. Coon drove Justin from the band room, during
10    the school hours, to anyplace? I mean, you saw
11    him four times. But do you have documents or
12    reports from any other source that Coon ever drove
13    Justin off campus during school hours?
14 A  No, sir.
15 Q  Do you have any other — any information of any
16    other inappropriate conduct or conduct that gave
17    you concern between Charles Coon and Justin that
18    would happen during school hours?
19        MS. DePAOLA: Besides what she testified
20            to earlier in the day?
21 Q  Other than driving from the band room to meet you
22    at the office, did Coon ever do anything else —
23    you said he fondled him, according to Justin, at

Mary Moore-Wynn, CSR              Mary Moore-Wynn                (334)244-0203
                                Court Reporting Services

Page 82

1     school. But did Coon ever engage in any other
2     conduct at school with Justin that you thought was
3     inappropriate?
4   A  He would go up -- he would get out of class to go
5     down to Mr. Coon's room during second period.
6   Q  Okay. How do you know that?
7   A  Because his teachers would let him out.
8   Q  How do you know that the teachers would let him?
9   A  Because Justin told me that a certain teacher
10     would let him out to go down there to take his
11     trumpet down there during class. Even though
12     break was fixing to be in five minutes, the
13     teacher would let Justin go down to the band room.
14  Q  Do you know what teacher did that?
15  A  Ms. Owens did it. She was his English teacher.
16  Q  Did any other teacher, to your knowledge?
17  A  Ms. Catrett would do it. After he finished his
18     work, she would let him go down to the band room.
19  Q  How do you know that Ms. Owens did it?
20  A  Because Justin got in trouble one time for going
21     down to the band room before the class was over.
22     He got sent to alternative school for six weeks.
23  Q  When did that happen?

Page 84

1   A  It may -- I don't recall.
2   Q  Do you have his agenda?
3   A  No, sir, I don't.
4   Q  Do your attorneys have the agenda?
5   A  No, sir.
6   Q  What's happened to the agenda?
7   A  Justin's done thrown it away.
8   Q  Do you have any documents that -- evidence,
9     that -- who was the other teacher, Mrs. K?
10  A  Ms. Catrett.
11  Q  -- that she let him out of class?
12  A  Yes, sir.
13  Q  What documentary evidence do you have?
14  A  It would be in the agenda.
15  Q  Do you have the agenda that shows that?
16  A  No, I don't. No, sir.
17  Q  Do you know how many times you saw that happen in
18     the agenda?
19  A  No, sir.
20  Q  Did any other teacher let him out of class to go
21     to the band room?
22  A  Yes, sir.
23  Q  Who?

Page 83

1   A  In 2000 -- 2004.
2   Q  During the 2003-2004 school year, or during the
3     2004-2005 --
4   A  2004-2005 school year.
5   Q  All right. So, he got in trouble for leaving
6     Ms. Owen's class and going to the band room?
7   A  Yes, sir.
8   Q  So, he wasn't supposed to do that?
9   A  He wasn't supposed to get out of class.
10  Q  Right. But he wasn't supposed to leave class,
11     either, and he was disciplined for that?
12  A  Justin got in trouble. Two boys got him in
13     trouble.
14  Q  Okay. Have you ever seen any written
15     documentation that Ms. Owens would let him out of
16     class?
17  A  It would be in his agenda.
18  Q  But have you ever seen anything in his agenda that
19     indicated he was being released from her class?
20  A  Yes, sir.
21  Q  How many times did that happen?
22  A  It happened -- I mean, out of Ms. Owens class?
23  Q  Uh-huh.

Page 85

1   A  His history teacher would let him go.
2   Q  The what?
3   A  His history teacher would let him go.
4   Q  Who was the history teacher?
5   A  Coach Suber.
6   Q  Do you know how many times?
7   A  No, sir.
8   Q  So, as far as you know, there is no documentary
9     evidence that would support your statement that
10     these teachers let Justin leave class to go to the
11     band room? That is, you don't have any such
12     documentation?
13  A  The one document -- on Ms. Owens, he got in
14     trouble for leaving that class.
15  Q  But in terms of the agenda, no agenda still exists
16     that showed that that took place; as far as you
17     know?
18  A  As far as -- as far as I know, no.
19  Q  Did Justin come to you and tell you that he was
20     leaving Ms. Owen's class or the other teachers'
21     class and going to the band room?
22  A  No, sir.
23  Q  So, you didn't know that?

JR, A Minor                              July 19, 2007                    Pike County Board of Education

23 (Pages 86 to 89)

Page 86

1  A  No, sir.
2  Q  When did you find out about that?
3  A  Through his agendas.  Jessie would tell me.
4  Q  Well, does an agenda show when that happens on the
5     day it happens?
6  A  Yes, sir.
7  Q  But you didn't see that when it happened on the
8     agenda?  You reviewed that sometime later?
9  A  There would be -- explain yourself -- I mean,
10    because on the agenda, the teacher would have to
11    write the time --
12 Q  When would you review the agenda and see that he
13    was leaving one teacher's class to go to the band
14    room?  When would you have done that?  From time
15    to time --
16 A  From time to time --
17 Q  -- during the 2004 --
18 A  -- 2004-2005.
19 Q  And did you ever ask Justin why he was doing that?
20 A  Yes, sir.
21 Q  What would he say?
22 A  He said he had to go down and see Mr. Coon.  He
23    had to go talk to Mr. Coon.

Page 87

1  Q  Did you inquire further why that was necessary?
2  A  I've asked Justin.  He said he needed to find out
3     if they had band practice.  Or if band practice --
4     when band practice was.
5  Q  So, as far as you could tell, it was a legitimate
6     reason to go from the class to the band room?
7  A  Yes, sir.
8  Q  I mean, at the time you were learning of this
9     information, you thought it sounded innocent?  It
10    wasn't of concern?
11 A  Yes, sir.
12 Q  And so you didn't report that to anybody?
13 A  No, sir.
14 Q  Of being concerned?
15    Justin is a special education student, isn't
16    he?
17 A  Yes, sir.
18 Q  So, he has an Individualized Education Plan?
19 A  Yes, sir.
20 Q  Did you meet from time to time with the school
21    system as a -- as his IEP was being developed?
22 A  Met once a year.
23 Q  And when you would meet with the school officials

Page 88

1     at the IEP committee meeting, would you share with
2     them any concerns that you would have about Justin
3     or his program or what was going on at the school?
4  A  No, sir.
5  Q  You were invited as his parent --
6  A  Yes, sir.
7  Q  -- to attend the IEPs; correct?
8  A  Yes, sir.
9  Q  Mr. Reed didn't attend those IEPs.  You were the
10    only parent that would attend them; correct?
11 A  Yes, sir.
12 Q  And at the IEPs that you attended, did you ever
13    bring up any concern about Charles Coon?
14 A  No, sir.  I was mostly there for what they were
15    fixing to do for Justin for the next school year.
16 Q  All right.  But --
17 A  I wasn't --
18 Q  But you would listen to what they were proposing,
19    wouldn't you?
20 A  What they were going to propose for Justin for
21    next year.
22 Q  And if you had concern about it, you would have
23    shared that as a concerned parent, wouldn't you?

Page 89

1  A  Yes, sir.
2  Q  All right.  So, as far as the IEP committee is
3     concerned for the -- and the plan for the
4     2003-2004 school year, you didn't raise any
5     objections or concerns with the IEP committee
6     about Justin's program, did you?
7  A  No, sir.
8  Q  As far as you were concerned, they were providing
9     an appropriate education for Justin?
10 A  Yes, sir.
11 Q  Now, for the 2004-2005 school year you attended an
12    IEP meeting, didn't you?
13 A  Yes, sir.
14 Q  And as far as you were concerned, the school
15    system was providing an appropriate educational
16    program for Justin?
17 A  Yes, sir.  Until I had to take him out of Algebra,
18    I.  I had a conflict with Mr. McDaniel.
19    Mr. McDaniel told me that it was too late to take
20    Justin out of Algebra, I and put him in Math, III.
21    And that we had to do a revised -- have another
22    IEP.
23 Q  Do you remember attending an IEP on May 25, 2005,

Mary Moore-Wynn, CSR                    Mary Moore-Wynn                    (334)244-0203
                                        Court Reporting Services

Page 90

1    that is, the end of the 2004-2005 school year for
2    Justin?
3    A  Yes, sir.
4    Q  At that IEP meeting, did you bring up any concerns
5       about Charles Coon?
6    A  No, sir.
7    Q  Or any concerns about Justin's program that had
8       taken place for the 2004-2005 school year?
9    A  Not in May.
10             (Whereupon, Defendant's Exhibit 3
11                was marked for identification and
12                is attached hereto.)
13   BY MR. SWEENEY
14   Q  Let me show you what's been marked for
15      identification as Defendant's Exhibit 3.  Do you
16      see two thirds of the way down signature of
17      Mrs. Reed and the date of 2/16/05?
18   A  Yes, sir.
19   Q  Is that your signature?
20   A  Yes, sir.
21   Q  Did you agree to meet with the IEP committee on
22      2/22/05 as shown on top of that page?  Right up
23      here, I believe.

Page 91

1    A  Yes, sir.
2    Q  Two or three pages into that document, Defendant's
3       3, there is a page that's styled, Individual
4       Education Program, and it shows midway down an
5       amendment on 2/22/05.  That's it.
6             MS. DePAOLA:  Stop.
7    Q  Do you see that amendment?  Was that the change of
8       math that you talked about?
9    A  Yes, sir.
10   Q  And --
11   A  Algebra, II, Resource Math.
12   Q  Do you see your signature, or initials, indicating
13      that change on February 22nd, '05?
14   A  Yes, sir.  Yes, sir.
15   Q  So, you attended that meeting, didn't you --
16   A  Yes, sir.
17   Q  -- where you were discussing the math?
18        On that occasion, when you were meeting with
19      the people at the IEP, did you have any concerns
20      that you shared with them about Charles Coon?
21   A  No, sir.
22   Q  So, if his security or privacy, or if he was being
23      abused in any way that had come to your attention

Page 92

1    or suspicion or concern, you could have shared
2    that with the officials that you met with at
3    school on February 22nd, 2005, couldn't you?
4    A  Yes, sir.
5    Q  A couple of pages further, there is a signature
6       page with a date of 5/13/04.  Would that have been
7       the annual meeting to review his IEP for the next
8       school year?  Do you see a 5/13 date?
9             MS. DePAOLA:  What was the question,
10                Donald?
11   Q  Do you see those dates, 5/13, and your signature,
12      and by the side, amended 2/22?
13   A  Yes, sir.
14   Q  Okay.  And at that meeting, as we have just gone
15      over, neither at 5/13/04 or when it was amended at
16      2/22; at neither of those IEP meetings did you
17      raise any concerns about Charles Coon?
18   A  No, sir.
19             (Whereupon, Defendant's Exhibit 4
20                was marked for identification and
21                is attached hereto.)
22   BY MR. SWEENEY
23   Q  Let me show you Defendant's Exhibit 4.  Do you see

Page 93

1    on the first page a caption, Notice of Proposed
2    Meeting?
3    A  Yes, sir.
4    Q  Do you see signature of Ms. Reed dated 5/6/05?
5    A  Yes, sir.
6    Q  Is that your signature?
7    A  Yes, sir.
8    Q  And did that propose an IEP meeting on May 25th,
9       2005 at 10:00 a.m. at Pike County High School?
10   A  Yes, sir.
11   Q  Thumbing to close to the end of that IEP, do you
12      see your signature beside the date of 5/25/2005?
13   A  Yes, sir.
14   Q  Do you see the date of 5/25/2005 is typed, and to
15      the right of that, do you see the signature of
16      Elizabeth Reed?
17   A  Yes, sir.
18   Q  Is that your signature?
19   A  Yes, sir.
20   Q  So, on May 25, 2005, you attended an IEP meeting?
21   A  Yes, sir.
22   Q  And that was essentially at the end of the
23      2004-2005 school year?

Page 94

1   A   Yes, sir.
2   Q   And at that time, I think as we previously
3       discussed, you had no reason to believe that
4       Charles Coon was abusing Justin?
5   A   No, sir.
6   Q   And you did not bring up any concerns about how
7       Pike County was educating your child or providing
8       an appropriate environment for Justin during the
9       2004-2005 school year at this meeting?
10  A   No, sir.
11  Q   And it was not until after this meeting sometime
12      in June that the first concern was raised, or
13      brought to your attention about Charles Coon?
14  A   Yes, sir.
15  Q   A minute ago, I think I made reference to the
16      complaint that we have previously identified,
17      Defendant's Exhibit 2.  Let me ask you some
18      questions about that.
19          MR. SWEENEY:  Do you think the food
20          might be here?  Why don't we take
21          just a minute, because I'm going to
22          go over the complaint.  Why don't we
23          take a short break and get something

Page 95

1       to eat?
2           (Lunch recess.)
3           MR. SWEENEY:  Back on the Record.
4   BY MR. SWEENEY
5   Q   Ms. Reed, I'm going to spend some time asking
6       questions on the complaint, so that I make sure
7       that I'm clear what your contentions are.  To the
8       extent that my questions suggest a legal
9       interpretation, your lawyer will object, and I
10      will defer to that.  But I want your information
11      about this.
12          You're suing the Pike County Board of
13      Education on the style.  And I have asked earlier
14      if you knew the names of the Board members.  And
15      you said you could name one Board member.  And am
16      I correct that you do not know the other members
17      of the Board?
18  A   Yes, sir.
19  Q   And you have had no discussions with them about
20      this case?
21  A   No, sir.
22  Q   Prior to June of 2005, do you have any knowledge
23      or information that any member of the Pike County

Page 96

1       Board of Education knew Charles Coon, or knew of
2       him, or knew what he was doing?
3           MS. DePAOLA:  Well, object.  That's
4           obviously a compound question.
5   Q   Do you know if any member of the Pike County Board
6       of Education knew Charles Coon prior to June of
7       2005?
8   A   Yes, sir -- I don't know.  I'm confused.  I mean,
9       explain -- I mean -- I --
10  Q   Let me structure it this way:  It's possible that
11      some member of the Pike County Board of Education
12      might have known Charles Coon prior to June of
13      2005 when you learned about the possibility of
14      abuse by Coon of your son.  It's possible that
15      some member of the Board might have known Coon.
16      Would you agree with that?
17  A   Yes -- yes, sir.
18  Q   Okay.  Beyond that possibility, do you know if any
19      member of the Pike County Board knew Charles Coon
20      prior to June of 2005?
21          MS. ALLEN:  Did you know for sure if any
22          of them knew?
23  A   No, sir.

Page 97

1   Q   Do you know or do you have information that anyone
2       prior to June of 2005 had ever come to any of the
3       members of the Pike County Board of Education with
4       any concern about Charles Coon?
5   A   No, sir.
6   Q   What are you contending that the Board members did
7       or did not do with regard to your son, Justin?
8       You have sued the Pike County Board.  And the Pike
9       County Board is made up of six members --
10          MS. DePAOLA:  Paragraph 4.
11  Q   Let me rephrase it, Ms. Reed:  The Pike County
12      Board of Education is made up of six Board
13      members.  And you have sued them.  What are you
14      contending that those six Board members did in
15      violation of your son's rights?
16          MS. DePAOLA:  Object to the form.  The
17          complaint speaks for itself.
18  Q   What are you contending?
19      If you don't know, just tell me.
20  A   I don't know.
21  Q   And so, rephrasing the question:  In what manner
22      or way did any of the six members of the Board
23      violate Justin's rights?

## Page 98

1     MS. DePAOLA:  What's the question, now?
2   Q   In what manner or way did any of the six Board
3       members, singly or severally, violate rights of
4       Justin Reed?
5   A   When he got in trouble one time in 2004, there was
6       two other boys involved, but the other boys did
7       not get in trouble.  Justin got in trouble.
8   Q   Did that ever come to the attention of the Pike
9       County Board of Education?
10  A   Justin had a hearing, because Justin got caught
11      with one of those -- what you call -- Swiss Army
12      knives.  And two other boys were skipping, too,
13      along with Justin.  But the other two boys did not
14      get in trouble.  Justin had to go in front of the
15      Board.  That's when he had to go to alternative
16      school.
17  Q   But with regard to Charles Coon, are you
18      contending that the six members of the Pike County
19      Board had any knowledge any kind concerning what
20      Charles Coon did to Justin prior to June of 2005?
21      MS. DePAOLA:  Object to the form.
22  A   Uhm --
23  Q   Are you?

## Page 99

1   A   No, sir.
2   Q   Okay.  Concerning Mark Bazzell, Superintendent,
3       what are you contending that Mr. Bazzell, as
4       Superintendent of the Pike County Board of
5       Education, did in violation of Justin's rights?
6       MS. DePAOLA:  Object to the form.  The
7           complaint speaks for itself.
8   A   That Mr. Bazzell did not -- was not -- should have
9       been aware of what's going on in school campus.
10      You know, like if a student is leaving school
11      campus with a teacher, I mean, one of the
12      principals or something like that should have said
13      something to Mr. Bazzell, said there is something
14      going on with Mr. Coon and Justin, which should
15      have been investigated, which it was not
16      investigated.  And hiring and training of the
17      teachers should be more -- more thoroughly checked
18      on the backgrounds.
19  Q   But do you know what Mr. Bazzell did as
20      Superintendent in order to train teachers about
21      sexual abuse?
22  A   No, sir.
23  Q   Do you know what information was ever given to

## Page 100

1       Mr. Bazzell about Charles Coon and your son?
2   A   No, sir.
3   Q   Are you alleging that Mr. Bazzell had information
4       that Charles Coon was abusing Justin prior to
5       June of 2005?
6   A   No, sir.
7   Q   You certainly hadn't brought any such information
8       to Mr. Bazzell's attention, had you?
9   A   No, sir.
10  Q   All right.  You know that he is the Superintendent
11      of the Board?
12  A   Yes, sir.
13  Q   You have sued him in his individual capacity.  Do
14      you know what the job description is of the
15      Superintendent?  Do you know what his duties and
16      responsibilities are as the Superintendent?
17  A   Yes, sir.
18  Q   All right.  Aside from his duties and
19      responsibilities as the Superintendent, what are
20      you contending he did in his individual capacity,
21      separate and apart from any official duty as
22      Superintendent, that violated the rights of
23      Justin?

## Page 101

1       MS. DePAOLA:  Object to the form.  The
2           complaint speaks for itself.
3   A   I don't know.
4   Q   So, in terms of what information you can share
5       with me why you're suing Mr. Bazzell in his
6       individual capacity, you have no information that
7       you can share with me today?
8   A   Not that I can recall.
9       MR. SWEENEY:  And just so that the
10          Record is clear from your
11          communication, Ms. Allen and
12          Ms. DePaola, I have indicated that
13          if at the end of the discovery you
14          don't dismiss the lawsuit against
15          these Defendants in their individual
16          capacity, I'm going to ask for
17          sanctions if there is no basis for
18          that.  So, I want to make sure that
19          you and your client are given every
20          opportunity to support what these
21          people did beyond the line and scope
22          of their employment.
23      MS. DePAOLA:  Actually, what you did was

## Page 102

1       insisted that we dismiss them before
2       we even had the first deposition.
3       MR. SWEENEY: I did.
4       MS. DePAOLA: And we declined to do
5       that.
6       MR. SWEENEY: You did that.
7       MS. DePAOLA: And we will reconsider all
8       of these at the end of the
9       deposition, but don't
10      mischaracterize what you told us.
11      MR. SWEENEY: I want to make sure that
12      we're clear in that regard.
13      MS. DePAOLA: I'm clear. I'm clear.
14  BY MR. SWEENEY
15  Q   With regard to Terry Casey, are you contending
16      that Terry Casey, as principal of Pike County High
17      School, had knowledge about what Charles Coon was
18      doing to Justin prior to June of 2005?
19      MS. DePAOLA: Object to the form.
20  A   I don't know.
21  Q   You've never discussed the contentions about what
22      appears in your complaint with Terry Casey, have
23      you?

## Page 103

1   A   Mr. Casey -- I mean, should be -- he's responsible
2       for those students on campus. And if there is
3       anything suspicious going on, he should be aware
4       of it and have investigation. I mean --
5   Q   And if there is nothing brought to his attention
6       of a suspicious nature, are you still contending
7       that he should have done something?
8   A   If he's -- he should have had suspicions of Justin
9       going -- I mean, riding in the vehicle with
10      Mr. Coon. He should have investigated on that.
11  Q   All right. You had that knowledge that Justin was
12      riding with Mr. Coon in his vehicle, didn't you?
13  A   Yes, sir.
14  Q   And you didn't have concerns that that was
15      happening, did you?
16  A   Not at first I did not know it was happening.
17  Q   And you didn't bring that concern to Mr. Casey's
18      attention, did you?
19  A   I mean, there would --
20  Q   Did you bring that concern to Mr. --
21      MS. DePAOLA: Let her finish her
22      questions, Donald. She's talking,
23      and you're interrupting her.

## Page 104

1   A   I mean, the principal, Mr. Casey, walked around
2       campus during break. He should have -- he
3       probably seen Justin get out of the vehicle with
4       Coon.
5   Q   Do you have any information that Mr. Casey knew
6       that Charles Coon was transporting Justin in his
7       private vehicle?
8   A   No, sir.
9   Q   So, you're suing him without knowing that he had
10      that information?
11  A   I mean, him being the principal of that school,
12      should -- he should have the responsibility of,
13      you know, checking on all the teachers to make
14      sure it was going on, and the activities and the
15      supervision of the students.
16  Q   Okay. But beyond what he should have known, do
17      you have any basis, any facts to support a
18      contention that Terry Casey knew that Charles Coon
19      was abusing Justin?
20  A   No, sir.
21  Q   Do you know when Terry Casey retired as high
22      school principal?
23  A   Yes, sir.

## Page 105

1   Q   When?
2   A   December, 2004.
3   Q   So, Terry Casey wasn't there for the entire second
4       semester of the 2005 school year?
5   A   Right. Yes, sir.
6   Q   Do you know, or have an idea of what the job
7       description is of a high school principal; that
8       is, what his duties and responsibilities are?
9   A   To hire high -- I mean, quality teachers and you,
10      know, make sure the teachers get workshops and see
11      that the school is run in the manner that a school
12      should be run.
13  Q   When Mr. Coon was hired, do you know if Terry
14      Casey was the principal at the time?
15  A   Yes, sir.
16  Q   Do you know if Mr. Coon submitted references and
17      letters of support for his application?
18  A   No, sir.
19  Q   Have you reviewed Mr. Coon's application for
20      employment with the Pike County Board of
21      Education?
22  A   No, sir.
23  Q   Do you know what Mr. Casey considered when he

Page 106

1    recommended that Mr. Coon be hired?
2  A   No, sir.
3  Q   Do you know of any problem that Mr. Coon had in
4      any school system prior to his employment at the
5      Pike County High School as the band director?
6  A   No, sir.
7  Q   Have you ever heard that there was ever a
8      complaint of sexual abuse against Mr. Coon prior
9      to his coming to the Pike County Board of
10     Education?
11 A   No, sir.
12 Q   I asked you if you knew in general terms what a
13     principal does, what Mr. Casey did as principal of
14     the Pike County High School. Aside from that,
15     you're suing Mr. Casey in his individual capacity,
16     separate and apart from his employment as a
17     principal. What are you contending he did in his
18     individual capacity; that is, as an individual
19     outside of the school system outside of his
20     employment with the Pike County Board of
21     Education?
22         MS. DePAOLA: Object to the form.
23 A   I don't know.

Page 107

1  Q   You have no information, as you testify today,
2      about information that would support a complaint
3      against Mr. Casey in his individual capacity; is
4      that correct?
5          MS. DePAOLA: She said "I don't know".
6          MR. SWEENEY: Uh-huh.
7  Q   Is there any information that you can share with
8      me today that would support a complaint that
9      Mr. Casey in his individual capacity violated the
10     rights of your son or you his parent?
11         MS. DePAOLA: Object to the form. These
12             are legal issues.
13 Q   Do you have any information you can share with me?
14 A   I don't know.
15 Q   Buddy Pryon. Was he the interim principal at Pike
16     County High School that took over after Mr. Casey
17     retired?
18 A   Yes, sir.
19 Q   You were suing him in his capacity as the
20     principal at Pike County High School. What are
21     you contending he did during that period from
22     January of 2005 to May of 2005 that violated
23     Justin's rights or your rights as Justin's

Page 108

1      parents?
2          MS. DePAOLA: Object to the form. The
3              complaint speaks for itself.
4  Q   What facts do you have to support a contention
5      that Mr. Pryon violated Justin's rights or your
6      rights as a parent during that roughly five-month
7      interval from January of 2005 to May of 2005?
8  A   He violated -- they should have done an
9      investigation, because there was a time Justin got
10     in trouble in, I think it was, April -- April or
11     May of 2005, where me, Mr. Pryon, and Justin had a
12     meeting in his office. And we had a thing about
13     Justin broke the band room window. And Justin
14     called Mr. Coon from down in the band room on
15     Mr. Coon's cell phone. But when we had the
16     meeting with Mr. Pryon, Mr. Pryon asked if
17     Justin's knew Mr. Coon's cell phone number. And
18     Justin said yes. So, he gave Mr. Pyron the cell
19     phone number. And Mr. Pyron called Mr. Coon. And
20     Mr. Coon denied giving Justin the phone number.
21     And Justin said Mr. Coon gave him the phone
22     number.
23         So, the things that Mr. Pryon violated, he

Page 109

1      should have done an investigation of how Justin
2      got Mr. Coon's cell phone number.
3  Q   Do you know what he did? Do you know what
4      Mr. Pryon did to follow up on that possibility?
5  A   He just -- the only thing I know that Mr. Pryon
6      did was ask Mr. Coon if he gave Justin his cell
7      phone number.
8  Q   That's all you know. Have you asked Mr. Pyron
9      what else he did to investigate that matter?
10 A   No, sir.
11 Q   Do you think the fact that a student has a
12     teacher's cell phone number is indicative of child
13     abuse?
14 A   I don't know.
15 Q   Weren't there a lot of occasions when your
16     children had to call Mr. Coon to find out about
17     band practices and communicate with him on the
18     telephone?
19 A   I don't know. I -- yes, sir.
20 Q   Yes, sir, they did have occasion to call Mr. Coon
21     to find out about band practices and schedules?
22 A   But that was on the computer.
23 Q   But I am asking you if they didn't have to call on

Page 110

1    the telephone from time to time.
2  A  Yes, sir.
3  Q  You were at that meeting. And when you heard that
4     Justin had his cell phone, did you turn to
5     Mr. Pryon and say, that's suspicious; I want to
6     find out about it?
7  A  Justin had Mr. Coon's cell phone number. He did
8     not have his cell phone.
9  Q  I know. And you heard Justin give the cell phone
10     number to Mr. Pryon, right, at that meeting?
11  A  Yes, sir.
12  Q  When you heard that Justin had that information,
13     did you immediately become suspicious that that
14     was an alarming development?
15  A  Yes, sir.
16  Q  Well, if you were alarmed as a parent, what did
17     you say to Mr. Pryon? What did you ask him to do?
18  A  I didn't ask him to do anything, because it's
19     really not -- I mean, if they're suspicious of
20     something going on at the school -- Justin told
21     Mr. Pryon about the cell phone number, giving it
22     to Mr. Pryon. Mr. Pryon should have been
23     responsible investigating it further -- further

Page 111

1     investigation.
2  Q  Well, are you a conscientious parent?
3  A  Yes, sir.
4  Q  And when concerns come to your attention about
5     your children, don't you follow through on those
6     concerns?
7  A  Yes, sir, but there was many others -- there is a
8     couple of other kids that had Mr. Coon's cell
9     phone.
10  Q  But at that meeting, if you had really been
11     concerned over the fact that Justin had Coon's
12     cell phone number, you would have shared that
13     concern with Mr. Pryon, wouldn't you?
14  A  But right then and there my concern at that point
15     was not that. It was that Justin wasn't the only
16     person that should have got in trouble that day.
17     We were having a meeting that day.
18  Q  But at any subsequent time, did you ever go back
19     to Mr. Pryon and say, I found it unusual that
20     Justin had Mr. Coon's cell phone number, and I
21     want you to investigate that? Did you ever share
22     that concern with Mr. Pryon?
23  A  No, sir.

Page 112

1  Q  Anything else that you can share with me that is
2     facts to support a contention that you should be
3     able to sue Mr. Pryon in his individual capacity?
4  A  No, sir.
5  Q  All right. Robert McDaniel. You're suing him as
6     assistant vice principal at Pike County High
7     School. What are you contending that he did in
8     his official capacity that violated Justin or your
9     rights?
10        MS. DePAOLA: Object to the form. The
11           complaint speaks for itself.
12  Q  What facts do you have to support a contention
13     that Robert McDaniel violated Justin's rights with
14     regard to Charles Coon or -- I mean, violated
15     Justin's rights with regard to Charles Coon's
16     behavior toward him?
17  A  I --
18        MS. DePAOLA: Same objection.
19  A  I don't know.
20  Q  Do you have any information from talking to
21     Mr. McDaniel or to anyone else that Mr. McDaniel
22     ever was told he should have concern or suspicion
23     about Charles Coon's conduct towards Justin?

Page 113

1  A  No, sir.
2  Q  Beyond his official capacity as assistant
3     principal, do you have any facts you can share
4     with me to support why you're suing him in his
5     individual capacity?
6        MS. DePAOLA: Object to the form. It
7           requires legal analysis by this
8           witness.
9  Q  Do you have any facts you can support why you're
10     suing Mr. McDaniel in his individual capacity
11     separate and apart from his employment as
12     assistant principal?
13  A  I don't know.
14  Q  In paragraph 4 of your complaint, you indicate
15     that the Board has the responsibility to monitor
16     and investigate sexually inappropriate conduct.
17     On what basis are you asserting that the Board
18     members have the responsibility to engage in
19     investigations?
20  A  I don't know.
21  Q  In paragraph 5 you say, Mr. Bazzell, as
22     Superintendent, has the responsibility to develop
23     and implement policies and procedures to address

JR, A Minor                    July 19, 2007                    Pike County Board of Education

30 (Pages 114 to 117)

Page 114

1  personal privacy and security of special education
2  students.  Where have you found that
3  responsibility of the superintendent outlined, or
4  is that just contentions of your lawyers?
5  A  On the development of the special ed students -- I
6  mean, Justin, he's been going to Pike County for
7  ten years.  And he has not progressed in his
8  education.  He's still doing the same reading
9  level, and his I -- his IQ is still the same.  It
10  has not progressed where, you know, if they hired
11  somebody -- a special ed student -- I mean, a
12  teacher, more qualified, then Justin would have
13  progressed.
14  Q  Well, are you suing Mr. Bazzell because of your
15  concerns about special education or because of
16  what Charles Coon did to him as sexual abuse?
17      MS. DePAOLA:  Object to the form.  The
18          complaint includes both.
19  Q  Which one are you suing him over?
20  A  I mean, I can't call -- I can't recall.  I don't
21  know.
22  Q  Well, you attended IEP meetings for Justin, didn't
23  you?

Page 115

1  A  Yes.  And his IEP meetings -- every time he would
2  have an IEP meeting every year, he had not made no
3  progress.
4  Q  Did you sign the IEPs as approving each year, the
5  IEP plans, Individual Education Plans, for Justin
6  that was being proposed by the Pike County school
7  system?
8  A  Yes.  But Justin did not make no progress in them.
9  Q  Well, if you had any concerns about the IEPs,
10  wasn't your opportunity to express those at the
11  IEP meetings?
12  A  Yeah, but at IEP meetings, not everybody was there
13  at the IEP meetings like they are supposed to be.
14  Q  Well, did you ever express any concerns to
15  Mr. Bazzell about the special education program
16  that Justin was getting at Pike County High
17  School?
18  A  Can you repeat the question?
19  Q  Sure.  Did you ever express concern or share
20  complaints with Mr. Bazzell about Justin's special
21  education program and plan?
22  A  No, sir.  I --
23  Q  Have you reviewed the sexual abuse policy that the

Page 116

1  Pike County Board of Education had in place during
2  the 2004-2005 school year?
3  A  I do not recall.
4  Q  Do you know if under Mr. Bazzell's supervision as
5  Superintendent that the Board had a sexual abuse
6  policy for the Pike County Board of Education and
7  its schools?
8      MS. DePAOLA:  Object to the form.
9  Q  Do you know whether they did?
10  A  I don't know.
11  Q  You haven't bothered to check to see if they have
12  a sexual abuse policy?
13  A  Yes, sir.
14  Q  Do you know whether Mr. Bazzell, as
15  Superintendent, has had inservice seminars and
16  training for his teachers regarding sexual abuse?
17  A  I don't know.
18  Q  Do you know if Mr. Coon ever attended inservice
19  seminars concerning sexual abuse while he was
20  employed with the Pike County school system?
21  A  I don't know.
22  Q  In paragraph 10, you mention that Charles Coon
23  pled guilty to crimes that he had been charged of.

Page 117

1  Do you know if what he pled guilty to was abusing
2  Justin at your home as opposed to at school?
3  A  I don't know.
4  Q  Has that ever come to your attention; that what
5  Charles Coon plead guilty to was for conduct that
6  occurred at your home and not at school?
7      MS. DePAOLA:  Object to the form.
8  Q  Do you know that?  Have you ever heard that?
9  A  No, sir.
10  Q  But you do know based on what Jessica told you --
11  and I guess maybe Justin -- that Mr. Coon fondled
12  Justin at your home?
13  A  Jessica said that she saw Mr. Coon fondle Justin
14  at school and --
15  Q  But didn't you have information that Mr. Coon had
16  fondled Justin at your home?  Didn't you share
17  that with me?
18  A  Yes, sir.
19  Q  So, at your home, where you're in charge of
20  supervision, Charles Coon sexually abused your
21  child?
22  A  Yes, sir.
23  Q  Do you find fault with yourself that you didn't

Mary Moore-Wynn, CSR                    Mary Moore-Wynn                    (334)244-0203
                                        Court Reporting Services

Page 118

1  prevent Charles Coon from sexually abusing your
2  child at your home?
3  A  There was times where we were there when Mr. Coon
4  was there. But I may have stepped outside for a
5  minute. And I don't know what happened, you know,
6  if I stepped outside. I trusted Mr. Coon in our
7  house.
8  Q  Well, why wouldn't it be fair to find you guilty
9  of improper supervision for Charles Coon abusing
10  Justin whether you were at your house or not?
11        MS. DePAOLA: Object to the form. I
12              didn't understand the question.
13  A  I don't understand --
14  Q  I mean, do you think it would be fair, Ms. Reed,
15  for you to be found at fault for what happened at
16  your house when you weren't there or for what you
17  don't know about?
18        MS. DePAOLA: Object to the form.
19  A  I don't know.
20  Q  Well, that wouldn't sound very fair, would it, if
21  someone blamed you for something that happened
22  that you didn't know about?
23  A  There was times I was not at home when Mr. Coon

Page 119

1  come to our house. I was watching my niece,
2  Jocie.
3  Q  But you had left Charles Coon at your house with
4  your children and went to do other things, didn't
5  you?
6  A  I take care of a multihandicapped daughter. But
7  no -- yes, I did check on Mr. Coon when he was
8  down there.
9  Q  And you knew of times when he was there at your
10  house without your supervision?
11  A  I was around when he was there. I mean, he was
12  not really under supervision -- I mean, he was
13  supervised with me being there. But I wasn't
14  there in the same room as him. I mean, I was in
15  the house. So, he was not unsupervised.
16  Q  Let me look at paragraph 25. You say beginning in
17  the academic year 2004-2005 the student's personal
18  privacy and security were repeatedly violated. I
19  asked you earlier when you believed Justin was
20  violated by Charles Coon. And I thought you said
21  you didn't know.
22  A  I said beginning -- I don't recall.
23  Q  So, with regard to 25, I understand you don't know

Page 120

1  when Charles Coon first violated Justin?
2        MS. DePAOLA: Object to the form.
3  Q  Or do you?
4  A  I don't know.
5  Q  With regard to 25, did Justin indicate to you that
6  Mr. Coon coerced him to engage in this sexually
7  inappropriate conduct?
8  A  I don't know. Alls I know is he took -- he went
9  off campus with Mr. Coon, because Justin would
10  say, I am not allowed to say what was talked about
11  when they left. It was hush-hush business between
12  Justin and Mr. Coon. It was like none of my
13  business what went on.
14  Q  Okay. But I was asking you about whether he was
15  coerced, forced --
16  A  I don't know.
17  Q  -- which is the language used in your complaint.
18  A  I don't know.
19  Q  But the reason that you know Coon drove Justin in
20  his car at school was because you saw him? That's
21  how you know that; correct?
22  A  Yes. And I -- and then somebody else told
23  Mr. Coon not to take Justin around in his vehicle.

Page 121

1  Q  But the reason you know it is because you saw him?
2  A  I saw him four times.
3  Q  And on those occasions, you never reported concern
4  to the school officials that you thought at that
5  time that that was inappropriate?
6  A  No, because I trusted Mr. Coon.
7  Q  On paragraph 29, you say the Defendants knowingly
8  failed to act with regard to what Coon was doing.
9  On what basis are you saying, for example, that
10  Mark Bazzell, the Superintendent, knew what was
11  going on but ignored it?
12  A  I don't know.
13  Q  Or Mr. Casey or Mr. Pryon or Mr. McDaniel; what
14  are you saying that was brought to their attention
15  that they ignored and failed to investigate?
16  A  I don't know.
17  Q  Page 38, you indicate that the Defendants had no
18  formal policy to address issues of body integrity,
19  personal security, and/or right to privacy. Have
20  you read the Pike County sexual abuse policy?
21        MS. DePAOLA: What paragraph are you
22              reading?
23        MR. SWEENEY: Huh?

JR, A Minor                    July 19, 2007                    Pike County Board of Education

                                                              32 (Pages 122 to 125)

Page 122

1          MS. DePAOLA: Paragraph 38? Is that
2      what you're reading? I can't tell
3      what you're reading.
4  BY MR. SWEENEY
5  Q    Let me ask you to look at paragraph 38.
6      Defendant's Board, Bazzell, Casey, Pyron,
7      McDaniel, and Doe Defendants 1 had no formal
8      policy to address issues of bodily integrity,
9      personal security, and the right to privacy.
10         MS. DePAOLA: As is it relates to
11     special education students?
12         MR. SWEENEY: Right.
13 Q    Have you read the Pike County sexual abuse policy?
14         MS. DePAOLA: Object to the form.
15 A    I don't know. I don't recall.
16 Q    Do you know if the sexual abuse policy applies to
17     all students; whether they are regular ed or
18     special ed?
19 A    Yes, sir.
20 Q    As far as you know, it applies to all students,
21     doesn't it?
22 A    (Witness Indicating.)
23         MS. DePAOLA: Donald, she has already

Page 123

1      told you she hasn't read it. So,
2      now, why are you badgering her about
3      this?
4      MR. SWEENEY: Well, I'm not trying to
5      badger her. But I thought she said
6      in the affirmative.
7      MS. DePAOLA: She said she hadn't read
8      it.
9  BY MR. SWEENEY
10 Q    Do you know if they have an abuse policy?
11 A    I don't know.
12 Q    Do you know why you would indicate in paragraph 38
13     that the school system doesn't have a policy
14     relating to bodily integrity and personal security
15     if you haven't looked at their sexual abuse
16     policy?
17         MS. DePAOLA: Object to the form. He's,
18     first of all, not reading the entire
19     statement. And the witness has
20     already testified she hasn't read
21     it. So, you are wasting everybody's
22     time.
23

Page 124

1  BY MR. SWEENEY
2  Q    Would you agree, Ms. Reed, that 38 is just
3      lawyer's talk rather than something based on your
4      personal knowledge?
5  A    I don't know.
6  Q    Paragraph 39, you indicate that the Defendants'
7      customs or policy were grossly insufficient and
8      resulted in violation of the Plaintiff's clear
9      protected constitutional rights. Do you know if
10     the Board and the administrative people that you
11     have sued acted diligently with regard to any
12     complaint that was brought to their attention
13     about Justin and Mr. Coon?
14 A    I don't know.
15 Q    Do you now know that a complaint was brought about
16     Mr. Coon concerning smoking with students?
17 A    Yes, sir.
18 Q    Do you know that Mr. Bazzell investigated that
19     matter immediately?
20         MS. DePAOLA: Object to the form.
21 A    I don't know.
22 Q    Do you know if Mr. Bazzell suspended Charles Coon
23     while he was engaging in an investigation of that

Page 125

1      matter?
2  A    I don't know.
3  Q    Paragraph 41 says there was a causal relation
4      between the Defendants' failure to act and the
5      injuries suffered. I asked you earlier if you had
6      any information that Mr. Bazzell, Casey, McDaniel,
7      Pyron, had knowledge that Coon was abusing Justin.
8      Do you remember me asking you that?
9  A    I don't recall. I --
10 Q    Well, let me ask you: Prior to June 2005, do you
11     have any information that Mr. Bazzell, as
12     Superintendent; Mr. Casey, as principal;
13     Mr. Pryon, as principal; or Mr. McDaniel, as
14     assistant principal, had any information or
15     suspicion that Charles Coon was engaging in
16     inappropriate conduct with Justin?
17 A    I don't know.
18 Q    In paragraph 42, you're asking for damages. Do
19     you have a dollar figure in mind that you're going
20     to ask for damages for what you complain about?
21 A    No, sir.
22 Q    In paragraph 46, you indicate that Justin's
23     special education plan was inappropriate.

JR, A Minor                    July 19, 2007                    Pike County Board of Education

33 (Pages 126 to 129)

Page 126

1   Defendants have willfully failed to address these
2   issues in planning a school program. "In planning
3   a school program", are you relating to his IEP?
4        MS. DePAOLA: If you know.
5   Q   Is that Justin's school program, his IEP?
6   A   What -- I mean, explain.
7   Q   In paragraph 46, you make reference to Justin's
8   school program. What do you have in mind when you
9   ask about his school program? Is that his IEP,
10  his Individualized Education Plan?
11  A   No. I mean, his progress that he makes every year
12  in school.
13  Q   Well, for Justin, as a special ed student, isn't
14  that a function of his IEP?
15  A   Yes, sir.
16  Q   And didn't you, on every occasion, agree with the
17  IEP that the school system was proposing for
18  Justin?
19  A   I don't know, because there is times where Justin
20  did not meet his goals that he was supposed to
21  meet every year.
22  Q   Right. Every time -- at least 2003-2004,
23  2004-2005 every time you met with the IEP

Page 127

1   committee, didn't you sign that you were in
2   agreement with what the school system was
3   proposing?
4   A   Yes, sir.
5   Q   In paragraph 53, Plaintiff was subjected to sexual
6   harassment at the hands of a school official.
7   That school official was Charles Coon; is that
8   right?
9   A   Yes, sir.
10  Q   You're not contending that any other employee of
11  the Pike County Board sexually abused Justin, are
12  you?
13  A   No, sir.
14  Q   In 54, you said the Board knew or should have
15  known. Let me first explore "knew". I have asked
16  you before, do you have any information that the
17  members of the Pike County Board knew that Charles
18  Coon was abusing your son prior to June of 2005?
19  A   I don't recall.
20  Q   Do you have any information or facts that
21  officials of the Board, including Mr. Bazzell,
22  Casey, Pryon, and McDaniel, knew that Coon was
23  abusing Justin?

Page 128

1   A   I don't know.
2   Q   In 55, you indicated that these people remained
3   deliberately indifferent. What facts were
4   presented to Mr. Bazzell, Mr. Casey, Mr. McDaniel
5   or Mr. Pryon, that indicated Charles Coon was
6   abusing Justin that they were deliberately
7   indifferent to?
8   A   Can you explain further?
9   Q   Sure. In this paragraph 55 of your complaint,
10  you're saying that the Defendants were
11  deliberately indifferent to what was happening to
12  Justin. What facts were presented to Mr. Bazzell
13  or McDaniel or Pryon or Casey that Charles Coon
14  was abusing Justin that they were deliberately
15  indifferent to; that is, that they ignored and did
16  nothing about? What facts do you know of?
17  A   I -- I don't know. I think maybe that he was
18  checking out all the time.
19  Q   Well, you don't know that they knew that, do you?
20       MS. DePAOLA: Would you let her finish
21       her answer?
22  A   They were up at the office when Justin checks out.
23  Q   How do you know that?

Page 129

1   A   And then Mr. Casey seen Justin go down to the band
2   room several times on break time.
3   Q   How do you know that?
4   A   Because there was a time we had a Board member
5   when Justin got in trouble that Mr. Casey said he
6   done seen Justin go down there during break. He
7   seen Justin go down there during break time.
8   Q   And you heard that testimony, didn't you?
9   A   Yes, sir, I did.
10  Q   When you heard that testimony, did you tell the
11  Board or any of the officials there that you
12  thought that was ample grounds to suspect sexual
13  abuse?
14  A   No, sir.
15  Q   And you didn't suspect at the time that that was
16  grounds to believe that sexual abuse was going on,
17  did you?
18  A   No, sir.
19  Q   Because if you had believed that, you wouldn't
20  have continued to let Mr. Coon spend time in your
21  house unsupervised with your children, would you?
22  A   No, sir.
23  Q   And you wouldn't have let your daughter go to

Page 130

1   Greenville with Mr. Coon?
2  A   I trusted Mr. Coon.
3  Q   And paragraph 58, you indicate that the Defendants
4      had the duty to report child abuse and/or
5      suspicions of child abuse.  Do you have
6      information when these Defendants first learned,
7      had the first suspicion, that Charles Coon might
8      be abusing Justin?
9  A   No, sir.
10  Q   Well, would you agree that they didn't have the
11      duty to report child abuse or suspicion of child
12      abuse until that came to their attention?
13  A   I --
14  Q   I mean, they couldn't report child abuse or
15      suspected child abuse until they had some basis to
16      suspect child abuse, could they?
17  A   I -- I don't know.
18  Q   Well, as a parent of Justin, if you had reason to
19      believe child abuse took place, didn't you have
20      some obligation to contact DHR or law enforcement
21      officials?  Wouldn't you consider that part of the
22      parental responsibility?
23  A   Yes, sir.

Page 131

1  Q   And you never had suspicions, so you never
2      contacted DHR or police officials prior to June of
3      2005, did you?
4  A   No, sir.
5  Q   And paragraph 59, you indicate that a timely
6      report was not made when Defendants first knew or
7      should have known that the abuse of minor child
8      had occurred.
9      What's your belief of when they first had
10      information that Charles Coon was violating
11      Justin?
12  A   I don't recall.  I don't know.
13  Q   You have no idea, do you?
14  A   The only thing I would think would be was when
15      they are taking him off campus in his vehicle.
16  Q   In paragraph 70, you indicate that as a result of
17      Defendants' conduct, J.R. has suffered and
18      continues to suffer mental anguish, depression,
19      humiliation, embarrassment, regression in academic
20      skills, exclusion from his regular school
21      environment with no friends or support, ongoing
22      fear and confusion, all exacerbated by his
23      disability.

Page 132

1      For the 2006-2007 school year, was Justin
2      enrolled in the Troy City school system?
3  A   Yes, sir.
4  Q   Did he have an IEP?
5  A   Yes, sir.
6  Q   Did he make progress that year academically?
7  A   Yes, sir.
8  Q   So, he was in school, and he made progress
9      pursuant to his program there?
10  A   Yes, sir.
11  Q   Was that arrangement for Justin to attend Troy
12      City school system made in cooperation with the
13      Pike County school system?
14  A   Explain.  I mean --
15  Q   Sure.  Didn't Karen Berry work with you in
16      arranging for Justin to have his academic program
17      transferred from Pike County to Troy City?
18  A   No -- I --
19  Q   You know Karen Berry, the special ed coordinator
20      for Pike County, don't you?
21  A   Yes, sir.
22  Q   And aren't you aware that Karen Berry worked with
23      Troy City for Justin to enroll in the Troy City

Page 133

1      school system and have an IEP there?
2  A   No, sir.  The reason why Karen Berry made
3      arrangements with Troy City schools is because
4      Justin failed American History, and Justin had to
5      retake it, because Pike County on Justin's IEP
6      violated his IEP, because there was a time where
7      his history teacher did not modify his tests.  And
8      so Pike County violated his IEP.
9  Q   For the 2005-2006 school year, not during the
10      summer, but for that school year, Justin enrolled
11      in the Troy City school system, didn't he?
12  A   2005-2006, he started.
13  Q   And my question is:  Didn't Pike County and Karen
14      Berry assist in that transition for him to go to
15      Troy City for that school year?
16  A   Yes, sir.
17  Q   And right now Justin is undergoing counseling and
18      care and treatment, but that's all being paid for
19      under his Medicaid or Medicare?
20  A   Yes, sir.
21  Q   So, right now, you are not having to expend any of
22      your own money for this care and treatment that
23      Justin needs?

Page 134

1  A    On the treatment, the only payment we have got is
2       taking him back and forth.
3  Q    You asked for various damages in the Prayer for
4       Relief.  Do you know any basis by which punitive
5       damages can be awarded against the Pike County
6       Board of Education?
7            MS. DePAOLA:  Object to the form.
8  A    I don't know.
9            MR. SWEENEY:  And, counsel, if you know
10               of any case law or statutes that
11               allow punitive damages against the
12               public school system, I wish you
13               would share that with me.
14 BY MR. SWEENEY
15 Q    You asked for attorney's fees.  Have you paid any
16      attorney fees to date?
17 A    No, sir.
18 Q    For this complaint?
19 A    No, sir.
20           MR. SWEENEY:  Let me have just a minute.
21           (Brief recess.)
22 BY MR. SWEENEY
23 Q    Ms. Reed, when we started this deposition, I

Page 135

1       indicated that I would conclude by asking if you
2       wanted to supplement information that you have
3       provided to any previous question I have asked.
4       Do you want to supplement any answer that you have
5       given me?
6            MS. DePAOLA:  Well, I just would mention
7                she did mention to us on the
8                break --
9  A    Yes.  I know Blake Faulkner pressed charges
10      against Mr. Coon.  And it was on sodomy charges.
11 Q    I'm sorry.  What?
12 A    Blake Faulkner put a warrant out on Coon.
13 Q    Okay.  Anything else you want to supplement, any
14      information you want to supplement to any answer
15      that you have given to a question that I have
16      asked?
17           MS. DePAOLA:  Okay.  I want to remind
18               her that you immediately called to
19               our attention -- he asked you what
20               Mona Watson said happened.
21 A    Oh, Ms. Watson said that she used dolls to -- when
22      she had the meeting with Justin, she used dolls.
23      And when she used dolls, that Justin said with the

Page 136

1       dolls that he penetrated Justin.  Said he used
2       penetration -- that he -- you know, other like
3       mouth -- you know, oral sex with Mr. Coon.
4  Q    Okay.  Anything else that you want to supplement?
5  A    Uhm --
6  Q    So, to the best of your knowledge, you have given
7       me complete answers to all of the questions that I
8       have asked you?
9  A    To the best of my knowledge, I have.
10 Q    Thank you very much.
11
12           (Whereupon, at approximately, 1:40
13           p.m. on the 19th day of July, 2007
14           the deposition was adjourned for
15           the day.)
16           * * * * * * * *
17 FURTHER DEPONENT SAITH NOT
18           * * * * * * * * * *
19
20
21
22
23

Page 137

1
2              REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7       I do hereby certify that the above and foregoing
8  transcript of the deposition of ELIZABETH ANN REED was
9  taken down by me in machine shorthand on the 19th of
10 July, 2007, and the questions and answers thereto
11 reduced to writing under my personal supervision, and
12 that the foregoing represents a true and correct
13 transcript of the proceedings given by said witness
14 upon said hearing.
15      I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18      Dated this 9th day of August, 2007.
19
20           _____
21           Mary Moore-Wynn
22           Certified Shorthand Reporter
23

JR, A Minor                          July 19, 2007                 Pike County Board of Education

Page 138

## A

**able** 50:22 57:21 58:6,18,23 112:3
**abuse** 35:17 36:3 46:22 47:13 49:14,17 50:13 51:11 53:19 58:12 65:2 96:14 99:21 106:8 109:13 114:16 115:23 116:5 116:12,16,19 121:20 122:13 122:16 123:10 123:15 129:13 129:16 130:4,5 130:11,12,14 130:15,16,19 131:7
**abused** 25:15,20 27:5,10,21 28:14,16 33:13 34:11,16 35:15 45:13,15 50:4 50:8 51:18 52:3,7,13,21 52:23 53:4,7 55:23 65:8 69:22 72:14 91:23 117:20 127:11
**abusing** 29:12 29:16 30:13 34:19 48:6 49:14 50:19 51:14 53:10,15 59:17 60:5,12 61:17 73:7,18 74:8,14,17 94:4 100:4 104:19 117:1 118:1,9 125:7 127:18,23

128:6,14 130:8
**academic** 119:17 131:19 132:16
**academically** 132:6
**accept** 81:1
**access** 67:17
**accommodate** 81:2
**accompanied** 19:4
**accompany** 14:10,19 18:21
**accurate** 25:21 26:2 76:5,8
**accurately** 75:22
**accusations** 61:9 61:13
**act** 36:5 121:8 125:4
**acted** 124:11
**action** 137:16
**active** 13:20 15:6
**activities** 13:12 14:18 15:1 16:10 17:21 30:12 104:14
**actual** 19:7
**add** 6:10
**additional** 40:8 44:13 47:16 48:9
**address** 7:2 113:23 121:18 122:8 126:1
**adjourned** 136:14
**administer** 19:19
**administrative** 124:10
**admission** 56:4 56:9
**admitted** 56:3

60:8,19 61:3 61:10,14
**adult** 75:4
**advised** 20:9
**Advocate** 35:8 38:2
**affirmative** 123:6
**afraid** 42:5
**Age** 9:10
**agenda** 83:17,18 84:2,4,6,14,15 84:18 85:15,15 86:4,8,10,12
**agendas** 86:3
**ago** 94:15
**agree** 6:6 76:4 90:21 96:16 124:2 126:16 130:10
**agreed** 3:6,18 4:3
**agreement** 127:2
**Alabama** 1:19 2:6,10,15 7:3 23:10 137:4
**alarmed** 110:16
**alarming** 110:14
**Algebra** 89:17 89:20 91:11
**allegations** 69:22
**alleging** 100:3
**Allen** 2:9 11:21 11:23 42:5,8 96:21 101:11
**allow** 21:18 134:11
**allowed** 120:10
**alls** 47:8 59:19 120:8
**all's** 70:7
**alternative** 82:22 98:15
**amended** 4:17

25:7 92:12,15
**amendment** 91:5,7
**American** 133:4
**ample** 129:12
**analysis** 70:2,23 113:7
**analyze** 69:18
**Andrew** 44:23 45:2 46:9
**and/or** 121:19 130:4
**anger** 26:14
**anguish** 131:18
**Ann** 1:16 3:8,20 4:10 5:1,9 137:8
**annual** 92:7
**answer** 6:1,3,10 6:15 26:3 75:23 128:21 135:4,14
**answering** 6:22
**answers** 6:7 136:7 137:10
**anybody** 7:12 39:19 40:3 44:22 48:18 49:3,4 52:2,20 53:14 54:22 57:17 64:7,10 87:12
**anyplace** 63:21 65:19 67:11 81:10
**apart** 100:21 106:16 113:11
**apologize** 46:5
**APPEARAN...** 2:3
**appears** 102:22
**application** 105:17,19
**applies** 122:16 122:20
**appointment**

35:8
**appropriate** 89:9,15 94:8
**approving** 115:4
**approximately** 1:21 136:12
**April** 38:6 74:12 108:10,10
**Arant** 2:13
**Army** 98:11
**arrangement** 132:11
**arrangements** 20:21 133:3
**arranging** 132:16
**arrest** 37:13 60:11
**arrested** 8:9
**Ascherman** 45:3 47:6,8 57:6,7,8 57:14
**Aside** 100:18 106:14
**asked** 6:19 48:17 51:23 53:3,9 58:16 58:22 65:16 67:5 79:10 87:2 95:13 106:12 108:16 109:8 119:19 125:5 127:15 134:3,15 135:3 135:16,19 136:8
**asking** 5:18 26:20,22 41:13 42:9,10 95:5 109:23 120:14 125:8,18 135:1
**asserting** 113:17
**assist** 133:14
**assistant** 54:13 112:6 113:2,12 125:14

**assume** 6:1
**assumed** 56:19
**Atlanta** 19:2
**attached** 11:13
  25:3 90:12
  92:21
**attend** 59:4 88:7
  88:9,10 132:11
**attended** 88:12
  89:11 91:15
  93:20 114:22
  116:18
**attending** 89:23
**attention** 91:23
  94:13 98:8
  100:8 103:5,18
  111:4 117:4
  121:14 124:12
  130:12 135:19
**attorney** 2:5
  5:10 60:7,18
  60:23 69:18,21
  134:16
**attorneys** 12:16
  12:22 68:7
  84:4
**attorney's** 70:23
  134:15
**audio** 11:18
**August** 34:18
  73:14,17,21
  137:18
**AUM** 10:8
**authorized** 14:6
**Avenue** 2:10,14
**awarded** 134:5
**aware** 75:7,11
  75:15 99:9
  103:3 132:22
**Azar** 2:9,9
**a.m** 1:21 93:9

_____
    **B**
_____
**B** 2:6
**back** 13:1 39:23
  40:22 66:11

80:20 95:3
111:18 134:2
**backgrounds**
  99:18
**badger** 123:5
**badgering** 123:2
**band** 13:2,6,16
  13:20 14:4,7,9
  14:10,12,15,19
  14:22 15:1,6
  15:11,15 16:1
  16:4,7,7,10,11
  16:12 17:10,11
  17:12,20 18:1
  18:4,6,8,12,15
  18:16,18,20,21
  19:1,4,7,12,13
  19:14,21,21
  21:10 22:6
  30:12 41:15,15
  41:19 42:3
  67:3,12 73:2,5
  73:9,15 74:2
  75:16 79:12,13
  80:3,11,21
  81:9,21 82:13
  82:18,21 83:6
  84:21 85:11,21
  86:13 87:3,3,4
  87:6 106:5
  108:13,14
  109:17,21
  129:1
**banquet** 75:16
  76:16,19
**based** 45:23
  46:18 117:10
  124:3
**basis** 16:19 23:2
  27:3 101:17
  104:17 113:17
  121:9 130:15
  134:4
**Bazzell** 2:18
  55:3 77:1,3,6
  77:14 78:2,22

99:2,3,8,13,19
100:1,3 101:5
113:21 114:14
115:15,20
116:14 121:10
122:6 124:18
124:22 125:6
125:11 127:21
128:4,12
**Bazzell's** 100:8
  116:4
**beginning**
  119:16,22
**behalf** 14:6
**behavior** 26:14
  73:23 78:17
  112:16
**belief** 29:11
  131:9
**believe** 74:7
  79:6 90:23
  94:3 129:16
  130:19
**believed** 119:19
  129:19
**bell** 80:22
**Berry** 132:15,19
  132:22 133:2
  133:14
**best** 22:13,19
  23:17 61:22
  136:6,9
**beyond** 27:3,8
  96:18 101:21
  104:16 113:2
**bills** 56:23
**Birmingham**
  2:15 38:4
**Blake** 52:17,18
  52:23 67:8
  72:12,14 135:9
  135:12
**Blake's** 72:17
**blamed** 118:21
**block** 24:6
**Board** 1:12,18

5:11 10:15
12:12 25:18
53:19,22 55:7
55:8,12,13,20
74:19 77:11
95:12,14,15,17
96:1,5,11,15
96:19 97:3,6,8
97:9,12,12,14
97:22 98:2,9
98:15,19 99:4
100:11 105:20
106:9,20
113:15,17
116:1,5,6
122:6 124:10
127:11,14,17
127:21 129:4
129:11 134:6
**bodily** 122:8
  123:14
**body** 121:18
**booster** 18:6
**boosters** 13:20
  14:4,7,9 16:7
  16:10,12 17:10
  17:11,13 18:1
  18:4,8,12,15
  18:16 19:1
  22:7 30:9
**bothered** 116:11
**boys** 83:12 98:6
  98:6,12,13
**Bradbury** 35:9
  35:14,14 36:12
  44:19 45:12,12
  45:23 71:3
**Bradley** 2:13
**break** 63:23
  74:23 82:12
  94:23 104:2
  129:2,6,7
  135:8
**Brief** 64:1
  134:21
**bring** 24:12 67:2

68:8 77:6
79:18 80:2,4
88:13 90:4
94:6 103:17,20
**bringing** 79:12
**broad** 38:17,23
**broke** 108:13
**brought** 11:19
  61:16 77:2
  78:20 80:19
  94:13 100:7
  103:5 121:14
  124:12,15
**Brundidge** 7:3,4
  64:10,16
**Buddy** 78:10
  107:15
**bus** 14:12 15:11
  15:15,23 16:1
  16:3,4 18:18
**business** 120:11
  120:13
**Butler** 63:20

_____
    **C**
_____
**cabin** 62:17
  63:11
**cafeteria** 54:21
**call** 29:2,7,20
  32:7,17 33:8
  35:7 37:4
  71:19 80:3
  98:11 109:16
  109:20,23
  114:20
**called** 29:17
  31:19 34:5
  71:11,14,16
  108:14,19
  135:18
**calls** 33:1
**camp** 63:14
**campus** 24:2,3,4
  30:16,21 31:6
  62:3,5 74:22
  81:13 99:9,11

103:2 104:2
120:9 131:15
**capacity** 100:13
100:20 101:6
101:16 106:15
106:18 107:3,9
107:19 112:3,8
113:2,5,10
**caption** 93:1
**car** 18:20 21:2
21:22 30:3
62:11 63:5
65:19 66:17
79:11 80:18,20
120:20
**care** 56:1 119:6
133:18,22
**case** 1:9 3:19,22
7:13 8:8 47:9
95:20 134:10
**Casey** 78:6,7,22
102:15,16,22
103:1 104:1,5
104:18,21
105:3,14,23
106:13,15
107:3,9,16
121:13 122:6
125:6,12
127:22 128:4
128:13 129:1,5
**Casey's** 103:17
**Catrett** 82:17
84:10
**caught** 98:10
**causal** 125:3
**cause** 137:17
**cell** 32:2,2,8,10
32:13,16,20
33:2,6,16,18
33:20,22 34:3
34:7 54:1
71:12 108:15
108:17,18
109:2,6,12
110:4,7,8,9,21

111:8,12,20
**Center** 35:9
38:2
**Central** 45:2
57:16
**certain** 26:22,22
82:9
**certainly** 100:7
**Certificate** 4:12
137:2
**Certified** 137:22
**certify** 137:7,15
**change** 6:10
91:7,13
**changed** 71:9
**chaperone** 15:12
**charge** 117:19
**charged** 34:19
116:23
**charges** 61:17
135:9,10
**charging** 60:12
**Charles** 13:6
15:3 19:18
22:16,22 23:17
23:19 27:5,10
27:21 28:13,15
29:12,16,21,22
29:23 30:7,13
31:15,23 32:7
33:12 40:6,9
40:14 41:6,9
41:19 42:2,16
42:20,21 43:8
43:10,14,18
44:6,14,17
47:7,17,22
48:2 49:14
50:4,8 52:3,8
52:13,21 53:1
53:4,7,10,15
53:20 54:10,14
54:18,23 55:4
55:17,21 57:20
59:4,10,12,21
60:1,3,8,11,14

60:19 61:3,10
61:21 62:10
63:5,9 64:19
65:2,16,18
72:11,18 73:3
73:18,22 74:5
74:8,13,17
75:7 76:10,23
77:8,19,22,23
78:7,11,17,21
79:2 80:10
81:17 88:13
90:5 91:20
92:17 94:4,13
96:1,6,12,19
97:4 98:17,20
100:1,4 102:17
104:6,18
112:14,15,23
114:16 116:22
117:5,20 118:1
118:9 119:3,20
120:1 124:22
125:15 127:7
127:17 128:5
128:13 130:7
131:10
**check** 68:14,18
116:11 119:7
**checked** 99:17
**checking** 104:13
128:18
**checks** 14:6
128:22
**child** 9:8,16,22
94:7 109:12
117:21 118:2
130:4,5,11,11
130:14,15,16
130:19 131:7
**children** 8:20
13:5,10 48:1
66:19 67:11,16
73:7 109:16
111:5 119:4
129:21

**children's** 13:12
35:8
**chronology** 39:3
**circumstance**
8:5
**City** 132:2,12,17
132:23,23
133:3,11,15
**Civil** 3:9
**claiming** 7:14
**class** 80:23 82:4
82:11,21 83:6
83:9,10,16,19
83:22 84:11,20
85:10,14,20,21
86:13 87:6
**clear** 5:22 73:12
76:21,21 95:7
101:10 102:12
102:13,13
124:8
**client** 5:21
101:19
**clients** 25:17
**close** 93:11
**closely** 14:3 15:3
**Coach** 85:5
**coerced** 58:14
120:6,15
**college** 9:15 10:7
**come** 13:1 15:18
24:13,17 39:22
48:6 51:15,20
60:7 73:5
78:16 80:6
85:19 91:23
97:2 98:8
111:4 117:4
119:1
**comes** 62:6
**coming** 62:6
106:9
**commencing**
1:20
**commission**
3:11

**Commissioner**
1:17 3:10
**committed**
53:20
**committee** 88:1
89:2,5 90:21
127:1
**committing**
60:15
**communicate**
69:4 109:17
**communicated**
69:14
**communication**
59:23 68:1,4,6
68:19 70:6
101:11
**complain** 32:22
66:13 73:22
74:18 125:20
**complaint** 4:17
5:20 12:6,13
25:6,7,9,12,17
25:21,23 26:2
26:6,8,9 27:4,7
27:12,13,17,20
28:6,9,11
37:16 64:5,22
77:2 78:16,20
78:23 94:16,22
95:6 97:17
99:7 101:2
102:22 106:8
107:2,8 108:3
112:11 113:14
114:18 120:17
124:12,15
128:9 134:18
**complaints**
115:20
**complete** 6:3
136:7
**complicated**
40:11
**compound** 96:4
**computer** 67:14

67:17,19,20,21
67:22,23 68:2
68:12,14,18,20
68:23 69:4,13
69:19,23 70:9
70:18,19 71:1
71:2,4 109:22
**computers**
69:12 70:7
**concern** 31:7,22
32:5 75:3
76:22 77:2,6
78:17,20 81:17
87:10 88:13,22
92:1 94:12
97:4 103:17,20
111:13,14,22
112:22 115:19
121:3
**concerned** 87:14
88:23 89:3,8
89:14 111:11
**concerning** 7:21
7:23 12:22
31:15 54:23
59:7 78:5,10
78:13,15 98:19
99:2 116:19
124:16
**concerns** 31:15
78:1,6,11 81:5
88:2 89:5 90:4
90:7 91:19
92:17 94:6
103:14 111:4,6
114:15 115:9
115:14
**concession** 16:6
16:8,15,22
17:7
**conclude** 135:1
**conduct** 26:22
31:16 78:17
81:16,16 82:2
112:23 113:16
117:5 120:7

125:16 131:17
**conducted** 48:3
**confessed** 60:4
**confidence**
66:16
**confidential**
47:4
**conflict** 89:18
**confused** 61:4
96:8
**confusing** 37:17
**confusion** 42:6
131:22
**connection** 40:1
**conscientious**
30:11 111:2
**consider** 130:21
**considered**
105:23
**constitutional**
124:9
**contact** 130:20
**contacted** 131:2
**contending** 27:9
97:6,14,18
98:18 99:3
100:20 102:15
103:6 106:17
107:21 112:7
127:10
**contention** 27:4
104:18 108:4
112:2,12
**contentions**
27:20 64:5
95:7 102:21
114:4
**continue** 15:6
**continued**
129:20
**continues**
131:18
**convenience**
21:16
**conversation**
33:11,23 36:6

72:1
**conversations**
12:10 54:16
60:21 68:9
**Coon** 13:6 14:3
15:3,8,23 16:4
18:15 19:18,22
20:2,9,20
21:10,18 22:3
22:7,16,23
23:4,9,17,19
23:21 24:7,11
24:13,21 27:5
27:10,21 28:14
28:15 29:12,16
29:21,22,23
30:7,13,15
31:1,2,15,23
32:1,7,19,22
33:2,5,12,15
33:17,20 34:2
34:7,11,16,18
35:22 36:6,23
37:14 38:1
39:7,9 40:6,9
40:14 41:7,10
41:19 42:2,16
42:20,21 43:9
43:10,14,18
44:6,14,18
47:7,17,22
48:2,5,6,12,19
49:5,9,14,22
50:4,8,13,19
51:14,18 52:3
52:8,13,21
53:1,5,7,10,15
53:20 54:10,14
54:18,23 55:4
55:17,21 57:20
58:12 59:1,3,4
59:10,12,21
60:1,3,14,19
61:3,5,7,10,17
61:21 62:1,6
62:10 63:5,11

63:15,19 64:19
65:2,9,16,18
66:6,13,16,18
66:20,22 67:1
67:4,5,8,10
68:2,9,15,16
68:17,19 69:4
69:6,7,10,22
70:7,12 72:8
72:11,15,19
73:3,6,18,22
74:5,8,14,17
75:7 76:10,23
77:8,19,22,23
78:7,12,17,21
79:2,7,8,9,11
79:18 80:10,13
80:16 81:2,7,9
81:12,17,22
82:1 86:22,23
88:13 90:5
91:20 92:17
94:4,13 96:1,6
96:12,14,15,19
97:4 98:17,20
99:14 100:1,4
102:17 103:10
103:12 104:4,6
104:18 105:13
105:16 106:1,3
106:8 108:14
108:19,20,21
109:6,16,20
112:14 114:16
116:18,22
117:5,11,13,15
117:20 118:1,3
118:6,9,23
119:3,7,20
120:1,6,9,12
120:19,23
121:6,8 124:13
124:16,22
125:7,15 127:7
127:18,22
128:5,13

129:20 130:1,2
130:7 131:10
135:10,12
136:3
**Coon's** 21:2
37:12 60:11
63:9 80:18,20
82:5 105:19
108:15,17
109:2 110:7
111:8,11,20
112:15,23
**cooperation**
132:12
**coordinator**
132:19
**correct** 21:16
26:18 29:13
30:5 31:6
48:21 68:23
75:4 78:4 88:7
88:10 95:16
107:4 120:21
137:12
**correspond** 40:2
**correspondence**
11:18
**counsel** 3:7,19
4:4 12:7 134:9
137:15
**counseling** 38:2
57:23 133:17
**counselor** 44:23
45:2 46:11,16
47:5
**County** 1:12,18
5:11 7:3 10:3,4
10:15 11:1
12:11 19:6,13
25:18 53:19,22
54:3,17,22
55:8,11,13
63:21,21 74:3
74:19 75:8,20
77:11 93:9
94:7 95:12,23

JR, A Minor                    July 19, 2007                Pike County Board of Education

96:5,11,19
97:3,8,9,11
98:9,18 99:4
102:16 105:20
106:5,9,14,20
107:16,20
112:6 114:6
115:6,16 116:1
116:6,20
121:20 122:13
127:11,17
132:13,17,20
133:5,8,13
134:5 137:5
**couple** 66:10
92:5 111:8
**court** 1:1 26:21
59:9 61:11
**covered** 61:20
**crime** 60:15
**crimes** 116:23
**criminal** 59:5
**CSR** 3:10
**current** 8:18
**custodian** 54:21
**customs** 124:7

_____

**D**
**DA** 61:4
**daddy** 72:17
**damages** 26:11
26:17,18
125:18,20
134:3,5,11
**date** 37:2,9,20
42:1 90:17
92:6,8 93:12
93:14 134:16
**dated** 93:4
137:18
**dates** 34:21
92:11
**daughter** 22:17
66:17 119:6
129:23
**day** 20:3,10,17

81:20 86:5
111:16,17
136:13,15
137:18
**days** 37:6
**deal** 58:2
**dealing** 31:23
**dealings** 46:19
71:20,23 72:2
**Deanie** 2:9
**December** 74:11
105:2
**declined** 102:4
**defendant** 1:14
2:12 7:16
**defendants** 5:12
7:13 12:11
25:11,18 26:21
101:15 121:7
121:17 122:7
124:6 125:4
126:1 128:10
130:3,6 131:6
131:17
**Defendant's**
4:15,16,17,18
11:11,14 25:1
25:5 90:10,15
91:2 92:19,23
94:17 122:6
**defer** 95:10
**deliberately**
128:3,6,11,14
**denied** 108:20
**Denise** 72:5
**DePaola** 2:5
19:10 22:21
25:22 26:3
27:6,11,15,23
28:3,7,10,18
28:23 34:21
36:2,4,11 38:8
38:16,20,23
39:4,15 43:23
44:8,11 45:8
46:7,13 50:5

51:10 52:9
63:23 75:10,12
75:21 76:3,8
81:19 91:6
92:9 96:3
97:10,16 98:1
98:21 99:6
101:1,12,23
102:4,7,13,19
103:21 106:22
107:5,11 108:2
112:10,18
113:6 114:17
116:8 117:7
118:11,18
120:2 121:21
122:1,10,14,23
123:7,17
124:20 126:4
128:20 134:7
135:6,17
**Department**
35:10 64:8,11
64:16
**DEPONENT**
136:17
**deposed** 5:13
**deposition** 1:16
3:7,9,14,20,21
4:5,15 5:16,18
6:9,14,16
11:15,22 12:15
26:6 58:16
102:2,9 134:23
136:14 137:8
**depressed** 26:14
39:20 46:17
**depression**
46:17 47:9,10
47:12 131:18
**describe** 58:18
**description** 4:14
100:14 105:7
**details** 39:12
47:16
**determine** 64:3

70:20
**develop** 113:22
**developed** 87:21
**development**
110:14 114:5
**DHR** 29:2,3,17
71:7,8,8,19
130:20 131:2
**diligently**
124:11
**directly** 39:16
**director** 106:5
**disability**
131:23
**disciplined**
83:11
**discovery**
101:13
**discuss** 34:8
59:1 65:7
72:13
**discussed** 72:10
94:3 102:21
**discussing** 20:20
91:17
**discussions**
59:23 72:8
95:19
**dismiss** 101:14
102:1
**distance** 79:15
**district** 1:1,2
60:7,18,23
69:18,21 70:23
**doctor** 46:10
56:11,13
**doctors** 56:2,15
**document** 85:13
91:2
**documentary**
12:5 84:13
85:8
**documentation**
83:15 85:12
**documents** 4:16
12:17 81:11

84:8
**Doe** 122:7
**dog** 8:1,6
**dogs** 7:21,23
16:17
**doing** 10:16 17:6
40:22 59:13,15
60:8,19 61:3
77:23 78:8,8
78:12,12 86:19
96:2 102:18
114:8 121:8
**dollar** 125:19
**dolls** 135:21,22
135:23 136:1
**Donald** 2:13
5:10 27:13
38:23 42:8
92:10 103:22
122:23
**Dr** 2:18 45:3,4
46:8 47:6,8,11
47:12 56:14
57:6,6,7,16
**drinks** 16:16
**drive** 21:11,19
21:21 23:6,9
23:12,15 24:4
24:6,8 30:3
65:19,21 66:19
79:3,9 80:10
80:20
**driven** 62:5
65:16
**driving** 18:20
23:21 31:5
79:7 80:14
81:2,21
**dropping** 18:15
**drove** 22:7,16,23
24:2 81:9,12
120:19
**duly** 5:3
**duties** 100:15,18
105:8
**duty** 100:21

Mary Moore-Wynn, CSR                    Mary Moore-Wynn                    (334)244-0203
                                        Court Reporting Services

130:4,11

**E**

**EAR** 1:4
**earlier** 43:7
   81:20 95:13
   119:19 125:5
**easily** 58:5,14
**East** 45:2 57:16
**eat** 39:22 95:1
**eating** 39:23
**ed** 114:5,11
   122:17,18
   126:13 132:19
**educating** 94:7
**education** 1:13
   1:18 5:11
   10:15 53:19,22
   55:8,12,13
   74:19 77:12
   87:15,18 89:9
   91:4 95:13
   96:1,6,11 97:3
   97:12 98:9
   99:5 105:21
   106:10,21
   114:1,8,15
   115:5,15,21
   116:1,6 122:11
   125:23 126:10
   134:6
**educational**
   89:15
**effect** 79:4
**either** 3:16,23
   49:8 83:11
**Elizabeth** 1:16
   3:8,20 4:10 5:1
   5:9 93:16
   137:8
**embarrassment**
   131:19
**employed** 10:10
   10:12,14 53:21
   116:20
**employee** 12:11

74:19 75:8
   127:10
**employees** 53:18
**employment**
   10:9 11:7
   75:19 76:11
   101:22 105:20
   106:4,16,20
   113:11
**encountered**
   26:11
**endeavor** 6:7
**enforcement**
   130:20
**engage** 82:1
   113:18 120:6
**engaged** 65:2
**engaging** 26:21
   124:23 125:15
**English** 82:15
**enjoin** 26:21
**enroll** 132:23
**enrolled** 132:2
   133:10
**entire** 29:10
   73:13 105:3
   123:18
**entirely** 29:21
**environment**
   94:8 131:21
**essentially** 93:22
**evaluation** 45:6
**everybody** 53:5
   115:12
**everybody's**
   123:21
**evidence** 3:15
   84:8,13 85:9
**exacerbated**
   131:22
**exact** 43:5
**exactly** 60:3
   76:5
**Examination**
   4:11 5:6
**example** 121:9

**exclusion** 131:20
**Excuse** 36:13
   44:1
**Exhibit** 4:14,15
   4:16,17,18
   11:11,15 25:1
   25:6 90:10,15
   92:19,23 94:17
**EXHIBITS** 4:13
**exists** 85:15
**expend** 133:21
**expenses** 56:20
**explain** 27:2
   40:10 48:4
   57:12 60:10
   68:22 77:4
   79:6 86:9 96:9
   126:6 128:8
   132:14
**explanation**
   18:3 81:1
**explicit** 45:14
**explore** 127:15
**express** 115:10
   115:14,19
**expressed** 18:14
**extent** 21:18
   40:13 95:8
**e-mail** 68:6

**F**

**fact** 60:4 109:11
   111:11
**facts** 76:4
   104:17 108:4
   112:2,12 113:3
   113:9 127:20
   128:3,12,16
**failed** 121:8,15
   126:1 133:4
**failure** 125:4
**fair** 29:20 118:8
   118:14,20
**fairly** 23:2 25:9
**fall** 15:21,22
**family** 56:11,13

70:7
**far** 10:9 79:13
   79:13 80:13
   85:8,16,18,18
   87:5 89:2,8,14
   122:20
**fashion** 74:18
**FATHER** 1:4
**Faulkner** 52:17
   67:8 72:12,14
   135:9,12
**fault** 117:23
   118:15
**fear** 131:22
**February** 74:11
   91:13 92:3
**Federal** 2:14 3:8
**fees** 134:15,16
**felt** 74:21
**Fernell** 45:8
**field** 19:1
**Fifth** 2:14
**figure** 125:19
**filed** 5:13,21
   7:13 25:7
   36:23 37:12
   60:11 61:4
**filing** 3:20 4:1
**find** 28:18,23
   43:9 58:17
   68:8 70:6 86:2
   87:2 109:16,21
   110:6 117:23
   118:8
**finding** 55:23
**findings** 71:1
**finish** 6:16
   103:21 128:20
**finished** 82:17
**fired** 11:9
**first** 4:16 5:2,16
   28:13,15,18,23
   29:15 73:14
   93:1 94:12
   102:2 103:16
   120:1 123:18

127:15 130:6,7
   131:6,9
**fish** 62:13
**fishing** 62:13
**fits** 6:18
**five** 43:2 82:12
**five-month**
   108:6
**fixing** 12:18
   80:2 82:12
   88:15
**flags** 19:14
   62:21
**Florida** 19:2,14
   23:15 62:19
   67:4,5,9
**follow** 109:4
   111:5
**follows** 5:4
**follow-up** 42:18
**fondle** 49:22
   117:13
**fondled** 35:20
   35:22,22 38:1
   39:6 40:16
   41:1,10,19
   42:2,21 43:20
   81:23 117:11
   117:16
**fondling** 45:16
   59:16
**food** 94:19
**football** 14:18
   16:8,16,22
   18:22 19:6
**forced** 120:15
**foregoing** 137:7
   137:12
**form** 3:12 19:10
   22:21 25:22
   27:7 36:2,4
   38:16 74:18
   75:10,12,21
   97:16 98:21
   99:6 101:1
   102:19 106:22

JR, A Minor                                July 19, 2007                      Pike County Board of Education
Page 144

107:11 108:2
112:10 113:6
114:17 116:8
117:7 118:11
118:18 120:2
122:14 123:17
124:20 134:7
**formal** 121:18
122:7
**formality** 3:11
**forth** 1:20 134:2
**forward** 73:6
**found** 43:8 70:8
70:20 71:3
111:19 114:2
118:15
**four** 8:22 13:10
79:20,22 81:11
121:2
**Fourteen** 10:2
**fourth** 9:22
**friends** 131:21
**front** 98:14
**full** 6:3,7
**function** 126:14
**functions** 19:7
**fund** 16:12
**funny** 74:21
**further** 3:18 4:3
39:12 87:1
92:5 110:23,23
128:8 136:17
137:15

**G**
**game** 18:22
**games** 14:18
16:8,16,22
19:6
**gay** 70:9,14,16
70:18 71:3
**general** 106:12
**generally** 52:11
52:12
**generated** 70:12
**Georgia** 62:21

**getting** 71:18
115:16
**give** 6:7,14
19:18,22 20:3
20:9 33:17
34:7 39:2 43:5
45:14 59:9
79:15 110:9
**given** 6:11,16
20:21,22 32:8
32:13,19 33:2
33:5,15,20
99:23 101:19
135:5,15 136:6
137:13
**giving** 32:2
108:20 110:21
**go** 10:3,7 14:14
19:1 27:16
39:18,21,23
40:22 54:2
62:8 63:10
66:17,22 67:4
67:5,7 69:8
82:4,4,10,13
82:18 84:20
85:1,3,10
86:13,22,23
87:6 94:22
98:14,15
111:18 129:1,6
129:7,23
133:14
**goals** 126:20
**goats** 8:6
**goes** 9:15 27:7
47:13
**going** 6:4 18:7
24:1 31:13
33:17 34:7
62:5 67:8
76:17 82:20
83:6 85:21
88:3,20 94:21
95:5 99:9,14
101:16 103:3,9

104:14 110:20
114:6 121:11
125:19 129:16
**graduate** 10:5
**Greenville** 23:10
63:20 65:22
66:7,17,23
67:11 130:1
**grossly** 124:7
**grounds** 129:12
129:16
**guess** 58:1
117:11
**guilty** 59:12,15
59:17,20 60:5
60:14 61:8
116:23 117:1,5
118:8
**Guntersville**
62:15

**H**
**Hall** 54:9
**hands** 127:6
**happen** 21:8
22:1 34:23
37:14 40:23
79:17 81:18
82:23 83:21
84:17
**happened** 22:19
35:3 36:9,14
36:17,19,22
37:18 38:1,12
38:18 41:11,14
41:16,21 42:2
42:13 45:22
46:1 49:11
50:2,11,16
51:3,9 58:3,11
58:17,18,22
65:10 73:3
83:22 84:6
86:7 118:5,15
118:21 135:20
**happening**

50:17 51:3
103:15,16
128:11
**happens** 86:4,5
**harassment**
127:6
**heard** 29:15
106:7 110:3,9
110:12 117:8
129:8,10
**hearing** 59:4,5
61:7 98:10
137:14
**help** 16:12
**helped** 58:2
**helpful** 35:6
**hereto** 3:16,23
11:13 25:3
90:12 92:21
**hey** 30:20
**high** 10:3,4,5,7
19:13 54:3,17
54:23 74:3
93:9 102:16
104:21 105:7,9
106:5,14
107:16,20
112:6 115:16
**hire** 105:9
**hired** 105:13
106:1 114:10
**hiring** 99:16
**history** 85:1,3,4
133:4,7
**home** 9:4,12,20
9:23 21:1,12
21:19,22 22:8
22:18 23:1,6
23:20 24:12,13
24:15,22 50:14
65:17 67:2,14
67:19 69:23
80:1 117:2,6
117:12,16,19
118:2,23
**Hon** 2:5,9,13

**hospital** 38:15
56:3,7
**hot** 16:17
**hours** 66:10
81:10,13,18
**house** 21:3 50:1
50:20 51:9
62:2,6,7,11
63:6,9 65:22
118:7,10,16
119:1,3,10,15
129:21
**Hubbard** 29:4,5
29:6,7,17
31:18 32:1
33:1,9,11,12
34:5 35:1,4,7
36:9,11 44:19
45:9 71:21
72:3
**Hubbard's** 37:4
71:5
**Huh** 28:2 70:15
79:21 121:23
**Human** 71:10
**humiliation**
131:19
**hush-hush**
120:11

**I**
**idea** 105:6
131:13
**identification**
11:12 25:2
90:11,15 92:20
**identified** 94:16
**IEP** 87:21 88:1
89:2,5,12,22
89:23 90:4,21
91:19 92:7,16
93:8,11,20
114:22 115:1,2
115:5,11,12,13
126:3,5,9,14
126:17,23

132:4 133:1,5
133:6,8
**IEPs** 88:7,9,12
115:4,9
**ignored** 121:11
121:15 128:15
**II** 91:11
**III** 89:20
**ill** 18:14
**immediately**
110:13 124:19
135:18
**impede** 6:22
**implement**
113:23
**impression** 43:2
**improper** 118:9
**inaccurate**
75:13
**Inapp** 61:15
**inappropriate**
49:5 59:16
69:16 81:16
82:3 113:16
120:7 121:5
125:16,23
**incident** 44:9
**includes** 114:18
**including** 56:8
127:21
**incurred** 56:19
**independent**
72:21
**INDEX** 4:9,13
**indicate** 33:12
113:14 120:5
121:17 123:12
124:6 125:22
130:3 131:5,16
**indicated** 23:18
26:5 83:19
101:12 128:2,5
135:1
**indicating** 37:23
91:12 122:22
**indicative**

109:12
**indifferent**
128:3,7,11,15
**individual** 91:3
100:13,20
101:6,15
106:15,18,18
107:3,9 112:3
113:5,10 115:5
**Individualized**
87:18 126:10
**inflicted** 58:12
**information** 6:5
6:17 28:15
29:11 34:10
39:12 40:6,8
42:19 43:8
44:5,13,17
45:14,19 47:4
47:7,21 48:2,9
48:20 49:2,8
63:8 64:4,18
64:20 68:11
69:18 72:17,18
72:21 81:5
87:9 95:10,23
97:1 99:23
100:3,7 101:4
101:6 104:5,10
107:1,2,7,13
110:12 112:20
117:15 125:6
125:11,14
127:16,20
130:6 131:10
135:2,14
**initials** 91:12
**injunctive** 25:10
25:19 27:1
**injured** 7:14
**injuries** 125:5
**innocent** 87:9
**inquire** 87:1
**inservice** 116:15
116:18
**insisted** 102:1

**insufficient**
124:7
**insurance** 57:3
**integrity** 121:18
122:8 123:14
**intelligence**
58:11
**interested**
137:17
**interim** 107:15
**Internet** 70:21
**interpretation**
95:9
**interrupting**
103:23
**interval** 108:7
**interview** 72:3
**introduced** 3:22
**investigate**
109:9 111:21
113:16 121:15
**investigated**
99:15,16
103:10 124:18
**investigating**
69:21 110:23
**investigation**
103:4 108:9
109:1 111:1
124:23
**investigations**
113:19
**invited** 88:5
**involved** 7:20
13:2,5,11,16
15:1 17:20
30:11 98:6
**IQ** 114:9
**issue** 18:11
**issues** 5:20 12:6
12:12 37:15
64:21 77:18
107:12 121:18
122:8 126:2

_____ **J** _____

**jail** 60:15,17
**January** 74:11
107:22 108:7
**Jennifer** 72:7
**Jeremy** 9:1
**Jessica** 9:9 13:9
21:21 22:4,8
32:19,22 48:5
49:2,15 53:11
65:18,19,21
66:7,9,13,22
67:2,4,5,16
68:15,16,17,19
68:23 69:13
72:6 117:10,13
**Jessica's** 68:14
**Jessie** 86:3
**job** 11:9 71:9
100:14 105:6
**Jocie** 119:2
**Joseph** 9:23
49:18,20 50:7
50:8,13,16
51:8,14,15,18
51:20,23 52:13
53:11
**JR** 1:4
**judgment** 22:13
22:19
**July** 1:17 34:14
136:13 137:10
**June** 29:9,17
30:14 31:19
32:17 37:3
40:5 43:16
54:1 56:16,21
60:1 64:6
65:11 71:11,23
73:5 76:22
77:1,7,15 78:4
78:18,22 94:12
95:22 96:6,12
96:20 97:2
98:20 100:5
102:18 125:10
127:18 131:2

**Justin** 9:17 13:2
19:19,21,22
20:4,9,12,21
21:1,11,19
22:3,7,23 23:5
23:10,19,21
24:2,2,8,12
25:12 27:4,10
27:21 28:16
29:12,16,23
30:3,14,16
31:16,23 32:2
32:8,10,13,16
32:20 33:2,3,6
33:13,16,17,17
33:20,22 34:2
34:7,12,15
35:11,15,22,22
36:16 37:11,13
37:18,23 38:2
38:3,13,21
39:5,6,9,13,16
39:17,18 40:5
40:8,13,15,16
40:23 41:5,13
41:22 42:3,12
43:5,9,11,14
43:19 44:6,14
44:15,18 45:7
45:13,20 46:19
46:21 47:5,7,8
47:9,17,18,22
48:3,6,12,19
49:5,9,14,22
50:13 51:11,14
52:14 53:20
54:11,14,19
55:1,5,18,21
55:23 56:7,20
57:4,19 58:8
58:10,13,16
59:17,20 60:12
60:20 61:8,21
62:1,8,10 63:5
63:8,14,20
64:19 65:3,8

65:16 67:2,2
67:16,21,22
68:1,10 69:12
69:22 70:20
72:4,19 73:3
73:15,18 74:2
74:8,14,17
77:20,22 78:1
78:8,13 79:3,7
79:10,10,19
80:1,8,14,18
81:9,13,17,23
82:2,9,13,20
83:12 85:10,19
86:19 87:2,15
88:2,15,20
89:9,16,20
90:2 94:4,8
97:7 98:4,7,10
98:10,13,14,20
99:14 100:4,23
102:18 103:8
103:11 104:3,6
104:19 108:9
108:11,13,13
108:18,20,21
109:1,6 110:4
110:7,9,12,20
111:11,15,20
112:8,23 114:6
114:12,22
115:5,8,16
117:2,11,12,13
117:16 118:10
119:19 120:1,5
120:9,12,19,23
124:13 125:7
125:16 126:13
126:18,19
127:11,23
128:6,12,14,22
129:1,5,6,7
130:8,18
131:11 132:1
132:11,16,23
133:4,4,10,17

133:23 135:22
135:23 136:1
**Justin's** 32:3
35:10 36:21
46:16 59:16
67:23 68:12
70:19 71:2,4
81:1 84:7 89:6
90:7 97:23
99:5 107:23,23
108:5,17
112:13,15
115:20 125:22
126:5,7 133:5
**J.R** 25:11,20
131:17

——————— **K** ———————
**K** 84:9
**Karen** 132:15
132:19,22
133:2,13
**kept** 67:19
**kids** 67:20 111:8
**killed** 8:6
**kind** 31:15
63:11 98:19
**knew** 31:5 33:5
34:18 46:1
75:18 80:13,13
80:16 95:14
96:1,1,2,6,19
96:22 104:5,18
106:12 108:17
119:9 121:10
127:14,15,17
127:22 128:19
131:6
**knives** 98:12
**know** 17:17 18:5
26:4,8 27:1
28:17 30:20
31:9 32:7,11
33:5 34:2,6
35:13,13 37:9
37:9 39:20

40:15 43:4
45:17 46:18,23
49:9 50:20
51:4,5,7 52:2
52:11,12,20,23
53:14 54:5
55:7,12 57:22
58:7,8,11,13
58:21 59:12,21
60:3 61:16
63:4,14,19
64:17,20 65:6
65:10 68:21
70:8,13,22
71:14,16,18
75:2 76:2,6,10
76:14 79:15,16
80:16 81:8
82:6,8,14,19
84:17 85:6,8
85:17,18,23
95:16 96:5,8
96:18,21 97:1
97:19,20 99:10
99:19,23
100:10,14,15
101:3 102:20
103:16 104:13
104:21 105:6
105:10,13,16
105:23 106:3
106:23 107:5
107:14 109:3,3
109:5,8,14,19
110:9 112:19
113:13,20
114:10,21
116:4,9,10,14
116:17,18,21
117:1,3,8,10
118:5,5,17,19
118:22 119:21
119:23 120:4,8
120:8,16,18,19
120:21 121:1
121:12,16

122:15,16,20
123:10,11,12
124:5,9,14,15
124:18,21,22
125:2,17 126:4
126:19 128:1
128:16,17,19
128:23 129:3
130:17 131:12
132:19 134:4,8
134:9 135:9
136:2,3
**knowing** 104:9
**knowingly**
121:7
**knowledge**
23:17 24:8
43:13 49:3,13
65:11 71:2
72:16 82:16
95:22 98:19
102:17 103:11
124:4 125:7
136:6,9
**known** 96:12,15
104:16 127:15
131:7

——————— **L** ———————
**lake** 23:12,12
62:11,13 63:11
67:11
**language** 120:17
**late** 89:19
**law** 2:5 130:20
134:10
**lawsuit** 5:12
7:10,14,16
12:18,22 25:8
27:9 101:14
**lawyer** 95:9
**lawyers** 114:4
**lawyer's** 124:3
**learn** 28:13
52:18
**learned** 34:14

47:17 54:1
96:13 130:6
**learning** 87:8
**leave** 62:7 83:10
85:10
**leaving** 83:5
85:14,20 86:13
99:10
**left** 63:10 119:3
120:11
**legal** 95:8
107:12 113:7
**legitimate** 87:5
**legs** 48:13,20
**letter** 18:6
**letters** 105:17
**level** 114:9
**Lexapro** 47:10
**licensed** 46:11
**light** 49:10
**line** 101:21
**listen** 88:18
**live** 9:4,12
**lives** 9:20,23
**long** 7:7 8:14
10:20 25:9
27:16
**look** 69:23
119:16 122:5
**looked** 123:15
**Lopez** 57:16
**lost** 19:11
**lot** 30:7 109:15
**Love** 1:19
**Lunch** 95:2

——————— **M** ———————
**machine** 137:9
**mad** 18:11
**mama** 30:11
80:4
**man** 30:17 51:1
75:1
**manner** 3:23
35:16 97:21
98:2 105:11

**March** 74:11
**Mark** 2:18 55:3
  77:1,3,6,14
  78:1 99:2
  121:10
**marked** 11:12
  25:2,5 90:11
  90:14 92:20
**marriage** 8:18
  8:20
**married** 8:11,14
  8:16
**Mary** 1:17 3:10
  137:21
**math** 89:20 91:8
  91:11,17
**matter** 109:9
  124:19 125:1
**matters** 5:19
**McCloud** 72:5
  72:10
**McDaniel** 78:15
  78:16,22 89:18
  89:19 112:5,13
  112:21,21
  113:10 121:13
  122:7 125:6,13
  127:22 128:4
  128:13
**meals** 24:15
**mean** 22:15
  26:13,15 27:13
  27:15 30:16
  31:9,20,20
  36:5 38:10
  39:15,16 44:8
  48:4 51:7 55:9
  56:22 57:23
  58:7,13 59:19
  60:10 62:4
  64:23 65:1
  68:21 69:8
  70:16,16 71:9
  75:1 76:3 77:4
  77:5 81:10
  83:22 86:9

87:8 96:8,9
99:11 103:1,4
103:9,19 104:1
104:11 105:9
110:19 112:14
114:6,11,20
118:14 119:11
119:12,14
126:6,11
130:14 132:14
**Medicaid** 57:4
  133:19
**medical** 45:3
  56:2,2,19,20
  56:23 57:3
**Medicare**
  133:19
**medication** 6:21
**medicine** 19:19
  19:23 20:4,10
  20:12,15,22
**meet** 60:18,20
  80:11,15 81:21
  87:20,23 90:21
  126:20,21
**meeting** 4:18,19
  12:16 88:1
  89:12 90:4
  91:15,18 92:7
  92:14 93:2,8
  93:20 94:9,11
  108:12,16
  110:3,10
  111:10,17
  115:2 135:22
**meetings** 92:16
  114:22 115:1
  115:11,12,13
**member** 13:20
  17:10,11,12,15
  17:23 55:20
  95:15,23 96:5
  96:11,15,19
  129:4
**members** 15:15
  16:1 55:7 70:6

95:14,16 97:3
97:6,9,13,14
97:22 98:3,18
113:18 127:17
**memorandum**
  11:17
**mental** 131:18
**mention** 116:22
  135:6,7
**mentioned** 31:6
  48:23 56:1,17
  57:5,14 72:20
  75:16 79:2
**messages** 69:6
**met** 60:20 87:22
  92:2 126:23
**Michael** 2:19
**MIDDLE** 1:2
**midway** 91:4
**mind** 15:19
  26:16 28:21
  30:20 125:19
  126:8
**minor** 1:4 131:7
**minors** 60:5
  61:18
**minute** 13:1
  94:15,21 118:5
  134:20
**minutes** 74:23
  82:12
**mischaracterize**
  102:10
**mispronounce**
  44:1
**Misty** 29:4,6
  44:19 71:5
  72:3
**MLF** 1:10
**modify** 133:7
**mom** 72:6
**Mona** 43:15,17
  43:23 44:1,2,3
  44:7,16,19
  46:3 135:20
**monetary** 25:10

**money** 16:11,12
  25:19 26:18
  133:22
**Monica** 43:22
**monitor** 113:15
**Montgomery**
  2:6,10 10:4
  137:5
**month** 37:8,9
  73:14,17,21
**months** 12:21
  37:7 58:23
  74:12,16
**Moore-Wynn**
  1:17 3:10
  137:21
**morning** 20:19
**mother** 1:4
  13:10 40:14
  72:7
**mouth** 136:3
**movie** 62:23
**multihandica...**
  119:6

---
**N**

**name** 5:8 32:3
  95:15
**named** 5:12
  25:18
**names** 8:23 44:1
  53:3 95:14
**nature** 7:19
  76:23 103:6
**necessary** 87:1
**need** 3:13
**needed** 80:5
  87:2
**needs** 133:23
**neighbor** 8:3
**neither** 92:15,16
  137:15
**never** 18:14 31:6
  32:16 69:16
  71:20 76:22
  77:1 78:1

102:21 121:3
131:1,1
**niece** 119:1
**North** 2:14
**note** 20:6
**notes** 11:17
  31:10
**notice** 4:17,18
  11:15 34:15
  93:1
**November** 74:11
**number** 4:14,14
  13:14 14:10
  16:23 41:2
  43:5 108:17,19
  108:20,22
  109:2,7,12
  110:7,10,21
  111:12,20

---
**O**

**object** 19:10
  22:21 25:22
  27:6 36:2,4
  38:16 75:10,12
  75:21 76:1
  95:9 96:3
  97:16 98:21
  99:6 101:1
  102:19 106:22
  107:11 108:2
  112:10 113:6
  114:17 116:8
  117:7 118:11
  118:18 120:2
  122:14 123:7
  124:20 134:7
**objection** 112:18
**objections** 3:11
  3:12 89:5
**obligation**
  130:20
**observe** 49:21
**observed** 48:14
  51:14 65:13
**observing** 69:14

**obtained** 47:21
**obviously** 96:4
**occasion** 19:18
  20:2 21:21
  23:22 24:7
  38:13 41:6,18
  44:15 55:21
  56:4 61:23
  63:4,19 66:1,6
  81:8 91:18
  109:20 126:16
**occasions** 16:23
  40:19 41:2
  65:23 79:8,23
  109:15 121:3
**occurred** 28:7
  117:6 131:8
**October** 74:10
**odd** 30:15
**offered** 3:15
**office** 41:15 79:9
  79:12,14,18,19
  79:23 80:11,15
  80:17 81:22
  108:12 128:22
**officer** 13:22
  15:9
**officers** 18:7
**offices** 1:18
**official** 31:8,13
  100:21 112:8
  113:2 127:6,7
**officials** 49:4
  87:23 92:2
  121:4 127:21
  129:11 130:21
  131:2
**Oh** 135:21
**Okay** 6:19 8:9
  9:16 10:22
  12:3,15 15:23
  16:3,10 20:12
  23:4 27:3
  28:10 31:18
  33:1 36:21
  37:1,23 38:7

40:11 43:7
44:5,22 45:22
46:3 47:6,11
48:5,18 49:2
51:8 60:21
66:19 67:10
73:11 81:1,8
82:6 83:14
92:14 96:18
99:2 104:16
120:14 135:13
135:17 136:4
**old** 9:2 10:1
**once** 36:10,14
  40:20,21 41:2
  41:3,17 45:23
  46:1 87:22
**ongoing** 131:21
**opinion** 58:10
**opportunity**
  6:15 39:2
  101:20 115:10
**opposed** 117:2
**oral** 136:3
**order** 99:20
**original** 39:14
**outing** 23:13
**outlined** 114:3
**outside** 35:20,23
  40:16 43:20
  45:16 49:22
  59:16 63:21
  106:19,19
  118:4,6
**out-of-town**
  63:12
**overly** 38:17
**overview** 25:8
  25:21 26:2
**Owens** 82:15,19
  83:15,22 85:13
**Owen's** 83:6
  85:20
**owned** 62:17

—————————
**P**

**page** 4:14 11:16
  90:22 91:3
  92:6 93:1
  121:17
**pages** 91:2 92:5
**paid** 133:18
  134:15
**pants** 35:20,23
  40:16 43:21
  45:16 49:22
  59:16
**parades** 14:17
**paragraph**
  97:10 113:14
  113:21 116:22
  119:16 121:7
  121:21 122:1,5
  123:12 124:6
  125:3,18,22
  126:7 127:5
  128:9 130:3
  131:5,16
**parent** 73:9 88:5
  88:10,23
  107:10 108:6
  110:16 111:2
  130:18
**parental** 130:22
**parents** 61:16
  73:2,5 108:1
**part** 27:9 130:21
**participate** 16:6
  18:19
**participated**
  14:17
**participating**
  73:15
**particular** 20:3
  20:10
**particularly**
  30:8
**parties** 3:7,19
  137:16
**party** 3:16,23
**Patterson** 56:14
**pay** 56:23

**payment** 134:1
**penetrated**
  136:1
**penetration**
  136:2
**people** 47:20
  53:9,10,21
  55:10 58:1
  61:16 64:4,6
  78:21 91:19
  101:21 124:10
  128:2
**performing**
  19:12
**period** 38:18
  82:5 107:21
**permission**
  19:18 21:11
  22:23 23:4,9
  30:22
**person** 26:16
  30:10 55:12
  111:16
**personal** 77:18
  114:1 119:17
  121:19 122:9
  123:14 124:4
  137:11
**personnel** 30:18
**persons** 53:3
  57:13
**pertinent** 12:5
**phone** 29:2 32:2
  32:3,8,10,13
  32:16,20 33:2
  33:6,16,18,20
  33:22 34:3,8
  35:7 54:2
  71:12,18
  108:15,17,19
  108:20,21
  109:2,7,12
  110:4,7,8,9,21
  111:9,12,20
**physical** 36:5
**picture** 55:10

**Pike** 1:12,18
  5:11 10:3,15
  11:1 12:11
  19:6,13 25:18
  53:18,22 54:3
  54:17,22 55:8
  55:11,13 63:21
  74:2,19 75:8
  75:19 77:11
  93:9 94:7
  95:12,23 96:5
  96:11,19 97:3
  97:8,8,11 98:8
  98:18 99:4
  102:16 105:20
  106:5,9,14,20
  107:15,20
  112:6 114:6
  115:6,16 116:1
  116:6,20
  121:20 122:13
  127:11,17
  132:13,17,20
  133:5,8,13
  134:5
**pill** 20:16
**place** 2:14 19:5
  21:5 23:12
  35:17 37:21
  38:5 45:17
  49:23 62:11,13
  63:6 65:17
  66:2,22 67:12
  85:16 90:8
  116:1 130:19
**places** 19:2 23:5
  23:6 66:20
**plaintiff** 1:7 2:4
  7:9 127:5
**Plaintiff's** 4:16
  124:8
**plan** 87:18 89:3
  115:21 125:23
  126:10
**planning** 126:2
  126:2

JR, A Minor                                July 19, 2007                    Pike County Board of Education

**plans** 115:5,5
**plead** 59:15,17
  117:5
**pleaded** 59:19
**pled** 59:12 60:5
  60:14 61:8
  116:23 117:1
**point** 60:14
  111:14
**police** 64:8,11
  64:16 131:2
**policies** 113:23
**policy** 115:23
  116:6,12
  121:18,20
  122:8,13,16
  123:10,13,16
  124:7
**pond** 62:13
**popcorn** 16:16
**pornography**
  70:9,10,12,13
  70:14,16,18
  71:4
**position** 14:1
  64:15 71:5
**possibility** 96:13
  96:18 109:4
**possible** 6:4 20:8
  96:10,14
**post-traumatic**
  26:13
**practice** 21:10
  67:3 87:3,3,4
**practices** 14:15
  19:21 109:17
  109:21
**Prayer** 134:3
**preparation**
  12:15 26:5
**prepare** 70:4
**present** 2:17 7:2
  41:5
**presented** 128:4
  128:12
**presently** 10:9

**president** 14:2,4
  14:9 17:4,18
  22:6 30:9
**pressed** 135:9
**pretty** 30:15
  73:12
**prevent** 51:3,6
  118:1
**previous** 7:9
  30:8 135:3
**previously** 6:11
  94:2,16
**principal** 30:18
  30:19 54:2,5
  54:13 102:16
  104:1,11,22
  105:7,14
  106:13,13,17
  107:15,20
  112:6 113:3,12
  125:12,13,14
**principals** 99:12
**prior** 7:12 18:15
  32:7,16 65:11
  76:21 77:1,7
  77:15 78:4,18
  95:22 96:6,12
  96:20 97:2
  98:20 100:4
  102:18 106:4,8
  125:10 127:18
  131:2
**privacy** 91:22
  114:1 119:18
  121:19 122:9
**private** 21:22
  22:9 23:1,21
  24:8,12 61:22
  62:8 63:10
  66:17,20 104:7
**probably** 37:3
  58:8 104:3
**problem** 34:21
  106:3
**problems** 58:4
**Procedure** 3:9

**procedures**
  113:23
**proceeding** 59:5
**proceedings**
  137:13
**produce** 68:12
**Production** 4:15
**professional**
  57:15
**program** 13:16
  16:13 19:7
  30:12 88:3
  89:6,16 90:7
  91:4 115:15,21
  126:2,3,5,8,9
  132:9,16
**programs** 16:11
  19:22
**progress** 115:3,8
  126:11 132:6,8
**progressed**
  114:7,10,13
**propose** 88:20
  93:8
**proposed** 4:17
  4:18 93:1
  115:6
**proposing** 88:18
  126:17 127:3
**protected** 124:9
**provide** 22:3
**provided** 3:16
  3:23 135:3
**providers** 56:2
**providing** 89:8
  89:15 94:7
**Pryon** 78:10,22
  107:15 108:5
  108:11,16,16
  108:23 109:4,5
  110:5,10,17,21
  110:22,22
  111:13,19,22
  112:3 121:13
  125:7,13
  127:22 128:5

  128:13
**psychiatric** 38:4
  45:4,6
**psychiatrist**
  57:5,8,11,12
**psychologist**
  57:10,12
**public** 134:12
**punitive** 134:4
  134:11
**purpose** 3:16
**purposes** 19:16
**pursuant** 1:19
  3:8 132:9
**pursue** 12:18
**put** 16:10 34:15
  89:20 135:12
**Pyron** 108:18,19
  109:8 122:6
**p.m** 136:13

**Q**

**qualified** 114:12
**quality** 105:9
**question** 6:2
  16:2,9 20:11
  30:23 40:4
  42:18 43:7
  52:9 74:10
  78:5,10,15
  92:9 96:4
  97:21 98:1
  115:18 118:12
  133:13 135:3
  135:15
**questions** 3:12
  3:13 5:19,21
  6:1,6,7,18,23
  94:18 95:6,8
  103:22 136:7
  137:10
**quick** 63:23
**quiet** 40:21
**quit** 17:23 18:3
**quite** 21:8

**R**

**R** 2:13
**raise** 16:11,12
  89:4 92:17
**raised** 94:12
**raising** 31:14
**read** 26:6 27:12
  61:9,13 121:20
  122:13 123:1,7
  123:20
**reading** 4:4
  114:8 121:22
  122:2,3 123:18
**real** 58:14 81:5
**really** 38:12
  40:11 110:19
  111:10 119:12
**reason** 30:13
  56:8 73:23
  74:7,13,16
  87:6 94:3
  120:19 121:1
  130:18 133:2
**recall** 10:21
  12:23 15:14,20
  16:9,14 17:3
  20:18,20 21:7
  22:5,7,10,11
  22:16 23:8,20
  29:7 31:20
  32:6,23 33:7
  33:14,15 34:13
  34:17,20,23
  35:13 36:18,20
  37:2 42:4
  43:20 44:4
  47:2,19 49:12
  52:4,19,22
  53:2,17,23
  59:8,19 60:9
  62:10 64:23
  66:3 73:10
  77:9,10,14
  84:1 101:8

114:20 116:3
119:22 122:15
125:9 127:19
131:12
**receive** 34:10
**recess** 64:1 95:2
134:21
**recollection**
31:11 52:6
61:23
**recommended**
106:1
**reconsider**
102:7
**Record** 73:12
76:21 95:3
101:10
**recordings**
11:18 12:9,13
**records** 11:17
11:19 12:5
**recreational**
19:15
**reduced** 137:11
**Reed** 1:16 2:19
3:8,20 4:10 5:1
5:9,10 8:11 9:1
9:9,17,23 13:9
49:18,20 61:20
64:3 65:8 88:9
90:17 93:4,16
95:5 97:11
98:4 118:14
124:2 134:23
137:8
**reference** 94:15
126:7
**references**
105:16
**referred** 25:12
**refine** 39:1
**reflect** 75:22
**refresh** 31:10
52:5
**refused** 39:8
67:6

**regard** 38:21
48:3 77:22
97:7 98:17
102:12,15
112:14,15
119:23 120:5
121:8 124:11
**regarding** 37:13
59:4 116:16
**regardless** 4:1
**regression**
131:19
**regular** 16:19
23:2 122:17
131:20
**regularity** 21:14
22:1
**regularly** 21:8
23:19
**related** 137:16
**relates** 122:10
**relating** 5:19
19:7 37:15
123:14 126:3
**relation** 38:20
38:22 125:3
**released** 83:19
**relevant** 6:17
12:12 64:21
**relief** 25:10,19
27:1 134:4
**rely** 6:4
**remained** 128:2
**remember** 20:6
31:13 37:1,20
89:23 125:8
**remind** 135:17
**repeat** 25:16
115:18
**repeatedly**
119:18
**rephrase** 10:22
19:9 97:11
**rephrasing**
97:21
**report** 50:2

51:16 70:4
87:12 130:4,11
130:14 131:6
**reported** 36:6
36:16 49:2
50:10 51:8
121:3
**Reporter** 137:22
**Reporter's** 4:12
137:2
**reports** 81:12
**representing** 3:7
3:19 11:22
**represents**
137:12
**request** 11:17
**requires** 113:7
**reserved** 3:14
**resident** 7:4
**resignation**
76:11
**resolved** 8:7
**Resource** 91:11
**Resources** 71:10
**response** 6:5
43:7
**responsibilities**
100:16,19
105:8
**responsibility**
104:12 113:15
113:18,22
114:3 130:22
**responsible**
103:1 110:23
**restate** 5:22
37:17
**restaurant** 63:2
**result** 8:20
131:16
**resulted** 124:8
**results** 137:17
**retake** 133:5
**retired** 75:7,11
104:21 107:17
**retiring** 75:17

75:18 76:17
**retrieve** 69:6
**return** 80:20
**review** 12:17
73:13 86:12
92:7
**reviewed** 67:23
86:8 105:19
115:23
**revised** 89:21
**Re-Notice** 4:15
**ride** 14:12 21:1
**riding** 15:14
16:1 18:18
74:22 103:9,12
**right** 8:12 26:16
29:18,20 30:23
32:4 34:5
41:18 43:6
44:10,12 47:14
47:20 51:2,13
57:5 58:13
60:5 61:9 71:8
71:11 75:18
77:3 79:6 83:5
83:10 88:16
89:2 90:22
93:15 100:10
100:18 103:11
105:5 110:10
111:14 112:5
121:19 122:9
122:12 126:22
127:8 133:17
133:21
**rights** 97:15,23
98:3 99:5
100:22 107:10
107:23,23
108:5,6 112:9
112:13,15
124:9
**Road** 7:3
**Robert** 78:15,16
112:5,13
**rode** 15:11

61:21
**room** 39:21 40:1
41:15,15,19
42:3 79:12,13
80:3,11,21
81:9,21 82:5
82:13,18,21
83:6 84:21
85:11,21 86:14
87:6 108:13,14
119:14 129:2
**Rose** 2:13
**roughly** 108:6
**Rules** 3:9
**ruling** 3:14
**run** 16:7 105:11
105:12
**rung** 80:22

---
**S**
**SAITH** 136:17
**sanctions** 101:17
**Saturday** 24:18
**saw** 32:16 49:5
49:22 50:13
69:16 79:8
81:10 84:17
117:13 120:20
121:1,2
**saying** 30:20
76:6 121:9,14
128:10
**says** 33:1 125:3
**schedules**
109:21
**school** 9:6,14
10:3,4,5,7,22
10:23 11:1
13:18,19 14:12
14:15 15:5,14
15:16 16:3,21
17:16,18 18:9
19:13 20:13,15
20:16 21:1,2,6
21:11,19,22
22:4,8,17,18

22:22 23:1,7
23:20 24:4,11
24:21 29:10,11
30:1 31:3,8,8
31:13,14 49:4
54:3,17,18,23
62:1,4 63:9
65:13,17 66:4
67:1,1 69:11
73:13,14 74:3
75:8,20 76:11
79:3,3,7 80:6
81:10,13,18
82:1,2,22 83:2
83:4 87:20,23
88:3,15 89:4
89:11,14 90:1
90:8 92:3,8
93:9,23 94:9
98:16 99:9,10
102:17 104:11
104:22 105:4,7
105:11,11
106:4,5,14,19
107:16,20
110:20 112:7
115:6,17 116:2
116:20 117:2,6
117:14 120:20
121:4 123:13
126:2,3,5,8,9
126:12,17
127:2,6,7
131:20 132:1,2
132:8,12,13
133:1,9,10,11
133:15 134:12
**schools** 116:7
133:3
**scope** 101:21
**secluded** 39:18
**second** 82:5
105:3
**security** 91:22
114:1 119:18
121:19 122:9

123:14
**see** 11:16 14:14
32:12 49:21,23
67:23 68:14,18
79:17,18 86:7
86:12,22 90:16
91:7,12 92:8
92:11,23 93:4
93:12,14,15
105:10 116:11
**seeking** 25:10,19
26:9,17,20
**seen** 32:10 48:12
48:19 70:23
83:14,18 104:3
129:1,6,7
**sees** 57:16
**self** 26:15
**semester** 105:4
**seminars** 116:15
116:19
**sent** 38:3,14
70:21 82:22
**separate** 100:21
106:16 113:11
**September** 74:2
74:7
**series** 5:19
**serve** 55:7
**served** 55:11
**serves** 55:13
**services** 57:1
**set** 1:20 35:7
**Seven** 38:8
**Seventeen** 9:19
9:20
**severally** 98:3
**severe** 47:9
**severely** 26:13
**sex** 136:3
**sexual** 35:17
36:3 47:13
53:19 65:1,2
99:21 106:8
114:16 115:23
116:5,12,16,19

121:20 122:13
122:16 123:15
127:5 129:12
129:16
**sexually** 25:15
25:20 27:5,10
27:21 28:14,16
33:13 34:11,16
34:19 35:15
45:13 50:4,8
50:13,19 51:18
52:2,7,13,20
52:23 53:4,7
53:10,15 55:23
60:12 61:17
65:8 72:14
113:16 117:20
118:1 120:6
127:11
**Shackleford**
64:13 65:4
**share** 6:5 7:19
39:3 47:16
48:2,7,11 75:3
78:6,11 88:1
101:4,7 107:7
107:13 111:21
112:1 113:3
115:19 117:16
134:13
**shared** 40:5
42:15,19 44:5
45:9 46:22
47:6 53:5,11
61:2 64:18,20
65:14 76:22
78:1 88:23
91:20 92:1
111:12
**shed** 49:10
**Sheriff's** 35:9
**Sherry** 64:14
**short** 94:23
**shorthand** 137:9
137:22
**show** 11:14 25:5

86:4 90:14
92:23
**showed** 85:16
**shown** 90:22
**shows** 84:15
91:4
**side** 92:12
**sign** 14:6 115:4
127:1
**signature** 90:16
90:19 91:12
92:5,11 93:4,6
93:12,15,18
**signing** 4:5
**singly** 98:3
**sir** 5:15,17,23
6:8,13,20 7:1,6
7:15,18 8:2,4
8:10,13,17,19
9:5,7,13,21
10:6,11,13
11:3,8,10,20
11:23 12:8,14
13:4,7,13,15
13:17,21,23
14:5,8,11,13
14:16,21,23
15:2,4,7,10,13
16:5,18,20
17:1,5,14,19
17:22 18:2,5
18:10,13,17,23
19:3,17,20
20:1,5,7,14,23
21:4,9,13,15
21:17,20,23
22:2,10,12,20
23:3,11,14,16
23:23 24:10,14
24:16,20,23
25:14 26:7,19
27:2 29:14,19
30:2,4,6 31:4
31:12,17 32:9
32:15,18,21
33:4,21 34:1,4

34:9 35:18
36:8,15 37:5
37:19 38:11
39:11 40:7,18
41:8,12,20,23
42:17,22 43:6
43:12 45:11,18
45:21 46:2,20
47:23 48:8,10
48:15,17 49:1
49:7,16 50:3,9
50:15,18,21
51:7,17,19,22
52:1,15 53:8
53:13 54:4,7
54:12,15,20
55:2,6,14,19
55:22 56:6,10
56:12,18 57:2
57:9,9,18
58:19 59:2,6
59:11,14 60:2
60:6,13,16,22
61:1,1,12 62:3
62:12,14,16,18
62:20,22 63:1
63:3,7,13,16
63:18,22 64:9
64:12,14 65:5
65:12,15,20
66:12,15,18,21
67:13,15,18
68:3,5,13 69:1
69:3,5,8,15,17
70:1,3,5,11
71:13,15,18,22
72:22 73:1,4,8
73:16,20 74:1
74:4,6,9,15,21
75:6 76:13,15
77:13,16,21
78:3,9,14,19
79:1,5 80:7,9
80:12 81:4,14
83:7,20 84:3,5
84:12,16,19,22

85:7,22 86:1,6
86:20 87:7,11
87:13,17,19
88:4,6,8,11,14
89:1,7,10,13
89:17 90:3,6
90:18,20 91:1
91:9,14,14,16
91:21 92:4,13
92:18 93:3,5,7
93:10,13,17,19
93:21 94:1,5
94:10,14 95:18
95:21 96:8,17
96:23 97:5
99:1,22 100:2
100:6,9,12,17
103:13 104:8
104:20,23
105:5,15,18,22
106:2,6,11
107:18 109:10
109:19,20
110:2,11,15
111:3,7,23
112:4 113:1
115:22 116:13
117:9,18,22
122:19 124:17
125:21 126:15
127:4,9,13
129:9,14,18,22
130:9,23 131:4
132:3,5,7,10
132:21 133:2
133:16,20
134:17,19
**sit** 39:21
**sitting** 8:11 77:7
**six** 12:21 19:14
  62:21 82:22
  97:9,12,14,22
  98:2,18
**skills** 131:20
**skip** 27:3
**skipping** 98:12

**smoking** 124:16
**sodomy** 135:10
**sold** 16:16
**somebody** 7:14
  7:17 52:6,10
  114:11 120:22
**someplace** 62:8
**son** 13:2 22:17
  25:11,20 26:11
  28:14 31:16
  50:19 65:3
  73:23 76:18
  96:14 97:7
  100:1 107:10
  127:18
**sons** 49:8
**son's** 30:12
  97:15
**sorry** 35:21
  36:13 49:19
  62:4 135:11
**sound** 118:20
**sounded** 87:9
**source** 28:13
  29:15 32:11
  34:6,11 70:13
  70:17 81:12
**sources** 43:10
**speak** 5:3 58:8
**speaks** 25:23
  26:8 97:17
  99:7 101:2
  108:3 112:11
**special** 87:15
  114:1,5,11,15
  115:15,20
  122:11,18
  125:23 126:13
  132:19
**specific** 40:10
  50:12 68:22
**specifically** 61:2
**spend** 76:17
  95:5 129:20
**spent** 30:7
**spring** 15:21

**staff** 53:21
**stand** 16:6,15
  17:8
**stands** 16:8,22
**started** 133:12
  134:23
**state** 5:8 137:4
**stated** 5:20 31:7
**statement** 36:21
  37:11 39:14
  73:12 85:9
  123:19
**STATES** 1:1
**stating** 76:4
**Statute** 3:17 4:1
**statutes** 134:10
**Steed** 55:16
**stepped** 118:4,6
**steps** 51:3,6
**stipulate** 27:19
  28:1,3,8,11
**stipulated** 3:6
  3:18 4:3
**stipulations**
  1:20 3:4 5:5
**stop** 17:6,15
  50:22 91:6
**stopped** 17:12
**Street** 1:19 2:6
**structure** 96:10
**student** 30:21
  34:19 59:18
  87:15 99:10
  109:11 114:11
  126:13
**students** 18:21
  19:5,14 63:17
  103:2 104:15
  114:2,5 122:11
  122:17,20
  124:16
**student's** 119:17
**style** 95:13
**styled** 91:3
**Suber** 85:5
**subjected** 127:5

**submitted** 76:10
  105:16
**subsequent**
  111:18
**substitute** 10:17
  10:18,20,21
  11:1,4
**sue** 112:3
**sued** 7:12,17
  97:8,13 100:13
  124:11
**suffer** 131:18
**suffered** 125:5
  131:17
**suggest** 95:8
**suing** 7:12 25:17
  95:12 101:5
  104:9 106:15
  107:19 112:5
  113:4,10
  114:14,19
**suit** 7:19
**Suite** 2:6
**summer** 48:21
  58:2 66:5
  133:10
**Sundays** 24:18
**superintendent**
  2:18 55:4 77:2
  77:11 99:2,4
  99:20 100:10
  100:15,16,19
  100:22 113:22
  114:3 116:5,15
  121:10 125:12
**supervised**
  119:13
**supervision** 74:5
  104:15 116:4
  117:20 118:9
  119:10,12
  137:11
**supplement** 6:10
  6:15 135:2,4
  135:13,14
  136:4

**support** 85:9
  101:20 104:17
  105:17 107:2,8
  108:4 112:2,12
  113:4,9 131:21
**supportive**
  14:22 64:5
**supposed** 83:8,9
  83:10 115:13
  126:20
**sure** 42:1 50:13
  61:21 73:11
  95:6 96:21
  101:18 102:11
  104:14 105:10
  115:19 128:9
  132:15
**Susan** 2:5 76:1
**suspect** 30:13
  74:13,17
  129:12,15
  130:16
**suspected** 73:6
  130:15
**suspended**
  124:22
**suspicion** 73:18
  92:1 112:22
  125:15 130:7
  130:11
**suspicions** 103:8
  130:5 131:1
**suspicious** 103:3
  103:6 110:5,13
  110:19
**Sweeney** 2:13
  4:11 5:5,7,10
  11:21 12:3,4
  25:4 26:1
  27:14,18 28:2
  28:5,8,12,22
  35:5 39:1,17
  42:14 44:10,12
  50:7 51:13
  64:2 75:14,23
  76:6 90:13

JR, A Minor                    July 19, 2007                    Pike County Board of Education

Page 153

92:22 94:19
95:3,4 101:9
102:3,6,11,14
107:6 121:23
122:4,12 123:4
123:9 124:1
134:9,14,20,22
**Swiss** 98:11
**sworn** 5:3
**system** 11:2 75:8
75:20 76:11
87:21 89:15
106:4,19 115:7
116:20 123:13
126:17 127:2
132:2,12,13
133:1,11
134:12

**T**

**take** 4:15 19:5
20:15,16,18
21:5 27:11
30:15 38:5
49:23 51:2,5
58:16 63:23
66:2 67:10
80:1 82:10
89:17,19 94:20
94:23 119:6
120:23
**taken** 1:16 3:8
3:10 45:17
63:5,9,20 90:8
137:9
**talk** 29:3 39:6,8
39:19 40:2
41:3 42:12
43:13 44:3,17
48:5 54:2,10
54:13 57:19,21
58:5,20 60:8
60:18 65:6
68:17 75:4
86:23 124:3
**talked** 12:21

33:3 35:1,3
38:14 39:9
40:13 41:6
44:16 47:3,11
49:6 53:18
54:21 55:3,17
55:20 64:6,7
64:10,14 65:3
73:2 77:17
91:8 120:10
**talking** 45:19
50:6 51:10
53:6 69:9
77:10,14
103:22 112:20
**tape** 12:9
**taped** 12:13
**teacher** 10:17,20
11:1,5 30:21
54:16 82:9,13
82:14,15,16
84:9,20 85:1,3
85:4 86:10
99:11 114:12
133:7
**teachers** 53:21
82:7,8 85:10
85:20 99:17,20
104:13 105:9
105:10 116:16
**teacher's** 86:13
109:12
**telephone**
109:18 110:1
**tell** 20:3 31:18
31:22 32:19
34:22 35:2,11
35:16,19 36:9
36:13,16,19
40:19 41:1,9
41:10,16 42:12
42:20 43:18
45:12,22,23
46:12,21 50:11
50:16 51:8,15
51:20,23 85:19

86:3 87:5
97:19 122:2
129:10
**telling** 33:19
41:1
**ten** 10:14,18
114:7
**tendered** 12:6
**terms** 62:5 85:15
101:4 106:12
**Terry** 78:6,7
102:15,16,22
104:18,21
105:3,13
**testified** 5:4
81:19 123:20
**testify** 107:1
**testimony** 35:10
35:12 37:18,23
38:13 39:5,13
39:15 59:9
129:8,10
**tests** 133:7
**Thank** 28:22
136:10
**thereto** 137:10
**thing** 26:20
34:23 70:8
74:21 108:12
109:5 131:14
**things** 26:17,23
42:11 108:23
119:4
**think** 6:18 27:22
34:14,18 37:6
53:4,6 61:20
94:2,15,19
108:10 109:11
118:14 128:17
131:14
**thirds** 90:16
**Thomas** 2:19
**thoroughly**
99:17
**thought** 30:15
30:17,18 33:12

75:1 82:2 87:9
119:20 121:4
123:5 129:12
**Thrash's** 72:7
**three** 44:22
58:23 91:2
**thrown** 84:7
**thrust** 25:17
**Thumbing**
93:11
**time** 3:13,14 6:9
7:5 11:4 14:14
14:14 15:12,12
16:4 18:18,18
24:17,17 27:12
27:16 29:15
30:7 37:11
38:19 39:22
40:4 41:17,21
42:15,16 54:6
55:11 60:17
76:17 80:22
81:6 82:20
86:11,14,15,16
86:16 87:8,20
87:20 94:2
95:5 98:5
105:14 108:9
110:1,1 111:18
115:1 121:5
123:22 126:22
126:23 128:18
129:2,4,7,15
129:20 133:6
**timely** 131:5
**times** 15:14,18
17:2 36:16
41:16 42:9,11
42:21,23 43:1
43:4 44:3
79:17,20,22
81:11 83:21
84:17 85:6
118:3,23 119:9
121:2 126:19
129:2

**TMR** 1:5
**today** 6:5,21
11:16 44:11
53:6 56:8
57:19 59:21
101:7 107:1,8
**told** 32:1 35:15
40:15,17,21
41:13,17 43:22
44:15 45:10
46:3 47:8
48:16,18,20
52:7,10 71:3
72:23 73:6,9
82:9 89:19
102:10 110:20
112:22 117:10
120:22 123:1
**top** 90:22
**touch** 48:12,19
49:5
**train** 99:20
**training** 99:16
116:16
**transcript** 137:8
137:13
**transferred**
23:19 132:17
**transition**
133:14
**transportation**
22:3
**transporting**
104:6
**trauma** 58:3
**travel** 19:13
**treated** 49:9
56:15
**treatment** 56:20
57:15 133:18
133:22 134:1
**trial** 3:22 59:7
61:7
**trigger** 30:19
**trip** 18:21 19:15
63:12 66:14

67:12
**trips** 14:10
  18:19 19:1,5
  23:5
**trouble** 82:20
  83:5,12,13
  85:14 98:5,7,7
  98:14 108:10
  111:16 129:5
**Troy** 1:19 64:7
  132:2,11,17,23
  132:23 133:3
  133:11,15
**true** 13:10,14
  137:12
**trumpet** 82:11
**trusted** 21:18
  29:22,23 30:3
  30:5,10 31:1,2
  51:1 66:18
  75:1 81:7
  118:6 121:6
  130:2
**trusting** 29:21
**trustworthy**
  30:17
**truth** 5:3,3,4
**try** 69:6
**trying** 27:14
  39:2 40:11
  64:3 123:4
**turn** 68:6 110:4
**Twenty** 9:11
**Twenty-five**
  8:15
**Twenty-three**
  9:3
**Twice** 15:17
**twins** 72:6
**two** 42:10 43:2
  49:8 58:23
  83:12 90:16
  91:2 98:6,12
  98:13
**type** 76:23
**typed** 93:14

**U**

**UAB** 38:3,15
  45:3 56:5,9
**uhm** 11:6 22:5
  47:13 68:13
  98:22 136:5
**Uh-huh** 9:10
  12:19 26:12
  61:6 83:23
  107:6
**undergoing**
  133:17
**understand** 16:2
  16:9 20:11
  22:15,15 25:8
  25:16 33:19
  42:8 58:15
  77:4 118:12,13
  119:23
**understanding**
  6:22
**understands**
  34:6
**understood** 6:2
**UNITED** 1:1
**unreimbursed**
  56:19
**unrelated** 67:12
**unsupervised**
  119:15 129:21
**unusual** 111:19
**Usual** 5:5

**V**

**various** 56:2
  57:23 134:3
**vehicle** 22:9
  23:1,22 24:9
  24:12 61:22
  62:8 63:10
  66:20 79:10
  103:9,12 104:3
  104:7 120:23
  131:15
**vice** 30:19 112:6
**video** 11:18

**violate** 97:23
  98:3
**violated** 100:22
  107:9,22 108:5
  108:8,23 112:8
  112:13,14
  119:18,20
  120:1 133:6,8
**violating** 131:10
**violation** 97:15
  99:5 124:8
**visit** 24:13,17,19
**VS** 1:9

**W**

**waiting** 79:23
  80:17
**waived** 3:21 4:6
**waiving** 4:1
**walked** 104:1
**want** 6:9 27:11
  27:16 40:14
  41:3 61:20
  73:11,12 95:10
  101:18 102:11
  110:5 111:21
  135:4,13,14,17
  136:4
**wanted** 135:2
**ward** 38:4 45:4
**warrant** 36:23
  37:12 59:3
  60:11 61:4
  135:12
**Warren** 45:4,5,6
  45:8 47:11,12
  57:6,14
**Washington**
  2:10 44:16
  46:3
**wasn't** 13:3
  18:11 37:3
  73:15 74:3
  83:8,9,10
  87:10 88:17
  105:3 111:15

115:10 119:13
**wasting** 123:21
**Wat** 44:20
**watch** 69:9
**watching** 119:1
**Watkins** 46:5
**Watson** 43:17
  44:2 46:4,6,7,8
  46:8 72:3
  135:20,21
**way** 23:18 29:12
  30:5 40:4 49:6
  73:19 90:16
  91:23 96:10
  97:22 98:2
**weekend** 24:18
  62:15 66:9
**weeks** 37:7
  82:22
**welcome** 24:22
**went** 10:4,8
  35:14 38:2
  59:1 60:15,17
  61:7 63:14
  119:4 120:8,13
**weren't** 15:8
  18:11 50:22
  109:15 118:16
**West** 2:6
**we're** 11:16
  12:18 53:6
  102:12
**White** 2:13 46:8
  46:8,12
**willfully** 126:1
**window** 108:13
**wise** 137:16
**wish** 134:12
**witness** 4:4,5 5:2
  28:20 35:2
  38:9 42:7
  113:8 122:22
  123:19 137:13
**witnessed** 49:17
  53:10,12,15
**witnesses** 49:13

**won** 8:8
**words** 26:10
**work** 10:23
  16:15 17:3
  66:8 82:18
  132:15
**worked** 11:4
  14:3 15:3
  16:21 54:17
  132:22
**worker** 54:22
**working** 17:7
**works** 54:22
**workshops**
  105:10
**wouldn't** 19:4
  58:20 77:12
  88:19,23
  111:13 118:8
  118:20 129:19
  129:23 130:21
**Wright** 44:23
  45:2 46:9,13
  46:14,15,16,18
  46:21 47:3
**write** 18:6 20:2
  44:21 86:11
**writing** 20:6
  137:11
**written** 20:8
  83:14
**wrong** 58:12,13
**W-R-I-G-H-T**
  46:15

**Y**

**Yahoo** 68:10
**yard** 66:8
**Yeah** 27:18
  28:10 115:12
**year** 10:8,23,23
  15:5,8,16
  16:21 17:16,18
  17:21,23 18:4
  18:9 20:13
  21:6 22:4,6,18

22:22 24:11,21
29:10,11 30:8
31:1,3,8,14
54:18 66:4
69:11 73:13,13
83:2,4 87:22
88:15,21 89:4
89:11 90:1,8
92:8 93:23
94:9 105:4
115:2,4 116:2
119:17 126:11
126:21 132:1,6
133:9,10,15
**years** 7:8 8:15
10:14,18 13:14
13:18,19 114:7

---

**0**

**05** 29:17 31:19
32:17 91:13

---

**1**

**1** 4:15 11:11,15
122:7
**1:40** 136:12
**10** 116:22
**10:00** 93:9
**10:25** 1:21
**101** 1:19
**11** 4:15
**137** 4:12
**15** 74:23
**162** 7:3
**1726** 2:6
**18** 9:18
**1819** 2:14
**19th** 1:17 136:13
137:9

---

**2**

**2** 4:16 11:16
25:1,6 94:17
**2nd** 2:6
**2/16/05** 90:17
**2/22** 92:12,16

**2/22/05** 4:18
90:22 91:5
**2:06-CV-1120**
1:10
**2000** 58:1 83:1
**2001** 11:6,7
**2003-2004** 13:18
13:19 14:2
17:4,18 22:4
22:18 83:2
89:4 126:22
**2004** 56:7 66:5,5
73:14 83:1
86:17 98:5
105:2
**2004-2005** 13:19
15:5,15 16:21
17:3,7,16 18:9
20:13 21:6
22:22 24:11,21
29:10 31:3,8
31:14 39:19
54:18 66:4
69:11 73:13
74:12 83:3,4
86:18 89:11
90:1,8 93:23
94:9 116:2
119:17 126:23
**2005** 29:9 30:14
37:22 38:14
40:5 41:5
43:16 48:21
54:1 56:16,21
58:2 60:1 64:7
65:11 71:11
72:1 73:5 75:9
76:12,20,22
77:1,7,15 78:4
78:18,23 89:23
92:3 93:9,20
95:22 96:7,13
96:20 97:2
98:20 100:5
102:18 105:4
107:22,22

108:7,7,11
125:10 127:18
131:3
**2005-2006** 133:9
133:12
**2006** 38:6
**2006-2007** 10:23
132:1
**2007** 1:18 38:9
38:15 136:13
137:10,18
**22nd** 91:13 92:3
**24** 4:16
**25** 7:8 89:23
93:20 119:16
119:23 120:5
**25th** 93:8
**260** 2:10
**29** 121:7

---

**3**

**3** 4:17 90:10,15
91:3 123:12
**35203** 2:15
**36010** 7:3
**36104** 2:10
**36105** 2:6
**38** 121:17 122:1
122:5 124:2
**39** 124:6

---

**4**

**4** 4:18 92:19,23
97:10 113:14
**41** 125:3
**42** 125:18
**4430** 7:3
**46** 125:22 126:7

---

**5**

**5** 4:11 113:21
**5/13** 92:8,11
**5/13/04** 92:6,15
**5/25/05** 4:19
**5/25/2005** 93:12
93:14

**5/6/05** 93:4
**53** 127:5
**54** 127:14
**55** 128:2,9
**58** 130:3
**59** 131:5

---

**7**

**70** 131:16

---

**9**

**9th** 137:18
**9:15** 74:23
**9:35** 74:23
**90** 4:17
**92** 4:18

---

EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS

MOTHER AND FATHER, EAR

AND TMR,


     PLAINTIFF,


VS.                                    CASE NO.:

                                       2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

     * * * * * * * * * *

DEPOSITION OF THOMAS MICHAEL REED, taken before

Mary Moore-Wynn, as Commissioner, on the 19th of July,

2007, in the offices of Pike County Board of Education,

101 Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 1:45 P.M.


     * * * * * * * * *

JR, A Minor                     July 19, 2007                Pike County Board of Education

| Page 2 | Page 4 |
|---|---|
| 1 | 1    It is further stipulated and agreed by and between |
| 2    * * * * * * * * * * | 2    counsel representing the parties in this case, that the |
| 3    APPEARANCES: | 3    filing of the deposition of THOMAS MICHAEL REED is |
| 4    FOR THE PLAINTIFF: | 4    hereby waived, and that said deposition may be |
| 5    Hon. Susan DePaola | 5    introduced at the trial of this case or used in any |
|      Attorney at Law | 6    other manner by either party hereto provided for by the |
| 6    1726 West 2nd Street, Suite B | 7    Statute, regardless of the waiving of the filing of |
|      Montgomery, Alabama  36105 | 8    same. |
| 7 | 9    It is further stipulated and agreed by and |
| 8    and | 10   between counsel and the witness that the reading |
| 9    Hon. Deanie Allen | 11   and signing of the deposition by the witness is |
|      Azar and Azar | 12   hereby waived. |
| 10   260 Washington Avenue | 13              INDEX |
|      Montgomery, Alabama  36104 | 14 |
| 11 | THOMAS MICHAEL REED |
| 12   FOR THE DEFENDANT: | 15 |
| 13   Hon. Donald R. Sweeney | Examination By Mr. Sweeney              5 |
|      Bradley, Arant, Rose & White | 16 |
| 14   One Federal Place | Reporter's Certificate                26 |
|      1819 Fifth Avenue North | 17 |
| 15   Birmingham, Alabama 35203 | 18 |
| 16 | 19 |
| 17   ALSO PRESENT: | 20 |
| 18   Dr. Mark Bazzell, Superintendent | 21 |
| 19   Ms. Ann Reed | 22    * * * * * * * * * |
| 20 | 23 |
| 21 | |
| 22 | |
| 23 | |

| Page 3 | Page 5 |
|---|---|
| 1 | 1         THOMAS MICHAEL REED |
| 2 | 2    (Whereupon, the witness, after having first been |
| 3 | 3    duly sworn to speak the truth, the whole truth, and |
| 4 | 4    nothing but the truth, testified as follows:) |
| 5    * * * * * * * * * * | 5       MR. SWEENEY:  Usual stipulations? |
| 6 | 6       MS. DePAOLA:  Yes. |
| 7 | 7          EXAMINATION |
| 8 | 8    BY MR. SWEENEY |
| 9 | 9    Q    Mr. Reed, state your name. |
| 10        STIPULATIONS | 10   A    Full name, Thomas Michael Reed. |
| 11 | 11   Q    And your address? |
| 12   It is hereby stipulated and agreed by and between | 12   A    162 County Road 4430, Brundidge, Alabama. |
| 13   counsel representing the parties that the deposition of | 13   Q    And you have lived there with your wife, |
| 14   THOMAS MICHAEL REED is taken pursuant to the Federal | 14       Elizabeth, whom we have just deposed? |
| 15   Rules of Civil Procedure, and that said deposition may | 15   A    Yes. |
| 16   be taken before Mary Moore-Wynn, CSR, as Commissioner | 16   Q    Have you ever been deposed before? |
| 17   without the formality of a commission; that objections | 17   A    No, I have not. |
| 18   to questions, other than objections as to the form of | 18   Q    You listened to the protocol I outlined that I |
| 19   the questions, need not be made at this time, but may | 19       will be asking questions.  If they are not clear, |
| 20   be reserved for a ruling at such time as the deposition | 20       please ask me to restate them? |
| 21   may be offered into evidence, or used for any other | 21   A    Uh-huh. |
| 22   purpose by either party hereto, provided by the | 22   Q    If you answer a question, I will assume that you |
| 23   Statute. | 23       understood it.  And that you are giving me your |

JR, A Minor                     July 19, 2007                     Pike County Board of Education

3 (Pages 6 to 9)

Page 6

1    full response to the question.  Is that agreeable?
2  A  Yes, sir.
3  Q  And if you want to change an answer or supplement
4    it at any time, will you do that?
5  A  Yes, sir.
6  Q  And at the end of the deposition, I will expect
7    that you have shared all of the information you
8    have relevant to the questions that I ask?
9  A  Yes, sir.
10  Q  I have marked and have before you, Defendant's
11    Exhibit 1, which is the deposition notice.  Do you
12    have any tapes or documents with you today?
13  A  No, I do not.
14  Q  So, are all of the documentary evidence that would
15    support the contentions in your complaint material
16    that you have given to your lawyers for turning
17    over to us?
18  A  Yes.
19  Q  What did you review in preparation for the
20    deposition?
21  A  We had a meeting, and we discussed --
22  Q  Other than meeting with your attorney.  Did you
23    review any documents?

Page 7

1  A  Be more specific, please.
2  Q  Did you read the complaint?
3  A  Yes.
4  Q  Did you read anything else other than the
5    complaint?
6  A  No.
7  Q  Have you ever been a Plaintiff suing someone prior
8    to this lawsuit?
9  A  No, I have not.
10  Q  Have you ever been a defendant?
11  A  Yes.
12  Q  What type of suit?
13  A  The small claims court we were sued against our
14    neighbor where he was indicating that our dogs had
15    attacked his goats.  And it went to the Judge.
16    The Judge looked at it.  And it wasn't our dogs.
17    And he threw it out of court.
18  Q  That was the only --
19  A  Yes, sir.
20  Q  -- suit that you have been named as a defendant?
21  A  Yes, sir.
22  Q  Where are you employed?
23  A  I am currently self-employed.

Page 8

1  Q  What is your business?
2  A  Construction.
3  Q  Your children have been involved in the band
4    program at Pike County High School for some years,
5    haven't they?
6  A  Yes, sir.
7  Q  Charles Coon came to the Pike County High School
8    band, I believe -- high school as the band
9    director, I think the records show, for the
10    2002-2003 school year.  Does that seem accurate to
11    you?
12  A  Yes, approximately.
13  Q  Did you have a child in the band program at Pike
14    County High School for the 2002-2003 school year?
15  A  Yes, we did.
16  Q  Did you work with the band as in the band boosters
17    or in any fashion with the band during that year?
18  A  On occasion.  But limitedly (sic).
19  Q  Based on your involvement with the Pike County
20    High School band for the 2002-2003 school years,
21    did you have any reason to suspect that Charles
22    Coon would engage in sexually abusive conduct
23    towards students?

Page 9

1  A  No.  We believed that the school system
2    investigated, hired, looked at, checked everything
3    out, and we put full faith in the school system
4    that they would hire appropriate people to be
5    teaching our children.
6  Q  And so you accepted Charles Coon as the band
7    director on that belief?
8  A  Yes.
9  Q  And based on your observation of Coon and your
10    working with the band, you saw nothing during the
11    2002-2003 school year to indicate that that was
12    an -- a poor choice by the Board?
13  A  Us not having the records of a previous band
14    director before, I, in being a band student,
15    myself -- from Pike County High School, actually,
16    many, many years ago -- don't believe that the
17    band is what it should be.
18  Q  All right.  But did you --
19  A  It has not been in numerous ways.  And I many
20    times questioned the quality of band directors
21    that they have hired in the past.  Coon seemed to
22    be of similar caliber.  And I don't -- I have no
23    way of being involved in the hiring or choosing

Page 10

1   who they hire bands.  But in my personal opinion,
2   the past several have not been worth a hill of
3   beans.
4   Q   Have you had an opportunity to review the
5       applicant pool to see if, in fact, Charles Coon,
6       when that vacancy occurred --
7   A   No, I did not.
8   Q   -- in the summer of --
9           MS. DePAOLA:  Let him finish his
10              question.
11          THE WITNESS:  I'm sorry.
12  Q   -- was the best-qualified person of the
13      applicants?
14  A   No.
15  Q   You don't have any information about that, do you?
16  A   No, sir.
17  Q   But in terms of sexual abuse, would I be fair and
18      accurate to say that nothing happened during the
19      2002-2003 school year that would have created a
20      suspicion with you that Charles Coon would
21      sexually abuse one of your children?
22  A   I am not educated to the point to look at the clue
23      signs of sexual-harassing teachers or

Page 11

1   sexual-abusing teachers and the things that they
2   do.  I am since better educated now and would know
3   what to look for.  But at the time, no.  I put
4   full faith in the school system to do and see the
5   right things, supervise the teachers, and look for
6   clue signs.
7       Now, when looking back on it, yeah, there are
8   several clue signs that I can see now.
9   Q   But during that year, 2002-2003, did you see or
10      observe or hear anything that puts you on notice
11      at that time --
12  A   No.
13  Q   -- that Charles Coon might sexually abuse Justin?
14  A   No.
15  Q   For the 2003-2004 school year, did you continue to
16      be involved in the band?
17  A   Limitedly.
18  Q   To whatever extent, did you see or hear anything
19      during that year that put you on notice that
20      Charles Coon might one day sexually abuse Justin?
21  A   No.
22  Q   During the 2004-2005 school year, were you
23      involved in the band program to some extent?

Page 12

1   A   Very little.
2   Q   But did you have anything to do with the band?
3   A   Going to practices.
4   Q   But you did have Charles Coon in your house on a
5       number of occasions?
6   A   Yes, sir.
7   Q   You did have opportunity to talk with him on a
8       number of occasions?
9   A   Yes, sir.
10  Q   Based on anything that happened during the
11      2004-2005 school year, did you have suspicion that
12      Charles Coon might sexually abuse Justin?
13  A   No.
14  Q   Because you had no suspicion that Charles Coon
15      might sexually abuse Justin, would I be fair in
16      concluding that you made no complaint about
17      Charles Coon to any member of the Pike County
18      Board of Education about Charles Coon?
19  A   No.
20  Q   Did you make any complaint about Charles Coon to
21      Mark Bazzell, the Superintendent?
22  A   No, sir.
23  Q   Or to Terry Casey, Buddy Pryon, or Robert

Page 13

1   McDaniel?
2   A   No, sir.
3   Q   Or to any other school employee?
4   A   No, sir.
5   Q   When was the first time you got information --
6   A   June --
7   Q   -- that would --
8           MS. DePAOLA:  Would you wait until he
9               finishes his questions, please?
10          THE WITNESS:  I'm sorry.
11  Q   -- first got information that Charles Coon might
12      have sexually abused Justin?
13  A   June, 2005.
14  Q   Was that the call that your wife received in June
15      from the DHR representatives?
16  A   Yes.
17  Q   Did you participate in that conversation?
18  A   With my wife, yes.
19  Q   No.  With the DHR representative.
20  A   No, I did not.  No, sir.
21  Q   Did your wife communicate about the cell phone?
22  A   Yes, sir.
23  Q   During your communication with your wife about the

Page 14

1    cell phone, were you immediately concerned that
2    sexual abuse might have taken place?
3  A    We were led to believe there was a possibility.
4  Q    In that first conversation?
5  A    Yes.
6  Q    Did you go to Justin and ask him about it?
7  A    Yes.
8  Q    What did Justin tell you?
9  A    Justin claimed he didn't know anything.
10  Q    He didn't know anything?
11  A    Didn't know anything about the cell phone. Did
12    not know anything.
13  Q    So, when did you get information confirming that
14    Charles Coon had, in fact, sexually abused Justin?
15  A    The phone call from DHR was to schedule a meeting
16    to bring Justin up and have him talk to Mona. And
17    Mona did a videotaped conversation with Justin,
18    which we have never seen the videotape. And that
19    led to full indication that sexual abuse had
20    occurred. She turned it over to Bradbury -- I
21    forget his first name -- Officer Bradbury. He
22    said that we wanted him to do further
23    investigation. He didn't feel that Mona had done

Page 15

1    a proper evaluation. And that it would be
2    inconclusive evidence against him. He wanted to
3    do extensive evaluation and prolonged doing any
4    kind of -- what's the word -- basically making an
5    arrest. He wanted to get more evidence. So, I
6    don't know. I really don't know where Bradbury
7    was going with it.
8  Q    Okay.
9  A    We had two or three meetings with Bradbury.
10  Q    Do you know what triggered the inquiry by DHR?
11    How they got information about a cell phone, or
12    who reported something to them?
13  A    After the meeting with Bradbury, he disclosed to
14    us that there was a complaint from Blake's family
15    and so forth. And they investigated Coon. They
16    confiscated stuff from his home. They found a
17    cell phone with Justin's name on it or in it. I
18    don't know all the details behind it. They were
19    checking all the children, which I have no idea
20    what all the names were that were being questioned
21    in this. Justin was just one of the names that
22    came up. I believe there was another child named
23    Adam, but I don't know his last name. And Justin

Page 16

1    was just one of them.
2  Q    Did you join with your wife in filing the warrant
3    for Coon's arrest?
4  A    We went to Bradbury. We wanted to pursue a
5    warrant at whatever cost, because we did not want
6    him on the street. Bradbury put us off. We never
7    actually had a direct meeting with the DA to
8    pursue this. Bradbury was investigating trying to
9    get more dirt on him, I guess, to make the case
10    stronger, or worse, or whatever. Justin, being of
11    the mentally handicapped state that he is, is
12    just -- he's locked up. He's stayed locked up
13    about the whole -- he won't talk about it. Mona
14    has apparently been the only one he really opened
15    up to. There was a videotape of that. And we
16    don't even -- we can't even get the videotape,
17    from what I understand.
18  Q    When was the first time you took this information
19    that Coon had sexually abused Justin and reported
20    it to any official or employee of the Pike County
21    Board of Education?
22  A    We assumed --
23  Q    I'm not asking assumption. I'm asking a more

Page 17

1    definite question. When is the first time you
2    took this information that Charles Coon had
3    sexually abused Justin and reported it to an
4    employee or official or Board member of the Pike
5    County?
6  A    We didn't.
7  Q    You personally have never had any discussions
8    about these matters with any of the six members of
9    the Pike County Board?
10  A    No, sir.
11  Q    Have you ever had any conversation where you
12    reported a complaint or information to Mark
13    Bazzell?
14  A    No, sir.
15  Q    Or to Terry Casey?
16  A    No, sir.
17  Q    Or to Robert McDaniel?
18  A    No, sir.
19  Q    Or to Buddy Pryon?
20  A    No, sir.
21  Q    Have you reviewed the Pike County Board of
22    Education sexual abuse policy?
23  A    No, sir.

Page 18

1  Q  Have you made any inquiry concerning the frequency
2     with which Mark Bazzell and the administrators of
3     the Pike County school system have inservice
4     training with their employees about sexual abuse?
5  A  No, sir.
6  Q  Do you have any information, Mr. Reed, that
7     Charles Coon, in his employment history prior to
8     coming to Pike County Board of Education, had ever
9     been accused of improper conduct with a student?
10 A  No, sir.
11 Q  Did you know that Jessica was going to go with
12    Mr. Coon to Greenville?
13 A  Yes, sir.
14 Q  Do you recall the date of when that took place?
15 A  The specific date, no.  It was during the summer.
16    And it was her and a group of other students that
17    were going over to his home to do some yard work.
18 Q  It was the summer of 2004?
19 A  Yes, sir.
20 Q  So, you knew about that, and that was fine with
21    you?  As the 2004-2005 school year started, you
22    had complete confidence in Mr. Coon to the extent
23    that it was fine if your daughter went with him to

Page 19

1     Greenville?
2  A  Yes, sir.
3  Q  With what regularity did you attend IEP meetings
4     for Justin?  That is, when the individualized
5     education committee would meet to review his
6     special education program, did you ever
7     participate?
8  A  Yes, sir.
9  Q  Did you do so in the 2003-2004 school year?
10 A  No, sir.
11 Q  Or the 2004-2005?
12 A  No, sir.
13 Q  During the 2004-2005 school year, did you ever
14    express concern to your wife that Charles Coon was
15    worrying you?
16 A  No, sir.
17 Q  During the 2004-2005 school year, did your wife
18    ever express to you any concern about Charles Coon
19    and how he might be interrelating with your
20    children?
21 A  Not to my knowledge.
22 Q  Are you informed, Mr. Reed, that Charles Coon may
23    have sexually violated Justin at your home?

Page 20

1  A  We later learned that that happened.
2  Q  Were you there when it happened?
3  A  I was not.
4  Q  Huh?
5  A  I was not.
6  Q  Do you have information that Coon sexually abused
7     Justin at your home more than once?
8  A  We don't know.
9  Q  Did you ask Jessica why she didn't report to you
10    concerns about Charles Coon and how he was
11    relating to Justin?
12 A  Fear.
13 Q  She told you that?
14 A  Yes.
15    Even today, she still will not talk about it.
16 Q  Did you ever see a cell phone with -- that Justin
17    had that you didn't know the whereabouts of?
18 A  No.
19 Q  Were you aware, as your wife was, that Justin was
20    communicating with Mr. Coon on the computer?
21 A  Yes.
22 Q  And that was okay with you?
23 A  We monitored several of their communicate -- it

Page 21

1     was not e-mail.  It was chat room.  So, there is
2     no record of those on computers, typically.
3  Q  Do you have access to Justin's computer?
4  A  Yes.
5  Q  Did you ever see gay pornography on his computer?
6  A  No, I did not.
7  Q  Did you see what the district attorney found?
8  A  No, I did not.
9  Q  Did you have access to Jessica's?
10 A  Yes.
11 Q  Did you ever see anything on either of their
12    computers relating to communication with Charles
13    Coon that you thought was inappropriate?
14 A  No.
15 Q  On how many occasions were you at home when
16    Charles Coon would drive Justin to your home from
17    school?
18 A  Four or five.
19 Q  So, you knew that he was doing that?
20 A  Yes.
21 Q  And were there occasions where he would bring
22    Justin to your home and get out of the car and
23    come in and talk with you all?

Page 22

1  A  Yes.
2  Q  And were there occasions when he would have meals
3     with you in your home?
4  A  No.
5  Q  To your knowledge, he never ate at your house?
6  A  No, sir.
7  Q  Do you know of any trip that -- other than the
8     Greenville trip -- that Charles Coon took either
9     Jessica or Justin on in his private vehicle?
10 A  No.
11 Q  Do you know of him going to Six Flags with Justin;
12    whether he drove him, or they were there together,
13    or anything like that?
14 A  Not to my knowledge.
15 Q  Or to Florida?
16 A  No, sir.
17 Q  Or to a fish pond in your area --
18 A  No, sir.
19 Q  -- where they fished?
20    MR. SWEENEY:  Let me have just a minute.
21       (Brief recess.)
22 BY MR. SWEENEY:
23 Q  Mr. Reed, I ask you earlier about the computers in

Page 23

1     your house.  During the 2004-2005 school year, how
2     many computers did you have in your home?
3  A  Four, I believe.
4  Q  And where were they located?
5  A  One was a laptop.  Three were desktops.  There is
6     one in each of the kids' rooms.  The boys all stay
7     in one room.  Of course, Jessica stays in her own
8     room.  And there is one in our bedroom.
9  Q  After the allegations came up about Coon after
10    June of 2005, did you ever go to those four
11    computers to check to see if there was anything on
12    the computers that was alarming?
13 A  Yes.
14 Q  What did you find?
15 A  Nothing.  I saw a little history on the boys
16    computer of like Playboy.com.  And I played that
17    off as typical boy's curiosity.
18 Q  On occasions when Charles Coon was in your house,
19    did he have access to your computers?
20 A  On a couple of occasions.
21 Q  Did you see that he was using your computer on
22    those occasions?
23 A  Yes.

Page 24

1  Q  Did you ever check to see what he was downloading
2     on the computers?
3  A  I didn't notice him downloading anything.  The
4     time he was this was limited.
5  Q  When the DA analyzed the computer information, did
6     they give you a timeframe of when the gay
7     pornography was linked?
8  A  They did not give us a time.  Bradbury --
9  Q  But you had checked the computers, and you hadn't
10    seen that?
11 A  Hadn't seen it.
12       From my understanding -- let me intervene with
13    this -- I haven't had any communication with the
14    DA whatsoever.  My communication was with
15    Bradbury.  From what I understand, Bradbury had it
16    sent to the Alabama Bureau of Investigation.  They
17    did a report on it.  He told us that there was
18    pornography, gay pornography on the computer.  He
19    did not cover anything else.  Did not show us the
20    report.  Did not give us anything.  And it took us
21    months to get the computer actually back.
22 Q  Did I understand you to say that Justin has been
23    reluctant to talk about this with you, or did you

Page 25

1     say he has never talked to you about it?
2  A  Justin basically has never said anything to us
3     about it.
4  Q  Okay.  Thank you.
5  A  We confront him.  We ask him.  He won't talk to
6     us.  But we have continually sought to get him
7     whatever help he needs, because we know it's
8     there.  It's in his mind.
9  Q  Thank you very much.  One last question:  Do you
10    have anything you want to supplement to any answer
11    you have previously given to a question?
12 A  Not that I can recall.
13 Q  So, to the best of your knowledge, you have shared
14    with me all of the relevant information that fits
15    the questions that I have asked?
16 A  Yes, sir.
17 Q  Thank you very much.
18       (Whereupon, at approximately, 2:15
19       p.m. on the 19th day of July, 2007
20       the deposition was concluded.)
21       * * * * * * * * *
22       FURTHER DEPONENT SAITH NOT
23       * * * * * * * * * *

```
Page 26
1
2        REPORTER'S CERTIFICATE
3
4   STATE OF ALABAMA
5   MONTGOMERY COUNTY
6
7        I do hereby certify that the above and foregoing
8   transcript of the deposition of THOMAS MICHAEL REED was
9   taken down by me in machine shorthand on the 19th of
10  July, 2007, and the questions and answers thereto
11  reduced to writing under my personal supervision, and
12  that the foregoing represents a true and correct
13  transcript of the proceedings given by said witness
14  upon said hearing.
15       I further certify that I am neither of counsel nor
16  related to the parties to the action, nor am I any wise
17  interested in the results of said cause.
18       Dated this 9th day of August, 2007.
19
20       _____
21       Mary Moore-Wynn
22       Certified Shorthand Reporter
23
```

**A**

abuse 10:17,21
  11:13,20 12:12
  12:15 14:2,19
  17:22 18:4
abused 13:12
  14:14 16:19
  17:3 20:6
abusive 8:22
accepted 9:6
access 21:3,9
  23:19
accurate 8:10
  10:18
accused 18:9
action 26:16
Adam 15:23
address 5:11
administrators
  18:2
ago 9:16
agreeable 6:1
agreed 3:12 4:1
  4:9
Alabama 1:19
  2:6,10,15 5:12
  24:16 26:4
alarming 23:12
allegations 23:9
Allen 2:9
analyzed 24:5
Ann 2:19
answer 5:22 6:3
  25:10
answers 26:10
apparently
  16:14
APPEARAN...
  2:3
applicant 10:5
applicants 10:13
appropriate 9:4
approximately
  1:21 8:12
  25:18

Arant 2:13
area 22:17
arrest 15:5 16:3
asked 25:15
asking 5:19
  16:23,23
assume 5:22
assumed 16:22
assumption
  16:23
ate 22:5
attacked 7:15
attend 19:3
attorney 2:5
  6:22 21:7
August 26:18
Avenue 2:10,14
aware 20:19
Azar 2:9,9

**B**

B 2:6
back 11:7 24:21
band 8:3,8,8,13
  8:16,16,17,20
  9:6,10,13,14
  9:17,20 11:16
  11:23 12:2
bands 10:1
based 8:19 9:9
  12:10
basically 15:4
  25:2
Bazzell 2:18
  12:21 17:13
  18:2
beans 10:3
bedroom 23:8
belief 9:7
believe 8:8 9:16
  14:3 15:22
  23:3
believed 9:1
best 25:13
best-qualified
  10:12

better 11:2
Birmingham
  2:15
Blake's 15:14
Board 1:12,18
  9:12 12:18
  16:21 17:4,9
  17:21 18:8
boosters 8:16
boys 23:6,15
boy's 23:17
Bradbury 14:20
  14:21 15:6,9
  15:13 16:4,6,8
  24:8,15,15
Bradley 2:13
Brief 22:21
bring 14:16
  21:21
Brundidge 5:12
Buddy 12:23
  17:19
Bureau 24:16
business 8:1

**C**

caliber 9:22
call 13:14 14:15
car 21:22
case 1:9 4:2,5
  16:9
Casey 12:23
  17:15
cause 26:17
cell 13:21 14:1
  14:11 15:11,17
  20:16
Certificate 4:16
  26:2
Certified 26:22
certify 26:7,15
change 6:3
Charles 8:7,21
  9:6 10:5,20
  11:13,20 12:4
  12:12,14,17,18

12:20 13:11
  14:14 17:2
  18:7 19:14,18
  19:22 20:10
  21:12,16 22:8
  23:18
chat 21:1
check 23:11
  24:1
checked 9:2
  24:9
checking 15:19
child 8:13 15:22
children 8:3 9:5
  10:21 15:19
  19:20
choice 9:12
choosing 9:23
Civil 3:15
claimed 14:9
claims 7:13
clear 5:19
clue 10:22 11:6
  11:8
come 21:23
coming 18:8
commencing
  1:20
commission
  3:17
Commissioner
  1:17 3:16
committee 19:5
communicate
  13:21 20:23
communicating
  20:20
communication
  13:23 21:12
  24:13,14
complaint 6:15
  7:2,5 12:16,20
  15:14 17:12
complete 18:22
computer 20:20
  21:3,5 23:16

23:21 24:5,18
  24:21
computers 21:2
  21:12 22:23
  23:2,11,12,19
  24:2,9
concern 19:14
  19:18
concerned 14:1
concerning 18:1
concerns 20:10
concluded 25:20
concluding
  12:16
conduct 8:22
  18:9
confidence
  18:22
confirming
  14:13
confiscated
  15:16
confront 25:5
Construction
  8:2
contentions 6:15
continually 25:6
continue 11:15
conversation
  13:17 14:4,17
  17:11
Coon 8:7,22 9:6
  9:9,21 10:5,20
  11:13,20 12:4
  12:12,14,17,18
  12:20 13:11
  14:14 15:15
  16:19 17:2
  18:7,12,22
  19:14,18,22
  20:6,10,20
  21:13,16 22:8
  23:9,18
Coon's 16:3
correct 26:12
cost 16:5

JR, A Minor                        July 19, 2007                        Pike County Board of Education

Page 28

counsel 3:13 4:2
4:10 26:15
County 1:12,18
5:12 8:4,7,14
8:19 9:15
12:17 16:20
17:5,9,21 18:3
18:8 26:5
couple 23:20
course 23:7
court 1:1 7:13
7:17
cover 24:19
created 10:19
CSR 3:16
curiosity 23:17
currently 7:23

**D**
DA 16:7 24:5,14
date 18:14,15
Dated 26:18
daughter 18:23
day 11:20 25:19
26:18
Deanie 2:9
defendant 1:14
2:12 7:10,20
Defendant's
6:10
definite 17:1
DePaola 2:5 5:6
10:9 13:8
DEPONENT
25:22
deposed 5:14,16
deposition 1:16
3:13,15,20 4:3
4:4,11 6:6,11
6:20 25:20
26:8
desktops 23:5
details 15:18
DHR 13:15,19
14:15 15:10
direct 16:7

director 8:9 9:7
9:14
directors 9:20
dirt 16:9
disclosed 15:13
discussed 6:21
discussions 17:7
district 1:1,2
21:7
documentary
6:14
documents 6:12
6:23
dogs 7:14,16
doing 15:3 21:19
Donald 2:13
downloading
24:1,3
Dr 2:18
drive 21:16
drove 22:12
duly 5:3

**E**
EAR 1:4
earlier 22:23
educated 10:22
11:2
education 1:13
1:18 12:18
16:21 17:22
18:19:5,6
either 3:22 4:6
21:11 22:8
Elizabeth 5:14
employed 7:22
employee 13:3
16:20 17:4
employees 18:4
employment
18:7
engage 8:22
evaluation 15:1
15:3
evidence 3:21
6:14 15:2,5

Examination
4:15 5:7
Exhibit 6:11
expect 6:6
express 19:14,18
extensive 15:3
extent 11:18,23
18:22
e-mail 21:1

**F**
fact 10:5 14:14
fair 10:17 12:15
faith 9:3 11:4
family 15:14
fashion 8:17
FATHER 1:4
Fear 20:12
Federal 2:14
3:14
feel 14:23
Fifth 2:14
filing 4:3,7 16:2
find 23:14
fine 18:20,23
finish 10:9
finishes 13:9
first 5:2 13:5,11
14:4,21 16:18
17:1
fish 22:17
fished 22:19
fits 25:14
five 21:18
Flags 22:11
Florida 22:15
follows 5:4
foregoing 26:7
26:12
forget 14:21
form 3:18
formality 3:17
forth 1:20 15:15
found 15:16
21:7
four 21:18 23:3

23:10
frequency 18:1
full 5:10 6:1 9:3
11:4 14:19
further 4:1,9
14:22 25:22
26:15

**G**
gay 21:5 24:6,18
give 24:6,8,20
given 6:16 25:11
26:13
giving 5:23
go 14:6 18:11
23:10
goats 7:15
going 12:3 15:7
18:11,17 22:11
Greenville 18:12
19:1 22:8
group 18:16
guess 16:9

**H**
handicapped
16:11
happened 10:18
12:10 20:1,2
hear 11:10,18
hearing 26:14
help 25:7
hereto 3:22 4:6
high 8:4,7,8,14
8:20 9:15
hill 10:2
hire 9:4 10:1
hired 9:2,21
hiring 9:23
history 18:7
23:15
home 15:16
18:17 19:23
20:7 21:15,16
21:22 22:3
23:2

Hon 2:5,9,13
house 12:4 22:5
23:1,18
Huh 20:4

**I**
idea 15:19
IEP 19:3
immediately
14:1
improper 18:9
inappropriate
21:13
inconclusive
15:2
INDEX 4:13
indicate 9:11
indicating 7:14
indication 14:19
individualized
19:4
information 6:7
10:15 13:5,11
14:13 15:11
16:18 17:2,21
18:6 20:6 24:5
25:14
informed 19:22
inquiry 15:10
18:1
inservice 18:3
interested 26:17
interrelating
19:19
intervene 24:12
introduced 4:5
investigated 9:2
15:15
investigating
16:8
investigation
14:23 24:16
involved 8:3
9:23 11:16,23
involvement
8:19

**J**

**Jessica** 18:11 20:9 22:9 23:7
**Jessica's** 21:9
**join** 16:2
**JR** 1:4
**Judge** 7:15,16
**July** 1:17 25:19 26:10
**June** 13:6,13,14 23:10
**Justin** 11:13,20 12:12,15 13:12 14:6,8,9,14,16 14:17 15:21,23 16:10,19 17:3 19:4,23 20:7 20:11,16,19 21:16,22 22:9 22:11 24:22 25:2
**Justin's** 15:17 21:3

**K**

**kids** 23:6
**kind** 15:4
**knew** 18:20 21:19
**know** 11:2 14:9 14:10,11,12 15:6,6,10,18 15:23 18:11 20:8,17 22:7 22:11 25:7
**knowledge** 19:21 22:5,14 25:13

**L**

**laptop** 23:5
**Law** 2:5
**lawsuit** 7:8
**lawyers** 6:16
**learned** 20:1
**led** 14:3,19

**limited** 24:4
**limitedly** 8:18 11:17
**linked** 24:7
**listened** 5:18
**little** 12:1 23:15
**lived** 5:13
**located** 23:4
**locked** 16:12,12
**look** 10:22 11:3 11:5
**looked** 7:16 9:2
**looking** 11:7
**Love** 1:19

**M**

**machine** 26:9
**making** 15:4
**manner** 4:6
**Mark** 2:18 12:21 17:12 18:2
**marked** 6:10
**Mary** 1:17 3:16 26:21
**material** 6:15
**matters** 17:8
**McDaniel** 13:1 17:17
**meals** 22:2
**meet** 19:5
**meeting** 6:21,22 14:15 15:13 16:7
**meetings** 15:9 19:3
**member** 12:17 17:4
**members** 17:8
**mentally** 16:11
**Michael** 1:16 3:14 4:3,14 5:1 5:10 26:8
**MIDDLE** 1:2
**mind** 25:8
**MINOR** 1:4

**minute** 22:20
**MLF** 1:10
**Mona** 14:16,17 14:23 16:13
**monitored** 20:23
**Montgomery** 2:6,10 26:5
**months** 24:21
**Moore-Wynn** 1:17 3:16 26:21
**MOTHER** 1:4

**N**

**name** 5:9,10 14:21 15:17,23
**named** 7:20 15:22
**names** 15:20,21
**need** 3:19
**needs** 25:7
**neighbor** 7:14
**neither** 26:15
**never** 14:18 16:6 17:7 22:5 25:1 25:2
**North** 2:14
**notice** 6:11 11:10,19 24:3
**number** 12:5,8
**numerous** 9:19

**O**

**objections** 3:17 3:18
**observation** 9:9
**observe** 11:10
**occasion** 8:18
**occasions** 12:5,8 21:15,21 22:2 23:18,20,22
**occurred** 10:6 14:20
**offered** 3:21
**Officer** 14:21
**offices** 1:18

**official** 16:20 17:4
**okay** 15:8 20:22 25:4
**once** 20:7
**opened** 16:14
**opinion** 10:1
**opportunity** 10:4 12:7
**outlined** 5:18

**P**

**participate** 13:17 19:7
**parties** 3:13 4:2 26:16
**party** 3:22 4:6
**people** 9:4
**person** 10:12
**personal** 10:1 26:11
**personally** 17:7
**phone** 13:21 14:1,11,15 15:11,17 20:16
**Pike** 1:12,18 8:4 8:7,13,19 9:15 12:17 16:20 17:4,9,21 18:3 18:8
**place** 2:14 14:2 18:14
**Plaintiff** 1:7 2:4 7:7
**Playboy.com** 23:16
**played** 23:16
**please** 5:20 7:1 13:9
**point** 10:22
**policy** 17:22
**pond** 22:17
**pool** 10:5
**poor** 9:12
**pornography** 21:5 24:7,18

24:18
**possibility** 14:3
**practices** 12:3
**preparation** 6:19
**PRESENT** 2:17
**previous** 9:13
**previously** 25:11
**prior** 7:7 18:7
**private** 22:9
**Procedure** 3:15
**proceedings** 26:13
**program** 8:4,13 11:23 19:6
**prolonged** 15:3
**proper** 15:1
**protocol** 5:18
**provided** 3:22 4:6
**Pryon** 12:23 17:19
**purpose** 3:22
**pursuant** 1:19 3:14
**pursue** 16:4,8
**put** 9:3 11:3,19 16:6
**puts** 11:10
**p.m** 1:21 25:19

**Q**

**quality** 9:20
**question** 5:22 6:1 10:10 17:1 25:9,11
**questioned** 9:20 15:20
**questions** 3:18 3:19 5:19 6:8 13:9 25:15 26:10

**R**

**R** 2:13
**read** 7:2,4

JR, A Minor                        July 19, 2007                    Pike County Board of Education

Page 30

| | | | | |
|---|---|---|---|---|
| reading 4:10 | Road 5:12 | shorthand 26:9 | stuff 15:16 | think 8:9 |
| really 15:6 | Robert 12:23 | 26:22 | sued 7:13 | Thomas 1:16 |
| 16:14 | 17:17 | show 8:9 24:19 | suing 7:7 | 3:14 4:3,14 5:1 |
| reason 8:21 | room 21:1 23:7 | sic 8:18 | suit 7:12,20 | 5:10 26:8 |
| recall 18:14 | 23:8 | signing 4:11 | Suite 2:6 | thought 21:13 |
| 25:12 | rooms 23:6 | signs 10:23 11:6 | summer 10:8 | three 15:9 23:5 |
| received 13:14 | Rose 2:13 | 11:8 | 18:15,18 | threw 7:17 |
| recess 22:21 | Rules 3:15 | similar 9:22 | Superintendent | time 3:19,20 6:4 |
| record 21:2 | ruling 3:20 | sir 6:2,5,9 7:19 | 2:18 12:21 | 11:3,11 13:5 |
| records 8:9 9:13 | | 7:21 8:6 10:16 | supervise 11:5 | 16:18 17:1 |
| reduced 26:11 | **S** | 12:6,9,22 13:2 | supervision | 24:4,8 |
| Reed 1:16 2:19 | SAITH 25:22 | 13:4,20,22 | 26:11 | timeframe 24:6 |
| 3:14 4:3,14 5:1 | saw 9:10 23:15 | 17:10,14,16,18 | supplement 6:3 | times 9:20 |
| 5:9,10 18:6 | schedule 14:15 | 17:20,23 18:5 | 25:10 | TMR 1:5 |
| 19:22 22:23 | school 8:4,7,8,10 | 18:10,13,19 | support 6:15 | today 6:12 20:15 |
| 26:8 | 8:14,14,20,20 | 19:2,8,10,12 | Susan 2:5 | told 20:13 24:17 |
| regardless 4:7 | 9:1,3,11,15 | 19:16 22:6,16 | suspect 8:21 | training 18:4 |
| regularity 19:3 | 10:19 11:4,15 | 22:18 25:16 | suspicion 10:20 | transcript 26:8 |
| related 26:16 | 11:22 12:11 | six 17:8 22:11 | 12:11,14 | 26:13 |
| relating 20:11 | 13:3 18:3,21 | small 7:13 | Sweeney 2:13 | trial 4:5 |
| 21:12 | 19:9,13,17 | sorry 10:11 | 4:15 5:5,8 | triggered 15:10 |
| relevant 6:8 | 21:17 23:1 | 13:10 | 22:20,22 | trip 22:7,8 |
| 25:14 | see 10:5 11:4,8,9 | sought 25:6 | sworn 5:3 | Troy 1:19 |
| reluctant 24:23 | 11:18 20:16 | speak 5:3 | system 9:1,3 | true 26:12 |
| report 20:9 | 21:5,7,11 | special 19:6 | 11:4 18:3 | truth 5:3,3,4 |
| 24:17,20 | 23:11,21 24:1 | specific 7:1 | | trying 16:8 |
| reported 15:12 | seen 14:18 24:10 | 18:15 | **T** | turned 14:20 |
| 16:19 17:3,12 | 24:11 | started 18:21 | taken 1:16 3:14 | turning 6:16 |
| Reporter 26:22 | self-employed | state 5:9 16:11 | 3:16 14:2 26:9 | two 15:9 |
| Reporter's 4:16 | 7:23 | 26:4 | talk 12:7 14:16 | type 7:12 |
| 26:2 | sent 24:16 | STATES 1:1 | 16:13 20:15 | typical 23:17 |
| representative | set 1:20 | Statute 3:23 4:7 | 21:23 24:23 | typically 21:2 |
| 13:19 | sexual 10:17 | stay 23:6 | 25:5 | |
| representatives | 14:2,19 17:22 | stayed 16:12 | talked 25:1 | **U** |
| 13:15 | 18:4 | stays 23:7 | tapes 6:12 | Uh-huh 5:21 |
| representing | sexually 8:22 | stipulated 3:12 | teachers 10:23 | understand |
| 3:13 4:2 | 10:21 11:13,20 | 4:1,9 | 11:1,5 | 16:17 24:15,22 |
| represents 26:12 | 12:12,15 13:12 | stipulations | teaching 9:5 | understanding |
| reserved 3:20 | 14:14 16:19 | 1:20 3:10 5:5 | tell 14:8 | 24:12 |
| response 6:1 | 17:3 19:23 | street 1:19 2:6 | terms 10:17 | understood 5:23 |
| restate 5:20 | 20:6 | 16:6 | Terry 12:23 | UNITED 1:1 |
| results 26:17 | sexual-abusing | stronger 16:10 | 17:15 | Usual 5:5 |
| review 6:19,23 | 11:1 | student 9:14 | testified 5:4 | |
| 10:4 19:5 | sexual-harassi... | 18:9 | Thank 25:4,9,17 | **V** |
| reviewed 17:21 | 10:23 | students 8:23 | thereto 26:10 | vacancy 10:6 |
| right 9:18 11:5 | shared 6:7 25:13 | 18:16 | things 11:1,5 | vehicle 22:9 |

JR, A Minor                                July 19, 2007                        Pike County Board of Education

**videotape** 14:18
  16:15,16
**videotaped**
  14:17
**violated** 19:23
**VS** 1:9

**W**

**wait** 13:8
**waived** 4:4,12
**waiving** 4:7
**want** 6:3 16:5
  25:10
**wanted** 14:22
  15:2,5 16:4
**warrant** 16:2,5
**Washington**
  2:10
**wasn't** 7:16
**way** 9:23
**ways** 9:19
**went** 7:15 16:4
  18:23
**West** 2:6
**whatsoever**
  24:14
**whereabouts**
  20:17
**White** 2:13
**wife** 5:13 13:14
  13:18,21,23
  16:2 19:14,17
  20:19
**wise** 26:16
**witness** 4:10,11
  5:2 10:11
  13:10 26:13
**word** 15:4
**work** 8:16 18:17
**working** 9:10
**worrying** 19:15
**worse** 16:10
**worth** 10:2
**writing** 26:11

**Y**

**yard** 18:17
**yeah** 11:7
**year** 8:10,14,17
  9:11 10:19
  11:9,15,19,22
  12:11 18:21
  19:9,13,17
  23:1
**years** 8:4,20
  9:16

**1**

**1** 6:11
**1:45** 1:21
**101** 1:19
**162** 5:12
**1726** 2:6
**1819** 2:14
**19th** 1:17 25:19
  26:9

**2**

**2nd** 2:6
**2:06-CV-1120**
  1:10
**2:15** 25:18
**2002-2003** 8:10
  8:14,20 9:11
  10:19 11:9
**2003-2004** 11:15
  19:9
**2004** 18:18
**2004-2005** 11:22
  12:11 18:21
  19:11,13,17
  23:1
**2005** 13:13
  23:10
**2007** 1:18 25:19
  26:10,18
**26** 4:16
**260** 2:10

**3**

**35203** 2:15
**36104** 2:10

**36105** 2:6

**4**

**4430** 5:12

**5**

**5** 4:15

**9**

**9th** 26:18

EXHIBIT 17

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS
MOTHER AND FATHER, EAR
AND TMR,


     PLAINTIFF,


VS.                              CASE NO.:

                                 2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

         * * * * * * * * * *

    DEPOSITION OF POLLY KING, taken before Mary

Moore-Wynn, as Commissioner, on the 19th of July, 2007,

in the offices of Pike County Board of Education, 101

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 9:00 a.m.


         * * * * * * * * * *

JR, A Minor                          July 19, 2007  Pike County Board of Education

---

Page 2

```
1
2          * * * * * * * * * *
3          APPEARANCES:
4    FOR THE PLAINTIFF:
5    Hon. Susan DePaola
     Attorney at Law
6    1726 West 2nd Street, Suite B
     Montgomery, Alabama 36105
7
8    and
9    Hon. Deanie Allen
     Azar and Azar
10   260 Washington Avenue
     Montgomery, Alabama 36104
11
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant, Rose & White
14   One Federal Place
     1819 Fifth Avenue North
15   Birmingham, Alabama 35203
16
17   ALSO PRESENT:
18   Dr. Mark Bazzell, Superintendent
19
20
21
22
23
```

Page 4

```
1    filing of the deposition of POLLY KING is hereby
2    waived, and that said deposition may be introduced a
3    the trial of this case or used in any other manner by
4    either party hereto provided for by the Statute,
5    regardless of the waiving of the filing of same.
6        It is further stipulated and agreed by and
7    between counsel and the witness that the reading
8    and signing of the deposition by the witness is
9    hereby waived.
10
11                    INDEX
12   POLLY KING
13   Examination By Ms. DePaola              5
         Examination By Mr. Sweeney         33
14   Further Examination By Ms. DePaola     39
15   Reporter's Certificate                 44
16
17
18
19
20
21
22
23          * * * * * * * * *
```

Page 3

```
1
2
3          * * * * * * * * * *
4
5
6
7
8            STIPULATIONS
9
10      It is hereby stipulated and agreed by and between
11   counsel representing the parties that the deposition of
12   POLLY KING is taken pursuant to the Federal Rules of
13   Civil Procedure, and that said deposition may be taken
14   before Mary Moore-Wynn, CSR, as Commissioner, without
15   the formality of a commission; that objections to
16   questions, other than objections as to the form of the
17   questions, need not be made at this time, but may be
18   reserved for a ruling at such time as the deposition
19   may be offered into evidence, or used for any other
20   purpose by either party hereto, provided by the
21   Statute.
22      It is further stipulated and agreed by and between
23   counsel representing the parties in this case, that the
```

Page 5

```
1              POLLY KING
2        (Whereupon, the witness, after having first been
3    duly sworn to speak the truth, the whole truth, and
4    nothing but the truth, and testified as follows:)
5              EXAMINATION
6    BY MS. DePAOLA
7    Q   Could you state your name for the Record, please?
8    A   My name is Polly King.
9    Q   And is that your official name?  I mean, is it
10       Elizabeth?  Or is that nickname?
11   A   No, that's my name.
12   Q   That's your name?
13   A   That's what my mother put on me at birth.
14   Q   And what is your street address?
15   A   9690 US Highway 29, North, Banks, Alabama, 3600
16   Q   And how long have you lived there, Ms. King?
17   A   At that particular address?
18   Q   Yes, ma'am.
19   A   I can't really tell you.  Uhm, four, maybe five
20       years.  I had a farm about a mile from there.  And
21       I sold it and moved there.
22   Q   And are you employed?
23   A   I am retired US Air Force.  Disabled, retired US
```

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

JR, A Minor                    July 19, 2007   Pike County Board of Education

---

Page 6

1    Air Force.
2  Q  What was your job with the Air Force?
3  A  I was a registered nurse.
4  Q  Oh, okay. And do you currently have any kids in
5     the Pike County school system?
6  A  My last child graduated this year.
7  Q  And what was his name?
8  A  Martin.
9  Q  And I know you also have a son name Matt; is that
10    correct?
11 A  That is MAK.
12 Q  Oh, I thought it was Matt?
13 A  No, it was MAK, M-A-K. His initials. That was
14    his nickname. I have four other -- I mean, three
15    other children besides him that have went through
16    the Pike County school system plus two
17    stepchildren that have went through the Pike
18    County system.
19 Q  Can you tell me the names of your children who
20    went through Pike County?
21 A  James Culley King. Charles Alva King. And then
22    my daughter, she went through 10th grade. And her
23    name was Angel Lynn King.

---

Page 7

1  Q  Are any of these children the one known as Matt?
2  A  Martin is MAK. There is no Matt.
3  Q  I have seen some reference in documents to Matt
4     King. That is not your son and --
5  A  I don't know who Matt King is. My son is MAK,
6     M-A-K.
7  Q  What year did MAK graduate?
8  A  He graduated this year in May.
9  Q  And in your duties as an RN with the Air Force,
10    can you just describe for me what you did?
11 A  I was a pediatric nurse specialist. I took care
12    of injured children. Our ward was so small that I
13    also had to take care of adult patients, as well,
14    because of the overflow. Uhm...
15 Q  Would this include children that had -- I don't
16    know if this is the right word -- that had
17    psychiatric injuries or problems as well as
18    physical?
19 A  The military had special facilities for
20    psychiatric patients. And I didn't work in
21    psychiatric.
22 Q  So, these are primarily physical injuries?
23 A  Yes, ma'am.

---

Page 8

1  Q  Any other employment that you have had?
2  A  Just as a nurse. I worked civilian nursing for
3     some years prior to going in the military.
4  Q  Okay. Now, do I understand correctly that you
5     have been a foster parent from time to time?
6  A  I was a foster parent for 16 years.
7  Q  Was that here in Pike County?
8  A  Yes, ma'am. It sure was.
9  Q  And what kind of -- I mean, can you just tell me a
10    little bit about that?
11 A  We were a specialty home. We took neglected,
12    abused, or very ill children. We were a home for
13    hard-to-place kids.
14 Q  Okay. And so did you have any experience seeing
15    or contact with children who have been sexually
16    abused?
17 A  Yes, ma'am. I had quite a few children in my home
18    that had been sexually abused.
19 Q  Okay. I'm going to get back to that, but I want
20    to sidetrack to another question. With respect to
21    the people around this table today, can you tell
22    me who you have met with around this table or
23    spoken to on the phone in the last six months?

---

Page 9

1  A  I know the Superintendent (indicating.) I have
2     known him for years.
3  Q  Did you speak with him in the last six months?
4        THE WITNESS: Were you at the meeting
5           when MAK was in trouble?
6        THE SUPERINTENDENT: I think we spoke?
7  A  We probably said hi. Other than that, that's
8     probably all we said to each other.
9  Q  All right. Have you spoken to Ms. Allen?
10 A  I know I have spoken to one of you all. I don't
11    know which one.
12 Q  Okay. Have you spoken to Mr. Sweeney before?
13 A  Not that I know of.
14 Q  Just to make sure you know who we all are,
15    Mr. Sweeney represents the Pike County Board of
16    Education and the individual defendants, and I
17    represent Justin Reed. And Deanie represents
18    Justin Reed. I should have done that at the
19    outset. I apologize.
20       So, in your role as a foster parent and seeing
21    kids who are sexually abused, can you tell me what
22    you experience in terms of signs or symptoms that
23    you would recognize of sexual abuse?

3  (Pages 6 to 9)

Page 10

1  A   Sexually abused children are usually sexually
2      aggressive.  They tend to be more talkative.  They
3      tend to be a little harder to handle.  They have
4      discipline problems.
5  Q   Okay.  All right.  Now, have you done any study on
6      the issue of sexual abuse?
7  A   No, ma'am.
8  Q   Are you familiar with any of the signals that
9      indicate that an adult may be sexually abusing a
10     child?
11 A   Uhm -- just my own opinion of what I feel like are
12     signs.  I mean, I haven't studied anything.
13 Q   I understand.  Can you just tell me what signs you
14     believe might be indicative of this?
15 A   Uhm, well, an adult that hangs around a child
16     that's not related to him an -- an excessively
17     amount of time; that buys children gifts --
18 Q   Okay.
19 A   -- that aren't related to him.  I mean, those
20     kinds of things kind of put up a red warning
21     signal.
22 Q   Okay.  Anything else that you can think of?
23 A   I --

Page 11

1  Q   I'm sorry?
2  A   I mean, I don't -- you know --
3  Q   Just from your --
4  A   If you see a guy that likes to put his hands on --
5      it seems to be, you know, always putting his hands
6      on a child or something like that.  You know,
7      those kind of things.
8  Q   Okay.  Now, it's my understanding that at some
9      point you had some concerns about Mr. Coon --
10     Charles Coon, I think his name is -- and may have
11     brought these concerns to the attention some
12     official.  And the purpose of this testimony is
13     just to get the history of what happened.  That's
14     all.
15 A   Not anything on sexual abuse, I didn't.  He
16     offered my son a Marijuana cigarette on the ride
17     home from a football game one night.  And I went
18     to the school and complained about that.  That's
19     the only time that I have had any complaint about
20     anything -- with him.
21 Q   So, can you tell me when this occurred or came to
22     your attention?
23 A   No.  I can't remember.

Page 12

1  Q   Okay.  Well, let me just give you some dates.
2      Mr. Coon plead guilty to sexual abuse in the
3      summer of 2005.  Would it be fair to assume it was
4      before that?
5  A   Oh, yes, ma'am, it was before that.
6  Q   Do you think it was during that school year,
7      2004-5, or 2003-4?
8  A   It was during -- let's see:  My son was in the
9      10th grade when it happened.  He graduated this
10     year.  So, you all do the math.
11 Q   So, I would expect that would be during the
12     2004-2005 school year he would be in the 10th
13     grade?
14 A   Okay.  (Indicating).
15 Q   I mean, he didn't fail any grades in the middle
16     there?
17 A   No, ma'am.  No, ma'am.
18 Q   So, during the 10th grade, how did you become
19     aware of the cigarette and the Marijuana aspect of
20     it?
21 A   My son came home, and he came straight to me and
22     says, I'm not going to ride home with him any
23     more, mama.  And I said, why?  He said, because

Page 13

1      they were trying to they were smoking pot.  And he
2      kept trying to get me to smoke.  And I said, well,
3      good; you don't need to ride with him any more.
4      And that was the end of it.
5  Q   Now, was your son in the band?
6  A   Yes, ma'am.  He was in the drum section.
7  Q   He was riding home with Mr. Coon, was this like
8      after a football game?
9  A   It was after a football game, I think.  I think it
10     was after a football game.  I can't swear to it.
11     It might have been after a practice.  It just
12     happened to be one of those nights when my other
13     two sons happened not to be in town.  And he
14     didn't have a way home.  And I guess I he couldn't
15     catch one with a friend.
16 Q   But you think it was sometime during the fall
17     either after a football game or after a practice?
18 A   Yes.  It would have had to have been for him to be
19     with them, you know.  It was some something with
20     the band.
21 Q   Okay.  So, I take it that MAK did not regularly
22     ride with Mr. Coon?
23 A   No.

4  (Pages 10 to 13)

JR, A Minor                    July 19, 2007   Pike County Board of Education

## Page 14

1  Q   Had you ever previously seen Mr. Coon ride any of
2      the other students around anywhere?
3  A   Oh, yes, ma'am. I saw him on several occasions
4      when my house -- my house burned during that
5      school year. And we had to live in the housing
6      projects, which is right behind the school. And
7      there was numbers of occasions when I would see
8      him go by with kids.
9  Q   Okay. I'm sorry. I know you can't remember the
10     exact dates or anything, but are we still talking
11     about during that fall of 2004?
12 A   During that school year.
13 Q   The whole school year?
14 A   Yeah. During that school year period.
15 Q   Was this during the school day or after school?
16     What can you remember about those?
17 A   After -- mostly after school, I guess. I may have
18     seen him once or twice with kids during school.
19     They may have been moving equipment. I don't
20     know. You know, just -- I just remember, you
21     know, that I did see him with other kids.
22 Q   Now, did he have a truck or a regular vehicle or
23     do you recall?

## Page 15

1  A   I don't remember. I don't recall.
2  Q   Don't recall? Okay. And had you directed your
3      son not to ride around with him?
4  A   After that date, yeah.
5  Q   After that date. Okay. All right. Can you
6      recall the names of any of the children that you
7      saw riding around with Mr. Coon?
8  A   Uhm, the one child specific that I saw quite a few
9      times with him was the little Helms boy. The one
10     that killed himself.
11     MR. SWEENEY:  The what boy?
12     THE WITNESS:  Helms boy.
13 Q   Helms. Adam?
14 A   Yeah. Adam and MAK were friends.
15 Q   Okay. So, when MAK came and told you this, that
16     he was being offered a Marijuana cigarette, did
17     you, then, discuss that with anybody? Did you
18     report it to anybody?
19 A   Yeah. I went and talked to the sup -- the
20     assistant principal at the high school.
21 Q   Is that Mr. McDaniel?
22 A   Yes, it was.
23 Q   Can you tell me how many times did you meet with

## Page 16

1      Mr. McDaniel?
2  A   I don't remember. It was a few times.
3  Q   And this would have been in the fall of 2004?
4  A   It was during the school year. I don't remember
5      what time it was.
6  Q   Did MAK play in the band in the winter?
7  A   Yes, ma'am. And he also took band during the
8      spring. So, you know, I don't know. I can't -- I
9      am on a lot of medications --
10 Q   Okay.
11 A   -- and I cannot remember dates.
12 Q   I understand. So, your meetings or contact with
13     Mr. McDaniel, were they at the school?
14 A   Yes, ma'am.
15 Q   And you think there was more than one meeting?
16 A   Yes, ma'am, I think so.
17 Q   And can you just summarize for us what you told
18     him your concern was?
19 A   I just told him that I thought that they needed to
20     watch Mr. Coon. That, you know I didn't know if
21     he was selling drugs on school or if he was just
22     giving them away to the kids. But that -- you
23     know, and I explained the incident that happened.

## Page 17

1      Basically, that's -- that was what our meeting was
2      about. I -- I do know that it got back later on
3      that the principal came in and talked to us. And
4      I don't remember who he was. I don't even
5      remember his face, because I only met him that one
6      time. But their conclusion was that there wasn't
7      enough evidence to do anything to Mr. Coon,
8      because they couldn't verify from any of the other
9      kids that he had ever done anything like that with
10     them. And so, it was dropped.
11 Q   During your conversations, did any kids other than
12     Adam come up?
13 A   I don't remember. I'm sorry.
14 Q   Let me just go over some names with you and ask
15     you if you might have brought these kids to their
16     attention. Jeron Senn?
17     MR. SWEENEY:  I'm sorry. What's the
18     question?
19     MS. DePAOLA:  The question was: I'm
20     going to go over these names, and
21     her if any of the people are names
22     that she might have brought to their
23     attention, I think I said.

Mary Moore-Wynn, CSR  Mary Moore-Wynn          (334)244-0203
              Court Reporting Services

JR, A Minor          July 19, 2007  Pike County Board of Education

Page 18

1      MR. SWEENEY: Brought to a school
2         official's attention?
3      MS. DePAOLA: Yes. To Mr. McDaniel's or
4         the principals.
5  BY MS. DePAOLA
6  Q  Jeron Senn?
7  A  No, ma'am. I don't know him.
8  Q  Don't know him and had no discussions about him?
9  A  No, ma'am.
10 Q  How about Andrew Law?
11 A  Yeah. I didn't mention Andrew, but I know Andrew.
12    Andrew and MAK are best friends. But I don't know
13    Andrew -- I mean, I didn't say anything to the
14    school about Andrew.
15 Q  Did you ever see Andrew or Jeron in the truck with
16    Mr. Coon?
17 A  Andrew didn't hang around with Mr. Coon. He
18    wasn't in the band.
19 Q  Levi Davis. Did you bring that name to anyone's
20    attention?
21 A  Levi is my neighbor. I mean, him and MAK are the
22    same age. But I don't remember.
23 Q  That wasn't something that came from you?

Page 19

1  A  No. No, not that I know of.
2  Q  How about Thomas Green?
3  A  Thomas Green also is my neighbor. But as far
4     as -- I don't know.
5  Q  Do you know after you brought this to
6     Mr. McDaniel's attention if he or anyone talked to
7     MAK?
8  A  Yes. Mr. McDaniels (sic), I know, talked to MAK.
9     But, like I said, they -- they concluded that
10    there wasn't enough evidence about the Marijuana
11    to do anything about it. And it was dropped.
12 Q  Okay. When he talked to MAK, do you know if he
13    did that at school?
14 A  I'm sure it was at school.
15 Q  Did they allow you to be present for that?
16 A  I'm sure if I wanted to have been, they could have
17    been. But at that time, my health was real bad.
18    And I didn't have transportation. And --
19 Q  Were you present? I should have asked it that
20    way.
21 A  No, not that I can remember.
22 Q  Okay. All right. And you met with Mr. McDaniel
23    you said a few times. You said it was more than

Page 20

1     once, but you don't remember how many.
2  A  Yeah, I don't remember exactly how many.
3  Q  And you met with a principal on one occasion.
4  A  Yeah, I was there to talk to Mr. McDaniels, and
5     the principal came in.
6  Q  You don't know if that was Mr. Pryon?
7  A  I just remember it was a white man. That's all I
8     can tell you. I don't really know who it was. I
9     had never met him before. And I never met him
10    again. So, I just --
11 Q  Okay. Other than speaking with school officials,
12    did you ever speak with anyone with the drug task
13    force, with police department, the sheriff? Any
14    other official?
15 A  I talked to a friend of mine who happens to work
16    for the Troy Police Department in the drug task
17    force or did at that time. He doesn't any more.
18 Q  Who is that?
19 A  Uhm, you know, I can't remember his name. I'm
20    sorry. Because as far as I know, they are not
21    even around here any more. What was his name?
22    It's been several years. My memory is not good.
23    I don't remember his name. I'm sorry. He worked

Page 21

1     for the Troy City Police Department. That's --
2     he -- and I just asked him what I needed to do.
3     And he told me to go to the school.
4  Q  So, you told him essentially the same --
5  A  Yeah.
6  Q  -- same story that you told the school officials?
7  A  I just told him that MAK had been offered
8     Marijuana by a teacher; what should I do?
9  Q  Was this before or after you went to the school?
10 A  It was before I went to the school.
11 Q  I see. Okay. So, he, to your knowledge, didn't
12    conduct any investigation?
13 A  It was out of his jurisdiction.
14 Q  Okay.
15 A  But he advised me to go to the school, and that if
16    I didn't get anything from the school, to go to
17    the Brundidge City Police.
18 Q  Anyone else besides your friend with the drug task
19    force -- any other official you tried to bring
20    this to their attention?
21 A  No, ma'am. Not that I can remember.
22 Q  Okay. Now, other than your meeting with
23    Mr. McDaniel and the principal and your attempt to

6  (Pages 18 to 21)

Mary Moore-Wynn, CSR  Mary Moore-Wynn        (334)244-0203
       Court Reporting Services

JR, A Minor                          July 19, 2007   Pike County Board of Education

---

Page 22

1    report it to the drug tasks force --
2  A  Well, I wasn't attempting to report it to the drug
3     task force.  I was just asking a friend for
4     advice.
5  Q  I see.  I'm sorry.  I didn't mean to
6     mischaracterize it.  So, other than those two
7     contacts, did you contact anyone else about it?
8  A  Not that I can remember.
9  Q  Did you ever discuss this matter with, for
10    instance, Mona Watson or anyone child protect or
11    an advocacy center?
12 A  I know Mona.  But I don't know if I talked to her
13    about it or not.  I don't remember talking to her
14    about it.
15 Q  All right.  Have you ever discussed this matter
16    with any of the Reeds?
17 A  Oh, yeah.  They called me.
18 Q  Okay.
19 A  And I told them I didn't know anything about their
20    son being involved in anything.
21 Q  Was it Mrs. Reed who called you or Mr. Reed?  I
22    mean, who?
23 A  I don't remember which one it was.  Me and

---

Page 23

1     Ms. Reed don't get along very well.  So, it was
2     probably Mr. Reed.
3  Q  Okay.  And, I mean, can you recall the content of
4     the conversation?  They called you for what
5     purpose?
6  A  To apologize for sicking you on me without
7     notifying me first.
8  Q  Okay.  Tell us what exactly you mean "sicking" us
9     on you.
10 A  Well, someone from the Reed family got Jeremy,
11    their oldest child, to get my number, because it's
12    unlisted, because he's a friend of my oldest son.
13    And they gave the number to you all, so you all
14    could call me.  And I got on Jeremy, because I
15    told him that he wasn't supposed to give my number
16    to anybody.  So, somebody from the family called
17    to try to apologize for giving my number to
18    someone.
19 Q  Do you feel like there is some reason you
20    shouldn't be required to testify in this case?
21 A  I don't have good health.  I'm on a lot of
22    medications.  I'm prone to have seizures under
23    stress.  Grand mal seizures.  And if you know

---

Page 24

1     anything about grand mal seizures, every time you
2     have one, it kills brain cells.  And I really -- I
3     don't know anything about sexual abuse.  So -- and
4     this is what this case is about.
5  Q  What medications are you on today?
6  A  Today?
7  Q  Uh-huh.
8  A  I am on Topamax.  I'm on Neurontin.  I'm on
9     Lorazepam, Clonazepam, Arava --
10 Q  Are these all things you have taken this morning?
11 A  That I take within a 24-hour period, yes, ma'am.
12 Q  What have you taken this morning?
13 A  Okay.  I have taken my Topamax, my Neurontin.
14    I've taken one Lorazepam.  I have taken -- taken
15    my Aspirin for my heart.  I took my shot this
16    morning, my Lovenox shot for my blood clot
17    disorder.  I've taken -- I'm trying to think which
18    ones I take in the morning.  I take a handful.
19    Oh, and my Arava.
20 Q  Arava?
21 A  Arava.
22 Q  What is that for?
23 A  It's an immunosuppressant.

---

Page 25

1  Q  Okay.  Now, did you ever discuss your concerns
2     that you have described to us about the Marijuana
3     cigarette and driving around in the car with
4     anyone else; husband, family members, neighbors;
5     anyone else?
6  A  I don't have a husband.  Uhm, not that I know of.
7     I mean, my children, probably, because they were
8     the ones that took me back and forth.
9  Q  To the school?
10 A  To the school, yeah.  Or to wherever I go, they
11    take me back and forth.
12 Q  Now, let me just see what else here we've got.
13    Did you ever see Mr. Coon with Blake Faulkner?
14 A  I don't know a Blake Faulkner.
15        MS. DePAOLA:  Is that his name?
16        MS. ALLEN:  Uh-huh.
17 Q  Did you ever become concerned that Adam may be
18    being sexually abused by Mr. Coon?
19        MR. SWEENEY:  Object to the form.
20 A  I don't -- as far as -- I am not sure.  Yeah, I
21    had concerns, because the child just -- he didn't
22    act right.  He didn't act like himself the last
23    year or so.

---

                                        7 (Pages 22 to 25)

JR, A Minor                     July 19, 2007  Pike County Board of Education

Page 26

1  Q   Okay. I'm sorry. I don't recall. Did you say
2      Adam was one of the kids that you saw riding
3      around in the car with Mr. Coon?
4  A   Yes. Adam lived over in our neighborhood, and I
5      saw Coon and him together quite often.
6  Q   Can you tell me what changed about his conduct
7      that caused you concern?
8  A   Adam was a real quiet, real easy-going child. He
9      got to where he was nervous. He was a little bit
10     of a daredevil. He started staying away from his
11     friends. Just little things. And he was all the
12     time with Coon. They were going on fishing trips
13     together. They were -- you know, camping trips,
14     doing things together all the time.
15         MR. SWEENEY: I'm sorry. Who was?
16         THE WITNESS: Adam.
17         MR. SWEENEY: And who?
18         THE WITNESS: The band director.
19  Q  Ms. King, how did you find out that this was going
20     on; the fishing trips and the camping trips?
21  A  Seen it with my own eyes, as far as the fishing
22     trips, because they would go to the pond down
23     below where Andrew Law -- I don't know how you all

Page 27

1      got his name -- but Andrew Law lives over in a
2      little neighborhood. And like I said, MAK and
3      Andrew are best friends. And there is a pond down
4      below his house. And I think Adam lived in --
5      matter of fact, Adam did live in the same
6      neighborhood. And Coon and him would go fishing
7      down there. And I have been fishing at the pond
8      when they happened to show up.
9  Q   Would they show up in Mr. Coon's truck, or do you
10     recall?
11  A   I don't remember. I just know they showed up at
12     the pond.
13  Q   And the camping trips, how would you know about
14     that?
15  A   From talk from the kids that was in the house, you
16     know. My house is kind of the neighborhood
17     hangout for the children.
18  Q   Did you ever discuss your concerns about Adam with
19     anyone?
20  A   Nobody except MAK when we were talking about this
21     kind of stuff, I asked him was Adam on the truck
22     with them the night they were smoking. And he
23     was. So, I mean, other than that --

Page 28

1  Q   But, I mean, did you ever -- I mean, did you ever
2      bring that to Mr. McDaniel's attention, your
3      concerns about him?
4  A   I may have mentioned it to him. I don't remember.
5      But I may very well have mentioned it to him.
6          MR. SWEENEY: I'm sorry. May have
7          mentioned it to who?
8          THE WITNESS: Mr. McDaniels.
9          MR. SWEENEY: But you're not sure?
10         THE WITNESS: No. I can't remember. I
11         have problems with my memory. I'm
12         sorry.
13 BY MS. DePAOLA
14  Q   Okay. Anybody else you may have discussed your
15     concerns about Adam with?
16  A   Not that I can recall.
17  Q   Okay. Did you ever discuss them with Adam's
18     parents?
19  A   I didn't know Adam's parents very well. I just
20     knew them when I saw them. I knew Adam's sister,
21     because she dated my oldest son.
22  Q   Okay. But, I mean, did you discuss it with them?
23  A   No. I would have never mentioned anything to her.

Page 29

1  Q   Did you feel that Mr. McDonald believed what you
2      said?
3  A   I felt like he did.
4  Q   Did you believe that he tried to investigate and
5      find out what happened?
6  A   I believe that he did.
7  Q   Did he ever tell you -- you seem to say they
8      couldn't prove anything. I mean, can you tell me
9      exactly what was said?
10 A   He just --
11 Q   Not exactly. Strike that part. To the best of
12     your recollection, what did he tell you?
13 A   The best I can remember was that they couldn't get
14     verification from any of the other children that
15     he had offered drugs to them and that -- and, too,
16     MAK, wasn't wanting to be cooperative, either,
17     because he didn't want to be a snitch. And I
18     think with all of it together, there just -- there
19     wasn't any concrete evidence to pin on him.
20 Q   Do you know anyone named Denise McCloud?
21 A   Not that I know of.
22 Q   Okay. Have you ever received any information from
23     anyone else regarding similar charges against

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
         Court Reporting Services

Page 30

1   Mr. Coon?
2 A   Not that I know of.
3 Q   Okay.  The person who worked with the drug task
4     force who you contacted, do you know was that a
5     male or a female?
6 A   He was a male.
7 Q   Was he white or black?
8 A   He was black.
9 Q   Do you know where he works now?
10 A   No, I don't.  I don't even know where he's at now.
11 Q   Don't even know if he's in Troy?
12 A   I don't even know if he's still in Troy or not.
13 Q   Other than seeing Mr. Coon with Adam at the pond
14     and driving in his car, you said somewhere near
15     the housing project --
16 A   Yeah, around the school.
17 Q   Did you ever see him in any stores, restaurants,
18     or any other places?
19 A   If I did, I don't remember.
20 Q   Now, other than -- I know you were aggravated at
21     the Reeds for giving us your phone number; had you
22     had some prior contact with them?
23 A   Just with the older son.  He used to hang around

Page 31

1     with my older son when they were kids.  And --
2 Q   You -- sorry.
3 A   They worked together some in the past year.
4 Q   Because you said you didn't get along with them
5     very well.  What was the problem?
6 A   Ms. Reed was just always real high strung.
7     Flirty.  I just didn't have much in common with
8     her.  And we really just didn't hit it off.  Not
9     that we had any problems.  It was no bad words
10     between us or anything like that.  I just didn't
11     care --
12 Q   Okay.
13     MS. DePAOLA:  I would like to take a
14          break for just a few seconds.
15          (Brief recess.)
16 BY MS. DePAOLA
17 Q   Do you know an Officer Phelps?
18 A   Ah, yeah.  What's his first name?
19 Q   I don't know.
20 A   Uhm, I think that's the last name of the guy I
21     talked to.
22 Q   Okay.
23 A   Like I said, this has been quite a few years ago.

Page 32

1 Q   Yes, ma'am.  Did you ever discuss this matter with
2     Carolyn Townsend?
3 A   Who is Carolyn Townsend?
4 Q   I think she is an employee of the Pike County
5     Board of Education -- or was.
6 A   (Witness Indicating.)  If I did, I don't remember.
7 Q   Okay.  Butch Phelps?
8 A   Butch?  Yeah.  Butch was -- Butch was who I talked
9     to.
10 Q   That's the person with the drug task force?
11 A   Yeah -- yeah.  Well, he worked for the City of
12     Troy.
13 Q   Okay.
14 A   I think he sometimes worked with the task force.
15     But he was actually employed by the City of Troy.
16     And like I said, I didn't call him in the
17     police capacity.  It was just as a -- a friend.
18 Q   Did you ever have any discussion with Moses
19     Davenport about it?
20 A   I don't think I ever talked to Mose about it.  I
21     was told if I didn't get anywhere with the school
22     to talk to the City.  But I don't think I ever
23     went to Mose with it.

Page 33

1 Q   Since all of this came to light -- and by all of
2     this, I mean Mr. Coon pleading guilty to sexual
3     abuse of several kids in Pike County -- have you
4     had any conversations with any other parents about
5     this matter?
6     MR. SWEENEY:  Object to the form.
7 A   Not that I can remember.  Other than just, you
8     know, the fact that we talked about maybe what was
9     on TV, you know, that they caught him.
10     I don't -- I don't really have any contact
11     with very many parents other than ones that just
12     live right close to me, because I don't get out.
13     I don't drive.
14 Q   Did you ever talk to Adam's parents?
15 A   No.
16 Q   Did you ever talk to Blake's parents?
17 A   No.
18     MS. DePAOLA:  Okay.  I don't have any
19          other questions.  Thank you.
20          EXAMINATION
21 BY MR. SWEENEY
22 Q   I have a couple of questions, if I could,
23     Ms. King.

Page 34

1  A  All right.
2  Q  When Martin reported this incident about Coon
3     offering him Marijuana cigarette, were other
4     students in the car?
5  A  Yes, it was two other boys. And I don't remember
6     exactly who the other boys were. I think the
7     little Helms boy was one of them, as best I can
8     remember. But other than that, I don't know who
9     they were.
10 Q  Do you remember sharing with Mr. McDaniel the
11    names of those boys and having him investigate by
12    talking to those boys?
13 A  I'm sure I did at that time, because my son
14    gave -- told me who the children were. I just
15    can't remember. It's just been so long.
16 Q  And I'm not trying to get exact names and so
17    forth. But you shared with Mr. McDaniel all of
18    the information you had about that complaint,
19    didn't you?
20 A  Yes, sir, I did.
21 Q  You shared with him what Martin told you?
22 A  Yes, sir.
23 Q  You shared with him the names of the boys if you

Page 35

1     knew them?
2  A  Yes, sir.
3  Q  And did Mr. McDaniel tell you that he would
4     investigate those matters?
5  A  Yes, he did.
6  Q  And after your initial conversation, you had a
7     follow-up meeting with him, didn't you?
8  A  Yes, sir.
9  Q  And did he explain to you what he had done and
10    what he had learned?
11 A  Yes. He said he had talked to the boys and that
12    none of them would confess that it had happened,
13    best I can remember, and that MAK wasn't being
14    cooperative either, because he didn't want to be a
15    snitch to his friends.
16 Q  Did he ask you if you had any other suggestions
17    about what else he should do?
18 A  Not that I can remember.
19 Q  Do you know if a conference was held with Mr. Coon
20    going over these allegations with him?
21 A  No, I never met with Coon.
22 Q  Do you know if Mr. Bazzell wrote Mr. Coon about
23    this incident or --

Page 36

1  A  I have no idea.
2  Q  -- talked with Mr. Coon?
3     At the time, were you satisfied that
4     Mr. McDaniel had looked at these matters very
5     earnestly and seriously?
6  A  I felt Mr. McDaniels had done everything he could.
7  Q  All right. Did the concern that you expressed
8     about Adam and Mr. Coon come up before or after
9     this episode concerning Marijuana?
10 A  I had noticed that Adam was hanging around him a
11    lot before the cigarette thing. So, yeah, I had
12    ideas even before then.
13 Q  Do you have information now as we're talking this
14    morning that Coon sexually abused Adam?
15 A  No, I don't. I sure don't.
16 Q  I don't, either. That's why I am asking about
17    your concern.
18 A  No, sir. I have no evidence whatsoever that he
19    did anything with Adam other than just ride him
20    around.
21 Q  Okay. Did you ever see Justin Reed with Mr. Coon?
22 A  I wouldn't have known it if I had, because I
23    didn't know who Justin was. I know the older Reed

Page 37

1     boy and the daughter, the red-headed daughter.
2     Those were the only Reed children I knew.
3  Q  Do you know when you first had concerns about Adam
4     that Adam had changed, or when that started
5     appearing in your mind?
6  A  Uhm, it was sometime before the cigarette
7     incident, but I'm not sure how long.
8  Q  And as I understand, you never went to Adam's
9     parents to share this concern?
10 A  No. I didn't know Adam's parents.
11 Q  And you didn't go to any school official to
12    share --
13        MS. DePAOLA: Object to the --
14 A  No.
15        MS. DePAOLA: That mischaracterizes her
16        prior testimony.
17 Q  Did you go to any school official to talk about
18    your concern with Adam?
19 A  No, I didn't.
20 Q  If Mr. McDaniel were to indicate you never
21    mentioned Adam to him in any form or fashion,
22    would you contradict that?
23 A  I don't remember. What I -- I said I may have

10 (Pages 34 to 37)

Page 38

1  said something to him about Adam. I do not know
2  for sure that I did.
3  Q  Are there any notes that you might have that could
4     refresh your recollection about that?
5  A  No, sir.
6  Q  You said it's possible you may have mentioned it;
7     correct?
8  A  Yes, sir. I may have.
9  Q  And you answered that in response to counsel's
10    question. But if Mr. McDaniel has no recollection
11    that you ever mentioned Adam or any students other
12    than those that were riding in the car, would you
13    contradict that?
14       MS. DePAOLA: Object to the form.
15 A  I can't remember. So, how could I object if he
16    says I didn't?
17 Q  In other words, you really don't know if you
18    mentioned Adam to Mr. McDaniel?
19 A  I do not remember.
20 Q  So, it's a possibility, but you don't remember
21    doing that?
22 A  I do not remember.
23 Q  When you saw Mr. Coon fishing with Adam, do you

Page 39

1  know what other students were with him at the
2  time?
3  A  Best I can remember, it was just him and Adam.
4  Q  Okay. You mentioned camping trips that your --
5  A  Those were just things that the kids told me. I
6     never saw any of it.
7  Q  And you don't know who might have gone on those
8     trips?
9  A  No, sir. I sure don't.
10 Q  But your son didn't go on those trips?
11 A  No, sir. My son never went anywhere with him
12    again.
13 Q  Okay.
14       MR. SWEENEY: Thank you for coming in
15    this morning.
16       THE WITNESS: Thank you.
17       FURTHER EXAMINATION
18 BY MS. DePAOLA
19 Q  Let me ask just a couple more questions. What
20    kids told you about -- what kids told you about
21    the camping trips?
22 A  Ma'am, there is probably 100 to 150 children in
23    and out of my home in a week's time. It could

Page 40

1  have been any of them.
2  Q  Does that mean you don't remember?
3  A  Yes, ma'am.
4  Q  That all you have to let me know.
5  A  I don't remember.
6  Q  If you don't recall, that's fine.
7       Did you ever hear that he took kids on trips
8     to Florida?
9  A  No, not that I can recall.
10 Q  How about Six Flags?
11 A  Now, I remember something somebody said that he
12    had taken somebody to Six Flags. But, you know, I
13    don't -- like I said, this is kids talking. And
14    me picking up pieces here and there. It wasn't
15    conversations directly to me.
16 Q  Prior to him pleading guilty to sexual abuse, did
17    you ever hear anything about the cell phones he's
18    provided children?
19 A  I think my son told me that he had gotten Adam a
20    cell phone. But, you know, that was just --
21    that's hearsay. That's just what I was told.
22 Q  Did you tell Mr. McDaniel about that?
23 A  I don't remember.

Page 41

1  Q  Okay. Are you aware of Mr. Coon -- I mean, have
2     you heard anything about Mr. Coon having prior
3     sexual abuse complaints against him in other
4     schools?
5  A  Not that I know of.
6  Q  And this is unrelated to Mr. Coon specifically,
7     but have you ever made any other complaints to the
8     school system about anything?
9  A  Oh, I am sure I have over the years. I have had a
10    lot of children to go through the school system.
11 Q  Okay.
12 A  But I can't recall what they would have been.
13    But, I mean, my oldest stepdaughter is 36 years
14    old, and she graduated from there. So, that's a
15    lot of years. So, I'm sure, over the years, I
16    have complained about things.
17 Q  I mean, complained to the extent of going to the
18    Superintendent or central office personnel?
19 A  Not that I can remember. Just go to the school,
20    complain to the principal or the assistant
21    principal.
22 Q  Okay. And had any of these prior complaints been
23    made to Mr. McDaniel?

11 (Pages 38 to 41)

Page 42

1  A  I think that was Mr. McDaniel's first year there
2     as best I can remember.
3  Q  So, is that a no?
4  A  Yes, ma'am.
5  Q  How about had any of these prior complaints been
6     made to Mr. Pryon?
7  A  I don't even know Mr. Pryon.
8  Q  How about to Mr. Casey?
9  A  Mr. Casey. I may have complained about something
10    to Mr. Casey. I don't remember. I had several
11    children in school during the time he was
12    principal.
13 Q  How about to Ms. Watson, Mona Watson?
14 A  I don't know Ms. Mona Watson.
15 Q  How about to Ms. Shakleford, the police officer?
16 A  Me and Sherry have been friends for a long time.
17    I may have said something to Sherry.
18 Q  Not about Mr. Coon?
19 A  No, not that I can remember.
20 Q  Where does Ms. Shackleford work now?
21 A  Not sure. I think she still works for the
22    Brundidge Police Department, best I can -- best I
23    know.

Page 43

1  Q  Do you know where she lives?
2  A  No, ma'am, I don't. She used to live in our
3     apartment when I had my house in town. But I have
4     no idea where Sherry lives now.
5  Q  Is she married?
6  A  Don't know.
7        MS. DePAOLA: That's all. Thank you.
8        MR. SWEENEY: Thank you very much. I
9        hope you are doing better.
10       THE WITNESS: Thank you.
11
12       (Whereupon, at approximately, 9:50
13       a.m. on the 19th day of July, 2007
14       the deposition was concluded.)
15
16
17       * * * * * * * * *
18       FURTHER DEPONENT SAITH NOT
19       * * * * * * * * * *
20
21
22
23

Page 44

1
2           REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8  transcript of the deposition of POLLY KING was taken
9  down by me in machine shorthand on the 19th of July,
10 2007, and the questions and answers thereto reduced to
11 writing under my personal supervision, and that the
12 foregoing represents a true and correct transcript of
13 the proceedings given by said witness upon said
14 hearing.
15     I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18     Dated this 9th day of August, 2007.
19
20     _____
21     Mary Moore-Wynn
22     Certified Shorthand Reporter
23

JR, A Minor                          July 19, 2007   Pike County Board of Education
Page 1

| A | | | | |
|---|---|---|---|---|

**A**
abuse 9:23 10:6
  11:15 12:2
  24:3 33:3
  40:16 41:3
abused 8:12,16
  8:18 9:21 10:1
  25:18 36:14
abusing 10:9
act 25:22,22
action 44:16
Adam 15:13,14
  17:12 25:17
  26:2,4,8,16
  27:4,5,18,21
  28:15 30:13
  36:8,10,14,19
  37:3,4,18,21
  38:1,11,18,23
  39:3 40:19
Adam's 28:17
  28:19,20 33:14
  37:8,10
address 5:14,17
adult 7:13 10:9
  10:15
advice 22:4
advised 21:15
advocacy 22:11
age 18:22
aggravated
  30:20
aggressive 10:2
ago 31:23
agreed 3:10,22
  4:6
Ah 31:18
Air 5:23 6:1,2
  7:9
Alabama 1:19
  2:6,10,15 5:15
  44:4
allegations
  35:20
Allen 2:9 9:9

25:16
allow 19:15
Alva 6:21
amount 10:17
Andrew 18:10
  18:11,11,12,13
  18:14,15,17
  26:23 27:1,3
Angel 6:23
answered 38:9
answers 44:10
anybody 15:17
  15:18 23:16
  28:14
anyone's 18:19
apartment 43:3
apologize 9:19
  23:6,17
APPEARAN...
  2:3
appearing 37:5
approximately
  1:20 43:12
Arant 2:13
Arava 24:9,19
  24:20,21
asked 19:19
  21:2 27:21
asking 22:3
  36:16
aspect 12:19
Aspirin 24:15
assistant 15:20
  41:20
assume 12:3
attempt 21:23
attempting 22:2
attention 11:11
  11:22 17:16,23
  18:2,20 19:6
  21:20 28:2
Attorney 2:5
August 44:18
Avenue 2:10,14
aware 12:19

41:1
Azar 2:9,9
a.m 1:20 43:13

**B**
B 2:6
back 8:19 17:2
  25:8,11
bad 19:17 31:9
band 13:5,20
  16:6,7 18:18
  26:18
Banks 5:15
Basically 17:1
Bazzell 2:18
  35:22
believe 10:14
  29:4,6
believed 29:1
best 18:12 27:3
  29:11,13 34:7
  35:13 39:3
  42:2,22,22
better 43:9
Birmingham
  2:15
birth 5:13
bit 8:10 26:9
black 30:7,8
Blake 25:13,14
Blake's 33:16
blood 24:16
Board 1:12,18
  9:15 32:5
boy 15:9,11,12
  34:7 37:1
boys 34:5,6,11
  34:12,23 35:11
Bradley 2:13
brain 24:2
break 31:14
Brief 31:15
bring 18:19
  21:19 28:2
brought 11:11

17:15,22 18:1
  19:5
Brundidge
  21:17 42:22
burned 14:4
Butch 32:7,8,8,8
buys 10:17

**C**
call 23:14 32:16
called 22:17,21
  23:4,16
camping 26:13
  26:20 27:13
  39:4,21
capacity 32:17
car 25:3 26:3
  30:14 34:4
  38:12
care 7:11,13
  31:11
Carolyn 32:2,3
case 1:9 3:23 4:3
  23:20 24:4
Casey 42:8,9,10
catch 13:15
caught 33:9
cause 44:17
caused 26:7
cell 40:17,20
cells 24:2
center 22:11
central 41:18
Certificate 4:15
  44:2
Certified 44:22
certify 44:7,15
changed 26:6
  37:4
charges 29:23
Charles 6:21
  11:10
child 6:6 10:10
  10:15 11:6
  15:8 22:10

23:11 25:21
  26:8
children 6:15,19
  7:1,12,15 8:12
  8:15,17 10:1
  10:17 15:6
  25:7 27:17
  29:14 34:14
  37:2 39:22
  40:18 41:10
  42:11
cigarette 11:16
  12:19 15:16
  25:3 34:3
  36:11 37:6
City 21:1,17
  32:11,15,22
Civil 3:13
civilian 8:2
Clonazepam
  24:9
close 33:12
clot 24:16
come 17:12 36:8
coming 39:14
commencing
  1:20
commission
  3:15
Commissioner
  1:17 3:14
common 31:7
complain 41:20
complained
  11:18 41:16,17
  42:9
complaint 11:19
  34:18
complaints 41:3
  41:7,22 42:15
concern 16:18
  26:7 36:7,17
  37:9,18
concerned 25:17
concerning 36:9

concerns 11:9
  11:11 25:1,21
  27:18 28:3,15
  37:3
concluded 19:9
  43:14
conclusion 17:6
concrete 29:19
conduct 21:12
  26:6
conference
  35:19
confess 35:12
contact 8:15
  16:12 22:7
  30:22 33:10
contacted 30:4
contacts 22:7
content 23:3
contradict 37:22
  38:13
conversation
  23:4 35:6
conversations
  17:11 33:4
  40:15
Coon 11:9,10
  12:2 13:7,22
  14:1 15:7
  16:20 17:7
  18:16,17 25:13
  25:18 26:3,5
  26:12 27:6
  30:1,13 33:2
  34:2 35:19,21
  35:22 36:2,8
  36:14,21 38:23
  41:1,2,6 42:18
Coon's 27:9
cooperative
  29:16 35:14
correct 6:10
  38:7 44:12
correctly 8:4
counsel 3:11,23

4:7 44:15
counsel's 38:9
County 1:12,18
  6:5,16,18,20
  8:7 9:15 32:4
  33:3 44:5
couple 33:22
  39:19
COURT 1:1
CSR 3:14
Culley 6:21
currently 6:4

—————
D
daredevil 26:10
date 15:4,5
dated 28:21
  44:18
dates 12:1 14:10
  16:11
daughter 6:22
  37:1,1
Davenport
  32:19
Davis 18:19
day 14:15 43:13
  44:18
Deanie 2:9 9:17
DEFENDANT
  1:14 2:12
defendants 9:16
Denise 29:20
DePaola 2:5
  4:13,14 5:6
  17:19 18:3,5
  25:15 28:13
  31:13,16 33:18
  37:13,15 38:14
  39:18 43:7
department
  20:13,16 21:1
  42:22
DEPONENT
  43:18
deposition 1:16

3:11,13,18 4:1
  4:2,8 43:14
  44:8
describe 7:10
described 25:2
directed 15:2
directly 40:15
director 26:18
Disabled 5:23
discipline 10:4
discuss 15:17
  22:9 25:1
  27:18 28:17,22
  32:1
discussed 22:15
  28:14
discussion 32:18
discussions 18:8
disorder 24:17
DISTRICT 1:1
  1:2
documents 7:3
doing 26:14
  38:21 43:9
Donald 2:13
Dr 2:18
drive 33:13
driving 25:3
  30:14
dropped 17:10
  19:11
drug 20:12,16
  21:18 22:1,2
  30:3 32:10
drugs 16:21
  29:15
drum 13:6
duly 5:3
duties 7:9

—————
E
EAR 1:4
earnestly 36:5
easy-going 26:8
Education 1:13

1:18 9:16 32:5
either 3:20 4:4
  13:17 29:16
  35:14 36:16
Elizabeth 5:10
employed 5:22
  32:15
employee 32:4
employment 8:1
episode 36:9
equipment
  14:19
essentially 21:4
evidence 3:19
  17:7 19:10
  29:19 36:18
exact 14:10
  34:16
exactly 20:2
  23:8 29:9,11
  34:6
Examination
  4:13,13,14 5:5
  33:20 39:17
excessively
  10:16
expect 12:11
experience 8:14
  9:22
explain 35:9
explained 16:23
expressed 36:7
extent 41:17
eyes 26:21

—————
F
face 17:5
facilities 7:19
fact 27:5 33:8
fail 12:15
fair 12:3
fall 13:16 14:11
  16:3
familiar 10:8
family 23:10,16

25:4
far 19:3 20:20
  25:20 26:21
farm 5:20
fashion 37:21
FATHER 1:4
Faulkner 25:13
  25:14
Federal 2:14
  3:12
feel 10:11 23:19
  29:1
felt 29:3 36:6
female 30:5
Fifth 2:14
filing 4:1,5
find 26:19 29:5
fine 40:6
first 5:2 23:7
  31:18 37:3
  42:1
fishing 26:12,20
  26:21 27:6,7
  38:23
five 5:19
Flags 40:10,12
Flirty 31:7
Florida 40:8
follows 5:4
follow-up 35:7
football 11:17
  13:8,9,10,17
force 5:23 6:1,2
  7:9 20:13,17
  21:19 22:1,3
  30:4 32:10,14
foregoing 44:7
  44:12
form 3:16 25:19
  33:6 37:21
  38:14
formality 3:15
forth 1:20 25:8
  25:11 34:17
foster 8:5,6 9:20

**four** 5:19 6:14
**friend** 13:15
  20:15 21:18
  22:3 23:12
  32:17
**friends** 15:14
  18:12 26:11
  27:3 35:15
  42:16
**further** 3:22 4:6
  4:14 39:17
  43:18 44:15

**G**

**game** 11:17 13:8
  13:9,10,17
**gifts** 10:17
**give** 12:1 23:15
**given** 44:13
**giving** 16:22
  23:17 30:21
**go** 14:8 17:14,20
  21:3,15,16
  25:10 26:22
  27:6 37:11,17
  39:10 41:10,19
**going** 8:3,19
  12:22 17:20
  26:12,19 35:20
  41:17
**good** 13:3 20:22
  23:21
**gotten** 40:19
**grade** 6:22 12:9
  12:13,18
**grades** 12:15
**graduate** 7:7
**graduated** 6:6
  7:8 12:9 41:14
**grand** 23:23
  24:1
**Green** 19:2,3
**guess** 13:14
  14:17
**guilty** 12:2 33:2

40:16
**guy** 11:4 31:20

**H**

**handful** 24:18
**handle** 10:3
**hands** 11:4,5
**hang** 18:17
  30:23
**hanging** 36:10
**hangout** 27:17
**hangs** 10:15
**happened** 11:13
  12:9 13:12,13
  16:23 27:8
  29:5 35:12
**happens** 20:15
**harder** 10:3
**hard-to-place**
  8:13
**health** 19:17
  23:21
**hear** 40:7,17
**heard** 41:2
**hearing** 44:14
**hearsay** 40:21
**heart** 24:15
**held** 35:19
**Helms** 15:9,12
  15:13 34:7
**hereto** 3:20 4:4
**hi** 9:7
**high** 15:20 31:6
**Highway** 5:15
**history** 11:13
**hit** 31:8
**home** 8:11,12,17
  11:17 12:21,22
  13:7,14 39:23
**Hon** 2:5,9,13
**hope** 43:9
**house** 14:4,4
  27:4,15,16
  43:3
**housing** 14:5

30:15
**husband** 25:4,6

**I**

**idea** 36:1 43:4
**ideas** 36:12
**ill** 8:12
**immunosuppr...**
  24:23
**incident** 16:23
  34:2 35:23
  37:7
**include** 7:15
**INDEX** 4:11
**indicate** 10:9
  37:20
**indicating** 9:1
  12:14 32:6
**indicative** 10:14
**individual** 9:16
**information**
  29:22 34:18
  36:13
**initial** 35:6
**initials** 6:13
**injured** 7:12
**injuries** 7:17,22
**instance** 22:10
**interested** 44:17
**introduced** 4:2
**investigate** 29:4
  34:11 35:4
**investigation**
  21:12
**involved** 22:20
**issue** 10:6

**J**

**James** 6:21
**Jeremy** 23:10,14
**Jeron** 17:16
  18:6,15
**job** 6:2
**JR** 1:4
**July** 1:17 43:13

44:9
**jurisdiction**
  21:13
**Justin** 9:17,18
  36:21,23

**K**

**kept** 13:2
**kids** 6:4 8:13
  9:21 14:8,18
  14:21 16:22
  17:9,11,15
  26:2 27:15
  31:1 33:3 39:5
  39:20,20 40:7
  40:13
**killed** 15:10
**kills** 24:2
**kind** 8:9 10:20
  11:7 27:16,21
**kinds** 10:20
**King** 1:16 3:12
  4:1,12 5:1,8,16
  6:21,21,23 7:4
  7:5 26:19
  33:23 44:8
**knew** 28:20,20
  35:1 37:2
**know** 6:9 7:5,16
  9:1,10,11,13
  9:14 11:2,5,6
  13:19 14:9,20
  14:20,21 16:8
  16:8,20,20,23
  17:2 18:7,8,11
  18:12 19:1,4,5
  19:8,12 20:6,8
  20:19,20 22:12
  22:12,19 23:23
  24:3 25:6,14
  26:13,23 27:11
  27:13,16 28:19
  29:20,21 30:2
  30:4,9,10,11
  30:12,20 31:17

31:19 33:8,9
  34:8 35:19,22
  36:23,23 37:3
  37:10 38:1,17
  39:1,7 40:4,12
  40:20 41:5
  42:7,14,23
  43:1,6
**knowledge**
  21:11
**known** 7:1 9:2
  36:22

**L**

**Law** 2:5 18:10
  26:23 27:1
**learned** 35:10
**let's** 12:8
**Levi** 18:19,21
**light** 33:1
**likes** 11:4
**little** 8:10 10:3
  15:9 26:9,11
  27:2 34:7
**live** 14:5 27:5
  33:12 43:2
**lived** 5:16 26:4
  27:4
**lives** 27:1 43:1,4
**long** 5:16 34:15
  37:7 42:16
**looked** 36:4
**Lorazepam** 24:9
  24:14
**lot** 16:9 23:21
  36:11 41:10,15
**Love** 1:19
**Lovenox** 24:16
**Lynn** 6:23

**M**

**machine** 44:9
**MAK** 6:11,13
  7:2,5,7 9:5
  13:21 15:14,15

16:6 18:12,21
19:7,8,12 21:7
27:2,20 29:16
35:13
**mal** 23:23 24:1
**male** 30:5,6
**mama** 12:23
**man** 20:7
**manner** 4:3
**Marijuana**
11:16 12:19
15:16 19:10
21:8 25:2 34:3
36:9
**Mark** 2:18
**married** 43:5
**Martin** 6:8 7:2
34:2,21
**Mary** 1:16 3:14
44:21
**math** 12:10
**Matt** 6:9,12 7:1
7:2,3,5
**matter** 22:9,15
27:5 32:1 33:5
**matters** 35:4
36:4
**ma'am** 5:18 7:23
8:8,17 10:7
12:5,17,17
13:6 14:3 16:7
16:14,16 18:7
18:9 21:21
24:11 32:1
39:22 40:3
42:4 43:2
**McCloud** 29:20
**McDaniel** 15:21
16:1,13 19:22
21:23 29:1
34:10,17 35:3
36:4 37:20
38:10,18 40:22
41:23
**McDaniels** 19:8

20:4 28:8 36:6
**McDaniel's** 18:3
19:6 28:2 42:1
**mean** 5:9 6:14
8:9 10:12,19
11:2 12:15
18:13,21 22:5
22:22 23:3,8
25:7 27:23
28:1,1,22 29:8
33:2 40:2 41:1
41:13,17
**medications**
16:9 23:22
24:5
**meet** 15:23
**meeting** 9:4
16:15 17:1
21:22 35:7
**meetings** 16:12
**members** 25:4
**memory** 20:22
28:11
**mention** 18:11
**mentioned** 28:4
28:5,7,23
37:21 38:6,11
38:18 39:4
**met** 8:22 17:5
19:22 20:3,9,9
35:21
**middle** 1:2
12:15
**mile** 5:20
**military** 7:19
8:3
**mind** 37:5
**mine** 20:15
**MINOR** 1:4
**mischaracterize**
22:6
**mischaracteri...**
37:15
**MLF** 1:10
**Mona** 22:10,12

42:13,14
**Montgomery**
2:6,10 44:5
**months** 8:23 9:3
**Moore-Wynn**
1:17 3:14
44:21
**morning** 24:10
24:12,16,18
36:14 39:15
**Mose** 32:20,23
**Moses** 32:18
**mother** 1:4 5:13
**moved** 5:21
**moving** 14:19
**M-A-K** 6:13 7:6

—————
N
—————
**name** 5:7,8,9,11
5:12 6:7,9,23
11:10 18:19
20:19,21,23
25:15 27:1
31:18,20
**named** 29:20
**names** 6:19 15:6
17:14,20,21
34:11,16,23
**near** 30:14
**need** 3:17 13:3
**needed** 16:19
21:2
**neglected** 8:11
**neighbor** 18:21
19:3
**neighborhood**
26:4 27:2,6,16
**neighbors** 25:4
**neither** 44:15
**nervous** 26:9
**Neurontin** 24:8
24:13
**never** 20:9,9
28:23 35:21
37:8,20 39:6

39:11
**nickname** 5:10
6:14
**night** 11:17
27:22
**nights** 13:12
**North** 2:14 5:15
**notes** 38:3
**noticed** 36:10
**notifying** 23:7
**number** 23:11
23:13,15,17
30:21
**numbers** 14:7
**nurse** 6:3 7:11
8:2
**nursing** 8:2

—————
O
—————
**object** 25:19
33:6 37:13
38:14,15
**objections** 3:15
3:16
**occasion** 20:3
**occasions** 14:3,7
**occurred** 11:21
**offered** 3:19
11:16 15:16
21:7 29:15
**offering** 34:3
**office** 41:18
**officer** 31:17
42:15
**offices** 1:18
**official** 5:9
11:12 20:14
21:19 37:11,17
**officials** 20:11
21:6
**official's** 18:2
**Oh** 6:4,12 12:5
14:3 22:17
24:19 41:9
**okay** 6:4 8:4,14

8:19 9:12 10:5
10:18,22 11:8
12:1,14 13:21
14:9 15:2,5,15
16:10 19:12,22
20:11 21:11,14
21:22 22:18
23:3,8 24:13
25:1 26:1
28:14,17,22
29:22 30:3
31:12,22 32:7
32:13 33:18
36:21 39:4,13
41:1,11,22
**old** 41:14
**older** 30:23 31:1
36:23
**oldest** 23:11,12
28:21 41:13
**once** 14:18 20:1
**ones** 24:18 25:8
33:11
**opinion** 10:11
**outset** 9:19
**overflow** 7:14

—————
P
—————
**parent** 8:5,6
9:20
**parents** 28:18
28:19 33:4,11
33:14,16 37:9
37:10
**part** 29:11
**particular** 5:17
**parties** 3:11,23
44:16
**party** 3:20 4:4
**patients** 7:13,20
**pediatric** 7:11
**people** 8:21
17:21
**period** 14:14
24:11

JR, A Minor                    July 19, 2007  Pike County Board of Education

person 30:3
  32:10
personal 44:11
personnel 41:18
Phelps 31:17
  32:7
phone 8:23
  30:21 40:20
phones 40:17
physical 7:18,22
picking 40:14
pieces 40:14
Pike 1:12,18 6:5
  6:16,17,20 8:7
  9:15 32:4 33:3
pin 29:19
Place 2:14
places 30:18
PLAINTIFF 1:7
  2:4
play 16:6
plead 12:2
pleading 33:2
  40:16
please 5:7
plus 6:16
point 11:9
police 20:13,16
  21:1,17 32:17
  42:15,22
Polly 1:16 3:12
  4:1,12 5:1,8
  44:8
pond 26:22 27:3
  27:7,12 30:13
possibility 38:20
possible 38:6
pot 13:1
practice 13:11
  13:17
present 2:17
  19:15,19
previously 14:1
primarily 7:22
principal 15:20

17:3 20:3,5
  21:23 41:20,21
  42:12
principals 18:4
prior 8:3 30:22
  37:16 40:16
  41:2,22 42:5
probably 9:7,8
  23:2 25:7
  39:22
problem 31:5
problems 7:17
  10:4 28:11
  31:9
Procedure 3:13
proceedings
  44:13
project 30:15
projects 14:6
prone 23:22
protect 22:10
prove 29:8
provided 3:20
  4:4 40:18
Pryon 20:6 42:6
  42:7
psychiatric 7:17
  7:20,21
purpose 3:20
  11:12 23:5
pursuant 1:19
  3:12
put 5:13 10:20
  11:4
putting 11:5

_____

**Q**

question 8:20
  17:18,19 38:10
questions 3:16
  3:17 33:19,22
  39:19 44:10
quiet 26:8
quite 8:17 15:8
  26:5 31:23

_____

**R**

R 2:13
reading 4:7
real 19:17 26:8,8
  31:6
really 5:19 20:8
  24:2 31:8
  33:10 38:17
reason 23:19
recall 14:23 15:1
  15:2,6 23:3
  26:1 27:10
  28:16 40:6,9
  41:12
received 29:22
recess 31:15
recognize 9:23
recollection
  29:12 38:4,10
Record 5:7
red 10:20
reduced 44:10
red-headed 37:1
Reed 9:17,18
  22:21,21 23:1
  23:2,10 31:6
  36:21,23 37:2
Reeds 22:16
  30:21
reference 7:3
refresh 38:4
regarding 29:23
regardless 4:5
registered 6:3
regular 14:22
regularly 13:21
related 10:16,19
  44:16
remember 11:23
  14:9,16,20
  15:1 16:2,4,11
  17:4,5,13
  18:22 19:21
  20:1,2,7,19,23
  21:21 22:8,13

22:23 27:11
  28:4,10 29:13
  30:19 32:6
  33:7 34:5,8,10
  34:15 35:13,18
  37:23 38:15,19
  38:20,22 39:3
  40:2,5,11,23
  41:19 42:2,10
  42:19
report 15:18
  22:1,2
reported 34:2
Reporter 44:22
Reporter's 4:15
  44:2
represent 9:17
representing
  3:11,23
represents 9:15
  9:17 44:12
required 23:20
reserved 3:18
respect 8:20
response 38:9
restaurants
  30:17
results 44:17
retired 5:23,23
ride 11:16 12:22
  13:3,22 14:1
  15:3 36:19
riding 13:7 15:7
  26:2 38:12
right 7:16 9:9
  10:5 14:6 15:5
  19:22 22:15
  25:22 33:12
  34:1 36:7
RN 7:9
role 9:20
Rose 2:13
Rules 3:12
ruling 3:18

_____

**S**

SAITH 43:18
satisfied 36:3
saw 14:3 15:7,8
  26:2,5 28:20
  38:23 39:6
says 12:22 38:16
school 6:5,16
  11:18 12:6,12
  14:5,6,12,13
  14:14,15,15,17
  14:18 15:20
  16:4,13,21
  18:1,14 19:13
  19:14 20:11
  21:3,6,9,10,15
  21:16 25:9,10
  30:16 32:21
  37:11,17 41:8
  41:10,19 42:11
schools 41:4
seconds 31:14
section 13:6
see 14:4 12:8
  14:7,21 18:15
  21:11 22:5
  25:12,13 30:17
  36:21
seeing 8:14 9:20
  30:13
seen 7:3 14:1,18
  26:21
seizures 23:22
  23:23 24:1
selling 16:21
Senn 17:16 18:6
seriously 36:5
set 1:20
sexual 9:23 10:6
  11:15 12:2
  24:3 33:2
  40:16 41:3
sexually 8:15,18
  9:21 10:1,1,9
  25:18 36:14

Shackleford 42:20
Shakleford 42:15
share 37:9,12
shared 34:17,21 34:23
sharing 34:10
sheriff 20:13
Sherry 42:16,17 43:4
shorthand 44:9 44:22
shot 24:15,16
show 27:8,9
showed 27:11
sic 19:8
sicking 23:6,8
sidetrack 8:20
signal 10:21
signals 10:8
signing 4:8
signs 9:22 10:12 10:13
similar 29:23
sir 34:20,22 35:2 35:8 36:18 38:5,8 39:9,11
sister 28:20
six 8:23 9:3 40:10,12
small 7:12
smoke 13:2
smoking 13:1 27:22
snitch 29:17 35:15
sold 5:21
somebody 23:16 40:11,12
son 6:9 7:4,5 11:16 12:8,21 13:5 15:3 22:20 23:12 28:21 30:23

31:1 34:13 39:10,11 40:19
sons 13:13
sorry 11:1 14:9 17:13,17 20:20 20:23 22:5 26:1,15 28:6 28:12 31:2
speak 5:3 9:3 20:12
speaking 20:11
special 7:19
specialist 7:11
specialty 8:11
specific 15:8
specifically 41:6
spoke 9:6
spoken 8:23 9:9 9:10,12
spring 16:8
started 26:10 37:4
state 5:7 44:4
STATES 1:1
Statute 3:21 4:4
staying 26:10
stepchildren 6:17
stepdaughter 41:13
stipulated 3:10 3:22 4:6
stipulations 1:19 3:8
stores 30:17
story 21:6
straight 12:21
street 1:19 2:6 5:14
stress 23:23
Strike 29:11
strung 31:6
students 14:2 34:4 38:11 39:1

studied 10:12
study 10:5
stuff 27:21
suggestions 35:16
Suite 2:6
summarize 16:17
summer 12:3
sup 15:19
Superintendent 2:18 9:1,6 41:18
supervision 44:11
supposed 23:15
sure 8:8 9:14 19:14,16 25:20 28:9 34:13 36:15 37:7 38:2 39:9 41:9 41:15 42:21
Susan 2:5
swear 13:10
Sweeney 2:13 4:13 9:12,15 15:11 17:17 18:1 25:19 26:15,17 28:6 28:9 33:6,21 39:14 43:8
sworn 5:3
symptoms 9:22
system 6:5,16,18 41:8,10

─────────
T
table 8:21,22
take 7:13 13:21 24:11,18,18 25:11 31:13
taken 1:16 3:12 3:13 24:10,12 24:13,14,14,14 24:17 40:12

44:8
talk 20:4 27:15 32:22 33:14,16 37:17
talkative 10:2
talked 15:19 17:3 19:6,8,12 20:15 22:12 31:21 32:8,20 33:8 35:11 36:2
talking 14:10 22:13 27:20 34:12 36:13 40:13
task 20:12,16 21:18 22:3 30:3 32:10,14
tasks 22:1
teacher 21:8
tell 5:19 6:19 8:9 8:21 9:21 10:13 11:21 15:23 20:8 23:8 26:6 29:7 29:8,12 35:3 40:22
tend 10:2,3
terms 9:22
testified 5:4
testify 23:20
testimony 11:12 37:16
Thank 33:19 39:14,16 43:7 43:8,10
thereto 44:10
thing 36:11
things 10:20 11:7 24:10 26:11,14 39:5 41:16
think 9:6 10:22 11:10 12:6 13:9,9,16

16:15,16 17:23 24:17 27:4 29:18 31:20 32:4,14,20,22 34:6 40:19 42:1,21
Thomas 19:2,3
thought 6:12 16:19
three 6:14
time 3:17,18 8:5 8:5 10:17 11:19 16:5 17:6 19:17 20:17 24:1 26:12,14 34:13 36:3 39:2,23 42:11,16
times 15:9,23 16:2 19:23
TMR 1:5
today 8:21 24:5 24:6
told 15:15 16:17 16:19 21:3,4,6 21:7 22:19 23:15 32:21 34:14,21 39:5 39:20,20 40:19 40:21
Topamax 24:8 24:13
town 13:13 43:3
Townsend 32:2 32:3
transcript 44:8 44:12
transportation 19:18
trial 4:3
tried 21:19 29:4
trips 26:12,13 26:20,20,22 27:13 39:4,8 39:10,21 40:7

| | | | |
|---|---|---|---|
| **trouble** 9:5 | **wanting** 29:16 | **wouldn't** 36:22 | **260** 2:10 |
| **Troy** 1:19 20:16 | **ward** 7:12 | **writing** 44:11 | **29** 5:15 |
| 21:1 30:11,12 | **warning** 10:20 | **wrote** 35:22 | |
| 32:12,15 | **Washington** | | **3** |
| **truck** 14:22 | 2:10 | **Y** | **33** 4:13 |
| 18:15 27:9,21 | **wasn't** 17:6 | **yeah** 14:14 15:4 | **35203** 2:15 |
| **true** 44:12 | 18:18,23 19:10 | 15:14,19 18:11 | **36** 41:13 |
| **truth** 5:3,3,4 | 22:2 23:15 | 20:2,4 21:5 | **36001** 5:15 |
| **try** 23:17 | 29:16,19 35:13 | 22:17 25:10,20 | **36104** 2:10 |
| **trying** 13:1,2 | 40:14 | 30:16 31:18 | **36105** 2:6 |
| 24:17 34:16 | **watch** 16:20 | 32:8,11,11 | **39** 4:14 |
| **TV** 33:9 | **Watson** 22:10 | 36:11 | |
| **twice** 14:18 | 42:13,13,14 | **year** 6:6 7:7,8 | **4** |
| **two** 6:16 13:13 | **way** 13:14 19:20 | 12:6,10,12 | **44** 4:15 |
| 22:6 34:5 | **week's** 39:23 | 14:5,12,13,14 | |
| | **went** 6:15,17,20 | 16:4 25:23 | **5** |
| **U** | 6:22 11:17 | 31:3 42:1 | **5** 4:13 |
| **Uhm** 5:19 7:14 | 15:19 21:9,10 | **years** 5:20 8:3,6 | |
| 10:11,15 15:8 | 32:23 37:8 | 9:2 20:22 | **9** |
| 20:19 25:6 | 39:11 | 31:23 41:9,13 | **9th** 44:18 |
| 31:20 37:6 | **West** 2:6 | 41:15,15 | **9:00** 1:20 |
| **Uh-huh** 24:7 | **we're** 36:13 | | **9:50** 43:12 |
| 25:16 | **we've** 25:12 | **1** | **9690** 5:15 |
| **understand** 8:4 | **whatsoever** | **10th** 6:22 12:9 | |
| 10:13 16:12 | 36:18 | 12:12,18 | |
| 37:8 | **white** 2:13 20:7 | **100** 39:22 | |
| **understanding** | 30:7 | **101** 1:18 | |
| 11:8 | **winter** 16:6 | **150** 39:22 | |
| **UNITED** 1:1 | **wise** 44:16 | **16** 8:6 | |
| **unlisted** 23:12 | **witness** 4:7,8 5:2 | **1726** 2:6 | |
| **unrelated** 41:6 | 9:4 15:12 | **1819** 2:14 | |
| **usually** 10:1 | 26:16,18 28:8 | **19th** 1:17 43:13 | |
| | 28:10 32:6 | 44:9 | |
| **V** | 39:16 43:10 | | |
| **vehicle** 14:22 | 44:13 | **2** | |
| **verification** | **word** 7:16 | **2nd** 2:6 | |
| 29:14 | **words** 31:9 | **2:06-CV-1120** | |
| **verify** 17:8 | 38:17 | 1:10 | |
| **VS** 1:9 | **work** 7:20 20:15 | **2003-4** 12:7 | |
| | 42:20 | **2004** 14:11 16:3 | |
| **W** | **worked** 8:2 | **2004-2005** 12:12 | |
| **waived** 4:2,9 | 20:23 30:3 | **2004-5** 12:7 | |
| **waiving** 4:5 | 31:3 32:11,14 | **2005** 12:3 | |
| **want** 8:19 29:17 | **works** 30:9 | **2007** 1:17 43:13 | |
| 35:14 | 42:21 | 44:10,18 | |
| **wanted** 19:16 | | **24-hour** 24:11 | |

EXHIBIT 18

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                              CASE NO.:

                         2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

             * * * * * * * * * *

    DEPOSITION OF LUCIA GRANTHAM, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 1:20 p.m.


            * * * * * * * * *

JR, A Minor                      October 1, 2007  Pike County Board of Education

---

Page 2

```
1
2              * * * * * * * * * *
3              APPEARANCES:
4   FOR THE PLAINTIFF:
5   Hon. Susan DePaola
    Attorney at Law
6   1726 West Second Street, Suite B
    Montgomery, Alabama 36106
7
8   and
9   Hon. Deanie C. Allen
    Azar & Azar
10  Aliant Center, Fourth Floor
    2740 Zelda Road
11  Montgomery, AL 36106
12  FOR THE DEFENDANT:
13  Hon. Donald R. Sweeney
    Bradley, Arant
14  One Federal Place
    1819 Fifth Avenue, North
15  Birmingham, AL 35203-2104
16  ALSO PRESENT:
17  Dr. Mark Bazzell
18  Ms. Ann Reed
19
20             * * * * * * * * * *
21
22
23
```

Page 4

```
1   counsel representing the parties in this case, that the
2   filing of the deposition of LUCIA GRANTHAM is hereby
3   waived, and that said deposition may be introduced at
4   the trial of this case or used in any other manner by
5   either party hereto provided for by the Statute,
6   regardless of the waiving of the filing of same.
7        It is further stipulated and agreed by and
8   between counsel and the witness that the reading
9   and signing of the deposition by the witness is
10  hereby waived.
11                    INDEX
12  LUCIA GRANTHAM
13  Examination By Ms. DePaola           5
    Examination By Mr. Sweeney          23
14  Further Examination By Ms. DePaola     35
15  Reporter's Certificate              37
16             INDEX OF EXHIBITS
17  Exhibit Number    Description     Page Number
18  Plaintiff's Exhibit 29  Subpoena for        6
        Attendance at Deposition
19  Plaintiff's Exhibit 30  Pike County Board   11
        of Education Inservice
20
21
22             * * * * * * * * * *
23
```

---

Page 3

```
1
2
3
4              * * * * * * * * * *
5
6
7
8
9              STIPULATIONS
10
11       It is hereby stipulated and agreed by and between
12  counsel representing the parties that the deposition of
13  LUCIA GRANTHAM is taken pursuant to the Federal Rules
14  of Civil Procedure, and that said deposition may be
15  taken before Mary Moore-Wynn, CCR, as Commissioner,
16  without the formality of a commission; that objections
17  to questions, other than objections as to the form of
18  the questions, need not be made at this time, but may
19  be reserved for a ruling at such time as the deposition
20  may be offered into evidence, or used for any other
21  purpose by either party hereto, provided by the
22  Statute.
23       It is further stipulated and agreed by and between
```

Page 5

```
1              LUCIA GRANTHAM
2       (Whereupon, the witness, after having first been
3   duly sworn to speak the truth, the whole truth, and
4   nothing but the truth, testified as follows:) Lucia
5        THE COURT REPORTER:  Usual stipulations?
6        MS. DePAOLA:  Yes.
7                 EXAMINATION
8   BY MS. DePAOLA
9   Q   Could you state your name, please?
10  A   Lucia Grantham.
11  Q   What is your home address?
12  A   4504 County Road 364, Elba.
13  Q   And you are here pursuant to a subpoena you
14      received from the Plaintiff in the case of J.R.
15      versus Pike County Board of Education; is that
16      correct?
17  A   Yes.
18  Q   All right.  And did you also receive -- I'm not
19      sure if you did receive this -- what we have mark
20      as Plaintiff's Exhibit 29, which is the Notice of
21      Deposition.
22  A   I did not.  This (indicating) is what I got.
23        MS. DePAOLA:  All right.  Let's remark
```

---

2 (Pages 2 to 5)

JR, A Minor                    October 1, 2007 Pike County Board of Education

| Page 6 |
|---|

1          this, then.
2          (Whereupon, Plaintiff's Exhibit 29
3          was marked for identification and
4          is attached hereto.)
5    BY MS. DePAOLA
6    **Q   Let me show you what we have marked as Plaintiff's**
7    **Exhibit 29 and ask you if that's the subpoena you**
8    **received for your attendance?**
9    A   Yes.
10   **Q   All right. And you are currently employed, as I**
11   **understand it, with Troy State University?**
12   A   Troy University.
13   **Q   Troy University. Sorry. In what department?**
14   A   Department of Human Services.
15   **Q   And tell me what that is.**
16   A   Uhm, under that department is the social work
17       department and the rehab department. And I'm
18       specifically assigned to the social work
19       department. But it's under that.
20   **Q   Okay. Could you tell the Court about your**
21   **educational background?**
22   A   I have an undergraduate degree from Troy -- well,
23       it was Troy State University at that point. And I

| Page 7 |
|---|

1        have MSW, Master's in Social Work, from the
2        University of Alabama.
3    **Q   Is BS also in social work?**
4    A   It is not. They didn't have a social work
5        program. It's social rehab services with a minor
6        in psychology and sociology.
7    **Q   Where have you been employed since you graduated?**
8    **Give us your employment.**
9    A   First 15 years after I finished my undergraduate
10       degree was with the Department of Human Resources.
11       And the next 15 years was at Troy University in
12       the social work department.
13   **Q   And when you were working for DHR, what counties**
14   **or area did you work in?**
15   A   I worked in a number of counties. I worked in
16       Houston County, Montgomery County, Coffee County,
17       Covington County, and with the State Department of
18       Human Resources.
19   **Q   And tell us what your duties were with DHR during**
20   **that period.**
21   A   I sort of ran the gamut. As a social worker,
22       front line worker, handled a caseload with family
23       and children services. Did investigations, what

| Page 8 |
|---|

1        they call can reports now. Basically everything.
2        Moved into supervision and supervised a unit of
3        family children services. Sort of my very last
4        stint was in the Division of Child Support.
5    **Q   All right. And in your capacity as a social**
6    **worker, did you ever receive complaints regarding**
7    **child abuse?**
8    A   I did.
9    **Q   So, have you worked any child -- let's limit it to**
10   **sexual abuse cases?**
11   A   Yes.
12   **Q   Do you have any estimate of how many years you**
13   **might have worked in receiving and addressing**
14   **child sexual abuse complaints?**
15   A   Ten.
16   **Q   And would you have received these complaints, for**
17   **instance, from school systems from time to time?**
18   A   Yes. Certainly.
19   **Q   From parents from time to time?**
20   A   Certainly. From neighbors.
21   **Q   I'm going to limit this to sexual abuse**
22   **complaints. Did you deal with complaints for the**
23   **full age spectrum of children?**

| Page 9 |
|---|

1    A   To age of majority.
2    **Q   To age 19?**
3    A   Right.
4    **Q   Okay. In other words, you have experience dealing**
5    **with these complaints from infants through age 19?**
6    A   Right. And even have had adults that have come
7        forward, and at that point that would be out of
8        our scope of responsibility. And we would usually
9        send those people to their local district
10       attorney's office for them to make the decision.
11   **Q   Did you ever deal with complaints relating to**
12   **individuals who were mentally retarded?**
13   A   Yes.
14   **Q   Based on your experience, could you tell me**
15   **whether or not you believe that children, or**
16   **individuals who are mentally retarded are at an**
17   **increased risk for being victims of sexual abuse?**
18       MR. SWEENEY: Object to the form.
19   **Q   You can answer it.**
20   A   Certainly.
21   **Q   Certainly? Can you explain that?**
22   A   Children that are developmentally delayed
23       specifically with mental retardation, their

Page 10

1   intellect is not at a normal stage.  They are
2   easily influenced.  They are not trusting.  They
3   can't articulate what's happened to them.  And to
4   me, the worst thing is they are not believable
5   when they disclose.
6   Q   You said "they are not trusting"?  Did you mean –
7   A   No, they very trusting.  Excuse me.
8   Q   And not believed when they disclose it; is that
9       what you said?
10  A   That is what I said.
11  Q   Okay.  And that's just based on your experience
12      with these mentally retarded individuals?
13  A   With these cases, when you would take them to the
14      authorities, they were not viewed as credible
15      witnesses, unfortunately.
16  Q   But, I mean, your overall opinion that they are at
17      increased risk or more vulnerable to sexual abuse
18      due to mental retardation, that's based on your
19      experience?
20  A   Absolutely.
21  Q   Not on any clinical research that you have done?
22  A   No.  The research is phenomenal out there.
23  Q   Explain that to me.

Page 11

1   A   Uhm, it's a whole 'nother – another avenue is I
2       was Coordinator of the Children's Justice Task
3       Force for a number of years.  That's a funding
4       source from the federal government which looks
5       specifically at investigation and prosecution of
6       child sexual abuse.  We did a lot of training all
7       over the state and attending much training.  And
8       all the research indicates for the reasons I have
9       said to you that that's a very vulnerable
10      population, and that they are at a higher risk,
11      because of all those reasons.
12  Q   Okay.  Now, were you asked by Pike County Board of
13      Education to provide training to any school
14      personnel relating to sexual abuse?
15  A   Yeah, an inservice.
16  Q   All right.  Who contacted you?
17  A   Gosh, I sure don't remember.
18  Q   All right.  Let me mark – and I don't know if you
19      have seen this – Plaintiff's Exhibit 30.
20              (Whereupon, Plaintiff's Exhibit 30
21              was marked for identification and
22              is attached hereto.)
23

Page 12

1   BY MS. DePAOLA
2   Q   Can you tell us if you have ever seen that
3       document before?
4   A   Got that when I was at the school system, I
5       believe.
6   Q   All right.  And is that the one incident in which
7       you provided training in Pike County?
8   A   It is.
9   Q   And what topic were you given when you were asked
10      to provide that training?
11  A   This says recognizing sexual abuse.  And as I
12      recall, it was that or indicators of sexual abuse.
13  Q   All right.  Were you asked to – who – that seems
14      to indicate that that was training provided to
15      teachers in K through five?
16  A   Elementary teachers.
17  Q   Were you ever asked to provide similar training
18      for junior high or high school teachers?
19  A   No.
20  Q   Were you ever asked to provide that training for
21      administrators?
22  A   No.
23  Q   All right.  Were you ever asked to provide any

Page 13

1       special training to the special education staff
2       relating to sexual abuse?
3   A   No.  I don't know if any of those people were
4       present that day or not.
5   Q   How much time was devoted to this seminar?
6   A   I recall an hour and a half.
7   Q   Okay.  And during that time, did you cover – tell
8       me what you covered.
9   A   Basically, we talked about – again, indicators
10      that a teacher might recognize.  Indicators of
11      sexual abuse, changes in the child's behavior,
12      changes in academic performance of the child,
13      language of the child, those kinds of things.
14  Q   All right.  Were you able to cover any what I
15      would call indicators of predator behavior?
16  A   No.
17  Q   You didn't have time to do that, or why wasn't
18      that done?
19  A   No, this is very short time.  We just sort of did
20      quick and to the point.
21  Q   All right.  Are you aware of any behaviors that
22      are – that I might call – are you aware of the
23      term "grooming" behaviors?

4  (Pages 10 to 13)

JR, A Minor                    October 1, 2007 Pike County Board of Education

Page 14

1  A  I am.
2  Q  Can you tell me what that means?
3  A  Grooming is basically what a predator is going to
4     do to a child to start engaging the child in hopes
5     the ultimate goal would be able to use that child
6     sexually.
7  Q  And can you give me any examples you can think of
8     if you were giving a seminar?
9  A  If I was giving a seminar, it would just -- the
10    very first thing the person is going to meet the
11    child, and offer up a few goodies, if you will.
12    And it's going to be real comfortable.  And we
13    would all probably enjoy that activity.  It might
14    be an ice cream cone.  It might be something that
15    the child likes.  It's going to be gifts.
16 Q  Would that include possibly cigarettes?
17 A  Well, to an older child, usually.
18 Q  Okay.
19 A  It's going to be a little secrecy involved in
20    that, particularly if it's a cigarette.
21 Q  All right.  What about gifts like -- well, okay.
22    I don't want to plant any in your mind.
23    What other predator behaviors would be

Page 15

1     important to be aware of?
2  A  Other than the gifts?
3  Q  Uh-huh.
4  A  Picking up the child.  Having the child available
5     to you, obviously.
6  Q  You mean transporting the child, when you say
7     picking him up?
8  A  Certainly.  Bringing him back and forth.  The
9     predator is going to be -- do his best.  And there
10    are certainly some women, but the majority of
11    predators, unfortunately, are men.  So, I'm going
12    to use that pronoun.  But he's going to try to
13    become the best friend to the child and do
14    whatever will help that relationship, if you will.
15    And that's going to be individual.  Predator is
16    going to seek me out, I'm going to want different
17    things than another child.  So, it will be fairly
18    individualized.
19 Q  Is the Internet or e-mail or chat rooms or any of
20    those a -- I don't know if I would say breeding
21    ground --
22 A  Well, they are.
23 Q  -- or an area where predators communicate with

Page 16

1     children?
2  A  Certainly.  As well as right out that (indicating)
3     back door.
4  Q  Okay.  Now, would you expect school officials to
5     be aware of these predator behaviors?
6        MR. SWEENEY: Object to the form.  You
7     mean, in the abstract or specifics?
8  BY MS. DePAOLA
9  Q  Can you tell me whether or not school officials
10    should be aware of these predator behaviors?
11       MR. SWEENEY: Object to the form.
12 Q  You can answer.
13 A  Ask that one more time.
14 Q  Can you tell me whether or not school officials
15    should become aware of these predator behaviors?
16 A  Generally aware, yes.
17 Q  Any other behaviors that you can identify as
18    predator behavior?
19    For instance, say someone was giving a
20    child -- a teacher was giving a child a cell
21    phone.  Would that -- might that be a predator
22    behavior?
23       MR. SWEENEY: Object to the form.

Page 17

1  Q  You can answer.
2  A  I -- I -- yes, it could be.  But, to me, that's a
3     red flag across the board.  That's inappropriate
4     behavior.  And I feel sure that wouldn't be
5     tolerated.
6  Q  How about taking a student -- you already said
7     transporting them in their private vehicle.  Would
8     you consider that a red flag, also?
9  A  I would.  I would want to know why the teacher is
10    that involved with the child.
11 Q  Would you consider giving the child your personal
12    cell phone number a red flag?
13 A  I would.  I would want to know the circumstances
14    that that's occurring.  It certainly could be
15    appropriate.  But I would want to know why.
16 Q  So, you're not -- we're not saying here that these
17    are, if you give a child a cell phone number,
18    you're engaging in inappropriate sexual conduct;
19    you're just saying these are red flags to you?
20 A  That's -- you would want to know why those
21    activities are occurring.  I would want to know
22    that.
23 Q  And because you associate them as potential

5  (Pages 14 to 17)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 18

1    grooming behaviors; is that accurate?
2  A   As -- absolutely.  As potential inappropriate
3    behavior.  Which way it's going, I couldn't tell
4    you.  But that's not appropriate behavior from a
5    professional to a child; teacher to student nor
6    social worker to a client.
7  Q   Now, in your experience, you said you had
8    experience indicating to you that most sexual
9    predators are male, or the ones you've dealt with;
10    is that right?
11  A   Right.
12  Q   Are there any other characteristics of these
13    people that you can cite us to, from your
14    experience?  Are they teachers, are they the ice
15    cream person?
16  A   No.  I think -- yeah, they are all of those.
17    There is not a profession that you would go,
18    always look there.
19  Q   Are they often well respected in the community?
20  A   Certainly.
21  Q   And in your experience, how astute are parents at
22    recognizing these sexual predators?
23  A   Not very.

Page 19

1  Q   Can you explain that?
2  A   Frequently, my child is in the Girl Scouts, and
3    that leader starts bringing my child home, I might
4    think that's okay.
5       Again, I would never allow my child those
6    kinds of things, unless I knew the reason why.
7    But I don't think that parents -- I think parents
8    are as part of that process sometimes,
9    unfortunately.  This person may not only befriend
10    this child, but also the parents, which is
11    insidious and awful.
12  Q   Okay.  Do you have an opinion as to whether
13    students with mental retardation need training on
14    how to prevent sexual victimisation?
15  A   I think it would be very helpful.
16  Q   Okay.  You don't know Justin Reed, do you?
17  A   No, I do not.
18  Q   Okay.  The children who you have dealt with in the
19    past who are mentally retarded -- let's just say
20    who are in the first percentile as far as mental
21    cognitive ability -- was it your experience that
22    they understood what was happening to them was a
23    right or wrong?

Page 20

1       MR. SWEENEY:  Object to the form.
2  Q   You can answer.
3  A   I can answer?  If the behavior was right or wrong?
4  Q   Uh-huh.
5  A   No.  I can't tell you that they knew it was wrong
6    until we became involved that it was wrong.
7  Q   Some lack of understanding did you see?
8  A   A huge lack of understanding, but that's not
9    totally different from a child with a normal IQ.
10    Do you realize the double bind these children are
11    put in?  There is this person that's being nice to
12    them and giving them stuff, and the sexual
13    behavior that they are experiencing, because
14    typically this is not rape, and the physical
15    characteristics of that, they can make feel okay
16    to this child.  This is very --
17  Q   "They", the predator?
18  A   Yes.  And it's very, very hard.  So, look -- and
19    going on with this child.
20       So, it's very hard, particularly with MR, for
21    them to understand all of the implications.
22  Q   Okay.  Just hypothetically assume you have
23    experience with a child with a mental ability in

Page 21

1    the first percentile, do they have any particular
2    difficulty in saying no to someone in authority?
3       MR. SWEENEY:  Object to the form.
4  Q   You can answer.
5  A   Certainly they do.
6  Q   Okay.  Have you ever heard the term "social
7    powerlessness"?
8  A   Yeah.
9  Q   Does a child with a cognitive ability in the
10    first percentile, in your experience, have some
11    feeling of social -- or powerlessness?
12  A   To a great degree.
13  Q   Okay.  Do these children -- I'm, again, talking
14    about a child in the first percentile of cognitive
15    ability -- do they ever have any impaired judgment
16    about what's going on?
17       MR. SWEENEY:  Object to the form.
18  A   I can answer?
19  Q   Yes.
20  A   Definitely.
21  Q   Can you explain that?
22  A   Again, you know, we're talking in generalities.
23    But the children don't have the capability -- they

6 (Pages 18 to 21)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 22

1   can't have all the facts.  Therefore, they can't
2   make a sound judgment.  They can't understand all
3   the facts.  What they have is what's there before
4   them.
5   Q    All right.  Were you asked by Pike County to make
6        any kind of recommendations as to procedures for
7        investigating sexual abuse complaints?
8   A    No.  No.
9   Q    Are you aware of any law or anything that outlines
10       how a sexual abuse complaint is supposed to be
11       handled?
12  A    Typically, in counties with the Child Advocacy
13       Center -- which it's new to Pike County -- but in
14       other counties, there would be protocol.  Of
15       course, teachers and administrators are mandated
16       reporters.
17  Q    Explain "mandated reporters".
18  A    That means if we have reason to believe that there
19       has been neglect in a situation, we are to report
20       that.  And the reporting agency is the Department
21       of Human Resources.
22  Q    I'm sorry.  I'm not sure if I asked you this
23       question.  I know you only presented this sexual

Page 23

1   abuse information to K through five teachers.  Is
2   there any reason it wouldn't be required for other
3   teachers?
4   A    No.
5        MS. DePAOLA:  I think that's all the
6        questions I have.
7        EXAMINATION
8   BY MR. SWEENEY:
9   Q    Do you know Mona Watson?
10  A    I do know.  Not well, but I certainly do.
11  Q    You have had some interfacing with her over the
12       years?
13  A    I have, and professionally, we know each other.
14       We know our names back and forth, yes.
15  Q    Based on what you know, is Mona Watson a very
16       competent social worker?
17  A    I don't think she's a social work.
18  Q    What does Mona Watson do?
19  A    I think she now is with the Advocacy Center; is
20       she not?
21  Q    Uh-huh.  In that capacity, do you have the opinion
22       that she is competent in what she does?
23  A    Yes.

Page 24

1   Q    Have you ever discussed with her child abuse?
2   A    I honestly don't think we have.  I'm thinking
3        about years past.  We have been on -- we have been
4        involved with Big Brothers, Big Sisters and some
5        other endeavors.  But I don't think we
6        specifically have.
7   Q    Would Mona Watson, based on what you do know about
8        her, be well versed and trained in recognizing
9        patterns of sexual abuse?
10  A    As Director of the Advocacy Center, most recently,
11       I would certainly say so.
12  Q    Do you know if she was a counselor at Pike County
13       High School when Justin Reed was there?
14  A    No, sir, I do not know that.
15  Q    Did you have any discussions with her for the
16       2004-2005 school year while she was -- during
17       which time she was a counselor there?
18  A    I'm -- I might have.  We don't talk frequently.
19  Q    Okay.  Have you ever been called upon to
20       investigate a sexual abuse matter at Pike County
21       High School?
22  A    No, sir.
23  Q    You indicated that you were with DHR for 15 --

Page 25

1   A    Yes, sir.
2   Q    -- 15 years?  During that time, how many cases did
3        you have where a teacher sexually abused a
4        student?
5   A    Maybe two.
6   Q    So, it's quite rare, isn't it?
7   A    That it's reported, yes.
8   Q    And you had, during that time, how many cases that
9        you probably investigated of sexual abuse?
10  A    Total number of sexual abuse.  Just a small
11       percentage of the other.
12       One hundred.
13  Q    And where would the two cases of sexual abuse that
14       you did investigate that involved a teacher?
15  A    One was in Houston County.  One was in Montgomery
16       County.
17  Q    But never before was a case reported to you
18       involving Pike County schools?
19  A    No, sir.
20  Q    You were asked some questions in the abstract, and
21       you answered in generalities about mentally
22       retarded students.  You also said that you did not
23       know Justin Reed?

7  (Pages 22 to 25)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 26

1       MS. DePAOLA: Object to the form.
2  Q    So, did you say you did not know Justin Reed?
3  A    That's what I said.
4  Q    Okay. So, when you were identifying
5       characteristics of mentally retarded students, you
6       weren't necessarily referring to Justin Reed?
7  A    I don't know the child.
8  Q    Prior to coming to this deposition, who have you
9       talked to about the subject of this deposition?
10 A    I received a phone call from Deanie and Susan.
11 Q    Did you talk about the case?
12 A    In generalities.
13 Q    What did you talk about?
14 A    Understand there was a child that was sexually
15      abused at Pike County school system.
16 Q    What other information was provided to you?
17 A    I don't even think I know -- knew the child's
18      name. I don't think.
19 Q    But they told you --
20 A    -- and that it was a teacher.
21 Q    But they told you that the child was abused at the
22      high school?
23 A    No, sir. They said there was a case involving a

Page 27

1       child -- this child had been sexually abused by a
2       teacher. I wasn't told where it occurred.
3  Q    What were you told you would be asked about?
4  A    This inservice (indicating).
5  Q    When did this inservice take place?
6  A    2002.
7  Q    I'm sorry, 2000 --
8  A    Two. February 15th, 2002.
9  Q    And you said you didn't recall who called you. Do
10      you have an opinion, Ms. Grantham, whether the
11      people that called you took sexual abuse very
12      seriously?
13 A    I honestly think I got a call because somebody
14      canceled. Okay? And they needed -- and I was
15      more than willing to provide the service. The
16      teachers that were present took the subject matter
17      very seriously.
18 Q    Do you know any of the faculty at Pike County High
19      School?
20 A    I do not. That I am aware of.
21 Q    Huh?
22 A    Not that I am aware. I might know somebody that's
23      there, but I don't know that I know it.

Page 28

1  Q    Okay. You were asked what the research was that
2       would indicate an increase -- a statistical
3       increase in mentally retarded students being
4       sexually abused. What is the research that you
5       referenced?
6  A    I didn't give you any specific. And I will be
7       glad to get that. What we found, of course, in
8       the early '80's late '70's is with the reporting
9       laws and the increase in that we certainly had
10      more cases reported. And significant increase in
11      children with developmental disabilities.
12 Q    Yeah. But is there some research you particularly
13      had in mind when you answered counsel's question?
14 A    Yes.
15 Q    What?
16 A    That there is specific research dealing with
17      children with developmental disabilities.
18 Q    But you can't share the name or the author at this
19      point?
20 A    No, I certainly don't. I can get that to you, or
21      to Dr. Bazzell.
22 Q    But you're familiar with some of the research and
23      studies concerning that?

Page 29

1  A    Yes.
2  Q    Would you agree that there is a wide range within
3       the mental retardation category as to students'
4       vulnerability?
5  A    Are you talking about the child's IQ? I don't
6       understand the question.
7  Q    Well, are there high-functioning mentally retarded
8       students, low-functioning retarded students?
9  A    Certainly.
10 Q    Are there retarded students with high self-esteem
11      and mentally retarded students with low
12      self-esteem?
13 A    Certainly.
14 Q    There are mentally retarded students that are
15      males?
16 A    Uh-huh.
17 Q    And mentally restarted students that are females?
18 A    Right.
19 Q    And would all of those variables affect the degree
20      to which a student might be vulnerable to sexual
21      abuse?
22 A    Certainly.
23 Q    And so when you talk in generalities about all

8  (Pages 26 to 29)

JR, A Minor                         October 1, 2007  Pike County Board of Education

Page 30

1   mental retardation students, you're encompassing a
2   wide variety of vulnerability?
3 A   That's correct.
4 Q   Have you studied any of the profile of Justin
5   Reed?
6 A   I have not.
7 Q   You were asked about the protocol or procedures
8   that should be followed if a school system has a
9   report of sexual abuse.  What would be your
10   recommendation of how a school system should
11   handle a report of sexual abuse?
12      Let's say a teacher had some reason to think a
13   child in his or her classroom was being sexually
14   abused, what should the teacher do?
15 A   They should report it.
16 Q   To whom?
17 A   The Department of Human Resources.
18 Q   In the school system?  Let's say a teacher at Pike
19   County High School --
20 A   Right, right.
21 Q   -- had some reason to believe a student was being
22   sexually abused.  What should that teacher do
23   within the high school?

Page 31

1      MS. DePAOLA:  Object to the form.  She
2      already said they should go to DHR.
3 A   I think it should be reported.  I know that's not
4   what's normally done.  But that's what should
5   occur.
6 Q   I'm just asking you --
7 A   I think they should call the Department of Human
8   Resources in Troy, Alabama.
9 Q   What else should they do?
10 A   At that point?
11 Q   Uh-huh.
12 A   The investigation will take place.  I think they
13   want to be aware of the child and the surroundings
14   of the child.
15 Q   So, the school system really should rely upon DHR
16   to conduct an investigation?
17 A   Yes.
18 Q   And depend on what DHR thinks is appropriate?
19 A   Yes.
20 Q   And rely on their conclusion?
21 A   Yeah.
22 Q   I may be asking you to be redundant, Ms. Grantham,
23   but let's take a 13-to-15-year-old male student in

Page 32

1   high school.  What would be signs that would
2   indicate that the child might be a victim of
3   sexual abuse?
4 A   That who would be observing this?
5 Q   Anybody.  Say teachers that are dealing with the
6   student.
7 A   If the child all of a sudden has a special friend,
8   if you will.  Somebody is paying undue -- little
9   more than normal interest to that child.  If the
10   child becomes more withdrawn or even more active.
11   There is just not one set.  Anything that's out of
12   the ordinary with this child is when you would
13   start being a little more observant of that.
14 Q   Anything else?
15 A   Yeah.  We could go on and on.  Is the child
16   doing -- is the child starting to act out
17   sexually?  Is the child using terms that are
18   different?
19 Q   What do you mean "act out sexually"?
20 A   Is he -- is he masturbating?  Is he trying to
21   touch other people?  Those would be behaviors that
22   you might have in a child.
23 Q   And when you gave your seminar inservice, you gave

Page 33

1   one session to the K through second teachers,
2   recognizing sexual abuse.  And you gave another
3   one to three through five teachers recognizing
4   sexual abuse.  Do you have a different
5   presentation to K through two teachers and three
6   through five teachers?
7 A   No.
8 Q   Would you take a similar approach to high school
9   teachers?
10 A   Yes.
11 Q   And your summary of what they should recognize
12   would be what you have shared with counsel today?
13 A   (Witness Indicating.)
14 Q   I mean --
15 A   Briefly, yes.
16 Q   -- I don't want to go back over it.
17 A   Yeah.
18 Q   Do you know the extent to which Pike County High
19   School administrators addressed sexual abuse at
20   the high school?
21 A   I have no idea.
22 Q   You said it might be helpful -- or you said it
23   would be helpful for mentally retarded students to

9  (Pages 30 to 33)

JR, A Minor                    October 1, 2007 Pike County Board of Education

Page 34

1   have training in sexual abuse.  What kind of
2   training would you recommend?
3 A  I think we would talk with them as well as all
4   children should have that.  It's certainly not
5   limit to mentally retarded children.  I think all
6   children in the school system should have at least
7   an overview of training about what could happen.
8      You have heard good touches, bad touches.  If
9   you're talking about children with mental
10  retardation, you're going to have to be sure that
11  you are giving it to them in a format that they
12  you can understand.  It would be different from a
13  5th grade group getting this as to a child -- a
14  special ed group.
15 Q  Do you know how many years Justin attended school
16  in the Pike County school system?
17 A  I have no earthly idea.
18 Q  Do you know what extent teachers in the early
19  grades went over those kind of things with him?
20 A  I do not.
21 Q  To what extent should parents educate their
22  children about personal safety matters, including
23  sexual abuse?

Page 35

1 A  They -- they certainly have a part in that.
2 Q  What is their part?
3 A  Again, dealing with parents that are competent to
4   handle that to discuss it, which you know that's
5   why we have to do training in school,
6   unfortunately.  Not all parents can do.  But
7   parent certainly should make their children aware
8   there are people out there that could potentially
9   harm them.
10 Q  Do you know Mr. Reed?
11 A  No, I do not.
12 Q  Do you know Mrs. Reed?
13 A  I do not.
14     MR. SWEENEY:  Excuse me just a second.
15     (Brief off-the-Record discussion.)
16     MR. SWEENEY:  Thank you very much.
17     FURTHER EXAMINATION
18 BY MS. DePAOLA
19 Q  Is the principal in the school ever an appropriate
20  person to conduct an investigation of sexual abuse
21  allegations?
22 A  Meaning to talk to the child?  I would never do
23  that.

Page 36

1 Q  Why is that?
2 A  Who is the most feared person in the school system
3   if you're a child?  It's the principal.  The child
4   can't tell the principal something bad about a
5   teacher.
6      MS. DePAOLA:  That's all.  Thank you.
7
8      (Whereupon, at approximately, 1:45
9      p.m. on the 1st day of October,
10     2007 the proceedings were
11     adjourned.)
12     * * * * * * * * *
13     FURTHER DEPONENT SAITH NOT
14     * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 37

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4
5      I do hereby certify that the above and foregoing
6  transcript of the deposition of LUCIA GRANTHAM in the
7  matter of JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND
8  TMR v. PIKE COUNTY BOARD OF EDUCATION, Case Number:
9  2:06-CV-1120-MEF was taken down by me in machine
10 shorthand on the 1st of October, 2007, and the
11 questions and answers thereto reduced to writing under
12 my personal supervision, and that the foregoing
13 represents a true and correct transcript of the
14 proceedings given by said witness upon said hearing.
15     I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18     Dated this 8th day of October, 2007.
19
20     _____
21     Mary Moore-Wynn
22     Certified Court Reporter
23     ABCR License #275

**A**

**ABCR** 37:23
**ability** 19:21 20:23 21:9,15
**able** 13:14 14:5
**absolutely** 10:20 18:2
**abstract** 16:7 25:20
**abuse** 8:7,10,14 8:21 9:17 10:17 11:6,14 12:11,12 13:2 13:11 22:7,10 23:1 24:1,9,20 25:9,10,13 27:11 29:21 30:9,11 32:3 33:2,4,19 34:1 34:23 35:20
**abused** 25:3 26:15,21 27:1 28:4 30:14,22
**academic** 13:12
**accurate** 18:1
**act** 32:16,19
**action** 37:16
**active** 32:10
**activities** 17:21
**activity** 14:13
**address** 5:11
**addressed** 33:19
**addressing** 8:13
**adjourned** 36:11
**administrators** 12:21 22:15 33:19
**adults** 9:6
**Advocacy** 22:12 23:19 24:10
**affect** 29:19
**age** 8:23 9:1,2,5
**agency** 22:20
**agree** 29:2
**agreed** 3:11,23

4:7
**AL** 2:11,15
**Alabama** 1:2,20 2:6 7:2 31:8 37:2
**Aliant** 2:10
**allegations** 35:21
**Allen** 2:9
**allow** 19:5
**Ann** 2:18
**answer** 9:19 16:12 17:1 20:2,3 21:4,18
**answered** 25:21 28:13
**answers** 37:11
**Anybody** 32:5
**APPEARAN...** 2:3
**approach** 33:8
**appropriate** 17:15 18:4 31:18 35:19
**approximately** 1:22 36:8
**Arant** 2:13
**area** 7:14 15:23
**articulate** 10:3
**asked** 11:12 12:9,13,17,20 12:23 22:5,22 25:20 27:3 28:1 30:7
**asking** 31:6,22
**assigned** 6:18
**associate** 17:23
**assume** 20:22
**astute** 18:21
**attached** 6:4 11:22
**attendance** 4:18 6:8
**attended** 34:15
**attending** 11:7

**Attorney** 2:5
**attorney's** 9:10
**author** 28:18
**authorities** 10:14
**authority** 21:2
**available** 15:4
**avenue** 2:14 11:1
**aware** 13:21,22 15:1 16:5,10 16:15,16 22:9 27:20,22 31:13 35:7
**awful** 19:11
**Azar** 2:9,9

**B**

**B** 2:6
**back** 15:8 16:3 23:14 33:16
**background** 6:21
**bad** 34:8 36:4
**based** 9:14 10:11,18 23:15 24:7
**basically** 8:1 13:9 14:3
**Bazzell** 2:17 28:21
**befriend** 19:9
**behavior** 13:11 13:15 16:18,22 17:4 18:3,4 20:3,13
**behaviors** 13:21 13:23 14:23 16:5,10,15,17 18:1 32:21
**believable** 10:4
**believe** 9:15 12:5 22:18 30:21
**believed** 10:8

**best** 15:9,13
**Big** 24:4,4
**bind** 20:10
**Birmingham** 2:15
**board** 1:13,19 4:19 5:15 11:12 17:3 37:8
**Bradley** 2:13
**breeding** 15:20
**Brief** 35:15
**Briefly** 33:15
**bringing** 15:8 19:3
**Brothers** 24:4
**BS** 7:3

**B**

**C** 2:9
**call** 8:1 13:15,22 26:10 27:13 31:7
**called** 24:19 27:9,11
**canceled** 27:14
**capability** 21:23
**capacity** 8:5 23:21
**case** 1:10 4:1,4 5:14 25:17 26:11,23 37:8
**caseload** 7:22
**cases** 8:10 10:13 25:2,8,13 28:10
**category** 29:3
**cause** 37:17
**CCR** 1:18 3:15
**cell** 16:20 17:12 17:17
**Center** 2:10 22:13 23:19 24:10
**certainly** 8:18

8:20 9:20,21
15:8,10 16:2
17:14 18:20
21:5 23:10
24:11 28:9,20
29:9,13,22
34:4 35:1,7
**Certainty** 8:20
**Certificate** 4:15 37:1
**Certified** 37:22
**certify** 37:5,15
**changes** 13:11 13:12
**characteristics** 18:12 20:15 26:5
**chat** 15:19
**child** 8:4,7,9,14 11:6 13:12,13 14:4,4,5,11,15 14:17 15:4,4,6 15:13,17 16:20 16:20 17:10,11 17:17 18:5 19:2,3,5,10 20:9,16,19,23 21:9,14 22:12 24:1 26:7,14 26:21 27:1,1 30:13 31:13,14 32:2,7,9,10,12 32:15,16,17,22 34:13 35:22 36:3,3
**children** 7:23 8:3,23 9:15,22 16:1 19:18 20:10 21:13,23 28:11,17 34:4 34:5,6,9,22 35:7
**Children's** 11:2
**child's** 13:11 26:17 29:5

cigarette 14:20
cigarettes 14:16
circumstances
  17:13
cite 18:13
Civil 3:14
classroom 30:13
client 18:6
clinical 10:21
Coffee 7:16
cognitive 19:21
  21:9,14
come 9:6
comfortable
  14:12
coming 26:8
commencing
  1:21
commission
  3:16
Commissioner
  1:18 3:15
communicate
  15:23
community
  18:19
competent 23:16
  23:22 35:3
complaint 22:10
complaints 8:6
  8:14,16,22,22
  9:5,11 22:7
concerning
  28:23
conclusion
  31:20
conduct 17:18
  31:16 35:20
cone 14:14
consider 17:8,11
contacted 11:16
Coordinator
  11:2
correct 5:16
  30:3 37:13

counsel 3:12 4:1
  4:8 33:12
  37:15
counselor 24:12
  24:17
counsel's 28:13
counties 7:13,15
  22:12,14
County 1:13,19
  4:19 5:12,15
  7:16,16,16,17
  11:12 12:7
  22:5,13 24:12
  24:20 25:15,16
  25:18 26:15
  27:18 30:19
  33:18 34:16
  37:3,8
course 22:15
  28:7
Court 1:1 5:5
  6:20 37:22
cover 13:7,14
covered 13:8
Covington 7:17
cream 14:14
  18:15
credible 10:14
CSR 1:18
currently 6:10

──── D ────
Dated 37:18
day 13:4 36:9
  37:18
deal 8:22 9:11
dealing 9:4
  28:16 32:5
  35:3
dealt 18:9 19:18
Deanie 2:9
  26:10
decision 9:10
DEFENDANT
  1:15 2:12

Definitely 21:20
degree 6:22 7:10
  21:12 29:19
delayed 9:22
DePaola 2:5
  4:13,14 5:6,8
  5:23 6:5 12:1
  16:8 23:5 26:1
  31:1 35:18
  36:6
department
  6:13,14,16,17
  6:17,19 7:10
  7:12,17 22:20
  30:17 31:7
depend 31:18
DEPONENT
  36:13
deposition 1:17
  3:12,14,19 4:2
  4:3,9,18 5:21
  26:8,9 37:6
Description 4:17
developmental
  28:11,17
developmenta...
  9:22
devoted 13:5
DHR 7:13,19
  24:23 31:2,15
  31:18
different 15:16
  20:9 32:18
  33:4 34:12
difficulty 21:2
Director 24:10
disabilities
  28:11,17
disclose 10:5,8
discuss 35:4
discussed 24:1
discussion 35:15
discussions
  24:15
district 1:1,2 9:9

Division 8:4
document 12:3
doing 32:16
Donald 2:13
door 16:3
double 20:10
Dr 2:17 28:21
due 10:18
duly 5:3
duties 7:19

──── E ────
EAR 1:6 37:7
early 28:8 34:18
earthly 34:17
easily 10:2
ed 34:14
educate 34:21
education 1:14
  1:20 4:19 5:15
  11:13 13:1
  37:8
educational 6:21
either 3:21 4:5
Elba 5:12
Elementary
  12:16
employed 6:10
  7:7
employment 7:8
encompassing
  30:1
endeavors 24:5
engaging 14:4
  17:18
enjoy 14:13
estimate 8:12
evidence 3:20
Examination
  4:13,13,14 5:7
  23:7 35:17
examples 14:7
Excuse 10:7
  35:14
Exhibit 4:17,18

4:19 5:20 6:2,7
  11:19,20
EXHIBITS 4:16
expect 16:4
experience 9:4
  9:14 10:11,19
  18:7,8,14,21
  19:21 20:23
  21:10
experiencing
  20:13
explain 9:21
  10:23 19:1
  21:21 22:17
extent 33:18
  34:18,21
e-mail 15:19

──── F ────
facts 22:1,3
faculty 27:18
fairly 15:17
familiar 28:22
family 7:22 8:3
far 19:20
FATHER 1:6
  37:7
feared 36:2
February 27:8
federal 2:14
  3:13 11:4
feel 17:4 20:15
feeling 21:11
females 29:17
Fifth 2:14
filing 4:2,6
finished 7:9
first 5:2 7:9
  14:10 19:20
  21:1,10,14
five 12:15 23:1
  33:3,6
flag 17:3,8,12
flags 17:19
Floor 2:10

followed 30:8
follows 5:4
Force 11:3
foregoing 37:5
  37:12
form 3:17 9:18
  16:6,11,23
  20:1 21:3,17
  26:1 31:1
formality 3:16
format 34:11
forth 1:21 15:8
  23:14
forward 9:7
found 28:7
Fourth 2:10
frequently 19:2
  24:18
friend 15:13
  32:7
front 7:22
full 8:23
funding 11:3
further 3:23 4:7
  4:14 35:17
  36:13 37:15

G
gamut 7:21
generalities
  21:22 25:21
  26:12 29:23
Generally 16:16
getting 34:13
gifts 14:15,21
  15:2
Girl 19:2
give 7:8 14:7
  17:17 28:6
given 12:9 37:14
giving 14:8,9
  16:19,20 17:11
  20:12 34:11
glad 28:7
go 18:17 31:2

32:15 33:16
goal 14:5
going 8:21 14:3
  14:10,12,15,19
  15:9,11,12,15
  15:16,16 18:3
  20:19 21:16
  34:10
good 34:8
goodies 14:11
Gosh 11:17
government
  11:4
grade 34:13
grades 34:19
graduated 7:7
Grantham 1:17
  3:13 4:2,12 5:1
  5:10 27:10
  31:22 37:6
great 21:12
grooming 13:23
  14:3 18:1
ground 15:21
group 34:13,14

H
half 13:6
handle 30:11
  35:4
handled 7:22
  22:11
happen 34:7
happened 10:3
happening
  19:22
hard 20:18,20
harm 35:9
heard 21:6 34:8
hearing 37:14
help 15:14
helpful 19:15
  33:22,23
hereto 3:21 4:5
  6:4 11:22

high 12:18,18
  24:13,21 26:22
  27:18 29:10
  30:19,23 32:1
  33:8,18,20
higher 11:10
high-functioni...
  29:7
home 5:11 19:3
Hon 2:5,9,13
honestly 24:2
  27:13
hopes 14:4
hour 13:6
Houston 7:16
  25:15
huge 20:8
Huh 27:21
Human 6:14
  7:10,18 22:21
  30:17 31:7
hundred 25:12
hypothetically
  20:22

I
ice 14:14 18:14
idea 33:21 34:17
identification
  6:3 11:21
identify 16:17
identifying 26:4
impaired 21:15
implications
  20:21
important 15:1
inappropriate
  17:3,18 18:2
incident 12:6
include 14:16
including 34:22
increase 28:2,3
  28:9,10
increased 9:17
  10:17

INDEX 4:11,16
indicate 12:14
  28:2 32:2
indicated 24:23
indicates 11:8
indicating 5:22
  16:2 18:8 27:4
  33:13
indicators 12:12
  13:9,10,15
individual 15:15
individualized
  15:18
individuals 9:12
  9:16 10:12
infants 9:5
influenced 10:2
information
  23:1 26:16
inservice 4:19
  11:15 27:4,5
  32:23
insidious 19:11
instance 8:17
  16:19
intellect 10:1
interest 32:9
interested 37:17
interfacing
  23:11
Internet 15:19
introduced 4:3
investigate
  24:20 25:14
investigated
  25:9
investigating
  22:7
investigation
  11:5 31:12,16
  35:20
investigations
  7:23
involved 14:19
  17:10 20:6

24:4 25:14
involving 25:18
  26:23
IQ 20:9 29:5

J
JR 1:5 37:7
judgment 21:15
  22:2
junior 12:18
Justice 11:2
Justin 19:16
  24:13 25:23
  26:2,6 30:4
  34:15
J.R 5:14

K
K 12:15 23:1
  33:1,5
kind 22:6 34:1
  34:19
kinds 13:13 19:6
knew 19:6 20:5
  26:17
know 11:18 13:3
  15:20 17:9,13
  17:15,20,21
  19:16 21:22
  22:23 23:9,10
  23:13,14,15
  24:7,12,14
  25:23 26:2,7
  26:17 27:18,22
  27:23,23 31:3
  33:18 34:15,18
  35:4,10,12

L
lack 20:7,8
language 13:13
late 28:8
law 2:5 22:9
laws 28:9
leader 19:3
let's 5:23 8:9

19:19 30:12,18
31:23
**License** 37:23
**likes** 14:15
**limit** 8:9,21 34:5
**line** 7:22
**little** 14:19 32:8
    32:13
**local** 9:9
**look** 18:18 20:18
**looks** 11:4
**lot** 11:6
**Love** 1:20
**low** 29:11
**low-functioning**
    29:8
**Lucia** 1:17 3:13
    4:2,12 5:1,4,10
    37:6

—— **M** ——
**machine** 37:9
**majority** 9:1
    15:10
**male** 18:9 31:23
**males** 29:15
**mandated** 22:15
    22:17
**manner** 4:4
**mark** 2:17 5:19
    11:18
**marked** 6:3,6
    11:21
**Mary** 1:17 3:15
    37:21
**Master's** 7:1
**masturbating**
    32:20
**matter** 24:20
    27:16 37:7
**matters** 34:22
**mean** 10:6,16
    15:6 16:7
    32:19 33:14
**Meaning** 35:22

**means** 14:2
    22:18
**meet** 14:10
**men** 15:11
**mental** 9:23
    10:18 19:13,20
    20:23 29:3
    30:1 34:9
**mentally** 9:12
    9:16 10:12
    19:19 25:21
    26:5 28:3 29:7
    29:11,14,17
    33:23 34:5
**MIDDLE** 1:2
**mind** 14:22
    28:13
**minor** 1:5 7:5
    37:7
**Mona** 23:9,15
    23:18 24:7
**Montgomery**
    2:6,11 7:16
    25:15 37:3
**Moore-Wynn**
    1:18 3:15
    37:21
**MOTHER** 1:6
    37:7
**Moved** 8:2
**MSW** 7:1

—— **N** ——
**name** 5:9 26:18
    28:18
**names** 23:14
**necessarily** 26:6
**need** 3:18 19:13
**needed** 27:14
**neglect** 22:19
**neighbors** 8:20
**neither** 37:15
**never** 19:5 25:17
    35:22
**new** 22:13

**nice** 20:11
**normal** 10:1
    20:9 32:9
**normally** 31:4
**North** 2:14
**nother** 11:1
**Notice** 5:20
**number** 4:17,17
    7:15 11:3
    17:12,17 25:10
    37:8

—— **O** ——
**Object** 9:18 16:6
    16:11,23 20:1
    21:3,17 26:1
    31:1
**objections** 3:16
    3:17
**observant** 32:13
**observing** 32:4
**obviously** 15:5
**occur** 31:5
**occurred** 27:2
**occurring** 17:14
    17:21
**October** 1:19
    36:9 37:10,18
**offer** 14:11
**offered** 3:20
**office** 9:10
**offices** 1:19
**officials** 16:4,9
    16:14
**off-the-Record**
    35:15
**okay** 6:20 9:4
    10:11 11:12
    13:7 14:18,21
    16:4 19:4,12
    19:16,18 20:15
    20:22 21:6,13
    24:19 26:4
    27:14 28:1
**older** 14:17

**ones** 18:9
**opinion** 10:16
    19:12 23:21
    27:10
**ordinary** 32:12
**outlines** 22:9
**overall** 10:16
**overview** 34:7

—— **P** ——
**Page** 4:17
**parent** 35:7
**parents** 8:19
    18:21 19:7,7
    19:10 34:21
    35:3,6
**part** 19:8 35:1,2
**particular** 21:1
**particularly**
    14:20 20:20
    28:12
**parties** 3:12 4:1
    37:16
**party** 3:21 4:5
**patterns** 24:9
**paying** 32:8
**people** 9:9 13:3
    18:13 27:11
    32:21 35:8
**percentage**
    25:11
**percentile** 19:20
    21:1,10,14
**performance**
    13:12
**period** 7:20
**person** 14:10
    18:15 19:9
    20:11 35:20
    36:2
**personal** 17:11
    34:22 37:12
**personnel** 11:14
**phenomenal**
    10:22

**phone** 16:21
    17:12,17 26:10
**physical** 20:14
**picking** 15:4,7
**Pike** 1:13,19
    4:19 5:15
    11:12 12:7
    22:5,13 24:12
    24:20 25:18
    26:15 27:18
    30:18 33:18
    34:16 37:8
**place** 2:14 27:5
    31:12
**Plaintiff** 1:8 2:4
    5:14
**Plaintiff's** 4:18
    4:19 5:20 6:2,6
    11:19,20
**plant** 14:22
**please** 5:9
**point** 6:23 9:7
    13:20 28:19
    31:10
**population**
    11:10
**possibly** 14:16
**potential** 17:23
    18:2
**potentially** 35:8
**powerlessness**
    21:7,11
**predator** 13:15
    14:3,23 15:9
    15:15 16:5,10
    16:15,18,21
    20:17
**predators** 15:11
    15:23 18:9,22
**present** 2:16
    13:4 27:16
**presentation**
    33:5
**presented** 22:23
**prevent** 19:14

JR, A Minor                    October 1, 2007 Pike County Board of Education
Page 5

| | R | related 37:16 | 19:19 25:22 | seen 11:19 12:2 |
|---|---|---|---|---|
| principal 35:19 | R 2:13 | relating 9:11 | 26:5 28:3 29:7 | self-esteem |
| 36:3,4 | ran 7:21 | 11:14 13:2 | 29:8,10,11,14 | 29:10,12 |
| Prior 26:8 | range 29:2 | relationship | 33:23 34:5 | seminar 13:5 |
| private 17:7 | rape 20:14 | 15:14 | right 5:18,23 | 14:8,9 32:23 |
| probably 14:13 | rare 25:6 | rely 31:15,20 | 6:10 8:5 9:3,6 | send 9:9 |
| 25:9 | reading 4:8 | remark 5:23 | 11:16,18 12:6 | seriously 27:12 |
| Procedure 3:14 | real 14:12 | remember 11:17 | 12:13,23 13:14 | 27:17 |
| procedures 22:6 | realize 20:10 | report 22:19 | 13:21 14:21 | service 27:15 |
| 30:7 | really 31:15 | 30:9,11,15 | 16:2 18:10,11 | services 6:14 7:5 |
| proceedings | reason 19:6 | reported 25:7 | 19:23 20:3 | 7:23 8:3 |
| 36:10 37:14 | 22:18 23:2 | 25:17 28:10 | 22:5 29:18 | session 33:1 |
| process 19:8 | 30:12,21 | 31:3 | 30:20,20 | set 1:21 32:11 |
| profession 18:17 | reasons 11:8,11 | Reporter 5:5 | risk 9:17 10:17 | sexual 8:10,14 |
| professional | recall 12:12 13:6 | 37:22 | 11:10 | 8:21 9:17 |
| 18:5 | 27:9 | reporters 22:16 | Road 2:10 5:12 | 10:17 11:6,14 |
| professionally | receive 5:18,19 | 22:17 | rooms 15:19 | 12:11,12 13:2 |
| 23:13 | 8:6 | Reporter's 4:15 | Rules 3:13 | 13:11 17:18 |
| profile 30:4 | received 5:14 | 37:1 | ruling 3:19 | 18:8,22 19:14 |
| program 7:5 | 6:8 8:16 26:10 | reporting 22:20 | | 20:12 22:7,10 |
| pronoun 15:12 | receiving 8:13 | 28:8 | S | 22:23 24:9,20 |
| prosecution | recognize 13:10 | reports 8:1 | | 25:9,10,13 |
| 11:5 | 33:11 | representing | safety 34:22 | 27:11 29:20 |
| protocol 22:14 | recognizing | 3:12 4:1 | SAITH 36:13 | 30:9,11 32:3 |
| 30:7 | 12:11 18:22 | represents 37:13 | saying 17:16,19 | 33:2,4,19 34:1 |
| provide 11:13 | 24:8 33:2,3 | required 23:2 | 21:2 | 34:23 35:20 |
| 12:10,17,20,23 | recommend | research 10:21 | says 12:11 | sexually 14:6 |
| 27:15 | 34:2 | 10:22 11:8 | school 8:17 | 25:3 26:14 |
| provided 3:21 | recommendati... | 28:1,4,12,16 | 11:13 12:4,18 | 27:1 28:4 |
| 4:5 12:7,14 | 30:10 | 28:22 | 16:4,9,14 | 30:13,22 32:17 |
| 26:16 | recommendati... | reserved 3:19 | 24:13,16,21 | 32:19 |
| psychology 7:6 | 22:6 | Resources 7:10 | 26:15,22 27:19 | share 28:18 |
| purpose 3:21 | red 17:3,8,12,19 | 7:18 22:21 | 30:8,10,18,19 | shared 33:12 |
| pursuant 1:21 | reduced 37:11 | 30:17 31:8 | 30:23 31:15 | short 13:19 |
| 3:13 5:13 | redundant | respected 18:19 | 32:1 33:8,19 | shorthand 37:10 |
| put 20:11 | 31:22 | responsibility | 33:20 34:6,15 | show 6:6 |
| p.m 1:22 36:9 | Reed 2:18 19:16 | 9:8 | 34:16 35:5,19 | significant |
| | 24:13 25:23 | restarted 29:17 | 36:2 | 28:10 |
| Q | 26:2,6 30:5 | results 37:17 | schools 25:18 | signing 4:9 |
| question 22:23 | 35:10,12 | retardation 9:23 | scope 9:8 | signs 32:1 |
| 28:13 29:6 | referenced 28:5 | 10:18 19:13 | Scouts 19:2 | similar 12:17 |
| questions 3:17 | referring 26:6 | 29:3 30:1 | second 2:6 33:1 | 33:8 |
| 3:18 23:6 | regarding 8:6 | 34:10 | 35:14 | sir 24:14,22 25:1 |
| 25:20 37:11 | regardless 4:6 | retarded 9:12 | secrecy 14:19 | 25:19 26:23 |
| quick 13:20 | rehab 6:17 7:5 | 9:16 10:12 | see 20:7 | Sisters 24:4 |
| quite 25:6 | | | seek 15:16 | |

**situation** 22:19
**small** 25:10
**social** 6:16,18
  7:1,3,4,5,12,21
  8:5 18:6 21:6
  21:11 23:16,17
**sociology** 7:6
**somebody** 27:13
  27:22 32:8
**sorry** 6:13 22:22
  27:7
**sort** 7:21 8:3
  13:19
**sound** 22:2
**source** 11:4
**speak** 5:3
**special** 13:1,1
  32:7 34:14
**specific** 28:6,16
**specifically** 6:18
  9:23 11:5 24:6
**specifics** 16:7
**spectrum** 8:23
**staff** 13:1
**stage** 10:1
**start** 14:4 32:13
**starting** 32:16
**starts** 19:3
**state** 5:9 6:11,23
  7:17 11:7 37:2
**STATES** 1:1
**statistical** 28:2
**Statute** 3:22 4:5
**stint** 8:4
**stipulated** 3:11
  3:23 4:7
**stipulations**
  1:21 3:9 5:5
**Street** 1:20 2:6
**student** 17:6
  18:5 25:4
  29:20 30:21
  31:23 32:6
**students** 19:13
  25:22 26:5

28:3 29:3,8,8
  29:10,11,14,17
  30:1 33:23
**studied** 30:4
**studies** 28:23
**stuff** 20:12
**subject** 26:9
  27:16
**subpoena** 4:18
  5:13 6:7
**sudden** 32:7
**Suite** 2:6
**summary** 33:11
**supervised** 8:2
**supervision** 8:2
  37:12
**Support** 8:4
**supposed** 22:10
**sure** 5:19 11:17
  17:4 22:22
  34:10
**surroundings**
  31:13
**Susan** 2:5 26:10
**Sweeney** 2:13
  4:13 9:18 16:6
  16:11,23 20:1
  21:3,17 23:8
  35:14,16
**sworn** 5:3
**system** 12:4
  26:15 30:8,10
  30:18 31:15
  34:6,16 36:2
**systems** 8:17

_____
        **T**
_____
**take** 10:13 27:5
  31:12,23 33:8
**taken** 1:17 3:13
  3:15 37:9
**talk** 24:18 26:11
  26:13 29:23
  34:3 35:22
**talked** 13:9 26:9

**talking** 21:13,22
  29:5 34:9
**Task** 11:2
**teacher** 13:10
  16:20 17:9
  18:5 25:3,14
  26:20 27:2
  30:12,14,18,22
  36:5
**teachers** 12:15
  12:16,18 18:14
  22:15 23:1,3
  27:16 32:5
  33:1,3,5,6,9
  34:18
**tell** 6:15,20 7:19
  9:14 12:2 13:7
  14:2 16:9,14
  18:3 20:5 36:4
**Ten** 8:15
**term** 13:23 21:6
**terms** 32:17
**testified** 5:4
**Thank** 35:16
  36:6
**thereto** 37:11
**thing** 10:4 14:10
**things** 13:3
  15:17 19:6
  34:19
**think** 14:7 18:16
  19:4,7,7,15
  23:5,17,19
  24:2,5 26:17
  26:18 27:13
  30:12 31:3,7
  31:12 34:3,5
**thinking** 24:2
**thinks** 31:18
**three** 33:3,5
**time** 3:18,19
  8:17,17,19,19
  13:5,7,17,19
  16:13 24:17
  25:2,8

**TMR** 1:7 37:8
**today** 33:12
**told** 26:19,21
  27:2,3
**tolerated** 17:5
**topic** 12:9
**Total** 25:10
**totally** 20:9
**touch** 32:21
**touches** 34:8,8
**trained** 24:8
**training** 11:6,7
  11:13 12:7,10
  12:14,17,20
  13:1 19:13
  34:1,2,7 35:5
**transcript** 37:6
  37:13
**transporting**
  15:6 17:7
**trial** 4:4
**Troy** 1:20 6:11
  6:12,13,22,23
  7:11 31:8
**true** 37:13
**trusting** 10:2,6,7
**truth** 5:3,3,4
**try** 15:12
**trying** 32:20
**two** 25:5,13 27:8
  33:5
**typically** 20:14
  22:12

_____
        **U**
_____
**Uhm** 6:16 11:1
**Uh-huh** 15:3
  20:4 23:21
  29:16 31:11
**ultimate** 14:5
**undergraduate**
  6:22 7:9
**understand** 6:11
  20:21 22:2
  26:14 29:6

34:12
**understanding**
  20:7,8
**understood**
  19:22
**undue** 32:8
**unfortunately**
  10:15 15:11
  19:9 35:6
**unit** 8:2
**UNITED** 1:1
**University** 6:11
  6:12,13,23 7:2
  7:11
**use** 14:5 15:12
**Usual** 5:5
**usually** 9:8
  14:17

_____
        **V**
_____
**v** 37:8
**variables** 29:19
**variety** 30:2
**vehicle** 17:7
**versed** 24:8
**versus** 5:15
**victim** 32:2
**victimisation**
  19:14
**victims** 9:17
**viewed** 10:14
**VS** 1:10
**vulnerability**
  29:4 30:2
**vulnerable**
  10:17 11:9
  29:20

_____
        **W**
_____
**waived** 4:3,10
**waiving** 4:6
**want** 14:22
  15:16 17:9,13
  17:15,20,21
  31:13 33:16
**wasn't** 13:17

JR, A Minor                          October 1, 2007  Pike County Board of Education
                                                                              Page 7

27:2
**Watson** 23:9,15
  23:18 24:7
**way** 18:3
**went** 34:19
**weren't** 26:6
**West** 2:6
**we're** 17:16
  21:22
**wide** 29:2 30:2
**willing** 27:15
**wise** 37:16
**withdrawn**
  32:10
**witness** 4:8,9 5:2
  33:13 37:14
**witnesses** 10:15
**women** 15:10
**words** 9:4
**work** 6:16,18
  7:1,3,4,12,14
  23:17
**worked** 7:15,15
  8:9,13
**worker** 7:21,22
  8:6 18:6 23:16
**working** 7:13
**worst** 10:4
**wouldn't** 17:4
  23:2
**writing** 37:11
**wrong** 19:23
  20:3,5,6

_____ **Y** _____
**yeah** 11:15
  18:16 21:8
  28:12 31:21
  32:15 33:17
**year** 24:16
**years** 7:9,11
  8:12 11:3
  23:12 24:3
  25:2 34:15

_____ **Z** _____

**Zelda** 2:10

_____ **#** _____
**#275** 37:23

_____ **1** _____
**1st** 1:18 36:9
  37:10
**1:20** 1:22
**1:45** 36:8
**101** 1:20
**11** 4:19
**13-to-15-year-...**
  31:23
**15** 7:9,11 24:23
  25:2
**15th** 27:8
**1726** 2:6
**1819** 2:14
**19** 9:2,5

_____ **2** _____
**2:06-CV-1120...**
  1:11 37:9
**2000** 27:7
**2002** 27:6,8
**2004-2005** 24:16
**2007** 1:19 36:10
  37:10,18
**23** 4:13
**2740** 2:10
**29** 4:18 5:20 6:2
  6:7

_____ **3** _____
**30** 4:19 11:19,20
**35** 4:14
**35203-2104** 2:15
**36081** 1:20
**36106** 2:6,11
**364** 5:12
**37** 4:15

_____ **4** _____
**4504** 5:12

_____ **5** _____
**5** 4:13
**5th** 34:13

_____ **6** _____
**6** 4:18

_____ **7** _____
**70's** 28:8

_____ **8** _____
**8th** 37:18
**80's** 28:8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JR, a minor, by his mother and )
father EAR and TMR, )
 )
    Plaintiffs, )
 )
 )     CIVIL ACTION NUMBER:
v. )     2:06-cv-1120-MEF
 )
PIKE COUNTY BOARD OF )
EDUCATION, et al., )
 )
    Defendants. )

## RE-NOTICE TO TAKE DEPOSITIONS
## AND PRODUCTION OF DOCUMENTS

TO:   Deanie Clark Allen, Esq.
      Azar & Azar, LLC
      Aliant Center
      2740 Zelda Road, Fourth Floor
      Montgomery, AL  36106

      Susan Shirock DePaola, Esq.
      1726 West Second Street, Suite B
      Montgomery, AL  36106

      Please take notice that pursuant to the Federal Rules of Civil Procedure 30, Defendants will take the depositions of Ann and Michael Reed, Plaintiffs, upon oral examination before an officer authorized by law to administer oaths.

DEFENDANT'S
EXHIBIT

Said depositions shall be taken on Thursday, July 19, 2007 beginning consecutively with Ann Reed at 11:00 a.m., earlier or later upon the completion of the deposition of Polly King.  Michael Reed's deposition will begin upon the completion of Ann Reed's deposition. The depositions will take place at the offices of the Pike County Board of Education, 101 West Love Street, Troy, Alabama, and shall continue and/or be resumed from time to time until completed.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant requests that deponents named herein produce at the time and date of the above set deposition copies of any and documents of whatsoever kind or nature regarding or relevant to the above-referenced lawsuit including, but not limited to:

1.    All records, notes, memoranda, correspondence, audio or video recordings.

2.    All documents which said deponent has utilized to prepare for testimony or refresh said deponent's recollection as to any of the subjects set forth herein.

Donald B. Sweeney, Jr.
One of the Attorneys for Named
Defendants

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the above and foregoing on:

Deanie Clark Allen, Esq.
Azar & Azar, LLC
Aliant Center
2740 Zelda Road, Fourth Floor
Montgomery, AL  36106

Susan Shirock DePaola, Esq.
1726 West Second Street, Suite B
Montgomery, AL  36106

by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to his regular mailing address, on this _16_ day of ~~June~~ July, 2007.

_____
Of Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JR a Minor, by his mother and father** | * | |
| **EAR and TMR** | * | |
| **Plaintiffs** | * | |
| **v.** | * | |
| | * | |
| **PIKE COUNTY BOARD OF** | * | PLAINTIFF DEMANDS A JURY |
| **EDUCATION,** | * | |
| **SAMUEL MARK BAZZELL** | * | **TRIAL ON ALL COUNTS** |
| **Individually and in his official capacity** | * | |
| **as Superintendent of Schools;** | * | |
| **TERRY CASEY, individually and in** | * | |
| **his official capacity as Principal** | * | |
| **of Pike County High School,** | * | **Case No. CV 2:06-cv-1120** |
| **BUDDY PYRON, individually and in** | * | |
| **his official capacity as** | * | |
| **Principal of Pike County High School,** | * | |
| **ROBERT MCDANIEL, individually** | * | |
| **and in his official capacity as Assistant/** | * | |
| **Principal of Pike County High School;** | * | |
| **CHARLES LESLIE COON, individually** | * | |
| **and in his official capacity as a teacher** | * | |
| **at Pike County High School** | * | |
| **DOE DEFENDANTS 1-5 being those** | * | |
| **persons legally responsible for providing** | * | |
| **for the safety of special education** | * | |
| **students and for conducting** | * | |
| **investigations of complaints** | * | |
| **relating to the physical safety of** | * | |
| **students and for establishing policies** | * | |
| **and procedures to protect said students.** | * | |
| **Defendants** | * | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT
### Parties

1. Plaintiff JR is a minor and is the son of EAR and TMR who sue on his behalf as
   his parents and legal guardians.   JR is a special education student and is
   mentally retarded.  He is a resident of Pike County, Alabama and at all times
   relevant hereto was enrolled in the Pike County School system.

1



DEFENDANT'S
EXHIBIT
2

2. Plaintiff EAR is the mother of JR. She is an adult resident of Pike County, Alabama and at all times relevant hereto she has been one of the custodial parents of JR.

3. Plaintiff TMR is the father of JR. He is an adult resident of Pike County, Alabama and at all times relevant hereto he has been one of the custodial parents of JR.

4. Defendant Pike County Board of Education (hereinafter the "Board") is now, and has been at all times material to this action, a local board of education located within the Northern Division of the Middle District of Alabama. The Board has the underlying responsibility for hiring, training and supervision of programs, activities and personnel;   development and implementation of policies and procedures to address personal privacy and security of special education students;   and,   for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

5. Defendant Mark Bazzell (hereinafter "Bazzell") is an adult and is an employee of the Pike County Board of Education, serving in the capacity of Superintendent of Education. In his capacity as Superintendent he is the agent of the Board responsible for  hiring, training and supervision of programs, activities and personnel;   development and implementation of policies and procedures to address personal privacy and security of special education students;   and,  for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

6. Defendant Terry Casey (hereinafter "Casey") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School. Casey was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students;   and,  for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

7. Defendant Buddy Pyron (hereinafter "Pyron") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School.   Pyron was at all times material hereto responsible for  hiring, training and supervision of programs, activities and personnel;   development and implementation of policies and procedures to address personal privacy and security of special education students;   and,  for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.   He is sued in his individual and his official capacity.

2

8.  Defendant Robert McDaniel (hereinafter "McDaniel") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Assistant Principal or Principal of the High School. McDaniel was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

9.  Defendant Charles Leslie Coon (hereinafter "Coon") is an adult and was, at all times material hereto, an employee of the Board. He was a teacher of the plaintiff JR and was at all times hereto responsible for oversight, supervision and personal safety and security of this student while he was in his custody and/or on school grounds. Coon is sued in his individual and official capacity.

10. Upon information and belief, Coon is currently incarcerated and has plead guilty to sexual abuse of Plaintiff JR.

11. Doe Defendants 1-5 are those persons legally responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

## Jurisdiction & Venue

12. Jurisdiction in this matter is based on The Rehabilitation Act of 1973, 29 U.S.C. §794 (hereinafter 504); 42 U.S.C. §1983; 42 U.S.C. §1988. The United States Constitution; 28 U.S.C. §1331; 28 U.S.C. §1367 and Title IX of the Education Amendments of 1972 20 U.S.C. §1681(a).

13. Venue is appropriate under 28 U.S.C. §1391(b).

## Facts

14. Plaintiff JR is a minor child and is a qualified individual with a disability as defined by the following statutes: the Alabama Exceptional Children's Education Act, Individuals with Disabilities Education Improvement Act and Section 504 of the Rehabilitation Act.

15. JR has been enrolled in the Pike County school system since approximately 1994 and has been classified as a special education student since approximately 1996. JR's area of disability is mental retardation.

16. The Board is a governmental entity for the purposes of 42 U.S.C. §1983 and
    §1988. The Board is required to provide special education and related services
    to students with disabilities within its jurisdiction pursuant to Section 504.

17. The Board is a recipient of Federal financial assistance to aid in the provision of
    special education and other educational services to students with disabilities.

18. Defendant Bazzell is an employee of the Board of Education, serving in the
    capacity of Superintendent of Education.

19. Defendant Casey at certain times material hereto was an employee of the Board,
    serving in the capacity of Principal of the High School.

20. Defendant Pyron at certain times material hereto was an employee of the Board,
    serving in the capacity of Principal of the High School

21. Defendant McDaniel at certain times material hereto was an employee of the
    Board, serving in the capacity of Assistant Principal of the High School.

22. Defendant Coon was, at all times material hereto, an employee of the Board and
    acting in his official capacity. He was a teacher of the Plaintiff JR and was at
    all times hereto responsible for oversight, supervision and personal safety and
    security of this student while he was in his custody and/or on school grounds.
    Coon was also responsible for implementing policies and procedures for the
    system as they related to the students including attending to the safety and
    security of said students.

23. Doe Defendants 1-5 are those persons designated by the Board with the
    responsibility for  hiring, training and supervision of programs, activities and
    personnel;  development and implementation of policies and procedures to
    address personal privacy and security of special education students; and, for
    monitoring and investigation of sexually inappropriate conduct and/or violations
    of personal privacy and security. .

24. At all times material hereto, Defendants individually and jointly acted under
    color of state law and all Defendants were agents, servants or employee of the
    Defendant Board.

25. Beginning in the academic year 2004-2005 the student's personal privacy and
    security were repeatedly violated by Defendant Coon. Said violations consisted
    of establishing and maintaining sexual contact with the student; using his
    authority as a teacher to intimidate and/or coerce the student to engage in
    sexually inappropriate conduct, taking the student off campus in a personal
    vehicle and using school property and/or school procedures to conduct said
    activities.

26. Defendants Board, Bazzell, Casey, Pyron and McDaniel and John Doe
    Defendants 1-5 were responsible for defelopment and implementation of

policies and procedures to address personal privacy and security of special education students.

27. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 were responsible for monitoring and investigating complaints of sexually inappropriate conduct and/or violations of personal privacy and security.

28. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 responsible for the hiring, training and supervision of programs, activities and personnel as it relates to personal privacy and security issues for students.

29. At all times material hereto, the Defendants knowingly and/or willfully and/or with reckless indifference failed to consider the issue of sexual assaults in hiring, failed to train and supervise programs, activities and personnel with respect to this issue, failed to develop and implement policies and procedures to address personal privacy and security issues as they relate to special education students and failed to monitor and investigate complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students including but not limited to a failure to inform teachers and parents of the existence of these allegations.

### Count I:  42 U.S.C. §1983
### Charles Leslie Coon

30. Plaintiff adopts and incorporates by reference paragraphs 1-28 hereinabove.

31. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

32. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

33. Defendant Coon violated those rights as set forth hereinabove.

34. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

### Count II:  42 U.S.C. §1983
### Pike County Board of Education, Mark Bazzell
### Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

5

35. Plaintiff adopts and incorporates by reference paragraphs 1-33 hereinabove.

36. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

37. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

38. Defendants Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had no formal policy to address issues of bodily integrity, personal security and/or the right to privacy as it relates to special education students in particular, including but not limited to policies relating to hiring, training and supervision of programs, activities and personnel, and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to investigation of complaints and monitoring and supervision of employee contact with special education students and in particular students with mental retardation.

39. In the alternative, Defendants' custom(s) or polic(ies) were grossly insufficient and resulted in violations of the Plaintiff's clearly protected constitutional rights to privacy, personal security and/or bodily integrity.

40. The Defendant's conduct as set forth hereinabove evidences deliberate or reckless indifferences to the Plaintiff's constitutional rights.

41. There is a casual relationship between the Defendants' failure to act as set forth hereinabove and the injuries or damages complained of herein.

42. As a result of the Defendants' conduct the Plaintiff has suffered injuries or damages as set forth hereinafter.

### Count III: Rehabilitation Act

43. Plaintiff adopts and incorporates by reference paragraphs 1-41 hereinabove.

44. Plaintiff is a disabled individual as that term is defined under the Rehabilitation Act. As a disabled individual he is entitled to services and accommodations necessitated by his disability (mental retardation) such that he will have similar access to educational programs and services and that he will not be subjected to extraordinary personal security risks arising out of his disability.

45. Because of the nature of the Plaintiff's mental disability he is unable to judge, respond to or internalize what behavior may be socially appropriate or inappropriate in the school setting to the same extent that a student who is not mentally retarded.

46. Defendants have willfully failed to address these issues in planning his school program.

47. Defendants have further failed to address these issues in terms of hiring, training and supervision of programs, activities and personnel, development and implementation of policies and procedures to address personal privacy and security of special education students and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to, monitoring and supervision of employees who come into contact with special education students such as the Plaintiff.

48. Defendants failure to act in this regard amounts to intentional, purposeful bad faith conduct, and violated the rights of Plaintiff secured by Section 504 of the Rehabilitation Act of 1973 *as amended*, 29 U.S.C. §794 and implementing regulations.

49. Accordingly, Defendants have subjected Plaintiff to discrimination on the basis of his disability in violation of 29 U.S.C. §794(a) and implementing regulations.

50. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Count IV:  20 U.S.C. §1681(a)
## Pike County Board of Education

51. Plaintiff adopts and incorporates by reference paragraphs 1-49 hereinabove.

52. Defendant Board is a recipient of Federal financial assistance as set forth hereinabove.

53. Plaintiff was subjected to sexual harassment at the hands of a school official which resulted in his exclusion from participation in and denial of the benefits of, an educational program or activity in violation of Title IX, 20 U.S.C. §1681(a).

54. The Board and/or officials of the Board knew or should have known of this harassment.

55. The Board and/or relevant officials who were invested by the Board with the duty to supervise the harasser and had the power to take action against him remained deliberately indifferent to this harassment and refused to take action against the harasser.

56. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

### Count V:  Negligence

57. Plaintiff adopts and incorporates by reference paragraphs 1-55 hereinabove.

58. Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had a non-delegable statutory duty to report child abuse and/or suspicions of child abuse to the Department of Human Resources pursuant to Ala. Code §26-14-3.

59. Upon information and belief, a timely report was not made when the Defendants first knew or should have known that the abuse of a minor child or children may have occurred.

60. The Defendants' conduct was a breach of the standard of care, particularly as it applies to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

61. The Defendant's conduct was the proximate cause of a continuing series of sexually abusive acts which were inflicted on the Phintiff and caused injury or damage as set forth hereinafter.

### Count VI:  Wanton and Reckless Conduct

62. Plaintiff adopts and incorporates by reference herein paragraphs 1-60 hereinabove.

63. The failure to report child abuse and/or suspicions of child abuse by Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 was wanton and reckless as it relates to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

64. The Defendants' conduct was the proximate cause of a continuing series of sexual abusive acts which were inflicted on the Plaintiff and caused injury or damage as set forth hereinafter.

### Count VII:  42 U.S.C. §1983
### Equal Protection
### Pike County Board of Education, Mark Bazzell
### Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

65. Plaintiff adopts and incorporates by reference herein paragraphs 1-63 hereinabove.

66. 42 U.S.C. §1983 provides that any person acting under color of state law who deprives any other person of rights granted by the Constitution or laws of the United States shall be liable to that person for equitable or legal relief.

67. As set forth hereinabove, Plaintiff was denied equal protection of the law to the extent that policies and procedures developed and implemented by the Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 did not allow him the same level of personal security, personal privacy and/or bodily integrity as was provided to other students enrolled in the Board's programs.

68. Defendants' conduct was the reckless and willful disregard for the student's right to participate in educational programs in a non-discriminatory manner.

69. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Injuries or Damages

70. As a result of Defendant's conduct, JR suffered and continues to suffer, mental anguish, distress, humiliation, embarrassment, regression in academic and social skills, exclusion from his regular school environment with no friends or support, ongoing fear and confusion, all exacerbated by his disability.

71. The Plaintiff will require continuing counseling, care and training associated with his social and emotional development which would not have been required but for the Defendants conduct.

## Prayer for Relief

**WHEREFORE, THE PREMISES CONSIDERED,** the Plaintiffs request the following relief:

A. That the Court assume Jurisdiction in this case;
B. That the matter be set for trial by jury;
C. Issue an award of compensatory damages against the Defendants;
D. Issue a mandatory injunction requiring the development and implementation of policies and procedures relating to hiring, training and supervision of programs, activities and personnel with respect to personal privacy and security issues;
E. Issue a mandatory injunction requiring the development and implementation of Board Policies and procedures relating to monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students;
F. Issue a mandatory injunction requiring the development and implementation of policies and procedures to address personal privacy and security of special education students;
G. Issue an award of punitive damages against the Defendants;

H.  Award Plaintiffs' attorneys fees and costs pursuant to 29 U.S.C. §794 and §42, U.S.C. §1988 and under the Rehabilitation Act;

I.  Award such other further relief deemed appropriate by this Honorable Court

Respectfully submitted on this 26th day of June, 2007

/s/   Susan Shirock DePaola
ASB: 7431-L75S

**Susan Shirock DePaola**
**1726 West Second Street~Suite B**
**Montgomery, AL 36106**
specialeducationattorney@mindspring.com

/s/   Deanie Clark Allen
ASB:  1662-G69A

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, AL 36106**
dallen@azarlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint has been served on the following by ECF or by first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on this the 26th day of June, 2007.

VIA US MAIL:
Charles Leslie Coon
AIS 244732
Kilby Correctional Facility
PO Box 150
Mt. Meigs, AL 36057

VIA ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/ Susan Shirock DePaola

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME _Justin Reed_
DATE _2/22/05_   TIME _2:40_   LOCATION _Pike County High_

The purpose of this meeting is to:

- ☐ Determine if Referral Requires Evaluation
- ☒ Discuss the Need for Additional Data Collection
- ☒ Determine Initial or Continued Eligibility
- ☒ Develop Initial IEP or (Review/Revise) IEP
- ☐ Review Exit IEP/Portfolio (for Occupational Diploma Students Only)
- ☐ Conduct Manifestation Determination
- ☒ Develop Functional Behavior Assessment Plan
- ☐ Develop/Revise Behavioral Intervention Plan
- ☐ _____
- ☐ _____
- ☐ _____

The following people will meet with us:

- ☒ Local Education Agency Representative
- ☒ Someone who Can Interpret the Instructional Implications of the Evaluation Results
- ☒ General Education Teacher
- ☒ Special Education Teacher
- ☒ Parent
- ☒ Student
- ☐ Career/Technical Representative
- ☐ Other Agency Representative(s) for Transition
  Agency Name _____
  Agency Name _____
- ☐ _____
- ☐ _____

Because your input is important to us, we encourage you to make every effort to attend this meeting. You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and the students who require notice and an explanation of their rights i their native language have been accommodated to ensure their understanding. You are fully protected under th pecial education rights. If you have questions, please contact:

_Karen T. Berry_ (Name)     at _566-1850_ (Telephone)

_Karen Berry_
Signature of Education Agency Official

Enclosure : *Special Education Rights*

### PARENTS - STUDENTS

Please check one of the following boxes, sign, date, and return this form to
_A. Short_                           before _2/22/05_

- ☒ **I WILL BE ABLE TO MEET WITH YOU.**
- ☐ **I CANNOT** meet at the date and time indicated. Please contact me to arrange another time.
- ☐ **I WILL NOT BE ABLE TO MEET WITH YOU.** I will contact you if I want more information.

_Mrs Reed_                                    _2/16/05_
Signature of Parent or Student at Age 19          Date

### OFFICE USE ONLY

Documented attempts to contact parent/student (Age 19) for IEP meeting.
Date Notice Sent: _2-15-05_   Result: _Parent Came_
2nd attempt Date: _____   Action: _____   Result: _____

Documented attempts to contact student/agency for IEP meeting regarding transition services.
Student was notified on _____ via _____
gency was notified on _____ via _____
Agency was notified on _____ via _____

DEFENDANT'S EXHIBIT 3

noticep 7/13/99
GibCo Dynamo

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME _Justin Reed_

DATE _5-13-04_    TIME _____    LOCATION _PCHS_

| The purpose of this meeting is to: | The following people will meet with us: |
|---|---|
| ☐ Determine if Referral Requires Evaluation | ☑ Local Education Agency Representative |
| ☐ Discuss the Need for Additional Data Collection | ☑ Someone who Can Interpret the Instructional |
| ☐ Determine Initial or Continued Eligibility | Implications of the Evaluation Results |
| ☑ Develop Initial IEP or Review/Revise IEP | ☑ General Education Teacher |
| ☐ Review Exit IEP/Portfolio (for Occupational | ☐ Special Education Teacher |
| Diploma Students Only) | ☑ Parent |
| ☐ Conduct Manifestation Determination | ☐ Student |
| ☐ Develop Functional Behavior Assessment Plan | ☐ Career/Technical Representative |
| ☐ Develop/Revise Behavioral Intervention Plan | ☐ Other Agency Representative(s) for Transition |
| ☐ _____ | Agency Name _____ |
| ☐ _____ | Agency Name _____ |
| | ☐ _____ |

Because your input is important to us, we encourage you to make every effort to attend this meeting. You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and the students who require notice and an explanation of their rights in their native language have been accommodated to ensure their understanding. You are fully protected under the special education rights. If you have questions, please contact:

_Karen Berry_ _____ at _566-1850_

(Name) (Telephone)

_Karen J Berry_

Signature of Education Agency Official

Enclosure : _Special Education Rights_

## PARENTS - STUDENTS

Please check one of the following boxes, sign, date, and return this form to

_____ before _____

☑ I WILL BE ABLE TO MEET WITH YOU.

☐ I CANNOT meet at the date and time indicated. Please contact me to arrange another time.

☐ I WILL NOT BE ABLE TO MEET WITH YOU. I will contact you if I want more information.

_Deborah Reed_ _____ _5-7-04_

Signature of Parent/Legal Guardian/Surrogate or Student at Age 19      Date

## OFFICE USE ONLY

Documented attempts to contact parent/legal guardian/surrogate - student (Age 19) for IEP meeting.

Date Notice Sent: _5-3-04_ Result: _not returned_

2nd attempt Date: _5-6-04_ , Action _2nd phone_ , Result: _returned_

Documented attempts to contact student/agency for IEP meeting regarding transition services.

Student was notified on _____ via _____

Agency was notified on _____ via _____

Agency was notified on _____ via _____

Noticep
7/13/99

GibCo Dynamo

**Pike County School System**
101 West Love St.
Troy, Alabama 36081

## ACCESS TO IEP DOCUMENTATION
As Required by 34 CFR § 300.342(b)(2)(3)

The following school personnel have access to the IEP and have been informed of their responsibility in implementing the IEP, and of specific accommodations, modifications, and supports that must be provided for _____ JUSTIN _____ REED _____ (student's name) for the _____ 2004-2005 _____ school year.

| DATE | SIGNATURE | POSITION |
|------|-----------|----------|
| 5-13-04 | Leigh Anne Richburg | Sp. Ed Teacher |
| 5·13·04 | Marie Davidson | Sp. Teacher |
| 5·13·04 | Pam Wells | Sp Ed Teacher |
| 5·13·04 | Ginger Booker | Sp. Ed. Teacher |
| 5/13/04 | Michael Brooks | Reg. Teacher |
| 5/13/04 | Karen Berry | LEA rep/sped coord? |
| 5/13/04 | Kevin Jahn | Job Coach |
| 5/13/04 | L.D.R. | V.R. |
| 5/13/04 | Elizabeth Reed | mother |
| 8/16/04 | Sylvia Helms | Art Teacher |
| 8/16/04 | Ruth Chancellor | Sp. ed. |
| 8/17/04 | Toni Sellin | Science Teacher |
| 8/17/04 | Leigh Ann Owens | English |
| 8/18/04 | Sylvia Helms | Art Teacher |
| 8/20/04 | | |
| 8/29/04 | A. Hart | new teacher |

Signature or person responsible for informing personnel of their responsibility.

Leigh Anne Richburg

# ACCESS TO IEP DOCUMENTATION
## As Required by 34 CFR § 300.342(b)(2)(3)

The following school personnel have access to the IEP and have been informed of their responsibility in implementing the IEP and of specific accommodations, modifications, and supports that must be provided for ___Justin Reed___ (student's name) for the ___2004 - 2005___ school year.

| DATE | SIGNATURE | POSITION |
|------|-----------|----------|
| 1-7-05 | _(signature)_ | Reg. Teacher |
| 1-12-05 | M. Morgan | Reg. Ed. Teacher |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Signature or person responsible for informing personnel of their responsibility.

_April Grant        Special Ed Teacher_

Pike County School System
101 West Love St.
Troy, Alabama 36081

# INDIVIDUALIZED EDUCATION PROGRAM

| STUDENT'S NAME    JUSTIN    REED | IEP INITIATION/DURATION DATES |
|---|---|
| DOB  07/28/1989   SCHOOL YEAR  2004-2005 | From    8/1/2004    To    5/31/2005 |

THIS IEP WILL BE IMPLEMENTED DURING THE REGULAR SCHOOL TERM UNLESS
NOTED IN EXTENDED SCHOOL YEAR SERVICES.

### STUDENT PROFILE

Justin is a 14 year old 9th grader at Pike County High School.  He currently lives at home with
his biological mother, father, sister and brothers.  Justin's mother describes him as a good,
polite young man who is interested in doing new things.  Justin currently takes Concerta for
ADDHD.  He also wears glasses for reading.  Justin's motivation to do well in school comes
from encouragement from teachers, peers and his family.  His mother feels that his strength in
academics is Math, and that his weakness is in Reading. Justin is in the band and he enjoys
this very much.   Justin enjoys playing games on the Play Station and working on the
computer.  On the transition planning assessment, Justin's mother states that he does not
have a realistic career goal, that he does not manage money wisely, and does not take his
medication independently.  She also states that Justin does participate in youth groups, is able
to get himself up and dressed including personal hygiene and can relate his skills involved for
jobs.

Justin did participate in the 8th grade SAT.    However, current tests scores are not available at
this time.  Justin mastered the majority of his 2003-04 IEP objectives.

On the brief KTEA, given in April, Justin's scores are as follows:  *Amended 2/22/05

**Math:      GE 3.3  SS 61**
**Reading: GE: 3.9  SS 70**
**Spelling: GE: 3.0  SS 66**

*Change of Schedule to functional Math & Add modifica*

*R. Corbett  B. Stant  C.L. J.R*

*RB  Justin Reed*

Justin will receive instruction in the general curriculum for all academics were he will work on
obtaining an Alabama High School Diploma.

Items checked "YES" will be addressed in this IEP:
SPECIAL INSTRUCTION FACTORS:

| | | |
|---|---|---|
| Does the student have behavior which impedes his/her learning or the learning of others? | ☐ Yes | ☒ No |
| Does the student have limited English proficiency? | ☐ Yes | ☒ No |
| Does the student need instruction in Braille and the use of Braille? | ☐ Yes | ☒ No |
| Does the student have communication needs (deaf or hearing impaired only)? | ☐ Yes | ☒ No |
| Does the student need assistive technology devices and/or services? | ☐ Yes | ☒ No |
| Does the student need special transportation? | ☐ Yes | ☒ No |
| Are transition services addressed in this IEP? | ☒ Yes | ☐ No |

### NONACADEMIC & EXTRACURRICULAR ACTIVITIES

Student will have the opportunity to participate in nonacademic/extracurricular activities with his/her nondisabled peers.

☒ YES   ☐ YES, with supports.  Describe: _____
☐ NO Explanation must be provided: _____

### METHOD/FREQUENCY FOR REPORTING PROGRESS OF ATTAINING GOALS TO PARENTS

Progress reports (indicating whether the progress, if continued, is sufficient to meet the annual goal) will be sent to parents
each grading period as scheduled by the school system every   4 1/2   weeks. Other _____

Page 1 of ____

Pike County School System
101 West Love St.
Troy, Alabama 36081

## TRANSITION INDIVIDUAL EDUCATION PLAN

| STUDENT'S NAME  JUSTIN | REED | DATE | 8/1/2004 |
|---|---|---|---|

### TRANSITION GOAL (beginning at age 14, or younger if appropriate)

Employment Outcome:  Competitive Employment with time-limited support

Community Living Outcome:  Independent living with no need for support

### STATEMENT OF TRANSITION SERVICES NEEDS THAT FOCUSES ON THE STUDENT'S COURSE OF STUDY (beginning at age 14, or younger if appropriate)

Justin will work on the requirements to obtain an Alabama High School Diploma.

Career Interest(s) Justin shows an interest in police work.

### STATEMENT OF NEEDED TRANSITION SERVICES
### (beginning at age 16, or younger if appropriate)

| Components Needed | Components NOT Needed | |
|---|---|---|
| X | _____ | 1. Instruction |
| X | _____ | 2. Related Services |
| X | _____ | 3. Community Experiences |
| X | _____ | 4. Development of Employment and Other Post-School Adult Living Objectives |

Based on this student's interests and needs, transition services will address the following checked areas. Goal(s) and/or benchmark(s) must be written for each area checked.

| | |
|---|---|
| _____ Vocational Evaluation (VE) | _____ Advocacy/Guardianship (AG) |
| _____ Employment Development (ED) | _____ Community Participation (CP) |
| _____ Postsecondary Education (PE) | _____ Transportation (T) |
| _____ Financial Management (FM) | _____ Medical (M) |
| _____ Personal Management (PM) | _____ Other |
| _____ Living Arrangements (LA) | _____ Other |

| EXIT DOCUMENT (beginning at age 16) | ANTICIPATED DATE OF EXIT |
|---|---|
| ☐ Alabama High School Diploma with Advanced Academic Endorsement  ☐ Alabama Occupational Diploma  ☑ Graduation Certificate  ☐ Alabama High School Diploma  ☐ Other | May  1  2008  Month    Year |

(annual) 1/22/05

### PROGRAM CREDIT TO BE EARNED

| For each course taken, indicate program credit to be earned. | MATH | SCIENCE | SOCIAL STUDIES | ENGLISH | | | |
|---|---|---|---|---|---|---|---|
| Alabama High School Diploma with Advanced Academic Endorsement | | | | | | | |
| Alabama High School Diploma | | | | | | | |
| Alabama Occupational Diploma | | | | | | | |
| Graduation Certificate | X 4 | X 4 | X 4 | X 4 | | | |

### FOR OCCUPATIONAL DIPLOMA STUDENTS ONLY. PORFOLIOS MUST BE REVIEWED ANNUALLY.

The following porfolios have been:

| Reviewed | | Completed | Date | Portfolio approved for graduation on |
|---|---|---|---|---|
| ☐ | Employment English | ☐ | _____ | |
| ☐ | Job Skills Math | ☐ | _____ | |
| ☐ | Life Skills Science | ☐ | _____ | _____ |
| ☐ | Career Preparation | | | Date |

11/10/99

GibCo Dynamo

Pike County School System
## INDIVIDUAL EDUCATIONAL PLAN

STUDENT'S NAME: _Justin Reed_

AREA: ALL ACADEMICS

PRESENT LEVEL OF PERFORMANCE:
_Justin_ IS PURSUING AN ALABAMA HIGH SCHOOL DIPLOMA BY PARTICIPATING IN THE GENERAL EDUCATION PROGRAM FOR ALL CORE ACADEMIC CLASSES.

KTEA SCORES: READING: GE _3.9_  MATH: GE: _3.3_  SPELLING: GE _3.0_

STRENGTH

WEAKNESS: _Reading Recording + Comprehension_

ANNUAL GOAL to be measured by achievement of benchmarks:
_Justin_ WILL COMPLETE ALL OF THE REQUIREMENTS OF THE 9TH GRADE ALABAMA COURSE OF STUDY WITH AT LEAST 60% MASTERY AND ACCOMMODATIONS.

| | Date of Mastery |
|---|---|
| For transition benchmark(s). person(s)/agency(ies) responsible: | |

Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel (including frequency, duration & location)

TESTS MAY BE READ ORALLY

EXTENDED TIME FOR TESTS AND PROJECTS

CALCULATOR FOR MATH

PROXIMITY SEATING

COPY OF TEACHERS NOTES

CONSULTATION BETWEEN REGULAR ED. TEACHER AND RESOURCE TEACHER ONCE A WEEK

※ _Student will write homework assignments in agenda + teacher, parent will sign._

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _English_ | | _12-04_ |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _Science_ | | _12-04_ |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _History_ | | _Cont_ |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _Life Skills math_ | | _5-05_ |

"X" TYPE(S) OF EVALUATION FOR ANNUAL GOAL

| | |
|---|---|
| ☐ a. Data Collection | ☐ f. See Benchmark |
| ☒ b. Teacher/Text Test | ☐ g. Other |
| ☐ c. Work Samples | ☐ h. Other |
| ☐ d. Teacher Observation | ☐ i. Other |
| ☒ e. Grades | |

Page: _____ of _____

GibCo Dynamo

# INDIVIDUAL EDUCATIONAL PLAN

**STUDENT'S NAME:** Justin Reed

**AREA:** Speech and Language

**PRESENT LEVEL OF PERFORMANCE:**

Justin is performing with a moderate language delay according to the OWLS.

**ANNUAL GOAL to be measured by achievement of benchmarks:**

Justin will increase his receptive and expressive language skills to an age appropriate level by May 2006.

| | Date of Mastery |
|---|---|
| | |

**For transition benchmark(s), person(s)/agency(ies) responsible:**

**Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel**
*(including frequency, duration & location)*

Justin comes to speech once a week for 30 minutes in the resource room with the SLP.

* games
* cards
* sheets
* stories

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| Justin will identify subject and verbs in a sentence with 85% accuracy by May 2005. | | ✓ |
| Justin will identify correct usage of antonyms synonyms and multiple meaning words with 80% accuracy by May 2005. | | ✓ |
| Justin will answer age appropriate Wh questions with 80% accuracy by May 2005. | | ✓ |
| | | |

**"X" TYPE(S) OF EVALUATION FOR ANNUAL GOAL**

- ☐ a. Data Collection
- ☒ b. Teacher/Text Test
- ☐ c. Work Samples
- ☐ d. Teacher Observation
- ☐ e. Grades
- ☒ f. See Benchmarks
- ☐ g. Other _____
- ☐ h. Other _____
- ☐ i. Other _____

Page: _____ of _____

GibCo Dynamo

## Individualized Educational Plan (IEP)

| STUDENT'S NAME | *Justin Reed* |
|---|---|

### GENERAL FACTORS

**HAS THE IEP TEAM CONSIDERED:**

| | |
|---|---|
| The strengths of the child? | ☒YES ☐ NO |
| The concerns of the parents for enhancing the education of the child? | ☒YES ☐ NO |
| The results of the initial or most recent evaluations of the child? | ☒YES ☐ NO |
| The results of performance on any State or district-wide assessments, as appropriate? | ☒YES ☐ NO |
| The need for extended school year services? | ☒YES ☐ NO |

### LEAST RESTRICTIVE ENVIRONMENT

Does this student attend the school (or for a preschool-age student, participate in the environment) he/she would attend if nondisabled? ☒ Yes ☐ No    If no, justify:

Does this student receive all special education services with nondisabled peers? ☒ Yes ☐ No    If no, justify: (Justification may not be solely because of needed modifications in the general curriculum.)
*low math and speech/language skills adversely affect educational progress in the general curriculum*

| AGE 6-21 YEARS OF AGE | 3-5 YEARS OF AGE |
|---|---|
| **Check One:** | 12 ☐ Early Childhood Setting |
| 01 ☒ 0 Hours Per Week Outside the Regular Classroom | 13 ☐ Early Childhood Special Education Setting |
| 02 ☐ Less than 6 Hours Per Week Outside the Regular Classroom | 14 ☐ Home |
| 03 ☒ 6-21 Hours Per Week Outside the Regular Classroom | 15 ☐ Part-Time Early Childhood/Part-Time |
| 04 ☐ Over 21 Hours per Week Outside the Regular Classroom |     Early Childhood Special Education Setting |
| 05 ☐ Private School (Parent Placed) | 16 ☐ Residential Facility |
| 06 ☐ Public Day School | 17 ☐ Separate School |
| 07 ☐ Private Day School | **COPY OF IEP** |
| 08 ☐ Home | Was a copy of the IEP given to parent at IEP meeting? |
| 09 ☐ Hospital | ☒YES ☒NO |
| 10 ☐ Public Residential School | If no, date copy sent to parent: **5/13/04** |
| 11 ☐ Private Residential School | |

### TRANSFER OF RIGHTS
**To be completed at least one year prior to the student's 19th birthday.**

I understand that the rights under the Individuals with Disabilities Education Act will transfer to me on my 19th birthday.

| Student's Signature | Date |
|---|---|

**THE FOLLOWING PEOPLE ATTENDED AND PARTICIPATED IN THE MEETING TO DEVELOP THIS IEP.**

| POSITION | DATE | IEP TEAM MEMBERS' SIGNATURE |
|---|---|---|
| PARENT(S) | 5/13/04 | *Elizabeth Reed  amended 2/22/* |
| PARENT(S) | | RS |
| LEA REPRESENTATIVE /psy | 5/13/04 | *Karen Berry*  AST  *eh* |
| SPECIAL EDUCATION TEACHER | 5-13-04 | *Leigh Anne Richburger R*  ms |
| GENERAL EDUCATION TEACHER | 5/13/04 | *Michael Brooks*  BR |
| STUDENT | | *KB* |
| CAREER/TECHNICAL EDUCATION REP | | |
| OTHER AGENCY REPRESENTATIVE | 5/13/04 | *Regina Booth* |
| *Job Coach* | 5-13-04 | *Pam Yates* |
| *U.R.* | 5/13/04 | *L. L.* |
| *Sp Teacher* | 5/13/04 | *Maria Davidson  5/13/04* |

I have received a copy of *Parent Rights*.    *Elizabeth Reed*    5/13/04

                       Signature of Parent(s)          Date

### INFORMATION FROM PEOPLE NOT IN ATTENDANCE

| NAME | POSITION |
|---|---|
| *Elizabeth Reed* | |

## IEP PARTICIPATION DOCUMENTATION
### Alabama Student Assessment Program

Revised May 2003

**When completed by the IEP Team, this checklist becomes a part of the student's IEP.**

Name: _Justin Reed_    School: _PCHS_    Grade: _9_    Year: _04-05_

### ALABAMA HIGH SCHOOL GRADUATION EXAM (AHSGE)

☑ 1. Student will participate in the *Alabama High School Graduation Exam*. Student is working toward either the Alabama High School Diploma or the Alabama Occupational Diploma.

☒ 2. No accommodations are required for student to participate in the *Alabama High School Graduation Exam*.

☐ 3. Accommodations are required for student to participate in the *Alabama High School Graduation Exam*. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

☐ 5. Student will participate in the *Alabama High School Graduation Exam* and GED. Student is working toward the Alabama High School Diploma and the Alternate Adult High School Diploma.

Justification for the committee decision: _____

_____

### STANFORD ACHIEVEMENT TEST, TENTH EDITION (Stanford 10)
### ALABAMA READING AND MATHEMATICS TEST (ARMT)

☑ 1. Student will participate in the Stanford 10 and *Alabama Reading and Mathematics Test*.

☒ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision: _____

_____

### ALABAMA DIRECT ASSESSMENT OF WRITING (ADAW)

☐ 1. Student will participate in the *Alabama Direct Assessment of Writing*.

☐ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision: _____N/A_____

### DYNAMIC INDICATORS OF BASIC EARLY LITERACY SKILLS (DIBELS)

☐ 1. Student will participate in the *Dynamic Indicators of Basic Early Literacy Skills*.

☐ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision: _____N/A_____

_____

If the school is chosen to participate in piloting of an assessment or the *National Assessment of Educational Progress* (NAEP), the student **will** participate unless the IEP Team is reconvened. Students needing special formats will participate in pilots only ⸰ecial formats are available.

23

*Justin K*

Parents:

It is once again time for IEP meetings. I am interested in your feedback about your child so that I may write his/her IEP as accurately as possible. Please answer the following questions and return to me as soon as possible.

I look forward to seeing you in May for IEP meetings. A date a time will follow in a few weeks.

Thank you for your cooperation.

*Leigh Anne Richburg*

Leigh Anne Richburg

1. Is your child currently taking any medications? _yes_____ If so, what is it for and what is the name of it.
   _ADDHD , Conceeta_____

2. What do you feel is your child's greatest strength in school (subject)?
   _Band___

3. What do you feel is your child's greatest weakness in school (subject)?
   _Reading_

4. What class, if any, do you feel your child could participate in the regular classroom with accommodations? _don't know____

5. Who lives in the home with your child? (Brothers, sisters, aunts, etc.)
   _mom, dad, Jarime, Jessica, Joey____

6. What activities (sports, arts etc.) does your child enjoy? _computer____

7. Please list three things that best describe your child.
   1. _good___  2. _wanting to do new things_ 3. _____

8. Does your child wear glasses or a hearing aid? _suppose too____

9. What motivates your child to want to do well in school? _parents encourgement_

10. What extra curricular activities does your child participate in? _none____

PARENTS SIGNATURE: _Elizabeth Reed_ DATE: _4/29/04_

Dear Parent,

As your child gets older, his/her teachers will be working to develop skills which will be needed for future employment and personal management. These skills are called transition skills, as your child makes the transition from childhood to young adulthood. Please complete these questions about your child. If you have any other concerns for your child, or feel that your child needs help in any other area, please comment on the next page.

## TRANSITION PLANNING ASSESSMENT

### Middle School/Junior High

I.  **Employment Development**
    Does the student:

    | | |
    |---|---|
    | Have a realistic career goal? | ____Yes ✓No |
    | Know where to find information on careers? | ✓ Yes ____No |
    | Self-evaluate skills/abilities realistically? | ✓ Yes ____No |
    | Relate skills/abilities to jobs? | ✓ Yes ____No |
    | Have any work responsibilities (i.e., paper route, babysitting, lawn mowing)? | ✓ Yes ____No |
    | State his/her likes/dislikes and interests in particular jobs? | ✓ Yes ____No |

II. **Financial Management**
    Does the student:

    | | |
    |---|---|
    | Earn an allowance? | ✓ Yes ____No |
    | Earn money from jobs such as babysitting? | ✓ Yes ____No |
    | Manage money wisely? | ____Yes ✓ No |
    | Make his/her own purchases? | ✓ Yes ____No |
    | Demonstrate an understanding of the different types of insurance (i.e., medical, automobile, etc.)? | ✓ Yes ____No |

III. **Personal Management**
    Does the student:

    | | |
    |---|---|
    | Get him/herself up in the mornings? | ✓ Yes ____No |
    | Independently care for hygiene and grooming? | ✓ Yes ____No |
    | Prepare simple meals? | ✓ Yes ____No |
    | Do his/her own laundry? | ✓ Yes ____No |
    | Independently complete assigned household chores? | ____Yes ✓ No |
    | Follow safety rules? | ✓ Yes ____No |
    | Purchase needed personal items? | ✓ Yes ____No |
    | Use time effectively? | ✓ Yes ____No |
    | Have age-appropriate friends? | ✓ Yes ____No |
    | Participate in activities with friends ( parties, etc.)? | ✓ Yes ____No |
    | Resolve conflicts with friends effectively? | ✓ Yes ____No |

Communicate effectively with peers and adults? ____✓ Yes ____ No

IV.    Community Participation
       Does the student:
       Move about in his/her neighborhood? ____✓ Yes ____ No
       Go to movies, grocery store, library, restaurants, etc? ____✓ Yes ____ No
       Participate in community sports activities? ____ Yes ✓ No
       Participate in youth groups? ____ Yes ✓ No
       Identify leisure-time interests? ____✓ Yes ____ No
       Participate in school extracurricular activities? ____ Yes ✓ No

V.     Medical
       Does the student:
       Demonstrate a basic understanding of different types
          of medical care (i.e., dental, vision, internal medicine)? ✓ Yes ____ No
       Realistically express his/her medical needs/limitations? ✓ Yes ____ No
       Independently take medication, if needed? ____✓ Yes ____ No
       Demonstrate skills needed to decide when to take over-
          the-counter medicines (i.e., aspirin)? ____✓ Yes ____ No

Pike County School System
THE FAMILY'S ASSESSMENT FOCUS (continued)                    Page 2

Child's Name: _____    _____

6.  What puzzles me about my (the) child: that he is not accomplishing more in school, then what I expect him too.


7.  Recent progress or changes I have seen in my (the) child: that he is still doing the same week in school as he was doing 2yes ago.


8.  My (the) child communicates with me by: accomplishment with his goals he completed.


9.  The most challenging aspect of raising my (the) child is: understanding him.


10. I would like my (the) child to learn or get better at: his studies in school


11. I would like help with: Reaching a better education in all his studies in school

GibCo Dynamo

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL          Page 1 Of 1

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME    JUSTIN MICHAEL REED

DATE    05/25/2005    TIME    10:00 AM    LOCATION  Pike County High School

**The purpose of this meeting is to:**
- [ ] Determine If Referral Requires Evaluation
- [ ] Discuss The Need For Additional Data Collection
- [ ] Determine Initial Or Continued Eligibility
- [x] Develop Initial IEP Or Review/Revise IEP
- [ ] Review Exit IEP/Portfolio (For Occupational Diploma Students Only)
- [ ] Conduct Manifestation Determination
- [ ] Develop Functional Behavior Assessment Plan
- [ ] Develop/Revise Behavioral Intervention Plan
- [ ] _____
- [ ] _____
- [ ] _____

**The following people will be invited to meet with us:**
- [x] Local Education Agency Representative
- [x] Someone Who Can Interpret The Instructional Implications Of The Evaluation Results
- [x] General Education Teacher
- [x] Special Education Teacher
- [x] Parent
- [x] Student
- [x] Career/Technical Representative
- [ ] Other Agency Representative(s) For Transition

  Agency Name  _____
  Agency Name  _____
- [ ] _____
- [ ] _____

Because your input is important to us, we encourage you to make every effort to attend this meeting. You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and students who require notice and an explanation of their rights in their native language have been accommodated to ensure their understanding. You are fully protected under the special education rights. If you have questions, please contact:

Karen T. Berry                                        at        566-1850
(Name)                                                          (Telephone)

Karen T. Berry
Signature of Education Agency Official
Enclosure: *Special Education Rights*

### Parent-Student

Please **check one** of the following boxes, sign, date, and return this form to   April S. Trant
before   05/09/2005

- [x] I **WILL BE ABLE TO MEET WITH YOU.**
- [ ] I **CANNOT** meet at the date and time indicated. Please contact me to arrange another time.
- [ ] I **WILL NOT BE ABLE TO MEET WITH YOU.** I will contact you if I want more information.

*Mrs Reed*                                        5/6/05
Signature of Parent or Student at Age 19          Date

### OFFICE USE ONLY

Documented attempts to contact parent/student (age 19) for IEP meeting.

Date Notice Sent    04/28/2005    Result    _____

2 nd  Attempt Date  _____    Action  _____  Result  _____

Documented attempts to contact student/agency for IEP meeting regarding transition services.

Student was notified on  _____  via  _____

Agency was notified on  _____  via  _____

Agency was notified on  _____  via  _____

DEFENDANT'S EXHIBIT
4

AL.0004001 4/26/2005                              noticep 7/13/99

PIKE COUNTY SCHOOLS                PIKE COUNTY HIGH SCHOOL                Page 1 Of 1

# INDIVIDUALIZED EDUCATION PROGRAM

**STUDENT'S NAME** JUSTIN MICHAEL REED                    **IEP INITIATION/DURATION DATES**

**DOB** 07/28/1989    **SCHOOL YR** 2005/2006    **GRADE** 9    FROM 08/10/2005    TO 05/25/2006

THIS IEP WILL BE IMPLEMENTED DURING THE REGULAR SCHOOL TERM UNLESS NOTED IN EXTENDED SCHOOL YEAR SERVICES

### STUDENT PROFILE

Justin is a 15 year old at Pike County High School. Justin has been successful in all general education curriculum classes except for Math. Justin has experienced failure due to his inability to grasp higher order math reasoning skills. Justin is in the Pike County High School Band and enjoys playing his instrument. Justin is a well-mannered student and gets along well with his peers. Justin does not yet have a career goal.

Justin mastered the majority of his 2004-2005 IEP objectives. On the brief KTEA, given in April, Justin's scores are as follows:

Math:    GE: 3.1  SS:  57
Reading:  GE: 2.8  SS:  62
Spelling:  GE: 3.3  SS:  65

Justin will continue to receive instruction in all general academic classes with accommodations, except Math. Due to his poor math ability affecting his educational progress in the general curriculum, he will receive modifications in math. Justin did not participate in the Standford 10, due to being a 9th grader.

Items checked "YES" will be addressed in this IEP:

**SPECIAL INSTRUCTIONAL FACTORS:**

- Does the student have behavior which impedes his/her learning or the learning of others?    ☐ YES    ☑ NO
- Does the student have limited English proficiency?    ☐ YES    ☑ NO
- Does the student need instruction in Braille and the use of Braille?    ☐ YES    ☑ NO
- Does the student have communication needs (deaf or hearing impaired only)?    ☐ YES    ☑ NO
- Does the student need assistive technology devices and/or services?    ☐ YES    ☑ NO
- Does the student need special transportation?    ☐ YES    ☑ NO
- Are transition services addressed in this IEP    ☑ YES    ☐ NO

### NONACADEMIC and EXTRACURRICULAR ACTIVITIES

**The student will have the opportunity to participate in nonacademic/extracurricular activities with his/her nondisabled peers.**

☑ YES    ☐ YES, with supports. Describe: _____

☐ NO.    Explanation must be provided: _____

### METHOD/FREQUENCY FOR REPORTING PROGRESS OF ATTAINING GOALS TO PARENTS

Progress reports (indicating whether the progress, if continued, is sufficient to meet the annual goal) will be sent to parents each grading period as scheduled by the school system every ___4.5___ weeks. Other ___report card___

AL0017a001 4/26/2005                                    11/10/99                                    STI

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL          Page 1 Of 1

STUDENT'S NAME: JUSTIN MICHAEL REED

## TRANSITION GOAL (beginning at age 14, or younger if appropriate)

Employment Outcome:
Comp Employment time-limited support

Community Living Outcome:
Independent No Support

## STATEMENT OF TRANSITION SERVICE NEEDS THAT FOCUSES ON THE STUDENT'S COURSE OF STUDY (beginning at age 14, or younger if appropriate)

Justin will be exposed to different community/job developement activities.

Career Interest(s):
Justin shows an interest in police work

## STATEMENT OF NEEDED TRANSITION SERVICES (beginning at age 16, or younger if appropriate)

| Components Needed | Components NOT Needed | |
|---|---|---|
| ☑ Needed | ☐ NOT Needed | 1. Instruction |
| ☑ Needed | ☐ NOT Needed | 2. Related Services |
| ☑ Needed | ☐ NOT Needed | 3. Community Experiences |
| ☑ Needed | ☐ NOT Needed | 4. Development of Employment and Other Post-School Adult Living Objectives |

Based on this student's interests, preferences, and needs, transition services will address the following checked areas. Goal(s) and/or benchmark(s) must be written for each area checked.

☐ Vocational Evaluation (VE)          ☐ Advocacy/Guardianship (AG)
☐ Employment Development (ED)          ☑ Community Participation (CP)
☐ Postsecondary Education (PE)          ☐ Transportation (T)
☐ Financial Management (FM)          ☐ Medical (M)
☐ Personal Management(PM)          ☐ Other _____
☐ Living Arrangements (LA)          ☐ Other _____

## EXIT DOCUMENT (beginning at age 16)          ANTICIPATED DATE OF EXIT

☐ Alabama High School Diploma with Advanced Academic Endorsement
☐ Alabama High School Diploma

☐ Alabama Occupational Diploma
☐ Graduation Certificate
☐ Other

_____ / _____
Month          Year

## PROGRAM CREDIT TO BE EARNED

| For each course taken, indicate program credit to be earned. | MATH | SCIENCE | SOCIAL STUDIES | ENGLISH | | | |
|---|---|---|---|---|---|---|---|
| Alabama High School Diploma with Advanced Academic Endorsement | | | | | | | |
| Alabama High School Diploma | | | | | | | |
| Alabama Occupational Diploma | | | | | | | |
| Graduation Certificate | | | | | | | |

## FOR OCCUPATIONAL DIPLOMA STUDENTS ONLY. PORTFOLIOS MUST BE REVIEWED ANNUALLY.

The following portfolios have been:

| Reviewed | Completed | Date |
|---|---|---|
| ☐ Employment English | ☐ | _____ |
| ☐ Job Skills Math | ☐ | _____ |
| ☐ Life Skills Science | ☐ | _____ |
| ☐ Career Preparation | ☐ | _____ |

Portfolio approved for graduation on

_____
Date

AL0017b001 4/26/2005                                              STI

PIKE COUNTY SCHOOLS

PIKE COUNTY HIGH SCHOOL

Page 1 of 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

**AREA:** Mathematics

**PRESENT LEVEL OF PERFORMANCE:**

Justin currently works on 3.1 grade level in math. Justin's strengths are basic addition and subtraction. He must use a calculator to perform single/ double digit multiplication and division. Word problems must be read orally to Justin.

**ANNUAL GOAL to be measured by achievement of benchmarks:**

Justin will be able to solve problems, including word problems, involving the basic operations of multiplication and division on whole numbers through two-digit multipliers and one-digit divisors with 60% accuracy. *based on progress monitoring observations*

*2005 will be monitoring - mastry*

| | Date of Mastery |
|---|---|

**For transition benchmark(s), person(s)/agency(ies) responsible:**
VRS Job Coach

| Special Education Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel *(including frequency, duration & location)* | | |
|---|---|---|

Calculator
90 minutes with functional math teacher, daily, in the resource classroom.
Oral reading of word problems.
Fewer problems
Parent contract through agenda book

---

**Benchmark**

Will solve problems involving multiplication and division with a sum no greater than 100 by first 9 weeks with 75% accuracy.

| | Transition Area | Date of Mastery |
|---|---|---|
| | NA | |

**Benchmark**

Will use multiplication and division facts to determine the missing integers by second 9 weeks with 60% accuracy.

| | Transition Area | Date of Mastery |
|---|---|---|
| | NA | |

**Benchmark**

Will be able to solve money problems under $5.00 using simple multiplication and division facts with 80% accuracy by end of term.

| | Transition Area | Date of Mastery |
|---|---|---|
| | NA | |

**Benchmark**

| | Transition Area | Date of Mastery |
|---|---|---|
| | | |

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|

☐ a. Data Collection     ☐ f. See Benchmarks
☑ b. Teacher/Text Test   ☐ g. Other
☐ c. Work Samples Teacher ☐ h. Other
☐ d. Observation         ☐ i. Other
☑ e. Grades

STI

PIKE COUNTY SCHOOLS                    PIKE COUNTY HIGH SCHOOL                    Page 1 Of 1

**STUDENT'S NAME:**  JUSTIN MICHAEL REED

**AREA:**  Academics(English, Social Studies, Science)

**PRESENT LEVEL OF PERFORMANCE:**

Justin's present grade level in Spelling is 3.3 and 2.8 in Reading. His strength is his ability to use context clues in reading. He frequently asks for help from teachers and that tests be read orally. He will complete extra credit assignments to obtain a passing grade.

**ANNUAL GOAL to be measured by achievement of benchmarks:**

Justin will master the objectives in 10th grade Alabama Course of Study with 60% accuracy.

**For transition benchmark(s), person(s)/agency(ies) responsible:**

VRS Job Coach

| Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel (including frequency, duration & location) |
|---|

Consultation with Special Education Teacher, daily basis.
Test read orally
Smaller task assignments
Preferential seating
Agenda with assignments written by Justin, checked by teacher and parent.
Calculator for use in scientific problems

*Wear glasses daily.*

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** | NA | |
| Will maintain a 60% grade average. | | |

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** | | |

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** | | |

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** | | |

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|

☐ a. Data Collection          ☐ f. See Benchmarks
☑ b. Teacher/Text Test        ☐ g. Other _____
☐ c. Work Samples Teacher     ☐ h. Other _____
☐ d. Observation              ☐ i. Other _____
☑ e. Grades                   _____

IEP-001 4/28/2005

STI

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL          Page 1 OF 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

**AREA:** Speech and Language

**PRESENT LEVEL OF PERFORMANCE:**

Justin is performing with a moderate language delay according to the OWLS.

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** Justin will place age appropriate vocabulary in appropriate categories with 80% accuracy by May 2006. | NA | |

**ANNUAL GOAL** to be measured by achievement of benchmarks:

Justin will increase his receptive and expressive language skill to an age appropriate level by May 2006.

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** Justin will correctly identify correct usage of antonyms synonyms and multiple meaning words with 85% accuracy by May 2006. | | |
| **Benchmark** Justin will answer age appropriate questions with 85% accuracy by May 2006. | | |

For transition benchmark(s), person(s)/agency(ies) responsible:

n/a

| | Transition Area | Date of Mastery |
|---|---|---|
| **Benchmark** | | |

**Special Education, Related Services, Supplementary Aids & Services, Assistive Technology,**
**Program Accommodations/Modifications and Support for Personnel**
*(including frequency, duration & location)*

Justin will come to speech once a week for 30 minutes in the resource room with the SLP.

*games
*sheets
*cards
*stories

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|
| ☐ a. Data Collection     ☑ f. See Benchmarks |
| ☑ b. Teacher/Text Test   ☐ g. Other |
| ☐ c. Work Samples Teacher ☐ h. Other |
| ☐ d. Observation         ☐ i. Other |
| ☐ e. Grades |

/10/2005

571

PIKE COUNTY SCHOOLS

PIKE COUNTY HIGH SCHOOL

Page 1 of 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

**AREA:** Social/Emotional Behavior

**PRESENT LEVEL OF PERFORMANCE:**

Justin has a problem following class and school rules.

**ANNUAL GOAL** to be measured by achievement of benchmarks:

Justin will decrease his inappropriate behavior and manage his behavior with 70% accuracy.

For transition benchmark(s), person(s)/agency(ies) responsible:

Teacher, Justin, parent

| | Benchmark | Transition Area | Date of Mastery |
|---|---|---|---|
| | Justin will follow classroom and school rules throughout the school year. | PM | |

| | Date of Mastery |
|---|---|

| | Benchmark | Transition Area | Date of Mastery |
|---|---|---|---|

| | Benchmark | Transition Area | Date of Mastery |
|---|---|---|---|

| Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel *(including frequency, duration & location)* |
|---|
| Decrease his inappropriate behavior by following classroom and school rules.<br>1st time: Name on Board<br>2nd time: Teacher's choice of punishment<br>3rd time: Sent to office with parent conference<br>4th time: Placement at ALC.<br>Disciplinary Council |

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|
| ☐ a. Data Collection    ☐ f. See Benchmarks |
| ☐ b. Teacher/Text Test    ☐ g. Other |
| ☐ c. Work Samples Teacher    ☐ h. Other |
| ☑ d. Observation    ☐ i. Other |
| ☐ e. Grades |

ksmm1Tr6d1 5/26/2005

S11

PIKE COUNTY SCHOOLS    PIKE COUNTY HIGH SCHOOL            Page 1 Of 1

**STUDENT'S NAME:**  JUSTIN MICHAEL REED

## GENERAL FACTORS

**HAS THE IEP TEAM CONSIDERED:**

| | | |
|---|---|---|
| • The strengths of the child? | ☑ YES | ☐ NO |
| • The concerns of the parents for enhancing the education of the child? | ☑ YES | ☐ NO |
| • The results of the initial or most recent evaluations of the child? | ☑ YES | ☐ NO |
| • The results of performance on any State or district-wide assessments, as appropriate? | ☑ YES | ☐ NO |
| • The need for extended school year services? | ☑ YES | ☐ NO |

## LEAST RESTRICTIVE ENVIRONMENT

Does this student attend the school (or for a preschool-age student, participate in the environment) he/she would attend if nondisabled?

☑ Yes  ☐ No  If no, justify: _____

Does this student receive all special education services with nondisabled peers?  ☐ Yes ☑ No  If no, justify (justification may not be solely because of needed modifications in the general curriculum):

low math skills adversely affect educational progress in the general curriculum

| 6-21 YEARS OF AGE | 3-5 YEARS OF AGE |
|---|---|
| Check One:<br>01 ☐ 0 Hours Per Week Outside the Regular Classroom<br>02 ☑ Less Than 6 Hours Per Week Outside the Regular Classroom<br>03 ☐ 6-21 Hours Per Week Outside the Regular Classroom<br>04 ☐ Over 21 Hours Per Week Outside the Regular Classroom<br>05 ☐ Private School (Parent Placed)<br>06 ☐ Public Day School<br>07 ☐ Private Day School<br>08 ☐ Home<br>09 ☐ Hospital<br>10 ☐ Public Residential School<br>11 ☐ Private Residential School | 12 ☐ Early Childhood Setting<br>13 ☐ Early Childhood Special Education Setting<br>14 ☐ Home<br>15 ☐ Part-Time Early Childhood/Part-Time Early Childhood Special Education Setting<br>16 ☐ Residential Facility<br>17 ☐ Separate School |

|  | **COPY OF IEP** |
|---|---|
|  | Was a copy of the IEP given to parent at IEP meeting?<br>☐ Yes ☐ No    If no, date copy sent to parent: |

## TRANSFER OF RIGHTS
### To be completed at least one year prior to the student's 19th birthday.

**I understand that the rights under the Individuals with Disabilities Education Act will transfer to me on my 19th birthday.**

_____        _____
        Student's Signature                              Date

## THE FOLLOWING PEOPLE ATTENDED AND PARTICIPATED IN THE MEETING TO DEVELOP THIS IEP.

| POSITION | DATE | IEP TEAM MEMBERS' SIGNATURES |
|---|---|---|
| PARENT(S) | 05/25/2005 | * *Elizabeth Reed* |
| PARENT(S) | | * |
| LEA REPRESENTATIVE /psy | 05/25/2005 | * *Karen Berry* |
| SPECIAL EDUCATION TEACHER | 05/25/2005 | * *April Stant* |
| GENERAL EDUCATION TEACHER | 05/25/2005 | * |
| STUDENT | 05/25/2005 | * *Justin Reed* |
| CAREER/TECHNICAL EDUCATION REP | 05/25/2005 | |
| OTHER AGENCY REPRESENTATIVE | | |
| *Sp. Ed. teacher* | *5/25/05* | *Regina Catutte* |
| *sped teacher* | *5/25/05* | *Alicia Tarsy* |

## INFORMATION FROM PEOPLE NOT IN ATTENDANCE

NAME  *Tammy L. Calhoun*            POSITION  *SGP*

Dear Parent,

As your child gets older, his/her teachers will be working to develop skills which will be needed for future employment and personal management. These skills are called transition skills, as your child makes the transition from childhood to young adulthood. Please complete these questions about your child. If you have any other concerns for your child, or feel that your child needs help in any other area, please comment on the next page.

## TRANSITION PLANNING ASSESSMENT

### Middle School/Junior High

I.  **Employment Development**
    Does the student:
    Have a realistic career goal? _____Yes ✓ No
    Know where to find information on careers? ✓ Yes _____ No
    Self-evaluate skills/abilities realistically? _____Yes ✓ No
    Relate skills/abilities to jobs? _____Yes ✓ No
    Have any work responsibilities (i.e., paper route,
        babysitting, lawn mowing)? ✓ Yes _____ No
    State his/her likes/dislikes and interests in particular
        jobs? ✓ Yes _____ No

II. **Financial Management**
    Does the student:
    Earn an allowance? ✓ Yes _____ No
    Earn money from jobs such as babysitting? ✓ Yes _____ No
    Manage money wisely? _____Yes ✓ No
    Make his/her own purchases? ✓ Yes _____ No
    Demonstrate an understanding of the different types
        of insurance (i.e., medical, automobile, etc.)? ✓ Yes _____ No

III. **Personal Management**
    Does the student:
    Get him/herself up in the mornings? ✓ Yes _____ No
    Independently care for hygiene and grooming? ✓ Yes _____ No
    Prepare simple meals? ✓ Yes _____ No
    Do his/her own laundry? _____Yes ✓ No
    Independently complete assigned household chores? _____Yes ✓ No
    Follow safety rules? ✓ Yes _____ No
    Purchase needed personal items? ✓ Yes _____ No
    Use time effectively? _____Yes ✓ No
    Have age-appropriate friends? ✓ Yes _____ No
    Participate in activities with friends ( parties, etc.)? _____Yes ✓ No
    Resolve conflicts with friends effectively? ✓ Yes _____ No

Communicate effectively with peers and adults? _____ Yes __✓__ No

IV.    Community Participation
       Does the student:
       Move about in his/her neighborhood? __✓__ Yes _____ No
       Go to movies, grocery store, library, restaurants, etc? __✓__ Yes _____ No
       Participate in community sports activities? __✓__ Yes _____ No
       Participate in youth groups? __✓__ Yes _____ No
       Identify leisure-time interests? __✓__ Yes _____ No
       Participate in school extracurricular activities? _____ Yes __✓__ No

V.     Medical
       Does the student:
       Demonstrate a basic understanding of different types
          of medical care (i.e., dental, vision, internal medicine)? __✓__ Yes _____ No
       Realistically express his/her medical needs/limitations? __✓__ Yes _____ No
       Independently take medication, if needed? __✓__ Yes _____ No
       Demonstrate skills needed to decide when to take over-
          the-counter medicines (i.e., aspirin)? __✓__ Yes _____ No

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JR, a minor, by his mother and          )
father EAR and TMR,                     )
                                        )
        Plaintiffs,                     )
                                        )    CIVIL ACTION NUMBER:
v.                                      )    2:06-cv-1120-MEF
                                        )
PIKE COUNTY BOARD OF                    )
EDUCATION, et al.,                      )
                                        )
        Defendants.                     )

### RE-NOTICE TO TAKE DEPOSITIONS
### AND PRODUCTION OF DOCUMENTS

TO:  Deanie Clark Allen, Esq.
     Azar & Azar, LLC
     Aliant Center
     2740 Zelda Road, Fourth Floor
     Montgomery, AL  36106

     Susan Shirock DePaola, Esq.
     1726 West Second Street, Suite B
     Montgomery, AL  36106

        Please take notice that pursuant to the Federal Rules of Civil

Procedure 30, Defendants will take the depositions of Ann and Michael Reed,

Plaintiffs, upon oral examination before an officer authorized by law to administer

oaths.

DEFENDANT'S
EXHIBIT

Said depositions shall be taken on Thursday, July 19, 2007 beginning consecutively with Ann Reed at 11:00 a.m., earlier or later upon the completion of the deposition of Polly King. Michael Reed's deposition will begin upon the completion of Ann Reed's deposition. The depositions will take place at the offices of the Pike County Board of Education, 101 West Love Street, Troy, Alabama, and shall continue and/or be resumed from time to time until completed.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant requests that deponents named herein produce at the time and date of the above set deposition copies of any and documents of whatsoever kind or nature regarding or relevant to the above-referenced lawsuit including, but not limited to:

1. All records, notes, memoranda, correspondence, audio or video recordings.

2. All documents which said deponent has utilized to prepare for testimony or refresh said deponent's recollection as to any of the subjects set forth herein.

_____
Donald B. Sweeney, Jr.
One of the Attorneys for Named
Defendants

<u>OF COUNSEL</u>

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that I have this date served the above and foregoing on:

Deanie Clark Allen, Esq.
Azar & Azar, LLC
Aliant Center
2740 Zelda Road, Fourth Floor
Montgomery, AL  36106

Susan Shirock DePaola, Esq.
1726 West Second Street, Suite B
Montgomery, AL  36106

by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to his regular mailing address, on this _16_ day of ~~June~~ July, 2007.

_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JR a Minor, by his mother and father | * | |
| EAR and TMR | * | |
| **Plaintiffs** | * | |
| v. | * | |
| | * | |
| PIKE COUNTY BOARD OF | * | PLAINTIFF DEMANDS A JURY |
| EDUCATION, | * | |
| SAMUEL MARK BAZZELL | * | TRIAL ON ALL COUNTS |
| Individually and in his official capacity | * | |
| as Superintendent of Schools; | * | |
| TERRY CASEY, individually and in | * | |
| his official capacity as Principal | * | |
| of Pike County High School, | * | Case No. CV 2:06-cv-1120 |
| BUDDY PYRON, individually and in | * | |
| his official capacity as | * | |
| Principal of Pike County High School, | * | |
| ROBERT MCDANIEL, individually | * | |
| and in his official capacity as Assistant/ | * | |
| Principal of Pike County High School; | * | |
| CHARLES LESLIE COON, individually | * | |
| and in his official capacity as a teacher | * | |
| at Pike County High School | * | |
| DOE DEFENDANTS 1-5 being those | * | |
| persons legally responsible for providing | * | |
| for the safety of special education | * | |
| students and for conducting | * | |
| investigations of complaints | * | |
| relating to the physical safety of | * | |
| students and for establishing policies | * | |
| and procedures to protect said students. | * | |
| **Defendants** | * | |

PLAINTIFF'S FIRST AMENDED COMPLAINT
Parties

1. Plaintiff JR is a minor and is the son of EAR and TMR who sue on his behalf as
his parents and legal guardians. JR is a special education student and is
mentally retarded. He is a resident of Pike County, Alabama and at all times
relevant hereto was enrolled in the Pike County School system.

1


DEFENDANT'S
EXHIBIT
2

2.  Plaintiff EAR is the mother of JR.  She is an adult resident of Pike County, Alabama and at all times relevant hereto she has been one of the custodial parents of JR.

3.  Plaintiff TMR is the father of JR.  He is an adult resident of Pike County, Alabama and at all times relevant hereto he has been one of the custodial parents of JR.

4.  Defendant Pike County Board of Education (hereinafter the "Board") is now, and has been at all times material to this action, a local board of education located within the Northern Division of the Middle District of Alabama. The Board has the underlying responsibility for hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,    for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

5.  Defendant Mark Bazzell (hereinafter "Bazzell") is an adult and is an employee of the Pike County Board of Education, serving in the capacity of Superintendent of Education.  In his capacity as Superintendent he is the agent of the Board responsible for   hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,   for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.  He is sued in his individual and his official capacity.

6.  Defendant Terry Casey (hereinafter "Casey") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School. Casey was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students;    and,   for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.  He is sued in his individual and his official capacity.

7.  Defendant Buddy Pyron (hereinafter "Pyron") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School.    Pyron was at all times material hereto responsible for   hiring, training and supervision of programs, activities and personnel;    development and implementation of policies and procedures to address personal privacy and security of special education students;    and,   for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.   He is sued in his individual and his official capacity.

8. Defendant Robert McDaniel (hereinafter "McDaniel") is an adult and at certain times material hereto was an employee of the Board, serving in the capacity of Assistant Principal or Principal of the High School. McDaniel was at all times material hereto responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. He is sued in his individual and his official capacity.

9. Defendant Charles Leslie Coon (hereinafter "Coon") is an adult and was, at all times material hereto, an employee of the Board. He was a teacher of the plaintiff JR and was at all times hereto responsible for oversight, supervision and personal safety and security of this student while he was in his custody and/or on school grounds. Coon is sued in his individual and official capacity.

10. Upon information and belief, Coon is currently incarcerated and has plead guilty to sexual abuse of Plaintiff JR.

11. Doe Defendants 1-5 are those persons legally responsible for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security.

## Jurisdiction & Venue

12. Jurisdiction in this matter is based on The Rehabilitation Act of 1973, 29 U.S.C. §794 (hereinafter 504); 42 U.S.C. §1983; 42 U.S.C. §1988. The United States Constitution; 28 U.S.C. §1331; 28 U.S.C. §1367 and Title IX of the Education Amendments of 1972 20 U.S.C. §1681(a).

13. Venue is appropriate under 28 U.S.C. §1391(b).

## Facts

14. Plaintiff JR is a minor child and is a qualified individual with a disability as defined by the following statutes: the Alabama Exceptional Children's Education Act, Individuals with Disabilities Education Improvement Act and Section 504 of the Rehabilitation Act.

15. JR has been enrolled in the Pike County school system since approximately 1994 and has been classified as a special education student since approximately 1996. JR's area of disability is mental retardation.

16. The Board is a governmental entity for the purposes of 42 U.S.C. §1983 and §1988. The Board is required to provide special education and related services to students with disabilities within its jurisdiction pursuant to Section 504.

17. The Board is a recipient of Federal financial assistance to aid in the provision of special education and other educational services to students with disabilities.

18. Defendant Bazzell is an employee of the Board of Education, serving in the capacity of Superintendent of Education.

19. Defendant Casey at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School.

20. Defendant Pyron at certain times material hereto was an employee of the Board, serving in the capacity of Principal of the High School

21. Defendant McDaniel at certain times material hereto was an employee of the Board, serving in the capacity of Assistant Principal of the High School.

22. Defendant Coon was, at all times material hereto, an employee of the Board and acting in his official capacity. He was a teacher of the Plaintiff JR and was at all times hereto responsible for oversight, supervision and personal safety and security of this student while he was in his custody and/or on school grounds. Coon was also responsible for implementing policies and procedures for the system as they related to the students including attending to the safety and security of said students.

23. Doe Defendants 1-5 are those persons designated by the Board with the responsibility for hiring, training and supervision of programs, activities and personnel; development and implementation of policies and procedures to address personal privacy and security of special education students; and, for monitoring and investigation of sexually inappropriate conduct and/or violations of personal privacy and security. .

24. At all times material hereto, Defendants individually and jointly acted under color of state law and all Defendants were agents, servants or employee of the Defendant Board.

25. Beginning in the academic year 2004-2005 the student's personal privacy and security were repeatedly violated by Defendant Coon. Said violations consisted of establishing and maintaining sexual contact with the student; using his authority as a teacher to intimidate and/or coerce the student to engage in sexually inappropriate conduct, taking the student off campus in a personal vehicle and using school property and/or school procedures to conduct said activities.

26. Defendants Board, Bazzell, Casey, Pyron and McDaniel and John Doe Defendants 1-5 were responsible for defelopment and implementation of

policies and procedures to address personal privacy and security of special education students.

27. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 were responsible for monitoring and investigating complaints of sexually inappropriate conduct and/or violations of personal privacy and security.

28. Defendants Board, Bazzell, Casey, Pyron and McDaniel and Doe 1-5 responsible for the hiring, training and supervision of programs, activities and personnel as it relates to personal privacy and security issues for students.

29. At all times material hereto, the Defendants knowingly and/or willfully and/or with reckless indifference failed to consider the issue of sexual assaults in hiring, failed to train and supervise programs, activities and personnel with respect to this issue, failed to develop and implement policies and procedures to address personal privacy and security issues as they relate to special education students and failed to monitor and investigate complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students including but not limited to a failure to inform teachers and parents of the existence of these allegations.

## Count I: 42 U.S.C. §1983
## Charles Leslie Coon

30. Plaintiff adopts and incorporates by reference paragraphs 1-28 hereinabove.

31. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

32. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

33. Defendant Coon violated those rights as set forth hereinabove.

34. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Count II: 42 U.S.C. §1983
## Pike County Board of Education, Mark Bazzell
## Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

35. Plaintiff adopts and incorporates by reference paragraphs 1-33 hereinabove.

36. Plaintiff has a constitutionally protected liberty interest in his personal security, a right to privacy and/or bodily integrity that is a protected interest under the United States Constitution.

37. The Plaintiff's constitutionally protected rights were clearly established at the time of these incidents and a reasonable person would have known of said rights.

38. Defendants Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had no formal policy to address issues of bodily integrity, personal security and/or the right to privacy as it relates to special education students in particular, including but not limited to policies relating to hiring, training and supervision of programs, activities and personnel, and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to investigation of complaints and monitoring and supervision of employee contact with special education students and in particular students with mental retardation.

39. In the alternative, Defendants' custom(s) or polic(ies) were grossly insufficient and resulted in violations of the Plaintiff's clearly protected constitutional rights to privacy, personal security and/or bodily integrity.

40. The Defendant's conduct as set forth hereinabove evidences deliberate or reckless indifferences to the Plaintiff's constitutional rights.

41. There is a casual relationship between the Defendants' failure to act as set forth hereinabove and the injuries or damages complained of herein.

42. As a result of the Defendants' conduct the Plaintiff has suffered injuries or damages as set forth hereinafter.

**Count III:  Rehabilitation Act**

43. Plaintiff adopts and incorporates by reference paragraphs 1-41 hereinabove.

44. Plaintiff is a disabled individual as that term is defined under the Rehabilitation Act. As a disabled individual he is entitled to services and accommodations necessitated by his disability (mental retardation) such that he will have similar access to educational programs and services and that he will not be subjected to extraordinary personal security risks arising out of his disability.

45. Because of the nature of the Plaintiff's mental disability he is unable to judge, respond to or internalize what behavior may be socially appropriate or inappropriate in the school setting to the same extent that a student who is not mentally retarded.

46. Defendants have willfully failed to address these issues in planning his school program.

47. Defendants have further failed to address these issues in terms of hiring, training and supervision of programs, activities and personnel, development and implementation of policies and procedures to address personal privacy and security of special education students and monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security including but not limited to, monitoring and supervision of employees who come into contact with special education students such as the Plaintiff.

48. Defendants failure to act in this regard amounts to intentional, purposeful bad faith conduct, and violated the rights of Plaintiff secured by Section 504 of the Rehabilitation Act of 1973 *as amended*, 29 U.S.C. §794 and implementing regulations.

49. Accordingly, Defendants have subjected Plaintiff to discrimination on the basis of his disability in violation of 29 U.S.C. §794(a) and implementing regulations.

50. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

### Count IV: 20 U.S.C. §1681(a)
### Pike County Board of Education

51. Plaintiff adopts and incorporates by reference paragraphs 1-49 hereinabove.

52. Defendant Board is a recipient of Federal financial assistance as set forth hereinabove.

53. Plaintiff was subjected to sexual harassment at the hands of a school official which resulted in his exclusion from participation in and denial of the benefits of, an educational program or activity in violation of Title IX, 20 U.S.C. §1681(a).

54. The Board and/or officials of the Board knew or should have known of this harassment.

55. The Board and/or relevant officials who were invested by the Board with the duty to supervise the harasser and had the power to take action against him remained deliberately indifferent to this harassment and refused to take action against the harasser.

56. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

### Count V:  Negligence

57. Plaintiff adopts and incorporates by reference paragraphs 1-55 hereinabove.

58. Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 had a non-delegable statutory duty to report child abuse and/or suspicions of child abuse to the Department of Human Resources pursuant to Ala. Code §26-14-3.

59. Upon information and belief, a timely report was not made when the Defendants first knew or should have known that the abuse of a minor child or children  may have occurred.

60. The Defendants' conduct was a breach of the standard of care, particularly as it applies to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

61. The Defendant's conduct was the proximate cause of a continuing series of sexually abusive acts which were inflicted on the Phintiff and caused injury or damage as set forth hereinafter.

### Count VI:  Wanton and Reckless Conduct

62. Plaintiff adopts and incorporates by reference herein paragraphs 1-60 hereinabove.

63. The failure to report child abuse and/or suspicions of child abuse by Defendants Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 was wanton and reckless as it relates to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or to seek protection or guidance from other authority figures.

64. The Defendants' conduct was the proximate cause of a continuing series of sexual abusive acts which were inflicted on the Plaintiff and caused injury or damage as set forth hereinafter.

### Count VII:  42 U.S.C. §1983
### Equal Protection
### Pike County Board of Education, Mark Bazzell
### Terry Casey, Buddy Pyron, Robert McDaniel and Doe Defendants 1-5

65. Plaintiff adopts and incorporates by reference herein paragraphs 1-63 hereinabove.

8

66. 42 U.S.C. §1983 provides that any person acting under color of state law who deprives any other person of rights granted by the Constitution or laws of the United States shall be liable to that person for equitable or legal relief.

67. As set forth hereinabove, Plaintiff was denied equal protection of the law to the extent that policies and procedures developed and implemented by the Board, Bazzell, Casey, Pyron, McDaniel and Doe Defendants 1-5 did not allow him the same level of personal security, personal privacy and/or bodily integrity as was provided to other students enrolled in the Board's programs.

68. Defendants' conduct was the reckless and willful disregard for the student's right to participate in educational programs in a non-discriminatory manner.

69. As a result of the Defendants' conduct, the Plaintiff has suffered injuries or damages as set forth hereinafter.

## Injuries or Damages

70. As a result of Defendant's conduct, JR suffered and continues to suffer, mental anguish, distress, humiliation, embarrassment, regression in academic and social skills, exclusion from his regular school environment with no friends or support, ongoing fear and confusion, all exacerbated by his disability.

71. The Plaintiff will require continuing counseling, care and training associated with his social and emotional development which would not have been required but for the Defendants conduct.

## Prayer for Relief

**WHEREFORE, THE PREMISES CONSIDERED,** the Plaintiffs request the following relief:

    A. That the Court assume Jurisdiction in this case;
    B. That the matter be set for trial by jury;
    C. Issue an award of compensatory damages against the Defendants;
    D. Issue a mandatory injunction requiring the development and implementation of policies and procedures relating to hiring, training and supervision of programs, activities and personnel with respect to personal privacy and security issues;
    E. Issue a mandatory injunction requiring the development and implementation of Board Policies and procedures relating to monitoring and investigation of complaints of sexually inappropriate conduct and/or violations of personal privacy and security of special education students;
    F. Issue a mandatory injunction requiring the development and implementation of policies and procedures to address personal privacy and security of special education students;
    G. Issue an award of punitive damages against the Defendants;

H.  Award Plaintiffs' attorneys fees and costs pursuant to 29 U.S.C. §794 and §42, U.S.C. §1988 and under the Rehabilitation Act;

I.  Award such other further relief deemed appropriate by this Honorable Court

Respectfully submitted on this 26th day of June, 2007

/s/   Susan Shirock DePaola
ASB: 7431-L75S

**Susan Shirock DePaola**
**1726 West Second Street~Suite B**
**Montgomery, AL 36106**
specialeducationattorney@mindspring.com

/s/   Deanie Clark Allen
ASB:  1662-G69A

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, AL 36106**
dallen@azarlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint has been served on the following by ECF or by first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on this the 26th day of June, 2007.

VIA US MAIL:
Charles Leslie Coon
AIS 244732
Kilby Correctional Facility
PO Box 150
Mt. Meigs, AL 36057

VIA ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/ Susan Shirock DePaola

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME _Justin Reed_
DATE _2/22/05_  TIME _2:40_   LOCATION _Pike County High_

The purpose of this meeting is to:

- [ ] Determine if Referral Requires Evaluation
- [x] Discuss the Need for Additional Data Collection
- [x] Determine Initial or Continued Eligibility
- [x] Develop Initial IEP or Review/Revise IEP
- [ ] Review Exit IEP/Portfolio (for Occupational Diploma Students Only)
- [ ] Conduct Manifestation Determination
- [x] Develop Functional Behavior Assessment Plan
- [ ] Develop/Revise Behavioral Intervention Plan
- [ ] _____
- [ ] _____
- [ ] _____

The following people will meet with us:

- [x] Local Education Agency Representative
- [x] Someone who Can Interpret the Instructional Implications of the Evaluation Results
- [x] General Education Teacher
- [x] Special Education Teacher
- [x] Parent
- [x] Student
- [ ] Career/Technical Representative
- [ ] Other Agency Representative(s) for Transition
  Agency Name _____
  Agency Name _____
- [ ] _____

Because your input is important to us, we encourage you to make every effort to attend this meeting. You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and the students who require notice and an explanation of their rights in their native language have been accommodated to ensure their understanding. You are fully protected under the special education rights. If you have questions, please contact:

_Karen T. Berry_ at _566-1850_
(Name)                              (Telephone)

_Karen Berry_
Signature of Education Agency Official

Enclosure : *Special Education Rights*

### PARENTS - STUDENTS

Please check one of the following boxes, sign, date, and return this form to
_A. Short_                                      before _2/22/05_

- [x] I WILL BE ABLE TO MEET WITH YOU.
- [ ] I CANNOT meet at the date and time indicated. Please contact me to arrange another time.
- [ ] I WILL NOT BE ABLE TO MEET WITH YOU. I will contact you if I want more information.

_Mrs Reed_                                      _2/16/05_
Signature of Parent or Student at Age 19           Date

### OFFICE USE ONLY

Documented attempts to contact parent/student (Age 19) for IEP meeting.
Date Notice Sent: _2-15-05_   Result: _Parent Came_
2nd attempt Date: _____   Action: _____   Result: _____

Documented attempts to contact student/agency for IEP meeting regarding transition services.
Student was notified on _____ via _____
Agency was notified on _____ via _____
Agency was notified on _____ via _____

DEFENDANT'S
EXHIBIT
3

noticep 7/13/99
GibCo Dynamo

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME _Justin Reed_

DATE _5-13-04_  TIME _____  LOCATION _PCHS_

| The purpose of this meeting is to: | The following people will meet with us: |
|---|---|
| ☐ Determine if Referral Requires Evaluation | ☑ Local Education Agency Representative |
| ☐ Discuss the Need for Additional Data Collection | ☑ Someone who Can Interpret the Instructional |
| ☐ Determine Initial or Continued Eligibility | Implications of the Evaluation Results |
| ☑ Develop Initial IEP or Review/Revise IEP | ☑ General Education Teacher |
| ☐ Review Exit IEP/Portfolio (for Occupational | ☑ Special Education Teacher |
| Diploma Students Only) | ☑ Parent |
| ☐ Conduct Manifestation Determination | ☐ Student |
| ☐ Develop Functional Behavior Assessment Plan | ☐ Career/Technical Representative |
| ☐ Develop/Revise Behavioral Intervention Plan | ☐ Other Agency Representative(s) for Transition |
| ☐ | Agency Name |
| ☐ | Agency Name |
| | ☐ |

Because your input is important to us, we encourage you to make every effort to attend this meeting. You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and the students who require notice and an explanation of their rights in their native language have been accommodated to ensure their understanding. You are fully protected under the special education rights. If you have questions, please contact:

_Karen Berry_                    at    _566-1850_
            (Name)                           (Telephone)

_Karen Berry_
Signature of Education Agency Official

Enclosure : *Special Education Rights*

### PARENTS - STUDENTS

Please check one of the following boxes, sign, date, and return this form to

_____ before

☑ I __WILL BE ABLE TO MEET WITH YOU__.

☐ I __CANNOT__ meet at the date and time indicated.  Please contact me to arrange another time.

☐ I __WILL NOT BE ABLE TO MEET WITH YOU__.  I will contact you if I want more information.

_Deborah Reed_                                    _5-7-04_
Signature of Parent/Legal Guardian/Surrogate or Student at Age 19          Date

### OFFICE USE ONLY

Documented attempts to contact parent/legal guardian/surrogate - student (Age 19) for IEP meeting.

Date Notice Sent: _5-3-04_  Result: _not returned_

2nd attempt Date: _5-6-04_  Action _2nd phone_  Result: _returned_

Documented attempts to contact student/agency for IEP meeting regarding transition services.

Student was notified on _____ via _____

Agency was notified on _____ via _____

Agency was notified on _____ via _____

Noticep
7/13/99

GibCo Dynamo

**Pike County School System**
101 West Love St.
Troy, Alabama 36081

## ACCESS TO IEP DOCUMENTATION
As Required by 34 CFR § 300.342(b)(2)(3)

The following school personnel have access to the IEP and have been informed of their responsibility in implementing the IEP, and of specific accommodations, modifications, and supports that must be provided for ___JUSTIN___ ___REED___ (student's name) for the ___2004-2005___ school year.

| DATE | SIGNATURE | POSITION |
|------|-----------|----------|
| 5-13-04 | Leigh Anne Richburg | Sp. Ed. Teacher |
| 5-13-04 | Marie Davidson | Sp. Teacher |
| 5-13-04 | Pam Wells | Sp. Ed. Teacher |
| 5-13-04 | Renee Booker | Sp. Ed. Teacher |
| 5/13/04 | Michael Brooks | Reg. Teacher |
| 5/13/04 | Karen Berry | LEA rep/sped coord/? |
| 5/13/04 | Kevin Jake | Job Coach |
| 5/13/04 | L. D. R. | V.R. |
| 5/13/04 | Elizabeth Reed | mother |
| 8/16/04 | Sylvia Helms | Art Teacher |
| 8/16/04 | Ruth Chancellor | Sp. Ed. |
| 8/17/04 | Toni Sellin | Science Teacher |
| 8/17/04 | Leigh Ann Owens | English |
| 8/18/04 | Sylvia Helms | Art Teacher |
| 8/20/04 | | |
| 8/29/04 | A. Hart | new teacher |

Signature or person responsible for informing personnel of their responsibility.

Leigh Anne Richburg

# ACCESS TO IEP DOCUMENTATION
## As Required by 34 CFR§ 300.342(b)(2)(3)

The following school personnel have access to the IEP and have been informed of their responsibility in implementing the IEP and of specific accommodations, modifications, and supports that must be provided for _Justin Reed_ (student's name) for the _2004-2005_ school year.

| DATE | SIGNATURE | POSITION |
|------|-----------|----------|
| 1-7-05 | _Josh Shun_ | Reg. Teacher |
| 1-12-05 | M. Morgan | Reg. Ed. Teacher |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Signature or person responsible for informing personnel of their responsibility.

_April Grant    Special Ed Teacher_

Pike County School System
101 West Love St.
Troy, Alabama 36081

# INDIVIDUALIZED EDUCATION PROGRAM

| STUDENT'S NAME    JUSTIN    REED | IEP INITIATION/DURATION DATES |
|---|---|
| DOB   07/28/1989   SCHOOL YEAR  2004-2005 | From    8/1/2004    To    5/31/2005 |

THIS IEP WILL BE IMPLEMENTED DURING THE REGULAR SCHOOL TERM UNLESS
NOTED IN EXTENDED SCHOOL YEAR SERVICES.

## STUDENT PROFILE

Justin is a 14 year old 9th grader at Pike County High School. He currently lives at home with his biological mother, father, sister and brothers. Justin's mother describes him as a good, polite young man who is interested in doing new things. Justin currently takes Concerta for ADDHD. He also wears glasses for reading. Justin's motivation to do well in school comes from encouragement from teachers, peers and his family. His mother feels that his strength in academics is Math, and that his weakness is in Reading. Justin is in the band and he enjoys this very much. Justin enjoys playing games on the Play Station and working on the computer. On the transition planning assessment, Justin's mother states that he does not have a realistic career goal, that he does not manage money wisely, and does not take his medication independently. She also states that Justin does participate in youth groups, is able to get himself up and dressed including personal hygiene and can relate his skills involved for jobs.

Justin did participate in the 8th grade SAT. However, current tests scores are not available at this time. Justin mastered the majority of his 2003-04 IEP objectives.

On the brief KTEA, given in April, Justin's scores are as follows:  *Amended 2/22/05

**Math:    GE 3.3  SS 61**
**Reading: GE: 3.9  SS 70**      Change of Schedule to
**Spelling: GE: 3.0  SS 66**      functional Math & Add modifica

R. Catrett  [signature] Chairperson  C.R. J.R
Justin will receive instruction in the general curriculum for all academics were he will work on   RVB
obtaining an Alabama High School Diploma.      [signatures] Reed

Items checked "YES" will be addressed in this IEP:
SPECIAL INSTRUCTION FACTORS:

| | Yes | No |
|---|---|---|
| Does the student have behavior which impedes his/her learning or the learning of others? | ☐ Yes | ☒ No |
| Does the student have limited English proficiency? | ☐ Yes | ☒ No |
| Does the student need instruction in Braille and the use of Braille? | ☐ Yes | ☒ No |
| Does the student have communication needs (deaf or hearing impaired only)? | ☐ Yes | ☒ No |
| Does the student need assistive technology devices and/or services? | ☐ Yes | ☒ No |
| Does the student need special transportation? | ☐ Yes | ☒ No |
| Are transition services addressed in this IEP? | ☒ Yes | ☐ No |

## NONACADEMIC & EXTRACURRICULAR ACTIVITIES

Student will have the opportunity to participate in nonacademic/extracurricular activities with his/her nondisabled peers.

☒ YES   ☐ YES, with supports. Describe: _____
☐ NO Explanation must be provided: _____

## METHOD/FREQUENCY FOR REPORTING PROGRESS OF ATTAINING GOALS TO PARENTS

Progress reports (indicating whether the progress, if continued, is sufficient to meet the annual goal) will be sent to parents each grading period as scheduled by the school system every  4 1/2  weeks. Other _____

11/10/99                                    GibCo Dynamo

Pike County School System
101 West Love St.
Troy, Alabama 36081
TRANSITION INDIVIDUAL EDUCATION PLAN

| STUDENT'S NAME   JUSTIN          REED          DATE    8/1/2004 |
|---|

**TRANSITION GOAL (beginning at age 14, or younger if appropriate)**

Employment Outcome:   Competitive Employment with time-limited support

Community Living Outcome:  Independent living with no need for support

**STATEMENT OF TRANSITION SERVICES NEEDS THAT FOCUSES ON THE STUDENT'S COURSE OF STUDY (beginning at age 14, or younger if appropriate)**

Justin will work on the requirements to obtain an Alabama High School Diploma.

Career Interest(s) Justin shows an interest in police work.

**STATEMENT OF NEEDED TRANSITION SERVICES**
**(beginning at age 16, or younger if appropriate)**

| Components Needed | Components NOT Needed | |
|---|---|---|
| X | _____ | 1. Instruction |
| X | _____ | 2. Related Services |
| X | _____ | 3. Community Experiences |
| X | _____ | 4. Development of Employment and Other Post-School Adult Living Objectives |

Based on this student's interests and needs, transition services will address the following checked areas. Goal(s) and/or benchmark(s) must be written for each area checked.

| | |
|---|---|
| _____ Vocational Evaluation (VE) | _____ Advocacy/Guardianship (AG) |
| _____ Employment Development (ED) | _____ Community Participation (CP) |
| _____ Postsecondary Education (PE) | _____ Transportation (T) |
| _____ Financial Management (FM) | _____ Medical (M) |
| _____ Personal Management (PM) | _____ Other |
| _____ Living Arrangements (LA) | _____ Other |

| EXIT DOCUMENT (beginning at age 16) | ANTICIPATED DATE OF EXIT |
|---|---|
| ☐ Alabama High School Diploma with Advanced Academic Endorsement   ☐ Alabama Occupational Diploma   ☑ Graduation Certificate   ☐ Alabama High School Diploma   ☐ Other | May  1  2008  <br> Month      Year |

(annual) 1/22/05

**PROGRAM CREDIT TO BE EARNED**

| For each course taken, indicate program credit to be earned. | MATH | SCIENCE | SOCIAL STUDIES | ENGLISH | | | | |
|---|---|---|---|---|---|---|---|---|
| Alabama High School Diploma with Advanced Academic Endorsement | | | | | | | | |
| Alabama High School Diploma | | | | | | | | |
| Alabama Occupational Diploma | | | | | | | | |
| Graduation Certificate | X 4 | X 4 | X 4 | X 4 | | | | |

**FOR OCCUPATIONAL DIPLOMA STUDENTS ONLY. PORFOLIOS MUST BE REVIEWED ANNUALLY.**

The following porfolios have been:

| Reviewed | | Completed | Date | |
|---|---|---|---|---|
| ☐ | Employment English | ☐ | _____ | Portfolio approved for graduation on |
| ☐ | Job Skills Math | ☐ | _____ | |
| ☐ | Life Skills Science | ☐ | _____ | _____ |
| ☐ | Career Preparation | | | Date |

11/10/99

GibCo Dynamo

Pike County School System
INDIVIDUAL EDUCAITIONAL PLAN

STUDENT'S NAME: _Justin Reed_

AREA: ALL ACADEMICS

PRESENT LEVEL OF PERFORMANCE:
_Justin_ IS PURSUING AN ALABAMA HIGH SCHOOL DIPLOMA BY PARTICIPATING IN THE GENERAL EDUCATION PROGRAM FOR ALL CORE ACADEMIC CLASSES.
KTEA SCORES: READING: GE _3.9_  MATH: GE: _3.3_  SPELLING: GE STRENGTH _3.0_
WEAKNESS: _Reading Decoding + comprehension_

ANNUAL GOAL to be measured by achievement of benchmarks:
_Justin_ WILL COMPLETE ALL OF THE REQUIREMENTS OF THE 9TH GRADE ALABAMA COURSE OF STUDY WITH AT LEAST 60% MASTERY AND ACCOMMODATIONS.

| | Date of Mastery |
|---|---|

For transition benchmark(s). person(s)/agency(ies) responsible:

Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel
*(including frequency, duration & location)*

TESTS MAY BE READ ORALLY

EXTENDED TIME FOR TESTS AND PROJECTS

CALCULATOR FOR MATH

PROXIMITY SEATING

COPY OF TEACHERS NOTES

CONSULTATION BETWEEN REGULAR ED. TEACHER AND RESOURCE TEACHER ONCE A WEEK

✱ _Staff will write homework assignments in agenda + teacher/parent will sign._

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _English_ | | 12-04 |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _Science_ | | 12-04 |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _History_ | | Cont |

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| _Life Skills math_ | | 5-05 |

"X" TYPE(S) OF EVALUATION FOR ANNUAL GOAL

| | |
|---|---|
| ☐ a. Data Collection | ☐ f. See Benchmark |
| ☒ b. Teacher/Text Test | ☐ g.Other ___ |
| ☐ c. Work Samples | ☐ h.Other ___ |
| ☐ d. Teacher Observation | ☐ i. Other ___ |
| ☒ e. Grades | |

Page: ___ of ___

GibCo Dynamo

# INDIVIDUAL EDUCATIONAL PLAN

**STUDENT'S NAME:** Justin Reed

**AREA:** Speech and Language

**PRESENT LEVEL OF PERFORMANCE:**

Justin is performing with a moderate language delay according to the OWLS.

**ANNUAL GOAL to be measured by achievement of benchmarks:**

Justin will increase his receptive and expressive language skills to an age appropriate level by May 2006.

| | Date of Mastery |
|---|---|
| | |

**For transition benchmark(s), person(s)/agency(ies) responsible:**

**Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel**
*(including frequency, duration & location)*

Justin comes to speech once a week for 30 minutes in the resource room with the SLP.

* games
* cards
* sheets
* stories

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| Justin will identify subject and verbs in a sentence with 85% accuracy by May 2005. | | ✓ |
| Justin will identify correct usage of antonyms synonyms and multiple meaning words with 80% accuracy by May 2005. | | ✓ |
| Justin will answer age appropriate Wh questions with 80% accuracy by May 2005. | | ✓ |
| | | |

**"X" TYPE(S) OF EVALUATION FOR ANNUAL GOAL**

- ☐ a. Data Collection
- ☒ b. Teacher/Text Test
- ☐ c. Work Samples
- ☐ d. Teacher Observation
- ☐ e. Grades
- ☒ f. See Benchmarks
- ☐ g. Other _____
- ☐ h. Other _____
- ☐ i. Other _____

Page: _____ of _____          GibCo Dynamo

**Individualized Educational Plan (IEP)**

STUDENT'S NAME _Justin Reed_

## GENERAL FACTORS

**HAS THE IEP TEAM CONSIDERED:**

The strengths of the child? ☒ YES ☐ NO

The concerns of the parents for enhancing the education of the child? ☒ YES ☐ NO

The results of the initial or most recent evaluations of the child? ☒ YES ☐ NO

The results of performance on any State or district-wide assessments, as appropriate? ☒ YES ☐ NO

The need for extended school year services? ☒ YES ☐ NO

## LEAST RESTRICTIVE ENVIRONMENT

Does this student attend the school (or for a preschool-age student, participate in the environment) he/she would attend if nondisabled? ☒ Yes ☐ No   If no, justify:

Does this student receive all special education services with nondisabled peers? ☒ Yes ☐ No   If no, justify:
(Justification may not be solely because of needed modifications in the general curriculum.)
low math and speech/language skills adversely affect educational progress in the general curriculum

### AGE 6-21 YEARS OF AGE

Check One:

01 ☒ 0 Hours Per Week Outside the Regular Classroom

02 ☐ Less than 6 Hours Per Week Outside the Regular Classroom

03 ☒ 6-21 Hours Per Week Outside the Regular Classroom

04 ☐ Over 21 Hours per Week Outside the Regular Classroom

05 ☐ Private School (Parent Placed)

06 ☐ Public Day School

07 ☐ Private Day School

08 ☐ Home

09 ☐ Hospital

10 ☐ Public Residential School

11 ☐ Private Residential School

### 3-5 YEARS OF AGE

12 ☐ Early Childhood Setting

13 ☐ Early Childhood Special Education Setting

14 ☐ Home

15 ☐ Part-Time Early Childhood/Part-Time Early Childhood Special Education Setting

16 ☐ Residential Facility

17 ☐ Separate School

#### COPY OF IEP

Was a copy of the IEP given to parent at IEP meeting?
☒ YES ☐ NO

If no, date copy sent to parent: _5/13/04_

## TRANSFER OF RIGHTS

**To be completed at least one year prior to the student's 19th birthday.**

I understand that the rights under the Individuals with Disabilities Education Act will transfer to me on my 19th birthday.

_____  Student's Signature    _____ Date

THE FOLLOWING PEOPLE ATTENDED AND PARTICIPATED IN THE MEETING TO DEVELOP THIS IEP.

| POSITION | DATE | IEP TEAM MEMBERS' SIGNATURE |
|---|---|---|
| PARENT(S) | 5/13/04 | Elizabeth Reed |
| PARENT(S) | | |
| LEA REPRESENTATIVE / psy | 5/13/04 | Karen Berry |
| SPECIAL EDUCATION TEACHER | 5-13-04 | Leigh Anne Richburg R |
| GENERAL EDUCATION TEACHER | 5/13/04 | Michael Brooks |
| STUDENT | | |
| CAREER/TECHNICAL EDUCATION REP | | |
| OTHER AGENCY REPRESENTATIVE | 5/13/04 | Jeana Booth |
| Job Coach | 5-13-04 | Pam Yates |
| S.R. | 5/13/04 | |
| Sp Teacher | 5/13/04 | Marie Davidson 5/13/04 |

I have received a copy of *Parent Rights*. _Elizabeth Reed_   _5/13/04_
                                    Signature of Parent(s)        Date

## INFORMATION FROM PEOPLE NOT IN ATTENDANCE

| NAME | POSITION |
|---|---|
| Elizabeth Reed | |

11/10/99    Page ___ of ___    GibCo Dynamo

## IEP PARTICIPATION DOCUMENTATION
### Alabama Student Assessment Program

Revised May 2003

**When completed by the IEP Team, this checklist becomes a part of the student's IEP.**

Name: _Justin Reed_      School : _PCHS_      Grade: _9_   Year: _04-05_

### ALABAMA HIGH SCHOOL GRADUATION EXAM (AHSGE)

☑ 1. Student will participate in the *Alabama High School Graduation Exam*. Student is working toward either the Alabama High School Diploma or the Alabama Occupational Diploma.

☒ 2. No accommodations are required for student to participate in the *Alabama High School Graduation Exam*.

☐ 3. Accommodations are required for student to participate in the *Alabama High School Graduation Exam*. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

☐ 5. Student will participate in the *Alabama High School Graduation Exam* and GED. Student is working toward the Alabama High School Diploma and the Alternate Adult High School Diploma.

Justification for the committee decision:

### STANFORD ACHIEVEMENT TEST, TENTH EDITION (Stanford 10)
### ALABAMA READING AND MATHEMATICS TEST (ARMT)

☑ 1. Student will participate in the Stanford 10 and *Alabama Reading and Mathematics Test*.

☒ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision:

### ALABAMA DIRECT ASSESSMENT OF WRITING (ADAW)

☐ 1. Student will participate in the *Alabama Direct Assessment of Writing*.

☐ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision:    N/A

### DYNAMIC INDICATORS OF BASIC EARLY LITERACY SKILLS (DIBELS)

☐ 1. Student will participate in the *Dynamic Indicators of Basic Early Literacy Skills*.

☐ 2. No accommodations are required for student to participate.

☐ 3. Accommodations are required for student to participate. (See attached ACCOMMODATIONS CHECKLIST.)

☐ 4. Student will participate in the *Alabama Alternate Assessment*.

Justification for the committee decision:    N/A

If the school is chosen to participate in piloting of an assessment or the *National Assessment of Educational Progress* (NAEP), the student <u>will</u> participate unless the IEP Team is reconvened. Students needing special formats will participate in pilots only ˙˙ ˙cial formats are available.

23

*Justin K*

Parents:

It is once again time for IEP meetings. I am interested in your feedback about your child so that I may write his/her IEP as accurately as possible. Please answer the following questions and return to me as soon as possible.

I look forward to seeing you in May for IEP meetings. A date a time will follow in a few weeks.

Thank you for your cooperation.

*Leigh Anne Richburg*

Leigh Anne Richburg

1. Is your child currently taking any medications? *yes* _____ If so, what is it for and what is the name of it. *ADDHD , Concerta* _____

2. What do you feel is your child's greatest strength in school (subject)? *Band*

3. What do you feel is your child's greatest weakness in school (subject)? *Reading*

4. What class, if any, do you feel your child could participate in the regular classroom with accommodations? *don't know*

5. Who lives in the home with your child? (Brothers, sisters, aunts, etc.) *mom, dad, Jarime, Jessica, Joey*

6. What activities (sports, arts etc.) does your child enjoy? *computer*

7. Please list three things that best describe your child.
   1. *good*   2. *wanting to do new things* 3. _____

8. Does your child wear glasses or a hearing aid? *suppose too*

9. What motivates your child to want to do well in school? *parents encourgement*

10. What extra curricular activities does your child participate in? *none*

PARENTS SIGNATURE: *Elizabeth Reed* DATE: *4/29/04*

Dear Parent,

   As your child gets older, his/her teachers will be working to develop skills which will be needed for future employment and personal management. These skills are called transition skills, as your child makes the transition from childhood to young adulthood. Please complete these questions about your child. If you have any other concerns for your child, or feel that your child needs help in any other area, please comment on the next page.

## TRANSITION PLANNING ASSESSMENT

### Middle School/Junior High

I.   **Employment Development**
     Does the student:

| | | |
|---|---|---|
| Have a realistic career goal? | _____ Yes | ✓ No |
| Know where to find information on careers? | ✓ Yes | _____ No |
| Self-evaluate skills/abilities realistically? | ✓ Yes | _____ No |
| Relate skills/abilities to jobs? | ✓ Yes | _____ No |
| Have any work responsibilities (i.e., paper route, babysitting, lawn mowing)? | ✓ Yes | _____ No |
| State his/her likes/dislikes and interests in particular jobs? | ✓ Yes | _____ No |

II.  **Financial Management**
     Does the student:

| | | |
|---|---|---|
| Earn an allowance? | ✓ Yes | _____ No |
| Earn money from jobs such as babysitting? | ✓ Yes | _____ No |
| Manage money wisely? | _____ Yes | ✓ No |
| Make his/her own purchases? | ✓ Yes | _____ No |
| Demonstrate an understanding of the different types of insurance (i.e., medical, automobile, etc.)? | ✓ Yes | _____ No |

III. **Personal Management**
     Does the student:

| | | |
|---|---|---|
| Get him/herself up in the mornings? | ✓ Yes | _____ No |
| Independently care for hygiene and grooming? | ✓ Yes | _____ No |
| Prepare simple meals? | ✓ Yes | _____ No |
| Do his/her own laundry? | ✓ Yes | _____ No |
| Independently complete assigned household chores? | _____ Yes | ✓ No |
| Follow safety rules? | ✓ Yes | _____ No |
| Purchase needed personal items? | ✓ Yes | _____ No |
| Use time effectively? | ✓ Yes | _____ No |
| Have age-appropriate friends? | ✓ Yes | _____ No |
| Participate in activities with friends (parties, etc.)? | ✓ Yes | _____ No |
| Resolve conflicts with friends effectively? | ✓ Yes | _____ No |

Communicate effectively with peers and adults?        ✓ Yes ____ No

IV.    Community Participation
       Does the student:
       Move about in his/her neighborhood?            ✓ Yes ____ No
       Go to movies, grocery store, library, restaurants, etc?  ✓ Yes ____ No
       Participate in community sports activities?    ____ Yes ✓ No
       Participate in youth groups?                   ____ Yes ✓ No
       Identify leisure-time interests?               ✓ Yes ____ No
       Participate in school extracurricular activities?  ____ Yes ✓ No

V.     Medical
       Does the student:
       Demonstrate a basic understanding of different types
         of medical care (i.e., dental, vision, internal medicine)?  ✓ Yes ____ No
       Realistically express his/her medical needs/limitations?  ✓ Yes ____ No
       Independently take medication, if needed?      ✓ Yes ____ No
       Demonstrate skills needed to decide when to take over-
         the-counter medicines (i.e., aspirin)?       ✓ Yes ____ No

Pike County School System
THE FAMILY'S ASSESSMENT FOCUS (continued)                    Page 2

Child's Name: _____ _____

6. What puzzles me about my (the) child: that he is not accomplishing more in school, then what I expect him too.

7. Recent progress or changes I have seen in my (the) child: that he is still doing the same week in school as he was doing 2yes ago.

8. My (the) child communicates with me by: accomplishment with his goals he completed.

9. The most challenging aspect of raising my (the) child is: understanding him.

10. I would like my (the) child to learn or get better at: his studies in school

11. I would like help with: Reaching a better education in all his studies in school

GibCo Dynamo

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL          Page 1 Of 1

## NOTICE OF PROPOSED MEETING

STUDENT'S NAME    JUSTIN MICHAEL REED

DATE    05/25/2005    TIME    10:00 AM    LOCATION    Pike County High School

**The purpose of this meeting is to:**
- ☐ Determine If Referral Requires Evaluation
- ☐ Discuss The Need For Additional Data Collection
- ☐ Determine Initial Or Continued Eligibility
- ☑ Develop Initial IEP Or Review/Revise IEP
- ☐ Review Exit IEP/Portfolio (For Occupational Diploma Students Only)
- ☐ Conduct Manifestation Determination
- ☐ Develop Functional Behavior Assessment Plan
- ☐ Develop/Revise Behavioral Intervention Plan
- ☐ _____
- ☐ _____
- ☐ _____

**The following people will be invited to meet with us:**
- ☑ Local Education Agency Representative
- ☑ Someone Who Can Interpret The Instructional Implications Of The Evaluation Results
- ☑ General Education Teacher
- ☑ Special Education Teacher
- ☑ Parent
- ☑ Student
- ☑ Career/Technical Representative
- ☐ Other Agency Representative(s) For Transition

Agency Name  _____
Agency Name  _____
- ☐ _____
- ☐ _____

Because your input is important to us, we encourage you to make every effort to attend this meeting.  You may bring other people whom you feel will be helpful to you in this process.

My signature below verifies that parents and students who require notice and an explanation of their rights in their native language have been accommodated to ensure their understanding.  You are fully protected under the special education rights. If you have questions, please contact:

Karen T.Berry                          at    566-1850
    (Name)                                  (Telephone)

Karen T. Berry
Signature of Education Agency Official
Enclosure: *Special Education Rights*

### Parent-Student

Please **check one** of the following boxes, sign, date, and return this form to    April S. Trant
before    05/09/2005

- ☑ I **WILL BE ABLE TO MEET WITH YOU.**
- ☐ I **CANNOT** meet at the date and time indicated.  Please contact me to arrange another time.
- ☐ I **WILL NOT BE ABLE TO MEET WITH YOU.**  I will contact you if I want more information.

*Mrs Reed*                              5/6/05
Signature of Parent or Student at Age 19          Date

### OFFICE USE ONLY

Documented attempts to contact parent/student (age 19) for IEP meeting.

Date Notice Sent    04/28/2005    Result  _____

2 ⁿᵈ Attempt Date  _____    Action  _____    Result  _____

Documented attempts to contact student/agency for IEP meeting regarding transition services.

Student was notified on  _____    via  _____

Agency was notified on  _____    via  _____

Agency was notified on  _____    via  _____

**DEFENDANT'S EXHIBIT 4**

AL0004001 4/26/2005          noticep 7/13/99

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL                Page 1 Of 1

# INDIVIDUALIZED EDUCATION PROGRAM

**STUDENT'S NAME** JUSTIN MICHAEL REED                **IEP INITIATION/DURATION DATES**

**DOB** 07/28/1989    **SCHOOL YR** 2005/2006    **GRADE** 9    FROM  08/10/2005    TO  05/25/2006

THIS IEP WILL BE IMPLEMENTED DURING THE REGULAR SCHOOL TERM UNLESS NOTED IN EXTENDED SCHOOL YEAR SERVICES

## STUDENT PROFILE

Justin is a 15 year old at Pike County High School.  Justin has been successful in all general education curriculum classes except for Math.  Justin has experienced failure due to his inability to grasp higher order math reasoning skills. Justin is in the Pike County High School Band and enjoys playing his instrument.  Justin is a well-mannered student and gets along well with his peers.  Justin does not yet have a career goal.

Justin mastered the majority of his 2004-2005 IEP objectives.  On the brief KTEA, given in April, Justin's scores are as follows:

Math:    GE: 3.1  SS: 57
Reading: GE: 2.8  SS: 62
Spelling: GE: 3.3  SS: 65

Justin will continue to receive instruction in all general academic classes with accommodations, except Math.  Due to his poor math ability affecting his educational progress in the general curriculum, he will receive modifications in math. Justin did not participate in the Standford 10, due to being a 9th grader.

**Items checked "YES" will be addressed in this IEP:**

**SPECIAL INSTRUCTIONAL FACTORS:**

- Does the student have behavior which impedes his/her learning or the learning of others? ☐ YES  ☑ NO
- Does the student have limited English proficiency? ☐ YES  ☑ NO
- Does the student need instruction in Braille and the use of Braille? ☐ YES  ☑ NO
- Does the student have communication needs (deaf or hearing impaired only)? ☐ YES  ☑ NO
- Does the student need assistive technology devices and/or services? ☐ YES  ☑ NO
- Does the student need special transportation? ☐ YES  ☑ NO
- Are transition services addressed in this IEP ☑ YES  ☐ NO

## NONACADEMIC and EXTRACURRICULAR ACTIVITIES

**The student will have the opportunity to participate in nonacademic/extracurricular activities with his/her nondisabled peers.**

☑ YES    ☐ YES, with supports. Describe: _____

☐ NO.    Explanation must be provided: _____

## METHOD/FREQUENCY FOR REPORTING PROGRESS OF ATTAINING GOALS TO PARENTS

Progress reports (indicating whether the progress, if continued, is sufficient to meet the annual goal) will be sent to parents each

grading period as scheduled by the school system every ___4.5___ weeks. Other ___report card___

AL0017a001 4/26/2005                          11/10/99                          STI

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL                Page 1 Of 1

STUDENT'S NAME: JUSTIN MICHAEL REED

## TRANSITION GOAL (beginning at age 14, or younger if appropriate)

Employment Outcome:
Comp Employment time-limited support

Community Living Outcome:
Independent No Support

## STATEMENT OF TRANSITION SERVICE NEEDS THAT FOCUSES ON THE STUDENT'S COURSE OF STUDY (beginning at age 14, or younger if appropriate)

Justin will be exposed to different community/job developement activities.

Career Interest(s):
Justin shows an interest in police work

## STATEMENT OF NEEDED TRANSITION SERVICES (beginning at age 16, or younger if appropriate)

| Components Needed | Components NOT Needed | |
|---|---|---|
| ☑ Needed | ☐ NOT Needed | 1. Instruction |
| ☑ Needed | ☐ NOT Needed | 2. Related Services |
| ☑ Needed | ☐ NOT Needed | 3. Community Experiences |
| ☑ Needed | ☐ NOT Needed | 4. Development of Employment and Other Post-School Adult Living Objectives |

Based on this student's interests, preferences, and needs, transition services will address the following checked areas. Goal(s) and/or benchmark(s) must be written for each area checked.

☐ Vocational Evaluation (VE)          ☐ Advocacy/Guardianship (AG)
☐ Employment Development (ED)      ☑ Community Participation (CP)
☐ Postsecondary Education (PE)        ☐ Transportation (T)
☐ Financial Management (FM)           ☐ Medical (M)
☐ Personal Management(PM)            ☐ Other _____
☐ Living Arrangements (LA)             ☐ Other _____

## EXIT DOCUMENT (beginning at age 16)    ANTICIPATED DATE OF EXIT

☐ Alabama High School Diploma with Advanced Academic Endorsement
☐ Alabama Occupational Diploma
☐ Graduation Certificate
☐ Alabama High School Diploma
☐ Other

_____ / _____
Month              Year

## PROGRAM CREDIT TO BE EARNED

| For each course taken, indicate program credit to be earned. | MATH | SCIENCE | SOCIAL STUDIES | ENGLISH | | | |
|---|---|---|---|---|---|---|---|
| Alabama High School Diploma with Advanced Academic Endorsement | | | | | | | |
| Alabama High School Diploma | | | | | | | |
| Alabama Occupational Diploma | | | | | | | |
| Graduation Certificate | | | | | | | |

## FOR OCCUPATIONAL DIPLOMA STUDENTS ONLY. PORTFOLIOS MUST BE REVIEWED ANNUALLY.

The following portfolios have been:

| Reviewed | Completed | Date |
|---|---|---|
| ☐ Employment English | ☐ | _____ |
| ☐ Job Skills Math | ☐ | _____ |
| ☐ Life Skills Science | ☐ | _____ |
| ☐ Career Preparation | ☐ | _____ |

Portfolio approved for graduation on

_____
Date

PIKE COUNTY SCHOOLS

PIKE COUNTY HIGH SCHOOL

Page 1 of 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

**AREA:** Mathematics

**PRESENT LEVEL OF PERFORMANCE:**

Justin currently works on 3.1 grade level in math. Justin's strengths are basic addition and subtraction. He must use a calculator to perform single/ double digit multiplication and division. Word problems must be read orally to Justin.

**ANNUAL GOAL to be measured by achievement of benchmarks:**

Justin will be able to solve problems, including word problems, involving the basic operations of multiplication and division on whole numbers through two-digit multipliers and one-digit divisors with 60% accuracy.

*2005 still many questions based on multiplying*

**For transition benchmark(s), person(s)/agency(ies) responsible:**

VRS Job Coach

| | Date of Mastery |
|---|---|

**Special Education Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel**
*(including frequency, duration & location)*

Calculator
90 minutes with functional math teacher, daily, in the resource classroom.
Oral reading of word problems.
Fewer problems
Parent contract through agenda book

| Benchmark | | Transition Area | Date of Mastery |
|---|---|---|---|
| Will solve problems involving multiplication and division with a sum no greater than 100 by first 9 weeks with 75% accuracy. | | NA | |

| Benchmark | | Transition Area | Date of Mastery |
|---|---|---|---|
| Will use multiplication and division facts to determine the missing integers by second 9 weeks with 60% accuracy. | | NA | |

| Benchmark | | Transition Area | Date of Mastery |
|---|---|---|---|
| Will be able to solve money problems under $5.00 using simple multiplication and division facts with 80% accuracy by end of term. | | NA | |

| Benchmark | | Transition Area | Date of Mastery |
|---|---|---|---|

**CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL:**

- [ ] a. Data Collection
- [x] b. Teacher/Text Test
- [ ] c. Work Samples Teacher
- [ ] d. Observation
- [x] e. Grades
- [ ] f. See Benchmarks
- [ ] g. Other
- [ ] h. Other
- [ ] i. Other

PIKE COUNTY SCHOOLS                PIKE COUNTY HIGH SCHOOL

Page 1 Of 1

**STUDENT'S NAME:**  JUSTIN MICHAEL REED

**AREA:**  Academics(English, Social Studies, Science)

**PRESENT LEVEL OF PERFORMANCE:**

Justin's present grade level in Spelling is 3.3 and 2.8 in Reading. His strength is his ability to use
context clues in reading. He frequently asks for help from teachers and that tests be read orally.
He will complete extra credit assignments to obtain a passing grade.

**ANNUAL GOAL to be measured by achievement of benchmarks:**
Justin will master the objectives in 10th grade Alabama Course of Study with 60%
accuracy.

**For transition benchmark(s), person(s)/agency(ies) responsible:**
VRS Job Coach

| Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel *(including frequency, duration & location)* |
|---|

Consultation with Special Education Teacher, daily basis.
Test read orally
Smaller task assignments
Preferential seating
Agenda with assignments written by Justin, checked by teacher and parent.
Calculator for use in scientific problems

*Wear glasses daily.*

PIKE COUNTY SCHOOLS                · 001 4/26/2005

| Benchmark | | Date of Mastery | Transition Area | Date of Mastery |
|---|---|---|---|---|
| Will maintain a 60% grade average. | | | NA | |
| Benchmark | | | Transition Area | |
| Benchmark | | | Transition Area | |
| Benchmark | | | Transition Area | |

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|
| ☐ a. Data Collection        ☐ f. See Benchmarks |
| ☑ b. Teacher/Text Test      ☐ g. Other ____ |
| ☐ c. Work Samples Teacher   ☐ h. Other ____ |
| ☐ d. Observation            ☐ i. Other ____ |
| ☑ e. Grades                 _____ |

STI

PIKE COUNTY SCHOOLS        PIKE COUNTY HIGH SCHOOL

Page 1 OF 1

**STUDENT'S NAME:**  JUSTIN MICHAEL REED

**AREA:**   Speech and Language

**PRESENT LEVEL OF PERFORMANCE:**

Justin is performing with a moderate language delay according to the OWLS.

| | Transition Area | Date of Mastery |
|---|---|---|

**Benchmark**

Justin will place age appropriate vocabulary in appropriate categories with 80% accuracy by May 2006.

NA

**ANNUAL GOAL** to be measured by achievement of benchmarks:
Justin will increase his receptive and expressive language skill to an age appropriate level by May 2006.

| | Transition Area | Date of Mastery |
|---|---|---|

**Benchmark**

Justin will correctly identify correct usage of antonyms synonyms and multiple meaning words with 85% accuracy by May 2006.

| | Transition Area | Date of Mastery |
|---|---|---|

**Benchmark**

Justin will answer age appropriate questions with 85% accuracy by May 2006.

For transition benchmark(s), person(s)/agency(ies) responsible:

n/a

| | Transition Area | Date of Mastery |
|---|---|---|

**Benchmark**

**Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for Personnel**
*(including frequency, duration & location)*

Justin will come to speech once a week for 30 minutes in the resource room with the SLP.

*games
*sheets
*cards
*stories

| CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL |
|---|
| ☐ a. Data Collection ☐ f. See Benchmarks |
| ☑ b. Teacher/Text Test ☐ g. Other |
| ☐ c. Work Samples Teacher ☐ h. Other |
| ☐ d. Observation ☐ i. Other |
| ☐ e. Grades |

| | Transition Area | Date of Mastery |
|---|---|---|

/10/2005

STI

PIKE COUNTY SCHOOLS

PIKE COUNTY HIGH SCHOOL

Page 1 of 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

**AREA:** Social/Emotional Behavior

**PRESENT LEVEL OF PERFORMANCE:**

Justin has a problem following class and school rules.

**ANNUAL GOAL to be measured by achievement of benchmarks:**
Justin will decrease his inappropriate behavior and manage his behavior with 70% accuracy.

**For transition benchmark(s), person(s)/agency(ies) responsible:**
Teacher, Justin, parent

**Special Education, Related Services, Supplementary Aids & Services, Assistive Technology, Program Accommodations/Modifications and Support for: Personnel**
*(including frequency, duration & location)*

Decrease his inappropriate behavior by following classroom and school rules.
1st time: Name on Board
2nd time: Teacher's choice of punishment
3rd time: Sent to office with parent conference
4th time: Placement at ALC.
Disciplinary Council

| Benchmark | Transition Area | Date of Mastery |
|---|---|---|
| Justin will follow classroom and school rules throughout the school year. | PM | |
| Benchmark | Transition Area | Date of Mastery |
| Benchmark | Transition Area | Date of Mastery |

**CHECK TYPE(S) OF EVALUATION FOR ANNUAL GOAL**

☐ a. Data Collection   ☐ f. See Benchmarks
☐ b. Teacher/Text Test   ☐ g. Other _____
☐ c. Work Samples Teacher   ☐ h. Other _____
☑ d. Observation   ☐ i. Other _____
☐ e. Grades

Date of Mastery

ReedJ16d01 5/20/2005

118

PIKE COUNTY SCHOOLS          PIKE COUNTY HIGH SCHOOL                    Page 1 Of 1

**STUDENT'S NAME:** JUSTIN MICHAEL REED

## GENERAL FACTORS

**HAS THE IEP TEAM CONSIDERED:**

| | | |
|---|---|---|
| • The strengths of the child? | ☑ YES | ☐ NO |
| • The concerns of the parents for enhancing the education of the child? | ☑ YES | ☐ NO |
| • The results of the initial or most recent evaluations of the child? | ☑ YES | ☐ NO |
| • The results of performance on any State or district-wide assessments, as appropriate? | ☑ YES | ☐ NO |
| • The need for extended school year services? | ☑ YES | ☐ NO |

## LEAST RESTRICTIVE ENVIRONMENT

Does this student attend the school (or for a preschool-age student, participate in the environment) he/she would attend if nondisabled?

☑ Yes   ☐ No   If no, justify: _____

Does this student receive all special education services with nondisabled peers?   ☐ Yes  ☑ No   If no, justify (justification may not be solely because of needed modifications in the general curriculum):

low math skills adversely affect educational progress in the general curriculum

| 6-21 YEARS OF AGE | 3-5 YEARS OF AGE |
|---|---|
| Check One: | |
| 01 ☐ 0 Hours Per Week Outside the Regular Classroom | 12 ☐ Early Childhood Setting |
| 02 ☑ Less Than 6 Hours Per Week Outside the Regular Classroom | 13 ☐ Early Childhood Special Education Setting |
| 03 ☐ 6-21 Hours Per Week Outside the Regular Classroom | 14 ☐ Home |
| 04 ☐ Over 21 Hours Per Week Outside the Regular Classroom | 15 ☐ Part-Time Early Childhood/Part-Time Early Childhood Special Education Setting |
| 05 ☐ Private School (Parent Placed) | 16 ☐ Residential Facility |
| 06 ☐ Public Day School | 17 ☐ Separate School |
| 07 ☐ Private Day School | **COPY OF IEP** |
| 08 ☐ Home | Was a copy of the IEP given to parent at IEP meeting? |
| 09 ☐ Hospital | ☐ Yes ☐ No    If no, date copy sent to parent: |
| 10 ☐ Public Residential School | |
| 11 ☐ Private Residential School | |

## TRANSFER OF RIGHTS
### To be completed at least one year prior to the student's 19th birthday.

**I understand that the rights under the Individuals with Disabilities Education Act will transfer to me on my 19th birthday.**

_____          _____
Student's Signature                                      Date

## THE FOLLOWING PEOPLE ATTENDED AND PARTICIPATED IN THE MEETING TO DEVELOP THIS IEP.

| POSITION | DATE | IEP TEAM MEMBERS' SIGNATURES |
|---|---|---|
| PARENT(S) | 05/25/2005 | * Elizabeth Reed |
| PARENT(S) | | |
| LEA REPRESENTATIVE /psy | 05/25/2005 | * Karen Berry |
| SPECIAL EDUCATION TEACHER | 05/25/2005 | * April Stant |
| GENERAL EDUCATION TEACHER | 05/25/2005 | * |
| STUDENT | 05/25/2005 | * Justin Reed |
| CAREER/TECHNICAL EDUCATION REP | 05/25/2005 | |
| OTHER AGENCY REPRESENTATIVE | | |
| Sp. Ed Teacher | 5/25/05 | Regina Catutti |
| Sped teacher | 5/25/05 | Donna Faust |

## INFORMATION FROM PEOPLE NOT IN ATTENDANCE

NAME _Tammy L. Calhoun_          POSITION _SGP_

AL0017d001 4/26/2005                                                                                     STi

Dear Parent,

As your child gets older, his/her teachers will be working to develop skills which will be needed for future employment and personal management. These skills are called transition skills, as your child makes the transition from childhood to young adulthood. Please complete these questions about your child. If you have any other concerns for your child, or feel that your child needs help in any other area, please comment on the next page.


TRANSITION PLANNING ASSESSMENT

Middle School/Junior High

I.    Employment Development
      Does the student:
      Have a realistic career goal?                                    _____Yes  ✓ No
      Know where to find information on careers?                      ✓ Yes  _____No
      Self-evaluate skills/abilities realistically?                  _____Yes  ✓ No
      Relate skills/abilities to jobs?                               _____Yes  ✓ No
      Have any work responsibilities (i.e., paper route,
          babysitting, lawn mowing)?                                 ✓ Yes  _____No
      State his/her likes/dislikes and interests in particular
          jobs?                                                      ✓ Yes  _____No

II.   Financial Management
      Does the student:
      Earn an allowance?                                             ✓ Yes  _____No
      Earn money from jobs such as babysitting?                      ✓ Yes  _____No
      Manage money wisely?                                           _____Yes  ✓ No
      Make his/her own purchases?                                    ✓ Yes  _____No
      Demonstrate an understanding of the different types
          of insurance (i.e., medical, automobile, etc.)?           ✓ Yes  _____No

III.  Personal Management
      Does the student:
      Get him/herself up in the mornings?                            ✓ Yes  _____No
      Independently care for hygiene and grooming?                   ✓ Yes  _____No
      Prepare simple meals?                                          ✓ Yes  _____No
      Do his/her own laundry?                                        _____Yes  ✓ No
      Independently complete assigned household chores?              _____Yes  ✓ No
      Follow safety rules?                                           ✓ Yes  _____No
      Purchase needed personal items?                               ✓ Yes  _____No
      Use time effectively?                                          _____Yes  ✓ No
      Have age-appropriate friends?                                  ✓ Yes  _____No
      Participate in activities with friends ( parties, etc.)?      _____Yes  ✓ No
      Resolve conflicts with friends effectively?                   ✓ Yes  _____No

Communicate effectively with peers and adults? _____Yes __✓__No

IV.     Community Participation
        Does the student:
        Move about in his/her neighborhood?                          __✓__Yes _____No
        Go to movies, grocery store, library, restaurants, etc?      __✓__Yes _____No
        Participate in community sports activities?                  __✓__Yes _____No
        Participate in youth groups?                                 __✓__Yes _____No
        Identify leisure-time interests?                             __✓__Yes _____No
        Participate in school extracurricular activities?            _____Yes __✓__No

V.      Medical
        Does the student:
        Demonstrate a basic understanding of different types
          of medical care (i.e., dental, vision, internal medicine)? __✓__Yes _____No
        Realistically express his/her medical needs/limitations?     __✓__Yes _____No
        Independently take medication, if needed?                    __✓__Yes _____No
        Demonstrate skills needed to decide when to take over-
          the-counter medicines (i.e., aspirin)?                     __✓__Yes _____No

## Organizational Diagram
### July 2006

### Pike County Board of Education

Rev. Herbert Reynolds, President; Rev. Earnest Green, Vice-President; Mr. Adam Register, Member; Mrs. Linda Steed, Member; Mr. Wyman Botts, Member; Mr. Greg Price, Member

### Superintendent
#### Dr. Mark Bazzell

Mrs. Sula Warren, Secretary to the Superintendent/Board
Renita Johnson, Board of Education Receptionist

**Director of Finance & Operations**
Mr. Tom Hicks

**CFO/Custodian Of Funds**
Mrs. Jennifer Hornsby
Bonnie Brown; Head Bookkeeper
Accountant

**Maintenance & Transportation Supervisor**
Mr. Mike Johnson

| **Prevention & Support/Special Special Education Services** | **Instructional Support & Ancillary Services** | **Instructional Programs** |
|---|---|---|
| Mrs. Karen Berry, Ad. Assist. | Mrs. Elizabeth Grubbs, Ad. Assist. | *Mrs. Carolyn Bakeale* ~~Mrs. Donnella Carter~~, Ad Assist. |
| Special Education | Textbooks* | IASA Title I |
| IDEA Part B | Community Education* | IASA Title VI |
| Title IX, 504 Compliance | Character Education* | Accreditation* |
| Pupil Health Services* | PEPE/Professional Dev./Inservice* | Alabama Reading Initiative* |
| Community Outreach* | Library Media* | MS Reading Initiatives* |
| Counseling & Guidance* | At-Risk/High Hopes* | Reading First Initiatives* |
| Drug Education/HIV/AIDS Edu.* | Indian Programs | School Improvement* |
| Truancy Intervention* | Student Assessment* | Migrant Programs |
| School Safety & Discipline* | Lee v. Macon Compliance* | Instructional Programs (K-12)* |
|  | Impact Aide* | Career Technical Education* |
|  |  | Academy Director/SW/SC/HSTW* |
|  |  | IIC, SIC, EIC* |

School Psychometrist
Mr. Robert Hudson
School Nurses§
Pam Moates, Gloria Leveque, Angela Youngblood

Community Outreach
Mrs. Sonja McKinney, Social Worker

Job Coach/Transition Coordinator
Mr. Kevin Jackson

Banks School
~~Mr. Mark Head~~, Principal *Mrs. L. Townsend*
Goshen Elementary
Mr. John Evers, Principal
Pike County Elementary School
~~Mrs. Ken Bynum~~ Principal *Mrs. D. Carter*
Mr. Teresa Sims, Assistant Principal
Pike County High School
~~Mr. Mike Hall~~, Principal *Mr. T. Casing*
~~Mr. Willie Wright~~, Assistant Principal *Mr. B. Byrd*
*Mr. R. McDow*
Goshen High School
Mr. Gene Nelson, Principal
Mr. Major Lane, Assistant Principal
Troy-Pike Regional Center for Technology
Dr. Al Griffin, Director
Child Advocacy Center
Mrs. Mona Watson, Director

Child Nutrition Programs: Mrs. Joy Taylor; Technology Coordinator, Mr. Marvin Jackson; Tech. Specialist, Daniel Reeves

Other Central Office Staff: Mrs. Jan Rascoe, Mrs. Molly Casey, Mrs. Jo Dansby

***JR v. Pike County BOE***
*Produced by Defendant PCBE*
*No. 0202*



PLAINTIFF'S EXHIBIT



PLAINTIFF'S
EXHIBIT
2

# PIKE COUNTY BOARD OF EDUCATION

**STUDENT
CODE OF CONDUCT**

ADOPTED: October 11, 1993
Revised: July 1998
Revised: July 1999
Revised: July 2000
Revised: June 2003

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0382*

FILE: JDEA

## PREAMBLE

Rules, regulations, and due process are designed to protect all members of the educational community in the exercise of their rights and responsibilities. The purpose of issuing this booklet is to inform students, parents/guardians, and others, of the policies, rules, and regulations of the Pike County School System related to student discipline.

This Code of Conduct is written in a manner that ensures a uniform understanding of the practices and procedures used in the Pike County School System to manage discipline. In addition, the Board of Education authorizes principals, working with teachers and other professional personnel, to make supplemental rules and regulations for individual schools as deemed necessary provided such rules and regulations do not conflict with Board Policy. These supplemental rules and regulations specific to individual schools may be found in local school student handbooks or other published local school documents.

## NON-DISCRIMINATION POLICY

It is the official policy of the Pike County Board of Education that no person shall; on the grounds of race, color, ethnicity, national origin, disability, sex, religion, belief, marital status, or age; be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, employment, re-employment, or advancement. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, Title VI Coordinator, and Title IX Coordinator, at 334-566-1850, between the hours of 8:00 am and 4:30 pm, Monday through Friday.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0383

# UNIFORM CODE OF STUDENT CONDUCT
## INTRODUCTION

Adopted by Pike County Board of Education, October 11, 1993
Revised: July 1998
Revised: July 1999
Revised: July 2000
Revised: May 2001
<u>Revised: June 2003</u>

The Pike County Board of Education believes that instruction should occur in an environment that is conducive to learning. Effective instruction requires good order and discipline which may be described as the absence of distractions, friction, and disturbances, which interfere with the effective functioning of the student, class, and school.

The Code of Student Conduct is designed to assist the faculty and school administration in maintaining a satisfactory environment by standardizing procedures for administering disciplinary actions.

The Code will apply to Pike County public school students during the times they are under the direct or indirect supervision of Pike County school board employees. It applies to the transportation of students to and from school and to students while they are involved in school sponsored activities both as spectators or participants. (This includes any activity involving the transportation of students. For Example: field trips, athletic events, band trips, etc.)

Each Special Education student's disability must be considered in applying the code. Special Education teachers will work closely with the students, parents, and administrators to ensure the code is applied so that students are not penalized because of their disabilities. However, the consequences outlined in the code will be applied as described when it has been determined that the misbehavior involved is not a manifestation of the student's disability.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0384

Bus drivers will be responsible for completing referral forms for code violations on school buses. School buses are considered extensions of the classroom and school with all sections of the code applying equally. The referral forms will be turned in to the principal's office and the principal or his/her designee will be responsible for carrying out the provisions of the code.

**Corporal Punishment** may be administered as a form of discipline unless the parent/guardian files a written dated objection with the school principal. It is the responsibility of the parent/guardian to see that the written dated objection is submitted to the principal's office. This notice should be attached to the "Certification of Receipt" and returned to the school office. Alternative disciplinary techniques will be applied to any student whose parents/guardian objects to corporal punishment.

Corporal punishment may only be administered for violations of posted classroom rules and Class I Offenses after other methods to modify the student's misbehavior have been documented. Corporal punishment must always be administered in accordance with board policy.

Corporal punishment may only be administered by certified staff members. Section 16-28A-5 of the Code of Alabama provides immunity against legal action when corporal punishment is administered in accordance with the policies and guidelines of the local board of education.

**School Discipline Plans:** Each school, with input from the school administration, school faculty & staff, students, and parents shall develop and maintain a written school discipline plan. All administrators, certified personnel, and non-certified personnel shall abide by the provisions of plan. At a minimum, the plan will consist of a set school-wide classroom rules aimed at addressing minor in-class infractions or disturbances which have a negative impact on the classroom learning environment. These rules will be posted in each classroom or other instructional area. For violations of these rules, a set of increasingly punitive consequences (up to office referral) to be enforced by teachers, shall be set forth along with the rules and will also be posted. The school administration shall take all steps necessary to ensure that consequences assigned by faculty for violations of classroom rules are strictly enforced.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0385

**Proper Documentation of Disciplinary Action:**

School personnel shall use the prescribed forms when documenting discipline matters. Supplementary narratives may accompany these forms when necessary.

## DISCIPLINE ACTIONS AND PROCEDURES

In order to have the best possible environment for learning to take place, rules have been established to make the environment conducive to instruction. Effective instruction requires good order and discipline. The Pike County Board of Education is committed to this belief and supports wholeheartedly the application of this code.

Teachers are expected to exhaust all reasonable means to manage routine disciplinary action or problems in the classroom. Contacting the parents of students whose conduct disrupts the class and/or teacher is strongly recommended. If the parent conference does not help and all other efforts fail, the student should be referred to the office with proper documentation of the teacher's efforts in disciplining the student.

Students suspended from school or the Alternative Learning Center (ALC) may not represent the school in any fashion.

4

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0386

Discipline infractions have been divided into four classifications according to their seriousness. Punishment will be given according to the seriousness of the offense and the number of times the student has been disciplined. The classifications are as follows:

**CLASS I OFFENSES:** (Class I offenses may be assessed by the teacher and/or administrator.)

THE NUMBER OF OFFENSES WILL ACCRUE FOR THE ENTIRE SCHOOL YEAR

    1.1 -  Excessive Tardiness

    1.2 -  Inappropriate public display of affection

    1.3 -  Gambling and card playing

    1.4 -  Any other offenses which the principal may deem reasonable and may fall in this classification

**MINIMUM CONSEQUENCES FOR CLASS I OFFENSES:**

Once appropriate intervention strategies have been unsuccessful in managing the student's behavior, the teacher may refer the student to the office for Class I Offenses. These interventions must include but are not limited to counseling with students and parental contact. When these interventions have not resulted in improved student behavior, office referrals will result. Referrals will be supported by teacher documentation of actions taken prior to the referral.

First Referral    - Office referral, with notification to the parents by the administrator. Students will be counseled by appropriate school personnel. Possible disciplinary action: work detail, detention, loss of privileges, corporal punishment, etc.

Second Referral    - REQUIRED parental conference, possible disciplinary actions as stated above. Failure of the parent to attend the conference will result in suspension of student or referral to the ALC until the conference is held.

5

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0387*

## Additional Referrals

- <u>5</u>-10 days of ALC or suspension. Parent conference required for readmittance.

Important note:    If a parent conference is indicated for students under 16 years of age, a juvenile petition may be signed if the parents do not attend. Under state law, referral of the parent to the Pike County District Attorney's office for prosecution may occur if parents fail to attend parent conferences or fail to reasonably support the school in its attempts to modify or improve student behavior.

6

## CLASS II OFFENSES:

2.1 -  Failure to follow directions of a teacher, administrator, or other school board employee

2.2 -  Failure to follow the posted (school-wide uniform) classroom rules

2.3 -  Fighting on campus, bus or at any school sanctioned activity (K-5 Only).

Any physical conflict, hitting or contact, or exchange of blows between two or more individuals which does not result in physical injury or property damage.

2.4 -  Use or possession of any tobacco products, matches, or lighters on campus

2.5 -  Unauthorized absence from class or school (cutting or skipping)

2.6 -  Insubordination

Failure to follow the reasonable directive or order of a school board employee.

2.7 -  Threats towards students (K-5 Only)

The intentional threat by word or act to do harm to another student.

2.8 -  Property damage up to $50.00 - Intentionally defacing or damaging the property of another (public or personal).  Up to $50.00, the student will be required to repair or replace the damaged item.

2.9 -  Stealing - Theft (Less than $50.00 in value)

Taking and/or carrying away of public or personal property.  The student will be required to replace, return (unharmed items), or pay the cost of such items.

7

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0389

2.10 - Intentionally providing false information

Providing false information including, but not limited to forgery of parents/guardian's names, changing grades, address, other school records, forging notes, passes or forms. Includes a student's refusal to identify themselves or inaccurate self-identification.

2.11- Speeding/reckless driving - Driving privileges may be suspended or revoked for these offenses and for violations of local noise ordinances while on campus. This includes reckless driving on the student's home campus, in and around school buses traveling to and from school and school events, while participating in school events, and while driving on any other school campus or on school system property.

2.12- Unjustified activation of fire alarm system or fire extinguisher; displaying an uncooperative attitude during fire, weather, or other school safety drills.

2.13 -Assault upon another student - (K-5 Only)

The actual causing of physical pain or harm to another student, including pushing, tripping, or striking another student

The school administrator has the option of managing this referral as an offense under 4.3.

2.14 -Possession of stolen property (less than $50.00 in value)

2.15 -Use of profane or obscene language or gestures

2.16 -Possession of an electronic pager or other similar device.

2.17- Any other offenses which the principal may deem reasonable and may fall in this classification.

8

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0390*

**MINIMUM CONSEQUENCES FOR CLASS II OFFENSES:**

First Offense -    Office referral and assignment <u>to ALC for 5 days</u> or 2-5 day suspension (depending upon the seriousness of the offenses), and parental conference.

<u>Second</u> Offense and any thereafter -
    Office referral, <u>5</u>-10 day suspension or assignment to ALC and parental conference, or Referral to the Superintendent's Discipline Council.

A referral to the Pike County Sheriff's Department may be made by the school administrator after any or all of the above offenses if necessary. Repeated incidents of misconduct of any student after the options listed in the code are exhausted may result in referral to the Superintendent's Discipline Council and Pike County Board of Education with a recommendation for expulsion. Parents/guardians shall be held responsible for monetary loss or damages as noted previously.

**CLASS III OFFENSES:**

3.1 - Threats toward students (6-12 Grades)

    The intentional threat by word or act to do harm to another student.

3.2 - Directing obscene or profane language or gestures to a school board employee

3.3 - Threat directed toward a school board employee or threat of or actual damage of a school board employee's property

    Threat by word or act to do violence to the person or property of a school board employee; actual damage to property (up to $50). Students will be required to pay restitution.

3.4 - Refusal to be scanned by a metal detector.

3.5 - Fighting on campus, bus, or at any school sanctioned activity. (Grades 6-12 or any K-5 fight in which physical injury or property damage occurs.)

<p align="center">9</p>

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0391

Any physical contact, hitting, or exchange of blows between two or more individuals.

3.6- Refusal to relinquish possession of electronic pager or communication devices, except for health or other extraordinary reasons upon approval of the Board of Education (Alabama Code 16-1-27)

3.7 - Extortion

Verbally or by a written or printed communication, threatening injury to the person, property, or reputation of another, with the intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will.

3.8- Possession of a weapon (excluding firearm or replica) or replicas of the items listed below on school property or at a school-sponsored event or function

Weapons include the following:

Knife, irrespective of the blade length, including but not limited to:

| | | |
|---|---|---|
| Box cutter | Key chain knife | Stiletto knife |
| Butterfly knife | Linoleum knife | Straight razor |
| Carpet knife | Lock blade knife | Switch blade |
| Exacto knife | Paint scraper | Swiss army knife |
| Fixed blade knife | Palm knife | Trench knife |
| Folding knife | Razor blade | Utility knife |
| Spring loaded knife | Laser pointer | |

Weapons Continued:

Any other item that utilizes a razor blade or other blade, replaceable or fixed

Numchucks (nanchaku), throwing stars, fighting claws or other weapon utilized in martial arts

Fingernail clippers or other items that contain a knife blade or fingernail file

10

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0392*

Fingernail file or any other object that has been sharpened in such a way as to cut or puncture

Toenail clippers of any sort

Bicycle chain or other heavy duty chain

Bike sprocket

| | | |
|---|---|---|
| "ARROW" gun | Cross bow | Machete |
| Arrow | Hand ax | Night stick |
| Baton | Hatchet | Skewer |
| Black jack | Ice pick | Sling shot |
| Blow gun | Impact baton | Spear |
| Bow & arrow | Kubotan | Spring billy |
| Brass knuckles | Leather strap | Stun gun |
| Bull whip | Loaded gloves | Sword or sword cane |
| Cattle prod | Mace | Tazier-Stun Gun |
| Club | Tear gas | Water guns |

Any device capable of discharging a projectile of any kind

ANY OTHER OBJECT NOT SPECIFICALLY LISTED WHICH IS PRIMARILY MEANT AND ADAPTED FOR ATTACK AND FOR THE INFLICTION OF INJURY

3.9-    Property damage, stealing/theft, or possession of stolen property when values exceed $50.00.

3.10-   Sexual Harassment

Includes offensive touching of a sexual nature of another student or written or verbal propositions to engage in sexual acts, or any other form of sexual harassment. Sexual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by a student or agent of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX.

11

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0393

The parents of all students involved in sexual harassment issues shall be notified in all cases. Law enforcement will be summoned by the school in substantiated cases of sexual harassment, in cases where students and parents wish to file criminal complaints, and in cases where a pattern of unsubstantiated complaints have been made concerning individual students.

3.11    Hazing - Any action taken or situation created, intentionally, whether on or off school property, to produce mental or physical discomfort, embarrassment, harassment, or ridicule. Such activities may include but are not limited to the following: use of alcohol; paddling in any form; creation of excessive fatigue; physical and psychological shocks; quests, treasure hunts, scavenger hunts, road trips, wearing of public apparel which is conspicuous and not normally in good taste; engaging in public stunts and buffoonery; morally degrading or humiliating games and activities; and other ritual activities not consistent with board of education regulations and policies.

Hazing is prohibited in all forms. Hazing is a criminal act as defined in the Code of Alabama. School sanctioned groups (grade, class, athletic team, club, etc.) may be penalized in whole for activities by individual members.

3.12-  Any other offenses which the principal may deem reasonable and may fall in this classification

**MINIMUM CONSEQUENCES FOR CLASS III OFFENSES:**

First Offense -          5-10 day suspension from school or referral to the
                        In-School Suspension/ALC.

Additional Offense -    Suspension pending a hearing before the
                        Superintendent's Disciplinary Council.

The Pike County Sheriff's Department or other appropriate law enforcement agency shall be notified by the school administrator after any of the above offenses if necessary. Parents/guardians shall be held responsible for monetary loss or damages occurring from the above violations and/or as previously noted.

12

## CLASS IV OFFENSES:

### 4.1 - Trespassing/loitering/unlawful assembly

Being present in an unauthorized place in the school or on school property or refusing to leave the premises when ordered to do so by school personnel; presence on school property at unauthorized times (such as during times of suspension). This also includes unauthorized visits to other school campuses.

### 4.2 - Inciting or participating in major student disorder

Leading, encouraging, or assisting in major disruptions which result in destruction or damage of public or private property, or personal injury to participants or others, or which results in serious disruption of the educational process.

### 4.3 - Assault upon another student (6-12, K-5 assaults resulting in injury)

The deliberate causing of bodily harm to another student, including but not limited to tripping, pushing, or striking another student.

### 4.4 - Assault of School Board employee

The actual striking or touching of a School Board employee against his or her will, or causing bodily harm to a School Board employee

### 4.5 - Sale, purchase, use of or possession of illegal drugs or alcoholic beverages

### 4.6 - Use, threatened use or display of weapons other than firearms or replica; Including Bomb Threats (See list of weapons in 3.8)

### 4.7 - The threatened use of an object not defined as a weapon with intent to injure or intimidate on school property or at a school sponsored event.

### 4.8 - The possession, use or display of firearms or replica
A firearm, including but not limited to any hand gun, shotgun, black powder firearm, flare gun, zip gun, stun-gun or any other device from which a projectile is discharged by explosive powder; or

**13**

A realistic replica of any firearm, including but not limited to replicas of handgun, rifle or shotgun, black powder firearm, flare gun or zip gun. Also included are gun clips (empty or loaded), ammunition, bullets, shell, or other projectiles used in any of these weapons:

> Air gun
> Blank Gun (Starter's Pistol)
> Gas Operated Gun

Pursuant to the Gun-Free Schools Act of 1994 (amended as part of the Improving America's Schools Act of 1994, under the reauthorization of the Elementary and Secondary Education Act of 1965, Public Law 103-382) local boards of education are required to expel for a period of one year (12 months) any student who is determined to have brought a weapon to school. A student who is referred to the board by the principal for possession of a weapon shall be liable for expulsion from school for not less than twelve months upon determination that the student brought a weapon to school. "Weapon," as used for this purpose, shall include the definition as set forth under § 921 of Title 18 of the United States Code as well as delineation of weapons as noted under item 4.4 of the Uniform Code of Student Conduct.

4.9 -   Hazing with Injury and/or Damage to Property - see 3.11 for definition of hazing. It will be considered as Class IV offense if hazing activities on or off school premises results in injuries to students or non-students; or if damage occurs to public or private property.

Although out of the jurisdiction of school authorities, school officials will contact parents when they become aware of the hazing activities of non-school sanctioned, community based social organizations.

4.10 - Other criminal acts which violate the laws of Pike County, State of Alabama, or United States

Including but not limited to burglary of school property, vandalism (over $50), arson, possession or igniting of explosives (including fireworks), bomb threats, robbery, and unlawful interference with school authorities in the discharge of their official duties

**14**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0396

### 4.11-Sexual Acts

Acts of sexual nature including, but not limited to sexual assault, intercourse or attempted intercourse, or deliberate indecent exposure

Participation in a series or pattern of threats or physical attacks to intimidate or coerce one or more students in a sexual or nonsexual way. This harassment may occur by one student acting alone or as a member of a group. Intimidation includes but is not limited to verbal or physical attacks threatening the safety or well-being of the student and/or his or her family.

Examples:

A male student forcing a female student by coercion into a situation of petting or other sexual acts by threatening bodily harm on her and/or some member of her family. Any intimidation commonly known as bullying or the forcing of other students to do something against their will by threat or physical force on them and/or their family members.

Legal Reference: Alabama Code 16-1-23
Section 4.8 adopted March 7, 1994

4.12- Possession of explosive devices, including fireworks.

2.    A student who willfully commits a second violation of a class three or four offense shall be permanently denied bus or vehicle riding privileges.

3.    Any brutally violent, malicious, or willfully vicious act by a student rider in which another student, driver, or other adult is physically injured shall subject the student to permanent revocation of riding privileges in addition to that which is called for in the Code.

4.    Parents may petition the Board of Education to have a student's riding privileges reinstated after the student has not

**15**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0397

4.13- Any other offenses which the principal may deem reasonable and may fall in this classification

## MINIMUM CONSEQUENCES FOR CLASS IV OFFENSES:

Immediate suspension from school pending a hearing before the Superintendent's Disciplinary Council. Expulsion from school is a possible consequence. Offenses shall also be reported to the police authorities for possible action.

## OTHER OFFENSES: NOT CLASSIFIED UNDER CLASS I, II, III, OR IV
(Managed by other methods)

Failure to bring materials to class

Not completing assignments or homework (reflected in academic grades)

Gum chewing or eating candy, etc.

Littering

Other Notes:

Punishment will not include placing the student in the hallway or unsupervised areas.

Penalties should not be imposed for an entire class for actions that involve fewer than the entire class.

16

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0398

## STUDENT/PARENT RESPONSIBILITIES:

I.    Attendance

Every child between the ages of 7 and 16 years shall be required to enroll in school and attend for the entire length of every scholastic year. (Alabama Code 16-28-3)

All students are expected to attend school regularly. Regardless of the reason for any absence, a written excuse, signed by the parent, should be brought on the first day back after the absence. The note should be submitted to the appropriate teacher as explained by the individual school rules. School officials will decide if your absence is excused or not. All absences will be considered unexcused in the absence of a written excuse.

**Written excuses and/or doctors excuses not received within the first five school days after the absence will not be accepted. These absences will remain <u>unexcused</u>. It is the responsibility of the parent to see that excuses are provided within this time period.**

Students will occasionally submit notes signed by someone other than their parents/guardians. In these cases, upon discovery, all absences will be considered unexcused and Denial of Credit could occur. Disciplinary action will be taken in these cases (see 2.3). A truancy petition may also be signed in juvenile court.

Students are expected to make up all work missed during any absence. It is the responsibility of the student and parent to arrange with the teacher for any make-up work. This must be done during the first two days the student is back in school.

Any student who is absent five unexcused days, will be reported to the Pike County Truancy Intervention Program by the School Attendance Officer. Students who accumulate over ten unexcused absences will be referred to the Pike County Juvenile Court and a Juvenile petition will be filed. A juvenile court appearance will be required. **<u>The school district will continue to sign "Contributing to the Delinquency of a Minor" warrant on parents who fail to meet their responsibilities regarding school attendance.</u>**

17

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0399

II.    The following absences are excusable by the State of Alabama:

- Personal Illness
- Inclement Weather (Bad weather which would make it dangerous to travel to school)
- Legal Quarantine (Contagious disease)
- Death in the immediate family
- Legal Obligations (Such as a court appearance)
- Emergency conditions or absent with the permission of the principal and parent.

Some inexcusable reasons for missing school are:

- Work
- Permission of the parent in the absence of one of the reason stated above (personal illness, inclement weather, etc.)
- Family errands
- Oversleeping
- Missing the bus
- Buying a prom dress
- Hunting trip
- Vacations (Unless educational and pre-approved by school principal)

III.    If the student participates in a school-day afternoon or evening extracurricular activity as an official representative of the school (such as a cheerleader, band member or an athletic team member), the student must have been in school that day, or have a previously excused absence from the principal.

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0400*

IV.   The Alabama Compulsory Attendance Law requires that a student attend school regularly until sixteen years of age. It is of extreme importance that good attendance be maintained by students for three reasons:

  (1)   An educational advantage;
  (2)   Maintaining a good permanent record of reference for the future;
  (3)   The number of teachers that each county is allocated by the state is based on the average daily membership of students within the county.

**In accordance with Alabama Law, any student who drops out of school prior to their eighteenth birthday will be reported to the Department of Public Safety. In these cases, the student's drivers license will be suspended by the Department.**

V.   Proof of residency (for attendance purposes) is required for all students in accordance with the terms of the Lee v. Macon County federal consent decree. All students are expected to attend school in the appropriate attendance zone. Reports of out-of-zone students will be forwarded to the school district the student is attending and to the US Department of Justice and the Lee v. Macon plaintiffs.

The Pike County Board of Education will not consider or discuss requests for transfers of out going students until they have been approved by the "receiving" school district. The Pike County Board of Education will not approve requests for transfer for in-coming students which do not meet the requirements of the consent decree.

19

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0401*

# PROMOTION AND HIGH SCHOOL COURSE CREDIT MAY BE DENIED ON THE BASIS OF ABSENCES FROM SCHOOL OR CLASS

I.    Alabama law provides that every child between the ages of seven and sixteen years shall be required to attend school. In compliance with the law, the following policies are established.

1.    A student, approved by the principal or his designee to participate in or attend a school sponsored or other approved activity during the school day, shall be counted present. Students are responsible for all assignments missed while participating in or attending said activities.

2.    A high school student (generally those in grades 7-12 on block scheduling) absent from any one class more than ten times per term (includes both excused and unexcused absences) will be assigned a grade of F and denied credit for the class.

Elementary students, including grades 7 and 8 not on block scheduling, may not miss more than 20 days in a school year in order to be promoted.

3.    Students who have been denied credit or promotion due to excessive absences may appeal this action. Upon notification of denial of credit or promotion, the parents will have ten calendar days to appeal this action or it will become final. It is the parents' responsibility to complete the appropriate appeal forms (which can be secured from the school office) and forward them to the school principal for review and consideration. Consideration will only be given in cases of extended illness, injury, or other extenuating circumstances exist and when documented proof of the reason for the excessive absences can be provided by the parent. See student due process appeal procedures JCAA.

4.    High school students are required to attend the entire class period. If a student misses the majority of the class due to a check-in or check-out, he/she will have that recorded as an absence.

**20**

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0402

6.  In case of prolonged absence (a week or more in the hospital), the parent/guardian should contact the school principal.

7.  Students are responsible for completing all "make-up" work.

II.  A serious illness or injury can keep students away from school for weeks. If a student has to miss two or more consecutive weeks, the parent should contact the school principal and the school district's special education coordinator. On a case by case basis, where the child cannot attend school for medical reasons (if documented by the proper authorities) special services may be provided on a temporary basis until the student can return to school.

III.  Tardiness, early check-outs or late check-ins: Students are required to report to their schools no later than the official beginning of the school day and to be on time in all classes during the day. Schools will devise procedures which will insure compliance with this regulation. Tardiness, late check-ins and check-outs are excused for the same reasons as absences. Tardiness, check-outs and late check-ins for any other reason is unexcused and may result in disciplinary action. For the purpose of denial of credit or promotion, three tardies, three check outs, or three late check-ins equals one unexcused absence.

IV.  Check-outs from School

1.  Students who leave school for any reason must check-out through the principal's office.

2.  Students may only be checked out by persons whose names appear on the student registration card unless the school receives permission in writing by the parent/guardian in advance. In an emergency situation wherein the school administrator is clearly convinced of the need through notification by proper officials, parents, or other known relatives of the student, the student will be allowed to check-out.

21

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0403

In cases where school officials suspect abuse of the check-out procedures by students and/or parents, the school principal may at his/her discretion restrict check-outs for specific students to situations where the parent must personally pick up the student at the time of check-out.

3.    Written permission is to be given by the parent/guardian or "emergency contact person" shown on the registration card before each checkout, except in cases of sudden illness, accident or similar incident where telephone confirmation is the only alternative.

4.    The nature of the checkout will determine whether the absence is excused.

5.    Checkouts are excused for the same reasons as absences.

6.    For the purpose of denial of credit or promotion, a student is considered absent if he/she is not in school for at least 50% of the school day. Regardless, high school students are subject to denial of credit on a class by class basis.

V.    Trip Permission

Any student making a trip under the sponsorship of the school is required to have written permission from the parent or guardian to participate in the trip. Students who leave school on the school bus must return on the school bus.  Any parent who does not wish for their student to ride a school bus for school activities must file a "Hold Harmless" release with the school system prior to the event.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0404

## Dress Code Information

VI.   Dress Code

The board is aware that personal dress and appearance constitute an individual expression, and within certain limits, wishes to allow students the freedom to express themselves in their own unique manner. The faculty and administration of each school shall encourage all students to be aware that dress and personal appearance may, in a very real manner, influence the image and attitude others come to assume of the student as an individual. Therefore, the Board shall require each student to consider reasonable judgement, tact, and decency in the selection of clothes for school and personal appearance. The administration of each school shall maintain authority in making subjective judgement concerning a student's dress and personal appearance.

The following guidelines are enforced for the health and well-being of all students:

1.   Footwear of some kind must be worn. Cleats and taps are not permitted in buildings. Flip flops are not permitted. Laces must be tied appropriately.

2.   Hats of any type are prohibited on all school property and on school buses during the school day, except on special occasions with the principal's permission ("Spirit" Day, dress-up day, field day). Special permission may be granted to students who because of medical reasons may need to wear a hat, cap, or other head apparel.

3.   Students may not wear rollers in their hair to school.

4.   Sunglasses are not permitted.

5.   Any clothing which contains an obscene message, encourages chemical dependency, advertizes tobacco or alcoholic beverages, or which contains racially insensitive language or symbols is not permitted.

23

6. The display of "colors" or gang-related paraphernalia, real or implied, is prohibited. This includes a bandanna, handkerchief, wristband, headband, or any other item which serves as a symbol for students belonging to a group which is not school-sanctioned.

7. Shorts/skorts/skirts will be permitted but must be worn in good taste. This clothing must not be so tight or short as to be offensive. As a general rule, shorts/skorts/skirts must extend no higher than three inches above the knee. The school administration shall be the final authority in determining what is acceptable in these cases.

8. Extremes are not permitted. Some examples are:

   a. Swim-wear
   b. Bare chests or abdomen showing (crop-tops)
      Clothing tops which expose the abdomen when the arms are raised are unacceptable.
   c. Clothing with holes that are designed to inappropriately expose parts of the body
   d. Underwear worn as outer clothing
   e. Muscle shirts without fitted arms
   f. Tank tops or spaghetti straps
   g. Footless tights or leggings may only be worn under approved outer garments. Tops to cover leggings should be dress length.
   h. Sweat pants
   i. Jogging pants without approved tops or which are tightly fitted
   j. Biking shorts
   k. Cut-off jeans, cut-off sweat pants, or jogging shorts
   l. Mini-skirts - measured in the same manner as shorts/skorts
   m. Any excessively tight fitting attire and sleeveless clothing tops. Undergarments will not be exposed.
   n. Pants worn loose and low on the hips (sagging).
   o. Wearing of clothing wrong side outwards.
   p. Shirt tails must be worn tucked in.

9. Any article of clothing or jewelry which compromises the safety and health of a student is prohibited.
   Examples:
   a. All belts must be buckled.
   b. Spiked articles or jewelry may not be worn.
   c. Rings must be designed for one finger only.
   d. Clothing or other items which could be expected to interfere with/or possibly cause accident to the student or others, particularly in the operation of equipment, shop machines, or in athletic or other physical activity.

10. Purses should not be larger than 8 inches by 10 inches.

11. Students participating in certain instructional areas may be subject to more restrictive dress requirements due to safety concerns.

In general, any garment, apparel, and/or any type of grooming which is so spectacular as to attract undue attention to the wearer, and which would tend to hamper the school in carrying on its regular schedule of activities, distract or disturb classes, interfere with the health of students, or disrupt the learning atmosphere in any way shall not be permissible. This includes any symbol, extra accessories, or ornaments that would be considered provocative, or would tend to promote student unrest as generally perceived.

## CONSEQUENCES FOR FAILING TO ADHERE TO THE DRESS CODE

First Offense:     The student will be sent to office. Upon this referral, parents will be called to either pick up the student, bring clothes for the student to change into, or the student may choose, if available, to wear school provided garments temporarily.

Additional Offenses:     Suspension 3-10 days or ALC assignment 5-10 days.

**Under no circumstances will inappropriately dressed students be allowed to remain in school.**

25

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0407

VI.    Student Organizations

While they are on school property or at any school sponsored events of the Pike County Public Schools, students are prohibited from participating in and/or recruiting membership for any club or organization which has not been approved and registered through the principal's office. Participation includes but is not necessarily limited to the wearing of club insignias or logos and/or exhibiting club signs, signals or language.

All sanctioned organizations must have a certified faculty sponsor, be governed by a set of written by-laws which have been approved by the school administration, be open to all students meeting membership requirements defined in the by-laws, and have a specific school related purpose such as community service or academic area promotion. All organizations must promote the school in a positive manner and any organization which fails to do this may have their sanction revoked.

VII.    Corporal Punishment Procedures/ISS/Alternative Learning Center (ALC)

A.    Corporal punishment may be administered after other measures, including counseling and/or parent conference, have not been effective and after the nature of the offense has been explained to the student.  In the event the student maintains that he/she is not guilty of the particular infraction, the principal will initiate an appeal of the paddling.  In this event, the parent will be immediately notified.  If the parent cannot be notified immediately, the principal will delay the corporal punishment and send written notification by the student to the parent notifying the parent to appear the next school day.  Upon talking to the parents and explaining the situation, the principal will proceed with the punishment, unless the parent signs a written objection.  If the parent signs a written objection, the principal may assign the student to ISS, the ALC, or suspend the student for an appropriate number of days, unless the parent and/or student have been able to prove that the child is not guilty.

B.    When necessary to administer corporal punishment, it must be done with the approval of the principal and administered by the principal or his/her designee, privately, and in the presence of another certified professional school employee, but not in the presence of the class or other students.  No more than three licks

26

shall be administered to the buttocks using the Board-approved paddle. (Shaking or slapping is not approved as a form of corporal punishment.)

C.    Corporal punishment may be administered as a form of discipline unless the parent/guardian files a written, dated objection with the school principal. It is the responsibility of the parent/guardian to see that the written, dated objection is submitted to the principal's office.

D.    ISS and the Alternative Learning Center are highly structured learning environments with additional rules and regulations which extend beyond this Code of Conduct. A parent or legal guardian must report with students to these locations on the first day of their assignment. The student and parent must sign a behavior contract upon their arrival the first day. Students are then expected to fully comply with the rules and regulations of this Code of Conduct, as well as, any ISS or Alternative Learning Center behavior contracts.

The ISS and Alternative Learning Center are not typical classrooms. All violations of the Code of Conduct or any behavior contract shall result in immediate referral to the Superintendent's Discipline Council and to the appropriate law enforcement agencies.

Parents are responsible for transporting students to and from the ALC.

The school hours for the ALC may differ than those of the student's home school. Students returning to their home school after completing ALC assignments must be accompanied by their parents and have in their possession the necessary admission paper-work from the ALC.

VIII.  Suspension Procedures

When it becomes necessary to suspend a student, notice of the charges against the student will be given and the student will have the opportunity to discuss the charges. A copy of the written documentation of the disciplinary action will be sent to parents/guardians with the student or will be mailed to the parent.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0409

A student may be suspended as follows:

1.  For a definite number of days (not to exceed 10).

2.  Pending a hearing before the Superintendent's Disciplinary Council (within 10 school days).

    a.  The parents will be notified by a certified letter as to the time, date and place of the hearing.

    b.  While the student is suspended, admittance is denied to any other schools in the system.

    c.  Student will be ineligible to attend or participate in extracurricular activities.

    d.  Parents must accompany students for a conference upon their return to school.

Parents/legal guardians **must** return with the student to school after suspensions for the student to be readmitted.  Students returning without parents/legal guardians are subject to additional disciplinary action.

The Pike County Board of Education will not admit students from other school systems who are not in good standing because of disciplinary problems.

IX.  Pregnancy

Pregnant students should follow their doctor's recommendations with regards to school attendance.  The school will not assume liability for accidents or injury to any pregnant student who does not seek and adhere to physicians' instructions or who endangers herself by participation in unhealthy, unsafe, or otherwise physically detrimental activities.

If a physician determines that it is necessary to place the student on homebound services before the delivery of the child, it is the student

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0410

and/or parents' responsibility to notify the school nurse. Failure to provide documentation for homebound services will result in loss of credit due to absences. Students placed on homebound services are responsible for completing all classroom assignments.

X.    Administration of Prescription Medication

The system has a procedure for administering prescription medicine to the students. This is on file in the principal's office. Parents/Guardians who request that school officials administer prescription medication to their child must contact the school, and provide a copy of the procedures for administering prescription medication. The approved protocol for the administration of all medications must be followed.

XI.    School Visitors: All visitors must report to the principal's office. Failure to do so may result in a charge of trespassing.

A.    All Parents/Guardians and Community Members

Parents and community members are invited and encouraged to visit the school but must sign-in at the school's main office.

1.    Conferences may be held with the school principal during the school day. <u>Depending on the schedule of the principal, these conferences may need to be scheduled through the school secretary.</u>

2.    Conferences with teachers may be held before or after school hours as scheduled through the school office or during their planning period. <u>Under no circumstance will instructional time be interrupted to conduct parent conferences.</u>

3.    Parents/Guardians should notify the school if a scheduled conference cannot be kept.

4.    Mutual courtesy and respect should be shown throughout the conference.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0411

5.  A parent-teacher conference should be attended only by the parents or guardian of the student, the student, and the teacher. If the parent(s)/guardian(s) desire to have other persons attend the conference, he/she should notify the school principal in advance of the conference giving the name(s) of the additional person(s) who shall be in attendance and the reason the person should be allowed to attend.

6.  Parents/Guardians and others wishing to visit the classroom should contact the school principal for permission.

B.  Disruptive visitors

Persons who become abusive or disruptive on school property will be required to leave campus and will be prosecuted to the fullest extent of the law.

All visitors to school campuses must report to the Principal's Office upon their arrival on campus. <u>For security purposes, all visitors must wear the designated visitor badges or stickers.</u>

School age friends, relatives, etc. of students may not attend school with students.

XII.  Distribution of Materials and/or Fund Raising

A.  The sale or distribution of any goods or materials on any school property by any individual or group of individuals is prohibited unless prior permission has been obtained from the principal of the school. Regulations as to acceptable types of materials, procedures, and time and place of distribution are to be secured from the principal.

B.  Fund raising activities must be scheduled in a way that will not interfere with instructional time.

30

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0412

XIII.   Inspection of School Property/Search of Persons and Vehicles

School officials reserve the right to inspect school property, including lockers, to insure the safety and security of the premises and pupils. Although a student may exercise exclusive control of his/her locker as opposed to access by fellow students, the control is not exclusive against school officials. Parking lots used by the school are considered school property. School officials reserve the right to conduct searches based on reasonable suspicion of vehicles on school property without notification to the owners or drivers of such vehicles. If there is reasonable cause to believe that a student is carrying articles that may endanger other individuals in the school or that such articles possessed are contrary to law or regulations of the Pike County Board of Education, the student may be searched in accordance with board policy.

Search dogs and metal detectors will be used to search on school property.

Surveillance cameras are used extensively throughout the school district. Surveillance coverage is wide spread in public areas inside and outside of the buildings. Cameras also provide coverage in some non-public areas where greater security is needed. Disciplinary action may result from actions by students viewed and/or preserved on security equipment.

The purpose of the district's surveillance program is to: discourage student misbehavior, discourage other inappropriate activities including criminal activity during the school day and after-hours, protect school system property, and to provide documentation should these activities occur. The district does not guarantee full coverage of all school activities and at its discretion may limit public or private viewing by third parties without subpoena.

Restrooms, dressing rooms, and classrooms are not covered by surveillance cameras. Camera placement on school buses depends on equipment availability.

XIV.  Textbooks

"...The parent, guardian, or other person having custody of a child to whom...textbooks are issued shall be held liable for any loss, abuse, or damage in excess of that which would result from the normal use of such

31

textbooks." (Alabama Code 16-36-32)
"...If such parent, guardian or person having custody of such child to whom the textbook was issued fails to pay assessed damages within 30 days of notification, such student shall not be entitled to further use of such textbook until remittance of the amount of loss or damage is made." (Alabama Code 16-36-32)

XV.  Safekeeping of valuables

Students are responsible for the safekeeping of valuables and should not leave books, clothing, wallets, purses or other valuables unattended.

XVI.  Fees

Certain laboratory fees, rental charges and deposits are authorized by the Pike County Board of Education in accordance with State law.

XVII.  Public Complaints

Parents/Guardians have the right to arrange a hearing with the principal on discipline matters if desired. At this hearing they have the right to ask any questions they wish, or to present witnesses or statements in the student's behalf.

Complaints and grievances shall be handled and resolved, whenever possible, as close to their origin as possible.

No member of the community shall be denied the right to petition the Board for redress of a grievance; however, the complaints shall be referred back through the proper administrative channels for solution before investigation or action by the Board. Exceptions are complaints that concern Board actions or Board operations only.

The Board advises the public that the proper channeling of complaints involving instruction, discipline, or learning materials is as follows:

1.  Teacher
2.  School Principal
3.  Superintendent
4.  Board of Education

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0414

Transportation:

1.  School Principal
2.  Transportation Supervisor
3.  Director of Finance & Operations
3.  Superintendent
4.  Board of Education

Any complaints about school personnel will be investigated by the administration before consideration and action by the Board.

XVIII.  Extracurricular Activity Participation – Academics First

All students in grades 7-12 wishing to participate in extracurricular activities must meet the academic standards outlined in 290-3-1.02 (17) of the Alabama Code. These include activities offered by the school through: math, science, band, choral music; and other conventions, parades, amusement parks trips and competitions, trips by tour companies, performances at various meetings, etc. Students who are not academically eligible under these provisions may not participate. In addition, student athletes must meet all requirements for participation outlined by the Alabama High School Athletic Association.

XIX.  Request for School Records and Special Services

Students and Parents must request records through the guidance office. This may be done by completing a record request form. The school system follows all federal and states laws pertaining to the release of student records.

All special education records must be requested through the special education office by calling 334.566.1850.

Requests for school officials to provide observation or health data for physicians or other individuals, public or private, must also be requested through the special education office. Parents should not make these requests directly to teachers.

33

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0415

## XX.   Emergency Procedures

The school system and each individual school has a school safety plan approved by the State Department of Education. The plans are comprehensive in that they provide for emergency responses by school officials as well as responses by outside agencies.

Parts of this plan describe look-down procedures and procedures for full evacuation of the affected campus. In these cases, the perimeter of the involved campus will be secured and traffic in and out of the campus will be restricted.

Parents should tune to WTBF Radio for emergency information. Parents should not report to the campus in these situations. When the lock-down is over the campus will be opened. If students have been evacuated from a campus, an alternative student pick-up location will be announced.

**Attention:**

**Underlined sections represent changes from previous Code of Conduct**

34

## SUPERINTENDENT'S DISCIPLINARY COUNCIL

The Superintendent's Disciplinary Council's purpose is to provide a formal due process hearing related to discipline matters referred by the schools. The decision of the Discipline Council is final unless the case is referred to the Pike County Board of Education.

Only Class IV offenses (see Code of Conduct File JDEA) will be referred automatically to the Superintendent's Discipline Council. If the recommendation of the Council is expulsion, the discipline case will be heard at the next regularly scheduled meeting of the Pike County Board of Education.

For Class IV offenses, the referring principals will provide to the parents (upon request) and to the Discipline Council hearing officer copies of all written documentation related to the student at the time of the request for a hearing. This includes a discipline history and other pertinent information (academic, etc.).

Offenses lower than Class IV may be considered for a due process hearing by the Superintendent's Discipline Council in accordance with the guidelines issued in this document. The referring principal will provide to the parents (upon request) and to the Discipline Council hearing officer copies of all written documentation related to the allegations against the student along with a disciplinary history and other pertinent information (academic, etc.) at the time of the request for a hearing.

All decisions of the Council may be appealed by the parents/legal guardian to the Pike County Board of Education. The rights of the student at this hearing include: the right to be present and participate in the meeting, the right for the parent(s)/legal guardian(s) to be present and participate in the hearing, the right to inspect any documents related to the discipline matter at hand, the right to be represented by a lawyer, and, at the expense of the student, to make a record or transcript of the proceeding.

These formal hearings will be video or audio taped for the purpose of maintaining a record of the hearing. All students will be photographed prior to the hearing. Photographs will be maintained in the student's central office discipline file.

35

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0417

The hearing officer will preside over the Discipline Council. The hearing officer may request the presence of law enforcement at these hearings and all participants are subject to search by metal detectors

## ATTENTION: PARENTS AND STUDENTS: BUS SAFETY

Riding the school bus is a privilege. It is not guaranteed by law. Parents must help students understand the importance of that privilege. That is, only appropriate behavior will be accepted.  Parents and students must understand that the bus driver's task is to get student to and from school in a safe manner. Misbehavior on the bus places all students on the bus in danger. As such, bus misconduct will not be tolerated. Each School Principal and/or their designee will move quickly and efficiently in accordance with the Student Code of Conduct to remove students from buses who insist on compromising the safety of others.

**Bus Misbehavior:**  Misbehavior on Buses or Other Motor Vehicles

1. If a student initiates/commits an infraction on a bus or other vehicle to such an extent that the driver must stop the vehicle to restore order, that student shall be deprived of the privilege of riding the bus or vehicle for a minimum of six weeks. Class Four infractions shall subject the student to a minimum privilege loss of no less than six months. More than six months may be assessed by the Superintendent's Disciplinary Council upon the recommendation of the principal for first-time infractions which are extremely severe in nature, particularly brutal or vicious physical attacks, use of weapons, or failure to obey the driver in a potentially dangerous situation.

5. Buses are considered extensions of the classroom. All classes and categories of disciplinary offenses shall be applied accordingly by bus drivers when documenting and reporting bus misbehavior. The school administration is responsible for all decisions related to bus discipline matters.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0418*

## Appendix A: Due Process Procedures

FILE: JCAA

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short and long term suspension, or expulsion are applied. Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

**PURPOSE:**
The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on Education Amendments of 1972 or the Rehabilitation Act of 1973. These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

**DEFINITIONS:**
A grievance is a complaint by any member of the professional staff, the non-professional staff, or the student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

**PROCEDURE:**
Each level of the procedure shall be observed and used with normal order of proper channels. If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

**STUDENT GRIEVANCE PROCEDURE:**

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (334) 566-1850 between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days (except in case of denial of credit: 10 days) of receipt of the request. If the grievance is resolved at

-1-


JR v. Pike County BOE
Produced by Defendant PCBE
No. 0419

this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level conference, the student shall file, within five days, with the next level of the administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of the administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the Superintendent of Education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of Education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the Board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommendation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regards to any allegations that the System has violated the statutes described above.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0420

-II-

## CERTIFICATION OF RECEIPT
## PIKE COUNTY BOARD OF EDUCATION
## STUDENT CODE OF CONDUCT

I certify that I have received and read a copy of the Student Code of Conduct.

School attending                           Grade

Student's signature                        Date

Parent's signature                         Date

If you should have any questions or comments pertaining to the contents of The Code, please contact your child's principal.

**PLEASE TEAR OUT THIS PAGE AND RETURN IT TO YOUR TEACHER OR PRINCIPAL.**

**37**

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0421*

# APPENDIX A

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0461

Appendix A:  Due Process Procedures

FILE: JCAA

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short and long term suspension, or expulsion are applied. Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

PURPOSE:
The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on Education Amendments of 1972 or the Rehabilitation Act of 1973. These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

DEFINITIONS:
A grievance is a complaint by any member of the professional staff, the non-professional staff, or the student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

PROCEDURE:
Each level of the procedure shall be observed and used with normal order of proper channels. If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

STUDENT GRIEVANCE PROCEDURE:

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (334) 566-1850 between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days (except in case of denial of credit: 10 days) of receipt of the request. If the grievance is resolved at

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0462*

this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level conference, the student shall file, within five days, with the next level of the administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of the administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the Superintendent of Education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of Education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the Board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommendation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regards to any allegations that the System has violated the statutes described above.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0463

JEAB

## PIKE COUNTY BOARD OF EDUCATION
## NOTICE FOR DIRECTORY INFORMATION

The Family Educational Rights and Privacy Act (FERPA), a Federal law, requires that Pike County School System, with certain exceptions, obtain your written consent prior to the disclosure of personally identifiable information from your child's education records. However, Pike County School System may disclose appropriately designated "**directory information**" without written consent, unless you have advised the Pike County School System to the contrary in accordance with Pike County School System's procedures. The primary purpose of directory information is to allow the Pike County School System to include this type of information from your child's education records in certain school publications. Examples include:

- A playbill, showing your student's role in a drama production;
- The annual yearbook; video production;
- Honor roll or other recognition lists;
- Graduation programs; and
- Sports activity sheets, such as for wrestling, showing weight and height of team members.

Directory information, which is information that is generally not considered harmful or an invasion of privacy if released, can also be disclosed to outside organizations without a parents/guardians prior written consent. Outside organizations include, but are not limited to, companies that manufacture class rings or publish yearbooks. In addition, two federal laws require local educational agencies (LEAs) receiving assistance under the Elementary and Secondary Education Act of 1965 (ESEA) to provide military recruiters, upon request, with three directory information categories - names, addresses and telephone listings – unless parents have advised the Pike County School System that they do not want their student's information disclosed without their prior written consent.

If you do not want the Pike County School System to disclose directory information from your child's education records without your prior written consent, you must notify the Pike County Board of Education in writing by December 1, 2003. Pike County School System has designated the following information as directory information: [Note: An LEA may, but does not have to, include all the information listed below.]

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0464*

- Student's name
- Participation in officially recognized activities and sports
- Address
- Telephone listing
- Weight and height of members of athletic teams

- Electronic mail address
- Photograph
- Degrees, honors, and awards received
- Date and place of birth
- Major field of study
- Dates of attendance
- Grade level
- The most recent educational agency or institution attended

The name and address of the person administering the Notice for Directory Information for the Pike County School System:

Karen T. Berry, Administrative Assistant
Pike County Board of Education
101 W. Love St.
Troy, Al 36081
334-566-1850, ext. 117.

~urce:
. adopted:
Legal Reference: 20 U.S.C. 7908
                 P.L. 107-110, 10 U.S.C. 503, P.L. 107-107

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0465

# PIKE COUNTY BOARD OF EDUCATION
## NOTIFICATION OF RIGHTS FOR ELEMENTARY AND SECONDARY SCHOOLS

The Family Educational Rights and Privacy Act (FERPA) affords parents/guardians and students over 18 years of age ("eligible students") certain rights with respect to the student's education records. These rights are:

1. The right to inspect and review the student's education records within 45 days of the day the Pike County School System receives a request for access. Parents/guardians or eligible students should submit to the appropriate school principal, a written request that identifies the record(s) they wish to inspect. The school principal will make arrangements for access and notify the parents/guardians or the eligible student of the time and place where the records may be inspected

2. The right to request the amendment of the student's education records that the parents/guardians or eligible student believes are inaccurate or misleading. Parents/guardians or eligible students may ask the Pike County School System to amend a record they believe is inaccurate or misleading. They should write the school principal, clearly identify the part of the record they want changed, and specify why it is inaccurate or misleading. If the Pike County School System decides not to amend the record as requested by the parents/guardians or eligible student of the decision and advise them of their right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided to the parents/guardians or eligible student when notified of the right to a hearing

3. The right to consent to disclosures of personally identifiable information contained in the student's education records, except to the extent that FERPA authorizes disclosure without consent. One exception, which permits disclosure without consent, is disclosure to school officials with legitimate educational interests. A school official is a person employed by the Pike County School System as an administrator, supervisor, instructor, staff member (including health or medical staff and law enforcement unit personnel); a person serving on the Pike County School Board; or a person or company with whom the Pike County School System has contracted to perform a special task (such as an attorney, auditor, medical consultant, school psychometrist, or therapist). A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility. Upon request, the

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0466

Pike County School System discloses education records without consent to officials of another district in which a student seeks or intends to enroll.

[NOTE: FERPA requires a school district (LEA) to make a reasonable attempt to notify the parents/guardians or eligible student of the records request unless it states in its annual notification that it intends to forward records on request.]

4. The right to file a complaint with the U.S. Department of Education concerning alleged failures by the Pike County School System to comply with the requirements of FERPA. The name and address of the office that administers FERPA:

Family Policy Compliance Office
U. S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-4605

Karen T. Berry, Administrative Assistant
Pike County Board of Education
101 W Love St.
Troy, Al 36081
334-566-1850 ext.117

Source:
Adopted:
Legal Reference:  20 U.S.C.  S. 1232g. S. 1232g

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0467*

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Rev. Earnest Green, President
Wyman Botts, Vice President
W. Greg Price
Adam Register
Herbert Reynolds
Linda Steed

**Dr. Mark Bazzell**
Superintendent



Dear Parents:

In response to the *No Child Left Behind Act of 2001*, please note that you may request, and this school system will provide upon your request, information which specifies the qualifications of your child's current classroom teacher(s) and the qualifications of any paraprofessional who is directly involved in the instruction of your child. If you would like to request this information, please contact me at (334) 566-1850. Our response to your request will be timely.

Our school system will also provide you with specific information regarding your child's level of achievement, as reflected on the most current state academic assessments. Please contact the guidance counselor or the principal at your child's school for this information.

You are your child's first and most important teacher and our school system continues to encourage your involvement and active participation in the education of your child. I thank you for your involvement and for your continuing support of our school system's efforts to provide the best educational opportunities for your child.

Sincerely,

*Carolyn Baker*

Carolyn Baker
Administrative Assistant for
Curriculum and Instruction

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0468

# Parent's Guide to Section 504 of the Rehabilitation Act

**What is Section 504?**

Section 504 of the Rehabilitation Act is a civil right act prohibiting discrimination based on disability. It was enacted to eliminate barriers that exclude persons with disabilities. Section 504 applies to all agencies that receive federal funds, including public schools, federal agencies, and places of public accommodation. In the Pike County School System, all staff and administrators have the responsibility of insuring that all students with disabilities are identified, evaluated and provided with needed accommodations and services, resulting in a free appropriate public education (FAPE). Section 504 is enforced by the U.S. Department of Education, Office of Civil Rights.

Public school districts have the duty to provide a free appropriate public education to all qualified disabled students. A FAPE must include an education designed to provide educational benefit despite the child's disability; it must be at no cost to the parent; and it must be provided in an environment that affords the greatest exposure to non-disabled peers.

**What is the difference between eligibility for IDEA and Section 504?**

Section 504 is a civil rights act, mandating equal access, whereas the Individuals with Disabilities Education Act (IDEA), commonly referred to as special education, is an education law which provides individualized educational programs and additional services beyond what is available to persons without disabilities. IDEA covers children within specific groups of disabilities and degrees of impairment. Unlike services offered through IDEA, school districts receive no additional federal or state funding under the Section 504 mandate.

**Who is a student with a disability under 504?**

Section 504 protects an individual who has, had, or is perceived as having a physical or mental impairment which substantially limits one or more major life activities, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working. It protects students when their disabilities limit their ability to attend, participate in, or receive benefit from their education. These provisions protect individuals with disabilities far beyond those covered by IDEA, and they also protect every student who is eligible for IDEA.

Section 504 does not specifically list qualifying disabilities although it does list examples. These include: diseases and conditions involving orthopedic, visual, speech, and hearing impairments; cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, drug addiction and alcoholism. HIV/AIDS, learning disabilities, ADD/ADHD, cystic fibrosis, severe allergies and asthma, among others, have also been recognized. In all cases the focus is on the extent to which the impairment limits a major life activity and whether the individual is unable to perform an activity that the average person in the general population can perform. Some students with these disabilities may be covered by IDEA, but only if they meet certain criteria.

**What are some examples of discriminatory practices prohibited by Section 504 in a school setting?**

- Penalizing a student whose absenteeism is related to disability;
- Not providing accessible transportation for a student who uses a wheelchair for field trips and school sponsored activities;
- Expelling a child for behavior related to a disability;
- Not permitting a student with a disability to participate in intramural or other non-academic activities;
- Not providing interpreters for deaf students who want to participate in school activities;
- Refusing to allow a child with a disability the opportunity to audition for athletic teams or other extracurricular activities;
- Not providing an interpreter for a deaf parent to attend a school meeting.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0469

Identification of Students Eligible under Section 504

If, as a parents/guardians, your child has a chronic condition or you suspect he/she may have a disability, you should inform your child's teacher, principal, or local school 504 coordinator. Following the referral, the school's 504 team will convene to implement the eligibility process. If a child is experiencing chronic problems at school, and if interventions which have been implemented have been unsuccessful, and the school or parent suspects a disability, the school has an obligation to refer the child for an evaluation.

What is an evaluation under Section 504?

Evaluations to determine 504 eligibility are different than evaluations required by Special Education. For purposes of Section 504, an evaluation means reviewing information from a variety of sources. This typically includes teacher reports, grades, standardized test scores, attendance and discipline reports, information from parents and medical providers, etc. The 504 team must include individuals who are knowledgeable about the child, the type of disability, the evaluative data being reviewed, and accommodation options. Obviously, parents should play an important role in the process. Parents are always notified when a referral for evaluation is made on a child. If the 504 team determines that there is not sufficient information to make a determination, or the team believes the child may be eligible for services under IDEA, a referral for an evaluation through Special Education is made.

It is not uncommon for a school to receive a doctor's letter stating that a student has a disability and needs certain accommodations. While the school always considers the recommendations of doctors or other professionals who work with the child, it remains the school's responsibility to review multiple sources of information to determine 504 eligibility and to implement any necessary accommodations for the student. Simply having an impairment does not automatically qualify a student under Section 504.

If a student is found to have a disability under Section 504, the team will make an individualized determination of the student's educational needs and an accommodation plan will be developed. Section 504 mandates services and placement in the least restrictive environment and most accommodations are provided in the regular classroom. Eligibility status and 504 plans are generally reviewed annually.

What are some examples of accommodations?

Accommodations are "adjustments" that are designed to minimize the impact of a disability and meet the unique needs of the student. There is no "list" of approved accommodations. They are determined individually for each child. Examples might include preferential seating to minimize distractions for children with attention/concentration difficulties; assisting a student with diabetes in monitoring his/her blood sugar levels; providing extra time or a quiet setting for exams; providing extensions on assignments; changes in attendance requirements for children with chronic health problems; or substituting physical education requirements for children whose physical impairments impact their ability to participate.

When is a 504 Plan inappropriate?

- When a student has a diagnosed disorder but is functioning well academically and is making adequate progress without accommodations, the student does not meet the criteria for 504 eligibility. This might include a student who is doing well in school but may not be working to potential; a student who a parent feels could be making A's rather than B's; or a student who only experiences difficulty in one subject area.
- When a plan is created only to support a request for extended time on College Board exams (SAT's, ACT's).
- When a student is eligible for services under IDEA but parents prefer Section 504 services.

What rights do you have under Section 504?

You have the right to:
- Have your child take part in, and receive benefit from, public education programs without discrimination based on disability.
- Have the school advise you of your rights under federal law.
- Receive notice and examine records with respect to identification, evaluation, programming, or placement of your child.
- Have your child receive a free appropriate public education. This includes the right to be educated with other children to the maximum extent appropriate. It also includes the right to have the schools make reasonable accommodations to allow your child an equal opportunity to participate in school and school-related activities.

- Have your child educated in facilities and receive services comparable to those provided to children without disabilities
- Have your child receive special education and related services if he/she is found to be eligible under the Individuals with Disabilities Education Act (IDEA), or to receive accommodations under Section 504 of the Rehabilitation Act.
- Have evaluation, educational, and placement decisions made based upon a variety of information sources, and by individuals who know the child, disability, evaluation data, and placement options.
- File a local grievance with your school if you feel your child is being discriminated against based on disability.
- Request a due process hearing and/or the assistance of a mediator to help resolve issues with the school.
- File a formal complaint with the regional Office for Civil Rights.

**What can I do if I have a complaint regarding Section 504 implementation?**

Most concerns and complaints parents may have can be resolved within the school by working with the principal, local school 504 coordinator and other school staff to reach a joint resolution of the issue(s). Should the issue not be resolved and you wish to file a 504 complaint, follow the guidelines outlined in the Pike County Board of Education's Section 504 and ADA manual. Copies of these procedures are available at each school, the ADA/504 Coordinator for the Pike County Board of Education, and on the website for Pike County Schools. Complaints can also be filed directly with the Office of Civil Rights.

**Who is my school contact for information about Section 504?**

A local Section 504 Coordinator has been assigned at each school to address your questions and concerns about Section 504. There is also a Pike County Board of Education ADA/504 Coordinator who is available to provide assistance and information.

The Pike County School System does not discriminate against anyone in the school system on the basis of race, age, marital status, creed, color, sex, disability or national origin. Pike County School System will not tolerate discrimination, harassment, or violence against anyone, including students and staff members, regardless of race, ethnicity, gender, sexual orientation, age, disability or religion.

Questions, complaints, or requests for additional information regarding the district's nondiscrimination policy should be forwarded to:

**Karen T. Berry**
**Pike County Board of Education**
**101 West Love Street**
**Troy, Alabama 36081**
**Phone (334) 566-1850**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0471

CERTIFICATION OF RECEIPT
PIKE COUNTY BOARD OF EDUCATION
STUDENT CODE OF CONDUCT

I certify that I have received and read a copy of the Student Code of Conduct.

School attending                               Grade

Student's signature                            Date

Parent's signature                             Date

If you should have any questions or comments pertaining to the contents of The Code, please contact your child's principal.

PLEASE TEAR OUT THIS PAGE AND RETURN IT TO YOUR TEACHER OR PRINCIPAL.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0472**

# PIKE COUNTY BOARD OF EDUCATION
## GIFTED EDUCATION PROGRAM

Gifted students are those who perform at high levels in academic or creative fields when compared to others of their age, experience, or environment. These students require services not ordinarily provided by the regular school program. Students possessing these abilities can be found in all populations, across all economic strata and in all areas of human endeavor.

A student may be referred by teachers, counselors, administrators, parents or guardians, peers, self, or any other individual with knowledge of the student's abilities. Additionally, all second grade students will be observed as potential gifted referrals using a gifted behavior checklist.

For each students referred, information is gathered in the following three areas:

1. *Aptitude*. Assessed through an individual or group test of intelligence or creativity.
2. *Characteristics.* A behavior rating scale designed to assess gifted behaviors is completed by a classroom teacher.
3. *Performance*. At least three indicators of performance at a gifted level such as achievement test scores, grades, products, work samples, and/or portfolios.

The scores from the assessments/items used are entered on a matrix where points are assigned according to established criteria. The total number of points earned determines if the student qualifies for gifted services.

For more information contact Karen T. Berry, Special Education Coordinator
Pike County Board of Education, 101 W. Love Street, Troy, Alabama 36081
Phone 334-566-1850 ext. 117

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0473

PLAINTIFF'S
EXHIBIT
3

# PIKE COUNTY SCHOOL SYSTEM

# ESSENTIAL

# ADMINISTRATIVE

# INFORMATION

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0313

## 2006 – 2007 SCHOOL YEAR

## TO ALL ADMINISTRATORS

This document is not all-inclusive.  It does, however, contain certain directions, board policy, and administrative directives which are to be followed.  This publication may be considered to be a type of handbook to be used in consort with the board policy manual.  Any conflict should defer to board policy.

Please thoroughly read the document and immediately report any errors or omissions directly to the superintendent so that corrections may be disseminated as soon as possible.  Questions and concerns should be addressed to the superintendent.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0314

PIKE COUNTY SCHOOL SYSTEM

ESSENTIAL ADMINISTRATIVE INFORMATION

1. OPENING SCHOOL INFORMATION

The opening day of school is Wednesday, August 9, 2006 (Institute is August 3, 2006 and will be held at the Cattlemen's Building on 231). Teacher Inservice and Workday will be held August 4, 7 and 8 respectively. Schools will remain in session for two-thirds of the day on the 9th. Meals will be served. Principals must insure that six hours of instruction, exclusive of breaks and recess, are provided each day for all children. Schools shall be classified, for convenience purposes, as follows:

> Pike County High School (PCHS) and Goshen High School (GHS)
> *Main or High school campuses.*
> Banks Schools (BS) {Includes Banks Primary Campus – BPS} and Goshen Elementary School (GES) Pike County Elementary School (PCES) – *Feeder campuses.*

Dismissal times for GHS and PCHS will be 3:06 p.m. daily and 12:30 p.m. for any two-thirds days scheduled (First day, last day, two parent conference days, and December 20).

Feeder schools should plan their dismissal times according to the main campus dismissal times allowing for time for the buses to leave or arrive before the 3:06 high school dismissals. These times will be different for each high school and feeder campuses.

Ideally, buses should be arriving at the appointed pick-up zones designated for each campus when students are dismissed. No children are to be allowed out of doors prior to the buses arriving (with the exception of those who drive/walk with approval of a written plan by the superintendent.)

Any deviation from the above shall only be approved in writing from the superintendent's office, or orally in the case of emergency situations, e.g. bad weather.

A memorandum showing the 2006-07 Bell Schedules for all schools and bus pick-up and departure sequences will be published separately.

2. ADMINISTRATOR'S MEETINGS:

Administrator's Meeting are held the second Wednesday of each month at the Central Office. These meetings begin promptly at 8:30 AM and last until all agenda items are covered. Attendance is mandatory. Attendees should include: All administrative assistants, supervisors, coordinators, and principals.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0315*

3.  <u>BOARD MEETINGS:</u>

Meetings of the Pike County Board of Education are generally held on the second Monday of each month in the board room at the Central Office at 5:30 PM. On occasion, meeting dates are moved as are beginning times. Also, on occasion, special meetings are held. Regardless, all meetings are announced well in advance as required by law. All administrative assistants, supervisors, and principals are expected to be in attendance.

4.  <u>REPORT CARD/CONFERENCE DAYS:</u>

Report Card/Conference Days are held the first Thursday after the end of first and third nine weeks. These are 2/3 days for students and 1 ½ days for teachers. Teachers dismiss at 7:30 PM. Parents are required to pick-up report cards at the school unless the principal determines that some circumstance exists that makes this unreasonable. In cases where elementary classes are departmentalized and in cases of all middle school and high school students; arrangements should be made that requires and verifies that parents have circulated among all teachers prior to picking up report cards from the homeroom teacher.

Under no circumstances, should additional hours worked on these date by employees who are classified as non-exempt employees under wage and hour laws result in the accumulation of overtime.

5.  <u>POLICY MANUAL:</u>

The Pike County Board of Education expects all personnel to follow board policy. Official board policy is contained in the district's policy manual. Administrators should refer to this manual in all cases when policy questions arise. A thorough knowledge of the district policy is required for all administrative staff. Hard copies of policy manuals are provided and on-line versions will be available by Fall of 2006.

6.  <u>CLOSING SCHOOL INFORMATION:</u>

Schools (students) will dismiss on May 24, 2007 at 12:30 p.m.  All nine-month employees will work the next day, May 25, 2005, until the end of the regular work day unless special notice has been issued from the office of the superintendent.

Principals should insure that all students return textbooks and other school property in the condition in which it was distributed considering reasonable wear on the item.

Teachers and other employees who have been distributed system property such as keys, calculators, roll books, grade books, teacher edition textbooks, and other system property, must account for and return said property in good condition or working order less consideration for reasonable wear.  Employees are responsible for any equipment, supplies, or machines which have been given into their care.  Principals and supervisors, as part of their end-of-school checklist, must reconcile the local school or department inventory with all items returned.  Lost or damaged items may be charged to employees depending upon the specific circumstances.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0316

7. SCHOOL OR INSTRUCTIONAL FEES

The Code of Alabama prohibits the collection of instructional fees for required courses or general fee required of all students. Instructional monies are provided by the legislature to take the place of these sorts of fees. The law regarding fees states, in part,

> It is the intent of the legislature that no fees shall be collected in the future for courses required for graduation [this means elementary courses too]. Reasonable fees may be required for laboratory and shop courses except those required for graduation.

A reasonable fee may be charged for elective courses. Fee rates must be approved by the superintendent. Under no circumstance should students be denied admission to any program of study due to financial hardship.

8. ELEMENTARY CLASSROOM SUPPLY LISTS

The district provides uniform elementary classroom supply lists by grade level. These are published on the district's web-site for review. Supply lists may not be modified at the local school level.

9. STUDENT HANDBOOKS

Each principal shall distribute handbooks for every student each year. Handbooks shall contain essential, pertinent, and informative data relative to student conduct, expectations, system and local school regulations, and other information useful in helping the students and parents understand the operation of the system and school. All school rules must conform to state, federal, and system law, policy, or procedure. Every effort will be made to allow local schools latitude in formulating rules felt to be needed at the local level, but any conflict will defer to federal, state, or local board law, policy, or procedure. The district also provides student planners for this purpose.

10. ASSEMBLIES, DAILY ACTIVITIES

The holding of local school assemblies is encouraged. It is recommended, particularly in elementary schools, that monthly themes be developed and assigned to all faculty members so that each faculty member has partial responsibility for program presentation. Assemblies should be used for instruction of students in good group and individual behavior and manners, recitation of the Pledge of Allegiance correctly (i.e. "... one nation under God..." {no comma after the word "nation"}), singing of patriotic songs, building of school spirit, and the like.

Principals should schedule a daily time, preferably at the beginning of the day, when students are able to voluntarily participate in the Pledge of Allegiance. Having the student body president, or other appropriate student, to lead the pledge over the intercom is appropriate.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0317

The Code of Alabama requires the display of the United States and Alabama State flags on a daily basis while school is in session.

## 11. SYSTEM HANDMAIL

Each Tuesday and Thursday, vans will deliver system communications and handmail as well as supplies which are not too heavy or bulky for the van drivers to lift. Principals are responsible for having mail bags ready when the drivers arrive and for insuring that communications are routed to the proper employees in an expeditious manner. A stop will be made at each campus. Principals must have a designated place for the mail bags to be delivered and picked up.

## 12. MAILBOXES AT THE CENTRAL OFFICE

Mailboxes for each school, administrator, supervisor, and other departments within the system are maintained for convenience and communication in the reception area of the central office. Each person who has a mailbox should routinely check his or her mail insure that dated materials are reviewed or distributed as needed. Every effort is made to place mail from local school mailboxes in the bi-weekly handmail delivery pouches to expedite delivery of dated material and for convenience of local school personnel.

## 13. INSURING THAT COMMUNICATIONS ARE EFFECTIVELY DISTRIBUTED

Principals and supervisors are responsible for insuring that verbal and written communications are properly and effectively given out to appropriate employees. General communications and instructions should be posted in a pre-arranged place known to all employees as the place where such information will be posted. Faculty and staff should be reminded periodically to read bulletin boards (or the designated place) on at least a weekly basis. Job vacancies will be posted in the above manner at each campus as well as the central office.

Each employee has been provided system e-mail accounts and mail should be checked several times daily. The districts web-site and web-portal is also used frequently to distribute information.

## 14. USE OF TECHNOLOGY FOR COMMUNICATIONS

All school administrators are expected to be proficient in the use of technology. Administrators should check their e-mail throughout the day on a regular basis since it is a frequently used method of communication.

## 15. EMPLOYEE SIGN-IN SHEETS

All employees must either sign or clock-in and out when reporting to and leaving from work. A central place, usually the office, for signing-in shall be designated by the principal or supervisor. Previous memoranda regarding the Fair Labor Standards Act and other local regulations have dealt in detail with clocking in and out as well as proper use of time sheets. Principals or supervisors who do not have said memoranda should immediately request copies so that faculty and staff are knowledgeable of and follow prescribed regulations.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0318

16. REPORT OF PROPERTY DAMAGE OR PHYSICAL ASSAULT

A report of property damage from any source must be filed with the superintendent as soon as is practicable following such damage. Vandalism, break-in's, theft, and burglary are also to be reported immediately to the proper police authorities. A copy of the police report is also to be filed with the superintendent in case insurance coverage applies. State law requires that the superintendent file a report to the sheriff of all assaults by students against teachers/administrators. A report of physical attacks by students upon school employees should be filed with the superintendent by the principal within five days of the assault.

17. PAYROLL AND OTHER REPORTS

The principal of each school is responsible for insuring that the various reports regularly due to the superintendent's office arrive on time and are accurate. It is essential that payroll report be not only accurate but also received on the date specified by the bookkeeping department because inaccurate or delayed reports could cause an employee to either not receive a check on time or that the check is not calculated in the correct amount. The principal must coordinate with his or secretary/bookkeeper to make sure that the reports are submitted correctly and on time.

Requests for other information will be sent from time to time. It is expected that these requests will be expeditiously completed. Every effort is made to keep these requests limited to only the information which the central office cannot compile itself or those requested from outside agencies such as the SDE.

18. SECURITY PLAN FOR LOCAL SCHOOLS

Each principal shall develop and submit to the superintendent a School Safety Plan developed with input from appropriate faculty and staff. The plan should address, at a minimum, areas of concern as follows and must meet SDE requirements:

a. Building security
b. Grounds security and surveillance
c. Property protection (personal property of students, faculty, staff, visitors)
d. Personal safety (students, faculty, staff, visitors, including a plan which addresses how substitutes will be made knowledgeable of the plan; must include how the administration and teachers will deal with student intimidation (bullying), coercion, and gangs)
e. Evacuation plans for fire, tornado, and bomb threats, or any other condition which warrants leaving the building – schools with gymnasiums and stadiums should include a plan for these facilities.
f. Listing of the responsibilities of each employee.
g. Safety at special activities including athletic events.

Faculty and staff need to be thoroughly familiar with the plan and students should be provided necessary information in handbooks. Evacuation plans are to be posted in prominent places in each classroom and work place.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0319

## 19. FUND-RAISING ACTIVITIES

Fund-raising activities are allowed by each school. As a general rule, principals should not enter into agreements with vendors in which the school receives less than approximately forty percent of the return on sales. Preferably, this figure should be fifty percent or more. Vendors should be thoroughly reviewed to determine their reliability, past performance, ability to meet deadlines and manage contingencies, and stability, among other things. No fund-raising activity may interfere with instructional time. All receipts from sales must be receipted by the person receiving the cash/checks and in turn receipted at the local school office by the secretary/bookkeeper, and these funds are to be deposited to the local school account. The amount due to vendors is to be paid as per pre-arranged agreements upon receipt of itemized invoices. A proper accounting of the receipts is required by the system. Forms are available from the central office. Under no circumstances are the total funds collected from sales for these various projects to be remitted to the vendor for distribution back to the school.

## 20. LOCAL SCHOOL AUDITS

Each local school will be audited by the State Examiners of Public Accounts annually. Principals are responsible for the accuracy of bookkeeping and accounting records and insuring that applicable state law and board policies are adhered to with respect to proper bookkeeping procedures. Each principal and secretary/bookkeeper is expected to fully cooperate with the auditors selected by furnishing required documents, signing applicable forms, and submitting books in a timely manner.

Upon receipt of the annual audit, each principal is to submit to the superintendent a report which will include, at the minimum, a statement of concurrence or exception to the audit findings on a case-by-case basis, a statement of how audit exceptions will be corrected or amended, and an explanation of why continued (year-to-year) audit exceptions recurred.

## 21. OUT-OF-DISTRICT ENROLLMENT

Only students who reside in Pike County outside of the Troy City limit, or who receive permission from the board for an interdistrict transfer, may attend Pike County Schools, except as noted below. Principals should report, in writing, all students who are attending school in another public school district but whose residence is in Pike County. It is the responsibility of the principal to verify the residence of each child attending his or her school. Verification must be done using criteria established in the Lee v. Macon County Consent Decree.

Students who move from the Pike County School District may continue to attend only under one of the circumstances as follows:

1. The student is in the ninth grade or above and has been attending for two or more years.

2. The student's parents request and receive permission from the superintendent for reasons explicit in the system federal court order.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0320

3.   The student's parents request and receive an interdistrict transfer from the board of education.

## 22. ATHLETIC ELIGIBILITY/NO PASS – NO PLAY

All secondary schools are responsible for determining the eligibility for each student who participates in Alabama High School Athletic Association-approved sports. Although eligibility lists are not required to be submitted to the AHSAA beginning with the 1993-4 school year, each participant school in this system is still required by local procedure to develop eligibility lists for each sport in which it participates and submit these to the principal and athletic director, if applicable. These reports are the first-line responsibility of the head coach for each sport and the overall responsibility of the principal. All eligibility reports should be checked separately by the coach and by the principal. No student will be allowed to participate in an Alabama High School Athletic Association-sanctioned endeavor until eligibility is verified by the coach and principal.

In the case where an eligibility (or other) violation is determined, the principal should immediately report such violation to the superintendent and in turn to the AHSAA.

Prior to participation students and parents must sign participation forms which clearly spell out specifically that participation may result in "catastrophic injury or death."

All students must have had a medical doctor's approval to participate prior to participation. Doctor shopping is strictly prohibited.

Participation includes practices, summer workouts, etc.

No Pass, No Play policy also involves students participating in other activities. This includes band as well as all other co-curricular activities. Principals are expected to enforce these policies.

## 23. KINDERGARTEN – FIRST GRADE ELIGIBILITY

Kindergarten – A child whose fifth birthday is on or before September 2nd is eligible to enroll in kindergarten.

First grade – A child whose sixth birthday is on or before September 2nd is eligible to enroll in first grade.

## 24. ENROLLMENT – SOCIAL SECURITY NUMBER, IMMUNIZATION CERTIFICATE, OTHER INFORMATION

To enroll in school, a child must present a birth certificate (certified copy or original,) a blue immunization certificate (or appropriate waiver), a social security card, and proof of residence address. Students transferring from other systems must present appropriate proof of grade level as well as the above.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0321

### 25. ATTENDANCE REPORTS

Principals are responsible for insuring that reports are accurate and submitted on time.

### 26. COMPULSORY ATTENDANCE

Principals should make students and parents aware of the state compulsory attendance law which requires regular attendance of all school age children between the ages of 7 and 16. Pike County Board of Education attendance requirements should also be made known to students and parents, i.e. even though a student is sixteen or over, regular attendance is required.

Principals are responsible for assigning the local school staff necessary to manage record keeping associated with maintaining accurate attendance records, including student excuses, etc. The procedures for clearing unexcused absences should be clear to students, parents, faculty, and staff.

Students who do not attend regularly shall be reported to the system's Truancy Intervention Program who will in turn coordinate any required action with other local officials, namely District Court and Juvenile officials.

Principals are to report any suspected non-enrollment of school age children to the superintendent. Children, enrolled last year, who are not enrolled by the end of the first full week of school, and who have not transferred, withdrawn, or moved their place of residence are to be listed together with their parent's names and last known address.

### 27. TOBACCO AND DRUG-FREE WORK ENVIRONMENT

The board has issued a proclamation which guarantees that students and employees shall have a drug-free environment. The ban against drugs and alcohol includes any use of any tobacco products by any student or school employee while on school property or at school events.

### 28. USE OF SCHOOL BUILDINGS FOR NON-SCHOOL PURPOSES

School facilities may be used by non-school connected parties for non-school purposes only by the interested party completing, and having approved, a school facility lease form. Principals should keep these forms on hand at the local school office for distribution to interested parties. All applicable information must be completed prior the superintendent's approval. Amounts of payment for use of the facilities and hiring of school personnel (lunchroom worker or janitor), as specified in the lease form, must be agreed upon by all parties prior to the submittal of the form to the superintendent. Board Policy KGH regulates non-routine use of kitchen and serving facilities and requires that a CNP employee be paid to be on hand when non-routine use of kitchen facilities and serving areas is undertaken. Principals should familiarize themselves with this policy and the instructions contained in the lease form.

No admission fees, use fees, assessments of attendees, or similar fee, is to be charged by the party making use of the facility except that in the case of voluntary donations to help defray the cost of the use of the facility and payment of school personnel is permitted for

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0322

11

such functions as family and class reunions. The intent of this procedure is to prohibit non-school entities from using school facilities for money-making activities. Any deviation from the above must be approved by action of the school board.

29. SCHOOL MEALS

Breakfast and lunch will be served at all elementary schools. High schools, after determination of anticipated participation, may opt to have breakfast if it is in the best interest of the children and will not interfere with maintaining a profitable lunch program. Prices of meals are as follows:

|  | Student | | Adult |
|---|---|---|---|
|  | Reduced price – full price | | |
| Breakfast - | $ .30 | $ .70 | $1.10 |
| Lunch - | $ .40 | $1.25 | $2.00 |

Cost of à la carte items will be approved by the board periodically. The CNP supervisor will provide a cost list of à la carte foods to each lunch room as the menu is approved.

Principals are reminded that strict federal regulations apply to FDA meal programs. Specifically, among others, the names of students who eat a free or reduced-price meal may not be published or otherwise publicly made known. Schools are to follow, without deviation, the prescribed meal procurement plan as set forth from the office of the superintendent, Child Nutrition Program section. All funds received for the CNP may not be commingled with any other funds.

Free and reduced price meal forms must be processed within ten days after receipt. Principals are to insure that forms are checked for accuracy before assigning free or reduced price status. No child may eat free or reduced-price meals unless a meal application is approved. At the beginning of school, last year's list may be used temporarily until new forms are received and approved or for a ten-day period.

Students may not "charge" their lunch!

30. COMPETITION WITH CHILD NUTRITION PROGRAM MEALS

Principals are reminded that sale of food items for breaks cannot interfere with the breakfast and lunch programs. No child may purchase snacks for break and take them into the cafeteria in lieu of participating in the school food services programs. Carbonated soft drinks and carcinogenic snacks are prohibited for sale at elementary schools. Sale of all snacks at high schools may only be carried out if the sale of snacks does not interfere with the participation of students in the school food services meals. Violation of the rule could subject the school to loss of FDA funds or repayment of such funds from the school general fund.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0323

### 31. MAINTENANCE REQUESTS/REPORTS

Maintenance requests shall be submitted to the Maintenance Department in the manner specified. Emergencies may be reported by telephone to either the central office or the Maintenance Department. General, non-emergency repairs will be prioritized by the maintenance department and assigned to a maintenance Team for action. Concerns over the efficiency of maintenance work should be directed to Mr. Tom Hicks, Director of Finance and Operations.

Procedures for requesting maintenance work will change during the 05-06 school year. The system will be using a web-based program and training will be provided in advance of implementation.

### 32. REPORT OF INJURY TO STUDENTS, STAFF, OR VISITOR, OR INCIDENT

The principal must file a report of injury to any person which occurs on his or her campus or as a result of or participating in any school related function whether on campus or not. The report shall be on system-approved forms, if applicable, and shall contain a narrative of requisite data pertaining to the incident. At a minimum, the report must include the full name of the person (if a student, full name of the parent as well), address of the person, telephone number, witnesses to the incident including written statements from the witnesses, date and time of occurrence, name of teacher supervising the child, and statement from said teacher.

Reports of on-the-job injury claims for employees should also include applicable reports from physicians, hospitals, emergency rooms, or other germane reports. Medical doctor costs, and any other connected costs, should be included as well.

### 33. TEXTBOOKS

Textbook funds are allocated to each school and each school is subsequently responsible for completing orders. Orders should be returned to the Central Office to be processed Delivery will be completed prior to the beginning of school. Shortages of textbooks should be immediately reported to the Instructional Support Administrative Assistant, Mrs. Elizabeth Grubbs. However, additional funding will not be approved unless extreme and unforeseen circumstances exit.

Textbooks must be used for a number of years. It is essential that administrators instruct teachers in the proper care of textbooks and that this information is passed on to students. The proper way to break-in new books, how to attach a book cover (paper grocery bags can be used if other covers are not available), and general rules for caring for books should be emphasized.

In the event that students lose or abuse the textbooks assigned to them, the principal should, after adequate time to locate lost books, bill the parents for the cost of the book based upon its value per state regulations. Defacing, marking, or other destruction of textbooks will also be charged to students. Inspection of books by teachers with appropriate reporting procedures should be carried out on at least a mid-semester and year-end basis.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0324

34. UNDERLINE PROCEDURE FOR RECOMMENDATION TO SUPERINTENDENT FOR EMPLOYMENT OF PERSONNEL

Administrators who are in direct-line supervisory positions who are the chief administrative employee for their system sub-unit (i.e. principal, local school, Chapter I, special education, day care, etc.) are to observe procedures for recommendation for employment of personnel to the superintendent as follows:

1. Confirm with the superintendent that a position availability exists.

2. Verify the qualifications required for the position. *NOTE: Code of Alabama, §16-23-1 prohibits the employment of any professional (certified) person unless that person holds a valid Alabama certificate.*

3. Verify that applicant is Highly Qualified under NCLB.

4. After reviewing the existing file of applicants at the central office, select those applicants who meet the qualifications and interview each one. In the event an applicant cannot be reached, is employed, or otherwise is no longer interested in employment in this system, the application is to be given to the central office receptionist who will properly file the application.

5. Upon selection of the candidate for recommendation, the administrator should review his/her recommendation, the application packet, etc. with the system's personnel director, Mrs. Elizabeth Grubbs.

6. Upon approval of Mrs. Grubbs, the administrator should contact the superintendent to arrange an interview for the selected applicant.

7. Following the interview process, a letter recommending the selected applicant is to be submitted to the superintendent. The letter must list each applicant interviewed as well as those who the administrator attempted to interview. A succinct summary of why the administrator feels that the applicant selected should be employed should be included in the letter.

8. If the superintendent concurs with the recommendation, the applicant, together with the supporting documentation, will be submitted to the board for approval. If the superintendent does not concur, the administrator will be notified to select another applicant.

9. If the board approves the employment of the applicant, the superintendent will notify the employee in writing of his or her approval. If the board does not approve, the superintendent will notify the administrator to submit another applicant, or other appropriate procedure, for the next board meeting.

10. There is to be no deviation to this procedure. Administrators are to bear in mind that all documentation must be submitted to the superintendent no later than 3:00 p.m. on the Wednesday preceding the Monday board meeting. (i.e. four days preceding the board meeting.)

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0325

11.    Administrators are reminded that all job vacancies, except in extreme emergencies as determined by the superintendent, must be posted for fourteen days or more prior to board action.

### 35. ASBESTOS IN SCHOOLS

According to federal regulations, schools are required to notify patrons and employees, on an annual basis, of any asbestos laden materials which may be in the local school work or classroom areas. This may be accomplished by including it in the Student/Parent/Teacher Handbook, by sending appropriate approved correspondence home with children, or other approved notification as prescribed in federal regulations.

Each school must have on permanent file a copy of its Building Asbestos Report. This report details the location of all materials containing asbestos. No renovation, remodeling, installations, demolition, or any manner or form of disturbing of the materials noted in the Report may be undertaken without first receiving approval to proceed from the system Asbestos Supervisor, Mr. Mike Johnson.

### 36. SCHOOL BOARD/CENTRAL OFFICE PERSONNEL/LOCAL SCHOOL RELATIONS

School board members and central office personnel are to be made welcome upon their visitation to school campuses. Principals and teachers should carry on duties during these visitations as the periodic visitations by these personnel are not intended to disrupt school activities. At the specific request of board members or central office personnel, principals may accompany visitors as needed provided that essential duties are not interfered with. In no case should instructional time be sacrificed during such visitations. Specific requests from board members or central office personnel for any variation to this procedure are to be routed through the superintendent.

### 37. PARENT/STUDENT/TEACHER/PRINCIPAL RELATIONS

Board employees are expected to represent the board in a respectable, professional manner at all times. Parents and students are the only reason that the school system is in existence and they should at all times be treated with the utmost respect and courtesy.

Principals and teachers are to "go the extra mile" in attempting to resolve conflicts with parents and students. As our patrons, parents and students should be afforded the benefit of the doubt when applying rules and regulations. This is not to say that rules should be broken or even bent, but to insure that our patrons are treated fairly and consistently.

Teachers and principals should use good common sense in dealing with patrons. Specifically, school personnel should not "play favorites" or allow privileges for a few at the exclusion of others. All students and parents must be given the same courtesies and fair treatment.

Conflicts with students and parents should be resolved at the lowest administrative level, beginning with the classroom teacher. One of the most important aspects of communication, and one of the most provocative omissions, is the art of listening to the concerned party. Many problems can be resolved, even if the patrons do not agree with the ruling of the school personnel, by simply giving them "their day in court."

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0326

However, should parents or students become abusive or threatening, school personnel may take reasonable steps to protect themselves and others. Threats of bodily harm should be taken seriously and the proper authorities notified. Physical assaults against school personnel may be defended against with appropriate, reasonable countermeasures by school personnel.

All school personnel should remember Our Promise to provide Friendly and Courteous Service. All departments, offices, etc. should provide prompt and efficient operations.

Instructional time must be protected at all times. Parent meetings/conferences may not be scheduled during instructional time. Faculty are expected to make themselves available before and after school to meet with parents. Faculty should make regular contact with parents.

## 38. WORKING HOURS

Teachers are to report to their work site by designed starting time as provided for on the system bell schedule. Principals should arrive prior to teachers to have buildings opened, grounds checked, and otherwise insure that all is ready and secure for the instructional day.

Teachers, unless otherwise specified in their contract, are to work until 3:30 p.m. (or to the time specified by the superintendent on non-routine days). Principals should insure that all buildings are secure and that everything is in order prior to leaving each day. Generally, principals should not leave school prior to 4:30 p.m. Obviously, there are special occasions and events which will require that the principal either stay significantly later or return to school. Principals and teachers should bear in mind that they need to work whatever time it takes to accomplish their assigned tasks.

Principals may not grant special arrangements to accommodate and faculty or staff member.

## 39. LEAVING SCHOOL DURING WORK DAY

Unless permission has been granted by the superintendent or through board action, all employees are expected to remain on campus until the conclusion of the work day. Employees should bring with them all materials, supplies, meals, and the like, which they will need to complete their assigned duties. No employee or student is allowed to leave school to purchase a meal, or to send students to pick up meals, as this activity places undue liability upon the system. Should a student or employee not wish to eat the meals provided by the school, he or she may bring a meal rather than purchasing a school-prepared meal.

With the express, written permission of parents, students may leave under certain school-sanctioned circumstances. Field trips; class activities; band, choral, academic, or athletic competition or activities; checking out from the school office after arriving at school (subject to local school and system rules), are some valid reasons for leaving school. Such permission must fully indicate that the parents understand why the student is leaving school and contain the signature of the parent or guardian. Students are permitted to leave with parents or guardians only, or, with another adult relative with the express

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0327

written consent of the parents or guardians. In special circumstances, as determined by the principal, a student may leave with someone other than a relative if the parent or guardian provides verified written permission or the principal or assistant principal personally speaks with the parent or guardian and receives his or her verbal permission. This verbal permission will be reduced to written form and kept on file with the other written permission as noted above.

**All administrators must notify the Central Office when they are leaving campus for any reason or are going to be absent from work.**

40. CONTACT BY ATTORNEYS OR EMPLOYEE REPRESENTATIVES

Should an administrator be contacted by an attorney, employee representative (AEA UniServe representative or others), insurance adjusters, news media reporters, or similar individuals from outside the school system, these individuals are to be informed that they should contact the superintendent for permission to speak with the requested employee. School system personnel are under no obligation to explain, justify, or otherwise discuss board policy, system procedures, local school procedures, or other possibly sensitive information. If contacted by any of the above individuals, the administrator, after directing the person to contact the superintendent's office, needs to inform the superintendent as soon as possible as to the requested information providing any pertinent documentation which might clarify the situation.

In case of contact by attorneys or AEA personnel, particularly regarding on-going litigation, threatened litigation, employee grievances, or other similar situations, no employee is to respond to questioning by any of the aforementioned individuals without express permission from the superintendent. This is quite simply to ensure that no conflicting statements or erroneous information is given from several different employees.

Upon receiving clearance from the office of the superintendent, those noted above may meet with employees, provided that the employee voluntarily agrees to meet.

41. PEPE:

PEPE observations must be completed in accordance with local and state procedures and guidelines each year. Central Office staff will perform unscheduled observations on non-tenured faculty.

42. PDPs:

Professional Development Plans must be on file for all certified employees. PDPs must be formulated in accordance with PEPE requirements.

43. FIRE AND TORNADO DRILLS:

Fire and tornado drills must be conducted monthly in accordance with state law. Procedure for these emergencies should be reviewed periodically with faculty, staff, and students. Evaluation routes must be posted in all classrooms.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0328

43. ACADEMIC PERFORMANCE:

High expectations should be communicated. The district expects that each school's level of performance on state assessments will increase. Administrators (Building Level Principals) must take a personal interest in seeing that this occurs. Improvement will not occur if administrators are not monitoring to ensure that quality instructional presentations are being provided. Instructional time must be protected and steps should be in place to monitor teacher planning and curriculum alignment as well as numerous other practices and methods. Teacher made assessments should frequently mirror state assessments.

44. SIC/EIC/IIC:

SIC is known as the Secondary Instructional Committee. This committee meets when necessary to discuss issues related to secondary (7-12) instruction. Local school principals and guidance counselors may not arbitrarily add or delete new course offerings, modify scheduling parameters, change promotional criteria, or change graduation requirements.

EIC is known as the Elementary Instructional Committee. . This committee meets when necessary to discuss issues related to elementary (K-6) instruction. Local school principals may not arbitrarily modify elementary instructional offerings, add new programs, modify scheduling time requirements, change promotional criteria, modify report card formats, etc.

Decisions related to secondary and elementary instruction evolve from work in SIC and EIC. In most cases, these changes also require board approval.

IIC is a committee comprised of faculty representatives from each school as well as school administrators and central office personnel. Its purpose is to provide a forum for teachers and administrators to directly communicate with central office personnel and the superintendent on matters of concern. It meets in the central office boardroom at 3:00 pm the first Monday of each month while school is in session. In addition, the district publishes a Connections and Board Biz Newsletter which is distributed in this meeting and subsequently provided by IIC members to each school's faculty and staff.

45. REQUEST FOR TRAVEL OUT OF STATE AND OVER NIGHT:

All out-of-state travel and travel by faculty and/or students involving over night stays must be approved in advance. Requests should be submitted through the school principal to the Central Office for inclusion on the agenda at a board meeting prior to the travel. No retro-active requests will be approved.

46. INTERNET USE POLICY AND TECHNOLOGY POLICY:

Forms are provided for all employees and students with access to computers. These forms must be signed and maintained in a secure location as directed by Marvin Jackson, System Technology Coordinator.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0329

47. <u>OVERTIME:</u>

All overtime must be approved in advance by the superintendent.

48. <u>TEACHER ORIENTATION AND COACHING:</u>

The district provides all new employees with district level orientation prior to the beginning of each school year. Principals are responsible for scheduling orientation sessions prior to the beginning of each school year with employees new to their campus. Discussion should include issue related to specific school campus sites. Each new employee should be assigned a coach who is willing to advise and mentor new employees. Principals should monitor the infusion of new personnel into their schools and be willing to answer questions and provide support.

49. <u>SUPERVISION OF STUDENTS:</u>

Principals should make every effort to ensure that professional staff has been assigned monitor and supervise students though out the school day.

50. <u>DISTRICT EMERGENCY CODE:</u>

All system administrators, supervisors, and coordinators must be familiar with the district's emergency response plan and crisis codes. All incidents should be reported as directed. Local school administrators should take steps to designate an office staff member to make crisis code reporting to the central office when it can not be made by the principal due to the nature of the emergency. However, only a school principal or assistant principal may make a code determination. In cases, where principals are not assigned to schools, principals may designate a certified staff member to make these determinations in the absence of the principal.

**The district's Emergency Response Plan and Crisis Codes are provided in the back of this manual.**

51. <u>SYSTEM ORGANIZATIONAL CHART:</u>

The district is organized into specific functions. Its purpose is to provide all interested parties with information on who to obtain information and advice from. Additionally, it provides employees with specific lines of authority and responsibility. All personnel are expected to follow the "chain of command."

**The district's organizational chart is provided in the back of this manual.**

52. <u>END OF YEAR PERSONNEL RECOMMENDATIONS:</u>

Each year, the superintendent will establish a deadline for submission of end-of year personnel recommendations. The principal, after consultation with system administrative assistants, the superintendent, and/or others involved in the supervision and monitoring specific employees, will make the final decision. In regard to teachers, decisions should

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0330*

be based on the individuals ability to provide quality instructional opportunities for students. In the case of non-renewals, principals and supervisors are hearby directed to not provide "reasons" for non-renewal. This is not required by law and to do so creates liability for the school district. As such, discussions with employees about their status prior to non-renewal (and giving a "reason" after non-renewal), or discussion with employees, community members, and board members concerning the status of personnel prior to the written employment recommendation and subsequent board approval shall be deemed "unprofessional conduct" and shall result in disciplinary action.

Principals are expected to have the courage to stand by their decisions and must be prepared to justify their decisions using various forms of documentation.

53. "SENIOR TRIPS AND OTHER NON-SANCTIONED ACTIVITES:

The school district will not sanction trips nor assume liability for students post-graduation and/or any student on summer activities such as this that are non-curricular. This includes summer athletic campus not approved by the board and/or superintendent.

Such trips may not be organized and planned at school nor may monies be collected through the school. If a trip is planned outside of school and involves board employees serving as organizers or chaperones, parents must be advised in writing by the principal that the activity is not a school sanctioned event and the district will bear no responsibility for accident, injury, or death occurring as a result of participation in the trip. Also, I am directing that this be delivered by principals personally or that personal contact with the parents of each ex-student (ie Senior Trips) or current student to be sure they have received a copy of the letter.

Faculty or staff members should be advised by principals of the same. The district will not assume any responsibility for students and faculty and staff. Chaperones who are board employees should also be advised that they are personally and individually responsible and will be provided no protection through the district.

54. HOLD HARMLESS LEASE AGREEMENTS

Hold harmless lease agreements must be completed and signed by all parties prior to principals or other certified staff allowing school property or facilities to be used by non-school employees during or after school hours.

55. LOANS, LEASES, AND CONTRACTS

School personnel, including principals, may not enter into contracts of any type without the express written consent of the superintendent and approval of the board of education. Local school spending must be in compliance with all local, state and federal laws. Questions concerning bid laws should be directed to the superintendent. Local schools may not expend over $7500.00 to any vendor during the fiscal year.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0331*

PLAINTIFF'S
EXHIBIT
4

# Pike County Schools

## High School
## Student Planner
## 2004-2005

### Banks Middle School
### Banks, Alabama

### Goshen High School
### Goshen, Alabama

### Pike County High School
### Brundidge, Alabama

_____
Name

_____
Homeroom

_____
School

# Pike County Schools

*101 West Love Street*
*Troy, Alabama 36081*
www.pikecountyschools.com

## 2004-2005
# High School Student Planner

*Banks Middle School*
*Banks, Alabama*

*Pike County High School*
*Brundidge, Alabama*

*Goshen High School*
*Goshen, Alabama*

_____
Name

_____
Home Room

_____
School

1

## ACCREDITED BY

Alabama State Department of Education
and
Southern Association of Colleges and
Secondary Schools

## ADMINISTRATION

Dr. Mark Bazzell
Superintendent

Carolyn Baker
Administrative Assistant

Karen Berry
Administrative Assistant

Elizabeth Grubbs
Administrative Assistant

## BOARD OF EDUCATION

Mr. Adam Register, President

Mrs. Linda Steed, Vice-President

Mr. Wyman Botts, Member

Rev. Earnest Green, Member

Mr. W. Greg Price, Member

Mr. Herbert Reynolds, Member

## SUPERINTENDENT'S MESSAGE

Welcome to the Pike County School System. We are glad to have you in attendance at one of our schools for the 2004-2005 school year. We hope you will find this school year to be one that is both exciting and memorable.

Communication and cooperation are essential and toward that end we encourage you to read this student/parent handbook thoroughly. The handbook answers many questions you may have about our academic programs, co-curricular and athletic activities, the school system's expectations concerning student conduct, and school policies and procedures.

The student/parent handbook will be helpful to you throughout the school year. The handbook is provided to assist students and parents in several ways. First, by communicating the information cited in the previous paragraph, as well as, other important information. And secondly, by providing each student a calendar for the school year and a student planner. We have found that students perform best when they organize well and we hope that students take advantage of these items in the handbook.

The Pike County School System is committed to its goal of providing both challenging and exciting educational opportunities to its students in a safe and caring environment. Our staff will continue to work hard to help students be the best they can be and we hope they will take advantage of the wonderful opportunities available through our school.

2

PIKE COUNTY BOARD OF EDUCATION
2004-2005 ATTENDANCE CALENDAR

| Month | Month Begins | Month Ends | Days on Roll Students | Teachers |
|---|---|---|---|---|
| 1st | August 4, 2004 (Teacher Institute – August 4, 2004) (Teacher Inservice – August 5, 2004) (Teacher Workday – August 6, 2004) (First Day for Students -- August 9, 2004) | September 3, 2004 | 20 | 23 |
| 2nd | September 7, 2004 (Labor Day – September 6, 2004) | October 4, 2004 | 20 | 20 |
| 3rd | October 5, 2004 (Intersession – October 11-15, 2004) (Report Cards/Conference Day – Students ½ Day – Teachers 1½ Day – October 21, 2004) | November 8, 2004 | 20 | 20.5 |
| 4th | November 9, 2004 (Veterans' Day – November 11, 2004) (Thanksgiving – November 24-26, 2004) | December 10, 2004 | 20 | 20 |
| 5th | December 13, 2004 (Christmas Holidays begin December 22, 2004) (Intersession – January 3-4, 2005) 12-month employees return – January 3, 2005 Teachers return – Teacher Workday/Inservice – January 5, 2005 Students return – January 6, 2005 (King/Lee Day – January 17, 2005) | January 25, 2005 | 20 | 21 |
| 6th | January 26, 2005 (Presidents' Day – February 21, 2005) | February 23, 2005 | 20 | 20 |
| 7th | February 24, 2005 (Intersession – March 14-18, 2005) (Spring Break – March 21-25, 2005) (Report Cards/Conference Day – Students ½ Day – Teachers 1½ Day – March 31, 2005) (Teacher Appreciation Day on March 31 – All Schools) | April 6, 2005 | 20 | 20.5 |
| 8th | April 7, 2005 | May 4, 2005 | 20 | 20 |
| 9th | May 5, 2005 | May 26 (students) May 27 (teachers) | 16 | 17 |
| | | | 176 | 182 |

| | | |
|---|---|---|
| Wednesday | August 4, 2004 | Teacher Institute |
| Thursday | August 5, 2004 | Teacher Inservice |
| Friday | August 6, 2004 | Teacher Workday |
| Monday | August 9, 2004 | 1st Day for Students (2/3 Day) |
| Monday | September 6, 2004 | Labor Day |
| Friday | October 8, 2004 | Ends First Nine Weeks |
| Monday-Friday | October 11-15, 2004 | Intersession |
| Monday | October 18, 2004 | Begins 2nd Nine Weeks |
| Thursday | October 21, 2004 | Report Cards/Conference Day (Students ½ Day / Teachers 1 ½ Day) (Teachers leave at 7:30 p.m.) |
| Thursday | November 11, 2004 | Veterans' Day |
| Wednesday-Friday | November 24-26, 2004 | Thanksgiving Holidays |
| Tuesday | December 21, 2004 | Ends 2nd 9 Weeks / 1st Semester (2/3 Student Day) |
| Wednesday-Friday | December 22-31, 2004 | Christmas Holidays |
| Monday-Tuesday | January 3-4, 2005 | Intersession |
| Monday | January 3, 2005 | 12-Month Employees Return to Work |
| Wednesday | January 5, 2005 | Teachers Return – Teacher Workday/Inservice |
| Thursday | January 6, 2005 | Students Return – Begins 2nd Semester/Begins 3rd Nine Weeks |
| Monday | January 17, 2005 | King/Lee Day* (Not a holiday for 12-month employees) |
| Monday | February 21, 2005 | President's Day* (Not a holiday for 12-months employees) |
| Friday | March 11, 2005 | Ends 3rd Nine Weeks |
| Monday-Friday | March 14-18, 2005 | Intersession |
| Monday-Friday | March 21-25, 2005 | Spring Break |
| Monday | March 28, 2005 | Begins 4th Nine Weeks |
| Thursday | March 31, 2005 | Report Cards/Conference Day - Teacher Appreciation Day - All Schools (Students ½ Day / Teachers 1½ Day) (Teachers leave at 7:30 p.m.) |
| Thursday | May 26, 2005 | Last Day for Students (2/3 Day)    (Goshen High Graduation) |
| Friday | May 27, 2005 | Last Day for Teachers    (Pike County High Graduation) |

| | | |
|---|---|---|
| First Nine Weeks | August 9 – October 8 | 44 days |
| Second Nine Weeks | October 18 – December 21 | 43 days |
| Third Nine Weeks | January 6 – March 11 | 45 days |
| Fourth Nine Weeks | March 28 – May 26 | 44 days |
| | | 176 |

3

## MESSAGE TO PARENTS

You may best assist the Pike County Schools in meeting the educational needs of your son/daughter by:

- Making a special effort to know your child's teachers.

- Studying each mid-term and nine weeks grade report carefully and contacting the school if you have any questions.

- Making an appointment to discuss your child's progress. (Please schedule ahead by calling the school secretary for these appointments.)

- Assisting the school with monitoring your child's attendance.

- Reading the information in this planner as well as fully understanding the separate policies, procedures, and operations of the school, which are located in the Student Handbook.

# GET INVOLVED!
# "School is a Community Affair."

*Elizabeth Grubbs*
*Pike County Board of Education*
*Community Education Coordinator*

## High School Bell Schedule

## 2004-2005

| | | | |
|---|---|---|---|
| 7:30 A.M. | Teachers Report to Work | 15 min. | |
| 7:45 – 9:15 A.M. | First Block | 90 min. | 1 Term |
| 9:15 – 9:30 A.M. | Break | 15 min | |
| 9:30 – 11:06 A.M. | Second Block | 96 min. | 1 Term |
| 11:11 – 1:05 P.M. | Third Block | 96 + 18 = 114 min. | 1 Term |
| 1:10 – 2:40 P.M. | Fourth Block | 90 min. | 1 Term |
| 2:40 – 3:30 P.M. | Teacher Planning | 50 min. | All year |

4

# Pike County High School



## 2004 Football Schedule

| **Date** | **Opponent** | **Location** | **Time** |
|----------|--------------|--------------|----------|
| August 20 | Charles Henderson | Home | 7:30 |
| August 27 | Booker T. Washington | Home | 7:00 |
| September 3 | W.S. Neal | Home | 7:30 |
| September 10 | Headland | Away | 7:30 |
| September 17 | Slocomb | Home | 7:30 |
| September 24 | Bullock County | Home | 7:30 |
| October 1 | Abbeville (*Homecoming*) | Home | 7:30 |
| October 8 | Dale County | Away | 7:30 |
| October 15 | T.R. Miller | Home | 7:30 |
| October 22 | Straughn | Away | 7:30 |
| October 29 | Elba | Home | 7:30 |

## *PIKE COUNTY HIGH SCHOOL*
## *ALMA MATER*

*On the rolling plains of Dixie*
*High above the rest*
*Proudly stands our Alma Mater*
*Dear P C H S*
*To thy name we'll sing and honor*
*Hearts that love you true*
*Pledge to thee our loyal service*
*All the ages through*
*Pike County High School, Pike County High School*
*Loud our praises be, Hail to thee our Alma Mater*
*Hail, oh hail to thee  God our father hear our prayers*
*May we stand the test*
*We will ever serve and honor*
*Ever do our best*
*All with joyful echoes murmur*
*Pike County High we praise*
*Sons as yet unborn shall hail thee*
*In the coming day.*

# Goshen High School



## 2004 Football Schedule

| Date | Opponent | Location |
|------|----------|----------|
| August 27 | Red Level | Home |
| September 3 | Brantley | Home |
| September 10 | McKenzie | Away |
| September 17 | Pleasant Home | Away |
| September 24 | R. C. Hatch | Home |
| October 1 | Zion Chapel | Away |
| October 8 | Ariton | Home |
| October 15 | Kinston | Home |
| October 22 | Florala | Away |
| October 29 | Montgomery Catholic | Away |

## *GOSHEN HIGH SCHOOL ALMA MATER*

*Goshen High Alma Mater,*
*Thy name we'll e'er cheer,*
*For you've guarded six years*
*Of our youth.*
*You have shown us the way*
*To form friendships so dear,*
*And have pointed the*
*Pathway to truth.*

*We have given our hopes all*
*Of our loyalties*
*To maintain higher*
*Standards for you.*
*May the gold never tarnish,*
*The purple ne'er fade,*
*'Til the dreams of our youth*
*Have come true.*

6

# HIGH SCHOOL
# DIPLOMA AND CERTIFICATE OPTIONS

## HIGH SCHOOL DIPLOMA

### Minimum Core Academic Requirements:

| Grade 9 | Grade 10 | Grade 11 | Grade 12 |
|---|---|---|---|
| 2131 English | 2141 English | 2151 English | 2161 English |
| 2234 World Hist/Geo | 2250 US History I | 2251 US History II | 2261 Gov/Eco |
| 2331 Physical Science | 2341 General Biology | 2352 Tech Bio/Chem | 2371 Env. Sci. |
| 2431 Algebra I | 2441 Geometry | 2443 Algebraic Connections | 2444 Algebra II |

**A maximum of one math and one science credit may be earned as an embedded credit. (See policy for issuance of embedded credit.)**

### Additional Requirements:

| | | | |
|---|---|---|---|
| 2500/2525 | Physical Education | 1 unit | Recommended 9th Grade |
| 2501 | Health | 1 unit | Recommended 10th Grade |
| | Fine Arts | 1 unit | Recommended 10th or 11th Grade. Must be acquired through a music related or visual arts elective. |
| 2618 | Computer Applications | | This computer applications requirement will be fulfilled in the 8th grade. This course will include a career exploratory & discovery component. |

| | |
|---|---|
| Total Academic Units Required | 19 Units |
| Total Elective Units Required | 11 Units |
| Total All Units Required | 30 Units |
| Total Units Available | 32 Units |
| Total Units Available Above Required | 13 Units |

**DUAL ENROLLMENT OPTION AVAILABLE FOR QUALIFIED STUDENTS.**

**STUDENTS MUST MEET ALL CARNEGIE UNIT REQUIREMENTS IN ORDER TO PARTICIPATE IN COMMENCEMENT CEREMONIES.**

# ADVANCED HIGH SCHOOL DIPLOMA

## Minimum Core Academic Requirements for Advanced Academic Endorsement:

| Grade 9 | Grade 10 | Grade 11 | Grade 12 |
|---|---|---|---|
| 2133 Hon Eng 9 | 2143 Hon Eng 10 | 2153 Hon Eng 11 | 2163 Hon Eng 12 |
| 2231 World Hist/Geo | 2250 US History I | 2251 US History II | 2261 Gov/Eco |
| 2331 Physical Science | 2343 Hon Biology | 2351 Chemistry | 2361 Physics or 2362 Anatomy |
| 2431 Algebra I | 2441 Geometry | 2451 Algebra II/Trig | 2461 PreCalculus or 2463 Algebra III with Stats |

**SPECIAL NOTE: EMBEDDED CREDIT MAY NOT BE APPLIED TOWARD THE ADVANCED ENDORSEMENT. TECH PREP (APPLIED) COURSE WORK MAY NOT BE APPLIED TOWARD THE ADVANCED ENDORSEMENT.**

## Additional Requirements:

| | | | |
|---|---|---|---|
| | Foreign Language | 2 units | Recommended 9th & 10th Grade Students may choose Spanish or Latin |

|  |  |  |  |
|---|---|---|---|
| | | 2730 Spanish I | 2740 Latin I |
| | | 2731 Spanish II | 2741 Latin II |

| | | | |
|---|---|---|---|
| 2500/2525 | Physical Education | 1 unit | Recommended 9th Grade |
| 2501 | Health | 1 unit | Recommended 10th Grade |
| | Fine Arts | 1 unit | Recommended 10th or 11th Grade Must be acquired through a music related or visual arts elective. |
| 2618 | Computer Applications | | This computer applications requirement will be fulfilled in the 8th grade. This course will include a career exploratory & discovery component. |

| | |
|---|---|
| Total Academic Units Required | 21 Units |
| Total Elective Units Required | 9 Units |
| Total All Units Required | 30 Units |
| Total Units Available | 32 Units |
| Total Units Available Above Required | 11 Units |

**DUAL ENROLLMENT OPTION AVAILABLE FOR QUALIFIED STUDENTS.**

**STUDENTS MUST MEET ALL CARNEGIE UNIT REQUIREMENTS IN ORDER TO PARTICIPATE IN COMMENCEMENT CEREMONIES.**

## SPECIAL NOTICE CONCERNING GRADE REQUIREMENTS FOR STUDENTS SEEKING ALL ADVANCED ACADEMIC ENDORSEMENTS

- Students must successfully pass all core academic courses (English, mathematics, science, social studies, and foreign language) with a grade of "C" or better for the unit to count toward advanced credit.

- Also, students must pass with a "C" or better in order to proceed to the next course in the advanced academic sequence in a particular subject area.

- Students who score below a "C" have two options.

Option 1:

The student may re-take the course under the course substitution rule. In this case, the course may be repeated. If the student scores above a "C", this course will count toward advanced credit. The substituted course, if passing, but below a "C" will be converted to elective credit.

Option 2:

The student may choose to have the course count for credit toward "The Alabama High School Diploma." In this case, the student should consider carefully his/her final diploma choice selection. It is possible that it will be necessary for students to change their diploma option.

# OCCUPATIONAL DIPLOMA

## Minimum Academic and Occupational Requirements:

| Grade 9 | Grade 10 | Grade 11 | Grade 12 |
|---|---|---|---|
| 2911 English 3 | 2911 English 3 | 2911 English 3 | 2911 English 3 |
| 2921 Social Studies 3 | 2921 Social Studies 3 | 2921 Social Studies 3 | 2921 Social Studies 3 |
| 2931 Science 3 | 2931 Science 3 | 2931 Science 3 | 2931 Science 3 |
| 2941 Math 3 | 2941 Math 3 | 2941 Math 3 | 2941 Math 3 |
| 2964 Job Skills | 2964 Job Skills | Career Technical Education Courses Total - 3 | |

## Additional Requirements:

| | | | |
|---|---|---|---|
| 2500/2525 | Physical Education | 1 unit | Recommended 9th Grade |
| 2951 | Health 3 | 1 unit | Recommended 10th Grade |
| | Fine Arts | 1 unit | Recommended 10th or 11th Grade<br>Must be acquired through a music related or visual arts elective. |
| | Career/Technical Education | 2 units | Students must first take Job Skills (2964) prior to enrolling in Career/Technical Courses.<br>**AS SHOWN ABOVE** |
| | Cooperative Career/ Technical Education | 1 unit | May be part of the two credits for Career/Technical Education. **AS SHOWN ABOVE** |
| 2618 | Computer Applications | | This computer applications requirement will be fulfilled in the 8th grade. This course will include a career exploratory & discovery component. |

| | |
|---|---|
| Total Academic Units Required | 22 Units |
| Total Elective Units Required | 8 Units |
| Total All Units Required | 30 Units |
| Total Units Available | 32 Units |
| Total Units Available Above Required | 10 Units |

It is recommended that all students seeking an occupational diploma participate in shadowing, service learning, mentoring, or approved unpaid work experience program. Occupational certification is encouraged.

**THE OCCUPATIONAL DIPLOMA OPTION IS AVAILABLE TO SPECIAL PROGRAM STUDENTS ONLY. THE OCCUPATIONAL DIPLOMA <u>DOES NOT</u> MEET THE GENERAL ACADEMIC REQUIREMENTS FOR ACCEPTANCE TO MOST POST-SECONDARY INSTITUTIONS. STUDENTS MUST PASS ALL UNIT REQUIREMENTS AND MEET ALL IEP GOALS PRIOR TO PARTICIPATION IN COMMENCEMENT CEREMONIES.**

# CERTIFICATE OF GRADUATION

## Minimum Program Requirements:

| Grade 9 | Grade 10 | Grade 11 | Grade 12 |
|---|---|---|---|
| 2913 English 3 | 2913 English 3 | 2913 English 3 | 2913 English 3 |
| 2943 Math 3 | 2943 Math 3 | 2943 Math 3 | 2943 Math 3 |
| 2933 Science 3 | 2933 Science 3 | 2933 Science 3 | 2933 Science 3 |
| 2963 Social Studies 3 | 2963 Social Studies 3 | 2963 Social Studies 3 | 2963 Social Studies 3 |
| 2500/2525 Phy Educ | | | |

## Recommended:

| 2964 | Job Skills Trans/Wk | 2964 Job Skills 2966 Transition | 2968 Trans/Wk 2968 2966 Transition |
|---|---|---|---|

Students whose **IEP Team** determines that the student is to transition and/or transition to work during their junior and senior years may as directed by the **IEP Team** have designated academic unit requirements waived. However, the student must be qualified for vocational rehabilitation services and must participate in job placement with the school system's job coach.

| | |
|---|---|
| Total Academic Units Required | 17 Units |
| Total Elective Units Required | 13 Units |
| Total All Units Required | 30 Units |
| Total Units Available | 32 Units |
| Total Units Available Above Required | 15 Units |

THE CERTIFICATE OF GRADUATION OPTION IS AVAILABE TO SPECIAL PROGRAM STUDENTS ONLY. THE CERTIFICATE OF GRADUATION DOES NOT MEET THE GENERAL ACADEMIC REQUIREMENTS FOR ACCEPTANCE TO POST-SECONDARY INSTITUTIONS.

THE *CERTIFICATE OF COURSE COMPLETION* (ALTERNATIVE DIPLOMA) IS NOT A "DIPLOMA" AND <u>DOES NOT</u> INDICATE THAT STUDENT HAS ATTAINED THE STATUS OF GRADUATE.

# SPECIAL NOTICE CONCERNING
# DIPLOMAS AND CERTIFICATES

Beginning with the Class of 2001:

Any student meeting all regular program course and unit requirements for the Alabama High School Diploma and the Alabama High School Diploma with Advanced Academic Endorsement and not passing all required sections of the *Alabama High School Graduation or Exit Exam* will receive a <u>Certificate of Course Completion (Alabama Alternative Diploma)</u> at commencement.

This certificate **is not** a high school diploma.

## SUMMARY OF DIPLOMA AND CERTIFICATE OPTIONS

- Alabama High School Diploma with Advanced Academic Endorsement — All Students

- Alabama High School Diploma with Advanced Career Technical Education Endorsement — All Students

- Alabama High School Diploma with Career Technical Education Endorsement — All Students

- Alabama High School Diploma with an Academy Endorsement — All Students

- Alabama Occupational Diploma — Special Program Students Only

- Certificate of Attendance — Special Program Students Only

- Certificate of Course Completion (Alternative Diploma) — Regular Program Students Only

## PLANNER SUMMARY: PROMOTIONAL CRITERIA

Students may be denied promotion and/or high school course credit(s) due to excessive absences in accordance with the procedures outlined in the **Student Code of Conduct.**

Student promotion in the Pike County Schools is based upon an evaluation of each student's achievement in terms of appropriate instructional goals. The determination should reflect teacher judgment based upon the following: successful progress in the county adopted curriculum, progress tests, classroom assignments, homework, and other objective data. The primary responsibility for determining each student's level of performance and ability to function academically at the next grade level is that of the classroom teacher and the Promotion Criteria Committee, subject to review and approval of the principal.

Schools shall adhere to the following evaluation plan for grading and reporting student progress.

**Kindergarten**

| Grade | Definition |
|-------|------------|
| S | Satisfactory |
| N | Needs Improvement |
| U | Unsatisfactory |

**Grades 1 - 12**

| Grade | Percent | Definition |
|-------|---------|------------|
| A | 90 - 100 | Outstanding Progress |
| B | 80 - 89 | Above Average Progress |
| C | 70 - 79 | Adequate Progress |
| D | 60 - 69 | Lowest Acceptable Progress |
| F | 0 - 59 | Failure |
| I | | Incomplete |

If an "I" (Incomplete) is recorded on a report card, the requirement for which the incomplete was assigned must be satisfied within one week of the issuance of report cards or the average grade is computed with each assignment not completed being averaged as "0". At the teacher's discretion, a longer period of time may be allowed for make-up work.

Grades in conduct are to be assigned independently of academic achievement. Standards for grading in these areas are to be explained to the students by the teacher giving the conduct grade. Since a student's conduct often reflect on performance, parents/guardians should give very close attention to conduct grades.

**Conduct Grades**

| Grade | Definition |
|-------|------------|
| S | Satisfactory |
| N | Needs Improvement |
| U | Unsatisfactory |

**Notice of Possible Retention:**

A *Notice of Possible Retention* will be sent home to students who are not meeting the criteria for promotion whenever it becomes apparent that a student is in danger of failing. Typically, these notices may be sent home at the end of the first term and/or the end of the third reporting period. Parent/guardians should understand that these notices are issued only to students who are in danger of failing and should be taken very seriously. Parents and guardians should respond immediately.

# PROMOTIONAL CRITERIA

### Grades 7 and 8

Students in grades 7 and 8 must meet the following criteria in order to advance to the next grade.

- Pass **all** core academic courses including English, mathematics, social studies, and science each year.

- Pass six of eight courses scheduled during the school year.

### Grades 9 - 12

Students in grades 9 through 12 must meet the following criteria in order to advance to the next grade.

- Pass **all** core academic courses, including English, mathematics, social studies, and science each year.

- Exit Ninth (9th) Grade          Pass     7 units

- Exit Tenth (10th) Grade          Pass    15 units

- Exit Eleventh (11th) Grade       Pass    22 units

- Exit Twelfth (12th) Grade*       Pass    30 units

**\*NO STUDENT MAY EXIT 12TH GRADE, PARTICIPATE IN COMMENCEMENT, OR OTHERWISE BE CONSIDERED A GRADUATE OR CERTIFICATE HOLDER FROM THE PIKE COUNTY SCHOOL SYSTEM EXCEPT UPON COMPLETION OF ONE OF THE PREVIOUSLY DESCRIBED DIPLOMA OR CERTIFICATE OPTIONS.**

14

"Try not.  Do or do not.  There is no try."

**Yoda**

## AUGUST 2004

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| 1 | 2 | 3 | 4<br><br>*Teacher Institute* | 5<br><br>*Teacher Inservice* | 6<br><br>*Teacher Workday* | 7 |
| 8 | 9<br><br>*1st Day for Students (2/3 Day)* | 10<br><br>*1st Full Day for Students* | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## MONTHLY GOALS:

**MONDAY, AUGUST 2, 2004**

**TUESDAY, AUGUST 3, 2004**

**WEDNESDAY, AUGUST 4, 2004**  *(Teacher Institute)*

**THURSDAY, AUGUST 5, 2004**  *(Teacher Inservice)*

**FRIDAY, AUGUST 6, 2004**  *(Teacher Workday)*

**SATURDAY, AUGUST 7, 2004**

**SUNDAY, AUGUST 8, 2004**

**WEEKLY GOALS:**

_____

_____

_____

_____

**Character Education**

***Attentiveness:***
Being mindful of the
comfort of others

**MONDAY, AUGUST 9, 2004**  *(1st Day for Students) (2/3 Day)*

**TUESDAY, AUGUST 10, 2004**  *(1st Full Day for Students)*

**WEDNESDAY, AUGUST 11, 2004**

**THURSDAY, AUGUST 12, 2004**

**FRIDAY, AUGUST 13, 2004**

**SATURDAY, AUGUST 14, 2004**

**SUNDAY, AUGUST 15, 2004**

**Character Education**

***Cooperation:***
Working together for
the benefit of all

**WEEKLY GOALS:**

**MONDAY, AUGUST 16, 2004**

**TUESDAY, AUGUST 17, 2004**

**WEDNESDAY, AUGUST 18, 2004**

**THURSDAY, AUGUST 19, 2004**

**FRIDAY, AUGUST 20, 2004**

**SATURDAY, AUGUST 21, 2004**

**SUNDAY, AUGUST 22, 2004**

**WEEKLY GOALS:**

_____
_____
_____
_____

**Character Education**

**_Self-Control:_**
Control of one's
emotions, desires,
and/or actions

GRADES BY COURSE

| 1st Term | | | | | | |
|---|---|---|---|---|---|---|
| **Course 1:** | | | | **Course 2:** | | |
| **Teacher:** | | | | **Teacher:** | | |
| Date | Assignment/Test/Project | | Grade | Date | Assignment/Test/Project | Grade |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# GRADES BY COURSE

| 1st Term | | | | | | |
|---|---|---|---|---|---|---|
| **Course 1:** | | | | **Course 2:** | | |
| **Teacher:** | | | | **Teacher:** | | |
| Date | Assignment/Test/Project | | Grade | Date | Assignment/Test/Project | Grade |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# GRADES BY COURSE

## 2nd Term

| Course 1: | | | Course 2: | | |
|---|---|---|---|---|---|
| Teacher: | | | Teacher: | | |
| Date | Assignment/Test/Project | Grade | Date | Assignment/Test/Project | Grade |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# GRADES BY COURSE

| 2nd Term | | | | | | |
|---|---|---|---|---|---|---|
| **Course 1:** | | | | **Course 2:** | | |
| **Teacher:** | | | | **Teacher:** | | |
| Date | Assignment/Test/Project | | Grade | Date | Assignment/Test/Project | Grade |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# HALL PASS

NAME _____     GRADE _____

| | 1st Term | | | | | 1st Term | | | |
|---|---|---|---|---|---|---|---|---|---|
| Teacher Sending | Time | | Date and Destination | Teacher Receiving | Teacher Sending | Time | | Date and Destination | Teacher Receiving |
| | IN | OUT | | | | IN | OUT | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| CODES FOR DESTINATION | INTERNET ACCESS APPROVAL |
|---|---|
| G = Guidance<br>L = Library<br>N = Nurse<br>O = Office<br>R = Restroom<br>C = Classroom | _____<br>Signature, Issuing Teacher<br><br>_____<br>Signature, Parent/Guardian |

# HALL PASS

NAME _____     GRADE _____

| 2nd Term | | | | 2nd Term | | | |
| Teacher Sending | Time | | Date and Destination | Teacher Receiving | Teacher Sending | Time | | Date and Destination | Teacher Receiving |
| | IN | OUT | | | | IN | OUT | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| CODES FOR DESTINATION | INTERNET ACCESS APPROVAL |
| --- | --- |
| G = Guidance<br>L = Library<br>N = Nurse<br>O = Office<br>R = Restroom<br>C = Classroom | Signature, Issuing Teacher<br><br>Signature, Parent/Guardian |



PLAINTIFF'S
EXHIBIT
5

FILE:    JGFB

## SUPERVISION OF STUDENTS

The policy of the Pike County Board of Education shall assure that all school personnel discharge in a reasonably prudent manner all responsibilities relative to the care, safety and welfare of students under their jurisdiction. The Superintendent shall direct all principals to establish faculty supervision regulations which assure that students are supervised effectively throughout the school day. In addition to classroom supervision, such regulations shall specify hall duties, between class and/or break duties, and bus duties before and after school.  Supervision of extracurricular activities shall also assure proper care of students.

The Superintendent shall instruct all principals to prepare supervision schedules and present these to assigned teaching personnel.  Supervision duty assignments shall include but not be limited to (1) bus duty, (2) lunchroom duty, (3) hall duty, (4) supervision of students prior to and following dismissal of school each day, and (5) grounds duty.

Scheduled assignments shall assure that all students are properly supervised before, during, and after each scholastic day.  At no time shall any Pike County School System certified employee abrogate his or her _in loco parentis_ based responsibility for reasonably prudent actions relative to student care, safety and welfare.

SOURCE:     The Pike County Board of Education
ADOPTED:    July 18, 1978; REVISED: May 1991
LEGAL REF.: Dailey v. Los Angeles Unified School District, 2 Cal. 3d 741 (Cal. Rptr. 1970); Titus v. Lindberg, 49 N.J. 66, 228A 2d 65 (1967); Cirillo v. City of Milwaukee, 34 Wis. 2d 705, 150 N.W. 2d 460 (1967); Schnell v. Travellers Insurance Company, 262 La. app., 1171 264 So. 2d 346 (1972); Hovey v. State, 27 N.Y.S. 2d 195 (1941).

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0112*

FILE:  JGFC

## DAILY DISMISSAL PRECAUTIONS
### (SAFETY)

Each school principal and staff shall develop a plan for the orderly and safe dismissal of all students at the conclu-sion of the regular school day.  The plan shall encompass the following:

1.  Provisions for proper supervision of students who must remain in the school building after regular school hours.

2.  Provisions for safe loading of students who utilize school transportation.

3.  Provisions for safety of students when school buses are departing from the school campus.

4.  Provisions for the safety of students when auto-mobiles and other motorized vehicles are departing school campus.

Said plan shall be available to the Superintendent at beginning of each school year.

SOURCE:  The Pike County Board of Education
ADOPTED:

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0113

FILE: GBREA

## SUPERVISION OF STUDENTS

The policy of the Board shall assure that all school personnel discharge in a reasonably prudent manner all responsibilities relative to the care, safety and welfare of students under their jurisdiction. The Superintendent shall direct all principals to establish faculty supervision regulations which assure that students are supervised effectively throughout the school day. In addition to classroom supervision, such regulations shall specify hall duties, between class and/or any break duties, and bus duties before and after school. Supervision of extracurricular activities shall also assure proper care of students. (See GBRE)

The Superintendent shall instruct all principals to prepare supervision schedules and present these to assigned teaching personnel. Supervision duty assignments shall include but not be limited to (1) bus duty, (2) lunchroom duty, (3) hall duty, (4) supervision of students prior to and following dismissal of school each day, and (5) grounds duty. Duties and other assignments shall be developed on a fair and equitable basis.

Scheduled assignments shall assure that all students are properly supervised before, during, and after each scholastic day. At no time shall any school system certified employee abrogate his or her in loco parentis-based responsibility for reasonably prudent actions relative to student care, safety and welfare.

SOURCE:  Pike County Board of Education, Troy, Alabama
ADOPTED: July 18, 1978; Revised
LEGAL REF: Dailey v. Los Angeles Unified School District, 2 Cal. 3d 741  (Cal. Rptr. 1970); Titus v. Lindberg, 49 N.J. 66, 228A 2d 65  (1967); Cirillo v. City of Milwaukee, 34 Wis. 2d 705, 150    N.W. 2d 460 (1967); Schnell v. Travellers Insurance Company,   262 La. app., j1171 264 So. 2d 346 (1972); Hovey v. State,    27 N.Y.S. 2d 195 (1941);

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0114

FILE: JFAC-R

# PARENT/FAMILY INVOLVEMENT POLICY

The Board of Education recognizes that a child's education is a responsibility shared by the school and family during the entire period the child spends in school. To support the goal of the school district to educate all students effectively, the school and parents must work as knowledgeable partners.

Although parents are diverse in culture, language, and needs, they share the school's commitment to the educational success of their children. This school district and the schools within its boundaries, in collaboration with parents, shall establish programs and practices that enhance parent involvement and reflect the specific needs of students and their families.

To this end, the board supports the development, implementation, and regular evaluation of a parent involvement program in each school, which will involve parents at all grade levels in a variety of roles. The parent involvement programs will be comprehensive and coordinated in nature. They will include, but not be limited to the following components of successful parent involvement programs:

- Communication between home and school is regular, two-way, and meaningful.
- Responsible parenting is promoted and supported.
- Parents play an integral role in assisting student learning.
- Parents are welcome in the school, and their support and assistance are sought.
- Parents are full partners in the decisions that affect children and families.
- Community resources are made available to strengthen school programs, family, practices, and student learning. (At least one percent of Pike County's Title I funds will be spent on parental involvement.)

The Board of Education supports professional development opportunities for staff members to enhance understanding of effective parent involvement strategies. The board also recognizes the importance of administrative leadership in setting expectations and creating a climate conducive to parental participation.

In addition to programs at the school level, the Board of Education supports the development, implementation, and regular evaluation of a program to involve parents in decisions and practices of the school district, using to the degree possible, the components listed above. The board also provides community outreach programs for this purpose.

Engaging parents is essential to improved student achievement. This school district shall foster and support active parental involvement.

SOURCE: Pike County Board of Education
ADOPTED: October 9, 2000

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0115

FILE:   JH

## STUDENT ACTIVITIES

School-sponsored student activities are a vital part of students' lives and of the total school program.  Therefore, the Board encourages the certified staff and students of the schools of the School System to plan and implement appropriate student activities to meet the needs of the students.

All school-sponsored student activities must have prior approval by the local school principal and activity sponsor.

All school-sponsored student activities shall be under the control of the local school principal or designee.

All school-sponsored activities shall be supervised adequately by a member or members of the school certified staff.

School principals shall be responsible for producing a written school plan that encompasses all school-sponsored activities.

A school activity is defined as any educational experience or curricular or extracurricular event that is approved officially by the school principal based on the following criteria:

1.   It is scheduled by the school principal, and

2.   The school principal has made specific assignments to an employee(s) of the Board to teach, coordinate, monitor, advise, sponsor, or chaperon said activity as a part of employment responsibilities.

SOURCE:
ADOPTED:

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0116

FILE: JCK

## Pike County Board of Education
## Prohibiting Harassment Policy

**L.      General Statement of Policy**

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation. This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0117

FILE: JCK

## II.    Definitions

## A.    Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1.    a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2.    the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to

- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical conduct such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0118

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office of the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation. The student will then be informed that he/she has three (3) choices:

1. The student may converse by phone with his/her parent or guardian.

2. The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3. The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect. If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services. The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0124

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0125

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:
U.S. Const. Amend. IV; U.S. Const. Amend.
XIV; Moore v. Student Affairs Committee of
Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
1970); Note from Moore:  "It is settled that
Fourth Amendment does not prohibit reasonable
searches when the search is conducted by a
superior charged with the responsibility of
maintaining discipline or of maintaining
security ..."; New Jersey v. T.L.O.

FILE: JCAC
(continued)

1.  The educator should immediately notify the principal.

2.  The principal/educator should consult with the school nurse and counselor.

Human Resource caseworkers will proceed to investigate the reported case. If the investigation is to begin at the school, the Human Resource caseworker will report to the school office and identify himself/herself to the principal or designated representative. Child abuse/neglect investigations are highly confidential, and the student's rights to privacy must be respected. Only those persons necessary to conduct the investigation should be present in any interview. After an evaluation/intervention has been made, the caseworker will provide feedback to the principal and arrange monitoring procedures as needed. Educators will report further incidents of abuse/neglect regarding that child to the assigned caseworker.

### Special Information Regarding Neglect Cases:

1.  Teachers should document and date <u>specific</u> instances or examples of neglect.
    Ex: On Wednesday, January 14, 1988, John Doe came to school with no coat, wearing unclean clothes and shoes with large holes.

2.  Keep a running account of the above examples over a period of time.

3.  Contact the parents and express concern over the neglect and make suggestions as to how they can help or seek help by calling Child Welfare at Human Resource.

### Right to Privacy Considerations:

1.  A student's school record continues to be protected by the terms of the Family Rights and Privacy Act and the policies of the Board. The School System needs a parental release form, court order or other legal document which gives school personnel the permission to release information in school records to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0126

2. In return, Human Resource personnel should share needed information with school officials. The school principal or counselor could be designated as a confidential person to receive this information and use it in the best interest of the student.

SOURCE:
ADOPTED:

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0127

FILE: JCK

## B.    Race or Color Harassment

For purposes of this policy, racial or color harassment of a student consists of verbal and/or physical conduct relating to a student's race or color, such as, but not limited to:

1.    the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive educational environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with a student's or academic performance; or

3.    the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute racial and/or color harassment may include, but not be limited to:

- graffiti containing racially offensive language which is derogatory of student's race or color
- threatening or intimidating conduct directed at a student because of the other's race or color
- jokes, rumors or name calling based upon a student's race or color
- slurs, negative stereotypes, and hostile acts which are based upon a student's race or color
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading students or members of protected classes
- a physical act of aggression or assault because of, or in a manner reasonably related to, a student's race or color
- other kinds of aggressive conduct such as theft or damage to property which is motivated by race or color.

FILE: JCK

## C.    National Origin or Ethnic Harassment

For purposes of this policy, ethnic or national origin harassment of a student consists of verbal and/or physical conduct relating to a student's ethnicity or country of origin of the student's parents, family members or ancestors such as, but not limited to:

1.    the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive educational environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with a student's or academic performance; or

3.    the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute ethnic or national origin harassment may include, but not be limited to:

- graffiti containing offensive language which is derogatory to others because of their national origin or ethnicity
- threatening or intimidating conduct directed at a student because of the other's national origin or ethnicity
- jokes, rumors or name calling based upon a student's national origin or ethnicity
- slurs, negative stereotypes, and hostile acts which are based upon a student's national origin or ethnicity
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading students or members of protected classes
- a physical act of aggression or assault because of, or in a manner reasonably related to, a student's national origin or ethnicity
- other kinds of aggressive conduct such as theft or damage to property which is motivated by national origin or ethnicity.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0120

**D.     Disability Harassment**

For purposes of this policy, harassment because of the disability of a student consists of verbal and/or physical conduct relating to a student's physical or mental impairment such as, but not limited to:

1.     the harassing conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive environment;

2.     the harassing conduct has the purpose or effect of substantially or unreasonably interfering with an individual's work or academic performance; or

3.     the harassing conduct otherwise adversely affects an individual's learning opportunities.

Examples of conduct which may constitute disability harassment may include but are not limited to:

- graffiti containing offensive language which is derogatory to others because of their physical or mental disability
- threatening or intimidating conduct directed at another because of the other's physical or mental disability
- jokes, rumors or name calling based upon an individual's physical or mental disability
- slurs, negative stereotypes, and hostile acts which are based upon another's physical or mental disability
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading individuals or members of protected classes
- a physical act of aggression or assault upon another because of, or in a manner reasonably related to, an individual's physical or mental disability
- other kinds of aggressive conduct such as theft or damage to property which is motivated by an individual's physical or mental disability.

FILE: JCK

**E.    Religious Affiliation Harassment**

For purposes of this policy, religious affiliation harassment of a student consists of verbal or physical conduct relating to an individual's religious affiliation, such as, but not limited to:

1.    the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with an student's work or academic performance; or

3.    the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute religious affiliation harassment because of may include but are not limited to:

- graffiti containing offensive language which is derogatory to others because of their religious affiliation
- threatening or intimidating conduct directed at a student because of the other's religious affiliation
- jokes, rumors or name calling based upon a student's religious affiliation
- slurs, negative stereotypes, and hostile acts which are based upon another's religious affiliation
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading individuals or members of protected classes
- a physical act of aggression or assault upon another because of, or in a manner reasonably related to, a student's religious affiliation
- other kinds of aggressive conduct such as theft or damage to property which is motivated by a student's religious affiliation.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0122*

FILE: JCK

### Elementary Schools of Pike County School System
### Racial Harassment/Discrimination Policy

1.  Everyone at **Goshen Elementary School** has a right to feel respected and safe. We want you to know about our policy to prevent racial harassment/discrimination of any kind.

2.  Harassment could come from a student or an adult.

3.  Harassment could include the following actions:

    a.  name calling, jokes or rumors;
    b.  notes or cartoons;
    c.  unwelcome touching;
    d.  offensive graphics;

4.  If any words or actions make you feel uncomfortable or fearful, you need to tell any school employee as soon as possible.

5.  You may also make a written report to any school employee.

6.  Your right to privacy will be respected as much as possible.

7.  The **Pike County School System** takes seriously all reports of racial harassment/discrimination and will take appropriate actions based on your report.

8.  The **Pike County School System** will also take action if anyone tries to intimidate or harm you because of your report.

**CONTACT: Mr. Mike Bragg, Principal**

SOURCE: Pike County Board of Education
ADOPTED: December 11, 2000

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0123

FILE:  JBDA

### STUDENTS LEAVING SCHOOL CAMPUS

A student is not permitted to leave the school campus during regular school hours except in accordance with the provisions that follows:

1. A student's parent or guardian may come to the school in person and check his/her child out of school.  A student may not be checked out of school by persons other than his/her parent or guardian or someone specifically designated by the student's parent or legal guardian.

2. A student may bring a written note signed by the student's parent or guardian and upon approval of the local school principal or designee may be permitted to leave the school campus.  All written parental requests shall remain on file in the principal's office for the remainder of the school year.

3. In emergency situations, the school principal or designee may permit a student to leave the school campus based upon a telephone request from the student's parent or guardian.  In such instances, the principal or designee shall attempt to recontact the student's parent by telephone to confirm the request.

A student shall be under the jurisdiction of the school from the time the student arrives at school each day until he/she leaves the school campus in the afternoon; however, students who walk should be under the jurisdiction of the school from the time they leave home until they return home. In case a student rides a bus, he/she shall be under the jurisdiction of the school from the time he/she boards the bus until the student exits the bus in the afternoon.  In addition, a student shall be under the jurisdiction of the school while attending any school sponsored activity either at school or away from school.  This shall apply to all students, including members of athletic teams, pep clubs, band, and other student organizations.

Any student violating this policy shall be subject to disciplinary action by the local school principal.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0128

FILE: JBDAB

SCHOOL ATTENDANCE STANDARDS FOR DRIVER'S LICENSE OR PERMIT

As required by Legislative Act 93-368, the Pike County Board of Education adopts this policy consistent with Alabama State Department of Education guidelines.

The purpose of the Act is to require school attendance standards as a prerequisite for a driver's license or learner's permit for the operation of a motor vehicle. School attendance standards are met by enrollment in a school or General Educational Development (GED) program or job training program approved by the State Superintendent of Education.

The requirements of the Act include:

A.  Verification of enrollment status by appropriate school personnel on Part I of the Student Enrollment/Exclusion Status form.

B.  Notification to the Department of Public Safety when a student has more than 10 consecutive or 15 cumulative days of unexcused absences during a single semester.

C.  Exemption for students due to circumstances beyond the control of the student.

D.  Implementation of an appeals process.

In accordance with Section 16-28-6, Code of Alabama, 1975, circumstances beyond the control of a student are limited to:

A.  Students who are mentally or physically unable to attend school.

B.  Students who are regularly and legally employed under the provision of the Child Labor Law.

C.  Students who, because of the distance they reside from school and the lack of public transportation, are compelled to walk more than two miles to attend a public school.

Suspension or expulsion from school or imprisonment are not circumstances that qualify for exemption. The school system superintendent or designee is the sole judge of whether or not the evidence presented meets the legal requirements of "circumstances that are beyond the control" of the student.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0129

FILE:  JCAA

### DUE PROCESS PROCEDURES

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short- and long-term suspension or expulsion are applied.  Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

PURPOSE

The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on the Education Amendments of 1972 or the Rehabilitation Act of 1973.  These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

DEFINITIONS

A grievance is a complaint by any member of the professional staff, the non-professional staff, and student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

PROCEDURE

Each level of the procedure shall be observed and used with normal order of proper channels.  If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

STUDENT GRIEVANCE PROCEDURE

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, handicap, sex, religion, creed, national origin, or age.  For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (205) 566-1850 between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher.  This conference shall be scheduled by the teacher within five days of receipt of the request.  If the grievance is resolved at this conference by

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0430

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0131

FILE: JCAA
(continued)

mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level con-ference, the student shall file, within five days, with the next level of administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the griev-ance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the super-intendent of education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommen-dation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the System.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regard to any allegations that the System has violated the statutes described above.

FILE: JCE

# PIKE COUNTY SCHOOLS
## SECTION 504 of the REHABILITATION ACT
### STUDENT GRIEVANCE PROCEDURE

The Pike County School System will use the following procedure for any grievance of any nature to include, but not be limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information contact Mrs. Karen Berry, 504 Coordinator, at 211 Lake Avenue, Troy, Alabama 36081, at 334-566-1850 between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days of receipt of the request. If the grievance is resolved at this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first-level conference, the student shall file, within five days, with the next level of administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the superintendent of education), the student may request to be heard by the board of education by submitting a request in writing to the superintendent of education. The superintendent shall insert in the appropriate place on the agenda of the next board meeting [providing that the time constraints (as per board policy) are met for inclusion on the most immediate agenda] an item which states that the student desires to address the board concerning a grievance.

The board shall review the original grievance. In addition, the board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The board of education will either uphold or deny the recommendation of the superintendent. A copy of the action of the board will be furnished to the student, either as a part of the minutes of the board of education or as a separate written statement from the office of the superintendent. The board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local board of education. The student retains at all time the right to contact the Office of Civil Rights with regard to any allegations that the system has violated the statutes described above.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0132

SOURCE: Pike County Board of Education, Troy, Alabama
ADOPTED: July 7, 1997



MEMORANDUM

TO: ALL PRINCIPALS

FROM: MARK BAZZELL

RE: NEW TEACHER ORIENTATION

DATE: JULY 24, 2002

New Teacher <u>System</u> Orientation will be held July 31, 2002 in the Board Room at the Central Office. Please contact your new staff members to make sure they are in attendance. We will not contact them, so please be sure everyone has been informed. We will begin at 8:00 AM promptly and will adjourn at 12:15 PM.

Please make sure you plan to provide them with their local school orientation on the afternoon of the 31st. I will need you to send to me a list of your new teachers and their mentors as soon as possible.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0139

# New Teacher Orientation
## *July 31, 2002*

| Time | Activity | Presenter/Facilitator |
|------|----------|----------------------|
| 8:00 | Welcome & Introductions | Dr. John R. Key, Superintendent |
| 8:10 | Superintendent's Comments | Dr. John R. Key, Superintendent |
| 8:40 | Student Assessment<br>Federal Programs | Mrs. Carolyn Burks, Coordinator |
| 9:15 | Break | |
| 9:30 | Instructional Initiatives, other topics related to instructional programs | Dr. Mark Bazzell, Assistant Superintendent |
| 10:00 | School Safety and Discipline | Dr. Mark Bazzell, Assistant Superintendent |
| 10:30 | Break | |
| 10:45 | Special Education Services | Mrs. Karen Berry, Coordinator |
| 11:00 | Indian Programs, At-Risk Programs | Mrs. Elizabeth Grubbs, Coordinator |
| 11:15 | PEPE | Dr. Mark Bazzell, Assistant Superintendent |
| 11:45 | PCEA | Mrs. Deana Elmore |
| 12:00 | Payroll Information, Insurance, other | Dr. Mark Bazzell, Assistant Superintendent |
| 12:15 | Dismiss | |

Report to assigned school for Local School Orientations by 1:30 PM or time designated by your principal.

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0140

## ADMINISTRATOR'S MEETING
### JUNE 10, 2003

| TIME | ACTIVITY | FACILITATOR | NOTES |
|------|----------|-------------|-------|
| 8:00 | IMPORTANT INFORMATION<br><br>Wage & Hour<br>Inventory<br>Facilities & Grounds<br>Grants<br>Student Agenda<br>Funding/Staffing<br>Summer School<br>Out-of-State Trips<br>Strategic Planning<br>REACH<br>Discipline Code<br>Curriculum Guide<br>New Teacher Orient.<br>Institute<br>Inservice<br>Consent Decree<br>Coaching Rec.<br>Web-Sites<br>Other | Dr. Bazzell | |
| | CHILD NUTRITION PROGRAMS | Mrs. Taylor | |
| | INSTRUCTIONAL PROGRAMS<br><br>SAT Scores<br>Writing Assessments<br>Daily Schedules<br>PEPE Improving Inst.<br>Title I<br>Title II<br>Migrant<br>HQT | Mrs. Baker | |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0141*

|  | **INSTRUCTIONAL SUPPORT**<br><br>**End of Year Reports**<br>**Community Education**<br>**Character Education**<br>**High Hopes**<br>**At-Risk**<br>**Textbook Orders**<br>**Math Workbooks** | **Mrs. Grubbs** |  |
|  | **PREVENTION AND SUPPORT, SPECIAL EDUCATION**<br><br>**Gifted Testing**<br>**Re-authorization IDEA**<br>**Volunteer Finger Print.**<br>**Emergency Kits**<br>**SIR data** | **Mrs. Berry** |  |
|  | **OPERATIONS** | **Mr. Hicks** |  |
|  | **SCHOOL REPORTS** | **Mr. Casey**<br>**Mr. Nelson**<br>**Mr. Hall**<br>**Mrs. Carter**<br>**Mr. Bragg**<br>**Mrs. Huggins** |  |
|  | **OTHER** | **TBA** |  |
| 11:15 | **ADJOURN** |  |  |

*JR v. Pike County BOE*<br>Produced by Defendant PCBE<br>No. 0142

1)   Lee vs Macon site visit

2)   PEPE

3)   Administrator's PEPE

4)   Furniture/Carpet

5)   Key receipts and inventory

6)   CATCH and Extension Service

7)   SIC, EIC, IIC

8)   Protect instructional time

9)   BBSST

10)  Prevention and Support

11)  ALC

12)  Local Funds Accounting Procedures, athletics, special accounts, fund raisers

13)  Cellular phone bills

14)  SDE Education stickers

15)  Promote "Our Promise"

16)  Copier purchases/leases

17)  Pay for Certified Substitutes

18)  Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0143*

**Administrator's Meeting**
November 6, 2003

**Dr. Bazzell**

**Personnel/Staffing/Evaluation/Professional Development**
Central Office Re-organization
PEPE for Administrators
PEPE for Teachers/Obs. Schedule
Professional Development/PDPs/Mentors
Renewal of non-tenured staff
Overtime Issues

**Other Personnel Issues**
School Calendar
Cellular Phone Bills
Employee background checks
Sexual Harassment
Management of Public Funds
        Athletics, Ethics Violations

**Policy Matters/Legal Issues**
Corporal Punishment
Reporting Requirements/DHR/Law Enforcement
Residency Verification
Criminal Background Checks/Certificate Status

**Instruction**
School Brochures
Classroom Instructional Support Funds
"Our Promise"
"No Excuses" Campaign
Outside Intervention in Priority Schools
Report Card Distribution
SEAL Network services
Comprehensive Plan
Comprehensive Monitoring
Web Page Assistance
Testing Protocol Violations
STI User Conference
SIC, EIC

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0144

**School Safety & Discipline**
Discipline Forms
Surv. Systems
AEDs
Media Relations

**Facilities**
Warehouse project
Siemen's project
On-line requests

**Funding**
FY05 Outlook

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
No. 0145

# Agenda Items: Dr. Bazzell
## 7.27.04

1.    Distribution of materials from SDE
           SDE Calendar
           HQT Info.
           Truancy Definition
           New Legislation

2.    New Teacher Orientation, Institute, Inservice

3.    Our Promise!

4.    School Opening
           Day 1
           Planner, Code of Conducts, Calendars
           Dress Code
           Teacher Dress
           Safety Plans, Bus Safety
           Discipline Plans
           Field Trip Moratorium
           IDs

5.    Facilities
           Custodians
           Grounds
           Maintenance Requests

5.    Instruction
           Accountability
           PEPE/SBWA/JBHM
           Schedules/HS & Elem.
           Classroom Appearance
           Lesson Plans
           Mrs. Baker !!

6.    Other

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0146

Dr. Bazzell - Agenda Items
October 19, 2004

1.    Executive Briefing - Online Learning - www.audied-online.com
2.    National Board Certification
3.    FY06 Budget Outlook
4.    ARI - new schools, data, coaching emphasis
5.    AMSTI
6.    Professional Development
7.    Student Health Issues
          BMI, fire safety, employee safety, asthma
8.    ADEM visit
9.    Discrimination
10.    Math C of S training
11.    Accountability - NCLB - HS grade placement, academic year
12.    Red Cross

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0147

General Information
1/26/05
Dr. Mark Bazzell, Superintendent
Pike County Schools

1.    AYP Appeals

2.    Out of State Trips and Overnight Trips

3.    Professional Leave

4.    TSU   "Snoopy"

5.    Customer Focus Training

6.    Community education, Web pages

7.    RCT, ALC

8.    Truancy Definition

9.    Corporal Punishment

10.   Observations

11.   Children's Advocacy Center

12.   Overtime

13.   Custodians

14.   School Operations and Transportation Center (SOTC), telephones

15.   Lee v. Macon

      Faculty Assignment & Hiring
            Retention
            Hiring & Promotions
            Faculty/Administration Assignment & Support

      Within School Assignment and Graduation Rates

      Intra and Inter-District Transfers

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0148

Special Education
    ID of students as MR
    ID of Students as Gifted and Talented

Discipline

Extra-curricular Activities

Facilities and Equipment

Complaints of Racial Harassment and Discrimination

Monitoring and Reporting

16.    Map and Globe Audit

17.    Student Assessments

18.    05-06 School Calendar

19.    Other

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0149

# ADMINISTRATOR'S MEETING
## JUNE 1, 2005

| Time | Activity | Presenter | Notes |
|------|----------|-----------|-------|
| 8:30 am | Welcome, Introductions, Ground Rules | Dr. Bazzell | |
| 8:35 am | Important Information | Dr. Bazzell | |
| | CNP | Mrs. Taylor | |
| | Maintenance and Transportation | Mr. Hicks | |
| | Technology | Mr. Jackson | |
| | Break | | |
| | Prevention and Support, Special Education | Mrs. Berry | |
| | Instructional Support | Mrs. Grubbs | |
| | Instructional Programs Federal Programs | Mrs. Baker | |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0150*

| | Break | | |
|---|---|---|---|
| | Student Code of Conduct Review | Dr. Bazzell | |
| | Adjourn | | |

### *Dr. Mark Bazzell, Superintendent*

1.   Essential Administrator's Information Manual 2005-06

2.   Student Planners

3.   Local School Publications

4.   2005-06 School Calendars

5.   SDE Information

6.   Release of testing information prior to state embargo date

7.    Summer Art Program

8.   Change in selected elementary report cards - EIC

9.   SIC meeting summary

10.   Anticipated student counts for 2005-06

11.   Summer work schedule

12.   Personnel Recommendations

13.   Record disposal information/procedures

14.   PEPE

15.   Consolidated Review

16.   Lee v. Macon

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0151*

17.     Fixed Asset Inventory

18.     Local School Audit Reports

19.     School closing checklist - Keys

20.     Web-site update(s)

21.     Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0152*

Administrator's Meeting
July 25, 2005

1.    New Teacher Orientation

        Local School Orientation

2.    Institute

        Agenda Review

3.    Inservice/Teacher Workday

4.    Day 1:  Procedures

5.    Technology

6.    Maintenance

7.    Transportation

8.    Child Nutrition

9.    Student Code of Conduct

10.   Student Planners

11.   School Calendars

12.   Lesson Plan Books and Class Record Books

13.   Lesson Plan Requirements

14.   Teacher Made Assessment Requirements

15.   Lee v. Macon

        Student Activities Notice
        Student Discipline

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0153

16.     Prevention and Support

         ALC
         Campus Inspections
         Health Department Inspections
         Athletic Facilities
         Security

17.     Instructional Support

18.     Instructional Programs

         AYP
         Test Results

19.     Future Capital Projects

20.     Records Disposal Procedures

21.     Fixed Asset Inventory

22.     New Health Requirements

23.     Cellular Telephone Bills

24.     Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0154*

Important Information-Administrator's Meeting
Dr. Mark Bazzell

September 7, 2005

1.  Records Disposal

2.  Lee v. Macon

3.  PEPE - John Osborn

4.  PEPE - Teachers

5.  Organizational Structure

6.  Child Advocacy Center

7.  Accountability Results - School Choice

8.  Facilities

9.  Consolidated Review

10. SACS

11. Adm. Pay

12. Customer Focus

13. CATCH

14. Finger Printing

15. Other

Participants: Mike Hall, Donnella Carter, Carolyn Townsend, John Evers, Gene Nelson, Mona Watson, Al Griffin, Karen Berry, Carolyn Baker, Liz Grubbs, Tom Hicks, Mike Johnson, Marvin Jackson, Michael Rose, Jennifer Hornsby,

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0155

# Administrator's Meeting Agenda
## July 27, 2006

| Time | Activity | Presenter/Leader | Notes |
|------|----------|------------------|-------|
| 9:00 am | Ground Rules, Welcome and Introductions | Dr. Bazzell | |
| | Important Information (See Separate Agenda) | Dr. Bazzell | |
| | Break | | |
| | Instructional Programs | Mrs. Carter<br>Mrs. Baker | |
| | Maintenance | Mr. Hicks<br>Mr. Johnson | |
| | Transportation | Mr. Hicks<br>Mr. Johnson | |
| | Technology | Mr. Jackson | |
| | Child Nutrition | Mrs. Taylor | |
| | Break | | |
| | Instructional Support Indian | Mrs. Grubbs | |
| | Prevention & Support Special Education | Mrs. Berry | |
| | Career Technical Education | Dr. Griffin | |
| | School Announcements | Mr. Hall<br>Mr. Bynum<br>Mr. Nelson<br>Mr. Evers<br>Mr. Head | |
| | Adjourn | | |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0156*

### *Agenda Activities*
Bazzell

1.    Bell Schedule

2.    RCT Schedule

3.    Institute Activities

4.    New Teacher Orientation/School Orientation/Mentors

5.    Code of Conduct, Student Planners, Sub Handbook, Promotional Criteria

6.    Textbook Delivery

7.    Textbook Inventory (HS)

8.    High School Schedules (Matrix Form)

9.    Observation/Evaluation

10.   Faculty meeting schedules (Bazzell)

11.   Grade Book - Report Cards

12.   School Plan/Comprehensive Plan/Monitoring

13.   Character Education (Elem)

14.   STI (insertion of pictures)

15.   E-mail ( new faculty)

16.   Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0157*

04 Staffing

04 Funding/REACH

Strategic Planning

Summer Work

Consent Decree

Wage & Hour

Curriculum Guides/Planners

Code of Conduct

Library Media Automation

PEPE/PDPs

School Locks/Keys

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0158**

## INSERVICE SCHEDULE
## PIKE COUNTY SCHOOLS
## FEBRUARY 15, 2002

7:40 - 11:15    Teachers report to individual schools for activities developed by the
Principal (Principals should submit morning schedules to Dr. Bazzell)
Goshen Elementary - Grade Book training by Marvin Jackson/Mona
Watson

11:15 - 12:30    Lunch

## ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE COUNTY ELEMENTARY SCHOOL

12:30 - 3:30    Selected teachers (New teachers hired after 8-1-01,  and teachers absent on
August 1, 2001),  Diversity Training - report to the computer lab in
Building 100, at the bottom of the hill. Presenter: Karen Berry

12:30 - 1:45    4th Grade teachers - Groundwater Festival Training - Room 208
Presenter: Michael Mullen & GWF staff, Troy State University

12:30 - 1:45    All other teachers and instructional assistants report to the Gym - What is
Bullying? Presenter: Carolyn Burks

1:45 - 2:10    Break (Snack area will be open for purchases)

2:10 - 3:30    *    Science Teachers - Grades 6-12 Environmental Awareness Training -
Presenter: Michael Mullen, Troy State University, Room 210

              *    English Teachers - Grades 6-12 Writing and Reading - Facilitators:
Carolyn Burks/Demetric Sermons, Room 209

              *    All other High School Teachers - Facilitator: Dr. Bazzell, Room 205
Block Scheduling - Instructional Strategies, Discipline

2:10 - 2:50    *    K - 2nd Teachers - Recognizing Sexual Abuse, Room 201
          *    3rd - 5th Teachers - Reading- Running Records, Room 202
2:55 - 3:30    *    K - 2nd Teachers - Reading - Running Records, Room 202
          *    3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201

        Presenter: Wendy Watson - Running Records
        Presenter: Lucia Grantham, Troy State University - Sexual Abuse

2:10 - 3:30    All Instructional Assistants - Make and Take Activities , Room 206

3:30    Dismissal Time

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0159*

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Rev. Herbert Reynolds, President
Rev. Earnest Green, Vice President
Wyman Botts
Norman Chandler
Adam Register
Linda Steed

**Dr. John R. Key**
Superintendent

October 31, 2002

Mr. Terry Casey, Principal
Pike County High School
552 South Main Street
Troy, Alabama 36010

Dear Mr. Casey:

In reflecting on the work which will take place in the next few weeks by the PCHS committee who will be looking into the development of a School-Wide Discipline Plan, I felt like I needed to provide both you and the committee with some guidance. You will find information I hope you will find useful attached. I feel very strongly that if the committee utilizes this information in developing the plan, much improvement will be seen.

Specifically, everyone must understand their responsibilities and the implementation plan. Also, everyone must understand the options available in term of actions which may be used to modify behavior. And, everyone must agree to follow those Key Points I provided.

The information I provided is not all inclusive. However, it does represent concepts, ideas, beliefs, etc. which I have found to be most useful and effective.

Please share this with the committee. I will be glad to meet with the group and/or assist as needed with facilitation of their work.

Sincerely,

Mark Bazzell, Ed.D
Assistant Superintendent

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0160**

101 W. Love Street, Troy, Alabama 36081-2613  Telephone: (334) 566-1850  Fax: (334) 566-2580

System Responsibilities

- Code of Conduct
- Board Policy
- Legal Advice
- Special Education Adaptations Review

School Administration Responsibilities

- Student Handbook/Planner
- Organization of School Day, Office Organization
- School Climate/ School Morale
- High Expectations for student behavior
- High Expectations for student achievement, teacher planning, protection of instructional time.
- High Expectations for teacher compliance with school-wide discipline plan
- Enforce Code of Conduct, enforce dress code, enforce other school rules
- Empower Teachers with authority to manage their own classrooms
- Monitor data, identify teachers who struggle with CM, provide professional development opportunities and support

Teacher Responsibilities

- High Expectations for student behavior and academic performance
- Provide quality instructional presentations, activities, etc.
- Post Classroom Rules and Consequences
- Work the classroom discipline plan
- Complete discipline forms properly including date, time, description of behavior without editorial comment.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0161*

Implementation

Review Code of Conduct with Teachers
Teachers Review Code of Conduct with Students, discuss expectations
Teachers post school wide rules and consequences, explain classroom procedures
Review usage of forms and procedures with teachers
Discuss legal issues relative to special education students
Discuss movement of students to lunchroom, other locations
Discuss positioning of faculty during assembly program
Teachers discuss expectations regarding behavior in assembly before every assembly
Secure agreement that all faculty members will enforce dress code, planner usage
Agree that teachers will keep students in lunch room and out of offices
Administrators supervise by walking around

Begin program - all same day


Actions all school officials can use to modify behavior

Conference with student
Conference with student and parent
Call parent by phone for conference
Assign break detention
Assign after-school detention (1 day notice)
Assign meaningful extra work

Actions administrators can use to modify behavior

Suspend in accordance with COC
Assign ALC in accordance with COC
Corporal Punishment (Suggest you try a three week moratorium on CP)

Why do students misbehave?

We let them....
Poor parenting resulting in failure to understand school expectations
Organic—do not know difference between right and wrong, very few.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 8162

Key Rules and Points to Remember:: Some things to make you think!

All teachers and administrators are responsible for enforcing COC violations they observe. If you see it, you report it, you document it!

Do not use telephone to report discipline unless it is a 911 call for assistance.

If it is serious enough for you to send a student to the office immediately during class time, then it is serious enough for you to have someone watch your class and you go with the student report the incident first hand. You should then document the infraction using the correct forms and send them to the office.

An administrator should be available to respond immediately to any discipline issue.

All referrals should be managed within one school day. Justice should be swift. Remember, the ultimate goal is to modify behavior. I know of no research, etc. that says behavior can be modified when there is no direct understanding of the cause and effect relationship between the misbehavior and consequence. Have we forgot our educational psychology.? Fights, drugs, weapons, and other similar violations are easy. It is the multiple Class I offenses that drive us all crazy and impact the quality of the instructional time of other students.

Every student who fails to respond to a teacher's direction, including the assignment of break detention, etc. must be suspended pending a parent conference at a minimum. Empower teachers! Students must know that when teachers say something, it can not be disregarded.

Every teacher must treat students with respect. You will not get respect if you do not do this. Do not unnecessarily push their buttons. There is no need to do this. You are the professional, if you have done what you are supposed to do, you will WIN.

Talk in low tones, do not challenge students. Avoid confrontations. If one does occur, keep calm...it is not necessary for you to win the verbal dispute. If you try, then you may end up saying something that will allow the parents to attempt to shift the focus to you rather than the misbehavior of their child. Again, you may not win the verbal dispute, but everyone (including the other students in your class) will get the message the next day when you are present and the students is not.

Treat everyone the same. Every teacher has a favorite. However, enforce your rules the same for everyone. If you allow a favorite to get away with dress code violations, or to leave class without their planner, then how easy is it going to be when you require this of others. Kids are not dumb, they see this.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0163*

Every teacher from time to time comes across a student who grinds on their nerves in every way. Try to love them. These are the ones who will put a lump in your throat and tears in your eyes in five or six years when you see them go across the stage at graduation.

Realize that most students go home to environments very different than yours. You must spend a lot of time talking to them, counseling with them, and helping them to understand not only the expectations of school, but also the expectations of society in general. Most of them feel like their destiny is to follow in the foot step of their parents or guardians. That is, unemployment, dependency on others, and all the other social ills we know are out their being experienced by a majority of our students.

Review those sections of your old "growth and development" books from college. I know it has been a long time for many of us. What is normal adolescent behavior? Do not condone improper behavior, but understand that some things are just to be expected. Dealing with this is just part of being an educator....understand that the same problems we face are typical.....every school has the same problems. I have seen them first hand. Do not talk bad about your students and school.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0164*

PIKE COUNTY HIGH SCHOOL
January 27, 2003
FACULTY MEETING

| | |
|---|---|
| *Dorothy Hassett* | *Charles Coon* |
| *Connie Campbell* | *Sylvia Helms* |
| *Regina Booth* | *Melinda Morgan* |
| *Pam Wells* | *Olivia Boyd* |
| *Marie Davidson* | *Mary Thomas* |
| *James Washington* | *Barbara Whatley* |
| *[signature]* | *Kristen Gibson* |
| *[signature]* | *Martha Jordan* |
| *Phil Patton* | *Mary J. Price* |
| *Kim Mount* | |
| *Arlesia Johnson* | |
| *Maya Watson* | |
| *Irene Ellis* | |
| *Michelle Moorer* | |
| *Mary Kelli Kelley* | |
| *Mike Green* | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0165

AGENDA
FACULTY MEETING
JANUARY 27, 2003

WELCOME

CASEY
    BIRTHDAYS

HASSETT

CASEY
    SAFETY PLAN
    DISCIPLINE HANDOUT
    CODES
    E-MAIL
    CALENDAR

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0166

SIGN IN SHEET
AUGUST 4, 2004
FACULTY MEETING

| | |
|---|---|
| Ted Holler | U Pritchett |
| Mike Drew | Judy Ervin |
| Jim Faust | Shari Suler |
| Donna Faust | |
| Beth Chancellor | |
| Leigh Ann Owens | |
| Toni Sullivan | |
| April Grant | |
| Lisa Knight | |
| Colette Ramsey | |
| Bryna Johnson | |
| | |
| Marilyn Cox | |
| Tina Golden | |
| Diane Calhoun | |
| Alice Phillips | |
| Daphne Coppage | |
| Mona Watson | |
| | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0167

AUGUST 4, 2004
FACULTY MEETING

Mr. Casey
    1. Welcome
    2. Faculty Handbook – pass out
    3. Safety Plan
    4. Board policy manuals
    5. Code of conduct and other materials

Mr. McDaniel
    6. Discipline
    7. Textbooks
    8. General comments

Mr. Casey
    9. General comments
        1. First day
        2. Lunchroom
        3. Bookkeeping
        4. Inservice
        5. Faculty handbook
        6. Other items

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0168*

## CLASS RULES

1. BRING ALL MATERIALS AND BE PREPARED FOR CLASS

2. STAY SEATED UNLESS PERMISSION IS GIVEN TO GET UP

3. RESPECT OTHER PEOPLE AND THEIR PROPERTY

4. SPEAK AT APPROPRIATE TIMES AS DESIGNATED BY THE TEACHER

5. NO ~~OPEN~~ GUM, FOOD, OR DRINKS IN THE CLASSROOM

## CONSEQUENCES

**WARNING:** NAME ON THE BOARD FOR THE WEEK

**CHECK #1:** WRITING ASSIGNMENT TO INCLUDE THE RULE BROKEN OR OTHER PUNISHMENT ASSESSED BY TEACHER

Call | contact -

**CHECK #2:** CALL PARENT AND OTHER PUNISHMENT ASSESSED BY TEACHER

**CHECK #3:** OFFICE REFERRAL (WRITTEN ON CLASS/DISCIPLINE FORM)

**\*SEVERE BEHAVIOR WILL RESULT IN IMMEDIATE OFFICE REFERRAL.**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0169

Jan 16th Rifle Comp- Dothan?
12th Drill Comp- Wetumpka

Linda Tillech
-78

PIKE COUNTY HIGH SCHOOL
December 02, 2002
FACULTY MEETING

| | |
|---|---|
| *[signature]* | *[signature]* |
| *[signature]* Booth | *[signature]* Coon |
| *[signature] Harden* | Mary Kellie Kelley |
| Connie Campbell | mike Dree |
| Irene Ellis | *[signature]* |
| Pam Wells | *[signature]* |
| Mary *[signature]* | *[signature]* |
| Kim Maunt | Fred Holle *[signature]* |
| Sylvia *[signature]* | Melinda Morgan |
| Barbara Whatley | Daphne Coppage |
| Kristen Gibson | Wayne Grf |
| Mava Watson | |
| James Washington | |
| Mary Thompson | |
| Dris Hartwell | |
| Ember | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0170

# AGENDA
## Faculty Meeting
### December 2, 2002

1. Birthdays

2. Hassett          Dr. Key's Retirement –

3. Watson           STI, etc. –

4. Casey            Final Examination Schedule  –
                    Class Rules
                    Duty Roster –
                    Testing
                    Evaluations – Teacher
                    Student Fees and Lost Textbook Fees are any other Fee
                    due no later than December 6th 2002.  Turn
                    the fee list into Mrs. Boswell.

Students must have Reciept & Boswell
well Reciept you.

PTO meeting Dec. 12TE

Teacher Contracts – come By and see me.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 8171

January 6, 2003

Faculty Meeting

Cynthia Hassett

Connie Campbell

Mona Watson

JAnna Kilpatrick

Kimberly Mount

Sharon Denison

Melinda Morgan

Martha Horton

Dina Boyd

Mary Thompson

James Washing

Wayne Grant

Fred Holland

LeAnne Richery

Daphne Coppage

Arletthia Kane

Barbara Whatley

Peggy Threadgill

Doris Hartwell

Regina Booth

Kristen Gibson

Irene Ellis

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0172**

PIKE COUNTY HIGH SCHOOL
FACULTY MEETING
JANUARY 6, 2003
AGENDA

1) BIRTHDAYS

2) WATSON/HASSETT BENEVOLENT FUND

3) ATHLETICS - COACH GRANT

4) MR CASEY
    TEXTBOOKS
    GRADES
    FINANCIAL MATTERS
    ATTENDANCE (tardies)
    CALENDARS
    DUTIES

5) ANNOUNCEMENTS
    *Disciplinary committee will meet immediately after faculty meeting.
    *PTO meeting at 7:00 pm in the library on January 23rd
    *Teacher announcements

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0173*

# January 2003

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 Basketball game @ Barbour County 5:00 p.m. | 4 Basketball gam @ Bullock County 4:30 p.m. |
| 5 | 6 Teacher Workday TEAM 2 DUTY | 7 Students return WELCOME BACK !! | 8 IIC 3:00 p.m. at the Central office | 9 Report Cards (students will report to homeroom at 2:25 p.m.) PCHS vs Calhoun at home 5:00 p.m. | 10 | 11 PCHS vs Barbour Co. at home 5:00 p.m. Drill Team Competition at Wetumpka |
| 12 | 13 SIAC meeting immediately after school TEAM 3 DUTY | 14 Basketball game @ Central Hayneville 5:00 p.m. | 15 | 16 PCHS vs Carroll High at home 5:00 p.m. Rifle Competition at Dothan | 17 ASVAB | 18 PCHS vs Goshen at home 5:00 p.m. |
| 19 | 20 King/Lee HOLIDAY TEAM 1 DUTY | 21 Basketball game @ Calhoun 5:00 p.m. | 22 | 23 PTO | 24 Basketball game @ Andalusia 4:30 p.m. | 25 Basketball game @ Charles Henderson 4:30 p.m. |
| 26 | 27 Mercedes Plant-Harbuck -FACULTY MEETING -PCHS vs Hayneville at home 5:00pm -TEAM 2 DUTY | 28 PCHS vs Luverne at home 5:00 pm | 29 | 30 | 31 Basketball game @ Goshen 5:00 pm | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0174

PIKE COUNTY HIGH SCHOOL
FACULTY MEETING
JANUARY 6, 2003
AGENDA

1) BIRTHDAYS

2) WATSON/HASSETT BENEVOLENT FUND

3) ATHLETICS - COACH GRANT

4) MR CASEY
    TEXTBOOKS
    GRADES
    FINANCIAL MATTERS
    ATTENDANCE (tardies)
    CALENDARS
    DUTIES

5) ANNOUNCEMENTS
    *Disciplinary committee will meet immediately after faculty meeting.
    *PTO meeting at 7:00 pm in the library on January 23rd
    *Teacher announcements

*[handwritten:] Homeroom 1st - schedules - bell 1st block
Report Cards - 4th block Thursday 4 PC
Bulletin on email*

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0175

*New Teacher Orientation*
*August 2, 2004*

Welcome & Introductions          Dr. Mark Bazzell, Superintendent

Superintendent's Comments

- Our Promise
- Calendar Distribution
- New Teacher Resources

Instructional Programs            Mrs. Carolyn Baker, Administrative Assistant

Break                             Pike County Education Association

Instructional Support            Mrs. Elizabeth Grubbs, Administrative Assistant

Prevention & Support/            Mrs. Karen Berry, Administrative Assistant
  Special Education Services

Pike County Education Association

Insurance & Payroll Information

Adjourn

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0176

INSERVICE
JANUARY 4, 2006

| TIME | GRADE LEVEL | LOCATION | PLAN |
|---|---|---|---|
| 8:00 – 12:00 | K-2nd Grade | Home Schools | Work with reading coach on DIBELS mid-year data and intervention groups. |
| | 6-12 Core Teachers, Special Education, Music, and Foreign Language Teachers, and ROTC | PCHS Media Center | Meet with JBHM consultant on training in intervention strategies and explicit teaching techniques |
| | Counselors | Central Office | Meet with Mrs. Grubbs |
| | Career Tech Teachers | Center for Technology | Meet with Mr. Griffin |
| | Paraprofessionals | | Meet with the group you work with most frequently. |
| 1:00 – 3:30 | K – 12th Grade P.E. | GES | Meet with Mrs. Berry and the Nurses on recognizing heat stroke and heat exhaustion |
| 1:00 – 3:30 | Library Media | Central Office | Meet with Mrs. Grubbs |
| 8:00 – 3:30 | 3rd – 5th Grade Teachers | Troy Elementary School | CATCH Program |
| 8:00 – 3:30 | Bus Drivers | Center for Technology (CRC – Rm 23) | Meet with Mr. Hicks |

*8:00 TES 11:45 Gym* (handwritten, left margin)

All Custodians report to school and begin cleaning in preparation for students on the 5th.

Remainder of the day is to be at the home school and used according to the directions of the principal.

**JR v. Pike County BOE**
*Produced by Defendant PCBE*
**No. 0177**

# AGENDA
### January 4, 2006
### Banks School Inservice

**People Who Should Attend:**
**Kindergarten Teachers**
**1st Grade Teachers**
**2nd Grade Teachers**
**Stephens and Sharpe**
**Pugh**
**Dunn**

### 8:00 – 10:00 DATA MEETINGS - MRS. TOWNSEND

**Objectives:**

- Review midyear data
- Review growth of ALL students
- Adjust goals and action plans
- Celebrate successes
- Regroup students and plan for students who did not reach benchmark

### 10:00 – 12:00 COMPUTER LAB TRAINING – DUNN, PUGH, STEPHENS

**Objectives:**

- Make computer lab schedule that will include all grades
- Train on fluent reader
- Train on new computer programs that have been installed

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0178

# New Teacher Training
## July 28, 2006

## AGENDA

| | |
|---|---|
| 8:00 | **Welcome and Introductions** |
| 8:30 | **STI and Technical Information** |
| 9:30 | **Expectations** |
| 10:15 | **Break** |
| 10:25 | **Curriculum and Evaluations** |
| 11:40 | **Lunch** |
| 12:30 | **Classroom Management and Procedures** |
| 2:20 | **Break** |
| 2:30 | **Follow-up discussions**<br>**Q & A**<br>**Planning** |
| 3:30 | **Conclusion** |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0179*

# NEW TEACHER ORIENTATION

## AGENDA

### Tuesday, August 1, 2006

#### 9:00 A.M.

| | | |
|---|---|---|
| 9:00 | Welcome & Introductions,<br>Superintendent's Comments | Dr. Mark Bazzell, Superintendent |
| 9:35 | Academic Programs, Federal Programs,<br>Professional Development | Mrs. Donnella Carter,<br>Administrative Assistant, Instruction |
| 9:55 | Instructional Support<br>PEPE | Mrs. Elizabeth Grubbs<br>Administrative Assistant, Instructional Support |
| 10:15 | BREAK | |
| 10:35 | Prevention & Support,<br>Special Education | Mrs. Karen Berry, Administrative Assistant<br>Prevention & Support, Special Education |
| 10:55 | Pike County Education Association | Mrs. Janet Wingard, President, PCEA<br>Mrs. Julie Swann, UniServ Director |
| 11:10 | Insurance | PEEHIP Insurance Representative |
| 11:30 | Adjourn | |

**JR v. Pike County BOE**
Produced by Defendant PCBE
**No. 0180**

# *Pike County Schools*
# *Institute Agenda*
# *August 3, 2006*

| | | |
|---|---|---|
| 8:30 | Posting of Colors | Goshen High School Colorguard |
| | Invocation | Mr. Marvin Jackson |
| | Welcome | Dr. Mark Bazzell |
| | Introduction of New Faculty and Staff | Principals |
| | Comments | Dr. Mark Bazzell |
| | Accountability | Mrs. Donnella Carter |
| 10:00 | Break | |
| 10:15 | Comments | Senator Wendell Mitchell |
| 10:20 | RSA / PEEHIP | Ms. Martha Scott |
| 10:40 | Pike Teachers Credit Union | Dr. Eugene Omasta |
| 10:45 | Pike County Education Association | Ms. Janet Wingard |
| 10:55 | Prevention and Support | Mrs. Karen Berry |
| 11:00 | Instructional Support | Mrs. Elizabeth Grubbs |
| 11:05 | Instructional Programs | Mrs. Donnella Carter |
| 11:10 | Special Recognition and Closing Comments | Dr. Mark Bazzell |
| 11:30 | Lunch | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0181

# Pike County Schools
## Inservice Schedule
### January 2, 2007

Topic:        Reading in the Content Area
Presenters:   Pike County Reading Coaches
Facilitator:  Gene Nelson
Location:     Goshen High School Cafeteria
Time:         8:00 AM – 11:00 AM
**Participants:** All 7th – 12th grade English/Reading, Math, History, Science, Business, Special Ed./
Collaborative, Foreign Language, Music, Ag., ROTC, Library/media, PE, and RCT
teachers - High School Instructional Assistants

Topic:        Technology as a tool for Assessment Standards
Presenter:    Donnella Carter
Location:     Pike County Elementary School Cafeteria
Time:         8:00 AM – 11:00 AM
**Participants:** All 3rd – 6th Regular, Special Ed./Collaborative, and Library/media teachers
Elementary Instructional Assistants

Topic:        Classroom Management
Presenter:    Dr. Michael Romanowski
Facilitator:  Elizabeth Grubbs
Location:     Pike County Board of Education Board Room
Time:         8:00 AM – 11:00 AM
**Participants:** All K – 2nd Regular, Special Ed./Collaborative, Speech, Gifted, Indian, and
K-6 PE teachers

Topic:        Bus Safety and Bus Routing
Presenter:    Mike Johnson
Facilitator:  Tom Hicks
Location:     Regional Center for Technology Meeting Room
Time:         8:00 AM – 12:00 Noon
**Participants:** All Bus Drivers

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0182

Location:     Report to Work Sites
Time:         Regular Day
**Participants:** Secretaries, Bookkeepers, Counselors, Maintenance Workers, Janitors, CNP Workers,
and Nurses

***All employees participating in professional development activities, except bus drivers,
should plan to have lunch on your own after your training session and report to your
work site no later than 12:45 PM.***





*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0183

3



## REFERRALS

## Why refer a student?

★ *Academic*

and / or

★ *Behavioral*

---

 

### ALABAMA SDE AT-RISK
### DEFINITION AND OBSERVABLE INDICATORS

At-risk students shall be defined as those students who have scored in stanines 1, 2, 3, and 4 in the most recent SAT or other approved standardized tests and/or students who have received academic grades lower than C in the core subjects of science, language arts, social studies, or mathematics or students defined as at-risk in *Code of Alabama (1975), Section 16-13-231 (Act 2003-436).* The Alabama State Department of Education recognizes that students may be at risk of not experiencing school success and are in danger of school failure and/or noncompletion.

This may be due to situations, circumstances, and/or conditions (e.g., environment, family, health) over which they may have limited control. By providing focused attention and assistance in identified areas of need, students will be given opportunities to experience school success. Many of these students may be served at the local level through alternative programs. Observable indicators used to identify students who are at risk may include, but are not limited to, the following:

*Academics (e.g., poor reading skills, inadequate communication skills, readiness to learn, poor performance, low test
      scores, retention).
*Attempted suicide
*Attendance (e.g., excessive tardiness and/or absences, truancy, dropouts).
*Behavior (e.g., inadequate social/emotional adjustment, discipline problems, juvenile court involvement).
*Environment (e.g., family, school, community): adverse or chronic health conditions, homelessness/family
      mobility, limited literacy in family, poverty, student neglect and/or abuse.
      *Student pregnancy/parenthood
      *Substance abuse
      *Traumatic experiences (e.g., family violence, death of family member, victim of natural disasters)

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0185



# BENEFITS

### The Major Advantage

A structure is provided for professionals to use their individual strengths for solving problematic issues as a team. This should result in achieving the ultimate goal of student success and overall school improvement.

### Through appropriate use of BBSST, the following occurs:

- ◆ A building-level, collaborative, problem-solving model is created, providing support for teachers and students.

- ◆ Responsibility, expertise, and accountability are shared among the school's staff.

- ◆ Immediate support for the teacher, parent, and/or student is established.

- ◆ Documentation of interventions/strategies attempted is provided to support the possible need for a special education evaluation, with valuable intervention time used effectively.

- ◆ Appropriate referrals are made for special education (IEP team) services.

- ◆ The nature of the student's academic and/or behavioral difficulty is clarified.

- ◆ Classroom programs are accommodated to meet individual student needs.

- ◆ The ability to successfully teach all students in the regular classroom can be enhanced.

- ◆ A more responsive, productive, and ultimately satisfying professional environment may be provided.



*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0187*

## BUILDING BASED STUDENT SUPPORT TEAM (BBSST)
## GENERAL DESCRIPTION

**A designated school-based committee designed to meet the needs of *general education* students at risk of failure due to academics, behavior, or drop-out. BBSST plans are for regular education classes only. BBSST is not used for students on an active IEP or 504, IB, or AP classes; Gifted classes or Magnet classes; or any other "honor" or advanced class of choice. It is used for students with chronic academic and/or behavior challenges in general education classes, career technical, and alternative education classes.**

- ❖ Addresses discipline, drop-out, academic, and behavioral student challenges within general education (see definition of At-Risk on page 24)
- ❖ Provides immediate support when confronting classroom concerns that need to be addressed in a timely manner
- ❖ Supports teachers as well as students by providing assistance in resolving the diverse problems/challenges of multi-level abilities in the general education classroom
- ❖ Discusses issues and writes plans related to specific individual needs of students and teachers
- ❖ Requires that all certified personnel have the basic BBSST training, as well as yearly updates through LEA Coordinators
- ❖ Requires teacher responsibility in implementing the instructional and behavioral intervention strategies and methods outlined in the individual student BBSST plans
- ❖ Requires administrative (building principal) monitoring and documentation of each teacher's implementation of plans
- ❖ Requires Central Office BBSST Coordinator to monitor and collect written documentation of individual BBSST teams at the school level, and to report this to SDE annually by April 1
- ❖ Provides the required first or simultaneous step in identifying students for referrals for special education testing. It is the process before and during special education testing, with more than 90% of the students served by the team remaining in their current general education placement
- ❖ Requires teams to include a functional assessment of the classroom environment (BASC) if a special education referral is made following the required six-week minimum BBSST plan
- ❖ Mandates the BBSST process as a part of the *Lee v. Macon* Consent Decree and the *Alabama Administrative Code,* which should currently be fully implemented in all schools, including use of the required pre-referral form and tracking log
- ❖ Provides parent information from individual schools and at the LEA level

Further guidelines for the BBSST process can be found in the *Lee v. Macon* Consent Decree, the SDE BBSST Manual, on the Prevention and Support Services Section Web site at www.alsde.edu, in the *Alabama Administrative Code § 290-3-1-.02* for Regulations Governing Public Schools, and in the *Alabama Administrative Code § 290-8-9-.01-.72ER(2).*

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0189

Alabama State Department of Education
Prevention and Support Services
Fall 2006

## ALABAMA SDE AT-RISK DEFINITION AND OBSERVABLE INDICATORS

**At-risk students shall be defined as those students who have scored in Stanines 1, 2, 3, and 4 in the most recent SAT or other approved standardized tests and/or students who have received academic grades lower than C in the core subjects of science, language arts, social studies, or mathematics or students defined as at-risk in *Code of Alabama* (1975), Section 16-13-231 (Act 2003-438).**

*The Alabama State Department of Education recognizes that students may be at risk of not experiencing school success and are in danger of school failure and/or noncompletion. This may be due to situations, circumstances, and/or conditions (e.g., environment, family, health) over which they may have limited control. By providing focused attention and assistance in identified areas of need, students will be given opportunities to experience school success. Many of these students may be served at the local level through alternative programs.*

*Observable indicators used to identify students who are at risk may include, but are not limited to, the following:*

- *Academics (e.g., poor reading skills, inadequate communication skills, readiness to learn, poor performance, low test scores, retention).*
- *Attendance (e.g., excessive tardiness and/or absences, truancy, dropouts).*
- *Behavior (e.g., inadequate social/emotional adjustment, discipline problems, juvenile court involvement).*
- *Environment (e.g., family, school, community):*
  - *Adverse or chronic health conditions.*
  - *Attempted suicide.*
  - *Homelessness/family mobility.*
  - *Limited literacy in family.*
  - *Poverty.*
  - *Student neglect and/or abuse.*
  - *Student pregnancy/parenthood.*
  - *Substance abuse.*
  - *Traumatic experiences (e.g., family violence, death of family member, victim of natural disasters).*
  - *Other.*

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0190**

# HIGH SCHOOL EXAMPLE
# STUDENT PREREFERRAL FORM

## SECTION I.  DOCUMENTATION OF SEVERITY AND DURATION OF PROBLEM
### (Complete one form for each identified problem)

Student's Name:  Sarah E. Larson_____    Sex: ____F____    Birth Date: _____1/2/84_____
Age: 16 School: Melville High School_____    Grade: ____11____    Date: _____10/20/00_____
Specific Problem:  Sarah is frequently absent from school; she frequently refuses to attempt work or turn in
incomplete assignments; she checks out often and has poor grades.
Person Completing Form: _____Thomas L. Merlowski, History teacher_____

### Evidence of Severity and Duration of Problem (attach documentation)

| Evaluation Method | Results | Dates (From - To |
|---|---|---|
| Analysis of work samples: | Significant weakness in math and science. | 8/14 – 10/20 |
| Attachment A | Significant number of incomplete or assignments not attempted. | 8/14 – 10/20 |
| Classroom tests: | Grades usually range from failing to D. | 8/14 – 10/20 |
| Attachment B | Sometimes won't take or make up missed tests. (2 out of 5 not made up) | 8/14 – 10/20 |
| Behavior assessment: | Withdrawn from staff and peers. | 8/14 – 10/20 |
| Attachment C | Frequently asks to be excused for illness (stomachache or headache) (1 to 2 times per week) | 8/14 – 10/20 |
| | Absent 2 to 4 times per month for illness. | |
| Performance assessment: | Work samples exhibit adequate language skills | 8/14 – 10/20 |
| Attachment D | for reading and comprehension of material | 8/14 – 10/20 |
| Report card grades: | Fs in math and science | 10/2/00 |
| Attachment E | Cs and Ds in other classes | 10/2/00 |
| Test information from | SAT-9 scores in third stanine | 4/99 |
| cumulative folder: | OLSAT scores in fifth stanine | 4/99 |
| Attachment F | Sarah has been a low B to low C student since third grade | 1992 – present |
| | Sarah's high school grades range from F to C | 1992 – present |
| Other teacher information: | Three telephone conferences with her mother: 8/22, 9/15, 10/6 | |
| Attachment G | Two parent conferences with her mother: 8/23, 9/18 | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0191

# DRAW OUT YOUR STUDENTS' STRENGTHS

| Intelligence Area: | Is Strong In: | Likes To: | Leans Best Through: | Famous Examples: | Common Misbehaviors: |
|---|---|---|---|---|---|
| Verbal/Linguistic | Reading, writing, telling stories, memorizing dates, thinking in words | Read, write, tell stories, talk, memorize, do word puzzles | Reading, hearing, and seeing words; speaking; writing; discussions | T. S. Eliot, Maya Angelou, Abraham | Passing notes, reading during lessons |
| Logical/mathematical | Math, reasoning, logic, problem-solving, patterns | Solve problems, question, reason, work with numbers, experiment, use computers | Working with patterns and relationships, classifying, abstract thinking | Albert Einstein, John Dewey, Susanne Langer | Working on math or building things during lessons |
| Visual/Spatial | Reading, maps, charts, drawing, puzzles, imagining things, visualization | Design, draw, build, create, daydream, look at pictures | Working with pictures and colors, visualizing, drawing | Pablo Picasso, Frank Lloyd Wright, Georgia O'Keffee, Bobby Fischer | Doodling, drawing, daydreaming |
| Bodily/Kinesthetic | Athletics, dancing, acting, crafts, using tools | Play sports, dance, move around, touch and talk, use body language | Touching, moving, processing knowledge through bodily sensations | Charlie Chaplin, Michael Jordan, Martha Graham | Fidgeting, wandering around the room |
| Musical/Rhythmic | Singing, picking up sounds, remembering melodies, rhythms | Sing, hum, play an instrument, listen to music | Rhythm, melody, singing, listening to music and melodies | Leonard Bernstein, Mozart, Ella Fitzgerald | Tapping pencil or feet |
| Interpersonal/Social | Understanding people, leading, organizing, communicating, resolving conflicts | Have friends, talk to people, join groups | Sharing, comparing, relating, interviewing, cooperating | Mohandas Gandhi, Ronald Reagan, Mother Teresa | Talking, passing notes |
| Interpersonal/Introspective | Understanding self, recognizing strengths and weaknesses, setting goals | Work alone, reflect, pursue interests | Working alone, self-paced projects, reflecting | Eleanor Roosevelt, Sigmund Freud, Thomas Merton | Conflicting with others |

Nelson, Kristen.
Seven Ways of Being Smart."
  Instructor. July/August 1995:29.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0192

# Behavior/Social Checklist

**Instructions:** Read the behaviors listed in each of the following categories. If an individual does not exhibit problem haviors in a category, check "No" for that category. If an individual does exhibit problem behaviors in a category, check es", describe the *major* behavior, and check its *frequency.*

## Hurtful to Self/Others

Examples: hitting, banging head, scratching, cutting or puncturing, biting, rubbing skin, pulling out hair, picking on skin, biting nails, pinching, kicking, or striking with an object
- O **No**
- O **Yes**  (if yes, describe the major problem)

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- O One to 6 times a week
- O One to 10 times daily
- O One or more times an hour

## Destructive to Property

Examples: deliberately breaking, defacing or destroying things by hitting, tearing, or cutting, throwing, burning, or marking or scratching things.
- O **No**
- O **Yes**  (if yes, describe the major problem)

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- O One to 6 times a week
- O One to 10 times daily
- O One or more times an hour

## Disruptive Behavior

Examples: Clinging, pestering or teasing, arguing or complaining, picking fights, laughing or crying without reason, interrupting, yelling or screaming, or interfering with others' activities.
- **No**
- ✓ **Yes** (if yes, describe the major problem

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- O One to  times a week
- O One to 10 times daily
- O One or more times an hour

## Withdrawal or Inattentive Behavior

Examples: Keeping away from others, shy or timid in social situations, expressing unusual fears, showing little interest in activities, appearing sad or worried, showing little concentration on a task, sleeping too much, or talking negatively about self.
- O **No**
- O **Yes**   (if yes, describe the major problem)

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- O One to 6 times a week
- O One to 10 times daily
- O One or more times an hour

## Child Independence

Examples: Constantly seeks help when could manage by self, quickly frustrated, loses emotional control, requires an unusual amount of teacher supervision to perform tasks.
- O **No**
- O **Yes**  (if yes, describe the major problem)

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- One to 6 times a week
- O One to 10 times a day
- O One or more times an hour

## Uncooperative Behavior

Examples: Refuses to obey or follow rules, acts defiantly or pouts, refuses to do work, refuses to attend school, arrives late to school, refuses to take turns or share, cheats, steals, breaks laws.
- O **No**
- O **Yes**  (if yes, describe the major problem)

_____

_____

**Frequency:**
- O Less than once a month
- O One to 3 times a month
- O One to 6 times a week
- O One to 10 times daily
- O One or more times an hour

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0194

4.   Accommodations for Material (continued)

- ☐ 04S  Contract with student and use rewards for completion of contract.
- ☐ 04T  Check the student's notebook to ensure the use of dividers, assignment sheets, and calendars.
- ☐ 04U  Provide a due date on written assignments.
- ☐ 04V  Provide a specific place for turning in completed assignments.
- ☐ 04W  Other:

---

5.   **Accommodations for Using Groups and Peers**

- ☐ 05A  Use cooperative learning strategies when appropriate.
- ☐ 05B  Assign a peer helper to check understanding of directions.
- ☐ 05C  Assign a peer helper to read important directions and essential information.
- ☐ 05D  Assign a peer tutor to record material dictated by the student.
- ☐ 05E  Other:

---

6.   **Accommodations for Attention**

- ☐ 06A  Establish relevancy and purpose for learning by relating to previous experiences.
- ☐ 06B  Shape approximations of desired behavior by providing direct reinforcement such as praise or immediate feedback for correct answers.
- ☐ 06C  Seat student close to teacher.
- ☐ 06D  Make a positive, personal comment every time the student shows any evidence of interest.
- ☐ 06E  Make frequent check for assignment progress or completion.
- ☐ 06F  Give advance warning or when a transition is going to take place.
- ☐ 06G  Use physical proximity and touch to help student focus.
- ☐ 06H  Other:

---

7.   **Accommodations to Assist the Reluctant Starter**

- ☐ 07A  Give a personal cue to begin work.
- ☐ 07B  Give work in smaller units.
- ☐ 07C  Provide immediate reinforcement and feedback.
- ☐ 07D  Make sure the appropriate books and materials are open to the correct pages.
- ☐ 07E  Introduce the assignment in sequential steps.
- ☐ 07F  Check for student understanding of instructions.
- ☐ 07G  Check on progress often in the first few minutes of work.
- ☐ 07H  Provide time suggestions for each task.
- ☐ 07I  Provide a checklist for long detailed tasks.
- ☐ 07J  Other:

---

8.   **Accommodations for Dealing with Inappropriate Behavior**

- ☐ 08A  Provide clear and concise classroom expectations and consequences.
- ☐ 08B  Consistently enforce rules.
- ☐ 08C  Avoid the use of confrontational techniques.
- ☐ 08D  Provide student with alternatives.
- ☐ 08E  Designate a "cooling off" location within the classroom.
- ☐ 08F  Assign activities which require some movement.
- ☐ 08G  Use praise generously.
- ☐ 08H  Avoid power struggles.
- ☐ 08I  Ignore attention-getting behavior for a short time.
- ☐ 08J  Avoid criticizing the student.
- ☐ 08K  Communicate frequently with parents.
- ☐ 08L  Monitor levels of tolerance and be mindful of signs of frustration.
- ☐ 08M  Speak privately, without the audience of peers, to student about inappropriate behavior.
- ☐ 08N  Establish behavioral contract.
- ☐ 08O  Other:

SAMPLE

**

Reference:
Suggested Interventions from "Making Modifications in the Classroom: A Collection of Checklists," Arlington County Public Schools, Arlington, Virginia.

** 6&S 3005  10 12 00

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0196

*Alabama State Department of Education*
*Special Education Services Section*

# IDEA AND SECTION 504
# A COMPARISON

| COMPONENT | IDEA<br>(Individuals with Disabilities Education Act 1997) | SECTION 504<br>(Rehabilitation Act 1973)<br>ADA<br>(Americans with Disabilities Act 1990) |
|---|---|---|
| General Purpose | Is a federal funding statute whose purpose is to provide financial aid to states in their efforts to ensure adequate and appropriate services for children with disabilities. | Is a broad civil rights law which protects the rights of individuals with disabilities in programs and activities that receive federal financial assistance from the U.S. Department of Education. It is an anti-discrimination statute. |
| Who is Protected? | Identifies all school-age children who fall within one or more specific categories of qualifying conditions. | Identifies all school-age children as disabled who meet the definition of qualified person and who has a physical or mental impairment which substantially limits a major life activity. Major life activities include walking, seeing, hearing, speaking, breathing, learning, working, caring for one's self, and performing manual tasks. The disabling condition need only substantially limit one major life activity in order for the student to be protected. |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0199*

# SELECTED INTERVENTIONS AND STRATEGIES

The following interventions and strategies identify ways educators can reach students who may be at risk of school failure and/or noncompletion. Although the information included in this section is directed at teaching students at risk, educators may find it helpful in working with any student. These are samples of suggested activities and are not intended to be all inclusive or considered the best ones to be used in any given situation.

## POWER-SEEKING

| Issue | Strategies/Techniques |
|---|---|
| Arguing with others | **Respond consistently to each arguing incident.** |



**Respond consistently to each arguing incident.**

Calmly and firmly correct with as little verbalization as possible. (e.g., "Adam and David, you are showing us what an argument is. Take turns talking and speak quietly. See me if you need help with your problem.")

**Reinforce appropriate behavior.**

Praise those who have a greater tendency to argue when they meet your expectations.

Periodically give the student who rarely or never argues "a pat on the back."

Applaud the entire class when there has been noticeable improvement in this area.

**Teach students how to resolve conflicts.**

Develop lessons that will help the student recognize what an argument is. Assist him in developing strategies on his own that will help him avoid arguing and teach him alternatives to arguing.

**Prompt appropriate behavior prior to potential argumentative situations.**

(e.g., "We will be working in groups on our project today. You may not agree with each other on certain points. I will be listening to see if you remember how to handle situations when you have a different opinion, like we practiced yesterday. I'm sure you can!")

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0200



EXHIBIT

# APPLICATION FOR EMPLOYMENT
### PIKE COUNTY BOARD OF EDUCATION
109 E. CHURCH STREET
TROY, AL 36081
(334) 566-1850

TEACHING POSITION DESIRED _Band Director_    MAJOR _Music Ed_ MINOR _Music Administration_

### PERSONAL INFORMATION

7-2000

_Coon_ _Charles_ _L._                                DATE _334-382.7639_
LAST NAME    FIRST    MIDDLE

_P.O. Box 201_                                      TELEPHONE _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_
STREET ADDRESS

_Greenville, AL    36037_                           SOCIAL SECURITY NO.
CITY, STATE, ZIP

HAVE YOU EVER BEEN CONVICTED OF A CRIME OTHER THAN A MINOR TRAFFIC VIOLATION? YES ___ NO _X_

IF YES, PLEASE EXPLAIN: _____

LIST MEMBERSHIP IN PROFESSIONAL OR CIVIC ORGANIZATIONS: _Member of Eureka Masonic Lodge_
_Scottish Rite Bodies – Past member of MENC – ABA – NEA AEA_
_and local associations_

### EDUCATION

COLLEGE (NO. OF YEARS COMPLETED) _5_    DEGREE(S) _M.Ed._

LIST SCHOOL(S) YOU ATTENDED AND WHERE YOU RECEIVED YOUR DEGREE(S): _Auburn University,_
_Livingston University, BME & M.Ed – AUM – Troy State University._

DO YOU HOLD A CURRENT ALABAMA TEACHING CERTIFICATE?    YES _✓_    NO _____

WHAT IS YOUR CERTIFICATE CLASSIFICATION?    CLASS B ____    CLASS A _✓_ CLASS AA ____

IN WHAT ACADEMIC FIELDS ARE YOU CERTIFIED TO TEACH? _Band    – Social Studies_

HAVE YOU EVER BEEN INVOLUNTARILY TERMINATED FROM ANY POSITION? _NO_

### EMPLOYMENT EXPERIENCE

EXPERIENCE OTHER THAN TEACHING: (LIST EACH JOB HELD STARTING WITH YOUR PRESENT OR LAST JOB.  INCLUDE MILITARY SERVICE ASSIGNMENTS AND VOLUNTEER ACTIVITIES.

| NAME OF FIRM OR EMPLOYER | ADDRESS | KIND OF WORK | FROM (DATES) TO |
|---|---|---|---|
| _Franklin Life_ | _P.O. Box 201_ _Greenville, AL_ | _Sales_ | _10-94 – Present_ |

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0002

YOUR APPLICATION FOR EMPLOYMENT CANNOT BE CONSIDERED COMPLETE UNTIL IT IS RETURNED TO THE SUPERINTENDENT'S OFFICE ALONG WITH YOUR FOUR LETTERS OF REFERENCE AND YOUR TRANSCRIPTS. IT IS YOUR RESPONSIBILITY TO SEE THAT LETTERS OF REFERENCE AND TRANSCRIPTS ARE SUBMITTED. ONCE THIS PROCESS IS COMPLETE IF WE HAVE A PERSONNEL NEED FOR YOUR AREA WE WILL BE HAPPY FOR YOU TO COME FOR A MORE EXTENSIVE INTERVIEW SHOULD YOU DESIRE TO DO SO.

INTERVIEWS ARE CONDUCTED ON THE BASIS OF PERSONNEL NEEDS AND TAKE APPROXIMATELY TWO HOURS. APPLICANTS MUST CALL AND SCHEDULE APPOINTMENTS FOR INTERVIEWS.

PLEASE FEEL FREE TO CALL SHOULD YOU NEED ADDITIONAL INFORMATION OR ASSISTANCE.

THE SALARY SCHEDULE FOR BEGINNING TEACHERS IN THE PIKE COUNTY SCHOOL SYSTEM WHO HAVE NO PRIOR TEACHING EXPERIENCE IS INDICATED BELOW. SHOULD ADDITIONAL FUNDS FOR SALARIES BECOME AVAILABLE BEFORE THE START OF THE NEXT SCHOOL YEAR, THE SALARY SCHEDULE WILL BE ADJUSTED ACCORDINGLY.

| RANK CERTIFICATE | ANNUAL SALARY | MONTHLY SALARY |
|---|---|---|
| AA | $29,782.00 | $2,481.84 |
| I (MASTER'S) | 27,836.00 | 2,319.67 |
| II (B.S.) | 24,203.00 | 2,016.92 |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0003

STUDENT TEACHING EXPERIENCE:

| NAME OF SCHOOL | LOCATION | GRADE OR SUBJECT | DATES | NAME AND ADDRESS OF SUPERVISING TEACHER |
|---|---|---|---|---|
| Gordo High School | Gordo, Al | Band 5-12 | Sp 1969 | E. O. Hobson |

TEACHING EXPERIENCE UNDER CONTRACT:

| NAME AND LOCATION OF SCHOOL | FROM TO | NAME & ADDRESS OF SCHOOL SYSTEM | GRADE OR SUBJECT |
|---|---|---|---|
| Red Level High School, Red Level, AL | 1993-94 | Covington County, Andalusia, Al | Band 5-12 ① (TAUGHT 72 Soc. St I-9) |
| Highland Home High School, Highland Home, AL | 1988-1993 | Crenshaw County, Luverne, Al | Band 5-12 ⑤ |
| Wicksburgh High School, Newton, AL | 1987-1988 | Houston County, Dothan, AL | Band 5-12, Soc. St 7+8 ① |
| Greenville High School, Greenville, AL | 1974-1984 | Butler County, Greenville, Al | Band 5-12 ⑩ |

✱ - See resume for additional experience information

TOTAL YEARS TEACHING EXPERIENCE ___20 +___  ARE YOU CURRENTLY UNDER CONTRACT?  ___NO___

(2.7)

REFERENCE CHECK

I GRANT PERMISSION FOR THE PIKE COUNTY SCHOOL SYSTEM TO REQUEST REFERENCE INFORMATION FROM THE PERSON(S) LISTED BELOW:

NAME: John Bradley

TITLE: Band. Director - Monroe Co. H.S.

ADDRESS: Tiger Drive

Monroeville, Al 36460

PHONE NUMBER: 334-575-9662
743-2890


NAME: Gerald Benson

TITLE: Retired Principal

ADDRESS: 111 Overlook Rd

Greenville, AL 36037

PHONE NUMBER: 334-382-5059


NAME: James Darby

TITLE: Owner - Capitol Music

ADDRESS: 3834 Harrison Rd

Montgomery, AL 36109

PHONE NUMBER: 1-800-588-4138
334-277-2990


NAME: J. Shelby Searcy

TITLE: Retired Superintendent

ADDRESS: 200 Shady Ridge Rd.

Greenville, Al 36037

PHONE NUMBER: 334-382-7921


___✗___ I WAIVE MY RIGHTS TO REVIEW REFERENCE INFORMATION.

_____ I DO NOT WAIVE MY RIGHTS TO REVIEW REFERENCE INFORMATION

DATE: 6-5-96          SIGNATURE: _____

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0004

THE FOLLOWING QUESTIONS ARE OPTIONAL AND WILL BE CONFIDENTIAL. THEY WILL NOT BE USED IN DETERMINING YOUR EMPLOYMENT.

BIRTH DATE: 01-02-48        RACE: W    SEX: M    HEIGHT: 6'2"    WEIGHT: 175
        (RACE, AGE OR SEX IS NOT A FACTOR IN EMPLOYMENT, PLACEMENT OR SALARY.)

MARITAL STATUS:    MARRIED ✓    SINGLE_____    DIVORCED_____    WIDOWED_____

SPOUSE'S NAME: Minnie L. Coon        SPOUSE'S OCCUPATION: Assistant Principal

NUMBER OF CHILDREN: 1        AGE OF CHILDREN: 15        IF YOUR CHILDREN ARE

SCHOOL AGE, LIST THE SCHOOL(S) THEY ATTEND: Greenville High School

ARE YOU ABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF THE POSITION YOU ARE APPLYING FOR WITHOUT REASONABLE ACCOMMODATION? YES ✓ NO_____ IF NO, WHAT ACCOMMODATION IS NEEDED?_____

ARE YOU A CITIZEN OF THE UNITED STATES? YES ✓ NO_____ ARE YOU A VETERAN? YES____ NO X

DID YOU RECEIVE AN HONORABLE DISCHARGE? YES____ NO____ (IF NO, PLEASE STATE WHAT TYPE OF A DISCHARGE AND REASON: _____

DO YOU HAVE ANY FRIENDS OR RELATIVES THAT WORK WITH THE PIKE COUNTY BOARD OF EDUCATION? YES___ NO X

IF YES, LIST NAME(S):_____

I UNDERSTAND THE INFORMATION PROVIDED IN THIS APPLICATION FOR EMPLOYMENT IS TRUE, CORRECT, AND COMPLETE. IF EMPLOYED, ANY MISSTATEMENT OR OMISSION OF FACT ON THIS APPLICATION MAY RESULT IN MY DISMISSAL.

I UNDERSTAND THAT ACCEPTANCE OF ANY OFFER OF EMPLOYMENT DOES NOT CREATE A CONTRACTUAL OBLIGATION UPON THE PIKE COUNTY BOARD OF EDUCATION TO CONTINUE TO EMPLOY ME IN THE FUTURE.

DATE 6-5-96        SIGNATURE _Charles Coon_

It is the official policy of the Pike County Board of Education that no person shall, on the grounds of race, color, handicap, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, and Title IX Coordinator, at (334) 566-1850 between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday.

AN EQUAL OPPORTUNITY EMPLOYER

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0005



June 6, 1997

Dr. John R. Key , Superintendent
Pike County Schools
211 Lake Avenue
Troy, Alabama 36081

Dear Sir:

Please let this letter serve as my notice of interest for the position of Assistant Principal at
Goshen High School. I have twenty years of teaching experience on the elementary,
middle school, high school, and junior college levels. I also have experience as a
substitute teacher (K-12), and as a Special Education Aide.

I would be most interested in talking with you about this position and would like to
request an interview at your earliest convenient time. I am enclosing my resume and a list
of references you may contact.

Sincerely,

Charles Coon
P.O. Box 201
Greenville, Alabama 36037

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0067

Charles L. Coon                          SSN 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
P.O. Box 201                             Phone 334-382-7639
Greenville, AL 36037

Educational Record:      Livingston University, Livingston, AL, BME 1969,
                         MED Administration and Supervision, 1974:
                         Additional graduate studies Auburn University at
                         Montgomery, 1988; Troy State University main
                         campus, 1988, 1989

Employment Experience:   November 1994-Present: Sales Representative
                         Franklin Life Insurance; February 1987-July 1987:
                         Sales Representative Mutual Savings Life Insurance
                         Company; September 1985-January 1987: Vice-President
                         Southeastern Photo of Alabama, Inc.

                         Twenty years of teaching experience on the elementary,
                         junior high, high school, and junior college levels.
                         Responsible for the band program and/or music programs
                         at the following schools:
                         Red Level High School, Red Level, AL,1993-94;   ①
                         Highland Home High School, Highland Home, AL,   ⑤
                         1988-1993;
                         Wicksburg High School, Newton, AL, 1987-1988;   ①
                         Holt High School, Holt, AL, 1984-1985;   ①
                         Greenville High School, Greenville, AL, 1974-1984;   ⑩
                         Phillips High School, Bear Creek, AL, 1972-1973;   ①
                         Southside High School, Selma, AL, 1970-1972;   ③
                         Orrville High School, Orrville, AL, 1969-1970;
                         LB Wallace Junior College, 2 quarters
                         Special Education Aide at Greenville High School
                         at present

Activities:              Salesman, Franklin Life Insurance Company and
                         Mutual Savings Life Insurance Company
                         Responsible for the hiring and training of sales staff
                         for Southeastern Photo of Alabama, Inc.
                         Served as chairperson for various in-service education
                         groups; chairman of the music department at Greenville
                         High School
                         Adjudicator for contest on district and state levels
                         Founded and organized the Camellia City Marching Band
                         Classic 1983; Founded Butler County Honor Band 1981
                         Former member of NEA, AEA, and local county education
                         organizations

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0038

Past member of MENC and ABA
Member of Eureka Masonic Lodge and Scottish Rite
Bodies of Alabama
Interim director for Antioch West Baptist Church Choir

Honors:

Deans List student
First Chair band scholarship 1966-1969
officer Phi Mu Alpha Sinfonia service fraternity

Transcripts:

On file at Livingston University (University of West
Alabama)
Troy State University
Auburn University at Montgomery

Personal Data:

DOB: January 2, 1948        Married
white                                  Baptist
1child                                 Health: excellent

References:

On request

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0033

# BUTLER COUNTY BOARD OF EDUCATION

Suzanne P. McGill, Superintendent
215 Administrative Drive
Greenville, AL 36037

Telephone   334-382-2665
Fax   334-382-8607

June 24, 1998

Mrs. Jane Thrash, Principal
Goshen High School
P.O. Box 7
Goshen, Alabama  36035-0007

Dear Mrs. Thrash:

Mr. Charles L. Coon, Jr. was employed by the Butler County Board of Education as band director at Greenville High School from August of 1974 until July of 1984. Mr. Coon has also been employed as a special education services aide since February of 1997 at Greenville High School. During the time he was band director in this system, I was assistant principal at a school in Georgiana and then a central office staff member from August of 1978.

During his ten years as band director I had the opportunity to see the band perform at football games, parades, concerts, and other events. After coming to the central office, I also had occasion to observe Mr. Coon's classes. Mr. Coon took over the band program when it was "down." Through his work the band grew and improved in quality and performance. Band members had the desire to become better and the willingness to work instilled in them via Charles Coon's directorship. This enthusiasm and the music quality continued until his resignation.

As special education services coordinator I have first hand knowledge of his work as an aide. Mr. Coon assisted an orthopedically impaired student in regular classes. This student obtained a standard (regular) diploma on May 25, 1998. He also worked with a mentally retarded student that included personal hygiene. Mr. Coon was caring and understanding of these and the other students with disabilities. He actively participated in professional development and worked in any way to support the total school. Mr. Coon also had experience in working with students with disabilities as band director.

Mr. Coon has proven himself to be an outstanding staff member in all positions. If you should have questions, I would be happy to discuss them with you.

It is without reservation that I recommend Charles L. Coon, Jr. to your attention.

Sincerely,

R. Wayne Boswell

R. Wayne Boswell, Ed.S.
Special Education Services (Disabilities, Gifted),
Section 504/ADA Service (Disability), and Equity
(Titles VI & IX, ADA, Section 504) Coordinator

RWB:gtk

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0009*

# W. O. PARMER ELEMENTARY SCHOOL

100 Butler Circle
Greenville, AL 36037
Phone: 334-382-8720 • FAX: 334-382-2425

ALLIN WHITTLE, Principal

MINIE COON, Assistant Principal
CAROLE TEAGUE, Assistant Principal

June 24, 1998

Mrs. Trash
Goshen High School
Equal Circle
Goshen, AL 36035

Dear Mrs. Thrash:

I am writing this letter in reference to Charles Coon. Charles is very capable of handling all levels of students with all abilities. He has been a substitute at W. O. Parmer Elementary School. He has also worked for the last two years as an aide for two disabled students at Greenville High School. Charles is dependable and reliable.

Mr. Coon is very caring and considers what is best for students in planning a band program. He encourages students to participate in all levels of the band program. He works well with the parents of his students as well as with the faculty and staff of the school.

Charles would be an asset to any school band program. He stresses the discipline needed to have an excellent program. He expects his students to be model students for the rest of the student body.

Sincerely,

Allin Whittle

Allin Whittle

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0018*

EDUCATING TODAY'S CHILDREN, SECURING TOMORROW'S FUTURE



# GREENVILLE HIGH SCHOOL

| DON D. YANCEY | DON D. OSWALD | JOSEPH WEST |
| Asst. Principal | Principal | Asst. Principal |

211 School Highland Road • Greenville, Alabama 36037 • (334) 382-2608 • Fax (334) 382-7202

June 24, 1998

Ms. Jane Thrash, Principal
Goshen High School
Eagle Circle
Goshen, AL 36035

Dear Ms. Thrash:

With great pleasure and confidence, I would like to recommend Mr. Charles Coon as the next Band Director at Goshen High School. Mr. Coon is a very astute professional in the music field. His music is a constant variety rather than the consistent same old thing.

As an administrator, I look for teachers who are competent, prudent, love children, and those that have a sense of humor. Mr. Coon possesses all those qualities. Therefore, I truly believe he would be an asset to your faculty.

Thank you in advance for your time and consideration.

Sincerely,

*Joseph West*
Joseph West

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0011*

*"The Friendly Campus in Camellia City"*
ACCREDITED BY:
SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS
STATE DEPARTMENT OF EDUCATION

*PCHS*
*Band Director*

# PRE-HIRE APPLICANT CHECK-LIST

## Professional Personnel

APPLICANT'S NAME: *Charles Coon*

___✓___ Application

___✓___ Administrator's Letter of Recommendation

___✓___ In Pike County Board of Education, Database

___▷___ Three (3) Reference Letters *(As per old application)*

___✓___ Transcripts

___✓___ Teacher Certificate ✓ Alabama ____ Other

___✓___ Basic Skills Written Test (If needed)

*Pending* OMAHA Interview

_____ Finger-printing Clearance

*N/A* Special License (Voc. Tech)   (If needed)

*July 22, 2002 (Michelle)*

Date of Verification *July 29, 2002*

*Elizabeth Grubbs*
Elizabeth Grubbs, Personnel Director

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0001

Received Time Jul.22. 7:46AM



**Pike County    High School**

Terry J. Casey
Principal

552 South Main Street
Brundidge, Alabama 36010-2299
Phone (334) 735-2389
Fax (334) 735-3176

Joseph Boyd
Administrative Assistant

July 22, 2002

Dr. John Key Superintendent
Pike County Board Of Education
101 West Love Street
Troy, Al 36081

Dear Dr. Key,

I would like to recommend Charles Coon for Band Director for the school year 2002-2003. After talking with references and Mr. Coon I feel his experience and maturity will be an asset to our band program.

If you have any questions please do not hesitate to call.

Thank you,

Terry Casey

TC/sb

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0007*

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977   Fax: (334) 242-0498   E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

### I. Personal data:

Applicant:      Charles     L.         Coon, Jr.
          First       Middle       Maiden      Last Name     Suffix (e.g., Jr., Sr.)

Permanent Address
      Street/Apt./P.O. Box/Route and Box       City       State      ZIP Code

418 - 60 - 5468     (   ).      PURPOSE OF SUBMISSION:
Social Security Number    Home Telephone Number     ☐ Renewal
                                    ☐ Issuance of a _____ certificate.

01/02/48        (   )       ☐ Superintendent election in _____ County.
Date of Birth      Work Telephone Number     ☒ Other    Verification
(Month/Day/Year)

### II. Verification of applicant's experience by employer.

A. Employed: ☒ Full-time   ☐ Part-time

B. Was this experience satisfactory? ☒ Yes   ☐ No

Dallas County Board of Education
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 8/1969 | 5/1972 | 9-12 | Band | Director | |
| | | | | | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0061*

FORM EXP 2002
NAME: ___Charles L. Coon, Jr.___    SOCIAL SECURITY NUMBER: _418_-_60_-_5468_

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

**III.** To be completed for **Alabama** experience only:
    Reason(s) for leaving the most recent position:
      ☐ Nonrenewal ☒ Resignation ☐ Decrease in teaching positions ☐ Retirement
      ☐ TERMINATION: ☐ *Incompetency ☐ *Insubordination ☐ *Neglect of Duty ☐ *Immorality ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

**IV.** Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

                                                              Total Clock Hours _____

*10 clock hours = 1 CEU

**V.** This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this _4th_ day of

_September_ , _2002_

_[signature]_
Seal and Signature of Notary Public
My Commission Expires: _4/23/06_

_[signature]_
Signature of Superintendent, Headmaster, Dean, Appropriate Director

Wayne K. May
Typed or Printed Name and Position

Dallas County Board of Education
School System, Nonpublic School, Institution, Appropriate Agency

P.O. Box 1056
Address

Selma, AL    36702-1056
City/State/ZIP Code

September 4, 2002
Date

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0062

**A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.**

**DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.**

FORM EXP 2001



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
telephone: (334) 242-9977  fax: (334) 242-0498  e-mail: tcert@sdenet.alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs) earned through Alabama school systems.

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

Applicant:    CHARLES    L.      COON
         First      Middle      Maiden      Last Name      Suffix (e.g., Jr., Sr.)

Permanent Address
         Street/Apt./P.O. Box/Route and Box      City      State      ZIP Code

418 - 60 - 5468
Social Security Number      (    )
                 Home Telephone Number

1-2-48
Date of Birth      (    )
(Month/Day/Year)      Work Telephone Number

PURPOSE OF SUBMISSION:
☐ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County.
☐ Other _____

**II. Verification of applicant's experience by employer.**

   A. Employed: ☒ Full-time  ☐ Part-time

   B. Was this experience satisfactory? ☒ Yes  ☐ No

Marion Co. Board of Ed.
188 Winchester Dr.
Hamilton, AL 35570

Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | Part-Time Only: Hours/Day |
|---|---|---|---|---|---|
| 8/72 | 5/73 | 7-12 | BAND | DIRECTOR | |
| | | | | | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0058*

FORM EXP 2001

NAME: _CHARLES COON_          SOCIAL SECURITY NUMBER: _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_

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters.

**III.** To be completed for **Alabama** experience only:

Reason(s) for leaving the most recent position:

☐ Nonrenewal  ☐ Resignation  ☐ Decrease in teaching positions  ☐ Retirement

☐ TERMINATION: ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

**IV.** Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU                                      Total Clock Hours _____

**V.** This is to certify that all information on this supplement pertaining to the above individual is true and correct:

_Brenda Jackson_
Signature of Superintendent, Headmaster, Dean, Appropriate Director

_____
Typed or Printed Name and Position

Marion Co. Board of Ed.
School System, Name of Institution, Appropriate Agency
188 Winchester Dr.
Address
Hamilton, AL  35570
City/State/ZIP Code

_8/13/02_
Date

Sworn to and subscribed before me this _13th_ day of
_August_, _2002_

_Patty S. Frederick_
SEAL and Signature of Notary Public

My Commission Expires: _____
My Commission Expires
7-24-05

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0059

*To: Pike County BOE*
*101 W. Love St.*
*Troy, AL 36081-2613*

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977    Fax: (334) 242-0498    E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

Applicant: _Charles_ _L._ _____ _Coon, Jr._
First        Middle        Maiden        Last Name        Suffix (e.g., Jr., Sr.)

Permanent Address _____
Street/Apt/P.O. Box/Route and Box        City        State        ZIP Code

_418 · 60 · 5468_
Social Security Number

( ___ ) _____
Home Telephone Number

_1/2/48_
Date of Birth
(Month/Day/Year)

( ___ ) _____
Work Telephone Number

**PURPOSE OF SUBMISSION:**
☐ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County.
☒ Other _Verification of experience_

**II. Verification of applicant's experience by employer.**

A. Employed: ☒ Full-time  ☐ Part-time

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0056

B. Was this experience satisfactory? ☒ Yes  ☐ No

_Butler County Board of Education_
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 8/74 | 6/84 | 7-12 | Band | Band Director | |
| | | | | | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

FORM EXP 2002
NAME: _Charles L. Coon, Jr._    SOCIAL SECURITY NUMBER: _418_ _60_ _5468_

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for **Alabama** experience only:
    Reason(s) for leaving the most recent position:
        ☐ Nonrenewal  ☒ Resignation  ☐ Decrease in teaching positions  ☐ Retirement
        ☐ TERMINATION:  ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU    Total Clock Hours _____

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this _26_ day of

_August_ _2002_

_Patricia K. Scott_
Seal and Signature of Notary Public

My Commission Expires: _8/14/2006_

_Mike Reed_
Signature of Superintendent, Headmaster, Dean, Appropriate Director
**Mike Reed, Ed.D., Superintendent**
Typed or Printed Name and Position

**Butler County Board of Education**
School System, Nonpublic School, Institution, Appropriate Agency
**215 Administrative Drive**
Address
**Greenville, AL  36037**
City/State/ZIP Code
_8/26/02_
Date

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0057

**A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.**

DO NOT RETURN THIS FORM TO THE APPLICANT. MAIL IT TO THE ADDRESS ON THE

FORM EXP 2001



STATE OF ALABAMA
DEPARTMENT OF EDUCATION
TEACHER EDUCATION AND CERTIFICATION OFFICE
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
telephone: (334) 242-9977   fax: (334) 242-0498   e-mail: tcert@sdenet.alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs) earned through Alabama school systems.

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

### I. Personal data:

Applicant: _Charles_ _Leslie_ _____ _Coon_ _____
          First        Middle        Maiden        Last Name        Suffix (e.g., Jr., Sr.)

Permanent Address _____
          Street/Apt./P.O. Box/Route and Box        City        State        ZIP Code

_413_ -_60_ -_5468_ (     )          PURPOSE OF SUBMISSION:
Social Security Number   Home Telephone Number      ☐ Renewal
                                                    ☐ Issuance of a _____ certificate.
_1/2/48_                                            ☐ Superintendent election in _____ County.
Date of Birth            (     )                    ☒ Other _Experience verification_
(Month/Day/Year)         Work Telephone Number

### II. Verification of applicant's experience by employer.

A. Employed:  ☒ Full-time  ☐ Part-time

B. Was this experience satisfactory?  ☒ Yes  ☐ No

_Tuscaloosa County Schools_
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | Part-Time Only: Hours/Day |
|---|---|---|---|---|---|
| 8/84 | 6/85 | 9-12 | Band | Teacher | |
| | | | | | |
| | | | | | |

## THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE
## BACK OF THIS FORM.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0054

FORM EXP 2001

NAME: _Charles L. Coon_    SOCIAL SECURITY NUMBER: 413 - 1-1 - 5463

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters.

III. To be completed for **Alabama** experience only:

Reason(s) for leaving the most recent position:

☐ Nonrenewal  ☒ Resignation  ☐ Decrease in teaching positions  ☐ Retirement

☐ TERMINATION:  ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated.  Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU

Total Clock Hours _____

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

_Signature of Superintendent, Headmaster, Dean, Appropriate Director_

**Dr. N. Joyce Sellers, Superintendent**
_Typed or Printed Name and Position_

**Tuscaloosa County Board of Education**
_School System, Nonpublic School, Institution, Appropriate Agency_

**P.O. Box 2568**
_Address_

**Tuscaloosa, AL  35403**
_City/State/ZIP Code_

8/12/02
_Date_

Sworn to and subscribed before me this _12th_ day of
_August_, _02_

_SEAL and Signature of Notary Public_

My Commission Expires 8-17-2002

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0055*

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977  Fax: (334) 242-0498  E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

Applicant: _Charles_ _L. Jr._ _Coon_
First    Middle    Maiden    Last Name    Suffix (e.g., Jr., Sr.)

Permanent Address _Unknown_
Street/Apt./P.O. Box/Route and Box    City    State    ZIP Code

_48_ - _60 5468_    ( )
Social Security Number    Home Telephone Number

PURPOSE OF SUBMISSION:
☐ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County.
☑ Other _Employment Certification_

_____    ( )
Date of Birth    - Work Telephone Number
(Month/Day/Year)

**II. Verification of applicant's experience by employer.**

**A. Employed:** ☑ Full-time  ☐ Part-time

**B. Was this experience satisfactory?** ☑ Yes  ☐ No

_Houston County School_
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 8-3-87 | 7-29-88 | High School | Social Studies | Teacher Band Director | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0052*

FORM EXP 2002
NAME: _*Chris L. Cary Jr.*_    SOCIAL SECURITY NUMBER: _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_

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for **Alabama** experience only:
   Reason(s) for leaving the most recent position:
      ☐ Nonrenewal   ☐ Resignation   ☐ Decrease in teaching positions   ☐ Retirement
      ☐ TERMINATION:   ☐ *Incompetency   ☐ *Insubordination   ☐ *Neglect of Duty   ☐ *Immorality   ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU                    Total Clock Hours _____

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this _25_ day of

_August_ _2002_
_Neda Worrall_
Seal and Signature of Notary Public
My Commission Expires: _10-8-2005_

_Kenneth Lord_
Signature of Superintendent, Headmaster, Dean, Appropriate Director
_Kenneth Lord, Superintendent_
Typed or Printed Name and Position
_Houston County Schools_
School System, Nonpublic School, Institution, Appropriate Agency
_PO Box 1688_
Address
_Dothan, AL 36302_
City/State/ZIP Code
_8-28-2002_
Date

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0053

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL. 36130-2101
Telephone: (334) 242-9977   Fax: (334) 242-0498   E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

Applicant: _CHARLES L. COON_

First    Middle    Maiden    Last Name    Suffix (e.g., Jr., Sr.)

Permanent Address _____

Street/Apt./P.O. Box/Route and Box    City    State    ZIP Code

_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_
Social Security Number

(   )  _____
Home Telephone Number

_____
Date of Birth
(Month/Day/Year)

(   )  _____
Work Telephone Number

PURPOSE OF SUBMISSION:
☐ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County.
☒ Other   _VERIFICATION OF EXPERIENCE_

**II. Verification of applicant's experience by employer.**

A. Employed: ☒ Full-time   ☐ Part-time

B. Was this experience satisfactory? ☒ Yes   ☐ No

_CRENSHAW COUNTY_
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 8-18-88 | 05-31-93 | 6-12 | BAND | BAND DIRECTOR | |
| | | | | | |
| | | | | | |
| | | | | | |

## THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0048*

FORM EXP 2002
NAME: __CHARLES L. COON_____    SOCIAL SECURITY NUMBER: ____-____-____

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for **Alabama** experience only:
   Reason(s) for leaving the most recent position:
   ☐ Nonrenewal  ☐ Resignation  ☐ Decrease in teaching positions  ☐ Retirement
   ☐ TERMINATION: ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU                                    Total Clock Hours _____

V. **This is to certify that all information on this supplement pertaining to the above individual is true and correct:**

Sworn to and subscribed before me this _16_ day of
__OCTOBER_____, 2002

_Wanda Williams_____          _Warren C. Pouncey_____
Seal and Signature of Notary Public          Signature of Superintendent, Headmaster, Dean, Appropriate Director

My Commission Expires: ┌──────────────────────┐          WARREN C. POUNCEY
                       │  WANDA WILLIAMS      │          Typed or Printed Name and Position
                       │ Notary Public, AL State at Large │
                       │ My Comm. Expires Mar. 16, 2005 │   CRENSHAW COUNTY
                       └──────────────────────┘          School System, Nonpublic School, Institution, Appropriate Agency

                                                          183 VOTEC DRIVE
                                                          Address
                                                          LUVERNE, AL. 36049
                                                          City/State/ZIP Code
                                                          OCT. 16, 2002
                                                          Date

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0049

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977   Fax: (334) 242-0498   E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

Applicant: *Charles          L.                              Coon*

First        Middle        Maiden        Last Name        Suffix (e.g., Jr., Sr.)

Permanent Address

Street/Apt./P.O. Box/Route and Box        City        State        ZIP Code

*418  60  5468*              (     )

Social Security Number      Home Telephone Number

PURPOSE OF SUBMISSION:
☐ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County
☐ Other

(     )

Date of Birth      Work Telephone Number
(Month/Day/Year)

**II. Verification of applicant's experience by employer:**

A. **Employed:** ☒ Full-time  ☐ Part-time

B. Was this experience satisfactory? ☒ Yes  ☐ No

*Covington County*

Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 8\93 | 5\94 | High | Band | Teacher | |
| | | | | | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0050

FORM EXP 2002

NAME: _____     SOCIAL SECURITY NUMBER: _____-_____-_____

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for **Alabama** experience only:

    Reason(s) for leaving the most recent position:

        ☐ Nonrenewal  ☐ Resignation  ☐ Decrease in teaching positions  ☐ Retirement

      ☐ TERMINATION:  ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU          Total Clock Hours _____

**V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:**

Sworn to and subscribed before me this _____ day of

_____

_____

Seal and Signature of Notary Public

My Commission Expires: _____

_Ronnie Driver_
Signature of Superintendent, Headmaster, Dean, Appropriate Director

_Ronnie Driver, Superintendent_
Typed or Printed Name and Position

_Covington County_
School System, Nonpublic School, Institution, Appropriate Agency

_P.O. Box 460_
Address

_Andalusia, AL 36420_
City/State/ZIP Code

_8-14-02_
Date

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0051

**A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.**

**DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.**

FORM EXP 2002



STATE OF ALABAMA
DEPARTMENT OF EDUCATION
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL  36130-2101
Telephone: (334) 242-9977   Fax: (334) 242-0498   E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

### TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in:  (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students.  Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery.  The letter shall bear the signature of the executive director of the organization.

I. Personal data:

Applicant:        CHALRES                                         COON
              First            Middle            Maiden          Last Name          Suffix (e.g., Jr., Sr.)

Permanent Address
              Street/Apt./P.O. Box/Route and Box              City              State              ZIP Code

418 - 60 - 5468          (        )        PURPOSE OF SUBMISSION:
Social Security Number      Home Telephone Number    ☒ Renewal
                                                     ☐ Issuance of a _____ certificate.
01-02-1948              (        )                    ☐ Superintendent election in _____ County.
Date of Birth          Work Telephone Number          ☐ Other _____
(Month/Day/Year)

II. Verification of applicant's experience by employer.

A.  Employed: ☒ Full-time  ☐ Part-time
B.  Was this experience satisfactory? ☒ Yes  ☐ No

### MONROE COUNTY SCHOOLS
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 10-16-2000 | 05-24-2002 | 07-12 | Music | Band Director/Tchr | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE
BACK OF THIS FORM.**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0023

FORM EXP 2002



**STATE OF ALABAMA**
DEPARTMENT OF EDUCATION
TEACHER EDUCATION AND CERTIFICATION OFFICE
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977  Fax: (334) 242-0498  E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

**I. Personal data:**

| | | | | |
|---|---|---|---|---|
| Applicant: | Charles | L. | Coon | |
| | First | Middle | Maiden     Last Name | Suffix (e.g., Jr., Sr.) |
| Permanent Address | P.O. Box 201 | | Greenville     AL | 36037 |
| | Street/Apt./P.O. Box/Route and Box | | City     State | ZIP Code |

418 - 60 - 5468
Social Security Number

( 334 ) 382-7639
Home Telephone Number

01-02-48
Date of Birth
(Month/Day/Year)

( 334 ) 735-2389
Work Telephone Number

PURPOSE OF SUBMISSION:
☒ Renewal
☐ Issuance of a _____ certificate.
☐ Superintendent election in _____ County.
☐ Other _____

**II. Verification of applicant's experience by employer.**

A. Employed: ☒ Full-time  ☐ Part-time

B. Was this experience satisfactory? ☒ Yes  ☐ No

Pike County Board of Education
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 08-01-02 | Present | 6-12 | Music | Band Director | |
| | | | | | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0024



PLAINTIFF'S EXHIBIT

# PIKE COUNTY HIGH SCHOOL



# FACULTY HANDBOOK
## Terry Casey, Principal

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0522

## GENERAL INFORMATION

It is the responsibility of each faculty member and staff member to be familiar with the contents of the Pike County Board of Education Policy and Procedures Manual, the student handbook, and this handbook. It is essential that all board policies and administrative directive outlined in these documents be followed. Any questions or concerns regarding the contents of these documents should be directed to the school principal.

It is essential that each student and faculty member become familiar with the policies and procedures of the student handbook. Time should be spent interpreting rules and regulations for students during the first few days of school and as the need arises. Please remind students frequently of the tardiness, attendance, and promotion policies in detail.

## CONFIDENTIALITY

**Confidentiality must be exercised when handling a student's permanent record, recording information about a student, or discussing students in general, whether on campus on any other location.**

## NON-DISCRIMINATION POLICY

It is the official policy of the Pike County Board of Education that no person shall; on the grounds of race, color, ethnicity, national origin, disability, sex, religion, belief, marital status, or age; be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, employment, re-employment, or advancement. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, Title VI Coordinator, and Title IX Coordinator, at 334-566-1850, between the hours of 8:00 am and 4:30 pm, Monday through Friday.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0524*

## FACULTY MEETINGS

Attendance at all faculty meetings is required. This includes the coaching staff or others involved in special activities unless approval from the principal has been granted. Faculty meetings will be held the last Monday of each month at 3:30 p.m. in the library.

## DEPARTMENTAL MEETINGS

Departmental meetings will be held once a month. The department head is responsible for making sure that these meetings are carried out and the minutes from the meeting turned in to Mr. Casey.

## LUNCHROOM PROCEDURES

Proper conduct is expected from students in the lunchroom. **Teachers must accompany their students to lunch and sit with them at assigned tables during the lunch period.**

## LIBRARY

The library is located in the 100 Building. The use of the library is encouraged. Scheduling may be done through the library media specialist.

## BUS RESERVATIONS FOR ATHLETICS, FIELD TRIPS, ETC.

Bus request forms can be picked up from the main office. Forms should be completed and returned to the office for the principals' signature **at least ten days prior to the trip.**

## MAINTENANCE

Maintenance request forms can be picked up from the main office. You must specify your building, room number, and nature of request on this form. After it is signed by the principal, we will fax it to the maintenance department or put it on the board depending on the severity of the request. Remember, we have no control over the maintenance department work schedule.

## GUIDANCE SERVICES

Comprehensive guidance services are provided for all students. This includes assistance in the following areas: academic counseling, career guidance, referrals to outside assisting agencies, individual personal counseling, and group counseling.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0525

The guidance office is also instrumental in assisting students with their efforts to seek financial aide. Students should act early in their efforts to seek financial aide. Letters of recommendation should not be sought on the day the application is due. This often affects the availability and quality of the letter.

## LESSON PLANS

Detailed lesson plans are due each Thursday by 3:00 p.m. to Mr. Casey.

## CORPORAL PUNISHMENT

The use of corporal punishment by teachers is strictly prohibited.

## MEDICAL ATTENTION

Medical attention may be sought in the office of the assistant principal. Only minor first aid can be provided. Decisions whether to call EMS will be made by the principal or assistant principal only.

## TELEPHONE USE/CELL PHONES

Students **should not** be released from class to use the telephone except in extreme emergencies. In these cases, the student should be sent directly to the office with an agenda. **The use of cell phones by students is strictly prohibited.** If a student has a cell phone in their possession, it is to be collected by the teacher and turned in to the office. **Teachers are not to use cell phones(sending/receiving)during school hours nor are cell phones to be visible at any time.**

## ASSEMBLIES

Assemblies must be attended by all faculty members unless approved by the school principal. Generally, students will sit either by grade level or with the teacher they are assigned during that time.

## PARENT CONTACT AND PUBLIC RELATIONS

Efforts should be made to deal with parents from a positive standpoint. Listening is important, even if they are angry. Parents who are verbally abusive will not be tolerated and appropriate action will be taken if necessary. Parent conferences should be scheduled before school or after school. A member of administration will attend any

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0526

necessary conferences.

Regardless of the nature of any conference with parents or the public in general, each visitor should leave with the feeling that we have done what we think is in the best interest of the student involved and the school in general.

## ACCOUNTING PROCEDURES
-see insert-

## BOOSTER ORGANIZATIONS

All booster organizations must be sanctioned by the school administration prior to representing PCHS in any form or fashion. The final authority over all booster activities is the Principal. Currently approved booster organizations are PCHS Sportsboosters and PCHS Band Boosters.

## SCHOOL VISITATION

All visitors must check in through the main office and must have official school business. These individuals will be required to sign in on the visitors log and issued a pass to be displayed. Any individuals without proper authorization should be questioned.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0527*

# PIKE COUNTY HIGH SCHOOL
## BELL SCHEDULE

1st block          7:45-9:15

Break            9:15-9:30

2nd block          9:35-11:06

3rd block          11:11-1:04

4th block          1:09-2:39

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0528*

| Month | Month Begins | Month Ends | Days on Roll Students | Teachers |
|---|---|---|---|---|
| 1ˢᵗ | August 4, 2004 (Teacher Institute - August 4, 2004) (Teacher Inservice - August 5, 2004) (Teacher Workday - August 6, 2004) (First day for students - August 9, 2004) | September 3, 2004 | 20 | 23 |
| 2ⁿᵈ | September 7, 2004 (Labor Day - September 6, 2004) | October 4, 2004 | 20 | 20 |
| 3ʳᵈ | October 5, 2004 (Intersession - October 11-15, 2004) (Report Cards/Conference Day-Students ½ Day-Teachers 1½ Day - Oct. 21, 2004) | November 8, 2004 | 20 | 20.5 * |
| 4ᵗʰ | November 9, 2004 (Veterans Day - November 11, 2004) (Thanksgiving - November 24-26, 2004) | December 10, 2004 | 20 | 20 |
| 5ᵗʰ | December 13, 2004 (Christmas Holidays begin December 22, 2004) (Intersession January 3-4, 2005) 12-months employees return - January 3, 2005 Teachers return - Teacher Workday/Inservice - January 5, 2005 Students return - January 6, 2005 (King/Lee Day - January 17, 2005) | January 25, 2005 | 20 | 21 |
| 6ᵗʰ | January 26, 2005 (President's Day - February 21, 2005) | February 23, 2005 | 20 | 20 |
| 7ᵗʰ | February 24, 2005 (Intersession - March 14-18, 2005) (Spring Break - March 21-25, 2005) (Report Cards/Conference Day - Students ½ Day-Teachers 1 ½ Day - March 31, 2005) (Teacher Appreciation Day on March 31 - All Schools) | April 6, 2005 | 20 | 20.5 * |
| 8ᵗʰ | April 7, 2005 | May 4, 2005 | 20 | 20 |
| 9ᵗʰ | May 5, 2005 | May 26 (students) May 27 (teachers) | 16 | 17 |
| | | | 176 | 182 * |

* Because of Wage & Hour rules and regulations, all employees working on an hourly rate will not work 1 ½ days on 10/21/04 and 03/31/05. Supervisors may schedule these employees for one additional workday at their discretion, but within Wage & Hour laws.

| | | |
|---|---|---|
| Wednesday | August 4, 2004 | Teacher Institute |
| Thursday | August 5, 2004 | Teacher Inservice |
| Friday | August 6, 2004 | Teacher Workday |
| Monday | August 9, 2004 | 1st Day for Students (2/3 day) |
| Monday | September 6, 2004 | Labor Day |
| Friday | October 8, 2004 | End First Nine Weeks |
| Monday-Friday | October 11-15, 2004 | Intersession |
| Monday | October 18, 2004 | Begins 2ⁿᵈ Nine Weeks |
| Thursday | October 21, 2004 * | Report Cards/Conference Day (Students ½ Day/Teachers 1½ Day) (Teachers leave at 7:30 p.m.) |
| Thursday | November 11, 2004 | Veterans Day |
| Wednesday-Friday | November 24-26, 2004 | Thanksgiving Holidays |
| Tuesday | December 21, 2004 | End 2ⁿᵈ 9-Weeks/1st Semester (2/3 Student Day) |
| Wednesday-Friday | Dec. 22-31, 2004 | Christmas Holidays |
| Monday-Tuesday | January 3-4, 2005 | Intersession |
| Monday | January 3, 2005 | 12-Months Employees Return to Work |
| Wednesday | January 5, 2005 | Teachers Return - Teacher Workday/Inservice |
| Thursday | January 6, 2005 | Students Return - Begins 2ⁿᵈ Semester/Begins 3ʳᵈ Nine Weeks |
| Monday | January 17, 2005 | King/Lee Day* (Not a holiday for 12-months employees) |
| Monday | February 21, 2005 | President's Day* (Not a holiday for 12-months employees) |
| Friday | March 11, 2005 | Ends 3ʳᵈ Nine Weeks |
| Monday-Friday | March 14-18, 2005 | Intersession |
| Monday-Friday | March 21-25, 2005 | Spring Break |
| Monday | March 28, 2005 | Begins 4ᵗʰ Nine Weeks |
| Thursday | March 31, 2005 * | Reports Cards/Conference Day - Teacher Appreciation Day-All Schools (Students ½ Day/Teachers 1½ Day)(Teachers leave at 7:30 p.m.) |
| Thursday | May 26, 2005 | Last Day for Students (2/3 Day)    (Goshen High Graduation) |
| Friday | May 27, 2005 | Last Day for Teachers    (Pike County High Graduation) |

| | | |
|---|---|---|
| First Nine Weeks | August 9 - October 8 | 44 days |
| Second Nine Weeks | October 18 - December 21 | 43 days |
| Third Nine Weeks | January 6 - March 11 | 45 days |
| Fourth Nine Weeks | March 28 - May 26 | 44 days |
| | | 176 |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0529

# ALMA MATER

On the rolling plains of Dixie
High above the rest
Proudly stands our Alma Mater
Dear P C H S
To thy name we'll sing and honor
Hearts that love you true
Pledge to thee our loyal service
All the ages through

Pike County High School,  Pike County High School
Loud our praises be, Hail to thee our Alma Mater
Hail, oh hail to thee     (Chorus)

God our father hear our prayers
May we stand the test
We will ever serve and honor
Ever do our best
All with joyful echoes murmur
Pike County High we praise
Sons as yet unborn shall hail thee
In the coming day.     (repeat chorus)

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0530

## TEACHER & STUDENT PARKING

All teachers in the 100 building, gym, office staff, lunchroom staff, and administration will park behind the gym in the new teacher parking lot.

All teachers in the 400 building, 700 building, and trailers will park in front of the Junior building.

**THERE WILL BE NO PARKING IN FRONT OF THE NEW 100 BUILDING.**

<u>All students</u> will park in front of the gym or in the new student parking lot.

The circle in back of the school will be for **buses only.**

All student pick-ups will be in front of the gym.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0531*

Alabama State Department of Education
Prevention and Support Services
May 2004

## TRUANCY DEFINITION

A parent, guardian, or other person having charge of any child officially enrolled in Alabama public schools (K-12) shall explain in writing the cause of any and every absence of the child no later than three (3) days following return to school. A failure to furnish such explanation shall be evidence of the child being truant each day he is absent. The child shall also be deemed truant for any absence determined by the principal to be unexcused based upon the State Department of Education's current School Attendance Manual. **Three (3) unexcused absences within a school year constitute a student being truant for the purpose of filing a petition with the Court.** The Interagency Committee on Youth Truancy Task Force recommendations known as the Early Warning Truancy Prevention Program timeline for reporting truancy shall define the truancy status of any student as follows:

1. **FIRST TRUANCY/UNEXCUSED ABSENCE (WARNING)**

   a. Parent/guardian shall be notified by the school principal or his/her designee that the student was truant and the date of the truancy.

   b. Parent/guardian shall also be provided with a copy of Alabama's compulsory school attendance laws and advised of the penalties that can be applied and the procedures that shall be followed in the event that other unexcused absences occur.

2. **NO EARLIER THAN THE SECOND UNEXCUSED ABSENCE (CONFERENCE)**

   a. The parent, guardian, or person having control of the child shall (1) attend a conference with the attendance officer and principal or his/her designee and/or (2) participate in the early warning program provided by the juvenile court.

   b. Attendance at one of these conferences shall be mandatory except where prior arrangements have been made or an emergency exists.

   c. Failure to appear at the school conference and/or to appear at the early warning program shall result in the filing of a complaint/petition **against the parent under *Code of Alabama (1975)*, §16-28-12(c) (failure to cooperate), or a truancy against the child, whichever is appropriate.**

3. **NO EARLIER THAN THIRD UNEXCUSED ABSENCE, BUT WITHIN TEN (10) SCHOOL DAYS (COURT)**

   File complaint/petition against the child and/or parent/guardian, **if appropriate.**

4. **CHILD UNDER PROBATION**

   a. The school attendance officer should be notified **by the juvenile probation officer** of all children in the school system under probation supervision by the juvenile court as **consistent with state statute,** *Code of Alabama (1975)*, §12-15-100 and 105

   b. Where a child under probation is truant, the school attendance officer should immediately notify the juvenile probation officer.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0532

Underlined information contains recommendations from the State Superintendent of Education Advisory Committee; excerpted from recommended Policies and Procedures for Court/School Truancy Prevention Programs.

CAMPUS DUTY LIST
2004-05

**TEAM 1**
Green (capt.)
Robinson
Calhoun
Harden
Owens
Denison
Lampley
Chancellor
Helms
Davidson

**TEAM 2**
Faust (capt)
Morgan
Golden
Mount
Sullivan, S
Phillips
Holland
Trant
Coon
Knight

**TEAM 3**
Suber (capt)
Kilpatrick
Hassett
Sullivan, T
JROTC
Coppage
Pritchett
Booth
Grant
Busby

**Morning (7:00 a.m.)**
Lunchroom =1male; 1 female
Gym =1 male; 2 female
Student parking =1
Bus unloading =1
Sidewalk intersection between
    jr bldg and round bldg =1

**Break  (all)**
-break area
-sidewalk edge of lunchroom
-sidewalk in front of ag bldg
-intersection of sidewalk between
    jr bldg and round bldg
-front of round bldg

**Afternoon (all)**
-student parking
    behind 100 bldg
-student parking
    front of gym
-bus loading
-break area
-round bldg

*Each team captain is responsible for designating their people to specific areas.

100 building = new building
400 building = ag building
500 building = gym
600 building = junior building
700 building = round building

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0533*

# DRESS CODE FOR SCHOOL PERSONNEL

This policy was developed by the Instructional Improvement Committee (IIC). In reference to certified personnel, the IIC submitted the statement as follows:

Teaching is a professional yet physically challenging profession. The teacher sets an example for his/her students not only through attire, but also through demeanor and actions as well. The committed teacher knows full well that teaching is not strictly a desk job. The teacher will often be seen moving about the classroom, using large gestures, kneeling beside a student's desk, and working on the floor with small groups. Some teachers are required to participate in physical education activities as well. To this end, the teacher must dress professionally, but in a manner that will not inhibit his/her teaching.

Teachers (Certified Personnel)

Teachers should be professionally yet suitable attired. Specific articles of clothing which **shall not** be worn by school personnel include:

- leggings or footless tights
- **NO blue jeans (unless permission is granted by the principal** in the case of a designated special occasion, such as field day)
- tight fitting, distracting, or revealing clothing
- shorts of any kind (except at such activities as field day, etc)

Physical education teachers shall wear pants or appropriate cover-up clothing and change into shorts as needed. Agricultural teachers shall dress professionally, putting on coveralls as needed.

Permission to deviate from the above guidelines shall be granted by the principal on a case-by-case basis.

Professional grievances should be filed according to stated grievance procedures.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0534

# BOOKKEEPING PROCEDURES

## 1. INDIVIDUAL TEACHER RECEIPT BOOK

You are furnished a PCHS receipt book for collecting money. After filling out the receipt, give the <u>WHITE</u> copy to the student and leave the yellow in the book. Please turn in your money and receipt book to me <u>DAILY</u> as soon as possible after 4th Block. <u>ALL MONEY MUST BE TURNED IN DAILY!</u>

## 2. LOCAL REQUISITIONS

If you have a club or class account, in order to make purchases, you must obtain a PCHS Local Requisition form, fill it out (<u>must be itemized</u>), then bring it to me. Mr. Casey will come by my office to sign your Requisition, I will then do a Purchase Order. <u>DO NOT MAKE ANY PURCHASES UNTIL THESE STEPS HAVE BEEN FOLLOWED. IF YOU DO, YOU PAY!</u> <u>No substitutions on items and do not go over amount of Purchase Order.</u>

Please remember this also includes refunds to students, field trips, transportation for trips on PCBOE buses, etc.(anything requiring a check from PCHS). <u>CLUBS, REMEMBER YOU MUST HAVE A COPY OF THE MINUTES ATTACHED TO YOUR REQUISITION FOR ALL PURCHASES</u>

## 3. COUNTY REQUISITIONS

To order materials on PCBOE Requisitions, whether it be instructional supply, grants, service learning or other funding sources, please pick up a PCBOE requisition form from me. After completing the requisition (must be itemized),then bring it back to me. I will handle it from this point. <u>PLEASE DO NOT TAKE THEM TO THE CENTRAL OFFICE YOURSELF. WE WILL BE AUDITED LOCALLY.</u> Instructional supply money is usually released as follows: One-half in October and one-half in February. <u>AGAIN, DO NOT ORDER UNTIL THE C.O. HAS ISSUED A PURCHASE ORDER. WHEN MAKING YOUR PURCHASES DO NOT SUBSTITUTE. BUY ONLY THE ITEMS LISTED ON THE P.O.</u>

## 4. CLUB/CLASS FUND RAISERS

If you decide to sponsor a fund raiser for your club/class you must get a <u>LOCAL SCHOOL FUND RAISING REPORT</u> filled out and signed by Mr. Casey okaying the fund raiser.

_Donna Boswell_ Bookkeeper.                _Terry Casey_ Principal

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0535

## FIRE DRILL AND EMERGENCY EVACUATION

**SIGNAL:**    INTERMITTENT RINGING OF THE SCHOOL BELL

**BACKUP:**    INTERMITTENT BLAST OF AN AIR HORN

**PROCEDURE:**

EVACUATE THE BUILDING AS PER POSTED ROUTE IN EACH CLASSROOM. LIGHTS SHOULD BE TURNED OFF AND DOORS CLOSED. WINDOWS SHOULD BE CLOSED. <u>TEACHERS SHOULD HAVE SAFETY PLAN AND ROLL BOOK IN HAND FOR CALLING ROLL ONCE OUTSIDE.</u> STUDENTS SHOULD LINE UP AT LEAST 50 FEET FROM THE BUILDING AND LISTEN FOR ROLL CALL AND FURTHER INSTRUCTIONS.

## SEVERE WEATHER WARNING

**SIGNAL:**    STEADY RINGING OF THE SCHOOL BELL

**BACKUP:**    STEADY BLAST OF AN AIR HORN

**PROCEDURE:**

TEACHERS AND STUDENTS ARE TO TAKE COVER IMMEDIATELY IN THE DESIGNATED AREA. UNDER NO CIRCUMSTANCE ARE STUDENTS TO BE ALLOWED TO GO OUTSIDE EXCEPT FOR WHEN STUDENTS/TEACHERS IN THE MOBILE CLASSROOMS ARE RELOCATING.

-GYM CLASSES USE THE LOCKER ROOMS AND THE BAND ROOM.

-ROUND BUILDING STUDENTS SHOULD TAKE COVER AROUND THE INNER WALL OF THE BUILDING WITH DESIGNATED CLASSES USING THE TEACHERS LOUNGE.

-JUNIOR BUILDING STUDENTS USE THE HALLWAY.

-MRS. DAVIDSON'S STUDENTS ARE TO USE THE HALLWAY LEADING TO THE RESTROOM.

-AGRIBUSINESS STUDENTS ARE TO USE THE CLASSROOM AND/OR THE HALLWAY BETWEEN THE OFFICE AND CLASSROOM.

-BUILDING 100 STUDENTS SHOULD TAKE COVER IN THE HALLWAY.

-STUDENTS IN THE MOBILE CLASSROOMS 3, 4, & 5 SHOULD MOVE TO THE JUNIOR BUILDING.    STUDENTS IN MOBILE CLASSROOMS 1&2 SHOULD MOVE TO ROOM 708 IN THE ROUND BUILDING.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0536



Pike County _igh School Gym
Building 0500

First Floor
Plan

Front of Gym

RR1-500
Concession Stand 2
Janitors Closet 2-500
500H
500Ha
Bandroom
Blower Toilet
Girls Locker Room
Office 1-500
500G
500Ga
500Aa
Ticket Booth
500J
Gym
Mechanical Room 1-500
Toilet
Shower
Locker Room 2-500
500Fa
Equipment Room
Office 2-500
Janitors Closet 3-500
Laundry Room
500B
Concession Stand 1
Janitors Closet 1-500
RR2-500
500C
Mechanical Room 2-500
502
500Ba
500Ca
501
500Da
500D
500Ea
Locker Room 1-500
Shower
Toilet
500

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0537



Pike County High School
Decagon Building

0700 Building

MOVE AT LEAST
250 FT away
FROM BUILDING

Track
Area

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0538



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0539



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0540

# BUILDING 100

Teacher Parking Lot

FIRE DRILL
EVACUATION

Student Parking Lot

**EAST**

LAB 101

DISTANCE

LEARNING

103

EXIT DOOR

**MEDIA CENTER**

105

107

SOUTH

**EXIT**

**HALL WAY**

**EXIT**

NORTH

102

104

GIRLS

BOYS

CLOSET

**FOYER**

ELECT

106

108

MECHANICA

BANK

Front Entrance

Grass Area

**WEST**

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0541

BUILDING 100

SEVERE WEATHER



*Students in building 100 are to use the hallway.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0542



Vocational Building
0400

BOOKROOM

404

404A

403A

SR403

403

DAVIDSON / JOHNSON

402A

RR2-400

RObinson

SR402

Shop
401

402

400A

405

Office 1-400

Shop
401A

RR1-400

SR401

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0543

# Pike County High School Gym
## Building 0500



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0544

Junior Building
0600

CALHOUN

601

RR1-600

Janitorial Closet 1-600

RR2-600

603

605A

605

MOUNT

Mechanical Room
1-600

Office 3-600

Office 2-600

SR 1-600

Office 1-600

600A

606

FAUST

604

SUPPLY ROOM
JROTC

602

JROTC STAFF

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0545*

Pike County High School
Decagon Building

0700 Building

( ||||| ) SAFE AREAS

703

704

701

HARDEN

COMPUTER LAB

SUBER

BOOTH

705

RR3-700
RR2-700
Electrical Closet 1-700
Janitor Closet 1-700
2-700
Teacher
Work
Area
RR1-700

TRANT

PHILLIPS

706

OWENS

SULLIVAN, T

HELMS

709

707

708

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0546

STUDENTS MOBILE CLASS ROOMS 1 AND 2 SHOULD REPORT TO ROOM 708 (SULLIVAN'S) IN THE ROUND BUILDING

Weather Evacuation Route For students in Mobile Class rooms should report to the ROTC (Junior) Building.

708

Jogging track

5

4

3

2

1

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0547

Schedule for Test Administrations

The scheduled days for the summer 2004 administration are

- Social Studies (AHSGE)..........................Monday...........................July 19, 2004

- Science (AHSGE)....................................Tuesday..........................July 20, 2004

- Mathematics (AHSGE and Exit Exam)...Wednesday.......................July 21, 2004

- Reading (AHSGE and Exit Exam)..........Thursday.........................July 22, 2004

- Language (AHSGE and Exit Exam)........Friday.............................July 23, 2004

**The scheduled days for the fall 2004 administration are**

- Language (AHSGE)..................................Monday.................September 20, 2004

- Social Studies (AHSGE)..........................Tuesday................September 21, 2004

- Science (AHSGE) ....................................Wednesday...........September 22, 2004

- Mathematics (AHSGE)............................Thursday...............September 23, 2004

- Reading (AHSGE)....................................Friday...................September 24, 2004

**The scheduled days for the midyear 2004 administration are**

- Reading (AHSGE and Exit Exam)..........Monday...................December 6, 2004

- Language (AHSGE and Exit Exam)........Tuesday...................December 7, 2004

- Social Studies (AHSGE)..........................Wednesday.............December 8, 2004

- Science (AHSGE) ....................................Thursday.................December 9, 2004

- Mathematics (AHSGE & Exit Exam)......Friday...................December 10, 2004

**The scheduled days for the spring 2005 administration are**

- Mathematics (AHSGE)............................Monday...........................March 7, 2005

- Reading (AHSGE) ..................................Tuesday..........................March 8, 2005

- Language (AHSGE)..................................Wednesday....................March 9, 2005

- Social Studies (AHSGE)..........................Thursday.......................March 10, 2005

- Science (AHSGE) ....................................Friday...........................March 11, 2005

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0548*

Alabama Department of Education
July 1, 2004

# 2004 - 2005 TESTING DATES

| TEST | TESTING PERIOD | DAYS NEEDED FOR TESTING |
|---|---|---|
| *Alabama High School Graduation Exam (AHSGE)* | July 19 – 23, 2004 | 5 days |
| *High School Basic Skills Exit Exam (Exit Exam)* | July 21 – 23, 2004 | 3 days |
| DIBELS | Days 1 – 20 of school calendar (LEA selects 2-week window) | 1 day |
| *Alabama High School Graduation Exam (AHSGE)* | September 20 – 24, 2004 | 5 days |
| *Alabama Reading and Mathematics Test (Pilot Test)* | September 8 – 10 and 13, 2004 | 1 day |
| *Alabama High School Graduation Exam (AHSGE)* | December 6 – 10, 2004 | 5 days |
| *High School Basic Skills Exit Exam (Exit Exam)* | December 6, 7, and 10, 2004 | 3 days |
| DIBELS | Days 80 – 100 of school calendar (LEA selects 2-week window) | 1 day |
| NAEP | January 24 – March 4, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Five* | February 23 – March 2, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Seven* | February 23 – March 2, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Ten* | February 23 – March 2, 2005 | 1 day |
| *Alabama High School Graduation Exam (AHSGE)* | March 7 – 11, 2005 | 5 days |
| *Alabama Alternate Assessment* | March 7 – April 15, 2005 | 1 day |
| English Language Acquisition Test | March 7 – April 15, 2005 | 3–5 days |
| *Stanford Achievement Test* | April 4 – 15, 2005 | 3 days |
| *Alabama Reading and Mathematics Test (Grades 3-8)* | April 4 – 15, 2005 | 1-2 days |
| DIBELS | Days 150 – 170 of school calendar (LEA selects 2-week window) | 1 day |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0549

# August 2004

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | New teacher orientation | 3 | 4 TEACHER INSTITUTE | 5 TEACHER INSERVICE | 6 TEACHER WORKDAY  Sports pictures | 7 |
| 8 | 9 1st day for students (2/3 day) | 10 | 11 | 12 Rusty Parker 2:00 p.m. to collect ring balances | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 PCHS -vs- Charles Henderson 7:30 p.m.  Bulldog stadium | 21 |
| 22 | 23 Rusty Parker 2:00 p.m. to hand out graduation information | 24 | 25 | 26 | 27 PCHS -vs- Booker T Washington 7:30 p.m.  Bulldog stadium | 28 |
| 29 | 30 | 31 | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0550

# September 2004

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | | | 1 | 2 | 3 PCHS -vs- W S Neal Bulldog Stadium 7:30 p.m. | 4 |
| 5 | 6 LABOR DAY HOLIDAY | 7 | 8 | 9 | 10 PCHS @ Headland 7:30 p.m. | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 PCHS -vs- Slocomb Bulldog Stadium 7:30 p.m. | 18 |
| 19 | 20 Alabama High School Graduation Exam LANGUAGE | 21 Alabama High School Graduation Exam SOCIAL STUDIES | 22 Alabama High School Graduation Exam SCIENCE | 23 Alabama High School Graduation Exam MATH | 24 Alabama High School Graduation Exam READING PCHS -vs-Bullock Co. Bulldog Stadium 7:30 p.m. | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0551

# October

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | **1** Homecoming PCHS-vs-Abbeville Bulldog Stadium 7:30 pm | **2** |
| **3** | **4** | **5** | **6** | **7** | **8** ENDS 1ST NINE WEEKS PCHS @ Dale County 7:30 p.m. | **9** |
| **10** | **11** INTERSESSION | **12** INTERSESSION | **13** INTERSESSION | **14** INTERSESSION | **15** INTERSESSION PCHS-vs-T R Miller Bulldog Stadium 7:30 pm | **16** |
| **17** | **18** BEGINS 2ND NINE WEEKS | **19** | **20** | **21** Report Card/ Conf. Day (1/2 day for students) (teachers leave at 7:30 p.m.) | **22** PCHS @ Straughn 7:30 p.m. | **23** |
| **24** | **25** | **26** | **27** | **28** | **29** PCHS -vs-Elba Bulldog Stadium 7:30 pm | **30** |
| **31** | | | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0552

# November

## 2004

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 VETERANS DAY HOLIDAY | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 THANKSGIVING HOLIDAYS | 25 THANKSGIVING HOLIDAYS | 26 THANKSGIVING HOLIDAYS | 27 |
| 28 | 29 | 30 |  |  |  |  |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0553

# December

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 Alabama High School Graduation Exam (Reading) | 7 Alabama High School Graduation Exam (Language) | 8 Alabama High School Graduation Exam (Social Studies) | 9 Alabama High School Graduation Exam (Science) | 10 Alabama High School Graduation Exam (Math) | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 Ends 2nd Nine Wks 2/3 day for students | 22 CHRISTMAS HOLIDAYS | 23 CHRISTMAS HOLIDAYS | 24 CHRISTMAS HOLIDAYS | 25 |
| 26 | 27 CHRISTMAS HOLIDAYS | 28 CHRISTMAS HOLIDAYS | 29 CHRISTMAS HOLIDAYS | 30 CHRISTMAS HOLIDAYS | 31 CHRISTMAS HOLIDAYS | |
| | | | | ***************** INTERSESSION JANUARY 3-4, 2005 TEACHERS RETURN JANUARY 5, 2005 | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0854

# Technology Mentor List
## 2004-05

| Denison | Hassett | Watson | Green |
|---------|---------|--------|-------|
| Kilpatrick | Harden | Office area | Morgan |
| Lampley | Suber | Trant | Pritchett |
| Sullivan, S | Booth | Robinson | Knight |
| Calhoun | Owens | Grant | Phillips |
| Faust | Holland | Coon | Sullivan, T |
| JROTC | Coppage | | Busby |
| Mount | Davidson | | Chancellor |
| | | | Helms |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0555**

2004
PIKE COUNTY HIGH SCHOOL
FOOTBALL SCHEDULE

| DATE | OPPONENT | SITE | TIME |
|------|----------|------|------|
| August 20 | Charles Henderson | Home | 7:30 |
| August 27 | Booker T Washington | Home | 7:30 |
| September 3 | WS Neal | Home | 7:30 |
| September 10 | Headland | Away | 7:30 |
| September 17 | Slocomb | Home | 7:30 |
| September 24 | Bullock County | Home | 7:30 |
| October 1 | Abbeville | Home(HC) | 7:30 |
| October 8 | Dale County | Away | 7:30 |
| October 15 | TR Miller | Home | 7:30 |
| October 22 | Straughn | Away | 7:30 |
| October 29 | Elba | Home | 7:30 |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0556

TEXTBOOK DISTRIBUTION/COLLECTION PROCEDURES:

1) **DISTRIBUTION:**
   A) TEXTBOOKS WILL BE MAINTAINED THROUGH PROPER INVENTORY PROCEDURES IN THE SCHOOL'S CENTRAL TEXTBOOK DEPOSITORY. TEACHERS WILL SIGN FOR BOOKS USING FORM #M1 WHICH IS TO BE MAINTAINED BY MR. MCDANIEL.

   B) TEXTBOOKS WILL BE PLACED IN YOUR CLASSROOM FROM THE DEPOSITORY. ANY ADDITIONAL BOOKS NEEDED WILL BE SENT AT YOUR REQUEST. CHECK YOUR BOOKS FOR ACCURACY AND GO BY MR. MCDANIELS OFFICE TO SIGN A #M1 FORM.

   C) FACULTY WILL BE ISSUED THE NUMBER OF BOOKS NEEDED FOR EACH CLASS BASED ON SCHEDULE INFORMATION. BOOKS MUST BE ISSUED ON THE FIRST FULL DAY USING THE APPROPRIATE FORM (FORM #M2).

2) **COLLECTION OF BOOKS AT END OF TERM:**
   A) BOOKS SHOULD BE TAKEN UP FROM STUDENTS ONLY AFTER THEIR SCHEDULED FINAL EXAM HAS BEEN GIVEN.
   CLOSE MONITORING OF COLLECTION SHOULD BE MADE TO ENSURE THAT STUDENTS ARE RETURNING BOOKS WITH THE BOOK NUMBERS ISSUED TO THEM.
   B) THE NUMBER OF BOOKS RETURNED + THE NUMBER LOST + THE NUMBER OF BOOKS WORN OUT MUST EQUAL THE TOTAL NUMBER OF BOOKS ISSUED TO THE FACULTY MEMBER. FACULTY WILL BE HELD RESPONSIBLE FOR ANY BOOKS LOST IF THEY CANNOT BE LINKED TO STUDENTS (THE LINK TO STUDENT MUST BE VERIFIABLE). GOOD RECORD KEEPING IS A MUST! KEEP FORM #2 ACCURATELY!

BOOKS LISTED AS WORN OUT MUST BE RETURNED FOR INSPECTION.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0557

3) **NEW STUDENTS:**

A) TEACHERS SHOULD SEE MR. MCDANIEL TO SECURE ADDITIONAL BOOKS FOR NEW STUDENTS AND THOSE INVOLVED IN SCHEDULE CHANGES. FACULTY MUST SIGN FOR THESE ADDITIONAL BOOKS ALSO. DOCUMENTATION OF THE ISSUANCE OF THESE BOOKS SHOULD BE DONE AS WITH ANY OTHER STUDENT USING THE APPROPRIATE FORM (FORM #1 OR #2).

4) **EXITING STUDENTS:**

A) TEACHERS SHOULD TAKE UP BOOKS FROM STUDENTS PRIOR TO THEIR DEPARTURE.  BOOKS SHOULD BE CHECKED IN USING FORM #2.

B) TEACHERS SHOULD RETURN BOOKS IMMEDIATELY TO MR. MCDANIEL WHEN THE STUDENT TURNS THEM IN AFTER WITHDRAWING. THE WITHDRAWAL FORM SHOULD BE SIGNED AT THIS TIME IF THEY ARE CLEAR FROM FINANCIAL OBLIGATIONS RELATED TO TEXTBOOKS. IF THEY ARE NOT CLEAR, THE AMOUNT OWED FOR THE BOOKS SHOULD BE CALCULATED AND PLACED ON THE WITHDRAWAL FORM. TEACHERS WILL FILE A FORM #3 FOR LOST TEXTBOOKS AT THE TIME OF WITHDRAWAL WITH MR. MCDANIEL.

ONCE THIS IS DONE, THE WITHDRAWAL FORM WILL BE SENT TO MRS. BOSWELL AND THE PRINCIPAL FOR COMPUTER WITHDRAWAL.

5) **LOST BOOKS:**

A) <u>STUDENTS WHO HAVE OUTSTANDING BILLS FOR LOST BOOKS DURING THE PREVIOUS YEAR SHOULD NOT BE ISSUED BOOKS</u>. A RECEIPT FROM MRS. BOSWELL INDICATING THAT THEIR TEXTBOOK OBLIGATIONS HAVE BEEN MET WILL BE NECESSARY PRIOR TO ISSUING THESE STUDENTS BOOKS. A LIST OF THESE STUDENTS WILL BE PROVIDED ON THE FIRST DAY OF SCHOOL.

IN THE CASE OF "FOUND" TEXTBOOKS, MRS. BOSWELL SHOULD BE NOTIFIED AND A REFUND LESS RECOVERY FEE OF $3.00 WILL BE ARRANGED.

A $3.00 RECOVERY CHARGE WILL BE ASSESSED ON ALL BOOKS RECOVERED BY FACULTY DURING THE SUMMER.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0558

B) A FORM #3 SHOULD BE SUBMITTED TO MRS. BOSWELL AS A PART OF SCHOOL CLOSING PROCEDURES. MR. MCDANIELS SIGNATURE MUST BE SECURED ON THIS FORM PRIOR TO TURNING IT IN. HIS SIGNATURE INDICATES THAT THE SUM OF THE STUDENTS ON THE LIST FOR FIRST TERM + THE SUM OF THE STUDENTS ON THE LIST FOR SECOND TERM = THE NUMBER OF BOOKS ISSUED TO YOU DURING THE YEAR.

C) EXTRA TEXTBOOKS SHOULD NOT BE STORED IN THE ROOM. FACULTY WILL BE RESPONSIBLE FOR LOST TEXTS WHICH HAVE BEEN TURNED IN BY STUDENTS AND NOT PROMPTLY TURNED OVER TO MR. MCDANIEL.

SPECIAL NOTE: TEACHERS, YOU ARE NOW THE INTERMEDIARY BETWEEN THE SCHOOL AND STUDENT WITH REGARD TO TEXTBOOK ISSUANCE. YOU MUST MAINTAIN EXCELLENT RECORDS. YOU MUST HOLD STUDENTS ACCOUNTABLE FOR LOST AND DAMAGED BOOKS. YOU MUST BE ABLE TO JUSTIFY TO PARENTS AND OTHERS YOUR DECISIONS RELATED TO CHARGING FOR A BOOK. POOR AND SLOPPY DOCUMENTATION GIVES EVERYONE THE IMPRESSION A MISTAKE COULD HAVE BEEN MADE. YOU WILL BE HELD ACCOUNTABLE FOR BOOKS IN CASES SUCH AS THESE.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0559

FORM M2
STUDENT BOOK CHECKOUT

| STUDENT NAME | BOOK NUMBER | CONDITION | STUDENT SIGN(OUT) | TEACHER SIGN(OUT) | STUDENT SIGN(IN) | TEACHER SIGN(IN) | RETURNED CONDITION | DESCRIPTION & DAMAGE CHARGE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0560



# PIKE COUNTY HIGH SCHOOL

# SCHOOL SAFETY PLAN

# MR. TERRY CASEY PRINCIPAL

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0616

PIKE COUNTY HIGH SCHOOL
BRUNDIDGE, ALABAMA  36010

- INTRODUCTION

- FLOOR AND EVACUATION PLAN

- SCHOOL EVACUATION PLAN

- SCHOOL PLANNING SAFETY COMMITTEE

- EMERGENCY SUPPLY LIST

- KEY PERSONNEL TELEPHONE NUMBERS

- EMERGENCY RESPONSE TEAM

- EMERGENCY TELEPHONE NUMBERS

- PREVENTION AND CURRICULUM, DUTY OF STAFF AND FACULTY,
  COMMUNICATIONS

- BUILDINGS AND GROUNDS SECURITY

- EMERGENCY LOCK DOWN PROCEDURES

- ASSESSING AND RECOVERY

- CAMPUS INTRUDER

- DRUGS AND ALCOHOL

- SHOOTING & DISCHARGING FIRE ARMS

- CHEMICAL SPILLS

- SUICIDE AND DEATH OF STUDENT OR FACULTY MEMBER

- HOSTAGE SITUATION

- RIOTS / STUDENTS DISTURBANCES

- VIOLENCE AND FIGHTING

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0617

- VANDALISM

- LOST / RUN AWAY STUDENTS

- KIDNAPPING

- WEAPONS

- RANDOM WEAPONS CHECKS

- SEXUAL ASSAULT / SEXUAL HARASSMENT

- EXPLOSIONS

-BOMB THREATS

- OTHER EMERGENCIES

- EMERGENCY RESPONSE CODES

- CENTRAL OFFICE SUPPORT RESPONSE TEAMS

- EMERGENCY RESPONSE PLAN

-UTILITY EMERGENCY MANAGEMENT PLAN

-MEDIA PLAN

- ATHLETIC ACTIVITIES VENUE

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0618*

**PIKE COUNTY HIGH SCHOOL**
**BRUNDIDGE, ALABAMA 36010**

**SCHOOL SAFETY PLAN**
**INTRODUCTION**

Pike County High School desires to make its environment the most comfortable and safest it can be for the students. A plan that involves all staff and students at the school is in effect to insure safety and security. The plan includes the policies and procedures that promote a safe and secure atmosphere for all students and faculty personnel.

The guidelines in the plan contain the primary elements or steps necessary to effect intervention and follow-up for selected common emergencies that affect our school. Since the enumeration is not possible, this guide, along with the exercise of good judgment should help to ensure that emergencies would be managed effectively. All school faculties, staff, and other staff have been or will be trained in the use of this plan or guide.

MR. TERRY CASEY, PRINCIPAL
PIKE COUNTY HIGH SCHOOL

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0619**

PIKE COUNTY HIGH SCHOOL
BRUNDIDGE, AL  36010

SCHOOL SAFETY PLAN
TRAINING FOR STAFF

The central office staff does all training of school staff in emergency situations.  Training of students in CPR, first aid and other areas of emergency situations are done by the staff at Pike County High School

Training of parents will be conducted on volunteer basis as needed.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0620

PIKE COUNTY HIGH SCHOOL
BRUNDIDGE, ALABAMA 36010

SCHOOL SAFETY PLAN
SEXUAL ASSAULT / SEXUAL HARASSMENT

DEFINITION: Sexual harassment is the offensive touching of a sexual nature of another student or written or verbal propositions to engage in sexual acts, or any other form of sexual harassment. Sexual harassment consists of verbal or physical contact of a sexual nature, imposed on the basis of sex, by a student or agent of a recipient that denies, limits provides differed, or conditions the provision of aid, benefits, services or treatment protected under TITLE IX. U.S. CODE.

POLICY: Sexual harassment or sexual assault will not be condoned on any campus, school grounds or activities supported by the schools of the Pike County School Systems.

ACTION BY ADMINISTRATORS: The parents of all students involved in sexual harassment issues shall be notified in all cases. Law enforcement will be summoned by the school in substantiated cases of sexual harassment, in cases where parents and student wish to file complaints, and in cases where a pattern of unsubstantiated complaints have been made concerning individual students.

ACTION BY TEACHERS:

1. Read the school policy on sexual harassment and the definition.

2. Inform students that anyone who violates the policy will be sent to the office immediately.

3. Any incident of sexual harassment, reported to you, should be recorded with who, did what, when, where, and how covered in the report. Personally present this report to the principal or assistant principal, make a copy for yourself and keep it on file somewhere.

4. Should you observe or overhear an act of sexual harassment or sexual assault, follow the same procedure in the above paragraph. In addition, escort all parties involved to the assistant principal or principal immediately.

5. In the case of sexual assaults, where there is physical contact, relating to sexual acts, or touching of the parts of the body that are private and protected under the statues of laws shall be reported immediately to the office.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0631

6. Any incident reported or information presented concerning the possibilities of rape regardless how lacking in details shall be recorded and reported to the principal. These are incidents, which may occur on school properties or activities. Other incidents should be reported to the local law enforcement activities.

## PREVENTION AND ASSISTANCE:

Rape prevention classes and information relating to reporting of rape, should be presented to all students attending Pike County High School.

Any student, who is or may be a victim of rape, sexual abuse, or harassment, will be provided assistance in dealing with the emotional problems brought forth by the misfortune.

The Guidance Counselor can provide information on the counseling services available and prepare referral forms to the respective agency or agencies.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0622



188 Ramage Circle
Brundidge, Alabama 36010
November 16, 2004

Pike County Board of Education
101 West Love Street
Troy, Al 36081

Dear Dr. Bazzell:

We, Mr. & Mrs. David Foster, are corresponding with you about a matter concerning our son, David M. Foster, a seventh grade student at Pike County High School. It was brought to our attention Saturday, November 13, 2004, that our son was inappropriately disciplined by the band teacher, Mr. Coon during the week of November 8-12, 2004.

During band practice, David obviously did something that did not meet Mr. Coon's approval. As a result of his disapproval, Mr. Coon grabbed and choked David. Our son was initially reluctant in disclosing any information to us. However, he did admit that the alleged accusations were true.

We send our children to school to learn, obey, and respect peers and those who are in authority. This is not to say that they never step out of line. Nevertheless, this method of discipline is unacceptable under any circumstances. As concerned parents, we want this incident thoroughly investigated. We want to be completely involved and informed throughout this investigation.

We believe that the Pike County School System is a responsible education facility/environment. We believe that safety is one of your top priorities for your students, faculty, and staff. Therefore, we know you will do the right thing and honor our request.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0077

There is no need for parents to wonder or worry if their child/children is/are being treated with respect in their need of discipline.  We will await for your reply, and we thank you for your consideration.

Sincerely,


Mr. & Mrs. David Foster

CC:

Mr. Wyman Botts, Rev. Earnest Green, Mr. Greg Price, Mr. Adam Register, Rev. Herbert Reynolds, Mrs. Linda Steed

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0078*

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Adam Register, President
Linda Steed, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Rev. Herbert Reynolds

**Dr. Mark Bazzell**
Superintendent



November 22, 2004

Mr. and Mrs. David Foster
188 Ramage Circle
Brundidge, Alabama 36010

Dear Mr. and Mrs. Foster:

The purpose of this correspondence is to confirm receipt of your letter dated November 16, 2004 on this date. I will be conducting a thorough investigation into your allegations and will correspond with you in writing upon completion of my review.

Please understand that we take all such complaints with the upmost seriousness and will be diligent in this review. Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Board of Education


cc: Mr. Terry Casey, Principal

Terry:
I need written statement from Mr. Coon, the student, and any other witnesses, etc. As soon as possible.

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0076**

101 W. Love Street, Troy, Alabama 36081-2613  Telephone : (334) 566-1850  Fax: (334) 566-2580

Dr. Bazzell,

Please find attached the documents on the Coon/David Foster case.
If there are any further questions please contact me.

Thanks,

Mr. Mc Daniel

Latonya Foster
( 735 - 3134 )
2683

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0079*



## Pike County High School

Terry J. Casey
Principal

552 South Main Street
Brundidge, Alabama 36010-2299
Phone (334) 735-2389
Fax (334) 735-3176

Robert L. McDaniel
Assistant Principal

Dr. Mark Bazzell, Superintendent
Pike County Board of Education

December 2, 2004

Dear Sir,

The purpose of this correspondence is to provide summation to the incident involving Mr. Charles Coon, the Pike County High School Band Director and David Foster, a member of the Pike County High School Band.

During the week of November 7, 2004 it was brought to my attention by the parents of David that Mr. Coon allegedly used improper discipline (choking) while attempting to restore order during band practice. Later that same day I met with David's Father who requested more details of the incident. Mr. Foster expressed concern regarding the perceived lack of decorum and discipline within the band but specifically the incident between their son and Mr. Coon. I advised the parents that I would investigate the incident but I also told them that it was within their right to use the Pike County Board of Education chain of command as well. I was ask by Mr. Casey, the Pike County High School Principal, to investigate/mediate the incident and provide the report to the superintendent's office.

On the evening of November 23rd 2004, both parties (parents and teacher) and I met and discussed the incident. I provided a copy of the complaint written by the Fosters to Mr. Coon and read it as the parents and Mr. Coon listened. Afterwards, I asked Mr. Coon if he wished to respond. Mr. Coon admitted that he "lost it." In explaining such, he admitted placing both hands around the child's neck. He acknowledged that he may have caused some pain and discomfort to the child due to his size and strength in relationship to David, who is considerably smaller in statue. On several occasions, Mr. Coon apologized and offered to present his apology via any forum that the parents wished. I. e. The Messenger, school board or band booster parents.

Mr. Foster, David's father expressed belief in the genuine sincerity of Mr. Coon's apology while also granting permission to discipline their son when needed. He sternly disagreed with the method used by Mr. Coon during the incident in question.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0080





## Pike County    High School

| | | |
|---|---|---|
| Terry J. Casey<br>Principal | 552 South Main Street<br>Brundidge, Alabama 36010-2299<br>Phone (334) 735-2389<br>Fax (334) 735-3176 | Robert L. McDaniel<br>Assistant Principal |

The meeting could be summarized as productive. I believe that Mr. Coon understands that his actions were far out of bounds. Both agreed to keep an ongoing dialogue between each other.

Sincerely,

Robert L. Mc Daniel
Assistant Principal
Pike County High School

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0081*

"OUR PROMISE"
Clean and Safe Schools • Friendly and Courteous Service • Academic Accountability • Fiscal Responsibility



David Foster      happen Nov 12, 2004      (Band)
4th Block

1. It started with a Boy name timothy williams,
he & Mr Coon had got into it. Timothy had a
theme song he made that he quited, he usually
Starts he's song off, but since he quited Mr
Coon let the saxes start it off the next day tim
dad came and talk to Mr coon Tim came
back bad practice started with tim song I started
it off because I was a saxophone player he
said something to me I didn't know what he was
talking about at first so I started of again he got
mad I said "I thought you wanted the
saxophone start off he didn't say nothing.
For the last time I started off again
he came over & started choking me &
said get off my field little boy.

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0082

**IMPORTANT MESSAGE**

FOR Dr. Bazzell

DATE 12/17/01    TIME 1:40 ☑ A.M. / P.M.

M Mrs. Foster

OF

PHONE

☐ FAX    AREA CODE    NUMBER    EXTENSION

☐ MOBILE    AREA CODE    NUMBER    TIME TO CALL

MESSAGE returned your call Ext 108

SIGNED

TOPS FORM 4008 MADE IN U.S.A.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0075

PLAINTIFF'S
EXHIBIT
11

TRS Form 10 (6/03)

135 South Union Street
Post Office Box 302150
Montgomery, Alabama 36130
(334) 832-4140 or 1-800-214-2158

# APPLICATION FOR RETIREMENT
## TEACHERS' RETIREMENT SYSTEM OF ALABAMA

**MEMBER INFORMATION**

Name  _Charles L. Coon, Jr._    Soc. Sec. No. _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_

Home Address _P.O. Box 201-308 Country Club Dr_    Date of Birth _1-02-1948_
Street or P.O. Box

_Greenville        AL        36037_    Home Phone _(334) 382-7638_
City          State         Zip

Employer _Pike County Board of Education_    Work Phone (____)

Type of Retirement (Check One): ☒ Service    ☐ Disability (Report of Disability form must also be submitted.)

Date of Retirement (This date is always the first of a month.) _July_ 1, 20 _05_
Month                    Year

Name of bank/financial institution to which retirement benefit is to be deposited _____
(The properly completed Direct Deposit Authorization form must be submitted to the TRS to authorize remittance to the bank/financial institution.)

**Beneficiary Designation**

I am designating the following beneficiary to receive any benefit due at my death _Minie L. Coon_

Relationship to me _wife_    Date of Birth _1-23-1947_

Soc. Sec. No. _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_

In the event the designated beneficiary listed above is different from that listed on my active account, I desire the change to be effective (Check One):

☐ Upon the duly executed completion of this application filed through the TRS with the Board of Control.
☐ On the date my retirement benefit becomes due and payable.

**Member Authorization**

Signature of Applicant _Minnie Coon_    Date _5/26/05_

STATE OF _Alabama_ , COUNTY OF _Pike_

On this _26_ day of _May_ , 20 _05_ personally appeared before me, the above named individual and made oath that the statements made are true.

Notary _Joe Lambet_

My Commission Expires: _4/17/07_

**EMPLOYER CERTIFICATION**

Date on which service of applicant will terminate _June 30, 2005_

Closing date of last payroll of applicant _July 31, 2005_

Job classification _Band Director_

Contract salary for full year _49,864.00_

Total contributions (to be) deducted
for the current scholastic year _2,493.24_

Total contributions (to be) deducted
after the current scholastic year _207.77_

Days worked/days contracted for the current contract period _202_

Total accrued unused sick leave days at retirement _143_

Signature of Authorized Official: _Jim Coon_

Employing Institution: _Pike County Board of Education_

| Please certify deductions for last 7 months for which contributions will be submitted. | | |
|---|---|---|
| Jul _207.77_ | Jan _207.77_ |
| Aug _____ | Feb _207.77_ |
| Sep _____ | Mar _207.77_ |
| Oct _____ | Apr _207.77_ |
| Nov _____ | May _207.77_ |
| Dec _____ | Jun _207.77_ |

JR v. Pike County BOE
Produced by Defendant PCBE.
No. 0203

Work Phone: ( 334 ) 566-1850

Date: _May 26, 2005_

RSA DDR (5/03)

# DIRECT DEPOSIT AUTHORIZATION
## Retirement Systems of Alabama

135 South Union Street
Post Office Box 302150
Montgomery, Alabama 36130
(334) 832-4140 or 1-800-214-2158

The retiree or beneficiary of a deceased retiree must complete the front page of this form. Then take or mail the form to your financial institution so they may verify the information on the front, **complete the information on the reverse side,** and agree to the Master Agreement.

### Retiree/Beneficiary Information

Social Security Number  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

Name  Charles L. Coon, Jr.

Address  P.O. Box 761

308 Country Club Dr.

Greenville, AL 36037

Benefit Recipient (Please check one):
☐ Retiree
☐ Beneficiary of Deceased Retiree/Member

Daytime Phone No. 334-382-7639

Indicate the system(s) from which you would like your benefit(s) direct deposited.

☒ Teachers' Retirement System      ☐ Employees' Retirement System      ☐ PEIRAF      ☐ Judicial Retirement Fund
                                                                          ☐ RSA-1

---

### Joint Account Holder's Certification:

I agree to notify the Retirement Systems of Alabama (RSA) immediately of the death of the recipient of the retirement benefits being deposited to this joint account, and to return all payments to the RSA that are deposited to this account after said death. The RSA will determine and pay any survivor benefits. The RSA is authorized to make necessary debit entries to this joint account for any credits that were made in error.

Name(s) of Joint Account Holder(s)

Charles L. Coon, Jr.

Mamie Coon

Signature(s) of Joint Account Holder(s)

Date _____

---

### Retiree/Beneficiary Certification:

Each benefit payment is to be credited to my account at the financial institution specified on the reverse side of this form and such payment will be in full payment, satisfaction, and discharge of the amount then falling due and payable to me on account of such payments.

If my death occurs prior to the due date of any payment made by the RSA in compliance with this request or if adjustments are required for any credit entries to my account, I authorize the RSA to make the necessary debit entries to my account. I hereby reserve the right to revoke or cancel this request, such revocation or cancellation to take effect within 30 days of receipt of written notice by the RSA.

I authorize my payment to be sent to the financial institution named on the reverse side of this form to be deposited to the designated account.

Signature of Retiree/Beneficiary _____     Date 5/26/05

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0204

(5/03)

# INSURANCE AUTHORIZATION FORM

## PUBLIC EDUCATION EMPLOYEES' HEALTH INSURANCE PROGRAM (PEEHIP)

### PART I: MEMBERS CURRENTLY ENROLLED

Members currently enrolled in Hospital/Medical coverage with PEEHIP check the box which applies:

☒ I wish to continue my Hospital/Medical coverage with PEEHIP.*

☐ I do not wish to continue my Hospital/Medical coverage with PEEHIP.

Marital Status: ☐ Single    ☒ Married    ☐ Divorced    ☐ Widowed

Signature of Retiree _____    Date 5/26/05

### PART II: MEMBER COMBINING ALLOCATIONS WITH SPOUSE

Members combining allocations with spouse check all that apply:

☒ I am presently transferring allocation to retired spouse contract number _____ and wish to continue in that manner.

☐ I am presently receiving allocation from my active spouse and wish to continue in that manner.

☐ I am presently transferring allocation to active spouse contract number _____ and understand that I must enroll in the Hospital Medical Plan in my name and receive my active spouse's allocation.**

| **PEEHIP policies require the retiree to enroll in insurance in his/her name if combining allocation with active spouse. Enrollment application will be sent to retiree to enroll. |
|---|

Spouse retiree date (if applicable) _____

### EMPLOYER CERTIFICATION (to be completed by payroll/insurance official)

The final payroll deduction of $ _____0_____, will be deducted for _August 2005_ coverage.
                                                                           Month

This employee is a _10_ month employee.
                   9, 10, 11, 12

Signature of Authorized Official _Bonnie Brown_    Date _5-26-05_

### PART III: OPTIONAL COVERAGE

Persons with **only** the Optional coverages (Dental, Cancer, Indemnity, and Vision) may continue all four coverages or drop two optionals at date of retirement. The retired state allocation will pay the premium for two of the optionals without a payroll deduction for those retired members enrolled in only the optional coverages. If you are not currently enrolled in optional coverage, you can only enroll during the open enrollment period. *

If you are enrolled in the Optional coverages only, please indicate which coverages you wish to keep on your date of retirement. If you wish to keep all four optionals, mark "all."

☐ Cancer    ☐ Indemnity    ☐ Dental    ☐ Vision    ☐ All

Signature of Retiree _____    Date _____

### PART IV: NON-PARTICIPATING SYSTEM

Persons whose public education employer does not participate in PEEHIP Hospital/Medical will be provided with information and an enrollment form about PEEHIP. If you wish to enroll, complete an enrollment form and submit it with the payment for the first month's premium no later than your effective date of retirement. If you are **not** enrolled in your employer's Hospital/Medical coverage, you and your dependents will be required to serve a 270-day waiting period on all pre-existing conditions with PEEHIP.

### PART V: VESTED MEMBERS NOT CURRENTLY ENROLLED

If you are not currently employed in public education in Alabama, you are eligible to enroll in the Hospital/Medical insurance through PEEHIP on your date of retirement. You and your dependents will be required to serve a 270-day waiting period on all pre-existing conditions unless proof of previous coverage is received and approved. Please indicate your intentions below and an enrollment form will be provided to be completed and returned no later than your date of retirement with the payment for the first month's premium.

☐ wish to enroll in the Hospital/Medical coverage with PEEHIP effective the date of my retirement.
☐ do not wish to enroll in the Hospital/Medical coverage with PEEHIP.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0205*

Signature of Retiree _____    Date _____

To members enrolled in both the PEEHIP Hospital/Medical coverage and one or more optional coverages: A member cannot drop optional coverages (Dental, Cancer, Indemnity, Vision) until the open enrollment period.

*Financial Institution Information (to be completed by a representative of the financial institution)*

Name of Retiree/Beneficiary _Charles L. Coon_    Soc. Sec. No. _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_

Depositor Account No. _5121605190_    Bank Routing No. _062200482_

Name of Financial Institution _The Peoples Bank & Trust Co_    Type of Account: ☑ Checking
    ☐ Savings

Mailing Address _PO Box 310_

_Greenville Al. 36037-0310_

Name(s) of Person(s) on this Account: _Charles L. Coon_

_Aurora Coon_
_(minor)_

---

**Financial Institution Certification and Master Agreement:**

Both the Retirement Systems of Alabama (RSA), as Originator, and the above named Financial Institution identified on this side of the form consider the following to be the Master Agreement and agree that it is to be applicable to all payments subject to Section 4.7 of the Operating Rules of the National Automated Clearing House Association sent by the RSA to the Financial Institution for the benefit of all benefit recipients having accounts at the Financial Institution.

In consideration of the RSA making payments in accordance with the foregoing request without requiring proof that the retiree/beneficiary identified on this form is alive on the date which such payments become due and are credited to his or her account, the Financial Institution hereby agrees to repay and refund to the RSA on demand, the amount of any payments made to and received by the Financial Institution, the due date of which occured after the date of death of the benefit recipient. The Financial Institution further agrees to accept the certification of the RSA as to the date of death of such payee as sufficient evidence.

I confirm the identity of the named retiree/beneficiary, account number and type. As representative of the above named Financial Institution, I certify that the Financial Institution agrees to receive and deposit identified payment in accordance with the Master Agreement and agrees that the Master Agreement is applicable to all payments subject to Section 4.7 of the Operating Rules of the National Automated Clearing House Association sent by the RSA to the Financial Institution for benefit of the retiree/beneficiary.

Name of Representative _Glenda O. Clark_

Signature of Representative _Glenda O. Clark_    Date _5/17/05_

Telephone Number _334-382-4124_

---

Note: Direct Deposit Authorization forms that are processed after the 18th of each month will become effective the following month.

---

Please return completed form to:

The Retirement Systems of Alabama
Post Office Box 302150
Montgomery, Alabama  36130-2150

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0206

May 15, 2005

Dr. Mark Bazzell, Superintendent
Pike County School System
101 West Love Street
Troy, AL 36081

Dear Sir:

Please let this letter serve as my notice of my retirement effective June 30, 2005.

I have enjoyed working with the administration, faculty, and students at Pike County High School, Pike County Elementary School., and Banks Middle School. If I can be of any service to you in the future please feel free to give me a call. Go PRIDE OF PIKE!!!!

Sincerely,

Charles Coon
cc: Mr. Buddy Pyron

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0207*



MINUTES OF THE MEETING OF THE
PIKE COUNTY BOARD OF EDUCATION
May 23, 2005
4:30 p.m.

1.  The Pike County Board of Education met at 4:30 p.m. in regular session at the offices of the board located at 101 W. Love Street, Troy, Alabama.  Board members present for the meeting were as follows:

    | | |
    |---|---|
    | Mrs. Linda Steed, President | District Four |
    | Rev. Herbert Reynolds, Vice-President | District Five |
    | Rev. Earnest Green | District One |
    | Mr. W. Greg Price | District Two |
    | Mr. Wyman Botts | District Three |
    | Mr. Adam Register | District Six |
    | Dr. Mark Bazzell, Superintendent | Secretary to the board |

2.  The meeting was called to order by the President, Mrs. Steed, and Mr. Botts gave the invocation.

3.  The minutes of the April 18, 2005, meeting were approved as presented on the motion of Mr. Register seconded by Mr. Botts.

4.  On the motion of Mr. Register seconded by Rev. Green, the board adopted the agenda for the meeting as presented.

5.  The request by a Pike County teacher who resides in Troy for her child to enroll in kindergarten at Goshen Elementary School in the fall was approved on the motion of Mr. Botts seconded by Mr. Price.

6.  The financial statement for April, 2005, was presented and approved on the motion of Mr. Register seconded by Rev. Reynolds.

7.  The board approved payment of payrolls and bills and accounts for the month of May, 2005, on the motion of Mr. Botts seconded by Mr. Price.

8.  On the motion of Mr. Price seconded by Rev. Green, the board approved changes in report cards for kindergarten and third grade as stated in the attached letter.

9.  The board gave approval to contract with Humidity Control Systems of South Alabama to provide humidity control panels for coolers in the lunchrooms at a total annual cost of $3,421.50, on the motion of Rev. Reynolds seconded by Mr. Register.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0208

Board minutes
page two
May 23, 2005

10.  On the motion of Mr. Botts seconded by Mr. Price, the board awarded Child Nutrition Program bids for the 2005-2006 school year to low bidders meeting specifications, as listed below. Mr. Register abstained from the vote.

Awarded the bid for milk to Barber Dairies in the amount of $48,645.35.

Awarded the bid for frozen snacks/ice cream to Blue Bell Creameries in the amount of $3,564.00.

Awarded the bid for bread to Sara Lee Baking Company in the amount of $18,160.00.

Awarded the bid for pest control to Meeks Termite and Pest Control in the amount of $138.00 per month.

Awarded the bid for small kitchen items to the lowest bidder meeting specifications, item by item, according to the printout generated by the bid/purchase order computer program.

11.  The board accepted the bid of $550 from Huntsville Restaurant Equipment for two surplus serving lines at Pike County High School, on the motion of Rev. Reynolds seconded by Mr. Register.

12.  On the motion of Rev. Green seconded by Mr. Price, the board approved the sale of two surplus cafeteria tables at $20 each to Phyllis Rodgers.

13.  On the motion of Mr. Botts seconded by Rev. Green, the board accepted bids received for surplus vehicles and equipment, as listed:

The sale of four 1989 Ford buses to Avery's Used Cars of Lakeland, Florida:     #89-01, VIN 1FDXJ75PXKVA08585 @ $1,098.00
           #89-03, VIN 1FDXJ75P3KVA08587 @ $1,098.00
           #89-05, VIN 1FDXJ75P7KVA08589 @ $1,098.00
           #89-06, VIN 1FDXJ75P3KVA08590 @ $1,098.00

The sale of one 1980 Ford Utility Van, VIN E04EHJD5660, to Lawrence Sankey @ $125.00.

The sale of one 1980 Chevrolet Pickup Truck, VIN CCG14A1105559, to Ann Stewart @ $210.00.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0209

Board minutes
page three
May 23, 2005

The sale of one Bay Lift Floor Jack, Serial #2230250, and one Walker Floor Jack, Serial #93657, to Tony Jones @ a total of $50.00.

14. On the motion of Rev. Green seconded by Mr. Botts, the board declared as surplus a water cooler and authorized its use at the Troy Cultural Arts Center.

15. On the motion of Mr. Price seconded by Rev. Green, the board declared as surplus nine portable classrooms/trailers at Pike County High School to be advertised for sale by sealed bids with a minimum price of $1,500 each for the five older buildings and $2,500 each for the four newer buildings.

16. The board approved architectural plans for the Prevention and Support Annex to be located at 120 Dean Street in Troy, on the motion of Mr. Botts seconded by Mr. Register.

17. On the motion of Rev. Green seconded by Mr. Price, the board approved contracting with PH & J Architects for structure design of the Prevention and Support Annex and for the Goshen Elementary School paving project.

18. The board, on the motion of Mr. Register seconded by Rev. Reynolds, approved the use of "School Dude.com", an on-line maintenance program designed to manage school facilities more efficiently.

19. On the motion of Mr. Botts seconded by Rev. Reynolds, the board approved the request by Mrs. Grubbs and Mrs. Carter to attend the Minority Leadership Conference in Biloxi, Mississippi, on May 31-June 3, 2005, as part of Lee v. Macon consent decree compliance.

20. The board, on the motion of Mr. Register seconded by Rev. Reynolds, approved the request for Goshen High School ROTC students to attend Summer Camp at Ft. McClellan, Alabama, from May 24-May 29, 2005.

21. On the motion of Rev. Green seconded by Mr. Price, the board approved an elementary summer art program to be conducted in cooperation with the Troy Arts Council and Troy Cultural Arts Center.

22. The board, on the motion of Mr. Botts seconded by Mr. Register, approved various summer school programs and teachers as outlined in the attached letters. Rev. Reynolds abstained from the vote.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0210

Board minutes
page four
May 23, 2005

23.  On the motion of Mr. Register seconded by Rev. Reynolds, the board approved an incentive plan for attracting teachers in areas designated as critical needs. (Attached)

24.  On the motion of Mr. Botts seconded by Rev. Green, the board approved FY 05 budget amendment #1.

The board went into executive session to hear a parent concern, after which regular open session was resumed.

25.  On the motion of Mr. Price seconded by Rev. Green, the board approved the superintendent's recommendation to suspend Stephen W. Neal, without pay, for one day for just cause. Mr. Neal has the right to contest this action by filing a written notice of appeal within fifteen days of receipt of notice of the board's action. If notice of appeal is not timely filed, the board's decision shall be final.

26.  On the motion of Mr. Botts seconded by Mr. Register, the board approved the following personnel action:

Ann McDougald's resignation for retirement on June 1, 2005, from her position as teacher at Goshen Elementary School.

Charles Coon's resignation for retirement on June 30, 2005, from his position as band director at Pike County High School.

Yvon Brantley's resignation at the end of the school year from her position as teacher at Banks School.

April Trant's resignation at the end of the school year as teacher at Pike County High School.

Leigh Ann Owens-Brown's resignation at the end of the school year as teacher at Pike County High School.

Approved Tom Jones' request for a medical leave of absence from his position as transportation supervisor.

Approved Jacqueline Barron's request for maternity leave under catastrophic leave and Family Medical Leave to begin in August, 2005, and last approximately four to six weeks, from her position as teacher at Pike County Elementary School.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0211*

Board minutes
page six
May 23, 2005

33. Michele Harris and Valorie Stroud were employed as Early Childhood/Elementary teachers at Goshen Elementary School with grade levels to be determined, on the motion of Mr. Register seconded by Rev. Green.

34. On the motion of Rev. Reynolds seconded by Rev. Green, the board approved personnel action as follows:

Employment of Michelle Taylor as guidance counselor at Goshen Elementary School.

Employment of Jennifer Carmen Evans as bookkeeper at Goshen Elementary School.

Employment of Kanfinae Jones as English teacher at Pike County High School.

Approved Mildred Davis to work an additional two weeks during the summer to be paid from Indian Education program funds.

35. On the motion of Rev. Green seconded by Rev. Reynolds, the board approved the superintendent's recommendation that no exceptions will be made regarding the current policies related to participation in graduation commencement activities.

36. There being no further business to come before the board, the meeting was adjourned at 6:42 p.m., on the motion of Rev. Reynolds seconded by Rev. Green.

ATTEST:

_Linda Steed_

Linda Steed, President

_Dr. Mark Bazzell_

Dr. Mark Bazzell, Superintendent/Secretary

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0213*

PLAINTIFF'S
EXHIBIT
12

FORM EXP 2002



**STATE OF ALABAMA**
**DEPARTMENT OF EDUCATION**
**TEACHER EDUCATION AND CERTIFICATION OFFICE**
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977  Fax: (334) 242-0498  E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

I. Personal data:

Applicant:   Charles        L.              Coon
             First          Middle          Maiden    Last Name      Suffix (e.g., Jr., Sr.)

Permanent Address   P.O. Box 201                    Greenville    AL        36037
                    Street/Apt./P.O. Box/Route and Box    City      State     ZIP Code

418 - 60 - 5468        ( 334 ) 382-7639     PURPOSE OF SUBMISSION:
Social Security Number  Home Telephone Number   ☒ Renewal
                                                ☐ Issuance of a _____ certificate.
01-02-48               ( 334 ) 735-2389         ☐ Superintendent election in _____ County.
Date of Birth          Work Telephone Number    ☐ Other _____
(Month/Day/Year)

II. Verification of applicant's experience by employer.

   A. Employed:  ☒ Full-time  ☐ Part-time

   B. Was this experience satisfactory?  ☒ Yes  ☐ No

Pike County Board of Education
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month\Year | To: Month\Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 08-01-02 | Present | 6-12 | Music | Band Director | |
| | | | | | |
| | | | | | |

**THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0024*

FORM EXP 2002
NAME: Charles L. Coon

SOCIAL SECURITY NUMBER: 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

If applicable, Section III and IV must be completed by Alabama superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for Alabama experience only:
Reason(s) for leaving the most recent position:

☐ Nonrenewal  ☐ Resignation  ☐ Decrease in teaching positions  ☐ Retirement
☐ TERMINATION:  ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through Alabama school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
| See attached Professional Development Data Collection Form. | | 59.6 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*10 clock hours = 1 CEU

Total Clock Hours   59.6

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this 7th day of May, 2004

_Janet C Rascoe_
Seal and Signature of Notary Public

My Commission Expires

JANET CAROL RASCOE
Notary Public, AL State at Large
My Comm. Expires Aug. 19, 2006

_S. Bazzell_
Signature of Superintendent, Headmaster, Dean, Appropriate Director

Dr. Mark Bazzell, Superintendent
Typed or Printed Name and Position

Pike County Board of Education
School System, Nonpublic School, Institution, Appropriate Agency

101 W. Love Street
Address

Troy, AL   36081
City/State/ZIP Code

5-7-04
Date

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0025

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

Name: Charles L. Coon      Social Security Number: 418 - 60 5468

**IV. Record of Education** (attach an additional sheet if needed):

| NAME OF COLLEGE OR UNIVERSITY | LOCATION | DATES ATTENDED | DEGREE |
|---|---|---|---|
| Livingston University | Livingston AL | 1966 - 1969 | B.M.E. |
| Livingston University | Livingston AL | 1993 - 1994 | M.Ed. |
| Troy State University | Troy, AL | Su 1985 - Su 1989 | |

**V. Educational Experience** (Do not include student teaching, substitute, or teacher aide experience. If you have no experience, enter the word "NONE" below. Please list your most recent experience first and attach an additional sheet if needed):

| DATE | NAME AND LOCATION OF SCHOOL | GRADES AND SUBJECTS TAUGHT |
|---|---|---|
| 8-2002- Present | Pike County High School, Brundidge AL | Band 5-12 - Music App - 9 - 12 |
| 10-2000- 7-2002 | J.F Shields High School, Beatrice AL. | Band 5-12 - Music App - 9 - 12 |
| 8-99-10-2000 | Monroe Academy, Monroeville AL | Band 5-12 - Music App - 9 |

**VI. Alabama Prospective Teacher Testing Program:**

<u>    N/A    </u>    Score Report    _____ submitted
Date Test Taken                 _____ to be submitted

**VII. Renewal** (complete for renewal of a professional educator or career/technical certificate):

Check the applicable documentation:

☐ **College Credit** (official transcripts)
☒ **Educational Experience** (Supplement EXP which must be received in this Office directly from employer)
☐ **Continuing Education Units** (Supplement EXP for CEUs earned through Alabama school systems, photocopies of completion certificates for CEUs earned through school systems outside of Alabama, or official transcripts or certificates of completion for any CEUs earned through a college or university)
☐ A copy of the valid license or certificate as a healthcare practitioner (healthcare science and technology only)
☐ Copies of the score reports for tests taken under the Alabama Prospective Teacher Testing Program, if certificate has lapsed for more than six months from the expiration date

**VIII. Career/Technical Certificate:**

☐ Healthcare Science and Technology (circle level)

Level 4      Indicate month and year New Teacher Institute was completed:_____
                 Enclose official transcript(s) of required coursework                   month/year
Level 5      Enclose official transcript of master's degree

☐ Technical Education (circle level)

Level 2      Indicate month and year New Teacher Institute was completed _____
                 Enclose official transcript(s) of required coursework; and            month/year
                 Enclose a copy of the certificate indicating verification of passing the approved occupational proficiency examination
Level 3      Enclose official transcript(s) of required coursework
Level 4 and/or 5    (Application must be made on the basis of completion of an approved teacher education program)

**IX. Record of last Alabama Teacher's Certificate(s) issued** (if none, enter the word "NONE"):

| CERTIFICATE(S) | YEAR ISSUED | NAME IN WHICH CERTIFICATE WAS ISSUED |
|---|---|---|
| Rank 1 | 1994 | Charles L. Coon |
| Rank 2 | 1994 | |

**X. Send Certificate To:**

☐ Applicant OR ☒ Employer (If to be mailed to employer, give name and address.)

**Pike County Board of Education**
Name of Alabama School System/Nonpublic School

**101 W. Love Street**
Address

**Troy, AL   36081**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0027

PLAINTIFF'S
EXHIBIT
13

I fear there will be no future for
those who do not change.
—Louis L'Amour

**5**
Wednesday
January 2005
5th Day 360 Left Week 1

**Daily Notes**

To Do:
1. Surv. Systems, Troy Cable
2. Distance Learning
3. Policy Review
4. RCT $, RCT To PC
5. ALE
6. Shipman House - Giff / Baxter
7. Donated Land
8. Seimens - CAP π
9. Foundation
10. La - Macon
11. Bus - TSU
12. Observations
13. GHS Band Audit - Jefcoat
14. Customer Focus
15. Coon Band
16. Turner - PE
17. JBHm
18. Acc - tability Appeals
15. CAC
20. ELC Read'g & Bks K-3
21. STC Test'g 9-12
22. Bus Stop BPS & BMS
23. Spanish D.L.
24. MT, Ag

LEGAL:
Harrison
Rideep
S. Link          — Ronald Erdine
Nikson           Ant Senior
EEOC             AL State Comp
CAC              in ArTs


Any Time A.S.

© FranklinCovey. All Rights Reserved. - franklincovey.com - Seasons-Classic

To make a fortune some assistance from fate
is essential. Ability alone is insufficient.
—Ihara Saikaku

Rev. Reynolds
(Bus Driver)

# 12
## Wednesday
## January 2005
12th Day · 353 Left · Week 2

**Daily Notes**



① 2:09   Tues.

✓② 2:13   Tues.   Jepson   J. Wed.
7:20 w            Thys Mn Serv. 372-0987

✓③ 2:53   Jackie Tuck   Tues.
7:20 w            670-6398

④ 250   3:13:   Tues.
            John Evens

⑤ ✶✶✶ 3:27 ✕ Shay Nicc   PCHS   Tues.
            566-1660   566-6065

⑥ ✓ 8:20   Wendel Island   (Tour)
            6. al. Eliot.   — Bus —
                              1/22

⑦ 8:40
            Charly Coon   566-2060
            Reg fuf Issue   670-2875
            11 20, 21
            82506

⑧ Rev. Green
            566-7681   Ethics
            372 - 0657

⑨ Rev. Reynolds   Ethics
            735 - 2270
            233 - 4203

⑩ Carl Dixon
            Plnt *
            205 - 752 - 4933

⑪ 250  10:10
            Buddy Byrne

⑫ 11:20   Arthur Cohn
            Prospect Paper
            770 - 667 - 3042

⑬ ____

D____ for
Hitler

____
To Jery

© FranklinCovey All Rights Reserved. · franklincovey.com · Seasons-Classic



Every day is my best day; this is my life.
I'm not going to have this moment again.
—Bernie Siegel

**14**
Monday
March 2005

Daily Notes

To Do:

1. Surv. Systems, Tran Cable
2. Policy Review   Inch. sex harrost, Remko, etc.
3. RCT TO PC
4. ALL
5. John Warren Land
6. Shelly, Landis          BOE
7. Variances              Skirey
8. Slym House            Reynolds - Bu
9. Foundation            B3 Perkin
10. Absention             Botts Plan
11. PRoE Adm.
12. Fac. Meeting (13)
13. Customer Focus
14. ETC, STC
15. Bus Stop - Banks      Local
16. Jones - Bus Driver    Russell
17. MT / AG               Wacen
18. PcHS - BoT            Nilson
19. Air Time Comm.        Lee Macon
20. Ayd. Spec. SP. 1"/2   Road
21. Coach Supervis        Holiday
22. Comm. Plan
23. Bond RO 50/50
24. Eng T / BOE Eval
25. LIB. Books Cirl.     ① Butch Phelps
26. IDEA                  670-2235
27. Map + Globe           TPD
28. MADD - Drug Brean
    526-8250
    PRiDE Say Rattle      - Nie
29. Thorpe               - Good
30. ESE Bond Issue
31. Assist ESG.

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0104

*Wednesday*
*March*

# 30
## 2005

Appointment Schedule

8

9

March 2005
S M T W T F S
          1 2 3 4 5
6 7 8 9 10 11 12
13 14 15 16 17 18 19
20 21 22 23 24 25 26
27 28 29 30 31

April 2005
S M T W T F S
                1 2
3 4 5 6 7 8 9
10 11 12 13 14 15 16
17 18 19 20 21 22 23
24 25 26 27 28 29 30

✓ Completed
→ Forwarded
✗ Deleted
G◯ Delegated
• In Process

1  ABC  Prioritized Daily Task List

- Phillip Faulkner (Cell phone)

Adam Helms   - Not at veHs (Banks)
Andrew Law
Jarron Senn
Levi Davis   ?
Thomas Green

11

12

1

2

3

4

5

6

7

8

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0105*

Life is not lost by dying; life is lost minute
by minute, day by dragging day, in all
the thousand small uncaring ways.
—Stephen Vincent Benét

# 30
### Wednesday
### March 2005

Daily Notes



# April 2005 Index

| Date | Index important information and events recorded on this month's daily notes. |
|------|------------------------------------------------------------------------------|

CALLS

(1) Charlotte Rogers    Return
235-9814

(2) Ed Ing - Pike Ballw Co.
opt 3
474-3856
e911    857 6685

(3) Coon
342-7635

(4) Pickett
appt

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0107

Whoever claims a right for himself
must respect the like right in another.
—James Bryce

**4**

Monday

**April 2005**

Daily Notes

1. Supv Syst. Terry Cable
2. Policy Review
3. Shelly Deed
4. Shipner House
5. Foundation
6. Observation (N3)
7. PEPE Adm.
8. Fac. Mostg Books
9. Customer Focus
10. ESE, etc.
11. Bus Stop Books
12. Teams - Roselle Bus Shop
13. MTI AC
14. PCHS Art
15. Ayp spec. Ed. Accountability
16. Coach Supports
17. Comm. Plan
18. 50/50 BPD
19. Sups / Boe Eval.
20. CTE BOND
21. Budget
22. Cell Bills
23. Eng Ship-g
24. Felton
25. Commission

BIC

BOE
Russell - Bus
RR lights
Belts - Plea

Legal
Russell
Harrison
Lee - Mond

Vinal

Coon

1. Pers - Thomas's report
2. 10:24 Chris Kelly
   - Bus - Nelson
   334-296-5043

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0108



**Monday**
**April**

**4**

**2005**

Appointment Schedule

8

9

10

ABC Prioritized Daily Task List

9:00  Bills/meet

9:30  cont. ...

11

1:30  Adm.
      meeting

12  cert.
    Bills

1

Study Deal
50/50 Bid

2

Felton
Shipes

3

Coon

4

King

BMS  Adam Helms

BMS  Andre Law

5

? James Sim

PCHS  ? Lodie Davis

BMS  ? Thomas Renew

6

7

Faulks

PCHS  Rick

PCHS  Matt King (matt

8  **JR v. Pike County BOE**
   Produced by Defendant PCBE
   No. 0109



Reality was such a jungle—with no
signposts, landmarks, or boundaries.
---Helen Hayes

**11**
Monday
April 2005

Daily Notes

① Tony Porter
452 - 1322

② Butch Phelps
670 - 2230

③ 10:35 —
④ Ins. 4-2-2005
34/35

⑤

Cell
Message

① Fri. - Adam
② Fri. - 11 - 322-0556
③ 8:15 - Adam
- Brazzell - $131.00
130.00

- Anthony Ballard - 529.00
- Mr. Nelson
(lounge)

① M.G.T - CEO
② S. Holmes (nat.)
③ 3:00 Rd. Ed. Sch. Cen. Fed.
Regina 206

My own experience has taught me this:
if you wait for the perfect moment when
all is safe and assured it may never arrive.
—Maurice Chevalier

# 13

**Wednesday**
**April 2005**
103rd Day · 262 Left · Week 15

**Daily Notes**



PLAINTIFF'S
EXHIBIT
14

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

**Dr. Mark Bazzell**
**Superintendent**

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register



April 1, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

This purpose of this correspondence is to notify you that you are being placed on administrative leave with pay, effective immediately, pending the outcome of an investigation into alleged misconduct involving a number of students. According to reports, you have allegedly engaged in the use of illegal drugs with students, provided illegal drugs to students, and also allegedly engaged in other inappropriate activities with students of a sexual nature. Since these reports involve allegations of criminal conduct on your part, I have also notified the appropriate law enforcement personnel.

I would very much like to meet with you at your earliest convenience to explain the nature of these reports and to offer you the opportunity to provide a written statement if you so desire. Also, I am directing that you not return to the Pike County High and Banks campus until this matter is resolved. In addition, I am further directing that you have no contact with Pike County High and Banks students, including band students until this matter is resolved.

Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Schools

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0087

101 W. Love Street, Troy, Alabama 36081-2613   Telephone : (334) 566-1850   Fax: (334) 566-2580

# escreen 123 Specimen Result Certificate

Printed by : 9971 - Pike Internal Medicine          Report printed on : 4/1/2005 11:08:33 AM

| | |
|---|---|
| To:<br>Cheryl Dichiara<br>Pike Internal Medicine<br>1350 Highway 231 South<br>Troy, AL 36081<br><br>Location:<br>9971-Pike Internal Medicine | Verification Date:<br>4/1/2005 11:08:41 AM<br><br>Medical Review Officer:<br>Drs. Peter DiChiara & G. Alan Young<br>1350 Highway 231 South<br>Troy AL 36081<br>334-566-1270 |

| | |
|---|---|
| Donor Name:<br>COON, CHARLES<br><br>Date of Test:<br>4/1/2005 11:03:09 AM CST<br><br>ID Number:<br>59105636<br><br>Lab<br>eCup | Donor SSN:<br>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<br><br>Other ID:<br>2424423<br><br>Donor Status:<br>Random |

| | |
|---|---|
| Drugs Tested:<br>**Marijuana**<br>**Cocaine**<br>**Amphetamines**<br>**Opiates**<br>**PCP** | Test Type:<br>Non-DOT |

**Final Result Disposition:**        **Negative**

**Additional Information:**

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0088

eScreen
.0895 Grandview, Suite 200
Overland Park, KS 66210
(800) 881-0722

## Custody Control Form
### 59105636



Lab ID:        LABONE
Lab Acct #:    2ZCV
Lab Panel ID:  CD51
Panels:        5 Panel(CD51)

---

eScreen                    Company Account:    9971-0
STEP 1.        **Pike Internal Medicine**              **Medical Review Officer**
               1350 Highway 231 South                  Pike Internal Medicine
               Troy AL 36081                           Drs. Peter DiChiara & G. Alan Young
               334-566-1270                            1350 Highway 231 South
               Cheryl Dichiara                         Troy AL 36081

---

| Step 2.        TO BE COMPLETED BY COLLECTOR | Step 3.  TO BE COMPLETED BY COLLECTOR AND DONOR |
|---|---|
| Specimen temperature for urine specimens must be read within 4 minutes of collection. | |
| Specimen temperature within range:  Yes | Collector affixes bottle seal on specimen. |
| | Type: |
| Verified Donor ID  ☑ | ☑ Urine   ☐ Oral   ☐ Blood   ☐ Breath |

---

STEP 4.    Reason For Test:

☐ Pre-employment        ☐ Return To Duty        ☐ Promotion        ☐ Periodic Medical
☐ Post Accident         ☐ Follow Up             ☐ Transfer         ☐ Other
☑ Random                ☐ Reasonable suspicion/cause

---

Step 5.        TO BE VERIFIED BY DONOR

| 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 | 1/2/1948 | 334-382-7639 | | 2424423 |
|---|---|---|---|---|
| Donor SSN | Date of Birth | Daytime Phone Number | Evening Phone Number | Drivers License |

*I certify that I provided my specimen to the collector, that I have not adulterated it in any manner, that the specimen bottle used was sealed with a tamper-evident seal in my presence, and that the information provided on this form and on the label affixed to the specimen bottle is correct. I hereby authorize the collector and testing service or laboratory (specifically including, but not limited to, eScreen, Inc.) to release the results of the test to the Company/Employer or their Designee.*

| CHARLES COON | 4/1/2005 11:03:09 AM CST | |
|---|---|---|
| Donor's Name | Date & Time | Signature of Donor |

---

Step 6.        TO BE VERIFIED BY COLLECTOR

Name of Collection Site, Address, City, ST, Zip              Collection Site ID
Pike Internal Medicine                                       9971
1350 Highway 231 South
Troy AL 36081

*I certify that the specimen identified on this form is the specimen presented to me by the donor providing the certification on Step 5 of this custody control form, that it bears the same specimen identification number as that set forth above, and that it has been collected, labeled and sealed as in accordance with applicable requirements.*

| Diana Johnson | 4/1/2005 11:03:09 AM CST | |
|---|---|---|
| Collector's Name | Date & Time | Signature of Collector |

---

Step 7.  LAB RECEIVED

| | | |
|---|---|---|
| | Date & Time | Signature |

---

ORIGINAL MUST ACCOMPANY SPECIMEN TO LABORATORY

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0089

<— Coon —>

x Adam Helms < 16
  Jeron Senn
  Andrew Law (15)
  Levi Davis (16)
x Thomas Green
<.< x  x  x >.>

<—> Truth or con — both sounding m[?] —>

( Cody Dunn's stone )

Matt King —

— B. Payne + R. McDowell report their string was
made by mother of Matt King late first
semester when she was at school concerning
math grade. While at this math she had
D or F in Band. She started the second
month earlier. No explanation as to why
she did not report. BP disagreed with
this — he didn't say m[?] used by anyone
— only e[?]gator — Denied any other inappropriate
activity — no knowledge of this.

Coon — no res[?]
in P.L. Co. —
Gun against report.

Random — Drug
Test
Negative

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0090

Pike County High School

Date Run: 3/31/05 10:51AM

**Student Profile - Faulkner, Phillip B.**

Page: 1

Student ID: 420333656 Previous #: 0

☐ Internet Access ☐ Foreign Exchange
☐ Vocational ☐ Homeless
☐ Gifted ☐ Immigrant
☐ Title I Indicator
☐ NELB

First Name: Phillip
Middle Name: Blake
Last Name: Faulkner
Nickname:
Address: 4032 County Road 45
Troy AL 36081
Phone: (334) 474-3118
SSN: 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
Lives With: Father
Birthplace:
Citizenship:
Migrant:
Locker Numb: Combin:
Lunch Code: 2 LEP:
Language: ☐ Esl
School Zone:
State Number:
Alternate #:
Impact Aid:
Address To:

Entry Date: 08/09/04 E-1
Withdrawal Date:
Grade: 09 Gender: M
Home Room: 903 Suber, Danny
Date of Birth: September 8, 1989 Age: 15
Bus 1 / Bus 2: 96-22 /
Transport Code: NT Geo Code:
Birth Certificate:
Parking Number:
Counselor: Watson, Ramona D.
Program 504:
Mother's Maiden:
Resident District:
Previous School:
Next School:

**Guardian Information**

| | | |
|---|---|---|
| Name: | Phillip Faulkner | Beverly Pevehouse |
| Address: | 4032 County Road 45<br>Troy AL 36081 | 241 Keith Street<br>Troy AL 36081 |
| Relation: | Father | Mother |
| Telephone: | 724-0667 1-877-23 | 277-5800 403-0336 |
| Education: | | |
| Employer: | State Of Alabama 775-3331 | 562-3093 |
| Mother's Maiden Name: | | |

**Emergency Information**

| | | |
|---|---|---|
| Contact: Debbie Faulkner | Relation: Grandmother | Phone: 474-3118or670-5 Wk: |
| Phillip Faulkner | Father | 775-3331 |

Doctor(s): Senecal Phone: 566-7800
New Phone 474-3337 Or 4743928

B. P[illegible] talked with student. No improvement. Student [illegible]. Denies allegations. Parents [illegible] of CC & student [illegible] time away from school.

[illegible]

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0091

STIOffice © 1997-2004, Software Technology Inc.

School District: 055                          **Student Discipline**                    7/11/2005 3:23:05 PM Page:   1
  School:   PIKE COUNTY HIGH SCHOOL
Student Name:   FAULKNER, PHILLIP B.

---

| | | |
|---|---|---|
| Infraction Detail | Mon 11/08/2004 12:48 PM   ELECTRONIC PAGERS | FAILED TO GIVE UP COMMUNICATION DEVICE |

Infraction Detail    Mon 11/08/2004 12:48 PM    ELECTRONIC PAGERS              FAILED TO GIVE UP COMMUNICATION DEVICE
                     Teacher Name:   OWENS, LEIGH A.
                     Course Name:
                     Alert:              Period:           Demerits:  0
                     Disposition:   OUT OF SCHOOL SUSPEN
                     Admin Date:
                     Admin Name:   MCDANIEL, ROBERT L.
                     Punishment   Tue 11/09/2004     End: Tue 11/16/2004

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0092*

Daisi/2000 (c) by Software Technology, Inc. 800-844-0884

Student Profile For:   FAULKNER, PHILLIP B.          PIKE COUNTY HIGH SCHOOL

## Student Information

| | | | | | |
|---|---|---|---|---|---|
| Student #: | 420333656 | | | | |
| First Name: | PHILLIP | Sex: | M | Home | 903 |
| Middle Name: | BLAKE | Race: | W | Grade: | 9 |
| Last Name: | FAULKNER | DOB: | 09/08/1989 | Entered: | 8/5/1998 |
| Address: | 4032 COUNTY ROAD 45 | SSN: | 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 | Withdrawn: | |
| City / Zip: | TROY          36081 | Sp Ed: | | | |
| Phone: | 474-3118 | | | | |

## Guardian Information

Lives With:

| | | | | | |
|---|---|---|---|---|---|
| Guardian 1: | PHILLIP FAULKNER | Address: | 4032 COUNTY ROAD 45 | Work: | 775-3331 |
| Guardian 2: | BEVERLY PEVEHOUSE | Address: | 241 KEITH STREET | Work: | 562-3093 |
| Emergency 1: | DEBBIE FAULKNER | Relation: | | Phone | 474-3118OR67 0-5000 |
| Emergency 2: | PHILLIP FAULKNER | Relation: | | Phone | 775-3331 |
| Doctor 1: | SENECAL | Phone: | 566-7800 | | |
| Doctor 2: | NEW PHONE | Phone: | 474-3337 OR 4743928 | | |
| Note: | | | | | |

## Schedule

| Term | Period | Course # | Course Description | Teacher Name |
|---|---|---|---|---|
| 1 | 1 | 10510.01 | AGRISCIENCE | ROBINSON, LOUIS A. |
| 1 | 2 | 2331.02 | PHYSICAL SCIENCE | SULLIVAN, SHARON |
| 1 | 3 | 2133.02 | HONORS ENGLISH 09 | BROWN, LEIGH A. |
| 1 | 4 | 2727.01 | MARCHING BAND | COON, CHARLES L. |
| 2 | 1 | 2431.03 | ALGEBRA I | GREEN, MICHAEL |
| 2 | 2 | 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY |
| 2 | 3 | 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY |
| 2 | 4 | 2728.01 | CONCERT BAND | COON, CHARLES L. |

## Attendance - Days Absent or Tardy

| Date | Day | Type | Reason |
|---|---|---|---|
| 09/15/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 09/20/2004 | Monday | ABSENT ALL DAY | NEGLECT |
| 09/21/2004 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 09/22/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 10/05/2004 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 10/14/2004 | Thursday | ABSENT ALL DAY | SICKNESS |
| 10/15/2004 | Friday | ABSENT ALL DAY | NEGLECT |
| 10/18/2004 | Monday | ABSENT ALL DAY | NEGLECT |
| 11/09/2004 | Tuesday | ABSENT ALL DAY | SUSPENDED |
| 11/10/2004 | Wednesday | ABSENT ALL DAY | SUSPENDED |
| 11/12/2004 | Friday | ABSENT ALL DAY | SUSPENDED |
| 11/15/2004 | Monday | ABSENT ALL DAY | SUSPENDED |
| 11/16/2004 | Tuesday | ABSENT ALL DAY | SUSPENDED |
| 12/15/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 01/12/2005 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 01/24/2005 | Monday | ABSENT ALL DAY | SICKNESS |
| 01/26/2005 | Wednesday | TARDY | CHECK IN EXCUSED |
| 02/01/2005 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 02/08/2005 | Tuesday | ABSENT ALL DAY | DEATH IN FAMILY |
| 02/18/2005 | Friday | TARDY | CHECK OUT UNEXCUSED |
| 04/06/2005 | Wednesday | ABSENT ALL DAY | CHECK OUT UNEXCUSED |
| 04/22/2005 | Friday | ABSENT ALL DAY | CHECK OUT UNEXCUSED |
| 05/02/2005 | Monday | TARDY | UNEXCUSED TARDY |
| 05/12/2005 | Thursday | ABSENT ALL DAY | NEGLECT |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0093

**Student Profile For:   FAULKNER, PHILLIP B.**          PIKE COUNTY HIGH SCHOOL

**Attendance - Days Absent or Tardy**

| Date | Day | Type | Reason |
|------|-----|------|--------|
| 05/23/2005 | Monday | ABSENT ALL DAY | CHECK OUT EXCUSED |
| 05/24/2005 | Tuesday | ABSENT ALL DAY | SICKNESS |

**Attendance - Entry / Withdraws**

| Date / Time | Type Cod | Grade | Home Rm | Sp Ed | From / To | Note |
|-------------|----------|-------|---------|-------|-----------|------|
| 08/09/2004 2:19 PM | E    E-1 | 9 | 903 | | | |

**Discipline**

| Date | Infraction / Disposition | Notes |
|------|--------------------------|-------|
| 11/08/04 12:48 pm | ELECTRONIC PAGERS | FAILED TO GIVE UP COMMUNICATION DEVICE |
| 11/09/04 | OUT OF SCHOOL SUSPEN | |

**Student Grades**

Grading Period:    2005    1    FIRST NINE WEEKS

| | | | 9WK | COM | COM |
|---|---|---|-----|-----|-----|
| 2133.02 | HONORS ENGLISH 09 | OWENS, LEIGH A. | 64 | 46 | |
| 2331.02 | PHYSICAL SCIENCE | SULLIVAN, SHARON | 74 | | |
| 2727.01 | MARCHING BAND | COON, CHARLES L. | 94 | | |
| 10510.01 | AGRISCIENCE | ROBINSON, LOUIS A. | 79 | 17 | |

Grading Period:    2005    2    2ND NINE WEEKS/TERM 1

| | | | 9WK | COM | EXM | TRM |
|---|---|---|-----|-----|-----|-----|
| 2133.02 | HONORS ENGLISH 09 | OWENS, LEIGH A. | 67 | 46 | 61 | 65 |
| 2331.02 | PHYSICAL SCIENCE | SULLIVAN, SHARON | 77 | | 75 | 75 |
| 2727.01 | MARCHING BAND | COON, CHARLES L. | 95 | | 100 | 96 |
| 10510.01 | AGRISCIENCE | ROBINSON, LOUIS A. | 85 | 3 | 70 | 80 |

Grading Period:    2005    3    THIRD NINE WEEKS

| | | | 9WK | COM | ABS | TAR |
|---|---|---|-----|-----|-----|-----|
| 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY | 51 | | | |
| 2431.03 | ALGEBRA I | GREEN, MICHAEL | 58 | 20 | | |
| 2728.01 | CONCERT BAND | COON, CHARLES L. | 97 | | | |
| 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY | 85 | | | |

Grading Period:    2005    4    4TH NINE WEEKS/TERM 2

| | | | 9WK | COM | ABS | EXM | TRM |
|---|---|---|-----|-----|-----|-----|-----|
| 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY | 68 | | | 61 | 60 |
| 2431.03 | ALGEBRA I | GREEN, MICHAEL | 60 | 8 | | 67 | 61 |
| 2728.01 | CONCERT BAND | COON, CHARLES L. | 98 | | | 100 | 98 |
| 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY | 75 | | | 66 | 77 |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0094*

Pike County High School
Date Run: 3/31/05   10:54AM

**Student Profile - Senn, Jeron C.**
Page:   1

| | | | |
|---|---|---|---|
| Student ID: | 416252705 | Previous #: | 0 ☒ Internet Access    ☐ Foreign Exchange |
| First Name: | Jeron | | ☐ Vocational    ☐ Homeless |
| Middle Name: | Carlton | | ☐ Gifted    ☐ Immigrant |
| Last Name: | Senn | | ☐ Title I Indicator |
| Nickname: | | | ☐ NELB |

Address:      9892 NORTH HWY 29        Entry Date:   08/09/04  E-1
              2336 County Rd 7761       Withdrawal Date:
              BANKS AL  36005           Grade:   12      Gender:  M
Phone:        (334) 243-5510
SSN:          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               Home Room:   1203      Phillips, Alice
Lives With:   Mother                    Date of Birth:   December 11, 1986      Age: 18
Birthplace:                             Bus 1 / Bus 2:              /
Citizenship:                            Transport Code:  T          Geo Code:
Migrant:                                Birth Certificate:
Locker Numb:            Combin:
Lunch Code:   1      LEP:               Parking Number:
Language:                      ☐ Esl   Counselor:   Watson, Ramona D.
School Zone:                            Program 504:
State Number:                           Mother's Maiden:
Alternate #:                            Resident District:
Impact Aid:                             Previous School:
Address To:                             Next School:

―――――――― Guardian Information ――――――――
Name:        Stanley & Deidre Senn
Address:     9892 N HWY 29
             BANKS Al  36005
Relation:    Father/Mother
Telephone:   334-243-5510
Education:
Employer:
Mother's Maiden Name:
―――――――― Emergency Information ――――――――
Contact:  Judy Stephens              Relation: Grandmother      Phone: 670-6027 566-46  Wk:

Doctor(s): Pearlstein               Phone:   566-9800

*[handwritten notes]* Confine — Smoking cig with shit.

(→) Saw them being caught together + smoking — Saw going by home on numerous occasions.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0095

STIOffice © 1997-2004, Software Technology Inc.

Pike County High School

**Student Profile - Green, Thomas**

Date Run: 3/31/05    10:56AM
Page:    1

| | | | | | |
|---|---|---|---|---|---|
| Student ID: | 416277121 | Previous #: | 0 | ☒ Internet Access | ☐ Foreign Exchange |
| First Name: | Thomas | | | ☐ Vocational | ☐ Homeless |
| Middle Name: | | | | ☐ Gifted | ☐ Immigrant |
| Last Name: | Green | | | ☐ Title I Indicator | |
| Nickname: | | | | ☐ NELB | |

| | |
|---|---|
| Address: | Rt. 2 Box 3-A |
| | 9679 N. US Highway 29 |
| | Banks AL  36005 |

Entry Date:    08/09/04  E-1
Withdrawal Date:
Grade:    11        Gender:  M

| | |
|---|---|
| Phone: | (334) 243-5741 |
| SSN: | 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 |

Home Room:    1102    Sullivan, Toni
Date of Birth:    September 8, 1987    Age: 17

Lives With:                                    Bus 1  /  Bus 2:            /
Birthplace:                                    Transport Code: NT        Geo Code:
Citizenship:                                    Birth Certificate:
Migrant:
Locker Numb:            Combin:            Parking Number:
Lunch Code:  3    LEP:                    Program 504:
Language:                        ☐ Esl    Counselor:    Watson, Ramona D.
School Zone:                                Program 504:
State Number:                                Mother's Maiden:
Alternate #:                                Resident District:
Impact Aid:                                Previous School:
Address To:                                Next School:

**Guardian Information**

| | | | |
|---|---|---|---|
| Name: | David Green | | Naomi Green |
| Address: | Rt. 2 Box 3-A | | Same |
| | Banks AL  36005 | | |
| Relation: | Grandfather | | Grandmother |
| Telephone: | 243-5741 | | 000-0000 |
| Education: | | | |
| Employer: | Retired | 000-0000 | Retired | 670-8219-car |
| Mother's Maiden Name: | | | |

**Emergency Information**

Contact:                Relation:            Phone:            Wk:

Doctor(s):                        Phone:

*PCHS*

*— No Knwledge*

**JR v. Pike County BOE**
*Produced by Defendant PCBE*
*No. 0096*

STIOffice © 1997-2004, Software Technology Inc.

Banks School                          Semester 1 Schedule
Date Run: 3/31/05    11:01AM    417377684    Helms, Adam Lee

| Per | Course No. | Course Description | Teacher Name | Room | Days Met |
|-----|-----------|-------------------|--------------|------|----------|
| 1 | 2221.01 | Social Studies 8 | B. Gray | 201 | MTWHF |
| 2 | 3580.01 | Physical Education 8 | K. Turner | 101 | MTWHF |
| 3 | 2423.01 | Pre-Algebra -8 | M. Gibson | 102 | MTWHF |
| 4 | 2321.02 | Science 8 | T. Goss | 203 | MTWHF |
| 5 | 2121.01 | English 8 | K. Adams | 204 | MTWHF |
| 6 | 2618.01 | Computer Application | K. MOUNT | 1A300 | MTWHF |
| 7 | 2618.01 | Computer Application | K. MOUNT | 1A300 | MTWHF |
| 8 | 2725.01 | Beginner Band | C. Coon | 101 | MTWHF |

Home Room: 81    B. Gray                      Room: 201    Phone: 566-9064
Guardian: Jackie Helms                        52 Co Rd 5526
DOB: 12/25/90  Age: 14    Grade: 08  Gender: M    Troy AL 36081
Helms, Adam Lee

Banks School                          Semester 2 Schedule
Date Run: 3/31/05    11:01AM    417377684    Helms, Adam Lee

| Per | Course No. | Course Description | Teacher Name | Room | Days Met |
|-----|-----------|-------------------|--------------|------|----------|
| 1 | 2221.01 | Social Studies 8 | B. Gray | 201 | MTWHF |
| 2 | 3580.01 | Physical Education 8 | K. Turner | 101 | MTWHF |
| 3 | 2423.01 | Pre-Algebra -8 | M. Gibson | 102 | MTWHF |
| 4 | 2321.02 | Science 8 | T. Goss | 203 | MTWHF |
| 5 | 2121.01 | English B | K. Adams | 204 | MTWHF |
| 6 | 3680.04 | Cre.Arts-Career Lab | G. Belcher | 1A300 | MTWHF |
| 7 | 3680.04 | Cre.Arts-Career Lab | G. Belcher | 1A300 | MTWHF |
| 8 | 2725.01 | Beginner Band | C. Coon | 101 | MTWHF |

Home Room: 81    B. Gray                      Room: 201    Phone: 566-9064
Guardian: Jackie Helms                        52 Co Rd 5526
DOB: 12/25/90  Age: 14    Grade: 08  Gender: M    Troy AL 36081
Helms, Adam Lee

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0099

Banks School Band Students Interview Responses

Adam Helms
- Thinks Mr. Coon's coming to Banks for beginner band is worthwhile
- Enjoys his afternoon band class, they play sheet music
- Gets along well with Mr. Coon, he makes good grades
- Would like to see band program continued
- Good teacher, thinks he should stay, comfortable with him
- Not a hard teacher, sometimes lets them get away with things
- Shared with Mr. Coon that he was sent to ALC for smoking. Said Mr. Coon told him he shouldn't have been smoking .

Jessica Henderson
- Fine with band, instrument broken
- N ice guy, funny, cool, she likes him, jokes with them
- Does good job, they get through music each day, then they have free time
- Not that strict, but will get on you if you miss a part while practicing
- Hope he is back, will attend program next year

Lacey Hussey
- Goes to PCHS at 1:00 for band
- Likes Mr. Coon, gets along well with Mr. Coon
- Thinks program is worthwhile, this her third year
- Fairly strict with them, will pull them out if needed
- Should have program again, thinks Mr. Coon should stay and continue program
- Not a bad man, she trusts him
- Want let students get by if he knows they are doing something

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0100*



# PIKE COUNTY BOARD OF EDUCATION

Board of Education

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register

**Dr. Mark Bazzell**
**Superintendent**



April 8, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

The purpose of this correspondence is to notify you that the investigation into allegations of misconduct on your part involving students has been completed. The nature of these allegations were outlined in my letter to you dated April 1, 2005.

After review, there is no evidence at this time to substantiate these claims. However, this matter has been turned over to the appropriate law enforcement agency for further investigation if they find it necessary. Also, should additional information come to light, it is possible the investigation could be re-opened.

The investigation did reveal numerous reports that on several occasions you used cigarettes with students. If this is the case, I am requesting that you cease and desist from this practice. As you know, use of tobacco products by individuals who are less that twenty-one years of age is a criminal act. It is also criminal to provide these items to these individuals. The use of tobacco products by staff while on school campus is also a violation of school board policy.

In addition, the investigation revealed numerous reports of students being transported in your personal vehicle. This should also cease unless it involves extreme situations where the safety and well-being of students are involved. Routine transport of students in your personal vehicle should not occur. The liabilities for both you and the school system are obvious.

With the conclusion of this investigation, I am hearby clearing you to resume your duties beginning Monday, April 11, 2005.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0101*

101 W. Love Street, Troy, Alabama 36081-2613  Telephone: (334) 566-1850



April 1, 05    Susp.    Apr 11                    Aug.

   Drug TEST - Apr. 1    BPS            Firing Him 1969
                   TPD
                   Source
                   Written Rpt

   Crim. Background Check - 1999              R.T. J-y i -

      FBI, ABI

   Re-appl. cont  6-24-04
   Monroe County              00 - 01
                    01 - 02

   @Greenville            10 yrs      74 - 84
   Crenshaw Co  Highland Home   5 yrs     88 - 93
   Dallas Co.              4 yrs

    Aug 02
Engl.   June 05

&#42; Crenshaw   5
   Conecuh Co.   1
   Houston Co.   1
   Tusc. Co.   1                 8 diffrent Systems
&#42; Butler   10
   Mari Co.   1
&#42; Dallas   4
   Pike   3
      —
     26

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0047

PLAINTIFF'S
EXHIBIT
16

Matt King:_____

B. Pyron and R. McDaniel report this story was made by mother of Matt King late first semester when she was at school concerning Matt's grades.  Made at time Matt had D or F in Band.  She stated ? occurred much earlier.  No explanation as to why she did not report.  BP discussed with ? - he denied MJ used by anyone - only cigarettes - Denied any other inappropriate activity - or knowledge of this.

## Student Discipline Report by Date

(*) Withdrawn Student

| 18334541 | Justin Michael Reed | Gender: M  Ethnicity: W  Home Rm905 | Grade: 09  Phone: 735-3925  DOB: 7/28/89 |

Parent: Thomas Reed
Elizabeth A. Reed

Address:  Rt 2 Box 318-F
158 County Road 4430
Brundidge AL  36010

| Date | Per Course | Teacher | Incident |
|------|-----------|---------|----------|

11/04/04        0.00                              Busby, Donna G.                    Weapon, Possession
Location:  ON CAMPUS              Infraction:  Weapon, Possession          Demerit:  0.0    Remain:  0.0    Alert:  0
Disposition:  Out Of School Suspen          Date:  11/04/04        End:  11/18/04        # of Days:  10    Hours:
Administrator:  McDaniel, Robert L.          Admin Date: 11/03/04  Conference:      / /

4/18/05   3       0.00                              Coon, Charles L.                   Criminal Mischief
Location:  ON CAMPUS              Infraction:  Criminal Mischief            Demerit:  0.0    Remain:  0.0    Alert:  0
Disposition:  Alternative Placemen          Date:  4/19/05    7:00AM  End:  5/02/05    3:00PM  # of Days:  9    Hours:  8
Administrator:  McDaniel, Robert L.          Admin Date:   / /      Conference:      / /

PLAINTIFF'S
EXHIBIT
17

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JR,  a minor by an through
His parents EAR &  TMR
      Plaintiff

v.

Pike County Board of Education et al.
      Defendants

CV:2:06-cv-1120-MEF

## NOTICE OF DEPOSITION

TO:   Donald B. Sweeney, Jr.
      One Federal Place
      1819 Fifth Avenue North
      Birmingham, AL  35203-2104

PLEASE TAKE NOTICE that the Plaintiff in the above stated case will take the deposition of Sherry Shakelford at the Pike County Board of Education offices at 101 W. Love Street in Troy Alabama  on September 4, 2007 beginning at 9:00 a.m. and said deposition is to continue until completed. Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. 30* before an officer duly authorized to administer oaths.

Done this the 30th day of July, 2007

Susan Shirock DePaola
Attorney for the Plaintiff

SUSAN SHIROCK  DEPAOLA
1726 West Second Street ~ Suite B
Montgomery, Alabama   36106

PLAINTIFF'S
EXHIBIT
18

Done this the 23rd day of August, 2007.

Susan Shirock DePaola
Attorney for the Plaintiff

SUSAN SHIROCK DEPAOLA
1726 West Second Street ~ Suite B
Montgomery, Alabama   36106

19. 22. Watson

gional Child Advocacy/Family Resource Center

### Date of Interview: 7/14/05

CAC CASE # 23          INTERVIEWER'S NAME:  Mona  Watson

VICTIM'S NAME:    Reed              Justin          Michael
                  (LAST)            (FIRST)         (MIDDLE)

ADDRESS:    Rt. 2 Box 318-F

TELEPHONE:   334-735-2935

DOB:   7/28/89          SEX:  M X        F __      RACE: White

PARENTS NAME:                  EMPLOYMENT:

POSSIBLE OFFENDER: Charles Coon        DOB/AGE:  unknown

ADDRESS: Greenville, AL

TYPE OF ABUSE:    Sexual

DATE OF INCIDENCE:

LOCATION:  Pike County High School Band Room & Home of Victim

DHR WORKER: Misty Hubbard

LE INVESTIGATOR:  Bob Bradberry

PRESENT AT FORENSIC INTERVIEW: Mona Watson, Misty Hubbard
                               Viewed by Bob Bradberry & DA

SUMMARY OF INTERVIEW:
   Justin had a very difficult time with interview. Even though he is fifteen years old he
has difficulty in verbalizing what happened to him. After a very difficult time, Justin
finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one
time he described was in the band room back before Christmas. He stated that Mr. Coon
had him lock the band room door and sit on the steps leading into the room. He stated that
Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in
order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last
time this happened was about three weeks ago when Mr. Coon went to Justin's house.
Parents were not there.



PLAINTIFF'S
EXHIBIT
19

Reed v. PCBE
124

State of Alabama
Twelfth Judicial Circuit
Pike County Multi-disciplinary Team Report

Reporting Agency: _____     Date: 8/9/05
(Place name of person reporting next to agency)     Phone 807-6143

DA _____
TPD _____
DHR M. Hubbard _____
BPD _____
PCSO _____
Other _____

Victim Information:

Name Justin Reed _____ DOB 7/28/89 Age #516
Address 162 Co. Rd 4430 _____ Gender (Male) Female
_____ Brundidge, AL _____
Phone (___) 735-3925

Mom cell
268-6483

Parent/guardian Elizabeth & Michael Reed _____

Other Household members (List Names, ages and relationship to victim)
Jeremy Reed - brother, age 21
Jessica Reed - sister, age 18
Joseph Reed - brother, age 12

Person Allegedly Responsible for Abuse/ Neglect Information:

Name Charles Coon _____ DOB ___/___/___ Age _____
Address _____ Gender (Male) Female
_____

Allegations
_____ Sexual abuse - _____
_____
_____
_____
_____
_____
_____

## MULTI-DISCIPLINARY CHILD PROTECTION TEAM REFERRAL FORM

**I.    IDENTIFYING INFORMATION**

**Case Name** Elizabeth Reed

**County** Pike

**DHR Worker** Misty Hubbard

**Telephone #** 807-6143

**DHR Case #** 26411

**DHR Supervisor** Debbie Meeks

**Telephone #** 807-6167

**II.    REFERRAL INFORMATION**

**Referral Date** 8/9/05

**Referral Reason** (Check all that apply)

- [ ] Child Safety
- [ ] Treatment Needs Unclear
- [ ] Foster Care Crisis
- [ ] Arbitrate Difference In Treatment Plan
- [ ] Adoption Crisis
- [x] Coordinate Resources

- [ ] Other (Specify)  enter referral reasons (other than above) here

**Child(ren)To Be Presented**  (Include name, age, and sex)

Justin Reed, 15, male

**Family Profile** (Members Of Child's Household)

Elizabeth Reed, mother
Michael Reed, father
Jeremy Reed, brother, age 21
Jessica Reed, sister, age 18
Joseph Reed, brother, age 12

**Family Situation** (e.g., issues/crises and needs, living conditions, extended family support)

Justin Reed was indetified as a possible vitcim in another case.  He was interviewed at the CAC and it was verified that he was indeed a victim.  He and his sister are receiving counseling from Catholic Social Services in Montgomery.

**Medical, Educational, And/Or Psychological Needs And Results Of Any Tests Or Evaluations**

**Summary Of DHR's Work With The Family** (including assessment of child safety in the home)

DHR helped the family arrange counseling and will continue to ensure that Justin's emotional needs are being met.

**Other Professionals/Agencies Directly Involved With The Family**

PCSD, Catholic Social Services.

_Misty Hubbard, LBSW_
_____
Worker's Signature

8/9/05
_____
Date

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| JR, a minor by an through | * | |
| His parents EAR & TMR | * | |
| Plaintiff | * | |
|  | * | **CV:2:06-cv-1120-MEF** |
| v. | * | |
|  | * | |
| Pike County Board of Education et al. | * | |
| Defendants | * | |

## AMENDED NOTICE OF DEPOSITION

TO:    Donald B. Sweeney, Jr.
        One Federal Place
        1819 Fifth Avenue North
        Birmingham, AL 35203-2104

**PLEASE TAKE NOTICE** that the Plaintiff in the above stated case will take the deposition of Mona Watson at the Pike County Board of Education offices at 101 W. Love Street in Troy Alabama on September 4, 2007 beginning at 10:00 a.m. and said deposition is to continue until completed. Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. 30* before an officer duly authorized to administer oaths.

**Request for Production of Documents:**

Plaintiff requests that the deponent named herein produce at the time and date of the deposition, copies of the following records:

1. All records relating to the plaintiff in this action.

2. All records relating to the younger brother of the plaintiff.

3. All records relating to investigations of sexual abuse complaints against Defendant Charles Coon—whether relating to these children or any other children.



PLAINTIFF'S
EXHIBIT
20

Done this the 23rd day of August, 2007.

<div align="right">
<u>Susan Shirock DePaola</u>

Attorney for the Plaintiff
</div>

**SUSAN SHIROCK DEPAOLA**
**1726 West Second Street ~ Suite B**
**Montgomery, Alabama   36106**

## PIKE REGIONAL CHILD ADVOCACY CENTER
## INVESTIGATIVE PROTOCOL

### Agencies:

**Pike County Department of Human Resources (DHR)**

**Pike County District Attorney's Office (DA)**

**Pike County Sheriff's Department (PCSO)**

**City of Troy Police Department (TPD)**

**City of Brundidge Police Department (BRD)**

**Pike Regional Child Advocacy Center (CAC)**

**Troy Regional Medical Center (TRMC)**

**East Central Mental Health (ECMH)**

**Pike County Juvenile Probation Services (PCJPS)**

*Reviewed and Executed By member Agencies: September 6, 2005*

PLAINTIFF'S
EXHIBIT
21

*PIKE REGIONAL CHILD ADVOCACY CENTER*

**MISSION STATMENT**

*The mission of the PRCAC Board and member agencies is to protect children in a safe, child friendly environment through a collaborative approach in a effort to minimize the child victim's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's of abuse and their families; to prevent the occurrence or recurrence of abuse or neglect through effective community services for children and families by providing a holistic approach to prevent, investigate, prosecute, and treat victims of child abuse and neglect.*

The purpose of this protocol is to establish a guide for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse. Such cases should be consistent with the definitions found in the Code of Alabama, 1975 Section 26-16-2, and remain consistent with the proper investigative authority vested in DHR and law enforcement.

This protocol neither creates additional authority nor limits or modifies the existing authority of the parties. This protocol is merely intended to establish

written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reported or suspected child abuse and neglect in Pike County, Alabama.

1.   **Disclosure and Reporting:** As soon as the CAC or law enforcement receives a report of suspected sexual or physical abuse or of neglect, DHR **must** immediately be notified by telephone or direct communication.  This should be followed up by a written report.  Notification of reports of suspected sexual abuse and severe physical abuse **must** be made to the DA's office in writing by DHR.  (Code of Alabama, 1975 Section 26-14-3)  Law Enforcement and the CAC are mandated by law to report all suspected Child Abuse and Neglect (CA/N) to DHR.  The Department of Human Resources will screen the information to determine if a CA/N report exists.  When a complaint is received, the DHR Child Abuse/Neglect (CA/N) investigator will notify the law enforcement agency and coordinate jointly the initial investigative process.  At times, it may be necessary for the DHR investigative worker to request accompaniment/assistance from Law Enforcement while conducting interviews (as a safety precaution).

After-hours communication between law enforcement and DHR will be accomplished through an after-hours paging network.  DHR

social workers will develop a schedule designating a worker to carry the after-hours pager. All law enforcement agencies and local hospitals may contact the on-call worker or supervisor through the DHR after-hour answering service. If a report of suspected child abuse/neglect is called in to law enforcement, the dispatcher should notify the worker on call. If, for some reason, the on-call worker cannot be reached, the Service Supervisor should be contacted to handle to situation. If immediate response is necessary, and law enforcement is not already responding to the situation, DHR will contact the appropriate law enforcement agency for assistance.

2. **Team Interview:**    In emergency situations, DHR and Law Enforcement will begin an investigation on-site with representatives from both agencies present when possible. **In-depth interviews of child victims should be conducted at the CAC unless emergency circumstances dictate otherwise.** DHR or law enforcement, depending on which agency receives the initial call, will decide if the case is one in which the initial interview can be scheduled at the CAC or if preliminary on-site contact is necessary. Follow-up inter-views with the victim should be done in child friendly environment of the CAC. DHR, law enforcement or the DA may schedule interviews at the CAC. The CAC forensic interviewer will notify the other appropriate agencies of the date and time of the

planned interview. Non-offending family members' interviews *may* also be scheduled at the CAC. When interviews involving clients of DHR are scheduled, notification to the DHR Social Worker will be made.

Child interviews will be done with complete separation of victim and offender, and in a manner to allow observation by (MDT) Multi-Disciplinary Team Members. **Suspected offenders are not allowed at the CAC.** Perpetrator interviews in cases where prosecution seems possible should be conducted by law enforcement as soon as possible after the child interview. DHR and law enforcement may conduct joint perpetrator interviews if practical. The law enforcement agency with jurisdiction in criminal abuse cases should be notified of child interviews. Interviews of child victims should include participation by all team members with investigative responsibilities in the case. Such interviews shall be conducted at the CAC with MDT members observing on close circuit monitors. It is in the best interest of the child to have one examiner conducting interview as other MDT members observe.

**Before the interview the Team Members should:**

1. Explain their individual roles to the family members (or attending adults).

2. Separate the child from the attending parent or adult if practical.

3. Separate siblings to interview individually.

4. Interview parents or caretakers concerning knowledge of the abuse.

*Child interviews done at the CAC will be done by trained Forensic Interviews in a manner, which is legally sound, non-duplicative, non-leading and neutral.*

## After the interview Team Members should:

1. Discuss the allegations and details provided by the child.

2. Establish a case plan to complete the investigation. Assign tasks to various team members. This may include counseling, a forensic evaluation of the victim, medical examination, additional interviews, etc.

3. Prepare a safety plan if indicated to insure the safety of the child.

4. Meet the child's non-offending parent or caretaker and explain the case plan.

5. The team member designated to take notes will prepare a written summary of the interview including the time, date and who was present, names, addresses and phone numbers of

child, family and witnesses; to be shared with all team members with investigative responsibilities in the case.

3.   **Case Review:**  Pending cases will be reviewed at least monthly by MDT members and an Assistant DA.  Case reviews should include all team members with involvement in the case.  CAC staff will notify representatives of the DA, DHR, LE, medical professionals, Counselors, etc. of cases set for review.  Every effort will be made to reach a mutual agreement on recommendations concerning an appropriate course of action for individual cases.  However, this protocol recognizes that LE, DHR or any interested party may petition the court on behalf of the child victim.

4.   **Counseling:**  Counseling will be available at not cost for victims and non-offending family members at the CAC.  MDT members may refer victims for counseling or Forensic Evaluations as deemed necessary.  Forensic evaluations and counseling conducted at the CAC will be done in a manner consistent with legal, ethical and professional standards.

5.   **Prosecution:**  The decision to prosecute or not is a decision made exclusively by the DA with input from MDT members as well as the victim and family members.  Child abuse cases are generally

referred to the Grand Jury for review, but warrants may be issued as deemed appropriate by the DA. The CAC will work with the child victim and family in matters concerning court. DHR will work with the family to ensure that the child remains safe. Law enforcement will conduct a thorough criminal investigation in an effort to present the DA all necessary information.

6.  **Medical Evaluations:** MDT members will refer children for medical evaluations and treatment as needed. In the event the team determines medical assistance is required, every effort will be made to schedule an appointment for the child prior to leaving the CAC. Sexual Abuse exams are available at not cost through prior arrangements with **Dr. Stephen Coleman** or Troy Regional Medical Center. Should any problems arise regarding a physical examination of a victim, Dr. Coleman should be contacted immediately.

7.  **Victim Support:** The Victim's Advocate for the CAC or the DA's office will maintain contact with victims and families throughout the investigation and prosecution providing; support, crisis intervention and information concerning case status, court dates, victim's rights, local services, etc.

8.    **Case Tracking:**  The CAC Case Manager will track all abuse cases pending in the child protective and criminal justice system. Information will include client demographics, case outcome and appropriate statistical information.  MDT members will have access to tracking information.

9.  **Confidentiality of Records:**  All the parties to this Protocol agree to maintain, within the bounds allowed by law, the confidentiality of all records and information gathered on suspected child abuse and neglect cases as outlined in Code of Alabama 1975,  Section 26-14-8. All parties further agree not to release any records or information on any child abuse or neglect case except as it relates to legitimate program operations of their respective agency.  No general media or public access to information and records will be allowed.  Appropriate information will be shared among MDT members unless prohibited by legal, ethical or professional standards of practice.

PIKE REGIONAL CHILD ADVOCACY CENTER

****

**Protocol for Joint Family Intervention**

**Pending Criminal Investigation and Prosecution**

I. **PURPOSE:** The following Protocol for the Department of Human Resources (DHR), the District Attorney (DA), and law enforcement is intended as a guide for cognitive joint intervention in cases of suspected child abuse or neglect of such severity that the alleged offender is arrested for prosecution.

II. **PARTIES:** The parties to this protocol are the Pike County Department of Human Resources, the Pike County District Attorney's Office, the Pike County Regional Child Advocacy Center, and the following law enforcement entities:

Reed v. PCBE
758

Pike County Sheriff's Department

City of Troy Police Department

City of Brundidge Police Department

III.    **RESTRICTION:**  This protocol neither creates additional authority nor limits or modifies the existing authority of the parties.  This protocol is merely intended to establish written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reports of suspected child abuse and neglect in Pike County, Alabama.

IV.    **DEFINITIONS:**

*ABUSE:*        Section 26-14-1 (1), as amended defines "abuse" as harm or threatened harm to a child's health or welfare.  Harm or threatened harm to a child's health or welfare can occur through non-accidental physical or mental injury, sexual abuse or attempted sexual abuse, or sexual exploitation or attempted sexual exploitation.  "Sexual abuse" includes the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or having a child assist any other person to engage in any sexually explicit conduct or any simulation of the conduct for the purpose of producing any visual depiction of the conduct; or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children as those acts are defined by Alabama law.  "Sexual exploitation" includes allowing, permitting or encouraging a child to engage in prostitution and allowing, permitting, encouraging, or

engaging in the obscene or pornographic photographing, filming, or depicting of a child for commercial purposes.

*NEGLECT:*    Section 26-14-1 (2), as amended defines "neglect" as negligent treatment or maltreatment of a child, including the failure to provide adequate food, medical treatment, supervision, clothing, or shelter.

*CHILD:*    Section 26-14-1 (3) defines a "child" as a person under the age of 18 years.

*LAW ENFORCEMENT:*    Any official or employee of the Pike County Sheriff's Department, or the city police departments of Troy and Brundidge.

*TEAM:*    A DHR planning team composed of persons **directly** involved with individual children and their families.  The team shall include at a minimum the child, if age appropriate; the child's parent(s); foster parent(s), if the child has been removed from home; DHR staff, and the DA or his designee.

## V.    PROCEDURES:

    *A.*    REPORTING. All parties to this protocol agree to report incidents of suspected child abuse and neglect as required by law. ***All non-Department of Human Resources parties agree to notify DHR immediately of all reports or incidents of suspected child abuse or neglect which come to their attention.***

B.    ARREST:

1.    Law enforcement shall notify DHR and the DA within 72 hours after an alleged perpetrator of abuse or neglect has been arrested on related criminal charges.

2.    DHR and the DA shall make a joint determination within 72 hours of the arrest as to whether contact between the alleged perpetrator and the child victim should be restricted.

3.    If the parties concur that it is necessary to seek legal remedies to further protect the child victim, a petition shall be filed with the appropriate court having jurisdiction.  The petition shall request a restraining order directing the alleged perpetrator to stay away from the home and imposing any other restrictions deemed necessary for protection.

C.    TEAM MEETINGS:

1.    In all cases where an arrest on criminal charges related to abuse or neglect has been made, the case shall be scheduled for review at a Team meeting to discuss issues relating to contact (e.g., placement, reunification, visitation, or mail/telephone contact) between the alleged perpetrator and the child victim or other children or modifications to restrictions previously imposed.

2.    All Team members shall be notified in advance of Team meetings, but all need not be present for meetings to occur. The expressed opinion of absent Team members shall be

considered at such meetings.  Follow-up meetings to consider

new issues or modifications of previous decisions shall be held.

3.    If there is disagreement among the Team members regarding

contact between the alleged perpetrator and the victim or other

children, the dispute will be submitted to the County DHR Director

and the DA for discussion.  If the dispute can not be resolved at this

level, the matter will be submitted to the appropriate court for

resolution.

**VI.  CONFIDENTIALITY OF RECORDS**:    All the parties to this Protocol

agree to maintain, within the bounds allowed by law, the confidentiality of all

records and information gathered on suspected child abuse and neglect

cases as outlined in <u>Code of Alabama,</u> 1975    Section 26-14-8.  All the

parties further agree **not** to release any records or information on any child

abuse or neglect cases except as it relates to legitimate program operations

of their respective agency.  No general media or public access to information

and records will be allowed.

**VII.  EFFECTIVE DATE**:  This protocol shall become effective on the date

signed by all parties.

**VIII.  TERMINATION OF PROTOCOL**:  This protocol may be terminated by

any party upon three days notice in writing to the other parties.

## PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

Office of the District Attorney
Twelfth Judicial Circuit
Troy, AL

Pike County Department of Human
Resources
Troy, AL

East Central Mental Health/Mental
Retardation, Inc.
Troy, AL

Charles Henderson Child Health
Center
Troy, AL

Troy Regional Medical Center
Troy, AL

Pike Regional Child Advocacy
Center
Troy, AL

Pike County Juvenile Probation Services
Troy, AL

Pike County Sheriff's Department
Troy, AL

City of Troy Police Department
Troy, AL

City of Brundidge Police Department
Brundidge, AL

Dr. Stephen Coleman
Forensic Medical Evaluator, Troy, AL

Executed this the 27th day of February 2007.

Reed v. PCBE
763

**Pike Regional Child Advocacy Center**
(PRCAC)

*Multi-disciplinary Team Inter-agency Agreement*

THIS AGREEMENT made and executed this 6th day of September, 2005, by and between the Pike Regional Child Advocacy/Family Resources Center Board and the following entities:

Pike County District Attorney,
12th Judicial Circuit
Pike County Sheriff's Department
City of Troy Police Department
City of Brundidge Police Department
Department of Human Resources
Troy Regional Medical Center
Charles Henderson Child Health Center
East Central Mental Health/Mental Retardation
Pike County Juvenile Probation Services
Board of Education, Pike County Schools
Board of Education, Troy City Schools

## Article I – Mission:

To provide a safe child-friendly environment in which child abuse victims are protected through a collaborative approach in an effort to minimize the child's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's and their families; to prevent the occurrence or recurrence of abuse and/or neglect through effective community services to children and families by providing a holistic approach to prevent, investigate, prosecute and treat victims of child abuse and neglect.

## Article II - Statement of Problem:

Victims of child abuse and their families in Pike County are underserved and in other instances, inadequately served due to a lack of coordination, collaboration, education and delivery of the numerous varied services that are available in Pike County and surrounding areas to victims and their families. The Pike Regional Child Advocacy Center's (hereinafter CAC) ultimate goal is to address and alleviate the problems by designing its services to address the specific needs and fragile condition of children who have been physically,

PLAINTIFF'S
EXHIBIT
2-2

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
No. 0134

emotionally and sexually abused. Pike County and its sister counties which are not served by a CAC, are in need of a structured, organized, Child Advocacy Center that is convenient and centrally located to most of the essential service provider. Crimes of sexual violence and physical abuse committed against and by our children appear to be on the rise in our community. The District Attorney in conjunction with other agencies has identified a need to create a consortium of agencies to investigate, provide forensic assessments, coordinated crisis intervention assistances and counseling to victims and their families, public awareness, education, tracking and prosecution of offenders. A high level of commitment has been demonstrated by a strong showing of support from the general community, medical and mental health professionals, educators as well as law enforcement in attendance at our Children's Policy Council Focused Groups and through letters of support.

## Article III – Statement of Need:

No single agency within Pike County has the resources necessary to combat child abuse and all its attending consequences to a victim and family. No single agency alone has sufficient resources to commit to sustain a Child Advocacy Center with the resources which a family in crisis needs when dealing with child abuse. Even though Pike County is in the developmental stage of a Child Advocacy Center, for many years the multi-disciplinary team model has been used by those agencies when handling child abuse cases. Uniting all of the available resources and agencies under on the PRCAC umbrella, will establish a mechanism for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse. The outpouring of public support is added evidence of the need and desire of this community to establish a Child Advocacy Center.

## Article IV – Statement of Objective:

The PRCAC Board, the agencies and/or entities who execute this agreement, hereby agree to unite to work with each other, the State, Federal and local law enforcement agencies to operate a Special Victims Unit and Multi-disciplinary Team, through the CAC to attack the child abuse and other related family violence problems within our community through a holistic approach.

## Article V – Statement of Purpose and Understanding:

The aforementioned member agencies enter into this Agreement to create and perpetuate the Pike Regional Child Advocacy Center for the purpose of combining resources to combat the problems of child abuse and its consequences to the family. *Nothing in this agreement creates additional authority nor limits or modifies the existing authority of the parties set forth under the applicable laws.* The parties to this Agreement specifically agree as follows:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0135

1. To provide a consortium of need appropriate services to abuse victims and families through a multi-disciplinary team approach.
2. To provide a child and family friendly environment where services are easily accessible and appropriate to victims' needs.
3. To coordinate through the Multi-disciplinary Team, interviews; forensic evaluations; medical examines; counseling and follow-up services.
4. To coordinate the efforts of Special Victims Unit and the Multi-disciplinary Team for efficient and successful prosecution of offenders.
5. To continue to stimulate public support by education and awareness of the problems of abuse and ways to combat the problems in our community.
6. To provide our medical staff with the most up to date training and medical equipment for detecting abuse of children and neglect.
7. To provide law enforcement with the most up to date training and equipment for detecting, and documenting evidence of child abuse and neglect.
8. To provide the prosecutors with the most current trends in prosecuting child abuse and neglect cases.
9. To provide counseling and follow-up services to victims and their families in an effort to promote the healing process.
10. To maintain an accurate data base of victims, offenses, disposition of cases and offender tracking.
11. To share information and resources to enhance the investigation and prosecution of child physical and sexual abuse cases while facilitating the treatment of the child victims and their families.
12. To direct the resources, experience, training and commitment of all agencies to bear on the consequences and problems of abuse those victims and their families must combat.
13. To promote training and educational opportunities for all agencies involved in fighting child abuse.
14. To promote education and awareness in at all level of our community to prevent the occurrence or recurrence of child abuse.

## Article VI -  Lead Agency:

The District Attorney's is hereby designated the lead agency for directing the Special Victim's Unit, Multi-disciplinary Team and  in conjunction with the PRCAC Board  making application for grant funds, accepting grant funds, accounting for use  and administration of grant funds, and collecting local cash matches when required.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0136

## Article VII – Establishment of Board:

By execution of this agreement, each participating entity affirms its support of the Board of Directors of the Pike Regional Child Advocacy Center. Said Board shall establish the general policies of the CAC by the adoption of the same as stated herein or as amended. The Board shall meet at least annually which may include conference calls, document circulation, and/or in person.

## Article VIII – Confidentiality:

*All agencies will adhere to their individual confidentiality requirements as prescribed by law. Furthermore, the undersigned agencies and their representatives agree that information pertaining to children and their families will be held in the strictest confidence. Information will be shared outside the team only as it is needed to properly investigate a case, develop a case plan or carry out the treatment or dispositional recommendation or by Court order.*

## Article VIIII – Disclaimer:

It is expressly understood that each of the undersigned agencies has specific responsibilities imposed by law and will continue to perform those functions designated to them. Nothing contained herein supersedes that statutes, rules and regulations governing each agency. In the event that any provision of this agreement is inconsistent with any statute, rule or regulation, the statute, rule or regulation shall prevail.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0137

## PIK REGIONAL CHILD ADVOCACY/FAMILY RESOURCES CENTER

## PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

Office of the District Attorney
Twelfth Judicial Circuit
Troy, Alabama

Pike County Department of Human
Resources
Troy, Alabama

East Central Mental Health/Mental
Retardation, Inc.
Troy, Alabama

Charles Henderson Child Health Center
Troy, Alabama

Troy Regional Medical Center
Troy, Alabama

Pike Regional Child Advocacy/Family
Resources Center
Troy, Alabama

Pike County Juvenile Probation
Services
Troy, Alabama

Pike County Sheriff Department
Troy, Alabama

City of Troy Police Department
Troy, Alabama

City of Brundidge Police Dept.
Brundidge, Alabama

Executed this the 6th day of September 2005

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0138*

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0133

~~gional Child Advocacy/Family Resource Center~~

<u>Date of Interview: 7/14/05</u>

CAC CASE # 23 _____    INTERVIEWER'S NAME: <u>Mona  Watson</u>

VICTIM'S NAME:    <u>Reed</u>        <u>Justin</u>        <u>Michael</u>
                  (LAST)        (FIRST)        (MIIDDLE)

ADDRESS: ___<u>Rt. 2 Box 318-F</u>_____

TELEPHONE: __<u>334-735-2935</u>

DOB: __<u>7/28/89</u>        SEX:  M <u>X</u>    F ___    RACE: <u>White</u>

PARENTS NAME:                EMPLOYMENT:

POSSIBLE OFFENDER: <u>Charles Coon</u>    DOB/AGE: __<u>unknown</u>

ADDRESS: <u>Greenville, AL</u>

TYPE OF ABUSE:    <u>Sexual</u>

DATE OF INCIDENCE:

LOCATION: <u>Pike County High School Band Room & Home of Victim</u>

DHR WORKER: <u>Misty Hubbard</u>

LE INVESTIGATOR: Bob Bradberry

PRESENT AT FORENSIC INTERVIEW:  <u>Mona Watson, Misty Hubbard</u>
                                <u>Viewed by Bob Bradberry & DA</u>

SUMMARY OF INTERVIEW:

   Justin had a very difficult time with interview. Even though he is fifteen years old he has difficulty in verbalizing what happened to him. After a very difficult time, Justin finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one time he described was in the band room back before Christmas. He stated that Mr. Coon had him lock the band room door and sit on the steps leading into the room. He stated that Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last time this happened was about three weeks ago when Mr. Coon went to Justin's house. Parents were not there.



PLAINTIFF'S EXHIBIT
19

**State of Alabama**
**Twelfth Judicial Circuit**
**Pike County Multi-disciplinary Team Report**

Reporting Agency: _____     Date: 8/9/05
(Place name of person reporting next to agency)          Phone 807-6143

DA _____
TPD_____
DHR _M. Hubbard_____
BPD_____
PCSO_____
Other_____

Victim Information:

Name _Justin Reed_____ DOB 7/28/89 Age 7/316
Address _162 Co. Rd 4430_____ Gender: (Male) Female
_____Brundidge, AL_____
Phone (    ) 735 - 3925_____            Mom cell
                                          268-6483
Parent/guardian _Elizabeth & Michael Reed_____

Other Household members (List Names, ages and relationship to victim)
_Jeremy Reed- brother, age 21_____
_Jessica Reed- sister, age 18_____
_Joseph Reed - brother, age 12_____

Person Allegedly Responsible for Abuse/ Neglect Information:

Name _Charles Coon_____ DOB ___/___/___ Age____
Address _____ Gender (Male) Female
_____

Allegations
_____Sexual abuse -_____
_____
_____
_____
_____
_____
_____

## MULTI-DISCIPLINARY CHILD PROTECTION TEAM REFERRAL FORM

### I.    IDENTIFYING INFORMATION

**Case Name**  Elizabeth Reed

**County**  Pike                                    **DHR Case #** 26411

**DHR Worker** Misty Hubbard                   **DHR Supervisor** Debbie Meeks

**Telephone #** 807-6143                        **Telephone #** 807-6167

### II.    REFERRAL INFORMATION          **Referral Date** 8/9/05

**Referral Reason** (Check all that apply)

☐ Child Safety                    ☐ Foster Care Crisis              ☐ Adoption Crisis

☐ Treatment Needs Unclear    ☐ Arbitrate Difference In        ☒ Coordinate Resources
                                         Treatment Plan

☐ Other (Specify)  enter referral reasons (other than above) here

**Child(ren)To Be Presented**  (Include name, age, and sex)

Justin Reed, 15, male

**Family Profile** (Members Of Child's Household)

Elizabeth Reed, mother
Michael Reed, father
Jeremy Reed, brother, age 21
Jessica Reed, sister, age 18
Joseph Reed, brother, age 12

**Family Situation** (e.g., issues/crises and needs, living conditions, extended family support)

Justin Reed was indetified as a possible vitcim in another case.  He was interviewed at the CAC and it was verified that he was indeed a victim.  He and his sister are receiving counseling from Catholic Social Services in Montgomery.

**Medical, Educational, And/Or Psychological Needs And Results Of Any Tests Or Evaluations**

**Summary Of DHR's Work With The Family** (including assessment of child safety in the home)

DHR helped the family arrange counseling and will continue to ensure that Justin's emotional needs are being met.

**Other Professionals/Agencies Directly Involved With The Family**

PCSD, Catholic Social Services.

_____                    _____
Misty Hubbard, BSW                                           8/9/05
Worker's Signature                                              Date

DHR-FCS-1510 (2

### III.   MULTI-DISCIPLINARY TEAM'S ASSESSMENT AND RECOMMENDATIONS

**Assessment**

**Recommendations**

**Comments**

### IV.   DISPOSITION

☐ **Team Will Review Case**  enter date here          ☐ **Team Is Closing Case**  enter date here

**Date Assessment/Recommendations Given/Sent To DHR Worker**  enter date here

_____                    _____
Team Coordinator's Signature                                                        Date

### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

JR, a minor by an through
His parents EAR & TMR
    Plaintiff

                         CV:2:06-cv-1120-MEF

v.

Pike County Board of Education et al.
    Defendants

## AMENDED NOTICE OF DEPOSITION

TO:    Donald B. Sweeney, Jr.
        One Federal Place
        1819 Fifth Avenue North
        Birmingham, AL  35203-2104

**PLEASE TAKE NOTICE** that the Plaintiff in the above stated case will take the deposition of Mona Watson at the Pike County Board of Education offices at 101 W. Love Street in Troy Alabama  on September 4, 2007 beginning at 10:00 a.m. and said deposition is to continue until completed. Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. 30* before an officer duly authorized to administer oaths.

**Request for Production of Documents:**

Plaintiff requests that the deponent named herein produce at the time and date of the deposition,  copies of the following records:

    1. All records relating to the plaintiff in this action.

    2. All records relating to the younger brother of the plaintiff.

    3. All records relating to investigations of sexual abuse complaints against Defendant Charles Coon—whether relating to these children or any other children.

PLAINTIFF'S
EXHIBIT
20

Done this the 23rd day of August, 2007.

<u>Susan Shirock DePaola</u>
Attorney for the Plaintiff

**SUSAN SHIROCK DEPAOLA**
**1726 West Second Street ~ Suite B**
**Montgomery, Alabama  36106**

## PIKE REGIONAL CHILD ADVOCACY CENTER
## INVESTIGATIVE PROTOCOL

### Agencies:

**Pike County Department of Human Resources (DHR)**

**Pike County District Attorney's Office (DA)**

**Pike County Sheriff's Department (PCSO)**

**City of Troy Police Department (TPD)**

**City of Brundidge Police Department (BRD)**

**Pike Regional Child Advocacy Center (CAC)**

**Troy Regional Medical Center (TRMC)**

**East Central Mental Health (ECMH)**

**Pike County Juvenile Probation Services (PCJPS)**

*Reviewed and Executed By member Agencies: September 6, 2005*

PLAINTIFF'S
EXHIBIT
21

Reed v. PCBE
749

*PIKE REGIONAL CHILD ADVOCACY CENTER*

**MISSION STATMENT**

*The mission of the PRCAC Board and member agencies is to protect children in a safe, child friendly environment through a collaborative approach in a effort to minimize the child victim's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's of abuse and their families; to prevent the occurrence or recurrence of abuse or neglect through effective community services for children and families by providing a holistic approach to prevent, investigate, prosecute, and treat victims of child abuse and neglect.*

The purpose of this protocol is to establish a guide for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse. Such cases should be consistent with the definitions found in the Code of Alabama, 1975 Section 26-16-2, and remain consistent with the proper investigative authority vested in DHR and law enforcement.

This protocol neither creates additional authority nor limits or modifies the existing authority of the parties. This protocol is merely intended to establish

written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reported or suspected child abuse and neglect in Pike County, Alabama.

1.    **Disclosure and Reporting:** As soon as the CAC or law enforcement receives a report of suspected sexual or physical abuse or of neglect, DHR **must** immediately be notified by telephone or direct communication.  This should be followed up by a written report.  Notification of reports of suspected sexual abuse and severe physical abuse **must** be made to the DA's office in writing by DHR.  (Code of Alabama, 1975 Section 26-14-3)  Law Enforcement and the CAC are mandated by law to report all suspected Child Abuse and Neglect (CA/N) to DHR.  The Department of Human Resources will screen the information to determine if a CA/N report exists.  When a complaint is received, the DHR Child Abuse/Neglect (CA/N) investigator will notify the law enforcement agency and coordinate jointly the initial investigative process.  At times, it may be necessary for the DHR investigative worker to request accompaniment/assistance from Law Enforcement while conducting interviews (as a safety precaution).

After-hours communication between law enforcement and DHR will be accomplished through an after-hours paging network.  DHR

social workers will develop a schedule designating a worker to carry the after-hours pager. All law enforcement agencies and local hospitals may contact the on-call worker or supervisor through the DHR after-hour answering service. If a report of suspected child abuse/neglect is called in to law enforcement, the dispatcher should notify the worker on call. If, for some reason, the on-call worker cannot be reached, the Service Supervisor should be contacted to handle to situation. If immediate response is necessary, and law enforcement is not already responding to the situation, DHR will contact the appropriate law enforcement agency for assistance.

2.   **Team Interview:**   In emergency situations, DHR and Law Enforcement will begin an investigation on-site with representatives from both agencies present when possible. **In-depth interviews of child victims should be conducted at the CAC unless emergency circumstances dictate otherwise.** DHR or law enforcement, depending on which agency receives the initial call, will decide if the case is one in which the initial interview can be scheduled at the CAC or if preliminary on-site contact is necessary. Follow-up inter-views with the victim should be done in child friendly environment of the CAC. DHR, law enforcement or the DA may schedule interviews at the CAC. The CAC forensic interviewer will notify the other appropriate agencies of the date and time of the

planned interview. Non-offending family members' interviews *may* also be scheduled at the CAC. When interviews involving clients of DHR are scheduled, notification to the DHR Social Worker will be made.

Child interviews will be done with complete separation of victim and offender, and in a manner to allow observation by (MDT) Multi-Disciplinary Team Members. **Suspected offenders are not allowed at the CAC.** Perpetrator interviews in cases where prosecution seems possible should be conducted by law enforcement as soon as possible after the child interview. DHR and law enforcement may conduct joint perpetrator interviews if practical. The law enforcement agency with jurisdiction in criminal abuse cases should be notified of child interviews. Interviews of child victims should include participation by all team members with investigative responsibilities in the case. Such interviews shall be conducted at the CAC with MDT members observing on close circuit monitors. It is in the best interest of the child to have one examiner conducting interview as other MDT members observe.

## Before the interview the Team Members should:

1. Explain their individual roles to the family members (or attending adults).

2. Separate the child from the attending parent or adult if practical.

3. Separate siblings to interview individually.

4. Interview parents or caretakers concerning knowledge of the abuse.

*Child interviews done at the CAC will be done by trained Forensic Interviews in a manner, which is legally sound, non-duplicative, non-leading and neutral.*

## After the interview Team Members should:

1. Discuss the allegations and details provided by the child.

2. Establish a case plan to complete the investigation. Assign tasks to various team members. This may include counseling, a forensic evaluation of the victim, medical examination, additional interviews, etc.

3. Prepare a safety plan if indicated to insure the safety of the child.

4. Meet the child's non-offending parent or caretaker and explain the case plan.

5. The team member designated to take notes will prepare a written summary of the interview including the time, date and who was present, names, addresses and phone numbers of

child, family and witnesses; to be shared with all team members with investigative responsibilities in the case.

3.  **Case Review:** Pending cases will be reviewed at least monthly by MDT members and an Assistant DA. Case reviews should include all team members with involvement in the case. CAC staff will notify representatives of the DA, DHR, LE, medical professionals, Counselors, etc. of cases set for review. Every effort will be made to reach a mutual agreement on recommendations concerning an appropriate course of action for individual cases. However, this protocol recognizes that LE, DHR or any interested party may petition the court on behalf of the child victim.

4.  **Counseling:** Counseling will be available at not cost for victims and non-offending family members at the CAC. MDT members may refer victims for counseling or Forensic Evaluations as deemed necessary. Forensic evaluations and counseling conducted at the CAC will be done in a manner consistent with legal, ethical and professional standards.

5.  **Prosecution:** The decision to prosecute or not is a decision made exclusively by the DA with input from MDT members as well as the victim and family members. Child abuse cases are generally

referred to the Grand Jury for review, but warrants may be issued as deemed appropriate by the DA. The CAC will work with the child victim and family in matters concerning court. DHR will work with the family to ensure that the child remains safe. Law enforcement will conduct a thorough criminal investigation in an effort to present the DA all necessary information.

6. **Medical Evaluations:** MDT members will refer children for medical evaluations and treatment as needed. In the event the team determines medical assistance is required, every effort will be made to schedule an appointment for the child prior to leaving the CAC. Sexual Abuse exams are available at not cost through prior arrangements with **Dr. Stephen Coleman** or Troy Regional Medical Center. Should any problems arise regarding a physical examination of a victim, Dr. Coleman should be contacted immediately.

7. **Victim Support:** The Victim's Advocate for the CAC or the DA's office will maintain contact with victims and families throughout the investigation and prosecution providing; support, crisis intervention and information concerning case status, court dates, victim's rights, local services, etc.

8.    **Case Tracking:**  The CAC Case Manager will track all abuse cases pending in the child protective and criminal justice system. Information will include client demographics, case outcome and appropriate statistical information.  MDT members will have access to tracking information.

9.  **Confidentiality of Records:**  All the parties to this Protocol agree to maintain, within the bounds allowed by law, the confidentiality of all records and information gathered on suspected child abuse and neglect cases as outlined in Code of Alabama 1975,  Section 26-14-8. All parties further agree not to release any records or information on any child abuse or neglect case except as it relates to legitimate program operations of their respective agency.  No general media or public access to information and records will be allowed.  Appropriate information will be shared among MDT members unless prohibited by legal, ethical or professional standards of practice.

PIKE REGIONAL CHILD ADVOCACY CENTER

★★★★

**Protocol for Joint Family Intervention**

**Pending Criminal Investigation and Prosecution**

I.      **PURPOSE:**  The following Protocol for the Department of Human Resources (DHR), the District Attorney (DA), and law enforcement is intended as a guide for cognitive joint intervention in cases of suspected child abuse or neglect of such severity that the alleged offender is arrested for prosecution.

II.     **PARTIES:**  The parties to this protocol are the Pike County Department of Human Resources, the Pike County District Attorney's Office, the Pike County Regional Child Advocacy Center, and the following law enforcement entities:

Reed v. PCBE
758

Pike County Sheriff's Department

City of Troy Police Department

City of Brundidge Police Department

**III.    RESTRICTION:** This protocol neither creates additional authority nor limits or modifies the existing authority of the parties. This protocol is merely intended to establish written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reports of suspected child abuse and neglect in Pike County, Alabama.

**IV.    DEFINITIONS:**

*ABUSE:*        Section 26-14-1 (1), as amended defines "abuse" as harm or threatened harm to a child's health or welfare. Harm or threatened harm to a child's health or welfare can occur through non-accidental physical or mental injury, sexual abuse or attempted sexual abuse, or sexual exploitation or attempted sexual exploitation. "Sexual abuse" includes the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or having a child assist any other person to engage in any sexually explicit conduct or any simulation of the conduct for the purpose of producing any visual depiction of the conduct; or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children as those acts are defined by Alabama law. "Sexual exploitation" includes allowing, permitting or encouraging a child to engage in prostitution and allowing, permitting, encouraging, or

engaging in the obscene or pornographic photographing, filming, or depicting of a child for commercial purposes.

*NEGLECT:*    Section 26-14-1 (2), as amended defines "neglect" as negligent treatment or maltreatment of a child, including the failure to provide adequate food, medical treatment, supervision, clothing, or shelter.

*CHILD:*    Section 26-14-1 (3) defines a "child" as a person under the age of 18 years.

*LAW ENFORCEMENT:*    Any official or employee of the Pike County Sheriff's Department, or the city police departments of Troy and Brundidge.

*TEAM:*    A DHR planning team composed of persons *directly* involved with individual children and their families.  The team shall include at a minimum the child, if age appropriate; the child's parent(s); foster parent(s), if the child has been removed from home; DHR staff, and the DA or his designee.

## V.    PROCEDURES:

A.    REPORTING.  All parties to this protocol agree to report incidents of suspected child abuse and neglect as required by law.  *All non-Department of Human Resources parties agree to notify DHR immediately of all reports or incidents of suspected child abuse or neglect which come to their attention.*

considered at such meetings.  Follow-up meetings to consider
new issues or modifications of previous decisions shall be held.

3.    If there is disagreement among the Team members regarding
contact between the alleged perpetrator and the victim or other
children, the dispute will be submitted to the County DHR Director
and the DA for discussion.  If the dispute can not be resolved at this
level, the matter will be submitted to the appropriate court for
resolution.

**VI.  CONFIDENTIALITY OF RECORDS**:    All the parties to this Protocol
agree to maintain, within the bounds allowed by law, the confidentiality of all
records and information gathered on suspected child abuse and neglect
cases as outlined in <u>Code of Alabama,</u> 1975    Section 26-14-8.  All the
parties further agree **not** to release any records or information on any child
abuse or neglect cases except as it relates to legitimate program operations
of their respective agency.  No general media or public access to information
and records will be allowed.

**VII.  EFFECTIVE DATE**: This protocol shall become effective on the date
signed by all parties.

**VIII.  TERMINATION OF PROTOCOL**: This protocol may be terminated by
any party upon three days notice in writing to the other parties.

Reed v. PCBE
762

PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

_____
Office of the District Attorney
Twelfth Judicial Circuit
Troy, AL

_____
East Central Mental Health/Mental
Retardation, Inc.
Troy, AL

_____
Troy Regional Medical Center
Troy, AL

_____
Pike County Juvenile Probation Services
Troy, AL

_____
City of Troy Police Department
Troy, AL

_____
Dr. Stephen Coleman
Forensic Medical Evaluator, Troy, AL

_____
Florence Hall Mitchell, MSW, LCSW
Pike County Department of Human
Resources
Troy, AL

_____
Charles Henderson Child Health
Center
Troy, AL

_____
Pike Regional Child Advocacy
Center
Troy, AL

_____
Pike County Sheriff's Department
Troy, AL

_____
City of Brundidge Police Department
Brundidge, AL

Executed this the 27th day of February 2007.

**Pike Regional Child Advocacy Center**
**(PRCAC)**

*Multi-disciplinary Team Inter-agency Agreement*

THIS AGREEMENT made and executed this 6th day of September, 2005, by and between the Pike Regional Child Advocacy/Family Resources Center Board and the following entities:

Pike County District Attorney,
12th Judicial Circuit
Pike County Sheriff's Department
City of Troy Police Department
City of Brundidge Police Department
Department of Human Resources
Troy Regional Medical Center
Charles Henderson Child Health Center
East Central Mental Health/Mental Retardation
Pike County Juvenile Probation Services
Board of Education, Pike County Schools
Board of Education, Troy City Schools

**Article I – Mission:**

To provide a safe child-friendly environment in which child abuse victims are protected through a collaborative approach in an effort to minimize the child's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's and their families; to prevent the occurrence or recurrence of abuse and/or neglect through effective community services to children and families by providing a holistic approach to prevent, investigate, prosecute and treat victims of child abuse and neglect.

**Article II - Statement of Problem:**

Victims of child abuse and their families in Pike County are underserved and in other instances, inadequately served due to a lack of coordination, collaboration, education and delivery of the numerous varied services that are available in Pike County and surrounding areas to victims and their families. The Pike Regional Child Advocacy Center's (hereinafter CAC) ultimate goal is to address and alleviate the problems by designing its services to address the specific needs and fragile condition of children who have been physically,

PLAINTIFF'S
EXHIBIT
2-2

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0134

emotionally and sexually abused. Pike County and its sister counties which are not served by a CAC, are in need of a structured, organized, Child Advocacy Center that is convenient and centrally located to most of the essential service provider. Crimes of sexual violence and physical abuse committed against and by our children appear to be on the rise in our community. The District Attorney in conjunction with other agencies has identified a need to create a consortium of agencies to investigate, provide forensic assessments, coordinated crisis intervention assistances and counseling to victims and their families, public awareness, education, tracking and prosecution of offenders. A high level of commitment has been demonstrated by a strong showing of support from the general community, medical and mental health professionals, educators as well as law enforcement in attendance at our Children's Policy Council Focused Groups and through letters of support.

## Article III – Statement of Need:

No single agency within Pike County has the resources necessary to combat child abuse and all its attending consequences to a victim and family. No single agency alone has sufficient resources to commit to sustain a Child Advocacy Center with the resources which a family in crisis needs when dealing with child abuse. Even though Pike County is in the developmental stage of a Child Advocacy Center, for many years the multi-disciplinary team model has been used by those agencies when handling child abuse cases. Uniting all of the available resources and agencies under on the PRCAC umbrella, will establish a mechanism for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse. The outpouring of public support is added evidence of the need and desire of this community to establish a Child Advocacy Center.

## Article IV – Statement of Objective:

The PRCAC Board, the agencies and/or entities who execute this agreement, hereby agree to unite to work with each other, the State, Federal and local law enforcement agencies to operate a Special Victims Unit and Multi-disciplinary Team, through the CAC to attack the child abuse and other related family violence problems within our community through a holistic approach.

## Article V – Statement of Purpose and Understanding:

The aforementioned member agencies enter into this Agreement to create and perpetuate the Pike Regional Child Advocacy Center for the purpose of combining resources to combat the problems of child abuse and its consequences to the family. *Nothing in this agreement creates additional authority nor limits or modifies the existing authority of the parties set forth under the applicable laws.* The parties to this Agreement specifically agree as follows:

***JR v. Pike County BOE***
Produced by Defendant PCBE
**No. 0135**

1. To provide a consortium of need appropriate services to abuse victims and families through a multi-disciplinary team approach.
2. To provide a child and family friendly environment where services are easily accessible and appropriate to victims' needs.
3. To coordinate through the Multi-disciplinary Team, interviews; forensic evaluations; medical examines; counseling and follow-up services.
4. To coordinate the efforts of Special Victims Unit and the Multi-disciplinary Team for efficient and successful prosecution of offenders.
5. To continue to stimulate public support by education and awareness of the problems of abuse and ways to combat the problems in our community.
6. To provide our medical staff with the most up to date training and medical equipment for detecting abuse of children and neglect.
7. To provide law enforcement with the most up to date training and equipment for detecting, and documenting evidence of child abuse and neglect.
8. To provide the prosecutors with the most current trends in prosecuting child abuse and neglect cases.
9. To provide counseling and follow-up services to victims and their families in an effort to promote the healing process.
10. To maintain an accurate data base of victims, offenses, disposition of cases and offender tracking.
11. To share information and resources to enhance the investigation and prosecution of child physical and sexual abuse cases while facilitating the treatment of the child victims and their families.
12. To direct the resources, experience, training and commitment of all agencies to bear on the consequences and problems of abuse those victims and their families must combat.
13. To promote training and educational opportunities for all agencies involved in fighting child abuse.
14. To promote education and awareness in at all level of our community to prevent the occurrence or recurrence of child abuse.


**Article VI -  Lead Agency:**

The District Attorney's is hereby designated the lead agency for directing the Special Victim's Unit, Multi-disciplinary Team and   in conjunction with the PRCAC Board  making application for grant funds, accepting grant funds, accounting for use  and administration of grant funds, and collecting local cash matches when required.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0136

## PIK REGIONAL CHILD ADVOCACY/FAMILY RESOURCES CENTER

## PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

Office of the District Attorney
Twelfth Judicial Circuit
Troy, Alabama

Pike County Department of Human
Resources
Troy, Alabama

East Central Mental Health/Mental
Retardation, Inc.
Troy, Alabama

Charles Henderson Child Health Center
Troy, Alabama

Troy Regional Medical Center
Troy, Alabama

Pike Regional Child Advocacy/Family
Resources Center
Troy, Alabama

Pike County Juvenile Probation
Services
Troy, Alabama

Pike County Sheriff Department
Troy, Alabama

City of Troy Police Department
Troy, Alabama

City of Brundidge Police Dept.
Brundidge, Alabama

Executed this the 6th day of September 2005

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0138*

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0133

# Interpretive Report of WISC-III Testing
## The Psychological Corporation

NAME: Justin Reed
AGE: 13 years 6 months
DATE OF BIRTH: 07/28/89
GENDER: Male
ETHNICITY: White
GRADE: 7th
SCHOOL: Pike County High

REPORT DATE: 05/16/03
EXAMINER: Robert L. Hudson
TITLE: School Psychometrist
TEST SITE: PCHS

**Test Administered:** WISC-III (02/13/03)

SCORES SUMMARY

| WISC-III SCALE | SCORE |
| --- | --- |
| Verbal (VIQ) | 57 |
| Performance (PIQ) | 58 |
| Full Scale | 53 |

## Reason for Referral

Justin was referred for an evaluation by Pike County Board of Education because of a required reevaluation. On a previous intelligence evaluation, the WISC-III, given on 02/14/00, Justin achieved a Verbal I.Q. score of 75, a Performance I. Q. score of 80, and a Full Scale I.Q. score of 76. This evaluation will help to determine if Justin is in need of or should continue special education and/or related services.

## Home

Justin is a 13-year-old teenager who lives with his mother. Three children besides Justin live in the home.



PLAINTIFF'S
EXHIBIT
23

Justin Reed

05/16/03

2

## Behavior Observations

The testing session began at 8:20 A.M. and ended at 8:55 A.M. on Thursday. There were no interruptions during the evaluation process and was completed in one sitting. Justin's behavior during the test session was that he appeared to be distracted. He seemed to hurry through the test items. Justin was appropriately dressed and adequately groomed. Other than seeming in a hurry, he interacted appropriately with the examiner. Rapport was easily established and he was able to provide all requested background information. Justin attended well to test instructions and his speech was intelligible.

The WISC-III was felt to be the appropriate measure for assessing his general intelligence because it is considered to be a reliable and well-standardized instrument.

## Interpretation of WISC-III Results

Justin may experience great difficulty in keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities. His general cognitive ability is within the intellectually deficient range of intellectual functioning, as measured by the Wechsler Intelligence Scale for Children--Third Edition. His overall reasoning abilities exceed those of approximately 1% of students his age (FSIQ = 53; 90% confidence interval = 50 - 60).

His ability to think with words is comparable to his ability to reason without the use of words. Both Justin's verbal and nonverbal reasoning abilities also are in the intellectually deficient range. His verbal reasoning abilities are above those of approximately 1% of his peers (VIQ = 57; 90% confidence interval = 54 - 64). His nonverbal reasoning abilities are better than those of approximately 1% of students Justin's age (PIQ = 58; 90% confidence interval = 55 - 69).

## Summary

Justin is a 13-year-old teenager who completed the WISC-III. He was referred for testing because of a required reevaluation. His general cognitive ability, as estimated by the WISC-III, is intellectually deficient (FSIQ = 53). Justin's verbal and performance ability scores were also both in the intellectually deficient range (VIQ = 57, and PIQ = 58).

Justin Reed                                    05/16/03                                    3

## Recommendations

It is recommended that the Multidisciplinary Eligibilty Determination Commitee carefully review all necessary and available data in order to make a determination as to Justin's eligibility to receive special education and/or related services.

This report is valid only if signed by a qualified professional:

_Robert L. Hudson_

Robert L. Hudson
School Psychometrist

Justin Reed                                05/16/03                                        4

## IQ SCORES SUMMARY

| SCALE | IQ | 90% CONFIDENCE INTERVAL | PR | CLASSIFICATION OF INTELLECTUAL FUNCTIONING |
|-------|-----|------------------------|-----|------------------------------------------|
| Verbal | 57 | 54- 64 | <1 | Intellectually Deficient |
| Performance | 58 | 55- 69 | <1 | Intellectually Deficient |
| Full Scale | 53 | 50- 60 | <1 | Intellectually Deficient |

Difference Between VIQ and PIQ = 1 ( ns, Freq =96.7%)

## INDEX SCORES SUMMARY

| | INDEX | 90% CONFIDENCE INTERVAL | PR |
|---|-------|------------------------|-----|
| Verbal Comprehension | 59 | 56- 67 | <1 |
| Perceptual Organization | 56 | 53- 67 | <1 |

## SUBTEST SCORES SUMMARY

| VERBAL SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|-----------------|-----------|--------------|-----|
| Information (IN) | 11 | 3 | 1 |
| Similarities (SM) | 8 | 1 | <1 |
| Arithmetic (AR) | 13 | 3 | 1 |
| Vocabulary (VO) | 20 | 3 | 1 |
| Comprehension (CO) | 14 | 2 | <1 |

Justin Reed                                    05/16/03                                              5

| PERFORMANCE SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Picture Completion (PC) | 13 | 2 | <1 |
| Coding (CD) | 39 | 5 | 5 |
| Picture Arrangement (PA) | 15 | 3 | 1 |
| Block Design (BD) | 25 | 4 | 2 |
| Object Assembly (OA) | 10 | 1 | <1 |

WISC-III Writer Windows Version 1.0

Listening Comprehension and Oral Expression

Name: Reed, Justin O                           Sex: Male
Test Date: 05/10/2005                          Grade/Ed Level: 9
Birth date: 07/28/1989                         School: PCHS
Age: 15-9                                       District:
Teacher/Counselor: Green                        Examiner: Calhoun

Reason for testing:

The Oral and Written Language Scales (OWLS) is a measure of receptive and
expressive language for children and young adults.  The scoring and
interpretation of the Listening Comprehension (LC) and Oral Expression (OE)
Scales is provided by the OWLS LC/OE ASSIST.  This ASSIST also provides
interpretation of the Oral Composite, which represents an overall level of
oral language functioning.  For further guidance in interpretation, see the
OWLS test manual for these scales.


                              SCORE SUMMARY

                 Raw   Standard  Conf.   Conf.           Test-Age
    Scales      Score   Score    Level  Interval  %ile   Equiv    NCE  Stanine
-------------   -----  --------  -----  --------  ----  --------  ---  -------
Listening Comp.   68      77      90%   68 - 86     6     9-2      18     2

Oral Expression   50      66      90%   56 - 76     1     6-11      2     1

Oral Composite            70      90%   64 - 79     2     8-1       8     1


          COMPARISON OF EXPRESSIVE AND RECEPTIVE SCALE SCORES

                                       Stand. Score  Signif.   Frequency of
            Scales                      Difference    Level    Difference
-------------------------------------  ------------  -------  ------------
Listening Comprehension > Oral Expression   11         .15       >25%


PLAINTIFF'S
EXHIBIT
24

COPYRIGHT 1995, AMERICAN GUIDANCE SERVICE, INC., CIRCLE PINES, MN 55014-1796

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **JR a Minor, by his mother and father** | * | |
| **EAR and TMR** | * | |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 2:06CV1120-MEF** |
| | * | |
| **PIKE COUNTY BOARD OF** | * | |
| **EDUCATION, et al.,** | * | |
| | * | |
| **Defendats** | * | |
| | * | |
| | * | |
| | * | |
| | * | |

## AMENDED NOTICE OF DEPOSITION

**TO:**   Donald B. Sweeney, Jr.
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104

   **PLEASE TAKE NOTICE** that the Plaintiff in the above styled proceeding will take the deposition of defendant **Andrew Wright** at the Pike County Board of Education the Pike County Board of Education located at 101 West Love Street, Troy Alabama, 36081 beginning on October 1, 2007 at 10:30 a.m. and said deposition is to continue until completed.

   Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. P.* Rule 30(b) (6) before an officer duly authorized to administer oaths in the state of Alabama.  The parties have stipulated that the deposition will be admissible in these proceedings as it relates to the authority of said officer to administer said oaths pursuant to Rule  29 F. R. Civ. P.

PLAINTIFF'S
EXHIBIT
25

Done this the 12th day of September, 2007.

S/ Deanie C. Allen

Attorney for the Plaintiff

SUSAN SHIROCK DEPAOLA
1726 West Second Street ~ Suite B
Montgomery, Alabama    36106

DEANIE C. ALLEN
Aliant Center, Fourth Floor
2740 Zelda Road
Montgomery, Alabama 36106

# East Central Mental Health - Mental Retardation, Inc.
## Plan of Care and Order of Services

Justin Reed

| | Case Number: | Date: |
|---|---|---|
| | 14689 | 3-26-07 |

| Diagnosis: | DSM-IV Code | Description | Addition and/or Revision (if needed) | Date of Addition and Revision (if needed) |
|---|---|---|---|---|
| AXIS I: | 304.31 | Attention deficit Hyperactivity Disorder, Predominantly Inattention Type, In Partial Remission | | |
| AXIS II: | 309.81 | Post traumatic Stress Disorder | | |
| Axis II | 296.34 | Major depressive Disorder, Severe, with Psychotic Features | | |
| AXIS III: →| V62.89 | Borderline Intellectual Functioning | | |
| AXIS IV: | | Sexual Abuse (2005) | | |

| AXIS V: | Current GAF/CGAS: 65 | GAF/CGAS at 6 mos: |
|---|---|---|
| | Highest Past Year: 65 | GAF/CGAS at closure: |

Comments: Client has history of behavior problems as well as experience some degree of sexual abuse 2 years ago.

**Identified Strengths Which May Facilitate Treatment:**

① client is motivated to do better.
② client is now compliant with meds.

**Identified Limitations or Barriers Which May Impede Treatment:**

① Client is borderline intellectual functioning.
② Client sometimes makes poor decisions.

**Prioritization of Problem Areas / Clinical Needs**

① eliminate aggression
② reduce behavior problems
③ explore and treat sexual abuse

PLAINTIFF'S
EXHIBIT
28

Reed v. PCBE
676

| Life Needs: | | (Check Appropriate Categories) | | Date: |
|---|---|---|---|---|

**(For Case Management Use)**    Case Mgr. Signature:

| | | | | |
|---|---|---|---|---|
| ☐ Emotional/Psychological | ☐ 2. Psychiatric | ☐ 3. Safety/Crisis | ☐ 4. Financial | ☐ 5. Housing |
| ☐ 6. Family/Social Support | ☐ 7. Legal | ☐ 8. Thinking | ☐ 9. Vocational | ☐ 10. Communication |
| ☐ 11. Self Direction Learning | ☐ 12. Leisure | ☐ 13. Behavior | ☐ 14. Ed/Learning | ☐ 15. Role Performance |
| ☐ 16. Mobility Transportation | ☐ 17. Language | ☐ 18. Self-Care | ☐ 19. Self-Sufficiency | ☐ 20. Health/Medical |
| ☐ 21. Substance Use Abuse | ☐ 22. Spiritual/Cultural | ☐ 23. Other | ☐ 24. Other | |

CMH-009

# United States District Court for the Middle District of Alabama

## SUBPOENA IN CIVIL CASE

### JR v. Pike County Board of Education et al
### Case Number 2:06-cv-1120

**TO:**  Lucia Grantham
104 McCartha Hall
Troy, Alabama 36081

A subpoena may be served by the sheriff, by his deputy, or by any other person who is not a party and who is not less than 18 years of age. Service of the subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for one day's attendance and the mileage allowed by law under the Federal Rules of Civil Procedure, USCS.

☐ YOU ARE COMMANDED to appear in the United State District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM | DATE AND TIME |
|---|---|---|
| | | |

x☐ YOU ARE COMMANDED to produce at the place, date, and time specified below, the following documents or objects:

| PLACE | DATE AND TIME |
|---|---|
| Produce all documents provided to Pike County High School in the sexual abuse training held on February 15, 2002. See attached. | 10/1/07 1:30 p.m. |

x☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE | DATE AND TIME |
|---|---|
| Pike County Board of Education 101 W. Love Street Troy, AL 36081 | 10/1/07 1:30 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person must testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S NAME, TITLE, & ADDRESS | PHONE & FAX NUMBERS |
|---|---|
| Deanie C. Allen (ALL067) Attorney for Plaintiff Aliant Center 2740 Zelda Road Montgomery, Alabama 36106 | (334) 265-8551 (334) 264-9453 - FAX |

SIGNATURE  *Deanie C. Allen*        DATE  9-12-07

PLAINTIFF'S
EXHIBIT
29

## PROOF OF SERVICE

| DATE SERVED | PLACE |
|---|---|
| September 12, 2007 | 104 McCartha Hall<br>Troy, AL 36081 |

| PERSON SERVED ON (PLEASE PRINT) | MANNER OF SERVICE |
|---|---|
| Lucia Grantham | Certified Mail |

| PERSON SERVED BY (PLEASE PRINT) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on: _____        _____

                                   By

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraphs (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in

which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any parties, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expenses, travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows the substantial need for the testimonial material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

### INSERVICE SCHEDULE
### PIKE COUNTY SCHOOLS
### FEBRUARY 15, 2002

| | |
|---|---|
| 7:40 - 11:15 | Teachers report to individual schools for activities developed by the Principal (Principals should submit morning schedules to Dr. Bazzell) Goshen Elementary - Grade Book training by Marvin Jackson/Mona Watson |
| 11:15 - 12:30 | Lunch |

**ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE COUNTY ELEMENTARY SCHOOL**

| | |
|---|---|
| 12:30 - 3:30 | Selected teachers (New teachers hired after 8-1-01, and teachers absent on August 1, 2001), Diversity Training - report to the computer lab in Building 100, at the bottom of the hill. Presenter: Karen Berry |
| 12:30 - 1:45 | 4th Grade teachers - Groundwater Festival Training - Room 208 Presenter: Michael Mullen & GWF staff, Troy State University |
| 12:30 - 1:45 | All other teachers and instructional assistants report to the Gym - What is Bullying? Presenter: Carolyn Burks |
| 1:45 - 2:10 | Break (Snack area will be open for purchases) |
| 2:10 - 3:30 | * Science Teachers - Grades 6-12 Environmental Awareness Training - Presenter: Michael Mullen, Troy State University, Room 210 |
| | * English Teachers - Grades 6-12 Writing and Reading - Facilitators: Carolyn Burks/Demetric Sermons, Room 209 |
| | * All other High School Teachers - Facilitator: Dr. Bazzell, Room 205 Block Scheduling - Instructional Strategies, Discipline |
| 2:10 - 2:50 | * K - 2nd Teachers - Recognizing Sexual Abuse, Room 201 * 3rd - 5th Teachers - Reading- Running Records, Room 202 |
| 2:55 - 3:30 | * K - 2nd Teachers - Reading - Running Records, Room 202 * 3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201 |
| | Presenter: Wendy Watson - Running Records Presenter: Lucia Grantham, Troy State University - Sexual Abuse |
| 2:10 - 3:30 | All Instructional Assistants - Make and Take Activities, Room 206 |
| 3:30 | Dismissal Time |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0159

INSERVICE SCHEDULE
PIKE COUNTY SCHOOLS
FEBRUARY 15, 2002

7:40 - 11:15   Teachers report to individual schools for activities developed by the
Principal (Principals should submit morning schedules to Dr. Bazzell)
Goshen Elementary - Grade Book training by Marvin Jackson/Mona
Watson

11:15 - 12:30   Lunch

## ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE COUNTY ELEMENTARY SCHOOL

12:30 - 3:30   Selected teachers (New teachers hired after 8-1-01, and teachers absent on
August 1, 2001), Diversity Training - report to the computer lab in
Building 100, at the bottom of the hill. Presenter: Karen Berry

12:30 - 1:45   4th Grade teachers - Groundwater Festival Training - Room 208
Presenter: Michael Mullen & GWF staff, Troy State University

12:30 - 1:45   All other teachers and instructional assistants report to the Gym - What is
Bullying? Presenter: Carolyn Burks

1:45 - 2:10   Break (Snack area will be open for purchases)

2:10 - 3:30   *   Science Teachers - Grades 6-12 Environmental Awareness Training -
Presenter: Michael Mullen, Troy State University, Room 210

   *   English Teachers - Grades 6-12 Writing and Reading - Facilitators:
Carolyn Burks/Demetric Sermons, Room 209

   *   All other High School Teachers - Facilitator: Dr. Bazzell, Room 205
Block Scheduling - Instructional Strategies, Discipline

2:10 - 2:50   *   K - 2nd Teachers - Recognizing Sexual Abuse, Room 201
   *   3rd - 5th Teachers - Reading - Running Records, Room 202
2:55 - 3:30   *   K - 2nd Teachers - Reading - Running Records, Room 202
   *   3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201

   Presenter: Wendy Watson - Running Records
Presenter: Lucia Grantham, Troy State University - Sexual Abuse

2:10 - 3:30   All Instructional Assistants - Make and Take Activities, Room 206

3:30   Dismissal Time



PLAINTIFF'S
EXHIBIT
30

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0152

Wright Exhibit



DEFENDANT'S
EXHIBIT
5

# TREATMENT PLAN REVIEW

| Name: *Justin Reed* | Case Number: *14684* |
|---|---|
| Treatment Review Summary # 1 | Date: *10/20/03* |

Progress Toward Goals
Goal 1: ☑ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☑ Good ☐ Resolved    Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments
Modification Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☑ No
Client Needs to Continue with Treatment    ☐ Yes ☐ No

Comments:

Reviewer Signature: *CAob, MC, lu*    Participation Signature:

Physician Signature:    Participation Signature:

Participation Signature:

| Treatment Review Summary # 2 | Date: |
|---|---|

Progress Toward Goals
Goal 1: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments
Modification Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☐ No
Client Needs to Continue with Treatment    ☐ Yes ☐ No

Comments:

Reviewer Signature:    Participation Signature:

Physician Signature:    Participation Signature:

Participation Signature:

| Treatment Review Summary # 3 | Date: |
|---|---|

Progress Toward Goals
Goal 1: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments
Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☐ No
Client Needs to Continue with Treatment    ☐ Yes ☐ No

Comments:

Reviewer Signature:    Participation Signature:

Physician Signature:    Participation Signature:

Participation Signature:

# TREATMENT PLAN REVIEW

| | |
|---|---|
| | Case Number: [handwritten] |
| Name: [handwritten] | Date: [handwritten] |

## Treatment Review Summary # 1

**Progress Toward Goals**
- Goal 1: ☐ None ☑ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
- Goal 2: ☐ None ☑ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:
- Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☑ No

Comments: [handwritten]

Client Needs to Continue with Treatment    ☐ Yes ☐ No

Reviewer Signature: [signature]    Participant Signature:

Physician Signature: [signature]    Participant Signature:

Participant Signature:

Date: [handwritten]

## Treatment Review Summary # 2

**Progress Toward Goals**
- Goal 1: ☐ None ☐ Minimal ☑ Moderate ☐ Good ☐ Resolved    Comments:
- Goal 2: ☐ None ☐ Minimal ☑ Moderate ☐ Good ☐ Resolved    Comments:
- Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☑ No

Comments:

Client Needs to Continue with Treatment    ☑ Yes ☐ No

Reviewer Signature: [signature]    Participant Signature:

Physician Signature: [signature]    Participant Signature:

Participant Signature:

Date: 7/27[...]

## Treatment Review Summary # 3

**Progress Toward Goals**
- Goal 1: ☐ None ☐ Minimal ☐ Moderate ☑ Good ☐ Resolved    Comments:
- Goal 2: ☐ None ☐ Minimal ☐ Moderate ☑ Good ☐ Resolved    Comments:
- Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved    Comments:

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☐ No

Comments:

Client Needs to Continue with Treatment    ☐ Yes ☐ No

Reviewer Signature: [signature]    Participant Signature:

Physician Signature: [signature]    Participant Signature:

Participant Signature:

## TREATMENT PLAN

Case #: _14684_    Name: _Justin Reed_    Date Completed: _10-8-98_

Diagnosis(es):

Axis I : 313.81 _Oppositional Defiant Disorder_
314.01 _Attention Deficit Hyperactivity Disorder_
V61.20 _Parent/Child Relational Problem_

Axis II : V71.09 _No Diagnosis_

Axis III: _None_

Axis IV:

Axis V:

| Problems/Clinical Issues | Goals/Outcome |
|---|---|
| (1) Oppositional Defiant Disorder | (1) Eliminate oppositional behavior |
| (a) argues | (a) eliminate arguing |
| (b) defies authority figures | (b) learn respect for authority figures |
| (c) spiteful | (c) eliminate spiteful behaviors |
| (d) tantrums | (d) eliminate tantrums |
| (2) Attention Deficit Disorder | (2) Monitor & control Wimpse medication |
| (a) difficulty complete tasks | (a) improve ability to complete tasks |
| (b) disruptive in class | (b) eliminate disruptive behavior |
| (c) difficulty staying focused | (c) improve ability to stay focused |
| (3) Parent/Child Relational Problem | (3) Improve relationships |
| (a) inconsistent discipline | (a) improve discipline techniques |
| (b) lack of appropriate communication | (b) improve communication skills |

Services Ordered:    (✓) Individual Therapy    ( ) Group Therapy    (✓) Family Therapy
( ) Physician Assessment    (✓) Medication Monitoring    ( ) Basic Living Skills
(✓) Family Support Individual    ( ) Family Support Group    ( ) Diagnostic Testing
( ) Case Management    (✓) Mental Health Consult    ( ) SA IOP

I understand that if I no show, without appointment cancellation, that I will automatically be scheduled for a group prior to being rescheduled with my therapist. I understand that if I am in SA IOP that I may be subject to discontinue if I am not compliant with treatment. I understand that I must be an active participant in my treatment and will work diligently and responsibly toward achieving my goals.

Client: _x Elizabeth Reed_    Date: _x 10/8/98_
Counselor: _Jami Jan ms_    Date: _10-8-98_
Program Coordinator: _Susan J Case, MD_    Date: _10/23/98_
Clinical Director: _Doston, FNC NCC_    Date: _10/23/98_
Psychiatrist: _(illegible)_    Date: _10-22-98_

Reed v. PCBE
634

FROM Azar, Azar & Moore, LLC

Central Mental Health - Mental Retardation, Inc.
**Comprehensive Client Information**

Referral _____
Intake _____
Crisis _____

___ New
___ Update
___ Re-admit

Referral Date: _9/18/98_

Admission Date: _10/8/98_

Case # : _14689_   Name: _Reed_ _____ _Justin_ _____
                        Last          First          MI

Address: _Rt 3 Box 318-F_
City: _Brundidge_ State: _AL_ Zip Code: _36010_
County: _SS_

Parent/Guardian: _Elizabeth Reed_
Phone: (___) _none_
SSN: _418_ - _33_ - _4541_   Veteran: _1_
Sex: _01_ Race: _02_ Hispanic: _1_   DOB: _7/28/89_

| Education: _03_ | Income Sources Amount |
|---|---|
| Referral: _C3_   Name _Dr. Alice Myers_ | 001 Wages/Salary $_2,000 month_ 008 None |
| Marital Status: _3_   Legal Detail: _0_ | 002 Public Asst _____ 009 SSI |
| Residential Arrangement: _0_   Legal Status: _8_ | 003 Retire/Pension _____ 010 SS Disb. |
| Living Arrangement: _2_ | 004 Disability _____ 098 Other |
| Residence Size: _6_ | 005 Social Security _____ 099 Unknown |
| Employment Status: _E_ | 006 Alimony _____ |
| Employer: _Unemployed_ | 007 Trust Fund _____ Total $_24,000_ |

Medicaid # : _000 / 418 / 33 / 4541 8_   Eff. Date: _10-98_

QMB only: _____ yes _____ no
Child Case Management

Eff. Date: _____   Authorization # : _____

Medicare # : ___ / ___ / ___ / ___

Funding Source (s): _1_ , _0_ ,

Insurance: _____

Ins. Address: _____   St.: ___ Zip: _____
City: _____
Person Insured: _Justine Reed_

Self Pay Fee: _25 00_

IDP Yearly Income: _____

IDP # in Family: _____

Policy # : _____   Group ID #: _____

**Presenting Problem:** (check all that apply)

| | | | |
|---|---|---|---|
| 001 ___ Marital | 010 ___ Alcohol |
| 002 ✓ Family | 011 ___ Drug |
| 003 ✓ Social | 012 ___ Criminal Justice |
| 004 ___ Interpersonal | 013 ___ Eating Disorder |
| 005 ___ Daily Coping | 014 ___ Thought Disorder |
| 006 ___ Medical | 015 ___ Abuse Victim |
| 007 ___ Somatic | 016 ___ Assault Victim |
| 008 ___ Depression/Mood Disorder | 097 ___ None |
| 009 ___ Suicidal | 098 ✓ Other _ADHD_ |
| 009 ___ Homicidal | 099 ___ Unknown |
| ___ Anxiety Disorder | |
| ___ Psychotic Disorder | |

**Medical Problem:** (check all that apply)

| | |
|---|---|
| 001 ___ Cerebral Palsy | 010 ___ Eating Disorder |
| 002 ___ Autism | 011 ___ Hemiplegia |
| 003 ___ Deaf/Blind | 012 ___ Paraplegia |
| 004 ___ Seizure Disorder | 013 ___ Quadriplegia |
| 005 ___ Visual Disorder | 014 ___ Developmental |
| 006 ___ Blindness | 097 ✓ None |
| 007 ___ Hearing Disorder | 098 ___ Other Specify:___ |
| 017 ___ Rape Victim | 008 ___ Deafness |
| 018 ___ Runaway Behavior | 009 ___ Communication |
| ___ Disorder | 099 ___ Unknown |

Clinician Initials: _JP_

Comments: _Placed on Ritalin by Dr. Myers. Severe defiant behavior @ home but not as bad @ school_

**Risk Assessment:** (check all that apply)

Danger to Self:
✓ None
___ Thoughts of Suicide
___ Threats of Suicide
___ Plan for Suicide
___ Suicide Gestures
___ Family History of Suicide
___ Preoccupation with Death
___ Other

Dangers to Others:
✓ None
___ Thoughts of Harm Others
___ Threats to Harm Others
___ Plan to Harm Others
___ Attempts to Harm Others
___ Inability to Care for Dependents
___ Other

Admission Priority:
___ Acute/1 hr
___ Urgent /24 hrs
✓ Routine

Diagnostic Impression: _____

Clinician Initials: _JP_

Staff ID: _489_   Completed By/Title: _Kim Barron, M.S._

Reed v. PCBE
635

Date: _10-8-98_

FROM Azar, Azar & Moore, LLC

Case # : _14Ca3+1_    Name: _Justine Reed_    Date: _10-8-'98_

Update _____

**Diagnostic Section:**

Primary Diagnosis: _313.81_    Diagnostic Description: _Oppositional Defiant Disorder_ Axis of Diagnosis: _I_

Diagnostic Description: _Attention Deficit Hyperactivity Disorder_ Axis of Diagnosis: _I_

Secondary Diagnosis: _314.01_

_V61.20_    _Parent / Child Relational Problem_    AXIS _I_

| Dual Diagnosis: | | MI Client | ✓ Yes ___ No |
|---|---|---|---|
| 00 ✓ Not Dually Diagnosed | | SA Client | ___ Yes ✓ No |
| 01 ___ MI-MR | | MR Client | ___ Yes ✓ No |
| 02 ___ MI-SA | | | |
| 03 ___ MR-SA | | | |

**SMI Eligibility:    Y=1    N=0**

01 ___ Meets Diagnosis and Disability Criteria
02 ___ History of DMH/MR Inpatient or Public
        Residential Treatment as a Result of Axis I
        MI diagnosis
03 ___ Imminent Risk of Inpatient Without
        Outpatient Intervention

**SED Eligibility:    (Y=1    N=0**
    ✓  DSM - IV
01 ___ Separated from Family
02 ✓ Functional Impairment
03 ___ Symptoms
04 ___ Risk of Separation

**Enrollment Record:        Enrollment Date**

144 ___ Supportive Treatment
150 ✓ Outpatient        _10-8-98_
170 ___ Case Management
200 ___ Indigent Drug Program
325 ___ S. C. L. H.
342 ___ MR Adult Activity
541 ___ SA IOP

**Outpatient Services Ordered:**

✓ Individual Therapy
___ Group Therapy
✓ Family Therapy
___ Physician Assessment
✓ Medication Monitoring
___ Basic Living Skills
✓ Family Support Individual
___ Family Support Group
___ Diagnostic Testing
___ SA IOP
___ Dual Diagnosis SA/MI
___ Expanded Outpatient

**Primary Service Level:**

1 ___ Other
2 ✓ Outpatient
3 ___ Residential
4 ___ Case Management

Reporting Unit: _411_

Staff ID: _489_

**For Transfers:**

From: RU _____    To: RU _____

From: Staff ID _____    To: Staff ID _____

Presenting Complaint/Other Information: _Justin is a 9 year old white male. Referred for services by his mother b/c of oppositional behavior along w/ attention deficit behavior. Child extremely defiant at home, but mother indicated doesn't have any problems @ school. Child is currently taking Ritalin._

Counselor: _Dave Sams, MS_    Date: _10-8-98_

Program Director: _Quay Jr Carr, MS_    Date: _10/23/98_

Clinical Director: _Kistna, DR, NCC_    Date: _10/19/98_

Psychiatrist: _____    Date: _11/4/98_

Reed v. PCBE
636

FROM Azar, Azar & Moore, LLC
(FRI)AUG 31 2007 15:32/ST. 15:30/No. 7501816000 P

# MENTAL STATUS EXAM

**DRESS/GROOMING /HYGIENE:**
- [✓] Good
- [ ] Fair
- [ ] Poor

**APPETITE:**
- [✓] Good
- [ ] Fair
- [ ] Poor
- [ ] Anorexia
- [ ] Bulimia

**SLEEP:**
- [✓] Good
- [ ] Fair
- [ ] Poor
- [ ] Insomnia
- [ ] Hypersomnia
- [ ] Nightmares

**MOOD:**
- [✓] Euthymic
- [ ] Dysphoric
- [ ] Irritable
- [ ] Elevated
- [ ] Expansive

**AFFECT:**
- [✓] Appropriate
- [ ] Constricted
- [ ] Blunted
- [ ] Flat
- [ ] Labile
- [ ] Inappropriate

**CONCENTRATION:**
- [✓] Normal and Focused
- [ ] Easily Distracted

**MOTOR ACTIVITY:**
- [✓] Calm
- [ ] Restless
- [ ] Agitated
- [ ] Pacing
- [ ] Shaking/Tremor
- [ ] Anxious
- [ ] Repetitive
- [ ] Tics
- [ ] Catatonic
- [ ] Echopraxia

**THOUGHT AND SPEECH PATTERN:**
- [✓] Coherent
- [ ] Rational
- [ ] Logical
- [ ] Illogical
- [ ] Flight of Ideas
- [ ] Normal Speech Rate
- [ ] Pressured
- [ ] Delayed
- [ ] Non-Verbal
- [ ] Loose Associations
- [ ] Circumstantial
- [ ] Incoherent
- [ ] Echolalia
- [ ] Blocking
- [ ] Poverty of Speech
- [ ] Poverty of Content

**THOUGHT CONTENT:**
- [✓] Appropriate
- [ ] Ideas of Reference
- [ ] Paranoid Ideation
- [ ] Delusions of:
  - [ ] Reference
  - [ ] Persecution
  - [ ] Grandiosity
  - [ ] Somatic
  - [ ] Bizarre
  - [ ] Being Controlled
  - [ ] Thought Broadcasting
  - [ ] Thought Insertion

**PERCEPTION DISTURBANCE:**
- [✓] None
- [ ] Delusions
- [ ] Derealization
- [ ] Depersonalization
- [ ] Hallucinations:
  - [ ] Auditory
  - [ ] Visual
  - [ ] Tactile
  - [ ] Gustatory
  - [ ] Olfactory

**ORIENTATION:**
- [✓] Normal
- [ ] Deficits:
  - [ ] Person
  - [ ] Place
  - [ ] Time
  - [ ] Situation

**JUDGMENT:**
- [✓] Average
- [ ] Poor

**ESTIMATED INTELLECTUAL FUNCTINING:**
- [ ] Above Average
- [ ] Average
- [✓] Below Average
- [ ] MR/DD

**INSIGHT:**
- [✓] Adequate
- [✓] Poor

## FAMILY HISTORY

Number of siblings: 3    Marital Status of Parents: Married

Family History of Mental Illness or Substance Abuse?

Brother (drug abuse)

Number of Children: 4    Ages: 6, 11, 9, 15

Employment History: N/A

Legal History: N/A

## MEDICAL HISTORY

Current Medications: Ritaline (regimin), Risperdal SR 3

Physician: Dr. Myers

Previous Psychiatric Hospitalization(s): N/A

Current Medical Problems: N/A

Allergies: N/A

Military History: N/A

Abuse History: [✓] None    [ ] Physical    [ ] Emotional

[ ] Sexual    [ ] Neglect    [ ] Domestic Violence

Comments: _____

## CHILD ASSESSMENT

Conduct: [✓] Oppositional/Defiant    [ ] Truancy    [ ] Runaway    [ ] School Suspension/Expulsion    [ ] Fighting with Peers/School/Staff

Other: _____

School Problems/Academic Performance: [✓] AD/HD    [✓] LD    [ ] BEH    [ ] EC    [ ] Speech/Hearing Impaired

School: Blue C. Elementary    [ ] No    Comments: bleed @ 2 months

Prenatal History/Complication: [✓] Yes    [ ] No

Postnatal Complications: [✓] Yes    [ ] No    Comments: premature

Juvenile Court Involvement: [ ] Yes    [✓] No    Comments: _____

Case Worker: _____

DHR: [ ] Yes    [✓] No

Reed v. PCBE
637

FROM Azar, Azar & Moore, LLC

(FRI) AUG 31 2007 15:32/ST. 15:30/No.

East Central Mental Health - Mental Retardation,
**Comprehensive Client Information**

Referral Date: _____
Intake Date: _9-23-05_
Crisis Date: _____

_____ New
_____ Update
__✓__ Re-admit

Case #: _14659_  Name: _Reed_ _Justin_ _____ MI    Admission Date: _9/13/05_
                        Last        First

Parent/Guardian: _Michael Reed_    Address: _162 Co Hy 2_

Home Phone: (__) _____    City: _Coverdling_ State: _AL_ Zip Code: _36016_

SSN: _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_    County: _2_

Sex: _M_ Race: _02_ Hispanic: _1_ Veteran: _N_    DOB: _3-1-2-87_

| | | **Income Sources Amount** |
|---|---|---|
| Education: _1_ Name: _Newton Reed_ | 001 | Wages/Salary _____ |
| Referral: _1_ | 002 | Public Asst (includes SSI) _____ |
| Marital Status: _single_ Legal Detail: _01_ | 003 | Retire/Pension _____ |
| Residential Arrangement: _3_ Legal Status: _0_ | 004 | Disability (includes SS Disb. & SSI Disb.) _18.00_ |
| Living Arrangement: _2_ Hearing Status: _1_ | 008 | None _____ |
| Residence Size: _6_ | 098 | Other _____ |
| Employment Status: _unemployed 1_ | TOTAL | _1909_ |
| Employer: _____ | | |

Medicaid #: _100 145 133 1454 1 5_    Eff. Date: _____    QMB only: _____ yes _____ no
Child Case Management
Medicare #: _____    Eff. Date: _____    Authorization #: _____

Insurance: _____    Funding Source(s): _____, _____, _____

Ins. Address: _____
City: _____ St.: _____ Zip: _____    Self Pay Fee: _____
                                              IDP Yearly Income: _____
Person Insured: _____
Policy #: _____ Group ID #: _____    IDP # in Family: _____

**Presenting Problem:** (check all that apply)

| | | | | |
|---|---|---|---|---|
| 001 ____ Marital | 010 ____ Alcohol |
| 002 ____ Family | 011 ____ Drug |
| 003 ____ Social | 012 ____ Criminal Justice |
| 004 ____ Interpersonal | 013 ____ Eating Disorder |
| 005 ____ Daily Coping | 014 ____ Thought Disorder |
| 006 ____ Medical | 015 ____ Abuse Victim |
| 007 ____ Somatic | 016 ____ Assault Victim |
| 008 ____ Depress/Mood Dis. | 017 ____ Rape Victim |
| 009 ____ Suicidal | 018 ____ Runaway Behavior Dis. |
| 009 ____ Homicidal | 097 ____ None |
| ____ Anxiety Disorder | 098 ____ Other _____ |
| ____ Psychotic Disorder | 099 ____ Unknown |

**Medical Problem:** (check all that apply)

| | |
|---|---|
| 001 ____ Cerebral Palsy | 010 ____ Eating Disorder |
| 002 ____ Autism | 011 ____ Hemiplegia |
| 003 ____ Deaf/Blind | 012 ____ Paraplegia |
| 004 ____ Seizure Disorder | 013 ____ Quadriplegia |
| 005 ____ Visual Disorder | 014 ____ Developmental |
| 006 ____ Blindness | 097 _✓_ None |
| 007 ____ Hearing Disorder | 098 ____ Other _____ |
| 008 ____ Deafness | 099 ____ Unknown |
| 009 ____ Communication | |

Clinician Initials: _CS_

Comments: _Need cleared by grades, reading writing_

Reed v. PCBE
638

**Risk Assessment:** (check all that apply)

Danger to Self:
_✓_ None
____ Thoughts of Suicide
____ Threats of Suicide
____ Plan for Suicide
____ Suicide Gestures
____ Family History of Suicide
____ Preoccupation with Death
____ Other

Danger to Other:
_✓_ None
____ Thoughts of Harm Others
____ Threats to Harm Others
____ Plan to Harm Others
____ Attempts to Harm Others
____ Inability to Care for Dependents
____ Other

Admission Policy:
____ Acute / 1 hr
____ Urgent / 24 hrs
_✓_ Routine

Diagnostic Impression: _300.02_
_Generalized Anxiety D/o_
Clinician Initials: _CS_

Scheduled Intake/Follow-up: _____

Staff ID: _121_ Completed By/Title: _Cliff Matthews_ Date: _____

FROM Azar, Azar & Moore, LLC

Case #: _14589_    Name: _Justin Reed_    Date: _6-13-05_

**Diagnostic Section:**    Update: _____

Primary Diagnosis: _300.02_    Diagnostic Description: _Generalized Anxiety_ Axis of Diagnosis: _I_

Secondary Diagnosis: _____    Diagnostic Description: _____    Axis of Diagnosis: _____

| Dual Diagnosis: | | |
|---|---|---|
| 00 ✓ Not Dually Diagnosed | MI Client ✓ Yes ___ No | |
| 01 ___ MI-MR | SA Client ___ Yes ___ No | |
| 02 ___ MI-SA | MR Client ___ Yes ___ No | |
| 03 ___ MR-SA | | |
| 04 ___ MI-MR-SA | | |

SMI/SED Eligibility:

1 ___ Meets Diagnosis and Disability Criteria
2 ___ History of DMH/MR Impatient and Public Residential Treatment as a Result of Axis I MI Diagnosis
3 ___ Imminent Risk of Impatient Without Outpatient Intervention
4 ___ SED-Separated from Family

5 ✓ SED-Functional Impairment
6 ___ SED-Symptoms
7 ___ SED-Risk of Separation
N ___ Does not meet SMI/SED or Contract Eligibility Criteria

Guardianship:
001 ___ Guardian - Full            004 ___ DHR Custody
002 ___ Guardian - Limited         005 ___ DYS Custody
003 ___ None

IDP Record:

IDP Start Date ___/___          Termination Record:
IDP End Date ___/___            Termination Date ___/___/___
IDP Clinical Criteria _____    Termination Reason _____
IDP Financial Criteria _____

| Enrollment Record: | Enrollment Date | Outpatient Services Ordered: | |
|---|---|---|---|
| 141 ___ Day Treatment | | ✓ Individual Therapy | ✓ Family Support Individual |
| 145 ___ Rehabilitative Day | | ___ Group Therapy | ___ Family Support Group |
| 150 ___ Outpatient | 6-13-05 | ✓ Family Therapy | ___ Diagnostic Testing |
| 170 ___ Case Management | | ___ Physician Assessment | ___ SA IOP |
| 325 ___ S.C.L.H. | | ✓ Medication Monitoring | ___ Dual Diagnosis SA/MI |
| 342 ___ MR Adult Activity | | ___ Basic Living Skills | ___ Expanded Outpatient |
| 541 ___ SA IOP | | | |

| Primary Service Level: | | For Transfers: | |
|---|---|---|---|
| 1 ___ Other | Reporting Unit: 411 | From: RU ___ | To: RU ___ |
| 2 ___ Outpatient | Staff ID: 575 | From: Staff ID ___ | To: Staff ID ___ |
| 3 ___ Residential | | | |
| 4 ___ Case Management | | | |

Presenting Complaint/Other Information: _Client's mother reports that client_
_was recently diagnosed by his ___ Dr. Barry Gardner as_
_residing in ___ ___ ___ ___ ___ ___ ___

Counselor: _____    Date: _6-13-05_
Program Director: _____    Date: _____
Clinical Director: _____    Date: _____    Reed v. PCB
Psychiatrist: _____    Date: _____    639
ECMH - 020

Case # : _____     Name: _Justin Reed_____     Date: _9-13-05_

## MENTAL STATUS EXAM

**DRESS/GROOMING/HYGIENE:**
- ✓ Good
- ___ Fair
- ___ Poor

**APPETITE:**
- ✓ Good
- ___ Fair
- ___ Poor
- ___ Anorexia
- ___ Bulimia

**SLEEP:**
- ✓ Good
- ___ Fair
- ___ Poor
- ___ Insomnia
- ___ Hypersomnia
- ___ Nightmares

**MOOD:**
- ✓ Euthymic
- ___ Dysphoric
- ___ Irritable
- ___ Elevated
- ___ Expansive

**AFFECT:**
- ✓ Appropriate
- ___ Constricted
- ___ Blunted
- ___ Flat
- ___ Labile
- ___ Inappropriate

**CONCENTRATION:**
- ___ Normal and Focused
- ___ Easily Distracted

**MOTOR ACTIVITY:**
- ✓ Calm
- ___ Restless
- ___ Agitated
- ___ Pacing
- ___ Shaking /Tremor
- ___ Anxious
- ___ Repetitive
- ___ Tics
- ___ Catatonic
- ___ Echopraxia

**THOUGHT AND SPEECH PATTERN:**
- ✓ Coherent
- ___ Rational
- ___ Logical
- ___ Illogical
- ___ Flight of Ideas
- ___ Normal Speech Rate
- ___ Pressured
- ___ Delayed
- ___ Non-Verbal
- ___ Loose Associations
- ___ Circumstantial
- ___ Incoherent
- ___ Echolalia
- ___ Blocking
- ___ Poverty of Speech
- ___ Poverty of Content

**THOUGHT CONTENT:**
- ✓ Appropriate
- ___ Ideas of Reference
- ___ Paranoid Ideation
- ___ Delusions of:
  - ___ Reference
  - ___ Persecution
  - ___ Grandiosity
  - ___ Somatic
  - ___ Bizarre
  - ___ Being in Control
  - ___ Thought Broadcasting
  - ___ Thought Insertion

**PERCEPTION DISTURBANCE:**
- ___ None
- ___ Delusions
- ✓ Derealization
- ___ Depersonalization
- ___ Hallucinations:
  - ___ Auditory
  - ___ Visual
  - ___ Tactile
  - ___ Gustatory
  - ___ Olfactory

**ORIENTATION:**
- ✓ Normal
- ___ Deficits:
  - ___ Person
  - ___ Place
  - ___ Time
  - ___ Situation

**ESTIMATED INTELLECTUAL FUNCTIONING:**
- ___ Above Average
- ___ Average
- ✓ Below Average
- ___ MR / DD

**INSIGHT:**
- ✓ Adequate
- ___ Poor

**JUDGEMENT:**
- ✓ Average
- ___ Poor

### FAMILY HISTORY

Number of siblings: _2_     Marital Status of Parents: _Married_

Family History of Mental Illness or Substance Abuse?

_None_

Number of Children: _✓_ Ages: _____

Employment History: _None_

Legal History: _None_

### MEDICAL HISTORY

Current Medications: _____

Physician: _____

Previous Psychiatric Hospitalization(s): _____

Current Medical Problems: _None_

Allergies: _none_

Military History: _____

Abuse History: ___ None ___ Physical ___ Emotional
✓ Sexual ___ Neglect ___ Domestic Violence

(Alleged)

Comments: _____

### CHILD ASSESSMENT

Conduct: ___ Oppositional/Defiant ___ Truancy ___ Runaway ___ School Suspension/Expulsion ___ Fighting with Peers/School Staff
___ Other: _None_

School Problems/Academic Performance: ✓ AD/HD ___ LD ___ BEH ___ EC ___ Speech/Hearing Impaired

School: _____

Prenatal History/Complication: ✓ Yes ✓ No     Comments: _premature_ _____

Postnatal Complications: ___ Yes ✓ No     Comments: _____

Juvenile Court Involvement: ___ Yes ✓ No     Comments: _____

DHR: ✓ Yes ___ No     Case Worker: _____

Reed v. PCBE
640

ECMH - 019

FROM Azar, Azar & Moore, LLC

East Cen____ Mental Health – Mental Reta____tion, Inc.

____lan of Care and Order for Services

| Name: _Just__ Reed_ | | | Case Number: _14689_ | Date: _10-15-99_ |
|---|---|---|---|---|
| **Diagnosis:** | **DSM-IV Code** | **Description** | **Addition and/or Revision (if needed)** | **Date of Addition and Revision (if needed)** |
| AXIS I: | CNW 31-3 313.81 | _Oppositional Defiant Disorder_ | | |
| | 314.01 | _Attention Deficit Hyperactivity Disorder_ | | |
| AXIS II: | V 71.09 | _No Diagnosis_ | | |
| AXIS III: | | _None_ | | |
| AXIS IV: | | | | |
| AXIS V: | Current GAF/CGAS: _70_ | | GAF/CGAS at 6 mos: | |
| | Highest Past Year: | | GAF/CGAS at closure: | |
| **Comments:** | | | | |

**Identified Strengths Which May Facilitate Treatment:**

_Support of family_

**Identified Limitations or Barriers Which May Impede Treatment:**

_Does not communicate_

**Prioritization of Problem Areas / Clinical Needs**

(1) _Improve anger management_
(2) _Improve academic functioning_

| Life Needs: | | (Check Appropriate Categories) | | Date: |
|---|---|---|---|---|
| (For Case Management Use) | | Case Mgr. Signature: | | |
| ❑ 1. Emotional/Psychological | ❑ 2. Psychiatric | ❑ 3. Safety/Crisis | ❑ 4. Financial | ❑ 5. Hou |
| ❑ 6. Family/Social Support | ❑ 7. Legal | ❑ 8. Thinking | ❑ 9. Vocational | ❑ 10. Co |
| ❑ 11. Self Direction Learning | ❑ 12. Leisure | ❑ 13. Behavior | ❑ 14. Ed/Learning | ❑ 15. Re |
| ❑ 16. Mobility Transportation | ❑ 17. Language | ❑ 18. Self-Care | ❑ 19. Self-Sufficiency | ❑ 20. H |
| ❑ 21. Substance Use Abuse | ❑ 22. Spiritual/Cultural | ❑ 23. Other | ❑ 24. Other | |

Reed v. PCBE
641

## PLAN OF CARE AND ORDER FOR SERVICES

| Name: _Justin Reed_ | | Case Number: _14689_ | Date: _10-15-99_ |
|---|---|---|---|

**Goal #1:** _improve anger management_

**Case Management Goal #1:**

| Start Date: _10-15-99_ | | Target Date of Completion: _10-15-2000_ | Actual Date of Completion: |
|---|---|---|---|

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| 10-15-99 | _Client's direct counseling to provide anger management tools_ | _2x per month_ | _Client will develop & implement appropriate ways to express anger_ |
| 10-15-99 | _Family counseling to focus on conflict resolution & effective communication skills._ | _2x per month_ | _Family will utilize conflict resolution skills & decrease problems as contained & specified measure_ |

**Goal #2:** _improve academic functioning_

**Case Management Goal #2:**

| Start Date: _10-15-99_ | | Target Date of Completion: _10-15-2000_ | Actual Date of Completion: |
|---|---|---|---|

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| 10-15-99 | _Monitor medication compliance_ | _1x per month or as needed_ | _Client will take medication as needed_ |
| 10-15-99 | _Client's direct counseling utilizing problem-solving techniques to address academic issues_ | _2x per month_ | _Client will complete school assignments, comply w/ school policies & attend_ |
| 10-15-99 | _Mental health consults to monitor & recommend services_ | _1x per month or as needed_ | _Good daily study habits_ |

**Goal #3:**

**Case Management Goal #3:**

| Start Date: | | Target Date of Completion: | Actual Date of Completion: |
|---|---|---|---|

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Referrals/Consults:**

**Services:**

| | | | | |
|---|---|---|---|---|
| ☑ Individual Therapy | ☐ Physician Assessment | ☑ Med. Monitoring | ☐ Med. Admin. | ☑ Family Therapy |
| ☐ Group Therapy | ☑ Mental Health Consult | ☐ Day Treatment | ☐ SA IOP | ☐ Diagnostic Testing |
| ☑ Family Support | ☐ Basic Living Skills | ☐ Case Management | ☐ Consults | ☐ Other |
| ☑ Ind ☐ Group | ☐ Ind ☐ Group | | | |

| Date: _10-15-99_ | Therapist Signature: _Keri Harmon, MS_ | Team Member Signature: | Date: |
|---|---|---|---|
| Date: | Program Coordinator Signature: | Team Member Signature: | Date: |
| Date: _10/15/99_ | Clinical Director Signature: _[signature]_ | Team Member Signature: | Date: |
| Date: _10-15-9_ | Psychiatrist Signature: _[signature]_ | Team Member Signature: | Date: |
| Date: | Case Manager Signature: | Team Member Signature: | Date: |
| Date: | Parent Signature (if applicable): | Team Member Signature: | Date: |

I have actively participated in the formation and/or modification of this individual treatment plan.

Client Signature: _Clt has not returned since update_   Date: _1/26/00_

_Elizabeth Reed_

Recd v. PCBE

## East Central Mental Health - Mental Retardation, Inc.
## Plan of Care and Order of Services

| Name: Justin Reed | | | Case Number: 18689 | Date: _(illegible)_ |
|---|---|---|---|---|
| **Diagnosis:** | **DSM-IV Code** | **Description** | **Addition and/or Revision (if needed)** | **Date of Addition and Revision (if needed)** |
| AXIS I: | 3xx.x | Attention Deficit Hyperactivity Disorder, Predominantly Inattentive Type, IN Partial | Remission |
| AXIS II: | 309.81 | Post traumatic Stress disorder | |
| | 296.3x | Major depressive Disorder, Severe with Psychotic features | |
| AXIS III: → | V62.89 | Borderline Intellectual Functioning | |
| AXIS IV: | | Sexual Abuse (Past) | |
| AXIS V: | Current GAF/CGAS: 65 | | GAF/CGAS at 6 mos: | |
| | Highest Past Year: 65 | | GAF/CGAS at closure: | |

**Comments:** Client has a history of behavior problems as well as aggression and dysc__ of sexual abuse and a warm spot.

**Identified Strengths Which May Facilitate Treatment:**
① client is motivated to do better
② client is now compliant with meds

**Identified Limitations or Barriers Which May Impede Treatment:**
① Client is borderline intellectual function
③ Client sometimes makes poor decision

**Prioritization of Problem Areas / Clinical Needs**
① eliminate aggression
② reduce behavior problems
③ explore and treat sexual abuse

---

**Life Needs:** (Check Appropriate Categories)    **Date:** _____

(For Case Management Use)    **Case Mgr. Signature:** _____

| | | | | |
|---|---|---|---|---|
| ☐ 1. Emotional/Psychological | ☐ 2. Psychiatric | ☐ 3. Safety/Crisis | ☐ 4. Financial | ☐ 5. Housing |
| ☐ 6. Family/Social Support | ☐ 7. Legal | ☐ 8. Thinking | ☐ 9. Vocational | ☐ 10. Communication |
| ☐ 11. Self Direction Learning | ☐ 12. Leisure | ☐ 13. Behavior | ☐ 14. Ed/Learning | ☐ 15. Role Performance |
| ☐ 16. Mobility Transportation | ☐ 17. Language | ☐ 18. Self-Care | ☐ 19. Self-Sufficiency | ☐ 20. Health/Medical |
| ☐ 21. Substance Use Abuse | ☐ 22. Spiritual/Cultural | ☐ 23. Other | ☐ 24. Other | |

Reed v. PCBE
643
(FRI)AUG 31 2007 15:34/ST. 15:30/No. 7503788889 P 13
FROM Azar, Azar & Moore, LLC

## East Central Mental Health - Mental Retardation, Inc.
## Plan of Care and Order of Services

| Name: Justin Reed | | Case Number: 14659 | | Date: 3-26-0. |
|---|---|---|---|---|
| **Diagnosis:** | **DSM-IV Code** | **Description** | **Addition and/or Revision (if needed)** | **Date of Addition and Revision (if needed)** |
| AXIS I: | 314.1 | Attention deficit Hyperactivity Disorder, Predominantly Inattention Type, In Partial Remission | | |
| ~~AXIS II:~~ | 309.81 | Post traumatic Stress Disorder | | |
| Axis II / AXIS III: | 296.3x | Major depressive Disorder, Severe, with recurrent features | | |
| | → V62.89 | Borderline Intellectual Functioning | | |
| AXIS IV: | | Sexual Abuse (Years) | | |
| AXIS V: | Current GAF/CGAS: 65 | | GAF/CGAS at 6 mos: | |
| | Highest Past Year: 65 | | GAF/CGAS at closure: | |

**Comments:** Client has history of behavior problems as well as repeated and different of sexual abuse d[...] a young age.

**Identified Strengths Which May Facilitate Treatment:**
① Client is motivated to do better
② Client is now compliant with meds

**Identified Limitations or Barriers Which May Impede Treatment:**
① Client is borderline intellectual functioning
② Client sometimes makes poor decisions

**Prioritization of Problem Areas / Clinical Needs**
① eliminate aggression
② reduce behavior problems
③ explore and treat sexual abuse

| Life Needs: | | (Check Appropriate Categories) | | Date: |
|---|---|---|---|---|
| (For Case Management Use) | | Case Mgr. Signature: | | |
| ☑ 1. Emotional/Psychological | ☐ 2. Psychiatric | ☑ 3. Safety/Crisis | ☐ 4. Financial | ☐ 5. Housing |
| ☑ 6. Family/Social Support | ☐ 7. Legal | ☐ 8. Thinking | ☐ 9. Vocational | ☐ 10. Communication |
| ☐ 11. Self Direction Learning | ☐ 12. Leisure | ☐ 13. Behavior | ☐ 14. Ed/Learning | ☐ 15. Role Performance |
| ☐ 16. Mobility Transportation | ☑ 17. Language | ☐ 18. Self-Care | ☐ 19. Self-Sufficiency | ☐ 20. Health/Medical |
| ☐ 21. Substance Use Abuse | ☐ 22. Spiritual/Cultural | ☐ 23. Other | ☐ 24. Other | |

Reed v. PCBE
644

(FRI)AUG 31 2007 15:34/ST. 15:30/No. 7507816559 P 14

FROM Azar, Azar & Moore, LLC

## PLAN OF CARE AND ORDER FOR SERVICES

| Name: _Jestin Reid_ | Case Number: _14689_ |
|---|---|

**Goal #1:** _reduce aggression involving violence/use_

**Case Management Goal #1:** _n/a_

**Start Date:** _7-26-07_   **Target Date of Completion:** _3-26-08_   **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| 7-26-07 | individual tx | as needed | 9 weeks |
| 7-26-07 | medication compliance | daily | episodes fewer |
| 7-26-07 | Family tx | as needed | 12 months |

**Goal #2:** _Reduce behavioral problems_

**Case Management Goal #2:** _n/a_

**Start Date:** _7-26-07_   **Target Date of Completion:** _3-26-08_   **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| 7-26-07 | Individual tx (behavior therapy) | as needed | Client will not take things without permission (Game, vehicles, etc.) |

**Goal #3:**

**Case Management Goal #3:**

**Start Date:**   **Target Date of Completion:**   **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Referrals/Consults:**

**Services:**

| | | | | |
|---|---|---|---|---|
| ☐ Individual Therapy | ☑ Physician Assessment | ☑ Med. Monitoring | ☐ Med. Admin | ☑ Family Therapy |
| ☐ Group Therapy | ☐ Mental Health Consult | ☐ Day Treatment | ☐ SA IOP | ☐ Diagnostic Testing |
| ☐ Family Support | ☐ Basic Living Skills | ☐ Case Management | ☐ Consults | ☐ Other |
| ☐ Ind ☐ Group | ☐ Ind ☐ Group | | | |

| | | |
|---|---|---|
| Date: _7-26-07_ Therapist Signature: _Rashad Wright_ | Team Member Signature: | Date: |
| Date: Program Coordinator Signature: | Team Member Signature: | Date: |
| Date: Clinical Director Signature: | Team Member Signature: | Date |
| Date: Psychiatrist Signature: | Team Member Signature: | Date: |
| Date: Case Manager Signature | Team Member Signature: | Date: |
| Date: Parent Signature (if applicable): | Team Member Signature: | Date: |

I have actively participated in the formation and/or modification of this individual treatment plan and do / do not (circle one) wish family involvement in my treatment.

Client Signature: _Jestin Reid_                    Reed v. PCBE    _ Date: _4/1/07_

ECMH-0076

645

(FRI)AUG 31 2007 15:34/ST. 15:30/No. 7507818653 P 15

FROM Azar, Azar & Moore, LLC

## PLAN OF CARE AND ORDER FOR SERVICES

| Name: _Justin Reed_ | Case Number: _14659_ |
|---|---|

**Goal #1:** _No aggression involving violence for_

**Case Management Goal #1:** _n/a_

**Start Date:** _____  **Target Date of Completion:** _3-26-07_  **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| | individual tx | as needed | Qualities |
| | medication compliance | daily | episodes for |
| | Family tx | as needed | 12 months |

**Goal #2:** _Reduce behavioral problems_

**Case Management Goal #2:** _n/a_

**Start Date:** _3-26-07_  **Target Date of Completion:** _3-26-07_  **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| 3-26-07 | Individual tx (behavior therapy) | as needed | Client will not take things without permission (amts, vehicles etc.) |

**Goal #3:**

**Case Management Goal #3:**

**Start Date:**  **Target Date of Completion:**  **Actual Date of Completion:**

| Date | Interventions/Services/Strategies | Frequency and Duration | Expected Outcomes |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Referrals/Consults:**

**Services:**

- ☑ Individual Therapy
- ☑ Physician Assessment
- ☑ Med. Monitoring
- ☐ Med. Admin
- ☑ Family Therapy
- ☐ Group Therapy
- ☐ Mental Health Consult
- ☐ Day Treatment
- ☐ SA IOP
- ☐ Diagnostic Testing
- ☐ Family Support
- ☐ Basic Living Skills
- ☐ Case Management
- ☐ Consults
- ☐ Other
  - ☐ Ind ☐ Group
  - ☐ Ind ☐ Group

| Date: | Therapist Signature: _Andrew Wright_ | Team Member Signature: | Date: |
|---|---|---|---|
| Date: | Program Coordinator Signature: | Team Member Signature: | Date: |
| Date: | Clinical Director Signature: | Team Member Signature: | Date: |
| Date: | Psychiatrist Signature: | Team Member Signature: | Date: |
| Date: | Case Manager Signature | Team Member Signature: | Date: |
| Date: | Parent Signature (if applicable): | Team Member Signature: | Date: |

I have actively participated in the formation and/or modification of this individual treatment plan and ⟨do⟩ do not (circle one) wish family involvement in my treatment.

Client Signature: _Justin Reed_

Date: _4/4/07_

FCMH-0070

**East Central Mental Health - Mental Retardation, Inc.**
**Comprehensive Client Information**

☑ New
___ Update
✓ Re-admit

Referral Date: _____
Intake Date: _____
Crisis Date: _____

Case #: 14654    Name: Reed    Justin    MI: ___    Admission Date: _____
Last    First    MI

Parent/Guardian: _____    Address: _____
Home Phone: (___) _____    City: _____ State: ___ Zip Code: _____
SSN: 4__-__-____    County: _____
Sex: M    Race: ___    Hispanic: __    Veteran: ✓    DOB: __ / __ / __

| Education: | | | **Income Sources Amount** | |
|---|---|---|---|---|
| Referral: Name: | | 001 | Wages/Salary | |
| Marital Status: ___ Legal Detail: ___ | | 002 | Public Asst (includes SSI) | |
| Residential Arrangement: ___ Legal Status: ___ | | 003 | Retire/Pension | |
| Living Arrangement: ___ Hearing Status: ___ | | 004 | Disability (includes SS Disb. & SSI Disb.) | |
| Residence Size: ___ | | 008 | None | |
| Employment Status: ___ | | 098 | Other | |
| Employer: N/A | | | **TOTAL** | |

Medicaid #: _____    Eff. Date: _____ QMB only: ___ yes ___ no
Medicare #: _____    Child Case Management
    Eff. Date: _____ Authorization #: _____

Insurance: _____    Funding Source(s): _____
Ins. Address: _____
City: ___ St: ___ Zip: ___    Self Pay Fee: 300
Person Insured: _____    IDP Yearly Income: _____
Policy #: ___ Group ID #: ___    IDP # in Family: _____

**Presenting Problem: (check all that apply)**

| | | | |
|---|---|---|---|
| 001 ___ Marital | 010 ___ Alcohol |
| 002 ___ Family | 011 ___ Drug |
| 003 ___ Social | 012 ___ Criminal Justice |
| 004 ___ Interpersonal | 013 ___ Eating Disorder |
| 005 ___ Daily Coping | 014 ___ Thought Disorder |
| 006 ___ Medical | 015 ___ Abuse Victim |
| 007 ___ Somatic | 016 ___ Assault Victim |
| 008 ___ Depress/Mood Dis. | 017 ___ Rape Victim |
| 009 ___ Suicidal | 018 ___ Runaway Behavior Dis. |
| 009 ___ Homicidal | 097 ___ None |
| ___ Anxiety Disorder | 098 ✓ Other _____ |
| ___ Psychotic Disorder | 099 ___ Unknown |

**Medical Problem: (check all that apply)**

| | | | |
|---|---|---|---|
| 001 ___ Cerebral Palsy | 010 ___ Eating Disorder |
| 002 ___ Autism | 011 ___ Hemiplegia |
| 003 ___ Deaf/Blind | 012 ___ Paraplegia |
| 004 ___ Seizure Disorder | 013 ___ Quadriplegia |
| 005 ___ Visual Disorder | 014 ___ Developmental |
| 006 ___ Blindness | 097 ✓ None |
| 007 ___ Hearing Disorder | 098 ___ Other _____ |
| 008 ___ Deafness | 099 ___ Unknown |
| 009 ___ Communication | |

Clinician Initials: _____

Comments: _____

**Risk Assessment: (check all that apply)**

Danger to Self:
___ None
___ Thoughts of Suicide
___ Threats of Suicide
___ Plan for Suicide
___ Suicide Gestures
___ Family History of Suicide
___ Preoccupation with Death
___ Other

Danger to Other:
___ None
___ Thoughts of Harm Others
___ Threats to Harm Others
___ Plan to Harm Others
___ Attempts to Harm Others
___ Inability to Care for Dependents
✓ Other _____

Admission Policy:
___ Acute / 1 hr
___ Urgent / 24 hrs
___ Routine

Diagnostic Impression: _____
Clinician Initials: _____

Scheduled Intake/Follow-up: _____

Staff ID: _____ Completed By/Title: _____ Date: _____

Reed v. PCBE
1647

Case #: _____    Name: _____    Date: _____

Update: _____

**Diagnostic Section:**

Primary Diagnosis: _____    Diagnostic Description: _____ Axis of Diagnosis: _____

Secondary Diagnosis: _____    Diagnostic Description: _____ Axis of Diagnosis: _____

---

Dual Diagnosis:

00 ___ Not Dually Diagnosed
01 ___ MI-MR
02 ___ MI-SA
03 ___ MR-SA
04 ___ MI-MR-SA

| | | |
|---|---|---|
| MI Client | ___ Yes | ___ No |
| SA Client | ___ Yes | ___ No |
| MR Client | ___ Yes | ___ No |

---

SMI/SED Eligibility:

1 ___ Meets Diagnosis and Disability Criteria
2 ___ History of DMH/MR Impatient and Public
Residential Treatment as a Result of Axis I
MI Diagnosis
3 ___ Imminent Risk of Impatient Without
Outpatient Intervention
4 ___ SED-Separated from Family

5 ___ SED-Functional Impairment
6 ___ SED-Symptoms
7 ___ SED-Risk of Separation
N ___ Does not meet SMI/SED or Contract Eligibility
Criteria

---

Guardianship:

001 ___ Guardian - Full
002 ___ Guardian - Limited
003 ___ None

004 ___ DHR Custody
005 ___ DYS Custody

---

IDP Record:

IDP Start Date ___ / ___
IDP End Date ___ / ___
IDP Clinical Criteria _____
IDP Financial Criteria _____

Termination Record:

Termination Date ___ / ___ / ___
Termination Reason _____

---

| Enrollment Record: | Enrollment Date |
|---|---|
| 141 ___ Day Treatment | _____ |
| 145 ___ Rehabilitative Day | _____ |
| 150 ___ Outpatient | _____ |
| 170 ___ Case Management | _____ |
| 325 ___ S.C.L.H. | _____ |
| 342 ___ MR Adult Activity | _____ |
| 541 ___ SA IOP | _____ |

Outpatient Services Ordered:

___ Individual Therapy          ___ Family Support Individual
___ Group Therapy               ___ Family Support Group
___ Family Therapy              ___ Diagnostic Testing
___ Physician Assessment        ___ SA IOP
___ Medication Monitoring       ___ Dual Diagnosis SA/MI
___ Basic Living Skills         ___ Expanded Outpatient

---

Primary Service Level:

1 ___ Other
2 ___ Outpatient
3 ___ Residential
4 ___ Case Management

Reporting Unit: _____

Staff ID: _____

For Transfers:

From: RU ___    To: RU ___
From: Staff ID ___    To: Staff ID ___

---

Presenting Complaint/Other Information: _____

_____

_____

_____

Counselor: _____ Date: _____

Program Director: _____ Date: _____

Clinical Director: _____ Date: _____

Psychiatrist: _____ Date: _____

Reed v. PCBF

FROM Azar, Azar & Moore, LLC

Case #: _14659_    Name: _Justin Reed_    Date: _4-9-07_

## MENTAL STATUS EXAM

| DRESS/GROOMING /HYGIENE: | APPETITE: | SLEEP: | MOOD: | AFFECT: | CONCENTRATION: |
|---|---|---|---|---|---|
| ☑ Good | ☑ Good | ☑ Good | ☑ Euthymic | __ Appropriate | ☑ Normal and Focused |
| __ Fair | __ Fair | __ Fair | __ Dysphoric | ☑ Constricted | __ Easily Distracted |
| __ Fair | __ Poor | __ Poor | __ Irritable | __ Blunted | |
| __ Poor | __ Anorexia | __ Insomnia | __ Elevated | __ Flat | |
| | __ Bulimix | __ Hypersomnia | __ Expansive | __ Labile | |
| | | __ Nightmares | | __ Inappropriate | |

| MOTOR ACTIVITY: | THOUGHT AND SPEECH PATTERN: | THOUGHT CONTENT: | PERCEPTION DISTURBANCE: | ORIENTATION: |
|---|---|---|---|---|
| ☑ Calm | ☑ Coherent | ☑ Appropriate | ☑ None | ☑ Normal |
| __ Restless | ☑ Rational | __ Ideas of Reference | __ Delusions | __ Deficits: |
| __ Agitated | ☑ Logical | __ Paranoid Ideation | __ Derealization | __ Person |
| __ Pacing | __ Illogical | __ Delusions of: | __ Depersonalization | __ Place |
| __ Shaking /Tremor | __ Flight of Ideas | __ Reference | __ Hallucinations: | __ Time |
| __ Anxious | __ Normal Speech Rate | __ Persecution | ☑ Auditory | __ Situation |
| __ Repetitive | __ Pressured | __ Grandiosity | __ Visual | |
| __ Tics | __ Delayed | __ Somatic | __ Tactile | |
| __ Catatonic | __ Non-Verbal | __ Bizarre | __ Gustatory | |
| __ Echopraxia | __ Loose Associations | __ Being in Control | __ Olfactory | |
| | __ Circumstantial | __ Thought Broadcasting | | |
| | __ Incoherent | __ Thought Insertion | | |

(next to Perception Disturbance, handwritten: "in feb hot not now")
(next to Orientation, handwritten: "don't not know president")

| INSIGHT: | THOUGHT AND SPEECH PATTERN (cont.): | JUDGEMENT: | ESTIMATED INTELLECTUAL FUNCTIONING: |
|---|---|---|---|
| ☑ Adequate | __ Echolalia | __ Average | __ Above Average |
| __ Poor | __ Blocking | ☑ Poor | __ Average |
| | __ Poverty of Speech | | ☑ Below Average |
| | __ Poverty of Content | | __ MR / DD |

### FAMILY HISTORY

Number of siblings: _7_    Marital Status of Parents: _married_

Family History of Mental Illness or Substance Abuse?
_NA_

Number of Children: _0_  Ages: _none_  _NA_

Employment History: _NA_

Legal History: _NA_

Comments: _____

### MEDICAL HISTORY

Current Medications: _Risperdal_

Physician: _D. Lopez_

Previous Psychiatric Hospitalization(s): _NA_

Current Medical Problems: _none_

Allergies: _none_

Military History: _none_

Abuse History:  __ None  __ Physical  __ Emotional
__ Sexual  __ Neglect  __ Domestic Violence
_Teacher_

### CHILD ASSESSMENT

Conduct: __ Oppositional/Defiant  __ Truancy  __ Runaway  __ School Suspension/Expulsion  __ Fighting with Peers/School Staff
__ Other: _____

School Problems/Academic Performance: __ AD/HD  __ LD  __ BEH  __ EC  __ Speech/Hearing Impaired

School: _____

Prenatal History/Complication: __ Yes  __ No  Comments: _____

Postnatal Complications: __ Yes  __ No  Comments: _____

Juvenile Court Involvement: __ Yes  __ No  Comments: _____

DHR: __ Yes  __ No  Case Worker: _____

Recd v. PCBE
640

ECMH - 019

(FRI)AUG 31 2007 15:88/ST. 15:80/No. 7507818698 P 19

FROM Azar, Azar & Moore, LLC

# PROGRESS NOTE
## (Face-to-Face Services)
### East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|---------------|-----------|
|        |             |     |              |           |           |               |           |

**NEXT APPOINTMENT:  DAY:** Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy    ____ Group Therapy    ____ Family Therapy    ____ Case Management

____ Ind BLS    ____ Group BLS    ____ Crisis Intervention    ____ Phys. Assess.    ____ Med. Monit.    ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate    ____ Blunted    ____ Labile    ____ Constricted    ____ Flat    ____ Inappropriate

Mood: ____ Anxious    ____ Dysphoric    ✓ Euthymic    ____ Expansive    ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations    ____ Delusions

____ Suicidal    ____ Homicidal    ____ Paranoid    ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good    ____ Fair    ____ Poor    ____ Insomnia    ____ Nightmares    ____ Hypersomnia

**APPETITE:** ✓ Good    ____ Fair    ____ Poor

**ORIENTED TO:** ✓ Normal    **DEFICITS:** ____ Person    ____ Place    ____ Time    ____ Situation

**MOTOR ACTIVITY:** ✓ Calm    ____ Restless    ____ Shaking/Tremor    ____ Tics    ____ Pacing    ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing pretty good. Reported that grades on report card were D's + F's, indicated would probably repeat.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of school performance + grades. Noted Justin still down + libo [illegible] verbal + unsure of it is b/c of his speech problem. Justin did explain was having difficulty understanding work.

**PROGRESS/ASSESSMENT:** Doing okay @ home. No major improvement academically, but behavior @ school is good.

**FOCUS FOR NEXT SESSION:** Continue to monitor school performance.

_____ M.S.
**Provider Signature**

Recd v. PCBE

# PROGRESS NOTE
## (Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|--------------|-----------|
|        |             |    |              |           |           |              |           |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS:** (Check Where Applicable):

Affect: _✓_ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric _✓_ Euthymic ____ Expansive _✓_ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid _✓_ N/A

**COMMENTS:** _____

**SLEEP:** _✓_ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** _✓_ Good ____ Fair ____ Poor

**ORIENTED TO:** _✓_ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** _✓_ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Spoke with Justin's grandmother re: behavior + she reported that he was doing pretty good @ times. Discussed how he refuses to cooperate w/ peers. Reported was doing as best as could be expected @ school. Grades fair_

**PROBLEMS/GOALS ADDRESSED:** _Attempted to address issue of reason he finds it difficult to talk during sessions. Noted refusal to talk ~~_____~~_

**PROGRESS/ASSESSMENT:** _Doing fine in school_

**FOCUS FOR NEXT SESSION:** _Continue to focus on poor attitude._

_[signature]_ ___ MS

**Provider Signature**

Reed v. PCBE

652

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _2-23-99_
LOCATION: _Xlu CLCd_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14659 | Justin Reed | 411 | 24 | -- | 459 | 8:00 | 5:00 |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing much better since placed on meds. Reported that Justin now reminds her when comes in for school, cheleris that appetite has also improved.

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** Doing well on meds _____

**FOCUS FOR NEXT SESSION:** Continue to monitor meds _____

_____, M S
**Provider Signature**

Reed v. PCBE
652

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|---------------|------------|
|        |             |     |              |            |           |               |            |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---
### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Mr. Reed reported that Justin was doing much better. Discussed poor performance academically, especially in area of reading, indicated that attitude has gotten better a bit.

**PROBLEMS/GOALS ADDRESSED:** Attempted to address school related issues w/ Justin but he was uncooperative + unresponsive. Noted that Justin not attempted to play like he was asleep.

**PROGRESS/ASSESSMENT:** Mr. Reed indicated that behavior + attitude have improved.

**FOCUS FOR NEXT SESSION:** Continue to focus on ODD behavior.

_____, M.S.
**Provider Signature**

Reed v. PCBE
653

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** __✓__ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention __✓__ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**

Affect: __✓__ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric __✓__ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid __✓__ N/A

**COMMENTS:** _____

**SLEEP:** __✓__ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** __✓__ Good ____ Fair ____ Poor

**ORIENTED TO:** __✓__ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** __✓__ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** *Ms. Reed reported that Justin was doing some better. Denied any problems w/ meds. Indicated school performance + grades were satisfactory. Reported that still has difficulty minding but not as bad.*

**PROBLEMS/GOALS ADDRESSED:** *Addressed issues of ADHD + ODD behaviors. Reported taking meds. Noted attitude has improved + was not defiant as he was in previous session. Discussed school performance + grades*

**PROGRESS/ASSESSMENT:** *Attitude has improved. School performance + grades satisfactory*

**FOCUS FOR NEXT SESSION:** *Continue to focus on behaviors + monitor meds.*

_____ , m.s.
**Provider Signature**

Rec'd v. PCBE
654

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTUAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Mo Reed reported that Justin has been fine. Noted that Justin had a better attitude this session. Discussed him seeing Dr. Dopey, psychiatrist, re behaviors + placement on new meds.

PROBLEMS/GOALS ADDRESSED: Addressed issue of behaviors w/ Justin + encouraged him to continue to do well. Discussed ADHD behaviors + behaviors @ school.

PROGRESS/ASSESSMENT: Attitude was much better this session.

FOCUS FOR NEXT SESSION: Continue to focus on behaviors + monitor meds.

_____ M.S.
**Provider Signature**

Reed v. PCBF
655

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**

Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Spoke w/ Ms. Reed re: Justin coming back in for review b/c of seeing Dr. Espy, psychiatrist; abt disability. Reported that Dr. Espy was wanting to place him on some other medication

PROBLEMS/GOALS ADDRESSED: Ms. Reed reported that Justin still has a bad attitude & doesn't want to mind

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

_____ M.S.
Provider Signature

Reed v. PCBE
656

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|--------------|-----------|
|        |             |    |              |           |           |              |           |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy   ____ Group Therapy   ____ Family Therapy   ____ Case Management

____ Ind BLS   ____ Group BLS   ____ Crisis Intervention   ____ Phys. Assess.   ____ Med. Monit.   ____ Consult

____ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate   ____ Blunted   ____ Labile   ____ Constricted   ____ Flat   ____ Inappropriate
Mood: ____ Anxious   ____ Dysphoric   ____ Euthymic   ____ Expansive   ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations   ____ Delusions
____ Suicidal   ____ Homicidal   ____ Paranoid   ____ N/A

COMMENTS: _____

**SLEEP:** ____ Good   ____ Fair   ____ Poor   ____ Insomnia   ____ Nightmares   ____ Hypersomnia
**APPETITE:** ____ Good   ____ Fair   ____ Poor

**ORIENTED TO:** ____ Normal   **DEFICITS:** ____ Person   ____ Place   ____ Time   ____ Situation

**MOTOR ACTIVITY:** ____ Calm   ____ Restless   ____ Shaking/Tremor   ____ Tics   ____ Pacing   ____ Catatonic

COMMENTS: Spoke w/ Ms. Ped re Justin using another counselor. asked/inquired if could see brother's counselor + explained what policy was. Reported what Dr. Myer's pediatrician had suggested she see someone else.

PROBLEMS/GOALS ADDRESSED: Explained to Ms. Ped would speak w/ Dr. Myers re Justin's behavior & attitude & would get back w/ her. Discussed fact that Justin was the one who needed to be more cooperative.

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

Provider Signature _____ MS

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME _Justin Reed_____ CASE# _14689_____

## TYPE OF UPDATE

TRANSFER_____           CLINICAL CLOSURE(90 DAYS)_✓___

TREATMENT PLAN REVIEW_____ CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST____   STAFFING_____

REFERRAL TO *H.R.O.P_____   OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____

### *(HIGH RISK OUTREACH PROGRAM)

Client uncoopera-
tive in session
(or could be services)
& this Counselor
is unable to get
anywhere.
Case Closed.

THERAPIST/CASE MANGER _____ ATS   DATE _____

UNIT DIRECTOR _____ MS   DATE 11-9-98

CLINICAL DIRECTOR_____   DATE_____

AND/OR PSYCHIATRIST_____   DATE_____

(FRI)AUG 31 2007 15:39/ST. 15:36/No. 7507318554 P  3
FROM Azar, Azar & Moore, LLC

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               | —          |            |               |            |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat __✓__ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive __✓__ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

SLEEP: __✓__ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

APPETITE: __✓__ Good ____ Fair ____ Poor

ORIENTED TO: __✓__ Normal DEFICITS: ____ Person ____ Place ____ Time ____ Situation

MOTOR ACTIVITY: __✓__ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was still "cutting up" c hour. Reported is on verge of being suspended off bus for being disrespectful + throwing things. Denied any problem in school.

PROBLEMS/GOALS ADDRESSED: Attempted to discuss ODD behavior w/ Justin. Noted he wanted to sit in chair + play like he was asleep + refused to talk. Explained to Ms. Reed that could not be available, he & attitude + not cooperative the more he's not.

PROGRESS/ASSESSMENT: School performance good.

FOCUS FOR NEXT SESSION: Review coping skills due to non-compliance from Justin.

_____
**Provider Signature**

Reed v. PCBE
659

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME _Justin Reed_                        CASE# _14689_

TYPE OF UPDATE

TRANSFER_____                CLINICAL CLOSURE(90 DAYS)_____

TREATMENT PLAN REVIEW_____    CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST____    STAFFING _✓_ _Review_

REFERRAL TO *H.R.O.P_____        OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____ .

*(HIGH RISK OUTREACH PROGRAM)

_Intake and treatment plan were_
_reviewed and approved as_
_prescribed._

THERAPIST/CASE MANGER _____ DATE _10-23-93_

UNIT DIRECTOR _Susan J. Cass, MS_  DATE _10/23/98_

CLINICAL DIRECTOR_____    DATE_____

AND/OR PSYCHIATRIST_____    DATE _10-27-98_

Reed v. PCBE
660

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

_____ TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart _____

**MENTAL STATUS: (Check Where Applicable):**
Affect: ___ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ✓ Inappropriate
Mood: ___ Anxious ___ Dysphoric ___ Euthymic ___ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was the same. Noted that Justin was extremely defiant + refused to cooperate. Explained to Ms. Reed that if Justin did not cooperate their session would not to be terminated.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss attitude + defiant behavior. Provided suggestions that could be done @ home. Stressed importance of being consistent w/ actions.

**PROGRESS/ASSESSMENT:** No progress re: behavior @ home. School performance fine.

**FOCUS FOR NEXT SESSION:** Continue to focus on behavior + mother needs

_____  M.S.
Provider Signature

Reed v. PCBE
661

## PROGRESS NOTE
### (Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

**NEXT APPOINTMENT:** DAY: Mon.  Tues.  Wed.  Thur.  Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ✓ Flat  ____ Inappropriate

Mood: ____ Anxious  ____ Dysphoric  ✓ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations  ____ Delusions

____ Suicidal  ____ Homicidal  ____ Paranoid  ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes  ____ No  COMMENTS: _____

**SLEEP:** ✓ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ✓ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ✓ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: _Mrs. Reed reported that Justin was the same. Reported that report card was fine. Still do I feel when is not into community as well._

PROBLEMS/GOALS ADDRESSED: _Addressed ADHD. Noted most of the session was report ___ use of shoulders also head was only form of communication. Justin did speak re: things of interest but only briefly._

PROGRESS/ASSESSMENT: _He progress continue to be non-verbal._

FOCUS FOR NEXT SESSION: _Continue to monitor meds._

_____  M.S.
Provider Signature

Reed v. PCBE
662

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| | | | | | | | |

NEXT APPOINTMENT: DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

SERVICES PROVIDED: ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

MENTAL STATUS: (Check Where Applicable):

Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

THOUGHTS OR PERCEPTIONAL DISTURBANCES:

____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes ____ No COMMENTS: _____

SLEEP: ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

APPETITE: ✓ Good ____ Fair ____ Poor

ORIENTED TO: ✓ Normal DEFICITS: ____ Person ____ Place ____ Time ____ Situation

MOTOR ACTIVITY: ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Mr. Ford reported that Justin has gotten back to his old ways in attitude & behavior. Reported that he tried to choke his brother over a piece of candy. Discussed her taking him to Juvenile. Can't file then actions were highly inappropriate

PROBLEMS/GOALS ADDRESSED: Attempted to address issues with Justin & he refused. Noted played in chair & acted asleep & would not sit up & talk. Mother did indicate that he has gotten where he doesn't want to take his medicine.

PROGRESS/ASSESSMENT: None to report.

FOCUS FOR NEXT SESSION: Will attempt to discuss issues again. Explain to parents if continue to refuse to talk will have to terminate services

_____  pn 5
Provider Signature

Rced v. PCBE
663

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME _Juti Pad_____    CASE# _14637_

TYPE OF UPDATE

TRANSFER_____    CLINICAL CLOSURE(90 DAYS) ___

TREATMENT PLAN REVIEW_____    CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST____    STAFFING_____

REFERRAL TO *H.R.O.P_____    OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____

*(HIGH RISK OUTREACH PROGRAM)

_Clt has had 3 consecutive NS's_
_after upon to follow-up_
_letter. Case Closed_

THERAPIST/CASE MANGER _X. Ra_____ MS    DATE _12-6-99_

UNIT DIRECTOR_____    DATE_____

CLINICAL DIRECTOR _PBailo, DY MC_    DATE _12/6/5_

AND/OR PSYCHIATRIST_____    DATE_____

Reed v. PCBE
664

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|---------------|-----------|
|        |             |    |              |           |           |               |           |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ✓ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Mrs. Reed reported that Justin was doing fine. Reported that school is a little better. Discussed setting up appt. to get further speech help._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issues of performance with Justin. Noted improvement in speech & in school. Explained to Ms. Reed & Justin that if talking & discussion does not improve, would have to refer elsewhere._

**PROGRESS/ASSESSMENT:** _School performance better._

**FOCUS FOR NEXT SESSION:** _Focus on communication._

_[signature]_ m.s.
Provider Signature

Reed v. PCBE
665

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|-----------|
|        |             |     |               |            |           |               |           |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**

Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No   **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Mo. Reed reported that meds were working. Reported no more headaches since stopped Clonidine. Indicated school performance good._

**PROBLEMS/GOALS ADDRESSED:** _ADHD under control though meds._

**PROGRESS/ASSESSMENT:** _School performance satisfactory._

**FOCUS FOR NEXT SESSION:** _Continue to monitor meds._

_____  M.S. _____
Provider Signature

Reed v. PCBE
666

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

NEXT APPOINTMENT: DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____    TIME: _____

SERVICES PROVIDED: __✓__ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS      ____ Group BLS      ____ Crisis Intervention      ____ Phys. Assess.      ____ Med. Monit.      ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

MENTAL STATUS: (Check Where Applicable):
Affect: __✓__ Appropriate    ____ Blunted    ____ Labile    ____ Constricted    ____ Flat    ____ Inappropriate
Mood: ____ Anxious    ____ Dysphoric    __✓__ Euthymic    ____ Expansive    ____ Irritable

THOUGHTS OR PERCEPTIONAL DISTURBANCES:
____ Hallucinations    ____ Delusions
____ Suicidal    ____ Homicidal    ____ Paranoid    __✓__ N/A

COMMENTS: _____

MED. COMPLIANCE: __✓__ Yes    ____ No    COMMENTS: _____

SLEEP: __✓__ Good    ____ Fair    ____ Poor    ____ Insomnia    ____ Nightmares    ____ Hypersomnia

APPETITE: __✓__ Good    ____ Fair    ____ Poor

ORIENTED TO: __✓__ Normal    DEFICITS: ____ Person    ____ Place    ____ Time    ____ Situation

MOTOR ACTIVITY: __✓__ Calm    ____ Restless    ____ Shaking/Tremor    ____ Ties    ____ Pacing    ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was doing pretty good. Reported that school still seems to be going okay. Reported that Justin was also playing football this year. Medicated had not checked it further spoke with.

PROBLEMS/GOALS ADDRESSED: Addressed issue of school performance. Discussed getting work completed + paying attention in class. Noted has started talking a little better, but still needs to continue improving.

PROGRESS/ASSESSMENT: Appears to be stable at this point.

FOCUS FOR NEXT SESSION: Continue to monitor ADHD.

_____  M.S.
Provider Signature

Reed v. PCBE
667

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _7-15-58_
LOCATION: _BL CCC_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|-----------|
| 14024 | John Reed | 411 | 24 | ---- | 459 | ----- | 50 min |

NEXT APPOINTMENT: DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

SERVICES PROVIDED: ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. _✓_ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

MENTAL STATUS: (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

THOUGHTS OR PERCEPTIONAL DISTURBANCES:
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

SLEEP: ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
APPETITE: ____ Good ____ Fair ____ Poor
ORIENTED TO: ____ Normal DEFICITS: ____ Person ____ Place ____ Time ____ Situation
MOTOR ACTIVITY: ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
COMMENTS: _Ms. Reed reported that Justin was having problems with the Clonidine but would not say what was bothering him. Discussed with Justin + he indicated that ___ he got headaches. Provided suggestions to try + if didn't work would think of psychiatrist._
PROBLEMS/GOALS ADDRESSED: _ADHD under control though meds still tends to not want to communicate_

PROGRESS/ASSESSMENT: _cls beginning to make progress_

FOCUS FOR NEXT SESSION: _Continue to monitor meds_

_____, M.S.
Provider Signature

Reed v. PCBE
668

# PROGRESS NOTE
## (Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing okay. Reported that he still
do _____ to tell child FD that Justin was still going through speech this
summer.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of speaking. Noted that this session
Justin was much more talkative + pleasant. Discussed what starting back +
trying his best this year.

**PROGRESS/ASSESSMENT:** Communicating better.

**FOCUS FOR NEXT SESSION:** Continue to monitor behavior + communication skills.

Provider Signature _____ M.S.

Recd v. PCBE
669

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|----|----|----|----|----|
|  |  | : |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: __✓__ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  __✓__ Flat  ____ Inappropriate
Mood: ____ Anxious  ____ Dysphoric  __✓__ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations  ____ Delusions
____ Suicidal  ____ Homicidal  ____ Paranoid  __✓__ N/A

**COMMENTS:** _____

**SLEEP:** __✓__ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** __✓__ Good  ____ Fair  ____ Poor

**ORIENTED TO:** __✓__ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** __✓__ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

**COMMENTS:** _Mom reported that Justin still does not talk. Reported that speech therapy starts next Tuesday & will be going Tues & Thurs. Reported did pass but barely. Reported was placed in regular classes next year & only help he will receive is in reading._

**PROBLEMS/GOALS ADDRESSED:** _Attempted to discuss speech therapy & plans for summer w/ Justin but refused._

**PROGRESS/ASSESSMENT** _Still continue to not talk_

**FOCUS FOR NEXT SESSION:** _Continue to make attempts to get Justin to talk_

_____ M.S.
Provider Signature

Reed v. PCBE
670

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Ms. Reed reported that Justin has been non-verbal all morning. Reported he would be upstairs. Further reported would he in speech again this summer. Denied any problem w/ meds._

PROBLEMS/GOALS ADDRESSED: _Attempted to discuss w/ Justin reason for silent treatment. Noted he refused to be verbal & sat in chair & would chew on fingers. Unsure if Justin is non-verbal b/c of speech problem._

PROGRESS/ASSESSMENT: _No improvement._

FOCUS FOR NEXT SESSION: _Continue to get Justin to be verbal._

_____

_____ M.S.
**Provider Signature**

Reed v. PCBE
671

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

NEXT APPOINTMENT:  DAY:  Mon.  Tues.  Wed.  Thur.  Fri.   DATE: _____   TIME: _____

SERVICES PROVIDED:  ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

MENTAL STATUS: (Check Where Applicable):
Affect: ____ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate
Mood: ____ Anxious  ____ Dysphoric  ____ Euthymic  ____ Expansive  ____ Irritable

THOUGHTS OR PERCEPTIONAL DISTURBANCES:
____ Hallucinations  ____ Delusions  
____ Suicidal  ____ Homicidal  ____ Paranoid  ____ N/A

COMMENTS: _____

MED. COMPLIANCE:  ____ Yes  ____ No   COMMENTS: _____

SLEEP:  ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

APPETITE:  ____ Good  ____ Fair  ____ Poor

ORIENTED TO:  ____ Normal  DEFICITS: ____ Person  ____ Place  ____ Time  ____ Situation

MOTOR ACTIVITY:  ____ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: Ms Reed reported that Justin's meds were fine. Reported that he still is active at times. Indicated that school has not complained. Indicated that meds was taken daily.

PROBLEMS/GOALS ADDRESSED: ADHD under control through meds.

PROGRESS/ASSESSMENT: Stable on meds.

FOCUS FOR NEXT SESSION: Continue to monitor meds.

_____ m. S
Provider Signature

Reed v. PCBE
672

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health · Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|---------------|-----------|-----------|---------------|------------|
|        |             |    |               |           |           |               |            |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE · Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was doing fine. Reported that he was still not talking like he should. Indicated school performance was about the same, reported that an IEP meeting should be set up shortly since school will be out this month.

PROBLEMS/GOALS ADDRESSED: Addressed issue of school performance. Discussed getting school work completed. Discussed also paying attention to the teacher. Noted that Justin was also talking more.

PROGRESS/ASSESSMENT: Alert, some progress

FOCUS FOR NEXT SESSION: Continue to monitor school performance.

Provider Signature _____

Reed v. PCBE
673

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke w/ Ms. Reed re: Justin's next appt. & time. Inquired how Justin was doing & indicated he be doing fine. Reported that IEP staff would be coming up soon.

**PROBLEMS/GOALS ADDRESSED:** Discussed his conduct in school & getting schoolwork completed. Discussed appropriate help & continuing w/ speech. Indicated he still well, but still doesn't want to say much.

**PROGRESS/ASSESSMENT:** N/A

**FOCUS FOR NEXT SESSION:** Will discuss school performance

Provider Signature _____ m. s.

Rec'd v. PCBE

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health – Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

<u>NEXT APPOINTMENT:</u> DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

<u>**SERVICES PROVIDED:**</u> ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

<u>**MENTAL STATUS:**</u> (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

<u>**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**</u>
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No  COMMENTS: _____

<u>**SLEEP:**</u> ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

<u>**APPETITE:**</u> ____ Good ____ Fair ____ Poor

<u>**ORIENTED TO:**</u> ____ Normal <u>**DEFICITS:**</u> ____ Person ____ Place ____ Time ____ Situation

<u>**MOTOR ACTIVITY:**</u> ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was really doing good on his meds.
Reported that change in meds was a good change.

PROBLEMS/GOALS ADDRESSED: Meds working to reduce anxiety.

PROGRESS/ASSESSMENT: Stable

FOCUS FOR NEXT SESSION: Continue to monitor meds.

_____
Provider Signature    m.s

Reed v. PCBE
675

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. (Wed.) Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes ___ No    COMMENTS: _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: Mr. Reed reported that Justin still doesn't want to talk. Reported
that school was still a problem re: grades. Indicated that father might be
_____ attitude of Justin

PROBLEMS/GOALS ADDRESSED: Addressed issues of school performance. Noted that Justin
was a little more talkative today. Discussed _____ with father might _____. Discussed
grades & completing assignments in class & any he might have for homework.

PROGRESS/ASSESSMENT: Slight progress.

FOCUS FOR NEXT SESSION: Continue to focus on school performance.

_____
**Provider Signature**

Reed v. PCBE
676

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ___ No **COMMENTS:** _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** _The pt reported still does not want to talk but since father talked to him about getting up + going to school, has not had anymore trouble out of him. Grades still not where they should be._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issues of ADHD. Discussed school performance + Justin still continues to say very little during sessions. Discussed getting school assignments completed + bringing homework home._

**PROGRESS/ASSESSMENT:** _Fair progress_

**FOCUS FOR NEXT SESSION:** _Continue to monitor ADHD._

_____ M.S
**Provider Signature**

Reed v. PCBE
677

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|--------------|-----------|
| | | | | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ✓ Consult

____ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke w/ Ms Wheeler, school counselor @ PCE, re: Justin's performance. Reported that he doesn't say a bit to any of the ISS teachers. Indicated that he has also witnessed inappropriate behavior towards others & she does nothing.

**PROBLEMS/GOALS ADDRESSED:** Discussed academic problems + behavior problems if any. Indicated main problem centered around grades.

**PROGRESS/ASSESSMENT:** N/A

**FOCUS FOR NEXT SESSION:** N/A

Provider Signature

Reed v. PCBE
678

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| | | | | — | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention __:__ Phys. Assess. _✓_ Med. Monit. ____ Consult

____ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS:** (Check Where Applicable):
Affect: __:__ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes __:__ No COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Ms. Reed indicated that meds were fine. Denied any problems w/ meds or side effects. Indicated taking meds daily._

PROBLEMS/GOALS ADDRESSED: _ADHD under control through meds._

PROGRESS/ASSESSMENT: _Stable_

FOCUS FOR NEXT SESSION: _Continue to monitor meds._

_____ MS _____
**Provider Signature**

Reed v. PCBE
679

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|-----------|
| | | | | | | | |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reel reported that Justin still down + won't to talk. Reported that grades were still poor. Indicated that behavior has improved ie is getting up in the morning & going to school.

**PROBLEMS/GOALS ADDRESSED:** Addressed issues of defiant behavior & ADHD. Discussed reason for not wanting to talk & fact that eventually will have to talk. Discussed completing his school work & paying attention in school.

**PROGRESS/ASSESSMENT:** No major progress. Note that parents say they follow through w/ suggestions but no progress seems to be occurring.

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD & defiant behavior.

_____ M.S.
Provider Signature

Recd v. PCBE
680

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|------------|---------------|------------|
|        |             |     |               |           |            |               |            |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Contacted by Ms. Reed re: actions of meet. @ Justin school re: Justin. Reported that they were going to provide all the services they could, but Justin needed to start trying more. Reported had a hard time trying to get him up in a.m. for school + was usually late.

**PROBLEMS/GOALS ADDRESSED:** Explained to Ms. Reed that she needed to start enforcing discipline more + taking him to Juvenile Court. Explained that she was the parent + that they needed to stop letting Justin rule them.

**PROGRESS/ASSESSMENT:** No progress.

**FOCUS FOR NEXT SESSION:** N/A.

_____ m S

Provider Signature

Reed v. PCBE

681

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|----|----|----|----|----|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

_✓_ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No  **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke w/ Mo. Reed in conversation w/ pediatrician. Reported
that she had agreed to write prescription for son ___. Reported had
already provided pediatrician w/ meds info.

**PROBLEMS/GOALS ADDRESSED:** Mo. Reed reports that he has been in trouble
in school & has gotten an attitude @ home. Suggested she be more strict
& follow through w/ consequences for action.

**PROGRESS/ASSESSMENT:** Due to family dynamics, counseling is not effective & that
is reason for termination.

**FOCUS FOR NEXT SESSION:** n/a _____

_____

Provider Signature _____ m.s.

Recd v. PCBE
682

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|---------------|------------|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke w/ Dr. Myers, pediatrician, re: Justin's progress. Reported that he was still not wanting to talk & that counseling was not doing him any good.

**PROBLEMS/GOALS ADDRESSED:** Discussed family dynamics & how a lot of the problem was his mother. Discussed fact had been seeing Dr. Lopez, psychiatrist for meds. Enquired if would write prescription from now on so that services could be terminated & she agreed to.

**PROGRESS/ASSESSMENT:** N/A

**FOCUS FOR NEXT SESSION:** N/A

_____ m.s.
**Provider Signature**

Reed v. PCBE
683

**PROGRESS NOTE**
(Face-to-Face Services)

# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
|        |             |     |              |           |           |              |           |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed indicated that Justin was taking his meds dedicated as ___ from school. Grades fine since back on old trades._

**PROBLEMS/GOALS ADDRESSED:** _ADHD under control thou ___ meds. Will speak w/ pediatrician ___ her writing the rest of Justin's prescription he receives thru f. Dr Lizzy psychiatrist, ___ of the unequal ___ of Justin by refusing to tattle_

**PROGRESS/ASSESSMENT:** _Does well on meds._

**FOCUS FOR NEXT SESSION:** _Continue to follow meds. Contact to be made w/ pediatrician._

_____
**Provider Signature** /m.s.

Reed v. PCBE
684

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
|        |             |     |               |            |           |               |            |

**NEXT APPOINTMENT:** DAY: Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No  **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was still not want to talk. Reported was completing work now that he was back w/ his old teacher. Discussed fact that services may have to be terminated due to lack of cooperation.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss ADHD + school performance. Justin played like he was asleep + refused to acknowledge this counselor. Reported would look in to other alternatives + let her know.

**PROGRESS/ASSESSMENT:** No progress.

**FOCUS FOR NEXT SESSION:** Will discuss termination of services w/ pediatrician b/c of lack of cooperation.

Provider Signature _____ m.s.

Reed v. PCBE
685

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| | | | | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes ____ No COMMENTS: _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _____

PROBLEMS/GOALS ADDRESSED: _____

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

_____
Provider Signature          M.S.

Reed v. PCBE
686

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|----|----|----|----|----|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Mo. Rpt indicated that Justin's meds were fine. Reported does better_
_now that one of his meds is legit, indicated that he ___ has knowledge he_
_was given his meds daily c schol._

**PROBLEMS/GOALS ADDRESSED:** _ADHD under control thy for meds. Better still continue_
_t has def t attitude._

**PROGRESS/ASSESSMENT:** _Stable on meds_

**FOCUS FOR NEXT SESSION:** _Continue t monitor meds._

_____ m.S.
**Provider Signature**

Reed v. PCBE
687

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|-----------|
|  |  |  |  |  |  |  |  |

NEXT APPOINTMENT: DAY: (Mon) Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

SERVICES PROVIDED: ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

_____ TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart _____

MENTAL STATUS: (Check Where Applicable):
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

THOUGHTS OR PERCEPTIONAL DISTURBANCES:
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes ____ No   COMMENTS: _____

SLEEP: ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

APPETITE: ✓ Good ____ Fair ____ Poor

ORIENTED TO: ✓ Normal  DEFICITS: ____ Person ____ Place ____ Time ____ Situation

MOTOR ACTIVITY: ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was doing okay. Reported that he a new special ed teacher & so far has not been doing his work. Inquired about old teacher & reported just didn't put him back in her class. Advised to request old teacher back, due to the fact she got him to do his work.

PROBLEMS/GOALS ADDRESSED: Addressed issue of ADHD & school performance. Note that Justin is again back in his talking stage. He did indicate that school was fine. Discussed completing work & making good grades.

PROGRESS/ASSESSMENT: No progress.

FOCUS FOR NEXT SESSION: Continue to monitor ADHD

Provider Signature _____ m.s.

Reed v. PCBE
889
FROM Azar, Azar & Moore, LLC

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|----|----|----|----|----|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

__✓_ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No  COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Spoke w/ Ms. Reed re: Justin's progress. Reported that school
had started off pretty good. Reported still does not want to talk. Reported
that he has a different special ed teacher this year.

PROBLEMS/GOALS ADDRESSED: Discussed school performance + getting him
motivated. Discussed fact that he is going to have to get out of this
stage of not wanting to talk. Behavior indicated to be pretty good.

PROGRESS/ASSESSMENT: N/A

FOCUS FOR NEXT SESSION: N/A

_____
Provider Signature

Reed v. PCBE

FROM Azar, Azar & Moore, LLC

980

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. _✓_ Med. Monit. ____ Consult

____ Family Support / Education

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed indicated that meds were fine. Denied any problem. Nte that his communication skills are improving. Reminded Jesse Ms. Reed of need a meds re-check w/ pediatrician every six months.

**PROBLEMS/GOALS ADDRESSED:** ADHD under control tho' on meds

**PROGRESS/ASSESSMENT:** Stable

**FOCUS FOR NEXT SESSION:** Continue to monitor meds

_____ m.S
**Provider Signature**

Reed v. PCBE
690

## PROGRESS NOTE
### (Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _____ / _____ /

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
|        |             |     |               |           |           |               |            |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ / **TIME:** _____

**SERVICES PROVIDED:** _____ Individual Therapy _____ Group Therapy _____ Family Therapy _____ Case Management

_____ Ind BLS _____ Group BLS _____ Crisis Intervention _____ Phys. Assess. _____ Med. Monit. _____ Consult

_____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: __✓__ Appropriate _____ Blunted _____ Labile _____ Constricted _____ Flat _____ Inappropriate
Mood: _____ Anxious _____ Dysphoric __✓__ Euthymic _____ Expansive _____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
_____ Hallucinations _____ Delusions
_____ Suicidal _____ Homicidal _____ Paranoid __✓__ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** __✓__ Yes _____ No **COMMENTS:** _____

**SLEEP:** __✓__ Good _____ Fair _____ Poor _____ Insomnia _____ Nightmares _____ Hypersomnia

**APPETITE:** __✓__ Good _____ Fair _____ Poor

**ORIENTED TO:** __✓__ Normal **DEFICITS:** _____ Person _____ Place _____ Time _____ Situation

**MOTOR ACTIVITY:** __✓__ Calm _____ Restless _____ Shaking/Tremor _____ Tics _____ Pacing _____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin has been doing pretty good. Reported that he has been having a few problems a Church w/ a couple of boys picking on him & telling him he didn't belong there. Reported going to leave in about a week to go to Disney World.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of ADHD. Discussed incident w/ boys @ Church + what he can do to handle his anger w/ them. Discussed the fact that he has just as much right to be a Church as they do + to let the necessary people know when it is happening.

**PROGRESS/ASSESSMENT:** _____

_____

_____

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD.

_____

_____

_____

_____ m.s.
**Provider Signature**

Reed v. PCBE
691

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|---------------|-----------|-----------|---------------|-----------|
|        |             |    |               |           |           |               |           |

**NEXT APPOINTMENT:** DAY: Mon.  Tues.  Wed.  Thur.  Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ✓ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate
Mood:  ____ Anxious  ____ Dysphoric  ✓ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations  ____ Delusions
____ Suicidal  ____ Homicidal  ____ Paranoid  ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes  ____ No  **COMMENTS:** _____

**SLEEP:** ✓ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ✓ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ✓ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: _Ms. Reed reported that Justin was doing pretty good. Reported that final grades turned out pretty good. Reported that the school was having some cut backs & was fearful that Justin may lose out b/c of this._

PROBLEMS/GOALS ADDRESSED: _Addressed issues of ADHD. Noted that Justin is being more talkative. Discussed end of year & felt had good grades & discussed doing well next year. Discussed practicing as well this summer on his school work._

PROGRESS/ASSESSMENT: _Stable._

FOCUS FOR NEXT SESSION: _Continue to monitor ADHD_

_____ m S .
**Provider Signature**

Recd v. PCBE
692

FROM Azar, Azar & Moore, LLC

**PROGRESS NOTE**

Austin Reed          14689                    111
NAME                    CASE #                          UNIT

Date, Service
Time of Day and
Time Spent/Units                    Record

2-23-01  Case management                     10. R.O P.
8:00, :45

        c. i. o.           drove
to      pike    County
Gumbrele     court   office
        c. i. o.      consulted
with     court    Gumbrele
probation         office
        c. i. o.       informed
her     about     plan
to       work     without
court        order     at
this        time
        c. i. o.    drove  from
office
        c. i. o.     consulted
with    client's   father
and     mother ; they
are     to      meet
with    c. i. o.    about
9:30  a. m.
        Andrew   Waite  m.s c.ps/c.i.o

# PROGRESS NOTE

NAME _Quentin Reed_          CASE # _14689_          UNIT _111_

Date, Service
Time of Day and
Time Spent/Units          Record

2-22-0?  Crises Int. / Crises Call                    12.R.O.P.

continued and two psychiatric

facilities

~~neither~~ Neither place

had a bed for

child.

Father reported that

child had been

taking car without

permission as well

as had become

oppressive

child hit brother

and ~~little~~ big brother.

Juvenile court, father

and C.S.O. all

~~agent~~ agreed to wait

until the a.m.

to work on placement

again since child

had calmed down.

Andrew Wright m.s. i.r.c./c.s.o.

Reed v. PCBE
694

## PROGRESS NOTE

NAME _Qnstin Reed_    CASE # _14689_    UNIT _III_

Date, Service
Time of Day and
Time Spent/Units

2-22-07, Crises Int. Record    12.R.o.P.
9:50 am, 45

C.L.O. received crises call from mom of Child Advocat advocacy. Mom reports that client is in need of inpatient evaluation/treatment. Mom informed C.L.O. about client being abused 2 years ago. mom feels trauma is coming to the surface. C.L.O. called Sheriff's office back as well about case. I say had called crises line as well.

Called Juvenile Court

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| | | | | | | 10 AM | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. (Fri) DATE: Oct 31 TIME: 2__

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

MED. COMPLIANCE: ✓ Yes ____ No COMMENTS: _____

**SLEEP:** ____ Good ✓ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ✓ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ✓ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Clt. was very sluggish. Clt. expressed that he stayed up late and was tired

PROBLEMS/GOALS ADDRESSED: I explained to clt that he needed to start going to sleep at a decent time so he won't be so tired. I explained to clt that I would be the counselor working with on

PROGRESS/ASSESSMENT: any issue that he may be concerned about. I also let him know that I would like for him to be able to talk to me about anything when he feels comfortable too.

FOCUS FOR NEXT SESSION: Conti. to monitor current situation & getting clt to open up.

Provider Signature _____ M.S.

ECMH - 006

Rced v. PCBF

 

**PROGRESS NOTE**
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: _10/?/05_
LOCATION: _Day Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|---------------|------------|
| 11165? | Justin Reed | ? | 41 | - | 53? | | 30 |

**NEXT APPOINTMENT:** **DAY:** Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy  ___ Group Therapy  ___ Family Therapy  ___ Case Management
___ Ind BLS  ___ Group BLS  ___ Crisis Intervention  ___ Phys. Assess.  ___ Med. Monit.  ___ Consult
_✓_ Family Support / Education

**TOP COPY** - Client / **WHITE ORIGINAL WITH NOTE** - Chart

**MENTAL STATUS:** (Check Where Applicable):

Affect: ___ Appropriate  ___ Blunted  ___ Labile  ___ Constricted  ___ Flat  ___ Inappropriate

Mood: ___ Anxious  ___ Dysphoric  ___ Euthymic  ___ Expansive  ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

___ Hallucinations  ___ Delusions

___ Suicidal  ___ Homicidal  ___ Paranoid  ___ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ___ Yes  ___ No  **COMMENTS:** _____

**SLEEP:** ___ Good  ___ Fair  ___ Poor  ___ Insomnia  ___ Nightmares  ___ Hypersomnia

**APPETITE:** ___ Good  ___ Fair  ___ Poor

**ORIENTED TO:** ___ Normal  **DEFICITS:** ___ Person  ___ Place  ___ Time  ___ Situation

**MOTOR ACTIVITY:** ___ Calm  ___ Restless  ___ Shaking/Tremor  ___ Tics  ___ Pacing  ___ Catatonic

**COMMENTS:** spoke with the mother and she let me know that the teacher
is suppose to dress up the class for Justin for teaching Justin a the autistic
appropriately which would be a medication change for him. She express
**PROBLEMS/GOALS ADDRESSED:** that's the only thing Justin told Mrs. Watson
in their last meeting even though she probed it + Mrs. Watson feels something
else more may have happened. I explained to her that I would try to
**PROGRESS/ASSESSMENT:** see if he would open up to me but find I would
have to establish a rapport so he could feel comfortable talking
to me but that would be accomplished at his pace.

**FOCUS FOR NEXT SESSION:** N/A

ECMH - 006

_Provider Signature_

Reed v. PCBE
697

# EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
## CLINICAL UPDATE

NAME _Justin Reed_____ CASE #_ _14639_____

**TYPE OF UPDATE:**

TRANSFER _____          CLINICAL CLOSURE (90 DAYS) ✓___

TREATMENT PLAN REVIEW _____     CASE INACTIVATION (12 MONTHS) _____

PHYSICAL CONSULTATION REQUEST _____     STAFFING _____

REFERRAL TO *H.R.O.P. _____     OTHER SUMMARY _____

*H.R.O.P. EXIT SUMMARY _____

*(HIGH RISK OUTREACH PROGRAM)

_Clt is not able to commit_
_to help + explained to his_
_mother that services need_
_to be term F/U due to his_
_not wanting of commit to._
_Case Closed._

THERAPIST/CASE MANAGER _____, m.s.    DATE _12-15-00_

UNIT DIRECTOR _____    DATE _____

CLINICAL DIRECTOR _____    DATE _12/19/00_

and/or

PSYCHIATRIST _____    DATE _____

Reed v. PCBE
698

EAST CENTRAL MENTAL HEALTH – MENTAL RETARDATION, INC.

## MEDICATION CHART AND DRUG USE PROFILE

*12-28-98*

IDP Eligible _____ Yes __✓__ No

Case Number: _196-98_

Name: _Justin Reel_

Allergies: _NKDA_

| Rx # | Medications, Dosage Directions | Comments | Prescribing Physician | Date Issued | Issued By |
|------|-------------------------------|----------|----------------------|-------------|-----------|
| | 12-28-98 Clonidine 0.1mg ½ tab bid #60 | | Lopez | | |
| | 03-15-99 Clonidine 0.1mg ½ tab bid #30 | | Lopez | | |
| | 03-15-99 Ritalin 10mg ÷ AM ÷ Noon ÷ 2:30 PM | Prescribed by Dr. Myers | " | | |
| | 06-07-99 Clonidine 0.1mg ½ tab bid #30 | D/C 09-13-99 | Lopez | | |
| | 06-07-99 Pamelor 10mg ½ tab qd #16 | " | | | |
| | 09-13-99 Pamelor 10mg ½ tab qd #16 | D/C 03-06-00 | Lopez | | |
| | 03-06-00 Prozac 10mg ÷ qd #30 | | Lopez | | |
| | 06-05-00 Prozac 10mg ÷ qd #30 | | Lopez | | |
| | 9-25-00 Prozac 10mg ÷ qd - new Liquid 20mg/5cc qd ½ tab per date | | Lopez | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Reed v. PCBE 715

Revised 5/1/96

**PROGRESS NOTE**
**(Face-to-Face Services)**
**East Central Mental Health - Mental Retardation, Inc.**

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
|        |             |     |               |            |            |               |            |

<u>NEXT APPOINTMENT:</u> **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

<u>SERVICES PROVIDED:</u> ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

<u>MENTAL STATUS:</u> **(Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

<u>THOUGHTS OR PERCEPTIONAL DISTURBANCES:</u>
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _Still no speech_

MED. COMPLIANCE: ✓ Yes ____ No COMMENTS: _____

<u>SLEEP:</u> ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

<u>APPETITE:</u> ✓ Good ____ Fair ____ Poor

<u>ORIENTED TO:</u> ✓ Normal <u>DEFICITS:</u> ____ Person ____ Place ____ Time ____ Situation

<u>MOTOR ACTIVITY:</u> ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
COMMENTS: _10 yr old Wt 69.5# Going to Disney World in July. Still_
_does not talk. Water in face. Takes Prozac as ordered. Jennifer_
_On Ritalin from Dr. Myers. CJ6_

PROBLEMS/GOALS ADDRESSED: _____

_____

PROGRESS/ASSESSMENT: _____

_____

FOCUS FOR NEXT SESSION: _Ritalin 10 y TID_

_Prozac 10 y # 6-5-07_

Provider Signature

Recd v. PCBE
716

PROGRESS NOTE
(Face-to-Face Services)
East Central Mental Health - Mental Retardation, Inc.

DATE: 030600

LOCATION:

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14698 | Justin Ted | 4/11 | 014/024 | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult
___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions ___ Paranoid ✓ N/A
___ Suicidal ___ Homicidal

COMMENTS: _____ Need - Im Toler

MED. COMPLIANCE: ✓ Yes ___ No COMMENTS: _____ eats well

SLEEP: ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

APPETITE: ✓ Good ___ Fair ___ Poor

ORIENTED TO: ___ Normal DEFICITS: ___ Person ___ Place ___ Time ___ Situation

MOTOR ACTIVITY: ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: 10 yr old WO 68# Being disturbed again Tantums.
Not going to school. CJohnsRi
J/H c

PROBLEMS/GOALS ADDRESSED: _____

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

Provider Signature

Reed v. PCBE

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _05/3??_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14698 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention _✓_ Phys. Assess. _✓_ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: _✓_ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric _✓_ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid _✓_ N/A

COMMENTS: _See Clien_ _does not ____ say_

**MED. COMPLIANCE:** _✓_ Yes ____ No  COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** _✓_ Good ____ Fair ____ Poor

**ORIENTED TO:** _✓_ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** _✓_ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _10 yr old wt. 60.5# Fourth grade. ____ not talking. Did_
_smile. (John Rd Clonidine causing ____). ghr_

_3/4.01_

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _Continue_ ____

**FOCUS FOR NEXT SESSION:** _Ritalin 10___  _Tics (D Mayer)_
_Ritalin 10, ___ 16_

Provider Signature _____

Reed v. PCBE
718




## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _060755_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14685 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _Doe't talk — AVM- need therapy_

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
COMMENTS: _9 yr old wt 62½ Refuses to talk. Can talk. Is in sped_
_therapy this summer. this is 3rd yr in therapy. Gets Ritalin from Dr._
_Myers & Clonidine from ECMH. Johns Rd._

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _Center_
_Cloud = 0.1 ½ 7½_

**FOCUS FOR NEXT SESSION:** _½ ½ Reed 10, ½ th el_

Provider Signature _6. 7.55_

Reed v. PCBE

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _03/15/99_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|--------------|-----------|
| 14685 | Justin Feek | 411 | OM/024 | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult
___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

COMMENTS: _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia
**APPETITE:** ___ Good ___ Fair ___ Poor
**ORIENTED TO:** ___ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation
**MOTOR ACTIVITY:** ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic
COMMENTS: _____

PROBLEMS/GOALS ADDRESSED: _____

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

Provider Signature _____

Recd v. PCBE

# PROGRESS NOTE

| _Quintin Reed_ | _14689_ | _411_ |
|----------------|---------|-------|
| NAME | CASE # | UNIT |

Date, Service
Time of Day and
Time Spent/Units

Record

| 012599 | Medication: |
| | Came c from with relaxed |
| | + aggressive |
| | // |

Recd v. PCBE
721

## MEDICATIONS INFORMED CONSENT

I have discussed with the Nurse and/or Physician the risks and benefits of those types of medications prescribed for me. I am aware that this form of treatment is recommended by the treatment staff and I agree to take medication as prescribed for my individual care. I am aware that I may seek further discussion of these risks and benefits at any time. I have been given a copy of the medication information sheet on these medications. I understand that I may talk with the pharmacist regarding my prescription(s) and have signed the Pharmacist Request sheet indicating the same.

| Date | Medication | Client Signature | RN / Physician |
|------|------------|------------------|----------------|
| *[handwritten]* | *[handwritten]* | *[handwritten]* | *[handwritten]* |

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: _12-28-58_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14698 | Justin Teed | 411 | | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention __✓__ Phys. Assess. __✓__ Med. Monit. ____ Consult

____ Family Support / Education

— TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: __✓__ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid __✓__ N/A

COMMENTS: _9 c. ð 3rd grade_

**SLEEP:** __✓__ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** __✓__ Good ____ Fair ____ Poor
**ORIENTED TO:** __✓__ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
COMMENTS: _9 grade Wt. 61# has a disability testing by dr. Sepulveda_
_suggested he need to be seen by Treatment Supervisory of 10-08-58. (John Cd)_

PROBLEMS/GOALS ADDRESSED: _ADHD_

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _Ritalin 10 / / —_
_Clonidine 0.1 / / BLS_

_12-28-58_

Provider Signature

Reed v. PCBE

MEDICATION CHART

NAME: _Justin Reed_____   CASE # _14689_____

INDIGENT DRUG PROGRAM? ___ YES _✓_ NO  ALLERGIES: _nla_____

CHCHC # _17628_

| ATE | DATE OF RX | MEDICATION, DOSAGE & DIRECTIONS | # OF TABS | # OF REF. | PRESCRIB. PHYSICIAN | INITIAL OF THE |
|---|---|---|---|---|---|---|
| | | Ritalin 10mg; 10 Cnane; 5mg @ 3:00 | | | Myers | SP |
| | 1-5-99 | Ritalin 10mg in A.m.; 10mg Cnas; 5mg @ 3:00 | | ·0 | Myers | SP |
| | 2-9-99 | Ritalin 10mg in A.m; 10mg Cnas; 5mg @ 3:00 | | ·0 | Myers | SP |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | / | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# EAST CENTRAL MENTAL HEALTH / MENTAL RETARDATION, INC.
## CLINICAL UPDATE

NAME _Justin Reed_____    CASE # _14689_____

**TYPE OF UPDATE:**

TRANSFER _____

TREATMENT PLAN REVIEW _____

PHYSICIAN CONSULTATION REQUEST _✓_

REFERRAL TO *H.R.O.P. _____

*H.R.O.P. EXIT SUMMARY _____

*(HIGH RISK OUTREACH PROGRAM)

CLINICAL CLOSURE (90 DAYS) _____

CASE INACTIVATION (12 MONTHS) _____

STAFFING _____

OTHER SUMMARY _____

_C.i.o. initially had a _____ client on 2-22-07 (Thursday) after he had hit his brother, hit brother and had become extremely agitated (ADHD). C.i.o. had considered placing client in a psychiatric facility, decision was made to treat client on out-pt. Client and family would like to switch client to Daytona. Client is client presently taking incinta 35mg. Client was also sexually abused two years ago._

THERAPIST / CASE MANAGER _Andrew Wright ms cec/ c.i.o._    DATE _2-26-07_ ?

UNIT DIRECTOR _Andrew Whaley_    DATE _2-26-07_

_In this 07?_

CLINICAL DIRECTOR _____    DATE _____

and/or

PSYCHIATRIST _____    DATE _____

ECMH-010

**Confidential**
**Psychological Report**

|  |  |
|---|---|
| **Name:** | Justin M. Reed |
| **ID #:** | 418334541 |
| **Gender:** | Male |
| **Date of Birth:** | 07/28/1989 |
| **Age:** | 17 |
| **Ethnicity:** | Caucasian/White |
| **Grade/Education:** | 11 |
| **Test Date:** | 02/27/2007 |
| **Examiner:** | Fernelle L. Warren, Ph.D. |

Clinical Impression:  314.01  Attention Deficit Hyperactivity Disorder, Predominantly
Inattention Type, In Partial Remission
309.81  Posttraumatic Stress Disorder
296.34  Major Depressive Disorder, Severe, With Psychotic
Features
V62.89  Borderline Intellectual Functioning

**Reason For Referral**
Justin is a 17 year, 6 month of age White/Caucasian male referred for testing because of
failing grades, poor concentration, difficulty following directions, and to assist in
facilitating development of a more appropriate treatment plan.

**Assessment Procedures**
Parent Conference
Diagnostic Intake

**Test Administered**
Reynolds Intellectual Assessment Scale (RIAS)
Wide Range Achievement Test (WRAT-4)
Behavior Rating Inventory of Executive Functioning (BRIEF)
Behavior Assessment System for Children (BASC-2)
Attention Deficit Hyperactivity Disorder Test (ADHDT)

**Background Information**
Justin currently resides with mother and father. He has three two brothers (ages 23 and
14) and one sister (age 20). He is in the 11th grade at Charles Henderson High School.
He attends regular classes with some modifications. He was sent to the alternative school
in 2004 for having a knife and recently has been sent to In School Suspension (ISS) for
having his cell phone on. He was sexually molested in 2005 while attending Charles
Henderson High School. He is currently taking medication for ADHD.

Justin is presenting with the following behaviors: psychosis (hearing voices of past 2
weeks); middle insomnia; startled response; forgetfulness; difficulty following directions;

impulsivity; defiance; temper problems; anger; mood swings; depressed mood; startled response; and self-mutilating behaviors.

**Relevant Medical History**
Meningitis

**Allergies**
None reported

**Previous Testing**
There is no known previous psychological testing.

**Observation**
Justin was escorted to the testing area by the examiner where rapport was established. He readily agreed to participate in the assessment. He completed all tasks unless they were discontinued by the examiner. During the testing session, his attention span was noticeably average when compared with other students of the same chronological age. He answered items carefully and appeared to think silently and aloud during the testing. He remained seated and was able to regulate his behaviors. Although he had a good understanding of concepts during testing, his articulation appeared to be poor. Currently, he denies suicidal or homicidal ideations or thoughts. Justin denies hallucinations/delusions at this testing. Overall, Justin was cooperative.

**TEST DATA AND INTERPRETATON**

**Intelligence Tests:**

   Reynolds Intellectual Assessment Scale (RIAS).

Justin received the following scores:

Verbal Intelligence Index            81
Nonverbal Intelligence Index         83
Composite Intelligence Index         80

Verbal, Nonverbal and Composite Intelligence Index mean scores are 100 with a standard deviation (SD) 15. Subtests Scores follow: (Subtests mean scores are 50 with a SD of 10).

| Verbal Subtests | SS | Nonverbal Subtests | SS |
|---|---|---|---|
| Guess What | 33 | Odd-Item Out | 44 |
| What's Missing | 33 | Nonverbal Memory | 46 |

Justin's overall intelligence was assessed using a variety of test items. Some of the RIAS items emphasize the understanding and use of words to solve problems. These items require the use of language, knowledge of words and their meanings, and thinking skills,

Reed v. PCBE
777

and are part of the RIAS Verbal Intelligence Index (VIX). Examples of such verbal items include, "What rises every morning, heats the earth, and shines brightly in the sky?"* and "Lead is to pencil as ink is to... ?"*

The RIAS also includes nonverbal items that require thinking with pictures and shapes or identifying the part of an object that is missing in a picture. Examples of such nonverbal items include a picture of a coffee cup with the handle missing* in which the examinee must identify the part that is missing, and a picture of three squares and a circle* in which the examinee must point out which object does not belong with the others. Such items are part of the RIAS Nonverbal Intelligence Index (NIX). When correct responses are added up across these verbal and nonverbal items, a good estimate of Justin's overall intelligence is obtained. In the case of the RIAS, this overall intelligence score is called the Composite Intelligence Index (CIX).

On testing with the RIAS, Justin earned a Composite Intelligence Index or CIX of 80 (*Borderline Intellectual Functioning*). On the RIAS, this level of performance falls within the range of scores designated as below average and exceeds the performance of 9% of individuals at Justin's age. The chances are 90 out of 100 that Justin's true CIX falls within the range of scores from 76 to 86.

Justin's VIX of 81 and NIX of 83 are consistent with his CIX noted above and indicate that Justin's verbal and nonverbal abilities are similarly developed.

**Achievement Tests:**

Wide Range Achievement Test - 4 (WRAT - 4)

Justin's academic achievement was assessed with the WRAT - 4. The WRAT - 4 has a mean of 100 and a SD of 15. Results follow:

| Subtest Scores | SS | PR | GE |
|---|---|---|---|
| Word Reading | 69 | 2 | 3.4 |
| Sentence Comprehension | 70 | 2 | 3.9 |
| Spelling | 70 | 2 | 3.5 |
| Math Computation | 70 | 2 | 3.7 |
| Reading Composite | 68 | 2 | — |

*Score significantly below IQ expectancy level.

The achievement scores are presented with both grade equivalent and standard scores. The grade equivalent scores represent the grade equivalent based on the national standardization sample. Percentile ranks are the percentage of individuals in the normative group obtaining scores below a particular standard score. The Standard Scores (SS) represent the anticipated IQ score for individuals the same age and can be compared directly to the IQ scores on the RIAS. Differences of 16 points or greater, between these standard scores and the IQ score, are usually considered significant.

In comparison to Justin's RIAS Composite Intelligence Index of 80, his Word Reading subtest was within the expected range. His standard score was 69, which yielded a percentile rank of 2 when compared with other children the same age. Based on the test, Justin's general ability to perform letter and word decoding through letter identification and word recognition was at lower extreme range. The grade equivalent was at the lower 3rd grade level.

On the Sentence Comprehension subtest, Justin obtained a standard score of 70, which yielded a percentile rank of 2 when compared with other children the same age. This suggest that Justin's general ability to gain meaning from words and to comprehend ideas and information contained in sentences throughout the use of a modified cloze technique was at the low range. In comparison to Justin's RIAS Composite Intelligence Index, his performance was within the expected range. The grade equivalent was at the upper 3rd grade level.

On the Spelling subtest, Justin obtained a standard score of 70, which placed him at the 2nd percentile rank. This suggest that Justin's general ability to encode sounds into written form through the use of a dictated spelling format containing both letters and words was at the low range. In comparison to Justin's RIAS Composite Intelligence Index, his performance was within the expected range. The grade equivalent was at the middle 3rd grade level.

On the Math Computation subtest, Justin obtained a standard score of 70, which placed him at the 2nd percentile rank. This suggests that Justin's general ability to perform basic mathematics computations through counting, identifying numbers, solving simple oral problems, and calculating written mathematics problems was at the low range. In comparison to Justin's RIAS Composite Intelligence Index, his performance was within the expected range. The grade equivalent was the upper 3rd grade level.

On the Reading Composite (Word Reading Standard Score + Sentence Comprehension Standard Score), Justin obtained a standard score of 68, which placed him at the 2nd percentile rank and his performance at the lower range. In comparison to Justin's RIAS Composite Intelligence Index, his performance was within the expected the range.

## Neuropsychological Test:

### Behavior Rating Inventory of Executive Functioning (BRIEF)

Justin's executive functioning was assessed with the BRIEF. The BRIEF has a T score mean of 50 and a SD of 10. Results follow:

**Parent Form**

Justin's parent completed the Parent form of the Behavior Rating Inventory of Executive Function (BRIEF) on 02/28/2007. In the context of these validity considerations, ratings of Justin's executive function exhibited in everyday behavior reveal some areas of concern.

The overall index, the Global Executive Composite (*GEC*), was elevated (*GEC T* = 76, %ile = 99). Both the Behavioral Regulation (*BRI*) and the Metacognition (*MI*) Indexes were elevated (*BRI T* = 73, %ile = 97 and *MI T* = 74, %ile = 98).

Within these summary indicators, all of the individual scales are valid. One or more of the individual BRIEF scales were elevated, suggesting that Justin exhibits difficulty with some aspects of executive function. Concerns are noted with his ability to adjust to changes in routine or task demands (Shift *T* = 76, %ile = 98), modulate emotions (Emotional Control *T* = 75, %ile = 98), initiate problem solving or activity (Initiate *T* = 76, %ile = 99), sustain working memory (Working Memory *T* = 71, %ile = 97), plan and organize problem solving approaches (Plan/Organize *T* = 77, %ile = 99), and monitor his own behavior (Monitor *T* = 65, %ile = 96). Justin's ability to inhibit impulsive responses (Inhibit *T* = 60, %ile = 89) and organize his environment and materials (Organization of Materials *T* = 63, %ile = 85) is not described as problematic by the respondent.

Justin's scores on the Shift scale and the Emotional Control scale are significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of Justin's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

The BRIEF Inhibit and Working Memory scales can be helpful in identifying Justin with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). In this particular profile, Justin's score on the Working Memory scale is significantly elevated as compared to like-aged peers (*T* = 71, %ile = 97) while his score on the Inhibit scale is not significantly elevated (*T* = 60, %ile = 89). This profile is similar to that seen in children clinically diagnosed with ADHD, Inattentive Type.

### Teacher Form

Justin's teacher completed the Teacher form of the Behavior Rating Inventory of Executive Function (BRIEF) on 02/27/2007. The respondent's ratings of Justin do not appear overly negative. In the context of these validity considerations, ratings of Justin's executive function exhibited in everyday behavior reveal some areas of concern.

The overall index, the Global Executive Composite (*GEC*), was elevated (*GEC T* = 89, %ile = 99). Both the Behavioral Regulation (*BRI*) and the Metacognition (*MI*) Indexes were elevated (*BRI T* = 73, %ile = 93 and *MI T* = 92, %ile = 99).

Within these summary indicators, all of the individual scales are valid. One or more of the individual BRIEF scales were elevated, suggesting that Justin exhibits difficulty with some aspects of executive function. Concerns are noted with his ability to inhibit impulsive responses (Inhibit *T* = 67, %ile = 93), adjust to changes in routine or task demands (Shift *T* = 84, %ile = 97), modulate emotions (Emotional Control *T* = 66, %ile = 90), initiate problem solving or activity (Initiate *T* = 101, %ile = 99), sustain working memory (Working Memory *T* = 101, %ile = 99), plan and organize problem solving approaches (Plan/Organize *T* = 78, %ile = 97), organize his environment and materials

(Organization of Materials $T$ = 90, %ile = 98), and monitor his own behavior (Monitor $T$ = 71, %ile = 91).

Justin's scores on the Shift scale and the Emotional Control scale are significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of Justin's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

The BRIEF Inhibit and Working Memory scales can be helpful in identifying Justin with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). In this particular profile, Justin's score on the Working Memory scale is significantly elevated as compared to like-aged peers ($T$ = 101, %ile = 99). His score on the Inhibit scale is also moderately elevated ($T$ = 67, %ile = 93). This profile is similar to that seen in children clinically diagnosed with ADHD, although the subtype is unclear given the moderate elevation on the Inhibit scale. Additional sources of data may assist in clarifying the diagnostic subtype.

**Note:** Higher T scores and percentiles indicate greater degrees of executive function. For all the BRIEF clinical scales and indexes, T scores at or above 65 (*) should be considered as having potential clinical significance.

### Personality and Emotional Assessment:

#### Behavior Assessment System for Children (BASC-2)

The BASC-2 is an Integrated behavior rating system designed to facilitate the differential diagnosis and classification of a variety of emotional and behavior disorders of children and to aid in the design of treatment plans. The BASC has Clinical and Adaptive Scaled Scores reported as T-Scores. T-Scores have a mean of 50 and a standard deviation of 10.

On the **Clinical Scales**, At-Risk (AR) T-Scores (60-69) indicate the presence of significant problems that, while requiring treatment and or monitoring, may not be severe enough to warrant a formal diagnosis. Clinically Significant (CS) scores (70 and above) denote a high level of maladaptive behavior. **Adaptive Scales** scores are CS if scores are 30 or less and are AR if between 31 and 40.

The **BASC** also identifies certain responses as Critical Items because they suggest the potential of causing harm to one's self or others. A listing of Critical Items Ms. Elizabeth Reed, the mother endorsed on the Parent Rating Scales (PRS) follows: (Ms. Reed Caution Indices were all in the acceptable range.

The following Critical Items were endorsed:

| Item | Response |
|------|----------|
| Sees things that are not there | Often |
| Threatens to hurt others | Sometimes |

Reed v. PCBE

| | |
|---|---|
| Hits other adolescents | Sometimes |
| Eats things that are not food | Often |
| Hears sounds that are not there | Often |
| Is easily annoyed by others | Almost always |

The male norm group comparison follows:

| Scale | T-Score | Percentile |
|---|---|---|
| **Clinical Scales** | | |
| Hyperactivity | 65+ | 91 |
| Aggression | 57 | 80 |
| Conduct Problems | 56 | 79 |
| Anxiety | 55 | 73 |
| Depression | 71* | 96 |
| Somatization | 54 | 76 |
| Atypicality | 86* | 99 |
| Withdrawal | 67+ | 94 |
| Attentional Problems | 66+ | 93 |
| | | |
| **Adaptive Scales** | | |
| Adaptability | 37+ | 12 |
| Social Skills | 35 | 7 |
| Leadership | 32+ | 4 |
| Activities of Daily Living | 32+ | 5 |
| Functional Communication | 25* | 1 |

| Scale | T-Score | Percentile |
|---|---|---|
| **Composite** | | |
| Externalizing Problems | 60+ | 87 |
| Internalizing Problems | 62+ | 89 |
| Behavioral Symptoms Index | 75* | 97 |
| Adaptive Skills | 29* | 3 |

+At-Risk Scores
*Clinically Significant Scores

Ms. Mitz Woodall completed the Teacher Rating Scale. His scores follow: (The Caution Indices were all in the acceptable range.)

The following critical items endorsed that may deserve attention:

| Item | Response |
|---|---|
| Is easily annoyed by others | Sometimes |

The male group norm comparison follows:

Recd v. PCBE

| Scale | T-Score | Percentile |
|-------|---------|------------|
| **Clinical Scales** | | |
| Hyperactivity | 47 | 51 |
| Aggression | 43 | 20 |
| Conduct Problems | 56 | 80 |
| Anxiety | 77 | 98 |
| Depression | 66 | 92 |
| Somatization | 79 | 97 |
| Attentional Problems | 74* | 99 |
| Learning Problems | 79* | 99 |
| Atypicality | 47 | 56 |
| Withdrawal | 80 | 99 |
| | | |
| **Adaptive Scales** | | |
| Adaptability | 42 | 24 |
| Social Skills | 53 | 61 |
| Leadership | 31+ | 1 |
| Study Skills | 38+ | 15 |
| Functional Communication | 28* | 1 |

| Scale | T-Score | Percentile |
|-------|---------|------------|
| **Composite** | | |
| Externalizing Problems | 49 | 53 |
| Internalizing Problems | 78* | 98 |
| School Problems | 79* | 99 |
| Behavioral Symptoms Index | 62+ | 89 |
| Adaptive Skills | 37 | 10 |

+At-Risk Scores
*Clinically Significant Scores

Any score in the Clinical Significant range suggest a high level of maladjustment. The TRS show clinical significant scores on Anxiety, Somatization, Attentional Problems, Learning Problems, and Withdrawal, and at risk scores on Depression. The PRS show clinical significant scores on Depression, Atypicality, and at risk scores on Hyperactivity, Withdrawal, and Attentional Problems. Both PRS and TRS were somewhat consistent with Justin's history of behaviors at home and school.

## Conclusion

Justin is a 17 year, 6 month of age White/Caucasian male referred for testing because of failing grades, poor concentration, difficulty following directions, and to assist in facilitating development of a more appropriate treatment plan.

On testing with the RIAS, Justin earned a Composite Intelligence Index or CIX of 80 (*Borderline Intellectual Functioning*). On the RIAS, this level of performance falls

within the range of scores designated as below average and exceeds the performance of 9% of individuals at Justin's age.

In comparison to Justin's RIAS Composite Intelligence Index of 80, his Word Reading, Sentence Comprehension, Spelling, Math Computation, and Reading Composite subtest standard scores of 69, 70, 70, 70, and 68, respectively, were within the expected range.

On the Parent and Teacher BRIEF rating scale, Justin's scores on the Shift scale and the Emotional Control scale were significantly elevated compared to age- and gender-matched peers. This profile suggests significant problem-solving rigidity combined with emotional dysregulation. Children with this profile have a tendency to lose emotional control when their routines or perspectives are challenged and/or flexibility is required. In order to develop a better understanding of Justin's difficulties, further examination of the situational demands that result in such a loss of emotional control would be helpful.

Moreover, The BRIEF Inhibit and Working Memory scales were helpful in identifying Justin with suspected Attention-Deficit/Hyperactivity Disorder (ADHD). On the Parent Rating Scale, Justin's score on the Working Memory scale was significantly elevated as compared to like-aged peers ($T = 71$, %ile = 97) while his score on the Inhibit scale is not significantly elevated ($T = 60$, %ile = 89). This profile is similar to that seen in children clinically diagnosed with ADHD, Inattentive Type. On the Teacher Rating Scale, Justin's score on the Working Memory scale was significantly elevated as compared to like-aged peers ($T = 101$, %ile = 99). His score on the Inhibit scale was also moderately elevated ($T = 67$, %ile = 93). This profile is similar to that seen in children clinically diagnosed with ADHD, although the subtype was unclear given the moderate elevation on the Inhibit scale. It is the examiners opinion that this score was suppressed due to his medication for ADHD.

According to the information from the BASC-2, The TRS show clinical significant scores on Anxiety, Somatization, Attentional Problems, Learning Problems, and Withdrawal, and at risk scores on Depression. The PRS show clinical significant scores on Depression, Atypicality, and at risk scores on Hyperactivity, Withdrawal, and Attentional Problems. Both PRS and TRS were somewhat consistent with Justin's history of behaviors at home and school. These serious problems, as indicated by results of the personality and emotional assessments indicate that Justin is expected to experience difficulty in the regular classroom without intervention or remediation.

Overall, given the reported history, observations and testing, it is the examiners opinion that Justin meets the criteria for Attention Deficit Hyperactivity, Predominantly Inattentive Type, In Partial Remission, Posttraumatic Stress Disorder, Major Depression Disorder, Severe With Psychotic Features, and Borderline Intellectual Functioning.

Results from these tests are considered a valid estimate of Justin's abilities.

## Recommendations

1. Justin may qualify for special education and related services. Ongoing monitoring of Justin's behavior and academic performance would be help in determining whether additional classroom interventions are needed.

2. It is suggested that Justin begin therapy sessions as needed to encourage appropriate behaviors and positive interactions. Also, Justin could benefit from weekly therapy sessions to explore and monitor his ADD-like behaviors/Anxiety/Depression. Furthermore, the seriousness of his emotional disturbances suggests that therapy should be initiated for both Justin and his parents.

2. Behavior-modification techniques may be valuable in developing new social skills.

**Additional student based interventions are suggested:**

*Working Memory Tasks*

1. Children with difficulties sustaining working memory often show problems in the ability to remain focused on a task or activity, particularly for schoolwork or homework assignments. Many demonstrate a natural tendency to use "self-talk" or verbal mediation in order to guide their own problem solving and to direct their attention. Such verbal mediation strategies might be encouraged or taught directly. Initially, Justin might verbalize aloud with supervision as he steps through a task. Eventually, talking aloud can be minimized such that Justin relies on subvocalization or only a whisper to direct his focus.

2. Individuals like Justin often demonstrate difficulties keeping track of more than one or two steps at a time. Providing a written checklist of steps required to complete a task can serve as an external memory support and alleviate some of the burden on working memory.

3. It is often necessary to repeat instructions or new information for children like Justin so that they may increase the amount of information captured.

4. Children like Justin can benefit from learning compensatory skills to apply independently. Justin can learn how to actively listen, such as stopping what he is doing at the time, focus his attention, ask questions, restate the information or question, or take notes. Have Justin repeat or paraphrase what he has heard or understood in order to check for accuracy and to provide an opportunity for rehearsal. Ultimately, teaching self-initiated "comprehension checking" strategies (e.g., the child asking for repetition of instructions) helps to promote independent management of working memory weaknesses.

*Inhibit Tasks*

1. A student with inhibitory control difficulties often requires additional structure in his environment at the outset in order to maintain more appropriately controlled behavior. Justin might need a more explicit, extensive, and/or clear set of rules and expectations, and might need these reviewed with him regularly.

2. Often, it is important to limit distractions that are problematic for a student with inhibitory control difficulties. This might include visual and auditory distractions as well as other students or activities that can pull Justin's attention away from a task.

3. Environmental structure can be an important consideration for children like Justin. Open classroom settings often have too many distractions and too many opportunities for impulsive behaviors.

4. A student like Justin often benefits from careful placement in the classroom. This is not necessarily in the front and center, but might be close to the center of activity to help him feel more involved or in a place where frequent eye contact with the teacher is likely.

5. Disinhibited children often require more frequent redirection and more frequent limit-setting from the teacher. Placement in close proximity of the teacher can facilitate greater interaction without disturbing other students.

6. Justin might benefit from sitting with or near more well-controlled and more focused peers who can serve as models and can resist his distracting tendencies.

*Emotional Control Tasks*

1. Children with executive difficulties, particularly with fragile inhibitory control and/or difficulties adapting to change in their home and school environments, may express their feelings more strongly and more directly than most children. This can make them seem more angry, irritable, sad, or silly than their peers. Such emotional expression should prompt evaluation to rule out mood or affective difficulties. When difficulties with modulation of affect occur in the context of other self-regulatory problems, management of the child's executive difficulties may be helpful.

2. Difficulties with emotional control can often be viewed as one expression of disinhibition. Thus, techniques for supporting inhibitory control and reducing impulsivity may be helpful.

3. Justin might benefit from opportunities to discuss upcoming situations or events that may provoke an emotional outburst. Increasing his awareness of the potential for emotional reactivity and the likely consequences to follow may help him modulate more effectively in the moment.

4. Processing situations that have led to emotional outbursts with Justin in a non-threatening setting and manner is important. Choose a situation where he is relaxed and therefore more receptive to objective analysis of what happened. This can help Justin gain better control while increasing his awareness of his reactions.

5. Peer modeling may be helpful for Justin. Placing him in activity-focused, small groups with well-controlled peers may help him emulate their behavior.

Thank you for referring this patient for psychological services. Should the reader have any questions in regards to this evaluation, feel free to contact me at (334) 808-8991.

_Fernelle J. W_                    3-12-07

Fernelle L. Warren, Ph.D.                    Date

Licensed Clinical Psychologist

Rced v. PCBE
737

# PROGRESS NOTE
## (Face-to-Face Services)
### East Central Mental Health - Mental Retardation, Inc.

DATE: 7-23-07

LOCATION: PIKE

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14689 | Justin Reed | 111 | 14/24 | | 484/589 | :15 | :15 |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management ____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult ____ Family Support / Education

**TOP COPY** - Client / **WHITE ORIGINAL WITH NOTE** - Chart

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: 17 yo wm wt 149 B/p 112/64 Reports medication compliance correctly recalls dosage. Attending Band Camp upcoming Senior in High School. _____

PROBLEMS/GOALS ADDRESSED: _____

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _____

Provider Signature

Reed v. PCBE
738

## AFTERCARE SERVICE SUMMARY
### Please keep this document and take it to future appointments.

**Patient Name:** Justin Reed
**DOB:** 7/28/89
**County:** Pike
**Parent/Guardian:** Ann and Thomas Reed
**Date Admitted:** 4/17/07
**Date Discharged:** 4/24/07

**Medications at Discharge:** Lexapro 20 mg. qd, Adderall XR 20 qam

### Diagnosis:

Axis I:    **Depressive Disorder NOS, PTSD, ADHD by history**
Axis II:   **None**
Axis III:  **PVC on EEG, on review patient is not symptomatic**
Axis IV:   **Sexual abuse, Conflict with parents, Peer problems**
Axis V:    GAF at Admission= 45  GAF at Discharge= 50

### Recommended Services:

1. Removal of all firearms and/or lethal weapons from the home environment.
2. Continue to take medication as prescribed.
3. Keep follow up appointment with Dr. Wright on 4/25/07 at 8:30 am. Continue outpatient therapy with Andrew Wright.

---

Nasima J. Amin, M.D.
Psychiatry Resident

Kathy A. Fleming, LCSW, PIP
Psychiatric Adolescent Social Worker

Reed v. PCBE

# EAST CENTRAL MENTAL HEALTH / MENTAL RETARDATION, INC.
## CLINICAL UPDATE

NAME _Justin Reed_                    CASE # _14 689_

**TYPE OF UPDATE:**

TRANSFER _____                          CLINICAL CLOSURE (90 DAYS) _____

TREATMENT PLAN REVIEW _____             CASE INACTIVATION (12 MONTHS) _____

PHYSICIAN CONSULTATION REQUEST _✓_      STAFFING _____

REFERRAL TO *H.R.O.P. _____             OTHER SUMMARY _____

*H.R.O.P. EXIT SUMMARY _____

*(HIGH RISK OUTREACH PROGRAM)

_Client was sent to UAB Adolescent unit on 4-16-07. Client client was in hospital for a week. Client is presently on the extended release (Adderall X R 20) but wants to be placed on (regular Adderall). Client should be remained on Lexapro 20 mg. qd,_

THERAPIST / CASE MANAGER _Andrew Wright m. s. L.pc/c.o._ DATE _4-30-07_

UNIT DIRECTOR _Andrew Wright m. s. L.pc / C._ DATE _4-30-0_

CLINICAL DIRECTOR _____ DATE _____

**and/or**

PSYCHIATRIST _____ DATE _____

ECMH-010

Reed v. PCBE

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: 4-30-07
LOCATION: Pike

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14689 | Justin Reed | 111 | 14 24 | | 484/585 | :15 | :15 |

**NEXT APPOINTMENT:  DAY:** Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ✓ Phys. Assess.  ✓ Med. Monit.  ____ Consult

____ Family Support / Education

**TOP COPY** - Client / **WHITE ORIGINAL WITH NOTE** - Chart

**MENTAL STATUS:  (Check Where Applicable):**

Affect: ✓ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate

Mood: ____ Anxious  ____ Dysphoric  ✓ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations  ____ Delusions

____ Suicidal  ____ Homicidal  ____ Paranoid  ____ N/A

COMMENTS: ____ Deny H_____

MED. COMPLIANCE: ____ Yes  ____ No  COMMENTS: _____

**SLEEP:** ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ____ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ____ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: 17yo b/o ble 62 wt 155 # Discharged from UAB.
See referral - Discharge meds Adderall XR & Lexapro -
however cks a mother inequest to return to plain Adderall 20mg)
Lexapro

PROBLEMS/GOALS ADDRESSED: _____ re _____

PROGRESS/ASSESSMENT: _____ emil _____

FOCUS FOR NEXT SESSION: _____ info rtf _____

Provider Signature

Reed v. PCBE
741
FROM Azar, Azar & Moore, LLC

# M DICATIONS INFORMED CO ENT

I have discussed with the nurse/or physician the risks and benefits of those type of medications prescribed for me. I am aware that this form of treatment is recommended by the treatment staff and I agree to take medications as prescribed for my individual care. I am aware that I may seek further discussions of these risks and benefits at any time. I have been given a copy of the medication information sheet on these medications. I understand that I may talk with the pharmacist regarding my prescription(s) and have signed the pharmasist request sheet indicating the same.

| DATE | MEDICATION | CLIENT SIGNATURE | RN / PHYSICIAN |
|------|-----------|------------------|----------------|
| 4-30-07 | Adderall 20mg ℥ QD | x _Jwalln Reed_ | _Robinson R_ |
|  | Lexapro 20mg ℥ QD |  |  |

Reed v. PCBE
742
ECMH-022

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: 2-36-07

LOCATION: PIKE

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|------|-------|-------|------|------|
| 14689 | Justin Reed | 111 | 14/24 | | 454/559 | :15 | :15 |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult
___ Family Support / Education

_____ TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart _____

**MENTAL STATUS: (Check where Applicable):**

Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate

Mood: ___ Anxious ___ Dysphoric ___ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

___ Hallucinations ___ Delusions

___ Suicidal ___ Homicidal ___ Paranoid ___ N/A

COMMENTS: _____

MED. COMPLIANCE: ___ Yes ___ No COMMENTS: _____

SLEEP: ___ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

APPETITE: ___ Good ___ Fair ___ Poor

ORIENTED TO: ___ Normal DEFICITS: ___ Person ___ Place ___ Time ___ Situation

MOTOR ACTIVITY: ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: 17 yo 120/78 B/p wt # Crisis referral

History- Sexual abuse by teacher 2yrs ago- mild MR ADHD Aggressive

Aud hallucinations see referral previously on Concerta Restlessness

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

Reed v. PCBE
743

FROM Azar, Azar & Moore, LLC

EAST CENTR..  MENTAL HEALTH - MENTAL R...  ARDATION, INC.
## MEDICATION CHART AND DRUG USE PROFILE

Medication Consent Form: 4-30-07

Case Number: 14689

IDP Eligible _____ Yes _____ No

Name: Justin Reed

Allergies: NKDH

| Rx # | Medications, Dosage Directions | Comments | Prescribing Physician | Date Issued | Issued By |
|---|---|---|---|---|---|
| | 2-26-07 Resperdal M-tab 1 mg QDay #30 ℞₃ | | Lopez | | |
| | 4-30-07 Lexapro 20mg 1 QD #30 ℞₃ | | Lopez | | |
| | Adderall 20mg 1 AM #30 ℞₃ | | ↓ | | |
| | 4-23-07 Lexapro 20mg 1 QD #30 ℞₃ | | Lopez | | |
| | Adderall 20mg 1 QAM #30 ℞ | | ↓ | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Reed v. PCBE
744

# PROGRESS NOTE

| Anglin    Reed | 14689 | 111 |
|---|---|---|
| **NAME** | **CASE #** | **UNIT** |

Date, Service
Time of Day and
Time Spent/Units                        Record

7-2-07,  Individual Ex.                              I.D.P.O.P

Fri  11:00   /  1:00
        a.m.

Client appears to
be much improved
in over all
simptomology.

Reed He appears to
be taking medication and
shows no signs of
aggression or property
destruction.
C.L.O will
continue to see
client at least
monthly.
next app. is scheduled
for 8-6-07 at 11:00 a.m.
C.L.O. will continue
to do behavioral
Ex. with client.
Ordered w/g.t m.S.L.C.J

C.L.O

## PROGRESS NOTE

Caroline Reed _____ 14689 _____ 111
NAME                    CASE #                    UNIT

Date, Service
Time of Day and
Time Spent/Units                    Record

6-11-07 Family Ly                                    1 D.R.O.F.

_____ 1:30

C.I.O. saw client
and mother in office.
Client continued to
be cooperative of
there.

Aod — the progress. Client shows no
signs of decompensation,
aggression, property destruction
or agitation.
Client appears to
be taking medication
as prescribed.
C.I.O. is to see
client again soon.
Behavior changes will
be continued to
be used with
client.

Adrien Nipolms C.RC/C.io

ECMH – 002                                    FROM Azar, Azar & Moore, LLC

# PROGRESS NOTE

| _Quatin Reed_ | _14689_ | _III_ |
|---|---|---|
| NAME | CASE # | UNIT |

Date, Service
Time of Day and
Time Spent/Units

Record.

4-30-07 Family Rx                                                    10 Rx 0 R

1:15 - 1:30
p.m.

        C.C.O. saw client
in office again today.
Client continue to
make good progress.
~~Good client shows no~~
~~signs of aggression~~
~~nor does he appear~~
~~angry or depressed.~~ Client also has
not taken anything
without permission. C.C.O. is to
continue behavioral therapy
with clients and
family. C.C.O. is to see
client again on 5-7-07
at 10:00 a.m.
     Andrew Wright M.J. L.PC/C.C.O

## PROGRESS NOTE

Austin Reed          CASE # 1 4 689          UNIT 111

NAME

Date, Service
Time of Day and
Time Spent/Units          Record

4-15-07, Family Ss...          12. R. 06

10:00, :30
A.m.

C.L.S. saw client and mother in office client appears to be making good progress. Client has not exhibiting any violent behavior and appears to be medication compliant. Client's mother report took extended labs of medication makes client drowsy in sick according to his report. Client is to see Dr. Syzey today at Ext. 2:00 P.m.

C.L.S. is to see client again on 4-30-07 Anna Wright m.s.w./c.c.s.

Reed v. PCBE
702

FROM Azar, Azar & Moore, LLC

## PROGRESS NOTE

_Quentin Reed_ _____ _14689_ _____ _III_
NAME                        CASE #                      UNIT

Date, Service
Time of Day and                          Record
Time Spent/Units

4·16·0?, Crisis Int                                    10 R.o. Y.

Continued

Guelae Hightower count
asked client to
C 5 North at UAB.

Andrew Wright MS L.P./LLO

# PROGRESS NOTE

Gustin Reed _____ 14689 _____ 111
**NAME** _____ **CASE #** _____ **UNIT**

Date, Service
Time of Day and
Time Spent/Units _____ Record

4-16-07, was P.I _____ 1 R.O.V.

continued in crying spell.
C.W.O. called
police as well as
juvenile authorities
C.W.O. and R.D
took client to E.R.
for sedation because
of lack of bedspace.
Client was taken home.

3:50
P.M. C.W.O. received phone
call phone call from
Pat Smith.
Pat Smith located
resource at UAB.

4:25 P.M. C.W.O. called UAB
and gave referral
information

6:d 5:15 P.M. UAB agreed to
accept client.

6:00 P.M. C.W.O. was present
at Judge Hightower's court.
Judge Hightower had hearing

ECMH - 002

Reed v. PCBE

# PROGRESS NOTE

14689

NAME _Quintin Reed_                    CASE # _14689 Cross Rd._                    UNIT _111_

Date, Service
Time of Day and
Time Spent/Units

Record

W. R. O. V.

4.16-07  Crisis Int.

10:15 , 4:00

c. i.o.  saw  client
in  office  today.
Client  seems  to
be  ~~having  an  increase~~
in  ~~agitation~~  and  uncooperative
~~behavior.~~

Client  had  threatened
to  tear  up  television  on
last  friday.
c. i.o.  person n.w.  provided
behavioral  techniques.
Client  is  to  return
to  school.

Ext 11:00    Client  and  mother
o.n    returned  to  office
after  client  refused
to  go  back  to  school.
Client  became  agitated
and  refused  to  get
out  of  van.
Client  also  engaged

Reed v. PCBE
705

# EAST CENTRAL MENTAL HEALTH / MENTAL RETARDATION, INC.
## CLINICAL UPDATE

NAME _Justin Reed_      CASE # _14689_

**TYPE OF UPDATE:**

TRANSFER _____

TREATMENT PLAN REVIEW _____

PHYSICIAN CONSULTATION REQUEST _____

REFERRAL TO *H.R.O.P. _____

*H.R.O.P. EXIT SUMMARY _____

*(HIGH RISK OUTREACH PROGRAM)

CLINICAL CLOSURE (90 DAYS) _____

CASE INACTIVATION (12 MONTHS) _____

STAFFING _____

OTHER SUMMARY _✓_

_2:30_

Client had a session with therapist then refused to go back to school, client appears to be exhibiting depressed mood, hopelessness, crying spells, agitation and mood swings. Client will become totally withdrawn at times. Client has become aggressive with the family in the past. Has not become aggressive with others.

THERAPIST / CASE MANAGER _Andrew Wright M.S._   _c.r.c./c.c.o._ DATE _4-16-07_

UNIT DIRECTOR _Andrew Wright M.S.L.P.C._ / _C.L._ DATE _4-16-07_

CLINICAL DIRECTOR _____ DATE _____

and/or

PSYCHIATRIST _____ DATE _____

Reed v. PCBE
706

# PROGRESS NOTE

Quentin Reed _____ 14659 _____ 111
NAME _____ CASE # _____ UNIT

Date, Service
Time of Day and
Time Spent/Units _____ Record _____

4-9-07, Individual tx _____ 12 R-3 P

10:00 / 1:00
am

C.C.O. saw client in office today. Client appears to be compliant with medication and does not appear to have engaged in violent or aggressive behavior. Client has taken something without permission. Client was placed on punishment / but possibly not severe enough. C.C.O. is to see client again next week. Plan is to continue behavioral therapy.

Andrew Wright M.S. L.P.C./C.C.O.

# PROGRESS NOTE

_Quolin Reed_ _____ _1 x 651_ _____ _/ 11_
NAME                    CASE #                    UNIT

Date, Service
Time of Day and
Time Spent/Units                    Record

2-19-0?  Case Int.                              I.V.R.P.P

continued   Client next week.

            C.I.O.   covered

    psychological   testing.

    Andrew Wright, MS, PC/CIO.

Reed v. PCBE
708

ECMH - 002

# PROGRESS NOTE

NAME: _Justin Reed_     CASE #: _14657_     UNIT: _III_

Date, Service
Time of Day and
Time Spent/Units

Record

3-19-07, Crisis Int          12, R.O.K.

10:00, 1:15

C.I.O. saw client
and mother in
office. C.I.O. covered behavior
problems with client
and mother.
~~mother reports that
client will not
go to school~~ a
day when he
has session appointments.
He also reports
that client went
up to grandmother's
house. Client is not
suppose to go to
grandmother's house.
Client was given
behavior therapy and
consequences of behavior.
C.I.O. is to see

_next page_

ECMH - 002

# PROGRESS NOTE

NAME _Austin Reid_    CASE # _1x 659_    UNIT _11 t_

Date, Service
Time of Day and
Time Spent/Units

_3-5-02, Cases Jnl_    Record    _1 d. v. o. k_

_1:19, 1:15_

C.C.O. saw client in office again today.
C.C.O. again worked on behavior therapy with client.

Client appears to be exhibiting progress as far as being less withdrawn. Client does not appear to be exhibiting agitation, feeling f or on act acting-al behavior.

Client has also not exhibited violent behavior.

C.C.O. is to see client again next week on 3-8-06 at 1:00 p.m.

_Andrew Naph m.s. c.c./c.c.o._

Recd v. PCBE
710

# PROGRESS NOTE

Quintin Reed                    14659                    111

**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

2.26.07, Crisis Int.                    W.R.O.V.

Continued

Client was given
behavior modification
techniques to help
with behavior.
Client was open
to techniques.
Andrew Wright M.S.L.P.C.
LC.L.O

ECMH - 002                    Rcvd v. PCBE
                    711

# PROGRESS NOTE

NAME _Austin Reed_                CASE # _1 x 689_                UNIT _111_

Date, Service
Time of Day and
Time Spent/Units                        Record

2-26-07, Crisis Int.                                    Id. R. O. V.

9:00 , 1:00
a.m

C. I. O. saw client
in office today.
C. I. O. come
up with a
plan of action to
help client to get
out of this
crises stage.
Client is to
see Dr. Sosy today
as well as be
referred for testing.
Client is to be
seen again on 3-5-07
at 8:30 a.m.
Client is doing
much better.
Andrew Williams L.P.C./C.I.O.

3-26-07, Crisis Int.
time, 1:00
p.m.

C. I. O. saw client
again in office.

Recd v. PCBE
712

# PROGRESS NOTE

Justin Reed _____ 14689 _____ 11

**NAME** _____ **CASE #** _____ **UNIT**

Date, Service
Time of Day and
Time Spent/Units

2-23-02    Crisis Int.    Record    12.R. o r.

9:30 p.m. , 2:00

C.L.O. met with client, dad, mother and brother of client. Client appears to have lost control last night. Client appears to be willing to follow out pt. plan of

① no taking of car

② no missed doses of meds

③ no aggression or outburst.

④ talk to parents before frustration builds

C.L.O. is to see client again on 2-26-02

Andrew Wright m.s. c.c./ C.L.O.

ECMH - 002

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _____

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|------------|---------------|------------|
|  |  |  |  |  |  |  |  |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy   ____ Group Therapy   ____ Family Therapy   ____ Case Management

____ Ind BLS   ____ Group BLS   ____ Crisis Intervention   ____ Phys. Assess.   ____ Med. Monit.   ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate   ____ Blunted   ____ Labile   ____ Constricted   ____ Flat   ____ Inappropriate
Mood: ____ Anxious   ____ Dysphoric   ____ Euthymic   ____ Expansive   ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations   ____ Delusions
____ Suicidal   ____ Homicidal   ____ Paranoid   ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes   ____ No   **COMMENTS:** _____

**SLEEP:** ✓ Good   ____ Fair   ____ Poor   ____ Insomnia   ____ Nightmares   ____ Hypersomnia

**APPETITE:** ____ Good   ____ Fair   ____ Poor

**ORIENTED TO:** ✓ Normal   **DEFICITS:** ____ Person   ____ Place   ____ Time   ____ Situation

**MOTOR ACTIVITY:** ____ Calm   ____ Restless   ____ Shaking/Tremor   ____ Tics   ____ Pacing   ____ Catatonic

**COMMENTS:** _He reports things are fine, doesn't like school. Says he takes his medication. likes Nintendo_

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

Provider Signature

200 Cherry Street
Troy, Alabama 36081
(334) 566-6022

**FERNANDO LOPEZ, M.D.**

Bullock • Pike • Macon

DEA No. BL3127619
ACS No. 6436

DEFENDANT'S
EXHIBIT
6

Name _____ Justin Reed _____ Age _____

Address _____ Date 7-33-07

℞    Lexapro  50mg  T QD  #30

Refill  0 • 1 • 2 • 3 • 4 • 5 • PRN



**Seroquel**®
quetiapine fumarate
25 mg, 100 mg, 200 mg & 300 mg tablets

Andrew —

Doc  OK'd  Adderall
for Justin — these are monthly
scripts so each month he can
pick up new one — they are
in his chart.

→ Justin states he only takes
Lexapro as needed and did not
take script with him. It is
also in chart if he should need
it.

Sharon

www.SEROQUEL.com

**East Central Mental Health - Mental Retardation, Inc.**

DATE: 7-23-07
LOCATION: Pike

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14689 | Justin Reed | 111 | 14/24 | | 484/589 | :15 | :15 |

**NEXT APPOINTMENT:** **DAY:** (Mon.)  Tues.  Wed.  Thur.  Fri.  **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy · ____ Group Therapy ____ Family Therapy ____ Case Management
____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult
____ Family Support / Education

**TOP COPY** - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____ 7 PM _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: 17 yo wm wt 149 B/p 112/64 Reports medication
compliance correctly recalls dosage - Attending Band Camp -
upcoming Senior in High School. - Justin Reed

**PROBLEMS/GOALS ADDRESSED:** _____ A/G _____

**PROGRESS/ASSESSMENT:** _____ euthy _____

**FOCUS FOR NEXT SESSION:** _____ next M _____

Provider Signature    7-23-07

Reed v.PCBE
633

# PROGRESS NOTE
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: 4-30-07
LOCATION: PIKE

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14689 | Justin Reed | 111 | 14/24 | | 484/589 | :15 | :15 |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult
___ Family Support / Education

---

TOP COPY - Client / **WHITE ORIGINAL WITH NOTE** - Chart

---

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ___ N/A
**COMMENTS:** _Dx M_

**MED. COMPLIANCE:** ___ Yes ___ No **COMMENTS:** _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia
**APPETITE:** ✓ Good ___ Fair ___ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation
**MOTOR ACTIVITY:** ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic
**COMMENTS:** 17yo b/o 2x6/72 wt 153 # Discharged from UAB.
See referral - Discharge meds Adderall XR & Lexapro-
however cot a mother request to return to plain Adderall 20mg

**PROBLEMS/GOALS ADDRESSED:** _re_
_Refinanced_

**PROGRESS/ASSESSMENT:** _Euclef_

**FOCUS FOR NEXT SESSION:** _left EVA_

Provider Signature

Reed v. PCBE
636

I have discussed with the nurse/or physician the risks and benefits of those type of medications prescribed for me. I am aware that this form of treatment is recommended by the treatment staff and I agree to take medications as prescribed for individual care. I am aware that I may seek further discussions of these risks and benefits at any time. I have been n a copy of the medication information sheet on these medications. I understand that I may talk with the pharmacist regarding my prescription(s) and have signed the pharmacist request sheet indicating the same.

| DATE | MEDICATION | CLIENT SIGNATURE | RN / PHYSICIAN |
|------|------------|------------------|----------------|
| 30-07 | Adderall 30mg TQD | Jamllin Reed | Hoffman RN |
|       | Ketapo 200mg QD |  |  |

Reed v. PCBE
637

**PROGRESS NOTE**
(Face-to-Face Services)
**East Central Mental Health - Mental Retardation, Inc.**

DATE: 9-25-00

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14/693 | Curtis Reed | 411 | 24/14 | | 464/484 | | |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult
___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ___ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ___ N/A

COMMENTS: _____

**ED. COMPLIANCE:** ___ Yes ___ No     COMMENTS: _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ___ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: Hgt/own 71.5# He reports things are fine, doesn't
like school. Says he takes his medication. likes nintendo

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

**Provider Signature**

# EAST CENTRAL MENTAL HEALTH – MENTAL RETARDATION, INC.
## MEDICATION CHART AND DRUG USE PROFILE

12 28 98

`Eligible _____ Yes ___✓___ No

Case Number: _146 98_

Name: _Justin Reel_                    Allergies: _NKDA_

| Rx # | Medications, Dosage Directions | Comments | Prescribing Physician | Date Issued | Issue By |
|---|---|---|---|---|---|
| | 122858 Clonidine 0.1mg ½ tab Bid  #60  x3 | | | | |
| | 031599 Clonidine 0.1mg ½ tab Bid  #30  x3 | | Lopez | | |
| | 031599 Ritalin 10mg ÷ AM÷Noon ÷ 3:30 PM  (2) | Prescribed by Dr. Myers | " | | |
| | 060799 Clonidine 0.1mg ½ tab Bid  #30  x3 | D/c 091399 | Lopez | | |
| | 060799 Pepcil 10mg ½ tab qd  #16  x3 | | " | | |
| | 091399 Pepcil 10mg ½ tab qd  #16  x3 | D/c 030600 | Lopez | | |
| | 030600 Prozac 10mg ÷ qd  #30  x3 | | Lopez | | |
| | 060500 Prozac 10mg ÷ qd  #30  x3 | | Lopez | | |
| | 9-25-00 Prozac 10mg ÷ qd- use Liquid 20mg/5cc give ½ teaspoon daily | | Lopez | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Reed v. PCBE
666

sed 5/1/96

(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _060500_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------| -----------|-----------|---------------|------------|
| 1465 | Creston Kirk | 411 | 014/024 | | 434/427 | | |

**NEXT APPOINTMENT: DAY:** (Mon.) Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS    ___ Group BLS    ___ Crisis Intervention    ✓ Phys. Assess.    ✓ Med. Monit.    ___ Consult

___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate    ___ Blunted    ___ Labile    ___ Constricted    ___ Flat    ___ Inappropriate
Mood: ___ Anxious    ___ Dysphoric    ✓ Euthymic    ___ Expansive    ___ Irritable

**THOUGHTS OR PERCEPTUAL DISTURBANCES:**
___ Hallucinations    ___ Delusions
___ Suicidal    ___ Homicidal    ___ Paranoid    ✓ N/A

COMMENTS: _Still no speech_

**MED. COMPLIANCE:** ✓ Yes    ___ No    COMMENTS: _____

**SLEEP:** ✓ Good    ___ Fair    ___ Poor    ___ Insomnia    ___ Nightmares    ___ Hypersomnia

**APPETITE:** ✓ Good    ___ Fair    ___ Poor

**ORIENTED TO:** ✓ Normal    **DEFICITS:** ___ Person    ___ Place    ___ Time    ___ Situation

**MOTOR ACTIVITY:** ___ Calm    ___ Restless    ___ Shaking/Tremor    ___ Tics    ___ Pacing    ___ Catatonic

COMMENTS: _10 yr old Wt 69.5# Going to Disney World in July. Still doesn't talk, Hides his face. Takes Prozac as ordered. Johnis On Ritalin from Dr. Myers. CJLS_

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _Rital 10g TID_
_Pzac 10 I H._    _6-5-0r_

_____
**Provider Signature**

Reed v. PCBE
667

## PROGRESS NOTE
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _030600_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14658 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

clonidine for B: 14 RR
aggressive

MMENTS: _Neat - Irritated_

eats Well

**MED. COMPLIANCE:** ✓ Yes ____ No COMMENTS: _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _10 yrs old Wt 68# Being destructive again. Tantrums._
_Not going to school. CJohns RN_

**PROBLEMS/GOALS ADDRESSED:** _____
7/4/01

Continue

**PROGRESS/ASSESSMENT:** _____

Ritalin 10 T⋯ (2 myers)
1) ( 10 mg
Prozac 11 x1

**FOCUS FOR NEXT SESSION:** _____

3/8/00

**Provider Signature**

Reed v. PCBE
668

(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: 09/399

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14698 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ✓ Phys. Assess.  ✓ Med. Monit.  ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate
Mood: ____ Anxious  ____ Dysphoric  ✓ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations  ____ Delusions
____ Suicidal  ____ Homicidal  ____ Paranoid  ✓ N/A

COMMENTS: seller does not say much

**ED. COMPLIANCE:** ✓ Yes  ____ No  **COMMENTS:** _____

**SLEEP:** ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ✓ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ✓ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: 10 yrs old wt 60.5# Fourth grade. Still not talking. Did
smile. Johns Rd Clonidine causing HA's. ♀ RN

**PROBLEMS/GOALS ADDRESSED:** 314.01

**PROGRESS/ASSESSMENT:** Continue

**FOCUS FOR NEXT SESSION:** Rital 10 - tics (& player)
Risuil 10, q h 16

Provider Signature                    9/13/99

Reed v. PCBE
669

(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _060799_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14685 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult

___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTUAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ___ N/A

COMMENTS: _Doe, 7 talk — AVM speed therapy_

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia
**APPETITE:** ___ Good ___ Fair ___ Poor
**ORIENTED TO:** ___ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation
**MOTOR ACTIVITY:** ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: _9 yr old wt 62½ Refuses to talk. Can talk. Is in speed therapy this summer - this is 3rd yr in therapy. Gets Ritalin from Dr. Myers & Clonidine from ECMH. Johns RN_

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** _Continue_

**FOCUS FOR NEXT SESSION:** _____

Provider Signature

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _03/5/99_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14685 | Justin Reed | 411 | 014/024 | | | | |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ___ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management
___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ___ Consult
___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

COMMENTS: _has 7 day suppl_

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia
**APPETITE:** ___ Good ___ Fair ___ Poor
**ORIENTED TO:** ___ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation
**MOTOR ACTIVITY:** ___ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic
COMMENTS: _9 yrs old 2Ht. 60.5# Refusing to talk. Chewing on shirt._
_Avoid eye contact. Reports taking Remeron and but CJ knols_

PROBLEMS/GOALS ADDRESSED: _seen_

PROGRESS/ASSESSMENT: _cont_

FOCUS FOR NEXT SESSION: _Ritalin 10g X 7_
_Remeron 0.1g ? PG_

Reed v. PCBE
671

Provider Signature _____ 3/15/99

_Justin Reed_          _14689_          _411_
**NAME**              **CASE #**        **UNIT**

ᴸ ᵉ, Service
Time of Day and
Time Spent/Units

Record

| 012599 | Medication! |
| | Came c growth satisfied |
| | ↓ aggressive |
| | ᴍ |

# MEDICATIONS INFORMED CONSENT

I have discussed with the Nurse and/or Physician the risks and benefits of those types of medications prescribed for me. I am aware that this form of treatment is recommended by the treatment staff and I agree to take medication as prescribed for my individual care. I am aware that I may seek further discussion of these risks and benefits at any time. I have been given a copy of the medication information sheet on these medications. I understand that I may talk with the pharmacist regarding my prescription(s) and have signed the Pharmacist Request sheet indicating the same.

| Date | Medication | Client Signature | RN / Physician |
|------|-----------|------------------|----------------|
| 12-28-98 | Clonidine 0.1mg/tablet | Elizabeth Davins | CJohnson |
| | | | |

Reed v. PCBE
673

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _122858_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14698 | Justin Reed | 4/11 | | | | | |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _9 c- ♂ 3rd grade_

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
COMMENTS: _9 y.old wt. 61# has a disability testing by Dr. Lopez who_
_supplied handouts to be us. Dr. Treatment Summary of 100898. (John R.)_

PROBLEMS/GOALS ADDRESSED: _ADHD_

PROGRESS/ASSESSMENT: _____

FOCUS FOR NEXT SESSION: _Ritol 10 [ ] T [ ] S_
_Clonidine 0.1 TÏ BÏ_

Provider Signature _____ _122858_

MEDICATION CHART

ME: _Justin Reed_____    CASE # _14689_

INDIGENT DRUG PROGRAM? ___ YES ✓ NO    ALLERGIES: _n/a_

CHCHC # 17628

| | DATE OF RX | MEDICATION, DOSAGE & DIRECTIONS | # OF TABS | # OF REF. | PRESCRIB. PHYSICIAN | INITIA OF THEI |
|---|---|---|---|---|---|---|
| | | Ritalin 10mg; 10 Q noon; 5mg @ 3:00 | | | Myers | JP |
| | 1-5-99 | Ritalin 10mg in A.M.; 10mg Q noon; 5mg @ 3:00 | | -0- | Myers | JP |
| | 2-9-99 | Ritalin 10mg in A.M.; 10mg Q noon; 5mg @ 3:00 | | -0- | Myers | JP |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# Comprehensive Client Information

____ Update
✓ Re-admit

Referral Date: _____
Intake Date: _____
Crisis Date: 2-23-0

Case #: 14689    Name: Reed    Justin
Last    First    MI

Admission Date: 2-23-07

Parent/Guardian: NA/Michael Reed

Address: 162 County Rd. 4430
City: Brundidge  State: AL  Zip Code: 36010

Home Phone: (374) 268-2760

County: 55

SSN: 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

Sex: M  Race: 02  Hispanic: 1  Veteran: N

DOB: 7 / 28 / 89

Education: 11
Referral: 08  Name: D.H.R/ Child Advocacy
Marital Status: 9
Residential Arrangement: B
Living Arrangement: 2
Residence Size: 6
Employment Status: E
Employer: NA
Legal Detail: 0
Legal Status: 1
Hearing Status: 1

### Income Sources Amount

| | | |
|---|---|---|
| 001 | Wages/Salary | |
| 002 | Public Asst (includes SSI) | |
| 003 | Retire/Pension | |
| 004 | Disability (includes SS Disb. & SSI Disb.) | |
| 008 | None | |
| 098 | Other | |
| TOTAL | | unknown |

Medicaid #: 5 000 005 960 193
Medicare #: ___ / ___ / ___
Insurance: _____
Ins. Address: _____
City: ___ St. ___ Zip: ___
___ Insured: _____
Policy #: _____  Group ID #: _____

Eff. Date: _____  QMB only: ___ yes ___ no
Child Case Management
Eff. Date: _____  Authorization #: _____

Funding Source(s): DID, ___ , ___

Self Pay Fee: 300
IDP Yearly Income: _____
IDP # in Family: _____

**Presenting Problem:** (check all that apply)

01 ____ Marital
02 ____ Family
03 ____ Social
04 ____ Interpersonal
05 ____ Daily Coping
06 ____ Medical
07 ____ Somatic
08 ____ Depress/Mood Dis.
09 ____ Suicidal
09 ____ Homicidal
____ Anxiety Disorder
____ Psychotic Disorder

010 ____ Alcohol
011 ____ Drug
012 ____ Criminal Justice
013 ____ Eating Disorder
014 ____ Thought Disorder
015 ____ Abuse Victim
016 ____ Assault Victim
017 ____ Rape Victim
018 ____ Runaway Behavior Dis.
097 ____ None
098 ✓ Other A.D.H.D.
099 ____ Unknown

**Medical Problem:** (check all that apply)

001 ____ Cerebral Palsy
002 ____ Autism
003 ____ Deaf/Blind
004 ____ Seizure Disorder
005 ____ Visual Disorder
006 ____ Blindness
007 ____ Hearing Disorder
008 ____ Deafness
009 ____ Communication

010 ____ Eating Disorder
011 ____ Hemiplegia
012 ____ Paraplegia
013 ____ Quadriplegia
014 ____ Developmental
097 ✓ None
098 ____ Other
099 ____ Unknown

Clinician Initials: A.W.

Comments: _____

Risk Assessment: (check all that apply)
✓ Danger to Self:
____ None
____ Thoughts of Suicide
____ Threats of Suicide
____ Plan for Suicide
____ Suicide Gestures
____ Family History of Suicide
____ Preoccupation with Death
✓ Other  aggression

✓ Danger to Other:
____ None
____ Thoughts of Harm Others
____ Threats to Harm Others
____ Plan to Harm Others
____ Attempts to Harm Others
____ Inability to Care for Dependents
✓ Other  hitting/biting

✓ Admission Policy:
✓ Acute / 1 hr
____ Urgent / 24 hrs
____ Routine

Diagnostic Impression: _____
Clinician Initials: A.W.

Scheduled Intake/Follow-up: Client is to be seen again on 2-26-07
ID #: 390  Completed By/Title: Archew Wright m.S.L.P.C.  Date: 2-23-07

Reed v. PCBE  678

4-020

Date: _2_ _23-0_ _1_

**Diagnostic Section:**

Update: _____

Primary Diagnosis: _314. 9_____ Diagnostic Description: _A D H D    N.O.S_ Axis of Diagnosis: _Axis I_

_econdary Diagnosis: _____ Diagnostic Description: _____ Axis of Diagnosis: _____

Dual Diagnosis:

00 __✓__ Not Dually Diagnosed
01 _____ MI-MR
02 _____ MI-SA
03 _____ MR-SA
04 _____ MI-MR-SA

MI Client ___✓__ Yes _____ No
SA Client _____ Yes __✓No
MR Client _____ Yes __✓No

SMI/SED Eligibility:

1 _____ Meets Diagnosis and Disability Criteria
2 _____ History of DMH/MR Impatient and Public
      Residential Treatment as a Result of Axis I
      MI Diagnosis
3 _____ Imminent Risk of Inpatient Without
      Outpatient Intervention
4 _____ SED-Separated from Family

5 _____ SED-Functional Impairment
6 _____ SED-Symptoms
7 __✓ SED-Risk of Separation
N_____ Does not meet SMI/SED or Contract Eligibility
      Criteria

Guardianship:
001 _____ Guardian - Full
002 _____ Guardian - Limited
003 _____ None

_N A_

004 _____ DHR Custody
005 _____ DYS Custody

IDP Record:

_N A_

IDP Start Date _____ / _____
IDP End Date _____ / _____
IDP Clinical Criteria _____
IDP Financial Criteria _____

Termination Record:

_N A_

Termination Date _____ / _____ / _____

Termination Reason _____

Enrollment Record:            Enrollment Date

141 _____ Day Treatment
145 _____ Rehabilitative Day
150 __✓ Outpatient              _2-23-07_
170 _____ Case Management
325 _____ S.C.L.H.
342 _____ MR Adult Activity
541 _____ SA IOP

Outpatient Services Ordered:

_____ Individual Therapy        _____ Family Support Individual
_____ Group Therapy             _____ Family Support Group
__✓ Family Therapy             _____ Diagnostic Testing
__✓ Physician Assessment       _____ SA IOP
__✓ Medication Monitoring      _____ Dual Diagnosis SA/MI
_____ Basic Living Skills        _____ Expanded Outpatient

Primary Service Level:
1 _____ Other
2 __✓ Outpatient
3 _____ Residential
4 _____ Case Management

Reporting Unit: _PPI_
Staff ID: _390_

For Transfers:
From: RU _____      _N A_      To: RU _____
From: Staff ID _____       To: Staff ID _____

resenting Complaint/Other Information: _Client    has    been    easily_
_agitated,    aggressive,    non-compliant_
_with    meds (concerta)    and    has_
_exhibited    behavioral    problems._

ounselor: _Andrew Wright  v 8 LPC/C.0_      Date: _2-23-07_
rogram Director: _Andrew Wright m 8 LPC/C.0_      Date: _2-23-07_
linical Director: _____      Date: _____
sychiatrist: _____      Date: _____

MH-020

Reed v. PCBE
679

Case #: _11-1_    Name: _Justin Reed_    Date: _4-9-07_

## MENTAL STATUS EXAM

**DRESS/GROOMING /HYGIENE:**
- [✓] Good
- [ ] Fair
- [ ] Poor

**APPETITE:**
- [✓] Good
- [ ] Fair
- [ ] Poor
- [ ] Anorexia
- [ ] Bulimia

**SLEEP:**
- [✓] Good
- [ ] Fair
- [ ] Poor
- [ ] Insomnia
- [ ] Hypersomnia
- [ ] Nightmares

**MOOD:**
- [✓] Euthymic
- [ ] Dysphoric
- [ ] Irritable
- [ ] Elevated
- [ ] Expansive

**AFFECT:**
- [ ] Appropriate
- [✓] Constricted
- [ ] Blunted
- [ ] Flat
- [ ] Labile
- [ ] Inappropriate

**CONCENTRATION:**
- [✓] Normal and Focused
- [ ] Easily Distracted

**MOTOR ACTIVITY:**
- [✓] Calm
- [ ] Restless
- [ ] Agitated
- [ ] Pacing
- [ ] Shaking /Tremor
- [ ] Anxious
- [ ] Repetitive
- [ ] Tics
- [ ] Catatonic
- [ ] Echopraxia

**THOUGHT AND SPEECH PATTERN:**
- [✓] Coherent
- [✓] Rational
- [✓] Logical
- [ ] Illogical
- [ ] Flight of Ideas
- [ ] Normal Speech Rate
- [ ] Pressured
- [ ] Delayed
- [ ] Non-Verbal
- [ ] Loose Associations
- [ ] Circumstantial
- [ ] Incoherent
- [ ] Echolalia
- [ ] Blocking
- [ ] Poverty of Speech
- [ ] Poverty of Content

**THOUGHT CONTENT:**
- [✓] Appropriate
- [ ] Ideas of Reference
- [ ] Paranoid Ideation
- [ ] Delusions of:
  - [ ] Reference
  - [ ] Persecution
  - [ ] Grandiosity
  - [ ] Somatic
  - [ ] Bizarre
  - [ ] Being in Control
  - [ ] Thought Broadcasting
  - [ ] Thought Insertion

**PERCEPTION DISTURBANCE:**
- [ ] None
- [ ] Delusions
- [ ] Derealization
- [ ] Depersonalization
- [✓] Hallucinations:
  - [ ] Auditory  *In Feb not now*
  - [ ] Visual
  - [ ] Tactile
  - [ ] Gustatory
  - [ ] Olfactory

**ORIENTATION:**
- [✓] Normal
- [ ] Deficits:
  - [ ] Person
  - [ ] Place
  - [ ] Time
  - [ ] Situation

*does not know president*

**INSIGHT:**
- [✓] Adequate
- [ ] Poor

**JUDGEMENT:**
- [ ] Average
- [✓] Poor

**ESTIMATED INTELLECTUAL FUNCTIONING:**
- [ ] Above Average
- [ ] Average
- [✓] Below Average
- [ ] MR / DD

### FAMILY HISTORY

Number of siblings: _3_    Marital Status of Parents: _married_

Family History of Mental Illness or Substance Abuse? _NA_

Number of Children: _0_  Ages: _none   NA_

Employment History: _NA_

Legal History: _NA_

Comments: _____

### MEDICAL HISTORY

Current Medications: _Risperdal_

Physician: _Dr. Lopez_

Previous Psychiatric Hospitalization(s): _NA_

Current Medical Problems: _none_

Allergies: _none_

Military History: _none_

Abuse History:
- [ ] None
- [ ] Physical
- [ ] Emotional
- [✓] Sexual
- [ ] Neglect
- [ ] Domestic Violence

_Teacher_

### CHILD ASSESSMENT

Conduct: [ ] Oppositional/Defiant  [ ] Truancy  [ ] Runaway  [ ] School Suspension/Expulsion  [ ] Fighting with Peers/School Staff
[ ] Other: _____

School Problems/Academic Performance: [ ] AD/HD  [ ] LD  [ ] BEH  [ ] EC  [ ] Speech/Hearing Impaired

School: _____

Prenatal History/Complication: [ ] Yes  [ ] No  Comments: _____

Natal Complications: [ ] Yes  [ ] No  Comments: _____

Juvenile Court Involvement: [ ] Yes  [ ] No  Comments: _____

IR: [ ] Yes  [ ] No    Case Worker: _____

Reed v. PCBE
680

ECMH - 019

Name: _____    Date: 9-30-5

# MENTAL STATUS EXAM

**DRESS/GROOMING /HYGIENE:**
- ✓ Good
- ___ Fair
- ___ Poor

**APPETITE:**
- ✓ Good
- ___ Fair
- ___ Poor
- ___ Anorexia
- ___ Bulimia

**SLEEP:**
- ✓ Good (sleep walks)
- ___ Fair
- ___ Poor
- ___ Insomnia
- ___ Hypersomnia
- ___ Nightmares

**MOOD:**
- ___ Euthymic
- ___ Dysphoric
- ___ Irritable
- ___ Elevated
- ___ Expansive

**AFFECT:**
- ✓ Appropriate
- ___ Constricted
- ___ Blunted
- ___ Flat
- ___ Labile
- ___ Inappropriate

**CONCENTRATION:**
- ___ Normal and Focused
- ___ Easily Distracted

**MOTOR ACTIVITY:**
- ✓ Calm
- ___ Restless
- ___ Agitated
- ___ Pacing
- ___ Shaking /Tremor
- ___ Anxious
- ___ Repetitive
- ___ Tics
- ___ Catatonic
- ___ Echopraxia

**THOUGHT AND SPEECH PATTERN:**
- ✓ Coherent
- ___ Rational
- ___ Logical
- ___ Illogical
- ___ Flight of Ideas
- ___ Normal Speech Rate
- ___ Pressured
- ___ Delayed
- ___ Non-Verbal
- ___ Loose Associations
- ___ Circumstantial
- ___ Incoherent
- ___ Echolalia
- ___ Blocking
- ___ Poverty of Speech
- ___ Poverty of Content

**THOUGHT CONTENT:**
- ✓ Appropriate
- ___ Ideas of Reference
- ___ Paranoid Ideation
- ___ Delusions of:
  - ___ Reference
  - ___ Persecution
  - ___ Grandiosity
  - ___ Somatic
  - ___ Bizarre
  - ___ Being in Control
  - ___ Thought Broadcasting
  - ___ Thought Insertion

**PERCEPTION DISTURBANCE:**
- ✓ None
- ___ Delusions
- ___ Derealization
- ___ Depersonalization
- ___ Hallucinations:
  - ___ Auditory
  - ___ Visual
  - ___ Tactile
  - ___ Gustatory
  - ___ Olfactory

**ORIENTATION:**
- ✓ Normal
- ___ Deficits:
  - ___ Person
  - ___ Place
  - ___ Time
  - ___ Situation

**INSIGHT:**
- ✓ Adequate
- ___ Poor

**JUDGEMENT:**
- ✓ Average
- ___ Poor

**ESTIMATED INTELLECTUAL FUNCTIONING:**
- ___ Above Average
- ___ Average
- ✓ Below Average
- ___ MR / DD

## FAMILY HISTORY

Number of siblings: 3    Marital Status of Parents: Married

Family History of Mental Illness or Substance Abuse?
None

Number of Children: ∅ Ages:
Employment History: None
Legal History: None

Comments: _____

## MEDICAL HISTORY

Current Medications: Concerta
Physician: Dr. Adan
Previous Psychiatric Hospitalization(s): _____
Current Medical Problems: None
Allergies: none
Military History: _____
Abuse History: ___ None    ___ Physical    ___ Emotional
                ✓ Sexual    ___ Neglect    ___ Domestic Violence
                (@ school)

## CHILD ASSESSMENT

Conduct: ___ Oppositional/Defiant    ___ Truancy    ___ Runaway    ___ School Suspension/Expulsion    ___ Fighting with Peers/School Staff
         ___ Other: None

School Problems/Academic Performance: ✓ AD/HD    ___ LD    ___ BEH    ___ EC    ___ Speech/Hearing Impaired

School: _____

Prenatal History/Complication: ✓ Yes    ✓ No    Comments: premature (2 mths early)

Postnatal Complications: ___ Yes    ✓ No    Comments: _____

Reed v. PCBE
683

Juvenile Court Involvement: ___ Yes    ✓ No    Comments: _____

R: ✓ Yes    ✓ No    Case Worker: Misty Hubbard / Mona Watson

ECMH - 019

# TREATMENT PLAN REVIEW

| Name: Justin Reed | Case Number: 14689 |
|---|---|

| Treatment Review Summary # 1 | Date: 10/20/00 |
|---|---|

**Progress Toward Goals**

Goal 1: ☑ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☑ Good ☐ Resolved — Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments
Modification Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☑ No
Client Needs to Continue with Treatment    ☑ Yes ☐ No

Comments:

| Reviewer Signature: | Participation Signature: |
|---|---|
| Physician Signature: | Participation Signature: |
|  | Participation Signature: |

| Treatment Review Summary # 2 | Date: |
|---|---|

**Progress Toward Goals**

Goal 1: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments
Modification Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☐ No
Client Needs to Continue with Treatment    ☐ Yes ☐ No

Comments:

| Reviewer Signature: | Participation Signature: |
|---|---|
| Physician Signature: | Participation Signature: |
|  | Participation Signature: |

| Treatment Review Summary # 3 | Date: |
|---|---|

**Progress Toward Goals**

Goal 1: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments:
Goal 2: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments:
Goal 3: ☐ None ☐ Minimal ☐ Moderate ☐ Good ☐ Resolved — Comments
Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes ☐ No
Client Needs to Continue with Treatment    ☐ Yes ☐ No

Comments:

| Reviewer Signature: | Participation Signature: |
|---|---|
| Physician Signature: | Participation Signature: |
|  | Participation Signature: |

Reed v. PCBE
686

## TREATMENT PLAN REVIEW

Name: Justin Reed                                    Case Number: 14689

Treatment Review Summary # 1                         Date: 1/24/00

**Progress Toward Goals**

| | None | Minimal | Moderate | Good | Resolved | Comments: |
|---|---|---|---|---|---|---|
| Goal 1: | ☐ | ☑ | ☐ | ☐ | ☐ | |
| Goal 2: | ☐ | ☑ | ☐ | ☐ | ☐ | |
| Goal 3: | ☐ | ☐ | ☐ | ☐ | ☐ | |

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes  ☑ No

Comments: _Ref. to tx shed last revw_

Client Needs to Continue with Treatment   ☑ Yes  ☐ No

Reviewer Signature: _____         Participant Signature:

Physician Signature: _____         Participant Signature:

                                            Participant Signature:

Treatment Review Summary # 2                         Date: 4/24/00

**Progress Toward Goals**

| | None | Minimal | Moderate | Good | Resolved | Comments: |
|---|---|---|---|---|---|---|
| Goal 1: | ☐ | ☐ | ☑ | ☐ | ☐ | |
| Goal 2: | ☐ | ☐ | ☑ | ☐ | ☐ | |
| Goal 3: | ☐ | ☐ | ☐ | ☐ | ☐ | |

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes  ☑ No

Comments:

Client Needs to Continue with Treatment   ☑ Yes  ☐ No

Reviewer Signature: _____         Participant Signature:

Physician Signature: _____         Participant Signature:

                                            Participant Signature:

Treatment Review Summary # 3                         Date: 7/27/00

**Progress Toward Goals**

| | None | Minimal | Moderate | Good | Resolved | Comments: |
|---|---|---|---|---|---|---|
| Goal 1: | ☐ | ☐ | ☐ | ☑ | ☐ | |
| Goal 2: | ☐ | ☐ | ☐ | ☑ | ☐ | |
| Goal 3: | ☐ | ☐ | ☐ | ☐ | ☐ | |

Modification/Changes to Plan, Frequency of Treatment, and/or Level of Care    ☐ Yes  ☑ No

Comments:

Client Needs to Continue with Treatment   ☑ Yes  ☐ No

Reviewer Signature: _____         Participant Signature:

Physician Signature: _____         Participant Signature:

                                            Participant Signature:

Reed v. PCBE
687

TREATMENT PLAN

Case #: 14689    Name: Justin Reed    Date Completed: 10-8-98

Diagnosis(es):

Axis I : 313.81  Oppositional Defiant Disorder
314.01  Attention Deficit Hyperactivity Disorder
V61.20  Parent / Child Relational Problem

Axis II : V71.09  No Diagnosis

Axis III: None
Axis IV:
Axis V:

| Problems/Clinical Issues | Goals/Outcome |
|---|---|
| (1) Oppositional Defiant Disorder | (1) Eliminate oppositional behavior |
| (a) argues | (a) eliminate arguing |
| (b) defies authority figures | (b) learn respect for authority figures |
| (c) spiteful | (c) eliminate spiteful behavior |
| (d) tantrums | (d) eliminate tantrums |
| (2) Attention Deficit Disorder | (2) Monitor & control through medication |
| (a) difficulty completing tasks | (a) improve ability to complete tasks |
| (b) disruptive in class | (b) eliminate disruptive behavior |
| (c) difficulty staying focused | (c) improve ability to stay focused |
| (3) Parent / Child Relational Problem | (3) Improve relationship |
| (a) inconsistent discipline | (a) improve discipline techniques |
| (b) lack of appropriate communication | (b) improve communication skills |

Services Ordered:
(✓) Individual Therapy    ( ) Group Therapy    (✓) Family Therapy
( ) Physician Assessment    (✓) Medication Monitoring    ( ) Basic Living Skills
(✓) Family Support Individual    ( ) Family Support Group    ( ) Diagnostic Testing
( ) Case Management    (✓) Mental Health Consult    ( ) SA IOP

I understand that if I no show, without appointment cancellation, that I will automatically be scheduled for a group prior to being rescheduled with my therapist. I understand that if I am in SA IOP that I may be subject to discontinue if I am not compliant with treatment. I understand that I must be an active participant in my treatment and will work diligently and responsibly toward achieving my goals.

Client: x Elizabeth Reed    Date: x 10/8/98
Counselor: Lori Pan, M.S.    Date: 10-8-98
Program Coordinator: Susan J Cara, MS    Date: 10/23/98
Clinical Director: C Dexter, LPC, NCC    Date: 10/23/98
Psychiatrist: (JLO)    Date: 10-27-98

Reed v. PCBE

E.___entral Mental Health – Mental Retardatio.___ .nc.
**Comprehensive Client Information**

_____ New
_____ Update
_____ Re-admit     Referral Date: 9/18/98.

Referral _____
Intake ✓
Crisis _____

Case # : 14689    Name: Reed          Justin                Admission Date: 10/8/98
                        Last              First        MI

Parent/Guardian: Elizabeth Reed
Phone: (    )  None  -
SSN: 418 - 33 - 4541
Sex: M   Race: 02   Hispanic: 1   Veteran: 1

Address: Rt 2 Box 318-F
City: Brundidge  State: Al  Zip Code: 36010
County: 55
DOB: 7 / 28 / 89

| | |
|---|---|
| Education: 03 | **Income Sources Amount** |
| Referral: 03   Name Dr. Alice Myers | 001 Wages/Salary $2,000 a month 008 None |
| Marital Status: 3      Legal Detail: 0 | 002 Public Asst                009 SSI |
| Residential Arrangement: 0  Legal Status: 8 | 003 Retire/Pension             010 SS Disb. |
| Living Arrangement: 2 | 004 Disability                 098 Other |
| Residence Size: 6 | 005 Social Security            099 Unknown |
| Employment Status: E | 006 Alimony |
| Employer: Unemployed | 007 Trust Fund               Total $24,000 |

Medicaid # : 000 / 418 / 33 / 4541 8    Eff. Date: 10-98    QMB only: _____ yes _____ no
                                                              Child Case Management
Medicare # : _____ / _____ / _____ / _____   Eff. Date: _____   Authorization # :

Insurance: _____                Funding Source (s): 1 , 0 ,
Ins. Address: _____
City: _____ St.: ____ Zip: _____            Self Pay Fee: 25 00
Person Insured: Justin Reed                        IDP Yearly Income: _____
Policy # : _____ Group ID #: _____           IDP # in Family: _____

**Presenting Problem:** (check all that apply)

| | |
|---|---|
| 001 ___ Marital | 010 ___ Alcohol |
| 002 ✓ Family | 011 ___ Drug |
| 003 ✓ Social | 012 ___ Criminal Justice |
| 004 ___ Interpersonal | 013 ___ Eating Disorder |
| 005 ✓ Daily Coping | 014 ___ Thought Disorder |
| 006 ___ Medical | 015 ___ Abuse Victim |
| 007 ___ Somatic | 016 ___ Assault Victim |
| 008 ___ Depression/Mood Disorder | |
| 009 ___ Suicidal | 097 ___ None |
| 009 ___ Homicidal | 098 ✓ Other ADHD |
| ___ Anxiety Disorder | 099 ___ Unknown |
| ___ Psychotic Disorder | |

**Medical Problem:** (check all that apply)

| | |
|---|---|
| 001 ___ Cerebral Palsy | 010 ___ Eating Disorder |
| 002 ___ Autism | 011 ___ Hemiplegia |
| 003 ___ Deaf/Blind | 012 ___ Paraplegia |
| 004 ___ Seizure Disorder | 013 ___ Quadriplegia |
| 005 ___ Visual Disorder | 014 ___ Developmental |
| 006 ___ Blindness | 097 ✓ None |
| 007 ___ Hearing Disorder | 098 ___ Other Specify: |
| 017 ___ Rape Victim | 008 ___ Deafness |
| 018 ___ Runaway Behavior | 009 ___ Communication |
| ___ Disorder | 099 ___ Unknown |

Clinician Initials: JP

Comments: Placed on Ritalin by Dr. Myers. Severe defiant behavior @ home, but not as bad @ school.

**Risk Assessment:** (check all that apply)

| Danger to Self: | Dangers to Others: | Admission Priority: |
|---|---|---|
| ✓ None | ✓ None | ___ Acute/1 hr |
| ___ Thoughts of Suicide | ___ Thoughts of Harm Others | ___ Urgent /24 hrs |
| ___ Threats of Suicide | ___ Threats to Harm Others | ✓ Routine |
| ___ Plan for Suicide | ___ Plan to Harm Others | |
| ___ Suicide Gestures | ___ Attempts to Harm Others | |
| ___ Family History of Suicide | ___ Inability to Care for Dependents | Diagnostic Impression: |
| ___ Preoccupation with Death | ___ Other | |
| ___ Other | | Clinician Initials: JP |

Staff ID: 489   Completed By/Title: Jan Jan___ M.S.              Date: 10-8-98

Reed v. PCBE

Case # : _146684_    Name: _Justin Reed_    Date: _10-8-98_

Update _____

**ﾌﾟagnostic Section:**

Primary Diagnosis: _313.81_    Diagnostic Description: _Oppositional Defiant Disorder_    Axis of Diagnosis: _I_

Secondary Diagnosis: _314.01_    Diagnostic Description: _Attention Deficit Hyperactivity Disorder_    Axis of Diagnosis: _I_

_V61.20_    _Parent/Child Relational Problem_    AXIS _I_

| Dual Diagnosis: | | |
|---|---|---|
| 00 ✓ Not Dually Diagnosed | MI Client | ✓ Yes ___ No |
| 01 ___ MI-MR | SA Client | ___ Yes ✓ No |
| 02 ___ MI-SA | MR Client | ___ Yes ✓ No |
| 03 ___ MR-SA | | |

| SMI Eligibility:    Y=1    N=0 | SED Eligibility:    (Y=1)    N=0 |
|---|---|
| | ✓ DSM-IV |
| 01 ___ Meets Diagnosis and Disability Criteria | 01 ___ Separated from Family |
| 02 ___ History of DMH/MR Inpatient or Public | 02 ✓ Functional Impairment |
| Residential Treatment as a Result of Axis I | 03 ___ Symptoms |
| MI diagnosis | 04 ___ Risk of Separation |
| 03 ___ Imminent Risk of Inpatient Without | |
| Outpatient Intervention | |

| Enrollment Record: | Enrollment Date | Outpatient Services Ordered: |
|---|---|---|
| 144 ___ Supportive Treatment | | ✓ Individual Therapy |
| 150 ✓ Outpatient | _10-8-98_ | ___ Group Therapy |
| 170 ___ Case Management | | ✓ Family Therapy |
| 200 ___ Indigent Drug Program | | ___ Physician Assessment |
| 325 ___ S. C. L. H. | | ✓ Medication Monitoring |
| 342 ___ MR Adult Activity | | ___ Basic Living Skills |
| 541 ___ SA IOP | | ✓ Family Support Individual |
| | | ___ Family Support Group |
| | | ___ Diagnostic Testing |
| | | ___ SA IOP |
| | | ___ Dual Diagnosis SA/MI |
| | | ___ Expanded Outpatient |

| Primary Service Level: | | For Transfers: |
|---|---|---|
| 1 ___ Other | Reporting Unit: _411_ | |
| 2 ✓ Outpatient | | From:   RU _____    To:   RU _____ |
| 3 ___ Residential | Staff ID: _489_ | |
| 4 ___ Case Management | | From:   Staff ID _____    To:   Staff ID _____ |

Presenting Complaint/Other Information: _Justin is a 9 year old, white male. Referred for services by his mother b/c of oppositional behavior along w/ attention deficit behavior. Child is extremely defiant @ home, but mother indicated doesn't have any problems @ school. Child is currently taking Ritalin._

Counselor: _Sam Sam   M.S._    Date: _10-8-98_

ram Director: _Lyndsay Jr Carr, MC_    Date: _10/23/98_

Clinical Director: _Dorothia, RN NCC_    Date: _10/19/98_

Psychiatrist: _____    Date: _____

Reed v. PCBE
690

MENTAL STATUS EXAM

| DRESS/GROOMING /HYGIENE: | APPETITE: | SLEEP: | MOOD: | AFFECT: | CONCENTRATION: |
|---|---|---|---|---|---|
| ✓ Good | ✓ Good | ✓ Good | ✓ Euthymic | ✓ Appropriate | ✓ Normal and Focused |
| ___ Fair | ___ Fair | ___ Fair | ___ Dysphoric | ___ Constricted | ___ Easily Distracted |
| ___ Poor | ___ Poor | ___ Poor | ___ Irritable | ___ Blunted | |
| | ___ Anorexia | ___ Insomnia | ___ Elevated | ___ Flat | |
| | ___ Bulimia | ___ Hypersomnia | ___ Expansive | ___ Labile | |
| | | ___ Nightmares | | ___ Inappropriate | |

| MOTOR ACTIVITY: | THOUGHT AND SPEECH PATTERN: | THOUGHT CONTENT: | PERCEPTION DISTURBANCE: | ORIENTATION: |
|---|---|---|---|---|
| ✓ Calm | ✓ Coherent | ✓ Appropriate | ✓ None | ✓ Normal |
| ___ Restless | ___ Rational | ___ Ideas of Reference | ___ Delusions | ___ Deficits: |
| ___ Agitated | ___ Logical | ___ Paranoid Ideation | ___ Derealization | ___ Person |
| ___ Pacing | ___ Illogical | ___ Delusions of: | ___ Depersonalization | ___ Place |
| ___ Shaking/Tremor | ___ Flight of Ideas | ___ Reference | ___ Hallucinations: | ___ Time |
| ___ Anxious | ___ Normal Speech Rate | ___ Persecution | ___ Auditory | ___ Situation |
| ___ Repetitive | ___ Pressured | ___ Grandiosity | ___ Visual | |
| ___ Tics | ___ Delayed | ___ Somatic | ___ Tactile | |
| ___ Catatonic | ___ Non-Verbal | ___ Bizarre | ___ Gustatory | |
| ___ Echopraxia | ___ Loose Associations | ___ Being Controlled | ___ Olfactory | |
| | ___ Circumstantial | ___ Thought Broadcasting | | |
| | ___ Incoherent | ___ Thought Insertion | | |

| INSIGHT: | ___ Echolalia | JUDGMENT: | ESTIMATED INGELLECTUAL FUNCTINING: |
|---|---|---|---|
| ✓ Adequate | ___ Blocking | ✓ Average | ___ Above Average |
| ✓ Poor | ___ Poverty of Speech | ✓ Poor | ___ Average |
| | ___ Poverty of Content | | ✓ Below Average |
| | | | ___ MR/DD |

**FAMILY HISTORY**

Number of siblings: 3   Marital Status of Parents: Married
Family History of Mental Illness or Substance Abuse?
Brother (mh services)

Number of Children: 4   Ages: 6, 11, 9, 15
Employment History: N/A
Legal History: N/A

**MEDICAL HISTORY**

Current Medications: Ritalin 10 mg in A.m., 10 mg @ noon; se
Physician: Dr. Myers
Previous Psychiatric Hospitalization(s): N/A
Current Medical Problems: N/A
Allergies: N/A

Military History: N/A
Abuse History: ✓ None ___ Physical ___ Emotional
___ Sexual ___ Neglect ___ Domestic Violence

Comments: _____

**CHILD ASSESSMENT**

Conduct: ✓ Oppositional/Defiant __ Truancy __ Runaway __ School Suspension/Expulsion __ Fighting with Peers/School/Staff
__ Other: _____
School Problems/Academic Performance: ✓ AD/HD ✓ LD ___ BEH ___ EC ___ Speech/Hearing Impaired
School: Pike Co. Elementary
Prenatal History/Complication: ✓ Yes ___ No   Comments: bleeding @ 2 mnths

Postnatal Complications: ✓ Yes ___ No   Comments: premature

Juvenile Court Involvement: ___ Yes ✓ No  Comments: _____

DHR: ___ Yes ✓ No    Case Worker: _____

## PROGRESS NOTE

_Quolin Reed_          1 4 6 8 9                    _/ / /_
**NAME**                              **CASE #**                              **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

7 - 3 - 0 7,  Individual Tx.                    12 R. 0. 0

Est 11:00    1:00
a.m.

Client appears to be much improved in over all symptomology.

Goal    He appears to be taking medication and shows no signs of aggression or property destruction. C. L. C. will continue to see client at least monthly. Next app. is scheduled for 8-6-07 at 11:00 a.m. C. L. C. will continue to do behavioral Tx. with client.

Andrew Wright m.s. L.P.

C. L. C.

Reed v. PCBE
692

# PROGRESS NOTE

Justin Reed                    14689                        111
**NAME**                        **CASE #**                      **UNIT**

Date, Service
Time of Day and
Time Spent/Units                      Record

6-11-03 Family Ty.                              10.R.O.P.

_____ :30

C.I.O. saw client
and mother in office.
Client continues to
be cooperative at
home.

_Goal_ Client shows no
signs of decompensation,
aggression, property destruction,
or agitation. Client appears to
be taking medication
as prescribed.

C.I.O. is to see
client again soon.
Behavior therapy will
be continued to
be used with
client.

Andrew Ipplens. C. R.C./C.I.O.

Reed v. PCBE
693

# PROGRESS NOTE

Austin Reed                    14689                    111
**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

4-30-07, Family hr                    10.VR.0.P

10:15, :30
o.m.

C. C. O. saw client in office again today. Client continues to make good progress. Goals Client shows no signs of aggression nor does he appear angry or depressed. Client also has not taken anything without permission. C. C. O. is to continue behavioral therapy with client and family. C. C. O. is to see client again on 5-7-07 at 10:00 a.m.

Andrei Wright M.S. L.P.C./C.C.O.

Reed v. PCBE
694

J02

# PROGRESS NOTE

| | | |
|---|---|---|
| Austin Reed | 1 4 689 | 111 |
| **NAME** | **CASE #** | **UNIT** |

Date, Service
Time of Day and
Time Spent/Units

Record

4-25-07, Family Sx.                                            12.R.O.E.

10:00  /:30
A.M.

            C.L.O. saw client and mother in office client appears to be making good progress.

**Goal** Client has not exhibiting any violent behavior and appears to be medication compliant. Client's mother reports that extended tabs of medication makes client drowsy energy sick according to this report.

Client is to see Dr. Lysay today at Ext. 2:00 P.M.

C.L.O. is to see client again on 4-30-07

Austin ____ m.s. c.r. /c.b.o.

Reed v. PCBE
695

# PROGRESS NOTE

| | | |
|---|---|---|
| Austin Reed | 14689 | 111 |
| **NAME** | **CASE #** | **UNIT** |

Date, Service
Time of Day and
Time Spent/Units

Record

4-16-07, Crisis Int                    1d R.O.P.
Continued.

Judge Hightower court
ordered client to
C 5 North at UAB.
Andrew Wright MS. LPC/CO

Reed v. PCBE
696

## PROGRESS NOTE

Gustin Reed                    14689                         111
**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

4-16-07, Crisis Int                              12 R.O.V.

continued        in      crying      spell.
                    C. I. O.      called
        police      as      well      as
        juvenile      authorities
                    C. I. O.      and      P. D
        took      client      to      E. R.
        for      sedation      because
        of      lack      of      bedspace.
        Client      was      taken home.

3:50        C. I. O.      received      phone
p. m        call      phone      call      from
        Pat      Smith.
                    Pat      Smith      located
        resource      at      U A B

4:25 p.m.        C. I. O.      called      U A B
        and      gave      referral
        information

Est 5:15 p.m        U A B      agreed      to
        accept      client.

6:00 p.m        C. I. O.      was      present
        at      Judge      Hightower's      court.
        Judge      Hightower      had      hearing

Reed v. PCBE

## PROGRESS NOTE

14684

NAME _Justin Road_    CASE # _14684_ _Error H.W._    UNIT _111_

Date, Service
Time of Day and
Time Spent/Units

Record

4-16-07, Crisis Int.    I.R.O.V.

10:15 , 4:00

C. I. O. saw client in office today. Client seems to be having an increase in agitation and uncooperative behavior. Client had threatened to tear up television on last friday. C. I. O. ~~at~~ _Error H.W._ provided behavioral techniques. client is to return to school.

Est 11:00 a.m. Client and mother returned to office after client refused to go back to school. Client became agitated and refused to get out of van. Client also engaged

Reed v. PCBE

# PROGRESS NOTE

| | | |
|---|---|---|
| Austin Reed | 14689 | 111 |
| **NAME** | **CASE #** | **UNIT** |

Date, Service
Time of Day and
Time Spent/Units

Record

4-9-03, Individual Tx.                    10.R.3.P.

10:00 , 1:00
am

C.C.O. saw client in office today.

Client appears to be compliant with medication and does not appear to have engaged in violent or aggressive behavior.

Client has taken something without permission.

Client was placed on punishment but possibly not severe enough.

C.C.O. is to see client again next week.

Plan is to continue behavioral therapy.

Andrew Wright M.S. C.I.C./C.C.O.

Reed v. PCBE
700

# PROGRESS NOTE

| Carolin Reed | 14689 | 11 |
|---|---|---|
| **NAME** | **CASE #** | **UNIT** |

| Date, Service<br>Time of Day and<br>Time Spent/Units | Record | |
|---|---|---|

3-19-03, Crisis Int.                                   12.R.2.B

continued    Client next week.

C. L. O. covered

psychological testing.

Andrew Wright MS, LPC/ C.L.O

# PROGRESS NOTE

NAME: Justin Reed    CASE #: 14689    UNIT: 111

| Date, Service Time of Day and Time Spent/Units | Record |
|---|---|
| 3-9-07, Crisis Int | 12, R.O.P. |
| 10:00 a.m. / 1:15 | |

C.I.O. saw client and mother in office.

C.I.O. covered behavior problems with client and mother.

Mother reports that client will not go to school on days when he has session appointment.

She also reports that client went up to grandmother's house. Client is not suppose to go to grandmother's house.

Client was given behavior therapy and consequences of behavior.

C.I.O. is to see

next page

Reed v. PCBE

# PROGRESS NOTE

Justin Reed                    1x689                    111

**NAME**                       **CASE #**              **UNIT**

Date, Service
Time of Day and
Time Spent/Units

Record

3-5-07, Crisis Intervention                    1d.v.o.r

1:19, 1:15

CLO saw client in office again today. C.L.O. again worked on behavior therapy with client.

Client appears to be exhibiting progress as far as being less withdrawn.

Client does not appear to be exhibiting agitation, feeling of con or acting out behavior.

Client has also not exhibited violent behavior.

C.L.O. is to see client again next week on 3-8-06 at 1:00 p.m.

Andrew Wright m.s. L.P.C / C.L.O.

Reed v. PCBE
703

ECMH - 002

# PROGRESS NOTE

Gustin Reed _____ 14689 _____ 111

**NAME** _____ **CASE #** _____ **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

2-26-03, Crisis Int.                              I.d.R.O.V.

Continued

Client was given
behavior modification
techniques to help
with behavior.
Client was open
to techniques.
Andrew Wright M.S. L.P.C
I.C.L.O

ECMH – 002

# PROGRESS NOTE

Justin Reed                    1 x 689                    111

**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

2-26-07, Crises Int.                    12.R.I.V.
9:00 , 1:00
a.m

C.I.O          saw    client
in          office    today.
C.I.O.          came
up          with          a
plan          of    action    to
help          client    log
out          of    the
crises          stage.
Client          is          to
see          Dr. Lopez    today
as          well    as    be
referred          for    testing.
Client          is    to    be
seen          again    on    3-5-07
at          8:30    a.m
Client          is    doing
much          better.

2-26-07, Crises Int. Andrew Wright M.S. L.P.C./K.I.O.
2:00 , 1:00
p.m

C.I.O.          saw    client
again          in    office.

## PROGRESS NOTE

Justin Reed                    14689                        111

**NAME**                      **CASE #**                   **UNIT**

Date, Service
Time of Day and
Time Spent/Units                        Record

2-23-02, Crisis Int.                                12.V. o.1,

9:30 a.m , 2:00

        C. L. O.    met with
client , dad, mother
and    brother    of client.
Client    appears to
have    lost    control
last    night.

    Client    appears to
be    willing    to
follow    out-pt plan
of

    ① no    taking of care
    ② no    missed dosages
      of meds
    ③ no    aggression
    or    outburst.
    ④ Talk to parents
    before    frustrations
    builds

    C. L. O    is to    see
client    again    on  2-26-02
Andrew Voigt m.s. c.p.s/ c. L. o.

Reed v. PCBE
706

## PROGRESS NOTE

NAME: Austin Reed    CASE #: 14689    UNIT: 111

Date, Service
Time of Day and
Time Spent/Units

Record

2-23-07, Case management                    I.d.R.O.P.
8:00, :45

C.L.O. drove to Pike County Guardiele Court office. C.L.O. consulted with court Guardiele probation officer. C.L.O. informed her about plan to work without court order at this time. C.L.O. drove from office. C.L.O. consulted with client's father and mother; they are to meet with C.L.O. about 9:30 a.m.

Andrew Wright M.S.C.P.C./C.L.O.

Reed v. PCBE
707

# PROGRESS NOTE

NAME: Austin Reed          CASE #: 14689          UNIT: 11

Date, Service
Time of Day and
Time Spent/Units

Record

2-22-0?, Crisis U. / Crisis Call          12. R. O. P.
continued and two psychiatric
facilities.
          Neither place
had a bed for
client.
          Father reported that
client had been
taking car without
permission as well
as had become
aggressive.
          Client hit brother
and bit brother.
          Juvenile court, father
and c. c. o. all
agree agreed to wait
until the a. m.
to work on placement
again since client
had calmed down.
          Andrew Wright m s i p s / c. c. o

# PROGRESS NOTE

NAME: *Austin Reed*     CASE #: *14689*     UNIT: *111*

Date, Service
Time of Day and
Time Spent/Units

2-22-07, Crisis Int.                Record          12.R.O.P.
9:50 am, 45

C.I.O. received crisis call from mom of Child Advocat Advocacy. Mom reports that client is in need of inpatient evaluation/treatment Mom informed C.I.O about client being abused 2 years ago. Mom feels trauma is coming to the surface. C.I.O. called Sheriff's office back as well about case. J say had called crisis line as well. Called Juvenile court

PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 10-4-05
LOCATION: P.K.Chlu

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 1468 | Justin Reed | 411 | CCU | C | 538 | 10 AM | 1 hr |

**NEXT APPOINTMENT:** **DAY:** Mon.  Tues.  Wed.  Thur. (Fri) **DATE:** Oct 21 **TIME:** 2:00

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ✓ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ✓ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ✓ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Clt was very sluggish. Clt expressed that he stayed up late and was tired.

---

**PROBLEMS/GOALS ADDRESSED:** I explained to clt that he needed to start going to sleep at a decent time so he won't have so restless. I explained to clt that I would be the counselor working with on

**PROGRESS/ASSESSMENT:** any issues that he may be concerned about. I also let him know that I would like for him to be able to talk to me about anything when he feels comfortable too.

**FOCUS FOR NEXT SESSION:** Conti. to monitor current situation + getting clt to open up.

---

Reed v. PCBE
710

_____ , MS
Provider Signature

PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 10 4 05
LOCATION: Pike Child

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14689 | Justin Reed | 411 | 41 | — | 533 | — | :30 |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

✓ Family Support / Education

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**

Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:**

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:**

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke with clts mother and she let me know that the teacher is suppose to plead guilty to Justin for teaching Justin on the outside inappropriately which would be a misdemeanor charge for him. She express

**PROBLEMS/GOALS ADDRESSED:** that the only thing Justin told Mrs. Watson in their last meeting even though she told it & Mrs Watson feels something else more may have happened. I explained to her that I would try to

**PROGRESS/ASSESSMENT:** see if he would open up to me but first I would have to establish a rapport so he could feel comfortable talking to me but that would be accomplished at his paced.

**FOCUS FOR NEXT SESSION:** N/M

Reed v. PCBE
711

Provider Signature

# EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
## CLINICAL UPDATE

NAME _Justin Reed_      CASE # _14689_

**TYPE OF UPDATE:**

TRANSFER _____

TREATMENT PLAN REVIEW _____

PHYSICAL CONSULTATION REQUEST _____

REFERRAL TO *H.R.O.P. _____

*H.R.O.P. EXIT SUMMARY _____

*(HIGH RISK OUTREACH PROGRAM)

CLINICAL CLOSURE (90 DAYS) ✓

CASE INACTIVATION (12 MONTHS) _____

STAFFING _____

OTHER SUMMARY _____

_Clt is not allowing counsel; to help & explained to his mother that services need to be terminated due to him not wanting to communicate. Case Closed._

THERAPIST/CASE MANAGER _____ m.s.    DATE _12-15-00_

UNIT DIRECTOR _____ DATE _____

CLINICAL DIRECTOR _____ DATE _12/19/00_

and/or

PSYCHIATRIST _____ DATE _____

Reed v. PCBE
712

**PROGRESS NOTE**
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: _4-7-03_

LOCATION: _After Clin___

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14439 | Justin Reed | 441 | 41 | — | 439 | — | 2:00 |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

_✓_ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Spoke w/ Ms. Reed re conversation w/ pediatrician. Reported
that she had agreed to write prescription from now on. Reported had
already provided pediatrician w/ needs info.

**PROBLEMS/GOALS ADDRESSED:** Ms. Reed reported that he has been in trouble
in school + has gotten an attitude @ home. Suggested she be more strict
+ follow through w/ consequences for action.

**PROGRESS/ASSESSMENT:** Due to family dynamics, counseling is not effective + that
is reason for termination.

**FOCUS FOR NEXT SESSION:** N/A

**Provider Signature** _____ m.s.

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _11-16-00_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 44689 | Justin Reed | 41 | 23 | | 439 | | 30 min |

**NEXT APPOINTMENT: DAY:** Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy   ____ Group Therapy   ____ Family Therapy   ____ Case Management

____ Ind BLS   ____ Group BLS   ____ Crisis Intervention   ____ Phys. Assess.   ____ Med. Monit.   ✓ Consult

✓ Family Support / Education

------

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

------

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate   ____ Blunted   ____ Labile   ____ Constricted   ____ Flat   ____ Inappropriate
Mood: ____ Anxious   ____ Dysphoric   ____ Euthymic   ____ Expansive   ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations   ____ Delusions
____ Suicidal   ____ Homicidal   ____ Paranoid   ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes   ____ No   **COMMENTS:** _____

**SLEEP:** ____ Good   ____ Fair   ____ Poor   ____ Insomnia   ____ Nightmares   ____ Hypersomnia

**APPETITE:** ____ Good   ____ Fair   ____ Poor

**ORIENTED TO:** ____ Normal   **DEFICITS:** ____ Person   ____ Place   ____ Time   ____ Situation

**MOTOR ACTIVITY:** ____ Calm   ____ Restless   ____ Shaking/Tremor   ____ Tics   ____ Pacing   ____ Catatonic

**COMMENTS:** _Spoke w/ Dr. Myers, pediatrician, re: Justin's progress._
_Reported that he was still not wanting to talk + that counseling_
_was not doing him any good._

**PROBLEMS/GOALS ADDRESSED:** _Discussed family dynamics + how a lot of the_
_problem was his mother. Discussed fact had been seeing Dr. Lopez, psychiatrist_
_for meds. Inquired if would write prescription for as so that services_
_could be terminated + she agreed to._

**PROGRESS/ASSESSMENT:** _N/A_

**FOCUS FOR NEXT SESSION:** _N/A_

Reed v. PCBE
714

_____ M.S.
**Provider Signature**

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _10-11-00_

LOCATION: _Phe Chld_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|------------|---------------|------------|
| 14089 | Justin Reed | 411 | 24 | — | 489 | — | 30m |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management
____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult
____ Family Support / Education

**TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart**

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ____ Good ____ Fair ____ Poor
**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
**COMMENTS:** Ms. Reed indicated that Justin was taking his meds, indicated no notes from school. Grades fair since back w/ old teacher.

**PROBLEMS/GOALS ADDRESSED:** ADHD under control thru his meds. Will speak w/ pediatrician or her writing the rest of Justin's prescription. He receives them f/ Dr. Lopez, psychiatrist, able of the unacceptiveness of Justin by refusing to take.

**PROGRESS/ASSESSMENT:** Does well on meds.

**FOCUS FOR NEXT SESSION:** Continue to follow meds. Contact to be made w/ pediatrician.

_____ m.S.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: _____ 10-11-00

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14629 | Justin Reed | 411 | 000 | | 489 | 8:00 | 10 |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _will reschedule_ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was still not wanting to talk. Reported was completing work now that he was back w/ his old teacher. Discussed fact that services may have to be terminated due to lack of cooperation.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss ADHD & school performance. Justin played like he was sleeping & refused to acknowledge this counselor. Reported would look into other alternatives & let her know.

**PROGRESS/ASSESSMENT:** No progress.

**FOCUS FOR NEXT SESSION:** Will discuss termination of services w/ pediatrician b/c lack of cooperation.

Provider Signature _____ M.S.

Reed v. PCBE
716

## PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _9-25-00_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | 00U | — | 489 | 9:00 | 1 ho. |

**NEXT APPOINTMENT:** **DAY:** Mon.  Tues. (Wed.) Thur.  Fri.  **DATE:** _Oct. 11_    **TIME:** _8:00 AM_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

_____

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

_____

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No  **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed indicated that Justin has started cursing again + is being totally defiant. Reported also has gotten where he doesn't want to talk again. Indicated he has been placed by in old teacher's classroom._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issue of ADHD. Justin refused to say anything. Explained that the defiant behavior was unnecessary + it needed to stop. Explained to Ms. Reed if this type behavior continued would probably have to terminate services._

**PROGRESS/ASSESSMENT:** _No progress_

_____

**FOCUS FOR NEXT SESSION:** _Continue to monitor ADHD + defiant behavior._

_____

Reed v. PCBE
717

_Dani S_____ M.S.
**Provider Signature**

PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _8-17-00_

LOCATION: _____

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|--------------|------------|
| 14-29 | Justin Reed | 411 | 24 | — | 483 | — | 30 min |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Mo. Reed indicated that Justin's meds were fine. Reported does better now that one of his meds is liquid. Indicated that to her knowledge he was given his meds daily a school.

**PROBLEMS/GOALS ADDRESSED:** ADHD under control though on meds. Note still continue to have defiant attitude.

**PROGRESS/ASSESSMENT:** Stable on meds

**FOCUS FOR NEXT SESSION:** Continue to monitor meds.

Provider Signature

**PROGRESS NOTE**
(Face-to-Face Services)

# East Central Mental Health - Mental Retardation, Inc.

DATE: _8-17-00_

LOCATION: _East Clel_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14684 | Justin Reid | 411 | 050 | — | 489 | 1:00 A.m. | 1 hr. |

**NEXT APPOINTMENT: DAY:** (Mon) Tues. Wed. Thur. Fri. **DATE:** _Sept 11_  **TIME:** _9:00 A.m._

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ___ No **COMMENTS:** _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** _Ms. Reed reported that Justin was doing okay. Reported that he a new special ed teacher & so far has not been doing his work. Enquired about old teacher & reported just didn't put him back in her class. Advised to request old teacher back, due to fact she got him to do his work._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issue of ADHD & school performance. Note that Justin is regressing back into his initial stage. He did indicate that school was fine. Discussed completing work & making good grades._

**PROGRESS/ASSESSMENT:** _No progress._

**FOCUS FOR NEXT SESSION:** _Continue to monitor ADHD._

_____ M.S.
**Provider Signature**



**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _8-2-03_
LOCATION: _Oak Cliff_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14620 | Justin Reed | 411 | 411 | — | 430 | — | 30:00 |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

_✓_ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Spoke w/ Ms. Reed re: Justin's progress. Reported that school had started off pretty good. Reported still doesn't want to talk. Reported that he has a different special ed teacher this year.

**PROBLEMS/GOALS ADDRESSED:** Discussed school performance + getting him motivated. Discussed fact that he is going to have to get out of this stage of not wanting to talk. Behavior indicated to be pretty good

**PROGRESS/ASSESSMENT:** N/A

**FOCUS FOR NEXT SESSION:** N/A

**Provider Signature** _____ M.S.

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _7-6-00_
LOCATION: _Ofc. Old_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|---|---|---|---|---|---|---|---|
| 14689 | Justin Reed | 41 | 24 | — | 480 | — | 30 |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. _✓_ Med. Monit. ____ Consult

____ Family Support / Education

_____

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Ms. Reed indicated that meds were fine. Denied any problem. Nte that his communication skills are improving. Reminded Justin Ms. Reed of need, a meds-re-check w/ pediatrician every six months._

PROBLEMS/GOALS ADDRESSED: _ADHD under control thru f meds_

_____

PROGRESS/ASSESSMENT: _Stable_

_____

FOCUS FOR NEXT SESSION: _Continue to monitor meds._

_____

Reed v.PCBE
721

_____ m.S.
**Provider Signature**

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _7-6-00_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14609 | Justin Reed | 411 | 004 | ---- | 489 | 2:00 | 1hr |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri.  DATE: _August 7_  TIME: _2:00 pm_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

____ Family Support / Education

### TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No  **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin has been doing pretty good. Reported that he has been having a few problems a Church w/ a couple of boys picking on him & telling him he didn't belong there. Reported going to leave in about a week to go to Disney World.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of ADHD. Discussed incident w/ boys @ Church & what he can do to to handle his anger w/ them. Discussed the fact that he has just as much right to be @ Church as they do & to let the necessary people know when he is being picked on.

**PROGRESS/ASSESSMENT:** Stable

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD.

_____ m.S.
**Provider Signature**

Reed v PCBE
722

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _6-5-00_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|------------|
| 14629 | Justin Reed | 411 | CYI | — | 489 | 9:00 | 1hn. |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. ~~Thur.~~ Fri. **DATE:** _July 6_ **TIME:** _3:00 Am_

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ✓ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ✓ Yes ___ No **COMMENTS:** _____

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

COMMENTS: Ms. Reed reported that Justin was doing pretty good. Reported that final grades turned out pretty good. Reported that the school was having some cut backs & was fearful that Justin may lose out b/c of this.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of ADHD. Noted that Justin is becoming more talkative. Discussed end of year & fact had good grades & discussed doing well next year. Discussed practicing as well this summer on his school work.

**PROGRESS/ASSESSMENT:** Stable.

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD

_____ M.S.
**Provider Signature**

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _5-8-00_

LOCATION: _The Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14089 | Justin Reed | 411 | 24 | — | 489 | — | 30 min |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS:** (Check Where Applicable):

Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Ms. Reed reported that Justin's meds were fine. Reported that he still is active at times. Indicated that school has not complained. Indicated that meds is taken daily._

PROBLEMS/GOALS ADDRESSED: _ADHD under control though meds._

PROGRESS/ASSESSMENT: _Stable on meds_

FOCUS FOR NEXT SESSION: _Continue to monitor meds_

Reed v. PCBE
724

_____ m.s
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _5-8-08_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|--------------|-----------|
| 141099 | Justin Reed | 411 | 004 | — | 489 | 8:00 | 1 hr. |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri. DATE: _June 5_ TIME: _9:00 AM_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ✓ Yes ____ No    **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal    **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Ms. Reed reported that Justin was doing fair. Reported that he was still not talking like he should. Indicated school performance was about the same, reported that an IEP meeting should be set-up shortly since school will be out this month._

PROBLEMS/GOALS ADDRESSED: _Addressed issues of school performance. Discussed getting school work completed. Discussed also paying attention to the teacher. Noted that Justin was also talking more._

PROGRESS/ASSESSMENT: _Making some progress._

FOCUS FOR NEXT SESSION: _Continue to monitor school performance._

**Provider Signature**

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _4-13-00_

LOCATION: _The Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 41 | — | 439 | — | 30 min. |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

_✓_ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate
Mood: ____ Anxious  ____ Dysphoric  ____ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations  ____ Delusions
____ Suicidal  ____ Homicidal  ____ Paranoid  ____ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ____ Yes  ____ No  **COMMENTS:** _____

**SLEEP:** ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ____ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ____ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: _Spoke w/ Ms. Reed re: Justin's next appt. & time. Inquired how Justin was doing & indicated to be doing fair. Reported that IEP would be coming up soon._

PROBLEMS/GOALS ADDRESSED: _Discussed his cooperation in school & getting school work completed. Discussed appropriate help & continuing w/ speech. Indicated was still ___ but still doesn't want to say much._

PROGRESS/ASSESSMENT: _N/a_

FOCUS FOR NEXT SESSION: _Will discuss school performance_

M.S.

**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _3-29-00_
LOCATION: _D.L. Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 44689 | Justin Reed | 411 | 24 | — | 439 | — | 30 min |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Ms. Reed reported that Justin was really doing good on his meds.
Reported that change in meds was a good change.

PROBLEMS/GOALS ADDRESSED: Meds working to reduce anxiety.

PROGRESS/ASSESSMENT: Stable.

FOCUS FOR NEXT SESSION: Continue to monitor meds.

_____ m.S
**Provider Signature**

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _3-29-00_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 441 | 004 | — | 439 | 8:00 A.m. | 1 hr. |

**NEXT APPOINTMENT:** DAY: Mon.  Tues.  (Wed.)  Thur.  Fri.  DATE: _April 19_  TIME: _8:00 A.M._

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS:** (Check Where Applicable):

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**

____ Hallucinations ____ Delusions

____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ✓ Yes ____ No  **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Mr. Reed reported that Justin still doesn't want to talk. Reported that school was still a problem re: grades. Indicated that father might come by to check on attitude of Justin.

PROBLEMS/GOALS ADDRESSED: Addressed issue of school performance. Noted that Justin was a little more talkative today, + uncertain if b/c father might show. Discussed grades + complete assignments in class + any he might have for homework.

PROGRESS/ASSESSMENT: Slight progress.

FOCUS FOR NEXT SESSION: Continue to focus on school performance.

Reed v. PCBE
728

_____ m.s.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _3-6-08_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|---------------|------------|
| 141689 | Austin Reed | 411 | 004 | — | 489 | 9:00 | 1 hr. |

**NEXT APPOINTMENT: DAY:** Mon. Tues. (Wed.) Thur. Fri. **DATE:** _March 29_ **TIME:** _8:00 AM_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed reported still doesn't want to talk, but since father talked to him about getting up & going to school, has not had anymore trouble out of him. Grades still not where they should be._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issue of ADHD. Discussed school performance + Justin still continues to say very little during sessions. Discussed getting school assignments completed & finishing homework time._

**PROGRESS/ASSESSMENT:** _Fair progress._

**FOCUS FOR NEXT SESSION:** _Continue to monitor ADHD._

_____ m.s
Provider Signature

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _2-24-00_
LOCATION: _Oak Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 20 | — | 439 | — | 30 min |

**NEXT APPOINTMENT:  DAY:** Mon. Tues. Wed. Thur. Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ✓ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No  COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Spoke w/ Ms. Wheeler, school counselor @ PCE, re: Justin's performance.
Reported that he doesn't say a lot to any of the (ESE) teachers. Indicated that
has also witnessed inappropriate behavior towards mother & she does nothing.

PROBLEMS/GOALS ADDRESSED: Discussed academic problems & behavior problems if any.
Indicated main problem centered around grades.

PROGRESS/ASSESSMENT: N/A

FOCUS FOR NEXT SESSION: N/A

_____ MS. _____
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _2-24-00_
LOCATION: _The Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | 24 | — | 489 | — | 30 min |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

---
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
---

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ____ Yes ____ No **COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed indicated that meds were fine. Denied any problems w/ meds or side effects. Medicated takes meds daily._

**PROBLEMS/GOALS ADDRESSED:** _ADHD under control through meds._

**PROGRESS/ASSESSMENT:** _Stable._

**FOCUS FOR NEXT SESSION:** _Continue to monitor meds._

_____ m.s.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: _____2-24-08_____

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 8:00 | 1 hr. |

**NEXT APPOINTMENT:** DAY: (Mon) Tues. Wed. Thur. Fri. DATE: March 10 TIME: 9:00 Am

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin still doesn't want to talk. Reported that grades were still poor. Indicated that behavior has improved re: getting up in the morning & going to school.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of defiant behavior & ADHD. Discussed reason for not wanting to talk & fact that eventually will have to talk. Discussed completing his school work & paying attention in school.

**PROGRESS/ASSESSMENT:** No major progress. Note that parents say they follow through w/ suggestions but no progress seems to be occurring.

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD & defiant behavior.

Reed v. PCBE
732

_____ M.S.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _2-4-00_

LOCATION: _Ottc ClP I_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 44639 | Justin Reed | 411 | 41 | — | 489 | — | 30 min |

**NEXT APPOINTMENT:  DAY:** Mon.  Tues.  Wed.  Thur.  Fri.  **DATE:** _____  **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy  ____ Group Therapy  ____ Family Therapy  ____ Case Management

____ Ind BLS  ____ Group BLS  ____ Crisis Intervention  ____ Phys. Assess.  ____ Med. Monit.  ____ Consult

_✓_ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate  ____ Blunted  ____ Labile  ____ Constricted  ____ Flat  ____ Inappropriate
Mood: ____ Anxious  ____ Dysphoric  ____ Euthymic  ____ Expansive  ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations  ____ Delusions
____ Suicidal  ____ Homicidal  ____ Paranoid  ____ N/A

COMMENTS: _____

**MED. COMPLIANCE:** ____ Yes  ____ No  **COMMENTS:** _____

**SLEEP:** ____ Good  ____ Fair  ____ Poor  ____ Insomnia  ____ Nightmares  ____ Hypersomnia

**APPETITE:** ____ Good  ____ Fair  ____ Poor

**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person  ____ Place  ____ Time  ____ Situation

**MOTOR ACTIVITY:** ____ Calm  ____ Restless  ____ Shaking/Tremor  ____ Tics  ____ Pacing  ____ Catatonic

COMMENTS: _Contacted by Ms. Reed re: outcome of meeting @ Goshen school re: Justin. Reported that they were going to provide all the services they could, but Justin needed to start trying more. Reported had a hard time trying to get him up in a.m. for school + was usually late._

**PROBLEMS/GOALS ADDRESSED:** _Explained to Ms. Reed that she needed to start enforcing discipline more & taking him to Juvenile Court. Explained that she was the parent & that they needed to stop letting Justin rule them._

**PROGRESS/ASSESSMENT:** _No progress._

**FOCUS FOR NEXT SESSION:** _N/A._

Reed v. PCBE
733

_Lisa S_____ m.s.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _1-25-00_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 144.29 | Justin Reed | 411 | 004 | ———— | 429 | 8:00 | 1hr |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. (Thur.) Fri. DATE: _Feb. 24_ TIME: _8:00AM_

**SERVICES PROVIDED:** _✓_ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

_____
TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart
_____

**MENTAL STATUS: (Check Where Applicable):**
Affect: _✓_ Appropriate ____ Blunted ____ Labile ____ Constricted _✓_ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric _✓_ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid _✓_ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** _✓_ Yes ____ No **COMMENTS:** _____

**SLEEP:** _✓_ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** _✓_ Good ____ Fair ____ Poor

**ORIENTED TO:** _✓_ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** _✓_ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was the same. Reported that report card was fair. Still doesn't talk @ home or school, noted counseling as well.

**PROBLEMS/GOALS ADDRESSED:** Addressed ADHD. Noted most of the session was silent & use of shoulders &/or head was only form of communication. Justin did speak re: things of interest but only briefly.

**PROGRESS/ASSESSMENT:** No progress continues to be non-verbal.

**FOCUS FOR NEXT SESSION:** Continue to monitor needs.

Reed v. PCBE
734

Provider Signature _____ M.S.

**PROGRESS NOTE**
(Face-to-Face Services)

## East Central Mental Health - Mental Retardation, Inc.

DATE: _1-5-00_
LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 161689 | Justin Read | 411 | 0001 | — | 489 | 8:00 | 1hn |

**NEXT APPOINTMENT: DAY:** Mon. (Tues.) Wed. Thur. Fri. **DATE:** _Jan 25_ **TIME:** _8:00 a.m_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed reported that Justin has gotten back to his old ways re: attitude & behavior. Reported that he tried to choke his brother over a piece of candy. Discussed her taking him to Juvenile Court like these actions were highly inappropriate._

**PROBLEMS/GOALS ADDRESSED:** _Attempted to address issues w/ Justin & he refused. Noted slayed in chair & acted asleep & would not sit up & talk. Mother did indicate that he has gotten where he doesn't want to take his medicine._

**PROGRESS/ASSESSMENT:** _None to report._

---

**FOCUS FOR NEXT SESSION:** _Will attempt to discuss issues again. Explain to parents if continues to refuse to talk we will have to terminate services._

---

Reed v. PCBE
735

_[signature]_ m.s.
**Provider Signature**

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME _Justin Reed_____    CASE# _14689_____

TYPE OF UPDATE

TRANSFER_____                        CLINICAL CLOSURE(90 DAYS) _✓_____

TREATMENT PLAN REVIEW_____          CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST_____       STAFFING_____

REFERRAL TO *H.R.O.P_____            OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____

*(HIGH RISK OUTREACH PROGRAM)

_Clt has had 2 consecutive NS's_
_w/ no response to follow-up_
_letter. Case Closed._

THERAPIST/CASE MANGER _Lori Pa_____ m.s._    DATE_12-6-99____

UNIT DIRECTOR_____              DATE_____

CLINICAL DIRECTOR _____             DATE_12/6/99_

AND/OR PSYCHIATRIST_____              DATE_____

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 9-13-99

LOCATION: Peko Child

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|--------------|-----------|
| 14649 | Justin Reed | 411 | 004 | — | 489 | 9:00 | 1 hr |

**NEXT APPOINTMENT: DAY:** Mon. Tues. (Wed.) Thur. Fri. **DATE:** October 13 **TIME:** 9:00 Am

**SERVICES PROVIDED:** ✔ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ___ Appropriate ___ Blunted ___ Labile ___ Constricted ✔ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ___ Euthymic ___ Expansive ✔ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✔ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✔ Yes ___ No **COMMENTS:** _____

**SLEEP:** ✔ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✔ Good ___ Fair ___ Poor

**ORIENTED TO:** ✔ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✔ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing fair. Reported that school is a little better. Discussed setting up appt. to get further such help.

**PROBLEMS/GOALS ADDRESSED:** Addressed issues of performance w/ Justin. Noted he was uncooperative & refused to talk. Explained to Ms. Reed & Justin that if talking & discussing does not improve would have to refer else where.

**PROGRESS/ASSESSMENT:** School performance better.

**FOCUS FOR NEXT SESSION:** Focus on communication.

Reed v. PCBE
737

_Provider Signature_ M.S.

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _8-30-99_
LOCATION: _the Clt_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|---|---|---|---|---|---|---|---|
| 14, 31 | Justin Reed | 411 | 24 | — | 439 | — | 30 min |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

COMMENTS: _____

MED. COMPLIANCE: ____ Yes ____ No COMMENTS: _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: _Mo. Reed reported that meds were working. Reported no more headaches since stopped Clonidine. Indicated school performance good._

PROBLEMS/GOALS ADDRESSED: _ADHD under control though meds._

PROGRESS/ASSESSMENT: _School performance satisfactory._

FOCUS FOR NEXT SESSION: _Continue to monitor meds._

Reed v. PCBE
738

_Levi Bann_ m.s.
**Provider Signature**

# East Central Mental Health - Mental Retardation, Inc.

DATE: _8-30-99_
LOCATION: _O.V. Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 8:00 a.m. | 1 hr. |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**MED. COMPLIANCE:** ✓ Yes ____ No **COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing pretty good. Reported that school still seems to be going okay. Reported that Justin was also playing football this year. Medication had not checked out further speech yet.

**PROBLEMS/GOALS ADDRESSED:** Addressed issues of school performance. Discussed getting work completed + paying attention in class. Noted has started talking a little better, but still needs to continue improving.

**PROGRESS/ASSESSMENT:** Appears to be stable @ this point.

**FOCUS FOR NEXT SESSION:** Continue to monitor ADHD.

_Provider Signature_ M.S.

# PROGRESS NOTE
### (Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _7-19-99_

LOCATION: _Ozhu Chld_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|------------|-----------|--------------|-----------|
| 14689 | _Justin Reed_ | 411 | 24 | — | 489 | — | 30 min |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy   ____ Group Therapy   ____ Family Therapy   ____ Case Management

____ Ind BLS   ____ Group BLS   ____ Crisis Intervention   ____ Phys. Assess.   ✓ Med. Monit.   ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate   ____ Blunted   ____ Labile   ____ Constricted   ____ Flat   ____ Inappropriate
Mood: ____ Anxious   ____ Dysphoric   ____ Euthymic   ____ Expansive   ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations   ____ Delusions
____ Suicidal   ____ Homicidal   ____ Paranoid   ____ N/A

**COMMENTS:** _____

**SLEEP:** ____ Good   ____ Fair   ____ Poor   ____ Insomnia   ____ Nightmares   ____ Hypersomnia

**APPETITE:** ____ Good   ____ Fair   ____ Poor

**ORIENTED TO:** ____ Normal   **DEFICITS:** ____ Person   ____ Place   ____ Time   ____ Situation

**MOTOR ACTIVITY:** ____ Calm   ____ Restless   ____ Shaking/Tremor   ____ Tics   ____ Pacing   ____ Catatonic

**COMMENTS:** _Ms. Reed reported that Justin was having problems w/ the Clonidine but would not say what was bothering him. Discussed w/ Justin + he indicated that when he got headaches. Provided suggestions to try + if didn't work would check w/ psychiatrist._

**PROBLEMS/GOALS ADDRESSED:** _ADHD under control thru meds. Still tends to not want to communicate._

**PROGRESS/ASSESSMENT:** _cls beginning to make progress._

**FOCUS FOR NEXT SESSION:** _Continue to monitor meds._

_____ M.S.
**Provider Signature**

## East Central Mental Health - Mental Retardation, Inc.

DATE: 7-19-99

LOCATION: Pike Child

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 001 | — | 489 | 10:00 | 1 hr. |

**NEXT APPOINTMENT: DAY:** (Mon) Tues. Wed. Thur. Fri. **DATE:** Aug 16 **TIME:** 9:00 A.M.

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

---

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing okay. Reported that he still does not want to talk. Indicated that Justin was still going through speech this summer.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of speaking. Noted that this session Justin was much more talkative & pleasant. Discussed school starting back + trying his best this year.

**PROGRESS/ASSESSMENT:** Communicating better.

**FOCUS FOR NEXT SESSION:** Continue to monitor behavior & communication skills.

Reed v. PCBE
741

Provider Signature M.S.

(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 6-9-99

LOCATION: Pike Chld

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 9:00 | 1 hr. |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. (Wed.) Thur. Fri. **DATE:** July 7 **TIME:** 10:00 Am

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ✓ Flat ___ Inappropriate

Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ___ Irritable

**THOUGHTS OR PERCEPTUAL DISTURBANCES:**

___ Hallucinations ___ Delusions

___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

**COMMENTS:**

---

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** Ms. Reed reported that Justin still doesn't want to talk. Reported that speech therapy starts next Tuesday, & will be going Tues & Thurs. Reported did pass, but barely. Reported was placed in regular classes next year & only help he will receive is in reading.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss speech therapy & plans for summer w/ Justin but refused.

**PROGRESS/ASSESSMENT:** Still continues to not talk.

**FOCUS FOR NEXT SESSION:** Continue to make attempts to get Justin to talk.

Reed v. PCBE
742

_____ M.S.
**Provider Signature**

## East Central Mental Health - Mental Retardation, Inc.

DATE: _5-17-99_
LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 9:00 | 1 hr |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** _✓_ Individual Therapy ____ Group Therapy _•_ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention _•_ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat _✓_ Inappropriate
Mood: ____ Anxious ____ Dysphoric _✓_ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid _✓_ N/A

**COMMENTS:** _____

**SLEEP:** _✓_ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** _✓_ Good ____ Fair ____ Poor

**ORIENTED TO:** _✓_ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** _✓_ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Mo. Reed reported that Justin has been non-verbal all morning. Reported he would be repeating. Further reported would be in speech again this summer. Denied any problems w/ meds._

**PROBLEMS/GOALS ADDRESSED:** _Attempted to discuss w/ Justin reason for silent treatment. Noted he refused to be verbal & sat in chair & also would chew on fingers. Unsure if Justin is non-verbal b/c of speech problem._

**PROGRESS/ASSESSMENT:** _No improvement._

**FOCUS FOR NEXT SESSION:** _Continue to get Justin to be verbal._

_(signature)_ M.S.
**Provider Signature**

Reed v. PCBE
743

PROGRESS NOTE
(Face-to-Face Services)

# East Central Mental Health - Mental Retardation, Inc.

DATE: 4-13-99
LOCATION: Pike Child

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 6111 | 004 | — | 489 | 10 Am | 1hr. |

**NEXT APPOINTMENT:** DAY: Mon. (Tues.) Wed. Thur. Fri. **DATE:** May 11 **TIME:** 9:00 A.m.

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing pretty good. Reported that grades on report card were D's + F's. Indicated would probably repeat.

**PROBLEMS/GOALS ADDRESSED:** Addressed issue of school performance + grades. Noted Justin still doesn't like to verbally respond + unsure if it is b/c of his speech problem. Justin did explain was having difficulty understanding work.

**PROGRESS/ASSESSMENT:** Doing okay @ home. No major improvement academically, but behavior @ school is good.

**FOCUS FOR NEXT SESSION:** Continue to monitor school performance.

Reed v. PCBE
744

_____ M.S.
**Provider Signature**

**PROGRESS NOTE**
**(Face-to-Face Services)**

# East Central Mental Health - Mental Retardation, Inc.

DATE: _3-15-99_

LOCATION: _Pira Oked_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 141689 | Justin Reed | 411 | 004 | — | 4189 | 8 AM | 1 hr. |

**NEXT APPOINTMENT: DAY:** (Mon.) Tues. Wed. Thur. Fri. **DATE:** April 5 **TIME:** 9:00AM

**SERVICES PROVIDED:** ✓ Individual Therapy ___ Group Therapy ___ Family Therapy ___ Case Management

___ Ind BLS ___ Group BLS ___ Crisis Intervention ___ Phys. Assess. ___ Med. Monit. ___ Consult

___ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ___ Blunted ___ Labile ___ Constricted ___ Flat ___ Inappropriate
Mood: ___ Anxious ___ Dysphoric ✓ Euthymic ___ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
___ Hallucinations ___ Delusions
___ Suicidal ___ Homicidal ___ Paranoid ✓ N/A

**COMMENTS:** _____

---

**SLEEP:** ✓ Good ___ Fair ___ Poor ___ Insomnia ___ Nightmares ___ Hypersomnia

**APPETITE:** ✓ Good ___ Fair ___ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ___ Person ___ Place ___ Time ___ Situation

**MOTOR ACTIVITY:** ✓ Calm ___ Restless ___ Shaking/Tremor ___ Tics ___ Pacing ___ Catatonic

**COMMENTS:** Spoke w/ Justin's grandmother re: behavior & she reported that
he was doing pretty good @ times. Discussed how he refuses to cooperate w/
her. Reported was doing as best as could be expected @ school. Grades fair.

**PROBLEMS/GOALS ADDRESSED:** Attempted to address issue of reason he finds it
difficult to talk during session. Noted refused to talk + just sat in chair.

**PROGRESS/ASSESSMENT:** Doing fair in school.

**FOCUS FOR NEXT SESSION:** Continue to focus on poor attitude.

Reed v. PCBE
745A

_Provider Signature_ M.S.

(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _2-23-99_

LOCATION: _The Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 24 | — | 489 | 8:00 | 30 min |

**NEXT APPOINTMENT: DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ✓ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing much better since placed on meds. Reported that Justin even reminds her when comes in for school children that appetite has also improved.

**PROBLEMS/GOALS ADDRESSED:** _____

**PROGRESS/ASSESSMENT:** Doing well on meds.

**FOCUS FOR NEXT SESSION:** Continue to monitor meds.

_____ M.S.
**Provider Signature**

Reed v. PCBE
746A

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _2-23-98_
LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|----|----|----|----|----|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 8 Am | 1 hr. |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was doing much better. Discussed poor performance academically especially in area of reading. Indicated that attitude has gotten better a b  .

**PROBLEMS/GOALS ADDRESSED:** Attempted to address school related issues w/ Justin but he was uncooperative + unresponsive. Noted that Justin even attempted to play like he was asleep.

**PROGRESS/ASSESSMENT:** Ms. Reed indicated that behavior + attitude have improved.

**FOCUS FOR NEXT SESSION:** Continue to focus on ODD behavior.

Reed v. PCBE
747A

_Lois Dawson_ M.S.
**Provider Signature**

**PROGRESS NOTE**
(Face-to-Face Services)

# East Central Mental Health - Mental Retardation, Inc.

DATE: _1-25-99_

LOCATION: _Pike Chied_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | CO4 | — | 489 | 8Am | 1HR |

**NEXT APPOINTMENT: DAY:** Mon. (Tues.) Wed. Thur. Fri. **DATE:** _Feb. 23_ **TIME:** _8:00 Am_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

---

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** _Ms. Reed reported that Justin was doing some better. Denied any problems w/ meds. Indicated school performance & grades were satisfactory. Reported that still has difficulty minding but not as bad._

**PROBLEMS/GOALS ADDRESSED:** _Addressed issues of ADHD + ODD behavior. Reported taking meds. Noted attitude has improved & was not defiant as he was in previous sessions. Discussed school performance & grades._

**PROGRESS/ASSESSMENT:** _Attitude has improved. School performance + grades satisfactory._

**FOCUS FOR NEXT SESSION:** _Continue to focus on behavior & monitor meds._

_Lori Davis_, M.S.
**Provider Signature**

(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _12-28-98_
LOCATION: _Pine Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|-----------|
| 141699 | Justin Reed | 411 | CCY | — | 489 | 8:30 | 1 HR |

**NEXT APPOINTMENT: DAY:** (Mon.) Tues. Wed. Thur. Fri. **DATE:** _Jan. 25_ **TIME:** _8:00 A_

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ✓ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ✓ N/A

**COMMENTS:** _____

---

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ✓ Good ____ Fair ____ Poor

**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin has been fine. Noted that Justin had a better attitude this session. Discussed his seeing Dr. Lopez, psychiatrist, re behavior + placement on new meds.

**PROBLEMS/GOALS ADDRESSED:** Addressed issues of behavior w/ Justin + encouraged him to continue to do well. Discussed ADHD behavior + behavior @ school.

**PROGRESS/ASSESSMENT:** Attitude was much better this session.

**FOCUS FOR NEXT SESSION:** Continue to focus on behavior + monitor meds.

Reed v. PCBE
749A

_[signature]_ M.S.
**Provider Signature**

(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _12·31·98_
LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|----|--------------|-----------|-----------|--------------|-----------|
| 141039 | Justin Reed | 411 | 41 | — | 489 | 11:00 | 30 min |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** _____ Individual Therapy _____ Group Therapy _____ Family Therapy _____ Case Management

_____ Ind BLS _____ Group BLS _____ Crisis Intervention _____ Phys. Assess. _____ Med. Monit. _____ Consult

_✓_ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: _____ Appropriate _____ Blunted _____ Labile _____ Constricted _____ Flat _____ Inappropriate
Mood: _____ Anxious _____ Dysphoric _____ Euthymic _____ Expansive _____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
_____ Hallucinations _____ Delusions
_____ Suicidal _____ Homicidal _____ Paranoid _____ N/A

**COMMENTS:** _____

**SLEEP:** _____ Good _____ Fair _____ Poor _____ Insomnia _____ Nightmares _____ Hypersomnia

**APPETITE:** _____ Good _____ Fair _____ Poor

**ORIENTED TO:** _____ Normal **DEFICITS:** _____ Person _____ Place _____ Time _____ Situation

**MOTOR ACTIVITY:** _____ Calm _____ Restless _____ Shaking/Tremor _____ Tics _____ Pacing _____ Catatonic

**COMMENTS:** Spoke w/ Ms. Reed re: Justin coming back in for services b/c of seeing Dr. Lopez, psychiatrist, about disability. Reported that Dr. Lopez was wanting to place him on some other medication.

**PROBLEMS/GOALS ADDRESSED:** Ms. Reed reported that Justin still has a bad attitude & doesn't want to mind.

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

_____ M.S.
**Provider Signature**

Reed v. PCBE
750A

**PROGRESS NOTE**
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: _11-13-93_
LOCATION: _The Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|--------------|-----------|-----------|--------------|-----------|
| 14689 | Justin Reed | 411 | 41 | — | 436 | 2 20 | 30 min |

**NEXT APPOINTMENT:** DAY: Mon. Tues. Wed. Thur. Fri. DATE: _____ TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

_✓_ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS:** (Check Where Applicable):
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ____ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** ____ Good ____ Fair ____ Poor

**ORIENTED TO:** ____ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

COMMENTS: Spoke w/ Ms. Reed re: Justin seeing another counselor. Inquired if could see brother's counselor & explained what policy was. Repeated that Dr. M pediatrician, had suggested he see someone else.

**PROBLEMS/GOALS ADDRESSED:** Explained to Ms. Reed would speak w/ Dr. Myers re: Justin's behavior & attitude & would get back w/ her. Discussed fact that Justin was the one who needed to be more cooperative.

**PROGRESS/ASSESSMENT:** _____

**FOCUS FOR NEXT SESSION:** _____

Reed v. PCBE
751A

_____  M.S
**Provider Signature**

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME *Justin Reed*                      CASE# 14689

## TYPE OF UPDATE

TRANSFER_____            CLINICAL CLOSURE(90 DAYS) ✓

TREATMENT PLAN REVIEW_____   CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST_____   STAFFING_____

REFERRAL TO *H.R.O.P_____       OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____

*(HIGH RISK OUTREACH PROGRAM)

*Clt is uncooperative ECID in session + this counselor is unable to get anywhere. Case Closed.*

THERAPIST/CASE MANGER *Geri Gann, M.S.*    DATE *11-9-98*

UNIT DIRECTOR *Susan Jo Carn, MS*          DATE *11-9-98*

CLINICAL DIRECTOR_____              DATE_____

AND/OR PSYCHIATRIST_____            DATE_____

Reed v. PCBE
752A

PROGRESS NOTE
(Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: 11-9-98
LOCATION: Ot. Child

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|------------|---------------|------------|
| 14689 | Justin Reed | 411 | 004 | — | 439 | 3:00 pm | 1 hr |

**NEXT APPOINTMENT:** **DAY:** Mon. Tues. Wed. Thur. Fri. **DATE:** _____ **TIME:** _____

**SERVICES PROVIDED:** ✓ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ✓ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A

**COMMENTS:** _____

**SLEEP:** ✓ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ✓ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ✓ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Mo. Reed reported that Justin was still "cutting up" @ home. Reported is on verge of being suspended off bus for being disrespectful + throw things. Denied any problems in school.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss ODD behavior w/ Justin. Noted he wanted to sit in chair + play like he was asleep + refused to talk. Explained to Mo. Reed that would not be rescheduling due to attitude + not wanting to cooperate on Justin's end.

**PROGRESS/ASSESSMENT:** School performance good.

**FOCUS FOR NEXT SESSION:** Terminating services due to non-compliance from Justin

Reed v. PCBE
753A

_____, M.S.
**Provider Signature**

EAST CENTRAL MENTAL HEALTH/MENTAL RETARDATION, INC.
CLINICAL UPDATE

NAME _Justin Reed_____    CASE# _14689_____

TYPE OF UPDATE

TRANSFER_____    CLINICAL CLOSURE(90 DAYS)_____

TREATMENT PLAN REVIEW_____    CASE INACTIVATION (12 MONTHS)_____

PHYSICIAN CONSULTATION REQUEST____    STAFFING _✓ 15 mins_

REFERRAL TO *H.R.O.P_____    OTHER SUMMARY_____

*H.R.O.P EXIT SUMMARY_____

*(HIGH RISK OUTREACH PROGRAM)

_Intake and treatment plan was_
_reviewed and approved, as_
_prescribed._

THERAPIST/CASE MANGER _Lori Davis_, M.S    DATE _10-23-98_

UNIT DIRECTOR _Susan J. Carr_, MS    DATE _10/23/98_

CLINICAL DIRECTOR_____    DATE_____

AND/OR PSYCHIATRIST_____    DATE _10-27-98_

Reed v. PCBE
754A

# PROGRESS NOTE
## (Face-to-Face Services)
# East Central Mental Health - Mental Retardation, Inc.

DATE: _10-19-98_

LOCATION: _Pike Child_

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID # | Time of Event | Time Spent |
|--------|-------------|-----|---------------|-----------|-----------|---------------|------------|
| 14689 | Justin Reed | 411 | 004 | — | 489 | 1:00 p.m. | 1h. |

**NEXT APPOINTMENT: DAY** (Mon.) Tues. Wed. Thur. Fri. **DATE:** _Nov 9_ **TIME:** _2:00 p.m._

**SERVICES PROVIDED:** _✓_ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management

____ Ind BLS ____ Group BLS ____ Crisis Intervention ____ Phys. Assess. ____ Med. Monit. ____ Consult

____ Family Support / Education

---

TOP COPY - Client / WHITE ORIGINAL WITH NOTE - Chart

---

**MENTAL STATUS: (Check Where Applicable):**
Affect: ____ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat _✓_ Inappropriate
Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive _✓_ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:**
____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid _✓_ N/A

**COMMENTS:** _____

---

**SLEEP:** _✓_ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia

**APPETITE:** _✓_ Good ____ Fair ____ Poor

**ORIENTED TO:** _✓_ Normal **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation

**MOTOR ACTIVITY:** _✓_ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic

**COMMENTS:** Ms. Reed reported that Justin was the same. Noted that Justin was extremely defiant & refused to cooperate. Explained to Ms. Reed that if Justin did not cooperate then services would need to be terminated.

**PROBLEMS/GOALS ADDRESSED:** Attempted to discuss attitude & defiant behavior. Provided suggestions that could be done @ home. Stressed importance of being consistent w/ actions.

**PROGRESS/ASSESSMENT:** No progress re: behavior @ home. School performance fair.

**FOCUS FOR NEXT SESSION:** Continue to focus on behavior + monitor meds.

_____ M.S.
**Provider Signature**

Reed v. PCBE



**DEFENDANT'S EXHIBIT 7**

## THE UNIVERSITY OF ALABAMA AT BIRMINGHAM

# FACE SHEET: ADMITTING

| Account # - Episode # | Date/Time Admitted | Patient's Name | ACCM | Nurs. Sta | Room | Bed |
|---|---|---|---|---|---|---|
| 064348065-7107 | 04/17/07  01:08 | REED, JUSTIN | S | C5N | C524 | 02 |

| Bed Phone | Medical Record No. | ER Chart# | Date of Birth | Patient Type | Mother's Maiden Name | S M W D P L |
|---|---|---|---|---|---|---|
| | 002269916 | | 07/28/1989 | INPATIENT | | S |

| Sex | Race | Age/Units | Service | Patient's Address | | | Phone |
|---|---|---|---|---|---|---|---|
| M | W | 17Y | 014 | 162 CTY RD 4430 | BRUNDIDGE | AL  360100000 | 334 2686483 |

| Social Security No | County | Nationality | Religion | Patient Occupation | Patient's Insurance Network | Type Policy |
|---|---|---|---|---|---|---|
| 999999999 | PIKE | AMR/ENG | UNKNOWN | | | |

| Policy Number | Admit/Visit Reason | Admit Source | Financial Class | Mode of Arrival |
|---|---|---|---|---|
| | BEHAVIORAL DISTRUBANCE | TX FROM A HOSPITAL | ST | CAR |

| COB | Admitting Physician | No. | Attending Physician | No. |
|---|---|---|---|---|
| | CULLINAN, JAMES T | 003991 | CULLINAN, JAMES T | 003991 |

| Primary Care Physician | No. | Phone |
|---|---|---|
| | | |

| Referring/Family Physician | No. | Phone |
|---|---|---|
| | | |

| Address |
|---|
| |

| Patient's Employer | Address |
|---|---|
| UNEMPLOYED | |

| Responsible Party | Address | | Phone | Admit Clerk |
|---|---|---|---|---|
| REED, THOMAS | 162 CTY RD 4430 | BRUNDIDGE   AL  360100000 | 334 2686483 | BC |

| Responsible Party's Employer | Address | Phone |
|---|---|---|
| UNEMPLOYED | | |

| Responsible Party's Occupation | Emergency Notification |
|---|---|
| UNK | REED, ELIZABETH |

| Relationship | Notify Phone # 1 | Notify Phone # 2 |
|---|---|---|
| MOTHER | | 334 2686483 |

| Policy Holder | Insurance Company | Policy No. | Group # | Effective Dates |
|---|---|---|---|---|
| | NO INSURANCE | | | |
| Policy Holder | Insurance Company | Policy No. | Group # | Effective Dates |
| | | | | |
| Policy Holder | Insurance Company | Policy No. | Group # | Effective Dates |
| | | | | |

| Date/Time Arrival | Date/Time Injury | Mother's Account Number | Police |
|---|---|---|---|
| 04/17/07  01:08 | | | |

Misc. Notes

Bloodless Medicine

Advance Directive ___N___

Date ___041707___

Admission Coordinator _____

Reed v. PCBE
808



**Hospital**
*a member of the UAB Health System*

## DISCHARGE SUMMARY

| REED, JUSTIN | MR#: 000002269916 | |
|---|---|---|
| PHYSICIAN: Lee I Ascherman, M.D. | ADMITTED: 04/17/07 | DISCHARGE: 04/24/2007 |

**DISCHARGE DIAGNOSES:**
Axis I:       Depressive disorder NOS, post traumatic stress disorder, ADHD by history.
Axis II:      None.
Axis III:     PVC on EKG, benign.
Axis IV:        Sexual abuse, conflict with parents, peer problem.
Axis V:       During admission 45, during discharge 50.

**DISCHARGE MEDICATIONS:**
1. Lexapro 20 mg p.o. q. day.
2. Adderall XR 20 mg p.o. in the morning.

**DISCHARGE DISPOSITION:**
Previously the patient was supposed to be discharged upon court approval. A letter was sent to the court and permission was received for the patient to be discharged to his parents with a scheduled court hearing in the near future. Outpatient treatment was recommended to the court.

**DISCHARGE FOLLOW UP:**
1. Removal of all firearms or lethal weapons from the home environment.
 2. Continue to take medication as prescribed.
3. Patient will have followup with his therapist Mr. Wright on 04/25/07 at 8:30 in the morning. After that the patient will have followup with Dr. Lopez, psychiatrist. Mr. Wright will arrange this followup.

**PROCEDURES:**
EKG shows PVC.

**CONSULTATIONS:**
1: Psychological testing done. Psychological testing shows, test data suggests that Justin views the world in an overly narrow frame of reference. He lacks consistent coping skills and tends to go back and forth between expressive and intentional ways of detecting with expressive, often intellectually. He is much less willing than most people to approach and process emotional stimuli and may appear emotionally or socially withdrawn to others. His lack of psychological complexity likely contributes significant to his coping deficit issues. The patient does have any thought disorder; however, he appears to be avoiding self focusing and stays away from complication. The patient is less interested in other people than most peers and has difficulty establishing relationship. Limited social skill, likely contributes to his social awkwardness. These individual coping deficits, interpersonal style, and narrow cognitive focus make change difficult. He is aware of many of his difficulties, yet is likely to feel powerless to make significant changes.
 Recommendations:
1. This individual will benefit from individual therapy as well as group therapy in order to address his social skill and coping deficits.
 2. Also he needs to see a psychiatrist for medication management.
 3. As the lack of consistent well defined coping style may make this individual vulnerable to impulse control monitoring for safety concerns during times of heightened stress is strongly urged.

The University of Alabama at Birmingham Hospital
Discharge Summary

| REED, JUSTIN | MR# 000002269916 | 04/24/2007 |
|---|---|---|
| Patient Name | Record No. | Discharge Date |

II. Cardiology consult. Patient's EKG shows PVC several times leading to a cardiology consultion. Cardiac enzymes were obtained and CKTs were repeated several times since his intiial CKT was elevated. Cardiology recommendations: His EKG is normal except for the frequent PVCs which are not concerning. If he is symptomatic from them he may decrease caffeine intake and see if it improves. It was also mentioned that his PVC is benign right now since he is asymptomatic.

**CHIEF COMPLAINT:**
"Behavioral problem."

**HISTORY OF PRESENT ILLNESS:**
The patient is a 17-year-old white male with history of ALD, ADHD referred from outside hospital. He was in therapy on 04/16/07 and became angry and told family he would not go back to school. He also kicked van door. He has been aggressive at home too. He had outbursts and defiant behavior recently. A month ago he took away his mother's van and on consultation he was very violent towards his father as well as his older sibling. His mother said that his behavior problems had been going on since he was abused sexually by a band teacher several years ago. The teacher eventually went to prison but was scheduled to be released this summer. Otherwise he is a very good youth with good behavior. The patient pretty much denied having any behavioral problems other than refusing to go to school after an outpatient appointment with his therapist stating he wanted to go to school later that afternoon. His therapist recommended he be sent to the hospital. He denied suicidal ideation, homicidal ideation, auditory visual hallucinations.

**PAST PSYCHIATRIC HISTORY:**
No inpatient treatment, no suicide attempt in the past. According to therapist note, he had the diagnosis of ADHD and MDD with psychosis, PTSD, and he was tried on Prozac and clonidine but patient and mother denied this.

**PAST MEDICAL HISTORY:**
1. Fracture of clavicle.
2. History of speech difficulty.
3. History of spinal meningitis.

**DEVELOPMENTAL HISTORY:**
The patient was 2 months premature, weighed about 2 pound 15 ounce. He was slow to warm up baby. Mom took tobacco during pregnancy. Motor milestone within normal limits. Speech was delayed. Potty training within normal limits.

**ALLERGIES:**
NKDA.

**MEDICATION(S) PRIOR TO ADMISSION:**
1. Risperdal 1 q.h.s.
2. He was on Concerta too but dose unknown.

**SOCIAL HISTORY:**
Lives in Brundidge. A history of sexual abuse by band teacher. The judge was involved and he was diagnosed with PTSD. Lives with mother, father, 2 brothers sister. He is in 11th grade special education at Henderson High School. Repeated first grade. "He has been friendly at the school."

**FAMILY PSYCHIATRIC HISTORY:**
None reported. Mom has possible depression, and took Xanax but the reason is unknown. Before admission the patient mentioned that he took one Xanax from his mother.

(FRI)NOV 16 2007 16:50/ST. 16:49/No. 7507318231 P 5

FROM Azar & Moore, LLC

The University of Alabama at Birmingham Hospital
Discharge Summary

| REED, JUSTIN | MR# 000002269916 | 04/24/2007 |
|---|---|---|
| Patient Name | Record No. | Discharge Date |

**MENTAL STATUS EXAM:**
The patient is sleeping, dressed in scrubs, fairly kept, calm, cooperative, very quiet. Motor no tics or tremors. Speech spontaneous with a soft volume, affect dysphoric. Mood he said "good." Thought process unable to fully assess because he did not talk that much. Thought content denies auditory visual hallucinations, suicidal ideations, homicidal ideation, insight, judgement limited.

**REVIEW OF SYSTEMS:**
Patient denies having any physical symptoms.

**PHYSICAL EXAM:**
Vital Signs: Temperature 98.1, respirations 19, pulse 88, blood pressure 121/72. The rest of the physical exam was in normal limits.

**LABORATORY DATA:**
1. Lab on 04/23/07 hemoglobin S antigen negative, hemoglobin core IgM negative. HAV IgM negative, hepatitis C antibody negative. CKT 152.
2. Also, lab on 04/21/07 CKT 186.
3. Lab on 04/18/07 CKT 917, CKMB 2.0, CAL CCK MI 0.2, troponin less than 0.10. Hemoglobin S antibody negative, hemoglobin E antigen negative. Hepatitis C antibody negative. Bilirubin 1.4, AST 43, ALT 13. Rest of the liver function test within normal limits.
4. Lab on 04/17/07 CBC within normal limit except hemoglobin 17.8, eosinophil 0.6, PT, PTT within normal limits. A T4 1.54, TSH 1.047. Fluid balance profile within normal limits. LFT within normal limits. total bilirubin 1.7, bilirubin indirect 1.5, AST 47, CKT 1000. RPR nonreactive. UDS positive for benzo, urinalysis negative.

**HOSPITAL COURSE:**
The patient was admitted to 5 North because of his behavioral problems. Later part of the hospital we came to know that patient actually was sent to the hospital according to court order because of his violent behavior. The patient was admitted under Dr. Ascherman's service. During the hospitalization safety was maintained. Multidisciplinary treatment was approached with the collaboration of parents and entire treatment team.

1. Depression NOS: The patient was found to have signs and symptoms of depression. In the past also he was diagnosed with MDD with psychosis according to medical records that came from his therapist. Patient and mother were completely unaware of it. The patient was started Lexapro 10 mg in the morning. Before starting Lexapro it had been discussed extensively with the mother and his family as well as patient about the rational of using this medication. Also we discussed the side effect pros and cons included reported violent ideation in initial weeks. His mother provided consent. He tolerated Lexapro pretty well and did not have any side effect and was increased to 20 mg in the morning. His mood improved as well as his affect. He started verbalizing more, he was capable of expressive feeling more. He became calm and cooperative. He did not have any kind of behavioral problem. He did get along with the other peers in the hospital very good. The current plan, he will see psychiatrist as the outpatient, Dr. Lopez and will be treated further.

2. PTSD: Patient was diagnosed with PTSD for a while because of his sexual abuse by one of his band teachers and he will continue Lexapro for that.

3. History of ADHD: The patient had a history of ADHD he was on Concerta and Clonidine. Concerta was started because the patient was not able to eat. He had a low appetite but his mother and the patient were completely unaware of about using clonidine. Adderall was started after talking to the mother in detail. She preferred to have Adderall since one of her family members, actually one of patient's cousins is on Adderall and he has benefit on it. After discussing side effect pros and cons, Adderall was started 5 mg at noon and from the next day of 10 mg in the morning and 10 mg at

Reed v. PCBE
911

5

The University of Alabama at Birmingham Hospital
Discharge Summary

| REED, JUSTIN | MR# 000002269916 | 04/24/2007 |
|---|---|---|
| Patient Name | Record No. | Discharge Date |

noon. The patient initially complained about stomach pain but it gradually went away. The patient ultimately tolerated Adderall very well and he had much more improvement in his work as well as his behavior. During this change we converted regular Ativan to Adderall XR so he will continue Adderall XR 20 mg in the morning. Will be further followed with Dr. Lopez.

4.  PVC on EKG: The patient's EKGs demonstrated that he has PVCs. As a result, we consulted cardiology service who reported that this was a benign PVC since the patient was asymptomatic. If he has any symptoms like chest pain, shortness of breath, or increased heart rate, he needs to cut down his caffeine intake first and see how he does. Maybe in the future he needs to followup with cardiologist. But currently he is fine. The mother also was told about this PVC and she was concerned whether the patient can continue his sports. It has been discussed with the cardiologist. Cardiology said that it is pretty normal to have increased heart rate during activity so it could even go up to 200 beat per minute and that it was okay for him to continue his sports play and also for him to now continue Adderall and Lexapro. Neither medication should have an affect on the PVCs but monitoring should occur. It was discussed with the patient's parents that the patient needs to have follow up with the primary care physician on this regard.

5.  Family conference: Family conference was held in the presence of Drs. Ascherman, Amin, and patient's mother and aunty as well as patient. His diagnosis, course, and prognosis have been discussed. Also discussed the rationale of using medication side effect pros and cons, and safety issues at home, especially no guns and no firearm. Also discussed about his heart condition as well as his activities.

6.  Court hearing: Later part of the hospital we came to know that patient was sent to our hospital per court hearing and he will have this court hearing on 04/24/07, and we will write a letter to the court about our recommendation. Our recommendation was patient needs to continue his therapy as well as treatment with psychiatrist and continue his school. Initially, his therapist told us that he will go to court on 04/24/07. So in the morning, on 04/24/07 we sent our recommendation to the court and the patient was supposed to be picked up by the Sheriff, but the Sheriff did not come. Rather than, patient's parents came and picked him up.

During the hospital stay, patient did not have any behavioral problems. He tolerated every activity very well, consistently denying having any auditory visual hallucinations, suicidal ideation, homicidal ideation. During the day of discharge, he was mentally stable, denied any auditory visual hallucinations, suicidal ideation, homicidal ideation.

Lee I Ascherman, M.D.

LIA/cv/2695
D. 2007-04-30
T. 4/30/07 2:34 PM
DOB: 07/28/1989

Dictated by: Nasima Amin, M.D.
**Electronically Signed by Lee Ascherman M.D. on 05/18/2007 at 1624 CDT**

cc:

JOB#: dscjob#0430-978

**UAB**

PATIENT PROBLEM LIST

REED, JUSTIN
04/17/07   072889
MN 2269915
CULLMAN, J

MD to Complete: Provisional Diagnosis:

Estimated LOS:

Provisional Discharge Location: ☐ Home ☐ Home with Skilled Care ☐ SNF ☐ Rehab ☐ Other

Status: ☐ Inpatient ☐ Bedded Outpatient ☐ Observation
☐ Outpatient ☐ Voluntary ☐ Involuntary
☐ Police Hold ☐ Prisoner Hold

Nursing Action:
☐ UR notified of Bedded OP, Observation pt.
☐ UAB Police notified of Police/Prisoner Hold

Pt./ Family understanding of reason for hospitalization and goals:
"Appt c̄ Therapist this am. During visit Pt. threw a temper tandrum"
Pt. refused to go back to school.

| PROBLEM Identified Standard of care | Entered by | | | STATUS | | |
|---|---|---|---|---|---|---|
| | Initial/Discipline | Date | MD (optional) | D=Defer A=Active M=Maintain | | Resolution Date |
| Behavioral Disturbance | VS/MH | 4-17-07 | | A | | |
| Need for Self Expression | | | | | | |

Consultant and Service Department Instructions: Nursing List special needs referrals/consults when initiated.
Consultants/Dept. representatives: Sign below to indicate response

| Service/Dept. | Name/Title | Date responded | Service/Dept. | Name/Title | Date responded |
|---|---|---|---|---|---|

85232 1/06 LHM

FROM Azar, Azar & Moore, LLC

Reed v. PCBE

524 2



UNIVERSITY
HOSPITAL



**HISTORY, PHYSICAL EXAMINATION AND PROGRESS NOTES**

R₂ H+P  4/17/07  0130    NOTES   1 of 2

**ID** 1st ↓ admit to this 17 y/o WM 11th grader who lives c̄ Mother, father, 2 bros (19 and 23) & sister (20) in Brundidge, AL   tx from CSU

**Inf** Pt, PIF

**CC**

**HPI** 17 y/o WM c̄ LD, ADHD tx from OSH in Troy AL. He was in therapy 4 mo and became angry, told family he would not go back to school. He also kicked van there. He has been aggressive @ home, "outbursts," and deviant behaviors recently inc taking parents van far joyride. Mother also concerned w/ ability to make good decisions. Mother endorses all attention sx/some behavioral sx and sexual mod/↑/developmental sx. He is fairly simple. He is asleep and unable to give any history. He denies SI/HI/MH per in note.

**Past ψ** ◊ inpt ◊ SH  sees therapist      spinal meningitis

**PMH** hx clavicle fx, speech difficulty, therminissapy Pip-oga

**Meds** Risperdal (qhs)  **All** NKDA (PMhx) none reported  
        Concerta?          **Dev** Pt ◊ mos premature 3#15oz, slow to warm, motor milestones while verbal delays

**Soc** lives in Brundidge. No sexual abuse by elementary school teacher. DHR was involved. ∅ SD sx. lives c̄ Mo, Fa, 2 bros & sister. He is in 11th grade spec ed @ Henderson HS, repeated 1st grade. Spec ed in all subj. "Friendly @ school"

**MSE** sleeping. dressed in scrubs. Fair/Kempt. speech/motor/Mood Affect/TP unable to fully assess. TC- denied SI/HI per RN TP limited

**A/P** 17 y/o WM I: mod diso s/s, ADHD, LD  II: BIF  III: abuse  IV: county jail  V: 25
1. Admit Adolescent  Dr. william @ Admit labs & restart Risp

Recd v. PCBE

 **UNIVERSITY HOSPITAL**


REED, JUSTIN
04/17/07  072083
ST 172 MM 2269916
64340044 7107CULLINAN, J
Koyplate

**HISTORY, PHYSICAL EXAMINATION AND PROGRESS NOTES**

*R2 H+P 4/17/07  0130*     NOTES   *20/2*

## REVIEW OF SYSTEMS   Circle pertinent; check box if negative **(10 or more)**

☐ **Gen:** ↑weight, ↓weight, fever night sweats

☐ **Head:** headache, LOC, trauma, dizziness

☐ **EENT:** ↓vision, ↓hearing, sinusitis, sore throat, headache

☐ **Respiratory:** hemoptysis, cough, dyspnea, wheezing

☐ **CV:** chest pain, orthopnea, palpitations, murmur

☐ **GI:** nausea, vomiting, abdominal pain, dysphasia, melena, constipation/diarrhea

☐ **GU:** hematuria, dysuria, frequency, hesitancy, sores, urethral/vaginal discharge
And

☐ **Menses:** menarche, irregularity, menopause, post menstrual bleeding

*NA*

☐ **Musculoskeletal:** pain, swelling, stiffness, locking joints

☐ **Endocrinology:** polyuria, ploydipsia, heat or cold intolerance
And

☐ **Hematology:** prolonged bleeding, easy bruising, anemia

☐ **Dermatology:** rashes, pruritus, mole or tumor

☐ **Neurology:** paralysis, weakness, numbness, seizures

☐ **Psych:** depression, "voices", "nerves", anxiety, hallucinations

☐ **All Others Negative**

*(A2ONBY 1735*

Signature: _____ MD     Date: 4/17/07

Reed v. PCBE

Reed v. Azar, Azar & Moore, LLC

VS/Gen 98¹ 19 88 121/72 prominent-alerted    Abd soft/NVD/BS
Heart/neck NCAT Penla eemi PERRLA supple QLAD    Ext/Sen QCCE Q rash Qc
Chest CTA ⓑ    Neuro nonfocal
CV RRR S m/g/r

Reed
22669916
CSN

C524 2

REED, JUSTIN
04/17/07   07281?
ST 17Y WR 226931?
64348065-7107CULLIMAN. J

**UAB UNIVERSITY HOSPITAL**

**CONSULTATION REPORT**

4/18/07     TO: _Cardiology_     FROM: _Adolescent Psych_
Date of Request     Name of Physician or Service     Physician Making Request

Opinion Requested Regarding: abnormal EKG

Date of Consultation: 4/18/07

17 yom hospitalized for psychiatric evaluation, ADD, PTSD, who was noted to have abnormal EKG automatic analysis on routine admission EKG. He denies physical complaints including CP, SOB, N/V, diaphoresis. He has no cardiac hx.

EKG reads: "Normal sinus rhythm... possible anterior infarct, age undetermined." We are consulted for abnormal EKG.

| | |
|---|---|
| PMH: 1. PTSD | current meds: Risperdal 1 QHS |
|     2. ADD | Ativan 1mg IM Q6 pen |
|     3. LD | Ativan 1mg PO pen |
|     4. meningitis as an infant | Maalox pen |
| | Tylenol pen |

FH: none known - no CAD.     ROS: See attached.

Social: denies EtOH, illicits, tobacco.

T 97°  P 84  R 18  BP 128/66  wt 68.1 kg.

| | |
|---|---|
| gen: WDWN young male, NAD | lungs: CTA Ⓑ |
| neck: no JVD | abd: soft, NTND NABS |
| CV: RRR + ectopy. no m/r/g | ext: 2+ pulses, no edema   UDS ⊖ cocaine ⊖ benzos |

CK 97↑
MB 2.0  Trop <0.10

EKG: NSR. frequent PVC's, no Qs. variable TWI V1-V3.

Imp/Recs: 17 yom hospitalized for Ψ eval, with questioned screening EKG. he is asymptomatic ē ⊖ troponin. His EKG is normal except for the frequent PVC's which are not concerning. If he is symptomatic from them, may ↓ caffeine intake & see if it improves. Will staff later today; we will not follow daily.

PLEASE DO NOT WRITE ON THE BACK OF THIS FORM; USE ANOTHER FORM

SIGNATURE OF CONSULTANT

AS Hajari, MD
HAJARI 2488

Reed v. PCBE
816

(FRI)NOV 18 2007 18:53/ST. 18:49/No. 5/078/8281 P 11
FROM HZAR, HZAR & MOORE,LLC

**UAB UNIVERSITY HOSPITAL**

C252

REED, JUSTIN
04/17/07  072889
ST 17Y WM 2269916
865-7107CULLMAN, J

**CONSULTATION RECORD**

H-20-2007    TO: Dr. Isbill    FROM:

Date of Request                Name of Physician or Service                Physician Making Request

Opinion Requested Regarding:
P/o Thought Disorder.                    1 HR @ testing

Date of Consultation:
H-22-2007

Justin Reed is a 17 yo WM who is presently
hospitalized on the UAB Adolescent Psychiatry Unit.
For additional information please ref to his hospital
record.

Assessment Procedures: Rorschach Inkblot Test, Interview

Test Behavior and Validity Indicators: The test was
given within standard test protocol. Justin was cooperative
to the testing but tended to give very brief responses. He
was reticent to expand responses or give more detail.
The possibility that acute emotional/behavioral issues may have
impinged upon his performance cannot be ruled out and
should be considered by the reader of this report.

PLEASE DO NOT WRITE ON THE BACK OF THIS FORM; USE ANOTHER FORM

P 1/3                    SIGNATURE OF CONSULTANT


UNIVERSITY
HOSPITAL

C526

**CONSULTATION REPORT**

REED, JUSTIN
04/17/07   072889
IT NR 2269916
64348065-7107CULLINAN, J

4-20-2007     TO: Dr. Isbell                          FROM:
Date of Request      Name of Physician or Service              Physician Making Request

**Opinion Requested Regarding:**

Sm p l

Date of Consultation:
4 - 22 - 2007

Test Results: Test data suggests that Justin views the world in an
overly narrow frame of reference. He lacks a consistent coping
style and tends to go back and forth between experience
and ideational ways of dealing ā experience, often ineffectively.
He is much less willing than most people to approach and
process emotional stimuli and may appear emotionally or
socially withdrawn to others. His lack of psychological
complexity likely contributes significantly to his coping deficit
issues.

There is no evidence in the current testing of a thought
disorder. However Justin appears to be avoiding self focusing
and staying away from introspection. Although data
suggest he may be vulnerable to affective disturbance
he appears to cope through denial and avoidance.

Justin is less interested in other people than most people
and has difficulty establishing relationships. Limited social
skills likely contributes to true social awkwardness.

PLEASE DO NOT WRITE ON THE BACK OF THIS FORM; USE ANOTHER FORM

P. 2/3

SIGNATURE OF CONSULTANT  Susan

Reed v. PCHE
012

**UAB UNIVERSITY HOSPITAL**

C52b

**CONSULTATION REPORT**

REED, JUSTIN
04/17/07  072889
177 WM 2269916
64348065-7107 CULLMAN, J

4-20-2007
Date of Request

TO: Dr. Isbill
Name of Physician or Service

FROM: _____
Physician Making Request

**Opinion Requested Regarding:**
sec p 1

**Date of Consultation:**
4-22-2007

This individual's coping defaults, interpersonal style and narrow cognitive focus make change difficult. He is aware of many of his difficulties yet is likely to feel powerless to make significant changes.

Recommendations:
(1) This individual would benefit from individual tx as well as group tx in order to address his social skills and coping deficits.
(2) This individual should continue to be monitored by a psychiatrist for medical intervention for his affective sx as needed.
(3) As the lack of a consistent, well defined coping style may make this individual vulnerable to impulsive responding, monitoring for safety concerns is strongly urged.

**PLEASE DO NOT WRITE ON THE BACK OF THIS FORM; USE ANOTHER FORM**

P3/3

SIGNATURE OF CONSULTANT _____

Reed v. PCBE

**HOSPITAL**
## MEDICATION RECONCILIATION

F. JISTIN
1/12/31  072A??
ST 177 WW 2269913
64348065-7107CULLINAN. J

| Allergies Drugs, Foods, Chemical, Latex, Other and response ☐ No Known Allergy | Allergies (Nursing)    ☐ No Action/Plan |
|---|---|
| NKA | ☐ Verify and/or enter all allergies in PIN<br>☐ Pharmacy referral for history of serious drug allergy<br>☐ Dietitian referral for potentially lethal food allergy<br>☐ Care in accord with standard Latex Allergy |

| | Medication (Nursing)    ☐ No Action/Plan |
|---|---|

**Vaccinations (Order in PIN if indicated)**   Current   Not Indicated   Refused

| | Current | Not Indicated | Refused |
|---|---|---|---|
| Influenza (Annual) | ☐ Yes ☐ No | ☐ | ☐ |
| Pneumonia (every 5 years) | ☐ Yes ☐ No | ☐ | ☐ |

**OTC, Herbal & Alternatives, Vitamins & Minerals**

Initiate Pharmacy Referral if:
☐ Admission due to drug/drug interaction
☐ Admission / complication due to adverse med reaction
☐ Idiosyncratic drug reaction
☐ Eats or drinks Grapefruit products ≥ 4 x per wk.
☐ Taking any of the following herbal medicines:
    Danshen, Garlic, Ginger, Ginkgo, Ginseng, Kava,
    Melatonin, Quinine, St. John's Wort, Tyramine,
    Valerian
☐ Greater than or equal to 8 medications

**Home Medication Disposition:** ☐ Meds sent home with _____
☐ Meds to pharmacy: Receipt # _____    ☐ Orders for bedside use
☐ No medicines with pt    ☐ Denies use of any medication at home

☐ Medication list continued on back of page

**Legend for source of information:** P-Patient F- Family R-Records O-Other

| Entered by: | | Current Prescription Drugs | | | | |
|---|---|---|---|---|---|---|
| MD | RN | Drug/Amt. | Frequency | Reason | Last Dose | Source of Information |
| | DS | Risperdal 1mg @ hs | | | | |

**DO NOT USE UNAPPROVED ABBREVIATIONS**

Identify initials of staff entering data

| Initial | Signature/Title | Date | Initial | Signature/Title | Date | Initial | Signature/Title | Date |
|---|---|---|---|---|---|---|---|---|
| DS | Spinger | 9-16-07 | | | | | | |
| Initial | Signature/Title | Date | Initial | Signature/Title | Date | | | |

**MD/Designee: I have reviewed the list of medications** _____ Signature _____ Date/Time

F# 369r (Ref # 736n Developed: 09/28/05 Revised: 8/2/06 Approved 09/28/05, 07/05/06

Recd v. PCBE
820

FROM Azar, Azar & Moore @ LLC

**DEANIE CLARK ALLEN**
*ATTORNEY AND COUNSELOR AT LAW*
2740 Zelda Road, Suite 400
Montgomery, Alabama 361046

(334) 293-0579
Fax: (334) 264-9453

E-mail: dallen@azarlaw.com

Fed. Tax I.D. # 20-2693174

## Facsimile Cover Page

PLEASE DELIVER TO:

Name:     Donald Sweeney, Esq.

Fax #:    (205) 488-6275

FROM:     Deanie C. Allen

RE:       Discovery– Bate Stamped 808-820

DATE:     November 16, 2007

Number of Pages transmitted (including cover sheet): 15

# PROGRESS NOTE

Justin Reed                    1 4 6 8 9                    111
**NAME**                       **CASE #**                  **UNIT**

Date, Service
Time of Day and
Time Spent/Units                        Record

10-1-07, m.h.c.                                             N.R.O.P.
         , 2:00

            C. C. o.        was
present    at   the    deposition
on    client's    case.
C. C. o.    testified    on
past    information    on
client's    case.
      Attorneys    questioned    c. c. o.
about    client's    treatment.
      C. C. o.    is    to
return    at    a    late
date.
      Andrew Wright    m.s.c.p.c./c. co.

DEFENDANT'S
EXHIBIT
8

ECMH - 002

## PROGRESS NOTE

Austin Reed          1 4 6 8 9                      /1/

**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units

Record

9-18-02, Crisis Int.                                    12.R0 P.
            , 1:00

C. L. O. saw client
and family in office
today.
C. L. O. basically
had a family session.
C. L. O. helped
while family to
cope with recent
stressor of loosing
father brother W.
Mother of client
seemed to be
under the most
stress.
C. L. O. helped children
to understand how
to assist their
mother as well as
how to assist one
another.
C. L. O. is to see client

Andrew
Wright M.S.
L. P.C. C.L.O.

again on 10-3-02 at 11:00 a.m.

# PROGRESS NOTE

Austin Reed _____ 14689 _____ 111

**NAME** _____ **CASE #** _____ **UNIT**

Date, Service
Time of Day and
Time Spent/Units

Record

9-10-02, Individual tx.                          I.R.V.R

continued    non-verbal or totally
tried to avoid topic.
Client was question
about feelings due
to abuse. Client
communicated feeling of shame
or humiliation when
questioned about certain
feelings.
C.... is to see
client again next month
but is to see
family and client on
9-18-02.
Assessment Client appears to be
taking meds and
shows no signs of
aggression or acting out.
Andrew Wiffle M.S. L.P.C./C...

# PROGRESS NOTE

Justin Reed                    1 4 6 8 9                    111

**NAME**                    **CASE #**                    **UNIT**

Date, Service
Time of Day and
Time Spent/Units                    Record

9-10-07,    Individual Sx                    12. P. o. R.

Est.  11:00  , 1:00
        a.m.

C. . . .    saw  client

in    office.

Client    and    C. . . .

spent    considerable    time

discussing    issues

surrounding    sexual    abuse

of    two    years    ago.

Client    was    asked

if    he    was    fondled

by    teacher

Client    admitted    that

he    was    fondled    more

than    once.

Client    was    asked

if    he    performed    oral

sex    on    teacher.  Client

denied    oral    sex    being

performed.

Client    only    responded

in    head    gestures    but

completely    seem    to    become

# PROGRESS NOTE

_Gaolin_ Reed          1 X 689          1 1 1
**NAME**                **CASE #**              **UNIT**

Date, Service
Time of Day and
Time Spent/Units

9-4-07, m, t.c.

                                        Record

                                                            H.R.O.P.

1:00   .30

          C. L. O.     was    present
at        the      pike   County
Board      of      Education.
          C. L. O.     was    supposed
to       do      a    deposition
on       child
          Deposition     was    continued
until      10-1-07.
          Andrew Wright  m.s.  L.P.S/C.L.O.

# United States District Court for the Middle District of Alabama

## SUBPOENA IN CIVIL CASE

### *JR v. Pike County Board of Education et al*
### Case Number 2:06-cv-1120

**TO:**    **Robert Bradbury**
**467 County Road 2239**
**Goshen, AL 36035**

A subpoena may be served by the sheriff, by his deputy, or by any other person who is not a party and who is not less than 18 years of age.  Service of the subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for one day's attendance and the mileage allowed by law under the Federal Rules of Civil Procedure, USCS.

---

☐ YOU ARE COMMANDED to appear in the United State District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM | DATE AND TIME |
|---|---|---|
| | | |

---

x☐ YOU ARE COMMANDED to produce at the place, date, and time specified below, the following documents or objects:

| PLACE | DATE AND TIME |
|---|---|
| Produce the original or a copy of the audio/video tape(s) of all interviews with Justin Reed regarding sexual abuse, including but not limited to any/all interviews at which you were present, observed and/or participated in. | 10-18-07<br>10:30 p.m. |

---

x☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE | DATE AND TIME |
|---|---|
| 101 W. Love Street<br>Troy, Alabama 36081 | 10-18-07<br>10:30 p.m. |

---

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

---

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person must testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S NAME, TITLE, & ADDRESS | PHONE & FAX NUMBERS |
|---|---|
| **Deanie C. Allen (ALL067) Attorney for Plaintiff**<br>**Aliant Center**<br>**2740 Zelda Road**<br>**Montgomery, Alabama 36106** | **(334) 265-8551**<br>**(334) 264-9453 – FAX** |

SIGNATURE  *Deanie C. Allen*                    DATE  10-09-07

PLAINTIFF'S
EXHIBIT
31

## PROOF OF SERVICE

| DATE SERVED | PLACE |
|---|---|
| October 9, 2007 | **467 County Road 2239**<br>**Goshen, AL 36035** |

| PERSON SERVED ON (PLEASE PRINT) | MANNER OF SERVICE |
|---|---|
| Robert Bradbury | Certified Mail |

| PERSON SERVED BY (PLEASE PRINT) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on: _____        _____

By

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraphs (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i)  fails to allow reasonable time for compliance;
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in

which the trial is held, or
(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.

(B)  If a subpoena
(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any parties, or
(iii)  requires a person who is not a party or an officer of a party to incur substantial expenses, travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows the substantial need for the testimonial material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMA

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # |
|---|---|---|---|
| 0 5 5 0 0 0 0 | Pike Co. Sheriff Dept | 07 06 05 | 07-413-05 |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Faulkner Phillip Blake | 07 06 05 | ☑ CONTINUATION ☐ FOLLOW-UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sodomy | | |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sexual Abuse | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR | PREMISE |
|---|---|---|---|---|---|
| ☐ YES ☑ NO | M D Y | ☐ YES ☑ NO WARRANT # | M D Y | YEAR | WEAPON |

| 20 ☐ DEFENDANT ☐ SUSPECT | 21 ☐ DEFENDANT ☐ SUSPECT |
|---|---|
| NAME: | NAME: |

| RACE | SEX | DOB | AGE | RACE | SEX | DOB | AGE |
|---|---|---|---|---|---|---|---|
| ☐W ☐A | ☐M ☐F | M D Y | | ☐W ☐A | ☐M ☐F | M D Y | |
| ☐B ☐I | | | | ☐B ☐I | | | |

**NARRATIVE**

Came into Sheriff Thomas's office and was taken down stairs to Investigators offices were Investigator Bradbury tape recorded Phillips statement. See Statement.

In the statement Phillip tells how Mr Coon would get him to stay late at the school would give him a ride home and would fondle phillip while they were riding in Coon's truck. No Sexual activity took place at the school (Pike Co. High)

Phillip went on to tell that Coon would give him money, buy him cell phones, and a computer as well as a lap top computer. Phillip was also given the use of three credit cards.

Phillip Further stated that Coon would say if you want something you have to give me something, or words to that affect.

An Investigator from Greenville Police Department is to come by at 2:00pm 7-6-05 and interview Phillip

| 22 LOCAL USE | | | | |
|---|---|---|---|---|
| 23 STATE USE | | | | |

**DOLLAR VALUE** (S C R D)

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S | S | S | S | S | S |
| R | R | R | R | R | R |
| D | D | D | D | D | D |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S | S | S | S | S |
| R | R | R | R | R |
| D | D | D | D | D |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 34xx UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS ☐ PENDING ☐ INACTIVE ☐ CLOSED ENTERED ACIC/NCIC DATE | 45 CASE DISPOSITION | ① CLEARED BY ARREST (JUV.) ② CLEARED BY ARREST (ADULT) ③ UNFOUNDED ⑤ ADM. CLEARED | ④ EXCEPTIONAL CLEARANCE: ① SUSPECT/OFFENDER DEAD ② OTHER PROSECUTION | 46 REPORTING OFFICER R.S Bradbury | 5511 | ID # |
|---|---|---|---|---|---|---|
| | | | | 47 ASSISTING OFFICER | | ID # |
| | | | | 48 SUPERVISOR APPROVAL | | ID # |

PLAINTIFF'S EXHIBIT 32

Reed v. PCBE

130

TYPE OR PRINT IN BLACK INK ONLY

ACJIC—33 REV. 11

ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATI

| 1 ORI # | 5 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 | 2 CASE # | 5 SFX |
|---|---|---|---|---|---|
| 0 5 5 0 0 0 | Pike Co Sheriff Dept | 07 07 05 | AM PM MIL | 07-413-05 | |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Faulkner Phillip Blake | 07 06 05 | CONTINUATION ☒ FOLLOW—UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sodomy 1st | | |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sexual Abuse | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR PREMISE |
|---|---|---|---|---|
| ☐ YES ☒ NO | M D Y | ☐ YES ☒ NO WARRANT # | M D Y | YEAR WEAPON |

| 20 ☒ DEFENDANT ☐ SUSPECT | 21 ☐ DEFENDANT ☐ SUSPECT |
|---|---|
| NAME: Coon Charles | NAME: |

| RACE | SEX | DOB | AGE | RACE | SEX | DOB | AGE |
|---|---|---|---|---|---|---|---|
| ☐W ☒A ☐B ☐I | ☐M ☐F | M D Y | | ☐W ☐A ☐B ☐I | ☐M ☐F | M D Y | |

**NARRATIVE**

ON 7-7-05 at approx 1:30pm I met with Sheriff Thom Capt. Riley and Investigator Bob Williamson in the Sheriff's Office.

I was advised that an Investigator from Greenville P.D. had come over and interviewed Phillip and that Investigator Williamson set up some recording equipment and had Phillip to call Coon. Two Telephone calls were recorded.

Phillip's Father brought A computer into the office that young Phillip had been given by Coon. Investigator Bradbury took the computer (tower-Hard drive) To Greg Spivey of PC Plus in Troy and software is being ran on the computer To recover any deleted material. No Files of interest were found.

At approx 7:00pm Investigator collected 8 cell phones from Blake Faulkner at his mothers residence at 2121 Parker Road in Pinelevel. Faulkner states that two phones are operational. The "Green" phone and A

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D | S R D |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24th UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS | 45 CASE DISPOSITION: | | 46 REPORTING OFFICER | ID # |
|---|---|---|---|---|
| ☐ PENDING ☐ INACTIVE ☐ CLOSED | ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | 4 EXCEPTIONAL CLEARANCE: A SUSPECT/OFFENDER DEAD B OTHER PROSECUTION C EXTRADITION DENIED D LACK OF PROSECUTION E JUVENILE, NO REFERRAL F DEATH OF VICTIM | R.S. Bradbury | SS11 |
| ENTERED ACIC/NCIC DATE | | | 47 ASSISTING OFFICER | ID # |
| | | | 48 SUPERVISOR APPROVAL    ID # | 49 WATCH CMDR.    ID # |

Reed v. PCBE
131

TYPE OR PRINT IN BLACK INK ONLY    CJIC—33 REV. 11

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATIO

**INCIDENT/OFFENSE REPORT CONTINUED**

95 DATE AND TIME OF REPORT   96 CASE #   97 SFX   98 □ OFFENDER □ SUSPECT ☑ CHECK IF MULTIPLE □ MISSING PERSON

99 NAME (LAST, FIRST, MIDDLE): Coon Charles
100 NICKNAME/ALIAS
101 RACE
102 SEX: M
103 DOB: 0 10 2 9 8
104 AGE

102 ADDRESS (STREET, CITY, STATE, ZIP): 308 Country Club Drive Greenville Al
105 HGT   107 WGT   108 EYE   109 HAIR   110 COMPLEXION

111 PROBABLE DESTINATION
112 ARMED? □ Y ☑ N □ UNK.
113 WEAPON

114 CLOTHING
□ SCARS  □ MARKS  □ TATOOS
115 □ ARRESTED □ WANTED

137  Mr. Phillip Faulkner has come into the Sheriff's Office and
has made it known to Sheriff Thomas and this investigator that
his 15 year old son Phillip Blake Faulkner has been sexualy abused
by a former teacher/band director at Pike County High School.
The suspect is Charles Coon who lives in Greenville, Al.
   That the abuse has taken place over the last 18 months, and
that his son has come forward and told of the abuse.
   Young Phillip is to come in to the office with his mother
for the purpose of talking with and making a statement about this
matter.
   At approx 10:00 AM young Phillip

CONTINUED ON SUPPLEMENT ☑

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE

149 REPORTING OFFICER: R.S. Bradbury   5511
150 ASSISTING OFFICER

Reed v. PCBE
129

**ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT**

CONFIDENTIAL

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATIO

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 9510900 | Pike Co. Sheriff Dept. | 07 08 05 : AM PM | 07-913-05 | |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Faulkner Phillip Blake | | CONTINUATION FOLLOW—UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sodomy | | |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR PREMISE |
|---|---|---|---|---|
| ☐ YES ☒ NO | M D Y | ☐ YES ☒ NO WARRANT # | M D Y | YEAR WEAPON |

| 20 ☐ DEFENDANT ☒ SUSPECT | 21 ☐ DEFENDANT ☐ SUSPECT |
|---|---|
| NAME: Charles Coon | NAME: |

| RACE ☐W 3A ☒B 4I | SEX ☐M ☐F | DOB M D Y | AGE | RACE ☐W 3A ☐B 4I | SEX ☐M ☐F | DOB M D Y | AGE |
|---|---|---|---|---|---|---|---|

**NARRATIVE**

At approx 9:30 Am Sheriff Thomas, Investigators Williams and Bradbury met with DA's McAliley and Anderson as well as members of the Greenville Police Dept. and Agents of ABI. We made plans for the search of Coon's residence and his arrest.

Coon was arrested by members of the Greenville Police Department and a search of his home was started at approx 1:00pm 7-8-05.

Coon was transported to the Greenville Police Department and interviewed by Lt. Randy Courtney. Coon made a statement about the sexual abuse to Courtney. Coon was placed in the Butler Co. Jail, charged with Three counts of Sodomy 2 and Three counts of enticing a child. Bond was set at $225,000.

| 22 LOCAL USE |
|---|
| 23 STATE USE |

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 34xx UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐Y WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐Y WHERE? |
|---|---|---|

**MULTIPLE CASES CLOSED**

| 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE |
|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS | 45 CASE DISPOSITION | 4 EXCEPTIONAL CLEARANCE: | 46 REPORTING OFFICER | ID # |
|---|---|---|---|---|
| ☐1 PENDING ☐2 INACTIVE ☐3 CLOSED ENTERED ACIC/NCIC DATE | ☐1 CLEARED BY ARREST (JUV.) ☐2 CLEARED BY ARREST (ADULT) ☐3 UNFOUNDED ☐4 ADM. CLEARED | ☐A SUSPECT/OFFENDER DEAD ☐B OTHER PROSECUTION ☐C EXTRADITION DENIED ☐D LACK OF PROSECUTION ☐E JUVENILE, NO REFERRAL ☐F DEATH OF VICTIM | R.S. Bradbury 5511 | |
| | | | 47 ASSISTING OFFICER | ID # |
| | | | 48 SUPERVISOR APPROVAL ID # | 49 WATCH CMDR. ID # |

**TYPE OR PRINT IN BLACK INK ONLY**

Reed v. PCBE
132

PHILLIP BLAKE FAULKNER IS GIVING STATEMENT TO INVESTIGATOR
ROBERT BRADBURY.

Bradbury:     Today's date is July 6, 2005. The time is 9:55 a.m. Present in the
              Investigation office, Mr. Phillip Blake Faulkner. The date of birth 09-08-
              89, myself Investigator Robert Bradbury, Pike County Sheriff's
              Department.

              Blake we are here to talk about an incident, several incidents, and an
              incident where you have been molested by a teacher, or former teacher. If
              you will start at the beginning and tell me who the teacher is. His name is?

Faulkner:     Mr. Charles Coon.

Bradbury:     Mr. Charles Coon lives where?

Faulkner:     In Greenville, Alabama.

Bradbury:     All right, when this alleged abuse began he was a teacher at what school?

Faulkner:     At Pike County High School.

Bradbury:     Here in Pike County, Alabama.

Faulkner:     Pike County, Alabama.

Bradbury:     Down at Brundidge?

Faulkner:     Yes sir.

Bradbury:     What capacity was he a teacher?

Faulkner:     He was a band instructor and the music appreciation associate.

Bradbury:     All right. As best you can and as far back as you can start at the first
              incident where you felt uncomfortable, where he was making advances at
              you, and tell me what happened.

Faulkner:     Well, on the first Friday night ah, during football season when it started
              last year, Mr. Coon asked me if it would be all right if I went home with
              him on that Friday. He carried me home on that Saturday. We got to his
              house and ah, I sat back in the chair watching t.v.

Bradbury:     All right, let me stop you just one minute. When you say he wanted to
              carry you home to his house, where is his house at?

PLAINTIFF'S
EXHIBIT
33

| | |
|---|---|
| Faulkner: | In Greenville, Alabama. |
| Bradbury: | All right do you know the address? |
| Faulkner: | Yes I do. |
| Bradbury: | What is the address? |
| Faulkner: | 308 Country Club Drive, Greenville, Alabama 36037. |
| Bradbury: | All right. So he wanted to carry you from Pike County High School, in Brundidge to his residence in Greenville. All right, go ahead. |
| Faulkner: | And after that he asked me if he could perform oral sex on me? |
| Bradbury: | This question was at the residence? |
| Faulkner: | At the residence. At the residence. |
| Bradbury: | All right, go ahead. |
| Faulkner: | And I told him no. He kept on begging so I just, I got, I felt like I was being pressured to do it. So, I just went ahead and told him to go ahead you know. And what I was telling myself was that I needed to get this over with. I kept on telling myself I wouldn't go back. But, he made out like he wanted me to do some work for him or wanted me to go help him at the school or something like that. Go straighten books, go get music to put up, sometimes he wanted me to go to Montgomery with him to the music shop, Capitol Music shop. Ah, I went there plenty of times with him. |
| | But, like from that Friday night on out, that's when it first started and it's been about that way ever since. |
| Bradbury: | All right, that first occasion, when he performed oral sex on you. |
| Faulkner: | Yes sir. |
| Bradbury: | And oral sex. Do you know what oral sex is? |
| Faulkner: | Yes sir. |
| Bradbury: | By definition oral sex is mouth to genitals. All right did he put his mouth on your genitals? |
| Faulkner: | Yes sir. |

Charles Coon00015
City of Greenvi"

Reed v. PCBE

16

2

COPY

Bradbury:      All right. Did he take your clothes off or did you take your clothes off?

Faulkner:      My clothes didn't come off. My pants were unzipped.

Bradbury:      Did he unzip them or did you unzip them?

Faulkner:      I unzipped them.

Bradbury:      Did you pull your penis out or did he pull it out?

Faulkner:      He pulled it out.

Bradbury:      All right. Ah, wearing shorts boxer shorts, jockeys or what?

Faulkner:      My pants, my pants I wore that Friday night under my uniform.

Bradbury:      So he had to unzip your uniform trousers?

Faulkner:      No. I changed my uniform at the school. I left my uniform at the school.

Bradbury:      So you had your street clothes on?

Faulkner:      Right.

Bradbury:      All right. Ah, how long of a period do you think that this might have taken place? This first occasion?

Faulkner:      Maybe thirty minutes. Forty-five minutes at the most.

Bradbury:      Since that time, how many occasions have occurred where he has performed oral sex or fondled you or something of that nature?

Faulkner:      About four times.

Bradbury:      Four times over the course of the last year or so?

Faulkner:      This year and over the season last year, or after Christmas.

Bradbury:      When was the last time that this occurred?

Faulkner:      The last time this occurred was last week when I went to his house. I think it was on Thursday.

Bradbury:      Last week on Thursday, which would have been June 30th? The last day of the month?

Charles Coon00016
City of Greenville

| | |
|---|---|
| Faulkner: | No, not June 30th. I don't know. It was sometime last week. |
| Bradbury: | Look at the calendar as best you can. |
| Faulkner: | What's today? I know it's not June 30th because we went to Wal-Mart that night. |
| Bradbury: | The 28th? |
| Faulkner: | The 28th. |
| Bradbury: | What did you go to Wal-Mart for? |
| Faulkner: | He, I ask him if we could go to Wal-Mart and he said yea. We just rode down there. I walked in by myself. |
| Bradbury: | Did he follow you into the store? |
| Faulkner: | No sir. Not that I am aware of. |
| Bradbury: | Now earlier you had said that he had purchased you certain items. What items were they? |
| Faulkner: | Computer, laptop, cell phone, cigarettes. That's it. |
| Bradbury: | Do you still have any of it? |
| Faulkner: | I have one of the computers and he has the rest of them. |
| Bradbury: | Now the computers were they purchased new or used? |
| Faulkner: | New. |
| Bradbury: | Purchased in whose name do you reckon? |
| Faulkner: | His name. He got them at the Wal-Mart, one at the Wal-Mart, well all of them at the Wal-Mart store in Greenville (unintelligible) two desktops and two laptops. |
| Bradbury: | How many cell phones? |
| Faulkner: | Ah, couple of Nextel. I'd say about two or three with Nextel. Three, two or three from Alltel. Some from Sprint. |
| Bradbury: | These are prepaid or what? |

Charles Coon00017
City of Greenville

Reed v. PCBE
18

COPY

Faulkner:     Contract.

Bradbury:     Contract. Ah, the contract was signed in his name with you as a user?

Faulkner:     With me as a user.

Bradbury:     And Alltel is located where?

Faulkner:     Well sometimes he goes to the one in Troy, downtown Troy or sometimes he goes to the one in Greenville.

Bradbury:     Nextel?

Faulkner:     Nextel, he did all that over the phone. All the Nextel we knew of was in Troy and we never went to Troy to the Nextel store.

Bradbury:     Okay. You said something about Sprint.

Faulkner:     Sprint. He ordered that over the internet.

Bradbury:     Do you know, do you know of any web sites that might show photographs of you or any, any other victims?

Faulkner:     Ah, the only web site I have is my screen name with Yahoo and it's got a photo picture ID of me with a shirt on, when I was at six flags with just my age, gender and stuff like that. I don't know if he has access to that or not.

Bradbury:     You had conversations through Yahoo with Mr. Coon?

Faulkner:     Many of them.

Bradbury:     What are those conversations consist of? Are they sexually explicated or they just two people talking or?

Faulkner:     Like two people talking. He wants me to come over to his house and do some work and he wants me to go to the school with him and stuff like that.

Bradbury:     He doesn't ever say that, that he wanted you to perform oral on him or of that nature?

Faulkner:     (No response heard on tape).

Bradbury:     Where was I at? We were interrupted by the phone. Where was I at?



Faulkner:     Ah, you were at where the conversations were.

Bradbury:     Ah, when he would have a conversation with you, it would be from his computer at his residence?

Faulkner:     The one that he does not have currently.

Bradbury:     What you mean?

Faulkner:     This computer, ah this computer that we are chatting on crashed. When I say crashed, I mean it completely turned off and would not turn back on. I mean all his files and stuff was gone. So he called Dell and Dell sent him another one. So that computer that me and him was chatting off of was two servers, that he currently does not have any more.

Bradbury:     What did he do with the old server?

Faulkner:     I have no clue.

Bradbury:     So since he's got the new computer you haven't had any chats with him?

Faulkner:     Uh uh. Now he's made, ever since he's got that first computer and I was staying over at my grandmother's house, ah, they do not have internet currently, but you still pull up yahoo and find my screen name and type some message to me. Then when I do log on I'll see that message that he typed and then I can reply back to that message. He has done that before.

              But from what computer, it could be from the school computer, it could be his computer, I have no idea.

Bradbury:     That was gone be my next question. Do you think he has ever used the school computer?

Faulkner:     Na, I wouldn't think he had.

Bradbury:     During the time that this abuse has occurred, has he ever taken your photograph?

Faulkner:     (Response not heard on tape).

Bradbury:     So what we are basically talking about is probably four or five times over the course of about a year, a year and one half. Each time he would take you from the school in Brundidge to his residence in Greenville. Is that right?



Charles Coon00019
City of Greenville

Faulkner:        Yes sir.

Bradbury:        Sheriff Thomas has just joined us for the benefit of the tape recorder. He
                 may want to ask you a question.

Thomas:          Go ahead.

Bradbury:        Ah, none of the sexual abuse occurred in Pike County?

Faulkner:        None of it.

Bradbury:        All of it was at his residence in Greenville?

Faulkner:        Ah, one of them was when we went to six flags and stayed in a hotel, this
                 past month.

Bradbury:        Over in Atlanta?

Faulkner:        Yes sir.

Bradbury:        Tell me about that.

Faulkner:        Well, basically we got back from six flags, no back that up. It rained so we
                 did not get to go to six flags. So, we went to the hotel room. When we got
                 to the hotel room we checked in and we left to get something to eat and
                 when we come back and I had got in the bed and was laying down
                 watching t.v. and came over beside me. And without me knowing it or
                 anything he just started whatever he wanted to do.

Bradbury:        Now the trip to six flags was just you and he?

Faulkner:        Just me and him

Bradbury:        Do you know of any alleged abuse to other students?

Faulkner:        No sir not that I think of. The only friend that I know that I have that's
                 come over once or twice is Adam. And he not been over in months and if
                 he does it's like maybe like a couple of hours and his mother and father
                 comes and gets him.

Bradbury:        Who is Adam?

Faulkner:        Adam Helms. He attends Banks middle school. Me and him has known
                 each other since kindergarten.

Bradbury:        So you don't think Adam has been sexually abused?

COPY

Reed v. PCBE
21

Faulkner:      I don't think so. He hasn't been there long enough to have anything done to him.

Bradbury:      What else can you tell us?

Faulkner:      Basically about the money and what he wants in return, just oral sex.

Bradbury:      Tell me how the money gets into the bank account?

Faulkner:      Sometimes he would give it to me and I would go deposit or sometimes he would deposit it himself.

Bradbury:      So your bank account is where?

Faulkner:      Southtrust Bank.

Bradbury:      Here in Troy?

Faulkner:      Here in Troy.

Bradbury:      Now does he go in and make a deposit here in Troy?

Faulkner:      That I don't know? He may, he may not. But like I said I had ten dollars I put in and then I come to find out I had like a hundred and seventy something in my account. I know I didn't make the deposit. The only thing I made was a fifty five-dollar deposit.

Thomas:        Would he even call you and tell you when he deposited money into your account?

Faulkner:      No sir, not usually. He may have once or twice, but not like every time he done it.

Thomas:        Some times he would and some times he wouldn't.

Faulkner:      Some times he would and some times he wouldn't.

Bradbury:      When he uses money for deposit is it cash or check?

Faulkner:      I don't know. Well maybe, like I say he did not normally give it to me. It may be (unintelligible) credit card or cash, check, money order.

Thomas:        Tell me about the credit card that you have got in your name.

Charles Coon00021
City of Greenville

Faulkner:     He told me that he was going to get me a credit card and put on his
              account in my name. So he got it and he called and activated it and he
              made me, he told me to sign the back of it. I signed the back of it and had
              the credit card.

              Then I had another one, a GM card. The first one was through
              (unintelligible). And that's the only thing I can think of.

Thomas:       Did you ever use those cards?

Faulkner:     Yes sir.

Thomas:       To buy what?

Faulkner:     I bought a pair of shoes, ah, a pair of pants and a shirt.

Thomas:       Did he tell you how much you could spend?

Faulkner:     He told me fifty.

Thomas:       Fifty a month?

Faulkner:     Yes sir.

Bradbury:     I'm sorry. How much?

Faulkner:     Fifty a month.

Bradbury:     You'll have to say it loud so the tape recorder will pick it up. When you
              nod it won't pick it up.

Faulkner:     Yes sir.

Bradbury:     I'm not trying to get ugly with you.

Faulkner:     That's basically it.

Thomas:       Now the times that you would stay over after school and he would take
              you home. Would any thing happen at the school and on the way home?

Faulkner:     On the way home. He would like rub me or rub my leg or rubbing my
              stomach. He always told me that he had a (unintelligible) and he would
              put his hand down my pants and rub back on myself and give me a kiss on
              my forehead and rub on the back of my neck.

Thomas:       And this would happen while you would be driving down the road?

Charles Coon00022
City of Greenville

Reed v. PCBE
23

9

Faulkner:     While he was driving. I was sitting in the passenger seat.

Thomas:       You would leave the school and this would begin?

Faulkner:     Yes sir.

Thomas:       And how long would this go on?

Faulkner:     Till we got home.

Thomas:       Did you ever pull over and go into the woods or go to an isolated place?

Faulkner:     No sir.

Thomas:       Would you be rubbing on him also?

Faulkner:     No sir. He would ask me but I wouldn't do it.

Bradbury:     Does anyone live with him?

Faulkner:     His wife.

Bradbury:     Where is his wife at when this takes place?

Faulkner:     She works at the Greenville High School. She is their secretary, or assistant secretary.

Bradbury:     On the times that he has performed oral sex on you she is not in the residence?

Faulkner:     She either, she's not in the residence or she's asleep.

Bradbury:     Is there anybody that you can think of that could be called as a witness? Anybody that has seen any of this activity?

Faulkner:     No sir. It's never been done outside the residence. Nobody's been at the residence when it happened. But as I met Mr. Coon I always looked at him as a friend. I never thought this would have occurred. But it's like it has ruined my mind, my thoughts, my future. I just don't know what to think. Every time I wake up in the morning I just don't know what to do. I mean I've been through so much.

Thomas:       And this has gone on since you were how old?

Faulkner:     Ever since I started eighth grade. I'd been fourteen.

Charles Coon00023
City of Greenville

Bradbury:     Can you think of anything else?

Faulkner:     No sir.

Bradbury:     This concludes the interview. The time is 10:12. Same date and same persons present.


END OF STATEMENT GIVEN BY PHILLIP BLAKE FAULKNER.

07-14-05

Peggy Barbaree

Charles Coon00024
City of Greenville



I HAVE REVIEWED THE STATEMENT OF Phillip Blake Faulkner
AND IT IS A TRUE AND CORRECT STATEMENT AS GIVEN TO ME BY THE
DEFENDANT.

_____
NAME                                          TITLE


_____
DATE

Charles Coon00025
City of Greenville



BRADBURY: Justin you're a fifteen years old and last year you went to Pike County High School, you were in the ninth grade?

REED:        Yeah.

BRADBURY: And you're going in the tenth grade this year?

REED:        Uh huh, yeah.

BRADBURY: Do you know what today's date is? If I told you today July the eighteenth, 2005, would that mean anything to you? Would you take my word for it?

REED:        Yes.

BRADBURY: And if I told you it was 9:17 in the morning, you'd know that because you not, you not wide awake are you?

REED:        Yeah.

BRADBURY: Ok, Justin what I wanted to talk to you about is, is ah, the same thing that Ms. Mona talked to you about. Do you remember talking to Ms. Mona?

REED:        Uh huh.

BRADBURY: As best you can I want you to tell me what happened. Now you know Ms. Mona, Ms. Mona used the some dolls talking to ya, and I don't have no dolls, so you gonna have to talk to me, you gonna have to tell me and ah, just, just me and you and Mr. Bruce over there and we talking, alright? Something happened with you down at the school that you didn't like? You gonna have to say it now, you gonna hav, you gonna have to say it so I can hear ya.

REED:        Yes.

BRADBURY: What happened down at the school that you didn't like? Sit up, come closer to me, I'm hard of hearing. Put your elbows on the table here like this. I'm hard of hearing, I need to talk.

REED:        (Unintelligible)

BRADBURY: One Aub, one Auburn man to another Auburn man, tell me what, what happened that you didn't like.

REED:        Well the band man ah, touched me in the wrong place and stuff.

BRADBURY: Band director you said? You know who the band director is?

PLAINTIFF'S
EXHIBIT
34

1

Reed v. PCBE

REED:          Mr. Coon.

BRADBURY: Mr. Coon.  When you say he touched you in the wrong place, where is the wrong place at?

REED:          Uh, between the legs.

BRADBURY: Ok, between your legs?  Now he did that at school?

REED:          Yes.

BRADBURY: What else did he do?

REED:          Like, that's it.

BRADBURY: He didn't do anything else?  Do you remember Ms. Mona with the dolls?  Did that happen?

REED:          Uh uh.

BRADBURY: Did he ever kiss ya?

REED:          No.

BRADBURY: Did he ever put his mouth on ya anywhere?  Did he, did he ever make you put your mouth on him?

REED:          No.

BRADBURY: You're sure?

REED:          Yes sir.

BRADBURY: Alright, when you say this happened at the school, whereabouts at the school did this happen?

REED:          In the band room.

BRADBURY: In the band room.  How many times do you reckon' it ever happened?

REED:          About ten, once.

BRADBURY: I'm sorry what?

REED:          Once or twice.

2

Reed v. PCBE

BRADBURY: Once or twice?  You started to say ten, what, what was ten?

REED:        Ah, my brain not awake yet.  Part of my brain's awake

BRADBURY: Part of your brain's awake?  So once or twice at the school?

REED:        Yes.

BRADBURY: Did you ever go for a ride with him in his truck?

REED:        Riding to school.

BRADBURY: Riding from your house to school?

REED:        Uh uh, we was out during school.

BRADBURY: Went out during school?  What did ya'll do when you were out during school?

REED:        Just talked about band practice and stuff.

BRADBURY: You didn't do nothing else?

REED:        Nope.  Just smoked.

BRADBURY: Sm, smoked cigarettes?

REED:        But I no was smoking, he trying to make me smoke.

BRADBURY: He tried to make you smoke?  Did you smoke any?

REED:        No.

BRADBURY: Ok, what about ah, did he buy you a coca-cola?

REED:        No.

BRADBURY: Six pack of beer?

REED:        No.

BRADBURY: Bottle of whiskey?

REED:        No.

3

Reed v. PCB

BRADBURY: I thought you Auburn men could understand that? Huh? What happened at the house? When he come to visit you at the house?

REED: No, he ah, tickled me

BRADBURY: Tickled ya?

REED: and tickled Joey too.

BRADBURY: That's all, just tickled ya? Didn't do anything else? He didn't touch you in the wrong place down there? I'm sorry?

REED: No.

BRADBURY: Just tickled ya?

REED: Uh huh.

BRADBURY: How many times do you think he ever come to your house?

REED: Couple of times, I don't know how many.

BRADBURY: Couple of times? What do you think about Mr. Coon? Do you like him or not?

REED: No.

BRADBURY: Don't like him? What's the reason you don't like him?

REED: Um,

BRADBURY: What's the reason, Justin?

REED: I don't know.

BRADBURY: Well do you like him or not?

REED: Kind of.

BRADBURY: Kinda. Do you like me? I'm alright huh? Huh?

REED: Yeah.

BRADBURY: Ok, what about Mr. Bruce, do you like Mr. Bruce?

REED: Yeah.

4

Reed v. PCE

BRADBURY: He's alright?

REED:        Yeah.

BRADBURY: He's pretty cool dude isn't he?

REED:        Uh huh.

BRADBURY: Alright, the times that ah, Mr. Coon touched you, when you were down at the band, at the band room at the school.

REED:        Uh huh.

BRADBURY: Did he touch with ah, his hand inside your pants or outside your pants?

REED:        Outside.

BRADBURY: He never touched you inside the pants?

REED:        Uh uh.

BRADBURY: I'm sorry?

REED:        No.

BRADBURY: Sit up here so I can hear ya, hell I'm old.  Sit up here so I can hear ya. You said, you said he touched him where?

REED:        On the pants.

BRADBURY: He touched, he touched you outside of the pants?

REED:        Yes.

BRADBURY: Did he ever want to do anything else to you?

REED:        No.

BRADBURY: He didn' t give you a hug?

REED:        No.

BRADBURY: Didn't give you no kiss?

REED:        No.

Reed v. PCE
5

BRADBURY: Tickle you at the band room?

REED:        Uh huh.

BRADBURY: Tickled ya at the band room.  What else he think he did?

REED:        (Unintelligible)

BRADBURY: Did you ever see him do anything to any other student?

REED:        Uh uh.

BRADBURY: Now when ah, on the occasion that he touched you at the band room, or touched you between your legs at the band room, was there any other students in the class?

REED:        No.

BRADBURY: Ah, how d, how did he keep folks from coming in and seeing ya'll?  Did he lock the door?  He locked the door or you locked the door?

REED:        That's when I locked the door.

BRADBURY: I'm sorry.

REED:        I locked the door.

BRADBURY: You locked the door.  What'd you lock the door for?  Justin, what'd you lock the door for?

REED:        Because he told me to.

BRADBURY: He told you too?

REED:        Uh huh.

BRADBURY: You do everything he tell you?

REED:        Uh uh.

BRADBURY: Are you in the band?

REED:        I was but I not now.

BRADBURY: What instrument did you play?

6

REED:        Trumpet.

BRADBURY: Trumpet?  Were you any good?  You not no good?  Huh?  You didn't like
              it or what?

REED:        I like it but I be in ROTC, you know.

BRADBURY: Well you like ROTC better?  Uh huh.  What you want to do when you get
              out of school?

REED:        Go to college.

BRADBURY: What you want to learn?

REED:        Um, different stuff.

BRADBURY: Different stuff?  Got anything interest ya?  I think I talked to your sister
              the other day, she was talking about maybe going into medicine.  That
              doesn't interest you?  Now she told me she's a whiz on math.  Are you a
              whiz on math too?

REED:        No.

BRADBURY: Huh?  I know, ask Joey, is that right?  Huh?

REED:        Uh huh.

BRADBURY: Ok, other than, other than Mr. Coon touching you in your private place,
              did he do anything else to you?

REED:        Nope.

BRADBURY: Nothing at all?

REED:        Uh uh.

BRADBURY: He never put his mouth on ya?

REED:        Nope.

BRADBURY: He never had you to put your mouth on him?

REED:        Uh uh.

BRADBURY: And he never touched you without, inside your clothes, inside your pants?

<center>7</center>

REED:        Uh uh.

BRADBURY: You must be really tired the way you stretching.

REED:        Uh huh.

BRADBURY: Do you think you can answer a question for Mr. Bruce?  Aw, come on
             now.  Bruce is a cool guy.

MATHEWS:  You don't want to talk to me Justin?

REED:        No.

MATHEWS:  Why?  What did I do to you?

REED:        Sleepy.

MATHEWS:  Me to, me to, you know what I did yesterday?

REED:        Uh uh.

MATHEWS:  Picked peas, corn, okra, all out in that hot sun, you was out there helping
             dig ditches weren't you?

REED:        Uh uh, I went to church.

BRADBURY: You went, you went to the truck?

REED:        I went to church.

BRADBURY: Oh, ok.  You went to the church, huh?

MATHEWS:  Was it Saturday you was out there helping dig the ditch?

REED:        And yesterday.

MATHEWS:  Laying wire and pipe, did you have to fill 'em back in?  Get dirt all up
             under your fingernails?  You didn't?  Did you have gloves on?  Oh, ok.

BRADBURY: Did that pay pretty good?  Ok.

MATHEWS:  Did you make you enough to get you another gameboy?

REED:        Uh uh.

8

Reed v. PCBE
8

MATHEWS:  Do you remember telling Ms. Mona that he put his mouth on you?

REED:      Uh uh.

MATHEWS:  Don't remember telling her that?

BRADBURY: I can't hear ya.

REED:      No.

MATHEWS:  Do you remember telling her that, that he, he pulled your pants down?
          You don't remember that?

REED:      Uh uh.

MATHEWS:  Hum,

BRADBURY: Do you remember anything you told Ms. Mona?  I'm sorry I can't hear ya.

REED:      Nope.

MATHEWS:  Remember when she showed you the dolls?  You don't even remember
          those dolls?

REED:      Uh uh.

MATHEWS:  Yes you do.

REED:      Uh uh.

MATHEWS:  You just joshing me, you just messing with me.

REED:      I got a short memory.

BRADBURY: Got a short memory

MATHEWS:  Short

REED:      Uh huh.

MATHEWS:  You remember how to play Zelda don't you?

REED:      Uh huh.

MATHEWS:  Ah, yeah right.

9

BRADBURY: Do you remember where you're at?

REED: Uh uh.

BRADBURY: Ah, now, you don't know where you're at?

REED: Uh uh.

BRADBURY: Look at me, do you remember where you're at now?

REED: Uh uh.

BRADBURY: Can't remember anything else that happened?

REED: Uh uh.

BRADBURY: You don't remember talking to Ms. Mona? Sure you do, I saw that smile come over your face. Huh? You remember talking to Ms. Mona?

REED: Uh huh.

BRADBURY: What did you tell Ms. Mona?

REED: I don't know, I done forgot.

BRADBURY: You forgot?

REED: Uh huh.

BRADBURY: Can you remember anything else to tell me?

REED: Uh uh.

BRADBURY: You can't remember or you don't want to tell me?

REED: I can't remember.

BRADBURY: Do you remember what your name is?

REED: Uh huh.

BRADBURY: What's your name?

REED: Justin.

BRADBURY: Justin what?

10

REED:          Reed.

BRADBURY: When were you born?

REED:          July 28, 1989.

MATHEWS:  You got a birthday coming up.

BRADBURY: Makes you an old man.  I got a granddaughter that's born July 26th, two
              days before you.  In fact my brother was born on your birthday, July the
              28th.  What you think about that?

REED:          (Unintelligible)

BRADBURY: Did you ever go to ah, Mr. Coon's house?

REED:          Uh uh.

BRADBURY: Did you ever go to the beach with him?

REED:          Uh uh.

BRADBURY: Did you ever go to Six Flags with him?

REED:          Uh uh.

BRADBURY: The only thing you ever did was ride around during school?

REED:          Uh huh.

BRADBURY: And he tired to get you to smoke?

REED:          Uh huh.

BRADBURY: Anybody else in the truck with you?

REED:          Uh uh.

BRADBURY: Just you and him?

REED:          Uh huh.

BRADBURY: He used to give you a pass to get out of class to didn't he?

REED:          Uh huh.

11

me a little bit about what's going on. You think you need to tell me anything else? I'm sorry I can't hear you.

REED:        Uh uh.

BRADBURY: You don't think so? Alright what you gonna do the rest of the day?

REED:        Sleep probably.

BRADBURY: Aw now, you can sleep anytime.

REED:        Or probably go outside, cut grass.

BRADBURY: You cut grass?

REED:        Sometimes.

BRADBURY: You got a riding mower or push mower?

REED:        Riding one.

BRADBURY: How long does it take you to cut the grass?

REED:        Not long.

BRADBURY: Half hour?

REED:        Uh huh.

BRADBURY: What you think Mr. Bruce, you got any questions?

MATHEWS: No sir.

BRADBURY: Well Justin I appreciate you coming and talking to me. Do you remember where you're at now?

REED:        The courthouse.

BRADBURY: What city are you in?

REED:        Troy.

BRADBURY: And where do I work?

REED:        At the courthouse.

BRADBURY: Look here.  What's this here?

REED:          Pike County Jail.

BRADBURY: Pike County Sheriff's Department.  Ok, alright I appreciate you talking to
              me.

On _____ I reviewed the tape and made the necessary corrections to the transcript.  The corrected transcript is a true representation of the taped interview.


_____
Bob Bradbury & Bruce Mathews

Typed by: Crys Fuller
Date:  July 18, 2005


14

Reed v. PCBE
14

of Alabama
icial System

CR-57 (front)    Rev. 8/98

# DEPOSITION

Warrant/Summons Number
WR05-241

Case Number

HE _____ DISTRICT _____ COURT OF _____ PIKE _____, ALABAMA
(Circuit, District or Municipal)          (Name of Municipality or County)

D.A. Contact

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

e of Accused (or Alias)  COON   CHARLES   LESLIE     Telephone Number

al Security Number  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 | Driver's License Number  2424423 | Date of Birth  01-02-48 | Age | Race  W | Sex  M

ht  '1" | Weight  155 | Hair  GRAY | Eyes  BLUE | Complexion

308  COUNTRY CLUB DRIVE | City  GREENVILLE | State  Al | Zip Code

e of Employer

ess of Employer | City | State | Zip Code | Employer's Telephone Number

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Sexual Abuse  3rd

nd Time of Offense:  JUNE  2005

f Occurrence:  Pike County

Attacked or Property Damaged:

ttacked:

ccused under the influence of alcohol or a controlled substance? ☐ Yes ☐ No

v enforcement agency contacted? ☒ Yes ☐ No
vhich one?  PCSO

used Possess or Use a Weapon? ☐ Yes ☐ No    Type:

go to the hospital? ☐ Yes ☐ No

e Done or Injuries Received:

f Property:

f Offense:  DURING AN INTERVIEW OF JUSTIN REED, AGE 15 HE ADVISED THAT
TEACHER (band director) HAD FONDLED HIS PRIVATES THRU HIS TROUSERS
H HIS HAND, WHILE AT THE BAND ROOM AT PIKE COUNTY HIGH SCHOOL.

**PLAINTIFF'S EXHIBIT**
35

Reed v. PCBE
127

Form CR-57 (back)    Rev. 8/98    |    **DEPOSITION**

Any Law Enforcement Agency Contacted ? ☒ Yes    ☐ No
If yes, which one? *PCSD*

I make this statement for the purpose of securing a WARRANT/SUMMONS against the named of accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this

_2_ _____ day of

_August_ 13 _2005_

_____    Complainant _____

Judge/Clerk/Magistrate

Address _____

## WITNESSES

| Name | Address | Telephone Number |
|---|---|---|
| WATSON MONA | 162 CoRd 4430 Brundidge Al | 268-6483 |
| Bradbury R.S. | PCSD | |
| Mathews/ Bruce | DA's Office | |
| | | |
| | | |
| | | |
| | | |

## MAGISTRATE NOTES

Warrant or Summons issued? ☐ Yes    ☐ No    Warrant Number: _____

## Witness Statement

Statement of: _CHARLES COON_

Race: _M_ Sex: _____ DOB: _1-2-48_ Age: _____

Address: _308 Country Club Drive Greenville, Al_

Place of Employment: _____

Telephone No. Home: _____ Work: _____

Place Statement Given: _Pike County Court House_

Date: _3-21-06_ Time Started: _____

Statement Given to: (Officer) _Bradbury_

This Statement is of my own free will without threats, promises, or duress having been made toward me.

_In The middle June 2005 I went To the Reed_
_Residence Justin And Joey were playing video_
_Games. Joey was in His underwear because school_
_was out, I began Tickleing Him and I may HAVE_
_Touched Him in The wrong place And up,_

_Charles Coon_

PLAINTIFF'S
EXHIBIT
36

Signature _____ Time Ended _____

STATE OF ALABAMA

VS.

CHARLES LESLIE COON

\*    IN THE CIRCUIT COURT OF

\*    BUTLER COUNTY, ALABAMA

\*    CASE NO. CC-2005-196

## AGREEMENT OF COUNSEL AND DEFENDANT

It is hereby agreed upon by and between the State of Alabama through its District Attorney for the Second Judicial Circuit, Counsel for the Defendant, **J. McGowin Williamson,** a practicing attorney duly licensed to practice law in the State of Alabama, and the above named Defendant, that:

1. Defendant is pleading guilty to the offense of: **ENTICING A CHILD FOR IMMORAL PURPOSES - THREE COUNTS**

2. The State of Alabama will recommend the following sentence in exchange for a plea of guilty by the Defendant:

**Defendant sentenced to 5 years in the penitentiary on each (3) count of the Indictment. Said sentence to be served on a split sentence bases, with one (1) year to initially be served in incarceration and the balance of four (4) years to be served on probation. The length of probation shall be for three (3) years after release from incarceration. The initial one (1) year of incarceration on each count shall be served concurrently. However, if the probationary portion of the sentence is ever revoked or invoked the balance of four (4) years on each count shall be served consecutively.**

**This sentence shall be served concurrently with any other sentence received by this Defendant involving this victim and may be due to be set aside if this Defendant receives any greater sentence than this in any other case involving this victim. Also to be served concurrently with any sentence received in case number DC-2005-438 in Pike County, Alabama.**

Case Number CC-2005-195 is to be dismissed.

As a condition of Defendant's probation he shall have no contact with the victim or his family.

**Defendant agrees that upon motion of the State of Alabama and without notice to the Defendant, the Court may amend its restitution order to revise the receiver of restitution to be ACVCC instead of original receiver to the extent ACVCC has paid all or part of Court ordered restitution; this in no way increases the amount of predetermined restitution to be paid by the Defendant.**

3. In consideration of the recommendation of the District Attorney for the Second Judicial Circuit of Alabama, or the recommendation of one of his Assistant District Attorneys, as set out in Paragraph 2, Defendant hereby agrees that he will not attack said guilty plea in any way, directly or collaterally, including, but not limited to, appeal, coram nobis and habeas corpus.

PLAINTIFF'S
EXHIBIT
37

4. In the event that the Defendant attacks said guilty plea and has it set aside or overturned, the original charge(s) in this matter and any charges dismissed pursuant to said agreement shall automatically be reinstated. Defendant hereby waives any claim of double jeopardy should said charge(s) be reinstated.

5. As the Defendant in this case, I am satisfied by the manner in which my Attorney has represented me.

6. The trial Judge has sole discretion in these premises and is not bound by this Agreement in any manner.

_____
**DISTRICT ATTORNEY**

_____
**DATE**

_____
**COUNSEL FOR DEFENDANT**

_____
**DEFENDANT**

Date of Interview: 7/14/05

CAC CASE # 23 _____    INTERVIEWER'S NAME: Mona Watson

VICTIM'S NAME:    Reed         Justin        Michael
                  (LAST)        (FIRST)       (MIIDDLE)

ADDRESS:   Rt. 2 Box 318-F

TELEPHONE:   334-735-2935

DOB:   7/28/89           SEX:  M X     F __     RACE: White

PARENTS NAME:                EMPLOYMENT:

POSSIBLE OFFENDER: Charles Coon      DOB/AGE: unknown

ADDRESS: Greenville, AL

TYPE OF ABUSE:   Sexual

DATE OF INCIDENCE:

LOCATION: Pike County High School Band Room & Home of Victim

DHR WORKER: Misty Hubbard

LE INVESTIGATOR: Bob Bradberry

PRESENT AT FORENSIC INTERVIEW: Mona Watson, Misty Hubbard
                               Viewed by Bob Bradberry & DA

SUMMARY OF INTERVIEW:

   Justin had a very difficult time with interview. Even though he is fifteen years old he has difficulty in verbalizing what happened to him. After a very difficult time, Justin finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one time he described was in the band room back before Christmas. He stated that Mr. Coon had him lock the band room door and sit on the steps leading into the room. He stated that Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last time this happened was about three weeks ago when Mr. Coon went to Justin's house. Parents were not there.

PLAINTIFF'S
EXHIBIT
36

CONFIDENTIAL

| | | | | 1 [1] INCIDENT  [2] OFFENSE | 2 CASE # | 3 SFX |
|---|---|---|---|---|---|---|
| | | | | [3] SUPPLEMENT | 07-436-05 | |

| 4 ORI # | 5 DATE AND TIME OF THIS REPORT | [1] AM [2] PM [3] MIL | 6 AGENCY NAME | 7 SUPPLEMENT ORIGINAL OFFENSE DATE |
|---|---|---|---|---|
| 0 5 5 0 0 0 0 | 07/14/05 | | Pike County Sheriff Dept | M D Y |

8 REPORTED BY [ ] VICTIM OR
WATSON MONA

9 ADDRESS (STREET, CITY, STATE, ZIP)

10 PHONE ( )

12 VICTIM (LAST, FIRST, MIDDLE NAME) 1P 2B 3S
Reed Justin

13 ADDRESS (STREET, CITY, STATE, ZIP)
162 County Road 4430 Brundidge Al

14 PHONE 268-648-

16 EMPLOYER/SCHOOL

17 OCCUPATION

17 ADDRESS (STREET, CITY, STATE, ZIP)
268-2295

18 PHONE 268-2760

19 [1] RESIDENT [2] NON-RESIDENT

20 INJURY [1] Y [2] N

21 RACE [1] W [2] B

22 SEX [1] MALE [2] FEMALE

23 HGT

24 WGT

25 DOB 07/28/89

26 AGE 15

27 WAS OFFENDER KNOWN TO VICTIM? [1] Y [2] N

28 VICTIM WAS (EXPLAIN RELATIONSHIP)

30 TYPE INCIDENT OR OFFENSE [1] FEL. [2] MISD.
Sexual Abuse

31 DEGREE (CIRCLE) 1 2 3

33 STATE CODE/LOCAL ORDINANCE

34 TYPE INCIDENT OR OFFENSE [1] FEL. [2] MISD.

35 DEGREE (CIRCLE) 1 2 3

37 STATE CODE/LOCAL ORDINANCE

38 PLACE OF OCCURRENCE

39 SECTOR

**EVENT**

40 POINT OF ENTRY [1] DOOR [2] WINDOW [3] ROOF [4] OTHER

41 METHOD OF ENTRY [1] FORCIBLE [2] NO FORCE [3] ATT. FORCIBLE

42 ASSAULT [1] SIMPLE [2] AGGR.

43 TREATMENT FOR ASSAULT INJURY [1] Y [2] N

44 OCCURRED ON OR BETWEEN
D 06 M  D 05 Y

45 TIME : [1] AM [2] PM [3] MIL

46 S M T W T F S

47 LIGHTING [1] NATURAL [2] MOON [3] ART. EXT. [4] ART. INT. [5] UNK.

48 WEATHER [1] CLEAR [2] CLOUDY [3] RAIN [4] FOG [5] SNOW [6] HAIL [7] UNK.

49 PREMISE [1] HWY.—ST.—ALLEY [2] RAILROAD [3] RESIDENCE [4] CHURCH [5] SCHOOL [6] CONVENIENCE [7] INDUSTRIAL [8] SERVICE STA. [9] BANK [10] DRUG STORE [11] APT./TWN. HSE. [12] SHOPPING CENTER [13] PARKING LOT [14] OTHER COMMER. [15] OTHER

54 VERIFY FOR [1] Y [2] N

55 TREAT. FOR [1] Y [2] N

62 TIME : [1] AM [2] PM [3] MIL

53 S M T W T F S

58 CIRCUMSTANCES HOMICIDE & ASSAULT

RAPE EXAM [2] N  RAPE INJURY [2] N  LOCATION: RAPE

58 WEAPON USED [1] FIREARM [2] KNIFE [3] HANDS, FISTS, VOICE, ETC. [4] OTHER DANGEROUS

59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE [1] HANDGUN [2] RIFLE [3] SHOTGUN [4] UNKNOWN

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | N/A | | | | |

CONFIDENTIAL

PLAINTIFF'S EXHIBIT
39

[ ] CONTINUED IN NARRATIVE

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

75 CHECK CATEGORIES [1] STOLEN [2] RECOVERED [3] SUSPECTS VEH. [4] VICTIMS VEH. [5] UNAUTH. USE [6] ABANDONED

**VEHICLES**

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|
| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |

STOLEN MTR. VEH ONLY

88 AREA STOLEN [1] BUS. [2] RES. [3] RUR.

89 OWNERSHIP VERIFIED BY: [1] TAG RECEIPT [2] BILL OF SALE [3] TITLE [4] OTHER

90 WARRANT SIGNED [1] N [2] Y  #

91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP)

92 PHONE ( )

MOTOR VEH. RECOVERY ONLY REQUIRED FOR 24xx UCR CODE

93 STOLEN IN YOUR JURISDICTION? [1] Y [2] N WHERE?

94 RECOVERED IN YOUR JURISDICTION? [1] Y [2] N WHERE?

**TYPE OR PRINT IN BLACK INK**

ACJIC—32 REV 8-96

INCHES  1  2  3  4

Reed v. PCBE
121

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

**INCIDENT/OFFENSE REPORT CONTINUED**

| 95 DATE AND TIME OF REPORT | | 1 AM / 2 PM / 3 MIL. | 96 CASE # | 97 SFX | 98 | OFFENDER / SUSPECT / MISSING PERSON | 4 CHECK IF MULTIPLE |
| M D Y | : | | | | | | |

NAME (LAST, FIRST, MIDDLE) — 100 NICKNAME/ALIAS — 101 RACE (1 W 3 A / 2 B 4 I) — 102 SEX (1 M / F) — 103 DOB (M D Y) — 104 AGE

105 ADDRESS (STREET, CITY, STATE, ZIP) — 106 HGT — 107 WGT — 108 EYE — 109 HAIR — 110 COMPLEXION

111 PROBABLE DESTINATION — 112 ARMED? (1 Y 2 N 3 UNK.) — 113 WEAPON

114 CLOTHING — 1 SCARS / 2 MARKS / 3 TATOOS — 115 (1 ARRESTED / 2 WANTED)

116 NAME (LAST, FIRST, MIDDLE) — 117 NICKNAME/ALIAS — 118 RACE (1 W 3 A / 2 B 4 I) — 119 SEX (1 M / F) — 120 DOB (M D Y) — 121 AGE

122 ADDRESS (STREET, CITY, STATE, ZIP) — 123 HGT — 124 WGT — 125 EYE — 126 HAIR — 127 COMPLEXION

128 PROBABLE DESTINATION — 129 ARMED? (1 Y 2 N 3 UNK.) — 130 WEAPON

131 CLOTHING — 1 SCARS / 2 MARKS / 3 TATOOS — 132 (1 ARRESTED / 2 WANTED)

**WITNESSES**

| 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
| #1 | SEX 1 M 2 F / RACE 1 W 3 A / 2 B 4 I / M D Y | | ( ) | ( ) |
| #2 | SEX 1 M 2 F / RACE 1 W 3 A / 2 B 4 I / M D Y | | ( ) | ( ) |
| #3 | SEX 1 M 2 F / RACE 1 W 3 A / 2 B 4 I / M D Y | | ( ) | ( ) |
| #4 | SEX 1 M 2 F / RACE 1 W 3 A / 2 B 4 I / M D Y | | ( ) | ( ) |

WITNESS #1 SSN — WITNESS #2 SSN — WITNESS #3 SSN — WITNESS #4 SSN

137

**NARRATIVE**

On 7-14-05 This investigator received a telephone call from Mona Watson stating That she had another victim of Charles Coon's in her office. That she had already interviewed This victim and That He had indicated That Coon had forced This child To perform oral sex on Him while at the Abe County Arque school.

I went To Ms Watsons office and was advised that this victim had a learning problem and That He would not Talk openly To people He didn't know. I spoke with Ms Watson and we agreed To view The Recording and possibly get Ms Watson To ask further questions if needed.

CONTINUED ON SUPPLEMENT ☐ Y ☒ N — ASSISTING AGENCY ORI — ASSISTING AGENCY CASE # — SFX

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE _____

**MULTIPLE CASES CLOSED** — 140 CASE # — 141 SFX — 142 CASE # — 143 SFX — 144 CASE # — 145 SFX — 146 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N

**ADMINISTR**

147 CASE STATUS: 1 PENDING / 2 INACTIVE / 3 CLOSED — ENTERED ACIC/NCIC DATE

148 DISPOSITION: 1 CLEARED BY ARREST (JUV.) / 2 CLEARED BY ARREST (ADULT) / 3 UNFOUNDED / 4 ADM. CLEARED

4 EXCEPTIONAL CLEARANCE: A SUSPECT/OFFENDER DEAD / B OTHER PROSECUTION / C EXTRADITION DENIED / D LACK OF PROSECUTION / E JUVENILE, NO REFERRAL / F DEATH OF VICTIM

149 REPORTING OFFICER   R.S. Bradbury   5511   ID #

150 ASSISTING OFFICER — ID #

151 SUPERVISOR APPROVAL — ID # — 152 WATCH CMDR. — ID #

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMA

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | | 4 CASE # |
|---|---|---|---|---|
| 0 5 5 0 0 0 0 | Pike Co. Sheriff Dept | 07/14/05 | ☐ AM ☐ PM ☐ MIL | |

EVENT

| 6 VICTIM'S NAME (ORIGINAL REPORT) | | |
|---|---|---|
| Reed    Justin | | |

| 9 ORIGINAL INCIDENT/OFFENSE | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Sexual Abuse | 07/14/05 | ☒ CONTINUATION ☐ FOLLOW—UP |

| 12 NEW INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR |
|---|---|---|---|---|
| ☐ YES ☒ NO | M D Y | ☐ YES ☒ NO WARRANT # | M D Y | YEAR PREMISE WEAPON |

| 20 ☐ DEFENDANT ☐ SUSPECT | 21 ☐ DEFENDANT ☐ SUSPECT |
|---|---|
| NAME- | NAME- |

| RACE | SEX | DOB | AGE | RACE | SEX | DOB | AGE |
|---|---|---|---|---|---|---|---|
| ☐W ☒A ☒B ☐I | ☐M ☒F | M D Y | | ☐W ☒A ☒B ☐I | ☐M ☒F | M D Y | |

NARRATIVE

Ms Watson was unable to stay and show me the recording at that time and we made arrangements to come back on 7-15-05. I contacted DA Investigator Bruce Matthews and together we went to view the recording. After viewing the recording we agreed that we needed to re interview Justin, and a time of 9:00 AM on 7-18-05 was agreed upon.

I spoke with both Mr & Mrs Reed on 7-14-05 and advised them my concern as to Justin being able to tell his story in front of a judge and jury.

| 22 LOCAL USE |
|---|
| 23 STATE USE |

DOLLAR VALUE

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24xx UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|---|

ADMIN/NARRATIVE

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐N |
|---|---|---|---|---|---|---|---|

| 44 CASE STATUS ☐ PENDING ☐ INACTIVE ☐ CLOSED ENTERED ACIC/NCIC DATE | 45 CASE DISPOSITION: ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | ☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM | 46 REPORTING OFFICER R.S. Bradbury 5511 ID # |
|---|---|---|---|
| | | 47 ASSISTING OFFICER | ID # |
| | | 48 SUPERVISOR APPROVAL    ID # | 49 WATCH CMDR.    ID # |

TYPE OR PRINT IN BLACK INK ONLY

ACJIC—33 REV. 11-94

CRIMINAL INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATI

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | | 4 CASE # | 5 SFX |
|---|---|---|---|---|---|
| 0 5 5 0 0 0 0 | Pike Co. Sheriff Dept | 0 7 1 8 0 5 : ☐ AM ☐ PM ☐ MIL | | | |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) | | 7 TYPE REPORT |
|---|---|---|
| Reed   Justin | 9 ORIGINAL OFFENSE DATE 0 7 1 4 0 5 | ☐ CONTINUATION  ☒ FOLLOW—UP |
| 8 ORIGINAL INCIDENT/OFFENSE Sexual Abuse | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |

| 15 HAS AN ARREST BEEN MADE? ☐ YES ☒ NO | 16 DATE OF ARREST M D Y | 17 HAS WARRANT BEEN OBTAINED? ☐ YES ☒ NO  WARRANT # | 18 DATE OF WARRANT M D Y | 19 PRIOR YEAR PREMISE WEAPON |
|---|---|---|---|---|

| 20 ☐ DEFENDANT ☐ SUSPECT NAME: | 21 ☐ DEFENDANT ☐ SUSPECT NAME: |
|---|---|
| RACE ☐ W ☐ A ☐ B ☐ I   SEX ☐ M ☐ F   DOB M D Y   AGE | RACE ☐ W ☐ A ☐ B ☐ I   SEX ☐ M ☐ F   DOB M D Y   AGE |

**NARRATIVE**

As arranged Ms Reed brought Justin into my Office so that I might talk with Him about Mr Coon and any sexual advances made towards Him.

After getting to know Him, I asked Him if anyone Had Touched Him or made Him feel uncomfortable. Justin stated Mr Coon His band director. When asked what Mr Coon Had done Justin stated that Coon Had touched His private parts. When asked How, Justin stated that Mr Coon and rubbed His privats thru His pants. Justin Further stated that this activity took place in the band Room at Pike County High School in Brundidge, Alabama.

Justin Also stated that Mr Coon Had come to His Residence and Had Tickled His brother Joey and Himself

Tape of interview of Justin given to DA Investigator Mathews To be Transcribed.

| 22 LOCAL USE |
| 23 STATE USE |

**S C R O D**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |
| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS | |
| S R D C | S R D C | S R D C | S R D C | S R D C | |

**DOLLAR VALUE**

MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 34xx UCR CODE

| 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|

**MULTIPLE CASES CLOSED**

| 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS ☐ PENDING ☐ INACTIVE ☐ CLOSED | 45 CASE DISPOSITION: ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM | 46 REPORTING OFFICER R.S. Bradbury | | ID # 5511 |
|---|---|---|---|---|---|
| ENTERED ACIC/NCIC ☑ DATE | | | 47 ASSISTING OFFICER | | ID # |
| | | | 48 SUPERVISOR APPROVAL   ID # | 49 WATCH CMDR. | ID # |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

Reed v. PCBE

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATIO

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 50 DATE AND TIME OF REPORT | | | 51 CASE # | 52 SFX |
|---|---|---|---|---|---|
| | M   D   Y | : | ① AM ② PM ③ MIL. | | |
| | 53 TYPE REPORT:  ☐ 1. CONTINUATION   ☐ 2. FOLLOW-UP | | | | |

ON 7-19-05 Tammy From The Child Advocacy Center Telephoned And Stated That she Had Mona Watson's Report Typed And I could pick up a copy.

I picked up The Report And Faxed A copy OF The Report To Dwight Wolhey At The DA's Office In Enterprise, Alabama.

NARRATIVE

NARRATIVE

NARRATIVE

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

**TYPE OR PRINT IN BLACK INK ONLY**

STATE OF ALABAMA       *      IN THE DISTRICT COURT OF

                                  *      PIKE COUNTY, ALABAMA

VS.                              *

CHARLES LESLIE COON,      *      CASE NO. DC 2005-438, 2006-272

          DEFENDANT.           *

## ORDER

These cases having come before the Court on Complaints and Warrants, the defendant appeared in court together with his attorney, J. McGowin Williamson, and Larry Jarrell representing the State of Alabama. The defendant was informed of the charge of Sexual Abuse, First Degree, his rights, and the possible punishment for the offense. The defendant pled guilty as charged, and the Court determined that the plea of guilty to Sexual Abuse, First Degree, should be accepted by the Court. The parties were allowed to comment and present evidence relating to the sentence.

**IT IS, THEREFORE, ORDERED as follows:**

1.    Charles Leslie Coon is adjudged guilty of the offense of Sexual Abuse, First Degree, and he is sentenced to one year in the Pike County Jail in each case with the sentences to run concurrently with each other and with any and all other sentences presently being served by the defendant.

2.    The defendant will pay a $25.00 Crime Victims Compensation Assessment and the costs in these cases.

3.    The defendant is not entitled to jail credit.

**DONE AND ORDERED this 21st day of March, 2006.**

DISTRICT JUDGE
PIKE COUNTY, ALABAMA

Williamson

PLAINTIFF'S
EXHIBIT
40

STATE OF ALABAMA,
PLAINTIFF
VS.

*Charles Leslie Coon*
DEFENDANT

   *
   *
   *
   *
   *

IN THE _District_ COURT OF
_Pike_ COUNTY, ALABAMA
_____ DIVISION
CASE NO. _DC05-438_
_DC06-272_

## SETTLEMENT AGREEMENT

After discussion and negotiation between counsel for the defendant, defendant and the prosecution, it is agreed, subject to acceptance by the Court that:

1.   The defendant will enter a plea of guilty to the charge(s) of _Sexual Abuse 2nd X 2_

2.   The prosecutor will recommend, and defendant agrees to accept a sentence of: _1 year in County Jail each case concurrently and concurrently with any sentence presently serving_
_____$ Demand Reduction Assessment, $_____ Dept. Forensic Science Fine, _____ months loss of driver's license, _____ CRO/SAP, $_____ FINE.

3.   Whether sentence is Suspended? Split? Probation? _____

4.   If probation is part of the agreement, Defendant will carry out all GENERAL conditions of probation. As a SPECIAL condition of probation, Defendant will pay court ordered monies at the rate of $_____ per _____ until court ordered monies are paid in full.

5.   Defendant will pay RESTITUTION in the amount of $_____ to the Clerk of Court for distribution to: _____

6.   Defendant shall be ordered: to pay COSTS of court in each case; an assessment to the Crime Victim's Compensation Commission of $ _25.00_ AND defendant ☑ will ☐ will not be required to reimburse the State of Alabama for indigent attorney's fees.

7.   Defendant affirmatively states Defendant reserves no issues for appeal. As a basis of this Settlement Agreement, Defendant waives/gives up any right of appeal in the above styled. Defendant acknowledges he is aware he has a right to demand a Pre-Sentence Report before Sentencing. Defendant expressly waives/gives up his right to demand a Pre-Sentence Report of Investigation before sentencing.

8.   Defendant shall receive credit for time spent in custody while awaiting trial and/or disposition in this/these case(s).

9.   No other terms or conditions related to judgment and sentence in this/these case(s) are agreed on or contemplated by the defendant or the prosecutor. The parties stipulate Defendant has _____ proper, prior felony convictions which are to be used for enhancement of sentence.

PLAINTIFF'S
EXHIBIT
_41_

_Charles Coon_
Signature of Defendant

_____
Signature of Defendant's Counsel

_Larry C. Jarrell_
Signature of Prosecutor

Having reviewed the settlement agreement entered into by the defendant and the prosecutor, the Court hereby:
☑ Accepts the Settlement Agreement and incorporates same in the judgment and sentence.
☐ Rejects the Settlement Agreement and modifies the terms as follows: _____

_3/21/06_
Date

_____
Judge

_BMP_

# EXHIBIT 20

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

EXHIBIT 21

FILED
2006 Sep-15 PM 12:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL FORTNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:04-cv-0318-TMP |
| | ) | |
| DONNIE BREASEALE, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The magistrate judge filed his report and recommendation in this cause on July 21, 2006, recommending that the motion for summary judgment filed by defendants Blount County Board of Education, Donnie Breaseale, Allen Hargett, Andy Neill, Gregg Armstrong, David Standridge, Steve Morton, and Bruce McAfee, be granted. Plaintiff filed her timely objections to the report and recommendation, and the task of reviewing the report and recommendation and objections was assigned to this judge. Having now reviewed and considered *de novo* all the materials in the court file, including the report and recommendation and the objections to it, the court finds that the objections are due to be overruled and the report and recommendation adopted.

This case is a difficult and disturbing one. It is not one that leaves the court feeling good about its resolution. We now know that a trusted teacher and band director engaged in a sexual relationship with a fourteen-year-old student for several weeks, if not months, during the 2002-2003 school year at Hayden High School. The focus of the present motion, however, is whether the school principal, school superintendent, and individual members of the school board can be held liable for being deliberately indifferent to that conduct. This assessment necessarily involves examining the

evidence of what they knew and believed about the illegal relationship at the time they were called

on to make certain decisions. As shown by the evidence here, that knowledge was often imperfect,

conflicting, and ambiguous, so much so that the court cannot find that these defendants were

deliberately indifferent to the abuse of the student.

Plaintiff has raised four broad categories of objections to the magistrate judge's report and

recommendation:

> (1) [the court's] conclusion that the Defendants were neither on "actual notice" nor
> were "deliberately indifferent" to a substantial risk of harm to the Plaintiff is belied
> by the record; (2) this conclusion is based upon a failure to construe the record facts
> in a light most favorable to the Plaintiff; (3) the Court's conclusion is based upon the
> inadmissible hearsay testimony proffered by Defendant Hargett without any further
> corroboration in the record; and (4) the Court completely failed to address the
> Defendants' liability based upon Superintendent Breaseale's undisputed failure to
> investigate and ensure that appropriate remedial action was taken when he received
> notice of a substantial risk of harassment to the minor Plaintiff.

The court has examined each of these objections and the record relating to them, but finds that they

are without merit. The court will examine each below.

Turning first to the what the court views as "procedural" objections, objections two and three,

the court finds that the magistrate judge did not fail to construe the evidence most favorably to the

plaintiff and did not consider inadmissible hearsay. True, a lot of the evidence offered in support

of the motion for summary judgment consists of defendant Hargett's deposition testimony about

conversations he had with other people in the course of carrying out his investigation, but this

testimony is not hearsay. It was not offered to prove the truth of the matters asserted in the

extrajudicial statements[1]; rather, the evidence is admissible to show what Hargett was told, what he

---

[1]It is interesting that plaintiff often commits the same error she contends the magistrate judge
made. For example, at page 7 of her objections, she argues that Principal Hargett was told by

2

discovered, and what he believed about the facts he was charged to investigate. What Hargett was told by someone may well have been wrong, but it was part of the information he possessed in making the decisions whether to investigate further or suspect that something improper was occurring. What was in Hargett's mind, whether factually correct or not, is directly relevant to whether he was deliberately indifferent. Consequently, Hargett's reliance on many statements made to him by other chaperones, parents, and students was not inadmissible hearsay, and it was not error for the magistrate judge to consider the evidence in that context.

The court also disagrees that the magistrate judge failed to construe the evidence in the light most favorable to the plaintiff. Reading plaintiff's objections, makes clear that what she objects to is the failure of the magistrate judge to draw the *legal* conclusion that the evidence sufficiently established that Principal Hargett was on "actual notice" of a "substantial likelihood" that Turner was sexually harassing the student. The *factual* matters she identifies clearly were found and considered by the magistrate judge. For example, the magistrate judge construed the evidence favorably to show that the student victim was seen in a car with Turner in December 2002; the magistrate judge accepted that Hargett trusted Turner and regarded him as a "pillar of the community"; and he accepted that two chaperones reported to Hargett in April 2003 that it was "obvious" that a mutual attraction and infatuation existed between Turner and the female student.

---

chaperones Henderson and Acker (in fact, Acker never spoke to Hargett) that "all chaperones" shared the view that something improper was occurring between Turner and the student. To the extent that this statement is offered simply to show what was said to Hargett, it would be admissible. But if it is offered to prove the *fact* that "all chaperones" shared this view, it is clearly inadmissible hearsay. Two chaperones would not be able to testify to what other chaperones actually believed. Furthermore, because Acker did not participate in the meeting with Hargett (it was Henderson and Moody), she cannot testify even about what was said to Hargett because she lacks personal knowledge of the events at the meeting.

3

A careful reading of the report and recommendation makes clear that, on every *factual* or *evidentiary* point raised by plaintiff, the magistrate judge accepted the evidence most favorable to her.[2] True, the magistrate judge also accepted evidence proffered by the defendants when that evidence was not disputed by the plaintiff, but such factual evaluation is proper under Rule 56. Rule 56 does not require the court to ignore *undisputed* evidence simply because it hurts the non-moving party's position.

The court concludes, therefore, that plaintiff's objections two and three are meritless, and are due to be overruled. The magistrate judge properly considered all undisputed evidence that was properly admissible.

Turning to the plaintiff's first and most important objection, the court agrees with the magistrate judge that the evidence simply fails to show the requisite deliberate indifference for Title IX liability. Citing Gebser v. Lago Vista Independent School District, 524 U.S. 275, 118 S. Ct. 1989, 41 L. Ed. 2d 277 (1998), the magistrate judge correctly stated the standard the plaintiff must meet as requiring that "an official of the school district who at a minimum ha[d] authority to institute corrective measures on the district's behalf ha[d] actual notice of, and [was] deliberately indifferent to, the teacher's misconduct." Gebser, 524 U.S. 277, 118 S. Ct. 1989, 141 L. Ed. 2d 284. Although Principal Hargett could constitute that "official," this standard — requiring actual notice and deliberate indifference — is very demanding and difficult to meet. The plaintiff must present

_____

[2]In some instances the magistrate judge rejected certain implications by the plaintiff that were not only unsupported by any evidence, but were affirmatively refuted by evidence. For example, plaintiff suggests that Principal Hargett did not speak to any of the girls who shared the room with the victim on the Florida band trip, when, in fact, Hargett testified explicitly that he spoke to two of them. Also, plaintiff suggests that, even after these allegations arose, Hargett continued to allow Turner to give private music lessons to the victim when, in fact, Hargett testified unequivocally that he instructed Turner that he was not to be alone with the girl.

4

evidence from which a reasonable jury could conclude both that Principal Hargett had "actual notice" of Turner's misconduct *and* that he was "deliberately indifferent" to it. Plaintiff does not disagree that this is the proper legal standard for assessing the potential liability of these defendants. The court agrees with the magistrate judge that the evidence simply does not meet this very high test.

The magistrate judge, and this court, acknowledge that Hargett's investigation of the allegations brought to him by the chaperones was inadequate, perhaps even negligent. But the test of Title IX liability is much more stringent than one for negligence. The evidence is quite clear that Hargett, after speaking with teachers, students, chaperones, and Turner himself, did not draw the conclusion that anything improper was occurring between Turner and the student. Hargett simply did not believe that anything more than the victim having a school-girl "crush" on Turner was going on. In hindsight, Hargett's conclusion was obviously wrong. But no evidence was presented that Hargett had "actual notice" of Turner's misconduct — Turner denied it, several other teachers and students found it improbable, and neither the victim herself nor anyone acting for her ever reported it or complained to Hargett. While this last fact does not justify Turner's crimes, or lessen the duty school officials have to protect their students, it does underscore, in the context of the court's application of the actual notice/deliberate indifference test, the absence of notice and knowledge Hargett and other school officials labored under.

Also, Hargett was not "deliberately indifferent." Although he certainly could have done more, talked to more people, and talked to the victim and her parents, the court cannot say that he turned a blind eye to the concerns expressed to him. He undertook an investigation — one that might be questioned in hindsight — attempting to assess the truthfulness of the allegations made and the seriousness of the problem. It was not improper, or even unusual, for Hargett to be skeptical of

5

the allegations, given that Turner presented himself well as a good and trustworthy teacher. Subjecting teachers to full-blown, probing, and stigmatizing investigations on the merest of allegations would be unreasonable and inappropriate in most instances. While school officials have a duty to look into all allegations, the level of inquiry and the intensiveness of the investigation necessarily turn on how probative the initial allegations are. In this instance, after hearing the initial allegations by Henderson and Moody (which Moody later regretted), Hargett was unable to find any other information corroborating the possibility that a trusted teacher was engaged in an improper relationship with this student. Whether Hargett might have done more, he did not act with deliberate indifference when he concluded that no evidence supported the concerns expressed by the two chaperones. Indeed, two other chaperones denied any impropriety, as did several students, and one of the complaining chaperones essentially recanted his allegations. Faced with this conflicting evidence, Hargett was not deliberately indifferent when he concluded that nothing wrong was going on. He may have been naive and foolish, even negligent, but he was not deliberately indifferent.

Finally, plaintiff argues that the magistrate judge failed to consider at all the argument that Breaseale, as superintendent of schools, had an obligation to look into the allegations independently of the investigation he assigned to Hargett. The court agrees with the magistrate judge that Breaseale acted reasonably by assigning the task of the investigation to Principal Hargett, Turner's immediate supervisor. Breaseale and the school board had the right to dictate the manner in which an investigation was carried out, as long as it was not deliberately indifferent. Assigning the investigation to Hargett was not improper or even unreasonable. Likewise, taking a verbal report from Hargett, rather than a written report, was not improper. Nothing in Title IX mandates a written report of the investigation, and it is difficult to see how putting in writing the same findings Hargett

6

verbally reported to Breaseale would have made any difference in this case. Hindsight is a wonderful luxury, but deliberate indifference must be judged on the basis of the information known to the officials at the time of their decisions.

The court finds that all of plaintiff's objections are due to be overruled. The standard of liability in this case is so high and difficult to meet, the court cannot say that Hargett and the other defendants had enough information to put them on "actual notice" of Turner's misconduct, or that they were deliberately indifferent to the information they had. Although they surely could have done more, that is not the test of liability. To hold the defendants liable simply because more could have been done would be to create something akin to strict liability under Title IX. Such an argument leads to the inevitable result that, whenever a student *is* being harassed, it means that something more could have been done to prevent it (or else it would not have happened), and that this alone proves Title IX liability. Instead, the correct legal test is whether, given the information they possessed and generated by reasonable investigation, were they on "actual notice" of the misconduct and deliberately indifferent to it. That simply is not the case here.

By separate order, the court will overrule the plaintiffs' objections and enter summary judgment for these defendants. The court also will refer the matter back to the magistrate judge for further proceedings with respect to plaintiffs' claims against defendant Turner.

The Clerk is DIRECTED to mail a copy of the foregoing to defendant Turner at his address of record.

DONE this 15th day of September 2006.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

# EXHIBIT 22

FILED
2006 Jul-21 PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|                                          |     |                              |
| ---------------------------------------- | --- | ---------------------------- |
| **CHERYL FORTNER,**                      | )   |                              |
|                                          | )   |                              |
| **Plaintiff,**                           | )   |                              |
|                                          | )   |                              |
| **vs.**                                  | )   | **CASE NO.  2:04-cv-0318-TMP** |
|                                          | )   |                              |
| **DONNIE BREASEALE,  et al,**            | )   |                              |
|                                          | )   |                              |
| **Defendants.**                          | )   |                              |

## REPORT AND RECOMMENDATION

This cause is before the court on the motion for summary judgment filed September 2, 2005, by defendants Blount County Board of Education (the Board), former Blount County Superintendent Donnie Breaseale, former Hayden High School principal Allen Hargett, and Board members Andy Neill, Gregg Armstrong, David Standridge, Steve Morton, and Bruce McAfee.  The motion has been more than fully briefed, and the court has considered the evidence and the arguments set forth by all parties.  The parties have not consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c), accordingly, the court enters this report and recommendation.[1]

---

[1]    The plaintiff's counsel and counsel for the movant defendants did sign and return a consent form providing authorization for the magistrate judge to exercise final dispositive jurisdiction.  However, defendant Turner, who no longer is represented and who has not filed any dispositive motion, has not indicated his assent to magistrate judge jurisdiction.  Accordingly, the consent form is not valid in that it has not been signed by all parties.

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. FACTS FOR SUMMARY JUDGMENT PURPOSES

Applying the foregoing standards to the evidence presented by the parties, the following facts appear to be undisputed or, if disputed, are taken in a light most favorable to the non-moving plaintiff. Plaintiff Cheryl Fortner, who brought this action as mother and next friend of her minor daughter, "Jane Doe," asserts claims against the defendants under 42 U.S.C. § 1983 and Title IX, and under Alabama state law. Her claims arise from a sexual relationship that took place in 2002-03 between Doe, a minor child and high school freshman, and Jeffrey Neal Turner, a former teacher and Hayden High School band director employed by the Board.[2] Viewed in the light most favorable to the plaintiff, the non-moving party, the following facts are relevant to the motion for summary judgment:

During the 2002-03 school year, Jane Doe was a 14-year-old freshman at Hayden High School ("Hayden"), a public school in Blount County, Alabama, operated by the Board. Doe was

---

[2]      Plaintiff also asserts state-law claims against Turner. Counsel for the defendants filed an answer on behalf of Turner, but later sought to withdraw, asserting that a conflict of interest existed between Turner and other defendants. The motion was granted, and Turner is not now represented by counsel. He has not filed a motion for summary judgment, and plaintiff has not sought summary adjudication of her claims against him; therefore, the court does not address any of the claims asserted against Turner.

4

a member of the marching band at Hayden. Defendant Turner was the band director at Hayden that

year, and defendant Hargett was the principal. Defendant Breaseale was superintendent of education

until he was replaced by James Carr in the summer of 2003. The other defendants were at the

relevant time members of the Board. As principal, Hargett was responsible for "overall

management" of the high school and the day-to-day safety and welfare of the student body. He also

had authority to reprimand and supervise faculty members at school, but had no power to fire or

suspend a teacher. That authority lay with the Board, which had the power to terminate or suspend

a teacher, but only upon the recommendation of the superintendent. Pursuant to Board policy, the

principal also was responsible for investigating any allegations of sexual harassment at the school.[3]

In December 2002, Marti Owens, who then worked as a secretary at Hayden Elementary

School, informed Hargett that she had seen Doe riding in a car with Turner off of school property

and after school hours and that such conduct didn't "look good." When asked by Hargett, Owens

replied that she did not believe anything inappropriate was going on between the student and Turner.

Her complaint was prompted by concern over the "appearance," and Owens told Hargett she liked

Turner and didn't want him to be in any trouble. Upon receiving that report in the afternoon, Hargett

met with Turner the next morning, and asked Turner if the report was true. Turner told Hargett that

he had two students in his car, and that the students had gone with him to pick up pizza that he had

---

[3]     The defendants assert, and plaintiff does not dispute, that only the Board could
terminate a teacher's employment. While there is much dispute over the precise limits on Hargett's
authority, it is undisputed that Hargett had the power to warn or reprimand a teacher, and that he
could impose conditions that could curtail conduct by a teacher that posed a serious risk of danger
to a student, such as by removing a student from the teacher's class and by forbidding the teacher
from having any contact with the student.

bought for the band to eat at an after-school practice. Hargett then questioned some band members, who confirmed Turner's account. When Hargett spoke with Owens, she admitted that she didn't know if another student was in the car. In response to Owens' complaint, Hargett told Turner that he should never be alone with any female student and should not conduct himself in such a way as to create any appearance of impropriety. Turner agreed. Also, Hargett made unannounced visits to the band room, both during and after school, to monitor Turner's conduct.

Hargett trusted Turner, and believed Turner to be a "pillar of the community." He had met Turner's wife and two children. He knew that Turner had served as a youth minister at church, and church members had expressed no concern over it. Hargett had observed Turner's demeanor around school, and noticed nothing inappropriate, often witnessing him pray before meals. Turner was known to refuse to sit with girls on the band bus to avoid any improper appearances.

There were not further reports of a problem involving Turner until April 2003, when the band took a trip to Florida. After returning, two chaperones on the trip, Owens and David Moody, told Hargett that the chaperones had a "collective perception that an improper relationship may be going on" between Doe and Turner, and that it was "obvious" to the chaperones that "there was a mutual attraction and infatuation between the two of them." They also told Hargett that Doe had been "frequently receiving passes" to be excused from class to go to the band room. The chaperones further told Hargett that Turner had changed the hotel room assignments in Florida in order to obtain a room for himself that adjoined a room shared by four girls, including Doe. The chaperones told

6

Hargett that Turner had gone for a walk on the beach with a group of girls in the band.[4]  When he met with the chaperones, Hargett was defensive of Turner and said the Board would back him on all matters.

The next day, Hargett contacted Breaseale and related the concerns about Turner.  Breaseale instructed Hargett to investigate the matter.  Hargett began an investigation.  Hargett called two other chaperones, Theresa Hall and Diane Stewart, and both told him they didn't think there was anything "going on" between Doe and Turner.  Hargett asked them to talk with their children, who also were band members, to see if they had seen or heard of any evidence of any inappropriate relationship.  Hargett was told that the children had not seen or heard of anything inappropriate.  Hargett also spoke with another teacher and an "auxiliary sponsor," both of whom had children in the band, to see if they or their children had seen any inappropriate conduct by Turner.  They said they had not and they told him their children had not.  Hargett did not contact Karen Acker, one of the chaperones and president of the band boosters.  Hargett did speak with two of the four girls in the room adjoining Turner's room on the Florida trip, and they did not report any untoward or suspicious conduct by Turner.  Hargett also contacted the assistant superintendent, who had been the principal at the school where Turner previously taught, and asked if there had been any problems with Turner, and he was assured that there had been no problems or allegations of wrongful conduct at Turner's previous job.  Hargett also asked his former assistant principal, who had daughters in the band, if she

---

[4]      Hargett denies that anyone told him that there was an inappropriate relationship between Turner and Doe, and maintains that the complaints were about several girls having a "crush" on Turner and about "appearances."  Of course, at this juncture, the plaintiff's evidence — in this case the affidavit of Owens — must be accepted as true.

had any such concerns, and she did not. Hargett had a daughter in the band, and his daughter took private music lessons from Turner, but he did not know that Doe also took private lessons from Turner.

That same day, the day after chaperones complained of Turner's conduct, Hargett called Turner into his office. He talked to Turner about the chaperones' report, and Turner denied any improper conduct. He told Hargett that he arranged the room assignments because he wanted to be in the room at the end of the hall near the stairwell because he believed his presence there would deter students from attempting to sneak out of the hotel after hours. Hargett again told Turner to avoid the appearance of impropriety. Turner told him that he was "never alone with any one girl at any time" and that he went walking on the beach with a group of girls after they had asked him to go with them.

Hargett also arranged for Turner to meet with Owens and Moody to discuss their concerns. After meeting with Turner, Moody called Hargett back and told him he felt like "a fool" and didn't believe that any improper relationship existed. In meeting with Turner, however, Hargett "read him the riot act," admonishing him to be careful not to be alone with female students and not to create inappropriate appearances. Hargett explicitly instructed Turner not to be alone with Doe.

Hargett did not make any written record of the complaints or his discussions with Turner. He later told Breaseale that he found no merit to the chaperones' allegations because there was no evidence of any inappropriate actions or relationship involving Turner and Doe. Breaseale relied on Hargett's findings, and Breaseale did not conduct any investigation of his own. No further actions were taken to investigate Turner's conduct or to limit Turner's contact with Doe or other female

8

students, other than the instructions given by Hargett not to be alone with them or to allow improper appearances. Hargett thought Turner was "innocent" and that there was "nothing to" allegations of improper conduct. Hargett did not interview Doe and did not contact Doe's parents about the concerns expressed to him. Also, he did not contact any law enforcement or child welfare officials about the concerns.

The school year ended three or four weeks after the Florida trip, and there were no other reports of problems. On July 24, 2003, however, Doe's uncle found Turner at Doe's home in the early morning. Turner claimed he was picking Doe up for band practice. The uncle called Ken Parker, the assistant principal at Hayden, and Parker called Hargett. Hargett instructed Turner and Parker to meet him at the school immediately. Doe's parents also came to the school. Hargett then met with Doe's parents and told them Turner had been found with Doe that morning. The parents asked Hargett to terminate Turner's employment immediately. Hargett told them he did not have the authority, but that he would tell the superintendent that Turner had defied his direct instructions not to be alone with Doe or any female student.

Hargett contacted the new superintendent of schools, James Carr,[5] who scheduled a meeting with Doe's parents. Doe's father said he had just learned that Turner had given Doe a cell phone. Carr asked them if they believed any sexual relationship existed, and they said they did not. Investigators from the county sheriff's office interviewed Doe, however, who admitted she was having a sexual relationship with Turner that began after the Florida trip in April. About three days later, Turner was arrested, and he resigned soon thereafter. The Board accepted the resignation the

---

[5]      By this time, Breaseale had been replaced with Carr.

9

next day, and then sought to revoke Turner's teaching certificate. Turner later pled guilty to felony charges arising from his relationship with Doe, and remains in prison serving a sentence.

### III.  DISCUSSION

#### A.  Title IX Claims

All defendants except Turner have moved for summary judgment in their favor on all of plaintiffs' claims against them in their individual and official capacities brought pursuant to Title IX. The plaintiff, in response, concedes that she asserts no claims against the individual defendants for violations of Title IX, and clarifies that her Title IX claim provides a basis only for her claim against the Board. (Plaintiff's response at p. 11). Accordingly, all claims against the individual defendants based on Title IX, whether in their individual or official capacities, are due to be dismissed, and the only Title IX claim at issue is plaintiff's claim against the Board itself.

Under 20 U.S.C. § 1681 *et seq.*, a student is protected from discrimination in the schools on the basis of sex. Gebser v. Lago Vista Independent School District, 524 U.S. 275, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998).  "Title IX provides, in pertinent part, that 'no person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....." Davis v. DeKalb County School District, 233 F.3d 1367, 1371 (11th Cir. 2000), quoting 20 U.S.C. § 1681(a), cert. denied, 532 U.S. 1066, 121 S. Ct. 2217, 150 L. Ed. 2d 1210 (2001).  Title IX further has been held to provide a cause of action arising from a teacher's sexual harassment of a student. Davis, 233 F.3d at 1371.  A school board is not, however, liable for the actions of a teacher under traditional notions

10

of *respondeat superior*. The Supreme Court set a much higher standard for the action for damages that is implied but not expressed in Title IX, and clarified that the standard by which a school board may be liable requires plaintiff to show that "an official of the school district who at a minimum ha[d] authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Gebser, 524 U.S. 277, 118 S. Ct. 1989, 141 L. Ed. 2d 284. The Court clearly intended to avoid holding an agency liable "not for its own official decision but instead for its employees' independent actions." Gebser, 524 U.S. at 290-91, 141 L. Ed. 2d at 292. In order to survive a properly supported motion for summary judgment, the plaintiff in a Title IX case against a school board must demonstrate: (1) that a supervisor with "authority to take corrective action had actual notice" of the conduct, and (2) that the supervisor was "deliberately indifferent" to the misconduct. Sauls v. Pierce County School District, 399 F.3d 1279, 1284 (11th Cir. 2005).

### 1. Sufficiency of Authority

To support a claim that the person who was on notice of the offending conduct was an official of sufficient authority that liability may attach requires a showing that the supervisor was "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." Floyd v. Waiters, 171 F. 3d 1264, 1264 (11th Cir. 1999), cert. denied, 528 U.S. 891, 120 S. Ct. 215, 145 L. Ed. 2d 181 (1999).[6] Although Floyd seems to require notice at the level of the superintendent or school board, and rejects the concept that notice

---

[6]    Floyd was decided before Gebser, then was vacated for reconsideration in light of Gebser. 133 F.3d 786 (11th Cir. 1998). After reconsidering its decision in light of Gebser, the Eleventh Circuit Court of Appeals reinstated its prior opinion.

11

to a low-level supervisor[7] is sufficient, it does not explicitly discuss whether notice to a principal who has authority to reprimand a teacher or remove a student is enough. Floyd v. Waiters, 133 F.3d 786, 792 (11ᵗʰ Cir. 1998).

In a student-on-student case of sexual harassment, the Supreme Court has indicated that notice to a principal is sufficient to impose liability. In Davis v. Monroe County Board of Education, 526 U.S. 629, 143 L. Ed. 2d 839, 119 S. Ct. 1661 (1999), parents and students complained to both classroom teachers and an elementary school principal about one student's harassment of another. There is no indication that the complaints were communicated beyond the principal's office. Even so, the Court found that where the victim's parents had sought "an audience with the school principal" and made repeated complaints, but the teacher and principal failed to take any action to end the harassment, the plaintiff "may be able to show both actual knowledge and deliberate indifference." 526 U.S. at 654, 143 L. Ed 2d at 860 (reversing and remanding the Eleventh Circuit Court of Appeals's affirmance of the district court's dismissal of the claims). In such cases, however, it also has been noted that notice to even a single classroom teacher may be sufficient because the teacher is often the person with the authority to stop the offending conduct. See, e.g., Hawkins v. Sarasota County School Board, 322 F.3d 1279, 1286-88 (11ᵗʰ Cir. 2003). It is difficult

---

[7]     The court specifically notes that a "deputy assistant director of transportation" who may know that a bus driver is engaged in misconduct, when no higher-level manager has such knowledge, should not be sufficient to trigger liability. 133 F.3d at 792 n.11. In limiting its discussion to board members and superintendents, however, the court discusses the fact that such officials are "elected officials [who] commonly can be and (we expect) are, contacted easily and regularly to report misconduct by school employees." 133 F.3d at 792 n. 12. Of course, principals may also fall into the category of persons "easily and regularly" contacted about misconduct by teachers.

to see how notice to such a lower level employee, even a teacher, can be squared with the holding in Floyd v. Waiters that even lower level supervisors are not high enough up the chain-of-command to implicate the policies of the school board itself. Thus, it may be that teacher-on-student cases of harassment require notice at a higher level in the chain-of-command precisely because the official must have the authority to take some corrective action over the accused teacher. Fellow teachers would not have that authority, and principals have only very limited authority.

The defendants dispute whether Hargett was an official with sufficient authority to trigger liability because he did not have the power to fire, suspend, or terminate Turner's employment. In Gebser, the Supreme Court found that complaints from parents that a teacher had made inappropriate comments during class was "plainly insufficient to alert the *principal* to the possibility that Waldrop was involved in a sexual relationship with a student." Gebser, 524 U.S. at 291, 141 L. Ed. 2d at 292 (emphasis added). This finding implies that a school principal might be an appropriate authority, but does not directly address that issue; the Court instead based its holding on a lack of actual notice.

The only analogous cases presented to the Eleventh Circuit Court of Appeals likewise fail to directly address the issue of who may be the appropriate authority. In Davis, the appellate court found it "unnecessary" to decide the issue of whether a principal is a proper supervisory official, but noted that Gebser did not require actual notice to the board or superintendent, and that liability could "attach upon notice to an 'appropriate person.'" 233 F.3d at 1372 n.5. In Sauls, the information constituting notice of sexual misconduct was directed to the superintendent, therefore the court never addressed whether notice to a principal might be sufficient.

13

Whether notice to a principal is sufficient turns on a fact-specific inquiry into whether that principal has power to remedy the offense.[8] It is undisputed that under Alabama law only the Board, upon recommendation of the Superintendent, can terminate a teacher's employment. However, it also is undisputed that Hargett had some authority to warn and reprimand teachers and to limit their activities. Indeed, Hargett did order Turner to refrain from being alone with any female student. Had Hargett's instruction been followed, the instruction would have sufficed as corrective action.[9] For purposes of this motion, the court assumes, without deciding, that Hargett is an official with sufficient authority to take "corrective action" as required under Title IX law. [10]

### 2. Actual Notice

Assuming Hargett had the requisite authority, the court next must examine whether the Board, through Hargett, had "actual notice" of the offending conduct. The "actual notice"

---

[8]    School principals have been found to be proper authorities whose knowledge of harassment can be charged to the school board. See, e.g., Murrell v. School District No. 1, 186 F.3d 1238, 1247 (10th Cir. 1999)(a student-on-student harassment case in which the court found that because school officials' "roles vary among school districts, deciding who exercises substantial control for puposes of Title IX liability is necessarily a fact-based inquiry). Other courts have determined that a teacher or guidance counselor is not an "appropriate person," see, e.g., Canutillo Independent School District v. Leija, 101 F.3d 393 (5th Cir. 1996); Warren ex rel. Good v. Reading School District, 278 F.3d 163 (3d Cir. 2002).

[9]    The Eleventh Circuit Court of Appeals noted in Davis v. DeKalb County School District, 233 F.3d 1367, 1373-74 (11th Cir. 2000), that a supervisor taking corrective action could instruct the employee never to be alone with a female student, which is exactly what Hargett did in response to the earliest complaint. On the other hand, since Turner was eventually caught with the minor at her home, away from school property and outside of school hours, it could be argued that Hargett could not have taken any corrective action that would stop the conduct.

[10]    The Eleventh Circuit Court of Appeals likewise in Davis v. DeKalb County School District, 233 F.3d 1367 (11th Cir. 2000), assumed arguendo that a principal could be such a supervisory official.

14

requirement of Title IX was not specifically articulated by the Supreme Court in Gebser. However, in Davis v Monroe County Board of Education, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999), the Court described Gebser as a case that determined Title IX liability would attach only where an agency is deliberately indifferent to "*known acts* of sexual harassment by a teacher." Davis, 526 U.S. at 641 (emphasis added). A fair reading of Gebser and Davis compels the conclusion that an appropriate official must know that the improper conduct is occurring in order to be held liable under Title IX.[11] It appears, however, that the Eleventh Circuit Court of Appeals interprets "actual knowledge" more loosely.

The Eleventh Circuit Court of Appeals concedes that "actual notice" requires more than a finding of constructive notice. Davis v. DeKalb County, 233 F.3d at 372, citing Gebser, 524 U.S. at 287-89, 118 S. Ct. at 1998-99, 141 L. Ed. 2d at 277. In Davis v. Dekalb County, the plaintiff argued that the school board "knew or should have known" that a teacher was sexually abusing students because of a complaint lodged by a student who was not a plaintiff. The appellate court held that a complaint by one student that the teacher had touched her inappropriately was not sufficient to apprise the school board that other students were being molested. Davis v. DeKalb County, 233 F.3d at 1373. The court further noted that it "cannot say that the complaint was sufficient to alert [the defendant school board] to the *possibility* that [the teacher] was sexually

---

[11]     The Seventh Circuit Court of Appeals has opined that the Supreme Court requires a Title IX plaintiff to prove "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct" and that the officials having the knowledge decided not to act on it. Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004), but cf. Bostic v. Smyrna School District, 418 F.3d 355, 360 (3d Cir. 2005)(accepting that knowledge of facts indicating a substantial risk was sufficient).

harassing Plaintiffs." 233 F.3d at 1373 (emphasis added).   The fact that the court did not find that actual notice existed in Davis v. DeKalb County supports a conclusion that rumors, allegations, and suspicions of improper conduct are insufficient to provide actual notice.  However, the court's use of the word "possibility" in the appellate opinion suggests that "actual notice" requires far less in this circuit than factual knowledge of the offending conduct, or even knowledge of a substantial risk or probability that the teacher would engage in the offending conduct.[12]

In Sauls v. Pierce County School District, 399 F.3d 1279 (11th Cir. 2005), the Eleventh Circuit Court of Appeals affirmed a grant of defendant's motion for summary judgment in a case involving a teacher's sexual abuse of a student, but did not decide whether the school board had actual knowledge of the abuse.  In Sauls, a complaint had been lodged with the assistant superintendent against a teacher in 1998, about a "potentially inappropriate relationship" between the teacher and a particular student.  The principal investigated the allegation at that time, found denials by the teacher and student to be credible, and did not find any evidence to support the allegation. Sauls, 399 F.3d at 1281-82. Three years later, the assistant superintendent received an anonymous email accusing the teacher of inappropriate relationships with several students, but did not name the student who was the plaintiff.  Later that same year, the principal, who was then the superintendent, received an anonymous phone call in which the caller said he or she had seen the

---

[12]     The Third Circuit Court of Appeals affirmed a district court's Title IX jury instruction that defined actual notice as "knowledge of facts sufficiently indicating a substantial danger to a student so that the institution can reasonably be said to be aware of the danger." That court rejected the appellants' contention that actual notice requires only "information sufficient to alert the principal to the possibility that a teacher was involved in a sexual relationship with a student." Bostic v. Smyrna School District, 418 F.3d 355, 360 (3d Cir. 2005).

teacher's and the plaintiff's cars parked in the woods. The caller did not allege to have any specific knowledge of any sexual acts or inappropriate conduct. Another investigation was launched, and both teacher and student denied any improper contact. A former student (the same student who denied the conduct in 1998) finally admitted that he had engaged in sex with the teacher while a student in 1998. In December of 2001, a substitute teacher found a note addressed to the defendant teacher that clearly indicated the teacher and a student were having a sexual relationship. Another investigation ensued, and the teacher resigned her position. Sauls, 399 F.3d at 1282-83.

The court in Sauls declined to determine whether the incidents that preceded the explicit note were sufficient to create actual knowledge on the part of the defendant, but did find that the defendant had not been deliberately indifferent. In *dicta*, however, the court noted that Gebser mandates that Title IX liability does not attach "based on principles of constructive notice or *respondeat superior*." 399 F.3d at 1284 n.3. It is difficult to discern, based upon these decisions, what degree of knowledge would suffice to constitute "actual knowledge" in the Eleventh Circuit, although clearly the standard requires more than a finding that the defendant board "should have known" of the misconduct.

Some guidance may be found in cases using the "deliberate indifference" standard in excessive force cases under the Eighth Amendment. Indeed, the plaintiff argues that much of the substance of the test under Title IX is taken from the Eighth Amendment analysis. In Rosa H. v. San Elizario Independent School District, 106 F. 3d 648 (5th Cir. 1997), the Fifth Circuit Court of Appeals wrote:

> Having rejected the pure agency and constructive-notice theories, we are left with the
> rule that a school district is not liable under Title IX for a teacher's sexual harassment

17

unless it has actual notice of the harassment. In order to flesh out the notion of actual notice, we borrow from recent discussions of the concept of deliberate indifference. Although these cases arose in very different areas of substantive law, they share with this case the problem of grasping what it means to harm someone intentionally by disregarding her plight.

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), the Supreme Court faced the question of what sort of conduct should count as deliberate indifference when an inmate brings a civil suit against prison officials for prison conditions that violate his Eighth Amendment rights. Deliberate indifference falls generally within the category of recklessness. Id. at 835-36, 114 S.Ct. at 1978. But the Court recognized a distinction between recklessness as "fail[ing] to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known" and recklessness as disregarding a risk of harm that is actually known. Id. at 835-38, 114 S. Ct. at 1978-79. The former amounts to objective recklessness, the latter to subjective recklessness. The Court adopted the subjective standard: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. It considered an objective, constructive-notice standard, id. at 838-42, 114 S. Ct. at 1980-81 (discussing City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)), but it concluded that such a standard is not appropriate because the liability of prison officials does not turn on inadequate training or supervision. Id. at 840-42, 114 S. Ct. at 1981. Instead, it turns on whether the officials have punished the prisoner, and "prison officials who lack[ ] knowledge of a risk cannot be said to have inflicted punishment." Id. at 843-44, 114 S. Ct. at 1982. We have recently followed the Farmer standard in analyzing jail officials' liability under the Due Process Clause for jail conditions imposed on pretrial detainees. Hare v. City of Corinth, 74 F.3d 633, 648-50 (5th Cir.1996) (en banc).

These cases construing the test for deliberate indifference are helpful because they highlight the distinction between an intentional wrong and a wrong that flows from mere neglect. As we have explained, Title IX liability depends on a school district's act of discriminating on the basis of sex. Just as a prison official has not punished an inmate unless he actually knows of a danger to the inmate and chooses not to alleviate the danger, a school district has not sexually harassed a student unless it knows of a danger of harassment and chooses not to alleviate that danger. Although drawn from a different body of law, Farmer and Hare clarify the indispensable role that deliberate action plays when liability stems from intentional conduct such as punishing or discriminating.

The reasoning in Farmer and Hare also clarifies what a school district must know before being held liable. Students need not show that the district knew that a particular teacher would abuse a particular student; the plaintiff could prevail in this case, for example, by establishing that the school district failed to act even though it

18

knew that Contreras posed a substantial risk of harassing students in general. But Title IX liability for sexual harassment will not lie if a student fails to demonstrate that the school district actually knew that the students faced a substantial threat of sexual harassment. In other words, the district can escape liability if it can show "that [it] did not know of the underlying facts indicating a sufficiently substantial danger and that [it was] therefore unaware of a danger, or that [it] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 843-44 , 114 S. Ct. at 1982. Any lower standard would veer in the direction of an objective test, which is necessarily "redolent with negligence and its measures." Hare, 74 F.3d at 650.

Rosa H. v. San Elizario Independent School District, 106 F. 3d 648, 658-659 (5th Cir. 1997). Taking

substance for the "deliberate indifference" test from Eighth Amendment law, the Eleventh Circuit

Court of Appeals has explained:

When officials become aware of a threat to an inmate's health and safety, the eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection. Hopkins v. Britton, 742 F.2d 1308, 1310 (11th Cir. 1984); Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981). Merely negligent failure to protect an inmate from attack does not justify liability under section 1983, however. Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670, 88 L. Ed. 2d 677 (1986). Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended "evolving standards of decency," thereby rising to the level of a constitutional tort. Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S. Ct. 285, 291-92, 50 L. Ed. 2d 251 (1976); Hopkins, 742 F.2d at 1310. *The known risk of injury must be "'a strong likelihood, rather than a mere possibility'" before a guard's failure to act can constitute deliberate indifference.* Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir. 1989) (quoting State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir. 1983)); see Meriwether v. Faulkner, 821 F.2d 408, 417 (7th Cir. 1987); Molton v. City of Cleveland, 839 F.2d 240, 243 (6th Cir. 1988). [Italics added].

Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990).

By analogy, the same quality of knowledge must exist before a school official can be said to

have "actual notice" of the substantial risk of harm to a student. The facts possessed by the school

19

official must be such that they indicate "a strong likelihood [of harassment], rather than a mere possibility." School officials come to possess a broad range of facts relating to the interactions between students and teachers, but it is only when those facts known to a school official indicate a "strong likelihood [of harassment], rather than a mere possibility" that it can be said that the school official has "actual notice" of the illegal sexual harassment. A lesser standard of knowledge runs the risk, as noted by the Fifth Circuit, of veering too much in the direction of mere negligence. School districts are not liable under Title IX when the facts known to school officials are vague, ambiguous, uncertain, or equivocal, because such circumstances measure the response of school officials in terms of their reasonableness, not their "actual notice" of a substantial risk of sexual harassment. As Brown suggests, the facts known must be such as to indicate a "strong likelihood, not a mere possibility" that illegal harassment is occurring or is threatened.

This case is like Davis v. DeKalb County in that the victim of the abuse who was bringing the lawsuit did not complain of the abuse, but in the instant case the complaints alleged only suspicions and appearances, not incidents of actual abuse. Like in Sauls, there are allegations in the instant case that involve Doe, and there was evidence that created a suspicion of wrongful conduct on the part of Turner. It appears clear that the defendant Board did not actually know that Turner was having a sexual relationship with Doe. In fact, according to Doe herself, the sexual relationship did not begin until after the Florida trip and the subsequent concerns were expressed by the chaperones. Although the facts may have been sufficient to alert Hargett to the "possibility" that

20

some inappropriately close or romantic relationship existed,[13] they did not indicate to Hargett or anyone else that there was a "strong likelihood" that such a relationship existed. The plaintiff has offered evidence that at least two chaperones from the Florida band trip told Hargett that they believed — and that it was "obvious" — that Turner might be engaged in an inappropriate relationship with Doe. Hargett knew Doe had been seen in Turner's car with him after school, and that Turner had changed room assignments to obtain a room adjoining Doe's on the Florida trip. Nevertheless, a great deal of evidence also suggested that nothing untoward was going on. Other chaperones denied seeing anything improper, and one of the complaining chaperones, Moody, later expressed feeling "foolish" that he ever raised a concern. Students denied any impropriety by Turner. Such was the ambiguity and uncertainty of the facts made known to Hargett, and those facts were insufficient as a matter of law to show that a "strong likelihood," more than a "mere possibility," of illegal harassment was occurring. Thus, the court concludes that neither Hargett, nor any other school official above him had "actual notice" of Turner's illegal conduct.

### 3. Deliberate Indifference

Even if the court assumes that some appropriate official did have "actual notice" of the harassment, the school district was not deliberately indifferent with respect to the knowledge. The Supreme Court clearly held that school officials are not liable for the sexual abuse inflicted by a teacher unless their response to such reports of sexual abuse "amount[s] to deliberate indifference to discrimination." Gebser, 524 U.S. at 290. The Court further has held that a school system is not

---

[13]     In fact, plaintiff does not argue that the Board or Hargett "actually knew" of the abuse, only that Hargett and other officials "should have been alerted to [the] real possibility that an improper relationship existed between Turner and [Doe]." (Plaintiff's Opposition Brief, p. 21).

liable except where the institution itself "intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of ... harassment of which it had actual knowledge." Davis, 526 U.S. at 642.

The concept of deliberate indifference derives from the standard used to establish a municipality's liability under 42 U.S.C. § 1983. Hawkins, 322 F.3d at 1284. The Eleventh Circuit has held that recipients of federal funds may be liable in Title IX actions only where "their own deliberate indifference effectively causes the discrimination." Hawkins, 322 F.3d at 1284, citing Gebser, 524 U.S. at 292-93, 118 S. Ct. at 2000. Furthermore, the "deliberate indifference issue is intertwined with the question of notice since whether the Board's actions were clearly unreasonable must be measured by what was known." Hawkins, 322 F.3d at 1287. Accordingly, the issue involves both an examination of the defendant Board's conduct, and whether there exists any causal link between the Board's action (or inaction) and the abuse. In Davis v. DeKalb County, the court determined that there was "no reasonable basis to believe that the failure to obtain written statements or to record the meetings" caused the investigation into allegations of abuse to fail to lead to relevant evidence. 233 F.3d at 1374. The fact that an investigation is flawed, and even that the investigation proved ineffective in stopping or detecting the abuse, does not necessarily mean that the defendant acted with deliberate indifference. 233 F.3d at 1375; see also Sauls, 399 F.3d at 1287. In Sauls, the court refused to find deliberate indifference "in light of the many corrective measures" taken by the principal and other school officials.

In the instant case, the court must resolve the issue of deliberate indifference in favor of the defendant Board. While it is clear, at least in hindsight, that Hargett should have taken the

allegations more seriously, should not have believed Turner's denials, and should have interviewed Doe, Acker, and Doe's parents,[14] such failings in Hargett's investigation do not rise to the high standard required for a showing of deliberate indifference.

It is undisputed that when the first complaint was voiced to Hargett about Turner in December 2002, he promptly confronted Turner and demanded an explanation. He further warned Turner against any similar conduct in the future. Hargett may have been wrong in assessing Turner's conduct as "innocent," but he was not indifferent to the student's welfare. Turner offered a plausible explanation for Doe's presence in his car, and his explanation was corroborated by other students. The complainant did not allege that Turner was engaged in any inappropriate relationship, but rather asserted that Turner being seen in a car with Doe didn't "look good." Hargett adequately (but perhaps naively) met and remedied that specific complaint.

Hargett did not receive any other complaints about Turner's conduct until April 2003, when two chaperones reported about the Florida trip. Again, Hargett promptly reacted to the complaint by questioning Turner, who denied any wrongdoing, and who again offered a plausible explanation for each concern raised by the chaperones. Hargett reported the complaint to the superintendent and

---

[14]    It should be noted, however, that it appears likely Doe would have denied the conduct, because she has admitted that she wanted to keep the relationship secret. Furthermore, Doe's parents, when first confronted with the evidence that Turner was with Doe at her home in the early morning hours, did not believe that any sexual relationship existed. Acker did not possess any direct evidence of the improper conduct, but only corroborated other reports of rumors and "appearances." Even though Acker's affidavit alludes to "rumors" of an improper relationship being rampant among the students, she does not testify that she reported these rumors to Hargett or that hargett otherwise knew of them. Accordingly, even a more thorough investigation may have proven equally ineffective in stopping Turner's conduct.

23

conducted further investigation.[15] He gathered information from teachers, parents, and students. In hindsight, that investigation may have been lacking. But mere negligence, even sloppiness or failure to adhere to policy, does not give rise to Title IX liability. The standard requires "deliberate indifference." Even viewing the facts in the light most favorable to the plaintiff, the evidence falls far short of such a high standard. At most, the facts demonstrate that Hargett was predisposed to believe that Turner was a good teacher and an honorable man, that Hargett failed to address the complaints directly to Doe or her parents, and that Hargett should have conducted an even more thorough investigation, documented the investigation, and more fully informed the superintendent. Of course, the facts also indicate that Hargett responded promptly and took the allegations seriously.[16] He confronted Turner directly, instructed Turner not to be alone with any female student, and sought more facts from students, chaperones, parents, and other supervisors. His investigation led to the conclusion — albeit one that turned out to be wrong — that Turner was a good teacher who had never engaged in any misconduct. It comes as no surprise that adults in a position of trust who molest children are adept at deception. Certainly, Turner's conduct should cause Hargett and

---

[15]    The plaintiff further argues that Hargett defied Board policy in failing to generate a written file on the matter. The Board policy is ambiguous as to whether a written report is required. Even assuming that policy required a written report of the complaint and investigation, however, the plaintiff has not offered any evidence that the lack of documentation caused the abuse or allowed the abuse to continue.

[16]    It must also be noted that Hargett took the allegations at least as seriously as those who complained of the conduct. There is no real dispute that the first complaint was prompted merely by concern over appearances, and that the complaint after the Florida trip was not based on any fact-based accusation of wrongdoing. While Owens and Acker now allege that the fact that they told Hargett they suspected a sexual relationship was ongoing between a teacher and his 14-year-old student, and that it was "obvious" to everyone, it appears that no one except Hargett confronted Turner, and not one of the adults called the police, talked with Doe, contacted state children's services, or took any other action to assist this child who was so "obviously" being abused.

any other school official to view explanations for reports of misconduct with more skepticism, and perhaps to more diligently investigate any accusations of wrongdoing. But Title IX does not impose upon school officials a duty to conduct perfect investigations; Title IX requires no more than an absence of deliberate indifference. The defendants clearly provided an imperfect investigation, and failed to protect Doe from her teacher. But the defendants are not liable under the law for that teacher's conduct. Accordingly, defendants' motion for summary judgment on plaintiff's Title IX claim is due to be granted, and all claims against the defendant Board are due to be dismissed.[17]

### B. § 1983 Claims

Plaintiff concedes that the only claims arising under § 1983 are against Breaseale, Hargett, and Turner, in their individual capacities. Consequently, all other § 1983 claims are due to be dismissed.

Defendants Breaseale and Hargett seek summary judgment in their favor on the § 1983 claims on the same grounds made the basis of their motion for summary judgment on the Title IX claims. To hold a supervisor liable for an employee's conduct under § 1983, a plaintiff must prove either that the supervisor personally participated in the misconduct (which plaintiff does not allege) or that there exists a causal connection between the actions of the supervisor and the alleged constitutional deprivation. Miller v. King, 384 F.3d 1248 (11th Cir. 2004). A causal connection may be demonstrated when a plaintiff establishes: "(1) a history of widespread abuse [that] puts the

---

[17]    For the reasons set forth herein, any claims based on Title IX against any other defendant, except Turner, who has not moved for dismissal of any claim, also are due to be dismissed.

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; (2) when a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Miller, 384 F.3d at 1261. Plaintiffs do not allege widespread abuse, but assert that an offending custom or policy existed, that Hargett and Breaseale knew that Turner would act unlawfully, and that they failed to stop Turner.

Although plaintiffs argue that Breaseale and Turner had a policy of ignoring allegations of sexual abuse, the court finds no basis in fact for this argument. As discussed *supra*, the investigation in this instance may have been ineffective, and may even have been inadequate, but the policy clearly was to investigate claims — which Hargett did — and to take action to end the conduct — which Hargett also did by instructing Turner not to be alone with a female student. And while it is true that Breaseale did not independently investigate or act, it cannot be said that his reliance on Hargett's investigation was unreasonable or deliberately indifferent. Similarly, plaintiff's allegation that the defendants had no policy for dealing with reports of abuse is likewise without foundation. The Board implemented a policy, and Hargett and Breaseale followed it, albeit unsuccessfully and arguably in an incomplete manner.

Finally, the evidence of what Hargett and Breaseale knew was discussed *supra* in relation to the actual notice requirement of Title IX claims. Plaintiff has failed to demonstrate that Hargett or Breaseale knew that Turner was acting unlawfully, or even that Turner posed a substantial risk

of sexually abusing students.   Accordingly, the § 1983 claims similarly are due to be dismissed pursuant to the defendants' motion for summary judgment.

### C. State-Law Claims

The only claim asserted against these defendants arising under state law is a claim that the defendants negligently hired, retained, and/or supervised Turner.  Under Alabama law, an employer may be held responsible for "his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." Armstrong Business Services, Inc., v. AmSouth Bank, 817 So. 2d 665, 682 (Ala. 2001).  To prevail against a well supported motion for summary judgment on a negligent supervision claim, the plaintiff must establish "by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned" of the employee's incompetence.  Id.  Such proof is accomplished by "showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." Id.

As discussed in relation to plaintiff's federal-law claims, plaintiff has produced evidence that acts of alleged harassment occurred in secret and in spite of warnings from the principal against such proscribed behavior.  The only evidence plaintiff has produced to demonstrate that any defendant knew of Turner's conduct was that it was "obvious" to the Owens on the Florida trip that "something was going on."  There is no evidence whatsoever that Hargett had actual knowledge of Turner's wrongful conduct, or that the conduct was of the "nature, character, and frequency" that Hargett or

27

the Board had notice of the misconduct. To the contrary, Hargett investigated every complaint brought to him, and his investigations led to the conclusion — albeit wrong — that Turner was not having an inappropriate relationship with the student. Absent sufficient evidence that any defendant knew or should have known of Turner's sexual harassment of Doe, this claim also must fail. Accordingly, the motion for summary judgment as to defendants' negligent supervision claim is due to be granted.

### IV. RECOMMENDATION

Based upon the foregoing undisputed facts and legal conclusions, the magistrate judge RECOMMENDS that the motion for summary judgment filed by defendants the Blount County Board of Education, Donnie Breaseale, Andy Neill, Gregg Armstrong, David Standridge, Steve Morton, Bruce McAfee, and Allen Hargett (court document #21) be GRANTED, and all claims against these defendants arising under Title IX, § 1983, and Alabama state law be DISMISSED WITH PREJUDICE.

It is further RECOMMENDED that this action be again referred to the undersigned magistrate judge for further proceedings with respect to the claims against defendant Turner.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.

The Clerk is DIRECTED to mail a copy of the foregoing report and recommendation to defendant Jeffrey Neal Turner at 225 Plain View Drive, Oneonta, AL 35121.

DONE this 21st day of July, 2006.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE