IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JR a Minor, by his mother | * | |
| EAR | * | |
| Plaintiffs | * | |
| v. | * | |
| | * | |
| PIKE COUNTY BOARD OF | * | |
| EDUCATION, | * | |
| SAMUEL MARK SUPERINTENDENT | * | |
| BAZZELL | * | |
| Individually and in his official capacity | * | |
| as Superintendent of Schools; | * | |
| TERRY CASEY, individually and in | * | |
| his official capacity as Principal | * | |
| Of Pike County High School, | * | Case No. CV 2:06-cv-1120-MEF |
| BUDDY PYRON, individually and in | * | |
| his official capacity as | * | |
| Principal of Pike County High School, | * | |
| ROBERT MCDANIEL, individually | * | |
| and in his official capacity as Assistant/ | * | |
| Principal of   Pike County High School; | * | |
| CHARLES LESLIE COON, individually | * | |
| and in his official capacity as a teacher | * | |
| at Pike County High School | * | |
| DOE DEFENDANTS 1-5 being those | * | |
| persons legally responsible for providing | * | |
| for the safety of special education | * | |
| students and for conducting | * | |
| investigations of complaints | * | |
| relating to the physical safety of | * | |
| students and for establishing policies | * | |
| and procedures to protect said students. | * | |
| Defendants | * | |

**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff by and through his attorneys of record and submits the following

points and authorities in opposition to Defendants' Motion for Summary Judgment. The

evidentiary submissions made concurrent herewith are adopted and incorporated by reference herein.

## I. Factual Background:[1]

Plaintiff JR was a 15 year old, 10th grade, special education  student at Pike County High School ("PCHS") during the 2004-2005 school year. JR's special education disability designation was mental retardation.  (KB 28).

### A. Defendants

Defendant Charles Coon ("Coon") was an employee of the Pike County Board of Education ("PCBOE") and served as band director at PCHS during the 2004-2005 school year.   (PX 12). Employment continued until the effective date of his resignation on June 30, 2005. (PX 11).   In 2005, Coon pled guilty to sexual abuse of 15 year old JR and sexual abuse of JR's 12 year old brother. (PX 40; PX 41).   As to BF, Coon pled guilty to several counts of enticing a child for immoral purposes.  (PX 37).   AH, another potential victim,  committed suicide the weekend his name was linked to the investigation of Coon. (RB 27-28 & 55-57).

Defendant Mark Superintendent Bazzell ("Superintendent Bazzell") was the Superintendent of the PCBOE during the 2004-2005 school year. (MB 6).

Defendant Terry Casey ("Casey") was an employee of the PCBOE and served as principal of PCHS during the first semester of the 2004-2005 school year.  (TC Aff. 2).

Defendant Buddy Pyron ("Pyron") was an employee of the PCBOE and served as principal of PCHS from January 3rd, 2005 through June of 2005.  (BP Aff. 2).

Defendant Robert McDaniel ("McDaniel") was an employee of the PCBOE and served as

---

[1] Defendants' brief contains a statement of facts which it maintains are "undisputed." Plaintiff does not agree with that characterization as set forth hereinafter.

assistant principal of PCHS during the 2004-2005 school year. (RM Aff. 2)

During the 2004-2005 school year, JR was the victim of sexual abuse at the hands of band director Coon in the band room at PCHS and at his home. (PX 19; PX 34 p. 2; PX 35; PX 36; PX 37; PX 38; PX 40; PX 41). Concerns and reports regarding Coon's repeated failure to adhere to PCHS policies and procedures were known to the PCBOE as early as August 2004. (RM 32; MB 119). Assistant principal McDaniel testified that he had a variety of class management and discipline concerns about Coon, beginning in the summer of 2004. (RM 18-19; RM Aff. 3). Superintendent Superintendent Bazzell acknowledged that McDaniel expressed to him his frustrations and concerns about Coon, in the fall of 2004. Superintendent Bazzell planned to discuss with principal Pyron the need to evaluate Coon and the band program "as to whether he was the right person to continue in that position." (RM 18-19; MB 119; PX 14).

### B. Transporting Students in Private Vehicle

Following band camp in the summer of 2004, assistant principal McDaniel reported "up the chain" that Coon was transporting students in his private vehicle and he [McDaniel] felt like it was unprofessional. (RM 32-33; PX 14).

Principal Casey knew in 2004 that Coon was taking kids home from various school functions (TC 40) and that Coon was transporting BF and AH. (TC 47; PX 14). Coon subsequently admitted to sodomy of BF. (PX 33 No. 00016; SX 3 p. 00029). AH, along with JR, were identified as victims of Coon as a result of the investigation and through a search of Coon's house following his arrest. (RB 12-13, 27-28 & 57). We can never know for sure what happened to AH at Coon's hand because he committed suicide following his identification as one of Coon's victims. (RB 27-28 & 55-57).

On several occasions, JR's mother EAR ("Reed") witnessed Coon driving JR around in his truck during school hours. She questioned JR about it. (EAR 78-79). JR later confirmed to Sheriff Robert Bradbury ("Bradbury") that "...we was out [riding in Coon's truck] during school...he trying to make me smoke..." (PX 34 p.3).

Superintendent Superintendent Bazzell testified "We don't have a policy concerning transporting students. Our practice is to discourage faculty members from transporting students unless... it's an emergency situation..." (MB 162). In fact there was an implicit policy contained in guidelines sent annually to school administrators. Superintendent Bazzell specifically instructed supervisory officials – employees are not allowed to leave campus during the school day without permission from the superintendent. Students are not allowed to leave   campus with anyone without express written parental consent. Written consents were required to be kept on file. (PX 3 pp.15-16).

### C. Removing JR from class to go to the band room

During the fall and throughout the 2004-2005 school year, Coon gave JR passes to leave classes early to come see Coon in the band room.   (EAR 82-86). JR told Sheriff Bradbury that Coon would give him a pass to get out of class to come to the band room. (PX 34 p.11).

Karen Berry ("Berry"), the Special Education Coordinator at PCHS during the 2004-2005 school year, testified she asked two teachers if this **repeatedly occurred** and they said no. Berry testified she never asked any teachers **if this ever occurred.** (KB 8, 51) (emphasis added).

### D. Smoking on Campus

At the beginning of the school year, some students reported to principal Casey that Coon was smoking in the band hall (Coon's classroom) on campus. Casey conducted an

"investigation," and reported the incident to superintendent Superintendent Bazzell. (TC 46). According to Casey, his "investigation" was to go speak to Coon about the situation "... and explain[ed] to him

that the school policy was that there was no smoking on the grounds. And that he should follow those policies, or we would have to take further action." (TC 34).

In fact, PCBOE policy guarantees students and employees a drug free environment. "The ban ...includes any use of any tobacco products by any student or employee...on school property..." (PX 3 p.10). In the student code of conduct, use or possession of any tobacco products is a Class II offense– minimum consequence for repeated offenses ranges from a 5-10 day suspension to a referral to the Pike County Sheriff's Dept and/or recommendation for expulsion. (PX 2 p.0389).

Principal Casey's "explanation" apparently failed to impress Coon. Sometime after the student report of Coon's smoking, guidance counselor Mona Watson ("Watson") reported to Casey she saw Coon smoking on campus. (MW 9; MW Aff. 2). Casey told Watson he had already discussed smoking on campus with Coon and told him not to do it.

### E. Choking a Student

Guidance counselor Watson testified that she frequently witnessed Coon getting angry at the kids, fussing and yelling "And then the next minute, he was their best friend...he just wasn't real consistent." (MW 53).

Then, in November of 2004, Coon "...grabbed a student around the neck in a fit of anger..." The parents of the 7th grade student brought the choking incident to assistant principal McDaniel and he relayed it verbally to principal Pyron who had  (RM 20; RM Aff. 4; PX 10)

come to PCHS in December, 2004 to replace Casey.    (BP 25).

In his  letter of December 2, 2004 summarizing the incident, assistant principal McDaniel told superintendent Superintendent Bazzell  that Coon "...used improper discipline (choking) while attempting to restore order during band practice...Coon admitted that he "lost it"...he admitted placing both hands around the child's neck.  He acknowledged that he may have caused some pain and discomfort to the child due to his size and strength in relationship to [the child], who is considerably smaller in stature..." (PX 10  pp.  0080 & 0082).

The parents also sent a letter to superintendent Superintendent Bazzell, with a copy  to all Board members, reporting the choking incident.  In their letter, the parents observed among other things, "Our son was initially reluctant in disclosing any information..."  ( PX.10 p.0077;  TC 36).

Assistant principal McDaniel issued a "verbal warning" to Coon, who apologized "...And the parents and Mr. Coon had an amiable agreement that he was wrong..."  "...Mr. Coon understands that his actions were far out of bounds:  (RM 20; RM Aff.; PX 10 p.0081).  Principal Casey testified he "remembered talking to Mr. Coon...and that he [referring to Coon] didn't mean to choke him**."**  (TC 35-36).

The faculty handbook strictly prohibits corporal punishment of a  student by a teacher. (PX 8 p.  0526).  According to the student code of conduct, if a student choked another student, it would be  a Class IV offense–the minimum consequence of which is immediate suspension pending a hearing before the Superintendent's Disciplinary Council. (PX 2 p.0398).   Expulsion from school is possible but in any case "...offenses shall be reported to the police authorities for possible action." (PX 2 pp. 13, 16). Superintendent Superintendent Bazzell testified in regard to

the choking incident "...After all this was investigated..."and although Coon... admittedly ...used excessive force "**...**it didn't raise any questions about his mental stability.  He [Coon] admitted in his letter that he was angry and acted inappropriately.  But you know...in the absence of other... situations where he was out of control...I viewed it at the time as an isolated incident for which he knew and understood that it was inappropriate." (MB 102,103; 124).

### F.  BF Cell Phone Incident

During the same month as the choking incident, in November 2004, assistant principal McDaniel confiscated a cell phone from BF because it was against school rules for a student to have a cell phone on campus.  Coon told McDaniel the phone belonged to him.  McDaniel felt Coon's explanation of why a student had a teacher's phone was "inappropriate," but he did not investigate further or contact the student's father to check to see if the explanation given to him by the student and Coon was truthful.  (RM 24-27).

Assistant principal McDaniel reported the incident to principal Casey, who testified when asked what was done about the cell phone incident,    "Same thing we do with any other [cell phone taken].  We try and contact the parents about it and retain possession of the cell phone." (TC 42).  But neither Casey nor McDaniel  contacted BF's parents, nor did they retain the cell phone, nor did they do any further investigation. (RM 23-27, TC 43)**.**

Superintendent Superintendent Bazzell admitted knowledge of this violation of PCBOE policy because Coon called Superintendent Bazzell to solicit his help in getting his phone back. (MB 104).  Superintendent Bazzell testified that he conducted no further investigation but that he told assistant principal McDaniel: "...I don't expect you to give it back to him.  I expect you to follow the policy.  The policy is that if we confiscate a cell phone from a student, it can only be

returned with the knowledge of the parent or to a parent." (MB 105-106). But contrary to PCBOE policy, McDaniel "... returned the cell phone to Mr. Coons, I believe some maybe one, two weeks afterwards–after the child stated that it was an agreement between his father and Mr. Coons that he was allowed to use the phone..." (RM 26).

Superintendent Superintendent Bazzell did not question BF or his father, even though he testified as to the father "...I know Mr. Faulkner. I've known him since...he was 14 years old." **"...**in isolation that [student who has cell phone given to him by teacher] wouldn't necessarily raise a red flag...outside the context of any other thing. (MB 106-162). Here is yet another incident that should have raised serious concerns about a teacher who gives a student a cell phone against Board policy. Instead it is viewed as another isolated incident and is not investigated at all.

All superintendent Superintendent Bazzell and school administrators had to do was follow the procedure outlined in the faculty handbook. It specifically states that **"**The use of cell phones by students

is strictly prohibited. If a student has a cell phone in their possession, it is to be collected by the teacher and turned into the office. (PX 8 p. 0526). According to the student code of conduct, possession of a cell phone by a student is a Class II offense – which at a minimum merits an office referral – but can result in expulsion. But in any case a parental conference is required. (PX 2 pp. 9-10). Neither superintendent Superintendent Bazzell, nor the PCBOE nor any of Coon's supervisors followed Board policy in this situation as it related to Coon. The records indicate that BF was suspended for 5 days on November 19, 2004 for possession of a cell phone but there is no evidence of any disciplinary action against Coon. (PX 14 pp. 0092, 0093, 0094).

### G.  Polly King's Direct  Report to McDaniel

Sometime late during first semester, parent Polly King ("King") was informed by her son MAK that Coon was driving him around in his truck and offering him marijuana cigarettes.  (PK 11-15).  King  contacted a friend who she thinks is named  "Butch Officer Phelps" (herein "Office Officer Phelps") (PK 31-32)  who worked for the Troy City Police  Department in the drug task force section. ( PK 20-21).    She told him of concerns she had regarding Coon and asked for his advice.  King told Officer Officer Phelps of reports of Coon smoking with students, offering them marijuana, riding by her house frequently with students – sometimes during the school day. (PK 12-14).  In particular she identified AH – a child she was concerned Coon might be sexually abusing.  (PK 16, 25)   King told Officer Officer Phelps essentially the same story she told to the school.   Officer Officer Phelps told her to go to the school with her information and if she "...didn't get anything from the school to go to the Brundidge City Police."  (PK 12-13; 20-21; 23).

Parent King went directly to  Assistant Principal  McDaniel and  met with him "a few times" regarding these allegations. (PK 16). She told McDaniel that Coon might be selling drugs or giving them to the kids. (PK 16-17). She told McDaniel that in addition to her son there were two other boys in the car when the marijuana was offered. (PK 34). King's son had told her that Coon had given AH a cell phone and she does not recall whether or not she told McDaniel  about that issue. (PK 40).   Apparently McDaniel talked to King's son on that occasion.  (PK  19). McDaniel and Principal Pyron apparently then met with King and told her there wasn't enough evidence to support the allegations. (PK   (PK  19-20).

Superintendent Superintendent Bazzell acknowledged that "...right around the end of the

9

first semester, beginning of the second" parent King went to PCHS to talk to assistant principal McDaniel about concerns related to Coon.  (PK 13; MB 154; PX 16; PX 13).According to assistant principal McDaniel,  parent King first came to him in January of '05 to complain about a grade her son MAK received from Coon.  McDaniel told King he would look into it and would refer it up the chain to principal Pyron and he [referring to Pyron], in turn relayed it to superintendent Superintendent Bazzell and "...Pyron handled the investigation from there."  (PK 13 & RM 21-23).

During December 2004 and January 2005, parent King met with assistant principal McDaniel – more than once– "a few times" in an effort to convince him of the truth of her allegations.   McDaniel "recalled several conversations..."  (PK 19-20; 16; RM 48-49).  When asked if her son's grade was the only concern King brought to his attention, McDaniel testified "The other concern was–it was not necessarily a concern, it was sort of a warning, threat, that if...the grade, or whatever was not fixed that she was concerned...she would report ...that he [referring to Coon] had a student in his truck and smoked with the student present."  (RM 21-22).

For her part, parent King said she went to assistant principal McDaniel after Coon gave her son MAK and AH a ride home from a football game or from band practice.  MAK came straight to her and said "...I'm not going to ride home with him any more, mama...because they were...smoking pot.  And he kept trying to get me to smoke..." (PK 12-13; 27-28).  After MAK told her Coon offered him a marijuana cigarette, King went to her friend Officer Officer Phelps and then to assistant principal McDaniel and told him "they needed to watch Mr. Coon...I didn't know if he was selling drugs on school or if he was just giving them away to the kids..."  (PK 15-17 & 20).

Parent King discussed other concerns "to the school..." (PK 25; 28) including Coon riding students around - going by her house with kids. (PK 14). In particular, King said she saw Coon "quite a few times with...the little [AH] boy. The one that killed himself." AH and her son MAK were friends and AH lived in her neighborhood. (PK 15; 26). King did not know JR so she would not have known him if she saw him with Coon. (PK 36-37).

Parent King testified she was concerned that AH was being sexually abused by Coon because of her experience with sexually abused children. Before she retired from the Air Force, King was a pediatric nurse specialist. King was also a foster parent in Pike County for 16 years. She took neglected, abused, or very ill children into her home "...I had quite a few children in my home that had been  sexually abused." (PK 5-8). In light of this experience, King noticed changes in AH that alerted her to the possibility AH was being sexually abused by Coon "...because the child...he didn't act right. He didn't act like himself the last year or so." "AH was a real quiet, real easy-going child. He got to where he was nervous...a little bit of a daredevil. Staying away from friends...little things...all the time with Coon. They were going on fishing trips together...camping trips, doing things together all the time." (PK 26; 36). King testified she occasionally witnessed the fishing trips herself when she was at the pond fishing. Her house was the neighborhood hang out and she heard the kids discussing the camping trips. She also heard the kids say that Coon had taken somebody to Six Flags– Coon later admitted he took BF several times. (PK 27; PX 39). King could not remember whether she told assistant principal McDaniel that MAK told her Coon had gotten AH a cell phone. (PK 40).

Principal Pyron branded parent King's complaint  an "...episode over a grade involving band and  a band student, involved criticism of Charles Coon by a mad parent, but nothing was

11

said or suggested that this band parent or band student had any concerns about Charles Coon's conduct with other students."  (BP Aff. 3).    Pyron further testified he "investigated" King's complaint about the grade and "That he [referring to Coon] might have been smoking, I think" because "she was upset."    He said he talked to Coon about the grade, "And the grade had been corrected.  And I guess it was solved.  But the main thing I wanted him to know is that he must validate his grades**.**"  Pyron also told Coon "You can't be smoking on campus."  (BP 27-29).

King felt that assistant principal McDaniel believed her when she relayed her concerns to him but that the kids would not verify it.  MAK "didn't want to be a snitch."  (PK 29).   She testified "... later on that the principal came in and talked to us.  The conclusion was that there was not enough evidence to do anything to Mr. Coon...And, so it was dropped."  (PK 16-17 & 20).

Defendants admit they had no procedure in place to investigate allegations of sexual abuse or inappropriate conduct of a teacher.  (MB 79, 80, 83; TC 48; BP 18, 24; RM 51).  The only investigation principal Pyron conducted of parent King's allegations was to question her son MAK.  (BP 48-49).   Defendants alternately insisted they investigated and denied that King made any reports of possible sexual abuse.  (MB 153; BP Aff. 3).

Guidance counselor Watson, who left PCHS in February 2005, insisted that "...during the time I served as counselor at PCHS no one raised a suspicion to me that ...Coon might be...engaging in sexually abusive conduct with students...if any of them had any suspicions...we would have diligently investigated and turned over any information to the DHR or law enforcement or both...by law, law enforcement and DHR would investigate any suspicious information."  (MW 53-54; MW Aff. pp. 2-4; BP Aff. p. 6)

Guidance counselor Watson's testimony that she/they had no knowledge of parent King's concerns, flies in the face of defendants testimony and her statements that a complaint of sexual abuse would come to the guidance counselor, to the principal and to DHR.  (MW Aff. p.4; TC 59; TC Aff. p.2; BP Aff. p.2; MB 108). Watson acknowledged "...as school counselor...I was one of the "go to" persons at the school if there was any concern about child abuse...and...sexual abuse.  (MW Aff. p. 2).   Superintendent Superintendent Bazzell further testified that "...all of our staff members know and understand that any concern that they have need to go to the counselor or to the principal." "...our schools are very small...their offices are close together...they communicate...every day about issues going on in the school...issues in most cases...go to counselors."   (MB 107-108).   Principal Pyron professed that if he had any information from any source that Charles Coon was sexually abusing a student, I would have brought in DHR..."   (BP Aff. p 6) (emphasis added).  When it came to Coon, the process touted by PCBOE and its supervisory officials broke down and they failed miserably to properly report and protect Coon's students and JR.

The facts, viewed in the light most favorable to JR could show that, even in view of Coon's prior violations of PCBOE policy and the similarity and seriousness of the complaint's brought by parent King of smoking, smoking marijuana with students, transporting students in his vehicle, and concern about possible sexual abuse, the defendants failed to take King's story seriously or report it properly.   Instead,    Superintendent Superintendent Bazzell dismissed King's concerns because   "...parents tend to start looking–when they are mad at a teacher–start looking at reasons why the teacher is a bad person...and King had said...that [assistant principal] Mr. McDaniel relayed to me was that Mr. Coon didn't need to be smoking with the kids down

13

there and riding around in the truck." (MB 135). Defendants failed to take King's concerns seriously, failed to investigate adequately, failed to take any remedial action and failed to report the allegations as the law requires and JR suffered as a result.

Parent King's allegations to school officials in December 2004 and January 2005 are critical in the chronology of the facts of this case. A reasonable jury could conclude that JR would have been spared, if not the sexual abuse that took place at PCHS in the fall, winter and spring, at least the abuse that followed during May and June of 2005. (PX 34 pp. 5-6; PX 36, 38 & 39).

### H. Officer Officer Phelps Report to Superintendent Bazzell

It is notable that Parent King reports she talked to Officer Phelps in the late Fall and that he advised her to go directly to school officials with her complaints which she did when she reported her concerns to McDaniel.

Superintendent Bazzell testified that he received a call from Officer Officer Phelps on March 14, 2005.(PX 13 p. 0104) ; the call was returned by Superintendent Bazzell on March 30, 2008 (PX 13 p. 0105-0106). Officer Phelps told Superintendent Bazzell "...he had received some confidential information ...I needed to know..." In contrast to Parent King's report, Superintendent Bazzell characterized Phelps's information as a "serious report." (MB 131-32).

Superintendent Bazzell testified that Officer Phelps went on to tell him that an informant told him "..that Coon was...using marijuana with students...in his vehicle..." and the names Officer Phelps gave him from the informant were "...AH, JS, LD, AL, TG...and "he [referring to Officer Phelps] mentioned that they were leaving during class time and had gone to..Hardees to get a hamburger." ( MB 132-134). Officer Phelps also told Superintendent Bazzell "... there

is one kid that the other kids make fun of...they refer to...this kid as being his [Coon's] butt buddy..." (MB 136).   Superintendent Bazzell took the butt buddy reference to have a sexual connotation and it raised a red flag.   (MB 137-138).

Superintendent Bazzell immediately recognized the information reported by Officer Phelps as the same story/ allegations against Coon as those made directly to the school by parent King several months earlier and Superintendent Bazzell admits "**Yeah...I never did get a chance to go there on the Polly King situation...We kind of stopped there.**"   (MB 134-35) (emphasis added).

Superintendent Bazzell also testified, as to principal  Pyron and assistant principal McDaniel...as soon as I gave them the information...they...immediately drew the same conclusions that that sounds like what Ms. King said...Last semester...she stated this occurred a month earlier..."  (MB 152-53).

It is unclear to this day whether  Parent King was Officer Phelps "confidential informant" in March of 2005.  King testified she went to Officer Phelps and then went to the school as he directed her to do. This was in December of 2004 or January of 2005.   It was not until March of 2005 (three months later) that Officer Phelps called with information from a "confidential informant."  Although King acknowledged that she knew and might have reported to Assistant Principal McDaniel about AH,  she denied even knowing  JS. (PK 18 & 19).   Thus, there is no explanation as to why  Officer Phelps would have waited three months to call the school other than the possibility of a second informant.

Superintendent Bazzell said he added BF and MAK's names to the list of names given to him by Officer Phelps because "...we wanted to go back and look at the cell phone

15

situation...when you start putting all the dots together. what are the things back there that could support some contention that inappropriate conduct was going on?"  (MB 134-135; 138-139). Of even more concern, Superintendent Bazzell admitted that he "had some suspicion that BF would be possibly the person that Butch (Officer Phelps) was referring to as the butt buddy." (MB 159-160)

On April 1, 2005, Superintendent Bazzell placed Coon on administrative leave. This was the first thing he did because the information came from "law enforcement" and was the first "serious report"  (MB 138-140; 150-152; PX 14; MB Aff. 5-6; 10).  In other words, Parent King's warnings were not taken seriously.

Superintendent Bazzell requested Coon take a drug test.  Despite the fact that the reports of marijuana smoking were originally made by parent King  late in the first  semester no drug testing was done at that time.  When the "serious report" came later in March, Superintendent Bazzell finally requested drug testing.  Despite the fact that he  understood marijuana to stay in the system up to 30 or 45 days, he had Coon take a urine test rather than a hair follicle test which measures the presence of drugs as far back as 90 days.  (PX 14 No. 0089; SX 2 EW Aff. ). "...[H]e [referring to  Officer Phelps] called in March...this is April l$^{st}$.  So we're about two weeks out...based on that information...this was something that happened fairly recently." (MB 142; 150-152; 135-36; PX 14). The urine testing is only valid for a much shorter period and may be adulterated. (SX 2 EW Aff.).

Superintendent Bazzell talked to Coon and he, not surprisingly,  denied the charges. Notably, Superintendent Bazzell did not ask Coon about BF having his cell phone even though he said he wanted to go back and look at that incident.  Neither did  Superintendent Bazzell

question Coon about his "suspicions that BF would be the person that Butch was referring to as [Coon's] butt buddy." (MB 141; 137-38; 160).

Superintendent Bazzell did not personally interview any of the children. He called principal Pyron, Carolyn Townsend ("Townsend") Banks Middle School principal and assistant principal McDaniel and told them to investigate the allegations. He told them to find out who "butt buddy" was, any indication of marijuana and any other inappropriate activity including sexual activity. (MB 158; 143; 155-56).

Lucia Grantham ("Grantham") testified that the principal should never conduct an investigation of sexual abuse allegations because "Who is the most feared person in the school system if you're a child? It's the principal. The child can't tell the principal something bad about a teacher." (LG 35-36; MB Aff. 4). Grantham who worked with the State Department of Human Resources ("DHR") for 15 years , 10 of which dealt with child sexual abuse complaints, was asked by the PCBOE in 2002 to do an in service relating to indicators of sexual abuse for grades K-5 (LG 6-7; 11-12; PX 30). When Parent King reported the same story to Assistant Principal McDaniel in December 2004 and January 2005, the school officials had not been successful in getting the kids to open up. (PK 16-17 & 20; BP 48-49).

Principal Pyron testified that when superintendent Bazzell called him, he told him to look into "...smoking, smoking with students, marijuana and any other inappropriate behavior...he [referring to Superintendent Bazzell] did not say sexual abuse…or ...sexual..." Pyron never mentioned sex abuse in his questions to students, because "That was not part of the investigation." As to whether or not Superintendent Bazzell mentioned butt buddy to him relative to the investigation, Pyron testified that one of the students brought up "... a term that I

17

questioned somewhat.....butt baby." Pyron couldn't remember whether it was one student or all

the students or who that mentioned the term to him "...when someone said that [referring to butt

baby], there was no allegation or no reference to

go–it was not eye opening that there was any activity or anything sexual harassment or abuse."

(BP 53; 54; 55; 36).  Yet Pyron insisted "If anyone had given me any information of any type

suggesting any sexual "grooming" or misconduct about Charles Coon...I would have used every

resource available to determine if that was happening."  (BP Aff. 7).  "If I had any information

from any source that Charles Coon was sexually abusing a student, I would have brought in

DHR and the law officials."  (BP Aff. p.6).

     In addition to student references to "butt baby," principal Pyron admitted that "...at least

one student said he saw Charles Coon driving students in his vehicle during the school day..."

(BP Aff. 4).

     Inexplicably, superintendent Superintendent Bazzell did not inform any of the parents of

the investigation and he did not know if Banks principal Townsend talked to any parents.

Principal Pyron never contacted any parents nor talked to Coon as part of his investigation.   But

when Coon returned to school after the investigation, Pyron told Coon, no smoking on campus

and no transporting students.   Pyron said he did not ask Coon about the butt baby thing.  (MB

149; 152; BP 46-47).

     Nevertheless, on April 8, 2005– at the end of a one week "investigation" –superintendent

Bazzell allowed Coon to return to work– telling him the  investigation would  continue and if

any additional information "...came to our attention, that we would certainly be revisiting his

situation."  (MB 177; PX 14).

Superintendent Bazzell's reinstatement letter to Coon read in part, "...investigation did reveal numerous reports that on several occasions you used cigarettes with students...and...numerous reports of students being transported in your personal vehicle."  (MB 171; PX 14 No. 0101).  Principal Pyron confirmed that "...at least one student said he saw Charles Coon driving students in his vehicle during the school day..."  (BP Aff. 4).

**I.  JR and the Band Room Incident**

"Additional information" came to assistant principal McDaniel and principal Pyron's attention on April 18, 2007 when JR broke a window in the band room in order to get out.  (RM 41; RM Aff. 5; PX 17).  According to principal Pyron "...a child [JR] was in the office, and some other kids was holding the door...he smashed the window to get out..."  (BP 65; PX 17). Assistant principal McDaniel charged JR with criminal mischief and sent him to Alternative School.  (PX 17).

JR's mother testified that she, JR and principal Pyron met in the principal's office regarding the broken window incident.  In the course of his explanation of why he broke the window, JR told Pyron that Coon had given him his cell number and he (JR) had called Coon from the band room.  Pyron called the cell number JR provided and confirmed it was Coon's number.  (EAR 108 109).

This incident occurred after Coon was allowed to return to PCHS and after superintendent Bazzell told him that if any new information came to his attention, he would "revisit" the situation.  (MB 177; PX 14 No. 0101).   In spite of all the allegations and known transgressions on Coon's part there is no evidence that this incident even resulted in Coon being questioned.  Here was yet another situation in which a child had Coon's cell number under

questionable circumstances; the principal knew it and the principal did nothing.   The record will show that JR–as well as his 12 year old brother–  will continue to be sexually abused by Coon into the summer of 2005.  (PX 36).

### J. Criminal Charges and Guilty Pleas

A report of the offense against JR indicates a report of "sexual abuse which occurred on an unspecified date in June of 2005. (PX 39). Coon ultimately plead guilty to sexual abuse of JR in March of 2006. (Case DC 05-438).  (PX 41).  Coon was also arrested for and plead guilty to sexual abuse of Plaintiff's younger brother. (DC 05-272). (PX 41). Coon's confession as to the younger brother is contained in PX 36.   Coon was also arrested on July 6, 2005 for sodomy and sexual abuse of BF (PX 32) and he pled guilty in that case to enticing a child for immoral purposes. (PX 37).   Coon remained as an employee of Pike County Board of Education until June 30, 2005. (PX 11).

## II. Argument:

Summary judgment may be granted only if the Court concludes that " . . . there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   F. R. Civ. P. 56(d).   In making this determination,   the Court will consider the pleadings, depositions,  answers to interrogatories, admissions and affidavits submitted by the parties and in making its review of these matters   "  . . all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,586 (1986); *Watkins v. Ford Motor Co.,* 190 F.3d 1213 (11th Cir. 1999).   Defendants have moved for summary judgment on Counts II through VII of Plaintiff's amended complaint and each will be addressed in turn herein.

**Count II  42 U. S. C. 1983**

Count II of Plaintiff's complaint asserts, in part,  a claim that plaintiff's right to privacy and/or bodily integrity arose out of the failure of the defendants to develop policies and procedures governing issues relating to sexual abuse. There are two sets of policies and procedures at issue: one is policies and procedures directed toward faculty and the other is policies and procedures directed toward students. This claim or cause of action is not an attempt to impose supervisory liability on a *respondeat superior* basis; rather it is when the "execution of the government's policy or custom. . . . inflicts the injury that the municipality may be held liable under Section 1983."  *Monell v. New York City Dept. of Social Services,*  436 U.S 658, 694 (1978).

The Eleventh Circuit, following that holding, has held that "Supervisory liability [under 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  *Brown v. Crawford,* 906 F.2d 667,671 (11th Cir. 1991). More recently, the 11th Circuit opined, "Supervisory liability under Section 1983 occurs . . . when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation" *Cottone v. Jenne* 326 F.3d 1352, 1360 (11th Cir. 2003) and that, "A causal connection may be established: . . . when a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Miller v. King*, 384 F.3d 1248,1261 (11th Cir. 2004). Liability may be imposed " . .. due to the existence of an improper policy or from the absence of a policy." *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

Which brings the inquiry to the "deliberate indifference" standard required under Section 1983 for policy & procedure violations. This deliberate indifference standard has been described as encompassing both a constitutionally flawed policy and "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." [Internal citations omitted] *Doe v. Dallas Independent School District, 153 F.3d 211, 217* (5th Cir. 1998).

The facts of this case indicate the following: The Pike County Board of Education (hereinafter "PCBOE") is responsible for formulating policies (MB-33). The school administrators are responsible for establishing procedures. (MB-33) The school principal, Terry Casey, admitted that he was responsible for developing and implementing policies and procedures to protect students from sexual abuse. (TC 55). The system has adopted (at least in part) two sets of policies and procedures: one directed at faculty and one directed to students

**Policies and Procedures Directed Toward Students:**

The only document remotely relevant to policies and procedures directed toward students is the Code of Student Conduct. (PX-2). This document is generated by the superintendent's office (MB 42-45) and approved by the Board (MB 49). This is a student Code of Conduct and outlines disciplinary infractions that students might commit. (MB 67, BP 9-11). In fact the document indicates it is "policies, rules and regulations of the Pike County School System related to **student discipline."** [emphasis added]. (PX 2 p. 0383). The Superintendent was unaware of any other document that described policies or procedures for addressing sexual abuse

22

issues. (MB 70).  [2] The Code of Student Conduct indicates that sexual harassment is a "Class C" disciplinary infraction punishable by a 5-10 day suspension from school on a first offense. (PX2 p. 0394).

There is absolutely no policy distributed to students or parents indicating that sexual abuse, or sexual contact of any kind (consensual or otherwise) between students and teachers is prohibited **nor** is there any procedure directing the manner in which sexual abuse claims by students against faculty members should be reported. One might assume that students would know that this kind of contact is prohibited but we are dealing in this case with a mentally retarded student who is entitled to the same constitutional protections as others. Accordingly the appropriateness of these policies and procedures with this student, and others similarly situated, require examination.

The Plaintiff was, at the time of the incidents, a 15 year old special education student described as having "mild to moderate" mental retardation with a full scale IQ of 53 placing him in the first percentile with respect to intellectual functioning. (AW 13). An individual with mental retardation has limitations intellectual development and limited adaptive skills. (KB 11-12). The Plaintiff also has deficits in the area of oral expression scoring in the first percentile on the Oral and Written Language Scales yielding an age-equivalent score of 6 years 11 months at a time when the student was fifteen years nine months old. (KB 15-18). He has poor insight and judgment, is very susceptible to the influence of others and may act without recognizing the potential consequences of his behavior. (AW 172). Evaluations indicate the student views the

---

[2] Several other documents were produced including "Essential Administrative Information" which went to administrators and included nothing relating to sexual abuse. (PX-3, MB 54, 64-65); a student planner which had nothing relating to sexual abuse (PX 4, MB 42-45, 59); and a Faculty Handbook which includes nothing relating to sexual abuse (PX 8, BP14, TC 22-23).

world in an overly narrow frame of reference, lacks consistent coping skills,  and is much less willing than most people to approach and process emotional stimuli.   ( AW  176-177 ).   He is also described as "lacking Psychological complexity" which contributes significantly to his coping deficits  (AW  177 - 178 )  and "gullible." (AW 55- 56).

Karen Berry, an administrator with the PCBOE and the special education coordinator acknowledges that there are unique personal safety issues for special education students. (KB 19-20), that mentally retarded children may have impaired judgment, an inability to distinguish right from wrong, and an inability to express themselves.  (KB 39-40).

Lucia Granthan,  who was hired to do one in-service on sexual abuse for teachers in Grades K-5 testified that individuals who are mentally retarded are "certainly" and "absolutely" at an increased risk for being victims of sexual abuse (LG 9),  that these children are easily influenced, can't articulate what is happening to them and are overly trusting. (LG 9-10).  Ms. Grantham testified that all of the research indicates that these children are "very vulnerable" and "at a higher risk" of being subjected to sexual abuse than their non-disabled peers. (LG 11)

While the Superintendent testified that he "may or may not" know that there is an increased incidence of sexual abuse among students with disabilities as compared to regular education students (MB 18) he acknowledged that it was his responsibility to be widely read, informed and educated on this topic. (MB  22-23).  The school principals simply do not know whether or not these children are at an increased risk for sexual abuse. (BP 22,  TC 32-33). Karen Berry, the special education coordinator  was unable to identify any author, study, workshop, or document that she has reviewed on the issue of student vulnerability (KB  25-28),

she has never reviewed the USDOE studies or summaries of research (DX 12)  on this issue and

has not even looked to see if there is any such document. (KB 25-28).

       Plaintiff's expert has opined clearly on the issue of increased vulnerability.

> " these students have a lack of social awareness, a diminished ability to
> distinguish right from wrong, an inclination to want to seek the approval of an
> adult who is in a position of authority, language difficulties that decrease the
> probability of accurate communication with others, including crucial self-
> reporting and self-esteem issues. All of these characteristics place them in a
> highly vulnerable position without the direct training or teaching regarding the
> issues associated with sexual abuse and inappropriate sexual conduct.  It is well
> established in the field of mental retardation, that individuals who have this
> condition will have difficulty learning in an incidental manner.  The education
> and training should be specific and concrete.  There is no evidence that such
> training occurred for JR.  There is no evidence that at any time during JR's
> educational career has he been exposed to the type of training that would increase
> his sensitivity to improper sexual advances.  This special vulnerability results in a
> statistical increase in incidence of sexual abuse and vulnerability to criminal
> conduct generally amongst this segment of the disabled population.  This research
> is comprehensive and professionals in the field should be familiar with this fact.

(DX 11).    In making his analysis plaintiff's expert, Dr. James  Sears,  reviewed and

relied upon the USDOE sponsored study.   (DX 12).   It is clear that Superintendent

Bazzell, Pyron, Casey and Berry similarly could have informed themselves on this issue

and chose not to do so and that their conduct in not informing themselves amounts to

deliberate indifference as it relates to this student which creates the necessary "causal

connection" required by Eleventh Circuit cases.[3]

       This student had no way of knowing or understanding that what was happening to him

was inappropriate, illegal and/or prohibited.  As stated by Plaintiff's expert,  he needed direct

---

[3] The defendants have not identified anyone as an expert witness in this case and thus the undisputed testimony
quoted hereinabove  is that these children are  "absolutely" at an increased risk for sexual violence and that " the
research is comprehensive and professionals in the field should be familiar with this fact."

training regarding issues associated with sexual abuse and would not simply learn this in an incidental manner as other students might.  (DX 11).

Moreover,  the procedures described  in the Code of Student Conduct assuming *arguendo* that they were even applicable to this situation, were clearly out of the reach of this student. First, there are substantial issues as to whether or not the student could even read the Code of Conduct. (DX 11).  Additionally,  the Code of Student Conduct requires the student to present his grievance **to the teacher** and then if he is not satisfied with the result,  he should present a written grievance to the administration. (PX 2).  Is it not deliberate indifference where the only described redress is known to be beyond the capacity of the individual in question?  Dr. Sears in his affidavit posed an analogy which makes the situation quite clear:  The defendants' policies and procedures are akin to leaving a deaf child in a building with only an auditory fire alarm. (DX 11). Plaintiff submits that the sexual abuse which occurred is a "likely consequence" of the defendants' failure to adopt and disseminate policies and procedures that would be understood by and accessible to this student.

**Faculty policies and Procedures:**

PCBOE has a Board Policy Manual  identified as PX-5.  This document is distributed only to teachers, not to parents or students . (MB  39, 41-42).  According to the Superintendent this is "all " of the Board's policies and procedures relating to sexual abuse. (MB 74).  The Superintendent identifies the Board's policy against sexual harassment as the only relevant policy  in the Board document. (MB 75-78).  The policy does not mention sexual abuse and was apparently copied from materials distributed at a seminar. (KB 43-47).  That policy arguably

would prohibit teacher/student sexual abuse nor do the plaintiffs believe that the administration and/or Board in any way condoned this conduct.

However, with respect to procedures for investigating complaints, the manual simply requires personnel to "act promptly." (PX 5 p. 117) As the Superintendent describes the procedures they don't have a list of "what to do." (MB 79-80). For that reason, there is an investigation in the current case which was so completely inadequate that it resulted in Charles Coon being allowed to return to the classroom and to continue his abuse of the plaintiff.[4]

Five students were identified by Officer Phelps' confidential informant as potentially having inappropriate contact with Charles Coon: AH, JS, AL, LD, TG. PX 14 p. 0090). Those individuals are identified in the Superintendent's notes. (PX 13 pp. 0106 & 0109) and the Superintendent is obviously aware that one or more of them may be Mr. Coon's "butt buddy." In addition to the students identified, Superintendent Bazzell included BF in the investigation as he began to "connect the dots" (MB 138) between the cell phone incident and the current questions about "sexual favors." (PX 13 Page 106). Superintendent Bazzell testified that it was his responsibility to investigate sexual abuse cases along with principals and assistant principals. (MB 85). Superintendent Bazzell did not interview any of the identified students (MB 147,158), did not inform any of the parents of an ongoing investigation or have any conversations whatsoever with parents or students about the situation. (MB 147-149, 158). Superintendent Bazzell directed Buddy Pyron to conduct the interviews of the identified students at Pike County

---

[4] There is also a page in PX 5 which relates to "Interrogation by Public Officials" which the Superintendent apparently does not believe is their internal policy for handling complaints of sexual abuse presented to school officials since it was never identified as such by him. The document appears to deal with situations in which Department of Human Resource officials "make it known that they wish to talk with a student" about child abuse or neglect. In these cases educators are directed to report to Department of Human Resources their own suspicions relating to possible abuse, immediately notify the principal and the school nurse. (PX 5 Page 124-125).

High School. (BP 38). Pyron admits he never received from PCBOE or Superintendent Bazzell any written policies or procedures to use in investigating sexual abuse complaints. (BP 24, 61-62). Robert McDaniel, the assistant principal at the high school confirmed that they were given no direction as to how to investigate claims of sexual abuse. (RM 13-14).

Lucia Grantham who had been selected by PCBOE to do in-service on sexual abuse (and who has been identified as an expert by the Plaintiff) opined that the principal is "never" the appropriate person to conduct such an investigation because he is the most "feared person in the school system" and students can't tell the principal something bad about a teacher. (LG 35-36). And so, the school principal who is identified by Lucian Grantham as "never" being an appropriate person to conduct an investigation and had no training in forensic interviewing (MB 146-147, 155, BP 24, 35-38) was designated to conduct the investigation.

Thus, the investigation conducted by Pyron consisted only of questions to **some** of the identified students about smoking, riding in the car and any behavior that was "unbecoming a band director" or "any other inappropriate behavior." (BP 35-38). Pyron did not ask about sexual abuse and asserted that this was not part of the investigation. (BP 45-46, 59-61). No reference was made by Pyron to any sexual conduct of any sort and he never asked if the teacher had touched the student in an inappropriate manner.(BP 59-61). Two of the students apparently were never interviewed (AL and LD)(BP 42-43), he did not contact the parents (BP 45) and he did not contact DHR (BP 46). In essence, without having been given any direction or training, the principal conducted a grossly inadequate investigation that reflected the deliberate indifference required by the statute.

Three months later,  we learn that in fact at least  two of the five identified students (all of whom were in the band)  were the subject of a police investigation relating to sexual abuse by Mr. Coon: one was BF  (RB 55 ) and the other AH  (RB 27   ).  We will never know what happened to  AH because he committed suicide on the day the charges were filed against Mr. Coon. (RB 55)  We do know, however that Coon subsequently plead guilty to sexual abuse of BF the details of said abuse being  reflected in the interview conducted by the Greenville Police Department. (SX 3).

The plaintiff does not contend that JR was identified by Parent Polly King in her initial contact with  Assistant Principal  Robert McDaniel, nor was he identified when  Officer Phelps called after receiving information from the "confidential informant."   Neither was BF identified in that call nor was MAK but both were  put on the interview list because  the Superintendent remembered the  cell phone incident and began  "putting all the dots together."   (MB  138-139). At the conclusion of the investigation Superintendent Bazzell still felt uncertain as to the truth of or falsity of the allegations.  (MB 178).  Defendants appear to believe that because JR was not specifically identified to them that they are shielded from liability.  The undersigned submit that the knowledge they have need not be "that a particular student was being abused" but could be satisfied by knowledge that the teacher was "currently abusing one of his students, even without any indication of which student was being abused."  *Bell v. Board of Education of the County of Fayette et a*l, 290 F. Supp. 2d 701, 706  (D. W.VA 2003), citing  *Baynard v. Malone,* 268 F.3d 228, 238 (4th Cir. 2001). Thus,  the Plaintiff submits that if the Court is satisfied that there is a genuine issue of material fact indicating that there was sufficient notice **any** of the students were being  abused, then the Plaintiff's burden has been satisfied.

29

Despite the fact that all of the identified students were in the Band, at no time did anyone make an effort to determine if there were any special education students in Mr. Coon's classes. (MB 175). The special education coordinator was not alerted to the sexual abuse issue (only possible cigarette smoking) and she did not conduct an investigation as to special education students in contact with this teacher. So, despite the fact that these students are "certainly:" and "absolutely" at an increased risk of sexual abuse (LG 9) and despite the fact that Superintendent Bazzell admits a duty to be widely read, informed and educated on the topic of sexual abuse (MB 23) and despite the fact that the research is comprehensive and professionals should be familiar with it (DX 11 ) no survey of enrolled students who had regular contact with Mr. Coon was made, no investigation, counseling, or inquiry was made. An individual who they continued to suspect to be involved in sexual abuse was provided continued access to his victims. We believe that this is deliberate indifference that resulted in continued abuse.

An appropriate procedure is identified by Plaintiff's expert as follows:

> Moreover, during any investigation of teacher sexual abuse, the student population under that teacher's control should be surveyed to determine if there are any students with special vulnerabilities, such as JR, who should be separately interviewed. The parents of a child with a disability should be contacted to discuss the potential for abuse and to investigate any unusual contact between the alleged abuser and the student. In this particular case, a discussion of the allegations of sexual abuse with the parents of JR would have yielded a wealth of information about the teacher's behavior, including his visits to the student's house, his contact in the chat rooms and e-mail and his invitations to take students to his home.

> In this case, JR is placed in a class with a teacher who has been employed by an unusually conspicuous number of school systems. Allegations had been made that one or more of five band students may have been smoking marijuana with this teacher and that one of the students was known as his "butt buddy." The superintendent clearly understood this reference to have sexual content. At that time a haphazard investigation was made by personnel without any apparent qualifications as forensic interviewers. No survey was done to determine if any of the special education population was in contact with this teacher and whether

30

special investigatory efforts were required with respect to those students.    Thus, the student was left in this class after authorities became aware that there were allegations of sexual abuse of one or more other students in the band and no effort was made to discuss the matter with this student despite the fact that self-reporting was not a viable option nor had the process of self-reporting ever been explained to him.

DX 11.

The concept that special education students are uniquely vulnerable has been recognized by other courts.  "[S]chool officials knew that [the teacher] taught special education students, who might not fully understand the inappropriateness of his actions, and who might be even more reluctant than mainstream students to report teacher misconduct. . ."  *C. M.  v. Southeast Delco School District*, 828 F. Supp. 1179 , 1185 (E. D. PA 1993).

There is one other document that deserves mention although it is unclear to whom this document is directed.  Terry Casey,  the school principal in the Fall of 2004-2005 drafted as a requirement of the State Department of Education a "School Safety  Plan" (PX 9)   which appears to require, in the event of  student on student harassment to require: "The parents of all students  involved  in  sexual  harassment  issues  shall  be  notified  in  all  cases." And for "law enforcement [to] be summoned where a pattern of unsubstantiated complaints have been made concerning  individual students."  (PX 9 p. 0621.  Again,  this document hardly amounts to a prohibition of  teacher-student  harassment,   does  not  outline  procedures  where  there  are allegations of teacher student harassment and, in any event, even assuming it might be applicable to  the  current  matter,   clearly  was  not  followed  inasmuch  as  neither  the  parents  nor  law enforcement were summoned.

Plaintiff submits that a "likely consequence" of the lack of policies and more importantly procedures is continued sexual abuse of these students.  The existence and adequacy of these

policies is clearly a question for the trier of fact "to be determined in light of community standards." *Mirelez v. Bay City Independent School* District, 992 F. Supp. 916, 920 (SD TX 1998).

Finally Count II also encompasses the lack of training of school personnel and students as a further violation of Section 1983. The Supreme Court has held that §1983 violations can arise from a failure to train personnel. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). The Eleventh Circuit has opined that a municipality can be held liable for a failure to train when it is on notice of a need to train in a particular area. *Gold v. City of Miami , 151 F.3d 1346* (11th Cir. 1998*)*.

With respect to administrators (i.e. the personnel placed in charge of this investigation) the school principal was unable to identify any training he received in issues relating to sexual abuse other than saying it might have been touched on in his Master's degree program (BP 20-21); the assistant principal said he received no training at Pike County regarding sexual abuse issues (RM 10-11) and the Superintendent could not recall doing any reading, study, internet research, or review of professional journals relating to the issue of sexual abuse. (MB 25-26).

Pike County Board of Education conducted **one** seminar on sexual abuse issues with teachers in grades K-5, indicating that they knew that this training was required. And yet, despite that fact no similar training was provided to faculty and administrators in grades 6-12.

As a result of that lack of training the Superintendent is unfamiliar with grooming behaviors other than providing gifts (MB 28, 108) (presumably such as cell phones and taking a student to lunch), and the principal had no information on grooming behaviors. (BP 21). There is no training provided to parents on sexual abuse issues (MB 182), no training is provided to

special education students with respect to sexual issues  (KB 29, 34-35) and faculty is not directed to provide any training to these students (KB 35) not even a discussion of "appropriate" and "inappropriate" touching (KB 36) although the special education coordinator does acknowledge this is a personal safety issue. (KB 36).

The Plaintiff submits that in light of these admissions that the lack of training directly caused or contributed to the sexual abuse to which the plaintiff was subjected.  JR received no training on this issue from the system, his parents received no training, his teachers (grades 6-12) received no training, and the administrators received no training.  Whether the so-called "BBST" training was relevant and/or sufficient is a question of fact for the jury. Plaintiff's expert has opined that it is of no relevance.  (DX 11).

Plaintiff's Prayer for Relief seeks a mandatory injunction requiring the development and implementation of policies and procedures for school personnel and for students relating to sexual abuse and  a mandatory injunction requiring teacher and student training on this issue. The undersigned submit that even if the Court determines that the plaintiff is not entitled to monetary relief as against these defendants in their individual capacity,  that plaintiff is nonetheless entitled to mandatory injunctive relief directed to these defendants in their official capacity.  Defendants Motion for Summary judgment does not address this request for mandatory injunctive relief.

**Count III Rehabilitation Act**

Count III of Plaintiff's complaint seeks relief on the basis of the Rehabilitation Act which provides:

No otherwise qualified individual with a disability in the United States, as defined

33

in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. §794. . To succeed on a Rehabilitation Act claim:

" [A] plaintiff must demonstrate that (1) the student is disabled as defined by the Act, (2) the student is "otherwise qualified" to participate in school activities, (3) the school or the board receives federal financial assistance, and (4) the student was excluded from participation in, denied the benefits of, or subject to discrimination at, the school."

*W.L.G. v. Houston County Bd. Of Education*, 975 F. Supp. 1317,1319 (M.D. Ala. 1997).

Remedies available under the Rehabilitation Act include monetary damages and injunctive relief.  The plaintiff seeks both in this case.

The basis for Defendants' motion for summary judgment are unclear.  We are all aware, and believe that it is undisputed that JR is a disabled individual, that he is otherwise qualified to participate in school programs and that the Board received federal financial assistance.  The fourth element is satisfied where a student is subjected to a hostile or offensive learning environment. See,  *Guckenberger v. Boston University,* 957 F. Supp. 306 (D. MA 1997*)*  It is unclear whether defendants are asserting an "exhaustion of administrative remedies" defense  or whether they believe that there is no evidence of "bad faith or gross misjudgment" as described by *M.P. v. Ind. School. Dist No*. 721 F.3d 865, 868 (8th Cir. 2006).   In either case their claims are without merit.

First,  the Plaintiff did exhaust administrative remedies, having filed a request for due process hearing under IDEA and having specifically received an order from the

34

Hearing Officer that none of the issues relating to the sexual abuse are "IDEA" issues. (SX    1).In fact,  the injury here is "non-educational" in nature and Plaintiff is not required to exhaust administrative remedies. *M.Y. v. Special School District No. 1*, 519 F. Supp. 2d 995, 1003 (D. MN 2007).

Moreover,  that contention misperceives the nature of the complaint.   The complaint is that the defendants did not develop policies and procedures that were reasonably required to protect the plaintiff's  personal security in light of his disability. Plaintiff's expert is quite clear in this regard.  (DX 11).  There is no Order a Hearing Officer could have entered to require the defendants to Act on this systemic violation which affects not only the Plaintiff, JR but all other individuals with disabilities in the Pike County School System

Turning to the second issue, whether the defendant's conduct represents "gross misjudgment" the plaintiff submits that the **only** evidence in that regard is the opinion of Plaintiff's expert:

> The procedures that the Defendants have for training, investigating, and reporting, sexual violations against students by teachers, do not adequately address the magnitude of the problem.  Adding the dimension of a disability, such as mental retardation where there is a natural reluctance to self-report, makes the Defendants' deficiencies more reprehensible.

DX 11.

Finally,  Defendants appear to suggest that the Plaintiff was not denied the opportunity to participate in programs or activities but the truth is that the Plaintiff was not able to participate with the same level  of personal security as others and participated

only at greater risk—which in this case resulted in injury to him. Again, the case is not unlike the auditory alarm in the school for the deaf—a reasonable accommodation is to provide an alarm that those students can see. Similarly, a reasonable accommodation is to provide JR with a policy describing sexual abuse in language that he can understand, a clear statement indicating to him that all sexual contact between teachers and students is prohibited, a reporting procedure that is clearly accessible to him and procedures for investigating complaints of sexual abuse that include a survey of students in contact with the offender and special attention or inquiry with respect to disabled individuals with higher than normal vulnerability.

The Plaintiff would also submit that sexual abuse is so " . . . objectively offensive, and that [it] so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities" in the context of a Rehabilitation Act claim. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S. Ct. 1661, 1675( 1999).

Whether or not the Court is prepared to issue an order requiring the payment of compensatory damages, the Court is empowered to issue a mandatory injunction as set forth in Paragraphs D, E and F of Plaintiff's prayer for relief. Plaintiff also submits that the rather draconian "gross misjudgment" and "actual knowledge" standards applicable to the various counts of the complaint under Section 1983, Title IX and Section 504 are not applicable to a prayer for equitable relief and therefore at a minimum Defendants' motion for summary judgment is due to be denied as to this claim for relief.

**Count IV:  Title IX**

Count IV of Plaintiff's complaint asserts a claim that Plaintiff JR was subjected to sexual harassment at the hands of a school official which resulted in his exclusion from, participation in and denial of benefits of an educational program or activity in violation of Title IX, 20 U.S.C. § 1681(a) ("Title IX").  JR asserts  his Title IX claim against the PCBOE and not the individual defendants named in this action because "a Title IX claim can only be brought against a recipient - - that is, a local school district [ receiving Federal financial assistance] - - and not an individual" *Floyd v. Waiters,* 133 F.3d 786, 789 (11th Cir. 1999).

The standard for liability under Title IX requires that "an official of the school district who at a minimum ha[d] authority to institute corrective measures on the district's behalf ha[d] actual notice of, and [was] deliberately indifferent to, the teacher's misconduct."  *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277 (1998).  Each of these requirements will be considered hereinafter.

**Authority to Institute Corrective Measures:**    While    not    denying    that Superintendent Bazzell is an official with authority to institute corrective measures, defendants deny that principals Pyron, and Casey and assistant principal McDaniel were invested with the power to take corrective action on behalf of the Board.  The plaintiff would note at the outset that a factual review of this matter indicates that in every instance, complaints about Coon were reported up the chain of command to  Superintendent Superintendent Bazzell and there is no dispute that he had sufficient authority to take appropriate action.   These reports to Superintendent Bazzell included the transportation of students in a private vehicle, smoking on campus, the choking incident, the BF cell phone incident as well as the detailed report by Officer

37

Phelps to Superintendent Bazzell in April of 2005. See, Section I subparts B, D, E and F hereinabove.

In addition, defendants apparently rely on *Forner v. Breaseale,* 2:04- cv00318-TMP which includes a discussion of sufficiency of authority. In the Report and Recommendation the Magistrate Judge wrote: "Although *Floyd* seems to require notice at the level of superintendent or school board, and rejects the concept that notice to a low-level supervisor is sufficient, it does not explicitly discuss whether notice to a principal who has authority to reprimand a teacher or remove a student is enough, citing, *Floyd v. Waiters*, 133 F.3d 786, 792 (11th Cir. 1998). (Report and Recommendation of the Magistrate Judge at pp. 11-12). The Magistrate concluded that for the purpose of a motion for summary judgment, the principal **was** an official with sufficient Title IX authority since the principal certainly had authority to warn and reprimand and to limit their activities. (Report and Recommendation of the Magistrate Judge at p. 14). Similarly, in the current case, the principals had the authority to reprimand, to reprimand and warn and certainly had the authority to remove the plaintiff JR from this hostile environment in light of his known disabilities and inability to adequately protect himself from this sexual abuse.

In *Davis v. Dekalb County School District*, 233 F.3d 1367, 1372 (11th Cir. 2000) the Court noted, "...the Supreme Court[ in *Gebser*] did not hold that liability must be predicated upon actual notice to the school board or superintendent. Rather, liability could attach upon notice to an "appropriate person." Citing, *Gebser, 524 U.S. at 285-90.* The *Davis* Court decided "We...leave for another day the task of delineating *Gebser's* "appropriate person." *Id*. at 1372.

The defendants rely in large measure on the strict standard of who constitutes an appropriate official articulated in *Baynard v. Malone,* 206 F.3d 238 (4th Cir. 2001) But other

courts disagree with the *Baynard* majority.     Other courts in other Circuits have rejected the *Baynard* standard: "The strict standard articulated by the *Baynard* majority is not consistent with the objectives of Title IX, notably to provide protection for individuals against discriminatory or abusive practices..." *Folkes v. NY College of Osteopathic Med.,* 214 F. Supp. 273, 285 ( E.D. N.Y. 2002).

Plaintiff submits that this Court should allow notice to principals to suffice and/or that in light of their testimony that they passed all information "up the chain of command" that the Court can find that the Superintendent was on notice of all the incidents cited in Plaintiff's brief. Certainly, at a minimum, as of April 1, 2005, Superintendent Bazzell was on notice of all allegations and the final episodes of abuse of the Plaintiff occurred thereafter in June of 2005.

**Actual Notice of Harassment:**   The Court must next consider what constitutes actual notice of harassment. Defendants argue, even if actual knowledge on part of defendant principals and assistant principal is sufficient to impute knowledge to the School Board – the defendants had no actual knowledge. Defendants argue they had no actual knowledge of sexual harassment because 1) the minor child did not report Coon's conduct to any school official; 2) the parents of the minor child did not know about the sexual relationship; 3) Coon's sexual abuse of JR occurred in secret.   These statements misperceive the "actual notice" requirement.

JR does not contest defendants' contention that neither the parents nor any school district official  knew that Coon was sexually abusing JR until he pled guilty in the summer of 2005.  JR does contend that during the 2004-2005 school year, Superintendent Bazzell was variously and repeatedly informed [and thereby put on notice] by principals Casey and Pyron and assistant principal  McDaniel  that Coon had repeatedly violated PCBOE policies as set forth hereinabove

39

and had actual knowledge of a substantial risk to JR in particular and the band students generally.

Plaintiff submits that the Court is not without guidance from the 11th Circuit.  In *Davis v. DeKalb County School District,* 233 F.3d 1367 (11th Cir. 2000) the Court relying on *Gebser v.Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) looked at whether the school district had notice of the "possibility" that the teacher was sexually harassing a student.  *Davis at. 1373.*.

The Report of the Magistrate Judge in the *Fortner* case submitted by Defendants states "A fair reading of *Gebser* and *Davis* compels the conclusion that an appropriate official must know that the improper conduct is occurring in order to be held liable under Title IX.  It appears, however the Eleventh Circuit Court of Appeals interprets "actual knowledge" more loosely." The Report and Recommendation goes on to say "The court (referring to *Davis*) further noted that it "cannot say that the complaint was sufficient to alert [the defendant school board] to the *possibility* that [the teacher] was sexually harassing Plaintiffs...the court's use of the word "possibility" in the appellate opinion suggests that "actual notice" requires far less in this circuit than factual knowledge of the offending conduct, or even knowledge of a substantial risk or probability that the teacher would engage in the offending conduct."  (Report and Recommendation of the Magistrate Judge at P. 8).

The Magistrate Judge then reviewed in detail decisions analyzing the actual notice standard which includes the following:  "an official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, " [*Farmer v. Brennan,* 511 U.S. 825, 837 (1994)]*,  or an official  "knows of underlying facts indicating a sufficiently

substantial danger" [*Id* at 843-844] and be aware of a "substantial risk" and/or a "strong likelihood" of harassment rather than a mere possibility. (Report and Recommendation of the magistrate at 19-20).

Additionally, "A district court in the Eleventh Circuit has noted that "it is generally accepted that the knowledge must encompass either actual notice of...the instance of abuse...*or actual knowledge of at least a significant risk of sexual abuse."* *Jane Doe v. Autauga County Board of Education,* 2:04-cv-1155-WKW quoting *Ross v. Corp. of Mercer Univ.,* 506 F. Supp. 2d 1325, 1348, 2007 U.S. Dist. LEXIS 23590, 60 (M.D. Ga. 2007) (emphasis added).

The Court in *Hart v. Paint Valley Local Sch. Dist.,* 2002 U.S. Dist. Lexis 25720 at 22 (S.D. Ohio Nov. 15, 2002):

> "...concludes that *Gebser* does not require that the offending teacher actually committed previous acts of sexual abuse before the school district may be liable for the teacher's misconduct under Title IX. Nor does *Gebser* require that the appropriate official have actual knowledge of current abuse. Rather, the actual notice standard is met with an appropriate official has actual knowledge of a substantial risk of abuse to children in the school based on prior complaint of other students. While the complaints may be unsubstantiated by corroborating evidence and denied by the allegedly offending teacher, whether such complaints put the school on notice of a substantial risk to students posed by a teacher is usually question for the jury."

Thus, the Defendants argument that they had no actual knowledge of sexual harassment because: the minor child did not report Coon's conduct to any school official and/or the parents of the minor child did not know about the sexual relationship and/or Coon's sexual abuse of JR occurred in secret all fail in light of the foregoing case law. The case law does not require that the child self report, that the parents be aware of the sexual abuse or that the district have direct knowledge of sexual abuse of JR since abuse obviously occurs "in secret." Plaintiff must only

demonstrate knowledge of a substantial risk of abuse and the evidence in that regard from Dr. Sears and Lucia Grantham clearly demonstrates that risk and the fact that knowledge of that risk is well known in the field of mental retardation.

In JR's case, the PCBOE had a disturbing amount of knowledge that Coon had repeatedly violated PCBOE policy that put JR in particular and other students at substantial risk . In light of the continued complaints, Coon's explanations and excuses were always accepted and – other than a one week suspension – not once was he held accountable for his actions. A student observing the PCBOE reaction to complaints about Coon had no reason to believe that any thing they reported about him would be acted upon. It was students who initially reported Coon's smoking on campus, transporting students in his private vehicle, being choked by Coon, smoking marijuana and leaving school with students during the school day. Even when a parent – with the background to spot sexual abuse – reported her concerns to the school, her reports were dismissed and not reported to DHR/law enforcement as the law and Board policy required.

In this case, as noted by the *Hart* Court, "...The evidence of record is at least in dispute as to whether the School District knew [Arnold] posed a risk and whether, in light of that risk, they failed to act to protect the students in his classroom...Actual knowledge of a substantial risk of abuse provides fair and sufficient notice to a school that it may face liability." *Hart*, 2002 U.S. Dist. at 24.

**Deliberate Indifference.** The record demonstrates that the PCBOE – indeed all the defendants – knew or should have known that Coon was a substantial risk, especially to his students and most especially to special needs students such as JR. Defendants argue that even if they had actual knowledge there is no evidence of deliberate indifference.

The "deliberate indifference issue is intertwined with the question of notice since whether the Board's actions were clearly unreasonable must be measured by what was known." *Hawkins v. Sarasota County Sch. Bd.,* 322 F.3d 1279, 1287 (11th Cir. 2003). Defendants point to *Gebser's* liability requirement that the School Board "refuse[d] to take action" or, in other words, refused to "remedy the violation." *Gebser, Supra* at 291. The question then becomes what is appropriate remedial action.

Defendants only argument they were not deliberately indifferent is that they investigated every concern they received regarding Coon. The issue of whether the Board investigated the known facts– smoking with students, transporting students off campus during and after the school day, choking a student, giving a student his cell phone – and known allegations of sexual abuse as reflected in the "butt buddy" report-- in a reasonable manner as defendants claim is in dispute. "Although no particular response is required and the school district is not required to eradicate all forms of sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances. *Vance v. Spencer Co. Pub. Sch. Dist.,* 231 F.3d 253, 261 (6th Cir. 2000)." *Vance* rejected the theory a school district could satisfy its obligations by "merely investigating and absolutely nothing more. Such a minimalist response is not within the contemplation of a reasonable response. *Id at 260.*

In order for JR to prevail against the PCBOE, he must demonstrate that the District's "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances." *Davis v. Monroe,* 526 U.S. 629, 648-49 (1999). In light of JR's disability, and his inability to self-report, the Plaintiff submits that the evidence creates a genuine issue of material fact on the element of deliberate indifference. In fact, the evidence as to this plaintiff

and his inability to self-report is undisputed.

 Plaintiff submits that none of PCBOE investigations proved adequate, especially as to its methods of questioning students and its failure to follow up with parents.  Pyron admitted that "sexual abuse" was not a part of his inquiry—despite the fact that Superintendent Bazzell's own notes relate to "sexual favors." Defendants acknowledge neither the PCBOE nor any school officials made any report to either DHR or law enforcement,  most notably after receiving the initial report   from parent King of inappropriate conduct by Coon in December 2004 or January 2005.  After receiving a further report from Butch Officer Phelps,  the defendants conducted a minimal inquiry which did not include questions about sexual abuse or even inappropriate touching, and failed *in toto* to consider the unique issues associated with a the highly vulnerable and at risk special education population in Coon's classes.    In light of the known circumstances and drawing all justifiable inferences in JR's favor, a reasonable jury could find that PCBOE received actual notice of a Title IX violation  that Coon posed a significant threat of  future sexual abuse and that the Board acted with deliberate indifference and reckless disregard particularly as it relates to the Plaintiff in this action.

**Count V Negligence.**

Count V of Plaintiff's complaint asserts a claim that defendants were negligent in failing to report child abuse or suspicions of child abuse to DHR/and or law enforcement pursuant to Ala. Code § 24-14-3.  The defendants had a non-delegable statutory duty to report child abuse and/or suspicions of child abuse as set forth herein above.  This is not a "discretionary function" as posited by Defendants.  Defendants all acknowledged their statutory duty to report.  (MB Aff. P. 2; MB 88-89 &123; BP Aff. P 2, & 6-8; TC Aff. P. 2; RM Aff. P. 7; RM 57).  In addition,

PCBOE incorporated into its policy the duty to immediately report suspected cases of child abuse/neglect to the Department of Human Services. ( PX 5 No. 0124 & 0125). When parent King reported to school officials in December 2004 and January 2005, those school officials had a non-delegable duty **at that time** to report those allegations and suspicions to DHR/and or law enforcement. None of them did so.

Defendants attempt to assert that there was no duty to report Coon's suspected sexual abuse to DHR or law enforcement authorities in December because the authorities were later involved to the extent that Officer Phelps informed them of his confidential information in March. Since Officer Phelps declined in April to act further, and Superintendent Bazzell was left with suspicions that BF was Coon's "butt buddy" plaintiffs submit that Bazzell and each of the other defendants continued to have a statutory duty to report which was disregarded.

**Count VI   Willful & Wanton Conduct**

Count VI of Plaintiff's complaint asserts a claim that defendants acted with wanton and reckless conduct in failing to report child abuse and/or suspicions of child abuse. Defendants' behavior was wanton and reckless especially as it relates to a mentally disabled student who was unable to act on his own behalf to protect himself from said abuse and/or seek protection or guidance from authority figures. JR. Suffered as a result of defendants' reckless and wanton behavior.

Wantonness is defined in *Ala Code* §6-11-20(b)(3) as "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." "What constitutes wanton misconduct depends on the facts of the case." *South Central Bell Telephone Co. v. Branum,* 568 So.2d 795 (Ala. 1990). The term requires an act done with knowledge or consciousnesses that

not doing the act will likely result in injury. *Lynn Strickland Sales & Service, Inc. v Aero-Lane Fabricators, Inc.* 510 So.2d 142 (Ala. 1987).

JR has presented sufficient evidence for summary judgment purposes, indicating that defendants knew or should have known that Coon presented a risk to his students and to JR in particular. Defendants had knowledge that Coon was in violation of PCBOE smoking policy (TC 34, 46; MB 135), transporting students during and after school (RM 32-33; TC 47; PX 14; BP Aff. 4), assaulting a student (PX 10; RM Aff. 4, RM 20; TC 35-36; MB 102-103, 124) and giving a student his cell phone against Board policy (RM 24-27; TC 40-43; MB 105-106). All of these violations constituted substantial risk to Coon's students and increased liability for the PCBOE. Defendants had knowledge—at a minimum—when parent King reported her suspicions and allegations of drug use and sexual abuse of (AH) in December 2004 or January 2005. (PK 12-17, 20-23; 25-28; RM 21-23). It was at this critical juncture that a jury could find that defendants' lack of reporting was reckless and/or was done in conscious disregard for the law and for the safety of their students—particularly for the safety of the plaintiff in this case. Defendants' reckless disregard for the mandatory reporting laws of Alabama and its own Board policy created circumstances in which harm to students such as JR was a foreseeable outcome. (BP 46; TC 59, RM 57; MB 171).

**Count VII Equal Protection**

Count VII of Plaintiff's complaint alleges that the policies and procedures of the Board did not allow him the same level of personal security, personal privacy and/or bodily integrity as were provided to other students enrolled in the Board's programs. The Supreme Court has held that the disabled are protected against discrimination by the Equal Protection Clause of the

United States Constitution.

> "The Fourteenth Amendment's Equal Protection Clause requires that "any person within its jurisdiction" be afforded the "equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, states are required to treat similarly situated individuals similarly. There are generally two ways in which to establish equal protection violations: (1) establish that an official government statute or ordinance discriminates on its face or (2) establish that a governmental body applied a facially neutral ordinance in a discriminatory manner.
> *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 442-47, 105 S.Ct. 3249, 87

L.Ed.2d 313 (1985).

The defendants in this case ask the Court to find that they do have policies and procedures which (1) allow students to know that sexual contact between a teacher and a student is prohibited and (2) describe for the students the procedures to be followed in cases of sexual abuse. Again, the identified document is the "Code of Student Conduct". (PX 2). As stated hereinabove., Plaintiff submits that this document does neither of these thing. However, to the extent that the Court accepts this document as a "policy and procedure" it is clearly insufficient with respect to a disabled student who (1) cannot read and understand such a document and (2) clearly is not going to be able to take his complaints to the teacher/abuser and/or to submit his grievances in writing to relevant authorities Plaintiff's expert opined:

> [T]here is no indication that JR could have read and comprehended these policies or that they were explained to him orally and on a level at which he could comprehend their content. Here, the Pike County Board of Education and its administrators have demonstrated a completed disregard for the needs for this special population as it relates to sexual abuse policies and procedures. Moreover, any such policy would have to include procedures specially tailored to address students who cannot self-report and/or may be unable to identify inappropriate sexual conduct. There is no indication there were any such policies for this population subgroup. This is not unlike equipping a school for the deaf

47

with only an auditory fire alarm. The students are at special risk from the minute
they enter the building.

DX 11.   If this is the policy upon which the defendants rely then it indicates reckless and

willful disregard for the student's right to participate in the educational process in a non-

discriminatory manner.    And "certainly" and "absolutely" leave him subject to a

heightened threat of violations of personal privacy and security.   (LG 9).

Dated this  2nd day of April , 2008.

s/  Susan Shirock DePaola

**Susan Shirock DePaola**
**1726 West Second Street ~Suite B**
**Montgomery, Alabama  36106**
**Phone:  334-262-1600          ASB: DEP001**
specialeducationattorney@mindspring.com

s/  Deanie Clark Allen

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, Alabama  36106**
**Phone:  334-265-8551          ASB:  ALL067**
dallen@azarlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion  has been served on    the following by ECF or  by  first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on  this the 2nd day of April, 2008.

VIA US MAIL:
Charles Leslie Coon
308 Country Club Drive
Greenville, AL   36037

VIA  ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/  Susan Shirock DePaola