IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JR a Minor, by his mother <br> EAR <br>            **Plaintiffs** <br> v. <br><br> PIKE COUNTY BOARD OF <br> EDUCATION, <br>  SAMUEL MARK BAZZELL <br> Individually and in his official capacity <br> as Superintendent of Schools; <br> TERRY CASEY, individually and in <br> his official capacity as Principal <br> Of Pike County High School, <br> BUDDY PYRON, individually and in <br> his official capacity as <br> Principal of Pike County High School, <br> ROBERT MCDANIEL, individually <br> and in his official capacity as Assistant/ <br>  Principal of   Pike County High School; <br> CHARLES LESLIE COON, individually <br> and in his official capacity as a teacher <br> at Pike County High School <br> DOE DEFENDANTS 1-5 being those <br>  persons legally responsible for providing <br> for the safety of special education <br> students and for conducting <br>  investigations of complaints <br> relating to the physycial safety of <br> students and for establishing policies <br>  and procedures to protect said students. <br>          **Defendants** | Case No. CV 2:06-cv-1120-MEF |

PLAINTIFF'S EVIDENTIARY SUBMISSION
IN RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Part I

Comes now JR by and through his attorney of record and submits the following evidentiary matters in opposition to Defendants' Motion for Summary Judgment.

Depositions:  Andrew Wright

                  James Sears

                  Mark Bazzell

                  Terry Casey

                  Buddy Pyron

                  Robert McDaniel

                  Sheriff Bradberry

                  Lucia Grantham,

                  Karen Berry

                  EAR

                  Polly King

                  Mona Watson

      Plaintiff also refers herein to Affidavits submitted by Defendants in support of their Motion for Summary Judgment.  These documents are not being resubmitted but portions thereof are referenced herein including the affidavit of Mark Bazzell  (Exhibit 2), affidavit of Mona Watson  (Exhibit 4)   affidavit of Buddy Pyron (Exhibit 11 ), affidavit of Terry Casey   (Exhibit 9 ), affidavit of Robert McDaniel (Exhibit 7).

      Dated this  2nd day of April, 2008.

                      s/  Susan Shirock DePaola

**Susan Shirock DePaola**
**1726 West Second Street ~Suite B**
**Montgomery, Alabama  36106**
**Phone:  334-262-1600**           **ASB: DEP001**

specialeducationattorney@mindspring.com

s/  Deanie Clark Allen

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, Alabama  36106**
**Phone:  334-265-8551                    ASB:  ALL067**
dallen@azarlaw.com

### CERTIFICATE OF RETENTION OF ORIGINAL

I hereby certify that the undersigned currently holds the original signature document with any required formalities and will make the same available upon request of the Court or of a party and will retain the hard copy of same as required under applicable rules of procedure.

s/  Susan Shirock DePaola

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion  has been served on    the following by ECF or  by  first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on  this the 2nd day of April, 2008..

VIA US MAIL:
Charles Leslie Coon
308 Country Club Drive
Greenville, AL   36037

VIA  ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/  Susan Shirock DePaola

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                              CASE NO.:

                    2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION

     DEFENDANT.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF ANDREW WRIGHT, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 10:30 a.m.


\* \* \* \* \* \* \* \* \*

## Page 2

```
 1
 2              * * * * * * * * * *
 3              APPEARANCES:
 4   FOR THE PLAINTIFF:
 5   Hon. Susan DePaola
     Attorney at Law
 6   1726 West Second Street, Suite B
     Montgomery, Alabama 36106
 7
 8   and
 9   Hon. Deanie C. Allen
     Azar & Azar
10   Aliant Center, Fourth Floor
     2740 Zelda Road
11   Montgomery, AL 36106
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant
14   One Federal Place
     1819 Fifth Avenue, North
15   Birmingham, AL 35203-2104
16   ALSO PRESENT:
17   Dr. Mark Bazzell
18
19
20
21
22
23
```

## Page 4

```
 1   waived, and that said deposition may be introduced at
 2   the trial of this case or used in any other manner by
 3   either party hereto provided for by the Statute,
 4   regardless of the waiving of the filing of same.
 5       It is further stipulated and agreed by and
 6   between counsel and the witness that the reading
 7   and signing of the deposition by the witness is
 8   hereby waived.
 9               INDEX
10   ANDREW WRIGHT
11   Examination By Ms. Allen               5
     Examination By Mr. Sweeney            23
12
     ANDREW WRIGHT, Resumed
13
     Further Examination By Mr. Sweeney      122
14   Further Examination By Ms. Allen        166
     Further Examination By Mr. Sweeney      182
15   Further Examination By Ms. Allen        183
16   Reporter's Certificate            186
17          INDEX OF EXHIBITS
18   Exhibit Number     Description      Page Number
19   Defendant's Exhibit 5  Composite Exhibit   111
         of East Central Mental Health
20       Records
     Defendant's Exhibit 6  Andrew Wright    121
21       Notes, Bates Stamped 632-655A
     Defendant's Exhibit 7  UAB Admission    122
22       Notes
     Defendant's Exhibit 8  Andrew Wright    124
23       Supplemental Notes
     Plaintiff's Exhibit 25  Notice of          5
```

## Page 3

```
 1
 2
 3              * * * * * * * * * *
 4
 5
 6
 7              STIPULATIONS
 8
 9       It is hereby stipulated and agreed by and between
10   counsel representing the parties that the deposition of
11   ANDREW WRIGHT is taken pursuant to the Federal Rules of
12   Civil Procedure, and that said deposition may be taken
13   before Mary Moore-Wynn, CSR, CCR, as Commissioner,
14   without the formality of a commission; that objections
15   to questions, other than objections as to the form of
16   the questions, need not be made at this time, but may
17   be reserved for a ruling at such time as the deposition
18   may be offered into evidence, or used for any other
19   purpose by either party hereto, provided by the
20   Statute.
21       It is further stipulated and agreed by and between
22   counsel representing the parties in this case, that the
23   filing of the deposition of ANDREW WRIGHT is hereby
```

## Page 5

```
 1       Deposition
 2   Plaintiff's Exhibit 26  Kathy A. Flemming     22
         Aftercare Service Summary
 3   Plaintiff's Exhibit 27  Dr. Fernando Lopez    22
         Progress Note
 4   Plaintiff's Exhibit 28  Treatment Plan,       23
         3/26/07
 5
 6
 7              * * * * * * * * * *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

## Page 6

1          ANDREW WRIGHT
2      (Whereupon, the witness, after having first been
3  duly sworn to speak the truth, the whole truth, and
4  nothing but the truth, testified as follows:)
5          MS. ALLEN:  Usual stipulations.
6          MR. SWEENEY:  Please.
7          MS. ALLEN:  Here's the notice to
8          include.
9          (Whereupon, Plaintiff's Exhibit 25
10         was marked for identification and
11         is attached hereto.)
12              EXAMINATION
13  BY MS. ALLEN
14  Q   Mr. Wright, you've met everybody.  You know who we
15      all are?
16  A   I do believe I know who everyone is.
17          MR. SWEENEY:  The superintendent.
18          THE WITNESS:  Yes.  I have known him for
19          quite some time.
20  Q   Would you state your name, please, for the Record?
21  A   My name is Andrew Wright.
22  Q   What is your address?
23  A   My work address is 200 Cherry Street, Troy,

## Page 7

1      Alabama.
2  Q   And that is the location of what?
3  A   East Central Mental Health.
4  Q   Can you give us a little bit of your educational
5      background?
6  A   Yes, ma'am.  I have a double Major in 1988 from
7      Troy University in criminal justice and
8      psychology.
9          MR. SWEENEY:  Criminal justice and what?
10         THE WITNESS:  Psychology.
11  A   In 1989, I obtained my Master's degree in clinical
12      psychology, specializing in testing and
13      evaluations.  I have been working for East Central
14      Mental Health as a therapist since 1990.  And I am
15      also a licensed professional counselor with the
16      State of Alabama, licensed to do private practice.
17  Q   When did you first begin treating Justin Reed?
18  A   I believe my first contact with him was back on
19      February 23rd.
20  Q   Of...
21          MR. SWEENEY:  Of what year?
22  A   Of this year.
23  Q   That was your first done contact with Justin?

## Page 8

1  A   Yes.  It was my first contact.
2  Q   So, the records that you gave us would have been
3      from other counselors who --
4  A   Yes, that is possibly correct.
5  Q   All right.  So, you began treating him again in
6      2003 --
7          MS. DePAOLA:  Five.  Did you say --
8  A   My first contact was 2007.  But he had prior
9      counselors to see him before my contact with him.
10      He was in services before seeing me.
11  Q   So, you did not counsel him or see him at all
12      until 2007?
13  A   2007, that's correct.
14  Q   So, you were not involved, then, in any way in his
15      being committed to UAB?
16  A   Absolutely.  That happened in February of 2007, or
17      March.
18  Q   All right.  Was that your first contact with
19      Justin?
20  A   My first contact with him.
21  Q   All right.  Would you tell us about that incident,
22      please?
23  A   I received a phone call, I'm going to say

## Page 9

1      approximately 10:30.
2  Q   Excuse me.  And the date would have been?
3  A   I believe it was on the 20 -- 22nd, or 23rd.
4          MS. DePAOLA:  Of...
5          THE WITNESS:  2007.
6          MR. SWEENEY:  February?
7  A   February.  I'm sorry.  And received a phone call
8      from the father requesting help for his son,
9      because he was having several symptoms that seemed
10      to be very out of character for his son:  Extreme
11      agitation; violence towards the father, violence
12      towards his older brother.  His father was very
13      concerned that he could be suffering from some
14      type of post-traumatic stress at this time.  I
15      believe he suffered in the past from ADHD,
16      historically speaking.  But this behavior was
17      totally out of character.  And this went on for
18      about an hour trying to coach the father and the
19      family on how to deal with this crises.
20      The next day, I scheduled Justin for an
21      appointment to see myself.  For approximately
22      several days, we tried to manage him on an
23      outpatient basis.  He did do well for a short

Page 10

1    while. But his temper and agitation symptoms
2    seemed to increase.
3        After a major outburst, he could not be
4    managed on an outpatient basis any longer. And we
5    had to commit him through the Juvenile Court
6    system.
7  Q   When you say to begin with you tried to coach the
8        father --
9  A   Yes.
10 Q   -- through the episode --
11 A   Yes, ma'am.
12 Q   -- that was on the phone?
13 A   Yes, ma'am.
14 Q   And then after that, you scheduled appointments
15       for Justin to come in three or four days in a row?
16 A   I'm not -- whatever the notes reflect. I know we
17       saw him several days in a row. We saw him on the
18       22nd. There was a crisis on -- on February 22nd,
19       2007, is when the initial crisis took place. I
20       saw him again the next day on February 23rd. I
21       saw him again on February 26th.
22       MR. SWEENEY: Twenty-sixth?
23       THE WITNESS: The 26th, yes.

Page 11

1  A   Several sessions in sequence.
2        And he also saw a psychiatrist on
3    February 26th, as well.
4  Q   Who was the psychiatrist?
5  A   Dr. Fernando Lopez.
6  Q   So, you actually saw Justin on those days?
7  A   Absolutely. Yes, I did.
8  Q   Did you have a history -- were you given or
9        provided with a history of --
10 A   Yes, I was provided with a history of Justin's
11       condition.
12 Q   You said that the father felt like that his
13       behavior was more extreme than it had ever been?
14 A   Absolutely.
15 Q   Okay. Did you diagnose Justin at that time?
16 A   Yes. I did give Justin a diagnoses somewhere
17       during this whole episode.
18 Q   What was your diagnosis?
19 A   My diagnoses consisted of historical information,
20       reports from the family, reports from Child
21       Advocacy, as well as my own evaluation of his
22       condition. And my diagnoses or diagnostic
23       impression was Attention Deficit Disorder --

Page 12

1    Attention Deficit Hyperactivity Disorder,
2    predominantly inattention type, in partial
3    remission, as well as Post-Traumatic Stress
4    Disorder, Major Depressive Disorder, severe, with
5    psychotic features; and borderline intellectual
6    functioning. And I believe on Axis IV, I did
7    notate a sexual abuse of 2005 on Axis IV.
8  Q   Okay. Did you attribute the Post-Traumatic Stress
9        Disorder to anything in particular?
10 A   Uhm, yes, primarily from historical information.
11       In trying to, I guess, articulate the symptoms
12       that Justin had over those several months, he
13       always avoided the conversation about the sexual
14       abuse. And I want to say -- and if I might say --
15       I think -- I think Justin and myself, we had a
16       mainly breakthrough on September 10th.
17 Q   Of...
18 A   Of this year.
19       -- and I spent -- I spent more time in that
20       session trying to articulate what feelings were
21       traumatic for him. I spent time consulting with
22       other experts about this condition. I spent time
23       searching the DSM-IV about this condition.

Page 13

1  Q   When you say "this condition" --
2  A   Yes, this condition. Specifically the
3    Post-Traumatic Stress Disorder.
4        And from every indication from the DSM-IV --
5    and if I might backtrack a little bit --
6  Q   Sure.
7  A   -- I spent a lot of time those first several
8        months dealing with the anger, dealing with his
9        depression. Justin was severely depressed during
10       the month of February. Lots of anger in the month
11       of February. We had the commitment process going
12       on. Trying to get him back into school. Didn't
13       really want to push him at that time dealing with
14       the post-traumatic stress, because he didn't want
15       to deal with it.
16       But this past -- I think I'm saying -- moving
17       forward to September 10th --
18 Q   Of 2000 --
19 A   Of 2007, yes. Every symptom I saw in that session
20       when I questioned him about the sexual abuse are
21       classic DSM-IV symptoms for Post-Traumatic Stress
22       Disorder.
23 Q   And -- excuse me. Go ahead.

## Page 14

1  A   I'm sorry.

2        MS. DePAOLA:  Go ahead.

3  Q   You continue.

4  A   Yeah, every symptom he exhibited were classic

5    symptoms -- you've got to excuse my voice; I've

6    got this sinus stuff going on -- but every symptom

7    seemed to be classic symptoms of a Post-Traumatic

8    Stress Disorder.

9      Historically speaking, I wasn't sure if the

10   anger was come from the Attention Deficit

11   Disorder, hyperactivity.  But the more research I

12   have done, it is apparent that the anger -- a lot

13   of the symptoms that we were seeing, were like I

14   said before, textbook symptoms from the DSM-IV of

15   a Post-Traumatic Stress Disorder.

16  Q   Do you relate that or not to the sexual abuse?

17  A   No doubt.  I have to relate that to the sexual

18   abuse.

19       MS. DePAOLA:  Do you want some water?

20      THE WITNESS:  That would help.  I'm

21      sorry.  I should have brought water

22      in here.  I'm sorry about my voice.

23      MS. DePAOLA:  We'll get you some.

## Page 15

1  BY MS. ALLEN

2  Q   You said that you were able to make real inroads

3    with Justin in September?

4  A   Yes.

5  Q   Did Justin ever relate to you what had happened to

6    him?  Was he ever able to articulate that to you?

7  A   No, he's not able to articulate.  But I think he

8    knows that he's been humiliated.  He knows he's

9    experiencing lots of shame.  And the thing that

10   complicates this is the fact that he has a

11   borderline intellectual functioning diagnoses,

12   which means that he suffers from a mild MR

13   diagnoses.  He's not really MR.  He's on the

14   borderline, you know what I mean?  And that does

15   complicate his ability to articulate his feelings.

16      All I know is that any topic I talk to Justin

17   about:  Anger at being committed, anger towards

18   his parents, issues at school, issues about his

19   siblings; you name it; he's a normal young man; he

20   can talk about those things.  But the minute I

21   brought up the sexual abuse, he completely shuts

22   down and disassociates.  That is a strong symptom

23   of a Post-traumatic Stress Disorder.  There is no

## Page 16

1    way he could fabricate that.  And that means that

2    he's experiencing lots of shame.  And he does

3    everything he can to avoid that stimulus.

4  Q   What does "disassociates" mean?

5  A   It means to move beyond a normal conscious

6    thinking into a mode of another personality or

7    completely shutting down as though the person is

8    not there.  And that's what he did in that

9    session.  He would only -- he wouldn't even -- in

10   the rest of that session, he would no longer even

11   talk.  He would only acknowledge my questions by

12   shaking his head.  He would not make eye contact.

13   As a matter of fact, he kept his eyes closed the

14   rest of that session.  He was not the same person

15   again.

16  Q   And you saw that as a breakthrough because --

17  A   Oh, well -- I did.  I did.  Especially when it

18   came to diagnoses and his symptomology and tying

19   that symptomology into what the DSM-IV says a

20   Post-Traumatic Stress Disorder is.

21  Q   So, he was not able to articulate to you what had

22    happened to him?

23  A   He did tell me what happened.  But articulate is

## Page 17

1    an advanced cognitive function.  And to tell me --

2    he told me what happened.  But he was not able to

3    articulate his emotions.  You know what I'm

4    saying?  To say, I feel hopeless; I feel shame; I

5    feel pain; I feel hurt.  Now, he did say he does

6    have some shame and hurt.  But I asked him those

7    questions, and he would shake his head in an

8    affirmative or in a negative like this

9    (indicating).

10      (Ms. Ann Reed present).

11  Q   When you say he did tell you what happened, how

12    specific was he?

13  A   I asked him -- there were some reports to me that

14   he performed oral sex on this gentleman.  He

15   denied that.  I said, did you perform oral sex on

16   this gentleman -- I hate to be so graphic about

17   this -- but he shook his head no like this

18   (indicating).  He didn't say a word.  Because,

19   remember, we're in this dissociative state now.

20   He's no longer verbal.  He did like this, with his

21   eyes closed.  I said, well, did he touch you,

22   fondle you? (Indicating).  That's the way he

23   responded, by shaking his head.

Page 18

1  Q  All right. Let me ask you this: You mentioned in
2     your diagnosis Major Depressive Disorder, I think
3     you said, severe, with --
4  A  Yes.
5  Q  -- severe with psychotic features? Is that what
6     you said?
7  A  Yeah, that's what I said.
8  Q  What do you mean when you say "psychotic
9     features"?
10 A  Him not being able to totally be in control of his
11    emotions or his thoughts and completely not being
12    able to function or to think correctly.
13 Q  Is this or is it not exacerbated by his MR
14    condition?
15 A  Are you asking me if --
16 Q  The psychotic features, the inability to -- how
17    did you put that --
18 A  To control his emotions, to manage his emotions or
19    his person, so to speak.
20       Does the borderline intellectual functioning
21    complicate that, you're asking me?
22 Q  Yes.
23 A  Yes. Absolutely. Lack of coping skills.

Page 19

1  Q  What is Justin's -- in your opinion, do you think
2     that Justin, with counseling, or further
3     treatment, what are his prospects to move beyond
4     or to work through what you have just described?
5  A  Uhm, I guess in psychology, or in psychiatry, we
6     measure cases' prognosis of good, fair, or poor.
7     I would say his is very good, because he's getting
8     counseling. And we have him on the right
9     medications. I mean, really, we've done a great
10    job with these medications for Justin. We really
11    have.
12 Q  What medications is he on?
13 A  Uhm, let me see. Adderall, 20 milligrams 1:00 AM.
14    Just a second. He's on some other meds, as well.
15    And also Lexapro, 20 milligrams.
16       MR. SWEENEY: Which one?
17       THE WITNESS: Lexapro.
18 Q  Lexapro. And what is the Lexapro for?
19 A  It's an antidepressant.
20 Q  So, he is on that for depression?
21 A  Yes, he is.
22       MS. ALLEN: Excuse me just one second.
23 Q  You said you were provided with Justin's records?

Page 20

1  A  Yes.
2  Q  Okay. Have you seen any of the school's
3     assessments of Justin's intellectual ability?
4  A  Uhm, I believe -- I have access. I referred
5     Justin for testing, psychological testing.
6  Q  But you --
7  A  That gave me some information on him.
8       We have some information also in the chart
9     from him seeing someone at East Central Mental
10    Health before I saw him. This was back in 2000
11    when he was 11. So, I had access to those
12    records.
13 Q  But as far as any actual testing, had you seen any
14    actual testing on his intellectual abilities?
15 A  I believe Dr. Warren --
16 Q  I mean prior to Dr. Warren's.
17 A  No. I don't believe that's in here. Now, I could
18    be wrong, but I don't believe that's in here.
19 Q  I just wanted to check and make sure.
20       When you said that his prognosis was good --
21 A  Yes.
22 Q  -- as far as -- I don't know if I should use the
23    word "recovering", but coming to terms or being

Page 21

1     able to deal with what had happened to him. And
2     you said it was good -- well, explain that to me.
3  A  Okay. As far as the severe symptoms of aggression
4     and the anger, sleep disturbance, those kinds of
5     things we saw back in February, I think he can
6     function well, I think, in society, as long as he
7     stays in therapy and remains on his medications.
8     But when it comes to a Post-traumatic Stress
9     Disorder -- how should I say this -- this is an
10    art, and not exactly a science. It depends on the
11    individual, how well he makes progress. I
12    probably should have clarified my statements more
13    earlier when I said that. I'm hoping that through
14    Justin trusting me that we can make progress. I
15    should have clarified that better. But to say how
16    well he's going to be able to deal with the trauma
17    of that event, I probably should have said that a
18    little bit better. I'm not sure how well he --
19 Q  So, if I understand you correctly, you're saying
20    that a lot of his -- a lot of it -- his
21    improvement or his ability to -- will depend on
22    continued counseling --
23 A  Yes.

## Page 22

1  Q  -- and the fact that he's on medication?
2  A  That's correct, yes.  And his willingness to deal
3     with it.
4  Q  Uh-huh.
5  A  His willingness to deal with it.
6  Q  I just have one other quick question:  I recall in
7     the -- in some of the notes, there were some
8     discussion of him hearing voices?
9  A  Yes.
10 Q  What would that be connected with?
11 A  Psychoses.
12 Q  Okay.  Under that --
13 A  Yes.  Yes.
14 Q  -- can you identify these?
15        (Brief off-the-Record discussion.)
16 Q  Can you identify -- what are the numbers of those
17    so I can say them?  I'll read them off, if you'll
18    look at them and then --
19        MR. SWEENEY:  Is this 25, Mary Moore?
20        THE COURT REPORTER:  No, sir.
21        Twenty-five is the Notice.
22        MS. DePAOLA:  This is -- could you give
23        us --

## Page 23

1        MR. SWEENEY:  Let's identify this as an
2        exhibit, though.
3        MS. ALLEN:  I am.  That's why I wanted
4        him to look at them.
5        MR. SWEENEY:  Okay.  But what's the next
6        exhibit in order?
7        MS. DePAOLA:  Twenty-six.
8        Let's mark it.
9        (Whereupon, Plaintiff's Exhibit 26
10       was marked for identification and
11       is attached hereto.)
12       MS. DePAOLA:  We think this is from your
13       records.  Could you identify it?
14 A  This is Aftercare Service Summary, I do believe,
15    from the psychiatric hospital that I referred him
16    to.  Kathy A. Flemming, licensed social worker.
17    Signed by her.
18       MS. ALLEN:  We have marked that
19       Plaintiff's Exhibit 26.  And we're
20       going to mark this Plaintiff's
21       Exhibit 27.
22 Q  See if you can identify this for us, please.
23       (Whereupon, Plaintiff's Exhibit 27

## Page 24

1        was marked for identification and
2        is attached hereto.)
3  A  Okay.  This is a progress note of a psychiatrist,
4     Dr. Fernando Lopez.
5  Q  Did that come from -- where?
6  A  Our chart, Section 2.
7        (Whereupon, Plaintiff's Exhibit 28
8        was marked for identification and
9        is attached hereto.)
10 Q  And we've got this marked Plaintiff's Exhibit 28,
11    if you can identify that, please.
12 A  This is the first page of my treatment plan, dated
13    3/26/07.
14       MS. ALLEN:  I have no further questions.
15       MR. SWEENEY:  Let me see those, if I
16       may.
17       EXAMINATION
18 BY MR. SWEENEY
19 Q  Is it Mr. Wright; is that right?
20 A  Yes.  I don't have a doctorate, so...
21 Q  On how many occasions have you actually seen
22    Justin, beginning, I think, February 23rd, 2007?
23 A  Okay.  Let --

## Page 25

1  Q  Can you refer to your notes where you have a chart
2     or have actually physically seen him?
3  A  Now, I have a service record, and I have the notes
4     in the chart.  So...
5  Q  Okay.  If you will give me the chronology of each
6     and every time you met with Justin.
7  A  Okay.  Okay.
8     Okay.  Now, do you want the context I met with
9     him or correspondence involving crises as well by
10    phone?  Do you want those as well, because a lot
11    of times I would --
12 Q  Conferences with Justin where you met face to face
13    with Justin.  Just the date for starters.
14 A  Okay.  All right.  2/23/07, 2/26/07, 3/5/07,
15    3/19/07.
16 Q  3/19?
17 A  Yes, sir.
18    4/9/07.  I believe 4/16/07, 4/25/07.  Do you
19    want the doctor's contact with him, or just mine?
20 Q  Just yours.
21 A  Okay.  6/11/07, 7/2/07, 8/6 -- wait a minute.  Let
22    me back up for a minute -- 8/7/07, 9/10/07.  And
23    those are the ones that I have had sessions with

Page 26

1    him.
2  Q  So, September 10 was the last time you saw him?
3  A  I saw him a week later with the family session,
4     but I primarily treated the whole family that day,
5     because the family has been through a lot, death
6     of the father.
7  Q  So, that would have been around 9/17?
8  A  Yes, sir.  Yes, sir.
9  Q  Do you have the exact date there?
10  A  I don't think I do on that, yet.  But I could
11     obtain that for you.  I don't have that on me
12     right now.
13  Q  What do your notes indicate took place on
14     February 26?
15  A  Uhm --
16  Q  Do you have your notes before you?
17  A  Yes.  Uhm, on that date, on February 26th -- one
18     moment here.
19  Q  Let me build, Mr. Wright, chronologically.  You
20     got a call from Mr. Reed on the 23rd?
21  A  That's correct.
22  Q  Or the 22nd.  I'm not sure.  Do you --
23  A  The 23rd.

Page 27

1  Q  The 23rd?
2  A  I believe it was.
3     The 22nd.  The 22nd.
4  Q  The 22nd.  Did you take an intake report of what
5     he reported to you?
6  A  Yes, I did.
7  Q  And what information did Mr. Reed give you on
8     February 22nd?
9  A  Okay.  All right.  Okay.  What happened was on
10     that evening, I was informed about the extreme
11     agitation and aggression towards the father and
12     brother.
13  Q  All right.  So, this happened in the evening he
14     called you?
15  A  In the evening, yes.  This was about 9:50 -- about
16     9:50.
17  Q  Were you on emergency call --
18  A  I was on call.
19  Q  -- that's why it was referred to you?
20  A  Yes.
21  Q  You had no prior knowledge or history about Justin
22     at that point?
23  A  I did not.

Page 28

1  Q  Had you had any prior contact with the family --
2  A  None whatsoever.
3  Q  -- prior to that date?
4  A  None whatsoever.
5  Q  You just happened to the emergency officer on
6     call?
7  A  That's correct.
8  Q  So, the father calls at 9:50.  And what does he
9     share with you?
10  A  The initial phone call was made by Mona Watson, of
11     Child Advocacy.  She, in turn, connected me with
12     the father who had called her.  Mona gave me the
13     history of the case, basically what was going on
14     as far as him being traumatized two years ago.
15     Sheriff's office was called for backup to help
16     control the situation.  That's how out of hand
17     that situation was.  I had made several phone
18     calls to psychiatric hospitals trying to find a
19     bed for him that night.  Couldn't find one.
20  Q  What was going on between Justin and his father or
21     family as reported --
22  A  Okay.
23  Q  -- in your notes?

Page 29

1  A  Father reported that he had taken the car without
2     permission.  Became very aggressive when the
3     father confronted him about that behavior.  Hit
4     the brother.  Bit the brother, bit him
5     (indicating), with his teeth.  Sheriff's office
6     arrived.  And when the sheriff's deputies arrived,
7     I believe he had calmed down.  So, they did bring
8     him under control that night and managed him until
9     the next day until I could get the court
10     proceedings started.
11  Q  And then the next day you began that process on
12     February 23rd?
13  A  I did.  But because he had improved the next day,
14     we put that court process on hold.  Because we
15     thought he could manage -- we thought we could
16     manage his anxiety and depression and aggression
17     with medication and counseling.  But it got worse
18     after that.
19  Q  What do your notes show you did on the 23rd?  Did
20     you meet with Justin?
21  A  Uhm, yes, I met with client, dad, mother, and
22     brother of client.
23  Q  What did you do when you met with him?

**Page 30**

1  A   Okay. We set a plan of action in place.

2  **Q   What was the plan of action?**

3  A   Uhm, the plan of action was for Justin to agree to

4      not take the car without permission, not to miss

5      any dosages of his medication. Also -- it's a

6      contingency plan that we set in place for him --

7      no aggression or outbursts. And talk to parents

8      about any frustrations he may have.

9          Now, here's the thing about Dustin (sic). In

10     the past, he would hold any frustration that he

11     had pent up on the inside of him until it built to

12     a point that he would explode. And according to

13     talking to the father that day, this appears to be

14     the situation at this time; that he had been

15     letting this build and build and build. And then

16     finally that evening, he just exploded, became

17     aggressive, biting and hitting people.

18 **Q   What was your plan on how to help him control this**

19     **aggression?**

20 A   The plan is take his medication. No more physical

21     violence.

22 **Q   I mean, you just told him, no more physical**

23     **violence, or was there behavior management --**

**Page 31**

1  A   Yes, this is behavior management, yes. And to

2      talk out his frustrations.

3          Now, the behavior management is, if you can do

4      these things, and you don't have anymore

5      aggression or outbursts, you come in for

6      counseling, and take your medication, then we

7      won't have to court order you to the hospital.

8      The behavioral therapy is, you have -- how should

9      I say this? You have behavior, and you have

10     consequences. We treat the behavior; therefore,

11     change the consequences. And the consequence here

12     is that we don't want you to go the hospital to be

13     restrained to get treatment. If you will do these

14     things, this won't happen.

15         That worked for a while with him. But after

16     several weeks, we had a relapse of symptoms.

17     So...

18 **Q   But you thought because of your interchange with**

19     **him and the knowledge that you had that explaining**

20     **the consequence would have a therapeutic --**

21 A   Yes.

22 **Q   -- benefit?**

23 A   Yes. Absolutely.

**Page 32**

1  Q   So, even though he's mildly retarded, his

2      retardation is not so severe that he can't

3      understand rational explanations?

4  A   Absolutely.

5          MS. DePAOLA: Object to the form of the

6          question.

7  Q   Is that correct?

8          MS. DePAOLA: Object to the form. You

9          can answer.

10         MS. ALLEN: You can answer.

11 BY MR. SWEENEY

12 Q   You can answer.

13 A   Oh, I'm sorry. Yes. I thought that he

14     functions -- well, I know that he functions high

15     enough to understand consequences. But his

16     condition was so severe that he couldn't

17     articulate -- the word she used earlier -- or

18     manage his behavior. Therefore, he's severely

19     mentally ill, or we call a child that's SED.

20 Q   Now, at that point, on February 23rd, did you make

21     a diagnosis as to the origin of his anger?

22 A   I did not make a diagnoses. Primarily working

23     with impressions up until that point. Well, let

**Page 33**

1      me look at my notes here.

2          On the 23rd, I gave him an initial impression

3      of ADHD disorder, NOS.

4  Q   Did you do any testing, or was this just from

5      observing him?

6  A   Observation. History and information from

7      parents. I made a referral for testing several

8      weeks later. And also did my more thorough

9      evaluation process in March.

10 Q   Okay. All right. Do your notes indicate any

11     other action taken on the 23rd?

12 A   Uhm, I rescheduled him to see me again on

13     February 26th.

14 Q   Did you do any testing of any type on the 23rd?

15 A   I did no testing. I didn't do the testing,

16     myself, because I wanted an expert to see him;

17     somebody that specializes in testing. And I made

18     a referral for him. And I may have the referral

19     date for that testing if you'd like.

20 Q   Okay. If you made a referral on the 23rd, what

21     did you refer him to be tested for?

22 A   Okay. I didn't make that on the 23rd. I made

23     that several weeks later.

Page 34

1  Q  Okay. Well, let's follow in sequence. You
2     scheduled a meeting on the 26th. What do your
3     notes indicate occurred on the 26th? What
4     information did you get, and what was your
5     diagnosis or plan or reaction?
6  A  Okay. It says CLO saw client in office today.
7        MS. DePAOLA: Wait, wait, wait.
8        THE WITNESS: I'm sorry.
9        THE COURT REPORTER: No, I'm fine.
10       MS. DePAOLA: Okay. Go ahead.
11 A  It says CLO -- that's myself, which means court
12    liaison officer -- saw client in the office today.
13    CLO came up with a plan of action to help client
14    stay out of the crisis stage.
15       Here's the thing with clients like Justin. If
16    you can head off the stimulus that will lead the
17    client into a crises, you can prevent the crises.
18       So, in other words, in behavioral therapy,
19    there are little queues of stimuli that help
20    promote a total meltdown, outburst of anger, or
21    enter into a -- how shall I say this -- a severe
22    psychotic episode.
23       The plan of action was -- is to develop a plan

Page 35

1     to help him from moving up that scale to prevent
2     him from escalating.
3  Q  What was the stimuli that you wanted to help him
4     avoid?
5  A  Uhm, Number 1, we talked about -- in the
6     appointment before the 26th -- is that whenever he
7     felt frustrated, not to keep those frustrations
8     in, but to share those frustrations. And this is
9     a part of anger management: Appropriately dealing
10    with stress as opposed to dealing with it
11    inappropriately.
12 Q  Did he seem to understand that plan of action?
13 A  I felt like he did. And, like I said, I thought
14    that worked for several weeks, and it did work for
15    several weeks.
16 Q  What else did you do or recommend?
17 A  That he continue to take his medications, continue
18    to voice concerns about his illness.
19 Q  What was the illness?
20 A  The Attention Deficit Disorder at this time. And
21    treating his ability to articulate his feelings.
22       We basically stayed there with that technique
23    of communicating.

Page 36

1        And something else we did, also, was set up a
2     behavior modification plan for him that if he went
3     one month without temper outbursts that his
4     parents would reward him for good behavior.
5  Q  All right. Is that documented in your --
6  A  No. I didn't put that in my notes. I probably
7     should have. But we did do that. The mother can
8     verify that. I -- but I should have wrote that
9     down.
10 Q  Now, how do you remember that that was the plan
11    that was put into effect the 26th without any
12    notations?
13 A  Well, because I have pretty good insight into what
14    I tell my clients. So, that's why I know.
15       But, anyway, I probably should have wrote that
16    down.
17 Q  Well, I'm not questioning that. I just want to
18    make sure when you put that in effect.
19       So, you thought Justin had enough cognitive
20    control that he could understand a plan of action
21    over time and understand the beneficial
22    consequences of controlling his behavior?
23 A  Yes. Now, you asked me that question about when I

Page 37

1     put that in place. I put it in place that day,
2     because right here, client was given behavior
3     modification techniques. So, I did document that
4     on the 26th.
5  Q  And you thought based on your two sessions with
6     him that that's something he could understand and
7     faithfully follow so that there was some prospect
8     of success?
9  A  Absolutely. And all indications that that was
10    working. And like I said --
11 Q  Well, what happened on March 5th?
12 A  Okay. On March 5th -- okay. It says here on
13    March 5th, continued behavior modification
14    therapy, or behavioral therapy. We continued that
15    same vein of treatment.
16 Q  Was he --
17 A  I documented he appeared to be less withdrawn.
18 Q  Okay. He was beginning to communicate with you?
19 A  Yes, he was. He was. Also did not appear to be
20    aggressive or agitated. No stealing behavior. No
21    acting-out behavior that we had saw the month
22    prior. No violent behavior. And I rescheduled
23    him to see me, again, on March 18th.

Page 38

1  Q   All right. So, the reasons to believe that the
2      medication and behavior modification plan were
3      working?
4  A   That's the way it was looking.
5  Q   Then the next meeting was March 19th. What
6      happened on the 19th?
7  A   Okay. Saw client and mother in the office.
8      Current behavioral problems. Again, every time he
9      come in, we address those problems or symptoms
10     that lead to a complete crisis situation. And
11     none of those symptoms that were leading to a
12     complete outbursts were exhibited by the client;
13     according to the client, and according to the
14     mother.
15 Q   So, he was still managing his behavior fairly
16     successfully?
17 A   Yes, he was. Yes.
18 Q   Did you change your plan of action or do anything
19     different in that session?
20 A   Give me one second to read this.
21     Okay. During this session here, we're
22     starting to see some inconsistencies or -- in his
23     behavior. He's starting to slip a little bit in

Page 39

1      his behavior now. There were some things as far
2      as him breaking rules again. No stealing of the
3      car -- no stealing of the car, but placing
4      himself -- placing himself in situations that
5      would lead him into a crises situation.
6          I think -- I don't know if I ought to go into
7      detail about these things or not. If you want to
8      ask me those, I'll give them to you.
9  Q   Yeah. What was it that he was actually doing?
10 A   Uhm, not wanting to go to school was one thing.
11     Going up to his grandmother's home, grandfather's
12     house, when he was not supposed to go up there.
13         Because one of the queues to his anger and
14     aggression is being teased, I think, by his
15     cousins, being teased by his family. His cousins
16     are very young. I guess a little bit younger than
17     he is. And being lied on also by his cousins.
18     They have a tendency to lie on him. These things
19     seem to set him off at times. And I had asked him
20     not to go to his grandmother's house or to his
21     cousins' house, because that would only create an
22     environment for him to lose control.
23         So, I was trying to offer him more control to

Page 40

1      prevent him from having a stimulus that would
2      cause him to become more angry or upset or easily
3      agitated.
4  Q   Okay. Did you do anything else? How did you
5      counsel this behavior slippage that you've made
6      reference to?
7  A   I reminded him about the reinforcements that we
8      talked about; rewards that would come if he did
9      the right behaviors, and the fact what would
10     happen if he did have a complete meltdown to
11     follow, and his anger, again.
12 Q   So, based on your relation with Justin through
13     those three meetings, you were concluding that he
14     understood good behavior?
15 A   Uh-huh.
16 Q   And bad behavior?
17 A   Yes.
18 Q   And that there were consequences for bad behavior?
19 A   That's correct.
20 Q   And you thought that in your discussions with him
21     that that was clear that he understood?
22 A   Yes.
23 Q   Okay. Did you change any medication or do any

Page 41

1      referral for testing at that point?
2  A   Uhm, well, by this time, I had received back -- it
3      says here on this date, I covered psychological
4      tests -- testing with him that day. That's what
5      it says here in my notes. So, evidently, I
6      already had made the referral, and we covered the
7      psychological testing information from the
8      psychologist.
9  Q   Okay. What were the tests that were done, and
10     what were the results of the tests?
11 A   Okay. I will have to locate that information
12     here. Let me see if I can see what section we put
13     it in. Hold on a second here.
14         Okay. One of the assessment tools --
15 Q   All right. You're looking at what document?
16 A   This is the complete psychological evaluation.
17 Q   And it was done by who and what date?
18 A   Dr. Fernell Warren.
19 Q   Is he with East --
20 A   No, he's just a consultant -- I mean, he -- we
21     make referrals for our psychological testing.
22 Q   Is he in Troy?
23 A   He's in Troy.

---

Page 42

1    **Q    What test did he undertake?**
2    A    He did several instruments.
3    **Q    What did he do?**
4    A    Okay. He did the Reynolds Intellectual Assessment
5        Scale. He did Wide Range Achievement Test. He
6        did the Behavioral Rating Inventory of Executive
7        Functioning. He did the Behavioral Assessment
8        System for Children, an Attention Deficit
9        Hyperactivity Disorder test.
10   **Q    When did he do this battery of tests?**
11   A    2/27/2007.
12   **Q    Okay. Given the test data that you had before**
13       **you, was there anything particularly significant**
14       **from your counseling perspective?**
15   A    Uhm, one of the things -- I underlined several
16       things that stood out for me. And I want to flip
17       through this so I can see things that were
18       significant that I didn't know. Most of the stuff
19       he did kind of reinforced what I already knew.
20       Hang on a second here.
21           Okay. It says here, personality and emotional
22       assessment, Behavioral Assessment System for
23       Children, some of the items that stood out for me

---

Page 43

1    I think was seeing things that others -- I mean,
2    seeing things that are not there. He says he
3    responded to that often. That's a visual
4    hallucination. Threatens to hurt others, and he
5    said sometimes. That stood out for me.
6        Hits other adolescents. He said sometimes.
7    That stood out for me.
8        Eats things that are not food. He said often.
9    That stood out for me.
10       Hears sounds that are not there. He said
11   often on the test. That stood out.
12       Easily annoyed by others, almost always. That
13   stood out for me.
14       Just a second here. This test is kind of
15   lengthy here, so bear with me. Testing of the
16   intellectual testing. And this kind of confirmed
17   that he functions in the borderline level. So, we
18   already know that. I won't say that again.
19       Okay. On the Behavior Assessment System for
20   Children, one of the things that stood out as
21   being significant in the testing, critical item,
22   he said -- the psychologist suggests that the
23   interpretation of this was -- is that -- it says

---

Page 44

1    here that the Behavioral Assessment System for
2    Children also identifies certain responses as
3    critical items, because they suggest potential for
4    causing harm to one's self and others. And that
5    was significant in this testing. And I just read
6    all those items.
7        So, that stood out for me. And that did
8    affect, basically, the approach we had in therapy.
9    And -- which led up to the point -- and I am
10   jumping ahead of myself here -- but led up to the
11   episode where we court ordered him to a
12   psychiatric hospital.
13   **Q    Okay. We'll visit that in a minute. With regard**
14       **to hallucinations, what is the cause or**
15       **explanation for hallucinations in any person?**
16   A    It could be to a mood disturbance, a mood
17       disorder, characterized by mood swings, being
18       extremely sad or extremely hyper. In his case, we
19       attributed that to him being extremely depressed.
20       And could be -- and we feel that it's exacerbated
21       by the Post-Traumatic Stress Disorder, the
22       depression is.
23   **Q    Have you reviewed his records to determine if**

---

Page 45

1    **there was any prior reference to hallucinations in**
2    **his life while he's been under treatment?**
3    A    I'll flip back to a note that I have access to.
4    **Q    Do you know of any information --**
5    A    Okay.
6    **Q    -- from his history that would indicate**
7    **hallucinations in the past?**
8    A    According to the documentation I see here in 2000,
9        there is no mention of any hallucinations at that
10       time.
11   **Q    All right. Is there any history of violent or**
12       **aggressive behavior or anger management issues for**
13       **him?**
14   A    I think that there is probably some emotional
15       oppositional-type symptomology, but none to
16       reflect aggression or assaultive behavior.
17   **Q    But just testifying from memory, you think that**
18       **Justin did have anger problems sometime in the**
19       **past prior to the alleged sexual abuse?**
20           **MS. DePAOLA: Object to the form.**
21   A    Okay. I'm looking at the -- if I may have a
22       minute to look at the documentation we have going
23       back to 1998. It appears here problems coping,

---

Page 46

1    social functioning, not wanting to go to school.
2    But nothing that resembles oppositional
3    defiant-type behavior, Attention Deficit Disorder.
4  Q  **Well, based on the record, why was he initially**
5     **referred for evaluation or treatment by mental**
6     **health?**
7  A  Okay. Oppositional behavior as well as Attention
8     Deficit Disorder.
9  Q  **So, in 1998, he had oppositional behavior**
10    **problems?**
11 A  Yes, as well as Attention Deficit Disorder.
12    Sometimes those disorders go hand in hand.
13 Q  **But those predated by seven years any reference to**
14    **the sexual abuse?**
15 A  Excuse me. I'm sorry.
16        Yes. But no anger, no intense anger, none
17    documented, or aggression.
18 Q  **Is there any reference in the history to problems**
19    **with his parents, problems with his siblings?**
20 A  It says a parent/child relationship problem, but
21    not to the point of violence or intense anger.
22 Q  **What does the record indicate?**
23 A  Okay. Basically, the same kind of stuff that we

Page 47

1    have talked about already: Not communicating like
2    he should; not having an appropriate relationship
3    with his parents; being very disruptive in nature
4    in his classes, but that's relating to the
5    Attention Deficit Disorder.
6  Q  **What is the reference to school that indicates**
7     **that?**
8  A  No problems basically in school.
9  Q  **Now, let's wait a second. You just said problems**
10    **at school. But the records show no problems in**
11    **school; correct?**
12 A  Okay. The problems in school --
13 Q  **Well, let's look --**
14 A  There are two problems in school.
15 Q  **Let's look at the records, Mr. Wright. In that**
16    **entry, does it say parent problems, but no**
17    **problems at school?**
18 A  Okay. There is two kinds of problems in school.
19 Q  **I want to know what the records say --**
20        MS. ALLEN: Let Mr. Wright --
21 A  Well, I was trying to explain what the record
22    said.
23 Q  **Okay. First, if you will read what the record**

Page 48

1     **says.**
2  A  Okay. Okay.
3  Q  **Please.**
4  A  All right. There is a parent/child relationship
5     problem.
6  Q  **Is that what it says?**
7  A  That's what it says.
8  Q  **Okay. Read it verbatim to me.**
9  A  Okay. Parent/child relationship problem.
10 Q  **What else does it say?**
11 A  Inconsistent discipline, lack of appropriate
12    communication. We talked about that. The goal is
13    to improve discipline techniques, improve
14    communication skills, improve relationship
15    basically with the parents. Okay. That's under
16    parent child problem.
17        Now, moving to Attention Deficit Disorder.
18 Q  **Let me stop just a minute just there for a second.**
19    **So, back in 1998, East Central Mental Health**
20    **was identifying adaptability problems of this**
21    **child, communication problems, and addressing**
22    **those?**
23 A  That's correct.

Page 49

1  Q  **And your records indicate that those were being**
2     **addressed --**
3  A  That's correct.
4  Q  **-- in a meaningful fashion --**
5  A  That's correct.
6  Q  **-- in 1998?**
7  A  That's correct.
8  Q  **All right. Now, I interrupted you. What about**
9     **the attention deficit problems?**
10 A  Okay. Difficulty completing tasks, disruptive in
11    class.
12 Q  **Is that what it says, "disruptive in class"?**
13 A  Yes. That's what it says.
14 Q  **Show me that where it says "disruptive in class".**
15 A  Okay. Right there.
16 Q  **Disruptive -- uh-huh.**
17 A  Difficulty staying focused. Now, those are all
18    classic Attention Deficit Disorder symptoms.
19 Q  **Okay.**
20 A  Okay. The next major heading under the same
21    Attention Deficit Disorder is -- the goal is, now,
22    to treat that monitor and control faults. Monitor
23    control through medication. And then on the

Page 50

1   subsection of that, improve ability to complete
2   tasks, eliminate disruptive behavior, improve
3   ability to stay focused. People that have
4   Attention Deficit Disorder can't stay focused, and
5   they are disruptive, because of the nature of the
6   illness.
7   Q   How did East Central Mental Health address the
8       parent/child issues?
9   A   Okay. Give me one second here. Sometimes we have
10      individual therapy, and sometimes we do family
11      sessions with the parents.
12  Q   Would there be notes and records from some source
13      concerning 1998 issues with the family?
14  A   Yes.
15  Q   Where would they be?
16  A   In the chart. Hold on one second. Okay. You
17      want it retroactive back to my first note here.
18      Okay. One of the notes we have here, back on
19      3/15/99, refusing to talk. I can't read the
20      doctor's note. Avoiding eye contact. Taking his
21      PO meds as ordered. And the doctor placed him on
22      Ritalin and other medications. So, let me go a
23      little further here trying to find the therapists'

Page 51

1   notes, because I think that's what you're looking
2   for. Okay.
3       Okay. Now, 12/21/98, the doctor adjusted his
4   medication. Talks about his attitude is not what
5   it should be according to the therapist note that
6   day. It says here, the next session on 12/28/98,
7   reports that his condition is fair. Has a better
8   attitude in this session. Placement on new
9   medications that day, according to the therapist.
10  Encouraged him to continue doing well.
11      So, I guess he's making improvement at this
12  time. Especially, I guess, with this medication
13  change.
14  Q   Is there --
15  A   No mention of hallucinations, though.
16  Q   Is there any scientific basis for an assertion
17      that a child with Attention Deficit Disorder would
18      be more or less likely to be sexually abused at
19      some point in their life?
20          MS. DePAOLA: Object to the form.
21  A   Could you rephrase it, again?
22  Q   Sure. We know Justin is Attention Deficit
23      Disorder as early as 1998.

Page 52

1   A   That's correct.
2   Q   Is there anything from the information that East
3       Central Mental Health had in 1998 or forward
4       concerning Attention Deficit Disorder for Justin
5       that would have indicated he was more vulnerable
6       than others for sexual abuse?
7   A   I don't know. I don't have any research from
8       that. I mean, there is no indication that he is
9       vulnerable to sexual abuse.
10  Q   So, based on the information that East Central
11      Mental Health had as far back as 1998 up to the
12      present, there is no indication that the fact that
13      he was Attention Deficit Disorder might make him
14      more vulnerable to sexual abuse?
15          MS. DePAOLA: Object to the form.
16  Q   Is there anything in the record --
17  A   No. No, no.
18  Q   Now, he was also oppositional defiant?
19  A   Yes.
20  Q   Is there any correlation between that
21      disability --
22  A   Uh-huh.
23  Q   -- and being more or less vulnerable to sexual

Page 53

1   abuse?
2   A   No.
3   Q   No correlation, is there? No necessary
4       correlation?
5   A   Well, I mean, I haven't done any research on that
6       to see if there is, but according to the
7       documentation, there is no correlation in the
8       chart.
9   Q   And if there had been anything in the record or
10      the evaluation or the counseling that was being
11      undertaken by East Central Mental Health for
12      Justin that he was vulnerable for sexual abuse,
13      you all would have addressed that, wouldn't you?
14          MS. DePAOLA: Object to the form.
15          MS. ALLEN: Object.
16  A   I believe we would have.
17  Q   I mean, you all were --
18  A   I mean, we don't go around -- every child that
19      comes through, we don't go around looking for
20      sexual abuse.
21  Q   Why wouldn't you?
22  A   Because that's not routine.
23  Q   It's unusual, isn't it? Sexual abuse is unusual,

**Page 54**

1    isn't it?
2  A    It is an unusual thing. I mean --
3  Q    What would be the kinds of things that would make
4      you --
5          Let's take a break. Do you need to get that?
6  A    No, I am trying to turn it off. I apologize.
7  Q    What would be the kinds of things that you
8      professionals would have been put on notice or
9      alarmed that would have suggested a need to
10     address sexual abuse for Justin?
11 A    If a person is very gullible, overtly gullible,
12     overtly easily influenced by others. But
13     according to this documentation here, there is no
14     indication that that was a symptom or a primary
15     area of concern at that juncture. It could have
16     been an area of concern. But it was not overt,
17     you know what I mean, to us.
18 Q    And so you all didn't address it, because there
19     was nothing that came to your attention?
20 A    Absolutely.
21 Q    And as far as your review of the records, there
22     was no indication at any time from 1998 through
23     2005 that Justin presented a profile that would

**Page 55**

1      indicate vulnerability to sexual abuse?
2  A    Well, now, I haven't read through all these notes
3      yet. But so far in the therapy progress, in the
4      therapy notes, there is no indication that he was
5      extremely gullible or easily influenced by others.
6  Q    Wouldn't you agree that people that are
7      oppositional defiant are almost at the other end
8      of the pole from being gullible?
9  A    The only setback in his case is borderline
10     intellectual functioning. That would open him up
11     to that.
12 Q    But oppositional defiant is not someone that's
13     pliable and gullible as a rule; wouldn't you agree
14     with that?
15 A    Separate from that disorder. That's true.
16 Q    But we're talking about Justin, who is
17     oppositional defiant.
18 A    If you -- see, to separate diagnoses like that is
19     not appropriate, though.
20 Q    Well, I've got to talk about them in some order.
21 A    Okay.
22 Q    Would you agree that Justin is a pliable, gullible,
23     person, notwithstanding his oppositional defiant?

**Page 56**

1  A    He is. He is definitely gullible.
2  Q    What is it in the records or testing that indicate
3      that?
4  A    The borderline intellectual functioning.
5  Q    Where in the reports, your reports or any other
6      reports, does it indicate that he's gullible?
7  A    I probably would have to go to the DSM-IV and look
8      up --
9  Q    Okay. But I am asking your reports --
10 A    Okay. Not in the reports --
11 Q    At any time --
12 A    No, no. Not in the reports.
13 Q    -- when Justin came to you --
14 A    No, not in the reports --
15 Q    -- did you make a notation --
16        MS. DePAOLA: Hold on just a second.
17        Can we have -- just wait until he
18        finishes his question.
19        THE WITNESS: Right.
20 BY MR. SWEENEY
21 Q    At any point while East Central Mental Health has
22     been working with Justin from 1998 through 2005,
23     is there any indication that any of you all, any

**Page 57**

1      of you experts at East Central Mental Health, put
2      down that Justin is gullible and therefore
3      susceptible or vulnerable to sexual abuse?
4  A    There is about 30 notes here that I haven't read
5      that are from 1998.
6  Q    Well, do you know of any reference --
7  A    Not so far, no, sir.
8  Q    -- to anything in the record --
9  A    No, sir.
10 Q    -- through 2005 that indicates that Justin was
11     perceived to be, by you folks who are treating
12     him, as being gullible and therefore
13     susceptible --
14 A    No, sir.
15 Q    -- to sexual abuse?
16 A    No, sir. Not so far.
17 Q    And if your folks, you experts that were dealing
18     with him during all this period of time, had any
19     indication that he was vulnerable to sexual abuse,
20     would you have addressed that?
21 A    Absolutely. If it was brought to our attention,
22     or if we thought that there was a major problem at
23     that time at nine years old, then we would have.

---

**Page 58**

1  Q   Or through 2007, if at any time during that
2      period -- not 2007 -- through 2005 that there was
3      any indication that he was vulnerable to sexual
4      abuse, you would have addressed it, wouldn't you?
5  A   If it was brought to our attention, we would have.
6  Q   Well, as experts treating this kid, if you saw
7      anything that indicated vulnerability, you would
8      have addressed it, wouldn't you?
9  A   The only thing I can say is, is we did address the
10     communication thing.  But other than that, sir,
11     no, sir.
12 Q   Let me ask the question again:  At any point
13     through 2005 while East Central Mental Health
14     professionals were dealing with Justin on
15     continuing basis, is there ever any treatment to
16     help him cope with vulnerability over sexual
17     abuse?
18         MS. DePAOLA:  Object to the form.
19         MS. ALLEN:  I --
20 A   No, sir, because that was never an issue at that
21     time.
22 Q   Never an issue to you professionals --
23 A   Never.

**Page 59**

1  Q   -- who were treating him?
2  A   Never overtly seen by therapist or communicated by
3      the teacher or a concern of the parents at that
4      time.
5  Q   And if there had been, you would have addressed it
6      in some form or fashion, wouldn't you?
7  A   Yes, sir, we would have.
8  Q   All right.  On April 9th, you saw Justin.  What
9      took place on that day?
10 A   Okay.  Okay.  Justin appeared to be compliant with
11     medications.  Does not appear to have engaged in
12     any violent behavior, aggressive behavior.  Has
13     not taken anything without permission.  Okay.
14 Q   On April --
15 A   All right.  He also was placed on punishment, I
16     think, during time.  That's part of the behavior
17     management program.  And I think I addressed on
18     that day, also, about the severity -- the severity
19     of the punishment -- severity of the punishment
20     correlating with the act of the behavior on that
21     day.  So, behavior management, again.
22 Q   Anything else significant happen on that day --
23 A   No, sir.

**Page 60**

1  Q   -- with regard to his post-trauma stress disorder?
2  A   That's correct.  Not --
3  Q   Is there any reference at that point to
4      post-trauma stress disorder and your --
5  A   No, sir.  That was -- none of those things,
6      because I think he was not willing to talk about
7      it, we did not -- I did not press the issue
8      getting him to open up about the others.
9  Q   On April 16th, what happened?
10 A   This is the day we had a complete meltdown.
11 Q   What happened?
12 A   Intense agitation.
13 Q   Did that happen before he came in, while he came
14     in, or after he had come in?
15 A   Uhm, before he came in.
16 Q   So, this was a --
17 A   Started regular --
18 Q   So, this was a --
19         MS. ALLEN:  Let him finish.
20 Q   -- the 4/16 was a scheduled meeting --
21 A   Yes.
22 Q   -- but before that took place, there had been a
23     meltdown?

**Page 61**

1  A   No, no.  Just increasing his agitation.
2  Q   But what I want to make sure is:  Was the meeting
3      on the 4/16 the result of an emergency, or was
4      that previously scheduled?
5  A   No.  I -- let me hold on a second here.
6  Q   It looks like you're meeting with him every week.
7      And so you previously met with him on 4/9.  And
8      then seven days later on 4/16?
9  A   Yeah.
10 Q   Does that appear to be the case?
11 A   Yeah.
12 Q   And when he comes in on the 4/16, you learn that
13     he had a meltdown?
14 A   No, not a meltdown.  He was starting to loose
15     control of his emotions, completely.
16 Q   Tell me what your notes indicate was occurring on
17     4/16.
18 A   Okay.  Seemed to be having an increase in
19     agitation.  Uncooperative.  Okay.  Client had
20     threatened to tear up the television on last
21     Friday.  I provided a behavioral technique for
22     him.  Again, talked about consequences.  Talked
23     about managing his anger.

---

**Page 62**

1  Q  Was the agitation based on his parent
2     relationship, sibling relationship --
3  A  No. This is something else. This is where we're
4     talking about this thing that happened in
5     February. This is where he has no control over
6     anything now. He's starting to become this other
7     person. This other personality is coming out.
8     Boundaries, consequences. Weighing the right and
9     wrong doesn't even matter anymore. And he seemed
10    to have a grasp of what I was saying to him.
11    Seemed to receive my counseling during that
12    session. But after the session, I saw him at
13    10:15 a.m. that morning. At 11:00 a.m., mother
14    calls me, says he completely refuses to go back to
15    school. Completely. I told the mother to bring
16    him back to the office. Became intensely
17    agitated. Refusing to get out of the van.
18    Started kicking the chair of the van. Police had
19    to be called. Troy Police Department came over.
20    Even with the police there, he refused to get out
21    of the van.
22       And at that point, I started commitment
23    proceedings. And we court ordered him that day to

**Page 63**

1     UAB for treatment.
2  Q  And was he admitted?
3  A  Yes, he was.
4  Q  That same day?
5  A  Yes, that same day.
6  Q  You saw him on April 25th?
7  A  Yes.
8  Q  Had he been released?
9  A  He had been released.
10 Q  How long was he at UAB?
11 A  I am going to say approximately nine days, I
12    think. A bit less, maybe.
13 Q  So, you saw him the day he was released?
14 A  Yes.
15 Q  Or approximately the day he was released.
16    Did you get any notes or information for what
17    UAB did while they were treating him?
18 A  The only thing they sent us was that summary
19    sheet.
20 Q  Do you have that in your file?
21    MS. ALLEN: Have what in your file?
22    THE WITNESS: The exhibit. She has it
23    somewhere. I have it in my chart,

**Page 64**

1     but I --
2     MS. DePAOLA: Do you have the three
3     exhibits?
4     THE COURT REPORTER: No, Mr. Sweeney has
5     got them.
6     MS. DePAOLA: You have them.
7  BY MR. SWEENEY
8  Q  I'm sorry. Which one is the summary sheet from
9     UAB?
10 A  Okay. Depress --
11 Q  Do you see an exhibit --
12 A  Yes, sir. Exhibit 26.
13 Q  What exhibit?
14 A  Exhibit 26.
15 Q  And that's from UAB?
16 A  From UAB. Depressive disorder, NOS.
17    Post-Traumatic Stress Disorder. Attention Deficit
18    Hyperactivity Disorder by history.
19 Q  All right. But do they indicate to you in any
20    report what they did with Justin while he was
21    there for nine days?
22 A  I have not gotten those records from them. I
23    don't know why they -- they told me they were

**Page 65**

1     going to send those records. But they never sent
2     the essence of those records. I don't know if
3     anyone else has them.
4  Q  Isn't that unusual? I mean, if he's in intensive
5     care for nine days at UAB, wouldn't that be
6     beneficial information as you pick up service?
7  A  The problem I see a lot of times with a lot of
8     psychiatric facilities, they never get around to
9     sending us the discharge summaries like they
10    should in a timely fashion. Probably forgot. And
11    I -- you know --
12 Q  And you didn't request it?
13 A  Well, a release was signed for me to get those
14    records. They were already approved for me to get
15    them. They told me they were going to send them
16    to me. But I just never -- I stay so busy. I've
17    never had a chance to call them to ask that they
18    send those to us.
19 Q  Well, even today as we testify in this deposition,
20    wouldn't that be information you would want?
21 A  Well, I had the summary report. And I thought
22    everything was pretty much consistent. They did
23    the same kind of things I have done with him in

Page 66

1    the office. The only difference was, and seemed
2    to be the breakthrough for him in the treatment
3    process at that point, was just the medication.
4    And the medication seems to be the main
5    therapeutic process for that visit.
6  Q   Is there any reason -- since you have a release to
7     get that information, is there any reason not to
8     request it?
9  A   All I can do is call them and insist they send it
10    to me, because they have the releases. And I just
11    need to do that, I guess.
12 Q   My question is: Is there any downside to having
13    additional information about this kid based on
14    what happened at UAB?
15 A   I thought -- there is no downside or upside,
16    because --
17 Q   Well, you don't know --
18 A   -- I'll tell you why --
19        MS. DePAOLA: Donald, would you let him
20     finish his answer?
21 Q   Yeah. Excuse me. Go ahead.
22 A   Because I felt like the problem here was to treat
23    that aggression and intense agitation was a

Page 67

1    chemical imbalance. And I felt like the
2    psychiatrist did the most therapeutic thing for
3    him. And that was the medication change.
4  Q   I bet we can simplify this.
5  A   Okay.
6  Q   I bet if you and I both step back for a second,
7     you would agree that having additional information
8     from UAB would be beneficial?
9  A   Oh, absolutely would be beneficial. But in the --
10 Q   That's all I am asking.
11 A   In the long range, yes.
12 Q   And is that something that you will request?
13 A   I will.
14 Q   And if you get that, is that something you will
15    share with us under subpoena?
16 A   Yes, sir, I will.
17 Q   Okay. I ask that you go ahead and do that.
18 A   I will.
19 Q   And I'll follow up with a letter to that effect.
20 A   Okay.
21 Q   Axis I, depressive disorder, not otherwise
22    specified?
23 A   That's correct.

Page 68

1  Q   What's PTSD?
2  A   Post-Traumatic Stress Disorder.
3  Q   ADHD by history?
4  A   Yes, sir.
5  Q   Sexual abuse, conflict with parents, peer
6     problems. So, in 2007, he's still having
7     conflict-with-parent problems?
8  A   Ah, before he came in, yes. Before he went in, he
9     was. That was a stressor.
10 Q   Okay. What happened on April 25th?
11 A   I tell you, he's a different young man, different
12    young man: Totally new attitude, talkative,
13    appropriate, functioning well, well adjusted,
14    taking medications, going to school. Everything
15    going smoothly.
16 Q   Do you think that is primarily a result of the
17    change of medication?
18 A   Most definitely. I think that -- as well as
19    placing him in a controlled, supervised
20    environment. I think the treatment was both
21    medically therapeutic, as well as behaviorally
22    therapeutic, by providing a consequence of
23    removing him from family and away from his social

Page 69

1    setting.
2  Q   On 6/11 -- is there some reason you didn't see him
3     during the month of May?
4  A   Probably our schedules had conflicts.
5  Q   And on the 25th, you thought he was doing well?
6  A   Yes, yes.
7  Q   So, there is no emergency reason to see him
8     immediately?
9  A   No, that's correct.
10 Q   You scheduled a meeting on June 11. What took
11    place on June 11?
12 A   Still functioning well. Just a follow-up
13    appointment, checkup, basically, to make sure
14    everything going smoothly.
15 Q   July 2nd?
16 A   Same thing.
17 Q   August 7th?
18 A   Same thing.
19 Q   Still doing well?
20 A   Still doing well.
21 Q   September 10th?
22 A   Still -- uhm, still doing well. Even after the
23    death of his father and being placed on -- with

| Page 70 | Page 72 |
|---|---|
| 1  these new medications, and coming in for | 1  counseling with East Central Mental Health, wasn't |
| 2  counseling, he continues to do well. | 2  he? |
| 3  Q   So, it's that predicate of success from June | 3  A   No, that was before the sexual trauma.  He went to |
| 4     through September -- | 4     Child Advocacy, I believe, for counseling, but not |
| 5  A   Yes. | 5     East Central Mental Health, to my knowledge. |
| 6  Q   -- that served the basis for the opinion you | 6        But he should have immediately been debriefed. |
| 7     shared that the prognosis is good? | 7  Q   All right.  So, the parents knew that he had been |
| 8  A   Yes.  Yes. | 8     in counseling with East Central Mental Health, |
| 9  Q   If he will stay on his medication -- | 9     didn't they? |
| 10 A   Yes. | 10 A   That's correct. |
| 11 Q   -- and continue therapy? | 11 Q   The parents knew sometime in 2007 that he had been |
| 12 A   Yes. | 12    sexually abused? |
| 13 Q   Because if we track what's happened since June | 13 A   I think it was 2005, right? |
| 14    through September, the prognosis is good? | 14 Q   I'm sorry.  You're correct.  I misstated that. |
| 15 A   Yes. | 15 A   That's all right. |
| 16 Q   What are you doing in these family sessions? | 16 Q   It was 2005.  Thank you. |
| 17 A   The family sessions primary is to assist the whole | 17 A   That's all right. |
| 18    family.  I felt like I needed to treat the whole | 18 Q   So, the parents knew sometime in 2005 that he had |
| 19    family, because if anybody's ever been through | 19    been sexually abused? |
| 20    grieving or suffered severe loss, Justin having | 20 A   That's correct. |
| 21    been court ordered to a hospital back in, I think | 21 Q   Would you agree that the parents should have taken |
| 22    it was, March, also losing his father all of a | 22    him to counseling at that time? |
| 23    sudden like that, I felt like the whole family | 23 A   I think he was in counseling at Child Advocacy. |

| Page 71 | Page 73 |
|---|---|
| 1  needed coping skills to help adjust to the father | 1     And I believe that they have documentation.  And |
| 2  not being in the home. | 2  if he was getting counseling there, that's fine. |
| 3  Q   How is Justin coping with his father's death? | 3        Now, what Mona Watson did -- I don't know if |
| 4  A   Extremely good so far.  Good so far.  I mean, | 4     she took him through the traumatic stress |
| 5     really, he really has been trying to do better. | 5     treatment process of debriefing him. |
| 6        We hit a few bumpy roads with him, because | 6  Q   The reason I am picking up on that, you said a |
| 7     he's getting ready -- I don't know if you want to | 7     minute ago that what didn't happen should have |
| 8     say graduate, but he's in 12th grade now.  He | 8     happened; that he was not taken to counseling |
| 9     tried to work a little bit in the mornings, but he | 9     after 2005 sexual abuse. |
| 10    couldn't hack it.  And he's now back in school | 10       Let's revisit that.  Did you mean to say that? |
| 11    full-time. | 11 A   I meant to say it, but I didn't know to say it the |
| 12 Q   Have you read literature in the last two or three | 12    way it sounded. |
| 13    years about the success with which young students | 13 Q   All right. |
| 14    can cope with sexual abuse? | 14 A   I'm just not sure -- |
| 15       MS. DePAOLA:  Object to the form. | 15 Q   Well, you respect Mona Watson, don't you? |
| 16 A   I haven't read any lately; no, I haven't. | 16 A   I do respect Mona Watson. |
| 17 Q   What is the most effective approach to enabling a | 17 Q   And if Mona Watson thought that he needed |
| 18    victim of sexual abuse to cope with that trauma? | 18    additional counseling, would she have recommended |
| 19 A   The most effective approach is something that | 19    it? |
| 20    should have been done at the initial time of the | 20       MS. DePAOLA:  Object to the form. |
| 21    trauma.  But he was not placed into counseling. | 21       MS. ALLEN:  Object. |
| 22    Number 1 is -- | 22 Q   I mean, you have had a working relationship with |
| 23 Q   Let me stop you just a minute.  He was in | 23    her, I assume? |

Page 74

1  A   Uhm, did I -- I want to answer truthfully.
2  Q   Sure.
3  A   I think Mona felt like he should have had more
4      counseling. That's what she told me. I think she
5      felt like his counseling should have been more
6      intense. And I'm just not so sure if it was as
7      intense as it should have been.
8  Q   Okay. So, what is the most effective way to deal
9      with adolescents who have been victimized by
10     sexual abuse?
11 A   Definitely --
12 Q   Such as Justin and what happened to him?
13 A   Definitely immediately, he should have been taken
14     through the process of dealing with any individual
15     whose been through trauma. He should have been
16     debriefed. And I'm not sure if he got debriefed
17     for that trauma immediately. That's the first
18     step with any trauma.
19 Q   And then subsequent to that, with Justin, what is
20     the most effective way, based on your research and
21     training, to deal with post-trauma stress disorder
22     for someone like Justin?
23 A   Not having read any recent research, but having

Page 75

1      training dealing with trauma, it is to take him
2      through the debriefing process. After that, after
3      you have taken that person through the steps of
4      dealing with the trauma after the first several
5      days, that person then has the choice of being
6      seen by a therapist on a weekly basis if they
7      choose to, by a clergyman, by a therapist like
8      myself, or by another therapist that specializes
9      in dealing with those disorders and not alone --
10     or those disorders -- exclusively with that
11     disorder and not others.
12         But I don't feel like anybody thought that was
13     necessary to send him to a specialist in Atlanta.
14     We are not sure -- because we felt like we could
15     handle it on our own, or I thought Mona thought --
16     Mona probably thought she could handle it with her
17     expertise.
18 Q   Anything else you think you would recommend to
19     help Justin cope with the trauma, the traumas of
20     his father dying and the sexual abuse at this
21     point?
22 A   Continue doing group therapy with the family.
23     Having the family deal with triggers. Taking them

Page 76

1      through the grief process, grief counseling, like
2      I have done, like I did on the week after
3      September 10th. Had a very good session with the
4      family. Very therapeutic for the whole family.
5      Each family member had a chance to see how every
6      family member was dealing with the grief of the
7      loss of the father. And they offered counseling
8      and support for one another. And it was a really
9      great -- it was really a great session.
10 Q   Okay. In your initial meeting, you indicated,
11     sexual abuse noted. Was that because somebody
12     reported that to you?
13 A   That's correct.
14 Q   That was Mona Watson?
15 A   That's correct.
16 Q   Okay. When was the first time Justin actually
17     talked to you about sexual abuse having occurred?
18 A   Not one time. Totally avoided the --
19 Q   Up to and through September --
20 A   Tenth.
21 Q   -- 9th?
22 A   Tenth. And that was because I spent the whole
23     session dealing with it.

Page 77

1  Q   What do you mean "the whole session"? You were
2      asking him the whole time to share with you?
3  A   And giving him time to process my questions. In
4      therapy technique, one technique that we use,
5      after we ask the question, there is a moment of
6      silence, which is a therapeutic moment of silence.
7      I did that a lot in that session, because I felt
8      like I needed to give him a chance to articulate
9      what I was saying, without asking another
10     question. Because if you ask too many questions
11     at one time, if you don't give the person enough
12     time to have therapeutic silence, then the person
13     won't probably articulate their emotions or not
14     properly communicate their wishes or desires or
15     feelings.
16 Q   But you have taken from March 5th until
17     September 10th --
18 A   Yes.
19 Q   -- before you would aggressively address --
20 A   Aggressively, yes.
21 Q   -- that problem?
22 A   Yes.
23 Q   So, you didn't think debriefing it by a head-on

Page 78

1   discussion was appropriate during those six
2   months?
3   A   No, I did not, because I wanted to make sure we
4       had properly dealt with that intense dangerous
5       anger. And there was no need to rush that process
6       until we made sure we had those symptoms treated.
7   Q   Do you know that Justin was sexually abused in his
8       home?
9           MS. DePAOLA: Object to the form.
10  Q   Has that information been shared with you?
11          MS. DePAOLA: It's not in evidence at
12      all.
13  A   I haven't -- I don't know where he was abused, per
14      se. We just got to the point of what happened,
15      per se.
16  Q   Would sexual abuse be more traumatic depending on
17      where it took place?
18  A   No, sir.
19  Q   So, if he --
20  A   I --
21  Q   -- was sexually abused in his home, would that
22      have been more traumatic than if there was sexual
23      abuse some place else?

Page 79

1   A   No. If a person is raped or sodomized, the trauma
2       is still the same regardless of where it happened.
3       If you have been victimized by someone, you are
4       victimized.
5   Q   Now, you indicated that you have consulted a
6       number of experts about Justin and what happened
7       to him. What experts did you consult?
8   A   Well, I probably should say I consulted my peers,
9       and I -- well, I consulted Dr. Warren. That was
10      my primary expert.
11  Q   Who?
12  A   Doctor Warren, Fernell Warren. He was the expert.
13  Q   What's Dr. Warren's background in post trauma
14      stress disorder or sexual abuse?
15  A   Dr. Warren has expertise in all those areas. But
16      as far as his certifications and areas of
17      specification and the credentials of that, I don't
18      have a copy of that.
19  Q   When you did your Master's degree, what was your
20      thesis?
21  A   In my Master's program, I did not have to do a
22      thesis.
23  Q   Did you have a concentration?

Page 80

1   A   Yes.
2   Q   Did you have courses on post-trauma stress
3       disorder?
4   A   I had specialized training in post trauma --
5   Q   What was your specialized training?
6   A   I don't have the -- I don't have the -- what do
7       you call it?
8   Q   Syllabus?
9   A   Yes -- in front of me.
10  Q   Did you have any particular course --
11  A   Yes.
12  Q   -- that had a major --
13  A   Yes.
14  Q   -- focus on post --
15  A   Yes. Absolutely.
16  Q   -- stress disorder?
17  A   I did.
18  Q   Who taught it?
19          MS. DePAOLA: Wait. Hold on. You need
20      to wait until he finishes his
21      question.
22          THE WITNESS: Okay.
23

Page 81

1   BY MR. SWEENEY:
2   Q   Who taught it?
3   A   I don't have that information in front of me.
4       It's been about -- I don't know -- it's been about
5       five, six, seven years ago when I had that
6       training. And I can't remember the name of that
7       company. But I know they certified me to do
8       post-trauma counseling. I was certified to do
9       that.
10  Q   By a company or by a course that you took?
11  A   By a company that specializes in preparing
12      individuals to do that.
13  Q   Where would that have taken place?
14  A   Mobile, Alabama.
15  Q   How long was the course that led to certification?
16  A   I'm going to say about seven to ten hours that
17      course was, or that --
18  Q   So, two days or so?
19  A   Yes. I believe it was a two-day conference I went
20      to.
21  Q   And what was the methodology that they suggested
22      you use for handling post-trauma stress disorder
23      that would apply to Justin?

Page 82

1  A   The primary thing -- here's the thing about
2      Post-Traumatic Stress Disorder. Primarily, you're
3      dealing with triggers. You're dealing with
4      relaxation techniques. You're dealing with making
5      the person feel secure and safe now. That's the
6      third step in that process; having the person feel
7      more comfortable and desensitize that person to
8      the trauma. Like I say, behavioral -- I'm sorry,
9      I say, that step process that you go through.
10     And we're just now dealing with him dealing with,
11     acknowledging the trauma. So, we haven't even got
12     that far in the process yet.
13         But the primary thing with Post-Traumatic
14     Stress Disorder is being able to debrief the
15     person up front. So, now, like I say, I don't
16     know if he was debriefed or not. So, now, we're
17     dealing with the process of primarily with the
18     behavior techniques. And we have just begun to
19     move up those steps to get him desensitized to the
20     fear response.
21         Because primarily what a Post-Traumatic Stress
22     Disorder is, is an avoidance to a fear or to a
23     stimuli that imposes danger, or you feel imposes

Page 83

1      danger on you.
2          So, we have not begun to move in that
3      therapeutic process yet further -- far enough.
4  Q   Mr. Wright, me understand what happens when
5      someone suffers trauma. Is one possibility they
6      bury it in their unconscious or sub --
7  A   In their subconscious, absolutely.
8  Q   Is one possibility that they retain active
9      memories of what took place?
10 A   Most definitely.
11 Q   Which is most likely, in your opinion at this
12     point, applicable to Justin? Has he buried it, or
13     is he conscious and recalls it?
14 A   My thought is, the word we use is, repressing it.
15     He won't think about it, dream about it, or
16     anything. Some clients do dream about it. But he
17     is not thinking about it whatsoever. But when you
18     mention it, immediate fear response. Shutting
19     down, the disassociating completely.
20 Q   If I were to take Justin's deposition like I am
21     taking yours, would he share with me what
22     happened?
23 A   No, sir. He would only acknowledge -- he will

Page 84

1      shut down on you and disassociate, become a
2      different personality altogether. He will do like
3      this: He will close his eyes (indicating).
4      (Indicating), those responses he will do. He
5      won't say a word.
6  Q   Assume an optimistic course of recovery, how long
7      would it be before Justin would share that kind of
8      information with me what actually happened?
9          MS. DePAOLA: In a deposition, are you
10             talking about, Donald?
11             MR. SWEENEY: In a deposition.
12 A   Sir, I have no idea.
13 Q   Or in a trial.
14 A   I have no idea. I'm not sure if he's able to
15     properly verbalize. His verbal skills -- I don't
16     know if he's able to verbalize, or if he has the
17     capacity to give appropriate verbal responses
18     other than shaking his head or doing this
19     (indicating). Especially when talking about the
20     trauma.
21 Q   Let me digress to another topic. Do you deal with
22     adolescents that have no disability in the sense
23     of Individuals With Disabilities Education Act?

Page 85

1      That is, just regular students that have
2      psychological problems?
3  A   The only dealings I have with adolescents
4      primarily has been crisis intervention. So, it's
5      adolescents that are depressed, severely
6      depressed, severely anxious, placement problems
7      with the parents; the parents can't cope with the
8      adolescent's behavior. Those kinds of cases.
9          But as far as ongoing counseling, Dustin --
10     let me see -- Justin's case was a case that I took
11     on and continued to work with, because we seemed
12     to have a rapport together.
13 Q   Can students with no cognitive disability have
14     psychological problems?
15 A   Cognitive disability? You're talking about mental
16     retardation, developmental disability, or are you
17     talking about --
18 Q   No, I'm trying to differentiate -- we have been
19     talking a lot about mental retardation and the
20     class of students that are mentally retarded.
21     Let's talk about students that have no mental
22     retardation. And I'll use that in rough reference
23     as regular students.

JR, a Minor                        November 20, 2007                    Pike County Board of Education

23 (Pages 86 to 89)

Page 86

1  A   Okay.
2  Q   **Can regular students have emotional and**
3       **psychiatric problems?**
4  A   Absolutely.
5  Q   **And can they have low self-esteem?**
6  A   Most definitely.
7  Q   **And if a regular student has low self-esteem and**
8       **psychiatric problems, can they be vulnerable to**
9       **sexual abuse?**
10 A   Absolutely.
11 Q   **Now, with regard to mental retardation, is that a**
12      **narrow band of category, or is there a broad band**
13      **of students that fit within the nomenclature of**
14      **mental retardation?**
15 A   That's not a broad band. There is only a certain
16      percentage of students in a sample that suffer
17      from mental retardation.
18 Q   **All right. Within the category of mental**
19      **retardation, are there high-functioning and**
20      **low-functioning mentally retarded students?**
21 A   Absolutely.
22 Q   **And there would be a wide variety of their**
23      **adaptability?**

Page 87

1  A   Most definitely.
2  Q   **Wide variety of their cognitive skills?**
3  A   Yes, yes, yes.
4  Q   **Wide variety in their ability to cope with the**
5       **external factors in their life?**
6  A   Absolutely. Absolutely.
7  Q   **Now, in addition, within that category, are there**
8       **students with mental retardation that have high**
9       **self-esteem, or higher self-esteem?**
10      **MS. DePAOLA: Higher than other than**
11          **mentally retarded students, or**
12          **regular students?**
13      **MR. SWEENEY: If you will let me --**
14      **MS. DePAOLA: What are you talking**
15          **about?**
16      **MR. SWEENEY: -- finish the question.**
17      **MS. DePAOLA: Object to the form.**
18      **MR. SWEENEY: This isn't your**
19          **deposition.**
20      **MS. DePAOLA: The question is unclear.**
21 **BY MR. SWEENEY**
22 Q   **Let me go back. A mentally retarded student might**
23      **have a loving, supportive environment; correct?**

Page 88

1  A   Most definitely.
2  Q   **And if a mentally retarded student has a loving,**
3       **supportive environment, would they possibly have a**
4       **higher self-esteem than a mentally retarded**
5       **student that comes --**
6  A   Absolutely.
7  Q   **-- comes from a family --**
8  A   Most definitely.
9  Q   **-- where there is conflict?**
10 A   Absolutely. Absolutely.
11 Q   **So, you can't really generalize about students**
12      **within that category of mental retardation, can**
13      **you?**
14      **MS. DePAOLA: Object to the form. About**
15          **what?**
16 Q   **I mean, wouldn't you agree that they have a wide**
17      **variety of susceptibilities, characteristics,**
18      **problems, assets, strengths?**
19 A   There are some things that are general in nature.
20      And there are some things that are specific.
21 Q   **Let's say a child with mental retardation that has**
22      **a high self-esteem because of a loving, nurturing**
23      **environment; would that child be more or less**

Page 89

1       **vulnerable, as a generality, to sexual abuse?**
2  A   Can I answer you --
3  Q   **Sure. Any way you want.**
4  A   Okay. I worked for the Department of Mental
5       Health before working for East Central Mental
6       Health. I was a Psych Associate, II. I saw
7       clients ranging from the profound level of mental
8       retardation to borderline intellectual
9       functioning, or low-average functioning, IQ score,
10      low average. Okay?
11      And the one central theme that I noticed about
12      individuals that suffer from mental retardation,
13      regardless of whether you are profound to
14      borderline intellectual functioning is, almost all
15      of those clients or consumers were extremely
16      trusting of others. Especially authority figures.
17      Extremely trusting. Not one of those clients I
18      worked for or served with the State Department
19      were ever distrusting of their caretakers.
20 Q   **Okay. Now, back to my question: Within that**
21      **category --**
22 A   Okay.
23 Q   **-- would higher-functioning mentally retarded**

Page 90

1   children have a better sense of what's appropriate
2   behavior and what's inappropriate behavior?
3   A   They would.  But not to prevent being mistreated
4   would be very difficult.
5   Q   Would lower-functioning mentally retarded children
6   have more or less ability to fend off
7   inappropriate conduct from an adult?
8   A   They would have less.  And the reason is, is
9   because people that are severely profound don't
10  even know they are in the world.
11  Q   So, you really have to know the individual
12  characteristics of a child to know whether they
13  are more or less vulnerable?
14  A   Absolutely.
15  Q   And to paint with a broad brush about mental
16  retardation isn't really accurate --
17       MS. DePAOLA:  Object to the form.
18  Q   -- given the variety of characteristics within
19  that definition?
20       MS. DePAOLA:  Object to the form.
21  A   There is a broad brush and a narrow brush both at
22  the same time.
23  Q   If a child, an adolescent, comes in to you for

Page 91

1   consultation, what has to be presented in order
2   for you to think about vulnerability for sexual
3   abuse?
4   A   If a person exhibits a history -- exhibits; notice
5   I said exhibits a history -- of being easily
6   manipulated by others.
7   Q   Okay.
8   A   Or exploited by others.
9   Q   Okay.  Anything else?
10  A   That's the primary thing.
11  Q   How would you determine or sense that a child is
12  highly manipulated by others?
13  A   Number 1, history information at the initial
14  referral, reports from family, reports from
15  teachers, as well as general conversations with
16  the student or with the adolescent.
17  Q   Is there anything in the history of Justin while
18  he was being consulted by East Central Mental
19  Health that should have put East Central Mental
20  Health on notice that Justin might be the victim
21  one day of sexual abuse?
22  A   No.
23       MS. DePAOLA:  Let me object to that

Page 92

1   question, because I think you have
2   previously testified you haven't
3   read the whole record.
4       Is that an accurate --
5   MR. SWEENEY:  If you will -- Deanie
6   Allen is taking this --
7   THE WITNESS:  (Inaudible).
8   MS. DePAOLA:  Okay.  Put my objection on
9   the Record.
10  MR. SWEENEY:  And you just prepared the
11  witness for the answer, and I object
12  and ask that you not do that again.
13  BY MR. SWEENEY
14  Q   Let's go back.  Is there anything that you know of
15  from the record in this case --
16       MS. ALLEN:  Object to the form.
17  Q   -- that should have put East Central Mental Health
18  on notice that Justin might one day be the victim
19  of sexual abuse?
20  A   There are no overt indicators that suggest that he
21  would be sexually abused by -- or manipulated
22  sexually.
23  Q   And there had been, you all would have addressed

Page 93

1   that, wouldn't you?
2   A   We would have placed that on the treatment plan.
3   Q   Now, what did Dr. Warren advise you concerning
4   Justin Reed?
5   A   One second.  Give me a chance to be find this
6   testing -- or section that I am looking for.
7       MS. DePAOLA:  What was the question,
8       Mary?
9       (Whereupon, the requested material
10      was read by the Court Reporter.)
11  A   Okay.  It says, Justin may qualify for special
12  education and related services.  Ongoing
13  monitoring of Justin's behavior and academic
14  performance would be helpful in determining
15  whether additional classroom interventions are
16  needed.  It is suggested that Justin begin therapy
17  sessions as needed to encourage appropriate
18  behaviors and positive interactions.  Justin could
19  benefit from weekly therapy sessions to explore
20  and monitor his ADD-like behaviors; anxiety, PTSD,
21  depression, et cetera.
22      Okay.  Therapy will be initiated for Justin
23  and his parents.  We have done all of that.

Page 94

1    Okay. And it says here, as a reminder,
2  Justin's insight and judgment are poor and its
3  susceptibility to the influence of others, and
4  thus may act without recognizing potential end
5  consequences of his behavior.
6    Behavior modifications techniques -- all of
7  that I was doing, already.
8  Q  Okay.
9  A  Then he goes on to talk about some school things
10  here. Okay.
11  Q  Let's take a timeframe, say December 2004 to May
12  of 2005.
13  A  Okay. Timeframe from where now? I'm sorry.
14  Q  December 2004 to May 2005.
15  A  Uh-huh.
16  Q  And let's take a particular student. So, we have
17  got a six-month period. What are the kinds of
18  things that could happen that would put people on
19  notice that a child might be the victim of sexual
20  abuse?
21  A  Acting out.
22  Q  Okay.
23  A  Extremely.

Page 95

1  Q  What do you mean "acting out"?
2  A  Uhm, talking back to parents. Talking back to
3  teachers. Fighting with siblings.
4  Q  Huh?
5  A  Fighting with siblings. Sexually acting out.
6  Stealing.
7  Q  I'm sorry, what?
8  A  Stealing.
9  Q  Chilling?
10  A  Stealing.
11  Q  What does that mean?
12    MS. DePAOLA: Stealing.
13  A  Stealing items. Stealing things from the house.
14  Stealing things from the school. Removing things.
15  Q  Okay. Stealing. Anything else?
16  A  I don't know. I lost my train of thought. There
17  was something else.
18    Possibly engaging in substance abuse. I don't
19  think he's done that, though. But...
20  Q  If those kinds of things happened, would they be
21  confined to one venue as opposed to another venue,
22  or could they happen across the board?
23  A  They could both happen in one venue, and it could

Page 96

1  be across the board.
2  Q  All right. Assume that the school system,
3  teachers, saw little or none of those indications
4  about Justin during December 2004 to May 2005;
5  should his parents have reported those kinds of
6  things to school officials if they saw them?
7  A  I think they should have if they saw them, yes.
8  Q  Are you in a position, based on what you know, to
9  blame the school system for not sensing that Jason
10  (sic) was being sexually abused from December 2004
11  to May 2005 as being asserted in this case? Do
12  you know of any reason why the school system
13  should have picked that up?
14    MS. DePAOLA: His name is Justin.
15    MR. SWEENEY: I -- what did I say?
16    MS. ALLEN: Jason.
17  Q  I'm sorry, Justin. Excuse me.
18    Without speculating, do you know of anything
19  from talking to any teacher or administrator, or
20  Mona Watson or anyone at the school that has given
21  you information firsthand that the school system
22  should have sensed that Justin was being sexually
23  abused?

Page 97

1  A  Well, a lot of adolescents act out and do those
2  things even though --
3  Q  Do you understand my question?
4    MS. DePAOLA: Let him finish his answer,
5  Donald.
6    MR. SWEENEY: It's not your deposition,
7  Ms. DePaola.
8    MS. DePAOLA: I don't care. You are --
9  unbelievable.
10  Q  Do you understand my question?
11  A  Yes, sir.
12  Q  Has anybody at the school; teachers,
13  administrators, officials at the school, provided
14  you with any information that would indicate to
15  you that they should have suspected child abuse
16  from December 2004 to May of 2005?
17  A  Well, I don't think we had him in our counseling
18  services during that period of time. So, I don't
19  think that --
20  Q  Well, have you had any conversations with any
21  teacher or administrator or people that worked
22  with Justin at the school during that period?
23  A  No, sir. We did not to my knowledge.

Page 98

1  Q  What information do you have other than history
2     that Justin might have been sexually abused? What
3     is the source of your information about that?
4  A  History and report from the client.
5  Q  Report from what client?
6  A  From Justin.
7  Q  From Justin?
8  A  Yes.
9  Q  And he hasn't told you anything, has he?
10 A  He did. He acknowledged to me that he was
11    fondled.
12 Q  Okay. That's all you know; that he was fondled?
13 A  Yeah.
14 Q  Did he tell you how many times?
15 A  On more than one occasion. I think on numerous
16    occasions.
17 Q  Did he tell you where it took place?
18 A  No, sir, we didn't get into where.
19 Q  What other information do you have that would
20    support your conclusion that he's been sexually
21    abused?
22 A  That's primarily it, because --
23 Q  Has his mother shared with you any --

Page 99

1  A  Absolutely.
2  Q  -- information?
3  A  Absolutely.
4  Q  What has she told you?
5  A  Basically that he had been abused. But -- and can
6     I just gave you two sources I received?
7  Q  Sure. But let's start with the mother. What did
8     she tell you about sexual abuse?
9  A  The mother feels like he --
10 Q  I'm not asking about feelings. What has she told
11    you in that regard?
12 A  She told me she felt like he performed oral sex.
13    That he's refusing to admit that he performed oral
14    sex on this --
15 Q  So, the mother has indicated Justin has never told
16    her that he has been the victim of sexual -- of
17    oral sex?
18 A  That's correct.
19 Q  What else did she tell you?
20 A  She did admit to the fact that he admitted to
21    being fondled. He would admit that to her and
22    admit that to me.
23 Q  Has he admitted that to his mother, and she's

Page 100

1     related that to you?
2  A  Yes. But not the oral sex thing. That was a
3     feeling she communicated she had.
4  Q  Okay. And did Ms. Reed tell you where it
5     happened?
6  A  No, sir. We never got into that.
7  Q  Okay. I may have interrupted. Who else has given
8     you information about the fact that he may have
9     been sexually abused?
10 A  Mona Watson.
11 Q  And what did she tell you?
12 A  She told me that Justin told her that he had
13    performed oral sex on him.
14 Q  Okay. Any other source?
15 A  No other source.
16 Q  You indicate that, in your notes, that he had
17    experienced shame and humiliation. Where in your
18    notes do you indicate that?
19 A  That was a session from September 10th. He
20    admitted to me that he had felt shame and
21    humiliation. Because I asked him, and he
22    responded to me in the affirmative.
23 Q  Do you mind referring to that notation,

Page 101

1     September 10th?
2  A  Now, I haven't written that note and placed that
3     in the chart yet. But I am getting ready to put
4     that in there. So, I have got to admit I have not
5     placed that in the chart. But I am getting ready
6     to.
7  Q  Well, do you often wait two or three weeks --
8  A  No, I don't. I don't.
9  Q  -- to put notations --
10 A  I don't. No, sir. I am just being honest with
11    you. No, sir.
12 Q  What is it that Justin told you about his shame?
13 A  I asked him does he fell shame for that. And he
14    shook his head yes.
15 Q  Shame for what?
16 A  Shame for being molested by --
17 Q  Did you say molested or being fondled?
18 A  Being fondled.
19 Q  What question did you pose to him the response to
20    which he said he felt shame?
21 A  I asked him, I said, Justin, do you feel shame
22    because of what happened? He said (indicating).
23    By he would not talk or would not open his eyes.

Page 102

1  Q  So, he just nodded his head?
2  A  He just nodded his head.
3  Q  He didn't verbalize?
4  A  No, he didn't verbalize.
5  Q  What did he say about humiliation?
6  A  I asked him did he feel humiliated? And he
7     (indicating), but no verbal response.
8  Q  And when you said that you made notes about that,
9     that was not entirely accurate, was it?
10 A  No, sir, I have not made the notes.
11 Q  The psychotic features, if I wanted to look at
12    DSM-IV, would I look under psychotic features to
13    understand what you mean when you say Justin
14    exhibits psychotic features?
15 A  I'm sorry, sir.
16 Q  Okay. Let's go back. You have said that Justin
17    manifests --
18 A  Major Depressive Disorder with psychotic features.
19 Q  So, you are indicating that major depression is a
20    psychotic feature? I haven't heard that.
21 A  No, sir. No, sir. Major depression with
22    psychotic features. In other words, his psychosis
23    is due to depression, but it could be to other

Page 103

1     disorders, as well.
2  Q  What is psychotic, and what aspects of psychosis
3     relates to Justin? What is psychotic?
4  A  Hearing and seeing things.
5  Q  And what aspects of psychotic features does Justin
6     indicate?
7  A  He exhibited hearing and seeing things.
8  Q  What has he told you he hears and sees? And when
9     did he do that?
10 A  According to the testing of Dr. Warren --
11 Q  But has he done that to you, or is this just
12    reports from others?
13 A  Give me one second here.
14    Primarily, when I saw him initially, the
15    dominant symptom I saw at my initial visit back in
16    February the 23rd, were the aggression symptoms,
17    easy agitation, noncompliance with meds,
18    exhibiting behavioral problems. And because we
19    were in a crisis mode, and because those were the
20    dominant symptoms -- not secondary symptoms -- I
21    treated those symptoms alone at that time, as well
22    as treated the ADHD.
23    But after the testing with Dr. Warren, and

Page 104

1     Dr. Warren doing the full psychological test
2     battery on him, me seeing those symptoms in his
3     testing, those test results, I adjusted my
4     treatment plan to reflect that diagnoses.
5  Q  Okay. Let me go back over your academic
6     credentials just a minute, Mr. Wright. You
7     indicate your undergraduate degree was from Troy?
8  A  Yes.
9  Q  With a double major?
10 A  Yes.
11 Q  Criminal justice and psychology?
12 A  Yes.
13 Q  How many credits did you have in psychology?
14 A  Oh, I don't have my syllabus in front of me. I
15    can't remember.
16 Q  Okay. You didn't have to do a thesis?
17 A  No, sir.
18 Q  Your employment record has included what?
19 A  I -- right out of graduate school, I went to work
20    for J.S. Tarwater, a mental retardation facility.
21 Q  Where is that?
22 A  Located -- it used to be located in Wetumpka,
23    Alabama. But now it's called Region IV.

Page 105

1  Q  What did you do there?
2  A  Psych Associate, II. Developed behavioral
3     management programs. Also I had dual
4     responsibilities as a Psych Associate, II, doing
5     behavioral management and behavior modification
6     and treatment from mentally retarded
7     individuals --
8  Q  All --
9  A  -- as well as -- as well as supervising a cottage.
10    Because this were short of help. So, I became a
11    director, or a unit director, for one of the
12    mental retardation cottages.
13 Q  And how long were you there?
14 A  About four months.
15 Q  And were all of the clients there adults?
16 A  There were adults and some adolescents, maybe one
17    or two adolescents.
18 Q  But primary that's an adult facility?
19 A  Primarily, adults, yes. That's correct.
20 Q  Then where did you go?
21 A  Because of the travel every day going back and
22    forth to Wetumpka, I resigned from there. Cut
23    grass for a while. Became a police officer for a

Page 106

1   short while. And then I am going to say left
2   there in April, and then four months later I went
3   to work for East Central in 1990, which is like
4   July 16th, 1990.
5   Q   And your position at East Central Mental Health is
6       what?
7   A   From 1990 to 1993, I provided counseling -- I was
8       just a therapist. From 1990 to 1993, I just did
9       therapy in the office working with individuals
10      suffering from a variety of mental disorders and
11      Emotional Disturbances. Then I got a promotion in
12      1993 as a Program Director doing all of the crisis
13      intervention for East Central Mental Health
14      covering Pike, Macon, and Bullock County. I
15      oversee all of that.
16  Q   That's your present position?
17  A   That's my present position. As well as doing
18      therapy in the office. I do both.
19  Q   Isn't it true and correct, Mr. Wright, that your
20      primary client base are adults?
21  A   That's correct.
22  Q   As opposed to adolescents?
23  A   That's correct. Yes.

Page 107

1   Q   Do you have any other adolescent that you are
2       seeing on an ongoing basis today other than
3       Justin?
4   A   Justin is the only one. As a matter of fact, I
5       only see about -- I don't see, I don't think, any
6       more than six to ten clients in my caseload. But
7       because I was so involved in this case, I kept him
8       on as one of my primary clients.
9           So, I only see about six to ten clients. I
10      won't see any more than that, because I am so busy
11      in the courts all the time, and doing crisis
12      interventions, consults at the jail, consults at
13      the hospital, consults at the nursing homes,
14      consults in court. So, that's what I do
15      primarily.
16  Q   When you're counseling Justin, do you ever address
17      issues of personal safety?
18  A   Yes, we do talk about personal safety. But not in
19      the context of sexual abuse. That is not
20      something I have talked about with him, because I
21      believe, fully believe, you know, he fully
22      understands the nature of what that is now and the
23      pain that it caused him. And I don't -- in my

Page 108

1   sessions, I don't suspend my time saying --
2   Q   Okay. You believe he knows that, but that's not
3       something you have really discussed with him?
4   A   No, I haven't. No, I haven't.
5   Q   That's just an intuitive --
6   A   Intuitive, yes.
7   Q   With regard to personal safety, do most students
8       learn personal safety or have some exposure to
9       issues of personal safety before they go to
10      school? That is, preschool age?
11  A   Well, I have covered that with my children. I've
12      definitely covered that with my children.
13  Q   Do you feel that's a parental responsibility to
14      address issues of personal safety?
15  A   I definitely do. Especially for young children.
16  Q   How have you addressed issues concerning sexual
17      abuse with your children?
18  A   I cover what's appropriate language. I've covered
19      who you -- I have covered answering the phone. I
20      covered who you open the door for, who you don't
21      open the door for if I am not home. I have
22      covered what's appropriate touching, what's
23      inappropriate touching. People don't touch you

Page 109

1   here. They shouldn't touch you there. Covered
2   all that with my children.
3   Q   Are those the kinds of things that responsible
4       parents should deal with their children?
5   A   Should be with all parents. Should be.
6   Q   So, the first level of personal safety ought to be
7       in the home between the parent and the child?
8   A   I think it's -- it should be the first level. But
9       it should the responsibility of everybody.
10  Q   All right. But is that something that parents
11      ought to undertake as a primary concern; the
12      personal safety of their children?
13  A   Should. Absolutely. That's what they are there
14      for.
15  Q   Do you think the personal safety of an individual
16      is the primary responsibility of the parent?
17  A   I'm sorry. Say that again.
18  Q   As opposed to anybody else?
19  A   I'm sorry. Say it again. Rephrase the question
20      for me.
21  Q   Sure. Would you agree that it's a parent's
22      primary responsibility to address issues of
23      personal safety with their children?

| Page 110 |
|---|

1  A  Primary, yes.
2  Q  Assume that Justin was sexually abused in his
3     home. Would Justin have some anger towards his
4     parents for letting that happen in his home?
5  A  I have no way of answering that at this juncture.
6  Q  Well, wouldn't you agree that most children
7     believe that they should enjoy a safe harbor in
8     their own home?
9  A  That stands to reason.
10 Q  And if a child is abused in their home, is that
11    something that would result in anger by the child
12    who is a abused in their home towards their
13    parent?
14    MS. ALLEN: He said he couldn't answer
15       that.
16 A  I can't answer who anger or blame would be
17    directed by the victim, because victims blame
18    themselves. And then anger -- you know, so, I
19    can't really answer that.
20 Q  Have you prepared and given to counsel all of your
21    records other than some summary chart? What have
22    you tried to give to us?
23 A  Progress notes, treatment plan -- uhm, I think I

| Page 111 |
|---|

1     gave you doctors' notes, those kinds of things.
2  Q  What have you not given us?
3  A  I need to give you progress note or two as well as
4     give you this section of the chart here
5     (indicating).
6  Q  All right. The progress notes consist of how many
7     pages?
8  A  Okay. Not many.
9  Q  I mean, that's this section here?
10 A  Yes. And it's going to be probably -- oh, boy.
11    We're talking about one, three, four, five, six,
12    seven --
13 Q  Is that something we can copy right now?
14 A  I rather we do that for you, if I can. I don't
15    know what our procedure is. But I rather me bring
16    that back to you. I can bring it back later to
17    you today or tomorrow.
18 Q  So, in addition to that, what else?
19 A  Just a couple of notes, and that's going to be it.
20    MR. SWEENEY: Let me mark Defendant's
21       Exhibit -- the records that we've
22       gotten, would that be exhibit, what?
23    THE COURT REPORTER: I don't know.

| Page 112 |
|---|

1     Eight, I think, maybe.
2     MS. DePAOLA: I only have four.
3     MR. SWEENEY: Do you have any objection
4        if we mark this packet that Deanie
5        as provided to me, Deanie, as
6        Plaintiff's Exhibit --
7     MS. ALLEN: What are the pages numbers?
8     MR. SWEENEY: Bates 632 through Bates
9        714.
10       What's the next number?
11    THE COURT REPORTER: Defendant's is
12       going to be 5.
13       (Whereupon, Defendant's Exhibit 5
14          was marked for identification and
15          is attached hereto.)
16    MS. DePAOLA: This one has got a bunch
17       of highlighting.
18    MR. SWEENEY: I'll go over those.
19 BY MR. SWEENEY
20 Q  Let me show you the documents beginning with Bates
21    632 through 714. Some of them are a little bit
22    difficult to read. The first entry appears to be
23    10/26. Can you read that date at the top that I

| Page 113 |
|---|

1     have highlighted?
2  A  That appears to be 2000.
3  Q  2000?
4  A  That's what it appears to be.
5     MS. ALLEN: Excuse me, Donald. Can we
6        go off the Record for just a second?
7        (Brief off-the-Record discussion.)
8  BY MR. SWEENEY
9  Q  Okay. Bates page 634 shows the date of 10/8 --
10 A  Ninety-eight, it appears.
11 Q  -- 98? And under axis, parent/child retaliation.
12 A  Relation.
13 Q  Okay. Relation?
14 A  Relational problems.
15 Q  Then I have bracketed a section of that. Can you
16    read what's within that section?
17 A  Parent/child relational problem. Appears to be
18    inconsistent discipline. Lack of appropriate
19    communication. Appropriate discipline techniques.
20    Improve communication skills. Improve
21    relationship.
22 Q  Okay. So, I take that to mean on the left-hand
23    column, problems are identified. And on the

| Page 114 | | Page 116 | |
|---|---|---|---|
| 1 | right, goals and objectives? | 1 Q | 9/13/05. And what's the comment? |
| 2 A | That's right. Absolutely. | 2 A | Sexual abused by teacher. Dealing with guilt. |
| 3 Q | And at the bottom, Ms. Reed signs that on 10/8/98? | 3 Q | Okay. Whose notes would those be? |
| 4 A | That's correct. | 4 A | This is -- |
| 5 Q | The next page, it looks like it's 10/8/98, Bates | 5 | MS. ALLEN: It says Mona Watson, I |
| 6 | 635. Can you read what's in the comment section? | 6 | think. |
| 7 A | Not as bad at school. | 7 A | No, it's LaShonda -- it looks like LaShonda |
| 8 Q | Severe problems, not as bad at school? | 8 | Stevens, I believe. Latesha something. Oh, boy. |
| 9 A | Severe defiant behavior at home, but not as bad at | 9 | It's one of our therapists we had at Mental |
| 10 | school. | 10 | Health. I'm trying to -- |
| 11 Q | Okay. The next page, 636. Can you read what's | 11 Q | This is a document from East Central Mental |
| 12 | been highlighted there? | 12 | Health? |
| 13 A | Oppositional behavior. Child is extremely defiant | 13 A | It is. It is. Yeah. |
| 14 | at home. | 14 Q | And who is she? |
| 15 Q | All right. So, we are showing a consistent | 15 A | She was a mental -- she was a Master's-level |
| 16 | oppositional defiant attitude between Justin and | 16 | therapist at Mental Health. |
| 17 | his parents? | 17 Q | So, she works with him along with you? |
| 18 A | That's what it's reflecting. | 18 A | No, sir. No, sir. She worked with him back in |
| 19 Q | Okay. On 10/8/98, it's judgment average. Poor. | 19 | 2005. But he dropped out of services for a while. |
| 20 | And I can't read what's under the family history? | 20 Q | So, what is her position? |
| 21 A | Hold on one second. Let me look in the chart | 21 A | She was a child and adolescent therapist at Mental |
| 22 | here. | 22 | Health. |
| 23 | THE WITNESS: Can I take a break for a | 23 Q | So, she would have been helping him debrief after |

| Page 115 | | Page 117 | |
|---|---|---|---|
| 1 | minute to call this Court that is | 1 | the realization that he had been sexually abused? |
| 2 | calling me? | 2 A | Yes. Because she specifically talks about guilt, |
| 3 | MS. DePAOLA: Sure. | 3 | dealing with guilt. |
| 4 | MS. ALLEN: Sure. | 4 Q | So, earlier we were talking that he did not get |
| 5 | (Brief recess.) | 5 | intensive therapy after it was discovered that he |
| 6 BY MR. SWEENEY | | 6 | may have been abused. We now learn from the |
| 7 Q | Did you find that, Mr. Wright, whatever the family | 7 | records that East Central Mental Health was |
| 8 | history is? I just can't read it. | 8 | providing him the debriefing that East Central |
| 9 A | Yes. Give me one second. | 9 | Mental Health thought was appropriate? |
| 10 Q | Uh-huh. | 10 A | Yes, especially the guilt feelings, because you |
| 11 A | Okay. | 11 | can -- |
| 12 Q | 10/8/98. | 12 Q | All right. And if East Central Mental Health had |
| 13 A | Okay. It says, brother, mental health services. | 13 | thought he needed more or less therapy than was |
| 14 Q | What is -- | 14 | being provided, you would have given it; correct? |
| 15 A | Brother. And mental health services. In other | 15 A | Let me look at the -- okay, I will tell you this, |
| 16 | words, brother has had treatment, it seems. | 16 | now, what we did. Can I just tell you? |
| 17 Q | Okay. Next page, the comment section, it says | 17 Q | Sure. Please. |
| 18 | what? | 18 A | He was readmitted on 9/13/05. Family education |
| 19 A | That's gonna be dated 3/9/05 or something. | 19 | and support with the mother on 10/04/05. |
| 20 Q | I can't read the date. | 20 Q | What was the previous session before that one you |
| 21 A | Yeah. | 21 | just made reference in September? |
| 22 Q | This is Bates Stamped 638. | 22 A | He was out of services for several years, it |
| 23 A | Almost there. Okay. 9/13/05. | 23 | appears. |

Page 118

1  Q  Okay.
2  A  So, on 9/13/05 readmitted. We saw the mother for
3     family support and education. And then on 10/04,
4     we saw him for individual therapy. 10/21, we saw
5     him for individual therapy. 10/27, saw him for
6     individual therapy -- oh, forgive me. Let me
7     backup. 10/21 -- uhm -- yes, 10/21. Then
8     rescheduled for 10/27 at 9:30. And then
9     rescheduled again for 11/15 at 10 a.m. And then
10    he no showed for 11/15.
11        So, I am not sure -- what it appears to be
12    here is that he was rescheduled for two
13    appointments. Then he no showed for an
14    appointment. They rescheduled him again, and he
15    no showed for the next appointment. Then we sent
16    him a follow-up appointment.
17 Q  And whose responsibility is it to get him to
18    appointments like that? It's the parents'
19    responsibility, isn't it?
20 A  Should -- should be the parent.
21 Q  And if there was some information that a
22    complication had come up, it wouldn't have been no
23    show, would it? There would have been some

Page 119

1     explanation? They just didn't come, did they?
2         MS. ALLEN: Object to the form.
3         Do you have knowledge of that?
4  A  Well, I probably wouldn't -- I wouldn't phrase it
5     that way.
6  Q  Okay. When one of you put in a chart like this,
7     no show, what does that usually mean?
8  A  You know, you say that -- I'm sorry. I'm not
9     trying to laugh, but the way you say that.
10        A lot of my peers have -- a lot of my peers
11    have a difficult time with no shows.
12 Q  Okay. Let's say there was an appointment.
13 A  Yes.
14 Q  And your people that had scheduled it expected
15    someone to come at that appointed hour, right?
16 A  Yes.
17 Q  And up until that moment happened they expected
18    the person to be there, right?
19 A  That's correct.
20 Q  And the person didn't show. And so they put down
21    no show?
22        MS. ALLEN: Object to the form, unless
23        you have specific knowledge of that.

Page 120

1  Q  Is that the procedure that's usually followed?
2  A  That's the way it appears, sir. That's the way it
3     appears.
4  Q  Let's look at the next page, 639.
5  A  Can I ask --
6  Q  Oh, please.
7  A  Okay. And I am here at your disposal.
8  Q  Sure.
9  A  And so -- I mean, I don't want -- in my testimony
10    I don't want to seem like I am trying to
11    incriminate anybody.
12 Q  Uh-huh. You're just telling the truth, aren't
13    you?
14 A  That's what I am trying to do.
15 Q  Okay.
16 A  But anyway, I just wanted to say that. Go ahead.
17 Q  Next page, can you read what's highlighted?
18 A  All righty. Let's see here.
19 Q  That's Bates 639.
20 A  Got my finger marking it.
21        Okay. Client is dealing with feelings. Okay.
22    Wait a minute. Client's mother reports that
23    client was sexually abused by his band teacher and

Page 121

1     is dealing with feelings of guilt and depression.
2  Q  Okay. Bates 643. This is East Central Mental
3     Health. And I can't see the date. Seven --
4  A  It's 3/26/07.
5  Q  3/26/07. So, that's recent. Are these your
6     notes?
7  A  Yes. Yes. My treatment plan.
8  Q  Okay. And this was what, 3/27?
9         Okay. Did we make reference to that? Yeah,
10    that was one of the early appointments, wasn't it?
11    Okay.
12        Bates -- I don't see the number. This has an
13    Azar, Azar & Moore, but no Bates number. Maybe
14    it's six -- I think it's 650, and it doesn't show
15    up. Do you have a date on --
16 A  It looks like there is something there. But you
17    can't read it. Am I right?
18 Q  That's what it appears.
19 A  That's -- that's a therapist. No. I've got to go
20    to another section.
21 Q  Would this be your writing?
22 A  No. Somebody else.
23 Q  So, somebody else has seen him on this occasion?

Page 122

1   A   I believe so. Give me one second.
2       What was the date behind that?
3   Q   The previous one is 3/26.
4   A   Okay. What's the note behind that one?
5   Q   See (indicating).
6   A   Okay. Let me -- give me one second here.
7       MS. ALLEN: Can we go off the Record for
8           one quick second?
9           (Brief recess.)
10
11          (Whereupon, at approximately, 12:55
12          p.m. on the 1st day of October,
13          2007 the proceedings were
14          adjourned for the day.)
15          (Whereupon, the deposition of
16          Andrew Wright was resumed at
17          approximately 10:00 a.m. on
18          November 20, 2007.)
19      MR. SWEENEY: Would you mark this as
20          Defendant's Exhibit 6?
21          (Whereupon, Defendant's Exhibit 6
22          was marked for identification and
23          is attached hereto.)

Page 123

1       MR. SWEENEY: And would you mark this as
2           Exhibit 7?
3           (Whereupon, Defendant's Exhibit 7
4           was marked for identification and
5           is attached hereto.)
6       MR. SWEENEY: Usual stipulations. And
7           if you will readminister the oath.
8       ANDREW WRIGHT, Resumed
9       (The witness, having previously been sworn,
10  further testified as follows:)
11          FURTHER EXAMINATION
12  BY MR. SWEENEY
13  Q   Mr. Wright, it's November 20th, 2007. And we're
14      resuming your deposition for the purposes of
15      having before us what we think are all of the
16      relevant documents; the documents you had in your
17      file; the documents that were obtained from UAB.
18      As far as you know, have you produced for the
19      attorneys in this case all of your records?
20  A   Uhm, there might be a few in my chart that you may
21      do have. And I can give these to you and let you
22      run a copy of them if you would like to.
23  Q   What were those? Do you have them with you?

Page 124

1   A   Just progress notes. It's nothing significant.
2   Q   We want all your records. Are these new notes
3       or --
4   A   No. Those are that you should have had a copy of
5       already, had not put in the chart. And I am going
6       to give these to you now if you'd like to have
7       them. And you can look over them and see if you
8       want copies of them. Let me pull these out. Hang
9       on a second.
10  Q   Your notes consist of --
11  A   Basically, individual and family.
12  Q   Now, you put some to the side. Are those --
13  A   Those were notes that you already have, I believe.
14      MS. ALLEN: Can I get a quick copy of
15          that?
16  A   This documentation here is basically
17      documentation --
18      MS. ALLEN: Can you all hold on just one
19          quick second?
20          (Brief recess.)
21  BY MR. SWEENEY
22  Q   Let's go back on the Record. Then, Mr. Wright, so
23      after you have checked what has been marked as

Page 125

1   Defendant's Exhibit 6, you have determined that we
2   now have all of your notes and all of the records
3   from your file concerning Justin Reed?
4   A   Uhm -- I guess we'll figure this out in a minute,
5       won't we? I still think that you still don't have
6       all my notes. I think I've got like a couple more
7       notes that you need to run copies of.
8       MS. ALLEN: Can we go off the Record
9           just a minute?
10          (Off-the-Record discussion.)
11      MR. SWEENEY: Mark that as Defendant's
12          Exhibit 8.
13          (Whereupon, Defendant's Exhibit 8
14          was marked for identification and
15          is attached hereto.)
16  BY MR. SWEENEY
17  Q   Let's go back on the Record. Let me show you
18      what's been marked as Defendant's Exhibit 6, which
19      is the compilation of notes that have been Bates
20      stamped pages 632 through 655A (sic).
21  A   Uh-huh.
22  Q   Did those come from the books and records that you
23      kept on Justin Reed?

Page 126

1  A   Yes, sir.
2  Q   In your earlier deposition, we made reference to
3      another set, which is essentially duplicated, but
4      has what different set of Bates numbers.  And
5      we're going to refer to what we have just marked
6      as Defendant's Exhibit 6 for purposes of this
7      deposition and for pleadings.  So, we'll refer to
8      that.
9          Now, with regard to your additional
10     information, I asked you if we now have all
11     documents that -- in your file relevant to Justin
12     Reed?
13 A   I believe so.
14 Q   I had previously marked as Defendant's Exhibit 7
15     documents that came from the University of Alabama
16     at Birmingham Hospital concerning Justin.
17         And now we have marked as Defendant's
18     Exhibit 8 some notes that you pulled from your
19     file to say these were additional notes?
20 A   Yes.  Yes.
21 Q   All right.  With regard to Defendant's Exhibit 6,
22     Bates stamped 632 through 755A, and Defendant's
23     Exhibit 8, is it your representation to us we now

Page 127

1      have all of your documents pertinent to Justin
2      Reed?
3  A   That is correct.
4  Q   Have you read the complaint in this case where the
5      plaintiffs, on behalf of Justin Reed, have sued
6      the Pike County Board of Education?
7  A   Partially.
8  Q   Partially?
9  A   Yeah.  Didn't fully read the whole packet of
10     information.
11 Q   So, you are generally aware of the allegations
12     against the Pike County Board of Education?
13 A   Generally aware, yes.
14 Q   Do you have any firsthand knowledge about matters
15     that occurred at Pike County High School during
16     the 2004-2005 school year?
17 A   Other than therapy sessions with the client.
18 Q   But no firsthand knowledge?
19 A   No firsthand knowledge.
20 Q   All of your information would be based on your
21     consultation with Justin?
22 A   That is correct.
23 Q   Have you had any conversations with Ms. Reed

Page 128

1      concerning what happened during the 2004-2005
2      school year at Pike County High School?
3  A   Yes.
4  Q   And what has she told you?
5  A   Just general information that the child was
6      sexually molested and that it's been reported or
7      she was communicating that oral sex might have
8      been performed on the teacher.  Now, those were
9      her reports.
10 Q   Okay.  Have you had any conversations with any
11     other law enforcement officials --
12 A   No.
13 Q   -- DHR officials --
14 A   No.
15 Q   -- or anyone else about what might have occurred
16     during the 2004-2005 school year at Pike County
17     High School?
18 A   Not to my knowledge.  Just maybe some off the
19     Record -- indirect -- not pertinent that you could
20     put in the Record, I don't think.
21 Q   I don't understand what you mean off the Record.
22     Who have you been talking to off the Record?
23 A   I wouldn't say off the Record, per se.  I will

Page 129

1      just say that maybe an informal conversation.
2          Well, let me back up.  When Justin was
3      initially referred to us, Mona Watson, okay,
4      informed me that the child was sexually molested
5      and that was the essence of his behavioral
6      disturbance.  So, I did talk to her.  That was on
7      the record, forgive me.
8  Q   Okay.  Do you have notes to reflect that
9      conversation?
10 A   Ah, yes, I do.  Some additional referral.
11 Q   So, any conversation you had with Mona would have
12     been reflected in your notes?
13 A   Yes.
14 Q   And that would be the best version of the
15     conversation that took place?
16 A   Yes.
17 Q   When did you last consult with Justin Reed?
18 A   It's been a couple of months now.  I haven't had a
19     session with him.  We need to reschedule a
20     session.  But I have been very busy.  And I think
21     he's been in school.  We have all been going in
22     different directions.
23 Q   Aside from that, what is the date of the last

Page 130

1      consultation that you had with Justin?
2    A  Last consultation with Justin, I believe, was on
3       9/18.
4    Q  Of '07?
5    A  Yes.
6    Q  And prior to that, when was the last -- in 2007,
7       starting with the most recent and going backwards,
8       when you have had consultation with Justin?
9    A  I'm going to say 9/10/07. I'm sorry. Do you want
10      the next date?
11   Q  Uh-huh.
12   A  I'm sorry. The next contact we had with him --
13   Q  Is this a contact or actual meeting?
14   A  I'm going to say -- we call them contacts. But
15      then we can be more specific about the contact.
16      The contact was a physician appointment with the
17      psychiatrist. And this is on July 23rd.
18   Q  Okay. What I would like to know is when you met
19      with Justin for consultation.
20   A  So, you do not want the psychiatrist visit?
21   Q  Not at this point in time. I want to know your --
22   A  Okay. The session before that was 7/2/07.
23   Q  Next?

Page 131

1    A  6/11/07.
2    Q  If you will continue through '07.
3    A  4/30/07.
4    Q  Four what?
5    A  Thirty.
6    Q  Uh-huh.
7    A  The one before that, 4/25/07, 4/16/07, 4/9/07,
8       3/26/07, 3/19/07. Uhm, 3/5/07, 2/26/07, 2/22/07.
9       And now, this was not -- this was the initial
10      crisis call that we received on --
11   Q  On 2/22?
12   A  Yes. That was the initial crisis -- that
13      initiated the case.
14   Q  And that's the first time you saw him?
15   A  No. That was a phone call with the father.
16   Q  Okay.
17   A  And I believe my first contact with him was on
18      2/23 that I visibly -- I mean, visually saw him.
19   Q  Now, what we have marked as Defendant's Exhibit 8,
20      that covers which visit?
21   A  Uhm, can I see what paper you're talking about?
22      That -- no, that was a deposition we had here.
23   Q  Huh?

Page 132

1    A  That was the last deposition that we had.
2    Q  All right. I can't read your writing.
3       Defendant's Exhibit 8, you have that before you?
4    A  Yes. Okay.
5    Q  What have you reported in Defendant's Exhibit 8?
6    A  Okay. I --
7    Q  Page 1?
8    A  Page 1 basically was the deposition that we were
9       here on 10/1.
10   Q  What do you say?
11   A  I basically say that I served in a deposition --
12      testified, I guess; whatever you call this -- on
13      the Record. Answered your questions and talked
14      about the treatment process. And that I was
15      supposed to return at a later date. So, basically
16      that's it.
17   Q  Okay. Page 2?
18   A  CLO saw client and family in the office today.
19      CLO is myself. I am the court liaison officer for
20      Mental Health.
21   Q  Now, if you will track all of the entries from
22      that visit with the family.
23   A  Okay.

Page 133

1    Q  First, who was in consultation that day?
2    A  Let me finish reading. CLO helped whole family to
3       cope with recent stressors of losing father.
4       Mother of client seemed to be under the most
5       stress.
6    Q  And this was on what day?
7    A  That was on 9/18/07.
8    Q  9/18?
9    A  Yes.
10   Q  How do you know that date? Where does that
11      appear? I got it.
12   A  You got it? Okay.
13   Q  And what have you indicated? If you will just
14      track from the top to the bottom.
15   A  Helping the children understand how to assist
16      their mother as well as how to assist one another
17      through this family stress. So, we worked on
18      that.
19   Q  Is that all that you have said here?
20   A  No. On to the next page.
21   Q  Okay. If you will look at page 2 and tell me what
22      you have written here, because I can't read your
23      writing. This is page 2.

Page 134

1  A  Okay.  Basically said I was supposed to see him on
2     10/3/07 again.  And that's the end of the note
3     here, basically, if I go back here --
4  Q  **Wait, I am apparently not asking questions well.**
5     **Would you start at the top of page 2 --**
6  A  Okay.
7  Q  **-- and tell me what you have stated in this --**
8  A  I did.  I just covered that note.
9  Q  **All right.  What does it say?**
10 A  I just read that to you.  Helping the family cope
11    with the stress.  Helping -- helping them how
12    to -- how should I say this? -- helping the family
13    to deal with --
14 Q  **The mother seems more distressed than the**
15    **children?**
16 A  Yes.  Yes.  I read all that to you.  So, I am
17    finished with that page.
18 Q  **All right.  At that meeting, Justin was there?**
19 A  He was.
20 Q  **And what do you recall Justin's affect during that**
21    **meeting?**
22 A  His affect seems to be pretty -- pretty adjusted.
23    He seems to be coping well with his father's death

Page 135

1     at that time.
2  Q  **Okay.  Next page?**
3  A  Okay.
4  Q  **This was 9/10.**
5  A  9/10.  Okay.  CLO saw client in the office.
6     Client and CLO spent considerable time discussing
7     issues surrounding sexual abuse of two years ago.
8     Client was asked if he was fondled by teacher.
9     Client admitted that he was fondled more than
10    once.  That's what he told me.  Client was asked
11    if he performed oral sex on teacher.  Client
12    denied oral sex being performed.  Client only
13    responded in head gestures, but completely seemed
14    to become -- one second -- nonverbal or totally
15    tried to avoid the topic.
16    Client was questioned about feeling -- client
17    was questioned -- it should have been questioned
18    about feelings due to abuse.  Client communicated
19    feeling -- feelings of shame or humiliation when
20    questioned about certain feelings.  CLO is to see
21    client again next month but is to see family and
22    client on 9/18/07.
23    Client appears to be taking meds and shows no

Page 136

1     signs of aggression or acting out.
2  Q  **So, he's doing better in that regard?**
3  A  Yes, he is.
4  Q  **Okay.**
5  A  Okay.
6  Q  **In that meeting, did you discuss where he said he**
7     **was fondled; that is, the location?**
8  A  Yes.
9  Q  **Where?**
10 A  Uhm.
11 Q  **I'm not asking you to speculate.  I'm asking you**
12    **if he specifically mentioned where he was fondled.**
13 A  I believe he specifically talked about his front
14    parts, his penis area.
15 Q  **Okay.  I am not asking what part of his anatomy.**
16 A  Okay.
17 Q  **I'm asking where did the fondling take place.  Did**
18    **that come up, whether it was at home --**
19 A  Oh, no, no.  I don't think we got into that in
20    that session.  No.
21 Q  **The last page, did you cover that as well?**
22    **Something about board of education?**
23 A  Yeah, that was another deposition appointment that

Page 137

1     I was present for.  That's basically it.
2  Q  **Okay.  If we review the notes from 9/18/07 back**
3     **through June 11, '07, would it be fair and correct**
4     **to say that Justin shows improvement?**
5  A  Let's see.  I'm going to refer to those notes so
6     that I can answer correctly.
7  Q  **And you're looking at what page of the Bates Stamp**
8     **of Board's Exhibit 6?**
9  A  Looking at pages 694.
10 Q  **I'm sorry.  What page?**
11 A  694.  693.  692.
12 Q  **Okay.  Six ninety-two relates to which of the**
13    **meetings?**
14 A  Individual therapy meeting.  Six ninety-two is the
15    7/2/07 meeting.
16 Q  **Okay.  How was he doing on that?**
17 A  Making good progress on the goals.
18 Q  **Okay.  So, you're encouraged that your**
19    **consultation and your therapy are helping Justin**
20    **adjust to the stresses in his life?**
21 A  That's correct.
22 Q  **693, what session does that relate to?**
23 A  Session of June 11th.  693.

Page 138

1  Q  693?
2  A  Yes.
3  Q  Is June 11th?
4  A  Yes.
5  Q  And 694?
6  A  Is April the 30th.
7  Q  Okay. Where do you find the notes for
8     September 10th and September 18th?
9  A  That's in another exhibit that we just did. That
10    was in Defendant's Exhibit 8. You said 6 or 9?
11    What month?
12 Q  I'm just asking about the consultation on
13    September 10 and September 18th.
14 A  Okay. That's going to be in Exhibit 8.
15 Q  Exhibit 8?
16 A  Yes. (Indicating).
17 Q  Okay. You mentioned that on February 22nd, '07,
18    you had the initial crisis referral?
19 A  Uh-huh.
20 Q  Who made that referral?
21 A  Mona Watson did.
22 Q  Okay. After that referral, you began seeing
23    Justin with some continuity between February 22nd,

Page 139

1     '07 and September 18th, '07. On how many
2     occasions have you met with or talked with
3     Justin's attorneys, Deanie Allen, or Susan
4     DePaola?
5  A  I have no idea. I don't know how many times. I
6     mean, just basically phone calls only consist of,
7     be here, be there, did you get my forms? Those
8     kinds of things.
9  Q  Okay. You haven't actually met with them --
10 A  No, no.
11 Q  -- to discuss the substance of your conversation?
12 A  We haven't met. No.
13 Q  Do you have any employment contract with them for
14    them to pay you as a consultant with them?
15 A  No, sir.
16 Q  No written or oral agreement?
17 A  No, sir.
18 Q  So, who, essentially, then employed you to work
19    with Justin?
20 A  Uhm, we are a State-reimbursed --
21 Q  Huh?
22 A  We are a State Medicare Medicaid reimbursed --
23    insurance reimbursed Agency. We're basically a

Page 140

1     community mental health center, the company I work
2     for. And that is that we see everybody -- or
3     anyone that needs counseling, unless they don't
4     meet our criteria for certain reasons. But that's
5     very few and far between.
6  Q  That's helpful. Let me turn to an entirely
7     different subject. Post-Traumatic Stress
8     Disorder. Let's talk about Post-Traumatic Stress
9     Disorder for just a minute.
10 A  Excuse me. I need my book. I had --
11        MS. ALLEN: Off the Record.
12        (Brief off the Record discussion.)
13 BY MR. SWEENEY
14 Q  Mr. Wright, we made reference to the DSM-IV, which
15    is what reference source?
16 A  That's correct.
17 Q  No, what is that as a reference source?
18 A  It is a diagnostic and statistical manual for
19    diagnoses of mental disorders.
20 Q  And that's considered somewhat the definitive
21    source for psychiatric reference?
22 A  That is correct.
23 Q  I am going to ask you some questions about

Page 141

1     Post-Traumatic Stress Disorder as preliminary to
2     asking questions about Justin. We don't have the
3     DSM-IV before us. That would be your reference,
4     wouldn't it?
5  A  Yes, absolutely.
6  Q  With that understanding, would you just give me a
7     general definition of Post-Traumatic Stress
8     Disorder?
9  A  It is a disorder, an anxiety disorder -- that's
10    the class it falls under -- whereby a person, I
11    guess -- how should I say this -- has recurring
12    thoughts, emotions, feelings, about a trauma
13    experienced, or an adverse -- aversive-type
14    stimulus or situation.
15 Q  And what are the tests to evaluate or diagnoses
16    someone having Post-Traumatic Stress Disorder?
17 A  There is no test. But primarily following the
18    criteria outlined in the DSM-IV. And the DSM-IV
19    gives you a list of criteria, symptoms you check,
20    in order to diagnose or give a diagnostic
21    impression of a person suffering from
22    Post-Traumatic Stress Disorder.
23 Q  While that would be the definitive source, for

## Page 142

1  purposes of our discussion, what are the symptoms
2  for PTSD?
3  A   Number 1, a person must have had some trauma.
4  That's the first criteria. If there is no trauma,
5  you can't diagnose a person with Post-Traumatic
6  Stress Disorder. Like, for example, 9/11, a
7  person that was in the area of the terrorist
8  attacks, or a person that might have seen planes
9  hit the building, that could be a trauma for that
10  person. Okay. So, that's an identifying event,
11  first of all.
12     Second of all, the person must experience some
13  distress over that event. Specifically, recurrent
14  thoughts about a trauma. Feeling of reliving that
15  trauma is another symptom. Having anxiety
16  symptoms about that trauma; such as, shaking,
17  sweating, any of the list of anxiety symptoms that
18  a person might have from anxiety.
19     The most prominent symptom for -- for
20  Justin -- and this is definitely a symptom of
21  anxiety -- we call it avoiding. A person exhibits
22  energy to avoid talking about it or thinking about
23  the traumatic event or withdrawing or shutting

## Page 143

1  down. That's called avoiding, as well. And that
2  is a prominent symptom I saw from Justin; shutting
3  down and avoiding the topic all together.
4  Becoming another personality.
5  Q  Is that also a defense mechanism to cope with the
6  trauma?
7  A  No -- absolutely, it could be. Absolutely. But
8  that is a symptom of a Post-Traumatic Stress
9  Disorder.
10  Q  Let's look at Defendant's Exhibit 7, the notes
11  from Justin's admission to UAB.
12  A  What page?
13  Q  Did you provide us -- that should be Defendant's
14  Exhibit 7.
15  A  I didn't get none of this.
16       MS. ALLEN: Off the Record a second.
17       (Off-the-Record discussion.)
18  BY MR. SWEENEY
19  Q  Let's look at Defendant's Exhibit 7, the notes.
20  Have you ever seen these before?
21  A  Not until today, to my knowledge.
22  Q  Okay. On page 2 of Defendant's Exhibits 7, it
23  shows in the upper right-hand that was

## Page 144

1  discharged -- upper right-hand column, discharged
2  April 24, 2007?
3  A  Yes.
4  Q  You were aware that he was admitted to UAB?
5  A  Yes.
6  Q  Didn't you have some involvement in that decision?
7  A  I made the referral.
8  Q  Because of the conduct that he displayed during a
9  consultation with you?
10  A  That's correct.
11  Q  So, that the reason for the referral was because
12  of his behavior?
13  A  That's correct.
14  Q  Do you know Lee Ascherman, upper left-hand column,
15  the physician?
16  A  Uhm, at the bottom.
17  Q  Right --
18       MS. ALLEN: It's on a page one. His
19       name is listed on page 1.
20  A  Okay. Page 1.
21     Never met this doctor, per se.
22  Q  Do you know him by reputation?
23  A  Uhm, probably as a treating physician. But that

## Page 145

1  was not the physician I spoke with directly during
2  initial referral. So, evidently, the admitting
3  physician and this physician are not the same.
4     But he is a treating physician.
5  Q  It says he was admitted on 04/17/07, and
6  discharged essentially a week later, 04/24/2007.
7  The discharge follow up says patient will have
8  follow up with his therapist, Mr. Wright, on
9  4/25/07?
10  A  Uh-huh.
11  Q  After that, will have follow up with Dr. Lopez.
12  Earlier when we were questioning and answering,
13  you said that you had a meeting with his
14  psychiatrist at some point. Was that Dr. Lopez?
15  A  I think I made a referral to a psychiatrist, and
16  that is Dr. Lopez.
17  Q  Let me make sure we have gotten the context. When
18  we're looking at the notes on Defendant's
19  Exhibit 7, you said that one of the notes referred
20  to a conversation or a meeting with the
21  psychiatrist?
22  A  That's called a physician consult. Basically, I
23  do a narrative for the doctor. And that's for him

Page 146

1  to understand what's going on with the patient at
2  that time.
3  Q  And was that Dr. Lopez?
4  A  That is Dr. Lopez.
5  Q  Did you give him a written or --
6  A  Written.
7  Q  -- oral narration?
8  A  Written narration.
9  Q  Do we have a copy of that?
10 A  Yes, you do.
11 Q  That's in Defendant's Exhibit --
12 A  Six.  Page 635.
13 Q  Eight six --
14     MS. ALLEN:  No, 635.
15 Q  Okay.  All right.  And you and Dr. Lopez discussed
16    what therapeutic interventions should take place
17    to help Justin cope with the stresses in his life?
18 A  That's correct.
19 Q  And what was the role that Dr. Lopez was going to
20    discharge?
21 A  The role that Dr. Lopez played that day was a role
22    prescribing the appropriate medication for Justin.
23    I think that he might have been on Adderall --

Page 147

1  plain Adderall.
2     Okay.  He was on -- client is presently on
3  extended release Adderall.  XR -- that's what XR
4  means, extended release.  But wants to be placed
5  on regular Adderall.  And he was having some side
6  effects from taking the extended release.
7  Q  And Adderall was for what purposes, to address
8    what?
9  A  Attention deficit, I believe.  Hyperactivity,
10    attention deficit disorder.
11 Q  And that's generally what it's administered for?
12 A  That's correct.  That's correct.
13 Q  In your conversation with Dr. Lopez, did you
14    discuss what medication might be appropriate to
15    help him address Post-Traumatic Stress Disorder or
16    depression?
17 A  He was prescribed Lexapro.  And I believe he might
18    have been discharged on that or placed on that at
19    the hospital.
20 Q  Okay.  In the consultation section of the UAB, it
21    says that this individual -- do you see at the
22    very bottom, recommendation -- this individual
23    will benefit from individual therapy as well as

Page 148

1  group therapy in order to address his social
2  skills and coping deficits?
3     And then aught two, he needs to see a
4  psychiatrist for medical management.  And that's
5  what you were doing with Dr. Lopez?
6  A  That's correct.
7  Q  The lack of consistent well-defined coping style
8    may make this individual vulnerable for impulse
9    control.  Monitoring for safety concerns during
10    times of stress is strongly urged.  Is that
11    something you are addressing?
12 A  Absolutely.
13 Q  Page 3, the reason he was referred to UAB for
14    residential placement on page 3 of this Exhibit,
15    page 2 of the report, was for behavior problems?
16 A  That is correct.
17 Q  Do you see that?
18 A  That is correct.
19 Q  When the UAB people were compiling a history of
20    Justin, who at that time was 17, they indicate he
21    has been a -- he was in therapy on 4/16 and became
22    angry and told family he would not go back to
23    school?

Page 149

1  A  That is correct.
2  Q  He also kicked the band door?
3  A  That is correct.
4  Q  He has been aggressive at home, too?
5  A  That is correct.
6  Q  He had outbursts and defiant behavior recently?
7  A  Yes.
8  Q  And then there is a recitation of the types of
9    behavior that culminated in this referral?
10 A  That's correct.
11 Q  Now, you're familiar with the records of Justin.
12    and isn't it true and correct that he has had
13    anger management problems since at least 1998?
14 A  I -- we're talking about something that maybe I
15    discussed last time I was here and had a chance to
16    reflect in those notes again.  But I do believe he
17    had some issues, but not issues to the magnitude
18    of what we saw in February and April.
19 Q  Well, have you referred to notes recently as to
20    what the manifestations were that resulted in
21    counseling and therapy in 1998?
22 A  I'm having to have to reflect back again.  I think
23    that's the best thing.

## Page 150

1 Q   Do you recall, Mr. Wright, that he had episodes of
2      choking a sibling and other physical --
3          MS. ALLEN: Object to the form.
4 Q   -- outbursts towards parents and family in 1998?
5 A   I don't remember reading that. I'll have to look
6      at that note if you don't mind.
7          MS. ALLEN: Yeah, let's look --
8 A   Because I don't remember saying that.
9 Q   If I ask you about the history of present illness
10     that appears on page 2 of this UAB report, page 3
11     of the exhibit, you're not in a position to tell
12     me whether this conduct mirrors conduct that he
13     has exhibited since 1998?
14         MS. ALLEN: Object to the form.
15 A   This --
16 Q   You can answer.
17 A   There is no indication that this is a mirror of
18     that behavior. No, sir. No indication
19     whatsoever.
20 Q   But you haven't recently referred to those notes
21     for the consulting people in 1998; is that right?
22 A   I'm sorry. Rephrase your question, again.
23 Q   Yeah. Okay. I have notes from Dr. Wright's

## Page 151

1      records. An entry on 10/8/98, referred for
2      services because of oppositional behavior along
3      with attention deficit behavior. Child is
4      extremely defiant at home. But mother indicated
5      doesn't have any problems with child at school.
6          Does that refresh your recollection about
7      notes in your records?
8 A   It does. But I don't remember saying that, you
9      know, he had choked a sibling back in '98, though.
10     And I think that's what you're saying. I don't
11     remember saying that.
12 Q   An entry on 11/9/98 --
13 A   Okay.
14 Q   -- reported that he, Justin, tried to choke his
15     brother over a piece of candy?
16         MS. ALLEN: Do you know what the Bates
17         Stamp --
18     MR. SWEENEY: I'm sorry. Just an entry
19         of 11/9/98. I may be able to find
20         that.
21 A   What page is that note?
22         MS. ALLEN: That's what we're looking
23         for.

## Page 152

1          THE WITNESS: What date did he say,
2          again?
3 Q   11/9. I have a 658 as 11/9.
4          For the Record, we will just have to find an
5      entry on 11/9/98. But as I ask you today, you
6      don't recall an incident that's in the record, or
7      I'm representing is in the records, for a
8      complaint on 11/9/98 that reported that Justin
9      tried to choke his brother over a piece of candy?
10     That's not something you recall?
11 A   I don't recall seeing that. I am looking at the
12     notes now, and I don't see anything reflecting
13     that he tried to --
14 Q   Do you know when Justin was first diagnosed as
15     having Oppositional Defiant Disorder?
16         (Brief interruption.)
17         THE WITNESS: Let me turn this off.
18         That's the best thing to do.
19 BY MR. SWEENEY
20 Q   Do you know when Justin was first diagnosed with
21     having Oppositional Defiant Disorder? I have a
22     note that that appears on 10/15/99. Do you have
23     any recollection that Justin has had difficulty

## Page 153

1      with anger management and attitude such that he
2      would have been diagnosed as Oppositional Defiant
3      Disorder as early as October 15, 1999?
4 A   I will say this: There is a trend of him having
5      behavioral issues. I'm trying to find the
6      diagnosis.
7 Q   Well, before a child is diagnosed with being
8      Oppositional Defiant Disorder, the trend has to be
9      pretty severe, doesn't it?
10 A   I won't say the word "severe". I would say
11     increased frequency of the behavior. That's the
12     way, as a scientist, to say that.
13 Q   Well, let's clarify terms, then. Do you, on
14     occasion, diagnose people that come to you as
15     having Oppositional Defiant Disorder?
16 A   I believe I have.
17 Q   And when you do, what is the order or symptoms
18     that you're categorizing with that label? Isn't
19     it persistent, defiant attitude?
20 A   I would -- absolutely.
21 Q   I mean, there has to be a persistent --
22 A   Persistent. Absolutely. That's a good one.
23 Q   Persistent, pervasive over time?

---

Page 154

1   A   Yes. Yes. Yes.
2   Q   Okay. Past psychiatric history, page 2 of the UAB
3       report, three of the exhibit, there is a reference
4       that he's had no suicidal attempt in the past. Is
5       that consistent with your information about
6       Justin?
7   A   What page are you on?
8   Q   Page 2 of the report on the bottom. Bates Stamp
9       810.
10  A   810. Okay.
11  Q   Past psychiatric history.
12  A   That's correct. No suicidal ideations to my
13      knowledge.
14  Q   Let's look at the next page, page 3 of the report,
15      page 4 the exhibit. During the consult at UAB,
16      Justin denied having any physical symptoms
17      relating to his problems. Do you see that, review
18      of systems? Entry --
19  A   Yes, I see it.
20  Q   -- or section number two?
21  A   I see that. What are you asking, though?
22  Q   Uhm?
23  A   It was asking no physical symptoms.

---

Page 155

1   Q   That's right. And that is consistent with your
2       observation that you have not seen any physical
3       manifestation of the mental issues that have
4       stressed him?
5   A   Okay. Okay. Yes.
6   Q   Hospital course. There is, starting in the
7       mid-section, it says, later part of the hospital,
8       we came to know that patient was actually sent to
9       hospital according to court order because of his
10      violent behavior?
11  A   That's correct.
12  Q   And that was on your referral?
13  A   That's -- well, yes.
14  Q   And it was violent behavior towards his family on
15      that occasion that precipitated the referral?
16  A   Uhm, initially, in February, and we were afraid
17      that he was going to become violent again in
18      April. That's why we referred him, because he was
19      starting to kick things and --
20  Q   But it was --
21  A   -- heading that way.
22  Q   But it was anger --
23  A   Yes.

---

Page 156

1   Q   -- and violent behavior --
2   A   Yes.
3   Q   -- in the context of his family and towards his
4       family; is that right?
5           MS. ALLEN: Object to the form.
6   A   I won't say he had become physically violent
7       towards family. But I think he had high potential
8       to become violent at that time.
9   Q   And that manifestation of hostility or anger
10      towards his family had been part of his records
11      since 1998?
12          MS. ALLEN: Object to the form.
13  Q   Is that correct? Based on your notes?
14  A   Based on my notes, there has been some -- but can
15      I clarify my answer?
16  Q   Please.
17  A   A child that's nine or ten exhibiting choking
18      behavior or aggression is not the same as a
19      teenager that's physically becoming violent
20      towards family and others. But --
21          And also this anger that you're talking about
22      did not appear, I guess, consistently, over that
23      seven-year period of time.

---

Page 157

1   Q   Well, the notes --
2   A   There was a re-manifestation, it seems.
3   Q   Are you sharing that opinion based on a recent
4       review of every entry in his chart?
5   A   Based on the fact that we have had no major
6       reports until this year from the family. And
7       according --
8   Q   But my question is: Are you sharing that opinion
9       based on a recent review from the documents you
10      have provided from his chart?
11  A   Just glancing through the notes.
12  Q   Hospital course, paragraph I, depression, in the
13      past, he was also diagnosed with MDD. What is
14      MDD? Mild depression disorder?
15  A   Major Depressive Disorder.
16  Q   Major depression. With psychosis, according to
17      medical records that came from his therapist.
18      Patient and mother were completely unaware of it.
19      Do you see that sentence: Patient and mother were
20      completely unaware of the previous diagnosis of
21      Major Depressive Disorder?
22  A   That's what the -- that's what the discharge
23      summary says.

---

Page 158

1  Q  Does that surprise you based own your consultation
2     with the family?
3  A  I'm not so sure if it's surprising -- see,
4     sometimes family and clients don't understand
5     diagnoses. But I think she understands that he
6     was depressed. But as far as being majorly
7     depressed, I don't think that they understood
8     that, maybe, and what that means.
9  Q  While Justin was at UAB, they treated him in part
10    with prescribed drugs, didn't they?
11 A  They did.
12 Q  And this is his discharge summary --
13 A  Yes.
14 Q  -- Defendant's Exhibit 8. When you read under
15    hospital course, paragraph numbered 1, do you
16    conclude that with the medicine that they were
17    prescribing at UAB, that he was doing much better
18    from beginning to end of that week stay?
19 A  Absolutely.
20 Q  And has he continued to be on Lexapro?
21 A  Yes.
22 Q  Has he had any violent outbursts, to your
23    knowledge, since April 24, of 2007?

Page 159

1  A  Not to my knowledge.
2  Q  During his stay at the UAB, the report concludes
3     on page 4, the last paragraph, during the hospital
4     stay, patient did not have any behavior problems.
5     He tolerated every activity very well.
6     Consistently denied having any auditory, visual
7     hallucinations, suicidal ideation, homicidal
8     ideation. During the day of discharge, he was
9     mentally stable. Denied any auditory, visual
10    hallucination, suicidal ideatsions, or homicidal
11    ideations. That's a good report, isn't it?
12 A  Yeah, it's good.
13 Q  He progressed significantly during his stay at
14    UAB?
15 A  That's correct.
16 Q  With the medication and consultation?
17 A  That's correct.
18 Q  Have you seen a continuation of that same positive
19    results during your subsequent visits with him?
20 A  Yes.
21 Q  There is no record in the UAB discharge that
22    Justin was constantly referring to the sexual
23    abuse that has been alleged in this lawsuit?

Page 160

1         MS. ALLEN: Object to the form.
2  Q  Do you see in the report of UAB any reference that
3     he has had recurring fixations or recurrent
4     thoughts about the alleged sexual misconduct?
5         MS. ALLEN: Object to the form.
6  A  Because he's avoiding. That's the symptom he's
7     exhibiting.
8  Q  My question is more specific than that: Do you
9     see anything in the UAB report that indicates that
10    he is having recurring flashbacks, nightmares,
11    anything that would reflect one -- or a
12    symptomatic signs of Post-Traumatic Stress
13    Disorder in the report?
14 A  No.
15 Q  Have you had any discussions with any of the
16    people that are presently administering Justin's
17    educational program?
18       Did you understand the question, Mr. Wright?
19 A  Yeah. I was just still stuck on this last
20    question you had asked me. And I'm sorry about
21    that, but I was making sure I answered that
22    question correctly. I'm sorry.
23       Can I have a moment just to look at something

Page 161

1     here?
2  Q  Sure.
3  A  Okay.
4     And what was the new question? I'm sorry.
5     That next question you asked me. I'm sorry.
6         MR. SWEENEY: Mary, do you remember?
7         (Whereupon, the requested material
8          was read by the Court Reporter.)
9         MR. SWEENEY: Very good. Thank you.
10 BY MR. SWEENEY
11 Q  Have you had any discussions with any of the
12    people that are administering his educational
13    program in the Troy City school system?
14 A  No, sir, I haven't.
15 Q  Have you had any discussions with Justin about his
16    school environment or his attitude toward school
17    in the last six or eight months?
18 A  With school officials, no.
19 Q  Or with Justin?
20 A  I'm quite sure we did discuss school, his
21    behaviors at school. And no adverse -- I mean,
22    there were no behavioral disturbances noted or
23    acting out.

Page 162

1 **Q So, as far as you know --**
2 A Yes, yes.
3 **Q -- things are going well in the school**
4 **environment?**
5 A That's correct. That's correct.
6 **Q You indicated in the last consultation with Justin**
7 **that you are verbalizing with him about the**
8 **alleged sexual abuse. Are you finding that Justin**
9 **is opening up gradually in his ability to cope**
10 **with that?**
11 A Justin seems -- in that last session -- completely
12 avoid the topic, which tells me, it's -- it's
13 painful and traumatizing to him to even discuss
14 it.
15 **Q Okay. What is your suggestion for continued**
16 **therapeutic intervention for Justin?**
17 A To continue to try to identify triggers that might
18 be -- that might exacerbate his condition, to
19 continue to develop coping skills, to continue to
20 identify symptoms of his Post-Traumatic Stress
21 Disorder. Right now, we seem to have a dominant
22 symptom, which like you said, the word you used,
23 is a defense mechanism to avoid dealing with the

Page 163

1 situation.
2 And then, also, as we identify those symptoms,
3 to employ behavioral and cognitive techniques to
4 help Justin to resolve this trauma.
5 **Q You indicated that there are areas where you're**
6 **encouraged that he's making progress. What are**
7 **the areas that you see that you're encouraged?**
8 A According to the treatment plan, one of the goals
9 we have is zero violent episodes for 12 months.
10 And I guess since April, he hasn't had one violent
11 episode.
12 **Q What other areas indicate positive improvement?**
13 A No -- no acting out behavior such as taking things
14 that didn't belong to him, or belongs to the
15 family. None of those episodes. And taking his
16 medication, he's been making progress doing that.
17 So, he is making good progress in those.
18 **Q With regard to depression, there is a diagnosis**
19 **that he has been diagnosed with having depression?**
20 A Yes.
21 **Q Is it fair and correct to say that with the**
22 **medication that he is now taking that the**
23 **depression is much improved?**

Page 164

1 A Yes. I would say the depression is much improved.
2 **Q Let's look for just a minute in Defendant's**
3 **Exhibit 6, Mr. Wright, at page 690. There is a**
4 **written entry, presenting complaint, other**
5 **information, on that page. And this is an entry**
6 **October 8, '98. Do you see that at the top**
7 **right-hand corner?**
8 A I do.
9 **Q Justin is a nine year old white male referred for**
10 **services by his mother because of oppositional**
11 **behavior along with attention deficit behavior.**
12 **Child is extremely defiant at home. But mother**
13 **indicated doesn't have any problems at school.**
14 **So, can we agree, Mr. Wright, that he has**
15 **manifested oppositional behavior as far back as**
16 **when he was nine years old in 1998?**
17 A That's correct.
18 **Q And the entry there, child is extremely defiant at**
19 **home?**
20 A Yes.
21 **Q So, he's had a long history of extreme --**
22 MS. ALLEN: Object to the form.
23 **Q -- defiance, hasn't he?**

Page 165

1 A Uhm --
2 **Q Based on the records.**
3 A It says here that is -- I'm going to read it like
4 it says. It says that, child is extremely defiant
5 at home. That's what it says.
6 **Q Let's look at 688, an entry on October 8, '98. On**
7 **that page, it indicates that almost ten years ago,**
8 **he was diagnosed as Oppositional Defiant Disorder.**
9 **Defies authority figures. Spiteful. Tantrums.**
10 **Parent/child relations problem. Inconsistent**
11 **discipline. Lack of appropriate communication.**
12 **That's a further entry that he's had difficulties;**
13 **correct?**
14 A That's correct.
15 **Q Let me take just a minute. Let me show you a**
16 **entry in the records. I don't have the page**
17 **number for this set, but it's an entry dated**
18 **January 5, 2000. And there is a portion of that**
19 **that is highlighted in yellow. Do you see --**
20 A 737.
21 **Q Do you see a date up here, 1/5 --**
22 A Okay.
23 **Q -- '00?**

JR, a Minor                    November 20, 2007              Pike County Board of Education

43 (Pages 166 to 169)

Page 166

1  A   Yes, I have it.
2  Q   Do you have that document.  There is an entry
3      there that says Ms. Reed noted that Justin has
4      gotten back to his old ways in attitude and
5      behavior.  Reported that he tried to choke his
6      brother over a piece of candy?
7  A   Okay.
8  Q   Does that refresh your recollection about that
9      reference?
10 A   Yes.  Yes.  Yes.
11 Q   So, there was year 2000, way before he was
12     enrolled in the Pike County High School?
13 A   That's correct.
14 Q   Am I correct that you have not talked to
15     Dr. Ascherman at UAB?
16 A   Have not spoken to Dr. Ascherman, to my
17     knowledge -- to my recollection.  If I did, it
18     might have been briefly by phone, but not
19     significant enough to discuss his case in detail.
20 Q   Now, as I understand your testimony, you started
21     seeing Justin in 2007.  So, that was approximately
22     two years -- I'm sorry.  Is that correct; 2007?
23 A   No, I started seeing -- yeah, two years him being

Page 167

1      out of service, you're saying?
2  Q   Two years after the alleged sexual abuse?
3  A   That's correct.
4          MS. ALLEN: Object to form.
5  Q   Which allegedly occurred during the 2004-2005
6      school year?
7  A   That's correct.
8  Q   So, with regard to any matters that occurred in
9      the 2004-2005 school year, you had no
10     communication with Justin contemporaneously with
11     those events; 2004-2005?
12 A   Not to my knowledge, we didn't have contact.
13 Q   Or any conversations, to your knowledge, with Mr.
14     Reed or Mrs. Read during the 2004-2005 school
15     year?
16 A   Not to my knowledge.
17         MR. SWEENEY: I think that's all.
18         FURTHER EXAMINATION
19 BY MS. ALLEN
20 Q   Okay.  Mr. Wright --
21 A   Yes, ma'am.
22 Q   -- are the opinions that you have offered in this
23     deposition based on your training and experience?

Page 168

1  A   Yes.
2  Q   Are the opinions that you have offered in this
3      deposition based on your research?
4  A   Yes.
5  Q   Are the opinions that you have offered in this
6      deposition based on consultation with other
7      professionals?
8  A   Yes.
9  Q   Are they based on your contact with Justin and his
10     parents?
11 A   That's correct.
12 Q   Have you reviewed the records that have been
13     provided to you?  And by that I would mean, the
14     prior -- at some point, have you reviewed all of
15     the prior records that have been provided to you
16     regarding Justin?
17 A   I believe I have glanced through the records.
18 Q   Okay.  After your review and based on your
19     experience, did you form an opinion as to whether
20     or not some of the behaviors you were seeing were
21     caused by sexual abuse?
22         MR. SWEENEY: Object to the form.
23 A   It definitely appears that Justin has a

Page 169

1      Post-Traumatic Stress Disorder.
2  Q   All right.  And can you connect that in any way to
3      the sexual abuse?
4          MR. SWEENEY: Object to the form.
5  A   There appears to be a connection to the sexual
6      abuse.
7  Q   Okay.  Can you tell the Court whether or not
8      Justin has sustained any kind of psychological
9      injury as a result of sexual abuse?
10         MR. SWEENEY: Object to the form.
11 A   There appears to be psychological injury.
12 Q   Okay.  So, I would be correct in that the
13     behaviors you are seeing are indications of a
14     psychological injury?
15         MR. SWEENEY: Object to the form.
16 A   I would say that it is a consensus that the
17     reoccurrence -- or it appears that the
18     reoccurrence and intensity of his aggression and
19     anger is linked to a psychological trauma.
20 Q   Okay.  Is sexual abuse and the psychological
21     injury resulting from that a permanent thing?
22         MR. SWEENEY: Object to the form.
23 Q   In your opinion?

Page 170

1    MR. SWEENEY: Object to the form.
2  A  I think that traumas can always be engraved in the
3     memory, but the effects of a trauma depend on the
4     person's willingness to resolve and recover from
5     that trauma and the administration of therapy.
6  Q  You indicate that recovery depends on, in part,
7     the person's willingness. Would recovery also
8     depend on the person's ability to deal with the
9     stress and the trauma?
10 A  Absolutely.
11    MR. SWEENEY: Object to the form.
12 Q  Okay. Would I be correct in interpreting what you
13    said that medications and therapy are not going to
14    cure anything; they are simply to help deal with
15    stressors --
16 A  Yes.
17    MR. SWEENEY: Object to the form.
18 Q  -- that aggravate the situation?
19 A  That's correct.
20    MR. SWEENEY: Object to the form.
21 Q  Okay. When we talk about ODD, is that a common
22    co-diagnosis or side effect of ADHD?
23 A  It is frequently, often seen with that diagnoses.

Page 171

1  Q  When you diagnose a child with ODD, is that any
2     reflection on how aggressive they are?
3  A  No.
4     MR. SWEENEY: Object to the form.
5  A  It's not.
6  Q  So, a child can be ODD, and be defiant to
7     authority and irritable -- stop me if I
8     mischaracterize anything -- and uncooperative, and
9     it has nothing to do with aggression?
10    MR. SWEENEY: Object to the form.
11 A  Absolutely.
12 Q  Okay. Would an isolated incidence, such as Justin
13    going after his brother and, quote, trying to
14    choke him, would that be indication of any -- in
15    your opinion -- a violent behavior?
16    MR. SWEENEY: Object to the form.
17 A  Not at ten years old. Not --
18 Q  Okay. When you say that at this point, Justin is
19    doing well, or improving, that is not an
20    indication -- or is that an indication that, in
21    your opinion, that he's dealing better with the
22    trauma, or is that an indication that the
23    medications and the therapy are helping

Page 172

1     alleviate --
2  A  It's definitely showing the medications and
3     therapy is helping to alleviate the symptoms of
4     his disorders.
5  Q  Okay. Okay. You are familiar with Dr. Warren's
6     psychological report; correct?
7  A  Yes. That's correct.
8  Q  Okay. Are you in agreement with Dr. Warren when
9     he indicates that Justin's insight and judgment
10    are poor?
11 A  Absolutely.
12 Q  Do you agree with Dr. Warren's report when he says
13    that he is very susceptible to the influence of
14    others?
15 A  Absolutely.
16 Q  Do you agree with Dr. Warren's report that he may
17    not -- he may act without recognizing the
18    potential consequences of his behavior?
19 A  Most definitely.
20 Q  Okay. Would you attribute these
21    characteristics -- in your opinion, are these
22    things that are more reflective of the fact that
23    Justin is borderline intellectual functioning, or

Page 173

1     are they more indicative of ADHD or ODD?
2     MR. SWEENEY: Object to the form.
3  A  Borderline intellectual functioning.
4  Q  Okay. One of the questions that Mr. Sweeney asked
5     you: Was there anything in the UAB report that
6     would indicate -- if I am correct -- that would
7     indicate that there was any suicidal ideations,
8     hearing voices, et cetera. I won't -- the
9     question is in the Record. Would you look at the
10    report from UAB?
11 A  Yes.
12 Q  And I do not have a page on that, but it's marked
13    Reed versus PCBE815. Do I understand this
14    correctly; it says circle pertinent check box if
15    negative. So, am I correct that the boxes are
16    checked, Justin showed no indication of those
17    symptomologies? In other words, any weight
18    problems?
19 A  Yes.
20 Q  Those boxes appear to be checked?
21 A  Yes.
22 Q  All right. When you get down to the very bottom,
23    the second from the last one, it says, psych?

Page 174

1   A   Yes.
2   Q   Now, my copy is not great. But it appears that
3       they have circled depression, voices, and anxiety.
4       Is that your impression?
5           MR. SWEENEY: Object to the form of the
6           question.
7   A   That's definitely my impression.
8   Q   Okay. I wanted to -- so, then there might have
9       been -- or there apparently was some indication at
10      UAB that some of these symptoms that were noted
11      prior to his being sent to UAB --
12          MR. SWEENEY: Object to the form.
13          That's not checked there. That's
14          not an indication. The others --
15      MS. ALLEN: This is history, physical
16          examination, and progress.
17      MR. SWEENEY: The box is not checked.
18      MS. ALLEN: Well, it says up here, check
19          if negative. See up at the top of
20          the page. Circle pertinent, check
21          if negative. Psych was not checked.
22      MR. SWEENEY: I will just object to the
23          form of the question.

Page 175

1       MS. ALLEN: Okay. That's fine.
2           Did we get a response to that?
3           I'm sorry.
4       MR. SWEENEY: Why don't you ask again?
5       MS. ALLEN: All right. Read the
6           question if you will, please, Mary?
7           (Whereupon, the requested material
8           was read by the Court Reporter.)
9       MR. SWEENEY: Object to the form.
10  BY MS. ALLEN
11  Q   Were noted at UAB?
12          MR. SWEENEY: Objection.
13  A   Yes. Appears to have been.
14  Q   Let me take you to page 1 of the UAB report of the
15      consultations. I would also like to refer you to
16      consultation report at the top. It says, C52B.
17      It's marked Reed 818. There is no page. It says
18      two of three at the bottom. But I'm simply trying
19      to identify it. And at the top, it has name of
20      physician or service, and it has what appears to
21      be Dr. Isbell. Right here.
22  A   Okay.
23  Q   I would ask you to look at that page and look back

Page 176

1       under consultations on page 1.
2   A   Okay.
3   Q   And see if it does not appear to you that
4       consultations, page 1 on the discharge summary, is
5       the typed notes of that page. You would have to
6       have gone through it --
7           MR. SWEENEY: That appears to be the
8           case, though.
9   A   Okay. It does appear to be the case.
10  Q   And the reason that I bring that out is because I
11      have noted some mistakes.
12  A   Uh-huh.
13  Q   And when I refer to them on page 1, if you want to
14      look back and see that I have -- you know --
15  A   I see. Uh-huh.
16  Q   Under consultation, it says that some
17      psychological testing was done. And I assume that
18      this is a result of Dr. Isbell?
19  A   Uh-huh.
20  Q   Do you know Dr. Isbell?
21  A   No.
22  Q   The psychological testing that was done -- and I
23      am reading from page 1 -- suggests that Justin

Page 177

1       views the world in an overly narrow frame of
2       reference?
3   A   Uh-huh.
4   Q   He lacks consistent coping skills and tends to go
5       back and forth between expressive, and they have
6       intentional, and I would say that that should have
7       been I-D-E-N-T-I-O-N-A-L, identional. Can you
8       tell us what that means?
9           Well, let me ask you this: That he goes back
10      and forth between expressive and some other way of
11      dealing with things?
12  A   Uh-huh. Uh-huh.
13  Q   And I am suggesting they are saying ways -- that
14      detecting should have been dealing with
15      experience. Often ineffectively. All right?
16  A   Uh-huh.
17  Q   He is much less willing than most people to
18      approach and process emotional stimuli. And may
19      appear emotionally or socially withdrawn to
20      others.
21  A   Uh-huh.
22  Q   His lack of psychological complexity likely
23      contributes significantly to his coping deficits

Page 178

1  issues.
2      Are these things, characteristics of Justin
3  that I have just read, do you agree with those?
4  A  I do agree.
5  Q  Were those characteristics of Justin that you
6  noted in your sessions with him?
7  A  I'm gonna say the notations would be probably
8  borderline intellectual functioning would be the
9  notations and reference.
10 Q  With all of these accompanying characteristics
11 that I have just read?
12 A  They describe that diagnoses.
13 Q  Okay. There is no evidence -- this was left out
14 of the typed report -- there is no evidence in the
15 current testing of a thought disorder. The typed
16 one says, the patient does not have any thought
17 disorder. The doctors note said there is no
18 evidence in the current testing of a thought
19 disorder. However, he appears to be avoiding self
20 focusing and stays away from introspection, not
21 complication. The patient is less interested in
22 other people than most peers. Difficulty
23 establishing relationships. Limited social skills

Page 179

1  likely contributes to social awkwardness. These
2  individual coping deficits, interpersonal style,
3  and narrow cognitive focus make change difficult.
4  He's aware of many of his difficulties, yet he's
5  likely to feel powerless to make significant
6  changes?
7  A  Uh-huh.
8  Q  Do you agree with that?
9  A  I do agree.
10 Q  All right. There was some discussion earlier
11 about the behavior modification --
12 A  Uh-huh.
13 Q  -- that you had found to be somewhat successful?
14 A  Uh-huh.
15 Q  And the behavior that you were discussing was
16 aggressive violent behavior?
17 A  That's correct.
18 Q  All right. Taking into account the
19 characteristics that you agree with that are
20 described in this consultation that UAB --
21 A  Uh-huh.
22 Q  -- says were a result of the testing, would it
23 surprise you, or would you expect anything

Page 180

1  different, if Justin was able to understand a
2  behavior modification program that was based on
3  rewards and threats?
4      MR. SWEENEY: Object to the form.
5  Q  You know, if you are violent, this is what's going
6  to happen?
7  A  Uh-huh. There you go.
8  Q  If you are not, this is what you are going to get?
9  A  Uh-huh.
10 Q  Is that the same as saying that Justin would be
11 able to understand what he was feeling as a result
12 of trauma?
13     MR. SWEENEY: Object to the form.
14 A  It is totally not the same whatsoever, because
15 feelings and trauma has to do with higher
16 cognitive processes. And behavior and actions and
17 consequences deal with the basic elements of
18 humans.
19 Q  In other words, you could take an elementary
20 school child --
21 A  That's correct.
22 Q  -- even borderline intellectual capacity --
23 A  Yes.

Page 181

1  Q  -- and do a behavior modification --
2  A  Absolutely.
3  Q  Okay.
4      -- that was based on the same type of thing
5  you were trying to do with Justin?
6  A  That's correct.
7      MR. SWEENEY: Object to the form.
8  Q  If I understand correctly, what you were trying to
9  do is to eliminate the stressors that were
10 bringing on this exceptionally violent behavior?
11     MR. SWEENEY: Object to the form.
12 A  That's correct.
13 Q  Okay. There seems to be a consensus between the
14 professionals who have tested, counseled, talked
15 to, and dealt with Justin -- and I will mention
16 those as yourself, Dr. Warren, the people at
17 UAB --
18 A  Uh-huh.
19 Q  -- there seems to be a consensus that Justin,
20 because of his borderline intellectual capacity,
21 his lack of intellectual complexity -- and I won't
22 go through all those things again -- that he would
23 have, and is having, an extremely difficult time

Page 182

1   with dealing with the kind of trauma that would be
2   brought on by something like sexual abuse?
3       MR. SWEENEY: Object to the form.
4   A   Difficult time processing it, yeah.
5   Q   Okay. Did you state the opinion that Justin will
6       need ongoing treatment for PTSD?
7   A   Yes.
8   Q   That he will need ongoing treatment for coping --
9       learning to -- social skills, coping skills, that
10      are connected with articulating --
11  A   Absolutely.
12  Q   Okay. So, you don't see that as a short-term
13      thing?
14  A   No.
15  Q   Do you envision a time when Justin may not need
16      the medication or the therapy, based on the
17      characteristics that are a part of his makeup that
18      are not -- that are just there?
19  A   It definitely seems like his diagnoses, the
20      imprinting of his behaviors, the way he copes with
21      life, will constantly need some external catalyst
22      to help him to adjust with every phase of life and
23      to deal with the day-to-day stressors of life.

Page 183

1   Q   The fact that it might be reported that Justin had
2       hallucinations, heard voices, ate things that
3       weren't food, some of that sort of thing; the fact
4       that he would -- and I will remind you that he did
5       admit those in the testing to Dr. Warren -- but
6       the fact that he would then later deny those
7       things, and even deny the oral sex or any other
8       specific experiences connected to the sexual
9       abuse, would that surprise you or -- in your
10      opinion, is that inconsistent with what you have
11      experienced with Justin and his diagnoses and his
12      lack of complexity and all of the other things
13      that are noted here?
14      MR. SWEENEY: Object to the form.
15  A   It seems to be pretty consistent.
16      MS. ALLEN: I have no more questions.
17      MR. SWEENEY: No more questions. Thank
18          you very much.
19      (Brief recess.)
20      (Off-the-Record discussion.)
21      FURTHER EXAMINATION
22  BY MR. SWEENEY
23  Q   Mr. Wright, you wanted to refer back to a question

Page 184

1   I asked you concerning conversations you might
2   have had with Mona Watson.
3   A   That's correct.
4   Q   Would you supplement what you told me?
5   A   Yes. I did have conversation with -- informal
6       conversation -- with Mona Watson about the case of
7       Justin Reed. And Mona informed me that during her
8       initial interview with Justin that he said that he
9       performed oral sex on the teacher. But when law
10      enforcement personal questioned Justin, he denied
11      it.
12      MR. SWEENEY: Thank you very much.
13      MS. ALLEN: Can I ask one question?
14      FURTHER EXAMINATION
15  BY MS. ALLEN
16  Q   Mr. Wright, when you had this conversation with
17      Mona -- which I didn't know until you just told
18      me -- but when you had this conversation with her,
19      did she -- since you all were talking, I would
20      assume that maybe she expressed, or you expressed
21      some -- did she believe Justin? Did she believe
22      he was telling her the truth when he told her
23      that --

Page 185

1       MR. SWEENEY: Object to the form. He's
2           told me what the conversation is.
3           You're asking him to speculate --
4       MS. ALLEN: No, I'm asking his opinion.
5       MR. SWEENEY: -- on her opinion, mental
6           operation.
7       MS. ALLEN: I'm asking your opinion.
8           Just your opinion.
9       MR. SWEENEY: I object to the opinion.
10          The conversation should be related
11          as to what was expressed.
12      MS. ALLEN: Well, we took --
13  BY MS. ALLEN
14  Q   Was anything expressed by her as to her belief or
15      disbelief?
16  A   There was before he admitted. Law enforcement
17      interview, he denied. She saw him again, and she
18      said, why didn't you tell them the truth? And he
19      responded not at all to her third interaction
20      about the sexual abuse. And that is he would not
21      comment why he didn't tell law enforcement the
22      truth about the oral sex.
23      MR. SWEENEY: Object to the form.

JR, a Minor

November 20, 2007

Pike County Board of Education

48 (Pages 186 to 187)

Page 186

1    **MS. ALLEN:  Thank you.**
2  A  But that's not in the chart.
3    **MS. ALLEN:  That's fine.  I appreciate**
4    **you letting us know.**
5
6    (Whereupon, at approximately, 11:30
7    p.m. on the 20th day of November,
8    2007 the deposition was
9    concluded.)
10   * * * * * * * * *
11   FURTHER DEPONENT SAITH NOT
12   * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 187

1
2    REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7    I do hereby certify that the above and foregoing
8  transcript of proceedings in the matter of ANDREW
9  WRIGHT was taken down by me in machine shorthand on the
10 27th of November, 2007, and the questions and answers
11 thereto reduced to writing under my personal
12 supervision, and that the foregoing represents a true
13 and correct transcript of the proceedings given by said
14 witness upon said hearing.
15   I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18   Dated this 27th day of November, 2007.
19
20
21   _____
     Mary Moore-Wynn
22   Certified Court Reporter,
23   ABCR License #275

# FREEDOM COURT REPORTING

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3
4    CIVIL ACTION NUMBER:
     2:06-cv-1120-MEF
5
6
     JR, a minor, by his mother
7    and father EAR and TMR,
8         Plaintiffs,
9         vs.
10   PIKE COUNTY BOARD OF
     EDUCATION, et al.,
11
          Defendants.                  COPY
12
13
14
15       S T I P U L A T I O N S
16       IT IS STIPULATED AND AGREED by and
17   between the parties, through their
18   respective counsel, that the deposition of
19   JAMES D. SEARS, ESQ. may be taken before
20   JANET T. McELROY, CSR, Commissioner, at the
21   offices of Sears Law Firm, 816-A Manci
22   Avenue, Daphne, Alabama 36526, on the 21st
23   day of January 2008.
```

Page 2

```
1        IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of
3    the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating
7    to the taking of depositions.
8        IT IS FURTHER STIPULATED AND AGREED
9    that is shall not be necessary for any
10   objections to be made by counsel to any
11   questions expect as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND AGREED
18   that the notice of filing of the deposition
19   by the Commissioner is waived.
20
21
22
23
```

Page 3

```
1               INDEX
2    EXAMINATION              PAGE
3    Mr. Sweeney          5
4
5    EXHIBITS:
6    Defendants' Exhibit 9 . . .      7
7    Defendants' Exhibit 10 . . .     7
8    Defendants' Exhibit 11 . . .     7
9    Defendants' Exhibit 12 . . .     9
10   Defendants' Exhibit 13 . . .   157
11   Defendants' Exhibit 14 . . .    14
12   Defendants' Exhibit 15 . . .    75
13   Defendants' Exhibit 16 . . .    79
14   Defendants' Exhibit 17 . . .    81
15   Defendants' Exhibit 18 . . .    84
16
17
18
19
20
21
22
23
```

Page 4

```
1         A P P E A R A N C E S
2    For the Plaintiffs:
3         Deanie Clark Allen, Esq.
4         AZAR & AZAR, L.L.C.
5         Aliant Center
6         2740 Zelda Road, Fourth Floor
7         Montgomery, Alabama 36101
8
9         Susan Shirock DePaola, Esq.
10        1726 West Second Street, Suite B
11        Montgomery, Alabama 36101
12
13
14   For the Defendants:
15        Donald B. Sweeney, Jr., Esq.
16        BRADLEY, ARANT, ROSE & WHITE
17        One Federal Place
18        1819 Fifth Avenue North
19        Birmingham, Alabama 35203-2104
20
21
22
23
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

1    I, JANET T. McELROY, a Court
2  Reporter of Fairhope, Alabama, and Notary
3  Public for the State of Alabama at Large,
4  acting as Commissioner, certify that on
5  this date, as provided by the Federal Rules
6  of Civil Procedure and the foregoing
7  stipulation of counsel, there came before
8  me at 816-A Manci Avenue, Daphne, Alabama
9  36526, beginning at 9:30 a.m., JAMES D.
10  SEARS, ESQ., witness in the above cause,
11  for oral examination, whereupon the
12  following proceedings were had:
13       JAMES D. SEARS, ESQ.,
14    the witness, having been first duly
15  sworn by the Court Reporter, was examined
16  and testified as follows:
17       EXAMINATION
18  BY MR. SWEENEY:
19  Q.  Would you state your name?
20  A.  James Donald Sears.
21  Q.  Address?
22  A.  816 Manci Avenue, Daphne, Alabama
23  36526.

1  Q.  You have taken and given
2  depositions I'm sure many times before?
3  A.  I have.
4  Q.  But let's just make sure we go over
5  the protocol.
6      If my questions aren't clear will
7  you make sure that I restate them in a
8  clear fashion and if you answer my
9  questions I'll assume you understood the
10  questions?
11  A.  I'll answer them as I understand
12  them, yes.
13  Q.  If at any time you want to
14  supplement any information you provided to
15  me in a previous question will you do so?
16  A.  I will.
17  Q.  At the end of the deposition I'll
18  give you that same opportunity and when we
19  conclude I'll assume that you shared all of
20  the relevant information that you know that
21  bears on the questions that I've asked.
22  A.  I will.
23  Q.  You're familiar with the complaint

1  that's been filed in this case by J.R., a
2  minor, by his mother and father against the
3  Pike County Board of Education and other
4  defendants?
5  A.  I am.
6  Q.  Prior to the deposition did you get
7  the notice of our deposition?
8  A.  No, I did not, but I have it here
9  now.
10  Q.  And you see that in the request for
11  the deposition that I have asked for
12  various documents?
13  A.  Okay.
14
15      (Whereupon, Defendants' Exhibits 9,
16  10, and 11 were marked for identification
17  and copy of same is attached hereto.)
18
19  Q.  (BY MR. SWEENEY:)  And I'll come
20  back to that in just a minute.
21      We have marked the Notice of
22  Deposition as Defendants' Exhibit 9.  I've
23  just handed you a copy of that.  I've

1  marked as Defendants' Exhibit 10 your
2  curriculum vitae.
3      Is that an accurate and up to date
4  vitae?
5  A.  It is accurate and it's up to date,
6  yes.
7  Q.  I've marked as Defendants' Exhibit
8  11 the report that you prepared at the
9  request of the plaintiffs?
10  A.  Yes.
11  Q.  Which consists of four pages?
12  A.  Yes, sir.
13  Q.  In preparation of this deposition
14  what did you do?
15  A.  I reviewed the documents and
16  depositions that I have listed on this
17  report.  I have also looked at some of the
18  literature relative to children who have
19  disabilities and abuse, as well as
20  educators and sexual abuse in schools.
21  Q.  What literature have you reviewed?
22  A.  Specifically it is A Synthesis of
23  Existing Literature.  Do you have a copy of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1 that?
2     MS. DePAOLA: I do. Here's a copy.
3     MR. SWEENEY: I want to mark that
4 as Defendants' Exhibit 12.
5
6     (Whereupon, Defendants' Exhibit 12
7 was marked for identification and copy of
8 same is attached hereto.)
9
10   Q. (BY MR. SWEENEY:) What else did
11 you review?
12   A. Since I have become involved in
13 this case I have been approached by several
14 clients to represent them in matters
15 involving sexual abuse in the education
16 system.
17   Q. Involving what school systems?
18   A. Mobile County Public School System.
19   Q. Any others?
20   A. No, sir.
21   Q. Have you agreed to represent them
22 in your capacity as a lawyer or as an
23 expert?

Page 10

1   A. As a lawyer.
2   Q. Have lawsuits been filed in those
3 cases?
4   A. No.
5   Q. Have due process requests?
6   A. Yes. In one case, yes.
7   Q. Have any of those been resolved?
8   A. No, sir.
9   Q. Are they all still pending?
10   A. Yes, sir.
11   Q. Have they been assigned to an
12 administrative law judge?
13   A. If they have I haven't received
14 notice yet.
15   Q. So they're very recent?
16   A. Yes, sir.
17   Q. What else did you do in
18 preparation?
19   A. I believe that's it. There was one
20 other deposition that I read and this was
21 the deposition of Andrew Wright that I just
22 received right before the holidays.
23   Q. Who contacted you about serving as

Page 11

1 an expert witness in this case?
2   A. Ms. Susan DePaola.
3   Q. When was that contact made?
4   A. I'll have to look in my notes.
5   Q. Approximately when?
6   A. Gosh, Mr. Sweeney, time passes by
7 so fast now. Sometime in the spring I
8 would presume.
9   Q. Of 2007?
10   A. Yes, sir.
11   Q. Since that time on how many
12 occasions have you met with the attorneys
13 for the plaintiffs in this case?
14   A. Two times.
15   Q. When did those meetings occur?
16   A. One was last night, yesterday
17 afternoon, and one was sometime in the
18 fall? No?
19     MS. DePAOLA: I don't remember.
20   Q. (BY MR. SWEENEY:) Where did the
21 first meeting take place?
22   A. Here.
23   Q. What fee arrangement do you have to

Page 12

1 serve as an expert?
2   A. $300 per hour.
3   Q. Do you have a letter of engagement?
4   A. Yes.
5   Q. Do you have a copy of that with
6 you?
7   A. I don't think it's in this file.
8 It would be in another file.
9   Q. I would ask that the letter of
10 engagement be marked as Defendants' Exhibit
11 13.
12     Have you prepared a work in
13 progress report that reflects the work that
14 you've done on this case?
15   A. Not totally, no, I have not. Not
16 yet.
17   Q. Have you submitted any bills for
18 fees to date in this case?
19   A. I have not submitted any bills so
20 far.
21   Q. How complicated would it be for you
22 to complete your work in progress up to
23 today?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1   A.  It would take some effort.  I have
2  changed secretarial staff recently and --
3     Q.  Will you submit that as soon as you
4  have an opportunity to prepare it?
5     A.  Certainly.
6     Q.  I mentioned earlier that I had sent
7  to the plaintiffs in this case, and I
8  understand a copy was to have been sent to
9  you as well, a deposition notice for
10 Defendants' Exhibit 9.
11       What documents did you bring as
12 part of your --
13    A.  These documents would include, I
14 believe, everything that I have listed on
15 my report, plus the deposition of Andrew
16 Wright.  And I believe there were some
17 counseling records also.
18    Q.  That are part of this packet of
19 information?
20    A.  Yes, sir.
21    Q.  You compiled all of that into a
22 three ring notebook?
23    A.  Yes, sir.

Page 14

1     Q.  Does that include all of the
2  documents that are listed on your report?
3     A.  I haven't gone through and checked
4  side by side, but I believe that was the
5  direction to my former secretary to do
6  that, yes.
7       MR. SWEENEY:  Let's mark that
8  notebook as Defendants' Exhibit 3.
9       MS. DePAOLA:  It would be 14.
10       MR. SWEENEY:  I'm sorry, 14.  I'm
11 sorry, I was looking at my notes.
12
13       (Whereupon, Defendants' Exhibit 14
14 was marked for identification and copy of
15 same is attached hereto.)
16
17    Q.  (BY MR. SWEENEY:)  I mentioned
18 earlier that we had marked your vitae as
19 Defendants' Exhibit 10.  You're an attorney
20 as it's identified in that document.
21       In the last ten years how many
22 lawsuits, including administrative
23 hearings, have you filed against public

Page 15

1  school systems in Alabama?
2     A.  Probably 600.
3     Q.  In the last five years how many,
4  just approximation, of lawsuits have you
5  filed against public school systems?
6     A.  Once again if you take it as an
7  approximation I would say 300.
8       MS. DePAOLA:  Are you talking about
9  lawsuits or due process hearings?
10       MR. SWEENEY:  Lawsuits and due
11 process hearings.
12    Q.  (BY MR. SWEENEY:)  How many times
13 in the year 2007, during which time you
14 were preparing the report which we marked,
15 did you file lawsuits and/or administrative
16 complaints against public school systems in
17 Alabama?
18    A.  Probably 45 to 50.
19    Q.  Has the United States Supreme Court
20 rendered opinions regarding liability of
21 public school systems where employees have
22 sexually abused students?
23    A.  To my knowledge, no.

Page 16

1     Q.  To your knowledge the United States
2  Supreme Court has rendered no opinions
3  respecting or establishing a standard by
4  which public school systems can be liable
5  where an employee engages in sexual abuse,
6  sexual misconduct of a student?
7     A.  Not to my knowledge.
8     Q.  Do you know if the 11th Circuit
9  Court of Appeals has rendered an opinion
10 regarding liability of a public school
11 system or its employees where an employee
12 has engaged in sexual abuse or misconduct
13 of a student?
14    A.  To my knowledge, no.
15    Q.  Do you know what the standard of
16 care is for a school system with regard to
17 its employees who have engaged in sexual
18 abuse?
19    A.  I would suspect that the --
20    Q.  No, not suspect.  Do you know what
21 that standard is as a practicing attorney?
22 Do you know what the standard is that's
23 required preliminary or as a precondition

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1 for a school board to be held liable for
2 the criminal misconduct of an employee?
3    A.   Yes.
4    Q.   What is that standard?
5    A.   Notice.  The Davis standard.  I'm
6 trying to think of the term, Mr. Sweeney.
7 Indifference and damages, is that right?
8 Notice, indifference -- oh, I'm sorry.
9 Inability to benefit from the educational
10 progress.
11    Q.   I'm sorry, what's the last one?
12    A.   Inability to benefit from the
13 educational process.
14    Q.   What kind of notice is required for
15 a public school system or its employees who
16 are liable for the criminal sexual
17 misconduct of an employee?
18    A.   Reasonable notice, as I understand
19 it.
20    Q.   What is reasonable notice in your
21 opinion?
22    A.   That there was sufficient
23 information provided to school personnel to

Page 18

1 warrant further investigation, further
2 inappropriate investigation.
3    Q.   When you say inability to benefit
4 from education what do you mean by that?
5    A.   That the sexual abuse or whatever
6 abuse, whatever constitutional violation
7 has occurred, has interfered with the
8 student's ability to benefit from the
9 educational process.
10    Q.   Referring to your report,
11 Defendants' Exhibit 11, I want to make sure
12 I understand all of the things that you
13 reviewed and upon which you base the
14 opinions you've shared in this report.
15       First with regard to the
16 depositions, you reviewed depositions of
17 the people listed on page one?
18    A.   Yes, sir.
19    Q.   Plus Andrew Wright?
20    A.   Yes, sir.
21    Q.   Were you provided the complete
22 depositions of each of those named people?
23    A.   Yes, sir.

Page 19

1    Q.   Did you read all of the depositions
2 of all of them?
3    A.   Yes, sir.
4    Q.   And are those contained in
5 Defendants' Exhibit 14?
6    A.   Yes, sir, I believe they are.  Now,
7 once again I have not gone side by side.
8    Q.   You have listed as documents and
9 exhibits on page one and extending to page
10 two of Defendants' Exhibit 11.
11       Have you reviewed any other
12 documents other than those listed there?
13    A.   Except for documents that came with
14 Wright's deposition, and those are, I
15 believe, included in here as well.  Those
16 were some notes, progress notes.
17    Q.   So you referred to the documents
18 that were contained in each of the
19 depositions, including Mr. Wright's?
20    A.   Yes, sir.
21    Q.   Anything else that you reviewed?
22 Any other documents?
23    A.   No, sir.

Page 20

1    Q.   Have you conducted any personal
2 interviews of any of the people whose
3 depositions you have read?
4    A.   No, I have not.
5    Q.   Have you interviewed J.R., the
6 student?
7    A.   Yes, I have.
8    Q.   In person?
9    A.   Yes, sir.
10    Q.   When did you do that?
11    A.   Yesterday.
12    Q.   Here in Daphne?
13    A.   Yes, sir, in this office.
14    Q.   For how long?
15    A.   About 45 minutes.
16    Q.   Was he able to answer questions?
17    A.   Yes, sir.
18    Q.   So he had the ability to
19 communicate?
20    A.   Yes, sir.  If I can qualify that by
21 saying that his ability to communicate was
22 somewhat impacted by his cognitive
23 deficits.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1    Q.  All right.  With regard to your
2    interview of J.R. did you make notes?
3    A.  No, sir.
4    Q.  No notes whatsoever?
5    A.  No, sir.
6    Q.  Did you record any of the give and
7    take?
8    A.  No, sir.
9    Q.  What questions did you ask him?
10   A.  I asked personal questions such as,
11   you know, where he was in school, what
12   subjects he enjoyed the most, what subjects
13   he enjoyed the least, what instrument he
14   played, what kind of interests that he had
15   outside of school, what kind of
16   relationship he had with his family
17   members, questions of that nature.
18   Q.  And what was his response when you
19   asked him about his relationship with his
20   family?
21   A.  He had a great relationship with
22   his mama.  He had the typical teenage boy
23   relationship with his younger brother,

Page 22

1    thought he was, I think the term was a
2    pain.  And he had, you know, a reasonable
3    relationship with his older brother, 22 or
4    23 year old brother, and a sister, a better
5    relationship with the sister.
6    Q.  Wouldn't you agree based on your
7    experience that it's unusual for an
8    attorney to interrogate someone without
9    taking notes?
10   A.  As an attorney I perhaps would
11   have, but I was talking to him to just get
12   my impression of his abilities.  I was not
13   taking --
14   Q.  Is it your impression that he is
15   capable of answering my questions?
16   A.  My suspicion, Mr. Sweeney, is that
17   he would have a difficult time answering
18   the types of questions you would ask him.
19   Q.  And what questions do you presume
20   that I would be asking?
21   A.  Questions related to damages, you
22   know, his counseling, his hospitalization
23   and his progress, how it interfered with

Page 23

1    his educational process, those types of
2    questions.
3    Q.  Did you ask him questions
4    concerning his relationship with Charles
5    Coon?
6    A.  No, I did not.
7    Q.  Did you form an impression of
8    whether he would be capable of answering my
9    questions concerning his relationship with
10   Charles Coon?
11   A.  In reviewing the records --
12   Q.  I'm not asking that.  I'm asking
13   you based on your conversation with J.R.
14   yesterday do you have an opinion on whether
15   he could answer my questions concerning his
16   relationship with Charles Coon?
17   A.  Could or would?  Could, probably.
18   Would, probably not.  I think that the
19   experience would have left him very shy
20   about answering those questions.
21   Q.  But so I'm clear, you did not ask
22   him any questions concerning the
23   allegations of the complaint, that is the

Page 24

1    sexual relationship that he might have had
2    with Charles Coon?
3    A.  No, I did not.
4    Q.  Or where such misconduct may have
5    taken place?
6    A.  No, I did not.
7    Q.  Did you interrogate his mother?
8    A.  No, I did not.
9    Q.  Have you ever talked to J.R.'s
10   mother?
11   A.  No, I have not.
12   Q.  Was she with you when you were
13   talking to J.R.?
14   A.  She was not.
15   Q.  Who was with you when you were
16   talking with J.R.?
17   A.  J.R. and myself.
18   Q.  Who brought him here?
19   A.  His mom and his uncle.
20   Q.  And who?
21   A.  His uncle.
22   Q.  And who is that?
23   A.  I did not meet him.

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1    Q.   But they were not in the room when
2    you were talking to him?
3        A.   No, sir, they were not in the
4    building when I talked to him.
5        Q.   So they left J.R. here?
6        A.   Yes, sir.
7        Q.   And he came in your room?
8        A.   He sat right here in this chair.
9        Q.   Have you ever met him before?
10       A.   No, sir.
11       Q.   Have you ever personally
12   interviewed Mark Bazzell, the
13   superintendent of the Pike County Board of
14   Education?
15       A.   I have not.
16       Q.   Have you personally interviewed
17   Robert McDaniel?
18       A.   No, sir.
19       Q.   Or Terry Casey, the former
20   principal?
21       A.   No, sir.
22       Q.   Or Mona Watson?
23       A.   No, sir.

Page 26

1        Q.   Or Karen Berry?
2        A.   No, sir.
3        Q.   Or Andrew Wright?
4        A.   No, sir.
5        Q.   Do you know any member of the Pike
6    County Board of Education?
7        A.   I do not.
8        Q.   Have you had any conversations with
9    any member of the Pike County Board of
10   Education?
11       A.   No, sir.
12       Q.   Defendants' Exhibit 12, A Synthesis
13   of Existing Literature, is that also
14   contained in Defendants' Exhibit 14?
15       A.   Yes, sir.  It does not have this
16   front page, but, yes, it's there.
17       Q.   What are the particular relevant
18   articles or references in what we've marked
19   as Defendants' Exhibit 12 that relate to
20   this case?
21       A.   Would you like for me to go through
22   them?
23       Q.   Yes.

Page 27

1        (Whereupon, a discussion was had
2    off the record.)
3
4        A.   Beginning on page 13, Mr. Sweeney,
5    I looked at those, and if I can, looked at
6    the information that was generated there.
7    3.2 on page 17.
8        Q.   17?
9        A.   Yes, the graph there.  And
10   understand that I read all of this, but
11   some of the things I focused on on page 18,
12   4.1 where it describes teachers whose job
13   description includes time with individual
14   students such as music teachers or coaches
15   are more likely to sexually abuse than
16   other teachers, that information.
17       I read, you know, with some
18   interest the gender of the victimized as
19   well as --
20       Q.   What page?
21       A.   That would have been beginning on
22   page 20.  And on page 20 also the percent
23   of student targets by job title of

Page 28

1    offender.
2        I looked at the chart on 22.  And
3    then beginning on page 25, a particular
4    note beginning 5.3 and then through the
5    table on page 26.  6.1 on page 27, through
6    page 29.
7        Q.   I'm sorry, what?
8        A.   Through page 29.  7.2 on page 31.
9    And 7.4.  And I see now the Gebser v. Lago
10   Vista Independent School District, the
11   Supreme Court ruling in 1998.
12       Q.   It's on what page?
13       A.   That's page 34, if I could
14   supplement my previous response, I did
15   notice that.
16       And then if I can supplement my
17   previous response to the standard that came
18   out of Davis was some direct knowledge,
19   notice, and it's deliberate indifference,
20   and the third was interferes with ability
21   to benefit from educational opportunities,
22   which is a Supreme Court case as well.
23       And then on 9.1, page 38.  And that

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  goes on through page 39. And then the
2  entire section ten, 40, 41. And 12.1
3  dealing with develop district and school
4  level policies. 12.2. 12.3 on page 43.
5  12.4, assign a case coordinator and
6  centralize information. 12.5, report all
7  allegations to both child protection and
8  law enforcement agencies. Of course 12.6,
9  12.7 on page 44. 12.8 on page 45. 12.9,
10  special education students or other
11  vulnerable students are often targets of
12  sexual predators. That was it.
13      Q.  Let's go back just a minute to
14  section 34.
15          In reviewing this document you
16  noted that the Supreme Court has in fact
17  rendered a decision in 1998 Gebser v. Lago
18  Vista Independent School District --
19      A.  What page is that?
20      Q.  Page 34. Let's read that section.
21  The Supreme Court's 1998 ruling in Gebser
22  v. Lago Vista Independent School District
23  (Gebser v. Lago Vista Independent School

Page 30

1  District), and I'll skip the citation, made
2  it more difficult for students to secure
3  monetary damages in staff to student sexual
4  violence cases and the increased barrier
5  was somewhat at odds with the OCR
6  regulations at that time. In Gebser, the
7  Supreme Court determined that for a
8  district to be liable for the sexual
9  harassment of a student by a staff member
10  someone with the authority to take an
11  action must have had actual knowledge of
12  the sexual violence and the institution or
13  individual must have acted with deliberate
14  indifference by not responding to the
15  knowledge.
16          Having heard that and read that as
17  I was listening, you now know that to be
18  the applicable standard for allegations
19  such as the plaintiff in this case has
20  brought against the defendants in this
21  case?
22      MS. DePAULA:  Object to the form.
23      MS. ALLEN:  Object.

Page 31

1      A.  As far as the 1998 ruling I
2  understand that to be the law in 1998 in
3  the Gebser ruling.
4      Q.  Well, you've held yourself out to
5  be an expert and a lawyer.
6          Do you know of any United States
7  Supreme Court that has changed that
8  standard since 1998?
9      A.  No, I do not.
10      Q.  Do you know of any opinion of the
11  11th Circuit Court of Appeal applicable to
12  Alabama that has changed that standard
13  since 1998?
14      A.  No, sir, I do not.
15      Q.  So as far as you know as this
16  deposition is taking place that is the
17  standard?
18      A.  As far as I know, yes, sir.
19      Q.  What is the origin of the
20  information set forth in Defendants'
21  Exhibit 12? Did you generate that or was
22  that provided to you by plaintiffs'
23  counsel?

Page 32

1      A.  It was provided to me by
2  plaintiffs' counsel.
3      Q.  Based on your review of all of the
4  material that you've previously recited and
5  as shown on Defendants' Exhibit 11, do you
6  know of any evidence that any member of the
7  Pike County Board of Education had actual
8  notice that J.R. was being abused by
9  Charles Coon?
10      A.  I believe that actual notice in a
11  sexual abuse case of this nature --
12      Q.  Do you understand my question?
13      MS. DePAULA:  Let him finish his
14  answer, Mr. Sweeney.
15      Q.  (BY MR. SWEENEY:)  I'm not asking
16  for your belief.
17          Do you know who the members of the
18  Pike County Board of Education are?
19      A.  I know that they're named in here.
20  Do I know them by name and personally?
21      Q.  That's right.
22      A.  No, I do not.
23      Q.  Well, with regard to any member of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1 the Pike County Board of Education do you
2 know of any evidence that's set forth in
3 any of the material that you reviewed, the
4 depositions, the exhibits, the documents,
5 that suggests that they had actual notice
6 that J.R. was being abused by Charles Coon?
7     A.   Okay.  Let me make sure that I
8 understand your question.
9     Q.   I'm asking if you have knowledge of
10 any evidence.  Not your belief, but
11 knowledge of any evidence if any member of
12 the Pike County Board of Education had
13 actual knowledge that Charles Coon was
14 abusing J.R.?
15     A.   Okay.  If you'll hold on just a
16 second, Mr. Sweeney.  (Reviewing.)  If I
17 understand your question correctly there
18 are --
19     Q.   I don't want you to guess.  If you
20 don't understand it --
21     A.   That's what I'm trying to clarify.
22     Q.   Do you know what evidence is as a
23 matter of law?

Page 34

1     A.   If I understand your --
2     Q.   Let me just --
3     A.   Can I finish my response?
4     Q.   But I want to make sure you
5 understand my question.  My question is
6 about evidence.
7         Do you know what admissible
8 evidence is in a United States District
9 Court?
10     A.   Yes, sir.
11     Q.   All right.  Do you know of any
12 evidence that any member of the Pike County
13 Board of Education had actual notice that
14 Charles Coon was sexually abusing J.R.?
15     A.   Okay.  Now this is the
16 clarification I need to make.  You asked me
17 to clarify it for you if I did not
18 understand.
19         Now, when you say a member of the
20 board of education does that include
21 superintendent?
22     Q.   No.
23     A.   Okay.  Just the board members.

Page 35

1     Q.   We established that there are five
2 members of the Pike County Board.
3     A.   No, I do not.
4     Q.   Your answer is you do not know of
5 any evidence that any member of the Pike
6 County Board of Education had actual notice
7 that Charles Coon was abusing J.R.?
8     A.   No, I do not.
9     Q.   Do you know of any evidence based
10 on your review of all of the material that
11 we've referred to that Mark Bazzell, the
12 superintendent, had actual notice that
13 Charles Coon was abusing J.R. before
14 Charles Coon left the employment of the
15 Pike County Board of Education?
16         MS. DePAULA:  Object to the form.
17     A.   What are you calling actual notice?
18     Q.   That he knew, was told by anyone,
19 that J.R. was being sexually abused by
20 Charles Coon.
21     A.   You're not asking me should he have
22 known?
23     Q.   What I'm referring to is the

Page 36

1 standard that the United States Supreme
2 Court established in the case we've just
3 referenced where actual notice is required
4 before a school board is liable for the
5 sexual abuse of an employee, that actual
6 notice.
7         Do you know of any evidence that
8 Mark Bazzell, Superintendent of the Pike
9 County Board of Education, had actual
10 notice that Charles Coon was abusing J.R.?
11         MS. DePAULA:  Object to the form.
12 It mischar--
13         MR. SWEENEY:  Your objection's
14 noted on the record.
15         MS. DePAULA:  No, no.  I'm going to
16 put my complete objection on the record.
17         MR. SWEENEY:  Well, I object to any
18 explanation.
19         MS. DePAULA:  -- attorney
20 mischaracterized and lumped together all of
21 the legal theories asserted in the
22 complaint and his statements as to what is
23 the law does not accurately reflect each of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  the different claims or causes of action.
2      MR. SWEENEY: Note your objection
3  on the record.
4      Q. (BY MR. SWEENEY:) Based on the
5  standard that the United States Supreme
6  Court established in the Lago Vista case do
7  you know of any evidence that Mark Bazzell,
8  Superintendent, had actual notice that J.R.
9  was being sexually abused by Charles Coon
10  while Charles Coon was an employee of the
11  Pike County Board of Education?
12      A. Only that he was told that there
13  was sexual abuse -- there were allegations
14  of sexual abuse going on in the school.
15      Q. Where do you find evidence of that?
16      A. In his deposition.
17      Q. In Mark Bazzell's deposition?
18      A. Yes, sir.
19      Q. So without going through all of his
20  deposition that would be the only evidence,
21  whatever that deposition shows, of actual
22  notice that Mark Bazzell might have had?
23      A. Yes, sir, I believe so.

Page 38

1      Q. Do you recall who provided that
2  actual notice of sexual abuse -- not use of
3  marijuana, but sexual abuse to Mark
4  Bazzell?
5      A. I don't recall, no, sir.
6      Q. Could you be mistaken in that
7  regard?
8      A. No, sir, because I believe there
9  was some talk about Coon having a butt
10  buddy within the student population.
11      Q. Do you know who shared that
12  information?
13      A. Off the top of my head, no, sir, I
14  can't recall.
15      Q. But whatever the reference to butt
16  buddy, that is the only evidence that you
17  know upon which you would base your opinion
18  that Mark Bazzell had actual notice of
19  sexual abuse?
20      A. If you would allow me to go back to
21  his deposition I think I could find it in
22  the discussion of the deposition.
23      Q. But that's the reference that

Page 39

1  you're referring to?
2      A. Yes, sir.
3      Q. Do you know of any evidence that
4  Terry Casey, the principal at Pike County
5  High School, had actual notice that Charles
6  Coon was abusing J.R.?
7      A. I believe the same thing would
8  apply to Casey. He was the first
9  principal, was he not, in this?
10      Q. That's correct.
11      A. I believe the same thing would
12  apply there.
13      Q. What's the same thing?
14      A. That there was information
15  regarding Coon having a butt buddy on
16  campus or within the student population.
17      Q. Well, I'm not asking you to guess.
18  I'm asking you based on your research for
19  your report and your opinion, that would be
20  the predicate for your assertion?
21      A. Yes, sir.
22      Q. Do you know when the conversation
23  took place between Mark Bazzell and the

Page 40

1  person that called him about Charles Coon
2  and the butt buddy reference?
3      A. Not in my memory banks, no. I
4  can't recall.
5      Q. Well, I'm not asking you to guess
6  in response to any of my questions.
7      Do you understand that?
8      A. Yes.
9      Q. And if Terry Casey wasn't even the
10  principal at the time that that
11  conversation came in would you be wrong in
12  your opinion?
13      A. As to his knowledge?
14      Q. That's right.
15      A. Let me make sure I understand your
16  question. As to Terry Casey's knowledge of
17  the butt buddy reference and when it
18  occurred?
19      Q. That's correct.
20      A. Certainly I could be mistaken.
21      Q. And if he wasn't even the principal
22  at the time that conversation took place
23  with Mark Bazzell would you change your

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  opinion that he had information or that he
2  had actual knowledge that Charles Coon was
3  abusing J.R.?
4      A.  While he was the principal?
5      Q.  That's correct.
6      A.  And rather than after the fact?
7      Q.  That's right, while he was the
8  principal.
9      A.  Right.  I could be mistaken, yes.
10     Q.  Other than that reference to butt
11 buddy, whenever that conversation took
12 place, do you know of any other evidence
13 that Terry Casey had actual knowledge that
14 Charles Coon was abusing J.R.?
15     A.  Actual knowledge, no.
16     Q.  Do you know of any evidence that
17 Buddy Pyron, the principal at Pike County
18 High School, had actual knowledge that
19 Charles Coon was abusing J.R.?
20     A.  Actual knowledge, no.
21     Q.  Do you know of any evidence that
22 Robert McDaniel, the assistant principal,
23 had actual knowledge that Charles Coon was

Page 42

1  abusing J.R.?
2      A.  No, sir, I don't recall.
3      Q.  Who is Mona Watson?
4      A.  She was the guidance counselor.
5      Q.  She was guidance counselor at the
6  Pike County High School?
7      A.  Yes, sir.
8      Q.  You reviewed her deposition?
9      A.  Yes, sir.
10     Q.  And other documents?
11     A.  Yes, sir.
12     Q.  Based on the information that you
13 have in preparation for this deposition and
14 in your report, do you know of any evidence
15 that Mona Watson had actual knowledge that
16 Charles Coon was abusing J.R.?
17     A.  Yes, sir.
18     Q.  What?
19     A.  In the reports in the depositions
20 it states that Mona Watson was told by J.R.
21 that he had performed oral sex on Coon and
22 had been fondled by Coon.
23     Q.  During the 2004/2005 school year is

Page 43

1  there any evidence that you know of that
2  Mona Watson had actual knowledge that
3  Charles Coon was sexually abusing J.R.?
4      A.  I don't know if that occurred
5  during that time frame.  I presume that it
6  did.
7      Q.  You presume but you don't know?
8      A.  I don't know specifically, no, sir.
9      Q.  Based on your review of all of this
10 information when was the first public
11 knowledge that Charles Coon may have
12 engaged in sexual abuse of students?
13     A.  The specific date?
14     Q.  Yes, sir.
15     A.  I can't give you that.
16     Q.  Do you know if it was sometime in
17 the summer of 2005?
18     A.  Once again I can't remember
19 specifically the dates.
20     Q.  Do you know if it was after he had
21 retired from his position of employment
22 with the Pike County Board of Education?
23     A.  My memory is that it was before.

Page 44

1      Q.  Do you want to check your records
2  to verify that?
3      A.  Yes, sir.
4
5         (Whereupon, a brief recess was
6  taken.)
7
8      Q.  (BY MR. SWEENEY:)  Mr. Sears, if I
9  represented to you that Charles Coon
10 retired as an employee of the Pike County
11 Board of Education at the end of the
12 2004/2005 school year would you have any
13 reason to dispute that?
14     A.  No, sir.  That's what it says in
15 Plaintiffs' Exhibit 11.
16     Q.  Assuming that he retired at the end
17 of May of 2005, which was the end of the
18 school year, do you now have information
19 that Mona Watson interviewed J.R. in July
20 of 2005?
21     MS. DePAULA:  Object to the form of
22 the question.  It mischaracterizes his
23 retirement date.

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    A.   His retirement date was July 31st.
2    Q.   Do you know when his last day of
3   work at Pike County High School was?
4    A.   It says date on which service of
5   applicant will terminate is June 30th.
6    Q.   Do you know if he had any duties or
7   responsibilities after the end of the month
8   of May of 2005?
9    A.   Would you repeat that? I'm sorry.
10    Q.   Sure. Well, let me ask it in this
11   way.
12        Assuming those records are correct,
13   that he retired as an employee June 30 of
14   2005, what date do you show that Mona
15   Watson interviewed J.R.?
16    A.   The date of interview is 7/14/05.
17    Q.   That would have been after Coon had
18   retired from the school system?
19    A.   After his service to the school
20   system had terminated. His retirement date
21   --
22    Q.   Prior to July 14, 2005, when Mona
23   Watson interviewed J.R., do you know of any

Page 46

1   evidence that she had actual knowledge that
2   Charles Coon was abusing J.R.?
3    A.   I do not.
4    Q.   Do you know who Karen Berry is?
5    A.   She is, as I recall, the special
6   education coordinator.
7    Q.   Do you know of any evidence that
8   Karen Berry had actual notice that Charles
9   Coon was abusing J.R. prior to July of
10   2005?
11    A.   No, I do not.
12    Q.   Have you interviewed any teachers
13   of J.R. that were working with him during
14   the 2004/2005 school year?
15    A.   No, sir, I have not.
16    Q.   Do you know of any teacher, other
17   than Charles Coon, who worked with J.R.
18   during the 2004/2005 school year that had
19   actual knowledge that Charles Coon was
20   abusing J.R.?
21    A.   No, I do not.
22    Q.   So as I understand your testimony,
23   the only notice that you're aware of that

Page 47

1   anybody had a potential of Charles Coon
2   abusing J.R. was the reference to butt
3   buddy?
4    A.   And that there were other children
5   that had potentially been involved.
6    Q.   What is the source of that
7   information and when was it provided?
8    A.   I don't know the source. I can't
9   recall the source. It was provided to
10   Bazzel, the superintendent.
11        MS. DePAULA: Would you like to see
12   his notes? Is that what you're looking
13   for?
14        THE WITNESS: His deposition.
15    Q.   (BY MR. SWEENEY:) Let me ask you
16   about that.
17        Do you remember who the source of
18   the information --
19    A.   I do not recall, no, sir.
20    Q.   Do you remember, Mr. Sears, if the
21   information was relating to smoking
22   marijuana with students?
23    A.   I think that was involved as well,

Page 48

1   yes, sir.
2    Q.   All right. Well, let's be as
3   accurate as possible.
4        If I represent to you that the
5   information was from a law enforcement
6   officer to Mr. Bazzell that there had been
7   reports of possible smoking marijuana with
8   students, do you have any reason to dispute
9   that representation?
10    A.   No, sir, I do not.
11    Q.   Now, marijuana doesn't necessarily
12   indicate sexual abuse, does it?
13    A.   It does not necessarily indicate
14   it, but it would be one of the things that
15   you would want to follow-up on in that type
16   of relationship, yes, sir.
17    Q.   And in that conversation, as I
18   recall, there was some reference to
19   somebody being Charles Coon's butt buddy?
20    A.   Yes, sir.
21    Q.   Do you recall based on your review
22   of Mark Bazzell's deposition whether the
23   source of the information knew who the butt

12  (Pages 45 to 48)

## FREEDOM COURT REPORTING

Page 49

1  buddy might be?
2     A.  I don't specifically recall, no,
3  sir.
4     Q.  Or whether that person specifically
5  named any other students?
6     A.  I believe at some point that --
7     Q.  I'm asking about that conversation.
8     A.  Yes, sir.  I can't recall that
9  conversation specifically.  If you'll
10  refresh my memory.
11     Q.  Do you recall from the reading of
12  the deposition the approximate time of that
13  call and sharing of information by the law
14  enforcement officer?
15     A.  I don't remember a specific date,
16  no, sir.
17
18        (Whereupon, a discussion was had
19  off the record.)
20
21     Q.  (BY MR. SWEENEY:)  Assuming that
22  conversation from the law enforcement
23  officer to Mark Bazzell occurred on March

Page 50

1  30, 2005 as an exhibit Ms. DePaola's just
2  shown to us indicates, do you know what
3  Mr. Bazzell did in response to that
4  information?
5     A.  I think he initiated an in-house
6  meeting within the school system
7  investigation.
8     Q.  Do you know what that investigation
9  consisted of?
10     A.  As I recall, talking to students,
11  but I don't recall specifically, no, sir.
12     Q.  Do you know what administrative
13  action he took towards Charles Coon?
14     A.  No, sir.
15     Q.  You don't remember whether he
16  suspended Charles Coon during the pendency
17  of the investigation?
18     A.  Well, yes, he was suspended during
19  the pendency, but then he was reinstated.
20     Q.  But I'm asking you what he did.
21     A.  He was suspended during the
22  pendency, as I recall, of the
23  investigation, but then was reinstated.

Page 51

1     Q.  Well, Mr. Sears, wouldn't you agree
2  that immediately suspending Charles Coon
3  while the investigation was taking place
4  was pretty serious action?
5     A.  I would believe that -- it's my
6  belief that that would be a standard
7  procedure.
8     Q.  It's standard because Charles Coon
9  by that time was a tenured employee, wasn't
10  he?
11     A.  Yes, sir.
12     Q.  And entitled to due process?
13     A.  Yes, sir.
14     Q.  And could not be fired on the spot,
15  could he?
16     A.  No, sir.
17     Q.  He would be entitled to a due
18  process hearing?
19     A.  Yes, sir.
20     Q.  So would you agree that the only
21  administrative step that a superintendent
22  could take during the pendency of an
23  investigation is to suspend an employee?

Page 52

1     A.  Administrative step against him,
2  against --
3     Q.  That's correct.
4     A.  Yes, sir.
5     Q.  And Mark Bazzell took that step,
6  didn't he?
7     A.  Yes, sir.
8     Q.  So as far as you could tell based
9  on the action taken did he take the
10  allegation seriously?
11     A.  No, sir, I don't believe that.  I
12  believe that had he taken the allegation
13  seriously he would have called in a
14  forensic type of person to interview the
15  children and would have gone further with
16  the investigation relative to children who
17  would be particularly more vulnerable.
18     Q.  With regard to his action towards
19  Charles Coon suspending him was a serious
20  action, wasn't it?
21     A.  Yes, sir.
22     Q.  After the investigation that Mark
23  Bazzell undertook following the information

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  on March 30th, do you know what
2  instructions he gave to Charles Coon
3  concerning conduct with students?
4      A.  I cannot recall.  I cannot recall.
5  I'd have to refer back to the deposition.
6      Q.  Can we agree based on the
7  information that you reviewed that prior to
8  March 30, 2005 Mark Bazzell had no
9  information from any source that Charles
10 Coon might be engaged in misconduct with
11 students?
12         MS. DePAULA:  Object to the form.
13     A.  To the best of my knowledge I did
14 not find --
15     Q.  After March 30th, when he commenced
16 his investigation and suspended Charles
17 Coon, do you have any evidence that Charles
18 Coon subsequently, that is after March
19 30th, engaged in any sexual misconduct with
20 any student?
21     A.  I don't have any knowledge of that,
22 no, sir.
23     Q.  Have you published any papers or

Page 54

1  made any written presentations addressing
2  what public school systems in Alabama
3  should do with regard to sexual abuse,
4  sexual harassment, of special education
5  students as written information?
6      A.  Written information, no, sir.
7      Q.  In your presentations that are
8  listed on page three during 2006, in any of
9  those presentations did you address what
10 school systems should do with regard to the
11 subject of sexual abuse as it might pertain
12 to special education students?  Looking at
13 the page three.
14     A.  Yes, sir.  2007 the --
15     Q.  I'm asking -- oh, 2007 and 2006,
16 yes.
17     A.  Okay.  In 2007, yes, sir.
18     Q.  Which one?
19     A.  The ethics and behavior analysis.
20     Q.  Which one is that?
21     A.  Right under presentations.  Are you
22 on page three?
23     Q.  Yes.  And you made that

Page 55

1  presentation to whom?
2      A.  To the Alabama Association For
3  Behavior Analysis.
4      Q.  Did you have a written presentation
5  -- I mean a written --
6      A.  Document that I distributed?  No,
7  sir.
8      Q.  Do you have notes from that
9  presentation?
10     A.  It was a panel discussion.  No,
11 sir, I do not.
12     Q.  Do you recall what you said at that
13 meeting?
14     A.  To some degree, yes, sir.
15     Q.  What would you have said with
16 regard to sexual abuse?
17     A.  What was discussed was the conduct
18 of behavior analysts and their relationship
19 with students, including students who had
20 behavior disorders and other special needs.
21     Q.  Now, behavior analysts, who are
22 behavior analysts?
23     A.  These are folks who work for the

Page 56

1  State Department of Mental Health and
2  Mental Retardation, the State Department of
3  Education, and all of the subsidiary
4  educational --
5      Q.  People that are conducting
6  functional behavior assessments?
7      A.  Yes, sir, functional behavior
8  assessments and people who work for mental
9  health organizations.
10     Q.  And what did you say the behavior
11 analysts should do?
12     A.  A variety of different things.
13 Certainly they should document all of their
14 contact with students.  They should
15 maintain their professional distance.
16 Just, you know, the expectations that they
17 should never be left alone with students
18 without somebody else's knowledge, you
19 know, close the door, you know, the basic
20 types of things.
21     Q.  Anything else?
22     A.  Off the top of my head, no, sir.
23     Q.  Let's look at Defendants' Exhibit

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

| Page 57 | Page 59 |
|---|---|
| 1 11, the report. | 1    A.  Yes. |

Page 57

1  11, the report.
2    A.  Okay.
3    Q.  J.R.'s IEP for 2004/2005, did that
4  IEP address behavior issues at all?
5    A.  Can you show me the IEP?
6    Q.  Is that part of the documents that
7  you reviewed?
8    A.  Yes, sir, it's part of the
9  documents I reviewed.
10    Q.  Well, let me ask you about the
11  IEP's in this way.
12      You reviewed the IEP's for both the
13  2004/2005 and 2005/2006 school years.  Does
14  the 2005/2006 school years have any
15  relevance to this lawsuit?
16    A.  Without looking, without having my
17  memory refreshed, I can't tell you.  I'd
18  have to look at it.
19    Q.  That would be the year following
20  the allegations of misconduct by Charles
21  Coon?
22    A.  Yes, sir.
23    Q.  With regard to the IEP for the

Page 59

1    A.  Yes.
2    Q.  Is it your contention that any
3  member of that board had either actual or
4  constructive knowledge of anything that
5  Charles Coon did during the 2004/2005
6  school year?
7    A.  I have no knowledge of that.
8    Q.  The Pike County Board of Education
9  Student Code of Conduct revised June 2003,
10  did that code of conduct reference sexual
11  behavior?
12    A.  It did.
13    Q.  What relevant sections do you
14  recall in that document?
15    A.  As I recall it referenced sexual
16  harassment.
17    Q.  That sexual harassment was
18  prohibited and proscribed conduct?
19    A.  Proscribed in what way?
20    Q.  That it was prohibited conduct and
21  proscribed that people should not engage in
22  sexual harassment.
23    A.  Yes, sir.

Page 58

1  2004/2005 school year, does that have any
2  particular relevance to the allegations of
3  the complaint in this case?
4    A.  Does it have relevance?  It should
5  have relevance.  And the relevance could be
6  found in the fact that it was not written
7  in a way that would bring out whether or
8  not he had any disruptive behaviors of a
9  serious nature or --
10    Q.  Well, do you know if he did?
11    A.  Would somebody know if they did?
12    Q.  No.  Do you know if he had any
13  disruptive behavior?
14    A.  Without having my memory refreshed
15  on that, no, I don't recall.
16    Q.  You reviewed the organizational
17  diagram for the Pike County Board.
18      Does that document have any
19  significance?
20    A.  Just level of responsibility.
21    Q.  And at the top of that chart would
22  be the Pike County Board of Education's --
23  the five elected members of the board?

Page 60

1    Q.  Did you find fault in any way with
2  the statement or policy that was set forth
3  in the student code of conduct?
4      MS. DePAULA:  The student code of
5  conduct?
6      MR. SWEENEY:  The student code of
7  conduct.
8    A.  Did I find fault with it or any
9  inaccuracies?
10    Q.  Yes.
11    A.  No, I thought that that was pretty
12  much an accurate statement.  The fault with
13  it was that it did not go far enough in
14  describing what would constitute.
15    Q.  Tell me a school board policy in
16  Alabama that you're familiar with that you
17  think does set forth sufficient
18  information.
19    A.  I don't know of one, Mr. Sweeney.
20    Q.  Thank you.  With regard to the
21  essential administrative information that's
22  listed as one of the documents you
23  reviewed, what relevance does that have to

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  the allegations of this complaint?
2      MS. DePAULA:  Do you want to see
3  it?
4      THE WITNESS:  Yes.
5      MS. DePAULA:  Here you go.
6  A.  Thank you.  (Reviewing.)  It
7  references the policy manual.
8  Q.  And does it have any relevance to
9  the allegations of this complaint
10  concerning Charles Coon's conduct?
11  A.  Oh, yes.  I think that, you know,
12  there should be a policy regarding sexual
13  abuse, both by --
14  Q.  In the essential --
15      MS. DePAULA:  Donald, please allow
16  him to finish his response.
17  A.  There should be a policy regarding
18  student on student.
19  Q.  But I'm talking about this, not the
20  policy manual.
21  A.  Right.  It references the policy
22  manual.  Well, okay.
23  Q.  I'm differentiating between the

Page 62

1  policies, which will be the third or the
2  next item down, and the essential
3  administrative information.
4      And my question is what in the
5  document that's shown is relevant to the
6  allegations of this complaint?
7      MS. DePAULA:  Object to the form.
8  A.  Nothing in the document.
9  Q.  Okay.  The high school student
10  planner for 2004/2005, have you reviewed
11  that document?
12  A.  Yes, sir.
13  Q.  Based on what you saw in the
14  document titled Pike County High School
15  Student Planner 2004/2005, did you find
16  anything that you thought was relevant to
17  the allegations of this complaint?
18  A.  No, sir.
19  Q.  Pike County Board of Education
20  policies, did the policy manual of the Pike
21  County Board have a policy relating to
22  sexual misconduct by employees?
23      MS. DePAULA:  Donald, are you

Page 63

1  referring to the sections that we've
2  previously marked Plaintiffs' Exhibit 5,
3  which we do not have the entire manual, but
4  is that the document you're referring to
5  now?
6  Q.  (BY MR. SWEENEY:)  Let me ask you,
7  in the documents and exhibits that you
8  reviewed one of the items is the Pike
9  County Board of Education policies?
10  A.  Yes, sir.
11  Q.  All right.  Are you looking at
12  whatever you reviewed in that regard?
13  A.  Yes, sir.
14  Q.  All right.  And does that have a
15  policy that you reviewed that relates to
16  sexual harassment, sexual abuse, sexual
17  misconduct?
18  A.  There is a policy here.  It is on
19  page 0118 of Exhibit 5.
20  Q.  And what is the policy of the Pike
21  County Board of Education with regard to
22  sexual conduct of employees?
23  A.  Do you want me to read the whole

Page 64

1  thing?
2  Q.  Please.
3  A.  Okay.  It says definition of sexual
4  harassment.  For purposes of this policy
5  sexual harassment of a student consists of
6  unwelcome and unsolicited sexual advances,
7  requests for sexual favors, sexually
8  motivated physical conduct or other verbal
9  or verbal and/or physical conduct or
10  communication of a sexual nature, such as
11  but not limited to, one, a school employee
12  causes a student to believe that he or she
13  must submit to unwelcome sexual conduct in
14  order to participate in a school program or
15  activity or when an employee or a third
16  party agent of this school system causes
17  the student to believe that the
18  employee/third party will make an
19  educational decision based on whether or
20  not the student submits to unwelcome sexual
21  conduct or, two, the unwelcome sexual
22  conduct is so severe, persistent, or
23  pervasive that it affects the student's

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  ability to participate in or benefit from
2  an educational program or activity or
3  created an intimidating, threatening, or
4  abusive educational environment.
5     Q.  With regard to the material you
6  just read, would you agree that the alleged
7  conduct by Charles Coon towards J.R. would
8  have been prohibited by that policy?
9     A.  Yes.
10    Q.  Is there any other policy in the
11 Pike County policy manual that related to
12 sexual abuse, sexual misconduct?
13    A.  It's not so much what is there as
14 much as it is what is not there.
15    Q.  Do you know of any policy of any
16 public school system in Alabama that you
17 think is a model in addressing sexual
18 abuse, sexual misconduct?
19    A.  No, sir, I do not.
20    Q.  You reviewed a memorandum from Mark
21 Bazzell regarding new teacher orientation.
22       Do you have that before you?
23    A.  Yes, sir, I do.

Page 66

1     Q.  What is the information set forth
2  in that memorandum?
3     A.  It says, New teacher system
4  orientation will be held July 31st, 2002 in
5  the board room at the central office.
6  Please contact your new staff members to
7  make sure they are in attendance.  We will
8  not contact them so please be sure everyone
9  has been informed.  We will begin at 8:00
10 a.m. promptly and will adjourn at 12:15
11 p.m.
12    Q.  You reviewed Charles Coon's
13 employment application.
14       Do you know the process by which
15 Mr. Coon was employed by the Pike County
16 Board of education?
17    A.  He makes application and his
18 application is considered.  I would presume
19 the --
20    Q.  Well, I'm not asking you to
21 presume.
22       Do you recall from reading the
23 depositions what steps the administrative

Page 67

1  staff of the Pike County Board of Education
2  undertook before Charles Coon was employed?
3     A.  To the best of my memory they took
4  his application, called one or more of his
5  references.
6     Q.  And do you know of any evidence
7  that's set forth in any of the documents or
8  depositions that you've read that should
9  have put them on actual notice that Charles
10 Coon might sexually abuse a student?
11    A.  Yes, sir.
12    Q.  What?  Actual notice.
13    A.  He had had, I believe, 12 different
14 employments.
15    Q.  I'm asking you about anything in
16 the record that indicates, aside from his
17 history of employment, that he had engaged
18 in misconduct with any student in any prior
19 position of employment.
20       Do you have any evidence of that?
21    A.  Well, you said that he might be
22 sexually abused.
23    Q.  No.  I'm saying if you have any

Page 68

1  information of actual notice of misconduct
2  by Mr. Coon from any previous position of
3  employment.
4     A.  That's a different question.
5     Q.  And what's your answer to that
6  question?
7     A.  No, there's nothing in there that
8  would indicate that he had sexually abused
9  somebody other than the suggestion that his
10 employment has jumped all over the place.
11    Q.  Based on the information that the
12 administrative staff had before hiring
13 Mr. Coon, do you know of any actual notice
14 that they were given that Charles Coon had
15 engaged in any misconduct with students
16 prior to his employment with the Pike
17 County Board of Education?
18    A.  There was nothing specifically in
19 there mentioning sexual abuse.
20    Q.  Did you review any of the
21 information they received concerning
22 references in his private employment?
23    A.  Yes, I did.

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    Q.  And what did the references
2  indicate?
3    A.  That he was an acceptable employee.
4    Q.  In reviewing the prior positions of
5  employment, do you agree that he changed
6  positions often from a position of a lower
7  responsibility to a position of higher
8  responsibility?
9    A.  Not always, no, sir.
10    Q.  Did you check the size of the
11  schools where he was being employed to
12  determine whether he was being advanced
13  during his career from smaller schools to a
14  larger school where he would make more
15  money?
16    A.  He'd make more money, yes, but not
17  necessarily as a function of going from
18  school to school or from year to year.  I
19  am familiar with some of the schools.
20    Q.  Did you analyze that as you were
21  assessing the information the school system
22  had prior to employing him?
23    A.  That information was not available

Page 70

1  to me.
2    Q.  Let me go back, Mr. Sears, to the
3  depositions of these individuals and ask
4  you a slightly different question.
5        You read the deposition of Robert
6  McDavid who was the assistant principal at
7  Pike County High School, didn't you?
8        MS. DePAULA:  It's McDaniel, and
9  the deposition is not in there.  That's my
10  notebook of exhibits.  It may be in your
11  notebook of stuff.
12        THE WITNESS:  I'm sorry to say that
13  it isn't in here.
14    Q.  (BY MR. SWEENEY:)  I'm looking at
15  your report.
16        You indicate that you read the
17  deposition of Robert McDaniel?
18    A.  Yes, sir.
19    Q.  Based on your reading of the
20  deposition of Robert McDaniel had he
21  received during the 2004/2005 school year
22  any complaint from anyone about Charles
23  Coon and his conduct towards students,

Page 71

1  based on the deposition?
2    A.  Without reviewing the deposition I
3  can't recall specifically.
4    Q.  If I ask you the same questions
5  concerning Terry Casey what would your
6  answer be?
7    A.  The same.
8    Q.  Mona Watson?
9    A.  First knowledge I have that -- or
10  the first indication I had that she had
11  knowledge was later than that.
12    Q.  So just summarizing, as far as you
13  know from your reading of the deposition
14  would it be true that the first information
15  that Mark Bazzell, Robert McDaniel, Terry
16  Casey, Mona Watson, Karen Berry, might have
17  had concerning misconduct by Charles Coon
18  occurred on March 30th when Mark Bazzell
19  received a call -- from March 30th, 2005
20  when Mark Bazzell received a call from a
21  law enforcement officer?
22    A.  Yes.
23        MS. DePAULA:  Object to the form.

Page 72

1  He said he would need to review the
2  deposition to completely respond to that.
3    Q.  (BY MR. SWEENEY:)  As far as you
4  know prior to March 30 none of these
5  people, none of these administrators or
6  members of the board of education, had
7  received any complaint about alleged
8  misconduct by Charles Coon towards J.R. or
9  any other student?
10    A.  To the best of my memory the first
11  indication was March 30th.
12    Q.  Let's look at your report,
13  Defendants' Exhibit 11, beginning on --
14        MS. DePAULA:  Let's go off the
15  record for a second.
16
17        (Whereupon, a discussion was had
18  off the record.)
19
20    Q.  (BY MR. SWEENEY:)  Might you have
21  reviewed in addition to the depositions
22  listed on page one of Defendants' Exhibit
23  11 the deposition of Buddy Pyron, who was a

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

| Page 73 | Page 75 |
|---|---|
| 1 principal at Pike County High School for a | 1    A.  Dear Dr. Bazzell:  This is -- |
| 2 portion of the 2005/2006 school year? | 2    Q.  Is that in the document that we |
| 3    A.  Yes, sir. | 3 have marked as Defendants' Exhibit 14? |
| 4    Q.  Based on your reading of the | 4    A.  I have 10. |
| 5 deposition of Buddy Pyron did he have any | 5    Q.  I mean, in your three ring |
| 6 information from any source about | 6 notebook. |
| 7 misconduct by Charles Coon towards students | 7    A.  No. |
| 8 at Pike County High School prior to March | 8 |
| 9 30, 2005? | 9    (Whereupon, a discussion was had |
| 10    A.  I believe that he did, but I would | 10 off the record.) |
| 11 have to review the deposition. | 11 |
| 12    Q.  But do you have any recollection? | 12    (Whereupon, Defendants' Exhibit 15 |
| 13    A.  Not a specific recollection at this | 13 was marked for identification and copy of |
| 14 time. | 14 same is attached hereto.) |
| 15    Q.  On page two of the report at the | 15 |
| 16 top you refer to the faculty handbook? | 16    Q.  (BY MR. SWEENEY:)  Defendants' |
| 17    A.  Yes, sir. | 17 Exhibit 14 is your notebook.  What we just |
| 18    Q.  Does that have any material in the | 18 marked as Defendants' Exhibit 15 are |
| 19 handbook itself that's relevant to the | 19 correspondence that you reviewed that were |
| 20 allegations of the complaint? | 20 not in Defendants' Exhibit 14, and as I |
| 21    A.  Only the absence of -- | 21 understand that consists of eight pages. |
| 22    Q.  I'm asking in the document itself. | 22    I have marked a document |
| 23    MS. DePAULA:  Well, he's responding | 23 Defendants' Exhibit 15.  In the left-hand |

| Page 74 | Page 76 |
|---|---|
| 1 to your question, Donald.  It is | 1 corner are pages one through eight. |
| 2 significant that -- | 2    A.  That had already been marked. |
| 3    MR. SWEENEY:  I phrased it | 3    MS. DePAOLA:  As part of your |
| 4 carefully. | 4 notebook you mean? |
| 5    Q.  (BY MR. SWEENEY:)  Is there | 5    THE WITNESS:  As a previous |
| 6 anything in the document that is pertinent | 6 exhibit, ten I think. |
| 7 to the allegations of the complaint? | 7    Q.  (BY MR. SWEENEY)  Okay.  But for |
| 8    A.  All right.  You're talking about | 8 purposes of this deposition what you have |
| 9 what is written in the document? | 9 before you is Defendants' Exhibit 15, |
| 10    Q.  That's right. | 10 correspondence that you reviewed? |
| 11    A.  No, sir. | 11    A.  Yes, sir. |
| 12    Q.  With regard to the school safety | 12    Q.  Do you see in the left-hand corner |
| 13 plan, is there anything in the document of | 13 that I marked the correspondence pages one |
| 14 the school safety plan that relates to the | 14 through eight, in the left-hand bottom |
| 15 allegations of the complaint? | 15 corner? |
| 16    A.  What is written in the document, | 16    A.  Yes, sir. |
| 17 yes, there is that same sexual assault, | 17    Q.  Let me look at that.  (Reviewing.) |
| 18 sexual harassment policy. | 18 There is a letter dated November 16th from |
| 19    Q.  And it proscribes or prohibits | 19 Mr. and Ms. David Foster, a letter from |
| 20 sexual misconduct? | 20 Dr. Bazzell dated November 22nd, 2004 to |
| 21    A.  Right. | 21 them, a note from Mr. McDaniel, a letter |
| 22    Q.  What general correspondence did you | 22 from Robert McDaniel to Mr. Bazzell dated |
| 23 review? | 23 December 2nd, 2004, a handwritten note that |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1  I've marked in the left-hand corner as page
2  seven with a date of November 12, 2004.
3       Do you know who authored that
4  document?
5       A.  That name isn't on there.
6       Q.  And the last page eight is a note
7  --
8       A.  Well, can we back up?
9       Q.  Sure.
10      A.  It said, I think, David Foster.  So
11  I don't know if that's the author of that
12  or not.
13      Q.  Okay.  And last page is a
14  memorandum for Dr. Bazzell, a Ms. Foster
15  returned his call?
16      A.  Yes, sir.
17      Q.  The next document that you reviewed
18  was Charles Coon, his application for
19  retirement.
20      That's in your packet of
21  information, isn't it?
22      A.  Yes, sir.
23      Q.  Finally a letter from Mark Bazzell

Page 78

1  placing Charles Coon on administrative
2  leave?
3       A.  Yes, sir.
4       Q.  Do you have that in your file?
5       MS. DePAULA:  Excuse me.  He's
6  looking at my exhibits.  He's not looking
7  at his notebook.
8       MR. SWEENEY:  Yes, that's helpful,
9  Susan.
10      Q.  (BY MR. SWEENEY:)  Would you look
11  in your notebook and see if that document
12  is in your notebook?
13      A.  It is not in my notebook.
14      Q.  Okay.  Is that in a section of
15  information that's not in your notebook or
16  just that document?  You're looking at --
17      A.  It's a section that's not in my
18  notebook.
19      Q.  So what information is not in your
20  notebook that was furnished to you that you
21  reviewed?
22      A.  All of Plaintiffs' Exhibit 11.
23      Q.  And that includes what?

Page 79

1       A.  The application for retirement.
2       Q.  All right.  Let's mark that as
3  Defendants' Exhibit 16.  Retirement
4  information of Charles Coon.  What else?
5       A.  A May 15th letter from Charles
6  Coon.
7       Q.  Well, let's just mark that packet
8  as Defendants' Exhibit 16.
9       That relates to Charles Coon and
10  his retirement?
11      A.  Yes, sir.  Now you referred to a
12  notice of suspension.
13      Q.  Well, so we keep this straight if
14  you'll pull that item from the notebook.
15      A.  Do you want a copy?
16      MR. SWEENEY:  Yes.  We can get a
17  copy of that.  Let's mark that as
18  Defendants' Exhibit 16.
19
20      (Whereupon, Defendants' Exhibit 16
21  was marked for identification and copy of
22  same is attached hereto.)
23

Page 80

1       (Whereupon, a discussion was had
2  off the record.)
3
4       THE WITNESS:  And what is the --
5       Q.  (BY MR. SWEENEY:)  It's the letter
6  from Mark Bazzell placing Charles Coon on
7  administrative leave.
8       A.  That's Defendants' Exhibit 14?
9       Q.  Let's pull that.  You reviewed
10  that, is that correct?
11      A.  Yes, sir.
12
13      (Whereupon, a brief recess was
14  taken.)
15
16      Q.  (BY MR. SWEENEY:)  The last exhibit
17  we referenced was the general
18  correspondence, which we marked as Exhibit
19  15.
20      Mr. Sears, with regard to the next
21  item on the documents that you referred to,
22  Charles Coon's application for retirement,
23  let me show you what's been marked as

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 81 |
|---|---|
| 1 | Defendants' Exhibit 16 and ask you if that |
| 2 | appears to be the packet relating to his |
| 3 | retirement that you referred to. |
| 4 | A. Yes, sir. |
| 5 | |
| 6 | (Whereupon, Defendants' Exhibit 17 |
| 7 | was marked for identification and copy of |
| 8 | same is attached hereto.) |
| 9 | |
| 10 | Q. (BY MR. SWEENEY:) The next item is |
| 11 | a letter from Mark Bazzell placing Charles |
| 12 | Coon on administrative leave. |
| 13 | Let me show you a letter dated |
| 14 | April 1, 2005 and ask you to read on the |
| 15 | record the two paragraphs of that letter. |
| 16 | A. This purpose of this correspondence |
| 17 | is to notify you that you are being placed |
| 18 | on administrative leave with pay, effective |
| 19 | immediately, pending the outcome of an |
| 20 | investigation into alleged misconduct |
| 21 | involving a number of students. According |
| 22 | to reports, you have allegedly engaged in |
| 23 | the use of illegal drugs with students, |

|  | Page 82 |
|---|---|
| 1 | provided illegal drugs to students, and |
| 2 | also allegedly engaged in other |
| 3 | inappropriate activities with students of a |
| 4 | sexual nature. Since these reports involve |
| 5 | allegations of criminal conduct on your |
| 6 | part, I have also notified the appropriate |
| 7 | law enforcement personnel. |
| 8 | I would very much like to meet with |
| 9 | you at your earliest convenience to explain |
| 10 | the nature of these reports and to offer |
| 11 | you the opportunity to provide a written |
| 12 | statement if you so desire. Also, I am |
| 13 | directing that you not return to the Pike |
| 14 | County High and Banks campus until this |
| 15 | matter is resolved. In addition, I am |
| 16 | further directing that you have no contact |
| 17 | with Pike County High and Banks students, |
| 18 | including band students, until this matter |
| 19 | is resolved. |
| 20 | Q. That letter is dated April 1? |
| 21 | A. 2005. |
| 22 | Q. 2005. We previously referenced a |
| 23 | note in the file of Mark Bazzell that |

|  | Page 83 |
|---|---|
| 1 | indicated he had received a call on the |
| 2 | previous day, March 30th, from a law |
| 3 | enforcement officer? |
| 4 | A. Yes, sir. |
| 5 | Q. So he acted with this letter the |
| 6 | very next day? |
| 7 | A. Yes, sir. |
| 8 | Q. The next item that you referenced |
| 9 | is J.R.'s psychological educational |
| 10 | evaluation. |
| 11 | What educational evaluations did |
| 12 | you refer to? |
| 13 | A. I recently received one that was by |
| 14 | Fernell -- |
| 15 | MS. DePAULA: Warren. |
| 16 | A. Warren. |
| 17 | Q. Is that in your notebook? |
| 18 | A. Yes, sir, it's in here. And |
| 19 | there's another one by -- it was done on |
| 20 | 5/16/03 by Robert L. Hudson. |
| 21 | Q. Those were the two that you |
| 22 | referred to? |
| 23 | A. Yes, sir. |

|  | Page 84 |
|---|---|
| 1 | Q. What is the report from Fernell |
| 2 | Warren? |
| 3 | A. What is it? |
| 4 | Q. Yes. |
| 5 | A. It's a psychological report. |
| 6 | Q. Dated when? |
| 7 | A. (Reviewing.) Mr. Sweeney, do you |
| 8 | have that in front of you? |
| 9 | Q. No. |
| 10 | A. (Reviewing.) |
| 11 | MS. DePAULA: It's previously been |
| 12 | marked as Defendants' Exhibit 5. Do you |
| 13 | want to remark it? |
| 14 | MR. SWEENEY: 19? |
| 15 | MS. ALLEN: There it is. |
| 16 | Q. (BY MR. SWEENEY:) So that's part |
| 17 | of your documents? |
| 18 | A. Yes. |
| 19 | Q. Okay. So we won't mark that as an |
| 20 | exhibit. And that's dated when? |
| 21 | A. This is dated 2/27/07. |
| 22 | |
| 23 | (Whereupon, Defendants' Exhibit 18 |

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1 was marked for identification and copy of
2 same is attached hereto.)
3
4    Q. (BY MR. SWEENEY:) Okay. The next
5 document that you reference is a case
6 action summary for sodomy second degree and
7 two counts of sexual abuse second degree.
8    Let me show you a two page document
9 which we've marked Defendants' Exhibit 18.
10 Do you have any information about what
11 Charles Coon pled guilt of other than the
12 case action summary which we've marked as
13 Defendants' Exhibit 18?
14    MS. DePAULA: Let me just put on
15 the record that that document doesn't look
16 familiar to me. I didn't bring my entire
17 file of everything and really am not sure
18 that's what I provided him. I see that
19 that's what he pulled off the thing, but --
20    Q. (BY MR. SWEENEY:) All right. Let
21 me clarify that.
22    Does what we've marked as
23 Defendants' Exhibit 18 appear to be what

Page 86

1 you reviewed?
2    A. The information is what I reviewed
3 but not the actual document.
4    Q. What would the actual document be?
5    A. It would be something generated by
6 the court.
7    Q. I'm sorry, what?
8    A. Something generated by the court.
9 It would be a case action docket. They
10 call it a docket sheet. And it would have
11 this information on it.
12    Q. The case action summary for sodomy
13 second degree, do you know what the
14 substance of it was, what misconduct he
15 admitted to doing in that particular
16 charge, sodomy second degree?
17    A. No.
18    MS. DePAULA: Where are you
19 reading, Donald?
20    MR. SWEENEY: On page two of the
21 report.
22    Q. (BY MR. SWEENEY:) Do you know, the
23 conduct relating to two counts of sexual

Page 87

1 abuse second degree, what the facts were
2 that he was admitting to?
3    A. No, I do not. It does not state
4 that in here.
5    Q. Did it state that in the court
6 action sheet?
7    A. I don't believe so.
8    Q. That's my information.
9    Okay. Now, let's look at the
10 report itself beginning on page two,
11 Established Facts, of your report.
12    A. Okay, I'm sorry.
13    Q. Which we've marked as Defendants'
14 Exhibit 11.
15    A. Yes, sir.
16    Q. On line two of the Established
17 Facts you indicate that J.R. has mental
18 retardation.
19    What is his full scale IQ?
20    A. He has two different IQ's, two very
21 different IQ's. The one reported by
22 Fernell Warren indicates that his
23 intellectual quotient, what he calls the

Page 88

1 composite intelligence index on the
2 Reynolds Intellectual Assessment Scale, is
3 80. But on this other -- the '03
4 psychological indicated a level of full
5 scale 53.
6    Q. That would be a significant
7 difference, wouldn't it?
8    A. Yes, sir.
9    Q. And a full scale IQ of 53 would be
10 fairly severe?
11    A. It would be in the moderate range,
12 what we used to refer to as the moderate
13 range of mental retardation.
14    Q. A full scale of 80 would be in what
15 range?
16    A. It would be in the borderline. It
17 would be --
18    Q. Border normal?
19    A. Border means both ways. Either
20 mental retardation or normal. The standard
21 was changed in 1973. It used to be you
22 would be borderline and mentally retarded
23 from 84 down to 70. So it's kind of in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

| Page 89 |
| --- |

1    that range there.
2        Q.   You indicate here the diagnosis of
3    oppositional defiant disorder.
4            What is oppositional defiant
5    disorder?
6        A.   That he is resistant to authority.
7        Q.   Did you read any reference in his
8    school records concerning oppositional
9    defiant behavior at school?
10       A.   In his school records?
11       Q.   Yes.
12       A.   That I can't recall.  I had his
13   IEP's.
14       Q.   But oppositional defiant means that
15   a person is defiant as opposed to
16   subservient?
17       A.   Some authority figures.  Not all
18   authority figures.  Authority figures who
19   are being more direct with him, telling him
20   to do things, yes.  Somebody who is on the
21   other hand in situations where they are
22   being befriended by an authority figure
23   then you would expect just the opposite

| Page 90 |
| --- |

1    reaction.
2        Q.   You say in line four that
3    psychoeducational evaluations placed him in
4    borderline to severe levels of mental
5    retardation.
6            Which psychoeducational evaluations
7    are you referring to?
8        A.   All of the way from this one to --
9        Q.   I don't understand this one.  What
10   are you --
11       A.   I'm sorry.  Fernell Warren's is at
12   the upper end and the lower end is the one
13   by --
14       Q.   That was done some years ago?
15           MS. DePAULA:  By the school system.
16       A.   By the school system, yes.  Hudson
17   I believe.
18       Q.   The last sentence of that first
19   paragraph you say J.R.'s disability places
20   him in a constitutionally protected class.
21           What do you mean by a
22   constitutionally protected class?
23       A.   A person who has a disability.

| Page 91 |
| --- |

1        Q.   What is a constitutional
2    protection?
3        A.   Would generate from two sources.
4    One would be Section 504 of the
5    Rehabilitation Act of 1973.
6        Q.   Well, that's a statute.
7        A.   Yes, sir.
8        Q.   But here you're referring to a
9    constitutionally protected class.
10       A.   The 14th Amendment to the U.S.
11   Constitution of equal protection for
12   somebody who has a disability.
13       Q.   The first sentence of the second
14   paragraph:  Charles Coon has pled guilty to
15   one count of second degree sexual abuse as
16   to the plaintiff in this action.
17           What is the documentation that
18   supports that?
19       A.   This (indicating).
20       Q.   Is there any reference there to
21   J.R., specific reference in Defendants'
22   Exhibit 18?
23       A.   The reference is by, by reference I

| Page 92 |
| --- |

1    guess you would say, in that it issues a
2    witness subpoena to J.R.'s mother Elizabeth
3    Reed, but because he's a minor --
4        Q.   But is there any reference in
5    Defendants' Exhibit 18 to J.R. by any name?
6        A.   Yes, sir.
7            MS. DePAULA:  Excuse me.  I want to
8    put on the record again that this is not a
9    document that we've ever provided
10   Mr. Sears.
11       A.   Yes, there is reference about two
12   fifths of the way down on page two of the
13   case action summary that refers to Justin
14   Reed.
15       Q.   But does that say that Charles Coon
16   has pled guilty to second degree sexual
17   abuse relating to Justin Reed or is it just
18   Justin Reed and his mother's name appear on
19   that document from which you extrapolate
20   that he's pled guilty with regard to that
21   individual?
22       A.   Well, what I read here is charge
23   one, sexual abuse disposed, second abuse

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1  second. Count one, disposed by guilty plea
2  on 3/21/06. And then once again the
3  reference to Justin Reed here earlier in
4  the case action summary.
5     Q. But you're basing it on the
6  information set forth there rather than any
7  narrative that describes the nature of the
8  misconduct?
9     A. Yes, sir.
10    Q. With regard to where any such
11 sexual abuse occurred, is there any
12 narrative that you've seen in any document
13 as to where and when sexual abuse took
14 place in the court records?
15    MS. DePAULA: Same objection.
16 These are not necessarily records that were
17 provided to him.
18    A. In the court records, no.
19    MS. DePAULA: Are you referring to
20 the court records right there by that
21 document?
22    THE WITNESS: Yes, this document
23 18.

Page 94

1     Q. (BY MR. SWEENEY:) Or any other
2  court records. Do you remember --
3     A. Off the top of my head I don't
4  recall. That doesn't mean that they
5  weren't there.
6     Q. The same thing regarding one count
7  of second degree sodomy of B.F., another
8  student.
9        That would be not J.R. but another
10 student?
11    A. Yes, sir. That I believe was the
12 Butler County case.
13    Q. You also make reference of one
14 count of sexual abuse of the brother of
15 J.R.
16       Where in the court documents is
17 there any reference to the brother of J.R.?
18    A. I believe that came out of a
19 deposition. It's not in the court
20 documents, although his sister is also
21 identified in here.
22    Q. Okay. But in terms of the
23 narrative that sets forth that Charles Coon

Page 95

1  admitted sexual abuse towards J.R.'s
2  brother, have you seen any narrative that
3  sets forth specifically that information in
4  the court records?
5     A. No, sir.
6     Q. In the third paragraph you indicate
7  that the administrators, Mark Bazzell,
8  Terry Casey, and Robert McDaniel, had the
9  duty to ensure the safe operations of Pike
10 County High School and the health and the
11 safety of the students enrolled therein.
12       What is the statutory or legal
13 basis for that assertion?
14    A. The administrators of a school,
15 they have the ultimate responsibility for
16 ensuring the safe operation of the school.
17 And they failed to develop the appropriate
18 policies.
19    Q. A duty is created in some fashion,
20 correct?
21    A. Yes, sir.
22    Q. And I'm just trying to find the
23 basis for your assertion there.

Page 96

1        The duty that you're attributing to
2  Mark Bazzell as superintendent and Terry
3  Casey as the principal and Robert McDaniel
4  as an administrator, where is that duty
5  defined to your knowledge that would
6  require them to be responsible for the safe
7  operations of the Pike County High School
8  and the health and safety of the students?
9     A. Let me say that it has been my
10 experience in reviewing other records
11 involving the line of authority in schools
12 and also formerly being a principal myself
13 that I was familiar with the roles the
14 various individuals play according to local
15 school board policies.
16    Q. Do you know of a document of the
17 Pike County Board of Education or the
18 Alabama Department of Education that
19 specifically defines that duty that you're
20 attributing to Mark Bazzell, Terry Casey,
21 and Robert McDaniel?
22    A. Yes, sir.
23    Q. What document?

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    A.  That is the document provided by
2  the State Board of Education, the roles of
3  superintendents and other administrators --
4    Q.  Where is that provided?
5    A.  Give me just a second and let me
6  think.  It is provided in the -- it's not
7  the certification requirements, but it's a
8  similar document to that.  If we can come
9  back to that.  Let me think of it.
10    Q.  Well, did you review any such
11  documents preliminary to making this
12  assertion in your report?
13    A.  I have reviewed them in the past
14  related to other cases.
15    Q.  But with regard to this statement
16  --
17    A.  No, sir.
18    Q.  -- have you recently reviewed that?
19  And the reference to some State Department
20  of Education document assigning that duty
21  and responsibility is not something you can
22  identify at this time?
23    A.  Not specifically at this time.  And

Page 98

1  I have reviewed it recently, but not
2  relative to this particular case.
3    Q.  You think it comes from the State
4  Department of Education in what manner?
5    A.  As a directive from the
6  superintendent of instruction, from
7  Dr. Morton.
8    Q.  The next sentence you say that they
9  also have the duty to ensure proper
10  training of subordinate staff.
11    What is the document from the State
12  Board of Education or policy of the Pike
13  County Board from which you predicate, or
14  upon which you predicate that assertion?
15    A.  The same document and my
16  experience.
17    Q.  From the State Board of Education?
18    A.  Yes, sir.
19    Q.  But you don't recall the document?
20    A.  Not right off the top of my head at
21  this time.  I'm trying.
22    Q.  What should a staff person -- let's
23  say what should a teacher be told about

Page 99

1  sexual harassment of a student?
2    A.  What should a teacher be told?
3    Q.  Yes.  Let's say you're the
4  principal of a high school and you want to
5  make some statement to a teacher about
6  sexual harassment, sexual involvement with
7  a student, what do you tell that teacher?
8    A.  All right.  Let me see if I
9  understand your question correctly.
10    You referenced a policy before that
11  is found a couple of places in the
12  documents that have been provided regarding
13  sexual harassment and sexual abuse.
14  Certainly that should be given to them.
15    They should also be told to be
16  observant of other characteristics of
17  students who have been the victims of
18  sexual abuse and be able to report that to
19  the appropriate authorities.
20    Q.  Do you know if that information --
21    MS. DePAULA:  Were you finished,
22  Mr. Sears?
23    Q.  (BY MR. SWEENEY:)  Were you

Page 100

1  through?
2    A.  No, not entirely.  And that
3  individuals who work with students who have
4  certain limitations, such as mental
5  retardation, and may be more vulnerable,
6  they should be more cognisant of the
7  potential for those children to be abused
8  and should be very closely watching them
9  relative to any characteristics that they
10  may demonstrate.
11    Q.  Do you know if that information was
12  communicated to Charles Coon while he was
13  an employee of the Pike County Board of
14  Education?
15    A.  I saw nothing in there to suggest
16  that.
17    Q.  You may not have seen anything, but
18  you haven't talked to Charles Coon, have
19  you?
20    A.  No, sir.
21    Q.  So you don't know from Charles Coon
22  whether information to that extent was
23  provided to him as proscribed in the

25 (Pages 97 to 100)

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  policies of the Pike County Board of
2  Education that he should not engage in any
3  activity or conduct towards a student of a
4  sexual nature?
5      MS. DePAULA:  Object to the form.
6      A.  Well, it is in the policies.  And
7  if you make the presumption that he is
8  under those policies and was given a policy
9  handbook that provision would be included
10 in there, yes.
11     Q.  Do you know how many seminars or
12 principals' meetings he attended while at
13 Pike County High School or Brundidge High
14 School where that subject was addressed?
15     A.  No, sir, I do not know that.  That
16 was not made available to me.
17     Q.  You indicated that teachers and
18 other staff should be informed of how to
19 report suspicious conduct of an employee
20 towards a student, right?
21     A.  Yes, sir.
22     Q.  Do you know what teachers were
23 employed at Pike County High School during

Page 103

1  observed anything suspicious about Charles
2  Coon in his conduct towards J.R. or any
3  other student?
4      A.  The information from, I believe it
5  was the superintendent's deposition,
6  indicated that there were rumors going
7  around and people were being told that he
8  was providing the marijuana.  And then
9  there was the reference to the rumor about
10 him having a butt buddy in the school
11 population.
12     Q.  Now, let me ask my question again
13 and maybe you can answer my question.
14         Do you know of any teacher at Pike
15 County High School during the 2004/2005
16 school year that observed or worked with
17 J.R. that had information of a suspicious
18 nature about conduct by Charles Coon
19 towards J.R.?
20     A.  No, I do not.
21     Q.  What is the responsibility of
22 parents to their children to educate them
23 about overtures of an inappropriate nature

Page 102

1  the 2004/2005 school year?
2      A.  No, sir, I do not.
3      Q.  Do you know what teachers had an
4  opportunity to work with or observe J.R.
5  during the 2004/2005 school year?
6      A.  I think I was provided a course
7  list that he had taken, you know, that he
8  was taking, but I did not know the
9  individual teachers teaching those courses
10 and did not communicate with them
11 individually.
12     Q.  Do you know of any teacher that
13 worked with J.R. during the 2004/2005
14 school year that had not been informed how
15 they could report suspicious conduct to the
16 administration?
17     A.  Do I know of any teachers that had
18 not been informed?
19     Q.  That's right.
20     A.  No.
21     Q.  Do you know of any teacher that had
22 an opportunity to work with J.R. or observe
23 J.R. during the 2004/2005 school year that

Page 104

1  from adults?
2      A.  I think their responsibilities are
3  within their capacity and their own
4  knowledge.  I don't make the presumption
5  that they should be as knowledgeable as
6  professionals, professional educators
7  especially, who are in contact with
8  children for six to seven hours a day, but,
9  you know, I think that parents should
10 discuss this with their children and from
11 time to time reinforce what they have been
12 told.
13     Q.  Do you know if J.R.'s mother
14 engaged in such instruction to J.R. and her
15 children?
16     A.  Number one, I don't know that she
17 would have the -- you know, what knowledge
18 base she would have in that regard.  But,
19 no, I don't know that.
20     Q.  Do you know the extent to which
21 J.R.'s mother was involved in the band
22 activity at Pike County High School during
23 the 2003/2004 school year?

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    A.  I understand she was a band
2  booster.
3    Q.  Do you know the extent to which she
4  was involved in the band program in
5  2004/2005?
6    A.  I believe she was still a band
7  booster.  I'm not positive.  I can't recall
8  exactly.  But yes, I presume that.
9    Q.  Do you have any information that
10  she had evidence that Charles Coon was
11  abusing J.R. based on her observation of
12  Charles Coon and his interaction with J.R.
13  prior to July of 2005?
14    A.  That she had knowledge specific to
15  --
16    Q.  Or suspicion that Charles Coon was
17  engaged in improper conduct towards J.R.
18  prior to July of 2005.
19    A.  I believe there were occasions when
20  she was familiar with the fact that he had
21  taken a special interest in J.R.
22    Q.  Let me rephrase my question.
23    A.  Yes, sir.

Page 106

1    Q.  From any information you see in any
2  of the documents or any conversation that
3  you've had with J.R.'s mother, do you have
4  any information that she suspected Charles
5  Coon was abusing J.R. prior to July of
6  2005?
7    A.  No, I do not.
8    Q.  Do you have any information that
9  J.R.'s mother ever complained to any school
10  official, principal, superintendent, board
11  members, teachers or other staff members,
12  about any conduct of Charles Coon prior to
13  July of 2005?
14    A.  I do not.
15    Q.  At the bottom of the report on page
16  two you begin a sentence, It is well
17  established in the field of mental
18  retardation that individuals who have this
19  condition will have difficulty learning in
20  an incidental manner.
21    When you say it is well established
22  what articles or publications are you
23  referring to, specifically that I can

Page 107

1  reference and read?
2    A.  Okay.  1967, An Introduction To
3  Mental Retardation, by Oliver P. Kolstoe,
4  K-o-l-s-t-o-e.
5    Q.  Is that some textbook you use?
6    A.  Yes, sir.  I believe it was 1972, a
7  chapter in the text on An Intro To Special
8  Education by Samuel Kirk.
9    Q.  Let me say in the last five years
10  so we have well established of current
11  literature and information that supports
12  this assertion in this report.
13    MS. DePAULA:  Object to the form.
14    A.  Introduction To Special Education
15  by Algozzine, A-l-g-o-z-z-i-n-e.
16    Q.  And what's your recollection of the
17  reference in that source that individuals
18  with mental retardation will have
19  difficulty learning in an incidental
20  manner?
21    A.  That people with mental retardation
22  need to be taught in a specific and
23  concrete manner.

Page 108

1    Q.  And what do you mean by incidental
2  manner?
3    A.  Well, most kids learn incidentally.
4    Q.  I don't understand that term.
5    A.  Just by being exposed.  For
6  example, language is learned incidentally.
7  You don't necessarily sit down and teach
8  your child each and every word.  But for
9  children who have mental retardation,
10  depending on their level of mental
11  retardation, you would have to be a great
12  deal more specific.  You would get into an
13  arrangement where over learning has to
14  occur.
15    For example, if you're going to
16  teach them the nature of a horse you would
17  show them a picture of a horse, you take
18  them out to the field and show them a
19  horse, and you would, you know, let them
20  smell a horse, feel a horse and experience
21  through overlearning, what would be very
22  specific and concrete.
23    Q.  With regard to that do you know any

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  system, public school system in Alabama,
2  that engages in specific one on one
3  training with every child that has mental
4  retardation concerning the potential for
5  sexual abuse by adults that they work with?
6      A.  Do I know of any, no.  Should I
7  know of some, yes.
8      Q.  Do you know of any system that
9  specifically focuses upon children with an
10  IQ range of from 80 to 53 to have as part
11  of their ongoing regular training specific
12  focus on sexual harassment by the people
13  that they work with, that is teachers, band
14  leaders, coaches and so forth?
15      A.  Yes and no.  Can I explain?
16      Q.  Yes.  But what system identifies
17  every student within that mental
18  retardation range and engages in specific
19  one on one concrete instructions concerning
20  the potential for sexual abuse from
21  teachers or employees of the school system?
22      A.  Given the qualifiers that you've
23  given I don't know of any.

Page 110

1          MS. DePAULA:  That's a different
2  question.
3      Q.  (BY MR. SWEENEY:)  In that same
4  paragraph at the top of page three, This
5  special vulnerability results in a
6  statistical increase in incidence of sexual
7  abuse, what is the source for that
8  information?
9      A.  It is in the synopsis, A Synthesis
10  of Existing Literature.
11      Q.  Which we have referred to?
12      A.  Yes.
13      Q.  That's what you're relying upon?
14      A.  Yes, sir.
15      Q.  Is there anything in that
16  documentation that enlightens us on the
17  frequency with which high school band
18  leaders have engaged in sexual abuse of
19  mentally retarded students in the State of
20  Alabama?
21      A.  It does not speak specifically to
22  the State of Alabama, no, sir.
23      Q.  Do you know how many students there

Page 111

1  were in the State of Alabama in the year
2  2004/2005 that were classified as students
3  with mental retardation?
4      A.  Specifically, a specific number,
5  no, sir, but generally the field accepts
6  three percent of the general school age
7  population as being in the mentally
8  retarded range.
9      Q.  Do you know how many incidents of
10  sexual abuse of students with mental
11  retardation in Alabama from employees of
12  the public school systems occurred in
13  2004/2005?
14      A.  Specific to those conditions or
15  qualifiers, no.
16      Q.  Or 2003/2004?
17      A.  The same response.
18      Q.  Have you had any involvement prior
19  to 2005 of an incident where a student with
20  mental retardation, a male student with
21  mental retardation, was sexually abused by
22  a male employee of a school system?
23      A.  Yes, sir.

Page 112

1      Q.  Where?
2      A.  In Mobile County.
3      Q.  And was the nature of the abuse
4  sexual?
5      A.  Yes, sir.
6      Q.  And when did that occur?
7      A.  There have been a number of
8  occasions.  I won't say yearly, annually,
9  but --
10      Q.  Well, did you file a suit with
11  regard to any of those?
12      A.  In some cases I reported it for
13  criminal action with the DA's office, yes,
14  sir.
15      Q.  Were any of the employees
16  criminally prosecuted?
17      A.  It is my understanding, yes, but I
18  don't know that for a fact.  It was passed
19  onto them.
20      Q.  Based on those incidents do you
21  know of any lawsuit for damages that were
22  filed by the parents of those students
23  against the school system?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1    A.  No, sir, I don't know.
2    Q.  Hasn't it been your experience that
3  where an employee engages in criminal
4  conduct there is not a suit that charges
5  the school system with responsibility for
6  such criminal conduct?
7    A.  You're going to have to break that
8  down for me.
9    Q.  Sure, I'll ask it better.
10      You're aware of some cases where
11  there's been a criminal prosecution of a
12  school board employee for sexually abusing
13  a student?
14    A.  Yes, sir.
15    Q.  Do you know of any civil lawsuit
16  that occurred relating to such criminal
17  misconduct where a school board employee
18  sexually abused a student?
19    A.  Besides this one, I can't recall
20  right off the top of my head, no, sir.
21    Q.  Paragraph two on page three, the
22  second full paragraph, you make the
23  statement: The parents of a child with a

Page 114

1  disability should be contacted to discuss
2  the potential for abuse and to investigate
3  any unusual conduct between the alleged
4  abuser and the student.
5      Has Justin Reed's mother discussed
6  what information she had that she did not
7  share with the school system during the
8  2004/2005 school year?
9    A.  She hasn't discussed that with me.
10    Q.  Do you know that she invited
11  Charles Coon to her house on a number of
12  occasions?
13      MS. DePAULA:  Object to the form.
14    A.  I don't have specific knowledge of
15  that.
16    Q.  Do you have knowledge that Charles
17  Coon spent a good bit of time in their
18  house during the 2004/2005 school year?
19    A.  I understand that he visited there.
20    Q.  As a result of his being in their
21  house on occasions do you know if Ms. Reed
22  ever reported any suspicious conduct that
23  she observed on those occasions to

Page 115

1  officials of the school system?
2    A.  I have no knowledge of that.
3    Q.  You reference chat rooms, that a
4  parent could have given information -- this
5  is in the same paragraph, the last
6  sentence -- information concerning his
7  conduct in the chat rooms.
8      What information would school
9  officials have found out about Charles Coon
10  if they knew about chat rooms?
11    A.  That is one of the characteristics
12  of an improper relationship with a teacher
13  with a student.
14    Q.  Have you seen any evidence that
15  Charles Coon communicated with J.R. through
16  a chat room?
17    A.  Yes.  It was in -- I believe it was
18  in Wright's deposition.
19    Q.  Have you seen any document though
20  or just his reference?
21    A.  Just his reference.
22    Q.  I haven't seen any document that
23  relates to communication through a chat

Page 116

1  room exchange.  Have you?
2    A.  I haven't seen a document, no, sir.
3  Like a printout, no, sir.
4    Q.  So the record's clear, what do you
5  have in mind when you say a parent might
6  have information concerning the teacher's
7  contact in the chat room?  What do you mean
8  by that chat room?
9    A.  An internet exchange that could
10  possibly be inappropriate.  It could be
11  expressly inappropriate or it could be a
12  reference to meeting me after school or
13  coming by the band room when nobody else is
14  here or something of that nature.
15    Q.  Do you recall specifically what
16  Andrew Wright said?
17    A.  No, sir, I don't.
18    Q.  All right.  Aside from Andrew
19  Wright do you have any information of
20  evidence concerning an exchange between
21  Charles Coon and J.R. in a chat room?
22    A.  No, sir.
23    Q.  Or through e-mail?

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1    A.  No, sir.
2    Q.  In the next sentence, the next
3    paragraph, you state that J.R. is placed in
4    a class with a teacher who has been
5    employed by an unusually conspicuous number
6    of school systems.
7         What do you mean when you say J.R.
8    is placed in a class?  Who placed him in a
9    class?
10   A.  The school personnel obviously had
11   placed him in a class because he was in the
12   band class.
13   Q.  So what you're talking about is the
14   band class and band program at Pike County
15   High School?
16   A.  Yes.
17   Q.  And Charles Coon was the band
18   director?
19   A.  Yes, sir.
20   Q.  And that's the placement you're
21   talking about?
22   A.  Yes, sir.
23   Q.  And he was employed by an unusual

Page 118

1    conspicuous number of school systems.
2         Do you know how many years Charles
3    Coon had been at the Pike County High
4    School prior to the 2004/2005 school year?
5    A.  Obviously I can go back to his
6    application.
7    Q.  What's your recollection?
8    A.  Well, he was on tenure, so at least
9    three years.
10   Q.  So at least three years.  Let's say
11   his last year was the 2004/2005 school
12   year.
13   A.  Yes, sir.
14   Q.  The previous year would have been
15   the 2003/2004 school year?
16   A.  Yes, sir.
17   Q.  Do you have any information that
18   anybody reported any complaint of
19   misconduct about Charles Coon in the
20   2003/2004 school year?
21   A.  No, sir.
22   Q.  Assume that he was employed for the
23   2002/2003 school year.

Page 119

1         Do you know of anybody that made
2    any complaints about Charles Coon during
3    that school year --
4    A.  No, sir.
5    Q.  -- concerning misconduct toward
6    students?
7    A.  No, sir.
8    Q.  And when you say an unusually
9    conspicuous number of school systems, we
10   previously talked about that?
11   A.  Yes, sir.
12   Q.  Do you know how many previous
13   school systems he had served as the
14   director of the band program?
15   A.  No, I don't.  I know that there
16   were 12 previous employments, school
17   employments.
18   Q.  Let's look at your vitae just a
19   minute, Defendants' Exhibit 10.
20   A.  Page number?
21   Q.  Page two.
22   A.  Yes, sir.
23   Q.  1969 to '71 you were an EMR

Page 120

1    teacher?
2    A.  Yes, sir.
3    Q.  I count 14 different personal
4    experiences on your resume.
5         Is that conspicuous?
6    A.  Well, given that -- very good.
7    Many of them were at the same university.
8    For example, if I can explain those before
9    suggestions are made.
10   Q.  But you moved in various positions,
11   didn't you, during your career?
12   A.  I started off as an EMR teacher and
13   I was offered a job as principal.  From
14   there I went to graduate school and earned
15   my doctoral degree.
16   Q.  Should I read this and consider
17   those conspicuous changes, those 14 that
18   you referenced in your curriculum vitae?
19   A.  They should not be conspicuous
20   because from 1977 to 1994 I stayed at the
21   same university.
22   Q.  All right.  And the last six years
23   of Charles Coon's career he spent at how

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  many schools?
2    A.  I would have to look.  I don't
3  know.
4    Q.  Okay.  You mention in the next
5  paragraph about forensic interviewers.
6        What is a forensic interviewer?
7    A.  Somebody that has been specifically
8  trained to focus on the possibility of
9  criminal charges.
10    Q.  What kind of training is a backdrop
11  in order to qualify to be a forensic
12  interviewer?
13    A.  Somebody who would most likely have
14  a degree in criminal justice or
15  criminology, probably a masters degree, and
16  would have taken specific and advanced
17  courses relative to sexual abuse.
18    Q.  Would it be true that you've sued
19  the Mobile County Commission a number of
20  times?
21    A.  I have sued them a number of times,
22  yes, sir.
23    Q.  And would it be true that you've

Page 122

1  sued the Baldwin County Board of Education
2  a number of times?
3    A.  Yes, sir.
4    Q.  With regard to any of those
5  lawsuits against the Mobile County School
6  Commission or Baldwin County School System,
7  have they ever engaged or utilized a
8  forensic interviewer?
9    A.  Not to my knowledge.
10    Q.  You state that the superintendent
11  engaged in what you refer to as a haphazard
12  investigation.  Let's begin in this
13  fashion.
14        Mark Bazzell received a call from a
15  law enforcement officer on March 30,
16  according to the records?
17    A.  Yes, sir.
18    Q.  What did he do next?
19    A.  He suspended Mr. Coon.
20    Q.  The next day?
21    A.  Yes, sir.
22    Q.  And then how many people did he
23  talk to concerning the allegations?

Page 123

1    A.  Specifically I don't know.
2    Q.  Do you know how many he talked to
3  on the very next day, April 1st?
4    A.  It indicated that he had turned it
5  over for investigation.
6    Q.  Do you know how many, though, that
7  Mark Bazzell talked to?
8    A.  No, sir.
9    Q.  Do you know how many people the
10  administrative staff at the high school
11  talked to?
12    A.  If it was in the records I don't
13  recall it.
14    Q.  Before sharing your adjective that
15  it was a haphazard investigation don't you
16  think in all fairness, Mr. Sears, it would
17  be beneficial for you to know how many
18  people Mr. Bazzell talked to?
19    A.  It would be more important to me to
20  know who he talked to.
21    Q.  Well, wouldn't that be helpful?
22    A.  Yes, sir.
23    Q.  Have you made any inquiry to learn

Page 124

1  who he talked to?
2    A.  Well, the information that I have
3  is that it was in-house, meaning within the
4  school system.  Had I been the
5  superintendent I would have requested, if
6  not insisted, that somebody from the
7  district attorney's office or somebody with
8  the police department come out and not only
9  engage in an investigation but also to
10  specifically identify children who may have
11  been at risk and have conducted a specific
12  investigation with him.
13    Q.  Okay.  Let's go back.  Not which
14  you would have done, but what Mr. Bazzell
15  did.
16        Was it haphazard that he suspended
17  Charles Coon the very next day?
18    A.  No, sir.
19    Q.  Was it haphazard that he discussed
20  this report with his staff?
21    A.  In some regards it may have been
22  because --
23    Q.  Well, do you know what conversation

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1    he had with the staff?
2      A.  No, I don't.
3      Q.  So you don't know whether it was a
4    haphazard conversation with the staff or
5    not, do you?
6      A.  The reference to haphazard would be
7    relative to the fact that he went to his
8    staff with this rather than specifically to
9    the police department.
10     Q.  All right.  Aside from things he
11   could have done, is it your opinion that a
12   superintendent following up on a report is
13   acting in a haphazard fashion when he talks
14   to his staff about the matters that's been
15   reported?
16     A.  Yes, sir.
17     Q.  You think it's haphazard for him to
18   talk to his staff?
19     A.  Yes.
20     Q.  Do you think he should have ignored
21   his staff and not discussed it with them?
22     A.  I think he should have gone
23   directly to the police because they --

Page 126

1    well, let me stop there.  He should have
2    gone directly to the police.
3      Q.  Well, in that regard then would you
4    agree that Mr. Bazzell had no duty or
5    responsibility to engage in an
6    investigation himself?
7      A.  No duty to -- you mean specifically
8    carry out --
9      Q.  Specifically.
10     A.  Let me finish. -- to carry out the
11   investigation by himself?
12     Q.  Is it your opinion that Mr. Bazzell
13   as superintendent of the Pike County Board
14   of Education had no responsibility or duty
15   to engage in an investigation himself
16   following the allegations that he got on
17   March 30 of 2005?
18     A.  I think he would engage in the
19   investigation by engaging the appropriate
20   authorities in the investigation.
21     Q.  I'm asking a more precise question.
22       Is it your opinion that Mr. Bazzell
23   had no duty and no responsibility to engage

Page 127

1    in an investigation himself once he got
2    that information?
3      A.  Are you asking me should he have
4    passed it onto somebody --
5      Q.  No.  I'm asking you if he had any
6    duty himself to investigate the allegations
7    that were shared with him the previous day.
8      A.  Given the nature of the allegations
9    he should not have engaged in the
10   investigation.
11     Q.  I just want to make sure.
12       So for the record it's your opinion
13   as an expert for the plaintiffs that Mark
14   Bazzell had no duty or responsibility to
15   engage in an investigation following the
16   allegations that were made on March 30th?
17       MS. DePAULA:  Object to the form.
18     A.  Are you asking me duty or
19   responsibility?
20     Q.  I'm asking you duty.
21     A.  Duty to engage himself, no.
22   Responsibility for ensuring that an
23   investigation did occur, yes.

Page 128

1      Q.  Okay.  Is it your opinion as the
2    expert for the plaintiff in this case that
3    Mark Bazzell as superintendent had no
4    responsibility to engage in an
5    investigation himself following the
6    allegations that were reported to him on
7    March 30th?
8        MS. DePAULA:  Object to the form.
9      A.  The responsibility was to engage
10   the appropriate authorities.
11     Q.  But in terms of responsibility for
12   Mark Bazzell as superintendent to
13   investigate himself, is it your opinion
14   that he had no responsibility to do so?
15       MS. DePAULA:  Object to the form.
16     Q.  (BY MR. SWEENEY:)  That is to
17   engage an investigation of his own
18   initiative.
19     A.  No, he did not -- he had the
20   responsibility to engage the appropriate
21   authorities, not himself.
22     Q.  So let me make sure the record's
23   clear.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1    Mr. Sears, as the expert for the
2  plaintiff it's your opinion that
3  Mr. Bazzell had no responsibility to
4  conduct an investigation concerning the
5  information that was shared with him on
6  March 30 himself as superintendent?
7    MS. DePAULA:  Object to the form.
8    A.  Let me clarify then.
9    Q.  Please answer the question based on
10 your previous testimony.
11   A.  This is what I believe as the
12 expert for the plaintiff in this case.  I
13 believe that he had a duty to engage the
14 services of the appropriate authorities,
15 people appropriately trained.  I believe
16 that he had the responsibility and the duty
17 to provide them with the information that
18 he had and to serve as a resource for them
19 as they engage in this investigation.  I
20 believe that he had the responsibility and
21 duty to provide them access to the students
22 and to their parents and to other teachers.
23   Q.  All right.  Back to my question.

Page 130

1    When Mr. Bazzell as superintendent
2  investigated to whatever extent he did
3  following the allegations are you saying he
4  was guilty of misconduct?
5    A.  Misconduct?  I wouldn't say
6  misconduct.
7    Q.  Have you ever reviewed any document
8  from the State Board of Education that says
9  or suggests that a superintendent of a
10 school system should not investigate
11 allegations of misconduct by a staff
12 member?
13   A.  I believe that's what I said.  You
14 know, there are various levels and degrees
15 of investigation and his level of
16 participation would be, you know, a
17 function of the allegations that are made.
18 In this case the allegations were very
19 serious and involved five kids, and
20 involved not only sexual abuse but it also
21 involved the use of marijuana.
22    So the investigation, I mean once
23 again what he should do, is -- that wasn't

Page 131

1  your question.  I'm sorry.  I got off on a
2  tangent.
3    Q.  Mr. Sears, hasn't it been your
4  experience that when a principal, for
5  example, gets a report of misconduct by a
6  staff member the principal immediately
7  commences an investigation to find out
8  what's going on?
9    A.  It would certainly depend upon the
10 circumstances and the allegations made.  I
11 have recently -- I don't have any firsthand
12 knowledge but only what I read in the
13 newspaper.  There was an investigation of a
14 principal that was immediately turned over
15 to the District Attorney's office.
16   Q.  Fine.  But isn't it generally the
17 experience that you've had that when a
18 principal gets information about misconduct
19 of an employee on his or her staff that the
20 principal looks into it?
21   A.  Looks into it, yes.
22   Q.  Investigates?
23   A.  Looks into it, yes.

Page 132

1    Q.  And if a superintendent gets
2  information of misconduct about some
3  employee of the school system hasn't it
4  been your experience that principals
5  generally look into the allegations
6  themselves?
7    A.  I think you mixed superintendents
8  and principals.
9    Q.  I didn't mix them.  I'm going to
10 ask you about superintendents.
11    Hasn't it been your experience that
12 when superintendents get information about
13 misconduct by employees of their school
14 system that they investigate the
15 allegations?
16   A.  They look into the -- it depends on
17 what you are referring to as the
18 investigation process.  If you're looking
19 for a final --
20   Q.  I'm not looking at anything other
21 than a superintendent gets information of
22 wrongdoing, the superintendent investigates
23 at the outset of those allegations, I want

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1  you to tell me whether that's been your
2  general practice.
3      Has that been the general practice
4  based on your experience in dealing with
5  superintendents or something to the
6  contrary?
7      MS. DePAULA: Object to the form.
8      A.  My experience in dealing with
9  superintendents is that it would depend
10  upon the type of allegation made.  For
11  example, if it involves drugs then it would
12  be turned over to the police immediately.
13      Q.  As far as you know there's no
14  evidence in this record that any sexual
15  abuse took place by Charles Coon after
16  March 30, 2005?
17      MS. DePAULA:  Object to the form.
18      Q.  (BY MR. SWEENEY:)  Do you know of
19  any evidence that Charles Coon engaged in
20  sexual conduct towards J.R. after he was
21  confronted by Mark Bazzell on April 1,
22  2005?
23      A.  I have no knowledge of any.

1      Q.  The last paragraph on page three
2  begins with the sentence, The amount of
3  time devoted to the subject of sexual abuse
4  and misconduct in the teacher workshops and
5  in-service is woefully insufficient.
6      On how many occasions during the
7  2004/2005 school year did Pike County have
8  in-service teachers workshops where the
9  subject of sexual abuse was addressed?
10      A.  I think there was one workshop
11  conducted that was provided to the
12  elementary school teachers, not to the high
13  school teachers.
14      Q.  Do you know whether Charles Coon
15  had had multiple seminars or in-service
16  training prior to 2004/2005 in the various
17  systems that he was in that addressed the
18  prohibited conduct of sexual involvement by
19  him with students?
20      A.  I have no documentation of that.
21      Q.  At a teacher workshop or in-service
22  teachers should be told that if they
23  observe anything of a suspicious nature

1  they should report that?
2      A.  Yes, sir.
3      Q.  And that's one of the things that
4  you would hope that would be communicated
5  clearly at a teachers workshop or
6  in-service training?
7      A.  Yes, sir.
8      Q.  Do you know of any teacher at Pike
9  County High School who was working there in
10  2004/2005 that did not know how they could
11  report suspicious activity at that school?
12      A.  I would have no way of knowing
13  that.
14      Q.  So as far as you know whether the
15  in-service or workshops were of a limited
16  amount of time, notwithstanding your
17  opinion in that regard, do you know of any
18  teacher that needed more training to know
19  whom they should report suspicious activity
20  to during the 2004/2005 school year?
21      MS. DePAULA:  Object to the form.
22      A.  That presumption was made on the
23  basis that there was not a sufficient

1  amount of training going on and that they
2  have not specifically been told to whom
3  they could report it and --
4      Q.  But with regard to what you know
5  there's no evidence in this record that any
6  teacher observed anything of a suspicious
7  nature during the 2004/2005 school year, is
8  there?
9      A.  I don't know what they observed,
10  but I know that there was to my knowledge
11  not a report made.  So they could have
12  observed it and not made the report.
13      Q.  But as far as the information you
14  provided there's no evidence of record that
15  any teacher at Pike County High School
16  observed anything of a suspicious nature
17  during the 2004/2005 school year?
18      A.  Are you asking me did I --
19      Q.  Based on what you know and the
20  documents that you've reviewed was there
21  any evidence that any teacher, specific
22  teacher, observed anything of a suspicious
23  nature during the 2004/2005 school year

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  concerning Charles Coon?
2      A.  I don't know what they observed.  I
3  can only state what they would have
4  reported and there was nothing reported.
5      Q.  Karen Berry testified about the
6  building based support team.
7          Do you see that on the bottom of
8  page three?
9      A.  That one I have.
10     Q.  Do you see that in your report?
11     A.  Yes, sir.
12     Q.  Bottom of page three?
13     A.  Yes, sir.
14     Q.  Who are the people that constitute
15  a building based support team?
16     A.  The BBST are individuals and
17  teachers.
18     Q.  Well, let's be more specific here.
19  You are an expert at being proffered by the
20  plaintiff in this case.
21         Do you know what a building based
22  support team is?
23     A.  Yes, sir, I do, very well.

Page 138

1      Q.  Under Alabama regulations?
2      A.  And federal law, yes, sir.
3      Q.  And the people that make up a
4  building based support team are not just
5  individuals, are they, they're specific
6  employees of the school system?
7      A.  Yes, sir.  They're teachers, yes,
8  sir.
9      Q.  All right.  And at Pike County High
10  School who would have been the members of a
11  building based support team based on
12  Alabama regulations?
13     A.  You would have an administrator.
14  You would have a -- administrator being a
15  principal or assistant principal, something
16  of that nature.  Possibly a supervisor.
17  You would have a guidance counselor.  And
18  you would have a special education teacher
19  and a general education teacher.
20     Q.  All right.  And if at a building
21  based support team seminar orientation or
22  training Karen Berry went over matters
23  relating to sexual abuse, was that

Page 139

1  inappropriate for her to be sharing that
2  information with administrators on the
3  building based support team?
4          MS. DePAULA:  Object to the form.
5      A.  It certainly would not have been
6  inappropriate, but was it sufficient would
7  be the question.
8      Q.  You're saying that sharing
9  information of a sexual abuse at a building
10  based support team is ludicrous.
11         Is it ludicrous for the special ed
12  coordinator to share information about
13  sexual abuse with the school administrator
14  that's serving on a building based support
15  team?
16     A.  I think the suggestion there was
17  that was going to be sufficient.  That is
18  not sufficient.
19     Q.  That's not what you state.  You say
20  it's ludicrous for a special ed coordinator
21  to share information or training about
22  sexual abuse with a building based support
23  team.

Page 140

1          Do you see your sentence?
2      A.  Yes, I see it.
3      Q.  The suggestion by the special ed
4  coordinator that the building based support
5  team receives training in sexual abuse is
6  ludicrous.  I want to explore that with
7  you.
8          Is it ludicrous for an
9  administrator serving on a building based
10  support team to receive training in sexual
11  abuse?
12     A.  No.
13     Q.  Is it ludicrous for a special ed
14  teacher serving on a building based support
15  team to receive information and training
16  concerning sexual abuse?
17     A.  No.
18     Q.  Is it ludicrous for a regular
19  teacher who's serving on a building based
20  support team to receive training in sexual
21  abuse?
22     A.  I think it would be safe to say
23  that people who are on a building based

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1 support team it is appropriate that they
2 receive it, but it is not appropriate to
3 assume that they are the only ones
4 receiving it.
5    Q.  There's nothing from Karen Berry's
6 deposition that makes that assumption, is
7 there?
8    A.  Well, I think so, because there is
9 not anything else to support the fact that
10 other teachers were trained in that regard.
11    Q.  Well, do you recall that in the
12 deposition of Karen Berry she was asked if
13 she engaged in training at a building based
14 support team with the people that served on
15 that at Pike County High School?
16    A.  If you will --
17    Q.  I'm just asking, do you recall that
18 from your review of the deposition?
19    A.  I remember some reference to that,
20 yes.
21    Q.  All right.  If Karen Berry said as
22 part of the training of the people that
23 served on a building based support team she

Page 142

1 went over training, or involved them in
2 training of sexual abuse, is it your
3 opinion as an expert that that's ludicrous
4 for her to have done so?
5    A.  It's ludicrous for her -- as I
6 recall it was very limited in scope and it
7 was limited in time, and that it was
8 limited to the people on the building based
9 support team.
10    Q.  I'm not asking about limited time
11 or limited support.  I'm asking about your
12 assertion as an expert that it was
13 ludicrous for her to share information,
14 training, of people on a building based
15 support team about sexual abuse.
16    A.  Of course not.
17    Q.  Of course not.  And yet that's what
18 you say in your statement, isn't it?
19    A.  What I say in my statement is --
20    Q.  Well, let's read your statement.
21    MS. DePAULA:  Let him finish his
22 answer.
23    MR. SWEENEY:  Well, let's not

Page 143

1 paraphrase.
2    MS. DePAULA:  He's trying to answer
3 the question and you're interrupting.
4    Q.  (BY MR. SWEENEY:)  Let's go back to
5 your statement.  The suggestion by the
6 special ed coordinator that the building
7 based support team (BBST) receives training
8 in sexual abuse is ludicrous.
9    A.  Individuals on the support team as
10 well as other individuals who are
11 professionals in that school should receive
12 the training.  It should not be limited to
13 just the building based support team.
14    Q.  In the last paragraph on page four
15 there's the statement:  Here, the Pike
16 County Board of Education and its
17 administrators have demonstrated a complete
18 disregard for the needs of this special
19 population as it relates to sexual abuse
20 policies and procedures.
21    Is it a complete disregard --
22    A.  Where are you?  I'm sorry.
23    Q.  Page four, midway down.  You say:

Page 144

1 Here, The Pike County Board of Education
2 and its administrators have demonstrated a
3 complete disregard for the needs of this
4 special population as it relates to sexual
5 abuse policies.
6    Now, they had a policy that the
7 Pike County Board adopted prohibiting
8 sexual misconduct by staff towards
9 students, didn't they?
10    A.  Yes, sir.
11    Q.  Is it your judgment that in
12 adopting that policy that they showed a
13 complete disregard for the needs of the
14 special education population?
15    A.  Yes, sir.
16    Q.  And the very act of adopting a
17 policy prohibiting that conduct in your
18 opinion demonstrates a complete disregard?
19    A.  That's not what I say here.
20    Q.  Well, that's what it says here.
21 Let's read it again.
22    A.  All right.  I'll read it for you.
23 Here, the Pike County Board of Education

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  and its administrators have demonstrated a
2  complete disregard for the needs of this
3  special population as it relates to sexual
4  abuse policies and procedures.
5     Q.  All right.  My question is in
6  adopting a policy that prohibits sexual
7  misconduct by staff towards employees is it
8  your opinion that they showed a complete
9  disregard for the needs of special ed
10  students?
11    A.  By the limited nature of the policy
12  they adopted, yes.
13    Q.  When Mark Bazzell suspended Charles
14  Coon the day after he received a complaint
15  from a law enforcement official, is it your
16  opinion that he showed a complete
17  disregard, an insensitivity, towards that
18  information?
19    A.  By suspending him?
20    Q.  That's right, the very next day.
21    A.  No.
22    Q.  Is it your opinion that he showed a
23  complete disregard for the needs of the

Page 146

1  special ed population when he began an
2  investigation the very next day?
3     A.  A disregard, no.
4     Q.  The next sentence:  Moreover, any
5  such policy would have to include
6  procedures specifically tailored to address
7  students who cannot self-report and/or may
8  be unable to identify inappropriate sexual
9  conduct.
10       Do you know of any school system,
11  public school system in Alabama, that has
12  adopted a policy that includes procedures
13  specially tailored to address students who
14  cannot self-report and are unable to
15  identify inappropriate sexual conduct?
16    A.  I don't know of any.
17    Q.  And you've been around a long time,
18  haven't you?
19    A.  I'm an old guy.
20    Q.  Mr. Sears, as an expert charging
21  $300 an hour in this case is it your intent
22  to be earnest and sincere or cute?
23    A.  Mr. Sweeney, you know that my

Page 147

1  history is to be a very zealous advocate
2  for children who have disabilities and I
3  have no intention of being cute.  I was
4  responding to your question about me being
5  around a long time.
6     Q.  Would you agree that to make a
7  statement based on what the Pike County
8  Board of Education adopted by its policy
9  and did with regard to its investigation,
10  that it's the equivalent of equipping a
11  school for the deaf with only an auditory
12  fire alarm is a cute rather than
13  responsible statement?
14    A.  No, it's an analogy.
15    Q.  The last sentence you say:  The
16  procedures that the defendants have for
17  training, investigating, and reporting
18  sexual violations against students by
19  teachers, do not adequately address the
20  magnitude of the problem.
21       Do you know how many reports of
22  sexual abuse by staff there have been at
23  Pike County High School in the history of

Page 148

1  the school?
2     A.  That has not been provided to me,
3  no, sir.
4     Q.  Wouldn't that be enlightening
5  information to either support or discredit
6  your statement about the magnitude of the
7  problem?
8     A.  It certainly would.  I would have
9  anticipated that had there been examples of
10  reporting that the defendants would have
11  provided that, and I did not see anything
12  supporting that.
13    Q.  When you're talking about the
14  magnitude of the problem in Pike County do
15  you base that on any information that there
16  has ever been another allegation of sexual
17  abuse by an employee at Pike County High
18  School?
19       MS. DePAULA:  Object to the form.
20    Q.  (BY MR. SWEENEY:)  Do you know any
21  other allegation?
22    A.  Again it has not been reported to
23  me.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1   Q. So are you telling me you do not
2 know as you make this statement about the
3 magnitude of the problem whether there has
4 ever been another report of sexual abuse at
5 Pike County High School by a staff member
6 towards a student?
7   A. What I was referring to when I
8 talked about the magnitude of the problem
9 was that there was insufficient training
10 for teachers, professionals, students, at
11 the school, to recognize potential for
12 problems related to sexual abuse or some
13 type of sexual harassment and that failing
14 to have the ability to adequately recognize
15 would some significant way impact reports
16 were being made or would be made.
17   Q. Well, let's just take a school in
18 the abstract.
19     If a high school has had no
20 experience of sexual abuse by staff members
21 towards students, would that be an
22 indication that the school system has had a
23 good training program?

Page 150

1   A. No.
2   Q. That's a possibility, though, isn't
3 it? It could be luck but it could be good
4 training, conscientious staff, and so
5 forth?
6   MS. DePAULA: Object to the form.
7   A. It could be, but it could also be
8 the fact that they did not have the
9 adequate training to recognize the
10 characteristics of potential abuse.
11   Q. But if a school has no record of
12 sexual abuse by staff toward students would
13 you consider the magnitude of the problem
14 at that school to be great magnitude or low
15 magnitude?
16   A. Ask me that again. I'm sorry.
17   Q. I'll rephrase it. When you talk
18 about magnitude of the problem are you
19 talking about a number of incidents that
20 have occurred?
21   A. I guess what I'm addressing there
22 is that times are different now than when
23 we were in school, that we are recognizing

Page 151

1 that the very people that we have entrusted
2 our children to are sometimes people who
3 will violate our children in some of the
4 worst ways and --
5   Q. I don't --
6   MS. DePAULA: Donald, would you
7 please allow him to finish his response?
8   Q. (BY MR. SWEENEY:) Go ahead.
9 Excuse me.
10   A. And what we as a society need to
11 do, as school systems need to do, is to
12 develop policies that ensure that
13 professionals are adequately trained, that
14 students and their families are given
15 sufficient information to recognize first
16 of all the potential, and secondly, the
17 characteristics of a situation where a
18 child might be abused.
19   Q. Is it your opinion that there is a
20 problem of great magnitude across the
21 United States with regard to sexual abuse
22 by teachers toward students?
23   A. Is there a problem across the

Page 152

1 United States, yes.
2   Q. A problem of great magnitude?
3   A. Yes.
4   Q. But with regard to Pike County High
5 School what is the support for your
6 contention, if you're making one, that they
7 have a problem of great magnitude at Pike
8 County High School?
9   A. That there's no training. There's
10 not adequate training, there's not adequate
11 information.
12   Q. But is it a problem where there has
13 been incidents of sexual abuse?
14   A. In this very case there are
15 incidents of sexual abuse.
16   Q. I'm sorry?
17   A. In this very case there are
18 incidents of sexual abuse.
19   Q. All right. We have this case, but
20 to what extent has --
21   A. These cases.
22   Q. We have the case of Charles Coon?
23   A. Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 153

1  Q.  Okay.  To what extent have there
2  been other problems at Pike County High
3  School with other employees other than
4  Charles Coon that you know of?
5  A.  That I know of, I know of no other.
6  That does not mean that there weren't
7  others.
8  Q.  And when you're talking about the
9  magnitude of the problem, I just asked you
10  about whether you know of any other
11  incident of sexual abuse by a staff person
12  at Pike County High School, but do you know
13  of any other incident of sexual abuse by an
14  employee of the Pike County Board of
15  Education against a student in the last ten
16  years?
17  A.  Are you referring to the board
18  members now or --
19  Q.  The whole school system, not just
20  Pike County High School, but any other --
21  A.  All of my information has been
22  focused on the student.
23  Q.  How many IEP's have you reviewed in

Page 154

1  the last five years?
2  A.  Hundreds.
3  Q.  Can you share with me any
4  particular example of an IEP that has
5  addressed as part of the IEP instructions
6  to a special ed student on how they should
7  self report sexual abuse?
8  A.  I have been engaged in -- and
9  understand that I typically get involved in
10  the IEP process at the end of the due
11  process hearing request.  So what I get is
12  -- typically I don't get the final version,
13  but I can tell you that I have attended IEP
14  meetings where sexual abuse, sexual
15  contact, appropriate sexual behavior, has
16  been included in IEP's.
17  Q.  Give me one example of a case of an
18  IEP where a school system included specific
19  information and procedures for the special
20  ed student regarding sexual abuse.
21  A.  I can give you several.
22  Q.  Okay.  Give me several.
23  A.  Well, I mean I certainly cannot

Page 155

1  name them.
2  Q.  Well, give me the school system.
3  A.  Mobile County.
4  Q.  In the last two years?
5  A.  Yes, sir.
6  Q.  So I subpoena records from the
7  Mobile County Commission for evidences of
8  IEP's that have specifically addressed
9  protocol and procedures for a special ed
10  student to report sexual abuse I will find
11  examples of that in your opinion?
12  A.  You should, yes.  And once again I
13  typically don't see the IEP's after I do
14  that last meeting.
15  Q.  Well, does that mean you know that
16  there is such or are you just guessing?
17  A.  Well, I know that it was discussed
18  at the IEP meetings and --
19  Q.  Okay.  Well, let me go back.
20  Do you know any IEP --
21  A.  Can I show you?
22  Q.  -- that you've seen and read
23  information on the IEP that addresses

Page 156

1  sexual abuse and gives specific procedures
2  and protocol to address sexual abuse for a
3  special ed student?
4  A.  It is common now when you're
5  talking about middle school and high school
6  children who have autism --
7  Q.  Mr. Sears, my question --
8  MS. DePAULA:  Let him finish his
9  answer.
10  Q.  (BY MR. SWEENEY:)  Can you tell me
11  of a specific IEP that you've read that
12  addressed procedures and protocols for the
13  student to self-report sexual abuse?
14  A.  That I have in my possession that I
15  have read, no.
16  Q.  I asked you at the outset if you
17  had prepared a WIP in this case.
18  How many hours would you estimate
19  you have spent in preparing your expert
20  testimony in this matter?
21  A.  Up to this point I would say it's
22  less than 30.
23  Q.  But 30 would be a good

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1  approximation?
2    A.  Thereabouts, yes.
3        MR. SWEENEY:  Thank you very much.
4
5        (Whereupon, the deposition was
6  concluded.)
7
8        (Whereupon, Defendants' Exhibits 13
9  and 14 were received subsequent to the
10  deposition.  Defendants' Exhibit 14 having
11  previously been marked, Defendants' 13 was
12  marked for identification and copy of same
13  is attached hereto.)
14
15
16
17
18
19
20
21
22
23

Page 158

1        C E R T I F I C A T E
2  STATE OF ALABAMA)
3  MOBILE COUNTY )
4
5        I hereby certify that the above and
6  foregoing deposition was taken down by me
7  in stenotype and the questions and answers
8  thereto were transcribed by means of
9  computer-aided transcription, and that the
10  foregoing represents a true and correct
11  transcript of the testimony given by said
12  witness upon said hearing.
13        I further certify that I am neither
14  of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in
16  the result of said cause.
17
          JANET T. McELROY, CSR,
18        AL-CSR-135
          NOTARY PUBLIC
19
20
21
22
23

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                    CASE NO.:

                                  2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

    DEPOSITION OF MARK BAZZELL, EdD, taken before Mary

Moore-Wynn, as Commissioner, on the 24th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 9:00 A.M.


* * * * * * * * *

JR, A Minor                              July 24, 2007                    Pike County Board of Education

2 (Pages 2 to 5)

## Page 2

```
 1        * * * * * * * * *
 2          APPEARANCES:
 3   FOR THE PLAINTIFF:
 4   Hon. Susan DePaola
       Attorney at Law
 5   1726 West 2nd Street, Suite
       Montgomery, Alabama 36104
 6
 7   and
 8   Hon. Deanie Allen
       Azar and Azar
 9   260 Washington Avenue
       Montgomery, Alabama 36104
10
11   FOR THE DEFENDANT:
12   Hon. Donald B. Sweeney
       Bradley, Arant, Rose & White
13   One Federal Place
       1819 Fifth Avenue North
14   Birmingham, Alabama 35203
15
16
17
18
19
20
21
22
23
```

## Page 4

```
 1   Statute, regardless of the waiving of the filing of
 2   same.
 3        It is further stipulated and agreed by and
 4   between counsel and the witness that the reading
 5   and signing of the deposition by the witness is
 6   hereby waived.
 7                    INDEX
 8   MARK BAZZELL, EDD
 9   Examination By Ms. DePaola              6
       Examination By Mr. Sweeney          185
10
       Reporter's Certificate             191
11
12              INDEX OF EXHIBITS
13   Exhibit Number    Description      Page Number
14   Plaintiff's Exhibit 1  Organizational     30
             Diagram for Pike County Schools
15   Plaintiff's Exhibit 2  Student Code of    45
             Conduct for 2004-2005
16   Plaintiff's Exhibit 3  Essential          57
             Administrative Information
17   Plaintiff's Exhibit 4  High School        58
             Student Planner (2004-2005)
18   Plaintiff's Exhibit 5  Pike County Board  74
             of Education Policy Manual
19           Excerpts
       Plaintiff's Exhibit 6  Training Material  98
20           Relating to Sexual Abuse
       Plaintiff's Exhibit 11  Coon Retirement  114
21           Documents
       Plaintiff's Exhibit 12  Monroe County   116
22           Schools Verification of
             Employment of Coon Document
23
```

## Page 3

```
 1        * * * * * * * * *
 2
 3
 4          STIPULATIONS
 5
 6     It is hereby stipulated and agreed by and between
 7   counsel representing the parties that the deposition of
 8   MARK BAZZELL, EdD, is taken pursuant to the Federal
 9   Rules of Civil Procedure, and that said deposition may
10   be taken before Mary Moore-Wynn, CSR, as Commissioner,
11   without the formality of a commission; that objections
12   to questions, other than objections as to the form of
13   the questions, need not be made at this time, but may
14   be reserved for a ruling at such time as the deposition
15   may be offered into evidence, or used for any other
16   purpose by either party hereto, provided by the
17   Statute.
18     It is further stipulated and agreed by and between
19   counsel representing the parties in this case, that the
20   filing of the deposition of MARK BAZZELL, EdD, is
21   hereby waived, and that said deposition may be
22   introduced at the trial of this case or used in any
23   other manner by either party hereto provided for by the
```

## Page 5

```
 1   Plaintiff's Exhibit 13  Dr. Bazzell's     128
             Diary Notes
 2   Plaintiff's Exhibit 14  Administrative    139
             Leave Letter for Mr. Coon
 3   Plaintiff's Exhibit 15  Bazzell           173
             Handwritten Document
 4
 5
 6
 7        * * * * * * * * *
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Case 2:06-cv-01120-MEF-WC    Document 76-4    Filed 04/02/2008    Page 3 of 49
JR, A Minor                          July 24, 2007                Pike County Board of Education

3 (Pages 6 to 9)

**Page 6**

1        MARK BAZZELL, EDD
2        (Whereupon, the witness, after having first been
3  duly sworn to speak the truth, the whole truth, and
4  nothing but the truth, testified as follows:)
5        THE COURT REPORTER: Usual stips?
6        MR. SWEENEY: Please.
7        MS. DePAOLA: Yes.
8        EXAMINATION
9  BY MS. DePAOLA
10 Q   Good Morning, Dr. Bazzell?
11 A   Good morning.
12 Q   Could you state your name for the Record, please?
13 A   Mark Bazzell.
14 Q   What is your residence address?
15 A   105 Woodley Avenue, Troy, Alabama.
16 Q   And your current employment is Superintendent of
17     schools?
18 A   Superintendent, Pike County Board of Education.
19 Q   And how long have you served in that capacity?
20 A   At the end of December, it will be five years.
21 Q   So, did you come in 2002?
22 A   January, 2003. I was elected in November of 2002.
23     And my term of office began January, 2003.

**Page 7**

1  Q   All right. And your term continues for how long?
2  A   It was a four-year term. And the position changed
3      from an elected position to an appointed position.
4  Q   When was that?
5  A   January of 2007.
6  Q   Okay. And if I understand the records, was Mr. --
7      I think his name Charles Coon -- hired prior to
8      you becoming Superintendent?
9  A   Uhm, he was hired in -- I would have to check the
10     record. He was employed -- I would have to check
11     the record. I'm not sure of the exact date. But
12     I believe -- it's my best recollection that he was
13     employed in 2003 --
14     MR. SWEENEY: Let's take a minute. My
15         recollection is August of 2002.
16     THE WITNESS: Yeah, I would have to look
17         at the --
18 BY MS. DePAOLA
19 Q   What records would you need to look at? Would it
20     be in the documents that you have produced?
21 A   It would be in the documents that I have
22     submitted.
23 Q   Okay.

**Page 8**

1  A   Yeah, July of 2002.
2  Q   Okay. All right. So, that was prior to your
3      becoming Superintendent?
4  A   That's correct.
5  Q   Were you employed here at that time?
6  A   Yes.
7  Q   What was your position?
8  A   Assistant Superintendent.
9  Q   Did you have any role in the hiring of Mr. Coon?
10 A   No.
11 Q   Okay. And am I correct you're appointed by the
12     Board of Education?
13 A   I'm -- yes, I am appointed by the Board of
14     Education, yes, when it became an appointed
15     position in January.
16 Q   All right. Could you, just for the Record, give
17     me your employment history?
18 A   Uhm, I have been Superintendent now going on five
19     years. It will be five years in -- it will be
20     five years in December. Prior to that, I served
21     as Assistant Superintendent for eight years. John
22     Key was the Superintendent.
23 Q   In Pike County?

**Page 9**

1  A   In Pike County. Prior to that, I was the
2      principal at Pike County High School for seven
3      years. Prior to that, I was the principal at
4      Banks School, which is a K-8 unit school -- or K-9
5      unit school for two years. And I was a teacher at
6      Pike County High School for five years. I think
7      that comes up to about 26 years. Twenty-one in
8      administration.
9  Q   All right. All of your experience in education
10     being in Pike County?
11 A   No. No.
12 Q   Okay. Where else have you --
13 A   I was employed at the University --
14 Q   University of Alabama?
15 A   Troy University over here for a year.
16 Q   What was your position there?
17 A   I was -- at that time, I was a graduate assistant
18     working on graduate degree. Prior to that, I was
19     employed in Florida for two years.
20 Q   At what school?
21 A   Rutherford High School.
22 Q   What was your teaching position there?
23 A   Science. Biology. Biology, Chemistry.

Page 10

1  Q   Any further employment history in education?
2  A   Uhm, I have done adjunct work for Troy University.
3  Q   Is that currently?
4  A   Ah, no.
5  Q   When was that?
6  A   That would have been in -- I stopped about a year
7      ago, because my wife became -- was ill, had an
8      illness. So, probably the three or four years
9      prior to that, I taught graduate classes for them.
10 Q   Were those in educational administration?
11 A   Ah, yes. It was courses -- the course I taught
12     was titled Teachers and the Law.
13 Q   So, did you always teach the same course?
14 A   Uh-huh.
15 Q   Did you have a textbook that you used in that
16     course?
17 A   Uh-huh.
18 Q   What was the name of it?
19 A   Oh, gosh, I don't recall that. I mean, I've got a
20     copy of it somewhere. But I don't recall that.
21 Q   Did any portion of it deal with identifying sexual
22     abuse in the schools?
23 A   I'm -- I'm sure it did.

Page 11

1  Q   And you don't know the name of the textbook you
2      used?
3  A   I don't recall the name.
4  Q   Do you have any of your teaching materials?
5  A   I would have to look and see. Like I said, it's
6      been chaotic the last year and a half with my
7      wife's situation.
8  Q   Okay.
9          MS. DePAOLA: Donald, is that something
10             you could follow up with him on and
11             produce any teaching materials he
12             had?
13         MR. SWEENEY: If there is any other than
14             the textbook. And we'll be glad to
15             give you the name of the textbooks.
16         MS. DePAOLA: And any notes he has from
17             lectures, course syllabus, any
18             things of that nature.
19 BY MS. DePAOLA
20 Q   Could you look for those things and provide them
21     to Mr. Sweeney?
22 A   Uh-huh.
23 Q   Any other employment that we haven't covered?

Page 12

1  A   Education related?
2  Q   Yes, sir.
3  A   Huh-huh.
4  Q   How about noneducation related? And I don't mean
5      to go back to when you were in high school. But
6      post college?
7  A   Uhm, I hold certification -- certification in --
8      technical degrees and certification as an
9      emergency medical technician, basic, intermediate,
10     and paramedic.
11 Q   So, have you worked in those fields?
12 A   Back in the day when I was a -- wasn't on a
13     12-month contract and had the responsibilities I
14     have now, like most teachers do, summertimes,
15     Christmas, and so forth, I worked as a paramedic.
16 Q   And that's with what agency or entity?
17 A   Oh, gosh, I worked with a lot of them. I worked
18     with --
19 Q   Like here in Pike County?
20 A   I worked with Haynes out of Montgomery. I worked
21     with Haynes in Troy. I worked with -- I can't
22     even remember the name of the -- there was a
23     couple here before Haynes. And I worked with

Page 13

1      them, too. So, that's been --
2  Q   But those are like private employers?
3  A   Yeah. Private.
4  Q   Did you ever work for any public agency as an EMT?
5  A   No.
6  Q   And just for the Record, could you tell us your
7      educational history?
8  A   Yes. I have an associates degree from Gulf Coast
9      Community College.
10 Q   In what field?
11 A   Education.
12 Q   Okay.
13 A   I have a Bachelor's degree from Troy State
14     University in education. I had --
15 Q   Is that in elementary or secondary?
16 A   No, I had -- I graduated in -- my degree qualified
17     me for certification in Biology, health -- Biology
18     and health and physical education. Biology,
19     health, and physical education.
20 Q   Is that "K" through twelve, the physical
21     education?
22 A   Yes.
23 Q   Okay.

Case 2:06-cv-01120-MEF-WC     Document 76-4     Filed 04/02/2008     Page 5 of 49
JR, A Minor                         July 24, 2007              Pike County Board of Education

5 (Pages 14 to 17)

Page 14

1  A   I have a Master's degree.
2  Q   **Is that an MEd?**
3  A   Master's of Science. Master's degree in secondary
4      education. The emphasis in Biology. I have
5      double "A" certification, which is six-year degree
6      certification in Biology. Then my wife says I
7      finally decided what I wanted to do when I grew
8      up, so I went back and got Master's level
9      certification in administration and double "A"
10     certification in administration. And then I have
11     a doctorate in educational foundations, leadership
12     and technology from Auburn University.
13 Q   **I'm sorry. I didn't get to write that down.**
14 A   Educational leadership foundations -- EFLT --
15     educational foundations leadership and technology,
16     Auburn.
17 Q   **What year did you get your EdD?**
18 A   '97.
19 Q   **What was your -- I assume you did a thesis,**
20     **doctoral dissertation?**
21 A   It was -- it use multi-varied analysis. It was
22     comparing the roles of principals -- I compared
23     how the roles of principals varied among different

Page 15

1      kinds of schools, I guess you might say. And the
2      variables that I looked at is how they differed
3      between the rural and urban schools. Differences
4      based on poverty level --
5  Q   **Okay.**
6  A   -- large schools versus small schools. And,
7      again, it was role variations, how the roles
8      changed in those locations.
9  Q   **The roles, meaning -- explain to me what factors.**
10 A   Actually, it was the task -- how the tasks of the
11     principal changed. And a measure of the role of
12     the principal was the tasks that the principals
13     performed and how those tasks changed, the
14     frequency in which the principal engaged in those
15     tasks -- in specific tasks in a large school
16     versus a small school, a rural school versus urban
17     school. A school that was in an affluent area
18     versus an area that was in poverty.
19 Q   **Could you tell me some of the tasks you're talking**
20     **about?**
21 A   For example, I went in with some assumptions, for
22     example, that a principal that worked in a -- in
23     an affluent school with a -- with students whose

Page 16

1      parents were more affluent who were actively
2      engaged in the school and did things for the
3      school would have to spend more time dealing with
4      things of a political nature and working with
5      parents and those kinds of things versus a school
6      where you didn't have a lot of parent involvement,
7      and you spent less time working with parents.
8          And so, the survey basically asks for
9      responses from principal as to with what frequency
10     did they engage in those tasks. That was a long
11     time ago. That was --
12 Q   **Okay. As part of your educational training, did**
13     **you ever receive any training in the field of**
14     **recognizing sexual abuse?**
15 A   I'm sure I did.
16 Q   **Well, could you tell us about that training?**
17 A   Oh, gosh, I don't -- I don't remember the
18     specific -- you know, I am sure it was part of
19     undergraduate training. I'm sure it was part of
20     graduate training.
21 Q   **Okay. Well, all right. What you're having**
22     **trouble identifying is specific courses in which**
23     **you may have received this training?**

Page 17

1  A   Yes.
2  Q   **Okay. Well, can you tell me any of the content of**
3      **the course? In other words, as a result of this**
4      **training and these courses, what signs are you**
5      **aware of that one should look for in recognizing**
6      **sexual abuse of students?**
7  A   Uhm, there is -- you know, there are -- there is a
8      lot of signs. You know --
9  Q   **Tell me any that you can think of while we're**
10     **sitting here.**
11 A   Uhm, all the ones that -- that the research says.
12     You know, the kids who are withdrawn. Kids who
13     are struggling academically. Kids who are -- uhm,
14     have trouble socializing, those kinds of things.
15 Q   **Any others you can think of?**
16 A   Uhm, I'm sure there are, giving me some time to
17     think about it.
18 Q   **Are you thinking about it, or do you want me to go**
19     **on?**
20 A   Give me the ones that I have listed.
21 Q   **Students who are withdrawn, struggling**
22     **academically, students with social problems.**
23 A   I can't recall others right this second. I'm sure

| Page 18 | Page 20 |
|---|---|

**Page 18**

1     there is many. It's been a while since I've
2     looked at it.
3 Q   **Well, as a result of your training, are you aware**
4     **that there is an increase incidence of sexual**
5     **abuse amongst students with disabilities as**
6     **opposed to regular ed students?**
7         MR. SWEENEY: Object to the form. You
8         can answer.
9 A   Uhm, repeat the question.
10 Q  **Can you tell me whether or not you are aware as a**
11     **result of your training that there is an increase**
12     **incidence of sexual abuse among students with**
13     **disabilities as compared to regular education**
14     **students?**
15         MR. SWEENEY: Object to the form.
16 A   Uhm, I'm not sure that I have read -- I am not
17     sure that I have read that.
18 Q  **So, you don't know that?**
19 A   I'm not sure that I have read that.
20 Q  **What does that mean; "I'm not sure that I have**
21     **read that"?**
22 A   It means I'm not sure that I recall reading that
23     and know that answer to that. I may know that. I

**Page 19**

1     may not. I just don't recall that.
2 Q   **Well, do you have an opinion as to that at this**
3     **point?**
4 A   Repeat the question again.
5 Q   **The question is: Are you aware that there is an**
6     **increased incidence of sexual abuse among students**
7     **with disabilities as compared to students in the**
8     **regular education population?**
9         MR. SWEENEY: Object to the form.
10 A   I would agree that individuals with --
11         MR. SWEENEY: Excuse me. If you
12         understand the question, answer it.
13         If you know what disability, what
14         incidence, what age group? That's a
15         complex question. If you understand
16         it, answer it. If you don't, ask
17         for clarification.
18 A   Okay. Repeat the question, again.
19 Q   **Okay.**
20         MS. DePAOLA: Would you read it back?
21         (Whereupon, the requested material
22         was read by the Court Reporter.)
23 A   Uhm, if you will be more specific, then I can

**Page 20**

1     probably maybe answer that. I don't know. The --
2         MR. SWEENEY: Let's go off the Record
3         just a minute.
4         (Brief recess.)
5 BY MS. DePAOLA
6 Q   **I will stick with my question: Do you have an**
7     **answer to my question?**
8 A   I --
9 Q   **I will limit that to the US --**
10 A   I think the problem that I am having, again, is it
11     is very broad. You know, there is a lot of
12     research out there on the topic of child abuse,
13     lots of it. Over the years, I have had the
14     opportunity to read a lot of it. And, you know,
15     an individual piece of research really has to
16     stand on its own merits: You kno, who the
17     researcher was, what was the quality of the
18     research, what was the research methodology used,
19     all of those different kinds of things.
20       So, you have this set of research, this set of
21     research, this set of research, this set of
22     research, and they all say different things. And
23     they all apply to the conclusions that you can

**Page 21**

1     draw from a specific set of research pertains to
2     the sample or the individuals in that study. They
3     don't necessarily apply to everybody in general.
4       And when you ask me to draw conclusions about
5     a -- that are very broad and very general, you
6     know, it's pretty hard to answer that question.
7 Q   **Are you aware of any research indicating that**
8     **regular education students are abused more often**
9     **than children with disabilities in the United**
10     **States?**
11 A   I'm not -- I'm not -- I do not recall right now
12     that research. That doesn't mean that I haven't
13     read that -- read research related to that.
14     Because, again, I have read a lot over the years.
15 Q   **Don't you think it's your responsibility to know**
16     **this?**
17 A   To know what?
18 Q   **Whether or not students with disabilities are more**
19     **likely to be subject to sexual abuse?**
20         MR. SWEENEY: Object to the form.
21 A   What disabilities?
22 Q   **Just children with disabilities.**
23 A   What disabilities?

Page 22

1  Q  Can you answer my question?
2  A  I could if I knew what specific disabilities we
3     were talking about.
4  Q  I'm talking about all your special education
5     students.
6  A  Well, we've got probably 600.
7  Q  Yes.
8  A  I would expect that in that 600, out of that 600
9     that we have, there may be more -- there may be
10    some that I would respond in the affirmative to
11    your question. And there may be some that I would
12    not respond in the affirmative to. So...
13 Q  But would you agree it's your responsibility to
14    know whether or not this occurs more often?
15 A  It's my responsibility to be -- to do my due
16    diligence and to be as informed as I can possibly
17    be on many, many topics.
18 Q  I am just here about one topic, Dr. Bazzell.
19 A  Including that topic.
20 Q  Is it your responsibility to know whether or not
21    special ed kids are subject to an increased
22    incidence of sexual abuse?
23 A  I think I just answered that question.

Page 23

1  Q  Is that a yes?
2  A  What I said was that I believe it is my
3     responsibility as Superintendent to be widely read
4     and informed and educated and schooled on a
5     wide -- on the research that exists on many, many
6     topics, including that topic.
7  Q  All right. Well, and I am asking you, as a result
8     of your responsibility to do this, what have you
9     learned about the incidence of sexual abuse of
10    disabled children?
11 A  What have I learned from -- from -- repeat the
12    question.
13       MS. DePAOLA: Could you read it back to
14       him, please?
15       (Whereupon, the requested material
16       was read by the Court Reporter.)
17 A  Again, that obviously depends on what the
18    disability is.
19 Q  Okay. Explain that to us.
20 A  I would -- I think it's a fair -- it's fair to say
21    that individuals, whether they are adults or
22    children -- that individuals whether adult or
23    children who have limited cognitive ability can be

Page 24

1     taken advantage of. And, again, that's whether
2     they are adults or children. And, again, it
3     depends on the setting and those kinds of things.
4  Q  All right. So, "can be taken advantage of", do
5     you mean sexually abused?
6  A  I think I mean be -- they can be the victim of
7     crime, whether it's sexual abuse or any -- you
8     know, all kinds of crime.
9  Q  And are you aware of an increased incidence of
10    sexual abuse among students with cognitive
11    disabilities as opposed to regular ed students?
12       MR. SWEENEY: Object to the form.
13 A  I haven't seen that data.
14 Q  You don't know that?
15 A  I haven't seen that data.
16 Q  Is it your responsibility to be informed on that
17    issue?
18       MR. SWEENEY: Object to the form.
19 A  Uhm, it's -- again, I would have to refer back to
20    my previous response. It's my responsibility to
21    be informed and schooled and -- on a wide variety
22    of topics; including those kinds of topics.
23 Q  And what have you done to investigate that issue?

Page 25

1  A  What issue is that?
2  Q  The increased incidence of sexual abuse among
3     individuals with cognitive disabilities?
4  A  What have I done to investigate that?
5  Q  Uh-huh. Yes.
6  A  I guess you are referring to what are the things I
7     have done to be schooled and informed about that
8     issue and other issues --
9  Q  I'm talking about the sexual abuse issue.
10 A  I haven't participated in any related training
11    that I can call that's outside the school system
12    recently that I can recall. That doesn't mean
13    that I haven't. I just can't recall any recently
14    that was put on by say SSA, or AASB or --
15 Q  What's SSA?
16 A  School Superintendent's Association. Alabama
17    Association of School Boards, different
18    professional organizations. I can't recall
19    anything in the last couple of years related to
20    those topics.
21 Q  Has there been anything that you have done outside
22    of those entities? In other words, reading,
23    study, looking on the Internet, anything to inform

Page 26

1    yourself?
2    A    I read a variety of professional journals.
3    Q    And I am focusing on the issue of sexual abuse.
4    A    I don't recall any.
5    Q    Okay. Now, you specifically said you don't recall
6         any training outside of the school system. Are
7         you saying that you received some training within
8         the school system?
9    A    We have conducted training within the school
10        system. And --
11   Q    All right. When was that?
12   A    That's in the documents that we have provided.
13   Q    Okay. Are you referring to the sexual abuse
14        seminar done for K through three and three through
15        five?
16   A    Well, I have got -- we can go through each one of
17        those documents individually where we have talked
18        about those and provided training. I don't recall
19        all of them, but --
20   Q    Okay. We'll do that later.
21            Now, have you done any research or looked into
22        the issue of signals -- I don't want to say
23        signals -- that you should be looking for when you

Page 27

1         look at the behavior of educators within your
2         system that relate to potential sexual abuse by
3         that educator?
4            MR. SWEENEY: Object to the form. I
5                don't understand "signals". Maybe
6                you do. I am just not clear about
7                that, Susan. I apologize.
8    Q    Things that you should look for.
9            MR. SWEENEY: As in detecting potential
10               sexual predators?
11           MS. DePAOLA: Sexual abuse by educators.
12   A    Uhm, I think I have already --
13   Q    Well, what you gave me before were things, it
14        looked to me like, the child might be withdrawn,
15        or the child might be struggling academically, or
16        the child might have social problems. I am
17        looking at it from the other perspective.
18   A    Again, you know, children struggle academically,
19        and kids withdraw socially and all those different
20        things for a lot of different reasons. Sexual
21        abuse could be one of those reasons. But --
22   Q    Okay. I am not asking about the child now. I am
23        looking at what do you look at in your teachers --

Page 28

1    A    I haven't seen any research related to that.
2    Q    And you don't know of any --
3            MS. DePAOLA: I said signals, and you
4                said something else that made it
5                clearer.
6            MS. ALLEN: Things you look at.
7    Q    -- things you look at --
8            MR. SWEENEY: Is there a profile of a
9                potential sexual abuser?
10   Q    I am asking if there are any behaviors that are
11        typical of a sexual abuser in the educational
12        setting.
13   A    I am not familiar with any research related to
14        that.
15   Q    Have you seen any research as to the teachers most
16        likely to commit sexual abuse?
17   A    Uhm, I don't recall.
18   Q    So, you may have seen that research?
19   A    I may have, may have not. I just don't recall.
20   Q    Well, as we sit here today do you have any
21        information --
22   A    I have no recollection of seeing that -- that kind
23        of research.

Page 29

1    Q    Have you seen or reviewed any of the research
2         regarding the percentage of victims that self
3         report sexual abuse within an educational setting?
4    A    Again, I don't -- in response to all those
5         questions, I don't -- I don't recall that. I
6         don't recall that research. I don't --
7    Q    Well, since that happened, have you done anything
8         to inform yourself more about the issues I have
9         just been over? Since all this happened; meaning,
10        you have got the history of at least two children
11        in your system being sexually abused by one of
12        your educators.
13           MR. SWEENEY: Object to the form.
14   Q    What have you done in response to that to educate
15        yourself more?
16           MR. SWEENEY: Object to the form. That
17               postdates what's happened and,
18               therefore, is not relevant to the
19               issue in your complaint. But you
20               can answer the question. I object
21               to the question.
22   A    Repeat the question.
23   Q    What have you done since you have learned that at

Page 30

1    least two of your students were sexually abused to
2    inform yourself more on these issues?
3            MR. SWEENEY:  Object to the form.
4  Q   If anything?
5            MR. SWEENEY:  Object to the form.
6  A   Uhm -- I haven't done anything related to that.
7    You know, it's just --
8            MS. DePAOLA:  Okay.  Would you mark this
9            as Plaintiff's Exhibit 1?
10           (Whereupon, Plaintiff's Exhibit 1
11           was marked for identification and
12           is attached hereto.)
13           MS. DePAOLA:  And, Donald, this is your
14           document number 202.
15  BY MS. DePAOLA
16  Q   Let me show you what we have marked as Plaintiff's
17    Exhibit 1 and ask you if you recognize that
18    document.
19  A   I do.
20  Q   What is that?
21  A   That is the Organizational Diagram for Pike County
22    schools.
23  Q   And I see that it's dated July, 2006.  And I also

Page 31

1    see some handwritten notes on the right-hand side.
2    Would I be correct in assuming that the changes
3    you made on the right-hand side reflect the status
4    of each of these positions in 2004 when the
5    complaint arose?
6  A   That's correct.
7  Q   Okay.  So, as of 2004, Mrs. Townsend was the
8    principal at Banks School.  Was that during the
9    entire year?
10  A   Yes.
11  Q   And Mr. Casey and Mr. Pyron were the principals at
12    Pike County High School.  And then Mr. McDaniel
13    was the assistant principal at Pike County High
14    School; is that correct?
15  A   That's correct.
16  Q   He wasn't the assistant principal there the whole
17    year, was he?
18  A   He was there the entire year, Mr. McDaniel was.
19  Q   Okay.  Because I understood he came in later in
20    the year.  No?
21  A   If I recall correctly, he was employed prior to
22    the beginning of school.  I mean, I -- yeah, he
23    was there the entire year.

Page 32

1  Q   Okay.  Where did he come from; do you know?
2  A   Oh, gosh.  Uhm, Mr. McDaniel was -- was retired
3    Air Force.  And I don't recall off the top of my
4    head.
5  Q   I mean, had he previously been employed somewhere
6    in Pike County, or was this the first --
7  A   No, no.  His first year to our system.
8  Q   Now, you said that you became appointed as
9    Superintendent in January of '07.  So, prior to
10    that, the relevant time period here being
11    2004-2005, you were an elected Superintendent
12    during that period; is that correct?
13  A   That's correct.
14  Q   Can you explain to me what your relationship is to
15    the Pike County Board of Education?  I mean, are
16    you a member of the Board, or the Secretary for
17    the Board?  Or do you vote?  Can you explain to
18    me --
19  A   I'm Secretary to the Board.  I don't vote.
20           MS. DePAOLA:  And, Donald, I meant to
21           put this on the Record at the
22           beginning.  As I understand it,
23           Mr. Bazzell here is testifying on

Page 33

1            his own behalf and also on behalf of
2            the Pike County Board of Education;
3            is that correct?
4            MR. SWEENEY:  That's correct.
5  BY MS. DePAOLA
6  Q   Okay.  Am I correct that the Pike County Board is
7    responsible for the overall control and
8    supervision of the Pike County school system?
9  A   They're responsible for making policy for the
10    Board.
11  Q   And how do they execute that responsibility?  Do
12    you make recommendations to them about policies?
13  A   I -- yes.
14  Q   And they vote on every single policy that's
15    promulgated for the school system?
16  A   Uhm, not all policies.  I mean, you have got
17    policies, procedures, and practices.  And, you
18    know, those things that we consider policies would
19    be voted on the Board -- by the Board.  We have --
20    we have procedures that are established
21    administratively, which, of course, have to be
22    consistent with and congruent with the policies
23    that guide them.

Page 34

1  Q   But do those procedures have to be approved by the
2      Board?  And this may be too generic of a question.
3      I mean, there may be some you present, and some
4      you don't present.  I don't know.
5  A   Uhm, I think that it's fair to say that, for
6      example -- and I can give you an example -- the
7      Board directs us to -- the Board has a policy that
8      basically says that we will have a curriculum -- a
9      curriculum guide that outlines what the academic
10     program will be.  The nuts and bolts of that and
11     all that are established are not necessarily
12     policy.  Non-substantive changes in that may not
13     come before the Board.  But if there is
14     substantive changes in that guide that relate to
15     the -- that relate to graduation, units necessary
16     for graduations, those kind of things; they would
17     certainly go before the Board.
18 Q   For instance, you have produced certain faculty --
19     looks like faculty handbooks in conjunction with
20     the request for production that we filed.  Are
21     those handbooks passed on by the Board?
22 A   You will have to let me see which ones you are
23     referring to, because some of them may have been.

Page 35

1      Some of them may have not been.
2  Q   Okay.  Let's look first at, for instance, what was
3      this 2006-07.  You have produced an Essential
4      Administrative Information document.
5  A   Uh-huh.
6  Q   I want to go back to 2004-2005.  Did you have a
7      document like that 2004-2005?
8  A   2004-2005.  It would -- yes, we did.  And it would
9      have essentially been the same document.  This
10     was -- this is produced -- this is produced by
11     me -- this was produced by me.  It is modeled
12     after the one that John Key did as Superintendent.
13     There may have been minor changes.  There may be
14     minor changes in this from year to year year.
15     But for the most part, the only thing that really
16     changed is the cover sheet with the date on it.
17 Q   Can you produce for us a copy of that document in
18     the state it was in as of 2004-2005?
19     THE WITNESS:  Donald, I think if we
20         could have done that, we would have
21         done that at that time -- at
22         discovery when we provided to begin
23         with.

Page 36

1  A   We don't -- we don't keep -- wouldn't necessarily
2      keep all these for each year.
3  Q   Can you identify any differences between that
4      document and what was in effect in 2004-2005?
5  A   I sure can.  Would you like for me to do that now?
6  Q   Let me -- we're talking about document number 313
7      produced by the Pike County Board of Education.
8  A   Sure.  It shouldn't take but just a second to do
9      that.
10     MS. DePAOLA:  Can you give me that
11         document, please?  It's 313.
12     MR. SWEENEY:  Let's go off the Record
13         just a minute.
14     (Brief recess.)
15 BY MS. DePAOLA
16 Q   So, what I asked you was:  What aspects of
17     document 313 through 331 —
18 A   Okay --
19 Q   -- were different in 2004?
20 A   Yeah, we can do that real quick.  The page 3,
21     school-opening information.  The dates would have
22     been different to reflect the school calendar for
23     that year.  The last sentence down there, they

Page 37

1      are --
2  Q   Okay.  Are you talking about paragraph 1, opening
3      school information?
4  A   Yeah, school opening information.
5  Q   Okay.  We will skip that.  We will say there may
6      have been changes in paragraph 1.
7      MR. SWEENEY:  Could we stipulate that
8          the relevant portion of that would
9          have to do with some issue in the
10         complaint, so that we can focus on
11         whether it addressed sexual abuse
12         policy or practices or something
13         germane to that as opposed to school
14         calendar?
15     MS. DePAOLA:  Well, I would like to --
16 BY MS. DePAOLA
17 Q   Let's do this, Dr. Bazzell:  Let me go through
18     these and ask you about the ones I am specifically
19     interested in, okay?
20 A   Okay.
21 Q   I am specifically interested in number 5, the
22     policy manual.  First of all, what policy manual
23     are you referring to there?  Is that this document

Page 38

1    or some other document?
2    A   It's the policy manual of the Board.
3    Q   And has that been produced?
4    A   Uhm, we produced those parts of the policy manual
5        that you requested.
6    Q   All right. So, those are some individual sheets
7        you produced relating to sexual discrimination; is
8        that what you're saying?
9    A   Those were the ones that you asked for, yes.
10   Q   Okay. So, paragraph 5 says that hard copies of
11       policy manuals are provided, and online versions
12       will be available. Did you provide any kind of
13       policy manual to the individual teachers that's
14       referenced in paragraph 5?
15   A   Ah, yes.
16   Q   And you did that in 2004?
17   A   Well, I don't remember the year that we -- uhm,
18       yes. At -- when they are employed, yes, they get
19       a policy manual.
20   Q   And that was the case in 2004-2005?
21   A   Yes.
22   Q   Okay. And did that policy manual go to parents or
23       students, the one referenced in paragraph 5 here?

Page 39

1    A   We don't send an entire policy manual to parents
2        and students.
3    Q   I'd like you to look at paragraph 9. There is a
4        reference there to student handbooks. Was this
5        paragraph in effect in 2004-2005?
6    A   Yes.
7    Q   And have you produced the student handbook for
8        2004-2005?
9    A   Uhm, I -- I believe we have. I don't know. I
10       would have to check.
11   Q   I mean, I see that you produced a Pike County
12       Student Code of Conduct. But I am not familiar
13       with what you're referring to in this in this
14       paragraph.
15   A   Student handbooks. Let me -- there is a variety
16       of -- there is a variety of documents that you may
17       or may not be calling student handbooks that we
18       may be calling something differently. The Board
19       of Education produces a -- what we call a student
20       planner, student calendar -- a student planner
21       calendar. It would be the -- I don't see it. I
22       don't see that. I know we have provided you with
23       those. But those are the -- those are published

Page 40

1    at the central office level. And they have got
2    the school calendar in it with all the dates. And
3    it's got some care education information in it and
4    some things that we would consider policy
5    statements and statements of procedure.
6    Q   Okay. Could you identify that in the documents
7        that you have given Mr. Sweeney -- I am sure he
8        has a complete set of the documents here -- what
9        you're referring to?
10       MR. SWEENEY: I'm sorry? Did you --
11       MS. DePAOLA: He says he's sure he's
12          produced the student handbook that's
13          given to the students. And I'm not
14          clear what document he's referring
15          to.
16   A   It would be all of these (tenders documents).
17   Q   Okay.
18       MS. DePAOLA: Have you produced these?
19       MR. SWEENEY: Uh-huh.
20       MS. DePAOLA: Have we seen these? They
21          are --
22       MS. ALLEN: They are all those calendar
23          sheets is what I'm assuming.

Page 41

1    A   We didn't produce the actual documents. Copies of
2        those. Yes. You have got all of that.
3        MS. ALLEN: Is that Bates stamped?
4        MS. DePAOLA: What Bates stamped pages
5           have you produced, Donald?
6        MR. SWEENEY: Susan, I would have to go
7           back and reconstruct. These come
8           from the file of this case, which I
9           understood to be documents produced
10          to you. But you would be the best
11          source of information whether you
12          have these. It's my information
13          they were prepared to give to you.
14       MS. DePAOLA: Let's go off the Record
15          for a second.
16          (Brief recess.)
17       MS. DePAOLA: Let's go back on the
18          Record.
19   BY MS. DePAOLA:
20   Q   We were looking at paragraph 9, which relates to
21       students' handbooks. And you said every student
22       received a handbook, but they did not receive the
23       Board's policy manual; is that correct?

Page 42

1  A  Right.
2  Q  And I'm not saying anybody has been hiding
3      anything.  I am not -- you know.  I am just saying
4      now I have seen here what you're referring to as
5      the student handbook.  And that is this document
6      that says, High School Student Planner for
7      2004-2005; is that correct?
8  A  Uh-huh.
9  Q  There is no other student handbook to which you're
10     referring?
11  A  Again, let me -- because there is a difference
12     between handbook, planner, Code of Conduct and so
13     forth.  There are three different planners each
14     year guiding different grade levels.  There is
15     like a kindergarten, 1st and 2nd grade planner.
16     There is a one that deals with elementary.  But,
17     yes, that is what we would consider the high
18     school planner.  That is generated by the Board --
19     by this office here.  And it is provided to each
20     school and provided to each student.  So, that is
21     the -- that is what we distribute from up here to
22     schools.  The local --
23  Q  All right.  Is there any other handbook that you

Page 43

1      distribute from here?
2  A  The local -- no, there is not.  We do distribute
3      the Student Code of Conduct from the system level.
4  Q  All right.  And is that the document that I am
5      showing you now which is Pike County document --
6  A  Yes.
7  Q  -- 382?
8  A  That's it.  Well, looks like part of it.
9  Q  How far back in the -- what page does it end on,
10     the Code of Conduct there?
11  A  Well, this looks like the entire document.  It
12     looks much thicker, because single pages for each.
13  Q  All right.  So, just -- excuse me, let me look at
14     that.  So, we're referring here -- I'm looking
15     Bates stamped number.  When you say Code of
16     Conduct, you're looking at document 382 through
17     521; is that correct?
18  A  Yes.
19  Q  Okay.  Is that what they all --
20  A  Wait just a second here, because I want to make
21     sure that -- this is actually a -- more than one
22     Code of Conduct.  This is multiple codes of
23     conduct that you have got in the same.

Page 44

1  Q  Let me ask you this:  Is there anything in the
2      Code of Conduct that relates to sexual abuse of
3      students?
4  A  Yes.
5  Q  All right.
6  A  This is more than one Student Code of Conduct.
7  Q  Can you show me the Student Code of Conduct that
8      was in effect for 2004-2005?
9  A  I can.  Okay.
10  Q  Okay.  Now, that's dated after the 2004-2005
11     school year.
12  A  Let me look and see.  2005.  Let me go back to the
13     next one.  Okay.  That would be -- it would be,
14     again -- and it's confusing.  I apologize.  It's
15     confusing.  But these are simply cover sheets for
16     the particular year.  What is important would be
17     these revision dates.  This was revised June of
18     2005.  The revision prior to that was in June of
19     2003.  So, it would be one where the revision 2005
20     was not there.  There would be one -- I'm sure
21     there is one here that says that.
22  Q  Can you find me that one, the applicable one.
23  A  Yeah.  Let me start and go through page by page.

Page 45

1      That's it right there.  It's this first one.
2  Q  All right.  And can you give me the beginning and
3      end and pages in the middle of the applicable Code
4      of Student Conduct?
5  A  Uhm, 382 through 19, 20, 22, 24, uhm, I believe it
6      ends on 421.
7  Q  Okay.  Let's take those pages out now.  We're
8      going to mark those.  And let me get all my other
9      pages away.
10         (Whereupon, Plaintiff's Exhibit 2
11          was marked for identification and
12          is attached hereto.)
13  Q  Mark this as Plaintiff's Exhibit 2.  And it's your
14     testimony that this was the applicable code of
15     student conduct distributed by the
16     Superintendent's office to students during
17     2004-2005; is that correct?
18  A  Let me look at it one more time.
19         MS. DePAOLA:  Let's go off the Record.
20         (Brief off-the Record discussion.)
21         MR. SWEENEY:  What are you looking for,
22     Mark?
23         THE WITNESS:  I'm looking at this to --

Page 46

1    MS. DePAOLA: Wait, are we on the
2       Record?
3    THE COURT REPORTER: Since Mr. Sweeney
4       asked him what he was looking for.
5    MS. DePAOLA: Oh, good.
6 A  This is -- repeat your question. You asked if
7    this was the Code of Conduct for the year 04-05?
8 Q  Yeah.
9 A  This is the Student Code of Conduct, minus what
10   is -- you know, the appendix that goes on the back
11   of it, which would include those things that --
12   let me show you.
13   MR. SWEENEY: Can you go get a copy of
14      just what's bracketed?
15   MS. DePAOLA: Wait. Let's go off the
16      Record.
17   (Brief off-the-Record discussion.)
18 BY MS. DePAOLA
19 Q  Are you looking for something in this?
20 A  Let me look. The letter -- these things at the
21   end here are not numbered. This information about
22   No Child Left Behind, gifted education, gifted
23   education, notification of rights for elementary

Page 47

1    and secondary schools, notice of directory
2    information. And then -- that was under Appendix
3    A. Now, there is some additional information
4    in -- related to 504 and so forth that fall under
5    the heading of Appendix A that we put in each year
6    in accordance -- to meet federal guidelines,
7    whether it's No Child Left Behind or whatever.
8    So, those are not numbered. But when we publish
9    the document, the Appendix A guess in the back.
10   THE WITNESS: Where is the Code of
11      Conduct, Donald, that we just had?
12 A  For example, this is Code of Conduct. But when
13   you get back to the back, you have an Appendix A.
14   Code of Conduct ends at 37, and then you have
15   Appendix A. And it covers all those
16   notifications.
17 Q  Would those have been the same in 2004-2005?
18 A  Uhm -- Parents Guide to 504. Yeah, I think they
19   would have pretty much been the same. Again, my
20   staff puts those in there according to what the
21   federal notifications need to be. And so we plug
22   those into the back.
23   MS. DePAOLA: Let me ask Donald if this

Page 48

1    would be all right with him -- and
2    we will remain on the Record --
3    could he get the appendix documents,
4    and we'll attach it to Plaintiff's
5    Exhibit 2? We can do that on the
6    break. It appears that the
7    appendices that he wants are
8    available to him now, and we can
9    attach it so we have a complete copy
10   of Plaintiff's Exhibit 2.
11   MR. SWEENEY: What do you want copied?
12   MS. DePAOLA: Whatever the appendices
13      were to include in Plaintiff's
14      Exhibit 2.
15   MR. SWEENEY: Where are they? Have you
16      got the appendices?
17   THE WITNESS: Yeah, they would be out of
18      that 2005 Student Code of Conduct.
19 A  So, you want copies of the Appendix to this?
20 Q  Any appendix that should be part of Plaintiff's
21   Exhibit 2.
22 A  That would be this. And we were looking at that,
23   still.

Page 49

1    MS. DePAOLA: Can we go off the Record
2       now?
3    (Brief recess).
4 BY MS. DePAOLA
5 Q  Dr. Bazzell, what I understand we will have when
6    they finish copying is a document that we have
7    marked Plaintiff's Exhibit 2 that is a complete
8    copy of the Code of Student Conduct for 2004-2005;
9    is that your understanding?
10 A  It would be Student Code of Conduct with the
11   attached Appendix.
12 Q  For 2004-2005?
13 A  Uh-huh.
14 Q  And as I understand, that was promulgated by the
15   Superintendent's office; is that correct; the Code
16   of Student Conduct?
17 A  Yes.
18 Q  And was it approved by the Board?
19 A  Yes.
20 Q  So, there will be some minutes or something of the
21   Board meeting showing the approval of the Code of
22   Student Conduct?
23 A  Uh-huh.

JR, A Minor                         July 24, 2007                         Pike County Board of Education

Page 50

1 Q    Let me back up to the planner, which is now being
2      copied.  As I understand, that was prepared by the
3      Superintendent's office; is that correct?
4 A    Prepared by our office, yes.
5 Q    And it was distributed to each student?
6 A    Uh-huh.
7 Q    Was it approved by the Board?
8 A    I believe we give them a copy.  We don't ask for
9      their approval.  Only because it's not -- no --
10 Q   And then --
11 A   And they approve -- again, I want to make sure --
12     they don't approve the document, itself.  There is
13     items within the document that are pieces and
14     parts of other documents that they did approve.
15 Q   Right.
16 A   For example, they would have approved the school
17     calendar that's within this document.  They would
18     have approved the high school diploma and
19     certificate options, which -- in another
20     document -- which is part of this document.  They
21     would have approved the promotional criteria
22     that's within this document, but is its own
23     separate document.  There is parts of the Student

Page 51

1      Code of Conduct that's in this document.
2 Q    Were those approved by the Board, the parts of
3      the --
4 A    Yeah.  There are parts in this -- there are -- in
5      this -- in each student planner, there are parts
6      of other documents that were approved by the
7      Board.
8          MS. DePAOLA:  Let's go off the Record.
9          (Brief off-the-Record discussion.)
10         MS. DePAOLA:  Let's go back on the
11         Record.
12 BY MS. DePAOLA:
13 Q    All right.  Now, when we started this, you also
14     said there was a handbook.  You said there was a
15     handbook, a planner, and Code of Conduct?  And
16     tell me what this handbook is.
17 A    Each school -- each school -- each school may or
18     may not generate a handbook at the local school
19     level.
20 Q    And for 2004-2005, was there a handbook at Pike
21     County High School?
22 A    Uhm --
23 Q    And I don't want to represent to you these are all

Page 52

1      the documents.  But these look like all of the
2      Pike County High School documents I have seen.
3 A    This is a -- this would not be a student handbook.
4      This is a faculty handbook.
5 Q    So, there would be both a student handbook and a
6      faculty handbook?
7 A    Again, that's at the discretion of the principal.
8      The principal might -- I think most of them do
9      have some kind of faculty handbook that tells --
10 Q   And can you identify for me the 2004-2005 faculty
11     handbook at Pike County High School?
12 A   Uhm, no, I can't do that.  I'm not -- Mr. Casey
13     may be able to do that from the ones that we have
14     here.
15 Q   So, you don't even review the faculty handbook?
16 A   The -- we do not review the faculty handbooks at
17     the local school, because, again, they are not --
18     they are not policy.  Most of them are filled with
19     procedures like what football game does each
20     teacher work and those kinds of things.  So, no,
21     we don't.
22 Q   Is there a student handbook for 2004-2005 for Pike
23     County High School?

Page 53

1 A    Again, that would be something Mr. Casey would
2      have to answer.  Most --
3          (Brief interruption.)
4 Q    Okay.  Would the student handbook be something you
5      would review?
6 A    Not necessarily.
7 Q    Okay.
8 A    Now, again, the -- most student handbooks -- most
9      student handbooks are pieces and parts of other
10     documents that we produce.  And they have to be
11     congruent with -- they have to operate within the
12     policies and procedures that we have established
13     at the system level.
14 Q   But are not approved up above the building level?
15 A   Well, you're talking about, you know, obviously a
16     student handbook might have things in it like how
17     do you go to lunch.  Well, how you go to lunch at
18     Pike County High School is different than how you
19     go to lunch at Goshen High School.
20         So, yes, there's things in the handbook that
21     are unique to that school that we would not
22     dictate from up here.
23         But general statements of policy within the

Mary Moore-Wynn, CSR                    Mary Moore-Wynn                    (334)244-0203
                                    Court Reporting Services

JR, A Minor                      July 24, 2007                Pike County Board of Education

Page 54

1    student handbook would have to be congruent with
2    what we put up here.
3  Q  Okay. Now, having gone through four types of
4     documents; the faculty handbook, the student
5     handbook, which are printed locally or published
6     locally, a planner, and a Code of Conduct, we are
7     still left with this document called Essential
8     Administrative Information. What is that?
9  A  Again, that is the -- Essential Administrative
10    Information is information that the
11    superintendent, both past and present, has
12    generated to -- to send to the members of the
13    administrative team.
14 Q  Just to building administrators?
15 A  To -- well, to central office administrators,
16    building-level administrators that's intended to
17    give them guidance.
18 Q  All right. And having been through all that, we
19    were attempting to determine whether anything in
20    this Essential Administrative Information document
21    that you produced was essentially different than
22    the one that would have been in effect in
23    2004-2005. And let me continue through here,

Page 55

1    because I'm not going to be interested in all
2    these paragraphs.
3        For instance, paragraph 15 -- are you in the
4    same document I am -- employee sign-in sheets.
5  A  Uh-huh.
6  Q  Would that have been the same in 2004-2005?
7  A  Uh-huh.
8  Q  How about paragraph 18? Would that have been the
9     same?
10 A  Yes.
11 Q  How about paragraph 27? Would that have been the
12    same?
13 A  Yes.
14 Q  How about paragraph 37? Would that have been the
15    same?
16 A  Ah, yes.
17 Q  How about 39?
18 A  Yes.
19 Q  How about paragraph 46?
20 A  Yes.
21 Q  How about 49? Would that have been the same?
22 A  Yes.
23      And, again, to my best recollection, all these

Page 56

1    would be -- all the ones including that one would
2    be the same. There may have been some slight
3    tweaking of the language. But there's not -- I
4    mean, when I am sitting there at the computer
5    going through it, I might decide, oh, it would
6    sound better if I said it this way. But,
7    essentially -- you know, substantively, it's the
8    same exact thing.
9  Q  How about paragraph 53; would that be
10    substantially the same?
11 A  Let's see, 53. Yes.
12 Q  Then would that be the end of this document?
13 A  No. It goes to -- well, there are -- yes. Well,
14    it has a calendar. And I think in this particular
15    one right here, it has some additional things that
16    would not have been there in 2005.
17 Q  2004-2005?
18 A  2004-2005.
19 Q  I'm going to mark document pages 313 through 331
20    as the Essential Administrative Information that
21    was in effect for 2004-2005 with your testimony
22    that it is essentially unchanged as to the
23    paragraphs I asked you about; is that correct?

Page 57

1  A  Yes, that's my best recollection. I can't recall
2     any substantive changes that were made -- or I
3     made what I was going through those. Again, I may
4     have changed the way I said a particular sentence
5     or something just to make it -- clarify it. But
6     other than that, it didn't change.
7        MS. DePAOLA: I'm going to mark this
8        document as Plaintiff's Exhibit 3 as
9        identified by this witness.
10       (Whereupon, Plaintiff's Exhibit 3
11        was marked for identification and
12        is attached hereto.)
13 BY MS. DePAOLA:
14 Q  Was the document I have labeled as Plaintiff's
15    Exhibit 3 approved by the Board?
16 A  No.
17 Q  Now, I'd like to go through each of these
18    documents. With respect to the planner -- did we
19    get the planner?
20 A  Did she bring it back?
21       MS. ALLEN: Not yet. No.
22       (Brief interruption.)
23       MS. DePAOLA: And there she is.

Mary Moore-Wynn, CSR            Mary Moore-Wynn            (334)244-0203
                            Court Reporting Services

Page 58

1  A  High school student planner, 04-05.
2        MS. DePAOLA: Thank you.
3  A  Oh, and this is the Appendix A, which would go in
4      the back of this; is that correct?
5  Q  Yes. If you could just put that in there.
6        THE WITNESS: Did you see that this is
7            Appendix A that would be included in
8            this?
9        MR. SWEENEY: Okay.
10 BY MS. DePAOLA
11 Q  Okay. Just to put on the Record now, Plaintiff's
12     Exhibit 2 is document 382 through 421, plus
13     Appendix A, which is pages 461 through 473; is
14     that accurate?
15 A  Uh-huh. Yes, ma'am.
16 Q  Okay. Let's go back over these.
17       MS. DePAOLA: Let me mark one more.
18           (Whereupon, Plaintiff's Exhibit 4
19               was marked for identification and
20               is attached hereto.)
21 BY MS. DePAOLA
22 Q  This will be Plaintiff's Exhibit 4. Would you
23     take a look at Plaintiff's Exhibit 4 and just

Page 59

1      identify what that is for the Record?
2  A  This is the high school student planner.
3      Sometimes we call it student calendar planner,
4      student calendar.
5  Q  Is that also called a student agenda?
6  A  Yes. It's sometimes referred to as a student
7      agenda, yes.
8  Q  And I did not copy every page as far as the
9      calendar portion of it. But, otherwise, does that
10     appear to be a complete copy of that planner?
11 A  It appears to be a complete copy of it.
12 Q  All right. Let's start with that one. With
13     respect to Plaintiff's Exhibit 4, is there
14     anything in Plaintiff's Exhibit 4 which relates to
15     sexual abuse; any policy or procedure which
16     relates to sexual abuse?
17 A  Ah, not that I recall.
18       I don't --
19 Q  Just wanted to give you a chance to review it.
20 A  No, I am not -- I'm just flipping through it
21     again. I mean -- I've already answered that.
22 Q  Well --
23 A  I'm not going to change it.

Page 60

1  Q  Well, not that I recall and no are two different
2      things. Is that no?
3  A  Well, not that I recall. I don't recall anything
4      in the planner that deals with sexual abuse. And,
5      you know, I mean, you can -- I can stretch that
6      answer and say, well, you know -- well, we, you
7      know, we are very diligent in our efforts to
8      supervise students. For example, one of the
9      reasons we provide the planner is so that it is --
10     is because of the -- is to provide the sign-out
11     information -- the hall pass information in the
12     back. I mean, that's --
13 Q  Okay. The planner, in essence, serves as their
14     hall pass?
15 A  Ah, yes.
16 Q  And does the school keep any records, other than
17     what's in the planner, as to when a student is out
18     of class as reflected in their hall pass?
19 A  Well, students -- students -- the planner is used,
20     and the hall pass in here are used for students
21     moving from teacher to teacher, or from teacher to
22     the office or from the office back. And it's --
23     you know, it has time in time out for sending

Page 61

1      teacher, receiving teacher. That is why we
2      have -- that is why we've done that.
3  Q  But my question is: Other than to the extent it's
4      contained in that document, is it contained in any
5      other school records?
6  A  Records concerning the movement of students within
7      the school?
8  Q  Yes, sir. Yes.
9  A  Uhm, I mean, we maintain records for students to
10     check in and check out. Records when kids, you
11     know, are absent from school or present in school.
12     We probably keep records pertaining to kids who
13     are absent from school for a field trip during the
14     day. We track the coming and going of students
15     who are attending career technical education
16     classes throughout the day, school day --
17 Q  Let me ask it this way --
18 A  -- all those things, yes.
19 Q  Okay. Justin Reed, we believe, was leaving class
20     to go down to the band room during the school day.
21     Would there be any records in your possession
22     relating to that occurring or not occurring?
23       MR. SWEENEY: Object to the form.

Page 62

1   A   Uhm, I'm sorry. Can I ask you to repeat the
2       question again? Because I don't want to --
3   Q   Okay. If Justin Reed were leaving his classroom,
4       say his English class, to go to the band room
5       during the school day, would you have any record
6       of that, other than what might be contained in the
7       planner?
8   A   Only -- only if his absence was authorized.
9   Q   What do you mean by "authorized", like a teacher
10      said, please go?
11  A   Like if a teacher -- if he was -- if he was
12      leaving class for a legitimate reason; such as, to
13      leave early to go -- leave early to go to the band
14      concert, or leave early to go to the parade along
15      with other students. You know, there is a number
16      of reasons students could be out of class
17      legitimately that may be tracked. But if a
18      student is leaving a class covertly, or in a
19      manner to --
20  Q   Covertly?
21  A   Well, not covertly -- that's not a good word --
22      but in a manner -- in a manner -- if a student is
23      trying to leave class in a manner -- if a student

Page 63

1       is leaving class in a -- in -- uhm, for a reason
2       that would not be authorized to leave class, no,
3       there is no method to track that.
4   Q   Okay. Let's --
5   A   Can I give you an example? Ms. Reed mentioned the
6       other day that Justin was disciplined for leaving
7       class when he wasn't supposed to leave class. No,
8       there wouldn't be a method for us to track that
9       other than the discipline file. But systems that
10      we have in place, such as this here
11      (indicating) --
12  Q   He's pointing to Plaintiff's Exhibit 4.
13  A   -- the planner is to try to track the comings and
14      goings of kids.
15  Q   Say that Mr. Coon was sending a note to Justin's
16      teacher, please let Justin come down to the band
17      room during your class, and the teacher was
18      allowing him to do so; would there be any record
19      in the central office or school office that would
20      track that?
21      MR. SWEENEY: Object to the form.
22  A   Again, that's a hypothetical that if that was
23      occurring. If that was occurring, there would be

Page 64

1       no method to track that.
2   Q   Okay.
3   A   I would expect -- you know, most of the teachers I
4       know wouldn't let them come and go like that.
5   Q   Have you investigated whether that occurred in the
6       Justin Reed case?
7   A   I have no information to suggest that that
8       occurred in the Justin Reed case.
9   Q   Have you talked to his teachers?
10  A   Uhm, yes.
11  Q   And they deny that that occurred?
12  A   Yes.
13  Q   All right. I want to go back to these documents.
14      So, as to Plaintiff's Exhibit 4, you indicated you
15      did not see anything in there related to sexual
16      abuse.
17      Let's look at Plaintiff's Exhibit 3. Is there
18      anything in there that relates to sexual abuse
19      policies or procedures?
20  A   That's the Essential Administrators --
21  Q   Dr. Bazzell, before you respond to that, could I
22      just interrupt you?
23  A   Uh-huh.

Page 65

1   Q   Ms. Allen wants me to ask you which teachers have
2       you spoken to about Justin being released from
3       class?
4   A   We spoke with, I believe, Ms. Catrett, and
5       Mr. Suber, I think.
6   Q   Thank you.
7   A   There is nothing in here that specifically
8       mentions child abuse. Again, there is numerous
9       sections that refer to issues related to
10      supervision of students and those kind of things.
11      Things that we have in place --
12  Q   Can you tell me what you're referring to that
13      might relate to supervision?
14  A   Uh-huh. Well, do you want me to go through all of
15      them? Forty-nine, specifically, the principal
16      should make every effort to insure that the
17      professional staff is assigned to monitor
18      supervise students throughout the day.
19      District emergency code relates to students'
20      safety and supervision.
21      Internet use policy refers to policies and
22      procedures in place to insure proper use of
23      technology.

JR, A Minor                    July 24, 2007                    Pike County Board of Education

18 (Pages 66 to 69)

Page 66

1    Leaving school during workday relates to --
2  Q  What paragraph are you reading from?
3  A  Thirty-nine.
4    Thirty-seven deals with parent-student-teacher
5    relationships.
6  Q  Okay.
7  A  And not creating a climate of openness for parents
8    to express any concerns they have about their
9    schools, including their -- any concerns they may
10   have about their teachers.
11   I think that's all.
12 Q  Okay.  All right.  So, we have looked at the
13   planner, the Essential Administrative Information.
14   Look at Plaintiff's Exhibit 2 and tell us if there
15   is anything there related to sexual abuse issues.
16 A  And, again, sexual abuse issues are very broad.
17   And I assume that you are asking questions about
18   things related to sexual harassment, student
19   supervision.  Complaints of discrimination and --
20 Q  I'm asking --
21 A  -- due process --
22 Q  I'm asking about sexual contact between educators
23   and students.

Page 67

1    MR. SWEENEY:  His response embraces
2    that.
3  BY MS. DePAOLA:
4  Q  Well, I just want to make clear you understand
5    what I am when I say sexual abuse.  I am talking
6    about educator/student sexual contact.  Is there
7    anything in there that relates to that?
8  A  Well, you know, this is -- this is an employee
9    Code of Conduct -- I mean, this is a Student Code
10   of Conduct, not an employee Code of Conduct.  But,
11   you know, there are procedures in here that
12   outline what students and parents need to do if
13   they have concerns about something that's going on
14   involving either another student or a staff -- or
15   a staff member.
16 Q  All right.  Show me where the procedure is for
17   concerns about sexual abuse.
18 A  I'm making sure I don't miss anything.
19   Uhm -- again, when you're talking about
20   complaints by students and/or parents, there is a
21   section on page 32 that deals with public
22   complaints that may or may not be related to that.
23 Q  Well, is this your procedure for reporting

Page 68

1    concerns about sexual abuse by a teacher?
2  A  No.
3  Q  Because this seems to appear to relate to
4    discipline matters.
5  A  No.  It relates to any public complaint -- any
6    public complaint or concern.
7  Q  Where does it say that on the front?
8  A  Page 32.
9  Q  Could you read me -- I see it says, parents
10   guardians have a right to arrange a hearing with
11   principal on discipline matters if desired.  Is
12   that what you're referring to?
13 A  Complaints and grievances shall be handled and
14   resolved whenever possible as close to their
15   origin as possible.
16 Q  That's your procedure for handling sexual abuse
17   claims?
18 A  No.  No.  That's -- I mean, that's one of the ways
19   that parents can have their concerns expressed --
20   or reviewed.
21   And then, of course, due process procedures.
22 Q  What page are you on?
23 A  The student -- I'm on page of Appendix A, due

Page 69

1    process procedures, under file JCAA.
2  Q  What Bates stamp number is in the lower right-hand
3    corner?
4  A  I'm sorry.  It's 419.
5  Q  Okay.  Are you saying that Appendix A due process
6    procedures is the Pike County Board's policy on
7    reporting and handling sexual abuse matters?
8  A  I am saying that the students and parents who have
9    concerns about that issue as well as a variety of
10   other issues, it says in the next to the last
11   paragraph, Pike County Board of Education, we use
12   the following procedure for any grievance of any
13   nature to include but not limited to alleged -- to
14   include but not limited to alleged discrimination
15   based on the grounds of race, color, disability,
16   sex, religion, creed, national origin, or age.
17 Q  So my question was:  Is this document here, page
18   419, Pike County's procedure for handling sexual
19   abuse complaints?
20 A  It says any grievance of any nature to include but
21   not limited to, so, yes --
22 Q  Is there any -- excuse me.  Go ahead.
23   Well, is there any other document that shows a

## Page 70

1  procedure for handling sexual abuse complaints
2  other than that page you have just showed me?
3  A   I don't recall any other.
4     You know, let me say this: You know, in the
5  case of Justin, we have an obligation to do the
6  very best we can to protect all students. And I
7  think that the information and documents that we
8  have provided does a -- outlines a very clear plan
9  for doing -- for doing that as it relates to
10  supervision, and those kinds of things. Above and
11  beyond that, you have -- in this case of Justin,
12  you have an IEP committee, multidisciplinary team
13  that meets, certainly is available to hear any
14  issues or concerns that might be brought up,
15  whether they relate to sexual abuse or other
16  issues.
17  Q   Are you telling me that's Pike County's procedure
18  for a parent and/or a student to go to the IEP
19  team about sexual abuse?
20  A   That's not what I said.
21  Q   You're saying that's another avenue?
22  A   I'm saying that's another avenue if there is any
23  concerns that are being expressed.

## Page 71

1  Q   Okay. So, we have looked at the Code of Conduct.
2  And we have looked at the planner. Have we looked
3  at all three of those documents now; Plaintiff's
4  Exhibit 2, 3, and 4, and you have identified all
5  of your policies and procedures in those documents
6  relating to sexual abuse complaint?
7  A   We have looked thoroughly at the three that you
8  have asked me about, yes.
9  Q   Okay. Since I have a pink sticky note from
10  Ms. Allen, let me go back to this question. Who
11  spoke with Ms. Catrett and Ms. Suber about Justin
12  Reed leaving class?
13  A   Ms. Berry.
14  Q   Now, how were those teachers selected?
15  A   It would have been -- it would have -- based on
16  the student's schedule. Based on the schedule
17  Justin had during that year.
18  Q   I mean, he had like four or five teachers. Do you
19  know why these were selected?
20  A   I'm not sure. She may have spoke with all of
21  them. I just -- and she -- I just don't know. I
22  know she spoke with -- I know she spoke with those
23  two. I think one of the other teachers is not

## Page 72

1  with us now is possibly why she didn't.
2  Q   Who is that?
3  A   I shouldn't guess like that, because I can't
4  recall her name. So...
5  Q   Okay. Are there any other policies and procedures
6  manuals for Pike County for 2004-2005 other than
7  what we have already identified?
8  A   Well, there is policies within the policy manual
9  itself --
10  Q   Okay.
11  A   -- that have not been.
12  Q   All right. Let's take a look at those. Now, as I
13  understand it, the policy manual itself is
14  promulgated by the Board?
15  A   Yes.
16  Q   And I'm not clear on whom it's distributed as of
17  2004-2005.
18  A   It's distributed to all faculty members.
19  Q   Any students?
20  A   Ah, no.
21  Q   Or parents?
22  A   No. There is a copy sent to the schools for -- to
23  maintain in the office. I mean, there is copies

## Page 73

1  available. But they are not distributed. They
2  are -- and, actually, there is student sections of
3  the policy manual. There is student sections of
4  the policy manual that wind up being distributed
5  to the parents in other forms, such as --
6  Q   Okay. Let me just see if we can figure out what
7  pages you're talking about.
8     MS. DePAOLA: Pull out pages 112 through
9  133.
10  BY MS. DePAOLA
11  Q   Okay. Let me just show you these documents, which
12  are numbered in the lower right-hand corner. Are
13  any of these documents what you are referring to
14  when you say the policy manual?
15  A   These are in the Pike County Board of Education --
16  Q   Policy manual? Okay. Now, which of these are in
17  the policy manual for 2004-2005?
18  A   All of these. No, this would not have been
19  (indicating).
20  Q   Okay. All right. So, we're going to mark this as
21  Plaintiff's Exhibit --
22  A   That last page would not have been.
23  Q   Sorry.

Page 74

```
 1          (Whereupon, Plaintiff's Exhibit 5
 2          was marked for identification and
 3          is attached hereto.)
 4   BY MS. DePAOLA
 5   Q   I'm going to mark this as Plaintiff's Exhibit 5
 6       and ask you:  Is it your testimony that all of
 7       those pages were in the policy manual in
 8       2004-2005?
 9   A   Yes.
10   Q   And which of those policies relate to the sexual
11       abuse of students?
12   A   The -- it will be the -- it would be -- again,
13       these -- all of those policies relate to
14       supervision of students in one way or another.
15       But as it relates to sexual harassment, it would
16       be JCK117, 118, 124 -- and all of these relate
17       remotely to the supervision of students.
18   Q   Are you aware of the words "sexual abuse"
19       appearing anywhere in these policies?
20   A   It's been a while since I have read it very
21       closely.  And, again, you are referring to JCK?
22   Q   I'm referring to Plaintiff's Exhibit 5, which is
23       the --
```

Page 75

```
 1   A   All of them?  All of these?
 2   Q   Yeah.  Do you have any knowledge of the words
 3       "sexual abuse" appearing in there?
 4   A   I know it's -- you're talking about 16 pages.
 5       Some of them are front and back.  It's been a
 6       while since I read it.  So, I can't answer that.
 7   Q   Do you distinguish in any way between sexual
 8       harassment and sexual abuse?
 9   A   Yes.
10   Q   Okay.  How?
11   A   Uhm, sexual harassment is -- is defined in JCK
12       there.
13   Q   Are you talking about 118?  Where are you
14       referring to, the Bates Stamp Numbers?
15   A   117, 118.  Uhm, and, again, not all -- let me
16       think about how -- uhm, sexual harassment is --
17       you know, you can have -- you can have situations
18       where someone is sexually harassing another
19       person, and it not necessarily be a criminal
20       activity.  But certainly, a great deal of sexual
21       harassment, particularly when it's between an
22       adult and a child, is obviously adult and a
23       student at school, would certainly be criminal.
```

Page 76

```
 1       So --
 2   Q   I mean, this is --
 3   A   I mean, you know --
 4   Q   I'm trying to understand.  Is your distinction
 5       sexual abuse is criminal and sexual harassment is
 6       not necessarily?
 7   A   No.  No.  No.
 8   Q   How do you distinguish between the two?
 9   A   Well, the criminal code specifically devines --
10       the criminal code specifically defines, you know,
11       the elements of a crime that -- as it relates to
12       specific things that -- uhm -- and, again, I want
13       to make sure I'm clear on this.  If a school
14       employee tells a joke that -- that is not
15       appropriate, it could certainly be considered
16       sexual harassment, particularly if the jokes are
17       something that happens over and over again and is
18       just an inappropriate kind of thing.  That would
19       be sexual harassment.  It wouldn't necessarily be
20       criminal.  It would certainly be something we
21       would be concerned about and take action on.
22           It is -- by the same token, touching, patting
23       grabbing, pinching, all those things listed on
```

Page 77

```
 1       page 118 would be both sexual harassment and
 2       criminal conduct.  So, you know, in some cases,
 3       it's both.
 4   Q   Who wrote this document, page 118?
 5   A   This document was put together by Ms. Karen Berry.
 6   Q   Do you see the reference in the definition of
 7       sexual harassment to unwelcome sexual advances?
 8   A   Where is that at?
 9   Q   Line one.  Sexual harassment of a student consists
10       of unwelcome and unsolicited sexual advances.
11   A   Uh-huh.  I do see that.
12   Q   So, if -- if the conduct is welcomed, does it
13       violate this policy?
14   A   If the conduct is welcomed?
15   Q   Yeah.
16   A   Again, let me make sure that --
17           MR. SWEENEY:  Read the whole policy
18           before you answer.
19           THE WITNESS:  Yeah.
20   A   Well, we would -- I mean, we would consider -- we
21       would consider whether it's welcomed or unwelcomed
22       if it involves a student or a child to sexual
23       harassment.  I mean, it's just not --
```

**Page 78**

1  **Q  So, even if it's welcomed by the child --**

2  A  If it's welcomed by the child --

3  **Q  -- it's sexual harassment?**

4  A  Yeah.

5  **Q  Does it say that here?**

6  A  Not that I see there.  No.  It does not.

7  **Q  Now, as I understand it, this policy that you're**

8    **referring to, document 118, is distributed only to**

9    **faculty members.  And there is a copy of the**

10  **document in the school?**

11  A  I'm not sure -- I know that to be correct.  I'm

12    not sure if there is other -- I'm not sure if

13    there is a wider distribution of that.  I can

14    check.

15  **Q  And this is the policy document we have marked as**

16    **Plaintiff's Exhibit 5 --**

17  A  Yes.

18  **Q  -- that is approved by the Board?**

19  A  Yes.  I'm trying to recall if that's published

20    somewhere else.  I just can't recall right now.

21  **Q  Is there anything in the policy manual about the**

22    **procedures for addressing complaints of sexual**

23    **abuse?**

**Page 79**

1  A  There -- within the -- within the Student Code of

2    Conduct, within the --

3  **Q  I'm looking at this document.**

4  A  Within this document here, there's -- again, I

5    refer back to the due process -- the due process

6    procedures and --

7  **Q  Are you --**

8  A  -- the grievance procedures.

9  **Q  Well, show me exactly what you mean.  Are you**

10  **talking about page 0130, student grievance**

11  **procedure?**

12  A  I'm, again, referring to the 130 through 132.

13  **Q  That appears to relate peripherally, anyway, to if**

14  **a student has some kind of grievance.  What about**

15  **procedures for faculty members or principals or**

16  **you to use when addressing issues of sexual abuse?**

17    **MR. SWEENEY:  You mean, reporting sexual**

18    **abuse?**

19    **MS. DePAOLA:  No.**

20  **Q  Is there any document that outlines the procedures**

21  **that your administrators, including you, are to**

22  **follow when there is a suspicion or allegation of**

23  **sexual abuse?**

**Page 80**

1  A  Let me just -- the last paragraph relates to --

2  **Q  What page are you on?**

3  A  I'm on 117 -- relates to school systems will act

4    promptly to investigate all complaints either

5    formal, informal, verbal or written of harassment.

6    And it lists all of those.  You know, so, I refer

7    to that and those documents that I have previously

8    mentioned as our policy concerning reporting those

9    matters.

10  **Q  Okay.  The only thing I -- as to procedures to be**

11    **used in investigating sexual abuse allegations or**

12    **issues, the only thing I have seen you refer to**

13    **thus far is page 117.  Tell me anything else that**

14    **outlines the procedures that you and your**

15    **administrators use in investigating sexual abuse**

16    **allegations.**

17  A  Again, the procedures that we would use to

18    investigate sexual abuse would be those same

19    procedures that we would use to investigate all

20    kinds of concerns.

21  **Q  And where are those procedures?  Show those to me**

22  A  As far as --

23  **Q  In any of the documents that we have produced.**

**Page 81**

1  A  Well, there is not -- I mean, if you are asking

2    for -- you know, each situation is different.  So,

3    if you are asking for a list of things, okay, this

4    is what you do first, and when you finish doing

5    that, then you go and do the second thing --

6  **Q  As it relates to sexual abuse complaints, yes,**

7    **where is that?**

8  A  Okay.  Well, that's what I am answering, is that,

9    you know, if you're asking for an itemized list of

10    what we would do in a complaint of sexual abuse,

11    or any other complaint, for that matter --

12  **Q  No, I am just limiting it --**

13    **MR. SWEENEY:  Let him finish.**

14  A  If you are asking for a list of canned steps that,

15    okay, the first thing you do is Number 1, and the

16    second thing you do is Number 2, and the next

17    thing you do is Number 3, and the next thing you

18    do is Number 4, we don't have that list.

19  **Q  Okay.  Whose responsibility would it be to draw up**

20    **procedures for administrators to use in**

21    **investigating sexual abuse complaints?**

22  A  Uhm, again, each situation is different, and --

23    each situation is different.  And what you do in

Page 82

1    terms of step by step by step varies by situation.
2  **Q    And whose responsibility is it to determine what**
3      **those steps are?**
4  A    Well -- and, again, the steps -- what would do in
5      a particular situation might vary. So, it would
6      not be -- it would not be appropriate to have a
7      one-size-fit-all (sic) list.
8  **Q    Okay. So, you felt it was not appropriate to have**
9      **a written procedure for investigating sexual abuse**
10     **complaints?**
11 A    No, that's not what I said. What I said is it's
12     not appropriate to have a one-size-fit-all list of
13     the steps that would need to be followed in
14     investigating a variety of different kinds -- all
15     complaints, including complaints of sexual abuse.
16 **Q    So, you've determined -- is that your**
17     **responsibility to determine whether or not to**
18     **promulgate a procedure for the investigation of**
19     **sexual abuse -- a written procedure for the**
20     **investigation of sexual abuse complaints? Is that**
21     **your duty?**
22 A    I think you asked -- I think that you asked that,
23     and I answered it. What I said was that -- again,

Page 83

1      is that I am not sure it's appropriate to -- to
2      for there to be a one-size-fits-all list of you do
3      A, B, C, D, E, as it relates to investigating any
4      kind of complaint, including complaints of sexual
5      abuse.
6  **Q    Is it your responsibility to make that decision**
7      **whether or not to promulgate a procedure to**
8      **investigate sexual abuse complaints?**
9  A    Uhm --
10 **Q    Or is it the principals' or is it the Board's?**
11 A    It's myself and the Board's responsibility to
12     determine -- to determine that.
13 **Q    Have you ever presented that issue to the Board?**
14     **Do we need a sexual abuse investigation procedure?**
15 A    Uhm, I don't recall doing that.
16 **Q    All right. Now, assuming that we don't have a**
17     **written procedure other than what you have already**
18     **identified, did you do any directions to any**
19     **principals or school administrators as to how to**
20     **investigate a sexual abuse complaint?**
21 A    Uhm, we've -- again -- you know, we -- our
22     policies say that complaints -- all complaints,
23     regardless of the nature of those complaints,

Page 84

1      would be investigated thoroughly. The -- you
2      know, I am not going to list a series of
3      step-by-step things that they need to do or should
4      do, because some of that is certainly
5      discretionary. That -- and again, situations
6      vary. You know, situations are different and may
7      call for a -- might call for a different -- you
8      know, they have got to -- they have got to use
9      their best judgment and some discretion to
10     investigate matters.
11 **Q    Have you ever given them any direction as to what**
12     **you expect them to do to investigate a**
13     **sexual-abuse complaint?**
14 A    On a case-by-case basis, yes, I have certainly
15     said -- if a complaint to my attention, I have
16     certainly called and said, I want you to talk
17     to -- this is what the complaint is. You need to
18     talk to A, B, C, and D. When you get done doing
19     that, you need to go to E and F.
20 **Q    So, you just ex--- what's the word -- you just**
21     **on-the-spot make a decision on a case-by-case**
22     **basis?**
23 A    We -- we investigate the cases. And the manner in

Page 85

1      which we proceed depends on where -- what the
2      information is that we're getting.
3  **Q    All right. Whose responsibility is it to**
4      **investigate sexual abuse cases? Within the school**
5      **system, whose responsibility is that? Is that**
6      **your responsibility?**
7  A    Yes. It's my responsibility with the assistance
8      of others.
9  **Q    Who else is responsible for conducting the**
10     **investigation?**
11 A    I answered that.
12 **Q    I'm sorry. I don't remember.**
13 A    Myself and others.
14 **Q    Who are the others?**
15 A    The others would be those related to the case or
16     those that have information relating to the case
17     who can help me conduct the investigation.
18 **Q    Would it be the principal's responsibility to**
19     **conduct --**
20 A    It might be principals, assistant principals.
21     And, again, you say "investigate" it. I am
22     talking about assisting with gathering
23     information. Would be principals, assistant

Page 86

1   principals, central office staff.
2   Q   All right. Well, exactly what training have you
3       provided to school personnel about sexual abuse?
4       And by "school personnel", I mean employees, not
5       students. I'm talking about school personnel.
6   A   We will need to go through that folder of those.
7       That was a specific question, I think, that was in
8       the interrogatories. And I think we provided --
9           MR. SWEENEY: Do you have those answers,
10          Susan?
11          Let's go off the Record.
12          (Brief recess.)
13  BY MS. DePAOLA
14  Q   All right. In response to interrogatories through
15      your attorney, Board's attorney has produced
16      pages 139 through 201, being all the training
17      materials relating to sexual harassment. Can you
18      identify in there any training materials relating
19      to sexual abuse? I'm sorry; not sexual
20      harassment.
21  A   I mean, I can go through page by page and tell you
22      what each one of these -- we have put checkmarks
23      by --

Page 87

1   Q   Anything relating to sexual abuse, please.
2   A   But all of it relates to protecting students in
3       some way or another. I mean, I can go through
4       these -- on the July 2002, new teacher
5       orientation, there is a block of time in there for
6       school safety and discipline. I was Assistant
7       Superintendent at that time. And I talked about
8       school safety and discipline issues, and that
9       would have included a topic relating to
10      supervision of students and abuse.
11  Q   All right. Excuse me. So, it's your testimony
12      under oath that in 2002 you talked to the teachers
13      about sexual abuse?
14  A   This is new teacher orientation.
15  Q   You talked to new teachers about sexual abuse?
16  A   It's my testimony that that would have been a
17      likely topic of discussion during new teacher
18      orientation during my block of time there from
19      10:00 to 10:30 under school safety and discipline.
20      It is something --
21  Q   You mean, you don't know --
22  A   -- that it --
23  Q   You don't know whether you talked about it or not?

Page 88

1   A   I'm saying it would have been a likely topic of
2       discussion in that block -- it usually is in that
3       section.
4   Q   All right. Now, let's look at that. So, did you
5       provide them with any training materials, policies
6       procedures, anything on sexual abuse at that --
7   A   I don't -- I don't recall.
8   Q   Anything else in this document about sexual abuse?
9   A   In -- on that page?
10  Q   This whole document.
11  A   This whole document. Again, as it relates to
12      category of student supervision, June 10th, 2003,
13      the administrators' meeting, we talked about
14      agenda and discipline.
15  Q   No. My question is anything about sexual abuse.
16  A   Page 143 talks about protecting instructional
17      time.
18  Q   Dr. Bazzell, is there anything that indicates you
19      talked about sexual abuse?
20  A   All right. Page 144 sexual harassment and
21      reporting requirements DHR law enforcement.
22  Q   Okay. So, page 144 has a reference to sexual
23      harassment; is that what you're saying?

Page 89

1   A   It has a reference to sexual harassment. And it
2       has a reference to reporting requirements, DHR,
3       law enforcement.
4   Q   Anything else in that document -- I'm sorry. Who
5       was that for; that one on page 144, is new
6       teachers?
7   A   Administrators, system administrators.
8   Q   And what was the date on that?
9   A   November 6th of 2003.
10  Q   And was that all administrators for a specific
11      school or what?
12  A   All system administrators.
13  Q   Okay. Who did a presentation on sexual abuse at
14      that meeting?
15  A   At that meeting on November 6th, this is -- this
16      is my portion of the agenda. And at that meeting,
17      I did -- I discussed with them reporting
18      requirements. It was under policy matters and
19      legal issues, reporting requirements, DHR law
20      enforcement.
21  Q   All right. Did you produce any materials to give
22      to them on sexual abuse?
23  A   I don't recall. It's been a long time ago.

Page 90

1      Again, the next one is --
2  Q   What page number are you looking at?
3  A   146. Relates to student supervision and safety
4      plans.
5  Q   Okay. I am asking you specifically about sexual
6      abuse. Is there anything on that document --
7      anything further in that document about sexual
8      abuse?
9  A   In this entire document?
10 Q   Yes, sir.
11 A   All right. Let me just go through all of them
12     again, because I -- you know, earlier we were
13     talking about broad categories of things that
14     somehow related in that other. And now we're not.
15         It does talk about discrimination on 147. But
16     I think you would not consider that what you were
17     asking. Uhm, 148 does talk about the Child
18     Advocacy Center. Page 149 talks about complaints
19     of racial harassment and discrimination of all
20     types, monitoring and reporting of those.
21 Q   Tell me who gave that presentation on monitoring
22     and reporting?
23 A   Uhm, let's see. That was under general

Page 91

1      information. On the -- that was in January of
2      2005, which would have been -- and it's under my
3      agenda -- my agenda --
4  Q   Okay. Let's stop right there. That would have
5      been a good time. January 2005. What did you
6      tell them the policies and procedures were for
7      reporting sexual abuse?
8  A   Uhm, I don't -- I don't remember the details of
9      that. I would have probably given them a copy of
10     the Code -- of the Alabama Code as it relates to
11     that.
12 Q   What are you referring to?
13 A   The --
14 Q   The criminal code on sexual abuse? You gave out
15     the criminal code?
16 A   The portion of the criminal code that deals with
17     reporting.
18 Q   Just the DHR report requirements; is that what
19     you're talking about?
20 A   The reporting requirement, yeah.
21         Let me just go through these. I think the
22     rest of these -- I think you would not consider
23     them. The things that we have already talked

Page 92

1      about; Code of Conduct, student planners. Again,
2      Child Advocacy Center was discussed again on
3      September 7th.
4          February 2005, recognizing sexual abuse.
5  Q   All right. Let's talk about that one. What page
6      number is that? Look at the bottom right-hand
7      corner.
8  A   Uhm, 159.
9  Q   Okay. What was the date on that document?
10 A   February 2002.
11 Q   Okay. Now, that's the only reference -- I'll just
12     represent to you that's the only reference to
13     sexual abusive I've seen in that entire document.
14     Are you aware of any other reference to sexual
15     abuse in those training materials?
16 A   I know that -- in this (indicating) here?
17 Q   Yes, sir.
18 A   Do you have the BBSST stuff?
19 Q   Yes, sir.
20 A   I know that it's discussed in BBSST training,
21     which is done with everybody.
22 Q   We're going to go over that. Let's go back to
23     page 159.

Page 93

1          In February '02, it appears that you had a
2      reference to sexual abuse on that document. What
3      schools was that training provided to?
4  A   It would have been the schools that had -- at that
5      time, we kind of -- at that time, we had -- well,
6      I think it would have covered all. It would have
7      been Banks -- uhm, Banks, Pike County Elementary,
8      Goshen Elementary.
9  Q   What grades were in Banks at that time?
10 A   K-8.
11 Q   Let me look at that document. I'm sorry. I don't
12     have another copy, apparently. I don't know where
13     it is at this point.
14         It appears to me from reading this that some
15     sort of recognizing sexual abuse seminars was done
16     with teachers for K through two and three through
17     five in February 2002. Is that what that document
18     indicates?
19 A   Ah, yes.
20 Q   Do you have any of the materials from that
21     training seminar?
22 A   That -- I don't know. That was -- the presenter
23     was Lucia Grantham, who works at Troy University.

Page 94

1   Q   Where is she now?
2   A   I'm not sure.
3   Q   Did you attend that seminar?
4   A   Yes.
5   Q   What are the signs that she went over --
6   A   That's 2002. I don't recall the materials at that
7      time.
8   Q   Well, did you think it was important to provide
9      this training to teachers in K through five?
10   A   I think it's important to provide it to all
11      teachers.
12   Q   Did you provide any similar seminars to any
13      teachers grade six through 12?
14   A   I think we provided -- I think we provided -- you
15      know, we provided that kind of information through
16      other -- through other -- in other manners such as
17      the BBSST.
18   Q   Is there anything else besides BBSST you can think
19      of?
20   A   Not that I can think of, no.
21   Q   Well, if you think of something, will you inform
22      your attorney, so I will have a complete response
23      on other training on sexual abuse?

Page 95

1   A   I sure will. Yes.
2   Q   Any other reference in those documents to sexual
3      abuse? We will get back to BBSST, because I think
4      it is in there. Any other training on sexual
5      abuse?
6   A   I don't see anything else right offhand.
7   Q   Was it your responsibility to determine whether or
8      not a teacher would receive training in sexual
9      abuse issues?
10   A   Uhm, it's not my responsibility entirely. The
11      professional development needs of our faculty and
12      staff is determined jointly by all of our
13      administrators.
14   Q   So, the principal and the Superintendent
15      determines what training is required?
16   A   Principal, superintendents, central office staff.
17      And we also rely on a number of surveys that are
18      sent out; needs surveys. Sometimes to faculty
19      members. Sometimes -- sometimes they are not even
20      conducted by us. I can't remember if we had any
21      done during those years. But sometimes the
22      Regional Inservice Center sends out a needs
23      assessment survey.

Page 96

1   Q   All right. The only other reference to sexual
2      abuse you have indicated was in the BBSST
3      documents; is that correct?
4   A   Uh-huh.
5   Q   All right. And could you show us in there what
6      you're referring to?
7   A   Is it -- I will have to see the documents. I
8      don't have them.
9   Q   This is what you produced as BBSST documents.
10   A   Alabama SDE at-risk definition of observable
11      indicators. And, again, you know, I guess what
12      you're trying to do with BBSST is to look for
13      reasons for kids not being successful. And it
14      lists under environment; family, school,
15      community, adverse or chronic health condition,
16      home, family, mobility, limited literacy, family
17      poverty, student neglect, and/or abuse. And it's
18      my understanding that that is a topic of
19      discussion when we -- when we -- when we go
20      through -- when we do the BBS training with our
21      faculty and staff. And Ms. Berry --
22   Q   Okay. What page are you referring to?
23   A   -- Ms. Berry does the training.

Page 97

1   Q   So, are you saying Ms. Berry is responsible for
2      deciding whether they are going to have training
3      on sexual abuse?
4   A   What I am saying is that Ms. Berry is responsible
5      for making sure that all of our faculty and staff
6      at all grade levels receive the BBSS training.
7      Part of the BBSS training includes going over the
8      Alabama SDE at-risk definition and observable
9      indicators which make reference to one of those
10      indicators being student neglect and/or abuse.
11      So, it would have been a topic that was covered.
12   Q   Are you speculating, Dr. Bazzell?
13   A   No, I am not speculating.
14   Q   Have you attended those discussions and heard a
15      discussion of sexual abuse?
16   A   No. I asked Ms. Berry -- I have discussed it with
17      Ms. Berry and asked about the content of BBSS
18      training and whether sexual abuse and those kinds
19      of topics were covered in -- in these discussions.
20   Q   All right. So, we'd have to depose Ms. Berry to
21      find out exactly what training she provided --
22   A   Yes.
23   Q   -- on sexual abuse?

Page 98

1  A   Yes.
2  Q   And would that have been provided to all teachers
3      at the high school?
4  A   It would have been provided to all teachers system
5      wide.
6          And she has indicated to me, again, talking
7      about at-risk indicators she would have -- those
8      are issues that are discussed as reasons why kids
9      have problems -- some kids have problems.
10 Q   All right. We're going to mark that as
11     Plaintiff's Exhibit 6.
12         (Whereupon, Plaintiff's Exhibit 6
13         was marked for identification and
14         is attached hereto.)
15         MR. SWEENEY:  I'm sorry, Susan, what is
16         6?
17         MS. DePAOLA:  As I understand it, it is
18         all of the training materials that
19         he has relating to sexual abuse.
20 BY MS. DePAOLA
21 Q   Is that accurate?
22 A   Yes.
23         MR. SWEENEY:  What he said was he had

Page 99

1          provided that information in the
2          response to discovery. And what you
3          presented to him appeared to be what
4          was referenced. But I haven't
5          verified that.
6  A   I -- I don't recall. I mean, it looks complete.
7      I don't recall anything else that we sent that's
8      not in there. There could be a page or two. I
9      don't know. It looks complete to me.
10         MS. DePAOLA:  Donald, can you look in
11         your documents and see what document
12         615 is?
13         MR. SWEENEY:  I don't have a 615.
14         MS. DePAOLA:  In your response to
15         interrogatories, you I have
16         identified document --
17         MR. SWEENEY:  I do. It's an inservice
18         schedule, Pike County schools
19         January 15, 2002.
20 BY MS. DePAOLA
21 Q   Can you show that to me so I can --
22 A   It's the one with sexual abuse -- recognizing --
23     it's that page.

Page 100

1          MS. DePAOLA:  Can I just look at that,
2          Donald?
3          MR. SWEENEY:  The reason I hesitated,
4          it's somewhat annotated.
5          MS. DePAOLA:  Okay. All right. Believe
6          it or not, I'm ready to get to the
7          specifics now.
8              Off the Record.
9          (Lunch recess.)
10         (Whereupon, at approximately 2:30,
11         the deposition of Dr. Bazzell was
12         resumed.)
13 BY MS. DePAOLA
14 Q   Dr. Bazzell, could you just authenticate this as
15     the records of the school system that relate to
16     the Foster incident? Mr. Casey didn't appear to
17     be familiar with them.
18 A   Yes.
19 Q   So, Plaintiff's Exhibit 10 is all the documents in
20     the Board's files relating to the Foster incident?
21 A   Yes.
22 Q   Can you tell me what your participation was in
23     that incident?

Page 101

1  A   Uhm, I received this letter in my office.
2  Q   Is that from the parent?
3  A   It's from the parents.
4  Q   Okay. Go ahead.
5  A   I received this letter, I don't recall the exact
6      date. And I wrote Mr. and Mrs. Foster back, which
7      would be the letter dated November 22nd. And I
8      sent a copy of this to Mr. Casey with the attached
9      note -- with the note that's on there.
10 Q   Directing him to investigate it?
11 A   Yes.
12 Q   And then did you do anything after that?
13 A   Actually, Mr. McDaniel -- I talked with Mr. Casey
14     about it and talked with Mr. McDaniel about it.
15     Mr. McDaniel stated that he was working -- had
16     already heard about the situation; and that he was
17     working on that and had met with the parents,
18     himself. And that he had scheduled some time
19     for -- he had already scheduled a meeting with
20     Mr. Coon and the parents. And he -- he then
21     reported back to me on -- on December 2 with a
22     letter that's in this file. And --
23 Q   And that would be document number 0080?

Page 102

1   A   That's correct.
2   Q   And 81, that was his letter to you?
3   A   Yes, ma'am.
4   Q   And then did you have any kind of meeting with
5       Mr. Coon.
6   A   No, I did not meet with Mr. Coon. We -- we also
7       had the statement here and also I think on 0079 --
8           (Brief interruption.)
9   A   -- on 0079, there is phone numbers for LaTonya
10      Foster and --
11  Q   Who is?
12  A   Who is the mother. And so, I spoke with
13      Ms. Foster. And also the last page back there, it
14      shows where Ms. Foster returned my call. So, if I
15      recall, I tried to call her back several times. I
16      spoke with her one time. And I'm almost certain
17      that I spoke with her husband, as well. After all
18      this was investigated, and they had a meeting and
19      so forth, I wanted to make sure that they were
20      satisfied that the matter had been -- had been
21      looked into.
22  Q   Did you consider Mr. Coon's action to be excessive
23      disciplinary force?

Page 103

1   A   Yes.
2   Q   Did it raise any questions in your mind about his
3       mental stability?
4       MR. SWEENEY: Object to the form.
5   A   It's certainly not something that we would condone
6       at all in terms of his -- it didn't raise any
7       concerns about his mental stability. He admitted
8       in his letter that he was angry and acted
9       inappropriately. But, you know, in the absence
10      of -- in the absence of other similar situations
11      or other situations where he was out of control
12      and -- you know, I viewed it at that time as an
13      isolated incident for which he knew and understood
14      that it was inappropriate. And --
15  Q   Was Mr. Casey correct in reporting that he called
16      you and let you know about Mr. Coon smoking in the
17      school?
18  A   I don't recall that.
19  Q   I think he also reported that he called you and
20      reported about the cell phone -- Mr. Coon
21      providing --
22  A   No, he didn't -- he didn't call me about that. I
23      knew about that, but he --

Page 104

1   Q   So, he never discussed it with you?
2   A   No, he did not call me about that.
3   Q   Was he still employed there when it occurred?
4   A   Yes.
5   Q   Tell me what happened with respect to that
6       incident.
7   A   I was on the campus and was circulating through
8       the classrooms and all the different buildings.
9       And Mr. Coon approached me and asked me if I could
10      intervene on his behalf and get his cell phone
11      returned to him. And I said -- he said that
12      Mr. McDaniel had his cell phone and would not
13      return it. And so I asked him what -- I asked him
14      what Mr. McDaniel was doing with it. And he said
15      that he -- he had lent it to a student to call his
16      parents or father, I don't remember the exact
17      words. But that he had lent it to him and that
18      the student had dropped it. And -- had dropped it
19      out of his pocket or something. And that the
20      teacher saw it drop on the floor. And the teacher
21      confiscated it from him and turned it in to
22      Mr. Coon.
23  Q   Mr. McDaniel?

Page 105

1   A   I mean -- I'm sorry -- Mr. McDaniel.
2   Q   So, what did you do next?
3   A   I told him that he knew and understood what the
4       policy was concerning cell phones on campus. And
5       that -- that was a matter that he would have to
6       take up with Mr. -- that would be a matter that he
7       would have to take up with Mr. McDaniel; that I
8       would not intervene on his behalf.
9   Q   Well, did you then conduct any further
10      investigation about why Mr. Coon was, in fact,
11      providing a cell phone to a student?
12  A   He wasn't -- he was allowing a student to use a
13      cell phone.
14  Q   I mean, that's what he told you?
15  A   Yes.
16  Q   Did you conduct any further investigation?
17  A   No. I talked with Mr. McDaniel. And I told him
18      that Mr. Coon had asked me about the cell phone.
19      I said, you know, I don't expect you to give it
20      back to him. I expect you to follow the policy.
21      The policy is that if we confiscate a cell phone
22      from a student, it can only be returned with the
23      knowledge of the parent or to the parent.

Page 106

1  Q   So, what happened?  Did they return it to the
2      parent?
3  A   I'm not sure.
4  Q   You didn't do anything further about it?
5  A   No.
6  Q   Didn't talk with the student who had the cell
7      phone?
8  A   No.  That would be -- you know, Mr. McDaniel, I
9      believe, and/or Mr. Casey had already done that.
10 Q   So, essentially -- I mean, you believed Mr. Coon's
11     story about how and/or why the student had the
12     cell phone?
13 A   Well, in isolation that wouldn't -- in isolation,
14     that wouldn't necessarily raise a red flag.  I
15     mean, there is probably not a day goes by that
16     some teacher or somebody has a cell phone and
17     doesn't hand it to a kid and let them use it for
18     just a minute to, you know, call a parent or
19     whatever.
20         So, that situation by itself outside the
21     context of any other thing wouldn't necessarily
22     raise a red flag.
23 Q   Would you agree it would be important to have some

Page 107

1      centralized reporting of incidents so that some
2      one person knows all the flags that are going up?
3  A   "All the flags"...
4  Q   All the red flags.  You said this wouldn't -- in
5      isolation, wouldn't raise a red flag.  Is it
6      important that there be a central person, one
7      person, who receives all these flags --
8  A   I think --
9  Q   -- so that they can look at the whole picture?
10         MR. SWEENEY:  Object to the form.
11 A   You know, it's the responsibility of the
12     principal, the counselor, and assistant principal.
13     Those are where the reports come to.  And our
14     schools are very small.  So, the -- you know,
15     their offices are close together.  And they
16     communicate, you know, every day about issues
17     going on within the school.
18 Q   So, you just gave me three people.  So, there is
19     no one central person to whom these issues are
20     reported?
21 A   Uhm -- well, the issues, in most cases, go -- go
22     to counselors.
23 Q   So, the counselor is the designated person to

Page 108

1      receive all --
2  A   The counselor is -- there is no designated person.
3      But I believe that all of our staff members know
4      and understand that any concerns that they have
5      need to go to the counselor or to the principal.
6  Q   Now, are you familiar with the term "grooming"?
7  A   I've heard that term.
8  Q   What's that mean to you?
9  A   It was described as Mr. Casey described it.
10 Q   Do you know of any -- well, so you agree with
11     everything he said as to grooming activities
12         MR. SWEENEY:  Object to the form.
13 A   I agree with the definition that he gave.  I don't
14     remember exactly how he worded it.
15 Q   Tell me what grooming activities you can identify
16     that you're familiar with.
17 A   Well, those, again, would be the same ones that he
18     mentioned:  Purchasing gifts.  Again, those things
19     that he mentioned.
20 Q   And you're not familiar with any others?
21 A   Well, that would be the ones -- likes I said, the
22     ones that he mentioned.
23 Q   Now, you are aware, I assume, that Justin Reed is

Page 109

1      mentally retarded?
2  A   I am aware that he -- I am aware that he is being
3      served by our special education program -- or was
4      being served at that time by our special education
5      program.
6  Q   Under what disability?
7  A   I now know that he is MR.
8  Q   And would it be fair to assume that you know that
9      he would have significant limits on his
10     intellectual functioning?
11         MR. SWEENEY:  Object to the form.
12 A   Well, his intellectual functioning would be, you
13     know, defined by the assessments that had been
14     done.
15 Q   Well, the assessment that your school did
16     indicated that he had a full scale IQ of 67, which
17     placed him at the first percentile.  Would you
18     agree that's a significant limitation on
19     intellectual ability?
20 A   Yes.
21 Q   Would you also agree that that would include his
22     ability to deal with academic tasks?
23 A   Certainly.

Page 110

1  Q  And would it also include his social skills?
2  A  Uhm, to some extent.
3  Q  Okay. Anything else you are aware of about Justin
4     Reed's areas of disability?
5  A  No, that's --
6  Q  Not aware of his expressive language problems?
7  A  No.
8  Q  Would it be fair to assume that children in the
9     first percentile in terms of mental ability would
10    be more likely to acquiesce to demands of
11    authority figures?
12         MR. SWEENEY: Object to the form.
13 A  I don't -- I haven't read that.
14 Q  You don't know that?
15 A  I haven't read that.
16 Q  Do you have an opinion on that?
17 A  Uhm, no.
18 Q  Okay. And if I am understanding the testimony
19    that you have given and that Mr. Casey has given,
20    nothing in your policies and procedures were done
21    different or especially for special education
22    students?
23 A  Our policies --

Page 111

1  Q  As they relate to sexual abuse, now.
2  A  Our policies and procedures are designed -- I
3     think, designed to -- we do the very best we can
4     to protect all students, regular program and those
5     students with disabilities.
6  Q  Is there anything additional you're doing for
7     special ed students to protect them?
8  A  Uhm, not specifically.
9  Q  Okay. Can you just identify for us the employment
10    application? I think it's --
11         MR. SWEENEY: I think it's 7.
12 Q  -- would be 7. Could you just identify that as
13    being the document in the record that related to
14    the employment of Mr. Coon?
15 A  Some of this -- some of this is from the
16    employment -- from the employment application.
17    This is the application, itself.
18 Q  Okay.
19 A  A lot of this other information in here is from
20    the personnel file.
21 Q  Okay. All of it relates to Charles Coon?
22 A  Yes, ma'am.
23 Q  And those are all from the records from Pike

Page 112

1     County Board of Education?
2  A  And there are some things missing from this that I
3     know we submitted.
4  Q  Like what?
5  A  The State Department -- the printout from -- well,
6     the transcripts from his universities.
7  Q  Sure. Yeah, okay.
8  A  Verification from the State Department of
9     Education that he had a criminal background check,
10    ABI and FBI criminal background check.
11 Q  Right.
12 A  And there may be other things. But this is not
13    complete in terms of what we provided from his
14    personnel file.
15 Q  But all of the documents in there are from his
16    personnel file?
17 A  Yes, ma'am.
18 Q  I wanted to ask you on the resume' portion, there
19    is some handwriting. Is that your handwriting?
20 A  No, that's not mine. But -- I was going to
21    speculate, but...
22 Q  And I note that there are no -- I strike that.
23 A  I can tell that's not mine. I'm left-handed. I

Page 113

1     make left-handed checks.
2  Q  I haven't marked this. Do you recognize the
3     handwriting on this pre-hire application
4     checklist?
5  A  That handwriting is Elizabeth Grubbs'.
6  Q  And that application is from 2000. But he wasn't
7     hired until 2002. Do you know why -- or if I am
8     correct in assuming they didn't get any new
9     references from him in 2002?
10         MR. SWEENEY: Object to the form.
11 A  That is -- it's not uncommon for applicants to
12    apply in the system. Our policy is to keep
13    applications -- and I believe it's two years or
14    three years -- in our applicant file. At some
15    point, we purge those, unless an applicant comes
16    in and says, I want you to -- I want to re-up, I
17    guess you might say.
18         So, the fact that his application was
19    submitted in 2000, and he was employed in 2002,
20    that would have still been a valid application in
21    our eyes.
22 Q  Well, I mean, it appears that his application was
23    actually submitted in 1996.

| Page 114 | Page 116 |
|---|---|

**Page 114**

1  A    And then he evidently called in July of 2000 and
2       asked us to change the date of his -- change the
3       date on the application. And that writing there
4       looks like Ms. June Collier's writing. She would
5       have scratched through that and put a new date,
6       which would have indicated that the applicant
7       would like to --
8  Q    Renew his application?
9  A    Yes. Renew his application, yes.
10 Q    Okay. Thank you. I want to address one other
11      issue. Let me show you what we're going to mark
12      as Plaintiff's Exhibit 11.
13          (Whereupon, Plaintiff's Exhibit 11
14          was marked for identification and
15          is attached hereto.)
16 BY MS. DePAOLA
17 Q    Ask you if these are documents relating to the
18      retirement of Mr. Coon. And I include in there
19      his application for retirement, his letter of
20      retirement, and the Board minutes from May 23rd,
21      '05. Are there any other documents you are aware
22      of that relate to his retirement?
23 A    Uhm -- no.

**Page 116**

1       in a private school. And that he was going to
2       retire and draw his State -- he was going to
3       retire, draw his State retirement, and go to work
4       in a private -- at a private school.
5  Q    What school was that?
6  A    I don't recall.
7  Q    Where did you hear about that?
8  A    I just don't recall who told me that. It would
9       have been somebody from -- I mean, somebody from
10      the school may have told me that.
11 Q    And were you subsequently asked by Monroe County
12      schools to verify his employment? And I'm showing
13      you Plaintiff's Exhibit 12 there.
14          (Whereupon, Plaintiff's Exhibit 12
15          was marked for identification and
16          is attached hereto.)
17 A    Were we asked by Monroe County to verify his
18      employment in that he was leaving us going to
19      Monroe? Is that what --
20 Q    Well, you tell me what 12 is.
21 A    Okay. This is -- this was completed and signed by
22      me in 2004. And -- let me see --
23 Q    Okay. Maybe I --

| Page 115 | Page 117 |
|---|---|

**Page 115**

1  Q    Was that no?
2  A    No, I don't think so.
3  Q    And am I correct that he — was he on a 12-month
4       contract?
5  A    He was on a ten-month contract. His contract
6       expired in -- I think it ended June 30th.
7  Q    Okay. So, he continued to be an employee through
8       June 30th of '05?
9  A    Uh-huh. Yes, ma'am.
10 Q    And that's reflected on this application for
11      retirement on page 1 at the bottom?
12 A    Yes.
13 Q    Now, did he come to you and advise you he was
14      going to retire for some reason?
15 A    No, ma'am. He just submitted the resignation
16      (sic) for retirement.
17 Q    And did you have any conversations with him about
18      that?
19 A    No, ma'am.
20 Q    And were you later asked to -- were you told he
21      was going to go work somewhere else?
22 A    I believe -- and, again, I don't remember who told
23      me -- but I believe he was considering employment

**Page 117**

1  A    I am trying to --
2  Q    What is this?
3  A    This is verification of employment.
4  Q    That you're asking someone else to verify?
5  A    Yes.
6  Q    Or they are asking you to verify?
7  A    We have -- if this came from our personnel file on
8       him, we should have one of these -- we should have
9       one of these from every place he's ever worked.
10 Q    Yes. Okay.
11 A    So, this would be verification of employment.
12 Q    Why would you have been doing this in May of 2004?
13 A    Actually, in May of 2004 -- in May of 2004, he --
14      I would have to ask Ms. Warren, Sheila Warren, why
15      we did one of these in May, 2004.
16          I do know that -- I do know that in one year,
17      it was either after the first year or the second
18      year, I received a call from a superintendent --
19      it may have been Monroe County -- requesting that
20      we release Mr. Coon to go to work for them.
21      Again, I don't remember if it was Monroe or who it
22      was. But we were inside the 45 days -- actually,
23      when he called, we were in -- actually -- I don't

Page 118

1    remember the exact dates. But he asked -- the
2    superintendent asked me to release Mr. Coon, so
3    that he could return to the school that he had
4    taught at previously. And that may have been --
5    he may have been in Monroe County prior to coming
6    to us. I don't recall. But he wanted -- the
7    superintendent down there wanted him to come back.
8    But it was inside the 45-day limit. And -- I
9    refused to release him. That's --
10 Q  Okay. All right.
11 A  And in anticipation of him being released, Sheila
12    may have done one of those for Monroe County.
13 Q  Is this your handwriting?
14 A  Yes.
15 Q  Okay. We'll go over that.
16        And is this your handwriting?
17 A  Yes.
18 Q  Okay. Okay. So, just to go to 2004-2005, did you
19    say earlier that Mr. Casey did not, to the best of
20    your recollection, report the smoking incident to
21    you?
22 A  I don't recall him doing that.
23 Q  So, what was the first report you had from any

Page 119

1    administrator regarding Mr. Coon in 04-05 --
2    negative? Let's put it that way.
3 A  The only -- Mr. McDaniel expressed his
4    frustrations with me about Mr. Coon. Or -- well,
5    it was -- he expressed his frustration about the
6    band program, overall band program. Not -- he was
7    frustrated with the discipline on the buses to and
8    from ball games. And he had stated that he had to
9    follow the bus or ride the bus.
10        So, Mr. McDaniel expressed with me some --
11    expressed some frustrations with me about the band
12    program in general. And that would the first time
13    anything came up as it related to Mr. Coon.
14 Q  When would this have been, what period of time?
15 A  Oh, it was during -- it was, you know,
16    mid-football season, probably October, November.
17 Q  Okay. Did Mr. McDaniel report the smoking
18    incident to you?
19 A  I don't recall that.
20 Q  Okay. Other than discipline on the buses, what
21    were Mr. McDaniel's other frustrations?
22 A  Uhm, that is the only thing that he -- that's the
23    only thing that he reported; that he was very

Page 120

1    frustrated with the band -- with the band students
2    and their -- and them not behaving themselves
3    properly, and those kind of things.
4 Q  And no complaints about Mr. Coon?
5 A  No. I mean, I assume from his comments that --
6    that he felt like some of the -- you know, the
7    buck stops with Mr. Coon when it comes to whether
8    the band is disciplined and doing what they are
9    supposed to do. So --
10 Q  "Doing what they are supposed to do", I mean, are
11    you talking about they are rowdy on the bus?
12 A  Well, you know, just the -- his big complaint was
13    the conduct of the students on the bus.
14 Q  So, what did you do in response to that?
15    Anything?
16 A  I didn't do anything in particular at that time.
17    I told them that we were -- you know, we were --
18    it was pretty clear that we were going to enter
19    into a transition period with new leadership; that
20    Mr. Casey was going to be leaving, and that at
21    some point in the spring that we would need to
22    evaluate the program.
23 Q  Did Mr. Casey have some kind of emotional

Page 121

1    breakdown?
2 A  No.
3 Q  You're not aware of him being treated for any
4    emotional problems?
5 A  No, ma'am.
6 Q  So, you said Mr. Casey -- we're in transition,
7    we'll deal with it later? I mean, is that --
8 A  No, I -- you know -- you know, the kids
9    misbehaving on the bus and those kind of things,
10    you know, I told him to continue to follow the bus
11    and monitor the situation. He spent a lot of
12    time -- Mr. McDaniel was a first-year principal --
13    or first-year assistant principal. And he ran
14    a -- he ran a real tight ship, he really did, in
15    terms of discipline. And his expectations were
16    very high in terms of student conduct. For
17    example, we made the Montgomery Advertiser that
18    year, because Mr. McDaniel cracked down on dress
19    code. That's the kind of person Mr. McDaniel is.
20    So --
21 Q  So, if we have heard comments that Mr. McDaniel
22    was brought in to clean up the situation at Pike
23    County High School; is that what you're talking

Page 122

1    about, disciplinary --
2  A  No.  Mr. McDaniel was employed to be the assistant
3    principal down there.  And I didn't know of
4    Mr. McDaniel prior to his employment down there.
5    I didn't know he was -- I didn't know whether he
6    would be an individual that would run a tight ship
7    or not.  After we employed him, it was pretty
8    clear that he -- that he was going to be the kind
9    of person who would run a tight ship.
10 Q  I want to talk about Mr. McDaniel for a minute.
11   Did Mr. McDaniel have any responsibility for
12   hiring of the faculty at Pike County High School?
13 A  No.
14 Q  Did he have any responsibility for training the
15   faculty at Pike County High School?
16 A  No.
17 Q  That would have been Mr. Casey's responsibility?
18 A  Mr. Casey.
19 Q  Did he have any responsibility for supervision of
20   personnel at Pike County High School?
21 A  Yes.
22 Q  That would include supervision of Mr. Coon?
23 A  It would include supervision of Mr. Coon.  And,

Page 123

1    also, he would have been expected to participate
2    in the annual evaluations, PEPE evaluations.
3  Q  Did he have any responsibility to develop policies
4    and procedures to address sexual-abuse issues?
5  A  No.
6  Q  Would he have any responsibility for investigating
7    complaints of sexual abuse?
8  A  He would -- I would expect him and any other
9    administrator to assist as directed by me to -- or
10   his immediate supervisor, the principal, and/or to
11   cooperate fully with law enforcement as it relates
12   to any of those kinds of investigations.
13 Q  At the school level, who was primarily responsible
14   for investigation of allegations of sexual abuse?
15 A  Well, sexual-abuse allegations that originate at
16   the school level, what we would expect would be
17   that the -- again, we have situations where
18   concerns were reported to teachers, and they go
19   straight to DHR.  And we have -- again, you're
20   talking about sexual abuse of a faculty member --
21   by a faculty member?
22 Q  Yeah.  And I am talking about what Mr. McDaniel's
23   responsibility was.

Page 124

1  A  As it relates to investigating an issue relating
2    to Mr. Coon, or any --
3  Q  Of sexual abuse by a faculty member.  I mean, was
4    that primarily Casey and/or Pyron's
5    responsibility, and anything Mr. McDaniel did was
6    under their supervision and control?
7  A  No.  I -- if they had any -- if they had any -- if
8    any of those three individuals had concerns about
9    the conduct of any of our faculty members, I would
10   expect them to let me know.  I would expect them
11   to -- because at that point, you know, that's
12   something that I need to know.
13 Q  Okay.  And I guess -- but that is not outlined in
14   any of these written documents we have looked at;
15   that procedure you just said?
16 A  No.
17 Q  Okay.  Now, after the band program frustration,
18   what was the next thing you heard about Mr. Coon?
19   Was that the Foster incident?  Or was there
20   anything else before that?
21 A  I think his -- what was the date on the Foster
22   situation?  November -- I think -- yeah, that was
23   November 22nd.  That's getting close to the end of

Page 125

1    the year -- close to the end -- right at
2    Thanksgiving time.  I think that's actually into
3    the playoff season.  So, his frustrations would
4    have been -- he would have told me his
5    frustrations earlier than this.
6  Q  The question is:  Is this the next thing you heard
7    about Mr. Coon of concern?
8  A  Yes.
9  Q  The Foster incident?
10 A  Uh-huh.
11 Q  And as I understand it, you didn't talk directly
12   with Mr. Coon about this?
13 A  Uhm, no.
14 Q  Now, what is the next issue or complaint that came
15   to your attention about Mr. Coon?
16 A  The only other -- the only other issue that I can
17   recall that school year that related to Mr. Coon
18   was -- and Ms. King, bless her heart, she is -- we
19   have gotten her kids through school.  And she --
20   it hasn't been without some trying times.  But she
21   had came to the school.  And I believe this was
22   in -- it would have been in January.  She came to
23   the school -- normally, the term ends in the third

Page 126

1    week of December.  First term would have ended in
2    December -- like December 18th or 19th.  And
3    report cards would have been distributed over in
4    January.  And it was my understanding that
5    Mrs. King at some point either around that time or
6    maybe even before that time had -- had came there
7    and was fussing with Mr. McDaniel about Mr. Coon.
8    And -- because her son, MAK -- Matt -- MAK had
9    received a poor grade in band program.  And --
10 Q   Was she claiming that some students were receiving
11     preferential treatment?
12 A   No.  She was mad because her son had not turned in
13     some equipment.  This was after the season, and
14     she was complaining that there was -- that he had
15     not turned in some equipment, and that because he
16     had not turned in that equipment, whether -- I
17     don't know if it was his uniform or whatever.  But
18     he had not turned it in, and it had reflected on
19     his grade.
20 Q   Now, did this come to your attention?
21 A   No, this came to my attention only later.  I had
22     not talked to her about that at all.
23 Q   You mean, later after --

Page 127

1  A   This was over in -- Mr. McDaniel told me about
2      this.
3  Q   At the time or later?
4  A   I think it was a little bit later.  I don't
5      remember.
6  Q   So, you didn't take any active role in that
7      complaint?
8  A   I didn't -- with Ms. King, no.
9  Q   Yes.
10 A   No.
11 Q   Then, what's the next thing you heard about
12     Mr. Coon?
13 A   That was it.  That's all.
14 Q   For the rest of the year?
15 A   Uh-huh.
16 Q   You never heard about these allegations that he
17     was giving the students Marijuana?
18 A   Oh, well, I did hear that.  That was over in --
19 Q   That's in April?
20 A   That was over in April.  Yeah.
21 Q   But between January, you said you didn't hear
22     about the January incident until later you said,
23     but you weren't clear where?

Page 128

1  A   Yeah, and I don't remember exactly when
2      Mr. McDaniel had that -- Ms. King came to him.
3      But January, February, March.  I didn't -- I had
4      not had no complaints.
5          (Whereupon, Plaintiff's Exhibit 13
6              was marked for identification and
7              is attached hereto.)
8  BY MS. DePAOLA:
9  Q   I am going to mark as Plaintiff's Exhibit 13 what
10     I understand to be your diary or notes.
11 A   Uh-huh.
12 Q   Is that accurate that that's some kind of planner
13     you have?
14 A   Yes, uh-huh.
15 Q   Now, January 5th, you have reference to Mr. Coon.
16     What was that about?  Item Number 15?
17 A   Uhm, I don't recall.  I mean, you know,
18     Mr. McDaniel had expressed enough frustration with
19     me about the band program.  We were in -- we were
20     in -- we were in the process, at that time, of
21     bringing in Mr. Pyron.  And I believe that note
22     there was to, you know, discuss with Mr. Pyron
23     that he needed to evaluate Mr. Coon and the band

Page 129

1      program during the spring of that year so that we
2      could make a decision as to whether he was the
3      right person to continue in that position.
4  Q   All right.  Is there anything else on that page
5      that relates to Mr. Coon or Justin Reed or any of
6      the allegations of sexual abuse that you have
7      heard since that time?
8  A   No.
9  Q   None of these legal matters relate to that?
10 A   No.
11 Q   All right.  You also have an entry on January 12th
12     that appears to relate to Charles Coon.  First of
13     all, could you read it to me, please?
14 A   Charles Coon requests professional leave 1/20,
15     1/21.
16 Q   And what's the 82506?
17 A   That's probably his extension.
18 Q   Do you know what that was for?
19 A   I don't recall.  He may have called me requesting
20     professional leave and wanted to ask me about
21     professional leave on the 20th and 21st.  I
22     can't -- my copies are color coded.  And -- they
23     are color coded.  And I could tell by the colors

## Page 130

1   what I did.  So, if it's color coded in green, I
2   could tell --
3   Q   Could you get that, and you can look at the color?
4       I mean, this is what I received.
5   A   (Witness Indicating.)
6       Okay.
7   Q   Do you have that here in the office?
8   A   Yeah, I've got about eight years of them.  So, I
9       would -- I mean, that's not going to be -- that's
10      something I will have to find.
11  Q   All right.  You also have a reference on
12      March 14th.  It's the next page to Mr. Coon, I
13      believe.  Is that correct?
14  A   Where is that?  Band -- at the bottom, yeah.
15  Q   What's that about?
16  A   Uhm, I don't recall.  These were -- Neil and Coon
17      were the two staff members.  Neil is at -- is at
18      the career tech center.  And, again, that's a
19      reference to making -- that we need to make sure
20      that when Pyron comes in that we evaluate that
21      program.
22  Q   Why would you be writing that on March 14th?
23  A   Well, again, we're -- in March 14th?

## Page 131

1   Q   Uh-huh.
2   A   I don't -- I don't recall.
3   Q   Now --
4   A   I mean, these were two -- these were -- those were
5       two individuals who we were concerned about their
6       performance in those programs.  These were two
7       important programs and --
8   Q   Okay.  Up above that, you have got a reference to
9       Butch Phelps.
10  A   That's correct.
11  Q   What does that -- does that have relationship to
12      this case?
13  A   Yes.
14  Q   What is that?
15  A   Butch Phelps called me on March 14th.  And the
16      left-handed check there indicates that I tried to
17      call him back on that date.
18  Q   And did he leave any message?
19  A   No.
20  Q   The next document that you produced was dated
21      March 30th.  Can you tell us what occurred that
22      caused you to make that entry there?
23  A   I think these are -- let's see here.

## Page 132

1   Q   I got the impression that you have like a
2       double-sided planner?
3   A   It is.  It is.  I was trying to figure out.  I
4       think it's like this (indicating).
5   Q   Okay.  So --
6   A   I think there are some pages in between here,
7       because -- I think there was some efforts in
8       between there where I attempted to call him back
9       that's documented.
10      But on March 30th, I finally heard from
11      Mr. Coon -- I mean, from Mr. Phelps.
12  Q   So, he returned your call on March 30th?
13  A   Uhm, no, actually I think I called him.
14  Q   You called him?
15  A   I think.
16  Q   Tell me to the best of your recollection the
17      substance of the March 30th conversation?
18  A   He told me that he had -- that he had received
19      some confidential information that he felt like I
20      needed to know about.
21  Q   And what did he say that information --
22  A   Or some -- actually, what he said was, I received
23      some information from a confidential informant
24      that I need to tell you about.

## Page 133

1   Q   Okay.
2   A   He told me that --
3   Q   And while he's talking, were you writing the stuff
4       that's on page 106?
5   A   Some of it, yes.  Well, yeah.
6   Q   Okay.  Go ahead and tell me what he said.
7   A   The -- he told me that -- he told me that his
8       informant had told him that Mr. Coon was -- that
9       there was an incident where Mr. Coon was using
10      Marijuana with students.
11  Q   Uh-huh.
12  A   I asked him where this was occurring at.  And he
13      said that the only incident that he -- the only
14      incident that the informant knew about was an
15      incident where kids were in -- kids were in --
16      there were some kids in his vehicle, I think three
17      other students.  And they were riding around and
18      smoking Marijuana.
19  Q   Who were those kids?
20  A   And I asked him to -- I asked him to give me the
21      names of the kids involved.  And he told me Adam
22      Helms, Jeron Senn, Levon Davis, Andrew Law, Thomas
23      Green.  And he did -- he did mention that that

Page 134

1    they were leaving during class time and had gone
2    to -- they had gone up to Hardees to get a
3    hamburger.
4  Q   So, he told you that Mr. Coon had one, two, three,
5      four, five, students with him in his truck; is
6      that what you said?
7  A   No. He -- you know, he didn't tell me a lot. I
8      mean, it came from a confidential informant. He
9      said that his informant had told him that they
10     were riding around in the truck smoking Marijuana.
11     And there was supposed to be three kids. And he
12     said, of course, that the kid that was reporting
13     to the confidential informant through that was
14     someone that didn't smoke any, but Mr. Coon and
15     the other kids did.
16 Q   I see you have Matt (sic) King's name there, too.
17     Is that in relation to this report from
18     Mr. Phelps?
19 A   Yeah. And I never did get a chance to go there on
20     the Polly King situation with the complaint back
21     in -- back around January or whatever about
22     Ms. King coming in and being frustrated. We kind
23     of stopped there.

Page 135

1      But Ms. King -- Ms. King had given a story
2    to -- one of the things that she -- parents tend
3    to start looking -- when they are mad at a
4    teacher -- start looking at reasons why the
5    teacher is a bad person. And one of the things
6    that Ms. King had said to Mr. McDaniel that
7    Mr. McDaniel relayed to me was that Mr. Coon
8    didn't need to be smoking with the kids down there
9    and riding around in the truck.
10 Q   Need to be smoking down where?
11 A   Did not need to be smoking --
12 Q   Down where?
13 A   -- down around the band room and with the kids in
14     the truck. And when I was sitting at my desk --
15     when I was sitting at my desk, and I was writing
16     down all these names. He did not give me the name
17     of Matt King. A bell went off in my head that
18     this story sounds like -- this story sounds
19     like -- this story sounds like a story I had heard
20     before.
21 Q   Okay. So, you just -- you came up with the name
22     Matt King?
23 A   Yes. That's, my --

Page 136

1  Q   And then up above that S. King or something
2      King -- oh, maybe that's smoking? What is that?
3  A   My writing is terrible. I don't know. It looks
4      like S. King or something.
5  Q   So, you just wrote that there. Did you discuss it
6      with Mr. Phelps, something about Polly King?
7  A   No, not yet. I didn't mention it to him at that
8      point.
9  Q   What else did he tell you?
10 A   That's pretty much all that he told me. I did --
11     I asked him, I said, well, Butch, do you know of
12     any other inappropriate conduct that may be going
13     on? I said, I need to know if there is anything
14     else. And he said -- he said, well, there is one
15     kid that the other kids make fun of that's
16     called -- and I said -- that they refer to him as
17     his -- they refer to this kid as being his best
18     buddy. And I said, well, is there -- do you know
19     anything about anything else that's not
20     appropriate? And he said, well, now the Marijuana
21     is -- the Marijuana is what I am calling you
22     about, the using the Marijuana -- the use of the
23     Marijuana.

Page 137

1  Q   You have got in there sexual favors, sex favors.
2  A   Yeah, he didn't say that. That's -- I wrote that
3      down kind of as a sexual favors question mark?
4      Is -- you know -- I mean, I --
5  Q   Was it at that point the alarms were going off?
6  A   Uhm, well, you know, I think -- I think what we
7      did shows a heightened sensitivity to these kind
8      of issues. I mean, it's -- you've got some
9      allegations kids -- he's smoking Marijuana with
10     them. And he's got a kid that other kids refer to
11     as butt buddy. It's not something we're going to
12     ignore.
13 Q   What did you understand butt buddy to mean?
14 A   Well, with kids, butt buddy could mean a lot of
15     things. We used to say, he's my right arm, or
16     he's my best friend or whatever. In kids'
17     terminology, butt buddy could be somebody's best
18     friend. And in other situations, it could mean
19     something else, in my opinion.
20 Q   Like homosexual intercourse, anal intercourse?
21 A   Well -- no, not that specifically. But, you know,
22     it certainly -- it certainly raised a red flag
23     with me. That, oh, oh, butt buddy. What is that

Page 138

1    about?  You know, that's --
2 Q    Well, did you take that to be a sexual
3       connotation?
4 A    Yes, I did.
5 Q    Okay.
6 A    At that point, I didn't even -- I didn't know
7       which student it was that --
8 Q    Was referred to that way?
9 A    -- was referred to.
10 Q   Now, I don't know which way these pages go, but on
11      the page, the facing page, you then listed these
12      one, two, three -- five names.  Was this done
13      after the conversation?
14 A    Yeah.  Yes, ma'am.  Yeah.
15 Q    And then at the top, you have written, Phillip
16      Faulkner, and cell phone.  What's that?
17 A    These are just the notes that I have -- just as --
18      you know, as we went through the week looking into
19      this, those are just the names -- you know -- you
20      know, we wanted to go back and look at the cell
21      phone situation.  I -- when you start putting all
22      the dots together over in -- when you start
23      putting the dots together over in March, you say,

Page 139

1       okay, what are the things back there that could
2       support some contention that inappropriate conduct
3       was going on?  So, these are the kids I wanted to
4       make sure that they talked to and looked into
5       those situations.  And that's what that is.
6 Q    Now, why is there a question by -- I can't read
7       this -- Levon Davis?
8 A    At some point in the process, I was not sure what
9       school he was at.  I wasn't sure if he was at
10      Banks or Pike County High, because he went to both
11      schools.
12 Q    So, when you received this information from
13      Mr. Phelps, what did you do?
14 A    I placed Mr. Coon on administrative leave.
15 Q    That's -- I mean, that's the first thing you did?
16      You didn't call the principal or -- I mean --
17 A    No.  I -- you know, I -- I -- you know, with that
18      information coming from law enforcement, even
19      though it was coming through a confidential
20      informant, it was not a situation that I was not
21      going to look at.  So, I placed him on
22      administrative leave.
23           (Whereupon, Plaintiff's Exhibit 14

Page 140

1            was marked for identification and
2            is attached hereto.)
3 BY MS. DePAOLA:
4 Q    Let me show you what I am going to mark as
5       Plaintiff's Exhibit 14 and ask you if that's the
6       letter you wrote placing Mr. Coon on
7       administrative leave.
8 A    That's correct.
9 Q    Did you have that hand delivered to him at school,
10      or what did you do?
11 A    I had him come to my office, and I handed it to
12      him.
13 Q    Did you have a conversation with him about it?
14 A    Yes.
15 Q    Did you call over to the school and direct them to
16      have him come to the office?
17 A    Uhm, yes.  Actually -- actually, I probably
18      composed this the night before.  When did I talk
19      to Mr. Phelps, on the 30th?  I would have composed
20      this letter right after that.  I probably had him
21      report to my office that morning instead of going
22      to school.
23 Q    And what conversation did you have with him that

Page 141

1       morning in your office?  Did you tell him what the
2       allegations are?
3 A    Yeah, I gave him the letter and told him what the
4       allegations are.  I did not -- I did not tell him
5       where the allegations came from, because, you
6       know, again, they came from a confidential
7       informant.  At that point, I was not going to tell
8       him that I was placing him on administrative leave
9       based on a confidential informant who may or may
10      not be reliable.
11 Q    What did he tell you about these allegations?
12 A    He denied these.  Denied them.  Denied them
13      completely.
14 Q    Did you ask him anything about the cell phone?
15 A    No, because that was not -- no, I didn't ask him
16      about that at that point.
17 Q    Did you consult with an attorney about this
18      matter?
19 A    I don't recall if I spoke with -- I don't recall
20      if I spoke with -- if I did, it would have been
21      Richard Calhoun.
22 Q    Do you have any --
23 A    I don't recall doing that.  But I may have.

Page 142

1  Q  All right. So, the first page of Plaintiff's
2     Exhibit 14 is the letter. Did you request that he
3     take a drug test?
4  A  I did.
5  Q  And did he agree to do that?
6  A  Uh-huh.
7  Q  Do you have any knowledge of how long, for
8     instance, Marijuana, remains in someone's system?
9  A  It's my understanding it's up to 30 or 45 days.
10 Q  And when did -- were you informed these incidents
11    occurred with the Marijuana use?
12 A  Uhm, you know, again, if -- he called me in March.
13    I mean, his first phone call to me would have been
14    in March. Actually, the first time he tried to
15    call me was in March. And so, you know, this is
16    April 1st. So, we're about two weeks out. So, my
17    assumption is, you know, based on that information
18    I had, was that this was something that happened
19    fairly recently. I could not --
20 Q  At least more than two weeks ago?
21 A  Possibly a little more than two weeks. I could
22    not imagine Mr. Coon -- I could not imagine
23    Mr. Phelps sitting on this for a month and a half

Page 143

1     before calling me.
2  Q  And the next two pages appear to be a drug report
3     indicating it was negative for Marijuana; is that
4     correct?
5  A  That's correct.
6  Q  And then the next page -- keep going one more
7     page. That is some handwritten notes. Is that
8     your handwriting?
9  A  That's my handwriting.
10 Q  Okay. Now, when were these generated?
11 A  During the investigation.
12 Q  Were you speaking with someone on the phone? Tell
13    me how you came to write --
14 A  I was speaking with -- well, the first one I was
15    speaking with Buddy Pyron on the phone.
16 Q  Okay. I'm not doing very well doing this. You
17    got Mr. Phelps' allegations on the phone. And you
18    immediately suspended Mr. Coon. He came to your
19    office. You suspended him and told him to go get
20    a drug test. What's the next thing that happened?
21    Let's do it that way.
22 A  Well, we -- I spoke with Carolyn Townsend. Spoke
23    with --

Page 144

1  Q  What did you tell Carolyn Townsend?
2  A  I gave her a list of names of students I wanted
3     her to speak with.
4  Q  Which of these students would Carolyn Townsend
5     have been directed to speak with?
6  A  Oh, well, we can go through these. Let me see.
7     Actually, there was only one -- there was actually
8     only one at her school.
9  Q  And who was that?
10 A  And that is Adam Helms. And that would be hers --
11    that's on Number 100.
12 Q  Those are her notes on 100?
13 A  Those are -- those are -- those are her notes.
14 Q  Well, tell me what you specifically asked her to
15    ask these students.
16 A  I told her that -- I told her that -- I told her
17    that we had an allegation that Mr. Coon was
18    engaged in inappropriate conduct with -- was
19    possibly involved in inappropriate conduct with
20    his students. And I said that the allegation is
21    that he used -- was using Marijuana with them --
22         (Brief interruption.)
23 Q  Sorry. Go ahead.

Page 145

1  A  I told her that -- I told her --
2  Q  I'm listening. I'm just going to turn it off.
3     It's my husband. He will call back.
4         (Off-the-Record discussion.)
5  Q  Go ahead. I'm sorry.
6  A  I asked her to -- I told her that the only student
7     that I knew at this point that was from her school
8     that I felt like needed to be talked to, but that
9     there may be others, but that I wanted her to
10    speak with Adam Helms.
11 Q  And did you define inappropriate conduct?
12 A  I told her that the allegation was that he was
13    smoking Marijuana with students.
14 Q  Did you bring up any other issues of possible
15    sexual abuse?
16 A  I told her that -- that I needed her to speak
17    with -- when you talk with Adam, to push him to
18    see if there was any other -- any other kinds of
19    things going on. And I said, I'm not sure -- I
20    think I told her I want to know who butt buddy is.
21    You know, at that point, I didn't know who butt
22    buddy was. I wanted to know who butt buddy was.
23 Q  Okay.

JR, A Minor                    July 24, 2007                    Pike County Board of Education

Page 146

1   A   And so, she was to push that. And I said, now, at
2       your school right now, there is only one person
3       you need to talk to. So, what I would like for a
4       you to do is talk to at least a couple of other
5       students about Mr. Coon and do it in the context
6       of -- do it in the context of -- of you're just
7       trying to get a feel for how the program is going.
8       And the other two students she picked to talk to
9       on that day are the ones that are in the notes.
10      They have no relationship to the situation.
11      Jessica Henderson and Lacey Hussey.
12  Q   Okay. Are those girls?
13  A   Yes.
14  Q   Okay. So, you directed her to find out who the
15      butt buddy was?
16  A   Well, I directed her to --
17  Q   To push that issue?
18  A   To push that issue, yes.
19  Q   Let me ask you this: What training in forensic
20      interviewing does Ms. Townsend have?
21  A   I don't know. I have no idea if she has any or
22      not.
23              (Brief off-the-Record discussion.)

Page 147

1   BY MS. DePAOLA
2   Q   Did you have anybody on staff that has training in
3       forensic interviewing?
4   A   No.
5   Q   Looking at page 100, you didn't interview any
6       children yourself?
7   A   I did not.
8   Q   And the only person you know of who interviewed
9       them was Ms. Townsend?
10  A   Yes.
11  Q   These three on page 100?
12  A   Yes.
13  Q   And did she just send this over to you, this
14      report?
15  A   I believe -- I believe she -- I don't know if she
16      emailed it or faxed it.
17  Q   Okay. Did you have a conversation with her about
18      this report?
19  A   Yeah. I called her back and told her that I had
20      received it. And that -- you know, we went
21      through the responses, because I wanted to make
22      sure that the responses that were on here
23      accurately reflected her -- accurately reflected

Page 148

1       the comments of the kids.
2   Q   Did you ask her to send over to you any notes she
3       had taken when she interviewed the kids?
4   A   No.
5   Q   Did she make any tapes of the conversations?
6   A   Not that I know of.
7   Q   There is nothing on here about butt buddy. Did
8       she pursue that issue with these kids?
9   A   I assume that she did.
10  Q   Did you ask her that?
11  A   I don't recall doing that.
12  Q   So, you really don't know what she asked them?
13  A   Well, I know -- all I know is what the responses
14      are to what --
15  Q   Okay.
16  A   -- that she sent to us.
17  Q   You didn't give her any specific direction about
18      questions to ask other than the push them on the
19      butt buddy and see if there is any issue of sexual
20      abuse?
21  A   Yeah. I asked her to push the Marijuana and butt
22      buddy.
23  Q   Now, did you inform any of the parents identified

Page 149

1       by Mr. Phelps that there is this ongoing
2       investigation?
3   A   I didn't. Now, at some point -- I don't think
4       that would be something we would do during the
5       investigation, because we certainly do not want
6       anybody to close ranks -- the kids to close ranks
7       and not talk to us. So, I know that -- I know
8       that the principals had conversations with some of
9       the parents. I don't know --
10  Q   Okay. Did Ms. Townsend have any conversations
11      with Adam Helms' parents?
12  A   I don't know.
13  Q   Did you have any conversations with any of the
14      parents?
15  A   No.
16  Q   Did Mr. Pyron or McDaniel have any conversations
17      with any of the parents?
18  A   I don't know that -- I don't know -- I don't know
19      for sure, but I -- well, let me put it this way:
20      I believe that Mr. McDaniel or Mr. Pyron, one or
21      the other, has told me that they did have
22      conversations with Mr. Faulkner.
23  Q   During this investigation?

JR, A Minor                                July 24, 2007                    Pike County Board of Education

| Page 150 |
|---|

1   A   At the conclusion of it.  And I think they -- I
2       think they -- yeah, at the conclusion of it.
3       Yeah.
4   Q   **What was the purpose of that conversation?**
5   A   Uhm --
6   Q   **You are not saying that Blake Faulkner was one of**
7       **the identified problems in this instance.  Why**
8       **would the principal have talked to Blake**
9       **Faulkner's father?**
10  A   Is it Blake Faulkner?  Yeah.  I am going to have
11      to look at my notes through this to maybe answer
12      that question.
13  Q   **Well, why you're doing that, would you mind**
14      **reading them out loud to me, because I can't read**
15      **them?  Just starting with underneath Cody Dunn's**
16      **store.  Does that say Cody Dunn's store?**
17  A   Yeah.
18  Q   **Read the rest there?**
19  A   It says Matt King -- or MAK King -- Buddy Pyron,
20      Robert McDaniel report the story was made by
21      mother of Matt King late first semester when she
22      was at school concerning Matt's grades.
23  Q   **Now, what does that mean?  Explain that sentence**

| Page 151 |
|---|

1       **to me.**
2   A   That the riding around in the car smoking
3       Marijuana is the same story that we had back in --
4       except it's transitioned from -- it's transitioned
5       from Polly King talking about -- with Mr. McDaniel
6       about smoking cigarettes to her talking with Butch
7       Phelps about it's now Marijuana.
8   Q   **So, they are telling you that -- or your**
9       **investigation indicated that during the first**
10      **semester Polly King had reported to Mr. McDaniel**
11      **that the kids were riding around smoking**
12      **cigarettes?**
13  A   Well, they connected -- I mean, Mr. McDaniel and
14      Mr. Pyron connected the dots just like I did
15      immediately when I told them this is what Butch
16      has said.  And, you know, the first thing that
17      came to mind with them --
18  Q   **Wait.  Butch who?  This is what Butch had said?**
19  A   Butch Phelps.
20  Q   **Okay.**
21  A   I'm sorry.  Mr. Phelps.
22  Q   **I'm sorry.  Say it again.**
23  A   What that says is that it -- this was made after

| Page 152 |
|---|

1       discussion with them, during discussions with
2       them.  Mr. Pyron, Mr. McDaniel, you know, as soon
3       as I gave them the information about what the
4       allegation was -- because I did tell them where it
5       came -- I did tell them where it came from.
6   Q   **I thought you didn't know.  I thought you said it**
7       **was a confidential source, and you didn't know?**
8   A   Well, I told them that it came from law
9       enforcement.
10  Q   **Okay.**
11  A   And they drew -- immediately drew the same
12      conclusions that that sounds like what Ms. King
13      said.
14  Q   **Last semester?**
15  A   Last semester.  So, she stated that this occurred
16      (inaudible) --
17  Q   **Okay.  Wait.  Wait.  Mary --**
18          THE WITNESS:  I'm sorry.  I forgot you
19              were trying to get all that down.
20  A   Buddy Pyron discussed with --
21  Q   **Where are you reading?**
22  A   I'm starting again.
23  Q   **Okay.  Can you just back up?  Made at the...**

| Page 153 |
|---|

1   A   Okay.  Made at the time Matt had D or F in band.
2   Q   **Okay.**
3   A   Stated -- she stated this occurred a month
4       earlier.  No explanation as to why she did not
5       report.
6   Q   **And we're still talking about the first semester?**
7   A   Why she didn't report -- yeah.  Why she didn't
8       report it earlier.  Buddy Pyron discussed with --
9       Chris -- but I think that means Matt.  In fact, is
10      his name Christopher Matt.
11          MS. ALLEN:  No, it's MAK, M-A-K.
12  A   MAK.  He denied seeing Marijuana used by anyone
13      only cigarettes.  And he denied any other
14      inappropriate activity or knowledge of this.
15  Q   **And are we talking about -- this is a report that**
16      **Mr. Pyron gave to you that he discussed it with**
17      **MAK?**
18  A   This is a summary I made -- yeah -- well, I was
19      speaking with him on the phone.
20  Q   **And writing?**
21  A   And writing, yeah.  Because we discussed
22      whether -- you know, you know, is it -- in fact,
23      in this conversation I said to Buddy, I said,

Page 154

1    Buddy, when I talk to Mr. Phelps again, Detective
2    Phelps whatever he is, I'm going to make him if
3    Polly King is his confidential informant.  I said,
4    I bet I know she is his confidential informant,
5    because the stories matched up so much.  And I
6    wanted to make sure that he had hit Matt (sic)
7    pretty good about the Marijuana and any other
8    inappropriate activity.
9  Q   Well, now, Mr. Phelps didn't tell you that anyone
10     alleged that MAK King had engaged in any of this,
11     did he?  Because he's not a listed person on
12     your --
13 A   No, but when Ms. -- when Ms. King made the
14     complaint to -- when Ms. King made the complaint
15     to Mr. McDaniel --
16 Q   First semester?
17 A   -- right -- right around the end of first
18     semester, beginning of second.
19 Q   Okay.
20 A   And it was probably second, because that's when
21     the report cards would have came out -- Ms. King
22     stated that Matt had witnessed that; and was in
23     the vehicle when they were smoking the cigarettes.

Page 155

1    But Matt didn't smoke.
2        Now that -- and, again, with it coming through
3    Mr. Phelps now, Matt wasn't there.  But because
4    the story sounded so much alike, I told them, you
5    know, you need to talk to Matt.  So, that's how
6    MAK, got into it.
7  Q   Now, what specifically did you direct -- did you
8      direct Mr. Pyron to conduct this investigation?
9  A   I spoke with both of them about it.  And I told
10     them I wanted the students interviewed.  And that
11     I would get back with them.  I needed, you know --
12     I needed some follow up in terms of whether
13     anything was going on.  Anything that was -- that
14     was of concern to them that -- I needed to follow
15     up from that.
16 Q   Well, did you tell -- are either of them forensic
17     interviewers?
18 A   No.
19 Q   Did you tell them to follow up on allegations or
20     issues relating to sexual abuse?
21 A   I told both of them just like I told Ms. Townsend
22     that -- I told them just like I told Ms. Townsend
23     that I wanted to know if they could find out who

Page 156

1    the student was that they were referring to as
2    butt buddy.
3  Q   Did you specifically mention you wanted to know if
4      there were any sexual activities involved?
5  A   I don't remember the exact words.  I think that
6      was made pretty clear; that I wanted to know
7      whether there was any indication that Marijuana
8      was being used; that -- or any other inappropriate
9      activity of any type, including inappropriate
10     sexual activity.
11 Q   So, did you have some suspicion as a result of
12     connecting all these dots that one or more of
13     these students may be being sexually abused?
14 A   I'm not sure which dots --
15 Q   Well, a minute ago you said you started connecting
16     the dots.
17 A   Well, I mean, I connect the dot -- I mean, you
18     know, basically standalone -- the cell phone
19     situation standing alone, to me, is not a red flag
20     considering the number of cell phones that are out
21     there.  Again, standing alone, that's not a thing.
22        The fact that Mr. -- the fact that
23     Mr. McDaniel has issues with the band --

Page 157

1    disciplining the band doesn't necessarily relate
2    to that kind of situation.
3  Q   Well, I think I am just using your phrase from
4      earlier you said you were correcting the dots.
5          MR. SWEENEY:  Let him finish his
6          explanation.
7  A   The -- you know, the -- the allegation that
8      Mr. Coon gave a bad grade to a student, because
9      he -- because he didn't turn in his band uniform.
10     And then we get this situation with Mr. Phelps
11     over in April that, again, comes from a
12     confidential informant who may or may not be
13     reliable.  You know, we have -- I believe that we
14     were very thorough and aggressive in the things
15     that we did in placing him on administrative leave
16     and in interviewing the number of students that we
17     interviewed.
18 Q   Did you at this point have some suspicion that
19     sexual abuse may be occurring?
20 A   No.
21 Q   Then why were you investigating it?
22 A   Well, what we were investigating -- we were
23     investigating whether there was any truth to the

Page 158

1    use of Marijuana. And --
2  Q    And such --
3  A    -- I wanted to know who butt buddy was. It would
4       not be -- again, maybe I am wrong. But the
5       information that I received from Mr. Phelps -- and
6       I think it's pretty clear where it came from --
7       that was Ms. King. And it was limited to the butt
8       buddy situation. So, I think it shows a
9       heightened sensitivity to the fact that we were --
10      you know, I wanted to know who butt buddy was.
11 Q    You had no suspicion, however, that any sexual
12      abuse had occurred?
13 A    No. I wanted to know -- I wanted to know who butt
14      buddy was.
15 Q    Because you thought it might refer to sexual
16      abuse?
17 A    I thought it might, because it obviously has a
18      sexual connotation, yes.
19 Q    Now, did you personally interview any of these
20      kids?
21 A    No.
22 Q    What is the reference to Cody Dunn's store there?
23 A    I don't -- I don't recall. I don't even know

Page 159

1       where Cody Dunn's store is.
2  Q    Is that your handwriting?
3  A    Yes.
4  Q    Was this -- were these notes made in relationship
5       to a conversation with Mr. Pyron or with
6       Mr. McDaniel?
7  A    Mr. -- these were made talking to Mr. Pyron.
8       Yeah, because they are -- the next pages have
9       those notes at the bottom.
10 Q    Now, did you direct him also to talk to Phillip
11      Faulkner -- Blake Faulkner?
12 A    Yes, I directed him to talk to all those students.
13 Q    Did you have some suspicion that Blake Faulkner
14      might be being sexually abused by Mr. Pyron?
15 A    I thought his name was on the original list of
16      people we needed to talk to. I would have to go
17      back and look.
18      Uhm, no -- and I will tell you the reason that
19      I -- was that I believe that I asked them to talk
20      to Blake -- to add Blake to the list, because he
21      was the one with the cell phone.
22 Q    What did that have to do with the Marijuana use?
23 A    Well, again, I believe trying to track down every

Page 160

1       lead that I possibly can that something
2       inappropriate might be going on.
3  Q    Such as sexual abuse?
4  A    Yes.
5  Q    So, you did have some suspicion that possibly
6       Blake Faulkner was being sexually abused?
7  A    Well, I had some suspicion that Blake would be
8       possibly the person that Butch was referring to as
9       the butt buddy.
10 Q    Can you read at the bottom of page 91 those notes
11      to us, please?
12 A    Sure. Buddy Pyron talked with student. No
13      information. Student cooperative. Denies
14      allegations. Parents approve of CC -- who is
15      Charles Coon -- and student spending time away
16      from school.
17 Q    So, now you knew also that they were spending time
18      together away from school?
19 A    Well, I knew that -- I knew that there were some
20      occasions where -- where Mr. Coon had taken him
21      home.
22 Q    All right. Did you know about the camping trips?
23 A    No.

Page 161

1  Q    When did you find out about those?
2  A    I didn't know that there was camping trips.
3  Q    How about fishing?
4  A    I had no idea.
5  Q    How about trips to Six Flags?
6  A    I have no idea they took trips to Six Flags.
7  Q    So, spending time away from school, the only thing
8       you understand that to be was driving him home?
9  A    No. Mr. Phillip Faulkner -- or Blake Faulkner's
10      father is Phillip Faulkner. And he is an Alabama
11      State Trooper. And I am not sure where he is
12      assigned now. But it was my understanding that he
13      was assigned Montgomery, Butler County area. And
14      they were divorced -- Phillip is divorced. The
15      mother lives in Montgomery County. Mr. Faulkner
16      lived in Bullock County. And Blake lived in Pike
17      County with grandparents. And it was my
18      understanding there were some times where -- where
19      Mr. -- I only found this out about this time --
20      that -- that Mr. -- that Mr. Coon had provided
21      transportation, so that he could -- so that Blake
22      could either meet his mother or meet his father
23      and that was with the permission of the mother and

Page 162

1     the father.
2  **Q   Meet Blake's mother and father?**
3  A    Yes. In other words, they were in a location away
4     from Pike County and that Mr. Coon would -- as
5     a -- to be helpful to the parents, he would carry
6     them to -- he would carry Blake to meet them.
7  **Q   You found that out as a result of this**
8     **investigation in March of '05?**
9  A    No. I think that was -- I think that was -- well,
10    that may have been during that time, because I
11    know I quizzed them about -- I quizzed them about,
12    you know, what's this about Blake going -- what do
13    you mean about being away from school? Because
14    again, that's what -- parents approve of CC and
15    student spending time away from school. He told
16    me that. And I was, what does that mean? What
17    does that mean "spending time away from school"?
18    And that's when he explained that the father was a
19    State Trooper. I know Mr. Faulkner. I've known
20    him since he was -- I know Blake's dad. I have
21    known him since he was 14 years old.
22 **Q   Would this conduct by Mr. Coon violate school**
23    **policy?**

Page 163

1         MR. SWEENEY: What conduct?
2  **Q   Transporting students.**
3  A    We don't have a policy concerning transporting
4     students. Our practice is to discourage -- our
5     practice is to discourage faculty members from
6     transporting students unless they are -- unless
7     it's an emergency situation. And the truth is
8     that we live in a rural -- we will in a rural
9     county. And there are many children, including
10    possibly the Reed children and many, many other
11    children who would not be able to participate in
12    programs like this if a coach didn't take them
13    home or band director take them home or debate
14    team teacher take them home or the drama club
15    teacher take them home.
16 **Q   Well, how about transporting a student across**
17    **county lines to visit their parents? Is that a**
18    **violation of school policy for teachers who do**
19    **that?**
20 A    No. There is no policy concerning transporting
21    students in county or out of county.
22 **Q   Okay. Now, why did you include in these documents**
23    **Phillip Faulkner's attendance records?**

Page 164

1  A    That wasn't pulled for any particular reason.
2     That was just when we ran the printout, it just
3     printed it out. I mean I -- I mean, you asked for
4     everything that we had. And I just --
5  **Q   Okay. Let's go over to page 095. Can you read**
6     **those notes to us? These relate to Jeron Senn.**
7  A    Confirmed smoking cigarettes with student. Saw
8     them leave campus together and smoking. Saw going
9     by house on several occasions.
10 **Q   Is that numerous occasions or several?**
11 A    Numerous. Saw him going by house on numerous
12    occasions, yeah. That refers to, again, Blake.
13 **Q   Oh, it says, Jeron Senn at the top.**
14 A    No, that's not -- that was not -- this refers to
15    Blake, because I think we were at some point
16    focusing in on Blake as the butt buddy.
17 **Q   So, you're saying that when Mr. Pyron interviewed**
18    **Jeron Senn that Jeron confirmed that Mr. Coon was**
19    **smoking with students?**
20 A    With a student.
21 **Q   With a student. And that Jeron Senn saw Mr. Coon**
22    **leaving campus and smoking with a student. And**
23    **you're saying that student was Blake Faulkner?**

Page 165

1  A    I don't recall who the student was. I would have
2     to ask Mr. Pyron.
3  **Q   And that Jeron Senn saw Mr. Coon going by Blake**
4     **Faulkner's home on numerous occasions? Is that**
5     **what this means?**
6  A    No, no. Let me -- I guess I need to back up and
7     start over. Jeron Senn, it was my understanding
8     that his statement was that, yes, he had seen
9     Mr. Coon smoking with a student. And that he also
10    saw Mr. Coon in a vehicle smoking with students,
11    or a student.
12 **Q   How about leaving campus?**
13 A    Yeah. Leaving campus together and smoking. Like
14    whether it was -- like when they said they were
15    going up to Hardees to get lunch, he saw them
16    leaving maybe going to Hardees to get something.
17    And that's when he saw them smoking.
18 **Q   What's the last thing? Seen going by home on**
19    **numerous occasions. What does that mean? Who is**
20    **going by whose home?**
21 A    I'm not sure where Jeron Senn lives, but he would
22    have seen them going by his house. That's the way
23    I took that; was that he saw them passing by his

## Page 166

1    house.
2    Q    Okay. The next page refers to Thomas Green. And
3         it just says, no knowledge. What's that
4         underneath it that's crossed out?
5    A    I have no idea.
6    Q    All right. Let's look at the next page. Andrew
7         Law. What does that say?
8    A    Uhm, BP. Something voc tech.
9    Q    What did he tell you about Andrew Law?
10   A    I don't recall.
11   Q    Back up. What did he tell you about Thomas Green?
12   A    He told me that Thomas Green had no knowledge of
13        the smoking -- smoking cigarettes or being
14        involved in smoking Marijuana. And he knew of no
15        other inappropriate conduct.
16   Q    All right. Look couple of pages over, Adam Helms.
17        It appears to say, see CT notes. What does that
18        mean?
19   A    CT. That's Carolyn Townsend.
20   Q    So, during this process, you personally spoke to
21        none of the kids; is that correct?
22   A    That's correct.
23   Q    You spoke to none of the parents?

## Page 167

1    A    I didn't.
2    Q    Okay. Well, do you know if Buddy Pyron or Carolyn
3         Townsend spoke to any of the parents in conducting
4         this investigation?
5    A    It was my understanding that they did. I'm -- I
6         don't know.
7    Q    Don't know? And the only person you spoke to was
8         Mr. Coon other than Buddy Pyron and Mr. McDaniel
9         and Carolyn Townsend?
10   A    No, I spoke with -- I spoke with -- I spoke Buddy
11        Pyron, Robert McDaniel. I spoke with Carolyn
12        Townsend. I spoke with Terry Casey. I spoke
13        with -- I spoke with Mr. Phelps about it. And I
14        spoke with Moses Davenport about it.
15   Q    All right. Now, with respect to Mr. Pyron, as I
16        understand, you directed him to make the
17        investigation. And you received the reports we
18        have just went over?
19   A    Yes.
20   Q    Did you have any other discussions with him about
21        it?
22   A    Not that I recall.
23   Q    And Mr. McDaniel, I don't know. What discussions

## Page 168

1    did you have with him?
2    A    I know that he was involved either directly or
3         indirectly in talking with some of the kids. I
4         don't know if they interviewed the kids together
5         or apart or --
6    Q    The question is: What conversations did you have
7         with Mr. McDaniel?
8    A    I don't recall.
9    Q    Don't know if you spoke with him about this at
10        all?
11   A    Oh, I'm sure I did.
12   Q    Because seems like he was the one most upset about
13        Mr. Coon.
14   A    Oh, I'm sure I did speak with him about it. I
15        don't recall specifically those conversations.
16   Q    Other than directing Carolyn Townsend to make this
17        report, what other conversations did you have with
18        her?
19   A    None.
20   Q    What conversations did you have with Terry Casey?
21   A    I asked him -- I asked him if he would -- as it
22        related to the Marijuana, did he ever have any
23        concerns that Mr. Coon may be using Marijuana or

## Page 169

1    drugs or those kind of things and whether he had
2    noticed any other inappropriate conduct.
3    Q    Did you bring up the butt-buddy question?
4    A    I don't recall that specifically.
5    Q    Did you bring up sexual abuse of any kind?
6    A    I don't recall that.
7    Q    What was Mr. Casey's response to your inquiry?
8    A    He told me that he had never had any suspicions
9         that Mr. Coon was involved in anything
10        inappropriate.
11   Q    Let me help ask you this -- and this is an
12        aside -- since this happened, have you heard that
13        Mr. Coon was involved in any inappropriate conduct
14        in any prior school systems?
15   A    No, ma'am.
16   Q    How about what was your conversations with
17        Mr. Phelps about the initial call that you
18        have already discussed with us?
19   A    I called him back and basically walked him through
20        everything that we had done. I told him that I
21        bet I knew who his confidential informant was.
22        And that I believed that his confidential
23        informant was Polly King -- that his confidential

## Page 170

1    informant was Polly King or somebody related to
2    Polly King. He did not confirm or deny that it
3    was her. But, you know, I discussed that with
4    him.
5  Q   Well, what significance was that?
6  A   I just thought it was -- you know, I just wanted
7    him to know that I had connected the dots on who
8    the confidential informant was, and that --
9  Q   Well, I mean, that's all you told him is, I know
10    who your confidential informant is?
11  A   No, I went through --
12  Q   What else?
13  A   I went through everything that we had, and I told
14    him that we had talked to all the kids that he had
15    suggested that we talk to. That he had tested
16    negative on a drug screen. And that unless he had
17    any more ideas about where the investigation
18    should go, anybody else that I needed to talk to
19    or -- that I would be glad to do that. But
20    that --
21  Q   Did he have any other suggestions?
22  A   No.
23  Q   So, on the last document in that pile of

## Page 171

1    Plaintiff's Exhibit 13 -- or maybe it's 14 -- is
2    that your letter to Mr. Coon?
3  A   In 13? This is 13? I think it's 14. Is it 14?
4  Q   Yes, sir.
5  A   Yes.
6  Q   And you said there is no evidence to substantiate
7    these claims. There certainly was evidence to
8    indicate he was smoking with students.
9  A   Well, I think that's in the next paragraph. It
10    says, the investigation did reveal numerous
11    reports that on several occasions you used
12    cigarettes with students.
13  Q   Okay. Did you indicate that transport off
14    campus --
15  A   Yeah. It says in the next paragraph, it says the
16    investigation revealed numerous reports of
17    students being transported in your personal
18    vehicle.
19  Q   Now, when did you inform DHR that you had these
20    suspicions relating to Blake Faulkner?
21  A   I didn't inform DHR. I reported back to the
22    source of the information, which was -- which was
23    Mr. Phelps, and I carried a complete packet -- I

## Page 172

1    carried a complete packet of everything at the
2    suggestion of Mr. Phelps to the Chief of Police in
3    Brundidge, Moses Davenport.
4  Q   Okay, now, a complete packet. Is that --
5  A   Everything.
6  Q   Is this Plaintiff's Exhibit 14?
7  A   Uhm --
8  Q   And 14 is this one (indicating).
9  A   The last page was not part of that.
10  Q   Okay. What is that last page?
11  A   That's where I summarized (Witness removing page
12    from staple) --
13  Q   Well.
14  A   Oops. I'm sorry. That's a bad habit. That
15    actually is where at some point I was interested
16    in summarizing -- going back and looking at his
17    employment -- I think that's where I went back and
18    looked at his --
19  Q   Okay. Let's go over that page. Maybe we should
20    take that one out that you're ripping out.
21  A   I apologize.
22  Q   So, let's mark this separately.
23  A   That's not really part of that, anyway. Or it

## Page 173

1    doesn't need to be.
2  Q   Let's mark this as Plaintiff's Exhibit 15.
3        (Whereupon, Plaintiff's Exhibit 15
4         was marked for identification and
5         is attached hereto.)
6  BY MS. DePAOLA:
7  Q   And just ask you to tell us what that is.
8  A   I don't remember when that was done. It may have
9    been after --
10  Q   At the top it says April 1, '05. That's the very
11    first entry on this document.
12  A   That's April 1, '05. That's when he was
13    suspended. There is not a date on this.
14        This might have actually been done after the
15    filing of this lawsuit. It might have been just
16    me going through looking at his -- at his
17    preemployment history.
18  Q   What would make you write there, eight different
19    systems?
20  A   Because he was employed in eight different
21    systems.
22  Q   Did you think that made you suspicious about him?
23  A   Not really, because for coaches and band

---

Page 174

1    directors, they tend to bounce around.  More --
2    important to me was the fact that he was tenured
3    in three -- he was tenured in three systems.  He
4    was tenured in Crenshaw County, Butler County, and
5    Dallas County.
6  Q   Did you ever call anybody in any of these other
7      systems where he only served one year to find out
8      why he was bouncing around?
9  A   Did I?
10 Q   Yeah.
11 A   I was not Superintendent at that time.  I was not
12     involved in that process.
13 Q   No, I mean when you were doing this investigation?
14 A   Oh, no.
15 Q   You've also produced in relation to this lawsuit,
16     it looks like a grade book.  Does that have any --
17       (Brief interruption.)
18 A   These are just his grade books.
19 Q   Did you pull them at the time of the investigation
20     to see who his students were?
21 A   Did we pull these?
22 Q   Uh-huh.
23 A   No.  No.

---

Page 175

1  Q   Did you make any effort to determine if there were
2      any special ed kids in his classes?
3  A   No.
4      I mean, it's more than likely -- it's more
5      than likely in a small school like ours that the
6      band is very small and that we're going to have
7      special ed football players, special ed band
8      members, special ed baseball players.
9  Q   Did you conduct any kind of separate or additional
10     investigation with respect to his relationship
11     with the special ed kids during this April
12     investigation?
13 A   Uhm, no.
14 Q   When did you become aware that Justin had
15     Mr. Coon's cell phone number?
16 A   I didn't know he did have it.
17 Q   Okay.  And you mentioned transporting the students
18     to Hardees.  Did you say someone reported he was
19     transporting a student or students to Hardees for
20     lunch?  I don't know if you were making that up as
21     an example.
22 A   No, no.  It was -- I think it was in -- one of the
23     notes.  I would have to go back and look.

---

Page 176

1      That's in the original call from Mr. Phelps.
2      I think it says, buy him -- buy -- buy lunch or
3      buy him lunch.  Class time, Hardees, it says
4      there.  That's where that came from.
5  Q   I'm sorry.  Is that this little thing up there?
6  A   Buy him lunch.  Class time.  Hardees.
7  Q   I see.  Are you saying -- I'm sorry; I don't
8      understand -- are you saying Mr. Phelps told you
9      that Mr. Coon was buying students lunch at
10     Hardees, or that this is another thing that sprang
11     to your mind?
12 A   No, no.  That's -- no, I think he told me that.
13     That -- that they were buying each other lunch.  I
14     mean, I -- I mean, I don't --
15 Q   And on March 30th, again, just to make sure I
16     understand everything here, what does this say?
17     And does this have any relation to any of --
18 A   My diary, unfortunately, is not an exact science.
19     But, Al Griffin is our technology coordinator.
20     And it says no MT, which was probably
21     manufacturing -- no manufacturing technology -- no
22     manufacturing -- MT is manufacturing technology.
23     B and I is probably business and industry.  And I

---

Page 177

1      can't read what the last one is.  But that's some
2      reference to career technical education.  And it
3      probably has to do with Mr. Neil, because Mr. Neil
4      was the career technical teacher.
5  Q   Now, when you wrote this letter to Mr. Coon, did
6      you call him into your office, or just mail it to
7      him, or what did you do?
8  A   No, I met with him.
9  Q   What was the substance of your discussions with
10     him?
11 A   I mailed -- I sent him a letter.  But I also
12     called him in and handed him the letter and told
13     him that I was going to place him back to work.
14     But that -- we would continue the investigation.
15     And that if additional information came -- came to
16     our attention, that we would certainly be
17     revisiting his situation.  And that -- I notified
18     him that I had passed on all this information to
19     law enforcement.
20 Q   Okay.  Tell me about your conversation with
21     Mr. Davenport.  When did this occur and --
22 A   It was -- I don't know the exact date.  I would
23     suspect that it was -- it actually would have

Page 178

1   probably been the date that I put him back to
2   work.
3  Q   Was it Mr. Davenport --
4  A   Chief Davenport --
5  Q   -- you said you gave a complete packet?
6  A   Chief Davenport. I personally went to the
7      Brundidge Police Department. We went into his
8      office. I sat down with him. I briefed him on
9      the situation. And gave him a packet of the
10     information.
11 Q   All right. And did he make any recommendations to
12     you?
13 A   No.
14 Q   Did he indicate he was going to do anything
15     further?
16 A   No, not at that time. I told him that we would be
17     glad to -- if he felt like there was anything else
18     that we could do or needed to be done, we would be
19     glad to assist him with that. But that we -- I
20     was not sure what else we could do at this point,
21     given the lack of information that we had.
22 Q   So, you still felt uncertain as to the truth or
23     falsity of the allegations?

Page 179

1  A   Ah, yes.
2  Q   Let's look on Plaintiff's Exhibit 13. I want to
3      go to the next entry. Following March 30th, I'm
4      not sure where this goes with.
5  A   That's the opposite side of --
6  Q   Is that the opposite side of April 4th, or do you
7      know?
8  A   That's the opposite side of April 4th.
9  Q   What's that number 3 with Coon next to it and a
10     phone number? What does that signify?
11 A   I think that was his phone number. I think he had
12     called me and left me his phone number to call
13     him. I --
14 Q   Did you call him?
15 A   I don't recall. I -- you know, he -- you know,
16     may have been that he was wanting to know what his
17     status was going to be. What is -- I am not sure
18     what day of the week April 30th is. But
19     Wednesday, April -- let's see, April 30th. That
20     would -- that could have been on a Friday. He may
21     have been wanting to know, you know, can I come
22     back to work?
23 Q   The next date I see Mr. Coon's name is April 4th.

Page 180

1  A   That's the same -- the same Neil and Coon that's
2      been running throughout the entire calendar.
3  Q   What were you going to do about Mr. Coon on
4      April 4th, Mr. Coon?
5  A   Well, we weren't going to do anything about him.
6      Those were two programs. Neil's program was
7      automotive technology program that we were not --
8      that was not -- I felt like the automotive
9      technology program was not performing up to
10     standards, and I had concerns about the band
11     program down there. And I knew we needed to
12     follow up and discuss those programs.
13 Q   All right. Go to the next page. There is a
14     reference here to Mr. Coon. Can you tell me what
15     caused you to write this down?
16 A   This is just some additional notes that were taken
17     during the investigation. We were -- you know, it
18     identifies Adam Helms as a Banks student. Andrew
19     Law, Pike County High. This is -- see, Lavine
20     Davis, again, has got the question mark by it,
21     Pike County High. We were just going through --
22 Q   Under the PCHS, what does that say under there
23     patio band? Or what does that say?

Page 181

1  A   Not in band.
2  Q   Okay. Not in band? Then below that you've got
3      blank Faulkner.
4  A   That's Blake. It said, Blake Helms. And it was
5      actually Blake Faulkner.
6  Q   Well, up above that, it's crossed out something
7      Faulkner?
8  A   Well, again, we were trying to match up names of
9      who was who. And I think it was Blake Helms and
10     something Faulkner. There was a cross up in the
11     first name and the last name.
12 Q   And then under Matt King, you have got
13     parentheses, mother. Then what does it say under
14     that?
15 A   Cigarette smelled like something.
16 Q   Well, that's what I want to know. What does it
17     say?
18 A   I have no idea.
19 Q   All right. Can you get your original documents
20     out and provide Mr. Sweeney with a translation of
21     what that says at the bottom of 0109?
22     MR. SWEENEY: Not right now, but we will
23     get that to you.

Page 182

1      MS. DePAOLA: Yeah, that's what I am
2      asking you to do.
3  BY MS. DePAOLA
4  Q   All right. In the lower left, what does that say?
5      Not told until --
6  A   Not told until he had an F. In band is what that
7      was.
8  Q   In other words --
9  A   That refers to Matt King's mother.
10 Q   Didn't tell you all this stuff?
11 A   Didn't tell us all this stuff about the cigarette
12     smoking until Matt had gotten an F in band.
13 Q   All right. April 11th, it appears you had a
14     meeting with Butch Phelps?
15 A   That's the day I talked to him.
16 Q   And on April 13th, you have got a reference to
17     Charles Coon. What's that?
18 A   That was probably a call from bookkeeping. That's
19     probably an internal call from bookkeeping wanting
20     to know how to code his absences.
21 Q   I see. Did you, at any time, provide any training
22     regarding sexual abuse issues to any of the
23     parents of your students?

Page 183

1  A   I don't recall us doing that. We have a fairly
2      decent community education program and parent
3      education program. Ms. Grubbs runs that program
4      and may have done that. I don't specifically
5      recall that.
6  Q   Okay.
7      MS. DePAOLA: Can we take a quick break?
8      (Brief recess.)
9  BY MS. DePAOLA
10 Q   Dr. Bazzell, have you reviewed the answer that was
11     filed on your behalf to the complaint?
12 A   Ah, yes.
13 Q   And do you deny that Justin Reed was sexually
14     abused?
15 A   Let me see what numbers and all you're referring
16     to.
17 Q   Okay. Paragraph 25 of the complaint and 25 on
18     your right is your answer. Twenty-five is the
19     question, and 25 is your answer.
20 A   Twenty-five? I -- I have no knowledge -- I have
21     no knowledge -- I have no knowledge and have seen
22     no information relating to whether he was abused
23     or not.

Page 184

1  Q   You haven't?
2  A   No.
3  Q   You haven't looked into it?
4  A   I haven't, no.
5  Q   You don't know that Mr. Coon pleaded guilty to
6      sexual abuse of Justin Reed?
7  A   I know that he pled guilty to that. But I have no
8      direct knowledge of that.
9  Q   Do you have any basis for denying it when you know
10     that there is a plea of guilty for same?
11 A   I have no knowledge of it.
12 Q   Of the guilty plea?
13 A   I have no knowledge even to what he pled guilty
14     to.
15 Q   And you have conducted no investigation in
16     conjunction to your responses to this complaint?
17 A   Uhm, no.
18     MS. DePAOLA: I don't have any further
19     questions. I would like to reserve
20     the right to -- if we cannot
21     understand the responses that were
22     submitted with respect to those
23     items we have identified that you're

Page 185

1      going to produce, we want to resume
2      as to those items for Mr. --
3      THE WITNESS: What were those?
4      MR. SWEENEY: Are you going to
5      specify --
6      MS. DePAOLA: I did during the
7      deposition.
8      MR. SWEENEY: For clarification, if you
9      will write me what you want from us,
10     that will be helpful.
11     MS. DePAOLA: I didn't write it all
12     down. It will be in the deposition.
13     I'll review it when it comes down.
14     EXAMINATION
15 BY MR. SWEENEY
16 Q   Dr. Bazzell, you have shared information about
17     Charles Coon in the deposition today. Have you
18     had any relation with Charles Coon outside the
19     line and scope of your employment as
20     Superintendent of this system?
21 A   No, sir.
22 Q   And with regard to every conversation,
23     communication, or correspondence between you on

Page 186

1    the one hand and Mr. Coon on the other, was that
2    always done within the line and scope of your
3    professional employment as Superintendent?
4    A    Yes.
5    Q    Have you had any personal or social relation of
6    any kind with Charles Coon?
7    A    No.
8    Q    Have you had any relationship with Justin Reed
9    outside of your official position as
10   Superintendent of this school system?
11   A    No.
12   Q    At any time prior to Mr. Coon's retirement, did
13   the name of Justin Reed come up as someone that
14   had been abused or potentially abused by Charles
15   Coon?
16   A    No.
17   Q    During April when you were investigating the
18   information Butch Phelps had given you, did Justin
19   Reed's name ever surface?
20   A    No.
21   Q    So, prior to what was reported in the summer of
22   2005, whatever Charles Coon admitted to, did you
23   have any information from any source that would

Page 187

1    have led you to be suspicious of conduct between
2    Charles Coon and Justin Reed?
3         MS. DePAOLA:  Object to the form.
4    A    No.
5    Q    Huh?
6    A    No.
7    Q    Okay.  After Butch Phelps called you with the
8    information that he did, how soon after that did
9    you put Charles Coon on administrative leave?
10   A    Immediately.
11   Q    So, you didn't waste any time --
12   A    No, sir.
13   Q    -- to take action in that regard?
14   A    No, sir.
15   Q    How seriously did you take the investigation
16   concerning the information that Butch Phelps
17   provided you?
18   A    We took it seriously.  And we acted, I believe,
19   aggressively in placing him on administrative
20   leave and reviewing -- and investigating the
21   matter.  I mean, I think it -- given -- given the
22   information we had, I think it -- I think what we
23   did shows a heightened sensitivity to the

Page 188

1    possibility, Number 1, that he was smoking
2    Marijuana, or alleged to be smoking Marijuana,
3    and/or that he may be engaged in other
4    inappropriate activity.
5    Q    To what extent did you try to collaborate and
6    cooperate with law enforcement officials
7    concerning this information from Butch Phelps?
8    A    Well, we took every -- we took all the information
9    that they gave us and did everything we could with
10   it and reported back to them and asked for
11   additional guidance in terms of whether we needed
12   to do anything else.  We took all the information
13   that we had and turned it over to a second law
14   enforcement agency and provided them all the
15   information and briefed them on what we had done.
16   Q    Did Butch Phelps or anyone from his department
17   ever request that you do anything further than
18   what you did?
19   A    No, we did -- we did everything that we felt like
20   they wanted us to do.
21   Q    Did Chief Davenport or the Brundidge police ever
22   suggest that you do anything more than what you
23   did after you reported to them?

Page 189

1    A    No.
2    Q    When you asked your principals to talk to these
3    students as a follow up to the information that
4    Butch Phelps gave you, why did you think it was
5    appropriate for the principals who knew the
6    students to talk to them rather than you?
7    A    Well, it's -- well, for a number of different
8    reasons.  Number 1, they are -- you know, they are
9    charged with that responsibility of conducting
10   those investigations and assist with gathering
11   information.  So, it's appropriate for them to do
12   that.
13        Number 2, I felt like the kids would be more
14   open in talking with them and more trusting in
15   talking with them than it would be for me, someone
16   they don't know, to come down there and start
17   asking, you know, a lot of questions when they
18   don't know me.
19   Q    In making that decision, were you using your
20   professional discretion as to what you thought
21   would be the most effective way to get information
22   from the students?
23   A    Yes.

JR, A Minor                         July 24, 2007                    Pike County Board of Education

49 (Pages 190 to 191)

Page 190

1        **MR. SWEENEY: Thank you very much.**

2

3            (Whereupon, at approximately, 4:30

4            p.m. on the 24th day of July, 2007

5            the deposition was concluded.)

6

7

8                    * * * * * * * * *

9        FURTHER DEPONENT SAITH NOT

10                  * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 191

1

2            REPORTER'S CERTIFICATE

3

4    STATE OF ALABAMA

5    MONTGOMERY COUNTY

6

7        I do hereby certify that the above and foregoing

8    transcript of deposition of MARK BAZZELL, EdD, was

9    taken down by me in machine shorthand on the 24th of

10   July, 2007, and the questions and answers thereto

11   reduced to writing under my personal supervision, and

12   that the foregoing represents a true and correct

13   transcript of the proceedings given by said witness

14   upon said hearing.

15       I further certify that I am neither of counsel nor

16   related to the parties to the action, nor am I any wise

17   interested in the results of said cause.

18       Dated this 10th day of August, 2007.

19

20       _____

21       Mary Moore-Wynn

22       Certified Shorthand Reporter

23

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                          CASE NO.:

                   2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF TERRY CASEY, taken before Mary

Moore-Wynn, as Commissioner, on the 24th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 12:00

noon.


\* \* \* \* \* \* \* \* \*

**Page 2**

```
 1          * * * * * * * * * *
 2              APPEARANCES:
 3   FOR THE PLAINTIFF:
 4   Hon. Susan DePaola
         Attorney at Law
 5       1726 West 2nd Street, Suite
         Montgomery, Alabama  36104
 6
 7   and
 8   Hon. Deanie Allen
         Azar and Azar
 9       260 Washington Avenue
         Montgomery, Alabama  36104
10
11   FOR THE DEFENDANT:
12   Hon. Donald B. Sweeney
         Bradley, Arant, Rose & White
13       One Federal Place
         1819 Fifth Avenue North
14       Birmingham, Alabama 35203
15
16   ALSO PRESENT:
17   Dr. Mark Bazzell
18
19
20
21
22
23
```

**Page 4**

```
 1   the trial of this case or used in any other manner by
 2   either party hereto provided for by the Statute,
 3   regardless of the waiving of the filing of same.
 4        It is further stipulated and agreed by and
 5   between counsel and the witness that the reading
 6   and signing of the deposition by the witness is
 7   hereby waived.
 8                    INDEX
 9   TERRY CASEY
10   Examination By Ms. DePaola              5
         Examination By Mr. Sweeney          59
11   Further Examination By Ms. DePaola      61
12   Reporter's Certificate              63
13              INDEX OF EXHIBITS
14   Exhibit Number     Description     Page Number
15   Plaintiff's Exhibit 7  Composite Exhibit    10
                  Including Application for
16                Employment (Coon)
         Plaintiff's Exhibit 8  2004-2005 Faculty     23
17                Handbook
         Plaintiff's Exhibit 9  School Safety Plan    26
18   Plaintiff's Exhibit 10  All Pike County    35
                  Board of Education Record
19                Relating to David Foster Incident
20
21
22
23
```

**Page 3**

```
 1
 2         * * * * * * * * * *
 3
 4
 5
 6              STIPULATIONS
 7
 8        It is hereby stipulated and agreed by and between
 9   counsel representing the parties that the deposition of
10   TERRY CASEY is taken pursuant to the Federal Rules of
11   Civil Procedure, and that said deposition may be taken
12   before Mary Moore-Wynn, CSR, as Commissioner, without
13   the formality of a commission; that objections to
14   questions, other than objections as to the form of the
15   questions, need not be made at this time, but may be
16   reserved for a ruling at such time as the deposition
17   may be offered into evidence, or used for any other
18   purpose by either party hereto, provided by the
19   Statute.
20        It is further stipulated and agreed by and between
21   counsel representing the parties in this case, that the
22   filing of the deposition of TERRY CASEY is hereby
23   waived, and that said deposition may be introduced at
```

**Page 5**

```
 1                TERRY CASEY
 2        (Whereupon, the witness, after having first been
 3   duly sworn to speak the truth, the whole truth, and
 4   nothing but the truth, testified as follows:)
 5                  EXAMINATION
 6   BY MS. DePAOLA
 7   Q   My name is Susan DePaola.  I represent Justin Reed
 8       in the lawsuit filed against you and the Pike
 9       County Board of Education.  This is Deanie Allen.
10       She is my co-counsel.
11   A   (Witness Indicating.)
12   Q   Could you give us your street address, please,
13       your home address?
14   A   200 Reynolds Street.
15   Q   200 what?
16   A   Reynolds.
17   Q   Oh, Reynolds.  In Brundidge?
18   A   Brundidge, Alabama, 36010.
19   Q   And where are you currently employed?
20   A   I'm under contract with Ozark City Board of
21       Education.
22   Q   You're on a contract?
23   A   (Witness Indicating.)
```

Page 6

1   Q   To do what?
2   A   Principal.
3   Q   At what school?
4   A   Carroll High School.
5   Q   And you began that position when?
6   A   Two years ago.
7   Q   Okay.  So, in July of 2005?
8   A   July of 2005.
9   Q   Now, you left the Pike County Board of
10      Education -- I don't know when you left.  Did you
11      leave in the middle of the year?
12  A   December, 2004.
13  Q   And why did you leave?
14  A   It was -- I was tired, stressed, and ready to
15      change.
16  Q   Tired and stressed and ready for a change?
17  A   (Witness Indicating.)
18  Q   Any of that stress related to your position as
19      principal?
20  A   There is always stress in a principal's position.
21  Q   So, between December of 2004 and July of 2005,
22      where were you employed?
23  A   I worked for myself.

Page 7

1   Q   What were you doing?
2   A   Carpentry work.
3   Q   Okay.  Now, have you ever been under treatment for
4       any psychiatric --
5   A   No, ma'am.
6   Q   -- issues?
7   A   No, ma'am.
8   Q   Never seen a psychologist or psychiatrist?
9   A   No, ma'am.
10  Q   Ever seen any medical doctors for any of these
11      issues that you just brought up; stress?
12  A   No, ma'am.
13  Q   So, you just tendered your resignation in December
14      of '04?
15  A   Yes, ma'am.
16  Q   Without any other employment with a school system
17      in sight; is that right?
18  A   Yes, ma'am.
19  Q   Had you decided to leave education?
20  A   At that point in time, yes.
21  Q   Okay.  How long were you employed in the Pike
22      County school system?
23  A   Seven and a half years.

Page 8

1   Q   And can you tell me what your employment was --
2   A   Principal.
3   Q   Were you always the principal?
4   A   Principal, Pike County High School.
5   Q   Now, did you know Charles Coon before you came to
6       Pike County?
7   A   Yes, ma'am.  I knew of him.
8   Q   How did you know of him?
9   A   I was the Vocational Director in Butler County.
10      And that is Greenville.  And that is where he
11      lives.  And he was working in the school system at
12      that time.
13  Q   Now, have you ever heard of any allegations of
14      sexual improprieties relating to Mr. Coon?
15  A   No, ma'am.
16  Q   Not --
17          MR. SWEENEY:  You mean, since this
18          allegation?
19  A   Since this.
20  Q   Prior to this allegation?
21  A   Prior to this, no, ma'am.
22  Q   And since these allegations arose, have you
23      learned that there were other allegations of

Page 9

1       sexual improprieties?
2   A   I have heard that, yes.
3   Q   Who did you hear that from?
4   A   Well, I have heard it from this incident here.
5       Dr. Bazzell called and told me about that.
6   Q   Okay.
7   A   The incident which he was charged in Butler
8       County, I was told.  I was not with the school
9       system.  Someone told me.  I forgot.  I think I
10      heard it on the news or something and asked
11      someone about it.
12  Q   You're talking about the Blake Faulkner case?
13  A   Yes, ma'am.  And of that, that's all I know.
14  Q   All right.  So, you haven't heard from any other
15      source, any rumors or information that he had ever
16      had similar allegations against him in any other
17      school system?
18  A   No, ma'am.
19  Q   Now, were you the person who actually contacted
20      him to come work in Pike County?
21  A   He had filled out an application for employment,
22      yes, ma'am.  And as a principal, I did all the
23      interviewing and made the recommendation to the

Page 10

1    superintendent for all teachers.
2  Q   Let me just show you what I would like to mark as
3      Plaintiff's Exhibit 7.
4            (Whereupon, Plaintiff's Exhibit 7
5            was marked for identification and
6            is attached hereto.)
7          MR. SWEENEY:  You marked this -- I'm
8            sorry, Susan -- as...
9          MS. DePAOLA:  Plaintiff's Exhibit 7.
10  BY MS. DePAOLA
11  Q   And, actually, it's a composite exhibit.  So,
12      let's look at some of it and see what you can
13      identify.  The first four pages of that, is that
14      what you're referring to when you said you were --
15      his application for employment?
16  A   This is the application of the Board, yes.
17  Q   For Charles Coon?
18  A   According to what's on the page, yes, ma'am.
19  Q   Have you ever seen this before?
20  A   I have seen his application, yes, ma'am.
21  Q   Well, to the best of your knowledge --
22  A   To the best of my knowledge, this looks like the
23      one I seen, yes, ma'am.

Page 11

1  Q   I notice on there that this application was filled
2      out -- well, there is an indication it was filled
3      out on June 5th, 1996.  Do you see that?  Where
4      did I see that?  It's hard to read upside down.
5      Right there (indicating).
6  A   Okay.
7  Q   And then it's crossed out and says 7/2000.  Do you
8      know what that is about?
9  A   All I would know is unless he had filed
10      application here before, and they just renewed his
11      application.
12  Q   Is that your handwriting on the 7/2000?
13  A   No, ma'am.
14  Q   Okay.  Well, when he applied -- when did he apply
15      that you talked to him?  Was it in 2000?  Because
16      you said it was --
17  A   Yes, ma'am.  It would have been --
18          MR. SWEENEY:  Didn't we stipulate it was
19            July of 2002?
20  A   2002.
21  Q   But I want to know if there is another application
22      that follows this application for employment,
23      which is dated '96 and 2000.

Page 12

1  A   I wouldn't know.
2          MS. DePAOLA:  Is there any other
3            applications, Donald?
4          MR. SWEENEY:  I don't know of any other,
5            other than what we have provided to
6            you.
7  BY MS. DePAOLA
8  Q   So, to the best of your knowledge, this is the
9      document that was in front of you when you
10      interviewed Mr. Coon?
11  A   Yes, ma'am.
12  Q   Well, did you ask him for any update of his
13      application since this was two years old at that
14      time?
15  A   At this point in time that I talked with him, I
16      read through this and talked to him about what he
17      was doing, because he was employed in another
18      school system at that time.
19  Q   Which school system?
20  A   Shields over in -- what's that -- T.G., T.J.
21      Shields over in West Alabama.
22  Q   T.J. Shields?
23  A   I think that's right.

Page 13

1  Q   Is that a public school?
2  A   Yes, ma'am.
3          THE SUPERINTENDENT:  I think it's J.F.
4  A   J.F.
5  Q   What did he tell you his reason for leaving was?
6  A   To get closer to home.
7  Q   All right.  Now, did you check any references on
8      Mr. Coon?
9  A   Yes, ma'am.
10  Q   Which ones did you check?
11  A   Having known him or known of him in Butler County.
12      I also talked with the principal at the high
13      school in which he was currently serving.
14  Q   Who was that?
15  A   I don't remember his name.
16  Q   So, the principal at the Shields High School,
17      you're saying?
18  A   Gave him a very good recommendation.
19  Q   All right.  Anybody else you talked to?
20  A   No, ma'am.
21  Q   Is there any policy or procedure handed down from
22      the central office as to what references you were
23      to check?

## Page 14

1 A   There is now. But I -- we always checked
2     references if -- you know, if we knew the people,
3     we always checked the references if they came from
4     a different school system.
5 Q   Was there any written policy --
6 A   Yes, ma'am.
7 Q   -- that you are aware -- let me finish my
8     question -- that told you who to check references,
9     which references to check?
10 A  Not that I am aware of.
11 Q  So, it's kind of discretionary with you which ones
12    you checked?
13 A  As long as I checked references. I was told to
14    check references.
15 Q  And that was extent of your instruction?
16 A  Pretty much.
17 Q  Who gave you that instruction?
18 A  The Superintendent that hired me.
19 Q  Was that Dr. Keys?
20 A  Yes.
21 Q  Did you receive any different instruction from
22    Dr. Bazzell?
23 A  That we were -- that is the time that we were

## Page 15

1     going under Lee versus Macon, and we were changing
2     all employment processes. And we did have a
3     policy for dealing with employment at that time.
4 Q   What policy did you have with respect to checking
5     references?
6 A   That we had to document the references that we
7     checked and show documentation of those references
8     and so forth.
9 Q   But they didn't tell you which one to check?
10 A  We just had to check references.
11 Q  The ones that were listed by the applicant, or
12    were you free to check other references at your
13    discretion?
14 A  We could check others at our discretion.
15 Q  Okay. Let's go to page 5 of Plaintiff's
16    Exhibit 7. And I'll ask you, did you ever see
17    this letter dated 1997 where Mr. Coon applied for
18    the position of assistant principal, were you
19    aware of that, at Goshen school?
20 A  I had -- I knew that he had applied for principal
21    and assistant principal at several school systems;
22    I didn't know particularly Goshen. Or I don't
23    remember.

## Page 16

1 Q   Let's look at the next item. Did you review this
2     vita that he apparently provided?
3 A   I can't remember, to be honest with you.
4 Q   Did you raise any questions about why he had
5     worked in so many school systems?
6 A   I don't remember, to be honest with you.
7 Q   So, essentially, you knew of him from prior
8     employment?
9 A   (Witness Indicating.)
10 Q  Did you conduct an interview with him?
11 A  I did.
12 Q  And you talked with the principal at Shields High
13    School about him?
14 A  I did.
15 Q  Is there anything else you did in the interview
16    and hiring process?
17 A  Not that I can remember.
18 Q  And then are you authorized to actually hire --
19 A  No, ma'am.
20 Q  -- or do you just make the recommendation?
21 A  I just make the recommendation.
22 Q  And you make that recommendation to -- is it
23    Dr. Key or Mr. Key?

## Page 17

1 A   Dr. Key.
2 Q   Did you make that recommendation to Dr. Key or to
3     Dr. Bazzell?
4 A   That would have been -- I think that would have
5     been Dr. Bazzell.
6 Q   Okay. All right. Is that a written
7     recommendation you made?
8 A   Yes, ma'am.
9 Q   Is there a form, or do you write a letter, or how
10    do you do that?
11 A  If I'm not mistaken, we do a thing -- we just do a
12    memo to Dr. Bazzell making recommendation -- or
13    the Superintendent making recommendations.
14        MS. DePAOLA: Do you have any such
15             document?
16        MR. SWEENEY: You would have gotten it
17             if we had one.
18        MS. ALLEN: Is this it?
19 BY MS. DePAOLA
20 Q   Let me show you page 007 produced by the Pike
21    County Board of Education. It's dated July 22nd,
22    2002. Is that your recommendation regarding
23    hiring?

Page 18

1  A  I would say so.
2  Q  Okay. And then does the Superintendent actually
3     interview the candidate?
4  A  That's totally the discretion of the
5     Superintendent.
6  Q  Did he interview Mr. Coon?
7  A  I am not aware.
8  Q  Mr. Casey, what training have you received from
9     Pike County with respect to sexual abuse;
10    recognizing and dealing with sexual abuse?
11 A  In training for the sexual abuse, or recognizing
12    sexual abuse, other than the educational training
13    I got with my degree, you know, we have had --
14 Q  Okay. Let's stick with Pike County, and then I'll
15    go back to your degree. What training did Pike
16    County provide to you?
17 A  We have had -- Dr. Bazzell and Dr. Key both during
18    institute would talk about the topic. They
19    wouldn't dwell on it. They would just mention the
20    topic. To be aware of it and so on and so forth
21    to protect the children as they go through their
22    institute day and --
23 Q  "Wouldn't dwell on it", I mean, you would say they

Page 19

1     would mention be careful of sexual abuse?
2  A  Be on the lookout for it. Make kids aware of it.
3     When we read the handbooks to them first day of
4     orientation, to make sure that they know what to
5     do and who to report it to. Those are just, you
6     know, things that we need to make sure we cover.
7  Q  Is that it? Is that the training?
8  A  No, ma'am. We -- the principals in many cases we
9     have had where articles would come out, and we
10    would read the articles and have discussions with
11    those with the faculty.
12 Q  Tell me any of those that you can recall --
13 A  I don't.
14 Q  -- doing with the faculty. Let me finish my
15    question. Are you saying you have discussed
16    sexual abuse with the faculty at Pike County High
17    School?
18 A  Yes, ma'am.
19 Q  And you read articles to them?
20 A  I didn't read articles to them.
21 Q  What are you saying you did as far as training
22    with faculty relating to sexual abuse?
23 A  I just highlighted the faculty, went over points

Page 20

1     to be looking for, or things to be looking for, as
2     signs of sexual abuse, based off articles we have
3     read or information that we have received.
4  Q  What were those points?
5  A  I don't remember all of those points.
6  Q  Do you remember any?
7  A  Just if a child came in -- not only sexually
8     abused, but physically abused, we discussed that
9     with the topic. If they came in with bruises. Or
10    if they came in reporting things to the teacher, a
11    lot of kids would talk to the teachers. They
12    would confide to the teachers that they needed to
13    report that immediately to the counselor or to
14    myself.
15 Q  This sounds very generic. I don't hear you
16    telling me that you provided any structured
17    training on sexual abuse.
18 A  Are you talking about a workshop?
19 Q  Yeah. Sure.
20 A  No, ma'am, I never did that in faculty meeting.
21 Q  Did you provide them any written materials on
22    sexual abuse?
23 A  No, ma'am.

Page 21

1  Q  Did you direct them as to, these are the
2     procedures to use when you suspect sexual abuse?
3  A  Yes, ma'am.
4  Q  What were those procedures?
5  A  If they suspected it, they were to contact either
6     myself, personally, or the counselor. And then we
7     would investigate it from that point on.
8  Q  And what were they supposed to look for to tip
9     them off that sexual abuse was taking place? Just
10    bruises? Is that what you're saying?
11 A  No. What I am saying is if a child came up and
12    told a teacher of abuse --
13 Q  Okay. So, if the victim reported it?
14 A  Reported it, this is the procedure you are to
15    follow.
16 Q  What if the victim didn't report it, and they
17    saw -- what suspicious signs should they be
18    looking for to identify sexual abuse is occurring?
19 A  I can't answer that question.
20 Q  Now, you have made some reference to the handbook.
21    And as I understand it, you were responsible for
22    producing a faculty handbook and a student
23    handbook if you so choose to do?

Page 22

1   A   Right.
2   Q   If you so chose to do.
3   A   Right.
4   Q   Let me ask you to look at some documents and tell
5       me for 2004-2005 whether your faculty handbook is
6       contained in those documents. There is several
7       faculty handbooks in there. So --
8   A   (Witness Indicating).
9   Q   Now, what we're looking for is the 2004-2005
10      faculty handbook.
11  A   Uh-huh.
12  Q   Okay.
13  A   Okay.
14  Q   Let me get rid of these. These are not 04-05; is
15      that right?
16  A   Not according to the cover.
17  Q   And let me look at these, please.
18  A   (Tenders documents).
19  Q   You have identified documents 522 through document
20      561 as being the 2004-2005 faculty handbook; is
21      that correct?
22  A   Based on the dates of the pages, yes, ma'am.
23  Q   Okay. And I am going to mark this -- let me put

Page 23

1       the sticker on the front -- Plaintiff's Exhibit 8.
2           (Whereupon, Plaintiff's Exhibit 8
3           was marked for identification and
4           is attached hereto.)
5   BY MS. DePAOLA
6   Q   Were you the author of that document?
7   A   Pretty much, yes, ma'am.
8   Q   Was it your responsibility to promulgate that
9       document?
10  A   Yes, ma'am.
11  Q   All right. Is there any reference in there
12      whatsoever to sexual abuse, policies, procedures,
13      prohibitions?
14  A   I didn't see any at the time I glanced through it.
15          MR. SWEENEY: Take your time and look
16          and see, if you will, Mr. Casey.
17  A   Okay.
18          MS. DePAOLA: What was the question,
19          again, Ms. Wynn?
20          (Whereupon, the requested material
21          was read by the Court Reporter.)
22  BY MS. DePAOLA
23  Q   Now, did you produce during 04-05 any kind of

Page 24

1       student handbook?
2   A   I think we had the student planner.
3   Q   So, nothing other than what's in the planner?
4   A   (Witness Indicating.)
5   Q   Is that correct?
6   A   Yes.
7   Q   And whatever is in the faculty handbook, I would
8       assume that was distributed only to faculty
9       members?
10  A   Right.
11  Q   Now, your attorney has also produced something
12      called a school safety plan?
13  A   Yes, ma'am.
14  Q   Could you tell me -- and there is three of them
15      here. I'm just trying to identify which was the
16      one -- I'm looking for 04-05.
17          If there was one, I'm not sure there was one.
18      I am just asking.
19  A   Student -- the safety plan?
20  Q   Yes.
21  A   I would think there would be one. It's a
22      requirement of the State.
23  Q   Is that it for 04-05?

Page 25

1   A   I can't be sure. It's not a date on it. But
2       basically -- the school safety plan was put
3       together, the original. And then all we did was
4       update each year with new information or anything
5       required by the State.
6   Q   For the 04-05 school safety plan, was it different
7       in that respect from any document?
8   A   If there were guidelines from the State asking for
9       more information or whatever, it would have been,
10      yes, ma'am.
11          MS. DePAOLA: Okay. Donald, can you
12          tell us what date that document is
13          for so we know whether that's the
14          applicable document?
15      MR. SWEENEY: I don't have that
16          information.
17      MS. DePAOLA: Can your client tell you
18          that?
19      MR. SWEENEY: I'm sure we can get that
20          if that's your request. I just --
21      MS. DePAOLA: Well, let's get it now, so
22          we don't have to --
23      MR. SWEENEY: Let's go off the Record

Page 26

1          for just a minute.
2          (Brief-off-the-Record discussion.)
3    BY MS. DePAOLA
4    Q   Let me go ahead and mark this as Plaintiff's
5          Exhibit 9.
6                (Whereupon, Plaintiff's Exhibit 9
7                was marked for identification and
8                is attached hereto.)
9    BY MS. DePAOLA
10   Q   Did you actually prepare this document, or who
11         prepared it?
12   A    I worked on it.  I had a leadership team that
13         worked with me on it.  Coaches worked with me.
14   Q   And who was this submitted to?
15   A    Dr. -- to the Superintendent -- or Ms. Berry, or
16         whoever was in charge.
17   Q   Was it distributed to the parents?
18   A    No, it was distributed -- no, ma'am.
19   Q   Who was it distributed to?
20   A    To teachers.
21   Q   So, every teacher received a copy of Plaintiff's
22         Exhibit 9?
23   A    The school safety plan, yes, ma'am.

Page 27

1    Q   Okay.  Okay.  We will come back to this.  Let me
2          ask you about your employment history.  Just give
3          me a complete summary of since you graduated from
4          college as it relates to educational employment?
5    A    My first employment was at Escambia County Board
6          of Education.
7          MR. SWEENEY:  Which one?
8    Q   When?
9          THE WITNESS:  Escambia.
10   A    In '81, 1981.  I was hired there at the what they
11         called the Voc tech, to teach marketing and
12         education.  And from there, I went in --
13   Q   How long did you stay there?
14   A    Six years, seven years.
15   Q   Okay.
16   A    Then I went into business for myself.
17   Q   What business was that?
18   A    Men's retail.
19   Q   Okay.
20   A    And then from there, I went to Greenville for a
21         year to fill in for a teacher to teach --
22   Q   What year was that?
23   A    Uhm -- '80 -- '90.

Page 28

1    Q   In the early '90's?
2    A    (Witness Indicating.)
3    Q   Late 80's, early 90's.  How long did you do that?
4    A    For A year.  And then I went to Phenix City.
5    Q   Okay.  What were you teaching there?
6    A    I taught marketing.
7    Q   How long did you stay there?
8    A    Three years.  And then I went back to Butler
9          County as vocational director.
10   Q   Okay.  How long did you stay there?
11   A    Three years.
12   Q   Okay.
13   A    Then I came to Pike County as principal of Pike
14         County High.
15   Q   So, seven years?
16   A    Seven and a half years.  And then I -- for six
17         months, December 2004, I was employed by myself.
18   Q   Okay.
19   A    And then in '05, I went to Ozark City.
20   Q   So, you haven't been an employee in Pike County
21         since you left in December of '04; is that right?
22   A    Yes, ma'am.
23   Q   Did Mr. Coon come with you from Greenville at the

Page 29

1          same time, or did he come after you?
2    A    No, ma'am.  He came after me.
3    Q   Okay.  On -- now, while you were the principal at
4          Pike County High School, did you have an occasion
5          to know Justin Reed?
6    A    Justin Reed was a 9th grader my last year there, I
7          think it was.
8    Q   All right.  And what did you know about him?  Was
9          he --
10   A    Well, I knew his older brother and his sister.  I
11         knew his parents.
12   Q   Okay.  I mean, academically, did you know
13         anything?  Did you know he was in special
14         education?
15   A    Yes, ma'am.
16   Q   Okay.  And did you know he was in the band?
17   A    Yes, ma'am.
18   Q   Now, are you familiar with the term "grooming" as
19         it relates to sexual predators?
20   A    I am aware it, yes, ma'am.
21   Q   What does it mean to your understanding?
22   A    Preparing to work up to a sexual event with a
23         person.

---

**Page 30**

1  Q   Okay. And what are some of the activities that
2      would be described as grooming activities?
3  A   Joking around with them. Teasing. In some cases,
4      it could be even looked at as sexual harassment,
5      things of that nature.
6  Q   Anything else? I mean "things of that nature" is
7      too broad. What other grooming activities are you
8      familiar with?
9  A   Minor touching. That's all.
10 Q   Okay. Well, how about giving kids gifts?
11 A   That can be perceived that way, yes, ma'am.
12 Q   Did you understand this back in 2004-2005 that
13     that could be a grooming activity?
14 A   Yes, ma'am.
15 Q   How about calling them at home on the telephone?
16 A   If that happened, that could be, yes, ma'am.
17 Q   How about providing them with cell phones?
18 A   Wouldn't that be a gift?
19 Q   Would you agree that might be a grooming activity?
20     You understood that to be a grooming activity?
21 A   It could have been, yes, ma'am.
22 Q   How about providing them with cigarettes?
23 A   That could be perceived as that.

---

**Page 31**

1  Q   All right. How about transporting them in a
2      private vehicle?
3  A   I wouldn't necessarily think that would be that.
4  Q   Okay. Are you saying it could be could or
5      couldn't be? Could be perfectly innocent?
6  A   Could be perfectly innocent, yes, ma'am.
7  Q   How about having children spend the night at your
8      house? Would you understand that to be a grooming
9      activity?
10 A   Depending on the context in which they were
11     spending.
12 Q   So, you can think of instances in which it would
13     be appropriate for a teacher to have their
14     students spending the night at their house?
15 A   I know of several incidents in which several
16     teachers have; cheerleader sponsors, and things of
17     that nature.
18 Q   And you don't understand that to be a grooming
19     activity?
20 A   I don't think that it's necessarily a grooming
21     activity.
22 Q   But it could be?
23 A   It could be.

---

**Page 32**

1  Q   How about taking children on overnight trips?
2      Could that be a grooming activity in your
3      understanding?
4  A   Taking a child over an overnight trip?
5  Q   Uh-huh.
6  A   Depending on the circumstances of the trip.
7  Q   It could be, or it could be innocent?
8  A   It could be. It could be innocent. We have kids
9      who go off with faculty on band trips and
10     competitions.
11 Q   All right. I would assume you are aware that
12     children with -- who are mentally retarded are at
13     an increased risk of sexual abuse?
14         MR. SWEENEY: Object to the form.
15 Q   Would that be a fair assumption of your
16     understanding?
17         MR. SWEENEY: Object to the form.
18 A   I would say that -- not necessarily at a higher
19     risk.
20 Q   You don't know that?
21 A   I am saying to the elements in which -- and
22     articles in which I have read.
23 Q   Oh --

---

**Page 33**

1  A   And being a principal through magazines and
2      articles and things that based on the
3      information -- depending on where the information
4      came from, and who was doing the source and who
5      was doing the study and how they wanted that study
6      to show up.
7  Q   Tell me any article you have read that indicates
8      my statement is incorrect? Any article.
9  A   I don't know --
10 Q   Any source?
11 A   I don't know any --
12 Q   Any author?
13 A   I don't know. Just articles in magazines.
14 Q   Can you provide those articles to Mr. Sweeney?
15 A   No, ma'am. Those things that come through the
16     office and go.
17 Q   So, it's your testimony that you have read there
18     is no indication that children who are mentally
19     retarded are at an increased risk of sexual abuse?
20 A   Not just point blank, no, ma'am.
21 Q   So, what is the first time that you received any
22     information about Mr. Coon engaging in any
23     activity that you thought was inappropriate or

---

Page 34

1      required an investigation by you?
2  A   Just when I was told he was smoking on campus.
3  Q   When was that? I guess you left in December of
4      '04, so it was prior to December of '04?
5  A   Yes, ma'am.
6  Q   Who told you that?
7  A   Some students.
8  Q   Do you recall who they were?
9  A   No, ma'am.
10 Q   None of them? You can't recall any of them?
11 A   No, ma'am. Just had some kids come and say, Coon
12     is down there smoking.
13 Q   Where was he smoking?
14 A   Down there at the band hall, which is on campus.
15 Q   Did you conduct an investigation?
16 A   I did.
17 Q   What did you do?
18 A   I went down and spoke to Mr. Coon about the
19     situation and explained to him that the school
20     policy was that there was no smoking on the
21     grounds. And that he should follow those
22     policies, or we would have to take further action.
23 Q   Were any students smoking with him?

Page 35

1  A   No, ma'am.
2  Q   So, the only allegation was that he was smoking on
3      the school grounds; is that correct?
4  A   Yes, ma'am.
5  Q   You don't recall who those kids were?
6  A   It was just a group of kids.
7  Q   And were there any other incidents that wre
8      reported to you of anything that you thought was
9      inappropriate while he was working at Pike County?
10 A   No, ma'am.
11 Q   I'm sorry. While you were working at Pike County?
12 A   No, ma'am.
13 Q   Were you there when the incident occurred with
14     David Foster?
15 A   David Foster?
16 Q   The choking incident.
17 A   I don't remember that.
18 Q   You don't remember it?
19 A   No, ma'am.
20         (Whereupon, Plaintiff's Exhibit 10
21          was marked for identification and
22          is attached hereto.)
23

Page 36

1  BY MS. DePAOLA
2  Q   I'm going to mark this as Plaintiff's Exhibit 10.
3      Ask you if that refreshes your recollection in any
4      way?
5  A   Okay.
6  Q   Does that refresh your recollection at all?
7  A   Yes, ma'am.
8  Q   What do you recall about this incident?
9  A   I remember -- I remember talking with Mr. Coon
10     about it. And he told me that he grabbed him.
11     And that he didn't mean to choke him or anything,
12     but he grabbed him and that -- if I am not
13     mistaken -- I don't remember all the details to
14     it, but if I am not mistaken -- I had a meeting
15     with the Fosters about the situation.
16 Q   Okay. Did you consider his conduct inappropriate
17     in that --
18 A   Well, no teacher should grab any child.
19 Q   So, you considered it outside of the bounds of
20     normal discipline?
21 A   Yes, ma'am. You don't grab a child.
22 Q   Look on page 3 of that Plaintiff's Exhibit 10.
23     There appears to be a handwritten note to you from

Page 37

1      Mr. Bazzell?
2  A   Uh-huh.
3  Q   Can you read that to yourself? Did you provide
4      him with any written statements from Mr. Coon or
5      the student?
6  A   I don't really remember, to be honest with you.
7  Q   Okay. The next page in this exhibit appears to be
8      a letter from Mr. McDaniel. Did he take over the
9      investigation or --
10 A   Mr. McDaniel was my assistant at that time.
11 Q   Yes, sir.
12 A   And he may have worked with the case, also.
13 Q   Okay. Have you ever seen the note from
14     Mr. McDaniel to Dr. Bazzell?
15 A   No.
16 Q   Pardon?
17 A   I don't remember seeing it, no,ma'am.
18 Q   How about the next page of this document; have you
19     ever seen that letter to Dr. Bazzell from
20     Mr. McDaniel?
21 A   I don't remember.
22 Q   Did you just sort of hand off the investigation to
23     Mr. McDaniel?

Page 38

1          MR. SWEENEY: Object to the form.
2   A   Mr. McDaniel looked into the investigation along
3       with myself. And we worked it together.
4   Q   Okay. Look through the rest of that and see if
5       there is anything else that you produced or that
6       you recognize in that exhibit.
7   A   All right. What's the question?
8   Q   Any indication that you had any further
9       participation in this incident from these
10      documents?
11  A   No, ma'am.
12  Q   Did you investigate Mr. Coon's mental stability in
13      any way after this incident?
14  A   No, ma'am.
15  Q   Would it be fair to say that choking a student was
16      probably a pretty extreme form of punishment in
17      Pike County High School in 04-05?
18          MR. SWEENEY: Object to the form.
19  Q   You can answer it.
20  A   I don't think any child should be choked.
21  Q   But you didn't investigate his mental stability as
22      a result of this incident?
23  A   No, ma'am.

Page 39

1   Q   Okay. Now, were you aware that Justin was being
2       released from class to go down to the band room
3       during the day?
4           MR. SWEENEY: Object to the form.
5   A   No, ma'am.
6   Q   You weren't aware of that?
7   A   No, ma'am.
8   Q   Do you know about it now?
9   A   I have heard about it, yes, ma'am.
10  Q   What have you heard?
11  A   I heard he went down to the band room.
12  Q   Who told you that?
13  A   It was in discussion with my attorney. That's
14      all.
15  Q   But your testimony is you weren't aware of it at
16      all during 2004?
17  A   No, ma'am.
18  Q   Okay. Did you ever see Mr. Coon driving J.R. or
19      any other students around in his vehicle?
20  A   Personally?
21  Q   Yes, sir.
22  A   Not that I am aware of. Not that I remember,
23      either.

Page 40

1   Q   Did you hear about it --
2   A   I --
3   Q   -- during 2004 before you left?
4   A   I know that Mr. Coon along with coaches and others
5       took students home after band practices or
6       football practices or whatever.
7   Q   So, you were aware of that during 2004?
8   A   Yes, ma'am.
9   Q   Any other incidence in which Mr. Coon was driving
10      students around in his vehicle that you heard
11      about or personally witnessed?
12  A   None that I am aware of. None that I can
13      remember. Let me put it that way.
14  Q   Did you become aware that at some point that
15      Mr. Coon was taking students on overnight trips?
16  A   No, ma'am.
17  Q   Never became aware of that in 2004-2005.
18      Were you ever aware that he had provided any
19      of his students with his personal cell phone
20      number?
21  A   The only cell phone incident I am aware of is the
22      one with Blake.
23  Q   All right. Tell me about that incident.

Page 41

1   A   All I know about that is we picked up a cell phone
2       from a student which was policy. And it turned
3       out to be Mr. Coon's.
4   Q   So, this would have been prior to December of '04
5       when you left?
6   A   Yes, ma'am.
7   Q   Okay. How did you come to pick up Blake's cell
8       phone?
9   A   He was using it on campus. And Mr. McDaniel, the
10      assistant principal, saw him using it and picked
11      it up.
12  Q   All right. And what was done about it?
13  A   Same thing we do with any other. We try and
14      contact the parents about it and retain possession
15      of the cell phone.
16  Q   Now, you testified earlier you knew that giving a
17      student a gift like a cell phone was a grooming
18      activity. What did you do with respect to the
19      possible sexual abuse implications of this gift?
20  A   At that time, I did not think it was sexual in any
21      way.
22  Q   Why?
23  A   From my understanding from Mr. McDaniel who picked

Page 42

1   it up, the young man was just using the telephone
2   to call somebody.
3   Q   So, in other words, although you know this may be
4       a grooming activity, you didn't look into it any
5       further?
6   A   No, ma'am.
7   Q   You did not?
8   A   No, ma'am.
9   Q   Okay. Did you talk to Mr. Faulkner?
10  A   Mr. McDaniel talked to him.
11  Q   Did you get a report back about this from
12      Mr. McDaniel?
13  A   I'm sure I did.
14  Q   What was the substance of that report?
15  A   I don't remember.
16  Q   Okay. Did you ever become aware that Mr. Coon had
17      provided cell phones to any other student?
18  A   No, ma'am.
19  Q   Did you ever become aware that Mr. Coon was
20      providing cigarettes to any students?
21  A   No, ma'am.
22  Q   All right. And I may have already asked you this:
23      But were you ever aware that Mr. Coon had provided

Page 43

1       students with his personal phone number?
2   A   No, ma'am.
3   Q   All right. So, you didn't meet with Mr. Faulkner?
4   A   No, ma'am.
5   Q   Did you notice when you reviewed Mr. Coon's
6       application that he had multiple employers; a
7       large number of educational employers?
8   A   Yes, ma'am.
9   Q   Did you make any inquiry into why that was?
10  A   I don't remember.
11  Q   Are you aware that that may be an indication of a
12      sexual predator?
13          MR. SWEENEY: Object to the form.
14  A   No, ma'am, I was not aware of that.
15  Q   Did you raise any questions about the gaps in his
16      employment?
17  A   No, ma'am.
18  Q   Did you contact any personnel in this process, in
19      this interviewing process, other than the
20      references given by Mr. Coon?
21  A   Personnel?
22  Q   Did you contact any references other than the ones
23      identified by Mr. Coon?

Page 44

1   A   Not that I remember.
2   Q   Okay. All right. So, from what date did you quit
3       in Pike County? December?
4   A   December the -- end of the December.
5   Q   December 31st. All right. In the spring of 2005,
6       were you ever contacted by anyone from Pike County
7       about Mr. Coon?
8   A   What do you mean "contacted by"?
9   Q   Dr. Bazzell, any employee of Pike County?
10  A   Dr. Bazzell called me at some point and --
11  Q   What was the substance of that conversation?
12  A   He made me aware that -- of the incident over in
13      Butler County.
14  Q   What incident are you talking about?
15  A   The incident in which he was charged within --
16  Q   I'm sorry?
17  A   I'm thinking.
18      I remember talking to Dr. Bazzell. It was
19      either March or April of that year.
20  Q   Did he call you, or you called him?
21  A   He -- my -- he sent a message by my wife, and I
22      called him, I think. I don't remember exactly.
23  Q   And tell me the substance of those discussions.

Page 45

1   A   I don't remember.
2   Q   You have no idea what you talked about?
3   A   I talked to Dr. Bazzell. We talked about --
4       during that spring, I talked to him. And it
5       was -- I want to say it was the charges about
6       drugs. But I am not sure.
7   Q   So, at some point in the spring, you talked with
8       him about drug charges against Mr. Coon?
9   A   Uh-huh.
10  Q   What do you recall about that conversation?
11  A   They were just -- there there were just charges
12      against him -- that him being investigated or
13      something.
14  Q   Was he was calling just to tell you that, or did
15      he ask you questions?
16  A   Yeah. Asked me if I knew anything about it. I told
17      him I didn't know anything about it. You know,
18      prior if I had any indication of it. I told him
19      no.
20  Q   Did you tell him about the cell phone incident?
21  A   Who, Dr. Bazzell?
22  Q   Yeah.
23  A   No, I didn't tell him the cell phone incident.

Page 46

1  Q  Why not?
2  A  I think Mr. McDaniel told him about that.
3  Q  Do you know if Mr. McDaniel told him about that?
4  A  About the cell phone?
5  Q  Uh-huh.
6  A  About when we picked it up at school?
7  Q  Uh-huh.
8  A  Yes.
9  Q  You know that Mr. McDaniel told Mr. Bazzell that
10    Mr. Coon had provided Blake Faulkner with a cell
11    phone?
12  A  Yes.
13  Q  Did you tell him about him smoking in the school?
14  A  Who, Dr. Bazzell?
15  Q  Yes.
16  A  Yes.
17  Q  When did you tell him that?
18  A  At the beginning of the year.
19  Q  You mean when it occurred with Mr. Coon, you
20    reported it to Dr. Bazzell?
21  A  Yeah.
22  Q  Okay. And I guess the incident with the Foster
23    child was reported to Dr. Bazzell, also; is that

Page 47

1    correct?
2  A  Yes, ma'am.
3  Q  Were you aware that -- I'm sorry. I'm not sure if
4    I asked this -- were you aware that Mr. Coon was
5    transporting Blake Faulkner in his vehicle?
6  A  I was aware that after band practice he had taken
7    Blake home.
8  Q  Okay.
9  A  Along with other students.
10  Q  Who were the other students you knew were being
11    transported?
12  A  I know he took -- I think he took the little Helms
13    boy home one time. He's taken band students who
14    didn't have rides.
15  Q  How about Justin Reed? Did you know that he had
16    transported Justin Reed in his private vehicle?
17  A  No.
18  Q  Did you report to Dr. Bazzell this transporting of
19    students in his private vehicle by Mr. Coon?
20  A  No, ma'am.
21  Q  So, as far as policies and procedures for
22    investigating sexual abuse complaints --
23  A  Uh-huh.

Page 48

1  Q  -- I'm not sure if you answered this -- who was
2    responsible to your understanding for promulgating
3    those policies and procedures?
4  A  There is a system of --
5  Q  It wasn't you?
6  A  You mean, like at the school, or --
7  Q  Well, I didn't see that you promulgated any
8    policies or procedures for investigating and
9    handling sexual abuse claims.
10  A  No.
11  Q  Okay. So, who was responsible for establishing
12    those policies and procedures to your
13    understanding? Was it you?
14  A  I would think that would be a Board policy.
15  Q  And who --
16  A  And state policy.
17  Q  Not your responsibility?
18  A  In -- in --
19  Q  For promulgating policies and procedures for
20    investigating sexual-abuse issues.
21  A  Give me your definition of "promulgating".
22  Q  Writing and/or disseminating.
23  A  I disseminated.

Page 49

1  Q  You were responsible for disseminating --
2  A  Yes, ma'am.
3  Q  -- policies as to the investigation of sexual
4    abuse complaints?
5  A  Disseminating that information to the faculty,
6    yes. Through the Board policy, yes.
7  Q  And you were responsible at your school for the
8    procedures for reporting and investigating sexual
9    abuse in your school?
10  A  Yes, ma'am.
11  Q  Those are apparently not represented in any of
12    these documents; is that correct?
13  A  They are Board policy, yes, ma'am.
14  Q  So, are you saying you didn't promulgate any
15    procedures, or you did?
16  A  Well, we -- you know, I'm saying that we used the
17    Board policy manual.
18  Q  Okay. Anything else?
19  A  That's all.
20  Q  You didn't believe that you had any responsibility
21    to promulgate or write any separate policies and
22    procedures?
23  A  No, ma'am.

---

**Page 50**

1   **Q   Okay. And, specifically, do you recall what**
2      **training -- well, whose responsibility was it to**
3      **provide faculty with training as it relates to**
4      **sexual abuse in your building, in Pike County High**
5      **School?**
6   A   I think that's twofold. I think it's mine and the
7      Board's.
8   **Q   And I'm just not clear on what training you**
9      **provided.**
10   A   As far as inservice training, straight --
11   **Q   On sexual abuse.**
12   A   -- bringing someone in or whatever, I don't ever
13      recall doing that.
14   **Q   Okay.**
15   A   Going over the policies of the Board, yes, we did
16      that.
17   **Q   And can you identify any policies of the Board**
18      **relating to sexual abuse that you went over?**
19   A   Not off the top of my head, no, ma'am.
20   **Q   Now, with respect to whatever was supposed to be**
21      **done in your school relating to investigation of**
22      **sexual abuse complaints, did you have any special**
23      **policies or procedures that related to special ed**

---

**Page 51**

1      kids?
2   A   No more so than any of the regular kids.
3   **Q   They were the same policies?**
4   A   Yes, ma'am.
5   **Q   Okay. I just want --**
6      **MS. DePAOLA: Let's go off the Record.**
7      (Brief recess.)
8   BY MS. DePAOLA
9   **Q   Mr. Casey, did you ever reprimand Mr. Coon for**
10      **taking students off campus in his private vehicle?**
11   A   No, ma'am.
12   **Q   Were you the principal when Justin broke the**
13      **window in the band room?**
14   A   No, ma'am.
15   **Q   Are you aware that happened?**
16   A   Yes, ma'am.
17   **Q   Okay. Do you know when that happened?**
18   A   No, ma'am.
19   **Q   What did you do to monitor and supervise employee**
20      **contact with your students?**
21   A   Repeat that, now.
22   **Q   What did you do to monitor and supervise employee**
23      **contact with the students?**

---

**Page 52**

1   A   As a principal, I walked around and checked all
2      classes -- you know, checked all my classes every
3      day. I was at most all athletic events. I made
4      sure that there were chaperones on buses when they
5      traveled. I did the things that most principals,
6      I would think, would do.
7   **Q   Did you ever instruct the teachers -- well, is**
8      **there any document that indicates you instructed**
9      **the teachers not to have students in a closed-door**
10      **office?**
11   A   Is there a document for that?
12   **Q   Yeah.**
13   A   Not that I am aware of.
14   **Q   Okay. Now, were there cameras at Pike County High**
15      **School?**
16      **MR. SWEENEY: I'm sorry. Was there**
17      **what?**
18   **Q   Security cameras?**
19   A   They -- let see. When did we put those things in?
20      We had some cameras, but we disengaged them when
21      we started new construction.
22   **Q   When would that have been?**
23   A   2002 -- 3 -- 5 -- 4 -- 3 -- 3.

---

**Page 53**

1   **Q   2003, you stopped running the security cameras?**
2   A   I think so.
3   **Q   When were they put back in?**
4   A   As soon as they put the system back in the new
5      building.
6   **Q   I mean, while you were there?**
7   A   Yes, ma'am.
8   **Q   And did you monitor those security cameras?**
9   A   Yes, ma'am.
10   **Q   And would those have covered the band room?**
11   A   The parking lot of the band room.
12   **Q   But the band room, itself?**
13   A   No, ma'am.
14   **Q   Are you the one who decided where those security**
15      **cameras would be placed?**
16   A   We -- Dr. Bazzell, myself, along with the
17      technicians to get the best coverage, decided
18      that, yes.
19   **Q   Have you reviewed the answer that was filed on**
20      **your behalf in this complaint?**
21   A   Yes, ma'am.
22   **Q   All right. You have denied that Justin Reed was**
23      **sexually abused by Mr. Coon. On what basis did**

---

Page 54

```
 1      you make that denial?
 2              MR. SWEENEY: Object to the form.  And
 3          would you show the witness the
 4          answer you're referring to?
 5  BY MS. DePAOLA
 6  Q   (Tenders document).
 7              MR. SWEENEY: Incidentally, Susan, have
 8          we gotten any signed -- do you have
 9          a signed copy of his answers yet?
10              MS. DePAOLA:  This is the answer to the
11          complaint.
12  BY MS. DePAOLA
13  Q   Paragraph 25 says that beginning in the year
14      2004-05, the student's personal privacy and
15      security were repeatedly violated by Defendant
16      Coon.  And I think if you look at paragraph 25
17      there, you have filed a denial of that.  What's
18      the basis for your denial of that?
19  A   Twenty-five?
20  Q   Uh-huh.
21  A   I had no evidence to believe that it happened.
22  Q   You don't believe today as we sit here that it
23      happened?
```

Page 55

```
 1  A   I don't know if it happened.
 2  Q   Well, you have to admit or deny in a complaint.  I
 3      think you have denied.  Is there some factual
 4      basis on which you base that denial?
 5  A   I don't have any evidence of that.  I don't know
 6      if he did or if he didn't.  All I have is hearsay.
 7  Q   Okay.  You don't know that he pled guilty to
 8      sexual abuse of Justin Reed?
 9  A   No, ma'am.
10  Q   You don't know that?
11  A   No, ma'am.
12  Q   Let's look at 26.  What does 26 say?  Does that
13      also say denied?
14  A   It just --
15  Q   Let me look at it and see what it says.
16          Would you admit that you were responsible for
17      the development and implementation of policies and
18      procedures to protect students from sexual abuse?
19              MR. SWEENEY: Object to the form.
20  A   I -- all students, yes, ma'am.
21  Q   And do you admit that you were responsible for
22      monitoring and investigating complaints of sexual
23      abuse as they relate to your students at Pike
```

Page 56

```
 1      County High School?
 2  A   Yes, ma'am.
 3  Q   And would you admit that you are responsible for
 4      training as it relates to sexual abuse issues,
 5      said training being provided to faculty at Pike
 6      County High School?
 7  A   Somewhat, yes, ma'am.
 8  Q   Have you spoken to any of the Reeds since these
 9      allegations of sexual abuse came to light?
10  A   Yes, ma'am.
11  Q   Who have you spoken to?
12  A   I have spoken to Justin.  I have spoken to their
13      daughter.  And I have spoken to Ms. Reed.
14  Q   All right.  When did you do this as to each of
15      them?
16  A   I saw Justin in I think it was Wal-Mart or Lowe's
17      one.  And he was telling me he went to Charles
18      Henderson and was graduating.  I have talked with
19      Jessica, because she was going to school, and I
20      asked her how school was going.  And then said
21      hello to their mom.
22  Q   Have you discussed any of the allegations of
23      sexual abuse with any of the Reeds?
```

Page 57

```
 1  A   No, ma'am.
 2  Q   Have you discussed any of the allegations of
 3      sexual abuse with anyone other than Mr. Sweeney
 4      since these allegations came to light?
 5  A   No, ma'am.
 6  Q   You didn't consider it important to determine how
 7      you missed this?
 8              MR. SWEENEY: Excuse me.  What was the
 9          question?
10              MS. DePAOLA:  How you missed it.
11  A   Missed what?
12  Q   The sexual abuse.
13              MR. SWEENEY: Object to the question.
14          That's argumentative.
15              MS. DePAOLA:  Well, I'm just asking.
16              MR. SWEENEY: Well, I'm objecting to the
17          question as being argumentative.
18          There is no evidence that while he
19          was principal there that sexual
20          abuse took place.
21              MS. DePAOLA:  Well, that's not true.
22              MR. SWEENEY: You have no factual
23          record.  You're assuming facts
```

Page 58

1    without a basis. Object to the
2    question.
3        MS. DePAOLA: What was the question?
4        (Whereupon, the requested material
5        was read by the Court Reporter.)
6        MR. SWEENEY: Object to the question.
7  BY MS. DePAOLA
8  Q   I'll put the question before you again. You can
9    answer it.
10  A  Missed what?
11  Q   Sexual abuse of a Pike County High School student
12    during the 04-05 school year.
13        MR. SWEENEY: Object to the question.
14  A  At that point in time in which I was at Pike
15    County High School, I had no reason to believe
16    there was any abuse.
17  Q   And since that time, you have made no further
18    investigation as to how this occurred?
19  A  As not being principal at Pike County High School,
20    and I have been gone from that situation, not
21    knowing the information, all I got was hearsay
22    from various folks or whatever, the news, or
23    whatever, is all I know about it.

Page 59

1        MS. DePAOLA: That's all. Thank you.
2        EXAMINATION
3  BY MR. SWEENEY
4  Q   Mr. Casey, while you are here, will you get a copy
5    of the answers that were submitted to counsel
6    unsigned and have those signed and notarized
7    before you leave?
8  A  Yes, sir.
9  Q   I have a couple of questions. If a complaint came
10    to you from a student about sexual abuse, what
11    would the procedure be there at the high school
12    while you were principal?
13  A  When I was there, if a complaint came down,
14    normally what we -- the procedure that we would
15    follow is I would get the counselor. The
16    counselor and I together would talk with the
17    student. From that point on, we would discuss it
18    with DHR. And then call DHR in and let DHR pick
19    it up from that point. We would contact the
20    superintendents and let them be aware of what we
21    are doing.
22  Q   Was the procedure that you would have followed for
23    any physical abuse or sexual abuse of any student?

Page 60

1  A  Any abuse of any child.
2  Q   So, you took matters of student abuse seriously --
3  A  Yes, sir.
4  Q   -- whatever the form?
5  A  Yes, sir.
6  Q   Prior to December of 2004, when you resigned your
7    position, did any student ever bring to you any
8    suggestion that Charles Coon was sexually abusing
9    them?
10  A  No, sir.
11  Q   Did any parent bring any information that would
12    indicate that Charles Coon was sexually abusing
13    any student?
14  A  No, sir.
15  Q   Did Mr. or Mrs. Reed ever bring any information to
16    you that Charles Coon was abusing Justin?
17  A  No, sir.
18  Q   Did Ms. Reed spend a lot of time at the school at
19    certain times?
20  A  Yes, sir.
21  Q   Was she real involved in the band?
22  A  Yes, sir.
23  Q   Did she ever report any misconduct or make any

Page 61

1    complaints about Charles Coon based on her
2    involvement with the band?
3  A  No, sir.
4  Q   Did any teacher or faculty person at Pike County
5    High School ever complain to you that Charles Coon
6    had an improper relationship with any student?
7  A  No, sir.
8  Q   You have been sued in this matter on an individual
9    basis as well as your professional capacity. Did
10    you have any connection or relation with Justin
11    Reed other than in your position as principal?
12  A  No, sir.
13  Q   Did you have any connection or dealings with
14    Charles Coon other than in your capacity as
15    principal?
16  A  No, sir.
17        MR. SWEENEY: Thank you very much.
18        (Off-the-Record discussion.)
19        FURTHER EXAMINATION
20  BY MS. DePAOLA
21  Q   Since you left Pike County, have you had any
22    further training in sexual-abuse issues?
23        MR. SWEENEY: Object to the form.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                              CASE NO.:

                                   2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

           * * * * * * * * * *

     DEPOSITION OF WALTER (BUDDY) PYRON, taken before

Mary Moore-Wynn, as Commissioner, on the 25th of July,

2007, in the offices of Pike County Board of Education,

107 Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 9:30 a.m.


           * * * * * * * * *

Page 2

```
 1
 2            * * * * * * * * * *
 3            APPEARANCES:
 4   FOR THE PLAINTIFF:
 5   Hon. Susan DePaola
     Attorney at Law
 6   1726 West 2nd Street, Suite B
     Montgomery, Alabama  36105
 7
 8   and
 9   Hon. Deanie Allen
     Azar and Azar
10   260 Washington Avenue
     Montgomery, Alabama  36104
11
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant, Rose & White
14   One Federal Place
     1819 Fifth Avenue North
15   Birmingham, Alabama 35203
16
17   ALSO PRESENT:
18   Dr. Mark Bazzell, Superintendent
19   Ms. Elizabeth Reed
20
21
22
23
```

Page 4

```
 1   introduced at the trial of this case or used in any
 2   other manner by either party hereto provided for by the
 3   Statute, regardless of the waiving of the filing of
 4   same.
 5       It is further stipulated and agreed by and
 6   between counsel and the witness that the reading
 7   and signing of the deposition by the witness is
 8   hereby waived.
 9
10                     INDEX
11   WALTER (BUDDY) PYRON
12   Examination By Ms. DePaola              5
     Examination By Mr. Sweeney             68
13   Further Examination By Ms. DePaola     72
14   Reporter's Certificate          74
15              INDEX OF EXHIBITS
16   Exhibit Number      Description      Page Number
17   Plaintiff's Exhibit 16  Typed Version of     50
                         Dr. Bazzell's Notes Regarding
18                       Buddy Pyron's Interview of
                         Students
19
20
21
22            * * * * * * * * *
23
```

Page 3

```
 1            * * * * * * * * * *
 2
 3
 4
 5
 6            STIPULATIONS
 7
 8       It is hereby stipulated and agreed by and between
 9   counsel representing the parties that the deposition of
10   WALTER (BUDDY) PYRON is taken pursuant to the Federal
11   Rules of Civil Procedure, and that said deposition may
12   be taken before Mary Moore-Wynn, CSR, as Commissioner,
13   without the formality of a commission; that objections
14   to questions, other than objections as to the form of
15   the questions, need not be made at this time, but may
16   be reserved for a ruling at such time as the deposition
17   may be offered into evidence, or used for any other
18   purpose by either party hereto, provided by the
19   Statute.
20       It is further stipulated and agreed by and between
21   counsel representing the parties in this case, that the
22   filing of the deposition of WALTER (BUDDY) PYRON is
23   hereby waived, and that said deposition may be
```

Page 5

```
 1            WALTER (BUDDY) PYRON
 2       (Whereupon, the witness, after having first been
 3   duly sworn to speak the truth, the whole truth, and
 4   nothing but the truth, testified as follows:)
 5              EXAMINATION
 6   BY MS. DePAOLA
 7   Q  I am Susan DePaola.  If you can't hear me, let me
 8      know?
 9   A  I hear you.
10   Q  What is your street address?
11   A  1105 East Hart, H-A-R-T, Avenue, Opp, Alabama,
12      36467.
13   Q  Where are you currently employed?
14   A  Well, I am independent consultant.  I am a retired
15      educator, 33 years.  But I am a consultant.
16   Q  What kind of consulting work do you do?
17   A  Education consultant.
18   Q  Where --
19   A  School improvement.
20   Q  Okay.  Are you currently consulting anywhere?
21   A  Well, the contracts have not been renewed at this
22      time, but at Lee County and in Bullock County the
23      past year.
```

Page 6

1  Q   **What kind of consulting --**
2  A   For school improvement. I mentor principals.
3      Work with teachers. Curriculum. Overall school.
4      It might be in activities, discipline. You know,
5      just anything that could improve the school.
6          And the main purpose why I was hired is
7      because of the AYP.
8  Q   **Annual yearly progress?**
9  A   Annual yearly progress. That and the fact that if
10     they show two years of not passing AYP or have
11     deficiencies, then they have to show school
12     improvement. And I am one of the people that
13     helps with that case.
14         So, teaching, instruction, finding out what
15     the problems are. Why they are not meeting the
16     requirement.
17 Q   **Okay. And could you give me your educational**
18     **employment history?**
19 A   Well, yes, ma'am. I was with the Opp City schools
20     for 29 years. And in that, I was eight years as a
21     math teacher, assistant principal, and principal
22     for 14 years. Assistant principal for seven
23     years. Fourteen years as principal.

Page 7

1          I worked two years for the Eufaula City
2      schools as principal for Eufaula High School. And
3      then I retired. For a total of 33 years. I
4      retired.
5  Q   **Okay. I missed two years in there.**
6  A   No, ma'am, they gave me retirement for attendance.
7      You know, you have attendance in the school
8      system.
9  Q   **But you were also employed by Pike County. I**
10     **didn't hear --**
11 A   Yes, ma'am. After that, after I retired, I was
12     employed as an interim principal. And that was
13     from the latter part of December through June --
14     December '04 to June '05.
15 Q   **Okay. So, you had no prior employment in Pike**
16     **County other than that?**
17 A   No, ma'am.
18 Q   **What's your understanding why they needed an**
19     **interim principal?**
20 A   Well, Dr. Bazzell called me and told me that he
21     needed an interim. And I came up and --
22 Q   **Did he tell you why?**
23 A   Didn't tell me why. He just said that Mr. Casey

Page 8

1      was leaving. And I came up and talked to him,
2      talked to Mr. Casey. And decided that I could do
3      that.
4  Q   **Okay. When you came here, did you understand any**
5      **portion of your responsibilities to be writing**
6      **policies and procedures for the school level?**
7  A   Ma'am, I came as an interim principal, which would
8      contain all the duties of principal. Principals
9      don't write policy. School boards write policy.
10 Q   **So, your understanding was that you had no**
11     **responsibility for writing any policies or**
12     **procedures?**
13 A   Correct. Responsibility other than policy at the
14     high school level. What I am saying, in the
15     standards of how we are going to do things
16     procedure wise. For instance -- let me clarify
17     what I am saying. Not writing policy for the
18     whole school, but writing policy which collecting
19     attendance, how we do the administrative things as
20     every day-to-day run of the school. That's what I
21     meant as far as policy, not legalized policy.
22 Q   **Were you responsible for writing the school's**
23     **policies and procedures with respect to sexual**

Page 9

1      **abuse complaints?**
2  A   No, no, ma'am.
3  Q   **And so I take it you didn't any new --**
4  A   Those kind of policies, yes, ma'am.
5  Q   **Let me finish my question: So, you didn't write**
6      **any policies or procedures relating to sexual**
7      **abuse complaints?**
8  A   No, ma'am.
9  Q   **Where was the policy or procedure with respect to**
10     **sexual abuse complaints; how to handle them; how**
11     **to investigate them, what they were?**
12 A   Well, there is policy in the Code of Conduct. And
13     teacher -- I meant, student handbook in reference
14     to sexual abuse or harassment.
15 Q   **Okay. The Code of Conduct being the offenses that**
16     **were applicable to students?**
17 A   Yes.
18 Q   **I mean, one student should not harass another**
19     **student?**
20 A   One student or an adult -- or employee.
21 Q   **So, you say the Code of Conduct contained the**
22     **policies and procedures?**
23 A   It tells you that -- how -- what -- it, first of

Mary Moore-Wynn, CSR Mary Moore-Wynn     (334)244-0203
Court Reporting Services

## Page 10

1    all, defines it.
2  Q  Okay.
3  A  And then it says that -- what you're to do, as far
4      as if you are abused or harassed.
5  Q  Are you familiar with it saying "sexual abuse" in
6      any place in that policy?
7  A  I would have to look at the policy right now,
8      because that's been more than two years.
9  Q  And you're -- are you talking about --
10 A  Pike County Code of Conduct.
11 Q  The Pike County Code of Conduct.  I was finding it
12     here.  I've got a list.  Let me show you
13     Plaintiff's Exhibit 2.  We have been informed that
14     that was the Code of Conduct for 2004.  Is that
15     the document you are referring to?
16 A  Well, it's revised for 2003.  So, for 04-05, I
17     would think it would be.
18     May I (indicating)?
19 Q  Sure.
20 A  It talks about, Number 11 here, sexual harassment,
21     verbal or physical conduct of sexual nature
22     imposed on the basis of sex by student or agent.
23     (inaudible).  That's what I was referring to,

## Page 11

1    ma'am.
2  Q  Is that your sexual-abuse policy?
3  A  That's the -- that's the policy that is in the
4      hand -- in the Code of Conduct that we had to go
5      by, yes, ma'am.
6  Q  Is that what you used as a sexual-abuse policy?
7  A  Yes, ma'am, as far as reference to sexual abuse.
8      Here, also, it states that the parents of all
9      students involved in sexual-harassment issues
10     shall be notified in all cases.  Law enforcement
11     will be summoned, dah dah dah dah dah.
12     So, it tells you what you're to do as far as
13     policy.
14 Q  Okay.  Just tell me what page you're referring to.
15 A  Eleven and 12.
16 Q  Okay.  Thank you.  Let me take a look.
17 A  Let me put it back together for you.
18     MR. SWEENEY:  That's Plaintiff's Exhibit
19     what?
20     MS. DePAOLA:  Two.
21 Q  All right.  Anything -- any other sexual abuse
22     policy in any -- you mentioned the student
23     handbook.  And let me just represent to you that

## Page 12

1    the only student handbook that we have been
2    provided is Plaintiff's Exhibit 4.  Is that the
3    document you're referring to?
4  A  Not this color one -- yes, ma'am.  Hold on.  Let
5      me look at it.
6      No, ma'am, this is -- this is not -- this is
7      the planner.  I was referring to, when I said
8      handbook, the rules and regulations.  And that's
9      not in here.
10     MS. DePAOLA:  Mr. Sweeney, is there any
11     other -- can you tell me what
12     document he's talking about?
13     MR. SWEENEY:  Huh-huh.  I can't.  I will
14     have to find out what he's talking
15     about.
16 A  And it may be referring to that same thing that
17     brings out those in there, ma'am.
18 Q  This (indicating)?
19 A  Yes, ma'am.  And referring to those as going
20     over -- I recall -- this is all the discipline
21     plans.  I'm talking about --
22     MR. SWEENEY:  Let's go off the Record.
23     (Brief off the Record discussion.)

## Page 13

1  BY MS. DePAOLA
2  Q  Can we go back on the Record and determine whether
3      or not there is an additional handbook that hasn't
4      been produced.
5  A  I can't say there is another handbook.  That's all
6      I know.  So -- but it was -- I remember one being
7      that color.
8  Q  Purple?
9  A  Yes, ma'am.
10 Q  Like this one?
11 A  Yes, ma'am.
12 Q  Which we have marked as Plaintiff's Exhibit 4?
13 A  Yes, ma'am.
14 Q  So, you've identified in the Code of Student
15     Conduct the sections relating to sexual abuse that
16     you are familiar with?
17 A  Yes, ma'am.
18 Q  Did you make any revisions to this Code of Student
19     Conduct?
20 A  No, ma'am.
21 Q  Did you have any responsibility to do so?
22 A  No, ma'am.
23 Q  Now, you also looked at what we've identified --

4  (Pages 10 to 13)

| Page 14 | Page 16 |
|---|---|
| 1    we called it a student handbook or planner.  Is | 1    abuse? |
| 2    there anything in this about policies and | 2  A  No, ma'am.  I did -- no, ma'am, other than what |
| 3    procedures relating to sexual abuse? | 3    was in the Code and having them go by the Code. |
| 4  A  I didn't see anything.  No. | 4    No, ma'am. |
| 5  Q  Would it have been your responsibility to put | 5  Q  I don't mean what did you do.  The question is: |
| 6    anything in this student handbook that you felt | 6    Did you have responsibility to provide training? |
| 7    was relevant to sexual abuse? | 7  A  I don't -- no, ma'am. |
| 8  A  No, ma'am.  The handbook was published prior to me | 8  Q  Whose responsibility was that? |
| 9    coming, and I didn't amend anything to it. | 9  A  If they were to have -- being an interim, if they |
| 10  Q  Did you have authority to amend it? | 10    were to have had that, it would be in the |
| 11  A  No, ma'am, without -- approval of the | 11    professional development plan for the year. |
| 12    Superintendent or the Board. | 12  Q  Well, whose responsibility was it to make sure |
| 13  Q  All right.  With approval -- so, your testimony is | 13    they received this training, if anyone felt it was |
| 14    that this handbook, what you put in it had to be | 14    necessary? |
| 15    approved by the Superintendent and the Board? | 15  A  Any particular person, you mean, or -- |
| 16  A  Yes, ma'am. | 16  Q  Yeah, I mean -- |
| 17  Q  Did you review when you arrived the faculty | 17  A  Well, the principal and the Superintendent work |
| 18    handbook? | 18    together in developing that plan. |
| 19  A  Yes, ma'am. | 19  Q  So, it was part of the principal's responsibility |
| 20  Q  Is there anything in that that you're familiar | 20    and the Superintendent's to determine what |
| 21    with that relates to sexual abuse? | 21    training was necessary for teachers? |
| 22  A  No, ma'am.  I did not see anything in reference to | 22  A  Yes, ma'am. |
| 23    that other than what was in the Code. | 23  Q  And during your tenure as principal, did you |

| Page 15 | Page 17 |
|---|---|
| 1  Q  Okay.  In your capacity as principal -- and I | 1    provide any training to faculty members relating |
| 2    understand you started late -- | 2    to the issues of sexual abuse? |
| 3  A  Yes, ma'am. | 3       MR. SWEENEY:  At Pike County High |
| 4  Q  -- but in your capacity as principal, did you have | 4       School? |
| 5    authority to include in the Pike County faculty | 5       MS. DePAOLA:  Yes, sir. |
| 6    handbook any policies and procedures you thought | 6  A  No, ma'am, other than covering the Code of |
| 7    were necessary relating to sexual abuse? | 7    Conduct -- what we have looked at. |
| 8  A  No, ma'am. | 8  Q  And what was the training that you provided with |
| 9  Q  You didn't have that authority? | 9    respect to covering the Code of Conduct? |
| 10  A  Not unless I approved it through the school Board. | 10  A  Going over it and the procedures that you do in |
| 11  Q  So, it's your testimony as to the handbook and | 11    reference to abuse or harassment. |
| 12    student handbook, Plaintiff's Exhibits 4 and 8, | 12  Q  What exactly were the procedures that were |
| 13    any amendments you made -- | 13    outlined in the Code of Conduct to do if there was |
| 14  A  Yes, ma'am. | 14    harassment? |
| 15  Q  -- had to be approved through the -- let me finish | 15  A  Well, first of all, if the teacher recognized -- |
| 16    yes -- Superintendent and the Board? | 16  Q  I'm sorry.  I'm interested what's in there. |
| 17  A  Yes, ma'am. | 17  A  Oh, okay. |
| 18  Q  Now, I understand that you would not have had any | 18       MR. SWEENEY:  So, you're asking what the |
| 19    responsibility with respect to the hiring of | 19       policy is, not what he did in |
| 20    Charles Coon? | 20       instructing the teachers? |
| 21  A  That is correct. | 21       MS. DePAOLA:  Right.  Right. |
| 22  Q  Now, as principal, did you have responsibility for | 22  A  You're asking me -- say that again. |
| 23    training of faculty and issues relating to sexual | 23  Q  What procedures were in this document that relate |

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
Court Reporting Services

JR, A Minor                July 25, 2007  Pike County Board of Education

---

Page 18

1  to the manner of investigation of complaints of
2  sexual abuse, what procedures were there?
3         MR. SWEENEY: Object to the form.
4  A  Okay. Law enforcement would be summoned by the
5  school in substantiated cases of sexual
6  harassment, in cases where students and parents
7  wish to file criminal complaints. And in cases
8  where a pattern or unsubstantiated complaints have
9  been made concerning the individual student. And,
10  of course, if I had been notified, I would have
11  notified the Superintendent. And --
12 Q  I'm asking what was in there.
13 A  It's not -- not that I would, as an administrator,
14  notify, no, ma'am.
15 Q  And the only other procedure I see in there is
16  that the parents will be notified; is that
17  correct?
18 A  Yes, ma'am.
19 Q  Okay. Thank you. Now, did you independently
20  develop and disseminate some kind of procedure?
21 A  No, ma'am.
22 Q  Okay. Because it sounded like you wanted to tell
23  me about a procedure that's not in this handbook.

---

Page 19

1  A  Well, prior to that, I'm saying about what I would
2  do?
3  Q  What did you tell the people --
4  A  No. Other than what's in the handbook.
5  Q  What did you tell the faculty to do that's not in
6  the handbook?
7  A  Again, I would have to say that I was -- my
8  experience.
9  Q  I'm asking what you did.
10  A  I'm saying things I shouldn't, because of the fact
11  that my experience is from what I have done in the
12  past. And I would not relate to that --
13  Q  And I didn't --
14  A  -- because it's not in the handbook.
15         MR. SWEENEY: Her question is: What did
16         you tell the faculty: Did you
17         answer that?
18  A  Well, yes --
19  Q  At Pike County High School.
20  A  Ma'am?
21  Q  At Pike County High School.
22  A  That obviously, they would be -- inform the
23  office, inform the administrator if they think or

---

Page 20

1  recognize any sexual abuse or harassment. Not
2  just sexual -- but harassment, itself.
3  Q  Okay. Anything else?
4  A  Ma'am?
5  Q  Is that it?
6  A  Yes, ma'am.
7  Q  Okay. Let me ask you this: Do you have any
8  training in recognizing sexual abuse?
9  A  Other than -- no, what I would say, certified
10  training, no, ma'am. Other than my professional
11  classes that I have been in. And --
12  Q  What professional classes are you referring to?
13  A  For a teacher or administrator.
14  Q  Okay. Let's back up. What is your
15  professional -- or your educational background?
16  A  I'm sorry. Well, I have a BS degree in math.
17  Q  Okay.
18  A  And I have a Master's in Administration. And a
19  double A in supervision.
20  Q  Okay. All right. Now, in your receiving your
21  Bachelor's in mathematics, did you get any
22  training in recognizing and investigating sexual
23  abuse complaints?

---

Page 21

1  A  Not precisely. Not other than what was discussed
2  or brought about in certain cases when you go
3  through an administration degree.
4  Q  So, you're saying during the Master's program or
5  the double A program, it may have been touched on?
6  A  It may have been touched on. No certified
7  training, no, ma'am.
8  Q  Do you recall what you were educated to look for
9  in recognizing sexual abuse?
10  A  I would -- I would say -- I can give you symptoms.
11  As far as actual things, no, ma'am.
12  Q  Symptoms that the child might exhibit?
13  A  Yes, ma'am.
14  Q  What are those?
15  A  I would say low self-esteem. Physical abuse.
16  Q  You mean, like bruises and stuff?
17  A  Yes, ma'am. Lonely. Loneliness, as far as being
18  by their self, or herself. Those type things.
19  And I can't think of any others right now.
20  Q  Did you learn any signals that you might look for
21  that an educator was a sexual predator, signs
22  or --
23  A  No, ma'am. I don't recall.

---

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

Page 22

1  Q   All right.  Did you ever read any statistics on
2      the incidence of sexual abuse amongst disabled
3      students as opposed to regular education students?
4  A   What precisely are you talking -- what --
5  Q   Do you have any education that led you to
6      understand that students with disabilities, such
7      as mental retardation, had an increased risk of
8      sexual abuse as opposed to children in regular
9      education?
10 A   I don't recall reading anything to that.
11 Q   So, you don't know that?
12 A   No, ma'am.
13 Q   All right.  And in implementing the policies and
14     procedures you implemented at Pike County High
15     School and in conducting investigations, did you
16     make any special efforts or any changes in your
17     routine as it relates to special education
18     students when sexual abuse issues arose?
19 A   We didn't have any, ma'am.  I don't know of any.
20 Q   No difference in your policies, procedure?
21 A   No, ma'am.  No, ma'am.
22 Q   Now, who in your -- I guess who in your school was
23     responsible for investigating sexual abuse

Page 23

1      complaints?
2  A   You're talking about Pike County or any school?
3  Q   No.  Pike County High School.
4  A   Well, first of all, the person that it comes to
5      would ask questions or relay it --
6  Q   You mean, the teacher?
7  A   Yes, ma'am.  If it came to a teacher, they would
8      certainly investigate and ask some questions to
9      validate or whatever.  And then bring it to their
10     superior, which would, of course, be
11     administration, and/or guidance.  And the overall
12     investigation would rest with administration.
13 Q   The principal?
14 A   Yes, ma'am.
15 Q   Was there anybody in Pike County High School that
16     had any forensic interview skills that you are
17     aware of?
18         MR. SWEENEY:  Object to the form.
19         THE WITNESS:  I'm sorry?
20         MR. SWEENEY:  You can answer.
21 A   Not that I am aware of.
22 Q   Anyone who had any training in forensic
23     investigation?

Page 24

1  A   Not that I am aware of.
2  Q   Did you have any such training or skills?
3  A   As far as -- no, ma'am.  Other than just
4      investigating.
5  Q   Well, I mean, did you have any special training in
6      interviewing victims of crime?
7  A   No special training.  Experience.
8  Q   You don't hold yourself out to be an expert --
9  A   No, ma'am, I am not.
10 Q   -- in forensic interviewing?
11 A   No, ma'am.
12 Q   Did you ever receive from the Pike County Board of
13     Education or Dr. Bazzell any written policy or
14     procedure to use in investigating sexual abuse
15     complaints?
16 A   Sexual abuse?
17 Q   Yes, sir.
18 A   No, ma'am.
19 Q   Okay.  Now, let's go back to when you arrived.  Do
20     you recall when you might have arrived at Pike
21     County High School?
22 A   Yes, ma'am.
23 Q   When was it?

Page 25

1  A   The latter part of December.  I call it the
2      transition period for Mr. Casey.  I remember,
3      semester tests, the last -- December 10th.
4      December 10th.
5  Q   December 10th.  Okay?
6  A   And I was there in the capacity of just observing
7      and transition.
8  Q   And when did you actually become the principal?
9  A   January 3rd.  The first week of January.
10 Q   All right.  First of all, did you know Charles
11     Coon anywhere else --
12 A   No, ma'am.
13 Q   -- before you encountered him at Pike County High
14     School?
15 A   No, ma'am.
16 Q   Are you, as we sit here today, aware of any other
17     school systems in which he was employed?
18 A   Well, not -- I do -- say that again, please.
19 Q   Are you aware of any other school systems in which
20     he was employed?
21 A   I was told.  He actually told me where he was
22     employed previously.
23 Q   Have you been informed that there were any

Page 26

1    allegations of sexual improprieties at any other
2    school where he ever worked?
3  A   No, ma'am.
4  Q   Tell me what your first contact was with Mr. Coon?
5  A   As a teacher in January. Just as --
6  Q   I mean, did you call him in your office and say,
7    let's have a talk or --
8  A   Oh, no, ma'am. You're talking about individual?
9  Q   Yes.
10  A   No, ma'am. There was an incident in reference to
11    a grade of a student. And the --
12  Q   Tell me about that.
13  A   There was a complaint that the grade was lower
14    than it should have been. And I consulted him
15    about the grade. And asked him why he gave a
16    child such a grade. And if I remember, he said it
17    was because he did not turn something in. And I
18    said, can you validate that? I remember --
19  Q   Did you talk to the complaining party?
20  A   No, ma'am, I don't remember talking to the
21    complaining party.
22  Q   Do you know if Mr. McDaniel spoke with the
23    complaining party?

Page 27

1  A   I think so. He brought it to my attention.
2  Q   Tell me everything Mr. McDaniel told you about
3    that complaint?
4  A   Is that Mr. Coon was accused of giving an F to the
5    child. And the mother was complaining about it.
6    And --
7  Q   Who was this mother?
8  A   You know, ma'am, I can't --
9  Q   Was it Polly King?
10  A   Possibly. I can't tell you exactly.
11  Q   All right. Did he tell you anything else that
12    Polly King said about Mr. Coon?
13  A   That he might have been smoking, I think.
14  Q   With other students or -- with students or what?
15  A   I'm not -- I cannot recall.
16  Q   But alls you recall is smoking?
17  A   Yes, ma'am.
18  Q   Anything else that she said to you -- I'm sorry --
19    that was reported to you?
20  A   Well, that's why I investigated, because she was
21    upset. Mr. McDaniel related she was upset. And
22    so I talked to Mr. Coon about the grade, why.
23  Q   Okay.

Page 28

1  A   And he indicated that the child had not done
2    something. But that had been corrected over the
3    holidays. I talked to him in January. So,
4    obviously, this happened earlier. And the grade
5    had been corrected. And I guess it was solved.
6    But the main thing I wanted him to know is
7    that he must validate his grades.
8  Q   What did you do about the smoking?
9  A   I talked to him about smoking.
10  Q   What did you say to him about that?
11  A   You can't be smoking on campus.
12  Q   Now, were you made aware of the incident with the
13    Foster child in which Mr. Coon choked a child --
14  A   No, ma'am.
15  Q   -- in November?
16  A   No, ma'am.
17  Q   Nobody told you about that?
18  A   Not anytime while I was there.
19  Q   Was there any centralized place at Pike County
20    where one would keep a record of these kind of
21    incidents?
22  A   Uhm --
23  Q   At the high school, I'm talking about.

Page 29

1  A   Well, yes, ma'am. There was a centralized office
2    at the high school. Of course, we were in
3    trailers at that time, or mobiles. And there
4    should have been incidents -- as far as if it was
5    filed. I -- (indicating) -- I am not aware at
6    that time. I wasn't there when it happened.
7  Q   And continuing during your employment in Pike
8    County, you never were aware of the Foster
9    incident, until this litigation came up, I assume?
10  A   I do not recall. I heard about it. But I don't
11    know -- not during the time I was there as far as
12    any --
13  Q   Now, was Mr. Coon smoking on campus reported to
14    Dr. Bazzell?
15  A   I talked with him about it. And -- I talked to
16    Mr. Coon. But there was a later incident where
17    Dr. Bazzell and I talked about it.
18  Q   Okay. At some point, you did report the smoking
19    incident to Dr. Bazzell?
20  A   Oh, yes, sir -- yes, ma'am.
21  Q   When was that?
22  A   Well, in April, I did an investigation in
23    reference to it.

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
            Court Reporting Services

## Page 30

1 Q   So, it was not until the later issues --
2 A   Yes, ma'am.
3 Q   -- came up that you reported it to Dr. Bazzell?
4     Okay.  Did Mr. McDaniel at the outset of your
5     employment in Pike County express to you any
6     concerns about Mr. Coon, of any nature?
7 A   I don't recall.  You said at the outset of my
8     employment.  We didn't talk about individual
9     teachers.
10 Q  All right.  Did he at some point express concerns
11    about Mr. Coon as a faculty?
12 A  Well, he told me in reference to that about the
13    grade thing.
14 Q  Okay.  Any time after that?
15 A  And that was like the second -- second week in
16    January or something.
17 Q  Did he bring any other issues to your attention
18    before April?
19 A  There was something about a cell phone that he
20    had.
21 Q  Tell me --
22 A  I'm not sure the timeline on that to be honest
23    with you.

## Page 31

1 Q   Is this when Blake Faulkner had a cell phone?
2 A   I don't know the names.  I'm sorry.
3 Q   Is it a student who had one of Mr. Coon's cell
4     phones?
5 A   I remember Mr. McDaniel referring that he had a
6     cell phone that belonged to Mr. Coon.
7 Q   A student did, or Mr. McDaniel?
8 A   Well, yeah, he had taken it up.
9 Q   And what did you do about that?
10 A  Well, he had already taken care of it when he told
11    me this.
12 Q  Just he had taken it up, and that was it; it was
13    over with?
14 A  Mr. Coon wanted to get it back.  And I think he
15    eventually got it back.
16 Q  From you?
17 A  Oh, no.  I didn't have it.  I never had it.
18 Q  Who kept the cell phone?
19 A  Mr. McDaniel.
20 Q  You didn't have any --
21 A  No contact about that.
22 Q  -- input in the decision -- no contact?
23 A  Right.

## Page 32

1 Q   When did you learn about that?
2 A   That, I cannot recall.  It was a later time.  I
3     cannot -- I cannot recall.
4 Q   So, there was no procedure in place that required
5     Mr. McDaniel to report that incident to you?
6 A   No, ma'am.
7 Q   And there was no procedure in place that
8     required -- if you had known about it -- you to
9     report that incident to Dr. Bazzell?
10 A  Uhm, I want to think that Mr. McDaniel reported to
11    Dr. Bazzell.
12 Q  But I'm asking you about -- that was apparently
13    discretionary, is that --
14 A  Well, I don't know of a procedure, other than --
15 Q  Now, did you become aware at some point that
16    Mr. Coon was transporting students in private
17    vehicles?
18 A  Yes.
19 Q  Tell me what you know about that.
20 A  In my investigation --
21 Q  In April?
22 A  In April.
23 Q  What did you learn?

## Page 33

1 A   (Witness Indicating.)
2 Q   I'm sorry.  I said, what did you learn?
3 A   Oh, I'm sorry.  I didn't understand.  I'm sorry.
4 Q   Okay.
5 A   Dr. Bazzell called me.  And he had a person who
6     informed him that it was possible -- that Mr. Coon
7     was smoking, possibly with kids, and possibly
8     Marijuana.  He asked me to do an investigation and
9     determine what the probability was or if it
10    happened or if it did not happen.  And so, he gave
11    me some students' names to investigate.
12 Q  Okay.  Can I -- I don't mean to interrupt you,
13    because I do want to hear about this incident.
14    But this was on or around April 1st?
15 A  April.  Sometime in April.
16 Q  Prior to April 1st and what you are talking about
17    right now, had you ever seen Mr. Coon transporting
18    any students --
19 A  I have never seen --
20 Q  -- in his private vehicle?
21 A  I've never seen Mr. Coon transport any --
22 Q  And had you ever heard of him doing it prior to
23    April 1st?

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 34

1  A  I do not recall -- I do not recall that, ma'am.
2  Q  You do not recall whether or not you had seen it?
3  A  I did not see it.
4  Q  And you don't know whether or not you had heard
5     it?
6  A  That I had heard it. Prior to that time.
7  Q  Okay. All right. Now, we can go to April.
8  A  I'm sorry.
9  Q  I just was trying to do before April 1st and after
10    April 1st.
11        So, let's go into some detail about the
12    conversation with Dr. Bazzell. We believe this
13    conversation occurred around April 1st. Does that
14    sound reasonable to you?
15  A  Yes, ma'am, it was in April. It was after we got
16    back from AEA. And he contacted me, Dr. Bazzell
17    contacted me, and requested that I do an
18    investigation into what I had told you --
19  Q  Now, what you mentioned was smoking with the kids
20    and/or smoking Marijuana.
21  A  Smoking and possibly smoking with kids --
22  Q  Just plain smoking?
23  A  -- and then the possible use of Marijuana.

Page 35

1  Q  Anything else he told you to investigate?
2  A  Uhm -- not that I know.
3  Q  Anything related to sexual abuse?
4  A  No, ma'am. Actually, that didn't come up.
5  Q  Okay.
6  A  He gave me six or seven names of people -- I don't
7     know where he got the names -- that could give me
8     some information. And I investigated them and
9     tried to probe -- using probing questions, I term
10    "probing" -- what they might know about Mr. Coon
11    and his behavior.
12  Q  Okay. Give me some examples. What questions do
13    you consider that you would have asked that would
14    be probing?
15  A  First of all, do you know, you know, does Mr. Coon
16    smoke?
17  Q  Okay.
18  A  Have you ever seen him smoke? Have you ever seen
19    him smoke on campus? Have you ever seen him smoke
20    with students? And the like. Have you ever heard
21    of Mr. Coon possibly smoking something other than
22    just regular cigarettes?
23  Q  Did you say Marijuana?

Page 36

1  A  I don't know if I used that word or not, to be
2     honest with you, ma'am.
3  Q  Something other than regular cigarettes?
4  A  Yes, ma'am.
5  Q  Any other questions that you can recall asking?
6  A  Any other behavior that would be -- you know,
7     unbecoming of a band director, I guess I would --
8     something like that.
9        No -- no student told me anything about
10    Marijuana or -- they did bring up a term that I
11    questioned somewhat. And that was the term "butt
12    baby".
13  Q  Butt baby?
14  A  (Witness Indicating.)
15  Q  And who brought that up?
16  A  I can't tell you, ma'am.
17  Q  But you're saying one of the students brought that
18    up?
19  A  Yes, ma'am.
20  Q  What do you mean, you questioned? I mean, what
21    did you say; what does that mean?
22  A  Yes, ma'am. In reference to -- explain it. And
23    they related it more as a pet. You know, you're

Page 37

1     my pet. Or treated -- I -- uhm -- I couldn't find
2     out any other than -- as far as them asking
3     questions and such.
4  Q  Did you take notes during these meetings?
5  A  Yes, ma'am.
6  Q  Where are those notes?
7  A  Ma'am, I gave -- I called Dr. Bazzell and related
8     everything that I had found for each student. And
9     he has -- he had those notes.
10  Q  Well, I mean, he took notes of what you said when
11    you talked to him on the phone?
12  A  Yes, ma'am.
13  Q  Did you also have physical notes?
14  A  Well, I just scratched it out.
15  Q  Where are those?
16  A  Today, I cannot tell you that.
17  Q  So, you weren't instructed to turn them in to the
18    office?
19  A  Well, no, ma'am. I asked if he had what he
20    needed.
21  Q  So, you didn't have any policy or procedure for
22    keeping your handwritten notes of these witness
23    examinations in any central location?

                              10  (Pages 34 to 37)

JR, A Minor                July 25, 2007   Pike County Board of Education

| Page 38 | Page 40 |
|---|---|
| 1   A   I can't recall exactly, ma'am, at this time what I | 1   A   Yes, he did. |
| 2    did with those notes. | 2   Q   So, I'm going to try and read you what he said. |
| 3   Q   Yeah, but -- | 3   A   Okay. |
| 4   A   Because I just scribbled them out as I talked to | 4   Q   Maybe that will refresh your recollection. |
| 5    them. | 5   A   That's fine. |
| 6   Q   Had you received any direction from the centra[l] | 6   Q   As to Jeron Senn -- and this is Plaintiff's |
| 7    office as to what you were supposed to do with | 7    Exhibit 14 -- confirmed dash smoking cigs with |
| 8    your handwritten notes? | 8    students. |
| 9   A   To report back to him. | 9   A   Okay. |
| 10   Q   No. What to do with your handwritten notes. | 10   Q   Do you recall Jeron Senn confirming that? |
| 11   A   At this time, I cannot -- I do not remember -- do | 11   A   Yes, ma'am. I -- not Jeron Senn. I can't recall |
| 12    not recall. | 12    which student said what. |
| 13   Q   So, you personally did the interviews with the | 13   Q   But that certainly was confirmed in your |
| 14    students? | 14    interviews? |
| 15   A   Yes, ma'am. | 15   A   Yes, ma'am. |
| 16   Q   Not Mr. McDaniel? | 16   Q   It says here that you -- on the Jeron Senn page I |
| 17   A   No, ma'am. I did. | 17    am reading from -- it says, saw them leaving |
| 18   Q   Did you ever see the letter that was written to | 18    campus together and smoking? |
| 19    Mr. Coon placing him on suspension? | 19   A   Okay. |
| 20   A   I know Dr. Bazzell related that to me; that he put | 20   Q   Do you recall hearing -- one of the students told |
| 21    him on suspension. I want to say, yes, ma'am, I | 21    you that? |
| 22    did see that. I cannot recall if I did or did | 22   A   Yes, ma'am. Between classes, if I remember. |
| 23    not. But I know Dr. Bazzell, he contacted me and | 23   Q   Okay. And then it says, a mysterious -- we're no[t] |

| Page 39 | Page 41 |
|---|---|
| 1    told me that he was putting him on suspension. | 1    sure what this means -- seen going by home on |
| 2   Q   Now -- | 2    numerous occasions. |
| 3   A   For that week. | 3   A   Yes, ma'am. (Indicating.) There was one |
| 4   Q   Did you meet face to face with Dr. Bazzell to | 4    student -- I don't know who -- said that he lived |
| 5    discuss this matter, at any time? | 5    in a certain area, and he would see Mr. Coon go by |
| 6   A   Well, yes, ma'am. At some time. I can't tell you | 6    smoking. |
| 7    exactly when. | 7   Q   Did he say Mr. Coon was going by smoking with |
| 8   Q   I'm just going to tell you some names of students | 8    other students in the class? |
| 9    and ask if you were the person who conducted the | 9   A   Ma'am, I don't remember that. I just remember he |
| 10    interview with these students. One of them is | 10    was frequently going by his house smoking. |
| 11    Jeron Senn? | 11   Q   Mr. Coon's house, or the student's house? |
| 12   A   Did I conduct the interview with her -- him. Is | 12   A   No, the child whoever it was, saw Mr. Coon going |
| 13    that a him or her, ma'am? | 13    by numerous times smoking. Now -- (indicating) -- |
| 14   Q   I don't know. | 14   Q   Anything else you can recall from the Jeron Senn |
| 15   A   I'm sorry. | 15    interview? |
| 16   Q   I don't know. I don't know the student. You | 16   A   I do not know the difference in the students, |
| 17    don't -- | 17    ma'am. I apologize. |
| 18   A   I cannot recall. | 18   Q   Okay. Did you also interview Andrew Law? Does |
| 19   Q   It's a boy -- a male. | 19    that name ring a bell? It's okay. If you don't, |
| 20   A   I cannot recall exactly who the students were. | 20    you don't. |
| 21   Q   Okay. Well, let me read you -- Dr. Bazzell has | 21   A   Well, I do not recall the names, ma'am. If there |
| 22    testified that when he talked with you on the | 22    is one down there from that from the telephone |
| 23    phone he made notes of what you said. | 23    conversation, I did. |

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
Court Reporting Services

JR, A Minor                July 25, 2007  Pike County Board of Education

Page 42

1       MS. DePAOLA:  Can we go off the Record
2           for a second?
3           (Off-the-Record discussion.)
4   BY MS. DePAOLA
5   Q   Dr. Bazzell, when you reported to him on Andrew
6       Law -- wrote down -- I guess that's Buddy Pyron --
7       voc tech?
8   A   What, ma'am?
9   Q   I think that means vocational technical, Voc tech.
10  A   Voc tech.
11  Q   What does that mean?  Does that refresh your
12      recollection as to your conversation with Andrew
13      Law?
14  A   No, ma'am.  Voc tech.  Maybe he was in voc tech.
15  Q   He's a 10th grade male at this point in time.
16      MR. SWEENEY:  Don't speculate.  If you
17          don't remember, tell her you don't
18          remember.
19  A   I do not remember.  I don't recall --
20  Q   So, you don't know what he said?
21  A   He wrote that.  I can't tell you.
22  Q   Did you also interview Levi Davis?
23  A   If Dr. Bazzell has notes from down there, I did,

Page 43

1       yes, ma'am.
2   Q   I do not see any notes.  Did you conduct an
3       interview --
4   A   Going back to -- was it Law?  He was at voc tech,
5       which was off campus.  And that is why I maybe did
6       not get to interview him.
7   Q   Okay.  That would have been Andrew Law?
8   A   Of the names that he had given me, I was not able
9       to interview possibly, because he was off -- at
10      voc tech.
11  Q   Levi Davis -- I don't see.  Did you interview Levi
12      Davis?
13  A   I do not recall, ma'am.  If there is notes from
14      Dr. Bazzell, I did.
15  Q   There are none.
16  A   I did not, then.
17  Q   How about Thomas Green?
18  A   Do you have notes from Dr. Bazzell?
19  Q   I'm looking.  Yes.
20  A   Okay.
21  Q   On him, I do.
22  A   No knowledge.
23  Q   Did you -- I mean, you would have been the person

Page 44

1       that spoke with him?
2   A   Yes, ma'am.
3   Q   Well, who else did you interview, if anyone?
4   A   I was given five or six or so names.
5   Q   Did you interview Blake Faulkner?
6   A   Again, I apologize.  I do not -- I don't know all
7       the names of these students, because I --
8   Q   Okay.  Well, let me let you -- let me read it to
9       you on Blake Faulkner.  This is Plaintiff's
10      Exhibit 14.  It says B. Pyron talked with student.
11  A   Blake Foster?
12  Q   B. Pyron?
13  A   That's me.
14  Q   Talked with student.
15  A   Which one?
16  Q   I'm sorry.  Blake Faulkner.
17  A   Okay.  Yes, ma'am, I talked with him, then.
18      MS. DePAOLA:  Could you just read him
19          your notes?  Could we just put this
20          on?  Dr. Bazzell is going to read
21          it.
22      DR. BAZZELL:  Buddy Pyron talked with
23          student.  No information.  Student

Page 45

1       cooperative.  Denies allegation.
2       Parents approve of CC -- who was
3       Charles Coon -- and student spending
4       time away from school.
5   BY MS. DePAOLA
6   Q   Does that refresh your recollection as to who
7       Blake Faulkner is?
8   A   No, ma'am.  If they came in, I would not be able
9       to recognize who they are.  But as far as
10      interviewing them, yes, ma'am.
11  Q   Did you call his father?  When you said, parent
12      approves of him spending --
13  A   That was just his statement, I'm sure.
14  Q   Oh.  That was Blake's statement?
15  A   Yes, ma'am.
16  Q   Now, why was Blake identified to be interviewed?
17  A   He was a name that was given to me by Dr. Bazzell.
18  Q   I gotcha.  Okay.
19      So, at no time were you instructed to do any
20      kind of investigation as to sexual abuse of these
21      children?
22  A   No, ma'am.  It was mainly the complaint of what
23      Dr. Bazzell -- and just like I said about smoking;

                        12  (Pages 42 to 45)

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 46

1    smoking with students, and possible Marijuana.
2  Q   All right. After you conducted these interviews,
3      did you contact any of the students' parents?
4  A   No, ma'am.
5  Q   Did you contact DHR?
6  A   No, ma'am.
7  Q   So, what's the next thing you did?
8  A   I -- reference to --
9  Q   After you talked to Dr. Bazzell on the phone --
10 A   Dr. Bazzell --
11 Q   -- then what did you do?
12 A   It was him. He was the one that asked for the
13     investigation. So, he -- when I gave him the
14     information, then he responded -- of course --
15 Q   What did you do further? I'm just asking what was
16     your next step?
17 A   Well, I talked to -- when he put Mr. Coon back in
18     school, I talked with Mr. Coon and told him in
19     reference to smoking on campus, again, that no way
20     was going to happen. And that he would be -- no
21     student would be in his vehicle or any reference
22     to him transporting students.
23 Q   Anything else you warned him about?

Page 47

1  A   I can't remember anything else, ma'am. But I did
2      have a conference with him after he came back,
3      which after Dr. Bazzell had had a conference with
4      him. And uhm --
5  Q   Well, did you ever interview Mr. Coon about these
6      allegations?
7  A   No, ma'am.
8  Q   As part of your investigation?
9  A   That was Dr. Bazzell doing that.
10 Q   Did you ever ask him about this "butt baby" thing?
11 A   No, I did not.
12 Q   Did you interview Matt or MAK King?
13 A   If there is notes there, I did. If not, I didn't.
14     I do not recall, Ms. DePaola, students. And, I
15     apologize, but I don't remember their names.
16 Q   Okay. Let me try and read this --
17 A   All of the students I interviewed were in the
18     band, I remember.
19 Q   Let me try and read you this note and see if you
20     have any recollection of what this is about.
21 A   Okay.
22 Q   First of all -- and this is Plaintiff's
23     Exhibit 14. It's page 90 of the Board's Exhibits,

Page 48

1      or production. In the middle it said, Cody Dunn's
2      store. (Indicating.) Does that have any meaning
3      to you in terms of this investigation?
4  A   No, ma'am.
5  Q   Okay. All right. Then it says Matt King, dash B.
6      Pyron and R. McDaniel report the story came --
7      well, I'm sorry --
8          MR. SWEENEY: Let's go off the Record.
9          (Brief recess.)
10 BY MS. DePAOLA:
11 Q   Mr. Pyron, have you had an opportunity to read the
12     note that Dr. Bazzell made about Matt King?
13 A   Yes, ma'am.
14 Q   Does that refresh your recollection --
15 A   Can I look at it again?
16 Q   Sure.
17 A   I've forgotten what it said. Okay. May he read
18     it again to me?
19 Q   Sure.
20 A   I can't read his writing.
21         DR. BAZZELL: Buddy Pyron and Robert
22             McDaniel report this story made by
23             mother of Matt King late first

Page 49

1      semester when she was at school
2      concerning Matt's grade. Made at
3      time Matt had D or F in band. She
4      stated occurred month earlier. No
5      explanation as to why she did not
6      report. Buddy Pyron discussed with
7      Chris. I don't know -- he denied
8      saying Marijuana used by anyone.
9      Only cigarettes. Denied any other
10     inappropriate activity or knowledge
11     of this.
12         MS. DePAOLA: Okay. Let me have that
13     back.
14 BY MS. DePAOLA:
15 Q   Does that refresh your recollection?
16 A   Yes, ma'am, I think in the investigation thing it
17     was on the second part of that.
18 Q   Talk to her (indicating).
19 A   I reported the second part of that in reference to
20     the investigation where Buddy Pyron --
21         THE WITNESS: You have a unique
22             handwriting, Dr. Bazzell.
23         MR. SWEENEY: Let's go off the Record

13 (Pages 46 to 49)

JR, A Minor                July 25, 2007   Pike County Board of Education

Page 50

1      just a minute.
2      (Brief recess.)
3      (Whereupon, Plaintiff's Exhibit 16
4      was marked for identification and
5      is attached hereto.)
6  BY MS. DePAOLA
7  Q   All right. Let's go back on the Record.
8      Mr. Pyron, I have marked as Plaintiff's Exhibit 16
9      a typed version of the notes that Mr. -- I'm
10     sorry -- that Dr. Bazzell has provided to us in
11     order to assist us in determining what he said --
12     what he wrote down.
13         Does this assist you in recalling your
14     interview with Matt King?
15 A   Yes, ma'am. Reading that, yes, ma'am.
16 Q   And in there, there is a reference to, this story
17     was made by mother late first semester. Does that
18     refer to the story about smoking late last
19     semester --
20 A   About the grades. See there, it refers to --
21 Q   It says when she was --
22 A   Made at a time Matt had a D or F in band.
23 Q   Right. So, what story --

Page 51

1  A   The story was in reference to grades was because
2      of something happened in first semester.
3  Q   So, in other words, there was no story first
4      semester that you recall about smoking, Mr. Coon
5      smoking?
6  A   That -- obviously, that means that -- that I
7      recall.
8      I talked to Mr. Coon in reference to the grade
9      in the band. And I think she reported it later
10     about him smoking, because of the grade.
11 Q   You don't know?
12 A   Best I can read from that, yes, ma'am.
13 Q   Oh, okay, yes.
14 A   Those were Dr. Bazzell's notes that he had.
15 Q   I know.
16 A   That he was confirming, I suppose.
17 Q   Well, it says, she stated question mark occurred
18     much earlier. Is that about the smoking, or
19     is it about the grade? What occurred much
20     earlier?
21 A   Yes, ma'am, first semester.
22 Q   What occurred first semester?
23 A   The smoking, ma'am, I would think.

Page 52

1  Q   Okay. No explanation as to why she did not report
2      it. Is that again why she didn't report the
3      smoking? Is that what you were telling
4      Dr. Bazzell?
5  A   Ma'am, these are Dr. Bazzell's notes --
6  Q   I know.
7  A   -- in reference to what we had reported earlier.
8      And, in turn, in our investigation, was asking --
9      as you notice down here, it says, then Buddy Pyron
10     discussed with the student, and he denied all
11     these other things.
12     He was -- he was saying that goes back to what
13     the parent had said similar earlier.
14 Q   About smoking?
15 A   About the smoking back with grade thing. Okay?
16 Q   Okay.
17 A   So, I'm thinking in his notes that he put that
18     down.
19 Q   But when you testified about the grade thing, you
20     didn't mention anything about the smoking thing, I
21     guess -- I don't think. Oh, yes, I apologize.
22     You said he might have been smoking. Is that your
23     testimony --

Page 53

1  A   Yes, ma'am.
2  Q   -- that when the grade issue came up, the might
3      have been smoking came up, also?
4  A   Yes, ma'am.
5  Q   I understand now.
6  A   Which happened in first semester. I was just
7      trying to solve the problem at the time. Couldn't
8      solve the problem then.
9  Q   Did you ask Matt King anything about sexual abuse?
10 A   Well, I asked him about any other inappropriate
11     activity.
12 Q   Okay.
13 A   The word "sexual abuse", I did not use.
14 Q   Earlier you said.
15 A   That was not part of the investigation.
16 Q   That wasn't part of your investigation?
17 A   No, ma'am.
18 Q   You said you asked them was there any other
19     behavior that would be unbecoming a band director.
20     Is that substantially the same question that was
21     asked to each of the students?
22 A   Yes, ma'am.
23 Q   Did you ask him about the butt baby?

14  (Pages 50 to 53)

Page 54

1  A   I don't remember exactly which student, what
2      student or all the students precisely about the
3      word "butt baby", ma'am. Uhm --
4  Q   **Is that one --**
5          MR. SWEENEY: Wait. He hadn't finished
6              his answer.
7          MS. DePAOLA: Sorry.
8  A   In Dr. Bazzell's statement to me to check in on
9      the Marijuana, the smoking with the students, if
10     there was any other inappropriate activity, okay.
11     I'm not sure if the word "butt baby", whether he
12     stated it to me at that time, or if the student
13     said butt baby; but when I started questioning
14     when someone said that, there was no allegation or
15     no reference to go -- it was not eye opening that
16     there was any activity or anything that was sexual
17     harassment or abuse.
18 Q   **Did you have a conversation with Dr. Bazzell about**
19     **this during the break?**
20 A   Uhm, in some terms, yes, ma'am.
21 Q   **What was said?**
22 A   That he sent me a letter -- it's evidence, I
23     think -- that had the investigation -- what he had

Page 55

1      done -- what he had requested me to do.
2  Q   **He sent you a letter telling you what you should**
3      **do?**
4  A   Yes, ma'am. In the suspension of Mr. Coon, the
5      letter that you referred to.
6  Q   **Yes, sir.**
7  A   I did get a copy of that.
8  Q   **Okay. So, he told you that during the break?**
9  A   Yes, ma'am.
10 Q   **Well, I had previously shown you Plaintiff's**
11     **Exhibit 14, and you said you had never seen that**
12     **before?**
13 A   No, ma'am. I said I don't recall it.
14 Q   **And now Dr. Bazzell has told you did?**
15 A   He did send me one, yes, ma'am.
16 Q   **And now you recall it?**
17 A   Uhm, yes, ma'am. The fact that he sent it to me
18     of what he was going to do with Mr. Coon, what he
19     wanted me to do as far as the investigation.
20 Q   **So, now you recall receiving this letter?**
21 A   Yes, ma'am.
22 Q   **Anything else you and Dr. Bazzell discussed during**
23     **the break?**

Page 56

1  A   No, ma'am, not that I know of.
2  Q   **Did you discuss the "butt-baby" thing during the**
3      **break?**
4  A   That -- that he sent me that or anything, no,
5      ma'am. We have discussed butt baby --
6          MR. SWEENEY: Now, don't indicate any
7              conversation with me or in my
8              presence.
9          THE WITNESS: Okay. And that's hard to
10             do.
11 A   Repeat your question, ma'am.
12 Q   **Outside of the presence of Mr. Sweeney, have you**
13     **and Dr. Bazzell discussed the butt-baby issue and**
14     **the questions that I have asked about that?**
15 A   In times past?
16 Q   **Yes.**
17 A   In times past, yes, ma'am.
18 Q   **Was Mr. Sweeney present during those meetings?**
19 A   Not always, no, ma'am.
20 Q   **Tell me any conversations you had with Dr. Bazzell**
21     **when Mr. Sweeney was not present.**
22 A   Well, when I found out in reference to -- when I
23     first heard of the situation that there was going

Page 57

1      to be a deposition.
2  Q   **Yes, sir.**
3  A   When I was notified, first of all, of what the
4      issue was about.
5  Q   **You and Dr. Bazzell had a conversation about the**
6      **butt-baby thing?**
7  A   Well, he called to me and explained to me what the
8      problem was.
9  Q   **Yes. Tell me what you recall about that**
10     **conversation. What was the problem?**
11 A   Well, that Mr. Coon, of course, had been charged
12     with sodomy or whatever. I don't know what he's
13     charged with. And that there was a new issue that
14     had arisen reference to Justin Reed --
15         THE WITNESS: Right?
16 A   -- and that there was about situations that
17     happened, supposedly happened, had been said it
18     happened. None of this on campus. But that he
19     was referring to the word "butt baby" --
20 Q   **He, who, Dr. Bazzell?**
21 A   No. Yeah, Dr. Bazzell.
22     -- that all this came about the same as far as
23     what -- I'm trying to recall exactly how we

15 (Pages 54 to 57)

Page 58

1    discussed that. He was informing me about what
2    the situation was. And I was just -- I was
3    unaware of any of it --
4  Q   Okay.
5  A   -- as far as the situation.
6  Q   All right. Did you discuss the butt baby or
7    similar term about Dr. Bazzell during the break we
8    took?
9  A   Briefly.
10 Q   What was said?
11 A   That he did -- on the letter he did recall me
12   to -- that he did ask me to look into the word
13   "butt baby", who they were or whatever. And I
14   remembered him giving me that letter now.
15 Q   So, you're changing your testimony --
16 A   In some aspect to the fact that I do recall it
17   differently.
18 Q   Now, is there anything in that letter about -- you
19   said butt baby. Is that what you're now recalling
20   Dr. Bazzell told you to look into?
21 A   No. He was -- he told me to look into smoking,
22   smoking with students, Marijuana, and any other
23   inappropriate behavior that might be -- that could

Page 59

1    be found out.
2  Q   Well, did he say, look into sexual abuse of these
3    children?
4  A   No, he did not say "sexual abuse", no, ma'am.
5  Q   Did he say any word "sexual"?
6  A   No, ma'am.
7  Q   Just any other inappropriate behavior?
8  A   Yes, ma'am.
9  Q   And that was in your telephone conversation?
10 A   Yes, ma'am.
11 Q   And now you're testifying you then received this
12   letter?
13 A   This was after he was suspended, I received the
14   letter indicating he was suspended, and what he
15   was suspended for.
16 Q   And did this letter direct you to investigate
17   possible sexual improprieties?
18 A   I would have to go back and read the letter,
19   ma'am.
20 Q   Please do.
21 A   It says here, according to reports, you have
22   allegedly engaged in the use of illegal drugs with
23   students, provided illegal drugs to students, and

Page 60

1    also allegedly engaged in other inappropriate
2    activities with students of a sexual nature.
3    Since these reports involve allegations of
4    criminal conduct on your part, I have also
5    notified appropriate law enforcement personnel.
6  Q   So, are you now testifying that your investigation
7    included sexual --
8  A   Inappropriate behavior.
9  Q   Just generally inappropriate behavior?
10 A   Anything that might not be appropriate.
11 Q   Did that include sexual abuse?
12 A   Yes, ma'am, if it was noted by the students.
13 Q   And the only question that you have told me you
14   asked them that would remotely relate to that, is
15   there any other behavior that would be unbecoming
16   to a band director? Is there any other question
17   that you asked?
18 A   I cannot recall exactly how I was asking the
19   questions. I did not come out and use the word
20   "sexual abuse or harassment". I did not use those
21   terms.
22 Q   Why not?
23 A   I didn't want to lead them. I wanted them to --

Page 61

1  Q   Just spontaneously --
2  A   -- come out and tell me, in my probing, that there
3    may be something else.
4  Q   What other probing did you do besides the one that
5    you gave me?
6  A   Well, all the others I gave you, as well, as far
7    as the activities that reference to Mr. Coon.
8  Q   You said, do you know if Mr. Coon smokes? Have
9    you seen him smoke on campus? Does he smoke with
10   other students? Does he smoke anything other than
11   regular cigarettes? And is there any other
12   behavior that would be unbecoming a band director?
13   Are there any other questions that you can
14   recall?
15 A   I cannot recall.
16 Q   Did you ever say, has Mr. Coon ever touched you in
17   an inappropriate fashion?
18 A   I do not.
19 Q   You do not?
20 A   I did not.
21 Q   Okay. And I take it you didn't have any policy or
22   procedure or manual to guide you in making this
23   investigation?

Page 62

1  A   I did not.
2  Q   After that -- after you conducted the interviews
3      and you had the phone conference with Mr. --
4      Dr. Bazzell, you met with Mr. Coon back at the
5      school when he returned?
6  A   When he returned the next week.
7  Q   You warned him about the smoking and don't
8      transport the students in the vehicle?
9  A   Right.
10 Q   Any other warnings?
11 A   I can't -- I can't recall.
12 Q   Any other questions to him or any other
13     investigatory attempts on your part with Mr. Coon?
14 A   Well, no, ma'am.  Reference -- it was to
15     Dr. Bazzell, as he had done his investigation.
16     Dr. Bazzell called me before he came back to the
17     school, and he told me what he had also talked
18     with him.  And then I talked with him.  And I was
19     just following up on what Dr. Bazzell had talked
20     with him.
21 Q   Okay.  Now, at some point, did you have some
22     contact with Justin Reed?
23         MR. SWEENEY:  You mean, anytime he was

Page 63

1      his interim principal?
2  Q   Not just -- I am not saying passing him in the
3      hall, but I am just saying --
4  A   Oh, no.  I remember Justin -- an incident on the
5      bus.  And it had to do with Justin and his
6      brother.
7         THE WITNESS:  He's got a brother named
8      Josh -- I think.
9  Q   Joseph.
10        THE WITNESS:  Younger brother?
11 Q   Yes, sir.
12 A   There was an incident on the bus where the bus
13     driver brought to my attention that the incident
14     happened.  And I remember reenacting the incident
15     and --
16 Q   What do you remember about it?
17 A   Uhm -- one of the kids -- and I can't remember if
18     it was -- Joseph is his name?
19 Q   Yes, sir.
20 A   -- either got hit in the stomach, or he hit
21     another kid in the stomach.  And Justin came from
22     the back of the bus to handle the situation.  And
23     I had -- and the bus driver had a -- I don't know

Page 64

1      what all happened on the bus right now.  But I
2      remember reenacting it, and someone, if I remember
3      correctly, was suspended from the bus a couple of
4      days.
5  Q   Okay.
6  A   Other than that, I don't remember.
7  Q   Okay.  Do you not recall the incident in which
8      Justin broke the window in the band room?
9  A   No, ma'am.
10 Q   And called Mr. Coon --
11 A   I remember a window being broken, but I do not
12     recall it was Justin that did it.
13 Q   Do you recall discovering at some point that
14     Justin had Mr. Coon's cell phone number and had
15     called Mr. Coon?
16 A   No, ma'am.
17 Q   Do you recall you then using that number to
18     call -- taking that number and calling it to see
19     if it was, in fact, Mr. Coon's cell phone?
20 A   No, ma'am.
21        MS. ALLEN:  Can we talk for just a
22        second?
23        MS. DePAOLA:  Sure.  Excuse us.

Page 65

1      (Brief off-the-Record discussion.)
2         MS. DePAOLA:  Back on the Record.
3  BY MS. DePAOLA
4  Q   Let me just make sure that you know all of the
5      facts that I know or think I know, and see if it
6      refreshes your recollection.  We understood that
7      Justin was locked in the band room during the
8      spring of 2005.
9  A   Okay.
10        MR. SWEENEY:  Object to the form.
11 Q   Does that refresh any recollection?
12        MR. SWEENEY:  Object to the form.
13        THE WITNESS:  (Witness Indicating.)
14        MR. SWEENEY:  You can answer.
15 A   I remember -- I did not remember it being Justin.
16     I remember a child was in the office, and some
17     other kids was holding the door.  And for some
18     unknown reason, he smashed the window to get out
19     (indicating).  And if that was Justin, I did not
20     remember it being Justin.  I just remember the
21     window being broken.
22 Q   And so whoever this child was, what did you do
23     about that?  Did you have a meeting in the office

JR, A Minor                     July 25, 2007   Pike County Board of Education

Page 66

1   with the child's parent?
2   A   I would think there would be restitution for the
3       window.
4   Q   I don't want you to speculate what you did.  Do
5       you recall being in the office with Mr. McDaniel,
6       Mrs. Reed -- this lady right here (indicating) --
7       a student, and in relation to this
8       breaking-the-window issue?
9   A   I do not recall that.
10  Q   Okay.
11  A   Very likely could have, because I would -- if the
12      child broke the window without reason -- I mean,
13      with -- acting -- it was not just an accident,
14      then I would have requested restitution.
15  Q   Were you aware that Justin was a child with mental
16      retardation?
17  A   No, ma'am.
18  Q   Did you do any evaluations on Mr. Coon?
19  A   PEPE evaluation.
20  Q   Okay.  And at any time, to your knowledge, did you
21      put in any of those evaluations any of the issues
22      about smoking with students?
23  A   No, ma'am, not on PEPE.

Page 67

1   Q   Anything that put people on notice of driving
2       students around in his private vehicle?
3           MR. SWEENEY:  Object to the form.
4   A   No, ma'am, not on PEPE.
5   Q   In anything?
6   A   No, ma'am.
7   Q   Did you at any time talk with Blake Faulkner's
8       father, Phillip Faulkner, the State Trooper?
9   A   Not that I recall.
10          MS. DePAOLA:  That's all.  Thank you --
11          do we have his signature on those?
12              EXAMINATION
13  BY MR. SWEENEY
14  Q   Mr. Pyron, you have been named as a Defendant in
15      this lawsuit both in your capacity as principal at
16      Pike County High School and as an individual.
17      You've made reference during the deposition that
18      you knew Charles Coon.  You knew the teacher at
19      Pike County High School named Charles Coon?
20  A   Yes, sir.  Only at Pike County.
21  Q   Did you have any dealings with him, with Charles
22      Coon, other than in your official capacity as
23      principal?

Page 68

1   A   No, sir.
2   Q   Did you have any dealings with Charles Coon
3       outside the line and scope of your employment as a
4       principal?
5   A   No.
6   Q   Did you know Charles Coon on a personal or social
7       basis?
8   A   No, sir.
9   Q   You have just indicated that you knew Justin Reed.
10      Did you deal with Justin Reed only within the line
11      and scope of your authority as a principal?
12  A   Only.  Yes, sir.  Yes, sir.
13  Q   Did you have any relation with Justin Reed on a
14      social or personal or private basis?
15  A   No, sir.
16  Q   During your tenure as interim principal at Pike
17      County High School, did any information come to
18      your attention that would have created a suspicion
19      that Justin Reed was being sexually abused?
20          MS. DePAOLA:  Object to the form.
21  Q   Did any information come to your attention while
22      you were interim principal that Justin Reed was
23      being sexually abused?

Page 69

1   A   (Inaudible).
2           MS. DePAOLA:  What did you say?
3           THE COURT REPORTER:  I'm sorry?
4           THE WITNESS:  I'm sorry?
5           MS. DePAOLA:  We can't hear you.
6           THE WITNESS:  I'm sorry.  By no means.
7   BY MR. SWEENEY
8   Q   Did any student ever bring to you any information
9       that would indicate that Justin Reed was being
10      sexually abused or evidence that might put you on
11      suspicion of that?
12          MS. DePAOLA:  Object to the form.
13  A   No, sir.
14  Q   Did any parent ever bring to you information that
15      would create a suspicion or accusation that
16      Charles Coon was abusing Justin Reed?
17          MS. DePAOLA:  Object to the form.
18  A   No, sir.
19  Q   Did any employee, faculty member, or otherwise,
20      ever bring any information to you that Charles
21      Coon might be acting in an inappropriate manner
22      with students?
23  A   No, sir.

18  (Pages 66 to 69)

Page 70

1  Q   Did any law enforcement person bring to your
2      attention information that Charles Coon might be
3      acting in an inappropriate way with students?
4  A   No, sir.
5  Q   As you and your staff investigated matters that
6      came up concerning Coon during the spring of 2005,
7      did any information, from students or any other
8      source, create a suspicion in your mind that
9      Charles Coon might be engaged in sexually
10     inappropriate conduct with any student?
11 A   Did not find that, no, sir.
12 Q   Did Justin Reed's name come up in any of your
13     investigation from any source that Charles Coon
14     might be having an inappropriate relation with
15     him?
16 A   Justin Reed's name did not come up.
17 Q   When Mark Bazzell asked you to investigate the
18     information that had been provided to him, did you
19     take that responsibility seriously?
20 A   Yes, sir.
21 Q   To the extent that you interrogated the students,
22     did you do so earnestly?
23 A   Yes, sir.

Page 71

1  Q   Diligently?
2  A   To the best of my knowledge.
3  Q   In your professional judgment, were you thorough
4      in investigating the information that was provided
5      you?
6  A   Yes, sir.
7          MR. SWEENEY:  Thank you very much.
8          MS. DePAOLA:  Just a second.
9          (Off-the-Record discussion.)
10         FURTHER EXAMINATION
11 BY MS. DePAOLA:
12 Q   Did any parent other than Polly King ever bring
13     any information to your attention that Charles
14     Coon might be engaged in any inappropriate
15     behavior?
16         MR. SWEENEY:  Object to the form.
17         THE WITNESS:  I'm sorry?
18         MR. SWEENEY:  You can answer.
19 A   I do not recall any.
20 Q   Do not recall any?
21 A   Huh-huh.
22         MS. DePAOLA:  That's all.  Thank you.
23         MR. SWEENEY:  Thank you.

Page 72

1          Buddy, you will need to sign
2      three copies of this -- you read
3      over it, you went back over it,
4      your answers to interrogatories?
5  THE WITNESS:  No, I didn't.
6  MR. SWEENEY:  Before you leave, you'l
7      need to sign that in front of the
8      notary.
9
10         (Whereupon, at approximately, 11:25
11     a.m. on the 25th day of July, 2007
12     the deposition was concluded.)
13
14
15         * * * * * * * * *
16 FURTHER DEPONENT SAITH NOT
17         * * * * * * * * * *
18
19
20
21
22
23

Page 73

1
2          REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8  transcript of the deposition of WALTER (BUDDY) PYRON
9  was taken down by me in machine shorthand on the 25th
10 of July, 2007, and the questions and answers thereto
11 reduced to writing under my personal supervision, and
12 that the foregoing represents a true and correct
13 transcript of the proceedings given by said witness
14 upon said hearing.
15     I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18     Dated this 10th day of August, 2007.
19
20
21     _____
21     Mary Moore-Wynn
22     Certified Shorthand Reporter
23

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                        CASE NO.:

                                           2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

    DEPOSITION OF ROBERT McDANIEL, taken before Mary

Moore-Wynn, as Commissioner, on the 25th of July, 2007,

in the offices of Pike County Board of Education, 107

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 12:00.


* * * * * * * * *

JR, A Minor                July 25, 2007  Pike County Board of Education

|  | Page 2 |
|---|---|
| 1 | * * * * * * * * * * |
| 2 | APPEARANCES |
| 3 | FOR THE DEFENDANT: |
| 4 | Hon. Susan DePaola |
|  | Attorney at Law |
| 5 | 1726 West 2nd Street, Suite B |
|  | Montgomery, Alabama 36105 |
| 6 |  |
| 7 | and |
| 8 | Hon. Deanie Allen |
|  | Azar and Azar |
| 9 | 260 Washington Avenue |
|  | Montgomery, Alabama 36104 |
| 10 |  |
| 11 | FOR THE DEFENDANT: |
| 12 | Hon. Donald R. Sweeney |
|  | Bradley, Arant, Rose & White |
| 13 | One Federal Place |
|  | 1819 Fifth Avenue North |
| 14 | Birmingham, Alabama 35203 |
| 15 |  |
| 16 | ALSO PRESENT: |
| 17 | Dr. Mark Bazzell, Superintendent |
| 18 | Ms. Elizabeth Reed |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 | * * * * * * * * * * |

|  | Page 4 |
|---|---|
| 1 | either party hereto provided for by the Statute, |
| 2 | regardless of the waiving of the filing of same. |
| 3 | It is further stipulated and agreed by and |
| 4 | between counsel and the witness that the reading |
| 5 | and signing of the deposition by the witness is |
| 6 | hereby waived. |
| 7 |  |
| 8 | INDEX |
| 9 | ROBERT MCDANIEL |
| 10 | Examination By Ms. DePaola            5 |
|  | Examination By Mr. Sweeney           51 |
| 11 | Further Examination By Ms. DePaola   57 |
| 12 | Reporter's Certificate          60 |
| 13 | INDEX OF EXHIBITS |
| 14 | Exhibit Number    Description     Page Number |
| 15 | Plaintiff's Exhibit 17  Student            37 |
|  | Disciplinary Report Relating to |
| 16 | Justin Reed |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 | * * * * * * * * * |
| 23 |  |

|  | Page 3 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 | STIPULATIONS |
| 6 |  |
| 7 | It is hereby stipulated and agreed by and between |
| 8 | counsel representing the parties that the deposition of |
| 9 | ROBERT McDANIEL is taken pursuant to the Federal Rules |
| 10 | of Civil Procedure, and that said deposition may be |
| 11 | taken before Mary Moore-Wynn, CSR, as Commissioner, |
| 12 | without the formality of a commission; that objections |
| 13 | to questions, other than objections as to the form of |
| 14 | the questions, need not be made at this time, but may |
| 15 | be reserved for a ruling at such time as the deposition |
| 16 | may be offered into evidence, or used for any other |
| 17 | purpose by either party hereto, provided by the |
| 18 | Statute. |
| 19 | It is further stipulated and agreed by and between |
| 20 | counsel representing the parties in this case, that the |
| 21 | filing of the deposition of ROBERT McDANIEL is hereby |
| 22 | waived, and that said deposition may be introduced at |
| 23 | the trial of this case or used in any other manner by |

|  | Page 5 |
|---|---|
| 1 | ROBERT MCDANIEL |
| 2 | (Whereupon, the witness, after having first been |
| 3 | duly sworn to speak the truth, the whole truth, and |
| 4 | nothing but the truth, testified as follows:) |
| 5 | EXAMINATION |
| 6 | BY MS. DePAOLA |
| 7 | Q  Could you state your name for the Record, please? |
| 8 | A  My name is Robert Lee McDaniel, Senior. |
| 9 | Q  What is your home address? |
| 10 | A  Home address is 9441 Winfield Place, Montgomery, |
| 11 | Alabama. |
| 12 | Q  Is it 36 -- |
| 13 | A  117. |
| 14 | Q  -- 116? |
| 15 | A  117. |
| 16 | Q  And where are you currently employed? |
| 17 | A  I am employed at Wilcox Central High School in |
| 18 | Camden, Alabama. |
| 19 | Q  And what is your position there? |
| 20 | A  I am the assistant -- one of the assistant |
| 21 | principals there. |
| 22 | Q  Could you just briefly give me a history of your |
| 23 | educational employment? |

Page 14

1   of sexual abuse?
2   A   No.
3   Q   Okay. Did you have any duty to establish policies
4       and procedure at Pike County High School?
5   A   Yes. And they were more or less on the line of
6       school climate; classroom management, discipline.
7       Different situations that would occur during the
8       regular school day.
9   Q   Would those be reflected in the faculty handbook?
10  A   No. They would have been reflected in the Code of
11      Conduct, but more or less just a re-reminder to
12      the students and the faculty how the Code of
13      Conduct reflects and determine the school climate
14      and culture of the school.
15  Q   But, I mean, I didn't understand that you had the
16      responsibility for writing that Code of Conduct.
17  A   No, when I say that, I meant just letters of
18      reminders, for example, reminding students that a
19      tardy bell means it's time to get to class.
20  Q   The question is: Did you have any responsibility
21      for establishing policies and procedure at Pike
22      County High School?
23  A   Only enforcing them.

Page 15

1   Q   Only enforcing them. Okay. All right. And you
2       are familiar with Charles Coon?
3   A   Yes.
4   Q   All right. And am I correct you were only in Pike
5       County one year?
6   A   One year, yes, ma'am.
7   Q   So, your first contact with him was at Pike County
8       High School?
9   A   Yes, ma'am.
10  Q   And now have you heard or do you know from any
11      source whatsoever other than Mr. Sweeney whether
12      Mr. Coon has ever been charged -- well, not
13      charged -- accused of any sexual improprieties in
14      any place other than Pike County?
15  A   No.
16  Q   You don't know that?
17  A   No.
18  Q   Okay. And tell me what your first contact was
19      with Mr. Coon other than general faculty meetings?
20      I mean, one-to-one contact with him.
21  A   Uhm, it was actually during the summer, band camp
22      of '05.
23  Q   And can you tell me about that contact?

Page 16

1   A   Basically, I met him, because I met the students
2       who were in band camp first. They were the only
3       students on campus. And I met the students who
4       were in the gym. As a matter of fact, it was my
5       second day there. And sometimes during that same
6       week, I met him in my office. He came up and
7       introduced himself as being the band director.
8   Q   At that time when you met him, did you have any
9       issues or concerns about him that you expressed to
10      him?
11  A   No.
12  Q   Were you aware at that time that he was
13      transporting Pike County High School students in
14      his private vehicle?
15          MR. SWEENEY: Object to the form.
16  A   No.
17  Q   Did you ever become aware of that?
18  A   I was told that by a third party January of '05 --
19      '0 -- '05.
20  Q   Who was that third party?
21  A   I believe it was a parent. Name was Polly King.
22  Q   Okay. Well, is that something that would be of
23      concern to you with your background of

Page 17

1   sexual-abuse training?
2   A   It was something that I thought was
3       unprofessional. And I relayed it up the chain.
4   Q   Okay. Who did you report that to?
5   A   I reported it to Mr. Pyron, who was at the time
6       the principal.
7   Q   And do you know if any action was taken in
8       response to that?
9   A   I am not aware of that -- of the specifics of it.
10  Q   Okay. Did you make any kind of note for any file
11      on Mr. Coon about that concern?
12  A   Written, no. No, I didn't.
13  Q   Okay. I want to go back in time. So, your first
14      contact with him was during band camp?
15  A   Uh-huh. Summer '04.
16  Q   Did you meet Justin Reed during that band camp?
17  A   Can't say. I don't remember.
18  Q   Do you know who Justin Reed is?
19  A   I knew of Justin, but not very well.
20  Q   I mean, if he walked through the door, would you
21      recognize him?
22  A   No, I wouldn't.
23  Q   All right. Tell me this: When is the first time

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 18

1    that you had any concerns about Mr. Coon's
2    behavior or contact with the students,
3    performance, whatever?
4  A   My only concern with Mr. Coons was from the
5    standpoint of classroom management, discipline.
6  Q   Can you explain that to me? What was the problem?
7  A   The problems I wouldn't say was specifically with
8    Mr. Coons (sic). It was my perception, or my
9    idea, of the conduct of any auxiliaries that
10   represented the school, which was the band, the
11   football team. My concern was that if they went
12   on the road that they would be ambassadors, good
13   ambassadors for the school. And any reports that
14   came back to me that arose that that was not the
15   case, I always addressed those to those
16   individuals who was in charge.
17 Q   What issues were there with respect to the band's
18   behavior?
19 A   I think basically kids being kids. Loud on the
20   bus during trips to -- to and from games.
21   Misconduct during band practices. Not --
22 Q   Such as?
23 A   Not reporting -- for example, had a policy that

Page 19

1    stated that any student who was on campus
2    following the last bell for the last class should
3    be under the control or supervision of a faculty
4    member, may it be band, cheerleaders, or whatever.
5    And, occasionally, they would roam and not show up
6    for practice on time.
7        So, other than that, that was it. Maintaining
8    control of your classes before, during, and after
9    school.
10 Q   And who did you report this concern to?
11 A   I wouldn't say it was a report. It was an
12   approach that I made to Mr. Coons to get better
13   control of the band during band practices.
14 Q   All right. Now, were you at school when the
15   choking incident occurred with the Foster child?
16 A   Uhm, I can't say if I was at school. But the
17   report was brought back to me.
18 Q   That was a bad question. I mean, are you familiar
19   with the indent involving the Foster --
20 A   Yes.
21 Q   Tell us what you know about that.
22 A   First of all, the parents brought the situation to
23   me about the alleged choking of the Foster child.

Page 20

1    And I had a conversation with Mr. Coons. And he
2    explained to me that because of, I guess his size,
3    or whatever, when he walked over and placed his
4    hand on the child, apparently, it stunned the
5    child. And the child reported back to the
6    parents. I had a meeting with the parents in my
7    office that same week. And both parents agreed
8    that they believed that it was kind of an
9    overreaction by Mr. Coons. And agreed to keep the
10   child in the band at that time.
11 Q   Did you report this incident to anyone?
12 A   I reported it to Mr. Pyron. And I believe he
13   relayed it to Dr. Bazzell.
14 Q   Okay. Was there any written record of this
15   incident placed in a file relating to Mr. Coon
16   somewhere?
17 A   It was a verbal warning to Mr. Coons, I believe.
18   And he agreed that he did put -- place his hand on
19   the child. And he apologized. And the parents
20   and Mr. Coon had an amiable agreement that he was
21   wrong. And they accepted his explanation of it.
22 Q   I think the question was: Was any written report
23   of this placed in a centralized file about

Page 21

1    Mr. Coon?
2  A   Only -- no, it was just a report that I did
3    referencing that particular case.
4  Q   To Dr. Bazzell?
5  A   Yes.
6  Q   Now, you mentioned that Polly King brought some
7    concern -- I think you said Polly King -- to your
8    attention about Mr. Coon. Is that correct?
9  A   That is correct.
10 Q   Tell me when that occurred and what she said.
11 A   That occurred January of '05 following first
12   semester report cards.
13 Q   And tell me what happened.
14 A   This particular parent arrived in my office to
15   complain about a grade that her son received
16   during the first semester. I explained to her
17   that I would look into the case. And as always
18   was the case, I would refer it up the chain to
19   Mr. Pyron, who was the principal. And --
20 Q   Is that the only concern she brought to your
21   attention?
22 A   The other concern was -- it was not necessarily a
23   concern, it was a sort of a warning, threat, that

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
             Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 22

1   if, you know, the grade or whatever was not fixed
2   that she was concerned, is that she would report
3   the fact that he had a student in his truck and
4   smoked with the student present.
5   Q   She was going to -- she was threatening to report
6       that to who?
7   A   She didn't say who she threatened to report it to.
8   Q   Now, having a student in the truck, transporting a
9       student in the truck, is that within the bounds of
10      professional conduct?
11  A   Absolutely not.
12  Q   And I wasn't clear what the report was.  Was it
13      that Mr. Coon was smoking, or Mr. Coon and the
14      student were smoking?
15  A   Mr. Coon.
16  Q   Was smoking in front of a student within the
17      bounds of professional conduct?
18  A   Absolutely not.
19  Q   So, what did you do about that aspect of the
20      problem?
21  A   I relayed that up the chain to Mr. Pyron, and he,
22      in turn, relayed it to Dr. Bazzell.
23  Q   How do you know that?

Page 23

1   A   Discussions.  What became of it, that type of
2       thing.
3   Q   What became of it?
4   A   In other words, discussion of the incident between
5       Mr. Pyron and myself.
6   Q   Okay.  But what was done about this?
7   A   Mr. Pyron, I believe, handled the investigation
8       from there.
9   Q   Was there any kind of centralized location where
10      you placed a report of this complaint?  You know,
11      like the file somewhere where you say, well,
12      here's another issue about Mr. Coon.  Let me put
13      this in that file?
14  A   No.
15  Q   Okay.  So, that brings you to January of '05.
16      After it was resolved, did you have further
17      conversation with Polly King?
18  A   None specifically that I can recall.  They were
19      always parents in and out of the office regarding
20      children, their grades, their performance,
21      discipline.  But specifically, no, I cannot recall
22      having a conversation with her.
23  Q   Was Ms. King one of the parents that was in

Page 24

1   complaining a lot?
2   A   She was at the school more than the average
3       parent, I would say.
4   Q   Complaining?
5   A   No.  Just a parent -- just at the school
6       occasionally.  Her son was in the band.  Band
7       parents stayed at the school a lot.
8   Q   What's the next issue that came to your attention
9       with respect to Mr. Coon, prior to April 1st, '05.
10      Let's say that.
11  A   None specifically.
12  Q   Okay.  Did you ever become aware that Mr. Coon had
13      provided a cell phone to Blake Faulkner?
14  A   Yes.  That actually occurred in the fall of '04.
15  Q   Tell me about that incident.
16  A   Which was normally the case; cell phones, dress
17      code, school climate, that type of thing, as
18      assistant principal, that was me.  Especially with
19      the situation with kids having cell phones.
20  Q   So, how did this incident come to your attention?
21  A   What happened is that the child was outside band
22      practice, I believe.  And during practice, I
23      believe the phone may have, I think, fell out.

Page 25

1   And I retrieved it.  And did with that particular
2   phone as I did with all the others.  I took it to
3   the office and labeled it and locked it up.
4   Q   So, what happened next about the phone?
5   A   I believe Mr. Coons, on the second or third day,
6       came in and requested the phone and stated that
7       the phone belonged to him.  I explained to him
8       that I retrieved the phone from a student, and it
9       was unauthorized, and I was going to treat it as I
10      did any other cell phone that I confiscated from a
11      student.  And I refused to give it back to him.
12  Q   Did you ask him why he provided a student with a
13      cell phone?
14  A   He volunteered the information to me.
15  Q   Which was what?
16  A   The fact that occasionally that particular student
17      being at band practice late or whatever, would
18      occasionally have to call a parent and use it.
19      So, he allowed him to use it.
20  Q   Did you consider this professionally appropriate
21      conduct?
22  A   I considered it inappropriate.
23  Q   So, to who did you report this?

Mary Moore-Wynn, CSR Mary Moore-Wynn    (334)244-0203
         Court Reporting Services

Page 26

1   A   I reported it to -- at the time, Mr. Pyron was not
2       with us at that time. I reported it to Mr. Casey,
3       who was still on campus at the time. And
4       Mr. Casey explained to him that it was my decision
5       to confiscate it -- confiscate it. And he stood
6       behind me. But I believe Mr. Coons got in touch
7       with the Superintendent. And the Superintendent
8       relayed the same; that it was confiscated. And he
9       was not going to force me to give it back.
10  Q   So, you never returned the cell phone?
11  A   I returned the cell phone to Mr. Coons, I believe
12      some maybe one, two weeks afterwards -- after the
13      child stated that it was an agreement between his
14      father and Mr. Coons that he was allowed to use
15      the phone. And I gave it back to Mr. Coons.
16  Q   So, Blake Faulkner came in and talked to you about
17      the cell phone?
18  A   Oh, Blake came in the same day and practically
19      every day to try to get the phone back.
20  Q   Tell me about those conversations.
21  A   Mr. Mc, can I have my phone? No, Blake you
22      cannot.
23  Q   Did you ever examine him about why he had accepted

Page 27

1       a gift like a cell phone --
2           MR. SWEENEY: Object to the form.
3   Q   -- Mr. Pyron -- Mr. Coon?
4           MR. SWEENEY: There is no evidence of a
5           gift.
6   A   No.
7   Q   Did you ever examine him about why he accepted a
8       cell phone from Mr. Coon?
9   A   No. I confiscated it as if I did any other cell
10      phone.
11  Q   And you made no investigation on that?
12  A   No.
13  Q   Did you contact Blake's father to see whether the
14      parent was aware --
15  A   No.
16  Q   -- that the child had a cell phone from the
17      teacher?
18  A   No.
19  Q   Did you ever talk to Blake's father?
20  A   No.
21  Q   The whole year, you never talked to Blake's
22      father?
23  A   No.

Page 28

1   Q   Did you ever look at any of the numbers on the
2       cell phone; contact information, anything? Did
3       you turn it on and look at any of that?
4   A   No. I occasionally took the batteries out to keep
5       it from being damaged. But other than that --
6       some of the phones stayed in the office for an
7       entire year, the entire time that I was there.
8       And I would simply remove the batteries.
9   Q   And it's your recollection that this occurred in
10      the fall of '04?
11  A   I believe it was the fall, ma'am, because at the
12      time, I know for a fact that Mr. Pyron was not
13      there. Mr. Pyron didn't get there until the
14      second semester. So, I am fairly certain that it
15      was the fall of the year.
16  Q   So, you're saying this cell phone thing was
17      reported to Mr. Casey?
18  A   Yes. Uh-huh. Uh-huh.
19  Q   Okay. Did you have any further concerns about any
20      incidents that came to your attention involving
21      Mr. Coon and students?
22  A   None.
23  Q   None. Okay. So, did you participate in the

Page 29

1       April 1st investigation relating to Mr. Coon?
2   A   I was aware of it, but I did not take part in the
3       investigation.
4   Q   How did you become aware of it?
5   A   Uhm, just general conversation between myself and
6       Mr. Pyron.
7   Q   Tell me what those conversations were, what you
8       can recall from them.
9   A   Specifically, I think it was more or less just
10      relayed that there was some things that were
11      not -- I would say, professional, that had been
12      found during Mr. Pyron's investigation. And that
13      Mr. Coons would -- was going to be placed on
14      leave.
15  Q   That's all you knew?
16  A   That's all I know.
17  Q   You were never told there was allegations of
18      inappropriate sexual contact?
19          MR. SWEENEY: Object to the form.
20  A   (Witness Indicating.)
21  Q   You were never told that there were, quote,
22      inappropriate activities with students of a sexual
23      nature, closed quote?

JR, A Minor                    July 25, 2007   Pike County Board of Education

Page 30

1  A   A very, very vague --
2  Q   Let's be specific. What do you recall?
3  A   The information that I think that I got was that
4      information that had been relayed through local
5      authorities back to the school regarding Mr. Coons
6      and a student.
7  Q   And who was that student?
8  A   Absolutely, ma'am, at this particular point, I
9      can't recall the student's name.
10 Q   Okay. Well, tell me what the very, very vague
11     recollection you have is.
12 A   It was reported to, I believe, the Superintendent
13     and back down through the chain to Mr. Pyron, who
14     did the investigation.
15 Q   What was reported?
16 A   The relationship between Mr. Coons and another
17     student.
18 Q   Are you saying that you got the very, very vague
19     impression that there was some, quote,
20     inappropriate activity with this student?
21 A   Yes.
22 Q   Of a sexual nature?
23 A   I wouldn't say a sexual nature. But the fact that

Page 31

1      there were unprofessional relationships.
2  Q   Well, in what respect?
3  A   Things that would not necessarily be indicative of
4      a student/teacher relationship.
5  Q   Like what?
6  A   Uhm, (indicating), students being in the same
7      automobile with a teacher, uhm, things of that
8      nature.
9  Q   I am sorry, I am not trying to badger you. But
10     "things of that nature" gives us no information.
11 A   I don't --
12 Q   What other things can you recall?
13 A   That's it.
14 Q   The only information you knew about was that he
15     was transporting students --
16 A   That's it.
17 Q   -- in an unprofessional manner?
18 A   Yes, ma'am.
19 Q   Did you, at that time, bring to anyone's attention
20     any of these prior incidents, like the cell phone
21     that Blake Faulkner had?
22 A   Can you repeat that, please?
23 Q   At that point, when you became aware there was a

Page 32

1      investigation about Mr. Coon, did you bring any of
2      these prior incidents to anyone's attention, like
3      Mr. Pyron or Dr. Bazzell, such as the Blake
4      Faulkner cell phone incident.
5  A   Well, they knew about it.
6  Q   Just answer my question.
7  A   Yes.
8  Q   Did you then, at that point in time, remind
9      anyone?
10 A   No.
11 Q   Did you remind anyone that you had previously
12     reprimanded Mr. Coon for transporting students in
13     a private vehicle?
14 A   I didn't -- at that particular time, I don't
15     recall reprimanding Mr. Coon.
16 Q   You said following band camp in 2005 you felt that
17     it was -- he was transporting students in a
18     private vehicle -- that it was unprofessional and
19     you reported it up the chain?
20 A   Repeat that.
21 Q   Was that not your testimony; that following band
22     camp you reported up the chain that Mr. Coon was
23     transporting students in a private vehicle, and

Page 33

1      you felt that was unprofessional?
2  A   Yes.
3  Q   Did you do that or not?
4  A   Yes.
5  Q   Well, when these new allegations came up, did you
6      remind anyone, did you call anyone like
7      Dr. Bazzell and say, you know, he's been doing
8      this since last summer?
9  A   No.
10         MS. ALLEN: Can we go off the Record for
11            just a minute.
12         (Brief off-the-Record discussion.)
13 BY MS. DePAOLA
14 Q   When you became aware there was allegations of
15     some kind of improper relationship, did you call
16     Dr. Bazzell and remind him of the incident where
17     this man, Mr. Coon, choked or attempted to choke
18     the Foster child?
19 A   No. He was aware of it. He was in part of the
20     report.
21 Q   It was in what?
22 A   It was part of the report that had been done.
23     Sort of a memo.

9  (Pages 30 to 33)

JR, A Minor                July 25, 2007  Pike County Board of Education

Page 34

1  Q  Did you call or remind anyone, Dr. Bazzell or
2     Mr. Pyron, about the Polly King allegations
3     that -- in January -- that Mr. Coon was
4     transporting students in the truck and smoking
5     with them?
6  A  No.
7  Q  Have you ever heard the term "butt buddy" used in
8     reference to Mr. Coon or any of the students who
9     were hanging around him?
10 A  Uhm, yes.  Only after the April incident.
11 Q  And what did you hear about that?
12 A  Only in reference to that particular student.
13 Q  Who was that student?
14 A  I can't recall.
15 Q  And what did you hear?
16 A  The fact that that particular student, who had
17    been reported to the authorities, school
18    authorities, was referred to as "butt buddy".
19 Q  And what did that mean?
20 A  (Witness Indicating.)  I'm not sure, ma'am.
21 Q  You're not sure?
22 A  No.
23 Q  So, you don't know who this student was?

Page 35

1  A  No.
2  Q  Because no one else seems to know who it is,
3     either?
4  A  I have no idea, ma'am.
5  Q  Well, who told you this?
6  A  I had actually gotten through conversations about
7     that particular title -- discussions with
8     Mr. Pyron during the investigation.
9  Q  So, Mr. Pyron informed you of the name of the
10    student, but you just can't remember it?
11 A  The title.
12 Q  Just the title?
13 A  Uh-huh.
14 Q  And did he explain to you what he thought that
15    meant?
16 A  I have a pretty good idea what it meant.
17 Q  What did you think it meant?
18 A  I assumed that it referred to some relationship
19    between the two.
20 Q  Sexual relationship?
21 A  Relationships.
22 Q  Well, what do you mean; they are just good
23    friends, or they have a sexual relationship?

Page 36

1  A  I just assumed that it was relationships, ma'am.
2  Q  Of what type?
3  A  Friends.
4  Q  So, you thought there was no sexual connotations
5     with that?
6  A  I had no evidence what it was, ma'am.
7  Q  I didn't ask you what you had evidence.  I said
8     what did you think?
9  A  I considered it friend, but I also, ma'am,
10    specifically thought that it was unprofessional
11    relationships between student and teacher.
12 Q  Well, did you think it meant sexual contact
13    between them?
14 A  No.
15 Q  Well, then, unprofessional in what respect?
16 A  Unprofessional from the standpoint that under
17    normal circumstances professional standards would
18    be Mr. Coons and whoever that student was, and not
19    necessarily Mr. Coon and a title like butt buddy.
20       MS. DePAOLA: Did you understand that?
21       MS. ALLEN:  No.
22       MS. DePAOLA: What was my question,
23         because I didn't understand his

Page 37

1         response?
2         (Whereupon, the requested material
3           was read by the Court Reporter.)
4  BY MS. DePAOLA
5  Q  All right.  I'll repeat it.  Unprofessional in
6     what respect?
7  A  Mr. Coons is referred to as Mr. Coons.  Whoever
8     this students were was referred to by name.  The
9     title of "butt buddy" was something that came up
10    during the investigation when Mr. Coons was
11    suspended.
12 Q  And it's unprofessional to have a nickname for a
13    student; is that what your comment was?
14 A  I would say so.
15 Q  That was your only concern?
16 A  Yes.
17 Q  Were you involved in the incident when Justin Reed
18    broke the band room window?
19 A  Yes.  I investigated it.
20         (Whereupon, Plaintiff's Exhibit 17
21           was marked for identification and
22           is attached hereto.)
23

10 (Pages 34 to 37)

JR, A Minor                July 25, 2007   Pike County Board of Education

Page 38

1   BY MS. DePAOLA
2   Q   I'm going to mark this as be Plaintiff's
3       Exhibit 17.
4           MS. DePAOLA: And we can make a clean
5               one, Donald, if you want. This one
6               has got a lot of highlighting on it.
7           MR. SWEENEY: Plaintiff's what?
8           MS. DePAOLA: Seventeen.
9           MR. SWEENEY: And it's what?
10          MS. DePAOLA: It's student's
11              disciplinary report.
12          (Brief interruption.)
13          THE WITNESS: Excuse me.
14          MR. SWEENEY: Do you need to take a
15              break?
16          THE WITNESS: Oh, no. I'm going to cut
17              it off.
18  BY MS. DePAOLA
19  Q   Mr. McDaniel, can you identify that as a student
20      discipline report relating to Justin Reed?
21  A   Ah, yes.
22  Q   I mean, you are kind of familiar with those
23      documents I would expect, generally?

Page 39

1   A   Yes.
2   Q   I will represent to you this was a disciplinary
3       report produced by the Pike County Board of
4       Education.
5   A   Uh-huh.
6   Q   And I see that there is an incident that happened
7       on April 18th that has your name, Robert McDaniel,
8       on it?
9   A   Uh-huh.
10  Q   Is that the incident that relates to the band
11      room?
12  A   I believe it is.
13  Q   Can you tell us what happened on that date?
14  A   If I recall, I was summoned to the band room
15      for -- to investigate a broken window -- a broken
16      plate glass inside the band room. And when I got
17      there, I noticed that the glass encasement where I
18      believe Mr. Coon's office, or a storage area was,
19      had been -- had been broken. And --
20  Q   Were there any students in there at that time?
21  A   Yes, as a matter of fact, there was students who
22      actually reported the incident back to me. And --
23      which is always the case. We sit down, and we

Page 40

1       take statements, sometimes verbal, sometimes
2       written, about the actual incident.
3   Q   So, what were you told about the incident by the
4       students?
5   A   That the window had been broken in the -- in the
6       band room.
7   Q   Did they identify anybody who did that?
8   A   Uhm, I believe the individual that was identified
9       was this particular child, Justin Reed. I cannot
10      recall specifically who the child was. But I do
11      remember investigating the incident.
12  Q   All right. And so what did you do to follow up?
13      Other than someone identifying Justin Reed to you
14      and you see the window, what else did you do?
15  A   Investigated it.
16  Q   Well, explain what you did.
17  A   I talked to several of the children, the best of
18      my recollection, ma'am, who were in the band room
19      at the time. And the best I can remember is that
20      this particular child had been locked inside the
21      office, uhm, used a -- the flag stick to break
22      the window, either to get out or by accident.
23      But --

Page 41

1   Q   Did you call that student to the office?
2   A   Yes. I did the referral.
3   Q   Okay. So, the student who was -- did he lock
4       himself in this office; is that what you're
5       saying?
6   A   I am not sure. At the time, as I recall writing
7       it up, is that he was charged with criminal
8       mischief, which entailed destruction of property,
9       breaking or destroying school property.
10  Q   So, if he's locked in this office, he's not
11      allowed -- it's some kind of offense to get
12      yourself in some way?
13  A   I wouldn't say so, ma'am, that it was an offense
14      to get yourself out. But it was reported to me
15      that he simply broke the glass.
16  Q   While he was locked inside?
17  A   The best I recall is that he was inside with a
18      flag baton. I believe that the statement from
19      this child stated that he was actually locked
20      inside. I'm not sure. But he did --
21  Q   "From this child" meaning Justin Reed?
22  A   Uh-huh.
23  Q   Okay. What else do you remember about the

11 (Pages 38 to 41)

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 42

1    incident?
2  A    That's basically it.
3  Q    All right.  Do you remember on that occasion
4       calling Justin and his mother to the office to
5       meet with you?  And this is his mother here
6       (indicating).
7  A    Uhm, yes, whenever there was an incident where a
8       child was disciplined, especially if they were
9       going to be some suspensions and things of that
10      nature, in-school suspension, alternative school,
11      the parent was always encouraged to visit with the
12      school officials --
13 Q    Well --
14 A    -- before --
15 Q    -- what happened in that meeting?
16 A    Uhm, best I recall, ma'am, is that we tried to
17      ascertain how the glass, or how the window was
18      broken.  And --
19 Q    What were you told?
20 A    Pardon me?
21 Q    What were you told?
22 A    I was told, I believe, by Justin, that he was
23      locked inside the office.  But if he's charged

Page 43

1       with criminal mischief, that is, breaking the
2       glass, if I reflect back, I'm thinking that he was
3       charged, and the office was not locked.
4          If he was locked inside the office, and could
5       not get out, I doubt very seriously if I would
6       have charged him with that.
7  Q    Is there a telephone in Mr. Coon's office?
8  A    I believe that there was a phone call -- a phone
9       inside the office, yes.
10 Q    Did Justin inform you that he had called Mr. Coon
11      to ask him about what should I do?
12 A    I don't recall the specifics of that, no.
13 Q    You don't recall that happening at all?
14 A    I don't recall that particular conversation as him
15      being in there to make a phone call.
16 Q    You don't ever recall Justin telling you that he
17      made a phone call to Mr. Coon?
18 A    No.  He may have, but I don't remember that
19      specifically.
20 Q    When you were in the office, did he tell you that
21      he wanted to call Mr. Coon?
22 A    Specifically, I don't remember that.
23 Q    Did you ever become aware during that incident

Page 44

1       that Justin Reed had Mr. Coon's cell phone number?
2  A    No.
3  Q    All right.  Did you place a call to Mr. Coon
4       during that incident?
5  A    I don't recall.
6  Q    You don't recall doing that?
7  A    No.
8  Q    Who else was in the meeting besides you?
9  A    Oh, I believe it was the student and during the
10      initial investigation, possibly the parent, as
11      well.  I don't recall the specific --
12 Q    Was Mr. Pyron present?
13 A    No, I don't believe he was.
14 Q    Have you ever received any information that
15      Mr. Coon took students off campus during school
16      hours?
17 A    No.
18 Q    Did you ever --
19 A    Other than with Ms. King.
20 Q    Okay.  Did you ever see Mr. Coon transport Justin
21      or any other student on campus in his truck?
22 A    No.
23 Q    Other than that document there, would there ever

Page 45

1       be any disciplinary report or documents that
2       relate to that incident?
3  A    No.
4  Q    You wouldn't have written up anything else?
5  A    No.
6  Q    Pike County doesn't have any forms you write up
7       that says, I interviewed the student?
8  A    Well, you know, there is always a referral -- what
9       we call a hard copy of the referral.  And that
10      referral is transferred into the -- into the
11      system's database.
12 Q    Is that a form, this referral thing?
13 A    Uh-huh.  Uh-huh.
14 Q    What do you do with the hard copy?
15 A    The hard copy is put inside a personnel file.
16 Q    On the student?
17 A    Uh-huh.
18 Q    Other than the referral, though, do you write on
19      there what your investigation showed and what the
20      outcome was on the referral form?
21 A    Yes.
22 Q    So, it's sort of one document that follows the
23      whole incident all the way through?

                              12  (Pages 42 to 45)

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

JR, A Minor                    July 25, 2007  Pike County Board of Education

Page 46

1  A   Uh-huh.  If it was extensive, ma'am, we would
2      occasionally do a narrative, or if there is not
3      enough space on the form to do that.
4  Q   Okay.
5          MS. DePAOLA:  Let me talk to her.
6          MS. ALLEN:  Yeah, let's do that.
7          (Brief recess.)
8          MS. DePAOLA:  Back on the Record.
9  BY MS. DePAOLA
10 Q   Mr. McDaniel, do you recall placing Justin in the
11     press box after this breaking-the-window incident
12     and leaving him there until his mother came after
13     school to pick him up?
14 A   Press box?  Press box?  Uhm, I don't recall
15     specifically placing --
16 Q   That doesn't refresh your recollection about what
17     happened?
18 A   No.  But there were -- there were occasions if
19     they -- there was not in-school suspension on
20     campus.  And if the temperature and everything was
21     okay, I would occasionally put a kid what I call
22     in timeout.
23 Q   In the press box?

Page 47

1  A   Well, not the press box, ma'am.  It was like in
2      the bleachers right across the street from my
3      office.
4  Q   Just put them in the bleachers in the outside?
5  A   Yeah.
6  Q   I'm sorry?
7  A   Outside.  The bleachers, out on the football
8      field.
9  Q   Now, do you recall calling in to your office, the
10     three boys who reported this incident and
11     examining them about it?
12         MR. SWEENEY:  The broken window?
13         MS. DePAOLA:  Yes, the broken window.
14 A   I interviewed those individuals who were present
15     at the time.
16 Q   And was the mother present during that?
17 A   No.  Not that I recall, ma'am.
18 Q   So, I'm still trying to understand why Justin Reed
19     was punished for this incident.
20 A   During the investigation, ma'am, as I look at what
21     I have here, basically, the punishment was done
22     based on what we thought was the witnesses of the
23     other student.

Page 48

1  Q   So, you interviewed these other three boys, and
2      they said he wasn't locked in there; is that what
3      you're telling me?
4  A   I am basing that, ma'am, on what I charged Justin
5      with.
6  Q   You don't have any independent recollection?
7  A   No.
8  Q   Was Mr. Coon a probationary employee the year that
9      you were there?
10 A   I think the term is "nontenured".
11 Q   Was he a nontenured --
12         MR. SWEENEY:  Wait a minute.  That's a
13         legal question.  He had been
14         employed since 2002.
15         MS. DePAOLA:  Right.
16 Q   I'm just talking about the year that you were
17     there.  What was his status the best that you
18     recall?
19 A   The best that I recall, that he was nontenured.
20 Q   Now, is it your testimony that Polly King only
21     talked with you one time during the whole year
22     about any problems or concerns she had about
23     Mr. Coon?

Page 49

1  A   Uhm, about Mr. Coon, specifically, that
2      conversation, as I have already said, yes, that
3      was it.
4  Q   That's the only time?
5  A   But there were conversations ongoing between
6      myself and parents.  So --
7  Q   Do you recall any other conversations with Polly
8      King during 2004-2005?
9  A   I recall several conversations, but the
10     specificity of them, I don't --
11 Q   You don't know what the subject matter is?
12 A   Parent will just occasionally walk in and talk.
13 Q   No, I am asking you about Polly King.  Do you
14     remember the subject matter of any other
15     conversations with her?
16 A   No.
17 Q   Now, you indicated at the outset that you had some
18     special training in the field of sexual abuse; is
19     that correct?
20 A   Sexual abuse?
21 Q   Yes.
22 A   Uhm, can you --
23 Q   Well, let's just ask that question:  Do you have

13 (Pages 46 to 49)

Page 50

1      any special training in the field of sexual
2      abuse --
3   A  No.
4   Q  -- whatsoever?
5   A  No.
6   Q  Pardon?
7   A  No.
8   Q  So, you don't consider yourself a forensic
9      interviewer for victims of sexual abuse?
10  A  Absolutely not.
11  Q  Do you have any knowledge about the statistical
12     prevalence of sexual abuse in school systems?
13  A  Other than the fact, ma'am, that it occasionally
14     happens.
15  Q  Do you have any information about the incidence of
16     sexual abuse as it relates to special education
17     students?
18  A  No, ma'am.
19  Q  And have you ever written a sexual-abuse policy
20     for this school, Pike County High School?
21  A  No.
22  Q  For any school?
23  A  No.

Page 51

1   Q  Have you ever written any procedural outlines for
2      investigating complaints of sexual abuse?
3   A  No.
4   Q  For this school or any other school?
5   A  No.
6   Q  So, if I understand your professional background
7      that you were talking about earlier, would it be
8      fair to say that was more in the area of equal
9      employment opportunity?
10  A  Uh-huh.
11  Q  Yes?
12  A  Uh-huh.
13  Q  And what was that training?
14  A  It was actually prior to my duties in public
15     education. It was in the military, which came
16     under the same umbrella.
17  Q  What years would that have been?
18  A  From 1979 until 1999.
19  Q  So, during that time, you received some training
20     about discrimination in the workplace; is that
21     what you're saying?
22  A  Discrimination in the workplace, sexual harassment
23     in the workplace.

Page 52

1         MS. DePAOLA: That's all I have.
2            EXAMINATION
3   BY MR. SWEENEY
4   Q  Do you know of any requirement that an assistant
5      principal in a public school in Alabama has to
6      have forensic training?
7   A  No.
8   Q  Do you know of any requirement that would preclude
9      an assistant principal from talking to students
10     about disciplinary Master's without forensic
11     training?
12  A  No. No.
13  Q  Was it one of your essential ongoing regular
14     duties to talk to students about conduct issues?
15  A  Repeat that, please.
16  Q  Yeah. Was it one of your regular duties as
17     assistant principal to investigate conduct issues
18     concerning students and to find out what might
19     have happened?
20  A  Yes.
21  Q  With regard to this incident with Justin and the
22     broken window, was the window a window of his
23     office, of Coon's office?

Page 53

1   A  Yes. It was the plateglass window that encased
2      his office.
3   Q  From his office, could he look out and see the
4      band room?
5   A  Yes. Yes.
6   Q  Do you recall if the door to the Coon's office
7      locked only from the inside?
8   A  It did lock only from the inside.
9   Q  So that if that were the case, then a student
10     locked inside could unlock the door from the
11     inside?
12  A  Absolutely.
13  Q  Did you get information from the students that
14     Coon had not broken the window to get out of a
15     locked room, or what do you recall in that regard?
16        MS. DePAOLA: I am assuming you mean
17           Justin.
18  BY MR. SWEENEY
19  Q  Let me rephrase that. As I understand what you
20     said, Justin Coon (sic) said he had been locked in
21     the office?
22  A  Uh-huh.
23  Q  Did you get a different version from the other

14  (Pages 50 to 53)

JR, A Minor                    July 25, 2007   Pike County Board of Education

| Page 54 |
| --- |

1    students you talked to?
2  A   Yes.
3  Q   Based on all of the information you had, what was
4     your conclusion about whether Justin has been
5     innocent or not?
6  A   I concluded based on what I was able to ascertain
7     from the other students is that if the office was
8     locked only from the inside, he could have opened
9     the door and not broken the lock.
10 Q   Was Charles Coon there that day, or was there a
11    substitute teacher?
12 A   It was a sub there at the time.
13 Q   You made reference to this "butt-buddy" reference.
14    Did you ever talk to Butch Phelps?
15 A   No, I didn't.
16 Q   Do you know what information he communicated to
17    Mark Bazzell about that term?
18 A   I have only a vague reference what it may have
19    been. Not a specific person, but just a term.
20 Q   You've mentioned that you had dialogue with
21    Charles Coon during that 2004-2005 school year.
22    Did you have any reason to deal with Coon outside
23    of the school?

| Page 55 |
| --- |

1  A   No.
2  Q   Did you have any opportunity or occasion when you
3     socialized with Charles Coon?
4  A   No.
5  Q   Or have any private dealings with him separate and
6     apart in your employment responsibilities as
7     assistant principal?
8  A   No.
9  Q   With regard to all of your dealings with Charles
10    Coon, was that always as an assistant principal
11    and within the line and scope of your duties as
12    assistant principal?
13 A   That's correct.
14 Q   With regard to Justin Reed, did you have any
15    dealings with him outside of your position as
16    assistant principal?
17 A   No.
18 Q   During the 2004-2005 year when you had various
19    opportunities to see Charles Coon, did you ever
20    see anything that would make you suspicious of him
21    in terms of sexual abuse of students?
22 A   No.
23 Q   Did any student ever report to you anything that

| Page 56 |
| --- |

1    would put you on notice that Charles Coon might be
2    sexually abusing students?
3  A   No.
4  Q   Or sexually abusing Justin Reed?
5  A   No, sir.
6  Q   In the investigation in April of 2005, did
7    anything come up in connection with Charles Coon
8    and Justin Reed?
9  A   No.
10       MS. DePAOLA: Object to the form.
11 A   No.
12 Q   Did any faculty member, parent, or law enforcement
13    officer ever report to you that Justin Reed should
14    be suspected of possible child abuse?
15 A   No, sir.
16 Q   When you heard that -- or did you hear that
17    Charles Coon had submitted his retirement at the
18    end of the school year, or had resigned?
19 A   Yes.
20 Q   Was there any indication, to your knowledge at
21    that time, that he was under any cloud of
22    investigation for improper conduct?
23 A   No, sir.

| Page 57 |
| --- |

1  Q   You indicated that you did not remember getting
2    the written material from anyone at Pike County on
3    sexual abuse. But you did have conversations and
4    communication about that subject?
5  A   Yes, sir.
6  Q   It's my impression from the things you have said
7    today that you are a pretty strict
8    disciplinarian --
9  A   Yes.
10 Q   -- would that be true?
11 A   That's correct.
12 Q   It's my impression that you're pretty strict about
13    what you think is an appropriate professional
14    relationship between teachers and students?
15 A   Yes, sir.
16 Q   If you had had any report that Charles Coon was
17    sexually abusing a student, what would you have
18    done?
19 A   I would have reported it to the authorities.
20 Q   The law enforcement authorities?
21 A   My superiors, Dr. Bazzell.
22 Q   And to...
23 A   The authorities.

15 (Pages 54 to 57)

Page 58

1  Q  **Would you have taken that seriously?**
2  A  Yes, sir.  Absolutely.
3        MR. SWEENEY:  Thank you very much.
4        FURTHER EXAMINATION
5  BY MS. DePAOLA
6  Q  **Okay.  Exactly what are those conversations and**
7     **communication that you say are training on sexual**
8     **abuse that you have had.  You just responded to**
9     **his questions, no written materials but**
10    **conversations and communications.  What are they?**
11    **Be specific.**
12 A  Basically, ma'am, those that entail
13    relationships --
14 Q  **With who?**
15 A  -- that are forbidden between students --
16 Q  **Conversations with who --**
17       MR. SWEENEY:  Let him finish his answer,
18       please.
19       MS. DePAOLA:  Well, we are we going to
20       go until tomorrow.
21       MR. SWEENEY:  Yeah, we can.  But we're
22       going to have the witness finish his
23       answers before we --

Page 59

1        MS. DePAOLA:  The question is --
2        MR. SWEENEY:  And I would like for you
3        to not interrupt when I am
4        objecting, please.
5  A  Go ahead, ma'am.
6  Q  **Conversations with whom?**
7  A  Faculty members about professional relationships.
8  Q  **Okay.  Conversations with any faculty members that**
9     **you can tell us about about sexual abuse.**
10 A  In the line of faculty meetings, faculty
11    communications, about professional relationships,
12    which might entail that.
13 Q  **Was there any discussion about sexual abuse,**
14    **specifically?**
15 A  No.
16 Q  **And were there any communications that you just**
17    **referred to about sexual abuse?**
18 A  No.
19       MS. DePAOLA:  That's all.  Thank you.
20       Could you get the signed
21       interrogatories?
22       MR. SWEENEY:  Yeah, we're doing that
23       now.

Page 60

1        (Whereupon, at approximately, 1:35
2        p.m. on the 25th day of July, 2007
3        the deposition was concluded.)
4        * * * * * * * * *
5        FURTHER DEPONENT SAITH NOT
6        * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 61

1
2        REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7     I do hereby certify that the above and foregoing
8  deposition of ROBERT McDANIEL was taken down by me in
9  machine shorthand on the 25th of July, 2007, and the
10 questions and answers thereto reduced to writing under
11 my personal supervision, and that the foregoing
12 represents a true and correct transcript of the
13 proceedings given by said witness upon said hearing.
14    I further certify that I am neither of counsel nor
15 related to the parties to the action, nor am I any wise
16 interested in the results of said cause.
17    Dated this 10th day of August, 2007.
18
19       _____
20       Mary Moore-Wynn
21       Certified Shorthand Reporter
22
23

IN THE U.S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

      PLAINTIFF,


VS.                                        CASE NO.:

                                           2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION,

      DEFENDANT.

* * * * * * * * * *

DEPOSITION OF ROBERT S. BRADBURY, taken before

Mary Moore-Wynn, CSR, CCR, as Commissioner, on the 18th

of October, 2007, in the offices of Pike County Board

of Education, 101 West Love Street, Troy, Alabama,

36081, pursuant to stipulations set forth herein,

commencing at approximately 9:45 a.m.


* * * * * * * * *

Page 2

```
 1
 2          * * * * * * * * * *
 3              APPEARANCES:
 4   FOR THE PLAINTIFF:
 5   Hon. Deanie Clark Allen
         Azar, Azar & Moore
 6   Aliant Center
         2740 Zelda Road
 7   Montgomery, Alabama  36106
 8
 9   FOR THE DEFENDANT:
10   Hon. Donald R. Sweeney
         Bradley, Arant
11   One Federal Place
         1819 Fifth Avenue North
12   Birmingham, AL  35203-2104
13   ALSO PRESENT:
14   Mr. Mark Bazzell, Superintendent
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1   introduced at the trial of this case or used in any
 2   other manner by either party hereto provided for by the
 3   Statute, regardless of the waiving of the filing of
 4   same.
 5       It is further stipulated and agreed by and
 6   between counsel and the witness that the reading
 7   and signing of the deposition by the witness is
 8   hereby waived.
 9                    INDEX
10   ROBERT S. BRADBURY
11   Examination By Ms. Allen              6
     Examination By Mr. Sweeney           74
12   Further Examination By Ms. Allen     86
     Further Examination By Mr. Sweeney   95
13   Further Examination By Ms. Allen     97
14   Reporter's Certificate         100
15            INDEX OF EXHIBITS
16   Exhibit Number    Description    Page Number
17   Plaintiff's Exhibit 31  Bob Bradbury     6
                 Deposition Subpoena
18   Plaintiff's Exhibit 32  Pike County     16
                 Sheriff's Department Reports on
19               Phillip Faulkner
     Plaintiff's Exhibit 33  Transcription of  20
20               Blake Faulkner Tape Recorded
                 Interview
21   Plaintiff's Exhibit 34  Justin Reed       33
                 statement/Bradbury
22   Plaintiff's Exhibit 35  Pike            51
                 County/Bradbury/Coon/Deposition
23
```

Page 3

```
 1        * * * * * * * * * *
 2
 3
 4
 5
 6            STIPULATIONS
 7
 8       It is hereby stipulated and agreed by and between
 9   counsel representing the parties that the deposition of
10   ROBERT S. BRADBURY is taken pursuant to the Federal
11   Rules of Civil Procedure, and that said deposition may
12   be taken before Mary Moore-Wynn, CSR, CCR, as
13   Commissioner, without the formality of a commission;
14   that objections to questions, other than objections as
15   to the form of the questions, need not be made at this
16   time, but may be reserved for a ruling at such time as
17   the deposition may be offered into evidence, or used
18   for any other purpose by either party hereto, provided
19   by the Statute.
20       It is further stipulated and agreed by and between
21   counsel representing the parties in this case, that the
22   filing of the deposition of ROBERT S. BRADBURY is
23   hereby waived, and that said deposition may be
```

Page 5

```
 1   Plaintiff's Exhibit 36  Charles Coon     51
                 Witness Statement
 2   Plaintiff's Exhibit 37  Butler County Case   55
                 #CC2005-196 Agreement of Counsel
 3               and Defendant (Coon)
     Plaintiff's Exhibit 38  Mona Watson     62
 4               Summary Interview
     Plaintiff's Exhibit 39  Pike County     63
 5               Sheriff's Department Reports on
                 Justin Reed
 6   Plaintiff's Exhibit 40  Pike County     72
                 District Court Case #'s 2005-438,
 7               2006-272, Plea Agreement (Coon)
     Plaintiff's Exhibit 41  Pike County     72
 8               District Court Case #'s 2005-438,
                 2006-272, Signed Settlement
 9               Agreement(Coon, Counsel,
                 Prosecutor, Judge)
10
11
12
13
14
15
16
17
18
19
20
21
22        * * * * * * * * *
23
```

**Page 6**

1           ROBERT S. BRADBURY
2     (Whereupon, the witness, after having first been
3   duly sworn to speak the truth, the whole truth, and
4   nothing but the truth, testified as follows:)
5           MS. ALLEN:  Let's make this Plaintiff's
6           Exhibit 31.
7           (Whereupon, Plaintiff's Exhibit 31
8             was marked for identification and
9             is attached hereto.)
10          THE COURT REPORTER:  And you want usual
11          stipulations?
12          MR. SWEENEY:  Yeah.
13          MS. ALLEN:  We want the -- thank you --
14          the usual stipulations.
15              EXAMINATION
16   BY MS. ALLEN:
17   Q   Mr. Bradbury, I think you know me.  Deanie Allen?
18   A   Yes, ma'am.
19   Q   We have met before.  You know Donald Sweeney?
20   A   No.  I've never met him.
21   Q   This is Donald Sweeney.  He represents the board
22       and the other defendants.
23          And you know Mr. Bazzell?

**Page 7**

1   A   Yes, ma'am.
2   Q   So, you have been deposed before?
3   A   No, not really.
4   Q   Oh, you have not been deposed before?
5   A   No.
6   Q   Well, just quickly, I will be asking you
7       questions.  And then Mr. Sweeney will ask you
8       questions.  If you don't understand the question,
9       please let me know, because if you answer it, I
10      will assume that you understood.  If you want to
11      correct anything or go back and discuss something
12      again, just let me know.  I will be glad to give
13      you that opportunity.
14          Did you talk to anybody in preparation for
15      this deposition?
16   A   Certainly.
17   Q   Who did you talk to?
18   A   Sheriff Thomas.
19   Q   Anybody else?
20   A   We had a conference on a three-way call -- well,
21      not three way, but on speakerphone:  Dr. Bazzell,
22      Sheriff Thomas, and Karen Berry.
23   Q   What was the gist of your discussion?

**Page 8**

1   A   They just asked me what I knew.
2   Q   Can you summarize what you told them?
3   A   Summarize what I told them.  I told them that the
4       initial interview done by Mona Watson was a poor
5       interview in as much that she was asking
6       questions -- making statements to the child and
7       saying this is the way it happened.  It was not
8       good for law enforcement.  You always want your
9       victim to testify, rather than agreeing to what
10      the interviewer says.
11          That I interviewed Justin Reed along with
12      district attorney investigator, Bruce Matthews',
13      tape-recorded statement, where he was -- well,
14      he's slow.  I mean, I don't want to say he's
15      retarded, because I'm not a doctor.  But he's
16      slow.  And he was reluctant to talk to us, because
17      he didn't know us.  As he got to know us a little
18      bit better, he stated that Mr. Coon had touched
19      him in his private parts once or twice with his
20      hand outside his clothing while in the band room
21      at school.
22          Uhm, I think that was the gist of it, to be
23      honest.  I mean...

**Page 9**

1   Q   There is nothing else that you can remember about
2       that conversation?
3   A   Well, I asked him several questions, and he
4       answered no to them.
5   Q   No, I'm talking about the -- I understand you're
6       relating to me your conversation with Dr. Bazzell,
7       Karen Berry, and --
8   A   Well, I was talking about the interview with
9       Justin.  But that's what I talked to them about.
10   Q   Right.  Is there anything else about the
11      conversation, the three-way, four-way conversation
12      you had with them that you can recall?
13   A   No, ma'am.
14   Q   Okay.  All right.  First of all, state your full
15      name for the Record.  I'm sorry.
16   A   Robert S. Bradbury, Junior.
17   Q   And what is your residence address?
18   A   467 County Road 2239, Goshen, Alabama.
19   Q   What's the zip code?
20   A   36035.
21   Q   Are you married?
22   A   Yes, ma'am.
23   Q   What is your wife's name?

---

**Page 10**

1  A   Sheila.
2  Q   Do you have any children?
3  A   One.
4  Q   How old and what is your child's name?
5  A   She's 30 -- 36.  Her name is Judith Ann.  And she
6      lives in Los Angeles, California.
7  Q   Okay.  First of all, give me a little rundown of
8      your educational history.
9  A   High school graduate.  Some college classes.
10 Q   Where did you graduate from high school?
11 A   Trenton, New Jersey.
12 Q   And what college did you have?
13 A   Some at Enterprise State.  Based on, you know, law
14     enforcement classes that we took down there.
15 Q   Do you have a degree?
16 A   No, ma'am.
17 Q   Okay.  So, when did you move to Alabama?
18 A   1977.
19 Q   All right.  Give me a rundown of your work
20     history, when you moved to Alabama.
21 A   Well, when we first moved, I worked at Zippy Mart
22     in Troy.  I worked at the Goshen Police
23     Department.

---

**Page 11**

1  Q   And that would be in 1977?
2  A   '77.  '77, and then '78, I joined the Pike County
3      Sheriff's Department.  And retired 2007.
4  Q   So, you worked for the Pike County Sheriff's
5      Department from 1978 to 2007?
6  A   Yes, ma'am.
7  Q   Okay.  How familiar were you with Pike County High
8      School?
9  A   Not at all.
10 Q   Okay.  Do you or did you know someone by the name
11     of Johnny Wright?
12 A   No.
13 Q   Okay.
14 A   You have to remember now, Pike County High School
15     is in the jurisdiction of Brundidge Police
16     Department.
17 Q   I understand.
18 A   Any problems that arise down there are to go
19     through the Brundidge Police Department.
20 Q   This was strictly by way of information that I was
21     asking you.
22        I'd like for you to tell me how you first got
23     involved with the investigation regarding

---

**Page 12**

1      Mr. Coon.
2  A   Telephone call from Mona Watson.
3  Q   All right.  When was that?
4  A   July of -- I don't even remember the year.  I know
5      it was in July.
6  Q   Would 2005 sound accurate to you?
7         MR. SWEENEY:  We'll stipulate it was
8      2005.
9  Q   And Mona Watson called you, and what did she say?
10 A   She said that she had a second victim of Charles
11     Coon in her office; that she had already
12     interviewed him.  And I believe she said that oral
13     sex had been involved.
14 Q   All right.  Did she say how she came about the
15     name -- Justin's name?
16 A   No, ma'am.
17 Q   Did she mention Justin's name to you at that time
18     when she said she had a second victim?
19 A   I believe she did.
20 Q   But she did not tell you how she knew or suspected
21     that Justin was a victim?
22 A   No, ma'am.
23 Q   Do you know how Justin's name came up as a victim

---

**Page 13**

1      of Mr. Coon?
2  A   Mona Watson called me.
3  Q   But -- so, that's all you know?
4  A   Well -- no.  Originally, she called me -- she
5      called me and told me that she had a second victim
6      in her office in the Justin Reed (sic) case.  And
7      I made arrangements to go down there and talk to
8      her and Ms. Reed.
9  Q   You went where to talk to her and Ms. Reed?
10 A   Child Advocacy Center.
11 Q   All right.  And when was that?
12 A   The same day, I believe.
13 Q   Okay.
14 A   You've got my reports there.  It should be written
15     out there.
16 Q   Well, I would like for you to explain a little bit
17     to me.
18 A   All right.
19 Q   Did you know Mr. Coon prior to the incident
20     involving Mr. Coon?
21 A   Personally, no.
22 Q   All right.  Did you know of Mr. Coon?
23 A   Certainly.

---

Page 14

1  Q  What did you know about him?
2  A  He was a suspect in a separate sex abuse case.
3  Q  All right. Was that your first knowledge of
4     Mr. Coon?
5  A  Yes.
6  Q  All right. So, your first knowledge of Mr. Coon
7     came about through a separate case. What case was
8     that?
9  A  Phillip Faulkner.
10 Q  All right. Can you tell me how you got involved
11    in that?
12 A  Well --
13 Q  So, this preceded the investigation and your
14    discussion about Justin?
15 A  Phillip Faulkner's case was ongoing at the time.
16    Sheriff Thomas and I believe Bob Williamson had
17    talked to the Faulkner child. And I think they
18    even got a telephone call recorded where Faulkner
19    called Coon. I was sort of on the outside looking
20    in. I was involved in other things. And it came
21    up to the point that we were going to Butler
22    County and obtain warrants against Coon for sexual
23    abuse on Faulkner. And we all went over there.

Page 15

1     And we got warrants issued from Butler County,
2     because the incidents that we investigated were --
3     took place in Butler County. And I was present at
4     the time of a search of Coon's residence. And I
5     was present at the time of Coon's arrest.
6  Q  If it took place in Butler County, why would the
7     Pike County Sheriff's Department be involved?
8  A  Phillip's father brought Phillip into our
9     office -- from what I understand. Now, I wasn't a
10    party to those conversations. But Phillip's
11    father brought Phillip into the office and talked
12    to Sheriff Thomas. And it was originally thought
13    that the incidents occurred in Pike County.
14 Q  And that's why Phillip Faulkner's dad brought him
15    into Pike County?
16 A  Yes, ma'am.
17 Q  All right. You were not a party to those
18    discussions?
19 A  With the Faulkner boy?
20 Q  Uh --
21 A  No, ma'am.
22 Q  With Mr. Faulkner.
23 A  No.

Page 16

1  Q  Can you identify this for me, please?
2        MR. SWEENEY: Are we going to mark those
3        as exhibits?
4     MS. ALLEN: I am.
5        MR. SWEENEY: That would be Plaintiff's
6        Exhibit 32?
7     MS. ALLEN: Right.
8        (Whereupon, Plaintiff's Exhibit 32
9        was marked for identification and
10       is attached hereto.)
11 A  This is reports on Phillip Faulkner.
12 Q  And whose signature is at the bottom of those
13    reports?
14 A  Mine.
15 Q  So, does that change your recollection of how you
16    came to be involved in Phillip Faulkner's things?
17 A  Well, if you would look closely, each one of these
18    are in my handwriting -- let's see 7/15 -- 7/8,
19    7/6 -- 6, 8, 17 -- that one should be there.
20 Q  All right. So, what is this document that I have
21    just handed you?
22 A  This is a supplemental report.
23 Q  All right. A supplemental report. And it's Bates

Page 17

1     Stamped 129 through 132 for the Record.
2        And it's a supplemental report on Blake
3     Faulkner. And what is the date on that?
4  A  Well, one of them says 7/6. One of them says 7/7.
5     One of them says 7/8.
6  Q  So, did you talk to Mr. Faulkner when he came in
7     and made the complaint?
8  A  I sure didn't remember this. On 7/6, the
9     supplemental report states that I took a statement
10    from Phillip Faulkner.
11       Now, this would have been done -- as I recall,
12    the Sheriff talked to Phillip and his son -- I
13    mean, Phillip and his father upstairs in their
14    office. I was called in the Sheriff's office and
15    told to go downstairs and take a tape-recorded
16    statement from Phillip.
17 Q  Did you do that?
18 A  Yes, ma'am.
19 Q  Did the Sheriff's Department keep a copy of the
20    tape-recorded statement?
21 A  No, ma'am. We kept the original.
22 Q  Excuse me. I mean the original. So, there is an
23    original copy of this statement?

Mary Moore-Wynn, CCR              Mary Moore-Wynn              (334)244-0203
                             Court Reporting Services

Page 18

1   A   Certainly.
2   Q   An original tape-recorded copy of that statement?
3   A   Certainly.
4   Q   Are you familiar with the subpoena that we served
5       on the Sheriff's Department asking for all tapes
6       and any documents that you may have on anything
7       related to Mr. Coon?
8   A   I got a subpoena asking me for it. I don't know
9       of any subpoena for the Sheriff's Department.
10  Q   You're not familiar with that?
11      All right. So, you went up to Sheriff Thomas'
12      office, and he asked you to go down and to get a
13      statement.
14          MS. ALLEN: I am going to enter this in
15          as Plaintiff's Exhibit 32.
16  Q   Did you then interview Blake Faulkner?
17  A   I took his tape-recorded statement. I asked him a
18      few questions, and he answered.
19  Q   Who was present when you asked him these
20      questions?
21  A   I don't recall.
22  Q   Would you identify this document for me, please?
23  A   It appears to be a transcript of a statement given

Page 19

1       to me by Phillip Blake Faulkner.
2   Q   Does that appear to be an accurate transcription
3       of the statement that he gave?
4   A   Well, without reading it and --
5   Q   Well, take your time.
6   A   Well, I would have to compare it to the tape
7       recording, too.
8   Q   Well, would that --
9   A   I was just looking to see if there was anybody
10      else present.
11          MR. SWEENEY: May I clarify; who did
12          that?
13          MS. ALLEN: That was given to me by the
14          Greenville Police Department in
15          response to our subpoena.
16          MR. SWEENEY: Okay.
17          MS. ALLEN: And it was marked, so you
18          should have a copy.
19          MR. SWEENEY: I do. I just didn't know
20          who typed it up.
21  BY MS. ALLEN
22  Q   It indicates on here --
23  A   I see on one of the back pages that Sheriff Thomas

Page 20

1       was present at part of it.
2   Q   It appears that he came in in part of it; is that
3       correct?
4   A   Yes, ma'am.
5   Q   All right. The person's name who is listed at the
6       bottom of this, Peggy --
7   A   Peggy Barbaree.
8   Q   Would that indicate that she was the one that
9       transcribed this?
10  A   Yes, ma'am.
11  Q   And who is she?
12  A   She is one of the secretaries in the Sheriff's
13      Department.
14  Q   So, would that make this, in your opinion, a
15      reliable transcription of the statement that was
16      given?
17  A   Yes.
18  Q   All right. Let me ask you this --
19          MR. SWEENEY: Can we mark that as
20          Plaintiff's Exhibit 33?
21          MS. ALLEN: Yes. Mark this as
22          Plaintiff's Exhibit 33, if you will.
23          (Whereupon, Plaintiff's Exhibit 33

Page 21

1           was marked for identification and
2           is attached hereto.)
3   BY MS. ALLEN
4   Q   What experience do you have in dealing with sexual
5       abuse cases in your position with the Pike County
6       Sheriff's Department?
7   A   Just 30 years experience in law enforcement. I
8       don't have -- I don't have any specific --
9   Q   How many sexual abuse cases would you estimate,
10      over that period of time -- and this would, I
11      understand, be an estimate -- of cases that you
12      handled that dealt with sexual abuse?
13  A   Uhm, maybe 15 or 20.
14  Q   How many of those dealt with -- or did they all
15      deal with children?
16  A   Mostly children.
17  Q   Okay. So, when you say you dealt with those
18      cases, what role did you play?
19  A   As far as...
20  Q   Investigation, anything, any role you played as
21      far as the case was concerned.
22  A   The only thing I do was investigate. Testify at
23      court, if need be.

## Page 22

1  **Q   And by "investigate", what do you mean?**
2  A   Try to get to the bottom of the facts. Get the
3     facts in the case.
4  **Q   Talk to the individuals?**
5  A   Talk to the individuals, the victims.
6  **Q   Talk to the victims. Do you talk to the person**
7     **who supposedly perpetrated the actions?**
8  A   Only when they allow me to.
9  **Q   Did you talk to Mr. Coon? Did you take a**
10    **statement from Mr. Coon?**
11 A   Yes, ma'am.
12 **Q   Did you interview Mr. Coon in the way that you**
13    **interviewed Blake Faulkner, or did you simply ask**
14    **him what happened?**
15 A   After the incident in Greenville, he lawyered up
16    and wouldn't talk to us.
17 **Q   Okay. Well, I will talk about Justin later. In**
18    **this discussion with Blake Faulkner, as opposed to**
19    **having you read this whole thing, can you recall**
20    **and summarize what Blake said?**
21 A   I believe that he indicated that Coon performed
22    oral sex on him; that he would take him to his
23    residence in Greenville. They would do odd jobs,

## Page 23

1     clean up the carport, whatever the case may be.
2     And sometimes they would get in the truck and go
3     off --
4        **MR. SWEENEY: I object to the relevance**
5           **of this testimony and move to strike**
6           **any reference to Blake Faulkner as**
7           **having no relevance in our case.**
8        **MS. ALLEN: Well, I think that the way**
9           **that Justin's name came up was**
10          **through this case. I think we have**
11          **a right to --**
12       **MR. SWEENEY: I'm not instructing the**
13          **witness not to answer. He's not my**
14          **witness. I'm just preserving my**
15          **objection that what happened with**
16          **Blake Faulkner has nothing to do**
17          **with the Pike County Board of**
18          **Education.**
19       **MS. ALLEN: I understand.**
20 **BY MS. ALLEN**
21 **Q   You can still answer.**
22       **MR. SWEENEY: Or this case.**
23 A   As I said, I think Faulkner indicated that Coon

## Page 24

1     had performed oral sex on him; that he had taken
2     him to Greenville to his residence -- Coon's
3     residence, that is. That they were friendly with
4     each other.
5  **Q   Did Blake Faulkner tell you when this sexual**
6     **activity began?**
7  A   I don't -- I don't recall. I would have to look
8     at the reports.
9  **Q   Okay. The report will show that it happened -- it**
10    **began two years earlier.**
11       **MS. ALLEN: Do you want me to find that**
12          **place in here?**
13       **MR. SWEENEY: Yes, and show the witness,**
14          **so he can review the accuracy of it.**
15 **Q   All right. Here's one of the places. You can**
16    **read where it says how long of a period do you**
17    **think this -- well, that's not -- you don't need**
18    **to start there. Since that time --**
19 A   Since that time, how many occasions have occurred
20    where he has performed oral sex or fondled you or
21    something of that nature? About four times. Four
22    times over the course of the last year or so?
23    This year and over the last -- over the season

## Page 25

1     last year, or after the Christmas.
2  **Q   Okay.**
3  A   And when was the last time this occurred? The
4     last time occurred was last week when I went to
5     his house. I think it was on Thursday. Last week
6     on a Thursday, which would have been June 30th.
7  **Q   So, he indicates that it took place for two years?**
8        **MR. SWEENEY: Object to the form.**
9           **That's not what he said.**
10 **Q   What was your understanding of what he said,**
11    **length of time that it took place?**
12       **MR. SWEENEY: Let's go with what it says**
13          **rather than understanding.**
14 **Q   Well, I want to ask you what your understanding**
15    **was as far as how long the activity had taken**
16    **place.**
17       **MR. SWEENEY: Object to the form.**
18 **Q   All right. Read this. The last two --**
19 A   And has this gone on since you were how old? Ever
20    since I started 8th grade. I would be 14.
21 **Q   So, that indicates that it had been going on for a**
22    **number of years.**
23       **MR. SWEENEY: Object to the form.**

JR, A Minor                    October 18, 2007                    Pike County Board of Education

8 (Pages 26 to 29)

### Page 26

1  Q   How old was he when this interview was done; do
2      you recall?
3  A   I don't recall.  I would have to look at the
4      reports.
5  Q   All right.  When was his birthday?
6  A   Birth date is 9/8/89.
7  Q   So, how old would have been?
8  A   As I say, I don't know.  I would have to look at
9      the report.  9/8/89.
10 Q   So, he was born in '89?  And this was done in
11     2005.
12 A   Yeah, 2005.  So, he's 17 or 16 -- 16 or 17.
13 Q   So, it's been going on since he was 14 --
14         MR. SWEENEY:  Object to the form --
15 Q   -- according to his --
16         MR. SWEENEY:  Instead of you testifying,
17         if you will ask him (inaudible).
18 BY MS. ALLEN
19 Q   All right.  What else did Blake testify to?
20 A   I really don't recall.  I didn't go and read those
21     reports.
22 Q   Do you recall him testifying that he was given
23     gifts by Mr. Coon?

### Page 27

1  A   Certainly.
2  Q   Can you recall any of those gifts?
3  A   Cell phones and a computer.
4  Q   Can you recall anything about a bank account?
5  A   I seem to remember a credit card or something.
6         MR. SWEENEY:  Excuse me.  What was the
7         last question?
8         MS. ALLEN:  Do you recall anything about
9         a bank account?
10 A   I seem to remember a credit card or something of
11     that nature.
12         MS. ALLEN:  All right.  I want to
13         introduce this interview with Blake
14         Faulkner as Plaintiff's Exhibit 33.
15 BY MS. ALLEN
16 Q   Do you recall any other child being mentioned by
17     Blake Faulkner in this interview?
18 A   Yes.
19 Q   Who was it?
20 A   The Helms boy.
21 Q   And what was the Helms boy's full name?
22 A   Adam.
23 Q   All right.  Adam Helms.  Can you recall what was

### Page 28

1      said, or do you want to read this?
2  A   I think Adam went to Greenville with them once or
3      twice.
4  Q   Okay.  Are you saying he indicated that Adam had
5      spent time with Mr. Coon?
6  A   Well, going to Greenville with him, yes.
7         MS. ALLEN:  Introduce this as
8         Plaintiff's Exhibit 33.
9  Q   All right.  So, you went to Butler County.  You
10     interviewed Blake Faulkner; you testified to that;
11     correct?
12 A   Here in Troy.
13 Q   Here in Troy.  So, what happened after that as far
14     as the investigation of Mr. Coon is concerned?
15 A   Sheriff Thomas and the Chief, Alonzo Ingram, I
16     believe his name is, talked.  The Sheriff was
17     talking to one or two of their investigators.  And
18     they got warrants issued in Butler County for
19     Mr. Coon's arrest.
20 Q   All right.  And what were the warrants for?
21 A   Sexual abuse, I guess.  I mean, I didn't --
22 Q   When you say "warrants", are you talking about
23     arrest warrants?

### Page 29

1  A   Yes, ma'am.
2  Q   Okay.
3  A   And a search warrant.
4  Q   And search warrants?  Okay.  Tell me about the
5      search warrants.
6  A   That was conducted by the Greenville Police
7      Department.  I was present.  I mean, I didn't
8      physically conduct the search.  Most of the time,
9      I stayed outside on the carport watching for Coon.
10 Q   Do you recall what was found?
11 A   Several cell phones.
12 Q   Anything else?
13 A   I don't know.  I mean, like I said, I wasn't party
14     to the search.
15 Q   So, you don't recall anything else that was found
16     as a result of the search warrants?
17 A   I don't think I was told what was found.  Of
18     course, I didn't want to know, either.
19 Q   Now, let me understand -- my understanding was
20     that you were an intricate part of this
21     investigation.  Is that accurate?
22 A   No.
23 Q   Okay.  Explain to me, then, what role you played

Mary Moore-Wynn, CCR              Mary Moore-Wynn                    (334)244-0203
                                Court Reporting Services

Page 30

1    in the investigation.
2  A   As far as Phillip Blake is concerned, the only
3    thing I did was take a statement from him.  The
4    Sheriff and Bob Williamson talked to Phillip's
5    father.  They did the telephone call where Coon
6    made an admission of some type of guilt.  I
7    traveled to Greenville with several officers.  I
8    stood outside while a search of the residence was
9    conducted.  I went inside once or twice just to
10    look.  But I didn't -- I didn't move anything, and
11    I didn't take anything.
12  Q   All right.  So, what happened after that as far as
13    the progress of the investigation?
14  A   First got to Coon's house, wasn't nobody there.
15    One of the investigators from Greenville, I
16    believe called him on the phone and told him that
17    his house had been burglarized and that needed him
18    to come home.  About an hour later, he drove up.
19    He was arrested.  He opened the residence up, and
20    the Greenville Police Department went in to
21    search.  Coon was transported to the Greenville
22    Police Department where he was questioned by one
23    of their investigators.

Page 31

1  Q   Do you have any knowledge of how Justin Reed's
2    name came up?
3  A   Only thing I can tell you is Mona Watson called
4    me.
5  Q   You don't know anything else about the
6    investigation that would have indicated how his
7    name was made known to Mona?
8  A   I don't.
9  Q   All right.  So, let's take it from there.  All
10    right.  Let's start back with -- did anything else
11    happen as far as Mr. Coon that you were a part of
12    until Mona called you?
13  A   No.
14  Q   All right.  Let's go back to when Mona called you.
15    Mona called you, and what happened then?
16  A   Told me that she had a second victim of Charles
17    Coon in her office; that she had already
18    interviewed him.  I think she said that he
19    indicated that oral sex had been involved.
20  Q   Okay.  And so what did you do then?
21  A   I went down to the Child Advocacy Center.  Talked
22    to Mona Watson and Mrs. Reed.  Made arrangements
23    for Bruce Matthews from the district attorney's

Page 32

1    office and myself to view the interview.  After
2    seeing the interview and its poor -- poor
3    investigative tactics, arranged to interview
4    Justin again.
5  Q   So, it was your judgment that Mona Watson was no
6    qualified to interview Justin?
7  A   I don't know whether she was qualified or not.  I
8    didn't particularly like the way she did it.
9  Q   And what, in particular, again, did you not like
10    about what she did?
11  A   I thought that she was testifying rather than the
12    child.
13  Q   Have you ever witnessed a forensic investigator or
14    anyone from child protect interview a child
15    before?
16  A   No.
17  Q   So, you had nothing to compare it to?
18  A   No.  Just experience.
19  Q   What experience would that be?
20  A   That's not the way you conduct an interview.  You
21    don't tell a child what happened and have him
22    agree to it.
23  Q   Okay.  All right.  Just a second.

Page 33

1  A   You have to remember that at the time that Justin
2    Reed's interview took place, the Child Advocacy
3    Center had just started up.  It was in his
4    infancy.
5  Q   So, does that mean the people that were working
6    there or handling these things were not qualified?
7    Is that something you learn on the job?
8      MR. SWEENEY:  Object to the form.
9  A   I wouldn't say that they weren't qualified.  I
10    just -- I wouldn't say that that was the proper
11    way you do things.  I mean, I don't have any idea
12    what Mona Watson's qualifications are.
13  Q   Okay.  Would you please identify this?
14  A   It appears to be a transcript of a statement given
15    by Justin Reed to me.
16      MS. ALLEN:  All right.  Let's mark that
17      as Plaintiff's Exhibit 34.
18      (Whereupon, Plaintiff's Exhibit 34
19      was marked for identification and
20      is attached hereto.)
21  BY MS. ALLEN
22  Q   All right.  Your primary objection to Mona
23    Watson's interview was that you objected to the

Page 34

1    way she questioned him?
2    A    Yes, ma'am.
3    Q    Did that make you doubt the results of her
4         interview?
5    A    Well, from looking at -- from looking at the
6         interview and seeing the way she had approached
7         the child, and the child's responses -- you know,
8         in any criminal investigation, you want the victim
9         to be able to tell the story as to what happened;
10        rather than the investigator to lead the person
11        through and have them agree with it. You want
12        everything in the victim's own words.
13   Q    All right. I want you to look at that. And I've
14        got another copy over here. And I would like to
15        go through this interview that you did with
16        Justin.
17            Justin, you're 15 years old. And last year
18        you went to Pike County High School. You're in
19        the 9th grade? Yeah. You're going into the
20        10th grade? Yeah. You know today's date? If I
21        told you July 18th, 2005, would that mean anything
22        to you?
23            So far, have you asked him a single direct

Page 35

1    question that you didn't give him the answer to
2    first?
3    A    Certainly.
4    Q    What?
5    A    I asked him what was today's date.
6    Q    Before he had a chance to answer, according to
7         this transcript, if I told you today July 18th,
8         2005, would that mean anything? Would you take my
9         word for it?
10   A    Well --
11   Q    Is that what you said?
12   A    Yeah, that's what I said. But you have to
13        understand you're talking to a child. The child
14        is not responsive, because he doesn't know you.
15        And as he sits there, you know, because it says,
16        do you know what today's date is? If I told you
17        July 18th, 2005, would you mean this -- anything
18        to you -- would you take this -- that's not all
19        one complete (indicating) question. I mean, I
20        have asked him, do you know what today's date is?
21        And he sits there (indicating). If I told you
22        today's date was such and such, would you
23        believe me? (Indicating.)

Page 36

1    Q    Would you say that that was reflected in the
2         interview that Mona Watson had with him; that same
3         type of response?
4    A    No. The interview that Mona Watson did, she was
5         dealing with dolls. And she said something to the
6         effect, didn't he do this to you? Didn't he do
7         this to you?
8    Q    According to my --
9    A    What I would have said was, what did he do to you?
10   Q    Okay. I'm reading on page 1. As best you can, I
11        want you to tell me what happened. Now, you know
12        Ms. Mona. Ms. Mona used the same dolls talking to
13        you. Did you used -- I assume that's supposed to
14        be -- it says the sum dolls -- talking to you.
15        And I don't have no dolls. So, you're gonna have
16        to talk to me. You're gonna have to tell me, just
17        me and you and Mr. Bruce over there. And we're
18        talking. All right? Something happened with you.
19        And you didn't like it. You are gonna have to say
20        it now. You are gonna have to say it so I can
21        hear you.
22            All right. Did Mona ask questions like that?
23   A    The best I can remember from viewing the

Page 37

1    interview -- and like I said, it's been a long
2    time, but --
3    Q    Is there tape of this interview --
4            MR. SWEENEY: Wait. He was answering.
5            MS. ALLEN: Excuse me. Excuse me.
6    Q    Go ahead. I'm sorry. I interrupted.
7    A    As best I can remember, the way Mona was asking
8         the questions, she was telling the child certain
9         things that happened, and then says, isn't this
10        the way it was? As best I can remember.
11   Q    So, if Mona said that she conducted the interview
12        in an appropriate manner as a forensic interviewer
13        would interview a child like this; would you say
14        that your experience of how the interview would
15        be conducted would outweigh her experience?
16            MR. SWEENEY: Object to the form. I
17            don't think that question makes
18            sense.
19   Q    Who has the greater experience; you or Mona?
20   A    I don't know.
21   Q    Okay. Further down: One -- uh, one Auburn man to
22        another Auburn man, tell me what -- what happened
23        that you didn't like.

---

Page 38

1    Let's see. And then we have Justin's
2    response.
3        Well, the band man touched me in the wrong
4    place and stuff. And then you respond to that.
5    And you said -- I'm missing a page. I'm sorry.
6        So, you said, band director, you know who the
7    band director is. And he said, Mr. Coon. And you
8    said, when you say he touched you in the wrong
9    place, where is the wrong place? And he says
10   between the legs. And he says -- you said, okay
11   between your legs. Now, he did that at school?
12   And he answers yes. What else did he do? And
13   then there that's it. The conversation goes on.
14       When you were interviewing him, and you asked
15   him a question, and he starts responding in this
16   manner, what is that response?
17   A   He didn't do anything else. Do you remember
18   Ms. Mona with the dolls? Did that happen?
19       I don't recall whether -- I would have to -- I
20   don't know.
21   Q   You don't recall --
22   A   I don't remember for it's a yes or no when he
23   answers that way.

---

Page 39

1    Q   Is there a copy of this interview?
2    A   There is a tape recording.
3    Q   A tape recording of this interview?
4    A   Yeah.
5        MS. ALLEN: All right. I want to
6        request on the Record a tape
7        recording of this interview, please.
8        MR. SWEENEY: Well, we certainly don't
9        have control over that. If you want
10       it from the Sheriff's Department,
11       you'll have to --
12       MS. ALLEN: Well, we have already
13       subpoenaed it. We will go back and
14       do it again.
15   BY MS. ALLEN
16   Q   Do you recall Justin talking about Mr. Coon trying
17       to get him to smoke?
18   A   Yes.
19   Q   What did Justin say?
20   A   Said he didn't do it.
21       MR. SWEENEY: If it's in the transcript,
22       let's rely on the transcript.
23   A   Said he didn't do it.

---

Page 40

1    Q   Just read the part where he said he tried to get
2    him to smoke.
3    A   When out during school, what did you all do when
4    you were out during school? Just talked about
5    band practice and stuff. You didn't do nothing
6    else? Nope, just smoked. Smoked? Cigarettes?
7    But I was not -- but I was no smoking. He was
8    trying to make me smoke. He tried to make me
9    smoke. Did you smoke? No.
10   Q   Okay. All right. Read this part here. Did you
11   ever go for a ride?
12   A   Did you ever go for a ride with him in his truck?
13   Riding to school. Riding from your house to
14   school? Uh-huh. We was out during school.
15   Q   We was out doing school?
16   A   During school.
17   Q   Okay. So, you read this response as uh-huh. So,
18   that's your recollection that U-H U-H is uh-huh?
19   A   It should be, yeah.
20   Q   All right. Read this part here, please.
21   A   All right. The times that Mr. Coon touched you
22   when you were down at the band, at the band room
23   at the school. Uh-huh. Did he touch you with his

---

Page 41

1    hand inside your pants or outside your pants?
2    Outside. He never touched you inside your pants?
3    Uh-huh.
4    Q   So, that's --
5    A   Or huh-uh.
6    Q   So, he indicated that it happened in the band room
7    at school?
8    A   On at least one occasion.
9    Q   Okay. Read this part right here, if you will.
10   A   Now, when on the occasion that he touched you at
11   the band room, or touched you between your legs at
12   the band room, was there any other students in the
13   class? No.
14   Q   Keep going.
15   A   How do you -- how did he keep folks from coming in
16   and seeing you all? Did he lock the door? He
17   locked the door on you, or you locked the door?
18   That's what I locked the door.
19   Q   And who --
20   A   Reed speaking.
21   Q   Okay. Thank you?
22   A   I'm sorry? Reed, I locked the door. Bradbury,
23   you locked the door? When you locked the door --

---

Page 42

1    what did you lock the door for, Justin?  What you
2    lock the door for?  Reed.  Because he told me to.
3  Q   Okay.  That's good.
4       All right.  Read this.
5  A   Bradbury, he never put his mouth on you?  Reed,
6    nope.  He never had you put your mouth on him?
7    Huh-huh.
8  Q   Now, that's the same U-H U-H that you read as
9    uh-huh earlier.
10 A   Well, is it U-H or U-H-P up above on the other
11   one?
12 Q   It was U-H.  Let me find it again.  Is that the
13   same U-H U-H that you read as uh-huh earlier?
14 A   That's the way she has got it typed.
15 Q   Okay.  Start here.
16 A   Bradbury, do you think you can answer a question
17   for Mr. Bruce?  Ah, come on now.  Bruce is a cool
18   guy.  Matthews, you don't want to talk to me,
19   Justin?  Reed, no.  Matthews, why?  What did I do
20   to you?  Reed, sleepy.  Matthews, me too.  Me,
21   too.  You know what I did yesterday?  Reed,
22   huh-huh.
23 Q   Okay.  That's good.  All right.  Start here

Page 43

1    Matthews.
2  A   Matthews, do you remember telling her that -- that
3    he pulled your pants down?  You don't remember
4    that?  Reed, huh-huh.
5  Q   Ah -- is that the same uh-huh?
6  A   To me, it's no.
7  Q   We can go back to that original page.
8  A   With that question and that response, to me,
9    that's no.
10 Q   But no is not what it says according to the rest
11   of this transcript, is it?
12 A   It sayings U-H U-H.
13 Q   Which is --
14 A   To me, in that question and that response, is no.
15 Q   So, are you saying that in the other places uh-huh
16   is yes, but in this place, it's no?
17 A   I'm telling you that in that question and that
18   response, my understanding is that it's no.
19 Q   But in other places uh-huh was yes?
20 A   Well, I would have to go back and listen to the
21   tape.  Just because it's typed that way doesn't
22   mean that's the correct answer.  Either U-H U-H or
23   U-H-M-P, I don't know.  I would have to go back to

Page 44

1    listen to the tape.
2  Q   Okay.  When you're doing an interview, do you
3    normally tell a person to answer yes or no, so
4    that it can be understood?
5  A   I just want them to tell me the truth.
6  Q   Do you normally ask them to answer out loud yes or
7    no?
8  A   No.  You can't ask questions and get yes or nos.
9    If I ask you, what's today's date and what is the
10   weather like?  Can you say, yes?  You're going to
11   have to tell me today's date and whether it's
12   raining or not.
13 Q   Mr. Bradbury --
14 A   The only thing I want them to do is tell me the
15   truth.
16      I am not trying to be ugly with you.  But I am
17   not going to say things that you want me to say.
18 Q   Suppose it's a question that has a yes or no
19   answer, and they indicate by shaking their head or
20   grunting, or making some sound that you cannot be
21   sure of what they are saying; would you say,
22   please answer yes or no?
23 A   Either that or tell them to explain.

Page 45

1  Q   Did you do that in this interview?
2  A   With Justin, it was difficult.
3  Q   Why?
4  A   Have you talked to Justin?
5  Q   I want you to tell me why.
6  A   Justin is slow, nonresponsive a lot of times.  And
7    if he doesn't know you, he's not going to open up
8    and talk to you.
9       Now, as time went on, after this statement, I
10   would see them in the stores, they would come up
11   and talk to me like I was a long-lost brother.
12 Q   But did they talk to you about this case?
13 A   No.
14 Q   So, it wasn't about the sexual abuse?
15 A   No.
16 Q   All right.  Exhibit 34, can you tell me what that
17   is up in the right-hand corner?
18 A   DA called.  DA.  John.  And told him to settle
19   this case.  And it looks like "our words".  I
20   don't -- I'm not sure.  I don't know what that
21   word right there (indicating) is.
22 Q   Could it be Anderson?  Who is the DA?  Who is the
23   DA in Pike County who is -- or Butler County --

Page 46

1   whose first name is John?  Do you know who it
2   might be?
3   A   Uhm, there is a John -- of course, he spells the
4   name J-O-H -- used to be the -- he's the son of
5   the former district attorney here in Pike County.
6   He's an assistant district attorney here in Pike
7   County.
8   Q   You're not sure what that last name is?
9   A   No, ma'am.
10  Q   Do you know why the decision was made to settle
11  this case?
12  A   No, ma'am.  Is that in Butler County or Pike
13  County?
14  Q   Well, when I say "this case", I'm referring to
15  Justin's case.  Do you know why the decision was
16  made to settle Justin's case?
17  A   I never knew that there was a decision to settle
18  the case, to be honest with you.
19  Q   Nobody discussed it with you?
20  A   District attorney's office did not discuss it with
21  me.
22  Q   Did they ask you whether or not you thought Justin
23  would make a good or bad witness?

Page 47

1   A   No, ma'am.
2   Q   Did you ever express that view to anybody?
3   A   Yes.
4   Q   Who did you express that to?
5   A   Mrs. Reed.
6   Q   Anybody else?
7   A   Not that I recall.  I mean --
8   Q   And what did you tell Mrs. Reed?
9   A   Mrs. Reed, I told her that I didn't believe he
10  would be a good witness in front of a jury and the
11  Judge, because of his inability to express
12  himself.
13  Q   Okay.  So, you did notice that he had an inability
14  to express himself?
15  A   Yes, ma'am.
16  Q   Okay.  All right.  Let's get back to the
17  chronology.  You did the interview with Justin,
18  and what happened after that?
19  A   Well, of course, the district attorney's
20  investigator was present at the time.
21  Q   And that was who?
22  A   Bruce Matthews from the -- you can see that
23  looking at the statement there -- or the questions

Page 48

1   in the statement.
2   I think it was left up to Matthews to take it
3   to the district attorney's office for further
4   consideration.
5   Q   Did Matthews take the tape with him?
6   A   I think I gave the tape to Matthews, because our
7   secretary was out.  And he was going to have it
8   transcribed out down there.  I believe.
9   Q   So, the person that transcribed it -- let's see --
10  who does it say transcribed it?
11  A   Fuller, C-R-Y-S Fuller.  How do you produce
12  C-Y-R-S (sic)?
13  Q   I'm not sure.
14  So, that person is not in the Sheriff's
15  Department?
16  A   I believe that person is in the district
17  attorney's office.  If I remember correctly,
18  Barbaree was out -- out sick or something.  And I
19  gave the tape to Matthews to have it transcribed
20  at the district attorney's office.
21  Q   What happened after that?
22  A   It was given back to me.
23  Q   What was given back?

Page 49

1   A   The tape of the transcribed statement.
2   Q   So, the tape was given back to you, and what did
3   you do with it then?
4   A   Put it in the case file in the Sheriff's office.
5   Q   So, as far as you know, the tape is still in the
6   case file in the Sheriff's office?
7   A   It should be.
8   Q   All right.  What happened after that?
9   A   If I recall, at some point in time, I was talking
10  to Justin -- no, I was talking to Justin's
11  brother -- and I don't recall his first name --
12  he's probably two or three years younger than
13  Justin.
14  Q   Would that be Joey?
15  A   Yes, ma'am.  And I was asking him if he saw
16  anything about Coon and his brother, and he
17  blurted out that he had been a victim, also; that
18  he had been fondled.
19  Q   So, the next thing that happened in the sequence
20  of events was that it came to your attention that
21  Joey had also been abused by Coon?
22  A   Yes, ma'am.
23  Q   Is that correct?

Page 50

1  A   And I think we set up an interview at Child
2      Advocacy Center for him.
3  Q   All right. Can you identify this for me, please?
4  A   That's a deposition written by myself.
5  Q   What is that? Describe that for me.
6  A   It's a deposition to obtain an arrest warrant.
7  Q   And what is -- what would the warrant be based on?
8  A   It says, during an interview of Justin Reed, age
9      15, he advised that his teacher, band director,
10     had fondled his privates through his trousers with
11     his hand while at the band room at the Pike County
12     High School.
13 Q   So --
14 A   Sexual abuse, third degree.
15 Q   All right. Why are these three names on this
16     document?
17 A   As witnesses.
18 Q   Were they there at the time?
19 A   Time of what?
20 Q   At the time when you took the statement.
21 A   Mona Watson took the initial statement from Justin
22     Reed. Myself and Bruce Matthews were there at the
23     time that we took the tape-recorded statement.

Page 51

1  Q   So, that's why the three of you all signed this?
2  A   I only signed it. They didn't sign it.
3  Q   You just listed the names --
4  A   I listed the name as witnesses.
5          MS. ALLEN: Okay. I want to introduce
6      this as Plaintiff's 35.
7          (Whereupon, Plaintiff's Exhibit 35
8          was marked for identification and
9          is attached hereto.)
10 BY MS. ALLEN
11 Q   Identify this, please.
12 A   That's a witness statement by Charles Coon.
13 Q   And what does that say?
14 A   In the middle of June, 2005, I went to the Reed
15     residence. Justin and Joey were playing video
16     games. Joey was in his underwear, because school
17     was out. I began tickling him, and I may have
18     touched him in the wrong place and way. Signed
19     Charles Coon.
20 Q   Okay.
21         MS. ALLEN: I want to mark that as
22     Plaintiff's Exhibit 36.
23         (Whereupon, Plaintiff's Exhibit 36

Page 52

1          was marked for identification and
2          is attached hereto.)
3  BY MS. ALLEN
4  Q   To your knowledge, did Charles Coon admit to
5      sexual abuse of Justin Reed?
6  A   As best as he could in that statement. Or as best
7      as he would. His lawyer wouldn't let him say a
8      whole lot.
9  Q   Were you present on the plea day when Charles Coon
10     went to court?
11 A   Yes, ma'am.
12 Q   Can you tell us what happened that day?
13 A   No, ma'am.
14 Q   You can't?
15 A   I was present, but I wasn't in the courtroom.
16 Q   Oh, you were not in the courtroom?
17 A   No, ma'am.
18 Q   Any particular reason why you weren't in the
19     courtroom?
20 A   If I remember correctly, we had prisoners
21     everywhere up there at that time.
22 Q   Are you familiar at all with the plea agreement
23     that was signed by Charles Coon and Pike County

Page 53

1      and Butler County?
2  A   No, ma'am.
3  Q   So, you have never seen that or --
4  A   No, ma'am. What did he agree to?
5  Q   (Tenders document.)
6  A   (Reviews document.)
7  Q   Can you summarize what he agreed to?
8          MR. SWEENEY: Let's just introduce the
9          document.
10         MS. ALLEN: I will. But I'd like to
11         know --
12         MR. SWEENEY: I don't know that that has
13         any utility. If we have got the
14         document, why should he summarize
15         it?
16         MS. ALLEN: I would like to know what
17         happened to Charlie Coon in Pike
18         County.
19         MR. SWEENEY: Isn't that --
20 A   That's Butler.
21 Q   Well, they agreed to consolidate the cases; did
22     they not?
23 A   I don't know whether he pled guilty or not,

Page 54

1    though. I wasn't in the courtroom.
2 Q   So, you're saying that you do not know that he
3    pled guilty?
4 A   I don't know.
5 Q   Did you know he was sent to prison?
6 A   I saw him.
7 Q   You were the Chief Investigator on this case; is
8    that correct?
9 A   Which case?
10 Q   Justin Reed's.
11 A   Yes, ma'am.
12 Q   You do not know the outcome of that case?
13 A   I know he pled guilty. But I don't know how much
14    time he got.
15 Q   I didn't ask you that. I said did you know that
16    he pled guilty?
17 A   I thought you asked me if I knew the outcome of
18    the case. To me, that's how much time he got.
19 Q   You do know that he pled guilty?
20 A   Yes, ma'am.
21 Q   To sexual abuse of Justin Reed?
22 A   Yes, ma'am.
23 Q   And sexual abuse of Joey Reed?

Page 55

1 A   Yes, ma'am.
2        MS. ALLEN: Mark this Plaintiff's
3        Exhibit 36, I think it is.
4        (Whereupon, Plaintiff's Exhibit 37
5        was marked for identification and
6        is attached hereto.)
7 BY MS. ALLEN
8 Q   When Adam Helmsly's name came up in your interview
9    with Blake Faulkner, did you do any investigation
10    regarding Adam Helmsly?
11 A   Adam Helms. Yes, ma'am.
12 Q   Helms, excuse me.
13 A   Yes, ma'am.
14 Q   What investigation did you do?
15 A   I had him and his mother come in and talk to me.
16 Q   Did you do an interview of him like you did
17    Blake --
18 A   I don't --
19 Q   -- a tape-recorded interview?
20 A   I don't recall whether it was tape recorded or
21    not. It should have been. I don't recall right
22    offhand, though.
23 Q   Speaking of --

Page 56

1 A   Do you know what happened to Mr. Helms?
2 Q   I do. He committed suicide the weekend this
3    became public.
4 A   Yes, ma'am.
5 Q   So, you must have talked to him right before he
6    committed suicide?
7 A   Yes, ma'am.
8 Q   Did he admit to anything?
9 A   No, ma'am.
10 Q   Let me go back and ask you about the tape
11    recording, the DVD that Mona Watson did and showed
12    to you. Mona Watson testified that she gave you
13    that DVD. What is your recollection of what
14    happened to that DVD?
15 A   My recollection is that Bruce Matthews and myself
16    went to the Child Advocacy Center, sat and viewed
17    the videotape. And we never had a hard copy of it
18    or the DVD. I'm sorry.
19 Q   Are you saying that she did not give you a copy
20    it?
21 A   I don't recall ever getting one.
22 Q   Do you recall me asking to see that DVD?
23 A   Certainly.

Page 57

1 Q   And do you recall your response to me?
2 A   Certainly. I said, if we had one, it's in the
3    file.
4 Q   You did not tell me that I would have to get it
5    from the DA's office?
6 A   No, I don't remember that. I said, if we had a
7    copy of the DVD, it would be in the file. But
8    failing that, Mona Watson could burn another one.
9 Q   What would be the usual procedure in a child abuse
10    case when there was an interview by DHR or child
11    protect; what happens to the tape or DVD?
12 A   Well, like I said, back in the days --
13 Q   I want to know in these days.
14 A   Today?
15 Q   2005.
16 A   All right. Back in that day, the Child Advocacy
17    Center -- the Child Advocacy Center was in its
18    infancy. Mona Watson and her staff were not all
19    that familiar with the electronics of doing a DVD
20    and making copies. On occasion, we didn't get a
21    DVD. Sometimes it was on the hard drive of the
22    computer, because they just didn't know how to
23    write it.

Page 58

1     When we did get a DVD, we didn't have the
2  ability to copy it. So, what we did was tried to
3  get the Advocacy Center to burn two copies, where
4  one would stay in the District Attorney's file and
5  one would stay in the Sheriff's Department's file.
6     Back in the days of Justin Reed, we're talking
7  about, I don't think Mona Watson and her staff
8  knew the mechanics of making a DVD at that point
9  in time. And I believe that Matthews and myself
10  went down there and viewed the DVD, or viewed the
11  recording off the computer. Didn't have a hard
12  copy of the DVD at that point in time.
13  Q   So, if she said that she gave it to you,
14      specifically to you, Bob Bradbury --
15  A   Yes, ma'am.
16  Q   -- that would not be accurate?
17  A   I don't think so.
18  Q   And you would not have requested a copy of that
19      for evidence of any kind?
20  A   Certainly we did. But like I said, they didn't
21      have -- they didn't have the knowledge of how to
22      write them at the time. And as time goes by, you
23      just don't get it.

Page 59

1  Q   So, you're talking about two years ago?
2  A   Right.
3  Q   We're talking about 2005?
4  A   Two years from today.
5  Q   Right.
6          MR. SWEENEY: What's your question?
7  Q   My question is: You're indicating that the
8      technology was not there? I'm unclear.
9  A   I didn't say the technology wasn't there. I said
10      that Mona Watson and her staff didn't know how to
11      do it.
12  Q   Okay. Do you know Polly King?
13  A   Polly King? Polly King? I'm not sure whether I
14      do or not. I mean, is she a red-headed lady lives
15      out at Banks?
16  Q   Yes.
17  A   I have had occasion to talk with her.
18  Q   Did you have occasion to talk to her about
19      anything to do with this -- Coon, Mr. Coon?
20  A   I don't believe so.
21  Q   Okay. Do you know anybody on the drug task force?
22  A   Bob Williamson.
23  Q   Bob Williamson?

Page 60

1  A   (Witness Indicating.)
2  Q   Now, the drug task force is a part of the
3      Sheriff's Department?
4  A   Well, it's combined with the Troy Police
5      Department, Pike County Sheriff's Department, and
6      I think Brundidge Police Department contributes
7      some funds to it. But the officers are from Troy
8      PD and Pike County Sheriff's Department.
9  Q   Do I understand it's not a separate entity; it's
10      just a part of the Police Department?
11  A   And the Sheriff's Department.
12  Q   But the police department and the Sheriff's
13      Department are not the same?
14  A   No, ma'am.
15  Q   So, I'm just trying to understand this. So, you
16      would have policemen on --
17  A   Well, the Sheriff's Department and the Police
18      Department contribute one officer to patrol drugs.
19  Q   Okay.
20  A   And Brundidge Police Department contributed funds,
21      I believe. They didn't have a man on the task
22      force.
23  Q   So, you had a Troy City, Brundidge City, and Pike

Page 61

1      County Sheriff's that contributed either personnel
2      or funds to make up the --
3  A   Yes, ma'am.
4  Q   And Bob Williamson --
5  A   He's a representative from the Sheriff's
6      Department.
7  Q   From the Pike County Sheriff's Department?
8  A   Yes, ma'am.
9  Q   I must have misunderstood. I thought you
10      mentioned Bob Williamson a minute ago in reference
11      to Butler County.
12  A   No. I said that Sheriff Thomas and Bob Williamson
13      interviewed Phillip Faulkner and talked with his
14      father prior to us going to Butler County. Bob
15      Williamson recorded -- or provided the recording
16      equipment whereby they recorded a telephone
17      conversation between Coon and Phillip Faulkner.
18  Q   Okay. I understand. I see what you're saying
19      now.
20          MS. ALLEN: Can we go off the Record for
21      one second?
22          (Off-the-Record discussion.)
23          MS. ALLEN: Let's make this an exhibit.

Page 62

1          (Whereupon, Plaintiff's Exhibit 38
2              was marked for identification and
3              is attached hereto.)
4    BY MS. ALLEN
5    Q    This is a summary that Mona Watson did of the
6        interview that she had with Justin. And it
7        indicates here that it was viewed by you and the
8        DA.
9          MS. ALLEN: And I want to introduce that
10       as Plaintiff's Exhibit 38.
11   Q    What DA would that have been?
12   A    Bruce Matthews. He's an investigator with the
13       district attorney's office.
14   Q    So, he's an investigator. He's not an assistant
15       DA?
16   A    No, ma'am.
17   Q    When it says viewed by you and DA, you did not
18       view it while it was being --
19   A    Conducted.
20   Q    -- while she was conducting it?
21   A    No, ma'am.
22   Q    You viewed it after the fact?
23   A    Yes, ma'am.

Page 63

1    Q    Okay. Let's see --
2    A    In that particular case, I viewed it after the
3        fact. Other occasions, I view it while it's going
4        on.
5    Q    So, is there any reason why you viewed it after
6        the fact in that case?
7    A    Yeah. She didn't call me.
8    Q    Okay. In Exhibit 32, can you identify this,
9        please?
10   A    This is a police report written myself in my
11       handwriting.
12   Q    And it refers to who?
13   A    Justin Reed.
14         MS. ALLEN: We'll mark that Plaintiff's
15       Exhibit 39.
16         (Whereupon, Plaintiff's Exhibit 39
17             was marked for identification and
18             is attached hereto.)
19   BY MS. ALLEN
20   Q    You indicated that you got a call from Mona
21       Watson -- you've already testified to that --
22       saying that she had another victim of abuse and
23       that she had already interviewed him. And this

Page 64

1    refers to Justin. And she indicated that Justin
2    had said that force -- that are Coon had forced
3    him to have oral sex. Okay. And then you go to
4    her office. And she tells you that Justin has a
5    learning problem. And that he would not talk
6    openly to people he did not know. She told you
7    that?
8    A    Yes, ma'am.
9    Q    And you didn't know Justin at the time, did you?
10   A    No, ma'am.
11   Q    Okay. And it says here that you spoke with
12       Ms. Reed and that we agreed -- I assume that means
13       you and Ms. Reed -- to view the recording and
14       possibly get Ms. Watson to ask further questions
15       if needed.
16         Then on this page, it says, Ms. Watson was
17       unable to stay. Can you explain to me, are we now
18       at the Sheriff's Department?
19   A    No, ma'am. We're still at the Child Advocacy
20       Center. She had another appointment someplace.
21   Q    Read that for me so I can clarify.
22   A    Ms. Watson was unable to stay and show me the
23       recording at that time. And we made arrangements

Page 65

1    to come back on 7/15, which was the following
2    morning. I contacted DA Investigator Bruce
3    Matthews, and together we went to view the
4    recording. After viewing the recording, we agreed
5    that we needed to reinterview Justin at a time --
6    and a time of 9:05 a.m., 7/18/05 was agreed upon.
7    I spoke with both Mr. and Mrs. Reed on 7/14 and
8    advised them of my concern as to Justin's being
9    able to tell his story in front of a judge and
10   jury.
11   Q    Okay. Had Ms. Watson already left?
12   A    Well, I wrote that report at my office.
13   Q    But you're at the CAC?
14   A    No, I wrote this report at my office. I'm
15       relating to the fact at CAC.
16         We were down at the Child Advocacy Center.
17       Ms. Mona Watson had another appointment. She
18       couldn't stay. So, we agreed to come back the
19       next morning and view the tape or view the DVD.
20         I keep getting confused with tape and --
21   Q    Right. I make that reference. It's DVD is what
22       it would be, audio and video.
23   A    Yes, ma'am. But in this particular case, when we

Page 66

1  viewed it, we viewed it off the hard drive. We
2  didn't have the DVD, itself.
3  Q  When you viewed it at Mona Watson's office?
4  A  Yes, ma'am.
5  Q  All right. Explain to me what you mean; you
6     viewed it off the hard drive.
7  A  Well, it's a system whereby they can photograph
8     you and have that result sent to a computer. And
9     when I say "we viewed it off of the hard drive",
10    they went on to the computer itself and replayed
11    it for us.
12 Q  Okay. Uhm, read --
13 A  I'm not technical now.
14 Q  I understand. I am not asking for technical.
15    All right. Read that if you will.
16 A  The whole thing?
17 Q  Yes.
18 A  As arranged, Mrs. Reed brought Justin into my
19    office so that I might talk with him about
20    Mr. Coon and any sexual advances made towards him.
21    After getting to know him, I asked him if anyone
22    had touched him or made feel uncomfortable.
23    Justin stated Mr. Coon, his band director. When

Page 67

1  asked what Mr. Coon had done, Justin stated that
2  Coon had touched his private parts. When asked
3  how, Justin stated that Mr. Coon had rubbed his
4  privates through his pants. Justin further stated
5  that his -- that this activity took place in the
6  band room at Pike County High School in Brundidge,
7  Alabama. Justin also stated that Mr. Coon had
8  come to his residence and had tickled his brother,
9  Joey, and himself. Tape with interview of Justin
10 given to DA Investigator Matthews to be
11 transcribed.
12 Q  All right. So, when you say the tape of the
13    interview was given to Matthews, what interview
14    are we talking about here?
15 A  Justin Reed.
16 Q  I know, but which interview; Mona's interview or
17    the interview that you did with Justin?
18 A  Mine.
19    This is just a statement -- or just a synopsis
20    of the report of what I did. Just a very short,
21    brief --
22 Q  Okay.
23 A  -- explanation of the statement itself.

Page 68

1  Q  Okay.
2  A  And the statement was given to Reed -- I mean, to
3     Matthews, as I said, because our secretary was out
4     sick.
5  Q  Okay. I just wanted to clarify what tape that
6     was.
7  A  Tape and DVD and VCR is sort of interchangeable
8     when I talk, isn't it?
9  Q  All right. Just read that for me, also, into the
10    Record.
11 A  On 7/19/05, Tammy from Child Advocacy Center
12    telephoned and stated that she had Mona Watson's
13    report typed. I picked up the report and faxed a
14    copy to the other -- to Dwight Holley at the DA's
15    office in Enterprise, Alabama.
16 Q  Would that report be Plaintiff's Exhibit 38, would
17    that be this, Plaintiff's Exhibit 38? Is this
18    what you picked up from her office?
19 A  It may be. I don't remember without looking in
20    the files.
21 Q  All right. Then, if there was something else,
22    that would have been in the file? So, we should
23    have a copy of that if we subpoenaed the entire

Page 69

1  file?
2  A  (Witness Indicating.)
3  Q  Okay.
4     Mona Watson indicated to you that Justin
5     probably would not talk to anybody he didn't know?
6  A  Yes, ma'am.
7  Q  Okay. You didn't know Justin?
8  A  No, ma'am.
9  Q  And so you indicate in your summary, in
10    Plaintiff's Exhibit 39, that Justin came in your
11    office, and you got to know him, and then you
12    interviewed him?
13 A  Yes, ma'am.
14 Q  Would you consider that sufficient for Justin to
15    feel comfortable with you?
16 A  To a point.
17 Q  Did Justin, in fact, feel comfortable with you?
18 A  I think he did.
19 Q  Did he talk to you in the way that you would have
20    liked for him to talk to you?
21 A  I would have liked him to have been more
22    responsive to some questions. But --
23    (indicating).

Page 70

1  **Q   Is there anything else that you can recall about**
2      **the investigation once the interviews were done;**
3      **any other role that you played in the case?  You**
4      **said --**
5  A   I don't --
6  **Q   -- you got a statement from Mr. Coon?**
7  A   Coon was here for court on some other related
8      matter.
9  **Q   Would it have been the Blake Faulkner matter?**
10 A   I think that's right.  And he wanted to -- his
11     lawyer indicated that he wanted to plead guilty to
12     everything at one time.  And I told his lawyer at
13     the time that we hadn't interviewed Mr. Coon.  The
14     only thing we had was the statement of the child.
15     And I think the lawyer indicated that -- that that
16     statement that you have got already with Coon,
17     that's what we had.  Once he told me, and I wrote
18     it out, his lawyer reviewed it before we signed
19     it.  I think later on that day, he pled guilty to
20     the two cases here in Pike County.
21 **Q   Do you recall what the charges were?**
22 A   Child abuse, third, I think it was.
23 **Q   All right.  Can you identify this for me, please?**

Page 71

1  A   That is Judge Hightower's Sentencing Order.
2  **Q   Sentence --**
3  A   And a sentence agreement underneath.
4  **Q   Sentencing Order of who?**
5  A   Charles Coon.
6  **Q   For?**
7  A   Sexual abuse, first degree.  And sentenced to one
8      year in the Pike County Jail for each with the
9      sentence to run concurrently with each other with
10     any and all other sentences presently being served
11     by the defendant.  Pay a $25 crime victims'
12     compensation assessment.  Defendant is not
13     entitled to jail credit.
14 **Q   So, that would be the Judge's Order that followed**
15     **Mr. Coon's plea of guilty to sexual abuse of**
16     **Justin and Joey?**
17 A   Well, I don't know.  I mean, I would assume so.
18     But their names aren't -- aren't mentioned.  The
19     only reference would be a court case number that
20     you can go back and pick up the court case.
21 **Q   Right.  And, let's see.  I guess we need to verify**
22     **that that is their cases.**
23     **MR. SWEENEY:  Was this plea marked as an**

Page 72

1      exhibit?
2      **MS. ALLEN:  I'm going to mark this as**
3      **Plaintiff's Exhibit 40.**
4  A   Both pages are 40?
5  **Q   Forty for the top page, and 41, which is part of**
6      **the settlement agreement that he signed.**
7      (Whereupon, Plaintiff's Exhibit 40
8      was marked for identification and
9      is attached hereto.)
10     (Whereupon, Plaintiff's Exhibit 41
11     was marked for identification and
12     is attached hereto.)
13 BY MS. ALLEN
14 **Q   We need to verify that those two cases refer to**
15     **Joey Reed.  Maybe we can do it with this.  Would**
16     **you identify this for me?**
17 A   Witness subpoena for myself.
18 **Q   And what was that for?**
19 A   State of Alabama versus Coon, Charles Coon.
20 **Q   Can you identify who the victim was?**
21 A   I would assume it would be Justin Reed.
22 **Q   And what is the case number?**
23 A   438.  205-438.

Page 73

1  **Q   All right.  And what is the case number on this**
2      **Order?**
3  A   Same number.  On the first case number.
4  **Q   All right.  Let's identify the second case number?**
5      **MS. ALLEN:  Unless you wish to stipulate**
6      **that those were the two cases.**
7  **Q   That subpoena was issued.  Did you end up going to**
8      **court and testifying --**
9  A   Testifying, no.
10 **Q   -- relative to that subpoena?**
11 A   No.
12 **Q   Do you recall why?**
13 A   I think he pled guilty.
14 **Q   Okay.**
15     **MS. ALLEN:  Excuse me.  I'm going to**
16     **have to find a case number for Joey.**
17 **Q   Do you understand that normally in cases that**
18     **involve minors that names are not put into these**
19     **court documents?**
20 A   Certainly.
21 **Q   So, that would explain why there is no reference**
22     **to Justin or Joey; is that correct?**
23 A   I would think so.

Page 74

1    THE WITNESS: Dr. Bazzell, you didn't
2        pay the heating bill? Everybody's
3        got long sleeves except me. I'm
4        cold.
5    DR. BAZZELL: Okay.
6        (Brief recess.)
7    BY MS. ALLEN
8    Q    Is there anything else as far as the investigation
9        is concerned that you can recall that you were
10       involved in?
11   A    No, ma'am.
12       MS. ALLEN: I have no more questions.
13           EXAMINATION
14   BY MR. SWEENEY
15   Q    Mr. Bradbury, I have a note that the first contact
16       you had with the Reeds occurred July 14th. Is
17       there any way from memory that you could confirm
18       that, or would you know the exact date from any of
19       the documents showing?
20   A    Ms. Allen entered one of the incident offense
21       reports, I believe, showing the date that I talked
22       to Ms. Mona Watson.
23   Q    And on that same day, did you talk to Mr. Reed?

Page 75

1    A    Later on in that day, yes, sir.
2    Q    And in that conversation, did you have an extended
3        conversation with Mr. and Mrs. Reed about Justin?
4    A    Mrs. Reed was reluctant to tell her husband about
5        what was going on. And I told her that if she
6        brought her husband back that I would -- I would
7        tell him. And I told him that, you know, I had
8        some concerns about what was going on.
9    Q    Mainly about what was happening with Justin?
10   A    Yes, sir.
11   Q    Okay.
12   A    And I told him where we were going as far as
13       reinterviewing him and stuff like that.
14   Q    And at that time, did Mr. Reed indicate he
15       intended to sue somebody?
16   A    Yes, sir.
17   Q    What did he say?
18   A    He said he was going to sue the school board. I
19       think he said something about his child hadn't
20       been receiving adequate education. And this just
21       put a topper on it.
22       MS. ALLEN: I object. That's hearsay.
23   Q    So, in the first conversation you had with

Page 76

1    Mr. Reed early in the investigation, he was
2    already saying he was going to sue the school
3    system?
4    A    Yes, sir.
5        MS. ALLEN: Object to the form.
6    Q    And he was indicating that that was based on his
7        dissatisfaction with the education and with the
8        preliminary information you had given him about
9        Justin and possibly Mr. Coon abusing him?
10   A    Yes, sir.
11       MS. ALLEN: Object to the form.
12   Q    Do you recall anything else that took place in
13       that early conversation with Mr. Reed or
14       Mrs. Reed?
15   A    No, sir.
16   Q    At that point, you had seen the interview that
17       Mona Watson conducted?
18   A    No, sir.
19   Q    Okay. What was the information that you were
20       sharing with Mr. Reed, then, on that first
21       conversation?
22   A    Just what Mona Watson had told me. I talked to
23       Mr. Reed on the 14th. We went back on the 15th to

Page 77

1    view the interview, myself and Matthews.
2    Q    Now, in that conversation, did you refer the Reeds
3        to go to the Brundidge Police Department?
4    A    I asked them if they had filed any complaints with
5        the Brundidge Police Department inasmuch as the
6        allegations were based in Brundidge.
7    Q    And what did they say?
8    A    They weren't satisfied with the Brundidge Police
9        Department.
10   Q    Did they explain why?
11   A    No, sir.
12   Q    But you thought it was appropriate that they take
13       a complaint, if they had one, to the Brundidge
14       Police?
15   A    Certainly. I mean, we try to work in concert with
16       each department.
17   Q    Okay. You eventually watched the DVD or the hard
18       drive of the interview that Ms. Watson conducted?
19   A    Yes, sir.
20   Q    And you conducted an interview of Justin yourself?
21   A    Yes, sir.
22   Q    And you were subpoenaed to testify, but you didn't
23       have to testify because of the plea guilty?

Page 78

1  A   Yes, sir.
2  Q   If you had testified, would you have rendered your
3        testimony based on your interview with Justin --
4  A   The --
5  Q   -- rather than the interview that you watched that
6        Mona Watson conducted?
7  A   I would base my testimony on my interview.
8  Q   In your opinion, would that have been a more
9        reliable basis for what might have happened?
10 A   I think so.
11 Q   Have you ever met, prior to this deposition, with
12       Deanie Allen?
13 A   I -- I've saw her two or three times down at the
14       Child Advocacy Center. I saw her two weeks ago
15       when you all were in depositions.
16 Q   Have you ever had discussions about this case with
17       Ms. Allen or Ms. DePaola?
18 A   Ms. DePaola?
19 Q   The other attorney.
20 A   Uhm, informal. I mean, informal.
21 Q   What do you mean "informal"? Have they asked you
22       about the case?
23 A   Ms. Allen asked me where the DVD was from the

Page 79

1        interview. And if I had one, it would be in the
2        file. And I told her that Mona Watson could
3        certainly burn another one. It's all still on the
4        hard drive.
5  Q   And that was really the extent of your
6        conversation with the Reeds' lawyers in this case?
7  A   Basically.
8  Q   You mentioned that you interviewed Charles Coon
9        early on before the lawyers shut him up. Now --
10 A   No, sir.
11 Q   Huh?
12 A   No, sir.
13 Q   Did I misunderstand?
14 A   Mr. Coon was interviewed by the Greenville Police
15       Department in reference to Phillip Faulkner.
16 Q   And you heard that?
17 A   No, sir. I didn't participate. When it came
18       necessary for us to talk to Mr. Coon about Justin
19       Reed, he already had an attorney and refused to
20       talk with us.
21 Q   Okay.
22 A   Now, I don't know whether his attorney was out of
23       Greenville or Pike County, but he didn't want to

Page 80

1        talk to us at the time.
2  Q   I may have misunderstood. You got a statement
3        from Coon, but after Greenville, he would not
4        talk?
5  A   The statement I got from Coon was on the day he
6        pled guilty upstairs in the small courtroom. In
7        fact, I think we went into the law library and
8        wrote out that short statement.
9  Q   Okay. And that's what I was referring to.
10       During this investigation in the summer of
11       2005, did you talk with anyone who was employed by
12       the Pike County Board of Education?
13 A   No, sir.
14 Q   Other than whatever the connection is between Mona
15       Watson and the board?
16 A   I didn't know Mona was employed by the Board of
17       Education.
18 Q   The Child Advocacy Center has a connection with
19       the Pike County Board. Are you aware of whatever
20       the arrangement is?
21 A   No, sir.
22 Q   I just didn't want to mislead to you about Mona
23       Watson. You did talk to her?

Page 81

1  A   Oh, yeah.
2  Q   But in terms of Mark Bazzell, or anyone at the
3        Pike County High School, you never talked to
4        anyone along those lines?
5  A   No, sir.
6  Q   So, based on any investigation that you conducted
7        during this time, did you ever have any
8        information that anyone at the Pike County High
9        School had knowledge that Coon might have been
10       abusing Justin Reed?
11 A   No, sir.
12 Q   You said that cell phones were collected from
13       Charles Coon's home. Do you know what happened to
14       those or if they were investigated in any fashion?
15 A   I think that the Greenville Police Department was
16       going to try and go back and get some phone
17       records off of them. But I don't know for a fact.
18 Q   Okay. But as far as your testimony today, do you
19       have any reason to believe that anyone at Pike
20       County High School had suspicion that Charles Coon
21       was abusing Justin Reed?
22 A   No, sir.
23 Q   Or anybody in the central office; Mark Bazzell, or

Page 82

1   anyone in the central office?
2   A   No, sir.
3   Q   Do you believe that Mona Watson was a caring
4       advocate for children?
5   A   I believe Mona Watson is a caring advocate for the
6       children --
7   Q   And --
8   A   -- based upon my experiences with the Reed case
9       and based upon the experiences with other cases
10      that followed.
11  Q   So, if she were at Pike County High School in the
12      fall of 2004, do you think Mona Watson, based on
13      your experience, would have been a child advocate
14      looking out for the welfare of students, including
15      Justin, at the school?
16  A   I believe she would be.
17  Q   Okay.
18          MR. SWEENEY: Can we take a minute?
19          (Brief off-the-Record discussion.)
20  BY MR. SWEENEY:
21  Q   When you were interviewing Justin, did any
22      information come up concerning a trip he might
23      have taken to the beach with Coon?

Page 83

1   A   There was questions came up about beach or Six
2       Flags or something of that nature. I don't recall
3       right offhand.
4   Q   I was going to ask you about Six Flags. Did
5       Mr. and Mrs. Reed indicate they had given
6       permission to Justin to go to the beach and Six
7       Flags with Mr. Coon?
8   A   I think there was three or four children that
9       went. Not just Justin, but there was one or two
10      others.
11  Q   And did you discuss with the Reeds that Justin has
12      gone to Greenville on occasion with Mr. Coon?
13  A   I remember -- I remember something about it, but I
14      don't remember the details.
15          MS. ALLEN: The best evidence would be
16          the interview, Plaintiff's
17          Exhibit --
18  BY MR. SWEENEY:
19  Q   Some questions were asked about the response that
20      Justin gave, uh-huh, huh-huh, and so forth. What
21      would be the best way to determine his response;
22      would be the tapes?
23  A   I think the tape, itself.

Page 84

1   Q   And those probably are still in existence as far
2       as you know, anyway?
3   A   When I left the Sheriff's Department, they were in
4       the case file.
5   Q   There was one last thing I was going to ask you if
6       you will hold on just a minute.
7           As far as Justin being willing to give
8       information about what had happened to him,
9       eventually you were able to establish a rapport?
10  A   Yes, sir.
11  Q   And have you seen him recently?
12  A   I haven't seen him, I'm guessing in a year. I
13      used to run into him and his mama or him and his
14      brother out at Wal-Mart. And they -- Justin and
15      Joey would run over to me and talk to me. But I
16      haven't seen them probably in a year. The boys,
17      I'm talking about. I saw Ms. Reed in here.
18  Q   But early on, you did not think he would be a good
19      witness in court. As you interrogated him, or
20      questioned or established a better rapport with
21      him, did you come to the conclusion that he would
22      be able to share what happened to him?
23  A   I was concerned that -- of course, he was bashful

Page 85

1   and shy, and probably ashamed of what had
2   happened. But he wasn't an open communicator. He
3   wouldn't communicate well with you.
4       When he got to know you a little bit better,
5   he would talk more openly and freely with you.
6   But that was my concern.
7   Q   Now, you spent some time in Greenville. And you
8       interfaced with law enforcement officials in
9       Greenville while you were there; correct?
10  A   Yes, sir.
11  Q   Did you have other communication with them from
12      time to time as you all were conducting your
13      interviews and investigation?
14  A   Their investigator called me once or twice and
15      told me what was -- you know, nothing about
16      telephones or something of that nature. Or asked
17      me for copies of reports. You know, we
18      communicated in that manner. But as far as
19      details of the case on Phillip Faulk (sic), no.
20  Q   Did you learn during that process that Mr. Coon
21      had previously worked in the Butler -- in Butler
22      County, with a school system in Butler County?
23  A   I think he worked with two or three school

**Page 86**

1  systems.
2  Q  Was there ever any indication from any source
3     during this investigation that there had been
4     prior notice or knowledge of Coon abusing
5     students?
6  A  No, sir.  Not to me.
7  Q  Nothing came up to the law enforcement people
8     during their investigation that Coon was suspected
9     of any misconduct towards students?
10 A  Not to my knowledge.
11        MR. SWEENEY:  Thank you very much.
12        MS. ALLEN:  Redirect, please.
13        FURTHER EXAMINATION
14 BY MS. ALLEN
15 Q  Did you do any investigation on any of the prior
16    school systems that he --
17 A  No, ma'am.
18 Q  So, if there is nothing there, was there any
19    investigation done to your knowledge?
20 A  I didn't do any investigation as to any other
21    school systems.
22 Q  Okay.  And you were the chief investigator?
23 A  That's a term that --

**Page 87**

1  Q  Well, who else worked -- excuse me.  Answer.
2  A  Chief investigator is a term that's come up
3     through television programs and lawyers.  I was an
4     investigator on the case, yes.  Were there other
5     people investigating?  Yes.
6  Q  Who else was investigating?
7  A  Sheriff Thomas.  Deputy Sheriff Bob Williamson, as
8     I told you earlier.
9  Q  All right.  But your name is on --
10 A  My name is on the reports, because they didn't
11    want to write them.  I had to write them.
12 Q  Not because you participated in that aspect of the
13    investigation?
14 A  No, I participated.  But the only thing I did on
15    the Faulkner case, as we have already said, is
16    Phillip came downstairs to my office and gave a
17    tape-recorded statement.  And I was with the
18    Sheriff and two or three others.  I can't remember
19    who -- I think maybe -- I think the district
20    attorney was over there, too.  But we went to
21    Greenville.
22 Q  But, is it accurate to say that normally, the
23    Deputy Sheriff or Sheriff or whoever that is

**Page 88**

1     handling an aspect of the investigation writes the
2     report on that aspect of the investigation?
3  A  Normal -- under normal conditions, yes.
4  Q  Okay.  You indicated to Mr. Sweeney that when you
5     left the Sheriff's Department the tapes were in
6     the file.  What tapes are we talking about here
7     for --
8  A  The tape-recorded statement of Justin Reed.  The
9     tape-recorded statement of Phillip Faulkner.
10 Q  And those were the only two tape-recorded
11    statements that you can say for sure were in the
12    file?
13 A  They are the only two taped statements that I
14    conducted.
15 Q  Okay.  But, I mean, you were privy to the file, I
16    would assume?
17 A  Yeah.
18 Q  So, had there been another tape in it, would you
19    have seen it?
20 A  Not necessarily.
21 Q  Okay.  Did you ever look at the file?
22 A  Sure.
23 Q  Well, I am trying to understand why you would have

**Page 89**

1     seen those but not seen anything else that was in
2     there.
3  A  The only statements I conducted.  I don't have any
4     need to see any other tapes if there is any in
5     there.
6  Q  Well, if you are investigating a case --
7  A  You're getting off the point.  I work for the Pike
8     County Sheriff's Department.  Russell Thomas is
9     the Sheriff.  He was conducting the investigation.
10    The only thing I did was take a statement from
11    Phillip Faulkner.
12 Q  So, the only two tapes that you know for sure
13    would have been -- so, you do know that those two
14    tapes were in the file?
15 A  Yeah.
16 Q  The one -- okay.  You indicated that the short
17    statement, admission of guilt, that we introduced
18    as an exhibit that Mr. Coon made you took that
19    from him somewhere -- where did that take place?
20 A  Upstairs in the law library at the courthouse.
21 Q  At the courthouse.  Was that admission taped?
22 A  No, ma'am.
23 Q  Is that the usual procedure not to tape an

Page 90

1    admission?
2    A    Sometimes.
3    Q    Well, what's the determining factor in whether or
4        not to tape an admission?
5    A    Time.
6    Q    Suppose Mr. Coon denied he ever made that
7        admission?
8    A    Then he wouldn't have pled guilty to those two
9        cases.
10   Q    Okay. So, that's the way investigations are held.
11       Did you discuss with Mona the method that she
12       used in interviewing Justin at any time?
13   A    After the fact.
14   Q    What did you tell her?
15   A    I told her that it wasn't good for law
16       enforcement.
17   Q    What about her methods, the methods that you have
18       indicated to us here today that -- I won't put
19       words in your mouth -- but that you thought were
20       inappropriate. Do you want to articulate that
21       again?
22   A    The question...
23   Q    What were the methods that Mona used with Justin

Page 91

1        that you feel were inappropriate?
2    A    Well, what she was doing is, I know that he did
3        this to you. I know that he did that to you.
4        Isn't that right? And he would say, yes.
5    Q    All right. The interview, according to Mona,
6        lasted approximately an hour and a half. So, I'm
7        assuming -- and you correct me if I'm wrong --
8        that the whole interview was not conducted that
9        way?
10   A    The parts that I saw where he admitted that --
11   Q    Did you watch the whole interview?
12   A    Yes, ma'am. The parts that he indicated that
13       sexual abuse took place I did not feel that could
14       be used by law enforcement, because it wasn't a
15       free and willing statement.
16   Q    Did you --
17   A    The district attorney's investigator with me, also
18       said that.
19   Q    Did you indicate that to Mona?
20   A    Yes, ma'am.
21   Q    And what was Mona's response?
22   A    Well, we can do it again.
23   Q    And is that why you decided to do it again at the

Page 92

1        police station?
2    A    No, ma'am.
3    Q    Well, why did you decide to do it again?
4    A    The district attorney's investigator suggested it.
5    Q    Why did the district attorney's investigator
6        suggest it?
7    A    I assume that he was in agreement with me.
8    Q    Which was...
9    A    That the statement that Mona Watson got from
10       Justin Reed was not usable by law enforcement.
11   Q    All right. You felt her statement wasn't usable.
12       And yet she is trained -- presumably, by her own
13       statements -- to do that kind of interview. You,
14       by your own statements, have indicated that you
15       are not trained to do that kind of interview. You
16       indicated that you did not know Justin. You
17       indicated that he was not likely to talk
18       to somebody he did not know. I'm confused as to
19       how you thought you might get some additional --
20       MR. SWEENEY: I object to the form of
21           the question. I don't know what you
22           are asking --
23   Q    What did you hope to get --

Page 93

1        MR. SWEENEY: -- based on that predicate
2            of information.
3    BY MS. ALLEN
4    Q    -- that Mona could not get?
5    A    A free and willing statement.
6    Q    Your hope was that he would repeat to you what he
7        had said to Mona?
8    A    A free and willing statement.
9    Q    About what?
10   A    About what had happened to him.
11   Q    Okay. So, you doubted Mona's summary of what
12       happened?
13   A    I doubted her method.
14   Q    Did you doubt her conclusions?
15   A    I didn't know. That's the reason I wanted to talk
16       to Justin myself.
17   Q    You did not know whether her conclusions were
18       accurate?
19   A    I didn't know. She indicated that oral sex had
20       been taking place at the school. Where when I
21       talked to the child, he said the only thing he did
22       was fondle him.
23   Q    Were you surprised at that?

Page 94

1    A    I wasn't surprised at anything.
2    Q    **Have you had occasion to have another sexual abuse**
3          **case that Mona has provided an interview for since**
4          **Justin Reed's case?**
5    A    Yes, ma'am.
6    Q    **Did you allow Mona to do the interview?**
7    A    Yes, ma'am.
8    Q    **Is that not the procedure for someone at child**
9          **protect to do the interview before the police do**
10         **the interview in Pike County?**
11   A    My understanding of the procedure is that the
12         Department of Human Resources is notified. The
13         appropriate law enforcement agency is notified.
14         And, on occasion, the district attorney's office
15         is notified.
16              And the procedure is that they do the
17         statement -- or do the interview of the child with
18         law enforcement, DHR present. They would in a
19         separate room viewing it on a TV screen.
20   Q    **So, the child protect person does the interview?**
21   A    Yes, ma'am.
22   Q    **So, presumably they are the ones that are**
23         **qualified to do it?**

Page 95

1    A    Yes, ma'am.
2              MS. ALLEN: I have no more questions.
3              FURTHER EXAMINATION
4    BY MR. SWEENEY
5    Q    **Mr. Bradbury, when you were called in to**
6          **investigate or play a role in these matters**
7          **concerning Justin, was your responsibility to be**
8          **an advocate for Justin?**
9    A    Is that the question?
10   Q    **That's my question.**
11   A    Yes, sir.
12   Q    **Was your role to be an advocate for Mr. Coon?**
13   A    No, sir.
14   Q    **Was your role simply to get the truth?**
15   A    Yes, sir.
16   Q    **So, when counsel is asking you whether you're**
17         **second-guessing Mona Watson, or words to that**
18         **effect, were you second-guessing anybody when you**
19         **conducted your interview?**
20   A    No, sir.
21              MS. ALLEN: Object to the form.
22   Q    **What was your sole and singular purpose in asking**
23         **Justin questions?**

Page 96

1    A    To get the facts.
2    Q    **And did you think your methodology was a more**
3          **reliable approach to getting the facts than what**
4          **she had used?**
5    A    At that point in time, yes.
6    Q    **Subsequently, has Mona improved the manner by**
7          **which she interrogates victims of child abuse, in**
8          **your opinion?**
9    A    Yes, sir.
10   Q    **Now, you're not critical of Mona, are you?**
11   A    No.
12   Q    **She just used a technique that would not have**
13         **stood up in court?**
14   A    That's right.
15   Q    **And that was the only reason you were criticizing**
16         **her approach?**
17   A    That's right.
18   Q    **You weren't second-guessing her motivation?**
19   A    No.
20   Q    **Correct?**
21   A    No. I wasn't second-guessing her motivation.
22   Q    **But back to the original line of questioning: Was**
23         **your only interest in interviewing these people,**

Page 97

1          including Justin, to get to the bottom of the
2          facts?
3    A    Yes, sir.
4    Q    **To clarify the facts in the best possible fashion?**
5    A    Yes, sir.
6    Q    **And if the facts indicated that Charles Coon was**
7          **guilty of something, were you going to go to see**
8          **that the law was enforced to the best of your**
9          **ability and responsibility?**
10   A    You can bet your life on it.
11              MS. ALLEN: Redirect.
12   BY MR. SWEENEY
13   Q    **Now, based on all of the interviews that you had,**
14         **and all the of the information that you acquired,**
15         **is it true and correct that there was no**
16         **indication that anybody had prior knowledge that**
17         **Charles Coon, in his history as an educator, had**
18         **engaged in child abuse?**
19   A    I had no knowledge.
20              MR. SWEENEY: Thank you.
21              FURTHER EXAMINATION
22   BY MS. ALLEN
23   Q    **Mr. Bradbury, just out of curiosity, you said Mona**

Page 98

1    is doing her interviews differently now?

2  A  Yes, ma'am.

3  Q  What is she doing differently?

4  A  She is not doing the adversarial-type of

5     interview.

6  Q  What does that mean?

7  A  By telling somebody they did something and having

8     them agree to it.

9        If I told you -- if I had you in an interview,

10     Mona Watson was interviewing you, and she told

11     you, didn't you stand up on the table and jump

12     onto the chairs?  Yes, ma'am, I did.  That's what

13     I consider to be an adversarial interview.

14        Now, if I asked you, what did you do when you

15     were in the board room?  And you said, well, I

16     stood up on the table and jumped onto the chair,

17     that would be a different story.

18  Q  So, you expressed your concern to her, and she has

19     changed her interview methods?

20  A  Yes, ma'am.

21            MS. ALLEN:  No more questions.

22            MR. SWEENEY:  Thank you very much.

23            (Whereupon, at approximately, 12:00

Page 99

1            NOON p.m. on the 18th day of

2            October, 2007 the deposition was

3            concluded.)

4            * * * * * * * *

5        FURTHER DEPONENT SAITH NOT

6            * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 100

1            REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4        I do hereby certify that the above and foregoing

5    deposition of ROBERT S. BRADBURY taken in the matter of

6    JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND TMR v.

7    PIKE COUNTY BOARD OF EDUCATION, Case Number:

8    2:06-CV-1120-MEF was taken down by me in machine

9    shorthand on the 18th of October, 2007, and the

10   questions and answers thereto reduced to writing under

11   my personal supervision, and that the foregoing

12   represents a true and correct transcript of the

13   proceedings given by said witness upon said hearing.

14       I further certify that I am neither of counsel nor

15   related to the parties to the action, nor am I any wise

16   interested in the results of said cause.

17       Dated this 26th day of October, 2007.

18

19       _____

20       Mary Moore-Wynn

21       Certified Court Reporter,

22       ABCR License #275

23

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,

VS.                                    CASE NO.:

                                     2:06-CV-1120-MEF

PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

               * * * * * * * * * *

     DEPOSITION OF LUCIA GRANTHAM, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 1:20 p.m.

               * * * * * * * * *

JR, A Minor                    October 1, 2007 Pike County Board of Education

| Page 2 | Page 4 |
|---|---|

**Page 2**

1
2       * * * * * * * * * *
3           APPEARANCES:
4   FOR THE PLAINTIFF:
5   Hon. Susan DePaola
        Attorney at Law
6   1726 West Second Street, Suite B
        Montgomery, Alabama 36106
7
8   and
9   Hon. Deanie C. Allen
        Azar & Azar
10  Aliant Center, Fourth Floor
        2740 Zelda Road
11  Montgomery, AL 36106
12  FOR THE DEFENDANT:
13  Hon. Donald R. Sweeney
        Bradley, Arant
14  One Federal Place
        1819 Fifth Avenue, North
15  Birmingham, AL 35203-2104
16  ALSO PRESENT:
17  Dr. Mark Bazzell
18  Ms. Ann Reed
19
20      * * * * * * * * * *
21
22
23

**Page 4**

1   counsel representing the parties in this case, that the
2   filing of the deposition of LUCIA GRANTHAM is hereby
3   waived, and that said deposition may be introduced at
4   the trial of this case or used in any other manner by
5   either party hereto provided for by the Statute,
6   regardless of the waiving of the filing of same.
7       It is further stipulated and agreed by and
8   between counsel and the witness that the reading
9   and signing of the deposition by the witness is
10  hereby waived.
11              INDEX
12  LUCIA GRANTHAM
13  Examination By Ms. DePaola          5
        Examination By Mr. Sweeney         23
14  Further Examination By Ms. DePaola    35
15  Reporter's Certificate        37
16          INDEX OF EXHIBITS
17  Exhibit Number     Description     Page Number
18  Plaintiff's Exhibit 29  Subpoena for      6
            Attendance at Deposition
19  Plaintiff's Exhibit 30  Pike County Board   11
            of Education Inservice
20
21
22      * * * * * * * * *
23

**Page 3**

1
2
3
4       * * * * * * * * * *
5
6
7
8
9           STIPULATIONS
10
11      It is hereby stipulated and agreed by and between
12  counsel representing the parties that the deposition of
13  LUCIA GRANTHAM is taken pursuant to the Federal Rules
14  of Civil Procedure, and that said deposition may be
15  taken before Mary Moore-Wynn, CCR, as Commissioner,
16  without the formality of a commission; that objections
17  to questions, other than objections as to the form of
18  the questions, need not be made at this time, but may
19  be reserved for a ruling at such time as the deposition
20  may be offered into evidence, or used for any other
21  purpose by either party hereto, provided by the
22  Statute.
23      It is further stipulated and agreed by and between

**Page 5**

1           LUCIA GRANTHAM
2       (Whereupon, the witness, after having first been
3   duly sworn to speak the truth, the whole truth, and
4   nothing but the truth, testified as follows:) Lucia
5       THE COURT REPORTER:  Usual stipulations?
6       MS. DePAOLA:  Yes.
7           EXAMINATION
8   BY MS. DePAOLA:
9   Q   Could you state your name, please?
10  A   Lucia Grantham.
11  Q   What is your home address?
12  A   4504 County Road 364, Elba.
13  Q   And you are here pursuant to a subpoena you
14      received from the Plaintiff in the case of J.R.
15      versus Pike County Board of Education; is that
16      correct?
17  A   Yes.
18  Q   All right.  And did you also receive -- I'm not
19      sure if you did receive this -- what we have mark
20      as Plaintiff's Exhibit 29, which is the Notice of
21      Deposition.
22  A   I did not.  This (indicating) is what I got.
23      MS. DePAOLA:  All right.  Let's remark

2  (Pages 2 to 5)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 6

1        this, then.
2            (Whereupon, Plaintiff's Exhibit 29
3            was marked for identification and
4            is attached hereto.)
5   BY MS. DePAOLA
6   Q   Let me show you what we have marked as Plaintiff's
7       Exhibit 29 and ask you if that's the subpoena you
8       received for your attendance?
9   A   Yes.
10  Q   All right.  And you are currently employed, as I
11      understand it, with Troy State University?
12  A   Troy University.
13  Q   Troy University.  Sorry.  In what department?
14  A   Department of Human Services.
15  Q   And tell me what that is.
16  A   Uhm, under that department is the social work
17      department and the rehab department.  And I'm
18      specifically assigned to the social work
19      department.  But it's under that.
20  Q   Okay.  Could you tell the Court about your
21      educational background?
22  A   I have an undergraduate degree from Troy -- well,
23      it was Troy State University at that point.  And I

Page 7

1       have MSW, Master's in Social Work, from the
2       University of Alabama.
3   Q   Is BS also in social work?
4   A   It is not.  They didn't have a social work
5       program.  It's social rehab services with a minor
6       in psychology and sociology.
7   Q   Where have you been employed since you graduated?
8       Give us your employment.
9   A   First 15 years after I finished my undergraduate
10      degree was with the Department of Human Resources.
11      And the next 15 years was at Troy University in
12      the social work department.
13  Q   And when you were working for DHR, what counties
14      or area did you work in?
15  A   I worked in a number of counties.  I worked in
16      Houston County, Montgomery County, Coffee County,
17      Covington County, and with the State Department of
18      Human Resources.
19  Q   And tell us what your duties were with DHR during
20      that period.
21  A   I sort of ran the gamut.  As a social worker,
22      front line worker, handled a caseload with family
23      and children services.  Did investigations, what

Page 8

1       they call can reports now.  Basically everything.
2       Moved into supervision and supervised a unit of
3       family children services.  Sort of my very last
4       stint was in the Division of Child Support.
5   Q   All right.  And in your capacity as a social
6       worker, did you ever receive complaints regarding
7       child abuse?
8   A   I did.
9   Q   So, have you worked any child -- let's limit it to
10      sexual abuse cases?
11  A   Yes.
12  Q   Do you have any estimate of how many years you
13      might have worked in receiving and addressing
14      child sexual abuse complaints?
15  A   Ten.
16  Q   And would you have received these complaints, for
17      instance, from school systems from time to time?
18  A   Yes.  Certainly.
19  Q   From parents from time to time?
20  A   Certainty.  Certainly.  From neighbors.
21  Q   I'm going to limit this to sexual abuse
22      complaints.  Did you deal with complaints for the
23      full age spectrum of children?

Page 9

1   A   To age of majority.
2   Q   To age 19?
3   A   Right.
4   Q   Okay.  In other words, you have experience dealing
5       with these complaints from infants through age 19?
6   A   Right.  And even have had adults that have come
7       forward, and at that point that would be out of
8       our scope of responsibility.  And we would usually
9       send those people to their local district
10      attorney's office for them to make the decision.
11  Q   Did you ever deal with complaints relating to
12      individuals who were mentally retarded?
13  A   Yes.
14  Q   Based on your experience, could you tell me
15      whether or not you believe that children, or
16      individuals who are mentally retarded are at an
17      increased risk for being victims of sexual abuse?
18          MR. SWEENEY: Object to the form.
19  Q   You can answer it.
20  A   Certainly.
21  Q   Certainly?  Can you explain that?
22  A   Children that are developmentally delayed
23      specifically with mental retardation, their

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn        (334)244-0203
                    Court Reporting Services

---

Page 10

1    intellect is not at a normal stage. They are
2    easily influenced. They are not trusting. They
3    can't articulate what's happened to them. And to
4    me, the worst thing is they are not believable
5    when they disclose.
6  Q  You said "they are not trusting"? Did you mean --
7  A   No, they very trusting. Excuse me.
8  Q  And not believed when they disclose it; is that
9     what you said?
10 A   That is what I said.
11 Q  Okay. And that's just based on your experience
12    with these mentally retarded individuals?
13 A   With these cases, when you would take them to the
14    authorities, they were not viewed as credible
15    witnesses, unfortunately.
16 Q  But, I mean, your overall opinion that they are at
17    increased risk or more vulnerable to sexual abuse
18    due to mental retardation, that's based on your
19    experience?
20 A   Absolutely.
21 Q  Not on any clinical research that you have done?
22 A   No. The research is phenomenal out there.
23 Q  Explain that to me.

---

Page 11

1  A   Uhm, it's a whole 'nother -- another avenue is I
2     was Coordinator of the Children's Justice Task
3     Force for a number of years. That's a funding
4     source from the federal government which looks
5     specifically at investigation and prosecution of
6     child sexual abuse. We did a lot of training all
7     over the state and attending much training. And
8     all the research indicates for the reasons I have
9     said to you that that's a very vulnerable
10    population, and that they are at a higher risk,
11    because of all those reasons.
12 Q  Okay. Now, were you asked by Pike County Board of
13    Education to provide training to any school
14    personnel relating to sexual abuse?
15 A   Yeah, an inservice.
16 Q  All right. Who contacted you?
17 A   Gosh, I sure don't remember.
18 Q  All right. Let me mark -- and I don't know if you
19    have seen this -- Plaintiff's Exhibit 30.
20        (Whereupon, Plaintiff's Exhibit 30
21             was marked for identification and
22             is attached hereto.)
23

---

Page 12

1  BY MS. DePAOLA
2  Q  Can you tell us if you have ever seen that
3     document before?
4  A   Got that when I was at the school system, I
5     believe.
6  Q  All right. And is that the one incident in which
7     you provided training in Pike County?
8  A   It is.
9  Q  And what topic were you given when you were asked
10    to provide that training?
11 A   This says recognizing sexual abuse. And as I
12    recall, it was that or indicators of sexual abuse.
13 Q  All right. Were you asked to -- who -- that seems
14    to indicate that that was training provided to
15    teachers in K through five?
16 A   Elementary teachers.
17 Q  Were you ever asked to provide similar training
18    for junior high or high school teachers?
19 A   No.
20 Q  Were you ever asked to provide that training for
21    administrators?
22 A   No.
23 Q  All right. Were you ever asked to provide any

---

Page 13

1     special training to the special education staff
2     relating to sexual abuse?
3  A   No. I don't know if any of those people were
4     present that day or not.
5  Q  How much time was devoted to this seminar?
6  A   I recall an hour and a half.
7  Q  Okay. And during that time, did you cover -- tell
8     me what you covered.
9  A   Basically, we talked about -- again, indicators
10    that a teacher might recognize. Indicators of
11    sexual abuse, changes in the child's behavior,
12    changes in academic performance of the child,
13    language of the child, those kinds of things.
14 Q  All right. Were you able to cover any what I
15    would call indicators of predator behavior?
16 A   No.
17 Q  You didn't have time to do that, or why wasn't
18    that done?
19 A   No, this is very short time. We just sort of did
20    quick and to the point.
21 Q  All right. Are you aware of any behaviors that
22    are -- that I might call -- are you aware of the
23    term "grooming" behaviors?

---

Page 14

1  A   I am.
2  Q   Can you tell me what that means?
3  A   Grooming is basically what a predator is going to
4      do to a child to start engaging the child in hopes
5      the ultimate goal would be able to use that child
6      sexually.
7  Q   And can you give me any examples you can think of
8      if you were giving a seminar?
9  A   If I was giving a seminar, it would just -- the
10     very first thing the person is going to meet the
11     child, and offer up a few goodies, if you will.
12     And it's going to be real comfortable.  And we
13     would all probably enjoy that activity.  It might
14     be an ice cream cone.  It might be something that
15     the child likes.  It's going to be gifts.
16 Q   Would that include possibly cigarettes?
17 A   Well, to an older child, usually.
18 Q   Okay.
19 A   It's going to be a little secrecy involved in
20     that, particularly if it's a cigarette.
21 Q   All right.  What about gifts like -- well, okay.
22     I don't want to plant any in your mind.
23     What other predator behaviors would be

Page 15

1      important to be aware of?
2  A   Other than the gifts?
3  Q   Uh-huh.
4  A   Picking up the child.  Having the child available
5      to you, obviously.
6  Q   You mean transporting the child, when you say
7      picking him up?
8  A   Certainly.  Bringing him back and forth.  The
9      predator is going to be -- do his best.  And there
10     are certainly some women, but the majority of
11     predators, unfortunately, are men.  So, I'm going
12     to use that pronoun.  But he's going to try to
13     become the best friend to the child and do
14     whatever will help that relationship, if you will.
15     And that's going to be individual.  Predator is
16     going to seek me out, I'm going to want different
17     things than another child.  So, it will be fairly
18     individualized.
19 Q   Is the Internet or e-mail or chat rooms or any of
20     those a -- I don't know if I would say breeding
21     ground --
22 A   Well, they are.
23 Q   -- or an area where predators communicate with

Page 16

1      children?
2  A   Certainly.  As well as right out that (indicating)
3      back door.
4  Q   Okay.  Now, would you expect school officials to
5      be aware of these predator behaviors?
6          MR. SWEENEY:  Object to the form.  You
7          mean, in the abstract or specifics?
8  BY MS. DePAOLA:
9  Q   Can you tell me whether or not school officials
10     should be aware of these predator behaviors?
11         MR. SWEENEY:  Object to the form.
12 Q   You can answer.
13 A   Ask that one more time.
14 Q   Can you tell me whether or not school officials
15     should become aware of these predator behaviors?
16 A   Generally aware, yes.
17 Q   Any other behaviors that you can identify as
18     predator behavior?
19     For instance, say someone was giving a
20     child -- a teacher was giving a child a cell
21     phone.  Would that -- might that be a predator
22     behavior?
23         MR. SWEENEY:  Object to the form.

Page 17

1  Q   You can answer.
2  A   I -- I -- yes, it could be.  But, to me, that's a
3      red flag across the board.  That's inappropriate
4      behavior.  And I feel sure that wouldn't be
5      tolerated.
6  Q   How about taking a student -- you already said
7      transporting them in their private vehicle.  Would
8      you consider that a red flag, also?
9  A   I would.  I would want to know why the teacher is
10     that involved with the child.
11 Q   Would you consider giving the child your personal
12     cell phone number a red flag?
13 A   I would.  I would want to know the circumstances
14     that that's occurring.  It certainly could be
15     appropriate.  But I would want to know why.
16 Q   So, you're not -- we're not saying here that these
17     are, if you give a child a cell phone number,
18     you're engaging in inappropriate sexual conduct;
19     you're just saying these are red flags to you?
20 A   That's -- you would want to know why those
21     activities are occurring.  I would want to know
22     that.
23 Q   And because you associate them as potential

5 (Pages 14 to 17)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 18

1   grooming behaviors; is that accurate?
2  A   As -- absolutely.  As potential inappropriate
3     behavior.  Which way it's going, I couldn't tell
4     you.  But that's not appropriate behavior from a
5     professional to a child; teacher to student nor
6     social worker to a client.
7  Q   Now, in your experience, you said you had
8     experience indicating to you that most sexual
9     predators are male, or the ones you've dealt with;
10    is that right?
11 A   Right.
12 Q   Are there any other characteristics of these
13    people that you can cite to us, from your
14    experience?  Are they teachers, are they the ice
15    cream person?
16 A   No.  I think -- yeah, they are all of those.
17    There is not a profession that you would go,
18    always look there.
19 Q   Are they often well respected in the community?
20 A   Certainly.
21 Q   And in your experience, how astute are parents at
22    recognizing these sexual predators?
23 A   Not very.

Page 19

1  Q   Can you explain that?
2  A   Frequently, my child is in the Girl Scouts, and
3     that leader starts bringing my child home, I might
4     think that's okay.
5        Again, I would never allow my child those
6     kinds of things, unless I knew the reason why.
7     But I don't think that parents -- I think parents
8     are as part of that process sometimes,
9     unfortunately.  This person may not only befriend
10    this child, but also the parents, which is
11    insidious and awful.
12 Q   Okay.  Do you have an opinion as to whether
13    students with mental retardation need training on
14    how to prevent sexual victimisation?
15 A   I think it would be very helpful.
16 Q   Okay.  You don't know Justin Reed, do you?
17 A   No, I do not.
18 Q   Okay.  The children who you have dealt with in the
19    past who are mentally retarded -- let's just say
20    who are in the first percentile as far as mental
21    cognitive ability -- was it your experience that
22    they understood what was happening to them was a
23    right or wrong?

Page 20

1        MR. SWEENEY:  Object to the form.
2  Q   You can answer.
3  A   I can answer?  If the behavior was right or wrong?
4  Q   Uh-huh.
5  A   No.  I can't tell you that they knew it was wrong
6     until we became involved that it was wrong.
7  Q   Some lack of understanding did you see?
8  A   A huge lack of understanding, but that's not
9     totally different from a child with a normal IQ.
10    Do you realize the double bind these children are
11    put in?  There is this person that's being nice to
12    them and giving them stuff, and the sexual
13    behavior that they are experiencing, because
14    typically this is not rape, and the physical
15    characteristics of that, they can make feel okay
16    to this child.  This is very --
17 Q   "They", the predator?
18 A   Yes.  And it's very, very hard.  So, look -- and
19    going on with this child.
20       So, it's very hard, particularly with MR, for
21    them to understand all of the implications.
22 Q   Okay.  Just hypothetically assume you have
23    experience with a child with a mental ability in

Page 21

1     the first percentile, do they have any particular
2     difficulty in saying no to someone in authority?
3        MR. SWEENEY:  Object to the form.
4  Q   You can answer.
5  A   Certainly they do.
6  Q   Okay.  Have you ever heard the term "social
7     powerlessness"?
8  A   Yeah.
9  Q   Does a child with a cognitive ability in the
10    first percentile, in your experience, have some
11    feeling of social -- or powerlessness?
12 A   To a great degree.
13 Q   Okay.  Do these children -- I'm, again, talking
14    about a child in the first percentile of cognitive
15    ability -- do they ever have any impaired judgment
16    about what's going on?
17       MR. SWEENEY:  Object to the form.
18 A   I can answer?
19 Q   Yes.
20 A   Definitely.
21 Q   Can you explain that?
22 A   Again, you know, we're talking in generalities.
23    But the children don't have the capability -- they

6  (Pages 18 to 21)

JR, A Minor                    October 1, 2007 Pike County Board of Education

---

Page 22

1    can't have all the facts. Therefore, they can't
2    make a sound judgment. They can't understand all
3    the facts. What they have is what's there before
4    them.
5    Q    All right. Were you asked by Pike County to make
6        any kind of recommendations as to procedures for
7        investigating sexual abuse complaints?
8    A    No. No.
9    Q    Are you aware of any law or anything that outlines
10       how a sexual abuse complaint is supposed to be
11       handled?
12   A    Typically, in counties with the Child Advocacy
13       Center -- which it's new to Pike County -- but in
14       other counties, there would be protocol. Of
15       course, teachers and administrators are mandated
16       reporters.
17   Q    Explain "mandated reporters".
18   A    That means if we have reason to believe that there
19       has been neglect in a situation, we are to report
20       that. And the reporting agency is the Department
21       of Human Resources.
22   Q    I'm sorry. I'm not sure if I asked you this
23       question. I know you only presented this sexual

---

Page 23

1        abuse information to K through five teachers. Is
2        there any reason it wouldn't be required for other
3        teachers?
4    A    No.
5            MS. DePAOLA: I think that's all the
6            questions I have.
7            EXAMINATION
8    BY MR. SWEENEY:
9    Q    Do you know Mona Watson?
10   A    I do know. Not well, but I certainly do.
11   Q    You have had some interfacing with her over the
12       years?
13   A    I have, and professionally, we know each other.
14       We know our names back and forth, yes.
15   Q    Based on what you know, is Mona Watson a very
16       competent social worker?
17   A    I don't think she's a social work.
18   Q    What does Mona Watson do?
19   A    I think she now is with the Advocacy Center; is
20       she not?
21   Q    Uh-huh. In that capacity, do you have the opinion
22       that she is competent in what she does?
23   A    Yes.

---

Page 24

1    Q    Have you ever discussed with her child abuse?
2    A    I honestly don't think we have. I'm thinking
3        about years past. We have been on -- we have been
4        involved with Big Brothers, Big Sisters and some
5        other endeavors. But I don't think we
6        specifically have.
7    Q    Would Mona Watson, based on what you do know about
8        her, be well versed and trained in recognizing
9        patterns of sexual abuse?
10   A    As Director of the Advocacy Center, most recently,
11       I would certainly say so.
12   Q    Do you know if she was a counselor at Pike County
13       High School when Justin Reed was there?
14   A    No, sir, I do not know that.
15   Q    Did you have any discussions with her for the
16       2004-2005 school year while she was -- during
17       which time she was a counselor there?
18   A    I'm -- I might have. We don't talk frequently.
19   Q    Okay. Have you ever been called upon to
20       investigate a sexual abuse matter at Pike County
21       High School?
22   A    No, sir.
23   Q    You indicated that you were with DHR for 15 --

---

Page 25

1    A    Yes, sir.
2    Q    -- 15 years? During that time, how many cases did
3        you have where a teacher sexually abused a
4        student?
5    A    Maybe two.
6    Q    So, it's quite rare, isn't it?
7    A    That it's reported, yes.
8    Q    And you had, during that time, how many cases that
9        you probably investigated of sexual abuse?
10   A    Total number of sexual abuse. Just a small
11       percentage of the other.
12       One hundred.
13   Q    And where would the two cases of sexual abuse that
14       you did investigate that involved a teacher?
15   A    One was in Houston County. One was in Montgomery
16       County.
17   Q    But never before was a case reported to you
18       involving Pike County schools?
19   A    No, sir.
20   Q    You were asked some questions in the abstract, and
21       you answered in generalities about mentally
22       retarded students. You also said that you did not
23       know Justin Reed?

---

7 (Pages 22 to 25)

Mary Moore-Wynn, CSR, CCR    Mary Moore-Wynn                (334)244-0203
Court Reporting Services

JR, A Minor                    October 1, 2007 Pike County Board of Education

## Page 26

1        MS. DePAOLA: Object to the form.
2  **Q   So, did you say you did not know Justin Reed?**
3  A   That's what I said.
4  **Q   Okay. So, when you were identifying**
5  **    characteristics of mentally retarded students, you**
6  **    weren't necessarily referring to Justin Reed?**
7  A   I don't know the child.
8  **Q   Prior to coming to this deposition, who have you**
9  **    talked to about the subject of the deposition?**
10 A   I received a phone call from Deanie and Susan.
11 **Q   Did you talk about the case?**
12 A   In generalities.
13 **Q   What did you talk about?**
14 A   Understand there was a child that was sexually
15     abused at Pike County school system.
16 **Q   What other information was provided to you?**
17 A   I don't even think I know -- knew the child's
18     name. I don't think.
19 **Q   But they told you --**
20 A   -- and that it was a teacher.
21 **Q   But they told you that the child was abused at the**
22 **    high school?**
23 A   No, sir. They said there was a case involving a

## Page 27

1      child -- this child had been sexually abused by a
2      teacher. I wasn't told where it occurred.
3  **Q   What were you told you would be asked about?**
4  A   This inservice (indicating).
5  **Q   When did this inservice take place?**
6  A   2002.
7  **Q   I'm sorry, 2000 —**
8  A   Two. February 15th, 2002.
9  **Q   And you said you didn't recall who called you. Do**
10 **    you have an opinion, Ms. Grantham, whether the**
11 **    people that called you took sexual abuse very**
12 **    seriously?**
13 A   I honestly think I got a call because somebody
14     canceled. Okay? And they needed -- and I was
15     more than willing to provide the service. The
16     teachers that were present took the subject matter
17     very seriously.
18 **Q   Do you know any of the faculty at Pike County High**
19 **    School?**
20 A   I do not. That I am aware of.
21 **Q   Huh?**
22 A   Not that I am aware. I might know somebody that's
23     there, but I don't know that I know it.

## Page 28

1  **Q   Okay. You were asked what the research was that**
2  **    would indicate an increase -- a statistical**
3  **    increase in mentally retarded students being**
4  **    sexually abused. What is the research that you**
5  **    referenced?**
6  A   I didn't give you any specific. And I will be
7      glad to get that. What we found, of course, in
8      the early '80's late '70's is with the reporting
9      laws and the increase in that we certainly had
10     more cases reported. And significant increase in
11     children with developmental disabilities.
12 **Q   Yeah. But is there some research you particularly**
13 **    had in mind when you answered counsel's question?**
14 A   Yes.
15 **Q   What?**
16 A   That there is specific research dealing with
17     children with developmental disabilities.
18 **Q   But you can't share the name or the author at this**
19 **    point?**
20 A   No, I certainly don't. I can get that to you, or
21     to Dr. Bazzell.
22 **Q   But you're familiar with some of the research and**
23 **    studies concerning that?**

## Page 29

1  A   Yes.
2  **Q   Would you agree that there is a wide range within**
3  **    the mental retardation category as to students'**
4  **    vulnerability?**
5  A   Are you talking about the child's IQ? I don't
6      understand the question.
7  **Q   Well, are there high-functioning mentally retarded**
8  **    students, low-functioning retarded students?**
9  A   Certainly.
10 **Q   Are there retarded students with high self-esteem**
11 **    and mentally retarded students with low**
12 **    self-esteem?**
13 A   Certainly.
14 **Q   There are mentally retarded students that are**
15 **    males?**
16 A   Uh-huh.
17 **Q   And mentally restarted students that are females?**
18 A   Right.
19 **Q   And would all of those variables affect the degree**
20 **    to which a student might be vulnerable to sexual**
21 **    abuse?**
22 A   Certainly.
23 **Q   And so when you talk in generalities about all**

8  (Pages 26 to 29)

Page 30

1    mental retardation students, you're encompassing a
2    wide variety of vulnerability?
3  A    That's correct.
4  Q    Have you studied any of the profile of Justin
5    Reed?
6  A    I have not.
7  Q    You were asked about the protocol or procedures
8    that should be followed if a school system has a
9    report of sexual abuse.  What would be your
10    recommendation of how a school system should
11    handle a report of sexual abuse?
12        Let's say a teacher had some reason to think a
13    child in his or her classroom was being sexually
14    abused, what should the teacher do?
15  A    They should report it.
16  Q    To whom?
17  A    The Department of Human Resources.
18  Q    In the school system?  Let's say a teacher at Pike
19    County High School --
20  A    Right, right.
21  Q    -- had some reason to believe a student was being
22    sexually abused.  What should that teacher do
23    within the high school?

Page 31

1        MS. DePAOLA: Object to the form.  She
2    already said they should go to DHR.
3  A    I think it should be reported.  I know that's not
4    what's normally done.  But that's what should
5    occur.
6  Q    I'm just asking you --
7  A    I think they should call the Department of Human
8    Resources in Troy, Alabama.
9  Q    What else should they do?
10  A    At that point?
11  Q    Uh-huh.
12  A    The investigation will take place.  I think they
13    want to be aware of the child and the surroundings
14    of the child.
15  Q    So, the school system really should rely upon DHR
16    to conduct an investigation?
17  A    Yes.
18  Q    And depend on what DHR thinks is appropriate?
19  A    Yes.
20  Q    And rely on their conclusion?
21  A    Yeah.
22  Q    I may be asking you to be redundant, Ms. Grantham,
23    but let's take a 13-to-15-year-old male student in

Page 32

1    high school.  What would be signs that would
2    indicate that the child might be a victim of
3    sexual abuse?
4  A    That who would be observing this?
5  Q    Anybody.  Say teachers that are dealing with the
6    student.
7  A    If the child all of a sudden has a special friend,
8    if you will.  Somebody is paying undue -- little
9    more than normal interest to that child.  If the
10    child becomes more withdrawn or even more active.
11    There is just not one set.  Anything that's out of
12    the ordinary with this child is when you would
13    start being a little more observant of that.
14  Q    Anything else?
15  A    Yeah.  We could go on and on.  Is the child
16    doing -- is the child starting to act out
17    sexually?  Is the child using terms that are
18    different?
19  Q    What do you mean "act out sexually"?
20  A    Is he -- is he masturbating?  Is he trying to
21    touch other people?  Those would be behaviors that
22    you might have in a child.
23  Q    And when you gave your seminar inservice, you gave

Page 33

1    one session to the K through second teachers,
2    recognizing sexual abuse.  And you gave another
3    one to three through five teachers recognizing
4    sexual abuse.  Do you have a different
5    presentation to K through two teachers and three
6    through five teachers?
7  A    No.
8  Q    Would you take a similar approach to high school
9    teachers?
10  A    Yes.
11  Q    And your summary of what they should recognize
12    would be what you have shared with counsel today?
13  A    (Witness Indicating.)
14  Q    I mean --
15  A    Briefly, yes.
16  Q    -- I don't want to go back over it.
17  A    Yeah.
18  Q    Do you know the extent to which Pike County High
19    School administrators addressed sexual abuse at
20    the high school?
21  A    I have no idea.
22  Q    You said it might be helpful -- or you said it
23    would be helpful for mentally retarded students to

Page 34

1 have training in sexual abuse. What kind of
2 training would you recommend?
3 A I think we would talk with them as well as all
4 children should have that. It's certainly not
5 limit to mentally retarded children. I think all
6 children in the school system should have at least
7 an overview of training about what could happen.
8 You have heard good touches, bad touches. If
9 you're talking about children with mental
10 retardation, you're going to have to be sure that
11 you are giving it to them in a format that they
12 you can understand. It would be different from a
13 5th grade group getting this as to a child -- a
14 special ed group.
15 Q Do you know how many years Justin attended school
16 in the Pike County school system?
17 A I have no earthly idea.
18 Q Do you know what extent teachers in the early
19 grades went over those kind of things with him?
20 A I do not.
21 Q To what extent should parents educate their
22 children about personal safety matters, including
23 sexual abuse?

Page 35

1 A They -- they certainly have a part in that.
2 Q What is their part?
3 A Again, dealing with parents that are competent to
4 handle that to discuss it, which you know that's
5 why we have to do training in school,
6 unfortunately. Not all parents can do. But
7 parent certainly should make their children aware
8 there are people out there that could potentially
9 harm them.
10 Q Do you know Mr. Reed?
11 A No, I do not.
12 Q Do you know Mrs. Reed?
13 A I do not.
14 MR. SWEENEY: Excuse me just a second.
15 (Brief off-the-Record discussion.)
16 MR. SWEENEY: Thank you very much.
17 FURTHER EXAMINATION
18 BY MS. DePAOLA
19 Q Is the principal in the school ever an appropriate
20 person to conduct an investigation of sexual abuse
21 allegations?
22 A Meaning to talk to the child? I would never do
23 that.

Page 36

1 Q Why is that?
2 A Who is the most feared person in the school system
3 if you're a child? It's the principal. The child
4 can't tell the principal something bad about a
5 teacher.
6 MS. DePAOLA: That's all. Thank you.
7
8 (Whereupon, at approximately, 1:45
9 p.m. on the 1st day of October,
10 2007 the proceedings were
11 adjourned.)
12 * * * * * * * *
13 FURTHER DEPONENT SAITH NOT
14 * * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 37

1 REPORTER'S CERTIFICATE
2 STATE OF ALABAMA
3 MONTGOMERY COUNTY
4
5 I do hereby certify that the above and foregoing
6 transcript of the deposition of LUCIA GRANTHAM in the
7 matter of JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND
8 TMR v. PIKE COUNTY BOARD OF EDUCATION, Case Number:
9 2:06-CV-1120-MEF was taken down by me in machine
10 shorthand on the 1st of October, 2007, and the
11 questions and answers thereto reduced to writing under
12 my personal supervision, and that the foregoing
13 represents a true and correct transcript of the
14 proceedings given by said witness upon said hearing.
15 I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18 Dated this 8th day of October, 2007.
19
20
21 Mary Moore-Wynn
22 Certified Court Reporter
23 ABCR License #275

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,


VS.                                  CASE NO.:

                                     2:06-CV-1120-MEF


PIKE COUNTY BOARD OF

EDUCATION

     DEFENDANT.

\* \* \* \* \* \* \* \* \* \*

    DEPOSITION OF KAREN BERRY, taken before Mary

Moore-Wynn, CSR, CCR, as Commissioner, on the 1st of

October, 2007, in the offices of Pike County Board of

Education, 101 Love Street, Troy, Alabama, 36081,

pursuant to stipulations set forth herein, commencing

at approximately 8:00 a.m.


\* \* \* \* \* \* \* \* \*

JR, A Minor                    October 1, 2007 Pike County Board of Education

Page 6

1  degree in special education with emphasis in
2  mental retardation and minor with Specific
3  Learning Disability. I have another Master's in
4  school psychometry, a double A in school
5  administration with emphasis in special ed. And I
6  am currently enrolled in the EdS program for
7  school psychologists.
8  Q  I'm sorry. The double A is in school
9     administration?
10 A  Yes, ma'am.
11 Q  And has your employment history consistently been
12    in education?
13 A  Yes, ma'am.
14 Q  All right. Could you just briefly go over with us
15    that employment background in education?
16 A  For example, when I first came to Pike County --
17 Q  Was that your first job after you finished school?
18 A  No. My first job was with Houston County schools,
19    Rehobeth. I taught special education.
20 Q  Okay. MR, children who were mentally retarded?
21 A  Yes, primarily.
22 Q  What grade level?
23 A  It was at the high school, seven through 12.

Page 7

1  Q  Okay.
2  A  In '74, I came to Pike County. I taught special
3     education resource. And at the elementary and at
4     the high school level until 1985.
5  Q  And when you say "resource", just for the federal
6     court's benefit, tell us what that means.
7  A  I taught reading, language, and math, the core
8     curriculum. And resource students were
9     mainstreamed into social studies and science,
10    regular classes.
11 Q  Okay. But what you're talking about is special
12    education students --
13 A  Yes.
14 Q  -- let me see if this is correct -- would come to
15    the resource room for assistance with reading,
16    language, and math?
17 A  Yes.
18 Q  And that might include children with disabilities,
19    such as, mental retardation?
20 A  Yes.
21 Q  And specific learning disabilities and others?
22 A  Yes, other disabilities.
23 Q  How long were you a resource teacher?

Page 8

1  A  Uhm, let's see, from '74 -- I became coordinator
2     in 1985.
3  Q  And you became coordinator of what?
4  A  I'm sorry. Coordinator of special education.
5  Q  And what are your responsibilities as coordinator
6     of special education?
7  A  My responsibilities as Special Education
8     Coordinator is to insure that each child receives
9     a free and appropriate public education.
10 Q  Okay. But what do you do to do that?
11 A  I participate in IEP meetings, eligibility
12    meetings, referral meetings.
13 Q  Anything else? Do you do any training?
14 A  As part of special education coordinator?
15 Q  Yes, ma'am.
16 A  Yes, I do.
17 Q  Okay. Who are you responsible for training?
18 A  Uhm, let's see. I'm responsible for training all
19    the special education teachers to insure they are
20    up to date on different aspects of the law,
21    especially reauthorization. I'm also responsible
22    for keeping them up to date for the Administrative
23    Code, Alabama Administrative Code, and its

Page 9

1     revisions.
2  Q  You're talking, again, about special education
3     teachers?
4  A  Yes. Yes.
5  Q  What else?
6  A  Okay. Now, let's see, recently, I have been in
7     charge of awareness training, which came out of
8     the Lee V. Macon Consent Decree from the special
9     education department where it was involving the --
10 Q  Well, excuse me. I don't mean to interrupt you,
11    but just to shorten this deposition, let's talk
12    about prior to what your responsibilities were
13    through the 2004-2005 school year.
14 A  Prior to?
15 Q  Well, through that year. In other words, anything
16    prior to 2006, we'll just put that aside for the
17    moment.
18 A  Prior to 2004, like I was saying, I was in charge
19    of awareness training. I was also in charge of --
20 Q  And just to let the Court know what that is,
21    you're talking about the awareness training
22    about --
23 A  The overidentification of certain

3 (Pages 6 to 9)

| Page 10 | Page 12 |
|---|---|
| 1  exceptionalities, certain minority children.  And<br>2  the underidentification of minority children.<br>3  **Q  Okay.**<br>4  A  I'm also, as part of the Lee V. Macon Consent<br>5  Decree, in charge of BBSST training,<br>6  Building-based Student Support Team training.<br>7  **Q  Do you ever do any training with general education**<br>8  **teachers?**<br>9  A  Yes, ma'am, I do.<br>10  **Q  What kind do you do?**<br>11  A  My training with general education teachers is<br>12  with awareness training and BBSST training.<br>13  **Q  Okay.  Awareness training as to these racial**<br>14  **issues?**<br>15  A  Yes, ma'am.<br>16  **Q  We will talk about BBSST in a minute.  Do you ever**<br>17  **do any training with administrators?**<br>18  A  Yes, ma'am, I do.<br>19  **Q  On what topic?**<br>20  A  Same type of topics.  When we first started this,<br>21  it was with administrators to --<br>22  **Q  On awareness training?**<br>23  A  On awareness training, yes, ma'am, because -- and | 1  A  Yes, ma'am.<br>2  **Q  Now, do you know or did you know Justin Reed prior**<br>3  **to 2006?**<br>4  A  Yes, ma'am, I did.<br>5  **Q  Okay.  And was he ever identified by the system as**<br>6  **a student with mental retardation?**<br>7  A  Yes, ma'am.<br>8  **Q  Okay.  And just -- we asked you to produce today**<br>9  **all of the student's educational records.  And I**<br>10  **did that simply to make sure we had everything.**<br>11  **The last intellectual evaluation I have conducted**<br>12  **for Pike County Board of Education is dated May of**<br>13  **2003.**<br>14  A  Yes, ma'am.<br>15  **Q  Is there any more recent evaluation prior to 2006,**<br>16  **but something done by Pike County Board of**<br>17  **Education?**<br>18  A  Not to my knowledge.<br>19  **Q  Okay.  And let me just ask you to identify this**<br>20  **document if you can, for us.  And you might want**<br>21  **to look at your own records.  But I will just**<br>22  **represent to you that's a copy of what I was given**<br>23  **as to your records.** |

| Page 11 | Page 13 |
|---|---|
| 1  on BBSST training.<br>2  **Q  Okay.  Any other kind of training that you have**<br>3  **ever provided to special ed, general ed, or**<br>4  **administrative personnel?**<br>5  MR. SWEENEY:  Object to the form.<br>6  A  No, ma'am.  To the --<br>7  **Q  You can't think of any?**<br>8  A  I cannot recall.<br>9  **Q  And if you think of any as we go along, you just**<br>10  **let me know.**<br>11  Okay.  So, you have a specialization in the<br>12  area of mental retardation?<br>13  A  Yes, ma'am.<br>14  **Q  Could you tell the Court what your definition of**<br>15  **mental retardation is?**<br>16  A  Mental retardation is a child or an adult whose IQ<br>17  falls anywhere from 69 and below.  It could also<br>18  be not only intellectually, it could be --<br>19  intellectually is part of it, but they have<br>20  somewhat limited adaptive skills.<br>21  **Q  Okay.  So, there is an intellectual component, the**<br>22  **IQ kind of component, and adaptive behavior**<br>23  **component?** | 1  A  Yes, ma'am.  It was administered by Mr. Hudson,<br>2  yes, sir -- yes, ma'am.<br>3  MS. DePAOLA:  Let's mark that, please.<br>4  (Whereupon, Plaintiff's Exhibit 23<br>5  was marked for identification and<br>6  is attached hereto.)<br>7  BY MS. DePAOLA:<br>8  **Q  Let me ask you to identify for the Record what**<br>9  **Plaintiff's Exhibit 23 is.  Tell the Court what**<br>10  **that is.**<br>11  A  Yes, ma'am.  This is a psychological given with<br>12  the Wechsler Intelligence Scale, III, which is an<br>13  individual IQ test.  Mr. Hudson, who is our school<br>14  psychometrist, administered it to Justin in<br>15  February of '03.<br>16  **Q  And if I have read that correctly, as a result of**<br>17  **that test, Mr. Hudson estimated Justin's IQ to be**<br>18  **a full scale IQ of 53; is that correct?**<br>19  A  Yes, ma'am.<br>20  **Q  And am I also correct that that puts him in the**<br>21  **first percentile with respect to intellectual**<br>22  **functioning as tested on that test?**<br>23  A  As tested on this one, yes, ma'am. |

Page 14

1  Q   And tell the Court what the first percentile
2      means.
3  A   The first --
4  Q   How would you explain that to a parent?
5  A   The first percentile means that a child who is --
6      has mild to moderate mental retardation.
7      One percent of the school population, or the
8      testing population, exhibited within this range of
9      scores, like children with mild to moderate mental
10     retardation.
11 Q   In other words, 99 percent of the school
12     population, or the population used in --
13 A   The stand --
14 Q   -- standardizing this test, would perform better
15     than Justin?
16 A   Yes.
17 Q   And his age equivalent on that test was seven
18     years, nine months?
19 A   I don't -- I don't see his age equivalent of seven
20     years, nine months.
21 Q   It's in here somewhere.  I don't know where I saw
22     that.
23     How old was Justin at the time this test was

Page 15

1      taken?
2  A   Thirteen years and six months.
3  Q   Okay.  Do you have his eligibility report done in
4      2003?
5  A   Yes, ma'am.  Do you mind --
6  Q   Might I look at that?
7  A   There is all his work samples and everything
8      (tenders documents).
9  Q   Thank you.
10 A   May I put it up?
11 Q   Yeah.  Sure.  That will be fine.
12 A   I'm peculiar about my documents.  I'm sorry.
13 Q   At the time that evaluation was done, did they
14     also do an evaluation of Justin's oral language
15     skills?
16     And let me just show you a document.  The top
17     is kind of cut off.  But I believe this is the
18     Oral and Written Language Scales also administered
19     in --
20 A   The OWLS, yes, ma'am, by Mrs. Calhoun.
21 Q   Actually, this was done in May of 2005; is that
22     correct?
23 A   Yes.  That's what I am seeing, yes, ma'am.

Page 16

1  Q   Are those also a part of the school's records?
2  A   I could check.  This -- he received speech therapy
3      services with Mrs. Calhoun.  And she may -- I'm
4      not familiar with her entire profile.  But I know
5      she gives this at the end of the school term as
6      part -- to see if he's improved or regressed.
7  Q   Could you look --
8  A   I would be glad to.
9              (Whereupon, Plaintiff's Exhibit 24
10                 was marked for identification and
11                 is attached hereto.)
12 BY MS. DePAOLA:
13 Q   Let me ask you if what we have marked as
14     Plaintiff's Exhibit 24 is part of the educational
15     records for Pike County as it relates to Justin
16     Reed?
17 A   I'm sorry.  Your question?
18 Q   Could you identify what I have marked as
19     Plaintiff's Exhibit 24?
20 A   Yes, ma'am.  That is the test of listening
21     comprehension and oral expression.
22 Q   For Justin Reed?
23 A   For Justin Reed.

Page 17

1  Q   And are part of the Pike County Board of Education
2      records for him?
3  A   Yes.
4  Q   And can you tell the Court what Justin scored as
5      far as a percentile rank on oral expression?
6  A   Standard score of 66.
7  Q   What was his percentile rank?
8  A   Percentile?  First.
9  Q   Okay.  And, again, would that mean that 99 percent
10     of the children who took that test scored higher
11     than Justin did?
12 A   On that particular subpart, yes.
13 Q   And if a child has a percentile rank of
14     first percentile in oral expression, would you
15     expect him to have difficulty with communication?
16 A   Would I expect?
17 Q   Well --
18 A   Some.
19 Q   -- put it this way:  What do you expect to --
20 A   What I look at is the totals.  I look at all of
21     that.
22 Q   Okay.  I'm just asking you about this one.
23 A   Okay.

5  (Pages 14 to 17)

JR, A Minor                    October 1, 2007  Pike County Board of Education

Page 18

1  Q   An oral expression score in the first percentile,
2      how would you expect this child to perform in
3      terms of communicating with others?
4  A   Somewhat -- with somewhat difficulty.  But not
5      that much of a difficulty.  Sixty-six.
6  Q   Okay.  You don't think being in the
7      first percentile is indicative of difficulties
8      communicating with others?
9  A   First percentile is somewhat misleading.  I would
10     look at the standard scores.
11 Q   And that oral expression, what age equivalent did
12     it indicate he was in his ability to communicate
13     with others on that test?
14 A   Six years, 11 months.
15 Q   And what was his chronological age at that time?
16 A   Fifteen years.
17 Q   Okay.
18 A   Fifteen years, nine months.
19 Q   All right.  Now, you mentioned earlier that a
20     child with mental retardation would also have
21     problems with adaptive skills?
22 A   Somewhat.
23 Q   What does that mean?

Page 19

1  A   As part of our assessment, we do an adaptive
2      behavior assessment in which it measures
3      communication, personal/social domain,
4      pre-vocational skills, or vocational skills.  It's
5      an overall adaptive scale to --
6  Q   Would it include like personal safety issues?
7  A   I'm not familiar -- I can't recall right off the
8      top of my head.  The teachers and the parents
9      administer --
10 Q   Well, I'm not asking about that test.  I mean, as
11     a specialist in the area of mental retardation --
12     which I guess you consider yourself to be; is that
13     accurate?
14 A   Yes, ma'am.
15 Q   Okay.  Is personal safety an issue that you want
16     to look at for children who are mentally retarded?
17 A   I try to insure that -- yes, very much so.
18 Q   Do you have some particular concerns about these
19     children, the mentally retarded children, as
20     opposed to this issue as it relates to the general
21     education population?
22 A   My concerns are for every child.
23 Q   I'm asking about these children:  Are there

Page 20

1      particular educational issues associated with
2      personal safety that you want to address with the
3      MR population?
4  A   My personal issues, yes, that they are given
5      knowledge; they are taught to be aware of personal
6      safety issues; for example, crossing the street,
7      uhm, different types of --
8  Q   Okay.  Let's stop there --
9          MR. SWEENEY:  She hadn't finished.
10         MS. DePAOLA:  I just want to use this
11         example --
12         MR. SWEENEY:  Let her finish the answer
13         she was giving.
14         Go ahead.
15 A   My personal safety issues is like with any --
16     especially with a mentally retarded child -- is to
17     make sure that we have taught them to -- to be
18     aware of different -- different things like
19     crossing the street, essential functional skills.
20 Q   Are you finished?  Are you finished?
21 A   Yes.
22 Q   So, let's take crossing the street.  I assume that
23     that's something you have to teach the special ed

Page 21

1      children, and you don't have to teach the general
2      ed population.
3  A   No, ma'am.  I hope we teach it to all.
4  Q   Okay.  So, what's the difference then with special
5      ed kids on that factor?
6  A   On what factor?
7  Q   Crossing the street.
8  A   Sometimes they have to be taught in different
9      modalities, like color coding signs.
10 Q   Do they sometimes have to be taught in more depth?
11 A   Sometimes, yes.
12 Q   Any other personal safety issues?
13 A   As to what?
14 Q   Anything that you, as a specialist in mental
15     retardation, you believe they should be taught?
16 A   Well, I think personal safety, if they are in the
17     pre-vocational aspect, I think they need to be
18     taught in depth about what different types of
19     jobs, what's related to their critical areas.  If
20     they want to go into a job, they have to be taught
21     personal safety issues.  It takes -- sometimes it
22     takes the job coach working with them to make sure
23     that they do know about different personal safety

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn        (334)244-0203
                    Court Reporting Services

JR, A Minor                October 1, 2007 Pike County Board of Education

Page 22

1    issues.
2  Q  Do you think it's a personal safety issue to teach
3     this MR population about the dangers of getting in
4     a car with a stranger?
5  A  Yes, ma'am.
6  Q  Do you think it's important to teach them the
7     problems with accepting gifts from strangers?
8  A  Yes.
9  Q  Do you think it's a problem to teach them about
10    giving personal information to strangers?
11 A  Yes.
12 Q  Why is this so important; those three things I
13    mentioned?
14 A  So, they would not -- uhm, it's part of their
15    personal safety, so they will not be victims of
16    society, any society.
17 Q  Victims of crime?
18 A  Victims of crime.
19 Q  Are they more susceptible to becoming victims of
20    crime, the mental retarded population?
21       MR. SWEENEY: Object to the form.
22 A  Not necessarily so.
23 Q  Not necessarily so. Then why are you teaching

Page 23

1     them these things?
2        MR. SWEENEY: Object to the form.
3  A  Why? I hope we're teaching it to all children.
4  Q  And you don't teach it in any more depth to the MR
5     population than they would to the general ed
6     population--
7        MR. SWEENEY: Object to the form.
8  Q  -- is that your testimony?
9  A  Yes.
10 Q  Well, then what is special about special ed?
11 A  You are asking me that when I taught special
12    education --
13 Q  I'm talking about what you're doing right now.
14    You're Director of Special Ed. You're the expert
15    for this system.
16 A  I hope my teachers, the special education
17    teachers, know their children. And if they need
18    more in-depth training, the children -- that those
19    teachers will do that.
20 Q  You haven't given them any instruction to make
21    sure that this MR population receives special
22    attention to the issue of personal safety?
23 A  As part of their overall academic environment,

Page 24

1    yes.
2  Q  Have you told them that these children are more
3     susceptible to being victims of crime?
4  A  I have talked to my staff about their
5     responsibilities as being special education
6     teachers.
7        MS. DePAOLA: Would you read my question
8        back? She didn't answer it.
9        (Whereupon, the requested material
10       was read by the Court Reporter.)
11 A  As I said, during our -- and I require all
12    teachers to go to BBSST training.
13 Q  Is that a yes or no?
14 A  I'm getting to that. Yes, I do tell them to be
15    on -- be aware of different types of -- especially
16    all special ed kids -- that their behavior, if we
17    notice a change in their behavior, to please be
18    aware of it; to go to the counselors if they
19    suspect anything out of the ordinary.
20 Q  That's not an answer to my question.
21       MR. SWEENEY: Well, if you would save
22       your editorial. I thought it was
23       very responsive to your question.

Page 25

1        MS. DePAOLA: Would you read it, once
2        again? I think a simple yes or no
3        would suffice.
4        MR. SWEENEY: It's a more complex
5        subject, and she's endeavoring to
6        respond in good faith.
7        MS. DePAOLA: Read it one more time.
8        (Whereupon, the requested material
9        was read by the Court Reporter.)
10 A  No.
11 Q  All right. Do you have any information that leads
12    you to believe they may be more susceptible to
13    becoming victims of crime?
14 A  No, ma'am, I don't.
15 Q  Is it your responsibility to research issues like
16    that?
17 A  Yes, ma'am.
18 Q  What research have you conducted?
19 A  I've read numerous articles and --
20 Q  Can you tell me any articles you have read, the
21    names, authors --
22       MR. SWEENEY: You're clipping the
23       witness' response. If you'll just

7 (Pages 22 to 25)

Page 26

1    let her --
2    MS. DePAOLA: I am just trying to
3    expedite the deposition, Donald.
4    MR. SWEENEY: You're expediting by
5    clipping her response. You --
6    MS. DePAOLA: We'll sit here all day,
7    then.
8    MR. SWEENEY: We may be.
9    MS. DePAOLA: And you can just miss all
10   of your meetings, then.
11   MR. SWEENEY: We may be.
12   You were saying that you have
13   read articles.
14   THE WITNESS: Yes, sir.
15 A  I have participated in workshops on different
16   types of issues involving special education
17   students.
18   MS. DePAOLA: What was my question?
19   (Whereupon, the requested material
20   was read by the Court Reporter.)
21 BY MS. DePAOLA
22 Q  Tell me specifically any articles you have read on
23   the topic of the victimisation of special ed kids.

Page 27

1  A  I cannot recall off the top of my head on --
2  Q  Do you have some resource you can consult to tell
3   us every article you've read off about special
4   needs children being victims or not victims of
5   crime?
6    MR. SWEENEY: In the last 30 years?
7  Q  In the last five years.
8  A  No, ma'am, I cannot even begin to tell you.
9  Q  Can you tell me any author or study that can
10   recall that says these children are not peculiarly
11   susceptible to becoming victims of crime?
12 A  No, ma'am.
13 Q  Any workshop that you have attended that indicates
14   that they are or are not peculiarly susceptible to
15   becoming victims of crime?
16 A  No.
17 Q  You can't think of one?
18 A  I really can't.
19 Q  Have you read any of the US Department of
20   Education studies or summaries of the research on
21   this issue?
22 A  No, I have not.
23 Q  Is that your responsibility to keep up with those

Page 28

1    kind of things?
2  A  Yes.
3  Q  Have you even looked to see if there is such a
4    document?
5  A  No, ma'am.
6  Q  Now, I'm going to talk especially here about
7    children with mental retardation.
8    MR. SWEENEY: Now, we're talking in the
9    abstract; not about Justin; is that
10   correct?
11   MS. DePAOLA: I'm talking about children
12   with mental retardation.
13 BY MS. DePAOLA
14 Q  Was Justin identified by the system as having
15   mental retardation?
16 A  Yes, he was.
17   MR. SWEENEY: And you're talking about
18   the whole spectrum of mental
19   retardation from A to Z, all the
20   different characteristics and
21   capabilities?
22 Q  Go ahead.
23   MS. DePAOLA: Thank you, Donald.

Page 29

1    MR. SWEENEY: Uh-huh. Is that what
2    you're asking?
3    MS. DePAOLA: I'm talking about children
4    who are mentally retarded, yes.
5  BY MS. DePAOLA
6  Q  Do you conduct any training that is different from
7    the general ed population with the mentally
8    retarded kids with respect to sexual issues?
9    MR. SWEENEY: I'm sorry. What's the
10   question?
11 A  Do you mind rewording or restating the question?
12   I'm sorry.
13 Q  Do you conduct any training with the mentally
14   retarded population relating to sexual issues?
15 A  With the mentally retarded students, the
16   population?
17 Q  Yes, yes.
18 A  No, I do not.
19 Q  Do you direct your faculty to do that?
20 A  Yes, I do.
21 Q  Okay. What have you directed them to cover?
22 A  I have asked them to -- well, primarily, it's
23   through the BBSST training that I do. And special

8  (Pages 26 to 29)

JR, A Minor                  October 1, 2007 Pike County Board of Education

Page 30

1    ed and regular ed teachers are present at that
2    training.
3  Q   And what does that consist of?
4  A   What we do, we look -- first of all, I do it every
5    fall, with all teachers, special and regular
6    education teachers. We go into what students may
7    be at risk. For example, are they low stanines
8    based on Stanford Achievement Tests, stanine one,
9    two, three, or four, which indicates that they may
10   be having a problem academically. I also go into
11   different types of behavioral characteristics that
12   may show something else may be going on. Like is
13   it a poor home life? Is there trouble at home?
14   Is there possible physical, emotional, or sexual
15   abuse? We go into that. And we have a handout
16   that I give them on behaviors to look to notice so
17   that they could be aware -- more aware --
18 Q   I think I asked you if you did any training with
19   the students.
20 A   And I said no.
21 Q   Okay. Okay. So, what you're saying is you have
22   this BBSST training, and is that the only training
23   you can tell us about relating to sexual issues?

Page 31

1  A   Yes, ma'am.
2  Q   What does it specifically consist of with respect
3    to sexual abuse?
4  A   I brought what I give the teachers. And we go --
5    this is -- I have it just this little paper gem
6    clipped right here.
7  Q   Let me just see if we've already got that as an
8    exhibit, so we can put this on the Record. I
9    believe you're referring to a portion of
10   Plaintiff's Exhibit 6. Is this the document that
11   you're talking about?
12 A   Yes, ma'am.
13 Q   Okay.
14 A   It is.
15 Q   All right. And so, tell me specifically is this
16   all of the training; you provide them with this
17   document, which is Pike County Board of Education
18   document 0190, which is part of Plaintiff's
19   Exhibit 6?
20     MR. SWEENEY: You mean, passing out that
21       page, or part of the training with
22       that page? What is your question?
23     MS. DePAOLA: What did I ask?

Page 32

1      (Whereupon, the requested material
2      was read by the Court Reporter.)
3  BY MS. DePAOLA:
4  Q   Is this the only document you provide them?
5  A   Is this all of that right there?
6  Q   Let me let you look through this.
7  A   Yes, ma'am.
8  Q   You're looking at Plaintiff's Exhibit 6 beginning
9    on page 0183. And you can just continue to look
10   through that and tell me if this is the document
11   to which you're referring to.
12 A   Yes, ma'am. This is how -- that's samples of how
13   to do the preferral intervention. This is the
14   checklist that they can look at.
15 Q   I'm just asking you if this is the document that
16   you're referring to.
17 A   I'm just making sure. Yes, ma'am.
18 Q   Now, is this the only written material you provide
19   teachers with respect to sexual abuse?
20 A   Yes.
21 Q   Okay. And tell me specifically how this relates
22   to sexual abuse.
23 A   It gives teachers a more in-depth overview to look

Page 33

1    at children that everything may not be as black
2    and white. It could also be any number of
3    factors.
4  Q   I'm trying to understand. The BBSST is the means
5    of looking at children with low academic
6    achievement; is that correct?
7  A   Not necessary -- not only low academic. It could
8    be like we have truancy, attendance issues. It
9    could be children who are having difficulty at
10   home.
11 Q   But, I mean, children who are failing, either
12   academically, socially, whatever, at school, to
13   determine what?
14 A   To see if they need interventions.
15 Q   Okay. And I don't see the term "sexual abuse" in
16   here anywhere.
17 A   Abuse? We look at -- I'm sorry -- student neglect
18   and/or abuse. We look at that.
19 Q   And that could cover anything?
20 A   Yes, ma'am, it covers --
21 Q   Verbal abuse? Physical --
22 A   Emotional, physical, sexual.
23 Q   Does the word "sexual abuse" occur in here

9 (Pages 30 to 33)

Page 34

1    anywhere?
2  A  No.
3  Q  And this list of factors here on page 0190 --
4  A  Do you mind if I refer --
5  Q  No, I don't mind.
6       -- are symptoms --
7  A  Possible indicators.
8  Q  That, what?
9  A  That there may be something going on.  That there
10    may be trouble at home.  There may be academic
11    problems or emotional problems.  It's just
12    indicators for it.
13  Q  Okay.  All right.  Tell me anything else other
14    than this one page that you do in terms of
15    training them on sexual abuse.
16  A  No, ma'am.  That's -- that's it.
17  Q  Now, what special training as to sexual issues do
18    you give to the special education students,
19    themselves?
20  A  I do not.
21  Q  Do you direct your teachers to give any training
22    on sexual issues with the special education
23    population?

Page 35

1       MR. SWEENEY:  From her, or from other
2         sources?
3       MS. DePAOLA:  I think I said, "do you
4         direct".
5  A  No.
6  Q  Okay.  So, you've never directed them to give any
7    training on appropriate means to gain attention or
8    affection?
9  A  I have never directed them to do that.  But they
10    are special education teachers, so as part of
11    their curriculum, as part of their self-help, I --
12    the teachers would go over that.
13  Q  Okay.  Tell me specifically if you know that has
14    been done with respect to Justin Reed.
15       MR. SWEENEY:  I'm sorry.  What has been
16         done?
17       MS. DePAOLA:  He has been educated on
18         appropriate means to gain attention
19         or affection.
20  A  I can't -- I cannot definitely say so.
21  Q  And you have never directed the teachers to
22    provide this education?
23  A  No, I have not.

Page 36

1  Q  Okay.  Have you ever directed your teachers to
2    educate the special education students about
3    appropriate and inappropriate sexual touching?
4  A  Yes.  I hope they have.  We have gone over the
5    Code.  We have gone over different characteristics
6    of each disability that they serve.  They are very
7    experienced teachers.
8  Q  So, you have directed them to educate the special
9    education student about inappropriate and
10    appropriate sexual touching?
11  A  Directed?  No, I have not.
12  Q  And do you have any information that Justin Reed
13    was ever provided with such information by the
14    school system?
15  A  No, I don't.
16  Q  Okay.  Do you direct the teachers -- would you
17    consider that a personal safety issue?
18       MR. SWEENEY:  Object to the form.
19  A  I'm sorry.
20  Q  Would you consider inappropriate and appropriate
21    sexual touching a personal safety issue?
22  A  Yes.
23  Q  Okay.  Have you ever directed the teachers to

Page 37

1    educate the special education population about
2    appropriate and inappropriate touching by adults?
3  A  I have never directed them.
4  Q  Okay.  So, specifically, what direction have you
5    given them with respect to training special
6    education students on sexual issues?
7  A  Do you mind saying your question, again?
8       MS. DePAOLA:  Would you mind reading the
9         question?
10       (Whereupon, the requested material
11         was read by the Court Reporter.)
12  A  I have not given them any specific directions.
13  Q  Okay.  And let me ask you another thing about this
14    adaptive behavior (indicating).  Does that also
15    include social skills?  Did we talk about that?
16  A  Yes.
17  Q  Social skills?
18  A  Uh-huh.
19  Q  Such as?  Can you tell me what those social skills
20    might be?
21  A  Socialization skills, interacting with peers,
22    interacting with adults, interacting with --
23    primarily with peers and adults.

10  (Pages 34 to 37)

Page 38

1  Q   Do they have some special need for training,
2      different from the general ed population, on these
3      issues?
4  A   Unless it's a different way of teaching it, no
5      more than anything like inappropriate touching.
6      Is that what you're getting at?
7  Q   Well, I mean, okay, so, the only difference in the
8      education of the special ed population is the
9      methodology?
10 A   And the techniques.
11 Q   How about the content?
12 A   The content.
13 Q   Such as, interactions with adults; you may not
14     have to teach that to the general ed population,
15     but you may have to teach it to the special ed
16     population?
17 A   I think we teach it to all; general ed and special
18     ed.
19 Q   Do children who are mentally retarded sometimes
20     have impaired judgment?
21         MR. SWEENEY: Object to the form.
22 A   Not always.
23 Q   I didn't say "always". I said "sometimes".

Page 39

1  A   Sometimes.
2          MR. SWEENEY: Object to the form.
3  Q   And do you have any specific tests that you
4      measure that on; impaired judgment?
5  A   Not to my knowledge.
6  Q   Okay. And by "impaired judgment", what do you
7      mean?
8  A   I'm sorry. I didn't use it. What do you mean by
9      "impaired judgment"?
10 Q   Well, you answered the question. So, I mean, do
11     you mean like they don't always know right from
12     wrong?
13         MR. SWEENEY: Object to the form.
14 Q   What do you mean when you said, yes, they have
15     impaired judgment?
16 A   To a degree. To some.
17 Q   "To some" what?
18 A   Some impaired judgment.
19 Q   Inability to distinguish right from wrong?
20 A   Sometimes.
21 Q   What else?
22 A   Inability to -- sometimes, inability to express
23     themselves.

Page 40

1  Q   Is that a judgment issue?
2  A   It could be.
3  Q   In what way?
4  A   In that they are -- if the child is severely and
5      mentally impaired, that they may have trouble
6      discussing their concerns.
7  Q   Okay. Well, how severe do they have to be to have
8      that problem?
9          MR. SWEENEY: Object to the form.
10 A   How severe?
11 Q   You used the word "severe", if they are severely
12     impaired.
13 A   I said sometimes they are, they have the
14     limited -- how to express themselves.
15 Q   Limited communication skills?
16 A   Could -- sometimes.
17         MR. SWEENEY: I object to all of this
18             line of questioning regarding this
19             broad class of mental retardation.
20             You might as well be asking about
21             the gender of students or the age of
22             students. There is such a wide span
23             of mental retardation that you're

Page 41

1          questions, in the abstract, I think
2          are just confusing the Record.
3  BY MS. DePAOLA
4  Q   Do you have any opinion as to whether or not
5      individuals with mental retardation when
6      confronted with authority figures are more likely
7      to acquiesce to their demands or not?
8          MR. SWEENEY: Object to the form.
9  A   I have --
10 Q   You have no opinion?
11 A   (Witness indicating.)
12 Q   You need to answer something.
13         MS. DePAOLA: She is shaking her head
14             no.
15         THE WITNESS: I'm sorry. No.
16 Q   Now, just to go back to the BBSST. In 2004-2005,
17     are you testifying that this Plaintiff's
18     Exhibit 6, that BBSST materials, was presented to
19     the teachers at Pike County High School?
20 A   Yes.
21 Q   Okay. Every single teacher was present?
22 A   To the best of my knowledge, they were.
23 Q   Were you present?

11 (Pages 38 to 41)

JR, A Minor                    October 1, 2007  Pike County Board of Education

|                          Page 42 |
| --- |

1   A   Yes.
2   Q   Okay.  Now, what faculty-wide training was
3       provided as to predator behaviors, sexual predator
4       behaviors?
5   A   I did not provide any.
6   Q   Okay.  Did you receive any training as to what
7       predator behaviors you should be looking for?
8   A   I have in the past, yes.
9   Q   I mean, from Pike County Board of Education.
10  A   The meetings, the different workshops I attend,
11      yes.
12  Q   Okay.  Tell me exactly what predator behaviors you
13      have been trained on by Pike County Board of
14      Education and when you received that training.
15  A   When, I don't actually recall.  Type of
16      predator-type behavior?  Gosh, giving gifts.
17      Uhm -- giving gifts.  That's about the -- right
18      there.
19  Q   That's the only one you are aware of?
20  A   Giving gifts, yes.
21  Q   And so did you provide any training for your
22      special ed teachers or the general ed teachers --
23      did you -- on predator behaviors?

|                          Page 43 |
| --- |

1   A   No, I did not.
2   Q   Can you recall attending any where there was any
3       presentation on predator behaviors?
4   A   Attending workshops?
5   Q   (Indicating).
6   A   Here?
7   Q   Within the system, yes.
8   A   Uhm, no, ma'am.
9   Q   Were you ever put in charge of writing a sexual
10      abuse policy for the Pike County Board of
11      Education?
12  A   Sexual harassment?
13  Q   Sexual abuse.
14  A   Uhm, what I was put in charge of was to come up
15      that we would prohibit any discrimination based on
16      race, sex, disability.  I know there's seven --
17      let's see -- ethnicity.  I was put in charge of
18      that; developing policy.  I was also given -- to
19      develop a sexual harassment policy.
20  Q   Okay.  No sexual abuse policy of which you're
21      aware?
22  A   Our policy is one that prohibits discrimination of
23      anything like that and --

|                          Page 44 |
| --- |

1   Q   So, the policy on sexual harassment is the only
2       thing you are aware of relating to sexual abuse?
3   A   Yes.
4   Q   And you wrote it?
5   A   Uhm, I took -- I was at -- may I see the policy?
6   Q   Well, I'm not sure if this is what you're
7       referring to.  Your attorney has produced a sexual
8       harassment policy.  Is that what you're referring
9       to?
10  A   Yes, ma'am.
11  Q   Did you write that?
12  A   Uhm, I went to a meeting sponsored by the Office
13      of Civil Rights in Birmingham where they had all
14      school systems to come in and receive help in
15      writing policies.
16  Q   Did you write that?
17  A   The whole thing?
18  Q   Yes, ma'am.
19  A   I took what OCR gave us.
20  Q   You just copied what someone gave you on sexual
21      harassment?
22  A   Yes.
23  Q   And so, does the word "sexual abuse" appear in

|                          Page 45 |
| --- |

1       this policy you wrote?
2   A   Conduct of a sexual nature.  Regarding race,
3       color, disability.  But not the words -- we do not
4       tolerate sexual harassment.
5           But as far as sexual abuse, there is no direct
6       mention of it.
7   Q   Okay.  And I notice in here that this refers to --
8       or defines sexual harassment as unwelcomed
9       advances.
10  A   Yes.
11  Q   So, if a student considers something unwelcomed
12      it violates this policy?
13  A   Yes.
14  Q   What if they thought it was great?  It's
15      welcome --
16          MR. SWEENEY:  Object to the form.
17  Q   -- does it violate this policy?
18  A   If they welcomed it?
19  Q   Yes.
20          MR. SWEENEY:  Object to the form.  You
21          can answer.
22          THE WITNESS:  I'm sorry?
23          MR. SWEENEY:  You can answer.

Mary Moore-Wynn, CSR, CCR   Mary Moore-Wynn          (334)244-0203
                Court Reporting Services

Page 46

1  BY MS. DePAOLA
2  Q   You can answer.
3  A   Yes.  Anytime a student is harassed, sexually or
4      whatever, it violates it.
5  Q   Would you look at the definition, because it seems
6      to limit it to unwelcome.
7  A   Unwelcome and/or unsolicited sexual advances.
8  Q   So, if a student welcomes these advances and
9      participates in them, does it violate that policy?
10             MR. SWEENEY:  Object to the form.
11             You mean if an adult abuses a
12             child, and it's welcome, you're
13             asking her if that is a violation
14             of the policy?
15             We're wasting our time.  Of
16             course, that's a violation.
17             MS. DePAOLA:  You're wasting my time by
18             interrupting and trying to teach
19             your witness.  I'm just asking my
20             question.
21  A   I think any sexual harassment, welcome or
22      unwelcome, violates this policy.
23  Q   Why did you include that welcome,unwelcome in

Page 47

1      there?
2             MR. SWEENEY:  It's part of policy.
3  Q   Is it because you just copied it?
4  A   It is part of policy.
5  Q   Okay.  You just copied this from something you
6      received at a seminar?
7  A   From the Office of Civil Rights.  And we did look
8      at it very carefully.
9  Q   But didn't include any mention of sexual abuse in
10     the policy?
11  A   No.
12  Q   And if I understand this policy, this is part of a
13     document that is -- well, let me ask you this:
14     Who gets this policy?  Who receives it?
15  A   Is that in -- that's the employee policy manual.
16  Q   Okay.  I mean, it's something maintained at the
17     Board?
18  A   Policy manuals are given to all teachers.
19  Q   Every teacher has it.  Okay.
20     Are you aware of any other policy that even
21     remotely relates to sexual abuse, written policy
22     in this system?
23  A   Not to my knowledge.

Page 48

1  Q   Are you aware of any written procedures for
2      investigating allegations of sexual abuse against
3      a student?
4  A   Written procedures, like for investigating we
5      have -- during the training, all training, BBSST
6      if they suspect any child, any type of physical,
7      sexual, any type of abuse, they are to notify the
8      counselor.  And the counselor --
9  Q   Okay.  Where is that?
10             MR. SWEENEY:  Ecuse me.  She is not
11             through with her explanation.  Go
12             ahead.
13  A   And the counselor informs the principal.  But the
14      counselor is required to notify the appropriate
15      authorities, either DHR or law enforcement.
16  Q   Where is that policy?
17  A   It's just procedure.  You do that.
18  Q   You're not aware of it being written down
19     anywhere?
20             MR. SWEENEY:  You asked the procedure.
21             She explained the procedures.
22             MS. DePAOLA:  I asked her for written
23             procedures, Donald.

Page 49

1             MR. SWEENEY:  No, you asked procedure.
2  BY MS. DePAOLA
3  Q   Okay.  Where are the written procedures for
4      investigating sexual abuse issues?
5  A   I have no idea.
6  Q   Okay.  But it's your understanding that you are to
7      report it to DHR or the school nurse, did you say?
8      I didn't hear what you said.
9  A   No.  I said, DHR or -- and/or appropriate law
10      authorities -- law enforcement.
11  Q   Okay.  Now, this manual we're talking about is not
12     distributed to students, is it?
13  A   No, ma'am.  They get a Code of Conduct, Student
14      Code of Conduct.
15  Q   And this manual we're talking about, which is
16     Plaintiff's Exhibit 5, is not distributed to the
17     parents, is it?
18  A   To my knowledge, there is one in every library at
19      the school, and each employee is given a policy
20      manual.
21  Q   Okay.  I'll repeat my question:  Is it distributed
22     to the parents?
23  A   No.

Mary Moore-Wynn, CSR, CCR  Mary Moore-Wynn          (334)244-0203
                  Court Reporting Services

JR, A Minor                          October 1, 2007  Pike County Board of Education

Page 50

1  **Q**  **Okay. Were you asked to investigate whether**
2      **Justin Reed was ever removed from class during the**
3      **school day?**
4  A  Excuse me?
5  **Q**  **Were you asked to investigate whether Justin Reed**
6      **was ever removed from class during the school day?**
7  A  No, I was not. The only time it was mentioned to
8      me was during mediation, and Dr. Bazzell, when I
9      was briefing him on mediation, asked me was I
10     aware of Justin being allowed out of class all the
11     time. And, to my knowledge, he was not.
12  **Q**  **Well, did you investigate?**
13  A  I asked the teachers, yes, I did.
14  **Q**  **Okay. So, you did conduct an investigation?**
15  A  I'm sorry.
16  **Q**  **Who do you speak to?**
17  A  I spoke to all the collaborative teachers.
18  **Q**  **Tell me their names.**
19  A  I will. Mrs. Catrett, Mrs. Trant, Mrs. Busby --
20     let's see -- Ms. Chancellor, and Mrs. Calhoun, his
21     speech teacher.
22  **Q**  **All right. And what did you ask them?**
23  A  I also asked Mr. Suber, the regular ed teacher.

Page 51

1      Mr. Suber, Ms. Morgan, Mrs. Helms, his art
2      teacher, Ms. Sylvia Helms, Sylvia -- were they
3      aware -- was Justin allowed repeatedly out of
4      class, and they said no.
5  **Q**  **Repeatedly?**
6  A  Repeatedly.
7  **Q**  **Did you ask them was he ever allowed out of class**
8      **to go to the band room?**
9  A  No, I did not. I asked repeatedly let out of
10     class. And they said, no, because he had an
11     agenda, a planner, that the teachers allowing him
12     to go must sign and then the receiving teacher.
13     And they said not to their knowledge.
14  **Q**  **And you never asked them if this ever occurred.**
15     **You just said did this repeatedly occur?**
16  A  Right.
17  **Q**  **Now, in the Spring of 2005, were you aware that**
18     **Mr. Coon was suspended from the school?**
19  A  In the spring of the '05, Dr. Bazzell asked me was
20     I aware that Mr. Coon had been suspended. And I
21     told him no. He said he was suspended pending an
22     investigation for alleged Marijuana use. He asked
23     me since I was conducting IEP meetings down at

Page 52

1      Pike County High to keep my ears open to see if
2      any of the students were saying anything about
3      this alleged Marijuana use.
4  **Q**  **Okay. Did he ever indicate to you that there was**
5      **some allegation that Mr. Coon had a butt buddy**
6      **down at Pike County High School?**
7          MR. SWEENEY: Object to the form. You
8              can answer it.
9  A  He said to -- when he said about the alleged
10     sexual abuse -- sexual abuse; I'm sorry -- about
11     the alleged Marijuana use, to just keep my ears
12     open, especially for possible students talking.
13     As far as "butt buddy," I don't actually recall
14     that phrase. But I was to listen out for
15     students. And if they said anything, to let him
16     know.
17         As far as butt buddy, I don't recall hearing
18     that from any students. But Dr. Bazzell may have
19     said, you know, keep your ears open. I am not
20     doubting that.
21  **Q**  **So, he never said to you there were any**
22     **allegations relating to sexual issues?**
23  A  No, just the allegation for alleged Marijuana use.

Page 53

1  **Q**  **And did you, at that time, interview any of the**
2      **special education students at Pike County High**
3      **School on this issue?**
4  A  For alleged Marijuana use?
5  **Q**  **Whatever he told you.**
6  A  No. I listened. And didn't hear.
7  **Q**  **Well, did you conduct interviews on this issue of**
8      **Marijuana use?**
9  A  No.
10  **Q**  **You just if someone happened to be in your**
11     **vicinity and mentioned it, you would report it**
12     **back?**
13  A  Yes.
14  **Q**  **Did you ever hear the results of Dr. Bazzell's**
15     **investigation of Mr. Coon?**
16  A  No, ma'am, I didn't.
17  **Q**  **Okay. Has it come to your attention that there**
18     **was an allegation at some point that Justin had**
19     **been sexually abused by Mr. Coon?**
20         MR. SWEENEY: Object to the form.
21  A  An allegation is what I have been told.
22  **Q**  **Okay. And when were you told that?**
23  A  Gosh, I really don't recall. I don't recall a

14  (Pages 50 to 53)

Page 54

1  date.
2  Q   Well, I mean, was it in the spring of 2005, in the
3      summer of 2005, last week?  You know, give us an
4      idea.
5  A   Well, I read about Mr. Coon's arrest in the paper.
6      I mean, that was my first knowledge of it.
7          MR. SWEENEY:  She would like to take
8          break.
9          MS. DePAOLA:  Okay.  That's fine.
10         (Brief recess.)
11         MS. DePAOLA:  Go back on the Record.
12 BY MS. DePAOLA
13 Q   Let me ask one other question:  In conducting
14     evaluations of students for special ed
15     eligibility, what intellectual evaluations do you
16     use?
17 A   Uhm, it depends on the child, really.  The C-TONI,
18     which is the Comprehensive Test of Nonverbal
19     Intelligence.  Sometimes the Wechsler scales --
20     Wechsler Individual Scale for Children, III -- I
21     apologize.  It's IV now.  Sometimes the
22     Stanford-Binet, Fifth Edition.  Let's see.  The
23     UNIT, Universal Test of Nonverbal Intelligence.

Page 55

1  Q   Any others that you use regularly?
2  A   For --
3  Q   Intellectual.
4  A   -- IQ?  Intellectual, that's it.
5  Q   Are these the tests approved by the State?
6  A   Yes, ma'am, they are.
7  Q   Any other intellectual evaluations approved by the
8      State that you are aware of?
9  A   Not -- not that I am aware.  There could be some
10     new ones on board.  But those are primarily the
11     ones that are approved by the State.
12 Q   And do you consider them reliable measures of
13     intellectual ability?
14 A   As reliable -- yes.
15 Q   Okay.
16         MS. DePAOLA:  That's all we have.  Thank
17         you.
18         MR. SWEENEY:  No questions.
19
20         (Whereupon, at approximately, 9:20
21         a.m. on the 1st day of October,
22         2007, the deposition was
23         concluded.)

Page 56

1          * * * * * * * * *
2      FURTHER DEPONENT SAITH NOT
3          * * * * * * * * * *

Page 57

1          REPORTER'S CERTIFICATE
2
3  STATE OF ALABAMA
4  MONTGOMERY COUNTY
5
6      I do hereby certify that the above and foregoing
7  transcript of the deposition of KAREN BERRY in the
8  matter of JR, A MINOR, BY HIS MOTHER AND FATHER EAR AND
9  TMR v. PIKE COUNTY BOARD OF EDUCATION, Case Number:
10 2:06-CV-1120-MEF was taken down by me in machine
11 shorthand on the 1st of October, 2007, and the
12 questions and answers thereto reduced to writing under
13 my personal supervision, and that the foregoing
14 represents a true and correct transcript of the
15 proceedings given by said witness upon said hearing.
16     I further certify that I am neither of counsel nor
17 related to the parties to the action, nor am I any wise
18 interested in the results of said cause.
19     Dated this 8th day of October, 2007.
20
21         _____
22         Mary Moore-Wynn
22         Certified Court Reporter
23         ABCR# 275

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS
MOTHER AND FATHER, EAR
AND TMR,


        PLAINTIFF,


VS.                              CASE NO.:

                                 2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

        DEFENDANT.

                * * * * * * * * * *

    DEPOSITION OF POLLY KING, taken before Mary

Moore-Wynn, as Commissioner, on the 19th of July, 2007,

in the offices of Pike County Board of Education, 101

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 9:00 a.m.


                * * * * * * * * *

## Page 2

1
2                * * * * * * * * * *
3                APPEARANCES:
4    FOR THE PLAINTIFF:
5    Hon. Susan DePaola
     Attorney at Law
6    1726 West 2nd Street, Suite B
     Montgomery, Alabama  36105
7
8    and
9    Hon. Deanie Allen
     Azar and Azar
10   260 Washington Avenue
     Montgomery, Alabama  36104
11
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant, Rose & White
14   One Federal Place
     1819 Fifth Avenue North
15   Birmingham, Alabama 35203
16
17   ALSO PRESENT:
18   Dr. Mark Bazzell, Superintendent
19
20
21
22
23

## Page 3

1
2
3                * * * * * * * * * *
4
5
6
7
8                STIPULATIONS
9
10        It is hereby stipulated and agreed by and between
11   counsel representing the parties that the deposition of
12   POLLY KING is taken pursuant to the Federal Rules of
13   Civil Procedure, and that said deposition may be taken
14   before Mary Moore-Wynn, CSR, as Commissioner, without
15   the formality of a commission; that objections to
16   questions, other than objections as to the form of the
17   questions, need not be made at this time, but may be
18   reserved for a ruling at such time as the deposition
19   may be offered into evidence, or used for any other
20   purpose by either party hereto, provided by the
21   Statute.
22        It is further stipulated and agreed by and between
23   counsel representing the parties in this case, that the

## Page 4

1    filing of the deposition of POLLY KING is hereby
2    waived, and that said deposition may be introduced at
3    the trial of this case or used in any other manner by
4    either party hereto provided for by the Statute,
5    regardless of the waiving of the filing of same.
6         It is further stipulated and agreed by and
7    between counsel and the witness that the reading
8    and signing of the deposition by the witness is
9    hereby waived.
10
11               INDEX
12   POLLY KING
13   Examination By Ms. DePaola             5
     Examination By Mr. Sweeney            33
14   Further Examination By Ms. DePaola    39
15   Reporter's Certificate                44
16
17
18
19
20
21
22
23               * * * * * * * * *

## Page 5

1                POLLY KING
2         (Whereupon, the witness, after having first been
3    duly sworn to speak the truth, the whole truth, and
4    nothing but the truth, and testified as follows:)
5                EXAMINATION
6    BY MS. DePAOLA
7    Q    Could you state your name for the Record, please?
8    A    My name is Polly King.
9    Q    And is that your official name?  I mean, is it
10        Elizabeth?  Or is that nickname?
11   A    No, that's my name.
12   Q    That's your name?
13   A    That's what my mother put on me at birth.
14   Q    And what is your street address?
15   A    9690 US Highway 29, North, Banks, Alabama, 36009
16   Q    And how long have you lived there, Ms. King?
17   A    At that particular address?
18   Q    Yes, ma'am.
19   A    I can't really tell you.  Uhm, four, maybe five
20        years.  I had a farm about a mile from there.  And
21        I sold it and moved there.
22   Q    And are you employed?
23   A    I am retired US Air Force.  Disabled, retired US

## Page 6

1    Air Force.

2  Q    What was your job with the Air Force?

3  A    I was a registered nurse.

4  Q    Oh, okay. And do you currently have any kids in

5     the Pike County school system?

6  A    My last child graduated this year.

7  Q    And what was his name?

8  A    Martin.

9  Q    And I know you also have a son name Matt; is that

10     correct?

11  A    That is MAK.

12  Q    Oh, I thought it was Matt?

13  A    No, it was MAK, M-A-K. His initials. That was

14     his nickname. I have four other -- I mean, three

15     other children besides him that have went through

16     the Pike County school system plus two

17     stepchildren that have went through the Pike

18     County system.

19  Q    Can you tell me the names of your children who

20     went through Pike County?

21  A    James Culley King. Charles Alva King. And then

22     my daughter, she went through 10th grade. And her

23     name was Angel Lynn King.

## Page 7

1  Q    Are any of these children the one known as Matt?

2  A    Martin is MAK. There is no Matt.

3  Q    I have seen some reference in documents to Matt

4     King. That is not your son and --

5  A    I don't know who Matt King is. My son is MAK,

6     M-A-K.

7  Q    What year did MAK graduate?

8  A    He graduated this year in May.

9  Q    And in your duties as an RN with the Air Force,

10     can you just describe for me what you did?

11  A    I was a pediatric nurse specialist. I took care

12     of injured children. Our ward was so small that I

13     also had to take care of adult patients, as well,

14     because of the overflow. Uhm...

15  Q    Would this include children that had -- I don't

16     know if this is the right word -- that had

17     psychiatric injuries or problems as well as

18     physical?

19  A    The military had special facilities for

20     psychiatric patients. And I didn't work in

21     psychiatric.

22  Q    So, these are primarily physical injuries?

23  A    Yes, ma'am.

## Page 8

1  Q    Any other employment that you have had?

2  A    Just as a nurse. I worked civilian nursing for

3     some years prior to going in the military.

4  Q    Okay. Now, do I understand correctly that you

5     have been a foster parent from time to time?

6  A    I was a foster parent for 16 years.

7  Q    Was that here in Pike County?

8  A    Yes, ma'am. It sure was.

9  Q    And what kind of -- I mean, can you just tell me a

10     little bit about that?

11  A    We were a specialty home. We took neglected,

12     abused, or very ill children. We were a home for

13     hard-to-place kids.

14  Q    Okay. And so did you have any experience seeing

15     or contact with children who have been sexually

16     abused?

17  A    Yes, ma'am. I had quite a few children in my home

18     that had been sexually abused.

19  Q    Okay. I'm going to get back to that, but I want

20     to sidetrack to another question. With respect to

21     the people around this table today, can you tell

22     me who you have met with around this table or

23     spoken to on the phone in the last six months?

## Page 9

1  A    I know the Superintendent (indicating.) I have

2     known him for years.

3  Q    Did you speak with him in the last six months?

4        THE WITNESS: Were you at the meeting

5          when MAK was in trouble?

6        THE SUPERINTENDENT: I think we spoke?

7  A    We probably said hi. Other than that, that's

8     probably all we said to each other.

9  Q    All right. Have you spoken to Ms. Allen?

10  A    I know I have spoken to one of you all. I don't

11     know which one.

12  Q    Okay. Have you spoken to Mr. Sweeney before?

13  A    Not that I know of.

14  Q    Just to make sure you know who we all are,

15     Mr. Sweeney represents the Pike County Board of

16     Education and the individual defendants, and I

17     represent Justin Reed. And Deanie represents

18     Justin Reed. I should have done that at the

19     outset. I apologize.

20        So, in your role as a foster parent and seeing

21     kids who are sexually abused, can you tell me what

22     you experience in terms of signs or symptoms that

23     you would recognize of sexual abuse?

Page 10

1   A   Sexually abused children are usually sexually
2       aggressive. They tend to be more talkative. They
3       tend to be a little harder to handle. They have
4       discipline problems.
5   Q   Okay. All right. Now, have you done any study on
6       the issue of sexual abuse?
7   A   No, ma'am.
8   Q   Are you familiar with any of the signals that
9       indicate that an adult may be sexually abusing a
10      child?
11  A   Uhm -- just my own opinion of what I feel like are
12      signs. I mean, I haven't studied anything.
13  Q   I understand. Can you just tell me what signs you
14      believe might be indicative of this?
15  A   Uhm, well, an adult that hangs around a child
16      that's not related to him an -- an excessively
17      amount of time; that buys children gifts --
18  Q   Okay.
19  A   -- that aren't related to him. I mean, those
20      kinds of things kind of put up a red warning
21      signal.
22  Q   Okay. Anything else that you can think of?
23  A   I --

Page 11

1   Q   I'm sorry?
2   A   I mean, I don't -- you know --
3   Q   Just from your --
4   A   If you see a guy that likes to put his hands on --
5       it seems to be, you know, always putting his hands
6       on a child or something like that. You know,
7       those kind of things.
8   Q   Okay. Now, it's my understanding that at some
9       point you had some concerns about Mr. Coon --
10      Charles Coon, I think his name is -- and may have
11      brought these concerns to the attention some
12      official. And the purpose of this testimony is
13      just to get the history of what happened. That's
14      all.
15  A   Not anything on sexual abuse, I didn't. He
16      offered my son a Marijuana cigarette on the ride
17      home from a football game one night. And I went
18      to the school and complained about that. That's
19      the only time that I have had any complaint about
20      anything -- with him.
21  Q   So, can you tell me when this occurred or came to
22      your attention?
23  A   No. I can't remember.

Page 12

1   Q   Okay. Well, let me just give you some dates.
2       Mr. Coon plead guilty to sexual abuse in the
3       summer of 2005. Would it be fair to assume it was
4       before that?
5   A   Oh, yes, ma'am, it was before that.
6   Q   Do you think it was during that school year,
7       2004-5, or 2003-4?
8   A   It was during -- let's see: My son was in the
9       10th grade when it happened. He graduated this
10      year. So, you all do the math.
11  Q   So, I would expect that would be during the
12      2004-2005 school year he would be in the 10th
13      grade?
14  A   Okay. (Indicating).
15  Q   I mean, he didn't fail any grades in the middle
16      there?
17  A   No, ma'am. No, ma'am.
18  Q   So, during the 10th grade, how did you become
19      aware of the cigarette and the Marijuana aspect of
20      it?
21  A   My son came home, and he came straight to me and
22      says, I'm not going to ride home with him any
23      more, mama. And I said, why? He said, because

Page 13

1       they were trying to they were smoking pot. And he
2       kept trying to get me to smoke. And I said, well,
3       good; you don't need to ride with him any more.
4       And that was the end of it.
5   Q   Now, was your son in the band?
6   A   Yes, ma'am. He was in the drum section.
7   Q   He was riding home with Mr. Coon, was this like
8       after a football game?
9   A   It was after a football game, I think. I think it
10      was after a football game. I can't swear to it.
11      It might have been after a practice. It just
12      happened to be one of those nights when my other
13      two sons happened not to be in town. And he
14      didn't have a way home. And I guess I he couldn't
15      catch one with a friend.
16  Q   But you think it was sometime during the fall
17      either after a football game or after a practice?
18  A   Yes. It would have had to have been for him to be
19      with them, you know. It was some something with
20      the band.
21  Q   Okay. So, I take it that MAK did not regularly
22      ride with Mr. Coon?
23  A   No.

Page 14

1  Q   Had you ever previously seen Mr. Coon ride any of
2      the other students around anywhere?
3  A   Oh, yes, ma'am. I saw him on several occasions
4      when my house -- my house burned during that
5      school year. And we had to live in the housing
6      projects, which is right behind the school. And
7      there was numbers of occasions when I would see
8      him go by with kids.
9  Q   Okay. I'm sorry. I know you can't remember the
10     exact dates or anything, but are we still talking
11     about during that fall of 2004?
12 A   During that school year.
13 Q   The whole school year?
14 A   Yeah. During that school year period.
15 Q   Was this during the school day or after school?
16     What can you remember about those?
17 A   After -- mostly after school, I guess. I may have
18     seen him once or twice with kids during school.
19     They may have been moving equipment. I don't
20     know. You know, just -- I just remember, you
21     know, that I did see him with other kids.
22 Q   Now, did he have a truck or a regular vehicle or
23     do you recall?

Page 15

1  A   I don't remember. I don't recall.
2  Q   Don't recall? Okay. And had you directed your
3      son not to ride around with him?
4  A   After that date, yeah.
5  Q   After that date. Okay. All right. Can you
6      recall the names of any of the children that you
7      saw riding around with Mr. Coon?
8  A   Uhm, the one child specific that I saw quite a few
9      times with him was the little Helms boy. The one
10     that killed himself.
11         MR. SWEENEY: The what boy?
12         THE WITNESS: Helms boy.
13 Q   Helms. Adam?
14 A   Yeah. Adam and MAK were friends.
15 Q   Okay. So, when MAK came and told you this, that
16     he was being offered a Marijuana cigarette, did
17     you, then, discuss that with anybody? Did you
18     report it to anybody?
19 A   Uhm. I went and talked to the sup -- the
20     assistant principal at the high school.
21 Q   Is that Mr. McDaniel?
22 A   Yes, it was.
23 Q   Can you tell me how many times did you meet with

Page 16

1      Mr. McDaniel?
2  A   I don't remember. It was a few times.
3  Q   And this would have been in the fall of 2004?
4  A   It was during the school year. I don't remember
5      what time it was.
6  Q   Did MAK play in the band in the winter?
7  A   Yes, ma'am. And he also took band during the
8      spring. So, you know, I don't know. I can't -- I
9      am on a lot of medications --
10 Q   Okay.
11 A   -- and I cannot remember dates.
12 Q   I understand. So, your meetings or contact with
13     Mr. McDaniel, were they at the school?
14 A   Yes, ma'am.
15 Q   And you think there was more than one meeting?
16 A   Yes, ma'am, I think so.
17 Q   And can you just summarize for us what you told
18     him your concern was?
19 A   I just told him that I thought that they needed to
20     watch Mr. Coon. That, you know I didn't know if
21     he was selling drugs on school or if he was just
22     giving them away to the kids. But that -- you
23     know, and I explained the incident that happened.

Page 17

1      Basically, that's -- that was what our meeting was
2      about. I -- I do know that it got back later on
3      that the principal came in and talked to us. And
4      I don't remember who he was. I don't even
5      remember his face, because I only met him that one
6      time. But their conclusion was that there wasn't
7      enough evidence to do anything to Mr. Coon,
8      because they couldn't verify from any of the other
9      kids that he had ever done anything like that with
10     them. And so, it was dropped.
11 Q   During your conversations, did any kids other than
12     Adam come up?
13 A   I don't remember. I'm sorry.
14 Q   Let me just go over some names with you and ask
15     you if you might have brought these kids to their
16     attention. Jeron Senn?
17         MR. SWEENEY: I'm sorry. What's the
18         question?
19         MS. DePAOLA: The question was: I'm
20         going to go over these names, and
21         her if any of the people are names
22         that she might have brought to their
23         attention, I think I said.

Page 18

| | |
|---|---|
| 1 | MR. SWEENEY: Brought to a school |
| 2 | official's attention? |
| 3 | MS. DePAOLA: Yes. To Mr. McDaniel's or |
| 4 | the principals. |
| 5 | BY MS. DePAOLA |
| 6 | **Q    Jeron Senn?** |
| 7 | A    No, ma'am. I don't know him. |
| 8 | **Q    Don't know him and had no discussions about him?** |
| 9 | A    No, ma'am. |
| 10 | **Q    How about Andrew Law?** |
| 11 | A    Yeah. I didn't mention Andrew, but I know Andrew. |
| 12 | Andrew and MAK are best friends. But I don't know |
| 13 | Andrew -- I mean, I didn't say anything to the |
| 14 | school about Andrew. |
| 15 | **Q    Did you ever see Andrew or Jeron in the truck with** |
| 16 | **Mr. Coon?** |
| 17 | A    Andrew didn't hang around with Mr. Coon. He |
| 18 | wasn't in the band. |
| 19 | **Q    Levi Davis. Did you bring that name to anyone's** |
| 20 | **attention?** |
| 21 | A    Levi is my neighbor. I mean, him and MAK are the |
| 22 | same age. But I don't remember. |
| 23 | **Q    That wasn't something that came from you?** |

Page 19

| | |
|---|---|
| 1 | A    No. No, not that I know of. |
| 2 | **Q    How about Thomas Green?** |
| 3 | A    Thomas Green also is my neighbor. But as far |
| 4 | as -- I don't know. |
| 5 | **Q    Do you know after you brought this to** |
| 6 | **Mr. McDaniel's attention if he or anyone talked to** |
| 7 | **MAK?** |
| 8 | A    Yes. Mr. McDaniels (sic) I know, talked to MAK. |
| 9 | But, like I said, they -- they concluded that |
| 10 | there wasn't enough evidence about the Marijuana |
| 11 | to do anything about it. And it was dropped. |
| 12 | **Q    Okay. When he talked to MAK, do you know if he** |
| 13 | **did that at school?** |
| 14 | A    I'm sure it was at school. |
| 15 | **Q    Did they allow you to be present for that?** |
| 16 | A    I'm sure if I wanted to have been, they could have |
| 17 | been. But at that time, my health was real bad. |
| 18 | And I didn't have transportation. And -- |
| 19 | **Q    Were you present? I should have asked it that** |
| 20 | **way.** |
| 21 | A    No, not that I can remember. |
| 22 | **Q    Okay. All right. And you met with Mr. McDaniel** |
| 23 | **you said a few times. You said it was more than** |

Page 20

| | |
|---|---|
| 1 | once, but you don't remember how many. |
| 2 | A    Yeah, I don't remember exactly how many. |
| 3 | **Q    And you met with a principal on one occasion.** |
| 4 | A    Yeah, I was there to talk to Mr. McDaniels, and |
| 5 | the principal came in. |
| 6 | **Q    You don't know if that was Mr. Pryon?** |
| 7 | A    I just remember it was a white man. That's all I |
| 8 | can tell you. I don't really know who it was. I |
| 9 | had never met him before. And I never met him |
| 10 | again. So, I just -- |
| 11 | **Q    Okay. Other than speaking with school officials,** |
| 12 | **did you ever speak with anyone with the drug task** |
| 13 | **force, with police department, the sheriff? Any** |
| 14 | **other official?** |
| 15 | A    I talked to a friend of mine who happens to work |
| 16 | for the Troy Police Department in the drug task |
| 17 | force or did at that time. He doesn't any more. |
| 18 | **Q    Who is that?** |
| 19 | A    Uhm, you know, I can't remember his name. I'm |
| 20 | sorry. Because as far as I know, they are not |
| 21 | even around here any more. What was his name? |
| 22 | It's been several years. My memory is not good. |
| 23 | I don't remember his name. I'm sorry. He worked |

Page 21

| | |
|---|---|
| 1 | for the Troy City Police Department. That's -- |
| 2 | he -- and I just asked him what I needed to do. |
| 3 | And he told me to go to the school. |
| 4 | **Q    So, you told him essentially the same --** |
| 5 | A    Yeah. |
| 6 | **Q    -- same story that you told the school officials?** |
| 7 | A    I just told him that MAK had been offered |
| 8 | Marijuana by a teacher; what should I do? |
| 9 | **Q    Was this before or after you went to the school?** |
| 10 | A    It was before I went to the school. |
| 11 | **Q    I see. Okay. So, he, to your knowledge, didn't** |
| 12 | **conduct any investigation?** |
| 13 | A    It was out of his jurisdiction. |
| 14 | **Q    Okay.** |
| 15 | A    But he advised me to go to the school, and that if |
| 16 | I didn't get anything from the school, to go to |
| 17 | the Brundidge City Police. |
| 18 | **Q    Anyone else besides your friend with the drug task** |
| 19 | **force -- any other official you tried to bring** |
| 20 | **this to their attention?** |
| 21 | A    No, ma'am. Not that I can remember. |
| 22 | **Q    Okay. Now, other than your meeting with** |
| 23 | **Mr. McDaniel and the principal and your attempt to** |

6 (Pages 18 to 21)

Page 22

1    report it to the drug tasks force --
2  A  Well, I wasn't attempting to report it to the drug
3    task force. I was just asking a friend for
4    advice.
5  Q  I see. I'm sorry. I didn't mean to
6    mischaracterize it. So, other than those two
7    contacts, did you contact anyone else about it?
8  A  Not that I can remember.
9  Q  Did you ever discuss this matter with, for
10    instance, Mona Watson or anyone child protect or
11    an advocacy center?
12  A  I know Mona. But I don't know if I talked to her
13    about it or not. I don't remember talking to her
14    about it.
15  Q  All right. Have you ever discussed this matter
16    with any of the Reeds?
17  A  Oh, yeah. They called me.
18  Q  Okay.
19  A  And I told them I didn't know anything about their
20    son being involved in anything.
21  Q  Was it Mrs. Reed who called you or Mr. Reed? I
22    mean, who?
23  A  I don't remember which one it was. Me and

Page 23

1    Ms. Reed don't get along very well. So, it was
2    probably Mr. Reed.
3  Q  Okay. And, I mean, can you recall the content of
4    the conversation? They called you for what
5    purpose?
6  A  To apologize for sicking you on me without
7    notifying me first.
8  Q  Okay. Tell us what exactly you mean "sicking" us
9    on you.
10  A  Well, someone from the Reed family got Jeremy,
11    their oldest child, to get my number, because it's
12    unlisted, because he's a friend of my oldest son.
13    And they gave the number to you all, so you all
14    could call me. And I got on Jeremy, because I
15    told him that he wasn't supposed to give my number
16    to anybody. So, somebody from the family called
17    to try to apologize for giving my number to
18    someone.
19  Q  Do you feel like there is some reason you
20    shouldn't be required to testify in this case?
21  A  I don't have good health. I'm on a lot of
22    medications. I'm prone to have seizures under
23    stress. Grand mal seizures. And if you know

Page 24

1    anything about grand mal seizures, every time you
2    have one, it kills brain cells. And I really -- I
3    don't know anything about sexual abuse. So -- and
4    this is what this case is about.
5  Q  What medications are you on today?
6  A  Today?
7  Q  Uh-huh.
8  A  I am on Topamax. I'm on Neurontin. I'm on
9    Lorazepam, Clonazepam, Arava --
10  Q  Are these all things you have taken this morning?
11  A  That I take within a 24-hour period, yes, ma'am.
12  Q  What have you taken this morning?
13  A  Okay. I have taken my Topamax, my Neurontin.
14    I've taken one Lorazepam. I have taken -- taken
15    my Aspirin for my heart. I took my shot this
16    morning, my Lovenox shot for my blood clot
17    disorder. I've taken -- I'm trying to think which
18    ones I take in the morning. I take a handful.
19    Oh, and my Arava.
20  Q  Arava?
21  A  Arava.
22  Q  What is that for?
23  A  It's an immunosuppressant.

Page 25

1  Q  Okay. Now, did you ever discuss your concerns
2    that you have described to us about the Marijuana
3    cigarette and driving around in the car with
4    anyone else; husband, family members, neighbors;
5    anyone else?
6  A  I don't have a husband. Uhm, not that I know of.
7    I mean, my children, probably, because they were
8    the ones that took me back and forth.
9  Q  To the school?
10  A  To the school, yeah. Or to wherever I go, they
11    take me back and forth.
12  Q  Now, let me just see what else here we've got.
13    Did you ever see Mr. Coon with Blake Faulkner?
14  A  I don't know a Blake Faulkner.
15      MS. DePAOLA: Is that his name?
16      MS. ALLEN: Uh-huh.
17  Q  Did you ever become concerned that Adam may be
18    being sexually abused by Mr. Coon?
19      MR. SWEENEY: Object to the form.
20  A  I don't -- as far as -- I am not sure. Yeah, I
21    had concerns, because the child just -- he didn't
22    act right. He didn't act like himself the last
23    year or so.

7 (Pages 22 to 25)

JR, A Minor                    July 19, 2007  Pike County Board of Education

---

Page 26

1  Q  Okay. I'm sorry. I don't recall. Did you say
2     Adam was one of the kids that you saw riding
3     around in the car with Mr. Coon?
4  A  Yes. Adam lived over in our neighborhood, and I
5     saw Coon and him together quite often.
6  Q  Can you tell me what changed about his conduct
7     that caused you concern?
8  A  Adam was a real quiet, real easy-going child. He
9     got to where he was nervous. He was a little bit
10    of a daredevil. He started staying away from his
11    friends. Just little things. And he was all the
12    time going on fishing trips. They were going on fishing trips
13    together. They were -- you know, camping trips,
14    doing things together all the time.
15       MR. SWEENEY: I'm sorry. Who was?
16       THE WITNESS: Adam.
17       MR. SWEENEY: And who?
18       THE WITNESS: The band director.
19 Q  Ms. King, how did you find out that this was going
20    on; the fishing trips and the camping trips?
21 A  Seen it with my own eyes, as far as the fishing
22    trips, because they would go to the pond down
23    below where Andrew Law -- I don't know how you all

Page 27

1     got his name -- but Andrew Law lives over in a
2     little neighborhood. And like I said, MAK and
3     Andrew are best friends. And there is a pond down
4     below his house. And I think Adam lived in --
5     matter of fact, Adam did live in the same
6     neighborhood. And Coon and him would go fishing
7     down there. And I have been fishing at the pond
8     when they happened to show up.
9  Q  Would they show up in Mr. Coon's truck, or do you
10    recall?
11 A  I don't remember. I just know they showed up at
12    the pond.
13 Q  And the camping trips, how would you know about
14    that?
15 A  From talk from the kids that was in the house, you
16    know. My house is kind of the neighborhood
17    hangout for the children.
18 Q  Did you ever discuss your concerns about Adam with
19    anyone?
20 A  Nobody except MAK when we were talking about this
21    kind of stuff, I asked him was Adam on the truck
22    with them the night they were smoking. And he
23    was. So, I mean, other than that --

Page 28

1  Q  But, I mean, did you ever -- I mean, did you ever
2     bring that to Mr. McDaniel's attention, your
3     concerns about him?
4  A  I may have mentioned it to him. I don't remember.
5     But I may very well have mentioned it to him.
6       MR. SWEENEY: I'm sorry. May have
7       mentioned it to who?
8       THE WITNESS: Mr. McDaniels.
9       MR. SWEENEY: But you're not sure?
10      THE WITNESS: No. I can't remember. I
11      have problems with my memory. I'm
12      sorry.
13 BY MS. DePAOLA
14 Q  Okay. Anybody else you may have discussed your
15    concerns about Adam with?
16 A  Not that I can recall.
17 Q  Okay. Did you ever discuss them with Adam's
18    parents?
19 A  I didn't know Adam's parents very well. I just
20    knew them when I saw them. I knew Adam's sister,
21    because she dated my oldest son.
22 Q  Okay. But, I mean, did you discuss it with them?
23 A  No. I would have never mentioned anything to her.

Page 29

1  Q  Did you feel that Mr. McDaniel believed what you
2     said?
3  A  I felt like he did.
4  Q  Did you believe that he tried to investigate and
5     find out what happened?
6  A  I believe that he did.
7  Q  Did he ever tell you -- you seem to say they
8     couldn't prove anything. I mean, can you tell me
9     exactly what was said?
10 A  He just --
11 Q  Not exactly. Strike that part. To the best of
12    your recollection, what did he tell you?
13 A  The best I can remember was that they couldn't get
14    verification from any of the other children that
15    he had offered drugs to them and that -- and, too,
16    MAK, wasn't wanting to be cooperative, either,
17    because he didn't want to be a snitch. And I
18    think with all of it together, there just -- there
19    wasn't any concrete evidence to pin on him.
20 Q  Do you know anyone named Denise McCloud?
21 A  Not that I know of.
22 Q  Okay. Have you ever received any information from
23    anyone else regarding similar charges against

8 (Pages 26 to 29)

Page 30

1  **Mr. Coon?**
2  A  Not that I know of.
3  Q  **Okay.  The person who worked with the drug task**
4  **force who you contacted, do you know was that a**
5  **male or a female?**
6  A  He was a male.
7  Q  **Was he white or black?**
8  A  He was black.
9  Q  **Do you know where he works now?**
10 A  No, I don't.  I don't even know where he's at now.
11 Q  **Don't even know if he's in Troy?**
12 A  I don't even know if he's still in Troy or not.
13 Q  **Other than seeing Mr. Coon with Adam at the pond**
14 **and driving in his car, you said somewhere near**
15 **the housing project --**
16 A  Yeah, around the school.
17 Q  **Did you ever see him in any stores, restaurants,**
18 **or any other places?**
19 A  If I did, I don't remember.
20 Q  **Now, other than -- I know you were aggravated at**
21 **the Reeds for giving us your phone number; had you**
22 **had some prior contact with them?**
23 A  Just with the older son.  He used to hang around

Page 31

1  with my older son when they were kids.  And --
2  Q  **You -- sorry.**
3  A  They worked together some in the past year.
4  Q  **Because you said you didn't get along with them**
5  **very well.  What was the problem?**
6  A  Ms. Reed was just always real high strung.
7  Flirty.  I just didn't have much in common with
8  her.  And we really just didn't hit it off.  But
9  that we had any problems.  It was no bad words
10 between us or anything like that.  I just didn't
11 care --
12 Q  **Okay.**
13    MS. DePAOLA: I would like to take a
14        break for just a few seconds.
15        (Brief recess.)
16 BY MS. DePAOLA
17 Q  **Do you know an Officer Phelps?**
18 A  Ah, yeah.  What's his first name?
19 Q  **I don't know.**
20 A  Uhm, I think that's the last name of the guy I
21 talked to.
22 Q  **Okay.**
23 A  Like I said, this has been quite a few years ago.

Page 32

1  Q  **Yes, ma'am.  Did you ever discuss this matter with**
2  **Carolyn Townsend?**
3  A  Who is Carolyn Townsend?
4  Q  **I think she is an employee of the Pike County**
5  **Board of Education -- or was.**
6  A  (Witness Indicating.)  If I did, I don't remember.
7  Q  **Okay.  Butch Phelps?**
8  A  Butch?  Yeah.  Butch was -- Butch was who I talked
'9  to.
10 Q  **That's the person with the drug task force?**
11 A  Yeah -- yeah.  Well, he worked for the City of
12 Troy.
13 Q  **Okay.**
14 A  I think he sometimes worked with the task force.
15 But he was actually employed by the City of Troy.
16 And like I said, I didn't call him in the
17 police capacity.  It was just as a -- a friend.
18 Q  **Did you ever have any discussion with Moses**
19 **Davenport about it?**
20 A  I don't think I ever talked to Mose about it.  I
21 was told if I didn't get anywhere with the school
22 to talk to the City.  But I don't think I ever
23 went to Mose with it.

Page 33

1  Q  **Since all of this came to light -- and by all of**
2  **this, I mean Mr. Coon pleading guilty to sexual**
3  **abuse of several kids in Pike County -- have you**
4  **had any conversations with any other parents about**
5  **this matter?**
6    MR. SWEENEY: Object to the form.
7  A  Not that I can remember.  Other than just, you
8  know, the fact that we talked about maybe what was
9  on TV, you know, that they caught him.
10 I don't -- I don't really have any contact
11 with very many parents other than ones that just
12 live right close to me, because I don't get out.
13 I don't drive.
14 Q  **Did you ever talk to Adam's parents?**
15 A  No.
16 Q  **Did you ever talk to Blake's parents?**
17 A  No.
18    MS. DePAOLA: Okay.  I don't have any
19        other questions.  Thank you.
20        EXAMINATION
21 BY MR. SWEENEY
22 Q  **I have a couple of questions, if I could,**
23 **Ms. King.**

9  (Pages 30 to 33)

Page 34

1  A  All right.
2  Q  When Martin reported this incident about Coon
3     offering him Marijuana cigarette, were other
4     students in the car?
5  A  Yes, it was two other boys. And I don't remember
6     exactly who the other boys were. I think the
7     little Helms boy was one of them, as best I can
8     remember. But other than that, I don't know who
9     they were.
10 Q  Do you remember sharing with Mr. McDaniel the
11    names of those boys and having him investigate by
12    talking to those boys?
13 A  I'm sure I did at that time, because my son
14    gave -- told me who the children were. I just
15    can't remember. It's just been so long.
16 Q  And I'm not trying to get exact names and so
17    forth. But you shared with Mr. McDaniel all of
18    the information you had about that complaint,
19    didn't you?
20 A  Yes, sir, I did.
21 Q  You shared with him what Martin told you?
22 A  Yes, sir.
23 Q  You shared with him the names of the boys if you

Page 35

1     knew them?
2  A  Yes, sir.
3  Q  And did Mr. McDaniel tell you that he would
4     investigate those matters?
5  A  Yes, he did.
6  Q  And after your initial conversation, you had a
7     follow-up meeting with him, didn't you?
8  A  Yes, sir.
9  Q  And did he explain to you what he had done and
10    what he had learned?
11 A  Yes. He said he had talked to the boys and that
12    none of them would confess that it had happened,
13    best I can remember, and that MAK wasn't being
14    cooperative either, because he didn't want to be a
15    snitch to his friends.
16 Q  Did he ask you if you had any other suggestions
17    about what else he should do?
18 A  Not that I can remember.
19 Q  Do you know if a conference was held with Mr. Coon
20    going over these allegations with him?
21 A  No, I never met with Coon.
22 Q  Do you know if Mr. Bazzell wrote Mr. Coon about
23    this incident or --

Page 36

1  A  I have no idea.
2  Q  -- talked with Mr. Coon?
3     At the time, were you satisfied that
4     Mr. McDaniel had looked at these matters very
5     earnestly and seriously?
6  A  I felt Mr. McDaniels had done everything he could.
7  Q  All right. Did the concern that you expressed
8     about Adam and Mr. Coon come up before or after
9     this episode concerning Marijuana?
10 A  I had noticed that Adam was hanging around him a
11    lot before the cigarette thing. So, yeah, I had
12    ideas even before then.
13 Q  Do you have information now as we're talking this
14    morning that Coon sexually abused Adam?
15 A  No, I don't. I sure don't.
16 Q  I don't, either. That's why I am asking about
17    your concern.
18 A  No, sir. I have no evidence whatsoever that he
19    did anything with Adam other than just ride him
20    around.
21 Q  Okay. Did you ever see Justin Reed with Mr. Coon?
22 A  I wouldn't have known it if I had, because I
23    didn't know who Justin was. I know the older Reed

Page 37

1     boy and the daughter, the red-headed daughter.
2     Those were the only Reed children I knew.
3  Q  Do you know when you first had concerns about Adam
4     that Adam had changed, or when that started
5     appearing in your mind?
6  A  Uhm, it was sometime before the cigarette
7     incident, but I'm not sure how long.
8  Q  And as I understand, you never went to Adam's
9     parents to share this concern?
10 A  No. I didn't know Adam's parents.
11 Q  And you didn't go to any school official to
12    share --
13        MS. DePAOLA: Object to the --
14 A  No.
15        MS. DePAOLA: That mischaracterizes her
16            prior testimony.
17 Q  Did you go to any school official to talk about
18    your concern with Adam?
19 A  No, I didn't.
20 Q  If Mr. McDaniel were to indicate you never
21    mentioned Adam to him in any form or fashion,
22    would you contradict that?
23 A  I don't remember. What I -- I said I may have

|                                      Page 38 |
| --- |
| 1    said something to him about Adam. I do not know |
| 2    for sure that I did. |
| 3  Q  Are there any notes that you might have that could |
| 4    refresh your recollection about that? |
| 5  A  No, sir. |
| 6  Q  You said it's possible you may have mentioned it; |
| 7    correct? |
| 8  A  Yes, sir. I may have. |
| 9  Q  And you answered that in response to counsel's |
| 10   question. But if Mr. McDaniel has no recollection |
| 11   that you ever mentioned Adam or any students other |
| 12   than those that were riding in the car, would you |
| 13   contradict that? |
| 14       MS. DePAOLA: Object to the form. |
| 15 A  I can't remember. So, how could I object if he |
| 16   says I didn't? |
| 17 Q  In other words, you really don't know if you |
| 18   mentioned Adam to Mr. McDaniel? |
| 19 A  So, it's a possibility, but you don't remember |
| 20 Q  So, it's a possibility, but you don't remember |
| 21   doing that? |
| 22 A  I do not remember. |
| 23 Q  When you saw Mr. Coon fishing with Adam, do you |

|                                      Page 39 |
| --- |
| 1    know what other students were with him at the |
| 2    time? |
| 3  A  Best I can remember, it was just him and Adam. |
| 4  Q  Okay. You mentioned camping trips that your -- |
| 5  A  Those were just things that the kids told me. I |
| 6    never saw any of it. |
| 7  Q  And you don't know who might have gone on those |
| 8    trips? |
| 9  A  No, sir. I sure don't. |
| 10 Q  But your son didn't go on those trips? |
| 11 A  No, sir. My son never went anywhere with him |
| 12   again. |
| 13 Q  Okay. |
| 14       MR. SWEENEY: Thank you for coming in |
| 15     this morning. |
| 16       THE WITNESS: Thank you. |
| 17       FURTHER EXAMINATION |
| 18 BY MS. DePAOLA |
| 19 Q  Let me ask just a couple more questions. What |
| 20   kids told you about -- what kids told you about |
| 21   the camping trips? |
| 22 A  Ma'am, there is probably 100 to 150 children in |
| 23   and out of my home in a week's time. It could |

|                                      Page 40 |
| --- |
| 1    have been any of them. |
| 2  Q  Does that mean you don't remember? |
| 3  A  Yes, ma'am. |
| 4  Q  That all you have to let me know. |
| 5  A  I don't remember. |
| 6  Q  If you don't recall, that's fine. |
| 7       Did you ever hear that he took kids on trips |
| 8    to Florida? |
| 9  A  No, not that I can recall. |
| 10 Q  How about Six Flags? |
| 11 A  Now, I remember something somebody said that he |
| 12   had taken somebody to Six Flags. But, you know, I |
| 13   don't -- like I said, this is kids talking. And |
| 14   me picking up pieces here and there. It wasn't |
| 15   conversations directly to me. |
| 16 Q  Prior to him pleading guilty to sexual abuse, did |
| 17   you ever hear anything about the cell phones he's |
| 18   provided children? |
| 19 A  I think my son told me that he had gotten Adam a |
| 20   cell phone. But, you know, that was just -- |
| 21   that's hearsay. That's just what I was told. |
| 22 Q  Did you tell Mr. McDaniel about that? |
| 23 A  I don't remember. |

|                                      Page 41 |
| --- |
| 1  Q  Okay. Are you aware of Mr. Coon -- I mean, have |
| 2    you heard anything about Mr. Coon having prior |
| 3    sexual abuse complaints against him in other |
| 4    schools? |
| 5  A  Not that I know of. |
| 6  Q  And this is unrelated to Mr. Coon specifically, |
| 7    but have you ever made any other complaints to the |
| 8    school system about anything? |
| 9  A  Oh, I am sure I have over the years. I have had a |
| 10   lot of children to go through the school system. |
| 11 Q  Okay. |
| 12 A  But I can't recall what they would have been. |
| 13   But, I mean, my oldest stepdaughter is 36 years |
| 14   old, and she graduated from there. So, that's a |
| 15   lot of years. So, I'm sure, over the years, I |
| 16   have complained about things. |
| 17 Q  I mean, complained to the extent of going to the |
| 18   Superintendent or central office personnel? |
| 19 A  Not that I can remember. Just go to the school, |
| 20   complain to the principal or the assistant |
| 21   principal. |
| 22 Q  Okay. And had any of these prior complaints been |
| 23   made to Mr. McDaniel? |

11 (Pages 38 to 41)

Page 42

1  A  I think that was Mr. McDaniel's first year there
2     as best I can remember.
3  Q  So, is that a no?
4  A  Yes, ma'am.
5  Q  How about had any of these prior complaints been
6     made to Mr. Pryon?
7  A  I don't even know Mr. Pryon.
8  Q  How about to Mr. Casey?
9  A  Mr. Casey. I may have complained about something
10    to Mr. Casey. I don't remember. I had several
11    children in school during the time he was
12    principal.
13 Q  How about to Ms. Watson, Mona Watson?
14 A  I don't know Ms. Mona Watson.
15 Q  How about to Ms. Shakleford, the police officer?
16 A  Me and Sherry have been friends for a long time.
17    I may have said something to Sherry.
18 Q  Not about Mr. Coon?
19 A  No, not that I can remember.
20 Q  Where does Ms. Shackleford work now?
21 A  Not sure. I think she still works for the
22    Brundidge Police Department, best I can -- best I
23    know.

Page 43

1  Q  Do you know where she lives?
2  A  No, ma'am, I don't. She used to live in our
3     apartment when I had my house in town. But I have
4     no idea where Sherry lives now.
5  Q  Is she married?
6  A  Don't know.
7        MS. DePAOLA: That's all. Thank you.
8        MR. SWEENEY: Thank you very much. I
9        hope you are doing better.
10       THE WITNESS: Thank you.
11
12       (Whereupon, at approximately, 9:50
13       a.m. on the 19th day of July, 2007
14       the deposition was concluded.)
15
16
17       * * * * * * * * *
18    FURTHER DEPONENT SAITH NOT
19       * * * * * * * * * *
20
21
22
23

Page 44

1
2            REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7     I do hereby certify that the above and foregoing
8  transcript of the deposition of POLLY KING was taken
9  down by me in machine shorthand on the 19th of July,
10 2007, and the questions and answers thereto reduced to
11 writing under my personal supervision, and that the
12 foregoing represents a true and correct transcript of
13 the proceedings given by said witness upon said
14 hearing.
15    I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18    Dated this 9th day of August, 2007.
19
20    _____
21    Mary Moore-Wynn
22    Certified Shorthand Reporter
23

Page 1

IN THE UNITED STATES DISTRICT COURT OF

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS

MOTHER AND FATHER, EAR

AND TMR,


      PLAINTIFF,


VS.                                    CASE NO.:

                         2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

      DEFENDANT.

            * * * * * * * * * *

    DEPOSITION OF ELIZABETH ANN REED, taken before

Mary Moore-Wynn, as Commissioner, on the 19th of July,

2007, in the offices of Pike County Board of Education,

101 Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 10:25 a.m.


            * * * * * * * * *

JR, A Minor                        July 19, 2007                 Pike County Board of Education

## Page 2

```
1
2          * * * * * * * * * *
3            APPEARANCES:
4   FOR THE PLAINTIFF:
5   Hon. Susan DePaola
    Attorney at Law
6   1726 West 2nd Street, Suite B
    Montgomery, Alabama 36105
7
8   and
9   Hon. Deanie Allen
    Azar and Azar
10  260 Washington Avenue
    Montgomery, Alabama 36104
11
12  FOR THE DEFENDANT:
13  Hon. Donald R. Sweeney
    Bradley, Arant, Rose & White
14  One Federal Place
    1819 Fifth Avenue North
15  Birmingham, Alabama 35203
16
17  ALSO PRESENT:
18  Dr. Mark Bazzell, Superintendent
19  Mr. Thomas Michael Reed
20
21
22          * * * * * * * * * *
23
```

## Page 3

```
1
2
3
4            STIPULATIONS
5
6      It is hereby stipulated and agreed by and between
7   counsel representing the parties that the deposition of
8   ELIZABETH ANN REED is taken pursuant to the Federal
9   Rules of Civil Procedure, and that said deposition may
10  be taken before Mary Moore-Wynn, CSR, as Commissioner
11  without the formality of a commission; that objections
12  to questions, other than objections as to the form of
13  the questions, need not be made at this time, but may
14  be reserved for a ruling at such time as the deposition
15  may be offered into evidence, or used for any other
16  purpose by either party hereto, provided by the
17  Statute.
18     It is further stipulated and agreed by and between
19  counsel representing the parties in this case, that the
20  filing of the deposition of ELIZABETH ANN REED is
21  hereby waived, and that said deposition may be
22  introduced at the trial of this case or used in any
23  other manner by either party hereto provided for by the
```

## Page 4

```
1   Statute, regardless of the waiving of the filing of
2   same.
3      It is further stipulated and agreed by and
4   between counsel and the witness that the reading
5   and signing of the deposition by the witness is
6   hereby waived.
7
8          * * * * * * * * * *
9              INDEX
10  ELIZABETH ANN REED
11  Examination By Mr. Sweeney                5
12  Reporter's Certificate              137
13            INDEX OF EXHIBITS
14  Exhibit Number      Description      Page Number
15  Defendant's Exhibit 1  Re-Notice to Take    11
                 Deposition and Production of
16               Documents
    Defendant's Exhibit 2  Plaintiff's First    24
17               Amended Complaint
    Defendant's Exhibit 3  Notice of Proposed   90
18               Meeting, 2/22/05
    Defendant's Exhibit 4  Notice of Proposed   92
19               Meeting, 5/25/05
20
21
22          * * * * * * * * * *
23
```

## Page 5

```
1            ELIZABETH ANN REED
2      (Whereupon, the witness, after having first been
3   duly sworn to speak the truth, the whole truth, and
4   nothing but the truth, testified as follows:)
5        MR. SWEENEY: Usual stipulations?
6            EXAMINATION
7   BY MR. SWEENEY
8   Q   Would you state your name?
9   A   Elizabeth Ann Reed.
10  Q   Ms. Reed, I'm Donald Sweeney. I'm the attorney
11      for the Pike County Board of Education and the
12      Defendants that have been named in the lawsuit
13      that you have filed. Have you been deposed
14      before?
15  A   No, sir.
16  Q   So, this is your first deposition?
17  A   Yes, sir.
18  Q   During the deposition, I will be asking you a
19      series of questions about matters relating to the
20      issues stated in the complaint which you have
21      filed against my client. If my questions aren't
22      clear, will you ask me to restate them?
23  A   Yes, sir.
```

JR, A Minor                    July 19, 2007                    Pike County Board of Education

| Page 6 |
|---|
| 1  Q  If you answer the questions, I will assume you |
| 2     understood question. If you will, I will ask that |
| 3     you be as full and complete with your answer as |
| 4     possible, because I'm going to rely on the |
| 5     information you share with me today in response to |
| 6     my questions. So, can we agree that you will |
| 7     endeavor to give me full answers to my questions? |
| 8  A  Yes, sir. |
| 9  Q  And if at any time during the deposition you want |
| 10    to supplement, change, add, or whatever an answer |
| 11    that you have previously given me, will you do |
| 12    that? |
| 13 A  Yes, sir. |
| 14 Q  And at the end of the deposition, I will give you |
| 15    an opportunity to supplement any answer that you |
| 16    have given, so when we finish the deposition, I |
| 17    will have all of the relevant information that you |
| 18    can think about that fits the questions I have |
| 19    asked. Okay? |
| 20 A  Yes, sir. |
| 21 Q  Are you under any medication today that you would |
| 22    impede you from understanding and answering my |
| 23    questions? |

| Page 7 |
|---|
| 1  A  No, sir. |
| 2  Q  What is your present address? |
| 3  A  162 County Road 4430, Brundidge, Alabama, 36010. |
| 4  Q  Have you been a resident of Brundidge for some |
| 5     time? |
| 6  A  Yes, sir. |
| 7  Q  For how long? |
| 8  A  For about 25 years. |
| 9  Q  Have you ever been a plaintiff in a previous |
| 10    lawsuit? |
| 11 A  No. |
| 12 Q  That is; have you ever sued anybody prior to suing |
| 13    the defendants in this case? Have you ever filed |
| 14    a lawsuit claiming somebody has injured you or -- |
| 15 A  No, sir. |
| 16 Q  Have you ever been a defendant in any lawsuit |
| 17    where somebody has sued you? |
| 18 A  Yes, sir. |
| 19 Q  Would you share with me the nature of the suit |
| 20    that you were involved in? |
| 21 A  It was concerning our dogs. |
| 22 Q  A what? |
| 23 A  It was concerning our dogs. |

| Page 8 |
|---|
| 1  Q  A dog? |
| 2  A  Yes, sir. |
| 3  Q  With a neighbor? |
| 4  A  Yes, sir. |
| 5  Q  And what was the circumstance? |
| 6  A  That they -- our dog killed some goats. |
| 7  Q  And how was that resolved? |
| 8  A  We won the case. |
| 9  Q  Okay. Have you ever been arrested for anything? |
| 10 A  No, sir. |
| 11 Q  And you're married to Mr. Reed, who is sitting on |
| 12    your right? |
| 13 A  Yes, sir. |
| 14 Q  And you have been married for how long? |
| 15 A  Twenty-five years. |
| 16 Q  Have you ever been married before -- |
| 17 A  No, sir. |
| 18 Q  -- your current marriage? |
| 19 A  No, sir. |
| 20 Q  As a result of this marriage, how many children do |
| 21    you have? |
| 22 A  Four. |
| 23 Q  And their names are? |

| Page 9 |
|---|
| 1  A  Jeremy Reed. |
| 2  Q  And he's how old? |
| 3  A  Twenty-three. |
| 4  Q  Does he live at home? |
| 5  A  Yes, sir. |
| 6  Q  Is he out of school? |
| 7  A  Yes, sir. |
| 8  Q  The next child? |
| 9  A  Jessica Reed. |
| 10 Q  Uh-huh. Age? |
| 11 A  Twenty. |
| 12 Q  Does she live at home? |
| 13 A  Yes, sir. |
| 14 Q  Is she still in school? |
| 15 A  She goes to college. |
| 16 Q  Okay. The next child? |
| 17 A  Justin Reed. |
| 18 Q  He's 18? |
| 19 A  Seventeen. |
| 20 Q  Seventeen. And he lives at home? |
| 21 A  Yes, sir. |
| 22 Q  And the fourth child? |
| 23 A  Joseph Reed. He lives at home. |

Page 10

1  Q   And he's how old?
2  A   Fourteen.
3  Q   Did you go to high school in Pike County?
4  A   I went to high school in Montgomery County.
5  Q   Did you graduate from high school?
6  A   Yes, sir.
7  Q   After high school, did you go to college?
8  A   I went to AUM for a year.
9  Q   And as far as employment, are you presently
10     employed?
11 A   No, sir.
12 Q   Have you been employed in the past?
13 A   Yes, sir.
14 Q   Where were you employed in the last ten years?
15 A   Pike County Board of Education.
16 Q   Doing what?
17 A   Substitute teacher.
18 Q   Have you been a substitute for the last ten years?
19 A   No.
20 Q   How long have you been a substitute teacher?
21 A   I was a substitute -- I don't recall.
22 Q   Okay. Let me rephrase it: During the last school
23     year, the 2006-2007 school year, did you work as a

Page 11

1      substitute teacher for the Pike County school
2      system?
3  A   No, sir.
4  Q   When was the last time you worked as a substitute
5      teacher?
6  A   Uhm, 2001.
7  Q   And since 2001, you have had no other employment?
8  A   No, sir.
9  Q   Have you ever been fired from any job?
10 A   No, sir.
11         (Whereupon, Defendant's Exhibit 1
12          was marked for identification and
13          is attached hereto.)
14 Q   Let me show you what is before you, Defendant's
15     Exhibit 1, which is the Notice of the Deposition
16     that we're taking today. You will see on page 2 a
17     request for records, notes, memorandum,
18     correspondence, audio or video recordings. Have
19     you brought with you any records?
20 A   No, sir.
21         MR. SWEENEY: Ms. Allen, are you
22          representing her in this deposition?
23         MS. ALLEN: Yes, sir. Everything

Page 12

1          that -- we gave you everything that
2          she has ever had.
3          MR. SWEENEY: Okay.
4  BY MR. SWEENEY
5  Q   So, we have all the documentary records pertinent
6      to the issues in your complaint as tendered to us
7      by your counsel?
8  A   Yes, sir.
9  Q   Have you ever had any tape recordings of any
10     conversations that you have had with any of the
11     defendants or any employee of the Pike County
12     Board that would be relevant to the issues in the
13     complaint? Have you ever taped any recordings?
14 A   No, sir.
15 Q   Okay. And in preparation for your deposition,
16     other than meeting with your attorneys, what
17     documents did you review?
18 A   On the lawsuit that we're fixing to pursue?
19 Q   Uh-huh.
20 A   That's it.
21 Q   Have you talked with anyone in the last six months
22     concerning this lawsuit other than your attorneys?
23 A   Not that I recall.

Page 13

1  Q   I'll come back to that in a minute. But let me
2      ask: Justin, your son, was involved in the band,
3      wasn't he?
4  A   Yes, sir.
5  Q   Were any of your other children involved in the
6      band while Charles Coon was there?
7  A   Yes, sir.
8  Q   Which one?
9  A   Jessica Reed.
10 Q   As a mother of four children, would it be true
11     that you have been very involved in your
12     children's activities?
13 A   Yes, sir.
14 Q   And has that been true for a number of years?
15 A   Yes, sir.
16 Q   Were you very involved in the band program?
17 A   Yes, sir.
18 Q   So, during the 2003-2004 school years; that is,
19     the 2003-2004 and 2004-2005 school years, you were
20     an active member of the band boosters?
21 A   Yes, sir.
22 Q   Were you an officer?
23 A   Yes, sir.

| Page 14 |
| --- |

1  Q   What was your position?
2  A   2003-2004, I was president.
3  Q   So, you worked very closely with Mr. Coon as
4      president of the band boosters, didn't you?
5  A   Yes, sir.
6  Q   And were you authorized to sign checks on behalf
7      of the band boosters?
8  A   Yes, sir.
9  Q   And as president of the band boosters, did you
10     accompany the band on a number of trips?
11 A   Yes, sir.
12 Q   Often ride in the school bus with the band?
13 A   Yes, sir.
14 Q   And you would go from time to time to see
15     practices of the band at school?
16 A   Yes, sir.
17 Q   And when they participated in parades or other
18     activities other than football games, often you
19     would accompany the band when they did that,
20     didn't you?
21 A   Yes, sir.
22 Q   So, you were very supportive of the band?
23 A   Yes, sir.

| Page 15 |
| --- |

1  Q   And very involved in the band activities?
2  A   Yes, sir.
3  Q   And worked very closely with Charles Coon?
4  A   Yes, sir.
5  Q   Now, for the 2004-2005 school year, did you
6      continue to be very active in the band?
7  A   No, sir.
8  Q   The last year Mr. Coon was there, you weren't an
9      officer?
10 A   No, sir.
11 Q   But you rode on the bus with the band as a
12     chaperone from time to time, didn't you?
13 A   Yes, sir.
14 Q   How many times do you recall riding on the school
15     bus with the band members during the 2004-2005
16     school year?
17 A   Twice.
18 Q   And when did you do those? Which times come to
19     your mind?
20 A   I don't recall.
21 Q   Fall, spring, or when?
22 A   It was the fall.
23 Q   Okay. And was Mr. Coon on the bus when you were

| Page 16 |
| --- |

1      riding on the bus with the band members?
2  A   Be more -- I don't understand the question.
3  Q   Okay. When you were on the school bus with the
4      band, was Mr. Coon on the bus at the same time?
5  A   Yes, sir.
6  Q   Did you also participate at the concession stand
7      for the band? That is, did the band boosters run
8      the concession stands at football games?
9  A   I don't understand the question. I don't recall.
10 Q   Okay. What activities did the band boosters put
11     on to raise money? Or what programs did the band
12     boosters have to help raise money to fund the band
13     program?
14 A   I don't recall.
15 Q   Did you ever work in the concession stand at
16     football games where they sold drinks and popcorn
17     and hot dogs?
18 A   Yes, sir.
19 Q   Did you do that on a regular basis?
20 A   No, sir.
21 Q   During the 2004-2005 school year, you worked at
22     the concession stands during football games on a
23     number of occasions, didn't you?

| Page 17 |
| --- |

1  A   No, sir.
2  Q   How many times did you do that?
3  A   I don't recall. I -- I don't work in 2004-2005.
4  Q   Did you for the 2003-2004 when you were president?
5  A   Yes, sir.
6  Q   And why did you stop doing that for the
7      2004-2005 -- that is, working in the concession
8      stand?
9  A   Because I didn't -- I didn't -- I was no -- being
10     no member of the band boosters. I was not a
11     member of the band boosters.
12 Q   You had stopped being a member of the band
13     boosters?
14 A   Yes, sir.
15 Q   Why did you stop being a member during the
16     2004-2005 school year?
17 A   I don't know.
18 Q   The 2003-2004 school year, you were president?
19 A   Yes, sir.
20 Q   So, you were very involved in all of the band
21     activities for that year?
22 A   Yes, sir.
23 Q   But the next year, you quit being a member of the

Page 18

1    band boosters?
2  A  Yes, sir.
3  Q  And do you have any explanation of why you quit
4    the band boosters for that year?
5  A  I don't know, sir.
6  Q  Did you write a letter to the band booster
7    officers and say you were not going to have
8    anything to do with the band boosters for the
9    2004-2005 school year?
10 A  No, sir.
11 Q  So, there wasn't any issue -- you weren't mad at
12    the band boosters, were you?
13 A  No, sir.
14 Q  And you never expressed any ill will towards the
15    band boosters or Mr. Coon prior to dropping out of
16    the band boosters?
17 A  No, sir.
18 Q  Besides riding on the band bus from time to time,
19    did you ever participate in any trips that the
20    band took; that is, driving your own car,
21    accompany the band students to any trip other
22    than, say, a football game?
23 A  No, sir.

Page 19

1  Q  Did the band boosters ever go on field trips to
2    Atlanta or Florida or other places?
3  A  No, sir.
4  Q  So, you wouldn't have accompanied the band
5    students when they would take trips to any place
6    away from Pike County, other than football games
7    or actual functions relating to the band program
8    itself?
9      I'll rephrase --
10      MS. DePAOLA:  Object to the form.  I got
11      lost.
12 Q  Other than where the band was performing as the
13    Pike County High School band, did you ever travel
14    with band students to Six flags or Florida or any
15    trip like that that was just for recreational
16    purposes?
17 A  No, sir.
18 Q  On occasion, did you give Charles Coon permission
19    to administer medicine to Justin?
20 A  No, sir.
21 Q  When Justin would be at band practices or band
22    programs, did Mr. Coon ever give Justin his
23    medicine?

Page 20

1  A  No, sir.
2  Q  Did you ever write Mr. Coon on an occasion and
3    tell him on that particular day he should not give
4    Justin his medicine?
5  A  No, sir.
6  Q  You don't remember writing such a note?
7  A  No, sir.
8  Q  Is it possible that you could have written
9    Mr. Coon and advised him not to give Justin
10    medicine on a particular day?
11 A  I don't understand the question.
12 Q  Okay.  Was Justin taking medicine during the
13    2004-2005 school year?
14 A  Yes, sir.
15 Q  Did he take medicine at school?  That is, would he
16    have to take a pill or something during the school
17    day?
18 A  Not -- no, not I recall.  He would take it
19    during -- in the morning.
20 Q  But you don't recall ever discussing with Mr. Coon
21    arrangements for Justin to be given or not to be
22    given medicine?
23 A  No, sir.

Page 21

1  Q  Did Justin ever ride home from the school in
2    Mr. Coon's car; that is, from the school to your
3    house?
4  A  Yes, sir.
5  Q  How often would that take place during the
6    2004-2005 school year?
7  A  I don't recall.
8  Q  Did it happen quite regularly?
9  A  Yes, sir.
10 Q  And so, after band practice, Mr. Coon had your
11    permission to drive Justin from the school to your
12    home?
13 A  Yes, sir.
14 Q  And he did that with regularity?
15 A  Yes, sir.
16 Q  And that was a convenience to you; correct?
17 A  Yes, sir.
18 Q  And you trusted Mr. Coon to that extent to allow
19    him to drive Justin from the school to your home?
20 A  Yes, sir.
21 Q  Did he also drive Jessica on occasion from the
22    school to your home in his private car?
23 A  Yes, sir.

Page 22

1  Q   Did that happen with regularity?
2  A   Yes, sir.
3  Q   Did Mr. Coon provide transportation for Justin and
4      Jessica during the 2003-2004 school year?
5  A   Uhm -- I don't recall.
6  Q   So, the year that you were president of the band
7      boosters you don't recall if Mr. Coon drove Justin
8      and Jessica from the school to your home in his
9      private vehicle?
10 A   Yes, sir. I don't recall.
11 Q   You don't recall?
12 A   No, sir.
13 Q   Do you have a best judgment of whether he did or
14     not?
15 A   I don't understand. I mean -- I don't understand.
16 Q   Well, you don't recall whether Charles Coon drove
17     your son and your daughter from the school to your
18     home during the 2003-2004 school year. But is it
19     your best judgment that that likely happened?
20 A   Yes, sir.
21     MS. DePAOLA: Object to the form.
22 Q   But during the 2004-2005 school year, Charles
23     Coon, with your permission, drove Justin from the

Page 23

1      school to your home in his private vehicle on a
2      fairly regular basis?
3  A   Yes, sir.
4  Q   Okay. Did Mr. Coon, with your permission, have
5      Justin with him on trips to other places; that is,
6      from your home to drive him to other places other
7      than to the school?
8  A   I don't recall.
9  Q   Did Mr. Coon ever, with your permission, drive
10     Justin to Greenville, Alabama?
11 A   No, sir.
12 Q   Did he ever drive him to a lake place or a lake
13     outing?
14 A   No, sir.
15 Q   Did he ever drive him to Florida?
16 A   No, sir.
17 Q   So, to the best of your knowledge, Charles Coon --
18     well, let me ask it this way: You have indicated
19     that Charles Coon regularly transferred Justin
20     from the school to your home. Do you recall
21     Mr. Coon ever driving Justin in his private
22     vehicle on any other occasion?
23 A   Yes, sir.

Page 24

1  Q   Where? Where would they have been going?
2  A   He drove Justin on campus -- took Justin off
3      campus.
4  Q   So, from school off campus, where would he drive
5      him to?
6  A   He would drive him around the block.
7  Q   Any other occasion that Mr. Coon, to your
8      knowledge, would drive Justin in his private
9      vehicle?
10 A   No, sir.
11 Q   During the 2004-2005 school year when Mr. Coon
12     would bring Justin home in his private vehicle,
13     would Mr. Coon come in and visit in your home?
14 A   Yes, sir.
15 Q   Would he have meals at your home?
16 A   No, sir.
17 Q   Did he come and visit you from time to time during
18     the weekend? That is, on Saturday or Sundays,
19     just to visit?
20 A   Yes, sir.
21 Q   So, during the 2004-2005 school year, Mr. Coon was
22     welcome in your home?
23 A   Yes, sir.

Page 25

1      (Whereupon, Defendant's Exhibit 2
2          was marked for identification and
3          is attached hereto.)
4  BY MR. SWEENEY
5  Q   Let me show you what's been marked as Defendant's
6      Exhibit 2, which is before you, the complaint that
7      you have filed, the amended complaint in this
8      lawsuit. As I understand, just in overview -- and
9      this is a fairly long complaint -- that you are
10     seeking monetary and injunctive relief against
11     these Defendants because your son -- J.R. is how
12     it's referred in the complaint -- that's Justin,
13     isn't it?
14 A   Yes, sir.
15 Q   -- was sexually abused.
16     So, let me repeat that. As I understand the
17     thrust of your complaint, you're suing my clients,
18     Pike County Board and the named Defendants,
19     seeking money and injunctive relief, because your
20     son, J.R., was sexually abused. Is that an
21     accurate overview of your complaint?
22     MS. DePAOLA: Object to the form. The
23         complaint speaks for itself.

JR, A Minor                          July 19, 2007                    Pike County Board of Education

8 (Pages 26 to 29)

Page 26

1   BY MR. SWEENEY
2   Q   Is that an accurate overview of your complaint?
3           MS. DePAOLA:  If you can answer.
4   A   I don't know.
5   Q   You indicated that in preparation for this
6       deposition you had read the complaint?
7   A   Yes, sir.
8   Q   While I know the complaint speaks for itself, what
9       is it that you're seeking in this complaint, in
10      your words?
11  A   Damages that my son has encountered.
12  Q   Uh-huh.
13  A   I mean, he's been -- he's severely post-traumatic
14      depressed.  His behavior, he's has anger.  He's
15      self -- I mean, to himself.  And he's just not a
16      right person in my mind.
17  Q   So, one of the things you're seeking is damages,
18      money damages; correct?
19  A   Yes, sir.
20  Q   And is another thing that you are seeking asking
21      the court to enjoin the Defendants from engaging
22      in certain conduct or asking them to do certain
23      things?

Page 27

1           Do you know what injunctive relief is?
2   A   No, sir.  Explain to me.
3   Q   Okay.  I will skip on beyond that.  But the basis
4       for your complaint is your contention that Justin
5       was sexually abused by Charles Coon?
6           MS. DePAOLA:  That's -- object to the
7           form.  Again, the complaint goes
8           beyond that.
9   Q   Are you contending as part of this lawsuit that
10      Charles Coon sexually abused Justin?
11          MS. DePAOLA:  Do you want her to take
12          the time to read the complaint?  I
13          mean, it's in the complaint, Donald.
14      MR. SWEENEY:  I'm just trying to --
15          MS. DePAOLA:  I mean, we can be here a
16          long time if you want her to go over
17          the complaint.
18      MR. SWEENEY:  Yeah, we can be.  If you
19          will stipulate that one of the
20          contentions in the complaint is that
21          Charles Coon sexually abused Justin,
22          I think we can get on with that.
23      MS. DePAOLA:  Yes.  I will.  And will

Page 28

1           you stipulate to that, too?
2       MR. SWEENEY:  Huh?
3           MS. DePAOLA:  Will you stipulate to
4           that, too?
5       MR. SWEENEY:  That that's in the
6           complaint.
7           MS. DePAOLA:  That that occurred.
8       MR. SWEENEY:  I will stipulate that
9           that's in the complaint.
10          MS. DePAOLA:  Okay.  Yeah, we will
11          stipulate that's in the complaint.
12  BY MR. SWEENEY
13  Q   From what source did you first learn that Charles
14      Coon had sexually abused your son?  What was the
15      first information you had that Charles Coon may
16      have sexually abused Justin?
17  A   I don't know.
18          MS. DePAOLA:  How did you first find out
19          about it?
20      THE WITNESS:  I got --
21          Do you mind?
22      MR. SWEENEY:  Thank you.
23          MS. DePAOLA:  How did you first find out

Page 29

1           about this?
2   A   I got a phone call from DHR.
3   Q   Who did you talk to at DHR?
4   A   Misty Hubbard.
5   Q   Mr. Hubbard?
6   A   Misty Hubbard.
7   Q   Mrs. Hubbard.  Do you recall when that call came
8       to you?
9   A   It was June of 2005.
10  Q   So, for the 2004-2005 school year, that entire
11      school year, you had no information or belief that
12      Charles Coon was abusing Justin in any way; is
13      that correct?
14  A   Yes, sir.
15  Q   The first time you heard from any source that
16      Charles Coon might be abusing Justin was when
17      Ms. Hubbard called you from DHR in June of '05; is
18      that right?
19  A   Yes, sir.
20  Q   All right.  Until that call, would it be fair to
21      say you were entirely trusting of Charles Coon?
22  A   Yes, I trusted Charles Coon.
23  Q   You trusted Charles Coon to be with Justin at

Mary Moore-Wynn, CSR              Mary Moore-Wynn                    (334)244-0203
                              Court Reporting Services

Page 30

1     school?
2  A  Yes, sir.
3  Q  You trusted him to drive Justin in his car?
4  A  Yes, sir.
5  Q  You trusted him in every way; correct?
6  A  Yes, sir.
7  Q  And you had spent a lot of time with Charles Coon,
8     particularly the previous year, hadn't you, as
9     president of the boosters?
10 A  Yes. I trusted him as a person.
11 Q  So, as a conscientious mama, very involved in the
12    band program and in your son's activities, you had
13    no reason to suspect that Charles Coon was abusing
14    Justin until June of 2005?
15 A  I thought it was pretty odd for Mr. Coon to take
16    Justin off campus. I mean, I didn't -- I
17    didn't -- I thought he would be a trustworthy man.
18    And I thought maybe the personnel, the principal
19    and the vice principal, would have some trigger in
20    their mind, you know, saying; hey, there is a
21    teacher taking a student off campus without
22    permission.
23 Q  All right. But my question to you is that you

Page 31

1     trusted Coon throughout that year, didn't you --
2  A  Yes, I trusted Mr. Coon.
3  Q  -- the 2004-2005 school year?
4  A  Yes, sir.
5  Q  And you knew that he might be driving him off
6     campus, but is it correct that you never mentioned
7     that concern that you have just stated to any
8     school official during the 2004-2005 school year?
9  A  I don't -- I don't know. I mean --
10 Q  Well, do you have any notes that you can refresh
11    your recollection?
12 A  No, sir.
13 Q  Do you remember ever going to any school official
14    during the 2004-2005 school year and raising any
15    concerns of any kind concerning Charles Coon and
16    his conduct with your son, Justin?
17 A  No, sir.
18 Q  Okay. What did Ms. Hubbard tell you when she
19    called in June of '05?
20 A  I don't recall. I mean, what do you mean, was
21    she --
22 Q  Did she tell you that there was some concern about
23    how Charles Coon was dealing with Justin?

Page 32

1  A  All -- Ms. Hubbard told me that Mr. Coon was
2     giving Justin a cell phone. There was a cell
3     phone in Justin's name.
4  Q  All right. And did she say why that was of
5     concern?
6  A  I don't recall.
7  Q  Did you know prior to that call that Charles Coon
8     had given Justin a cell phone?
9  A  No, sir.
10 Q  Had you ever seen a cell phone with Justin, the
11    source of which you didn't know?
12 A  No. I did not see --
13 Q  Did Justin have a cell phone that you had given
14    him?
15 A  No, sir.
16 Q  And you never saw Justin with a cell phone prior
17    to this call in June of '05?
18 A  No, sir.
19 Q  Did Jessica ever tell you that Mr. Coon had given
20    Justin a cell phone?
21 A  No, sir.
22 Q  Did Jessica ever complain to you about Mr. Coon?
23 A  Not that I -- I don't recall.

Page 33

1  Q  Okay. So, Ms. Hubbard calls you and says,
2     Mr. Coon has given Justin a cell phone. Had she
3     talked with Justin?
4  A  No, sir.
5  Q  Do you know how she knew that Mr. Coon had given
6     Justin a cell phone?
7  A  I don't recall.
8  Q  What did you do next after you got the call from
9     Ms. Hubbard?
10 A  I didn't do anything.
11 Q  In that conversation with Ms. Hubbard, did
12    Ms. Hubbard indicate that she thought Charles Coon
13    might have sexually abused Justin?
14 A  I don't recall.
15 Q  All you recall is that she said Mr. Coon had given
16    Justin a cell phone?
17 A  Justin was -- Mr. Coon was going to give Justin a
18    cell phone.
19 Q  So, as I understand what you're telling me,
20    Mr. Coon had not yet given Justin a cell phone?
21 A  Yes, sir.
22 Q  Did you ask Justin about a cell phone after that
23    conversation?

Page 34

1   A   No, sir.
2   Q   Do you know if Mr. Coon ever actually gave Justin
3       a cell phone?
4   A   No, sir.
5   Q   All right. So, when Ms. Hubbard called, she let
6       you know that from some source she understands
7       that Mr. Coon is going to give Justin a cell
8       phone, but that's all you discuss?
9   A   Yes, sir.
10  Q   What's the next information you receive from any
11      source that Mr. Coon might have sexually abused
12      Justin?
13  A   I don't recall.
14  Q   Do you think you learned something in July that
15      might have put you on notice about Justin being
16      sexually abused by Mr. Coon?
17  A   I don't recall.
18  Q   Do you think you knew by August that Mr. Coon was
19      being charged with sexually abusing a student?
20  A   I don't recall.
21          MS. DePAOLA: Is your problem the dates,
22              or can you just tell him what the
23              next thing is you recall happen

Page 35

1           after you talked with Ms. Hubbard?
2           THE WITNESS: I can tell him what
3               happened next after I talked with
4               Ms. Hubbard.
5   BY MR. SWEENEY:
6   Q   That would be helpful.
7   A   I got a phone call. Ms. Hubbard set an
8       appointment up with the Children's Advocate
9       Center. And Mr. Bradbury from the Sheriff's
10      Department took Justin's testimony.
11  Q   And what did Justin tell them when he gave that
12      testimony?
13  A   I don't know. I don't recall -- I don't know what
14      went on between Mr. Bradbury. All Mr. Bradbury
15      told me was Justin was sexually abused.
16  Q   Did he tell you in what manner; that is, how the
17      sexual abuse took place, what was done?
18  A   Yes, sir.
19  Q   What did he tell you?
20  A   He said he fondled him outside his pants.
21  Q   I'm sorry. What?
22  A   He fondled Justin -- Mr. Coon fondled Justin
23      outside his pants.

Page 36

1   Q   Did he do anything else --
2           MS. DePAOLA: Object to the form.
3   Q   -- of a sexual abuse --
4           MS. DePAOLA: Object to the form.
5   Q   -- other than that physical act? I mean, was it
6       reported to you in that conversation that Mr. Coon
7       had done anything else other than that?
8   A   No, sir.
9   Q   Did Mr. Hubbard tell you whether that had happened
10      more than once?
11          MS. DePAOLA: Mr. Hubbard?
12  A   Mr. Bradbury.
13  Q   I'm sorry. Excuse me. Did he tell you that it
14      had happened more than once?
15  A   Yes, sir.
16  Q   Did he tell you how many times Justin had reported
17      it had happened?
18  A   I don't recall.
19  Q   Did he tell you where it had happened?
20  A   I don't recall.
21  Q   Okay. So, after they took Justin's statement,
22      what happened next?
23  A   Then I filed a warrant against Mr. Coon.

Page 37

1   Q   Okay. Do you remember when you did that?
2   A   I don't recall the date.
3   Q   It was probably after June, though, wasn't it,
4       after Ms. Hubbard's call?
5   A   Yes, sir.
6   Q   Do you think it was a few days after or a few
7       weeks or a few months?
8   A   I don't -- it might have been about a month. I
9       don't know. I don't know the month or the date of
10      that.
11  Q   Between the time when Justin gave his statement
12      and when you filed a warrant for Mr. Coon's
13      arrest, did you do anything else regarding Justin
14      and Mr. Coon? That is, did anything else happen
15      after that relating to the issues in this
16      complaint?
17          I'm confusing you. Let me restate it.
18          Justin gave testimony about what had happened?
19  A   Yes, sir.
20  Q   And you don't remember the date of when that took
21      place?
22  A   It was in 2005.
23  Q   Okay. After Justin gave that testimony indicating

Page 38

1      **Mr. Coon had fondled him, what happened next?**
2   A   Justin went to counseling at the Advocate Center.
3      And then after that, Justin got sent to UAB
4      psychiatric ward in Birmingham.
5   Q   **When did that take place?**
6   A   That was April of 2006.
7   Q   **Okay.**
8          MS. DePAOLA:  Seven.
9          THE WITNESS:  2007.
10  Q   **You mean just recently?**
11  A   Yes, sir.
12  Q   **And nothing else, really, has happened between the**
13     **testimony Justin gave on that occasion that you**
14     **talked about in 2005 and when he was sent to the**
15     **hospital at UAB in 2007?**
16         MS. DePAOLA:  Object to the form.  It's
17         overly broad.
18  Q   **Well, what else happened during that period of**
19     **time --**
20         MS. DePAOLA:  In relation to what?
21  Q   **-- with regard to Justin?**
22  A   In relation --
23         MS. DePAOLA:  That's so broad, Donald.

Page 39

1          MR. SWEENEY:  I'll refine it.  I'm
2          trying to give her an opportunity to
3          share with me the chronology.
4   BY MS. DePAOLA
5   Q   **After Justin gave his testimony about being**
6      **fondled, did you talk to Justin about what**
7      **Mr. Coon had done?**
8   A   He refused to talk to me.
9   Q   **Has Justin ever talked to you about what Mr. Coon**
10     **did to him?**
11  A   No, sir.
12  Q   **So, you have no further information or details**
13     **other than the testimony that Justin gave in that**
14     **original statement?**
15         MS. DePAOLA:  You mean -- testimony you
16         mean from Justin directly?
17         MR. SWEENEY:  From Justin.
18  A   Justin would be secluded.  He would go -- he would
19     not talk to anybody from 2004-2005.  He would just
20     be like -- like, you know, be depressed.  And just
21     go to his room.  Just sit there.  And then when it
22     was time to eat, he would come out.  And then
23     after he got done eating, he would go back in his

Page 40

1      room.  He had no connection with nobody.  He would
2      be to himself.  He would not correspond or talk to
3      anybody.
4   Q   **Let me ask the question in this way:  At any time**
5      **since June of 2005, has Justin shared with you**
6      **information about what Charles Coon did to him?**
7   A   No, sir.
8   Q   **So, you have no additional information from Justin**
9      **himself about what Charles Coon did to him?**
10  A   I don't -- be more specific.  Explain.
11  Q   **Okay.  I am really not trying to be complicated**
12     **about it.**
13         **To the extent that Justin talked to you, his**
14     **mother, about what Charles Coon did to him, I want**
15     **to know what Justin told you.**
16  A   Justin said that he fondled him outside his pants.
17  Q   **And he told you that?**
18  A   Yes, sir.
19  Q   **Did he tell you that on several occasions or just**
20     **once?**
21  A   He just told us once.  And then he would be quiet
22     about it.  And just go back to what he was doing.
23  Q   **But did that happen -- that is, when Justin was**

Page 41

1      **telling you that he had been fondled, did he tell**
2      **you that on a number of occasions or just once?**
3   A   Just once, because he said he didn't want to talk
4      about it.
5   Q   **So, between 2005 and the present, Justin has only**
6      **talked to you on one occasion about what Charles**
7      **Coon did to him?**
8   A   Yes, sir.
9   Q   **What else did he tell you other than that Charles**
10     **Coon fondled him?  Did he tell you when it**
11     **happened or where?**
12  A   Yes, sir.
13  Q   **Where did he -- and I'm asking what Justin told**
14     **you -- where did he say it happened?**
15  A   In the band room.  In the office in the band room.
16  Q   **How many times did he tell you it happened?**
17  A   He just told me that one time.  Once.
18  Q   **All right.  So, he said that on one occasion**
19     **Charles Coon fondled him at the band room?**
20  A   Yes, sir.
21  Q   **That was the only time that happened, according to**
22     **Justin?**
23  A   Yes, sir.

Page 42

1   Q   And you're not sure the date of when that
2       happened; that is, when Charles Coon fondled
3       Justin at the band room?
4   A   I don't recall.
5       MS. ALLEN:  I am afraid there might be
6           some confusion.
7       THE WITNESS:  Yes.
8       MS. ALLEN:  You understand that Donald
9           is asking you how many times --
10          Well, you are asking her two
11          things.  One, how many times did
12          Justin talk to her and tell her
13          what happened?
14  BY MR. SWEENEY
15  Q   And you said one time.  He shared with you only on
16      one time what Charles Coon had done to him?
17  A   Yes, sir.
18  Q   And then my follow-up question was:  When he
19      shared that information with you, when he said
20      what Charles Coon did to him, did he tell you how
21      many times Charles Coon had fondled him?
22  A   Yes, sir.
23  Q   How many times?

Page 43

1   A   Several times.
2   Q   Do you have the impression it was two or five or
3       what?
4   A   I don't know how many times.
5   Q   So, Justin didn't give you an exact number?
6   A   Right.  Yes, sir.
7   Q   Okay.  In response to a question earlier, you said
8       you found out other information about what Charles
9       Coon had done to Justin.  Did you find out from
10      other sources what Charles Coon might have done to
11      Justin?
12  A   Yes, sir.
13  Q   Who else did you talk to that had knowledge about
14      what Charles Coon had done to Justin --
15  A   Mona --
16  Q   -- after June of 2005?
17  A   Mona Watson.
18  Q   And what did she tell you Charles Coon had done to
19      Justin?
20  A   I don't recall.  Just fondled him outside his
21      pants.
22  Q   Monica told you that?
23      MS. DePAOLA:  Mona.

Page 44

1   Q   Excuse me.  I mispronounce names sometimes.  Mona?
2   A   Mona Watson.
3   Q   How many times did you talk to Mona, about this?
4   A   I don't recall.
5   Q   Okay.  Who else shared with you information about
6       what Charles Coon had done to Justin other than
7       Mona?
8       MS. DePAOLA:  Do you mean ever since the
9           incident?
10      MR. SWEENEY:  That's right.
11      MS. DePAOLA:  To today?
12      MR. SWEENEY:  That's right.
13  Q   Who else?  You said you had additional information
14      about what Charles Coon had done to Justin other
15      than what Justin told you on that one occasion.
16      You talked to Mona Washington.  Who else did you
17      talk to that had information about what Charles
18      Coon had done to Justin?
19  A   It was Misty Hubbard, Mr. Bradbury, and Mona
20      Wat --
21  Q   Let me write this.
22      Okay.  Anybody else?  Just those three?
23  A   Andrew Wright, who is his counselor.

Page 45

1   Q   Who?
2   A   Andrew Wright.  He's a counselor at East Central
3       Medical.  And Dr. Ascherman.  He is with UAB
4       psychiatric ward.  And Dr. Warren.
5   Q   Warren?
6   A   Warren.  He did a psychiatric evaluation on
7       Justin.
8       MS. DePAOLA:  Fernell Warren.
9   Q   Have you shared with me everything Mr. Hubbard
10      told you?
11  A   Yes, sir.
12  Q   Mr. Bradbury.  What did Mr. Bradbury tell you?
13  A   That Justin was sexually abused by --
14  Q   Did he give you any explicit information about how
15      he was abused?
16  A   Fondling outside his pants.
17  Q   Did he know when or where that had taken place?
18  A   Yes, sir.
19  Q   And was that information that he got from talking
20      to Justin?
21  A   Yes, sir.
22  Q   Okay.  And did he tell you that it happened more
23      than once?  Did Mr. Bradbury tell you that based

**Page 46**

1  on what he knew it had happened more than once?
2  A  Yes, sir.
3  Q  Okay. You told me about Mona Washington?
4  A  Ms. Watson.
5  Q  Watkins. I apologize.
6  A  Watson.
7      MS. DePAOLA: Watson.
8  Q  Watson. Watson. Mr. White or a Dr. White?
9  A  Andrew Wright.
10 Q  Is he a doctor?
11 A  He's a licensed counselor.
12 Q  And what did Mr. White tell you?
13     MS. DePAOLA: Mr. Wright.
14 A  Wright.
15 Q  Wright, W-R-I-G-H-T?
16 A  He's -- Mr. Wright is Justin's counselor for his
17    being depressed, for his depression.
18 Q  So, what Mr. Wright would know would be based on
19    his dealings with Justin?
20 A  Yes, sir.
21 Q  And what did Mr. Wright tell you that Justin had
22    shared with him about the abuse?
23 A  I don't know.

**Page 47**

1  Q  You haven't --
2  A  I don't recall.
3  Q  -- actually talked with Mr. Wright?
4  A  It's confidential information between the
5    counselor and Justin.
6  Q  Okay. Dr. Ascherman. Has he shared with you any
7    information about what Charles Coon did to Justin?
8  A  Alls Mr. -- Dr. Ascherman told us that Justin
9    is -- has a severe case of depression. And Justin
10   is taking Lexapro for his depression.
11 Q  Okay. Have you talked to Dr. Warren?
12 A  Dr. Warren said that his depression is with his --
13   it's uhm, goes with the sexual abuse.
14 Q  All right.
15 A  That everything --
16 Q  Did he share any additional details about what he
17   had learned that Charles Coon had done to Justin
18   from Justin?
19 A  I don't recall.
20 Q  All right. And those are the people that from
21   whom you have obtained some information about what
22   Charles Coon did to Justin?
23 A  Yes, sir.

**Page 48**

1  Q  After this came up, did any of your other children
2    share any information about how Charles Coon
3    conducted himself with regard to Justin?
4  A  What do you mean? Explain yourself.
5  Q  Okay. Did Jessica talk to you about Mr. Coon and
6    what had come out about Coon abusing Justin? Did
7    she share any --
8  A  Yes, sir.
9  Q  -- additional information?
10 A  Yes, sir.
11 Q  What did she share?
12 A  She had seen Mr. Coon touch Justin between his --
13   between his legs.
14 Q  She actually observed that?
15 A  Yes, sir.
16 Q  But she hadn't told you about that, had she?
17 A  No, sir, not -- not until we asked her.
18 Q  Okay. Had she told anybody else about that; that
19   she had seen Mr. Coon touch Justin between the
20   legs? She told you that after this information
21   came up in the summer of 2005; correct?
22 A  Yes.
23 Q  But she had not mentioned that to you before?

**Page 49**

1  A  No, sir.
2  Q  Okay. Had Jessica reported that information to
3    anybody else, to your knowledge? That is, had she
4    gone to the school officials or anybody and said,
5    I saw Mr. Coon touch Justin in an inappropriate
6    way, before she talked to you?
7  A  No, sir.
8  Q  Did either of your two sons have information about
9    how Coon had treated Justin? Did they know
10   anything that would shed light on what had
11   happened?
12 A  I don't recall.
13 Q  To your knowledge, were there any witnesses of
14   this abuse -- of Charles Coon abusing Justin --
15   other than Jessica?
16 A  Yes, sir.
17 Q  Who else witnessed the abuse?
18 A  Joseph Reed.
19 Q  I'm sorry?
20 A  Joseph Reed.
21 Q  What did he observe or see?
22 A  He saw Mr. Coon fondle Justin outside his pants.
23 Q  When did he see that take place?

## Page 50

1   A   At our house.
2   Q   Did he report that to you when it happened?
3   A   No, sir.
4   Q   Was he sexually abused by Charles Coon?
5           MS. DePAOLA:  He who?  Who are we
6       talking about?
7           MR. SWEENEY:  What is it, Joseph.
8   Q   Was Joseph sexually abused by Charles Coon?
9   A   Yes, sir.
10  Q   But he hadn't reported that to you?  When it
11      happened, he didn't tell you about that, did he?
12  A   Be more specific.
13  Q   Sure.  Joseph saw Coon sexually abuse Justin at
14      your home?
15  A   Yes, sir.
16  Q   And when that happened, did Joseph tell you what
17      was happening?
18  A   No, sir.
19  Q   So, Coon was sexually abusing your son in your
20      house, and you didn't know that?
21  A   No, sir.
22  Q   So, you weren't able to do anything to stop it,
23      were you?

## Page 51

1   A   I trusted the man.
2   Q   Right.  And because of that, you didn't take any
3       steps to prevent what happened from happening?
4   A   Because I did not know.
5   Q   And because you didn't know it, you didn't take
6       any steps to prevent it, did you?
7   A   I don't know.  I mean -- no, sir.
8   Q   Okay.  Did Joseph tell you why he had not reported
9       that to you when it happened at your house?
10          MS. DePAOLA:  Now, what are we talking
11      about; about the abuse of Justin or
12      that he --
13          MR. SWEENEY:  That's right.
14  Q   When Joseph observed Coon abusing Justin, did
15      Joseph tell you why he didn't come to you and
16      report it?
17  A   No, sir.
18  Q   And Joseph was sexually abused by Coon?
19  A   Yes, sir.
20  Q   But Joseph didn't come and tell you about that,
21      did he?
22  A   No, sir.
23  Q   Have you asked Joseph why he didn't tell you?

## Page 52

1   A   No, sir.
2   Q   Do you know of anybody else that was sexually
3       abused by Charles Coon?
4   A   I don't recall.
5   Q   Is there anything that would refresh your
6       recollection about that; about somebody else that
7       has told you that they were sexually abused by
8       Charles Coon?
9           MS. DePAOLA:  Is the question:  Has
10      somebody else told her that, or does
11      she know generally anything?
12  Q   Generally.  Do you know of anyone else that was
13      sexually abused by Charles Coon other than Joseph
14      or Justin?
15  A   Yes, sir.
16  Q   Who?
17  A   Blake Faulkner.
18  Q   And how did you learn about Blake?
19  A   I don't recall.
20  Q   Anybody else that you know of that's been sexually
21      abused by Charles Coon?
22  A   I don't recall.
23  Q   Do you know when Blake was sexually abused by

## Page 53

1       Charles Coon?
2   A   I don't recall.
3   Q   So, I have asked you about the names of persons
4       that you think were sexually abused by Charles
5       Coon.  Have you shared with me everybody you can
6       think of as we're talking today that might have
7       been sexually abused by Charles Coon?
8   A   Yes, sir.
9   Q   And I have asked you about the people that
10      witnessed Charles Coon sexually abusing people.
11      And you have shared that Jessica and Joseph both
12      witnessed that?
13  A   Yes, sir.
14  Q   Is there anybody else that you know of that might
15      have witnessed Charles Coon sexually abusing
16      someone?
17  A   I don't recall.
18  Q   Have you talked with any employees of the Pike
19      County Board of Education about the sexual abuse
20      that Charles Coon committed on Justin; any
21      teachers, any staff people, anyone that's employed
22      by the Pike County Board of Education?
23  A   I don't recall.

**Page 54**

1  Q  After you learned in June of 2005 about the cell
2       phone, did you ever go and talk to the principal
3       of the Pike County High School?
4  A  No, sir.
5  Q  Do you know who the principal is or was at that
6       time?
7  A  Yes, sir.
8  Q  Who was that?
9  A  Mr. Hall.
10 Q  Did you ever talk to him about what Charles Coon
11      did to Justin?
12 A  No, sir.
13 Q  Did you ever talk to the assistant principal about
14      what Charles Coon had done to Justin?
15 A  No, sir.
16 Q  Have you had any conversations with any teacher
17      that worked at Pike County High School during the
18      2004-2005 school year about Charles Coon and what
19      he did to Justin?
20 A  No, sir.
21 Q  Have you talked to any custodian or cafeteria
22      worker or anybody else that works at Pike County
23      High School concerning what Charles Coon did to

**Page 55**

1       Justin?
2  A  No, sir.
3  Q  Have you ever talked to Mark Bazzell, the
4       Superintendent, about what Charles Coon did to
5       Justin?
6  A  No, sir.
7  Q  Do you know any of the Board members who serve on
8       the Pike County Board of Education?
9  A  What do you mean?
10 Q  These people whose picture are behind us have at
11      one time or another served on the Pike County
12      Board of Education. Do you know any person that
13      serves on the Pike County Board of Education?
14 A  Yes, sir.
15 Q  Who?
16 A  Ms. Steed.
17 Q  Have you talked to her about what Charles Coon did
18      to Justin?
19 A  No, sir.
20 Q  Have you talked to any Board member on any
21      occasion about what Charles Coon did to Justin?
22 A  No, sir.
23 Q  Since finding out that Justin was sexually abused,

**Page 56**

1       you mentioned that he's been under the care of
2       various medical doctors and medical providers.
3       Has he been admitted to the hospital on any
4       occasion other than this most recent admission to
5       UAB?
6  A  No, sir.
7  Q  So, since 2004, has Justin been in the hospital
8       for any reason up to and including today, other
9       than the UAB admission?
10 A  No, sir.
11 Q  Does he have a family doctor?
12 A  Yes, sir.
13 Q  Who is his family doctor?
14 A  Dr. Patterson.
15 Q  Has he been treated by any other doctors since
16      June of 2005, other than those you have already
17      mentioned?
18 A  No, sir.
19 Q  Have you assumed or incurred unreimbursed medical
20      expenses for the medical treatment that Justin has
21      had since June of 2005?
22 A  What you mean, have --
23 Q  Have you had bills to pay for these medical

**Page 57**

1       services?
2  A  No, sir.
3  Q  Do you have medical insurance?
4  A  Justin is on Medicaid.
5  Q  All right. You have mentioned the psychiatrist.
6       That's Dr. Warren and Dr. Ascherman?
7  A  Dr. Ascherman.
8  Q  Ascherman. Has he been to any other psychiatrist?
9  A  No, sir. No, sir.
10 Q  Has he been to a psychologist, or just
11      psychiatrist?
12 A  Explain on the psychologist and the psychiatrist.
13 Q  Well, other than the persons that you have
14      mentioned; Warren, Ascherman, has he been to any
15      other professional for treatment?
16 A  He sees Dr. Lopez at East Central.
17 Q  Anybody else?
18 A  No, sir.
19 Q  If you were to ask Justin today to talk to you
20      about what Charles Coon did to him, would he be
21      able to talk to you about it?
22 A  I don't know.
23 Q  I mean, he's had counseling from these various

Page 58

1  people during the -- since, I guess, 2000 -- the
2  summer of 2005. Has that helped him deal with the
3  trauma of what happened to him?
4  A  He still has problems.
5  Q  But can he talk about it more easily than he was
6  able to in the past?
7  A  I -- I don't know. I can't -- I mean, I can't
8  speak for Justin. I don't know. He probably
9  would.
10 Q  Does Justin, in your opinion, have the
11  intelligence to know that what happened to him,
12  the abuse that Coon inflicted on him, was wrong?
13 A  Justin doesn't know right from wrong. I mean, he
14  would be real easily coerced into something that
15  he does not understand.
16 Q  If I asked to take the deposition of Justin to
17  find out what had happened to him, would he be
18  able to describe what had happened?
19 A  No, sir.
20 Q  He wouldn't talk to me?
21 A  I don't know.
22 Q  Well, if you asked him about what happened in the
23  last two or three months, was he more able to

Page 59

1  discuss what he went through with Coon?
2  A  No, sir.
3  Q  You said you took out a warrant for Coon. Did you
4  ever attend any hearing regarding Charles Coon,
5  any criminal hearing or proceeding?
6  A  Yes, sir.
7  Q  Was there a trial concerning what he did?
8  A  It was just -- I don't -- I don't recall.
9  Q  Did you ever have to give testimony in a court
10  against Charles Coon?
11 A  No, sir.
12 Q  Do you know what Charles Coon actually pled guilty
13  for doing?
14 A  Yes, sir.
15 Q  What did he plead guilty for doing?
16 A  Inappropriate fondling outside of Justin's pants.
17 Q  Did he plead guilty for abusing Justin or for some
18  other student?
19 A  He -- I don't recall. I mean, alls he pleaded
20  guilty on Justin.
21 Q  Do you know where Charles Coon is today?
22 A  I do not.
23 Q  Have you had any discussions or communication with

Page 60

1  Charles Coon since June of 2005?
2  A  No, sir.
3  Q  So, you don't know exactly what Charles Coon
4  confessed to have done other than the fact that he
5  pled guilty to abusing minors; is that right?
6  A  Yes, sir.
7  Q  Did the district attorney ever come to you and
8  talk to you about what Charles had admitted doing?
9  A  I don't recall.
10  Explain yourself. I mean --
11 Q  You filed a warrant for Charles Coon's arrest
12  charging him with sexually abusing Justin?
13 A  Yes, sir.
14 Q  At some point after that, Charles Coon pled guilty
15  of committing a crime and went to jail, didn't he?
16 A  Yes, sir.
17 Q  At any time before he went to jail, did the
18  district attorney meet with you to talk about what
19  Charles Coon had admitted doing?
20 A  He didn't meet with me. He met with Justin.
21 Q  Okay. But did you have any conversations --
22 A  No, sir.
23 Q  -- with the district attorney?

Page 61

1  A  No, sir.
2  Q  So, no one has shared with you what specifically
3  Charles Coon admitted doing?
4  A  I'm confused -- yes, the DA -- I filed a warrant
5  against Coon.
6  Q  Uh-huh.
7  A  We went to trial -- we had a hearing. Mr. Coon
8  pled guilty on Justin.
9  Q  All right. But did they read out accusations
10  about what Charles Coon had done, and he admitted
11  it in court?
12 A  Yes, sir.
13 Q  And what were the accusations that were read out
14  that he admitted to?
15 A  Inapp -- I don't recall.
16 Q  Do you know if any other parents or people brought
17  charges against Coon for sexually abusing other
18  minors?
19 A  I don't recall.
20 Q  I think I covered this, Ms. Reed, but I want to
21  make sure. Justin rode with Charles Coon in his
22  private vehicle. But to the best of your
23  recollection, the only occasion for that was when

Page 62

1    Coon would be taking Justin from school to your
2    house?
3  A   No, sir.  He took him off campus.
4  Q   I'm sorry.  I didn't mean -- at school, he may
5    have driven him off campus.  But in terms of going
6    to -- coming to your house, Coon comes to your
7    house.  Did he ever leave your house in his
8    private vehicle with Justin to go someplace else?
9  A   I don't recall.
10 Q   So, do you recall Charles Coon ever taking Justin
11   in his car from your house to a lake place?
12 A   No, sir.
13 Q   To a fishing place, a pond or a lake to fish?
14 A   No, sir.
15 Q   To Guntersville for the weekend?
16 A   No, sir.
17 Q   Or a cabin that he might have owned?
18 A   No, sir.
19 Q   To Florida?
20 A   No, sir.
21 Q   To Six Flags Over Georgia?
22 A   No, sir.
23 Q   To a movie?

Page 63

1  A   No, sir.
2  Q   Or to a restaurant?
3  A   No, sir.
4  Q   So, you don't know of any other occasion where
5    Charles Coon would have taken Justin in his car
6    from your house to some other place?
7  A   No, sir.
8  Q   Do you have any information that Justin would have
9    been taken to Charles Coon's house or the school
10   in some private vehicle, and then he left to go
11   with Coon to a lake or a cabin or some kind of
12   out-of-town trip?
13 A   No, sir.
14 Q   Do you know if Justin ever went on a camp out with
15   Coon?
16 A   No, sir.
17 Q   With other students or by himself?
18 A   No, sir.
19 Q   And you don't know of any occasion where Coon
20   would have taken Justin to Greenville or Butler
21   County or anyplace outside of the Pike County?
22 A   No, sir.
23      MS. DePAOLA:  Can we take a quick break?

Page 64

1      (Brief recess.)
2  BY MR. SWEENEY
3  Q   Ms. Reed, I was trying to determine from you
4    people that had information that would be
5    supportive of the contentions in the complaint and
6    people that you have talked to.  Since June of
7    2005, have you talked to anybody with the Troy
8    Police Department?
9  A   No, sir.
10 Q   Have you talked with anybody with the Brundidge
11   Police Department?
12 A   No, sir.
13 Q   Is there a Mr. or Mrs. Shackleford?
14 A   Yes, sir.  I have talked to Sherry.
15 Q   And what is her position?  Is she with the
16   Brundidge Police Department?
17 A   I don't know.
18 Q   Well, does she have -- has she shared information
19   with you about Charles Coon and Justin; that is,
20   does she know any information or shared anything
21   that might be relevant to the issues in your
22   complaint?
23 A   I don't recall.  I -- let me -- what do you mean,

Page 65

1    you mean with the sexual --
2  Q   The sexual abuse that Charles Coon engaged in with
3    your son, Justin; have you talked with
4    Ms. Shackleford about that?
5  A   Yes, sir.
6  Q   What did you talk about?  What does she know, and
7    what did she discuss with you?
8  A   That my -- that Justin Reed was sexually abused by
9    Mr. Coon.
10 Q   Did she know anything about what had happened
11   prior to June of 2005 to your knowledge?
12 A   No, sir.
13 Q   Or had she observed anything at school that she
14   shared with you?
15 A   No, sir.
16 Q   I asked you if Charles Coon had ever driven Justin
17   from your home to any place other than to school.
18   Let me ask about Jessica.  Did Charles Coon ever
19   drive Jessica in his car to anyplace?
20 A   Yes, sir.
21 Q   Where did he drive Jessica?
22 A   To his house in Greenville.
23 Q   On several occasions?

Page 66

1  A  On one occasion.
2  Q  And when did that take place?
3  A  I don't recall.
4  Q  Was it during the 2004-2005 school year?
5  A  2004. It was the summer 2004.
6  Q  And what was the occasion for Mr. Coon taking
7     Jessica to Greenville?
8  A  To do some yard work.
9  Q  Was Jessica there over the weekend?
10 A  She was only there for a couple of hours.
11 Q  And then they came back?
12 A  Yes, sir.
13 Q  Did Jessica complain about anything that Mr. Coon
14    did during that trip?
15 A  No, sir.
16 Q  But you had confidence enough in Mr. Coon to let
17    your daughter go to Greenville in his private car?
18 A  Yes, sir. I trusted Mr. Coon.
19 Q  Okay. Did any of your other children ever drive
20    to places with Mr. Coon in his private vehicle?
21 A  No, sir.
22 Q  Did Jessica ever go any other place with Mr. Coon
23    other than to Greenville?

Page 67

1  A  The only -- from school. After school, Mr. Coon
2     would bring Justin and -- Justin and Jessica home
3     after band practice.
4  Q  Did Jessica ever go to Florida with Mr. Coon?
5  A  Mr. Coon asked Jessica to go to Florida, but she
6     refused to.
7  Q  When did he ask her to go?
8  A  It was when Mr. Coon and Blake Faulkner were going
9     to Florida.
10 Q  Okay. Did Mr. Coon ever take any of your other
11    children to anyplace like a lake or Greenville or
12    any other place unrelated to a band trip?
13 A  No, sir.
14 Q  Do you have a computer in your home?
15 A  Yes, sir.
16 Q  Would Justin or Jessica or the children have
17    access to your computer?
18 A  Yes, sir.
19 Q  Where is the computer kept in your home?
20 A  Each one of our kids have a computer.
21 Q  Justin had a computer?
22 A  Justin had a computer.
23 Q  Have you reviewed Justin's computer to see if

Page 68

1     there is any communication between Justin and
2     Mr. Coon on his computer?
3  A  Yes -- yes, sir.
4  Q  Was there communication?
5  A  Yes, sir.
6  Q  Did you turn the e-mail communication over to your
7     attorneys?
8  A  They couldn't find any -- they couldn't bring
9     anything up on the conversations between Mr. Coon
10    and Justin, because it was on Yahoo.
11 Q  So, there was no information that you could
12    produce from Justin's computer?
13 A  Uhm, I -- no, sir.
14 Q  Did you check Jessica's computer to see if there
15    was anything from Mr. Coon to Jessica or from
16    Jessica to Mr. Coon?
17 A  Jessica would talk to Mr. Coon.
18 Q  But on her computer, did you check to see if there
19    is any communication between Jessica and Mr. Coon
20    on a computer?
21 A  I -- I can't -- I don't know. I mean, be more
22    specific. Explain yourself.
23 Q  Jessica has a computer; correct?

Page 69

1  A  Yes, sir.
2  Q  Of her own?
3  A  Yes, sir.
4  Q  Did she communicate with Mr. Coon on her computer?
5  A  Yes, sir.
6  Q  Did you try to retrieve messages from Coon to her
7     and from her to Coon?
8  A  No, sir, because I would -- I mean, I would go
9     over and watch them when they were talking to
10    Mr. Coon.
11 Q  So, during the 2004-2005 school year when they
12    were on their computers, whether it was Justin on
13    his computer or Jessica, you say you were
14    observing what was being communicated?
15 A  Yes, sir.
16 Q  And you never saw anything inappropriate?
17 A  No, sir.
18 Q  Did the district attorney analyze information that
19    was on the computer?
20 A  Be more --
21 Q  As the district attorney was investigating
22    allegations that Mr. Coon had abused Justin, did
23    they look at any computer in your home?

Page 70

1   A   Yes, sir.
2   Q   Did they do an analysis?
3   A   Yes, sir.
4   Q   Did they prepare a report?
5   A   Yes, sir.
6   Q   Did they find communication between members of
7       your family on you all's computers with Mr. Coon?
8   A   I don't know. The only thing that they found on
9       the computer was gay pornography.
10  Q   Was pornography?
11  A   Yes, sir.
12  Q   Was that pornography generated by Mr. Coon, or
13      what? Do you know the source of the pornography?
14  A   Gay pornography.
15  Q   Huh?
16  A   It was gay pornography. I mean, what do you mean
17      by "the source"?
18  Q   On whose computer was the gay pornography?
19  A   On Justin's computer.
20  Q   Could they determine whether Justin had found that
21      on the Internet, or had that been sent to him?
22  A   I don't know.
23  Q   Have you seen the district attorney's analysis of

Page 71

1       the findings of what was on the computer?
2   A   The only knowledge I have on Justin's computer was
3       Mr. Bradbury told me that they found gay
4       pornography on Justin's computer.
5   Q   What is Misty Hubbard's position?
6   A   She is -- I --
7   Q   Is she with DHR?
8   A   She is with DHR. But she is not with DHR right
9       now -- I mean, she got her job changed. She is
10      with something else with the Human Resources.
11  Q   All right. She called you in June of 2005 about
12      the cell phone?
13  A   Yes, sir.
14  Q   Did you know her before she called you?
15  A   No, sir.
16  Q   So, you didn't know who she was when she called
17      you?
18  A   No, sir. I did not know why I was getting a phone
19      call from DHR.
20  Q   And you had never had any dealings with
21      Ms. Hubbard before then?
22  A   No, sir.
23  Q   Have you had dealings with her since the June of

Page 72

1       2005 conversation?
2   A   The only dealings I had with her is when
3       Ms. Watson and Misty Hubbard did the interview
4       with Justin.
5   Q   Who is Denise McCloud?
6   A   She is one of the twins' mom -- Jessica and
7       Jennifer Thrash's mother.
8   Q   Have you had discussions with her about Mr. Coon?
9   A   Yes.
10  Q   What have you discussed with Ms. McCloud about
11      Charles Coon?
12  A   About Blake Faulkner.
13  Q   And what did you discuss?
14  A   That Blake Faulkner was sexually abused by
15      Mr. Coon.
16  Q   Did she have any knowledge about that?
17  A   She got information from Blake's daddy.
18  Q   Did she have any information about what Charles
19      Coon had done to Justin?
20  A   I mentioned it to her.
21  Q   But did she have any independent information --
22  A   No, sir.
23  Q   -- other than what you told her?

Page 73

1   A   No, sir.
2   Q   Have you talked to any other band parents about
3       Charles Coon and what happened to Justin?
4   A   No, sir.
5   Q   Have any band parents, since June of 2005, come
6       forward and told you that they suspected Mr. Coon
7       was up to -- was abusing the children?
8   A   No, sir.
9   Q   No band parent has told you that?
10  A   Not that I recall.
11  Q   Okay. I want to make sure that I have got on the
12      Record a pretty clear statement. So, I want to
13      review the entire year of 2004-2005 school year.
14      In August of 2004, the first month of school,
15      Justin was participating in the band, wasn't he?
16  A   Yes, sir.
17  Q   During the month of August, did you have any
18      suspicion that Charles Coon was abusing Justin in
19      any way?
20  A   No, sir.
21  Q   And during the month of August, did you ever
22      complain to anyone about Charles Coon and his
23      behavior towards your son and for any reason?

Page 74

1  A  No, sir.
2  Q  In September, Justin was in the band at Pike
3     County High School, wasn't he?
4  A  Yes, sir.
5  Q  Under the supervision of Charles Coon?
6  A  Yes, sir.
7  Q  Did you have any reason to believe in September
8     that Charles Coon was abusing Justin?
9  A  No, sir.
10 Q  If I ask you the same question for October,
11    November, December, January, February, March,
12    April, and May; during those months of 2004-2005,
13    did you have any reason to suspect that Charles
14    Coon was abusing Justin?
15 A  No, sir.
16 Q  And during those months, since you had no reason
17    to suspect that Charles Coon was abusing Justin,
18    you didn't complain in any form or fashion to any
19    employee of the Pike County Board of Education,
20    did you?
21 A  No, sir. The only thing I felt funny about is
22    when he was taking him off campus and riding
23    during break. Those 15 minutes from 9:15 to 9:35.

Page 75

1     I mean, I thought I trusted that man. I don't
2     know --
3  Q  But you didn't share that concern with anyone;
4     correct? No other adult did you talk to about
5     that?
6  A  No, sir.
7  Q  Are you aware that Charles Coon retired as an
8     employee from the Pike County school system in May
9     of 2005?
10       MS. DePAOLA: Object to the form. I --
11 Q  Are you aware that he retired in May?
12       MS. DePAOLA: Object to the form.
13       That's inaccurate.
14 BY MR. SWEENEY
15 Q  Are you aware of that?
16 A  He mentioned at the band banquet that he was
17    retiring.
18 Q  All right. So, you knew that he was retiring at
19    the end of May from his employment with the Pike
20    County school system?
21       MS. DePAOLA: Object to the form. It
22       doesn't accurately reflect --
23       MR. SWEENEY: Just let her answer. You

Page 76

1     can object, Susan.
2  Q  Did you know that?
3        MS. DePAOLA: Well, I mean, she doesn't
4        have to agree. You're stating facts
5        that are not exactly accurate.
6        MR. SWEENEY: I'm saying, did you know
7        that?
8        MS. DePAOLA: You're not being accurate?
9  A  I don't --
10 Q  Did you know Charles Coon submitted his
11    resignation from employment with the school system
12    in May of 2005?
13 A  No, sir.
14 Q  You didn't know that?
15 A  No, sir.
16 Q  What did he say at the banquet?
17 A  He was retiring, and he was going to spend time
18    with his son.
19 Q  When was the banquet?
20 A  It was in May of 2005.
21 Q  And so I'm clear and the Record is clear: Prior
22    to June of 2005, you never shared any concern
23    about Charles Coon of any type, any nature with

Page 77

1     Mark Bazzell? Prior to June of 2005, you never
2     brought any complaint or concern to Superintendent
3     Mark Bazzell; is that right?
4  A  I don't -- I mean, I don't understand. Explain
5     yourself. I mean --
6  Q  Did you ever bring any concern to Mark Bazzell,
7     who is sitting next to me, prior to June of 2005
8     about Charles Coon?
9  A  I don't recall. I --
10 Q  Well, you would recall talking to the
11    Superintendent of the Pike County Board of
12    Education, wouldn't you?
13 A  Yes, sir.
14 Q  Do you recall talking to Mark Bazzell about
15    anything prior to June of 2005?
16 A  Yes, sir.
17 Q  What would you have talked to him about?
18 A  Other personal issues.
19 Q  But did they have anything to do with Charles Coon
20    or Justin?
21 A  No, sir.
22 Q  So, with regard to Charles Coon and Justin and
23    what Charles Coon might or might not be doing with

Page 78

1   Justin, you never shared any concerns with Mark
2   Bazzell?
3   A   No, sir.
4   Q   Prior to June of 2005; correct?
5       And if I ask you the same question concerning
6   Terry Casey: Did you ever share any concerns with
7   Terry Casey about Charles Coon and what he was
8   doing or not doing with Justin?
9   A   No, sir.
10  Q   Same question concerning Buddy Pryon. Did you
11  ever share any concerns with him about Charles
12  Coon and what he might be doing or was not doing
13  concerning Justin?
14  A   No, sir.
15  Q   Same question concerning Robert McDaniel? Did you
16  ever come to Robert McDaniel with any complaint or
17  concern about conduct or behavior of Charles Coon
18  prior to June 2005?
19  A   No, sir.
20  Q   Have you ever brought any concern or complaint
21  about Charles Coon to any of those people;
22  Mr. Bazzell, Casey, Pryon, or McDaniel, since June
23  of 2005, other than this complaint?

Page 79

1   A   No, sir.
2   Q   Now, you mentioned that Charles Coon would
3   sometimes drive Justin from school during school.
4   Did you say something to that effect?
5   A   Yes, sir.
6   Q   All right. Explain that. What do you believe
7   Mr. Coon would do at school in driving Justin?
8   A   There was on occasions, I saw Mr. Coon -- I was in
9   the office, and Mr. Coon would drive up with
10  Justin in the vehicle. And I asked Justin why
11  were you in the car? And he said, Mr. Coon was
12  just bringing me from the band room to the office.
13  Q   How far away is that? How far is the band room to
14  the office?
15  A   I -- I don't know. I can't give you a distance.
16  I don't know.
17  Q   How many times did you see that happen where you
18  were in the office, and you would see Coon bring
19  Justin to the office?
20  A   Four times.
21  Q   Huh?
22  A   Four times.
23  Q   On those occasions, were you in the office waiting

Page 80

1   for Justin to take him home?
2   A   No. I was fixing to bring something up to him,
3   because he would call down at the band room and
4   say, mama, can you bring me something that he
5   needed.
6   Q   So, you would come to the school?
7   A   Yes, sir.
8   Q   With something for Justin?
9   A   Yes, sir.
10  Q   And then Charles Coon would drive him from the
11  band room up to the office to meet you?
12  A   Yes, sir.
13  Q   So, as far as you knew, Mr. Coon knew that you
14  were there, and he was driving Justin to the
15  office to meet you?
16  A   I don't know if Mr. Coon knew I was up there at
17  the office waiting for something.
18  Q   Well, when Justin would get out of Mr. Coon's car
19  when you had brought something for him, would he
20  then return to Mr. Coon's car and drive back to
21  the band room?
22  A   No. At that time, the bell had rung, and he had
23  to get to class.

Page 81

1   Q   Okay. Did you accept Justin's explanation that
2   Coon was just driving him there to accommodate
3   him?
4   A   Yes, sir.
5   Q   And so you didn't have any real concerns at the
6   time?
7   A   No, because I trusted Mr. Coon.
8   Q   Okay. On any other occasion, do you know whether
9   Mr. Coon drove Justin from the band room, during
10  the school hours, to anyplace? I mean, you saw
11  him four times. But do you have documents or
12  reports from any other source that Coon ever drove
13  Justin off campus during school hours?
14  A   No, sir.
15  Q   Do you have any other -- any information of any
16  other inappropriate conduct or conduct that gave
17  you concern between Charles Coon and Justin that
18  would happen during school hours?
19      MS. DePAOLA: Besides what she testified
20      to earlier in the day?
21  Q   Other than driving from the band room to meet you
22  at the office, did Coon ever do anything else --
23  you said he fondled him, according to Justin, at

Page 82

1   school. But did Coon ever engage in any other
2   conduct at school with Justin that you thought was
3   inappropriate?
4   A   He would go up -- he would get out of class to go
5       down to Mr. Coon's room during second period.
6   Q   Okay. How do you know that?
7   A   Because his teachers would let him out.
8   Q   How do you know that the teachers would let him?
9   A   Because Justin told me that a certain teacher
10      would let him out to go down there to take his
11      trumpet down there during class. Even though
12      break was fixing to be in five minutes, the
13      teacher would let Justin go down to the band room.
14  Q   Do you know what teacher did that?
15  A   Ms. Owens did it. She was his English teacher.
16  Q   Did any other teacher, to your knowledge?
17  A   Ms. Catrett would do it. After he finished his
18      work, she would let him go down to the band room.
19  Q   How do you know that Ms. Owens did it?
20  A   Because Justin got in trouble one time for going
21      down to the band room before the class was over.
22      He got sent to alternative school for six weeks.
23  Q   When did that happen?

Page 83

1   A   In 2000 -- 2004.
2   Q   During the 2003-2004 school year, or during the
3       2004-2005 --
4   A   2004-2005 school year.
5   Q   All right. So, he got in trouble for leaving
6       Ms. Owen's class and going to the band room?
7   A   Yes, sir.
8   Q   So, he wasn't supposed to do that?
9   A   He wasn't supposed to be let out of class.
10  Q   Right. But he wasn't supposed to leave class,
11      either, and he was disciplined for that?
12  A   Justin got in trouble. Two boys got him in
13      trouble.
14  Q   Okay. Have you ever seen any written
15      documentation that Ms. Owens would let him out of
16      class?
17  A   It would be in his agenda.
18  Q   But have you ever seen anything in his agenda that
19      indicated he was being released from her class?
20  A   Yes, sir.
21  Q   How many times did that happen?
22  A   It happened -- I mean, out of Ms. Owens class?
23  Q   Uh-huh.

Page 84

1   A   It may -- I don't recall.
2   Q   Do you have his agenda?
3   A   No, sir, I don't.
4   Q   Do your attorneys have the agenda?
5   A   No, sir.
6   Q   What's happened to the agenda?
7   A   Justin's done thrown it away.
8   Q   Do you have any documents that -- evidence,
9       that -- who was the other teacher, Mrs. K?
10  A   Ms. Catrett.
11  Q   -- that she let him out of class?
12  A   Yes, sir.
13  Q   What documentary evidence do you have?
14  A   It would be in the agenda.
15  Q   Do you have the agenda that shows that?
16  A   No, I don't. No, sir.
17  Q   Do you know how many times you saw that happen in
18      the agenda?
19  A   No, sir.
20  Q   Did any other teacher let him out of class to go
21      to the band room?
22  A   Yes, sir.
23  Q   Who?

Page 85

1   A   His history teacher would let him go.
2   Q   The what?
3   A   His history teacher would let him go.
4   Q   Who was the history teacher?
5   A   Coach Suber.
6   Q   Do you know how many times?
7   A   No, sir.
8   Q   So, as far as you know, there is no documentary
9       evidence that would support your statement that
10      these teachers let Justin leave class to go to the
11      band room? That is, you don't have any such
12      documentation?
13  A   The one document -- on Ms. Owens, he got in
14      trouble for leaving that class.
15  Q   But in terms of the agenda, no agenda still exists
16      that showed that that took place; as far as you
17      know?
18  A   As far as -- as far as I know, no.
19  Q   Did Justin come to you and tell you that he was
20      leaving Ms. Owen's class or the other teachers'
21      class and going to the band room?
22  A   No, sir.
23  Q   So, you didn't know that?

Page 86

1  A   No, sir.
2  Q   When did you find out about that?
3  A   Through his agendas. Jessie would tell me.
4  Q   Well, does an agenda show when that happens on the
5      day it happens?
6  A   Yes, sir.
7  Q   But you didn't see that when it happened on the
8      agenda? You reviewed that sometime later?
9  A   There would be -- explain yourself -- I mean,
10     because on the agenda, the teacher would have to
11     write the time --
12 Q   When would you review the agenda and see that he
13     was leaving one teacher's class to go to the band
14     room? When would you have done that? From time
15     to time --
16 A   From time to time --
17 A   -- during the 2004 --
18 A   -- 2004-2005.
19 Q   And did you ever ask Justin why he was doing that?
20 A   Yes, sir.
21 Q   What would he say?
22 A   He said he had to go down and see Mr. Coon. He
23     had to go talk to Mr. Coon.

Page 87

1  Q   Did you inquire further why that was necessary?
2  A   I've asked Justin. He said he needed to find out
3      if they had band practice. Or if band practice --
4      when band practice was.
5  Q   So, as far as you could tell, it was a legitimate
6      reason to go from the class to the band room?
7  A   Yes, sir.
8  Q   I mean, at the time you were learning of this
9      information, you thought it sounded innocent? It
10     wasn't of concern?
11 A   Yes, sir.
12 Q   And so you didn't report that to anybody?
13 A   No, sir.
14 Q   Of being concerned?
15     Justin is a special education student, isn't
16     he?
17 A   Yes, sir.
18 Q   So, he has an Individualized Education Plan?
19 A   Yes, sir.
20 Q   Did you meet from time to time with the school
21     system as a -- as his IEP was being developed?
22 A   Met once a year.
23 Q   And when you would meet with the school officials

Page 88

1      at the IEP committee meeting, would you share with
2      them any concerns that you would have about Justin
3      or his program or what was going on at the school?
4  A   No, sir.
5  Q   You were invited as his parent --
6  A   Yes, sir.
7  Q   -- to attend the IEPs; correct?
8  A   Yes, sir.
9  Q   Mr. Reed didn't attend those IEPs. You were the
10     only parent that would attend them; correct?
11 A   Yes, sir.
12 Q   And at the IEPs that you attended, did you ever
13     bring up any concern about Charles Coon?
14 A   No, sir. I was mostly there for what they were
15     fixing to do for Justin for the next school year.
16 Q   All right. But --
17 A   I wasn't --
18 Q   But you would listen to what they were proposing,
19     wouldn't you?
20 A   What they were going to propose for Justin for
21     next year.
22 Q   And if you had concern about it, you would have
23     shared that as a concerned parent, wouldn't you?

Page 89

1  A   Yes, sir.
2  Q   All right. So, as far as the IEP committee is
3      concerned for the -- and the plan for the
4      2003-2004 school year, you didn't raise any
5      objections or concerns with the IEP committee
6      about Justin's program, did you?
7  A   No, sir.
8  Q   As far as you were concerned, they were providing
9      an appropriate education for Justin?
10 A   Yes, sir.
11 Q   Now, for the 2004-2005 school year you attended an
12     IEP meeting, didn't you?
13 A   Yes, sir.
14 Q   And as far as you were concerned, the school
15     system was providing an appropriate educational
16     program for Justin?
17 A   Yes, sir. Until I had to take him out of Algebra,
18     I. I had a conflict with Mr. McDaniel.
19     Mr. McDaniel told me that it was too late to take
20     Justin out of Algebra, I and put him in Math, III.
21     And that we had to do a revised -- have another
22     IEP.
23 Q   Do you remember attending an IEP on May 25, 2005;

Page 90

1    that is, the end of the 2004-2005 school year for
2    Justin?
3  A    Yes, sir.
4  Q    At that IEP meeting, did you bring up any concerns
5        about Charles Coon?
6  A    No, sir.
7  Q    Or any concerns about Justin's program that had
8        taken place for the 2004-2005 school year?
9  A    Not in May.
10                (Whereupon, Defendant's Exhibit 3
11                 was marked for identification and
12                 is attached hereto.)
13  BY MR. SWEENEY
14  Q    Let me show you what's been marked for
15        identification as Defendant's Exhibit 3.  Do you
16        see two thirds of the way down signature of
17        Mrs. Reed and the date of 2/16/05?
18  A    Yes, sir.
19  Q    Is that your signature?
20  A    Yes, sir.
21  Q    Did you agree to meet with the IEP committee on
22        2/22/05 as shown on top of that page?  Right up
23        here, I believe.

Page 91

1  A    Yes, sir.
2  Q    Two or three pages into that document, Defendant's
3        3, there is a page that's styled, Individual
4        Education Program, and it shows midway down an
5        amendment on 2/22/05.  That's it.
6             MS. DePAOLA:  Stop.
7  Q    Do you see that amendment?  Was that the change of
8        math that you talked about?
9  A    Yes, sir.
10  Q    And --
11  A    Algebra, II, Resource Math.
12  Q    Do you see your signature, or initials, indicating
13        that change on February 22nd, '05?
14  A    Yes, sir.  Yes, sir.
15  Q    So, you attended that meeting, didn't you --
16  A    Yes, sir.
17  Q    -- where you were discussing the math?
18        On that occasion, when you were meeting with
19        the people at the IEP, did you have any concerns
20        that you shared with them about Charles Coon?
21  A    No, sir.
22  Q    So, if his security or privacy, or if he was being
23        abused in any way that had come to your attention

Page 92

1    or suspicion or concern, you could have shared
2    that with the officials that you met with at
3    school on February 22nd, 2005, couldn't you?
4  A    Yes, sir.
5  Q    A couple of pages further, there is a signature
6        page with a date of 5/13/04.  Would that have been
7        the annual meeting to review his IEP for the next
8        school year?  Do you see a 5/13 date?
9             MS. DePAOLA:  What was the question,
10                Donald?
11  Q    Do you see those dates, 5/13, and your signature,
12        and by the side, amended 2/22?
13  A    Yes, sir.
14  Q    Okay.  And at that meeting, as we have just gone
15        over, neither at 5/13/04 or when it was amended at
16        2/22; at neither of those IEP meetings did you
17        raise any concerns about Charles Coon?
18  A    No, sir.
19                (Whereupon, Defendant's Exhibit 4
20                 was marked for identification and
21                 is attached hereto.)
22  BY MR. SWEENEY
23  Q    Let me show you Defendant's Exhibit 4.  Do you see

Page 93

1    on the first page a caption, Notice of Proposed
2    Meeting?
3  A    Yes, sir.
4  Q    Do you see signature of Ms. Reed dated 5/6/05?
5  A    Yes, sir.
6  Q    Is that your signature?
7  A    Yes, sir.
8  Q    And did that propose an IEP meeting on May 25th,
9        2005 at 10:00 a.m. at Pike County High School?
10  A    Yes, sir.
11  Q    Thumbing to close to the end of that IEP, do you
12        see your signature beside the date of 5/25/2005?
13  A    Yes, sir.
14  Q    Do you see the date of 5/25/2005 is typed, and to
15        the right of that, do you see the signature of
16        Elizabeth Reed?
17  A    Yes, sir.
18  Q    Is that your signature?
19  A    Yes, sir.
20  Q    So, on May 25, 2005, you attended an IEP meeting?
21  A    Yes, sir.
22  Q    And that was essentially at the end of the
23        2004-2005 school year?

Page 94

1  A  Yes, sir.
2  Q  And at that time, I think as we previously
3     discussed, you had no reason to believe that
4     Charles Coon was abusing Justin?
5  A  No, sir.
6  Q  And you did not bring up any concerns about how
7     Pike County was educating your child or providing
8     an appropriate environment for Justin during the
9     2004-2005 school year at this meeting?
10 A  No, sir.
11 Q  And it was not until after this meeting sometime
12    in June that the first concern was raised, or
13    brought to your attention about Charles Coon?
14 A  Yes, sir.
15 Q  A minute ago, I think I made reference to the
16    complaint that we have previously identified,
17    Defendant's Exhibit 2. Let me ask you some
18    questions about that.
19        MR. SWEENEY: Do you think the food
20        might be here? Why don't we take
21        just a minute, because I'm going to
22        go over the complaint. Why don't we
23        take a short break and get something

Page 95

1        to eat?
2        (Lunch recess.)
3        MR. SWEENEY: Back on the Record.
4  BY MR. SWEENEY:
5  Q  Ms. Reed, I'm going to spend some time asking
6     questions on the complaint, so that I make sure
7     that I'm clear what your contentions are. To the
8     extent that my questions suggest a legal
9     interpretation, your lawyer will object, and I
10    will defer to that. But I want your information
11    about this.
12        You're suing the Pike County Board of
13    Education on the style. And I have asked earlier
14    if you knew the names of the Board members. And
15    you said you could name one Board member. And am
16    I correct that you do not know the other members
17    of the Board?
18 A  Yes, sir.
19 Q  And you have had no discussions with them about
20    this case?
21 A  No, sir.
22 Q  Prior to June of 2005, do you have any knowledge
23    or information that any member of the Pike County

Page 96

1     Board of Education knew Charles Coon, or knew of
2     him, or knew what he was doing?
3        MS. DePAOLA: Well, object. That's
4        obviously a compound question.
5  Q  Do you know if any member of the Pike County Board
6     of Education knew Charles Coon prior to June of
7     2005?
8  A  Yes, sir -- I don't know. I'm confused. I mean,
9     explain -- I mean -- I --
10 Q  Let me structure it this way: It's possible that
11    some member of the Pike County Board of Education
12    might have known Charles Coon prior to June of
13    2005 when you learned about the possibility of
14    abuse by Coon of your son. It's possible that
15    some member of the Board might have known Coon.
16    Would you agree with that?
17 A  Yes -- yes, sir.
18 Q  Okay. Beyond that possibility, do you know if any
19    member of the Pike County Board knew Charles Coon
20    prior to June of 2005?
21        MS. ALLEN: Did you know for sure if any
22        of them knew?
23 A  No, sir.

Page 97

1  Q  Do you know or do you have information that anyone
2     prior to June of 2005 had ever come to any of the
3     members of the Pike County Board of Education with
4     any concern about Charles Coon?
5  A  No, sir.
6  Q  What are you contending that the Board members did
7     or did not do with regard to your son, Justin?
8     You have sued the Pike County Board. And the Pike
9     County Board is made up of six members --
10        MS. DePAOLA: Paragraph 4.
11 Q  Let me rephrase it, Ms. Reed: The Pike County
12    Board of Education is made up of six Board
13    members. And you have sued them. What are you
14    contending that those six Board members did in
15    violation of your son's rights?
16        MS. DePAOLA: Object to the form. The
17        complaint speaks for itself.
18 Q  What are you contending?
19        If you don't know, just tell me.
20 A  I don't know.
21 Q  And so, rephrasing the question: In what manner
22    or way did any of the six members of the Board
23    violate Justin's rights?

**Page 98**

1      MS. DePAOLA: What's the question, now?

2  Q   In what manner or way did any of the six Board

3      members, singly or severally, violate rights of

4      Justin Reed?

5  A   When he got in trouble one time in 2004, there was

6      two other boys involved, but the other boys did

7      not get in trouble. Justin got in trouble.

8  Q   Did that ever come to the attention of the Pike

9      County Board of Education?

10 A   Justin had a hearing, because Justin got caught

11     with one of those -- what you call -- Swiss Army

12     knives. And two other boys were skipping, too,

13     along with Justin. But the other two boys did not

14     get in trouble. Justin had to go in front of the

15     Board. That's when he had to go to alternative

16     school.

17 Q   But with regard to Charles Coon, are you

18     contending that the six members of the Pike County

19     Board had any knowledge any kind concerning what

20     Charles Coon did to Justin prior to June of 2005?

21     MS. DePAOLA: Object to the form.

22 A   Uhm --

23 Q   Are you?

**Page 99**

1  A   No, sir.

2  Q   Okay. Concerning Mark Bazzell, Superintendent,

3      what are you contending that Mr. Bazzell, as

4      Superintendent of the Pike County Board of

5      Education, did in violation of Justin's rights?

6      MS. DePAOLA: Object to the form. The

7      complaint speaks for itself.

8  A   That Mr. Bazzell did not -- was not -- should have

9      been aware of what's going on in school campus.

10     You know, like if a student is leaving school

11     campus with a teacher, I mean, one of the

12     principals or something like that should have said

13     something to Mr. Bazzell, said there is something

14     going on with Mr. Coon and Justin, which should

15     have been investigated, which it was not

16     investigated. And hiring and training of the

17     teachers should be more -- more thoroughly checked

18     on the backgrounds.

19 Q   But do you know what Mr. Bazzell did as

20     Superintendent in order to train teachers about

21     sexual abuse?

22 A   No, sir.

23 Q   Do you know what information was ever given to

**Page 100**

1      Mr. Bazzell about Charles Coon and your son?

2  A   No, sir.

3  Q   Are you alleging that Mr. Bazzell had information

4      that Charles Coon was abusing Justin prior to

5      June of 2005?

6  A   No, sir.

7  Q   You certainly hadn't brought any such information

8      to Mr. Bazzell's attention, had you?

9  A   No, sir.

10 Q   All right. You know that he is the Superintendent

11     of the Board?

12 A   Yes, sir.

13 Q   You have sued him in his individual capacity. Do

14     you know what the job description is of the

15     Superintendent? Do you know what his duties and

16     responsibilities are as the Superintendent?

17 A   Yes, sir.

18 Q   All right. Aside from his duties and

19     responsibilities as the Superintendent, what are

20     you contending he did in his individual capacity,

21     separate and apart from any official duty as

22     Superintendent, that violated the rights of

23     Justin?

**Page 101**

1      MS. DePAOLA: Object to the form. The

2      complaint speaks for itself.

3  A   I don't know.

4  Q   So, in terms of what information you can share

5      with me why you're suing Mr. Bazzell in his

6      individual capacity, you have no information that

7      you can share with me today?

8  A   Not that I can recall.

9      MR. SWEENEY: And just so that the

10     Record is clear from your

11     communication, Ms. Allen and

12     Ms. DePaola, I have indicated that

13     if at the end of the discovery you

14     don't dismiss the lawsuit against

15     these Defendants in their individual

16     capacity, I'm going to ask for

17     sanctions if there is no basis for

18     that. So, I want to make sure that

19     you and your client are given every

20     opportunity to support what these

21     people did beyond the line and scope

22     of their employment.

23     MS. DePAOLA: Actually, what you did was

Page 102

1       insisted that we dismiss them before
2       we even had the first deposition.
3       MR. SWEENEY: I did.
4       MS. DePAOLA: And we declined to do
5       that.
6       MR. SWEENEY: You did that.
7       MS. DePAOLA: And we will reconsider all
8       of these at the end of the
9       deposition, but don't
10      mischaracterize what you told us.
11      MR. SWEENEY: I want to make sure that
12      we're clear in that regard.
13      MS. DePAOLA: I'm clear. I'm clear.
14  BY MR. SWEENEY
15  Q   With regard to Terry Casey, are you contending
16      that Terry Casey, as principal of Pike County High
17      School, had knowledge about what Charles Coon was
18      doing to Justin prior to June of 2005?
19      MS. DePAOLA: Object to the form.
20  A   I don't know.
21  Q   You've never discussed the contentions about what
22      appears in your complaint with Terry Casey, have
23      you?

Page 103

1   A   Mr. Casey -- I mean, should be -- he's responsible
2       for those students on campus. And if there is
3       anything suspicious going on, he should be aware
4       of it and have investigation. I mean --
5   Q   And if there is nothing brought to his attention
6       of a suspicious nature, are you still contending
7       that he should have done something?
8   A   If he's -- he should have had suspicions of Justin
9       going -- I mean, riding in the vehicle with
10      Mr. Coon. He should have investigated on that.
11  Q   All right. You had that knowledge that Justin was
12      riding with Mr. Coon in his vehicle, didn't you?
13  A   Yes, sir.
14  Q   And you didn't have concerns that that was
15      happening, did you?
16  A   Not at first I did not know it was happening.
17  Q   And you didn't bring that concern to Mr. Casey's
18      attention, did you?
19  A   I mean, there would --
20  Q   Did you bring that concern to Mr. --
21      MS. DePAOLA: Let her finish her
22      questions, Donald. She's talking,
23      and you're interrupting her.

Page 104

1   A   I mean, the principal, Mr. Casey, walked around
2       campus during break. He should have -- he
3       probably seen Justin get out of the vehicle with
4       Coon.
5   Q   Do you have any information that Mr. Casey knew
6       that Charles Coon was transporting Justin in his
7       private vehicle?
8   A   No, sir.
9   Q   So, you're suing him without knowing that he had
10      that information?
11  A   I mean, him being the principal of that school,
12      should -- he should have the responsibility of,
13      you know, checking on all the teachers to make
14      sure it was going on, and the activities and the
15      supervision of the students.
16  Q   Okay. But beyond what he should have known, do
17      you have any basis, any facts to support a
18      contention that Terry Casey knew that Charles Coon
19      was abusing Justin?
20  A   No, sir.
21  Q   Do you know when Terry Casey retired as high
22      school principal?
23  A   Yes, sir.

Page 105

1   Q   When?
2   A   December, 2004.
3   Q   So, Terry Casey wasn't there for the entire second
4       semester of the 2005 school year?
5   A   Right. Yes, sir.
6   Q   Do you know, or have an idea of what the job
7       description is of a high school principal; that
8       is, what his duties and responsibilities are?
9   A   To hire high -- I mean, quality teachers and, you
10      know, make sure the teachers get workshops and see
11      that the school is run in the manner that a school
12      should be run.
13  Q   When Mr. Coon was hired, do you know if Terry
14      Casey was the principal at the time?
15  A   Yes, sir.
16  Q   Do you know if Mr. Coon submitted references and
17      letters of support for his application?
18  A   No, sir.
19  Q   Have you reviewed Mr. Coon's application for
20      employment with the Pike County Board of
21      Education?
22  A   No, sir.
23  Q   Do you know what Mr. Casey considered when he

Page 106

1    recommended that Mr. Coon be hired?
2  A  No, sir.
3  Q  Do you know of any problem that Mr. Coon had in
4     any school system prior to his employment at the
5     Pike County High School as the band director?
6  A  No, sir.
7  Q  Have you ever heard that there was ever a
8     complaint of sexual abuse against Mr. Coon prior
9     to his coming to the Pike County Board of
10    Education?
11 A  No, sir.
12 Q  I asked you if you knew in general terms what a
13    principal does, what Mr. Casey did as principal of
14    the Pike County High School. Aside from that,
15    you're suing Mr. Casey in his individual capacity,
16    separate and apart from his employment as a
17    principal. What are you contending he did in his
18    individual capacity; that is, as an individual
19    outside of the school system outside of his
20    employment with the Pike County Board of
21    Education?
22         MS. DePAOLA: Object to the form.
23 A  I don't know.

Page 107

1  Q  You have no information, as you testify today,
2     about information that would support a complaint
3     against Mr. Casey in his individual capacity; is
4     that correct?
5         MS. DePAOLA: She said "I don't know".
6         MR. SWEENEY: Uh-huh.
7  Q  Is there any information that you can share with
8     me today that would support a complaint that
9     Mr. Casey in his individual capacity violated the
10    rights of your son or you his parent?
11        MS. DePAOLA: Object to the form. These
12            are legal issues.
13 Q  Do you have any information you can share with me?
14 A  I don't know.
15 Q  Buddy Pryon. Was he the interim principal at Pike
16    County High School that took over after Mr. Casey
17    retired?
18 A  Yes, sir.
19 Q  You were suing him in his capacity as the
20    principal at Pike County High School. What are
21    you contending he did during that period from
22    January of 2005 to May of 2005 that violated
23    Justin's rights or your rights as Justin's

Page 108

1    parents?
2         MS. DePAOLA: Object to the form. The
3            complaint speaks for itself.
4  Q  What facts do you have to support a contention
5     that Mr. Pryon violated Justin's rights or your
6     rights as a parent during that roughly five-month
7     interval from January of 2005 to May of 2005?
8  A  He violated -- they should have done an
9     investigation, because there was a time Justin got
10    in trouble in, I think it was, April -- April or
11    May of 2005, where me, Mr. Pryon, and Justin had a
12    meeting in his office. And we had a thing about
13    Justin broke the band room window. And Justin
14    called Mr. Coon from down in the band room on
15    Mr. Coon's cell phone. But when we had the
16    meeting with Mr. Pryon, Mr. Pryon asked if
17    Justin's knew Mr. Coon's cell phone number. And
18    Justin said yes. So, he gave Mr. Pyron the cell
19    phone number. And Mr. Pyron called Mr. Coon. And
20    Mr. Coon denied giving Justin the phone number.
21    And Justin said Mr. Coon gave him the phone
22    number.
23       So, the things that Mr. Pryon violated, he

Page 109

1    should have done an investigation of how Justin
2    got Mr. Coon's cell phone number.
3  Q  Do you know what he did? Do you know what
4     Mr. Pryon did to follow up on that possibility?
5  A  He just -- the only thing I know that Mr. Pryon
6     did was ask Mr. Coon if he gave Justin his cell
7     phone number.
8  Q  That's all you know. Have you asked Mr. Pyron
9     what else he did to investigate that matter?
10 A  No, sir.
11 Q  Do you think the fact that a student has a
12    teacher's cell phone number is indicative of child
13    abuse?
14 A  I don't know.
15 Q  Weren't there a lot of occasions when your
16    children had to call Mr. Coon to find out about
17    band practices and communicate with him on the
18    telephone?
19 A  I don't know. I -- yes, sir.
20 Q  Yes, sir, they did have occasion to call Mr. Coon
21    to find out about band practices and schedules?
22 A  But that was on the computer.
23 Q  But I am asking you if they didn't have to call on

## Page 110

1   the telephone from time to time.
2   A   Yes, sir.
3   Q   You were at that meeting. And when you heard that
4       Justin had his cell phone, did you turn to
5       Mr. Pryon and say, that's suspicious; I want to
6       find out about it?
7   A   Justin had Mr. Coon's cell phone number. He did
8       not have his cell phone.
9   Q   I know. And you heard Justin give the cell phone
10      number to Mr. Pryon, right, at that meeting?
11  A   Yes, sir.
12  Q   When you heard that Justin had that information,
13      did you immediately become suspicious that that
14      was an alarming development?
15  A   Yes, sir.
16  Q   Well, if you were alarmed as a parent, what did
17      you say to Mr. Pryon? What did you ask him to do?
18  A   I didn't ask him to do anything, because it's
19      really not -- I mean, if they're suspicious of
20      something going on at the school -- Justin told
21      Mr. Pryon about the cell phone number, giving it
22      to Mr. Pryon. Mr. Pryon should have been
23      responsible investigating it further -- further

## Page 111

1   investigation.
2   Q   Well, are you a conscientious parent?
3   A   Yes, sir.
4   Q   And when concerns come to your attention about
5       your children, don't you follow through on those
6       concerns?
7   A   Yes, sir, but there was many others -- there is a
8       couple of other kids that had Mr. Coon's cell
9       phone.
10  Q   But at that meeting, if you had really been
11      concerned over the fact that Justin had Coon's
12      cell phone number, you would have shared that
13      concern with Mr. Pryon, wouldn't you?
14  A   But right then and there my concern at that point
15      was not that. It was that Justin wasn't the only
16      person that should have got in trouble that day.
17      We were having a meeting that day.
18  Q   But at any subsequent time, did you ever go back
19      to Mr. Pryon and say, I found it unusual that
20      Justin had Mr. Coon's cell phone number, and I
21      want to investigate that? Did you ever share
22      that concern with Mr. Pryon?
23  A   No, sir.

## Page 112

1   Q   Anything else that you can share with me that is
2       facts to support a contention that you should be
3       able to sue Mr. Pryon in his individual capacity?
4   A   No, sir.
5   Q   All right. Robert McDaniel. You're suing him as
6       assistant vice principal at Pike County High
7       School. What are you contending that he did in
8       his official capacity that violated Justin or your
9       rights?
10          MS. DePAOLA: Object to the form. The
11          complaint speaks for itself.
12  Q   What facts do you have to support a contention
13      that Robert McDaniel violated Justin's rights with
14      regard to Charles Coon or -- I mean, violated
15      Justin's rights with regard to Charles Coon's
16      behavior toward him?
17  A   I --
18          MS. DePAOLA: Same objection.
19  A   I don't know.
20  Q   Do you have any information from talking to
21      Mr. McDaniel or to anyone else that Mr. McDaniel
22      ever was told he should have concern or suspicion
23      about Charles Coon's conduct towards Justin?

## Page 113

1   A   No, sir.
2   Q   Beyond his official capacity as assistant
3       principal, do you have any facts you can share
4       with me to support why you're suing him in his
5       individual capacity?
6          MS. DePAOLA: Object to the form. It
7          requires legal analysis by this
8          witness.
9   Q   Do you have any facts you can support why you're
10      suing Mr. McDaniel in his individual capacity
11      separate and apart from his employment as
12      assistant principal?
13  A   I don't know.
14  Q   In paragraph 4 of your complaint, you indicate
15      that the Board has the responsibility to monitor
16      and investigate sexually inappropriate conduct.
17      On what basis are you asserting that the Board
18      members have the responsibility to engage in
19      investigations?
20  A   I don't know.
21  Q   In paragraph 5 you say, Mr. Bazzell, as
22      Superintendent, has the responsibility to develop
23      and implement policies and procedures to address

### Page 114

1  personal privacy and security of special education
2  students. Where have you found that
3  responsibility of the superintendent outlined, or
4  is that just contentions of your lawyers?
5  A   On the development of the special ed students -- I
6  mean, Justin, he's been going to Pike County for
7  ten years. And he has not progressed in his
8  education. He's still doing the same reading
9  level, and his I -- his IQ is still the same. It
10  has not progressed where, you know, if they hired
11  somebody -- a special ed student -- I mean, a
12  teacher, more qualified, then Justin would have
13  progressed.
14  Q   Well, are you suing Mr. Bazzell because of your
15  concerns about special education or because of
16  what Charles Coon did to him as sexual abuse?
17       MS. DePAOLA: Object to the form. The
18          complaint includes both.
19  Q   Which one are you suing him over?
20  A   I mean, I can't call -- I can't recall. I don't
21  know.
22  Q   Well, you attended IEP meetings for Justin, didn't
23  you?

### Page 115

1  A   Yes. And his IEP meetings -- every time he would
2  have an IEP meeting every year, he had not made no
3  progress.
4  Q   Did you sign the IEPs as approving each year, the
5  IEP plans, Individual Education Plans, for Justin
6  that was being proposed by the Pike County school
7  system?
8  A   Yes. But Justin did not make no progress in them.
9  Q   Well, if you had any concerns about the IEPs,
10  wasn't your opportunity to express those at the
11  IEP meetings?
12  A   Yeah, but at IEP meetings, not everybody was there
13  at the IEP meetings like they are supposed to be.
14  Q   Well, did you ever express any concerns to
15  Mr. Bazzell about the special education program
16  that Justin was getting at Pike County High
17  School?
18  A   Can you repeat the question?
19  Q   Sure. Did you ever express concern or share
20  complaints with Mr. Bazzell about Justin's special
21  education program and plan?
22  A   No, sir. I --
23  Q   Have you reviewed the sexual abuse policy that the

### Page 116

1  Pike County Board of Education had in place during
2  the 2004-2005 school year?
3  A   I do not recall.
4  Q   Do you know if under Mr. Bazzell's supervision as
5  Superintendent that the Board had a sexual abuse
6  policy for the Pike County Board of Education and
7  its schools?
8       MS. DePAOLA: Object to the form.
9  Q   Do you know whether they did?
10  A   I don't know.
11  Q   You haven't bothered to check to see if they have
12  a sexual abuse policy?
13  A   Yes, sir.
14  Q   Do you know whether Mr. Bazzell, as
15  Superintendent, has had inservice seminars and
16  training for his teachers regarding sexual abuse?
17  A   I don't know.
18  Q   Do you know if Mr. Coon ever attended inservice
19  seminars concerning sexual abuse while he was
20  employed with the Pike County school system?
21  A   I don't know.
22  Q   In paragraph 10, you mention that Charles Coon
23  pled guilty to crimes that he had been charged of.

### Page 117

1  Do you know if what he pled guilty to was abusing
2  Justin at your home as opposed to at school?
3  A   I don't know.
4  Q   Has that ever come to your attention; that what
5  Charles Coon plead guilty to was for conduct that
6  occurred at your home and not at school?
7       MS. DePAOLA: Object to the form.
8  Q   Do you know that? Have you ever heard that?
9  A   No, sir.
10  Q   But you do know based on what Jessica told you --
11  and I guess maybe Justin -- that Mr. Coon fondled
12  Justin at your home?
13  A   Jessica said that she saw Mr. Coon fondle Justin
14  at school and --
15  Q   But didn't you have information that Mr. Coon had
16  fondled Justin at your home? Didn't you share
17  that with me?
18  A   Yes, sir.
19  Q   So, at your home, where you're in charge of
20  supervision, Charles Coon sexually abused your
21  child?
22  A   Yes, sir.
23  Q   Do you find fault with yourself that you didn't

Page 118

1  prevent Charles Coon from sexually abusing your
2  child at your home?
3  A   There was times where we were there when Mr. Coon
4  was there. But I may have stepped outside for a
5  minute. And I don't know what happened, you know,
6  if I stepped outside. I trusted Mr. Coon in our
7  house.
8  Q   Well, why wouldn't it be fair to find you guilty
9  of improper supervision for Charles Coon abusing
10  Justin whether you were at your house or not?
11      MS. DePAOLA: Object to the form. I
12      didn't understand the question.
13  A   I don't understand --
14  Q   I mean, do you think it would be fair, Ms. Reed,
15  for you to be found at fault for what happened at
16  your house when you weren't there or for what you
17  don't know about?
18      MS. DePAOLA: Object to the form.
19  A   I don't know.
20  Q   Well, that wouldn't sound very fair, would it, if
21  someone blamed you for something that happened
22  that you didn't know about?
23  A   There was times I was not at home when Mr. Coon

Page 119

1  come to our house. I was watching my niece,
2  Jocie.
3  Q   But you had left Charles Coon at your house with
4  your children and went to do other things, didn't
5  you?
6  A   I take care of a multihandicapped daughter. But
7  no -- yes, I did check on Mr. Coon when he was
8  down there.
9  Q   And you knew of times when he was there at your
10  house without your supervision?
11  A   I was around when he was there. I mean, he was
12  not really under supervision -- I mean, he was
13  supervised with me being there. But I wasn't
14  there in the same room as him. I mean, I was in
15  the house. So, he was not unsupervised.
16  Q   Let me look at paragraph 25. You say beginning in
17  the academic year 2004-2005 the student's personal
18  privacy and security were repeatedly violated. I
19  asked you earlier when you believed Justin was
20  violated by Charles Coon. And I thought you said
21  you didn't know.
22  A   I said beginning -- I don't recall.
23  Q   So, with regard to 25, I understand you don't know

Page 120

1  when Charles Coon first violated Justin?
2      MS. DePAOLA: Object to the form.
3  Q   Or do you?
4  A   I don't know.
5  Q   With regard to 25, did Justin indicate to you that
6  Mr. Coon coerced him to engage in this sexually
7  inappropriate conduct?
8  A   I don't know. Alls I know is he took -- he went
9  off campus with Mr. Coon, because Justin would
10  say, I am not allowed to say what was talked about
11  when they left. It was hush-hush business between
12  Justin and Mr. Coon. It was like none of my
13  business what went on.
14  Q   Okay. But I was asking you about whether he was
15  coerced, forced --
16  A   I don't know.
17  Q   -- which is the language used in your complaint.
18  A   I don't know.
19  Q   But the reason that you know Coon drove Justin in
20  his car at school was because you saw him? That's
21  how you know that; correct?
22  A   Yes. And I -- and then somebody else told
23  Mr. Coon not to take Justin around in his vehicle.

Page 121

1  Q   But the reason you know it is because you saw him?
2  A   I saw him four times.
3  Q   And on those occasions, you never reported concern
4  to the school officials that you thought at that
5  time that that was inappropriate?
6  A   No, because I trusted Mr. Coon.
7  Q   On paragraph 29, you say the Defendants knowingly
8  failed to act with regard to what Coon was doing.
9  On what basis are you saying, for example, that
10  Mark Bazzell, the Superintendent, knew what was
11  going on but ignored it?
12  A   I don't know.
13  Q   Or Mr. Casey or Mr. Pryon or Mr. McDaniel; what
14  are you saying that was brought to their attention
15  that they ignored and failed to investigate?
16  A   I don't know.
17  Q   Page 38, you indicate that the Defendants had no
18  formal policy to address issues of body integrity,
19  personal security, and/or right to privacy. Have
20  you read the Pike County sexual abuse policy?
21      MS. DePAOLA: What paragraph are you
22      reading?
23      MR. SWEENEY: Huh?

Page 122

```
 1        MS. DePAOLA: Paragraph 38? Is that
 2           what you're reading? I can't tell
 3           what you're reading.
 4   BY MR. SWEENEY
 5   Q   Let me ask you to look at paragraph 38.
 6       Defendant's Board, Bazzell, Casey, Pyron,
 7       McDaniel, and Doe Defendants I had no formal
 8       policy to address issues of bodily integrity,
 9       personal security, and the right to privacy.
10        MS. DePAOLA: As it relates to
11           special education students?
12        MR. SWEENEY: Right.
13   Q   Have you read the Pike County sexual abuse policy?
14        MS. DePAOLA: Object to the form.
15   A   I don't know. I don't recall.
16   Q   Do you know if the sexual abuse policy applies to
17       all students; whether they are regular ed or
18       special ed?
19   A   Yes, sir.
20   Q   As far as you know, it applies to all students,
21       doesn't it?
22   A   (Witness Indicating.)
23        MS. DePAOLA: Donald, she has already
```

Page 123

```
 1           told you she hasn't read it. So,
 2           now, why are you badgering her about
 3           this?
 4        MR. SWEENEY: Well, I'm not trying to
 5           badger her. But I thought she said
 6           in the affirmative.
 7        MS. DePAOLA: She said she hadn't read
 8           it.
 9   BY MR. SWEENEY
10   Q   Do you know if they have an abuse policy?
11   A   I don't know.
12   Q   Do you know why you would indicate in paragraph
13       that the school system doesn't have a policy
14       relating to bodily integrity and personal security
15       if you haven't looked at their sexual abuse
16       policy?
17        MS. DePAOLA: Object to the form. He's,
18           first of all, not reading the entire
19           statement. And the witness has
20           already testified she hasn't read
21           it. So, you are wasting everybody's
22           time.
23
```

Page 124

```
 1   BY MR. SWEENEY
 2   Q   Would you agree, Ms. Reed, that 38 is just
 3       lawyer's talk rather than something based on your
 4       personal knowledge?
 5   A   I don't know.
 6   Q   Paragraph 39, you indicate that the Defendants'
 7       customs or policy were grossly insufficient and
 8       resulted in violation of the Plaintiff's clear
 9       protected constitutional rights. Do you know if
10       the Board and the administrative people that you
11       have sued acted diligently with regard to any
12       complaint that was brought to their attention
13       about Justin and Mr. Coon?
14   A   I don't know.
15   Q   Do you now know that a complaint was brought about
16       Mr. Coon concerning smoking with students?
17   A   Yes, sir.
18   Q   Do you know that Mr. Bazzell investigated that
19       matter immediately?
20        MS. DePAOLA: Object to the form.
21   A   I don't know.
22   Q   Do you know if Mr. Bazzell suspended Charles Coon
23       while he was engaging in an investigation of that
```

Page 125

```
 1       matter?
 2   A   I don't know.
 3   Q   Paragraph 41 says there was a causal relation
 4       between the Defendants' failure to act and the
 5       injuries suffered. I asked you earlier if you had
 6       any information that Mr. Bazzell, Casey, McDaniel,
 7       Pryon, had knowledge that Coon was abusing Justin.
 8       Do you remember me asking you that?
 9   A   I don't recall. I --
10   Q   Well, let me ask you: Prior to June 2005, do you
11       have any information that Mr. Bazzell, as
12       Superintendent; Mr. Casey, as principal;
13       Mr. Pryon, as principal; or Mr. McDaniel, as
14       assistant principal, had any information or
15       suspicion that Charles Coon was engaging in
16       inappropriate conduct with Justin?
17   A   I don't know.
18   Q   In paragraph 42, you're asking for damages. Do
19       you have a dollar figure in mind that you're going
20       to ask for damages for what you complain about?
21   A   No, sir.
22   Q   In paragraph 46, you indicate that Justin's
23       special education plan was inappropriate.
```

Page 126

1    Defendants have willfully failed to address these
2    issues in planning a school program. "In planning
3    a school program", are you relating to his IEP?
4         MS. DePAOLA: If you know.
5    Q  Is that Justin's school program, his IEP?
6    A  What -- I mean, explain.
7    Q  In paragraph 46, you make reference to Justin's
8    school program. What do you have in mind when you
9    ask about his school program? Is that his IEP,
10   his Individualized Education Plan?
11   A  No. I mean, his progress that he makes every year
12   in school.
13   Q  Well, for Justin, as a special ed student, isn't
14   that a function of his IEP?
15   A  Yes, sir.
16   Q  And didn't you, on every occasion, agree with the
17   IEP that the school system was proposing for
18   Justin?
19   A  I don't know, because there is times where Justin
20   did not meet his goals that he was supposed to
21   meet every year.
22   Q  Right. Every time -- at least 2003-2004,
23   2004-2005 every time you met with the IEP

Page 127

1    committee, didn't you sign that you were in
2    agreement with what the school system was
3    proposing?
4    A  Yes, sir.
5    Q  In paragraph 53, Plaintiff was subjected to sexual
6    harassment at the hands of a school official.
7    That school official was Charles Coon; is that
8    right?
9    A  Yes, sir.
10   Q  You're not contending that any other employee of
11   the Pike County Board sexually abused Justin, are
12   you?
13   A  No, sir.
14   Q  In 54, you said the Board knew or should have
15   known. Let me first explore "knew". I have asked
16   you before, do you have any information that the
17   members of the Pike County Board knew that Charles
18   Coon was abusing your son prior to June of 2005?
19   A  I don't recall.
20   Q  Do you have any information or facts that
21   officials of the Board, including Mr. Bazzell,
22   Casey, Pryon, and McDaniel, knew that Coon was
23   abusing Justin?

Page 128

1    A  I don't know.
2    Q  In 55, you indicated that these people remained
3    deliberately indifferent. What facts were
4    presented to Mr. Bazzell, Mr. Casey, Mr. McDaniel
5    or Mr. Pryon, that indicated Charles Coon was
6    abusing Justin that they were deliberately
7    indifferent to?
8    A  Can you explain further?
9    Q  Sure. In this paragraph 55 of your complaint,
10   you're saying that the Defendants were
11   deliberately indifferent to what was happening to
12   Justin. What facts were presented to Mr. Bazzell
13   or McDaniel or Pryon or Casey that Charles Coon
14   was abusing Justin that they were deliberately
15   indifferent to; that is, that they ignored and did
16   nothing about? What facts do you know of?
17   A  I -- I don't know. I think maybe that he was
18   checking out all the time.
19   Q  Well, you don't know that they knew that, do you?
20        MS. DePAOLA: Would you let her finish
21        her answer?
22   A  They were up at the office when Justin checks out.
23   Q  How do you know that?

Page 129

1    A  And then Mr. Casey seen Justin go down to the band
2    room several times on break time.
3    Q  How do you know that?
4    A  Because there was a time we had a Board member
5    when Justin got in trouble that Mr. Casey said he
6    done seen Justin go down there during break. He
7    seen Justin go down there during break time.
8    Q  And you heard that testimony, didn't you?
9    A  Yes, sir, I did.
10   Q  When you heard that testimony, did you tell the
11   Board or any of the officials there that you
12   thought that was ample grounds to suspect sexual
13   abuse?
14   A  No, sir.
15   Q  And you didn't suspect at the time that that was
16   grounds to believe that sexual abuse was going on,
17   did you?
18   A  No, sir.
19   Q  Because if you had believed that, you wouldn't
20   have continued to let Mr. Coon spend time in your
21   house unsupervised with your children, would you?
22   A  No, sir.
23   Q  And you wouldn't have let your daughter go to

Page 130

1   Greenville with Mr. Coon?
2  A   I trusted Mr. Coon.
3  Q   And paragraph 58, you indicate that the Defendants
4      had the duty to report child abuse and/or
5      suspicions of child abuse. Do you have
6      information when these Defendants first learned,
7      had the first suspicion, that Charles Coon might
8      be abusing Justin?
9  A   No, sir.
10 Q   Well, would you agree that they didn't have the
11     duty to report child abuse or suspicion of child
12     abuse until that came to their attention?
13 A   I --
14 Q   I mean, they couldn't report child abuse or
15     suspected child abuse until they had some basis to
16     suspect child abuse, could they?
17 A   I -- I don't know.
18 Q   Well, as a parent of Justin, if you had reason to
19     believe child abuse took place, didn't you have
20     some obligation to contact DHR or law enforcement
21     officials? Wouldn't you consider that part of the
22     parental responsibility?
23 A   Yes, sir.

Page 131

1  Q   And you never had suspicions, so you never
2      contacted DHR or police officials prior to June of
3      2005, did you?
4  A   No, sir.
5  Q   And paragraph 59, you indicate that a timely
6      report was not made when Defendants first knew or
7      should have known that the abuse of minor child
8      had occurred.
9          What's your belief of when they first had
10     information that Charles Coon was violating
11     Justin?
12 A   I don't recall. I don't know.
13 Q   You have no idea, do you?
14 A   The only thing I would think would be was when
15     they are taking him off campus in his vehicle.
16 Q   In paragraph 70, you indicate that as a result of
17     Defendants' conduct, J.R. has suffered and
18     continues to suffer mental anguish, depression,
19     humiliation, embarrassment, regression in academic
20     skills, exclusion from his regular school
21     environment with no friends or support, ongoing
22     fear and confusion, all exacerbated by his
23     disability.

Page 132

1      For the 2006-2007 school year, was Justin
2      enrolled in the Troy City school system?
3  A   Yes, sir.
4  Q   Did he have an IEP?
5  A   Yes, sir.
6  Q   Did he make progress that year academically?
7  A   Yes, sir.
8  Q   So, he was in school, and he made progress
9      pursuant to his program there?
10 A   Yes, sir.
11 Q   Was that arrangement for Justin to attend Troy
12     City school system made in cooperation with the
13     Pike County school system?
14 A   Explain. I mean --
15 Q   Sure. Didn't Karen Berry work with you in
16     arranging for Justin to have his academic program
17     transferred from Pike County to Troy City?
18 A   No -- I --
19 Q   You know Karen Berry, the special ed coordinator
20     for Pike County, don't you?
21 A   Yes, sir.
22 Q   And aren't you aware that Karen Berry worked with
23     Troy City for Justin to enroll in the Troy City

Page 133

1      school system and have an IEP there?
2  A   No, sir. The reason why Karen Berry made
3      arrangements with Troy City schools is because
4      Justin failed American History, and Justin had to
5      retake it, because Pike County on Justin's IEP
6      violated his IEP, there was a time where
7      his history teacher did not modify his tests. And
8      so Pike County violated his IEP.
9  Q   For the 2005-2006 school year, not during the
10     summer, but for that school year, Justin enrolled
11     in the Troy City school system, didn't he?
12 A   2005-2006, he started.
13 Q   And my question is: Didn't Pike County and Karen
14     Berry assist in that transition for him to go to
15     Troy City for that school year?
16 A   Yes, sir.
17 Q   And right now Justin is undergoing counseling and
18     care and treatment, but that's all being paid for
19     under his Medicaid or Medicare?
20 A   Yes, sir.
21 Q   So, right now, you are not having to expend any of
22     your own money for this care and treatment that
23     Justin needs?

Page 134

1  A  On the treatment, the only payment we have got is
2     taking him back and forth.
3  Q  **You asked for various damages in the Prayer for**
4     **Relief. Do you know any basis by which punitive**
5     **damages can be awarded against the Pike County**
6     **Board of Education?**
7        **MS. DePAOLA: Object to the form.**
8  A  I don't know.
9        **MR. SWEENEY: And, counsel, if you know**
10            **of any case law or statutes that**
11            **allow punitive damages against the**
12            **public school system, I wish you**
13            **would share that with me.**
14 **BY MR. SWEENEY**
15 Q  **You asked for attorney's fees. Have you paid any**
16    **attorney fees to date?**
17 A  No, sir.
18 Q  **For this complaint?**
19 A  No, sir.
20       **MR. SWEENEY: Let me have just a minute.**
21       (Brief recess.)
22 **BY MR. SWEENEY**
23 Q  **Ms. Reed, when we started this deposition, I**

Page 135

1     indicated that I would conclude by asking if you
2     wanted to supplement information that you have
3     provided to any previous question I have asked.
4     Do you want to supplement any answer that you have
5     given me?
6        **MS. DePAOLA: Well, I just would mention**
7            **she did mention to us on the**
8            **break --**
9  A  Yes. I know Blake Faulkner pressed charges
10    against Mr. Coon. And it was on sodomy charges.
11 Q  **I'm sorry. What?**
12 A  Blake Faulkner put a warrant out on Coon.
13 Q  **Okay. Anything else you want to supplement, any**
14    **information you want to supplement to any answer**
15    **that you have given to a question that I have**
16    **asked?**
17       **MS. DePAOLA: Okay. I want to remind**
18           **her that you immediately called to**
19           **our attention -- he asked you what**
20           **Mona Watson said happened.**
21 A  Oh, Ms. Watson said that she used dolls to -- when
22    she had the meeting with Justin, she used dolls.
23    And when she used dolls, that Justin said with the

Page 136

1     dolls that he penetrated Justin. Said he used
2     penetration -- that he -- you know, other like
3     mouth -- you know, oral sex with Mr. Coon.
4  Q  **Okay. Anything else that you want to supplement?**
5  A  Uhm --
6  Q  **So, to the best of your knowledge, you have given**
7     **me complete answers to all of the questions that I**
8     **have asked you?**
9  A  To the best of my knowledge, I have.
10 Q  **Thank you very much.**
11
12       (Whereupon, at approximately, 1:40
13        p.m. on the 19th day of July, 2007
14        the deposition was adjourned for
15        the day.)
16       * * * * * * * * *
17       FURTHER DEPONENT SAITH NOT
18       * * * * * * * * * *
19
20
21
22
23

Page 137

1
2            REPORTER'S CERTIFICATE
3
4  STATE OF ALABAMA
5  MONTGOMERY COUNTY
6
7     I do hereby certify that the above and foregoing
8  transcript of the deposition of ELIZABETH ANN REED was
9  taken down by me in machine shorthand on the 19th of
10 July, 2007, and the questions and answers thereto
11 reduced to writing under my personal supervision, and
12 that the foregoing represents a true and correct
13 transcript of the proceedings given by said witness
14 upon said hearing.
15    I further certify that I am neither of counsel nor
16 related to the parties to the action, nor am I any wise
17 interested in the results of said cause.
18    Dated this 9th day of August, 2007.
19
20    _____
21    Mary Moore-Wynn
22    Certified Shorthand Reporter
23

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT


JR, A MINOR BY HIS
MOTHER AND FATHER, EAR
AND TMR,


     PLAINTIFF,


VS.                              CASE NO.:

                                 2:06-CV-1120 MLF


PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

    DEPOSITION OF POLLY KING, taken before Mary

Moore-Wynn, as Commissioner, on the 19th of July, 2007,

in the offices of Pike County Board of Education, 101

Love Street, Troy, Alabama, pursuant to stipulations

set forth herein, commencing at approximately 9:00 a.m.

* * * * * * * * *

JR, A Minor                 July 19, 2007  Pike County Board of Education

## Page 2

```
 1
 2          * * * * * * * * * *
 3              APPEARANCES:
 4   FOR THE PLAINTIFF:
 5   Hon. Susan DePaola
     Attorney at Law
 6   1726 West 2nd Street, Suite B
     Montgomery, Alabama  36105
 7
 8   and
 9   Hon. Deanie Allen
     Azar and Azar
10   260 Washington Avenue
     Montgomery, Alabama  36104
11
12   FOR THE DEFENDANT:
13   Hon. Donald R. Sweeney
     Bradley, Arant, Rose & White
14   One Federal Place
     1819 Fifth Avenue North
15   Birmingham, Alabama 35203
16
17   ALSO PRESENT:
18   Dr. Mark Bazzell, Superintendent
19
20
21
22
23
```

## Page 3

```
 1
 2
 3          * * * * * * * * * *
 4
 5
 6
 7
 8              STIPULATIONS
 9
10      It is hereby stipulated and agreed by and between
11   counsel representing the parties that the deposition of
12   POLLY KING is taken pursuant to the Federal Rules of
13   Civil Procedure, and that said deposition may be taken
14   before Mary Moore-Wynn, CSR, as Commissioner, without
15   the formality of a commission; that objections to
16   questions, other than objections as to the form of the
17   questions, need not be made at this time, but may be
18   reserved for a ruling at such time as the deposition
19   may be offered into evidence, or used for any other
20   purpose by either party hereto, provided by the
21   Statute.
22      It is further stipulated and agreed by and between
23   counsel representing the parties in this case, that the
```

## Page 4

```
 1   filing of the deposition of POLLY KING is hereby
 2   waived, and that said deposition may be introduced at
 3   the trial of this case or used in any other manner by
 4   either party hereto provided for by the Statute,
 5   regardless of the waiving of the filing of same.
 6      It is further stipulated and agreed by and
 7   between counsel and the witness that the reading
 8   and signing of the deposition by the witness is
 9   hereby waived.
10
11                  INDEX
12   POLLY KING
13   Examination By Ms. DePaola            5
     Examination By Mr. Sweeney          33
14   Further Examination By Ms. DePaola   39
15   Reporter's Certificate              44
16
17
18
19
20
21
22
23          * * * * * * * * *
```

## Page 5

```
 1              POLLY KING
 2      (Whereupon, the witness, after having first been
 3   duly sworn to speak the truth, the whole truth, and
 4   nothing but the truth, and testified as follows:)
 5              EXAMINATION
 6   BY MS. DePAOLA
 7   Q  Could you state your name for the Record, please?
 8   A  My name is Polly King.
 9   Q  And is that your official name?  I mean, is it
10      Elizabeth?  Or is that nickname?
11   A  No, that's my name.
12   Q  That's your name?
13   A  That's what my mother put on me at birth.
14   Q  And what is your street address?
15   A  9690 US Highway 29, North, Banks, Alabama, 36001
16   Q  And how long have you lived there, Ms. King?
17   A  At that particular address?
18   Q  Yes, ma'am.
19   A  I can't really tell you.  Uhm, four, maybe five
20      years.  I had a farm about a mile from there.  And
21      I sold it and moved there.
22   Q  And are you employed?
23   A  I am retired US Air Force.  Disabled, retired US
```

Mary Moore-Wynn, CSR   Mary Moore-Wynn      (334)244-0203
         Court Reporting Services

## Page 6

1     Air Force.

2 **Q**  **What was your job with the Air Force?**

3 **A**  I was a registered nurse.

4 **Q**  **Oh, okay. And do you currently have any kids in**

5     **the Pike County school system?**

6 **A**  My last child graduated this year.

7 **Q**  **And what was his name?**

8 **A**  Martin.

9 **Q**  **And I know you also have a son name Matt; is that**

10     **correct?**

11 **A**  That is MAK.

12 **Q**  **Oh, I thought it was Matt?**

13 **A**  No, it was MAK, M-A-K. His initials. That was

14     his nickname. I have four other -- I mean, three

15     other children besides him that have went through

16     the Pike County school system plus two

17     stepchildren that have went through the Pike

18     County system.

19 **Q**  **Can you tell me the names of your children who**

20     **went through Pike County?**

21 **A**  James Culley King. Charles Alva King. And then

22     my daughter, she went through 10th grade. And her

23     name was Angel Lynn King.

## Page 7

1 **Q**  **Are any of these children the one known as Matt?**

2 **A**  Martin is MAK. There is no Matt.

3 **Q**  **I have seen some reference in documents to Matt**

4     **King. That is not your son and --**

5 **A**  I don't know who Matt King is. My son is MAK,

6     M-A-K.

7 **Q**  **What year did MAK graduate?**

8 **A**  He graduated this year in May.

9 **Q**  **And in your duties as an RN with the Air Force,**

10     **can you just describe for me what you did?**

11 **A**  I was a pediatric nurse specialist. I took care

12     of injured children. Our ward was so small that I

13     also had to take care of adult patients, as well,

14     because of the overflow. Uhm...

15 **Q**  **Would this include children that had -- I don't**

16     **know if this is the right word -- that had**

17     **psychiatric injuries or problems as well as**

18     **physical?**

19 **A**  The military had special facilities for

20     psychiatric patients. And I didn't work in

21     psychiatric.

22 **Q**  **So, these are primarily physical injuries?**

23 **A**  Yes, ma'am.

## Page 8

1 **Q**  **Any other employment that you have had?**

2 **A**  Just as a nurse. I worked civilian nursing for

3     some years prior to going in the military.

4 **Q**  **Okay. Now, do I understand correctly that you**

5     **have been a foster parent from time to time?**

6 **A**  I was a foster parent for 16 years.

7 **Q**  **Was that here in Pike County?**

8 **A**  Yes, ma'am. It sure was.

9 **Q**  **And what kind of -- I mean, can you just tell me a**

10     **little bit about that?**

11 **A**  We were a specialty home. We took neglected,

12     abused, or very ill children. We were a home for

13     hard-to-place kids.

14 **Q**  **Okay. And so did you have any experience seeing**

15     **or contact with children who have been sexually**

16     **abused?**

17 **A**  Yes, ma'am. I had quite a few children in my home

18     that had been sexually abused.

19 **Q**  **Okay. I'm going to get back to that, but I want**

20     **to sidetrack to another question. With respect to**

21     **the people around this table today, can you tell**

22     **me who you have met with around this table or**

23     **spoken to on the phone in the last six months?**

## Page 9

1 **A**  I know the Superintendent (indicating.) I have

2     known him for years.

3 **Q**  **Did you speak with him in the last six months?**

4     THE WITNESS: Were you at the meeting

5     when MAK was in trouble?

6     THE SUPERINTENDENT: I think we spoke?

7 **A**  We probably said hi. Other than that, that's

8     probably all we said to each other.

9 **Q**  **All right. Have you spoken to Ms. Allen?**

10 **A**  I know I have spoken to one of you all. I don't

11     know which one.

12 **Q**  **Okay. Have you spoken to Mr. Sweeney before?**

13 **A**  Not that I know of.

14 **Q**  **Just to make sure you know who we all are,**

15     **Mr. Sweeney represents the Pike County Board of**

16     **Education and the individual defendants, and I**

17     **represent Justin Reed. And Deanie represents**

18     **Justin Reed. I should have done that at the**

19     **outset. I apologize.**

20     **So, in your role as a foster parent and seeing**

21     **kids who are sexually abused, can you tell me what**

22     **you experience in terms of signs or symptoms that**

23     **you would recognize of sexual abuse?**

JR, A Minor          July 19, 2007  Pike County Board of Education

---

Page 10

1  A   Sexually abused children are usually sexually
2      aggressive.  They tend to be more talkative.  They
3      tend to be a little harder to handle.  They have
4      discipline problems.
5  Q   All right.  Now, have you done any study on
6      the issue of sexual abuse?
7  A   No, ma'am.
8  Q   Are you familiar with any of the signals that
9      indicate that an adult may be sexually abusing a
10     child?
11 A   Uhm -- just my own opinion of what I feel like are
12     signs.  I mean, I haven't studied anything.
13 Q   I understand.  Can you just tell me what signs you
14     believe might be indicative of this?
15 A   Uhm, well, an adult that hangs around a child
16     that's not related to him an -- an excessively
17     amount of time; that buys children gifts --
18 Q   Okay.
19 A   -- that aren't related to him.  I mean, those
20     kinds of things kind of put up a red warning
21     signal.
22 Q   Okay.  Anything else that you can think of?
23 A   I --

---

Page 11

1  Q   I'm sorry?
2  A   I mean, I don't -- you know --
3  Q   Just from your --
4  A   If you see a guy that likes to put his hands on --
5      it seems to be, you know, always putting his hands
6      on a child or something like that.  You know,
7      those kind of things.
8  Q   Okay.  Now, it's my understanding that at some
9      point you had some concerns about Mr. Coon --
10     Charles Coon, I think his name is -- and may have
11     brought these concerns to the attention some
12     official.  And the purpose of this testimony is
13     just to get the history of what happened.  That's
14     all.
15 A   Not anything on sexual abuse, I didn't.  He
16     offered my son a Marijuana cigarette on the ride
17     home from a football game one night.  And I went
18     to the school and complained about that.  That's
19     the only time that I have had any complaint about
20     anything -- with him.
21 Q   So, can you tell me when this occurred or came to
22     your attention?
23 A   No.  I can't remember.

---

Page 12

1  Q   Okay.  Well, let me just give you some dates.
2      Mr. Coon plead guilty to sexual abuse in the
3      summer of 2005.  Would it be fair to assume it was
4      before that?
5  A   Oh, yes, ma'am, it was before that.
6  Q   Do you think it was during that school year,
7      2004-5, or 2003-4?
8  A   It was during -- let's see:  My son was in the
9      10th grade when it happened.  He graduated this
10     year.  So, you all do the math.
11 Q   So, I would expect that would be during the
12     2004-2005 school year he would be in the 10th
13     grade?
14 A   Okay.  (Indicating).
15 Q   I mean, he didn't fail any grades in the middle
16     there?
17 A   No, ma'am.  No, ma'am.
18 Q   So, during the 10th grade, how did you become
19     aware of the cigarette and the Marijuana aspect of
20     it?
21 A   My son came home, and he came straight to me and
22     says, I'm not going to ride home with him any
23     more, mama.  And I said, why?  He said, because

---

Page 13

1      they were trying to they were smoking pot.  And he
2      kept trying to get me to smoke.  And I said, well,
3      good; you don't need to ride with him any more.
4      And that was the end of it.
5  Q   Now, was your son in the band?
6  A   Yes, ma'am.  He was in the drum section.
7  Q   He was riding home with Mr. Coon, was this like
8      after a football game?
9  A   It was after a football game, I think.  I think it
10     was after a football game.  I can't swear to it.
11     It might have been after a practice.  It just
12     happened to be one of those nights when my other
13     two sons happened not to be in town.  And he
14     didn't have a way home.  And I guess I he couldn't
15     catch one with a friend.
16 Q   But you think it was sometime during the fall
17     either after a football game or after a practice?
18 A   Yes.  It would have had to have been for him to be
19     with them, you know.  It was some something with
20     the band.
21 Q   Okay.  So, I take it that MAK did not regularly
22     ride with Mr. Coon?
23 A   No.

Mary Moore-Wynn, CSR Mary Moore-Wynn    (334)244-0203
Court Reporting Services

## Page 14

1  Q   Had you ever previously seen Mr. Coon ride any of
2      the other students around anywhere?
3  A   Oh, yes, ma'am. I saw him on several occasions
4      when my house -- my house burned during that
5      school year. And we had to live in the housing
6      projects, which is right behind the school. And
7      there was numbers of occasions when I would see
8      him go by with kids.
9  Q   Okay. I'm sorry. I know you can't remember the
10     exact dates or anything, but are we still talking
11     about during that fall of 2004?
12 A   During that school year.
13 Q   The whole school year?
14 A   Yeah. During that school year period.
15 Q   Was this during the school day or after school?
16     What can you remember about those?
17 A   After -- mostly after school, I guess. I may have
18     seen him once or twice with kids during school.
19     They may have been moving equipment. I don't
20     know. You know, just -- I just remember, you
21     know, that I did see him with other kids.
22 Q   Now, did he have a truck or a regular vehicle or
23     do you recall?

## Page 15

1  A   I don't remember. I don't recall.
2  Q   Don't recall? Okay. And had you directed your
3      son not to ride around with him?
4  A   After that date, yeah.
5  Q   After that date. Okay. All right. Can you
6      recall the names of any of the children that you
7      saw riding around with Mr. Coon?
8  A   Uhm, the one child specific that I saw quite a few
9      times with him was the little Helms boy. The one
10     that killed himself.
11         MR. SWEENEY: The what boy?
12         THE WITNESS: Helms boy.
13 Q   Helms. Adam?
14 A   Yeah. Adam and MAK were friends.
15 Q   Okay. So, when MAK came and told you this, that
16     he was being offered a Marijuana cigarette, did
17     you, then, discuss that with anybody? Did you
18     report it to anybody?
19 A   Yeah. I went and talked to the sup -- the
20     assistant principal at the high school.
21 Q   Is that Mr. McDaniel?
22 A   Yes, it was.
23 Q   Can you tell me how many times did you meet with

## Page 16

1      Mr. McDaniel?
2  A   I don't remember. It was a few times.
3  Q   And this would have been in the fall of 2004?
4  A   It was during the school year. I don't remember
5      what time it was.
6  Q   Did MAK play in the band in the winter?
7  A   Yes, ma'am. And he also took band during the
8      spring. So, you know, I don't know. I can't -- I
9      am on a lot of medications --
10 Q   Okay.
11 A   -- and I cannot remember dates.
12 Q   I understand. So, your meetings or contact with
13     Mr. McDaniel, were they at the school?
14 A   Yes, ma'am.
15 Q   And you think there was more than one meeting?
16 A   Yes, ma'am, I think so.
17 Q   And can you just summarize for us what you told
18     him your concern was?
19 A   I just told him that I thought that they needed to
20     watch Mr. Coon. That, you know I didn't know if
21     he was selling drugs on school or if he was just
22     giving them away to the kids. But that -- you
23     know, and I explained the incident that happened.

## Page 17

1      Basically, that's -- that was what our meeting was
2      about. I -- I do know that it got back later on
3      that the principal came in and talked to us. And
4      I don't remember who he was. I don't even
5      remember his face, because I only met him that one
6      time. But their conclusion was that there wasn't
7      enough evidence to do anything to Mr. Coon,
8      because they couldn't verify from any of the other
9      kids that he had ever done anything like that with
10     them. And so, it was dropped.
11 Q   During your conversations, did any kids other than
12     Adam come up?
13 A   I don't remember. I'm sorry.
14 Q   Let me just go over some names with you and ask
15     you if you might have brought these kids to their
16     attention. Jeron Senn?
17         MR. SWEENEY: I'm sorry. What's the
18         question?
19         MS. DePAOLA: The question was: I'm
20         going to go over these names, and
21         her if any of the people are names
22         that she might have brought to their
23         attention, I think I said.

## Page 18

1    MR. SWEENEY: Brought to a school
2    official's attention?
3    MS. DePAOLA: Yes. To Mr. McDaniel's or
4    the principals.
5  BY MS. DePAOLA
6  Q  Jeron Senn?
7  A  No, ma'am. I don't know him.
8  Q  Don't know him and had no discussions about him?
9  A  No, ma'am.
10 Q  How about Andrew Law?
11 A  Yeah. I didn't mention Andrew, but I know Andrew.
12    Andrew and MAK are best friends. But I don't know
13    Andrew -- I mean, I didn't say anything to the
14    school about Andrew.
15 Q  Did you ever see Andrew or Jeron in the truck with
16    Mr. Coon?
17 A  Andrew didn't hang around with Mr. Coon. He
18    wasn't in the band.
19 Q  Levi Davis. Did you bring that name to anyone's
20    attention?
21 A  Levi is my neighbor. I mean, him and MAK are the
22    same age. But I don't remember.
23 Q  That wasn't something that came from you?

## Page 19

1  A  No. No, not that I know of.
2  Q  How about Thomas Green?
3  A  Thomas Green also is my neighbor. But as far
4    as -- I don't know.
5  Q  Do you know after you brought this to
6    Mr. McDaniel's attention if he or anyone talked to
7    MAK?
8  A  Yes. Mr. McDaniels (sic), I know, talked to MAK.
9    But, like I said, they -- they concluded that
10    there wasn't enough evidence about the Marijuana
11    to do anything about it. And it was dropped.
12 Q  Okay. When he talked to MAK, do you know if he
13    did that at school?
14 A  I'm sure it was at school.
15 Q  Did they allow you to be present for that?
16 A  I'm sure if I wanted to have been, they could have
17    been. But at that time, my health was real bad.
18    And I didn't have transportation. And --
19 Q  Were you present? I should have asked it that
20    way.
21 A  No, not that I can remember.
22 Q  Okay. All right. And you met with Mr. McDaniel
23    you said a few times. You said it was more than

## Page 20

1    once, but you don't remember how many.
2  A  Yeah, I don't remember exactly how many.
3  Q  And you met with a principal on one occasion.
4  A  Yeah, I was there to talk to Mr. McDaniels, and
5    the principal came in.
6  Q  You don't know if that was Mr. Pryon?
7  A  I just remember it was a white man. That's all I
8    can tell you. I don't really know who it was. I
9    had never met him before. And I never met him
10    again. So, I just --
11 Q  Okay. Other than speaking with school officials,
12    did you ever speak with anyone with the drug task
13    force, with police department, the sheriff? Any
14    other official?
15 A  I talked to a friend of mine who happens to work
16    for the Troy Police Department in the drug task
17    force or did at that time. He doesn't any more.
18 Q  Who is that?
19 A  Uhm, you know, I can't remember his name. I'm
20    sorry. Because as far as I know, they are not
21    even around here any more. What was his name?
22    It's been several years. My memory is not good.
23    I don't remember his name. I'm sorry. He worked

## Page 21

1    for the Troy City Police Department. That's --
2    he -- and I just asked him what I needed to do.
3    And he told me to go to the school.
4  Q  So, you told him essentially the same --
5  A  Yeah.
6  Q  -- same story that you told the school officials?
7  A  I just told him that MAK had been offered
8    Marijuana by a teacher; what should I do?
9  Q  Was this before or after you went to the school?
10 A  It was before I went to the school.
11 Q  I see. Okay. So, he, to your knowledge, didn't
12    conduct any investigation?
13 A  It was out of his jurisdiction.
14 Q  Okay.
15 A  But he advised me to go to the school, and that if
16    I didn't get anything from the school, to go to
17    the Brundidge City Police.
18 Q  Anyone else besides your friend with the drug task
19    force -- any other official you tried to bring
20    this to their attention?
21 A  No, ma'am. Not that I can remember.
22 Q  Okay. Now, other than your meeting with
23    Mr. McDaniel and the principal and your attempt to

6  (Pages 18 to 21)

## Page 22

1  report it to the drug tasks force --
2  A   Well, I wasn't attempting to report it to the drug
3      task force. I was just asking a friend for
4      advice.
5  Q   I see. I'm sorry. I didn't mean to
6      mischaracterize it. So, other than those two
7      contacts, did you contact anyone else about it?
8  A   Not that I can remember.
9  Q   Did you ever discuss this matter with, for
10     instance, Mona Watson or anyone child protect or
11     an advocacy center?
12 A   I know Mona. But I don't know if I talked to her
13     about it or not. I don't remember talking to her
14     about it.
15 Q   All right. Have you ever discussed this matter
16     with any of the Reeds?
17 A   Oh, yeah. They called me.
18 Q   Okay.
19 A   And I told them I didn't know anything about their
20     son being involved in anything.
21 Q   Was it Mrs. Reed who called you or Mr. Reed? I
22     mean, who?
23 A   I don't remember which one it was. Me and

## Page 23

1      Ms. Reed don't get along very well. So, it was
2      probably Mr. Reed.
3  Q   Okay. And, I mean, can you recall the content of
4      the conversation? They called you for what
5      purpose?
6  A   To apologize for sicking you on me without
7      notifying me first.
8  Q   Okay. Tell us what exactly you mean "sicking" us
9      on you.
10 A   Well, someone from the Reed family got Jeremy,
11     their oldest child, to get my number, because it's
12     unlisted, because he's a friend of my oldest son.
13     And they gave the number to you all, so you all
14     could call me. And I got on Jeremy, because I
15     told him that he wasn't supposed to give my number
16     to anybody. So, somebody from the family called
17     to try to apologize for giving my number to
18     someone.
19 Q   Do you feel like there is some reason you
20     shouldn't be required to testify in this case?
21 A   I don't have good health. I'm on a lot of
22     medications. I'm prone to have seizures under
23     stress. Grand mal seizures. And if you know

## Page 24

1      anything about grand mal seizures, every time you
2      have one, it kills brain cells. And I really -- I
3      don't know anything about sexual abuse. So -- and
4      this is what this case is about.
5  Q   What medications are you on today?
6  A   Today?
7  Q   Uh-huh.
8  A   I am on Topamax. I'm on Neurontin. I'm on
9      Lorazepam, Clonazepam, Arava --
10 Q   Are these all things you have taken this morning?
11 A   That I take within a 24-hour period, yes, ma'am.
12 Q   What have you taken this morning?
13 A   Okay. I have taken my Topamax, my Neurontin.
14     I've taken one Lorazepam. I have taken -- taken
15     my Aspirin for my heart. I took my shot this
16     morning, my Lovenox shot for my blood clot
17     disorder. I've taken -- I'm trying to think which
18     ones I take in the morning. I take a handful.
19     Oh, and my Arava.
20 Q   Arava?
21 A   Arava.
22 Q   What is that for?
23 A   It's an immunosuppressant.

## Page 25

1  Q   Okay. Now, did you ever discuss your concerns
2      that you have described to us about the Marijuana
3      cigarette and driving around in the car with
4      anyone else; husband, family members, neighbors;
5      anyone else?
6  A   I don't have a husband. Uhm, not that I know of.
7      I mean, my children, probably, because they were
8      the ones that took me back and forth.
9  Q   To the school?
10 A   To the school, yeah. Or to wherever I go, they
11     take me back and forth.
12 Q   Now, let me just see what else here we've got.
13     Did you ever see Mr. Coon with Blake Faulkner?
14 A   I don't know a Blake Faulkner.
15     MS. DePAOLA: Is that his name?
16     MS. ALLEN: Uh-huh.
17 Q   Did you ever become concerned that Adam may be
18     being sexually abused by Mr. Coon?
19     MR. SWEENEY: Object to the form.
20 A   I don't -- as far as -- I am not sure. Yeah, I
21     had concerns, because the child just -- he didn't
22     act right. He didn't act like himself the last
23     year or so.

7 (Pages 22 to 25)

## Page 26

1  Q   Okay. I'm sorry. I don't recall. Did you say
2      Adam was one of the kids that you saw riding
3      around in the car with Mr. Coon?
4  A   Yes. Adam lived over in our neighborhood, and I
5      saw Coon and him together quite often.
6  Q   Can you tell me what changed about his conduct
7      that caused you concern?
8  A   Adam was a real quiet, real easy-going child. He
9      got to where he was nervous. He was a little bit
10     of a daredevil. He started staying away from his
11     friends. Just little things. And he was all the
12     time with Coon. They were going on fishing trips
13     together. They were -- you know, camping trips,
14     doing things together all the time.
15         MR. SWEENEY: I'm sorry. Who was?
16         THE WITNESS: Adam.
17         MR. SWEENEY: And who?
18         THE WITNESS: The band director.
19 Q   Ms. King, how did you find out that this was going
20     on; the fishing trips and the camping trips?
21 A   Seen it with my own eyes, as far as the fishing
22     trips, because they would go to the pond down
23     below where Andrew Law -- I don't know how you all

## Page 27

1      got his name -- but Andrew Law lives over in a
2      little neighborhood. And like I said, MAK and
3      Andrew are best friends. And there is a pond down
4      below his house. And I think Adam lived in --
5      matter of fact, Adam did live in the same
6      neighborhood. And Coon and him would go fishing
7      down there. And I have been fishing at the pond
8      when they happened to show up.
9  Q   Would they show up in Mr. Coon's truck, or do you
10     recall?
11 A   I don't remember. I just know they showed up at
12     the pond.
13 Q   And the camping trips, how would you know about
14     that?
15 A   From talk from the kids that was in the house, you
16     know. My house is kind of the neighborhood
17     hangout for the children.
18 Q   Did you ever discuss your concerns about Adam with
19     anyone?
20 A   Nobody except MAK when we were talking about this
21     kind of stuff, I asked him was Adam on the truck
22     with them the night they were smoking. And he
23     was. So, I mean, other than that --

## Page 28

1  Q   But, I mean, did you ever -- I mean, did you ever
2      bring that to Mr. McDaniel's attention, your
3      concerns about him?
4  A   I may have mentioned it to him. I don't remember.
5      But I may very well have mentioned it to him.
6         MR. SWEENEY: I'm sorry. May have
7             mentioned it to who?
8         THE WITNESS: Mr. McDaniels.
9         MR. SWEENEY: But you're not sure?
10        THE WITNESS: No. I can't remember. I
11            have problems with my memory. I'm
12            sorry.
13 BY MS. DePAOLA
14 Q   Okay. Anybody else you may have discussed your
15     concerns about Adam with?
16 A   Not that I can recall.
17 Q   Okay. Did you ever discuss them with Adam's
18     parents?
19 A   I didn't know Adam's parents very well. I just
20     knew them when I saw them. I knew Adam's sister,
21     because she dated my oldest son.
22 Q   Okay. But, I mean, did you discuss it with them?
23 A   No. I would have never mentioned anything to her.

## Page 29

1  Q   Did you feel that Mr. McDaniel believed what you
2      said?
3  A   I felt like he did.
4  Q   Did you believe that he tried to investigate and
5      find out what happened?
6  A   I believe that he did.
7  Q   Did he ever tell you -- you seem to say they
8      couldn't prove anything. I mean, can you tell me
9      exactly what was said?
10 A   He just --
11 Q   Not exactly. Strike that part. To the best of
12     your recollection, what did he tell you?
13 A   The best I can remember was that they couldn't get
14     verification from any of the other children that
15     he had offered drugs to them and that -- and, too,
16     MAK, wasn't wanting to be cooperative, either,
17     because he didn't want to be a snitch. And I
18     think with all of it together, there just -- there
19     wasn't any concrete evidence to pin on him.
20 Q   Do you know anyone named Denise McCloud?
21 A   Not that I know of.
22 Q   Okay. Have you ever received any information from
23     anyone else regarding similar charges against

Page 30

1   **Mr. Coon?**
2   A   Not that I know of.
3   Q   **Okay.  The person who worked with the drug task**
4       **force who you contacted, do you know was that a**
5       **male or a female?**
6   A   He was a male.
7   Q   **Was he white or black?**
8   A   He was black.
9   Q   **Do you know where he works now?**
10  A   No, I don't.  I don't even know where he's at now.
11  Q   **Don't even know if he's in Troy?**
12  A   I don't even know if he's still in Troy or not.
13  Q   **Other than seeing Mr. Coon with Adam at the pond**
14      **and driving in his car, you said somewhere near**
15      **the housing project --**
16  A   Yeah, around the school.
17  Q   **Did you ever see him in any stores, restaurants,**
18      **or any other places?**
19  A   If I did, I don't remember.
20  Q   **Now, other than -- I know you were aggravated at**
21      **the Reeds for giving us your phone number; had you**
22      **had some prior contact with them?**
23  A   Just with the older son.  He used to hang around

Page 31

1       with my older son when they were kids.  And --
2   Q   **You -- sorry.**
3   A   They worked together some in the past year.
4   Q   **Because you said you didn't get along with them**
5       **very well.  What was the problem?**
6   A   Ms. Reed was just always real high strung.
7       Flirty.  I just didn't have much in common with
8       her.  And we really just didn't hit it off.  Not
9       that we had any problems.  It was no bad words
10      between us or anything like that.  I just didn't
11      care --
12  Q   **Okay.**
13          MS. DePAOLA: I would like to take a
14          break for just a few seconds.
15          (Brief recess.)
16  BY MS. DePAOLA
17  Q   **Do you know an Officer Phelps?**
18  A   Ah, yeah.  What's his first name?
19  Q   **I don't know.**
20  A   Uhm, I think that's the last name of the guy I
21      talked to.
22  Q   **Okay.**
23  A   Like I said, this has been quite a few years ago.

Page 32

1   Q   **Yes, ma'am.  Did you ever discuss this matter with**
2       **Carolyn Townsend?**
3   A   Who is Carolyn Townsend?
4   Q   **I think she is an employee of the Pike County**
5       **Board of Education -- or was.**
6   A   (Witness Indicating.)  If I did, I don't remember.
7   Q   **Okay.  Butch Phelps?**
8   A   Butch?  Yeah.  Butch was -- Butch was who I talked
9   to.
10  Q   **That's the person with the drug task force?**
11  A   Yeah -- yeah.  Well, he worked for the City of
12      Troy.
13  Q   **Okay.**
14  A   I think he sometimes worked with the task force.
15      But he was actually employed by the City of Troy.
16      And like I said, I didn't call him in the
17      police capacity.  It was just as a -- a friend.
18  Q   **Did you ever have any discussion with Moses**
19      **Davenport about it?**
20  A   I don't think I ever talked to Mose about it.  I
21      was told if I didn't get anywhere with the school
22      to talk to the City.  But I don't think I ever
23      went to Mose with it.

Page 33

1   Q   **Since all of this came to light -- and by all of**
2       **this, I mean Mr. Coon pleading guilty to sexual**
3       **abuse of several kids in Pike County -- have you**
4       **had any conversations with any other parents about**
5       **this matter?**
6           MR. SWEENEY: Object to the form.
7   A   Not that I can remember.  Other than just, you
8       know, the fact that we talked about maybe what was
9       on TV, you know, that they caught him.
10      I don't -- I don't really have any contact
11      with very many parents other than ones that just
12      live right close to me, because I don't get out.
13      I don't drive.
14  Q   **Did you ever talk to Adam's parents?**
15  A   No.
16  Q   **Did you ever talk to Blake's parents?**
17  A   No.
18          MS. DePAOLA: Okay.  I don't have any
19          other questions. Thank you.
20          EXAMINATION
21  BY MR. SWEENEY
22  Q   **I have a couple of questions, if I could,**
23      **Ms. King.**

9  (Pages 30 to 33)

JR, A Minor                July 19, 2007  Pike County Board of Education

Page 34

1  A  All right.
2  Q  When Martin reported this incident about Coon
3     offering him Marijuana cigarette, were other
4     students in the car?
5  A  Yes, it was two other boys. And I don't remember
6     exactly who the other boys were. I think the
7     little Helms boy was one of them, as best I can
8     remember. But other than that, I don't know who
9     they were.
10 Q  Do you recall sharing with Mr. McDaniel the
11    names of those boys and having him investigate by
12    talking to those boys?
13 A  I'm sure I did at that time, because my son
14    gave -- told me who the children were. I just
15    can't remember. It's just been so long.
16 Q  And I'm not trying to get exact names and so
17    forth. But you shared with Mr. McDaniel all of
18    the information you had about that complaint,
19    didn't you?
20 A  Yes, sir, I did.
21 Q  You shared with him what Martin told you?
22 A  Yes, sir.
23 Q  You shared with him the names of the boys if you

Page 35

1     knew them?
2  A  Yes, sir.
3  Q  And did Mr. McDaniel tell you that he would
4     investigate those matters?
5  A  Yes, he did.
6  Q  And after your initial conversation, you had a
7     follow-up meeting with him, didn't you?
8  A  Yes, sir.
9  Q  And did he explain to you what he had done and
10    what he had learned?
11 A  Yes. He said he had talked to the boys and that
12    none of them would confess that it had happened,
13    best I can remember, and that MAK wasn't being
14    cooperative either, because he didn't want to be a
15    snitch to his friends.
16 Q  Did he ask you if you had any other suggestions
17    about what else he should do?
18 A  Not that I can remember.
19 Q  Do you know if a conference was held with Mr. Coon
20    going over these allegations with him?
21 A  No, I never met with Coon.
22 Q  Do you know if Mr. Bazzell wrote Mr. Coon about
23    this incident or --

Page 36

1  A  I have no idea.
2  Q  -- talked with Mr. Coon?
3     At the time, were you satisfied that
4     Mr. McDaniel had looked at these matters very
5     earnestly and seriously?
6  A  I felt Mr. McDaniels had done everything he could.
7  Q  All right. Did the concern that you expressed
8     about Adam and Mr. Coon come up before or after
9     this episode concerning Marijuana?
10 A  I had noticed that Adam was hanging around him a
11    lot before the cigarette thing. So, yeah, I had
12    ideas even before then.
13 Q  Do you have information now as we're talking this
14    morning that Coon sexually abused Adam?
15 A  No, I don't. I sure don't.
16 Q  I don't, either. That's why I am asking about
17    your concern.
18 A  No, sir. I have no evidence whatsoever that he
19    did anything with Adam other than just ride him
20    around.
21 Q  Okay. Did you ever see Justin Reed with Mr. Coon?
22 A  I wouldn't have known it if I had, because I
23    didn't know who Justin was. I know the older Reed

Page 37

1     boy and the daughter, the red-headed daughter.
2     Those were the only Reed children I knew.
3  Q  Do you know when you first had concerns about Adam
4     that Adam had changed, or when that started
5     appearing in your mind?
6  A  Uhm, it was sometime before the cigarette
7     incident, but I'm not sure how long.
8  Q  And as I understand, you never went to Adam's
9     parents to share this concern?
10 A  No. I didn't know Adam's parents.
11 Q  And you didn't go to any school official to
12    share --
13       MS. DePAOLA: Object to the --
14 A  No.
15       MS. DePAOLA: That mischaracterizes her
16          prior testimony.
17 Q  Did you go to any school official to talk about
18    your concern with Adam?
19 A  No, I didn't.
20 Q  If Mr. McDaniel were to indicate you never
21    mentioned Adam to him in any form or fashion,
22    would you contradict that?
23 A  I don't remember. What I -- I said I may have

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

Page 38

1    said something to him about Adam. I do not know
2    for sure that I did.
3  Q   Are there any notes that you might have that could
4      refresh your recollection about that?
5  A   No, sir.
6  Q   You said it's possible you may have mentioned it;
7      correct?
8  A   Yes, sir. I may have.
9  Q   And you answered that in response to counsel's
10     question. But if Mr. McDaniel has no recollection
11     that you ever mentioned Adam or any students other
12     than those that were riding in the car, would you
13     contradict that?
14       MS. DePAOLA: Object to the form.
15 A   I can't remember. So, how could I object if he
16     says I didn't?
17 Q   In other words, you really don't know if you
18     mentioned Adam to Mr. McDaniel?
19 A   So, it remember.
20 Q   So, it's a possibility, but you don't remember
21     doing that?
22 A   I do not remember.
23 Q   When you saw Mr. Coon fishing with Adam, do you

Page 39

1      know what other students were with him at the
2      time?
3  A   Best I can remember, it was just him and Adam.
4  Q   Okay. You mentioned camping trips that your --
5  A   Those were just things that the kids told me. I
6      never saw any of it.
7  Q   And you don't know who might have gone on those
8      trips?
9  A   No, sir. I sure don't.
10 Q   But your son didn't go on those trips?
11 A   No, sir. My son never went anywhere with him
12     again.
13 Q   Okay.
14       MR. SWEENEY: Thank you for coming in
15       this morning.
16       THE WITNESS: Thank you.
17       FURTHER EXAMINATION
18 BY MS. DePAOLA:
19 Q   Let me ask just a couple more questions. What
20     kids told you about -- what kids told you about
21     the camping trips?
22 A   Ma'am, there is probably 100 to 150 children in
23     and out of my home in a week's time. It could

Page 40

1      have been any of them.
2  Q   Does that mean you don't remember?
3  A   Yes, ma'am.
4  Q   That all you have to let me know.
5  A   I don't remember.
6  Q   If you don't recall, that's fine.
7        Did you ever hear that he took kids on trips
8      to Florida?
9  A   No, not that I can recall.
10 Q   How about Six Flags?
11 A   Now, I remember something somebody said that he
12     had taken somebody to Six Flags. But, you know, I
13     don't -- like I said, this is kids talking. And
14     me picking up pieces here and there. It wasn't
15     conversations directly to me.
16 Q   Prior to him pleading guilty to sexual abuse, did
17     you ever hear anything about the cell phones he's
18     provided children?
19 A   I think my son told me that he had gotten Adam a
20     cell phone. But, you know, that was just --
21     that's hearsay. That's just what I was told.
22 Q   Did you tell Mr. McDaniel about that?
23 A   I don't remember.

Page 41

1  Q   Okay. Are you aware of Mr. Coon -- I mean, have
2      you heard anything about Mr. Coon having prior
3      sexual abuse complaints against him in other
4      schools?
5  A   Not that I know of.
6  Q   And this is unrelated to Mr. Coon specifically,
7      but have you ever made any other complaints to the
8      school system about anything?
9  A   Oh, I am sure I have over the years. I have had a
10     lot of children to go through the school system.
11 Q   Okay.
12 A   But I can't recall what they would have been.
13     But, I mean, my oldest stepdaughter is 36 years
14     old, and she graduated from there. So, that's a
15     lot of years. So, I'm sure, over the years, I
16     have complained about things.
17 Q   I mean, complained to the extent of going to the
18     Superintendent or central office personnel?
19 A   Not that I can remember. Just go to the school,
20     complain to the principal or the assistant
21     principal.
22 Q   Okay. And had any of these prior complaints been
23     made to Mr. McDaniel?

11 (Pages 38 to 41)

Page 42

1  A   I think that was Mr. McDaniel's first year there
2      as best I can remember.
3  Q   So, is that a no?
4  A   Yes, ma'am.
5  Q   How about had any of these prior complaints been
6      made to Mr. Pryon?
7  A   I don't even know Mr. Pryon.
8  Q   How about to Mr. Casey?
9  A   Mr. Casey. I may have complained about something
10     to Mr. Casey. I don't remember. I had several
11     children in school during the time he was
12     principal.
13 Q   How about to Ms. Watson, Mona Watson?
14 A   I don't know Ms. Mona Watson.
15 Q   How about to Ms. Shakleford, the police officer?
16 A   Me and Sherry have been friends for a long time.
17     I may have said something to Sherry.
18 Q   Not about Mr. Coon?
19 A   No, not that I can remember.
20 Q   Where does Ms. Shackleford work now?
21 A   Not sure. I think she still works for the
22     Brundidge Police Department, best I can -- best I
23     know.

Page 43

1  Q   Do you know where she lives?
2  A   No, ma'am, I don't. She used to live in our
3      apartment when I had my house in town. But I have
4      no idea where Sherry lives now.
5  Q   Is she married?
6  A   Don't know.
7          MS. DePAOLA: That's all. Thank you.
8          MR. SWEENEY: Thank you very much. I
9          hope you are doing better.
10         THE WITNESS: Thank you.
11
12         (Whereupon, at approximately, 9:50
13         a.m. on the 19th day of July, 2007
14         the deposition was concluded.)
15
16
17         * * * * * * * * *
18     FURTHER DEPONENT SAITH NOT
19         * * * * * * * * * *
20
21
22
23

Page 44

1
2              REPORTER'S CERTIFICATE
3
4   STATE OF ALABAMA
5   MONTGOMERY COUNTY
6
7      I do hereby certify that the above and foregoing
8   transcript of the deposition of POLLY KING was taken
9   down by me in machine shorthand on the 19th of July,
10  2007, and the questions and answers thereto reduced to
11  writing under my personal supervision, and that the
12  foregoing represents a true and correct transcript of
13  the proceedings given by said witness upon said
14  hearing.
15     I further certify that I am neither of counsel nor
16  related to the parties to the action, nor am I any wise
17  interested in the results of said cause.
18     Dated this 9th day of August, 2007.
19
20     _____
21     Mary Moore-Wynn
22     Certified Shorthand Reporter
23

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JR, A MINOR, BY HIS

MOTHER AND FATHER, EAR

AND TMR,

     PLAINTIFF,

VS.                                CASE NO.:

                               2:06-CV-1120-MEF

PIKE COUNTY BOARD OF

EDUCATION,

     DEFENDANT.

* * * * * * * * * *

    DEPOSITION OF MONA WATSON, taken before Mary

Moore-Wynn, as Commissioner, on the 4th of September,

2007, in the offices of Pike County Board of Education,

101 West Love Street, Troy, Alabama, pursuant to

stipulations set forth herein, commencing at

approximately 10:30 a.m.


* * * * * * * * *

## Page 2

```
 1          * * * * * * * * * *
 2          APPEARANCES:
 3  FOR THE PLAINTIFF:
 4  Hon. Deanie Clark Allen
    Azar and Azar
 5  260 Washington Avenue
    Montgomery, Alabama 36104
 6
 7  and
 8  Hon. Susan Shirock DePaola
    Attorney at Law
 9  1726 West Second Street, Suite B
    Montgomery, Alabama 36106
10
11  FOR THE DEFENDANT:
12  Hon. Donald R. Sweeney
    Bradley, Arant
13  One Federal Place
    1819 Fifth Avenue North
14  Birmingham, AL 35203-2104
15  ALSO PRESENT:
16  Elizabeth Ann Reed
17  Dr. Mark Bazzell, Superintendent
18
19
20
21
22
23
```

## Page 3

```
 1          * * * * * * * * * *
 2
 3
 4
 5
 6          STIPULATIONS
 7
 8    It is hereby stipulated and agreed by and between
 9  counsel representing the parties that the deposition of
10  MONA WATSON is taken pursuant to the Federal Rules of
11  Civil Procedure, and that said deposition may be taken
12  before Mary Moore-Wynn, CSR, as Commissioner, without
13  the formality of a commission; that objections to
14  questions, other than objections as to the form of the
15  questions, need not be made at this time, but may be
16  reserved for a ruling at such time as the deposition
17  may be offered into evidence, or used for any other
18  purpose by either party hereto, provided by the
19  Statute.
20    It is further stipulated and agreed by and between
21  counsel representing the parties in this case, that the
22  filing of the deposition of MONA WATSON is hereby
23  waived, and that said deposition may be introduced at
```

## Page 4

```
 1  the trial of this case or used in any other manner by
 2  either party hereto provided for by the Statute,
 3  regardless of the waiving of the filing of same.
 4    It is further stipulated and agreed by and
 5  between counsel and the witness that the reading
 6  and signing of the deposition by the witness is
 7  hereby waived.
 8               INDEX
 9  MONA WATSON
10  Direct Examination By Ms. Allen          5
11  Reporter's Certificate          66
12          INDEX OF EXHIBITS
13  Exhibit Number     Description     Page Number
14  Plaintiff's Exhibit 19  Mona Watson          33
        Interview Summary of Justin Reed
15  Plaintiff's Exhibit 20  Mona Watson Notice    55
        of Deposition
16  Plaintiff's Exhibit 21  Pike Regional        58
        Child Advocacy Investigative
17      Protocol
    Plaintiff's Exhibit 22  Multidisciplinary    59
18      Team Agreement
19
20
21
22
23
```

## Page 5

```
 1               MONA WATSON
 2    (Whereupon, the witness, after having first been
 3  duly sworn to speak the truth, the whole truth, and
 4  nothing but the truth, testified as follows:)
 5          MS. ALLEN:  Usual stipulations?
 6          MR. SWEENEY:  Please.
 7          DIRECT EXAMINATION
 8  BY MS. ALLEN
 9  Q  Please state your name.
10  A  Mona Watson.
11  Q  Ms. Watson, we have talked before.  You know that
12      I am the attorney for Justin, and Susan DePaola.
13      You have met her.  We represent Justin in this
14      case against the Pike County Board of Education
15      and the individuals named.
16  A  Uh-huh.
17  Q  Have you ever been deposed before?
18  A  Uhm, no.  Not like this.
19  Q  Well, I will be asking you questions about the
20      issues in this case.  And if you don't understand
21      my question, please be sure to stop me.  And I'll
22      try to clarify it.  If you don't, and you answer
23      the question, I will assume that you understood
```

JR, A Minor                        September 4, 2007 Pike County Board of Education

Page 6

1   what the question was.
2       I'll try to give you a chance, and at any
3   time, if you want to say, I need to change that,
4   add to that, clarify that, feel free to do so.
5       Have you talked to anybody prior to this
6   deposition besides us?
7   A   Since when?
8       MR. SWEENEY:  You have talked to me in
9       my capacity as attorney for the
10      Board.
11  A   Yes.  Yes.
12  Q   What did you all discuss?
13      MR. SWEENEY:  Object to the form.  She
14      is an employee of the school system.
15      And I object that that is
16      attorney/client confidential
17      discussions.
18  BY MS. ALLEN
19  Q   Where do you currently reside?
20  A   In Troy.
21  Q   What is your address?
22  A   515 West Fairview Street, Troy.
23  Q   And the zip code?

Page 7

1   A   36081.
2   Q   How long have you lived there?
3   A   Twenty-nine years.
4   Q   So, you're lifelong resident of Troy?
5   A   Yes -- well, since '73.
6   Q   Are you married?
7   A   I am.
8   Q   To whom?
9   A   Wallace Watson.
10  Q   Is this the only marriage?
11  A   Uh-huh.
12  Q   Do you have any children?
13  A   I do.
14  Q   How many?
15  A   Two.
16  A   How old are they?
17  A   Brandon is 27, and Brad is 24.
18  Q   Give me a little bit of your educational history
19  A   I have a BS degree in physical education and
20      recreation.  I have a Master's degree in secondary
21      education.  I have a Master's degree in special
22      education, with emphasis in mental retardation.  I
23      also have certification, Master's level

Page 8

1   certification, in learning disabilities and
2   emotional conflict.  I also have a Master's degree
3   in counseling psychology.
4   Q   Wow.  What in your education -- or have you had
5       any specific training in sexual abuse?
6   A   Yes.  Back in the '80's, late '80's, sexual abuse
7       became my point of interest and my point of study.
8       I began going to all the conferences and
9       symposiums I could in that area.  I began
10      attending the national symposium on child abuse --
11      which is a week-long training -- 12 years ago.
12      And I have been every year since then.
13      I have been to forensic evaluation and
14      interviewing of sexually abused children, which is
15      a 40-hour course.  I have been to play therapy
16      trainings.  I have been to numerous trainings on
17      sexual abuse.
18      MS. DePAOLA:  Let me stop you.
19      (Off-the-Record discussion.)
20  Q   We want to clarify:  You were not an employee of
21  Pike County Board of Education during 2004-2005,
22  were you?
23      MR. SWEENEY:  Object to the form.  You

Page 9

1       can answer.
2   A   Yes.
3   Q   Yes, you were an employee?
4   A   Uh-huh.
5   Q   So, you were an employee of Pike County Board of
6       Education during 2004 and 2005?
7   A   Uh-huh.
8       MS. ALLEN:  Can we go off the Record for
9       a second?
10      (Brief off-the-Record discussion.)
11  BY MS. ALLEN
12  Q   Back on the Record.  What we want to clarify is --
13      and we'll get to this -- but when did you leave
14      Pike County High School?
15  A   In February -- February 1st of 2005, I left Pike
16      County High School as guidance counselor and
17      became the Executive Director of the Child
18      Advocacy Center.
19  Q   Okay.  All right.  So, you've got extensive
20      training in sexual abuse?
21  A   (Witness Indicating.)
22  Q   What about training as far as mentally retarded or
23      handicapped children who are sexually abused; have

3 (Pages 6 to 9)

JR, A Minor                          September 4, 2007 Pike County Board of Education

| Page 10 | Page 12 |

**Page 10**

1    you had training in that area?
2  A  Uhm, yes.
3  Q  Go ahead.
4  A  That's why I do what I do now.  Back in the '80's,
5     I worked with Emotionally Disturbed children.  And
6     most of those children were or had been abused in
7     some way.  Most of those children that were in my
8     class were special education students.  They all
9     were special education students.  So, that's when
10    I began my training in working with special
11    education students who had been abused.
12 Q  So, is it your experience that mentally retarded
13    or special needs children that there is a higher
14    incidence of sexual abuse among those children?
15 A  No, ma'am.
16       MR. SWEENEY:  Object to the form.  You
17          can answer.
18 A  No.
19 Q  Can you clarify what you were saying then?  You
20    said you worked with special needs kids, and it
21    was --
22 A  Well, what I meant was emotionally disturbed
23    children.  Emotionally disturbed children, a lot

**Page 11**

1     of the times, end up being placed in special
2     education, because the definition of Emotionally
3     Disturbed was children who did not perform in
4     school due to an unknown reason.  And those
5     unknown reasons, a lot of the times, were due to
6     abuse or dysfunctional home environments, those
7     kinds of things.
8        I have found that through my own work, through
9     my own study, that that was the case as to
10    children who were acting out, unusual behavior
11    patterns, those kinds of things.  But that doesn't
12    mean all children ended up that way.
13 Q  Right.  Are you familiar with any studies which
14    indicate that mentally retarded, or special needs
15    kids -- and I'm not talking about just emotionally
16    disturbed -- are more vulnerable to sexual abuse?
17 A  No specific studies, no.
18 Q  So, in your experience, there is not a higher
19    incidence of sexual abuse among special needs kids
20    or mentally retarded kids?
21 A  I don't see that now.  I don't see that.  Sexual
22    abuse occurs across the board.  We have children
23    that are doctors' children, lawyers' children,

**Page 12**

1     valedictorians, all the way down to mentally
2     retarded.
3  Q  Well, but, specifically, I was talking about any
4     studies or statistics that would indicate that
5     mentally retarded or special needs kids are more
6     vulnerable to sexual abuse.
7        MR. SWEENEY:  I'm sorry.  You asked her
8          about her experience, and that's
9          what she was answering.
10 Q  All right.  Then let me ask you about your -- I
11    thought I asked you about any studies or any
12    statistics that you were aware of.
13 A  I have statistics that we have been tracking since
14    2002.  There is no indication in our statistics
15    that indicate any certain group of children is
16    more apt to be sexually abused as any other group.
17 Q  So, when you say you have been tracking
18    statistics, from what group, what kind of control
19    group?
20 A  Our Pike County, Bullock County, Coffee County.
21 Q  Oh, okay.  So, you have records of those students
22    that you have been tracking that are mentally
23    retarded versus those that are not?

**Page 13**

1  A  Having their specific disabilities, no.  No.
2  Q  Are you saying that you have never reviewed any
3     professional literature that indicated that
4     mentally retarded -- and I don't want to eliminate
5     any kind of special need that has to do with
6     intelligence -- but that mentally retarded
7     children are not more vulnerable to sexual abuse?
8  A  I won't say that I haven't.  I review a lot of
9     literature.  My emphasis when I am reviewing
10    literature is signs and repercussions -- what
11    causes children to become abused.  I don't look at
12    a particular type of child.  That's just not been
13    my field of study.
14 Q  You mentioned signs.  What would be some of the
15    signs that you would look for in a child that had
16    been sexually abused?
17 A  I do a lot of inservices and a lot of speeches, or
18    whatever, on this area.  And there is no set rule
19    of signs.  People like to think that children that
20    have been abused are withdrawn.  They -- you know,
21    they tell somebody right off.  They may act out
22    sexually.  I'm just pulling a few off the list
23    that most people think is the way it should be.

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
              Court Reporting Services

JR, A Minor                                    September 4, 2007 Pike County Board of Education

Page 14

1    But that's not the way it should be, because some
2    children -- I mean, there is not a book written
3    anywhere that says this is the signs that sexually
4    abused children always have, because that's not
5    the case.
6  Q   All right.  There are no signs that say that these
7    are the -- there is no indication that these are
8    the signs they always have, but what are some of
9    the signs that you see in sexually abused
10   children?
11 A   Some of the signs that I see common, sexually
12   acting out.  Uhm, usually, some type of change in
13   behavior from before and after.  Maybe a change in
14   grades before and after.  Withdrawing from
15   friends, those kinds of things.
16 Q   You have an expertise in the area of sexual abuse?
17 A   Uh-huh.
18 Q   Have you ever done any seminars or been asked to
19   do any seminars or training by the Pike County
20   Board of Education?
21 A   I do inservice with all the teachers in all the
22   schools since I've taken on this capacity at the
23   Child Advocacy Center.

Page 15

1  Q   And when did you take on that capacity at the
2    Child --
3  A   February of 2005.
4  Q   All right.  Prior to February of 2005, did you
5    ever do any seminars or training on sexual abuse?
6  A   As counselor?
7  Q   In any capacity.
8  A   Uhm, I can't remember dates, but there have been
9    many times that I would talk to the faculties of
10   whichever school I was at at the time about
11   reporting and our procedure as far as reporting
12   and what to look for and those kinds of things as
13   counselor.
14 Q   Did you do any specific seminars at Pike County
15   High School?
16 A   No.  Other than just that.
17        MS. DePAOLA:  We want to know the
18          specifics, please.  When you did
19          these seminars.
20 Q   Right.  When you did it, what materials --
21 A   No.
22 Q   -- if any, did you disseminate?
23 A   No.  Not at Pike County High, not as counselor.

Page 16

1  Q   In any capacity.
2  A   As Executive Director of the Child Advocacy
3    Center, in the -- I believe in the fall, last
4    fall, I believe we did the mandatory reporter.
5  Q   I'm talking about prior to 2005.
6  A   No.  No.
7  Q   Do you know Justin Reed?
8  A   Yes.
9  Q   You know that Justin transferred from Pike County
10   High School to Charles Henderson.
11 A   Un-huh.
12 Q   Did you play any role in that?
13 A   I did.
14 Q   What was that?
15 A   I wrote a letter recommending -- because his mom
16   had asked me to do so -- recommending that he be
17   allowed to transfer to Charles Henderson just
18   because of any repercussions that he might get
19   from other children or anything like that.
20 Q   Did you feel like a transfer was in his best
21   interest?
22 A   Uhm, personally, I don't know.  I really don't
23   know if that was the best thing for him to do.

Page 17

1    Justin has a hard time getting along with other
2    children.  Has a hard time making friends.  He has
3    a hard time talking to people.  I was concerned
4    about that, changing schools and not knowing
5    anyone.
6  Q   And what was the reason that he would be changing
7    schools?
8  A   Because his mother was concerned that he would be
9    getting a lot of teasing and repercussions from
10   the other children due to what had happened with
11   him and Mr. Coon.
12 Q   So, you were aware of what had happened with
13   Justin and Mr. Coon?
14 A   Yes.
15 Q   And you were concerned about him transferring,
16   because you knew that Justin had difficulty making
17   friends --
18 A   That was a concern.
19 Q   -- and that he was withdrawn and had difficulty
20   talking to people?
21        So, transferring, in your opinion, was a mixed
22   blessing?
23 A   Yeah.

5  (Pages 14 to 17)

Page 18

1 Q  Do you recall what you put in the letter that you
2    wrote to Troy City schools requesting the
3    transfer?
4 A  Actually, I directed the letter to the Pike County
5    Board, I believe, asking for permission for him to
6    transfer to Charles Henderson.
7 Q  Do you recall what you put in that letter to the
8    Pike County Board?
9 A  Not exactly. I sure don't.
10 Q  I don't think I asked you this:  When did you
11    start as guidance counselor at Pike County?
12 A  2000.
13 Q  So, you started in 2000, and your last day at Pike
14    County was in February of 2005?
15 A  Five. Uh-huh.
16 Q  And, specifically, you left Pike County for what
17    reason?
18 A  To become Director of the Child Advocacy Center.
19 Q  What was the purpose of the Child Advocacy Center?
20 A  The purpose of the Child Advocacy Center is to do
21    interviews of children that have been sexually
22    abused that are referred to us by the Department
23    of Human Resources or law enforcement.  We do

Page 19

1    courtesy interviews.  We do not set up the
2    interviews.  We do not solicit the interviews.  We
3    do them as a courtesies for the Department of
4    Human Resources and law enforcement..
5 Q  So, there was no Child Advocacy Center prior to
6    February --
7 A  No.
8 Q  -- of 2005?  All right.  Where were those
9    interviews and that sort of intervention done?
10 A  I have done interviews for a number of years at
11    the DA's office or at law enforcement -- for law
12    enforcement or at the DA's office.  They did them
13    themselves.
14 Q  While you were working at the Pike County High
15    School?
16 A  Yes.
17 Q  So, explain to me exactly who your employer is.
18    When you were -- as an employee of the Child
19    Advocacy Center, are you an employee of the Pike
20    County Board of Education?
21 A  I am.  Do you want me to explain that?
22 Q  Were you an employee of the Pike County Board of
23    Education -- you were an employee of the Pike

Page 20

1    County Board of Education while you were a
2    guidance counselor at Pike County High School?
3 A  Yes.
4 Q  And then when you left Pike County and went to the
5    Child Advocacy Center, you were still an employee?
6 A  Technically.
7 Q  All right.  Explain that.
8 A  Okay.  When I was hired as Director of the Child
9    Advocacy Center, we had formed a board.  I am a
10    separate entity of the Pike County Board.  I am
11    not -- I am a separate -- I work under a separate
12    board.  I have a board who directs what we do, how
13    we do it.  That board is directed by the Alabama
14    Network of Children's Advocacy Centers.  I am
15    employed by the Pike County Board of Education due
16    to a partnership that was formed between the Pike
17    County Board and the Child Advocacy Center Board
18    to basically retain my retirement.  Funds that pay
19    my salary is paid to the Pike County Board of
20    Education through grants.  Pike County Board of
21    Education does not pay me a cent from their funds.
22    All monies that are paid to me is paid to me
23    through grants and monies that are raised through

Page 21

1    the Child Advocacy Center.
2 Q  All right.  You said you were working under a
3    different board than the Pike County Board of
4    Education.  Explain that.
5 A  I am under the Pike County Board of Education as
6    far as hiring and firing and all of those kinds of
7    things.  But as far as what we do and how we do it
8    at the Child Advocacy Center, we have a separate
9    board that is in no way connected to the Pike
10    County Board of Education.
11 Q  So, in 2005, when you became Director of the Child
12    Advocacy Center, you were -- let me get back to
13    that.  Let me make sure I understand what you have
14    said.  I will go back and review that.
15    Tell me what your responsibilities were as far
16    as counselor at Pike County High School.
17 A  At Pike County High School, I was responsible for
18    scheduling, scholarships, planning -- four-year
19    plans for the children, you know, getting them
20    ready for college, helping them get into college,
21    doing scholarships and grades and that kind of
22    thing, as well as counseling.  I tried to do a
23    little counseling when I could.  But as a high

6 (Pages 18 to 21)

JR, A Minor                          September 4, 2007 Pike County Board of Education

## Page 22

1    school guidance counselor, you don't have that
2    much time.
3  **Q  How involved were you in discipline matters at**
4    **Pike County High School?**
5  A   I was not involved in discipline.
6  **Q   Whatsoever?**
7  A   I would say a lot of times when a child was --
8    gotten into some type of trouble or something,
9    then the principal or assistant principal would
10   refer them to me for counseling as part of
11   their -- due to what had happened.
12 **Q   Were you required or did you attend BBSST meetings**
13   **while you were counselor at Pike County High**
14   **School?**
15 A   BBSST, yes.
16 **Q   Was there ever any any discussion or training at**
17   **BBSST meetings that related to sexual abuse?**
18 A   Uhm --
19 **Q   Did the topic ever come up?**
20 A   Yes. Uhm, BBSST training was about making sure
21   that children receive the appropriate educational
22   placement and academic help as well as what to do
23   if they were showing signs of any other problems,

## Page 23

1    you know, who to go to, who to call, who to
2    contact, that kind of thing.
3  **Q   Was there any specific training at those meetings**
4    **on recognizing sexual abuse, what to do if it was**
5    **suspected, that sort of thing?**
6  A   Yes.
7  **Q   When? Tell me when. During the 2004 school year,**
8    **did you have any specific trainings at BBSST**
9    **meetings?**
10 A   We always did BBSST training in the fall when
11   school first started.
12 **Q   So, in 2004, when school first started, you had**
13   **some specific training on recognizing sexual**
14   **abuse?**
15 A   I would say, yes. But I'm not -- I mean, I'm
16   almost positive. But I couldn't say what date.
17 **Q   So, you can't recall -- how many meetings did you**
18   **have in the fall?**
19 A   In training, BBSST training?
20 **Q   Right.**
21 A   I think it's one day of training, possibly two.
22 **Q   You're talking about Pike County High School,**
23   **right; at Pike County High School?**

## Page 24

1  A   Isn't that what you asked me?
2  **Q   That's what I was asking. You're taking about**
3    **Pike County High School. So, you had one or two**
4    **meetings and --**
5  A   Training dates. And then we had a committee
6    formed.
7  **Q   So, you don't recall any specific -- or if there**
8    **was any specific training on recognizing sexual**
9    **abuse?**
10 A   We always discuss that. That's part of the
11   training procedure.
12 **Q   All right. So, can you tell me what was**
13   **discussed, any materials that were given out, who**
14   **led the discussion?**
15 A   Karen Berry usually did the training on BBSST.
16   And then we would talk about specifics. That's
17   been four years ago. I cannot remember exactly
18   who did what at that particular time.
19 **Q   Can you recall any discussion about recognizing**
20   **sexual abuse in children?**
21 A   That was part of the training, yes.
22 **Q   Right. Can you recall any of the discussion --**
23 A   No.

## Page 25

1  **Q   None of it?**
2  A   That's been --
3  **Q   Any of the discussion about recognizing abusers?**
4  A   I have given so many seminars since that date on
5    recognizing the abusers and signs of sexual abuse,
6    I cannot pinpoint one time back four years ago.
7  **Q   Did you discuss any policy or procedure that the**
8    **Board might have for reporting --**
9  A   Yes. Yes.
10 **Q   All right. What was that?**
11 A   Procedure, we had -- we have -- well, we had a
12   procedure throughout the County that if a
13   report -- if a teacher suspected that there was
14   any type of abuse or any problem dealing with a
15   child that might interfere with their academic
16   progress to report it to the counselor. And then
17   the counselors were usually the reporters after
18   they told the principal.
19 **Q   The counselor reported it to the principal, and**
20   **then who did the counselor report it to?**
21 A   Department of Human Resources.
22 **Q   Is this written down anywhere in any school Board**
23   **policy or procedure manual?**

7 (Pages 22 to 25)

Page 26

1   A   It's in our -- again, that's been four years ago.
2       It's in our policy and procedure book now on
3       mandatory reporter. But back then, I think it was
4       just basically an accepted fact. That's the way
5       we did it.
6           In the State of Alabama, there is not a set
7       way that it has to be done. It's usually adopted
8       by each individual school system as to how they do
9       it. And as I go out and speak to all these
10      schools now, I make sure I tell them how important
11      it is to have, you know, a procedure in place.
12          But as far as whether it's written down, I'm
13      not sure.
14  Q   So, you never saw any Pike County Board of
15      Education policy or procedure for reporting sexual
16      abuse?
17          MR. SWEENEY: Object to the form.
18  A   I believe --
19          MR. SWEENEY: You can answer.
20  A   I believe it's in our policies and procedure book.
21      But I am the one that usually did the inservices
22      on that. So, I am not sure.
23  Q   Had you ever seen any Pike County Board policy or

Page 27

1       procedure on investigating sexual abuse
2       allegations?
3   A   Absolutely not. That's not the purpose of the
4       Board.
5   Q   Excuse me?
6   A   The Board does not investigate child abuse. That
7       is done by law enforcement or Department of Human
8       Resources.
9   Q   So, the Board does not do any investigations of
10      child abuse allegations in schools?
11  A   If it's done by a Board employee, then they would
12      do their investigation as far as that goes. But
13      as far as investigating a child abuse allegation
14      of any sort, no. If it involves a Board employee,
15      yes.
16  Q   All right. If a school -- if there is an
17      allegation, as in this case, of a teacher sexually
18      abusing a child, is there a Board policy and
19      procedure to do the investigation, how to handle
20      the investigation?
21  A   That would be administrative handbook. And I was
22      not an administrator. I don't know.
23  Q   So, have you ever seen anything like that?

Page 28

1   A   Administrative handbook? No.
2   Q   Have you ever seen a Board, a written policy or
3       procedure put out by the Pike County Board of
4       Education that -- that informed its employees of
5       how to investigate sexual abuse allegations?
6   A   It's made mention to in our policies and
7       procedures. But as far as exactly what's done,
8       no.
9   Q   No procedure that you have ever seen?
10  A   Basically, I am -- I think I remember it being
11      mentioned in our policies and procedures, but as
12      far as exactly what's done, that's in our
13      administrative handbook. And that's for
14      administration.
15  Q   When you say administrative handbook, what are you
16      referring to?
17  A   Administrators have their own -- have a handbook
18      that --
19  Q   As a guidance counselor in the school, would it
20      not be part of your responsibility to know the
21      procedure for investigating a sexual abuse --
22  A   Of a Board --
23  Q   -- (inaudible.)

Page 29

1           THE COURT REPORTER: I'm sorry. I
2       missed part of that.
3   Q   As a guidance counselor in a school, would it not
4       be part of your responsibility to know what the
5       procedure was to investigate sexual abuse
6       allegations by a Board employee?
7   A   No.
8   Q   That would not be part of your --
9   A   No.
10  Q   -- responsibility?
11  A   Okay.
12          MS. DePAOLA: Even when a student is
13      involved?
14          MS. ALLEN: Pardon?
15          MS. DePAOLA: Even when a student is
16      involved?
17          THE WITNESS: My responsibility as a
18      guidance counselor is to report to
19      the proper authorities what has been
20      suspected or allegations -- or any
21      allegations that have been made.
22          My position as a Board
23      employee, as a guidance counselor,

Mary Moore-Wynn, CSR   Mary Moore-Wynn      (334)244-0203
Court Reporting Services

JR, A Minor                        September 4, 2007 Pike County Board of Education

---

Page 30

1    is not to investigate. That's not
2    my job.
3    BY MS. ALLEN
4    **Q    Okay.  I didn't ask you if that was your job to**
5    **investigate.  I asked you was it your job to know**
6    **what the procedure to investigate is; what the**
7    **Board procedure to investigate is.**
8    A    No.  My job -- that would be left up to the
9    administrators.
10   **Q    When did you first become aware of any allegations**
11   **of sexual abuse by Mr. Coon?**
12   A    In July of 2005.
13   **Q    Can you tell me how you became aware of the**
14   **allegations?**
15   A    Uhm, I was contacted by the Department of Human
16   Resources and law enforcement to do an interview
17   of Justin Reed due to allegations that were
18   made -- or reported to law enforcement.
19   **Q    Did you hear about the allegations of sexual abuse**
20   **of Blake Faulkner before you heard about the**
21   **allegations against Justin Reed?**
22   A    Yes.
23   **Q    Were you called by the Department of Human**

---

Page 31

1    **Resources to do an interview of Blake Faulkner?**
2    A    No.
3    **Q    Why would that be?**
4    A    Because the alleged abuse occurred in Butler
5    County.
6    **Q    So, the Child Advocacy Center in Butler County**
7    **would have done that interview?**
8    A    I would hope so.
9    **Q    So, you never interviewed Blake Faulkner?**
10   A    No.
11   **Q    Did you ever interview anyone other than Justin**
12   **Reed?**
13   A    Uhm --
14   **Q    Relative to any sexual abuse claims by Mr. Coon.**
15   A    No, not until we interviewed Joey.
16   **Q    All right.  I want to talk to you about the**
17   **interview with Justin.  When was the first time**
18   **you interviewed Justin?**
19   A    I believe it was on July 13th.
20       MR. SWEENEY: I'm sorry.  What was the
21       date?
22       THE WITNESS: 13th.
23       MR. SWEENEY: Of what month?

---

Page 32

1       THE WITNESS: July.
2    BY MS. ALLEN
3    **Q    Of '05?**
4    A    Uh-huh.
5    **Q    And you did this interview at the request of who?**
6    A    Law enforcement.
7    **Q    Specifically, who called you from law enforcement?**
8    A    Bob Bradbury, Investigator.
9    **Q    Where did the interview take place?**
10   A    At the Child Advocacy Center.
11   **Q    To your knowledge, was this the first time Justin**
12   **had been interviewed by anybody?**
13   A    I'm sure law enforcement had done preliminaries.
14   But I'm not sure.
15   **Q    Does the procedure allow for law enforcement to do**
16   **any interviewing before you do the interview?**
17   A    The procedure is if a allegation comes in to law
18   enforcement or to the Department of Human
19   Resources, they get just the preliminary
20   information, basic information, and then they set
21   the interview up at the Child Advocacy Center.
22   The purpose of that is to keep that child from
23   having to go through the -- you know, the whole

---

Page 33

1    thing over and over and over again.
2    **Q    So, Mr. Bradbury called you and asked you to**
3    **interview Justin.  And interview held on July 13th**
4    **of '05?**
5    A    During that week.
6    **Q    Who was present at that interview?**
7    A    Bob Bradbury with the Pike County Sheriff's
8    Department, and Misty Hubbard through the
9    Department of Human Resources, and myself.  And I
10   believe that was all.
11   **Q    Was the DA present at the interview?**
12   A    No.
13   **Q    Okay.  I want to introduce this as an exhibit.**
14   **Would you tell me what that is?**
15   A    It's just a brief summary of the interview.
16       MR. SWEENEY: What are we marking this
17       as Exhibit what?
18       MS. ALLEN: Exhibit 19.  Plaintiff's
19       Exhibit 19.
20       (Whereupon, Plaintiff's Exhibit 19
21       was marked for identification and
22       is attached hereto.)
23

---

Mary Moore-Wynn, CSR Mary Moore-Wynn         (334)244-0203
Court Reporting Services

Page 34

1  BY MS. ALLEN
2  **Q    If you will notice where it says present at**
3  **forensic interview --**
4  A    Uh-huh.
5  **Q    -- who does it say was present?**
6  A    Mona Watson, Misty Hubbard, and Bob Bradbury.
7  **Q    And --**
8  A    DA.
9  **Q    Who would that have been?**
10 A    Viewed by the DA.
11      Bruce Matthews with the DA's office viewed the
12      tape.
13 **Q    So, is Bruce Matthews a DA?**
14 A    No.  He's an investigator through the DA's office.
15 **Q    So, explain.  Was he actually present --**
16 A    No.
17 **Q    -- at the interview?**
18 A    I -- I don't think so.  He was not there.  That's
19      not the norm for the DA to be there.  The norm is
20      for him to view the tape.  The norm is not for him
21      to be there.
22      To clarify that a little bit, when we do an
23      interview, the only person in the room with the

Page 35

1      victim, or the alleged victim, is myself.  This
2      was a little bit unusual that day, because Misty
3      Hubbard actually sat in on the interview with me.
4      We no longer do that.
5      But the DA normally is not there during the
6      interview.
7  **Q    And do you recall him being there during that**
8  **interview?**
9  A    Bruce?  He might have been.  I know now he would
10     not have been.  But at that time, he might have
11     been.
12 **Q    Was Bob Bradbury there during that interview?**
13 A    I don't think so.  I don't -- really, I don't
14     think so.  I think that he actually viewed the
15     tape at a later date.
16 **Q    All right.  Tell me about the tape.  Was it an**
17 **audio as well as a videotape?**
18 A    It's a DVD tape.  It's audio and video.
19 **Q    What happened to the tape?**
20 A    The tape is turned over as State's evidence to the
21     DA's office.
22 **Q    And who was the tape turned over to specifically?**
23 A    Bob Bradbury.

Page 36

1  **Q    So, do you have any idea what happened to the**
2  **tape?**
3  A    The -- once the tape is turned over to law
4      enforcement, it's submitted as State's evidence.
5  **Q    Okay.  So, that was the first interview that you**
6  **had with Justin.  And then Plaintiff's Exhibit 19**
7  **says the date of interview was 7/14/05?**
8  A    Right.
9  **Q    Is that correct as far as you're concerned?**
10 A    Yes.
11 **Q    You summarized the interview; is that correct?**
12 A    Base -- yes.  That's basically just a brief
13     summary of what was stated in the interview.
14 **Q    Can you tell us what your summary says?**
15     MR. SWEENEY:  The best evidence is the
16     report.
17 **Q    All right.  Well, I want you to tell me in your**
18 **own words what Justin said in that interview.**
19     MR. SWEENEY:  Object to the form.  If
20     the summary is the best evidence, do
21     you want her to read what's in the
22     document?
23     MS. ALLEN:  No.  I want her to tell me

Page 37

1      from her recollection what Justin
2      told her in that interview.
3      MR. SWEENEY:  Have you put that down in
4      your summary?
5      THE WITNESS:  Uh-huh.
6      MR. SWEENEY:  Well, if you will, rather
7      than second guess that, if you will
8      just read the summary.
9      MS. ALLEN:  No, no, no, no.  I want to
10     know --
11     MS. DePAOLA:  Now, wait a minute Donald.
12     We're entitled to her answering the
13     question.
14     MR. SWEENEY:  You have introduced an
15     exhibit that's the best evidence of
16     what took place two years ago.  And
17     now you're asking her to --
18     MS. ALLEN:  To try to recall --
19     MR. SWEENEY:  -- (inaudible) what she
20     remembers.  I object to the
21     question.
22 BY MS. ALLEN
23 **Q    I would like for you to recall to the best of your**

10  (Pages 34 to 37)

Page 38

1  ability what Justin said to you in that interview.
2           MR. SWEENEY: Let's take a break. And
3           if you will read the document, and
4           then respond to the question. But
5           if you will, read that summary in
6           it's entirety.
7           (Witness reads document.)
8       THE WITNESS: Okay.
9       MR. SWEENEY: Is that more than one
10          page?
11      THE WITNESS: No, this is it.
12      MS. ALLEN: We're back on the Record.
13  BY MS. ALLEN
14  Q   Would you please, Ms. Watson, to the best of your
15      ability, tell me what you recall about that
16      interview with Justin?
17  A   The thing I recall the most about that interview
18      is that Justin had a very difficult time talking
19      about it. He had a very difficult time
20      verbalizing it. He said that Mr. Coon had him
21      perform oral sex on him on several occasions. He
22      said that some of the time it occurred in the band
23      room at Pike County High School. And he said that

Page 39

1      he would have him sit on the steps that led down
2      to the band room from the side door -- that he
3      would have him sit on the steps, and that Mr. Coon
4      would unzip his pants and have him perform oral
5      sex on him.
6   Q   How long did the interview last?
7   A   A long time. It was probably around an hour, hour
8      and a half.
9   Q   And to the best of your recollection, it was just
10      you and Misty Hubbard in the room?
11  A   I know that's --
12  Q   Is that what you said?
13  A   Yes.
14  Q   You think that Bob Bradbury might have been in the
15      room, though?
16  A   Not in our room, no. He might have been in an
17      observation room.
18  Q   But you're sure that he wasn't present during the
19      interview?
20  A   Positive.
21  Q   Okay. But he was observing from another room,
22      Bob?
23  A   If he was not in the other room, he -- I think I

Page 40

1      remember him having to leave during that
2      interview. But as I said, we were taping the
3      interview. So, the only people that were actually
4      in the room during the interview was Misty Hubbard
5      and myself.
6   Q   All right. What happened after the interview?
7      What did you recommend? So, you don't think Bob
8      Bradbury was still there?
9   A   I don't remember.
10  Q   Okay. That was the first interview done with
11      Justin. Do you know when another interview was
12      done with Justin?
13  A   By me?
14  Q   All right. As I recall, Justin gave an interview
15      to Mr. Bradbury and Bruce Matthews. Okay. That
16      was provided as one of the discovery documents.
17      Whose idea was that that he give that interview to
18      them; that they interview him?
19  A   Not mine.
20  Q   Were you present during that interview?
21  A   No.
22  Q   Should they have conducted that interview if they
23      were not trained forensic interviewers?

Page 41

1   A   Was this after my interview or before?
2   Q   After your interview.
3   A   They were trying -- now, I do not investigate.
4      All I do is interview.
5   Q   I understand.
6   A   What they decide to do is their decision. Should
7      they have? Probably because of the fact that we
8      had such a hard time getting information from
9      Justin during the interview.
10  Q   Excuse me just a minute, please.
11          (Off-the-Record discussion.)
12  BY MS. ALLEN
13  Q   Did you indicate to Mr. Bradbury what Justin had
14      told you in the interview?
15  A   Yes.
16  Q   Did you indicate to Mr. Bradbury that it might be
17      a good idea for him to try and get that
18      information -- get Justin to admit to that
19      information to them?
20  A   Yes.
21  Q   Okay. So, did an interview follow?
22  A   I don't know.
23  Q   How would they have gotten the information if they

11 (Pages 38 to 41)

JR, A Minor                    September 4, 2007 Pike County Board of Education

---

Page 42

1    did not interview Justin personally?
2  A   That would be the only way they got the
3      information. Unless I went over with them what
4      was stated in the interview because Justin was
5      speaking so low and so quietly during the
6      interview that they could not understand him on
7      the DVD. So, the only way that we could possibly
8      get enough information for them to prosecute would
9      be for Justin to talk directly to them, which he
10     would not do.
11 Q   How did you know he wouldn't do that?
12 A   Because we agonized over that. We wanted Justin
13     to tell them.
14 Q   Who is "we"?
15 A   Everyone involved. We wanted -- Bob Bradbury,
16     Bruce Matthews, myself -- we wanted him to be able
17     to tell. But he wouldn't. He couldn't.
18 Q   Is it unusual for a mentally retarded child to
19     have difficulty talking about sexual abuse?
20 A   It's hard for any child to talk about sexual
21     abuse. Not just a mentally retarded child.
22 Q   Would it be, in your educational experience, be
23     more difficult, or could it be more difficult for

---

Page 43

1      a mentally retarded child to talk about sexual
2      abuse?
3  A   In Justin's case, it was more of a
4      humiliation-type situation, more so than his
5      disability. Justin is not that low mentally.
6  Q   Okay. Explain what you mean by more of a
7      humiliation issue.
8  A   He was embarrassed. He was a 15-year-old young
9      man. He was embarrassed. He didn't want to talk
10     about it. He talked about it to me, but he didn't
11     want to talk about anyone else. He wanted it to
12     go away. He wanted it to stop.
13 Q   Did Justin articulate to you that he was
14     embarrassed?
15 A   Yes.
16 Q   Did he ever articulate to you that felt guilty?
17 A   Yes.
18 Q   All right. Let's get back to -- all right. That
19     was the initial interview that you did. There was
20     an interview with Mr. Bradbury and Bruce Matthews
21     after that. Did you have any other interviews
22     with Justin?
23 A   Not official interviews, no.

---

Page 44

1  Q   So, that was the only official interview that you
2      had?
3  A   Right.
4  Q   You did end up meeting with Justin, counseling
5      with Justin?
6  A   I talked with Justin on several occasions. Joey
7      and Jessica and Justin were coming in for
8      mentoring, which is a program that we do, as big
9      brother, big sister type just to help them deal
10     with what had happened. They did not discuss what
11     had happened with their mentors. I personally
12     talked with Justin. I wanted Justin to be able to
13     tell what had happened to him. He just -- he just
14     didn't want to. He was receiving counseling
15     originally in Montgomery, so I did not do
16     counseling him, technically. Even though we
17     chatted a lot.
18 Q   Do you know how the sexual abuse allegations
19     became known to begin with, initially, against
20     Mr. Coon?
21 A   Referring to Blake or Justin?
22 Q   Period. Yeah, Blake first. I assume that was
23     when it first came out.

---

Page 45

1  A   I under -- when the interview was set up with
2      Justin, then I was told what else had happened
3      with Blake.
4  Q   All right. Were any other potential victims
5      mentioned?
6  A   Uhm, we felt like there might be. But we didn't
7      know that. Some names had been mentioned. But we
8      had no way of knowing.
9  Q   Do you recall what those names were?
10 A   Uhm, Blake, of course -- and Justin -- Justin's
11     name did not come out until quite a period of time
12     after Blake, I believe. And the only reason
13     Justin's name came out was because Justin's -- I
14     think his number was in Blake's phone or something
15     like that. I think that's where some of the names
16     had come out.
17          MS. DePAOLA: She didn't answer the
18          question.
19          MS. ALLEN: Would you read the question
20          back?
21          (Whereupon, the requested material
22          was read by the Court Reporter.)
23 A   Just speculation, just word of mouth. Justin,

Page 46

1   Blake. Uhm, I think Adam's name was mentioned. I
2   am not sure. That is strictly off the Record.
3   That is just hearsay.
4   Q   Adam who?
5   A   Helms.
6   Q   Did you hear, or were you told, that Justin's name
7       came up because it showed up on Mr. Coon's
8       computer?
9   A   On Mr. Coon's computer?
10  Q   Right.
11  A   I don't --
12  Q   That when a search warrant was issued, and his --
13  A   I believe so, yes.
14  Q   Were any other names mentioned as having come up
15      on Mr. Coon's computer?
16  A   Yes. But I was not at liberty to know that. I am
17      not a part of the investigation.
18  Q   I understand that. But were you told any other
19      names that came up on the computer?
20  A   I believe -- well, Blake's name. I think Adam's
21      name was mentioned. And Justin's. And Jessica's.
22      You know, he was e-mailing a lot of the kids.
23  Q   Anybody else that you can recall?

Page 47

1   A   I would be afraid to say. I can't remember
2       exactly.
3   Q   Okay. So, who told you about the names that
4       showed up on the computer, on Coon's computer?
5   A   I believe Bob Bradbury told me about that.
6   Q   Uhm --
7   A   When we were reviewing the case before the
8       interview.
9   Q   All right. Were you familiar with the
10      investigation that was done by the school based on
11      reports to the school of inappropriate behavior by
12      Mr. Coon?
13          MR. SWEENEY: Object to the form.
14  Q   Were you aware of the investigation?
15  A   No.
16  Q   Were you aware of any reports made to the school
17      by anyone regarding any inappropriate behavior?
18  A   When we received -- when I was asked to do this
19      interview with Justin, I did not know any of that.
20  Q   No, I'm talking about in April or --
21  A   No. I did not know --
22  Q   -- in 2005, did you know that any reports were
23      made to the school?

Page 48

1   A   No.
2   Q   Have you ever heard that?
3   A   I've heard that later.
4   Q   When did you hear that?
5   A   It was during MDT talking about the case.
6           MS. DePAOLA: What's MDT?
7           THE WITNESS: MDT is multidisciplinary
8               team meetings. That's when all the
9               agencies are involved in a case come
10              together to discuss a case.
11  BY MS. ALLEN
12  Q   When would that have been?
13  A   We do it the second Tuesday of every month.
14  Q   When would the MDT meeting have been when you
15      first heard about --
16  A   Probably the first Tuesday of August -- second
17      Tuesday of August in --
18  Q   What year?
19  A   -- 2005.
20  Q   So, you didn't have any idea that anybody had
21      reported any inappropriate behavior of Mr. Coon
22      until August of 2005?
23          MR. SWEENEY: Object to the form.

Page 49

1   A   That's true. I had no way of knowing. I was no
2       longer at the school. I was too busy trying to
3       get a Child Advocacy Center started. I did not in
4       the loop. I did not know.
5   Q   Did you not talk to Mr. Bazzell about any of the
6       reports that were made?
7   A   Not prior to July. Not prior to all of this
8       coming out about -- after school was out that
9       year. I did not know anything about that.
10  Q   So, you were not called in to be an unofficial
11      part of any kind of investigation that was done of
12      Mr. Coon during the 2005 school year?
13  A   That was in April. I left in February.
14  Q   I understand. I said, were you called in --
15  A   No.
16  Q   -- in an unofficial capacity --
17  A   No.
18  Q   Did you talk to Mr. Bazzell during the first part
19      of the -- after you left, and the investigation
20      was taking place --
21  A   No.
22  Q   Okay. Do you know Polly King?
23  A   Yes.

13 (Pages 46 to 49)

JR, A Minor                          September 4, 2007 Pike County Board of Education

Page 50

1  Q   How do you know her?
2  A   She is one of our parents -- or was one of our
3      parents.
4  Q   What do you know about her in connection to the
5      investigation of Mr. Coon?
6  A   She is a band parent.
7  Q   And that's it?
8  A   Allegedly -- uhm, let's see -- I believe that -- I
9      think she was the one that allegedly had made a
10     report about Mr. Coon or something like that, that
11     I heard about later.
12 Q   And you heard about that report she made when?
13 A   After school was out that year.  After all this
14     came out.
15 Q   And what did you hear?
16         MR. SWEENEY:  Object to the form.  You
17         can answer.
18 A   I just heard that she had made a report about
19     something that had happened with Mr. Coon.  Like I
20     said, I was not in on that.  I don't know.  I
21     couldn't say for sure, because I was not there.
22     And I was not part of that investigation.
23 Q   So, again -- while you were at Pike County High

Page 51

1      School, did you ever hear of any -- any suggestion
2      of any inappropriate behavior of any kind by
3      Mr. Coon?
4  A   Sexually?
5  Q   Any kind.
6  A   Inappropriate behavior?
7  Q   Any kind.  That would include --
8  A   He smoked on campus.  Uhm -- the only other time
9      that was inappropriate was one time right before I
10     left he had loaned his -- he said he had loaned
11     his cell phone to Blake, and Blake got his cell
12     phone taken up.  And Mr. Coon had a fit.
13     Screaming at everybody because he had gotten his
14     phone taken up.  And I told him, well, you
15     shouldn't have loaned it to the student.
16 Q   Mr. Coon loaning his cell phone to a student, did
17     that raise any question in your mind about the --
18 A   Other than him being ignorant, no.  We all loan
19     our cell phones to students at some point in time
20     if there is a need that they may use that phone.
21     He told me that the reason he had loaned his phone
22     to Blake was because Blake needed to contact his
23     father who left at 4:00 o'clock in the morning.  I

Page 52

1      did not find that unusual.  I just found it
2      irresponsible.
3  Q   Did you ever loan your cell phone to a student
4      while you were a guidance counselor?
5  A   Every now and then.
6  Q   Did you let them take the phone out of your sight?
7  A   No.
8  Q   Okay.  When you loaned it to them, they always
9      used it with you present?
10 A   Right.
11 Q   Would you ever have loaned your --
12 A   No.
13 Q   Okay.  Did you hear of, or were you aware of, an
14     incident with Mr. Coon connected to choking a
15     child?
16 A   No.
17 Q   You never heard anything about that?
18 A   Choking a child?
19 Q   Choking a child whose last name was Foster.
20 A   No.
21 Q   That would have happened in the fall of '04.
22 A   I remember things -- you know, Mr. Coon would get
23     upset with kids and fly off the handle with kids.

Page 53

1      But as far as choking a child, no.  I don't
2      remember that.
3  Q   Who did you hear, or what were the circumstances
4      of you hearing that he would fly off the handle
5      with kids?
6  A   He would just get angry.  He would get mad with
7      them over -- I've seen it.  I mean, you know, he
8      would get mad.  He was constantly calling me down
9      to his office trying to fix his computer, and he
10     would be fussing and yelling at the kids, you
11     know, about different things.  And then the next
12     minute, he was their best friend.
13         So, you know, you just really -- he just
14     wasn't real consistent.
15 Q   Okay.  So, when it came to the smoking on campus,
16     was that against school policy?
17 A   Yes.
18 Q   Do you know or have any idea what happened as a
19     result of that?
20 A   No.
21     I reported it.
22 Q   Who did you report it to?
23 A   Mr. Casey.

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services

JR, A Minor                                      September 4, 2007 Pike County Board of Education

---

Page 54

1   Q   When did you make that report?
2   A   I can't remember the exact date. But it was
3       during the 2004-2005 year.
4   Q   Would it have been in the fall of 2004? Well, it
5       would have had to have been if it was Mr. Casey.
6   A   Yeah.
7   Q   Because Mr. Casey left in December.
8   A   In December, correct.
9   Q   Were you aware that some kids had reported to
10      Mr. Casey that Mr. Coon had been smoking --
11          MR. SWEENEY: Object to the form.
12  Q   -- on campus?
13  A   I wouldn't know that.
14  Q   Did Mr. Casey indicate whether he had any
15      knowledge of Mr. Coon smoking on campus when you
16      reported it to him; any prior knowledge?
17  A   He had -- I mean, he told me he had discussed that
18      with him and told him not to do it. But now, I
19      don't know.
20  Q   But you actually saw him doing it?
21  A   Yes.
22  Q   So, this would have been after he had done it
23      before, because Mr. Casey had told him not to do

---

Page 55

1       it?
2   A   I don't know when he had been told, or I just know
3       what I --
4   Q   But he said he had talked to him?
5   A   Yes.
6   Q   Mr. Casey said he had talked to him?
7           MS. ALLEN: Can we take a quick break?
8           (Whereupon, Plaintiff's Exhibit 20
9           was marked for identification and
10          is attached hereto.)
11          (Brief recess.)
12  BY MS. ALLEN
13  Q   All right. I'm going to try one more time to
14      clarify something that we're not clear about.
15      Okay. Between February when you left Pike County
16      High School and September when you signed an
17      agreement with the Child Advocacy Center, were you
18      receiving checks from Pike County High School, or
19      Pike County Board of Education?
20  A   Paid by Pike County Board of Education?
21  Q   Yes.
22  A   My last check from Pike County Board of Education
23      came the end of February.

---

Page 56

1   Q   So, you were not an employee during that interim
2       period of Pike County Board of Education?
3   A   Technically, yes, on paper.
4           MS. DePAOLA: Technically yes what?
5   Q   Technically yes what?
6           MR. SWEENEY: If you will let one
7           attorney ask questions, Ms. DePaola.
8   A   It is a very confusing situation. However, it is
9       a partnership between the Pike County Board of
10      Education and the Child Advocacy Center that
11      monies to pay my salary, which comes from grants
12      and other things, runs through -- we reimburse the
13      Pike County Board of Education for my salary every
14      month due to the fact -- so that I could retain my
15      retirement. I only needed two more years to
16      retire. I told the Pike County Board -- the DA's
17      office and the Board of the Child Advocacy Center
18      that I could not accept that job unless I could
19      retain my retirement. It would have been crazy.
20      So, the Board of Education agreed to retain me
21      as an employee, name only, to -- and allow me --
22      they did me a favor -- by allowing me to retain my
23      employment and to retain my retirement.

---

Page 57

1       I do not -- they do not have anything to do
2       with what we do, how we do it, when we do it.
3   Q   So, you did not get paid during that interim by
4       the Pike County Board?
5   A   Monies --
6   Q   February to September of '05, you were not paid by
7       the Pike County Board?
8   A   My check that I get every month is a Pike County
9       Board of Education check. They cut me a check
10      just like they do everyone else.
11  Q   During that period of time?
12  A   They do it today.
13  Q   Okay. But they did it during that period of time?
14  A   Yes.
15  Q   February to September of '05.
16  A   Yes. But the monies were not from the Pike County
17      Board.
18  Q   Did you have any responsibilities as far as the
19      Pike County Board was concerned --
20  A   The only --
21  Q   -- during February to September of '05?
22  A   The only responsibilities that I had was to come
23      to administrators meetings and serve as an

---

15   (Pages 54 to 57)

JR, A Minor                    September 4, 2007 Pike County Board of Education

| Page 58 |
| --- |

1    administrator.
2  Q  Of?
3  A    Pike County Board. I just come to the
4      administrators meetings to keep abreast of what's
5      going on.
6  Q   Okay.
7          MS. ALLEN: I want to introduce this
8          Pike County Regional CAC Protocol
9          into evidence.
10  Q  And ask you, Ms. Watson, if you will identify
11      that.
12  A   This is the Pike Regional Child Advocacy Center
13      Investigative Protocol. This is the way we
14      investigate our cases from the time it's reported
15      to the time it is -- goes for prosecution.
16          (Whereupon, Plaintiff's Exhibit 21
17          was marked for identification and
18          is attached hereto.)
19  BY MS. ALLEN
20  Q  And when was that protocol put into place?
21  A   This was -- the first one was done in September of
22      '05. However, the last one was done February of
23      '07.

| Page 59 |
| --- |

1  Q  So, prior to September of '05, was there a
2      protocol?
3  A   Yes. This was just an update.
4  Q  Okay. Are there any significant changes --
5  A   No.
6  Q  -- in this protocol?
7  A   No. This was done -- actually, it was done in
8      September of '03, the first one. This was just an
9      update. And then this was yet another update. We
10      update it every two years.
11          MS. ALLEN: We will mark that
12          Plaintiff's Exhibit 21.
13          (Whereupon, Plaintiff's Exhibit 22
14          was marked for identification and
15          is attached hereto.)
16      MR. SWEENEY: What was 20?
17      THE COURT REPORTER: You haven't said it
18          on the Record.
19      MS. ALLEN: What was 20?
20      THE COURT REPORTER: It's her Notice.
21      MS. ALLEN: I'm sorry. My Notice of
22          Deposition.
23          And this will be 22, and it is

| Page 60 |
| --- |

1          the Multidisciplinary Team
2          Agreement.
3  BY MS. ALLEN
4  Q  Can you identify Plaintiff's Exhibit 22?
5  A   This is the interagency agreement where all
6      agencies involved in working together for this
7      purpose signs this agreement.
8  Q  Is this an update of an earlier agreement, or is
9      this the initial agreement?
10  A   There has only been one of these. The only thing
11      we do is we sign these every two years, as well.
12      This has not been changed, however.
13  Q  So, this is the initial agreement dated
14      September 6, if I recall?
15  A   2005. But there was one prior to that.
16  Q  All right. I'd like for you to read under
17      Article 2 that first sentence.
18  A   Victims of child abuse and their family in Pike
19      County are underserved in another inadequately
20      served due to a lack of (inaudible) --
21          THE COURT REPORTER: Okay. That's too
22          fast. Sorry.
23  A   Victims of child abuse and their families in Pike

| Page 61 |
| --- |

1      County are underserved in and other instances,
2      inadequately served due to a lack of coordination,
3      collaboration, education, and delivery of the
4      numerous varied services that are available in
5      Pike County and surrounding areas to victims and
6      their families.
7  Q  All right. Can you tell me what some of the
8      inadequacies are that that statement refers to?
9  A   It simply --
10          MR. SWEENEY: Object to the form.
11  A   It simply refers to the fact that prior to the
12      organization of the Child Advocacy Center, all
13      agencies had a job to do. Each agency did their
14      job. But they didn't coordinate services.
15          The purpose of the Child Advocacy Center was
16      to bring all the agencies together to coordinate
17      services so that children and families didn't fall
18      through the cracks, which was happening. And
19      without a coordinating service, that's always
20      going to happen.
21  Q  To your knowledge, did any of this come about as a
22      result of the sexual abuse allegation as at Pike
23      County High School?

Mary Moore-Wynn, CSR Mary Moore-Wynn          (334)244-0203
            Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 62

1          MR. SWEENEY: Object to the form.
2  A   Absolutely not.
3  Q   **The timing of this was not in any way --**
4  A   Absolutely not. We have been working on this for
5      20 years.
6  Q   **Twenty years?**
7  A   Yes, ma'am. My first child abuse case occurred in
8      1987 at Goshen Elementary School. That's when it
9      started.
10 Q  **Okay. Finally, let me ask you a little bit about**
11     **the investigation that was done once the abuse**
12     **allegations became public. Are you familiar with**
13     **the investigation that was -- that took place at**
14     **Pike County High School?**
15 A   As -- personally, no.
16 Q  **If the record indicated that no parents were**
17     **contacted --**
18         MR. SWEENEY: I'm sorry. I'm confused.
19         What investigation are you talking
20         about?
21         MS. ALLEN: The investigation at Pike
22         County High School after the
23         allegations of sexual abuse were

Page 63

1          initially made.
2          MR. SWEENEY: You mean in July?
3          MS. ALLEN: No -- to the school.
4          MR. SWEENEY: You're assuming a fact
5          that's not of record that there was
6          a sexual abuse investigation in
7          April. I object to the form of the
8          question.
9          MS. DePAOLA: You can answer. We --
10         Dr. Bazzell testified there was an
11         investigation.
12         MR. SWEENEY: It's one thing that an
13         investigation concerning Marijuana
14         and smoking took place. It's
15         another based on the insertion of
16         sexual abuse that you have just
17         included.
18             I object to the form of the
19         question.
20         MS. DePAOLA: You can answer.
21         MS. ALLEN: You can answer.
22 A   I didn't -- I wasn't involved in that.
23 Q  **I understand. My question is this: If an**

Page 64

1      investigation was conducted, and no parents were
2      contacted, no teachers were contacted --
3          (Off-the-Record discussion.)
4          MS. ALLEN: I'll withdraw that question.
5          Do you have anything else?
6          (Off-the-Record discussion.)
7  BY MS. ALLEN
8  Q   **Would I be correct in saying that this policy that**
9      **we have introduced as -- where is it --**
10     **Plaintiff's Exhibit 21 does not cover**
11     **investigating sexual abuse by a teacher against a**
12     **student?**
13 A   No.
14 Q  **No, it does not?**
15 A   It does not. It's any allegation. It doesn't
16     matter if it's a teacher or not.
17 Q  **I understand. I understand. But there is nothing**
18     **specifically in there that would cover**
19     **investigation of sexual abuse by a teacher against**
20     **a student?**
21 A   No. This is not investigative protocol of a
22     school.
23         MS. ALLEN: I understand. I understand.

Page 65

1          That's all.
2          MR. SWEENEY: Thank you very much. No
3          questions. You may be excused.
4          (Whereupon, at approximately, 11:50
5          a.m. on the 4th day of September,
6          2007 the deposition was
7          concluded.)
8          * * * * * * * * *
9      FURTHER DEPONENT SAITH NOT
10         * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23

17  (Pages 62 to 65)

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
            Court Reporting Services

JR, A Minor                    September 4, 2007 Pike County Board of Education

Page 66

```
 1
 2            REPORTER'S CERTIFICATE
 3
 4   STATE OF ALABAMA
 5   MONTGOMERY COUNTY
 6
 7      I do hereby certify that the above and foregoing
 8   transcript of the deposition of MONA WATSON was taken
 9   down by me in machine shorthand on the 4th of
10   September, 2007, and the questions and answers thereto
11   reduced to writing under my personal supervision, and
12   that the foregoing represents a true and correct
13   transcript of the proceedings given by said witness
14   upon said hearing.
15      I further certify that I am neither of counsel nor
16   related to the parties to the action, nor am I any wise
17   interested in the results of said cause.
18      Dated this 11th day of September, 2007.
19
20            _____
21            Mary Moore-Wynn
22            Certified Shorthand Reporter
23
```

Mary Moore-Wynn, CSR Mary Moore-Wynn        (334)244-0203
        Court Reporting Services