**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **JR a Minor, by his mother** * | |
| **EAR** * | |
| **Plaintiffs** * | |
| * | |
| **v.** * | |
| * | |
| **PIKE COUNTY BOARD OF** * | |
| **EDUCATION,** * | |
| **SAMUEL MARK BAZZELL** * | |
| **Individually and in his official capacity** * | |
| **as Superintendent of Schools;** * | |
| **TERRY CASEY, individually and in** * | |
| **his official capacity as Principal** * | |
| **Of Pike County High School,** * | **Case No. CV 2:06-cv-1120-MEF** |
| **BUDDY PYRON, individually and in** * | |
| **his official capacity as** * | |
| **Principal of Pike County High School,** * | |
| **ROBERT MCDANIEL, individually** * | |
| **and in his official capacity as Assistant/** * | |
| **Principal of Pike County High School;** * | |
| **CHARLES LESLIE COON, individually** * | |
| **and in his official capacity as a teacher** * | |
| **at Pike County High School** * | |
| **DOE DEFENDANTS 1-5 being those** * | |
| **persons legally responsible for providing** * | |
| **for the safety of special education** * | |
| **students and for conducting** * | |
| **investigations of complaints** * | |
| **relating to the physycial safety of** * | |
| **students and for establishing policies** * | |
| **and procedures to protect said students.** * | |
| **Defendants** * | |

**PLAINTIFF'S EVIDENTIARY SUBMISSION**
**IN RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
**Part II**

Comes now JR by and through his attorney of record and submits the following
evidentiary matters in opposition to Defendants' Motion for Summary Judgment.

Exhibits:       Plaintiffs Exhibits[1] 2,3,5,6,,8,9,10,11,12, 13,14, 15-20, 21-22, 23-29, 30, 31-41.

Defendants Exhibits 10, 11, & 12.

Supplemental Exhibits:

SX 1 Due Process Hearing Documents

SX 2 Affidavit of Eric Williams

SX 3 Transcript of statement of Charles Coon produced by

Greenville Police Department in response to non-party

Subpoena

Dated this  2nd day of April, 2008.

s/  Susan Shirock DePaola

**Susan Shirock DePaola**
**1726 West Second Street ~Suite B**
**Montgomery, Alabama  36106**
**Phone:  334-262-1600**        **ASB: DEP001**
specialeducationattorney@mindspring.com

s/  Deanie Clark Allen

**Deanie Clark Allen**
**Aliant Center**
**2740 Zelda Road, Fourth Floor**
**Montgomery, Alabama  36106**
**Phone:  334-265-8551**        **ASB:  ALL067**
dallen@azarlaw.com

**CERTIFICATE OF RETENTION OF ORIGINAL**

I hereby certify that the undersigned currently holds the original signature document with any required formalities and will make the same available upon request of the Court or of a party and will retain the hard copy of same as required under applicable rules of procedure.

s/  Susan Shirock DePaola

**<u>CERTIFICATE OF SERVICE</u>**

---

[1] These  numbers are  taken from the composite exhibits used for the depositions in this case.

I hereby certify that a copy of the foregoing Motion  has been served on    the following by ECF or  by  first class mail, postage prepaid and deposited in a United States mailbox located in Montgomery, Alabama, on  this the 2nd day of April, 2008..

VIA US MAIL:

Charles Leslie Coon
308 Country Club Drive
Greenville, AL   36037

VIA  ECF
Donald Sweeney
Via ECF
(for all remaining Defendants)

s/  Susan Shirock DePaola



PLAINTIFF'S
EXHIBIT
2

# PIKE COUNTY BOARD OF EDUCATION

---

**STUDENT
CODE OF CONDUCT**

---

ADOPTED: October 11, 1993
Revised: July 1998
Revised: July 1999
Revised: July 2000
Revised: June 2003

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0382

FILE: JDEA

## PREAMBLE

Rules, regulations, and due process are designed to protect all members of the educational community in the exercise of their rights and responsibilities. The purpose of issuing this booklet is to inform students, parents/guardians, and others, of the policies, rules, and regulations of the Pike County School System related to student discipline.

<u>This Code of Conduct is written in a manner that ensures a uniform understanding of the practices and procedures used in the Pike County School System to manage discipline.</u> In addition, the Board of Education authorizes principals, working with teachers and other professional personnel, to make supplemental rules and regulations for individual schools as deemed necessary provided such rules and regulations do not conflict with Board Policy. These supplemental rules and regulations specific to individual schools may be found in local school student handbooks or other published local school documents.

## NON-DISCRIMINATION POLICY

It is the official policy of the Pike County Board of Education that no person shall; on the grounds of race, color, ethnicity, national origin, disability, sex, religion, belief, marital status, or age; be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, employment, re-employment, or advancement. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, Title VI Coordinator, and Title IX Coordinator, at 334-566-1850, between the hours of 8:00 am and 4:30 pm, Monday through Friday.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0383

# UNIFORM CODE OF STUDENT CONDUCT
## INTRODUCTION

**Adopted by Pike County Board of Education, October 11, 1993**
Revised: July 1998
Revised: July 1999
Revised: July 2000
Revised: May 2001
<u>Revised: June 2003</u>

The Pike County Board of Education believes that instruction should occur in an environment that is conducive to learning. Effective instruction requires good order and discipline which may be described as the absence of distractions, friction, and disturbances, which interfere with the effective functioning of the student, class, and school.

The Code of Student Conduct is designed to assist the faculty and school administration in maintaining a satisfactory environment by standardizing procedures for administering disciplinary actions.

The Code will apply to Pike County public school students during the times they are under the direct or indirect supervision of Pike County school board employees. It applies to the transportation of students to and from school and to students while they are involved in school sponsored activities both as spectators or participants. (This includes any activity involving the transportation of students. For Example: field trips, athletic events, band trips, etc.)

Each Special Education student's disability must be considered in applying the code. Special Education teachers will work closely with the students, parents, and administrators to ensure the code is applied so that students are not penalized because of their disabilities. However, the consequences outlined in the code will be applied as described when it has been determined that the misbehavior involved is not a manifestation of the student's disability.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0384*

Bus drivers will be responsible for completing referral forms for code violations on school buses. School buses are considered extensions of the classroom and school with all sections of the code applying equally. The referral forms will be turned in to the principal's office and the principal or his/her designee will be responsible for carrying out the provisions of the code.

**Corporal Punishment** may be administered as a form of discipline unless the parent/guardian files a written dated objection with the school principal. It is the responsibility of the parent/guardian to see that the written dated objection is submitted to the principal's office. This notice should be attached to the "Certification of Receipt" and returned to the school office. Alternative disciplinary techniques will be applied to any student whose parents/guardian objects to corporal punishment.

Corporal punishment may only be administered for violations of posted classroom rules and Class I Offenses after other methods to modify the student's misbehavior have been documented. Corporal punishment must always be administered in accordance with board policy.

Corporal punishment may only be administered by certified staff members. Section 16-28A-5 of the Code of Alabama provides immunity against legal action when corporal punishment is administered in accordance with the policies and guidelines of the local board of education.

**School Discipline Plans:** Each school, with input from the school administration, school faculty & staff, students, and parents shall develop and maintain a written school discipline plan. All administrators, certified personnel, and non-certified personnel shall abide by the provisions of plan. At a minimum, the plan will consist of a set school-wide classroom rules aimed at addressing minor in-class infractions or disturbances which have a negative impact on the classroom learning environment. These rules will be posted in each classroom or other instructional area. For violations of these rules, a set of increasingly punitive consequences (up to office referral) to be enforced by teachers, shall be set forth along with the rules and will also be posted. The school administration shall take all steps necessary to ensure that consequences assigned by faculty for violations of classroom rules are strictly enforced.

3

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0385

## Proper Documentation of Disciplinary Action:

School personnel shall use the prescribed forms when documenting discipline matters. Supplementary narratives may accompany these forms when necessary.

## DISCIPLINE ACTIONS AND PROCEDURES

In order to have the best possible environment for learning to take place, rules have been established to make the environment conducive to instruction. Effective instruction requires good order and discipline. The Pike County Board of Education is committed to this belief and supports wholeheartedly the application of this code.

Teachers are expected to exhaust all reasonable means to manage routine disciplinary action or problems in the classroom. Contacting the parents of students whose conduct disrupts the class and/or teacher is strongly recommended. If the parent conference does not help and all other efforts fail, the student should be referred to the office with proper documentation of the teacher's efforts in disciplining the student.

Students suspended from school or the Alternative Learning Center (ALC) may not represent the school in any fashion.

4

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0386*

Discipline infractions have been divided into four classifications according to their seriousness. Punishment will be given according to the seriousness of the offense and the number of times the student has been disciplined. The classifications are as follows:

**CLASS I OFFENSES:** (Class I offenses may be assessed by the teacher and/or administrator.)

**THE NUMBER OF OFFENSES WILL ACCRUE FOR THE ENTIRE SCHOOL YEAR**

    1.1 -  Excessive Tardiness

    1.2 -  Inappropriate public display of affection

    1.3 -  Gambling and card playing

    1.4 -  Any other offenses which the principal may deem reasonable and may fall in this classification

**MINIMUM CONSEQUENCES FOR CLASS I OFFENSES:**

Once appropriate intervention strategies have been unsuccessful in managing the student's behavior, the teacher may refer the student to the office for Class I Offenses. These interventions must include but are not limited to counseling with students and parental contact. When these interventions have not resulted in improved student behavior, office referrals will result. Referrals will be supported by teacher documentation of actions taken prior to the referral.

First Referral    - Office referral, with notification to the parents by the administrator. Students will be counseled by appropriate school personnel. Possible disciplinary action: work detail, detention, loss of privileges, corporal punishment, etc.

Second Referral    - REQUIRED parental conference, possible disciplinary actions as stated above. Failure of the parent to attend the conference will result in suspension of student or referral to the ALC until the conference is held.

5

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0387

**Additional Referrals**

- 5-10 days of ALC or suspension. Parent conference required for readmittance.

**Important note:** If a parent conference is indicated for students under 16 years of age, a juvenile petition may be signed if the parents do not attend. Under state law, referral of the parent to the Pike County District Attorney's office for prosecution may occur if parents fail to attend parent conferences or fail to reasonably support the school in its attempts to modify or improve student behavior.

6

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0388

## CLASS II OFFENSES:

2.1 -  Failure to follow directions of a teacher, administrator, or other school board employee

2.2 -  Failure to follow the posted (school-wide uniform) classroom rules

2.3 -  Fighting on campus, bus or at any school sanctioned activity (K-5 Only).

Any physical conflict, hitting or contact, or exchange of blows between two or more individuals which does not result in physical injury or property damage.

2.4 -  Use or possession of any tobacco products, matches, or lighters on campus

2.5 -  Unauthorized absence from class or school (cutting or skipping)

2.6 -  Insubordination

Failure to follow the reasonable directive or order of a school board employee.

2.7 -  Threats towards students (K-5 Only)

The intentional threat by word or act to do harm to another student.

2.8 -  Property damage up to $50.00 - Intentionally defacing or damaging the property of another (public or personal).   Up to $50.00, the student will be required to repair or replace the damaged item.

2.9 -  Stealing - Theft (Less than $50.00 in value)

Taking and/or carrying away of public or personal property.  The student will be required to replace, return (unharmed items), or pay the cost of such items.

7

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0389

**2.10 - Intentionally providing false information**

Providing false information including, but not limited to forgery of parents/guardian's names, changing grades, address, other school records, forging notes, passes or forms. Includes a student's refusal to identify themselves or inaccurate self-identification.

**2.11- Speeding/reckless driving -** Driving privileges may be suspended or revoked for these offenses and for violations of local noise ordinances while on campus. This includes reckless driving on the student's home campus, in and around school buses traveling to and from school and school events, while participating in school events, and while driving on any other school campus or on school system property.

**2.12-** Unjustified activation of fire alarm system or fire extinguisher; displaying an uncooperative attitude during fire, weather, or other school safety drills.

**2.13 - Assault upon another student - (K-5 Only)**

The actual causing of physical pain or harm to another student, including pushing, tripping, or striking another student

The school administrator has the option of managing this referral as an offense under 4.3.

**2.14 - Possession of stolen property (less than $50.00 in value)**

**2.15 - Use of profane or obscene language or gestures**

**2.16 - Possession of an electronic pager or other similar device.**

**2.17-** Any other offenses which the principal may deem reasonable and may fall in this classification.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0390

**MINIMUM CONSEQUENCES FOR CLASS II OFFENSES:**

First Offense -     Office referral and assignment <u>to ALC for 5 days</u> or 2-5 day
                    suspension (depending upon the seriousness of the
                    offenses), and parental conference.

<u>Second</u> Offense and any thereafter -
                    Office referral, <u>5</u>-10 day suspension or assignment to ALC
                    and parental conference, or Referral to the Superintendent's
                    Discipline Council.

A referral to the Pike County Sheriff's Department may be made by the school
administrator after any or all of the above offenses if necessary. Repeated
incidents of misconduct of any student after the options listed in the code are
exhausted may result in referral to the Superintendent's Discipline Council and
Pike County Board of Education with a recommendation for expulsion.
Parents/guardians shall be held responsible for monetary loss or damages as
noted previously.

**CLASS III OFFENSES:**

    3.1 - Threats toward students (6-12 Grades)

        The intentional threat by word or act to do harm to another student.

    3.2 -  Directing obscene or profane language or gestures to a school
        board employee

    3.3 -  Threat directed toward a school board employee or threat of or
        actual damage of a school board employee's property

        Threat by word or act to do violence to the person or property of a
        school board employee; actual damage to property (up to $50).
        Students will be required to pay restitution.

    3.4 -  Refusal to be scanned by a metal detector.

    3.5 -  Fighting on campus, bus, or at any school sanctioned activity.
        (Grades 6-12 or any K-5 fight in which physical injury or property
        damage occurs.)

<div align="center">9</div>

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0391*

Any physical contact, hitting, or exchange of blows between two or more individuals.

3.6- Refusal to relinquish possession of electronic pager or communication devices, except for health or other extraordinary reasons upon approval of the Board of Education (Alabama Code 16-1-27)

3.7 - Extortion

Verbally or by a written or printed communication, threatening injury to the person, property, or reputation of another, with the intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will.

3.8- Possession of a weapon (excluding firearm or replica) or replicas of the items listed below on school property or at a school-sponsored event or function

Weapons include the following:

Knife, irrespective of the blade length, including but not limited to:

| | | |
|---|---|---|
| Box cutter | Key chain knife | Stiletto knife |
| Butterfly knife | Linoleum knife | Straight razor |
| Carpet knife | Lock blade knife | Switch blade |
| Exacto knife | Paint scraper | Swiss army knife |
| Fixed blade knife | Palm knife | Trench knife |
| Folding knife | Razor blade | Utility knife |
| Spring loaded knife | Laser pointer | |

Weapons Continued:

Any other item that utilizes a razor blade or other blade, replaceable or fixed

Numchucks (nanchaku), throwing stars, fighting claws or other weapon utilized in martial arts

Fingernail clippers or other items that contain a knife blade or fingernail file

10

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0392

Fingernail file or any other object that has been sharpened in such a way as to cut or puncture

Toenail clippers of any sort

Bicycle chain or other heavy duty chain

Bike sprocket

| | | |
|---|---|---|
| "ARROW" gun | Cross bow | Machete |
| Arrow | Hand ax | Night stick |
| Baton | Hatchet | Skewer |
| Black jack | Ice pick | Sling shot |
| Blow gun | Impact baton | Spear |
| Bow & arrow | Kubotan | Spring billy |
| Brass knuckles | Leather strap | Stun gun |
| Bull whip | Loaded gloves | Sword or sword cane |
| Cattle prod | Mace | Tazier-Stun Gun |
| Club | Tear gas | Water guns |

Any device capable of discharging a projectile of any kind

ANY OTHER OBJECT NOT SPECIFICALLY LISTED WHICH IS PRIMARILY MEANT AND ADAPTED FOR ATTACK AND FOR THE INFLICTION OF INJURY

3.9-   Property damage, stealing/theft, or possession of stolen property when values exceed $50.00.

3.10-  Sexual Harassment

Includes offensive touching of a sexual nature of another student or written or verbal propositions to engage in sexual acts, or any other form of sexual harassment. Sexual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by a student or agent of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX.

11

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0393

The parents of all students involved in sexual harassment issues shall be notified in all cases. Law enforcement will be summoned by the school in substantiated cases of sexual harassment, in cases where students and parents wish to file criminal complaints, and in cases where a pattern of unsubstantiated complaints have been made concerning individual students.

3.11   Hazing - Any action taken or situation created, intentionally, whether on or off school property, to produce mental or physical discomfort, embarrassment, harassment, or ridicule. Such activities may include but are not limited to the following: use of alcohol; paddling in any form; creation of excessive fatigue; physical and psychological shocks; quests, treasure hunts, scavenger hunts, road trips, wearing of public apparel which is conspicuous and not normally in good taste; engaging in public stunts and buffoonery; morally degrading or humiliating games and activities; and other ritual activities not consistent with board of education regulations and policies.

Hazing is prohibited in all forms. Hazing is a criminal act as defined in the Code of Alabama. School sanctioned groups (grade, class, athletic team, club, etc.) may be penalized in whole for activities by individual members.

3.12-  Any other offenses which the principal may deem reasonable and may fall in this classification

## MINIMUM CONSEQUENCES FOR CLASS III OFFENSES:

First Offense -          5-10 day suspension from school or referral to the
                        In-School Suspension/ALC.

Additional Offense -     Suspension pending a hearing before the
                        Superintendent's Disciplinary Council.

The Pike County Sheriff's Department or other appropriate law enforcement agency shall be notified by the school administrator after any of the above offenses if necessary. Parents/guardians shall be held responsible for monetary loss or damages occurring from the above violations and/or as previously noted.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0394

## CLASS IV OFFENSES:

### 4.1 - Trespassing/loitering/unlawful assembly

Being present in an unauthorized place in the school or on school property or refusing to leave the premises when ordered to do so by school personnel; presence on school property at unauthorized times (such as during times of suspension). This also includes unauthorized visits to other school campuses.

### 4.2 - Inciting or participating in major student disorder

Leading, encouraging, or assisting in major disruptions which result in destruction or damage of public or private property, or personal injury to participants or others, or which results in serious disruption of the educational process.

### 4.3 - Assault upon another student (6-12, K-5 assaults resulting in injury)

The deliberate causing of bodily harm to another student, including but not limited to tripping, pushing, or striking another student.

### 4.4 - Assault of School Board employee

The actual striking or touching of a School Board employee against his or her will, or causing bodily harm to a School Board employee

### 4.5 - Sale, purchase, use of or possession of illegal drugs or alcoholic beverages

### 4.6 - Use, threatened use or display of weapons other than firearms or replica; Including Bomb Threats (See list of weapons in 3.8)

### 4.7 - The threatened use of an object not defined as a weapon with intent to injure or intimidate on school property or at a school sponsored event.

### 4.8 - The possession, use or display of firearms or replica

A firearm, including but not limited to any hand gun, shotgun, black powder firearm, flare gun, zip gun, stun-gun or any other device from which a projectile is discharged by explosive powder; or

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0395*

A realistic replica of any firearm, including but not limited to replicas of handgun, rifle or shotgun, black powder firearm, flare gun or zip gun. Also included are gun clips (empty or loaded), ammunition, bullets, shell, or other projectiles used in any of these weapons:

Air gun
Blank Gun (Starter's Pistol)
Gas Operated Gun

Pursuant to the Gun-Free Schools Act of 1994 (amended as part of the Improving America's Schools Act of 1994, under the reauthorization of the Elementary and Secondary Education Act of 1965, Public Law 103-382) local boards of education are required to expel for a period of one year (12 months) any student who is determined to have brought a weapon to school. A student who is referred to the board by the principal for possession of a weapon shall be liable for expulsion from school for not less than twelve months upon determination that the student brought a weapon to school. "Weapon," as used for this purpose, shall include the definition as set forth under § 921 of Title 18 of the United States Code as well as delineation of weapons as noted under item 4.4 of the Uniform Code of Student Conduct.

4.9 -   Hazing with Injury and/or Damage to Property - see 3.11 for
        definition of hazing. It will be considered as Class IV offense if
        hazing activities on or off school premises results in injuries to
        students or non-students; or if damage occurs to public or private
        property.

        Although out of the jurisdiction of school authorities, school officials
        will contact parents when they become aware of the hazing
        activities of non-school sanctioned, community based social
        organizations.

4.10 - Other criminal acts which violate the laws of Pike County, State of
       Alabama, or United States

       Including but not limited to burglary of school property, vandalism
       (over $50), arson, possession or igniting of explosives (including
       fireworks), bomb threats, robbery, and unlawful interference with
       school authorities in the discharge of their official duties

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0396

4.11-Sexual Acts

Acts of sexual nature including, but not limited to sexual assault, intercourse or attempted intercourse, or deliberate indecent exposure

Participation in a series or pattern of threats or physical attacks to intimidate or coerce one or more students in a sexual or nonsexual way. This harassment may occur by one student acting alone or as a member of a group. Intimidation includes but is not limited to verbal or physical attacks threatening the safety or well-being of the student and/or his or her family.

Examples:

A male student forcing a female student by coercion into a situation of petting or other sexual acts by threatening bodily harm on her and/or some member of her family. Any intimidation commonly known as bullying or the forcing of other students to do something against their will by threat or physical force on them and/or their family members.

Legal Reference: Alabama Code 16-1-23
Section 4.8 adopted March 7, 1994

4.12- Possession of explosive devices, including fireworks.

2.    A student who willfully commits a second violation of a class three or four offense shall be permanently denied bus or vehicle riding privileges.

3.    Any brutally violent, malicious, or willfully vicious act by a student rider in which another student, driver, or other adult is physically injured shall subject the student to permanent revocation of riding privileges in addition to that which is called for in the Code.

4.    Parents may petition the Board of Education to have a student's riding privileges reinstated after the student has not

15

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0397

4.13- Any other offenses which the principal may deem reasonable and may fall in this classification

## MINIMUM CONSEQUENCES FOR CLASS IV OFFENSES:

Immediate suspension from school pending a hearing before the Superintendent's Disciplinary Council. Expulsion from school is a possible consequence. Offenses shall also be reported to the police authorities for possible action.

## OTHER OFFENSES: NOT CLASSIFIED UNDER CLASS I, II, III, OR IV
### (Managed by other methods)

Failure to bring materials to class

Not completing assignments or homework (reflected in academic grades)

Gum chewing or eating candy, etc.

Littering

Other Notes:

Punishment will not include placing the student in the hallway or unsupervised areas.

Penalties should not be imposed for an entire class for actions that involve fewer than the entire class.

16

JR v. Pike County BOE
Produced by Defendant PCBE
No. D398

## STUDENT/PARENT RESPONSIBILITIES:

I.    Attendance

Every child between the ages of 7 and 16 years shall be required to enroll in school and attend for the entire length of every scholastic year. (Alabama Code 16-28-3)

All students are expected to attend school regularly.  Regardless of the reason for any absence, a written excuse, signed by the parent, should be brought on the first day back after the absence.  The note should be submitted to the appropriate teacher as explained by the individual school rules.  School officials will decide if your absence is excused or not. All absences will be considered unexcused in the absence of a written excuse.

**Written excuses and/or doctors excuses not received within the first five school days after the absence will not be accepted. These absences will remain <u>unexcused</u>. It is the responsibility of the parent to see that excuses are provided within this time period.**

Students will occasionally submit notes signed by someone other than their parents/guardians. In these cases, upon discovery, all absences will be considered unexcused and Denial of Credit could occur. Disciplinary action will be taken in these cases (see 2.3). A truancy petition may also be signed in juvenile court.

Students are expected to make up all work missed during any absence.  It is the responsibility of the student and parent to arrange with the teacher for any make-up work. This must be done during the first two days the student is back in school.

Any student who is absent five unexcused days, will be reported to the Pike County Truancy Intervention Program by the School Attendance Officer.  Students who accumulate over ten unexcused absences will be referred to the Pike County Juvenile Court and a Juvenile petition will be filed.  A juvenile court appearance will be required. **<u>The school district will continue to sign "Contributing to the Delinquency of a Minor" warrant on parents who fail to meet their responsibilities regarding school attendance.</u>**

17

II.    The following absences are excusable by the State of Alabama:

- Personal Illness
- Inclement Weather (Bad weather which would make it dangerous to travel to school)
- Legal Quarantine (Contagious disease)
- Death in the immediate family
- Legal Obligations (Such as a court appearance)
- Emergency conditions or absent with the permission of the principal and parent.

Some inexcusable reasons for missing school are:

- Work
- Permission of the parent in the absence of one of the reason stated above (personal illness, inclement weather, etc.)
- Family errands
- Oversleeping
- Missing the bus
- Buying a prom dress
- Hunting trip
- Vacations (Unless educational and pre-approved by school principal)

III.    If the student participates in a school-day afternoon or evening extracurricular activity as an official representative of the school (such as a cheerleader, band member or an athletic team member), the student must have been in school that day, or have a previously excused absence from the principal.

**18**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0400

IV.    The Alabama Compulsory Attendance Law requires that a student attend school regularly until sixteen years of age. It is of extreme importance that good attendance be maintained by students for three reasons:

(1)    An educational advantage;
(2)    Maintaining a good permanent record of reference for the future;
(3)    The number of teachers that each county is allocated by the state is based on the average daily membership of students within the county.

**In accordance with Alabama Law, any student who drops out of school prior to their eighteenth birthday will be reported to the Department of Public Safety. In these cases, the student's drivers license will be suspended by the Department.**

V.    Proof of residency (for attendance purposes) is required for all students in accordance with the terms of the Lee v. Macon County federal consent decree. All students are expected to attend school in the appropriate attendance zone. Reports of out-of-zone students will be forwarded to the school district the student is attending and to the US Department of Justice and the Lee v. Macon plaintiffs.

The Pike County Board of Education will not consider or discuss requests for transfers of out going students until they have been approved by the "receiving" school district. The Pike County Board of Education will not approve requests for transfer for in-coming students which do not meet the requirements of the consent decree.

19

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0401

# PROMOTION AND HIGH SCHOOL COURSE CREDIT MAY BE DENIED ON THE BASIS OF ABSENCES FROM SCHOOL OR CLASS

I.  Alabama law provides that every child between the ages of seven and sixteen years shall be required to attend school. In compliance with the law, the following policies are established.

1.  A student, approved by the principal or his designee to participate in or attend a school sponsored or other approved activity during the school day, shall be counted present. Students are responsible for all assignments missed while participating in or attending said activities.

2.  A high school student (generally those in grades 7-12 on block scheduling) absent from any one class more than ten times per term (includes both excused and unexcused absences) will be assigned a grade of F and denied credit for the class.

    Elementary students, including grades 7 and 8 not on block scheduling, may not miss more than 20 days in a school year in order to be promoted.

3.  Students who have been denied credit or promotion due to excessive absences may appeal this action. Upon notification of denial of credit or promotion, the parents will have ten calendar days to appeal this action or it will become final. It is the parents' responsibility to complete the appropriate appeal forms (which can be secured from the school office) and forward them to the school principal for review and consideration. Consideration will only be given in cases of extended illness, injury, or other extenuating circumstances exist and when documented proof of the reason for the excessive absences can be provided by the parent. See student due process appeal procedures JCAA.

4.  High school students are required to attend the entire class period. If a student misses the majority of the class due to a check-in or check-out, he/she will have that recorded as an absence.

6.    In case of prolonged absence (a week or more in the hospital), the parent/guardian should contact the school principal.

7.    Students are responsible for completing all "make-up" work.

II.    A serious illness or injury can keep students away from school for weeks. If a student has to miss two or more consecutive weeks, the parent should contact the school principal and the school district's special education coordinator. On a case by case basis, where the child cannot attend school for medical reasons (if documented by the proper authorities) special services may be provided on a temporary basis until the student can return to school.

III.    Tardiness, early check-outs or late check-ins: Students are required to report to their schools no later than the official beginning of the school day and to be on time in all classes during the day.  Schools will devise procedures which will insure compliance with this regulation. Tardiness, late check-ins and check-outs are excused for the same reasons as absences.  Tardiness, check-outs and late check-ins for any other reason is unexcused and may result in disciplinary action. For the purpose of denial of credit or promotion, three tardies, three check outs, or three late check-ins equals one unexcused absence.

IV.    Check-outs from School

1.    Students who leave school for any reason must check-out through the principal's office.

2.    Students may only be checked out by persons whose names appear on the student registration card unless the school receives permission in writing by the parent/guardian in advance.  In an emergency situation wherein the school administrator is clearly convinced of the need through notification by proper officials, parents, or other known relatives of the student, the student will be allowed to check-out.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0403

In cases where school officials suspect abuse of the check-out procedures by students and/or parents, the school principal may at his/her discretion restrict check-outs for specific students to situations where the parent must personally pick up the student at the time of check-out.

3.  Written permission is to be given by the parent/guardian or "emergency contact person" shown on the registration card before each checkout, except in cases of sudden illness, accident or similar incident where telephone confirmation is the only alternative.

4.  The nature of the checkout will determine whether the absence is excused.

5.  Checkouts are excused for the same reasons as absences.

6.  For the purpose of denial of credit or promotion, a student is considered absent if he/she is not in school for at least 50% of the school day. Regardless, high school students are subject to denial of credit on a class by class basis.

V.  Trip Permission

Any student making a trip under the sponsorship of the school is required to have written permission from the parent or guardian to participate in the trip. Students who leave school on the school bus must return on the school bus. Any parent who does not wish for their student to ride a school bus for school activities must file a "Hold Harmless" release with the school system prior to the event.

22

**Dress Code Information**

## VI.    Dress Code

The board is aware that personal dress and appearance constitute an individual expression, and within certain limits, wishes to allow students the freedom to express themselves in their own unique manner. The faculty and administration of each school shall encourage all students to be aware that dress and personal appearance may, in a very real manner, influence the image and attitude others come to assume of the student as an individual. Therefore, the Board shall require each student to consider reasonable judgement, tact, and decency in the selection of clothes for school and personal appearance. The administration of each school shall maintain authority in making subjective judgement concerning a student's dress and personal appearance.

The following guidelines are enforced for the health and well-being of all students:

1.    Footwear of some kind must be worn. Cleats and taps are not permitted in buildings. Flip flops are not permitted. Laces must be tied appropriately.

2.    Hats of any type are prohibited on all school property and on school buses during the school day, except on special occasions with the principal's permission ("Spirit" Day, dress-up day, field day). Special permission may be granted to students who because of medical reasons may need to wear a hat, cap, or other head apparel.

3.    Students may not wear rollers in their hair to school.

4.    Sunglasses are not permitted.

5.    <u>Any clothing which contains an obscene message, encourages chemical dependency, advertizes tobacco or alcoholic beverages, or which contains racially insensitive language or symbols is not permitted.</u>

23

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0405

6. The display of "colors" or gang-related paraphernalia, real or implied, is prohibited. This includes a bandanna, handkerchief, wristband, headband, or any other item which serves as a symbol for students belonging to a group which is not school-sanctioned.

7. Shorts/skorts/skirts will be permitted but must be worn in good taste. This clothing must not be so tight or short as to be offensive. As a general rule, shorts/skorts/skirts must extend no higher than three inches above the knee. The school administration shall be the final authority in determining what is acceptable in these cases.

8. Extremes are not permitted. Some examples are:

   a. Swim-wear
   b. Bare chests or abdomen showing (crop-tops)
      Clothing tops which expose the abdomen when the arms are raised are unacceptable.
   c. Clothing with holes that are designed to inappropriately expose parts of the body
   d. Underwear worn as outer clothing
   e. Muscle shirts without fitted arms
   f. Tank tops or spaghetti straps
   g. Footless tights or leggings may only be worn under approved outer garments. Tops to cover leggings should be dress length.
   h. Sweat pants
   i. Jogging pants without approved tops or which are tightly fitted
   j. Biking shorts
   k. Cut-off jeans, cut-off sweat pants, or jogging shorts
   l. Mini-skirts - measured in the same manner as shorts/skorts
   m. Any excessively tight fitting attire and sleeveless clothing tops. Undergarments will not be exposed.
   n. Pants worn loose and low on the hips (sagging).
   o. Wearing of clothing wrong side outwards.
   p. <u>Shirt tails must be worn tucked in.</u>

9.  Any article of clothing or jewelry which compromises the safety and health of a student is prohibited.
    Examples:
    a.  All belts must be buckled.
    b.  Spiked articles or jewelry may not be worn.
    c.  Rings must be designed for one finger only.
    d.  Clothing or other items which could be expected to interfere with/or possibly cause accident to the student or others, particularly in the operation of equipment, shop machines, or in athletic or other physical activity.

10. Purses should not be larger than 8 inches by 10 inches.

11. Students participating in certain instructional areas may be subject to more restrictive dress requirements due to safety concerns.

In general, any garment, apparel, and/or any type of grooming which is so spectacular as to attract undue attention to the wearer, and which would tend to hamper the school in carrying on its regular schedule of activities, distract or disturb classes, interfere with the health of students, or disrupt the learning atmosphere in any way shall not be permissible. This includes any symbol, extra accessories, or ornaments that would be considered provocative, or would tend to promote student unrest as generally perceived.

## CONSEQUENCES FOR FAILING TO ADHERE TO THE DRESS CODE

First Offense:      The student will be sent to office. Upon this referral, parents will be called to either pick up the student, bring clothes for the student to change into, or the student may choose, if available, to wear school provided garments temporarily.

Additional Offenses:      Suspension 3-10 days or ALC assignment 5-10 days.

**Under no circumstances will inappropriately dressed students be allowed to remain in school.**

25

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0407

## VI.    Student Organizations

While they are on school property or at any school sponsored events of the Pike County Public Schools, students are prohibited from participating in and/or recruiting membership for any club or organization which has not been approved and registered through the principal's office. Participation includes but is not necessarily limited to the wearing of club insignias or logos and/or exhibiting club signs, signals or language.

All sanctioned organizations must have a certified faculty sponsor, be governed by a set of written by-laws which have been approved by the school administration; be open to all students meeting membership requirements defined in the by-laws, and have a specific school related purpose such as community service or academic area promotion. All organizations must promote the school in a positive manner and any organization which fails to do this may have their sanction revoked.

## VII.    Corporal Punishment Procedures/ISS/Alternative Learning Center (ALC)

A.    Corporal punishment may be administered after other measures, including counseling and/or parent conference, have not been effective and after the nature of the offense has been explained to the student. In the event the student maintains that he/she is not guilty of the particular infraction, the principal will initiate an appeal of the paddling. In this event, the parent will be immediately notified. If the parent cannot be notified immediately, the principal will delay the corporal punishment and send written notification by the student to the parent notifying the parent to appear the next school day. Upon talking to the parents and explaining the situation, the principal will proceed with the punishment, unless the parent signs a written objection. If the parent signs a written objection, the principal may assign the student to ISS, the ALC, or suspend the student for an appropriate number of days, unless the parent and/or student have been able to prove that the child is not guilty.

B.    When necessary to administer corporal punishment, it must be done with the approval of the principal and administered by the principal or his/her designee, privately, and in the presence of another certified professional school employee, but not in the presence of the class or other students. No more than three licks

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0408

shall be administered to the buttocks using the Board-approved paddle. (Shaking or slapping is not approved as a form of corporal punishment.)

C.    Corporal punishment may be administered as a form of discipline unless the parent/guardian files a written, dated objection with the school principal. It is the responsibility of the parent/guardian to see that the written, dated objection is submitted to the principal's office.

D.    ISS and the Alternative Learning Center are highly structured learning environments with additional rules and regulations which extend beyond this Code of Conduct. A parent or legal guardian must report with students to these locations on the first day of their assignment. The student and parent must sign a behavior contract upon their arrival the first day. Students are then expected to fully comply with the rules and regulations of this Code of Conduct, as well as, any ISS or Alternative Learning Center behavior contracts.

The ISS and Alternative Learning Center are not typical classrooms. All violations of the Code of Conduct or any behavior contract shall result in immediate referral to the Superintendent's Discipline Council and to the appropriate law enforcement agencies.

Parents are responsible for transporting students to and from the ALC.

The school hours for the ALC may differ than those of the student's home school. Students returning to their home school after completing ALC assignments must be accompanied by their parents and have in their possession the necessary admission paper-work from the ALC.

VIII.  Suspension Procedures

When it becomes necessary to suspend a student, notice of the charges against the student will be given and the student will have the opportunity to discuss the charges. A copy of the written documentation of the disciplinary action will be sent to parents/guardians with the student or will be mailed to the parent.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0409

A student may be suspended as follows:

1.    For a definite number of days (not to exceed 10).

2.    Pending a hearing before the Superintendent's Disciplinary Council (within 10 school days).

    a.    The parents will be notified by a certified letter as to the time, date and place of the hearing.

    b.    While the student is suspended, admittance is denied to any other schools in the system.

    c.    Student will be ineligible to attend or participate in extracurricular activities.

    d.    Parents must accompany students for a conference upon their return to school.

Parents/legal guardians **must** return with the student to school after suspensions for the student to be readmitted.  Students returning without parents/legal guardians are subject to additional disciplinary action.

The Pike County Board of Education will not admit students from other school systems who are not in good standing because of disciplinary problems.

IX.    Pregnancy

Pregnant students should follow their doctor's recommendations with regards to school attendance.  The school will not assume liability for accidents or injury to any pregnant student who does not seek and adhere to physicians' instructions or who endangers herself by participation in unhealthy, unsafe, or otherwise physically detrimental activities.

If a physician determines that it is necessary to place the student on homebound services before the delivery of the child, it is the student

**28**

and/or parents' responsibility to notify the school nurse. Failure to provide documentation for homebound services will result in loss of credit due to absences. Students placed on homebound services are responsible for completing all classroom assignments.

X.    Administration of Prescription Medication

The system has a procedure for administering prescription medicine to the students. This is on file in the principal's office. Parents/Guardians who request that school officials administer prescription medication to their child must contact the school, and provide a copy of the procedures for administering prescription medication. The approved protocol for the administration of all medications must be followed.

XI.    School Visitors: All visitors must report to the principal's office. Failure to do so may result in a charge of trespassing.

A.    All Parents/Guardians and Community Members

Parents and community members are invited and encouraged to visit the school but must sign-in at the school's main office.

1.    Conferences may be held with the school principal during the school day. Depending on the schedule of the principal, these conferences may need to be scheduled through the school secretary.

2.    Conferences with teachers may be held before or after school hours as scheduled through the school office or during their planning period. Under no circumstance will instructional time be interrupted to conduct parent conferences.

3.    Parents/Guardians should notify the school if a scheduled conference cannot be kept.

4.    Mutual courtesy and respect should be shown throughout the conference.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0411

5.    A parent-teacher conference should be attended only by the parents or guardian of the student, the student, and the teacher. If the parent(s)/guardian(s) desire to have other persons attend the conference, he/she should notify the school principal in advance of the conference giving the name(s) of the additional person(s) who shall be in attendance and the reason the person should be allowed to attend.

6.    Parents/Guardians and others wishing to visit the classroom should contact the school principal for permission.

B.    Disruptive visitors

Persons who become abusive or disruptive on school property will be required to leave campus and will be prosecuted to the fullest extent of the law.

All visitors to school campuses must report to the Principal's Office upon their arrival on campus. For security purposes, all visitors must wear the designated visitor badges or stickers.

School age friends, relatives, etc. of students may not attend school with students.

XII.    Distribution of Materials and/or Fund Raising

A.    The sale or distribution of any goods or materials on any school property by any individual or group of individuals is prohibited unless prior permission has been obtained from the principal of the school. Regulations as to acceptable types of materials, procedures, and time and place of distribution are to be secured from the principal.

B.    Fund raising activities must be scheduled in a way that will not interfere with instructional time.

30

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0412

XIII.   Inspection of School Property/Search of Persons and Vehicles

School officials reserve the right to inspect school property, including lockers, to insure the safety and security of the premises and pupils. Although a student may exercise exclusive control of his/her locker as opposed to access by fellow students, the control is not exclusive against school officials. Parking lots used by the school are considered school property. School officials reserve the right to conduct searches based on reasonable suspicion of vehicles on school property without notification to the owners or drivers of such vehicles. If there is reasonable cause to believe that a student is carrying articles that may endanger other individuals in the school or that such articles possessed are contrary to law or regulations of the Pike County Board of Education, the student may be searched in accordance with board policy.

Search dogs and metal detectors will be used to search on school property.

Surveillance cameras are used extensively throughout the school district. Surveillance coverage is wide spread in public areas inside and outside of the buildings. Cameras also provide coverage in some non-public areas where greater security is needed. Disciplinary action may result from actions by students viewed and/or preserved on security equipment.

The purpose of the district's surveillance program is to: discourage student misbehavior, discourage other inappropriate activities including criminal activity during the school day and after-hours, protect school system property, and to provide documentation should these activities occur. The district does not guarantee full coverage of all school activities and at its discretion may limit public or private viewing by third parties without subpoena.

Restrooms, dressing rooms, and classrooms are not covered by surveillance cameras. Camera placement on school buses depends on equipment availability.

XIV.  Textbooks

"...The parent, guardian, or other person having custody of a child to whom...textbooks are issued shall be held liable for any loss, abuse, or damage in excess of that which would result from the normal use of such

31

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0413

textbooks." (Alabama Code 16-36-32)
"...If such parent, guardian or person having custody of such child to whom the textbook was issued fails to pay assessed damages within 30 days of notification, such student shall not be entitled to further use of such textbook until remittance of the amount of loss or damage is made." (Alabama Code 16-36-32)

XV. Safekeeping of valuables

Students are responsible for the safekeeping of valuables and should not leave books, clothing, wallets, purses or other valuables unattended.

XVI. Fees

Certain laboratory fees, rental charges and deposits are authorized by the Pike County Board of Education in accordance with State law.

XVII. Public Complaints

Parents/Guardians have the right to arrange a hearing with the principal on discipline matters if desired. At this hearing they have the right to ask any questions they wish, or to present witnesses or statements in the student's behalf.

Complaints and grievances shall be handled and resolved, whenever possible, as close to their origin as possible.

No member of the community shall be denied the right to petition the Board for redress of a grievance; however, the complaints shall be referred back through the proper administrative channels for solution before investigation or action by the Board. Exceptions are complaints that concern Board actions or Board operations only.

The Board advises the public that the proper channeling of complaints involving instruction, discipline, or learning materials is as follows:

1. Teacher
2. School Principal
3. Superintendent
4. Board of Education

32

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0414

Transportation:

1.    School Principal
2.    Transportation Supervisor
3.    <u>Director of Finance & Operations</u>
3.    Superintendent
4.    Board of Education

Any complaints about school personnel will be investigated by the administration before consideration and action by the Board.

XVIII.  Extracurricular Activity Participation – Academics First

All students in grades 7-12 wishing to participate in extracurricular activities must meet the academic standards outlined in 290-3-1.02 (17) of the Alabama Code. These include activities offered by the school through: math, science, band, choral music; and other conventions, parades, amusement parks trips and competitions, trips by tour companies, performances at various meetings, etc. Students who are not academically eligible under these provisions may not participate. In addition, student athletes must meet all requirements for participation outlined by the Alabama High School Athletic Association.

XIX.  <u>Request for School Records and Special Services</u>

<u>Students and Parents must request records through the guidance office. This may be done by completing a record request form. The school system follows all federal and states laws pertaining to the release of student records.</u>

<u>All special education records must be requested through the special education office by calling 334.566.1850.</u>

<u>Requests for school officials to provide observation or health data for physicians or other individuals, public or private, must also be requested through the special education office. Parents should not make these requests directly to teachers.</u>

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0415

## XX.  Emergency Procedures

The school system and each individual school has a school safety plan approved by the State Department of Education. The plans are comprehensive in that they provide for emergency responses by school officials as well as responses by outside agencies.

Parts of this plan describe look-down procedures and procedures for full evacuation of the affected campus. In these cases, the perimeter of the involved campus will be secured and traffic in and out of the campus will be restricted.

Parents should tune to WTBF Radio for emergency information. Parents should not report to the campus in these situations. When the lock-down is over the campus will be opened. If students have been evacuated from a campus, an alternative student pick-up location will be announced.

**Attention:**

**Underlined sections represent changes from previous Code of Conduct**

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0416

## SUPERINTENDENT'S DISCIPLINARY COUNCIL

The Superintendent's Disciplinary Council's purpose is to provide a formal due process hearing related to discipline matters referred by the schools. The decision of the Discipline Council is final unless the case is referred to the Pike County Board of Education.

Only Class IV offenses (see Code of Conduct File JDEA) will be referred automatically to the Superintendent's Discipline Council. If the recommendation of the Council is expulsion, the discipline case will be heard at the next regularly scheduled meeting of the Pike County Board of Education.

For Class IV offenses, the referring principals will provide to the parents (upon request) and to the Discipline Council hearing officer copies of all written documentation related to the student at the time of the request for a hearing. This includes a discipline history and other pertinent information (academic, etc.).

Offenses lower than Class IV may be considered for a due process hearing by the Superintendent's Discipline Council in accordance with the guidelines issued in this document. The referring principal will provide to the parents (upon request) and to the Discipline Council hearing officer copies of all written documentation related to the allegations against the student along with a disciplinary history and other pertinent information (academic, etc.) at the time of the request for a hearing.

All decisions of the Council may be appealed by the parents/legal guardian to the Pike County Board of Education. The rights of the student at this hearing include: the right to be present and participate in the meeting, the right for the parent(s)/legal guardian(s) to be present and participate in the hearing, the right to inspect any documents related to the discipline matter at hand, the right to be represented by a lawyer, and, at the expense of the student, to make a record or transcript of the proceeding.

These formal hearings will be video or audio taped for the purpose of maintaining a record of the hearing. All students will be photographed prior to the hearing. Photographs will be maintained in the student's central office discipline file.

35

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0417*

The hearing officer will preside over the Discipline Council. The hearing officer may request the presence of law enforcement at these hearings and all participants are subject to search by metal detectors

## ATTENTION: PARENTS AND STUDENTS: BUS SAFETY

Riding the school bus is a privilege. It is not guaranteed by law. Parents must help students understand the importance of that privilege. That is, only appropriate behavior will be accepted. Parents and students must understand that the bus driver's task is to get student to and from school in a safe manner. Misbehavior on the bus places all students on the bus in danger. As such, bus misconduct will not be tolerated. Each School Principal and/or their designee will move quickly and efficiently in accordance with the Student Code of Conduct to remove students from buses who insist on compromising the safety of others.

**Bus Misbehavior:**  Misbehavior on Buses or Other Motor Vehicles

1.   If a student initiates/commits an infraction on a bus or other vehicle to such an extent that the driver must stop the vehicle to restore order, that student shall be deprived of the privilege of riding the bus or vehicle for a minimum of six weeks. Class Four infractions shall subject the student to a minimum privilege loss of no less than six months. More than six months may be assessed by the Superintendent's Disciplinary Council upon the recommendation of the principal for first-time infractions which are extremely severe in nature, particularly brutal or vicious physical attacks, use of weapons, or failure to obey the driver in a potentially dangerous situation.

5.   Buses are considered extensions of the classroom. All classes and categories of disciplinary offenses shall be applied accordingly by bus drivers when documenting and reporting bus misbehavior. The school administration is responsible for all decisions related to bus discipline matters.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0418*

## Appendix A:  Due Process Procedures

FILE: JCAA

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short and long term suspension, or expulsion are applied. Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

PURPOSE:
The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on Education Amendments of 1972 or the Rehabilitation Act of 1973. These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

DEFINITIONS:
A grievance is a complaint by any member of the professional staff, the non-professional staff, or the student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

PROCEDURE:
Each level of the procedure shall be observed and used with normal order of proper channels. If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

STUDENT GRIEVANCE PROCEDURE:

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (334) 566-1850 between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days (except in case of denial of credit: 10 days)  of receipt of the request. If the grievance is resolved at

-I-

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0419

this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level conference, the student shall file, within five days, with the next level of the administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of the administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the Superintendent of Education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of Education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the Board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommendation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regards to any allegations that the System has violated the statutes described above.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0420

-II-

## CERTIFICATION OF RECEIPT
## PIKE COUNTY BOARD OF EDUCATION
## STUDENT CODE OF CONDUCT

I certify that I have received and read a copy of the Student Code of Conduct.

School attending                    Grade

Student's signature                 Date

Parent's signature                  Date

If you should have any questions or comments pertaining to the contents of The Code, please contact your child's principal.

## PLEASE TEAR OUT THIS PAGE AND RETURN IT TO YOUR TEACHER OR PRINCIPAL.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0421

# APPENDIX A

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0461

Appendix A:  Due Process Procedures

FILE: JCAA

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short and long term suspension, or expulsion are applied. Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

PURPOSE:
The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on Education Amendments of 1972 or the Rehabilitation Act of 1973. These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

DEFINITIONS:
A grievance is a complaint by any member of the professional staff, the non-professional staff, or the student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

PROCEDURE:
Each level of the procedure shall be observed and used with normal order of proper channels. If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

STUDENT GRIEVANCE PROCEDURE:

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (334) 566-1850 between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days (except in case of denial of credit: 10 days)  of receipt of the request. If the grievance is resolved at

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0462

this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level conference, the student shall file, within five days, with the next level of the administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of the administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the Superintendent of Education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of Education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the Board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommendation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regards to any allegations that the System has violated the statutes described above.

JEAB

## PIKE COUNTY BOARD OF EDUCATION
### NOTICE FOR DIRECTORY INFORMATION

The Family Educational Rights and Privacy Act (FERPA), a Federal law, requires that Pike County School System, with certain exceptions, obtain your written consent prior to the disclosure of personally identifiable information from your child's education records. However, Pike County School System may disclose appropriately designated **"directory information"** without written consent, unless you have advised the Pike County School System to the contrary in accordance with Pike County School System's procedures. The primary purpose of directory information is to allow the Pike County School System to include this type of information from your child's education records in certain school publications. Examples include:

- A playbill, showing your student's role in a drama production;
- The annual yearbook; video production;
- Honor roll or other recognition lists;
- Graduation programs; and
- Sports activity sheets, such as for wrestling, showing weight and height of team members.

Directory information, which is information that is generally not considered harmful or an invasion of privacy if released, can also be disclosed to outside organizations without a parents/guardians prior written consent. Outside organizations include, but are not limited to, companies that manufacture class rings or publish yearbooks. In addition, two federal laws require local educational agencies (LEAs) receiving assistance under the Elementary and Secondary Education Act of 1965 (ESEA) to provide military recruiters, upon request, with three directory information categories - names, addresses and telephone listings – unless parents have advised the Pike County School System that they do not want their student's information disclosed without their prior written consent.

If you do not want the Pike County School System to disclose directory information from your child's education records without your prior written consent, you must notify the Pike County Board of Education in writing by December 1, 2003. Pike County School System has designated the following information as directory information: [Note: An LEA may, but does not have to, include all the information listed below.]

- Student's name
- Participation in officially recognized activities and sports
- Address
- Telephone listing
- Weight and height of members of athletic teams

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0464

- Electronic mail address
- Photograph
- Degrees, honors, and awards received
- Date and place of birth
- Major field of study
- Dates of attendance
- Grade level
- The most recent educational agency or institution attended

The name and address of the person administering the Notice for Directory Information for the Pike County School System:

Karen T. Berry, Administrative Assistant
Pike County Board of Education
101 W. Love St.
Troy, Al 36081
334-566-1850, ext. 117.

Source:
Adopted:
Legal Reference: 20 U.S.C. 7908
            P.L. 107-110, 10 U.S.C. 503, P.L. 107-107

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0465

JEAA

# PIKE COUNTY BOARD OF EDUCATION
## NOTIFICATION OF RIGHTS FOR ELEMENTARY AND SECONDARY SCHOOLS

The Family Educational Rights and Privacy Act (FERPA) affords parents/guardians and students over 18 years of age ("eligible students") certain rights with respect to the student's education records. These rights are:

1. The right to inspect and review the student's education records within 45 days of the day the Pike County School System receives a request for access. Parents/guardians or eligible students should submit to the appropriate school principal, a written request that identifies the record(s) they wish to inspect. The school principal will make arrangements for access and notify the parents/guardians or the eligible student of the time and place where the records may be inspected

2. The right to request the amendment of the student's education records that the parents/guardians or eligible student believes are inaccurate or misleading. Parents/guardians or eligible students may ask the Pike County School System to amend a record they believe is inaccurate or misleading. They should write the school principal, clearly identify the part of the record they want changed, and specify why it is inaccurate or misleading. If the Pike County School System decides not to amend the record as requested by the parents/guardians or eligible student of the decision and advise them of their right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided to the parents/guardians or eligible student when notified of the right to a hearing

3. The right to consent to disclosures of personally identifiable information contained in the student's education records, except to the extent that FERPA authorizes disclosure without consent. One exception, which permits disclosure without consent, is disclosure to school officials with legitimate educational interests. A school official is a person employed by the Pike County School System as an administrator, supervisor, instructor, staff member (including health or medical staff and law enforcement unit personnel); a person serving on the Pike County School Board; or a person or company with whom the Pike County School System has contracted to perform a special task (such as an attorney, auditor, medical consultant, school psychometrist, or therapist). A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility. Upon request, the

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0466

Pike County School System discloses education records without consent to officials of another district in which a student seeks or intends to enroll.

[NOTE: FERPA requires a school district (LEA) to make a reasonable attempt to notify the parents/guardians or eligible student of the records request unless it states in its annual notification that it intends to forward records on request.]

4. The right to file a complaint with the U.S. Department of Education concerning alleged failures by the Pike County School System to comply with the requirements of FERPA. The name and address of the office that administers FERPA:

Family Policy Compliance Office
U. S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-4605

Karen T. Berry, Administrative Assistant
Pike County Board of Education
101 W Love St.
Troy, Al 36081
334-566-1850 ext.117

Source:
Adopted:
Legal Reference: 20 U.S.C. S. 1232g. S. 1232g

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0467*

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Rev. Earnest Green, President
Wyman Botts, Vice President
W. Greg Price
Adam Register
Herbert Reynolds
Linda Steed

**Dr. Mark Bazzell**
**Superintendent**



Dear Parents:

In response to the *No Child Left Behind Act of 2001*, please note that you may request, and this school system will provide upon your request, information which specifies the qualifications of your child's current classroom teacher(s) and the qualifications of any paraprofessional who is directly involved in the instruction of your child. If you would like to request this information, please contact me at (334) 566-1850. Our response to your request will be timely.

Our school system will also provide you with specific information regarding your child's level of achievement, as reflected on the most current state academic assessments. Please contact the guidance counselor or the principal at your child's school for this information.

You are your child's first and most important teacher and our school system continues to encourage your involvement and active participation in the education of your child. I thank you for your involvement and for your continuing support of our school system's efforts to provide the best educational opportunities for your child.

Sincerely,

*Carolyn Baker*

Carolyn Baker
Administrative Assistant for
Curriculum and Instruction

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0468

# Parent's Guide to Section 504 of the Rehabilitation Act

**What is Section 504?**

Section 504 of the Rehabilitation Act is a civil right act prohibiting discrimination based on disability. It was enacted to eliminate barriers that exclude persons with disabilities. Section 504 applies to all agencies that receive federal funds, including public schools, federal agencies, and places of public accommodation. In the Pike County School System, all staff and administrators have the responsibility of insuring that all students with disabilities are identified, evaluated and provided with needed accommodations and services, resulting in a free appropriate public education (FAPE). Section 504 is enforced by the U.S. Department of Education, Office of Civil Rights.

Public school districts have the duty to provide a free appropriate public education to all qualified disabled students. A FAPE must include an education designed to provide educational benefit despite the child's disability; it must be at no cost to the parent; and it must be provided in an environment that affords the greatest exposure to non-disabled peers.

**What is the difference between eligibility for IDEA and Section 504?**

Section 504 is a civil rights act, mandating equal access, whereas the Individuals with Disabilities Education Act (IDEA), commonly referred to as special education, is an education law which provides individualized educational programs and additional services beyond what is available to persons without disabilities. IDEA covers children within specific groups of disabilities and degrees of impairment. Unlike services offered through IDEA, school districts receive no additional federal or state funding under the Section 504 mandate.

**Who is a student with a disability under 504?**

Section 504 protects an individual who has, had, or is perceived as having a physical or mental impairment which substantially limits one or more major life activities, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working. It protects students when their disabilities limit their ability to attend, participate in, or receive benefit from their education. These provisions protect individuals with disabilities far beyond those covered by IDEA, and they also protect every student who is eligible for IDEA.

Section 504 does not specifically list qualifying disabilities although it does list examples. These include: diseases and conditions involving orthopedic, visual, speech, and hearing impairments; cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, drug addiction and alcoholism. HIV/AIDS, learning disabilities, ADD/ADHD, cystic fibrosis, severe allergies and asthma, among others, have also been recognized. In all cases the focus is on the extent to which the impairment limits a major life activity and whether the individual is unable to perform an activity that the average person in the general population can perform. Some students with these disabilities may be covered by IDEA, but only if they meet certain criteria.

**What are some examples of discriminatory practices prohibited by Section 504 in a school setting?**

- Penalizing a student whose absenteeism is related to disability;
- Not providing accessible transportation for a student who uses a wheelchair for field trips and school sponsored activities;
- Expelling a child for behavior related to a disability;
- Not permitting a student with a disability to participate in intramural or other non-academic activities;
- Not providing interpreters for deaf students who want to participate in school activities;
- Refusing to allow a child with a disability the opportunity to audition for athletic teams or other extracurricular activities;
- Not providing an interpreter for a deaf parent to attend a school meeting.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0469

Identification of Students Eligible under Section 504

If, as a parents/guardians, your child has a chronic condition or you suspect he/she may have a disability, you should inform your child's teacher, principal, or local school 504 coordinator. Following the referral, the school's 504 team will convene to implement the eligibility process. If a child is experiencing chronic problems at school, and if interventions which have been implemented have been unsuccessful, and the school or parent suspects a disability, the school has an obligation to refer the child for an evaluation.

What is an evaluation under Section 504?

Evaluations to determine 504 eligibility are different than evaluations required by Special Education. For purposes of Section 504, an evaluation means reviewing information from a variety of sources. This typically includes teacher reports, grades, standardized test scores, attendance and discipline reports, information from parents and medical providers, etc. The 504 team must include individuals who are knowledgeable about the child, the type of disability, the evaluative data being reviewed, and accommodation options. Obviously, parents should play an important role in the process. Parents are always notified when a referral for evaluation is made on a child. If the 504 team determines that there is not sufficient information to make a determination, or the team believes the child may be eligible for services under IDEA, a referral for an evaluation through Special Education is made.

It is not uncommon for a school to receive a doctor's letter stating that a student has a disability and needs certain accommodations. While the school always considers the recommendations of doctors or other professionals who work with the child, it remains the school's responsibility to review multiple sources of information to determine 504 eligibility and to implement any necessary accommodations for the student. Simply having an impairment does not automatically qualify a student under Section 504.

If a student is found to have a disability under Section 504, the team will make an individualized determination of the student's educational needs and an accommodation plan will be developed. Section 504 mandates services and placement in the least restrictive environment and most accommodations are provided in the regular classroom. Eligibility status and 504 plans are generally reviewed annually.

What are some examples of accommodations?

Accommodations are "adjustments" that are designed to minimize the impact of a disability and meet the unique needs of the student. There is no "list" of approved accommodations. They are determined individually for each child. Examples might include preferential seating to minimize distractions for children with attention/concentration difficulties; assisting a student with diabetes in monitoring his/her blood sugar levels; providing extra time or a quiet setting for exams; providing extensions on assignments; changes in attendance requirements for children with chronic health problems; or substituting physical education requirements for children whose physical impairments impact their ability to participate.

When is a 504 Plan inappropriate?

- When a student has a diagnosed disorder but is functioning well academically and is making adequate progress without accommodations, the student does not meet the criteria for 504 eligibility. This might include a student who is doing well in school but may not be working to potential; a student who a parent feels could be making A's rather than B's; or a student who only experiences difficulty in one subject area.
- When a plan is created only to support a request for extended time on College Board exams (SAT's, ACT's).
- When a student is eligible for services under IDEA but parents prefer Section 504 services.

What rights do you have under Section 504?

You have the right to:
- Have your child take part in, and receive benefit from, public education programs without discrimination based on disability.
- Have the school advise you of your rights under federal law.
- Receive notice and examine records with respect to identification, evaluation, programming, or placement of your child.
- Have your child receive a free appropriate public education. This includes the right to be educated with other children to the maximum extent appropriate. It also includes the right to have the schools make reasonable accommodations to allow your child an equal opportunity to participate in school and school-related activities.

Produced by Defendant FCBE
. 0470

- Have your child educated in facilities and receive services comparable to those provided to children without disabilities
- Have your child receive special education and related services if he/she is found to be eligible under the Individuals with Disabilities Education Act (IDEA), or to receive accommodations under Section 504 of the Rehabilitation Act.
- Have evaluation, educational, and placement decisions made based upon a variety of information sources, and by individuals who know the child, disability, evaluation data, and placement options.
- File a local grievance with your school if you feel your child is being discriminated against based on disability.
- Request a due process hearing and/or the assistance of a mediator to help resolve issues with the school.
- File a formal complaint with the regional Office for Civil Rights.

**What can I do if I have a complaint regarding Section 504 implementation?**

Most concerns and complaints parents may have can be resolved within the school by working with the principal, local school 504 coordinator and other school staff to reach a joint resolution of the issue(s). Should the issue not be resolved and you wish to file a 504 complaint, follow the guidelines outlined in the Pike County Board of Education's Section 504 and ADA manual. Copies of these procedures are available at each school, the ADA/504 Coordinator for the Pike County Board of Education, and on the website for Pike County Schools. Complaints can also be filed directly with the Office of Civil Rights.

**Who is my school contact for information about Section 504?**

A local Section 504 Coordinator has been assigned at each school to address your questions and concerns about Section 504. There is also a Pike County Board of Education ADA/504 Coordinator who is available to provide assistance and information.

The Pike County School System does not discriminate against anyone in the school system on the basis of race, age, marital status, creed, color, sex, disability or national origin. Pike County School System will not tolerate discrimination, harassment, or violence against anyone, including students and staff members, regardless of race, ethnicity, gender, sexual orientation, age, disability or religion.

Questions, complaints, or requests for additional information regarding the district's nondiscrimination policy should be forwarded to:

**Karen T. Berry**
**Pike County Board of Education**
**101 West Love Street**
**Troy, Alabama 36081**
**Phone (334) 566-1850**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0471*

CERTIFICATION OF RECEIPT
PIKE COUNTY BOARD OF EDUCATION
STUDENT CODE OF CONDUCT


I certify that I have received and read a copy of the Student Code of Conduct.

School attending                              Grade

Student's signature                           Date

Parent's signature                            Date


If you should have any questions or comments pertaining to the contents of The
Code, please contact your child's principal.


PLEASE TEAR OUT THIS PAGE AND RETURN IT TO YOUR
TEACHER OR PRINCIPAL.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0472*

## PIKE COUNTY BOARD OF EDUCATION
## GIFTED EDUCATION PROGRAM

Gifted students are those who perform at high levels in academic or creative fields when compared to others of their age, experience, or environment. These students require services not ordinarily provided by the regular school program. Students possessing these abilities can be found in all populations, across all economic strata and in all areas of human endeavor.

A student may be referred by teachers, counselors, administrators, parents or guardians, peers, self, or any other individual with knowledge of the student's abilities. Additionally, all second grade students will be observed as potential gifted referrals using a gifted behavior checklist.

For each students referred, information is gathered in the following three areas:

1. *Aptitude*. Assessed through an individual or group test of intelligence or creativity.
2. *Characteristics*. A behavior rating scale designed to assess gifted behaviors is completed by a classroom teacher.
3. *Performance*. At least three indicators of performance at a gifted level such as achievement test scores, grades, products, work samples, and/or portfolios.

The scores from the assessments/items used are entered on a matrix where points are assigned according to established criteria. The total number of points earned determines if the student qualifies for gifted services.

For more information contact Karen T. Berry, Special Education Coordinator
Pike County Board of Education, 101 W. Love Street, Troy, Alabama 36081
Phone 334-566-1850 ext. 117

---

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0473

PLAINTIFF'S
EXHIBIT
3

# PIKE COUNTY SCHOOL SYSTEM

# ESSENTIAL

# ADMINISTRATIVE

# INFORMATION

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0313

## 2006 – 2007 SCHOOL YEAR

## TO ALL ADMINISTRATORS

This document is not all-inclusive.  It does, however, contain certain directions, board policy, and administrative directives which are to be followed.  This publication may be considered to be a type of handbook to be used in consort with the board policy manual.  Any conflict should defer to board policy.

Please thoroughly read the document and immediately report any errors or omissions directly to the superintendent so that corrections may be disseminated as soon as possible.  Questions and concerns should be addressed to the superintendent.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0314

PIKE COUNTY SCHOOL SYSTEM

ESSENTIAL ADMINISTRATIVE INFORMATION

1.  OPENING SCHOOL INFORMATION

The opening day of school is Wednesday, August 9, 2006 (Institute is August 3, 2006 and will be held at the Cattlemen's Building on 231). Teacher Inservice and Workday will be held August 4, 7 and 8 respectively. Schools will remain in session for two-thirds of the day on the 9th. Meals will be served. Principals must insure that six hours of instruction, exclusive of breaks and recess, are provided each day for all children. Schools shall be classified, for convenience purposes, as follows:

> Pike County High School (PCHS) and Goshen High School (GHS)
> *Main or High school campuses.*
> Banks Schools (BS) {Includes Banks Primary Campus – BPS} and Goshen Elementary School (GES) Pike County Elementary School (PCES) – *Feeder campuses.*

Dismissal times for GHS and PCHS will be 3:06 p.m. daily and 12:30 p.m. for any two-thirds days scheduled (First day, last day, two parent conference days, and December 20).

Feeder schools should plan their dismissal times according to the main campus dismissal times allowing for time for the buses to leave or arrive before the 3:06 high school dismissals. These times will be different for each high school and feeder campuses.

Ideally, buses should be arriving at the appointed pick-up zones designated for each campus when students are dismissed. No children are to be allowed out of doors prior to the buses arriving (with the exception of those who drive/walk with approval of a written plan by the superintendent.)

Any deviation from the above shall only be approved in writing from the superintendent's office, or orally in the case of emergency situations, e.g. bad weather.

A memorandum showing the 2006-07 Bell Schedules for all schools and bus pick-up and departure sequences will be published separately.

2.  ADMINISTRATOR'S MEETINGS:

Administrator's Meeting are held the second Wednesday of each month at the Central Office. These meetings begin promptly at 8:30 AM and last until all agenda items are covered. Attendance is mandatory. Attendees should include: All administrative assistants, supervisors, coordinators, and principals.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0315

3. <u>BOARD MEETINGS:</u>

Meetings of the Pike County Board of Education are generally held on the second Monday of each month in the board room at the Central Office at 5:30 PM. On occasion, meeting dates are moved as are beginning times. Also, on occasion, special meetings are held. Regardless, all meetings are announced well in advance as required by law. All administrative assistants, supervisors, and principals are expected to be in attendance.

4. <u>REPORT CARD/CONFERENCE DAYS:</u>

Report Card/Conference Days are held the first Thursday after the end of first and third nine weeks. These are 2/3 days for students and 1 ½ days for teachers. Teachers dismiss at 7:30 PM. Parents are required to pick-up report cards at the school unless the principal determines that some circumstance exists that makes this unreasonable. In cases where elementary classes are departmentalized and in cases of all middle school and high sch: students; arrangements should be made that requires and verifies that parents have circulated among all teachers prior to picking up report cards from the homeroom teacher.

Under no circumstances, should additional hours worked on these date by employees who are classified as non-exempt employees under wage and hour laws result in the accumulation of overtime.

5. <u>POLICY MANUAL:</u>

The Pike County Board of Education expects all personnel to follow board policy. Official board policy is contained in the district's policy manual. Administrators should refer to this manual in all cases when policy questions arise. A thorough knowledge of the district policy is required for all administrative staff. Hard copies of policy manuals are provided and on-line versions will be available by Fall of 2006.

6. <u>CLOSING SCHOOL INFORMATION:</u>

Schools (students) will dismiss on May 24, 2007 at 12:30 p.m. All nine-month employees will work the next day, May 25, 2005, until the end of the regular work day unless special notice has been issued from the office of the superintendent.

Principals should insure that all students return textbooks and other school property in the condition in which it was distributed considering reasonable wear on the item.

Teachers and other employees who have been distributed system property such as keys, calculators, roll books, grade books, teacher edition textbooks, and other system property, must account for and return said property in good condition or working order less consideration for reasonable wear. Employees are responsible for any equipment, supplies, or machines which have been given into their care. Principals and supervisors, as part of their end-of-school checklist, must reconcile the local school or department inventory with all items returned. Lost or damaged items may be charged to employees depending upon the specific circumstances.

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0316*

7.  SCHOOL OR INSTRUCTIONAL FEES

The Code of Alabama prohibits the collection of instructional fees for required courses or general fee required of all students. Instructional monies are provided by the legislature to take the place of these sorts of fees. The law regarding fees states, in part,

> *It is the intent of the legislature that no fees shall be collected in the future for courses required for graduation [this means elementary courses too]. Reasonable fees may be required for laboratory and shop courses except those required for graduation.*

A reasonable fee may be charged for elective courses. Fee rates must be approved by the superintendent. Under no circumstance should students be denied admission to any program of study due to financial hardship.

8.  ELEMENTARY CLASSROOM SUPPLY LISTS

The district provides uniform elementary classroom supply lists by grade level. These are published on the district's web-site for review. Supply lists may not be modified at the local school level.

9.  STUDENT HANDBOOKS

Each principal shall distribute handbooks for every student each year. Handbooks shall contain essential, pertinent, and informative data relative to student conduct, expectations, system and local school regulations, and other information useful in helping the students and parents understand the operation of the system and school. All school rules must conform to state, federal, and system law, policy, or procedure. Every effort will be made to allow local schools latitude in formulating rules felt to be needed at the local level, but any conflict will defer to federal, state, or local board law, policy, or procedure. The district also provides student planners for this purpose.

10. ASSEMBLIES, DAILY ACTIVITIES

The holding of local school assemblies is encouraged. It is recommended, particularly in elementary schools, that monthly themes be developed and assigned to all faculty members so that each faculty member has partial responsibility for program presentation. Assemblies should be used for instruction of students in good group and individual behavior and manners, recitation of the Pledge of Allegiance correctly (i.e. "… one nation under God…" {no comma after the word "nation"}), singing of patriotic songs, building of school spirit, and the like.

Principals should schedule a daily time, preferably at the beginning of the day, when students are able to voluntarily participate in the Pledge of Allegiance. Having the student body president, or other appropriate student, to lead the pledge over the intercom is appropriate.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0317*

6

The Code of Alabama requires the display of the United States and Alabama State flags on a daily basis while school is in session.

## 11. SYSTEM HANDMAIL

Each Tuesday and Thursday, vans will deliver system communications and handmail as well as supplies which are not too heavy or bulky for the van drivers to lift. Principals are responsible for having mail bags ready when the drivers arrive and for insuring that communications are routed to the proper employees in an expeditious manner. A stop will be made at each campus. Principals must have a designated place for the mail bags to be delivered and picked up.

## 12. MAILBOXES AT THE CENTRAL OFFICE

Mailboxes for each school, administrator, supervisor, and other departments within the system are maintained for convenience and communication in the reception area of the central office. Each person who has a mailbox should routinely check his or her mail insure that dated materials are reviewed or distributed as needed. Every effort is made to place mail from local school mailboxes in the bi-weekly handmail delivery pouches to expedite delivery of dated material and for convenience of local school personnel.

## 13. INSURING THAT COMMUNICATIONS ARE EFFECTIVELY DISTRIBUTED

Principals and supervisors are responsible for insuring that verbal and written communications are properly and effectively given out to appropriate employees. General communications and instructions should be posted in a pre-arranged place known to all employees as the place where such information will be posted. Faculty and staff should be reminded periodically to read bulletin boards (or the designated place) on at least a weekly basis. Job vacancies will be posted in the above manner at each campus as well as the central office.

Each employee has been provided system e-mail accounts and mail should be checked several times daily. The districts web-site and web-portal is also used frequently to distribute information.

## 14. USE OF TECHNOLOGY FOR COMMUNICATIONS

All school administrators are expected to be proficient in the use of technology. Administrators should check their e-mail throughout the day on a regular basis since it is a frequently used method of communication.

## 15. EMPLOYEE SIGN-IN SHEETS

All employees must either sign or clock-in and out when reporting to and leaving from work. A central place, usually the office, for signing-in shall be designated by the principal or supervisor. Previous memoranda regarding the Fair Labor Standards Act and other local regulations have dealt in detail with clocking in and out as well as proper use of time sheets. Principals or supervisors who do not have said memoranda should immediately request copies so that faculty and staff are knowledgeable of and follow prescribed regulations.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0318

16. REPORT OF PROPERTY DAMAGE OR PHYSICAL ASSAULT

A report of property damage from any source must be filed with the superintendent as soon as is practicable following such damage. Vandalism, break-in's, theft, and burglary are also to be reported immediately to the proper police authorities. A copy of the police report is also to be filed with the superintendent in case insurance coverage applies. State law requires that the superintendent file a report to the sheriff of all assaults by students against teachers/administrators. A report of physical attacks by students upon school employees should be filed with the superintendent by the principal within five days of the assault.

17. PAYROLL AND OTHER REPORTS

The principal of each school is responsible for insuring that the various reports regularly due to the superintendent's office arrive on time and are accurate. It is essential that payroll report be not only accurate but also received on the date specified by the bookkeeping department because inaccurate or delayed reports could cause an employee to either not receive a check on time or that the check is not calculated in the correct amount. The principal must coordinate with his or secretary/bookkeeper to make sure that the reports are submitted correctly and on time.

Requests for other information will be sent from time to time. It is expected that these requests will be expeditiously completed. Every effort is made to keep these requests limited to only the information which the central office cannot compile itself or those requested from outside agencies such as the SDE.

18. SECURITY PLAN FOR LOCAL SCHOOLS

Each principal shall develop and submit to the superintendent a School Safety Plan developed with input from appropriate faculty and staff. The plan should address, at a minimum, areas of concern as follows and must meet SDE requirements:

    a.  Building security
    b.  Grounds security and surveillance
    c.  Property protection (personal property of students, faculty, staff, visitors)
    d.  Personal safety (students, faculty, staff, visitors, including a plan which addresses how substitutes will be made knowledgeable of the plan; must include how the administration and teachers will deal with student intimidation (bullying), coercion, and gangs)
    e.  Evacuation plans for fire, tornado, and bomb threats, or any other condition which warrants leaving the building – schools with gymnasiums and stadiums should include a plan for these facilities.
    f.  Listing of the responsibilities of each employee.
    g.  Safety at special activities including athletic events.

Faculty and staff need to be thoroughly familiar with the plan and students should be provided necessary information in handbooks. Evacuation plans are to be posted in prominent places in each classroom and work place. **JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0319

8

### 19. FUND-RAISING ACTIVITIES

Fund-raising activities are allowed by each school. As a general rule, principals should not enter into agreements with vendors in which the school receives less than approximately forty percent of the return on sales. Preferably, this figure should be fifty percent or more. Vendors should be thoroughly reviewed to determine their reliability, past performance, ability to meet deadlines and manage contingencies, and stability, among other things. No fund-raising activity may interfere with instructional time. All receipts from sales must be receipted by the person receiving the cash/checks and in turn receipted at the local school office by the secretary/bookkeeper, and these funds are to be deposited to the local school account. The amount due to vendors is to be paid as per pre-arranged agreements upon receipt of itemized invoices. A proper accounting of the receipts is required by the system. Forms are available from the central office. Under no circumstances are the total funds collected from sales for these various projects to be remitted to the vendor for distribution back to the school.

### 20. LOCAL SCHOOL AUDITS

Each local school will be audited by the State Examiners of Public Accounts annually. Principals are responsible for the accuracy of bookkeeping and accounting records and insuring that applicable state law and board policies are adhered to with respect to proper bookkeeping procedures. Each principal and secretary/bookkeeper is expected to fully cooperate with the auditors selected by furnishing required documents, signing applicable forms, and submitting books in a timely manner.

Upon receipt of the annual audit, each principal is to submit to the superintendent a report which will include, at the minimum, a statement of concurrence or exception to the audit findings on a case-by-case basis, a statement of how audit exceptions will be corrected or amended, and an explanation of why continued (year-to-year) audit exceptions recurred.

### 21. OUT-OF-DISTRICT ENROLLMENT

Only students who reside in Pike County outside of the Troy City limit, or who receive permission from the board for an interdistrict transfer, may attend Pike County Schools, except as noted below. Principals should report, in writing, all students who are attending school in another public school district but whose residence is in Pike County. It is the responsibility of the principal to verify the residence of each child attending his or her school. Verification must be done using criteria established in the Lee v. Macon County Consent Decree.

Students who move from the Pike County School District may continue to attend only under one of the circumstances as follows:

1.    The student is in the ninth grade or above and has been attending for two or more years.

2.    The student's parents request and receive permission from the superintendent for reasons explicit in the system federal court order.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0320

3.    The student's parents request and receive an interdistrict transfer from the board of education.

## 22. ATHLETIC ELIGIBILITY/NO PASS – NO PLAY

All secondary schools are responsible for determining the eligibility for each student who participates in Alabama High School Athletic Association-approved sports.   Although eligibility lists are not required to be submitted to the AHSAA beginning with the 1993–4 school year, each participant school in this system is still required by local procedure to develop eligibility lists for each sport in which it participates and submit these to the principal and athletic director, if applicable.   These reports are the first-line responsibility of the head coach for each sport and the overall responsibility of the principal.   All eligibility reports should be checked separately by the coach and by the principal.   No student will be allowed to participate in an Alabama High School Athletic Association-sanctioned endeavor until eligibility is verified by the coach and principal.

In the case where an eligibility (or other) violation is determined, the principal should immediately report such violation to the superintendent and in turn to the AHSAA.

Prior to participation students and parents must sign participation forms which clearly spell out specifically that participation may result in "catastrophic injury or death."

All students must have had a medical doctor's approval to participate prior to participation. Doctor shopping is strictly prohibited.

Participation includes practices, summer workouts, etc.

No Pass, No Play policy also involves students participating in other activities. This includes band as well as all other co-curricular activities. Principals are expected to enforce these policies.

## 23. KINDERGARTEN – FIRST GRADE ELIGIBILITY

Kindergarten – A child whose fifth birthday is on or before September 2nd is eligible to enroll in kindergarten.

First grade – A child whose sixth birthday is on or before September 2nd is eligible to enroll in first grade.

## 24. ENROLLMENT – SOCIAL SECURITY NUMBER, IMMUNIZATION CERTIFICATE, OTHER INFORMATION

To enroll in school, a child must present a birth certificate (certified copy or original,) a blue immunization certificate (or appropriate waiver), a social security card, and proof of residence address.   Students transferring from other systems must present appropriate proof of grade level as well as the above.

## 25. ATTENDANCE REPORTS

Principals are responsible for insuring that reports are accurate and submitted on time.

## 26. COMPULSORY ATTENDANCE

Principals should make students and parents aware of the state compulsory attendance law which requires regular attendance of all school age children between the ages of 7 and 16. Pike County Board of Education attendance requirements should also be made known to students and parents, i.e. even though a student is sixteen or over, regular attendance is required.

Principals are responsible for assigning the local school staff necessary to manage record keeping associated with maintaining accurate attendance records, including student excuses, etc. The procedures for clearing unexcused absences should be clear to students, parents, faculty, and staff.

Students who do not attend regularly shall be reported to the system's Truancy Intervention Program who will in turn coordinate any required action with other local officials, namely District Court and Juvenile officials.

Principals are to report any suspected non-enrollment of school age children to the superintendent. Children, enrolled last year, who are not enrolled by the end of the first full week of school, and who have not transferred, withdrawn, or moved their place of residence are to be listed together with their parent's names and last known address.

## 27. TOBACCO AND DRUG-FREE WORK ENVIRONMENT

The board has issued a proclamation which guarantees that students and employees shall have a drug-free environment. The ban against drugs and alcohol includes any use of any tobacco products by any student or school employee while on school property or at school events.

## 28. USE OF SCHOOL BUILDINGS FOR NON-SCHOOL PURPOSES

School facilities may be used by non-school connected parties for non-school purposes only by the interested party completing, and having approved, a school facility lease form. Principals should keep these forms on hand at the local school office for distribution to interested parties. All applicable information must be completed prior the superintendent's approval. Amounts of payment for use of the facilities and hiring of school personnel (lunchroom worker or janitor), as specified in the lease form, must be agreed upon by all parties prior to the submittal of the form to the superintendent. Board Policy KGH regulates non-routine use of kitchen and serving facilities and requires that a CNP employee be paid to be on hand when non-routine use of kitchen facilities and serving areas is undertaken. Principals should familiarize themselves with this policy and the instructions contained in the lease form.

No admission fees, use fees, assessments of attendees, or similar fee, is to be charged by the party making use of the facility except that in the case of voluntary donations to help defray the cost of the use of the facility and payment of school personnel is permitted for

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0322

11

such functions as family and class reunions. The intent of this procedure is to prohibit non-school entities from using school facilities for money-making activities. Any deviation from the above must be approved by action of the school board.

## 29. SCHOOL MEALS

Breakfast and lunch will be served at all elementary schools. High schools, after determination of anticipated participation, may opt to have breakfast if it is in the best interest of the children and will not interfere with maintaining a profitable lunch program. Prices of meals are as follows:

|  | Student | | Adult |
|---|---|---|---|
|  | Reduced price – full price | | |
| Breakfast - | $ .30 | $ .70 | $1.10 |
| Lunch     - | $ .40 | $1.25 | $2.00 |

Cost of à la carte items will be approved by the board periodically. The CNP supervisor will provide a cost list of à la carte foods to each lunch room as the menu is approved.

Principals are reminded that strict federal regulations apply to FDA meal programs. Specifically, among others, the names of students who eat a free or reduced-price meal may not be published or otherwise publicly made known. Schools are to follow, without deviation, the prescribed meal procurement plan as set forth from the office of the superintendent, Child Nutrition Program section. All funds received for the CNP may not be commingled with any other funds.

Free and reduced price meal forms must be processed within ten days after receipt. Principals are to insure that forms are checked for accuracy before assigning free or reduced price status. No child may eat free or reduced-price meals unless a meal application is approved. At the beginning of school, last year's list may be used temporarily until new forms are received and approved or for a ten-day period.

Students may not "charge" their lunch!

## 30. COMPETITION WITH CHILD NUTRITION PROGRAM MEALS

Principals are reminded that sale of food items for breaks cannot interfere with the breakfast and lunch programs. No child may purchase snacks for break and take them into the cafeteria in lieu of participating in the school food services programs. Carbonated soft drinks and carcinogenic snacks are prohibited for sale at elementary schools. Sale of all snacks at high schools may only be carried out if the sale of snacks does not interfere with the participation of students in the school food services meals. Violation of the rule could subject the school to loss of FDA funds or repayment of such funds from the school general fund.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0323

## 31. MAINTENANCE REQUESTS/REPORTS

Maintenance requests shall be submitted to the Maintenance Department in the manner specified. Emergencies may be reported by telephone to either the central office or the Maintenance Department. General, non-emergency repairs will be prioritized by the maintenance department and assigned to a maintenance Team for action. Concerns over the efficiency of maintenance work should be directed to Mr. Tom Hicks, Director of Finance and Operations.

Procedures for requesting maintenance work will change during the 05-06 school year. The system will be using a web-based program and training will be provided in advance of implementation.

## 32. REPORT OF INJURY TO STUDENTS, STAFF, OR VISITOR, OR INCIDENT

The principal must file a report of injury to any person which occurs on his or her campus or as a result of or participating in any school related function whether on campus or not. The report shall be on system-approved forms, if applicable, and shall contain a narrative of requisite data pertaining to the incident. At a minimum, the report must include the full name of the person (if a student, full name of the parent as well), address of the person, telephone number, witnesses to the incident including written statements from the witnesses, date and time of occurrence, name of teacher supervising the child, and statement from said teacher.

Reports of on-the-job injury claims for employees should also include applicable reports from physicians, hospitals, emergency rooms, or other germane reports. Medical doctor costs, and any other connected costs, should be included as well.

## 33. TEXTBOOKS

Textbook funds are allocated to each school and each school is subsequently responsible for completing orders. Orders should be returned to the Central Office to be processed Delivery will be completed prior to the beginning of school. Shortages of textbooks should be immediately reported to the Instructional Support Administrative Assistant, Mrs. Elizabeth Grubbs. However, additional funding will not be approved unless extreme and unforeseen circumstances exit.

Textbooks must be used for a number of years. It is essential that administrators instruct teachers in the proper care of textbooks and that this information is passed on to students. The proper way to break-in new books, how to attach a book cover (paper grocery bags can be used if other covers are not available), and general rules for caring for books should be emphasized.

In the event that students lose or abuse the textbooks assigned to them, the principal should, after adequate time to locate lost books, bill the parents for the cost of the book based upon its value per state regulations. Defacing, marking, or other destruction of textbooks will also be charged to students. Inspection of books by teachers with appropriate reporting procedures should be carried out on at least a mid-semester and year-end basis.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0324

## 34. PROCEDURE FOR RECOMMENDATION TO SUPERINTENDENT FOR EMPLOYMENT OF PERSONNEL

Administrators who are in direct-line supervisory positions who are the chief administrative employee for their system sub-unit (i.e. principal, local school, Chapter I, special education, day care, etc.) are to observe procedures for recommendation for employment of personnel to the superintendent as follows:

1.    Confirm with the superintendent that a position availability exists.

2.    Verify the qualifications required for the position. *NOTE: Code of Alabama, §16-23-1 prohibits the employment of any professional (certified) person unless that person holds a valid Alabama certificate.*

3.    Verify that applicant is Highly Qualified under NCLB.

4.    After reviewing the existing file of applicants at the central office, select those applicants who meet the qualifications and interview each one. In the event an applicant cannot be reached, is employed, or otherwise is no longer interested in employment in this system, the application is to be given to the central office receptionist who will properly file the application.

5.    Upon selection of the candidate for recommendation, the administrator should review his/her recommendation, the application packet, etc. with the system's personnel director, Mrs. Elizabeth Grubbs.

6.    Upon approval of Mrs. Grubbs, the administrator should contact the superintendent to arrange an interview for the selected applicant.

7.    Following the interview process, a letter recommending the selected applicant is to be submitted to the superintendent. The letter must list each applicant interviewed as well as those who the administrator attempted to interview. A succinct summary of why the administrator feels that the applicant selected should be employed should be included in the letter.

8.    If the superintendent concurs with the recommendation, the applicant, together with the supporting documentation, will be submitted to the board for approval. If the superintendent does not concur, the administrator will be notified to select another applicant.

9.    If the board approves the employment of the applicant, the superintendent will notify the employee in writing of his or her approval. If the board does not approve, the superintendent will notify the administrator to submit another applicant, or other appropriate procedure, for the next board meeting.

10.   There is to be no deviation to this procedure. Administrators are to bear in mind that all documentation must be submitted to the superintendent no later than 3:00 p.m. on the Wednesday preceding the Monday board meeting. (i.e. four days preceding the board meeting.)

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0325

11.    Administrators are reminded that all job vacancies, except in extreme emergencies as determined by the superintendent, must be posted for fourteen days or more prior to board action.

## 35. ASBESTOS IN SCHOOLS

According to federal regulations, schools are required to notify patrons and employees, on an annual basis, of any asbestos laden materials which may be in the local school work or classroom areas.    This may be accomplished by including it in the Student/Parent/Teacher Handbook, by sending appropriate approved correspondence home with children, or other approved notification as prescribed in federal regulations.

Each school must have on permanent file a copy of its Building Asbestos Report.  This report details the location of all materials containing asbestos.    No renovation, remodeling, installations, demolition, or any manner or form of disturbing of the materials noted in the Report may be undertaken without first receiving approval to proceed from the system Asbestos Supervisor, Mr. Mike Johnson.

## 36. SCHOOL BOARD/CENTRAL OFFICE PERSONNEL/LOCAL SCHOOL RELATIONS

School board members and central office personnel are to be made welcome upon their visitation to school campuses.  Principals and teachers should carry on duties during these visitations as the periodic visitations by these personnel are not intended to disrupt school activities.    At the specific request of board members or central office personnel, principals may accompany visitors as needed provided that essential duties are not interfered with.  In no case should instructional time be sacrificed during such visitations. Specific requests from board members or central office personnel for any variation to this procedure are to be routed through the superintendent.

## 37. PARENT/STUDENT/TEACHER/PRINCIPAL RELATIONS

Board employees are expected to represent the board in a respectable, professional manner at all times.  Parents and students are the only reason that the school system is in existence and they should at all times be treated with the utmost respect and courtesy.

Principals and teachers are to "go the extra mile" in attempting to resolve conflicts with parents and students.  As our patrons, parents and students should be afforded the benefit of the doubt when applying rules and regulations.  This is not to say that rules should be broken or even bent, but to insure that our patrons are treated fairly and consistently.

Teachers and principals should use good common sense in dealing with patrons. Specifically, school personnel should not "play favorites" or allow privileges for a few at the exclusion of others.  All students and parents must be given the same courtesies and fair treatment.

Conflicts with students and parents should be resolved at the lowest administrative level, beginning with the classroom teacher.    One of the most important aspects of communication, and one of the most provocative omissions, is the art of listening to the concerned party.  Many problems can be resolved, even if the patrons do not agree with the ruling of the school personnel, by simply giving them "their day in court."



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0535

However, should parents or students become abusive or threatening, school personnel may take reasonable steps to protect themselves and others. Threats of bodily harm should be taken seriously and the proper authorities notified. Physical assaults against school personnel may be defended against with appropriate, reasonable countermeasures by school personnel.

All school personnel should remember Our Promise to provide Friendly and Courteous Service. All departments, offices, etc. should provide prompt and efficient operations.

Instructional time must be protected at all times. Parent meetings/conferences may not be scheduled during instructional time. Faculty are expected to make themselves available before and after school to meet with parents. Faculty should make regular contact with parents.

## 38. <u>WORKING HOURS</u>

Teachers are to report to their work site by designed starting time as provided for on the system bell schedule. Principals should arrive prior to teachers to have buildings opened, grounds checked, and otherwise insure that all is ready and secure for the instructional day.

Teachers, unless otherwise specified in their contract, are to work until 3:30 p.m. (or to the time specified by the superintendent on non-routine days). Principals should insure that all buildings are secure and that everything is in order prior to leaving each day. Generally, principals should not leave school prior to 4:30 p.m. Obviously, there are special occasions and events which will require that the principal either stay significantly later or return to school. Principals and teachers should bear in mind that they need to work whatever time it takes to accomplish their assigned tasks.

Principals may not grant special arrangements to accommodate and faculty or staff member.

## 39. <u>LEAVING SCHOOL DURING WORK DAY</u>

Unless permission has been granted by the superintendent or through board action, all employees are expected to remain on campus until the conclusion of the work day. Employees should bring with them all materials, supplies, meals, and the like, which they will need to complete their assigned duties. <u>No employee or student is allowed to leave school to purchase a meal, or to send students to pick up meals</u>, as this activity places undue liability upon the system. Should a student or employee not wish to eat the meals provided by the school, he or she may bring a meal rather than purchasing a school-prepared meal.

With the express, written permission of parents, students may leave under certain school-sanctioned circumstances. Field trips; class activities; band, choral, academic, or athletic competition or activities; checking out from the school office after arriving at school (subject to local school and system rules), are some valid reasons for leaving school. Such permission must fully indicate that the parents understand why the student is leaving school and contain the signature of the parent or guardian. Students are permitted to leave with parents or guardians only, or, with another adult relative with the express

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0327

16

written consent of the parents or guardians. In special circumstances, as determined by the principal, a student may leave with someone other than a relative if the parent or guardian provides verified written permission or the principal or assistant principal personally speaks with the parent or guardian and receives his or her verbal permission. This verbal permission will be reduced to written form and kept on file with the other written permission as noted above.

**All administrators must notify the Central Office when they are leaving campus for any reason or are going to be absent from work.**

40. <u>CONTACT BY ATTORNEYS OR EMPLOYEE REPRESENTATIVES</u>

Should an administrator be contacted by an attorney, employee representative (AEA UniServe representative or others), insurance adjusters, news media reporters, or similar individuals from outside the school system, these individuals are to be informed that they should contact the superintendent for permission to speak with the requested employee. School system personnel are under no obligation to explain, justify, or otherwise discuss board policy, system procedures, local school procedures, or other possibly sensitive information. If contacted by any of the above individuals, the administrator, after directing the person to contact the superintendent's office, needs to inform the superintendent as soon as possible as to the requested information providing any pertinent documentation which might clarify the situation.

In case of contact by attorneys or AEA personnel, particularly regarding on-going litigation, threatened litigation, employee grievances, or other similar situations, <u>no employee</u> is to respond to questioning by any of the aforementioned individuals without express permission from the superintendent. This is quite simply to ensure that no conflicting statements or erroneous information is given from several different employees.

Upon receiving clearance from the office of the superintendent, those noted above may meet with employees, provided that the employee voluntarily agrees to meet.

41. <u>PEPE:</u>

PEPE observations must be completed in accordance with local and state procedures and guidelines each year. Central Office staff will perform unscheduled observations on non-tenured faculty.

42. <u>PDPs:</u>

Professional Development Plans must be on file for all certified employees. PDPs must be formulated in accordance with PEPE requirements.

43. <u>FIRE AND TORNADO DRILLS:</u>

Fire and tornado drills must be conducted monthly in accordance with state law. Procedure for these emergencies should be reviewed periodically with faculty, staff, and students. Evaluation routes must be posted in all classrooms.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0328

17

### 43. ACADEMIC PERFORMANCE:

High expectations should be communicated. The district expects that each school's level of performance on state assessments will increase. Administrators (Building Level Principals) must take a personal interest in seeing that this occurs. Improvement will not occur if administrators are not monitoring to ensure that quality instructional presentations are being provided. Instructional time must be protected and steps should be in place to monitor teacher planning and curriculum alignment as well as numerous other practices and methods. Teacher made assessments should frequently mirror state assessments.

### 44. SIC/EIC/IIC:

SIC is known as the Secondary Instructional Committee. This committee meets when necessary to discuss issues related to secondary (7-12) instruction. Local school principals and guidance counselors may not arbitrarily add or delete new course offerings, modify scheduling parameters, change promotional criteria, or change graduation requirements.

EIC is known as the Elementary Instructional Committee. . This committee meets when necessary to discuss issues related to elementary (K-6) instruction. Local school principals may not arbitrarily modify elementary instructional offerings, add new programs, modify scheduling time requirements, change promotional criteria, modify report card formats, etc.

Decisions related to secondary and elementary instruction evolve from work in SIC and EIC. In most cases, these changes also require board approval.

IIC is a committee comprised of faculty representatives from each school as well as school administrators and central office personnel. Its purpose is to provide a forum for teachers and administrators to directly communicate with central office personnel and the superintendent on matters of concern. It meets in the central office boardroom at 3:00 pm the first Monday of each month while school is in session. In addition, the district publishes a Connections and Board Biz Newsletter which is distributed in this meeting and subsequently provided by IIC members to each school's faculty and staff.

### 45. REQUEST FOR TRAVEL OUT OF STATE AND OVER NIGHT:

All out-of-state travel and travel by faculty and/or students involving over night stays must be approved in advance. Requests should be submitted through the school principal to the Central Office for inclusion on the agenda at a board meeting prior to the travel. No retro-active requests will be approved.

### 46. INTERNET USE POLICY AND TECHNOLOGY POLICY:

Forms are provided for all employees and students with access to computers. These forms must be signed and maintained in a secure location as directed by Marvin Jackson, System Technology Coordinator.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0329

47. <u>OVERTIME</u>:

   All overtime must be approved in advance by the superintendent.

48. <u>TEACHER ORIENTATION AND COACHING</u>:

   The district provides all new employees with district level orientation prior to the beginning of each school year. Principals are responsible for scheduling orientation sessions prior to the beginning of each school year with employees new to their campus. Discussion should include issue related to specific school campus sites. Each new employee should be assigned a coach who is willing to advise and mentor new employees. Principals should monitor the infusion of new personnel into their schools and be willing to answer questions and provide support.

49. <u>SUPERVISION OF STUDENTS</u>:

   Principals should make every effort to ensure that professional staff has been assigned monitor and supervise students though out the school day.

50. <u>DISTRICT EMERGENCY CODE</u>:

   All system administrators, supervisors, and coordinators must be familiar with the district's emergency response plan and crisis codes. All incidents should be reported as directed. Local school administrators should take steps to designate an office staff member to make crisis code reporting to the central office when it can not be made by the principal due to the nature of the emergency. However, only a school principal or assistant principal may make a code determination. In cases, where principals are not assigned to schools, principals may designate a certified staff member to make these determinations in the absence of the principal.

   **The district's Emergency Response Plan and Crisis Codes are provided in the back of this manual.**

51. <u>SYSTEM ORGANIZATIONAL CHART</u>:

   The district is organized into specific functions. Its purpose is to provide all interested parties with information on who to obtain information and advice from. Additionally, it provides employees with specific lines of authority and responsibility. All personnel are expected to follow the "chain of command."

   **The district's organizational chart is provided in the back of this manual.**

52. <u>END OF YEAR PERSONNEL RECOMMENDATIONS</u>:

   Each year, the superintendent will establish a deadline for submission of end-of year personnel recommendations. The principal, after consultation with system administrative assistants, the superintendent, and/or others involved in the supervision and monitoring specific employees, will make the final decision. In regard to teachers, decisions should

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0330*

19

be based on the individuals ability to provide quality instructional opportunities for students. In the case of non-renewals, principals and supervisors are hearby directed to not provide "reasons" for non-renewal. This is not required by law and to do so creates liability for the school district. As such, discussions with employees about their status prior to non-renewal (and giving a "reason" after non-renewal), or discussion with employees, community members, and board members concerning the status of personnel prior to the written employment recommendation and subsequent board approval shall be deemed "unprofessional conduct" and shall result in disciplinary action.

Principals are expected to have the courage to stand by their decisions and must be prepared to justify their decisions using various forms of documentation.

53. "SENIOR TRIPS AND OTHER NON-SANCTIONED ACTIVITES:

The school district will not sanction trips nor assume liability for students post-graduation and/or any student on summer activities such as this that are non-curricular. This includes summer athletic campus not approved by the board and/or superintendent.

Such trips may not be organized and planned at school nor may monies be collected through the school. If a trip is planned outside of school and involves board employees serving as organizers or chaperones, parents must be advised in writing by the principal that the activity is not a school sanctioned event and the district will bear no responsibility for accident, injury, or death occurring as a result of participation in the trip. Also, I am directing that this be delivered by principals personally or that personal contact with the parents of each ex-student (ie Senior Trips) or current student to be sure they have received a copy of the letter.

Faculty or staff members should be advised by principals of the same. The district will not assume any responsibility for students and faculty and staff. Chaperones who are board employees should also be advised that they are personally and individually responsible and will be provided no protection through the district.

54. HOLD HARMLESS LEASE AGREEMENTS

Hold harmless lease agreements must be completed and signed by all parties prior to principals or other certified staff allowing school property or facilities to be used by non-school employees during or after school hours.

55. LOANS, LEASES, AND CONTRACTS

School personnel, including principals, may not enter into contracts of any type without the express written consent of the superintendent and approval of the board of education. Local school spending must be in compliance with all local, state and federal laws. Questions concerning bid laws should be directed to the superintendent. Local schools may not expend over $7500.00 to any vendor during the fiscal year.



PLAINTIFF'S
EXHIBIT
5

FILE:   JGFB

### SUPERVISION OF STUDENTS

The policy of the Pike County Board of Education shall assure that all school personnel discharge in a reasonably prudent manner all responsibilities relative to the care, safety and welfare of students under their jurisdiction. The Superintendent shall direct all principals to establish faculty supervision regulations which assure that students are supervised effectively throughout the school day. In addition to classroom supervision, such regulations shall specify hall duties, between class and/or break duties, and bus duties before and after school. Supervision of extracurricular activities shall also assure proper care of students.

The Superintendent shall instruct all principals to prepare supervision schedules and present these to assigned teaching personnel. Supervision duty assignments shall include but not be limited to (1) bus duty, (2) lunchroom duty, (3) hall duty, (4) supervision of students prior to and following dismissal of school each day, and (5) grounds duty.

Scheduled assignments shall assure that all students are properly supervised before, during, and after each scholastic day. At no time shall any Pike County School System certified employee abrogate his or her _in loco parentis_ based responsibility for reasonably prudent actions relative to student care, safety and welfare.

SOURCE:       The Pike County Board of Education
ADOPTED:      July 18, 1978; REVISED: May 1991
LEGAL REF.:   Dailey v. Los Angeles Unified School District, 2
              Cal. 3d 741 (Cal. Rptr. 1970); Titus v. Lindberg,
              49 N.J. 66, 228A 2d 65 (1967); Cirillo v. City of
              Milwaukee, 34 Wis. 2d 705, 150 N.W. 2d 460
              (1967); Schnell v. Travellers Insurance Company,
              262 La. app., 1171 264 So. 2d 346 (1972); Hovey
              v. State, 27 N.Y.S. 2d 195 (1941).

_JR v. Pike County BOE_
Produced by Defendant PCBE
No. 0112

FILE:  JGFC

## DAILY DISMISSAL PRECAUTIONS
## (SAFETY)

Each school principal and staff shall develop a plan for the orderly and safe dismissal of all students at the conclusion of the regular school day.  The plan shall encompass the following:

1.  Provisions for proper supervision of students who must remain in the school building after regular school hours.

2.  Provisions for safe loading of students who utilize school transportation.

3.  Provisions for safety of students when school buses are departing from the school campus.

4.  Provisions for the safety of students when automobiles and other motorized vehicles are departing school campus.

Said plan shall be available to the Superintendent at beginning of each school year.

SOURCE:  The Pike County Board of Education
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0113

FILE: GBREA

## SUPERVISION OF STUDENTS

The policy of the Board shall assure that all school personnel discharge in a reasonably prudent manner all responsibilities relative to the care, safety and welfare of students under their jurisdiction. The Superintendent shall direct all principals to establish faculty supervision regulations which assure that students are supervised effectively throughout the school day. In addition to classroom supervision, such regulations shall specify hall duties, between class and/or any break duties, and bus duties before and after school. Supervision of extracurricular activities shall also assure proper care of students. (See GBRE)

The Superintendent shall instruct all principals to prepare supervision schedules and present these to assigned teaching personnel. Supervision duty assignments shall include but not be limited to (1) bus duty, (2) lunchroom duty, (3) hall duty, (4) supervision of students prior to and following dismissal of school each day, and (5) grounds duty. Duties and other assignments shall be developed on a fair and equitable basis.

Scheduled assignments shall assure that all students are properly supervised before, during, and after each scholastic day. At no time shall any school system certified employee abrogate his or her in loco parentis-based responsibility for reasonably prudent actions relative to student care, safety and welfare.

SOURCE:  Pike County Board of Education, Troy, Alabama
ADOPTED: July 18, 1978; Revised
LEGAL REF: Dailey v. Los Angeles Unified School District, 2 Cal. 3d 741  (Cal. Rptr. 1970); Titus v. Lindberg, 49 N.J. 66, 228A 2d 65   (1967); Cirillo v. City of Milwaukee, 34 Wis. 2d 705, 150    N.W. 2d 460 (1967); Schnell v. Travellers Insurance Company,   262 La. app., j1171 264 So. 2d 346 (1972); Hovey v. State,   27 N.Y.S. 2d 195 (1941);

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0114*

FILE: JFAC-R

# PARENT/FAMILY INVOLVEMENT POLICY

The Board of Education recognizes that a child's education is a responsibility shared by the school and family during the entire period the child spends in school. To support the goal of the school district to educate all students effectively, the school and parents must work as knowledgeable partners.

Although parents are diverse in culture, language, and needs, they share the school's commitment to the educational success of their children. This school district and the schools within its boundaries, in collaboration with parents, shall establish programs and practices that enhance parent involvement and reflect the specific needs of students and their families.

To this end, the board supports the development, implementation, and regular evaluation of a parent involvement program in each school, which will involve parents at all grade levels in a variety of roles. The parent involvement programs will be comprehensive and coordinated in nature. They will include, but not be limited to the following components of successful parent involvement programs:

- Communication between home and school is regular, two-way, and meaningful.
- Responsible parenting is promoted and supported.
- Parents play an integral role in assisting student learning.
- Parents are welcome in the school, and their support and assistance are sought.
- Parents are full partners in the decisions that affect children and families.
- Community resources are made available to strengthen school programs, family, practices, and student learning. (At least one percent of Pike County's Title I funds will be spent on parental involvement.)

The Board of Education supports professional development opportunities for staff members to enhance understanding of effective parent involvement strategies. The board also recognizes the importance of administrative leadership in setting expectations and creating a climate conducive to parental participation.

In addition to programs at the school level, the Board of Education supports the development, implementation, and regular evaluation of a program to involve parents in decisions and practices of the school district, using to the degree possible, the components listed above. The board also provides community outreach programs for this purpose.

Engaging parents is essential to improved student achievement. This school district shall foster and support active parental involvement.

SOURCE: Pike County Board of Education
ADOPTED: October 9, 2000

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0115

FILE:  JH

## STUDENT ACTIVITIES

School-sponsored student activities are a vital part of students' lives and of the total school program.  Therefore, the Board encourages the certified staff and students of the schools of the School System to plan and implement appropriate student activities to meet the needs of the students.

All school-sponsored student activities must have prior approval by the local school principal and activity sponsor.

All school-sponsored student activities shall be under the control of the local school principal or designee.

All school-sponsored activities shall be supervised adequately by a member or members of the school certified staff.

School principals shall be responsible for producing a written school plan that encompasses all school-sponsored activities.

A school activity is defined as any educational experience or curricular or extracurricular event that is approved officially by the school principal based on the following criteria:

1. It is scheduled by the school principal, and

2. The school principal has made specific assignments to an employee(s) of the Board to teach, coordinate, monitor, advise, sponsor, or chaperon said activity as a part of employment responsibilities.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0116

**Pike County Board of Education**
**Prohibiting Harassment Policy**

**I.     General Statement of Policy**

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation.  This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0117

## II.     Definitions

### A.     Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1.   a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2.   the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to

- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical conduct such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0118

FILE: JCK

**B.    Race or Color Harassment**

For purposes of this policy, racial or color harassment of a student consists of verbal and/or physical conduct relating to a student's race or color, such as, but not limited to:

1.    the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive educational environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with a student's or academic performance; or

3.    the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute racial and/or color harassment may include, but not be limited to:

- graffiti containing racially offensive language which is derogatory of student's race or color
- threatening or intimidating conduct directed at a student because of the other's race or color
- jokes, rumors or name calling based upon a student's race or color
- slurs, negative stereotypes, and hostile acts which are based upon a student's race or color
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading students or members of protected classes
- a physical act of aggression or assault because of, or in a manner reasonably related to, a student's race or color
- other kinds of aggressive conduct such as theft or damage to property which is motivated by race or color.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0119

## C.    National Origin or Ethnic Harassment

For purposes of this policy, ethnic or national origin harassment of a student consists of verbal and/or physical conduct relating to a student's ethnicity or country of origin of the student's parents, family members or ancestors such as, but not limited to:

1.    the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive educational environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with a student's or academic performance; or

3.    the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute ethnic or national origin harassment may include, but not be limited to:

- graffiti containing offensive language which is derogatory to others because of their national origin or ethnicity
- threatening or intimidating conduct directed at a student because of the other's national origin or ethnicity
- jokes, rumors or name calling based upon a student's national origin or ethnicity
- slurs, negative stereotypes, and hostile acts which are based upon a student's national origin or ethnicity
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading students or members of protected classes
- a physical act of aggression or assault because of, or in a manner reasonably related to, a student's national origin or ethnicity
- other kinds of aggressive conduct such as theft or damage to property which is motivated by national origin or ethnicity.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0120

**D.    Disability Harassment**

For purposes of this policy, harassment because of the disability of a student consists of verbal and/or physical conduct relating to a student's physical or mental impairment such as, but not limited to:

1.    the harassing conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive environment;

2.    the harassing conduct has the purpose or effect of substantially or unreasonably interfering with an individual's work or academic performance; or

3.    the harassing conduct otherwise adversely affects an individual's learning opportunities.

Examples of conduct which may constitute disability harassment may include but are not limited to:

- graffiti containing offensive language which is derogatory to others because of their physical or mental disability
- threatening or intimidating conduct directed at another because of the other's physical or mental disability
- jokes, rumors or name calling based upon an individual's physical or mental disability
- slurs, negative stereotypes, and hostile acts which are based upon another's physical or mental disability
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading individuals or members of protected classes
- a physical act of aggression or assault upon another because of, or in a manner reasonably related to, an individual's physical or mental disability
- other kinds of aggressive conduct such as theft or damage to property which is motivated by an individual's physical or mental disability.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0121

E.  **Religious Affiliation Harassment**

For purposes of this policy, religious affiliation harassment of a student consists of verbal or physical conduct relating to an individual's religious affiliation, such as, but not limited to:

1.  the harassing conduct is sufficiently severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening or abusive environment;

2.  the harassing conduct has the purpose or effect of substantially or unreasonably interfering with an student's work or academic performance; or

3.  the harassing conduct otherwise adversely affects a student's learning opportunities.

Examples of conduct which may constitute religious affiliation harassment because of may include but are not limited to:

- graffiti containing offensive language which is derogatory to others because of their religious affiliation
- threatening or intimidating conduct directed at a student because of the other's religious affiliation
- jokes, rumors or name calling based upon a student's religious affiliation
- slurs, negative stereotypes, and hostile acts which are based upon another's religious affiliation
- written or graphic material containing comments or stereotypes which is posted or circulated and is aimed at degrading individuals or members of protected classes
- a physical act of aggression or assault upon another because of, or in a manner reasonably related to, a student's religious affiliation
- other kinds of aggressive conduct such as theft or damage to property which is motivated by a student's religious affiliation.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0122

FILE: JCK

## Elementary Schools of Pike County School System
## Racial Harassment/Discrimination Policy

1.  Everyone at **Goshen Elementary School** has a right to feel respected and safe. We want you to know about our policy to prevent racial harassment/discrimination of any kind.

2.  Harassment could come from a student or an adult.

3.  Harassment could include the following actions:

    a.  name calling, jokes or rumors;
    b.  notes or cartoons;
    c.  unwelcome touching;
    d.  offensive graphics;

4.  If any words or actions make you feel uncomfortable or fearful, you need to tell any school employee as soon as possible.

5.  You may also make a written report to any school employee.

6.  Your right to privacy will be respected as much as possible.

7.  The **Pike County School System** takes seriously all reports of racial harassment/discrimination and will take appropriate actions based on your report.

8.  The **Pike County School System** will also take action if anyone tries to intimidate or harm you because of your report.

**CONTACT:  Mr. Mike Bragg, Principal**

SOURCE: Pike County Board of Education
ADOPTED: December 11, 2000

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0123

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation.  The student will then be informed that he/she has three (3) choices:

1.  The student may converse by phone with his/her parent or guardian.

2.  The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3.  The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect.  If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services.  The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0124

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:     U.S. Const. Amend. IV; U.S. Const. Amend.
                XIV1; Moore v. Student Affairs Committee of
                Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
                1970); Note from Moore:  "It is settled that
                Fourth Amendment does not prohibit reasonable
                searches when the search is conducted by a
                superior charged with the responsibility of
                maintaining discipline or of maintaining
                security ..."; New Jersey v. T.L.O.

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0125*

FILE: JCAC
(continued)

1. The educator should immediately notify the
   principal.

2. The principal/educator should consult with the
   school nurse and counselor.

Human Resource caseworkers will proceed to investigate
the reported case.  If the investigation is to begin at the
school, the Human Resource caseworker will report to the
school office and identify himself/herself to the principal or
designated representative. Child abuse/neglect investigations
are highly confidential, and the student's rights to privacy
must be respected.  Only those persons necessary to conduct
the investigation should be present in any interview.  After
an evaluation/intervention has been made, the caseworker will
provide feedback to the principal and arrange monitoring pro-
cedures as needed.  Educators will report further incidents of
abuse/neglect regarding that child to the assigned caseworker.

### Special Information Regarding Neglect Cases:

1. Teachers should document and date <u>specific</u> instances
   or examples of neglect.
   Ex: On Wednesday, January 14, 1988, John Doe came
   to school with no coat, wearing unclean clothes and
   shoes with large holes.

2. Keep a running account of the above examples over a
   period of time.

3. Contact the parents and express concern over the
   neglect and make suggestions as to how they can
   help or seek help by calling Child Welfare at Human
   Resource.

### Right to Privacy Considerations:

1. A student's school record continues to be protected
   by the terms of the Family Rights and Privacy Act
   and the policies of the Board.  The School System
   needs a parental release form, court order or other
   legal document which gives school personnel the
   permission to release information in school records
   to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
**No. 0126**

FILE:JCAC
(continued)

2. In return, Human Resource personnel should share needed information with school officials.  The school principal or counselor could be designated as a <u>confidential</u> person to receive this information and use it in the best interest of the student.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0127

FILE:  JBDA

### STUDENTS LEAVING SCHOOL CAMPUS

A student is not permitted to leave the school campus during regular school hours except in accordance with the provisions that follows:

1. A student's parent or guardian may come to the school in person and check his/her child out of school.  A student may not be checked out of school by persons other than his/her parent or guardian or someone specifically designated by the student's parent or legal guardian.

2. A student may bring a written note signed by the student's parent or guardian and upon approval of the local school principal or designee may be permitted to leave the school campus.  All written parental requests shall remain on file in the principal's office for the remainder of the school year.

3. In emergency situations, the school principal or designee may permit a student to leave the school campus based upon a telephone request from the student's parent or guardian.  In such instances, the principal or designee shall attempt to recontact the student's parent by telephone to confirm the request.

A student shall be under the jurisdiction of the school from the time the student arrives at school each day until he/she leaves the school campus in the afternoon; however, students who walk should be under the jurisdiction of the school from the time they leave home until they return home. In case a student rides a bus, he/she shall be under the jurisdiction of the school from the time he/she boards the bus until the student exits the bus in the afternoon.  In addition, a student shall be under the jurisdiction of the school while attending any school sponsored activity either at school or away from school.  This shall apply to all students, including members of athletic teams, pep clubs, band, and other student organizations.

Any student violating this policy shall be subject to disciplinary action by the local school principal.

SOURCE:
ADOPTED:

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0128

FILE: JBDAB

SCHOOL ATTENDANCE STANDARDS FOR DRIVER'S LICENSE OR PERMIT

As required by Legislative Act 93-368, the Pike County Board of Education adopts this policy consistent with Alabama State Department of Education guidelines.

The purpose of the Act is to require school attendance standards as a prerequisite for a driver's license or learner's permit for the operation of a motor vehicle. School attendance standards are met by enrollment in a school or General Educational Development (GED) program or job training program approved by the State Superintendent of Education.

The requirements of the Act include:

    A.  Verification of enrollment status by appropriate school personnel on Part I of the Student Enrollment/ Exclusion Status form.

    B.  Notification to the Department of Public Safety when a student has more than 10 consecutive or 15 cumulative days of unexcused absences during a single semester.

    C.  Exemption for students due to circumstances beyond the control of the student.

    D.  Implementation of an appeals process.

In accordance with Section 16-28-6, Code of Alabama, 1975, circumstances beyond the control of a student are limited to:

    A.  Students who are mentally or physically unable to attend school.
    B.  Students who are regularly and legally employed under the provision of the Child Labor Law.

    C.  Students who, because of the distance they reside from school and the lack of public transportation, are compelled to walk more than two miles to attend a public school.

Suspension or expulsion from school or imprisonment are not circumstances that qualify for exemption. The school system superintendent or designee is the sole judge of whether or not the evidence presented meets the legal requirements of "circumstances that are beyond the control" of the student.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0129

FILE:   JCAA

### DUE PROCESS PROCEDURES

Students shall be treated with fairness in all discipline matters and shall be accorded procedural due process when the discipline measures of corporal punishment, short- and long-term suspension or expulsion are applied.  Before punishing students for violation of a Board Policy or local school rule and regulation, the local school principal or designee shall ensure that students are accorded appropriate due process.

PURPOSE

The purpose of this procedure shall be to settle equitably, at the lowest possible administration level, differences and issues relating to discrimination against employees and/or students based on the Education Amendments of 1972 or the Rehabilitation Act of 1973.  These proceedings shall be kept as informal and confidential as may be appropriate at all levels of procedure.

DEFINITIONS

A grievance is a complaint by any member of the professional staff, the non-professional staff, and student body. A grievance procedure is a description of the systematic process by which a person may seek to correct what the person considers to be an injustice or inconsistency.

PROCEDURE

Each level of the procedure shall be observed and used with normal order of proper channels.  If the time limits specified in each level of the procedure are not met, the grievance shall not be considered.

STUDENT GRIEVANCE PROCEDURE

The Pike County Board of Education will use the following procedure for any grievance of any nature to include, but not limited to, alleged discrimination based on the grounds of race, color, handicap, sex, religion, creed, national origin, or age.  For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, at (205) 566-1850 between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher.  This conference shall be scheduled by the teacher within five days of receipt of the request.  If the grievance is resolved at this conference by

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0130

FILE: JCAA
(continued)

mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first level conference, the student shall file, within five days, with the next level of administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference, the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the superintendent of education), the student may request to be heard by the Board of Education by submitting in writing to the Superintendent of education. The Superintendent shall insert in the appropriate place on the agenda of the next board meeting (provided that the time constraints (as per board policy) are met for inclusion on the most immediate agenda) an item which states that the student desires to address the board concerning a grievance.

The Board shall review the original grievance. In addition, the board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The Board of Education will either uphold the recommendation of the Superintendent or require the system to take some other action in response to the grievance. A copy of the action of the Board will be furnished to the student, either as a part of the minutes of the Board of Education or as a separate written statement. The Board shall be the final reviewing authority within the System.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local Board of Education. The student retains at all times the right to contact the Office of Civil Rights with regard to any allegations that the System has violated the statutes described above.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0131

FILE: JCE

# PIKE COUNTY SCHOOLS
## SECTION 504 of the REHABILITATION ACT
### STUDENT GRIEVANCE PROCEDURE

The Pike County School System will use the following procedure for any grievance of any nature to include, but not be limited to, alleged discrimination based on the grounds of race, color, disability, sex, religion, creed, national origin, or age. For further information contact Mrs. Karen Berry, 504 Coordinator, at 211 Lake Avenue, Troy, Alabama 36081, at 334-566-1850 between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday.

When a student has a grievance, he or she shall, within five days of when the grievance is first known, request a conference with his or her teacher. This conference shall be scheduled by the teacher within five days of receipt of the request. If the grievance is resolved at this conference by mutual agreement, there shall be no further action. Both parties shall state in writing that they are in agreement with the proposed resolution.

If the grievance is not resolved at the first-level conference, the student shall file, within five days, with the next level of administration, the assistant principal (if applicable), a written description of the grievance. Upon receipt of the grievance, the assistant principal and the teacher shall schedule a conference with the student to be held within five days of the receipt of the grievance. This conference shall be for the purpose of resolving the filed grievance. Following the conference the assistant principal shall respond in writing within five days to the student as to his or her decision regarding the disposition of the grievance.

Should the grievance not be resolved to the satisfaction of the student, he or she may continue through each level of administration in the same manner as prescribed heretofore. Upon completion of the final administrative level (the superintendent of education), the student may request to be heard by the board of education by submitting a request in writing to the superintendent of education. The superintendent shall insert in the appropriate place on the agenda of the next board meeting [providing that the time constraints (as per board policy) are met for inclusion on the most immediate agenda] an item which states that the student desires to address the board concerning a grievance.

The board shall review the original grievance. In addition, the board may, but is not required to, hear directly from any individual with knowledge of any relevant facts relating to the grievance.

The board of education will either uphold or deny the recommendation of the superintendent. A copy of the action of the board will be furnished to the student, either as a part of the minutes of the board of education or as a separate written statement from the office of the superintendent. The board shall be the final reviewing authority within the system.

This policy is not intended to deprive any student of any right they may have to file a grievance pursuant to any other policy of the local board of education. The student retains at all time the right to contact the Office of Civil Rights with regard to any allegations that the system has violated the statutes described above.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0132

SOURCE: Pike County Board of Education, Troy, Alabama
ADOPTED: July 7, 1997



PLAINTIFF'S
EXHIBIT
6

MEMORANDUM

TO: ALL PRINCIPALS

FROM: MARK BAZZELL

RE: NEW TEACHER ORIENTATION

DATE: JULY 24, 2002

New Teacher <u>System</u> Orientation will be held July 31, 2002 in the Board Room at the Central Office. Please contact your new staff members to make sure they are in attendance. We will not contact them, so please be sure everyone has been informed. We will begin at 8:00 AM promptly and will adjourn at 12:15 PM.

Please make sure you plan to provide them with their local school orientation on the afternoon of the 31st. I will need you to send to me a list of your new teachers and their mentors as soon as possible.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0139

# New Teacher Orientation
## *July 31, 2002*

| Time | Activity | Presenter/Facilitator |
|------|----------|----------------------|
| 8:00 | Welcome & Introductions | Dr. John R. Key, Superintendent |
| 8:10 | Superintendent's Comments | Dr. John R. Key, Superintendent |
| 8:40 | Student Assessment<br>Federal Programs | Mrs. Carolyn Burks, Coordinator |
| 9:15 | Break | |
| 9:30 | Instructional Initiatives, other topics related to instructional programs | Dr. Mark Bazzell, Assistant Superintendent |
| 10:00 | School Safety and Discipline | Dr. Mark Bazzell, Assistant Superintendent |
| 10:30 | Break | |
| 10:45 | Special Education Services | Mrs. Karen Berry, Coordinator |
| 11:00 | Indian Programs, At-Risk Programs | Mrs. Elizabeth Grubbs, Coordinator |
| 11:15 | PEPE | Dr. Mark Bazzell, Assistant Superintendent |
| 11:45 | PCEA | Mrs. Deana Elmore |
| 12:00 | Payroll Information, Insurance, other | Dr. Mark Bazzell, Assistant Superintendent |
| 12:15 | Dismiss | |

Report to assigned school for Local School Orientations by 1:30 PM or time designated by your principal.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0140*

## ADMINISTRATOR'S MEETING
### JUNE 10, 2003

| TIME | ACTIVITY | FACILITATOR | NOTES |
|------|----------|-------------|-------|
| 8:00 | **IMPORTANT INFORMATION**<br><br>**Wage & Hour<br>Inventory<br>Facilities & Grounds<br>Grants<br>Student Agenda<br>Funding/Staffing<br>Summer School<br>Out-of-State Trips<br>Strategic Planning<br>REACH<br>Discipline Code<br>Curriculum Guide<br>New Teacher Orient.<br>Institute<br>Inservice<br>Consent Decree<br>Coaching Rec.<br>Web-Sites<br>Other** | **Dr. Bazzell** | |
| | **CHILD NUTRITION PROGRAMS** | **Mrs. Taylor** | |
| | **INSTRUCTIONAL PROGRAMS**<br><br>**SAT Scores<br>Writing Assessments<br>Daily Schedules<br>PEPE Improving Inst.<br>Title I<br>Title II<br>Migrant<br>HQT** | **Mrs. Baker** | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0141

|  | **INSTRUCTIONAL SUPPORT**<br><br>**End of Year Reports**<br>**Community Education**<br>**Character Education**<br>**High Hopes**<br>**At-Risk**<br>**Textbook Orders**<br>**Math Workbooks** | **Mrs. Grubbs** |  |
|  | **PREVENTION AND SUPPORT, SPECIAL EDUCATION**<br><br>**Gifted Testing**<br>**Re-authorization IDEA**<br>**Volunteer Finger Print.**<br>**Emergency Kits**<br>**SIR data** | **Mrs. Berry** |  |
|  | **OPERATIONS** | **Mr. Hicks** |  |
|  | **SCHOOL REPORTS** | **Mr. Casey**<br>**Mr. Nelson**<br>**Mr. Hall**<br>**Mrs. Carter**<br>**Mr. Bragg**<br>**Mrs. Huggins** |  |
|  | **OTHER** | **TBA** |  |
| **11:15** | **ADJOURN** |  |  |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0142

1)    Lee vs Macon site visit

2)    PEPE

3)    Administrator's PEPE

4)    Furniture/Carpet

5)    Key receipts and inventory

6)    CATCH and Extension Service

7)    SIC, EIC, IIC

8)    Protect instructional time

9)    BBSST

10)   Prevention and Support

11)   ALC

12)   Local Funds Accounting Procedures, athletics, special accounts, fund raisers

13)   Cellular phone bills

14)   SDE Education stickers

15)   Promote "Our Promise"

16)   Copier purchases/leases

17)   Pay for Certified Substitutes

18)   Other

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0143

**Administrator's Meeting**
November 6, 2003

**Dr. Bazzell**

**Personnel/Staffing/Evaluation/Professional Development**
Central Office Re-organization
PEPE for Administrators
PEPE for Teachers/Obs. Schedule
Professional Development/PDPs/Mentors
Renewal of non-tenured staff
Overtime Issues

**Other Personnel Issues**
School Calendar
Cellular Phone Bills
Employee background checks
Sexual Harassment
Management of Public Funds
      Athletics, Ethics Violations

**Policy Matters/Legal Issues**
Corporal Punishment
Reporting Requirements/DHR/Law Enforcement
Residency Verification
Criminal Background Checks/Certificate Status

**Instruction**
School Brochures
Classroom Instructional Support Funds
"Our Promise"
"No Excuses" Campaign
Outside Intervention in Priority Schools
Report Card Distribution
SEAL Network services
Comprehensive Plan
Comprehensive Monitoring
Web Page Assistance
Testing Protocol Violations
STI User Conference
SIC, EIC

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0144



**School Safety & Discipline**
Discipline Forms
Surv. Systems
AEDs
Media Relations

**Facilities**
Warehouse project
Siemen's project
On-line requests

**Funding**
FY05 Outlook

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
No. 0145

# Agenda Items: Dr. Bazzell
7.27.04

1. Distribution of materials from SDE
SDE Calendar
HQT Info.
Truancy Definition
New Legislation

2. New Teacher Orientation, Institute, Inservice

3. Our Promise!

4. School Opening
Day 1
Planner, Code of Conducts, Calendars
Dress Code
Teacher Dress
Safety Plans, Bus Safety
Discipline Plans
Field Trip Moratorium
IDs

5. Facilities
Custodians
Grounds
Maintenance Requests

5. Instruction
Accountability
PEPE/SBWA/JBHM
Schedules/HS & Elem.
Classroom Appearance
Lesson Plans
Mrs. Baker !!

6. Other

**JR v. Pike County BOE**
Produced by Defendant PCBE
**No. 0146**

Dr. Bazzell - Agenda Items
October 19, 2004

1.    Executive Briefing - Online Learning - www.audied-online.com
2.    National Board Certification
3.    FY06 Budget Outlook
4.    ARI - new schools, data, coaching emphasis
5.    AMSTI
6.    Professional Development
7.    Student Health Issues
          BMI, fire safety, employee safety, asthma
8.    ADEM visit
9.    Discrimination
10.   Math C of S training
11.   Accountability - NCLB - HS grade placement, academic year
12.   Red Cross

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0147*

General Information
1/26/05
Dr. Mark Bazzell, Superintendent
Pike County Schools

1.    AYP Appeals

2.    Out of State Trips and Overnight Trips

3.    Professional Leave

4.    TSU   "Snoopy"

5.    Customer Focus Training

6.    Community education, Web pages

7.    RCT, ALC

8.    Truancy Definition

9.    Corporal Punishment

10.   Observations

11.   Children's Advocacy Center

12.   Overtime

13.   Custodians

14.   School Operations and Transportation Center (SOTC), telephones

15.   Lee v. Macon

      Faculty Assignment & Hiring
            Retention
            Hiring & Promotions
            Faculty/Administration Assignment & Support

      Within School Assignment and Graduation Rates

      Intra and Inter-District Transfers

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0148

Special Education
    ID of students as MR
    ID of Students as Gifted and Talented

Discipline

Extra-curricular Activities

Facilities and Equipment

Complaints of Racial Harassment and Discrimination

Monitoring and Reporting

16.     Map and Globe Audit

17.     Student Assessments

18.     05-06 School Calendar

19.     Other

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0149

## ADMINISTRATOR'S MEETING
### JUNE 1, 2005

| Time | Activity | Presenter | Notes |
|------|----------|-----------|-------|
| 8:30 am | Welcome, Introductions, Ground Rules | Dr. Bazzell | |
| 8:35 am | Important Information | Dr. Bazzell | |
| | CNP | Mrs. Taylor | |
| | Maintenance and Transportation | Mr. Hicks | |
| | Technology | Mr. Jackson | |
| | Break | | |
| | Prevention and Support, Special Education | Mrs. Berry | |
| | Instructional Support | Mrs. Grubbs | |
| | Instructional Programs Federal Programs | Mrs. Baker | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0150

| | Break | | |
|---|---|---|---|
| | Student Code of Conduct Review | Dr. Bazzell | |
| | Adjourn | | |

### *Dr. Mark Bazzell, Superintendent*

1.    Essential Administrator's Information Manual 2005-06

2.    Student Planners

3.    Local School Publications

4.    2005-06 School Calendars

5.    SDE Information

6.    Release of testing information prior to state embargo date

7.     Summer Art Program

8.    Change in selected elementary report cards - EIC

9.    SIC meeting summary

10.    Anticipated student counts for 2005-06

11.    Summer work schedule

12.    Personnel Recommendations

13.    Record disposal information/procedures

14.    PEPE

15.    Consolidated Review

16.    Lee v. Macon

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0151*

17.   Fixed Asset Inventory

18.   Local School Audit Reports

19.   School closing checklist - Keys

20.   Web-site update(s)

21.   Other

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0152

Administrator's Meeting
July 25, 2005

1.    New Teacher Orientation

        Local School Orientation

2.    Institute

        Agenda Review

3.    Inservice/Teacher Workday

4.    Day 1:  Procedures

5.    Technology

6.    Maintenance

7.    Transportation

8.    Child Nutrition

9.    Student Code of Conduct

10.   Student Planners

11.   School Calendars

12.   Lesson Plan Books and Class Record Books

13.   Lesson Plan Requirements

14.   Teacher Made Assessment Requirements

15.   Lee v. Macon

        Student Activities Notice
        Student Discipline

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0153*

16.    Prevention and Support

       ALC
       Campus Inspections
       Health Department Inspections
       Athletic Facilities
       Security

17.    Instructional Support

18.    Instructional Programs

       AYP
       Test Results

19.    Future Capital Projects

20.    Records Disposal Procedures

21.    Fixed Asset Inventory

22.    New Health Requirements

23.    Cellular Telephone Bills

24.    Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0154*

Important Information-Administrator's Meeting
Dr. Mark Bazzell

September 7, 2005

1.      Records Disposal

2.      Lee v. Macon

3.      PEPE - John Osborn

4.      PEPE - Teachers

5.      Organizational Structure

6.      Child Advocacy Center

7.      Accountability Results - School Choice

8.      Facilities

9.      Consolidated Review

10.     SACS

11.     Adm. Pay

12.     Customer Focus

13.     CATCH

14.     Finger Printing

15.     Other

Participants: Mike Hall, Donnella Carter, Carolyn Townsend, John Evers, Gene Nelson, Mona Watson, Al Griffin, Karen Berry, Carolyn Baker, Liz Grubbs, Tom Hicks, Mike Johnson, Marvin Jackson, Michael Rose, Jennifer Hornsby,

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0155**

# Administrator's Meeting Agenda
## July 27, 2006

| Time | Activity | Presenter/Leader | Notes |
|------|----------|------------------|-------|
| 9:00 am | Ground Rules, Welcome and Introductions | Dr. Bazzell | |
| | Important Information (See Separate Agenda) | Dr. Bazzell | |
| | Break | | |
| | Instructional Programs | Mrs. Carter Mrs. Baker | |
| | Maintenance | Mr. Hicks Mr. Johnson | |
| | Transportation | Mr. Hicks Mr. Johnson | |
| | Technology | Mr. Jackson | |
| | Child Nutrition | Mrs. Taylor | |
| | Break | | |
| | Instructional Support Indian | Mrs. Grubbs | |
| | Prevention & Support Special Education | Mrs. Berry | |
| | Career Technical Education | Dr. Griffin | |
| | School Announcements | Mr. Hall Mr. Bynum Mr. Nelson Mr. Evers Mr. Head | |
| | Adjourn | | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0156

### *Agenda Activities*
Bazzell

1.    Bell Schedule

2.    RCT Schedule

3.    Institute Activities

4.    New Teacher Orientation/School Orientation/Mentors

5.    Code of Conduct, Student Planners, Sub Handbook, Promotional Criteria

6.    Textbook Delivery

7.    Textbook Inventory (HS)

8.    High School Schedules (Matrix Form)

9.    Observation/Evaluation

10.   Faculty meeting schedules (Bazzell)

11.   Grade Book - Report Cards

12.   School Plan/Comprehensive Plan/Monitoring

13.   Character Education (Elem)

14.   STI (insertion of pictures)

15.   E-mail ( new faculty)

16.   Other

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0157*

04 Staffing

04 Funding/REACH

Strategic Planning

Summer Work

Consent Decree

Wage & Hour

Curriculum Guides/Planners

Code of Conduct

Library Media Automation

PEPE/PDPs

School Locks/Keys

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0158**

# INSERVICE SCHEDULE
# PIKE COUNTY SCHOOLS
# FEBRUARY 15, 2002

**7:40 - 11:15**  Teachers report to individual schools for activities developed by the Principal (Principals should submit morning schedules to Dr. Bazzell) Goshen Elementary - Grade Book training by Marvin Jackson/Mona Watson

**11:15 - 12:30**  Lunch

## ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE COUNTY ELEMENTARY SCHOOL

**12:30 - 3:30**  Selected teachers (New teachers hired after 8-1-01, and teachers absent on August 1, 2001), Diversity Training - report to the computer lab in Building 100, at the bottom of the hill. Presenter: Karen Berry

**12:30 - 1:45**  4th Grade teachers - Groundwater Festival Training - Room 208 Presenter: Michael Mullen & GWF staff, Troy State University

**12:30 - 1:45**  All other teachers and instructional assistants report to the Gym - What is Bullying? Presenter: Carolyn Burks

**1:45 - 2:10**  Break (Snack area will be open for purchases)

**2:10 - 3:30**  \*  Science Teachers - Grades 6-12 Environmental Awareness Training - Presenter: Michael Mullen, Troy State University, Room 210

\*  English Teachers - Grades 6-12 Writing and Reading - Facilitators: Carolyn Burks/Demetric Sermons, Room 209

\*  All other High School Teachers - Facilitator: Dr. Bazzell, Room 205 Block Scheduling - Instructional Strategies, Discipline

**2:10 - 2:50**  \*  K - 2nd Teachers - Recognizing Sexual Abuse, Room 201
\*  3rd - 5th Teachers - Reading- Running Records, Room 202

**2:55 - 3:30**  \*  K - 2nd Teachers - Reading - Running Records, Room 202
\*  3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201

Presenter: Wendy Watson - Running Records
Presenter: Lucia Grantham, Troy State University - Sexual Abuse

**2:10 - 3:30**  All Instructional Assistants - Make and Take Activities , Room 206

**3:30**  Dismissal Time

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0159

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Rev. Herbert Reynolds, President
Rev. Earnest Green, Vice President
Wyman Botts
Norman Chandler
Adam Register
Linda Steed

**Dr. John R. Key**
Superintendent



October 31, 2002

Mr. Terry Casey, Principal
Pike County High School
552 South Main Street
Troy, Alabama 36010

Dear Mr. Casey:

In reflecting on the work which will take place in the next few weeks by the PCHS committee who will be looking into the development of a School-Wide Discipline Plan, I felt like I needed to provide both you and the committee with some guidance. You will find information I hope you will find useful attached. I feel very strongly that if the committee utilizes this information in developing the plan, much improvement will be seen.

Specifically, everyone must understand their responsibilities and the implementation plan. Also, everyone must understand the options available in term of actions which may be used to modify behavior. And, everyone must agree to follow those Key Points I provided.

The information I provided is not all inclusive. However, it does represent concepts, ideas, beliefs, etc. which I have found to be most useful and effective.

Please share this with the committee. I will be glad to meet with the group and/or assist as needed with facilitation of their work.

Sincerely,

Mark Bazzell, Ed.D
Assistant Superintendent

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
No. 0168

101 W. Love Street, Troy, Alabama 36081-2613  Telephone: (334) 566-1850  Fax: (334) 566-2580

System Responsibilities

- Code of Conduct
- Board Policy
- Legal Advice
- Special Education Adaptations Review

School Administration Responsibilities

- Student Handbook/Planner
- Organization of School Day, Office Organization
- School Climate/ School Morale
- High Expectations for student behavior
- High Expectations for student achievement, teacher planning, protection of instructional time.
- High Expectations for teacher compliance with school-wide discipline plan
- Enforce Code of Conduct, enforce dress code, enforce other school rules
- Empower Teachers with authority to manage their own classrooms
- Monitor data, identify teachers who struggle with CM, provide professional development opportunities and support

Teacher Responsibilities

- High Expectations for student behavior and academic performance
- Provide quality instructional presentations, activities, etc.
- Post Classroom Rules and Consequences
- Work the classroom discipline plan
- Complete discipline forms properly including date, time, description of behavior without editorial comment.

Implementation

> Review Code of Conduct with Teachers
> Teachers Review Code of Conduct with Students, discuss expectations
> Teachers post school wide rules and consequences, explain classroom procedures
> Review usage of forms and procedures with teachers
> Discuss legal issues relative to special education students
> Discuss movement of students to lunchroom, other locations
> Discuss positioning of faculty during assembly program
> Teachers discuss expectations regarding behavior in assembly before every assembly
> Secure agreement that all faculty members will enforce dress code, planner usage
> Agree that teachers will keep students in lunch room and out of offices
> Administrators supervise by walking around

> Begin program - all same day

Actions all school officials can use to modify behavior

> Conference with student
> Conference with student and parent
> Call parent by phone for conference
> Assign break detention
> Assign after-school detention (1 day notice)
> Assign meaningful extra work

Actions administrators can use to modify behavior

> Suspend in accordance with COC
> Assign ALC in accordance with COC
> Corporal Punishment (Suggest you try a three week moratorium on CP)

Why do students misbehave?

> We let them....
> Poor parenting resulting in failure to understand school expectations
> Organic—do not know difference between right and wrong, very few.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0162*

Key Rules and Points to Remember:: Some things to make you think!

All teachers and administrators are responsible for enforcing COC violations they observe. If you see it, you report it, you document it!

Do not use telephone to report discipline unless it is a 911 call for assistance.

If it is serious enough for you to send a student to the office immediately during class time, then it is serious enough for you to have someone watch your class and you go with the student report the incident first hand. You should then document the infraction using the correct forms and send them to the office.

An administrator should be available to respond immediately to any discipline issue.

All referrals should be managed within one school day. Justice should be swift. Remember, the ultimate goal is to modify behavior. I know of no research, etc. that says behavior can be modified when there is no direct understanding of the cause and effect relationship between the misbehavior and consequence. Have we forgot our educational psychology.? Fights, drugs, weapons, and other similar violations are easy. It is the multiple Class I offenses that drive us all crazy and impact the quality of the instructional time of other students.

Every student who fails to respond to a teacher's direction, including the assignment of break detention, etc. must be suspended pending a parent conference at a minimum. Empower teachers! Students must know that when teachers say something, it can not be disregarded.

Every teacher must treat students with respect. You will not get respect if you do not do this. Do not unnecessarily push their buttons. There is no need to do this. You are the professional, if you have done what you are supposed to do, you will WIN.

Talk in low tones, do not challenge students. Avoid confrontations. If one does occur, keep calm...it is not necessary for you to win the verbal dispute. If you try, then you may end up saying something that will allow the parents to attempt to shift the focus to you rather than the misbehavior of their child. Again, you may not win the verbal dispute, but everyone (including the other students in your class) will get the message the next day when you are present and the students is not.

Treat everyone the same. Every teacher has a favorite. However, enforce your rules the same for everyone. If you allow a favorite to get away with dress code violations, or to leave class without their planner, then how easy is it going to be when you require this of others. Kids are not dumb, they see this.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0163

Every teacher from time to time comes across a student who grinds on their nerves in every way. Try to love them.  These are the ones who will put a lump in your throat and tears in your eyes in five or six years when you see them go across the stage at graduation.

Realize that most students go home to environments very different than yours. You must spend a lot of time talking to them, counseling with them, and helping them to understand not only the expectations of school, but also the expectations of society in general. Most of them feel like their destiny is to follow in the foot step of their parents or guardians. That is, unemployment, dependency on others, and all the other social ills we know are out their being experienced by a majority of our students.

Review those sections of your old "growth and development" books from college. I know it has been a long time for many of us. What is normal adolescent behavior?  Do not condone improper behavior, but understand that some things are just to be expected. Dealing with this is just part of being an educator....understand that the same problems we face are typical.....every school has the same problems. I have seen them first hand. Do not talk bad about your students and school.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0164*

PIKE COUNTY HIGH SCHOOL
January 27, 2003
FACULTY MEETING

| | |
|---|---|
| *Dorothy Hassett* | *Charles Cason* |
| Connie Campbell | *Sylvia Helms* |
| Regina Booth | Melinda Morgan |
| Pam Wells | Olivia Boyd |
| Marie Davidson | *Mary Thompson* |
| *James Washington* | *Barbara Whatley* |
| *signature* | *Kristen Gibson* |
| *Kim Golden* | *Martha Jordan* |
| *Kilpatrick* | Mary J. Price |
| *Lisa Mount* | |
| *Arlisa Johnson* | |
| *Maria Walton* | |
| *Irene Ellis* | |
| Michelle Massey | |
| *Mary Keller Kelley* | |
| *Peter Brown* | |

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0165

AGENDA
FACULTY MEETING
JANUARY 27, 2003

WELCOME

CASEY
  BIRTHDAYS

HASSETT

CASEY
  SAFETY PLAN
  DISCIPLINE HANDOUT
  CODES
  E-MAIL
  CALENDAR

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0166**

SIGN IN SHEET
AUGUST 4, 2004
FACULTY MEETING

| | |
|---|---|
| *[signature]* | *[signature]* |
| *[signature]* | *[signature]* |
| Jim Faust | Shan Sula |
| Donna Parish | |
| Beth Chancellor | |
| Leigh Ann Owens | |
| Toni Sullivan | |
| April Kant | |
| *[signature]* | |
| Colette Rowley | |
| Krissa Johnson | |
| *[signature]* | |
| *[signature]* | |
| Tina Golden | |
| Diane Calhor | |
| Alice Phillips | |
| Daphne Coppage | |
| Mona Watson | |
| *[signature]* | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0167

AUGUST 4, 2004
FACULTY MEETING

Mr. Casey
1. Welcome
2. Faculty Handbook – pass out
3. Safety Plan
4. Board policy manuals
5. Code of conduct and other materials

Mr. McDaniel
6. Discipline
7. Textbooks
8. General comments

Mr. Casey
9. General comments
1. First day
2. Lunchroom
3. Bookkeeping
4. Inservice
5. Faculty handbook
6. Other items

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0168*

## CLASS RULES

1. BRING ALL MATERIALS AND BE PREPARED FOR CLASS

2. STAY SEATED UNLESS PERMISSION IS GIVEN TO GET UP

3. RESPECT OTHER PEOPLE AND THEIR PROPERTY

4. SPEAK AT APPROPRIATE TIMES AS DESIGNATED BY THE TEACHER

5. NO ~~OPEN~~ GUM, FOOD, OR DRINKS IN THE CLASSROOM

## CONSEQUENCES

**WARNING:** NAME ON THE BOARD FOR THE WEEK

**CHECK #1:** WRITING ASSIGNMENT TO INCLUDE THE RULE
BROKEN OR OTHER PUNISHMENT ASSESSED BY
TEACHER

Call | contact

**CHECK #2:** CALL PARENT AND OTHER PUNISHMENT ASSESSED
BY TEACHER

**CHECK #3:** OFFICE REFERRAL (WRITTEN ON CLASS DISCIPLINE
FORM)

**\*SEVERE BEHAVIOR WILL RESULT IN IMMEDIATE OFFICE REFERRAL.**

Jan 16th Rifle Comp- Dothan ?
12th Drill Comp- Wetumpka

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0169

Linda Tyson
'08

PIKE COUNTY HIGH SCHOOL
December 02, 2002
FACULTY MEETING

| | |
|---|---|
| *Cecelia Hassett* | *Lisa Belden* |
| *Regina Booth* | *Martha Coon* |
| *Martha Harden* | *Mary Kellie Kelley* |
| *Connie Campbell* | *Mike Dice* |
| *Irene Ellis* | |
| *Pam Wells* | |
| *Mark ___* | |
| *Kim Mount* | *Fred Holley* |
| *Sylvia Helm* | *Melinda Morgan* |
| *Barbara Whatley* | *Daphne Coppage* |
| *Kristen Gibson* | *Wayne Gil* |
| *Mona Watson* | |
| *James Washington* | |
| *Mary Morgan* | |
| *Chris Jackwell* | |
| *Ember* | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0170

# AGENDA
## Faculty Meeting
### December 2, 2002

1. Birthdays

2. Hassett        Dr. Key's Retirement –

3. Watson         STI, etc. –

4. Casey          Final Examination Schedule  –
                  Class Rules
                  Duty Roster –
                  Testing
                  Evaluations – *Teacher*
                  Student Fees and Lost Textbook Fees are *any other fee*
                  due no later than December 6th 2002.  Turn
                  the fee list into Mrs. Boswell.

*Students must have Reciept & Boswell*
*will Reciept you.*

*PTO meeting Dec. 12TH*
*Teach Contracts – come by and see me.*

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0171

*January 6, 2003*

*Faculty Meeting*

Heather Hackett

Connie Campbell

Mona Watson

JAnna Kilpatrick

Kimberly Mount

Sharon Denison

Melinda Morgan

Mattie Harden

Alina Boyd

Mary Thompson

James Washing

Wayne

Fred Holland

LeJohnnie Richers

Daphne Coppage

Arletthia Kone

Zabra Whatley

Doris Hartwell

Regina Booth

Kristen Gibson

Irene Ellis

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0172

PIKE COUNTY HIGH SCHOOL
FACULTY MEETING
JANUARY 6, 2003
AGENDA

1) BIRTHDAYS

2) WATSON/HASSETT BENEVOLENT FUND

3) ATHLETICS - COACH GRANT

4) MR CASEY
    TEXTBOOKS
    GRADES
    FINANCIAL MATTERS
    ATTENDANCE (tardies)
    CALENDARS
    DUTIES

5) ANNOUNCEMENTS
    *Disciplinary committee will meet immediately after faculty meeting.
    *PTO meeting at 7:00 pm in the library on January 23rd
    *Teacher announcements

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0173

# January 2003

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | | | 1 | 2 | 3 Basketball game @ Barbour County 5:00 p.m. | 4 Basketball gan @ Bullock County 4:30 p.m. |
| 5 | 6 Teacher Workday<br><br>TEAM 2 DUTY | 7 Students return<br>**WELCOME BACK !!** | 8 IIC 3:00 p.m. at the Central office | 9 **Report Cards** (students will report to homeroom at 2:25 p.m.)<br><br>PCHS vs Calhoun at home 5:00 p.m. | 10 | 11 PCHS vs Barbour Co. at home 5:00 p.m.<br><br>Drill Team Competition at Wetumpka |
| 12 | 13 SIAC meeting immediately after school<br><br>TEAM 3 DUTY | 14 Basketball game @ Central Hayneville 5:00 p.m. | 15 | 16 PCHS vs Carroll High at home 5:00 p.m.<br><br>Rifle Competition at Dothan | 17 ASVAB | 18 PCHS vs Goshen at home 5:00 p.m. |
| 19 | 20 King/Lee **HOLIDAY**<br><br>TEAM 1 DUTY | 21 Basketball game @ Calhoun 5:00 p.m. | 22 | 23 PTO | 24 Basketball game @ Andalusia 4:30 p.m. | 25 Basketball game @ Charles Henderson 4:30 p.m. |
| 26 | 27 Mercedes Plant-Harbuck MEETING<br>-FACULTY MEETING<br>-PCHS vs Hayneville at home 5:00pm<br>-TEAM 2 DUTY | 28 PCHS vs Luverne at home 5:00 pm | 29 | 30 | 31 Basketball game @ Goshen 5:00 p.m. | |

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0174

PIKE COUNTY HIGH SCHOOL
FACULTY MEETING
JANUARY 6, 2003
AGENDA

1) BIRTHDAYS

2) WATSON/HASSETT BENEVOLENT FUND

3) ATHLETICS - COACH GRANT

4) MR CASEY
      TEXTBOOKS
      GRADES
      FINANCIAL MATTERS
      ATTENDANCE (tardies)
      CALENDARS
      DUTIES

5) ANNOUNCEMENTS
      *Disciplinary committee will meet immediately after faculty meeting.
      *PTO meeting at 7:00 pm in the library on January 23rd
      *Teacher announcements

*Homeroom 1st - schedules - bell 1st block*
*Report Cards - 4th block Thursday 4 C*
*By Bulletin or email*

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0175

*New Teacher Orientation*
*August 2, 2004*

| | |
|---|---|
| Welcome & Introductions | Dr. Mark Bazzell, Superintendent |
| Superintendent's Comments | |

- Our Promise
- Calendar Distribution
- New Teacher Resources

| | |
|---|---|
| Instructional Programs | Mrs. Carolyn Baker, Administrative Assistant |
| Break | Pike County Education Association |
| Instructional Support | Mrs. Elizabeth Grubbs, Administrative Assistant |
| Prevention & Support/<br>Special Education Services | Mrs. Karen Berry, Administrative Assistant |
| Pike County Education Association | |
| Insurance & Payroll Information | |
| Adjourn | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0176

INSERVICE
JANUARY 4, 2006

| TIME | GRADE LEVEL | LOCATION | PLAN |
|---|---|---|---|
| 8:00 – 12:00 | K-2nd Grade | Home Schools | Work with reading coach on DIBELS mid-year data and intervention groups. |
| | 6-12 Core Teachers, Special Education, Music, and Foreign Language Teachers, and ROTC | PCHS Media Center | Meet with JBHM consultant on training in intervention strategies and explicit teaching techniques |
| | Counselors | Central Office | Meet with Mrs. Grubbs |
| | Career Tech Teachers | Center for Technology | Meet with Mr. Griffin |
| | Paraprofessionals | | Meet with the group you work with most frequently. |
| 1:00 – 3:30 | K – 12th Grade P.E. | GES | Meet with Mrs. Berry and the Nurses on recognizing heat stroke and heat exhaustion |
| 1:00 – 3:30 | Library Media | Central Office | Meet with Mrs. Grubbs |
| 8:00 – 3:30 | 3rd – 5th Grade Teachers | Troy Elementary School | CATCH Program |
| 8:00 – 3:30 | Bus Drivers | Center for Technology *(CRC- Rm 23)* | Meet with Mr. Hicks |

*8:00 TES*
*11:45 Gym*

All Custodians report to school and begin cleaning in preparation for students on the 5th.

Remainder of the day is to be at the home school and used according to the directions of the principal.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0177*

# AGENDA
### January 4, 2006
### Banks School Inservice

**People Who Should Attend:**
**Kindergarten Teachers**
**1st Grade Teachers**
**2nd Grade Teachers**
**Stephens and Sharpe**
**Pugh**
**Dunn**

**8:00 – 10:00  DATA MEETINGS - MRS. TOWNSEND**

**Objectives:**

- **Review midyear data**
- **Review growth of ALL students**
- **Adjust goals and action plans**
- **Celebrate successes**
- **Regroup students and plan for students who did not reach benchmark**

**10:00 – 12:00 COMPUTER LAB TRAINING – DUNN, PUGH, STEPHENS**

**Objectives:**

- **Make computer lab schedule that will include all grades**
- **Train on fluent reader**
- **Train on new computer programs that have been installed**

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0178*

New Teacher Training
July 28, 2006

AGENDA

8:00        Welcome and Introductions

8:30        STI and Technical Information

9:30        Expectations

10:15       Break

10:25       Curriculum and Evaluations

11:40       Lunch

12:30       Classroom Management and Procedures

2:20        Break

2:30        Follow-up discussions
            Q & A
            Planning

3:30        Conclusion

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0179

# NEW TEACHER ORIENTATION

## AGENDA

### Tuesday, August 1, 2006

#### 9:00 A.M.

| | | |
|---|---|---|
| 9:00 | Welcome & Introductions, Superintendent's Comments | Dr. Mark Bazzell, Superintendent |
| 9:35 | Academic Programs, Federal Programs, Professional Development | Mrs. Donnella Carter, Administrative Assistant, Instruction |
| 9:55 | Instructional Support PEPE | Mrs. Elizabeth Grubbs Administrative Assistant, Instructional Support |
| 10:15 | BREAK | |
| 10:35 | Prevention & Support, Special Education | Mrs. Karen Berry, Administrative Assistant Prevention & Support, Special Education |
| 10:55 | Pike County Education Association | Mrs. Janet Wingard, President, PCEA Mrs. Julie Swann, UniServ Director |
| 11:10 | Insurance | PEEHIP Insurance Representative |
| 11:30 | Adjourn | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0180

# *Pike County Schools*
# *Institute Agenda*
# *August 3, 2006*

| | | |
|---|---|---|
| 8:30 | Posting of Colors | Goshen High School Colorguard |
| | Invocation | Mr. Marvin Jackson |
| | Welcome | Dr. Mark Bazzell |
| | Introduction of New Faculty and Staff | Principals |
| | Comments | Dr. Mark Bazzell |
| | Accountability | Mrs. Donnella Carter |
| 10:00 | Break | |
| 10:15 | Comments | Senator Wendell Mitchell |
| 10:20 | RSA / PEEHIP | Ms. Martha Scott |
| 10:40 | Pike Teachers Credit Union | Dr. Eugene Omasta |
| 10:45 | Pike County Education Association | Ms. Janet Wingard |
| 10:55 | Prevention and Support | Mrs. Karen Berry |
| 11:00 | Instructional Support | Mrs. Elizabeth Grubbs |
| 11:05 | Instructional Programs | Mrs. Donnella Carter |
| 11:10 | Special Recognition and Closing Comments | Dr. Mark Bazzell |
| 11:30 | Lunch | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0181

# Pike County Schools
## Inservice Schedule
### January 2, 2007

Topic:        Reading in the Content Area
Presenters:   Pike County Reading Coaches
Facilitator:  Gene Nelson
Location:     Goshen High School Cafeteria
Time:         8:00 AM – 11:00 AM
**Participants:** All 7th – 12th grade English/Reading, Math, History, Science, Business, Special Ed./
              Collaborative, Foreign Language, Music, Ag., ROTC, Library/media, PE, and RCT
              teachers - High School Instructional Assistants

Topic:        Technology as a tool for Assessment Standards
Presenter:    Donnella Carter
Location:     Pike County Elementary School Cafeteria
Time:         8:00 AM – 11:00 AM
**Participants:** All 3rd – 6th Regular, Special Ed./Collaborative, and Library/media teachers
              Elementary Instructional Assistants

Topic:        Classroom Management
Presenter:    Dr. Michael Romanowski
Facilitator:  Elizabeth Grubbs
Location:     Pike County Board of Education Board Room
Time:         8:00 AM – 11:00 AM
**Participants:** All K – 2nd Regular, Special Ed./Collaborative, Speech, Gifted, Indian, and
              K-6 PE teachers

Topic:        Bus Safety and Bus Routing
Presenter:    Mike Johnson
Facilitator:  Tom Hicks
Location:     Regional Center for Technology Meeting Room
Time:         8:00 AM – 12:00 Noon
**Participants:** All Bus Drivers

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0182

Location:     Report to Work Sites
Time:         Regular Day
**Participants:** Secretaries, Bookkeepers, Counselors, Maintenance Workers, Janitors, CNP Workers,
              and Nurses

***All employees participating in professional development activities, except bus drivers,
should plan to have lunch on your own after your training session and report to your
work site no later than 12:45 PM.***





JR v. Pike County BOE
Produced by Defendant PCBE
No. 0183









JR v. Pike County BOE
Produced by Defendant PCBE
No. 0184





## REFERRALS

# Why refer a student?

★ *Academic*

*and / or*

★ *Behavioral*

---

**ALABAMA SDE AT-RISK**
**DEFINITION AND OBSERVABLE INDICATORS**




At-risk students shall be defined as those students who have scored in stanines 1, 2, 3, and 4 in the most recent SAT or other approved standardized tests and/or students who have received academic grades lower than C in the core subjects of science, language arts, social studies, or mathematics or students defined as at-risk in *Code of Alabama (1975), Section 16-13-231 (Act 2003-438)*. The Alabama State Department of Education recognizes that students may be at risk of not experiencing school success and are in danger of school failure and/or noncompletion.

This may be due to situations, circumstances, and/or conditions (e.g., environment, family, health) over which they may have limited control. By providing focused attention and assistance in identified areas of need, students will be given opportunities to experience school success. Many of these students may be served at the local level through alternative programs. Observable indicators used to identify students who are at risk may include, but are not limited to, the following:

*Academics (e.g., poor reading skills, inadequate communication skills, readiness to learn, poor performance, low test scores, retention).
*Attempted suicide.
*Attendance (e.g., excessive tardiness and/or absences, truancy, dropouts).
*Behavior (e.g., inadequate social/emotional adjustment, discipline problems, juvenile court involvement).
*Environment (e.g., family, school, community): adverse or chronic health conditions, homelessness/family mobility, limited literacy in family, poverty, student neglect and/or abuse
    *Student pregnancy/parenthood
    *Substance abuse
    *Traumatic experiences (e.g., family violence, death of family member, victim of natural disasters)

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0185





*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0186



### The Major Advantage

A structure is provided for professionals to use their individual strengths for solving problematic issues as a team. This should result in achieving the ultimate goal of student success and overall school improvement.

### Through appropriate use of BBSST, the following occurs:

- ◆ A building-level, collaborative, problem-solving model is created, providing support for teachers and students.

- ◆ Responsibility, expertise, and accountability are shared among the school's staff.

- ◆ Immediate support for the teacher, parent, and/or student is established.

- ◆ Documentation of interventions/strategies attempted is provided to support the possible need for a special education evaluation, with valuable intervention time used effectively.

- ◆ Appropriate referrals are made for special education (IEP team) services.

- ◆ The nature of the student's academic and/or behavioral difficulty is clarified.

- ◆ Classroom programs are accommodated to meet individual student needs.

- ◆ The ability to successfully teach all students in the regular classroom can be enhanced.

- ◆ A more responsive, productive, and ultimately satisfying professional environment may be provided.



*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0187

4

# PURPOSE


To provide immediate aid through a BBSST plan for students in general education who are struggling academically and/or behaviorally. The BBSST plan provides intervention strategies that are implemented in a six- to nine-week plan within the general education classroom. After the plan is implemented, it is evaluated for its effectiveness and suggestions are made for future recommendations.

**BBSST _is not_ a guarantee of:**

- ❖ Promotion
- ❖ Making the honor roll
- ❖ Passing the graduation exam
- ❖ Higher SAT scores

**BBSST _can be_ an opportunity for each student to be given every consideration and accommodation that your staff can offer as an opportunity for success.**

**BBSST _is not_ used for:**

- ❖ International Baccalaureate (I.B.) Classes
- ❖ Advanced Placement (A.P.) Classes
- ❖ Gifted Classes
- ❖ Magnet Classes
- ❖ Any other class of "CHOICE"

**BBSST _is_ used for:**

- ❖ General Education Classes
- ❖ Career Technical Classes
- ❖ Alternative Education
- ❖ Any class that counts toward graduation credit

**Active 504 or IEP students <u>NEVER</u> go to BBSST.**

**BBSST Teams are <u>NOT</u> 504, IEP, or ESL Teams.**



*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0188

3

## BUILDING BASED STUDENT SUPPORT TEAM (BBSST)
## GENERAL DESCRIPTION

**A designated school-based committee designed to meet the needs of _general education_ students at risk of failure due to academics, behavior, or drop-out. BBSST plans are for regular education classes only. BBSST is not used for students on an active IEP or 504, IB, or AP classes; Gifted classes or Magnet classes; or any other "honor" or advanced class of choice. It is used for students with chronic academic and/or behavior challenges in general education classes, career technical, and alternative education classes.**

- ❖ Addresses discipline, drop-out, academic, and behavioral student challenges within general education (see definition of At-Risk on page 24)
- ❖ Provides immediate support when confronting classroom concerns that need to be addressed in a timely manner
- ❖ Supports teachers as well as students by providing assistance in resolving the diverse problems/challenges of multi-level abilities in the general education classroom
- ❖ Discusses issues and writes plans related to specific individual needs of students and teachers
- ❖ Requires that all certified personnel have the basic BBSST training, as well as yearly updates through LEA Coordinators
- ❖ Requires teacher responsibility in implementing the instructional and behavioral intervention strategies and methods outlined in the individual student BBSST plans
- ❖ Requires administrative (building principal) monitoring and documentation of  each teacher's implementation of plans
- ❖ Requires Central Office BBSST Coordinator to monitor and collect written documentation of individual BBSST teams at the school level, and to report this to SDE annually by April 1
- ❖ Provides the required first or simultaneous step in identifying students for referrals for special education testing. It is the process before and during special education testing, with more than 90% of the students served by the team remaining in their current general education placement
- ❖ Requires teams to include a functional assessment of the classroom environment (BASC) if a special education referral is made following the required six-week minimum BBSST plan
- ❖ Mandates the BBSST process as a part of  the _Lee v. Macon_ Consent Decree and the _Alabama Administrative Code,_ which should currently be fully implemented in all schools, including use of the required pre-referral form and tracking log
- ❖ Provides parent information from individual schools and at the LEA level

Further guidelines for the BBSST process can be found in the _Lee v. Macon_ Consent Decree, the SDE BBSST Manual, on the Prevention and Support Services Section Web site at www.alsde.edu, in the _Alabama Administrative Code § 290-3-1-.02_ for Regulations Governing Public Schools, and in the _Alabama Administrative Code § 290-8-9-.01-.72ER(2)._

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0189

Alabama State Department of Education
Prevention and Support Services
Fall 2006

## ALABAMA SDE AT-RISK DEFINITION AND OBSERVABLE INDICATORS

**At-risk students shall be defined as those students who have scored in Stanines 1, 2, 3, and 4 in the most recent SAT or other approved standardized tests and/or students who have received academic grades lower than C in the core subjects of science, language arts, social studies, or mathematics or students defined as at-risk in *Code of Alabama* (1975), Section 16-13-231 (Act 2003-438).**

*The Alabama State Department of Education recognizes that students may be at risk of not experiencing school success and are in danger of school failure and/or noncompletion. This may be due to situations, circumstances, and/or conditions (e.g., environment, family, health) over which they may have limited control. By providing focused attention and assistance in identified areas of need, students will be given opportunities to experience school success. Many of these students may be served at the local level through alternative programs.*

*Observable indicators used to identify students who are at risk may include, but are not limited to, the following:*

- *Academics (e.g., poor reading skills, inadequate communication skills, readiness to learn, poor performance, low test scores, retention).*
- *Attendance (e.g., excessive tardiness and/or absences, truancy, dropouts).*
- *Behavior (e.g., inadequate social/emotional adjustment, discipline problems, juvenile court involvement).*
- *Environment (e.g., family, school, community):*
  - *Adverse or chronic health conditions.*
  - *Attempted suicide.*
  - *Homelessness/family mobility.*
  - *Limited literacy in family.*
  - *Poverty.*
  - *Student neglect and/or abuse.*
  - *Student pregnancy/parenthood.*
  - *Substance abuse.*
  - *Traumatic experiences (e.g., family violence, death of family member, victim of natural disasters).*
  - *Other.*

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0190

## HIGH SCHOOL EXAMPLE
## STUDENT PREREFERRAL FORM

### SECTION I.  DOCUMENTATION OF SEVERITY AND DURATION OF PROBLEM
(Complete one form for each identified problem)

Student's Name:  Sarah E. Larson_____    Sex: ____F____    Birth Date: _____1/2/84_____
Age: 16  School: Melville High School_____    Grade: ____11____    Date: _____10/20/00_____
Specific Problem:  Sarah is frequently absent from school; she frequently refuses to attempt work or turn in incomplete assignments; she checks out often and has poor grades.
Person Completing Form:                        Thomas L. Merlowski, History teacher

### Evidence of Severity and Duration of Problem (attach documentation)

| Evaluation Method | Results | Dates (From - To) |
|---|---|---|
| Analysis of work samples: | Significant weakness in math and science. | 8/14 – 10/20 |
| Attachment A | Significant number of incomplete or assignments not attempted. | 8/14 – 10/20 |
| | | |
| Classroom tests: | Grades usually range from failing to D. | 8/14 – 10/20 |
| Attachment B | Sometimes won't take or make up missed tests. (2 out of 5 not made up) | 8/14 – 10/20 |
| | | |
| Behavior assessment: | Withdrawn from staff and peers. | 8/14 – 10/20 |
| Attachment C | Frequently asks to be excused for illness (stomachache or headache) (1 to 2 times per week) | 8/14 – 10/20 |
| | Absent 2 to 4 times per month for illness. | |
| Performance assessment: | Work samples exhibit adequate language skills | 8/14 – 10/20 |
| Attachment D | for reading and comprehension of material | 8/14 – 10/20 |
| | | |
| Report card grades: | Fs in math and science | 10/2/00 |
| Attachment E | Cs and Ds in other classes | 10/2/00 |
| | | |
| Test information from | SAT-9 scores in third stanine | 4/99 |
| cumulative folder: | OLSAT scores in fifth stanine | 4/99 |
| Attachment F | Sarah has been a low B to low C student since third grade | 1992 – present |
| | Sarah's high school grades range from F to C | 1992 – present |
| Other teacher information: | Three telephone conferences with her mother: 8/22, 9/15, 10/6 | |
| Attachment G | Two parent conferences with her mother: 8/23, 9/18 | |
| | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0191

# DRAW OUT YOUR STUDENTS' STRENGTHS

| Intelligence Area: | Is Strong In: | Likes To: | Leans Best Through: | Famous Examples: | Common Misbehaviors: |
|---|---|---|---|---|---|
| Verbal/Linguistic | Reading, writing, telling stories, memorizing dates, thinking in words | Read, write, tell stories, talk, memorize, do word puzzles | Reading, hearing, and seeing words; speaking; writing; discussions | T. S. Eliot, Maya Angelou, Abraham | Passing notes, reading during lessons |
| Logical/mathematical | Math, reasoning, logic, problem-solving, patterns | Solve problems, question, reason, work with numbers, experiment, use computers | Working with patterns and relationships, classifying, abstract thinking | Albert Einstein, John Dewey, Susanne Langer | Working on math or building things during lessons |
| Visual/Spatial | Reading, maps, charts, drawing, puzzles, imagining things, visualization | Design, draw, build, create, daydream, look at pictures | Working with pictures and colors, visualizing, drawing | Pablo Picasso, Frank Lloyd Wright, Georgia O'Keffee, Bobby Fischer | Doodling, drawing, daydreaming |
| Bodily/Kinesthetic | Athletics, dancing, acting, crafts, using tools | Play sports, dance, move around, touch and talk, use body language | Touching, moving, processing knowledge through bodily sensations | Charlie Chaplin, Michael Jordan, Martha Graham | Fidgeting, wandering around the room |
| Musical/Rhythmic | Singing, picking up sounds, remembering melodies, rhythms | Sing, hum, play an instrument, listen to music | Rhythm, melody, singing, listening to music and melodies | Leonard Bernstein, Mozart, Ella Fitzgerald | Tapping pencil or feet |
| Interpersonal/Social | Understanding people, leading, organizing, communicating, resolving conflicts | Have friends, talk to people, join groups | Sharing, comparing, relating, interviewing, cooperating | Mohandas Gandhi, Ronald Reagan, Mother Teresa | Talking, passing notes |
| Interpersonal/Introspective | Understanding self, recognizing strengths and weaknesses, setting goals | Work alone, reflect, pursue interests | Working alone, self-paced projects, reflecting | Eleanor Roosevelt, Sigmund Freud, Thomas Merton | Conflicting with others |

Nelson, Kristen.
Seven Ways of Being Smart."
    Instructor. July/August 1995:29.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0192

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0193



**LINGUISTIC**

**LOGICAL-MATHEMATICAL:** learn through logic, patterns, categories, relationships

**KINESTHETIC:** learn through hands-on sensations, touching, manipulating

**SPATIAL:** learn through images & pictures

**MUSICAL:** learn through sound & rhythm

**INTERPERSONAL:** learn through interaction & communication with others

59

# SAMPLE Behavior/Social Checklist

**Instructions:** Read the behaviors listed in each of the following categories. If an individual does not exhibit problem behaviors in a category, check "No" for that category. If an individual does exhibit problem behaviors in a category, check "Yes", describe the *major* behavior, and check its *frequency*.

## Hurtful to Self/Others

Examples: hitting, banging head, scratching, cutting or puncturing, biting, rubbing skin, pulling out hair, picking on skin, biting nails, pinching, kicking, or striking with an object

O **No**
O **Yes** (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times daily
O One to 3 times a month     O One or more times
O One to 6 times a week           an hour

## Destructive to Property

Examples: deliberately breaking, defacing or destroying things by hitting, tearing, or cutting, throwing, burning, or marking or scratching things.

O **No**
O **Yes** (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times daily
O One to 3 times a month     O One or more times
O One to 6 times a week           an hour

## Disruptive Behavior

Examples: Clinging, pestering or teasing, arguing or complaining, picking fights, laughing or crying without reason, interrupting, yelling or screaming, or interfering with others' activities.

   **No**
✓ **Yes** (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times daily
O One to 3 times a month     O One or more times
O One to  times a week           an hour

## Withdrawal or Inattentive Behavior

Examples: Keeping away from others, shy or timid in social situations, expressing unusual fears, showing little interest in activities, appearing sad or worried, showing little concentration on a task, sleeping too much, or talking negatively about self.

O **No**
O **Yes**   (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times daily
O One to 3 times a month     O One or more times
O One to 6 times a week           an hour

## Child Independence

Examples: Constantly seeks help when could manage by self, quickly frustrated, loses emotional control, requires an unusual amount of teacher supervision to perform tasks.

O **No**
O **Yes** (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times a day
O One to 3 times a month     O One or more times
   One to 6 times a week           an hour

## Uncooperative Behavior

Examples: Refuses to obey or follow rules, acts defiantly or pouts, refuses to do work, refuses to attend school, arrives late to school, refuses to take turns or share, cheats, steals, breaks laws.

O **No**
O **Yes** (if yes, describe the major problem)

_____

_____

**Frequency:**
O Less than once a month     O One to 10 times daily
O One to 3 times a month     O One or more times
O One to 6 times a week           an hour

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0194

EXAMPLES OF FLIERS FOR DISSEMINATION OF PARENT INFORMATION

## EXAMPLE

# BBSST
(Building Based Student Support Team)

*A Service to Students, Parents and Teachers*



**BBSST:**

- Is a designated school-based committee designed to meet the needs of general education at-risk students.

- Is composed of regular education teachers, administrators, counselors and others as needed.

- Addresses discipline, drop-out, academic and behavioral student challenges.

. . .

For further information, contact your local _____ County Scho...

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0195

# BBSST
(Building Based Student Support Team)

*A Service to Students, Parents and Teachers*



**BBSST:**

- Is a designated school-based committee desig... meet the needs of general education at-risk st...

- Is composed of regular education teachers, administrators, counselors and others as need...

- Addresses discipline, drop-out, academic and behavioral student challenges.

. . .

For further information, contact your local _____ Count...

4.  Accommodations for Materials (continued)

- [ ] 04S  Contract with student and use rewards for completion of contract.
- [ ] 04T  Check the student's notebook to ensure the use of dividers, assignment sheets, and calendars.
- [ ] 04U  Provide a due date on written assignments.
- [ ] 04V  Provide a specific place for turning in completed assignments.
- [ ] 04W  Other:

5.  **Accommodations for Using Groups and Peers**

- [ ] 05A  Use cooperative learning strategies when appropriate.
- [ ] 05B  Assign a peer helper to check understanding of directions.
- [ ] 05C  Assign a peer helper to read important directions and essential information.
- [ ] 05D  Assign a peer tutor to record material dictated by the student.
- [ ] 05E  Other:

6.  **Accommodations for Attention**

- [ ] 06A  Establish relevancy and purpose for learning by relating to previous experiences.
- [ ] 06B  Shape approximations of desired behavior by providing direct reinforcement such as praise or immediate feedback for correct answers.
- [ ] 06C  Seat student close to teacher.
- [ ] 06D  Make a positive, personal comment every time the student shows any evidence of interest.
- [ ] 06E  Make frequent check for assignment progress or completion.
- [ ] 06F  Give advance warning or when a transition is going to take place.
- [ ] 06G  Use physical proximity and touch to help student focus.
- [ ] 06H  Other:

7.  **Accommodations to Assist the Reluctant Starter**

- [ ] 07A  Give a personal cue to begin work.
- [ ] 07B  Give work in smaller units.
- [ ] 07C  Provide immediate reinforcement and feedback.
- [ ] 07D  Make sure the appropriate books and materials are open to the correct pages.
- [ ] 07E  Introduce the assignment in sequential steps.
- [ ] 07F  Check for student understanding of instructions.
- [ ] 07G  Check on progress often in the first few minutes of work.
- [ ] 07H  Provide time suggestions for each task.
- [ ] 07I  Provide a checklist for long detailed tasks.
- [ ] 07J  Other:

8.  **Accommodations for Dealing with Inappropriate Behavior**

- [ ] 08A  Provide clear and concise classroom expectations and consequences.
- [ ] 08B  Consistently enforce rules.
- [ ] 08C  Avoid the use of confrontational techniques.
- [ ] 08D  Provide student with alternatives.
- [ ] 08E  Designate a "cooling off" location within the classroom.
- [ ] 08F  Assign activities which require some movement.
- [ ] 08G  Use praise generously.
- [ ] 08H  Avoid power struggles.
- [ ] 08I  Ignore attention-getting behavior for a short time.
- [ ] 08J  Avoid criticizing the student.
- [ ] 08K  Communicate frequently with parents.
- [ ] 08L  Monitor levels of tolerance and be mindful of signs of frustration.
- [ ] 08M  Speak privately, without the audience of peers, to student about inappropriate behavior.
- [ ] 08N  Establish behavioral contract.
- [ ] 08O  Other:

SAMPLE

\*\*
Reference:
Suggested Interventions from "Making Modifications in the Classroom: A Collection of Checklists," Arlington County Public Schools, Arlington, Virginia.
\*\* rkb  3003  10 12 04

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0196

## Identified Problems (Learning and/or Behavioral Problems)

- [ ] 01 Reading below grade level
- [ ] 02 Math performance below grade level
- [ ] 03 Performs test or classroom assignments/quizzes at a failing level.
- [ ] 04 Fails to complete assignments independently
- [ ] 05 Has difficulty with short term memory
- [ ] 06 Has difficulty with abstract concepts.
- [ ] 07 Has difficulty staying on task
- [ ] 08 Does not follow directions
- [ ] 09 Poor peer interaction
- [ ] 10 Temper tantrums
- [ ] 11 Other:

## Suggested Interventions

### 1.  Accommodations for Presentation of Material
- [ ] 01A Break assignments into segments of shorter tasks.
- [ ] 01B Use concrete examples of concepts before teaching the abstract.
- [ ] 01C Relate information to the student's experiential base.
- [ ] 01D Reduce the number of concepts presented at one time.
- [ ] 01E Provide an overview of the lesson before beginning.
- [ ] 01F Monitor the students comprehension of language used during instruction.
- [ ] 01G Schedule frequent, short conferences with the student to check for comprehension.
- [ ] 01H Provide consistent review of any lesson before introducing new information.
- [ ] 01I Allow student to obtain and report information utilizing: cassette recorders, dictation, typewriters, computers, interviews, calculators, and fact sheets.
- [ ] 01J Highlight important concepts to be learned in text material.
- [ ] 01K Monitor the rate at which material is presented.
- [ ] 01L Give additional presentations by varying the methods using repetition, simpler explanations, more examples, and modeling.
- [ ] 01M Require verbal responses to indicate comprehension.
- [ ] 01N Give frequent reminders of homework assignments.
- [ ] 01O Provide clear, concise directions, and concrete examples for homework assignments.
- [ ] 01P Assign tasks at an appropriate reading level.
- [ ] 01Q Allow for the oral administration of tests.
- [ ] 01R Check assignment sheet for accuracy.
- [ ] 01S Other:

### 2.  Accommodations for the Environment
- [ ] 02A Use study carrels.
- [ ] 02B Seat student in an area free of distractions.
- [ ] 02C Use preferential seating.
- [ ] 02D Allow the student to select his/her seating.
- [ ] 02E ... materials.
- [ ] 02F Use checklists to help the student get organized.
- [ ] 02G Frequently check the organization of the student's notebook.
- [ ] 02H Monitor the student's use of his/her assignment sheet.
- [ ] 02I Check the assignment sheet for accuracy.
- [ ] 02J Provide opportunities for movement.
- [ ] 02K Other:

### 3.  Accommodations for Time Demands
- [ ] 03A Increase time allowed for completion of tests or assignments.
- [ ] 03B Reduce the amount of work or length of tests.
- [ ] 03C Prioritize assignments and/or steps to completing assignments for the student.
- [ ] 03D Space short work periods with breaks or change of tasks.
- [ ] 03E Consistently follow a specific routine.
- [ ] 03F Alternate quiet and active tasks.
- [ ] 03G Set time limits for specific task completion.
- [ ] 03H Other:

### 4.  Accommodations for Material
- [ ] 04A Allow for spelling errors.
- [ ] 04B Allow student to use either cursive or manuscript.
- [ ] 04C Set realistic and mutually agreed upon expectations for neatness.
- [ ] 04D Let student type, record, or give answers orally instead of writing.
- [ ] 04E Avoid pressures of speed and accuracy.
- [ ] 04F Provide copies of notes.
- [ ] 04G Reduce the amount of copying from text and board.
- [ ] 04H Keep written assignments and work area free from extraneous and/or irrelevant distracters.
- [ ] 04I Review visual task with student and make sure student has a clear understanding of all parts of the assignment.
- [ ] 04J Avoid cluttered worksheets by using techniques such as blocking (blocking assignments into smaller segments); cutting (cut worksheets into sections); and highlighting, color coding, or underlining.
- [ ] 04K Give written directions to supplement verbal directions.
- [ ] 04L Keep statements simple and avoid the use of metaphors, idioms, and puns.
- [ ] 04M Familiarize students with any new vocabulary before beginning the lesson.
- [ ] 04N Alert student's attention before expressing key points.
- [ ] 04O Use visual aids such as charts and graphs.
- [ ] 04P Use manipulative, hands-on activities whenever possible.
- [ ] 04Q Cue student by calling his/her name before asking questions.
- [ ] 04R Always demonstrate how new material relates to previously learned information.

**SAMPLE**

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0197

Alabama State Department of Education
Special Education Services Section

# IDEA AND SECTION 504
# A COMPARISON

| COMPONENT | IDEA (Individuals with Disabilities Education Act 1997) | SECTION 504 (Rehabilitation Act 1973) ADA (Americans with Disabilities Act 1990) |
| --- | --- | --- |
| General Purpose | Is a federal funding statute whose purpose is to provide financial aid to states in their efforts to ensure adequate and appropriate services for children with disabilities. | Is a broad civil rights law which protects the rights of individuals with disabilities in programs and activities that receive federal financial assistance from the U.S. Department of Education. It is an anti-discrimination statute. |
| Who is Protected? | Identifies all school-age children who fall within one or more specific categories of qualifying conditions. | Identifies all school-age children as disabled who meet the definition of qualified person and who has a physical or mental impairment which substantially limits a major life activity. Major life activities include walking, seeing, hearing, speaking, breathing, learning, working, caring for one's self, and performing manual tasks. The disabling condition need only substantially limit one major life activity in order for the student to be protected. |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0199

Alabama State Department of Education
Prevention and Support Services
Fall 2003

## ALABAMA SDE AT-RISK DEFINITION AND OBSERVABLE INDICATORS

**At-risk students shall be defined as those students who have scored in stanines 1, 2, and 3 in the most recent SAT or other approved standardized tests and/or students who have received academic grades lower than C in the core subjects of science, language arts, social studies, or mathematics or students defined as at-risk in Code of Alabama (1975), Section 16-13-231 (Act 2003-438).**

*The Alabama State Department of Education recognizes that students may be at risk of not experiencing school success and are in danger of school failure and/or noncompletion. This may be due to situations, circumstances, and/or conditions (e.g., environment, family, health) over which they may have limited control. By providing focused attention and assistance in identified areas of need, students will be given opportunities to experience school success. Many of these students may be served at the local level through alternative programs.*

*Observable indicators used to identify students who are at risk may include, but are not limited to, the following:*

- *Academics (e.g., poor reading skills, inadequate communication skills, readiness to learn, poor performance, low test scores, retention).*
- *Attendance (e.g., excessive tardiness and/or absences, truancy, dropouts).*
- *Behavior (e.g., inadequate social/emotional adjustment, discipline problems, juvenile court involvement).*
- *Environment (e.g., family, school, community):*
  - *Adverse or chronic health conditions.*
  - *Attempted suicide.*
  - *Homelessness/family mobility.*
  - *Limited literacy in family.*
  - *Poverty.*
  - *Student neglect and/or abuse.*
  - *Student pregnancy/parenthood.*
  - *Substance abuse.*
  - *Traumatic experiences (e.g., family violence, death of family member, victim of natural disasters).*
  - *Other.*

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0198*

# SELECTED INTERVENTIONS AND STRATEGIES

The following interventions and strategies identify ways educators can reach students who may be at risk of school failure and/or noncompletion. Although the information included in this section is directed at teaching students at risk, educators may find it helpful in working with any student. These are samples of suggested activities and are not intended to be all inclusive or considered the best ones to be used in any given situation.

## POWER-SEEKING

| Issue | Strategies/Techniques |
|---|---|
| Arguing with others | **Respond consistently to each arguing incident.** |



Calmly and firmly correct with as little verbalization as possible. (e.g., "Adam and David, you are showing us what an argument is. Take turns talking and speak quietly. See me if you need help with your problem.")

**Reinforce appropriate behavior.**

Praise those who have a greater tendency to argue when they meet your expectations.

Periodically give the student who rarely or never argues "a pat on the back."

Applaud the entire class when there has been noticeable improvement in this area.

**Teach students how to resolve conflicts.**

Develop lessons that will help the student recognize what an argument is. Assist him in developing strategies on his own that will help him avoid arguing and teach him alternatives to arguing.

**Prompt appropriate behavior prior to potential argumentative situations.**

(e.g., "We will be working in groups on our project today. You may not agree with each other on certain points. I will be listening to see if you remember how to handle situations when you have a different opinion, like we practiced yesterday. I'm sure you can!")

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0200

**Excessively Competitive**

**Teach students how to determine when situations call for competition and when competition is inappropriate.**

Have the student learn to discriminate between activities that require personal competition, need teamwork, and are non-competitive. (e.g., Have students determine a way to enter a room without turning it into a race!)

**Provide situations that will emphasize the student's strengths, especially those that are not connected to competition.**

(e.g., A student with good reading skills could learn to assist a younger student who has difficulty reading.)

**Assist a student in learning positive self-talk.**

Determine types of self-talk a student may be using. (e.g., "I've got to be first," "I am stupid," or "I had the best grade, so I am the smartest.") Focus on methods of replacing negative self-talk with positive, more productive statements.

**Develop ways for occasionally evaluating the student's behavior and establish a method for reinforcing appropriate behavior.**

Establish time intervals during the day so that the student's competitive behavior can be reviewed during that period. Time periods need to be short enough so the student will have a reasonably good chance of succeeding.

Develop a list of reinforcers that a student can earn for appropriate behavior.

When several students within a class are considered overly competitive by fellow classmates; have a class discussion regarding the problem and/or encourage the class to set a daily performance goal.



*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0201*



PLAINTIFF'S
EXHIBIT

# PIKE COUNTY HIGH SCHOOL



# FACULTY HANDBOOK
## Terry Casey, Principal

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0522

## MISSION STATEMENT: PIKE COUNTY HIGH SCHOOL

The mission of Pike County High School is to actively work with the local community and parents to provide students with the opportunities to develop educational and social skills required to achieve their maximum potentials and become productive citizens in society.

## BELIEFS OF PIKE COUNTY HIGH SCHOOL

1. All students can learn.

2. Students' learning needs should be the primary focus of all decisions impacting the work of the school.

3. Students need to not only demonstrate their understanding of essential knowledge and skills but also need to be actively involved in solving problems and producing quality work.

4. Students need to apply their work in a meaningful way.

5. Students learn in different ways and should be provided with a variety of instructional approaches to support their learning.

6. A students' self esteem is enhanced by positive relationships and mutual respect among and between students and staff.

7. A safe and physically comfortable environment promotes student learning.

8. Teachers, administrators, parents, and community share the responsibility for advancing the school's missions.

9. The commitment to continuous improvement is imperative if our school is going to enable students to become confident, self-directed, lifelong learners.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0523

## GENERAL INFORMATION

It is the responsibility of each faculty member and staff member to be familiar with the contents of the Pike County Board of Education Policy and Procedures Manual, the student handbook, and this handbook. It is essential that all board policies and administrative directive outlined in these documents be followed. Any questions or concerns regarding the contents of these documents should be directed to the school principal.

It is essential that each student and faculty member become familiar with the policies and procedures of the student handbook. Time should be spent interpreting rules and regulations for students during the first few days of school and as the need arises. Please remind students frequently of the tardiness, attendance, and promotion policies in detail.

## CONFIDENTIALITY

**Confidentiality must be exercised when handling a student's permanent record, recording information about a student, or discussing students in general, whether on campus on any other location.**

## NON-DISCRIMINATION POLICY

It is the official policy of the Pike County Board of Education that no person shall; on the grounds of race, color, ethnicity, national origin, disability, sex, religion, belief, marital status, or age; be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, employment, re-employment, or advancement. For further information, contact Mrs. Karen Berry, 504 Compliance Coordinator, Title VI Coordinator, and Title IX Coordinator, at 334-566-1850, between the hours of 8:00 am and 4:30 pm, Monday through Friday.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0524*

## FACULTY MEETINGS

Attendance at all faculty meetings is required. This includes the coaching staff or others involved in special activities unless approval from the principal has been granted. Faculty meetings will be held the last Monday of each month at 3:30 p.m. in the library.

## DEPARTMENTAL MEETINGS

Departmental meetings will be held once a month. The department head is responsible for making sure that these meetings are carried out and the minutes from the meeting turned in to Mr. Casey.

## LUNCHROOM PROCEDURES

Proper conduct is expected from students in the lunchroom. **Teachers <u>must</u> accompany their students to lunch and sit with them at assigned tables during the lunch period.**

## LIBRARY

The library is located in the 100 Building. The use of the library is encouraged. Scheduling may be done through the library media specialist.

## BUS RESERVATIONS FOR ATHLETICS, FIELD TRIPS, ETC.

Bus request forms can be picked up from the main office. Forms should be completed and returned to the office for the principals' signature **at least ten days prior to the trip.**

## MAINTENANCE

Maintenance request forms can be picked up from the main office. You must specify your building, room number, and nature of request on this form. After it is signed by the principal, we will fax it to the maintenance department or put it on the board depending on the severity of the request. Remember, we have no control over the maintenance department work schedule.

## GUIDANCE SERVICES

Comprehensive guidance services are provided for all students. This includes assistance in the following areas: academic counseling, career guidance, referrals to outside assisting agencies, individual personal counseling, and group counseling.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0525

The guidance office is also instrumental in assisting students with their efforts to seek financial aide. Students should act early in their efforts to seek financial aide. Letters of recommendation should not be sought on the day the application is due. This often affects the availability and quality of the letter.

## LESSON PLANS

Detailed lesson plans are due each Thursday by 3:00 p.m. to Mr. Casey.

## CORPORAL PUNISHMENT

The use of corporal punishment by teachers is strictly prohibited.

## MEDICAL ATTENTION

Medical attention may be sought in the office of the assistant principal. Only minor first aid can be provided. Decisions whether to call EMS will be made by the principal or assistant principal only.

## TELEPHONE USE/CELL PHONES

Students **should not** be released from class to use the telephone except in extreme emergencies. In these cases, the student should be sent directly to the office with an agenda. **The use of cell phones by students is strictly prohibited.** If a student has a cell phone in their possession, it is to be collected by the teacher and turned in to the office. **Teachers are not to use cell phones(sending/receiving)during school hours nor are cell phones to be visible at any time.**

## ASSEMBLIES

Assemblies must be attended by all faculty members unless approved by the school principal. Generally, students will sit either by grade level or with the teacher they are assigned during that time.

## PARENT CONTACT AND PUBLIC RELATIONS

Efforts should be made to deal with parents from a positive standpoint. Listening is important, even if they are angry. Parents who are verbally abusive will not be tolerated and appropriate action will be taken if necessary. Parent conferences should be scheduled before school or after school. A member of administration will attend any

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0526*

necessary conferences.

Regardless of the nature of any conference with parents or the public in general, each visitor should leave with the feeling that we have done what we think is in the best interest of the student involved and the school in general.

## ACCOUNTING PROCEDURES
-see insert-

## BOOSTER ORGANIZATIONS

All booster organizations must be sanctioned by the school administration prior to representing PCHS in any form or fashion. The final authority over all booster activities is the Principal. Currently approved booster organizations are PCHS Sportsboosters and PCHS Band Boosters.

## SCHOOL VISITATION

All visitors must check in through the main office and must have official school business. These individuals will be required to sign in on the visitors log and issued a pass to be displayed. Any individuals without proper authorization should be questioned.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0527

# PIKE COUNTY HIGH SCHOOL
## BELL SCHEDULE

| | |
|---|---|
| 1st block | 7:45-9:15 |
| Break | 9:15-9:30 |
| 2nd block | 9:35-11:06 |
| 3rd block | 11:11-1:04 |
| 4th block | 1:09-2:39 |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0526

| | | | | Days on Roll | |
|---|---|---|---|---|---|
| Month | Month Begins | Month Ends | | Students | Teachers |
| 1st | August 4, 2004 | September 3, 2004 | | 20 | 23 |
| | (Teacher Institute - August 4, 2004) | | | | |
| | (Teacher Inservice - August 5, 2004) | | | | |
| | (Teacher Workday - August 6, 2004) | | | | |
| | (First day for students - August 9, 2004) | | | | |
| 2nd | September 7, 2004 | October 4, 2004 | | 20 | 20 |
| | (Labor Day - September 6, 2004) | | | | |
| 3rd | October 5, 2004 | November 8, 2004 | | 20 | 20.5 * |
| | (Intersession - October 11-15, 2004) | | | | |
| | (Report Cards/Conference Day-Students ½ Day-Teachers 1½ Day - Oct. 21, 2004) | | | | |
| 4th | November 9, 2004 | December 10, 2004 | | 20 | 20 |
| | (Veterans Day - November 11, 2004) | | | | |
| | (Thanksgiving - November 24-26, 2004) | | | | |
| 5th | December 13, 2004 | January 25, 2005 | | 20 | 21 |
| | (Christmas Holidays begin December 22, 2004) | | | | |
| | (Intersession January 3-4, 2005) | | | | |
| | 12-months employees return - January 3, 2005 | | | | |
| | Teachers return - Teacher Workday/Inservice - January 5, 2005 | | | | |
| | Students return - January 6, 2005 | | | | |
| | (King/Lee Day - January 17, 2005) | | | | |
| 6th | January 26, 2005 | February 23, 2005 | | 20 | 20 |
| | (President's Day - February 21, 2005) | | | | |
| 7th | February 24, 2005 | April 6, 2005 | | 20 | 20.5 * |
| | (Intersession - March 14-18, 2005) | | | | |
| | (Spring Break - March 21-25, 2005) | | | | |
| | (Report Cards/Conference Day - Students ½ Day-Teachers 1 ½ Day - March 31, 2005) | | | | |
| | (Teacher Appreciation Day on March 31 - All Schools) | | | | |
| 8th | April 7, 2005 | May 4, 2005 | | 20 | 20 |
| 9th | May 5, 2005 | May 26 (students) | | 16 | |
| | | May 27 (teachers) | | | 17 |
| | | | | 176 | 182 * |

* Because of Wage & Hour rules and regulations, all employees working on an hourly rate will not work 1 ½ days on 10/21/04 and 03/31/05. Supervisors may schedule these employees for one additional workday at their discretion, but within Wage & Hour laws.

| | | |
|---|---|---|
| Wednesday | August 4, 2004 | Teacher Institute |
| Thursday | August 5, 2004 | Teacher Inservice |
| Friday | August 6, 2004 | Teacher Workday |
| Monday | August 9, 2004 | 1st Day for Students (2/3 day) |
| Monday | September 6, 2004 | Labor Day |
| Friday | October 8, 2004 | End First Nine Weeks |
| Monday-Friday | October 11-15, 2004 | Intersession |
| Monday | October 18, 2004 | Begins 2nd Nine Weeks |
| Thursday | October 21, 2004 * | Report Cards/Conference Day (Students ½ Day/Teachers 1½ Day) |
| | | (Teachers leave at 7:30 p.m.) |
| Thursday | November 11, 2004 | Veterans Day |
| Wednesday-Friday | November 24-26, 2004 | Thanksgiving Holidays |
| Tuesday | December 21, 2004 | End 2nd 9-Weeks/1st Semester (2/3 Student Day) |
| Wednesday-Friday | Dec. 22-31, 2004 | Christmas Holidays |
| Monday-Tuesday | January 3-4, 2005 | Intersession |
| Monday | January 3, 2005 | 12-Months Employees Return to Work |
| Wednesday | January 5, 2005 | Teachers Return - Teacher Workday/Inservice |
| Thursday | January 6, 2005 | Students Return - Begins 2nd Semester/Begins 3rd Nine Weeks |
| Monday | January 17, 2005 | King/Lee Day* (Not a holiday for 12-months employees) |
| Monday | February 21, 2005 | President's Day* (Not a holiday for 12-months employees) |
| Friday | March 11, 2005 | Ends 3rd Nine Weeks |
| Monday-Friday | March 14-18, 2005 | Intersession |
| Monday-Friday | March 21-25, 2005 | Spring Break |
| Monday | March 28, 2005 | Begins 4th Nine Weeks |
| Thursday | March 31, 2005 * | Reports Cards/Conference Day - Teacher Appreciation Day-All Schools |
| | | (Students ½ Day/Teachers 1½ Day)(Teachers leave at 7:30 p.m.) |
| Thursday | May 26, 2005 | Last Day for Students (2/3 Day)  (Goshen High Graduation) |
| Friday | May 27, 2005 | Last Day for Teachers  (Pike County High Graduation) |

| | | |
|---|---|---|
| First Nine Weeks | August 9 - October 8 | 44 days |
| Second Nine Weeks | October 18 - December 21 | 43 days |
| Third Nine Weeks | January 6 - March 11 | 45 days |
| Fourth Nine Weeks | March 28 - May 26 | 44 days |
| | | 176 |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0529

# ALMA MATER

On the rolling plains of Dixie
High above the rest
Proudly stands our Alma Mater
Dear P C H S
To thy name we'll sing and honor
Hearts that love you true
Pledge to thee our loyal service
All the ages through

Pike County High School,  Pike County High School
Loud our praises be, Hail to thee our Alma Mater
Hail, oh hail to thee     (Chorus)

God our father hear our prayers
May we stand the test
We will ever serve and honor
Ever do our best
All with joyful echoes murmur
Pike County High we praise
Sons as yet unborn shall hail thee
In the coming day.     (repeat chorus)

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0530

## TEACHER & STUDENT PARKING

All teachers in the 100 building, gym, office staff, lunchroom staff, and administration will park behind the gym in the new teacher parking lot.

All teachers in the 400 building, 700 building, and trailers will park in front of the Junior building.

**THERE WILL BE NO PARKING IN FRONT OF THE NEW 100 BUILDING.**

<u>All students</u> will park in front of the gym or in the new student parking lot.

The circle in back of the school will be for **buses only.**

All student pick-ups will be in front of the gym.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0531*

*Alabama State Department of Education*
*Prevention and Support Services*
*May 2004*

## TRUANCY DEFINITION

A parent, guardian, or other person having charge of any child officially enrolled in Alabama public schools (K-12) shall explain in writing the cause of any and every absence of the child no later than three (3) days following return to school. A failure to furnish such explanation shall be evidence of the child being truant each day he is absent. The child shall also be deemed truant for any absence determined by the principal to be unexcused based upon the State Department of Education's current School Attendance Manual. <u>Three (3) unexcused absences within a school year constitute a student being truant for the purpose of filing a petition with the Court</u>. The Interagency Committee on Youth Truancy Task Force recommendations known as the Early Warning Truancy Prevention Program timeline for reporting truancy shall define the truancy status of any student as follows:

1. <u>FIRST TRUANCY/UNEXCUSED ABSENCE (WARNING)</u>

    a.  Parent/guardian shall be notified by the school principal or his/her designee that the student was truant and the date of the truancy.

    b.  Parent/guardian shall also be provided with a copy of Alabama's compulsory school attendance laws and advised of the penalties that can be applied and the procedures that shall be followed in the event that other unexcused absences occur.

2. <u>NO EARLIER THAN THE SECOND UNEXCUSED ABSENCE (CONFERENCE)</u>

    a.  The parent, guardian, or person having control of the child shall (1) attend a conference with the attendance officer and principal or his/her designee and/or (2) participate in the early warning program provided by the juvenile court.

    b.  Attendance at one of these conferences shall be mandatory except where prior arrangements have been made or an emergency exists.

    c.  Failure to appear at the school conference and/or to appear at the early warning program shall result in the filing of a complaint/petition <u>against the parent under *Code of Alabama (1975)*, §16-28-12(c) (failure to cooperate), or a truancy against the child, whichever is appropriate</u>.

3. <u>NO EARLIER THAN THIRD UNEXCUSED ABSENCE, BUT WITHIN TEN (10) SCHOOL DAYS (COURT)</u>

    File complaint/petition against the child and/or parent/guardian, <u>if appropriate</u>.

4. <u>CHILD UNDER PROBATION</u>

    a.  The school attendance officer should be notified <u>by the juvenile probation officer</u> of all children in the school system under probation supervision by the juvenile court as <u>consistent with state statute</u>, *Code of Alabama (1975)*, §12-15-100 and 105

    b.  Where a child under probation is truant, the school attendance officer should immediately notify the juvenile probation officer.

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0532

Underlined information contains recommendations from the State Superintendent of Education Advisory Committee; excerpted from recommended Policies and Procedures for Court/School Truancy Prevention Programs.

CAMPUS DUTY LIST
2004-05

| TEAM 1 | TEAM 2 | TEAM 3 |
|---|---|---|
| Green (capt.) | Faust (capt) | Suber (capt) |
| Robinson | Morgan | Kilpatrick |
| Calhoun | Golden | Hassett |
| Harden | Mount | Sullivan, T |
| Owens | Sullivan, S | JROTC |
| Denison | Phillips | Coppage |
| Lampley | Holland | Pritchett |
| Chancellor | Trant | Booth |
| Helms | Coon | Grant |
| Davidson | Knight | Busby |

Morning (7:00 a.m.)
Lunchroom =1male; 1 female
Gym =1 male; 2 female
Student parking =1
Bus unloading =1
Sidewalk intersection between
   jr bldg and round bldg =1

Break  (all)
-break area
-sidewalk edge of lunchroom
-sidewalk in front of ag bldg
-intersection of sidewalk between
   jr bldg and round bldg
-front of round bldg

Afternoon (all)
-student parking
   behind 100 bldg
-student parking
   front of gym
-bus loading
-break area
-round bldg

*Each team captain is responsible for designating their people to specific areas.

100 building = new building
400 building = ag building
500 building = gym
600 building = junior building
700 building = round building

# DRESS CODE FOR SCHOOL PERSONNEL

This policy was developed by the Instructional Improvement Committee (IIC). In reference to certified personnel, the IIC submitted the statement as follows:

Teaching is a professional yet physically challenging profession. The teacher sets an example for his/her students not only through attire, but also through demeanor and actions as well. The committed teacher knows full well that teaching is not strictly a desk job. The teacher will often be seen moving about the classroom, using large gestures, kneeling beside a student's desk, and working on the floor with small groups. Some teachers are required to participate in physical education activities as well. To this end, the teacher must dress professionally, but in a manner that will not inhibit his/her teaching.

Teachers (Certified Personnel)

Teachers should be professionally yet suitable attired. Specific articles of clothing which **shall not** be worn by school personnel include:

- leggings or footless tights
- **NO blue jeans (unless permission is granted by the principal** in the case of a designated special occasion, such as field day)
- tight fitting, distracting, or revealing clothing
- shorts of any kind (except at such activities as field day, etc)

Physical education teachers shall wear pants or appropriate cover-up clothing and change into shorts as needed. Agricultural teachers shall dress professionally, putting on coveralls as needed.

Permission to deviate from the above guidelines shall be granted by the principal on a case-by-case basis.

Professional grievances should be filed according to stated grievance procedures.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0534

# BOOKKEEPING PROCEDURES

## 1. INDIVIDUAL TEACHER RECEIPT BOOK

You are furnished a PCHS receipt book for collecting money. After filling out the receipt, give the **WHITE** copy to the student and leave the yellow in the book. Please turn in your money and receipt book to me **DAILY** as soon as possible after 4th Block. **ALL MONEY MUST BE TURNED IN DAILY!**

## 2. LOCAL REQUISITIONS

If you have a club or class account, in order to make purchases, you must obtain a PCHS Local Requisition form, fill it out (**must be itemized**), then bring it to me. Mr. Casey will come by my office to sign your Requisition, I will then do a Purchase Order. **DO NOT MAKE ANY PURCHASES UNTIL THESE STEPS HAVE BEEN FOLLOWED. IF YOU DO, YOU PAY!** No substitutions on items and do not go over amount of Purchase Order.

Please remember this also includes refunds to students, field trips, transportation for trips on PCBOE buses, etc.(anything requiring a check from PCHS). **CLUBS. REMEMBER YOU MUST HAVE A COPY OF THE MINUTES ATTACHED TO YOUR REQUISITION FOR ALL PURCHASES**

## 3. COUNTY REQUISITIONS

To order materials on PCBOE Requisitions, whether it be instructional supply, grants, service learning or other funding sources, please pick up a PCBOE requisition form from me. After completing the requisition (must be itemized),then bring it back to me. I will handle it from this point. **PLEASE DO NOT TAKE THEM TO THE CENTRAL OFFICE YOURSELF. WE WILL BE AUDITED LOCALLY.** Instructional supply money is usually released as follows: One-half in October and one-half in February. **AGAIN, DO NOT ORDER UNTIL THE C.O. HAS ISSUED A PURCHASE ORDER. WHEN MAKING YOUR PURCHASES DO NOT SUBSTITUTE. BUY ONLY THE ITEMS LISTED ON THE P.O.**

## 4. CLUB/CLASS FUND RAISERS

If you decide to sponsor a fund raiser for your club/class you must get a LOCAL SCHOOL FUND RAISING REPORT filled out and signed by Mr. Casey okaying the fund raiser.

_Donna Barron_ Bookkeeper    _Terry Casey_ Principal

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0535

# FIRE DRILL AND EMERGENCY EVACUATION

**SIGNAL:**    INTERMITTENT RINGING OF THE SCHOOL BELL

**BACKUP:**    INTERMITTENT BLAST OF AN AIR HORN

**PROCEDURE:**
EVACUATE THE BUILDING AS PER POSTED ROUTE IN EACH CLASSROOM.  LIGHTS SHOULD BE TURNED OFF AND DOORS CLOSED.  WINDOWS SHOULD BE CLOSED.  <u>TEACHERS SHOULD HAVE SAFETY PLAN AND ROLL BOOK IN HAND FOR CALLING ROLL ONCE OUTSIDE.</u>  STUDENTS SHOULD LINE UP AT LEAST 50 FEET FROM THE BUILDING AND LISTEN FOR ROLL CALL AND FURTHER INSTRUCTIONS.

# <u>SEVERE WEATHER WARNING</u>

**SIGNAL:**    STEADY RINGING OF THE SCHOOL BELL

**BACKUP:**    STEADY BLAST OF AN AIR HORN

**PROCEDURE:**
TEACHERS AND STUDENTS ARE TO TAKE COVER IMMEDIATELY IN THE DESIGNATED AREA.  UNDER NO CIRCUMSTANCE ARE STUDENTS TO BE ALLOWED TO GO OUTSIDE EXCEPT FOR WHEN STUDENTS/TEACHERS IN THE MOBILE CLASSROOMS ARE RELOCATING.

-GYM CLASSES USE THE LOCKER ROOMS AND THE BAND ROOM.

-ROUND BUILDING STUDENTS SHOULD TAKE COVER AROUND THE INNER WALL OF THE BUILDING WITH DESIGNATED CLASSES USING THE TEACHERS LOUNGE.

-JUNIOR BUILDING STUDENTS USE THE HALLWAY.

-MRS. DAVIDSON'S STUDENTS ARE TO USE THE HALLWAY LEADING TO THE RESTROOM.

-AGRIBUSINESS STUDENTS ARE TO USE THE CLASSROOM AND/OR THE HALLWAY BETWEEN THE OFFICE AND CLASSROOM.

-BUILDING 100 STUDENTS SHOULD TAKE COVER IN THE HALLWAY.

-STUDENTS IN THE MOBILE CLASSROOMS 3, 4, & 5 SHOULD MOVE TO THE JUNIOR BUILDING.    STUDENTS IN MOBILE CLASSROOMS 1&2 SHOULD MOVE TO ROOM 708 IN THE ROUND BUILDING.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0536

Pike County High School Gym
Building 0500

Floor Evacuation Plan

Front of Gym

RR1-500

Concession Stand 2

Janitors Closet 2-500

500H

500Ha

500A

Ticket Booth

500Aa

Bandroom

Shower  Toilet

Girls Locker Room

Office 1-500

500Ga

500G

500Gg

Mechanical Room 1-500

Toilet

Shower

Locker Room 2-500

Gym

500Fa

Office 2-500

Janitors Closet 3-500

Locker Room 3-500

Equipment Room

500Ea

500B

Concession Stand 1

Janitors Closet 1-500

500C

RR2-500

500Ca

502

Mechanical Room 2-500

500Ba

500Da

501

500D

Locker Room 1-500

Shower

Toilet

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0537



Pike County High School
Decagon Building

0700 Building

SIDE WALK

TEMPO CIRCLE

MOVE AT LEAST 250 FT away FROM BUILDING

Track Area

701 702 703 704 705 706 707 708 709

RR3-700 T-2-700
RR2-700
Electrical Closet 1-700
Janitor Closet 1-700
Teacher Work Area
RR1-700
L-700



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0539



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0540

**BUILDING 100**



*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0541

BUILDING 100

SEVERE WEATHER



*Students in building 100 are to use the hallway.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0542



Vocational Building
0400

BOOKROOM

DAVIDSON / JOHNSON

ROBINSON

404

405

404A

403A

403

SR403

RR2-400

402A

SR402

402

400A

401
Shop

Office 1-400

Shop
401A

RR1-400

SR401

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0543

# Pike County High School Gym
## Building 0500



Gym

RR1-500
Concession Stand 2
Janitors Closet 2-500
501H
500Ha
500Aa
500A
Ticket Booth
500B
Concession Stand
500Ba
500Ca
502
500C
Mechanical Room 2-500
Janitors Closet 1-500
RR2-500
Concession Stand 1
GRANT
501
500Da
500D
500Ea
Equipment Room
Locker Room 1-500
HOLLAND
Shower
Toilet
Office2-500
Janitors Closet 3-500
500Fa
Locker Room 2-500
500Ga
COON
Bandroom
Shower Toilet
Girls Locker Room
COPPAGE
Offide 1-500
500G
Toilet
Mechanical Room 1-500
Shower

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0544



Junior Building
0600

CALHOUN

601

JROTC STAFF

602

RR1-600

Janitorial Closet 1-600

SUPPLY ROOM
JROTC

604

RR2-600

603

FAUST

605A

606

MOUNT

605

600A

Office 3-600

Office 2-600

Office 1-600

SR 1-600

Mechanical Room
1-600

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0545

Pike County High School
Decagon Building

0700 Building    (IIIII) SAFE AREAS

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0546

STUDENTS MOBILE CLASS ROOMS 1 AND 2 SHOULD REPORT TO ROOM 708 (SULLIVAN'S) IN THE ROUND BUILDING

708

Weather Evacuation Route For students in Mobile Class rooms should report to the ROTC (Junior) Building.

Jogging track

5

4

3

2

1

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0547

Schedule for Test Administrations

The scheduled days for the summer 2004 administration are

- Social Studies (AHSGE)...........................Monday ...........................July 19, 2004

- Science (AHSGE)..................................Tuesday ...........................July 20, 2004

- Mathematics (AHSGE and Exit Exam) ...Wednesday.......................July 21, 2004

- Reading (AHSGE and Exit Exam) ..........Thursday.........................July 22, 2004

- Language (AHSGE and Exit Exam) ........Friday ..............................July 23, 2004

The scheduled days for the fall 2004 administration are

- Language (AHSGE) ...................................Monday ................September 20, 2004

- Social Studies (AHSGE)...........................Tuesday ...............September 21, 2004

- Science (AHSGE) ....................................Wednesday...........September 22, 2004

- Mathematics (AHSGE) ............................Thursday...............September 23, 2004

- Reading (AHSGE)...................................Friday ...................September 24, 2004

The scheduled days for the midyear 2004 administration are

- Reading (AHSGE and Exit Exam) ..........Monday ....................December 6, 2004

- Language (AHSGE and Exit Exam) ........Tuesday ...................December 7, 2004

- Social Studies (AHSGE)...........................Wednesday..............December 8, 2004

- Science (AHSGE) ...................................Thursday.................December 9, 2004

- Mathematics (AHSGE & Exit Exam)......Friday ....................December 10, 2004

The scheduled days for the spring 2005 administration are

- Mathematics (AHSGE) ............................Monday ...........................March 7, 2005

- Reading (AHSGE) ..................................Tuesday ...........................March 8, 2005

- Language (AHSGE) .................................Wednesday.......................March 9, 2005

- Social Studies (AHSGE)...........................Thursday.........................March 10, 2005

- Science (AHSGE) ...................................Friday ............................March 11, 2005

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0548

Alabama Department of Education
July 1, 2004

# 2004 - 2005 TESTING DATES

| TEST | TESTING PERIOD | DAYS NEEDED FOR TESTING |
|---|---|---|
| *Alabama High School Graduation Exam* (AHSGE) | July 19 – 23, 2004 | 5 days |
| *High School Basic Skills Exit Exam* (Exit Exam) | July 21 – 23, 2004 | 3 days |
| DIBELS | Days 1 – 20 of school calendar (LEA selects 2-week window) | 1 day |
| *Alabama High School Graduation Exam* (AHSGE) | September 20 – 24, 2004 | 5 days |
| *Alabama Reading and Mathematics Test* (Pilot Test) | September 8 – 10 and 13, 2004 | 1 day |
| *Alabama High School Graduation Exam* (AHSGE) | December 6 – 10, 2004 | 5 days |
| *High School Basic Skills Exit Exam* (Exit Exam) | December 6, 7, and 10, 2004 | 3 days |
| DIBELS | Days 80 – 100 of school calendar (LEA selects 2-week window) | 1 day |
| NAEP | January 24 – March 4, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Five* | February 23 – March 2, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Seven* | February 23 – March 2, 2005 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Ten* | February 23 – March 2, 2005 | 1 day |
| *Alabama High School Graduation Exam* (AHSGE) | March 7 – 11, 2005 | 5 days |
| *Alabama Alternate Assessment* | March 7 – April 15, 2005 | 1 day |
| English Language Acquisition Test | March 7 – April 15, 2005 | 3–5 days |
| *Stanford Achievement Test* | April 4 – 15, 2005 | 3 days |
| *Alabama Reading and Mathematics Test* (Grades 3-8) | April 4 – 15, 2005 | 1-2 days |
| DIBELS | Days 150 – 170 of school calendar (LEA selects 2-week window) | 1 day |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0549

# August 2004

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | 3 | 4 TEACHER INSTITUTE | 5 TEACHER INSERVICE | 6 TEACHER WORKDAY | 7 |
| 8 New teacher orientation | 9 1st day for students (2/3 day) | 10 | 11 | 12 Rusty Parker 2:00 p.m. to collect ring balances | 13 Sports pictures | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 PCHS -vs- Charles Henderson 7:30 p.m. Bulldog stadium | 21 |
| 22 | 23 Rusty Parker 2:00 p.m. to hand out graduation information | 24 | 25 | 26 | 27 PCHS -vs- Booker T Washington 7:30 p.m. Bulldog stadium | 28 |
| 29 | 30 | 31 | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0550

# September

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3<br>PCHS -vs- W S Neal<br>Bulldog Stadium   7:30 p.m. | 4 |
| 5 | 6<br>LABOR DAY<br>HOLIDAY | 7 | 8 | 9 | 10<br>PCHS @ Headland<br>7:30 p.m. | 11 |
| 12 | 13 | 14 | 15 | 16 | 17<br>PCHS -vs- Slocomb<br>Bulldog Stadium   7:30 p.m. | 18 |
| 19 | 20<br>Alabama High School<br>Graduation Exam<br>LANGUAGE | 21<br>Alabama High School<br>Graduation Exam<br>SOCIAL STUDIES | 22<br>Alabama High School<br>Graduation Exam<br>SCIENCE | 23<br>Alabama High School<br>Graduation Exam<br>MATH | 24<br>Alabama High School<br>Graduation Exam<br>READING<br>PCHS-vs-Bullock Co.<br>Bulldog Stadium   7:30 p.m. | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

JR v. Pike County BOE<br>Produced by Defendant PCBE<br>No. 0551

# October

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | | | | | **1** Homecoming PCHS -vs-Abbeville Bulldog Stadium 7:30 pm | **2** |
| **3** | **4** | **5** | **6** | **7** | **8** ENDS 1ST NINE WEEKS PCHS @ Dale County 7:30 p.m. | **9** |
| **10** | **11** *INTERSESSION* | **12** *INTERSESSION* | **13** *INTERSESSION* | **14** *INTERSESSION* | **15** *INTERSESSION* PCHS -vs-T R Miller Bulldog Stadium 7:30 pm | **16** |
| **17** | **18** BEGINS 2ND NINE WEEKS | **19** | **20** | **21** Report Card/ Conf. Day (1/2 day for students) (teachers leave at 7:30 p.m.) | **22** PCHS @ Straughn 7:30 p.m. | **23** |
| **24** | **25** | **26** | **27** | **28** | **29** PCHS -vs-Elba Bulldog Stadium 7:30 pm | **30** |
| **31** | | | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0552

# November

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 VETERANS DAY HOLIDAY | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 THANKSGIVING HOLIDAYS | 25 THANKSGIVING HOLIDAYS | 26 THANKSGIVING HOLIDAYS | 27 |
| 28 | 29 | 30 | | | | |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0553

# December

**2004**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 Alabama High School Graduation Exam ( Reading ) | 7 Alabama High School Graduation Exam (Language) | 8 Alabama High School Graduation Exam (Social Studies) | 9 Alabama High School Graduation Exam (Science) | 10 Alabama High School Graduation Exam (Math) | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 Ends 2nd Nine Wks  2/3 day for students | 22 CHRISTMAS HOLIDAYS | 23 CHRISTMAS HOLIDAYS | 24 CHRISTMAS HOLIDAYS | 25 |
| 26 CHRISTMAS HOLIDAYS | 27 CHRISTMAS HOLIDAYS | 28 CHRISTMAS HOLIDAYS | 29 CHRISTMAS HOLIDAYS | 30 CHRISTMAS HOLIDAYS | 31 CHRISTMAS HOLIDAYS | |
| | | | | ****************** INTERSESSION JANUARY 3-4, 2005 TEACHERS RETURN JANUARY 5, 2005 | | |

JR v. Pike County/BOE
Produced by Defendant PCBE
No. 0254

Technology Mentor List
2004-05

| Denison | Hassett | Watson | Green |
|---------|---------|--------|-------|
| Kilpatrick | Harden | Office area | Morgan |
| Lampley | Suber | Trant | Pritchett |
| Sullivan, S | Booth | Robinson | Knight |
| Calhoun | Owens | Grant | Phillips |
| Faust | Holland | Coon | Sullivan, T |
| JROTC | Coppage | | Busby |
| Mount | Davidson | | Chancellor |
| | | | Helms |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0555

2004
PIKE COUNTY HIGH SCHOOL
FOOTBALL SCHEDULE

| DATE | OPPONENT | SITE | TIME |
|------|----------|------|------|
| August 20 | Charles Henderson | Home | 7:30 |
| August 27 | Booker T Washington | Home | 7:30 |
| September 3 | WS Neal | Home | 7:30 |
| September 10 | Headland | Away | 7:30 |
| September 17 | Slocomb | Home | 7:30 |
| September 24 | Bullock County | Home | 7:30 |
| October 1 | Abbeville | Home(HC) | 7:30 |
| October 8 | Dale County | Away | 7:30 |
| October 15 | TR Miller | Home | 7:30 |
| October 22 | Straughn | Away | 7:30 |
| October 29 | Elba | Home | 7:30 |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0556

TEXTBOOK DISTRIBUTION/COLLECTION PROCEDURES:

1) **DISTRIBUTION:**
   A) TEXTBOOKS WILL BE MAINTAINED THROUGH PROPER INVENTORY PROCEDURES IN THE SCHOOL'S CENTRAL TEXTBOOK DEPOSITORY. TEACHERS WILL SIGN FOR BOOKS USING FORM #M1 WHICH IS TO BE MAINTAINED BY MR. MCDANIEL.

   B) TEXTBOOKS WILL BE PLACED IN YOUR CLASSROOM FROM THE DEPOSITORY. ANY ADDITIONAL BOOKS NEEDED WILL BE SENT AT YOUR REQUEST. CHECK YOUR BOOKS FOR ACCURACY AND GO BY MR. MCDANIELS OFFICE TO SIGN A #M1 FORM.

   C) FACULTY WILL BE ISSUED THE NUMBER OF BOOKS NEEDED FOR EACH CLASS BASED ON SCHEDULE INFORMATION. BOOKS MUST BE ISSUED ON THE FIRST FULL DAY USING THE APPROPRIATE FORM (FORM #M2).

2) **COLLECTION OF BOOKS AT END OF TERM:**
   A) BOOKS SHOULD BE TAKEN UP FROM STUDENTS ONLY AFTER THEIR SCHEDULED FINAL EXAM HAS BEEN GIVEN.
   CLOSE MONITORING OF COLLECTION SHOULD BE MADE TO ENSURE THAT STUDENTS ARE RETURNING BOOKS WITH THE BOOK NUMBERS ISSUED TO THEM.
   B) THE NUMBER OF BOOKS RETURNED + THE NUMBER LOST + THE NUMBER OF BOOKS WORN OUT MUST EQUAL THE TOTAL NUMBER OF BOOKS ISSUED TO THE FACULTY MEMBER. FACULTY WILL BE HELD RESPONSIBLE FOR ANY BOOKS LOST IF THEY CANNOT BE LINKED TO STUDENTS (THE LINK TO STUDENT MUST BE VERIFIABLE). GOOD RECORD KEEPING IS A MUST! KEEP FORM #2 ACCURATELY!

BOOKS LISTED AS WORN OUT MUST BE RETURNED FOR INSPECTION.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0557

3) **NEW STUDENTS:**
     A) TEACHERS SHOULD SEE MR. MCDANIEL TO SECURE
ADDITIONAL BOOKS FOR NEW STUDENTS AND THOSE INVOLVED IN
SCHEDULE CHANGES. FACULTY MUST SIGN FOR THESE
ADDITIONAL BOOKS ALSO. DOCUMENTATION OF THE ISSUANCE OF
THESE BOOKS SHOULD BE DONE AS WITH ANY OTHER STUDENT
USING THE APPROPRIATE FORM (FORM #1 OR #2).

4) **EXITING STUDENTS:**
     A) TEACHERS SHOULD TAKE UP BOOKS FROM STUDENTS
PRIOR TO THEIR DEPARTURE.  BOOKS SHOULD BE CHECKED IN
USING FORM #2.
     B) TEACHERS SHOULD RETURN BOOKS IMMEDIATELY TO
MR. MCDANIEL WHEN THE STUDENT TURNS THEM IN AFTER
WITHDRAWING. THE WITHDRAWAL FORM SHOULD BE SIGNED AT
THIS TIME IF THEY ARE CLEAR FROM FINANCIAL OBLIGATIONS
RELATED TO TEXTBOOKS. IF THEY ARE NOT CLEAR, THE AMOUNT
OWED FOR THE BOOKS SHOULD BE CALCULATED AND PLACED ON
THE WITHDRAWAL FORM. TEACHERS WILL FILE A FORM #3 FOR
LOST TEXTBOOKS AT THE TIME OF WITHDRAWAL WITH
MR. MCDANIEL.

ONCE THIS IS DONE, THE WITHDRAWAL FORM WILL BE SENT TO
MRS. BOSWELL AND THE PRINCIPAL FOR COMPUTER WITHDRAWAL.

5) **LOST BOOKS:**
     A) **STUDENTS WHO HAVE OUTSTANDING BILLS FOR LOST
BOOKS DURING THE PREVIOUS YEAR SHOULD NOT BE ISSUED
BOOKS.** A RECEIPT FROM MRS. BOSWELL INDICATING THAT
THEIR TEXTBOOK OBLIGATIONS HAVE BEEN MET WILL BE
NECESSARY PRIOR TO ISSUING THESE STUDENTS BOOKS.
A LIST OF THESE STUDENTS WILL BE PROVIDED ON THE FIRST
DAY OF SCHOOL.

IN THE CASE OF "FOUND" TEXTBOOKS, MRS. BOSWELL SHOULD
BE NOTIFIED AND A REFUND LESS RECOVERY FEE OF $3.00
WILL BE ARRANGED.

A $3.00 RECOVERY CHARGE WILL BE ASSESSED ON ALL BOOKS
RECOVERED BY FACULTY DURING THE SUMMER.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0558

B) A FORM #3 SHOULD BE SUBMITTED TO MRS. BOSWELL AS A PART OF SCHOOL CLOSING PROCEDURES. MR. MCDANIELS SIGNATURE MUST BE SECURED ON THIS FORM PRIOR TO TURNING IT IN. HIS SIGNATURE INDICATES THAT THE SUM OF THE STUDENTS ON THE LIST FOR FIRST TERM + THE SUM OF THE STUDENTS ON THE LIST FOR SECOND TERM = THE NUMBER OF BOOKS ISSUED TO YOU DURING THE YEAR.

C) EXTRA TEXTBOOKS SHOULD NOT BE STORED IN THE ROOM. FACULTY WILL BE RESPONSIBLE FOR LOST TEXTS WHICH HAVE BEEN TURNED IN BY STUDENTS AND NOT PROMPTLY TURNED OVER TO MR. MCDANIEL.

SPECIAL NOTE: TEACHERS, YOU ARE NOW THE INTERMEDIARY BETWEEN THE SCHOOL AND STUDENT WITH REGARD TO TEXTBOOK ISSUANCE. YOU MUST MAINTAIN EXCELLENT RECORDS. YOU MUST HOLD STUDENTS ACCOUNTABLE FOR LOST AND DAMAGED BOOKS. YOU MUST BE ABLE TO JUSTIFY TO PARENTS AND OTHERS YOUR DECISIONS RELATED TO CHARGING FOR A BOOK.  POOR AND SLOPPY DOCUMENTATION GIVES EVERYONE THE IMPRESSION A MISTAKE COULD HAVE BEEN MADE.  YOU WILL BE HELD ACCOUNTABLE FOR BOOKS IN CASES SUCH AS THESE.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0559

FORM M2
STUDENT BOOK CHECKOUT

| STUDENT NAME | BOOK NUMBER | CONDITION | STUDENT SIGN(OUT) | TEACHER SIGN(OUT) | STUDENT SIGN(IN) | TEACHER SIGN(IN) | RETURNED CONDITION | DESCRIPTION & DAMAGE CHARGE |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0560

FORM #5

## LOST BOOK REPORT

TEACHER: _____          ASSISTANT PRINCIPAL: _____

PERIOD: _____          PRINCIPAL: _____

COURSE/SECTION: _____

| | STUDENT NAME | BOOK # | TEACHER SIGNATURE | STUDENT SIGNATU |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| | | | | |
| 4 | | | | |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0561



# PIKE COUNTY HIGH SCHOOL

# SCHOOL SAFETY PLAN

# MR. TERRY CASEY PRINCIPAL

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0616

PIKE COUNTY HIGH SCHOOL
BRUNDIDGE, ALABAMA  36010

- INTRODUCTION

- FLOOR AND EVACUATION PLAN

- SCHOOL EVACUATION PLAN

- SCHOOL PLANNING SAFETY COMMITTEE

- EMERGENCY SUPPLY LIST

- KEY PERSONNEL TELEPHONE NUMBERS

- EMERGENCY RESPONSE TEAM

- EMERGENCY TELEPHONE NUMBERS

- PREVENTION AND CURRICULUM, DUTY OF STAFF AND FACULTY, COMMUNICATIONS

- BUILDINGS AND GROUNDS SECURITY

- EMERGENCY LOCK DOWN PROCEDURES

- ASSESSING AND RECOVERY

- CAMPUS INTRUDER

- DRUGS AND ALCOHOL

- SHOOTING & DISCHARGING FIRE ARMS

- CHEMICAL SPILLS

- SUICIDE AND DEATH OF STUDENT OR FACULTY MEMBER

- HOSTAGE SITUATION

- RIOTS / STUDENTS DISTURBANCES

- VIOLENCE AND FIGHTING

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0617*

- VANDALISM

- LOST / RUN AWAY STUDENTS

- KIDNAPPING

- WEAPONS

- RANDOM WEAPONS CHECKS

- SEXUAL ASSAULT / SEXUAL HARASSMENT

- EXPLOSIONS

-BOMB THREATS

- OTHER EMERGENCIES

- EMERGENCY RESPONSE CODES

- CENTRAL OFFICE SUPPORT RESPONSE TEAMS

- EMERGENCY RESPONSE PLAN

-UTILITY EMERGENCY MANAGEMENT PLAN

-MEDIA PLAN

- ATHLETIC ACTIVITIES VENUE

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0618

# PIKE COUNTY HIGH SCHOOL
## BRUNDIDGE, ALABAMA 36010

## SCHOOL SAFETY PLAN
## INTRODUCTION

Pike County High School desires to make its environment the most comfortable and safest it can be for the students. A plan that involves all staff and students at the school is in effect to insure safety and security. The plan includes the policies and procedures that promote a safe and secure atmosphere for all students and faculty personnel.

The guidelines in the plan contain the primary elements or steps necessary to effect intervention and follow-up for selected common emergencies that affect our school. Since the enumeration is not possible, this guide, along with the exercise of good judgment should help to ensure that emergencies would be managed effectively. All school faculties, staff, and other staff have been or will be trained in the use of this plan or guide.

MR. TERRY CASEY, PRINCIPAL
PIKE COUNTY HIGH SCHOOL

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0619

# PIKE COUNTY HIGH SCHOOL
## BRUNDIDGE, AL 36010

## SCHOOL SAFETY PLAN
## TRAINING FOR STAFF

The central office staff does all training of school staff in emergency situations. Training of students in CPR, first aid and other areas of emergency situations are done by the staff at Pike County High School

Training of parents will be conducted on volunteer basis as needed.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
**No. 0620**

PIKE COUNTY HIGH SCHOOL
BRUNDIDGE, ALABAMA 36010

SCHOOL SAFETY PLAN
SEXUAL ASSAULT / SEXUAL HARASSMENT

DEFINITION: Sexual harassment is the offensive touching of a sexual nature of another student or written or verbal propositions to engage in sexual acts, or any other form of sexual harassment. Sexual harassment consists of verbal or physical contact of a sexual nature, imposed on the basis of sex, by a student or agent of a recipient that denies, limits provides differed, or conditions the provision of aid, benefits, services or treatment protected under TITLE IX. U.S. CODE.

POLICY: Sexual harassment or sexual assault will not be condoned on any campus, school grounds or activities supported by the schools of the Pike County School Systems.

ACTION BY ADMINISTRATORS: The parents of all students involved in sexual harassment issues shall be notified in all cases. Law enforcement will be summoned by the school in substantiated cases of sexual harassment, in cases where parents and student wish to file complaints, and in cases where a pattern of unsubstantiated complaints have been made concerning individual students.

ACTION BY TEACHERS:

1. Read the school policy on sexual harassment and the definition.

2. Inform students that anyone who violates the policy will be sent to the office immediately.

3. Any incident of sexual harassment, reported to you, should be recorded with who, did what, when, where, and how covered in the report. Personally present this report to the principal or assistant principal, make a copy for yourself and keep it on file somewhere.

4. Should you observe or overhear an act of sexual harassment or sexual assault, follow the same procedure in the above paragraph. In addition, escort all parties involved to the assistant principal or principal immediately.

5. In the case of sexual assaults, where there is physical contact, relating to sexual acts, or touching of the parts of the body that are private and protected under the statues of laws shall be reported immediately to the office.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0621

6. Any incident reported or information presented concerning the possibilities of rape regardless how lacking in details shall be recorded and reported to the principal. These are incidents, which may occur on school properties or activities. Other incidents should be reported to the local law enforcement activities.

## PREVENTION AND ASSISTANCE:

Rape prevention classes and information relating to reporting of rape, should be presented to all students attending Pike County High School.

Any student, who is or may be a victim of rape, sexual abuse, or harassment, will be provided assistance in dealing with the emotional problems brought forth by the misfortune.

The Guidance Counselor can provide information on the counseling services available and prepare referral forms to the respective agency or agencies.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0622

PLAINTIFF'S EXHIBIT 11

TRS Form 10 (6/03)

# APPLICATION FOR RETIREMENT
## TEACHERS' RETIREMENT SYSTEM OF ALABAMA

135 South Union Street
Post Office Box 302150
Montgomery, Alabama 36130
(334) 832-4140 or 1-800-214-2158

**MEMBER INFORMATION**

Name __Charles L. Coon, Jr.__     Soc. Sec. No. __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__

Home Address __P.O. Box 201-308 Country Club Dr__     Date of Birth __1-02-1948__
<span>Street or P.O. Box</span>

__Greenville__     __AL__     __36037__     Home Phone __(334) 382-7639__
<span>City     State     Zip</span>

Employer __Pike County Board of Education__     Work Phone ( )

Type of Retirement (Check One): ☒ Service     ☐ Disability (Report of Disability form must also be submitted.)

Date of Retirement (This date is always the first of a month.) __July__ 1, 20 __05__
<span>Month     Year</span>

Name of bank/financial institution to which retirement benefit is to be deposited _____
(The properly completed Direct Deposit Authorization form must be submitted to the TRS to authorize remittance to the bank/financial institution.)

**Beneficiary Designation**

I am designating the following beneficiary to receive any benefit due at my death __Minie L. Coon__

Relationship to me __wife__     Date of Birth __1-23-1947__

Soc. Sec. No. __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__

In the event the designated beneficiary listed above is different from that listed on my active account, I desire the change to be effective (Check One):

☐ Upon the duly executed completion of this application filed through the TRS with the Board of Control.
☐ On the date my retirement benefit becomes due and payable.

**Member Authorization**
Signature of Applicant __Charles Coon__     Date __5/26/05__

STATE OF __Alabama__ , COUNTY OF __Pike__

On this __26__ day of __May__ , 20 __05__ personally appeared before me, the above named individual and made oath that the statements made are true.

Notary __[signature]__

My Commission Expires: __4/17/07__

**EMPLOYER CERTIFICATION**

Date on which service of applicant will terminate __June 30, 2005__

Closing date of last payroll of applicant __July 31, 2005__

Job classification __Band Director__

Contract salary for full year __49,864.00__

Total contributions (to be) deducted
for the current scholastic year __2,493.24__

Total contributions (to be) deducted
after the current scholastic year __207.77__

Days worked/days contracted for the current contract period __202__

Total accrued unused sick leave days at retirement __143__

Signature of Authorized Official: __[signature]__

Employing Institution: __Pike County Board of Education__

| Please certify deductions for last 7 months for which contributions will be submitted. | | | |
|---|---|---|---|
| Jul | 207.77 | Jan | 207.77 |
| Aug | | Feb | 207.77 |
| Sep | | Mar | 207.77 |
| Oct | | Apr | 207.77 |
| Nov | | May | 207.77 |
| Dec | | Jun | 207.77 |

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0203

Work Phone: ( 334 ) 566-1850

Date: __May 26, 2005__

RSA DDR (5/03)

# DIRECT DEPOSIT AUTHORIZATION
## Retirement Systems of Alabama

135 South Union Street
Post Office Box 302150
Montgomery, Alabama 36130
(334) 832-4140 or 1-800-214-2158

The retiree or beneficiary of a deceased retiree must complete the front page of this form. Then take or mail the form to your financial institution so they may verify the information on the front, complete the information on the reverse side, and agree to the Master Agreement.

### Retiree/Beneficiary Information

Social Security Number  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

Name  Charles L. Coon, Jr.

Address  P.O. Box 761

308 Country Club Dr.

Greenville, AL 36037

Benefit Recipient (Please check one):
- ☐ Retiree
- ☐ Beneficiary of Deceased Retiree/Member

Daytime Phone No. 334-382-7639

Indicate the system(s) from which you would like your benefit(s) direct deposited.

☒ Teachers' Retirement System     ☐ Employees' Retirement System     ☐ PEIRAF     ☐ Judicial Retirement Fund
                                                                    ☐ RSA-1

### Joint Account Holder's Certification:

I agree to notify the Retirement Systems of Alabama (RSA) immediately of the death of the recipient of the retirement benefits being deposited to this joint account, and to return all payments to the RSA that are deposited to this account after said death. The RSA will determine and pay any survivor benefits. The RSA is authorized to make necessary debit entries to this joint account for any credits that were made in error.

Name(s) of Joint Account Holder(s)

Charles L. Coon, Jr.

Minnie Coon

Signature(s) of Joint Account Holder(s)

Date _____

### Retiree/Beneficiary Certification:

Each benefit payment is to be credited to my account at the financial institution specified on the reverse side of this form and such payment will be in full payment, satisfaction, and discharge of the amount then falling due and payable to me on account of such payments.

If my death occurs prior to the due date of any payment made by the RSA in compliance with this request or if adjustments are required for any credit entries to my account, I authorize the RSA to make the necessary debit entries to my account. I hereby reserve the right to revoke or cancel this request, such revocation or cancellation to take effect within 30 days of receipt of written notice by the RSA.

I authorize my payment to be sent to the financial institution named on the reverse side of this form to be deposited to the designated account.

Signature of Retiree/Beneficiary _____     Date  5/26/05

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0204

(6/03)

# INSURANCE AUTHORIZATION FORM
## PUBLIC EDUCATION EMPLOYEES' HEALTH INSURANCE PROGRAM (PEEHIP)

### PART I: MEMBERS CURRENTLY ENROLLED

Members currently enrolled in Hospital/Medical coverage with PEEHIP check the box which applies:

☒ I wish to continue my Hospital/Medical coverage with PEEHIP.*

☐ I do not wish to continue my Hospital/Medical coverage with PEEHIP.

Marital Status: ☐ Single   ☒ Married   ☐ Divorced   ☐ Widowed

Signature of Retiree _Carter Ivey_   Date _5/26/05_

### PART II: MEMBER COMBINING ALLOCATIONS WITH SPOUSE

Members combining allocations with spouse check all that apply:

☒ I am presently transferring allocation to retired spouse contract number _____ and wish to continue in that manner.

☐ I am presently receiving allocation from my active spouse and wish to continue in that manner.

☐ I am presently transferring allocation to active spouse contract number _____ and understand that I must enroll in the Hospital Medical Plan in my name and receive my active spouse's allocation.**

> **PEEHIP policies require the retiree to enroll in insurance in his/her name if combining allocation with active spouse. Enrollment application will be sent to retiree to enroll.

Spouse retiree date (if applicable) _____

### EMPLOYER CERTIFICATION (to be completed by payroll/insurance official)

The final payroll deduction of $ ___0___ , will be deducted for _August  2005_ coverage.
Month

This employee is a ___10___ month employee.
9, 10, 11, 12

Signature of Authorized Official _Bonnie Brown_   Date _5-26-05_

### PART III: OPTIONAL COVERAGE

Persons with only the Optional coverages (Dental, Cancer, Indemnity, and Vision) may continue all four coverages or drop two optionals at date of retirement. The retired state allocation will pay the premium for two of the optionals without a payroll deduction for those retired members enrolled in only the optional coverages. If you are not currently enrolled in optional coverage, you can only enroll during the open enrollment period. *

If you are enrolled in the Optional coverages only, please indicate which coverages you wish to keep on your date of retirement. If you wish to keep all four optionals, mark "all."

☐ Cancer   ☐ Indemnity   ☐ Dental   ☐ Vision   ☐ All

Signature of Retiree _____   Date _____

### PART IV: NON-PARTICIPATING SYSTEM

Persons whose public education employer does not participate in PEEHIP Hospital/Medical will be provided with information and an enrollment form about PEEHIP. If you wish to enroll, complete an enrollment form and submit it with the payment for the first month's premium no later than your effective date of retirement. If you are not enrolled in your employer's Hospital/Medical coverage, you and your dependents will be required to serve a 270-day waiting period on all pre-existing conditions with PEEHIP.

### PART V: VESTED MEMBERS NOT CURRENTLY ENROLLED

If you are not currently employed in public education in Alabama, you are eligible to enroll in the Hospital/Medical insurance through PEEHIP on your date of retirement. You and your dependents will be required to serve a 270-day waiting period on all pre-existing conditions unless proof of previous coverage is received and approved. Please indicate your intentions below and an enrollment form will be provided to be completed and returned no later than your date of retirement with the payment for the first month's premium.

☐ wish to enroll in the Hospital/Medical coverage with PEEHIP effective the date of my retirement.

☐ do not wish to enroll in the Hospital/Medical coverage with PEEHIP.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0205

Signature of Retiree _____   Date _____

To members enrolled in both the PEEHIP Hospital/Medical coverage and one or more optional coverages: A member cannot drop optional overages (Dental, Cancer, Indemnity, Vision) until the open enrollment period.

*Financial Institution Information (to be completed by a representative of the financial institution)*

Name of Retiree/Beneficiary Charles L. Coon          Soc. Sec. No. 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

Depositor Account No. 5121605190          Bank Routing No. 062200482

Name of Financial Institution The Peoples Bank & Trust Co          Type of Account: ☑ Checking
                                                                    ☐ Savings

Mailing Address PO Box 310

          Greenville, Al. 36037-0310

Name(s) of Person(s) on this Account: Charles L. Coon

          Minnie Coon
          (Minie)

**Financial Institution Certification and Master Agreement:**

Both the Retirement Systems of Alabama (RSA), as Originator, and the above named Financial Institution identified on this side of the form consider the following to be the Master Agreement and agree that it is to be applicable to all payments subject to Section 4.7 of the Operating Rules of the National Automated Clearing House Association sent by the RSA to the Financial Institution for the benefit of all benefit recipients having accounts at the Financial Institution.

In consideration of the RSA making payments in accordance with the foregoing request without requiring proof that the retiree/beneficiary identified on this form is alive on the date which such payments become due and are credited to his or her account, the Financial Institution hereby agrees to repay and refund to the RSA on demand, the amount of any payments made to and received by the Financial Institution, the due date of which occured after the date of death of the benefit recipient. The Financial Institution further agrees to accept the certification of the RSA as to the date of death of such payee as sufficient evidence.

I confirm the identity of the named retiree/beneficiary, account number and type. As representative of the above named Financial Institution, I certify that the Financial Institution agrees to receive and deposit identified payment in accordance with the Master Agreement and agrees that the Master Agreement is applicable to all payments subject to Section 4.7 of the Operating Rules of the National Automated Clearing House Association sent by the RSA to the Financial Institution for benefit of the retiree/beneficiary.

Name of Representative Glenda D. Clark

Signature of Representative Glenda D. Clark          Date 5/17/05

Telephone Number 334-382-4124

Note: Direct Deposit Authorization forms that are processed after the 18th of each month will become effective the following month.

Please return completed form to:

The Retirement Systems of Alabama
Post Office Box 302150
Montgomery, Alabama 36130-2150

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0206

May 15, 2005

Dr. Mark Bazzell, Superintendent
Pike County School System
101 West Love Street
Troy, AL 36081

Dear Sir:

Please let this letter serve as my notice of my retirement effective June 30, 2005.

I have enjoyed working with the administration, faculty, and students at Pike County High School, Pike County Elementary School., and Banks Middle School. If I can be of any service to you in the future please feel free to give me a call. Go PRIDE OF PIKE!!!!

Sincerely,

Charles Coon
cc: Mr. Buddy Pyron

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0207


SEE
# 26

MINUTES OF THE MEETING OF THE
PIKE COUNTY BOARD OF EDUCATION
May 23, 2005
4:30 p.m.

1.   The Pike County Board of Education met at 4:30 p.m. in regular session
     at the offices of the board located at 101 W. Love Street, Troy,
     Alabama.  Board members present for the meeting were as follows:

     Mrs. Linda Steed, President                District Four
     Rev. Herbert Reynolds, Vice-President      District Five
     Rev. Earnest Green                         District One
     Mr. W. Greg Price                          District Two
     Mr. Wyman Botts                            District Three
     Mr. Adam Register                          District Six
     Dr. Mark Bazzell, Superintendent           Secretary to the board

2.   The meeting was called to order by the President, Mrs. Steed, and Mr.
     Botts gave the invocation.

3.   The minutes of the April 18, 2005, meeting were approved as presented
     on the motion of Mr. Register seconded by Mr. Botts.

4.   On the motion of Mr. Register seconded by Rev. Green, the board
     adopted the agenda for the meeting as presented.

5.   The request by a Pike County teacher who resides in Troy for her child
     to enroll in kindergarten at Goshen Elementary School in the fall was
     approved on the motion of Mr. Botts seconded by Mr. Price.

6.   The financial statement for April, 2005, was presented and approved on
     the motion of Mr. Register seconded by Rev. Reynolds.

7.   The board approved payment of payrolls and bills and accounts for the
     month of May, 2005, on the motion of Mr. Botts seconded by Mr. Price.

8.   On the motion of Mr. Price seconded by Rev. Green, the board approved
     changes in report cards for kindergarten and third grade as stated in the
     attached letter.

9.   The board gave approval to contract with Humidity Control Systems of
     South Alabama to provide humidity control panels for coolers in the
     lunchrooms at a total annual cost of $3,421.50, on the motion of Rev.
     Reynolds seconded by Mr. Register.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0208*

Board minutes
page two
May 23, 2005

10.    On the motion of Mr. Botts seconded by Mr. Price, the board awarded Child Nutrition Program bids for the 2005-2006 school year to low bidders meeting specifications, as listed below. Mr. Register abstained from the vote.

Awarded the bid for milk to Barber Dairies in the amount of $48,645.35.

Awarded the bid for frozen snacks/ice cream to Blue Bell Creameries in the amount of $3,564.00.

Awarded the bid for bread to Sara Lee Baking Company in the amount of $18,160.00.

Awarded the bid for pest control to Meeks Termite and Pest Control in the amount of $138.00 per month.

Awarded the bid for small kitchen items to the lowest bidder meeting specifications, item by item, according to the printout generated by the bid/purchase order computer program.

11.    The board accepted the bid of $550 from Huntsville Restaurant Equipment for two surplus serving lines at Pike County High School, on the motion of Rev. Reynolds seconded by Mr. Register.

12.    On the motion of Rev. Green seconded by Mr. Price, the board approved the sale of two surplus cafeteria tables at $20 each to Phyllis Rodgers.

13.    On the motion of Mr. Botts seconded by Rev. Green, the board accepted bids received for surplus vehicles and equipment, as listed:

The sale of four 1989 Ford buses to Avery's Used Cars of Lakeland, Florida:
    #89-01, VIN 1FDXJ75PXKVA08585 @ $1,098.00
    #89-03, VIN 1FDXJ75P3KVA08587 @ $1,098.00
    #89-05, VIN 1FDXJ75P7KVA08589 @ $1,098.00
    #89-06, VIN 1FDXJ75P3KVA08590 @ $1,098.00

The sale of one 1980 Ford Utility Van, VIN E04EHJD5660, to Lawrence Sankey @ $125.00.

The sale of one 1980 Chevrolet Pickup Truck, VIN CCG14A1105559, to Ann Stewart @ $210.00.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0209

Board minutes
page three
May 23, 2005

The sale of one Bay Lift Floor Jack, Serial #2230250, and one Walker Floor Jack, Serial #93657, to Tony Jones @ a total of $50.00.

14.   On the motion of Rev. Green seconded by Mr. Botts, the board declared as surplus a water cooler and authorized its use at the Troy Cultural Arts Center.

15.   On the motion of Mr. Price seconded by Rev. Green, the board declared as surplus nine portable classrooms/trailers at Pike County High School to be advertised for sale by sealed bids with a minimum price of $1,500 each for the five older buildings and $2,500 each for the four newer buildings.

16.   The board approved architectural plans for the Prevention and Support Annex to be located at 120 Dean Street in Troy, on the motion of Mr. Botts seconded by Mr. Register.

17.   On the motion of Rev. Green seconded by Mr. Price, the board approved contracting with PH & J Architects for structure design of the Prevention and Support Annex and for the Goshen Elementary School paving project.

18.   The board, on the motion of Mr. Register seconded by Rev. Reynolds, approved the use of "School Dude.com", an on-line maintenance program designed to manage school facilities more efficiently.

19.   On the motion of Mr. Botts seconded by Rev. Reynolds, the board approved the request by Mrs. Grubbs and Mrs. Carter to attend the Minority Leadership Conference in Biloxi, Mississippi, on May 31-June 3, 2005, as part of Lee v. Macon consent decree compliance.

20.   The board, on the motion of Mr. Register seconded by Rev. Reynolds, approved the request for Goshen High School ROTC students to attend Summer Camp at Ft. McClellan, Alabama, from May 24-May 29, 2005.

21.   On the motion of Rev. Green seconded by Mr. Price, the board approved an elementary summer art program to be conducted in cooperation with the Troy Arts Council and Troy Cultural Arts Center.

22.   The board, on the motion of Mr. Botts seconded by Mr. Register, approved various summer school programs and teachers as outlined in the attached letters. Rev. Reynolds abstained from the vote.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0210*

Board minutes
page four
May 23, 2005

23.    On the motion of Mr. Register seconded by Rev. Reynolds, the board
       approved an incentive plan for attracting teachers in areas designated as
       critical needs. (Attached)

24.    On the motion of Mr. Botts seconded by Rev. Green, the board approved
       FY 05 budget amendment #1.

The board went into executive session to hear a parent concern, after which
regular open session was resumed.

25.    On the motion of Mr. Price seconded by Rev. Green, the board approved
       the superintendent's recommendation to suspend Stephen W. Neal,
       without pay, for one day for just cause. Mr. Neal has the right to contest
       this action by filing a written notice of appeal within fifteen days of
       receipt of notice of the board's action. If notice of appeal is not timely
       filed, the board's decision shall be final.

26.    On the motion of Mr. Botts seconded by Mr. Register, the board
       approved the following personnel action:

       Ann McDougald's resignation for retirement on June 1, 2005, from her
       position as teacher at Goshen Elementary School.

       Charles Coon's resignation for retirement on June 30, 2005, from his
       position as band director at Pike County High School.

       Yvon Brantley's resignation at the end of the school year from her
       position as teacher at Banks School.

       April Trant's resignation at the end of the school year as teacher at Pike
       County High School.

       Leigh Ann Owens-Brown's resignation at the end of the school year as
       teacher at Pike County High School.

       Approved Tom Jones' request for a medical leave of absence from his
       position as transportation supervisor.

       Approved Jacqueline Barron's request for maternity leave under
       catastrophic leave and Family Medical Leave to begin in August, 2005,
       and last approximately four to six weeks, from her position as teacher at
       Pike County Elementary School.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0211

Board minutes
page five
May 23, 2005

Approved Diana Malcolm to receive the head girls basketball supplement for 2004-2005 at Pike County High School.

27. On the motion of Mr. Register seconded by Rev. Green, the board approved the following personnel action:

Approved a summer work request for maintenance and clean-up as described in Mr. Tom Hicks' letter. (Attached)

Approved high school counselors for 20 additional work days this summer.

Approved high school bookkeepers for 10 additional work days this summer (five additional days as previously approved each year to close out school books and five days for McAleer software update training), and approved school secretaries for 5 additional work days.

Approved the attached summer work schedule for 12-months employees.

28. The item regarding end-of-year personnel recommendations of principals, administrative assistants, and supervisors was not approved. Motion was made by Mr. Register and seconded by Mr. Botts who voted yes. Voting no were Mrs. Steed, Rev. Green, Mr. Price, and Rev. Reynolds.

29. The board, on the motion of Mr. Price seconded by Rev. Reynolds, approved end-of-year personnel recommendations of principals, administrative assistants, and supervisors, with changes as discussed by the board. (Attached)

30. The request by Helen Siler for a voluntary transfer from her position as lunchroom worker as Goshen Elementary School to that of lunchroom worker at Banks School was approved on the motion of Mr. Botts seconded by Rev. Reynolds.

31. Mike Hall was employed as principal for Pike County High School, on the motion of Rev. Green seconded by Rev. Reynolds.

32. Jean Hicks was employed as Spanish teacher for Pike County High School and Goshen High School, on the motion of Mr. Register seconded by Mr. Botts.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0212

Board minutes
page six
May 23, 2005

33.   Michele Harris and Valorie Stroud were employed as Early Childhood/Elementary teachers at Goshen Elementary School with grade levels to be determined, on the motion of Mr. Register seconded by Rev. Green.

34.   On the motion of Rev. Reynolds seconded by Rev. Green, the board approved personnel action as follows:

Employment of Michelle Taylor as guidance counselor at Goshen Elementary School.

Employment of Jennifer Carmen Evans as bookkeeper at Goshen Elementary School.

Employment of Kanfinae Jones as English teacher at Pike County High School.

Approved Mildred Davis to work an additional two weeks during the summer to be paid from Indian Education program funds.

35.   On the motion of Rev. Green seconded by Rev. Reynolds, the board approved the superintendent's recommendation that no exceptions will be made regarding the current policies related to participation in graduation commencement activities.

36.   There being no further business to come before the board, the meeting was adjourned at 6:42 p.m., on the motion of Rev. Reynolds seconded by Rev. Green.

ATTEST:

_____
Linda Steed, President

_____
Dr. Mark Bazzell, Superintendent/Secretary

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0213*

PLAINTIFF'S
EXHIBIT
12

FORM EXP 2002



STATE OF ALABAMA
DEPARTMENT OF EDUCATION
TEACHER EDUCATION AND CERTIFICATION OFFICE
5201 GORDON PERSONS BUILDING
POST OFFICE BOX 302101
MONTGOMERY, AL 36130-2101
Telephone: (334) 242-9977   Fax: (334) 242-0498   E-mail: tcert@alsde.edu

## SUPPLEMENT EXP

## TO BE COMPLETED BY EMPLOYER; NOT BY APPLICANT

This supplement is to be completed for verification of educational experience and for verification of Continuing Education Units (CEUs).

Educational experience is defined as full-time educational work in: (a) any state or local public school, regionally accredited postsecondary school, educational agency, or educational association; (b) an accredited, state registered, state-approved, and/or church-related nonpublic school; and (c) rehabilitation facilities for P-12 students. Educational experience as an intern, graduate assistant, student teacher or in positions such as substitute teacher, aide, or clerical worker will not be considered appropriate. **NONPUBLIC SCHOOLS WHICH ARE NOT CHURCH RELATED MUST SUBMIT DOCUMENTATION OF THEIR ACCREDITATION WITH THIS FORM.**

In addition to this verification of experience document, an individual verifying educational experience with educational agencies (other than local school systems), educational associations, or rehabilitation facilities for P-12 students shall also request that a description of the position held be documented on the organization's letterhead stationery. The letter shall bear the signature of the executive director of the organization.

I. Personal data:

Applicant: **Charles          L.          Coon**
          First        Middle        Maiden        Last Name        Suffix (e.g., Jr., Sr.)

Permanent Address  **P.O. Box 201**                    **Greenville    AL      36037**
          Street/Apt./P.O. Box/Route and Box        City        State        ZIP Code

**418 - 60 - 5468**              **(334) 382-7639**        PURPOSE OF SUBMISSION:
Social Security Number            Home Telephone Number      ☒ Renewal
                                                             ☐ Issuance of a _____ certificate
**01-02-48**                      **(334) 735-2389**         ☐ Superintendent election in _____ County
Date of Birth                     Work Telephone Number      ☐ Other _____
(Month/Day/Year)

II. Verification of applicant's experience by employer.

  A. Employed:  ☒ **Full-time**  ☐ **Part-time**

  B. Was this experience satisfactory?  ☒ **Yes**  ☐ **No**

**Pike County Board of Education**
Name of School System, Nonpublic School, Institution, or Appropriate Agency

| From: Month/Year | To: Month/Year | Grade(s) Taught | Subject Area(s) | Position Held | If Part-Time List Hours/Days |
|---|---|---|---|---|---|
| 08-01-02 | Present | 6-12 | Music | Band Director | |
| | | | | | |
| | | | | | |
| | | | | | |

## THE SUPERINTENDENT, HEADMASTER, DEAN OR APPROPRIATE DIRECTOR MUST SIGN THE BACK OF THIS FORM.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0024

FORM EXP 2002

NAME: ___Charles L. Coon___        SOCIAL SECURITY NUMBER: __418_-_60_-_5468__

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for **Alabama** experience only:
   Reason(s) for leaving the most recent position:
   ☐ Nonrenewal ☐ Resignation ☐ Decrease in teaching positions ☐ Retirement
   ☐ TERMINATION: ☐ *Incompetency ☐ *Insubordination ☐ *Neglect of Duty ☐ *Immorality ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
| See attached Professional Development Data Collection Form. | | 59.6 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*10 clock hours = 1 CEU                        Total Clock Hours __59.6__

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this __7th__ day of

___May___, __2004__

_Janet C Rascoe_
Seal and Signature of Notary Public
My Commission Expires

JANET CAROL RASCOE
Notary Public, AL State at Large
My Comm. Expires Aug. 19, 2006

_S. Bazzell_
Signature of Superintendent, Headmaster, Dean, Appropriate Director

__Dr. Mark Bazzell, Superintendent__
Typed or Printed Name and Position

__Pike County Board of Education__
School System, Nonpublic School, Institution, Appropriate Agency

__101 W. Love Street__
Address

__Troy, AL   36081__
City/State/ZIP Code

__5 - 7 - 04__
Date

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0025

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE
FRONT OF THIS FORM.

NAME: ___CHARLES COON_____    SOCIAL SECURITY NUMBER: _418_ - _60_ - _5468_

If applicable, Section III and IV must be completed by **Alabama** superintendents or headmasters. Section V is to be completed for all individuals submitting this form.

III. To be completed for Alabama experience only:

Reason(s) for leaving the most recent position:

☐ Nonrenewal  ☒ Resignation  ☐ Decrease in teaching positions  ☐ Retirement

☐ TERMINATION: ☐ *Incompetency  ☐ *Insubordination  ☐ *Neglect of Duty  ☐ *Immorality  ☐ *Other

*For termination, forward copies of minutes of board meetings at which employee was terminated. Also forward copy of tenure commission ruling and applicable court decisions, if any, directly to the State Department of Education at the address on the front of this form.

IV. Verification of Continuing Education Units (CEUs) earned through **Alabama** school systems:

CEUs earned and applied toward renewal shall be related to professional education with consideration given to the sponsoring organization, the professional qualifications of the presenter, and the purposes, goals and evaluation of the activity.

| Professional Development Activity | Date | Number of Clock Hours* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*10 clock hours = 1 CEU                                          Total Clock Hours _____

V. This is to certify that all information on this supplement pertaining to the above individual is true and correct:

Sworn to and subscribed before me this _29th_ day of

_____April_____ _2004_

_Regina C Hicks_ (signature)

Seal and Signature of Notary Public

My Commission Expires: _4-29-05_

_Dennis L. Mixon_ (signature)

Signature of Superintendent, Headmaster, Dean, Appropriate Director

**Dennis L. Mixon, Superintendent**

Typed or Printed Name and Position

**Monroe County Schools**

School System, Nonpublic School, Institution, Appropriate Agency

**P O Box 967**

Address

**Monroeville AL  36461**

City/State/ZIP Code

**04-29-04**

Date

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0026

A NOTARY SEAL MUST BE AFFIXED TO THIS FORM.

DO NOT RETURN THIS FORM TO THE APPLICANT, MAIL IT TO THE ADDRESS ON THE FRONT OF THIS FORM.

FORM APP-150

Name: _Charles L. Coon_                                    Social Security Number: _413_ - _60_ - _5468_

IV. Record of Education (attach an additional sheet if needed):

| NAME OF COLLEGE OR UNIVERSITY | LOCATION | DATES ATTENDED | DEGREE |
|---|---|---|---|
| Livingston University | Livingston AL | 1966-1969 | B. M. E. |
| Livingston University | Livingston AL | 1993-1994 | M. Ed. |
| Troy State University | Troy AL | Su 1988-Su 1989 | — |

V. Educational Experience (Do not include student teaching, substitute, or teacher aide experience. If you have no experience, enter the word "NONE" below. Please list your most recent experience first and attach an additional sheet if needed):

| DATE | NAME AND LOCATION OF SCHOOL | GRADES AND SUBJECTS TAUGHT |
|---|---|---|
| 8-2002- Present | Pike County High School, Brundidge AL | Band 5-12 - Music App - 9-12 |
| 10-2000- 7-2002 | J.F. Shields High School, Beatrice AL. | Band 5-12 - Music App - 9-12 |
| 8-99-10-2000 | Monroe Academy, Monroeville, AL | Band 5-12 - Music App - 9 |

VI. Alabama Prospective Teacher Testing Program:

_____N/A_____          Score Report    ____ submitted
Date Test Taken                        ____ to be submitted

VII. Renewal (complete for renewal of a professional educator or career/technical certificate):

Check the applicable documentation:

☐ College Credit (official transcripts)
☒ Educational Experience (Supplement EXP which must be received in this Office directly from employer)
☐ Continuing Education Units (Supplement EXP for CEUs earned through Alabama school systems, photocopies of completion certificates for CEUs earned through school systems outside of Alabama, or official transcripts or certificates of completion for any CEUs earned through a college or university)
☐ A copy of the valid license or certificate as a healthcare practitioner (healthcare science and technology only)
☐ Copies of the score reports for tests taken under the Alabama Prospective Teacher Testing Program, if certificate has lapsed for more than six months from the expiration date

VIII. Career/Technical Certificate:

☐ Healthcare Science and Technology (circle level)

Level 4    Indicate month and year New Teacher Institute was completed:_____
           Enclose official transcript(s) of required coursework                    month/year
Level 5    Enclose official transcript of master's degree

☐ Technical Education (circle level)

Level 2    Indicate month and year New Teacher Institute was completed _____
           Enclose official transcript(s) of required coursework; and              month/year
           Enclose a copy of the certificate indicating verification of passing the approved occupational proficiency examination
Level 3    Enclose official transcript(s) of required coursework
Level 4 and/or 5    (Application must be made on the basis of completion of an approved teacher education program)

IX. Record of last Alabama Teacher's Certificate(s) issued (if none, enter the word "NONE"):

| CERTIFICATE(S) | YEAR ISSUED | NAME IN WHICH CERTIFICATE WAS ISSUED |
|---|---|---|
| Rank 1 | 1994 | Charles L. Coon |
| Rank 2 | 1994 | |

X. Send Certificate To:

☐ Applicant OR ☒ Employer (If to be mailed to employer, give name and address.)

_Pike County Board of Education_
Name of Alabama School System/Nonpublic School

_101 W. Love Street_
Address

_Troy, AL    36081_

**JR v. Pike County BOE**
*Produced by Defendant PCBE*
*No. 0027*

PLAINTIFF'S
EXHIBIT
13

I fear there will be no future for
those who do not change.
—Louis L'Amour

# 5
Wednesday
## January 2005
(5th Day  360 Left  Week )

Daily Notes

To Do:
1. Surv. Systems, Troy Cable
2. Distance Learning
3. Policy Review
4. RCT $, RCT To PC
5. ALC
6. Shipman House - Giff/Baxter
7. Donated Land
8. Seimens - CAP K
9. Foundation
10. Lee - Macon
11. Bus - TSU
12. Observations
13. GHS Band Audit - Jefferson
14. Customer Focus
15. Coop Band
16. Turner - PE
17. JBHM
18. Accountability Appeals
19. CAC
20. EEC Exams K-3, K-2
21. SEC Test 9-12
22. Bus Stop BPS/BMS
23. Spanish D.L.
24. MT, Ag

Legal
Harrison
R????
S. Link          — Ronald Gordie
Nikson           Art Scenic
EEOC             Al State Comp
CAC              in Arts

Mag Time H.S.

© FranklinCovey All Rights Reserved · franklincovey.com · Seasons-Classic

To make a fortune some assistance from fate
is essential. Ability alone is insufficient.
—Ihara Saikaku

# 12
### Wednesday
## January 2005
12th Day  353 Left  Week 2

Rev. Reynolds
(Bus Driver)

**Daily Notes**



① 2:09   Tues.

② 2:13   Tues   Jessica
9:20 w         J. Wade
Thomi   Mc — Sav.   372-0987

③ 2:53   Jackie Turk   Tues
9:20 w         670-6398

④ 250   3:13:   Tues
John Evans

⑤ **** 3:29 & Shay Hill   PCHS   Tues.
****         566-1660   566-6065

⑥ ✓ 8:30   W—lat Island   (Tom)
S. El. Elct. — Bus —
1/22

⑦ 8:40         566-2065
Chuck Soon         670-2875
Ry Buff Home
1/20, 21
82506

⑧ Rev. Green
566-7681   Ethics
372-0667

⑨ Rev. Reynolds   Ethics
735-2270
273-4203

⑩ Cindy Dixon
✓ Plato
205-752-4933

⑪ 250 10:00
Bud4 Ryan

⑫ 11:20   Arlan Cohn
Pepper & Paper
770-667-3042

⑬

P Cinata
Hilta

To Bay

© FranklinCovey. All Rights Reserved. · franklincovey.com · Seasons-Classic

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0103



Every day is my best day; this is my life.
I'm not going to have this moment again.
—Bernie Siegel

**14**

Monday
March 2005

Daily Notes

TO DO:

| | | |
|---|---|---|
| 1 | Surv. Systems, Tron Coble | |
| 2 | Polig Review - Sexl Sex, harrasst, Rambig, etc | |
| 3 | RET TO PC | |
| 4 | ALL | |
| 5 | John Wright Land | |
| 6 | Shelly Long | BOE |
| 7 | Vacian | Skiren |
| 8 | Shym House | Reynolds - Bus |
| 9 | Foundation | BiB Hinkly |
| 10 | Orientation | Botts / Clan |
| 11 | PEPE Adm. | |
| 12 | Fac. Meeting (13) | |
| 13 | Customer Focus | |
| 14 | ETC, STC | |
| 15 | Bus stop - Banks | LEGAL |
| 16 | Jones - Bus Driver | Russell |
| 17 | MT/AL | Waccian |
| 18 | PCHS - R&T | Nickson |
| 19 | Air Time Comm. | Lee Macon |
| 20 | Pay $ Spec. SB. 1% | Reed |
| 21 | Comp Sapphire | Hollinger |
| 22 | Comp. Plan | |
| 23 | Brand RD 50/50 | |
| 24 | Emp T / BOE EVAl | |
| 25 | LIB Bu-Les Cody | ① Butch Phelps |
| 26 | IDEA | 670-2222 |
| 27 | Map + Globe | TPD |
| 28 | MADD - Dong Brand | |
| | 566-8230 | |
| | Price Eng Rattle | - N.E. |
| 29 | Thorpe | - Coal |
| 30 | STC Bond issue | |
| 31 | Auditor 2006 | |

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0104

## Wednesday
## March

# 30
### 2005

**Appointment Schedule**

| March 2005 | April 2005 |
|---|---|
| S M T W T F S | S M T W T F S |

✓ Completed
→ Forwarded
✗ Deleted
G◎ Delegated
In Process

**1 ABC  Prioritized Daily Task List**

- Phillip Faulkner (cell phone)

Adam Helms  — NOT AT PCHS (Banks)
Andrew Law
Jordon Senn
Levi Davis  ?
Thomas Green

8
9
11
12
1
2
3
4
5
6
7
8

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0105

Life is not lost by dying; life is lost minute
by minute, day by dragging day, in all
the thousand small uncaring ways.
—Stephen Vincent Benét

**30**
Wednesday
March 2005

**Daily Notes**



JR v. Pike County BOE
Produced by Defendant PCBE
No. 0106

# April 2005 Index



| Date | Index important information and events recorded on this month's daily notes. |
|------|---|
| | |

CALLS

① Charlotte Rogers  Robinson
235-9814

② Ev. Im _ - Pike Ballwin Co.
apt 3
454-3356
ESH   ESP 6687

③ Soon
342-7635

④ Pickett
appt

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0107

Whoever claims a right for himself
must respect the like right in another.
—James Bryce

# 4
## Monday
### April 2005

Daily Notes

1. Surv. Syst - Tony Cable
2. Policy Review
3. Shelly, Dred
4. Shipment House
5. Foundation                    BIC
6. Obkuntin (N3)
7. PEPE Adm.
8. Fac. Mentg Banks
9. Customer Focus
10. ESC, SIC
11. Bus Stop Banks
12. Jones - Roadl. Bus Shp
13. MTLAC
14. PLHS Art
15. AyP spec. 58. Assmbly
16. Coach Support
17. Comm. Plan              BOE
18. 50/50 BFD              Rundl - Bus
19. Snft / Bus Eval.       RR lights
20. CTE Bond              Betts - Plan
21. Budget
22. Cell Bills            Legal?
23. Guy Ship-J  } BSC    Russell
24. Felton    }           Harrison
25. Commission            Lee-Maxed

                          J. Neal
                          J. Coon

1. ?CITS - Thomas Oppat
2. 10:24  Chris Kelly
   - Bus - Nelson
   334-296-9043  M

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0108

**Monday**

**April**

# 4

**2005**

Appointment Schedule

April 2005 · May 2005
S M T W T F S · S M T W T F S

ABC Prioritized Daily Task List

8

9

10

6:00  B.lls / mtg

9:30  Golf P                11
      Whitley

1:30  Adm.               12  CEII.
      mtg                    B.lls

1

Shelly Dep.
50/50 327                2

( Felton )
( Shipes )                3

— COON —
King                     4

BHS — Aton Helms
BHS — Anda Lewis         5
      ? Karen Sim
PCHS ? Leslia Davis      6
      BWD  Thomas Queen
                         7
      Faulkie
PCHS  Black              8    **JR v. Pike County BOE**
PCHS  Matt King / Smith      Produced by Defendant PCBE
                             No. 0109

Reality was such a jungle—with no
signposts, landmarks, or boundaries.
—Helen Hayes

**11**

Monday
April 2005

**Daily Notes**



① Tony Porter
732 - 1322

② Butch Phelps
670-2230

③ 10:35 —
④ Ins- op 2005
B4133

⑤

LEII.
Message

① Fax — Adams
② Fax — 11 - 322-0556
③ 8:15 — Adams
— Russell — $5131.00
150.00
— Anthony Ballard — 5281.00
— Mr. Nelson
(Louise)

⑥ McCoy — LEII

⑦ L. Balme (no T.)

⑧ 3:00 Ki Edwards LEII Fund
Regina 236

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0110



My own experience has taught me this:
if you wait for the perfect moment when
all is safe and assured it may never arrive.
—Maurice Chevalier

# 13
*Wednesday*
## April 2005
103rd Day · 262 Left · Week 15

**Daily Notes**



PLAINTIFF'S
EXHIBIT
14

# PIKE COUNTY BOARD OF EDUCATION

**Dr. Mark Bazzell**
**Superintendent**

**Board of Education**

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register



April 1, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

This purpose of this correspondence is to notify you that you are being placed on administrative leave with pay, effective immediately, pending the outcome of an investigation into alleged misconduct involving a number of students. According to reports, you have allegedly engaged in the use of illegal drugs with students, provided illegal drugs to students, and also allegedly engaged in other inappropriate activities with students of a sexual nature. Since these reports involve allegations of criminal conduct on your part, I have also notified the appropriate law enforcement personnel.

I would very much like to meet with you at your earliest convenience to explain the nature of these reports and to offer you the opportunity to provide a written statement if you so desire. Also, I am directing that you not return to the Pike County High and Banks campus until this matter is resolved. In addition, I am further directing that you have no contact with Pike County High and Banks students, including band students until this matter is resolved.

Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Schools

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0087*

# escreen 123 Specimen Result Certificate

Printed by : 9971 - Pike Internal Medicine                    Report printed on : 4/1/2005 11:08:33 AM

| | |
|---|---|
| To:<br>Cheryl Dichiara<br>Pike Internal Medicine<br>1350 Highway 231 South<br>Troy, AL 36081 | Verification Date:<br>4/1/2005 11:08:41 AM<br><br>Medical Review Officer:<br>Drs. Peter DiChiara & G. Alan Young<br>1350 Highway 231 South |
| Location:<br>9971-Pike Internal Medicine | Troy AL 36081<br>334-566-1270 |

| | |
|---|---|
| Donor Name:<br>COON, CHARLES | Donor SSN:<br>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 |
| Date of Test:<br>4/1/2005 11:03:09 AM CST | Other ID:<br>2424423 |
| ID Number:<br>59105636 | Donor Status:<br>Random |
| Lab<br>eCup | |

| | |
|---|---|
| Drugs Tested:<br>**Marijuana**<br>**Cocaine**<br>**Amphetamines**<br>**Opiates**<br>**PCP** | Test Type:<br>Non-DOT |

Final Result Disposition:            **Negative**

Additional Information:

*JR v. Pike County BOE*<br>*Produced by Defendant PCBE*<br>*No. 0088*



**eScreen**
0895 Grandview, Suite 200
Overland Park, KS 66210
(800) 881-0722

Custody Control Form
**59105636**

| Lab ID: | LABONE |
| Lab Acct #: | 2ZCV |
| Lab Panel ID: | CD51 |
| Panels: | 5 Panel(CD51) |

---

**eScreen**
Company Account:    9971-0

STEP 1.

**Pike Internal Medicine**
1350 Highway 231 South
Troy AL 36081
334-566-1270
Cheryl Dichiara

**Medical Review Officer**
Pike Internal Medicine
Drs. Peter DiChiara & G. Alan Young
1350 Highway 231 South
Troy AL 36081

---

Step 2.    TO BE COMPLETED BY COLLECTOR
Specimen temperature for urine specimens must be read within 4 minutes of collection.

Specimen temperature within range:  Yes

Verified Donor ID  ☑

Step 3.  TO BE COMPLETED BY COLLECTOR AND DONOR

Collector affixes bottle seal on specimen.
Type:
☑ Urine    ☐ Oral    ☐ Blood    ☐ Breath

---

STEP 4.    Reason For Test:

☐ Pre-employment     ☐ Return To Duty     ☐ Promotion     ☐ Periodic Medical

☐ Post Accident     ☐ Follow Up     ☐ Transfer     ☐ Other

☑ Random     ☐ Reasonable suspicion/cause

---

Step 5.    TO BE VERIFIED BY DONOR

| 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 | 1/2/1948 | 334-382-7639 | | 2424423 |
| Donor SSN | Date of Birth | Daytime Phone Number | Evening Phone Number | Drivers License |

*I certify that I provided my specimen to the collector, that I have not adulterated it in any manner, that the specimen bottle used was sealed with a tamper-evident seal in my presence, and that the information provided on this form and on the label affixed to the specimen bottle is correct. I hereby authorize the collector and testing service or laboratory (specifically including, but not limited to, eScreen, Inc.) to release the results of the test to the Company/Employer or their Designee.*

| CHARLES COON | 4/1/2005 11:03:09 AM CST | |
| Donor's Name | Date & Time | Signature of Donor |

---

Step 6.    TO BE VERIFIED BY COLLECTOR

Name of Collection Site, Address, City, ST, Zip
Pike Internal Medicine
1350 Highway 231 South
Troy AL 36081

Collection Site ID
9971

*I certify that the specimen identified on this form is the specimen presented to me by the donor providing the certification on Step 5 of this custody control form, that it bears the same specimen identification number as that set forth above, and that it has been collected, labeled and sealed as in accordance with applicable requirements.*

| Diana Johnson | 4/1/2005 11:03:09 AM CST | |
| Collector's Name | Date & Time | Signature of Collector |

---

Step 7.  LAB RECEIVED

| | |
| Date & Time | Signature |

---

ORIGINAL MUST ACCOMPANY SPECIMEN TO LABORATORY

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0089

<— Coon —>

X Adam Helms < 16 ✓
✓ Jeron Senn
✓ Andrew Law (15)
✓ Levi Davis (16)
X Thomas Green
<·<—x— x —x—>·>

<—> Trunk in car — both smoking cig. —>

( Cody Dunn's stolen )

Coon — no residue
= P.L. Co. —
Gun against report.

Random – Drug
Test =
Negative

Matt King —

— B. Payne & R. McDaniel report their sting was
made by mother of Matt King late first
semester when she was at school covering
math grades. Made at time math class
was in Bowl. She still she occurred
month earlier. No explanation as to why
she did not report. BP disagreed with
this — he doesn't say was used by anyone
— only a partner — Denies any other misappropriate
activity — or knowledge of this.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0090

Pike County High School
Date Run: 3/31/05 10:51AM

**Student Profile - Faulkner, Phillip B.**

Page: 1

---

Student ID: 420333656 Previous #: 0
First Name: Phillip
Middle Name: Blake
Last Name: Faulkner
Nickname:
Address: 4032 County Road 45

Troy AL 36081
Phone: (334) 474-3118
SSN: 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
Lives With: Father
Birthplace:
Citizenship:
Migrant:
Locker Numb: Combin:
Lunch Code: 2 LEP:
Language: ☐ Esl
School Zone:
State Number:
Alternate #:
Impact Aid:
Address To:

☐ Internet Access
☐ Vocational
☐ Gifted
☐ Title I Indicator
☐ NELB
☐ Foreign Exchange
☐ Homeless
☐ Immigrant

Entry Date: 08/09/04 E-1
Withdrawal Date:
Grade: 09 Gender: M

Home Room: 903 Suber, Danny
Date of Birth: September 8, 1989 Age: 15
Bus 1 / Bus 2: 96-22 /
Transport Code: NT Geo Code:
Birth Certificate:

Parking Number:
Counselor: Watson, Ramona D.
Program 504:
Mother's Maiden:
Resident District:
Previous School:
Next School:

**Guardian Information**

| | | |
|---|---|---|
| Name: | Phillip Faulkner | Beverly Pevehouse |
| Address: | 4032 County Road 45 | 241 Keith Street |
| | Troy AL 36081 | Troy AL 36081 |
| Relation: | Father | Mother |
| Telephone: | 724-0667 1-877-23 | 277-5800 403-0336 |
| Education: | | |
| Employer: | State Of Alabama 775-3331 | 562-3093 |
| Mother's Maiden Name: | | |

**Emergency Information**

| | | | |
|---|---|---|---|
| Contact: Debbie Faulkner | Relation: Grandmother | Phone: 474-3118or670-5 | Wk: |
| Phillip Faulkner | Father | | 775-3331 |

Doctor(s): Senecal Phone: 566-7800
New Phone 474-3337 Or 4743928

B. Pegram talked with student. No improvement. Student complaining. Denies allegations. Parents approve of [illegible] & student getting time away from school.

[illegible signature]

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0091

STIOffice © 1997-2004, Software Technology Inc.

School District: 055                    **Student Discipline**          7/11/2005 3:23:05 PM Page:  1
School:  PIKE COUNTY HIGH SCHOOL
Student Name:  FAULKNER, PHILLIP B.

| | | |
|---|---|---|
| Infraction Detail | Mon 11/08/2004 12:48 PM | **ELECTRONIC PAGERS**          FAILED TO GIVE UP COMMUNICATION DEVICE |
| | Teacher Name: | OWENS, LEIGH A. |
| | Course Name: | |
| | Alert: | Period:          Demerits:  0 |
| | Disposition: | OUT OF SCHOOL SUSPEN |
| | Admin Date: | |
| | Admin Name: | MCDANIEL, ROBERT L. |
| | Punishment | Tue 11/09/2004    End: Tue 11/16/2004 |

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0092*

Student Profile For:   FAULKNER, PHILLIP B.          PIKE COUNTY HIGH SCHOOL

## Student Information

| | | | | | |
|---|---|---|---|---|---|
| Student #: | 420333656 | | | | |
| First Name: | PHILLIP | Sex: | M | Home | 903 |
| Middle Name: | BLAKE | Race: | W | Grade: | 9 |
| Last Name: | FAULKNER | DOB: | 09/08/1989 | Entered: | 8/5/1998 |
| Address: | 4032 COUNTY ROAD 45 | SSN: | 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 | Withdrawn: | |
| City / Zip: | TROY          36081 | Sp Ed: | | | |
| Phone: | 474-3118 | | | | |

## Guardian Information

Lives With:
| | | | | | |
|---|---|---|---|---|---|
| Guardian 1: | PHILLIP FAULKNER | Address: | 4032 COUNTY ROAD 45 | Work: | 775-3331 |
| Guardian 2: | BEVERLY PEVEHOUSE | Address: | 241 KEITH STREET | Work: | 562-3093 |
| Emergency 1: | DEBBIE FAULKNER | Relation: | | Phone | 474-3118OR67 0-5000 |
| Emergency 2: | PHILLIP FAULKNER | Relation: | | Phone | 775-3331 |
| Doctor 1: | SENECAL | Phone: | 566-7800 | | |
| Doctor 2: | NEW PHONE | Phone: | 474-3337 OR 4743928 | | |
| Note: | | | | | |

## Schedule

| Term | Period | Course # | Course Description | Teacher Name |
|---|---|---|---|---|
| 1 | 1 | 10510.01 | AGRISCIENCE | ROBINSON, LOUIS A. |
| 1 | 2 | 2331.02 | PHYSICAL SCIENCE | SULLIVAN, SHARON |
| 1 | 3 | 2133.02 | HONORS ENGLISH 09 | BROWN, LEIGH A. |
| 1 | 4 | 2727.01 | MARCHING BAND | COON, CHARLES L. |
| 2 | 1 | 2431.03 | ALGEBRA I | GREEN, MICHAEL |
| 2 | 2 | 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY |
| 2 | 3 | 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY |
| 2 | 4 | 2728.01 | CONCERT BAND | COON, CHARLES L. |

## Attendance - Days Absent or Tardy

| Date | Day | Type | Reason |
|---|---|---|---|
| 09/15/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 09/20/2004 | Monday | ABSENT ALL DAY | NEGLECT |
| 09/21/2004 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 09/22/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 10/05/2004 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 10/14/2004 | Thursday | ABSENT ALL DAY | SICKNESS |
| 10/15/2004 | Friday | ABSENT ALL DAY | NEGLECT |
| 10/18/2004 | Monday | ABSENT ALL DAY | NEGLECT |
| 11/09/2004 | Tuesday | ABSENT ALL DAY | SUSPENDED |
| 11/10/2004 | Wednesday | ABSENT ALL DAY | SUSPENDED |
| 11/12/2004 | Friday | ABSENT ALL DAY | SUSPENDED |
| 11/15/2004 | Monday | ABSENT ALL DAY | SUSPENDED |
| 11/16/2004 | Tuesday | ABSENT ALL DAY | SUSPENDED |
| 12/15/2004 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 01/12/2005 | Wednesday | ABSENT ALL DAY | NEGLECT |
| 01/24/2005 | Monday | ABSENT ALL DAY | SICKNESS |
| 01/26/2005 | Wednesday | TARDY | CHECK IN EXCUSED |
| 02/01/2005 | Tuesday | ABSENT ALL DAY | NEGLECT |
| 02/08/2005 | Tuesday | ABSENT ALL DAY | DEATH IN FAMILY |
| 02/18/2005 | Friday | TARDY | CHECK OUT UNEXCUSED |
| 04/06/2005 | Wednesday | ABSENT ALL DAY | CHECK OUT UNEXCUSED |
| 04/22/2005 | Friday | ABSENT ALL DAY | CHECK OUT UNEXCUSED |
| 05/02/2005 | Monday | TARDY | UNEXCUSED TARDY |
| 05/12/2005 | Thursday | ABSENT ALL DAY | NEGLECT |

*JR v. Pike County BOE*
**Produced by Defendant PCBE**
**No. 0093**

FAULKNER, PHILLIP B.

PIKE COUNTY SCHOOLS

Student Profile For:   FAULKNER, PHILLIP B.          PIKE COUNTY HIGH SCHOOL

**Attendance - Days Absent or Tardy**

| Date | Day | Type | Reason |
|------|-----|------|--------|
| 05/23/2005 | Monday | ABSENT ALL DAY | CHECK OUT EXCUSED |
| 05/24/2005 | Tuesday | ABSENT ALL DAY | SICKNESS |

**Attendance - Entry / Withdraws**

| Date / Time | Type | Cod | Grade | Home Rm | Sp Ed | From / To | Note |
|-------------|------|-----|-------|---------|-------|-----------|------|
| 08/09/2004 2:19 PM | E | E-1 | 9 | 903 | | | |

**Discipline**

| Date | Infraction / Disposition | Notes |
|------|--------------------------|-------|
| 11/08/04 12:48 pm | ELECTRONIC PAGERS | FAILED TO GIVE UP COMMUNICATION DEVICE |
| 11/09/04 | OUT OF SCHOOL SUSPEN | |

**Student Grades**

| Grading Period: | 2005 | 1 | FIRST NINE WEEKS | | 9WK | COM | COM | |
|-----------------|------|---|------------------|---|-----|-----|-----|---|
| 2133.02 | HONORS ENGLISH 09 | | OWENS, LEIGH A. | | 64 | 46 | | |
| 2331.02 | PHYSICAL SCIENCE | | SULLIVAN, SHARON | | 74 | | | |
| 2727.01 | MARCHING BAND | | COON, CHARLES L. | | 94 | | | |
| 10510.01 | AGRISCIENCE | | ROBINSON, LOUIS A. | | 79 | 17 | | |

| Grading Period: | 2005 | 2 | 2ND NINE WEEKS/TERM 1 | | 9WK | COM | EXM | TRM |
|-----------------|------|---|-----------------------|---|-----|-----|-----|-----|
| 2133.02 | HONORS ENGLISH 09 | | OWENS, LEIGH A. | | 67 | 46 | 61 | 65 |
| 2331.02 | PHYSICAL SCIENCE | | SULLIVAN, SHARON | | 77 | | 75 | 75 |
| 2727.01 | MARCHING BAND | | COON, CHARLES L. | | 95 | | 100 | 96 |
| 10510.01 | AGRISCIENCE | | ROBINSON, LOUIS A. | | 85 | 3 | 70 | 80 |

| Grading Period: | 2005 | 3 | THIRD NINE WEEKS | | 9WK | COM | ABS | TAR |
|-----------------|------|---|------------------|---|-----|-----|-----|-----|
| 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY | | 51 | | | |
| 2431.03 | ALGEBRA I | | GREEN, MICHAEL | | 58 | 20 | | |
| 2728.01 | CONCERT BAND | | COON, CHARLES L. | | 97 | | | |
| 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY | | 85 | | | |

| Grading Period: | 2005 | 4 | 4TH NINE WEEKS/TERM 2 | | 9WK | COM | ABS | EXM | TRM |
|-----------------|------|---|-----------------------|---|-----|-----|-----|-----|-----|
| 2234.03 | WORLD HIS/GEOGRAPHY | SUBER, DANNY | | 68 | | | 61 | 60 |
| 2431.03 | ALGEBRA I | | GREEN, MICHAEL | | 60 | 8 | | 67 | 61 |
| 2728.01 | CONCERT BAND | | COON, CHARLES L. | | 98 | | | 100 | 98 |
| 520506.05 | BUS/TECH ESSENTIALS | MOUNT, KIMBERLY | | 75 | | | 66 | 77 |

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0094

Pike County High School

**Student Profile - Senn, Jeron C.**

Date Run: 3/31/05    10:54AM
Page:   1

| | | |
|---|---|---|
| Student ID: | 416252705    Previous #:    0 ☒ Internet Access | ☐ Foreign Exchange |
| First Name: | Jeron | ☐ Vocational    ☐ Homeless |
| Middle Name: | Carlton | ☐ Gifted    ☐ Immigrant |
| Last Name: | Senn | ☐ Title I Indicator |
| Nickname: | | ☐ NELB |

Address:     9892 NORTH HWY 29        Entry Date:    08/09/04 E-1
             2336 County Rd 7761        Withdrawal Date:
             BANKS AL  36005           Grade:    12      Gender:  M
Phone:       (334) 243-5510
SSN:         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              Home Room:    1203    Phillips, Alice
Lives With:  Mother                  Date of Birth:   December 11, 1986    Age: 18
Birthplace:                          Bus 1  /  Bus 2:           /
Citizenship:                         Transport Code:  T            Geo Code:
Migrant:                             Birth Certificate:
Locker Numb:          Combin:
Lunch Code:  1        LEP:           Parking Number:
Language:                      ☐ Esl  Counselor:    Watson, Ramona D.
School Zone:                         Program 504:
State Number:                        Mother's Maiden:
Alternate #:                         Resident District:
Impact Aid:                          Previous School:
Address To:                          Next School:

Guardian Information ───────────────────────────────────────
Name:        Stanley & Deidre Senn
Address:     9892 N HWY 29
             BANKS AI  36005
Relation:    Father/Mother
Telephone: 334-243-5510
Education:
Employer:
Mother's Maiden Name:
Emergency Information ───────────────────────────────────────
Contact:  Judy Stephens          Relation: Grandmother      Phone: 670-6027 566-46  Wk:

Doctor(s): Pearlstein            Phone:  566-9800

_Confined — Smoking cigaritte sh1t._

_(→) Saw them being compi together_
_+ smoking — Saw going by_
_home on numerous Decasions._

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0095

Pike County High School

**Student Profile - Green, Thomas**

Date Run: 3/31/05     10:56AM
Page:   1

---

Student ID:   416277121     Previous #:          0 ⊠ Internet Access     ☐ Foreign Exchange
First Name:   Thomas                                    ☐ Vocational          ☐ Homeless
Middle Name:                                            ☐ Gifted              ☐ Immigrant
Last Name:   Green                                      ☐ Title I Indicator
Nickname:                                               ☐ NELB
Address:   Rt. 2 Box 3-A                  Entry Date:   08/09/04  E-1
           9679 N. US Highway 29          Withdrawal Date:
           Banks AL  36005                Grade:   11          Gender:  M
Phone:   (334) 243-5741
SSN:   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                        Home Room:   1102     Sullivan, Toni
Lives With:                               Date of Birth:   September 8, 1987     Age: 17
Birthplace:                               Bus 1  /  Bus 2:              /
Citizenship:                              Transport Code:  NT          Geo Code:
Migrant:                                  Birth Certificate:
Locker Numb:            Combin:
Lunch Code:   3     LEP:                  Parking Number:
Language:                     ☐ Esl      Counselor:   Watson, Ramona D.
School Zone:                              Program 504:
State Number:                             Mother's Maiden:
Alternate #:                              Resident District:
Impact Aid:                               Previous School:
Address To:                               Next School:

---

**Guardian Information**
Name:   David Green                              Naomi Green
Address:   Rt. 2 Box 3-A                         Same
           Banks AL  36005
Relation:   Grandfather                          Grandmother
Telephone: 243-5741                              000-0000
Education:
Employer:   Retired            000-0000          Retired            670-8219-car
Mother's Maiden Name:

---

**Emergency Information**
Contact:                    Relation:          Phone:          Wk:

Doctor(s):                           Phone:

*PCHS*

*— No Knowledge*

**JR v. Pike County BOE**
**Produced by Defendant PCBE**
**No. 0096**

Pike County High School

**Student Profile - Law, Andrew**

Date Run: 3/31/05     10:53AM
Page:     1

| | | | | |
|---|---|---|---|---|
| Student ID: | 417334650 | Previous #: | 0 | ☐ Internet Access   ☐ Foreign Exchange |
| First Name: | Andrew | | | ☐ Vocational   ☐ Homeless |
| Middle Name: | | | | ☐ Gifted   ☐ Immigrant |
| Last Name: | Law | | | ☐ Title I Indicator |
| Nickname: | | | | ☐ NELB |

Address:     213 Stella Dr.
             252 County Road 5525
             Troy AL  36081
Phone:       (334) 000-0000
SSN:         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
Lives With:
Birthplace:
Citizenship:
Migrant:
Locker Numb:                Combin:
Lunch Code:  3      LEP:
Language:                          ☐ Esl
School Zone:
State Number:
Alternate #:
Impact Aid:
Address To:

Entry Date:        08/09/04  E-1
Withdrawal Date:
Grade:     10           Gender:  M

Home Room:     1003    Catrett, Regina B.
Date of Birth:     March 25, 1989       Age: 16
Bus 1  /  Bus 2:            /
Transport Code:  T              Geo Code:
Birth Certificate:

Parking Number:
Counselor:          *Not on File*
Program 504:
Mother's Maiden:
Resident District:
Previous School:
Next School:

**Guardian Information**
Name:       Wayne Law                        Judy Law
Address:    213 Stella Dr.                   Same
            Troy AL  36081
Relation:   Father                           Mother
Telephone: 670-0885                          000-0000
Education:
Employer:  Mechanic           774-2551       Loan Operations        566-2270
Mother's Maiden Name:

**Emergency Information**
Contact:                  Relation:          Phone:          Wk:

Doctor(s):                          Phone:

*BP. — w.T.e*

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0097

STIOffice © 1997-2004, Software Technology Inc.

Banks School                                                        Date Run: 3/31/05    11:00AM

**Student Profile - Helms, Adam L.**                                           Page:  1

| | | | |
|---|---|---|---|
| Student ID: | 417377684 | Previous #: | 0  ☐ Internet Access    ☐ Foreign Exchange |
| First Name: | Adam | | ☐ Vocational    ☐ Homeless |
| Middle Name: | Lee | | ☐ Gifted    ☐ Immigrant |
| Last Name: | Helms | | ☐ Title I Indicator |
| Nickname: | | | ☐ NELB |

Address:      52 Co Rd 5526                        Entry Date:       08/09/04  E
              52 County Road 5526                  Withdrawal Date:
              Troy AL  36081                       Grade:      08          Gender:  M
Phone:        (334) 566-9064
SSN:          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                          Home Room:       81       Gray, Bette
Lives With:                                        Date of Birth:    December 25, 1990       Age: 14
Birthplace:                                        Bus 1 / Bus 2:     96-22 /
Citizenship:                                       Transport Code:  T          Geo Code:
Migrant:                                           Birth Certificate:
Locker Numb:                    Combin:
Lunch Code:  3          LEP:                        Parking Number:
Language:                            ☐  Esl        Counselor:       Wyrosdick, James R.
School Zone:                                        Program 504:
State Number:                                       Mother's Maiden:
Alternate #:                                        Resident District:
Impact Aid:                                         Previous School:
Address To:                                         Next School:

**Guardian Information**
Name:       Jackie Helms                           Jeff Helms
Address:    206 Oak Road                           206 Oak Rd.
            Troy AL  36081                         Troy AL  36081
Relation:   Mother                                 Father
Telephone: 566-9064                                566-9064
Education:
Employer:  Alacare Home Health & Hos  566-9238     Self                 566-2182
Mother's Maiden Name:

**Emergency Information**
Contact:   Jackie Helms          Relation: Mother        Phone: 735-3030        Wk:
           Jeff Helms                      Father                566-2162

Doctor(s): Coggins                          Phone:  271-5959

See C.T. note

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0098

Banks School                    Semester 1 Schedule
Date Run: 3/31/05    11:01AM    417377684    Helms, Adam Lee

| Per | Course No. | Course Description | Teacher Name | Room | Days Met |
|-----|-----------|--------------------|--------------|------|----------|
| 1 | 2221.01 | Social Studies 8 | B. Gray | 201 | MTWHF |
| 2 | 3580.01 | Physical Education 8 | K. Turner | 101 | MTWHF |
| 3 | 2423.01 | Pre-Algebra -8 | M. Gibson | 102 | MTWHF |
| 4 | 2321.02 | Science 8 | T. Goss | 203 | MTWHF |
| 5 | 2121.01 | English 8 | K. Adams | 204 | MTWHF |
| 6 | 2618.01 | Computer Application | K. MOUNT | 1A300 | MTWHF |
| 7 | 2618.01 | Computer Application | K. MOUNT | 1A300 | MTWHF |
| 8 | 2725.01 | Beginner Band | C. Coon | 101 | MTWHF |

Home Room: 81        B. Gray                    Room: 201    Phone: 566-9064
Guardian:  Jackie Helms                    52 Co Rd 5526
DOB: 12/25/90  Age: 14    Grade: 08  Gender: M    Troy AL  36081
            Helms, Adam Lee

Banks School                    Semester 2 Schedule
Date Run: 3/31/05    11:01AM    417377684    Helms, Adam Lee

| Per | Course No. | Course Description | Teacher Name | Room | Days Met |
|-----|-----------|--------------------|--------------|------|----------|
| 1 | 2221.01 | Social Studies 8 | B. Gray | 201 | MTWHF |
| 2 | 3580.01 | Physical Education 8 | K. Turner | 101 | MTWHF |
| 3 | 2423.01 | Pre-Algebra -8 | M. Gibson | 102 | MTWHF |
| 4 | 2321.02 | Science 8 | T. Goss | 203 | MTWHF |
| 5 | 2121.01 | English 8 | K. Adams | 204 | MTWHF |
| 6 | 3680.04 | Cre.Arts-Career Lab | G. Belcher | 1A300 | MTWHF |
| 7 | 3680.04 | Cre.Arts-Career Lab | G. Belcher | 1A300 | MTWHF |
| 8 | 2725.01 | Beginner Band | C. Coon | 101 | MTWHF |

Home Room: 81        B. Gray                    Room: 201    Phone: 566-9064
Guardian:  Jackie Helms                    52 Co Rd 5526
DOB: 12/25/90  Age: 14    Grade: 08  Gender: M    Troy AL  36081
            Helms, Adam Lee

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0099

Banks School Band Students Interview Responses

Adam Helms
- Thinks Mr. Coon's coming to Banks for beginner band is worthwhile
- Enjoys his afternoon band class, they play sheet music
- Gets along well with Mr. Coon, he makes good grades
- Would like to see band program continued
- Good teacher, thinks he should stay, comfortable with him
- Not a hard teacher, sometimes lets them get away with things
- Shared with Mr. Coon that he was sent to ALC for smoking. Said Mr. Coon told him he shouldn't have been smoking

Jessica Henderson
- Fine with band, instrument broken
- Nice guy, funny, cool, she likes him, jokes with them
- Does good job, they get through music each day, then they have free time
- Not that strict, but will get on you if you miss a part while practicing
- Hope he is back, will attend program next year

Lacey Hussey
- Goes to PCHS at 1:00 for band
- Likes Mr. Coon, gets along well with Mr. Coon
- Thinks program is worthwhile, this her third year
- Fairly strict with them, will pull them out if needed
- Should have program again, thinks Mr. Coon should stay and continue program
- Not a bad man, she trusts him
- Want let students get by if he knows they are doing something



# PIKE COUNTY BOARD OF EDUCATION

Board of Education

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register

**Dr. Mark Bazzell**
Superintendent



April 8, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

The purpose of this correspondence is to notify you that the investigation into allegations of misconduct on your part involving students has been completed. The nature of these allegations were outlined in my letter to you dated April 1, 2005.

After review, there is no evidence at this time to substantiate these claims. However, this matter has been turned over to the appropriate law enforcement agency for further investigation if they find it necessary. Also, should additional information come to light, it is possible the investigation could be re-opened.

The investigation did reveal numerous reports that on several occasions you used cigarettes with students. If this is the case, I am requesting that you cease and desist from this practice. As you know, use of tobacco products by individuals who are less that twenty-one years of age is a criminal act. It is also criminal to provide these items to these individuals. The use of tobacco products by staff while on school campus is also a violation of school board policy.

In addition, the investigation revealed numerous reports of students being transported in your personal vehicle. This should also cease unless it involves extreme situations where the safety and well-being of students are involved. Routine transport of students in your personal vehicle should not occur. The liabilities for both you and the school system are obvious.

With the conclusion of this investigation, I am hearby clearing you to resume your duties beginning Monday, April 11, 2005.

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0101*

101 W. Love Street, Troy, Alabama 36081-2613  Telephone  (334) 566-1050  F  (334) 566



PLAINTIFF'S
EXHIBIT
15

April 1, 05   Susp.    Apr 11                          Aug.
    Dry Test — Apr. 1     BPS              Final Hire  1989
                          TPD
                          Source
                          Written Rpt

    Emp Background Check — 1999                R.T. July 1 —
        FBI, ABI

    Re: Appl. Test  6-24-04
    Monroe County              00 - 01
                               01 - 02

    Greenville             10 yrs      74 - 84
    Crenshaw Co  High L Home   5 yrs      88 - 93
    Dallas Co.                 4 yrs

        Aug 02
Engl.   June 05

*  Crenshaw    5
   Conecuh Co.  1
   Houst Co.    1
   Tusc. Co.    1
*  Butler     10
   Mari Co.    1
*  Dallas      4.
   Pike        3
              ___
              26

        8 different Systems

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0047

PLAINTIFF'S
EXHIBIT
_____16_____

Matt King:_____

B. Pyron and R. McDaniel report this story was made by mother of Matt King late first semester when she was at school concerning Matt's grades.  Made at time Matt had D or F in Band.  She stated ? occurred much earlier.  No explanation as to why she did not report.  BP discussed with ? - he denied MJ used by anyone - only cigarettes - Denied any other inappropriate activity - or knowledge of this.

## Student Discipline Report by Date

(*) Withdrawn Student

---

418334541    Justin Michael Reed          Gender: M  Ethnicity: W  Home Rm905          Grade: 09   Phone: 735-3925   DOB: 7/28/89

Parent: Thomas Reed                        Address:   Rt 2 Box 318-F
Elizabeth A. Reed                                     158 County Road 4430
Brundidge AL  36010

---

| Date | Per | Course | Teacher | Incident |
|------|-----|--------|---------|----------|
| 11/04/04 | | 0.00 | Busby, Donna G. | Weapon, Possession |

Location: ON CAMPUS          Infraction: Weapon, Possession          Demerit: 0.0    Remain: 0.0    Alert: 0
Disposition: Out Of School Suspen          Date: 11/04/04          End:  11/18/04          # of Days:  10    Hours:
Administrator: McDaniel, Robert L.          Admin Date: 11/03/04  Conference:      / /

| 4/18/05 | 3 | 0.00 | Coon, Charles L. | Criminal Mischief |

Location: ON CAMPUS          Infraction: Criminal Mischief          Demerit: 0.0    Remain: 0.0    Alert: 0
Disposition: Alternative Placemen          Date: 4/19/05    7:00AM    End:  5/02/05    3:00PM    # of Days:  9    Hours:  8
Administrator: McDaniel, Robert L.          Admin Date:  / /  Conference:      / /

PLAINTIFF'S
EXHIBIT
17

Office © 1997-2004, Software Technology Inc.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JR, a minor by an through
His parents EAR & TMR
    Plaintiff

                     CV:2:06-cv-1120-MEF

v.

Pike County Board of Education et al.
    Defendants

## NOTICE OF DEPOSITION

TO:   Donald B. Sweeney, Jr.
       One Federal Place
       1819 Fifth Avenue North
       Birmingham, AL 35203-2104

PLEASE TAKE NOTICE that the Plaintiff in the above stated case will take the deposition of Sherry Shakelford at the Pike County Board of Education offices at 101 W. Love Street in Troy Alabama on September 4, 2007 beginning at 9:00 a.m. and said deposition is to continue until completed. Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ.* 30 before an officer duly authorized to administer oaths.

Done this the 30th day of July, 2007

                          Susan Shirock DePaola
                          Attorney for the Plaintiff

SUSAN SHIROCK DEPAOLA
1726 West Second Street ~ Suite B
Montgomery, Alabama  36106

gional Child Advocacy/Family Resource Center

### Date of Interview: 7/14/05

CAC CASE # 23        INTERVIEWER'S NAME: Mona Watson

VICTIM'S NAME:    Reed            Justin            Michael
                  (LAST)          (FIRST)           (MIIDDLE)

ADDRESS:    Rt. 2 Box 318-F

TELEPHONE:    334-735-2935

DOB:  7/28/89        SEX:  M _X_    F ___    RACE: White

PARENTS NAME:                EMPLOYMENT:

POSSIBLE OFFENDER: Charles Coon    DOB/AGE: unknown

ADDRESS: Greenville, AL

TYPE OF ABUSE:    Sexual

DATE OF INCIDENCE:

LOCATION: Pike County High School Band Room & Home of Victim

DHR WORKER: Misty Hubbard

LE INVESTIGATOR: Bob Bradberry

PRESENT AT FORENSIC INTERVIEW: Mona Watson, Misty Hubbard
                              Viewed by Bob Bradberry & DA

SUMMARY OF INTERVIEW:

  Justin had a very difficult time with interview. Even though he is fifteen years old he has difficulty in verbalizing what happened to him. After a very difficult time, Justin finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one time he described was in the band room back before Christmas. He stated that Mr. Coon had him lock the band room door and sit on the steps leading into the room. He stated that Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last time this happened was about three weeks ago when Mr. Coon went to Justin's house. Parents were not there.



PLAINTIFF'S
EXHIBIT
__19__

Reed v. PCBE
124

State of Alabama
Twelfth Judicial Circuit
Pike County Multi-disciplinary Team Report

Reporting Agency: _____

(Place name of person reporting next to agency)

Date: 8/9/05

Phone 807-6143

DA _____

TPD _____

DHR _M. Hubbard_____

BPD _____

PCSO _____

Other _____

Victim Information:

Name _Justin Reed_____ DOB 7/28/89 Age ~~15~~16

Address _162 Co. Rd 4430_____ Gender: (Male) Female

_Brundidge, AL_

Phone (___) 735-3925____

Mom cell
268-6483

Parent/guardian _Elizabeth & Michael Reed_____

Other Household members (List Names, ages and relationship to victim)

_Jeremy Reed - brother, age 21_

_Jessica Reed - sister, age 18_

_Joseph Reed - brother, age 12_

Person Allegedly Responsible for Abuse/ Neglect Information:

Name _Charles Coon_____ DOB ___/___/___ Age_____

Address _____ Gender (Male) Female

_____

Allegations

_____Sexual abuse -_____

_____

_____

_____

_____

_____

Reed v. PCBE
125

## MULTI-DISCIPLINARY CHILD PROTECTION TEAM REFERRAL FORM

**I.    IDENTIFYING INFORMATION**

**Case Name**  Elizabeth Reed

**County**  Pike                                          **DHR Case #** 26411

**DHR Worker** Misty Hubbard                  **DHR Supervisor** Debbie Meeks

**Telephone #** 807-6143                         **Telephone #** 807-6167

**II.    REFERRAL INFORMATION**

**Referral Date** 8/9/05

**Referral Reason** (Check all that apply)

☐ Child Safety                    ☐ Foster Care Crisis              ☐ Adoption Crisis

☐ Treatment Needs Unclear    ☐ Arbitrate Difference In         ☒ Coordinate Resources
                                          Treatment Plan

☐ Other (Specify)  enter referral reasons (other than above) here

**Child(ren) To Be Presented**  (Include name, age, and sex)

Justin Reed, 15, male

**Family Profile** (Members Of Child's Household)

Elizabeth Reed, mother
Michael Reed, father
Jeremy Reed, brother, age 21
Jessica Reed, sister, age 18
Joseph Reed, brother, age 12

**Family Situation** (e.g., issues/crises and needs, living conditions, extended family support)

Justin Reed was indetified as a possible vitcim in another case.  He was interviewed at the CAC and it was verified that he was indeed a victim.  He and his sister are receiving counseling from Catholic Social Services in Montgomery.

**Medical, Educational, And/Or Psychological Needs And Results Of Any Tests Or Evaluations**

**Summary Of DHR's Work With The Family** (including assessment of child safety in the home)

DHR helped the family arrange counseling and will continue to ensure that Justin's emotional needs are being met.

**Other Professionals/Agencies Directly Involved With The Family**

PCSD, Catholic Social Services.

_Misty Hubbard, LBSW_                          8/9/05
Worker's Signature                                 Date

DHR FCS 1519 (September 2002)                                    125

## III.   MULTI-DISCIPLINARY TEAM'S ASSESSMENT AND RECOMMENDATIONS

**Assessment**

**Recommendations**

**Comments**

## IV.      DISPOSITION

☐ **Team Will Review Case**  enter date here          ☐ **Team Is Closing Case**  enter date here

**Date Assessment/Recommendations Given/Sent To DHR Worker**  enter date here

_____                    _____
Team Coordinator's Signature                                                              Date

DHR-FCS-1610 (September 2003)

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| JR, a minor by an through | * | |
| His parents EAR & TMR | * | |
| Plaintiff | * | |
| | * | CV:2:06-cv-1120-MEF |
| v. | * | |
| | * | |
| Pike County Board of Education et al. | * | |
| Defendants | * | |

## AMENDED NOTICE OF DEPOSITION

TO:    Donald B. Sweeney, Jr.
       One Federal Place
       1819 Fifth Avenue North
       Birmingham, AL  35203-2104

**PLEASE TAKE NOTICE** that the Plaintiff in the above stated case will take the deposition of Mona Watson at the Pike County Board of Education offices at 101 W. Love Street in Troy Alabama  on September 4, 2007 beginning at 10:00 a.m. and said deposition is to continue until completed. Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. 30* before an officer duly authorized to administer oaths.

**Request for Production of Documents:**

Plaintiff requests that the deponent named herein produce at the time and date of the deposition,  copies of the following records:

1. All records relating to the plaintiff in this action.

2. All records relating to the younger brother of the plaintiff.

3. All records relating to investigations of sexual abuse complaints against Defendant Charles Coon—whether relating to these children or any other children.



PLAINTIFF'S
EXHIBIT
20

Done this the 23rd day of August, 2007.

<u>Susan Shirock DePaola</u>

Attorney for the Plaintiff

**SUSAN SHIROCK DEPAOLA**
**1726 West Second Street ~ Suite B**
**Montgomery, Alabama    36106**

## PIKE REGIONAL CHILD ADVOCACY CENTER
## INVESTIGATIVE PROTOCOL

### Agencies:

**Pike County Department of Human Resources (DHR)**

**Pike County District Attorney's Office (DA)**

**Pike County Sheriff's Department (PCSO)**

**City of Troy Police Department (TPD)**

**City of Brundidge Police Department (BRD)**

**Pike Regional Child Advocacy Center (CAC)**

**Troy Regional Medical Center (TRMC)**

**East Central Mental Health (ECMH)**

**Pike County Juvenile Probation Services (PCJPS)**

*Reviewed and Executed By member Agencies: September 6, 2005*

AINTIFF'S
EXHIBIT
21

Reed v. PCBE
749

## PIKE REGIONAL CHILD ADVOCACY CENTER

## MISSION STATMENT

The mission of the PRCAC Board and member agencies is to protect children in a safe, child friendly environment through a collaborative approach in a effort to minimize the child victim's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's of abuse and their families; to prevent the occurrence or recurrence of abuse or neglect through effective community services for children and families by providing a holistic approach to prevent, investigate, prosecute, and treat victims of child abuse and neglect.

The purpose of this protocol is to establish a guide for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse.  Such cases should be consistent with the definitions found in the Code of Alabama, 1975 Section 26-16-2, and remain consistent with the proper investigative authority vested in DHR and law enforcement.

This protocol neither creates additional authority nor limits or modifies the existing authority of the parties.  This protocol is merely intended to establish

written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reported or suspected child abuse and neglect in Pike County, Alabama.

1.   **Disclosure and Reporting:** As soon as the CAC or law enforcement receives a report of suspected sexual or physical abuse or of neglect, DHR **must** immediately be notified by telephone or direct communication. This should be followed up by a written report. Notification of reports of suspected sexual abuse and severe physical abuse **must** be made to the DA's office in writing by DHR. (Code of Alabama, 1975 Section 26-14-3) Law Enforcement and the CAC are mandated by law to report all suspected Child Abuse and Neglect (CA/N) to DHR. The Department of Human Resources will screen the information to determine if a CA/N report exists. When a complaint is received, the DHR Child Abuse/Neglect (CA/N) investigator will notify the law enforcement agency and coordinate jointly the initial investigative process. At times, it may be necessary for the DHR investigative worker to request accompaniment/assistance from Law Enforcement while conducting interviews (as a safety precaution).

After-hours communication between law enforcement and DHR will be accomplished through an after-hours paging network. DHR

Reed v. PCBE
751

social workers will develop a schedule designating a worker to carry the after-hours pager. All law enforcement agencies and local hospitals may contact the on-call worker or supervisor through the DHR after-hour answering service. If a report of suspected child abuse/neglect is called in to law enforcement, the dispatcher should notify the worker on call. If, for some reason, the on-call worker cannot be reached, the Service Supervisor should be contacted to handle to situation. If immediate response is necessary, and law enforcement is not already responding to the situation, DHR will contact the appropriate law enforcement agency for assistance.

2.    **Team Interview:**    In emergency situations, DHR and Law Enforcement will begin an investigation on-site with representatives from both agencies present when possible. **In-depth interviews of child victims should be conducted at the CAC unless emergency circumstances dictate otherwise.** DHR or law enforcement, depending on which agency receives the initial call, will decide if the case is one in which the initial interview can be scheduled at the CAC or if preliminary on-site contact is necessary. Follow-up inter-views with the victim should be done in child friendly environment of the CAC. DHR, law enforcement or the DA may schedule interviews at the CAC. The CAC forensic interviewer will notify the other appropriate agencies of the date and time of the

planned interview. Non-offending family members' interviews *may* also be scheduled at the CAC. When interviews involving clients of DHR are scheduled, notification to the DHR Social Worker will be made.

Child interviews will be done with complete separation of victim and offender, and in a manner to allow observation by (MDT) Multi-Disciplinary Team Members. **Suspected offenders are not allowed at the CAC.** Perpetrator interviews in cases where prosecution seems possible should be conducted by law enforcement as soon as possible after the child interview. DHR and law enforcement may conduct joint perpetrator interviews if practical. The law enforcement agency with jurisdiction in criminal abuse cases should be notified of child interviews. Interviews of child victims should include participation by all team members with investigative responsibilities in the case. Such interviews shall be conducted at the CAC with MDT members observing on close circuit monitors. It is in the best interest of the child to have one examiner conducting interview as other MDT members observe.

## Before the interview the Team Members should:

1. Explain their individual roles to the family members (or attending adults).

2. Separate the child from the attending parent or adult if practical.

3. Separate siblings to interview individually.

4. Interview parents or caretakers concerning knowledge of the abuse.

*Child interviews done at the CAC will be done by trained Forensic Interviews in a manner, which is legally sound, non-duplicative, non-leading and neutral.*

## After the interview Team Members should:

1. Discuss the allegations and details provided by the child.

2. Establish a case plan to complete the investigation. Assign tasks to various team members. This may include counseling, a forensic evaluation of the victim, medical examination, additional interviews, etc.

3. Prepare a safety plan if indicated to insure the safety of the child.

4. Meet the child's non-offending parent or caretaker and explain the case plan.

5. The team member designated to take notes will prepare a written summary of the interview including the time, date and who was present, names, addresses and phone numbers of

child, family and witnesses; to be shared with all team members with investigative responsibilities in the case.

3.  **Case Review:** Pending cases will be reviewed at least monthly by MDT members and an Assistant DA. Case reviews should include all team members with involvement in the case. CAC staff will notify representatives of the DA, DHR, LE, medical professionals, Counselors, etc. of cases set for review. Every effort will be made to reach a mutual agreement on recommendations concerning an appropriate course of action for individual cases. However, this protocol recognizes that LE, DHR or any interested party may petition the court on behalf of the child victim.

4.  **Counseling:** Counseling will be available at not cost for victims and non-offending family members at the CAC. MDT members may refer victims for counseling or Forensic Evaluations as deemed necessary. Forensic evaluations and counseling conducted at the CAC will be done in a manner consistent with legal, ethical and professional standards.

5.  **Prosecution:** The decision to prosecute or not is a decision made exclusively by the DA with input from MDT members as well as the victim and family members. Child abuse cases are generally

referred to the Grand Jury for review, but warrants may be issued as deemed appropriate by the DA. The CAC will work with the child victim and family in matters concerning court. DHR will work with the family to ensure that the child remains safe. Law enforcement will conduct a thorough criminal investigation in an effort to present the DA all necessary information.

6.    **Medical Evaluations:** MDT members will refer children for medical evaluations and treatment as needed. In the event the team determines medical assistance is required, every effort will be made to schedule an appointment for the child prior to leaving the CAC. Sexual Abuse exams are available at not cost through prior arrangements with **Dr. Stephen Coleman** or Troy Regional Medical Center. Should any problems arise regarding a physical examination of a victim, Dr. Coleman should be contacted immediately.

7.    **Victim Support:** The Victim's Advocate for the CAC or the DA's office will maintain contact with victims and families throughout the investigation and prosecution providing; support, crisis intervention and information concerning case status, court dates, victim's rights, local services, etc.

8.  **Case Tracking:**  The CAC Case Manager will track all abuse cases pending in the child protective and criminal justice system. Information will include client demographics, case outcome and appropriate statistical information.  MDT members will have access to tracking information.

9.  **Confidentiality of Records:**  All the parties to this Protocol agree to maintain, within the bounds allowed by law, the confidentiality of all records and information gathered on suspected child abuse and neglect cases as outlined in <u>Code of Alabama</u> 1975,  Section 26-14-8. All parties further agree not to release any records or information on any child abuse or neglect case except as it relates to legitimate program operations of their respective agency.  No general media or public access to information and records will be allowed.  Appropriate information will be shared among MDT members unless prohibited by legal, ethical or professional standards of practice.

PIKE REGIONAL CHILD ADVOCACY CENTER

\*\*\*\*

**Protocol for Joint Family Intervention**

**Pending Criminal Investigation and Prosecution**

I.    **PURPOSE:**  The following Protocol for the Department of Human Resources (DHR), the District Attorney (DA), and law enforcement is intended as a guide for cognitive joint intervention in cases of suspected child abuse or neglect of such severity that the alleged offender is arrested for prosecution.

II.    **PARTIES:**  The parties to this protocol are the Pike County Department of Human Resources, the Pike County District Attorney's Office, the Pike County Regional Child Advocacy Center, and the following law enforcement entities:

Pike County Sheriff's Department

City of Troy Police Department

City of Brundidge Police Department

**III.    RESTRICTION:** This protocol neither creates additional authority nor limits or modifies the existing authority of the parties. This protocol is merely intended to establish written procedures to which the parties will attempt to adhere in order to coordinate and integrate interventions in cases of reports of suspected child abuse and neglect in Pike County, Alabama.

**IV.    DEFINITIONS:**

*ABUSE:*        Section 26-14-1 (1), as amended defines "abuse" as harm or threatened harm to a child's health or welfare. Harm or threatened harm to a child's health or welfare can occur through non-accidental physical or mental injury, sexual abuse or attempted sexual abuse, or sexual exploitation or attempted sexual exploitation. "Sexual abuse" includes the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or having a child assist any other person to engage in any sexually explicit conduct or any simulation of the conduct for the purpose of producing any visual depiction of the conduct; or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children as those acts are defined by Alabama law. "Sexual exploitation" includes allowing, permitting or encouraging a child to engage in prostitution and allowing, permitting, encouraging, or

engaging in the obscene or pornographic photographing, filming, or depicting of a child for commercial purposes.

*NEGLECT:*    Section 26-14-1 (2), as amended defines "neglect" as negligent treatment or maltreatment of a child, including the failure to provide adequate food, medical treatment, supervision, clothing, or shelter.

*CHILD:*    Section 26-14-1 (3) defines a "child" as a person under the age of 18 years.

*LAW ENFORCEMENT:*    Any official or employee of the Pike County Sheriff's Department, or the city police departments of Troy and Brundidge.

*TEAM:*    A DHR planning team composed of persons *directly* involved with individual children and their families.  The team shall include at a minimum the child, if age appropriate; the child's parent(s); foster parent(s), if the child has been removed from home; DHR staff, and the DA or his designee.

V.    **PROCEDURES:**

   *A.*    REPORTING.  All parties to this protocol agree to report incidents of suspected child abuse and neglect as required by law.  *All non-Department of Human Resources parties agree to notify DHR immediately of all reports or incidents of suspected child abuse or neglect which come to their attention.*

B.   ARREST:

1.   Law enforcement shall notify DHR and the DA within 72 hours after an alleged perpetrator of abuse or neglect has been arrested on related criminal charges.

2.   DHR and the DA shall make a joint determination within 72 hours of the arrest as to whether contact between the alleged perpetrator and the child victim should be restricted.

3.   If the parties concur that it is necessary to seek legal remedies to further protect the child victim, a petition shall be filed with the appropriate court having jurisdiction.  The petition shall request a restraining order directing the alleged perpetrator to stay away from the home and imposing any other restrictions deemed necessary for protection.

C.   TEAM MEETINGS:

1.   In all cases where an arrest on criminal charges related to abuse or neglect has been made, the case shall be scheduled for review at a Team meeting to discuss issues relating to contact (e.g., placement, reunification, visitation, or mail/telephone contact) between the alleged perpetrator and the child victim or other children or modifications to restrictions previously imposed.

2.   All Team members shall be notified in advance of Team meetings, but all need not be present for meetings to occur. The expressed opinion of absent Team members shall be

considered at such meetings. Follow-up meetings to consider new issues or modifications of previous decisions shall be held.

3.     If there is disagreement among the Team members regarding contact between the alleged perpetrator and the victim or other children, the dispute will be submitted to the County DHR Director and the DA for discussion. If the dispute can not be resolved at this level, the matter will be submitted to the appropriate court for resolution.

**VI.  CONFIDENTIALITY OF RECORDS:**    All the parties to this Protocol agree to maintain, within the bounds allowed by law, the confidentiality of all records and information gathered on suspected child abuse and neglect cases as outlined in Code of Alabama, 1975   Section 26-14-8. All the parties further agree **not** to release any records or information on any child abuse or neglect cases except as it relates to legitimate program operations of their respective agency. No general media or public access to information and records will be allowed.

**VII.  EFFECTIVE DATE:**  This protocol shall become effective on the date signed by all parties.

**VIII.  TERMINATION OF PROTOCOL:**  This protocol may be terminated by any party upon three days notice in writing to the other parties.

Reed v. PCBE
762

## PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

_____
Office of the District Attorney
Twelfth Judicial Circuit
Troy, AL

_____
East Central Mental Health/Mental
Retardation, Inc.
Troy, AL

_____
Pike County Department of Human
Resources
Troy, AL

_____
Charles Henderson Child Health
Center
Troy, AL

_____
Troy Regional Medical Center
Troy, AL

_____
Pike Regional Child Advocacy
Center
Troy, AL

_____
Pike County Juvenile Probation Services
Troy, AL

_____
Pike County Sheriff's Department
Troy, AL

_____
City of Troy Police Department
Troy, AL

_____
City of Brundidge Police Department
Brundidge, AL

_____
Dr. Stephen Coleman
Forensic Medical Evaluator, Troy, AL

Executed this the 27th day of February 2007.

**Pike Regional Child Advocacy Center**
**(PRCAC)**

*Multi-disciplinary Team Inter-agency Agreement*

THIS AGREEMENT made and executed this 6th day of September, 2005, by and between the Pike Regional Child Advocacy/Family Resources Center Board and the following entities:

Pike County District Attorney,
12th Judicial Circuit
Pike County Sheriff's Department
City of Troy Police Department
City of Brundidge Police Department
Department of Human Resources
Troy Regional Medical Center
Charles Henderson Child Health Center
East Central Mental Health/Mental Retardation
Pike County Juvenile Probation Services
Board of Education, Pike County Schools
Board of Education, Troy City Schools

## Article I – Mission:

To provide a safe child-friendly environment in which child abuse victims are protected through a collaborative approach in an effort to minimize the child's trauma by reducing the number of interviews and persons involved in the investigation; to improve the quality of factual and forensic evidence collected; to reduce the number of court appearances; to efficiently and successfully prosecute child sexual and physical abuse cases as well as provide counseling and follow-up services to victim's and their families; to prevent the occurrence or recurrence of abuse and/or neglect through effective community services to children and families by providing a holistic approach to prevent, investigate, prosecute and treat victims of child abuse and neglect.

## Article II - Statement of Problem:

Victims of child abuse and their families in Pike County are underserved and in other instances, inadequately served due to a lack of coordination, collaboration, education and delivery of the numerous varied services that are available in Pike County and surrounding areas to victims and their families. The Pike Regional Child Advocacy Center's (hereinafter CAC) ultimate goal is to address and alleviate the problems by designing its services to address the specific needs and fragile condition of children who have been physically,

PLAINTIFF'S
EXHIBIT
2-2

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0134

emotionally and sexually abused. Pike County and its sister counties which are not served by a CAC, are in need of a structured, organized, Child Advocacy Center that is convenient and centrally located to most of the essential service provider. Crimes of sexual violence and physical abuse committed against and by our children appear to be on the rise in our community. The District Attorney in conjunction with other agencies has identified a need to create a consortium of agencies to investigate, provide forensic assessments, coordinated crisis intervention assistances and counseling to victims and their families, public awareness, education, tracking and prosecution of offenders. A high level of commitment has been demonstrated by a strong showing of support from the general community, medical and mental health professionals, educators as well as law enforcement in attendance at our Children's Policy Council Focused Groups and through letters of support.

## Article III – Statement of Need:

No single agency within Pike County has the resources necessary to combat child abuse and all its attending consequences to a victim and family. No single agency alone has sufficient resources to commit to sustain a Child Advocacy Center with the resources which a family in crisis needs when dealing with child abuse. Even though Pike County is in the developmental stage of a Child Advocacy Center, for many years the multi-disciplinary team model has been used by those agencies when handling child abuse cases. Uniting all of the available resources and agencies under on the PRCAC umbrella, will establish a mechanism for coordination and collaboration for the agencies that are legally responsible for protecting the lives of children, and investigating and prosecuting cases of child sexual and physical abuse. The outpouring of public support is added evidence of the need and desire of this community to establish a Child Advocacy Center.

## Article IV – Statement of Objective:

The PRCAC Board, the agencies and/or entities who execute this agreement, hereby agree to unite to work with each other, the State, Federal and local law enforcement agencies to operate a Special Victims Unit and Multi-disciplinary Team, through the CAC to attack the child abuse and other related family violence problems within our community through a holistic approach.

## Article V – Statement of Purpose and Understanding:

The aforementioned member agencies enter into this Agreement to create and perpetuate the Pike Regional Child Advocacy Center for the purpose of combining resources to combat the problems of child abuse and its consequences to the family. *Nothing in this agreement creates additional authority nor limits or modifies the existing authority of the parties set forth under the applicable laws.* The parties to this Agreement specifically agree as follows:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0135

1. To provide a consortium of need appropriate services to abuse victims and families through a multi-disciplinary team approach.
2. To provide a child and family friendly environment where services are easily accessible and appropriate to victims' needs.
3. To coordinate through the Multi-disciplinary Team, interviews; forensic evaluations; medical examines; counseling and follow-up services.
4. To coordinate the efforts of Special Victims Unit and the Multi-disciplinary Team for efficient and successful prosecution of offenders.
5. To continue to stimulate public support by education and awareness of the problems of abuse and ways to combat the problems in our community.
6. To provide our medical staff with the most up to date training and medical equipment for detecting abuse of children and neglect.
7. To provide law enforcement with the most up to date training and equipment for detecting, and documenting evidence of child abuse and neglect.
8. To provide the prosecutors with the most current trends in prosecuting child abuse and neglect cases.
9. To provide counseling and follow-up services to victims and their families in an effort to promote the healing process.
10. To maintain an accurate data base of victims, offenses, disposition of cases and offender tracking.
11. To share information and resources to enhance the investigation and prosecution of child physical and sexual abuse cases while facilitating the treatment of the child victims and their families.
12. To direct the resources, experience, training and commitment of all agencies to bear on the consequences and problems of abuse those victims and their families must combat.
13. To promote training and educational opportunities for all agencies involved in fighting child abuse.
14. To promote education and awareness in at all level of our community to prevent the occurrence or recurrence of child abuse.

## Article VI -  Lead Agency:

The District Attorney's is hereby designated the lead agency for directing the Special Victim's Unit, Multi-disciplinary Team and   in conjunction with the PRCAC Board  making application for grant funds, accepting grant funds, accounting for use  and administration of grant funds, and collecting local cash matches when required.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0136*

## Article VII – Establishment of Board:

By execution of this agreement, each participating entity affirms its support of the Board of Directors of the Pike Regional Child Advocacy Center. Said Board shall establish the general policies of the CAC by the adoption of the same as stated herein or as amended. The Board shall meet at least annually which may include conference calls, document circulation, and/or in person.

## Article VIII – Confidentiality:

*All agencies will adhere to their individual confidentiality requirements as prescribed by law. Furthermore, the undersigned agencies and their representatives agree that information pertaining to children and their families will be held in the strictest confidence. Information will be shared outside the team only as it is needed to properly investigate a case, develop a case plan or carry out the treatment or dispositional recommendation or by Court order.*

## Article VIIII – Disclaimer:

It is expressly understood that each of the undersigned agencies has specific responsibilities imposed by law and will continue to perform those functions designated to them. Nothing contained herein supersedes that statutes, rules and regulations governing each agency. In the event that any provision of this agreement is inconsistent with any statute, rule or regulation, the statute, rule or regulation shall prevail.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0137

## PIK REGIONAL CHILD ADVOCACY/FAMILY RESOURCES CENTER

## PARTICIPANTS IN INTERAGENCY INVESTIGATIVE PROTOCOL

Signatures of Authorized Agency Representatives:

_____
Office of the District Attorney
Twelfth Judicial Circuit
Troy, Alabama

_____
Pike County Department of Human
  Resources
Troy, Alabama

_____
East Central Mental Health/Mental
Retardation, Inc.
Troy, Alabama

_____
Charles Henderson Child Health Center
Troy, Alabama

_____
Troy Regional Medical Center
Troy, Alabama

_____
Pike Regional Child Advocacy/Family
  Resources Center
Troy, Alabama

_____
Pike County Juvenile Probation
  Services
Troy, Alabama

_____
Pike County Sheriff Department
Troy, Alabama

_____
City of Troy Police Department
Troy, Alabama

_____
City of Brundidge Police Dept.
Brundidge, Alabama

Executed this the 6th day of September 2005

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0138

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

**JR v. Pike County BOE**
Produced by Defendant PCBE
**No. 0133**

# Interpretive Report of WISC-III Testing
## The Psychological Corporation

NAME: Justin Reed
AGE: 13 years 6 months
DATE OF BIRTH: 07/28/89
GENDER: Male
ETHNICITY: White
GRADE: 7th
SCHOOL: Pike County High

REPORT DATE: 05/16/03
EXAMINER: Robert L. Hudson
TITLE: School Psychometrist
TEST SITE: PCHS

**Test Administered:** WISC-III (02/13/03)

SCORES SUMMARY

| WISC-III SCALE | SCORE |
| --- | --- |
| Verbal (VIQ) | 57 |
| Performance (PIQ) | 58 |
| Full Scale | 53 |

## Reason for Referral

Justin was referred for an evaluation by Pike County Board of Education because of a required reevaluation. On a previous intelligence evaluation, the WISC-III, given on 02/14/00, Justin achieved a Verbal I.Q. score of 75, a Performance I. Q. score of 80, and a Full Scale I.Q. score of 76. This evaluation will help to determine if Justin is in need of or should continue special education and/or related services.

## Home

Justin is a 13-year-old teenager who lives with his mother. Three children besides Justin live in the home.

PLAINTIFF'S
EXHIBIT
23

## Behavior Observations

The testing session began at 8:20 A.M. and ended at 8:55 A.M. on Thursday. There were no interruptions during the evaluation process and was completed in one sitting. Justin's behavior during the test session was that he appeared to be distracted. He seemed to hurry through the test items. Justin was appropriately dressed and adequately groomed. Other than seeming in a hurry, he interacted appropriately with the examiner. Rapport was easily established and he was able to provide all requested background information. Justin attended well to test instructions and his speech was intelligible.

The WISC-III was felt to be the appropriate measure for assessing his general intelligence because it is considered to be a reliable and well-standardized instrument.

## Interpretation of WISC-III Results

Justin may experience great difficulty in keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities. His general cognitive ability is within the intellectually deficient range of intellectual functioning, as measured by the Wechsler Intelligence Scale for Children--Third Edition. His overall reasoning abilities exceed those of approximately 1% of students his age (FSIQ = 53; 90% confidence interval = 50 - 60).

His ability to think with words is comparable to his ability to reason without the use of words. Both Justin's verbal and nonverbal reasoning abilities also are in the intellectually deficient range. His verbal reasoning abilities are above those of approximately 1% of his peers (VIQ = 57; 90% confidence interval = 54 - 64). His nonverbal reasoning abilities are better than those of approximately 1% of students Justin's age (PIQ = 58; 90% confidence interval = 55 - 69).

## Summary

Justin is a 13-year-old teenager who completed the WISC-III. He was referred for testing because of a required reevaluation. His general cognitive ability, as estimated by the WISC-III, is intellectually deficient (FSIQ = 53). Justin's verbal and performance ability scores were also both in the intellectually deficient range (VIQ = 57, and PIQ = 58).

Justin Reed

05/16/03

3

**Recommendations**

It is recommended that the Multidisciplinary Eligibilty Determination Commitee carefully review all necessary and available data in order to make a determination as to Justin's eligibility to receive special education and/or related services.

This report is valid only if signed by a qualified professional:

Robert L. Hudson
School Psychometrist

IQ SCORES SUMMARY

| SCALE | IQ | 90% CONFIDENCE INTERVAL | PR | CLASSIFICATION OF INTELLECTUAL FUNCTIONING |
|-------|-----|------------------------|-----|------------------------------------------|
| Verbal | 57 | 54- 64 | <1 | Intellectually Deficient |
| Performance | 58 | 55- 69 | <1 | Intellectually Deficient |
| Full Scale | 53 | 50- 60 | <1 | Intellectually Deficient |

Difference Between VIQ and PIQ = 1 ( ns, Freq =96.7%)

INDEX SCORES SUMMARY

|  | INDEX | 90% CONFIDENCE INTERVAL | PR |
|--|-------|------------------------|-----|
| Verbal Comprehension | 59 | 56- 67 | <1 |
| Perceptual Organization | 56 | 53- 67 | <1 |

SUBTEST SCORES SUMMARY

| VERBAL SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|-----------------|-----------|--------------|-----|
| Information (IN) | 11 | 3 | 1 |
| Similarities (SM) | 8 | 1 | <1 |
| Arithmetic (AR) | 13 | 3 | 1 |
| Vocabulary (VO) | 20 | 3 | 1 |
| Comprehension (CO) | 14 | 2 | <1 |

| PERFORMANCE SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Picture Completion (PC) | 13 | 2 | <1 |
| Coding (CD) | 39 | 5 | 5 |
| Picture Arrangement (PA) | 15 | 3 | 1 |
| Block Design (BD) | 25 | 4 | 2 |
| Object Assembly (OA) | 10 | 1 | <1 |

*WISC-III Writer Windows Version 1.0*

Listening Comprehension and Oral Expression

Name: Reed, Justin O                    Sex: Male
Test Date: 05/10/2005                   Grade/Ed Level: 9
Birth date: 07/28/1989                  School: PCHS
Age: 15-9                               District:
Teacher/Counselor: Green                Examiner: Calhoun

Reason for testing:

The Oral and Written Language Scales (OWLS) is a measure of receptive and
expressive language for children and young adults.  The scoring and
interpretation of the Listening Comprehension (LC) and Oral Expression (OE)
Scales is provided by the OWLS LC/OE ASSIST.  This ASSIST also provides
interpretation of the Oral Composite, which represents an overall level of
oral language functioning.  For further guidance in interpretation, see the
OWLS test manual for these scales.

## SCORE SUMMARY

| Scales | Raw Score | Standard Score | Conf. Level | Conf. Interval | %ile | Test-Age Equiv | NCE | Stanine |
|--------|-----------|----------------|-------------|----------------|------|----------------|-----|---------|
| Listening Comp. | 68 | 77 | 90% | 68 - 86 | 6 | 9-2 | 18 | 2 |
| Oral Expression | 50 | 66 | 90% | 56 - 76 | 1 | 6-11 | 2 | 1 |
| Oral Composite |  | 70 | 90% | 64 - 79 | 2 | 8-1 | 8 | 1 |

## COMPARISON OF EXPRESSIVE AND RECEPTIVE SCALE SCORES

| Scales | Stand. Score Difference | Signif. Level | Frequency of Difference |
|--------|-------------------------|---------------|-------------------------|
| Listening Comprehension > Oral Expression | 11 | .15 | >25% |



PLAINTIFF'S
EXHIBIT
24

COPYRIGHT 1995, AMERICAN GUIDANCE SERVICE, INC., CIRCLE PINES, MN 55014-1796

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JR a Minor, by his mother and father          *
EAR and TMR                                   *
              Plaintiffs       *
                          *    Civil Action No.: 2:06CV1120-MEF
v.                                            *
                          *
PIKE COUNTY BOARD OF                          *
EDUCATION, et al.,                            *
                          *
             Defendats        *
                          *
                          *
                          *

## AMENDED NOTICE OF DEPOSITION

TO:    Donald B. Sweeney, Jr.
        One Federal Place
        1819 Fifth Avenue North
        Birmingham, AL 35203-2104

**PLEASE TAKE NOTICE** that the Plaintiff in the above styled proceeding will take the deposition of defendant **Andrew Wright** at the Pike County Board of Education the Pike County Board of Education located at 101 West Love Street, Troy Alabama, 36081 beginning on October 1, 2007 at 10:30 a.m. and said deposition is to continue until completed.

      Such deposition will be taken upon oral examination for the purpose of discovery or as evidence, or both, pursuant to *Fed. R. Civ. P.* Rule 30(b) (6) before an officer duly authorized to administer oaths in the state of Alabama. The parties have stipulated that the deposition will be admissible in these proceedings as it relates to the authority of said officer to administer said oaths pursuant to Rule 29 F. R. Civ. P.



PLAINTIFF'S
EXHIBIT
25

Done this the 12th day of September, 2007.

S/ Deanie C. Allen

Attorney for the Plaintiff


SUSAN SHIROCK DEPAOLA
1726 West Second Street ~ Suite B
Montgomery, Alabama    36106

DEANIE C. ALLEN
Aliant Center, Fourth Floor
2740 Zelda Road
Montgomery, Alabama 36106

PLAINTIFF'S
EXHIBIT
26

## AFTERCARE SERVICE SUMMARY
### Please keep this document and take it to future appointments.

**Patient Name:  Justin Reed**
**DOB: 7/28/89**
**County:  Pike**
**Parent/Guardian:  Ann and Thomas Reed**
**Date Admitted: 4/17/07**
**Date Discharged: 4/24/07**

**Medications at Discharge:  Lexapro 20 mg. qd, Adderall XR 20 qam**

### Diagnosis:

Axis I:    Depressive Disorder NOS, PTSD, ADHD by history
Axis II:   None
Axis III:  PVC on EEG, on review patient is not symptomatic
Axis IV:   Sexual abuse, Conflict with parents, Peer problems
Axis V: GAF at Admission=   45   GAF at Discharge= 50

**Recommended Services:**
1. Removal of all firearms and/or lethal weapons from the home environment.
2. Continue to take medication as prescribed.
3. Keep follow up appointment with Dr. Wright on 4/25/07 at 8:30 am.
   Continue outpatient therapy with Andrew Wright.


_____

Nasima J. Amin, M.D.
Psychiatry Resident

Kathy A. Fleming, LCSW, PIP
Psychiatric Adolescent Social Worker

Reed v PCBE
634

# PROGRESS NOTE
(Face-to-Face Services)
## East Central Mental Health - Mental Retardation, Inc.

DATE: 2-26-07
LOCATION: PIKE

| Case # | Client Name | RU | Activity Code | # in Group | Staff ID# | Time of Event | Time Spent |
|--------|-------------|-----|---------------|------------|-----------|---------------|------------|
| 14689 | Justin Reed | 111 | 14/24 | | 484/5589 | :15 | :15 |

**NEXT APPOINTMENT:** DAY: (Mon.) Tues. Wed. Thur. Fri.  DATE: _____  TIME: _____

**SERVICES PROVIDED:** ____ Individual Therapy ____ Group Therapy ____ Family Therapy ____ Case Management
____ Ind BLS ____ Group BLS ____ Crisis Intervention ✓ Phys. Assess. ✓ Med. Monit. ____ Consult
____ Family Support / Education

_____ **TOP COPY** - Client / **WHITE ORIGINAL WITH NOTE** - Chart _____

**MENTAL STATUS: (Check Where Applicable):**

Affect: ✓ Appropriate ____ Blunted ____ Labile ____ Constricted ____ Flat ____ Inappropriate

Mood: ____ Anxious ____ Dysphoric ____ Euthymic ____ Expansive ✓ Irritable

**THOUGHTS OR PERCEPTIONAL DISTURBANCES:** mother + ? good health

____ Hallucinations ____ Delusions
____ Suicidal ____ Homicidal ____ Paranoid ____ N/A
**COMMENTS:** 17 c.ō. 11 ā special Ed chele Wilson
No psycho b.c.

**MED. COMPLIANCE:** ____ Yes ____ No  **COMMENTS:** pt (sleep) well

**SLEEP:** ____ Good ____ Fair ____ Poor ____ Insomnia ____ Nightmares ____ Hypersomnia
**APPETITE:** ✓ Good ____ Fair ____ Poor
**ORIENTED TO:** ____ Normal  **DEFICITS:** ____ Person ____ Place ____ Time ____ Situation
**MOTOR ACTIVITY:** ____ Calm ____ Restless ____ Shaking/Tremor ____ Tics ____ Pacing ____ Catatonic
**COMMENTS:** 17 yo 120/78 B/P wt # Crisis referral.
History - Sexual abuse by teacher 2yrs. ago - mild MR - ADHD, Aggressive
Auditory hallucinations - see referral previously on Concerta

**PROBLEMS/GOALS ADDRESSED:** ↑ P↓ + MH ↑Risperdal

Reed v. PCBE
638

**PROGRESS/ASSESSMENT:** Currently

Risperdal m Tab. 1, tb

**OCUS FOR NEXT SESSION:**

PLAINTIFF'S
EXHIBIT
27

2-26-07

ECMH 006

# East Central Mental Health - Mental Retardation, Inc.
## Plan of Care and Order of Services

| | | | | |
|---|---|---|---|---|
| _Justin Reed_ | | Case Number: _14689_ | | Date: _3-26-07_ |

| Diagnosis: | DSM-IV Code | Description | Addition and/or Revision (if needed) | Date of Addition and Revision (if needed) |
|---|---|---|---|---|
| AXIS I: | 304.01 | Attention deficit Hyperactivity Disorder, Predominantly Inattention Type, In Partial Remission | | |
| ~~AXIS II.~~ | 309.81 | Post traumatic Stress Disorder | | |
| Axis II AXIS III: | 296.3x → V62.89 | Major depressive Disorder, Severe, with psychotic features Borderline Intellectual Functioning | | |
| AXIS IV: | | Sexual Abuse (2005) | | |

| AXIS V: | Current GAF/CGAS: 65 | GAF/CGAS at 6 mos: |
|---|---|---|
| | Highest Past Year: 65 | GAF/CGAS at closure: |

Comments: _Client has history of behavior problems as well as experience some degree of sexual abuse 2 years ago._

Identified Strengths Which May Facilitate Treatment:
① _client is motivated to do better._
② _client is now compliant with meds._

Identified Limitations or Barriers Which May Impede Treatment:
① _Client is borderline intellectual functioning_
② _Client sometimes makes poor decisions_

### Prioritization of Problem Areas / Clinical Needs

① _eliminate aggression_
② _reduce behavior problems_
③ _explore and treat sexual abuse_

PLAINTIFF'S EXHIBIT
28

Reed v. PCBE
676

| Life Needs: | (Check Appropriate Categories) | Date: |
|---|---|---|

(For Case Management Use)    Case Mgr. Signature:

| | | | | |
|---|---|---|---|---|
| ☐ 1. Emotional/Psychological | ☐ 2. Psychiatric | ☐ 3. Safety/Crisis | ☐ 4. Financial | ☐ 5. Housing |
| ☐ 6. Family/Social Support | ☐ 7. Legal | ☐ 8. Thinking | ☐ 9. Vocational | ☐ 10. Communication |
| ☐ 11. Self Direction Learning | ☐ 12. Leisure | ☐ 13. Behavior | ☐ 14. Ed/Learning | ☐ 15. Role Performance |
| ☐ 16. Mobility Transportation | ☐ 17. Language | ☐ 18. Self-Care | ☐ 19. Self-Sufficiency | ☐ 20. Health/Medical |
| ☐ 21. Substance Use Abuse | ☐ 22. Spiritual/Cultural | ☐ 23. Other | ☐ 24. Other | |

CMH-009

# United States District Court for the Middle District of Alabama

## SUBPOENA IN CIVIL CASE

### *JR v. Pike County Board of Education et al*
### Case Number 2:06-cv-1120

**TO:**   **Lucia Grantham**
**104 McCartha Hall**
**Troy, Alabama 36081**

A subpoena may be served by the sheriff, by his deputy, or by any other person who is not a party and who is not less than 18 years of age. Service of the subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for one day's attendance and the mileage allowed by law under the Federal Rules of Civil Procedure, USCS.

---

☐ YOU ARE COMMANDED to appear in the United State District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM | DATE AND TIME |
|-------|-----------|---------------|
|       |           |               |

---

x☐ YOU ARE COMMANDED to produce at the place, date, and time specified below, the following documents or objects:

| PLACE | DATE AND TIME |
|-------|---------------|
| Produce all documents provided to Pike County High School in the sexual abuse training held on February 15, 2002. See attached. | 10/1/07  1:30 p.m. |

---

x☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE | DATE AND TIME |
|-------|---------------|
| Pike County Board of Education | 10/1/07 |
| 101 W. Love Street | 1:30 p.m. |
| Troy, AL 36081 | |

---

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|----------|---------------|
|          |               |

---

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person must testify. Federal Rules of Civil Procedure, 30(b)(6).

---

| ISSUING OFFICER'S NAME, TITLE, & ADDRESS | PHONE & FAX NUMBERS |
|---|---|
| **Deanie C. Allen (ALL067) Attorney for Plaintiff** | |
| **Aliant Center** | |
| **2740 Zelda Road** | **(334) 265-8551** |
| **Montgomery, Alabama 36106** | **(334) 264-9453 - FAX** |

SIGNATURE *Deanie C. Allen*                     DATE  9-12-17



PLAINTIFF'S
EXHIBIT
289

## PROOF OF SERVICE

| DATE SERVED<br>September 12, 2007 | PLACE<br>104 McCartha Hall<br>Troy, AL 36081 |
|---|---|
| PERSON SERVED ON (PLEASE PRINT)<br><br>Lucia Grantham | MANNER OF SERVICE<br><br>Certified Mail |
| PERSON SERVED BY (PLEASE PRINT) | TITLE |

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on: _____

By _____

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraphs (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any parties, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expenses, travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows the substantial need for the testimonial material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

INSERVICE SCHEDULE
PIKE COUNTY SCHOOLS
FEBRUARY 15, 2002

7:40 - 11:15    Teachers report to individual schools for activities developed by the
                Principal (Principals should submit morning schedules to Dr. Bazzell)
                Goshen Elementary - Grade Book training by Marvin Jackson/Mona
                Watson

11:15 - 12:30   Lunch

**ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE
COUNTY ELEMENTARY SCHOOL**

12:30 - 3:30    Selected teachers (New teachers hired after 8-1-01, and teachers absent on
                August 1, 2001), Diversity Training - report to the computer lab in
                Building 100, at the bottom of the hill. Presenter: Karen Berry

12:30 - 1:45    4th Grade teachers - Groundwater Festival Training - Room 208
                Presenter: Michael Mullen & GWF staff, Troy State University

12:30 - 1:45    All other teachers and instructional assistants report to the Gym - What is
                Bullying? Presenter: Carolyn Burks

1:45 - 2:10     Break (Snack area will be open for purchases)

2:10 - 3:30     *   Science Teachers - Grades 6-12 Environmental Awareness Training -
                    Presenter: Michael Mullen, Troy State University, Room 210

                *   English Teachers - Grades 6-12 Writing and Reading - Facilitators:
                    Carolyn Burks/Demetric Sermons, Room 209

                *   All other High School Teachers - Facilitator: Dr. Bazzell, Room 205
                    Block Scheduling - Instructional Strategies, Discipline

2:10 - 2:50     *   K - 2nd Teachers - Recognizing Sexual Abuse, Room 201
                *   3rd - 5th Teachers - Reading- Running Records, Room 202
2:55 - 3:30     *   K - 2nd Teachers - Reading - Running Records, Room 202
                *   3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201

                    Presenter: Wendy Watson - Running Records
                    Presenter: Lucia Grantham, Troy State University - Sexual Abuse

2:10 - 3:30     All Instructional Assistants - Make and Take Activities , Room 206

3:30            Dismissal Time

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0159*

INSERVICE SCHEDULE
PIKE COUNTY SCHOOLS
FEBRUARY 15, 2002

7:40 - 11:15    Teachers report to individual schools for activities developed by the
Principal (Principals should submit morning schedules to Dr. Bazzell)
Goshen Elementary - Grade Book training by Marvin Jackson/Mona
Watson

11:15 - 12:30    Lunch

**ALL TEACHERS AND INSTRUCTIONAL ASSISTANTS REPORT TO PIKE
COUNTY ELEMENTARY SCHOOL**

12:30 - 3:30    Selected teachers (New teachers hired after 8-1-01, and teachers absent on
August 1, 2001), Diversity Training - report to the computer lab in
Building 100, at the bottom of the hill. Presenter: Karen Berry

12:30 - 1:45    4th Grade teachers - Groundwater Festival Training - Room 208
Presenter: Michael Mullen & GWF staff, Troy State University

12:30 - 1:45    All other teachers and instructional assistants report to the Gym - What is
Bullying? Presenter: Carolyn Burks

1:45 - 2:10    Break (Snack area will be open for purchases)

2:10 - 3:30    *    Science Teachers - Grades 6-12 Environmental Awareness Training -
Presenter: Michael Mullen, Troy State University, Room 210

*    English Teachers - Grades 6-12 Writing and Reading - Facilitators:
Carolyn Burks/Demetric Sermons, Room 209

*    All other High School Teachers - Facilitator: Dr. Bazzell, Room 205
Block Scheduling - Instructional Strategies, Discipline

2:10 - 2:50    *    K - 2nd Teachers - Recognizing Sexual Abuse, Room 201
*    3rd - 5th Teachers - Reading- Running Records, Room 202
2:55 - 3:30    *    K - 2nd Teachers - Reading - Running Records, Room 202
*    3rd - 5th Teachers - Recognizing Sexual Abuse, Room 201

Presenter: Wendy Watson - Running Records
Presenter: Lucia Grantham, Troy State University - Sexual Abuse

2:10 - 3:30    All Instructional Assistants - Make and Take Activities , Room 206

3:30    Dismissal Time

PLAINTIFF'S
EXHIBIT
30

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0159

# United States District Court for the Middle District of Alabama

## SUBPOENA IN CIVIL CASE

### *JR v. Pike County Board of Education et al*
### Case Number 2:06-cv-1120

**TO:**  **Robert Bradbury**
       **467 County Road 2239**
       **Goshen, AL 36035**

A subpoena may be served by the sheriff, by his deputy, or by any other person who is not a party and who is not less than 18 years of age. Service of the subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for one day's attendance and the mileage allowed by law under the Federal Rules of Civil Procedure, USCS.

---

☐ **YOU ARE COMMANDED** to appear in the United State District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM | DATE AND TIME |
|---|---|---|
| | | |

---

x☐ **YOU ARE COMMANDED** to produce at the place, date, and time specified below, the following documents or objects:

| PLACE | DATE AND TIME |
|---|---|
| Produce the original or a copy of the audio/video tape(s) of all interviews with Justin Reed regarding sexual abuse, including but not limited to any/all interviews at which you were present, observed and/or participated in. | 10-18-07  10:30 p.m. |

---

x☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE | DATE AND TIME |
|---|---|
| 101 W. Love Street  Troy, Alabama 36081 | 10-18-07  10:30 p.m. |

---

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

---

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person must testify. Federal Rules of Civil Procedure, 30(b)(6).

---

ISSUING OFFICER'S NAME, TITLE, & ADDRESS

**Deanie C. Allen (ALL067) Attorney for Plaintiff**
**Aliant Center**
**2740 Zelda Road**
**Montgomery, Alabama 36106**

PHONE & FAX NUMBERS

**(334) 265-8551**
**(334) 264-9453 - FAX**

SIGNATURE *Deanie C. Allen*    DATE 10-09-07

PLAINTIFF'S
EXHIBIT
31

## PROOF OF SERVICE

| DATE SERVED | PLACE |
|---|---|
| October 9, 2007 | **467 County Road 2239**<br>**Goshen, AL 36035** |
| PERSON SERVED ON (PLEASE PRINT) | MANNER OF SERVICE |
| Robert Bradbury | Certified Mail |
| PERSON SERVED BY (PLEASE PRINT) | TITLE |

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on: _____

_____

By

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate action, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraphs (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in

which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any parties, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expenses, travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows the substantial need for the testimonial material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 85 DATE AND TIME OF REPORT M D Y | : | AM PM MIL. | 96 CASE # | 97 SFX | 98 | OFFENDER SUSPECT MISSING PERSON | CHECK IF MULTIPLE |
|---|---|---|---|---|---|---|---|---|

| 99 NAME (LAST, FIRST, MIDDLE) | 100 NICKNAME/ALIAS | 101 RACE | 102 SEX | 103 DOB | 104 AGE |
|---|---|---|---|---|---|
| Coon Charles | | W B I A K O | M F | 04 02 58 | |

105 ADDRESS (STREET, CITY, STATE, ZIP)   308 Country Club Drive Greenville Al
106 HGT   107 WGT   108 EYE   109 HAIR   110 COMPLEXION

111 PROBABLE DESTINATION   112 ARMED? Y N UNK.   113 WEAPON

114 CLOTHING   SCARS   MARKS   TATOOS   115 ARRESTED WANTED

116 NAME (LAST, FIRST, MIDDLE)   117 NICKNAME/ALIAS   118 RACE   119 SEX   120 DOB   121 AGE

122 ADDRESS (STREET, CITY, STATE, ZIP)   123 HGT   124 WGT   125 EYE   126 HAIR   127 COMPLEXION

128 PROBABLE DESTINATION   129 ARMED? Y N UNK.   130 WEAPON

131 CLOTHING   SCARS   MARKS   TATOOS   132 ARRESTED WANTED

| WITNESSES | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|---|
| | #1 | SEX M F RACE W B I A K O | | ( ) | ( ) |
| | #2 | SEX M F RACE W B I A K O | | ( ) | ( ) |
| | #3 | SEX M F RACE W B I A K O | | ( ) | ( ) |
| | #4 | SEX M F RACE W B I A K O | | ( ) | ( ) |

WITNESS #1 SSN   WITNESS #2 SSN   WITNESS #3 SSN   WITNESS #4 SSN

**NARRATIVE**

137

Mr. Phillip Faulkner has come into the Sheriff's Office and has made it known to Sheriff Thomas and this investigator that his 15 year old son Phillip Blake Faulkner has been sexually abused by a Former Teacher/Band director at Pike County High School. This suspect is Charles Coon who lives in Greenville, Al.

That the abuse has taken place over the last 14 months, and that his son has come forward and told of the abuse.

Young Phillip is to come in to the office with his mother for the purpose of talking with and making a statement about this matter.

At Approx 10:00 am Young Phillip

CONTINUED ON SUPPLEMENT   ASSISTING AGENCY ORI   ASSISTING AGENCY CASE #   SFX

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | 146 ADDITIONAL CASES SINCE NARRATIVE Y N |
|---|---|---|---|---|---|---|---|

| ADMINISTRATION | 147 CASE STATUS | 148 CASE DISPOSITION: | EXCEPTIONAL CLEARANCE: | 149 REPORTING OFFICER | ID # |
|---|---|---|---|---|---|
| | PENDING INACTIVE CLOSED ENTERED ACIC/NCIC DATE M D Y | CLEARED BY ARREST (JUV.) CLEARED BY ARREST (ADULT) UNFOUNDED ADM. CLEARED | A SUSPECT/OFFENDER DEAD B OTHER PROSECUTION C EXTRADITION DENIED D LACK OF PROSECUTION E JUVENILE, NO REFERRAL F DEATH OF VICTIM | R.S. Bradbury   5511 | |
| | | | | 150 ASSISTING OFFICER   ID # | |
| | | | | 151 SUPERVISOR APPROVAL   ID # 152 WATCH CMDR.   ID # | |

Reed v. PCBE
129

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMA

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # |
|---|---|---|---|
| 0 5 5 0 0 0 0 | Piky Co. Sheriff Dept | 07 06 05 | 97-413-05 |

EVENT

| 5 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Faulkner Phillip Blake | 07 06 05 | X CONTINUATION  ☐ FOLLOW-UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sodomy | | |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sexual Abuse | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT |
|---|---|---|---|
| ☐ YES  ☐ NO | M D Y | ☐ YES  ☐ NO | M D Y |

| 20 ☐ DEFENDANT  ☐ SUSPECT | 21 ☐ DEFENDANT  ☐ SUSPECT |
|---|---|
| NAME: | NAME: |

| RACE | SEX | DOB | AGE | RACE | SEX | DOB | AGE |
|---|---|---|---|---|---|---|---|
| ☐W ☐A ☐B ☐I | ☐M ☐F | M D Y | | ☐W ☐A ☐B ☐I | ☐M ☐F | M D Y | |

NARRATIVE

Came into Sheriff Thomas's office and was taken down stairs to Investigators offices were Investigator Bradbury Tape recorded Phillips statement. See statement.

In the statement Phillip tells how Mr. Coon would get him to stay late at the school, would give him a ride home and would fondle Phillip while they were riding in Coon's truck. No sexual activity took place at the school (Pike Co. High) Phillip went on to tell that Coon would give him money, buy him cell phones, and a computer as well as a lap top computer. Phillip was also given the use of three credit cards. Phillip further stated that Coon would say if you want something you have to give me something, or words to that affect.

An Investigator from Greenville Police Department is to come by at 2:00pm 7-6-05 and interview Phillip.

DOLLAR VALUE

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 35a/ UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | SFX | 39 CASE # | 40 SFX | 41 CASE # | SFX | 43 ADDITIONAL CASES CLOSED |
|---|---|---|---|---|---|---|---|

ADMINISTRATIVE

| 44 CASE STATUS | 46 CASE DISPOSITION | | 45 REPORTING OFFICER |
|---|---|---|---|
| ☐ PENDING ☐ INACTIVE ☐ CLOSED | ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | ☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION | R.S. Bradbury    5511 |
| ENTERED ACIC/NCIC DATE | | 47 ASSISTING OFFICER | |
| | | 48 SUPERVISOR APPROVAL | |

32 LOCAL USE
33 STATE USE

PLAINTIFF'S EXHIBIT 32

Reed v. PCBE
130

TYP... ...K INK ONLY          ACJIC—33 REV. 11

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATI

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | AM PM | 4 CASE # | 5 SFX |
|---|---|---|---|---|---|
| 0 1 5 5 0 0 0 | Alg Co Sheriff Dept | 07 07 05 | | 07-413-05 | |

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Faulkner Phillip Blake | 07 06 05 | ☐ CONTINUATION ☒ FOLLOW-UP |

**EVENT**

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sodomy 1st | | |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Sexual Abuse | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT |
|---|---|---|---|
| ☐ YES ☐ NO | M D Y | ☐ YES ☐ NO ☐ WARRANT # | M D Y |

| 20 ☐ DEFENDANT ☒ SUSPECT | 21 ☐ DEFENDANT ☐ SUSPECT |
|---|---|
| NAME: Coon Charles | NAME: |

| RACE | SEX | DOB M D Y | AGE | RACE | SEX | DOB M D Y | AGE |
|---|---|---|---|---|---|---|---|
| ☐W ☐A ☐B | ☐M ☐F | | | ☐W ☐A ☐B | ☐M ☐F | | |

**NARRATIVE**

ON 7-7-05 at approx 1:30pm I met with Sheriff Thomas Capt. Riley and Investigator Bob Williamson in the Sheriff's office.

I was advised that an investigator from Greenville P.D. had come over and interviewed Phillip and that Investigator Williamson set up some recording equipment and had Phillip to call Coon. Two Telephone calls were recorded.

Phillip's Father brought a computer into the office that young Phillip had been given by Coon. Investigator Bradbury took this computer (tower - hard drive) to Greg Spivey of PC Plus so that and software is being ran on the computer to recover any deleted material. No files of interest were found.

At approx 7:00pm Investigator collected 8 cell phones from Blake Faulkner at his mothers residence at 2621 Parker Road in Pinelevel. Faulkner states that two phones are operational. The "Green" phone and a

**DOLLAR VALUE**

| 30 MOTOR VEHICLE | 35 CURRENCY, NOTES | 36 JEWELRY | 37 CLOTHING/FURS | 38 FIREARMS | 39 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 30x UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? | | |
|---|---|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED ☐Y ☐N |
|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS | 45 CASE DISPOSITION: | 47 EXCEPTIONAL CLEARANCE: | 46 REPORTING OFFICER | ID # |
|---|---|---|---|---|
| ☐ PENDING ☐ INACTIVE ☐ CLOSED | ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM | R.S. Bradbury   5511 | |
| ENTERED ACIC/NCIC DATE | | | 47 ASSISTING OFFICER | ID # |
| | | | 48 SUPERVISOR APPROVAL   ID #   49 WATCH CMDR.   ID# | |

TYPE OR PRINT IN BLACK INK ONLY

CJIC—33 REV. 11

ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

CONFIDENTIAL
OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATIO

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 9559000 | Ptlo Co. Shoriff Dept. | 07 08 05 | 03-413-05 | |

**EVENT**

6 VICTIM'S NAME (ORIGINAL REPORT): Faulkner Phillip Blake

7 ORIGINAL OFFENSE DATE: M D Y    8 TYPE REPORT: ☐ CONTINUATION  ☐ FOLLOW-UP

9 ORIGINAL INCIDENT/OFFENSE: Sodomy

10 UCR CODE    11 STATE CODE/LOCAL ORDINANCE

12 NEW INCIDENT/OFFENSE    13 UCR CODE    14 STATE CODE/LOCAL ORDINANCE

15 HAS AN ARREST BEEN MADE? ☐ YES ☐ NO    16 DATE OF ARREST M D Y    17 HAS WARRANT BEEN OBTAINED? ☐ YES ☐ NO WARRANT #    18 DATE OF WARRANT M D Y

20 ☐ DEFENDANT  ☒ SUSPECT    NAME: Charles Coon

21 ☐ DEFENDANT  ☐ SUSPECT    NAME:

| RACE ☐W ☒A ☐B | SEX ☒M ☐F | DOB M D Y | AGE | RACE ☐W ☐A ☐B | SEX ☐M ☐F | DOB M D Y | AGE |
|---|---|---|---|---|---|---|---|

**NARRATIVE**

At approx 9:30 Am Sheriff Thomas, Investigators Williams and Bradbury met with DA's McAlily and Anderson as well as members of the Greenville Police Dept. and Agents of ABI. We made plans for the search of Coon's residence and his arrest.

Coon was arrested by members of the Greenville Police Department and a search of his home was started at approx 1:00pm 7-8-05.

Coon was transported to the Greenville Police Department and interviewed by Lt. Randy Courtney. Coon made a statement about the sexual abuse to Courtney. Coon was placed in the Butler Co. Jail, charged with Three counts of Sodomy 2 and Three counts of enticing a child. Bond was set at $225,000.

22 LOCAL USE

23 STATE USE

**DOLLAR VALUE $ ¢**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| | S R D C | S R D C | S R D C | S R D C | S R D C |
| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS | |
| | S R D C | S R D C | S R D C | S R D C | S R D C |

MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR Stolen UCR CODE    35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ WHERE?    36 RECOVERED IN YOUR JURISDICTION? ☐ WHERE?

**MULTIPLE CASES CLOSED**    37 CASE #    38 SFX    39 CASE #    40 SFX    41 CASE #    42 SFX    43 ADDITIONAL CASES CLOSED NUMBER

**ADMINISTRATIVE**

44 CASE STATUS ☐ PENDING ☐ INACTIVE ☐ CLOSED    ENTERED ACIC/NCIC DATE

45 CASE DISPOSITION ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED

☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM

46 REPORTING OFFICER: R.S. Bradbury    ID # 5571

47 ASSISTING OFFICER    ID #

48 SUPERVISOR APPROVAL    ID #    49 WATCH CMDR.    ID #

TYPE OR PRINT IN BLACK INK ONLY

Reed v. PCBE
132

JIC–33 REV. 11-

**PHILLIP BLAKE FAULKNER IS GIVING STATEMENT TO INVESTIGATOR ROBERT BRADBURY.**

Bradbury:    Today's date is July 6, 2005. The time is 9:55 a.m. Present in the Investigation office, Mr. Phillip Blake Faulkner. The date of birth 09-08-89, myself Investigator Robert Bradbury, Pike County Sheriff's Department.

Blake we are here to talk about an incident, several incidents, and an incident where you have been molested by a teacher, or former teacher. If you will start at the beginning and tell me who the teacher is. His name is?

Faulkner:    Mr. Charles Coon.

Bradbury:    Mr. Charles Coon lives where?

Faulkner:    In Greenville, Alabama.

Bradbury:    All right, when this alleged abuse began he was a teacher at what school?

Faulkner:    At Pike County High School.

Bradbury:    Here in Pike County, Alabama.

Faulkner:    Pike County, Alabama.

Bradbury:    Down at Brundidge?

Faulkner:    Yes sir.

Bradbury:    What capacity was he a teacher?

Faulkner:    He was a band instructor and the music appreciation associate.

Bradbury:    All right. As best you can and as far back as you can start at the first incident where you felt uncomfortable, where he was making advances at you, and tell me what happened.

Faulkner:    Well, on the first Friday night ah, during football season when it started last year, Mr. Coon asked me if it would be all right if I went home with him on that Friday. He carried me home on that Saturday. We got to his house and ah, I sat back in the chair watching t.v.

Bradbury:    All right, let me stop you just one minute. When you say he wanted to carry you home to his house, where is his house at?

PLAINTIFF'S EXHIBIT 33

Faulkner:    In Greenville, Alabama.

Bradbury:    All right do you know the address?

Faulkner:    Yes I do.

Bradbury:    What is the address?

Faulkner:    308 Country Club Drive, Greenville, Alabama 36037.

Bradbury:    All right. So he wanted to carry you from Pike County High School, in Brundidge to his residence in Greenville. All right, go ahead.

Faulkner:    And after that he asked me if he could perform oral sex on me?

Bradbury:    This question was at the residence?

Faulkner:    At the residence. At the residence.

Bradbury:    All right, go ahead.

Faulkner:    And I told him no. He kept on begging so I just, I got, I felt like I was being pressured to do it. So, I just went ahead and told him to go ahead you know. And what I was telling myself was that I needed to get this over with. I kept on telling myself I wouldn't go back. But, he made out like he wanted me to do some work for him or wanted me to go help him at the school or something like that. Go straighten books, go get music to put up, sometimes he wanted me to go to Montgomery with him to the music shop, Capitol Music shop. Ah, I went there plenty of times with him.

             But, like from that Friday night on out, that's when it first started and it's been about that way ever since.

Bradbury:    All right, that first occasion, when he performed oral sex on you.

Faulkner:    Yes sir.

Bradbury:    And oral sex. Do you know what oral sex is?

Faulkner:    Yes sir.

Bradbury:    By definition oral sex is mouth to genitals. All right did he put his mouth on your genitals?

Faulkner:    Yes sir.

Charles Coon00015
City of Greenvi**

Reed v. PCBE
16

Bradbury:     All right. Did he take your clothes off or did you take your clothes off?

Faulkner:     My clothes didn't come off. My pants were unzipped.

Bradbury:     Did he unzip them or did you unzip them?

Faulkner:     I unzipped them.

Bradbury:     Did you pull your penis out or did he pull it out?

Faulkner:     He pulled it out.

Bradbury:     All right. Ah, wearing shorts boxer shorts, jockeys or what?

Faulkner:     My pants, my pants I wore that Friday night under my uniform.

Bradbury:     So he had to unzip your uniform trousers?

Faulkner:     No. I changed my uniform at the school. I left my uniform at the school.

Bradbury:     So you had your street clothes on?

Faulkner:     Right.

Bradbury:     All right. Ah, how long of a period do you think that this might have taken place? This first occasion?

Faulkner:     Maybe thirty minutes. Forty-five minutes at the most.

Bradbury:     Since that time, how many occasions have occurred where he has performed oral sex or fondled you or something of that nature?

Faulkner:     About four times.

Bradbury:     Four times over the course of the last year or so?

Faulkner:     This year and over the season last year, or after Christmas.

Bradbury:     When was the last time that this occurred?

Faulkner:     The last time this occurred was last week when I went to his house. I think it was on Thursday.

Bradbury:     Last week on Thursday, which would have been June 30th? The last day of the month?

Charles Coon00016
City of Greenville

COPY

Faulkner:    No, not June 30th. I don't know. It was sometime last week.

Bradbury:    Look at the calendar as best you can.

Faulkner:    What's today? I know it's not June 30th because we went to Wal-Mart that night.

Bradbury:    The 28th?

Faulkner:    The 28th.

Bradbury:    What did you go to Wal-Mart for?

Faulkner:    He, I ask him if we could go to Wal-Mart and he said yea. We just rode down there. I walked in by myself.

Bradbury:    Did he follow you into the store?

Faulkner:    No sir. Not that I am aware of.

Bradbury:    Now earlier you had said that he had purchased you certain items. What items were they?

Faulkner:    Computer, laptop, cell phone, cigarettes. That's it.

Bradbury:    Do you still have any of it?

Faulkner:    I have one of the computers and he has the rest of them.

Bradbury:    Now the computers were they purchased new or used?

Faulkner:    New.

Bradbury:    Purchased in whose name do you reckon?

Faulkner:    His name. He got them at the Wal-Mart, one at the Wal-Mart, well all of them at the Wal-Mart store in Greenville (unintelligible) two desktops and two laptops.

Bradbury:    How many cell phones?

Faulkner:    Ah, couple of Nextel. I'd say about two or three with Nextel. Three, two or three from Alltel. Some from Sprint.

Bradbury:    These are prepaid or what?

Charles Coon00017
City of Greenville

Reed v. PCBE
18

COPY

Faulkner:    Contract.

Bradbury:    Contract. Ah, the contract was signed in his name with you as a user?

Faulkner:    With me as a user.

Bradbury:    And Alltel is located where?

Faulkner:    Well sometimes he goes to the one in Troy, downtown Troy or sometimes he goes to the one in Greenville.

Bradbury:    Nextel?

Faulkner:    Nextel, he did all that over the phone. All the Nextel we knew of was in Troy and we never went to Troy to the Nextel store.

Bradbury:    Okay. You said something about Sprint.

Faulkner:    Sprint. He ordered that over the internet.

Bradbury:    Do you know, do you know of any web sites that might show photographs of you or any, any other victims?

Faulkner:    Ah, the only web site I have is my screen name with Yahoo and it's got a photo picture ID of me with a shirt on, when I was at six flags with just my age, gender and stuff like that. I don't know if he has access to that or not.

Bradbury:    You had conversations through Yahoo with Mr. Coon?

Faulkner:    Many of them.

Bradbury:    What are those conversations consist of? Are they sexually explicated or they just two people talking or?

Faulkner:    Like two people talking. He wants me to come over to his house and do some work and he wants me to go to the school with him and stuff like that.

Bradbury:    He doesn't ever say that, that he wanted you to perform oral on him or of that nature?

Faulkner:    (No response heard on tape).

Bradbury:    Where was I at? We were interrupted by the phone. Where was I at?

Faulkner:    Ah, you were at where the conversations were.

Bradbury:    Ah, when he would have a conversation with you, it would be from his computer at his residence?

Faulkner:    The one that he does not have currently.

Bradbury:    What you mean?

Faulkner:    This computer, ah this computer that we are chatting on crashed. When I say crashed, I mean it completely turned off and would not turn back on. I mean all his files and stuff was gone. So he called Dell and Dell sent him another one. So that computer that me and him was chatting off of was two servers, that he currently does not have any more.

Bradbury:    What did he do with the old server?

Faulkner:    I have no clue.

Bradbury:    So since he's got the new computer you haven't had any chats with him?

Faulkner:    Uh uh. Now he's made, ever since he's got that first computer and I was staying over at my grandmother's house, ah, they do not have internet currently, but you still pull up yahoo and find my screen name and type some message to me. Then when I do log on I'll see that message that he typed and then I can reply back to that message. He has done that before.

But from what computer, it could be from the school computer, it could be his computer, I have no idea.

Bradbury:    That was gone be my next question. Do you think he has ever used the school computer?

Faulkner:    Na, I wouldn't think he had.

Bradbury:    During the time that this abuse has occurred, has he ever taken your photograph?

Faulkner:    (Response not heard on tape).

Bradbury:    So what we are basically talking about is probably four or five times over the course of about a year, a year and one half. Each time he would take you from the school in Brundidge to his residence in Greenville. Is that right?



Faulkner:      Yes sir.

Bradbury:      Sheriff Thomas has just joined us for the benefit of the tape recorder. He may want to ask you a question.

Thomas:        Go ahead.

Bradbury:      Ah, none of the sexual abuse occurred in Pike County?

Faulkner:      None of it.

Bradbury:      All of it was at his residence in Greenville?

Faulkner:      Ah, one of them was when we went to six flags and stayed in a hotel, this past month.

Bradbury:      Over in Atlanta?

Faulkner:      Yes sir.

Bradbury:      Tell me about that.

Faulkner:      Well, basically we got back from six flags, no back that up. It rained so we did not get to go to six flags. So, we went to the hotel room. When we got to the hotel room we checked in and we left to get something to eat and when we come back and I had got in the bed and was laying down watching t.v. and came over beside me. And without me knowing it or anything he just started whatever he wanted to do.

Bradbury:      Now the trip to six flags was just you and he?

Faulkner:      Just me and him

Bradbury:      Do you know of any alleged abuse to other students?

Faulkner:      No sir not that I think of. The only friend that I know that I have that's come over once or twice is Adam. And he not been over in months and if he does it's like maybe like a couple of hours and his mother and father comes and gets him.

Bradbury:      Who is Adam?

Faulkner:      Adam Helms. He attends Banks middle school.  Me and him has known each other since kindergarten.

Bradbury:      So you don't think Adam has been sexually abused?



Reed v. PCBE
21

Charles Coon00020
City of Greenville                    7

| Faulkner: | I don't think so. He hasn't been there long enough to have anything done to him. |
| --- | --- |
| Bradbury: | What else can you tell us? |
| Faulkner: | Basically about the money and what he wants in return, just oral sex. |
| Bradbury: | Tell me how the money gets into the bank account? |
| Faulkner: | Sometimes he would give it to me and I would go deposit or sometimes he would deposit it himself. |
| Bradbury: | So your bank account is where? |
| Faulkner: | Southtrust Bank. |
| Bradbury: | Here in Troy? |
| Faulkner: | Here in Troy. |
| Bradbury: | Now does he go in and make a deposit here in Troy? |
| Faulkner: | That I don't know? He may, he may not. But like I said I had ten dollars I put in and then I come to find out I had like a hundred and seventy something in my account. I know I didn't make the deposit. The only thing I made was a fifty five-dollar deposit. |
| Thomas: | Would he even call you and tell you when he deposited money into your account? |
| Faulkner: | No sir, not usually. He may have once or twice, but not like every time he done it. |
| Thomas: | Some times he would and some times he wouldn't. |
| Faulkner: | Some times he would and some times he wouldn't. |
| Bradbury: | When he uses money for deposit is it cash or check? |
| Faulkner: | I don't know. Well maybe, like I say he did not normally give it to me. It may be (unintelligible) credit card or cash, check, money order. |
| Thomas: | Tell me about the credit card that you have got in your name. |

Charles Coon00021
City of Greenville

Reed v. PCBE
22                8

COPY

Faulkner:    He told me that he was going to get me a credit card and put on his account in my name. So he got it and he called and activated it and he made me, he told me to sign the back of it. I signed the back of it and had the credit card.

Then I had another one, a GM card. The first one was through (unintelligible). And that's the only thing I can think of.

Thomas:    Did you ever use those cards?

Faulkner:    Yes sir.

Thomas:    To buy what?

Faulkner:    I bought a pair of shoes, ah, a pair of pants and a shirt.

Thomas:    Did he tell you how much you could spend?

Faulkner:    He told me fifty.

Thomas:    Fifty a month?

Faulkner:    Yes sir.

Bradbury:    I'm sorry. How much?

Faulkner:    Fifty a month.

Bradbury:    You'll have to say it loud so the tape recorder will pick it up. When you nod it won't pick it up.

Faulkner:    Yes sir.

Bradbury:    I'm not trying to get ugly with you.

Faulkner:    That's basically it.

Thomas:    Now the times that you would stay over after school and he would take you home. Would any thing happen at the school and on the way home?

Faulkner:    On the way home. He would like rub me or rub my leg or rubbing my stomach. He always told me that he had a (unintelligible) and he would put his hand down my pants and rub back on myself and give me a kiss on my forehead and rub on the back of my neck.

Thomas:    And this would happen while you would be driving down the road?

| | |
|---|---|
| Faulkner: | While he was driving. I was sitting in the passenger seat. |
| Thomas: | You would leave the school and this would begin? |
| Faulkner: | Yes sir. |
| Thomas: | And how long would this go on? |
| Faulkner: | Till we got home. |
| Thomas: | Did you ever pull over and go into the woods or go to an isolated place? |
| Faulkner: | No sir. |
| Thomas: | Would you be rubbing on him also? |
| Faulkner: | No sir. He would ask me but I wouldn't do it. |
| Bradbury: | Does anyone live with him? |
| Faulkner: | His wife. |
| Bradbury: | Where is his wife at when this takes place? |
| Faulkner: | She works at the Greenville High School. She is their secretary, or assistant secretary. |
| Bradbury: | On the times that he has performed oral sex on you she is not in the residence? |
| Faulkner: | She either, she's not in the residence or she's asleep. |
| Bradbury: | Is there anybody that you can think of that could be called as a witness? Anybody that has seen any of this activity? |
| Faulkner: | No sir. It's never been done outside the residence. Nobody's been at the residence when it happened. But as I met Mr. Coon I always looked at him as a friend. I never thought this would have occurred. But it's like it has ruined my mind, my thoughts, my future. I just don't know what to think. Every time I wake up in the morning I just don't know what to do. I mean I've been through so much. |
| Thomas: | And this has gone on since you were how old? |
| Faulkner: | Ever since I started eighth grade. I'd been fourteen. |

Charles Coon00023
City of Greenville

| Bradbury: | Can you think of anything else? |
|-----------|--------------------------------|
| Faulkner: | No sir. |
| Bradbury: | This concludes the interview. The time is 10:12. Same date and same persons present. |

END OF STATEMENT GIVEN BY PHILLIP BLAKE FAULKNER.

07-14-05

Peggy Barbaree

Charles Coon00024
City of Greenville



Reed v. PCBE
25                    11

I HAVE REVIEWED THE STATEMENT OF <u>Phillip Blake Faulkner</u>
AND IT IS A TRUE AND CORRECT STATEMENT AS GIVEN TO ME BY THE
DEFENDANT.

NAME _____ TITLE _____

DATE _____

Charles Coon00025
City of Greenville



BRADBURY: Justin you're a fifteen years old and last year you went to Pike County High School, you were in the ninth grade?

REED:    Yeah.

BRADBURY: And you're going in the tenth grade this year?

REED:    Uh huh, yeah.

BRADBURY: Do you know what today's date is? If I told you today July the eighteenth, 2005, would that mean anything to you? Would you take my word for it?

REED:    Yes.

BRADBURY: And if I told you it was 9:17 in the morning, you'd know that because you not, you not wide awake are you?

REED:    Yeah.

BRADBURY: Ok, Justin what I wanted to talk to you about is, is ah, the same thing that Ms. Mona talked to you about. Do you remember talking to Ms. Mona?

REED:    Uh huh.

BRADBURY: As best you can I want you to tell me what happened. Now you know Ms. Mona, Ms. Mona used the some dolls talking to ya, and I don't have no dolls, so you gonna have to talk to me, you gonna have to tell me and ah, just, just me and you and Mr. Bruce over there and we talking, alright? Something happened with you down at the school that you didn't like? You gonna have to say it now, you gonna hav, you gonna have to say it so I can hear ya.

REED:    Yes.

BRADBURY: What happened down at the school that you didn't like? Sit up, come closer to me, I'm hard of hearing. Put your elbows on the table here like this. I'm hard of hearing, I need to talk.

REED:    (Unintelligible)

BRADBURY: One Aub, one Auburn man to another Auburn man, tell me what, what happened that you didn't like.

REED:    Well the band man ah, touched me in the wrong place and stuff.

BRADBURY: Band director you said? You know who the band director is?

PLAINTIFF'S EXHIBIT
34

1

REED:          Mr. Coon.

BRADBURY: Mr. Coon.  When you say he touched you in the wrong place, where is the wrong place at?

REED:          Uh, between the legs.

BRADBURY: Ok, between your legs?  Now he did that at school?

REED:          Yes.

BRADBURY: What else did he do?

REED:          Like, that's it.

BRADBURY: He didn't do anything else?  Do you remember Ms. Mona with the dolls?  Did that happen?

REED:          Uh uh.

BRADBURY: Did he ever kiss ya?

REED:          No.

BRADBURY: Did he ever put his mouth on ya anywhere?  Did he, did he ever make you put your mouth on him?

REED:          No.

BRADBURY: You're sure?

REED:          Yes sir.

BRADBURY: Alright, when you say this happened at the school, whereabouts at the school did this happen?

REED:          In the band room.

BRADBURY: In the band room.  How many times do you reckon' it ever happened?

REED:          About ten, once.

BRADBURY: I'm sorry what?

REED:          Once or twice.

2

BRADBURY: Once or twice?  You started to say ten, what, what was ten?

REED:        Ah, my brain not awake yet.  Part of my brain's awake

BRADBURY: Part of your brain's awake?  So once or twice at the school?

REED:        Yes.

BRADBURY: Did you ever go for a ride with him in his truck?

REED:        Riding to school.

BRADBURY: Riding from your house to school?

REED:        Uh uh, we was out during school.

BRADBURY: Went out during school?  What did ya'll do when you were out during school?

REED:        Just talked about band practice and stuff.

BRADBURY: You didn't do nothing else?

REED:        Nope.  Just smoked.

BRADBURY: Sm, smoked cigarettes?

REED:        But I no was smoking, he trying to make me smoke.

BRADBURY: He tried to make you smoke?  Did you smoke any?

REED:        No.

BRADBURY: Ok, what about ah, did he buy you a coca-cola?

REED:        No.

BRADBURY: Six pack of beer?

REED:        No.

BRADBURY: Bottle of whiskey?

REED:        No.

3

BRADBURY: I thought you Auburn men could understand that?  Huh?  What happened at the house?  When he come to visit you at the house?

REED:          No, he ah, tickled me

BRADBURY: Tickled ya?

REED:          and tickled Joey too.

BRADBURY: That's all, just tickled ya?  Didn't do anything else?  He didn't touch you in the wrong place down there?  I'm sorry?

REED:          No.

BRADBURY: Just tickled ya?

REED:          Uh huh.

BRADBURY: How many times do you think he ever come to your house?

REED:          Couple of times, I don't know how many.

BRADBURY: Couple of times?  What do you think about Mr. Coon?  Do you like him or not?

REED:          No.

BRADBURY: Don't like him?  What's the reason you don't like him?

REED:          Um,

BRADBURY: What's the reason, Justin?

REED:          I don't know.

BRADBURY: Well do you like him or not?

REED:          Kind of.

BRADBURY: Kinda.  Do you like me?  I'm alright huh?  Huh?

REED:          Yeah.

BRADBURY: Ok, what about Mr. Bruce, do you like Mr. Bruce?

REED:          Yeah.

4

BRADBURY: He's alright?

REED:          Yeah.

BRADBURY: He's pretty cool dude isn't he?

REED:          Uh huh.

BRADBURY: Alright, the times that ah, Mr. Coon touched you, when you were down at
                 the band, at the band room at the school.

REED:          Uh huh.

BRADBURY: Did he touch with ah, his hand inside your pants or outside your pants?

REED:          Outside.

BRADBURY: He never touched you inside the pants?

REED:          Uh uh.

BRADBURY: I'm sorry?

REED:          No.

BRADBURY: Sit up here so I can hear ya, hell I'm old.  Sit up here so I can hear ya.
                 You said, you said he touched him where?

REED:          On the pants.

BRADBURY: He touched, he touched you outside of the pants?

REED:          Yes.

BRADBURY: Did he ever want to do anything else to you?

REED:          No.

BRADBURY: He didn' t give you a hug?

REED:          No.

BRADBURY: Didn't give you no kiss?

REED:          No.

Reed v. PCE
5

BRADBURY: Tickle you at the band room?

REED:        Uh huh.

BRADBURY: Tickled ya at the band room. What else he think he did?

REED:        (Unintelligible)

BRADBURY: Did you ever see him do anything to any other student?

REED:        Uh uh.

BRADBURY: Now when ah, on the occasion that he touched you at the band room, or touched you between your legs at the band room, was there any other students in the class?

REED:        No.

BRADBURY: Ah, how d, how did he keep folks from coming in and seeing ya'll? Did he lock the door? He locked the door or you locked the door?

REED:        That's when I locked the door.

BRADBURY: I'm sorry.

REED:        I locked the door.

BRADBURY: You locked the door. What'd you lock the door for? Justin, what'd you lock the door for?

REED:        Because he told me to.

BRADBURY: He told you too?

REED:        Uh huh.

BRADBURY: You do everything he tell you?

REED:        Uh uh.

BRADBURY: Are you in the band?

REED:        I was but I not now.

BRADBURY: What instrument did you play?

6

REED:          Trumpet.

BRADBURY: Trumpet?  Were you any good?  You not no good?  Huh?  You didn't like
               it or what?

REED:          I like it but I be in ROTC, you know.

BRADBURY: Well you like ROTC better?  Uh huh.  What you want to do when you get
               out of school?

REED:          Go to college.

BRADBURY: What you want to learn?

REED:          Um, different stuff.

BRADBURY: Different stuff?  Got anything interest ya?  I think I talked to your sister
               the other day, she was talking about maybe going into medicine.  That
               doesn't interest you?  Now she told me she's a whiz on math.  Are you a
               whiz on math too?

REED:          No.

BRADBURY: Huh?  I know, ask Joey, is that right?  Huh?

REED:          Uh huh.

BRADBURY: Ok, other than, other than Mr. Coon touching you in your private place,
               did he do anything else to you?

REED:          Nope.

BRADBURY: Nothing at all?

REED:          Uh uh.

BRADBURY: He never put his mouth on ya?

REED:          Nope.

BRADBURY: He never had you to put your mouth on him?

REED:          Uh uh.

BRADBURY: And he never touched you without, inside your clothes, inside your pants?

7

REED:        Uh uh.

BRADBURY: You must be really tired the way you stretching.

REED:        Uh huh.

BRADBURY: Do you think you can answer a question for Mr. Bruce? Aw, come on now. Bruce is a cool guy.

MATHEWS: You don't want to talk to me Justin?

REED:        No.

MATHEWS: Why? What did I do to you?

REED:        Sleepy.

MATHEWS: Me to, me to, you know what I did yesterday?

REED:        Uh uh.

MATHEWS: Picked peas, corn, okra, all out in that hot sun, you was out there helping dig ditches weren't you?

REED:        Uh uh, I went to church.

BRADBURY: You went, you went to the truck?

REED:        I went to church.

BRADBURY: Oh, ok. You went to the church, huh?

MATHEWS: Was it Saturday you was out there helping dig the ditch?

REED:        And yesterday.

MATHEWS: Laying wire and pipe, did you have to fill 'em back in? Get dirt all up under your fingernails? You didn't? Did you have gloves on? Oh, ok.

BRADBURY: Did that pay pretty good? Ok.

MATHEWS: Did you make you enough to get you another gameboy?

REED:        Uh uh.

8

MATHEWS: Do you remember telling Ms. Mona that he put his mouth on you?

REED: Uh uh.

MATHEWS: Don't remember telling her that?

BRADBURY: I can't hear ya.

REED: No.

MATHEWS: Do you remember telling her that, that he, he pulled your pants down? You don't remember that?

REED: Uh uh.

MATHEWS: Hum,

BRADBURY: Do you remember anything you told Ms. Mona? I'm sorry I can't hear ya.

REED: Nope.

MATHEWS: Remember when she showed you the dolls? You don't even remember those dolls?

REED: Uh uh.

MATHEWS: Yes you do.

REED: Uh uh.

MATHEWS: You just joshing me, you just messing with me.

REED: I got a short memory.

BRADBURY: Got a short memory

MATHEWS: Short

REED: Uh huh.

MATHEWS: You remember how to play Zelda don't you?

REED: Uh huh.

MATHEWS: Ah, yeah right.

9

Reed v. PCBE
9

BRADBURY: Do you remember where you're at?

REED: Uh uh.

BRADBURY: Ah, now, you don't know where you're at?

REED: Uh uh.

BRADBURY: Look at me, do you remember where you're at now?

REED: Uh uh.

BRADBURY: Can't remember anything else that happened?

REED: Uh uh.

BRADBURY: You don't remember talking to Ms. Mona? Sure you do, I saw that smile come over your face. Huh? You remember talking to Ms. Mona?

REED: Uh huh.

BRADBURY: What did you tell Ms. Mona?

REED: I don't know, I done forgot.

BRADBURY: You forgot?

REED: Uh huh.

BRADBURY: Can you remember anything else to tell me?

REED: Uh uh.

BRADBURY: You can't remember or you don't want to tell me?

REED: I can't remember.

BRADBURY: Do you remember what your name is?

REED: Uh huh.

BRADBURY: What's your name?

REED: Justin.

BRADBURY: Justin what?

REED:        Reed.

BRADBURY: When were you born?

REED:        July 28, 1989.

MATHEWS:   You got a birthday coming up.

BRADBURY: Makes you an old man.  I got a granddaughter that's born July 26th, two days before you.  In fact my brother was born on your birthday, July the 28th.  What you think about that?

REED:        (Unintelligible)

BRADBURY: Did you ever go to ah, Mr. Coon's house?

REED:        Uh uh.

BRADBURY: Did you ever go to the beach with him?

REED:        Uh uh.

BRADBURY: Did you ever go to Six Flags with him?

REED:        Uh uh.

BRADBURY: The only thing you ever did was ride around during school?

REED:        Uh huh.

BRADBURY: And he tired to get you to smoke?

REED:        Uh huh.

BRADBURY: Anybody else in the truck with you?

REED:        Uh uh.

BRADBURY: Just you and him?

REED:        Uh huh.

BRADBURY: He used to give you a pass to get out of class to didn't he?

REED:        Uh huh.

me a little bit about what's going on. You think you need to tell me anything else? I'm sorry I can't hear you.

REED:          Uh uh.

BRADBURY: You don't think so? Alright what you gonna do the rest of the day?

REED:          Sleep probably.

BRADBURY: Aw now, you can sleep anytime.

REED:          Or probably go outside, cut grass.

BRADBURY: You cut grass?

REED:          Sometimes.

BRADBURY: You got a riding mower or push mower?

REED:          Riding one.

BRADBURY: How long does it take you to cut the grass?

REED:          Not long.

BRADBURY: Half hour?

REED:          Uh huh.

BRADBURY: What you think Mr. Bruce, you got any questions?

MATHEWS: No sir.

BRADBURY: Well Justin I appreciate you coming and talking to me. Do you remember where you're at now?

REED:          The courthouse.

BRADBURY: What city are you in?

REED:          Troy.

BRADBURY: And where do I work?

REED:          At the courthouse.

13

BRADBURY: Look here. What's this here?

REED:        Pike County Jail.

BRADBURY: Pike County Sheriff's Department. Ok, alright I appreciate you talking to me.

On _____ I reviewed the tape and made the necessary corrections to the transcript. The corrected transcript is a true representation of the taped interview.

_____
Bob Bradbury & Bruce Mathews

Typed by: Crys Fuller
Date: July 18, 2005

Alabama
Judicial System

**DEPOSITION**

Warrant/Summons Number
WRDS-241

Case Number

CR-57 (front)    Rev. 8/98

THE_____ DISTRICT _____ COURT OF _____ PIKE _____, ALABAMA
(Circuit, District or Municipal)                          (Name of Municipality or County)

D.A.  Contact _____

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED**

Name of Accused (or Alias)  Coon    Charles    Leslie

Social Security Number  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    Driver's License Number  2424423    Telephone Number

Height  1"    Weight  155    Hair  Gray    Eyes  Blue    Date of Birth  01-02-48    Age    Race  W    Sex  M

Complexion

Address of Accused (or Alias)  308 Country Club Drive    City  Greenville    State  Al    Zip Code

Name of Employer                                                                   Employer's Telephone Number

Address of Employer    City    State    Zip Code

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE**

Offense  Sexual Abuse 3rd

Date and Time of Offense:  June 2005

Place of Occurrence:  Pike County

Person Attacked or Property Damaged:

Item Attacked:

Was Accused under the influence of alcohol or a controlled substance? ☐ Yes  ☐ No

Was law enforcement agency contacted? ☒ Yes  ☐ No

If so which one?  PCSO

Did Accused Possess or Use a Weapon? ☐ Yes  ☐ No    Type:

Did Victim go to the hospital? ☐ Yes  ☐ No

Damage Done or Injuries Received:

Value of Property:

Details of Offense:  During an interview of Justin Reed, Age 15 He advised that Teacher (band director) had fondled his privates Thru his trousers with his hand, while at the band room at Pike County High School.

**PLAINTIFF'S EXHIBIT**
**35**

Reed v. PCBE
127

CR-57 (back)    Rev. 8/98

## DEPOSITION

ny Law Enforcement Agency Contacted ? ☑ Yes    ☐ No
yes, which one?    *PCSO*

make this statement for the purpose of securing a WARRANT/SUMMONS against the named of accused. I understand that I am instituting a criminal
roceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue I may, in addition to any other punishment
rovided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this

2                    day of

august            13 2005

_____
udge/Clerk/Magistrate

Complainant _____

Address _____

## WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
| Watson Mona | 162 CoRd 4430 Brundidge Al | 268-6483 |
| Bradbury R.S. | PCSO | |
| Mathews Bruce | DA's Office | |

## MAGISTRATE NOTES

Varrant or Summons issued? ☐ Yes    ☐ No        Warrant Number: _____

## Witness Statement

Statement of: _Charles Coon_

Race: _M_ Sex: _____ DOB: _1-2-48_ Age: _____

Address: _308 Country Club Drive Greenville, Al_

Place of Employment: _____

Telephone No. Home: _____ Work: _____

Place Statement Given: _Pike County Court House_

Date: _3-21-06_ Time Started: _____

Statement Given to: (Officer) _Bradbury_

This Statement is of my own free will without threats, promises, or duress having been made toward me.

_In The middle June 2005 I went to the Reed Residence Justin And Joey were playing video games, Joey was in his underwear because school was out, I began Tickling him and I may have Touched him in the wrong place And Up,_

_Charles Coon_

PLAINTIFF'S
EXHIBIT
_36_

Signature

Time Ended

Reed v. PCBE
113

STATE OF ALABAMA

VS.

CHARLES LESLIE COON

\* IN THE CIRCUIT COURT OF

\* BUTLER COUNTY, ALABAMA

\* CASE NO. CC-2005-196

## AGREEMENT OF COUNSEL AND DEFENDANT

It is hereby agreed upon by and between the State of Alabama through its District Attorney for the Second Judicial Circuit, Counsel for the Defendant, **J. McGowin Williamson,** a practicing attorney duly licensed to practice law in the State of Alabama, and the above named Defendant, that:

1. Defendant is pleading guilty to the offense of: **ENTICING A CHILD FOR IMMORAL PURPOSES - THREE COUNTS**

2. The State of Alabama will recommend the following sentence in exchange for a plea of guilty by the Defendant:

Defendant sentenced to 5 years in the penitentiary on each (3) count of the Indictment. Said sentence to be served on a split sentence bases, with one (1) year to initially be served in incarceration and the balance of four (4) years to be served on probation. The length of probation shall be for three (3) years after release from incarceration. The initial one (1) year of incarceration on each count shall be served concurrently. However, if the probationary portion of the sentence is ever revoked or invoked the balance of four (4) years on each count shall be served consecutively.

This sentence shall be served concurrently with any other sentence received by this Defendant involving this victim and may be due to be set aside if this Defendant receives any greater sentence than this in any other case involving this victim. Also to be served concurrently with any sentence received in case number DC-2005-438 in Pike County, Alabama.

Case Number CC-2005-195 is to be dismissed.

As a condition of Defendant's probation he shall have no contact with the victim or his family.

Defendant agrees that upon motion of the State of Alabama and without notice to the Defendant, the Court may amend its restitution order to revise the receiver of restitution to be ACVCC instead of original receiver to the extent ACVCC has paid all or part of Court ordered restitution; this in no way increases the amount of predetermined restitution to be paid by the Defendant.

3. In consideration of the recommendation of the District Attorney for the Second Judicial Circuit of Alabama, or the recommendation of one of his Assistant District Attorneys, as set out in Paragraph 2, Defendant hereby agrees that he will not attack said guilty plea in any way, directly or collaterally, including, but not limited to, appeal, coram nobis and habeas corpus.

PLAINTIFF'S
EXHIBIT
37

Reed v. PCBE
94

4. In the event that the Defendant attacks said guilty plea and has it set aside or overturned, the original charge(s) in this matter and any charges dismissed pursuant to said agreement shall automatically be reinstated. Defendant hereby waives any claim of double jeopardy should said charge(s) be reinstated.

5. As the Defendant in this case, I am satisfied by the manner in which my Attorney has represented me.

6. The trial Judge has sole discretion in these premises and is not bound by this Agreement in any manner.

---
**DISTRICT ATTORNEY**

---
**DATE**

---
**COUNSEL FOR DEFENDANT**

---
**DEFENDANT**

Reed v. PCBE
95

<u>Date of Interview: 7/14/05</u>

CAC CASE # 23        INTERVIEWER'S NAME: <u>Mona Watson</u>

VICTIM'S NAME:   <u>Reed</u>                <u>Justin</u>            <u>Michael</u>
                      (LAST)              (FIRST)            (MIIDDLE)

ADDRESS:   <u>Rt. 2 Box 318-F</u>

TELEPHONE:   <u>334-735-2935</u>

DOB:   <u>7/28/89</u>            SEX:   M <u>X</u>      F <u>__</u>      RACE: <u>White</u>

PARENTS NAME:                EMPLOYMENT:

POSSIBLE OFFENDER: <u>Charles Coon</u>        DOB/AGE:  <u>unknown</u>

ADDRESS: <u>Greenville, AL</u>

TYPE OF ABUSE:   <u>Sexual</u>

DATE OF INCIDENCE:

LOCATION: <u>Pike County High School Band Room & Home of Victim</u>

DHR WORKER: <u>Misty Hubbard</u>

LE INVESTIGATOR: <u>Bob Bradberry</u>

PRESENT AT FORENSIC INTERVIEW: <u>Mona Watson, Misty Hubbard</u>
                            <u>Viewed by Bob Bradberry & DA</u>

SUMMARY OF INTERVIEW:
    Justin had a very difficult time with interview. Even though he is fifteen years old he has difficulty in verbalizing what happened to him. After a very difficult time, Justin finally admitted that he had performed oral sex on Mr. Coon on several occasions. The one time he described was in the band room back before Christmas. He stated that Mr. Coon had him lock the band room door and sit on the steps leading into the room. He stated that Mr. Coon had him perform oral sex on him. He stated that Mr. Coon unzipped his pants in order for this to happen. He said Mr. Coon told him not to tell anyone. He said the last time this happened was about three weeks ago when Mr. Coon went to Justin's house. Parents were not there.



PLAINTIFF'S
EXHIBIT
36

CONFIDENTIAL

| 1 ☐ INCIDENT ☐ OFFENSE | 2 CASE # 07-436-05 | 3 SFX |
|---|---|---|
| ☐ SUPPLEMENT | | |

| 4 ORI # 0,5,5,0,0,0,0 | 5 DATE AND TIME OF THIS REPORT 07/14/05 ☐ AM ☐ PM ☐ MIL | 6 AGENCY NAME Pike County Sheriff Dept | 7 SUPPLEMENT ORIGINAL OFFENSE DATE M M D D Y Y |
|---|---|---|---|

| 8 REPORTED BY ☐ VICTIM OR WATSON MONA | 9 ADDRESS (STREET, CITY, STATE, ZIP) | 10 PHONE ( ) |
|---|---|---|

| 14 VICTIM (LAST, FIRST, MIDDLE NAME) Reed Justin  1P 2B 3S | 15 ADDRESS (STREET, CITY, STATE, ZIP) 162 County Road 4430 Brundidge Al | 16 PHONE ( ) 268-648- |
|---|---|---|
| 16 EMPLOYER/SCHOOL | 17 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) 268-2295 | 18 PHONE ( ) 268-2760 |

| 19 ☐ RESIDENT ☐ NON-RESIDENT | 20 INJURY | 21 RACE W | 22 SEX ☐ MALE ☐ FEMALE | 22 HGT | 23 WGT | 24 DOB 07 28 89 | 25 AGE 15 | 27 WAS OFFENDER KNOWN TO VICTIM? ☐ Y ☐ N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) |
|---|---|---|---|---|---|---|---|---|---|

| 30 TYPE INCIDENT OR OFFENSE Sexual Abuse ☐ FEL ☐ MISD. | 31 DEGREE (CIRCLE) 1 2 3 | 33 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| 34 TYPE INCIDENT OR OFFENSE ☐ FEL ☐ MISD. | 35 DEGREE (CIRCLE) 1 2 3 | 37 STATE CODE/LOCAL ORDINANCE |

| 38 PLACE OF OCCURRENCE | | 39 SECTOR |
|---|---|---|

**EVENT**

| 40 POINT OF ENTRY ☐ DOOR ☐ ROOF ☐ WINDOW ☐ OTHER | 41 METHOD OF ENTRY ☐ FORCIBLE ☐ NO FORCE ☐ ATT. FORCIBLE | 42 ASSAULT ☐ SIMPLE ☐ AGGR. | 43 TREATMENT FOR ASSAULT INJURY ☐ Y ☐ N |
|---|---|---|---|

| 44 OCCURRED ON OR BETWEEN 0 16 0 05 M D M D | 45 TIME ☐ AM ☐ PM ☐ MIL 46 ☐ S T W T F S S 47 LIGHTING ☐ NATURAL ☐ MOON ☐ ART. EXT. ☐ ART. INT. ☐ UNK. | 48 WEATHER ☐ CLEAR ☐ CLOUDY ☐ RAIN ☐ FOG ☐ SNOW ☐ HAIL ☐ UNK. | 49 PREMISE ☐ HWY.—ST.—ALLEY ☐ RAILROAD ☐ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☐ INDUSTRIAL ☐ SERVICE STA. | ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☐ OTHER |
|---|---|---|---|---|

| 54 VERIFY FOR ☐ Y RAPE EXAM ☐ N | 55 TREAT. FOR ☐ Y RAPE INJURY ☐ N | 56 CIRCUMSTANCES Homicide & Assault LOCATION: RAPE | 57 WEAPON USED ☐ FIREARM ☐ HANDS, FISTS, VOICE, ETC. ☐ KNIFE ☐ OTHER DANGEROUS |
|---|---|---|---|

| 59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN |
|---|

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) DESCRIBE: | 62 DOLLAR VALUE STOLEN | DAMAGED | 63 RECOVERED DATE | VALUE |
|---|---|---|---|---|---|
| | N/A | | | | |

CONFIDENTIAL

CONFIDENTIAL

```
┌─────────────────────┐
│  PLAINTIFF'S         │
│  EXHIBIT             │
│    39                │
└─────────────────────┘
```

CONFIDENTIAL

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | S D D | 65 CURRENCY, NOTES | S R D | 66 JEWELRY | S R D | 67 CONFIDENTIAL | | 68 FIREARMS | S R D | 69 OFFICE EQUIPMENT | S D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 70 ELECTRONICS | S R D | 71 HOUSEHOLD | S R D | 72 CONSUMABLE GOODS | S R D | 73 LIVESTOCK | S R D | 74 MISCELLANEOUS | | S R D |

**VEHICLES**

| 75 CHECK CATEGORIES | ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED |
|---|---|

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|
| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |

| STOLEN MTR. VEH ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY: ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | 90 WARRANT SIGNED ☐ Y # |
|---|---|---|---|
| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | 90 PHONE ( ) |

| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 1984 UCR CODE | 92 STOLEN IN YOUR JURISDICTION? ☐ WHERE? | 94 RECOVERED IN YOUR JURISDICTION? ☐ WHERE? |
|---|---|---|

**TYPE OR PRINT IN BLACK INK**

INCHES    1    2    3    4    5    6

4CJIC—32 REV 8-96

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

**INCIDENT/OFFENSE REPORT CONTINUED**

NARRATIVE

On 7-14-05 This investigator received a Telephone call from Mona Watson stating that she had another victim of Charles Coon's in her office. That she had already interviewed this victim and that he had indicated that Coon had forced this child to perform oral sex on him while at The Abe County Argul school.

I went to Ms Watsons office and was advised that this victim had a learning problem and that he would not talk openly to people he didn't know. I spoke with Ms Reed and we agreed to view the recording and possibly get Ms Watson to ask further questions if needed.

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE

149 REPORTING OFFICER     R.S. Bradbury     5511

150 ASSISTING OFFICER

OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMA

| 1 ORI # 0 5 5 0 0 0 0 | 2 AGENCY NAME Pike Co Sheriff Dept | 3 DATE AND TIME OF REPORT 07-18-05 | : | □ AM □ PM | 4 CASE # | 5 SU |

**EVENT**

7 VICTIM'S NAME (ORIGINAL REPORT) Reed Justin
6 ORIGINAL OFFENSE DATE 07-16-05   8 TYPE REPORT ☑ CONTINUATION  □ FOLLOW-UP
9 ORIGINAL INCIDENT/OFFENSE Sexual Abuse
10 UCR CODE   11 STATE CODE/LOCAL ORDINANCE
12 NEW INCIDENT/OFFENSE
13 UCR CODE   14 STATE CODE/LOCAL ORDINANCE

| 13 HAS AN ARREST BEEN MADE? □ YES □ NO | 16 DATE OF ARREST M D Y | 17 HAS WARRANT BEEN OBTAINED? □ YES ☑ NO  WARRANT # | 18 DATE OF WARRANT M D Y |

20 □ DEFENDANT  □ SUSPECT   NAME-
21 □ DEFENDANT  □ SUSPECT   NAME:

| RACE □W □A ☑B □I | SEX □M □F | DOB M D Y | AGE | RACE □W □A □B □I | SEX □M □F | DOB M D Y | AGE |

**NARRATIVE**

Ms Watson was unable to stay and show me the recording at that time and we made arrangements to come back on 7-15-05. I contacted DA Investigator Bruce Mathews and together we went to view the recording. After viewing the recording we agreed that we needed to re interview Justin, and a time of 9:00AM on 7-18-05 was agreed upon.

I spoke with both Mr & Mrs Reed on 7-14-05 and advised them my concern as to Justin being able to tell his story in front of a judge and jury.

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

22 LOCAL USE
23 STATE USE

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
| S R D C | S R D C | S R D C | S R D C | S R D C |

MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR Max UCR CODE
35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? □  □ WHERE?
36 RECOVERED IN YOUR JURISDICTION? □  □ WHERE?

**ADMINistrATIVE**

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED SIGNATURE □Y □N |

44 CASE STATUS □ PENDING □ INACTIVE □ CLOSED
ENTERED ACIC/NCIC DATE
45 CASE DISPOSITION:
□ CLEARED BY ARREST (JUV.)
□ CLEARED BY ARREST (ADULT)
□ UNFOUNDED
□ ADM. CLEARED
□ EXCEPTIONAL CLEARANCE:
□ SUSPECT/OFFENDER DEAD
□ OTHER PROSECUTION
□ EXTRADITION DENIED
□ LACK OF PROSECUTION
□ JUVENILE, NO REFERRAL
□ DEATH OF VICTIM
46 REPORTING OFFICER R.S. Beachway   ID #
47 ASSISTING OFFICER   5511 ID #
48 SUPERVISOR APPROVAL   ID #
49 WATCH CMDR.   ID #

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

CRIMINAL INCIDENT/OFFENSE REPORT SUPPLEMENT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATI

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 0 5 5 0 0 0 0 | Pike Co Sheriff Dept | 07 18 05 | | |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) |
|---|
| Reed Justin |

| 8 ORIGINAL INCIDENT/OFFENSE | 9 ORIGINAL OFFENSE DATE | 6 TYPE REPORT |
|---|---|---|
| Sexual Abuse | 02 R410's | ☐ CONTINUATION  ☒ FOLLOW-UP |

| 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT |
|---|---|---|---|
| ☐ YES  ☒ NO | M D Y | ☐ YES  ☒ NO  WARRANT # | M D Y |

| 20 ☐ DEFENDANT  ☐ SUSPECT | 21 ☐ DEFENDANT  ☐ SUSPECT |
|---|---|
| NAME: | NAME: |

| RACE | SEX | DOB | AGE | RACE | SEX | DOB | AGE |
|---|---|---|---|---|---|---|---|

**NARRATIVE**

As arranged Ms Reed brought Justin into my office so that I might talk with him about Mr Coon and any sexual advances made towards him.

After getting to know him, I asked him if anyone had touched him or made him feel uncomfortable. Justin stated Mr Coon his band director. When asked what Mr Coon had done Justin stated that Coon had touched his private parts. When asked how, Justin stated that Mr Coon and rubbed his privates thru his pants. Justin further stated that this activity took place in the band room at Pike County High School in Brundidge, Alabama.

Justin also stated that Mr Coon had come to his residence and had tickled his brother Joey and himself. Tape of interview of Justin given to DA Investigator Matthews to be transcribed.

| 22 LOCAL USE |
|---|

| 23 STATE USE |
|---|

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D | S R D |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24m UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐  ☐ WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐  ☐ WHERE? |
|---|---|---|

**ADMINISTRATIVE**

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED |
|---|---|---|---|---|---|---|---|

| 44 CASE STATUS | 45 DISPOSITION: | 46 REPORTING OFFICER | ID # |
|---|---|---|---|
| ☐ PENDING | ☐ CLEARED BY ARREST (JUV.) | ☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD | RS Bradbury  5511 |
| ☐ INACTIVE | ☐ CLEARED BY ARREST (ADULT) | ☐ OTHER PROSECUTION  ☐ EXTRADITION DENIED | 47 ASSISTING OFFICER  ID # |
| ☐ CLOSED | ☐ UNFOUNDED | ☐ LACK OF PROSECUTION | |
| ENTERED ACIC/NCIC DATE | ☐ ADM. CLEARED | ☐ JUVENILE, NO REFERRAL  ☐ DEATH OF VICTIM | 48 SUPERVISOR APPROVAL  ID #   49 WATCH CMDR.  ID # |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

Reed v. PCBE

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATIO

**ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED**

| 50 DATE AND TIME OF REPORT | | 51 CASE # | 62 SFX |
| M | D | Y | : | | |
| 53 TYPE REPORT: ☐ 1. CONTINUATION ☐ 2. FOLLOW-UP | | | |

NARRATIVE

On 7-19-05 Tammy Ferm The Child Advocacy Center Telephoned And stated That she Had Maua Watson's Report Typed And I could pick up a copy.

I picked up This Report And FAXed A copy OF The Report To Dwight Walloy At The DA's Office in Enterprise, Alabama.

**TYPE OR PRINT IN BLACK INK ONLY**

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

STATE OF ALABAMA

vs.

CHARLES LESLIE COON,
DEFENDANT.

\*
\*
\*
\*
\*
\*

IN THE DISTRICT COURT OF
PIKE COUNTY, ALABAMA

CASE NO. DC 2005-438, 2006-272

## ORDER

These cases having come before the Court on Complaints and Warrants, the defendant appeared in court together with his attorney, J. McGowin Williamson, and Larry Jarrell representing the State of Alabama. The defendant was informed of the charge of Sexual Abuse, First Degree, his rights, and the possible punishment for the offense. The defendant pled guilty as charged, and the Court determined that the plea of guilty to Sexual Abuse, First Degree, should be accepted by the Court. The parties were allowed to comment and present evidence relating to the sentence.

### IT IS, THEREFORE, ORDERED as follows:

1. Charles Leslie Coon is adjudged guilty of the offense of Sexual Abuse, First Degree, and he is sentenced to one year in the Pike County Jail in each case with the sentences to run concurrently with each other and with any and all other sentences presently being served by the defendant.

2. The defendant will pay a $25.00 Crime Victims Compensation Assessment and the costs in these cases.

3. The defendant is not entitled to jail credit.

**DONE AND ORDERED this 21st day of March, 2006.**

_____
DISTRICT JUDGE
PIKE COUNTY, ALABAMA

Williamson

PLAINTIFF'S
EXHIBIT
40

Reed v. PCBE
471

STATE OF ALABAMA,
PLAINTIFF
VS.

*Charles Leslie Coon*
DEFENDANT

IN THE _District_ COURT OF
_Pike_ COUNTY, ALABAMA
_____ DIVISION
CASE NO. _DC 05-438_
_DC 05-272_

## SETTLEMENT AGREEMENT

After discussion and negotiation between counsel for the defendant, defendant and the prosecution, it is agreed, subject to accept-
ance by the Court that:

1.    The defendant will enter a plea of guilty to the charge(s) of _Sexual Abuse 2nd X 2_

2.    The prosecutor will recommend, and defendant agrees to accept a sentence of: _1 year in County Jail each case concurrently and Concurrently with any sentence presently serving_
_____ $ Demand Reduction Assessment, $_____ Dept. Forensic Science Fine, _____ months loss of driver's license,
CRO/SAP, $_____ FINE.

3.    Whether sentence is Suspended? Split? Probation? _____

4.    If probation is part of the agreement, Defendant will carry out all GENERAL conditions of probation. As a SPECIAL condition of probation, Defendant will pay court ordered monies at the rate of $_____ per _____ until court ordered monies are paid in full.

5.    Defendant will pay RESTITUTION in the amount of $_____ to the Clerk of Court for distribution to:
_____

6.    Defendant shall be ordered: to pay COSTS of court in each case; an assessment to the Crime Victim's Compensation Commission of $ _25.00_ AND defendant ☑ will ☐ will not be required to reimburse the State of Alabama for indigent attorney's fees.

7.    Defendant affirmatively states Defendant reserves no issues for appeal. As a basis of this Settlement Agreement, Defendant waives/gives up any right of appeal in the above styled. Defendant acknowledges he is aware he has a right to demand a Pre-Sentence Report before Sentencing. Defendant expressly waives/gives up his right to demand a Pre-Sentence Report of Investigation before sentencing.

8.    Defendant shall receive credit for time spent in custody while awaiting trial and/or disposition in this/these case(s).

9.    No other terms or conditions related to judgment and sentence in this/these case(s) are agreed on or contemplated by the defendant or the prosecutor. The parties stipulate Defendant has _____ proper, prior felony convictions which are to be used for enhancement of sentence.

PLAINTIFF'S
EXHIBIT
#1

_Charles Coon_
Signature of Defendant

_____
Signature of Defendant's Counsel

_Larry C. Daniel_
Signature of Prosecutor

Having reviewed the settlement agreement entered into by the defendant and the prosecutor, the Court hereby:
☑ Accepts the Settlement Agreement and incorporates same in the judgment and sentence.
☐ Rejects the Settlement Agreement and modifies the terms as follows: _____

_3/21/06_
Date

_____
Judge

BMP 4

Reed v. PCBE
472

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JR, a minor, by his mother and father,
EAR and TMR,

       Plaintiffs,

v.                                                                Civil Case Number: 2:06-CV-1120-MEF

PIKE COUNTY BOARD OF EDUCATION,

       Defendant.

## REPORT

This report is submitted by James D. Sears, Ed.D., J.D., at the request of the Plaintiffs.

<u>Bases of the facts and opinions of this report.</u>  In addition to relying on my education, training and experience, I reviewed the following depositions, documents and exhibits for the purposes of establishing facts and forming opinions related to this action:

Depositions:

| | |
|---|---|
| Mark Bazzell | Superintendent, Pike County Board of Education |
| Robert McDaniel | Assistant Principal, Wilcox Central High School |
| Terry Casey | Former Principal, Pike County High School |
| Mona Watson | Guidance Counselor, Pike County High School |
| Karen Berry | Pike County Board of Education, Special Education Coordinator |
| Lucia Grantham | Troy State University Faculty |

Documents and Exhibits:

       Plaintiff's Complaint
       Plaintiff's First Amended Complaint
       JR's IEP (8/1/2004–5/31/2005)
       JR's IEP (8/10/2005–5/25/2006)
       Pike County Board of Education Organizational Diagram
       Pike County Board of Education Student Code of Conduct (Revised June 2003)
       Pike County School System Essential Administrative Information (2006-2007 School Year)
       Pike County Schools High School Student Planner 2004-2005
       Pike County Board of Education Policies
       Memorandum from Mark Bazzell re: New Teacher Orientation
       Charles Coon Employment Application

DEFENDANT'S
EXHIBIT

11

Pike County High School Faculty Handbook
Pike County High School--School Safety Plan
General Correspondence
Charles Coon Application for Retirement
Letter from Mark Bazzell placing Charles Coon on Administrative Leave
JR–Psychological/Educational Evaluations
Case Action Summaries for Sodomy 2nd Degree and 2 Counts of Sexual Abuse 2nd Degree.

Established Facts

JR, the child of EAR and TMR, is an adolescent male who is, and was at all times material to this action, functioning in the intellectual range of an individual who has mental retardation. He also had diagnoses of Oppositional Defiant Disorder, Attention Deficit Disorder, and severely delayed oral expression skills. Psychoeducational evaluations place him in the borderline to severe levels of mental retardation. His performance evaluation and IEPs indicated that he was operating at the level of an individual in the mental age range of a seven-to-nine year old. JR's disability places him in a constitutionally protected class.

Charles Coon has plead guilty to one count of 2nd degree sexual abuse as to the plaintiff in this action, one count of 2nd degree sodomy of BF, another student in his classes, and one count of sexual abuse of the brother of JR.    At the time of the aforementioned violations Coon was employed as a teacher with the Pike County Board of Education. JR was one of the students in his band class and under his direct supervision.

Mark Bazzell, Terry Casey and Robert McDaniel, at all time material to this action, were in positions of administration and authority with the Pike County Board of Education and therefore had the duty to ensure the safe operations of Pike County High School and the health and safety of the students enrolled therein. Further, Bazzell, Casey and McDaniel, in their official capacities had the duty to ensure the proper training of subordinate staff, including Coon, and students and parents and to supervise, monitor and enforce board policies.

The Pike County Board of Education had the duty to develop, implement, supervise, and enforce school policies. The Pike County Board of Education was responsible for the hiring and termination of all Board Employees.

Opinion

JR is a student who has special vulnerabilities due to his disability. He is classified by the school district as mentally retarded. This means that he has significantly subaverage intellectual functioning and deficits in adaptive functioning. Thus, he will have difficulty not only in academic tasks but also in social and practical skills which fall within the rubric of "adaptive behavior." For example these students have a lack of social awareness, a diminished ability to distinguish right from wrong, an inclination to want to seek the approval of an adult who is in a position of authority, language difficulties that decrease the probability of accurate communication with others, including crucial self-reporting and self-esteem issues. All of these characteristics place them in a highly vulnerable position without the direct training or teaching regarding the issues associated with sexual abuse and inappropriate sexual conduct. It is well established in the field of

2

mental retardation, that individuals who have this condition will have difficulty learning in an incidental manner. The education and training should be specific and concrete. There is no evidence that such training occurred for JR. There is no evidence that at any time during JR's educational career has he been exposed to the type of training that would increase his sensitivity to improper sexual advances. This special vulnerability results in a statistical increase in incidence of sexual abuse and vulnerability to criminal conduct generally amongst this segment of the disabled population. This research is comprehensive and professionals in the field should be familiar with this fact.

In addition to the training of the student, it is critically important that the parents of a student who has a disability, especially one of mental retardation, should be made aware of the behaviors of a child who is being pressured to engage in this untoward conduct at the insistence of someone in authority over the child. Parents should also be made aware of "grooming" activities of sexual predators so that they can recognize this conduct as it occurs with their child. Parents should know the reporting procedures in such instances. There is no other agency which would have the opportunity to discuss these matters with the parents of a child with a disability other than school authorities.

Moreover, during any investigation of teacher sexual abuse, the student population under that teacher's control should be surveyed to determine if there are any students with special vulnerabilities, such as JR, who should be separately interviewed. The parents of a child with a disability should be contacted to discuss the potential for abuse and to investigate any unusual contact between the alleged abuser and the student. In this particular case, a discussion of the allegations of sexual abuse with the parents of JR would have yielded a wealth of information about the teacher's behavior, including his visits to the student's house, his contact in the chat rooms and e-mail and his invitations to take students to his home.

In this case, JR is placed in a class with a teacher who has been employed by an unusually conspicuous number of school systems. Allegations had been made that one or more of five band students may have been smoking marijuana with this teacher and that one of the students was known as his "butt buddy." The superintendent clearly understood this reference to have sexual content. At that time a haphazard investigation was made by personnel without any apparent qualifications as forensic interviewers. No survey was done to determine if any of the special education population was in contact with this teacher and whether special investigatory efforts were required with respect to those students. Thus, the student was left in this class after authorities became aware that there were allegations of sexual abuse of one or more other students in the band and no effort was made to discuss the matter with this student despite the fact that self-reporting was not a viable option nor had the process of self-reporting ever been explained to him.

The amount of time devoted to the subject of sexual abuse and misconduct in the teacher workshops and inservice is woefully insufficient. The allotted time that was devoted to this subject during staff training would only allow for a cursory treatment of the issue. How to recognize the predatory behaviors of individuals who are intent on corrupting the teacher-student relationship was not addressed. Moreover, the training was limited to a set of elementary school teachers on one occasion. The suggestion by the Special Education Coordinator that the "Building Based Support Team" (the BBST) receives training in sexual abuse is ludicrous. The BBST is designed only to explore educational options prior to identifying a student as a student with a disability and the possibility that students who have been abused may need special education services or interventions.

3

This subject matter is not comfortably discussed in any setting, especially in an educational setting. However, simply having a policy against "sexual harassment" that is not explained to (a) students and their parents, and (b) teachers and other school personnel, is not sufficient to establish a knowledgeable basis for an investigation or for appropriate reporting procedures. Moreover, there is no indication that JR could have read and comprehended these policies or that they were explained to him orally and on a level at which he could comprehend their content. Here, the Pike County Board of Education and its administrators have demonstrated a complete disregard for the needs of this special population as it relates to sexual abuse policies and procedures. Moreover, any such policy would have to include procedures specially tailored to address students who cannot self-report and/or may be unable to identify inappropriate sexual conduct. There is no indication there were any such policies for this population subgroup. This is not unlike equipping a school for the deaf with only an auditory fire alarm. The students are at special risk from the minute they enter the building.

The procedures that the Defendants have for training, investigating, and reporting, sexual violations against students by teachers, do not adequately address the magnitude of the problem. Adding the dimension of a disability, such as mental retardation where there is a natural reluctance to self-report, makes the Defendants' deficiencies more reprehensible.

<div style="text-align:center">

_____s/James D. Sears_____
JAMES D. SEARS, Ed.D., J.D.

</div>

SEARS LAW FIRM
816 Manci Avenue
Daphne AL 36526
251/621-3485
Fax: 866/436-3778
jdsears@searslawfirm.com

4

**Interactive, Inc.**
*e.valuation for e.learning*



Educator Sexual Misconduct:


# A Synthesis of Existing Literature

Prepared for

**Planning and Evaluation Service**
**Office of the Undersecretary**
**US Department of Education**


By

**Charol Shakeshaft, Ph.D., Professor,**
**Foundations, Leadership and Policy Studies,**
**Hofstra University and**
**Managing Director, Interactive, Inc.**


**1 March 2004**
**Other submitted versions:  5 March 2003;  20 May 2003; 18 November 2003;**
**16 January 2004**

61 Green Street • Huntington, New York 11743-6913
Phone: 631-351-1190 • Website: www.interactiveinc.org • Fax: 631-351-1194

TABLE OF CONTENTS

1.0 Purpose and Methods of Synthesis                                         1
    1.1 Definitions                                                        1
    1.2 Scope of synthesis search                                          3
    1.3 Methods of synthesis                                               4

2.0 Description of Existing Research, Literature, or Other Verifiable Sources     4

    2.1 Categories of discourse                                            4
    2.2 Systematic studies                                                 5
    2.3 Practice-based accounts with first or third person descriptions    8
    2.4 Newspaper and other media sources                                 10
    2.5 General child sexual abuse data sets and instruments              11
    2.6 Availability of research                                          12

3.0 Prevalence of Educator Sexual Misconduct                                13
    3.1 Sources and methods                                               13
    3.2 Prevalence in the U.S.                                            17
    3.3 Prevalence in the U.K.                                            17

4.0 Offender Characteristics                                                18
    4.1 Job of offenders                                                  18
    4.2 Sex of offenders                                                  20
    4.3 Age of offenders                                                  22
    4.4 Same sex offenders                                                22

5.0 Targets of Educator Sexual Misconduct                                   23
    5.1 Sex of targets                                                    24
    5.2 Race/ethnicity of target                                          24
    5.3 Disability and targets                                            25

6.0 Patterns of Educator Sexual Misconduct with Students                    27
    6.1 Context                                                           27
    6.2 Selection                                                         28
    6.3 Maintaining secrecy and silence                                   28
    6.4 Geography of abuse                                                29

7.0 Allegations and Response                                                30
    7.1 Allegations                                                       30
    7.2 Response to allegations                                           31
    7.3 Investigative practices                                           31
    7.4 False accusations                                                 32
8.0 Extent and Impact of Legal Initiative                                   33
    8.1 Federal laws                                                      33
    8.2 State child sexual abuse laws                                     36

8.3 State sexual assault laws                                          36
8.4 State educator sexual misconduct laws                             36
8.5 Limitations of state laws                                         36
8.6 Tenure and licensure                                              36

9.0 Effects of Educator Sexual Misconduct                             38
9.1 Effects on abused students: Academic, emotional and               38
    developmental
9.2 Effects on other students                                         39

10.0 Consequences of Allegations of Educator Sexual Misconduct        40
10.1 Consequences for  abusers                                        40
10.2 Consequences for targets                                         41

11.0 Union and Professional Organization Roles                        42
11.1 Actions of teacher unions                                        42
11.2 Actions of professional organizations                            42

12.0 Prevention of Educator Sexual Misconduct                         43
12.1 Develop district and school level policies                       43
12.2 Hiring practices                                                 43
12.3 Screen employees                                                43
12.4 Assign a case coordinator and central information               44
    law enforcement agencies
12.5 Report all allegations to both child protection and law enforcement  44
12.6 Develop thorough investigative practices                         44
12.7 Educate employees                                               44
12.8 Educate students                                                45
12.9 Be aware of signs of educator sexual misconduct                 45
12.10 Change state educator certification regulations                45
12.11 Provide adequate state registry                                45
12.12 Provide adequate federal registry                              45
12.13 Enact and standardize state policies and statutes              46
12.14 Enact laws giving immunity to public employees who provide     46
12.15 Expand Title IX                                                46

13.0 Summary of Existing Studies and Recommendations for             47
    Additional Analysis

Appendix I. Newspaper articles reviewed                              49

Appendix I. Studies and Measures of Child Sexual Abuse               78

Bibliography                                                         86

## LIST OF TABLES

Table 1.  Empirical Studies of Educator Sexual Misconduct                6
Table 2.  Summary of Practice-Base, First Person Reports and              9
          Third Person Reports
Table 3.  Studies of Prevalence of Educator Sexual Misconduct in U.S.    13
Table 4.  Percent of U.S. Students Who Have Experienced Educator         17
          Sexual Misconduct by Method
Table 5.  Sources for Descriptions of Offenders                          19
Table 6.  Percent of Student Targets by Job Title of Offender            20
Table 7.  Sex of Offenders                                               21
Table 8.  Same Sex Abuse                                                 22
Table 9.  U.S. Sources for Descriptions of Targets                       23
Table 10. Targets by Sex                                                 24
Table 11. Targets by Race/Ethnicity vs. Sample                           24
Table 12. Targets by Race/Ethnicity and Sex vs. Sample                   25
Table 13. Sexual Abuse Reports by Disability Status                      26
Table 14. Sources for Descriptions of Patterns                           27
Table 15  Sources for Allegations and Response                           30
Table 16. Features Being Considered for Legislation                      35
Table 17  Effects of Educator Sexual Misconduct                          38
Table 18. Educator Sexual Misconduct: Data Available and Needs           47
          For Future Research

# Educator Sexual Misconduct:
# A Synthesis of Existing Literature

## 1.0    PURPOSE AND METHODS OF SYNTHESIS

Section 5414 of the Elementary and Secondary Education Act of 2001 as amended in the No Child Left Behind Act authorizes a national study of educator sexual misconduct.  This synthesis reviews existing data which relate to educator sexual misconduct including the methods used to collect those data.  This report documents research on educator sexual misconduct, <u>not</u> advice or practice recommendations unless supported by data.[1]   Using data related to sexual misconduct, the synthesis examines:

- Incidence and prevalence
- Offender descriptions
- Target/victim descriptions
- Patterns of misconduct
- School district responses
- Legal remedies
- Effects on targets and others
- Consequences to offenders of allegations
- Union and professional organization roles
- Prevention

**1.1    Definitions.**  The phenomena examined in this synthesis include behavior by an educator that is directed at a student and intended to sexually arouse or titillate the educator or the child.  In this review, "educator" includes any person older than 18 who works with or for a school or other educational or learning organization.  This service may be paid or unpaid, professional, classified or volunteer.  Adults covered by this review might be teachers, counselors, school administrators, secretaries, bus drivers, coaches, parent volunteers for student activities, lunchroom attendants, tutors, music teachers, special education aides, or any other adult in contact in a school-related relationship with a student.

"Students" include any person, whatever age, in an educational institution up through 12th grade.  This review does not examine the literature on post secondary or higher education educator-to-student sexual misconduct.

The behaviors included in the review are physical, verbal, or visual.  Examples include touching breasts or genitals of students; oral, anal, and vaginal penetration; showing students pictures of a sexual nature; sexually-related conversations, jokes, or questions directed at students.

---

[1] Practice guidelines can be found in Bithell, 1991; Hendrie, 1998 and 2003; Jennings and Tharp, 2003; Olson and Lawler, 2003; Robins, 1998; Ross and Marlowe, 1985; Seryak, 1997; Shakeshaft and Cohan, 1994 and 1995; Shakeshaft, 1994, 2002, 2003; Shoop, 2004; Willmsen and O'Hagan, 2003; Zemel and Twedt, 1999.

"Molestation", "rape", "sexual exploitation", "sexual abuse", "sexual harassment" – these words and phrases are often used to describe adult-to-student sexual abuse in schools. Shoop (2004) defines these behaviors as educator sexual exploitation. There is considerable discussion concerning the appropriate label for these actions. While "*educator sexual abuse*" is a common reference, "*educator sexual misconduct*" is a more appropriate term for the purposes of this review.

In naming the focus of this inquiry, I use as a guide the policy of The Ontario (Canada) College of Teachers that recommends the term *educator sexual misconduct* because the phrase "educator sexual abuse" fails to include the larger set of inappropriate, unacceptable and unprofessional behaviors.

By referring to "sexual abuse" the emphasis is placed on the victim, and the question of whether the victim did or did not suffer abuse or harm. This is not the appropriate focus. The proper emphasis must not be on the student, but on the teacher, who is solely responsible for his or her professional conduct. That is why the College believes it is preferable to define "sexual misconduct". (Ontario College of Teachers, 2001, p. 3)

The Ontario College of Teachers arrived at this position as a result of a 4-year series of reports and legislation. Their policy referred to the earlier Robins report which discussed the inadequacies of the term "sexual abuse" because it failed to capture the full range of sexual misconduct which may properly be the subject of disciplinary actions by an educator's employer.[2] Further, the term conveys to many the incorrect assumption that the only types of behaviors that count as sexual abuse are physical, criminal, or involve a significant age difference.

For instance, patterns of grooming a potential victim of sexual abuse are not commonly included in criminal definitions of child sexual abuse, and yet are very much part of the pattern of abuse. Other behaviors encompassed under "educator sexual misconduct" that might not be assumed using conventional definitions are an excess of academic or school-related contacts such as email messages or telephone calls not directly related to assignments or classroom expectations, gifts to students, invitations to an educator's home or to social events, questions about sexual activity, and offers of rides to or from school activities. While traditional definitions of sexual abuse are included under the umbrella of educator sexual misconduct, they are insufficient in describing the range of behaviors that are the focus of this report. These additional components of inappropriate behaviors cross boundaries of professional obligation, but may

---

[2] In response to Justice Robins' 1998 report of a government funded study, "Protecting our students: A review to identify and prevent sexual misconduct in Ontario schools", the Ontario legislature passed the Student Protection Act (SPA). The SPA had created a definition of sexual abuse that the Ontario College of Teachers, the regulatory body of the teaching profession in Ontario, found inadequate. In a brief to the legislature and then in its first professional advisory, the Ontario College of Teachers defined the parameters and the language to discuss issues of educator sexual misconduct.

not yet be sexual.  However, they are often the best indicators of the potential for harm.

Using the Ontario College of Teachers "Professional Advisory on Professional Misconduct Related to Sexual Abuse and Sexual Misconduct" (2002, p.2) as a guide, educator sexual misconduct in this review is defined as any "behavior of a sexual nature which may constitute professional misconduct." (p. 1).  Included in this broad listing are several types of conduct including overt and covert actions:

- Any conduct that would amount to sexual harassment under Title IX of the (U.S.) Education Amendments of 1972.
- Any conduct that would amount to sexual abuse of a minor person under state criminal codes.
- Any sexual relationship by an educator: with a student, regardless of the student's age; with a former student under 18; with a former student (regardless of age) who suffers from a disability that would prevent consent in a relationship.  All students enrolled in the school and in any organization in which the educator holds a position of trust and responsibility are included.
- Any activity directed toward establishing a sexual relationship such as sending intimate letters; engaging in sexualized dialogue in person, via the internet, in writing or by phone; making suggestive comments; dating a student.

This definition includes criminal, civil, and professional codes of conduct and responds to the missing elements in much of the literature on child sexual abuse.  It will be central to the development of future studies on educator sexual misconduct.

**1.2    Scope of synthesis search.**  Using the general descriptor "educator sexual misconduct" (and its subsidiary or component behaviors), I have identified nearly 900 relevant citations including *sui generis* original studies, secondary analyses of existing data, journalistic articles, reports for professional and governmental organizations, and other related scholarship.  I searched reference databases in education, juvenile and criminal justice, social sciences, law and public policy.

I augmented those searches by contacts through listservs and website destinations.  Over 1,000 researchers, educators and policy makers were contacted to identify current studies of educator sexual abuse.  In particular, I examined sources identified for data on educator sexual misconduct that:

- Document frequency
- Describe offenders/predators
- Describe student targets/victims
- Identify patterns of misconduct
- Detail school district responses

- Examine legal solutions
- Describe effects on targets
- Document consequences for offenders
- Detail union and professional organization involvement
- Document prevention interventions

**1.3    Methods of synthesis.**  Appropriate synthesis techniques depend on the design of studies and the types of data in the research literature.  Normally, a research synthesis includes search, review, categorization, frequency analysis, comparative analysis and weighting or evaluating the results.  Synthesis usually follows these steps:

- Assign studies to topical areas
- Screen for studies based upon empirical data
- Categorize by research method
- Assess research quality and design
- Assign confidence intervals by research design type and quality
- Synthesize results using: lists of findings, counts of expert judgments, and/or meta-analysis

Unfortunately, there are few empirical studies on educator sexual misconduct.  As a result, there are insufficient studies to undertake even the simple synthesis method of counting the votes, let alone to merit the more formal and rigorous methods of synthesis such as meta-analysis.  Thus, this synthesis is confined to a review of existing empirical literature and identification of issues which need initial or further study.  This report does not review discussions of best practice that are not based upon data.

**2.0    DESCRIPTION OF EXISTING RESEARCH, LITERATURE, OR OTHER VERIFIABLE SOURCES**

**2.1    Categories of discourse.**  The citations identified can be categorized as:
- Books, government reports, and journal articles that describe systematic studies that can be replicated or verified
- Books, government reports, and journal articles that include first or third person accounts of cases or incidents of educator sexual misconduct within a context of practice-based knowledge.
- Newspaper or popular magazine reports of cases or descriptions of educator sexual misconduct

**2.2    Systematic studies**.  Although I identified nearly 900 citations in the literature[3] that discussed educator sexual misconduct in some format, there were only 14

---

[3] The bibliography includes all sources that were screened for an empirical or systematic analytic foundation.

U.S. [4] and 5 Canadian or UK[5] empirical studies on educator sexual misconduct.   Of the U.S. studies, only one (Shakeshaft, 1994, 1995) received federal funding (U.S. Department of Education).  None of these studies -- either singly or as a group --answer all of the reasonable questions that parents, students, educators and the public ask about educator sexual misconduct, and they certainly do not provide information at a level of reliability and validity appropriate to the gravity of these offenses.  Nevertheless, the purpose and approach of these studies, which are briefly described in Table 1, are the best currently available**.**

      **2.2.1  U.S. nationwide studies**.  Four studies include survey data from national samples, but only the AAUW studies are based upon data from a representative national sample (AAUW, 1993; 2001; Cameron et al, 1986; Stein, Marshall, and Tropp, 1993; SESAME, 1997).  There are three studies which examine national samples of cases or regulations (Hendrie, 1987, 2003; Zemel and Twedt, 1999).

      The American Association of University Women (AAUW) *Hostile Hallways* surveys, administered to a nationwide sample of 8th to 11th grade students in 1993 and again in 2000, are the only studies that provide reliable nationwide U.S. data on educator misconduct.  The purpose of these two studies was not specifically to document educator sexual misconduct.  Peer sexual harassment is the primary focus of the surveys and the reports. However, the data from these studies were subjected to a secondary re-analysis which focused only on educator sexual misconduct (Shakeshaft, 2003).

      Cameron, Coburn, Larson, Proctor, Forde, and Cameron (1986) surveyed 5 metropolitan areas in different geographic locations to gather data on sexual attitudes, activities, and experiences.  Although not the direct focus of this inquiry, questions were included that documented respondent experience with teacher sexual misconduct.

      Stein, Marshall, and Tropp (1993) analyzed results of a survey included in *Seventeen Magazine*.  Although they came from across the United States, respondents were not representative because all were female readers of the magazine who volunteered to return the survey.

      SESAME (1997) also surveyed volunteers who had been targets of educator sexual misconduct.  The respondents sample came from all parts of the United States, included both sexes, but was a volunteer sample.

---

[4] AAUW 1993, 2001; Cameron et al., 1985; Corbett, Gentry, and Pearson, 1993; Hendrie, 1998, 2003; Jennings and Tharp, 2003; SESAME, 1997; Shakeshaft and Cohan, 1994, 1995; Shakeshaft, 2003; Stein, Marshall, & Tropp, 1993; Willmsen and O'Hagan, 2003; Wishnietsky, 1991; Zemel and Twedt, 1999
[5] Abuse and Disability Project, 1992; Robins, S., 1998.  UK studies: Cawson, Wattam, Brooker, & Kelly, 2000; Freel, 2003; Gallagher, 2000

| Table 1. Empirical Studies of Educator Sexual Misconduct | |
|---|---|
| **Study** | **Description** |
| *Abuse and Disability Project* (1992). Edmonton, Canada: University of Alberta. Edmonton, 1992 | Analysis of 162 cases of sexual abuse of children or adults with disabilities in Canada. Reports on abuse by transportation workers. |
| American Association of University Women (1993). *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation. | 1,632 field surveys of U.S. public school students in grades 8 to 11 in 79 schools. The sample was representative of students in public schools in the U.S. Students in this sample were asked questions about physical, verbal and visual sexual harassment |
| American Association of University Women (2001). *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation. | Replication of 1993 study. 2,063 field surveys of U.S. public school students in grades 8 to 11. The sample was representative of students in public schools in the U.S. Students in this sample were asked questions about physical, verbal and visual sexual harassment. |
| Paul Cameron, William Coburn, Jr., Helen Larson, Kay Proctor, and Nels Forde and Kirk Cameron (1986). Child Molestation and Homosexuality. *Psychological Reports*, 58, 327-337. | Cluster sample of 5 metropolitan areas. Door-to-door sampling and administration of a 550 question survey about sexual attitudes, activities and experiences. 4,340 surveys were retuned, a 45.5% response rate. |
| Pat Cawson, C. Wattam, S. , Brooker, and G. Kelly (2000) *Child Maltreatment in the United Kingdom: A Study of Prevalence of Child Abuse and Neglect.* London: NSPCC | Interviews of United Kingdom national random sample of 2,869 young people ages 18-24 on incidence of sexual abuse as children. |
| Kelly Corbett, Cynthia Gentry, and Willie Pearson, Jr. (1993). Sexual harassment in high school. *Youth and Society, 25*(1), 93-103. | Survey of 185 college students in an introductory sociology course. Survey asked students to estimate sexual harassment of a student in high school by a teacher, both about other students and themselves. |
| Mike Freel (2003). Child Sexual Abuse and the Male Monopoly: An Empirical Exploration of Gender and a Sexual Interest in Children. *The British Journal of Social Work*, 33 (481-498). | Paper and pencil survey of 92 female and 91 male U.K. public sector child care workers examining their sexual interest in children as well as incidence of sexual abuse as children. |
| Bernard Gallagher (2000). The extent and nature of known cases of institutional child sexual abuse. *British Journal of Social Work,* 30 (795-817). | Search of 20,000 child protection files from 8 English and Welsh regions. Descriptions of reports of child sexual abuse by a worker in the institution. |
| Caroline Hendrie, (December 2, 9, 16, 1998) A Trust Betrayed. Sexual Abuse by Teachers. *Education Week*. | Compilation of 244 cases active in either criminal or civil courts or being handled by school district investigators between March and August of 1998. Survey of officials from each of the 50 states on their laws and policies on sexual relations with students and the reporting of alleged abuse by school employees. |

| Table 1. Continued | |
|---|---|
| **Study** | **Description** |
| Caroline Hendrie, (April 30 & May 7, 2003)  Trust Betrayed. An Update of Sexual Misconduct in Schools. *Education Week*. | Two part series updating 1998 three part series.  Survey of state sexual misconduct policies. |
| Diane Jennings and Robert Tharp (May 4, 5, 6, 2003) Betrayal of Trust. *The Dallas Morning News*. | Three part series examined 606 cases of educator sexual abuse in Texas from records about disciplined educators maintained by the State Board of Educator Certification. |
| Sydney L. Robins, (2000).  *Protecting Our Students:  A Review to Identify & Prevent Sexual Misconduct in Ontario Schools*. | Content analysis of 120 cases of sexual misconduct brought before the Ontario Teachers' Federation and Ontario College of Teachers between 1989 and 1997.  Review of 100 criminal cases against teachers between 1986 and 1997. |
| SESAME , 1997, www.sesamenet.org | Survey of 100 survivors of educator sexual misconduct in U.S.  Data from 74 girls and 26 boys who had been victimized.  Educators identified by staff positions held and survivor reports of consequences for perpetrators. |
| Charol Shakeshaft and Audrey Cohan, (1995, March). Sexual abuse of students by school personnel.  *Phi Delta Kappan*, 76 (7)  513-520. (1994). *In loco parentis: Sexual abuse of students in schools.  What administrators should know*.  Report to the U. S. Department of Education, Field Initiated Grants. | Survey o of 778 superintendents in New York State on incidence of educator sexual misconduct.  Telephone survey of 225 school superintendents who reported they had dealt with educator sexual misconduct. Follow-up interviews with others involved in the cases. |
| Charol Shakeshaft (2003) Educator Sexual Abuse.  *Hofstra Horizons*, Spring, 10-13 | Secondary re-analysis of AAUW Hostile Hallways data to focus on educator sexual misconduct. 2.063 field surveys of public school students in grades 8 to 11.  The sample was representative of the overall population of students in public schools in the U.S. |
| Nan D. Stein, Nancy L. Marshall and Linda R. Tropp (1993).  *Secrets In Public: Sexual Harassment in Our Schools*.  Wellesley, MA:  Wellesley Centers for Women. | Survey in *Seventeen Magazine* on sexual harassment. 4,200 girls grades 2 through 12 responded |
| Christine Willmsen and Maureen O'Hagan (December 14 – 16, 2003).  Coaches who Prey, *The Seattle Times*. | Series on coaches in Washington state who sexually abuse students.  Analysis of school district records that identified 159 coaches that had been reprimanded or fired for sexual misconduct between 1993 and 2003. |
| Dan H. Wishnietsky (1991). Reported and unreported teacher-student sexual harassment. *Journal of Educational Research*, 84 (3), 164-169. | Survey reports from 300 graduates of North Carolina high schools asking their experiences with educator sexual misconduct. |
| Jane Elizabeth Zemel and Steve Twedt (October 31 to November 2, 1999).  Dirty Secrets, *Pittsburgh Post-Gazette*. | Three part series on educator sexual abuse in the Pittsburg, PA Post- Gazette.  Results from survey of state education departments on reasons for revocation of teacher licenses.  Data from 45 states and D.C. public schools. |

Hendrie examined newspaper reports of educator sexual misconduct nationwide (1998) and state criminal and education laws (1998, 2003).   Zemel and Twedt (1999) also surveyed State Education Departments.

**2.2.2   Regional studies**.  In addition to national coverage, there are 6 regional studies (Corbett, Gentry, and Pearson, 1993; Jennings and Tharp, 2003; Shakeshaft and Cohan, 1994, 1995; Willmsen and O'Hagan, 2003; Wishnietsky, 1991; Zemel and Twedt, 1999).   These focus on Texas, New York, Washington, North Carolina and Pennsylvania.

**2.2.3  Canadian and UK studies**.   Five Canadian and UK studies provide data on educator sexual misconduct.  Cawson, Wattam, Brooker, and Kelly (2000) surveyed a random sample of young people in England on the prevalence of sexual abuse of children and included questions on professional identity of offenders.  Freel (2003) surveyed child care providers in England, asking about their sexual attraction to children.  Gallagher (2000) in England and  Wales, Robins (1998) in Canada and the Abuse and Disability Project (1992) in Canada,  all examined public records of educator sexual misconduct.  In the Gallagher study, 20,000 referred cases to social services or the police between January 1988 and December 1992 were searched for instances of sexual abuse of students in institutional settings by those who worked in these settings.

**2.3     Practice-Based accounts with first or third person descriptions.**  The publications in this category describe incidents of educator sexual misconduct from a practice perspective.  The U.S. cases have been collected in a variety of ways:  Bithell (1991); Olson and Lawler (2003); Ross and Marlow (1985); and Shoop (2004) report on incidents encountered during their professional lives.  Seryak (1997), also an educator, invited adults who had experienced childhood sexual abuse to contribute their stories.  Robins (2000) describes situations of educator sexual misconduct included in his data set of 120 cases brought before the Ontario Teachers Federation and Ontario College of Teachers as well as documenting 100 criminal cases against teachers.  Table 2 lists these accounts.

| Table 2.  Summary of Practice-Based, First Person Reports, and Third Person Reports | |
|---|---|
| **Source** | **Description** |
| Sherry B. Bithell (1991). *Educator Sexual Abuse.* Boise:  Tudor House Publishing. | Summary of information on child sexual abuse necessary for educators to effectively intervene.  Portrayals of offenders based upon interviews, observations and court records. Written by educator with 26 years in the public schools who also developed a state-wide program in child abuse prevention. |
| Matthew D. Olson and Gregory Lawler (2003). *Guilty until Proven Innocent.* Stillwater, OK: New Forums Press. | Includes descriptions of 5 cases in which a Colorado teacher was wrongly accused of mistreatment or abuse of a student. Written by the defense attorney and the union representative involved with the case, the descriptions were based upon their interactions with the accused, court records, and newspaper accounts. |
| Victor J. Ross and John Marlowe (1985). *The Forbidden Apple: Sex in the Schools.* Palm Springs, CA: ETC Publications. | Two administrators share their experiences with cases of educator sexual misconduct, provide an overview of the issues, and include advice on preventing sexual abuse of students by adults in schools. |
| Sydney L. Robins (2000). *Protecting Our Students: A Review to Identify and Prevent Sexual Misconduct in Ontario Schools*. Ontario, Canada:  Ontario Ministry of the Attorney General. | Description of educator sexual misconduct cases in Ontario, Canada.  Provides guidance for recognizing and preventing sexual abuse of children by educators. |
| John M. Seryak (1997). *Dear Teacher, If You Only Knew!: Adults Recovering from Child Sexual Abuse Speak to Educators*.  Bath, Ohio: The Dear Teacher Project. | Publication of a project in which adults wrote letters to an imaginary or surrogate teacher about the childhood sexual abuse they experienced.  While the abuse described is not generally by educators, the focus is on the behaviors and cries for help that educators should hear. |
| Robert J. Shoop  (2004). *Sexual Exploitation in Schools: How to Spot It and Stop It.*  Thousand Oaks, CA: Corwin Press. | Used interviews, newspaper reports, journal articles, court documents and personal experience to describe educator sexual misconduct in schools.  Guidelines for recognizing and preventing abuse are included. Includes descriptions of cases of educator sexual misconduct. |

9

**2.4    Newspaper and other media sources**.  Most public knowledge about educator sexual misconduct comes from newspaper reports.  Appendix 1 is a list of newspaper articles reviewed for this synthesis.  Journalists report allegations and these news stories increase public awareness.  The newspaper items excerpted below appeared in one month, February 2003, and are a small sample of the incidents that come to the attention of school and law enforcement officials.

- Henderson, NC: The Henderson Count School Board agrees to pay $1.78 million to the families of 17 children who were alleged sexual victims of a former teacher assistant.
- Augusta, WI:  Family alleges sexual assault of 12-year-old boy by male teacher.
- Ann Arbor, MI:  Male high school teacher assaults female student.
- Indiana:  Former principal of a Baptist school to be sentenced for taking an 11 year old female student across country to have sex with her.
- Omaha, NB:  Wrestling coach sentenced to 45 days in jail and required to apologize publicly to female student he assaulted.
- Sarasota, FL:  Former female high school assistant coach pleads no contest to unlawful sexual activity and committing a lewd and lascivious act with two students on her basketball and softball teams.
- Westminster, CO:  Male coach gets 6 years in prison for sexually assaulting 7 girls on his softball team.
- Amelia, OH:  Former male high school administrative assistant gets 18 month sentence for having sex with female high school student.
- Hackensack, NJ: 42 year old female middle school teacher admits sexual intercourse with 6th grade male student.
- Yonkers, NY:  50 year old male Montessori teacher fondles 7-year-old student in bathroom.
- Bullhead City, AZ:  Male ELL teacher has sexual contact with 12-year-old female student.  Teacher is a registered sex offender in Florida.

While most articles are single reports of cases, several series which include data collection were found.  *Education Week*  produced two multi-part reports of educator sexual misconduct using newspaper reports as the primary data ("A Trust Betrayed: Sexual Abuse by Teachers," December 1998; "Trust Betrayed: Update on Sexual Misconduct in Schools," April 2003.  Hendrie, C.  & Drummond, S., eds.).  Zemel and Twedt (1999) analyzed educator sexual misconduct in a three-part series, including results of a survey of state education departments to document the reasons behind teacher license revocations.

Two recent series, one in the *The Dallas Morning News* (Jennings and Tharp, May 2003) and the other in *The Seattle Times* (Willmsen and O'Hagan, December 2003), examined educator sexual misconduct in the respective states.  Jennings and Tharp focused on 606 cases of educator sexual misconduct from Texas State Board of Educator Certification records and Willmsen and O'Hagan targeted abuse by coaches.

In both instances, reporters commented on the difficulty of obtaining information on educator sexual misconduct.  O'Hagan and Willmsen (December 14, 2003) write:

> When the *Seattle Times* asked the Bellevue School District for information about teachers and coaches accused of sexual misconduct, school officials and the state's most powerful union teamed up behind the scenes to try to hide the files.  Bellevue school officials even let teachers purge their own records at union-organized "file parties" to prevent disclosure.

> *Good Housekeeping Magazine* covered educator sexual misconduct (May 2003; December 2003 follow-up) and also sponsored a write-in campaign from readers to encourage federal action to prevent educator sexual misconduct (http://magazines.ivillage.com/goodhousekeeping/pring/0,,572804m00,html).

**2.5    General child sexual abuse data sets and instruments**.  Appendix 2 lists the most cited surveys, instruments, data sets, or reports that include data on child abuse or that are developed to collect data on child abuse.  While the studies in Appendix 2 aren't specifically focused on educator sexual misconduct, they provide insights into both sexual abuse of children by adults and methods for studying child sexual abuse.

Many of the Appendix 2 studies and surveys on child sexual abuse -- and certainly the most significant ones -- are federally funded.  However, there are no *national* government funded studies that document *prevalence* of <u>educator</u> sexual misconduct.  It is relevant to note that *none* of the federally funded data sets or reports on child sexual abuse listed below and/or included in Appendix 2 even contain questions that would enable analysis of educator sexual misconduct.

- Fast Response Survey System: Principal/School Disciplinarian Study; Violence and Discipline Problems in U.S. Public Schools; Violence and Crime at School
- Indicators of School Crime and Safety, National Center for Educational Statistics and Bureau of Justice Statistics
- Longitudinal Studies on Child Abuse and Neglect (LONGSCAN) Questionnaire, Children's Bureau, U.S. Department of Health & Human Services
- Metropolitan Life Survey of the American Teacher, 1999: Violence in America's Public Schools
- Monitoring the Future 2002, 2002, 2003, National Institute on Drug Abuse
- National Crime Victimization Survey and School Crime Supplement, Bureau of Justice Statistics, National Center for Education Statistics
- National Incidence Studies, National Center of Child Abuse and Neglect (NIBRS)
- National Longitudinal Study of Adolescent Health, National Institutes of Child Health and Human Development (NICHHD)
- National Survey of Adolescents in the United States
- National Survey of Family Growth, National Center for Health Statistics

- National Violence Against Women Survey, National Institutes of Justice and Center for Policy Research
- National Youth Victimization Prevention Programs:  A National Survey of Children's Exposure and Reactions
- Youth Risk Behavior Surveillance System, Centers for Disease Control, National Institutes of Health

Most information on child sexual abuse comes from either child welfare or law enforcement agencies.  A typical example of how studies that report sexual abuse of children are not helpful for understanding educator sexual misconduct is the National Incidence-Based Reporting System (NIBRS).  NIBRS collects data from law enforcement agencies on reported crimes.  However, there is no category in this data set that allows identification by professional caretaker status such as "teacher"; instead, these incidents are included in a category of "acquaintances."  In some state data sets, cases of teacher sexual misconduct would be reported as a "non-family caretaker" or under another general category.

**2.6 Availability of research**.  There are 24 sources which meet the criteria for review.  These studies include systematic focus on issues related to educator sexual misconduct and/or case and practice accounts.

12

**3.0     PREVALENCE OF EDUCATOR SEXUAL MISCONDUCT**

**3.1     Sources and methods.**   Studies documenting child sexual abuse by any adult are conducted using two approaches.  Incidence studies examine child sexual abuse official reports to child protective or criminal agencies.  Prevalence studies ask children or adults if they have ever been sexually abused as a child by an adult**.**  Incidence rates are generally lower than prevalence, since many more children are sexually abused than report this abuse to authorities.  Studies that attempt to distinguish actual cases from reported cases consistently report that only 5 to 6% of child sexual abuse cases become known to social services or the police (Kelly et al, 1991).

Results of prevalence studies differ based upon definitions of sexual abuse, sample, and data collection methods, but range from 13 to 34 percent of females and 7 to 16 percent of males (Freel, 2003).  Gorey and Leslie (1997) in a review of prevalence studies where they controlled for response rates and operational definitions concluded that 15 percent of women and 7 percent of men were sexually abused as children**.**

While there is no <u>national</u> U.S. incidence or prevalence study that has examined educator sexual abuse as its <u>primary</u> purpose, there are 7 U.S. studies using 6 data sets that have examined prevalence of educator sexual misconduct from either an ancillary or regional perspective. (Table 3).

| Table 3.  Studies of Prevalence of Educator Sexual Misconduct in U.S. |
| --- |
| American Association of University Women (1993).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation. |
| American Association of University Women (2001).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation. |
| Paul Cameron, William Coburn, Jr., Helen Larson, Kay Proctor, and Nels Forde and Kirk Cameron (1986).   Child molestation and homosexuality.  *Psychological Reports*, 58, 327-337. |
| Kelly Corbett, Cynthia S. Gentry, and Willie Pearson, Jr. (1993)  Sexual harassment in high school.  *Youth and Society, 25* (1), 93-103. |
| Charol Shakeshaft (2003). Educator Sexual Abuse.  *Hofstra Horizons*, Spring, 10-13. |
| Nan D. Stein, Nancy L. Marshall and Linda R. Tropp (1993).   *Secrets In Public: Sexual Harassment in Our Schools*.  Wellesley, MA:  Wellesley Centers for Women. |
| Dan H. Wishnietsky (1991). Reported and unreported teacher-student sexual harassment.  *Journal of Educational Research*, *84* (3), 164-169. |

**3.1.1.1          AAUW data and Shakeshaft secondary analysis**.  The AAUW "Hostile Hallways" surveys administered in 1993 and again in 2000 provide the most complete data using the most reliable questions.  Both surveys present stems of the question below and ask 8th to 11th grade students to select one of the following frequencies:  "often", "occasionally", "rarely", "never" or "don't know".

During your whole school life, how often, if at all, has anyone (this includes students, teachers, other school employees, or anyone else) done the following things to you when you did not want them to?

- Made sexual comments, jokes, gestures, or looks
- Showed, gave or left you sexual pictures, photographs, illustrations, messages or notes
- Wrote sexual messages/graffiti about you on bathroom walls, in locker rooms, etc.
- Spread sexual rumors about you
- Said you were gay or a lesbian
- Spied on you as you dressed or showered at school
- Flashed or "mooned" you
- Touched, grabbed, or pinched you in a sexual way
- Intentionally brushed up against you in a sexual way
- Pulled at your clothing in a sexual way
- Pulled off or down your clothing
- Blocked your way or cornered you in a sexual way
- Forced you to kiss him/her
- Forced you to do something sexual, other than kissing

Criticisms of the AAUW study for the purposes of estimating prevalence are that:

- Students report on their entire school career, thus making it difficult to determine prevalence by year or grade
- Sample includes only 8-12 graders which might miss earlier incidents not remembered later
- Questions on educator sexual misconduct are limited
- Analysis was broad brushed and cursory, excluding many details of educator sexual misconduct
- Survey only asked about incidents that were unwanted, excluding reports of misconduct that were either welcome or that did not fall into either a welcome or unwelcome category, likely underreporting sexual misconduct

The 2000 AAUW data (published in 2001) were the subject of a secondary analysis (Shakeshaft, 2003)[6] that indicates that 9.6% of all students in grades 8 to 11 report contact and/or non-contact educator sexual misconduct that was *unwanted*.   Of these, 8.7% report non-contact sexual abuse, 6.7% experienced contact abuse.  Of students who experienced any kind of sexual abuse in schools, 21% were targets of educators, while the remaining 79% were targets of other students.

To get a sense of the extent of the number of students who have been targets of educator sexual misconduct, I applied the percent of students who report experiencing

---

[6] AAUW drew from a list of 80,000 schools to create a stratified two-stage sample of 1,559 public school students in grades 8 to 11 who then were surveyed in school in fall 2000.  An additional sample of 505 students, also in grades 8 to 11, completed online surveys in fall 2000.

educator sexual misconduct to the population of all K-12 students.  Based on the assumption that the AAUW surveys accurately represent the experiences of all K-12 students, more than 4.5 million students are sexually harassed or abused by an employee of a school some time between kindergarten and 12th grade.  This is about the same number of people who live in all of Alaska, Delaware, Montana, North Dakota, South Dakota, Vermont and Wyoming.   And this is probably an underestimate since students who were not consciously offended or upset by these actions are not included in this number.

       **3.1.2 Cameron et al. data**.  An earlier survey of 4,340 adults examining sexual attitudes and experiences reported that 4.1% of respondents had a physical sexual experience with a teacher.  Respondents were asked:

> Sometimes people in charge of us or who bear an especially powerful relationship to us have sexual desires for us.  For each of the following kinds of persons, we would like to know how many have made serious sexual advances to you and with how many you have had physical sexual relations (at their initiative or yours).  We would also like to know your age when either or both of these things first occurred.  (p. 329)

This question was followed by a list of 36 different caretakers including secondary, elementary and private teachers.

       The limitations, which suggest an undercount, are:
- A full range of educators was not studied.  Only teachers are included in the list of possible offenders.
- Only physical sexual misconduct was included.
- There is a possibility of non-response bias.  Only 45.5% of those sampled completed surveys.
- The sample is not proportionate to the population.  White respondents are over-represented.  The sample sites were all metropolitan areas.

       **3.1.3  Corbett et al data**.  185 students in Wake Forest and another university who were taking introductory sociology courses completed a survey on frequency of sexual harassment by a teacher in high school.  The students were asked questions both about other students and about their own experiences.  The sample was nearly equally representative of males and females and included 84% white, 13% black and 3% Asian students.  Limitations include the local nature of the study as well as a voluntary sample.

       **3.1.4  Wishnietsky 1991**.  Prior to the AAUW studies, and for a regional population, Dan Wishnietsky tried to determine the extent of sexual abuse by staff in schools, surveying 300 1989 graduates of North Carolina high schools. His findings of students who have been the targets of educator sexual misconduct are five times those of the AAUW study. In his survey he used this definition of sexual harassment and abuse:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly as a term or condition for academic advisement, (2) submission to or rejection of such conduct by an individual is used as a basis for academic decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive academic environment (1991, p. 167).

Wishnietsky then asked the graduates, "Based on the above definition, do you believe that you experienced sexual harassment during your high school years?" Forty three percent reported insulting comments, looks, or gestures by a teacher; 17.5% reported sexual touching; and 13.5% reported sexual intercourse with a teacher.

The criticisms of Wishnietsky's study are that:
- The response rate was only 49.3%
- Students were asked only about sexual abuse by a teacher, leaving out administrators and other school personnel
- Students were only asked about high school abuse, leaving out any lower grade sexual abuse

With the exception of the weakness in the response rate, the other two criticisms argue that the results are an under-estimate.

**3.1.5  Stein et al. data**. In a joint project of The Center for Research on Women at Wellesley College and the NOW Legal Defense and Education Fund, Nan Stein, Nancy L. Marshall, and Linda R. Tropp analyzed data from a sexual abuse survey published in *Seventeen Magazine*. The *Seventeen Magazine* survey asked students:

Did anyone do any of the following to you when you didn't want them to in the last school year?
- Touch, pinch, or grab you
- Lean over you or corner you
- Give you sexual notes or pictures
- Make suggestive or sexual gestures, looks, comments, or jokes
- Pressure you to do something sexual
- Force you to do something sexual

Of the 4,200 girls in grades 2 through 12 who voluntarily responded that they had been sexually harassed or abused during the 1992/93 school year, 3.7% said the abuse came from a teacher, administrator, counselor, or other member of the school staff.

The primary criticism of this study is that:
- Sample is all female
- Sample is volunteer

16

- sample is drawn from people who read *Seventeen Magazine*
- asked about incidents only for prior year

3.2    **Prevalence in the U.S**.  As a group, these studies present a wide range of estimates of the percentage of U.S. students sexually abused by school staff and vary from 3.7 to 54.3% (Table 4).   Because of its carefully drawn sample and survey methodology, the AAUW report that nearly 9.6% of students are sexually abused by school staff during their school careers is probably the most accurate data available at this time.

| Table 4.  Percent of U.S. Students Who Have Experienced Educator Sexual Misconduct by Method | | | | | | |
|---|---|---|---|---|---|---|
| | **AAUW 2000/Shakeshaft Secondary Analysis 2003** | **Cameron et al.** | **Corbett et al. Personal Experience** | **Corbett et al. Others** | **Stein et al.** | **Wishnietsky** |
| Contact | 6.7 | 4.1 | Not reported | 21.1 | Not reported | 17.5 |
| Non-contact | 8.7 | Not Studied | Not reported | 19.5 | Not reported | 43 |
| All Abuse | 9.6 | Not Studied | 6.5 | 50.3 | 3.7 | Not reported |

3.3    **Prevalence in the U.K**.  A 2000 random probability sample of 2,869 young people between 18 and 24 in a computer assisted survey focused on abuse and maltreatment of children (Cawson, Wattam, Brooker, and Kelley).  One section of the survey covered sexual abuse and asked respondents if they had experienced a number of behaviors and, if so, with whom.  The results of this study indicated that .3% of the respondents had experienced sexual abuse with a professional, a category which included priests, religious leaders, case workers, and teachers.   This is the only study available that includes prevalence data on educator sexual misconduct for the UK.

Gallagher (2000) in an incident study of 20,000 child protective referrals to social services or the police, found that less than 1% took place in institutional settings.  Of those, 31% were reports of cases in some type of institutional school setting.

## 4.0    OFFENDER CHARACTERISTICS

Terminology used to identify offenders ranges from pedophile to molester to abuser.  This confused terminology often clouds descriptions and identification of offenders.  Pedophilia is an adult psychosexual disorder "characterized by a preference for prepubescent children as sexual partners" (Herek, 2003).  Hebephilia is the sexual preference of adults for adolescents.  Both of these are diagnostic labels.  Child sexual abuse is sexual contact between adults and children and is an action.  Not all pedophiles or hebephiles engage in sexual contact with children; many never act upon their sexual preference.  And, not all sexual contact with children is delivered by a pedophile or hebephile.   Because diagnostic labels are not perfectly correlated with action, Finkelhor and Araji (1986) note that descriptions such as pedophile are not very helpful and suggest that offender sexual orientation be labeled on a scale from exclusive interest in children to exclusive interest in adult partners.  Among the cases of educator offenders studied by Shakeshaft and Cohan (1994), there were those who were exclusively interested in children or adolescents and those who were more likely to be exploiters of any sexual situation, whether children or adult.

The limited available data  (Hendrie, 1998; Jennings and Tharp, 2003; Shakeshaft, 2003; Shoop, 2004; Zemel and Twedt, 1999) indicate that teachers who sexually abuse belie the stereotype of an abuser as an easily identifiable danger to children.  Many are those most celebrated in their profession.

Although we do not know how many or what percent of school employees are offenders, several studies describe the employees who have been identified (Table 5) using both surveys and first or third person descriptions of incidents of educator sexual misconduct.  A number of the studies below, as well as newspaper and court reports, indicate that many are chronic predators; thus, the number of teachers who abuse is fewer than the number of students who are abused.

**4.1    Job of offenders**.  Reflecting the re-analysis of the 2000 Hostile Hallways data (published in 2001), Table 6 documents the percent of students who have been targets of educator sexual misconduct by role of educator.  Teachers are reported most often, followed by coaches. Gallagher (2000) reported that teachers accounted for 90% of the school institutional sexual abuse cases in his analysis.[7]

Teachers whose job description includes time with individual students, such as music teachers or coaches, are more likely to sexually abuse than other teachers.  Jennings and Tharp found that 25% of the educators in Texas who were disciplined for sexual infractions involving students between 1995 and 2003 were coaches or music teachers.  Willmsen and O'Hagan found Washington state teachers who coach were "three times more likely to be investigated by the state for sexual misconduct than non-coaching  teachers".  The AAUW data do not identify the abuser by job position in a way that can be connected to type of misconduct

---

[7] Calculated from tables in Gallagher (2000).

| Table 5.  Sources for Descriptions of Offenders |
| --- |
| American Association of University Women (1993).  *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation |
| American Association of University Women (2001).  *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation |
| Sherry B. Bithell (1991). *Educator Sexual Abuse,* Boise:  Tudor House Publishing, 1991. |
| Paul Cameron, William Coburn, Jr.,  Helen Larson, Kay Proctor, and Nels Forde and Kirk Cameron (1986).   Child Molestation and Homosexuality.  *Psychological Reports*, 58, 327-337. |
| Kelly Corbett, Cynthia S. Gentry, and Willie Pearson, Jr. (1993).  Sexual harassment in high school.  *Youth & Society, 25*(1), 93-103. |
| Mike Freel (2003).  Child sexual abuse and the male monopoly:  An empirical exploration of gender and a sexual interest in children.  *British Journal of Social Work 33* (481-817) |
| Bernard Gallagher (2000). The extent and nature of known cases of institutional child sexual abuse.  *British Journal of Social Work 30*, 795-817. |
| Caroline Hendrie (December 2, 9, 16, 1998). A Trust Betrayed. Sexual Abuse by Teachers. *Education Week*. |
| Caroline Hendrie, (April 30 & May 7, 2003). Trust Betrayed. An Update of Sexual Misconduct in Schools.  *Education Week*. |
| Diane Jennings and Robert Tharp (May 4, 5, 6, 2003). Betrayal of Trust.  *The Dallas Morning News.* |
| Victor J. Ross and John Marlowe (1985).  *The Forbidden Apple: Sex in the Schools* Palm Springs, CA: ETC Publications. |
| John M. Seryak (1997). Dear Teacher, If You Only Knew! Adults Recovering from Child Sexual Abuse Speak to Educators.  Bath, Ohio: The Dear Teacher Project. |
| SESAME (1997) *Survivor Survey*. www.sesamenet.org; (1997-2003) *Survivor Stories*. |
| Charol Shakeshaft and Audrey Cohan (1995, March). Sexual abuse of students by school personnel.  *Phi Delta Kappan*, <u>76</u> (7) 513-520. |
| _____(1994). *In loco parentis: Sexual abuse of students in schools.  What administrators should know*.  Report to the U. S. Department of Education, Field Initiated Grants. |
| Charol Shakeshaft (2003) Educator Sexual Abuse.  *Hofstra Horizons*, Spring, 10-13 |
| Robert J. Shoop (2004).  *Sexual Exploitation in Schools: How to Spot It and Stop It*. Thousand Oaks, CA: Corwin Press. |
| Nan D. Stein, Nancy L. Marshall and Linda R. Tropp (1993).   *Secrets In Public: Sexual Harassment in Our Schools*.  Wellesley, MA:  Wellesley Centers for Women. |
| Christine Willmsen and Maureen O'Hagan (December 14 – 16, 2003).  Coaches Who Prey. *The Seattle Times*. |
| Dan H. Wishnietsky (1991). Reported and unreported teacher-student sexual harassment.  *Journal of Educational Research*, <u>84</u> (3), 164-169. |
| Jane Elizabeth Zemel and Steve Twedt (October 31 to November 2, 1999).  Dirty Secrets.  *Pittsburgh Post-Gazette*. |

.

| Table 6. Percent of Student Targets by Job Title of Offender ||
|---|---|
| **Job Title** | **Percent** |
| Teacher | 18 |
| Coach | 15 |
| Substitute Teachers | 13 |
| Bus Driver | 12 |
| Teacher's Aide | 11 |
| Other School Employee | 10 |
| Security Guard | 10 |
| Principal | 6 |
| Counselor | 5 |
| Total | 100 |

Source:  Shakeshaft, 2003; AAUW, 2001

**4.2    Sex of offenders.**  Sex of offenders is documented in three types of studies:  analysis of newspaper reports or state education disciplinary records; surveys or interviews of adults; and surveys of students.

Three studies examined public records.  Jennings and Tharp (2003) searched educator sexual misconduct discipline proceedings of 606 teachers in Texas; 12.7% were females and 87.3% males.  The Hendrie (1998) analysis of 244 cases in newspapers in a six month period reports a higher proportion of females; 20% were female offenders vs. 80% who were males.  Gallagher (2000) reports 96% male and 4% female offenders.

Freel (2003) and Shakeshaft and Cohan (1994) surveyed and interviewed adults in schools.  In telephone interviews of 225 superintendents, Shakeshaft and Cohan documented that 4% the educators investigated for educator sexual misconduct were females and 96% males.  Freel surveyed 183 child care workers in West Yorkshire, England, and found that 15% of men and 4% of women expressed sexual interest in children.  When asked if they "would have sex with a child if it was certain no one would find out and there would be no punishment" (p. 489), 4% of men and 2% of women indicated they would have sex with a child.

In studies that ask students about offenders, sex differences are less than in adult reports.  The 2000 AAUW data indicate that 57.6% of all students report a male offender and 42.4% a female offender with the Cameron et al. study reporting nearly identical proportions as the 2000 AAUW data (57% male offenders vs. 43% female offenders).

20

| Table 7. Sex of Offenders | | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAUW and Shakeshaft secondary analysis | Cameron, et al. | Corbett et al. | Gallagher | Hendrie | Jennings and Tharp | Shakeshaft and Cohan |
| Percent Males | 57.2 | 57 | 85 | 96 | 57 | 87.3 | 96 |
| Percent Females | 42.4 | 43 | 15 | 4 | 43 | 12.7 | 4 |

Except for the Gallagher and Shakeshaft and Cohan studies, the reports of educator sexual misconduct by sex of offender are in contrast to the research on child sexual abuse in general.  Researchers who study child sexual abuse report a "monopoly" by male abusers (Freel, 2003).  Finkelhor (1986) in a review reports 90 to 98% of females and 18 to 86% of males are sexually abused by a male.   Analysts speculate that female abusers might be under-reported if the target is male, because males have been socialized to believe they should be flattered or appreciative of sexual interest from a female.  On the other hand, it is hypothesized that males might also under-report sexual abuse by another male, because of the social stigma of same-sex sex.  The issue of male under-reporting has more relevance to the number of males that are sexually abused than to the sex of the abuser.

Analysts are more likely to explore, as a separate category, the reasons why females abuse than the reasons why being male leads to being an abuser.   For instance Hendrie (1998), Robins (1998), and Shoop (2004) discuss female offenders as a separate category.  Hislop (2001) devoted an entire book to a synthesis of the research on female sex offender, including cases of female teachers who sexually abused students (Chideckel, 1935: Larson & Maison, 1987; Peluso & Putnam, 1996).  Finkelhor and Russell (1984) assert that treating females as a special group grows out of a set of societal beliefs that  sex abuse by males is "normal" (although unacceptable) while sexual abuse by females is defined as abnormal and, therefore, in need of additional discussion.

**4.3    Age of offenders**.  Hendrie (1998) found the age of offenders ranged from "21 to 75 years old, with an average age of 28".

**4.4    Same sex offenders.**  Same sex abuse ranges from 18 to 28% of the reported cases, depending upon the study (Table 8).  Same sex is not the same as sexual identity.  For instance, in Shakeshaft and Cohan (1994), of the 24% of males who targeted other males, all of the offenders described themselves as heterosexual, with most living in married or heterosexual relationships.

| Table 8. Same Sex Abuse | | | | |
|---|---|---|---|---|
| | **AAUW 2000 and Shakeshaft Reanalysis** | **Cameron et al.** | **Corbett et al.** | **Shakeshaft and Cohan** |
| Percent Male Educator and Male Student | 15.2 | 8.9 | 7.5 | 24 |
| Percent Female Educator and Female Student | 13.1 | 8.9 | 0 | 3 |
| Percent Same Sex Abuse of All Abuse Reported | 28.3 | 17.8 | 7.5 | 27 |

Researchers have failed to find a consistent connection between sexual identification or sexual orientation label and child sexual abuse. For instance, Jenny et al. (1994) reviewed 350cases of child sexual abuse and found no patterns. In another study (Freund et al, 1984), researchers found that homosexual males responded no differently to pictures of male children than did heterosexual males to pictures of female children.

## 5.0    TARGETS OF EDUCATOR SEXUAL MISCONDUCT

The matter of how to "name" students who have been sexually abused by educators is more than semantic; it is also political.  Complainant connotes a legal perspective and hints that the abuse is merely alleged.  Victim is believed by some to attach weakness to the student.  Survivor describes a process.  While I believe that all are accurate, I have chosen to use "target" in identifying students who are sexually abused by educators.  Target is a reminder that someone other than the student is responsible for the act of sexual abuse.  Table 9 lists studies, both quantitative and qualitative, in which there are data that help to describe who is targeted in schools.

| Table 9.  U.S. Sources for Descriptions of Targets |
|---|
| American Association of University Women (1993).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| American Association of University Women (2001).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| Sherry B. Bithell (1991). *Educator Sexual Abuse.* Boise: Tudor House Publishing, 1991. |
| Kelly Corbett, Cynthia S. Gentry, Willie Pearson, Jr. (1993).  Sexual harassment in high school.  *Youth and Society, 25*(1), 93-103. |
| Bernard Gallagher (2000).  The extent and nature of known cases of institutional child sexual abuse.  *British Journal of Social Work 30,* 795-817. |
| Caroline Hendrie (December 2, 9, 16, 1998).  A trust betrayed. Sexual abuse by teachers.  *Education Week*. |
| Diane Jennings and Robert Tharp (May 4, 5, 6, 2003).  Betrayal of trust.  *The Dallas Morning Ne*ws. |
| Victor J. Ross and John Marlowe (1985).  *The Forbidden Apple: Sex in the Schools.* Palm Springs, CA: ETC Publications |
| John M. Seryak (1997). *Dear Teacher, If You Only Knew!: Adults Recovering from Child Sexual Abuse Speak to Educators*.  Bath, Ohio: The Dear Teacher Project. |
| SESAME  (1997) *Survivor Survey.  Survivor Stories* (2004)  www.sesamenet.org |
| Charol Shakeshaft and Audrey Cohan (1995, March). Sexual abuse of students by school personnel.  *Phi Delta Kappan*, 76 (7)  513-520.<br>_____(1994). *In loco parentis: Sexual abuse of students in schools.  What administrators should know*.  Report to the U. S. Department of Education, Field Initiated Grants. |
| Charol Shakeshaft (2003).  Educator Sexual Abuse.  *Hofstra Horizons*, Spring, 10-13 |
| Robert J. Shoop (2004).  *Sexual Exploitation in Schools: How to Spot It and Stop It.* Thousand Oaks, CA: Corwin Press. |
| Nan Stein, Nancy L. Marshall and Linda R. Tropp (1993).  *Secrets In Public: Sexual Harassment in Our Schools*.  Wellesley, MA:  Wellesley Centers for Women. |
| Christine Willmsen and Maureen O'Hagan (December 14 – 16, 2003). Coaches who prey.  *The Seattle Times.* |
| Dan H. Wishnietsky (1991). Reported and unreported teacher-student sexual harassment.  *Journal of Educational Research,* 84 (3), 164-169. |
| Jane Elizabeth Zemel and Steve Twedt (October 31 to November 2, 1999).  Dirty secrets.  *Pittsburgh Post-Gazette.* |

**5.1    Sex of targets**.  While the majority of students who are sexually targeted by educators are females, the proportions vary by type of study.  As is illustrated in Table 10, the three studies that examine formal reports (Gallagher, 2000; Hendrie, 1998; Shakeshaft & Cohan, 1994) find a higher percent of female students as targets than do the studies that ask students directly.  These findings suggest that abuse of females is more likely to be reported than abuse of males, but that the differences between the percentages of males and females who are abused may be much smaller than has been previously reported.

The differences in reports of educator sexual misconduct by sex of target depending upon the data source need further examination, particularly in understanding reporting patterns by sex.

| Table 10.  Targets by Sex | | | | | | |
|---|---|---|---|---|---|---|
| | **AAUW 2000 and Shakeshaft Re-analysis** | **Cameron et al.** | **Corbett et al** | **Gallagher** | **Hendrie** | **Shakeshaft and Cohen** |
| Percent Female Students | 56 | 57 | 77 | 54 | 76 | 66 |
| Percent Male Students | 44 | 43 | 23 | 46 | 24 | 33 |

**5.2    Race/ethnicity of targets**.  Using the Shakeshaft reanalysis of the 2000 AAUW data as a guide, students of color (African descent, American Indian, and Latina/o) are over-represented as targets of educator sexual misconduct in comparison with their representation in the sample, while white and Asian students are underrepresented.  Students of color account for 44% of the targets but 33.2% of the sample.

| Table 11.  Targets by Race/Ethnicity vs. Sample | | |
|---|---|---|
| | **Percent of Students Who Are Targets of Educator Sexual Misconduct** | **Percent of All Students in Sample** |
| White | 51.5 | 58.6 |
| African Descent | 25.3 | 19.8 |
| Latina/o | 15.7 | 12.4 |
| American Indian | 3.0 | 1.0 |
| Asian | .5 | 2.7 |
| No response | 4.0 | 5.5 |
| Total | 100.0 | 100.0 |

Table 12 gives a breakdown of the percentage of students by race and sex who report having been sexually abused by an employee of a school district.  Females, and particularly females of color, are over-represented as targets of educator sexual

24

misconduct in relation to their proportion of the population. Females are 53% of the sample and 57% of the targets of educator sexual abuse. Females of color are 18.2% of the sample and 27.3% of those targeted.

| Table 12. Targets by Race/ethnicity and Sex vs. Sample | | | | |
|---|---|---|---|---|
| | Percent of Students Who Are Targets of Educator Sexual Misconduct | | Percent of All Students in Sample | |
| | Male | Female | Male | Female |
| White | 24.7 | 26.8 | 28.1 | 30.5 |
| African Descent | 10.1 | 15.2 | 9.2 | 10.6 |
| Latina/o | 5.1 | 10.6 | 5.2 | 7.2 |
| American Indian | 1.5 | 1.5 | .5 | .4 |
| Asian | 0 | .5 | 1.6 | 1.0 |
| No Response | 1.5 | 2.5 | 2.4 | 3.3 |
| Total | 42.9 | 57.1 | 47 | 53 |

**5.3   Disabilities and targets**.  There is scant U.S. data on sexual abuse of students with disabilities, and none on educator sexual abuse of students.  Studies do indicate that students with disabilities are more likely to be maltreated than students without disabilities (Sobsey, 1994; Sobsey, Randall, & Parrila, 1997; Sullivan & Knutson, 2000).

Examining this question using data from the National Data Archive on Child Abuse and Neglect, Sobsey et al. (1997) found that nearly twice as many disabled girls than disabled boys were sexually abused and nearly 4 times as many non-disabled girls than non disabled boys were sexually abused.  However, of those sexually abused,  53% of boys were disabled compared with 11.4% of girls.  These data don't tell us the percent of the total population by disability that were sexually abused since this was a study looking only at children with substantiated sexual abuse.

Sullivan and Knutson (2000) were able to document the proportion of all children by disability status with substantiated reports of sexual abuse.  Merging the electronic data base of 50,2778 students in the Omaha, Nebraska schools system with the records from the Central Registry of the Nebraska Department of Social Services, the Nebraska Foster Care Review Board records, and the victimization records from the County sheriff and Omaha police, Sullivan and Knutson (2000) were able to document maltreatment by disability status.   Using data tables in their report, I calculated that 8.8% of students with disabilities vs. 2.8% of students without disabilities were sexually abused.   Students with behavior disorders are more than 5 times as likely than non-disabled students to be sexually abused, with mentally retarded students more than three times as likely.

While very helpful, these data do not distinguish by role of offender, so there is no way to determine how many of these reported cases are examples of educator sexual misconduct.  Further, since this is a study of cases reported to the child welfare or criminal justice systems, these percentages do not include all children who were sexually abused.

Gallagher's UK (2000) examination of reported incidents in institutional settings, which included schools, found that students with special needs were targets in 17% of the cases.   The University of Alberta Abuse and Disability Project (1992) documented that 7% of the sexual abuse of disabled children came from bus drivers, an important finding since children with disabilities are often transported off-site for services.

| Table 13.  Sexual Abuse Reports by Disability Status | | | |
|---|---|---|---|
| | Number in Population | Number Sexually Abused | Percent Sexually Abused |
| None | 36,949 | 1,044 | 2.8 |
| Behavior disorder and autism | 688 | 104 | 15.1 |
| Communication disorder Speech, language, hearing, learning disabilities | 1161 | 61 | 5.3 |
| Health/orthopedic Visual, orthopedic, health | 515 | 30 | 5.8 |
| Mental retardation | 898 | 91 | 10.1 |
| Subtotal disabilities | 3262 | 286 | 8.8 |

Numbers in table calculated from data reported in Sullivan and Knutson (2000)

**6.0    PATTERNS OF EDUCATOR SEXUAL MISCONDUCT WITH STUDENTS**

Both qualitative and quantitative sources provide information on patterns of educator sexual misconduct (Table 14).

| Table 14.   Sources for Descriptions of Patterns |
|---|
| American Association of University Women (1993).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| American Association of University Women (2001).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| Caroline Hendrie (December 2, 9, 16, 1998).  A trust betrayed. Sexual abuse by teachers.  *Education Week.* |
| Matthew D. Olson and Gregory Lawler (2003).  *Guilty until Proven Innocent.* Stillwater, OK: New Forums Press. |
| Sydney L. Robins (2000).  Protecting Our Students.  Ontario, Canada:  Ontario Ministry of the Attorney General. |
| SESAME  (1997) *Survivor Survey.  Survivor Stories* (2004)  www.sesamenet.org |
| Charol Shakeshaft and Audrey Cohan (1995, March). Sexual abuse of students by school personnel.  *Phi Delta Kappan*, <u>76</u> (7)  513-520. |
| _____(1994). *In loco parentis: Sexual abuse of students in schools.  What administrators should know.*  Report to the U. S. Department of Education, Field Initiated Grants. |

**6.1  Context**.  Sexual abuse of students occurs within the context of schools, where students are taught to trust teachers.  It is also a place where teachers are more often believed than are students and in which there is a power and status differential that privileges teachers and other educators.  While we know very little about the contexts in which students are sexually abused by adults in schools, newspaper data and interview studies suggest that -- like sexual predators anywhere -- sexual abusers in schools use various strategies to trap students.  They lie to them, isolate them, make them feel complicit, and manipulate them into sexual contact.  Often teachers target vulnerable or marginal students who are grateful for the attention.  And, students that adults regard as marginal are also unlikely to be accepted as credible complainants against a celebrated teacher (Shakeshaft and Cohan, 1994).

In elementary schools, the abuser is often one of the people that students most like and that parents most trust.  The abusers of children younger than 7th grade have different patterns than those who abuse older children (Shakeshaft, 2003).   The educators who target elementary school children are often professionally accomplished and even celebrated.  Particularly compared to their non-abusing counterparts, they hold a disproportionate number of awards.  It is common to find that educators who have been sexually abusing children are also the same educators who display on their walls a community "Excellence in Teaching" award or a "Teacher of the Year" certificate.  This popularity confounds district officials and community members and prompts them to ignore allegations on the belief that "outstanding teachers" cannot be abusers. (Shakeshaft and Cohan, 1994)

Many educators who abuse work at being recognized as good professionals in order to be able to sexually abuse children.   For them, being a good educator is the path to children, especially those who abuse elementary and younger middle school students (Shakeshaft and Cohan, 1994).   At the late middle and high school level, educator abusers may or may not be outstanding practitioners.  At this level, the initial acts are somewhat less premeditated and planned and more often opportunistic, a result of bad judgment or a misplaced sense of privilege (Shakeshaft and Cohan, 1994)

**6.2     Selection**.  Whether premeditated or opportunistic, selection is influenced by the compliance of the student and the likelihood of secrecy.  Because most educator abusers seek to conceal their sexual contact with students, offenders often target students that they can control.  In some cases, control is characterized by force.  However, most abuse occurs within the much subtler framework of grooming and enticement.  While almost all children respond to positive attention from an educator, students who are estranged from their parents, who are unsure of themselves, who are engaged in risky behavior or whose parents are engaged in such behavior are often targeted, not only because they might be responsive, but also because they are more likely to maintain silence (Robins, 2000; Shakeshaft and Cohan, 1994).

Robins (2000) describes the process of grooming, where an abuser selects a student, gives the student attention and rewards, provides the student with support and understanding, all the while slowly increasing the amount of touch or other sexual behavior.  The purpose of grooming is to test the child's ability to maintain secrecy, to desensitize the child through progressive sexual behaviors, to provide the child with experiences that are valuable and that the child won't want to lose, to learn information that will discredit the child and to gain approval from parents (Robins, 2000).  Grooming allows the abuser to test the student's silence at each step.  It also serves to implicate the student, resulting in children believing that they are responsible for their own abuse because "I never said stop."

Grooming often takes place in the context of providing a child with extras like additional help learning a musical instrument, advisement on a science project, opportunities for camping and outdoor activity.  These opportunities not only create a special relationship with students, they are also ones for which parents are usually appreciative.

Although not every instance of educator sexual misconduct includes a grooming phase, because grooming precedes sexual engagement, grooming has the added benefit to the abuser of being able to test a child's compliance.  Any complaint can be discredited because it does not yet constitute identifiable sexual misconduct.  Robins and others believe that grooming patterns must be better understood if educator sexual misconduct is to be prevented or detected.

**6.3     Maintaining secrecy and silence**.  Some of the children who are sexually abused by educators do not characterize what is happening as abuse.  That is not to say they don't identify what is happening as shameful, unwanted, wrong or frightening.  In many cases, they are told that what is happening is love.  Many abusers of children at all ages couch what they are doing to the children as love, both romantic and parental.

28

Offenders work hard to keep children from telling.  Almost always they persuade students to keep silence either by intimidation and threats (if you tell, I'll fail you), by exploiting the power structure (if you tell, no one will believe you), or by manipulating the child's affections (if you tell, I'll get in trouble; if you tell, I won't be able to be your friend anymore).

Thus, childish or adolescent naiveté is taken advantage of to keep children silent. Because many children who are targeted have previously been abused by others, the legacy of abuse increases the likelihood of silence.  Fear of discovery and punishment or shame for doing something forbidden also keep children from speaking.  Boys abused by men often don't tell because of homophobia.

Because children often get something positive in the transaction – attention, gifts, physical pleasure, and feelings of belonging or attractiveness – they can be made to feel responsible.  Offenders use this to their advantage.

Finally, abuse is allowed to continue because even when children report abuse, they are not believed.  Because of the power differential, the reputation difference between the educator and the child, or the mindset that children are untruthful, many reports by children are ignored or given minimal attention.

**6.4    Geography of abuse**.  An analysis of documentation from legal proceedings and from interviews with school officials and student targets indicates that sexual misconduct by educators occurs in the school, in classrooms (empty or not), in hallways, in offices, on buses, in cars, in the educator's home, and in outdoor secluded areas.  Sometimes the abuse happens right in front of other students.  Within the documents found in case law, it is not unusual to find instances where a teacher has taken a student into a storage room attached to the classroom and had sexual intercourse while the rest of the class does seat work (Shakeshaft and Cohan, 1994; Shakeshaft, 2002).  Often teachers touch students during movies.  In one class, boys reported that the teacher would call them up to his desk at the front of the room and, one at a time, while discussing homework, would fondle each boy's penis.  Every child in the room knew what was happening and students talked about it among themselves.  The teacher repeated this behavior for 15 years before one student finally reported to an official who would act upon the information that everyone knew. (Shakeshaft and Cohan, 1994)

## 7.0    ALLEGATIONS AND RESPONSE

Five studies include data on patterns of educator sexual misconduct in schools.

| Table 15.  Sources for Descriptions of Patterns |
| --- |
| American Association of University Women (1993).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| American Association of University Women (2001).  *Hostile Hallways.* Washington, D.C.: AAUW Educational Foundation |
| Caroline Hendrie (December 2, 9, 16, 1998).  A trust betrayed. Sexual abuse by teachers.  *Education Week.* |
| SESAME  (1997)  *Survivor Survey.  Survivor Stories* (2004)  www.sesamenet.org |
| Charol Shakeshaft and Audrey Cohan (1995, March). Sexual abuse of students by school personnel.  *Phi Delta Kappan*, <u>76</u> (7)  513-520. _____(1994). *In loco parentis: Sexual abuse of students in schools.  What administrators should know*.  Report to the U. S. Department of Education, Field Initiated Grants. |

**7.1    Allegations.**  According to Shoop (2004), notice of educator sexual misconduct comes to the attention of school officials in five ways:  formal complaints, informal complaints, observed abuse, observed suspicious behaviors, or rumors and/or anonymous reports.

Formal and informal complaints are most likely to originate from targets or parents of targets, although parents of a target's friend sometime report the abuse.  Seldom is the abuse reported by a teacher, even if the child has told the teacher.

 Several studies estimate that only about 6% of all children report sexual abuse by an adult to someone who can do something about it.  The other 94% do not tell anyone, or talk only to a friend.  (And they swear their friend to secrecy) (Finkelhor, Hotaling and Kerti Yllo, 1988; National Resource Center on Child Sexual Abuse, 1994).  However, a reanalysis of the AAUW data set found that 71.2% of students who had been targets of educator sexual misconduct told someone, with 56.6% telling more than one person.  Most students told a friend (69.7%), followed by someone else (44.9%), then a parent (31.8%), a teacher (14.6%), or another school employee (14.1%).[8]

When asked if they would complain to a school employee if sexually harassed by teacher or other school employee, 71% responded affirmatively.  However, among the students who were harassed by a school employee, only 21.2% actually told a teacher or other employee.  With implications for Supreme Court rulings on reporting educator

---

[8] However, although these are reports by students who have reported educator sexual misconduct, nearly 75% have also been sexually harassed by a student.   These findings should be used with caution because of the inability to disaggregate these data. The question about reporting the misconduct and harassment focuses on all types of abuse and cannot be disaggregated by whether the report was about educator sexual misconduct or peer harassment.

sexual misconduct to an employee who has the authority to stop the abuse, only 14.1% of students reported to another school employee.  It is likely that many of those employees were not in a supervisory position.

While formal reports might not be made in school, informal information is passed on through rumor, innuendo, and jokes.  Often it is a friend of the target or a parent of a friend who brings the issue to school authorities.

When students do report, they almost always report incidents of contact sexual abuse -- touching, kissing, hugging, forced intercourse.  Verbal and visual abuse are rarely reported to school officials[9].  Of the cases that come to a superintendent's attention, nearly 90% are contact sexual misconduct (Shakeshaft and Cohan, 1994).  When alleged misconduct is reported, the majority of complaints are ignored or disbelieved (Shakeshaft and Cohan, 1994).  Other students note this lack of response and conclude that teachers (or coaches or administrators) cannot be stopped (Shakeshaft, 2002).  If the school will not act, what can a mere student do?

Few students, families, or school districts report incidents to the police or other law enforcement agencies.  When criminal justice officials are alerted, it is almost always because parents have made the contact.  Thus, most cases are not entered into criminal justice information systems (Shakeshaft and Cohan, 1994).  As one consequence, abusers are subject only to informal personnel actions within the relative privacy of school employee records  (Shakeshaft and Cohan, 1994).

**7.2    Response to allegations.**  Robins (2000) found that the most common reason that students don't report educator sexual misconduct is fear that they won't be believed.  Research indicates that students have good reasons to suspect they won't be believed.  Robins documents the case of a teacher, Kenneth DeLuca, who was convicted of sexually abusing 13 students between the ages of 10 and 18 over a period of 21 years.  Nearly all of the students reported this abuse at the time.  However, school officials did not take these accusations seriously.

Overwhelmingly, the girls experienced a disastrous response when they told about DeLuca's behavior.  Many were disbelieved, some were told to leave schools, parents were allegedly threatened with lawsuits. (129-130)

**7.3    Investigative practices.**  Only one study (Shakeshaft and Cohan, 1994) has examined school district response to allegations.  This study is limited, but documents that investigative skills of school administrators are poor.  In many cases, no formal investigation was conducted.  If a police investigation did occur, districts often

---

[9]  While sexual misconduct is most often thought of as physical, verbal sexual abuse such as harassing or sexually explicit language and visual sexual abuse such as pornography or sexual gestures are more common in the school setting, but rarely reported (Shakeshaft, 2003).

failed to do their own reporting in terms of violations of district policy or Title IX requirements.

**7.4    False accusations.**  The possibility of a false accusation is included in this section because there is widespread belief that false accusations are common.  Because this is the prevailing mental model, students are often not believed

Currently, there is no mechanism for determining how many false accusations occur.  Because many of the accusations involve behavior that might not be easily prosecuted under criminal statutes, for instance verbal and visual abuse or physical abuse that is not penetration, there is confusion about what constitutes abuse.  While this issue will be explored in more detail in a subsequent section, the distinction between a criminal offense that can be proven beyond a reasonable doubt and an incident of sexual misconduct is sometimes blurred, leaving the impression that if there is not a prosecution (or a criminal charge) the accusation must have been false.

There are no systematic studies of false accusations of educators, but studies of child sexual abuse in general indicate that false allegations are not common.  In a 1991 review of false or mistaken accusations of sexual abuse, Yates concludes that the majority of false accusations occur in custody cases and that in other circumstances, the incidence of false accusations appears rare.

In the Shakeshaft and Cohan (1995) study of 225 allegations of educator sexual misconduct, there was not one in which the actions reported weren't proved to have happened.  Although the accuracy of student reports of educator behavior was unanimous, the meaning of the behavior differed between student and educator.  In a handful of cases, the student's characterization of the act as sexual misconduct was labeled by the educator and administrative officials as touching with no sexual intent.

However, both Robin (1992) and Yates (1991) have pointed out that false accusations can cause serious emotional stress to the person falsely accused.  Olson and Lawler (2003) have compiled cases in which educators have been falsely accused of maltreatment of students, including accusations of sexual abuse. Their accounts describe the harm that false accusations coupled with inadequate investigations can yield.

## 8.0    EXTENT AND IMPACT OF LEGAL INITIATIVES

While there are several sources that present and discuss the foundations of the laws that govern educator sexual misconduct, there are no studies which examine the impact of initiatives or that trace the legal reasoning of current federal law.  Therefore, this section briefly describes relevant federal and state laws and regulations, as well as professional organization policies.  Depending upon the nature of the behavior, educator sexual misconduct violates a number of federal and state laws.

**8.1    Federal laws.**  One of the first remedies for pursuing damages for educator sexual misconduct was 42 USCA – 1983 – Civil Actions for Deprivation of Rights.  Alexander v. Yale was the first use of the statute in which a coed at Yale brought suit for sexual harassment by a professor and won.  In 1993, the Supreme Court ruled in Stoneking v. Bradford Area School District that a student who has been sexually harassed by a member of the school staff can maintain a civil rights action under S1983 by showing that the district did not protect students through their policies or practices or by failure to take action.  School officials who allow abuse to occur are not entitled to qualified immunity because they act under color of law, and can be held liable for not stopping the sexual abuse of students in schools.  "Students are confined to the school, during school functions, pursuant to compulsory education laws" and therefore, S1983 is applicable.  Although occasionally still used in cases of educators sexual misconduct of multiple victims, 1983 has been replaced by Title IX.

The matriarch of legal remedies for sexual violence in schools is Title IX of the 1972 Education Amendments.  The language of Title IX doesn't mention sexual harassment, but, rather, is a statute that prohibits discrimination on the basis of sex in any educational organization that receives federal funds.[10]  Title IX's regulatory strength initially depended only upon the federal investigations of allegations of sexual discrimination and the possibility of loss of federal funds for any educational institution in violation.

Adopted in 1972, it took 20 years and the Supreme Court in *Franklin v. Gwinnett County Public Schools* to rule that students can seek monetary damages from schools for sexual violence visited on them by school employees.  Although it was a breakthrough in equating sexual harassment in schools as sex discrimination and in assigning schools monetary liability for damages, *Franklin* did not provide educators a clear framework for understanding their legal responsibility to provide a harassment-free school.

---

[10] Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance"  (Title IX, Section 1681)

The Office of Civil Rights enforces Title IX and publishes guidelines to help schools comply.[11]  The Guidelines are used to write sexual harassment policies and to clarify the responsibilities of school personnel.  They emphasize that schools are responsible for prohibiting sexual harassment and point out the liability consequences of sexual harassment of students by staff.

The Supreme Court's 1998 ruling in *Gebser v. Lago Vista Independent School District* (Gebser v. Lago Vista Independent School District, *000 U.S. 96-1866 (1998)* made it more difficult for students to secure monetary damages in staff-to-student sexual violence cases and the increased barrier was somewhat at odds with the OCR regulations at that time.  In *Gebser*, the Supreme Court determined that for a district to be liable for the sexual harassment of a student by a staff member someone with the authority to take an action must have had actual knowledge of the sexual violence and the institution or individual must have acted with deliberate indifference by not responding to the knowledge.

*Davis v. Monroe County Board of Education*, a Supreme Court ruling on peer sexual harassment, extends further the parameters for liability which might be used in educator sexual misconduct claims.   The decision reinforced the similarly stringent requirements found in *Gebser*. Like *Gebser*, *Davis* is the first Supreme Court ruling that affirms that school staff members can be held liable for peer harassment under Title IX, but only if the staff member with authority to act has direct knowledge of the harassment and responds with deliberate indifference to the victim.   Additionally, in *Davis*, the justices ruled that the harassment must be so persistent and harsh that it interferes with the target student's ability to benefit from educational opportunities.

However, *Davis* left unclear a number of issues – also neglected in *Gebser* -- including which school staff members must have knowledge of the harassment, what constitutes knowledge, and how "deliberate indifference" is determined.

Prior to interpreting Title IX coverage to include sexual harassment as a form of sex discrimination, there was little in the law that was available to victims of sexual violence in schools, beyond criminal statutes that were unavailable for most cases of harassment and certainly not in sexually harassing speech incidents.  By holding school districts and individual actors within schools liable for damages if they permitted a hostile and harassing environment, Title IX raised the stakes in the prevention of sexual violence.  Teachers and administrators were on notice that if they did not intervene to stop harassment, they might become personally liable for damages.  This threat, combined with increased public awareness of both the definition of sexual violence and the responsibilities of school personnel, has resulted in more student awareness of rights and expectations (AAUW, 2001)

However, there are no studies that examine the relationship of liability to prevention or reduction of educator sexual misconduct.  Moreover, the analysis by Grossman (2003) of the effects of Title VII decisions on policies, procedures and actions

---

[11] Sexual Harassment Guidance:  Harassment of Student by School Employees, Other Students, and Third Parties.

in the workplace would suggest that while the Title IX rulings might increase the number of school policies, they are not likely to have been effective in deterring educator sexual misconduct.

Title VII prohibits discrimination in employment on the basis of sex, race, color, religion, or national origin.  Because Title VII is an employment law, it only covers students if they are employees of the schools.  However, Title VII is important for understanding the sexual abuse of students primarily because the courts have used Title VII and rulings in Title VII as guides for Title IX decisions on sexual harassment in schools.  Despite the influence Title VII has had on the development of Title IX, the Supreme Court has followed a narrower line of reasoning for awarding damages for school cases than for workplace cases.  An analysis of these differences has not been published.

To change this limited scope of school district liability for educator sexual misconduct  requires legislation.  Justice O'Connor, writing for the majority in *Gebser*: "Until Congress speaks directly on the subject, however, we will not hold a school district liable in damages under Title IX for a teacher's sexual harassment of a student absent actual notice and deliberate indifference."

Former United States Senators Bob Smith (New Hampshire) and Jesse Helms (North Carolina) worked on federal legislation to prohibit educator sexual misconduct. Currently, Congresswoman Shelley Berkley from Nevada is drafting a related bill.   Table 15 summarizes federal initiatives that are believed likely to reduce educator sexual misconduct.  However, these initiatives have not been studied.

**8.2     State child sexual abuse laws.**   Depending upon a number of factors (age of student, age of educator, type of sexual misconduct, etc.) educators who sexually abuse might be prosecuted under a variety of statutes.  Criminal codes are not uniform across the states.  While all states have laws that prohibit adults from having sex with children, each state defines that crime differently.  Child sexual abuse, sexual assault, anti-stalking, and lewdness with a minor are legal categories under which state laws might exist.  For instance, if the abuse is physical and the child is younger than the age of consent (which differs by state), child sexual abuse statutes might be invoked.  If the misconduct is not physical, lewdness with a minor covers sexual acts with children 14 and under in some states.

State laws regarding "consensual sex" (referred to generally as statutory rape laws) prohibit adult-child relationships, but define childhood differently, depending upon the state.  Although research indicates that children under 17 or 18 cannot make informed choices about sex with an adult, in one state 15 is an adult, in 32 states a 16 year old is legally able to consent to sex under general statutory rape laws, while in six it is 17, and in eleven the age of consent is 18.  (Park, 2003)  I found no studies of state criminal statues that cover educators who sexually abuse.

**8.3     State sexual assault laws**.  While sexual assault laws prohibiting coercive or forced sex cover some types of educator sexual misconduct, these laws don't cover all

35

of the ways in which educators might sexually abuse students.  Anti-stalking laws also exist in all states and often cover educator sexual misconduct behavior.  As is true of the other legal categories synthesized, there were no studies exploring state sexual assault laws and educator sexual misconduct. (Park, 2003)

**8.4    State educator sexual misconduct laws**.  In addition to general sexual assault laws and criminal statutes prohibiting adult sexual contact with children, some states have adopted laws that specifically prohibit sexual abuse by educators or people in a position of trust.  Ohio's Sexual Battery law (Section 2907.3) and Colorado's Sexual Assault by One in a Position of Trust (Statute 18-3-405.3) are examples of laws that protect children 18 and under from sexual misconduct by adults in a position of trust.  As of March 2003, 27 states have laws prohibiting a person in a position of trust from sexual activity with a minor, with Iowa moving legislation forward.  Of those, two protect students up to age 15; 20 states protect students up to 17; and five have no limit on the age of students.

**8.5    Limitations of state laws.**  From a national perspective, there are several drawbacks to using state statutes to address educator sexual misconduct.  (1) many of the laws include only students who have not reached the age of consent and the age of consent differs by state;  (2) many do not require those found guilty under these statutes to register as sex offenders (see, for instance, Nevada Revised Statutes: Chapter 201); (3) there is no uniform legal definition of child sexual assault or criminal sexual activity from state to state; (4) there is no uniform penalty for similar actions across the states; and (5) the age of minors varies by state.

I found no reports that codify educator sexual misconduct statutes by state.  Neither did I find studies on convictions of educators, nor that examined impact on students' behavior.

**8.6    Tenure and licensure.**  Besides federal, civil and criminal approaches to identifying and stopping educator predators, legally enforceable codes of professional conduct, generally in connection with state licensure, exist in most states.  The language in many of the states such as New York's "conduct unbecoming a teacher" is inclusive of a wide variety of behaviors.  As a result, it is often difficult to categorize the various behaviors that have been found to be prohibited.  However, sanctions by state teacher certification agencies do provide for revocation of a professional license for misconduct (LaRue, 1996).  Like criminal approaches, these regulations vary by state.

Most states require criminal background checks which use FBI and state records in addition to fingerprinting.  An April 2003 Education Week report notes that only 8 states do not require these checks.

I found no formal studies of licensure revocation in cases of educator sexual misconduct, although there are newspaper accounts that document local or state instances (see section 2.4).   Seventeen states require school officials to report any alleged educator misconduct to state education officials.  To insure safety in reporting, 17

states[12] (although not all the same states as require reports to state officials) protect school officials from lawsuits based upon job references.

A 1996 study of tenure laws (LaRue) notes that most states include language that covers a broad range of behaviors in their statutes for revoking tenure. Thus, educator sexual misconduct might be covered by prohibitions such as "immorality", "conduct unbecoming a teacher", or "moral turpitude". Twelve states have no category into which educator sexual misconduct would fit. However, LaRue found no state that specifically listed educator sexual misconduct (or language that was similar) as a reason for terminating or dismissing an employee.

National teacher associations, to date, have not included suggestions for preventing educator sexual misconduct nor conducted studies of incidence. Suggestions for collective bargaining model language from the two national teacher unions is not specific on this topic.

| Table 16.  Features Being Considered for Legislation and Regulation | |
|---|---|
| Liability | School districts shall be held liable in damages under Title IX for a teacher's sexual harassment of a student based upon the same guidelines as Title VII |
| Prohibition | No person in a position of trust may engage in sexual conduct with students 18 years old and younger, regardless of any state's age of consent.  Violation would be a Class C felony |
| Prohibition | No confidential settlements with alleged abusers; no discretion for judges in imposing settlements |
| Reporting | Violators of the federal law would be required to register as sex offenders |
| Reporting | Mandated reporting of conviction by adjudicating agency and by educator; failure to report would be a gross misdemeanor and result in the forfeiture of professional education license |
| Reporting | Required reporting to the state licensing agency of all allegations of educator sexual misconduct, including those that result in a termination or resignation |
| Reporting | State data collection and reporting on extent of educator sexual misconduct |
| Reporting | National clearinghouse on educator sexual misconduct |
| Requirement | 10 year statute of limitations on filing complaints, bringing charges |
| Requirement | Mandatory background and interim employment career checks for all teachers and school employees (not just newly hired), including fingerprinting |
| Requirement | School officials must ask former employees whether a job applicant had a history of sexual misconduct allegations |

12 Arizona, Colorado, Delaware, Florida, Louisiana, Maryland, Michigan, Minnesota, New Mexico, North Carolina, North Dakota, Ohio, Rhode Island, South Carolina, Utah, Virginia, Wisconsin (Education Week, April 30, 2003, p. 17)

### 9.0    EFFECTS OF EDUCATOR SEXUAL MISCONDUCT

The data collected by the AAUW studies offers student reports of effects of educator sexual misconduct, while the three remaining studies in Table 16 provide accounts from or about targets. .

| Table 17. Effects of Educator Sexual Misconduct |
| --- |
| American Association of University Women (1993).  *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation |
| American Association of University Women (2001).  *Hostile Hallways*, Washington, D.C.: AAUW Educational Foundation |
| Victor J. Ross and John Marlowe (1985).  *The Forbidden Apple: Sex in the Schools* Palm Springs, CA: ETC Publications. |
| John M. Seryak (1997). Dear Teacher, If You Only Knew! Adults Recovering from Child Sexual Abuse Speak to Educators.  Bath, Ohio: The Dear Teacher Project. |
| SESAME (1997) *Survivor Survey*. www.sesamenet.org; (1997-2003) *Survivor Stories*. |

### 9.1    Effects on abused students:  Academic, emotional and developmental.

Re-analysis of the AAUW data indicates that targets of educator sexual misconduct report that they suffer emotional, educational and developmental or health effects.  At least a third of students report behaviors that would negatively affect academic achievement:

- Avoid the teacher or other educator (43%)
- Do not want to go to school (36%)
- Do not talk much in class (34%)
- Have trouble paying attention (31%)
- Stayed home from school or cut a class (29%)
- Found it hard to study (29%)

About a quarter of students who were targets of educator sexual misconduct report academic or discipline repercussions:

- Thought about changing schools (19%)j
- Changed schools (6%)
- Received a lower grade on a test or assignment (25%)
- Received a lower grade in a class (25%)
- Got into trouble with school authorities (25%)
- Felt less likely to get a good grade (23%)

Health effects such as sleep disorder and appetite loss were reported by 28% of students.  A substantial number of students report negative feelings of self worth because of the abuse.

- Felt embarrassed (51%)
- Felt self conscious (39%)

38

- Less sure of self or less confident (37%)
- Felt afraid or scared (36%)
- Felt confused about identity (29%)
- Doubted whether could ever have a happy romantic relationship (29%)

For most children, being the victim of a sexual crime does damage that lasts well into adulthood, and for most it is never fully repaired.  Child sexual abuse targets lose trust in adults and authority figures, suffer physical ailments and lowered immune systems, and do less well in school.  They often drop out of or avoid school.  Sexually abused children are more likely than children who are not sexually abused to be substance users as adults and to have difficulty forming intimate relationships.  David Finkelhor (2001), the premier researcher of child sexual abuse, notes that the same sense of betrayal and shame that attaches to incest is found in sexual abuse by teachers where the pseudo parental relationship that the teacher plays has been sexualized.

**9.2     Effects on Other Students.**  In addition to costs to the targeted child, there are costs to society from condoning educator sexual abuse.  For instance, a report on sexual abuse in the New York City schools indicates that more than $18.7 million was paid between 1996 and 2001 to students who were sexually abused by educators, and 110 cases were still active.  Fees for attorneys and investigators are in addition to the settlement amounts.  (Campanile & Montero, 2001)  A 2004 report (Campanile, January 20, 2004, http://www.nypost.com/news/retionalnews/16207.htm) lists more than 600 legal claims and lawsuits filed against New York City public schools in the three years since 2001 at a cost of hundreds of millions of dollars if the claims prevail.  If educator sexual misconduct had been prevented, the effort and resources necessary to respond to the claims might have been put to better use.

Where educator sexual misconduct is not adequately addressed, the negative effects spread to other staff and students.  Studies of sexual harassment in the workplace indicate that the climate and culture changes when sexualization and abuse are not prevented.  There are no studies that examine the effects on school climate and the others who exist within that climate.

Thus, the additional harm to other students as well as the cost of litigation is an area about which little is known and which would benefit from examination.

## 10.0 CONSEQUENCES OF ALLEGATIONS OF EDUCATOR SEXUAL MISCONDUCT

The studies which include documentation of the consequences of educator sexual misconduct primarily focus on what happens after allegations are made.  Most document the ways in which schools and districts fail to remove abusers from the classroom.

**10.1  Consequences for abusers.**  In an early study of 225 cases of educator sexual abuse in New York, <u>all of the accused had admitted to contact sexual abuse of a</u> student but none of the abusers was reported to authorities and only 1% lost their license to teach (Shakeshaft and Cohan, 1994).  All of the accused had admitted to physical sexual abuse of a student but only 35% received a negative consequence for their actions: 15% were terminated or, if not tenured, they were not rehired; and 20% received a formal reprimand or suspension.  Another 25% received no consequence or were reprimanded informally and off the record.  Nearly 39% chose to leave the district, most with positive recommendations or even retirement packages intact.

Of those who left, superintendents reported that 16% were teaching in other schools and that they had no idea what the other 84% were doing.   A recent report on sexual abuse in New York City indicates that 60% of employees who were accused of sexual abuse were transferred to desk jobs at offices inside schools and 40% of these teachers were repeat offenders. (Campanile & Montero, 2001)  In many instances, agreements are made to avoid legal battles with the alleged abuse.

Several investigative reports have publicized individual cases and the response by districts to allegations of educator sexual misconduct.  For instance, O'Hagen and Willmsen report that of 159 Washington state coaches "who were reprimanded, warned, or let go in the past decade because of sexual misconduct…at least 98 of them continued coaching or teaching afterward." (December 15, 2003)  Many school districts make confidential agreements with abusers, trading a positive recommendation for a resignation.  O'Hagan (2004) details two examples of coaches in Washington that illustrate this practice.

In 1995, a Sharples Alternative School student accused tutor Sione Hefa of going to her home at 3 a.m. and forcing her to have sex with him. "At one point, he held her neck with his arm so she couldn't get up," according to investigative notes.  "She kept telling him she did not want to have sex wit him."

When the district investigated, Hefa refused to answer questions, citing his Fifth Amendment rights.  His Seattle Education Association representative denied the accusations.

The district's human-resources director later told Hefa in a letter: "The District investigation reveled that you went to the home of one of your female students at 3:00a.m. on Sunday, January 22, 1995, you were let inside, and that you forced her to have sex with you."

Records indicate the district suspected that Hefa may have victimized other girls.  After negotiations, the district allowed Hefa to

40

resign, promising in writing not to tell future employers about the allegations.

In another example, O'Hagen (2004) reports that a Seattle educator, Luke Markishtum,  had two decades of complaints of sex with students and providing alcohol and marijuana to students prior to his arrest for smuggling 6 tons of marijuana into the state.  The district paid Markishtum the remainder of his salary that year, agreed to keep the record secret, and gave him an additional $69,000.

There is little data on sentencing within states or across states.  An analysis of State of Nevada sentences in educator sexual abuse cases between 1994 and 2003 illustrates the lack of uniformity of response and consequences.  We know little about the legal consequences for abusers.

**10.2    Consequences for targets.**  The school or district rarely prescribes a therapeutic and healing intervention for targets of educator sexual misconduct or for others in the school.  I have found no descriptions of policies and procedures that debrief other students or their parents. Neither have I been able to locate any suggestions for types of support a targeted student should receive from the school.  Most school officials report that if action is taken against the abuser, they have done all that is necessary (Shakeshaft and Cohan, 1993).

Limited data from interviews, newspaper reports, and court documents indicate that there is often a negative public response to the student who is seeking protection from educator sexual misconduct.  Student targets report that other teachers single them out for threats.  Additionally, it is not uncommon for educators and the public to come to the assistance of the accused educator. (Shakeshaft and Cohan, 1993)

## 11.0   UNION AND PROFESSIONAL ORGANIZATION ROLES

**11.1   Actions of teacher unions.**  Until recently, teacher unions in many states have actively opposed legislation that would require positive identification (e.g., finger-printing) of teachers convicted of sexual abuse of students.  In most states, teachers who are already employed are exempt from regulations such as fingerprint identification.

Typical is New York State's Chapter 180 of the Laws of 2000 regulations that require applicants for teaching and administrative certification and other employees of schools to undergo a fingerprint-supported criminal history background check.  The law went into effect on July 1, 2001, but exempted "individuals who have provided services to the covered school in the previous year" (New York State Education Department, Office of School Personnel Review and Accountability, http://www.highered.nysed.gov/tcert/ospra/geninfo.htm).  Volunteers, student teachers, employees in private schools and bus drivers are also not required to be fingerprinted. There is no research that documents teacher union attempts to identify predators among their members.

**11.2   Actions of professional organizations.**  Administrative professional organizations have hosted workshops and talks at annual meetings on the topic of educator sexual abuse and *The School Administrator*, the official publication of the American Association of School Administrators, published an issue devoted to the topic. However, specific guidance and direction to members has not been formal nor did I find evidence that professional organizations for teachers have addressed the topic for their members.

## 12.0   PREVENTION OF EDUCATOR SEXUAL MISCONDUCT

Educator sexual misconduct has not been systematically addressed in schools. While the advent of money damages to abused students, a result of Title IX legislation, and newspaper and other media coverage have prodded some school district officials to acknowledge educator sexual misconduct, educator sexual misconduct is still occurring. Some believe that the rights of adults are favored over the safety of children (Sesame, 2003; Shoop, 2003).

Because so little has been done to prevent educator sexual misconduct, it is not surprising that there are no studies of the effectiveness of prevention programs or legislation.   However, although not empirically documented, there are practices that many believe are likely to reduce educator sexual misconduct.  In New York City, under the leadership of the late Edward F. Stancik who was Special Commissioner for Investigations, a commission assembled a list of 35 recommendations for reducing educator sexual misconduct.

**12.1   Develop district and school level policies**.  All school districts need written policies prohibiting educator sexual misconduct and inappropriate educator-student relationships to include consensual relationships between staff and students. The behaviors prohibited should be described in the policy so that there is no ambiguity about what types of actions are unacceptable.  In addition to making clear the prohibitions against adult to student sex, United Educator's (2004) has suggested that policies should include reference to:
- Descriptions of educationally appropriate touching
- Limitations on closed door and after hours activities with only one student
- Investigatory rights without formal complaint
- Required reporting by other teachers and employees
- Required report of any criminal investigation or conviction during period of employment
- Required chaperones, at least one male and one female, for offsite trips
- Deadline for reporting allegations with the option for waiving the time limit

**12.2   Hiring practices.**  A common form should be used for all applications which includes questions on work history, identification that will facilitate background checks, and all information on criminal history. The form should include a statement that incomplete or false information can result in termination.  Interviewers should be trained to identify red flags in applicant backgrounds.

**12.3   Screen employees.**   Use multiple screening methods that include references, background checks, license information, and application information.  Obtain personnel information from current employer.  Include probationary periods of employment.

Background checks with fingerprint screens should be completed for all current and new employees.  Where collective bargaining agreements prohibit screening of current employees, steps should be taken to change these restrictions.   While screening

will not identify the majority of educators who have or will sexually abuse, it signals seriousness on the part of the district.  To make background screens more effective, those who hire should check for gaps in employment, inquire into reasons for movement between schools or districts, contact school personnel in previous sites reaching beyond those listed as references, ask direct questions, and search DWI offenses.   Check social security numbers.

**12.4    Assign a case coordinator and centralize information.**  Appoint a case coordinator who handles all incidents of educator sexual misconduct.  In the most effective structure, the case coordinator is outside of district control, but with regulatory authority within the district.

One reason that educator sexual misconduct continues is that in most schools and school districts there is no one person to whom all rumors, allegations, or complaints are channeled.  As a result, patterns of behavior are often not detected.  Selecting one person to whom all school personnel must report any rumor, allegation, complaint, or suspicion is necessary to insure that no student falls through the crack.

Record all  allegations and outcomes in employee personnel file.  Do not agree to expunge molestation findings.

**12.5    Report all allegations to both child protection and law enforcement agencies.**  The majority of allegations of educator sexual misconduct are not reported to the police by the school districts.  District policy should require that the allegation be reported to both the police and child protection agencies. Consult police immediately and build relationships for shared investigation.

**12.6    Develop thorough investigative practices.**  Train regional investigators who can respond quickly to allegations.  Insure that investigations are completed within 48 hours and reports are presented to school authorities, students, and parents.  Define the roles of all parties in the investigation including notification responsibilities.  Do not terminate investigation if employee resigns.  Complete investigation and file report internally, with criminal justice authorities, and with state licensing entities.

**12.7    Educate employees.**  With rare exceptions, sexual abuse prevention training for educators and school staff –whether pre-professional or while on the job -- does not include educator sexual misconduct.  These programs focus on what to do when sexual or any other kind of abuse or maltreatment is suspected from a source outside the school.  Therefore, additional training for educators and other staff about educator sexual misconduct is important.  Training outlines the behaviors that are not acceptable so that everyone – both those who abuse and those who do not abuse – are working from the same set of expectations.  By making expectations explicit and public, school decision makers are also helping educators understand their own responsibility in reporting behavior that does not conform to those expectations.  Thus, the training is to educate about unacceptable behavior and to remind everyone of the responsibility to report.

**12.8   Educate students.**   Like staff, students need to understand the boundaries that educators should not cross.  This is important both for students who might be targeted and for students who observe such behaviors.  Both sets of students need to know that such behavior is prohibited and that there is a person to whom they can and should report such incidents.  Materials and programs that have been developed to protect students from sexual abuse rarely include examples of predators who are educators.  Students need to know that educators might cross boundaries and what to do if this happens.

**12.9   Be aware of signs of educator sexual misconduct.**  To increase the possibilities for identification of educator sexual misconduct, educators, parents, and students need to know:

- Any employee, including volunteers, might molest
- Educator sexual predators are often well liked and considered excellent teachers
- Special education students or other vulnerable students are often targets of sexual predators
- Adults who have access to students before or after school or in private situations are more likely to sexually abuse students than those who don't (coaches, music teachers, etc.)
- Physical signs of sexual abuse include difficulty walking or sitting, torn clothing, stained or bloodied underwear, pain or itching in genital area, venereal disease, pregnancy, and changes in weight
- Behavior indicators in students might include age inappropriate sexual behavior, late arrivals to class, changes in personality, and increased time at school with one adult
- Rumors are an important source of information on educator sexual misconduct
- Behaviors of adults who molest include close personal relationships with students, time alone with students, time before or after school with students, time in private spaces with students,  flirtation behavior with students, off-color remarks in class

**12.10  Change state educator certification regulations.**   State certification requirements for educators need to include required training on educator sexual abuse.  New entrants to the field need to understand the professional expectations and ethics in regard to student relationships.

**12.11  Provide adequate state registry.**  In most cases where educators cross boundaries, the educator does not lose her or his license.  Therefore, a state list of educators who sexually abuse which is maintained by the state certification office is a place where future employers or parents can turn to check backgrounds.

**12.12  Provide adequate federal registry.**  Currently there is no electronic federal registry that can be accessed to search for educators who have had certification and licenses suspended.  Nor is there central place that lists those who engage in sexual misconduct.

**12.13  Enact and standardize state policies and statutes.**  State laws which prohibit educators who abuse their positions of trust should be implemented to include any student, no matter what age, in an educational institution.  Criminal background checks using FBI and state records along with fingerprinting should be required by all states and the information stored in a federal repository that can be accessed easily.  State laws should require school officials to report any alleged sexual misconduct or the resignation or suspension of educators accused of sexual misconduct to state education officials.  Laws protecting school officials from lawsuits for job references given should be in place in every state.  The age of consent should be standardized across states as should the definition of what constitutes child sexual abuse.

**12.14  Enact laws giving immunity to public employees who provide references.**  State laws that protect employers who give good-faith references on former employees will help increase the information exchange across districts.  Although state personnel laws already protect former employers in this process, additional laws will increase feelings of security.

**12.15  Expand Title IX.**  Make the damage intent of Title IX clear, using Title VII parameters in deciding liability.

**13.0  SUMMARY OF EXISTING STUDIES AND RECOMMENDATIONS FOR ADDITIONAL ANALYSIS**

Educator sexual misconduct is woefully under-studied.  We have scant data on incidence and even less on descriptions of predators and targets.  There are many questions that call for answers.  Table 18 summarizes the research (or lack of research) synthesized in this report and suggests possible responses in each of the categories.

The report recommends a series of studies to deepen the understanding of educator sexual misconduct and strategies to prevent the abuse of students.

| Table 18.  Educator Sexual Misconduct: Data Available And Needs for Future Research | | |
|---|---|---|
| **Topic** | **Studies Available** | **Recommendations for Future Study** |
| Prevalence | Limited national data | Nationwide study, representative sample of households with children 12 and older.  Questions on prevalence, patterns, outcomes, descriptions of targets, descriptions of predators, reporting patterns, effects on academic performance, effects on social interactions |
| Offenders | No profile data | Study of educators convicted of sexual misconduct with students. Random sample of educators, using newspaper stories and court files to identify predators. Telephone, face-to-face and paper and pencil surveys.  Representative sample of teachers to determine false accusations. |
| Targets | Limited data on profile, patterns, effects | Study of children who have been targets of educator sexual misconduct. Questions on patterns, experiences with schools, experiences with law enforcement.  Parent involvement in stopping abuse. |
| Patterns | Limited data on patterns | Content analysis of court documents; survey data from households |
| Effects on Targets | Limited data | Longitudinal study of students abused by educators. Retrospective studies. |
| Effects on other students | No data | Study of schools in which educator sexual misconduct has occurred.  Effect on other students, other teachers, parents? Reputation of the school? Administrators?  Financial effects? |
| School and District Responses | Little data on effective prevention strategies | Study of prevention strategies.  What is different in schools and districts in which there is no educator sexual misconduct vs. those with substantial sexual misconduct? |
| Consequences for Offenders | Little data on distribution or gravity of legal consequences. | Examination of sentencing records of convicted educators. Comparison of laws across states for consequences of same actions. |
| Public responses | Little data on public response to allegations | Survey of households; response to allegations; cases studies of public and school responses to allegations |
| Responses of professional organizations | Little data on professional organization educational support | Survey studies. |
| Investigative | Little data on most | Observational, interview, survey studies. |

| practices | effective investigative practices | |
|---|---|---|
| Legal Analyses | No analyses of the development of legal arguments, policies, regulations, and laws | Analysis of relationships between Title VII, Title VI and Title IX decisions; comparison of state laws; efficacy of federal and state responses. |

**Appendix I**
**Newspaper, News Wire, and Broadcast References**

## Newspaper Accounts

Abuse case ends in mistrial. (2003, June 20).  <u>The Baltimore Sun</u>.

Abuse gets teacher 46 years.  (2003, June 7). <u>The Arizona Republic</u>.

Abuse jury is told of secret taping. (2002, December 13). <u>Evening Chronicle</u>. Newcastle, (UK).

Accused coach has record of sex abuse (2003, February 4). <u>Washington Post</u>.

Accused molester facing another charge. (2003, April 2). <u>Island Packet</u> (SC).

Accused teacher quits. (1987, September 17). <u>Newsday</u>, p. 37.

Ahearn L.A. (2000, February 17). Giving a voice to the victims: Our criminal justice system must empower children who have been sexually abused. <u>Newsday</u>. p. B7.

Alcott, J. (1987, May 13). Mahopac teacher charged with molesting. <u>Gannett Westchester Newspapers</u>, p. 3.

Allen, J.L.  (2003, February 28). Ex-coach accepts plea agreement: Jennifer Brooks takes a three-year prison term in her felony case.  <u>Sarasota Herald-Tribune</u> (FL).

Anthony, S. (2001, April 25). Parents search for answers after teacher is arrested; Some aren't sure how to discuss sexual abuse. <u>St. Louis Post-Dispatch</u>.

Area news briefs: Probation given in sex case. (1986, February 12). <u>The Daily Star</u>, p. 3.

Arrested in kid-sex. (1991, October 3).  <u>Daily News</u>, p. 28.

Attorney general: Sexual predators lurk in Ontario schools. (2000, April 7).  <u>The Ottawa Citizen (Canada)</u>.

Bail is reset for teacher in sexual assault retrial.  (2003, March 14). <u>Cherry Hill Courier Post</u> (NJ).

Bailey, S. (2001, June 16). Youth board set to hear charges against two.  <u>The Birmingham News</u>.

Barac, L. V.  (1991, October 3).  Probable cause: School district failed to handle sexual harassment. <u>Chaska Herald</u>, pp. 1, 10.

Barac, L. V.  (1990, August 30).  School district accused of failure to act against sexual harassment.  <u>Chaska Herald</u>, pp. 1, 12-13.

Barrie teacher acquitted of sex assault. (2002, July 19). <u>Ottawa Citizen</u> (Canada).

Barringer, F.  (1993, June 2).  School hallways as gauntlets of sexual taunts.  <u>The New York Times</u>, p. B7.

Bartsch, P. (2003, April 14). Abuser back on the job.  <u>The Sunday Times</u> (Perth, Australia).

Basler, G. (1989, August 29). JC may suspend coach with pay. <u>Press and Sun Bulletin</u>, pp. 1B, 3B.

Baxter students finally to get abuse settlement.  (2003, February 25). <u>Kennebec Journal</u> (ME).

Beaven, Stephen. (2001, December 3).  Ex-Oregon city teacher sentenced for sex crimes. <u>The Oregonian</u>. p. C02.

Benham, K.  (2003, July 28).  Principal case sparks 'uproar.''  <u>St. Petersburg Times</u>, Fl. p. 1B.

Bennett, D. (2000, January 28). Grand jury to hear case.  <u>The News Herald</u>. Ashtabula, OH.

Berger, J.  (1991, October 11).  Cover-up charged in school official's sex abuse case.  The New York Times, pp. B1, B2.

Bernstein, N. (1996, February 11). Civil rights lawsuit in rape cases challenges integrity of a campus.  The New York Times, pp. 1, 32.

Bessent, A. E. (1991, February 21). In abuse case, kids face trial too. Newsday, p. 29.

Bessent, A. E. (1990, June 25).  Despite record, hired to teach. Daily News, pp. 3, 28.

Bessent, A.E.  (1990, March 28).  Teacher convicted of sexual abuse.  Newsday, p. 20.

BHS teacher charged in rape case (2003, March 12). Brookline Tab (MA)

Bill eases path for child sex-abuse suits. (2003, January 15). Louisville Courier-Journal (KY).

Blackwell, T.  (2000, April 8). Sex abuse by Teachers 'not isolated' report warns:  Pedophile educators are allowed to move and 'hunt' again.  The Ottawa Citizen.

Blame game:  Girl's troubles with internet at issue.  (2003, September 6.  The News Tribune (Jefferson City, MO).

Board hears alleged improper relationship case.  (2003, May 1).  Ruidoso News (NM).

Bolten, K.  (2003, May 17).  State bans teacher after affair.  Des Moines Register.

Bolton, M.M. (2001, April 4). Professor faces additional sex abuse charges.  The Times Union. (Albany, NY).  p. B7.

Bono, A. (February 13, 2004) Picture of child sex abuse in U.S. society clouded by lack of data.  Catholic News Service

Boodman, S.G. (2002, July 29). How deep the scars of Abuse? Some victims crippled; others stay resilient.  Washington Post

Boomsma, J. (1993, November 14). Principal recalls effort to keep matter quiet. The Grand Rapids Press, p. B2.

Boult, T. (1993, November 14). Spared by her teacher.  The Grand Rapids Press, p. B3.

Bowers, C. L. (1993, September 5). After 15 years of lies, Price didn't see any sense in denying anymore'.  The Sun, p. 1C.

Bowers, C. L.  (1993, June 10).  School knew in 1989 of rumors Price was involved with 10 girls.  The Sun, pp. 1B, 3B.

Bowers, C. L., & O'Brien, D., with Siegel, A. F. (1993, August 10).  3rd Northeast teacher faces pupil-sex count.  The Sun, pp. 1B, 4B.

Bowles, P. (2001, February 8). Teacher charged in city assaults.  Newsday.

Bowles, P., & Kowal, J.  (1995, October 19).  Girl: Bus driver molested me.  Newsday, p. A30.

Bradley, E. (2002, August 9). School district violated state law: Placing a student in a teacher's home illegal in Wisconsin.  The Northwestern. (Oshkosh, Wisconsin).

Bradley, E. (2002, June 7).  Counselor's case differs from Mosher's.  The Northwestern. Oshkosh, WI.

Breuer, H.  and Myerhoff, M. (2002, June 14). Girl, 16, testifies against former coach.  Pasadena Star News.

Bricker, J. (2002, July 20). Sexy notes not enough to convict teacher.  National Post. Canada

Bright, M.  (2002, November 17).  Surgical tags plans for sex offenders: Silicon chip to be inserted under skin.  The Observer. UK.

Broderick, D.  (1993, July 9).  Parents rip ed board over sex scandal.  New York Post, p. 14.

Broderick, D.  (1993, July 8).  School sex shocker: Counselor had affair with 2 students.  New York Post, p. 2.

Brooks, A. P. (1995, July 7). When flirting becomes hurting in the schools. Austin American-Statesman, pp. A1, A11.

Brooks, J. (2001, June 6). Coach facing more counts of sex abuse: Total charges up to 9, concern boys under 13. The Arkansas Democrat-Gazette.

Broussard, S. (1989, July 23). School bus driver in sex rap. Daily News, p. 14.

Buckey son to be retried. (1990, February 1). Daily News, p. 11

Buder (1988, March 29). A pornographer given 10 years by a U. S. Judge: L.I. teacher also faces sentence in state case. The New York Times, p. B4.

Buettner, R. (1995, May 11). Teacher, teen on the run for love. Newsday, p. A6.

Burke, C. (1995, June 2). Trying to punish these perverts is a joke. New York Post. p. 5.

Burke, C. (1992, June 13). Bronx teacher in sex shocker. New York Post, p. 7.

Campanile, C. (2001, May 24). Roy's state bill: Make schools report sex cases. The New York Post.

Campanile, C. and Montero, D. (2001, August 6). You pay for school assaults. New York Post.

Campbell, J. (1996, February 25). New York disclosure law snares a school chief. The New York Times, p. 37.

Camron, V.A.F. (2002, May 25). State drops sex abuse charges. Kane County Chronicle.

Cannizaro, S. (2001, June 13). Reports of child sex abuse increases; Task force helping teachers to spot signs. The Times-Picayune.

Career is over for principal who says he was falsely accused. (2003, May 31). St. Louis Post-Dispatch.

Carmichael, A. (2001, May 17). Teacher who sent teenaged boy love letters loses teaching license. Canadian Press

Carmichael, A. (2001, May 16). Psychologist concedes teacher's actions toward student were predatory. Canadian Press

Campanile, C. (January 20, 2004). Savage school halls. New York Post Online Edition.

Carmichael, A. (2001, May 17). Teacher who sent teenaged boy love letter loses teaching license. Canadian Press.

Carmichael, A. (2001, May 16). Psychologist concedes teacher's actions toward student were predatory. Canadian Press.

Carr, N. (2002, July 15). Crush letter 'a joke' teacher's husband testifies. The Star. (Barrie, Ontario, Canada).

Cassese, S. (1992, February 11). Mom suing school for $5M in sex abuse case. Newsday, p. 25.

Charge is gone, but stigma remains. (2003, May 31). Orange County Register (CA).

Charges for teacher. (1989, April 7). New York Daily News, p. 35.

Charlotte coach who had sex with players is freed. (2003, November 18) The News-Press. (Ft. Myers, FL).

Chiles, N. and Gardiner, S. (2001, May 5). 2 more boys say teacher molested them: Chancellor fires investigator who conducted 1998 inquiry. Newsday.

Chiles, N. and Gardiner, S. (2001, May 4). More accuse teacher. New York Newsday.

Ciotta, R. (1989, April 12). 5 accused of abuse were escorts for children's outings two staff members were charged before taking patients outside. The Buffalo News.

Ciotta, R. (1989, March 9). Sex claims at child center date to '83. The Buffalo News, pp. A1, A11.

City, board sued over abuse-case grilling. (1991, May 28). Daily News, KSI , p. 2.

51

Clayton, Chris. (2002, February 14).  Abuse alleged at Glenwood Center.  The Omaha World-Herald. p. 1A.

Clinton teacher charged with sexual assault.  (2003, June 18),  The Hartford Courant.

Coach accused of molesting six girls. (2002, December 4). Chicago Daily Herald.

Coach accused of 7th molestation.  (2003, January 10). Chicago Sun-Times.

Coach accused of touching female student.  (2003, May 30).  Sarasota Herald-Tribune.

Coach background checks get scrutiny. (2003, February 10). The Common Denominator.

Coach guilty of molesting student.  (2003, July 13).  The Tennessean.

Coach in court charged with player affair. (2003, March 12). Morganton News Herald (NC).

Coach had run-in with girl's folks, police say.  (2003, May 31).  Albuquerque Tribune.

Coach may face private prosecution.  (2003, March 20).  The Courier Mail, Brisbane Australia.

Coach-player relationship is examined by SI. (2001, September 6). Philadelphia Daily News,

Coach surrenders over alleged sex with student.  (2003, March 21),  Phoenixville News, PA.

Coaches face scrutiny.  (2003, July 6).  Florida Sun-Sentinel.

Coaches' sexual abuse of athletes a worry for parents, schools.  (2004, January 26). The Columbian  (Vancouver, WA).

Cochran seeks suit dismissal.  (2003, June 6).  The Adrian Daily Telegram (Michigan)

Cohen, T. (2001, June 9). Suspect Loses Right to Teach Driving Course. Portland Press Herald

College rape trends studied. (1992, August 17). Newsday, p. 13

Communication is the best defense against abuse. (2003, June 17).  The Washington Times.  Sports.

Complaints against teacher ignored for years. (2003, October 26).  Lawrence Journal World (KS)

Compton, J. (2002, July 31). Glen Dale parents learn to talk to kids about sexual aggression. The Intelligencer – Wheeling News Register.

Cool, L.C. (2001, August 8). The Bullying Epidemic. Ladies Home Journal.

Court rules schools can be liable for unchecked sexual harassment. (1999, May 25). The New York Times,  p. A24.

Court rules teacher should go to jail for sex with student. (2002, July 26). Asbury Park Press (NJ).

Court upholds sentencing of LA-area coach.  (2003, November 26).  San Jose Mercury-News (CA).

Covello, D., as told to Willen, L.  (1996, February).  I was abused by my guidance counselor.  Good Housekeeping, pp. 70-75.

Craig, T. (2001, March 22). 2 more charge martial arts teacher with sexual abuse. The Baltimore Sun.

Crombie, N. (2001, March 17). Middle school teacher charged with sexual abuse. The Oregonian.

Crossing the line.  (2003, June 18).  The Washington Times. Sports.

Crowd rallies to back Old Forge teacher. (2003, September 25).  Times Leader (PA).

Cummins, H. J. (1995) Crushes usually harmless, counselors say. Newsday, pp. 27, 29.

Cummins, H. J.  (1995, May 27).  Dealing with harassment in your child's classroom. Newsday, pp. B2-B3.

Dale, C. (2003, April 16).  Teacher's appeal denied by state education board.
    Parkersburg News and Sentinel, WV.
Dance teacher convicted.  (2003, September 22).  North Jersey Herald & News.  (NJ)
Dance teacher is found guilty of sexual abuse.  (2003, July 17).  The Baltimore Sun.
Dance teacher seeks new trial.  (2003, July 31).  The Baltimore Sun.
Danks, H. (2001, Sept. 10).  Forest Grove School District sued over sexual abuse case.
    The Oregonian. p. E05.
Danks, H. (2001, January 5). Teacher convicted of sexual abuse.  The Oregonian.
Davis, Cary. (2002, May 31). Testimony may alter teacher's sex case.  St. Petesburg
    Times.
Dayton teacher charged in sex assault. (2003, March 12). Cleveland Advocate.
De La Cruz, J. (2002, August 10). E. Rapids teacher reassigned after sex allegations.
    Lansing State Journal.
Decades of sexual abuse alleged.  (2003, April 13).  Canadian Press.
Defiant Volkers vows to keep on coaching.  (2003, April 5). The Courier Mail (Brisbane,
    Australia)
Demoretcky, T.  (1995, October 3).  Warnings of sex abuse unheeded, lawyer says.
    Newsday, p. A23.
Dentzer, B.  (1996, February 20).  Mistrust strains classroom relationships, experts say.
    The Citizen Register, p. 5A.
Deopere, J. (2001, March 7). Girl's mother sues school board over sex case. The Ledger.
DeStefano, A.M.  (1992, May 25).  Kids who lie: Most sex charges against teachers prove
    to be false.  Newsday, p. 5.
Details arise of control, sex abuse at Oregon group home.  (2001, February 7). Kennebec
    Journal. (Augusta, ME).
Deutsch, L. (1990, January 19). 2 cleared in child sex rapes. Daily News, p. 2.
Diesenhouse, S. (1988, January 31). Child sex abuse cases rising in MA. The New York
    Times, p. 43.
Dillon, S. (1994, June 28). Teacher tenure: Rights vs. discipline. New York Times, p. 1.
District lets accused teacher go.  (2003, July 5).  Rockford Register Star (Illinois).
District severs ties with teacher. (2003, April 10). The Arizona Republic.
Driving teacher accused of rape pleads innocent.  (2003, April 13).  The Lowell Sun (MA).
Duddy, J., Sheridan, D.  (1991, May 3).  Aide held in five rapes:  Pregnant student, 14,
    sparks inquiry.  Daily News, p. 7.
Echtenkamp, J. (2002, July 16). Band director gets prison for sex abuse. Loudon Times
    Mirror.
Edelman, S. (2000, March 13). Teachers axed: One who exposed abuse pays price. The
    New York Post.
Educator gets 18 months for sex with teen. (2003, March 4). Cincinnati Enquirer.
Educators scrutinize contact with students.  (1996, February 20). The Reporter Dispatch,
    pp. 1, 5A.
Educators seek safeguards against child sex abuse.  (2003, July 9).  The Oregonian.
Egelko. B. (2003, February 24). State law opened door to sue on alleged long-ago abuse.
    Defense lawyers cry foul, but prosecutors point to safeguards.  San Francisco
    Chronicle.  P. B2.
Elizabeth, J. (2003, February 6).  A question of quality: Paperwork and legal threats
    discourage teacher firings.  Pittsburgh Post-Gazette.
Emerson, J., & Wait, T. F. (1989, July 29). Fallsburg delays report on abuse. The Times

Herald Record, pp. 3, 10.

Equestrian coach begins prison term for sex assault. (2003, July 9). The Hartford Courant (CT).

Evans, F. (1987, May 7). Teacher facing court, district probe. The Smithtown News, pp. 1, 14.

Evans, H. (1991, May 4). Suspect in rapes not aide. Daily News, p. 6.

Evans, J. (2004, January 26). Coaches' sexual abuse of athletes a worry for parents, schools. The Columbian (Vancouver, WA). Front page.

Ex-coach gets probation in sex assault. (2003, March 1). Omaha World-Herald (NE).

Ex-coach sentenced. (2003, July 30). The Virginian-Pilot (Norfolk, VA).

Ex-Livingston coach jailed on child sex charges. (2003, June 4). The Houston Chronicle.com

Ex-Pine View teacher pleads guilty to raping 17-year-old. (2001, April 1). The Deseret News..

Ex-student, administrator settle sex molestation suit. (1995, June 27). The Star-Ledger p. 20.

Ex-swim coach gets nine-year sentence. (2001, November 11). Milwaukee Journal Sentinel.

Ex-teacher accused of sex abuse. (2003, June 20). The Syracuse Post-Standard.

Ex-teacher charged with sexual abuse. (2001, December 14). The Salt Lake Tribune. p. C2.

Ex-teacher gets 7 years for abuse. (2001, November 11). The Record (Bergen County, NJ).

Experts: Sexual predators often present benign façade. (2003, May 1). The Arizona Republic, Phoenix, AZ.

Fabbre, A. (2001, July 27). Geneva High teacher faces more charges that he sexually abused a female student. Chicago Daily Herald.

Fabbre, A. (2001, July 27). Geneva high teacher denies new sexual abuse charges. Chicago Daily Herald. p.1.

Family sues over child sex assault. (2003, February 23). Eau Claire Leader-Telegram (WI).

Farrell, B. (1993, June 24). Probation for driver in sex abuse of boys. Daily News, p. 20.

Farrell, B. (1993, March 9). Teacher held on sex rape. Daily News, p. 16.

Father testifies about alleged abuse. (2003, February 27). Stamford Advocate (CT).

Feld, J.J. and Maxey, A. (1999, January 6). Teacher placed on leave: Dobbs Ferry educator ran New Castle program for third-grade boys. Gannett Suburban Newspapers. (Westchester, Putnam and Rockland counties, NY).

Ferris, R. (2002, August 13). Questions raised about CISD official's knowledge of teacher/student affair. The Courier. (Montgomery County, TX).

Finn, R. (1999, March 7). Growth in women's sports stirs harassment issue. The New York Times. p. A1, 24.

Fitz-Gibbon, J. (1994, March 15). Janitor raped me, girl, 10, testifies. Daily News, p. 25.

Fitz-Gibbon, J. (1994, March 8). PS janitor rape trial under way. Daily News, Metro p. 1.

Flaws in system allowed molester back in school. (1993, November 14). The Grand Rapids Press, p. B1.

Florence, E. (2000, November). Who's at school with your kids? Readers' Digest Canada.

Foderaro, L.W. (2002, April 14). Conduct by a teacher causes doubt and fear. The New York Times.

Former band director sentenced.  (2003, October 24).  Minneapolis Star Tribune.

Former basketball coach sentenced to prison.  (2003, September 5). The Wilmington Star News (North Carolina).

Former Beaverton teacher gets 10 years.  (2003, November 4).  The Oregonian.

Former coach is given a year in prison.  (2003, November 8).  Lorain Morning Journal (OH).

Former coach pleads innocent.  (2003, July 9).  Wisconsin Rapids Daily Tribune.

Former coach pleads not guilty.  (2003, August 10).  The Daily Democrat. (Woodland, CA)

Former coach, teacher convicted.  (2003, August 2).  Dayton Daily News (OH).

Former deputy gets six months.  (2004, January 21).  Hamilton Journal-News (OH).

Former Dons coach Otis might return.  (2002, October 23). Long Beach Press-Telegram. (CA).

Former Hopatcong teacher sentenced to prison.  (2003, September 26).  New Jersey Herald.

Former school coach admits to using drugs with students.  (20303, June 8).  The Seattle Post-Intelligencer.

Former school coach sentenced to 40 years for violating probation.  (2003, August 1).  Houston Chronicle.

Former student seeks damages of $75,000.  (2002, December 19).  Topeka Capital-Journal.

Former teacher, coach acquitted on sex charges (2003, February 3). Macomb Daily (IL).

Former teacher faces trial in abuse case.  (2003, September 9).  The Ahwatukee Foothills News (AZ)

Former teacher sentenced.  (2003, September 25)..  The Concord Monitor (NH).

Former Wauconda teacher faces felony sex charges.  (2003, February 26).  Chicago Daily Herald.

Former Waverly teacher sentenced.  (2003, February 23).  Towanda Daily and Sunday Review (PA).

Forrest, S. (1991, March 7). Bus driver charged in sex abuse. Newsday, p. 31.

4 accused coaches could lose positions.  (2004, January 26).  Seattle Times.

Four more families sue former Clovis teacher. (2002, October 23). Amarillo Globe-News.

4th-graders lied about molestation. (1994, May 19).  Newsday, p. A19.

Frank, R. (2001, January 3). Judge dismisses three of 15 charges against teacher.  The Oregonian

Frownfelder, D.  (2003, May 3).  Teacher pleads not guilty.  The Lenawee Connection/ The Daily Telegram.  Adrian, MI.

Fukumoto, Ken. (2002, February 11).  Failing the grade; Japanese are scandalized by a wave of arrests of schoolteachers accused of sex-related crimes. Newsweek. p.19.

Gaines, Judith. (2002, January 13). A test of character:  When Paul Christopher became headmaster of the Berkshire school he brought with him credentials as an ethicist and champion of traditional values. Now he's embroiled in a sexual harassment scandal. Boston Globe. p. 10.

Galarneau, A.Z. (2001, May 12). Parents confront teacher who molested pupils. The Buffalo News.

Gallagher, M.  (1992, April 16).  Abuse charge for teacher:  NY probe found no basis for girl's sex complaint.  Newsday, pp. 7, 31.

Gallotto, A.A. (1995, August 17).  Teacher sentenced for public masturbation.  The Star-Ledger, p. 41.

Gardiner, S. (2001, January 19). Ex-teacher charged in sex abuse. Newsday.

Garrison, J. and Hayasaki, E.  (2001, September 6).  Schools roll out plans to get tough on bullies. Los Angeles Times.

Gearty, R.  (1993, September 22).  Cortines:  Ax pedophile:  'Man-boy lover' found unfit to teach, he'll appeal.  Daily News, p. 8.

Gendar, A., Marzulli, J. and Goldiner, D.  (2001, May 5). P.S. sex probe expands.  New York Daily News.

Gendar, A. and Weir, R. (2001, May 25). Fury over silence after sex attack on Bronx students. New York Daily News.

George, K. (1986, December 28). Debate continues over school's handling of abuse case. Press and Sun Bulletin, pp. 1A, 10A.

George, K. (1986, December 28). Sex-abuse law soft on schools. Press and Sun Bulletin, pp. 1A, 10A.

George, K. (1986, December 20). SV's abuse probe draws fire. Press and Sun Bulletin, pp. 1A, 11A.

George, K. (1989, October 6). Judge drops Hudy sex case. Press and Sun Bulletin, pp. 1A, 6A.

George, K. (1989, September 26). Stanbro charged in sex cases: JC coach accused of abusing two girls at school. Press and Sun Bulletin, pp. 1A, 4A.

George, K. (1986, September 5). Teacher accused of sex abuse. Press and Sun Bulletin, pp. 1A, 8A.

Gerard, W. (1992, July 11).  Molesters prey on 'passive' disabled women.  Toronto Star. A1-A2.

Gerber, J.  (1993, November 14).  Nightmares awaken old feelings.  The Grand Rapids Press, pp. B1-B2.

Giles, D.  (1996, February 22).  Girl, 10, wears wire to nail teacher who fondled her.  New York Post, p. 2.

Gillespie, K. (2001, June 3). Hidden and unreported: Sexual abuse of students. We admit that it goes on, but we're not stopping it.  The Toronto Star.

Girl's mother sues school, teacher. (2002, December 23). Rochester Democrat and Chronicle.

Giusti, M. (2001, June 3). Breach of trust: Unwrapping the saga of 'Coach Ron.'  The Daytona Beach News-Journal.

Giusti, M. (2001, June 3). Private schools receive less stringent background checks. Trust Abuse articles and media reports: The Daytona Beach News-Journal.

Glaser, C.  (1993, November 14).  The Grand Rapids Press, p. B2.

Goetz, K. (200, September 28).  Net sex charges follow teacher: Popular educator faces 34 counts.  The Cincinnati Enquirer.

Goldberg, C.  (1995, May 21).  Betraying a trust: Teacher-student sex is not unusual, experts say.  The New York Times, p. 37.

Goldberg, C.  (1995, May 12).  Mother tapes video plea to teen-age girl who ran off with teacher.  New York Times, p. B3.

Goldberg, N. (1994, July 2).  NY bill makes firing teachers easier.  Newsday, p. A8.

Goldman, D. (2001, April 2). Bullying is a horrible reality the state will not ignore. Adweek. p.14.

Good, O.S. (2001, June 26). Parents of abuse victims sue: Employees are accused of knowing that founder of Boulder private school had molested students. Rocky Mountain News. p. 16A.

Goodnow, C. (2002, May 21). Nasty clique behavior among girls draws new attention. Seattle Post-Intelligencer.

Goodrich, R. (2001). Junior high student says gym teacher touched her repeatedly, offered her money to disrobe; but she admits she has made up stories and was angry with the man. St. Louis Post-Dispatch.

Goodstein, Laurie. (2003, June 110. Louisville Archdiocese to pay $25 million abuse settlement. The New York Times.

Goodyear, C. and Bell, E. (2002, February 26). Teacher accused of sex with 16-year-old Walnut Creek student tells of 5-month affair. San Francisco Chronicle.

Gootman, Elissa. (2001, November 22). 2 boys charged in sex abuse in high school locker room. The New York Times. p. 2.

Gordon Fox, T. (2001, May 27). Northeast corner confronts an overload of abuse. The Hartford Courant.

Grand jury indicts coach on 53 counts. (2003, April 12). Dayton Daily News, OH.

Greeley, Andrew. (2001, August 12). Teen boys make life dangerous for girls. Chicago-Sun Times. p. 38.

Gregorian, D. (1996, June 22). Gym teacher molested four girls: Cops. New York Post, p. 10.

Gryta, M. (1989, May 31). Former school aide gets prison term. The Buffalo News, p. B5.

Gryta, M. (1989, March 31). Student tells grand jury of sex with teacher aide. The Buffalo News, pp. A1, A4.

Gryta, M. (1989, March 30). School sex investigation targets fired aide. The Buffalo News, p. B1.

Gryta, M. (1989, March 26). Ex-youth official is target of sex-probe. The Buffalo News, p. B3.

Guart, A. (1993, November 6). Teachers prey on kids in sex-abuse scandal. New York Post, p. 5.

Gym coach pleads guilty in molestation case. (2003, October 4). Contra Costa Times (CA).

Haberstroh, J. (1995, March 12). Suspended teacher due back at work. Newsday, p. A31.

Hajela, D. (1995, July 11). Ex-school psychologist sentenced in sex abuse. Newsday, p. A18.

Hancock, L. (1991, October 3). Arrested in kid-sex. Daily News, p. 28.

Haner, J. (1994, January 8). Terrible secrets kept for 20 years. The Sun, p. 1A.

Haner, J., & Hermann, P. (1994, January 9). New sexual allegations raised against ex-teacher. The Sun, p. 1A.

Hanley, R. (2003, April 9). Arrest of a popular athletic director leaves students stunned. The New York Times. p. D5.

Hanley, R. (1990, December 8). Principal fondled students, New Jersey prosecutor says. New York Times, p. 28.

Hanrahan, M. (1991, April 3). He admits kindergarten rapes. Daily News, p. 7.

Harrison, B. (2000, March 13). Stunned students of 'cool guy' insist: It's not true.  The New York Post.

Hays, D., Hancock, L.  (1992, December 22).  School sex abuse rap:  Say E. Harlem educator fondled 14-year-old boy.  Daily News, p. 3.

Hays, T.  (1995, May 19).  Teenager runs from the 'Magic Kingdom' to tabloid tales of taboo sex.  The Star-Ledger, p. 5.

Hench, D. (2001, April 7). Bonny Eagle teacher faces sex charges: The high school instructor is accused of offering alcohol to a student and having sexual contact with her.  Portland Press Herald.

Henneberger, M.  (1993, August 22).  Assertions of sexual harassment and a teacher is dismissed.  New York Times, p. 38.

Henneberger, M.  (1993, July 4).  Abuse at school is called common: Teen-agers say that both boys and girls are the victims.  The New York Times, p. 24.

Herbert, B. (1989, June 27). City forcing creeps on our kids. Daily News, p. 4.

Hernandez, R.  (1994, July 20).  Karate coach is charged with abuse: Female student, 16, says he fondled her.  The New York Times, B4.

Herricks teacher fired.  (1992, December 23).  Newsday, p. 28.

Herszenhorn, D.M.  (2000, February 26). Hazing is team tradition, a defendant's lawyer says.  The New York Times.  p. B5.

Hessler, Carl. Jr. (2002, July 20). High school trainer denies molesting girl. The Mercury. (Pottstown, PA).

Hildebrand, J.  (1995, March 16). Voters: Crack down in classrooms.  Newsday, p. A7.

Hildebrand, J.  (1994, March 15).  Four years later, teacher is fired in sex case.  Newsday, p. 31.

Hirschman, B. (2001, January 29). Top Broward official hired teacher despite strong protest.  South Florida Sun Sentinel.

Hoffman, L. (2002, April 14). The priest scandal isn't just about sex. Newsday. p. B8.

Hogarth, M. (2002, July 29). School's troubled past begs questions.  The Courier News.

Hoops coach gives up defense in sex case.  (2003, July 19).  King County Journal. Bellevue, WA.

House of Lords to amend sex offense bill.  (2003, June 4).  The Guardian (UK).

How city bungled 'sex teacher' case (2001, May 6). New York Post.

Howard, T. (2001, December 11). Woman sues Diocese, teacher over alleged sexual abuse. St. Louis Post-Dispatch, p. C4.

Hu, W. (2001, July 28). Two images of a teacher at a sexual abuse trial. The New York Times.

Inappropriate Headline? (2001, May 14). The Record.

Indians come forward with tales of physical and sexual abuse at missionary boarding schools.  (2003, June 8).  The Washington Post.

Jacobson, S. (2001, May 25).  School's hiring has cracks.  Orlando Sentinel

Jahier, J.  (1993, May 4).  DA accused of ignoring rape case.  Newsday, p. 35.

Jefferson teacher charged with sexual abuse sues accuser (2003, January 31). Louisville Courier-Journal (KY).

Jennings, D. (2003, May 6).  Teacher's seeming rapport with children deflected concerns. The Dallas Morning News.

Jennings, D. (2003, May 5). Schools may soft-sell problem teachers.  The Dallas Morning News.

Jennings, D. (2003, May 4). Congenial young woman gained people's confidence: Family thought she was a friend but abuse took place for 3 years.  The Dallas Morning News.

Jewett, C. (2002, July 19). Former band teacher given six-month term: Sentence follows guilty plea in sex case. Washington Post. p. LZ03.

Johnson, G. (2002, May 20). School district, police cleared in Fualaau case. Seattle Post-Intelligencer.

Johnston, E. (2000, March 19). Sixth-graders admit hoax.  Washington Post.  p. C2.

Jones, T.  (2003, May).  The predator in the classroom: Why you can't rely on background checks – and how to protect your kids.  Good Housekeeping. New York, NY.

Judge denies plea-bargain for teacher.  (2003, March 15).  Parsippany Daily Record (NJ.

Judge faults inequalities of sex law.  (2003, June 21).   The Arizona Republic.

Judge in case of child abuse dismisses some of the charges. (1988, October 13). The New York Times, p. 21.

Judge rejects teacher's libel and slander lawsuit. (2002, July 25). Union-Tribune.

Judge scolds, jails teacher in sex case.  (2003, July 12).  Cincinnati Enquirer.

Judge who gave probation in teacher sex case faces conduct panel.  (2002, June 6). Asbury Park Press (NJ).

Jurors mark 2 years on California abuse case. (1989, April 23). The New York Times, p. 31.

Jury finds guilt on sex charges. (1985, November 24). The Daily Star, p. 3.

Jury gives $108,000 to abuse student.  (2003, July 3).  Des Moines Register.

Kalogerakis, G. (2002, August 3). Teacher acquitted, judge upbraided in sex-assault case.  Montreal Gazette.

Karp, H. (2000, March). Who's going to school with your kids?  Reader's Digest, pp. 76-82.

Katz, D. M.  (1994, October 30).  School districts formulating policies on sexual harassment.  The New York Times, pp. 1, 6-7.

Kauwell, J.  (1993, November 14). The Grand Rapids Press, p. B2.

Keeshan, C. (2001, March 1). Former teacher/coach pleads guilty to molesting student. Chicago Daily Herald.

Keeshan, C. (2001, February 26). Teacher faces student-sex charge. Chicago Daily Herald..

Kerrison, R.  (1993, September 1).  Perverts teach our children:  Man-boy love scandal to rock city schools.  New York Post, pp. 7, 12.

Kershaw, S. & Morrison, D. (1997, October 22). Official: No Sodomy Took Place. Newsday, p. 38.

Kessler, G.  (1993, November 28).  Memories of abuse: Courts, therapists struggle as thousands of new cases emerge.  Newsday, p. 54.

Kidwell, D., Grotto, J., & Figueras, T. (2002, September 8). State child-welfare payroll includes employees who have criminal pasts. The Miami Herald.

Kim, A. L. (2001, February 2).  Retracing steps on teacher hiring: Accusations slipped through the cracks.  Newsday.

Kim, R., & Willen, L. (1994, April 14)  Facing memories of abuse: While taping, man confronts teacher he says fondled him. Newsday, p. A8.

Kiss leads to a policy revision.  (1996, October 9).  The New York Times. p. B9.

Kleinknecht, W.  (1996, March 7).  Teacher is charged with molesting children.  The Star-

Ledger, p. 36.

Komarnitsky, S.J. (2001, August 22). School district hit with sex abuse lawsuit. Anchorage Daily News. P. B1.

Komarnitsky, S.J. (2001, July 25). Ex-Colony teacher makes plea deal: Man charged with having sex with 17-year old. Anchorage Daily News.

Komarnitsky, S.J. (2001, April 7). Colony teacher charged with sex abuse: relationship with 17-year old yields six felonies, one misdemeanor. Anchorage Daily News.

Komarnitsky, S.J. (2001, February 9). Teacher pursued boy, troopers say: Relationship was more intimate than initially believed, court documents say. Anchorage Daily News.

Kovner, J. & Stannard, C. (2003, January 11). Teachers accused, but they stayed on. Sexual abuse allegations did not derail 2 careers. Hartford Courant.

Kramer, M. (1989, April 5). Teacher cons return to classrooms. Daily News, pp. 3, 27.

L.I. child molester gets 20 to 60 years. (1991, May 8). Daily News, p. 16.

L.I. teacher charged with rape of student. (1993, June 24). New York Post, p. 16.

Labi, N. (2001, April 2). "Let Bullies Beware." TIME, p. 46.

Laboy, J. (1995, June 24). Teacher charged with lewdness. Newsday, p. A18.

Lambiet, J. (1995, February 17). Accused, he kept his teaching job. Daily News, p. 32.

Lambiet, J. (1993, October 5). Girl's diary of abuse nails school worker. Daily News, pp. 7, 10.

Lander Smith, E. (1994, May 19). Teacher guilty in student sex case. Newsday, p. A5.

Lander Smith, E. (1994, May 17). Sachem teacher's sex case going to the jury. Newsday, p. A22.

Lander Smith, E. (1994, May 6). Teen to testify at teacher's sex trial. Newsday, p. A25.

Landsberg, M. (1990, January 21). McMartin landmark abuse case. Daily News, p. 40.

Language teacher held on sexual abuse charge. (2002, February 16). The Times Union. p.B4.

Lawsuit against Pickens school dismissed. (2003, January 16). Greenville Courier Online (SC).

Lawsuit filed against Dickenson County School Board. (2003, March 19). Coalfield Press, VA.

Leary, W. (1988, March 22). Risk of sex abuse in day care seen as lower than at home. The New York Times, p. 20.

Lee, F.R. (1990, January 13). Bronx principal named in cover-up is suspended. New York Times, p. 31.

Lee, F. R. (1990, January 12). Panel sees cover-up of teacher's assault record. The New York Times, pp. Bl, B5.

Lefkowitz, M. (2001, June 5). Arrests in school sex attacks. Newsday, p. A16.

Less of a victim? (2003, September 22). Chicago Daily Herald.

Lesser, H. (1992, November 5). Teacher under arrest: Nab suspected molester. South Shore Record, p. 11.

Levine, S. N. (1989, August 23). JC coach charged with sodomy. Press and Sun Bulletin, pp. 1A, 8A.

Lewin, T. (1998, June 26). 1 in 8 Boys of High - School Age Has Been Abused, Survey shows. The New York Times, p. A11.

Lewin, T. (1996, October 6). Kissing cases highlight schools' fears of liability for sexual harassment. The New York Times, p.22.

Lewin, T. (1994. July 15). Students seeking damages for sex bias: School officials

around nation view lawsuits with trepidation.  The New York Times, p. B7..

Liability: Public school student may sue officials for sexual molestation by teacher, Superintendent and principal had affirmative duty to protect.  (1993).   The Guardian, pp. 5-6.

Lima, P. (2002, July 24). Prosecutor seeks jail term in teacher-pupil sex case. North Jersey News,.

Lima, P. (2002, July 20). Teacher-teen sex case judge reassigned. North Jersey News.

Lima, P. (2002, June 16). Mother, step-dad say boy hurt by teacher tryst. North Jersey News..

Lowe, H. (2001, June 12). No bail for teacher in sex case. Newsday,

Luo, M. (2001, April 10). The Correnti files. Cops: Teacher's computers recorded relations with girls. Newsday

Luo, M. (2001, April 10). Data sparse on sex abuse by educators. Newsday, A35.

Lynwander, L.  (1992, December 27).  Sex abuse and the mentally retarded.  New York Times, pp. 1, 15.

Mangan, P.  (1994, June 20).  Poolside Romeo seeks lifeguard job.  Daily News, p. A6.

Mangan, P.  (1994, March 12).  Principal admits to sex abuse.  Daily News, p. 6.

Mangan, P.  (1993, December 1).  Cortines plans sex abuse panel.  Daily News, p. 4.

Mangan, P.  (1993, November 23). Teacher furor over sex memo.  The Daily News, p. 2.

Mangan, P.  (1993, July 20).  School shrink is nabbed in boy sex.  Daily News, p. 5.

Mangan, P., & Siemaszko, C.  (1995, June 2).  Rudy, Cortines war as scandals erupt.  The Daily News, p. 5.

Markon, J. (1996, September 26). Guilty plea to sexual-abuse charge. Newsday, p. A31.

Markon, J.  (1996, February 22).  Ex-Roosevelt coach sues for $1M.  Newsday, p. A25.

Marshall, T. (2001, May 23). Students often fail to recognize sexual harassment by teachers.  South Florida Sun Sentinel.

Marshall, T. (2001, January 29). Teacher's career marked by disturbing accusations.  South Florida Sun Sentinel.

Martinez, R. & Martinez, E. (2001, June 6). Boys held in school sex attacks. The New York Post, p. 024.

Marzulli, J. (1989, December 9). Teacher charged: Say he fondled girls aged 9 to 11.  Daily News, p. 7.

Mason, B., & Mintz, P.  (1995, June 8).  School aide arrested in alleged sex abuse.  Newsday, p. A24.

Mason, C.  (1994, February 5).  'I have not violated any law,' teacher says.  Press Democrat.

Mathews, J. (2002, July 23). Protecting innocent teachers with the law. The Washington Post..

McFadden, R. E. (2000, February 25). Eight wrestlers at high school are accused in hazing.  The New York Times, p. B1.

McGrath, M. (1999, November 3). Profile of a pedophile.  Pittsburgh Post Gazette,

McGrath-Kerr, D.  (1994, Nov. 1).  Ramon pushes fight vs. sex abuse.  Daily News, p. 16.

McKinley, J.C. (1993, March 9) Sex activity by children brings suit against home: Woman says her complaints were ignored.  The New York Times, p. B3.

McLaughlin, S. (2000, June 6).  Sex with student nets prison. Judge rejects defendant's plea for treatment.  The Cincinnati Inquirer.

McLaughlin, P.  (1991, June 12).  Sex charge for janitor.  Daily News, p. 25.

McMenamin, J. (2001, June 29). Charges against teacher dropped; Carroll woman, 22, had been accused of child sexual abuse; 2 misdemeanor counts. The Baltimore Sun, p. 1A.

McMenamin, J. (2001, June 8). Third Carroll teacher arrested on sex charges: Man is accused of molesting 5 boys.  Elementary teacher is accused of sexual contact with 5 pupils.  The Baltimore Sun.

McMenamin, J. (2001, May 22). Carroll schools chief 'disgusted' by Key High sexual abuse case: Police investigation of teacher continues.  The Baltimore Sun.

McMurdo, D. (2001, November 21). Jury again finds Lepley guilty in rape of students. The Pahrump Valley Times, NV.

Medina, R.  (1995, November 4).  Judge orders bail set for accused child molester. Democrat and Chronicle, p. 2B.

Meier, B.  (1995, February 27).  Sexual predators' finding sentence may last past jail. The New York Times, pp. A1, B8.

Mendez, I.  (1996, April 20).  Students, staff 'shocked' at Lodi teacher's arrest.  The Star-Ledger, p. 31.

Messing, P., Sheehy, K. (1997, October 21).  Boys, ages 8 & 9, in sex attack on classmate: Cops. New York Post.

Metz, A., Lam, C. (1997, October 23). Popular educator fondled third-grader, cops say. Newsday, p. A3.

MGH psychologists being investigated in priest abuse scandal.  (2003, September 6). The Boston Herald.

Minneapolis teacher charged with sex abuse practiced black magic, complaint says. (2003, May 2).  Minneapolis Star Tribune.

Minnesota: State loses track of more than 2,000 sex offenders.  (2003, January 10).  St. Paul Pioneer Press (MN).

Mitchell, C.  (1994, November 11).  PTA prez out after sex raps:  Lag enrages parents. Daily News, p. 6.

Molestation case against ex-Redlands teacher tossed.  (2003, July 9).  San Bernardino Sun (CA).

Molester sentenced.  (1990, November 15).  Daily News, p. 18.

Monahan, S.  (1990, February 11). Lawrence teachers get directive on 'touching'. The New York Times. P. LI17.

Monsky, A., Simmons, J.  (1994, April 14).  1970s kid-sex scandal forces school big out. New York Post, p. 21.

Montero, D. (2001, July 31). Girls not getting help they need.  The New York Post.

Montero, D. (2001, July 31). 5 staffers you don't want near your kids. The New York Post, p. 019.

Montero, D. (2001, July 31). Pervs duck weak rules. Bd. of Ed puts no teeth into abuse laws: Officials. The New York Post, p. 019.

Montero, D. (2001, July 30). Secret shame of our schools: Sexual abuse of students runs rampant. The New York Post, p. 001.

Montero, D. (2001, July 30). Student Sex Abuse Runs Rampant. The New York Post,

Montero, D. (2001, June 10). Why this zero-tolerance policy makes zero sense. The New York Post, p.012.

Morantz, David. (2002, January 17).  Sex offender pleads guilty to molesting boy.  The Omaha World-Herald. p. 2B.

More sex abuse charges.  (2003, July 30).  The Arizona Daily Sun.

Morrison, D., Kershaw, S. (1997, October 22).  Official: No sodomy took place. Newsday, p.38.

Morton, J. (2001, July 19). Ex-teacher in Valley gets year in sex case. Omaha World-Herald.

Mozzocco, J. (2000, January 28).  Teacher under investigation quits. The News-Herald,.

Murphy, W.J. (2001, July 29). Spare child, spoil abuser – Molest victims should testify. The Boston Herald.

Murray, W.  (1995, June 2).  So now it's hug-free zones?  Newsday, p. A45.

Murvosh, M. (2001, May 10).  Former teacher pleads guilty to sex abuse. The Salt Lake Tribune, p. C3.

Music teacher suspended after student sex charge.  (1996, March 28).  The Star-Ledger, p. 47.

Mydans, S. (1990, January 20). Child abuse: some prosecutions win. The New York Times, p. A2.

Mydans, S. (1990, January 19). For jurors, facts could not be sifted from fantasies. The New York Times, p. A18.

Neal, A. (2002, June 19). Predatory teachers get a free pass. Indianapolis Star.

New tool to fight violence in schools ignores gay harassment, critics charge.  (2002, February 12).  St. Louis-Dispatch.  p. B2

1980s molestation charges against diving coach dropped.  (2003, July 15).  San Jose Mercury News  (CA).

Noted coach's relationships with players questioned.  (2003, December 6).  The Oregonian

Numbers don't tell whole story of sexual misconduct by teachers.  (2003, March 23).  The Arizona Republic.

Oakville High teacher is accused of having sex with students.  (2003, March 23).  St. Louis Post-Dispatch.

O'Connor, D.  (1993, July 3).  No criminal charges filed against teacher: Former Rosemount band instructor faces civil suit over sexual conduct.  Saint Paul Pioneer Press, p. 1D.

Offending doctors now listed online.  (2003, July 30).  WV Gazette (West Virginia)

O'Hagan, M. (February 23, 2004).  Teacher conduct proposal may get diluted.  The Seattle Times

O'Hagan, M. & Willmsen, C. (2003, December). Unregulated world of private coaching ripe for exploitation.  The Seattle Times.

O'Hagan, M. & Willmsen, C. (2001, December 14).Coaches continue working for schools and private team after being caught for sexual misconduct.  The Seattle Times.

Olmeda, R.A.  (1993, September 24).  I learned physics from man-boy lover.  New York Daily  News, p. 41.

Onley, D.S.  (1996, April 18).  Principal suspended amid teen sex assault charges.  The Star-Ledger, p. 38.

Ortega, R. (2002, February 12).  4 at troubled school busted in sex attack. New York Daily News, L.P. p.14.

Osburn, D. (2001, December 4). Play by same rules.  USA Today. p. A12.

O'Shaughnessy, P.  (1992, June 13).  Teacher charged with abuse.  Daily News, p. 6.

O'Shaughnessy, P. (1989, June 27).  Teacher held in sex abuse.  Daily News, p. 4.

O'Shaughnessy, P. (1989, April 6). Teacher charged in child sex abuse. Daily News, p. 29.

O'Shaughnessy, P. (1989, January 28). Teacher nabbed: Charged with fondling 2. Daily News, p. 2.

Othón, N.L. (2001, April 16). Arrest of authority figures presents confusing situation for children. South Florida Sun-Sentinel

Ove, T. (2002, July 25). Coach denied assaults in taped statement. Pittsburgh Post-Gazette.

Ove, T. (2002, July 24). Cheerleader says coach 'terrified' her. Pittsburgh Post-Gazette,.

Pallasch, A.M. (2001, March 28). Cicero schools face abuse suit: Dad says girl sent home with pedophile. Chicago Sun-Times, p. 22.

Paquette, C. (1987, September 17). Teacher resigns on eve of hearing. Messenger, Smithtown, Long Island, p. 4.

Parascandola, R. (2001, May 11). High school student charged in 3 cases of sexual abuse. Newsday, p. A58.

Parascandola, R. (2001, March 15). Girls allege sex abuse at schools. Newsday, p. A08.

Parents can protect kids from pedophiles. (2003, March 16). South Bend Tribune (IN).

Paul, K. (1993, July 1). Teacher fights sex-abuse verdict. Newsday, p. 30.

Perez, A.J. (2002, November 22). Source: Otis among Dons' candidates. Prep basketball: Ex-coach part of group being considered for job. Long Beach Press-Telegram. Sports section.

Perez-Pena, R. (1997, October 17). School system can be held liable in rape of girl on field trip, court appeal says. The New York Times, p. B4.

Perlman, S. E. (1991, September 25). Teacher pleads guilty to endangering child. Newsday, p. 32.

Perlman, S. E. (1991, August 23). Teacher charged with abuse. Newsday, p. 30.

Perlman, S. E. (1991, May 8). Izzo sentenced to 20-60 years: Crowded courtroom bursts into applause. Newsday, pp. 22, 24.

Perlman, S. E. (1991, March 5). Man sentenced in sex abuse case. Newsday, p. 27.

Perlman, S. E. (1991, February 21). Sobs from boy's mom at Izzo trial. Newsday, p. 29.

Perlman, S. E. (1991, February 22). Izzo testifies, denies charges of sex abuse. Newsday, p. 7.

Perlman, S. E. (1991, February 28). Izzo guilty on all sex counts. Newsday, p. 8.

Perlman, S. E. (1991, February 14). Boy describes sex abuse. Newsday, pp. 22, 26.

Perlman, S. E., & Mintz, P. (1991, February 20). Grueling testimony: Boy in sex-abuse case grilled on statements. Newsday, p. 21.

Peters, J., & Marcano, T. (1989, February 4). Sex charges hit teacher. New York Daily News, p. 2.

Peyser, A. (1995, May 11). Teen and her teacher: Administrators knew--but did nothing. New York Post, pp. 5, 21.

Phillips, K. (1991, April 16). Sex-abuse teacher to get probation: DA to protest at sentencing. New York Post, p. 13.

Plank, D. (1993, July 9). Held in sex abuse. New York Newsday, p. 23.

Police: Teacher had sex with student. (2003, May 30). Peoria Journal Star.

Polner, R. (1990, January 20). Fernandez orders third principal ousted. New York Post, p. 4.

Polner, R. (1990, January 12). Principal's in hot water over convicted child molester. New York Post, pp. 4, 18.

Polner, R. (1990, January 12).  School panel 'rips' teacher screening.  New York Post, pp. 4, 18.

Polner, R. (1989, November 30).  Child-sex convict got job as city gym teacher.  New York Post, p. 23.

Porter, C. (2002, June 19). Former coach seeks pardon. New Britain Herald (CT).

Posorske, Alex. (2001, August 27).  Hazelwood schools join system that traces arrests; databases will flag accused employees.  St. Louis Post-Dispatch.  p. 3.

Predators in the D.C. public schools.  (2003, June 6).  The Washington Post.

Private school child abuse reports up 33%.  (2003, January 3). Sydney Morning Herald. (Australia).

Province passes student sex abuse bill. (2002, June 13). Ottawa Citizen (Canada).

PS 136 safety aide is charged in rape.  (1994, June 29).  Daily News, p. 24.

Psychiatrist in sex case to get new trial.  (2003, July 15).  Milwaukee Journal Sentinel.

Psychology board hears testimony on ex-prof.  (2003, November 24).  Terre Haute Tribune Star.

Puit, G. (2002, August 9). Former teacher admits having sex with student. Las Vegas Review Journal.

Quintanilla, B. (1998, July 22). Track coach faces molestation charges. Newsday, p. A29.

Quittner, J. (1988, May 17).  Teacher acquitted of sex-abuse charge.  Newsday, p. 23.

Rae, L.,&  Feld, J. (1999, January 5). Incident revives call for end of ban on fingerprinting of prospective teachers. The Journal News, Gannett-Suburban Newspapers, p. 1A.

Ragland, J. (2003, February 23). Abusive teacher is back in custody.  Los Angeles Times.  p. B8.

Raftery, T., and Weir, R. (2001, June 2). Boys charged in girl attack.  New York Daily News, p. 7.

Rashbaum, W.K. (2003, January 28). A closer eye on the worst sex offenders. The New York Times.  Metro Section.

Rashbaum, W.K. (2001, June 9). Sexual abuse charge leads to Bronx Dean's dismissal. The New York Times, p. B6.

Ratcliffe, H. (2001, June 27). Roxana High teacher is charged with sexual abuse of student; David Ellis has taught in district for more than 30 Years, official says. St. Louis Post-Dispatch.

Ratcliffe, H. (2001, March 28). Teacher accused of assaulting teen invited him to move in authorities say; he faces charges on both sides of Mississippi. St. Louis Post-Dispatch.

Reavy, P. (2001, March 3). Teacher arrest highlights flaw. The Deseret News.

Reinhold, R. (1990, January 19). 2 acquitted of child molestation in nation's longest criminal trial.  The New York Times, pp. Al, A18.

Reisman, P. (1999, January 17). Yes, Virginia, killers and sex offenders also want to teach. Gannett Suburban Newspapers, NY.

Reisman, P. (1999, January 14). Sometimes, we let evil into our homes unknowingly. Gannett Suburban Newspapers, NY.

Religious order that owns Nashua school sued (2003, February 19).The Stamford Advocate (CT)

Renewed pressure on swim coach to resign. (2003, February 11). The Age (Australia).

Report:  State doctors lightly punished. (2003, July 30).The Tennessean (Nashville, TN)

Reveles Acosta, G. (2002, May 20). Schools try to improve checks on teachers. El Paso Times.

Reyes, S. (1993, March 4). Fernandez moves vs. principal. Daily News, p. 17.

Reyes, S. (1993, February 25). Joe wants answer in child rape. Daily News, p. 25.

Rieser, C. (1987, July 2). Jury finds teacher innocent. Putnam Trader, p. 1.

Robb, J. (2002, May 20). Teacher is a local matter, Curtiss says. Omaha World Herald,.

Robbins, D. (2001, April 22). Out of bounds: Sexual misconduct by educators in Texas. Chronicle investigation reveals relationship of coaches and students rife with abuse. Houston Chronicle.com

Robbins, D. (2001, April 22). We trust our kids to them every day. But a Chronicle investigation reveals the relationship between secondary school coaches and students is rife with abuse. Out of bounds. The Houston Chronicle

Rodriguez, Y. (1992, December 23). Herricks teacher fired. Newsday, p. 28.

Rohde, M. (2002, May 19). Critics say program for abuse victims is flawed. Journal Sentinel Staff. .

Rose, M. D. (1990, February 13). Why weren't we told? Parents: School acted slowly in abuse case. Newsday, p. 19.

Rosenberg, H. (2002, August 9). Innocent Until Named? Los Angeles Times.

Roskelley, L. (2003, February 14). Ogden Board won't respond to queries. Supporters of woman who claims she was raped present questions. Standard Examiner. Ogden, UT.

Rothenberg, J. (1995, May 19). Teacher pulled from class as schools probe sexy lectures. New York Post, p. 19.

Sahagun, D. (2002, September 6). Teacher sex cases prompt call for probe. Las Vegas Sun

St. Joseph teacher, coach arrested. (2003, August 3). Lompoc Record (CA).

Salcedo, M. (1995, February 22). Teacher in rape case popular at school. Newsday, p. A20.

Salcedo, M. (1995, February 21). Teacher held in student's rape. Newsday, p. A19.

Salcedo, M. (1993, April 9). Agency is sued in sex-abuse case. Newsday, pp. 6, 33.

Salcedo, M. (1993, February 16). Boys' home aide accused in sex case. Newsday, pp. 4, 19.

Santangelo, M. & Gentile, D. (1990, March 8). Parents charge abuse: They say their kids molested. Daily News. p.2.

Schemo, D. J. (2002, June 18). Silently shifting teachers in sex abuse cases. The New York Times.

School aide accused of molesting 9 kids. (2001, June 1). The Record (Bergen County, NJ).

School denies liability in suit. (2002, December 16). Concord Monitor (NH).

School knew about abuse by teacher, suit claims. (2003, September 27). Des Moines Register.

School molestation lawsuit settled. (2003, February 26). Asheville Citizen-Times (NC).

School perv alarm. (2003, January 22). New York Post.

School principal charged with sexual assault of teen. (1996, April 17). The Star-Ledger, p. 27.

School principal put on leave, was warned of teacher abuse. (2003, January 22). Arizona Republic.

Scott, K. (2003, May 8). Young teachers not well trained in misconduct matters, critics

say.  The Arizona Republic.

Scranton coach accused of sex crime. (2003, May 30).  Fort Smith Times Record (AR)

Scrutiny increases as teachers charged.  (2003, September 27).  The Raleigh News Observer.

Sengupta, S.  (1995, April 30).  Bus driver accused of lewdness.  Newsday, p. A26.

Sex probe coach can still work. (2003, March 3). The Age (Australia).

Sexual assault charges against skating coach dropped. (2002, December 4). Chicago Daily Herald.

Shellenbarger, P.  Misty memory: Years later, a story of abuse tears at a family.  The Grand Rapids Press, pp. E1-E2.

Sidney teacher resigns. (1983, November 23).  The Daily Star, p. 3. (Tucson, AZ)

Simmons, J.  (1994, September 19).  Union bids to reinstate principal.  New York Post, p. 16.

Simmons, J.  (1994, January 20).  Teacher in boy-sex flap sues to get old job back.  New York Post, p. 4.

Sinai, R.  (2003, May 12).  Bill seeks to castrate rapists of children.  Haaretz (English edition).  Jerusalem, Israel.

Six Indians allege abuse at schools.  (2003, April 11).  The Longview News Journal, TX.

Skating coach surrenders on sex charges.  (2003, June 21).  The Cincinnati Post.

Slade, D. (2002, July 26). Mediation fails to settle sex abuse case. Calgary Herald. (Canada)

Smith, A. (2003, March 1). 'Burn in hell,' girls tells rapist in court.  Newsday. p. A13.

Smith, A. (2001, September 22).  Ex-teacher faces sex sentence.  Newsday

Smith, A. (2001, January 30). DA: Big child-porn collection: Calls ex-teacher's cache largest seized in Suffolk. Newsday.

Smith, E.L.  (1994, July 19).  Jail for teacher in student's sex abuse:  Ex-Sachem staffer gets 4 to 12 years.  Newsday, pp. A4, A45.

Smith, E.L.  (1994, May 17).  Sachem teacher's sex case going to the jury.  Newsday, p. A22.

Smith, K. (2001, June 1). Deal made in case of sex abuse at boys home.  Las Vegas Sun.

Smoke, S. (2002, August 13). Saundra Smoke: Schools should define appropriate behavior. Naples Daily News,

Smothers, R. (2003, February 22). New Jersey teacher gets jail term in sexual assaults of girls. The New  York Times. p. B2.

Smyrna student wins lawsuit. (2003, July 19). The News-Journal.  Wilmington, DE.

Soccer coach sentenced to up to 66 years after sex abuse conviction.  (2003, June 5).  Newsday (NY).

Southington graduate sues former coaches. (2003, March 12). The Hartford Courant.

Spencer, K. (2002, February 16).  School faced tough calls on Florea.  The Omaha World-Herald. 1A.

Spencer, K. (2002, February 9). Prosecutor: Accused teacher claimed to be doing research. Omaha World-Herald, p.5B.

Spencer, K. & Robb, J. (2003, January 9).  Millard teacher arrested on suspicion of molesting a former student. Omaha World-Herald.

Staff. (1983, November 21). Teacher faces dismissal.  The Daily Star (Tucson, AZ).  p. 3.

Statement recanted in Delaware sex trial.  (1985, October 23).  The Daily Star, p. 3. (Tucson, AZ)

Stepzinski, T. (2002, July 17).  Family sues former teacher; case centers on sexual misconduct.  Times-Union.

Stone Lombardi, K. (2002, January 27).  Long days, long hallways. The New York Times. p. WC. 1.

Stover, B.  (1999, November 8).  Violations of trust.  The Monday Gazette. pp. 5 B, 6A.

Student name principal, Winona ISD in suit.  (2003, August 10).  Tyler Morning Times. (TX)

Suburban coach held on charges of sex abuse. (2002, December 15). Chicago Sun-Times.

Sugarman, R.  (1995, March 29).  Schools sex scandal: 33 Suspended, but still near kids. The Daily News, p. B5.

Suit says Laurel School knew former teacher was a danger.  (2003, March 18). Cleveland Plain Dealer.

Sullivan, E.  (1992, June 25).  Officials monitored accused sex abuser.  The Independent, 28.

Sullivan, R.  (1990, May 10).  Dean is indicted on sex charges in abuse of girl.  New York Times, p. B5.

Sultan, A. (2001, January 31). Teacher faces criminal sex abuse charge; middle school teacher in East St. Louis allegedly fondled girl; he already has been suspended. St. Louis Post-Dispatch

Superintendent of school for deaf quits. (2003, January 23). The Oregonian.

Supporters unite behind ex-Allegany coach. (2003, June 15). The Roanoke Times  (VA)

[A] Supreme trust in serious doubt.  (2003, November 19).  The Washington Post.

Sutton, L. (1989, November 30).  Teacher is held as sex offender.  Daily News, p. 19.

SV acted properly (Editorial) (1987, January 4). Press and Sun Bulletin. p. 2E.

Swim coach pleads innocent to sex abuse. (2002, December 17). Arizona Daily Sun.

Tayler, L.  (1995, June 9).  A community pillar accused of sex abuse.  Newsday, p. A26.

Taylor, S. (1988, March 22).  High court to decide on liability of local officials in child abuse.  The New York Times, p. A21.

Teacher arrested in probe of sex abuse.  (2001, June 19). The Deseret News (Salt Lake City, UT).  p. B4

Teacher charged with abuse of student.  (1991, October 11).  Newsday, p. 32.

Teacher charged with sex abuse is registered sex offender in Florida.  (2002, January 29). Mohave Daily News

Teacher charged with soliciting students.  (2003, August 10).  Fulton County News (PA).

Teacher charged with student sex was unlicensed. (2003, February 5). Minneapolis Star Tribune.

Teacher convicted. (1987, December 15).  Newsday, p. 21

Teacher convicted despite heroic send-off. (2003, July 11).  The Age. (Australia)

Teacher faces dismissal. (1983, November 21). The Daily Star, p. 3. (Tucson, AZ)

Teacher had felony conviction.  (2003, November 8).  Utica Observer-Dispatch (NY).

Teacher in morals case assigned to desk job. (1987, April 10).  Newsday, p. 35.

Teacher indicted on sex abuse charges.  (2001, May 15).  Newsday.

Teacher is accused of molesting five pupils.  (2003, May 31).  San Diego Union Tribune.

Teacher pleads guilty in student sex case.  (2003, June 21). Seattle Post-Intelligencer.

Teacher's behavior questioned in the past. (2003, March 2). Ann Arbor News (MI).

Teacher sex cases: News Charts. (2002, September 29). Las Vegas Review-Journal.

Teacher sex story lays bare double standard (2003, March 6).  Chicago Sun-Times.

Teacher's former students now tell terrible secrets from 20 years ago (1994, January 8). Baltimore Sun, p. 1A.

Teacher to be tried for teen affair in 1978-79. (2002, September 28). San Diego Union-Tribune

Teachers accused, but they stay on. (2003, January 11). The Hartford Courant

Teens often pal with coaches. (2003, August 2). Atlanta-Journal Constitution.

Teichroeb, R. (2001, November 27). Allegations and denial of rape hang over Oregon school. Seattle Post-Intelligencer.

Teichroeb, R. (2001, November 27). Abuse and silence: Examining America's schools for the deaf. Sex abuse plagues schools for the deaf nationwide. Seattle Post-Intelligencer.

Teichroeb, R. (2001, November 27). When children are abused, no one is spared: Victim, victimizer and their mothers all suffer while school looks away. Seattle Post-Intelligencer

Teichroeb, R. (2001, August 29). More trouble for deaf school two other families file legal action, ringing total alleging sexual abuse at state-un facility to seven. Seattle Post-Intelligencer, p. B1.

Teichroeb, R. (2001, April 26). In Maine, a step toward healing: Bill would allow compensation for students who were abused at Governor Baxter School for the Deaf. Seattle Post-Intelligencer.

Teichroeb, R. (2001, April 25). Decades of sex abuse plague deaf school: For generations, state's students kept secrets. The Seattle Post-Intelligencer.

Tench, M. (2002, July 14). Educators urged to connect with students to curb violence. Boston Globe, p. C7.

The cruel, cold world they call women's tennis. (2003, June 23). The Advertiser News. Adelaide (Australia).

Tomasson, R.E. (1990, December 4). Bus matron charged in sex abuse of handicapped students. New York Times, p. B2.

Topousis, T. (2001, May 4) Watch for these clues from your kids. The New York Post.

Track coach accused of crossing the line.(2003, February 19). Holmdel Independent (NJ).

Track coach released on bail. (2003, April 3). Springfield News (OH).

Trial begins in Smyrna High lawsuit over student-coach relationship. (2003, July 15). The News-Journal (Wilmington, DE).

Tumour 'turned teacher into paedophile' (2002, October 22). Sydney Morning Herald (Australia).

Tuttle, G. (2001, July 12). 2nd time rape offender sentenced to prison. The Billings Gazette

Twedt, S. (1999, October 31). Dirty Secrets: Bad Teacher came with a letter of recommendation. Pittsburgh Post-Gazette

Untouchable: Teacher dodges sex raps and keeps job. (2003, September 25). New York Daily News.

Vachss, A. (1993, January 5). Sex predators can't be saved. The New York Times, A15.

Valden, D. (1995, May 22). TH principal leaving to take superintendent job. The Independent. p. 28

Valden, D. (1994, April 18). Lanciault tenure gets thumbs up. The Independent, p. 6

Vargas, T. (2001, November 22). Charges in locker room incident. Newsday, p. A8.

Victim's parents request maximum sentence.  (203, September 27).  The Tennessean.

Victims, families: "We won!"  (2003, June 12). The Marion Star (Ohio)

Vigh, M. (2001, April 3).  Disabled student takes stand in school molestation trial. The Salt Lake Tribune, p. C2.

Vincent, S.   Policy on sex abuse complaints.  Newsday, p. 39.

Volkers under siege.  (2003, April 4).  The Age (Melbourne, Australia).

Wait, T. F. (1988, October 30).  System urged to screen teachers.  Sunday Record, pp. 3, 74.

Walden, G. (1987, May 16).  Teachers testify Miller often told lies.  Gannett Westchester Newspapers, p. 3.

Warikoo, N. (1997, September 23).  A Crusade Targets Sex Abuse in Schools. Newsday, p. A31.

Warner, P. (2002, January 12).  Third trial for ex-Raymond teacher delayed: Defense lawyers wants jurors asked about misconduct.  The Union Leader. p. B10.

Warner, P. (2001, April 5). Convicted teacher wins new trial. The Union Leader.

Wasserman, E.  (1993, July 1).  Teacher's plea is not guilty.  Newsday, p. 24.

Wasserman, J.  (1993, April 22).  Mom raps judge in molest case.  Daily News, p. KSI1.

Wasserman, J., & Landa, R. (1990, January 12).  Sex abuser in JHS job.  Daily News, p. 5.

Wasserman, J., & Landa, R. (1990, January 12). Teacher lied, got job.  Daily News, p. 5.

Webby, S. (1999, February 7).  Parents' act of concern turns to nightmare. The Journal News, Gannett Newspapers News, p. 2A.

Webby, S., & Bandler, J. (1999, February 7).  Teacher's clouded past is revealed: Former employer hid suspicions of sexual misconduct while recommending Nowicki. The Journal News, Gannett Newspaper News, p. 1A.

Weiss, M., Robinson, E., Campanile, C., Malave, M. and Sanderson, B. (2001, May 3). Cops: HIV-positive teacher raped boy, 9.  New York Post

Weiss, M.J. (1984, November). Child molesting: What must be done to protect our children.  Ladies Home Journal, 114-118, 198-202.

Wessol, S. (2001, March 22). Floyd Teacher Charged with Sexual Abuse. Roanoke Times & World News.

Whaley, M. (2001, October 24). Bullying will be banished if state program gets its way. Denver Post.

White, B., & Wisniewski, L.  (1994, October 30).  Sexual abuse by teachers:  Are schools covering it up?  The Atlanta Journal/The Atlanta Constitution,  A1, A10, A11.

Whiteley, E.  (1992, October).  Nightmare in our classrooms.  Ladies Home Journal, pp. 74-83.

Whitherspoon, T. (2000). Ex-McGregor teacher's aide says she has been wrongfully accused of sexual assault.  Tribune-Herald.  Waco, TX.

Wilkerson, I.  (1995, January 5). After an assault, questions on school's duty. The New York Times, p. A20.

Willen, L.  (1994, December 1).  Redemption.  Newsday, p. A3.

Willen, L.  (1994, December 1).  Woman regains dignity by facing alleged abuser. Newsday, p. A8.

Willen, L.  (1993, February 9).  Abused in school former student accuses her teacher. Newsday, p. 21.

Willen, L.  (1993, February 5).  School bungles girl's cry for help.  Newsday, p. 6.

Willen, L, & Freifeld, K.  (1995, June 2).  City aide, teacher charged in rapes.  Newsday, p. A23.

Willmsen, C. & O'Hagan, M.  (2003, December 14, 15, 16).  Coaches who prey.  The Seattle Times.

Wilson, D.  (2004, January 21).  Teacher gets 20 years for assaults:  Woller apologizes for 'twisted, vile' sexual crimes.  The Post-Crescent.  (Appleton-Neenah-Menasha, WI).

Wilson, M. (2001, September 6).  2 Attorneys attack Mormon church. The Oregonian, p. D07.

Winningest coach in Calif. history charged with 1960s molestation. (2003, February 21). Miami Herald. Sports.

Winton, R.  (2001, July 20). District to pay $900,000 in molestation: Lawsuit contended that school should have known of potential sex abuse.  Los Angeles Times. p. 1.

Woman alleges underage affair with ex-teacher in $5 million suit.  (2001, November 17). Milwaukee Journal Sentinel.

Woman coach admits having sex with teens. (2003, July 14) The Aberdeen News  (SD).

Women accuse retired coach of sex abuse. (2003, January 3). The Hartford Courant.

Wyatt, E. (2001, June 22).  Schools ignore plan to thwart sex abuse. The New York Times, p. B1.

Wyatt, E. (2001, June 3).  Sexual attacks in New York City's schools are up sharply. The New York Times

Wyatt, E. (2001, May 23).  Schools show jump in reports of sex abuse. The New York Times, p. B1.

Wyatt, E. (2001, May 5).  Levy punishes four involved in '98 inquiry. The New York Times, p.B1.

Yan, E.  (1993, June 25).  Accusers had trusted him.  Newsday, pp. 7, 37.

Yan, E., Topping, R.  (1993, June 24).  School sex abuse:  Sachem H.S. teacher held in case involving teens.  Newsday, p. 1.

Zemel, J. (1999, November 2).  Dirty Secrets: Message from a pedophile. Pittsburgh Post-Gazette,.

Zemel, J. (1999, November 2). Dirty Secrets: State education officials want legislators' help to end sexual abuse. Pittsburgh Post-Gazette,

Zemel, J. (1999, November 1).  Dirty Secrets: 13 years after abuse, victim helps put teacher in jail. Pittsburgh Post-Gazette.

Zemel, J. (1999, October 31). Dirty Secrets: Rash of Cases leads one district to take hard look at policies. Pittsburgh Post-Gazette.

Zemel, J. (1999, October 31). Dirty Secrets' Case Files: Emily Slee and Robin Behling. Pittsburgh Post-Gazette.

Zemel, J., & Twedt, S. (1999, October 31). Dirty Secrets: Why sexually abusive teachers aren't stopped. Pittsburgh Post-Gazette.

**News Wire Services**

Acting Bronx High School dean charged with sexual abuse. (2001, June 9). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database

American Fork teacher and coach sentenced for child sexual abuse. (2001, October 2). *The Associated Press State & Local Wire*.  Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database

Appeals court upholds sentence of coach for sex abuse.  (2001, August 1). *The Associated Press State & Local Wire*.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Atlanta track coach arrested.  (2003, June 4).  *The Associated Press*. Picked up by www.accessnorthga.com

Bail for coach in sex case irks families. (2002, December 27). *The Associated Press*.

Bronx teacher indicted by grand jury in student sex case.  (2001, May 14). *The Associated Press State & Local Wire*.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Case against basketball coach sent to grand jury. (2002, July 27). *The Associated Press State & Local Wire*. Retrieved July 29, 2002 from www.dailypress.com

Charges mount against teacher aide accused of sex offenses. (2001, March 31). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Coach accused of seducing girls: A cheerleading coach 'seduced' three teenage girls and their parents to arrange a trip to London. (2002, July 31). *The Associated Press State & Local Wire*. Retrieved August 1, 2002 from www.phillyburbs.com

Coach convicted in teen sex case. (2002, August 2). *The Associated Press State & Local Wire*. Retrieved August 13, 2002 from www.zwire.com

Coach suit. (2002, May 20). City News Services.  Los Angeles. Retrieved June 3, 2002 from Lexis-Nexis Academic Universe database.

Colony High teacher pleas to abuse charge.  (2001, July 25). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Colony High teacher sentenced for sexual abuse. (2001, November 28). Student, mother suing boarding school over sexual abuse. (2002, January 5). *The Associated Press*.

Driver's ed teacher charged with sexual abuse. (2001, April 6). *The Associated Press State & Local Wire*.

Edinburg teacher arrested on allegations of sexual abuse. (2002, February 1).  *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Ex-school worker gets 160 years for sex abuse. (2001, July 13).  *The Associated Press*. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/160_years.html

Families settle abuse lawsuit with Port St. Lucie Little League.  (2003, June 21).  *The Associated Press*.

Families sue Pasco school in sexual abuse case.  (2001, April 24). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Father of missing girl: She "thinks she's in love."  (2001, May 8).  *The Associated Press*. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/baptist_princ.html

Fired teacher's aide gets 90-day sentence for statutory rape. (2003, February 19). *The Associated Press*. http://syracuse.com/newsflash/regional/index.ssf?/cgi-free/getstory_ssf.cgi?n0476_BC_NY-BRF--Teacher-Rape&&news&nystatenews

Former Biloxi girls' softball coach indicted on sex-related charges.  (2002, October 24). *The Associated Press*.

Former coach faces sex charges. (2001, December 16).  *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Former Culver teacher sentenced to 45 Months on sex charges. (2001, June 23). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Former principal ordered help without bond in sex case involving girl, 11. (2001, June 13). *The Associated Press*.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/baptist_princ3.html

Gedda, G.  (2003, December 17). U.S. tries to combat sexual abuse of kids.  *The Associated Press.*

Girls basketball coach sentenced to three years in prison. (2003, January 18). *The Associated Press.*

Grand jury refuses to indict teacher accused of abusing students. (2001, June 20). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Hearing planned in sexual harassment lawsuit against soccer coach. (2003, January 22). *The Associated Press*.  http://www.wral.com/sports/1929245/detail.html

High school teacher pleads guilty to sex with student. (2001, June 22). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Middle school teacher charged with sex abuse. (2001, March 17). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Mountain Shadows Montessori founder sentenced to 20 years prison. (2001, September 1). *The Associated Press State & Local Wire.* Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Nuckols, B.  (2001, May 24). Second Carroll County teacher accused of having sex with students.  *The Associated Press*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Paterson [NJ] teacher fired for making sexual comments about female students.  (2001, September 14).  *The Associated Press State & Local Wire.*  Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Principal caught in Las Vegas with missing girl.  (2001, May 8).  *Reuters*.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero

5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/baptist_princ2.html

Principal charged with sexual abuse, abduction of minor. (2001, May 4). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Public school sexual assault probe expands.  (2001, May 5).  *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Rabbi pleads guilty to sex crimes involving three male students. (2002, February 4). City News Service. Los Angeles.

School board won't retain coach accused of sexual abuse. (2001, May 16). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

School denies prior knowledge of abuse by teacher. (2003, January 2). *The Associated Press*.
http://boston.com/dailynews/002/region/School_denies_prior_knowledge_:.shtml

School district settles sexual abuse lawsuit.  (2001, July 20).  *The Associated Press State & Local Wire*.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

School sued over sex abuse.  (2002, December 23). *The Associated Press*.
http://www.newsday.com/news/,\local/wire/ny-bc-ny-brf--sexabuselawsu1223dec23,0,2949333.story?coll=ny-ap-regional-wire

Sentencing set for Indiana principal who took student to Vegas. (2003, February 27). *The Associated Press*. http://www.rgi.com/news/stories/html/2003/02/27/3552.php?sp1=rgj&sp2=News&sp3=Local+News

Settlement approved in teacher-student sex case.  (2003, June 20).  *The Associated Press*.

Sex offender had stolen identity of dead teacher, records show.  (2001, July 8). *The Associated Press*. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/stolen_id.html

Soccer coach accused of abusing young players. (2002, January 24).  *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

State begins process of compensating abuse victims at school for deaf. (2001, November 26).  *The Associated Press*.

Student, mother suing boarding school over sexual abuse. (2002, January 5). *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Substitute teacher charged in sexual abuse. (2001, February 17). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher accused of grades-for-sex solicitation gets 90 days. (2001, March 8). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher allegedly had relationship with student. (2001, May 23). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher charged with sexual abuse is jailed for additional. (2001, February 8). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher charged with sexual abuse. (2002, February 15). *The Associated Press State & Local Wire.* Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Teacher executed by firing squad for child rape in central Vietnam. *The Associated Press*. Retrieved June 10, 2002 from Lexis-Nexis Academic Universe database.

Teacher faces second set of sex charges. (2003, June 21). *The Associated Press*. http://www.stamfordadvocate.com/news/local/state/hc-21182105.apds.m0386.bc-ct-brf-jun21,0,111383.story?coll=hc-headalines-local-wire

Teacher gets 80 years for sex assaults of students. (2002, July 11). *The Associated Press.* Retrieved July 19, 2002 from www.cnn.com

Teacher indicted on charges of having sex with underage teen students. (2001, February 7). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher pleads guilty to four sex offenses. (2001, July 19). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher sentenced for sexual assault. (2002, July 28). *The Associated Press State & Local Wire*. Retrieved July 29, 2002 from www.zwire.com

Teacher sentenced to 35 years for sex assault, child porn. (2002, May 24). *The Associated Press*. Retrieved June 3, 2002 from www.caller.com

Teacher sentenced: Former Coquille woman gets 5 years. (2002, July 29). *The Associated Press State & Local Wire*. Retrieved July 29, 2002 from www.theworldlink.com

**Online Media - Web Publications**

Cobb teacher charged with child molestation.  (2003, August 8).  SouthernVoice.com.
   (Atlanta, GA)

Ex-Lady Vol Davis charged for sex with student.  (2003, September 19).   http://
   sportsillustrated.cnn.com/2003./basketball/ncaa/wp,em/0919/davis.arrested.ap/

Ex-teacher's rape conviction upheld.  (2003, July 31).  www.nynews.com (The Journal
   News: A Gannett suburban web-paper for Westchester, Rockland, and Putnam
   counties, NY).

Field, H. (2001, May 30). Investigative report: UF hired sexual predator. Florida public
   colleges, universities have no background check policy.  Click10.com (WPLG-TV
   Miami).  Retrieved February 25, 2002 from Circle of Trust Abuse articles and
   media reports: The Zero 5.Olaf – The official website of Andrew Vachss.
   http://www.vachss.com/help_text/archive/uf_hired.html

Former coach gets life.  (2003, July 13).  The Associated Press.  Picked up by KVOA.-
   TV, Tucson, AZ. http://www.kvoa.com/stories/7/7132003_6.html

Former Farwell basketball coach convicted of sexual assault. (2001, May 31).  The
   Associated Press.  Retrieved on June 3, 2002 from www.lubbockonline.com

Former state champion coach sentenced to 7 years.  (2003, June 18).  The Associated
   Press.  www.nola.com (New Orleans news online from the Times Picayune, LA).

Herek, G.M.  Facts about homosexuality and child molestation.
   http://psychology.ucdavis.edu/rainbow/html/facts_molestation.html

High school basketball coach convicted for having sex with teen. (2002, June 20).  The
   Associated Press. Retrieved June 25, 2002 from www.signonsandiego.com

Miller, A. (2003, March 2).  How kids charmed sex-rap teacher. The New York Post.
   Online Edition.

Molestation charge dropped, but Panhandle ex-coach still jailed.  (2003, July 16).  The
   Associated Press.  www.al.com (Alabama news online)

Softball coach gets 6 years for sex assault. (2003, February 19). The Associated Press.
   http://thedenverchannel.com/news/1991639/detail.html

[A] suburban family in hell.  (2003, May 30).  Salon.  (www.salon.com )

Teacher gets house arrest.  (2003, September 9).
   http://www.azcentral.com/news/articles/0909-ON.html

Teacher gets 2 years for sex with student. (2003, June 21).  The Associated Press.
   http://www.dailybulletin.com/Stories/0,1413,203~1469775,00.html

Teacher in abuse case gets probation.  (2002, May 24). The Associated Press. Retrieved
   June 3, 2002 from www.washingtonpost.com

Teacher sentenced to prison. (203, August 2).  The Associated Press.
   Seacoastonline.com  (Portsmouth, NH online news)

Thomas, J. (2001, April). Principal resigns amid sex probe. 11Alive.com (Atlanta).

Valley teacher at center of sex probe reinstated.  (2003, June 6).  Penn Live.com
   (Allentown-Bethlehem, PA).

Watson, C. (2001, June 17). Educators increasingly accused of sex crimes.  The
   Oklahoman Online.

Watson, C. (2001, June 17). Guidelines may prevent false accusations.  The Oklahoman
   Online

Youth hockey coach sentenced on molest.  (2003, June 18).  The Boston Channel
    WCVB-TV, Channel 5, Boston Online).

**Broadcast News Media**

Coach acquitted of molesting player. (2003, March 12). WPVI Philadelphia.
Ex-coach could lose teaching license. (2003, April 2). WSOC-TV News. Southington, CT.
Ex-teacher, ex-student now can be together.  (2000, July 31). KOMO-TV. Seattle, WA.
Ex-teacher wins lawsuit over sex abuse claims. (2003, January 16). WAVE-TV
    (Louisville, KY).
Flagler teacher faces sex charges.  (2001, November 16). WESH News.
Man fired from tennis club because of 20-year-old accusations.  (2003, October 24).
    http://www.wfsb.com/Global/story.asp?S=1495054  (WFSB Eyewitness News,
    Connecticut)
Northern governments face lawsuits over sex crimes against students.  (2003, October
    17).  CBC (Canadian Broadcasting Corporation)
Olympic coach jailed for sex assaults.  (2002, September 17).  BBC News.
Parents say school didn't do enough to protect kids from alleged molester.  (2003, April
    4).  KTUL (Tulsa, Oklahoma).
Public School Sex Abuse: A Report Card. (1984, November 10). Transcripts from Cable
    News Network (CNN) Special Assignment Unit. Reporter: Larry Woods, Producer:
    Sandee Myers.
School faces second suit over alleged sexual relationship between coach and student
    (2003, February 20). NBC4, Los Angeles.
Schools settle molestation case for $1.78 million (2003, February 27).  WSOC-TV
    (Hendersonville, NC).
Soccer coach gets two years for molesting players.  (2003, June 13).   KGTV-Channel
    10 News, San Diego
Students accuse Amelia High School coach of harassment.  (2003, May 2).  WCPO/
    Channel 9 News.  Cincinnati, OH.
Teacher appears in court.  (2003, July 15).  Capital News 9 (Albany, NY).  Time Warner
    cable station.
Teacher arraigned on sex charges.  (2001, December 13). News12.com/Westchester.
Teacher charged with sexual assault faces new allegations.  (2003, March 14). NBC-10
    Philadelphia.
Teachers told of drama tutor's abuse. (2002, September 26). BBC News.
Teens testify against former lacrosse coach. (2003, January 31). KYW Philadelphia.
Tucker, D. (2003, May 5). Sexual abuse and Texas' Teachers. Fox14 TV, Amarillo, TX.
Youngsters targeted by digital bullies. (2002, April 15). BBC News. Available.

**Appendix II**
**Surveys and Studies on Child Sexual Abuse**

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| Adapted Oregon Youth Risk Behavior Survey (1993) | Self report survey of 2,332students in 25 schools in grades 9-12. Reports physical and sexual abuse. | No relevant data. |
| Alberta Adult Victimization Survey, (Gomez, et al., 2000 ) Alberta Law Foundation | Random sample of 10,000 adults in Alberta Canada were surveyed about whether they had been victimized.  Telephone surveys of 56 adults who reported they had been victimized examined seriousness of incident, experience with police, filing a victim impact statement, and access to services provided to victims. | No relevant data. |
| Alberta Youth Victimization, Crime, and Delinquency Survey (Gomez, et al., 1999 ) Canadian Research Institute for Law and the Family, Calgary | A representative sample of 490 Edmonton 7th to 12th grade students was asked about victimization including being "touched against one's will". | No relevant data. |
| Child and Adolescent Psychiatric Assessment (CAPA) – Traumatic Life Events Section (Amaya-Jackson, et al, 2000; Angold et al., 1995; Costello et al., 1996) | Interview instrument for children and parents to assess child's psychiatric symptoms, functional empairment, demographics, and family structure and functioning. | No relevant data |
| Childhood Experiences of Violence Questionnaire (Walsh and MacMillan, 1999) | No Information | No relevant data |
| Child Maltreatment – 2001. Administration for Children and Families, DHHS | Based on all known cases referred to state Child Protective Services and forwarded to NCANDS, this reports sexual abuse. Non-family perpetrator characteristics are reported only as "non-parent". | No relevant data. |
| Children's Report of Exposure to Violence (Cooley, Turner, and Beidel, 1995) | Study of development of a self-report instrument assessing exposure to community violence. Development included administration of the survey to 228 public school students ages 9-15. | No relevant data |
| Conflict Tactics Scales – Parent Child Version (Straus et al., 1998) | Instrument which measures aggression and physical assault | No relevant |

| STUDY | DESCRIPTION | RELEVANT |
|-------|-------------|----------|
| | scale, nonviolent discipline scale, scale for neglect, and questions on discipline methods and sexual abuse.  Development included administration to 1,000 participants who were parents of children from infancy to 17 years old. | data |
| Determining Our Viewpoints of Violent Events | Self report scale for children that documents attitudes toward violence. | No relevant data |
| Exposure to Violence in Minority School-Based Adolescents | The study administered the 14-item exposure to violence screening instrument to 94 6th to 8th graders in a NYC parochial school. | No relevant data |
| Exposure to Violence Screening Measure | Survey of 352 10-19 year old inner-city teenagers | No relevant data |
| Exposure to Violence Subscale of Chicago Stress and Coping Interview | Survey of 245 African-American and Latinos aged 11-15 and caregivers. | No relevant data |
| Fast Response Survey System (FRSS) Principal/School Disciplinarian Survey National Center for Education Statistics (Violence and Discipline Problems in U.S. Public Schools: 1996-1997; Violence and Crime at School, FRSS Principal/School Disciplinarian Survey 1996) | The FRSS is a survey system designed to collect small amounts of information on issues in a short time.  The 1997 survey focused on incidents of crimes and offenses that happen in schools.  The sample for FRSS includes 1,234 public school principals selected from the 1993-1994 NCES Common Core of Data Public School Universe File.  Study reports the number of incidents of rape or other sexual battery report to school and/or law enforcement officials. | No relevant data. |
| Finland Prevalence Study 1990 | National representative self report survey of 7,349 children ages 15 and 16 on violence. Include sexual violence. | No relevant data |
| Great Smokey Mountains Study (1993-1995) | Face to race and telephone study of 1,422 children in grades 9 through college.  Includes questions on sexual abuse. | No relevant data |
| Indicators of School Crime and Safety, National Center for Education | Reports made every year from 1997 to 2000.  Synthesis of data | No relevant |

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| Statistics and Bureau of Justice Statistics, October 2000 (NCJ 196753). | from four data sets: Fast Response Survey System: Principal/School Disciplinarian Survey on School Violence (1997); National Household Education Survey (1993, school and safety supplement), National Crime Victimization Survey (1992-99); School Crime Supplement to the NCVS (1989, 1995, 1999); School Associated Violent Death Study (1992-1994; 1994-1999); Youth Risk Behavior Survey (1993, 1995, 1997, 1999); and School and Staffing Survey (1993-94, Teacher victimization supplement.). Data on rape and sexual battery. | data |
| Juvenile Victimization Questionnaire (Hamby and Finkelhor, 1999) | Reports data on 35 offenses against children and youth (8 – 17) six general areas (e.g., "sexual assault"). | No relevant data |
| Longitudinal Studies on Child Abuse and Neglect (LONGSCAN) Questionnaire Children's Bureau, U.S. Dept. of Health & Human Services | Reports on 1,70 maltreated children. | No relevant data |
| Maltreatment and the Academic and Social Adjustment of School Children National Data Archive on Child Abuse and Neglect, 1987-88, 2000 | Data (1987-88) on abuse of 8,600 children, including sexual abuse and on K-12 school and adjustment consequences.  Effects of child sexual abuse. | No relevant data |
| Management of Sex Offenders by Probation and Parole Agencies in the United States, 1994 National Institute of Justice / Inter-University Consortium for Political and Social Research (ICPSR) (Kim, 1994) | Examined various ways states approach and sanction sex crimes (i.e., child sexual abuse, incest, and sexual assault) and sex offenders. | No relevant data |
| Metropolitan Life Survey of the American Teacher, 1999: Violence in America's Public Schools—Five Years Later<br><br>Teacher Survey, Student Survey, Law Enforcement Officer Survey | Survey of students, teachers and law enforcement officials on violence in public schools. Excluded data collection about sexual abuse or harassment | No relevant data |

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| (Binns and Markow, 1999)<br>Louis Harris & Associates, Inc. | | |
| Minnesota Adolescent Health Survey<br>University of Minnesota, 1987 | Survey of 36,254 students in grades 7 to 12.  Issues of sexual contact. | No relevant data |
| Monitoring the Future 2001, 2002 , 2003<br>Victimization Questions<br>National Institute of Drug Abuse<br>1978 through 2002<br>(Bachman, O'Malley, and Johnston, 1978; Wells and Rank, 1995) | Annual national survey of attitudes, behaviors and values of 12,000-15,000 secondary students about drug use and other risk behaviors. | No relevant data |
| My Exposure to Violence  (My ETV)<br>(Selner-O-Hagan et al, 1998) | Structured interview protocol that includes 6 scales covering both lifetime and past year victimization, witnessing of violence, and total exposure.  Development study interviewed 80 participants, ages 9 to 24. | No relevant data |
| National American Indian Adolescent Health Survey  1991 | Survey of 13,454 students grades 7-12 from 55 tribes in 8 of the 12 Indian Health Service areas.  Questions include incidents of risk behavior and victimization. | No relevant data |
| National Crime Victimization Survey<br>Bureau of Justice Statistics<br>School Crime Supplement<br>Bureau of Justice Statistics and NCES | This is the primary source of information on crime victimization and victims of crime in the U.S. for people ages 12 and older.  The annual survey, begun in 1972, collects data on many crimes including rape and sexual assault and includes crimes reported as well as those not reported to police<br><br>The School Crime Supplement was included in 1989, 1995, and 1999 to document crimes in schools as well as traveling to and from school (NCES).  Sample size differs by year but ranges from 8,398 to 10,449.  Rape is reported separately but not other sexual abuse or harassment.  No information on perpetrators. | No relevant data |
| National Household Education Survey, 1991, 1993, 1995, 1996, | A data collection system that provides descriptive data on the | No relevant |

81

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| 1999, 2001, 2003<br>National Center for Education Statistics | condition of education in the U.S. It is a bi-annual series that describes homes and parents but does not deal with sexual abuse. (The 1993 Household Education Survey focused on general school safety, not sexual abuse.) | data |
| National Incidence Studies National Center on Child Abuse and Neglect.  NIS-3, 1993.<br><br>Third National Incidence Study of Child Abuse and Neglect, National Center on Child Abuse and Neglect, DHHS<br>(Sedlak, Hantman, Schulta, 1997) | Three studies (NIS-1, NIS-2, NIS3) that report data from child protection agencies and others on child abuse, sexual abuse and maltreatment.  Information about perpetrators includes only "care-taker" and "non-relative". | No relevant data |
| National Institutes of Mental Health Community Violence Project 1990 | Study of 77 students, ages 6 to 10 and 51 students ages 10 to 18. Questions in small group format. | No relevant data |
| National Longitudinal Study of Adolescent Health (NICHHD) 1998 | Analyzes social context for wellness and health including sexual activity.  Data are from 90,000 students in school and 20,000 students at home.  No information on perpetrators of abuse. | No relevant data |
| National Survey of Adolescents in the United States, (1993-1995)<br>Victimization questions (Kilpatrick et al., 2000) | National household sample of 4,023 adolescents ages 12 to 17. Includes questions regarding history of sexual assault, physical assault, and harsh physical discipline including a description of the event and perpetrator, extent of injuries, age at abuse.  Did not identify perpetrators by job title. | No relevant data |
| National Survey of Family Growth National Center for Health Statistics 1973, 1976, 1988, and 1995. (Abma, Driscoll, and Moore, 1998) | These surveys were based on personal interviews conducted in the homes of a national sample of women and men 15-44 years of age.  Focus on experience in the family and victimization. | No relevant data |
| National Violence Against Women Survey 1995-1996<br>National Institutes of Justice and | Surveys of 8,000 women and 8,005 men 18 and older on incidents of violence.  Survey includes sexual abuse questions. | No relevant data |

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| Center for Policy Research (Tjaden and Thoennes, 1998) | | |
| National Youth Survey (1977-1981) | Face to face interviews of a U.S. sample of 1,725 students (depends upon year). Some questions on sexual assault. | No relevant data |
| National Youth Victimization Prevention Programs: A National Survey of Children's Exposure and Reactions. Family Research Laboratory, New Hampshire University, Durham (1992-1993) | Telephone interviews with 2,000 youth (10-16) to measure their exposure to victimization prevention programs. Information on sexual abuse, but not on educator predators. | No relevant data |
| Ontario Health Supplement Survey 1990-1991 | Self report survey of 1,891 young people that reports physical and sexual abuse. | No relevant data |
| Parenting Among Women Sexually Abused in Childhood NDACAN, | Study of women sexually abused and their parenting behaviors | No relevant data |
| Perceptions of Peer Support Scale (Kochenderfer and Ladd, 1996) | Self-report survey of 1,891 children ages 15 – 24 that includes incidents of physical and sexual abuse. | No relevant data |
| Recent Exposure to Physical Violence | A 22-item scale that asks children questions about experiences with violence, either as victims or witnesses. | No relevant data |
| School Associated Violent Death Study Centers for Disease Control and Prevention U.S. Department of Education U.S. Department of Justice 1992-1994; 1994-1999; | Two studies (1992-1994; 1994-1999) that examine school associated violent deaths. Data from school and police officials. No information about sexual perpetrators. | No relevant data |
| Schools and Staffing Survey (SASS) NCES 1993-1994 | Three surveys (1987-88; 1990-91; 1993-94) that provide national and state level data on public and private schools, principal, school districts and teachers. The 1993-94 survey provided information on teacher victimization. . | No relevant data |
| Screen for Adolescent Violence Exposure (Hastings and Kelley, 1997) | Survey developed using 1,250 inner city adolescents that examines traumatic violence, indirect violence, and physical/verbal violence. | No relevant data |

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| Sexual Abuse of Deaf Children in the Residential Setting, Mark Lineberger, mtlinebe@uncg.edu | Estimates prevalence of problem but no information on perpetrators. | No relevant data |
| Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics National Center for Juvenile Justice July 2000 (NCJ 182990) Howard N. Snyder | Data (through 1996) from law enforcement agencies in 12 states about 60,000 incidents of four categories of sexual assault. Specificity of perpetrator data stops at "non-residential" and "acquaintance". | No relevant data |
| Sexual Experiences Survey | Instrument for assessing degrees of sexual aggression among male offenders and female victims. | No relevant data |
| Social Experience Questionnaire – Self Report | The questionnaire has been used to measure the reports of 474 3rd to 6th graders of the frequency of their victimization by peers, only. No adult perpetrator information. | No relevant data |
| Survey of Children's Exposure to Violence (Richters and Martinez, 1993) Violence Institute of New Jersey | As part of an NIMH project on community violence, this 15-item structured interview was developed for 436 African-American 6 to 14 year old students. No data collection on specific perpetrators. | No relevant data |
| Survey of Probation and Parole National Institute of Justice 1994 | Data from probation and parole officers who manage sex offenders. No data on school-related offenses or offenders. | No relevant data |
| Violence Against Women Survey, 1996 | Retrospective data collected from 8,000 female and 8,000 male victims of violence, rape and sexual assault including characterization of perpetrator as "acquaintance" or not. | No relevant data |
| Violence Exposure Scale for Children (Fox and Leavitt, 1995) | Scale to determine how much violence children experience | No relevant data |
| Violence in America's Public Schools Five Years Later: Metropolitan Life Survey of the American Teacher, 1999:  (Binns and Markow, 1999) Louis Harris & Associates, Inc. | Survey of students, teachers and law enforcement officials but excluded data collection about sexual abuse or harassment. | No relevant data |
| Violence Screening Survey 1990 | Study of 1,011 students in 6 inner city schools, ages 10 to 19. Self | No relevant |

84

| STUDY | DESCRIPTION | RELEVANT |
|---|---|---|
| | report survey in incidents of violence. | data |
| Voice of Connecticut Youth 1996 | Self report survey of 12,402 young people in 7th, 9th, and 11th grade students.  Includes sexual behavior questions | No relevant data |
| Washington State Adolescent Abuse Study (1999) | Self report survey of 4,790 students in 44 schools in grades 1, 10, and 12.  Includes questions on physical and sexual molestation. | No relevant data |
| Youth Risk Behavior Surveillance System, Centers for Disease Control, 1993, 1995, 1997, 1999, 2001 | Developed by the Centers for Disease Control and prevention to monitor the prevalence of youth behaviors that most influence health, this system includes data from a national sample of students in grades 9 to 12.  Surveys ask about sexual attacks and harassment. | No relevant data |

# Bibliography
## Educator Sexual Misconduct

AAUW (1993). (See American Association of University Women. Hostile Hallways.)

Abma, J.C., et al. (1998) National Survey of Family Growth. National Center for Health Statistics.

Abuse and Disability Project (1992). University of Alberta. Edmonton, Canada.

Abuse case ends in mistrial. (2003, June 20). The Baltimore Sun.

Abuse gets teacher 46 years. (2003, June 7). The Arizona Republic.

Abuse in the schoolroom. (no date). Federation on Child Abuse and Neglect.

Abuse jury is told of secret taping. (2002, December 13). Evening Chronicle. Newcastle, (UK).

Accused coach has record of sex abuse (2003, February 4). Washington Post. http://washingtonpost.com/wp-dyn/articles/A26768-2003Feb4.html

Accused molester facing another charge. (2003, April 2). Island Packet (SC).

Accused teacher quits. (1987, September 17). Newsday, p. 37.

Acting Bronx High School dean charged with sexual abuse. (2001, June 9). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database

Adams, C. J. (1993, April 12). Amendments to 8 NYCRR 83- determination of good moral character. Albany, NY: The University of the State of New York, The State Department of Education.

Administrators can be sued for overlooking sexual harassment by staff. (1989, October 23). Nation's Schools Report, pp. 7-8.

Administrators must take tough stance against harassment. (1989, August 14). Nation's Schools Report, 15 (14), 1-2.

Adolescent Health Survey. (1985). WHO [World Health Organization] Collaborating Centre in Adolescent Health, Division of General Pediatrics and Adolescent Health. University of Minnesota Adolescent Health Program (Robert H. Blum, Director).

Agree/Disagree sexual harassment survey. (no date). Sexual Harassment to Teenagers: It's Not Fun/ It's Legal. Minnesota: Department of Education.

Ahearn L.A. (2000, February 17). Giving a voice to the victims: Our criminal justice system must empower children who have been sexually abused. Newsday. p. B7.

Alberta Adult Victimization Survey (see Gomes, et al.).

Alberta Youth Victimization, Crime and Delinquency Survey (see Gomes, et al).

Alcott, J. (1987, May 13). Mahopac teacher charged with molesting. Gannett Westchester Newspapers, p. 3.

Alexander, A. (1994, March 20 - 22). Criminals in the classroom: Official inaction put kids at risk. Report, pp. 4R, 5R.

Allen, J. (1986). Turning stumbling blocks into stepping stones: Child sexual abuse and day care. Paper presented at the Annual Meeting of the National Association for the Education of Young Children, Washington, DC, 1-15.

Allen, J.L. (2003, February 28). Ex-coach accepts plea agreement: Jennifer Brooks takes a three-year prison term in her felony case. Sarasota Herald-Tribune (FL). http://www.heraldtribune.com/apps/pbcs.dll/article?Site=SH&Date=20030228&Category=NEWS&ArtNo=302280408&Ref=AR&Profile=1006&SectionCat=SPORTS

Amaya-Jackson, L., Socolar, R.R.S., Hunter, W., Runyan, D.K., & Colindres, R. (2000)

Directly questioning children and adolescents about maltreatment.   <u>Journal of Interpersonal Violence</u>. 15 (7), 725-759.

American Association For Protecting Children. (1988). <u>Highlights of official child neglect and abuse reporting 1986</u>. Denver, CO: The American Humane Association

American Association of University Women. (2001; 1993).<u>Hostile hallways: The AAUW survey on sexual harassment in America's schools</u>. Washington, DC: American Association of University Women.

American Education Statistics at a Glance.   (1999, June) <u>Public Education Topic</u>. NEA Research. National Education Association.  Washington, D.C.

American Fork teacher and coach sentenced for child sexual abuse. (2001, October 2). *The Associated Press State & Local Wire*.  Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database

American Humane Association (1981).  <u>National study on child neglect and abuse reporting</u>.  Denver, CO

American Humane Association Fact Sheet # 3, 5, 7, 8, 14. (no date). Washington, DC

Anderson, M., Kaufman, J., Simon, T.R., Barrios, L. Paulozzi, L., Ryan, G., Hammond, R., Modzeleski, W., Feucht, T., & Potter, L.  School-associated violent deaths in the United States, 1994-1999.  (2001, December 5).  <u>JAMA</u>, 286 (21), 2695-2702.

Angold, A., Prendergast, M., Cox, A., Harrington, R., Simonoff, E., & Rutter, M. (1995) The Child and Adolescent Psychiatric Assessment. (CAPA). <u>Psychological Medicine</u>. 25, 739-753.

Anthony, S. (2001, April 25). Parents search for answers after teacher is arrested; Some aren't sure how to discuss sexual abuse. <u>St. Louis Post-Dispatch</u>. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Appeals court upholds sentence of coach for sex abuse. (2001, August 1). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

<u>Are we safe? Focus on teens.  The 2001 National Crime Prevention Survey</u>. (2002). National Crime Prevention Council.  Washington, D.C.

Area news briefs: Probation given in sex case. (1986, February 12). <u>The Daily Star</u>, p. 3.

Arent, R. P. (1992). <u>Trust building with children who hurt</u>. New York: The Center for Applied Research in Education.

Arrested in kid-sex.  (1991, October 3).  <u>Daily News</u>, p. 28.

Ascher, C.  (1994, September).  Gaining control of violence in the schools: A view from the field.  <u>ERIC Clearinghouse on Urban Education, Digest 100.</u>

Asdigian, N. & Finkelhor, D.  (1995, December).  What works for children in resisting assaults?  <u>Journal of Interpersonal Violence</u>.  10 (4), 402-418.

Asdigian, N., Finkelhor, D., & Hotaling, G.  (1995, September).  Varieties of non-family abduction of children and adolescents.  <u>Criminal Justice and Behavior</u>.  22 (3), 215-232.

Ash, S. and Wood, D. (2001, March 6).  Student abuse hidden, board told. <u>The Record.com</u> (Waterloo region, Ontario,Canada).

Assistant principal entitled to backpay for time spent defending against criminal sexual conduct charges.  (1993, August).   <u>Legal Notes for Education</u>, pp. 5-6.

Astor, R.A., Behre, W.J., & Meyer, H.A. (1999, Spring). Un-owned Places and Times: Maps and Interviews About Violence in High Schools. <u>American Educational Research Journal, 36 </u>(1), pp. 3-42.

Atlanta track coach arrested. (2003, June 4). *The Associated Press*.

www.accessnorthga.com

Atten, D. W., & Milner, J. S. (1987). Child abuse potential and work satisfaction in day-care employees. Child Abuse & Neglect, 11, 117-123.

Attorney general: Sexual predators lurk in Ontario schools. (2000, April 7). The Ottawa Citizen.

Avoidance of sexual misconduct of teachers. New member CD. National Education Association. Available. http://www.student-wea.org/misc/miscndct.htm

Badgley, R., Allard, H., McCormick, N., Proudfoot, P., Fortin, D., Ogilvie, D., Raegrant, Q., Gelinas, P., Pepin, L, & Sutherland, S. [Committee on Sexual Offences Against Children] (1984). Sexual offences against children (Vol. 1). Ottawa: Canadian Government Publishing Centre.

Bail for coach in sex case irks families. (2002, December 27). The Associated Press. http://www.tucsoncitizen.com/local/12_27_02briefs.html

Bail is reset for teacher in sexual assault retrial. (2003, March 14). Cherry Hill Courier Post (NJ). http://www.courierpostonline.com/news/southjersey/m031403k.htm

Bailey, S. (2001, June 16). Youth board set to hear charges against two. The Birmingham News. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/sex_scandal2.html

Baker, C.D. (1983). A "second look" at interviews with adolescents. Journal of Youth and Adolescence, 12 (6), 501-519.

Baker, K. (2000). Public schools and the internet. University of Nebraska Law Review. 79, 929. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Ballet teacher who molested pupil sentenced to 6 years. (2003, October 31). http://news.mywebpal.com/news_tool_v2cfm?pnpID=805&NewsID=501711&CategoryID=5768&show=localnews&om=1

Barac, L. V. (1991, October 3). Probable cause: School district failed to handle sexual harassment. Chaska Herald, pp. 1, 10.

Barac, L. V. (1990, August 30). School district accused of failure to act against sexual harassment. Chaska Herald, pp. 1, 12-13.

Barker, P. (1990). Clinical interviews with children and adolescents. New York: W.W. Norton & Company.

Barnard, G. W., Fuller, A. K., Robbins, L., & Shaw, T. (1989). The child molester: An integrated approach to evaluation and treatment. New York: Brunner/Mazel Publishers.

Baron, A. I., & Carey-Place, E. M. (1993, December 15). Final Report of Special Counsel to the Anne Arundel County Board of Education, Maryland, p. 3.

Baron, A. I., & Carey-Place, E. M., & Heller, D. B. (1993, October 4). Report of Special Counsel to the Anne Arundel County Board of Education, pp. 1-28.

Barrie teacher acquitted of sex assault. (2002, July 19). Ottawa Citizen, http://www.canada.com/ottawa/story.asp?id

Barringer, F. (1993, June 2). School hallways as gauntlets of sexual taunts. The New York Times, p. B7.

Bartsch, P. (2003, April 14). Abuser back on the job. The Sunday Times (Perth, Australia). http://www.sundaytimes.news.com.au/common/story_page/0,7034,6280722%255E421,00.html

Basler, G. (1989, August 29). JC may suspend coach with pay. Press and Sun Bulletin, pp. 1B, 3B.

Basta, S. M., & Peterson, R. F. (1990). Perpetrator status and the personality characteristics of molested children. Child Abuse & Neglect, 14, 555-566.

Bastian, L. D., & Taylor, B. M. (1991, September). School crime: A national crime victimization survey report. U. S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Bates, M., & Koskie, B. (1985). Child abuse issues for child care providers. MN: University of Minnesota and the Greater Minneapolis Day Care Association.

Baxter students finally to get abuse settlement. (2003, February 25). Kennebec Journal (ME). http://www.centralmaine.com/news/stories/030225baxter_s.shtml

Beale, S.S. (2000). Federalizing hate crimes: Symbolic politics, expressive law, or tool for criminal enforcement? Boston University Law Review. 80, 1227. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Beaven, Stephen. (2001, December 3). Ex-Oregon city teacher sentenced for sex crimes. The Oregonian. p. C02.

Bell, C.C. & Jenkins, E.J. (1993). Community violence and children on Chicago's Southside. Psychiatry. 56, pp. 46-54.

Benham, K. (2003, July 28). Principal case sparks "uproar." St. Petersburg Times, FL.

Bennett, D. (2000, January 28). Grand jury to hear case. The News Herald. Ashtabula, OH.

Berg, E. (1985). Stop it! CA: Network Publications.

Berg, E. (1985). Tell someone! CA: Network Publications.

Berger, J. (1991, October 11). Cover-up charged in school official's sex abuse case. The New York Times, pp. B1, B2.

Berliner, L., & Conte, J. R. (1990). The process of victimization: The victim's perspective. Child Abuse & Neglect, 14, 29-40.

Bernstein, D.E. (1999). Sex discrimination laws versus civil liberties. University of Chicago Legal Forum. 1999, 133. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database

Bernstein, N. (1996, February 11). Civil rights lawsuit in rape cases challenges integrity of a campus. The New York Times, pp. 1, 32.

Berry, J. (1992). Lead us not into temptation: Catholic priests and the sexual abuse of children. New York: Doubleday.

Bessent, A. E. (1991, February 21). In abuse case, kids face trial too. Newsday, p. 29.

Bessent, A. E. (1990, June 25). Despite record, hired to teach. Daily News, pp. 3, 28.

Bessent, A.E. (1990, March 28). Teacher convicted of sexual abuse. Newsday, p. 20.

Beyond victims and villains: Addressing sexual violence in the education sector. (2003, May). The Panos Institute, London, UK.

BHS teacher charged in rape case (2003, March 12). Brookline Tab (MA). http://www.townonline.com/brookline/news/local_regional/bt_covbrhicksrungr0312 2003.htm

Bill eases path for child sex-abuse suits. (2003, January 15). Louisville Courier-Journal (KY). http://courier-journal.com/localnews/2003/01/15/ke011503s349714.htm

Bithell, S.B. (1991). Educator sexual abuse: A guide for prevention in the schools. Boise, ID: Tudor House Publishing Company.

Blackwell, T. (2000, April 8). Sex abuse by Teachers 'not isolated' report warns: Pedophile educators are allowed to move and 'hunt' again. The Ottawa Citizen.

Blame game:  Girl's troubles with internet at issue.  (2003. September 6).  *The Associated Press*. The News Tribune, Jefferson City, MO.

Blase, J. & Blase, J.  (2003).  Breaking the silence: Overcoming the problem of principal mistreatment of teachers.  Corwin Press. Thousand Oaks, CA.

Board hears alleged improper relationship case.  (2003, May 1).  Ruidoso News (NM).

Board of education not liable for after-hours rape of female student.  (1993, October).  Legal Notes for Education, p. 5.

Bolten, K. (2003, May 17). State bans teacher after affair.  Des Moines Register.

Bolton, M.M. (2001, April 4). Professor faces additional sex abuse charges.  The Times Union. (Albany, NY).  p. B7.

Boney-McCoy, S. & Finkelhor, D.  (1998, June).  Psychopathology associated with sexual abuse:  A reply to Nash, Neimeyer, Hulsey, and Lambert (1998).  Journal of Consulting and Clinical Psychology.  66 (3), 572-573

Bono, A. (February 13, 2004) Picture of child sex abuse in U.S. society clouded by lack of data.  Catholic News Service.

Boodman, S.G. (2002, July 29). How deep the scars of Abuse? Some victims crippled; others stay resilient.  Washington Post.  Available. www.washingtonpost.com/wp-dyn/articles/A14253-2002Jul28.html

Boomsma, J. (1993, November 14).  Principal recalls effort to keep matter quiet.  The Grand Rapids Press, p. B2.

Boult, T. (1993, November 14). Spared by her teacher.  The Grand Rapids Press, p. B3.

Bowers, C. L.  (1993, June 10).  School knew in 1989 of rumors Price was involved with 10 girls.  The Sun, pp. 1B, 3B.

Bowers, C. L. (1993, September 5). After 15 years of lies, Price didn't see any sense in denying anymore.  The Sun, p. 1C.

Bowers, C. L., & O'Brien, D., with Siegel, A. F. (1993, August 10).  3rd Northeast teacher faces pupil-sex count.  The Sun, pp. 1B, 4B.

Bowles, P. (2001, February 8). Teacher charged in city assaults.  Newsday. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Bowles, P., & Kowal, J.  (1995, October 19).  Girl: Bus driver molested me.  Newsday, p. A30.

Boyle, M.H., Offord, D.R., Campbell, D., Catlin, G., Goering, P., Lin, E. & Racine, Y.A.  Mental Health Supplement to the Ontario Health Survey:  Methodology.  (1996, November).  Canadian Journal of Psychiatry.  41, 549-558.

Bradley, E. (2002, August 9). School district violated state law: Placing a student in a teacher's home illegal in Wisconsin.  The Northwestern. (Oshkosh, Wisconsin).  Available. www.wisinfo.com/northwestern/news/archives/local_5457436.shtml

Bradley, E. (2002, June 7).  Counselor's case differs from Mosher's.  The Northwestern.  Oshkosh, WI. Available. www.wisinfo.com/northwestern/local/060702-1.html

Brant, R. S. T., & Tisza, V. B. (1977). The sexually misused child.  American Journal of Orthopsychiatry, 47 (1), 80-90.

Breuer, H.  and Myerhoff, M. (2002, June 14). Girl, 16, testifies against former coach.  Pasadena Star News.  Available.  www.pasadenastarnews.com/news/articles/0602/14.asp

Bricker, J. (2002, July 20). Sexy notes not enough to convict teacher.  National Post.  Canada

Brief to Standing Committee on Justice and Social Policy. Re: Bill 101, Student Protection Act. (2001, October 30). Ontario College of Teachers. Toronto.

Briere, J. (1984, April). The long-term effects of childhood sexual abuse: Defining a post-sexual abuse syndrome. Paper presented at the Third National Conference on Sexual Victimization of Children, Washington, DC

Briere, J. & Runtz, M. (1988). Post sexual abuse trauma. In Wyatt, G.E. & Powell, G.J. (eds). Lasting effects of child sexual abuse. Sage Publications. Newbury Park, CA

Bright, M. (2002, November 17). Surgical tags plans for sex offenders: Silicon chip to be inserted under skin. The Observer, UK.

Broadhurst, D. D. (1986). Educators, schools and child abuse. IL: National Committee For The Prevention Of Child Abuse.

Broderick, D. (1993, July 9). Parents rip ed board over sex scandal. New York Post, p. 14

Broderick, D. (1993, July 8). School sex shocker: Counselor had affair with 2 students. New York Post, p. 2.

Bronx teacher indicted by grand jury in student sex case. (2001, May 14). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Brooks, A. P. (1995, July 7). When flirting becomes hurting in the schools. Austin American-Statesman, pp. A1, A11.

Brooks, J. (2001, June 6). Coach facing more counts of sex abuse: Total charges up to 9, concern boys under 13. The Arkansas Democrat-Gazette. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Broussard, S. (1989, July 23). School bus driver in sex rap. Daily News, p. 14.

Broussard, S. D., & Wagner, W. G. (1988). Child sexual abuse: Who is to blame? Child Abuse & Neglect, 12, 563-569.

Brown, M.H., (1997). A Psychosynthesis Approach to the Use of Mental Imagery with Adult Survivors of Childhood Sexual Abuse. Journal of Humanistic Education and Development, 36. pp. 13-22. Retrieved January 15, 2003, www.aap-psychosynthesis.org.

Browne, A., & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. Psychological Bulletin, 99 (I), 66-77.

Buckey son to be retried. (1990, February 1). Daily News, p. 11

Buder (1988, March 29). A pornographer given 10 years by a U. S. Judge: L.I. teacher also faces sentence in state case. The New York Times, p. B4.

Budin, L. E., & Johnson, C. F. (1989). Sex abuse prevention programs: Offenders' attitudes about their efficacy. Child Abuse & Neglect, 13, 77-87.

Buettner, R. (1995, May 11). Teacher, teen on the run for love. Newsday, p. A6.

Bullying widespread in U.S. Schools, Survey Finds. (2001, April 24). National Institute of Child Health & Human Development. http://www.nichd.nih.gov/new.releases/bullying.cfm.

Bullying, teasing and harassment in school. (Summer 2001). AAUW In Action. pp. 1, 5.

Burke, C. (1995, June 2). Trying to punish these perverts is a joke. New York Post. p. 5.

Burke, C. (1992, June 13). Bronx teacher in sex shocker. New York Post, p. 7.

California district settles long-running peer sexual harassment case for $250,000. (1997). SVA, 3 (2).

Cameron, P. (1993). Child Molestation and Homosexuality. Colorado Springs, CO: Family Research Institute.

Cameron, P, Proctor, K, Coburn, W Jr, Forde, N, Larson, H, Cameron, K. (1986) Child molestation and homosexuality. Psychological Reports. 58, pp. 327-37; 57, pp. 1227-1236.

Campanile, C. (2001, May 24). Roy's state bill: Make schools report sex cases. The New York Post. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Campanile, C. (January 20, 2004).  Savage school halls.  New York Post Online Edition.

Campanile, C. and Montero, D. (2001, August 6). You pay for school assaults. New York Post.

Campbell, J.  (1996, February 25).  New York disclosure law snares a school chief.  The New York Times, p. 37.

Camron, V.A.F. (2002, May 25). State drops sex abuse charges.  Kane County Chronicle. Available. http://ww2.kcchronicle.com/KCC/news/275065216192481.bsp

Cannata, Michele.  Students' level of stress in response to bullying and peer sexual harassment: The impact of frequency, ego development and social support. Dissertation. Pace University. New York, NY.

Cannizaro, S. (2001, June 13). Reports of child sex abuse increases; Task force helping teachers to spot signs. The Times-Picayune. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Career is over for principal who says he was falsely accused.  (2003, May 31).  St. Louis Post-Dispatch.

Carmichael, A. (2001, May 17). Teacher who sent teenaged boy love letters loses teaching license. Canadian Press.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/markson_3.html

Carmichael, A. (2001, May 16). Psychologist concedes teacher's actions toward student were predatory. Canadian Press. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/markson_1.html

Carr, N. (2002, July 15). Crush letter 'a joke' teacher's husband testifies.  The Star. (Barrie, Ontario, Canada).  Available. www.thestar.com/NASApp/cs/ContentServer?pagename=thestar/Layout/Article_Type1

Carter, C. B., & Cahill Jr., W. W., Smith, M. P.   Reply to the Report of Special Counsel to the Anne Arundel County Board of Education and to The Report of MSDE Special Investigation Team, pp. 1-47.

Case against basketball coach sent to grand jury. (2002, July 27). The Associated Press State & Local Wire. Retrieved July 29, 2002 from www.dailypress.com

Cases of International or Internet Child Sexual Abuse.  Research Protocol and National Postal Questionnaire Surveys.  Centre for Applied Childhood Studies, School of Human & Health Sciences, University of Huddersfield,  UK. (See Gallagher, B.)

Cassese, S.  (1992, February 11).  Mom suing school for $5M in sex abuse case. Newsday, p. 25.

Cawson, P., Wattam, C., Brooker, S., & Kelly, G. (2000). Child maltreatment in the United Kingdom: A study of the prevalence of child abuse and neglect. National Society for the Prevention of Cruelty to Children (UK). London.

Chapman, D.W. & Burchfield, S.A. (1994).  How headmasters perceive their role: A case study in Botswana.  International Review of Education.  40 (6), 401-419.

Charge is gone, but stigma remains.  (2003, May 31). Orange County Register, CA.

Charges for teacher. (1989, April 7). New York Daily News, p. 35.

Charges mount against teacher aide accused of sex offenses. (2001, March 31). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Charlotte coach who had sex with players is freed. (2003, November 18). The News-Press. Ft. Myers, FL.
http://www.newspress.com/prepsports/stories/031118sexupdate.html

Chideckel, M. (1935). Female Sex Perversion. Oxford, England: Eugenics Publ. Co.

Child abuse: A handbook for Manitoba teachers. (1988, January). The Manitoba Association of School Superintendents. Manitoba Education, Manitoba Community Services.

Child abuse: A national epidemic. Taking care of children. (Undated). A workbook for administration, staff and parents by Sgt. Bill Davis, Beaumont, TX Police Department.

Child abuse: Educator's responsibilities. (1986) Sacramento: California State Office of the Attorney General, Crime Prevention Center.

Child maltreatment, 2001. Administration for Children and Families, U.S. Department of Health & Human Services.

Child maltreatment in the United Kingdom: A study of the prevalence of child abuse and neglect. (See Cawson, P. et al.)

Child protection and child abuse: A protocol for child care workers (1991) Winnipeg, Manitoba: Manitoba Family Services: Child Day Care.

Child sexual abuse: An administrator's nightmare. (1993, December). School Safety Update, pp. 1-4.

Child sexual abuse: Canadian Guidelines. (No date). Canadian Guidelines Laboratory, Centre for Disease Control, Health Canada. The Montreal Children's Hospital.

Child and Adolescent Psychiatric Assessment (see Amaya-Jackson, et al; Angold, A. et al; Costello, E.J., et al).

Chiles, N. and Gardiner, S. (2001, May 5). 2 more boys say teacher molested them: Chancellor fires investigator who conducted 1998 inquiry. Newsday. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Chiles, N. and Gardiner, S. (2001, May 4). More accuse teacher. New York Newsday. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/hiv_teacher_2.html

Childhood Experiences of Violence Questionnaire (see Walsh, C. and MacMillan, H.)

Children's Report of Exposure to Violence (see Cooley, M.R., et al).

Ciotta, R. (1989, April 12). 5 accused of abuse were escorts for children's outings two staff members were charged before taking patients outside. The Buffalo News, p. TRK.

Ciotta, R. (1989, March 9). Sex claims at child center date to '83. The Buffalo News, pp. A1, A11.

City, board sued over abuse-case grilling. (1991, May 28). Daily News, KSI , p. 2.

Clayton, Chris. (2002, February 14). Abuse alleged at Glenwood Center. The Omaha World-Herald. p. 1A. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database

Clinton teacher charged with sexual assault. (2003, June 18). The Hartford Courant.

Clouse, T. and Schwandt, S. (2004, January 30). Officials investigate reported rape of autistic teen. The Spokesman-Review.com

Coach accused of molesting six girls. (2002, December 4). Chicago Daily Herald.
    http://www.dailyherald.com/kane/main_story.aso?intlD=37594113
Coach accused of seducing girls: A cheerleading coach 'seduced' three teenage girls and
    their parents to arrange a trip to London. (2002, July 31). The Associated Press
    State & Local Wire. Retrieved August 1, 2002 from www.phillyburbs.com
Coach accused of 7th molestation. (2003, January 10). Chicago Sun-Times.
    http://www.suntimes.com/output/news/cst-nws-met10.html
Coach accused of touching female student. (2003, May 30). Sarasota Herald-Tribune.
Coach acquitted of molesting player. (2003, March 12). WPVI Philadelphia.
    http://abclocal.go.com/wpvi/news/03122003_nw_coach.html
Coach background checks get scrutiny. (2003, February 10). The Common Denominator.
    http://www.thecommondenominator.com/021003_sports1.html
Coach convicted in teen sex case. (2002, August 2). The Associated Press State & Local
    Wire. Retrieved August 13, 2002 from www.zwire.com
Coach guilty of molesting student. (2003, July 13). The Tennessean.
Coach had run-in with girl's folks, police say. (2003, May 31). Albuquerque Tribune.
Coach in court charged with player affair. (2003, March 12). Morganton News Herald
    (NC). http://morganton.com/news/MGB2U0F46DD.html
Coach may face private prosecution. (2003, March 20). The Courier Mail, Brisbane,
    Australia.
Coach-player relationship is examined by SI. (2001, September 6). Philadelphia Daily
    News,
Coach suit. (2002, May 20). City News Services. Los Angeles. Retrieved June 3, 2002
    from Lexis-Nexis Academic Universe database.
Coach surrenders over alleged sex with student. (2003, March 21). Phoenixville News,
    PA.
Coaches face scrutiny. (2003, July 6). Florida Sun-Sentinel.
Coaches' sexual abuse of athletes a worry for parents, schools. (2004, January 26).
    The Columbian (Vancouver, WA).
Cobb teacher charged with child molestation. (2003, August 8). SouthernVoice.com
    (Atlanta, GA).
Cochran seeks suit dismissal. (2003, June 6). The Adrian Daily Telegram, Michigan.
Codes of ethics of the education profession: Preamble. (Adopted 1975) National
    Education Association. Available. http://www.nea.org/aboutnea/code.html
Cohan, A. (1991). Child sexual abuse within the schools. Dissertation, Hofstra
    University.
Cohen, D. (1993, June 23). Safeguards urged in querying young children about sexual
    abuse. Education Week, p. 15.
Cohen, T. (2001, June 9). Suspect Loses Right to Teach Driving Course. Portland Press
    Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.
Cohn-Donnelly, A. H. (1991). What we have learned about prevention: What we should
    do about it. Child Abuse & Neglect, 15, 99-106.
College rape trends studied. (1992, August 17). The Associated Press. Newsday, p. 13.
Colony High teacher sentenced for sexual abuse. (2001, November 28). The Associated
    Press.
Colony High teacher pleas to abuse charge. (2001, July 25). The Associated Press State
    & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe
    database.

Communication is the best defense against abuse.  (2003, June 17). The Washington Times. Sports.

Complaints against teacher ignored for years.  (2003, October 26). The Associated Press.  Lawrence Journal-World (KS). http://ljworld.com/section/stateregional/story/149974

Compton, J. (2002, July 31). Glen Dale parents learn to talk to kids about sexual aggression. The Intelligencer – Wheeling News Register. Available. www.news-register.net/news/story/07312002_newsdale.asp

Congress.  (1993, April 21).  H.R. 1795.  In the House of Representatives.

Conte, J. R. (1986). A look at child sexual abuse. IL: National Committee For Prevention Of Child Abuse.

Conte, J. R., & Berliner, L. (1984).  Impact of sexual abuse in children (Report I). (Contract No. PHS - 1Ro1M437133). Washington, DC.

Conte, J. R., & Fogarty, L. A. (1990). Sexual abuse prevention programs for children. Education and Urban Society, 22 (3), 270-284.

Conte, J. R., & Schuerman, J. R. (1988). The effects of sexual abuse on children: A multidimensional view. In G. E. Wyatt and G. J. Powell (Eds.), Lasting effects of child sexual abuse (pp. 157-170). Newbury Park, CA: Sage Publications.

Conte, J. R., Wolf, S., & Smith, T. (1989). What sexual offenders tell us about prevention strategies. Child Abuse & Neglect, 13 (2), 293-301.

Cook, J.L. (2000). Bitch v. whore: The current trend to define the requirements of an actionable hostile environment claim in verbal sexual harassment cases. The John Marshall Law School, The John Marshall Law Review. 33, 465. Retrieved September 27, 2001 from Lexis-Nexis Academic Universe database.

Cook, M., & Howells, K. (Eds.). (1981). Adult sexual interest in children. New York: Academic Press.

Cool, L.C. (2001, August 8). The Bullying Epidemic. Ladies Home Journal. Retrieved February 25, 2003 from Ladies Home Journal website. http://www.lhj.com/lhj/printableStory.jhtml?id=/templatedata/lhj/story/data/edu_bully_08082

Cooley, M.R., Turner, S.M., & Beidel, D.C. (1995). Assessing community violence: Children's Report of Exposure to Violence. Journal of the American Academy of Child and Adolescent Psychiatry. Vol. 34, No. 2, pp. 201-20.

Corbett, K., Gentry, C., & Pearson, W., Jr. (1993). Sexual harassment in high school. Youth and Society.  Vol. 25, No. 1, pp. 93-103.

Cortines, R.C. (Chancellor, Board of Education), & Stancik, E.F. (Special Commissioner, The Special Commissioner of Investigation).  [Draft] Joint Commission of the Chancellor and the Special Commissioner of Investigation for the Prevention of Child Sexual Abuse, pp. 1-44.

Corwin, D.L. (1988). Early diagnosis of child sexual abuse.  Diminishing the lasting effects. In Wyatt, G.E. and Powell, G. J. (eds). Lasting effects of child sexual abuse.  Sage Publications, Newbury Park, CA. Chapter 14, pp. 251-269.

Costello, E.J., Angold, A., Burns, B.J., Stangl, D.K., Tweed, D.L., Erlanki, A., & Worthman, C.M. (1996). The Great Smoky Mountains study of youth: Goals, design, methods, and the prevalence of DSM-III-R disorders.  Archives of General Psychiatry. 53, pp. 1129-1136.

Court address school safety issues: Case law update - sex is outside scope of employment.  (1994, December).  School Safety Update, p. 6.

Court affirms school liability, reins in damages for abuse.  (1995, July 17).  Education U.S.A., p. 5.

Court considers standard for judging sexual harassment.  (1993, October 25).  Education U.S.A., p. 5.

Court dismisses student suit alleging counselor inaction.  (1995, May 22).  Education U.S.A., p. 5.

Court rules schools can be liable for unchecked sexual harassment. (1999, May 25). The New York Times, p. A24.

Court rules teacher should go to jail for sex with student. (2002, July 26). Asbury Park Press (NJ).

Court says schools liable for K-12 peer harassment. (1998, March 23). Education USA, pp. 1, 3.

Court:  School may be liable for harassment by student.  (1996, February 26).  Education USA.  pp. 1, 3.

Court: Schools liable for employees' misconduct.  (1992, October 26).  Education USA.  pp. 1, 3.

Court slows students' ability to sue districts over sexual harassment. (1998, March).

Court throws out teacher's sex harassment claims (1996, January 29). Education U.S.A., p. 5.

Court to take second look at student protection decision (1993, March 29). Education U.S.A., pp. 1-16.

Court to take second look at student protection decision.  (1993, March 29).  Education U.S.A., p. 9.

Court upholds dismissal of tenured elementary school teacher.  (1990, April).  Legal Notes for Education, p. 5.

Court upholds sentencing of LA-area coach. (2003, November 26). The Associated Press.  http://bayarea.com/mld/mercurynews/news/local/7358898.htm

Covello, D., as told to Willen, L.  (1996, February).  I was abused by my guidance counselor.  Good Housekeeping, pp. 70-75.

Crabtree, M.A. (2000).  Sexual harassment laws: A consideration of the imposition on Oregon free speech interests. University of Oregon, Oregon Law Review. 79, 721. . Retrieved September 27, 2001 from Lexis-Nexis Academic Universe database.

Craig, T. (2001, March 22). 2 more charge martial arts teacher with sexual abuse. The Baltimore Sun. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Crick, R.N., & Bigbee, M.A. (1998). Relational and overt forms of peer victimization: A multi-informant approach.  Journal of Consulting and Clinical Psychology. 66 (2), 337-347.

Crick, N.R. & Grotpeter, J.K. (1996). Children's treatment by peers: Victims of relational and overt aggression. Development and Psychopathology.  8, pp. 367-380.

Crombie, N. (2001, March 17). Middle school teacher charged with sexual abuse. The Oregonian. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Crossing the line.  (2003, June 18).  The Washington Times.  Sports.

Crowd rallies to back Old Forge teacher.  (2003, September 25).  Times  Leader (PA).

Cummins, H. J.  (1995, May).  Crushes usually harmless, counselors say. Newsday, pp. 27, 29.

Cummins, H. J.  (1995, May 27).  Dealing with harassment in your child's classroom.

Newsday, pp. B2-B3.

Cummins, J.C., Ireland, M., Resnick, M., & Blum, R.W. (1999). Correlates of physical and emotional health among Native American adolescents. Journal of Adolescent Health. 24 (1), 38-44.

Dale, C. (2003, April 16). Teacher's appeal denied by state education board. Parkersburg News and Sentinel, WV.
http://newsandsentinel.com/news/story/0416202003_new04teacher.asp

Dance teacher gets 6 years in abuse case. (2003, October 24).
http://news.mywebpal.com/news_too_v2.cfm?pnpIID=658&NewsID=500162&CategoryID=1825&show=localnews+om=1

Dance teacher convicted. (2003, September 22). North Jersey Herald & News (NJ).

Dance teacher seeks new trial. (2003, July 31). The Baltimore Sun.

Dance teacher is found guilty of sexual abuse. (2003, July 17). The Baltimore Sun.

Danks, H. (2001, Sept. 10). Forest Grove School District sued over sexual abuse case. The Oregonian. p. E05.

Danks, H. (2001, January 5). Teacher convicted of sexual abuse. The Oregonian. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Daugherty, L. B. (1984). Why me? Help for victims of child sexual abuse (even if they are adults now). Wisconsin: Mother Courage Press.

Davis, Cary. (2002, May 31). Testimony may alter teacher's sex case. St. Petesburg Times.

Dayton teacher charged in sex assault. (2003, March 12). Cleveland Advocate.
http://www.zwire.com/site/news.cfm?BRD=1571&dept_id=183964&newsid=7346056&PAG=461&rfi=9

De Francis, V. (1969). Protecting the child victim of sex crimes committed by adults. Denver, CO: The American Humane Association.

De La Cruz, J. (2002, August 10). E. Rapids teacher reassigned after sex allegations. Lansing State Journal. Available. www.lsj.com/news/local/020810_mazur_1b.html

Deblinger, E., Mcleer, S. V., Atkins, M. S., Ralphe, D., & Foa, E. (1989). Post-traumatic stress in sexually abused, physically abused, and nonabused children. Child Abuse & Neglect, 13, 403-408.

Decades of sexual abuse alleged. (2003, April 13). Canadian Press.
http://cnews.canoe.ca/CNEWS/Canada/2003/04/13/63928-cp.html

Defiant Volkers vows to keep on coaching. (2003, April 5). The Courier Mail (Brisbane, Australia)
http://thecouriermail.news.com.au/common/story_page/0,5936,6238801%255E3102,00.html

Demoretcky, T. (1995, October 3). Warnings of sex abuse unheeded, lawyer says. Newsday, p. A23.

Dentzer, B. (1996, February 20). Mistrust strains classroom relationships, experts say. The Citizen Register, p. 5A.

Deopere, J. (2001, March 7). Girl's mother sues school board over sex case. The Ledger. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

DeStefano, A.M. (1992, May 25). Kids who lie: Most sex charges against teachers prove to be false. Newsday, p. 5.

Details arise of control, sex abuse at Oregon group home. (2001, February 7). Kennebec Journal. (Augusta, ME). Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Determining our viewpoints of violent events: A reliability study" submitted to <u>American Journal of Public Health</u>. (No date).

Deutsch, L. (1990, January 19). 2 cleared in child sex rapes. <u>Daily News</u>, p. 2.

Dewar, R. (1989, July). Brace yourself to handle charges of sexual assault. <u>The Executive Educator</u>, 25-26.

Diesenhouse, S. (1988, January 31). Child sex abuse cases rising in MA. <u>The New York Times</u>, p. 43.

Dillon, S. (1994, June 28). Teacher tenure: Rights vs. discipline. <u>New York Times</u>, p. 1.

Dissent: Ruling Teaches Johnny the Wrong Lessons. (1999, June 2). <u>Education Weekly</u>, p.23.

District lets accused teacher go.  (2003, July 5).  <u>Rockford Register Star</u> (Illinois).

District severs ties with teacher. (2003, April 10). <u>The Arizona Republic</u>.
    http://azcentral.com/arizonarepublic/local/articles/0410evfiring.html

Districts (1992, November 18). <u>Education Week</u>, p. 2.

Districts (1992, Oct. 21) <u>Education Week</u> p. 3.

Districts. (1992, October 21).  <u>Education Week</u>, p. 2.

Districts. (1993, March 31). <u>Education Week</u>, p. 3.

Doe v. Petaluma City School District, 830 F. Supp. 1560 (N. D).

Doe v. Taylor Independent School District, (1994). 15 F. 3d 443 (5th Circuit).

Doe v. Taylor Independent School District. (1993). <u>United States Law Week</u>, <u>61</u>, 2264.

Driver's ed teacher charged with sexual abuse. (2001, April 6). *The Associated Press State & Local Wire*.

Driving teacher accused of rape pleads innocent.  (2003, April 13).  <u>The Lowell Sun</u> (MA).
    http://www.lowelsun.com/Stories/0,1413,105~1322968,00.html

Dubé, R., & Hébert, M. (1988). Sexual abuse of children under 12 years of age: A review of 511 cases. <u>Child Abuse & Neglect</u>, <u>12</u>, 321-330.

Duddy, J., Sheridan, D.  (1991, May 3).  Aide held in five rapes:  Pregnant student, 14, sparks inquiry.  <u>Daily News</u>, p. 7.

Duncan, L., (1998). Gender Role Socialization and Male-on-Male vs. Female-on-Male Child Sexual Abuse. <u>Sex Roles: A Journal of Research</u>*,* Nov. no page numbers. Retrieved March 3, 2003 from findarticles.com.

Echtenkamp, J. (2002, July 16). Band director gets prison for sex abuse. <u>Loudon Times Mirror</u>. Retrieved July 18, 2002 from www.zwire.com

Eckenrode, J., Munsch, J., Powers, J., & Doris, J (1988). The nature and substantiation of official sexual abuse reports. <u>Child Abuse & Neglect</u>, <u>12</u>, 311-319.

Edelman, S. (2000, March 13). Teachers axed: One who exposed abuse pays price. <u>The New York Post.</u>

Edinburg teacher arrested on allegations of sexual abuse. (2002, February 1).  *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Educator gets 18 months for sex with teen. (2003, March 4). <u>Cincinnati Enquirer</u>.
    http://enquirer.com/editions/2003/03/04/loc_cann04.html

Educator jobless after misconduct charge.  (2003, October 23).
    http://myrtlebeachonline.com/mld/sunnews/news/local/7081934.htm

Educators seek safeguards against child sex abuse.  (2003, July 9).  <u>The Oregonian</u>.

Educators scrutinize contact with students.  (1996, February 20).  <u>The Reporter Dispatch</u>, pp. 1, 5A.

EEOC (1993, October 1). Proposed guidelines on harassment based on race, color,

religion, gender, national origin, age, or disability. Federal Register, 58, (189).

EEOC Policy Guidelines on Sexual Harassment, Section 1604.11, 29 CFR Chapter XIV, Part 1604.

EEOC Regulations on Sexual Harassment.  (1990, July).   Section 1604.11, Code of Federal Regulations,  29, Ch. XIV, 2/3.

EEOC: Policy guidance on sexual harassment.  (1990, April).   19-39.

Egelko. B. (2003, February 24). State law opened door to sue on alleged long-ago abuse. Defense lawyers cry foul, but prosecutors point to safeguards.  San Francisco Chronicle.  P. B2.

Elizabeth, J. (2003, February 6).  A question of quality:  Paperwork and legal threats discourage teacher firings.  Pittsburgh Post-Gazette.

Ellickson, P.L. & McGuigan, K.A. (2000). Early predictors of adolescent violence. American Journal of Public Health, 90 (4), 566-572.

Elliott, D.S. (1995).  National Youth Survey.  Inter-University Consortium for Political and Social Research (ICPSR). University of Michigan. Ann Arbor, MI.

Elliott, D.S., Huizinga, D. & Ageton, S.S. (1985).  Explaining delinquency and drug use. Sage Publications. Beverly Hills, CA.

Emans, R. L. (1987, June). Abuse in the name of protecting children. Phi Delta Kappan, 68 (10), 740-743.

Emerson, J., & Wait, T. F. (1989, July 29). Fallsburg delays report on abuse. The Times Herald Record, pp. 3, 10.

Employment: Teacher's termination overruled because conduct not irremediable. (1991, August). Legal Notes for Education, p. 3.

English, K.  (1994).   Management of Sex Offenders by Probation and Parole Agencies in the United States.  Colorado Department of Public Safety, Denver, CO.

Equestrian coach begins prison term for sex assault.  (2003, July 9).  The Hartford Courant.

Evans, F. (1987, May 7). Teacher facing court, district probe. The Smithtown News, pp. 1, 14.

Evans, H.  (1991, May 4).  Suspect in rapes not aide.  Daily News, p. 6.

Evans, J.  (2004, January 26).  Coaches' sexual abuse of athletes a worry for parents, schools.   The Columbian (Vancouver, WA).  Front page.

Ex-coach could lose teaching license. (2003, April 2). WSOC-TV News. Southington, CT.

Ex-coach gets probation in sex assault.  (2003, March 1). Omaha World-Herald (NE). http://www.omaha.com/index.php?u_np=0&u_pg=36&u_sid=668182

Ex-coach sentenced. (2003, July 30).  The Virginian-Pilot, Norfolk, VA.

Ex-Clifton teacher admits having sex with 13-year old student.  (2002, January 18). Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Ex-Lady Vol Davis charged for sex with student.  (2003, September 19). http://sportsillustrated.cnn.com/2003/basketball/ncaa/wp.em/0919/davis.arrested.ap/

Ex-Livingston coach jailed on child sex charges.  (2003, June 4).  The Associated Press. The Houston Chronicle.com

Ex-Pine View teacher pleads guilty to raping 17-year-old. (2001, April 1). The Deseret News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Ex-school worker gets 160 years for sex abuse. (2001, July 13). The Associated Press. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media

reports: The Zero 5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/160_years.html

Ex-student, administrator settle sex molestation suit.  (1995, June 27).  The Star-Ledger, p. 20.

Ex-swim coach gets nine-year sentence.  (2001, November 11).  Milwaukee Journal Sentinel.  Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Ex-teacher accused of sex abuse.  (2003, June 20).  The Syracuse Post-Standard.

Ex-teacher charged with sexual abuse. (2001, December 14).  The Salt Lake Tribune. p. C2.

Ex-teacher, ex-student now can be together.  (2000, July 31). KOMO-TV. Seattle, WA.

Ex-teacher gets 7 years for abuse.  (2001, November 11). The Record (Bergen County, NJ). Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database

Ex-teacher's rape conviction upheld.  (2003, July 31).  www.nynews.com . The Journal News:  A Gannett suburban web-paper for Westchester, Rockland and Putnam counties (NY).

Ex-teacher wins lawsuit over sex abuse claims. (2003, January 16). WAVE-TV (Louisville, KY).
http://www.wave3.com/Global/story.asp?S=1087344&nav=0RZFDPhJ

Experts:  Sexual predators often present benign façade.  (2003, May 1). The Arizona Republic, Phoenix, AZ.

Fabbre, A. (2001, July 27). Geneva High teacher faces more charges that he sexually abused a female student. Chicago Daily Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Fabbre, A. (2001, July 27).  Geneva high teacher denies new sexual abuse charges. Chicago Daily Herald. p.1. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Families settle abuse lawsuit with Port St. Lucie Little League.  (2003, June 21).  The Associated Press.

Families sue Pasco school in sexual abuse case.  (2001, April 24). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Family sues over child sex assault. (2003, February 23). Eau Claire Leader-Telegram (WI). http://www.leadertelegram.com/story.asp?id=23465

Farrell, B.  (1993, June 24).  Probation for driver in sex abuse of boys.  Daily News, p. 20.

Farrell, B.  (1993, March 9).  Teacher held on sex rape.  Daily News, p. 16.

Fast Response Survey System (FRSS).  Violence and discipline problems in U.S. public schools: 1996-1997.  National Center for Education Statistics. Washington, D.C.

Fast Response Survey System (FRSS). (1996)  Principal/School Disciplinarian Survey. Violence and crime at school.  National Center for Education Statistics. Washington, D.C.

Father of missing girl: She "thinks she's in love."  (2001, May 8).  The Associated Press. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/baptist_princ.html

Father testifies about alleged abuse. (2003, February 27). Stamford Advocate (CT).
http://www.stamfordadvocate.com/news/local/scn-sa-fields2feb27,0,44889.story?coll=stam-news-local-headlines

Feld, J.J. and Maxey, A. (1999, January 6). Teacher placed on leave: Dobbs Ferry educator ran New Castle program for third-grade boys.  Gannett Suburban Newspapers. (Westchester, Putnam and Rockland counties, NY).

Ferris, R. (2002, August 13). Questions raised about CISD official's knowledge of teacher/student affair.  The Courier. (Montgomery County, TX. Retrieved August 15, 2002 from www.zwire.com

Field, H. (2001, May 30). Investigative report: UF hired sexual predator. Florida public colleges, universities have no background check policy.  Click10.com (WPLG-TV Miami).  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/uf_hired.html

Fine, L.  (2000, November 8). Jury awards $105 million in teacher-student abuse case. Education Week.  Available. http://www.edweek.org/ew/ew_printstory.cfm?slug=10abuse.h20

Finkelhor, D. (1994, Summer/Fall). Current information on the scope and nature of child sexual abuse.  Future of Children. 4 (2), 31-53.  David and Lucile Packard Foundation.

Finkelhor, D. (1984). Child sexual abuse: New theory and research. New York: The Free Press.

Finkelhor, D. (1979). What's wrong with sex between adults and children? Ethics and the problem of sexual abuse. American Journal of Orthopsychiatry, 49 (4), 692-697.

Finkelhor, D. &  Araji, S., with Wyatt, G.E., Peters, S.D., Browne, A. & Baron, L.  (1986, December)  A source book on child sexual abuse.  Sage Publications, Newbury Park, CA.

Finkelhor, D. & Asdigina, N.L. (1996, Spring). Risk factors for youth victimization: Beyond a lifestyles/routine activities theory approach.  Violence and Victims. 11 (1), 3-20.

Finkelhor, D. & Berliner, L.  (1995, November).  Research on the treatment of sexually abused children: A review and recommendations. Journal of the American Academy of Child and Adolescent Psychiatry.  34 (11), 1408-1423.

Finkelhor,  D.  &  Dziuba-Leatherman,  J.  (1995).  Victimization  prevention  programs:  A national  survey  of  children's  exposure  and  reactions.  Child Abuse and Neglect. 19 (2), 129-139.

Finkelhor, D. & Dziuba-Leatherman, J. (1994). Children as victims of violence: A national survey. Pediatrics. 94 (4), 413-420.

Finkelhor, D. & Hamby, S.L. (2000, July). The victimization of children: Recommendations for assessment and instrument development.  Journal of the American Academy of Child and Adolescent Psychiatry. 39 (7), 829-840.

Finkelhor, D. & Hashima, P.  (2001). The victimization of children and youth: A comprehensive overview.  In: Law and Social Science Perspectives on Youth and Justice. (S.O. White, Ed.).  Plenum Publishing. New York, NY. pp. 49-78.

Finkelhor, D. & Hashima, P. (1999, August).  Violent victimization of youth versus adults in the National Crime Victimization Survey.  Journal of Interpersonal Violence.  14 (8), 799-820.

Finkelhor, D. and Ormrod, R. (2001, May). Child abuse reported to the police.  Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs. Office of Juvenile Justice and Delinquency Prevention.  Washington, D.C

Finkelhor. D. and Ormrod, R. (1999, November). Reporting Crimes Against Juveniles. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs.

Office of Juvenile Justice and Delinquency Prevention.  Washington, D.C.

Finkelhor, D. & Wells, M. (2003, January).  Improving data systems about juvenile victimization in the United States.  Child Abuse and Neglect.  27 (1), 77-102.

Finkelhor, D., Hotaling, G. and Yllo, K.  (1988).  Stopping family violence:  Research priorities in the coming decade.  Sage Publications, Newbury Park, CA.

Finkelhor, D., Williams, L. M., & Burns, N.  (1988).  Nursery crimes: Sexual abuse in day care.  Newbury Park, CA: Sage Publications, Inc.

Finn, R. (1999, March 7). Growth in women's sports stirs harassment issue.  The New York Times. p. A1, 24.

Fired teacher's aide gets 90-day sentence for statutory rape. (2003, February 19). *The Associated Press*. http://syracuse.com/newsflash/regional/index.ssf?/cgi-free/getstory_ssf.cgi?n0476_BC_NY-BRF--Teacher-Rape&&news&nystatenews

Fitz-Gibbon, J. (1994, March 15). Janitor raped me, girl, 10, testifies.  Daily News, p. 25.

Fitz-Gibbon, J.  (1994, March 8). PS janitor rape trial under way. Daily News, Metro p. 1.

Flagler teacher faces sex charges.  (2001, November 16). WESH News. Available.  http://dailynews.yahoo.com/h/wesh/20011116/lo/978423_1.html

Flaws in system allowed molester back in school.  (1993, November 14).  The Grand Rapids Press, p. B1.

Flisher, A.J., Kramer, R.A., Hoven, C.W., Greenwald, S., Alegria, M., Bird, H.R., Canino, G.M., Connell, R., & Moore, R.E. (1997).  Psychosocial characteristics of physically abused children and adolescents.  Journal of the American Academy of Child and Adolescent Psychiatry.  36 (1), 123-131.

Florence, E.  (2000, November).  Who's at school with your kids?  Readers' Digest Canada. Available online:  http://www.readersdigest.ca/mag/2000/11/school.html

Foderaro, L.W. (2002, April 14). Conduct by a teacher causes doubt and fear. The New York Times. Available.  www.nytimes.com/2002/04/14/nyregion/14ABUS.html?todaysheadlines=&pagewante

Former band director sentenced.  (2003, October 24).  Minneapolis Star-Tribune.

Former basketball coach sentenced to prison. (2003, September 5). *The Associated Press*.  The Wilmington Star-News (North Carolina).

Former Beaverton teacher gets 10 years.  (2003, November 4).  The Oregonian.

Former Biloxi girls' softball coach indicted on sex-related charges.  (2002, October 24).  *The Associated Press*.  http://www.sanluisobispo.com/mld/sanluisobispo/sports/4350466.htm

Former coach faces sex charges. (2001, December 16).  *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Former coach gets life.  (2003, July 13).  *The Associated Press*.  http://kvoa.com/stories/7/7132003_6.html

Former coach is given a year in prison.  (2003, November 8).  Lorain Morning Journal (OH).

Former coach pleads innocent.  (2003, July 9).  Wisconsin Rapids Daily Tribune.

Former coach pleads not guilty.  (2003, August 10). The Daily Democrat.  Woodland, CA.

Former coach, teacher convicted.  (2003, August 2).  Dayton Daily News (OH).

Former Culver teacher sentenced to 45 Months on sex charges. (2001, June 23). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Former deputy gets six months.  (2004, January 21).  Hamilton Journal-News  (OH).

Former Dons coach Otis might return.  (2002, October 23). Long Beach Press-Telegram.
http://presstelegram.com/Stories/0,1413,204%257E23180%257E43088,00.html

Former Farwell basketball coach convicted of sexual assault. (2001, May 31).  The
Associated Press.  Retrieved on June 3, 2002 from www.lubbockonline.com

Former Hopatcong teacher sentenced to prison.  (2003, September 26).  New Jersey
Herald.

Former principal ordered held without bond in sex case involving girl, 11. (2001, June
13). The Associated Press.  Retrieved February 25, 2002 from Circle of Trust
Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew
Vachss.  http://www.vachss.com/help_text/archive/baptist_princ3.html

Former school coach admits to using drugs with students.  (2003, June 8).  The
Associated Press.  The Seattle Post-Intelligencer.

Former school coach sentenced to 40 years for violating probation.  (2003, August 1).
Houston Chronicle.

Former state champion coach sentenced to 7 years.  (2003, June 18).  The Associated
Press.  www.nola.com (New Orleans news online from the Times Picayune, LA).

Former  student  seeks  damages  of $75,000.   (2002, December  19).  Topeka Capital-
Journal.

Former teacher, coach acquitted on sex charges (2003, February 3). Macomb Daily (IL).
http://www.zwire.com/site/newsid=cfm?newsid=6916151&BRD=988&PAG=461&d
ept_id=141265&rfi=6

Former teacher faces trial in abuse case.  (2003, September 9).  The Ahwatukee
Foothills News (AZ).

Former teacher sentenced.  (2003, September 25).  The Associated Press. The Concord
Monitor (NH).

Former Wauconda teacher faces felony sex charges.  (2003, February 26).  Chicago
Daily Herald.  http://www.dailyherald.com/dup[age/main_story.asp?intlD=3767857

Former Waverly teacher sentenced.  (2003, February 23).  Towanda Daily and Sunday
Review (PA).
http://www.thedailyreview.com/site/news.cfm?newsid=7151560&BRD=2276&PAG
=461&dept_id=465049&rfi=6

Forrest, S. (1991, March 7). Bus driver charged in sex abuse. Newsday, p. 31.

Fossey, R.  (1995, March/April).  Courts hold coworkers liable for knowledge of sex
abuse.  The Harvard Education Letter, 11 (2), 5-6.

Fossey, R., & Stein, N.  (1994, March 30).  Molesters in our midst: A disturbing lawsuit for
educators.  Education Week, p. 31.

4 accused coaches could lose positions.  (2004, January 26).  Seattle Times.

Four more families sue former Clovis teacher. (2002, October 23). Amarillo Globe-News.
http://www.amarillonet.com/stories/102302/new_fourmore.shtml

4th-graders lied about molestation.  (1994, May 19).  The Associated Press.  Newsday.
p. A19.

Fox, N.A., & Leavitt, L.A. (1995).  The Violence Exposure Scale for Children –  Revised
VEX-R.  Department of Human Development, University of Maryland. College
Park, MD.

Frank, R. (2001, January 3). Judge dismisses three of 15 charges against teacher.  The
Oregonian.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe
database

103

Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, (1992).
Freel, M. (in press). Child sexual abuse and the male monopoly: An empirical exploration of gender and a sexual interest in children. British Journal of Social Work.

Freel, M.  (2003). Child sexual abuse and the male monopoly: An empirical exploration of gender and a sexual interest in children.  The British Journal of Social Work. No. 33, pp 481-498.

Freidrich, W. N. (1988). Behavior problems in sexually abused children: An adaptational perspective. In G. Wyatt & G. Powell (Eds.), Lasting effects of child sexual abuse. Newbury Park, CA: Sage Publications.

Freund, K., Watson, R., & Rienzo, D. (1989). Heterosexuality, homosexuality, and erotic age preference. The Journal of Sex Research, 26 (1), 107-117.

Frownfelder, D.  (2003, May 3).  Teacher pleads not guilty.  The Lenawee Connection/ The Daily Telegram.  Adrian, MI.

Fukumoto, Ken. (2002, February 11).  Failing the grade; Japanese are scandalized by a wave of arrests of schoolteachers accused of sex-related crimes. Newsweek. p.19.

Furger, R. (2002, January 21). Assessment for understanding.  The George Lucas Educational Foundation

Furr, K.D. (2000). How well are the nation's children protected from peer harassment at school: Title IX liability in the wake of Davis v. Monroe County Board of Education. North Carolina Law Review. 78, 1573. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Gaines, Judith. (2002, January 13). A test of character:  When Paul Christopher became headmaster of the Berkshire school he brought with him credentials as an ethicist and champion of traditional values. Now he's embroiled in a sexual harassment scandal. Boston Globe. p. 10.

Galarneau, A.Z. (2001, May 12). Parents confront teacher who molested pupils. The Buffalo News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Gallagher, B. (2002, August).  Cases of international or internet child sexual abuse. Center for Applied Childhood Studies, School of Human and Health Sciences, University of Huddersfield, W. Yorkshire, UK.

Gallagher, B. (2000).  The extent and nature of known cases of institutional child sexual abuse.  British Journal of Social Work.  30, pp. 795-817.

Gallagher, M.  (1992, April 16).  Abuse charge for teacher:  NY probe found no basis for girl's sex complaint. Newsday, pp. 7, 31.

Gallotto, A.A.  (1995, August 17).  Teacher sentenced for public masturbation.  The Star-Ledger, p. 41.

Gardiner, S. (2001, January 19). Ex-teacher charged in sex abuse. Newsday.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/correnti_charged.html

Garrison, J. and Hayasaki, E.  (2001, September 6).  Schools roll out plans to get tough on bullies. Los Angeles Times.  Available. www.latimes.com/templates/misc/printstory.jsp?slug=la%2D000072014sep06

Gearty, R.  (1993, September 22).  Cortines:  Ax pedophile:  'Man-boy lover' found unfit to teach, he'll appeal.  Daily News, p. 8.

Gedda, G.  (2003, December 17).  U.S. tries to combat sexual abuse of kids.  *The Associated Press.*

Gendar, A. and Weir, R. (2001, May 25). Fury over silence after sex attack on Bronx students. New York Daily News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Gendar, A., Marzulli, J. and Goldiner, D.  (2001, May 5). P.S. sex probe expands.  New York Daily News.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

George, K. (1986, December 28). Debate continues over school's handling of abuse case. Press and Sun Bulletin, pp. 1A, 10A.

George, K. (1986, December 28). Sex-abuse law soft on schools. Press and Sun Bulletin, pp. 1A, 10A.

George, K. (1986, December 20). SV's abuse probe draws fire. Press and Sun Bulletin, pp. 1A, 11A.

George, K. (1989, October 6). Judge drops Hudy sex case. Press and Sun Bulletin, pp. 1A, 6A.

George, K. (1989, September 26). Stanbro charged in sex cases: JC coach accused of abusing two girls at school. Press and Sun Bulletin, pp. 1A, 4A.

George, K. (1986, September 5). Teacher accused of sex abuse. Press and Sun Bulletin, pp. 1A, 8A.

Gerard, W. (1992, July 11).  Molesters prey on 'passive' disabled women.  Toronto Star. A1-A2.

Gerber, J.  (1993, November 14).  Nightmares awaken old feelings.  The Grand Rapids Press, pp. B1-B2.

Gidycz, C.A. & Koss, M.P. (1989).  The impact of adolescent sexual victimization: Standardized measures of anxiety, depression, and behavioral deviancy.  Violence and Victims.  4 (2), 139-149.

Giles, D.  (1996, February 22).  Girl, 10, wears wire to nail teacher who fondled her.  New York Post, p. 2.

Gillespie, K. (2001, June 3). Hidden and unreported: Sexual abuse of students. We admit that it goes on, but we're not stopping it. The Toronto Star.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/hidden_and.html

Girl's mother sues school, teacher. (2002, December 23). Rochester Democrat and Chronicle. http://www.democratandchronicle.com/news/1223story5_news.shtml

Girls basketball coach sentenced to three years in prison. (2003, January 18). *The Associated Press.* http://www.heraldtribune.com/aps/pbcs.dll/article?Date=20030116&Category=APN&ArtNo=301160810&Ref=AR

Giusti, M. (2001, June 3). Breach of trust: Unwrapping the saga of 'Coach Ron.' *The Daytona Beach News-Journal.* Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/breach_trust.html

Giusti, M. (2001, June 3). Private schools receive less stringent background checks. *The Daytona Beach News-Journal.*  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/private_schools.html

Glaser, C. (1993, November 14). The Grand Rapids Press, p. B2.

Goedert, J. G., Sanders, A.S., & Steinke, R. J. (1993). Report of the MSDE Special Investigation Team: Child Abuse Reporting and Investigation Anne Arundel County Public Schools, Maryland, pp. 1-22.

Goetz, K. (200, September 28). Net sex charges follow teacher: Popular educator faces 34 counts. The Cincinnati Enquirer.

Goldberg, C. (1995, May 21). Betraying a trust: Teacher-student sex is not unusual, experts say. The New York Times, p. 37.

Goldberg, C. (1995, May 12). Mother tapes video plea to teen-age girl who ran off with teacher. New York Times, p. B3.

Goldberg, N. (1994, July 2). NY bill makes firing teachers easier. Newsday, p. A8.

Goldman, D. (2001, April 2). Bullying is a horrible reality the state will not ignore. Adweek. p.14.

Gomes, J.T., Bertrand, L.D., Paetsch, J.J. and Hornick, J.P. (2000). The extent of Youth Victimization, Crime, and Delinquency in Alberta, 1999. Canadian Research Institute for Law and the Family. Calgary, Alberta.

Gomes, J.T., Ringseis, E.L., Boyle, P.J., Bertrand, L.D., Paetsch, J.J., & Day, D.C. (2002). Perceptions and experiences of victimization in Alberta: Findings from a survey of Alberta adults, 2000-2001. Canadian Research Institute for Law and the Family. Calgary, Alberta, Canada.

Good, O.S. (2001, June 26). Parents of abuse victims sue: Employees are accused of knowing that founder of Boulder private school had molested students. Rocky Mountain News. p. 16A. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database

Goodnow, C. (2002, May 21). Nasty clique behavior among girls draws new attention. Seattle Post-Intelligencer.

Goodrich, R. (2001). Junior high student says gym teacher touched her repeatedly, offered her money to disrobe; but she admits she has made up stories and was angry with the man. St. Louis Post-Dispatch. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Goodstein, L. (2003, June 11). Louisville Archdiocese to pay $25 million abuse settlement. The New York Times.

Goodyear, C. and Bell, E. (2002, February 26). Teacher accused of sex with 16-year-old Walnut Creek student tells of 5-month affair. San Francisco Chronicle.

Gootman, Elissa. (2001, November 22). 2 boys charged in sex abuse in high school locker room. The New York Times. p. 2.

Gordon, D. (2001, August 1). Dating violence among teens widespread. IntelliHealth. Available. www.intelihealth.com/IH/ihtPrint/WSIHW000/333/343/329858.html?k=basePrint

Gordon Fox, T. (2001, May 27). Northeast corner confronts an overload of abuse. The Hartford Courant. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Gorey, K.M. and Leslie, D. R. (1997. The prevalence of child sexual abuse: Integrative review adjustment for potential response and measurement biases. Child Abuse & Neglect, 21(4), 392-398.

Gorman-Smith, D. and Tolan, P. (1998). The role of exposure to community violence and developmental problems among inner-city youth. Development and Psychopathology. 10 (1), 101-116.

Gould, J. (1999). The triumph of hate speech regulation: Why gender wins but race loses in America. Michigan Journal of Gender & Law. 6,153. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Grand jury indicts coach on 53 counts. (2003, April 12). Dayton Daily News, OH. http://www.daytondailynews.com/localnews/content/localnews/daily/0412coach.html

Grand jury refuses to indict teacher accused of abusing students. (2001, June 20). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Graves, B. (1994). When the abuser is an educator. The School Administrator, 51 (9), 8-21.

Gray, E., & DiLeonardi, J. (1982). Evaluating child abuse prevention programs. IL: National Committee For The Prevention of Child Abuse.

Grayson, J. (ed.). (1989, Summer). Female sex offenders. Virginia Child Protection Newsletter, 28, pp. 1-13.

Greeley, Andrew. (2001, August 12). Teen boys make life dangerous for girls. Chicago-Sun Times. p. 38.

Gregorian, D. (1996, June 22). Gym teacher molested four girls: Cops. New York Post, p. 10.

Grossman, J.L. (2003). The culture of compliance: The final triumph of form over substance in sexual harassment law. Harvard Women's Law Review, 26 L.J. 3.

Groth, A. N., Hobson, W. F., & Gary, T. S. (1986). The child molester: Clinical observations. In D. C. Haden (Ed.), Out of harm's way: Readings on child sexual abuse, its prevention and treatment (pp. 140-141). Phoenix, AZ: The Oryx Press.

Groth, A. N., Longo, R. E., & McFadin, J. B. (1982). Undetected recidivism among rapists and child molesters. Crime and Delinquency, 28 (3), 450-458.

Gruber, K.J., Wiley, S.D., Broughman, S.P., Strizek, G.A., & Burian-Fitzgerald, M. (2002). Schools and Staffing Survey, 1999-2000: Overview of the Data for Public, Private, Public Charter, and Bureau of Indian Affairs Elementary and Secondary Schools. NCES 2002 – 313. U.S. Department of Education, National Center for Education Statistics. Washington, D.C.

Gryta, M. (1989, May 31). Former school aide gets prison term. The Buffalo News, p. B5.

Gryta, M. (1989, March 31). Student tells grand jury of sex with teacher aide. The Buffalo News, pp. A1, A4.

Gryta, M. (1989, March 30). School sex investigation targets fired aide. The Buffalo News, p. B1.

Gryta, M. (1989, March 26). Ex-youth official is target of sex-probe. The Buffalo News, p. B3.

Guart, A. (1993, November 6). Teachers prey on kids in sex-abuse scandal. New York Post, p. 5.

Guidelines for protecting child victims. (1989). Child Victims of Abuse and Neglect, New Brunswick.

Gym coach pleads guilty in molestation case. (2003, October 4). Contra Costa Times (CA). http://bayarea.com/mld/cctimes/news/6931641.htm

Haberstroh, J. (1995, March 12). Suspended teacher due back at work. Newsday, p. A31.

Hacking, I. (1991, Winter). The making and molding of child abuse. Critical Inquiry, pp. 253-288.

Haddock, M.D., & McQueen, W.M. (1983). Assessing employee potentials for abuse. Journal of Clinical Psychology, 39 (6), 1021-1029.

Hajela, D. (1995, July 11). Ex-school psychologist sentenced in sex abuse. Newsday, p. A18.

Hancock, L. (1991, October 3). Arrested in kid-sex. Daily News, p. 28.

Haner, J. (1994, January 8). Terrible secrets kept for 20 years. The Sun, p. 1A.

Haner, J., & Hermann, P. (1994, January 9). New sexual allegations raised against ex-teacher. The Sun, p. 1A.

Hanley, R. (2003, April 9). Arrest of a popular athletic director leaves students stunned. The New York Times. p. D5.

Hanley, R. (1990, December 8). Principal fondled students, New Jersey prosecutor says. New York Times, p. 28.

Hanrahan, M. (1991, April 3). He admits kindergarten rapes. Daily News, p. 7.

Harassment-Free Hallways, How to Stop Sexual Harassment in Schools: A Guide for Students, Parents, and Teachers. (2002, August, 20). AAUW Educational Foundation Sexual Harassment Task Force. Washington, D.C.

Harber, C. (1997). School effectiveness and education for democracy and non-violence. University of Natal, South Africa.

Harber, C. & Dadey, A. (1993). The job of headteacher in Africa: Research and reality. International Journal of Educational Development. 13 (2), 147-160.

Harris/Scholastic Research. (1993). Sexual harassment in America's schools (Volume I - data tabulations (8th-11th grade students)). New York: Louis Harris and Associates, Inc.

Harris/Scholastic Research. (1993). Sexual harassment in America's public schools (Volume II - data tabulations (8th-11th grade students) ). New York: Louis Harris Associates, Inc.

Harris/Scholastic Research. (1993). Sexual harassment in America's public schools (Volume III - data tabulations (8th-11th grade students)). New York: Louis Harris and Associates, Inc.

Harrison, B. (2000, March 13). Stunned students of 'cool guy' insist: It's not true. The New York Post.

Hastings, T.L. & Kelley, M.L. (1997). Development and validation of the Screen for Adolescent Violence Exposure (SAVE). Journal of Abnormal Child Psychology. 25 (6), 511-520.

Haugaard, J. J., & Emery, R. E. (1989). Methodological issues in child sexual abuse research. Child Abuse & Neglect, 13, 89-100.

Hays, D., & Hancock, L. (1992, December 22). School sex abuse rap: Say E. Harlem educator fondled 14-year-old boy. Daily News, p. 3.

Hays, T. (1995, May 19). Teenager runs from the 'Magic Kingdom' to tabloid tales of taboo sex. The Star-Ledger, p. 5.

Hearing planned in sexual harassment lawsuit against soccer coach. (2003, January 22). The Associated Press. http://www.wral.com/sports/1929245/detail.html

Help stop child abuse: A handbook for employers and volunteer coordinators (1994, June) Ministry of Attorney General Ministry of Social Services. Province of British Columbia.

Hench, D. (2001, April 7). Bonny Eagle teacher faces sex charges: The high school instructor is accused of offering alcohol to a student and having sexual contact

with her. Portland Press Herald. Retrieved March 1, 2002, from Lexis-Nexis Academic Universe database.

Hendrie, C. (1999, March 31). Texas, N.Y. consider new restrictions on staff-student sex. Education Week, p. 17.

Hendrie, C. (May 7, 2003). Familyheals after teacher-student relationship. Education Week., p. 1, 18.

Hendrie, C. and Drummond, S. (eds). (2003, April 30 & May 7). Trust betrayed; Update on sexual misconduct in schools. Education Week.

Hendrie, C. and Drummond, S. (eds) (1998, December 2, 9 & 16). A trust betrayed: Sexual abuse by teachers. Education Week.

Henneberger, M. (1993, August 22). Assertions of sexual harassment and a teacher is dismissed. New York Times, p. 38.

Henneberger, M. (1993, July 4). Abuse at school is called common: Teen-agers say that both boys and girls are the victims. The New York Times, p. 24.

Herbert, B. (1989, June 27). City forcing creeps on our kids. Daily News, p. 4.

Herek, G.M. (2003). Evaluating interventions to alter sexual orientation: Methodological and ethical considerations (Comment on Spitzer, 2003). Archives of Sexual Behavior, 32 (5), pp. 438-439.

Hernandez, R. (1994, July 20). Karate coach is charged with abuse: Female student, 16, says he fondled her. The New York Times, B4.

Herricks teacher fired. (1992, December 23). Newsday, p. 28.

Herszenhorn, D.M. (2000, February 26). Hazing is team tradition, a defendant's lawyer says. The New York Times. p. B5.

Hessler, Carl. Jr. (2002, July 20). High school trainer denies molesting girl. The Mercury. (Pottstown, PA). Retrieved July 22, 2002 from www.zwire.com

Heubert, J. P. (1994, April) Sexual harassment and racial harassment of public-school students: Federal protections and what state law may add to them. Paper presented at the annual meeting of the American Educational Research Association, New Orleans, La., 1-25.

Higginson, N. (1993, November). Addressing sexual harassment in the classroom. Educational Leadership, 51 (3), 93-96.

High court to set liability for teacher-student abuse. (1997, December 15), Education USA, pp. 1,3.

High school basketball coach convicted for having sex with teen. (2002, June 20). The Associated Press. Retrieved June 25, 2002 from www.signonsandiego.com

High school teacher pleads guilty to sex with student. (2001, June 22). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Hildebrand, J. (1995, March 16). Voters: Crack down in classrooms. Newsday, p. A7.

Hildebrand, J. (1994, March 15). Four years later, teacher is fired in sex case. Newsday, p. 31.

Hill, H.M. & Jones, L.P. (1997). Children's and parents' perceptions of children's exposure to violence in urban neighborhoods. JAMA. 89 (4), 270-276.

Hill, H.M., Levermore, M., Twaite, J., & Jones, L.P. (1996). Exposure to community violence and social support as predictors of anxiety and social and emotional behavior among African-American children. Journal of Child and Family Studies. 5 (4), 399-414.

Hindman. (1988, July/August). Research disputes assumptions about child molesters.

National District Attorneys Association Bulletin, 7 (4), 1, 3.

Hirschman, B. (2001, January 29). Top Broward official hired teacher despite strong protest.  South Florida Sun Sentinel.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/fla_teacher_2.html

Hislop, J. (2001).  Female sex offenders: What therapists, law enforcement and child protective services need to know.  Issues Press (a division of Idyll Arbor, Inc.) Ravensdale, WA.

Hoffman, L. (2002, April 14). The priest scandal isn't just about sex. Newsday. p. B8.

Hogarth, M. (2002, July 29). School's troubled past begs questions.  The Courier News. Available. www.suburbanchicagonews.com/couriernews/top/e29moose.htm

Hoops coach gives up defense in sex case.  (2003, July 19). King County Journal, Bellevue, WA.

Horner, B.  (1993, June).  Four-year review of the child sexual abuse provisions of the criminal code and the Canada Evidence Act (Formerly Bill C-15), pp.1-47.

Hostile hallways:  Bullying, teasing and sexual harassment in school. (2001). See: American Association of University Women.  Washington, D.C.

House of Lords to amend sex offense bill.  (2003, June 4).  The Associated Press.  The Guardian (UK).

How city bungled 'sex teacher' case (2001, May 6). New York Post. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/hiv_teacher_3.html

Howard, T. (2001, December 11). Woman sues Diocese, teacher over alleged sexual abuse. St. Louis Post-Dispatch, p. C4. http://www.lvrj.com/cgi-bin/printable.cgi?lvrj_home/2001/June-12-Tue-2001/news/16299199…

Hu, W. (2001, July 28). Two images of a teacher at a sexual abuse trial. The New York Times. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database

Hymowitz, K.S. (2000). Tinker and the lessons from the slippery slope. Drake Law Review. 48, 547.  Retrieved September 28, 2001, from Lexis-Nexis Academic Universe database.

Hyson, M. C., Whitehead, L. C., & Prudhoe, C. M. (1986). Influences on attitudes toward physical affection between adults and children. Washington, DC: Office of Educational Research and Improvement.

Inappropriate Headline? (2001, May 14). The Record. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

[The] Incidence and prevalence of child sexual abuse.  (1994). The National Resource Center on Child Sexual Abuse (NRCCSA).  Huntsville, AL.

Indians come forward with tales of physical and sexual abuse at missionary boarding schools.  (2003, June 8).  The Washington Post.

Indicators of School Crime and Safety (1999). U.S. Department of Education, Office of Educational Research and Improvement, National Center for Education Statistics and U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.  Washington, D.C.

Jacobson, S. (2001, May 25).  School's hiring has cracks.  Orlando Sentinel.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero

5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/school_hiring.html

Jahier, J. (1993, May 4). DA accused of ignoring rape case. Newsday, p. 35.

Jane Doe v. Petaluma City School

Jean, S. (2000). Peer sexual harassment since Oncale and Davis: Taking the 'sex' out of sexual harassment. Law Review of Michigan State University - Detroit College of Law. 2000, 485. Retrieved September 27, 2001 from Lexis-Nexis Academic Universe database.

Jefferson teacher charged with sexual abuse sues accuser (2003, January 31). Louisville Courier-Journal (KY). http://www.courier-journal.com/localnews/2003/01/31/ke013103s358621.htm

Jennings, D. (2003, May 6). Teacher's seeming rapport with children deflected concerns. The Dallas Morning News.

Jennings, D. (2003, May 5). Schools may soft-sell problem teachers. The Dallas Morning News.

Jennings, D. (2003, May 4). Congenial young woman gained people's confidence: Family thought she was a friend but abuse took place for 3 years. The Dallas Morning News.

Jennings, D. & Tharp, R. (2003, May 4, 5, 6). Betrayal of trust. The Dallas Morning News.

Jenny, C., Roesler, T. A., & Poyer, K. L. (1994). Are children at risk for sexual abuse by homosexuals? Pediatrics, 94(1), 41-44.

Jewett, C. (2002, July 19). Former band teacher given six-month term: Sentence follows guilty plea in sex case. Washington Post. p. LZ03.

Johnson, G. (2002, May 20). School district, police cleared in Fualaau case. Seattle Post-Intelligencer. Available. http://seattlepi.nwsource.com/printer2/index.asp?ploc=b

Johnston, E. (2000, March 19). Sixth-graders admit hoax. Washington Post. p. C2.

Johnston, L.D., O'Malley, P.M., & Bachman, J.G. (2003). The Monitoring the Future national survey results on adolescent drug use: Overview of key findings, 2002. NIH Publications No. 03-5374. National Institute on Drug Abuse. Bethesda, MD.

Jones, L.M., Finkelhor, D. & Kopiec, K. (2001, September). Why is sexual abuse declining? A survey of state child protection administrators. Child Abuse and Neglect. 25 (9), 1139-1158.

Jones, M.G., & Wheatley, J. (1989). Gender influences in classroom displays and student-teacher behaviors. Science Education, 73 (5), 535-545.

Jones, T. (2003, May). The predator in the classroom: Why you can't rely on background checks – and how to protect your kids. Good Housekeeping. New York, NY.

Jordan, K., (2001). Monitoring Our Own: Suggested Additions to the IAMFC Code. The Family Journal, 9 (1), pp. 52-54.

Judge denies plea-bargain for teacher. (2003, March 15). Parsippany Daily Record (NJ). http://www.dailyrecord.com/news/03/03/15/news9-Steve.htm

Judge faults inequalities of sex law. (2003, June 21). The Arizona Republic.

Judge in case of child abuse dismisses some of the charges. (1988, October 13). The New York Times, p. 21.

Judge rejects teacher's libel and slander lawsuit. (2002, July 25). Union-Tribune. http://www. Signonsandiego.com/news/northcountry/20020725-999_1mc25 teacher.html.

Judge scolds, jails teacher in sex case.  (2003, July 12).  Cincinnati Enquirer.

Judge who gave probation in teacher sex case faces conduct panel.  (2002, June 6).  Asbury Park Press.  www.app.com/app2001/story/0,21133,576755,00.html

Judgment reversed and case remanded with directions:  The people of the State of Colorado v. William Vinson.  (2002, January 17).  Opinion by Judge Metzger, Ney and Taubman, JJ, concur.  Colorado Court of Appeals, Division I.

Juliano, A. & Schwab, S.J. (2001).  The sweep of sexual harassment cases.  Cornell Law Review. 86, 548. Retrieved September 27, 2001 from Lexis-Nexis Academic Universe database.

Jurors mark 2 years on California abuse case. (1989, April 23). The New York Times, p. 31.

Jury could not decide if sexual abuse of student was 'welcome.'  (1998, March).  Maintaining Safe Schools - School Violence Alert, 4(3), pp.10-11.

Jury finds guilt on sex charges. (1985, November 24). The Daily Star, p. 3.

Jury gives $108,000 to abuse student.  (2003, July 3).  Des Moines Register.

Justices let stand ruling absolving school in abuse case.  (1993, July 5).  Education U.S.A., p. 7.

Justices send board liability case back to lower court.  (1989, March 27).  Nation's Schools Report, pp. 7-8.

Juvenile Victimization Questionnaire (JVQ).  Crimes Against Children Research Center. University of New Hampshire. Durham, NH

Kachur, S.P., Stennies, G., Powell, K., et al. (1996).  School-associated violent death in the United States, 1992 to 1994.  JAMA (Journal of the American Medical Association). 275 (22), pp. 1729-1733.

Kalogerakis, G. (2002, August 3). Teacher acquitted, judge upbraided in sex-assault case.  Montreal Gazette.

Karp, H.  (2001). Who's going to school with your kids? People with criminal records are getting jobs in our schools and no one's the wiser. America's Most Wanted Newsbeat.  Reprinted with permission from Readers' Digest.

Karp, H. (2000, March). Who's Going to School With Your Kids?  Reader's Digest, pp. 76-82.

Katz, D. M.  (1994, October 30).  School districts formulating policies on sexual harassment.  The New York Times, pp. 1, 6-7.

Kauwell, J.  (1993, November 14). The Grand Rapids Press, p. B2.

Keeshan, C. (2001, March 1). Former teacher/coach pleads guilty to molesting student. Chicago Daily Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Keeshan, C. (2001, February 26). Teacher faces student-sex charge. Chicago Daily Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Keller, R. A., Cicchinelli, L. F., & Gardner, D. M. (1989). Characteristics of child sexual abuse treatment programs. Child Abuse & Neglect, 13, 361-368.

Kempe, C. H. (1989). Publications catalog. Denver, CO: C. Henry Kempe National Center for the Prevention and Treatment of Child Abuse and Neglect.

Kendall-Tackett, K. A., Williams, L. M., & Finkelhor, D.  (1993). Impact of sexual abuse on children:  A review and synthesis of recent empirical studies.  Psychological Bulletin, 113 (1), 164-180.

Kerrison, R.  (1993, September 1).  Perverts teach our children:  May-boy love scandal to rock city schools.  New York Post, pp. 7, 12.

Kershaw, S. & Morrison, D. (1997, October 22). Official: No Sodomy Took Place. Newsday, p. 38.

Kessler, G. (1993, November 28). Memories of abuse: Courts, therapists struggle as thousands of new cases emerge. Newsday, p. 54.

Kidwell, D., Grotto, J., & Figueras, T. (2002, September 8). State child-welfare payroll includes employees who have criminal pasts. The Miami Herald. Retrieved September 16, 2002 from www.miamiherald.com

Kilpatrick, D.G. & Saunders, B.E. (1995). Prevalence and consequences of child victimization: Results from the National Survey of Adolescents. Final Report to the U.S. Department of Justice. National Crime Victims Research and Treatment Center, Department of Psychiatry and Behavioral Sciences, Medical University of South Carolina. Charleston,SC.

Kim, A. L. (2001, February 2). Retracing steps on teacher hiring: Accusations slipped through the cracks. Newsday. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database. Also retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/correnti_hiring.html

Kim, R., & Willen, L. (1994, April 14) Facing memories of abuse: While taping, man confronts teacher he says fondled him. Newsday, p. A8.

Kindred, K.P. (1999). When equal opportunity meets freedom of expression: Student-on-student sexual harassment and the first amendment in school. North Dakota Law Review. 75, 205. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Kiss leads to a policy revision. (1996, October 9). The New York Times. p. B9.

Kitavi, M.W. & Van der Westhuizan, P.C. (1997). Problems facing beginning school principals in developing countries: A study of beginning principals in Kenya. International Journal of Educational Development. (17 (3), 251-263.

Kleinknecht, W. (1996, March 7). Teacher is charged with molesting children. The Star-Ledger, p. 36.

Knight, E.D., Runyan, D.K., Dubowitz, H., Brandford, C., Kotch, J., Litrownik, A., & Hunter, W. (2000, July). Methodological and ethical challenges associated with child self-report of maltreatment. Journal of Interpersonal Violence. Vol. 15, No. 7, pp. 760-775.

Kochenderfer, B.J. & Ladd, G.W. (1996). Peer victimization: Cause or consequence of school maladjustment? Child Development. 67, pp. 1305-1317.

Komarnitsky, S.J. (2001, August 22). School district hit with sex abuse lawsuit. Anchorage Daily News. P. B1.

Komarnitsky, S.J. (2001, July 25). Ex-Colony teacher makes plea deal: Man charged with having sex with 17-year old. Anchorage Daily News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Komarnitsky, S.J. (2001, April 7). Colony teacher charged with sex abuse: relationship with 17-year old yields six felonies, one misdemeanor. Anchorage Daily News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Komarnitsky, S.J. (2001, February 9). Teacher pursued boy, troopers say: Relationship was more intimate than initially believed, court documents say. Anchorage Daily News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Koss, M.P. & Dinero, T. E. (1989). Discriminant analysis of risk factors for sexual victimization among a national sample of college women. Journal of Consulting

and Clinical Psychology, 57 (2), 242-250.

Koss, M.P. & Oros, C.J. (1982). Sexual experiences survey: A research instrument investigating sexual aggression and victimization. Journal of Consulting and Clinical Psychology. 50 (3), 455-457.

Kovner, J. & Stannard, C. (2003, January 11). Teachers accused, but they stayed on. Sexual abuse allegations did not derail 2 careers. Hartford Courant.

Kramer, M. (1989, April 5). Teacher cons return to classrooms. Daily News, pp. 3, 27.

L.A. student wins lawsuit. (1996, October 2). Education Week. p.4.

L.I. child molester gets 20 to 60 years. (1991, May 8). Daily News, p. 16.

L.I. teacher charged with rape of student. (1993, June 24). New York Post, p. 16.

Labi, N. (2001, April 2). "Let Bullies Beware." Time, p. 46.

Laboy, J. (1995, June 24). Teacher charged with lewdness. Newsday, p. A18.

Lambiet, J. (1995, February 17). Accused, he kept his teaching job. Daily News, p. 32.

Lambiet, J. (1993, October 5). Girl's diary of abuse nails school worker. Daily News, pp. 7, 10.

Lander Smith, E. (1994, May 19). Teacher guilty in student sex case. Newsday, p. A5.

Lander Smith, E. (1994, May 17). Sachem teacher's sex case going to the jury. Newsday, p. A22.

Lander Smith, E. (1994, May 6). Teen to testify at teacher's sex trial. Newsday, p. A25.

Landsberg, M. (1990, January 21). McMartin landmark abuse case. Daily News, p. 40.

Language teacher held on sexual abuse charge. (2002, February 16). The Times Union. p.B4.

Larson, N. & Maison, S.R. (1987). Psychosexual Treatment Program for Women Sex Offenders in a Prison Setting. Training Manual. St. Paul, MN: Meta Resources.

LaRue, A.H. (1996, August). Summary of state teacher tenure laws, from: The changing face of teacher tenure. Report presented to the faculty of the Graduate School of the University of Texas at Austin in partial fulfillment of the requirements of the degree of Doctor of Jurisprudence and Masters of Public Affairs.

Lawsuit against Pickens school dismissed. (2003, January 16). Greenville Courier Online (SC). http://greenvilleonline.com/news/2003/01/16/ke011603s350100.htm

Lawsuit filed against Dickenson County School Board. (2003, March 19). Coalfield Press (VA).

Lawton, M. (1996, February 21). District may be held liable for harassment, court rules. Education Week, p. 5.

Lawton, M. (1994, August 3). More students falsely charge teachers with abuse. Education Week, pp. 1, 16.

Lawton, M. (1993). Student group at Mass. High School makes itself heard on issues of concern to women. Education Week.

Lawton, M. (1993, October 27). 3 Sex-abuse scandals leave mark on N.Y. District. Education Week, pp. 1, 14.

Lawton, M. (1993, June 9). Four of five students in grades 8 to 11 sexually harassed at school, poll finds. Education Week, p. 5.

Lawton, M. (1993, March 31). Survey paints 'picture' of school sexual harassment. Education Week, p. 16.

Leary, W. (1988, March 22). Risk of sex abuse in day care seen as lower than at home. The New York Times, p. 20.

Lee, F.R. (1990, January 13). Bronx principal named in cover-up is suspended. New York Times, p. 31.

Lee, F. R. (1990, January 12). Panel sees cover-up of teacher's assault record. The New York Times, pp. Bl, B5.

Lefkowitz, M. (2001, June 5). Arrests in school sex attacks. Newsday, p. A16.

Lenhardt, A., Willert, J. (2002, June). "Involving Stakeholders in Resolving School Violence." NASSP. http://www.nassp.org/news/bltn_invstake0602.htm.

Less of a victim?  (2003, September 22).  Chicago Daily Herald.

Lesser, H.  (1992, November 5).  Teacher under arrest:  Nab suspected molester.  South Shore Record, p. 11.

Levine, S. N. (1989, August 23). JC coach charged with sodomy. Press and Sun Bulletin, pp. 1A, 8A.

Lewin, T. (1998, June 26). 1 in 8 Boys of high - school age has been abused, survey shows. The New York Times, p. A11.

Lewin, T. (1996, October 6). Kissing cases highlight schools' fears of liability for sexual harassment. The New York Times, p.22.

Lewin, T.  (1994. July 15).  Students seeking damages for sex bias: School officials around nation view lawsuits with trepidation.  The New York Times, p. B7.

Lewis, K. (2000). The evolution theory and peer sexual harassment: Suggestions for schools in light of the Davis v. Monroe decision.  University of Missouri at Kansas City Law Review.  68, 745.  Retrieved September 26, 2001 from Lexis-Nexis Academic Universe database.

Lhotka, W. (2002, May 24). Islamic teacher sentenced to 45 years in prison for sexual assault. STL Today, http://stltoday.com/stltoday/news/stories.nsf/News/C9DE871851F23DA686256BC3007.html.

Liability: Public school student may sue officials for sexual molestation by teacher, Superintendent and principal had affirmative duty to protect.  (1993).  The Guardian, pp. 5-6.

Lima, P. (2002, July 24). Prosecutor seeks jail term in teacher-pupil sex case. North Jersey News, http://www.bergen.com/page.php?level_3_id=7&page=4393214.

Lima, P. (2002, July 20). Teacher-teen sex case judge reassigned. North Jersey News. http://www.bergen.com/page.php?level_3_id=7&page=4345883

Lima, P. (2002, June 16). Mother, step-dad say boy hurt by teacher tryst. North Jersey News, http://www.bergen.com/page.php?level_3_id=7&page=3911556.

Linn, E., Stein, N., Young, J., with Davis, S. (1992). Bitter lessons for all: Sexual harassment in schools.  In J. T. Sears (Ed.), Sexuality and the curriculum: The politics and practices of sexuality education (pp. 106-123).  New York: Teachers College Press.

Longitudinal Studies of Child Abuse and Neglect (LONGSCAN), Assessments 0-4. NDACAN Dataset Number 87, User's Guide. (2001, October). National Data Archive on Child Abuse and Neglect. Family Life Development Center. Cornell University.  Ithaca, NY.

Loughran, R.A., & Farfan-Rocco, E.  (1993, February).  An investigation into the failure of personnel at PS 30/31 Manhattan to report suspected child abuse.  City Of New York- The Special Commissioner of Investigation for the New York City School District, 1-12.

Lowe, H. (2001, June 12). No bail for teacher in sex case. Newsday, http://vachss.com/help_text/archive/hiv_teacher_5.html.

Lucas, Kelly. (2002, January 30).  GA tackles child abuse laws. The Indiana Lawyer. p. 1.

Luo, M. (2001, April 0). The Correnti files. Cops: Teacher's computers recorded relations with girls. Newsday. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/correnti_files.html

Luo, M. (2001, April 10).  Cops: Teacher's computers recorded relations with girls. Newsday, http://www.vachss.com/help_text/archive/correnti_files.html.

Luo, M. (2001, April 10). Data sparse on sex abuse by educators. Newsday, A35.

Lynwander, L.  (1992, December 27).  Sex abuse and the mentally retarded.  New York Times, pp. 1, 15.

Maintaining State Schools-School Violence Alert,4(3), pp. 1,8.

Malamuth, N. (1986).  Predictors of naturalistic sexual aggression.  Journal of Personality and Social Psychology, 50 (5), 953-962.

Maltreatment and the Academic and Social Adjustment of School Children. NDACAN Dataset Number 59. User's Guide. (2000, September). National Data Archive on Child Abuse and Neglect. Family Life Development Center, Cornell University. Ithaca, NY.

Man fired from tennis club because of 20-year old accusations. ((2003, October 24). http://www.wfsb.com/Global/story.asp?S=1495054 (WSFB Eyewitness News, Connecticut).

Management of sex offenders by probation and parole agencies in the United States (see English, K.).

Mangan, P.  (1993, December 1).  Cortines plans sex abuse panel.  Daily News, p. 4.

Mangan, P.  (1993, November 23).  Teacher furor over sex memo.  The Daily News, p. 2.

Mangan, P.  (1993, July 20).  School shrink is nabbed in boy sex.  Daily News, p. 5.

Mangan, P.  (1994, June 20).  Poolside Romeo seeks lifeguard job.  Daily News, p. A6.

Mangan, P.  (1994, March 12).  Principal admits to sex abuse.  Daily News, p. 6.

Mangan, P., & Siemaszko, C.  (1995, June 2).  Rudy, Cortines war as scandals erupt. The Daily News, p. 5.

Manning, M.  (Undated).  Teasing or harassment? Courts can't agree. Raising Teens: House Keys. Medill Magazine Publishing, Medill School of Journalism, Northwestern University, Evanston, IL.

Mansell, S., Sobsey, D. & Moskal, R.  (1998, February).  Clinical findings among sexually abused children with and without developmental disabilities.  Mental Retardation. Vol. 36, No. 1, pp. 12-22.

Mansell, S., Sobsey, D. & Wilgosh, L. (1997).  Sexual abuse of children with disabilities: Patterns, prevention, intervention and treatment.  International Journal of Special Education.  Vol. 12, No. 2, pp. 1-11.

Mansell, S., Sobsey, D., Wilgosh, L. & Zawallich, A.  (1997). The sexual abuse of young people with disabilities:  Treatment considerations.  International Journal for the Advancement of Counselling.  Vol. 19, pp. 293-302.

Markon, J. (1996, September 26). Guilty plea to sexual-abuse charge. Newsday, p. A31.

Markon, J.  (1996, February 22).  Ex-Roosevelt coach sues for $1M.  Newsday, p. A25.

Marshall, T. (2001, May 23). Students often fail to recognize sexual harassment by teachers.  South Florida Sun Sentinel. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/students_often.html

Marshall, T. (2001, January 29). Teacher's career marked by disturbing accusations. South Florida Sun Sentinel. Retrieved February 25, 2002 from Circle of Trust

Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/fla_teacher_1.html

Martinez, R. & Martinez, E. (2001, June 6). Boys held in school sex attacks. The New York Post, p. 024.

Marzulli, J. (1989, December 9). Teacher charged: Say he fondled girls aged 9 to 11. Daily News, p. 7.

Mason, B., & Mintz, P. (1995, June 8). School aide arrested in alleged sex abuse. Newsday, p. A24.

Mason, C. (1994, February 5). 'I have not violated any law,' teacher says. Press Democrat.

Mathews, J. (2002, July 23). Protecting innocent teachers with the law. The Washington Post, http://www.washingtonpost.com/wp-dyn/articles/A50196-2002Jul 23.html.

Mawdsley, R. D. (1992, September). A legal memorandum: Sexual misconduct by school employees. National Association of Secondary School Principals, pp. 1-8.

McCarthy, M. (2001). Students as targets and perpetrators of sexual harassment: Title IX and beyond. Hastings Women's Law Journal. 12, 177. Retrieved September 27, 2001 from Lexis-Nexis Academic Universe database.

McClare, G. (1990). The principal's role in child abuse. Education and Urban Society, 22 (3), 307-313.

McEvoy, A. W. (1990). Child abuse law and school policy. Education and Urban Society, 22 (3), 247-257.

McFadden, R. E. (2000, February 25). Eight wrestlers at high school are accused in hazing. The New York Times.  p. B1.

McGrath, M. (1999, November 3). Profile of a pedophile. Pittsburgh Post Gazette, http://www.post-gazette.com/newslinks/19991102profile.asp.

McGrath, M.J. (1994). The psychodynamics of school sexual abuse investigations. Reprinted with permission from The School Administrator magazine. AASA.

McGrath, M.J. (1993, August). Schools' legal exposure grows for student, employee sexual harassment. Educator's Newsletter, 4 (4), 1-2.

McGrath-Kerr, D. (1994, Nov. 1). Ramon pushes fight vs. sex abuse. Daily News, p. 16.

McKinley, J.C. (1993, March 9) Sex activity by children brings suit against home: Woman says her complaints were ignored. The New York Times, p. B3.

McLaughlin, S. (2000, June 6). Sex with student nets prison. Judge rejects defendant's plea for treatment. The Cincinnati Inquirer.

McLaughlin, P. (1991, June 12). Sex charge for janitor. Daily News, p. 25.

McLeod, S. (1993). Peer sexual harassment in elementary schools. Unpublished paper. Hofstra University.

McMenamin, J. (2001, June 29). Charges against teacher dropped; Carroll woman, 22, had been accused of child sexual abuse; 2 misdemeanor counts. The Baltimore Sun, p. 1A.

McMenamin, J. (2001, June 8). Third Carroll teacher arrested on sex charges: Man is accused of molesting 5 boys.  Elementary teacher is accused of sexual contact with 5 pupils. The Baltimore Sun.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

McMenamin, J. (2001, May 22). Carroll schools chief 'disgusted' by Key High sexual abuse case: Police investigation of teacher continues. The Baltimore Sun. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

McMurdo, D. (2001, November 21). Jury again finds Lepley guilty in rape of students. The Pahrump Valley Times, NV.

Medina, R. (1995, November 4). Judge orders bail set for accused child molester. Democrat and Chronicle, Rochester, NY. p. 2B.

Meier, B. (1995, February 27). Sexual predators' finding sentence may last past jail. The New York Times, pp. A1, B8.

Menard, S. & Huizinga, D. (1989, June). Age, period, and cohort size effects on self-reported alcohol, marijuana, and polydrug use: Results from the National Youth Survey. Social Science Research. 18 (2), pp. 174-194.

Mendez, I. (1996, April 20). Students, staff 'shocked' at Lodi teacher's arrest. The Star-Ledger, p. 31.

Mercer, M. (1982). Closing the barn door: The prevention of institutional abuse through standards. Child & Youth Services, 4 (1-2), 127-132.

Meritor Savings Bank v. Vinsom, 106 S. Ct. 2399 (1986).

Messing, P., Sheehy, K. (1997, October 21). Boys, ages 8 & 9, in sex attack on classmate: Cops. New York Post.

[The] Metropolitan Life Survey of the American Teacher, 1999: Violence in America's Public Schools – Five Years Later. A Survey of Students, Teachers and Law Enforcement Officers. Binns, K. and Markow, D., Project Directors. The Metropolitan Life Insurance Company, New York, NY.

Metz, A., Lam, C. (1997, October 23). Popular educator fondled third-grader, cops say. Newsday, p. A3.

MGH psychologists being investigated in priest abuse scandal. (2003, September 6). The Boston Herald.

Michaelis, K.L. Reporting suspected child abuse and neglect: Guidelines for public school employees (Dissertation), 1-86.

Middle school teacher charged with sex abuse. (2001, March 17). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Miller, A. (2003, March 2). How kids charmed sex-rap teacher. The New York Post. Online Edition. www.nypost.com/news/regionalnews/69716.htm

Miller, W. (2002, September 10). Support for plan on sex-offenders. Retrieved online from www.theage.com.au

Miller-Perrin, C. L., & Wurtele, S. K. (1989). Children's conceptions of personal body safety: A comparison across ages. Journal of Clinical Child Psychiatry, 18 (I), pp. 25-35.

Miller-Perrin, C. L., Wurtele, S. K., & Kondrick, P. A. (1990). Sexually abused and nonabused children's conceptions of personal body safety. Child Abuse & Neglect. 14, pp. 99-112.

Millsap, J. (2002, July 17). More counseling offered after coach's arrest. The Herald News Online, http://www.suburbanchiagonews.com/heraldnews/city/j17chcoun.htm.

Milner, J. S., & Ayoub, C. (1980). Evaluation of "at risk" parents using the child abuse potential inventory. Journal of Clinical Psychology, 36 (4), pp. 945-948.

Milner, J. S., & Wimberley, R. C. (1980). Prediction and explanation of child abuse. Journal of Clinical Psychology, 36 (4) pp. 875-884.

Milner, J. S., & Wimberley, R. C. (1979). An inventory for the identification of child abusers. Journal of Clinical Psychology, 35 (1), pp. 95-100.

Milner, J. S., Gold, R. G., Ayoub, C., & Jacewitz, M. M. (1984). Predictive validity of the child abuse potential inventory. Journal of Consulting and Clinical Psychology, 52 (5), 879-884.

Minneapolis teacher charged with sex abuse practiced black magic, complaint syas. (2003, May 2). Minneapolis Star Tribune.

Minnesota Department of Education (1993). Sexual harassment to teenagers: It's not fun; it's illegal. St. Paul, MN: Minnesota Department of Education.

Minnesota follows U.S. ruling that district created offensive atmosphere. (1993, December). Monthly Bulletin, p. 3.

Minnesota: State loses track of more than 2,000 sex offenders. (2003, January 10). The Associated Press. St. Paul Pioneer Press (MN).

Mitchell, C. (1994, November 11). PTA prez out after sex raps: Lag enrages parents. Daily News, p. 6.

Molestation case against ex-Redlands teacher tossed. (2003, July 9). San Bernardino Sun (CA).

Molestation charge dropped, but Panhandle ex-coach still jailed. (2003, July 16). The Associated Press. www.al.com (Alabama news online).

Molester sentenced. (1990, November 15). Daily News, p. 18.

Monahan, S. (1990, February 11). Lawrence teachers get directive on <touching'. The New York Times. P. LI17.

Mondschein, E.S. (1994, March 11). Enacting the vision: Scholars, skills & schools-"Investigating allegations of sexual harassment". (Presentation: Inn at the Century House, Latham, New York), 1-33.

Mondschein, E. S., & Greene, L. L. (1986). Sexual harassment in employment and educational practices. In T. N. Jones & D. P. Semler (Eds.), School Law Update, 47-62. Kansas: National Organization On Legal Problems Of Education.

Monitoring the Future national survey results on drug use, 1975-2002. Volume I: Secondary school students. NIH Publications No. 02-5106. National Institute on Drug Abuse, Bethesda, MD. (See Johnston, L.D. et al.)

Monsky, A., Simmons, J. (1994, April 14). 1970s kid-sex scandal forces school big out. New York Post, p. 21.

Montero, D. (2001, July 31). 5 staffers you don't want near your kids. The New York Post, p. 019.

Montero, D. (2001, July 31). Girls not getting help they need. The New York Post. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/girls_not.html

Montero, D. (2001, July 31). Pervs duck weak rules- Bd. Of Ed puts no teeth into abuse laws: Officials. The New York Post, p. 019.

Montero, D. (2001, July 30). Secret shame of our schools: Sexual abuse of students runs rampant. The New York Post, p. 001.

Montero, D. (2001, July 30). Student Sex Abuse Runs Rampant. The New York Post, http://www.vachss.com/help_text/archive/runs_ranpant.html.

Montero, D. (2001, June 10). Why this zero-tolerance policy makes zero sense. The New York Post, p.012.

Morantz, David. (2002, January 17). Sex offender pleads guilty to molesting boy. The Omaha World-Herald. p. 2B.

More sex abuse charges. (2003, July 30). The Arizona Daily Sun.

Morrison, D., Kershaw, S. (1997, October 22).  Official: No sodomy took place. Newsday, p.38.

Morton, J. (2001, July 19). Ex-teacher in Valley gets year in sex case. Omaha World-Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Mountain Shadows Montessori founder sentenced to 20 years prison. (2001, September 1). The Associated Press State & Local Wire. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Mozzocco, J. (2000, January 28).  Teacher under investigation quits. The News-Herald, http://www.news-herald.com/jrc-html/papers/fullstory_aLK01287098.html.

Murphy, W.J. (2001, July 29). Spare child, spoil abuser – Molest victims should testify. The Boston Herald. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Murray, W.  (1995, June 2).  So now it's hug-free zones?  Newsday, p. A45.

Murvosh, M. (2001, May 10).  Former teacher pleads guilty to sex abuse. The Salt Lake Tribune, p. C3.

Music teacher suspended after student sex charge.  (1996, March 28).  The Star-Ledger, p. 47.

Mydans, S. (1990, January 20). Child abuse: some prosecutions win. The New York Times, p. A2.

Mydans, S. (1990, January 19). For jurors, facts could not be sifted from fantasies. The New York Times, p. A18.

Myers, J. E. B., Epley, B. G., & Nakaue, P. G. (1986). Responding to child abuse: critical issues for educators and their counsel. In T. N. Jones and D. P. Semler (Eds.), School Law Update, (pp. 203-221). Kansas: National Organization on Legal Problems Of Education.

Myers, K.  (1993, November 8).  A student-faculty code on sex adopted after Whittier lawsuit.  The National Law Journal, 4.

Nansel, T. et. al. (2001, April 25). "Bullying Behaviors Among US Youth." JAMA, Vol. 285, No. 16.

National American Indian Adolescent Health Survey, 1991-1992 (see Cummins, J. C.)

National Association of Secondary School Principals. (1994, November).  Sexual harassment in the schools.  A Legal Memorandum. Reston, VA.

National Center for Education Statistics (1993).  America's teachers: Profile of a profession.  Washington, DC: U. S. Department of Education

National Crime Victimization Survey: School Crime Supplement, 1999.  United States Department of Justice, Bureau of Justice Statistics.  Inter-University Consortium for Political and Social Research.  University of Michigan. Ann Arbor, MI.

National Household Education Surveys.  (1999). National Center for Education Statistics. U.S. Department of Education.  Inter-University Consortium for Political and Social Research. University of Michigan. Ann Arbor, MI.

National Incidence Studies (1997).  (See Sedlak, et al.)

National Longitudinal Study of Adolescent Health (1998). Carolina Population Center. University of North Carolina. Chapel Hill, NC.

National Resource Center on Child Abuse and Neglect, Denver, CO   (Provides resources to help agencies and private agencies respond to child abuse and neglect. Funded by the National Center on Child Abuse and Neglect.)

National Survey of Adolescents in the United States. (1995).   (See Kilpatrick, D.G.)

National Violence Against Women Survey. (2000, November). (See Tjaden, P. &

Thoennes, N.)

National Youth Victimization Prevention Programs: A national survey of children's exposure and reactions. (1992-1993).  Family Research Laboratory, New Hampshire University, Durham, NH. (See also Finkelhor, et al. multiple listings.)

Neal, A. (2002, June 19). Predatory teachers get a free pass. *Indianapolis Star*, http://www.starnews.com/article.php?ecolneal19.html.

Nelson, A., & Oliver P. (1998, October). Gender and The Construction of Consent in Child-Adult Sexual Contact: Beyond Gender Neutrality and Male Monopoly. Gender & Society, 12(5), 554-577.

Nelson, M., & Clark, K. (Eds.). (1986). The educator's guide to preventing child sexual abuse. CA: Network Publications.

Nevada Coalition Against Sexual Violence (2003).  State of Nevada, Data Collection-Educator Sexual Abuse 1994-2003.

New approach to interviewing children: A test of its effectiveness (1992, May). National Institute of Justice: Research in Brief. U. S. Department of Justice.

New tool to fight violence in schools ignores gay harassment, critics charge.  (2002, February 12).  St. Louis Post-Dispatch.  p. B2

New York State School Safety Group 491, in cooperation with A.W. Lawrence and Co., Inc., Group Manager.  Staying Out of Trouble: Protecting Students and Protecting the Rights of Employees (Sexual Abuse and Sexual Harassment), pp. 1-50, Appendix B, 1-8, Appendix C.

Newberger, J.  (1999). 'Kids will be kids' is no excuse. www.connectforkids.org

Newton, D. E. (1978). Homosexual behavior and child molestation: A review of the evidence. Adolescence, 13 (49), 29-43.

1980s molestation charges against diving coach dropped.  (2003, July 15).  San Jose Mercury News  (CA).

Nolin, M.J., Davies, E., & Chandler, K.  (1995, October).  Student victimization at school (pp. 1-8).  National Center for Education Statistics. U. S. Department of Education. Washington, D.C.

Northern governments face lawsuits over sex crimes against students.  (2003, October 17).  CBC (Canadian Broadcasting Corporation).

Noted coach's relationships with players questioned.  (2003, December 6).  The Oregonian.

Nuckols, B.  (2001, May 24). Second Carroll County teacher accused of having sex with students.  *The Associated Press*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Numbers don't tell whole story of sexual misconduct by teachers.  (2003, March 23).  The Arizona Republic.

Oakville High teacher is accused of having sex with students.  (2003, March 23).  St. Louis Post-Dispatch.

O'Connor, D.  (1993, July 3).  No criminal charges filed against teacher: Former Rosemount band instructor faces civil suit over sexual conduct.  Saint Paul Pioneer Press, p. 1D.

OCR says school mishandled first-grader's sexual harassment.  (1993, May 10).  Education U.S.A., p. 7.

Offending doctors now listed online.  (2003, July 30).  WV Gazette (West Virginia).

O'Hagan, M. (February 23, 2004).  Teacher conduct proposal may get diluted.  The Seattle Times.



O'Hagan, M. & Willmsen, C. (2003, December). Unregulated world of private coaching ripe for exploitation.  The Seattle Times.

O'Hagan, M. & Willmsen, C. (2001, December 14).Coaches continue working for schools and private team after being caught for sexual misconduct.  The Seattle Times.

Oliver, R. (2001, June 12). Pornography charges filed against teacher: Investigators allege computer at school had children's photos.  Las Vegas Review-Journal. Available online:

Olmeda, R.A.  (1993, September 24).  I learned physics from man-boy lover.  New York Daily News, p. 41.

Olson, L.  (1984, October 24).  Florida chief seeks data on revocation of teacher licenses.  Education Week, pp. 1, 16.

Olson, M.D. & Lawler, G. (2003, July) Guilty Until Proven Innocent: Teachers and Accusations of Abuse. New Forum Press.  Stillwater, Oklahoma.

Olympic coach jailed for sex assaults.  (2002, September 17).  BBC News.  Available. http://news.bbc.co.uk/1/hi/england/2264580.stm

Onley, D.S.  (1996, April 18).  Principal suspended amid teen sex assault charges.  The Star-Ledger, p. 38.

Ontario College of Teachers Report (2001). (See 'Brief to Standing Committee on Justice and Social Policy.)

Orange-Ulster Board of Cooperative Educational Services policy on procedures on sexual abuse involving school personnel.  (1988, December 1). 1-4.

Ortega, R. (2002, February 12).  4 at troubled school busted in sex attack. New York Daily News, L.P. p.14.

Osburn, D. (2001, December 4). Play by same rules.  USA Today. p. A12.

O'Shaughnessy, P.  (1992, June 13).  Teacher charged with abuse.  Daily News, p. 6.

O'Shaughnessy, P. (1989, June 27).  Teacher held in sex abuse.  Daily News, p. 4.

O'Shaughnessy, P. (1989, April 6). Teacher charged in child sex abuse. Daily News, p. 29.

O'Shaughnessy, P. (1989, January 28). Teacher nabbed: Charged with fondling 2. Daily News, p. 2.

Othón, N.L. (2001, April 16). Arrest of authority figures presents confusing situation for children. South Florida Sun-Sentinel.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/arrest_authority.html

Out of bounds: Sexual abuse by coaches violation of athletes, their trust.  (2003, June 18).  Press release for Shoop report).  http://www.ascribe.org (See Shoop, R.J.)

Ove, T. (2002, July 25). Coach denied assaults in taped statement. Pittsburgh Post-Gazette.  http://www.post-gazette.com/localnews/20020725hayward3.asp

Ove, T. (2002, July 24). Cheerleader says coach 'terrified' her.  Pittsburgh Post-Gazette, http://post-gazette.com/localnews/20020724hayward3.asp

Paedophile cleared to guard schools.  (2003, August 3). http://news.ninemsn.com.au

Pallasch, A.M. (2001, March 28). Cicero schools face abuse suit: Dad says girl sent home with pedophile. Chicago Sun-Times, p. 22.

Paludi, M.A. (1999). The psychology of sexual victimization: A handbook. Greenwood/Praeger. Westport, CT.

Paquette, C. (1987, September 17).  Teacher resigns on eve of hearing.  Messenger, Smithtown, Long Island, p. 4.

Parascandola, R. (2001, May 11).  High school student charged in 3 cases of sexual abuse. Newsday, p. A58.

Parascandola, R. (2001, March 15). Girls allege sex abuse at schools. Newsday, p. A08.

Parenting among women sexually abused in childhood (1998). National Data Archives on Child Abuse and Neglect. Family Life Development Center, College of Human Ecology.  Cornell University. Ithaca, NY.

Parents can protect kids from pedophiles.  (2003, March 16).  South Bend Tribune (IN).  http://www.southbendtribune.com/stories/2003/03/16/local.20030316-sbt-FULL-A1-Parents_can_protect.sto

Parents say school didn't do enough to protect kids from alleged molested.  (2003, April 4).  KTUL (Tulsa, Oklahoma).  http://ktul.com/showstory.hrb?f=n&s=81776&f1=loc

Paterson [NJ] teacher fired for making sexual comments about female students.  (2001, September 14).  The Associated Press State & Local Wire.  Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Park, J. (April 30, 2003).  State policies on sexual misconduct between educators and students. Education Week.

Paul, K.  (1993, July 1).  Teacher fights sex-abuse verdict.  Newsday, p. 30.

Pechman, L.  (1993, March/April).  Emerging issues in hostile work environment sexual harassment.  New York State Bar Journal, 38-41.

Perceptions and experiences of victimization in Alberta: Findings from a survey of Alberta adults, 2000-2001.  (2002, March).  Canadian Research Institute for Law and the Family.  Calgary, Alberta, Canada.

Perez, A.J. (2002, November 22). Source: Otis among Dons' candidates. Prep basketball: Ex-coach part of group being considered for job. Long Beach Press-Telegram. Sports section.

Perez-Pena, R. (1997, October 17). School system can be held liable in rape of girl on field trip, court appeal says. The New York Times, p. B4.

Perlman, S. E.  (1991, September 25).  Teacher pleads guilty to endangering child. Newsday, p. 32.

Perlman, S. E.  (1991, August 23).  Teacher charged with abuse.  Newsday, p. 30.

Perlman, S. E.  (1991, May 8).  Izzo sentenced to 20-60 years:  Crowded courtroom bursts into applause.  Newsday, pp. 22, 24.

Perlman, S. E. (1991, March 5).  Man sentenced in sex abuse case.  Newsday, p. 27.

Perlman, S. E. (1991, February 28).  Izzo guilty on all sex counts.  Newsday, p. 8.

Perlman, S. E. (1991, February 22).  Izzo testifies, denies charges of sex abuse. Newsday, p. 7.

Perlman, S. E. (1991, February 21).  Sobs from boy's mom at Izzo trial.  Newsday, p. 29.

Perlman, S. E. (1991, February 14).  Boy describes sex abuse.  Newsday, pp. 22, 26.

Perlman, S. E., & Mintz, P. (1991, February 20). Grueling testimony: Boy in sex-abuse case grilled on statements.  Newsday, p. 7.

Peluso, E. & Putnam, N. (1996).  Case Study: Sexual Abuse of Boys by Females. Journal of the American Academy of Child and Adolescent Psychiatry, 35(1): pp. 51-54.

Perrotta, Tom. (2001, November 2).  Panel rules against insurer on school's policy.  New York Law Journal. p. 1.

Peters, J., & Marcano, T. (1989, February 4). Sex charges hit teacher.  New York Daily News, p. 2.

Peters, S. D. (1988). Child sexual abuse and later psychological problems.  In G. Wyatt & G. Powell (Eds.), Lasting effects of child sexual abuse. Newbury Park, CA: Sage

Publications, Inc.

Petersen, K., & Petersen, S. (1993). Creating safe and caring elementary schools. School Safety Update, pp. 11-15.

Petersilia, J. (2000, Winter). Invisible victims: Violence against persons with developmental disabilities. Human Rights. 27 (1), 9-13.

Pettis, K. W., & Hughes, R. D. (1985). Sexual victimization of children: Implications for educators. Behavioral Disorders, 10 (3), 175-182.

Peyser, A. (1995, May 11). Teen and her teacher: Administrators knew--but did nothing. New York Post, pp. 5, 20.

Phillips, K. (1991, April 16). Sex-abuse teacher to get probation: DA to protest at sentencing. New York Post, p. 13.

Phyfe-Perkins, E. (1988, March). Child sexual abuse: Guidelines for protection and prevention in child care settings. Paper presented at the Annual Conference of the National Coalition for Campus Child Care, Inc., Pacific Grove, CA.

Phyfe-Perkins, E., & Birtwell, N. (1989, November). Comprehensive child abuse prevention: Working with staff, parents, and children, 1-14.

Plank, D. (1993, July 9). Held in sex abuse. New York Newsday, p. 23.

Plaut, S.M. (1993). Boundary issues in teacher-student relationships. The Journal of Sex and Marital Therapy. 19, 210-219. Available from website of AdvocateWeb. http://www.advocateweb.org/hope/teachms.asp

Poftak, A. (2001, February) Expert advice: Dr. Kimberly Weiner, virtual peacemaker. Technology & Learning. Section: Q&A, p22.

Police: Teacher had sex with student. (2003, May 30). Peoria Journal Star.

Polner, R. (1990, January 20). Fernandez orders third principal ousted. New York Post, p. 4.

Polner, R. (1990, January 12). Principal's in hot water over convicted child molester. New York Post, pp. 4, 18.

Polner, R. (1990, January 12). School panel 'rips' teacher screening. New York Post, pp. 4, 18.

Polner, R. (1989, November 30). Child-sex convict got job as city gym teacher. New York Post, p. 23.

Porter, C. (2002, June 19). Former coach seeks pardon. New Britain Herald, http://www.zwire.com/site/news.cfm?newsid+448868&BRD=1641&PAG=461&dep t_id=10110&rfi=6.

Portner, J. (1995, June 14). Fla. report documents sexual misconduct of teachers. Education Week, p. 8.

Portner, J. (1992, October 28). 1 in 14 youths tried suicide in one-year period, study finds. Education Week, p. 8.

Posorske, Alex. (2001, August 27). Hazelwood schools join system that traces arrests; databases will flag accused employees. St. Louis Post-Dispatch. p. 3.

Powell, G. J. (1988). Child sexual abuse research: The implications for clinical practice. In G. E. Wyatt and G. J. Powell (Eds.), Lasting effects of child sexual abuse (pp. 271-283). Newbury Park, CA: Sage Publications, Inc.

Predators in the D.C. public schools. (2003, June 6). The Washington Post.

Principal caught in Las Vegas with missing girl. (2001, May 8). Reuters. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/baptist_princ2.html

Principal charged with sexual abuse, abduction of minor. (2001, May 4). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Private school child abuse reports up 33%. (2003, January 3). Sydney Morning Herald. (Australia). http://www.smh.com.au/artciles/2003/01/02/1041196739903.html

Protecting our students: Executive summary and recommendations. (2000). *Ministry of the Attorney General of Ontario, Canada*. Available.

Professional advisory. on professional misconduct related to sexual abuse and sexual misconduct. (2002, October 8). Ontario College of Teachers. Toronto.

Proposals seek closer scrutiny of youth coaches. (2004, January 12). *The Associated Press*. The Olympian, Olympia, WA.

Protecting our students: Executive summary and recommendations. (2000). Ministry of the Attorney General of Ontario, Canada. (See Robins, S.L.). Available. http://www.attorneygeneral.jus.gov.on.ca/html/robins/robinsrvw.htm

Province passes student sex abuse bill. (2002, June 13). Ottawa Citizen, http://www.canada.com/ottawa/story.asp?id+{F0EA2360-DB61-4F5F-8C7E-9CBD8A871.

Pryor, D. W. (1996). Unspeakable Acts: Why Men Sexually Abuse Children. New York University Press. New York, NY.

PS 136 safety aide is charged in rape. (1994, June 29). Daily News, p. 24.

Psychiatrist in sex case to get new trial. (2003, July 15). Milwaukee Journal Sentinel.

Psychology board hears testimony on ex-prof. (2003, November 24). Terre Haute Tribune Star (IN). http://www.tribstar.com/articles/2003/11/24/news/news06.txt

Public Citizen's press releases about questionable doctors in various states. (2003, July 29). http://www.citizen.org/pressroom

Public school sex abuse: A report card. (1984, November 10). Transcripts from Cable News Network (CNN) Special Assignment Unit. Reporter: Larry Woods. Producer: Sandee Myers.

Public school sexual assault probe expands. (2001, May 5). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Puit, G. (2002, August 9). Former teacher admits having sex with student. Las Vegas Review Journal, http://www.lvrj.com/lvrj_home/2002/Aug-09-Fri-2002/news/19376772.html.

Q & A...on sex abuse and corruption investigations. (1994, January). A United Federation of Teachers Status Report. 22, 1-3.

Questions and answers about memories of childhood abuse (1995, August). American Psychological Association, Washington, DC.

Quintanilla, B. (1998, July 22). Track coach faces molestation charges. Newsday, p. A29.

Quittner, J. (1988, May 17). Teacher acquitted of sex-abuse charge. Newsday, p. 23.

Rabbi pleads guilty to sex crimes involving three male students. (2002, February 4). City News Service. Los Angeles.

Rae, L.,& Feld, J. (1999, January 5). Incident revives call for end of ban on fingerprinting of prospective teachers. The Journal News, Gannett-Suburban Newspapers, p. 1A.

Ragland, J. (2003, February 23). Abusive teacher is back in custody. Los Angeles Times. p. B8.

125

Raftery, T., and Weir, R. (2001, June 2). Boys charged in girl attack. New York Daily News, p. 7.

Rashbaum, W.K. (2003, January 28). A closer eye on the worst sex offenders. The New York Times. Metro Section.

Rashbaum, W.K. (2001, June 9). Sexual abuse charge leads to Bronx Dean's dismissal. The New York Times, p. B6.

Ratcliffe, H. (2001, June 27). Roxana High teacher is charged with sexual abuse of student; David Ellis has taught in district for more than 30 Years, official says. St. Louis Post-Dispatch. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Ratcliffe, H. (2001, March 28). Teacher accused of assaulting teen invited him to move in authorities say; he faces charges on both sides of Mississippi. St. Louis Post-Dispatch. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Reavy, P. (2001, March 3). Teacher arrest highlights flaw. The Deseret News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Reddy, B. (2002, June 13). Gym coach accused of sex with 12-year-old student. News-Press.com, http://www.news-press.com/news/today/p_020613charged.html.

Reinhold, R. (1990, January 19). 2 acquitted of child molestation in nation's longest criminal trial. The New York Times, pp. Al, A18.

Reisman, P. (1999, January 17). Yes, Virginia, killers and sex offenders also want to teach. Gannett Suburban Newspapers, NY.

Reisman, P. (1999, January 14). Sometimes, we let evil into our homes unknowingly. Gannett Suburban Newspapers, NY.

Religious order that owns Nashua school sued (2003, February 19). The Associated Press. http://www.stamfordadvocate.com/news/local/state/hc-12200143.apds.m0519.bc-ct--churfeb12,0,2213170.story?coll=hc-headlines-local-wire

Renewed pressure on swim coach to resign. (2003, February 11). The Age (Australia). http://www.theage.com.au/articles/2003/02/11/1044927579547.html

Reply to the report of special counsel to the Anne Arundel County Board of Education and to The report of MSDE special investigation team. Maryland.

Report of special counsel to the Anne Arundel County Board of Education: Phase I regarding C. Berry Carter, II (1993, October 4). pp. 1-27, Maryland.

Report on sexual misconduct by the Ad Hoc Committee on Sexual Misconduct. (1997, April 24). Brown University, Office of the Provost. Available. http://www.brown.edu/Administration/Provost/blumstein_report.html

Report: Civil Service Law, Section 75, Subdivision 2, Chpt. (1987). pp. 1-2.

Report: Fieldston School: Student policy on sexual harassment, pp. 1-3.

Report: School district policy and procedures on sexual abuse involving school personnel. (1988). pp. 1-4.

Reported child-abuse cases continue to rise, report says. (1993, April 14). Education Week, p. 2.

Reporter: Larry Woods, Producer: Sandee Myers. (1984, November 10). Transcripts from Cable News Network Special Assignment Unit. Public School Sex Abuse: A Report Card.

Residential school had duty to protect, but was not on notice. (1994, November 3). Individuals with Disabilities Education Law Report. 21 (8).

Reveles Acosta, G. (2002, May 20). Schools try to improve checks on teachers. El Paso Times. Available. www.borderlandnews.com/stories/borderland/20020520-117142.shtml

Reyes, S. (1993, March 4). Fernandez moves vs. principal. Daily News, p. 17.

Reyes, S. (1993, February 25). Joe wants answer in child rape. Daily News, p. 25.

Richards, K.N. (1992). Tender mercies: Inside the world of a child abuse investigator. Chicago, IL: Noble Press.

Richters, J.E., & Martinez, P. (1993). The NIMH Community Violence Project: I. Children as victims of and witnesses to violence. Psychiatry: Interpersonal & Biological Processes. 56, 7-21.

Richters, J.E. & Saltman, W. (1990). Survey of exposure to community violence: Parent Report version. National Institute of Mental Health. Rockville, MD.

Richters, J.E., Martinez, P., and Valla, J.P. (1990). Levonn: A cartoon-based structured interview for assessing young children's distress symptoms (Things I have seen and heard). National Institute of Mental Health. Rockville, MD.

Rieser, C. (1987, July 2). Jury finds teacher innocent. Putnam Trader, p. 1.

Rieser, M. (1991, December). Recantation in child sexual abuse cases. Child Welfare, 70 (8), 611-621.

Robb, J. (2002, May 20). Teacher is a local matter, Curtiss says. Omaha World Herald, http://www.omaha.com/story_printer.php?u_sid=398290&u=brow=Internet+Explorer&u_ver.html

Robbins, D. (2001, April 22). Out of bounds: Sexual misconduct by educators in Texas. Chronicle investigation reveals relationship of coaches and students rife with abuse. Houston Chronicle.com Available online: http://www.chron.com/cs/CDA/printstory.hts/special/coaches/884307

Robbins, D. (2001, April 22). We trust our kids to them every day. But a Chronicle investigation reveals the relationship between secondary school coaches and students is rife with abuse. Out of bounds. The Houston Chronicle. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Robertson, K. R. & Milner, J. S. (1983). Construct validity of the child abuse potential inventory. Journal of Clinical Psychology, 39 (3), 426-429.

Robin, M. (1992). The trauma of false allegations of sexual abuse. In E.C. Viano (ed.) Critical issues in victimology: International perspectives. pp. 140-148. Springer Verlag. NY

Robins, S.L. (1998). Protecting our students: A review to identify and prevent sexual misconduct in Ontario schools. Ontario Ministry of the Attorney General, Toronto.

Robinson, L.K. (1986). Sexual contacts between teachers and students: A study of the knowledge and the perceptions of public school teachers in British Columbia, 1985-1986. Dissertation. Brigham Young University, UT.

Rodriguez, Y. (1992, December 23). Herricks teacher fired. Newsday, p. 28.

Rohde, M. (2002, May 19). Critics say program for abuse victims is flawed. Journal Sentinel Staff, http://www.jsonline.com/news/metro/may02/44685.asp.

Roland, C.B., (2002). Counseling Adult Survivors of Childhood Sexual Abuse. In Burlew, L. & Capuzzi, D. (2002) Sexuality Counseling. New York: Nova Science Press.

Rose, M. D. (1990, February 13). Why weren't we told? Parents: School acted slowly in abuse case. Newsday, p. 19.

Rosenberg, H. (2002, August 9). Innocent Until Named? Los Angeles Times.

Roskelley, L. (2003, February 14). Ogden Board won't respond to queries. Supporters of

woman who claims she was raped present questions. <u>Standard Examiner</u>. Ogden, UT.

Ross, V.J. & Marlowe, J. (1985). <u>The forbidden apple: Sex in the schools.</u> ETC Publications. Palm Springs, CA.

Rothenberg, J. (1995, May 19). Teacher pulled from class as schools probe sexy lectures. <u>New York Post</u>, p. 19.

Rothman, R. (1990, February 23). Survey reveals wide latitude in reporting abuse. <u>Education Week</u>, pp. 1, 28.

Rowinsky v. Bryan Independent School District (1996).

Rubin, S. (1988, August). <u>Sex education - Teachers who sexually abuse students</u>. Paper presented at XXIV International Congress of Psychology, Sydney, Australia, 1-20.

Runyan, D.K. (2000, July). The ethical, legal and methodological implications of directly asking children about abuse. Introduction to the Special Issue: The Sexual Experiences Survey: Interpretation and validity. <u>Journal of Interpersonal Violence</u>. Vol. 15, No. 7.

Russell, D. E. H. (1983). The incidence and prevalence of intrafamilial and extrafamilial sexual abuse of female children. <u>Child Abuse & Neglect</u>, <u>7</u>, 133-146.

Rutter, P. (1989). <u>Sex in the forbidden zone: When men in power - therapists, doctors, clergy, teachers, and others - betray women's trust.</u> Los Angeles: Jeremy P. Tarcher, Inc.

Sadowski, M. (2001, September-October ). "Sexual Minority Students Benefit form School-Based Support—Where It Exists." <u>Harvard Education Letter</u>. <u>http://www.edletter.org/current</u>.

Sahagun, D. (2002, September 6). Teacher sex cases prompt call for probe. <u>Las Vegas Sun</u>. <u>www.lasvegassun.com</u>

St. Joseph teacher, coach arrested. (2003. August 3). <u>Lompoc Record</u> (CA).

Salcedo, M. (1995, February 22). Teacher in rape case popular at school. <u>Newsday</u>, p. A20.

Salcedo, M. (1995, February 21). Teacher held in student's rape. <u>Newsday</u>, p. A19.

Salcedo, M. (1993, April 9). Agency is sued in sex-abuse case. <u>Newsday</u>, pp. 6, 33.

Salcedo, M. (1993, February 16). Boys' home aide accused in sex case. <u>Newsday</u>, pp. 4, 19.

Salter, A. C. (1988). <u>Treating child sex offenders and victims: A practical guide</u>. Newbury Park, CA: Sage Publications, Inc.

Salter, A. C. (1988). Occurrence of child sexual abuse: Prevalence and responsibility. In A. C. Salter, <u>Treating child sex offenders and victims: A practical guide</u>, 16-24. Newbury Park, CA: Sage Publications, Inc.

Sandler, B. R. (1990). An ecological perspective to understanding sexual harassment. In M. A. Paludi (Ed.), <u>Ivory power: Sexual harassment on campus</u> (pp. xvi, xvii). Albany, NY: State University of New York Press.

Sandler, B. R., & Paludi, M. A. (1993). <u>Educator's guide to controlling sexual harassment</u>. Thomson Publishing Group. Washington, DC.

Sandler, B. R. & Shoop, R.J. (1996). <u>Sexual harassment on campus: A guide for administrators, faculty and students</u>. Allyn & Bacon, Boston, MA.

Sandler, B., Silverberg, L., & Hall, R. (1996). <u>The chilly classroom climate: A guide to improve the education of women</u>. Washington DC: National Association for Women in Education.

Santangelo, M., & Gentile, D. (1990, March 8). Parents charge abuse: They say their kids molested. Daily News, p. 2.

Schemo, D. J. (2002, June 18). Silently shifting teachers in sex abuse cases. The New York Times.

Schoener, G.R. (1992, October). Sexual exploitation: Historical overview. Presented at the Second International Conference on Sexual Exploitation by Professionals. Minneapolis, MN. Edited, rewritten and published in Breach of Trust (1994). Gonsiorek, J.C. (Ed.). Sage Press. Thousand Oaks, CA.

School-Associated Violence Deaths study (see Anderson, M. et al [2001]; also, Kachur, S.P. [1996]).

School aide accused of molesting 9 kids. (2001, June 1). The Record (Bergen County, NJ). Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Schools and Staffing Survey 1999-2000: Overview of the Data for Public, Private, Public Charter, and Bureau of Indian Affairs Elementary and Secondary Schools (see Gruber, et al).

School board liable for molestation of nine-year old girl. (1991, October). Legal Notes for Education, p. 4.

School board won't retain coach accused of sexual abuse. (2001, May 16). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

School board's child abuse training programs held adequate. (1992, January). Legal Notes for Education, p. 9.

School denies liability in suit. (2002, December 16). Concord Monitor (NH).

School denies prior knowledge of abuse by teacher. (2003, January 2). The Associated Press. http://boston.com/dailynews/002/region/School_denies_prior_knowledge_:.shtml

School district not liable for teacher's sexual molestation. (1994, March). Legal Notes for Education, p. 5.

School district settles sexual abuse lawsuit. (2001, July 20). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

School faces second suit over alleged sexual relationship between coach and student (2003, February 20). NBC4, Los Angeles. http://www.nbc4.tv/news/1992997.html

School knew about abuse by teacher, suit claims. (2003, September 27). Des Moines Register.

School molestation lawsuit settled. (2003, February 26). Asheville Citizen-Times (NC). http://cgi.citizen-times.com/cgi-bin/story/news/29557

School not liable for sexual abuse of student by janitor. (1998, March). Maintaining Safe Schools – School Violence Alert,4(3), p. 11.

School not responsible for teacher's abuse of student. (1993, August 2). Education U.S.A., p. 8.

School perv alarm. (2003, January 22). New York Post. http://www.nypost.com/news/regionalnews/67096.htm

School principal charged with sexual assault of teen. (1996, April 17). The Star-Ledger, p. 2.

School principal put on leave, was warned of teacher abuse. (2003, January 22). Arizona Republic. http://www.arizonarepublic.com/arizona/articles/0122teacher22.html

Schools may be liable for harassment by teachers (1996, September 23). Education

U.S.A., pp. 1, 3.

Schools not liable for charges of sex harassment, judge rules.  (1992, January 29). Education Week, p. 3.

School sued over sex abuse.  (2002, December 23). The Associated Press. http://www.newsday.com/news/,\local/wire/ny-bc-ny-brf-- sexabuselawsu1223dec23,0,2949333.story?coll=ny-ap-regional-wire

Schools settle molestation case for $1.78 million (2003, February 27).    WSOC-TV (Hendersonville, NC).  http://www.wsoctv.com/news/2008271/detail.html

Scott, K. (2003, May 8). Young teachers not well trained in misconduct matters, critics say.   The Arizona Republic.

Scranton coach accused of sex crime.  (2003, May 30).  Fort Smith Times Record (AR).

Scrutiny increases as teachers charged.  (2003, September 27).   The Raleigh News Observer.

Sedlak, A.J. (1991). Supplementary analyses of data on the national incidence of child abuse and neglect (NIS-2 p. vii). Washington, DC: American Enterprise Institute.

Sedlak, A.J. (1990).  Technical amendment to the study findings--National incidence and prevalence of child abuse and neglect: 1988. Rockland, MD: Westat, Inc.

Sedlak, A.J. & Broadhurst, D.D. (1996, September).   Executive summary of the Third National Incidence Study of Child Abuse and Neglect. U.S. Department of Health & Human Services. Washington, D.C.

Sedlak, A.J., Hantman, I., & Schultz, D. (1997, April).   Third National Incidence Study of Child Abuse and Neglect (NIS-3). Public Use Files Manual. U.S. Department of Health & Human Services.  Washington, D.C.

Sedney, M. A., & Brooks, B. (1984).   Factors associated with a history of childhood sexual experience in a nonclinical female   population. Journal of the American Academy of Child Psychiatry, 23 (2), 215-218.

Segal, L. G., & Krug, C.J.  (1992, September).  Treating the victim as the accused: Interim acting principal Jewel Moolenaar's serious mishandling of the complaint of a sexually abused child at CS 129. City of New York: The Special Commissioner of Investigation for the New York City School District, 1-14.

Selected child abuse information and resources directory. (1989).  Chicago, IL: National Committee for the Prevention of Child Abuse.

Selkin, J., & Schouten, P. G. W. (1988).  The child sexual abuse case in the courtroom: A source book.  Denver, CO: James Selkin Publisher.

Selner-O'Hagan, M.B., Kindlon, D.J., Buka, S.L., Raudenbush, S.W., & Earls, F.J. (1998).  Assessing exposure to violence in urban youth. Journal of Child Psychology and Psychiatry and Allied Professions.  39 (2), 215-224.

Sengupta, S.  (1995, April 30).  Bus driver accused of lewdness.  Newsday, p. A26.

Sentencing set for Indiana principal who took student to Vegas.  (2003, February 27). The Associated Press. http://www.rgj.com/news/stories/html/2003/02/27/3552.php?sp1=rgj&sp2=News&s p3=Local+News

Serious crime up 29 percent in New York City Schools, report says.  (1992, September 23). Education Week, p. 2.

Seryak, J. M. (1999). Dear Teacher, If You Only Knew! Adults recovering from child sexual abuse.   The Dear Teacher Project. Bath, OH

Seryak, J. (1997).  Dear Teacher, If You Only Knew! Adults recovering from child sexual abuse.  The Dear Teacher Project. Bath, OH

S.E.S.A.M.E (Survivors of Educator Sexual Abuse and Misconduct Emerge). (1997-2003 and ongoing).  Survivors Stories: Summary of information  from 100 survivors responses to S.E.S.A.M.E., Inc.  www.sesamenet.org

Settlement approved in teacher-student sex case.  (2003, June 20).  *The Associated Press.*

Sex offender had stolen identity of dead teacher, records show.  (2001, July 8). *The Associated Press*. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/stolen_id.html

Sex probe coach can still work. (2003, March 3). The Age.  http://www.theage.com.au/articles/2003/03/03/1046540133091.html

Sexual assault charges against skating coach dropped. (2002, December 4). Chicago Daily Herald.

Sexual harassment in Iowa high schools: Report of a statewide survey.  Selzer Boddy, Inc., pp. 1-4.

Shahinfar, A., Fox, N.A., & Leavitt, L.A. (2000).  Preschool children's exposure to violence: Relation of behavior problems to parent and child reports. American Journal of Orthopsychiatry. 70 (1), 115-125.

Shakeshaft, C. (2003, Spring).  Educator Sexual Abuse.  Hofstra Horizons, pp. 10-13.

Shakeshaft, C. (2002). Sexual Violence in Schools. In J. Koch & B. Irby (Eds.), Defining and Redefining Gender Equity in Education (pp. 117-132). Connecticut: Information Age Publishing.

Shakeshaft, C., & Cohan, A. (1995, March). Sexual abuse of students by school personnel.  Phi Delta Kappan, 76 (7) pp. 513-520.

Shakeshaft, C. (1994).  Responding to complaints of sexual abuse.  The School Administrator, 51 (9), 22-27.

Shakeshaft, C., & Cohan, A.  (1994, January).  In loco parentis: Sexual abuse of students in schools (What administrators should know), 1-40.  Administration and Policy Studies, Hofstra University.

Shakeshaft, C., & Cohan, A. (1994).  In loco parentis: Sexual abuse of students in schools.  What administrators should know.  Report to the U. S. Department of Education, Field Initiated Grants.

Shakeshaft, C., & Cohan, A. (1990, April). In loco parentis: sexual abuse of students by staff.  Paper presented at the annual meeting of the American Educational Research Association, Boston.

Shaman, E. J. (1986).  Prevention for children with disabilities.  In M. Nelson and K. Clark (Eds.), The educator's guide to preventing child sexual abuse (pp. 122-125).  CA: Network Publications.

Sheehan, K., DiCara, J.A., LeBailly, S., & Christoffel, K.K. (1997).  Children's exposure to violence in an urban setting.  Archives of Pediatrics and Adolescent Medicine. 51, pp. 502-504.

Shellenbarger, P.  Misty memory: Years later, a story of abuse tears at a family.  The Grand Rapids Press, pp. E1-E2.

Sherman, R.   School districts sued on sexual harassment by fellow students.  National Law Journal.

Shoop, R.J. (2004). Sexual exploitation in schools: How to spot it and stop it.  Corwin Press, Thousand Oaks, CA.

Shoop, R.J. & Dunklee, D.R. (2002, December) Risk management.  Principal Leadership.

Shoop, R.J. (2002, March). Identifying a standard of care.  Principal Leadership.

Shoop, R.J. (2000, September).  The Principal's dilemma: Protecting students from abuse while protecting a teacher's reputation.  Principal Leadership, 1 (1).

Shoop, R.J. (1999, May/June).  Sexual abuse of students by teachers. The High School Magazine.  6 (7).

Shoop, R.J. (1998, Winter).  The legal context of sexual harassment in education.  Midwestern Educational Researcher.  11 (1).

Shoop, R.J. (1997).  Sexual harassment prevention: A guide for school leaders.  The Masterteacher, Manhattan, KS.

Shoop, R.J. (1997, June).  Demonstrate your district's earnestness in eliminating sexual harassment.  Managing School Business.  2 (8).

Shoop, R.J. (1997, May).  How to investigate a sexual harassment complaint.  School Business Affairs Journal.  63 (5).

Shoop, R.J. (1995, July).  An ounce of knowledge = a pound of deterrence: Preventing sexual harassment.  School Business Affairs Journal.  61 (7).

Shoop, R.J. (1995, July).  Harassment: What's sex got to do with it.  Journal for a Just and Caring Education.  1 (3).

Shoop, R.J. & Edwards, D.L.  (1994). How to stop sexual harassment in our schools.  Allyn & Bacon.  Boston, MA.

Shoop, R.J., & Hayhow Jr., J.W.  (1994). Sexual harassment in our schools: What parents and teachers need to know to spot it and stop it!  MA: Allyn and Bacon.

Shoop, R.J. & Urick, M. (2001, December).  Don't get blindsided: Prevent sexual harassment. Athletics Administration.

Shore, R.  (1995, February).  How one high school improved school climate.  Educational Leadership, 52 (5), 76-78.

Sidney teacher resigns. (1983, November 23).  The Daily Star, p. 3.

Simmons, J.  (1994, September 19).  Union bids to reinstate principal. New York Post, p. 16.

Simmons, J.  (1994, January 20).  Teacher in boy-sex flap sues to get old job back.  New York Post, p. 4.

Sinai, R.  (2003, May 12).  Bill seeks to castrate rapists of children.  Haaretz (English edition). Jerusalem, Israel.

Singer, M. I., Anglin, T. M., Song, L., & Lunghofer, L.  (1995, February 8).  Adolescents' exposure to violence and associated symptoms of psychological trauma.  JAMA, 273 (6), 477-482.

Siris, K. (2001). Alleviating Bullying and Victimization in the Classroom: An Action Research Study. Hempstead, NY: Hofstra University.

Siris, K. (2000).  Bullying in Schools: How Selected Teachers Can Help Alleviate the Problem.  Submitted to Hofstra University.

Six Indians allege abuse at schools.  (2003, April 11).  The Associated Press. In the Longview News Journal, TX.

Skating coach surrenders on sex charges.  (2003, June 21).  The Cincinnati Post.

Slade, D. (2002, July 26). Mediation fails to settle sex abuse case. Calgary Herald. (Canada).

Smith, A. (2003, March 1). 'Burn in hell,' girls tells rapist in court.  Newsday. p. A13.

Smith, A.  (2001, September 22).  Ex-teacher faces sex sentence.  Newsday.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero

5.Olaf – The official website of Andrew Vachss.
http://www.vachss.com/help_text/archive/correnti_verdict.html

Smith, A. (2001, January 30). DA: Big child-porn collection: Calls ex-teacher's cache largest seized in Suffolk. Newsday. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/correnti_porn.html

Smith, E.L. (1994, July 19). Jail for teacher in student's sex abuse: Ex-Sachem staffer gets 4 to 12 years. Newsday, pp. A4, A45.

Smith, E.L. (1994, May 17). Sachem teacher's sex case going to the jury. Newsday, p. A22.

Smith, K. (2001, June 1). Deal made in case of sex abuse at boys home. Las Vegas Sun. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/deal_made.html

Smith, T. A. (1987). You don't have to molest that child. IL: The National Committee for Prevention of Child Abuse.

Smoke, S. (2002, August 13). Saundra Smoke: Schools should define appropriate behavior. Naples Daily News, http://www.naplesnews.com/02/08/perspective/d800469a.htm.

Smothers, R. (2003, February 22). New Jersey teacher gets jail term in sexual assaults of girls. The New York Times. p. B2.

Smyrna student wins lawsuit. (2003, July 19). The News-Journal. Wilmington, DE.

Snider, W. (1990, January 24). Court declines to review two sexual-abuse cases. Education Week, p. 20.

Snyder, H.N. (2000, July). Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics. A NIBRS Statistical Report. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, D.C.

Snyder, M. (2001). A Deafening Silence: Various School Systems' Reactions to Student Sexual Victimization by School Personnel. Grand Forks, North Dakota: University of North Dakota.

Sobsey, D. (1994). Violence and Abuse in the Lives of People With Disabilities: The End of Silent Acceptance? Baltimore, MD: Paul H. Brookes Publishing Co.

Sobsey, D. (2003). Private correspondence from. Re: University of Alberta (Canada) Abuse and Disability Project.

Sobsey, D. & Mansell, S. (1994). An international perspective on patterns of sexual assault and abuse of people with disabilities. International Journal of Adolescent Medicine and Health. Vol. 7, No. 2, pp. 153-178.

Sobsey, D. & Mansell, S. (1994). Sexual abuse patterns of children with disabilities. The International Journal of Children's Rights. Vol. 2, pp. 96-100.

Sobsey, D., Randall, W. & Parrila, R.K. (1997). Gender differences in abused children with and without disabilities. Child Abuse and Neglect. Vol. 21, No. 8, pp. 707-720.

Soccer coach accused of abusing young players. (2002, January 24). The Associated Press State & Local Wire. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Soccer coach gets six years for sex assault.  (2003, February 19).  *The Associated Press*.  http://thedenverchannel.com/news/1991639/detail.html

Soccer coach gets two years for molesting players.  (2003, June 13).  San Diego Channel 10 News, KGTV.

Soccer coach sentenced to up to 66 years after sex abuse conviction.  (2003, June 5).  Newsday (NY).

Softball coach gets 6 years for sex assault. (2003, February 19). *The Associated Press*.  http://thedenverchannel.com/news/1991639/detail.html

Soothill, K., and Walby, S.  (1991).  Sex crime in the news.  New York: Routledge.

Sorenson, G. P. (1994).   Peer sexual harassment: Remedies and guidelines under federal and state law.  West's Education Law Quarterly, 3 (4), 621-638.

Sorenson, G. P. (1991). Sexual abuse in schools: Reported court cases from 1987-1990.  Educational Administration Quarterly, 27 (4)460-480.

Southington graduate sues former coaches. (2003, March 12).  The Hartford Courant.  http://ctnow.com/news/local/hc-soujaneroe0312.artmar12,0,7811616.story?coll=hc-headlines-local

Spate of cases leaves liability for student welfare unresolved. (1993, July 19). Education U.S.A., pp. 1, 3.

Special education policy manual (1989, October).  Saskatchewan Education Special Education Policy Manual. Sakatchewan, Canada

Special education services offeror's lawsuit against educational cooperative fails.  (1993, October).  Legal Notes for Education, p. 6.

Spencer, K. (2002, February 16).  School faced tough calls on Florea.  The Omaha World-Herald. 1A.

Spencer, K. (2002, February 9).  Accused teacher claims to be doing research.  The Omaha World-Herald. p. 5B.

Spencer, K. (2002, February 9). Prosecutor: Accused teacher claimed to be doing research. Omaha World-Herald, p.5B.

Spencer, K. & Robb, J. (2003, January 9).  Millard teacher arrested on suspicion of molesting a former student.  .  Omaha World-Herald.

Sports: p. 88.  http://nl9.newsbank.com/nl-search/we/Archives?p_action=doc&p_docid=0EE60DD3F4ED1E.

Staff (1983, November 21).  Teacher faces dismissal.  The Daily Star (Tucson, AZ). p. 3.

State begins process of compensating abuse victims at school for deaf. (2001, November 26).  *The Associated Press.*

State of Arizona Reporting Procedures.  (2003, April).  Arizona Department of Education/ Arizona State Board of Education.

Statement recanted in Delaware sex trial.  (1985, October 23).  The Daily Star (Tucson, AZ).  p. 3.

Stein, N. (1999) Classrooms & Courtrooms: Facing Sexual Harassment in K-12 Schools.  New York , N.Y. : Teachers college Press.

Stein, N. (1992, November 4).  School harassment- An update.  Education Week, p. 37.

Stein, N. (1992, November 4).  Commentary: School harassment- An update.  Education Week, p. 27.

Stein, N.  (1991, November 27). It happens here, too: Sexual harassment in the schools.  Breaking the K-12 silence on sexual harassment. Education U.S.A., pp. 25, 32.

Stein, N., Marshall, N.L., & Tropp, P. (1993) Secrets in public: Sexual harassment in our schools. A report  on the results of a Seventeen magazine survey. Wellesley

Center for Women. Wellesley, MA.

Stepzinski, T. (2002, July 17).  Family sues former teacher; case centers on sexual misconduct. Times-Union, http://www.jacksonville.com/tu-online/stories/071702/met_9932002.html.

Stone Lombardi, K. (2002, January 27).  Long days, long hallways. The New York Times. p. WC. 1.

Stone, M. E. (1986).  New myths about child sexual abuse.  In M. Nelson and K. Clark (Eds.), The educator's guide to preventing child sexual abuse (pp. 130-132).  CA: Network Publications.

Stone, R. J. (1987).  Child abuse in schools: Issues and recommendations.  Syracuse: Commissioners Task Force On Child Sexual Abuse.

Stoneking v. Bradford. U.S. Third Circuit Court of Appeals, 87-3636. 882 F. 2d 720, 58 U.S.L.W. 2135, 55 Ed. Law Rep. 429. (1993).

Stopping Violence Before it Starts. (2001, December 4).  RAND Health. http://www/rand.org/publications/RB/RB4536.

Stover, B. (1999, November 8).  Violations of trust. The Monday Gazette, p. 5B, 6A.

Straus, M.A., Hamby, S.L., Finkelhor, D., Moore, D.W., & Runyan, D. (1998). Identification of child maltreatment with the Parent-Child Conflict Tactics Scales: Development and psychometric data for a national sample of American parents. Child Abuse and Neglect. 22 (4), 249-270.

Strauss, S. (1993, March).  Sexual harassment in the schools: Students are taking legal action, and administrators are have to confront ugly facts.  Vocational Education Journal, 68 (3), 28-31.

Student, mother suing boarding school over sexual abuse. (2002, January 5). The Associated Press State & Local Wire. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Student names principal, Winona ISD in suit.  (2003, August 10).  Tyler Morning News (TX).

Students accuse Amelia High School coach of harassment.  (2003, May 2).  WCPO/ Channel 9 News.  Cincinnati, OH.

Study findings: Study of national incidence and prevalence of child abuse and neglect: 1988.  Washington, DC: U. S. Department of Health and Human Services, National Center on Child Abuse and Neglect.

Substitute teacher charged in sexual abuse. (2001, February 17). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Suburban coach held on charges of sex abuse. (2002, December 15). Chicago Sun-Times.

[A] suburban family in hell.  (2003, May 30).  Salon.  (www.salon.com)

Sugarman, R.  (1995, March 29).  Schools sex scandal: 33 Suspended, but still near kids. The Daily News, p. B5.

Suit says Laurel School knew former teacher was danger.  (2003, March 18).  Cleveland Plain Dealer.

Sullivan, E.  (1992, June 25).  Officials monitored accused sex abuser.  The Independent, 28.

Sullivan, R. (1990, May 10).  Dean is indicted on sex charges in abuse of girl.  New York Times, p. B5.

Sullivan, P.M., & Knutson, J. F. (2000). The prevalence of disabilities and maltreatment

among runaway children.  Child Abuse and Neglect.  Vol 24, No. 10, pp. 1275-1288.

Sultan, A. (2001, January 31). Teacher faces criminal sex abuse charge; middle school teacher in East St. Louis allegedly fondled girl; he already has been suspended. St. Louis Post-Dispatch. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Summit, R. C. (1988).  Hidden victims, hidden pain: societal avoidance of child sexual abuse.  In G. E. Wyatt and G. J. Powell (Eds.), Lasting effects of child sexual abuse (pp. 39-60). Newbury Park, CA: Sage Publications, Inc.

Superintendent of school for deaf quits. (2003, January 23). The Oregonian. http://www.oregonlive.com/metronorth//oregonian/index.ssf?/base/metro_north_news/1043240551188220.xml

Supporters unite behind ex-Allegany coach.  (2003, June 15).  The Roanoke Times (VA).

Supreme Court of the United States.  (1993, November 9).  Legal Document: On Writ of Certiorari to the United States Court of Appeals for the Sixth Circuit (Teresa Harris, Petitioner v. Forklift Systems, Inc.), 1-3.

Supreme Court of the United States.  (1993, October 13, 1993, November 9).  Syllabus: Certiorari to the United States Court of Appeals for the Sixth Circuit (Harris v. Forklift Systems, Inc.).

Supreme Court reduces burden for proving sex harassment.  (1993, November 22). Education U.S.A., p. 5.

Supreme Court soon to decide three sexual harassment suits. (1998, March). Maintaining Safe Schools-School Violence Alert, 4 (3), pp. 9.

Supreme court to set burden of proof in sex harassment case.  (1993, March 15). Education U.S.A., p. 7.

[A] supreme trust in serious doubt.  (2003, November 19).  The Washington Post.

Surveys and studies.  (1994, October).  Educator's guide to controlling sexual harassment, 2 (1), 5.

Sutton, L. (1989, November 30).  Teacher is held as sex offender.  Daily News, p. 19.

SV acted properly (Editorial) (1987, January 4). Press and Sun Bulletin. p. 2E.

Swim coach pleads innocent to sex abuse. (2002, December 17). Arizona Daily Sun.

Tape that trapped sex abuse football coach. (2002, December 17). IcNewcastle, UK. http://icnewcastle.icnetwork.co.uk/0100news/0100local/page.cfm?objectid=12460773&method=full&siteid=50081

Tatel, D. S., Brannan, P. A., & Kohrman, D. B.  The 1992-93 term of the United States Supreme Court and its impact on public schools.  Education Law Reporter, 3-29.

Tayler, L.  (1995, June 9).  A community pillar accused of sex abuse.  Newsday, p. A26.

Taylor, S. (1988, March 22).  High court to decide on liability of local officials in child abuse.  The New York Times, p. A21.

Teacher accused of grades-for-sex solicitation gets 90 days. (2001, March 8). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher acquitted, judge upbraided in sex-assault case. Retrieved August 6, 2002 from advocateweb.com website.

Teacher allegedly had relationship with student. (2001, May 23). The Associated Press State & Local Wire. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher appears in court.  (2003, July 15).  <u>Capital News 9</u> (Albany, NY). Time Warner cable station.

Teacher arraigned on sex charges.  (2001, December 13). <u>News12.com/Westchester</u>. Available. <u>http://www.news12.com/CDA/Articles/print/0,2244,11-11-28181-35,00.html</u>

Teacher arrested in probe of sex abuse.  (2001, June 19). <u>The Deseret News</u> (Salt Lake City, UT).  p. B4

Teacher charged with abuse of student.  (1991, October 11).  <u>Newsday</u>, p. 32.

Teacher charged with sex abuse is registered sex offender in Florida.  (2002, January 29). <u>Mohave Daily News</u>.  Retrieved February 27, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. <u>http://www.vachss.com/help_text/archive/in_fla.html</u>

Teacher charged with sexual abuse. (2002, February 15). *The Associated Press State & Local Wire*. Retrieved March 5, 2002 from Lexis-Nexis Academic Universe database.

Teacher charged with sexual abuse is jailed for additional.  (2001, February 8).  *The Associated Press State & Local Wire*.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher charged with sexual assault faces new allegations.  (2003, March 14). <u>NBC-10 Philadelphia</u>.  <u>http://www.nbc10.com/news/2040801/detail.html</u>

Teacher charged with soliciting students.  (2003, August 10).  <u>Fulton County News</u> (PA).

Teacher charged with student sex was unlicensed. (2003, February 5). <u>Minneapolis Star Tribune</u>. <u>http://www.startribune.com/stories/484/3634655.html</u>

Teacher convicted. (1987, December 15).  <u>Newsday</u>, p. 21.

Teacher convicted despite heroic send-off.  (2003, July 11).  <u>The Age</u>  (Australia).

Teacher executed by firing squad for child rape in central Vietnam. *The Associated Press*. Retrieved June 10, 2002 from Lexis-Nexis Academic Universe database.

Teacher faces dismissal.  (1983, November 21).  <u>The Daily Star</u> (Tucson, AZ). p. 3.

Teacher faces second set of sex charges.  (2003, June 21).  *The Associated Press*. <u>http://www.stamfordadvocate.com/news/local/state/hc-21182105.apds.m0386.bc-ct-brf-jun21.0.111383.story?coll=hc-headlines-local-wire</u>

Teacher gets 80 years for sex assaults of students. (2002, July 11). *The Associated Press State & Local Wire*. Retrieved July 19, 2002 from <u>www.cnn.com</u>

Teacher gets house arrest.  (2003, September 9). <u>http://www.azcentral.com/news/article/0909-ON.html</u>

Teacher gets 20 years for assaults. (2004, January 21). <u>http://wisinfo.com/postcrescent/news/archive/local_14264887.shtml</u>

Teacher gets two years for sex with student.  (2003, June 21).  *The Associated Press*. <u>http://www.dailybulletin.com/Stories/0.1413.203~1469775.00.html</u>

Teacher had felony conviction.  (2003, November 8).  <u>Utica Observer-Dispatch</u> (NY).

Teacher in abuse case gets probation.  (2002, May 24). *The Associated Press*. Retrieved June 3, 2002 from www.washingtonpost.com

Teacher in morals case assigned to desk job. (1987, April 10).  <u>Newsday</u>, p. 35.

Teacher indicted on charges of having sex with underage teen students. (2001, February 7). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher indicted on sex abuse charges. (2001, May 15).  <u>Newsday.</u> Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher is accused of molesting five pupils.  (2003, May 31).  San Diego Union Tribune.

Teacher pleads guilty in student sex case.  (2003, June 21).  Seattle Post-Intelligencer.

Teacher pleads guilty to four sex offenses. (2001, July 19). *The Associated Press State & Local Wire*. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Teacher's behavior questioned in the past. (2003, March 2). Ann Arbor News (MI). http://mlive.com/news/aanews/inex.ssf?/xml/storu.ssf/html_standard.xsl?/base/news-3/1046603640208520.xml

Teacher sentenced for sexual assault. (2002, July 28). *The Associated Press State & Local Wire*. Retrieved July 29, 2002 from www.zwire.com

Teacher sentenced to 35 years for sex assault, child porn.  (2002, May 24). *The Associated Press*. Retrieved June 3, 2002 from www.caller.com

Teacher sentenced: Former Coquille woman gets 5 years. (2002, July 29). *The Associated Press State & Local Wire*. Retrieved July 29, 2002 from www.theworldlink.com

Teacher sentenced to prison.  (2003, August 2). *The Associated Press*. Seacoastonline.com  (Portsmouth, NH online news).

Teacher sex cases: News Charts. (2002, September 29). Las Vegas Review-Journal. Available online: www.lvrj.com/lvrj_home/Sep-29-Sun-2002/news/19738370.html

Teacher sex story lays bare double standard  (2003, March 6).  Chicago Sun-Times. http://www.suntimes.com/output/roeper/cst-roep061.html

Teacher's former students now tell terrible secrets from 20 years ago (1994, January 8). Baltimore Sun, p. 1A.

Teacher to be tried for teen affair in 1978-79. (2002, September 28). San Diego Union-Tribune.

Teachers accused, but they stay on.  (2003, January 11).  The Hartford Courant. http://www.ctnow.com/news/loca/hc-teachersex0111.artjan11,0,5667306.story?coll-hc-headlines-local

Teachers told of drama tutor's abuse. (2002, September 26). BBC News. http://news.bbc.co.uk/1/hi/wales/2283769.stm

Teens often pal with coaches.  (2003, August 2). Atlanta Journal-Constitution.

Teens testify against former lacrosse coach. (2003, January 31). KYW Philadelphia. http://kyw.com/Local%20News/local_story_031124839.html

Teichroeb, R. (2001, November 27).  Allegations and denial of rape hang over Oregon school.  Seattle Post-Intelligencer.

Teichroeb, R. (2001, November 27). Abuse and silence: Examining America's schools for the deaf. Sex abuse plagues schools for the deaf nationwide.  Seattle Post-Intelligencer.

Teichroeb, R. (2001, November 27). When children are abused, no one is spared: Victim, victimizer and their mothers all suffer while school looks away.  Seattle Post-Intelligencer.

Teichroeb, R. (2001, August 29). More trouble for deaf school two other families file legal action, ringing total alleging sexual abuse at state-run facility to seven.  Seattle Post-Intelligencer, p. B1.

Teichroeb, R. (2001, April 26). In Maine, a step toward healing: Bill would allow Compensation for students who were abused at Governor Baxter School for the Deaf.  Seattle Post-Intelligencer.

Teichroeb, R. (2001, April 25). Decades of sex abuse plague deaf school: For generations, state's students kept secrets. The Seattle Post-Intelligencer. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Tench, M. (2002, July 14). Educators urged to connect with students to curb violence. Boston Globe, p. C7.

Tennessee court rules on sex abuse case filed against school board and employees. (1993, November). Legal Notes for Education, p. 7.

Tharinger, D., Horton, C. B., & Millea, S. (1990). Sexual abuse and exploitation of children and adults with mental retardation and other handicaps. Child Abuse & Neglect, 14, 301-312.

The cruel, cold world they call women's tennis. (2003, June 23). The Advertiser News. Adelaide, Australia. http://www.theadertiser.news.com.au

The Governor's Task Force on Sexual Harassment. (1993). Sexual harassment: Building a consensus for change.

The mental health consequences of adolescents' exposure to violence (Report) (1994). Case Western Reserve University- Mandel School of Applied Social Sciences, pp. 1-86.

The Metropolitan Toronto Special on Child Abuse: Sexual assault - Facts and prevalence (Pamphlet). (1993 September). Toronto, Ontario, Canada.

The State Education Department Bureau of Professional Education Program Review. (1991, October 22). Training in child-abuse identification & reporting.

The State Education Department. Memorandum to institutions and organizations concerned with child abuse and neglect.

The Wellesley College Center for Research on Women. (1992). Girls in schools: A bibliography of research on girls in U. S. public schools, kindergarten through grade 12. Wellesley, MA.

Things I have seen and heard. (See Richters, J.E. & Martinez, P.)

Third Circuit Constitutional Law. (2001, March 5). Pennsylvania Law Weekly. Section: Digest of recent opinions, d7. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Thomas, J. (2001, April). Principal resigns amid sex probe. Originally posted at 11Alive.com (Atlanta). Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/principal_resigns.html

Thornton, T.A., Craft, C.A., Dahlberg, L.L., Lynch, B.S., & Baer, K.S. (2000). Best practices of youth violence prevention: A Sourcebook for Community Action. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control.

Title IX of the Education Amendments of 1972. Sec. 1681.

Title VI of the Education Amendments.

Title VII of the Education Amendments.

Tjaden, P., & Thoennes, N. (2000, November). Full Report on the Prevalence, Incidence, and Consequences of Violence Against Women. Findings from the National Against Women Survey. National Institute of Justice, U.S. Department of Justice, and Centers for Disease Control and Prevention.

Tomasson, R.E. (1990, December 4). Bus matron charged in sex abuse of handicapped students. New York Times, p. B2.

Topousis, T. (2001, May 4) Watch for these clues from your kids. The New York Post. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Tower, C. (1988). Secret scars: A guide for survivors of child sexual abuse. Viking Press. New York.

Track coach accused of crossing the line.(2003, February 19). Holmdel Independent (NJ). http://independent.gmnews.com/news/2003/0219/Front_Page/026.html

Track coach released on bail. (2003, April 3). Springfield News (OH). http://www.springfieldnewssun.com/news/newsfd/auto/feed/news/2003/04/03/1049430263.00353.5143.6614.html

Trial begins in Smyrna High lawsuit over student-coach relationship. (2003, July 15). The News-Journal (Wilmington, DE).

Trei, L. (2004, January 9). Research reveals brain has biological mechanism to bloc unwanted memories. News service website, Stanford University. http://www.stanford.edu/news

Trombetta, A. (1995, February 27). Education confronting sexual abuse problems. The Legislative Gazette, 25.

Trudell, B., & Whatley, M. H. (1988). School sexual abuse prevention: Unintended consequences and dilemmas. Child Abuse & Neglect, 12, 103-113.

Tsai, M., Feldman-Summers, S., & Edgar, M. (1979). Childhood molestation: Variables related to differential impacts on psychosexual functioning in adult women. Journal of Abnormal Psychology, 88 (4), 407-417.

Tucker, D. (2003, May 5). Sexual abuse and Texas' Teachers. Fox14 TV, Amarillo, TX.

Tumour 'turned teacher into paedophile' (2002, October 22). Sydney Morning Herald (Australia). http://www/smh.com.au/articles/2002/10/22/1034561450249.html

Turner, R. (1991, December). One in seven 6th-12th graders had an unwanted sexual encounter, including one in five females. Digest, 23 (6), 286-287

Tuttle, G. (2001, July 12). 2nd time rape offender sentenced to prison. The Billings Gazette. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/2nd_time.html

Twedt, S. (1999, October 31). Dirty Secrets: Bad Teacher came with a letter of recommendation. Pittsburgh Post-Gazette, http://www.post-gazette.com/regionstate/19991031Justin7.asp.

U.S. Third Circuit Constitutional Law. (2001, February 26). New Jersey Law Journal. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Ullman, D.G., Simington, C., Donnelley, W.O., & Knox, J. (1991, August). Child sexual abuse prevention programs: Effects on early identification. Paper presented at the Annual Convention of the American Psychological Association, San Francisco, CA, 1-6.

United Educators (January 28, 2004). Policy Guidelines: Preventing Molestation in Schools.

United States General Accounting Office. (1995). School safety: Promising initiatives for addressing school violence. United States General Accounting Office.

Untouchable: Teacher dodges sex rap and keeps job. (2003, September 25). New York Daily News.

Urban group profiles techniques schools use to fight violence. (1994, March 23). Education Week, p. 4.

Urquiza, A.J., & Goodlin-Jones, B.L. (1994). Child sexual abuse and adultrevictimization

with women of color.  Violence and Victims, 9 (3), pp. 223-232.

Urquiza, A. J., Wyatt, G. E., & Root, M. P. P.  (1994).  Introduction.  Violence and Victims, 9 (3), pp. 203-206.

Vachss, A., Esq. (1993).  Sex crimes.  New York: Random House

Vachss, A.  (1993, January 5).  Sex predators can't be saved.  The New York Times, A15.

Valden, D.  (1995, May 22).  TH principal leaving to take superintendent job.  The Independent. p. 28.

Valden, D.  (1994, April 18).  Lanciault tenure gets thumbs up.  The Independent, p. 6.

Valente, W.D.  Commentary: School district and official liability for teacher sexual abuse of students under 42 U.S.C.  (1983).  57 West Education Law Reporter, 645, pp. 25-39.

Valley teacher at center of sex probe reinstated.  (2003, June 6).  Penn Live.com. (Allentown-Bethlehem, PA).

Van Halen.  (1984). (Song): Hot for teacher. New York: Warner Bros. Publications Inc.

Vargas, T. (2001, November 22).  Charges in locker room incident. Newsday, p. A8.

Vargyas, E.J.  (1994). Breaking down barriers: A legal guide to Title IX.  Washington, DC: National Women's Law Center.

Vergon, C.  (1988). The educator's guide to child abuse and neglect reporting., pp. 1-16. A Joint Publication of the Bureau of Accreditation and School Improvement Studies, The University of Michigan School of Education, Michigan Elementary and Middle School Principals Association, Michigan Association of Secondary School Principals, and  Michigan Association of School Administrators.

Viadero, D.  (1993, November 17).  A trust betrayed.  Education Week, pp. 18-25.

Victim's parents request maximum sentence.  (2003, September 27).  The Tennessean.

Victims' families:  "We won!"  (2003, June 12).  The Marion Star (Ohio).

Vigh, M. (2001, April 3).  Disabled student takes stand in school molestation trial. The Salt Lake Tribune, p. C2. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Vincent, S.   Policy on sex abuse complaints.  Newsday, p. 39.

Vogel, J.S. (1999). Between a (schoolhouse) rock and a hard place: Title IX peer harassment liability after Davis v. Monroe County Board of Education. Houston Law Review. 37, 1525. Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database.

Voice of Connecticut Youth Survey (1996).  Connecticut Department of Public Health, Hartford.CT.

Volkers under siege.  (2003, April 4).  The Age (Melbourne, Australia). http://www.theage.com.au/articles/2003/04/04/1048962918857.html

Wait, T. F. (1988, October 30).  System urged to screen teachers.  Sunday Record, pp. 3, 74.

Walden, G. (1987, May 16).  Teachers testify Miller often told lies.  Gannett Westchester Newspapers, p. 3.

Walford, G. (Ed.). (1994). Researching the powerful in education. London: UCL Press.

Walsh, C.  (1993, April).   Openly addressing sexual harassment in schools.  School Safety Update, pp. 1-4.

Walsh, C., and MacMillan, H. (1999). The development of a population-based instrument measuring maltreatment of youth in Canada.  Paper presented at the 6th International Family Violence Research Conference, Durham, NH, July 1999.

Walsh, M. (1999, June 2). Harassment Ruling Poses Challenges: But Officials Say They Can Live With Them. Education Week, pp.1, 22.

Walsh, M. (1996, September 25). In harassment suits, a new era emerges: Districts could face costly judgments. Education Week, pp. 1, 14.

Warikoo, N. (1997, September 23).  A Crusade Targets Sex Abuse in Schools. Newsday, p. A31.

Warner, P. (2002, January 12).  Third trial for ex-Raymond teacher delayed: Defense lawyers wants jurors asked about misconduct.  The Union Leader. p. B10. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Warner, P. (2001, April 5). Convicted teacher wins new trial. The Union Leader. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Wasserman, E.  (1993, July 1).  Teacher=s plea is not guilty.  Newsday, p. 24.

Wasserman, J.  (1993, April 22).  Mom raps judge in molest case.  Daily News, p. KSI1.

Wasserman, J., & Landa, R. (1990, January 12).  Sex abuser in JHS job.  Daily News, p. 5.

Wasserman, J., & Landa, R. (1990, January 12). Teacher lied, got job. Daily News, p. 5.

Watson, C. (2001, June 17). Educators increasingly accused of sex crimes.  The Oklahoman Online. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/ok_educators.html

Watson, C. (2001, June 17). Guidelines may prevent false accusations.  The Oklahoman Online.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/ok_educators2.html

Webby, S. (1999, February 7).  Parents' act of concern turns to nightmare. The Journal News, Gannett Newspapers News, p. 2A.

Webby, S., Bandler, J. (1999, February 7).  Teacher's clouded past is revealed: Former employer hid suspicions of sexual misconduct while recommending Nowicki. The Journal News, Gannett Newspaper News, p. 1A.

Weiss, M., Robinson, E., Campanile, C., Malave, M. and Sanderson, B. (2001, May 3). Cops: HIV-positive teacher raped boy, 9.  New York Post. Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss.  http://www.vachss.com/help_text/archive/hiv_teacher.html

Weiss, M.J. (1984, November). Child molesting: What must be done to protect our children. Ladies Home Journal, 114-118, 198-202.

Weist, M.D., Myers, P., Warner, B.S., Varghese, S. & Dorsey, N.  (In press).  A clinically useful screening interview to assess violence exposure in youth.  Child Psychology and Human Development

Wells, L.E. & Rankin, J.H. (1995, August). Juvenile victimization: Convergent validation of alternative measurements. Journal of Research in Crime and Delinquency.  32 (3), pp. 287-307.

Welner, M. (1998). Defining evil: A depravity scale for today's courts. The Forensic Echo. II (6), 4-12. Retrieved July 12, 2001 from The Forensic Panel online, http://www.depravityscale.org/depravity5.htm

Werner, M.A., (1999). One Woman's Story: The Development of S.E.S.A.M.E. In M.A. Paludi (Ed.), The Psychology of Sexual Victimization: A Handbook (pp. 199-210). Connecticut: Greenwood Press.

Wessol, S. (2001, March 22). Floyd Teacher Charged with Sexual Abuse. Roanoke Times & World News. Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Whaley, M. (2001, October 24). Bullying will be banished if state program gets its way. Denver Post, htttp://www.denverpost.com/Stories/0,1002,53~192407,00.html.

What do we need to know about child abuse in youth sports? Youth Sports Directory & Resource Guide: Parents Guide. Reprinted with permission from the Child Abuse & Youth Sports: A comprehensive risk management program. (1996) The National Alliance for Youth Sports.

When consensual sex is a crime: Information about statutory rape.  Pamphlet issued by the Nevada Public Health Foundation and Nevada Welfare Division.

Whitcomb, D., Goodman, G., Runyan, D., & Hoak, S. (1994, April). The emotional effects of testifying on sexually abused children.  National Institute of Justice: Research in Brief U. S. Department of Justice.

White, A. (2001, February 26).  Anti-harassment policy violates free speech. Pennsylvania Law Weekly. Section: Constitutional Law, p.1.  Retrieved September 28, 2001, from Lexis-Nexis Academic Universe database.

White, A. (2001, February 15). Court finds school anti-harassment policy violates free speech rights.  The Legal Intelligencer. p.1. Retrieved September 28, 2001, from Lexis-Nexis Academic Universe database.

White, B., & Wisniewski, L.  (1994, October 30).  Sexual abuse by teachers:  Are schools covering it up?  The Atlanta Journal/The Atlanta Constitution,  A1, A10, A11.

Whiteley, E.  (1992, October).  Nightmare in our classrooms.  Ladies Home Journal, pp. 74-83.

Whitherspoon, T. (2000). Ex-McGregor teacher's aide says she has been wrongfully accused of sexual assault.  Tribune-Herald.  Waco, TX.

Whitla, M. (1991). Child sexual abuse. Australian Journal of Guidance and Counseling, 1 (1), 3-16.

Wilkerson, I.  (1995, January 5). After an assault, questions on school's duty. The New York Times, p. A20.

Willen, L.  (1994, December 1).  Redemption.  Newsday, p. A3.

Willen, L.  (1994, December 1).  Woman regains dignity by facing alleged abuser. Newsday, p. A8.

Willen, L.  (1993, February 9).  Abused in school former student accuses her teacher. Newsday, p. 21.

Willen, L.  (1993, February 5).  School bungles girl's cry for help.  Newsday, p. 6.

Willen, L, & Freifeld, K.  (1995, June 2).  City aide, teacher charged in rapes.  Newsday, p. A23.

Williams, L. M.  (1994).  Recall of childhood trauma: A prospective study of women's memories of child sexual abuse.  Journal of Consulting and Clinical Psychology, 62 (6), 1167-1176.

Willmsen, C. & O'Hagan, M. (2003, Dec. 14, 15, 16) Coaches who prey.  The Seattle Times.

Wilson, D.  (2004, January 21).  Teacher gets 20 years for assaults: Woller apologizes for 'twisted, vile' sexual crimes.  The Post-Crescent (Appleton-Neenah-Menasha, WI).

Wilson, M. (2001, September 6).  2 Attorneys attack Mormon church. The Oregonian, p. D07.

Winningest coach in Calif. History charged with 1960s molestation. (2003, February 21). *The Associated Press*.
http://www.miami.com/mld/miamiherald/sports/5227112.htm

Winton, R.  (2001, July 20). District to pay $900,000 in molestation: Lawsuit contended that school should have known of potential sex abuse.  Los Angeles Times. p. 1.  Retrieved March 1, 2002 from Lexis-Nexis Academic Universe database.

Wishnietsky, D. H. (Ed.). (1992). Sexual harassment in the educational environment. Bloomington, IN: Center for Evaluation, Development and Research, Phi Delta Kappa.

Wishnietsky, D. H. (1991). Reported and unreported teacher-student sexual harassment. Journal of Educational Research, 84 (3), pp. 164-169.

Wishon, P. M. (1979).  School-aged victims of sexual abuse: Implications for educators. Paper presented at the Conference of the National Association for the Education of Young Children, New York.

Wolbring, G. (1994).  Violence and abuse in the lives of people with disabilities.  Available. http://www.thalidomide.ca/gwolbring/violence.html

Woman alleges underage affair with ex-teacher in $5 million suit.  (2001, November 17). Milwaukee Journal Sentinel.  Available. www.jsonline.com:80/racine/nov01/r-suitr18111701a.asp

Woman coach admits having sex with teens.  (2003, July 14).  *The Associated Press*. The Aberdeen News (SD).

Women accuse retired coach of sex abuse. (2003, January 3). The Hartford Courant.

Woodward, L.M. (1999). Collision in the classroom: Is academic freedom a license for sexual harassment?  Capital University Law Review. 27, 667.  Retrieved September 28, 2001 from Lexis-Nexis Academic Universe database

Wurtele, S. K., & Miller, C. L. (1987).  Children' conceptions of sexual abuse.  Journal of Clinical Child Psychiatry, 16 (3), 184 -191.

Wyatt, E. (2001, June 22). Schools ignore plan to thwart sex abuse. The New York Times, p. B1.

Wyatt, E.  (2001, June 3).  Sexual attacks in New York City's schools are up sharply. The New York Times.  Retrieved February 25, 2002 from Circle of Trust Abuse articles and media reports: The Zero 5.Olaf – The official website of Andrew Vachss. http://www.vachss.com/help_text/archive/attacks_nyc.html

Wyatt, E. (2001, May 23).  Schools show jump in reports of sex abuse. The New York Times, p. B1.

Wyatt, E. (2001, May 5).  Levy punishes four involved in '98 inquiry. The New York Times, p.B1.

Wyatt, G. E. (1984).  Wyatt childhood sexual abuse questions.  Neuropsychiatric Institute, University of California, Los Angeles.

Wyatt, G. E., & Powell, G.  J.  (eds.).  (1988).  Lasting effects of child sexual abuse. Sage Publications. Newbury Park, CA.

Wyatt, G. E., & Powell, G.  J.  (1988).  Child sexual abuse research: The implications for clinical practice.  In G. E. Wyatt and G. J. Powell (eds.), Lasting effects of child sexual abuse.  pp. 271-281.  Sage Publications.  Newbury Park, CA.

Wyatt, G.  E., & Powell, G.  J.  (1988). Identifying the Lasting Effects of Child Sexual Abuse: An Overview, in G. E. Wyatt & G. J. Powell (eds), Lasting effects of child sexual abuse.  pp. 11-17.  Sage Publications.  Newbury Park, CA.

Yan, E.  (1993, June 25).  Accusers had trusted him.  Newsday, pp. 7, 37.

Yan, E., Topping, R.  (1993, June 24).  School sex abuse:  Sachem H.S. teacher held in case involving teens.  Newsday, p. 7.

Yates, A.  (1991). False and mistaken allegations of sexual abuse. In Tasman, A., Goldfinger, S.M., & Stephen, M. (eds.).  Review of Psychiatry: Sexual abuse of children and adolescents. Vol. 10, Chapter 15, pp. 320-335. American Psychiatric Press. Washington, DC.

Yaworsky, W.A. (1990, May 31). Manitoba public primary elementary school teachers' (K-3) perceptions of appropriate and inappropriate physical contact with students. Dissertation. The University of Manitoba, Canada.

Youngsters targeted by digital bullies. (2002, April 15). BBC News. Available. http://news.bbc.co.uk/hi/english/uk/newsid_1929000/1929944.stm

Youth boxing coach accused.  (2003, September 9). http://www.mlive.com/newsflash/michigan/index.ssf?/newsflash/get_story.ssf?cgi-free/getstory_SSF.CGI?G6435_BC_MI-BoxingCoachGetCharge&&news&newsflash-michigan

Youth hockey coach sentenced on molest.  (2003, June 18).  The Boston Channel. (WCVB-TV, Channel 5 Boston Online).

Youth Risk Behavior Survey (Annual). Youth Risk Behavior Surveillance System. Division of Adolescent and School Health.  U.S. Department of Health & Human Services, Centers for Disease Control and Prevention. Atlanta, GA.

Zakariya, S. B. (1988, August).  How you can identify people who shouldn't work with kids.  The Executive Educator, 10, 17-21.

Zemel, J. (1999, November 2).  Dirty Secrets: Message from a pedophile. Pittsburgh Post-Gazette. http://www.post-gazette.com/regionstate/19991102sletter3.asp

Zemel, J. (1999, November 2). Dirty Secrets: State education officials want legislators' help to end sexual abuse. Pittsburgh Post-Gazette.  http://www.post-gazette.com/regionstate/19991102dspenn2.asp

Zemel, J. (1999, November 1).  Dirty Secrets: 13 years after abuse, victim helps put teacher in jail. Pittsburgh Post-Gazette.  http://www.post-gazette.com/regionstate/19991001marianne2.asp

Zemel, J. (1999, October 31). Dirty Secrets: Rash of Cases leads one district to take hard look at policies. Pittsburgh Post-Gazette.   http://www.post-gazette.com/regionstate/19991031super7.asp

Zemel, J. (1999, October 31). Dirty Secrets' Case Files: Emily Slee and Robin Behling. Pittsburgh Post-Gazette, http://www.post-gazette.com/regionstate/19991031casefiles7.asp

Zemel, J. & Twedt, S. (1999, October 31). Dirty Secrets: Why sexually abusive teachers aren't stopped. Pittsburgh Post-Gazette, http://www.post-gazette.com/regionstate/19991031newabuse1.asp.

Zirkel, P. A. (1988).  Wrong by Wright: Liability for sexual abuse.  Phi Delta Kappan, 69 (6), pp. 451-452.

F:\Users\Clients-Current\US Dept of Ed\Bibliography\Bibliography.030204 Update.doc

JUSTIN REED                          *
                                    *
        Plaintiff,                  *
                                    *
v.                                  *
                                    *       Case Number:    06-37
PIKE COUNTY                         *
BOARD OF EDUCATION, et al           *
                                    *
        Defendant.                  *

## COMPLAINT

This is an action against the Pike County Board of Education by Plaintiff Justin Reed for equitable relief, damages, costs, attorney fees and expenses in accordance with the Individuals with Disabilities Education Improvement Act ("IDEIA") 20 U.S.C. §§1400 *et seq.*; the Alabama Exceptional Child Education Act (Ala. Code §§ 16-39-1 *et seq.*; Title II of the Americans with Disabilities Act ("ADA") 42 U.S.C. §§12115, *et seq.*; § 504 of the Rehabilitation Act of 1973 ("§ 504") 29 U.S.C. 794;  42 U.S.C. 1983 ("1983").

## FACTUAL ALLEGATIONS

1.      Justin Reed is 16 years old and has significant, multiple disabilities.  He was determined eligible for special education services by the Pike County School District at all times relevant to this action, thereby entitling him to a nondiscriminatory free appropriate public education (FAPE) designed to meet his unique needs. 20 U.S.C. 1402, C.F.R. 300.7.  Justin is also a student with a disability under Title II of the ADA and § 504.42 U.S.C. 12102. 34 C.F.R. 104.3.

2.      During the time period covered by this complaint, Justin was a  9th grade special education student at Pike County High School in Brundidge, Alabama,  in Pike County,

1



Alabama.

3.     Defendants failed to provide Justin with FAPE and failed to provide the personal security
to which he is entitled under the laws outlined in this complaint.   As a result, on March
23, 2006, Justin's parents and legal guardians,  Mike and Ann Reed, filed for an impartial
due process hearing under IDEIA, 20 U.S.C. 1415 and § 504 of the Rehabilitation Act 29
U.S.C. §794;  C.F.R. 104.36.

4.     The IDEIA claims have been largely resolved.  This complaint addresses the § 504, ADA
and 1983 claims.

5.     Justin was a special education student in the 9th grade at Pike County High School during
the 2004-2005 school year.

6.     Justin's IEP and behavioral plan (nonexistent) failed to adequately address his unique
needs and Justin failed to make any progress.

7.     The Student Profile portion  of Justin's IEP dated 9-12-05, initiation/duration dates from
8-1-04 to 5-31-05, document Justin's present level of performance as  3.3 GE for Math;
3.9 GE for Reading; and 3.0 GE for Spelling.  His IEP called for, *inter alia,* "90 minutes
with functional math teacher, daily, in the resource classroom".

8..    Despite his extremely low functional level and the IEP- mandated related service of 90
minutes per day, Math teacher, Ms. Regina Catrett,  allowed Justin  to leave Math class
early on numerous occasions to go to the band room at the written request of Charles
Coon.

9.     Despite his extremely low functional level in the areas of Reading and Spelling, Ms.
Marie Davidson allowed Justin to leave Science class early, and Ms. Owens allowed him

to leave Reading class early to go to the band room at the written request of Charles Coon.

10.    The School failed to provide Justin with an education plan that addressed his individual needs and failed to implement the IEP dated 9-12-05. On the KTEA administered at the end of the 2004-2005 school year, Justin's GE had dropped to 3.1/Math; 2.8/Reading; and 3.3/Spelling.

11.    School employees allowed Justin to leave classes early in violation of his IEP, and despite the fact that he was performing well below grade level. As documented above, Justin failed to progress as a result. These actions by school employees rose to the level of deliberate indifference. But this indifference resulted in even greater harm to Justin.

12,    Plaintiff avers that during the time when Justin was wrongfully and negligently allowed to leave class, he was sexually molested by band director Charles Coon.

13.    Plaintiff further avers that Coon was allowed to take Justin off campus, during school time, contrary to school rules. Justin repeatedly got into Coon's truck, in plain view of the school office and school employees on numerous occasions. Again, the school demonstrated deliberate indifference towards the safety of a disabled student and its own policies.

14.    Plaintiff avers that at some time during the 2004-2005 school year, the Pike County Superintendent of Education, the Board, and the school administration were made aware of sexual allegations against Coon. Though some students were allegedly questioned regarding these allegations, neither Justin nor other students known to have constant contact with Coon were questioned.

3

15.     Plaintiff avers that at some point during the second semester of the 2004-2005 school
        year, Coon was reprimanded for "inappropriate behavior." Plaintiff further avers, on
        information and belief, that the discovery process will show that the incidents
        surrounding this "reprimand" put the Pike County Board and the school administration on
        notice and should have raised serious concerns about Coon's repeated request for Justin
        to leave classes early to come to the Band room, and the numerous, blatant occasions
        when Coon took Justin off campus.   At the very least, Justin should have been one of the
        students questioned, as well as several other "regulars" who left class to go to the Band
        room and who can testify as to what occurred there.

16.     If Pike County Board of Education and Pike County High School had simply followed the
        dictates of IDEIA and § 504, and exercised reasonable care and caution with one of its
        most vulnerable students, especially after receiving notice of allegations against Coon,
        this tragic situation might have been avoided.

17.     Charles Coon subsequently pled guilty to 2nd Degree Sexual Abuse of Justin Reed (and
        his brother).  Coon is serving that sentence concurrent with the one he received for a
        guilty plea to 2nd Degree Sodomy of another student.

18.     Due to the gross indifference, thoughtlessness and wanton  negligence of the Defendants,
        Justin endured sexual and emotional trauma which could have lifelong effects.   During
        the time period encompassing the sexual abuse, his academic progress was nonexistent
        and he was forced to change schools due to embarrassment and inability to deal with the
        trauma.   Justin's limitations have made adjustment to a new school and  the ongoing
        counseling process slow and painful, as his limitations hinder his ability to understand

4

and deal with what happened to him.

19.    Wherefore, Plaintiff respectfully asks this Hearing Officer to grant the following relief:

a.    Issue a Declaration finding that the Defendants' actions have harmed Justin Reed, thus entitling Plaintiff to the relief requested herein.

b.    Issue a Declaration stating that Plaintiff is the prevailing party in this action and Plaintiff is entitled to reasonable attorney fees, costs and expenses.

c.    Issue an award of compensatory damages against Defendants.

d.    Issue an award of punitive damages against Defendants.

e.    Award such other and further relief and benefits as justice may require.

Respectfully submitted,

DEANIE CLARK ALLEN   (ALL067)
Attorney for Plaintiff

OF COUNSEL:

Deanie Clark Allen
Attorney and Counselor at Law
110 South McDonough Street
Montgomery, Alabama 36104

## CERTIFICATE OF SERVICE

I hereby certify that on this the _____3rd_____ day of ____August____, 2006 a copy of the foregoing was served on all counsel of record, by placing the same in the United States Mail, postage prepaid and properly addressed.

5

OF COUNSEL

Donald Sweeney, Esq.
**Bradley Arant Rose & White LLP**
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JUSTIN REED,               )
                               )
       Plaintiff,        )
                               )
v.                          )   CIVIL ACTION NUMBER:  06-cv-
                               )
PIKE COUNTY BOARD OF EDUCATION,  )
et al.,                  )
                               )
       Defendants.

## ANSWER

Comes now the Pike County Board of Education (hereinafter "Board" or "Defendant") to answer the complaint; and in furtherance thereof states:

### General Denial

The Board denies that Plaintiff is entitled to relief as requested in this complaint.

### Affirmative Defenses

1.      Plaintiff's sole remedy for damages as a matter of law is to file a request with the Alabama State Board of Adjustment.

2.      The doctrine of governmental immunity constitutes a complete defense to Plaintiff's request for relief.

EXHIBIT
B

3.     As a matter of law, Plaintiff is not entitled to recover compensatory or punitive damages against the Board.

4.     Plaintiff's claims for punitive damages are barred by the Fourteenth Amendment to the United States Constitution.

5.     Plaintiff cannot recover punitive damages against the Board because such an award, which is penal in nature, would violate the Board's constitutional rights protected under the Alabama Constitution of 1901, as amended, and the Constitution of the United States.

<u>Response to Allegations in Complaint</u>

Without waiving any of the foregoing defenses, the Defendants respond to the specific allegations made by Plaintiffs. Defendants, in response to the specific allegations raised in Plaintiffs' complaint, state in seriatim as follows:

1.     Admit that Justin is eligible for special education services.

2.     Admit that Justin was a student in the Pike County School System.

3.     Deny that Defendant failed to provide Justin with FAPE or appropriate personal security. Admit that Plaintiff filed for due process.

4.     Deny that Plaintiff is entitled to relief under IDEA or § 504, ADA or § 1983.

5.     Admit.

2

6.    Deny.

7.    Defendant neither admits nor denies the factual allegation of this paragraph and demands strict proof thereof.

8.    Deny.

9.    Deny.

10.    Deny.

11.    Deny.

12.    Deny.

13.    Deny.

14.    Deny.

15    Deny the multiple allegations of this paragraph and deny the allegation of fault attributed to the Board.

16.    Deny.

17.    Admit based on information and belief.

18.    Deny.

3

19.    Defendant Board denies that Plaintiff is entitled to any relief from the Board.

## Denial of Factual Allegations

Defendant Board denies the factual allegations of this complaint, except to those facts specifically admitted.  Defendant Board reserves the right to amend and/or supplement its answer based on information disclosed through the discovery process.

_____
Donald B. Sweeney, Jr. (SWE002)

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

4

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on September ___, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

   Deanie Clark Allen, Esq. (ALL067)

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

   None

        Respectfully submitted,

        <u>s/ Donald B. Sweeney, Jr.</u>
        Donald B. Sweeney, Jr. (asb-3803-277d)
        Bradley Arant Rose & White LLP
        One Federal Place
        1819 Fifth Avenue North
        Birmingham, AL 35203-2104
        Telephone: (205) 521-8000
        Facsimile: (205) 521-8800
        E-mail: dsweeney@bradleyarant.com

## BEFORE THE DEPARTMENT OF EDUCATION
## OF THE STATE OF ALABAMA

JUSTIN REED,                          )
                                      )
    Petitioner,                 )
                                      )
v.                                    )          **Special Education No: 06-37**
                                      )
PIKE COUNTY BOARD                     )
OF EDUCATION,                         )
                                      )
    Respondent.                 )

## ORDER

This matter having come to be considered upon a settlement agreement by and between the parties and the same having been reviewed, it is

ORDERED as follows:

1.    That Petitioner, along with his brother, shall be allowed to attend Troy City Schools until completion of each of the twelfth grade.

2.    That all other IDEA-related issues of a free appropriate public education raised by the due process hearing request have been resolved.

3.    That Petitioner's Individuals with Disabilities Education Act (IDEA) claims are resolved. 20 U.S.C. §1415(1). The remaining claims of Petitioner are not remotely related to Petitioner's access to a free appropriate public education nor any decision(s) made thereon. The remaining claims are entirely non-educational claims. Indeed, they appear to be tort claims for negligence, wantonness, assault and battery, etc. which just so happen to be brought on behalf of a disabled child. (See Exhibit A and B attached hereto). Neither the genesis nor manifestation of the abuse alleged by Petitioner in the initial due process hearing complaint were educational. Consequently, the IDEA administrative

process does not offer potential relief for the injuries the child allegedly suffered. <u>Witte v. Clark Co. School Dist.</u>, 197 F. 3d 1171, 1275 (9th Cir. 1999); <u>Walden v. Moffett</u>, 2006 WL 2520291 (E.D. Ca. 2006).

4.    That Petitioner has exhausted all administrative remedies. The Petitioner's IDEA complaint has been resolved. The remaining portions of the complaint do not seek relief for which local or state agency expertise would assist in the resolution. There is no issue remaining as to the choice of educational methods most suitable to the child's needs. There is no need to craft an individualized education plan (IEP) or its remedial substitutes. A detailed administrative record on the remaining issues is unnecessary.

5.    That this Order and the settlement agreement upon which it is based shall not impede Petitioner's right to file a suit for monetary damages under §504 of the Rehabilitation Act of 1973.

6.    That Petitioner is the prevailing party before the Administrative Hearing Officer and has obtained a consent decree as a consequence of his efforts by which means relief has been awarded and there has been a judicially sanctioned change in the legal relationship of the parties. <u>P.N. v. Clementon Bd. of Educ.</u>, 442 F. 3d 848 (3rd Cir. 2006); <u>A.R. v. New York City Dept. of Educ</u>, 407 F. 3d 65 (2d Cir. 2005).

This settlement is judicially enforceable. <u>Brandon K. v. New Lenox School Dist.</u>, 2001 WL 1491499 (N.D. Ill. 2001); <u>M.S. v. New York City Board of Education</u>, 2002 WL 31556385 (S.D. N.Y. 2002); <u>K.R. v. Jefferson Township Board of Education</u>, 2002 WL 1625411 (D. N.J. 2002)(n.7).

7.    Upon entry of this Order the IDEA due process hearing request is withdrawn.

DONE this the 20th day of November, 2006.

Wesley Romine
Hearing Officer

cc:    Deanie Allen
       Donald Sweeney
       Kathy Adams

## AFFIDAVIT OF
## ERIC WILLIAMS

Before me, the undersigned Notary Public, in and for the county and said state,personally appeared Eric Williams, who being first duly sworn, deposes and says as follows:

My name is Eric Williams.  I am an adult over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me. I am employed as the Operations Manager for DrugTest Services, LLC, a private company in Montgomery, AL. In that capacity I am responsible for all aspects of drug- and alcohol-testing matters, including sample collection, sample testing, and interpretation of results.

DrugTest Services, LLC, provides testing services as well as educational, advice, and testimony services to numerous agencies, including circuit and district court (2nd Judicial District, 15$^{th}$Judicial District, and 19th Judicial District), the Alabama Department of Public Safety, the Montgomery County Sheriff's Office, the Montgomery County District Attorney's office, the Alabama Department of Human Resources, the Alabama Board of Pardons and Paroles, and Montgomery County Community Corrections.

I am a Certified Professional Collector Trainer (CPCT) through the Drug and Alcohol Testing Industry Association (DATIA). DATIA was founded in 1995 as the National Association of Collection Sites, and has grown to represent over 1300 members, and expanded its scope. DATIA now represents the entire spectrum of drug and alcohol service providers including collection sites, laboratories, consortia, third-party administrators, Medical Review Officers, and testing equipment manufacturers. I served on the Specimen Collection Committee of that association in 2004, when it assisted the United States' Congress' Drug Testing Advisory Board in the creation of new federal drug testing regulations, specifically as they concern alternative specimens such as hair, oral fluids, and sweat.

I am also a Certified Medical Review Officer Assistant (MRO-A) through the Medical Review Officer Certification Council (MROCC). MROCC is an independent physician-based certifying body that represents a multi-specialty partnership among a variety of medical specialty groups such as the American

College of Occupational and Environmental Medicine, the American Academy of Clinical Toxicologists, the American College of Medical Toxicology, the American Society of Addiction Medicine, the College of American Pathologists, and the American Medical Association. MROCC's MRO Assistant Certification Program identifies qualified MRO staff with the highest professional standards of expertise and skills necessary to assist physician Medical Review Officers in the evaluation of drug and alcohol test results in public and private sectors. As a certified MRO Assistant I have been trained and, through written examination, found to be proficient in carrying out the specific functions and tasks necessary to perform at the highest level of competency within the drug testing and evaluation arena. I work in these matters with N.A. Garrison, M.D., a board-certified MRO with numerous years of clinical experience.

I have been admitted in court as an expert witness in this field numerous times at the administrative, district, and circuit court levels.

It is my testimony that hair testing generally can detect drug usage within the past ninety (90) days (dependent upon hair length) – a much longer period in comparison to urine, sweat, blood, or oral fluid.  Hair is easily collected, transported, and stored, and it is more difficult to adulterate than urine.

Eric Williams

Sworn to and subscribed before me this the _25 th_ day of March, 2008.

_Beth B. Davis_
Notary Public

My Commission expires: _11/18/08_
(Seal)



**Results While You Wait • On-Site Testing and Collections**

**On-site drug testing is here to stay! It is quick, accurate, and has a place in your business.**



DrugTest Services Inc., is a distributor of on-site (ins drug testing devices. These kits will test from one to drugs of abuse in less than five minutes. This type of testing is ideal for our clients who need fast initial res for pre-employment, random, post-accident or reaso cause testing and require drug screen results immed

DrugTest Services, Inc., also offers the option to hav clients' specimens tested at a SAMHSA-certified laboratory. This type of testing is required for clients DOT jurisdiction, and it is ideal for clients who wish t utilize a medical review officer (MRO) to oversee the specimen results.

DrugTest Services, Inc., assists our clients with all pl of their DOT and Non-DOT drug testing program, fro development of their drug testing policy to the collect procedures and reporting of the screening results. W utilize clinics, hospitals, and our office for collections also provide on-site collectors 24-hours a day for collections at a client's place of business.

DrugTest Services, Inc., is a drug testing company tr has earned the reputation of consistently providing o customers with the high quality of service that they deserve. We offer our clients the highest level of convenience, confidentiality, and specimen integrity. our products and services are fully guaranteed to be accurate as well as confidential.

## *New! Oral Testing Available!*

Pre-Employment Screening
DOT/Non-DOT Physicals
Staff MRO
Staff Physicians
EBT/BAT Alcohol Testing

Pregnancy Testing
DNA Paternity Testing
Drug Test Policy Development
Computerized Random Selection
On-Site Prescreen Drug Kits

Confidential Screening
Community Services

Drug Awareness Training
Confidential HIV Testing

If you are searching for information on specific drugs, you may look here:

MedLine Plus

**DrugTest Services Incorporated**
433 St. Luke's Drive • Montgomery, AL  36117
(334) 396-3872 • Fax:  (334) 396-5872
E-Mail:  eric@drugtestservices.com

**2004**

Copyright © 2003 All Rights Reserved.
DrugTest Services, Incorporated

This is a typed reproduction of a taped statement taken by Lt. Randy Courtney.

**COURTNEY:** I'm Lt. Randy Courtney with the Greenville Police Dept., investigator. Today's date is July 8, 2005, the time is 4:21 p.m. Talking to Mr. Charles L. Coon. This is going to be in reference to a sodomy, second case and also a child molestation case, enticing a child. Mr. Coon's already been, warrants have been signed, he's already been charged with this. And this will just be a statement concerning the facts of this case.

Mr. Coon, I'd just like for you to start and just, from the beginning where you was a band teacher at Pike County High School and tell me how you become involved with a juvenile, Blake Faulkner.

**COON:** Ok. That started uh fall of 2000. He was in beginner band, went through beginner band, made him part of the band. We became friends, uh, he helped me do things with the band, so far as chart shows, lining fields, what have you. Blake had a pretty rough home life at the time. I think he still does. And I guess I just became a little too close to him. Uh, one thing led, well I won't say led, but he asked me to get him a cell phone, I got him a cell phone. Uh, he came home with me on different occasions at which time he helped me do work in the yard and work around the house. And we've been places together before, uh, my wife and him and one other student went to Six Flags last summer and all. And Blake would come home and type the programs for half time shows, programs for the concerts that we did and what have you on my computer. He had access to my computer and he downloaded some things, I didn't go in and check 'em. I, I felt like I could trust him and some of the things that are downloaded on the computer on either one of them he did. And I don't know what he downloaded. I guess I should have been checking a little more closely. Uh, things went from one thing to the other and we came much more closely. Some things did take place, but they were mutual at times and usually were mutual and all. I'm sorry they took place, uh, but they took place and I can't retract them, they took place and I'm sorry they did take place.

Charles Coon00029
City of Greenville

**PAGE TWO**

**COURTNEY:** All right. Charles, when you say things took place, I, just tell me what actually did happen. I mean…I know, was it just oral sex on, or intercourse or, or just tell me exactly what happened.

**COON:** Ok. They, they was no intercourse involved. There was mutual kissing and there was some oral sex involved and at one, one time in particular it was on both parts.

**COURTNEY:** Ok. So basically what you're saying is, is he was… Mr. Coon, I had to turn the tape off, we had some problems. So we gonna start over again and just continue.

**FUSSELL:** No, don't start over.

**COURTNEY:** We're gonna just continue go where we was at. Uh, uh, if you would, I was asking you about exactly what did happen, you said that, that both, you know, that ya'll did have oral sex and it was a mutual thing, which meant that he, that you performed oral sex on him and he also performed oral sex on you. And, and, but when I say him, I mean Blake Faulkner. Is this correct?

**COON:** That's correct.

**COURTNEY:** Ok. And no sexual intercourse ever occurred?

**COON:** None.

**COURTNEY:** How many times do you think the oral sex occurred?

**COON:** I think it was three.

**COURTNEY:** Ok. When you and him went to Six Flags, he told me ya'll went to Six Flags twice. First time was you and your wife and him and Adam and then later on, I believe in June of this year, you and him went to Six Flags, you and Blake. And ya'll spent the night in the LaQuinta Inn by Six Flags. He said that was one occasion that oral sex occurred. Is that true?

**PAGE THREE**

**COON:**          Yes.

**COURTNEY:**     Ok. And then he told me the other 3 times was here at your house in Greenville.

**COON:**          I only recall 3 times in all.

**COURTNEY:**     Ok. That's fine. During the time you and him was friends and all, had a relationship together, I understand that you helped him open him a checking account at South Trust Bank in Pike County. Is that correct?

**COON:**          That's correct.

**COURTNEY:**     He also had 2 credit cards, one was a GM card and one of them was an Emerald Bank card. Did you assist him in getting those cards?

**COON:**          I did assist him in getting the Emerald bank card. I did not know that he had obtained the GM card.

**COURTNEY:**     So he got that on his own?

**COON:**          He got that on his own, I guess by getting online.

**COURTNEY:**     Ok. So there was basically just the cell phones, you bought him a, you also bought him a cell phone, one of them was a Alltel phone and one of them was a Nextel phone and then one, then one Southern Link. Is that correct?

**COON:**          Right.

**COURTNEY:**     Ok. And you also had it during about this time had bought his friend Adam a cell phone and uh, Blake's younger sister a cell phone.

**COON:**          Right. Esther. Uh, I got Blake's sister a cell phone at the request of Blake's dad, Phillip Faulkner.

**PAGE FOUR**

**COURTNEY:** Ok. Uh, during this whole time did anybody else, any of Blake's friends come over and stay at your house?

**COON:** Uh, no one besides Adam.

**COURTNEY:** Ok. While Adam was at your house he never was involved in any kind of sexual...

**COON:** None whatsoever.

**COURTNEY:** Ok. During the time ya'll would leave Pike County and be you know coming, driving to Butler County to Greenville, did, at any time on the road or did ya'll ever, did anything ever happen sexually, you have any sexual contact on the road like fondling, or touching, or kissing, or anything like that in another county?

**COON:** Well it's kinda hard to do that and drive.

**COURTNEY:** Yeah. I understand that. I was just wondering you know, you know while ya'll were driving or something, did, did he ever touch you or you ever touch him or something. Because he made mention that maybe there was some fondling going on or something, some hands in pants, or touching or something like that. You remember, remember that?

**COON:** If it did I don't remember doing that.

**COURTNEY:** Ok.

**COON:** Not trying to drive.

**COURTNEY:** Ok. Ya'll went to, uh, Six Flags twice?

**COON:** Right.

**COURTNEY:** At any time did ya'll go any where else? Gulf Shores maybe?

**PAGE FIVE**

**COON:**          We went to the beach one time last summer and Adam was with us, so nothing took place.

**COURTNEY:**    That was just you, Adam, and Blake.

**COON:**          Right.

**COURTNEY:**    Ok.

**COON:**          And we went and came the same day.

**COURTNEY:**    Right. Ok. At any time when you, whenever ya'll was talking and this was going on, did ya'll communicate back and forth? You from Greenville and him in Pike County, uh, via email on the computer or...

**COON:**          Of course we emailed each other.

**COURTNEY:**    Right. How about any kind of chat, chat rooms and all, chatting back and forth...

**COON:**          Not, not in a chat room.

**COURTNEY:**    Ok. So ya'll was just basically emailing each other back and forth.

**COON:**          Well not email, I use MSN Messenger or Yahoo.

**COURTNEY:**    Ok. On your computers at home, is there, will there be any pornographic sight materials or anything like that, nude pictures of children or, or anything on those computers?

**COON:**          There shouldn't be any pictures of any children, they're probably some sights with adults on it.

**COURTNEY:**    Right. Ok. Any, will there be anything else in your house that would have like pornographic material on it, videos, uh, pictures of children, or, or magazines, or anything else like that?

**PAGE SIX**

**COON:**　　　　There's one video that my wife's uncle gave me and he was from California.  And they moved here and then moved back and it had some adults only stuff on.

**COURTNEY:**　　Ok.  How long you been a teacher?

**COON:**　　　　I taught for 30 years.

**COURTNEY:**　　Tell me where all you taught at.

**COON:**　　　　I taught in Dallas County, I taught in Marion County, I taught in Walker County, Tuscaloosa County, Pike County and Monroe County.

**COURTNEY:**　　And how long have you been a teacher or been involved in the Public School System?

**COON:**　　　　30 years.

**COURTNEY:**　　And during your time in But, as a teacher, or even before that, before you was a teacher, had you ever been involved in a sexual relationship with any child under the age of 18 during this time?

**COON:**　　　　No.

**COURTNEY:**　　So this was the first time and only time in your life that you've ever been involved in anything like this?

**COON:**　　　　Right.

**COURTNEY:**　　Ok.  And you, you're giving this statement on your own free will?

**COON:**　　　　Right.

**COURTNEY:**　　Nothing's been promised to you, I've made no threats to you, or nothing, right?

**PAGE SEVEN**

**COON:**        No.

**COURTNEY:**        Ok.

**FUSSELL:**        That'll conclude this interview.

**COURTNEY:**        At this time, the time is 4:35, this will end the
statement with Mr. Charles Coon.

_____

**DATE:**        _____

**WITNESS:** _____

Charles Coon00035
City of Greenville





188 Ramage Circle
Brundidge, Alabama 36010
November 16, 2004

Pike County Board of Education
101 West Love Street
Troy, Al 36081

Dear Dr. Bazzell:

We, Mr. & Mrs. David Foster, are corresponding with you about a matter concerning our son, David M. Foster, a seventh grade student at Pike County High School. It was brought to our attention Saturday, November 13, 2004, that our son was inappropriately disciplined by the band teacher, Mr. Coon during the week of November 8-12, 2004.

During band practice, David obviously did something that did not meet Mr. Coon's approval. As a result of his disapproval, Mr. Coon grabbed and choked David. Our son was initially reluctant in disclosing any information to us. However, he did admit that the alleged accusations were true.

We send our children to school to learn, obey, and respect peers and those who are in authority. This is not to say that they never step out of line. Nevertheless, this method of discipline is unacceptable under any circumstances. As concerned parents, we want this incident thoroughly investigated. We want to be completely involved and informed throughout this investigation.

We believe that the Pike County School System is a responsible education facility/environment. We believe that safety is one of your top priorities for your students, faculty, and staff. Therefore, we know you will do the right thing and honor our request.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0877

There is no need for parents to wonder or worry if their child/children is/are being treated with respect in their need of discipline. We will await for your reply, and we thank you for your consideration.

<div align="right">Sincerely,</div>

<div align="right">Mr. &amp; Mrs. David Foster</div>

CC:

Mr. Wyman Botts, Rev. Earnest Green, Mr. Greg Price, Mr. Adam Register, Rev. Herbert Reynolds, Mrs. Linda Steed

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0078*

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Adam Register, President
Linda Steed, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Rev. Herbert Reynolds

**Dr. Mark Bazzell**
Superintendent



November 22, 2004



Mr. and Mrs. David Foster:
188 Ramage Circle
Brundidge, Alabama 36010

Dear Mr. and Mrs. Foster:

The purpose of this correspondence is to confirm receipt of your letter dated November 16, 2004 on this date. I will be conducting a thorough investigation into your allegations and will correspond with you in writing upon completion of my review.

Please understand that we take all such complaints with the upmost seriousness and will be diligent in this review. Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Board of Education

*Tommy:*

*I need written statement from Mr. Coon, the student, and any other witnesses, etc. As soon as possible.*

cc: Mr. Terry Casey, Principal

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0076

101 W. Love Street, Troy, Alabama 36081-2613  Telephone : (334) 566-1850  Fax: (334) 566-2580

Dr. Bazzell,

Please find attached the documents on the Coon/David Foster case.
If there are any further questions please contact me.

Thanks,

Mr. Mc Daniel

Latonya Poston
( 735 + 8134 )
2683

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0079



# Pike County <span>High School</span>

**Terry J. Casey**
**Principal**

552 South Main Street
Brundidge, Alabama 36010-2299
Phone (334) 735-2389
Fax (334) 735-3176

**Robert L. McDaniel**
**Assistant Principal**

Dr. Mark Bazzell, Superintendent
Pike County Board of Education

December 2, 2004

Dear Sir,

The purpose of this correspondence is to provide summation to the incident involving Mr. Charles Coon, the Pike County High School Band Director and David Foster, a member of the Pike County High School Band.

During the week of November 7, 2004 it was brought to my attention by the parents of David that Mr. Coon allegedly used improper discipline (choking) while attempting to restore order during band practice. Later that same day I met with David's Father who requested more details of the incident. Mr. Foster expressed concern regarding the perceived lack of decorum and discipline within the band but specifically the incident between their son and Mr. Coon. I advised the parents that I would investigate the incident but I also told them that it was within their right to use the Pike County Board of Education chain of command as well. I was ask by Mr. Casey, the Pike County High School Principal, to investigate/mediate the incident and provide the report to the superintendent's office.

On the evening of November 23rd 2004, both parties (parents and teacher) and I met and discussed the incident. I provided a copy of the complaint written by the Fosters to Mr. Coon and read it as the parents and Mr. Coon listened. Afterwards, I asked Mr. Coon if he wished to respond. Mr. Coon admitted that he "lost it." In explaining such, he admitted placing both hands around the child's neck. He acknowledged that he may have caused some pain and discomfort to the child due to his size and strength in relationship to David, who is considerably smaller in statue. On several occasions, Mr. Coon apologized and offered to present his apology via any forum that the parents wished. I. e. The Messenger, school board or band booster parents.

Mr. Foster, David's father expressed belief in the genuine sincerity of Mr. Coon's apology while also granting permission to discipline their son when needed. He sternly disagreed with the method used by Mr. Coon during the incident in question.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0080



**"OUR PROMISE"**
Clean and Safe Schools • Friendly and Courteous Service • Academic Accountability • Fiscal Responsibility



# Pike County          High School

Terry J. Casey
Principal

552 South Main Street
Brundidge, Alabama 36010-2299
Phone (334) 735-2389
Fax (334) 735-3176

Robert L. McDaniel
Assistant Principal

The meeting could be summarized as productive. I believe that Mr. Coon understands that his actions were far out of bounds. Both agreed to keep an ongoing dialogue between each other.

Sincerely,

Robert L. Mc Daniel
Assistant Principal
Pike County High School

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0061

**"OUR PROMISE"**
Clean and Safe Schools • Friendly and Courteous Service • Academic Accountability • Fiscal Responsibility



David Foster          happen Nov 12, 2004    (Band)
4th Block

It started with a Boy name Timothy williams, he & Mr. Coon had got into it. Timothy had the theme song, he made that. He quited, he usually starts his song off, but sense he quited Mr. Coon let the saxes start it off. the next day tim dad came and talk to Mr.coon Tim came back bad practice started with tim song I started it off because I was a saxophone player he said something to me I didn't know what he was talking about at first so I started of again he got mad I said "I thougt you wanted the saxophnes start off, he didn't say nothing. So the last time I started of again he came over & started choking me & said get off my field little boy.

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0082

**IMPORTANT MESSAGE**

FOR _Dr. Brazzell_

DATE _12/7/04_    TIME _1:40_ A.M. / P.M.

M _Mis Foster_

OF _____

PHONE _____
AREA CODE    NUMBER    EXTENSION

☐ FAX
☐ MOBILE
AREA CODE    NUMBER    TIME TO CALL

MESSAGE _returned your call Ext 108_

SIGNED _____

**TOPS** 4009
MADE IN U.S.A.

JR v. Pike County BOE
Produced by Defendant PCBE
No. 0075

# CURRICULUM VITA

JAMES D. SEARS
Sears Law Firm
816-A Manci Avenue
Daphne, Alabama 36526
(251) 621-3485; Fax 621-3486
Email: jdsears@searslawfirm.com

## EDUCATION

| | | |
|---|---|---|
| 1988 | J.D. | The University of Alabama School of Law; Tuscaloosa, Alabama |
| 1975 | Ed.D. | University of Florida;  Gainesville, Florida (Special Education/Mental Retardation; Minor - Research and Statistics). |
| 1971 | M.Ed. | University of Florida; Gainesville, Florida (Special Education/Mental Retardation). |
| 1968 | B.A. | University of South Florida; Tampa, Florida (Liberal Arts/History). |

## PROFESSIONAL EXPERIENCE

1995-Present        Private Practice, Attorney at Law; Southwest Alabama

Special Education Law--representing children with disabilities.

Criminal Law--representing defendants who have diagnoses of mental retardation and/or mental illness.

Fall, 1996        Adjunct Professor, Spring Hill College, Mobile, Alabama

1988-1994        Private Practice, Attorney at Law; Tuscaloosa, Alabama

Special Education Law--representing children with disabilities.


DEFENDANT'S EXHIBIT

*10*

–1–

Criminal Law--representing defendants who have diagnoses of mental retardation and/or mental illness.

1984-1994    <u>Director</u>, West Alabama Comprehensive Services, The University of Alabama; Tuscaloosa, Alabama--a university affiliated program for adults who have severe disabilities.

1981-1994    <u>Associate Professor of Special Education</u>
The University of Alabama, Area of Special Education; Appointments in the fields of Mental Retardation and Orthopedic and Other Health Impairments

(Coordinator of Programs for the Multidisabled), The University of Alabama, Area of Special Education; Tuscaloosa, Alabama

1977-1981    <u>Assistant Professor of Special Education</u>, The University of Alabama, Area of Special Education; Tuscaloosa, Alabama Appointments in the fields of Mental Retardation and Orthopedic and Other Health Impairments

1975-1977    <u>Assistant Professor of Special Education</u>, Bowling Green State University; Bowling Green, Ohio

Summer, 1974    <u>Instructor</u>, University of South Alabama; Mobile,  Alabama

1973-1975    <u>Graduate Assistant</u>, Department of Special Education, The University of Florida; Gainesville, Florida

1971-1973    <u>Principal</u>, Hillcrest School; Ocala, Florida

<u>1969-1971</u>    <u>EMR Teacher</u>, Long Branch Elementary; Jacksonville, Florida


## PROFESSIONAL ASSOCIATIONS

Phi Delta Kappa

Alabama Bar Association

Mobile County Bar Association

Baldwin County Bar Association

## **BAR ADMISSIONS**

State of Alabama

United States Court of Appeals for the Eleventh Circuit

United States District Court, Northern District of Alabama

United States District Court, Middle District of Alabama

United States District Court, Southern District of Alabama

United States District Court, Southern District of Mississippi

United States District Court, Eastern District of Louisiana

## **PROFESSIONAL AWARDS**

Liberty Bell Award.  Mobile Bar Association, Law Day.  May 16, 2003.  In recognition of providing legal representation for individuals who have disabilities.

Professional of the Year.  The ARC of Alabama.  June 4, 1994.  In recognition of providing legal representation for individuals who have disabilities.

## **PRESENTATIONS**

Alabama Association for Behavior Analysis.  Ethics and behavior analysis.  Tuscaloosa, AL.  October 25, 2007.

Alabama Council for Exceptional Children.  Thirty years of special education:  what went wrong? Birmingham, AL.  February, 2007.

Alabama Association for Behavior Analysis.   Behavior analysis in the public school program.  Birmingham, AL.  November, 2006.

Conecuh County Board of Education.  Complying with the Individuals with Disabilities Education Improvement Act (2004), Evergreen, AL.  August 3, 2006.

Montgomery County Board of Education.  Complying with the Individuals with Disabilities Education Improvement Act (2004), Montgomery, AL.  June 14, 2006.

Conecuh County Board of Education.  Legal issues associated with providing services to students who have disabilities, Evergreen, AL.  June 8, 2006.

<u>Lorman Education Services</u>.  Student discipline issues in Alabama, Montgomery, AL.  May 23, 2006.

<u>Special Education Action Committee: Symposium on Special Education and the Juvenile Justice System</u>.  The Individuals with Disabilities Education Improvement Act, as Reauthorized in 2004 and the Juvenile Justice System, Mobile, AL.  November 8, 2005.

<u>Alabama Association for Behavior Analysis</u>.  Behavior: According to the Individuals with Disabilities Education Improvement Act, as Reauthorized in 2004, Birmingham, AL.  October 25, 2005.

<u>Medical Educational Services-Professional Development Network</u>.  The Individuals with Disabilities Education Improvement Act, 2004 Reauthorization, Birmingham, AL.  December 10, 2004.

<u>Alabama Association for Behavior Analysis</u>.  Functional Behavior Assessments, Behavior Intervention Programs, and the Individuals with Disabilities Education Act, Birmingham, AL.  November 17, 2004.

<u>Mobile County, Alabama Bar Association Criminal Practice Seminar</u>.  Incompetency and Mental Examination--Law, Rules, and Practice, Mobile, AL.  May 7, 2004.

<u>Lorman Education Services</u>.  Requests for Due Process Hearings, Birmingham, AL. March 5, 2004.

<u>Lorman Education Services</u>.  Discipline of Students with Special Needs in Alabama, Montgomery, AL.  February 24, 2004.

<u>International Council for Exceptional Children, Teacher Education Division</u>.  Best Professional Practice: The Case for Redefinition of Teaching Students with Disabilities, Biloxi, MS.  November 16, 2003.

<u>Medical Educational Services-Professional Development Network</u>.  Legal Aspects of Student Discipline in Alabama, Birmingham, AL.  November 6, 2003.

<u>Medical Educational Services-Professional Development Network</u>, Legal Aspects of Student Discipline in Alabama, Birmingham, AL.  November 21, 2002.

<u>Alabama Council of School Board Attorneys</u>, Discipline Under IDEA, Gulf Shores, AL.  July 20, 2002.

<u>Lorman Educational Services</u>, Discipline of Students with Special Needs, Montgomery, AL.  May 15, 2002.

<u>Professional Development Network</u>, Special Education Law in Alabama,  Evaluations, Eligibility Determination and IEPs, Birmingham, AL.  May 3, 2002.

<u>Alabama Bar Institute for Continuing Legal Education, Practical Criminal Defense Law Seminar</u>, The Criminal Defendant Who is Mentally Retarded. Tuscaloosa, AL.  September 15, 2001.

<u>Medical Educational Services, Inc.</u>  Special Education Law for the New Millennium in Alabama.  Birmingham, AL.  April 20, 2001.

<u>Alabama Criminal Defense Lawyers Association.</u>  *Loosening the Death Belt Seminar V: Matters of Life and Death*.  A Practical Guide to Representing People Who have Mental Retardation in Death Penalty Cases.  Birmingham, AL.  January 26, 2001.

<u>Alabama State Bar Association</u>, Disabilities Law Section Meeting, Special Education Law Update,  Orange Beach, AL.  July 14, 2000.
<u>Mobile Bar Association, Continuing Legal Education</u>, Individuals with Disabilities Education Act, as Reauthorized in 1997, 20 U.S.C. 1400, *et seq.*  Mobile, AL. January 20, 2000.

<u>Professional Development Network</u>; Special Education Law in Alabama: Rights and Responsibilities (Individualized Education Program, Placement Decisions and Parent Participation).  Birmingham, AL.  Faculty, February 23, 1999.

<u>Odyssey Program</u>; University of South Alabama, Mobile, AL.  Anatomy of a Murder Trial. Lecturer, Fall, 1998.

<u>Odyssey Program</u>; University of South Alabama, Mobile, AL.  Overview of the Legal Process.  Lecturer, Fall, 1997.

<u>Baldwin County Friends of Special Education</u>; Fairhope, AL.  Developing IEPs.  February 1997.

<u>Baldwin County Friends of Special Education</u>; Fairhope, AL.  Parents Rights in Special Education.  October 1996.

<u>Alabama Association on Learning and Behavior Disorders</u>; Mobile, AL.  Law in the Special Education Classroom, January  1996.

<u>University of South Alabama</u>; Mobile, AL.   Legal Aspects of an IEP, April  1995.

<u>Alabama Council for Exceptional Children/MR Division</u>; Tuscaloosa, AL.  Legal Aspects of Mainstreaming, February 1994.

<u>Juvenile Practice and Procedure Seminar</u>; Birmingham, AL.  How to of a 94-142 Case, November 1991.

Repton Senior High School, Reston, AL.  What I would tell my son on his graduation day, Commencement Address, June  1989.

Alabama Municipal Judges Conference; Montgomery, AL.  The Mentally Retarded in the Municipal Court System, March  1989.

Alabama Council for Exceptional Children SuperConference; Birmingham, AL.  The Impact of Recent Litigation and Legislation on Special Education in Alabama, February  1989.

Alabama Municipal Judges Conference; Tuscaloosa, AL.  The Mentally Retarded in the Municipal Court System, February  1989.

Alabama Attorney General's Commission on the Handicapped; Huntsville, AL. Providing Educational Services to the Handicapped in Alabama, October 1988.

Mississippi Band of Choctaw Indians; Philadelphia, MS.  Managing the Behavior of Students Who Are Handicapped, August  1988.

University of Montevallo--Teacher Inservice Center; Talladega, AL.  The Pragmatics of Mainstreaming, August  1988.

Association of Retarded Citizens of Jefferson County; Talladega, AL.  The Pragmatics of Mainstreaming, August  1988.

Association of Retarded Citizens of Jefferson County; Birmingham, AL.  Graduation Address; Preparing for the Future in Special Education, August  1988.

Universities of Alabama/ Livingston--Teacher Inservice Center; Tuscaloosa, AL.  The Law and Special Education, July 1988.

Auburn University Student Counsel for Exceptional Children; Auburn, AL.  AIDS and Special Education, April 1988.

Association for Retarded Citizens of Morgan County; Decatur, AL.  Special Education in Alabama: Past, Present and Future, March 1988.

Alabama SuperConference, Council for Exceptional Children; Birmingham, AL.  AIDS and Special Education,  February  1988.

Association of Retarded Citizens of Jefferson County; Birmingham, AL.  Due Process, January 1988.

Council for Exceptional Children, Birmingham Chapter; Birmingham, AL.  The Law and Special Educators,  November 1987.

<u>Tuscaloosa City Schools</u>; Tuscaloosa, AL.  Physical Management of Aggressive Behaviors, November  1987.

<u>University of Montevallo--Teacher Inservice Center</u>; Montevallo, AL.  Mainstreaming Exceptional  Children, August  1987.

<u>Alabama SuperConference, Council for Exceptional Children</u>; Montgomery, AL. Special Education and the Law: Teaching the Mentally Retarded About Their Miranda Rights, February  1987.

<u>Decatur City Board of Education</u>; Decatur, AL.  Physical  Management of Aggressive Behavior, January  1987.

<u>The University of Alabama/Livingston  -- Teacher In-Service Center</u>; Tuscaloosa, AL.

    1.    Identifying Handicapped Students in the General Education Program, August 1986.

    2.    Physical Management of Aggressive Behavior, July  1986.

    3.    Physical Management of Aggressive Students, February 1986.

    4.    Needs and Characteristics of Handicapped Students, January 1986.

    5.    The  Use  of  Punishment  with  Handicapped  Students  and  Legal Considerations Relative to Special Education, July 1985.

    6.    The Educable Mentally Retarded in Public School Programs, July 1985.

<u>Alabama State Department of Education (State Board Hearing on Programs for Exceptional Children and Youth, Policies and Procedures Manual</u>; Tuscaloosa, AL. Policy Recommendations for Mental Retardation Programs, September     1985.

<u>Oak Hill School</u>; Tuscaloosa, AL.  Special Education in the Future (Graduation Address), May 1985.

<u>Cerebral Palsy Institute</u>; Tuscaloosa, AL.  Legal Implications for Public Law 94-142, June 1984.

<u>Florida Developmental Disabilities Learning Resource Systems Annual Meeting</u>; St. Augustine, FL. Conferencing with Parents of Early Childhood Handicapped Children and Using the IEP Meeting as a Parent Conference, 1983-1984.

    1.    Interactions with Paraprofessionals, May 1983.

    2.     Physical Management of Aggressive Behavior, May and October 1983; February and March 1984.

Alabama SuperConference, Council for Exceptional Children; Birmingham, AL. Utilizing Microcomputers as an Augmentative Communication Aid, February 1984.

West Alabama Consortium; Tuscaloosa, AL. Sex Education for the Mentally Retarded and Managing Aggressive Behaviors of Handicapped Students, October 1983.

Montgomery Children's Center; Montgomery, AL. Augmentative Communication Aids for the Non-Speaking, January 1983.

Tuscaloosa City Schools; Tuscaloosa, AL. Managing Aggressive Behaviors of Handicapped Students, January 1983.

Council for Exceptional Children; National Meeting, Washington, D.C. Providing Consulting Assistance for Least Restrictive Environments, April 1980.

Gatlinburg Conference on Research in MR/DD; Gatlinburg, TN. Chairperson. Self-Injurious and Stereotyped Behaviors, March 1980.

State Meeting of the American Association on Mental Deficiency; Birmingham, AL. University Programs Designed to Train Professionals to Work With the Severely and Profoundly Handicapped, December 1980.

National Conference of American Speech and Hearing Association; Detroit, MI. A Comparison of the Use of Blissymbolics and Manual Signs When Used with Severely and Profoundly Mentally Retarded Subjects, November 1980.

National Conference of the American Association of the Severely and Profoundly Handicapped; Chicago, IL; Legal Aspects of Using Punishment with a Severely/Profoundly Handicapped Population and Defining the Severely and Profoundly Handicapped from an Educational Perspective, October 1979.

Council of Administrators of Special Education; State of Alabama Meeting; Montgomery, AL. Programming for the Severely and Profoundly Handicapped, July 1979.

Southeastern Regional Coalition for the Preparation of Personnel to Work With the Severely Handicapped; State Education Agency Meeting; Nashville, TN. Certification Reciprocity for the Severely/Profoundly Handicapped Area, May 1979.

Cerebral Palsy Institute; The University of Alabama; Tuscaloosa, AL. Programming for the Severely/Profoundly Handicapped, June 1978.

National Conference of the American Association on Mental Deficiency; Denver, CO. Residential Programming: A Model for Private Residential Institutions, May 1978.

Professional Association for the Retarded, State Meeting; Columbus, OH. Developing Programs for the Severely/Profoundly Retarded, October 1977.

International Conference of the Council for Exceptional Children; Atlanta, GA. Creative Behavior of Trainable Mentally Retarded Adolescents, April 1977.

Sunshine Children's Home; Program Committee; Toledo, OH. Program Planning for the Residential Institution, January 1977.

Professional Association for the Retarded, State Meeting; Columbus, OH. Parent Counseling, October 1976.

Lucas County Board of Mental Retardation, Orientation Meeting; Toledo, OH. Normalization of TMR Students,   September 1976.

District Meeting, Professional Association for the Retarded; Bowling Green, OH. Intermediate-Level TMR Program Training, May 1976.

Florida Council for Exceptional Children; Miami, FL. Citizens Advocacy at the University of Florida, May 1974.

Florida Association of Supervisors and Curriculum Directors; Orlando, FL. Developing a Curriculum for the Trainable Mentally Retarded in a Moderate Size County, February 1972.

## CONSULTING

Conecuh County Board of Education; Educational/Legal Consultant, 2006.

Tuscaloosa City Schools; Tuscaloosa, AL. Legal Consultant, 1998 - 1999.

Madison County Schools; Huntsville, AL. Legal Consultant, 1989.

Huntsville City Schools; Huntsville, AL. Expert Witness, 1988 - 1989.

Shelby County Board of Education; Huntsville, AL. Legal Consultant, 1988.

Mississippi Band of Choctaw Indians; Philadelphia, MS. October 1988.

Alabama Developmental Disabilities Program; Tuscaloosa, AL. Expert Witness, 1985-1994.

United States Department of Education; Washington, D.C.  Grant Review; August 1987.

Alabama State Department of Mental Health; Eufala, AL.  Programming for the Severely Handicapped Adult,  February 1986.

Alabama Developmental Disabilities Advocacy Program; Tuscaloosa, AL.  Developing Individual Education Plans,  September 1984.

Guntersville School System; Guntersville, AL. Sex Education for the Handicapped, August 1984.

Jasper City School Board; Jasper, AL. Physical Management of Aggressive Behavior, March 1984.

Mobile County School Board; Mobile, AL.  Conferencing with Parents of Exceptional Children: Topical Areas of Concern, February 1984.

Mobile County School Board; Mobile, AL.  Conferencing with Parents of Exceptional Children:  Counseling Needs,  November 1983.

United States Department of Education; Washington, D. C.  Grant Review, April 1983; October 1982; December 1979.

Central Mississippi Legal Services; Jackson, MS.  Expert Witness,   August 1980 - May 1982.

Mobile County Schools; Mobile, AL.  Assessing Multihandicapped Students, September 1981.

Talladega County Schools; Talladega, AL.  Programming for the Severely/Profoundly Handicapped, January 1981.

Partlow State School; Tuscaloosa, AL.   Programming  for  the  Most  Profoundly Handicapped, August 1979-1982.

Project REACT; Tuscaloosa, AL.  July 1979-1982.

Jasper City Schools; Jasper, AL.  Special Education Program Evaluation, June 1979.

Alabama State Department of Education; Due Process Hearing Officer, December 1978-1981.

John S. Jones Elementary School (Severe/Profound Program); Gadsden, AL. September 1978.

Tuscumbia City School Board; Tuscumbia, AL.  September 1978.

Sheffield City School Board; Sheffield, AL.  September 1978.

Sumter County Opportunity Center, Inc.; York, AL.  April - December 1978.

Regional Education Center Classes for the Severely/Profoundly and Multiply Handicapped; Northport, AL.  April 1978.

Head Start Programs of Dadeville; Montgomery and Anniston, AL.  The Use of IEP=s with Young Children Who Are Handicapped,   March/April 1978.

Alabama Cluster III of Head Start Programs; Montgomery, AL.  Developing Individual Education Plans,  November 1977.

Cuyahoga Board of Mental Retardation; Cleveland, OH.  Assessments and Activities for TMR Students and Evaluation Techniques for Principals in the TMR School, March 1977. Sunshine Children's Home; Maumee, OH.  Program Consultant, January - August, 1977.

Cuyahoga Board of Mental Retardation; Cleveland, OH.  Philosophy of Education for TMR Centers, January 1977.

Department of Special Education, University of Florida, Gainesville, FL.  Career Education for the Handicapped, December 1976.

Van Wert Board of Mental Retardation; Van Wert, OH.  Teaching Trainable Mentally Handicapped Students,  February 1976.

Cuyahoga Board of Mental Retardation; Cleveland, OH.  Appropriate Skills for Trainable Students, March 1975.

Putnam County Public Schools; Putnam County, FL.  Career Education for the Mentally Retarded, October 1974.

## PROFESSIONAL PARTICIPATION

Southeastern Regional foundation for Autism Spectrum Disorders, Board Member.  Mobile, AL.  2007-Present.

Alabama Disabilities Advocacy Program, Advisory Board.  The University of Alabama; Tuscaloosa, AL.  2004-Present.

Editorial Board, *Addendum*, Alabama State Bar Association.  Montgomery, AL.  2001.

Board Member, Mobile Bar Association, Volunteer Lawyer Program (Pro Bono Program) 1998-Present.

Member, Program Advisory Committee, Learning Disabilities Association; Mobile, AL. 1996-1997.

Director, Tuscaloosa Area Special Olympics; Tuscaloosa, AL. 1991 - 1994.

Member, Board of Directors; Alabama State Special Olympics; Montgomery, AL. 1991-1994.

Member, Outreach Committee, Alabama State Special Olympics; Montgomery, AL. 1991 - 1994.

Member, Mayor's Council for People with Disabilities; Tuscaloosa, AL. 1992 - 1994.

Chairperson, Goals and Objectives Committee, Mayor's Council for People with Disabilities;   Tuscaloosa, AL. 1992 - 1993.

Chairperson, Southeastern American Association on Mental Retardation - Education Division; Atlanta, GA.  1991 - 1993.

Treasurer, Alabama Division, Association on Mental Retardation; Montgomery, AL. 1989 - 90.

Editorial Board, University of Alabama, School of Law,  Law and Psychology Review, Tuscaloosa, AL.  1987-1988.

Member, Professional Advisory Committee, Indian Rivers Mental Health Center; Tuscaloosa, AL. 1988 - 1994.

Member, College of Education, The University of Alabama, Leadership Review Committee; Tuscaloosa, AL.  1987 - 1988.

Chairperson, By-Law Committee, Alabama Council for Exceptional Children, 1985-1987.

President, Alabama Council for Exceptional Children/MR Division; Montgomery, AL.  1985 - 1986.

President-elect, Alabama Council for Exceptional Children/MR Division; Montgomery, AL. 1984 - 1985.

Chairperson, Evaluation and Review Subcommittee of the Tuscaloosa Association for Retarded Citizens; Tuscaloosa, AL.  1985.

Board Member, Tuscaloosa Association for Retarded Citizens; Tuscaloosa, AL. 1983 - 1993.

Chairperson, Regional Education Center Advisory Committee; Northport, AL. 1982 - 1985.

President, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1981 - 1982.

Board Member, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1979 - 1981.

Vice-President, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1979 - 1981.

President, Council for Exceptional Children, Chapter 244; Tuscaloosa, AL.  1978 - 1979.

Vice-President, Council for Exceptional Children; Chapter 244; Tuscaloosa, AL; 1978 - 1979.

Member, Education Committee, Executive Board, Alabama Association for Retarded Citizen; Montgomery, AL.  1979.

Member, Severely/Profoundly Handicapped Certification Committee, Alabama State Department of Education, 1977 - 1978.

Board Member, Wood County Association for Retarded Citizens; Bowling Green State University; Bowling Green, OH. 1975 - 1976.

Committee to Develop a Collaborative Model for Public Education, College of Education, University of Florida; Gainesville, FL., Fall 1973.

Principal's Committee on Comprehensive Planning, Marion County Public Schools; Marion County, FL., 1973.

Co-Chairperson, Marion County Special Olympics; Marion County, FL. 1972.

Grant Review Committee for New Hope School and Opportunity Workshop; Marion County, FL. 1972.

Representative, Systems Analysis for Education Training, Duval County Public Schools; Jacksonville, FL. Spring 1970.

Representative. Committee on Public School Desegregation, Duval County Public Schools; Jacksonville, FL. Spring 1970.

## PUBLICATIONS

2006    Student discipline issues.  Lorman Education Services.  With Eliabeth M. Hall.

1996    Educational goals for individuals with a severe disability: parental and professional preferences. *Education,* June 22, 1996. With Kenneth Coffey.

1989    Mental retardation and unconscionability. *Law and Psychology Review*, 18, 77 - 90.

   Teaching Miranda rights to students who have mental retardation. *Teaching Exceptional Children*, 21, 2, 38-43.  With A. Bishop and E. Stevens.

1988    Learning disabilities, postsecondary education, and Section 504 of the Rehabilitation Act of 973. *Law and Psychology Review*, 12, 61 - 78.

   AIDS and special education.  In *Proceedings, Alabama Teacher Education Division.*  With E. Stevens.

1987    Toward a conceptualization of seriously emotionally disturbed.    In *Proceedings of the Eighth National Institute on Legal Problems of Educating the Handicapped*. UP-10.  Alexandria, VA: CRR Publishing Co.  With E. Stevens.

1985    The use of punishment with handicapped students and legal considerations relative to special education.  Monograph.    *The University of Alabama/Livingston, Teacher In-Service Center.*

   The educational definition and classification of mental retardation in the state of Alabama. (1985). *The Alabama Council for Exceptional Children Journal*, 6(1), 4-6.  With T. Russell and R. Palk.

1984    Correlates of therapeutic progress by infants with cerebral palsy and motor delay.  *Perceptual and Motor Skills*, 58, 159-163.  With P. Parette and L. Holder.

1983    Teacher/parent Conferencing skills: Inservice modules. Monograph.  *Florida Diagnostic and Learning Resources System.*

   Assessment of early therapeutic intervention effectiveness utilizing Bayley psychomotor gains. *Capstone Journal of Education*, 3 (2), 30-38.  With P. Parette and L. Holder.

1982    Guidelines for the development of personnel preparation programs designed to train personnel to teach severely handicapped individuals. *Teacher Education in Special Education*, 4, 1. With members of the Southeastern Regional Coalition of Personnel Preparation for the Severely Handicapped.

Characteristics of teachers and teacher aides of the severely and profoundly handicapped. *Education and Training of the Mentally Retarded, 17* (3), 190-195. With R. Escudero.

1981    The effect of the use of galvanic skin responses in determining the reactivity of special education majors to nonverbal career related cues. *College Student Journal*, 15 (4), 290-294. With T. Uno and R. Gargiulo.

1979    Punishment: Beyond the right to an education. (1979). *Law and Psychology Review*, 5, 79-101. With H. Stephens.

The dimensional preferences of individuals who are mentally retarded. *Bulletin of the Psychonomic Society*, 14 (3), 219-222. With R. Gargiulo and T. Uno.

1978    Communication for the severely and profoundly handicapped: new challenges. *Journal of Speech and Hearing Association of Alabama*, 8, 1.

Galvanic skin responses of special education students to relevant and nonrelevant verbal cues. (1978). *College Student Journal*, 12 (2), 204-211. With T. Uno and R. Gargiulo.

1977    Creativity in the developmentally disabled adolescent. *Psychological Reports: Perception and Motor Skills*, 40, 1207-1212. With T. Uno, R. Gargiulo, and M. Maurer.

A study of adaptive behavior scale ratings for community based TMR adults. *Mental Retardation*, 15 (1), 44-45. With J. Whorton.

1976    Creativity behavior of trainable and educable mentally retarded adolescents. *Journal of Creative Behavior, 10* (3), 221. with T. Uno, R. Gargiulo, and M. Mauter.

## SPONSORED PROGRAMS (FUNDED)

1984 -1994   Annual renewal grants. West Alabama Comprehensive Services, Alabama State Department of Mental Health.

–15–

1984        Utilizing Microcomputers as an Augmentative Communication Aid, the University of Alabama, College of Education Research Grant.

            The Use of Microcomputer Technology with a Severely Handicapped Adult, the University of Alabama, Graduate School Biomedical Research Grant.

1983        Severe/Profound Teacher Preparation, Office of Special Education, United States Department of Education.

1982        Severe/Profound Component , Area of Special Education Training Grant. Office of Special Education: Handicapped Personnel Training Program, Handicapped Teacher Education.  United States Department of Education.

            Trainers of Paraprofessionals, Office of Special Education, United States Department of Education.

1981        Severe/Profound Component, Area of Special Education Training Grant. Office of Special Education: Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

1980        Severe/Profound Component, Area of Special Education Training Grant. Office of Special Education:  Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

            Trainers of Paraprofessionals, Office of Special Education, United States Department of Education.

1979        Severe/Profound Component, Area of Special Education Training Grant. Bureau of Educationally Handicapped:  Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

            Rural Education and Corrective Therapy, United Cerebral Palsy of Alabama, Inc.

            Conference on the Severely/Profoundly Handicapped, Project RESET, Bureau of Educationally Handicapped Training Grant, United States Department of Education, Department of Health, Education and Welfare.

            Alternative Forms of Communication for the Severely and Profoundly Handicapped, Venture Fund, The University of Alabama.

1978        Severe/Profound Component, Area of Special Education Training Grant. Bureau of Educationally Handicapped Training Grant, United States Department of Education, Department of Health, Education and Welfare.

–16–

1977      The Severely/Profoundly Handicapped:  In-Depth Training, Alabama State
          Department of Education.

          Severe/Profound Component, Area of Special Education Training   Grant.
          Bureau of Educationally Handicapped Training Grant, United States
          Department of Education, Department of Health, Education and Welfare.

          TMR Program Redesign, Project 419 (University Redesign ), Bowling Green
          State University.

1976      Characteristic Assessment of Elderly Severely Mentally Retarded Individuals.
          Faculty Research Committee, Bowling Green State University.

–17–