IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JR, a minor, by his mother and    )
father EAR and TMR,    )
    )
    Plaintiffs,    )
    )
    CIVIL ACTION NUMBER:
v.    )    2:06-cv-1120-MEF
    )
PIKE COUNTY BOARD OF    )
EDUCATION, et al.,    )
    )
    Defendants.    )

**MOVANTS' EVIDENTIARY SUBMITTAL
IN SUPPORT OF
BRIEF IN REPLY TO PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Come now Defendants, Pike County Board of Education, Samuel Mark Bazzell, Terry Casey, Buddy Pyron, and Robert McDaniel, to submit this evidentiary submittal in support of Defendants' Brief in Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment filed concurrently herewith. As additional support of the brief, Defendants submit the following evidence attached hereto:

23.    Letter from Superintendent Mark Bazzell to Charles Coon dated April 1, 2005

24.    Letter from Superintendent Mark Bazzell to Charles Coon dated April 8, 2005;

25.    *M.Y. v. Special Sch. Dist. #1*, 519 F.Supp.2d 995 (D. Minn. 2007)

26.    Affidavit of Mona Watson, former Counselor at Pike County High School

27.    Affidavit of Mark Bazzell, Superintendent, Pike County Board of Education

28.    Affidavit of Robert McDaniel, Assistant Principal, Pike County High School

29.    Affidavit of Terry Casey, Principal, Pike County High School

30.    Affidavit of Walter L. Pyron, Interim Principal, Pike County High School


s/Donald B. Sweeney, Jr.
Donald B. Sweeney, Jr.

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800


## CERTIFICATE OF RETENTION OF ORIGINAL

As attorney for the filer of this document, I hereby certify that the filer or the filer's attorney currently holds the original signature document with any required formalities, will make the same available upon request of the Court or of a party, and will retain the hard copy of the same for one year after the expiration of all time periods for appeals, or resolution of appeals, whichever is later.

s/ Donald B. Sweeney, Jr.
Attorney for Defendants

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deanie Clark Allen, Esq.
Susan Shirock DePaola, Esq.

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Mr. Charles L. Coon
308 Country Club Drive
P.O. Box 201
Greenville, AL  36037

s/ Donald B. Sweeney, Jr.

# EXHIBIT 23

PLAINTIFF'S
EXHIBIT
14

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register

**Dr. Mark Bazzell**
**Superintendent**



April 1, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

This purpose of this correspondence is to notify you that you are being placed on administrative leave with pay, effective immediately, pending the outcome of an investigation into alleged misconduct involving a number of students. According to reports, you have allegedly engaged in the use of illegal drugs with students, provided illegal drugs to students, and also allegedly engaged in other inappropriate activities with students of a sexual nature. Since these reports involve allegations of criminal conduct on your part, I have also notified the appropriate law enforcement personnel.

I would very much like to meet with you at your earliest convenience to explain the nature of these reports and to offer you the opportunity to provide a written statement if you so desire. Also, I am directing that you not return to the Pike County High and Banks campus until this matter is resolved. In addition, I am further directing that you have no contact with Pike County High and Banks students, including band students until this matter is resolved.

Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Schools

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0087*

101 W. Love Street, Troy, Alabama 36081-2613   Telephone : (334) 566-1850   Fax: (334) 566-2580

# EXHIBIT 24



# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register

**Dr. Mark Bazzell**
Superintendent



April 8, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

The purpose of this correspondence is to notify you that the investigation into allegations of misconduct on your part involving students has been completed. The nature of these allegations were outlined in my letter to you dated April 1, 2005.

After review, there is no evidence at this time to substantiate these claims. However, this matter has been turned over to the appropriate law enforcement agency for further investigation if they find it necessary. Also, should additional information come to light, it is possible the investigation could be re-opened.

The investigation did reveal numerous reports that on several occasions you used cigarettes with students. If this is the case, I am requesting that you cease and desist from this practice. As you know, use of tobacco products by individuals who are less that twenty-one years of age is a criminal act. It is also criminal to provide these items to these individuals. The use of tobacco products by staff while on school campus is also a violation of school board policy.

In addition, the investigation revealed numerous reports of students being transported in your personal vehicle. This should also cease unless it involves extreme situations where the safety and well-being of students are involved. Routine transport of students in your personal vehicle should not occur. The liabilities for both you and the school system are obvious.

With the conclusion of this investigation, I am hearby clearing you to resume your duties beginning Monday, April 11, 2005.

*JR v. Pike County BOE*
Produced by Defendant PCBE
*No. 0101*

101 W. Love Street, Troy, Alabama 36081-2613  Telephone: (334) 566-1850

# EXHIBIT 25

Westlaw.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

Page 1

**C**
M.Y. ex rel. J.Y. v. Special School Dist. No. 1
D.Minn.,2007.

United States District Court,D. Minnesota.
M.Y., by and through her Parents, J.Y. and D.Y.,
Plaintiffs,
v.
SPECIAL SCHOOL DISTRICT NO. 1, Minneapol-
is Public Schools and Adbihakim Mohamed Isse,
Defendants.
**Civil No. 06-3045(DSD/SRN).**

Sept. 18, 2007.

**Background:** Disabled student, through her par-
ents, brought suit against school district, alleging
violations of federal and state law, arising out of
her sexual maltreatment by school bus driver.
School district moved for summary judgment.

**Holdings:** The District Court, Davis S. Doty, J.,
held that:
(1) student was not required to exhaust administrat-
ive remedies under Individuals with Disabilities
Education Act (IDEA) on Rehabilitation Act and §
1983 claims;
(2) school district's decision to remove special edu-
cation transportation from student's individualized
education plan (IEP) did not violate Rehabilitation
Act, absent showing of disability discrimination;
(3) no nexus existed between alleged assault and
any custom or policy of school district as required
to support substantive due process claim under §
1983;
(4) school district did not maintain inadequate re-
porting and remedial action plan in violation of stu-
dent's due process rights;
(5) school district did not violate Minnesota Mal-
treatment of Minors Act; and
(6) school district was not vicariously liable for its
employee's sexual assault.

Motion granted.

West Headnotes

**[1] Schools 345 ⟜155.5(3)**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k155.5 Handicapped Children, Pro-
ceedings to Enforce Rights
                345k155.5(2) Judicial Review or Inter-
vention
                    345k155.5(3) k. Exhaustion of
Remedies. Most Cited Cases
Plaintiff need not exhaust IDEA's administrative
procedures when pursuing a non-IDEA claim if the
claim is wholly unrelated to the individualized edu-
cation plan (IEP) process, which involves individu-
al identification, evaluation, educational placement,
and free and appropriate public education (FAPE)
decisions. Individuals with Disabilities Education
Act, § 615(*l*), 20 U.S.C.A. § 1415(*l*).

**[2] Civil Rights 78 ⟜1018**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1016 Handicap, Disability, or Illness
            78k1018 k. Elements of Discrimination
Claims in General. Most Cited Cases
To make a prima facie case under Rehabilitation
Act, a plaintiff must show among other things that
she was discriminated against based on her disabil-
ity. Rehabilitation Act of 1973, § 504(a), 29
U.S.C.A. § 794(a).

**[3] Civil Rights 78 ⟜1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1351    Governmental    Ordinance,
Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

Cases

Municipality can be held liable for a constitutional violation under § 1983 if the violation was committed pursuant to an official policy or custom. 42 U.S.C.A. § 1983.

**[4] Administrative Law and Procedure 15A 229**

15A Administrative Law and Procedure
  15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
    15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases

Courts will forego the exhaustion requirement only if it would be futile, if the administrative remedies are unable to provide adequate relief, or if an agency practice or policy of general applicability is contrary to law.

**[5] Schools 345 155.5(3)**

345 Schools
  345II Public Schools
    345II(L) Pupils
      345k155.5 Handicapped Children, Proceedings to Enforce Rights
        345k155.5(2) Judicial Review or Intervention
          345k155.5(3) k. Exhaustion of Remedies. Most Cited Cases

Proper inquiry in determining whether to require exhaustion of administrative remedies under IDEA on related claims is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies. Individuals with Disabilities Education Act, § 615(*l*), 20 U.S.C.A. § 1415(*l*).

**[6] Schools 345 155.5(3)**

345 Schools
  345II Public Schools
    345II(L) Pupils
      345k155.5 Handicapped Children, Proceedings to Enforce Rights
        345k155.5(2) Judicial Review or Intervention
          345k155.5(3) k. Exhaustion of Remedies. Most Cited Cases

Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required on related claims in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem. Individuals with Disabilities Education Act, § 615(*l*), 20 U.S.C.A. § 1415(*l*).

**[7] Schools 345 155.5(3)**

345 Schools
  345II Public Schools
    345II(L) Pupils
      345k155.5 Handicapped Children, Proceedings to Enforce Rights
        345k155.5(2) Judicial Review or Intervention
          345k155.5(3) k. Exhaustion of Remedies. Most Cited Cases

Disabled student who allegedly was sexually assaulted by school bus driver on regular summer school bus was not required to exhaust administrative remedies under IDEA on her Rehabilitation Act and § 1983 claims against school district for monetary damages, even though claims were not wholly unrelated to the individualized education plan (IEP) process as they involved her placement on regular summer school bus, where she sought to redress injuries resulting from alleged sexual assault, not from her deprivation of special education transportation to summer school. Individuals with Disabilities Education Act, § 615(*l*), 20 U.S.C.A. § 1415(*l*); Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 1033(1)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1030 Acts or Conduct Causing Deprivation
      78k1033 Discrimination in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

Page 3

78k1033(1) k. In General. Most Cited Cases
To make a prima facie case under Rehabilitation Act, plaintiff must show that the alleged disability discrimination reflected bad faith or gross misjudgment. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a).

**[9] Schools 345** ⚖⇒**148(2.1)**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k148 Nature of Right to Instruction in General
            345k148(2) Handicapped Children and Special Services Therefor
               345k148(2.1) k. In General. Most Cited Cases
School district that removed special education transportation from disabled student's individualized education plan (IEP) did not violate Rehabilitation Act or Minnesota Human Rights Act (MHRA) in connection with student's alleged sexual assault by regular route school bus driver, absent showing that district discriminated against student because of her disability or that it acted with bad faith or gross misjudgment. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); M.S.A. § 363A.12(1).

**[10] Civil Rights 78** ⚖⇒**1351(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(2) k. Education. Most Cited Cases
Requisite nexus did not exist between school bus driver's alleged sexual assault of disabled student and school district's alleged custom or policy of denying special education transportation to special education students when they attended general edu-

cation activities to support substantive due process violation under § 1983, even assuming that policy could be considered unconstitutional. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[11] Constitutional Law 92** ⚖⇒**4211**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
         92XXVII(G)8 Education
            92k4204 Students
               92k4211 k. Duty to Protect; Failure to Act. Most Cited Cases

**Schools 345** ⚖⇒**159.5(6)**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k159.5 Transportation of Pupils to and from Schools or Provisions in Lieu Thereof
            345k159.5(6) k. Drivers. Most Cited Cases
School district's immediate filing of state-required reports, cooperation in police investigation of student's alleged sexual assault by school bus driver, and its termination of driver precluded substantive due process claim that it maintained inadequate system for investigating and taking remedial action regarding student-related sexual misconduct of district employees. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[12] Infants 211** ⚖⇒**13.5(1)**

211 Infants
   211II Protection
      211k13.5 Duty to Report Child Abuse
         211k13.5(1) k. In General. Most Cited Cases
School district's timely filing of oral report within one day of learning of school bus driver's alleged sexual assault of student and filing of written report within three days complied with Minnesota Mal-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

Page 4

treatment of Minors Act. M.S.A. § 626.556(3)(a)(1), (7).

**[13] Labor and Employment 231H ☞3045**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(B) Acts of Employee
         231HXVIII(B)1 In General
            231Hk3044 Scope of Employment
               231Hk3045 k. In General. Most Cited Cases
Under Minnesota law, employer is vicariously liable for the torts of its employee when the tort is related to the duties of the employee and occurs within work-related limits of time and place.

**[14] Labor and Employment 231H ☞3045**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(B) Acts of Employee
         231HXVIII(B)1 In General
            231Hk3044 Scope of Employment
               231Hk3045 k. In General. Most Cited Cases
Under Minnesota law, a tort is related to the duties of the employee, for purposes of holding the employer vicariously liable, even if it would not be imputable to the employer, so long as it is so connected with and immediately grows out of another act of the employee imputable to the employer, that both acts are treated as one indivisible tort.

**[15] Labor and Employment 231H ☞3056(1)**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(B) Acts of Employee
         231HXVIII(B)1 In General
            231Hk3054 Intentional Acts
               231Hk3056 Assault and Battery
                  231Hk3056(1) k. In General.

Most Cited Cases
Under Minnesota law, where sexual assaults by employees in a particular profession are a foreseeable risk of that profession and a "well-known hazard," a sexual assault may be considered related to the employee's duties for purposes of imposing vicarious liability on the employer.

**[16] Schools 345 ☞89.3**

345 Schools
   345II Public Schools
      345II(F) District Liabilities
         345k89.3 k. Particular Torts in General. Most Cited Cases
Absent any showing that sexual assault between bus drivers and school children was a well-known hazard and among costs to school district of providing a public education, school district could not be held vicariously liable under Minnesota law for driver's sexual assault of disabled student.

**\*998** Margaret O'Sullivan Kane, Esq. and Kane Education Law, LLC, St. Paul, MN, for Plaintiffs.
Margaret A. Skelton, Esq., Isaac Kaufman Esq. and Ratwik, Roszak & Maloney, Minneapolis, MN, for Defendants.

## ORDER

DAVID S. DOTY, District Judge.
This matter is before the court upon defendant's motion for summary judgment [Doc. No. 28]. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

## BACKGROUND

M.Y. is a fifteen year old female student who has attended public schools in the Special School District No. 1 ("District") since at least 2001. She attended Loring Elementary until beginning at the W. Harry Davis Academy ("Academy") in the fall of 2004. M.Y. qualifies for special education services under the Individuals with Disabilities Education

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
(Cite as: 519 F.Supp.2d 995)

Page 5

Act ("IDEA"). 20 U.S.C. § 1400 et seq. Until May 2005, M.Y.'s Individualized Education Programs ("IEP") consistently required that she receive curb-to-curb busing to and from school during the regular school year. (D.Y.Aff.[FN1]) M.Y. also received the assistance of a one-to-one aide during the regular school year.[FN2] M.Y. has not qualified for extended school year ("ESY") services since 2001, but she attended regular education summer school during the summers of 2002-2004, 2006 and 2007 and received special education transportation during each of those summers.[FN3] (D.Y.Aff.)

> FN1. "D.Y. Aff." refers to the Corrected Amended Affidavit of D.Y.
>
> FN2. The one-to-one aide was removed at the end of the 2004-2005 school year, but was later reinstated in the middle of the 2005-2006 school year at the insistence of M.Y.'s special educator. (D.Y.Aff.2.) M.Y.'s March 9, 2006, IEP, however, does not provide for a one-to-one aid.
>
> FN3. As discussed below, M.Y. attended only the first three days of summer school in 2005 as a result of the incident at issue in this case.

M.Y.'s May 18, 2004, IEP provides that she "needs to be driven to school on a special education bus. She requires curb to curb transportation with an educational assistant riding the bus to and from school. Her teachers and parents are concerned about her welfare." (Pl.Ex. No. 1.) At an IEP team meeting on May 12, 2005, the IEP team altered M.Y.'s special education transportation by removing the provision requiring an educational assistant and providing that M.Y. would use general education transportation when attending general education activities. (Def.Ex. J.) D.Y., M.Y.'s mother, signed her approval on May 18, 2005. (Def.Exs.H, J.) However, it was not until D.Y. received a postcard on June 18, 2005, that she realized M.Y. would be required to use general education transportation for summer school. (Def.Ex.H.) As a res-

ult, when M.Y. began summer school on June 20, *999 2005, she was required to use general education transportation, which dropped M.Y. off and picked her up at a stop a half block from her home. (Def.Ex.H.)

When M.Y. was returning home from summer school on June 23, 2005, the school bus driver, Abdhihakim Isse ("Isse"), allegedly left his normal route to M.Y.'s bus stop and sexually assaulted M.Y. (Def.Exs.K, O.) After M.Y. notified D.Y. of the incident that evening, D.Y. and J.Y., M.Y.'s father, immediately called the police. (Def.Ex.H.) The District learned of the incident when the police department contacted the Department of Transportation Services for Minneapolis Public Schools on June 24, 2005. (Def.Ex.L.) The District notified Isse on June 29, 2005, that he was suspended with pay effective June 27, 2005, and on October 26, 2005, notified Isse that he was suspended without pay effective September 30, 2005. (Def.Exs.M, N.)

The District orally contacted the Minnesota Department of Education ("MDE") on June 24, 2005, and submitted a Maltreatment of Minors report three days later. As a result, the MDE conducted a Maltreatment of Minors investigation. (Def.Ex.O.) The MDE concluded that there was no maltreatment on the part of the Academy because it "did not have any prior knowledge of any inappropriate sexual touching by [Isse]," and because of the lack of comparative responsibility between the Academy and Isse. (Id.) The MDE affirmed this conclusion upon reconsideration, further concluding that the Academy had complied with the proper policies in hiring and training Isse, that the Academy had no notice that Isse would sexually assault a student,[FN4] that Isse had no restrictions that would have prevented him from driving a special education school bus and that at the time of the incident M.Y.'s IEP did not provide for special education transportation. (Def.Ex. P.) The maltreatment investigation did, however, conclude by a preponderance of the evidence that Isse committed maltreatment.[FN5] (Def.Ex.O.) The District terminated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
(Cite as: 519 F.Supp.2d 995)

Page 6

Isse's employment effective September 26, 2006. (Hixson Aff.)

> FN4. The MDE specifically found that Isse successfully completed a background check, that Isse had not had any complaints since he began working for the District in 2000 and that there was no documentation related to sexual misconduct by Isse. (Def.Ex. P.)

> FN5. According to the July 5, 2006 mal-treatment investigation report, Isse has been charged with two counts of criminal sexual conduct and there has been a warrant out for his arrest since October 2005, but his whereabouts as of the date of the report were unknown. (Def.Ex.O.) This order addresses only the claims that M.Y. has asserted against the District.

On June 19, 2006, M.Y. filed an 11-count complaint in state court alleging violation of the United States Constitution and several federal laws including Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C. § 1983.[FN6] In addition, the complaint asserted state law claims for violation of the Minnesota Human Rights Act ("MHRA"), the Mal-treatment of Minors Reporting Act, sexual assault and battery, intentional infliction of emotional distress, loss of consortium and the Minnesota Constitution.[FN7] The District removed the case to federal court on July 18, 2006. On June 1, 2007, the District filed a motion for summary judgment on all counts.

> FN6. M.Y. voluntarily withdrew count one alleging violation of Title IX of the Educational Amendments of 1972.

> FN7. M.Y. voluntarily withdrew count ten of the complaint alleging negligent infliction of emotional distress.

#### *1000 DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 255, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex, 477* U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.*

### II. Administrative Exhaustion

The District argues that M.Y.'s Rehabilitation Act and § 1983 claims must be dismissed because M.Y. failed to exhaust the administrative remedies required by IDEA. M.Y. responds that her claims are wholly unrelated to the IDEA process, that the remedies she is seeking are not available under IDEA and that she is therefore under no duty to exhaust administrative remedies before pursuing judicial action.

Congress enacted IDEA to ensure that all children with disabilities have access to a free and appropri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
(Cite as: 519 F.Supp.2d 995)

Page 7

ate public education ("FAPE"). 20 U.S.C. § 1400(d). IDEA seeks to accomplish this objective through a complex statutory framework that grants substantive and procedural rights to children and their parents. *See Winkelman v. Parma City Sch. Dist.,* ---U.S. ----, ---- - ----, 127 S.Ct. 1994, 1999-2005, 167 L.Ed.2d 904 (2007). Under this framework, challenges based on IDEA violations must be brought pursuant to IDEA's administrative procedures. 20 U.S.C. § 1415(f)-(g). IDEA does not "restrict or limit the rights, procedures, and remedies available under ... other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l* ). It does, however, require that plaintiffs exhaust administrative procedures to the same extent provided for in IDEA when "seeking relief that is also available" under IDEA. 20 U.S.C. § 1415(*l* ).

**A. Rehabilitation Act and § 1983 Claims Are Not Wholly Unrelated to the IEP Process**

[1] If a student qualifies for special education services, a school district must convene a team to develop an IEP that identifies the services the child will receive. 20 U.S.C. § 1414(d). FAPE decisions are those involving special education and related services-including transportation-that "are provided in conformity with the [IEP]."20 U.S.C. § 1401(9)(D); 34 C.F.R. § 300.34. A plaintiff need not exhaust IDEA's administrative procedures when pursuing a non-IDEA claim if the claim is "wholly unrelated to the IEP process, which involves individual identification, evaluation, educational placement, *1001 and [FAPE] decisions." *M.P. v. Ind. Sch. Dist. No. 721,* 439 F.3d 865, 868 (8th Cir.2006).

**1. Section 504 of the Rehabilitation Act**

[2] Section 504 of the Rehabilitation Act prohibits discrimination by governmental actors on the basis of disability. It provides in relevant part that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To make a prima facie case under Section 504, a plaintiff must show among other things that she "was discriminated against based on her disability." *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.,* 178 F.3d 968, 971 (8th Cir.1999). A plaintiff must also show that the discrimination reflected bad faith or gross misjudgment. *M.P.,* 439 F.3d at 868.

In her complaint, M.Y. asserts that the District acted "intentionally and with deliberate indifference to [M.Y.'s] rights as a student with a disability, including being denied her educational and non-academic benefits and services by reason of her disabilities in violation of Section 504." (Compl.9.) M.Y. failed to explain this statement in her memorandum in opposition to the District's motion for summary judgment. Presumably, M.Y.'s claim under Section 504 is that by not providing her with special education transportation, the District discriminated against her because of her disability. The issue of special education transportation is a FAPE decision that is specifically addressed in M.Y.'s IEP. Therefore, M.Y.'s Section 504 claim is not wholly unrelated to the IEP process.

**2. 42 U.S.C. § 1983**

[3] A municipality can be held liable for a constitutional violation under § 1983 if the violation was committed pursuant to an official "policy or custom." *See Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Granda v. City of St. Louis,* 472 F.3d 565, 568 (8th Cir.2007).

M.Y. asserts that Isse's sexual assault against her violated her substantive due process rights under the Fourteenth Amendment and that this violation was committed pursuant to the District's custom or policy of not providing special education transportation for general education activities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

(Pl's.Mem.Opp.S.J.16, 19.) In the alternative, M.Y. alleges that the constitutional violation was committed pursuant to the District's failure to train or supervise its employees with respect to special education transportation.[FN8] (*Id.* 19.) In either case, the claim is not wholly unrelated to the IEP process because the provision of transportation services is a FAPE decision. Whether the District engaged in a custom or policy pursuant to which M.Y. was sexually assaulted requires a determination of whether the District wrongfully withheld special education transportation. This determination is directly related to the IEP process. Therefore, M.Y.'s § 1983 claim is not wholly unrelated to the IEP process.

> FN8. In her complaint, M.Y. also alleges that the District's failure to investigate claims of sexual misconduct by employees forms the basis of liability. Although this claim would be wholly unrelated to the IEP process M.Y. does not pursue the argument.

**B. Relief Sought**

M.Y. argues further that administrative exhaustion is not required because she is seeking monetary damages unavailable under**1002** IDEA. *See Heidemann v. Rother,* 84 F.3d 1021, 1033 (8th Cir.1996) (noting that general and punitive damages are not available under IDEA). The District argues that administrative exhaustion is still required even though M.Y. seeks relief not available under IDEA.

[4] Administrative exhaustion "permits agencies 'to exercise discretion and apply their expertise, ... allows complete development of the record before judicial review, ... prevents parties from circumventing the procedures established by Congress, and ... avoids unnecessary judicial decisions by giving the agency an opportunity to correct errors.' "*Blackmon v. Springfield R-XII Sch. Dist.,* 198 F.3d 648, 656 (8th Cir.1999) (quoting *Urban v. Jefferson County Sch. Dist. R-1,* 89 F.3d 720, 724 (10th Cir.1996)). These benefits of exhaustion are substantial and

courts only forego the exhaustion requirement if it would be futile, if the administrative remedies are unable to provide adequate relief, or if an agency practice or policy of general applicability is contrary to law. *Id.*

[5][6] A plaintiff is not excused from IDEA's exhaustion requirement simply by requesting relief that IDEA does not provide. *See Charlie F. v. Bd. of Educ.,* 98 F.3d 989, 991-92 (7th Cir.1996) ("[W]hat relief is 'available' does not necessarily depend on what the aggrieved party wants.").[FN9] Rather, a court's primary concern is the source and nature of the alleged injuries for which the remedy is sought. *Padilla,* 233 F.3d at 1274. Therefore, the proper inquiry is "whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." *Id.*"Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem." *Id.* (citing *Charlie F.,* 98 F.3d at 992-93).

> FN9. The Eighth Circuit Court of Appeals has not addressed the specific issue of whether exhaustion of administrative remedies under IDEA is required even though a plaintiff is seeking relief not afforded by IDEA. Other circuits, however, have addressed the issue. *Compare Covington v. Knox County Sch. Sys.,* 205 F.3d 912, 917 (6th Cir.2000) (exhaustion not required because futile under "unique circumstances" of the case), *Witte v. Clark County Sch. Dist.,* 197 F.3d 1271, 1275 (9th Cir.1999) (exhaustion not required where plaintiff seeks money damages and all educational issues were already resolved), *and Padilla v. Sch. Dist. No. 1,* 233 F.3d 1268, 1274 (10th Cir.2000) (exhaustion not required because relief provided by IDEA could not address plaintiff's "completely noneducational injuries."), *with Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 64

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
(Cite as: 519 F.Supp.2d 995)

Page 9

(1st Cir.2002) (exhaustion required for § 1983 action based on IDEA violation), *Polera v. Bd. of Educ.,* 288 F.3d 478, 488 (2d Cir.2002) (exhaustion required because IDEA was intended to "remedy precisely the sort of claim" made by plaintiff), *and Charlie F.,* 98 F.3d at 993 (exhaustion required where the "genesis and the manifestations of the problem are educational."). This court finds the approach taken by the Seventh and Tenth Circuits well-reasoned and will apply it to this case.

[7] M.Y. seeks damages to redress injuries resulting from Isse's alleged sexual assault, not from her deprivation of special education transportation.FN10 In other words, M.Y. does not allege that her deprivation of special education transportation *1003 to attend summer school injured her. Rather, she argues that the deprivation of transportation led to the sexual assault that caused her injuries. In these narrow circumstances, IDEA's remedies do not address the noneducational injuries asserted by M.Y. Therefore, M.Y. is not required to exhaust her administrative remedies under IDEA.

> FN10. M.Y.'s complaint seeks money damages "to overcome the effects of the discrimination, indignity, emotional harm, out-of-pocket costs and impaired earning capacity." (Compl.15.) M.Y. also asserts that "[t]he request for monetary relief is to award damages for the injuries that were sustained by [M.Y.] as a result of her seizure, sexual assault, and the deprivation of her personal liberty, property and right to be free from offensive bodily intrusions." (Pl.Mem.Opp.S.J.11.)

## III. Section 504 and Minnesota Human Rights Act Claims

[8] To make a prima facie case under Section 504, a plaintiff must show among other things that she "was discriminated against based on her disability." *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.,* 178

F.3d 968, 971 (8th Cir.1999). A plaintiff must also show that the discrimination reflected bad faith or gross misjudgement. *M.P. v. Ind. Sch. Dist. No. 721,* 439 F.3d 865, 868 (8th Cir.2006) (citing *Monahan v. Nebraska,* 687 F.2d 1164, 1171 (8th Cir.1982)). The MHRA prohibits discrimination "in the access to, admission to, full utilization of or benefit from any public service because of ... disability." Minn.Stat. § 363A.12, subd. 1. The analysis under the MHRA and the Rehabilitation Act are the same. *See Yeng Thao v. City of St. Paul,* 481 F.3d 565, 567 n. 3 (8th Cir.2007); *Moubry v. Ind. Sch. Dist. 696,* 9 F.Supp.2d 1086, 1110 (D.Minn.1998).

[9] In her complaint, M.Y. stated that the District acted "intentionally and with deliberate indifference to [her] rights as a student with a disability, including being denied her educational and non-academic benefits and services by reason of her disabilities in violation of Section 504." However, M.Y. did not address the District's argument in opposition to her section 504 claim.FN11 Moreover, she has not provided any evidence showing that the District discriminated against her because of her disability, or that the District acted with bad faith or gross misjudgment. Because M.Y. has presented no evidence to establish a genuine issue of material fact, the court finds that summary judgment as to M.Y.'s section 504 and MHRA claims is warranted.

> FN11. The court presumed the validity of M.Y.'s Section 504 argument for purposes of the exhaustion argument above. In addressing the merits of the claim, however, the court will not consider arguments that M.Y. has failed to pursue or provide evidence to support.

## IV. Section 1983 Claim

M.Y. contends that Isse sexually assaulted her pursuant to the District's unconstitutional customs or policies.

Section 1983 provides in relevant part that:
[e]very person who, under color of any statute,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Municipalities are considered persons under section 1983 and are thus subject to liability for constitutional violations. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish municipal liability a plaintiff must show that a constitutional violation was committed pursuant to an official "policy or custom." *Id.* at 694, 98 S.Ct. 2018; *Granda v. City of St. Louis,* 472 F.3d 565, 568 (8th Cir.2007). "The first task in applying Monell is to identify what the governmental body's policy*1004 is. The second task is to determine whether that policy is unconstitutional." *Dick v. Watonwan County,* 738 F.2d 939, 943 (8th Cir.1984).

[10] M.Y. argues that the District maintains a custom or policy of denying special education transportation to special education students when they attend general education activities. Even if there was sufficient evidence to establish that the District maintains such a policy, M.Y. has provided no legal authority suggesting that it would be unconstitutional. Furthermore, M.Y. has not established that Isse assaulted her pursuant to the alleged custom or policy. In other words, M.Y. has not established the requisite nexus between the District's alleged custom or policy of denying special education transportation and Isse's sexual assault.

[11] M.Y. makes two alternative arguments. First, she argues that the District maintained a custom or policy of failing to train or supervise its employees with respect to the provision of special education transportation. M.Y., however, has provided no evidence or legal authority to support this argument. Second, M.Y. argues that the District "maintained an inadequate system of investigating,

reporting, or taking appropriate remedial action regarding the sexual misconduct or allegations of sexual misconduct by District teachers, employees, and administrators against students of the District." The record, however, demonstrates the opposite. Upon learning of the incident, the District immediately filed a Maltreatment of Minors Report, cooperated in the investigation of the incident and ultimately terminated Isse. Thus, there is nothing in the record to support M.Y.'s allegation. Accordingly, summary judgment is warranted on M.Y.'s § 1983 claim.[FN12]

> FN12. M.Y. also asserts violations of her Fourth Amendment "right to be free in her person against unreasonable searches, seizures, and invasions of privacy," and her "equal protection rights under the United States constitution." M.Y., however, did not plead these claims under § 1983. *See Bishop v. Tice,* 622 F.2d 349, 356 (8th Cir.1980) ("By enacting section 1983, Congress has provided an appropriate and exclusive remedy for constitutional violations committed by municipalities."). Even if M.Y. had properly pleaded these claims, they would not survive summary judgment because Isse did not sexually assault M.Y. pursuant to a District custom or policy.

**V. M.Y.'s Remaining State Law Claims**

**A. Maltreatment of Minors Act**

[12] M.Y. alleges that the District violated Minnesota's Maltreatment of Minors Act because it "did not make a good faith effort to make an incident report or conduct an investigation regarding" Isse's sexual misconduct. The District argues that it properly complied with all requirements under the Act.

The Maltreatment of Minors Act requires that a school district's employees make an immediate oral report to "the agency responsible for assessing or investigating the report," if the employee "knows or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995                                                                                          Page 11
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

has reason to believe a child ... has been neglected or physically or sexually abused within the preceding three years." Minn.Stat. § 626.556, subd. 3(a)(1). Within 72 hours of the oral report, a written report must be submitted. Minn.Stat. § 626.556, subd. 7.

Here, the Minnesota Department of Education acknowledged receipt of an oral report the day after the incident and a written report was submitted on June 27, 2005. M.Y. has presented no evidence to rebut the District's compliance with the Maltreatment of Minors Act. Accordingly, summary judgment for the District is warranted on this claim.

**\*1005 B. Vicarious Liability**

M.Y. asserts that the District is vicariously liable for Isse's alleged sexual assault and battery and intentional infliction of emotional distress. Moreover, M.Y. claims that the District is vicariously liable for her parents loss of society and services and the medical expenses incurred as a result of Isse's alleged assault. The District responds that it is not vicariously liable because Isse was not acting within the scope of his employment at the time of the alleged sexual assault.

[13][14][15] An employer is vicariously liable for the torts of its employee when the tort "is related to the duties of the employee and [occurs] within work-related limits of time and place." *Lange v. Nat'l Biscuit Co.,* 297 Minn. 399, 211 N.W.2d 783, 786 (1973). A tort is related to the duties of the employee even if it "would not be imputable to the [employer]," so long as it is "so connected with and immediately grows out of another act of the [employee] imputable to the [employer], that both acts are treated as one indivisible tort." *Id.* at 785-86. "[W]here sexual assaults by employees in a particular profession are a foreseeable risk of that profession, a sexual assault may be considered 'related to' the employee's duties." *Longen v. Fed. Express Corp.,* 113 F.Supp.2d 1367, 1371 (D.Minn.2000) (gathering Minnesota cases). A

plaintiff, however, must bring forth some evidence suggesting that sexual assaults by employees are a "well-known hazard." *P.L. v. Aubert,* 545 N.W.2d 666, 668 (Minn.1996); *see also Fahrendorff v. North Homes, Inc.,* 597 N.W.2d 905, 911-12 (Minn.1999); *Marston v. Minneapolis Clinic of Psychiatry and Neurology,* 329 N.W.2d 306, 311 (Minn.1982).

[16] M.Y. argues that her vulnerabilities as reflected in her IEP put the District on notice of her susceptibility to being sexually assaulted. This argument, however, conflates the foreseeability inquiry for negligence with that for vicarious liability. The Minnesota Supreme Court adopted California's distinction between the two inquiries as follows:

'foreseeability' in [the vicarious liability] context must be distinguished from 'foreseeability' as a test for negligence. In the latter sense 'foreseeable' means a level of probability which would lead a prudent person to take effective precautions whereas 'foreseeability' as a test for [vicarious liability] merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.

*Fahrendorff,* 597 N.W.2d at 912.

Thus, the District's knowledge of M.Y.'s vulnerabilities as reflected in her IEP would be relevant in a negligence action against the District, but it is not relevant to determine whether it would be fair to include the loss resulting from Isse's actions among the District's costs of providing public education.FN13 Because M.Y. has brought forth no evidence suggesting that sexual assault between bus drivers and school children is a well-known hazard, summary judgment in favor of the District is warranted.

> FN13. Similarly, it is unnecessary to account for the evidence provided by the District that it followed proper protocol in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

519 F.Supp.2d 995
519 F.Supp.2d 995, 227 Ed. Law Rep. 676
**(Cite as: 519 F.Supp.2d 995)**

Page 12

hiring Isse and that it had no notice that Isse might sexually assault a student.

## C. Minnesota Constitution

M.Y. also argues that the District violated her equal protection rights and right to be free from unreasonable searches, seizures\*1006 and invasions of privacy under the Minnesota Constitution. M.Y., however, has offered no cogent arguments or legal authority to support her allegations. Therefore, summary judgment as to M.Y.'s claims under the Minnesota Constitution is warranted.

## CONCLUSION

Accordingly, based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. No. 28] is granted.

**LET JUDGMENT BE ENTERED ACCORD-INGLY**

D.Minn.,2007.
M.Y. ex rel. J.Y. v. Special School Dist. No. 1
519 F.Supp.2d 995, 227 Ed. Law Rep. 676

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 26

## AFFIDAVIT OF
### MONA WATSON

Before me, the undersigned Notary Public, in and for said county and said state,

personally appeared Mona Watson, who being by me first duly sworn, deposes and says as

follows:

My name is Mona Watson. I am an adult, over the age of 21 years of age and

with no impediments, physical or otherwise, that would impair me from truthfully stating facts

known to me.

I am aware of the complaint filed on behalf of student J.R. against the Pike

County Board of Education stating that J.R. was sexually abused during the 2004-2005 school

year at Pike County High School. I was the school counselor at Pike County High School.

I served Pike County High School as school counselor for five school years:

2000-2001, 2001-2002, 2002-2003, 2003-2004, and 200-4 until January 23, 2005.

As school counselor, I was particularly sensitive to any allegations or information

concerning student abuse. In my position, I was one of the "go to" persons at the school if there

was any concern about child abuse of any type, and, as pertinent to J.R., sexual abuse.

I knew J.R. He was a student at Pike County High School while I was counselor.

I knew Charles Coon, the band director, who, I understand, pled guilty in the

summer of 2005 of sexual misconduct involving J.R.

At no time during the 2004-2005 school year while I was school counselor did I

see or hear anything that created any suspicion or concern that Charles Coon was engaged in

sexually inappropriate conduct with J.R. or any other student. Nor did anyone say anything to

1/1677198.1

MAR-06-2008 17:28 From Case 2:06-cv-01120-MEF-WC Document 79-5 Filed 04/09/2008 Page 3 of 6 P.03

me that created any concern or suspicion in my mind – not students whom I counseled; not teachers, administrators, or parents.

If I had seen or otherwise learned of anything of a suspicious nature about Charles Coon regarding inappropriate sexual conduct toward students, I would have reported it. That was my training, my responsibility, and my duty to my students.

I have had extensive training in sexual abuse. I have a Master's degree in special education with an emphasis in mental retardation. I have Master's level certification in learning disabilities and emotional conflict. I also have a Master's degree in counseling psychology.

For some 20 years – since the 1980s – I have made the subject of sexual abuse a point of study and particular focus. For the last 12 years, I have attended a week-long national symposium on child abuse. As part of this training, I have taken a 40-hour training course on forensic evaluation and interviewing sexually abused children. This training is in addition to numerous courses and clinics I have attended regarding sexual abuse.

With this professional training and with an abiding interest and concern about sexual abuse of children, I know I would have been sensitive to any suspicious signs, conduct, behavior or reference to sexual abuse of J.R. or any other student at Pike County High School and Charles Coon.

I had no such information. I would have investigated and acted upon any such information about Charles Coon's conduct if it had come to my attention.

People other than me have been sued in this case. But I want to state in the strongest possible terms that during the time I served as counselor at Pike County High School no one raised a suspicion to me that Charles Coon might be "grooming" or otherwise engaging in sexually abusive conduct with students. I cannot speak for the people sued in this case, but I can

1/1677198.1

say if any of them had any suspicion -- which I understand they did not -- we would have diligently investigated and turned over any information to the Department of Human Resources or law enforcement officials or both.

We have had numerous in-service training for teachers. I have discussed on numerous occasions what I look for regarding abuse, how to go about reporting sexual abuse, and the procedure to follow.

I regularly attended Building-Based Student Support Team meetings while at Pike County High School. At these meeting, we discussed what do to if there were any signs of child abuse, and in particular sexual abuse. We had such BBSST training meetings, for example, in the fall of 2004. The BBSST training lasted a full day. Karen Berry, Federal Program Director, discussed at these meetings sexual abuse, and how to recognize sexual abuse in children.

We would discuss that any teacher who suspected abuse should report it to the school counselor and then the school counselor would report the information to the principal and to DHR. By law, law enforcement officers and DHR would then investigate any suspicious information.

As I said, I never heard anything about Charles Coon while I was at Pike County High School that made me suspicious at the time that he might sexually abuse students.

I saw Charles Coon smoking on campus and reported him for this violation of school policy. I did know that Charles Coon had let a student use his cell phone and the phone had been confiscated. I did not think at the time this was out of the ordinary given band practice and schedules. I did see Charles Coon at school on a fairly regular basis. Charles Coon often asked me to come to the band room to fix his computer. In the band room I would see him

1/1677198.1

working with the band students. Nothing I saw made me suspicious of Charles Coon or be concerned that he might sexually abuse his students.

I left Pike County High School to become the Director of the Pike County Child Advocacy Center in January of 2005. I was hired in this position because of my expertise and training in working with special education children. In this position, I do in-service training for Pike County teachers as one of my responsibilities.

Prior to leaving Pike County High School in January 2005, I can say without qualification that no one to my knowledge suspected Charles Coon of sexually abusing his students in general, or J.R. in particular. What he did is outrageous, and he deserved to be treated like a criminal.

But it is my professional opinion based on my employment at Pike County High School that sexual abuse was taken seriously, that any suspicious conduct would have been reported immediately to law enforcement officials, and misconduct would have been dealt with aggressively. At Pike County High School we did not cover up reports or suspicion of child abuse, and we had no history or record, prior to Charles Coon, of having sexual abuse of students at Pike County High School.

It is very important to me – both professionally and personally – to let the court know that while I was counselor at Pike County High School, I never suspected Charles Coon to be sexually abusing his students. Never. If I had, I would have reported it. I believed that Charles Coon was a professional and was accountable for his conduct. When I saw him smoking in violation of school rules, I reported him. And, I can assure the court if I had heard or seen anything of a suspicious nature about Charles Coon and J.R. or any other student I would have reported it to DHR or law enforcement officials.

1/1077198.1

_Mona Watson_

Mona Watson

Sworn to and subscribed before me this the ____ day of March, 2008.

_Notary signature_

Notary Public

My Commission expires: _4-17-2011_

(Seal)

> GAIL LAMBERT
> Notary Public, AL State or L.
> My Comm. Expires Ap      2011

1/1677198.1

# EXHIBIT 27

**AFFIDAVIT OF
DR. MARK BAZZELL**

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Dr. Mark Bazzell, who being by me first duly sworn, deposes and says as follows:

My name is Dr. Mark Bazzell. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am the appointed Superintendent of the Pike County Board of Education. In this position, I have the statutory responsibility to "see that the laws relating to the schools, the rules and regulations of the state and county boards of education are carried into effect." Ala. Code § 16-9-13. (Copy attached as Appendix A.)

I am aware of the mandate set forth in Ala. Code § 26-14-3 to report "known or suspected" child abuse "to a duly constituted authority." (Copy attached as Appendix B.)

If I had any suspicion that Charles Coon, the band director at Pike County High School, had sexually abused J.R. or any student, I would have reported him to law enforcement officials.

When I did get a complaint about Charles Coon on March 30, 2005, it was from Butch Phelps with the Troy City Police. Officer Phelps reported that an informant believed Charles Con had been smoking marijuana with students in his private vehicle. Mindful of my duties as superintendent, I immediately called Charles Coon into office and put him on administrative leave pending an investigation. When we finished our investigation, I shared

everything I had – all the information – with Officer Phelps and also with Moses Davenport, Chief of Police for the Brundidge Police Department. Pike County High School is in Brundidge and is under the law enforcement authority of the Brundidge Police Department. I explained to both officers what we had done, what information we had about Charles Coon, what we were going to do, and asked both officers if they thought we should do anything else.

I shared this information to indicate that the first time I had any report from any source about potentially serious misconduct about Charles Coon, I immediately put him on administrative leave; I had the information thoroughly investigated as a first priority concern; and I shared with law enforcement officers everything we knew; and I asked the law enforcement officers if we should do anything else.

In May of 2005, Coon submitted his resignation in order to retire from public education. The Board accepted his resignation at its Board meeting May 23, 2005. At that time, we had no reason to suspect and did not suspect that Charles Coon had sexually abused J.R. or any student. It was a complete shock to learn in July of 2005 that Charles Coon had been arrested and charged with sexual misconduct.

The complaint in this case sues me individually and in my official capacity as superintendent. The complaint sues me and other administrators for not having policies and procedures to protect J.R. from sexual abuse; for not monitoring and investigating complaints; for not training and supervising Charles Coon; and for negligent conduct.

In Pike County, we have what is essentially a "no tolerance" policy regarding sexual abuse and sexual harassment. (Policy attached as Appendix C.) As Superintendent, I have set up in-service programs for all our employees at Institute Day. I have requested at principal meetings that in-services be conducted at each school. I have instructed our people that

1/1677919.1

we have a mandatory obligation to report known or suspected child abuse to law enforcement authorities. We communicate each year with all students and parents through the Student Code of Conduct how they should report concerns or problems. I have arranged for guest speakers such as Lucia Grantham from Troy University to conduct sexual abuse training. Our special education coordinator Karen Berry has conducted training for our Building-Based Student Support Team people. This information and efforts involved the staff and employees at Pike County High School.

Through these efforts, I think we have achieved an excellent record. To my knowledge, the matter with Charles Coon is the first case of sexual abuse by an employee of the Pike County School System.

When Charles Coon was recommended for employment beginning August 1, 2002 at Pike County High School, Principal Terry Case believed that Charles Coon was an excellent candidate based on what he knew of Charles Coon and from Charles Coon's references. Mr. Casey had worked in Butler County for three years. Charles Coon and his wife also worked for the Butler County School System. Mr. Casey said Charles Coon was well respected in Butler County. Mr. Casey checked each of Charles Coon's references and every one was complimentary about Charles Coon. Prior to employment, Mr. Coon submitted to ABI and FBI background checks as required by Alabama Law and was issued a positive suitability report from the Alabama State Department of Education. In other words, before Charles Coon was hired, we had done our due diligence check on Charles Coon and had no information that should have given us concern.

Plaintiff says we were negligent in hiring Charles Coon. But I think it is important for the Court to know that one of Charles Coon's former employers tried to get Charles

Coon to leave Pike County after we hired him. It was either the first or second year of Charles

Coon's employment with us that I received a call from the superintendent of the Monroe County

Board of Education asking if we would release Charles Coon so Charles Coon could come back

and work for Monroe County. The superintendent of Monroe County thought that much of

Charles Coon based on Charles Coon's work in that system.

Prior to April 2005, I recall only three complaints about Charles Coon. Assistant

Principal McDaniel complained that there was not enough discipline on the band buses and in

the band class.

The second complaint came in November 2004 from a parent of a student.

Charles Coon had grabbed the student by the neck. The matter was investigated; and Charles

Coon was reprimanded for what he did. A written record was completed.

The third problem occurred in January 2005 when a parent complained about the

grade – an F – that Charles Coon gave her son in band. I learned of this matter some time after

the parent complained. By that time, it had been resolved and properly addressed by the school

principal.

None of these problems regarding Charles Coon had sexual implications and none

of these incidents raised any suspicion in my mind about Charles Coon engaging in sexual

misconduct with a student. One other matter came to my attention about Charles Coon. Charles

Coon himself called me. Charles Coon let a student, Blake Faulkner, use his cell phone to call

his parents according to Charles Coon. It was a violation of school policy for a student to have a

cell phone. The cell phone as confiscated by the assistant principal. Charles Coon called me to

ask that it be returned. I told Charles Coon that was a local school matter and I would not

intervene.

By comparison, the information I received from Officer Phelps on March 30, 2005 was serious and I reacted to the information provided with serious concern. I put Charles Coon on administrative leave the next day and I asked my staff to investigate every aspect of the information given to me.

What Officer Phelps said was this: he had learned from an informant about an incident where Charles Coon allegedly used marijuana while riding around with students in his vehicle. He gave me a list of six or seven names of kids who might be able to corroborate the story.

Matt King was one of the students. It was his mother who told Mr. McDaniel in January that Charles Coon should not smoke with the kids around the band room sitting in his truck.

I asked Officer Phelps if there was anything else I needed to know. Officer Phelps told me there was one kid that the other kids made fun of – they referred to him as his butt buddy. I asked if Officer Phelps if the informant had indicated anything about any other inappropriate conduct. He said no that he was just calling about the marijuana – the use of marijuana. Officer Phelps made no mention of J.R. and said nothing about sexual favors or misconduct.

Nevertheless, this phrase – butt buddy – raised a red flag in my mind and I asked the principal to keep that in mind as he talked to each of the listed students about Charles Coon smoking marijuana.

The next day I put Charles Coon on administrative leave. Appendix D is the letter I gave to Charles Coon. While Officer Phelps had not called about sexual misconduct, I thought the reference to "butt buddy" justified my statement to Charles Coon about alleged sexual

misconduct. The phrase "butt buddy" was the only information I had but I took that as a red flag I wanted to investigate.

It may sound self-serving but I thought and think my reaction reflects that was not insensitive or indifferent to the information provided: I was alarmed at the outset to the possibility of sexual abuse.

In addition to putting Charles Coon on administrative leave, I had Charles Coon drug tested for marijuana. Marijuana stays in the human system 30 to 45 days after use. Knowing Officer Phelps, I felt the information he was sharing was very current. I thought the drug test would be a timely response to Officer Phelps' report.

The drug test came back negative.

Charles Coon worked at two schools: Pike County High School and Banks School. I talked with both principals, gave them the names of the students and asked them to investigate these students and any other students whose names came up. I asked them to see if Charles Coon had been smoking with students and/or smoking marijuana. Either would be a violation. I also directed both principals to see if Charles Coon had engaged in any other inappropriate conduct with his students. I wanted them to push the questioning of the students to see if anything else was going on. And I wanted them to see if they could identify the student who was referred to as the "butt buddy." I wanted to know who the butt buddy was if we could determine that fact. I told them to talk to other students beyond those listed – at least a couple – about Charles Coon and to do it in the context of trying to get a feed for how the program was going.

I have one other thought as I was trying to exhaust this matter. I remembered the cell phone incident where Blake Faulkner had Charles Coon's cell phone. I told Mr. Pyron to talk to him even though Blake was not one of the students listed, as I recall.

I was just trying to track down every lead to see if something inappropriate was going on – such as sexual abuse.

The two principals followed my instruction and reported back to me. None of the students identified a "butt buddy."

At least one student confirmed that Charles Coon had smoked with students. No student confirmed ever seeing Charles Coon smoke marijuana. At least one student saw Charles Coon driving from school after school with a student in the vehicle. The student in the vehicle was not identified, but we learned that Blake Faulkner's parents had given Charles Coon permission to drive Blake in his vehicle after band practice.

No student provided any information about other misconduct by Charles Coon – no information of any inappropriate conduct. Attached as Appendix E are notes we have about student responses.

I also talked with former Principal Terry Casey to see if he had suspected any misconduct by Charles Coon. He had none.

After going over this information in detail with my administrators, I called Officer Phelps and discussed it with him. I then went to Brundidge and met in person with Police Chief Moses Davenport and reviewed with him everything we had done and all we had learned.

I told both Officer Phelps and Chief Davenport that I thought I had to put Charles Coon back to work but we would remain on the look out and continue to investigate if anything

new came up. I asked each of them – Officer Phelps and Chief Davenport – if there was anything else they thought we should do. Neither did.

The final step was to go over what we had with Charles Coon. I am attaching my letter to Charles Coon dated April 8, 2005. I wanted him to know that we had turned this matter over to the appropriate law enforcement people for further investigation if necessary.

I pointed out that it was a criminal act for him to provide cigarettes to students and that it was a violation of school policy for him to smoke on school property. I told him not to transport students in his personal vehicle except in extreme emergency situations.

Between April 8, 2005 and the end of the school year, we received no further complaints of any kind about Charles Coon. On May 15, 2005, Charles Coon wrote saying he intended to retire at the end of the school year. On May 23, 2005 I recommended and the Board accepted Charles Coon's resignation. Charles Coon's resignation was accepted without any knowledge that he had sexually abused J.R. or any student.

In conclusion, I cannot think of anything more reprehensible than for a teacher to sexually abuse a student. The thought is revolting. But this suit is very troubling.

I take my statutory responsibilities very, very seriously. We had every reason to believe Charles Coon was a good educator. He had obtained tenure in three other systems. The superintendent where he had previously worked tried to rehire him after he was employed by Pike County. He obviously had a good record there.

None of our staff had any reason to suspect that Charles Coon was abusing J.R. J.R.'s name never came up as a student that might be subject to abuse. We have asked our teachers if they suspected any misconduct by Charles Coon and they did not.

1/1677919.1

Mrs. Reed was a past president of the Band Boosters and thought enough of Charles Coon that he was a visitor to their house and had the Reed's permission to take J.R., their other son, and daughter on trips with him.

We have been conscientious about training our people and we have an excellent record as a result. This is the only case of child abuse I know of by an employee of the Pike County School System.

When a serious report about Charles Coon came to our attention, we worked diligently to investigate and we shared everything we found with the Troy City Police (Butch Phelps) and the Brundidge City Police (Moses Davenport).

I sincerely believe we have been diligent; not indifferent or insensitive. I did all I could think of to explore the possibility of misconduct by Charles Coon, and I would have done anything else the law enforcement people recommended.

This suit against me in my personal and professional capacities is a very sad development. I hope the Court will dismiss the lawsuit in its entirety.

Dr. Mark Bazzell

Sworn to and subscribed before me this the 2<u>th</u> day of March, 2008.

Notary Public

My Commission expires: _July 18, 2009_
(Seal)

# APPENDIX A

<u>**Section 26-14-13**</u>

**nalty for failure to make required report.**

Any person who shall knowingly fail to make the report required by this chapter shall be guilty of a misdemeanor and shall be punished by a sentence of not more than six months' imprisonment or a fine of not more than $500.00.

*(Acts 1965, No. 563, p. 1049, §5; Acts 1975, No. 1124, p. 2213, §1.)*

# APPENDIX B

**Section 26-14-3**

**Mandatory reporting.**

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

# APPENDIX C

FILE: JCK

## Pike County Board of Education
### Prohibiting Harassment Policy

**I.      General Statement of Policy**

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation.  This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0117*

FILE: JCK

## II.    Definitions

### A.    Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1. a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2. the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to

- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical conduct such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
No. 0118

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office of the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation. The student will then be informed that he/she has three (3) choices:

1. The student may converse by phone with his/her parent or guardian.

2. The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3. The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect. If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services. The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0124*

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:      U.S. Const. Amend. IV; U.S. Const. Amend.
                 XIV1; Moore v. Student Affairs Committee of
                 Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
                 1970); Note from Moore: "It is settled that
                 Fourth Amendment does not prohibit reasonable
                 searches when the search is conducted by a
                 superior charged with the responsibility of
                 maintaining discipline or of maintaining
                 security ..."; New Jersey v. T.L.O.

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0125*

FILE: JCAC
(continued)

1.  The educator should immediately notify the principal.

2.  The principal/educator should consult with the school nurse and counselor.

Human Resource caseworkers will proceed to investigate the reported case. If the investigation is to begin at the school, the Human Resource caseworker will report to the school office and identify himself/herself to the principal or designated representative. Child abuse/neglect investigations are highly confidential, and the student's rights to privacy must be respected. Only those persons necessary to conduct the investigation should be present in any interview. After an evaluation/intervention has been made, the caseworker will provide feedback to the principal and arrange monitoring procedures as needed. Educators will report further incidents of abuse/neglect regarding that child to the assigned caseworker.

Special Information Regarding Neglect Cases:

1.  Teachers should document and date specific instances or examples of neglect.
    Ex: On Wednesday, January 14, 1988, John Doe came to school with no coat, wearing unclean clothes and shoes with large holes.

2.  Keep a running account of the above examples over a period of time.

3.  Contact the parents and express concern over the neglect and make suggestions as to how they can help or seek help by calling Child Welfare at Human Resource.

Right to Privacy Considerations:

1.  A student's school record continues to be protected by the terms of the Family Rights and Privacy Act and the policies of the Board. The School System needs a parental release form, court order or other legal document which gives school personnel the permission to release information in school records to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0126

FILE:JCAC
(continued)

2.  In return, Human Resource personnel should share
    needed information with school officials.  The
    school principal or counselor could be designated
    as a _confidential_ person to receive this information
    and use it in the best interest of the student.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0127

# APPENDIX D

PLAINTIFF'S
EXHIBIT
14

# PIKE COUNTY BOARD OF EDUCATION

**Board of Education**

Linda Steed, President
Rev. Herbert Reynolds, Vice President
Wyman Botts
Rev. Earnest Green
W. Greg Price
Adam Register

**Dr. Mark Bazzell**
Superintendent



April 1, 2005

Mr. Charles Coon, Band Director
Pike County High School
Brundidge, Alabama

Dear Mr. Coon:

This purpose of this correspondence is to notify you that you are being placed on administrative leave with pay, effective immediately, pending the outcome of an investigation into alleged misconduct involving a number of students. According to reports, you have allegedly engaged in the use of illegal drugs with students, provided illegal drugs to students, and also allegedly engaged in other inappropriate activities with students of a sexual nature. Since these reports involve allegations of criminal conduct on your part, I have also notified the appropriate law enforcement personnel.

I would very much like to meet with you at your earliest convenience to explain the nature of these reports and to offer you the opportunity to provide a written statement if you so desire. Also, I am directing that you not return to the Pike County High and Banks campus until this matter is resolved. In addition, I am further directing that you have no contact with Pike County High and Banks students, including band students until this matter is resolved.

Please let me know if you have any questions or comments.

Sincerely,

Dr. Mark Bazzell, Superintendent
Pike County Schools

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0087*

101 W. Love Street, Troy, Alabama 36081-2613   Telephone : (334) 566-1850   Fax: (334) 566-2580

# EXHIBIT E

**Wednesday**

**March**

# 30

**2005**

| March 2005 | April 2005 |
|---|---|
| S M T W T F S | S M T W T F S |

✓ Completed
→ Forwarded
X Deleted
○○ Delegated
to Points

**ABC  Prioritized Daily Task List**

- Phillip Faulkner (Cell phone #)
- Adam Helms — not at vehs (Banks)
- Andrew Law
- Jarron Senn
- Levin Davis ?
- Thomas Green

**Appointment Schedule**

8

9

11

12

1

2

3

4

5

6

7

8

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0105



Life is not lost by dying; life is lost minute
by minute, day by dragging day, in all
the thousand small uncaring ways.
—Stephen Vincent Benét

**30**
*Wednesday*
*March 2005*

Daily Notes

# April 2005 Index

| Date | Index important information and events recorded on this month's daily notes. |
|------|------|

*(handwritten notes)*

(1) Charlotte Rogers
235-9814

(2) Ed. Img — Pike Bulletin Co.

474-3836
6911   833 66X7

(3) Soon
342-7635

(4) Pickett
appt

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0107

Whoever claims a right for himself
must respect the like right in another.
—James Bryce

**4**
Monday
April 2005

**Daily Notes**

1. Surv. Syst. Tom Cable
2. Policy Review
3. Shelly Dued
4. Shipman House
5. Foundation
6. Observation (NR)          B I C
7. PEPE Adm.                   In
8. Fac. mostly Banks          O_y
9. Customer Focus
10. ESE, SEC                    Dy
11. Bus Stop Banks
12. Jones - Roadle Bus Stop
13. MT (AC
14. Pettis Art
15. Byp. spec. Ed. Assembly
16. Coach Support
17. Comm. Plan                 BOE
18. 50/50 Bp D                 Pundle - Bus
19. Saft (Bus Eval            RR lights
20. CTE Board                 Bolts - Plan
21. Budget
22. Cell Bills                 Avery?
23. Bus Ship-g                Russell
24. Felton    } BSE          Harrison
25. Commission               Rec - mixed

Neal
Coon

1. Cirs - Thomas report
2. 10:24 Chris Kelly
   — Bass — Alexander
   334-296-5043

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0108



**Monday**

**April**

**4**

**2005**

Appointment Schedule

8

9

10

11

12

1

2

3

4

5

6

7

8

**JR v. Pike County BOE**
Produced by Defendant PCBE
No. 0109



Reality was such a jungle—with no
signposts, landmarks, or boundaries.
---Helen Hayes

**11**

Monday
April 2005

Daily Notes

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0110

My own experience has taught me this:
if you wait for the perfect moment when
all is safe and assured it may never arrive.
—Maurice Chevalier

## 13
### Wednesday
### April 2005

Daily Notes



*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0111

# EXHIBIT 28

## AFFIDAVIT OF
## ROBERT MCDANIEL

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Robert McDaniel, who being by me first duly sworn, deposes and says as follows:

My name is Robert McDaniel. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I served as assistant principal at Pike County High School during the 2004-2005 school year.

During that year I did not see, hear or know of anything that indicated Charles Coon, the band director, would be a sexual predator.

I have been in education for nine years after retiring from a career of 22 years in the U.S. Air Force. I consider myself a military man – rules and regulations are there to be followed, no exceptions. While I had a number of duties as assistant principal at Pike County High School, I considered a primary responsibility to see that student discipline was enforced, no exceptions. As an African-American with a military background, I wanted to be a role model for the students as well as a disciplinarian. I think most of the students and my colleagues understood that I intended to see that everyone followed and respected the rules.

I did not make exceptions for student J.R. when I had to deal with him and I did not make exceptions for Charles Coon when I had to deal with him.

1/1677710.1

I knew that the law made it mandatory to report known or suspected child abuse. I would have reported Charles Coon without the slightest hesitation if I had known or suspected he was abusing J.R. or any student at Pike County High School.

For anyone to assert that I would have ignored Pike County policy regarding sexual misconduct or violated the law to protect Charles Coon – who was no friend of mine – is irresponsible. Yet I am being sued in this case as an individual and as assistant principal.

I first met Charles Coon at band camp for Pike County High School in the summer of 2004. I did not know him before coming to Pike County High School, and I had no dealings with him except in my professional capacity as assistant principal.

During the 2004-2005 school year, I would see Charles Coon frequently as I walked through the school and I had several situations during the year where I had to deal with Charles Coon rather extensively.

Early in the school year, I told Charles Coon I wanted him to get better control of his students. I thought the band and the athletes were the school ambassadors. I wanted his band students in their class when the bell rang, and I wanted the band class to be as orderly as any other class. I let Charles Coon know my expectations and that his students would be disciplined if they were not in class on time and on task.

I share this to let the Court know that from the get-go my relationship with Charles Coon was an arms' length, entirely professional one.

Later in the fall of 2004, I caught a student with a cell phone. It dropped out of his pocket. Having a cell phone violated school rules. In accordance with our policy, I confiscated the phone. It turned out that the phone was Charles Coon's. He let the student use it to call his parents. Charles Coon demanded that I return the phone to him. I refused. The rule is

Case 2:06-cv-01120-MEF-WC    Document 79-7    Filed 04/09/2008    Page 4 of 7
08/07/08  02:52pm  P. 005
Case 2:06-cv-01120-MEF-WC    Document 70-9    Filed 03/10/2008    Page 4 of 7

the rule. The student should not have had a cell phone and I did not care who owned it. I did learn that there was an agreement between Charles Coon and the student's parents to let him use the phone. Charles Coon said he let that particular student use the phone and other band students on occasion to call parents about late band practice. I thought it was inappropriate for the student to have the phone in violation of policy. But the explanation seemed credible. There was nothing about this incident that suggested to me an inappropriate relationship between Charles Coon and the student.

In January of 2005, a parent, Polly King, complained about an F Charles Coon gave her son for band. She was very mad about the grade. During her tirade about the grade and about Charles Coon, she mentioned that Charles Coon had been smoking in the presence of students. I reported this to Principal Pyron because I thought smoking on campus was unprofessional conduct if it happened. Mr. Pyron reprimanded Charles Coon.

During this incident there was no suggestion of misconduct of a sexual nature about Charles Coon; no suggestion of grooming the students. The parent, if anything, was mad because the grade was too harsh – not preferential.

Later on in the year, a parent complained that Charles Coon had grabbed a student around the neck in a fit of anger. I investigated. Charles Coon admitted he had overreacted. He apologized; he apologized to the student and to the parents. The parents were satisfied after I told them in front of Charles Coon that we did not approve of what he did, and we would not tolerate such behavior. I reprimanded Charles Coon for his conduct and reported it to the principal.

Grabbing a student by the neck was unacceptable conduct. We investigated it and reprimanded Charles Coon. Sexual abuse is infinitely worse conduct. You can be absolutely sure

1/1677710.1

we would have reported Charles Coon if we had any suspicion. Charles Coon was not above the rules and we cut him no slack.

In April of 2005, I knew Mr. Pyron was investigating Charles Coon but I did not participate in the interviews. I knew that Superintendent Bazzell placed Charles Coon on administrative leave during the investigation.

In the context of the investigation, Mr. Pyron told me that they had received a report about Charles Coon acting unprofessionally – smoking and riding with students. I did not know all the details. There was also reference to the term "butt buddy" but I understood that to mean a teacher's pet or favorite. There was nothing I knew that suggested to me the term had a sexual connotation.

On April 18, 2005, I investigated a matter involving J.R. He broke a window in Charles Coon's office. I investigated by taking statements from the students who witnessed what happened. J.R. had taken a flag stick and knocked the window out. It was first reported he was locked in the office. That was not the case. The office locked from the inside. I had J.R. charged with criminal mischief for what he did.

Now this was mid April – toward the end of the school year and not long before Charles Coon submitted his resignation to retire.

Neither J.R. nor his parents said anything at this late date near the end of the school year about Charles Coon abusing J.R. No complaint whatsoever. And to my knowledge neither J.R. nor the parents complained to law enforcement people about Charles Coon in connection with the criminal mischief charge against J.R.

1/1677710.1

Other than the information reported to Mr. Pryon that he was investigating information that Charles Coon was transporting students, I never saw Charles Coon riding with students and never had any information that Charles Coon took students off campus.

To summarize, I had a number of opportunities to deal with and about Charles Coon. I always insisted the rules be followed and I always reported when I found he had violated the rules. I was never indifferent to rule violations by Coon. If I had any reason to suspect misconduct by Charles Coon toward I R., I would have reported it. I had none.

During my deposition, I was asked about my training or expertise concerning sexual abuse. During my Master's degree courses, I received training about sexual abuse. While in the Air Force, I taught a course for six years that covered sexual abuse. When I worked at other school systems – Macon County and Elmore County – I received professional development courses on sexual abuse.

During the year I was at Pike County High School, I attended faculty meetings where we talked about professional standards – the line that must be kept between faculty and students. We talked about liability if there was inappropriate conduct between teachers and students.

As a result of my training, I knew about "grooming" as a tactic used by sexual predators. I knew to look for or be aware of reports of inappropriate touching, speech or gifts that might be indicative of an inappropriate relationship.

I saw things about Charles Coon I did not like and I reprimanded him on several occasions. I never saw anything that made me suspicious that Charles Coon was "grooming" his students or was engaged in or trying to engage students in an inappropriate relationship.

If Mrs. Reed had complained in any manner to me about Charles Coon, I would have carried the matter as far as it needed to go.

If I had any information that Charles Coon was abusing anyone, I would have reported it to the authorities. I knew the law required that; I knew we had a no tolerance policy regarding sexual abuse; and I had a professional commitment to see that the rules and laws were respected.

Robert McDaniel

Sworn to and subscribed before me this the 7th day of March, 2008.

Notary Public

My Commission expires: 08/16/2011
(Seal)

1/1677710.1

# EXHIBIT 29

## AFFIDAVIT OF
## TERRY CASEY

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Terry Casey, who being by me first duly sworn, deposes and says as follows:

My name is Terry Casey. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I have been sued in this case in my professional and personal capacities. I served as Principal of Pike County High School for seven and a half years. I resigned as principal in December of 2004. The complaint states that student J.R. was sexually abused by Charles Coon during the 2004-2005 school year.

Prior to resigning, I never suspected Charles Coon of inappropriate conduct with J.R. or any student. No student, faculty member, parent or anyone said anything to me that created in my mind any suspicion that Charles Coon was sexually mistreating students.

As far as I was concerned as principal at Pike County High School, we had a "no tolerance" policy regarding sexual abuse and sexual harassment. I knew it was the law, the District policy and the policy and practice at Pike County High School to report any complaint of sexual harassment to DHR or law enforcement officials. I would have done just that – reported Charles Coon to DHR or law officials – if I had any reason to suspect he was sexually abusing J.R. or any student.

1/1677339.1

MAR 07 2008 10:07AM PIKE CO BOARD OF EDUCATION    Case 2:06-cv-01120-MEF-WC    Document 79-1    Filed 03/10/2008    No 4857   Page 3 of 5 P.03

Regarding J.R., I knew how involved his mother Mrs. Reed had been with the band program at Pike County High School. For the 2003-2004 school year, Mrs. Reed was President of the Band Boosters. She worked constantly with Charles Coon. She rode the bus with the band to events; she worked with Charles Coon for band activities; and she was often at band practice.

It is my recollection that Mrs. Reed continued to be very active with the band program during the fall of the 2004 school year.

Neither Mrs. Reed nor Mr. Reed ever complained to me about Charles Coon. Nor did they ever complain, to my knowledge, to any of my staff.

It is my understanding that Charles Coon was a welcome visitor to the Reed's home and that the Reeds trusted Charles Coon to drive this children in his car, to take trips and to be with them.

If the Reeds had said anything to me about Charles Coon, I would have investigated. They did not. I must assume they were as unsuspecting as we were, else they would have complained to us about Charles Coon and put a stop to the visits to their house.

As I said, nothing happened at Pike County High School that made me suspicious of Charles Coon.

I knew of Charles Coon when I was Vocational Director for the Butler County School System for three years. Charles Coon was the band director. He was very well respected and his wife held an important administrative position for the school system. I did not know them well, but I did know that they were a respected family.

When Charles Coon applied for the band director position at Pike County High School, I interviewed him and checked out his references. The principal at his school, T. J.

Case 2:06-cv-01120-MEF-WC    Document 79-8    Filed 04/09/2008    Page 4 of 5
MAR 06    Mar 7, 2008 10:07AM    PIKE CO BOARD OF EDUCATION    No. 4657  P. 4
Case 2:06-cv-01120-MEF-WC    Document 70-21    Filed 03/10/2008    Page 4 of 5 .04

Shields, gave him a very good recommendation. Everything I knew and learned about Charles Coon during the application process was positive. I did our "due diligence" as required in checking him out. It is not true for anyone to assert we did not carefully check his record and his references. We were diligent and nothing in this file, record or references indicated any problems.

At Pike County High School we had a "no tolerance policy" regarding sexual harassment and sexual abuse. We trained our staff regarding our policy and our practice. At Institute Day, which all employees attend, Dr. Bazzell, Superintendent, and the former superintendent John Key, talked about sexual abuse. We made sure our students read the handbook and knew to report abuse and how to report it. As principal, I discussed sexual harassment and sexual abuse – what to look for, the signs and what to do if sexual abuse was suspected. Any suspected abuse was to be reported immediately to the counselor or to the principal.

While I was principal, no one expressed any concern about Charles Coon sexually abusing any student. In December of 2004, I received information that he was smoking on campus. I met with Charles Coon, and told him he had to obey the no smoking policy. This incident raised no suspicion about student abuse.

I received a complaint that Charles Coon got mad at a student and grabbed the student around the neck. I investigated this complaint, met with Charles Coon and the parents. Charles Coon apologized and the parents were satisfied. I reprimanded Charles Coon for what he did. Nothing about this incident caused suspicion about sexual abuse.

I also knew that Charles Coon let a band student use his cell phone. My staff investigated it. Charles Coon said he had not "given" the student the phone but let him use it.

1/1677339.1

This did not seem strange in context. Coaches and activity sponsors often do this when transportation is affected by practice schedules. At the time, the cell phone incident created no suspicion.

If Mrs. Reed or anyone else had complained that Charles Coon was engaged in any type of suspicious conduct, I would have investigated it immediately.

During my years as principal at Pike County High School, we were diligent in investigating complaints. To my knowledge, we had no other occurrence of sexual abuse. Moreover, no one — until this lawsuit — has ever accused me of not being diligent in looking after my students.

The Reeds apparently saw nothing of a suspicious nature during all the time Mrs. Reed and her husband spent with the band program, or spent with Charles Coon at their home, and neither I nor my staff saw anything that would create a basis to suspect Charles Coon would sexually abuse J.R.

Finally, I had no dealings with Charles Coon other than in my professional capacity.

_Terry Casey_
Terry Casey

Sworn to and subscribed before me this the 7th day of March, 2008.

_Janet C. Rascoe_
Notary Public

> JANET C. RASCOE
> Notary Public, AL State at Large
> My Comm. Expires Aug. 19, 2010

My Commission expires:_____
(Seal)

1/1677359.1

# EXHIBIT 30

Case 2:06-cv-01120-MEF-WC   Document 79-9   Filed 04/09/2008   Page 2 of 18
MAR-7-2008  02:09  FROM:OFF HIGH SCHOOL 334 493 2146   TO:12054886275   P:2/8
Case 2:06-cv-01120-MEF-WC   Document 70-13   Filed 03/10/2008   Page 2 of 8

## AFFIDAVIT OF
## WALTER L. PYRON

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Walter L. Pyron, who being by me first duly sworn, deposes and says as follows:

My name is Walter L. Pyron. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I was the interim principal at Pike County High School for six months from January 3, 2005 when Terry Casey resigned through June of 2005. I was hired as an interim principal. I have been sued in my professional and individual capacities. The complaint in this lawsuit says J.R. was sexually abused by the band director Charles Coon during the 2004-2005 school year.

I did not employ Charles Coon. I did not write the sexual harassment and abuse policy of the Pike County High School. But I was committed to enforcing the policy. I did talk with the faculty on occasions about sexual abuse, and I did tell the faculty to inform an administrator immediately if they had any suspicions. The "no tolerance policy" of Pike County is in the Code of Conduct. Ala. Code § 26-14-3 mandates reporting child abuse to law enforcement officials for investigation. (Appendix A) It is a misdemeanor not to report. If a report of suspected sexual abuse were made to a teacher, the teacher would report it to the counselor or principal. The counselor would report the complaint to me and I would call DHR or law enforcement officials.

1/1677339.1

Case 2:06-cv-01120-MEF-WC    Document 79-9    Filed 04/09/2008    Page 3 of 18
MAR-7-2008  08:09  FROM:PCH HIGH SCHOOL 334 493 2746
Case 2:06-cv-01120-MEF-WC    Document 70-13    Filed 03/10/2008  Page 3 of 8    P:3/8

When I started serving as interim principal on January 3, 2005, I did not know Charles Coon or know anything about him. He was simply the band director.

Soon after I assumed my position at Pike County High School, a parent complained about a grade Charles Coon had given her son – an F in band. Robert McDaniel, assistant principal, talked with the parent. During the discussion, the parent said that Charles Coon had been smoking on campus. When Mr. McDaniel brought this fact to my attention, I called Charles Coon in and told him I would not tolerate smoking on campus.

This episode over a grade involving band and a band student involved criticism of Charles Coon by a mad parent, but nothing was said or suggested that this band parent or band student had any concerns about Charles Coon's conduct with students.

In April of 2005, Superintendent Mark Bazzell asked me to investigate a complaint about Charles Coon. Superintendent Bazzell had received a report that Charles Coon had been smoking, possibly marijuana with students in his car. The report also referenced that Charles Coon had a butt buddy.

Prior to that time, I had not seen Charles Coon transporting students in his car, and did not know if he had or had not been doing so. But the information Superintendent Bazzell received was that Charles Coon was smoking in his vehicle in the presence of students. Dr. Bazzell had the names of six or seven students. He asked me to question the students about Charles Coon – about smoking, about smoking marijuana, and to see if there was anything about his conduct with students that might be of further concern.

Charles Coon was put on administrative leave by Dr. Bazzell as soon as the complaint came in. So Charles Coon was not at the school when I questioned the students.

I talked to each of the students who we thought might have information. I asked questions like 'have you seen Charles Coon smoke?; have you heard that Charles Coon smokes things other than cigarettes?; what do you think of Charles Coon?' how is he with students?'

One student responded that Charles Coon had his favorites – his butt buddy. But the student said this in the context that Charles Coon had his favorites –in my terminology, teacher's pet. I sensed nothing in the context of that conversation or my discussion with any of the other students that sexual misconduct was going on. Dr. Bazzell had me cued to be sensitive to the implications of whatever the students said or suggested.

After over 29 years in education, any suggestion of sexual misconduct by or about Charles Coon would have registered with me. And I can assure the Court I had no private or personal loyalty to Charles Coon. I did not know him. If I had picked up any suspicion, I would have reported it to Dr. Bazzell and seen to it that Charles Coon did not come back to Pike County High School. I would have reported any suspicion of abuse to law enforcement officials as required by Ala. Code § 24-14-3.

A student that I talked to as part of this investigation did say Charles Coon smoked cigarettes with students. And at least one student said he saw Charles Coon driving students in his vehicle during the school day. As the students were sharing this information, I felt they were being truthful and felt comfortable that they were that they were sharing the truth of the extent they had information. Yet none said anything about Charles Coon's abusing students or anything about 'suggestive' activities or comments by Charles Coon.

I reported the results of my investigation to Dr. Bazzell. We decided that the evidence warranted reprimanding Charles Coon for violating the no smoking on campus policy and for driving students in his vehicle. There being no facts or suggestion of any other

Case 2:06-cv-01120-MEF-WC   Document 79-9   Filed 04/09/2008   Page 5 of 18
MAR-7-2008  02:09  FROM:OPP HIGH SCHOOL 334 493 2146   TO:12854886875   P:5/8
Case 2:06-cv-01120-MEF-WC   Document 70-13   Filed 03/10/2008   Page 5 of 8

misconduct, we felt that there was no basis to sustain a recommendation for termination. This was Charles Coon's third year with Pike County. He was a probationary employee, which meant we would decide during the remaining two months of the 2004-2005 school year whether to nonrenew Charles Coon as an employee.

After our investigation, Dr. Bazzell met with Charles Coon and I met with Charles Coon. We told Charles Coon we would not tolerate further violation of the no smoking policy, and he was not to drive students in his vehicle. Charles Coon assured us he would do as we asked.

Charles Coon decided in May to submit his resignation as band director and retire. The Board accepted his resignation, as I recall, at the May 2005 Board meeting. When that happened, we still had no knowledge or suspicion that Charles Coon had abused any student.

The chronology of what happened regarding Charles Coon during the six months I was principal seems important:

| | |
|---|---|
| January 3, 2005 | I became interim principal. |
| January 2005 | A complaint is made by a parent concerning a grade in Charles Coon's band class. |
| | The student is in the school band and a student in Charles Coon's band class. |
| | Parent mad and critical of Charles Coon. But no criticism or suggestion made by parent indicating inappropriate relationship with students. |
| | Only complaint other than grade: smoking on campus. |
| April 4, 2005 | Dr. Bazzell asked me to investigate a report that Charles Coon was smoking with students and to see if there was any significance to the reference "butt buddy." |

MAR-7-2008  02:10  FROM:DFB HIGH SCHOOL 334 493 2146            TO:12054886275    P:6/8

Investigation went forward immediately.  Charles Coon was reprimanded for smoking and told not to drive students in his personal vehicle.

No information from any student that Charles Coon was abusing students or information creating suspicion about such a possibility.

May 2005    Charles Coon resigns his employment.

No evidence from any source that Charles Coon had sexually abused a student.

July 2005    Charles Coon arrested and charged with sexual misconduct.

Charles Coon had retired:  no longer an employee of the Pike County Board of Education.

During this five month period – January 2005 to May 2005 – while Charles Coon was an employee and while I was interim principal, no one brought anything to my attention – not one thing – indicating or even raising a suspicion in my mind that Charles Coon was sexually molesting student J.R.   I investigated complaints that were brought to my attention.  I reprimanded Charles Coon based on facts that were developed.  I had no reason to be indifferent to complaints about Charles Coon and I was not.  I did not know Charles Coon other than he was an employee.  As an employee, I reprimanded him without hesitation.  If I had any information from any source that Charles Coon was sexually abusing a student, I would have brought in DHR and the law officials.

When Dr. Bazzell and I were investigating Charles Coon in April of 2005, I knew Dr. Bazzell was communicating with the law enforcement people.  I knew Dr. Bazzell was sharing the information we found with the Brundidge Police Department.

We did not ignore our responsibility.  I questioned the students as conscientiously as I possibly could.  I may not be a forensic expert as I was asked in my deposition, but after 29

Case 2:06-cv-01120-MEF-WC   Document 79-9   Filed 04/09/2008   Page 7 of 18
MAR-7-2008  02:10  FROM:OER HIGH SCHOOL  334 493 2146   TO:12054886275   P:7/8
Case 2:06-cv-01120-MEF-WC   Document 70-13   Filed 03/10/2008   Page 7 of 8

years of being a professional educator, I have a lot of experience dealing with and questioning students. Dr. Bazzell let me know when he discussed the information he was given in April that I was to investigate this information earnestly and carefully. I did.

I am being sued in this case as an individual, as well as in my professional capacity. I am being sued by J.R. and his parents.

But I want the Court to know that at no time during the six months I was interim principal at Pike County High School did anyone share any facts or give me any suggestion or share any suspicion that Charles Coon was sexually abusing J.R. or any student.

Most importantly to me as I react to this lawsuit against me individually is this: in our investigation of Charles Coon, the name of J.R. never came up. No student, no parent, no information from anyone put us on notice about J.R. Smoking: yes. Driving with students: yes. But no mention or reference to J.R.

If anyone had given me any information of any type suggesting any sexual "grooming" or misconduct about Charles Coon, I can assure the Court I would have used every resource available to determine if that was happening.

I am attaching as Appendix B to my affidavit the policies of the Pike County School System regarding sexual abuse and sexual harassment.

I am also attaching Ala. Code § 26-14-3 and § 26-14-13 (Appendix A) which mandates reporting of suspected child abuse and makes it a misdemeanor not to do so.

Policies and mandatory legal obligations are important, of course. But professional standards and professional integrity are just as important. I have lived a professional career without blemish of professional misconduct. To be attacked in this lawsuit that I might have been indifferent or insensitive to sexual abuse by an employee under my

Case 2:06-cv-01120-MEF-WC     Document 79-9     Filed 04/09/2008     Page 8 of 18
MAR-7-2008  02:10  FROM:DPR HIGH SCHOOL 334 493 2146     TB:13285406875  P:8/8
Case 2:06-cv-01120-MEF-WC     Document 70-13     Filed 03/10/2008     Page 8 of 8

supervision is an outrageous attack. If Charles Coon sexually abused J.R., he engaged in the most depraved and disgusting conduct I can imagine for a professional educator. If we had been given any information of that possibility, I would have shared it with law enforcement officials just as we shared what we did find. That would have been my legal and moral duty. We had nothing. We worked with the law enforcement people. Dr. Bazzell shared with the Brundidge Police Department what we found.

My professional standards and my respect for the standards of professional education were a lot more important to me than Charles Coon. I did not and would not be indifferent or insensitive to the type of misconduct he has gone to jail for doing.

_____
Walter L. Pyron

Sworn to and subscribed before me this the __7__ day of March, 2008.

_____
Notary Public

My Commission expires: __1/19/10__
(Seal)

# APPENDIX A

Case 2:06-cv-01120-MEF-WC    Document 79-9    Filed 04/09/2008    Page 10 of 18
Section 26-14 Case 2:06-cv-01120-MEF-WC    Document 70-14    Filed 03/10/2008    Page 2 of 10    Page 1 of 1

**Section 26-14-3**

## Mandatory reporting.

(a) All hospitals, clinics, sanitariums, doctors, physicians, surgeons, medical examiners, coroners, dentists, osteopaths, optometrists, chiropractors, podiatrists, nurses, school teachers and officials, peace officers, law enforcement officials, pharmacists, social workers, day care workers or employees, mental health professionals, members of the clergy as defined in Rule 505 of the Alabama Rules of Evidence, or any other person called upon to render aid or medical assistance to any child, when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report, or cause a report to be made of the same, orally, either by telephone or direct communication immediately, followed by a written report, to a duly constituted authority.

(b) When an initial report is made to a law enforcement official, the official subsequently shall inform the Department of Human Resources of the report so that the department can carry out its responsibility to provide protective services when deemed appropriate to the respective child or children.

(c) When the Department of Human Resources receives initial reports of suspected abuse or neglect involving discipline or corporal punishment committed in a public or private school or suspected abuse or neglect in a state-operated child residential facility, the Department of Human Resources shall transmit a copy of school reports to the law enforcement agency and residential facility reports to the law enforcement agency and the operating state agency which shall conduct the investigation. When the investigation is completed, a written report of the completed investigation shall contain the information required by the state Department of Human Resources which shall be submitted by the law enforcement agency or the state agency to the county department of human resources for entry into the state's central registry.

(d) Nothing in this chapter shall preclude interagency agreements between departments of human resources, law enforcement, and other state agencies on procedures for investigating reports of suspected child abuse and neglect to provide for departments of human resources to assist law enforcement and other state agencies in these investigations.

(e) Any provision of this section to the contrary notwithstanding, if any agency or authority investigates any report pursuant to this section and the report does not result in a conviction, the agency or authority shall expunge any record of the information or report and any data developed from the record.

(f) Subsection (a) to the contrary notwithstanding, a member of the clergy shall not be required to report information gained solely in a confidential communication privileged pursuant to Rule 505 of the Alabama Rules of Evidence which communication shall continue to be privileged as provided by law.

*Acts 1965, No. 563, p. 1049, §1; Acts 1967, No. 725, p. 1560; Acts 1975, No. 1124, p. 2213, §1; Acts 1993, 1st Ex. Sess., No. 93-890, p. 162, §3; Act 2003-272, p. 645, §1.)*

Section 26-14-13

**Penalty for failure to make required report.**

Any person who shall knowingly fail to make the report required by this chapter shall be guilty of a misdemeanor and shall be punished by a sentence of not more than six months' imprisonment or a fine of not more than $500.00.

*(Acts 1965, No. 563, p. 1049, §5; Acts 1975, No. 1124, p. 2213, §1.)*

# APPENDIX B

FILE: JCK

## Pike County Board of Education
## Prohibiting Harassment Policy

### I.      General Statement of Policy

It is the policy of this school system to maintain a learning environment that is free from harassment because of a student's race, color, sex, national origin, disability and religious affiliation. This school system prohibits any and all forms of harassment because of race, color, sex, national origin, disability and religious affiliation.

It shall be a violation of this school's systems policy for any student, teacher, administrator or other school personnel of this school system to harass a student through conduct of a sexual nature, or regarding race, color, national origin, disability, or religious affiliation, as defined by this policy and laws of Alabama.

It shall be also be a violation of system policy for any teacher, administrator or other school personnel of this school system to tolerate sexual harassment or harassment because of a student's race, color, national origin, disability, or religious affiliation, as defined by this policy, by a student, teacher, administrator, other personnel, or any third parties who are participating in, observing, or otherwise engaged in activities, including sporting events and other extracurricular activities, under the auspices of the Pike County School System.

For the purpose of this policy, the term of "school personnel" includes school board members, school employees, agents, volunteers, contractors, or persons subject to the supervision and control of this school system.

This school system will act to promptly investigate all complaints, either formal or informal, verbal or written, of harassment because of race, color, sex, national origin, disability, or religious affiliation; to promptly take appropriate action to protect students from further harassment; and, if it determines that unlawful harassment occurred, to promptly and appropriately discipline any student, teacher, administrator or other school personnel who is found to have violated this policy, and/or to take other appropriate action reasonably calculated to end the harassment, including possible criminal charges.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0117

FILE: JCK

## II.   Definitions

### A.   Sexual Harassment

For purposes of this policy, sexual harassment of a student consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or verbal and/or physical conduct or communication of a sexual nature such as, but not limited to:

1.   a school employee causes a student to believe that he or she must submit to unwelcome sexual conduct in order to participate in a school program or activity, or when an employee or a third party agent of this school system causes the student to believe that the employee/third party will make an educational decision based on whether or not the student submits to unwelcome sexual conduct; or

2.   the unwelcome sexual conduct is so severe, persistent or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity, or created an intimidating, threatening or abusive educational environment.

Examples of conduct which may constitute sexual harassment may include, but not limited to

- sexual advances
- touching, patting, grabbing or pinching another person's intimate parts, whether that person is of the same or opposite sex
- coercing, forcing or attempting to coerce or force sexual intercourse or a sexual act on another
- graffiti of a sexual nature
- sexual gestures
- sexual or dirty jokes
- touching oneself sexually or talking about one's sexual activity in front of others
- spreading rumors about or rating other students as to sexual activity or performance
- unwelcome, sexually motivated or inappropriate patting, pinching or physical contact. This prohibition does not include legitimate, nonsexual physical contact such as the use of necessary restraints to avoid physical harm to persons or property, or conduct such as teacher's consoling hug of a young student, or physical contact with a student as the result of sport moves
- Other unwelcome sexual behavior or words, including demands for sexual favors, when accompanied by implied or overt threats concerning a student or implied or overt promises of preferential treatment.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0118

FILE: JCAC

## INTERROGATION BY PUBLIC OFFICIALS

### Law Enforcement Officials

When law enforcement officers make it known that they wish to talk to a student while under supervision of the school, the student will be called to the office of the principal, and in the presence of the officers, the school principal or his/her designated representative shall attempt to notify by telephone the student's parent or guardian of the situation. The student will then be informed that he/she has three (3) choices:

1. The student may converse by phone with his/her parent or guardian.

2. The student may decline to talk with the officers until his/her parent(s) or guardian(s) is present.

3. The student may talk with the officers either in or outside the presence of a school official.

In case an arrest warrant is presented by law enforcement officers, the school principal or his/her designated representative shall make every effort to notify the parents or legal guardians of the student in question prior to the student's removal from the school premises.

### Department of Human Resource Officials

When Department of Human Resource officials make it known that they wish to talk with a student while under the supervision of the school, the principal or his/her designated representative shall seek to determine if the visit relates to child abuse or neglect. If so, the Human Resource official shall be permitted to talk with the student in accordance with the following procedure:

### Procedure for Handling Child Abuse/Neglect

All educators are required to report immediately suspected cases of child abuse/neglect to the Department of Human Services. The following guidelines are suggested if child abuse/neglect is suspected:

*JR v. Pike County BOE*
*Produced by Defendant PCBE*
*No. 0124*

FILE: JCAB
(Continued)

SOURCE:
ADOPTED:
LEGAL REF.:     U.S. Const. Amend. IV; U.S. Const. Amend.
                XIVl; Moore v. Student Affairs Committee of
                Troy State Univ., 284 F. Supp. 725, (M>D> Ala.
                1970); Note from Moore: "It is settled that
                Fourth Amendment does not prohibit reasonable
                searches when the search is conducted by a
                superior charged with the responsibility of
                maintaining discipline or of maintaining
                security ..."; New Jersey v. T.L.O.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0125

FILE: JCAC
(continued)

1. The educator should immediately notify the
   principal.

2. The principal/educator should consult with the
   school nurse and counselor.

Human Resource caseworkers will proceed to investigate
the reported case.  If the investigation is to begin at the
school, the Human Resource caseworker will report to the
school office and identify himself/herself to the principal or
designated representative.  Child abuse/neglect investigations
are highly confidential, and the student's rights to privacy
must be respected.  Only those persons necessary to conduct
the investigation should be present in any interview.  After
an evaluation/intervention has been made, the caseworker will
provide feedback to the principal and arrange monitoring pro-
cedures as needed.  Educators will report further incidents of
abuse/neglect regarding that child to the assigned caseworker.

### Special Information Regarding Neglect Cases:

1. Teachers should document and date _specific_ instances
   or examples of neglect.
   Ex: On Wednesday, January 14, 1988, John Doe came
   to school with no coat, wearing unclean clothes and
   shoes with large holes.

2. Keep a running account of the above examples over a
   period of time.

3. Contact the parents and express concern over the
   neglect and make suggestions as to how they can
   help or seek help by calling Child Welfare at Human
   Resource.

### Right to Privacy Considerations:

1. A student's school record continues to be protected
   by the terms of the Family Rights and Privacy Act
   and the policies of the Board.  The School System
   needs a parental release form, court order or other
   legal document which gives school personnel the
   permission to release information in school records
   to Human Resource caseworkers.

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0126

FILE:JCAC
(continued)

2.  In return, Human Resource personnel should share
needed information with school officials.  The
school principal or counselor could be designated
as a <u>confidential</u> person to receive this information
and use it in the best interest of the student.

SOURCE:
ADOPTED:

*JR v. Pike County BOE*
Produced by Defendant PCBE
No. 0127