IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JR, a minor, by his mother and     )
father EAR and TMR,     )
    )
    Plaintiffs,     )
    )
v.     )    CIVIL ACTION NUMBER:
    )    2:06-cv-1120-MEF
    )
PIKE COUNTY BOARD OF     )
EDUCATION, et al.,     )
    )
    Defendants.     )

## CASES IN SUPPORT OF ARGUMENT
## FOR SUMMARYJUDGMENT

Comes now Defendants, by and through the undersigned counsel of record, and hereby submit additional cases Defendants will reference in argument during the pretrial conference now scheduled for June 3, 2008:

I.
TITLE IX AND § 1983

*Sauls v. Pierce County School District*,
399 F.3d 1279 (11th Cir. 2005)
(Copy attached as Appendix A)

The Eleventh Circuit Court of Appeals (Judges Anderson, Dubina and Black) granted summary judgment ruling that a school district could not be held liable under Title IX where a teacher sexually abused a student since district officials did not act with deliberate indifference in response to actual notice of

incidents of misconduct. While the district officials may have been ineffective in preventing the teacher's sexual harassment, the district officials sufficiently responded to each report of misconduct. Since there was no showing that the school officials were deliberately indifferent to complaints about the teacher, there could be no showing that the district had a custom of responding to teacher's alleged discriminatory actions with deliberate indifference; thus, the school district will not be liable under § 1983.

II.
Constitutional Claim: Due Process Protection
Privacy and Bodily Integrity

Failure to Train

State Actors May Only be Held
Liable Under § 1983 for Their
Own Acts, and Not the Acts of Third Parties

*Ruiz v. McDonnell*,
299 F.3d 1173, 1182 (10th Circ. 2002)
(Copy attached as Appendix B)

*Plumeau v. School District #40 County of Yamhill*,
130 F.3d 432, 438 (9th Cir. 1997)
(Copy attached as Appendix C)

*DeShaney v. Winnebago County Dept. of Soc. Services*,
489 U.S. 189, 197
(Copy attached as Appendix D)

The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees citizens the right to be free from "state imposed violation

of bodily integrity." Generally, "state actors may only be held liable under § 1983 for their own acts, and not the acts of third parties." *Ruiz v. McDonnell*, 299 F.3d 1182 (citing *DeShaney v. Winnebago County Dep't. of Soc. Serv.*, 489 U.S. at 197). "A state's failure to protect an individual from private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.  To impose municipal liability under § 1983 for a violation of constitutional rights, plaintiffs must show:

    (1)    that the plaintiff possessed a constitutional right of which he was deprived;

    (2)    that the municipality had a policy;

    (3)    that the policy amounts to deliberate indifference to the plaintiff's constitutional rights;

    (4)    that the policy is the moving force behind the constitutional violation.

In *Plumeau v. School District #40 County of Yamhill*, 130 F.3d 438-439, the Ninth Circuit affirmed summary judgment for the school district where a janitor sexually abused a student:

> . . . after reviewing the entire record, and viewing the evidence as we must in the light most favorable to the Plumeaus, we agree with the district court that the Plumeaus have failed to raise a genuine issue of material fact as to § 1983 municipal liability insofar as their claims were based upon:  (i) a custom or practice of ignoring complaints; (ii) unconstitutional actions taken by those with policy making authority; or (iii) an affirmative duty to protest.

> The district court also concluded that the Plumeaus did not submit evidence, sufficient to survive a motion for summary judgment, to

support their claim that the School District was deliberately indifferent to the need to provide training in identifying the signs of sexual abuse.[4] . . .

[4] . . . To be actionable under § 1983, a "municipality's failure to train must amount to "deliberate indifference" to the rights of others. *City of Canton v. Harris*, 489 U.S. 378, 387. For liability to attach, the need for training must be obvious and violation of constitutional rights must be a highly predictable consequence. *Board of County Commissioners of Bryon County v. Brown*, __ U.S. __, 117 S. Ct. 1382, 1391, 137 L.Ed.2d 626 (1997) . . . .

III.
*Kline v. Mansfield*,
255 Fed. Appx. 624 (3rd Cir. 2007)
(Copy attached as Appendix E)

The Third Circuit Court of Appeals affirmed summary judgment for the Hamburg School District and school principal in a case involving teacher/student sexual abuse. The abuser pled guilty and was sentenced to jail. Neither the student nor her parents complained about the teacher. No official of the school district possessed actual knowledge of the intimate or sexual nature of the relationship.

Plaintiff alleged Substantive Due Process claims, in addition to equal protection and right to privacy claims, arguing that the school district had a custom or policy of deliberate indifference that violated her constitutional rights to be free from sexual abuse. Both the district court and the Court of Appeals rejected plaintiff's contention, stating in pertinent part:

In *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court stated that a municipality can be liable under Section 1983 if its policy or custom causes a constitutional injury. With respect to a sexual abuse claim:

[i]n order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and that the defendant acted with deliberate indifference to that abuse. In order to establish deliberate indifference on the part of the defendant, "something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm" to plaintiffs.

*Black by Black v. Indiana Area Sch. Dist.,* 985 F.2d 707, 712-13 (3d Cir.1993)(quoting *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1025 (3d Cir.1991)).

Kline conceded that neither she, nor her mother, complained to any school official about Mansfield's conduct. Instead, Kline based her claim on the knowledge that school officials possessed regarding the contacts between her and Mansfield. For example, Kline noted that she was suspended from school after she skipped band rehearsal to be with Mansfield in his classroom. She also noted that teachers complained that she was spending too much time with Mansfield in his classroom. Furthermore, she stated that her seventh grade teachers stated at one point that she was not to be in Mansfield's room for any reason. Finally, Kline stated that the school failed to enforce its policy of not allowing seventh grade students in the sixth grade hallway.

Kline's evidence does not create a material issue of fact that Hamburg was deliberately indifferent. At best, it shows that Hamburg might have been negligent in failing to recognize a high risk of harm.[FN5] However, this does not establish a material issue of fact with respect to this claim. *See id.*, *cf., Shepard v. Kemp,* 912 F.Supp. 120, 127-28 (M.D.Pa.1995)(noting that officials were aware of reports that children were spending inordinate amount of time with teacher, but that there was no disclosure of any wrongdoing). Therefore, the District Court properly granted summary judgment in favor of the Defendants on this claim.[FN6]

FN5. On appeal, Kline compares her case to *Stoneking v. Bradford Area School District,* 882 F.2d 720 (3d Cir.1989), *Craig v. Lima City Schools Board of Education,* 384 F.Supp.2d 1136 (N.D.Ohio 2005) and *C.M. v. Southeast Delco School District,* 828 F.Supp. 1179 (E.D.Pa.1993). These cases are all distinguishable. In *Stoneking,* the record revealed complaints about sexual assaults of female students by teachers and staff. The vice-principal recorded these allegations in a secret file at home rather than in the teachers' personnel file. *See Stoneking,* 882 F.2d at 728-29. Additionally, the defendants continued to give the teachers excellent performance evaluations and discouraged and/or intimidated parents from pursuing their complaints. *See id.* Unlike *Stoneking,* the record in this case did not show that the school officials had notice of any sexual misconduct. *Craig* and *C.M.* are also similarly distinguishable. In *Craig,* teachers saw the plaintiff go into her teacher's classroom with the lights out, the door closed and the shades drawn. Teachers also saw the plaintiff and her sexual abuser go to his van alone and leave school property together on a daily basis. The two would sit together on bus trips and cuddle underneath a blanket and fall asleep against one another. Furthermore, once the superintendent found out about the relationship between the teacher and the plaintiff, he wrote a memo and entitled it, "consensual sex." *See Craig,* 384 F.Supp.2d at 1148. In *C.M.,* the District Court noted that there was a student complaint about a teacher and that staff members complained to school officials that the teacher was a "depraved and dangerous" man. These complaints also disclosed the sexual overtones of the teacher's behavior. *See* 828 F.Supp. at 1185.

FN6. Much of the analysis supporting summary judgment for Hamburg also supports summary judgment for Padasak. In particular, Padasak knew only that Kline spent time in Mansfield's classroom when she was scheduled to be elsewhere. There is no record evidence that prior to Mansfield's eventual arrest, Padasak knew or should have known that Mansfield ever sexually abused Kline. Padasak's actions, therefore, do not amount to deliberate indifference to Kline's constitutional rights.

Considering and rejecting plaintiffs' failure to train argument, the Third Circuit

stated:

> To attach liability to Hamburg, the identified deficiency in the training program must be closely related to the ultimate injury. *See id.* at 391, 109 S.Ct. 1197. Proving that an injury could have been avoided if a school official had better or more training is not enough to show municipal liability. *See id.* Otherwise, "[s]uch a claim could be made about almost any encounter resulting in injury." *Id.*

> "Establishing municipal liability on a failure to train claim under § 1983 is difficult." *Reitz,* 125 F.3d at 145. "Failure to train ... municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *See Berg v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir.2000)(per curiam)(citing *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 408-09, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

> \*\*\*
> Because this evidence was unknown, the failure to train school officials could not be perceived as a conscious or deliberate choice on Hamburg's part. *See City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197. Finally, Kline relies on the evidence of her expert, Dr. Kent. Dr. Kent stated that additional training might have prevented Kline from being sexual abused by Mansfield. This evidence does not create a material issue of fact with respect to this claim. Indeed, as previously stated, the fact that further training might have prevented constitutional injury, does not, in and of itself establish a failure to train claim. *See id.* at 392.

> Because Kline failed to show that Hamburg's failure to train its officials to spot signs of sexual abuse caused a pattern of sexual abuse, she can only proceed under the narrow theory described in *Bryan County.* In support of this theory, Kline relies on *Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992). *Walker* is distinguishable. *Walker* involved a motion to dismiss as opposed to summary judgment. The plaintiff in that case alleged that the police department failed to train and supervise police officers in their obligation not to commit or suborn perjury. *See id.* at 298. The Second Circuit

reversed, not on the narrow theory described in *Bryan County,* but because the plaintiff should have been allowed to show a pattern of police misconduct. *See Walker,* 974 F.2d at 299-300. It stated that because not committing perjury was obvious to all without any further training or supervision, the failure to train was generally not so likely to produce a wrong decision supporting an inference of deliberate indifference by the city in the need to train or supervise. *See id.*

Unlike *Walker,* Kline was given the opportunity to show a pattern of sexual abuse. For the reasons previously stated, she failed to show such a pattern. Additionally, because not committing the crime of sexually abusing a child is obvious, the failure of Hamburg to train its employees to spot signs of sexual abuse such as Mansfield's "grooming" methods was not deliberately indifferent. *See, e.g., id.* at 299-300.

Finally, Kline argued that Hamburg failed to train its employees on reporting sexual abuse. However, there is no evidence that any school official knew of the sexual abuse that was occurring between Mansfield and Kline. Therefore, the District Court properly entered summary judgment in favor of the Defendants on Kline's failure to train claim.

IV.

Equal Protection:  Special Education Students

*Ms. K v. City South Portland*,
407 F. Supp. 2d 290 (D. Me. 2006)
(Copy attached as Appendix F)

In a case involving similar issues to the case now before the Court, the

District Court considered three similar claims –

(1)    Injury to special education student,

(2)    Failure to train,

(3)    Violation of equal protection.

8

After considering each of these claims and contentions, the court granted summary judgment.

Regarding the Equal Protection claim, plaintiff in *Ms. K* alleged discriminatory treatment toward some special education students (wheel bound). The court at 407 F. Supp. 300, concluded that special education students "are not categorically the same" and thus plaintiff failed to demonstrate a genuine issue as to whether plaintiff was treated differently because of his disability. The court also found that the danger (icy conditions) that caused the injury to plaintiff was a danger to all students, not just to plaintiff because of his disability.

Plaintiff in this case, as the plaintiff in *Ms. K*, had the right to ask for a behavioral management plan and special placement if she thought J.R. was particularly vulnerable to sexual abuse. She made no such request. On the same basis, Defendants had no reason to suspect J.R. needed special features in his IEP to insulate him from sexual exploitation. The No Sexual Harassment Policies of the Board were designed to protect all students from sexual abuse.

In *Ms. K* no one anticipated the danger, or knew of the danger; consequently, the court found that there was no evidence of 'deliberate discrimination because of his handicap' that caused the injury. Moreover, the court in *Ms. K* determined that there was no evidence of egregious misconduct or bad faith by defendants as required for liability under § 504.

<u>Conclusion</u>

Defendants will argue based on the controlling case law that all Defendants, excepting Coon, are entitled to summary judgment. The case law, it is respectfully submitted, including the Eleventh Circuit opinion in *Sauls*, provide compelling reason why the Court should enter judgment for these Defendants.

Respectfully submitted,

s/Donald B. Sweeney, Jr.
_____

Donald B. Sweeney, Jr.
One of the Attorneys for Named
Defendants

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deanie Clark Allen, Esq.
Susan Shirock DePaola, Esq.

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Mr. Charles L. Coon
308 Country Club Drive
P.O. Box 201
Greenville, AL  36037

s/Donald B. Sweeney, Jr.
Donald B. Sweeney, Jr.

# APPENDIX A

## Westlaw.

399 F.3d 1279                                                                                      Page 1
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
**(Cite as: 399 F.3d 1279)**

▷
Sauls v. Pierce County School Dist.
C.A.11 (Ga.),2005.

United States Court of Appeals,Eleventh Circuit.
Bobby E. SAULS, Terri L. Sauls, et al., Plaintiffs-
Appellants,
v.
PIERCE COUNTY SCHOOL DISTRICT, Pierce
County High School, et al., Defendants-Appellees.
**No. 03-16267.**

Feb. 9, 2005.

**Background:** Student's parents brought action
against school district, seeking damages for teach-
er-on-student sexual harassment. The United States
District Court for the Southern District of Georgia,
No. 02-00073-CV-5,William T. Moore, Jr., Chief
Judge, granted summary judgment for school dis-
trict, and parents appealed.

**Holding:** The Court of Appeals, Black, Circuit
Judge, held that although school district officials
ultimately may have been ineffective in preventing
teacher's sexual harassment of student, district
could not be held liable under Title IX since district
officials did not act with deliberate indifference in
response to actual notice of incidents of miscon- duct.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1067(3)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1059 Education
            78k1067 Sex Discrimination
                78k1067(3) k. Sexual Harassment;
Sexually Hostile Environment. Most Cited Cases
Title IX plaintiffs seeking to recover damages

against a school district for teacher-on-student
sexual harassment must establish: (1) a school dis-
trict official with the authority to take corrective
measures had actual notice of the harassment; and
(2) the official with such notice was deliberately in-
different to the misconduct. Education Amend-
ments of 1972, § 901(a), 20 U.S.C.A. § 1681(a).

**[2] Civil Rights 78 ☞1067(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1059 Education
            78k1067 Sex Discrimination
                78k1067(4) k. Discrimination Against
Males. Most Cited Cases
Although school district officials ultimately may
have been ineffective in preventing female teacher's
sexual harassment of male student, district could
not be held liable under Title IX since district offi-
cials did not act with deliberate indifference in re-
sponse to actual notice of incidents of misconduct;
district officials sufficiently responded to each re-
port of misconduct they received by investigating
the allegations and interviewing the relevant
parties, and also consistently monitored teacher's
conduct and warned her about her interaction with
students. Education Amendments of 1972, § 901(a),
20 U.S.C.A. § 1681(a).

**[3] Civil Rights 78 ☞1352(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1352 Lack of Control, Training, or Su-
pervision; Knowledge and Inaction
                78k1352(2) k. Education. Most Cited
Cases
Since there was no evidence demonstrating that
school district officials were deliberately indifferent
to the reports of alleged teacher-on-student sexual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
**(Cite as: 399 F.3d 1279)**

Page 2

harassment, there could be no showing that district had a custom of responding to teacher's alleged discriminatory actions with deliberate indifference; thus, school district could not be held liable under § 1983. 42 U.S.C.A. § 1983.

**\*1280** Brent J. Savage, C. Dorian Britt, Savage, Turner, Pinson & Karsman, Savannah, GA, David McCrea, Law Office of David McCrea, Alma, GA, for Plaintiffs-Appellants.
Phillip Leroy Hartley, Martha M. Pearson, Daniel R. Murphy, Harben & Hartley, LLP, Gainesville, GA, Martha F. Dekle, Brunswick, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Southern District of Georgia.

Before ANDERSON, DUBINA and BLACK, Circuit Judges.

BLACK, Circuit Judge:
This appeal involves teacher-on-student sexual harassment. Appellants Bobby and Terri Sauls allege their son, Appellant Dustin Sauls, was sexually harassed by Beth Blythe, a former teacher at Pierce County High School. Appellants claim Pierce County School District (PCSD) violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX), by ignoring the sexual relationship that allegedly developed between Dustin and Blythe. Appellants also seek to recover damages against PCSD under 42 U.S.C. § 1983, arguing PCSD is liable for Dustin's injuries based on its custom of ignoring Blythe's discriminatory practices. Appellants argue the district court erred when it granted summary judgment for PCSD on both counts. We affirm the district court.[FN1]

> FN1. We note the district court also dismissed several claims brought against other Defendants named in the Sauls' complaint; however, those issues have not been challenged on appeal, and we do not consider them.

**\*1281 I. BACKGROUND**

In reviewing a grant of summary judgment, we are required to view the facts in the light most favorable to the nonmoving party. *Davis v. Dekalb County Sch. Dist.,* 233 F.3d 1367, 1371 (11th Cir.2000). We, therefore, set forth the facts of this case in the light most favorable to Appellants.

Dustin began attending Pierce County High School in the fall of 1998. In general, Dustin performed poorly in school. During his sophomore year, Dustin failed several classes and missed a total of 81 days of school. In addition, Dustin had disciplinary problems involving alcohol and marijuana use.

Dustin first encountered Blythe in the first term of his freshman year, when he was taking a course taught next door to Blythe's classroom. During the fall of 1999, the first term of his sophomore year, Dustin had Blythe as a science teacher-a class which he failed. At the time, Dustin and Blythe had nothing more than a teacher/student relationship.

In the summer and early fall of 2000, their relationship became more personal. Dustin's younger sister, Ashley, was starting high school and began participating in Flag Corps, an activity which Blythe was running at the time. Also, Blythe's son, Ben, was starting the second grade, and Dustin's mother was his teacher at Patterson Elementary School. Blythe started visiting the Sauls' home on a regular basis to speak with Dustin's mother about Ben and to drive Ashley home from Flag Corps practice. Blythe would socialize with the Sauls family during these visits, and she soon became friends with Dustin's mother. Blythe and Dustin's mother would discuss their personal and marital lives. Moreover, Dustin's mother agreed to look after Ben at the elementary school, and Blythe promised to look after Dustin and Ashley in high school.

The sexual relationship between Dustin and Blythe allegedly began around the end of 2000-about halfway through Dustin's junior year. Dustin was 16 years old at the time, and under Georgia law, he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
**(Cite as: 399 F.3d 1279)**

Page 3

had the legal capacity to consent to sex. *See* Ga.Code Ann. § 16-6-3(a) (defining statutory rape as sex with someone under 16 years of age). Most of their alleged sexual encounters occurred on school grounds. Blythe would write notes to other teachers requesting that Dustin be allowed to come to her room for various reasons. Dustin primarily missed his Biology class to meet with Blythe, although he missed other classes as well.

In addition to their encounters on school grounds, Dustin would stay at Blythe's home when her husband went on fishing trips, and they once met in a hotel room. During their relationship, Blythe allegedly provided Dustin with prescription drugs and pain pills. She also paid Dustin's speeding tickets, and gave him money, clothes, and a cell phone. While the purported sexual relationship was ongoing, Dustin's academic performance improved-he passed all his classes during the 2000/2001 school year.

On March 24, 2001, Dr. Joy Williams, who was then the assistant superintendent of the Pierce County School System, received an anonymous email alleging Blythe had inappropriate relationships with specific students. The named students had either graduated or dropped out of school. Dustin was not mentioned in the email.

**\*1282** In response to the allegation, Dr. Williams conducted an investigation. She asked Lowell Williamson, the principal of Pierce County High School at the time, and Don Spence, the superintendent at the time, whether they knew any relevant information concerning Blythe. Williamson explained he had received a complaint in October 1998 about a potentially inappropriate relationship between Blythe and a student named Brandon Davis. Williamson investigated the allegation at that time. He spoke with Davis's mother, who complained Blythe had been removing Davis from some of his classes. Williamson interviewed Davis, who vehemently denied having any inappropriate relationship with Blythe. Williamson also interviewed Blythe, who similarly denied the allegation. Willi-

amson found their denials credible, and he did not uncover any evidence supporting the validity of the allegation.[FN2] He warned Blythe to always keep her conduct with students beyond reproach and to avoid any situation that could be viewed as inappropriate. After interviewing Davis and Blythe, Williamson informed Superintendent Spence of the allegation and the results of his investigation. During his discussion with Dr. Williams in the spring of 2001, Williamson indicated he had not observed any inappropriate conduct by Blythe, and he had not received any other accusations against her. He provided Dr. Williams with a copy of his notes from the 1998 investigation.

> FN2. Two assistant principals were present during Williamson's interview of Davis, and they similarly concluded Davis's denial was credible.

After discussing the 1998 allegation, Williamson and Dr. Williams interviewed Blythe about the March 2001 email. Once again, Blythe strongly denied any misconduct. Dr. Williams warned Blythe, orally and in writing, to avoid even the appearance of impropriety in her dealings with students. Dr. Williams told Blythe to avoid any potentially suspect situations where she would be alone with male students at school or other social functions.

In July 2001, Dr. Williams-who, by that time, had been promoted to superintendent-received a phone call from a "concerned citizen" claiming to have seen Blythe's and Dustin's vehicles parked in the woods. The anonymous caller did not claim to have witnessed any sexual or inappropriate acts between Dustin and Blythe. Dr. Williams promptly notified the Pierce County Board of Education about this allegation. She also reported the matter to the Professional Standards Commission (PSC), the Georgia entity responsible for investigating allegations of unethical behavior by educators. Dr. Williams explicitly requested PSC to conduct an investigation of Blythe's behavior. In addition, Dr. Williams discussed the allegation with the local police depart-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279                                                                              Page 4
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
(Cite as: 399 F.3d 1279)

ment.

Dr. Williams also directed the high school's new principal, Anthony Smith, to prevent any unnecessary contact between Blythe and Dustin. Dr. Williams instructed Smith to monitor their activities and to report any suspicious behavior to her. Throughout the fall of 2001, Smith and other members of the high school staff often stopped Dustin in the hallway and questioned him about what he was doing and where he was going. Furthermore, Smith interviewed Dustin and expressly asked him whether he was engaged in an inappropriate relationship with Blythe. Dustin assured Smith that he and Blythe did not have such a relationship. Dustin has now admitted that he lied to Smith and other school officials to conceal the nature of his relationship with Blythe. At the time, Dustin also lied to his parents when they asked him about his relationship with Blythe.

*1283 Based on Dr. Williams' request, PSC also conducted an investigation of Blythe during the fall of 2001. John Grant, who was heading PSC's investigation, interviewed Dustin and his father. They both denied that any inappropriate relationship existed. Grant also called Dustin's mother, who stated she did not believe Dustin was involved in an illicit relationship with Blythe. Moreover, Blythe denied any wrongdoing during her interview with Grant.

As part of his investigation, Grant interviewed some former students of the high school, including Davis. Davis now admitted to Grant that he did have a sexual relationship with Blythe while he was a student. Davis also, however, admitted he concealed this relationship and denied its existence when questioned by school officials at the time.

In early December 2001, a substitute teacher discovered a note addressed to Blythe, which Dustin admittedly had written. In the note, Dustin demanded three things from Blythe and stated if his demands were not met, he would "call that dude [John Grant] and me and him will have a long talk on how you fed me full of shit for a year that way you

could fuck me at school everyday .... I get what I want or I tell what they want to hear." He later explained in his deposition that the three things he had demanded from Blythe were (1) to receive $100, (2) to get his cell phone back, and (3) to have sex with her at a specific time.

After discovery of the note, Dr. Williams again interviewed Blythe, who continued to deny having any sexual involvement with Dustin. Nonetheless, she resigned her teaching position on December 20, 2001. On May 9, 2002, Blythe voluntarily surrendered her teaching certificate.

On June 27, 2002, Appellants filed a complaint in federal district court, alleging PCSD, among others, remained idle in the face of known teacher-on-student harassment. Appellants argued Title IX was violated because Blythe's harassment of Dustin was ignored and allowed to continue. In addition, Appellants sought to recover damages for Dustin's injuries under § 1983. The district court granted summary judgment for PCSD with respect to both claims. This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's grant of summary of judgment de novo. *Davis v. Dekalb County Sch. Dist.,* 233 F.3d 1367, 1371 (11th Cir.2000). "We are required to resolve all reasonable inferences and facts in a light most favorable to the nonmoving party." *Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1216 (11th Cir.1999) (citation omitted).

## III. DISCUSSION

### A. *Title IX Claim*

Title IX provides, in pertinent part, that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
(Cite as: 399 F.3d 1279)

Page 5

sistance ...." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX for cases involving intentional sexual discrimination, and it has held money damages are available in such lawsuits. *Franklin v. Gwinnett County Public Schs.,* 503 U.S. 60, 65, 75, 112 S.Ct. 1028, 1032, 1038, 117 L.Ed.2d 208 (1992). The Court also has established that a teacher's sexual harassment of a student constitutes actionable discrimination for the purposes of Title IX. *Id.* at 74-76, 112 S.Ct. at 1037-38; *see also Davis,* 233 F.3d at 1371.

**\*1284** Our analysis in cases involving teacher-on-student sexual harassment is governed by the Supreme Court's decision in *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In *Gebser,* the Supreme Court held a school district will not be liable in damages under Title IX for teacher-on-student sexual harassment "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."[FN3] *Id.* at 277, 118 S.Ct. at 1993. The Court defined the deliberate indifference standard as "an official decision by the recipient [of federal funds] not to remedy the violation." *Id.* at 290, 118 S.Ct. at 1999.

> FN3. In *Gebser,* the Supreme Court emphasized a school district will not be liable under Title IX for a teacher's harassment based on principles of constructive notice or *respondeat superior.* 524 U.S. at 281-290, 118 S.Ct. at 1995-99.

Although it reached the correct conclusion, the district court relied on the legal standard applicable in Title IX claims based on student-on-student sexual harassment.[FN4] The Supreme Court has applied a more rigorous standard when a Title IX plaintiff seeks damages against a school district for student-on-student harassment. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 650-53, 119 S.Ct. 1661, 1675-76, 143 L.Ed.2d 839 (1999). The

Court explained student-on-student harassment will rise to the level of actionable discrimination under Title IX only if the harassment is "sufficiently severe." *Id.* at 650, 119 S.Ct. at 1674. The Court concluded that to prevail on a Title IX claim based on student-on-student harassment, the plaintiff must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect." *Id.* at 650-52, 119 S.Ct. at 1675; *see also Hawkins v. Sarasota County Sch. Bd.,* 322 F.3d 1279, 1285 (11th Cir.), *reh'g and reh'g en banc denied,* 67 Fed. Appx. 590 (11th Cir.2003).

> FN4. This Court has held "we must affirm the summary judgment if we find that the district court reached the right result notwithstanding its reliance on an incorrect rationale." *Solitron Devices, Inc. v. Honeywell, Inc.,* 842 F.2d 274, 278 (11th Cir.1988) (citation omitted).

[1] Because this case involves teacher-on-student harassment, Appellants need not establish Blythe's misconduct was "so severe, pervasive, and objectively offensive" that it denied Dustin equal access to educational programs or opportunities. Title IX plaintiffs, like Appellants, seeking to recover damages against a school district for teacher-on-student sexual harassment must establish two things to survive summary judgment: (1) a school district official with the authority to take corrective measures had actual notice of the harassment; and (2) the official with such notice was deliberately indifferent to the misconduct. *See Gebser,* 524 U.S. at 290-93, 118 S.Ct. at 1999-2000; *Davis v. Dekalb County Sch. Dist.,* 233 F.3d 1367, 1371 (11th Cir.2000).

[2] In this case, Appellants argue PCSD violated Title IX because it was aware of Blythe's sexual relationship with Dustin and other students, and it was deliberately indifferent to stopping her harassment. We disagree.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
(Cite as: 399 F.3d 1279)

Page 6

The parties dispute when PCSD received the actual notice required under *Gebser.* Appellants contend PCSD had actual notice of Blythe's misconduct in either October 1998 (the Davis allegation) or March 2001 (the anonymous email). **\*1285** PCSD, on the other hand, asserts it did not receive notice until June 2001, when Dr. Williams received the phone call about Dustin's and Blythe's vehicles being parked in the woods. We need not, however, address the actual notice issue because regardless of whether PCSD had the requisite notice in October 1998, March 2001, or July 2001, Appellants' Title IX claim fails because they cannot demonstrate PCSD officials acted with deliberate indifference at any of these times. Rather, PCSD officials sufficiently responded to each report of misconduct they received. Therefore, our decision rests on *Gebser's* requirement that the school district act with deliberate indifference.

This Court examined and applied the deliberate indifference standard in *Davis.* 233 F.3d at 1373-75. In *Davis,* the plaintiffs asserted the defendant school district knew or should have known Kelvin Mency, the teacher in question, was sexually abusing them because school officials had previously received a complaint involving Mency and a student who was not one of the plaintiffs. *Id.* at 1372. According to the prior complaint, Mency had inappropriately touched the non-party student during a football game and tried to touch her again at the water fountain, but she moved away. *Id.* at 1372-73. In response to this complaint, the high school principal ordered an investigation. *Id.* at 1373. School officials interviewed the alleged victim and other students. *Id.* They also interviewed Mency, who denied doing anything improper. *Id.* The investigation failed to uncover reasonable evidence demonstrating Mency's conduct was inappropriate. *Id.* Based on their interviews, the school officials concluded the touching was probably inadvertent and not sexual in nature. *Id.*

In addition, the high school principal in *Davis* instituted corrective measures. The principal removed the non-party student from Mency's after-school physical education class. *Id.* The principal also offered to remove the student from her regular physical education class with Mency, but the student decided she wanted to stay in that class. *Id.* The principal directed Mency to avoid out-of-class contact with the alleged victim and not to be alone with any female students. *Id.* at 1374. The principal followed up with the alleged victim several times, but she did not have any further complaints. *Id.* The principal also monitored Mency, but did not observe any indiscretions. *Id.*

In light of these actions, we found the school district and its officials "responded with anything but deliberate indifference." *Id.* at 1373. We noted a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs. *Id.* at 1375 (citing *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 456 n. 12 (5th Cir.1994) (applying deliberate indifference standard in § 1983 analysis and holding "many good faith but ineffective responses ... might satisfy a school official's obligation in these situations, *e.g.,* warning the state actor, notifying the student's parents, or removing the student from the teacher's class")). We explained the relevant inquiry is not whether the measures taken were effective in stopping discrimination, but whether the school district's actions amounted to deliberate indifference. *Id.*

In this case, each time PCSD officials received a complaint concerning Blythe, they responded in a fashion similar to that of the school officials in *Davis.* PCSD officials responded to the reports in October 1998, March 2001, and July 2001 by investigating the allegations and interviewing the relevant parties. School officials also consistently monitored Blythe's conduct**\*1286** and warned her about her interaction with students.

*1. October 1998*

Even if we assume, without deciding, PCSD had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
(Cite as: 399 F.3d 1279)

Page 7

actual notice of Blythe's harassment in October 1998, it did not respond with deliberate indifference at that time. Principal Williamson started an investigation the day after he received the complaint about Blythe and Davis. Williamson interviewed the two separately, and they both denied the allegation. He also spoke with Davis's mother. Williamson, who had been a school administrator for over 15 years, determined Davis's and Blythe's denials were credible. This conclusion was reinforced by two assistant principals, who similarly found Davis's denial trustworthy. Williamson was unable to find any evidence supporting the allegation that Blythe was engaged in an inappropriate relationship with Davis. Like the principal in *Davis*, Williamson did not observe any misconduct by Blythe and he did not receive any further complaints about her until March 2001.

Even though Williamson failed to find any evidence supporting the allegation, he nonetheless issued a warning to Blythe. He directed Blythe to avoid any situation that could be construed as inappropriate and warned that her interaction with students must always be beyond reproach. Williamson notified his superior, former Superintendent Spence, of his investigation and conclusions. Under *Davis*, Williamson's response to the 1998 complaint did not constitute deliberate indifference.

### 2. *March 2001*

Assuming PCSD officials had actual notice in March 2001, they again did not respond with deliberate indifference. After Dr. Williams, the assistant superintendent at the time, received the anonymous email, she investigated the allegation. She quickly learned none of the students named in the email still attended Pierce County High School, and one of the students, Davis, had been the subject of an investigation in 1998. Dr. Williams interviewed the superintendent, Spence, and the high school principal, Williamson, about Blythe's behavior with students. Principal Williamson explained he was unable to find any evidence to support the 1998 com-

plaint concerning Davis, and he provided Dr. Williams with a copy of his notes from that investigation. Dr. Williams, along with Principal Williamson, interviewed Blythe about the email, and she, once again, vehemently denied the allegations.

Although PCSD still did not have any evidence of misconduct by Blythe, Dr. Williams took corrective action. Because the email only referred to former students, Dr. Williams did not have the option of removing any of the students from Blythe's classes. Dr. Williams did, however, admonish Blythe both orally and in writing, and directed her to avoid even the appearance of impropriety when dealing with students. Similar to the warning issued in *Davis*, Dr. Williams also instructed Blythe to avoid situations where she would be alone with male students. Based on these actions, we conclude PCSD was not deliberately indifferent to the March 2001 allegation.

### 3. *June 2001*

Finally, PCSD officials instituted several corrective measures in response to the July 2001 phone call, which alleged Dustin's and Blythe's cars had been seen parked in the woods. This phone call was the first time PCSD had received a report specifically linking Blythe with Dustin.

Soon after receiving the phone call, Dr. Williams contacted the Professional Standards*1287 Commission (PSC) and requested that it investigate Blythe. PSC complied with this request and assigned John Grant to conduct an investigation during the fall of 2001. Dr. Williams also notified the Pierce County Board of Education and the local police department about the allegation. She instructed the new high school principal, Smith, to closely monitor Blythe and Dustin, to prevent any unnecessary contact between the two, and to report any suspicious behavior. That fall, whenever Smith or other members of the high school staff observed Dustin near Blythe's classroom, they questioned him about his purpose and destination. Smith also

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
(Cite as: 399 F.3d 1279)

separately interviewed Dustin and Blythe about the allegations. Dustin and Blythe denied the existence of any illicit relationship. They also denied any misconduct when interviewed by Grant. It is undisputed that Dustin lied to school officials and his parents when questioned about his relationship with Blythe.

School officials finally received more concrete evidence of an inappropriate relationship when Dustin's explicit note was discovered in December 2001. Shortly after being confronted with this note, Blythe resigned her teaching post at Pierce County High School. She also surrendered her teaching certificate in the spring of 2002. In light of the many corrective measures taken by Dr. Williams and other school officials, we cannot conclude PCSD was deliberately indifferent to the allegation raised in July 2001.

In summary, we conclude Appellants' Title IX claim fails under the deliberate indifference standard. Even when we draw all reasonable inferences for Appellants, they cannot create a genuine issue of material fact that PCSD acted with deliberate indifference. Although PCSD officials ultimately may have been ineffective in preventing Blythe's harassment of Dustin, they did not act with deliberate indifference. The district court, therefore, correctly granted summary judgment for PCSD on Appellants' Title IX claim.

*B. Section 1983*

Appellants further argue PCSD should be held liable for Dustin's injuries under § 1983. It is well established that municipalities, like a school district, may not be held liable under § 1983 based on a theory of *respondeat superior. Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); *Davis,* 233 F.3d at 1375. To impose liability on a municipality under § 1983, the plaintiff must identify a municipal "policy" or "custom" causing the deprivation of federal rights. *Brown,* 520 U.S. at 403, 117

S.Ct. at 1388. The Supreme Court explained:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Id.* at 403-04, 117 S.Ct. at 1388 (citations omitted).

The Court further explained "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Id.* at 404, 117 S.Ct. at 1388. Rather, "[a] plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *1288Davis,* 233 F.3d at 1375- 76 (citing *Brown,* 520 U.S. at 407, 117 S.Ct. at 1390). Thus, the deliberate indifference standard applies in § 1983 claims alleging a municipality is liable for its failure to prevent a deprivation of federal rights. *Gebser,* 524 U.S. at 291, 118 S.Ct. at 1999 (citations omitted); *Davis,* 233 F.3d at 1376.

[3] In this case, Appellants argue PCSD is liable under § 1983 for the deprivation of Dustin's rights because it had a custom of ignoring Blythe's sexual harassment of students. However, as we explained in our analysis of Appellants' Title IX claim, there is no evidence demonstrating PCSD officials were deliberately indifferent to the reports of alleged misconduct by Blythe. Thus, Appellants cannot establish PCSD had a custom of responding to Blythe's alleged discriminatory actions with deliberate indifference. Accordingly, we conclude the district court did not err in granting summary judgment for PCSD on Appellants' § 1983 claim.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1279

Page 9

399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214
**(Cite as: 399 F.3d 1279)**

IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment for PCSD on Appellants' Title IX and § 1983 claims.

AFFIRMED.

C.A.11 (Ga.),2005.
Sauls v. Pierce County School Dist.
399 F.3d 1279, 195 Ed. Law Rep. 767, 18 Fla. L. Weekly Fed. C 214

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX B

Westlaw.

299 F.3d 1173                                                                                    Page 1
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

**H**

Ruiz v. McDonnell
C.A.10 (Colo.),2002.

United States Court of Appeals,Tenth Circuit.
Rose RUIZ, Plaintiff-Appellant,
v.
Barbara McDONNELL, Executive Director of the
Colorado Department of Human Services; Colorado
Department of Human Services; Renee L. Gallegos;
Charles Gallegos; Victoria Gallegos; Leroy Galleg-
os; and John Does numbers one through four, De-
fendants-Appellees.
**No. 01-1010.**

Aug. 8, 2002.

Mother brought § 1983 action after death of her son
in a day-care facility, alleging violation of substant-
ive due process rights by state's Department of Hu-
man Services and its director, as well as state tort
law and contract claims against operators of facil-
ity. The United States District Court for the District
of Colorado, Wiley Daniel, J., granted state defend-
ants' motion to dismiss except as against one oper-
ator defendant, and mother appealed. The Court of
Appeals, VanBebber, Senior District Judge, sitting
by designation, held that: (1) Court of Appeals had
jurisdiction; (2) district court lacked jurisdiction
over § 1983 claim with respect to Department of
Human Services and its director acting in her offi-
cial capacity; and (3) state defendants' motion to
dismiss was properly granted.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟨⟩668**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(E) Proceedings for Transfer of Case
            170Bk665 Notice, Writ of Error or Cita-

tion
            170Bk668 k. Time for Filing in Gener-
al. Most Cited Cases
A notice of appeal that is filed before the district
court disposes of all the claims is nevertheless ef-
fective, where appellant obtains either certification
pursuant to Rule 54(b) or final adjudication before
the Court of Appeals considers the appeal on its
merits. Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

**[2] Federal Courts 170B ⟨⟩668**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(E) Proceedings for Transfer of Case
            170Bk665 Notice, Writ of Error or Cita-
tion
            170Bk668 k. Time for Filing in Gener-
al. Most Cited Cases
Court of Appeals had jurisdiction, in review of dis-
missal of mother's § 1983 action alleging violation
of due process rights on basis of her son's death in a
state-licensed day-care facility, even though notice
of appeal was filed before adjudication by district
court of all claims; notice of appeal ripened when
plaintiff filed district court's subsequent order adju-
dicating the remaining claim. Fed.Rules
Civ.Proc.Rule 54(b), 28 U.S.C.A.

**[3] Federal Courts 170B ⟨⟩265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in
General; Immunity. Most Cited Cases
An assertion of Eleventh Amendment immunity
concerns the subject matter jurisdiction of the dis-
trict court. U.S.C.A. Const.Amend. 11.

**[4] Federal Civil Procedure 170A ⟨⟩1742(1)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)2 Grounds in General
                170Ak1742 Want of Jurisdiction
                    170Ak1742(1) k. In General. Most Cited Cases
Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction, or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[5] Federal Courts 170B &#x21D2;797**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk797 k. Dismissal. Most Cited Cases
In analyzing a motion to dismiss on basis of a facial attack on the allegations of subject matter jurisdiction contained in the complaint, Court of Appeals presumes all of the allegations contained in the complaint to be true. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[6] Federal Courts 170B &#x21D2;265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases
With certain limited exceptions, the Eleventh Amendment prohibits a citizen from filing suit against a state in federal court. U.S.C.A. Const.Amend. 11.

**[7] Federal Courts 170B &#x21D2;265**

170B Federal Courts

170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
    170BIV(A) In General
        170Bk264 Suits Against States
            170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases

**Federal Courts 170B &#x21D2;269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk268 What Are Suits Against States
                170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases
To assert Eleventh Amendment immunity, a defendant must qualify as a state or an arm of a state. U.S.C.A. Const.Amend. 11.

**[8] Federal Courts 170B &#x21D2;269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk268 What Are Suits Against States
                170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases
Director of Colorado Department of Human Services was entitled to Eleventh Amendment immunity, in § 1983 action by mother whose child had been killed in a state-licensed day-care facility, to extent claim was asserted against director in her official capacity; as a state official, director was acting as arm of the state. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

**[9] Federal Courts 170B &#x21D2;269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk268 What Are Suits Against States
                170Bk269 k. State Officers or Agen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 3

cies, Actions Against. Most Cited Cases

**Federal Courts 170B ☞272**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk268 What Are Suits Against States
            170Bk272 k. Injunctive or Mandatory Relief; Declaratory Judgments. Most Cited Cases
A state official might not be protected by Eleventh Amendment immunity in a case where plaintiff seeks prospective injunctive relief as a remedy. U.S.C.A. Const.Amend. 11.

**[10] Federal Courts 170B ☞265**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk264 Suits Against States
            170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases

**Federal Courts 170B ☞267**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk266 Waiver of Immunity
            170Bk267 k. Consent to Suit. Most Cited Cases
A citizen may sue a state without offending Eleventh Amendment immunity where Congress has abrogated the state's Eleventh Amendment immunity or where the state has waived its Eleventh Amendment immunity and consented to be sued. U.S.C.A. Const.Amend. 11.

**[11] Federal Courts 170B ☞265**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on

170BIV(A) In General
      170Bk264 Suits Against States
         170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases

**Federal Courts 170B ☞269**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk268 What Are Suits Against States
            170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases
District court lacked jurisdiction with respect to Colorado Department of Human Services and its director, acting in her official capacity, in § 1983 action filed by mother of child who was killed in state-licensed day-care facility; state's Eleventh Amendment immunity was not abrogated by enactment of civil rights statute, and Colorado had not waived its immunity in case. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

**[12] Federal Courts 170B ☞776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews de novo the district court's dismissal for failure to state a claim upon which relief can be granted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ☞1773**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 4

A motion to dismiss for failure to state a claim may be granted only if it appears beyond doubt that plaintiff is unable to prove any set of facts entitling her to relief under her theory of recovery. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[14] Federal Civil Procedure 170A ☜1829**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
       170Ak1827 Determination
        170Ak1829 k. Construction of Pleadings. Most Cited Cases

**Federal Civil Procedure 170A ☜1835**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
       170Ak1827 Determination
        170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
In ruling on a motion to dismiss for failure to state a claim, all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true, court must view all reasonable inferences in favor of plaintiff, and the pleadings must be liberally construed. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ☜1771**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)3 Pleading, Defects In, in General
       170Ak1771 k. In General. Most Cited Cases
The issue in reviewing the sufficiency of a complaint is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support her claims. Fed.Rules Civ.Proc.Rule

12(b)(6), 28 U.S.C.A.

**[16] Civil Rights 78 ☜1350**

78 Civil Rights
   78III Federal Remedies in General
     78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1350 k. Other Particular Cases and Contexts. Most Cited Cases
     (Formerly 78k206(1))

**Civil Rights 78 ☜1360**

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
      78k1360 k. Other Particular Cases and Contexts. Most Cited Cases
     (Formerly 78k207(1))
Motion to dismiss was properly granted in § 1983 action, against Colorado Department of Human Services and its director, by mother whose child was killed in state-licensed day-care facility; neither the Department nor its director were "persons" for purposes of § 1983. 42 U.S.C.A. § 1983.

**[17] Federal Courts 170B ☜759.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk759 Theory and Grounds of Decision of Lower Court
        170Bk759.1 k. In General. Most Cited Cases
In review of the decision of a district court, Court of Appeals may affirm on any grounds supported by the record.

**[18] Constitutional Law 92 ☜4278**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(G) Particular Issues and Applica-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 5

tions

  92XXVII(G)12 Trade or Business
    92k4266 Particular Subjects and Regulations
      92k4278 k. Child Care. Most Cited Cases
  (Formerly 92k287.2(1))

**Infants 211 ☞17**

211 Infants
  211II Protection
    211k17 k. Societies, Agencies, and Officers in General. Most Cited Cases
In § 1983 action by mother whose child was killed in state-licensed day-care facility, alleged acts and omissions of Colorado Department of Human Services and its director, in licensing the facility, did not violate constitutional protections of substantive due process, and therefore action was properly dismissed; state actors did not engage in any pertinent affirmative conduct, inasmuch as state conduct did not involve an immediate threat of harm and was not directed at mother or child, or in any conduct that shocked the conscience. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[19] Civil Rights 78 ☞1039**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1030 Acts or Conduct Causing Deprivation
      78k1039 k. Failure to Act or Protect or to Enforce Law. Most Cited Cases
  (Formerly 78k117)

**Civil Rights 78 ☞1336**

78 Civil Rights
  78III Federal Remedies in General
    78k1334 Persons Liable in General
      78k1336 k. Vicarious or Respondeat Superior Liability in General. Most Cited Cases
  (Formerly 78k205(1))

State actors generally may only be held liable under § 1983 for their own acts, and not for the violent acts of third parties. 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 ☞1039**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1030 Acts or Conduct Causing Deprivation
      78k1039 k. Failure to Act or Protect or to Enforce Law. Most Cited Cases
  (Formerly 78k117)

**Civil Rights 78 ☞1336**

78 Civil Rights
  78III Federal Remedies in General
    78k1334 Persons Liable in General
      78k1336 k. Vicarious or Respondeat Superior Liability in General. Most Cited Cases
  (Formerly 78k205(1))
Exceptions to rule that state actors generally may only be held liable under § 1983 for their own acts, and not for the violent acts of third parties, are (1) the "special relationship" exception; and (2) the "danger creation" exception. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 ☞1039**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1030 Acts or Conduct Causing Deprivation
      78k1039 k. Failure to Act or Protect or to Enforce Law. Most Cited Cases
  (Formerly 78k117)
Under "special relationship" exception to general rule that state actors may only be held liable under § 1983 for their own acts, and not for the violent acts of third parties, liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty and that restraint hindered plaintiff's freedom to act to protect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
(Cite as: 299 F.3d 1173)

Page 6

himself from the third party. 42 U.S.C.A. § 1983.

**[22] Civil Rights 78 ⬅︎1039**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1039 k. Failure to Act or Protect or to
Enforce Law. Most Cited Cases
        (Formerly 78k117)
Under "special relationship" exception to general
rule that state actors may only be held liable under
§ 1983 for their own acts, and not for the violent
acts of third parties, a state actor may be held liable
for the violent acts of a third party if the state actor
created the danger that caused the harm. 42
U.S.C.A. § 1983.

**[23] Civil Rights 78 ⬅︎1039**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1039 k. Failure to Act or Protect or to
Enforce Law. Most Cited Cases
        (Formerly 78k117)
To state a prima facie case under the "danger cre-
ation" exception to general rule that state actors
may only be held liable under § 1983 for their own
acts, and not for the violent acts of third parties,
plaintiff must show that: (1) charged state actors
created the danger or increased plaintiff's vulnerab-
ility to the danger in some way, (2) plaintiff was a
member of a limited and specifically definable
group, (3) defendants' conduct put plaintiff at sub-
stantial risk of serious, immediate, and proximate
harm, (4) the risk was obvious or known, (5) de-
fendants acted recklessly in conscious disregard of
that risk, and (6) the conduct, when viewed in total,
shocks the conscience. 42 U.S.C.A. § 1983.

**[24] Civil Rights 78 ⬅︎1039**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1039 k. Failure to Act or Protect or to
Enforce Law. Most Cited Cases
        (Formerly 78k117)
State-created danger exception to general rule that
state actors may only be held liable under § 1983
for their own acts, and not for the violent acts of
third parties, necessarily involves affirmative con-
duct on the part of the state in placing plaintiff in
danger. 42 U.S.C.A. § 1983.

**[25] Civil Rights 78 ⬅︎1039**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1039 k. Failure to Act or Protect or to
Enforce Law. Most Cited Cases
        (Formerly 78k117)
Affirmative conduct for purposes of a § 1983 action
alleging a state-created danger should typically in-
volve conduct that imposes an immediate threat of
harm, which by its nature has a limited range and
duration. 42 U.S.C.A. § 1983.

**[26] Civil Rights 78 ⬅︎1039**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1039 k. Failure to Act or Protect or to
Enforce Law. Most Cited Cases
        (Formerly 78k117)
For purposes of a § 1983 action alleging a state-
created danger, affirmative conduct on the part of
the state in placing plaintiff in danger should be dir-
ected at a discrete plaintiff rather than at the public
at large. 42 U.S.C.A. § 1983.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 7

**[27] Constitutional Law 92 ☞4050**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)1 In General
                92k4047 Duty to Protect; Failure to Act
                    92k4050 k. Creation of Danger or Risk. Most Cited Cases
    (Formerly 92k253(1))
In determining whether a challenged state action shocks the conscience, for purposes of § 1983 action claiming that state government action created the danger that caused the harm to plaintiff in violation of substantive due process, court examines (1) the need for restraint in defining the scope of substantive due process claims, (2) the concern that § 1983 not replace state tort law, and (3) the need for deference to local policymaking bodies in making decisions impacting public safety. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[28] Constitutional Law 92 ☞4050**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)1 In General
                92k4047 Duty to Protect; Failure to Act
                    92k4050 k. Creation of Danger or Risk. Most Cited Cases
    (Formerly 92k253(1))
Determination that state government action shocks the conscience, as required for application of "danger creation" exception to rule that state actors may only be held liable for violation of substantive due process under § 1983 for their own acts, and not for violent acts of third parties, is reserved for exceptional circumstances, in that ordinary negligence does not shock the conscience, and permitting unreasonable risks to continue is not necessarily conscience shocking; rather, a plaintiff must

demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**\*1177** Jonathan S. Willett of Willett & Mestas, LLC, Denver, CO, appearing for Plaintiff-Appellant.
Friedrick C. Haines, Assistant Attorney General, Denver, CO, for Defendants-Appellees Barbara McDonnell and Colorado Department of Human Services, (Ken Salazar, Attorney General, Denver, CO, for Defendants-Appellees Barbara McDonnell and Colorado Department of Human Services, and John Barry, Patrick M. Groom, and Timothy V. Clancy of Witwer, Oldenburg, Barry & Bedingfield, LLP, Greeley, CO, for Defendants-Appellees Victoria Gallegos, and Leroy Gallegos, with him on the brief).

Before HENRY, Circuit Judge, HOLLOWAY, Senior Circuit Judge, and VANBEBBER, Senior District Judge.[FN*]

> FN* The Honorable G. Thomas Van-Bebber, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

VANBEBBER, Senior District Judge.
Plaintiff-Appellant, Rose Ruiz, filed this action alleging violations of her and her deceased son's Fourteenth Amendment substantive due process rights under 42 U.S.C. § 1983 against Defendants-Appellees Colorado Department of Human Services ("CDHS") and Barbara McDonnell, Executive Director of CDHS (collectively referred to as the "State Defendants"), and John Does numbers one through four. Ms. Ruiz also brought ancillary state law tort and contract claims against Defendants-Appellees Renee Gallegos, Charles Gallegos, Victoria Gallegos and Leroy Gallegos (collectively referred to as the "Private Defendants"). The State Defendants moved to dismiss Ms. Ruiz's claims against them pursuant to Fed.R.Civ.P. 12(b)(1) and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
(Cite as: 299 F.3d 1173)

12(b)(6). The district court granted the motion pursuant to Rule 12(b)(6) and, declining to exercise supplemental jurisdiction over Ms. Ruiz's remaining state law claims, dismissed without prejudice all Defendants except Renee Gallegos. The district court subsequently entered default judgment against Renee Gallegos pursuant to Fed.R.Civ.P. 55. Ms. Ruiz appeals the district court's order granting the State Defendants' motion to dismiss. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

### I. BACKGROUND

Ms. Ruiz relies on the following facts alleged in her first amended complaint and proposed second amended complaint.[FN1] In *1178 August 1998, Ms. Ruiz, a single working mother receiving federal assistance to cover day care expenses, began taking her infant son, J.R., to the Tender Heart Day Care ("Tender Heart") in Greeley, Colorado. Tender Heart was a private, licensed day care service operated by Renee Gallegos in the home that she shared with her husband, Charles Gallegos, and which was owned by Charles Gallegos's parents, Leroy and Victoria Gallegos. On October 17, 1998, J.R. suffered severe head injuries consistent with violent shaking while in the care of Tender Heart. J.R. died from his injuries on November 10, 1998. Renee Gallegos later pleaded guilty to felony child abuse charges in connection with J.R.'s death and is now imprisoned for that crime.

> FN1. When it granted the State Defendants' motion to dismiss, the district court denied as moot a motion for leave to file a second amended complaint that Ms. Ruiz submitted several months prior to the district court's order. The proposed second amended complaint sought to: (1) add as defendants the Weld County Department of Public Health and Environment ("WCDPHE") and Dr. John Wallace, Executive Director of WCDPHE; (2) add allegations that it was a practice and custom

of the CDHS and the WCDPHE not to investigate child care license applicants and holders; and (3) supplement a premises liability claim against Charles, Victoria and Leroy Gallegos. Ms. Ruiz contends that the district court should have considered the proposed second amended complaint's allegations before it granted the State Defendants' motion to dismiss, and she urges us to consider those allegations on appeal. She has not complied with Fed. R.App. P. 24(a)(5). The statement of the issues presented for review in Ms. Ruiz's opening brief does not specifically raise the district court's denial of the motion seeking leave to file the second amended complaint as an issue. Nevertheless, the issue is discussed elsewhere in Ms. Ruiz's opening brief. As a result, we have considered the proposed second amended complaint's allegations for purposes of thoroughly reviewing Ms. Ruiz's claims on appeal, but we conclude that the proposed amendments do not affect our decision in this case.

Tender Heart, which received federal funding for its services, was licensed as a "Family Child Care Home" by the CDHS, whose Executive Director at the relevant time was Ms. McDonnell. As part of its licensing process, the CDHS was required to conduct an investigation into Renee and Charles Gallegos's fitness as child care providers and to verify that Tender Heart carried valid public liability insurance. Ms. Ruiz alleges in her amended and proposed second amended complaints that the CDHS failed in both regards by neglecting to uncover an extensive history of domestic violence between Renee and Charles Gallegos that Ms. Ruiz contends was available through a simple search of court records, and by failing to discover that Tender Heart did not carry the proper insurance. Ms. Ruiz alleges in her proposed second amended complaint that it was a practice and custom of the agents of the CDHS to neglect conducting the requisite background and insurance checks, and that Ms. McDon-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 9

nell failed to stop or correct that practice. Both the amended and proposed second amended complaints allege that the Gallegoses' history of domestic violence and Tender Heart's lack of valid public liability insurance were grounds upon which the CDHS should have denied licensing to Tender Heart.

On May 8, 2000, Ms. Ruiz commenced this suit against the State Defendants, the Private Defendants, the Weld County Department of Human Services and its Executive Director, Walter Speckman (collectively referred to as the "County Defendants"), and John Does numbers one through four, all of whom were alleged to be unknown employees of the State and County Defendants.[FN2] Ms. Ruiz based her § 1983 claim on the failure to deny a family child care home license to Tender Heart. Specifically, Ms. Ruiz alleged that the state and federal statutes and regulations governing child care licensing "embody a substantive constitutional right to be free from the deprivation of life and liberty without due process of law under the Fourteenth Amendment of the United States Constitution" and that the licensure of Tender Heart after an inadequate, or nonexistent,*1179 investigation into the facility ultimately deprived her and J.R. of those rights.

> FN2. Ms. Ruiz later substituted the WCD-PHE and Dr. Wallace, its Executive Director, as the named County Defendants, and added Cheryl Estrich, an employee of the CDHS, as an additional State Defendant. The County Defendants and Ms. Estrich were either dismissed by the district court or not served with process. They are not parties to this appeal. John Does numbers one through four remain unknown and unserved. Despite this, we note that Ms. Ruiz's § 1983 allegations against these Defendants were in all relevant respects identical to the allegations against the State Defendants. Thus, although the balance of this opinion refers only to Ms. Ruiz's allegations against the State Defendants, the al-

legations applied equally to these other Defendants as well.

On June 23, 2000, the State Defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), arguing that: (1) the CDHS was entitled to immunity under the Eleventh Amendment to the United States Constitution; (2) neither the CDHS nor Ms. McDonnell, acting in her official capacity, were "persons" within the meaning of § 1983; (3) Ms. McDonnell, acting in her individual capacity, was entitled to qualified immunity; and (4) Ms. Ruiz failed to allege a constitutional violation by the State Defendants because she could not state facts sufficient to satisfy either the "special relationship" or "danger creation" exceptions to the general rule that state actors are not liable for the violence of private individuals under the Fourteenth Amendment's Due Process Clause.

Ms. Ruiz conceded in her response to the motion to dismiss and at an October 19, 2000, hearing on the motion that her claims against the CDHS and Ms. McDonnell, acting in her official capacity, were improper under § 1983. On December 4, 2000, the district court entered an order dismissing Ms. Ruiz's § 1983 claim against the State Defendants pursuant to Fed.R.Civ.P. 12(b)(6) based on the State Defendants' argument that Ms. Ruiz failed to allege facts sufficient to satisfy either exception to the general rule that state actors cannot be held liable for the violence of private individuals under the Due Process Clause. Having disposed of the only claim over which the district court had original jurisdiction, the court declined to exercise supplemental jurisdiction over Ms. Ruiz's remaining state law claims. As a result, the district court dismissed all Defendants from the case except for Renee Gallegos, against whom the court entered default judgment on March 21, 2001.

Ms. Ruiz now appeals the district court's order of December 4, 2000, arguing that the district court erred when it concluded that Ms. Ruiz's amended complaint failed to sufficiently allege a "danger creation" cause of action under § 1983.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

## II. DISCUSSION

### A. Appellate Jurisdiction

As an initial matter, Defendants-Appellees argue that we lack jurisdiction over this appeal because Ms. Ruiz allegedly failed to properly file her notice of appeal with the district court. Specifically, Defendants Appellees contend that Ms. Ruiz's notice of appeal was premature because the district court had not yet adjudicated all claims against all Defendants when Ms. Ruiz filed the notice. According to Defendants Appellees, Ms. Ruiz should have filed a second, timely notice of appeal after the district court entered final judgment. We disagree.

[1] We directly addressed and rejected the same argument as made by Defendants-Appellees in *Lewis v. B.F. Goodrich Co.*, 850 F.2d 641 (10th Cir.1988) (en banc). In *Lewis*, we held that a notice of appeal filed before the district court disposes of all claims is nevertheless effective if the appellant obtains either certification pursuant to Fed.R.Civ.P. 54(b) or final adjudication before the court of appeals considers the case on its merits. 850 F.2d at 645-46. In such a situation, the premature notice simply ripens on the date of certification or final adjudication, and the filing of a second notice of appeal is unnecessary. *Id.* at 645.

[2] Here, the district court issued an order on December 4, 2000, dismissing without prejudice all Defendants except for Renee Gallegos. Ms. Ruiz filed her notice of appeal on January 5, 2001. Because the district court had not yet adjudicated**1180** all claims against all Defendants, we ordered counsel for Ms. Ruiz to serve and file with us either a district court order granting certification or a district court order explicitly adjudicating the remaining claim against Renee Gallegos. The district court entered default judgment against Renee Gallegos on March 21, 2001, and Ms. Ruiz's counsel provided us with the district court's order to that effect on March 28, 2001. Ms. Ruiz's notice of appeal, filed on January 5, 2001, ripened on March 21, 2001, with the district court's entry of default judgment against Renee Gallegos. Ms. Ruiz was not required to file a second notice of appeal. As a result, we conclude that we have appellate jurisdiction in this case pursuant to 28 U.S.C. § 1291.

### B. Eleventh Amendment Immunity

[3] Defendants Appellees next argue that the CDHS and Ms. McDonnell, to the extent that a claim has been asserted against her in her "official capacity," are entitled to Eleventh Amendment immunity. Although the State Defendants raised this argument in their motion to dismiss, the district court declined to address it. Because an assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court, we address that issue before turning to the merits of the case. *Thompson v. Colorado*, 278 F.3d 1020, 1023-24 (10th Cir.2001) (citations omitted).

[4][5] The State Defendants raised the Eleventh Amendment immunity defense pursuant to Fed.R.Civ.P. 12(b)(1). Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir.1995) (citation omitted). Here, the State Defendants' Rule 12(b)(1) motion constituted a facial attack on the allegations of subject matter jurisdiction contained in Ms. Ruiz's amended complaint. Accordingly, we presume all of the allegations contained in the amended complaint to be true. *Id.* at 1002 (citation omitted).

[6][7] With certain limited exceptions, the Eleventh Amendment prohibits a citizen from filing suit against a state in federal court. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1231-32 (10th Cir.1999) (citation omitted). To assert Eleventh Amendment immunity, a defendant must qualify as a state or an "arm" of a state. *Id.* at 1232

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 11

(citation omitted). Here, there exists no dispute between the parties that the CDHS qualifies as an "arm" of the state of Colorado. Ruiz alleges in her amended complaints that "[t]he Colorado State Department of Human Services is a part of the Colorado State Government responsible for administration of Federal programs to provide family and child care services to the needy."

[8][9] In addition, to the extent that a claim has been asserted against Ms. McDonnell in her "official capacity," she may also assert Eleventh Amendment immunity as an "arm" of the state in that she assumes the identity of the CDHS. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citations omitted) (explaining that a state official sued in his or her "official capacity" is generally entitled to assert the same immunities as the governmental entity for which he or she works). We recognize, of course, that a state official like Ms. McDonnell might not be protected by Eleventh Amendment immunity in a case where the plaintiff seeks prospective injunctive relief as a remedy. *Thompson,* 278 F.3d at 1024 (citing *Seminole Tribe v. Florida,* 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and *Ex parte* *1181*Young,* 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Because Ms. Ruiz seeks no such relief in this case, the exception does not apply.

[10] We have recognized two primary circumstances in which a citizen may sue a state without offending Eleventh Amendment immunity. Congress may abrogate a state's Eleventh Amendment immunity. *Thompson,* 278 F.3d at 1024 (citing *Seminole Tribe,* 517 U.S. at 55). A state may also waive its Eleventh Amendment immunity and consent to be sued. *Id.* at 1024 (citing *Idaho v. Coeur d'Alene,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)). Neither exception applies in this case.

[11] First, the United States Supreme Court has previously held that Congress did not abrogate states' Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983. *Quern v. Jordan,* 440 U.S. 332, 345,

99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (citation omitted). Second, Ruiz neither alleges in her amended complaint, nor is there any other indication in the record, that the state of Colorado waived its Eleventh Amendment immunity in this case. For those reasons, we conclude that the district court lacked subject matter jurisdiction over Ms. Ruiz's § 1983 claim with respect to the CDHS and Ms. McDonnell, acting in her "official capacity." Accordingly, we affirm the district court's dismissal of those parties on that ground.

### C. Section 1983 Claim

Finally, Defendants-Appellees argue that: (1) Ms. Ruiz's § 1983 claim is barred with respect to the CDHS and Ms. McDonnell, acting in her "official capacity," because neither qualifies as a "person" within the meaning of § 1983; and (2) Ms. Ruiz's amended complaints fail to properly allege a "danger creation" cause of action against the State Defendants under § 1983. The State Defendants advanced both arguments in their motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

[12][13][14][15] We review *de novo* the district court's dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. *Stidham v. Peace Officer Standards & Training,* 265 F.3d 1144, 1149 (10th Cir.2001) (citation omitted). A Rule 12(b)(6) motion to dismiss may be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling her to relief under her theory of recovery. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984) (citation omitted). The court must view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally construed. *Id.* (citation omitted). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[FN3]

> FN3. We note Ms. Ruiz's argument that our recent decision in *Currier v. Doran,* 242 F.3d 905, 916-17 (10th Cir.2001), rejects the application of a heightened pleading standard to § 1983 cases in which qualified immunity is raised as a defense. Although the district court did not reach the issue of qualified immunity in its decision, and we see no evidence that it applied a heightened pleading standard in evaluating Ms. Ruiz's claim, we agree that a heightened standard is not appropriate here. We therefore apply the traditional Rule 12(b)(6) standards enunciated above in our *de novo* review of Ms. Ruiz's claim.

### 1. "Persons" Under § 1983

[16][17] In *Will v. Michigan Department of State Police,* the United States *1182 Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Although the district court declined to address the State Defendants' argument that the CDHS and Ms. McDonnell, acting in her "official capacity," did not qualify as "persons" under § 1983, "we may affirm on any grounds supported by the record." *Duncan v. Gunter,* 15 F.3d 989, 991 (10th Cir.1994) (citation omitted). Because the Supreme Court's precedent in *Will* mandates that we conclude that neither the CDHS nor Ms. McDonnell, acting in her "official capacity," qualify as "persons" under § 1983, we affirm the district court's dismissal of those parties on that ground.

### 2. "Danger Creation" Cause of Action Under § 1983

[18] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Section 1983, in turn, permits an individual to pursue an action against any person who "under color of any statute, ordinance, regulation, custom, or usage," deprives the plaintiff of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Here, Ms. Ruiz contends that the acts and omissions of the State Defendants in licensing Tender Heart as a family child care home violated constitutional protections of substantive due process when Ms. Ruiz's son, J.R., was injured and ultimately died at the hands of Renee Gallegos.

[19][20][21][22] Generally, state actors may only be held liable under § 1983 for their own acts, and not for the violent acts of third parties. *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). We have recognized two exceptions to this general rule: (1) the "special relationship" exception; and (2) the "danger creation" exception. *Armijo v. Wagon Mound Pub. Schs.,* 159 F.3d 1253, 1260 (10th Cir.1998) (quoting *Liebson v. New Mexico Corr. Dep't,* 73 F.3d 274, 276 (10th Cir.1996)). Under the "special relationship" exception, liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty and that restraint hindered the plaintiff's freedom to act to protect himself from the third party. *Id.* at 1261. Under the "danger creation" exception, a state actor may be held liable for the violent acts of a third party if the state actor "created the danger" that caused the harm. *Id.* at 1262 (citation omitted). The district court in this case analyzed Ms. Ruiz's claim under both exceptions and concluded that Ms. Ruiz failed to state a claim under either. Ms. Ruiz now contends that the district court erred in concluding that she failed to state a claim under the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
(Cite as: 299 F.3d 1173)

Page 13

"danger creation" exception.[FN4]

> FN4. Because Ms. Ruiz does not argue that the district court erred by concluding that she failed to state a claim under the "special relationship" exception, we deem that issue waived on appeal. *See Veile v. Martinson,* 258 F.3d 1180, 1183 n. 2 (10th Cir.2001) (citing *State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994)).

[23][24] To state a prima facie case under the "danger creation" exception, a plaintiff must show that: (1) the charged state actors created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a *1183 member of a limited and specifically definable group; (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendants acted recklessly in conscious disregard of that risk; and (6) the conduct, when viewed in total, shocks the conscience. *Armijo,* 159 F.3d at 1262-63 (citations omitted). Further, "[t]his state-created danger doctrine 'necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger.' " *Graham v. Indep. Sch. Dist. No. I-89,* 22 F.3d 991, 995 (10th Cir.1994) (citation omitted). Because we find that Ms. Ruiz failed to allege either any pertinent affirmative conduct on the part of the State Defendants or any conduct that "shocks the conscience," we conclude that the district court properly dismissed Ms. Ruiz's § 1983 claim pursuant to Fed.R.Civ.P. 12(b)(6).

[25][26] First, Ms. Ruiz has alleged no facts in her amended or proposed second amended complaints that demonstrate affirmative conduct on the part of the State Defendants that created or increased the danger to J.R. Affirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration. *Id.* (quoting *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 733 n. 4 (8th Cir.1993)) (holding that a school district's

enrollment of an aggressive student in public school does not constitute the requisite affirmative conduct necessary to maintain a § 1983 claim for injuries inflicted by the student because the risk posed by mere enrollment is indefinite). Moreover, the conduct should be directed at a discrete plaintiff rather than at the public at large. *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 (3d Cir.1995) (holding that the plaintiff, whose home was deliberately burned by a volunteer firefighter, could not maintain a § 1983 claim on the sole basis that the fire department failed to properly screen firefighter applicants because the department's conduct affected the public at large and was not directed at the plaintiff).

Here, the crux of Ms. Ruiz's claim is that J.R. suffered injuries of constitutional proportions because the State Defendants improperly licensed Tender Heart after failing to conduct an investigation into the facility. However, we do not view the mere licensure of Tender Heart as constituting the requisite affirmative conduct necessary to state a viable § 1983 claim. Specifically, the improper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration. Moreover, the licensure affected the public at large; it was not aimed at J.R. or Ms. Ruiz directly. Unlike the direct placement of a child into an abusive home, the mere licensure of Tender Heart was not an act directed at J.R. which, in and of itself, placed J.R. in danger. For those reasons, we conclude that Ms. Ruiz has failed to allege any affirmative conduct on the part of the State Defendants that created or increased the danger to J.R.

[27][28] Second, even if we were to hold that Ms. Ruiz had alleged affirmative conduct on the part of the State Defendants, we cannot conclude that the conduct alleged "shocks the conscience." As noted, the ultimate standard for evaluating a substantive due process claim is whether the challenged government action "shocks the conscience" of federal judges.[FN5] *Uhlrig v. Harder,* 64 F.3d 567, 573

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

Page 14

(10th Cir.1995)**\*1184** (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). To assist us in that determination, we look to the following three factors: (1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety. *Id.* (citations omitted). "These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances." *Eckert v. Town of Silverthorne,* No. 00-1030, 2001 WL 1152781, at \*8, 25 Fed.Appx. 679 (10th Cir. July 9, 2001). We have noted that ordinary negligence does not shock the conscience, *DeAnzona v. City & County of Denver,* 222 F.3d 1229, 1236 (10th Cir.2000) (citing *DeShaney,* 489 U.S. at 202), and that even permitting unreasonable risks to continue is not necessarily conscience shocking, *Uhlrig,* 64 F.3d at 574 (citing *Collins,* 503 U.S. at 128). Rather, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.*

> FN5. Ms. Ruiz contends that we should look to whether the State Defendants' conduct "shocks the conscience" of parents, as opposed to federal judges. Unfortunately, Ms. Ruiz provides us with no authority that would allow us to deviate from the standard that the conduct must "shock the conscience" of federal judges, and given the clear dictate already outlined by this court in previous cases, we will not depart from that standard here.

While we deeply sympathize with Ms. Ruiz in the tragic death of her son, we cannot conclude that the State Defendants' conduct in this case was so "egregious, outrageous or fraught with unreasonable risk" as to "shock the conscience." *See Liebson,* 73 F.3d at 277. Taking all of Ms. Ruiz's allegations as true, as we must, we do not believe that the State Defendants' failure to conduct the requisite

background and insurance checks rises above the level of negligence. Because negligent acts are insufficient to sustain a substantive due process claim under § 1983, we conclude that the district court properly granted the State Defendants' motion to dismiss.

In reaching this conclusion, we have considered Ms. Ruiz's argument that we should find the State Defendants' conduct "conscience shocking" because, according to Ms. Ruiz: (1) "there is no remedy in state tort law[ ] for this incident as Tender Heart Day Care satisfied the public insurance requirement with a homeowner[']s policy that did not offer cover[age] for any operation of the day care business;" and (2) the State Defendants' alleged practice of not conducting background and insurance checks is not entitled to judicial deference. We are not persuaded that either of these factors tips the balance in favor of finding the State Defendants' conduct "conscience shocking." First, we note that Tender Heart's failure to carry the proper public liability insurance has no bearing on Ms. Ruiz's ability to file suit against any of the Defendants under state tort law. At most, the Private Defendants' failure to carry the proper insurance affects only the question of who would ultimately be responsible for paying any judgment that Ms. Ruiz might obtain against the Private Defendants.[FN6] Second, although we agree **\*1185** that the State Defendants' conduct in this case, if true, is not necessarily entitled to judicial deference, we still cannot conclude that the conduct "shocks the conscience."

> FN6. Although not argued by Ms. Ruiz on appeal, we recognize that the Colorado Governmental Immunity Act might pose an impediment to Ms. Ruiz pursuing a claim against the State Defendants under state tort law. *See* Colo.Rev.Stat. § 24-10-106 (providing immunity in most cases to "public entities" for "claims for injury which lie in tort or could lie in tort"). Ms. Ruiz would not be barred from pursuing such a claim, however, if she

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

could satisfy any of the six exceptions to the governmental immunity doctrine, *Id.* § 24-10-106(1)(a)(f), or if she could show that any of the State Defendants' employees' acts or omissions in causing her or J.R.'s injuries were "willful or wanton," *Id.* § 24-10-118. Ms. Ruiz chose not to pursue those options in this case. In fact, Ms. Ruiz's counsel specifically admitted at oral argument that, "In terms of accountability, it was Plaintiff's primary desire to, because she felt betrayed by the state licensing scheme, to proceed under the federal civil rights statute." Thus, we cannot conclude that Ms. Ruiz had no remedy under state tort law against the State Defendants.

We have also considered Ms. Ruiz's reliance on *Currier v. Doran,* 242 F.3d 905 (10th Cir.2001), to support her argument that the State Defendants' conduct "shocks the conscience." We believe, however, that the facts of *Currier* are distinguishable from the facts of this case. In *Currier,* the state granted physical, and eventually legal, custody of two young children to the children's father. 242 F.3d at 909-10. Prior to the state granting physical custody to the father, a state social worker assigned to the case became aware of the father's history of financial irresponsibility with respect to the children, including making only eight child support payments in the previous three years. *Id.* at 909. Despite this knowledge, the social worker said nothing to the Children's Court during the hearing at which physical custody was awarded to the father. *Id.* Later, but prior to the father gaining legal custody of the children, the same social worker noticed bruises on the children on at least two occasions while the children were in the physical custody of the father, and was informed on at least three other occasions that the children's father and/or the father's girlfriend were allegedly abusing the children. *Id.* at 909-10, 919. Despite these indications of abuse, the social worker failed to launch any investigation and ultimately, through either his affirmative recommendation or his silence with re-

spect to the indications of abuse, was responsible for the father obtaining legal custody of the children. *Id.* The father later killed one of the children by scalding him with boiling water. *Id.* at 910. Representatives of the children filed suit under § 1983, alleging that the social worker violated the children's Fourteenth Amendment substantive due process rights by creating the danger of the harm suffered by the children. *Id.* at 908, 919-20. We held that the plaintiffs had alleged facts sufficient to show that the social worker's conduct "shocked the conscience." *Id.* at 920.

Ms. Ruiz now urges us to construe our holding in *Currier* to mean that "a state actor's failure to adequately investigate a child's private placement by authorizing placement with a person who ultimately harmed the child is actionable and satisfies the shocks the conscience standard." We disagree. Our holding in *Currier* is simply not that far-reaching. The conduct by the social worker in *Currier,* given the father's history of financial irresponsibility with respect to the children and the numerous *specific* indications of abuse of the children by the father and/or his girlfriend, was of a different degree and type of culpability than the State Defendants' alleged failure to conduct background and insurance checks on the family child care home license applicants in this case. The conduct of the State Defendants in this case did not involve the direct placement of a child in the hands of an abuser; it merely involved the licensure of a facility. While we find that the State Defendants' actions might have risen to the level of negligence, we do not consider them to be "conscience-shocking."

Defendants-Appellees do not request that we consider the State Defendants' qualified immunity argument on appeal, and because we have already concluded that Ms. Ruiz's § 1983 claim fails to assert a violation of federal constitutional law, we agree that we need not do so. *See id.* at *1186 917 (citations omitted) (stating that before the court examines whether a defendant is entitled to qualified immunity, it must first determine whether the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

299 F.3d 1173
299 F.3d 1173, 53 Fed.R.Serv.3d 1425
**(Cite as: 299 F.3d 1173)**

plaintiff has asserted a violation of federal law).

AFFIRMED.

C.A.10 (Colo.),2002.
Ruiz v. McDonnell
299 F.3d 1173, 53 Fed.R.Serv.3d 1425

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX C

Westlaw.

130 F.3d 432                                                                                    Page 1
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
**(Cite as: 130 F.3d 432)**

▷
Plumeau v. School Dist. #40 County of Yamhill
C.A.9 (Or.),1997.

United States Court of Appeals,Ninth Circuit.
Barbara PLUMEAU, Personally; Amanda Barton-
Plumeau, by her mother and guardian ad litem, Bar-
bara Plumeau, Plaintiffs-Appellants,
v.
SCHOOL DISTRICT #40 COUNTY OF YAM-
HILL; and Adrian Moore, Defendants-Appellees.
**No. 96-35074.**

Argued and Submitted March 6, 1997.
Decided Dec. 4, 1997.

Student, who was allegedly sexually abused by jan-
itor, and her mother brought § 1983 and tort claims
against school district and janitor. The United
States District Court for the District of Oregon,
Janice M. Stewart, United States Magistrate Judge,
907 F.Supp. 1423, entered summary judgment for
school district, and plaintiffs appealed. The Court
of Appeals, Fletcher, Circuit Judge, held that: (1)
plaintiffs did not give actual notice of claim to
school district under Oregon Tort Claims Act
(OTCA); (2) plaintiffs' formal notice of tort claim
was untimely; (3) student had constitutional right to
be free from sexual abuse from school employees;
(4) district was not liable for abuse under § 1983;
and (5) district court's denial of plaintiffs' purported
motion for leave to amend complaint was not abuse
of discretion.

Affirmed.

West Headnotes

**[1] Limitation of Actions 241 ☞95(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action

            241k95(1) k. In General; What Consti-
tutes Discovery. Most Cited Cases
Under Oregon law, "discovery rule" is applied to
determine when cause of action accrues: notice
period begins to run when plaintiff knows, or in ex-
ercise of reasonable care should have known, facts
which would make reasonable person aware of sub-
stantial possibility that tort action exists.

**[2] Schools 345 ☞112**

345 Schools
    345II Public Schools
        345II(I) Claims Against District
            345k112 k. Presentation and Allowance of
Claims. Most Cited Cases
Act of student and parent in informing children's
services agency, police department, and county at-
torney about school janitor's alleged abuse of stu-
dent within 270 days after abuse was discovered
did not give school district actual notice of result-
ing claim against district under Oregon Tort Claims
Act (OTCA), as agencies were not designated by
statute to receive notice of tort claims for district
and were not acting on behalf of district. ORS
30.275(6).

**[3] Municipal Corporations 268 ☞741.30**

268 Municipal Corporations
    268XII Torts
        268XII(A) Exercise of Governmental and
Corporate Powers in General
            268k741 Notice or Presentation of Claims
for Injury
                268k741.30 k. Service or Presentation;
Time Therefor. Most Cited Cases
To satisfy Oregon Tort Claims Act (OTCA), actual
notice of claim must be provided to person respons-
ible for investigating tort claims brought against
agency. ORS 30.275(6).

**[4] Schools 345 ☞112**

345 Schools

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
(Cite as: 130 F.3d 432)

Page 2

345II Public Schools
    345II(I) Claims Against District
        345k112 k. Presentation and Allowance of
Claims. Most Cited Cases
Letter from attorney for student and parent to attorney for school district was not timely formal notice of resulting claim, under Oregon Tort Claims Act (OTCA), that district was vicariously liable in tort for abuse by janitor and was directly liable for its own negligence, as letter was sent more than 270 days after discovery of abuse and after plaintiffs should have known of district's potential liability. ORS 30.275(4, 5).

**[5] Municipal Corporations 268 &#8596;741.30**

268 Municipal Corporations
    268XII Torts
        268XII(A) Exercise of Governmental and Corporate Powers in General
            268k741 Notice or Presentation of Claims for Injury
                268k741.30 k. Service or Presentation; Time Therefor. Most Cited Cases
Plaintiff who seeks to bring claim under Oregon Tort Claims Act (OTCA) has duty to use due diligence in effort to discover party responsible for her injury. ORS 30.260-30.300.

**[6] Civil Rights 78 &#8596;1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
    (Formerly 78k206(3))
To impose municipal liability under § 1983 for violation of constitutional rights, plaintiff must show: (1) that plaintiff possessed constitutional right of which she was deprived; (2) that municipality had policy; (3) that policy amounted to deliberate indifference to plaintiff's constitutional right; and, (4) that policy was moving force behind constitutional violation. 42 U.S.C.A. § 1983.

**[7] Constitutional Law 92 &#8596;4210**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)8 Education
                92k4204 Students
                    92k4210 k. Use of Force; Assault, Abuse, and Harassment. Most Cited Cases
    (Formerly 92k278.5(5.1))
Student had constitutional right, under due process clause, to be free from state-imposed violations of bodily integrity, including freedom from excessive physical abuse and sexual abuse by school employees. U.S.C.A. Const.Amend. 14.

**[8] Civil Rights 78 &#8596;1066**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
            78k1066 k. Sexual Assault and Abuse; Sexual Activity. Most Cited Cases
    (Formerly 78k127.1)

**Civil Rights 78 &#8596;1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
    (Formerly 78k206(3))
School district was not liable, under § 1983, for due process violation arising from school janitor's sexual abuse of student, absent sufficient evidence of custom or practice of ignoring complaints, unconstitutional actions taken by those with policy-mak-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
**(Cite as: 130 F.3d 432)**

Page 3

**[9] Civil Rights 78 ☜1352(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
                78k1352(1) k. In General. Most Cited Cases
    (Formerly 78k206(4))
To be actionable under § 1983, municipality's failure to train must amount to deliberate indifference to rights of others; for liability to attach, need for training must be obvious and violation of constitutional rights must be highly predictable consequence. 42 U.S.C.A. § 1983.

**[10] Federal Civil Procedure 170A ☜851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
Magistrate's denial of plaintiffs' purported motion to amend their complaint in response to defendant school district's municipal liability arguments, in § 1983 action alleging that plaintiff student was sexually abused by school janitor, was not abuse of discretion, as issue of qualified immunity, which was raised in purported motion, was not involved in case, so amendment would have been futile. 42 U.S.C.A. § 1983.

**[11] Federal Courts 170B ☜555**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)1 In General
                170Bk554 Nature, Scope and Effect of Decision

ing authority, or affirmative duty to protect. 42 U.S.C.A. § 1983.

                170Bk555 k. Parties, Process or Pleading. Most Cited Cases
District court's failure to rule on motion for leave to amend is appealable.

**[12] Federal Civil Procedure 170A ☜828.1**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak828 Discretion of Court
                170Ak828.1 k. In General. Most Cited Cases

**Federal Courts 170B ☜763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                   170Bk763.1 k. In General. Most Cited Cases
Leave to amend is generally within discretion of district court, but denial of leave to amend after responsive pleading has been filed is strictly reviewed in light of strong policy permitting amendment.

*433 Kent L. Gubrud, McMinnville, OR, for plaintiffs-appellants.
Carol J. Fredrick (argued), Larry A. Brown (on the brief), McMinnville, OR, for defendants-appellees.

Appeal from the United States District Court for the District of Oregon; Janice M. Stewart, Magistrate Judge, Presiding. D.C. No. CV-94-00569-JMS.

Before: FLETCHER and TASHIMA, Circuit Judges, and SCHWARZER, FN*District Judge.

        FN* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432                                                                                          Page 4
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
(Cite as: 130 F.3d 432)

FLETCHER, Circuit Judge.

Amanda Barton-Plumeau and her mother Barbara Plumeau ("Plumeaus") appeal the grant of summary judgment to the County of Yamhill, Oregon School District # 40 ("School District"), dismissing their claims against the School District for Amanda's sexual abuse by a school janitor on school premises.[FN1] We have jurisdiction, 28 U.S.C. §§ 636(c) and 1291, and we affirm.

> FN1. The janitor, Adrian Moore, filed Chapter 13 bankruptcy and all proceedings against him have been stayed. *See* 11 U.S.C. § 362.

## *434 FACTS

Between 1983 and 1987 Amanda Barton-Plumeau, then 6-9 years of age, attended Memorial Grade School, a public grade school in McMinnville, Oregon. During this period, Amanda was sexually abused on school premises by the school janitor, Adrian Moore. Memorial School employees and School District officials claim that they knew nothing about the abuse at the time. The Plumeaus contend that Moore's behavior should have alerted school personnel to the possibility that Moore was abusing children at Memorial.

When Amanda was in the first grade, Amanda was standing in line for lunch in the school cafeteria when she saw Moore and ran out of line to greet him. Moore picked her up and hugged her. Amanda recalls that her first grade teacher reprimanded her and told her to get back in line. Later the same day, Amanda was taken to the office of the school principal, Valva Just. told Amanda that it was inappropriate for Moore to pick her up and that she should not permit him to do so. Just did not ask Amanda whether Moore had any other physical contact with her.

Beginning in early 1986, Just began receiving complaints about Moore's behavior from Memorial School employees. Jean Bresee, an instructional technician, reported that on numerous occasions she had observed Moore standing around on the playground watching children. Jean Meicho, a teacher's assistant responsible for playground duty during recess, also reported to Just that she witnessed Moore standing around on the playground, holding the little girls' hands, and hugging them.

In September 1986, Bresee and Meicho asked Just to come out on the playground to observe Moore's behavior. According to Just's records, when she went to the playground Moore came out to watch the children, but quickly went back inside when he saw her. After this incident, Just asked Meicho to report to her whenever she witnessed Moore watching children on the playground. Other Memorial School staff also reported to Just that Moore stood around watching children on the playground. Several teachers reported to Just that Moore spent almost an entire morning observing aerobic exercise classes. Mrs. Williams, a teacher, reported to Just that she had observed Moore picking up children on the playground.

Just informed the School District's Maintenance Supervisor and Moore's official direct supervisor, Hal Schultz, of the complaints about Moore. On June 9, 1986, Just and Schultz held a conference with Moore to discuss their concerns about his work. They warned Moore to stop watching and picking up children on the playground. In the Fall of 1986, Just and Schultz held two more conferences with Moore to discuss their concerns about his failure to perform adequately his job duties and his wasting time standing around watching children. They admonished him in writing to stay off the playground while children were present and told the teachers aides to notify Just if they observed Moore on the playground during the school day.

Despite these repeated admonitions, the complaints about Moore continued. On January 20, 1987, Bresee reported to Just that she discovered Moore standing alone in a darkened room peeking out the window onto the playground where the children were playing. On February 2, 1987, Just and Mr. Williams, the principal at Adams Elementary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432                                                                                        Page 5
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
**(Cite as: 130 F.3d 432)**

School, another grade school in the School District, arranged a job-switch between Moore and Leonard Cushman, a disabled janitor from Adams School, ostensibly to accommodate Cushman's disability, and to improve Moore's work performance. At the time of the switch, Just informed Mr. Williams that Moore had been observed watching children and she also told Mr. Williams she was concerned about Moore's job performance. She did not inform Mr. Williams that Moore had been observed holding students' hands, hugging them, and picking them up.

Less than three months after Moore's transfer to Adams School, the father of a female student at Adams School called Mr. Williams to report that his daughter told him that she had been sexually abused by Moore while she was in his work area. Mr. *435 Williams immediately reported these allegations to the Interim Superintendent of the School District. The following day Mr. Williams and a School District Child Development Specialist interviewed the girl and others who reported similar behavior by Moore.

The day after the Adams School father complained, the School District fired Moore. The following day he was arrested on charges of sexual abuse. The Children's Services Division ("CSD") and the McMinnville Police Department ("MPD") were informed of the allegations and both agencies conducted investigations. These investigations disclosed that Moore sexually abused approximately seventeen Adams students during his two and one half months at the school. Moore admitted to the police that he had touched the children when they were alone in his work area to help with janitorial tasks. He pled guilty to three counts of Sexual Abuse in the First Degree of ten girls and was sentenced a term of imprisonment not to exceed five years on each count. However, the court suspended Moore's sentence and ordered that he be placed on probation for five years.

The MPD and CSD investigators also interviewed Memorial School personnel, including Just who

seemed to discourage investigation at Memorial. According to MPD Detective Day, Just minimized the facts about Moore having been observed picking up and watching children and "did not seem to want to talk about Moore's transfer to Adams or anything else concerning Moore." The investigators found one child who had been sexually abused at Memorial School. However, no further investigation was carried out at Memorial School and Moore's abuse of Amanda was not discovered at that time.

In May 1992, five years after Moore's initial arrest and conviction, Amanda attempted suicide and was hospitalized. Shortly after being admitted to the hospital, Amanda disclosed for the first time that she had been sexually abused by Moore between 1984 and 1987. The CSD, MPD, and the Yamhill County District Attorney immediately investigated Amanda's claims. Barbara Plumeau fully cooperated with the agencies' investigations. Moore pled guilty to First Degree Sexual Abuse of Amanda, was convicted, and sentenced to five years' probation.

At Moore's sentencing hearing on September 9, 1993, a Victims' Assistance Worker from the Yamhill County District Attorney's office, Kathleen Robbins, told Barbara Plumeau that she believed that Just was responsible for what had happened to Amanda and the other students at Memorial. At this point, the Plumeaus claim they began investigating Just's actions and the actions of the School District in regard to Amanda's abuse. On May 10, 1994, the Plumeaus' counsel formally notified the School District, through its counsel, of the Plumeaus' claims against the School District.

The Plumeaus brought this action in federal court against the School District and Moore for negligence, battery and sexual abuse under the Oregon Tort Claims Act, Oregon Revised Statutes §§ 30.260-.300 ("OTCA"), and for violation of Amanda's civil rights, under 42 U.S.C. § 1983. The parties consented to hearing before a magistrate judge. Fed.R.Civ.P. 73; 28 U.S.C. § 636(c). The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432                                                                                          Page 6
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
**(Cite as: 130 F.3d 432)**

magistrate judge granted summary judgment to the School District on all counts. *Plumeau v. Yamhill County Sch. Dist. #40,* 907 F.Supp. 1423 (D.Or.1995). The magistrate judge concluded that the Plumeaus state tort claims were barred for failure to notify the School District of their claims within the time specified by the OTCA. *Id.* at 1433-35; Or.Rev.Stat. § 30.275. The magistrate judge further held that the facts did not support municipal liability under § 1983. *Id.* at 1435-46. The Plumeaus timely appealed.

### ANALYSIS

### I. Standard of Review

We review a grant of summary judgment de novo. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and **\*436** whether the district court correctly applied the relevant substantive law. *Bagdadi,* 84 F.3d at 1197. We must not weigh the evidence or determine the truth of the matter, but determine only whether there is a genuine issue for trial. *Abdul-Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996). Summary judgment is not proper if material disputed factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,*516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

### II. OTCA Notice Requirement

[1] The Oregon Tort Claims Act provides an exclusive remedy for pursuing a tort claim against a public body. Or.Rev.Stat. § 30.260-.300. The OTCA requires a minor plaintiff to provide notice of claim within 270 days after the alleged

[FN2] Or.Rev.Stat. § 30.275. The notice period begins when the cause of action accrues for purposes of the statute of limitations. *Adams v. Oregon State Police,* 289 Or. 233, 611 P.2d 1153, 1156 (1980). Oregon applies the "discovery rule" to determine when a cause of action accrues. *See Gaston v. Parsons,* 318 Or. 247, 864 P.2d 1319, 1322 (1994).[FN3] Accordingly, the notice period begins to run "when the plaintiff knows, or in the exercise of reasonable care should have known, facts which would make a reasonable person aware of a substantial possibility that [a tort action] exists." *Gaston,* 864 P.2d at 1324. The burden is on the plaintiff to prove that notice of claim was timely. Or.Rev.Stat. § 30.275(7). A plaintiff may satisfy the notice requirement by "formal notice," "actual notice," or commencement of an action by or on behalf of the claimant. Or.Rev.Stat. § 30.275(3). The Plumeaus argue that they provided adequate and timely actual and formal notice to the School District and accordingly the district court erred in dismissing their state law claims.

> FN2. The normal notice period is 180 days, but there is a 90-day extension for minors. Or.Rev.Stat. § 30.275(2). The Oregon Supreme Court has specifically held that the notice period for a minor is not tolled until the appointment of a guardian ad litem. *Perez v. Bay Area Hosp.,* 315 Or. 474, 846 P.2d 405, 409 (1993).

> FN3. During oral argument counsel for the School District asserted that in *Cooksey v. Portland Public Sch. Dist.,* 143 Or.App. 527, 923 P.2d 1328 (1996), the Oregon Court of Appeals held that the discovery rule does not apply in OTCA cases. This is a bald misstatement of the holding in *Cooksey.* That case stands for the unrelated proposition that the limitations period is not tolled pending the appointment of a guardian *ad litem* for the minor plaintiff.

### A. Actual Notice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
(Cite as: 130 F.3d 432)

[2] The Plumeaus contend that they provided timely actual notice under the OTCA because they informed the "investigatory agents" of the School District about the abuse within 270 days after it was discovered. Under the OTCA, a defendant is deemed to have received "actual notice" when:

any person responsible for administering claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body. A person responsible for administering claims on behalf of a public body is one who, as an officer, employee or agent of a public body or as an employee or agent of an insurance carrier insuring the public body ... engages in investigation, negotiation, adjustment or defense of claims ... or in furnishing or accepting forms for claimants to provide claim information, or in supervising any of those activities.

Or.Rev.Stat. § 30.275(6).

The Plumeaus argue that the CSD, the MPD, and the Yamhill County District Attorney were "investigatory agents" of the School District within the meaning of the OTCA notice provision because the School District delegated responsibility for the investigation of Amanda's abuse claims to these agencies.

[3] Although the CSD, the MPD, and the Yamhill County District Attorney were all involved in investigating the allegations that *437 Moore abused Amanda, the investigations were in aid of potential criminal charges against Moore, not potential tort claims against the School District. Notice must be provided to the person responsible for investigating tort claims brought against the agency. *McCabe v. State of Oregon,* 314 Or. 605, 841 P.2d 635, 638 (1992). None of these agencies was designated by statute to receive notice of tort claims for the School District, nor were they acting on behalf of

the School District. The OTCA notice requirement is to provide notice to public bodies of potential tort actions against them. Holding a notice to other public entities to be sufficient would defeat that purpose. The information the Plumeaus provided to the law enforcement agencies does not satisfy the OTCA "actual notice" requirement.

**B. Formal Notice**

[4] The Plumeaus argue in the alternative that the May 11, 1994 letter from their attorney to the attorney for the School District satisfied the OTCA requirement of formal notice. They contend that factual issues remain regarding whether the letter was timely. The magistrate judge dismissed all of the Plumeaus' claims under the OTCA, concluding that as a matter of law the formal notice was untimely.

"Formal notice" entails:

[A] written communication from a claimant or representative of a claimant containing:

(a) A statement that a claim for damages is or will be asserted against the public body or an officer, employee or agent of the public body;

(b) A description of the time, place and circumstances giving rise to the claim, so far as known to the claimant; and

(c) The name of the claimant and the mailing address to which correspondence concerning the claim may be sent.

[In addition] formal notice of claim shall be given by mail or personal delivery.... If the claim is against a local public body ... to the public body at its principal administrative office, to any member of the governing body of the public body, or to an attorney designated by the governing body as its general counsel.

Or.Rev.Stat. § 30.275(4)-(5).

The Plumeaus' first cause of action alleges that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432                                                                                                    Page 8
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
**(Cite as: 130 F.3d 432)**

School District is vicariously liable in tort under state law for Moore's abuse of Amanda because the abuse took place within the scope of Moore's employment as a school janitor. It is undisputed that on May 29, 1992 the Plumeaus knew that Moore had sexually abused Amanda. Because the May 11, 1994 letter was sent to the School District more than 270 days after the Plumeaus knew of the abuse, the letter is untimely under the OTCA.

The Plumeaus' second cause of action alleges that the School District is directly liable for its own negligence in failing properly to supervise and train Moore and in failing to prevent Moore from sexually abusing Amanda. The Plumeaus argue that because they only discovered that the School District may possibly have been responsible for Moore's actions at the sentencing hearing on September 9, 1993, the May 11, 1994 letter fell within the requisite 270 days after they discovered the alleged injury. The School District argues, and the magistrate agreed, that the Plumeaus should have known that the School District was potentially liable for Amanda's abuse long before the Victim's Assistance Worker relayed to them her theory of the case.

[5] A plaintiff has a duty to use due diligence in an effort to discover the party responsible for her injury. *Georgeson v. State of Oregon,* 75 Or.App. 213, 706 P.2d 570, 571 (1985). The Plumeaus knew the abuse took place during school hours and on school property and that the abuser was a school district employee. We agree with the district court that these facts were sufficient to apprise the Plumeaus of their potential claims against the district for failure to supervise Moore.

### III. Municipal Liability Under 42 U.S.C. § 1983

The Plumeaus' third cause of action alleges a claim against the School District for violating Amanda's federally protected rights under**438 the Due Process Clause of the Fifth and Fourteenth Amendments.

### A. Applicable Statute of Limitations

Because 42 U.S.C. § 1983 does not provide a statute of limitations, the limitations period for commencement of § 1983 actions must be borrowed from state law. We have held that § 1983 claims are to be characterized as personal injury actions for statute of limitations purposes. *Davis v. Harvey,* 789 F.2d 1332, 1333 (9th Cir.1986). Oregon's general tort statute provides a 2-year statute of limitations. Or.Rev.Stat. § 12.110(1). The district court in this case apparently assumed a timely filing. We agree, since the date of discovery was May 29, 1992, shortly following Amanda's attempted suicide. The action was filed on May 20, 1994.

### B. Requirements for Municipal Liability

[6] The district court analyzed the Plumeaus' claims under the various theories of § 1983 municipal liability. *Plumeau,* 907 F.Supp. at 1435-46. To impose municipal liability under § 1983 for a violation of constitutional rights plaintiff must show: "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and, (4) that the policy is the 'moving force behind the constitutional violation.' " *Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388-89, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989)).

[7] Amanda had a constitutional right to be free from state-imposed violations of bodily integrity. *P.B. v. Koch,* 96 F.3d 1298, 1303 (9th Cir.1996). This includes freedom from excessive physical abuse by school employees. *Id.* at 1302-03; *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) ("[W]here school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432                                                                                                          Page 9
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
(Cite as: 130 F.3d 432)

terests are implicated."). Although this court has never explicitly stated that this liberty interest includes the right to be free from sexual abuse by school employees, a student's liberty interest in bodily integrity logically encompasses such freedom.

In considering whether substantive due process has been violated, this court has considered the following factors:

the need for the governmental action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm.

*Koch,* 96 F.3d at 1304 (quotation omitted). Each of these factors weighs heavily in favor of the conclusion that public school children have a constitutionally protected right not to be sexually abused by school employees at school. No governmental need could justify such conduct. *See Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 727 (3d Cir.1989) ("a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice"). The extent of harm inflicted by sexual abuse is immeasurable. And, in contrast to corporal punishment, sexual abuse is never inflicted in "good faith." Thus, we agree with the other circuits that have considered this issue: the Constitution protects a child's right to be free from sexual abuse by school employees while attending public school. *See Doe v. Taylor Independent Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.1994) (en banc) ("If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a school child from physical sexual abuse ... by a public schoolteacher."), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1995); *D.T. By M.T. v. Independent Sch. Dist. No. 16,* 894 F.2d 1176 (10th Cir.1990); *Stoneking,* 882 F.2d at 727 (holding that student's right to be free from sexual molestation is clearly established). The Plumeaus provided ample evidence that Amanda was deprived of this right.

[8] However, after reviewing the entire record, and viewing the evidence as we must **439 in the light most favorable to the Plumeaus, we agree with the district court that the Plumeaus have failed to raise a genuine issue of material fact as to § 1983 municipal liability in so far as their claims were based upon: (i) a custom or practice of ignoring complaints; (ii) unconstitutional actions taken by those with policy-making authority; or, (iii) an affirmative duty to protect.

[9] The district court also concluded that the Plumeaus did not submit evidence, sufficient to survive a motion for summary judgment, to support their claim that the School District was deliberately indifferent to the need to provide training in identifying the signs of child sexual abuse.[FN4] Because the Plumeaus have not argued failure to train on appeal and, indeed, reject the theory as one upon which they rely, this court cannot address that issue. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 738 (9th Cir.1986) (holding that the court of appeals will not consider matters not specifically and distinctively argued in brief).

> FN4. A municipality's failure adequately to train an employee can be an unconstitutional "policy" for purposes of § 1983 liability. *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). To be actionable under § 1983, a municipality's failure to train must amount to "deliberate indifference" to the rights of others. *Id.* at 387, 109 S.Ct. at 1203. For liability to attach, the need for training must be obvious and violation of constitutional rights must be a highly predictable consequence. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, ----, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997); *see also Thelma D. v. Board of Educ.,* 934 F.2d 929, 934-35 (8th Cir.1991) (stating that notice to a school board may be implied "where failure to train ... employees is so likely to res-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 F.3d 432
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663
(Cite as: 130 F.3d 432)

Page 10

ult in a violation of constitutional rights that the need for training is patently obvious.").

### IV. Denial of Leave to Amend Complaint

[10][11][12] The Plumeaus appeal the magistrate's denial of what they style a motion to amend their complaint in response to the School District's municipal liability arguments. The Plumeaus sent a letter to the magistrate requesting that the court strike certain of the School District's arguments from the record because they had not been afforded sufficient opportunity to respond. The magistrate did not rule on this "motion." [FN5] Leave to amend is generally within the discretion of the district court. *Nelson v. Pima Community College,* 83 F.3d 1075, 1079 (9th Cir.1996). However, a denial of leave to amend after a responsive pleading has been filed is "strictly" reviewed in light of the strong policy permitting amendment. *Pierce v. Multnomah County,* 76 F.3d 1032, 1043 (9th Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996).

> FN5. The School District argues both in its brief and in a separate motion to this court that because there is no formal Motion to Amend in the Record and no order denying a Motion to Amend, this court lacks jurisdiction over this issue on appeal. The School District is incorrect. A failure to rule on a motion is appealable.
>
> The School District also erroneously argues that because the Plumeaus failed to mention specifically this issue in their Notice of Appeal, the appeal of the issue is untimely and that we lack jurisdiction. Even where the Notice of Appeal fails to specify the specific orders appealed from, the intent to appeal the specific order is inferred if the appellee is not prejudiced or misled. *Simpson v. Lear Astronics Corp.,* 77 F.3d 1170, 1176 (9th Cir.1996). We conclude that the School District has been neither prejudiced nor

misled.

The magistrate judge did not abuse her discretion. First, in all likelihood the magistrate judge did not construe the letter as a motion for leave to amend. Nowhere does the letter request such leave. Indeed, the letter laments the fact that the Plumeaus "have no right to respond" to arguments newly raised by the defendant. Second, the letter discusses the issue of qualified immunity for state-law tort claims, not municipal liability under § 1983. Thus, even if we accept the Plumeaus' argument that their letter to the court was a motion to amend the complaint, it was not an abuse of discretion for the magistrate judge to deny that motion because qualified immunity is not an issue in this case and any such amendment would have been futile. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 339 (9th Cir.1996) (denial of a leave to amend is not an abuse of discretion where further amendment would be futile).

### CONCLUSION

We affirm the dismissal of the Plumeaus' first two causes of action alleging state law *440 tort claims. The OTCA notice was untimely. We affirm the grant of summary judgment to the School District on the Plumeaus' § 1983 claims (as to some on the merits, but as to the failure to train issue, because it was waived on appeal).

AFFIRMED.

C.A.9 (Or.),1997.
Plumeau v. School Dist. No. 40 County of Yamhill
130 F.3d 432, 122 Ed. Law Rep. 588, 97 Cal. Daily Op. Serv. 9081, 97 Daily Journal D.A.R. 14,663

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX D

Westlaw.

109 S.Ct. 998                                                                                                    Page 1
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
**(Cite as: 489 U.S. 189, 109 S.Ct. 998)**

▷
DeShaney v. Winnebago County Dept. of Social
Services
U.S.Wis.,1989.

Supreme Court of the United States
Joshua DeSHANEY, a Minor, by his Guardian Ad
Litem, and Melody DeShaney, Petitioners
v.
WINNEBAGO COUNTY DEPARTMENT OF SO-
CIAL SERVICES, et al.
**No. 87-154.**

Argued Nov. 2, 1988.
Decided Feb. 22, 1989.

Mother of child who had been beaten by father
brought civil rights action against social workers
and local officials who had received complaints that
the child was being abused by his father but had not
removed him from his father's custody. The United
States District Court for the Eastern District of Wis-
consin, John W. Reynolds, J., entered summary
judgment in favor of defendant, and mother ap-
pealed. The Court of Appeals for the Seventh Cir-
cuit, 812 F.2d 298, affirmed, and certiorari was
granted. The Supreme Court, Chief Justice
Rehnquist, held that State had no constitutional
duty to protect child from his father after receiving
reports of possible abuse.

Affirmed.

Justice Brennan dissented and filed an opinion in
which Justice Marshall and Justice Blackmun joined.

Justice Blackmun dissented and filed an opinion.

West Headnotes

**[1] Federal Courts 170B ⬤⟿461**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts
of Appeals
            170Bk460 Review on Certiorari
                170Bk461 k. Questions Not Presented
Below or in Petition for Certiorari. Most Cited Cases
Argument raised for the first time in petitioner's
brief to the Supreme Court that state statutes cre-
ated an entitlement protected by due process would
not be considered. U.S.C.A. Const.Amend. 14.

**[2] Constitutional Law 92 ⬤⟿3941**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(D) Applicability to Governmental
or Private Conduct; State Action
            92k3941 k. Non-Government Entities and
Individuals, Actions Of. Most Cited Cases
    (Formerly 92k251)

**Constitutional Law 92 ⬤⟿4048**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)1 In General
                92k4047 Duty to Protect; Failure to Act
                    92k4048 k. In General. Most Cited
Cases
    (Formerly 92k251)
Nothing in the language of the due process clause
requires state to protect life, liberty, and property of
its citizens against invasion by private actors.
U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 ⬤⟿4048**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)1 In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998

489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218

**(Cite as: 489 U.S. 189, 109 S.Ct. 998)**

Page 2

92k4047 Duty to Protect; Failure to Act
92k4048 k. In General. Most Cited
Cases
(Formerly 92k251)
Due process clause is phrased as a limitation on the
state's power to act, not as a guarantee of certain
minimal levels of safety and security. U.S.C.A.
Const.Amend. 14.

**[4] Constitutional Law 92 ☞4048**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applica-
tions
92XXVII(G)1 In General
92k4047 Duty to Protect; Failure to Act
92k4048 k. In General. Most Cited
Cases
(Formerly 92k251.2, 92k251)
Due process clause forbids the state itself to deprive
individual's life, liberty, or property without due
process of law, but its language cannot be fairly ex-
tended to impose an affirmative obligation on the
state to ensure that those interests do not come to
harm through other means. U.S.C.A. Const.Amend.
14.

**[5] Constitutional Law 92 ☞4048**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applica-
tions
92XXVII(G)1 In General
92k4047 Duty to Protect; Failure to Act
92k4048 k. In General. Most Cited
Cases
(Formerly 92k251) ·
Purpose of the due process clause was to protect the
people from the state, not to ensure that the state
protected them from each other. U.S.C.A.
Const.Amend. 14.

**[6] Constitutional Law 92 ☞3039**

92 Constitutional Law
92XXVI Equal Protection
92XXVI(A) In General
92XXVI(A)5 Scope of Doctrine in Gener-
al
92k3038 Discrimination and Classific-
ation
92k3039 k. In General. Most Cited
Cases
(Formerly 92k213.1(1))
State may not selectively deny protective services
to certain disfavored minorities without violating
the equal protection clause. U.S.C.A. Const.Amend.
14.

**[7] Constitutional Law 92 ☞4048**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applica-
tions
92XXVII(G)1 In General
92k4047 Duty to Protect; Failure to Act
92k4048 k. In General. Most Cited
Cases
(Formerly 92k253(1))
State's failure to protect an individual against
private violence does not constitute a violation of
the due process clause. U.S.C.A. Const.Amend. 14.

**[8] Sentencing and Punishment 350H ☞1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in Gen-
eral
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treat-
ment. Most Cited Cases
(Formerly 110k1213.10(3))
To make out an Eighth Amendment claim based on
the failure to provide adequate medical care, pris-
oner must show that state defendants exhibited de-
liberate indifference to his serious medical needs;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998

Page 3

489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
**(Cite as: 489 U.S. 189, 109 S.Ct. 998)**

mere negligent or inadvertent failure to provide adequate care is not enough. U.S.C.A. Const.Amend. 8.

**[9] Constitutional Law 92 €═4049**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
         92k4047 Duty to Protect; Failure to Act
            92k4049 k. Custody or Restraint;
Special Relationship. Most Cited Cases
   (Formerly 92k255(1))
When state takes a person into its custody and holds him there against his will, Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being; affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which is imposed on his freedom to act on his own behalf. U.S.C.A. Const.Amend. 14.

**[10] Constitutional Law 92 €═4401**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
         92XXVII(G)18 Families and Children
            92k4400 Protection of Children; Child Abuse, Neglect, and Dependency
               92k4401 k. In General. Most Cited Cases
   (Formerly 92k255(4))
State owed no duty to child whose abuse it was investigating to protect him from beating by his father, despite claim that special relationship existed between the child and the state. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[11] Constitutional Law 92 €═3845**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(A) In General
         92k3843 Relationship to Other Sources of Law
         92k3845 k. Tort Law. Most Cited Cases
   (Formerly 92k253(1))
Due process clause does not transform every tort committed by a state actor into a constitutional violation. U.S.C.A. Const.Amend. 14.

**\*\*999 \*189 *Syllabus* [FN*]**

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner is a child who was subjected to a series of beatings by his father, with whom he lived. Respondents, a county department of social services and several of its social workers, received complaints that petitioner was being abused by his father and took various steps to protect him; they did not, however, act to remove petitioner from his father's custody. Petitioner's father finally beat him so severely that he suffered permanent brain damage and was \*\*1000 rendered profoundly retarded. Petitioner and his mother sued respondents under 42 U.S.C. § 1983, alleging that respondents had deprived petitioner of his liberty interest in bodily integrity, in violation of his rights under the substantive component of the Fourteenth Amendment's Due Process Clause, by failing to intervene to protect him against his father's violence. The District Court granted summary judgment for respondents, and the Court of Appeals affirmed.

*Held:* Respondents' failure to provide petitioner with adequate protection against his father's violence did not violate his rights under the substantive component of the Due Process Clause. Pp. 1002-1007.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 4

(a) A State's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause, because the Clause imposes no duty on the State to provide members of the general public with adequate protective services. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security; while it forbids the State itself to deprive individuals of life, liberty, and property without due process of law, its language cannot fairly be read to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Pp. 1002-1004.

(b) There is no merit to petitioner's contention that the State's knowledge of his danger and expressions of willingness to protect him against that danger established a "special relationship" giving rise to an affirmative constitutional duty to protect. While certain "special relationships" created or assumed by the State with respect to particular individuals may give rise to an affirmative duty, enforceable through the Due Process*190 Clause, to provide adequate protection, see *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, the affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty. No such duty existed here, for the harms petitioner suffered occurred not while the State was holding him in its custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that he faced, it played no part in their creation, nor did it do anything to render him more vulnerable to them. Under these circumstances, the Due Process Clause did not impose upon the State an affirmative duty to provide petitioner with adequate protection. Pp. 1004-1006.

(c) It may well be that by voluntarily undertaking to provide petitioner with protection against a danger it played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. But the Due Process Clause does not transform every tort committed by a state actor into a constitutional violation. Pp. 1006-1007.

812 F.2d 298 (CA7 1987) affirmed.

REHNQUIST, C.J., delivered the opinion of the Court, in which WHITE, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post,* p. 1007. BLACKMUN, J., filed a dissenting opinion, *post,* p. 1012.

*Donald J. Sullivan* argued the cause for petitioners. With him on the briefs was *Curry First.*
*Mark J. Mingo* argued the cause for respondents. With him on the brief were *Wayne M. Yankala* and *Joel I. Klein.*
*Deputy Solicitor General Ayer* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Bolton, Roy T. Englert, Jr., Barbara L. Herwig,* and *John S. Koppel.* *
* Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union Children's Rights Project et al. by *Christopher A. Hansen, Marcia Robinson Lowry, John A. Powell, Steven R. Shapiro,* and *Helen Hershkoff;* and for the Massachusetts Committee for Children and Youth by *Laura L. Carroll.*
Briefs urging affirmance were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Peter H. Schiff,* Deputy Solicitor General, and *Michael S. Buskus,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Dave Frohnmayer,* Attorney General of Oregon, *LeRoy S. Zimmerman,* Attorney General of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 5

Pennsylvania, *Donald J. Hanaway,* Attorney General of Wisconsin, and *Charles Hoornstra,* Assistant Attorney General; and for the National Association of Counties et al. by *Benna Ruth Solomon* and *Douglas A. Poe.*

*Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon* filed a brief for the National School Boards Association as *amicus curiae.*

**\*191 \*\*1001** Chief Justice REHNQUIST delivered the opinion of the Court.

Petitioner is a boy who was beaten and permanently injured by his father, with whom he lived. Respondents are social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove petitioner from his father's custody. Petitioner sued respondents claiming that their failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We hold that it did not.

I

The facts of this case are undeniably tragic. Petitioner Joshua DeShaney was born in 1979. In 1980, a Wyoming court granted his parents a divorce and awarded custody of Joshua to his father, Randy DeShaney. The father shortly thereafter moved to Neenah, a city located in Winnebago County, Wisconsin, taking the infant Joshua with him. There he entered into a second marriage, which also ended in divorce.

**\*192** The Winnebago County authorities first learned that Joshua DeShaney might be a victim of child abuse in January 1982, when his father's second wife complained to the police, at the time of their divorce, that he had previously "hit the boy causing marks and [was] a prime case for child abuse." App. 152-153. The Winnebago County Department of Social Services (DSS) interviewed the father, but he denied the accusations, and DSS did not pursue them further. In January 1983, Joshua was admitted to a local hospital with multiple bruises and abrasions. The examining physician suspected child abuse and notified DSS, which immediately obtained an order from a Wisconsin juvenile court placing Joshua in the temporary custody of the hospital. Three days later, the county convened an ad hoc "Child Protection Team"-consisting of a pediatrician, a psychologist, a police detective, the county's lawyer, several DSS caseworkers, and various hospital personnel-to consider Joshua's situation. At this meeting, the Team decided that there was insufficient evidence of child abuse to retain Joshua in the custody of the court. The Team did, however, decide to recommend several measures to protect Joshua, including enrolling him in a preschool program, providing his father with certain counselling services, and encouraging his father's girlfriend to move out of the home. Randy DeShaney entered into a voluntary agreement with DSS in which he promised to cooperate with them in accomplishing these goals.

Based on the recommendation of the Child Protection Team, the juvenile court dismissed the child protection case and returned Joshua to the custody of his father. A month later, emergency room personnel called the DSS caseworker handling Joshua's case to report that he had once again been treated for suspicious injuries. The caseworker concluded that there was no basis for action. For the next six months, the caseworker made monthly visits to the DeShaney home, during which she observed a number of suspicious injuries on **\*193** Joshua's head; she also noticed that he had not been enrolled in school, and that the girlfriend had not moved out. The caseworker dutifully recorded these incidents in her files, along with her continuing suspicions that someone in the DeShaney household was physically abusing Joshua, but she did nothing more. In November 1983, the emergency room notified DSS that Joshua had been treated once again for injuries that they believed to be caused by child abuse. On the caseworker's next two visits to the DeShaney home, she was told that Joshua was too ill to see her. Still DSS took no action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 6

In March 1984, Randy DeShaney beat 4-year-old Joshua so severely that he fell into a life-threatening coma. Emergency brain surgery revealed a series of hemorrhages caused by traumatic injuries to the head inflicted over a long period of time. **1002 Joshua did not die, but he suffered brain damage so severe that he is expected to spend the rest of his life confined to an institution for the profoundly retarded. Randy DeShaney was subsequently tried and convicted of child abuse.

Joshua and his mother brought this action under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Wisconsin against respondents Winnebago County, DSS, and various individual employees of DSS. The complaint alleged that respondents had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known. The District Court granted summary judgment for respondents.

The Court of Appeals for the Seventh Circuit affirmed, 812 F.2d 298 (1987), holding that petitioners had not made out an actionable § 1983 claim for two alternative reasons. First, the court held that the Due Process Clause of the Fourteenth Amendment does not require a state or local governmental entity to protect its citizens from "private violence, or other *194 mishaps not attributable to the conduct of its employees." *Id.,* at 301. In so holding, the court specifically rejected the position endorsed by a divided panel of the Third Circuit in *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 510-511 (1985), and by dicta in *Jensen v. Conrad,* 747 F.2d 185, 190-194 (CA4 1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), that once the State learns that a particular child is in danger of abuse from third parties and actually undertakes to protect him from that danger, a "special relationship" arises between it and the child which imposes an affirmative constitutional duty to provide adequate protection. 812 F.2d, at 303-304.

Second, the court held, in reliance on our decision in *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), that the causal connection between respondents' conduct and Joshua's injuries was too attenuated to establish a deprivation of constitutional rights actionable under § 1983. 812 F.2d, at 301-303. The court therefore found it unnecessary to reach the question whether respondents' conduct evinced the "state of mind" necessary to make out a due process claim after *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). 812 F.2d, at 302.

Because of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights, see *Archie v. Racine,* 847 F.2d 1211, 1220-1223, and n. 10 (CA7 1988) (en banc) (collecting cases), cert. pending, No. 88-576, and the importance of the issue to the administration of state and local governments, we granted certiorari. 485 U.S. 958, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988). We now affirm.

II

[1] The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Petitioners *195 contend that the State [FN1] deprived Joshua of his liberty interest in "free[dom] from ... unjustified intrusions on personal security," see *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), by failing to provide him with adequate protection against his father's violence. The claim is one invoking the substantive rather than the procedural component of the Due Process Clause; petitioners do not **1003 claim that the State denied Joshua protection without according him appropriate procedural safeguards, see *Morris-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 7

*sey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), but that it was categorically obligated to protect him in these circumstances, see *Youngberg v. Romeo,* 457 U.S. 307, 309, 102 S.Ct. 2452, 2454, 73 L.Ed.2d 28 (1982).FN2

> FN1. As used here, the term "State" refers generically to state and local governmental entities and their agents.

> FN2. Petitioners also argue that the Wisconsin child protection statutes gave Joshua an "entitlement" to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under our decision in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Brief for Petitioners 24-29. But this argument is made for the first time in petitioners' brief to this Court: it was not pleaded in the complaint, argued to the Court of Appeals as a ground for reversing the District Court, or raised in the petition for certiorari. We therefore decline to consider it here. See *Youngberg v. Romeo,* 457 U.S., at 316, n. 19, 102 S.Ct., at 2458, n. 19; *Dothard v. Rawlinson,* 433 U.S. 321, 323, n. 1, 97 S.Ct. 2720, 2724, n. 1, 53 L.Ed.2d 786 (1977); *Duignan v. United States,* 274 U.S. 195, 200, 47 S.Ct. 566, 568, 71 L.Ed. 996 (1927); *Old Jordan Mining & Milling Co. v. Societe Anonyme des Mines,* 164 U.S. 261, 264-265, 17 S.Ct. 113, 114-115, 41 L.Ed. 427 (1896).

[2][3][4][5] But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due

process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. *196 Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression,"*Davidson v. Cannon, supra,* 474 U.S., at 348, 106 S.Ct., at 670; see also *Daniels v. Williams, supra,* 474 U.S., at 331, 106 S.Ct., at 665 (" ' "to secure the individual from the arbitrary exercise of the powers of government," ' " and "to prevent governmental power from being 'used for purposes of oppression' ") (internal citations omitted); *Parratt v. Taylor,* 451 U.S. 527, 549, 101 S.Ct. 1908, 1919, 68 L.Ed.2d 420 (1981) (Powell, J., concurring in result) (to prevent the "affirmative abuse of power"). Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

[6][7] Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. See, *e.g., Harris v. McRae,* 448 U.S. 297, 317-318, 100 S.Ct. 2671, 2688-2689, 65 L.Ed.2d 784 (1980) (no obligation to fund abortions or other medical services) (discussing Due Process Clause of Fifth Amendment); *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) (no obligation to provide adequate housing) (discussing Due Process Clause of Fourteenth Amendment); see also *Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"). As we said in *Harris v. McRae:* "Although the liberty protected

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 8

by the Due Process Clause affords protection against unwarranted *government* interference ..., it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." 448 U.S., at 317-318, 100 S.Ct., at 2688-2689 (emphasis added). If the Due Process Clause does not require the State to provide its citizens with particular protective**1004 services, it follows that the State cannot *197 be held liable under the Clause for injuries that could have been averted had it chosen to provide them.[FN3] As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

> FN3. The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause. See *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). But no such argument has been made here.

Petitioners contend, however, that even if the Due Process Clause imposes no affirmative obligation on the State to provide the general public with adequate protective services, such a duty may arise out of certain "special relationships" created or assumed by the State with respect to particular individuals. Brief for Petitioners 13-18. Petitioners argue that such a "special relationship" existed here because the State knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger. *Id.,* at 18-20. Having actually undertaken to protect Joshua from this danger-which petitioners concede the State played no part in creating-the State acquired an affirmative "duty," enforceable through the Due Process Clause, to do so in a reasonably competent fashion. Its failure to discharge that duty, so the argument goes, was an abuse of governmental power that so "shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed.

183 (1952), as to constitute a substantive due process violation. Brief for Petitioners 20.[FN4]

> FN4. The genesis of this notion appears to lie in a statement in our opinion in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In that case, we were asked to decide, *inter alia,* whether state officials could be held liable under the Due Process Clause of the Fourteenth Amendment for the death of a private citizen at the hands of a parolee. Rather than squarely confronting the question presented here-whether the Due Process Clause imposed upon the State an affirmative duty to protect-we affirmed the dismissal of the claim on the narrower ground that the causal connection between the state officials' decision to release the parolee from prison and the murder was too attenuated to establish a "deprivation" of constitutional rights within the meaning of § 1983. *Id.,* at 284-285, 100 S.Ct., at 558-559. But we went on to say:
>
> "[T]he parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.,* at 285, 100 S.Ct., at 559 (footnote omitted).
>
> Several of the Courts of Appeals have read this language as implying that once the State learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 9

the victim against that danger, a "special relationship" arises between State and victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render adequate protection. See *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 510-511 (CA3 1985); *Jensen v. Conrad,* 747 F.2d 185, 190-194, and n. 11 (CA4 1984) (dicta), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); *Balistreri v. Pacifica Police Dept.,* 855 F.2d 1421, 1425-1426 (CA9 1988). But see, in addition to the opinion of the Seventh Circuit below, *Estate of Gilmore v. Buckley,* 787 F.2d 714, 720-723 (CA1),cert. denied, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *Harpole v. Arkansas Dept. of Human Services,* 820 F.2d 923, 926-927 (CA8 1987); *Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030, 1034-1037 (CA11 1987).

[8] *198 We reject this argument. It is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals. In *Estate v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), we recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, **1005*Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), requires the State to provide adequate medical care to incarcerated prisoners. 429 U.S., at 103-104, 97 S.Ct., at 290-291.[FN5] We reasoned*199 that because the prisoner is unable " 'by reason of the deprivation of his liberty [to] care for himself,' " it is only " 'just' " that the State be required to care for him. *Ibid.,* quoting *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).

FN5. To make out an Eighth Amendment

claim based on the failure to provide adequate medical care, a prisoner must show that the state defendants exhibited "deliberate indifference" to his "serious" medical needs; the mere negligent or inadvertent failure to provide adequate care is not enough. *Estelle v. Gamble,* 429 U.S., at 105-106, 97 S.Ct., at 291-292. In *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), we suggested that a similar state of mind is required to make out a substantive due process claim in the prison setting. *Id.,* at 326-327, 106 S.Ct., at 1088.

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), we extended this analysis beyond the Eighth Amendment setting,[FN6] holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. *Id.,* at 314-325, 102 S.Ct., at 2457-2463; see *id.,* at 315, 324, 102 S.Ct., at 2457, 2462 (dicta indicating that the State is also obligated to provide such individuals with "adequate food, shelter, clothing, and medical care"). As we explained: "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id.,* at 315-316, 102 S.Ct., at 2457-2458; see also *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (holding that the Due Process Clause requires the responsible government or governmental agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police).

FN6. The Eighth Amendment applies "only after the State has complied with the constitutional guarantees traditionally as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

sociated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright,* 430 U.S. 651, 671-672, n. 40, 97 S.Ct. 1401, 1412-1413, n. 40, 51 L.Ed.2d 711 (1977); see also *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 99 S.Ct. 1861, 1872, n. 16, 60 L.Ed.2d 447 (1979).

[9] But these cases afford petitioners no help. Taken together, they stand only for the proposition that when the State takes a person into its custody and holds him there *200 against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See *Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("When a person is institutionalized and wholly dependent on the State[,] ... a duty to provide certain services and care does exist").[FN7] The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble, supra,* 429 U.S., at 103-104, 97 S.Ct., at 290-291; *Youngberg v. Romeo, supra,* 457 U.S., at 315-316, 102 S.Ct., at 2457-2458. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament **1006 or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See *Estelle v. Gamble, supra,* 429 U.S., at 103, 97 S.Ct., at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so,

those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.[FN8]

> FN7. Even in this situation, we have recognized that the State "has considerable discretion in determining the nature and scope of its responsibilities." *Youngberg v. Romeo,* 457 U.S., at 317, 102 S.Ct., at 2458.

> FN8. Of course, the protections of the Due Process Clause, both substantive and procedural, may be triggered when the State, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement. See, *e.g., Whitley v. Albers, supra,* 475 U.S., at 326-327, 106 S.Ct., at 1087-1088 (shooting inmate); *Youngberg v. Romeo, supra,* 457 U.S., at 316, 102 S.Ct., at 2458 (shackling involuntarily committed mental patient); *Hughes v. Rowe,* 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980) (removing inmate from general prison population and confining him to administrative segregation); *Vitek v. Jones,* 445 U.S. 480, 491-494, 100 S.Ct. 1254, 1262-1264, 63 L.Ed.2d 552 (1980) (transferring inmate to mental health facility).

[10] *201 The *Estelle-Youngberg* analysis simply has no applicability in the present case. Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.[FN9] While the State may have been aware of the dangers that Joshua faced in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 11

the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

> FN9. Complaint ¶ 16, App. 6 ("At relevant times to and until March 8, 1984, [the date of the final beating,] Joshua DeShaney was in the custody and control of Defendant Randy DeShaney"). Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to *Estelle* and *Youngberg,* that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. See *Doe v. New York City Dept. of Social Services,* 649 F.2d 134, 141-142 (CA2 1981), after remand, 709 F.2d 782, cert. denied *sub nom.Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 794-797 (CA11 1987) (en banc), cert. pending *Ledbetter v. Taylor,* No. 87-521. We express no view on the validity of this analogy, however, as it is not before us in the present case.

[11] It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty

under state tort law to provide *202 him with adequate protection against that danger. See Restatement (Second) of Torts § 323 (1965) (one who undertakes to render services to another may in some circumstances be held liable for doing so in a negligent fashion); see generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts § 56 (5th ed. 1984) (discussing "special relationships" which may give rise to affirmative duties to act under the common law of tort). But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation. See *Daniels v. Williams,* 474 U.S., at 335-336, 106 S.Ct., at 667; **1007*Parratt v. Taylor,* 451 U.S., at 544, 101 S.Ct., at 1917; *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 26, 61 L.Ed.2d 433 (1979); *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not "all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment." *Daniels v. Williams, supra,* 474 U.S., at 335, 106 S.Ct., at 667. Because, as explained above, the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so-though calamitous in hindsight-simply does not constitute a violation of the Due Process Clause.FN10

> FN10. Because we conclude that the Due Process Clause did not require the State to protect Joshua from his father, we need not address respondents' alternative argument that the individual state actors lacked the requisite "state of mind" to make out a due process violation. See *Daniels v. Williams,* 474 U.S., at 334, n. 3, 106 S.Ct., at 666, n. 3. Similarly, we have no occasion to consider whether the individual respondents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 12

might be entitled to a qualified immunity defense, see *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), or whether the allegations in the complaint are sufficient to support a § 1983 claim against the county and DSS under *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny.

Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive adequate compensation for the grievous *203 harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them. In defense of them it must also be said that had they moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection.

The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

*Affirmed.*

Justice BRENNAN, with whom Justice MARSHALL and Justice BLACKMUN join, dissenting.
"The most that can be said of the state functionaries in this case," the Court today concludes, "is that

they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Ante,* at 1007. Because I believe that this description of respondents' conduct tells only part of the story and that, accordingly, the Constitution itself "dictated a more active role" for respondents in the circumstances presented here, I cannot agree that respondents had no constitutional duty to help Joshua DeShaney.

It may well be, as the Court decides, *ante,* at 1002-1004, that the Due Process Clause as construed by our prior cases creates no general right to basic governmental services. That, *204 however, is not the question presented here; indeed, that question was not raised in the complaint, urged on appeal, presented in the petition for certiorari, or addressed in the briefs on the merits. No one, in short, has asked the Court to proclaim that, as a general matter, **1008 the Constitution safeguards positive as well as negative liberties.

This is more than a quibble over dicta; it is a point about perspective, having substantive ramifications. In a constitutional setting that distinguishes sharply between action and inaction, one's characterization of the misconduct alleged under § 1983 may effectively decide the case. Thus, by leading off with a discussion (and rejection) of the idea that the Constitution imposes on the States an affirmative duty to take basic care of their citizens, the Court foreshadows-perhaps even preordains-its conclusion that no duty existed even on the specific facts before us. This initial discussion establishes the baseline from which the Court assesses the DeShaneys' claim that, when a State has-"by word and by deed," *ante,* at 1004-announced an intention to protect a certain class of citizens and has before it facts that would trigger that protection under the applicable state law, the Constitution imposes upon the State an affirmative duty of protection.

The Court's baseline is the absence of positive rights in the Constitution and a concomitant suspicion of any claim that seems to depend on such rights. From this perspective, the DeShaneys' claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 13

is first and foremost about inaction (the failure, here, of respondents to take steps to protect Joshua), and only tangentially about action (the establishment of a state program specifically designed to help children like Joshua). And from this perspective, holding these Wisconsin officials liable-where the only difference between this case and one involving a general claim to protective services is Wisconsin's establishment and operation of a program to protect children-would seem to punish an effort that we should seek to promote.

*205 I would begin from the opposite direction. I would focus first on the action that Wisconsin *has* taken with respect to Joshua and children like him, rather than on the actions that the State failed to take. Such a method is not new to this Court. Both *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), began by emphasizing that the States had confined J.W. Gamble to prison and Nicholas Romeo to a psychiatric hospital. This initial action rendered these people helpless to help themselves or to seek help from persons unconnected to the government. See *Estelle, supra,* 429 U.S. at 104, 97 S.Ct., at 291 ("[I]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself"); *Youngberg, supra,* 457 U.S. at 317, 102 S.Ct., at 2458 ("When a person is institutionalized-and wholly dependent on the State-it is conceded by petitioners that a duty to provide certain services and care does exist"). Cases from the lower courts also recognize that a State's actions can be decisive in assessing the constitutional significance of subsequent inaction. For these purposes, moreover, actual physical restraint is not the only state action that has been considered relevant. See, *e.g., White v. Rochford,* 592 F.2d 381 (CA7 1979) (police officers violated due process when, after arresting the guardian of three young children, they abandoned the children on a busy stretch of highway at night).

Because of the Court's initial fixation on the gener-

al principle that the Constitution does not establish positive rights, it is unable to appreciate our recognition in *Estelle* and *Youngberg* that this principle does not hold true in all circumstances. Thus, in the Court's view, *Youngberg* can be explained (and dismissed) in the following way: "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the 'deprivation of liberty' triggering the protections of the Due Process *206 Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Ante,* at 1006. This restatement of *Youngberg's***1009 holding should come as a surprise when one recalls our explicit observation in that case that Romeo did not challenge his commitment to the hospital, but instead "argue[d] that he ha[d] a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that petitioners infringed these rights *by failing to provide* constitutionally required conditions of confinement." 457 U.S., at 315, 102 S.Ct., at 2457 (emphasis added). I do not mean to suggest that "the State's affirmative act of restraining the individual's freedom to act on his own behalf,"*ante,* at 1006, was irrelevant in *Youngberg;* rather, I emphasize that this conduct would have led to no injury, and consequently no cause of action under § 1983, unless the State then had failed to take steps to protect Romeo from himself and from others. In addition, the Court's exclusive attention to state-imposed restraints of "the individual's freedom to act on his own behalf," *ante,* at 1006, suggests that it was the State that rendered Romeo unable to care for himself, whereas in fact-with an I.Q. of between 8 and 10, and the mental capacity of an 18-month-old child, 457 U.S., at 309, 102 S.Ct., at 2454-he had been quite incapable of taking care of himself long before the State stepped into his life. Thus, the fact of hospitalization was critical in *Youngberg* not because it rendered Romeo helpless to help himself, but because it separated him from other sources of aid that, we held, the State was ob-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 14

ligated to replace. Unlike the Court, therefore, I am unable to see in *Youngberg* a neat and decisive divide between action and inaction.

Moreover, to the Court, the only fact that seems to count as an "affirmative act of restraining the individual's freedom to act on his own behalf" is direct physical control. *Ante,* at 1006 (listing only "incarceration, institutionalization, [and] other similar restraint of personal liberty" in describing relevant "affirmative acts"). I would not, however, give *Young berg\*207* and *Estelle* such a stingy scope. I would recognize, as the Court apparently cannot, that "the State's knowledge of [an] individual's predicament [and] its expressions of intent to help him" can amount to a "limitation ... on his freedom to act on his own behalf" or to obtain help from others. *Ante,* at 1006.

*Youngberg* and *Estelle* are not alone in sounding this theme. In striking down a filing fee as applied to divorce cases brought by indigents, see *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), and in deciding that a local government could not entirely foreclose the opportunity to speak in a public forum, see, *e.g., Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), we have acknowledged that a State's actions-such as the monopolization of a particular path of relief-may impose upon the State certain positive duties. Similarly, *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), and *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), suggest that a State may be found complicit in an injury even if it did not create the situation that caused the harm.

Arising as they do from constitutional contexts different from the one involved here, cases like *Boddie* and *Burton* are instructive rather than decisive in the case before us. But they set a tone equally well established in precedent as, and contradictory to,

the one the Court sets by situating the DeShaneys' complaint within the class of cases epitomized by the Court's decision in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The cases that I have cited tell us that \*\*1010*Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (recognizing entitlement to welfare under state law), can stand side by side with *Dandridge v. Williams,* 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (implicitly rejecting idea that welfare is a fundamental right), and that \*208*Goss v. Lopez,* 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975) (entitlement to public education under state law), is perfectly consistent with *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 29-39, 93 S.Ct. 1278, 1294-1300, 36 L.Ed.2d 16 (1973) (no fundamental right to education). To put the point more directly, these cases signal that a State's prior actions may be decisive in analyzing the constitutional significance of its inaction. I thus would locate the DeShaneys' claims within the framework of cases like *Youngberg* and*Estelle,* and more generally, *Boddie* and *Schneider,* by considering the actions that Wisconsin took with respect to Joshua.

Wisconsin has established a child-welfare system specifically designed to help children like Joshua. Wisconsin law places upon the local departments of social services such as respondent (DSS or Department) a duty to investigate reported instances of child abuse. See Wis.Stat. § 48.981(3) (1987-1988). While other governmental bodies and private persons are largely responsible for the reporting of possible cases of child abuse, see § 48.981(2), Wisconsin law channels all such reports to the local departments of social services for evaluation and, if necessary, further action. § 48.981(3). Even when it is the sheriff's office or police department that receives a report of suspected child abuse, that report is referred to local social services departments for action, see § 48.981(3)(a); the only exception to this occurs when the reporter fears for the child's *immediate* safety. § 48.981(3)(b). In this way, Wisconsin law invites-indeed, directs-citizens and other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
(Cite as: 489 U.S. 189, 109 S.Ct. 998)

Page 15

governmental entities to depend on local departments of social services such as respondent to protect children from abuse.

The specific facts before us bear out this view of Wisconsin's system of protecting children. Each time someone voiced a suspicion Joshua was being abused, that information was relayed to the Department for investigation and possible action. When Randy DeShaney's second wife told the police that he had " 'hit the boy causing marks and [was] a prime case for child abuse,' " the police referred her *209 complaint to DSS. *Ante*, at 1001. When, on three separate occasions, emergency room personnel noticed suspicious injuries on Joshua's body, they went to DSS with this information. *Ante*, at 1001-1002. When neighbors informed the police that they had seen or heard Joshua's father or his father's lover beating or otherwise abusing Joshua, the police brought these reports to the attention of DSS. App. 144-145. And when respondent Kemmeter, through these reports and through her own observations in the course of nearly 20 visits to the DeShaney home, *id.*, at 104, compiled growing evidence that Joshua was being abused, that information stayed within the Department-chronicled by the social worker in detail that seems almost eerie in light of her failure to act upon it. (As to the extent of the social worker's involvement in, and knowledge of, Joshua's predicament, her reaction to the news of Joshua's last and most devastating injuries is illuminating: " 'I just knew the phone would ring some day and Joshua would be dead.' " 812 F.2d 298, 300 (CA7 1987).)

Even more telling than these examples is the Department's control over the decision whether to take steps to protect a particular child from suspected abuse. While many different people contributed information and advice to this decision, it was up to the people at DSS to make the ultimate decision (subject to the approval of the local government's Corporation Counsel) whether to disturb the family's current arrangements. App. 41, 58. When Joshua first appeared at a local hospital with injur-

ies signaling physical abuse, for example, it was DSS that made the decision to take **1011 him into temporary custody for the purpose of studying his situation-and it was DSS, acting in conjunction with the corporation counsel, that returned him to his father. *Ante*, at 1001. Unfortunately for Joshua DeShaney, the buck effectively stopped with the Department.

In these circumstances, a private citizen, or even a person working in a government agency other than DSS, would doubtless feel that her job was done as soon as she had reported*210 her suspicions of child abuse to DSS. Through its child-welfare program, in other words, the State of Wisconsin has relieved ordinary citizens and governmental bodies other than the Department of any sense of obligation to do anything more than report their suspicions of child abuse to DSS. If DSS ignores or dismisses these suspicions, no one will step in to fill the gap. Wisconsin's child-protection program thus effectively confined Joshua DeShaney within the walls of Randy DeShaney's violent home until such time as DSS took action to remove him. Conceivably, then, children like Joshua are made worse off by the existence of this program when the persons and entities charged with carrying it out fail to do their jobs.

It simply belies reality, therefore, to contend that the State "stood by and did nothing" with respect to Joshua. *Ante*, at 1007. Through its child-protection program, the State actively intervened in Joshua's life and, by virtue of this intervention, acquired ever more certain knowledge that Joshua was in grave danger. These circumstances, in my view, plant this case solidly within the tradition of cases like *Youngberg* and *Estelle*.

It will be meager comfort to Joshua and his mother to know that, if the State had "selectively den[ied] its protective services" to them because they were "disfavored minorities," *ante*, at 1004, n. 3, their § 1983 suit might have stood on sturdier ground. Because of the posture of this case, we do not know why respondents did not take steps to protect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 998                                                                    Page 16
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218
**(Cite as: 489 U.S. 189, 109 S.Ct. 998)**

Joshua; the Court, however, tells us that their reason is irrelevant so long as their inaction was not the product of invidious discrimination. Presumably, then, if respondents decided not to help Joshua because his name began with a "J," or because he was born in the spring, or because they did not care enough about him even to formulate an intent to discriminate against him based on an arbitrary reason, respondents would not be liable to the DeShaneys because they were not the ones who dealt the blows that destroyed Joshua's life.

*211 I do not suggest that such irrationality was at work in this case; I emphasize only that we do not know whether or not it was. I would allow Joshua and his mother the opportunity to show that respondents' failure to help him arose, not out of the sound exercise of professional judgment that we recognized in *Youngberg* as sufficient to preclude liability, see 457 U.S., at 322-323, 102 S.Ct., at 2461-2462, but from the kind of arbitrariness that we have in the past condemned. See, *e.g., Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (purpose of Due Process Clause was "to secure the individual from the arbitrary exercise of the powers of government" (citations omitted)); *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 399, 57 S.Ct. 578, 585, 81 L.Ed. 703 (1937) (to sustain state action, the Court need only decide that it is not "arbitrary or capricious"); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 389, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926) (state action invalid where it "passes the bounds of reason and assumes the character of a merely arbitrary fiat," quoting *Purity Extract & Tonic Co. v. Lynch,* 226 U.S. 192, 204, 33 S.Ct. 44, 47, 57 L.Ed. 184 (1912)).

*Youngberg's* deference to a decisionmaker's professional judgment ensures that once a caseworker has decided, on the basis of her professional training and experience, that one course of protection is preferable for a given child, or even that no special protection is required, she will not be found liable for the harm that follows. (In this **1012 way,

*Youngberg's* vision of substantive due process serves a purpose similar to that served by adherence to procedural norms, namely, requiring that a state actor stop and think before she acts in a way that may lead to a loss of liberty.) Moreover, that the Due Process Clause is not violated by merely negligent conduct, see *Daniels, supra,* and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), means that a social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983.

As the Court today reminds us, "the Due Process Clause of the Fourteenth Amendment was intended to prevent government*212 'from abusing [its] power, or employing it as an instrument of oppression.' " *Ante,* at 1003, quoting *Davidson, supra,* at 348, 106 S.Ct., at 670. My disagreement with the Court arises from its failure to see that inaction can be every bit as abusive of power as action, that oppression can result when a State undertakes a vital duty and then ignores it. Today's opinion construes the Due Process Clause to permit a State to displace private sources of protection and then, at the critical moment, to shrug its shoulders and turn away from the harm that it has promised to try to prevent. Because I cannot agree that our Constitution is indifferent to such indifference, I respectfully dissent.

Justice BLACKMUN, dissenting.

Today, the Court purports to be the dispassionate oracle of the law, unmoved by "natural sympathy." *Ante,* at 1007. But, in this pretense, the Court itself retreats into a sterile formalism which prevents it from recognizing either the facts of the case before it or the legal norms that should apply to those facts. As Justice BRENNAN demonstrates, the facts here involve not mere passivity, but active state intervention in the life of Joshua DeShaney-intervention that triggered a fundamental duty to aid the boy once the State learned of the severe danger to which he was exposed.

The Court fails to recognize this duty because it attempts to draw a sharp and rigid line between ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion and inaction. But such formalistic reasoning has no place in the interpretation of the broad and stirring Clauses of the Fourteenth Amendment. Indeed, I submit that these Clauses were designed, at least in part, to undo the formalistic legal reasoning that infected antebellum jurisprudence, which the late Professor Robert Cover analyzed so effectively in his significant work entitled Justice Accused (1975).

Like the antebellum judges who denied relief to fugitive slaves, see *id.,* at 119-121, the Court today claims that its decision, however harsh, is compelled by existing legal doctrine. On the contrary, the question presented by this case *213 is an open one, and our Fourteenth Amendment precedents may be read more broadly or narrowly depending upon how one chooses to read them. Faced with the choice, I would adopt a "sympathetic" reading, one which comports with dictates of fundamental justice and recognizes that compassion need not be exiled from the province of judging. Cf. A. Stone, Law, Psychiatry, and Morality 262 (1984) ("We will make mistakes if we go forward, but doing nothing can be the worst mistake. What is required of us is moral ambition. Until our composite sketch becomes a true portrait of humanity we must live with our uncertainty; we will grope, we will struggle, and our compassion may be our only guide and comfort").

Poor Joshua! Victim of repeated attacks by an irresponsible, bullying, cowardly, and intemperate father, and abandoned by respondents who placed him in a dangerous predicament and who knew or learned what was going on, and yet did essentially nothing except, as the Court revealingly observes, *ante,* at 1001,"dutifully recorded these incidents in [their] files." It is a sad commentary upon American life, and constitutional principles-so full of late of patriotic fervor and proud proclamations **1013 about "liberty and justice for all"-that this child, Joshua DeShaney, now is assigned to live out the remainder of his life profoundly retarded. Joshua and his mother, as petitioners here, deserve-but now

are denied by this Court-the opportunity to have the facts of their case considered in the light of the constitutional protection that 42 U.S.C. § 1983 is meant to provide.

U.S.Wis.,1989.
DeShaney v. Winnebago County Dept. of Social Services
489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX E

Westlaw.

255 Fed.Appx. 624                                                                                    Page 1
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

# H

Kline ex rel. Arndt v. Mansfield
C.A.3 (Pa.),2007.
This case was not selected for publication in the
Federal Reporter.Not for Publication in West's Fed-
eral Reporter See Fed. Rule of Appellate Procedure
32.1 generally governing citation of judicial de-
cisions issued on or after Jan. 1, 2007. See also
Third Circuit LAR, App. I, IOP 5.7. (Find CTA3
App. I, IOP 5.7)
  United States Court of Appeals,Third Circuit.
  Heather A. KLINE, By and through her parent and
  natural guardian, Stepahnie J. Arndt*, Appellant
                        v.
  Troy Paul MANSFIELD; Hamburg Area School
            District; Joseph Padasak.
              (*Amended 12/1/06).
                 **No. 06-4583.**

              Argued Oct. 23, 2007.
              Filed: Nov. 27, 2007.

**Background:** Student brought action against
school district, school teacher, and principal under
§ 1983, asserting claims for sexual harassment, in-
tentional infliction of emotional distress, respondeat
superior, and sexual assault and battery. The United
States District Court for the Eastern District of
Pennsylvania, Arnold C. Rapoport, United States
Magistrate Judge, 454 F.Supp.2d 258, entered sum-
mary judgment on federal claims and declined sup-
plemental jurisdiction over state law claims. Stu-
dent appealed.

**Holdings:** The Court of Appeals, Cowen, Circuit
Judge, held that:
(1) denial of student's motion for leave to file
amended complaint was not abuse of discretion;
(2) summary judgment evidence did not demon-
strate that school district had custom or policy of
deliberate indifference to student's right to be free
from sexual abuse; and
(3) school district's failure to provide training to
district employees to recognize and report signs of

sexual abuse did not demonstrate conscious or de-
liberate indifference to student's right to be free
from sexual abuse.

Affirmed.

                  West Headnotes

**[1] Federal Civil Procedure 170A ⟨⟩839.1**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak839.1 k. In General. Most Cited
Cases
Denial of student's motion for leave to file amended
complaint against teacher, school district, and prin-
cipal to include specific language about her sub-
stantive due process rights, specifically claims that
school district had policy or custom of deliberate
indifference towards sexual abuse by teacher, and
failure to train employees on recognizing and re-
porting signs of sexual abuse, where claims were
implicitly included in original complaint and claims
were argued on merits on summary judgment.
U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⟨⟩1352(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1352 Lack of Control, Training, or Su-
pervision; Knowledge and Inaction
                78k1352(2) k. Education. Most Cited
Cases
School district's knowledge that student had been
suspended from school after she skipped class to be
with teacher in his sixth grade classroom, that
teachers complained that she was spending too
much time with teacher, and that seventh grade
teachers prohibited student from going to teacher's
room for any reason, together with school's failure

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624                                                                                                     Page 2
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

to enforce policy of not allowing seventh grade students in sixth grade hallway, although demonstrating that school district was negligent, did not indicate that school district had custom or policy of deliberately indifference to student's right to be free from sexual abuse, as required for student to recover against school district in § 1983 action against district, teacher, and principal. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ☞1352(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
                78k1352(2) k. Education. Most Cited Cases
School district's failure to provide training to district employees to recognize and report signs of sexual abuse did not demonstrate conscious or deliberate indifference to student's right to be free from sexual abuse at hands of teacher, in student's § 1983 action against school district, teacher, and principal; other incidents of abuse were too attenuated from her abuse to show there was pattern of sexual abuse, student never disclosed abuse to school officials, and fact that further training might have prevented student from sexual abuse by teacher did not, in and of itself, establish claim for failure to train. 42 U.S.C.A. § 1983.

*625 On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil No. 03-cv-04006), Magistrate Judge: Hon. Arnold C. Rapoport.
John J. Speicher, Esq. (Argued), Leisawitz, Heller, Abramowitch & Phillips, Wyomissing, PA, for Appellant.
Anne E. Hendricks, Esq. (Argued), Paul N. Lalley, Esq., Stacy G. Smith, Esq., Levin Legal Group, Huntingdon Valley, PA, for Appellees Hamburg Area School District and Joseph Padasak.

BEFORE: FISHER, STAPLETON and COWEN,

Circuit Judges.


OPINION

COWEN, Circuit Judge.
**\*\*1** Heather Kline appeals from the denial of her motion for leave to amend the complaint as well as the grant of summary judgment in favor of the Defendants, Hamburg Area School District ("Hamburg") and Joseph Padasak. For the following reasons, we will affirm.


I.

In 1997, Kline met Troy Mansfield as a student in his third-grade class. After Kline finished the third grade, her contact with Mansfield continued. In 2001, when Kline was in the seventh grade, Mansfield was transferred to the Hamburg Area Middle School to teach sixth grade.

During the 2001-2002 academic year, Kline began to frequently visit Mansfield in his sixth grade classroom. These visits occurred before, during and after school. At one point in March 2002, Kline was caught in Mansfield's classroom cutting band rehearsal. After this incident, Kline's seventh grade teachers met and issued a statement that "Heather Kline is not allowed to go to Mr. Mansfield's room for any reason." (App.782a).

The relationship between Kline and Mansfield became intimate and eventually sexual during the 2001-2002 academic year. Kline admits that neither she, nor her mother, Stephanie J. Arndt, complained to school officials about Kline's contact with Mansfield. Furthermore, no official of Hamburg possessed actual knowledge of the intimate or sexual nature of the relationship.

Ultimately, Mansfield was charged with various sexual offenses arising from his conduct. In 2004, he pled guilty, and was sentenced to eleven-and-one-half years to thirty-one years imprisonment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624                                                                                                                    Page 3
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

## II.

In July 2003, Kline filed a complaint against Mansfield, Hamburg and Padasak (principal of Hamburg Area Middle School). She alleged sexual harassment against all of the Defendants in violation of Title IX; violations of 42 U.S.C. § 1983 [FN1] against all of the Defendants; intentional infliction of emotional distress against Mansfield; respondeat superior liability against Hamburg; and sexual assault and battery against Mansfield.

> FN1. Kline specifically asserted that her rights to equal protection and privacy were violated.

During discovery, Kline moved to amend the complaint. The proposed amended complaint asserted similar federal claims against all of the Defendants; sexual assault*626 and battery against Mansfield; and negligence against Mansfield. Within her federal claims, Kline sought to add specific substantive due process language. In September 2004, the District Court denied the motion to amend without prejudice. The District Court stated that Kline could refile a motion for leave to amend the complaint.

In December 2004, Kline filed a second motion for leave to file an amended complaint. Most important for purposes of this appeal, Kline again sought to include specific language of her substantive due process rights. In September 2005, the District Court denied the motion for leave to amend the complaint, observing that "portions of the new averments [were] futile" while "other portions seem to simply state more specifically the nature of plaintiff's Section 1983 claims." (App.32a.) After noting that the "new averments as to special relationship [between Kline and the school were] futile" in light of our decision in *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992)(en banc), the District Court went on to conclude as follows:

**\*\*2** The general averment contained in the Section 1983 Count of the initial complaint reads:

"[a]ll Defendants had a duty to provide and ensure an educational environment for the minor, Heather, free of sexual innuendo, intimidation and harassment and to enforce the regulations, rules and laws necessary to protect the minor, Heather, from the acts of sexual abuse. (Complaint, paragraph 38 at page 7.)"

Defendants did not object to the language, nor in fact raise any objections to Plaintiff's complaint, instead choosing to file an answer to it. In the proposed amended complaint, plaintiff includes this same paragraph but includes a few additional paragraphs averring that the responding defendants failed to have policies and training to protect minors from abuse. Defendants argue that they were not prepared for claims of failure to train and inadequate policy, and they have not conducted discovery into these issues. Defendants argue that inclusion of these claims in the proposed amended complaint mark a change in legal theories.

From our review of the initial complaint, several paragraphs within the initial complaint do either refer to or imply such claims. Paragraph 16 of the initial complaint references the school district's "rules, polices and regulations" and that other teachers made Mr. Padasak aware that Mr. Mansfield's conduct was violating those policies. Paragraph 20 of the initial complaint avers that Mr. Padasak had the authority to train his employees, including defendant. Paragraph 25 of the initial complaint avers that the District knew or should have known of the inappropriate relationship and that neither took any steps to address it.

These averments are sufficient to put the responding defendants on notice that their policies and practices could form part of plaintiff's cause of action. Accordingly, denial of plaintiff's motion does not automatically preclude any evidence on the inadequacy of training or policies, because these claims are either explicit or can be inferred from the initial complaint to which there was no objection.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

Page 4

(App.32a-33a.)

Hamburg and Padasak eventually moved for summary judgment. The District Court granted the motion in September 2006.[FN2] *See* *627*Kline ex rel. Arndt v. Mansfield,* 454 F.Supp.2d 258 (E.D.Pa.2006). While the District Court read the prior opinion denying the motion for leave to file an amended complaint as precluding any constitutional claims other than Kline's equal protection and right to privacy claims, it nevertheless did address and grant summary judgment in favor of the Appellees on Kline's theory of a municipal policy or practice of deliberate indifference to the risk of sexual abuse and an alleged failure to train. Kline appealed this judgment as well as the District Court's order denying her motion for leave to file an amended complaint.

> FN2. The District Court also granted summary judgment in favor of Mansfield on the federal claims and declined supplemental jurisdiction over the remaining state law claims. Kline does not appeal these decisions.

### III.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review the denial of a motion to amend a complaint for abuse of discretion. *See Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir.2000) (citation omitted). We exercise plenary review over a District Court's order granting summary judgment. *See Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318, 322 n. 2 (3d Cir.2005).

### IV.

A. Motion for Leave to File an Amended Complaint

**\*\*3** [1] Kline argues that the District Court abused its discretion in denying the motion for leave to file an amended complaint. If the District Court had

denied Kline the opportunity to proceed on the "policy or practices" and "failure to train" claims she sought to pursue, we would agree that the District Court abused its discretion. The proposed amended complaint, in that regard, was not futile, and, as the District Court ruled, would not have prejudiced the Appellees. As we read the District Court's order denying the motion for leave to amend the complaint, however, it properly concluded that both of those claims were at least implicitly included in the original complaint. It allowed those claims to go forward.

In any event, Kline has no cause to complain about the process in the District Court. The only two claims that she wishes to litigate on appeal were considered by the District Court when the Appellees moved for summary judgment and were resolved on the merits. The fact that the District Court did not expressly recognize them as "substantive due process" claims is immaterial. Given that we have a final judgment on those claims, we can now proceed to address them on the merits.[FN3]

> FN3. Because we find that the District Court analyzed Kline's substantive due process claims on the merits, we need not reach Kline's argument that the District Court violated the law of the case doctrine.

B. Kline's Substantive Due Process Claims [FN4]

> FN4. The District Court also granted summary judgment in favor of the Defendants on Kline's equal protection and right to privacy claims. Kline does not appeal the decisions regarding those claims.

Kline raised two substantive due process claims. First, she asserted that Hamburg had a policy or custom of deliberate indifference towards her sexual abuse. Second, Kline asserted that Hamburg failed to properly train its employees to recognize and report signs of sexual abuse. The District Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624                                                                                           Page 5
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

granted summary judgment in favor of Hamburg on both of these claims. We consider each of these claims in turn.

#### i. Policy/Custom of Inaction

[2] Kline argues that the District Court erred in granting summary judgment because there were material issues of fact regarding whether Hamburg had a custom or policy of deliberate indifference **\*628** that violated her constitutional right to be free from sexual abuse. In *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court stated that a municipality can be liable under Section 1983 if its policy or custom causes a constitutional injury. With respect to a sexual abuse claim:

> [i]n order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and that the defendant acted with deliberate indifference to that abuse. In order to establish deliberate indifference on the part of the defendant, "something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm" to plaintiffs.

*Black by Black v. Indiana Area Sch. Dist.,* 985 F.2d 707, 712-13 (3d Cir.1993)(quoting *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1025 (3d Cir.1991)).

Kline conceded that neither she, nor her mother, complained to any school official about Mansfield's conduct. Instead, Kline based her claim on the knowledge that school officials possessed regarding the contacts between her and Mansfield. For example, Kline noted that she was suspended from school after she skipped band rehearsal to be with Mansfield in his classroom. She also noted that teachers complained that she was spending too much time with Mansfield in his classroom. Fur-

thermore, she stated that her seventh grade teachers stated at one point that she was not to be in Mansfield's room for any reason. Finally, Kline stated that the school failed to enforce its policy of not allowing seventh grade students in the sixth grade hallway.

**\*\*4** Kline's evidence does not create a material issue of fact that Hamburg was deliberately indifferent. At best, it shows that Hamburg might have been negligent in failing to recognize a high risk of harm.[FN5] However, this does not create a material issue of fact with respect to this claim. *See id., cf., Shepard v. Kemp,* 912 F.Supp. 120, 127-28 (M.D.Pa.1995)(noting that officials were aware of reports that children were spending inordinate amount of time with teacher, but that there was no disclosure of any wrongdoing). Therefore, the District Court properly granted summary **\*629** judgment in favor of the Defendants on this claim.[FN6]

> FN5. On appeal, Kline compares her case to *Stoneking v. Bradford Area School District,* 882 F.2d 720 (3d Cir.1989), *Craig v. Lima City Schools Board of Education,* 384 F.Supp.2d 1136 (N.D.Ohio 2005) and *C.M. v. Southeast Delco School District,* 828 F.Supp. 1179 (E.D.Pa.1993). These cases are all distinguishable. In *Stoneking,* the record revealed complaints about sexual assaults of female students by teachers and staff. The vice-principal recorded these allegations in a secret file at home rather than in the teachers' personnel file. *See Stoneking,* 882 F.2d at 728-29.Additionally, the defendants continued to give the teachers excellent performance evaluations and discouraged and/or intimidated parents from pursuing their complaints. *See id.* Unlike *Stoneking,* the record in this case did not show that the school officials had notice of any sexual misconduct. *Craig* and *C.M.* are also similarly distinguishable. In *Craig,* teachers saw the plaintiff go into her teacher's classroom

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624                                                                                              Page 6
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))

with the lights out, the door closed and the shades drawn. Teachers also saw the plaintiff and her sexual abuser go to his van alone and leave school property together on a daily basis. The two would sit together on bus trips and cuddle underneath a blanket and fall asleep against one another. Furthermore, once the superintendent found out about the relationship between the teacher and the plaintiff, he wrote a memo and entitled it, "consensual sex." *See Craig,* 384 F.Supp.2d at 1148. In *C.M.,* the District Court noted that there was a student complaint about a teacher and that staff members complained to school officials that the teacher was a "depraved and dangerous" man. These complaints also disclosed the sexual overtones of the teacher's behavior. *See* 828 F.Supp. at 1185.

FN6. Much of the analysis supporting summary judgment for Hamburg also supports summary judgment for Padasak. In particular, Padasak knew only that Kline spent time in Mansfield's classroom when she was scheduled to be elsewhere. There is no record evidence that prior to Mansfield's eventual arrest, Padasak knew or should have known that Mansfield ever sexually abused Kline. Padasak's actions, therefore, do not amount to deliberate indifference to Kline's constitutional rights.

### ii. Failure to Train

Next, Kline asserts that Hamburg failed to properly train its employees to spot and report signs of sexual abuse. "[I]n the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under § 1983." *Reitz v. County of Bucks,* 125 F.3d 139, 145 (3d Cir.1997)(citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Failure to train can be the basis for Ham-

burg's liability if the failure to train reflects a deliberate or conscious choice by Hamburg. *See City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197. To attach liability to Hamburg, the identified deficiency in the training program must be closely related to the ultimate injury. *See id.* at 391, 109 S.Ct. 1197. Proving that an injury could have been avoided if a school official had better or more training is not enough to show municipal liability. *See id.* Otherwise, "[s]uch a claim could be made about almost any encounter resulting in injury." *Id.*

"Establishing municipal liability on a failure to train claim under § 1983 is difficult." *Reitz,* 125 F.3d at 145. "Failure to train ... municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *See Berg v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir.2000)(per curiam)(citing *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 408-09, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). While it is possible to maintain a failure to train claim without showing a pattern, the Supreme Court has stated that the burden on a plaintiff in such a case is high. *City of Canton* "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan County,* 520 U.S. at 409, 117 S.Ct. 1382. Indeed, the Supreme Court noted [in the context of a failure to train law enforcement case]:

in a narrow range of circumstances, a violation of federal rights may be a highly predicable consequence of a failure to equip law enforcement officers with specific tools to handle recurrent situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train an officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

violation of a specific constitutional or statutory right.

**\*\*5** *Id.*[FN7] Kline raised her failure to train claim under both theories.

> FN7. For example, arming police officers without training them in the constitutional limits of using the arms is an example of deliberate indifference to an obvious risk. *See Berg*, 219 F.3d at 276 (citing *City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197).

**\*630** [3] First, Kline argues that additional training was necessary given the rampant sexual misconduct that was occurring within the School District. Kline's evidence does not create a material issue of fact that there was a pattern of sexual abuse such that Hamburg was deliberately indifferent in failing to institute additional training to its staff. Upon reviewing the record, Kline's pattern evidence is far too attenuated from her circumstances to show that there was a pattern of sexual abuse that necessitated Hamburg institute training to its employees to spot signs of sexual abuse. Furthermore, Kline's reliance on instances of possible sexual abuse that were unknown to Hamburg is also misplaced. Because this evidence was unknown, the failure to train school officials could not be perceived as a conscious or deliberate choice on Hamburg's part. *See City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197. Finally, Kline relies on the evidence of her expert, Dr. Kent. Dr. Kent stated that additional training might have prevented Kline from being sexual abused by Mansfield. This evidence does not create a material issue of fact with respect to this claim. Indeed, as previously stated, the fact that further training might have prevented constitutional injury, does not, in and of itself establish a failure to train claim. *See id.* at 392.

Because Kline failed to show that Hamburg's failure to train its officials to spot signs of sexual abuse caused a pattern of sexual abuse, she can only proceed under the narrow theory described in *Bryan*

*County.* In support of this theory, Kline relies on *Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992). *Walker* is distinguishable. *Walker* involved a motion to dismiss as opposed to summary judgment. The plaintiff in that case alleged that the police department failed to train and supervise police officers in their obligation not to commit or suborn perjury. *See id.* at 298. The Second Circuit reversed, not on the narrow theory described in *Bryan County,* but because the plaintiff should have been allowed to show a pattern of police misconduct. *See Walker,* 974 F.2d at 299-300. It stated that because not committing perjury was obvious to all without any further training or supervision, the failure to train was generally not so likely to produce a wrong decision supporting an inference of deliberate indifference by the city in the need to train or supervise. *See id.*

Unlike *Walker,* Kline was given the opportunity to show a pattern of sexual abuse. For the reasons previously stated, she failed to show such a pattern. Additionally, because not committing the crime of sexually abusing a child is obvious, the failure of Hamburg to train its employees to spot signs of sexual abuse such as Mansfield's "grooming" methods was not deliberately indifferent. *See, e.g., id.* at 299-300.

Finally, Kline argued that Hamburg failed to train its employees on reporting sexual abuse. However, there is no evidence that any school official knew of the sexual abuse that was occurring between Mansfield and Kline. Therefore, the District Court properly entered summary judgment in favor of the Defendants on Kline's failure to train claim.

## V.

**\*\*6** In conclusion, the District Court did not err in granting summary judgment in favor of Hamburg and Padasak on Kline's substantive due process claims. We will affirm the District Court's judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

255 Fed.Appx. 624
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)), 230 Ed. Law Rep. 183
**(Cite as: 255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3 (Pa.)))**

C.A.3 (Pa.),2007.
Kline ex rel. Arndt v. Mansfield
255 Fed.Appx. 624, 2007 WL 4171108 (C.A.3
(Pa.)), 230 Ed. Law Rep. 183

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX F

Westlaw.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

Page 1

**H**
Ms. K v. City of South Portland
D.Me.,2006.

United States District Court,D. Maine.
MS. K, Mother and Next Friend of S.B., a Minor
Plaintiff,
v.
CITY OF SOUTH PORTLAND, et al., Defendants.
**No. Civ. 04-275-P-S.**

Jan. 3, 2006.

**Background:** Mother of special education student
brought action against school district defendants,
alleging violations of federal and state law resulting
in injuries to student, who slipped and fell on a
patch of ice on the sidewalk after exiting school bus
and walking toward the school. Defendants moved
for summary judgment.

**Holdings:** The District Court, Singal, Chief Judge,
held that:
(1) icy sidewalk leading from the regular school
bus into high school did not constitute a violation
of the Americans with Disabilities Act (ADA);
(2) school district was not liable under § 1983 for
injury sustained by special education student since
there was no showing that alleged constitutional vi-
olation was causally linked to an actual policy, cus-
tom, or failure to train;
(3) sidewalk near a public school did not constitute
an "appurtenance" within meaning of Maine Tort
Claims Act exception to immunity; and
(4) for equal protection purposes, non-wheelchair
using special education students were not similarly
situated to wheelchair-using special education stu-
dents with regard to manner in which school district
chose to transport such students to school.

Motion granted.

West Headnotes

**[1] Civil Rights 78 ☞1033(1)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1033 Discrimination in General
                78k1033(1) k. In General. Most Cited
Cases
A civil rights plaintiff can demonstrate intentional
discrimination by showing personal animosity or
discriminatory animus; alternatively, a plaintiff can
show intentional discrimination by acting with at
least deliberate indifference to the strong likelihood
that a violation of federally protected rights would
result.

**[2] Schools 345 ☞155.5(5)**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k155.5 Handicapped Children, Pro-
ceedings to Enforce Rights
                345k155.5(5) k. Judgment and Relief;
Damages, Injunction, and Costs. Most Cited Cases
Compensatory damages generally are not available
for claims under Title II of the Americans with Dis-
abilities Act (ADA) if those claims are based upon
an underlying violation of the Individuals with Dis-
abilities Education Act (IDEA). Americans with
Disabilities Act of 1990, § 202, 42 U.S.C.A. §
12132; Individuals with Disabilities Education Act,
§ 601 et seq., 20 U.S.C.A. § 1400 et seq.

**[3] Civil Rights 78 ☞1021**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1016 Handicap, Disability, or Illness
            78k1021 k. Physical Access and Mobility;
Carriers. Most Cited Cases
Icy sidewalk leading from the regular school bus
into high school, which caused special education

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
**(Cite as: 407 F.Supp.2d 290)**

Page 2

student's injury, did not constitute a violation of the Americans with Disabilities Act (ADA); icy sidewalk constituted a hazard for the disabled and non-disabled alike, and did not rise to the level of a permanent barrier to the disabled. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

**[4] Civil Rights 78 ☜1055**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1055 k. Publicly Assisted Programs. Most Cited Cases
To prevail on a claim under Rehabilitation Act, a plaintiff must establish that (1) he is a "handicapped individual"; (2) he is "otherwise qualified" for participation in the program; (3) the program receives federal financial assistance; and, (4) he was denied the benefits of or subject to discrimination under the program. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794.

**[5] Civil Rights 78 ☜1017**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1016 Handicap, Disability, or Illness
         78k1017 k. In General. Most Cited Cases
A claim brought under Rehabilitation Act is interpreted in the same manner as a claim brought under the Americans with Disabilities Act (ADA). Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

**[6] Civil Rights 78 ☜1351(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(2) k. Education. Most Cited

Cases

**Civil Rights 78 ☜1352(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
            78k1352(2) k. Education. Most Cited
Cases
School district was not liable under § 1983 for injury sustained by special education student who fell on icy sidewalk leading from the regular school bus into high school since there was no showing that alleged constitutional violation was causally linked to an actual policy, custom, or failure to train; practice of assigning only high school students utilizing wheelchairs to ride the wheelchair accessible buses did not constitute a municipal custom of denying any form of special education transportation to all students who qualified for it and no showing that school district Defendants actually chose a training policy with deliberate indifference toward special education children. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☜1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
In order to attach liability to a municipality under § 1983 on basis of a policy, a plaintiff must point to a policy, not a violation of a policy, as the source of the constitutional violation. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☜1351(1)**

78 Civil Rights
   78III Federal Remedies in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
**(Cite as: 407 F.Supp.2d 290)**

Page 3

78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351    Governmental    Ordinance, Policy, Practice, or Custom
78k1351(1) k. In General. Most Cited Cases
For § 1983 liability to stem from a municipal custom, the custom must be attributable to the municipality and must also be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice; custom must also have been both the cause and the moving force behind the deprivation of constitutional rights. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⇐1352(1)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
78k1352(1) k. In General. Most Cited Cases
For municipal liability under § 1983 to stem from failure to train, the plaintiff must show an actual policy of inadequate training, where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need; plaintiff must also demonstrate that a municipality deliberately chose an inadequate training program. 42 U.S.C.A. § 1983.

**[10] Schools 345 ⇐89.5(2)**

345 Schools
345II Public Schools
345II(F) District Liabilities
345k89.5 Condition of Premises
345k89.5(2) k. Condition of Grounds. Most Cited Cases
Sidewalk near a public school did not constitute an

"appurtenance" within meaning of Maine Tort Claims Act exception to immunity for a governmental entity's negligent acts or omissions in the construction, operation, or maintenance of any public building or the appurtenances to any public building, and therefore school district was immune from liability for failing to clear snow or ice from the sidewalk. 14 M.R.S.A. § 8104-A(2).

**[11] Parent and Child 285 ⇐7(1)**

285 Parent and Child
285k7 Actions for Injuries To, Loss of Services, Control, or Society of Child
285k7(1) k. Right of Action in General. Most Cited Cases
Maine law precluded mother's recovery for the loss of consortium of her injured son. 14 M.R.S.A. § 302.

**[12] Parent and Child 285 ⇐7(1)**

285 Parent and Child
285k7 Actions for Injuries To, Loss of Services, Control, or Society of Child
285k7(1) k. Right of Action in General. Most Cited Cases
Parent could not recover under Maine law for loss of the services or earnings of her child where there was no evidence that child performed any services or collected any earnings. 14 M.R.S.A. § 303.

**[13] Constitutional Law 92 ⇐4215**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)8 Education
92k4213 Disabled Students
92k4215 k. Notice and Hearing; Proceedings and Review. Most Cited Cases
(Formerly 92k278.5(7))
Generally, any person claiming violations of federal and state requirements for special education is entitled to a due process hearing in which she is af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290                                                                                    Page 4
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

forded the opportunity to respond, explain, and de-
fend. U.S.C.A. Const.Amend. 14; Individuals with
Disabilities Education Act, § 615 et seq., 20
U.S.C.A. § 1415 et seq.

**[14] Constitutional Law 92 €══4215**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)8 Education
                92k4213 Disabled Students
                    92k4215 k. Notice and Hearing;
Proceedings and Review. Most Cited Cases
    (Formerly 92k278.5(7))

**Schools 345 €══155.5(1)**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k155.5 Handicapped Children, Pro-
ceedings to Enforce Rights
                345k155.5(1) k. In General. Most
Cited Cases
Special education student's mother received due
process with respect to student's due process hear-
ing where she was given an opportunity to respond,
explain, and defend her position regarding student's
transportation at both the pre-hearing conference
and the hearing itself. U.S.C.A. Const.Amend. 14;
Individuals with Disabilities Education Act, § 615
et seq., 20 U.S.C.A. § 1415 et seq.; 20-A M.R.S.A.
§ 7202 et seq.

**[15] Constitutional Law 92 €══3159**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(B) Particular Classes
            92XXVI(B)3 Disability or Disease, Phys-
ical or Mental
                92k3157 Education
                    92k3159 k. Students. Most Cited
Cases

    (Formerly 92k242.2(6))

**Schools 345 €══159.5(4)**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k159.5 Transportation of Pupils to and
from Schools or Provisions in Lieu Thereof
                345k159.5(4) k. Handicapped Chil-
dren. Most Cited Cases
For equal protection purposes, special education
students who did not use wheelchairs were not sim-
ilarly situated to special education students who did
use wheelchairs with regard to manner in which
school district chose to transport such students to
school. U.S.C.A. Const.Amend. 14.

**[16] Conspiracy 91 €══2**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Li-
ability Therefor
            91k1 Nature and Elements in General
                91k2 k. Combination. Most Cited Cases
Single legal entity cannot form a § 1985 conspiracy
with itself. 42 U.S.C.A. § 1985.

**[17] Schools 345 €══148(2.1)**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k148 Nature of Right to Instruction in
General
                345k148(2) Handicapped Children and
Special Services Therefor
                    345k148(2.1) k. In General. Most
Cited Cases
An individualized education program (IEP) is not a
legally binding contract.

**\*292** Peter Clifford, Hodsdon & Clifford, LLC,
Kennebunk, ME, for Plaintiff.
Edward R. Benjamin, Jr., Thompson & Bowie,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
**(Cite as: 407 F.Supp.2d 290)**

Page 5

Melissa A. Hewey, Amy K. Tchao, Drummond, Woodsum & Macmahon, David P. Very, Norman, Hanson & Detroy, Portland, ME, for Defendants.

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SINGAL, Chief Judge.

Before the Court is Defendants' Motion for Summary Judgment (Docket # 27). Through this motion, Defendants seek summary judgment on ten counts of Plaintiff's eleven-count Amended Complaint (Docket # 17).[FN1] For the reasons laid out below, the Court GRANTS Defendants' Motion for Summary Judgment.

> FN1. Count I of Plaintiff's Amended Complaint is an appeal pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400*et seq.* Because Plaintiff has the burden of going forward on that appeal, Defendants are not moving for summary judgment on Count I at this time. Rather, the Court has already established a separate briefing schedule for resolving this claim (Docket # 62).

### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that **\*293** there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida-Gonzalez v. Tirado-Delgado,* 990 F.2d 701, 703 (1st Cir.1993). The court views the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See McCarthy v. Northwest*

*Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni v. Potter,* 369 F.3d 594, 598 (1st Cir.2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

### II. BACKGROUND

Plaintiff Ms. K is the mother of S.B., a minor. S.B. has a number of physical and mental disabilities, including cerebral palsy and cognitive deficits. Until November 2004, S.B. was enrolled in South Portland public schools. Because of his disabilities, S.B. participated in South Portland's special education program, and a Pupil Evaluation Team ("PET") was required to annually draw up an Individualized Education Program ("IEP") to address his needs, including his transportation needs. Throughout middle school, S.B.'s IEP called for "special education transportation," and, pursuant to this designation, S.B. was transported on a bus carrying only special education students. (S.B.'s Individualized Education Program ("IEP") of November 4, 2003 (Ex. 1 to Docket # 43).) This bus carried S.B. dir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

Page 6

ectly from his home to the Memorial Middle School's handicapped-accessible ramp.

S.B.'s IEP was not revised between the time he completed middle school and began high school. However, during the summer of 2003, shortly before S.B. began ninth grade at South Portland High School, his mode of transportation was changed. Sheila Godin, a bus system scheduler and dispatcher for the South Portland School Department, decided to place S.B. on a regular bus in order to reduce the time he would spend in transit. At the time she made this decision, Ms. Godin has not seen S.B.'s IEP. She informed Ms. K of the change, but does not recall if she spoke with anyone else regarding S.B.'s transportation. S.B. was placed on a bus driven by Robert Packer, who was not aware that S.B. was a special education student. S.B. sat in the front seat of the bus and got off the bus first, but otherwise received no special accommodation. The bus dropped students off *294 some distance from the high school's main entrance.

In accordance with this transportation plan, on the morning of December 12, 2003, S.B., then a 15-year-old ninth grader, was transported to South Portland High School. He exited the bus and, while walking toward the school, slipped and fell on a patch of ice on the sidewalk. He suffered severe injuries leading to multiple surgeries, including a hip fusion. When he returned to school on January 5, 2004 he was provided with door-to-door transportation. In July of 2004, a Pupil Evaluation Team ("PET") met regarding S.B.'s IEP and amended the IEP to explicitly require door-to-door transportation. On September 24, 2004, Ms. K filed a Dispute Resolution Request Form with the Due Process Office of the State of Maine Department of Education, initiating a special education due process hearing. (*See K & B v. South Portland School Dept.*, No. 04.132H (Nov. 22, 2004) (Ex. 1 to Docket # 1) at 1.) She alleged that the South Portland School Department violated a number of S.B.'s constitutional, statutory, and common-law rights. *Id.* at 6.

At the pre-hearing conference before a Due Process

Office hearing officer on October 19, 2004, the South Portland School Department made a motion to dismiss Ms. K's administrative complaint, and the hearing officer gave both parties an opportunity to submit written arguments on the motion. *Id.* at 3. As a result of these written submissions, the hearing officer dismissed a number of the issues contained in Ms. K's "Statement of Issues." *Id.*

On November 4, 2004, the hearing officer conducted a hearing on the remaining issues. He issued his nine-page report, finding against the Plaintiff, on November 22, 2004. As explained in the report, the hearing officer determined that a number of the remedies sought by the Plaintiff, including monetary damages, injunctive relief, attorney's fees, and rulings on constitutional rights, were beyond the hearing officer's jurisdiction. With respect to Plaintiff's request that S.B.'s IEP be amended to clarify that S.B. was entitled to door-to-door transportation, the hearing officer found that the present IEP was clear as to the services that S.B. was to receive. *Id.* at 8. In addition, the hearing report noted that the family moved out of the South Portland School District a week prior to the decision being issued. *Id.* In light of this change in circumstances, the hearing officer declined to reach the merits of the request for amendment of the IEP, noting that it would be futile to order South Portland to make changes to S.B.'s IEP when S.B. was attending school in another district and was covered under another IEP. *Id.* at 8-9.

On December 15, 2004, Plaintiff filed her Complaint (Docket # 1), which alleged that, by moving S.B. off the special education bus and allowing him to walk over an icy sidewalk from the regular bus into the high school, various defendants had violated the Individuals with Disabilities in Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, 42 U.S.C. § 1983, the Maine Civil Rights Act, and 42 U.S.C. § 1985. It also claimed that these defendants had acted negligently, breached their contract with Plaintiff, deprived Plaintiff of S.B.'s consorti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

Page 7

um, and violated Plaintiff's due process and equal protection rights. On March 21, 2005, Plaintiff filed an Amended Complaint (Docket # 17), which clarified that Plaintiff was pressing the above claims against the following Defendants: the City of South Portland; the South Portland School Department; Kathleen Fries, Director of Special Education for the South Portland School Department; Wendy Houlihan, Superintendent of the *295 South Portland School Department; Philip Thompson, a special education teacher at South Portland High School; and Robert Packer, a bus driver for the South Portland School Department (together, "Defendants").

Defendants now seek summary judgment in their favor on all but one of Plaintiff's eleven claims thereby reserving only the IDEA claim for a separate determination by the Court.

### III. DISCUSSION

#### A. Americans with Disabilities Act (Count III)

To recover under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132et seq., a Plaintiff must show that he

(i) is a qualified individual with a disability; (ii) was excluded from participation in, or denied the benefits of, a public entity's services, programs or activities or was otherwise discriminated against; and (iii) the exclusion or denial of benefits was by reason of disability.

*Badillo Santiago v. Andreau-Garcia,* 70 F.Supp.2d 84, 89 (D.P.R.1999).

[1] Here Plaintiff seeks compensatory damages, which are available only in cases of intentional discrimination. *See,e.g.Nieves-Marquez v. Puerto Rico,* 353 F.3d 108, 126 (1st Cir.2003). Plaintiff agrees with the Defendants that this Count is "rooted in the concept of purposeful or intentional discrimination." (Pl.'s Resp. in Opp'n (Docket # 42) at 13.) A plaintiff can demonstrate intentional dis-

crimination by showing personal animosity or discriminatory animus. *SeeFerguson v. City of Phoenix,* 157 F.3d 668, 675 (9th Cir.1998). Alternatively, a plaintiff can show intentional discrimination by acting with "at least deliberate indifference to the strong likelihood that a violation of federally protected rights [would] result." *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir.1998).

[2][3] Defendants argue that "there is no evidence in this record that any of the Defendants engaged in intentional discrimination." (Defs.' Mot. For Summ. J. (Docket # 27) at 20.) In fact, in her response to Defendant's Motion for Summary Judgment, Plaintiff does not allege a single material fact that would point to intentional discrimination, and claims only that Defendants failed to provide an accessible walkway.[FN2] Thus, the Court concludes that there is not evidence that would allow a reasonable jury to find intentional discrimination and thereby award Plaintiff compensatory damages on the ADA claim.

> FN2. Moreover, compensatory damages generally are not available for claims under Title II of the ADA if those claims are based upon an underlying violation of the IDEA. *SeeNieves-Marquez,* 353 F.3d at 125. Although not discussed at length by the parties, to the extent that any of Plaintiff's ADA claims are rooted in the notion that Defendants did not comply with the IDEA, the Court finds that compensatory damages are not available on Plaintiff's ADA claim.

Moreover, the icy sidewalk alone does not constitute a violation of the ADA. The icy sidewalk that led to S.B.'s unfortunate injury constituted a hazard for the disabled and non-disabled alike, and did not rise to the level of a permanent barrier to the disabled. Therefore, the conditions under which S.B. was injured are not analogous to the conditions found in *Parker v. Universidad de Puerto Rico,* 225 F.3d 1 (1st Cir.2000) (recognizing recovery for per-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290                                                           Page 8
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

sonal injury damages under the ADA over a per-
manently inaccessible walkway). Absent any evid-
ence creating a trialworthy issue as to this ADA
claim, the Court *296 GRANTS Summary Judg-
ment to all of the Defendants on Count III.[FN3]

> FN3. Even if a trialworthy issue were to
> exist on Plaintiff's ADA claim, the Court
> would grant summary judgment on behalf
> of the individual employee defendants. The
> guidance of the courts in neighboring cir-
> cuits suggests that the ADA does not au-
> thorize a cause of action against the indi-
> vidual employee defendants in this case.
> See Gough v. E. Me. Dev. Corp., 172
> F.Supp.2d      221,      224      (D.Me.2001)
> (citing Tomka v. Seiler Corp., 66 F.3d
> 1295, 1317 (2d Cir.1995); Sheridan v. E.I.
> DuPont de Nemours & Co., 100 F.3d 1061,
> 1078 (3d Cir.1996); Lissau v. S. Food Ser-
> vice, Inc., 159 F.3d 177, 181 (4th
> Cir.1998); Indest v. Freeman Decorating,
> Inc., 164 F.3d 258, 262 (5th Cir.1999);
> Wathen v. Gen. Elec. Co., 115 F.3d 400,
> 405 (6th Cir.1997); Silk v. City of Chicago,
> 194 F.3d 788, 797 n. 5 (7th Cir.1999);
> Spencer v. Ripley County State Bank, 123
> F.3d 690, 692 (8th Cir.1997); Miller v.
> Maxwell's Int'l, Inc., 991 F.2d 583, 587-88
> (9th Cir.1993); Butler v. City of Prairie
> Village, Kan., 172 F.3d 736, 744 (10th
> Cir.1999); Busby v. City of Orlando, 931
> F.2d 764, 772 (11th Cir.1991); Gary v.
> Long, 59 F.3d 1391, 1399 (D.C.Cir.1995)).

**B. Section 504 of the Rehabilitation Act (Count II)**

[4] To prevail on a claim under Section 504, a
plaintiff must establish that

(1) he is a "handicapped individual"; (2) he is
"otherwise qualified" for participation in the pro-
gram; (3) the program receives "federal financial
assistance"; and, (4) he was "denied the benefits
of" or "subject to discrimination" under the pro-

gram.

*Darian v. University of Mass. Boston,* 980 F.Supp.
77, 84-85 (D.Mass.1997) (internal citations omit-
ted).

[5] A claim brought under Section 504 is inter-
preted in the same manner as a claim brought under
the ADA. *See, e.g., Theriault v. Flynn,* 162 F.3d 46,
48 n. 3 (1st Cir.1998). Following the ADA analysis
above, the Court similarly fails to find any evidence
of intentional discrimination. Thus, the Court
GRANTS Summary Judgment to the Defendants as
to Count II.

**C. 42 U.S.C. § 1983 (Count VII)**

[6][7] Under 42 U.S.C. § 1983, Defendants will be
liable if Plaintiff can demonstrate "a direct causal
link" between a "policy or custom" of the School
Department and an alleged constitutional depriva-
tion. *City of Canton v. Harris,* 489 U.S. 378, 385,
109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Liability
can stem from an actual policy, a custom, or a mu-
nicipality's failure to train its employees. Plaintiff
initially argues that the Defendants are liable be-
cause they are violating three actual municipal
policies: "1) the IEP; 2) the written policy requiring
transport of special education students in accord
with PET recommendations; and 3) the written
policy requiring supervision of all students at all
times." (Pl.'s Resp. in Opp'n (Docket # 42) at 7.)
Defendants properly note that under § 1983, a
Plaintiff must point to a policy, not a violation of a
policy, as the source of the constitutional violation
in order to attach liability. Plaintiff here fails to do
so, and thus this Court does not find any liability
stemming from a policy of the Defendants.

[8] Plaintiff also claims that there is municipal cus-
tom in place that is directly linked to a violation of
S.B.'s constitutional rights. For liability to stem
from a custom, the custom "must be attributable to
the municipality" and must also "be so well settled
and widespread that the policymaking officials of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

Page 9

the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted). The custom must also have been both "the cause of and the moving force *297 behind the deprivation of constitutional rights." *Id.*

Plaintiffs claim that Defendants had a custom of moving all non-wheelchair bound high school students to non-wheelchair buses stems almost entirely from the deposition of Sheila Godin. Plaintiff argues that Godin testified that "in the past, she has routinely taken special education children on the wheelchair bus and switched them to regular busing." (Pl.'s Statement of Material Fact (Docket # 38) at ¶ 10). Plaintiff also argues that the decision to change S.B.'s bus assignment "was made without any authorization from the special education director or the Pupil Evaluation Team (PET)." (Pl.'s Statement of Material Fact (Docket # 38) at ¶ 57). These arguments mischaracterize and overstate Godin's testimony.[FN4] Taken in a light most favorable to the Plaintiff, at most, Godin's testimony establishes that she sought to shorten the length of time students spent commuting on the school bus.

> FN4. In response to a question asking her whether there were "instances prior to the decision in this case to switch S.B. in which you made that decision to take somebody from a wheelchair bus to a regular bus without checking with somebody from special ed?" Godin responded "No, I generally check with somebody. I just don't recall all the times who I'm checking with and [sic] right at this moment." (Dep. of Sheila Godin (Ex. 1 to Docket # 37) at 60.)

Plaintiff also does not address Defendants' repeated contention that a wheelchair accessible bus is not the only form of "special education" transportation, and that sitting in the front seat of a bus, and exiting the bus first, is also a form of "special education transportation." Even assuming the truth of

Plaintiffs allegation that only high school students utilizing wheelchairs were assigned to ride the wheelchair accessible buses, this practice does not constitute a municipal custom of denying any form of special education transportation to all students who qualify for it. Special education transportation could involve placing students on non-wheelchair buses with additional accommodations or assistance.[FN5] In short, the Court does not find that a custom existed that would give rise to liability under § 1983.

> FN5. This could include having a student sit in the front seat of the bus, placing an educational aid on the bus, or allowing a student to exit the bus first.

[9] Finally, Plaintiff also alleges that the South Portland School Department violated § 1983 by failing to train its employees in providing handicapped-accessible transportation. (Pl.'s Am. Compl. (Docket # 17) at 9.) For liability to stem from failure to train, the Plaintiff must show an actual policy of inadequate training, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."*City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. To prevail on a § 1983 claim based on inadequate training, Plaintiff must also demonstrate that a municipality deliberately chose an inadequate training program. *Id.* at 427, 109 S.Ct. 1197. Plaintiff fails to do so. Absent any showing of previous harm arising from this training policy, or any evidence of deliberation on the school department's part, Plaintiff fails to demonstrate an issue of material fact as to whether the Defendants actually chose a policy with deliberate indifference toward special education children.

As Plaintiff does not demonstrate a constitutional violation that can be causally linked to an actual policy, custom, or failure*298 to train, the Court GRANTS Defendants summary judgment on Count VII.[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290                                                                           Page 10
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
**(Cite as: 407 F.Supp.2d 290)**

FN6. As the Court has already found for the Defendants on this Count, there is no need to reach the issue of qualified immunity. However, the Court does find that all of the individual defendants in this case enjoy qualified immunity from liability on Count VII. Officials enjoy such immunity so long as their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court finds no such violation of clearly established rights in this case.

## D. Maine Civil Rights Act (Count V)

Claims brought under the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681 *et. seq.,* are interpreted in the same manner as claims brought under 42 U.S.C. § 1983, as the state statute is modeled upon the federal. *See, e.g.,Jenness v. Nickerson,* 637 A.2d 1152, 1158 (Me.1994); *Forbis v. City of Portland,* 270 F.Supp.2d 57, 61 (D.Me.2003). Plaintiff, having failed to demonstrate a policy, custom, or policy of failure to train that could lead to recovery under § 1983, similarly fails to create a trialworthy issue under the MCRA. The Court therefore GRANTS Defendants summary judgment on Count V.[FN7]

FN7. The Court's qualified immunity analysis is also identical. Government officials entitled to qualified immunity under § 1983 are likewise entitled to qualified immunity under the MCRA. *Jenness,* 637 A.2d at 1159. Having found that the individual defendants would be entitled to qualified immunity under § 1983, the Court similarly finds that such defendants would be entitled to qualified immunity under the MCRA.

## E. Negligence (Count VI)

Plaintiff seeks to recover for Defendants' alleged negligence in transporting S.B. and negligence in maintaining the sidewalk where S.B. was injured. Before reaching the question of negligence, the Court must first determine whether Defendants enjoy immunity from such claims.

[10] Under the Maine Tort Claims Act, 14 M.R.S.A. § 8101-A(4), governmental entities are not liable "for any defect, lack of repair or lack of sufficient railing" on sidewalks. In addition, Maine statute provides that:

No town is liable to an action for damages to any person on foot on account of snow or ice on any sidewalk or cross-walk nor on account of the slippery condition of any sidewalk or crosswalk.

23 M.R.S.A. § 3658.

Plaintiff argues that Defendants' actions fall under two exceptions to these statutory grants of immunity: 14 M.R.S.A. § 8104-A(1)(A), which makes a governmental entity liable "for its negligent acts or omissions in its ownership, maintenance or use of any" motor vehicle, and 14 M.R.S.A. § 8104-A(2), which creates liability for a governmental entity's "negligent acts or omissions in the construction, operation or maintenance of any public building or the appurtenances to any public building." Neither of these exceptions apply in this case.

Maine courts have consistently held that paved walkways, including sidewalks and fire lanes used for pedestrian traffic, are not appurtenances. *SeeCampbell v. Washington County Technical College,* 1999 WL 1995217, *3-4, 1999 U.S. Dist. Lexis 16842, *7-12 (D.Me.1999), *aff'd*219 F.3d 3 (1st Cir.2000); *O'Keefe v. Maine Technical College Systems,* 1999 Me.Super. Lexis 99, *3-5 (Me.Super.Ct.1999). S.B. was injured on a sidewalk near a public school. As a sidewalk does not constitute an appurtenance, Defendants retain their immunity and cannot be found *299 liable for failing to clear snow or ice from the sidewalk.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

Page 11

There is also no indication that there was any negligence in the ownership, maintenance, or use of the school bus that deposited S.B. at school. Plaintiff has not alleged any negligence in ownership or maintenance, but instead contends that Defendants' failure to use a ramp or wheelchair bus constitutes negligent operation or use. The Court disagrees. Notwithstanding the wisdom of transporting S.B. on a non-wheelchair bus, by all accounts the bus and its equipment were used exactly as they were intended to be used, and thus there is no trialworthy allegation of negligence.

For these reasons, the Court GRANTS Defendants summary judgment on Count VI.

**F. Loss of Consortium (Count VII)**

[11][12] Although Plaintiff claims damages stemming from the loss of consortium of her son, Maine law allows for recovery under such claims only for the loss of a spouse. *See* 14 M.R.S.A. § 302. As such, Plaintiff cannot recover under Section 302. In her response to Defendants' Motion for Summary Judgment, Plaintiff also attempts to make out a claim for loss of services under 14 M.R.S.A. § 303. (*See* Pl.'s Argument in Opp'n to Defs.' Mot. for Summ. J. (Docket # 42) at 6.) The Court questions the timeliness of this claim, and additionally finds it to be without merit. Section 303 allows a parent to "maintain an action for loss of the services or earnings" of a child. Here Plaintiff has not created any issue of material fact that could lead the Court to find that S.B. performed any services or collected any earnings.

Absent a trialworthy issue, the Court GRANTS Defendants summary judgment as to Count VII.

**G. Due Process (Count VIII)**

[13] Federal and state laws concerning special education outline the procedures a school district must follow in conducting a special education due process hearing. *See* 20 U.S.C. § 1415 *et seq.;* 20-A

M.R.S.A. § 7202 *et seq.* Generally, any person claiming violations of federal and state requirements for special education is entitled to a due process hearing in which she is afforded "the opportunity to respond, explain, and defend." *Gorman v. University of Rhode Island,* 837 F.2d 7, 12-13 (1st Cir.1988).

[14] Plaintiff's complaint seeks relief for due process violations, and complains that her right to be heard was violated when the hearing officer "dismissed the appeal for lack of jurisdiction because the school had allegedly already remedied the IEP problems." (Pl.'s Argument in Opp'n to Defs.' Mot. for Summ. J. (Docket # 42) at 17.) This is not an accurate description of the hearing officer's actions. The hearing officer stated that he was unable to reach the merits of the argument because he had no remedy available to him-the family had already moved outside the school district before the opinion issued. (*See K & B v. South Portland School Dept.*, No. 04.132H (Nov. 22, 2004) (Ex. 1 to Docket # 1) at 1.) Plaintiff was given an opportunity respond, explain, and defend her position at both the prehearing conference and the hearing itself. As such, this Court finds that Plaintiff did receive due process with respect to S.B.'s due process hearing. For this reason, the Court GRANTS Defendants summary judgment as to Count VIII.

**H. Equal Protection (Count IX)**

In order to prevail on a claim alleging a violation of the Equal Protection Clause of *300 the United States Constitution, a plaintiff must prove intentional or purposeful discrimination based upon his or her disability. *See Soto v. Flores,* 103 F.3d 1056, 1067 (1st Cir.1997), *cert. denied,* 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). First, Plaintiff must show that persons who were similarly situated to S.B. "in all relevant respects" were treated differently from him because of an unconstitutional classification. *Barrington Cove Ltd. Partnership v. Rhode Island Hous. & Mortgage Fin. Co.,* 246 F.3d 1, 8 (1st Cir.2001). In addition, Plaintiff must show

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
(Cite as: 407 F.Supp.2d 290)

that Defendants "selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.' " *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

Plaintiff has identified the group of similarly situated persons as special education students who were not wheelchair bound; Plaintiff alleges that these students "were intentionally and purposefully denied access to special education transportation." (Pl.'s Argument in Opp'n to Defs.' Mot. for Summ. J. (Docket # 42) at 15.)

[15] As a first hurdle, Plaintiff fails to allege that Defendants have been treating differently "persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Plaintiff argues that by being moved to the regular bus S.B. and all other non-wheelchair bound special education students were treated differently from all other similarly situated students. While Plaintiff does not clearly identify who these other similarly situated students are, it appears that Plaintiff is suggesting that non-wheelchair bound special education students are in all relevant respects similarly situated to wheelchair bound special education students and, thus, both groups should have been transported in the same manner. Quite simply, when it comes to transportation, all special education students capable of walking are not categorically the same as special education students who utilize wheelchairs. Thus, at the most basic level, Plaintiff has failed to demonstrate a genuine issue as to whether S.B. and other special educations students who were moved to regular busing were being treated differently because of an unconstitutional classification.

Even if Plaintiff had cleared this first hurdle, she still fails to meet a second element required to survive the summary judgment motion. Namely, Plaintiff fails to identify any evidence that might demonstrate that Defendants sought to move S.B. or any other special education students from handi-

capped-accessible buses "because of" the adverse effect the move would have on such students, as required under *Soto,* 103 F.3d at 1067-68. At most, Plaintiff has demonstrated that the school bus dispatcher moved special education students onto so-called "regular school buses" to reduce the time the children spent in transit or to "mainstream" them. (Pl.'s Argument in Opp'n to Defs.' Mot. for Summ. J. (Docket # 42) at 16.) There is no evidence that Defendants sought to move special education children to "regular school buses" because of any increased likelihood that children would be adversely affected by their new placements.

As such, Plaintiff fails to demonstrate any issue of material fact on the issue of equal protection, and the Court GRANTS Defendants summary judgment as to Count IX.

**I. 42 U.S.C. § 1985 (Count X)**

Plaintiff alleges that Defendants violated 42 U.S.C. § 1985 by engaging in a conspiracy to deprive S.B. of his due process and equal protection rights. The Court has already determined that Plaintiff cannot *301 prove a violation of S.B.'s rights to due process and equal protection in this case. For that reason, the Court has ruled that Defendants are entitled to summary judgment on Plaintiff's due process (Count VIII) and equal protection (Count IX) claims. In light of these rulings, it is clear that Plaintiff's claims of a conspiracy to commit these violations is without merit.

[16] In addition, Defendants have also argued that they are entitled to judgment on Count X as a matter of law since the named Defendants are not separate legal entities and a single legal entity cannot form a conspiracy with itself. *SeeHilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir.1994) (finding widespread agreement that school boards, administrators and employees are part of a single legal entity); *Faucher v. City of Auburn,* 465 A.2d 1120, 1120 n. * (Me.1983) (noting that Maine courts have found a city and its school department are a single

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 290                                               Page 13
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31 NDLR P 225
**(Cite as: 407 F.Supp.2d 290)**

legal entity). The Court notes that it would alternat-
ively find the Defendants were entitled to summary
judgment on Count X on this basis even if it found
that Plaintiff's claims for violations of due process
and equal protection could survive summary judg-
ment.

For these reasons, the Court GRANTS Defendants
summary judgment on Count X.

### J. Breach of Contract (Count XI)

[17] Plaintiff encounters a similar problem with re-
spect to Count XI. Plaintiff's Amended Complaint
contends that the South Portland School Depart-
ment has breached the transportation contract,
either express or implied, that it holds with each of
its students. Defendants offer extensive detailed
analysis, well supported by considerable case law,
in arguing that there existed neither an express nor
an implied contract between S.B. and the South
Portland School Department. (Defs.' Mot. For
Summ. J. (Docket # 27) at 16-18.) Defendants also
offered specific precedent demonstrating that an
IEP is not a legally binding contract (*SeeCarter v.
Florence,* 17 EHLR 452 (D.S.C.1991); *Parents v.
Bangor School Department,* Case No. 01.281,*http://
www.maine.gov/      educa      tion/speced/2001%
20hearings/01281% 20doc .doc* ).

The Court finds Defendants' analysis entirely per-
suasive. Plaintiff's response fails to create a trial-
worthy issue regarding the existence of an enforce-
able contract between the parties. In light of this
failure, there is no doubt that Defendants are en-
titled to summary judgment as to Count XI.

### IV. CONCLUSION

As explained above, the Court hereby GRANTS
Defendants' Motion for Summary Judgment
(Docket # 27) and ORDERS that summary judg-
ment be entered in favor of Defendants on Counts
II through XI.

SO ORDERED.

D.Me.,2006.
Ms. K v. City of South Portland
407 F.Supp.2d 290, 206 Ed. Law Rep. 191, 31
NDLR P 225

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.