IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JR, a Minor, by his mother EAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-cv-1120-MEF |
| | ) | (WO - Do not publish) |
| PIKE COUNTY BOARD OF | ) | |
| EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiff, who is mentally retarded and classified as a special education student, was sexually abused by his former band teacher, Defendant Charles Coon. He brings this suit though his mother against Coon, the Pike County Board of Education, and four school officials.[1] Coon failed to defend himself in this action, and consequently, the Clerk entered default against him. (Doc. # 15). The Court reserves ruling on Plaintiff's Motion for Default Judgment against Coon. (Doc. # 72). All other Defendants (the "Movants") filed a Motion for Summary Judgment, which is presently before the Court.

---

[1] Plaintiff also sued a number of fictitious defendants. Federal courts do not allow fictitious party practice. *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997) ("[F]ictitious party practice is not permitted in federal court."). Therefore, the fictitious defendants are due to be dismissed. *See, e.g.*, *Wiggins v. Risk Enterprise Mgmt. Ltd.*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D. Ala. 1998) (DeMent, J.) (dismissing *sua sponte* fictitious defendants).

(Doc. # 68).[2]

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under an act of Congress, 42 U.S.C. § 1983. The parties do not contest venue and personal jurisdiction, and the Court finds a sufficient basis for each.

## III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of

---

[2] Movants filed additional briefs in support of its Motion for Summary Judgment. (Docs. # 87 and 88). These briefs were submitted without leave from the Court, soon before the pretrial hearing. The Court did not consider them in rendering this Memorandum Opinion and Order. At the pretrial hearing, counsel for Movants withdrew these briefs after being told that the Court would consider them only if the Plaintiff had an opportunity to respond.

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## IV. FACTS AND PROCEDURAL BACKGROUND

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following relevant facts:

### A. Background and Parties

Plaintiff was a fifteen year old, tenth grade, special education student at Pike County High School ("PCHS") during the 2004-2005 school year. Plaintiff's special education disability designation was mental retardation. Dep. of Karen Berry (Doc. # 70-17, at 28).

The Defendants are the Pike County Board of Education ("PCBOE") and five school officials. Charles Coon ("Coon") was the band director at PCHS during the 2004-2005 school year. Dr. Mark Bazzell ("Bazzell") was the Superintendent of the PCBOE during the 2004-2005 school year. Dep. of Dr. Mark Bazzell (Doc. # 70-5, at 6-7). Terry Casey ("Casey") was Principal of PCHS in 2004. Aff. of Terry Casey (Doc. # 70-11, at 2). Buddy Pyron ("Pyron") succeeded Casey and was Interim Principal from January 3rd, 2005 through June of 2005. Aff. of Buddy Pyron (Doc. # 70-13, at 2). Robert McDaniel ("McDaniel") was Assistant Principal of PCHS during the 2004-2005 school year. Aff. of Robert McDaniel (Doc. # 70-9, at 2).

**B. Coon's conduct**

During the 2004-2005 school year, Coon sexually abused Plaintiff in the PCHS band room and at Plaintiff's home. (Doc. # 77-12, PX 19); (Doc. # 77-16, PX 34, at 20); (Doc. # 77-16, PX 35); (Doc. # 77-16, PX 36); (Doc. # 77-16, PX 37); (Doc. # 77-16, PX 40); (Doc. # 77-16, PX 41). PCBOE, Bazzell, Casey, Pyron, and McDaniel did not actually know that Coon sexually abused Plaintiff before Coon was arrested in July of 2005. However, Plaintiff claims that the PCBOE and its employees are liable under several legal theories partly because Coon's violations of school policies and procedures, as well as information from a police officer investigating Coon, should have alerted school officials to the possibility that Coon was sexually abusing a student. The Court will review Coon's conduct below.

**1. Driving students**

In 2004, Coon drove students in his private vehicle, and Casey and McDaniel knew he did so. Dep. of Robert McDaniel (Doc. # 70-10, at 32-33); Dep. of Terry Casey (Doc. # 70-12, at 40). BF and AH, whom Pyron knew were transported in Coon's vehicle, later were known to have been sexually abused. (Doc. # 70-12, at 47); (Doc. # 77-16, PX 33); (Doc. # 77-21, SX 3); Dep. of Robert Bradbury (Doc. # 70-16, at 12-13, 27-28). The school informally discouraged faculty members from transporting students in non-emergency situations, and the school had a written policy of not allowing student to leave campus with anyone without express written parental consent. (Doc. # 70-5, at

162); (Doc. # 77-3, PX 3, at 15-16).

Coon transported Plaintiff in his vehicle.  (Doc. # 70-12, at 47).  Plaintiff's mother witnessed Coon driving Plaintiff on the PCHS campus, and she also knew that Coon drove Plaintiff from school to home on a regular basis during the 2004-2005 school year. Dep. of Elizabeth Reed (Doc. # 70-18, at 22-23, 78-79).

### 2. Passes to leave class

According to Plaintiff's mother, Plaintiff told her that during the 2004-2005 school year, he left class with his teacher's permission and went to see Coon in the band room. (Doc. # 70-18, at 82-86).  Plaintiff's teachers deny that he left class early to go to the band room.  (Doc. # 70-5, at 64, 65).  Karen Berry, the special education coordinator for the PCBOE, investigated this aspect of the case, and testified that Plaintiff's teachers told her that this did not happen repeatedly.  (Doc. # 70-17, at 51).

### 3. Smoking on campus

At the beginning of the 2004-2005 school year, some students reported to Casey that Coon was smoking in the band room.  (Doc. # 70-12, at 34, 46).  Casey went to the band room and told Coon that school policy prohibited smoking on campus.  (*Id.* at 34). Casey warned Coon that he would take further action if Coon did not adhere to the policy. (*Id.*).  Casey reported the incident to Bazzell.  (*Id.* at 46).  Some time in the fall of 2004, guidance counselor Mona Watson caught Coon smoking on campus.  Dep. of Mona Watson (Doc. # 70-7, at 53-54).  She reported the incident to Casey.  (*Id.*).

6

### 4. Choking a student

In November of 2004, Coon grabbed one of his band students by the neck. (Doc. # 70-10, at 19). The student's parents reported the incident to McDaniel, who reported it to Pyron verbally and Bazzell in writing. (*Id.* at 19-20). McDaniel investigated the incident and issued a verbal warning to Coon, who apologized and admitted that he was angry and acted inappropriately. (*Id.*). The parents reached an "amiable agreement" with Coon, accepted Coon's explanation, and agreed to keep their child in the band. (*Id.*). For Bazzell, the incident did not raise questions about Coon's mental stability because Bazzell believed that it was "an isolated incident for which [Coon] knew and understood that it was inappropriate." (Doc. # 70-5, at 102,103, 124).

### 5. A student had Coon's phone

Also in November of 2004, McDaniel caught BF in possession of a cell phone that Coon owned. (Doc. # 70-10, at 24-27). The school prohibited students from possessing cell phones on campus. (*Id.*). McDaniel confiscated the phone and reported the incident to Casey, who reported it to Bazzell. (*Id.*); (Doc. # 70-12, at 42-43). The school's policy was that the phone can be returned either with the knowledge of the parent or to the parent. (Doc. # 70-5, at 105-106). BF told McDaniel that BF's father and Coon agreed that BF could use Coon's cell phone, and McDaniel returned the cell phone to Coon.

7

(Doc. # 70-10, at 26).[3]  The school officials viewed this as an isolated incident that did not raise a red flag because it was common for teachers to let students borrow their cell phones.  (Doc. # 70-5, at 106).

### 6. Smoking marijuana with students

Some time in late 2004 or early 2005, MAK, a student, informed his mother Polly King ("King") that Coon drove him around in his truck and offered him marijuana cigarettes.  Dep. of Polly King (Doc. # 70-20, at 11).  King contacted Officer Butch Phelps ("Phelps") of the Troy City Police Department drug task force, and Phelps told her to direct her concerns to school officials.  (*Id.* at 20-21, 31-32).

King met with McDaniel a few times and told him that Coon might be selling or giving drugs to students, and that there were two other boys in the vehicle with MAK when Coon offered marijuana.  (*Id.* at 16-17, 34).  King also had concerns about a failing grade that MAK received in Coon's class.  (Doc. # 70-10, at 21-22).  King said that if the grade was not "fixed," then she would report that Coon was smoking in his truck in the presence of a student.  (*Id.*).  McDaniel reported King's concerns to Pyron, who then briefed Bazzell.  (Doc. # 70-10, at 21-22). Pyron handed the investigation.  (*Id.* at 22). Pyron talked to Coon about the grade, which was corrected. Dep. of Buddy Pyron (Doc. # 70-15, at 27-29). Pyron also told Coon that he "can't be smoking on campus."  (*Id.*).

---

[3] BF's father also gave Coon permission to drive BF in Coon's vehicle.  (Doc. # 70-5, at 160-161).

King, who has experience dealing with sexually abused children, testified that during the 2004-2005 school year, she was concerned that Coon might be sexually abusing AH, another student, based on changes in AH's behavior that she observed. (Doc. # 70-20, at 25). King testified that she had no evidence that Coon sexually abused AH. (*Id.* at 36). Contrary to what Plaintiff's response brief suggests (Doc. # 75, at 13), there is no evidence that King reported this concern to McDaniel or other school officials. Rather, as Movants point out, the evidence from King's own deposition is that she did not mention anything about possible sexual abuse in her complaint to McDaniel. (Doc. # 70-20, at 11).

## C. Investigation into Coon's misconduct

On March 30, 2005, Officer Phelps talked to Bazzell. (Doc. # 70-5, at 132-33). Phelps received information from a confidential informant who reported that Coon and some students had used marijuana in Coon's vehicle. (*Id.* at 133-134). Phelps said that the following students were involved in the marijuana smoking: AH, JS, LD, AL, and TG. (*Id.* at 132-134). It is undisputed that Plaintiff was not mentioned in this report. Bazzell asked if there was anything else that he needed to know, and Phelps said that there was one student who was made fun of and referred to as Coon's "butt buddy," a term that Bazzell understood to have a sexual connotation, among other possible, nonsexual meanings. (*Id.* at 136-38); (Doc. # 70-3, at 6-7). Bazzell again asked if there was any information regarding other misconduct, and Phelps said there was not. (Doc. # 70-3, at

9

6).

On April 1, 2005, Bazzell put Coon on administrative leave. (*Id.* at 187); (Doc. #
70-4, PX 14, at 13). Bazzelll had Coon tested for marijuana, and the test came back
negative. Aff. of Dr. Mark Bazzell (Doc. # 70-3, at 7). Bazzell immediately commenced
an investigation into the allegations. He made a list of students to interview for the
investigation into the allegations about Coon. Bazzell added MAK and BF's names to the
list of names that Phelps provided. (*Id.* at 134-135, 138-139). Bazzell added MAK's
name because Phelps's report sounded similar to King's report, and Bazzell thought that
investigating Coon's prior misconduct could shed light on the current allegations. (*Id.* at
134-35). For the same reason, Bazzell added BF's name because of the incident where
BF possessed Coon's cell phone. (*Id.* at 138-139). Furthermore, Bazzell "had some
suspicion that BF would be possibly the person that Butch (Officer Phelps) was referring
to as the 'butt buddy.'" (*Id.* at 159-160).

On or about April 4, 2005, Bazzell assembled a team to investigate the allegations
in Phelps's report. This team consisted of PCHS Principal Pyron, PCHS Assistant
Principal McDaniel, and Carolyn Townsend, Principal of Banks Middle School, which is
another school where Coon worked. (*Id.* at 143-44, 155-58); (Doc. # 70-3, at 7); (Doc. #
70-13, at 5). Bazzell told them to investigate whether marijuana was used, which student
was referred to as Coon's "butt buddy," and whether any other inappropriate activity,
including sexual activity, had occurred involving any student. (*Id.* at 156). Pyron led the

investigation, which primarily involved interviewing students. (Doc. # 70-9, at 5). Pyron was aware that the allegations involved smoking marijuana and that Bazzell wanted to know the significance of the "butt buddy" reference. Dep. of Buddy Pyron (Doc. # 70-15, at 60); (Doc. # 70-13, at 5). Pyron interviewed all of the students who were thought by Bazzell and Pyron to have information. (Doc. # 70-13, at 4). He asked them about smoking, riding in the car, and any behavior that was "unbecoming a band director" or "inappropriate." (Doc. # 70-15, at 35-38, 42-43). He also asked students what they thought of Coon and how Coon was with students. (Doc. # 70-13, at 4). Pyron did not ask students whether Coon had touched them in an appropriate manner because he did not want to "lead them." (Doc. # 70-15, at 60-61).

At least one student confirmed that Coon smoked cigarettes with students and drove a student after school in Coon's vehicle. (Doc. # 70-3, at 8). No student confirmed that Coon used marijuana with students, and no student identified the "butt buddy." (*Id.*). Pyron testified that "[o]ne student responded that Charles Coon has his favorites – his butt buddy. But the student said this in the context that Charles Coon had his favorites – in my terminology, teacher's pet." (Doc. # 70-13, at 4). McDaniel, who did not interview students but was aware of the investigation and the "butt buddy" reference, understood the term to mean a teacher's pet or favorite, and to him, there was nothing to suggest that it had a sexual connotation. (Doc. # 70-9, at 5).

Bazzell discussed the findings with Phelps and Brundidge Police Department

11

Chief Moses Davenport, and they both agreed that nothing else could be done with the information they had, and it was appropriate to allow Coon to return  (*Id.* at 8-9).  It is undisputed that Plaintiff's name never came up in the investigation.  (Doc. # 70-5, at 186).

On April 8, 2005, Bazzell allowed Coon to return to work.  (Doc. # 77-11, PX 14, at 15).  Bazzell's reinstatement letter to Coon stated, in part, that the "investigation did reveal numerous reports that on several occasions you used cigarettes with students . . . and . . . numerous reports of students being transported in your personal vehicle."  (*Id.*).  Bazzell stated that smoking with students was against the law and against school policy, and Coon should not drive student absent "extreme situations where the safety and well-being of students are involved."  (*Id.*).  Bazzell stated that the matter was turned over to law enforcement, the school investigation was concluded, and the school investigation would be reopened if additional information came to light.  (*Id.*).

## D. Plaintiff broke the window and had Coon's cell phone number

On April 18, 2005, Plaintiff broke a window in the band room.  (Doc. # 70-9, at 5).  Plaintiff, his mother, and Pyron met to discuss the incident.  Plaintiff stated he broke the window because students held the door shut; however, the door locked from the inside, and thus McDaniel had Plaintiff  charged with criminal mischief.  (*Id.*).  During the meeting about the broken window, Plaintiff also stated that Coon gave Plaintiff his cell phone number, and Plaintiff called Coon's cell phone from the band room.  (Doc. # 70-

12

18, at 108, 109).  The revelation that Plaintiff had Coon's cell phone number did not

prompt the school officials to revisit the recent investigation into Coon's misconduct.

During the investigation of the broken window incident, there was no mention or

suspicion of Coon sexually abusing Plaintiff.  (Doc. # 70-9, at 5).

**E. Coon resigns**

On May 23, 2005, Coon submitted and the school board accepted his retirement.

(Doc. # 70-3, at 7).  The effective date of the retirement was July 1, 2005.  (Doc. # 77-8,

PX 11).

**F. Police investigation and arrest of Coon**

Robert Bradbury of the Pike County Sheriff Department testified that he

investigated Coon's sexual abuse of BF.   (Doc. # 70-16, at 22-23).  On July 6, 2005,

Bradbury interviewed BF and learned that Coon performed oral sex on BF about four

times between late December 2004 and June 30, 2005 at Coon's house in Greenville and

at a hotel in Georgia.  (Doc. # 77-16, PX 33, at 9, 13).  BF mentioned AH in the interview

and said that AH went with BF and Coon to Greenville.  (*Id.* at 13-14).  On July 8, 2005,

officers arrested Coon at his house in Greenville and searched the house.  (Doc. # 70-16,

at 28-30); (Doc. # 77-16, PX 32, at 6).

In July, 2005, Bradbury called Mona Watson ("Watson") and asked her to

interview Plaintiff about allegations of sexual abuse.  (Doc. # 70-7, at 30, 32).  At that

time, Watson was Director of the Pike County Child Advocacy Center.  (Doc. # 70-6, at

2).  Watson was aware of the investigation of Coon and Coon's sexual abuse of BF.

(Doc. # 70-7, at 30, 32).  On July 13, 2005, Watson met with Plaintiff and learned that

Coon had sexually abused him.  Plaintiff said that Coon performed oral sex on him on

several occasions.  (*Id.* at 38-39).  Watson called Bradbury to inform him that Plaintiff

was abused.[4]  (Doc. # 70-16, at 31).

Shortly thereafter, Bradbury conducted a second interview of Plaintiff because he

believed that Watson did a poor job in her interview because she asked Plaintiff leading

questions.  (*Id.* at 8).  Plaintiff told Bradbury that Coon touched him once or twice on his

private parts.  (*Id.*); (Doc. # 77-16, PX 34, at 20, 23).  Plaintiff denied that Coon touched

him inside the pants and performed oral sex on him.  (Doc. # 77-16, PX 34, at 20, 23).

According to Bradbury's report of the offense against Plaintiff, sexual abuse occurred on

an unspecified date in June of 2005.  (Doc. # 77-16, PX 39, at 38).

## G. The school officials and Plaintiff's parents had no knowledge that Coon sexually abused Plaintiff prior to Coon's arrest

Watson served as the "go to" person at the school if there was any concern about

child abuse because of her extensive training in the field.  (Doc. # 70-6, at 2).  She

testified that, prior to January 2005, when she left PCHS, no one to her knowledge

suspected Coon of sexually abusing his students in general or Plaintiff in particular.  (*Id.*

---

[4] Bradbury testified that this phone call was the first time he heard about Plaintiff in
connection with the Coon investigation.  (*Id.* at 12-13).  This testimony seems to contradict
Watson's testimony, which indicated that Bradbury told her to interview Plaintiff.  (Doc. # 70-7,
at 30, 32).

at 3).

Sherry Shackelford is a Brundidge Police Officer who serves as a the school resource officer at PCHS. Dep. of Sherry Shackelford (Doc. # 70-8, at 8). She knew Coon in the 2004-2005 school year and described him as an "old school" teacher who was "high strung and had a 'thing' about kids leaving school, their driving habits, and being loud and boisterous." (*Id.* at 14). Shackelford visited the band room in the afternoons, at the request of Coon, who wanted her to see what the students were doing. (*Id.* at 13, 14, 22). She never heard any sexual allegations about Coon. (*Id.* at 23). Shackelford, who had training to look for signs of abuse, never pictured Coon as being an abuser. (*Id.* at 26-28).

Casey never suspected Coon of any sexual conduct with Plaintiff or any other student when he was Principal in 2004. (Doc. # 70-11, at 2).

McDaniel never saw anything in his dealings with Coon to make him suspicious that Coon sexually abused students. (Doc. # 70-10, at 55). McDaniel investigated Phelps's allegations, and no student reported anything that suggested Coon was sexually abusing students. (*Id.* at 55-56).

Pyron also investigated Phelps's allegations and did not suspect that Coon was sexually abusing students. (Doc. # 70-13, at 4). He thought that the "butt buddy" was a "teacher's pet." (*Id.*).

Bradbury testified that no one at PCHS or the PCBOE suspected that Coon was

15

abusing Plaintiff. (Doc. # 70-16, at 81).

Plaintiff's mother and father first learned about the abuse in June of 2005 from DHR. (Doc. # 70-18, at 29). Prior to this revelation, she trusted Coon to be alone with her children. (*Id.* at 130). She allowed Coon to drive Plaintiff and his sister home and stay with them in her home. (*Id.* at 21-22, 24, 117). Coon would even visit the home on weekends. (*Id.* at 24). Coon visited their house four or five times. Dep. of Thomas Michael Reed (Doc. # 70-19, at 21-22). Plaintiff's sister did yard work for Coon at Coon's house in Greenville, with permission from her parents. (*Id.* at 18-19). Plaintiff's sister made no complaint about Coon. (Doc. # 70-18, at 66).

Plaintiff's father first learned about the abuse in June of 2005 from DHR. (Doc. # 70-19, at 13). Prior to this revelation, he did not suspect that Coon sexually abused Plaintiff, and he made no complaint about Coon to PCBOE or PCHS officials. (Doc. # 70-19, at 12-13, 17).

## H. Policies and procedures

Plaintiff contends that the Movants' failure to adopt adequate sexual abuse policies and reporting procedures for students and teachers, and Movants' failure to inform faculty about the vulnerability of special educations students, caused the sexual abuse suffered by Plaintiff. Court will review the relevant school policies below.

### 1. Student policies and procedures

The Code of Student Conduct, which is generated by the superintendent's office

and approved by the PCBOE, outlines disciplinary infractions that students might commit.  (Doc. # 70-5, at 42-45, 49, 67); (Doc. # 70-14, at 9-11); (Doc. # 77-2, PX2). With respect to policies, the Code does not discuss what kind of contact is inappropriate. Plaintiff's expert witness testified that a student with Plaintiff's disability needs training to learn what kind of contact is inappropriate, and that such a student would not learn without training, as other students do.  Dep. of James Sears (Doc. # 76-3, at 109, 146). However, the expert could not identify any public school system in Alabama that has adopted a policy that includes procedures specifically tailored to address students who cannot self-report and are unable to identify inappropriate sexual conduct.  (*Id.* at 146).

### 2. Faculty policies and procedures

With respect to faculty policies, Plaintiff states that, although he believes the PCBOE did not condone sexual abuse, the PCBOE Policy Manual (Doc. # 76-4, PX 5), which is distributed to teachers, at most only arguably prohibits sexual abuse (the closest policy is the one prohibiting sexual harassment).  (*Id.* at 6).

PCBOE argues that it provided systematic training for the faculty to recognize and report sexual abuse.  (Doc. # 77-2, PX2, at 12-13; (Doc. # 77-4, PX 5, at 6-7).  Bazzell, Watson, and Berry testified that the school provided in-service programs to address sexual abuse, identifying students who are sexually abused, and reporting suspicions of sexual abuse.  (Doc. # 70-3, at 3-4); (Doc. # 70-5, at 74-77, 87, 89, 91-92, 97); (Doc. # 70-6, at 4); (Doc. # 70-7, at 23-25, 27); (Doc. # 70-17, at 10, 24-26, 30, 32-33, 44, 47-49).

17

With respect to procedures for investigating complaints, the manual states that the school system will act "promptly" to investigate all complaints (Doc. # 77-4, PX 5, at 6), but it does not have a list of "what to do." (Doc. # 70-5, at 79-80). Pyron and McDaniel testified that they were not given specific instructions on how to deal with complaints involving sexual abuse. (Doc. # 70-14, at 24, 61-62); (Doc. # 70-10, at 13-14).

## I. Procedural background

On December 19, 2006, Plaintiff, by his mother and father, sued PCBOE, Bazzell, Casey, Pyron, McDaniel, and Coon. (Doc. # 1). On June 26, 2007, Plaintiff filed an Amended Complaint. (Doc. # 29). Plaintiff makes the following claims: (1) against Coon and pursuant to 42 U.S.C. § 1983 for a violation of Plaintiff's "protected liberty interest in his personal security" and his right to privacy and bodily integrity; (2) against the Movants and pursuant to § 1983 for the same violation because Movants had either no formal policy to address special education students' bodily integrity, safety, and privacy, or in the alternative, the policies or customs were grossly insufficient; (3) against all Defendants and pursuant to § 504 of the Rehabilitation Act, 29 U.S.C. § 794, for intentionally discriminating against Plaintiff on the basis of his disability; (4) against the PCBOE and pursuant to Title IX, 20 U.S.C. § 1681, for acting with deliberate indifference and refusing to take action when it knew or should have known about Coon's sexual abuse of Plaintiff; (5) against Bazzell, Casey, Pyron, and McDaniel for negligence because they allegedly did not timely report suspicions of child abuse to a "a duly

constituted authority" pursuant to Ala. Code § 26-14-3; (6) against Bazzell, Casey, Pyron, and McDaniel for wanton and reckless conduct for failure to report suspected abuse, and (7) against the Movants and pursuant to 42 U.S.C. § 1983 for denying Plaintiff equal protection of the law because Movants' policies did not allow Plaintiff the same level of security, privacy, and bodily integrity as other students.

## V. DISCUSSION

### A. § 1983 claims (Counts II and VII)

#### 1. § 1983 Claims against PCBOE

A school board "may not be held liable under section 1983 on a theory of respondeat superior." *Floyd v. Waiters*, 133 F.3d 786, 793 (11th Cir. 1998) (vacated on other grounds by *Floyd v. Waiters*, 525 U.S. 802 (1998)). A plaintiff seeking to impose liability on a school board must identify a "policy" or "custom" that caused a deprivation of federal rights. *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000) (citing *Bd. of County Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 (1997)). "[R]ecovery from a [school board] is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)). To overcome a motion for summary judgment, a plaintiff must present evidence to create a genuine issue that the school board acted with deliberate indifference to actual knowledge or evidence of sexual abuse. Deliberate indifference amounts to an "an official decision

19

not to remedy the violation." *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998)).

In this case, there is no evidence that either the PCBOE or any individual Movant had actual knowledge of Coon's sexual abuse of Plaintiff or any other student prior to Coon's arrest. Furthermore, even drawing all reasonable inferences in favor of Plaintiffs, there is no genuine issue of material fact that the PCBOE acted with deliberate indifference to evidence of sexual abuse.

After Bazzell received a report that Coon smoked with students and had a "butt buddy," he immediately put Coon on administrative leave and investigated the allegations. Bazzell's investigation included not only students who were mentioned by Officer Phelps, but also students associated with Coon's prior allegations of misconduct. Although Pyron did not directly ask students about sexual abuse because he did not want to lead them, he asked about smoking, riding in the car, and any behavior that was "unbecoming a band director" or "inappropriate." Pyron's interviews confirmed that Coon smoked cigarettes with students and that Coon had a "butt buddy," although, according to Pyron and McDaniel's unrebutted testimony, the context indicated that the term meant a teacher's pet.

Having found no evidence of sexual misconduct, Bazzell reprimanded Coon only for smoking with and driving students, and Bazzell shared the findings of the investigation with law enforcement. The investigation was a reasonable response to the

allegations and the information known at the time. Therefore, the PCBOE did not act with deliberate indifference. *See id.* at 1373-74 (finding no deliberate indifference where principal took such steps as interviewing witnesses and forbidding the teacher to engage in inappropriate conduct).

Plaintiff's § 1983 claim also encompasses the lack of training of school personnel and students. Section 1983 violations can arise from a failure to train personnel. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). A municipality can be held liable for a failure to train when it is on notice of a need to train in a particular area. *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998). In this case, there is evidence that faculty received training with respect to sexual abuse. Furthermore, there was no notice of a need to train in a particular area because there was no history of sexual abuse at PCHS. Dep. of Lucia Grantham (Doc. # 70-21, at 24-25).

Plaintiff's also alleges disparate treatment in violation of his equal protection rights under the Fourteenth Amendment. Plaintiff claims that the PCBOE's policies and procedures did not allow him the same level of personal security, personal privacy, and bodily integrity as were provided to other students enrolled in the PCBOE's programs. In this case, the evidence shows that the PCBOE policies and training were designed to protect all students. There was no indication of a need to provide training to special educations students because there was no history of sexual abuse of any students at PCHS, and there was no evidence that other schools had such policies. As the facts show,

21

Coon was a danger to all students, and not just special education students, and no school official or parent knew that Coon sexually abused students prior to his arrest.

For the reasons stated above, the § 1983 claims against the PCBOE are due to be DISMISSED.

### 2. Official capacity claims against Movants

Plaintiff's claims against Bazzell, Casey, Pryon, and McDaniel in their official capacities are "functionally equivalent" to claims against the entity they represent. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Therefore, summary judgment is due to be granted on these claims, as well. *See Gadley v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1403 (M.D. Ala. 1998).

### 3. Individual capacity claims against Movants

Supervisory officials cannot be held liable under § 1983 for the unconstitutional acts of their subordinates "on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Rather, supervisory liability under § 1983 occurs "either when the supervisor personally participates in the alleged unconstitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Id.*; *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

In this case, Plaintiff does not allege that the individual Movants personally participated in the sexual abuse of Plaintiff. Rather, he argues that there was a causal

connection between the individual Movants' actions and the sexual abuse.

There are two ways in which a plaintiff can establish a causal connection:  First, he may show that a "history of widespread abuse" put the Movants on notice of the need to correct the alleged deprivation, and they failed to do so.  *Hartley*, 193 F.3d at 1269.  The widespread abuse sufficient to notify the Movants "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Id.*  Based on the evidence before the Court, it appears that there was no history of widespread sexual abuse by Coon or any evidence or complaint of any sexual abuse by any other teachers that was "obvious, flagrant, rampant and of continued duration," and Plaintiff does not argue that there was such a history.

A second type of causal connection exists when the supervisors' improper "custom or policy . . . results in deliberate indifference to constitutional rights."  *Id.*; *Miller v. King*, 384 F.3d 1248,1261 (11th Cir. 2004).  Liability may be imposed "due to the existence of an improper policy or from the absence of a policy."  *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).  In *Rivas*, a detainee sued a sheriff and other officials for his arrest and six-days of incarceration that resulted from being misidentified as a probationer.  *Id.* at 1492-93.  The sheriff was found "liable because he failed to establish sufficient and appropriate procedures and policies regarding identification of arrestees, warrantless searches, and computer checks for information."  *Id.* at 1495.  There was evidence that the sheriff "knew of prior instances of mistaken identity, but allowed his

deputies to detain individuals even where discrepancies existed." *Id.*

In this case, the investigation was reasonable under the circumstances and did not display deliberate indifference to evidence of sexual abuse. Upon hearing the allegations that Coon smoked marijuana with students and had a "butt buddy," Bazzell suspended Coon immediately and directed Pyron to interview students to see whether the "butt buddy" reference had a sexual connotation. The investigation revealed no evidence of sexual misconduct. Although the PCBOE procedures regarding the investigation of sexual misconduct were not very detailed, there is no evidence that more detailed policies would have prevented further sexual abuse by Coon. Furthermore, here is no evidence of prior instances of sexual abuse that would put Movants on notice of the need to adopt more detailed policies and procedures. Lucia Grantham, who worked with the Department of Human Resources in Pike County for fifteen years, testified that she never had a case of sexual abuse at PCHS or in the Pike County School System. (Doc. # 70-21, at 24-25).

There was no policy or custom—or lack thereof—that resulted in a deliberate indifference to Plaintiff's constitutional rights. Therefore, no causal connection between the individual Movants' actions and the sexual abuse of Plaintiff exists, and thus summary judgment is due to be granted with respect to the § 1983 claims against the individual Movants.

**B. § 504 claim against all Movants (Count III)**

24

Plaintiff seeks relief under the provisions of § 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794. The Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The elements of a claim under the Rehabilitation Act are: "(1) that [he] is a 'handicapped individual' under the Act, (2) that [he] is 'otherwise qualified' for the [benefit] sought, (3) that [he] was [discriminated against] solely by reason of [his] handicap, and (4) that the program or activity in question receives federal financial assistance." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1300 (11th Cir. 2005) (quoting *Grzan v. Charter Hosp. of N.W. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997)). It is undisputed that elements one, two, and four are satisfied.

Under the third element, there must be evidence to create an issue of a material fact as to whether Plaintiff was discriminated against by the Movants solely because of his handicap. 29 U.S.C. § 794. With respect to the education of handicapped children, the discrimination must reflect bad faith or gross misjudgment. *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982) ("So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504."); *B.R. v. District of Columbia*, 524 F. Supp. 2d 35, 41 (D.D.C. 2007).

Plaintiff seeks monetary damages and injunctive relief.  Plaintiff asserts that the Movants violated § 504 by not developing policies and procedures that were reasonably required to protect the plaintiff's personal security in light of his disability.  Plaintiff asserts that "as a disabled individual he is entitled to services and accommodations necessitated by his disability (mental retardation) . . . and that he will not be subjected to extraordinary personal security risks arising out of his disability." Complaint ¶ 44. Plaintiff claims that this "failure to act" amounts to intentional, purposely bad faith conduct.

In this case, there is no evidence that the Movants acted with bad faith.  Their conduct did not display gross misjudgment because the April, 2005 investigation was reasonable in light of what was known at the time.  There is no evidence that other public school systems in Alabama adopted procedures specifically tailored to address students who cannot self-report and are unable to identify inappropriate sexual conduct.  Thus, the PCBOE policies did not depart grossly from accepted standards among educational professionals.

Simply put, the sexual abuse of Plaintiff went undetected not because of the PCBOE's inadequate policies and training of faculty and special education students, but because nobody, including school officials and Plaintiff's parents, knew anything that would have raised their suspicions.

**C. Title IX claim against PCBOE (Count IV)**

Under Title IX, 20 U.S.C. § 1681, a school district may be liable for damages arising out of its own misconduct. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).[5] A school district may be liable for the sexual abuse of a student if the plaintiff demonstrates that "(1) [a] school district official with authority to institute corrective action, (2) has actual notice of, and (3) is deliberately indifferent to student abuse." *Id.* at 642; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 304 (1998). There is no respondeat superior liability under Title IX. *Gebser*, 524 U.S. at 285.

In *Gebster*, the Supreme Court explained the rationale for the actual knowledge standard:

> Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation.

*Id.* at 290-91.

Plaintiff argues that the deliberate indifference standard does not require Movants to know that Plaintiff was being sexually abused, but they just had to know that Coon was "currently abusing one of his students, even without any indication of which student was being abused." *Bell v. Bd. of Educ. of the County of Fayette, et al*, 290 F. Supp. 2d 701, 706 (D. W. Va. 2003) (citing *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001)).

---

[5] Individual defendants are not liable under Title IX. *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999).

27

Even applying the standard in *Baynard v. Malone*, there is no evidence that the Movants knew that Coon was sexually abusing Plaintiff or any other student prior to Coon's arrest. Furthermore, there was no deliberate indifference to information that would have indicated that the sexual abuse was going on. The only information that had a sexual connotation was the "butt buddy" reference, but the investigation did not reveal additional information. Rather, the investigation indicated that the term did not have a sexual connotation. Therefore, summary judgment is due to be granted with respect to the Title IX claim.

**D. Negligence and Wanton Conduct Claims against all Movants (Counts V and VI)**

The elements of negligence are (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury. *Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995).

Wantonness is "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala Code § 6-11-20(b)(3). "What constitutes wanton misconduct depends on the facts of the case." *S. Cent. Bell Tel. Co. v. Branum*, 568 So. 2d 795 (Ala. 1990). The term requires an act done with knowledge or consciousness that not doing the act will likely result in injury. *Lynn Strickland Sales & Serv., Inc. v Aero-Lane Fabricators, Inc.*, 510 So. 2d 142 (Ala. 1987).

Ala. Code § 26-14-3 requires school officials to report suspicion of sexual abuse to

authorities, such as law enforcement.  Plaintiff contends that Bazzell, Casey, Pyron and McDaniel were negligent in failing to report child abuse or suspicions of child abuse when they knew or should have known that the abuse of Plaintiff had occurred.  Am. Compl. (Doc. # 35) Count V.  Plaintiff also contends that the failure of these individual Movants to report suspicions of child abuse was wanton and reckless.  *Id.* Count VI.

As discussed in detail above, the April, 2005 report from Phelps to Bazzell that Coon had a "butt buddy" was the first complaint about Coon that had a sexual connotation.  The Movants immediately put Coon on administrative leave, investigated the report reasonably, found no evidence of sexual misconduct, and followed up with law enforcement on their findings.  There is no evidence that the Movants knew or should have known about Coon's sexual abuse prior to his arrest.  Therefore, Movants were not negligent or wanton in failing to report suspicions of child abuse, and thus summary judgment is due to be granted on these counts.

## VI. CONCLUSION

Accordingly, it is hereby ORDERED as follows:

(1)     The Motion for Summary Judgment (Doc. # 68) is GRANTED.

(2)     Plaintiff's claims in this case against Defendants PCBOE, Bazzell, Pyron, Casey, and McDaniel are DISMISSED WITH PREJUDICE.

(3)     The July 14, 2008 trial setting in this case is CANCELLED.

(4)     On or before July 7, 2008, Plaintiff shall file a legal memorandum and

proper certification in support of the fees and expenses he seeks as part of his award. Plaintiff should address the degree to which his limited success in this lawsuit should effect any fee award. Plaintiff shall file an itemization of the amounts sought as attorney's fees and expenses with supporting documentation, including affidavits establishing the nature of the tasks undertaken by counsel, the amount of time each task took, the reasonableness of the time spent on the matter, and the reasonableness of the hourly rates requested. Any affidavit addressing the reasonableness of the hourly rate sought must come from an attorney, other than counsel of record, who has knowledge about the current rates for this type of work in the relevant legal market, Montgomery, Alabama. These submissions should include specific and detailed evidence from which the Court can determine the reasonableness of the time spent on different parts of the lawsuit (specifically, Plaintiff shall disclose whether the work performed was on the part of the case against Defendant Coon or on the part of the case against the other defendants) and must set out with sufficient particularity the general subject matter of the time expenditures so that the court can assess the time claimed for each activity. These submissions must also include itemized documentation of any expense for which Plaintiff seeks an award. For example, if Plaintiff seeks the cost of exemplification

and copies of papers necessarily obtained for use in this case, Plaintiff

should submit information concerning the number of pages copied, the cost

per page for each copy, and some statement concerning the reason the

copies were necessary to the case.

(5)    Defendant Coon shall be allowed to dispute any claim for attorneys fees and

costs by filing an objection with a brief and legal authority on or before July

21, 2008.

(6)    The Court will enter a ruling on the Motion for Default Judgment without

further hearing unless otherwise ordered by the Court.

Done this the 13th day of June, 2008.

/s/ Mark E. Fuller
_____
CHIEF UNITED STATES DISTRICT JUDGE

31

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.    **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)    **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)    **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)    **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)    **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)    **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

*Rev.: 4/04*

2.    <u>**Time for Filing**</u>: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    <u>**Format of the notice of appeal:**</u> Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    <u>**Effect of a notice of appeal:**</u> A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).